**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Oakwood Homes Corporation, et al.,<br>Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW)<br>Jointly Administered |
| OHC Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br>Credit Suisse (f/k/a. Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>Defendants. | Adversary Proceeding No. 04-57060<br><br>Civil Action No. 07-799 (JJF) |

**DECLARATION OF BRENDAN J. MURPHY**
**IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S**
**JURY TRIAL DEMAND**

I, Brendan J. Murphy, declare as follows:

1.    I am an attorney associated with the law firm of Linklaters LLP, counsel to Defendants in this action.    I submit this Declaration in connection with Defendants' Motion to Strike Plaintiff's Jury Trial Demand.

2.    Attached hereto as Exhibit A is a true and correct copy of the Proof of Claim filed by Credit Suisse First Boston LLC dated March 27, 2003.

3.    Attached hereto as Exhibit B is a true and correct copy of the Objection to the Proof of Claim filed by Credit Suisse First Boston LLC; Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (6) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency; and Demand for Jury Trial dated November 13, 2004.

4.    Attached hereto as Exhibit C is a true and correct copy of Plaintiff OHC Liquidation Trust's Supplement to its Rule 26(a)(1) Initial Disclosures dated May 1, 2006.

5.    Attached hereto as Exhibit D is a true and correct copy of the Transcript of the Proceedings Before the Honorable Peter J. Walsh United States Bankruptcy Judge on September 25, 2006.

6.    Attached hereto as Exhibit E is a true and correct copy of the Plaintiff and Defendants' Joint Status Conference Report submitted in connection with the October 4, 2007 status conference.

7.    Attached hereto as Exhibit F is a true and correct copy of the Order of the Bankruptcy Court dated November 15, 2007.

8.    Attached hereto as Exhibit G is a true and correct copy of the Memorandum Opinion of the Bankruptcy Court dated November 15, 2007.

9.    Attached hereto as Exhibit H is a true and correct copy of the Class A Note Purchase Agreement dated February 9, 2001.

10.    Attached hereto as Exhibit I is a true and correct copy of the Agreement dated February 9, 2001.

11.    Attached hereto as Exhibit J is a true and correct copy of the Report of Alan C. Shapiro, Ph.D. dated April 30, 2007.

12.    Attached hereto as Exhibit K is a true a correct copy of the Transcript of the Status Conference Before the Honorable Peter J. Walsh United States Bankruptcy Judge on October 4, 2007.

13.   Attached hereto as Exhibit L is a true and correct copy of the unreported decisions cited in Defendants' Opposition to Plaintiff's Motion to Withdraw the Reference.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 6, 2008
       New York, New York


                                        Brendan J. Murphy, Esq.

**EXHIBIT A**

ORIGINAL

B10 (Official Form 10) (9/97)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| In re:<br>OAKWOOD HOMES CORPORATION, et al. | Chapter 11 Case No.<br>02-13396 (PJW) |
|---|---|
| Name of Debtor<br>**OAKWOOD HOMES CORPORATION** | Case Number:<br>02-13396 (PJW) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Credit Suisse First Boston LLC, the successor to Credit Suisse First Boston Corporation**

Name and Address Where Notices Should be Sent

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Attention: Roland S. Young, Esq.
Telephone No. (212) 906-1200

☐ Check box if you are aware that a ....... filed a proof of claim relating to copy of statement giving particu

☐ Check box if you have never rec from the bankruptcy court in thi
☐ Check box if the address differs the envelope sent to you by the ...

Filed: USBC - District of Delaware
Oakwood Homes Corporation, Et Al.
02-13396 (PJW)
0000006119

**THIS SPACE IS FOR COURT USE ONLY**

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (fill out below)
Your SS #: _____ _____ _____
Unpaid compensations for services performed
from _____ to _____
(date)        (date)

| 2. Date debt was incurred:<br>**August 19, 2002-November 15, 2002** | 3. If court judgment, date obtained:<br>**None.** |
|---|---|

**4. Total Amount of Claim at Time Case Filed:**      **$2,082,558.04 plus a contingent claim in the amount of $1,205,833.50 and contingent and unliquidated claims in respect of attorneys fees and expenses and indemnification obligations.**

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $_____

Amount of arrearage and other charges <u>at time case filed</u> included in secured claim above, if any $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,000),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $1,800* of deposits toward purchase, lease, or rental of property or services for personal family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(1).
*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**9. Date — Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**FILED / RECEIVED**

**MAR 27 2003**

^NKRUPTCY SERVICES, I^

Date:
March 17, 2003

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): Credit Suisse First Boston LLC, the successor to Credit Suisse First Boston Corporation
By: _____
Jared Felt, Director

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

NY\757152.3

**RIDER TO PROOF OF CLAIM OF CREDIT SUISSE FIRST
BOSTON LLC, THE SUCCESSOR TO CREDIT SUISSE FIRST
BOSTON CORPORATION, IN THE CASE OF IN RE OAKWOOD
HOMES CORPORATION, ET AL., CASE NO. 02-13396**

Basis for Claim:

1.      Jared Felt is a Director at Credit Suisse First Boston LLC, the successor to

Credit Suisse First Boston Corporation, which maintains an office at Eleven Madison Avenue,

New York, NY 10010.  Mr. Felt is authorized to make this Proof of Claim on behalf of Credit

Suisse First Boston LLC, the successor to Credit Suisse First Boston Corporation (the

"Claimant").

2.      As of November 15, 2002 (the "Petition Date"), the Claimant was entitled

to $2,074,177 in unpaid amounts due pursuant to a letter agreement between the Claimant,

Oakwood Homes Corporation, Oakwood Acceptance Corporation, LLC, Oakwood Mobile

Homes, Inc. and HBOS Manufacturing, LP (collectively, the "Debtors" and, together with the

Claimant, the "Parties") dated August 19, 2002 (the "Engagement Letter"), wherein the Parties

agreed that the Claimant would act as the Debtors' exclusive financial advisor in connection with

a contemplated Restructuring Transaction (as defined in the Engagement Letter).[1]  A copy of the

Engagement Letter is attached hereto as Exhibit A.

3.      Pursuant to the Section 4 of the Engagement Letter, the Claimant is

entitled to certain fees including a Restructuring Transaction Fee (as defined in the Engagement

Letter) payable in stages as certain milestones were met in connection with a Restructuring

Transaction.  In the case of a prenegotiated restructuring to be implemented in a chapter 11 case,

25 percent of this fee was payable when the Claimant first approached the holders of the

---

[1]      Concurrently herewith, the Claimant is asserting the full amount of its claim jointly and
         severally against each of the above-referenced Debtors.  Each of the Debtors is a
         signatory to the Engagement Letter, and each is liable thereunder.

Debtors' Old Securities (as defined in the Engagement Letter) in connection with a possible Restructuring Transaction.[2] An additional 50 percent of the Restructuring Transaction Fee, less 75 percent of the monthly fees paid under paragraph 4(a) of the Engagement Letter (the "Net Phase Two Fee") became due upon obtaining indications of support from the Debtors' creditors for a plan of restructuring sufficient to justify the Debtors' filing of a plan of reorganization. A copy of an invoice calculating the Net Phase Two Fee is attached hereto as Exhibit B.

4.      As described below, the Claimant earned the right to receive this Net Phase Two Fee prior to the filing of the Debtors' chapter 11 cases. The Claimant performed prepetition all the services necessary to justify the filing of a plan of reorganization, including analyzing the Debtors' finances, assessing the possible future cash flows of the Debtors' REMIC securities, working closely with the Debtors and their boards of directors to create a viable capital structure and restructuring strategy, negotiating with creditors and various other parties to settle outstanding issues, eventually crafting the terms and conditions of the prenegotiated plan of reorganization proposed by the Debtors and ultimately serving a critical role to garner the support of the Debtors' creditors for the prenegotiated plan of reorganization.

5.      In addition, the Debtors' own public statements confirm that the Claimant is entitled to the Restructuring Transaction Fee:

- The Debtors filed a press release on November 15, 2002 announcing that they had reached an agreement in principle with creditors representing nearly 40 percent of the Debtors' senior unsecured debt and REMIC guarantee obligations to restructure the Debtors' balance sheet. The Debtors announced their intention to accomplish this restructuring through the filing of a voluntary chapter 11 petition.

- The Debtors disclosed their agreement with their major creditors by filing with the Securities Exchange Commission a Form 8-K announcement of the agreement in principle with creditors to restructure the Debtors'

---

[2]      The Debtors have in fact paid this amount.

12. The Claimant reserves the right to amend, modify or supplement this Proof of Claim.

13. All notices to the Claimant should be sent to (a) Credit Suisse First Boston LLC, the successor to Credit Suisse First Boston Corporation, at Eleven Madison Avenue, New York, NY 10010, Attention: Jared Felt and (b) Latham & Watkins LLP, 53rd at Third, 885 Third Avenue, Suite 1000, New York, New York 10022-4802, Attention: Roland S. Young, Esq.

4

## EXHIBIT A

**Engagement Letter**

**CREDIT SUISSE | FIRST BOSTON**

CREDIT SUISSE FIRST BOSTON

Eleven Madison Avenue        Telephone  212 325 3000
New York, NY 10010-3629

August 19, 2002

Oakwood Homes Corporation
7800 McCloud Road
Greensboro, NC 27409

Attention:    Robert A. Smith
              Executive Vice President

Gentlemen:

      This letter agreement (the "Agreement") will confirm the understanding between Oakwood Homes Corporation, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc. and HBOS Manufacturing, LP (collectively, the "Company") and Credit Suisse First Boston Corporation ("CSFB") pursuant to which the Company has retained CSFB to render financial advisory services to the Company, on the terms and subject to the conditions set forth herein, in connection with (i) the sale, merger, consolidation or any other business combination, in one or a series of transactions involving all or a portion of the business, securities or assets of the Company, other than sales in the ordinary course of business and disposition of surplus assets consistent with the Company's past practice (a "Sale Transaction") and/or (ii) any complete or partial recapitalization, restructuring and/or refinancing of the Company including (in one or a series of transactions) each offer to holders of one or more classes of Old Securities to purchase or acquire (whether by tender offer, exchange offer, open market purchase, private purchase or otherwise) Old Securities, and/or any solicitation by the Company and/or any Related Entity with respect to any Old Securities, (including but not limited to, each offer or solicitation involving issuance of New Securities (as defined in paragraph 7 hereof) and/or the payment of other consideration (including cash) to holders of Old Securities in exchange for, in consideration of, or as the purchase price of: (x) any or all of the Old Securities, (y) consents or waivers with respect to any or all of the Old Securities or (z) any combination of the foregoing and any amendment or modification to any of the foregoing (a "Restructuring Transaction"). A consent or waiver under, or an amendment to, the Foothill Credit Facility (in any such case that does not affect any payment or collateral arrangements under the Foothill Credit Facility and that is not effected as part of a broader Restructuring Transaction affecting other Old Securities), to conform to changed circumstances or revised forecasts shall not constitute a Restructuring Transaction. The Sale Transaction and the Restructuring Transaction are hereinafter collectively referred to as the "Transactions".

1.    Certain Definitions. For the purposes of this Agreement, all defined references shall have the meanings as set forth herein.

2.    Retention. The Company hereby retains CSFB as its exclusive financial advisor, and CSFB agrees to act as exclusive financial advisor to the Company, in connection with the Transactions. Subject to the terms and conditions of this Agreement, CSFB proposes to undertake certain services on behalf of the Company as its exclusive financial advisor until the Termination Date, including, as requested by the Company:

    (a)    assist the Company in its evaluation of certain strategic alternatives, their feasibility and possible means of execution;

    (b)    with respect to a Sale Transaction:

[00085994 v 2] Oakwood Homes.doc

Oakwood Homes Corporation
Page 2

August 19, 2002

    (i)   assist in preparing materials describing the Company or certain of the Company's assets, its operations, its historical financial results and future prospects to be provided to selected qualified acquirors acceptable to the Company ("Potential Acquirors");

    (ii)  Identify and contact Potential Acquirors;

    (iii)  arrange for Potential Acquirors and holders of the Old Securities to conduct reasonable business investigations into the Company or certain of the Company's assets;

    (iv)  if requested and subject to further mutual agreement of the parties, render an opinion as to the fairness from a financial point of view to the Company or its stockholders of the consideration to be received in the proposed Sale Transaction (a "Fairness Opinion"). If we are requested to render an opinion, the nature and scope of our analysis as well as the form and substance of our opinion shall be such as we deem appropriate. If requested by you, our opinion shall be delivered in writing;

(c)  and with respect to a Restructuring Transaction:

    (i)  advise the Company with respect to the terms and timing of any Restructuring Transaction, provided, however, that the Company shall retain its own legal counsel and accountants for legal and tax advice;

    (ii)  assist the Company in preparing Offer Documents (as defined below) to the extent that such documents relate to the terms of a Restructuring Transaction; and

    (iii)  except in connection with a Section 3(a)(9) Offer (as defined in paragraph 4(e) below), and to the extent otherwise permitted by applicable law, assist the Company in soliciting tenders and consents in connection with any Restructuring Transaction.

3.    Further Agreements. CSFB shall have the right, but not the obligation, to the extent the Company requests anyone to be dealer manager in connection with a Restructuring Transaction on or prior to the Termination Date and to the extent permitted by applicable law, to act as dealer manager with respect to any Restructuring Transaction commenced on or prior to the Termination Date; *provided, however*, that the Company shall, on or prior to the commencement of any Restructuring Transaction, execute and deliver a dealer manager agreement containing terms and conditions customary for such agreements entered into by CSFB, the terms of which shall be reasonably satisfactory to CSFB and its counsel and to the Company and its counsel.

In connection with the entry of an order for relief concerning a case by or against the Company pursuant to Title 11 of the United State Code, if requested by CSFB, the Company shall use its best efforts to obtain the entry of an order by such court approving of the retention of CSFB as exclusive financial advisor to the Company on terms substantially similar to those set forth in this Agreement and reasonably acceptable to CSFB and to the Company. In addition, immediately prior to the entry of an order for relief concerning a case by the Company pursuant

Oakwood Homes Corporation
Page 3

August 19 , 2002

to Title 11 of the Unites States Code, the Company shall pay to CSFB (or cause CSFB to be paid), in cash, all amounts earned or incurred but unpaid to CSFB pursuant to this Agreement.

In addition, CSFB shall have the right, but not the obligation, to act as exclusive placement agent for the Company in connection with any sale of its securities. In the event any such sale of securities is to be effected pursuant to an underwritten offering, the issuer of such securities and CSFB will enter into a customary underwriting agreement acceptable to CSFB and its counsel and to the Company and its counsel, which together with this Agreement shall govern the terms of such sale. In the event any such sale of securities is to be pursuant to a non-underwritten offering, the issuer of such securities and CSFB will enter into a customary placement agent agreement acceptable to CSFB and its counsel and to the Company and its counsel, which together with this Agreement shall govern the terms of such sale.

Notwithstanding any other provision contained herein, this Agreement does not constitute any agreement, express or implied, on the part of CSFB or any commitment by CSFB to underwrite, purchase, place, or cause the placement of any securities or indebtedness. Any such commitment by CSFB shall be at CSFB's option and would, in each case, be subject to, among other things, the satisfactory completion by CSFB of an appropriate due diligence investigation of the Company and the execution and delivery by CSFB and the issuer of the securities of a customary agreement acceptable to CSFB and its counsel.

4. Compensation. As compensation for services rendered and to be rendered hereunder by CSFB, the Company agrees, subject to the provisions of paragraph 5 hereof, to pay CSFB non-refundable fees as follows:

(a) a monthly non-refundable cash fee of $150,000 payable in advance on August 19, 2002 and thereafter on the first business day of each month prior to the Termination Date; *provided, however,* that no additional monthly fee shall be paid pursuant to this paragraph after the payment of the transaction fee referred to in paragraph 4(b) below; *provided further,* the Company may credit any of the fees paid (except to the extent previously credited) under paragraph 4(a) hereof against the aggregate amount of fees that become payable pursuant to paragraphs 4(b) or 4(c);

(b) in connection with a Sale Transaction commenced on or prior to the Termination Date, a non-refundable success fee, payable upon closing thereof, of 1.00% of the Aggregate Value (the "Sale Transaction Fee"); *provided however,* if the proceeds from the Sale Transaction are expressly used to effectuate a Restructuring Transaction, in this case the Company may credit any of the fees paid under paragraph 4(b) hereof against the aggregate amount of fees that become payable pursuant to this paragraph 4(c);

(c) in connection with a Restructuring Transaction commenced on or prior to the Termination Date, a non-refundable cash transaction fee (the "Restructuring Transaction Fee"), payable upon closing thereof, equal to 1.00% of the total of (i) the face amount (for purposes of this Agreement, the term "face amount" means principal amount in the case of debt obligations) of the Old Securities, (ii) 1/3 (one-third) of the face amount of the Securitization Guarantees and (iii) 1/3 (one-third) of the face amount of the Floor Plan Guarantees that the Company or any Related Entity offers to amend, modify, purchase, exchange or otherwise acquire in such Restructuring Transaction; *provided*

Oakwood Homes Corporation
Page 4

August 19 , 2002

*however,* that 25% of the Restructuring Transaction Fee (calculated assuming all Old Securities, Securitization Guarantees and Floor Plan Guarantees are subject to such Restructuring Transaction) pursuant to this paragraph 4(c) hereof will be due and payable when CSFB, at the direction of the Company or the Company's Board of Directors, first approaches any of the holders of the Company's Old Securities in connection with a possible Restructuring Transaction (the "Phase One Restructuring Transaction Fee").

(d)   in connection with a Fairness Opinion, a non-refundable cash transaction fee (the "Fairness Opinion Fee") of $1,000,000 payable at the time CSFB notifies the Company that it is prepared to deliver the Fairness Opinion, irrespective of the conclusion reached therein; *provided however,* the Company may credit any of the fees paid under paragraph 4(d) hereof against the aggregate amount of fees that become payable pursuant to paragraph 4(b);

(e)   in connection with any Restructuring Transaction described in paragraph 4(c) hereof that is intended to be effected, in whole or in part, as all or a portion of a prepackaged, partial prepackaged or prearranged plan of reorganization anticipated to involve the solicitation of consents, waivers, acceptances, authorizations or approvals of such plan in compliance with the bankruptcy laws of any jurisdiction, by or on behalf of the Company, from holders of any class of the Company's securities or indebtedness (a "Plan"), (1) 25% of the Restructuring Transaction Fee (calculated assuming all Old Securities, Securitization Guarantees and Floor Plan Guarantees are subject to such Restructuring Transaction) will be due and payable when CSFB, at the direction of the Company or the Company's Board of Directors, first approaches any of the holders of the Company's Old Securities in connection with a possible Restructuring Transaction (also, the "Phase One Restructuring Transaction Fee"), (2) 50% of the Restructuring Transaction Fee (the "Phase Two Restructuring Transaction Fee") shall be payable upon (i) receipt of votes from the Company's creditors necessary to confirm a Plan, the terms of which are acceptable to the Board of Directors of the Company or (ii) obtaining indications of support from the Company's creditors, which in the good faith judgement of the Board of Directors of the Company are sufficient to justify filing a Plan upon acceptable terms, and the balance of the Restructuring Transaction Fee (the "Final Restructuring Transaction Fee") upon consummation of the Restructuring Transaction; provided that the Company may credit seventy-five percent (75%) of the payments made under paragraph 4(a) hereof first against the Phase Two Restructuring Transaction Fee and thereafter, if applicable, the remainder against the Final Restructuring Transaction Fee;

(f)   in connection with any Restructuring Transaction described in paragraph 4(c) hereof that is intended to comply with the requirements of Section 3(a)(9) (a "Section 3(a)(9) Offer") of the Securities Act of 1933, as amended (the "Securities Act"), CSFB's Restructuring Transaction Fee shall be earned immediately prior to the Company's mailing, delivering, or otherwise disseminating the Offer Documents and shall not be contingent upon the consummation of or results of such Section 3(a)(9) Offer or any other event. In the case of a Section 3(a)(9) Offer, the Company shall pay the Restructuring Transaction Fee immediately upon the first mailing, delivery, or other dissemination of any Offer Documents to any holder in connection with a Section 3(a)(9)

Oakwood Homes Corporation
Page 5

August 19 , 2002

Offer; *provided, however,* that the Company may credit any payments under paragraph 4(a) hereof, to the extent paid, against the Restructuring Transaction Fee;

(g) in addition to the compensation to be paid to CSFB as provided above, and without regard to whether any Sale Transaction or Restructuring Transaction is consummated, the Company shall pay to, or on behalf of CSFB, promptly as billed, all reasonable out-of-pocket expenses (including all reasonable fees and expenses of CSFB's counsel) incurred by CSFB in connection with its services to be rendered hereunder.

5. Termination or Resignation. Subject to paragraph 11 hereof, if CSFB resigns or the Company terminates CSFB's services for any reason, CSFB and its counsel shall be entitled to receive all of the amounts earned and payable pursuant to paragraph 4 hereof, up to and including the Termination Date; *provided, however,* that if the Company terminates CSFB's services or CSFB resigns due to a disagreement over the terms of any Transaction and (i) the Company thereafter proceeds with any Restructuring Transaction within twelve months from the Termination Date, on terms and conditions similar to those proposed by CSFB prior to the Termination Date or (ii) at any time prior to the expiration of twelve months after any such termination the Company consummates, or enters into an agreement providing for, a Sale Transaction, CSFB shall also be entitled to receive all of the compensation provided for in paragraph 4 hereof as if CSFB had been the financial advisor in connection therewith as though this Agreement had not been terminated.

6. Indemnity. As CSFB will be acting on behalf of the Company, the Company agrees to indemnify CSFB as set forth in Schedule I hereto, which is incorporated herein and made a part hereof.

7. Representations and Warranties of Company. The Company represents and warrants to CSFB that at the commencement, throughout the continuance, and at the consummation of each Restructuring Transaction:

(a) each of the Offer Documents will comply in all material respects with the Securities Act, the Securities Act of 1934, as amended (the "Exchange Act"), and the Trust Indenture Act of 1939, as amended (the "TIA" and collectively with the Securities Act and the Exchange Act, the "Acts"), as such Acts may be applicable, and in each case the applicable rules and regulations of the Securities and Exchange Commission (the "Commission" or "SEC") thereunder, and with all material applicable rules or regulations of any governmental or regulatory authority or body, including applicable Blue Sky or similar securities laws or statutes, and no consent or approval of, or filing with, any governmental or regulatory authority or body is required in connection with the commencement or consummation of any such transaction, other than those consents or approvals which will have been obtained or any filing which will have been made prior to the consummation of each such transaction and other than notice filings which may be made after the consummation of such transaction without any adverse effect upon the Company;

(b) none of the Offer Documents and no other report, filing, document, release or communication published or filed by or on behalf of the Company in connection with any of such transactions will contain any untrue statement of a material fact or omit to

Oakwood Homes Corporation
Page 6

August 19 , 2002

state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(c) any new securities offered in consideration of any Old Securities ("New Securities") that are debt instruments (the "New Debt Securities"), if any, and the indentures pertaining to the New Debt Securities and any supplemental indentures pertaining to any amendments to the Old Securities (together, the "Indentures") will be duly authorized by the Company, and when the Indentures are duly executed in accordance with such authorization and when the New Securities are issued, the Indentures and the New Debt Securities will be the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and each of the New Securities and the Indentures, if any, will conform to the description thereof in the Offer Documents in all material respects;

(d) the New Securities that are capital stock, if any, will be duly authorized by the Company and, when issued, will be validly issued, fully paid and non-assessable;

(e) the New Debt Securities, if any, and the Indentures, if any, will comply in all material respects with the TIA;

(f) the issuance of the New Securities and the consummation of the transactions contemplated by the Offer Documents will not result in a breach of any of the terms or provisions of, or constitute a default or cause an acceleration of any obligation under, the Company's charter or bylaws or any material bond, note, debenture or other evidence of indebtedness or any material indenture, mortgage, deed of trust or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of them is bound, or any order of any court or governmental agency or authority entered in any proceeding to which the Company or any of its subsidiaries was or is a party or by which it or any of them is bound, except as could not, singly or in the aggregate, have a material adverse effect on the properties, business, results of operations or condition (financial or otherwise) of the Company, taken as a whole;

(g) this Agreement will be duly authorized and validly executed and delivered by the Company and will constitute a legal, valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and except as rights to indemnification and contribution under this Agreement may be limited by applicable law; and

(h) in connection with any Restructuring Transaction purported by the Company to be made pursuant to a Section 3(a)(9) Offer, the Company has not paid any commission or other remuneration, directly or indirectly, for soliciting or recommending such Section 3(a)(9) Offer to any soliciting broker, dealer, salesman, agent, employee or director of the

Oakwood Homes Corporation
Page 7

August 19 , 2002

Company, or any other person involved in any way on behalf of the Company in conflict with such Section 3(a)(9) of the Securities Act.

8.    **Further Covenants of the Company.** The Company agrees as follows:

    (a)   the Company agrees that any reference to CSFB or any affiliate of CSFB in any Offer Document, or any other release or communication to any party outside the Company, is subject to CSFB's prior approval in writing. If CSFB resigns or is terminated prior to the dissemination of any Offer Document or any other release or communication, no reference shall be made therein to CSFB without CSFB's prior written permission; and

    (b)   in connection with CSFB's activities hereunder, the Company agrees to furnish CSFB with all information concerning the Company that the CSFB reasonably deems appropriate and agrees to provide CSFB with accountants, counsel, consultants and other appropriate agents and representatives. The Company acknowledges that CSFB may rely upon the completeness and accuracy of information and data furnished to it by the Company's officers, directors, employees, agents and representatives without an independent verification of such information and data or an appraisal of the Company's assets.

9.    **Opinions of Counsel.** Prior to the commencement and at the closing of each Restructuring Transaction, the Company's outside counsel shall deliver to CSFB an opinion or opinions reasonably satisfactory to CSFB and its counsel. Without limitation, such counsel shall state that such counsel has participated in conferences with officers and representatives of the Company and representatives of the independent accountants of the Company at which such transaction and related matters were discussed and the Offer Documents were prepared, and that, subject to the limitations inherent in the nature of factual inquiry, nothing has come to the attention of such counsel to cause it to believe that any of the Offer Documents, as of their respective dates, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except that no belief need be expressed with respect to the financial information contained in any of the Offer Documents). The Company's counsel shall also deliver such other opinions covering matters incidental to each Restructuring Transaction as CSFB and its counsel may reasonably request.

10.   **Confidentiality.** Except to the extent authorized by the Company or required by any Federal or state law, rule or regulation or any decision or order of any court or regulatory authority, CSFB agrees that it will refrain from disclosing to any person, other than to holders of the Old Securities and their affiliates, representatives and agents, and any agents, attorneys, accountants, employees, officers, and directors of CSFB who need to know the information in connection with CSFB's engagement hereunder, any confidential information which has not become public (other than through disclosure in violation of this paragraph 10 hereof), about the Company received by CSFB from the Company or its agents, attorneys or accountants in connection with the services rendered hereunder (the "Confidential Information"). In addition, CSFB has policies and procedures, including a Chinese Wall, designed to prevent the misuse of non-public information received hereunder.

Oakwood Homes Corporation
Page 8

August 19 , 2002

11. <u>Survival of Certain Provisions.</u>  The compensation and expense reimbursement provisions contained in paragraph 4 hereof, the termination provisions contained in paragraph 5 hereof, this paragraph 11 hereof, the indemnity and contribution agreements contained in paragraph 6 hereof and Schedule I of this Agreement and the representations and warranties of the Company contained in paragraph 7 hereof shall remain operative and in full force and effect regardless of (a) any investigation made by or on behalf of CSFB or by or on behalf of any affiliate of CSFB, any Indemnified Person, or any person controlling any of them, (b) consummation of any Restructuring Transaction, or (c) any termination or expiration of this Agreement, and shall be binding upon, and shall inure to the benefit of, any successors, assigns, heirs and personal representatives of the Company, CSFB, the Indemnified Persons and any such person.

12. <u>Notices.</u> Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered to the Company at Oakwood Homes Corporation, 7800 McCloud Road, Greensboro, NC 27409, Attention: Robert A. Smith and to CSFB at 11 Madison Avenue, New York, NY 10010, Attention: Beth Barish May.

13. <u>Construction.</u>  This Agreement incorporates the entire understanding of the parties and supersedes all previous agreements and shall be governed by, and construed in accordance with, the laws of the State of New York as applied to contracts made and performed in such State, without regard to principles of conflict of laws.

14. <u>Severability.</u>  Any determination that any provision of this Agreement may be, or is, unenforceable shall not affect the enforceability of the remainder of this Agreement.

15. <u>Headings.</u>  The paragraph headings in this Agreement have been inserted as a matter of convenience for reference and are not an effective part of this Agreement.

16. <u>Counterparts.</u>  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

17. <u>Third-Party Beneficiaries.</u>  This Agreement has been and is made solely for the benefit of the Company, CSFB and the other Indemnified Persons referred to in paragraph 5 hereof and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

18. <u>Succession.</u>  This Agreement shall be binding upon and inure to the benefit of the Company, CSFB, the Indemnified Persons and their respective successors, assigns, heirs and personal representatives.

19. <u>Advertisements.</u>  The Company agrees that CSFB shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing their services to the Company hereunder; provided, that (i) CSFB shall have submitted a copy of any such proposed advertisement to the Company for its prior approval, which approval shall not be unreasonably withheld or delayed and (ii) the publication of such advertisement shall comply with applicable law.

20. <u>Acknowledgements.</u>  CSFB is a full service securities firm engaged in securities trading and brokerage activities as well as investment banking and financial advisory services.  In the

Oakwood Homes Corporation
Page 9

August 19 , 2002

ordinary course of our trading and brokerage activities, CSFB or its affiliates may hold positions, for its own account or the accounts of customers, in equity, debt or other securities of the Company or any other company that may be involved in the matters contemplated by this agreement.

If the foregoing terms correctly set forth our agreement, please confirm this by signing and returning to CSFB the duplicate copy of this letter. Thereupon this letter, as signed in counterpart, shall constitute our agreement on the subject matter herein.

CREDIT SUISSE FIRST BOSTON CORPORATION

By: _____

Jared C. Felt

Director

Confirmed and Agreed to:
OAKWOOD HOMES CORPORATION

By: _____

Robert A. Smith
Executive Vice President

OAKWOOD ACCEPTANCE CORPORATION, LLC

By: _____

Robert A. Smith
Vice President

OAKWOOD MOBILE HOMES, INC.

By: _____

Robert A. Smith
Vice President

HBOS MANUFACTURING, LP

By: OAKWOOD MOBILE HOMES, INC._____
As General Partner

By: _____

Robert A. Smith
Vice President

Date: _8/19/02_____

[00062994 v.2]Oakwood Homes.doc

## SCHEDULE I

This Schedule I is a part of and is incorporated into that certain letter agreement (together, the "Agreement"), dated August 19, 2002 by and between Oakwood Homes Corporation and its subsidiaries (collectively, the "Company") and Credit Suisse First Boston Corporation ("CSFB").

The Company agrees to indemnify and hold harmless CSFB, its affiliates and its parent and its affiliates, and the respective directors, officers, agents and employees of CSFB, its affiliates and its parent and its affiliates (CSFB and each such entity or person, an "Indemnified Person") from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively "Liabilities"), and will reimburse each Indemnified Person for all fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), (i) caused by, or arising out of or in connection with, any untrue statement or alleged untrue statement of a material fact contained in the offer documents referred to in the agreement (including any amendments thereof and supplements thereto) ("Offer Documents") or by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (other than untrue statements or alleged untrue statements in, or omissions or alleged omissions from, information relating to an Indemnified Person furnished in writing by or on behalf of such Indemnified Person expressly for use in the Offer Documents or (ii) otherwise arising out of or in connection with advice or services rendered or to be rendered by any Indemnified Person pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions; provided that, in the case of clause (ii) only, the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any of the advice, actions, inactions or services referred to above. The Company also agrees to reimburse each Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Person's rights under this Agreement (including, without limitation, its rights under this Schedule I).

Upon receipt by an Indemnified Person of actual notice of an Action against such Indemnified Person with respect to which indemnity may be sought under this Agreement, such Indemnified Person shall promptly notify the Company in writing; provided that failure so to notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall have been materially prejudiced by such failure. The Company shall, if requested by CSFB, assume the defense of any such Action including the employment of counsel reasonably satisfactory to CSFB. Any Indemnified Person shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person, unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Person and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Action in the same jurisdiction, in addition to any local counsel. The Company shall not be liable for any settlement of any Action effected without its written consent (which shall not be unreasonably withheld). In addition, the Company will not, without prior written consent of CSFB, settle, compromise or consent to the entry of any judgment in or otherwise seek

to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all Liabilities arising out of such Action.

In the event that the foregoing indemnity is unavailable to an Indemnified Person other than in accordance with this Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement or (ii) if the allocation provided by the immediately preceding clause is not permitted by the applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and CSFB, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations; provided that in no event shall the Company contribute less than the amount necessary to ensure that all Indemnified Persons, in the aggregate, are not liable for any Liabilities and Expenses in excess of the amount of fees actually received by CSFB pursuant to this Agreement. For purposes of this paragraph, the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company or the Company's shareholders, as the case may be, in the transaction or transactions that are within the scope of this Agreement, whether or not any such transaction is consummated, bears to (b) the fees paid to CSFB under this Agreement.

The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Person pursuant to this agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions except for Liabilities (and related Expenses) of the Company that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any such advice, actions, inactions or services.

The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.

## SCHEDULE II

(a) term "Aggregate Value" shall mean the total fair market value (at the time of closing or, in the case of publicly traded common stock, the average closing price over the fifteen trading days immediately prior to announcement of the Sale Transaction) of all consideration (including cash, securities, property, all debt, guarantees (in the case of the Securitization Guarantees and the Floor Plan Guarantees, one-third of the face amount thereof) and other obligations remaining on the Company's financial statements at closing and other indebtedness, guarantees (in the case of the Securitization Guarantees and the Floor Plan Guarantees, one-third of the face amount thereof) and obligations directly or indirectly assumed, retired or defeased in connection with the Sale Transaction and any other form of consideration) paid or payable, or otherwise to be distributed, directly or indirectly, to the Company or its stockholders in connection with the Sale Transaction.

(b) the term "Offer Documents" means each document that is filed with the Securities and Exchange Commission (the "Commission" or "SEC") or that is otherwise made publicly available or that is sent or given to the holders of Old Securities in connection with any Restructuring Transaction (which may include, but is not limited to, the following: (i) offering circular(s), sales memoranda, private placement memoranda or other selling material, explanatory statement(s) filed with the SEC under the Securities Act of 1933, as amended, (iii) each registration statement, preliminary and final prospectus required to be filed with the SEC, (iv) each document required to be filed with the SEC pursuant to the provisions of the Securities Exchange Act of 1934, as amended, pertaining to any Restructuring Transaction, and (v) each appendix, attachment, amendment or supplement to any of the foregoing and all related documents, including but not limited to, each related letter of transmittal and each related letter to holders of Old Securities);

(c) the term "Related Entities" shall mean each subsidiary and affiliate of the Company as of the date hereof and each corporation, partnership, or other entity formed after the date hereof by or on behalf of the Company in connection with, or for the purpose of effecting a Transaction; and

(d) the term "Termination Date" means the earliest of (i) the date, if any, that the Company terminates CSFB's services under this Agreement pursuant to paragraph 5 hereof, and (ii) the date, if any, that CSFB resigns pursuant to paragraph 5 hereof.

FEB. 16. 2003 1:07PM CREDIT SUISSE FIRST BOSTON     NO. 7773    P. 15/15
AUG. 19. 2002  5:20PM     3366643224 SSE FIRST BOSTON        NO. 7773    P. 15/15

Case 1:07-cv-00798-JJF  Document 32-2  Filed 02/06/2008  Page 20 of 24

## SCHEDULE III

The term "Old Securities" shall mean each of the following and any interest or obligations created thereunder:

(a) Foothill Credit Facility;

(b) 7.875% Senior Notes due March 1, 2004; and

(c) 8.125% Senior Notes due March 1, 2009,

The term "Securitization Guarantees" shall mean outstanding amounts of the Company-guaranteed subordinated securities issued by REMIC trusts.

The term "Floor Plan Guarantees" shall mean outstanding floor plan debt which is guaranteed by the Company.

## EXHIBIT B

**Invoice Calculating the Net Phase Two Fee**

Client Code O167

# INVOICE

November 15, 2002

Douglas Muir
Executive Vice President
Oakwood Homes Corporation
7800 McCloud Road
P.O. Box 27081
Greensboro, NC 27425-7081

In connection with the Letter Agreement between Oakwood Homes Corporation and CSFB dated as of August 19, 2002:

*Pursuant to paragraph 4(e) Section 2 of the Engagement Letter,*

"50% of the Restructuring Transaction Fee (the "Phase Two Restructuring Transaction Fee") shall be payable upon (i) receipt of votes from the Company's creditors necessary to confirm a Plan, the terms of which are acceptable to the Board of Directors of the Company or (ii) obtaining indications of support from the Company's creditors, which in the good faith judgement of the Board of Directors of the Company are sufficient to justify filing a Plan upon acceptable terms…provided that the Company may credit seventy-five percent (75%) of the [monthly] payments made under paragraph 4(a) hereof first against the Phase Two Restructuring Transaction Fee…."

*Calculation of the Restructuring Transaction Fee*

| | |
|---|---:|
| 1.00% of the total face amount of the Senior Notes ($300.0MM) | $3,000,000.00 |
| 1.00% of the Foothill Facility[1] ($63.0MM) | + 630,000.00 |
| 1.00% of 1/3 (one-third) of the face amount of the Securitization Guarantees ($91.7MM) | + 916,667.00 |
| 1.00% of 1/3 (one-third) of the face amount of the Floor Plan Guarantees ($27.7MM) | + 276,667.00 |
| Restructuring Transaction Fee | 4,823,334.00 |

*Calculation of the Phase Two Restructuring Transaction Fee*

| | |
|---|---:|
| Restructuring Transaction Fee | 4,823,334.00 |
| Proportion payable | x 50% |
| Phase Two Restructuring Transaction Fee | 2,411,677.00 |

*Calculation of amount creditable toward the Phase Two Restructuring Transaction Fee*

| | |
|---|---:|
| Monthly payments made under paragraph 4(a) of the Engagement Letter | 450,000.00 |
| Proportion creditable | x 75% |
| Creditable Amount | - 337,500.00 |

| | |
|---|---:|
| **Amount Payable** | **$2,074,177.00** |

Please wire funds to the following account:

Citibank
111 Wall Street
New York, NY 10005
For the Account of Credit Suisse First Boston Account # 09253506
ABA# 021000089
Attention: Accounts Receivable Dept.-IBD
Reference: Oakwood Homes Corp.

If remittance is by check:

Credit Suisse First Boston
Accounting Department
Attn: Accounts Receivable - IBD
11 Madison Avenue, 9th Floor
New York, NY 10010

---

1  The engagement letter dated as of August 19, 2002 does not specify whether the Restructuring Fee related to the Foothill Credit Facility should be based on outstanding amounts or maximimum availablity. We have assumed the smaller amount.

# EXHIBIT C

**Calculation of the Remaining Portion of the Restructuring Transaction Fee**

## CONTINGENT "FINAL RESTRUCTURING TRANSACTION FEE"

In connection with the Letter Agreement between Oakwood Homes Corporation and CSFB dated as of August 19, 2002:

*Pursuant to paragraph 4(e) Section 2 of the Engagement Letter,*

"the balance of the Restructuring Transaction Fee (the "Final Restructuring Transaction Fee") [shall be payable] upon consummation of the Restructuring Transaction; provided that the Company may credit seventy-five percent (75%) of the [monthly] payments made under paragraph 4(a) hereof first against the Phase Two Restructuring Transaction Fee and thereafter, if applicable, the remainder against the Final Restructuring Transaction Fee;"

*Calculation of the Restructuring Transaction Fee*

| | |
|---|---:|
| 1.00% of the total face amount of the Senior Notes ($300.0MM) | $3,000,000.00 |
| 1.00% of the Foothill Facility[1] ($63.0MM) | + 630,000.00 |
| 1.00% of 1/3 (one-third) of the face amount of the Securitization Guarantees ($91.7MM) | + 916,667.00 |
| 1.00% of 1/3 (one-third) of the face amount of the Floor Plan Guarantees ($27.7MM) | + 276,667.00 |
| Restructuring Transaction Fee | 4,823,334.00 |

*Calculation of the Final Restructuring Transaction Fee*

| | |
|---|---:|
| Restructuring Transaction Fee | 4,823,334.00 |
| Proportion payable | x 25% |
| Phase Two Restructuring Transaction Fee | 1,205,833.50 |

*Calculation of amount creditable toward the Final Restructuring Transaction Fee*

| | |
|---|---:|
| Monthly payments made under paragraph 4(a) of the Engagement Letter | 450,000.00 |
| Proportion creditable | x 75% |
| Creditable Amount | 337,500.00 |
| Amount credited toward the Phase Two Restructuring Transaction Fee | - 337,500.00 |
| Net amount creditable toward the Final Restructuring Transaction Fee | - 0.00 |

| | |
|---|---:|
| **Contingent Amount Payable** | **$1,205,833.50** |

---

1 The engagement letter dated as of August 19, 2002 does not specify whether the Restructuring Fee related to the Foothill Credit Facility should be based on outstanding amounts or maximimum availablity. We have assumed the smaller amount.

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, et al., | ) Case No. 02-13396 (PJW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) **JURY TRIAL DEMANDED** |
| | ) |
| v. | ) |
| | ) Adversary Proceeding No. 04-57060 (PBL) |
| Credit Suisse First Boston, a Swiss banking | ) |
| corporation, Credit Suisse First Boston LLC, a | ) |
| Delaware limited liability corporation, Credit | ) |
| Suisse First Boston, Inc., Credit Suisse First | ) |
| Boston (U.S.A.), Inc., a Delaware corporation | ) |
| and a wholly owned subsidiary of Credit Suisse | ) |
| First Boston Inc., the subsidiaries and affiliates | ) |
| of each, and Does 1 through 100, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**OBJECTION TO PROOFS OF CLAIM FILED BY CREDIT SUISSE FIRST BOSTON LLC; COUNTERCLAIMS FOR (1) BREACH OF FIDUCIARY DUTY; (2) NEGLIGENCE; (3) UNJUST ENRICHMENT; (4) EQUITABLE SUBORDINATION; (5) AVOIDANCE AND RECOVERY OF 90 DAY PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550; (6) AVOIDANCE AND RECOVERY OF ONE YEAR PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550; (7) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548 AND 550; (8) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND APPLICABLE STATE LAW; (9) BREACH OF IMPLIED AND EXPRESS CONTRACT; AND (10) DEEPENING INSOLVENCY; AND DEMAND FOR JURY TRIAL**

{D:9039990.1}

In support of its objection to the proofs of claim filed by Credit Suisse First Boston

LLC, successor to Credit Suisse First Boston Corporation, and counterclaims against those and

other entities within the Credit Suisse Group (as defined below), the OHC Liquidation Trust

("Liquidation Trust" or "Plaintiff") by and through its duly appointed trustee Alvarez & Marsal,

LLC, hereby alleges as follows:

## I.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C.

§§ 1334 and 157, in that this adversary proceeding is a civil proceeding arising under and/or

relating to cases arising under title 11 of the United States Code, jointly administered under In re

Oakwood Homes Corporation, et al., Case No. 02-13396 (PJW) (collectively, the "Bankruptcy

Cases").

2.    Venue in this District is proper under 28 U.S.C. § 1409 because the

Bankruptcy Cases to which this action relates are pending before this Court.

3.    This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff

demands a jury trial of any issue triable by a jury.

## II.

## THE PARTIES

A.    Plaintiff.

4.    Oakwood Homes Corporation ("OHC," and together with all of its

subsidiaries and affiliates the "Oakwood Companies") and certain of its subsidiaries and affiliates

are the above-captioned reorganized debtors (collectively, the "Debtors") in the Bankruptcy Cases

currently pending in the United States Bankruptcy Court for the District of Delaware (the

"Court"). The Debtors' Bankruptcy Cases are jointly administered under Case Number 02-13396

(PJW). OHC Liquidation Trust, defined earlier as "Liquidation Trust" is Plaintiff and is

authorized to bring and prosecute this adversary proceeding, as described below.

5.    OHC was a North Carolina corporation with its principal place of business

in Greensboro, North Carolina. At all times relevant to this adversary proceeding, the Debtors

designed, manufactured, marketed, and, in some instances, financed, manufactured and modular

homes. At the time of the chapter 11 filing, the Debtors had manufacturing plants in multiple

states including Texas, North Carolina, Georgia, Indiana, Oregon, Arizona, Pennsylvania,

California, Colorado, Kansas, Minnesota and Tennessee. The homes manufactured by the Debtors

were sold under the registered trademarks "Oakwood," "Freedom," "House Smart," "Golden

West," "Schult," "Crest," "Marlette," and the trade name "Victory."

6.    On November 15, 2002 (the "Petition Date") certain of the Debtors filed

with Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The remaining

Debtors filed for chapter 11 protection on March 5, 2004.

7.    By order ("Confirmation Order") entered on March 31, 2004, the Court

confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood

Homes Corporation and Its Affiliated Debtors and Debtors in Possession" ("Plan"). The Plan

became effective as to all but one of the Debtors on April 13, 2004 (the "Effective Date"), and for

the remaining Debtor on April 27, 2004.

8.    Pursuant to Paragraph 40 of the Confirmation Order, Section 6.3(b) of the

Plan, and the Liquidation Trust Agreement dated April 13, 2004 (the "LTA"), the executed version

of which was annexed to the Plan Supplement filed on April 14, 2002 [Docket No. 3972], the Liquidation Trust was deemed established as of the Plan's Effective Date.

9.      Pursuant to the Confirmation Order, the Plan, and the LTA, the Liquidation Trust holds the right to prosecute, compromise, and settle all of the Debtors' Estate's Claims and Causes of Action (as defined in Sections 1.1(54) and 1.1(52) of the Plan, respectively). This objection and the related counterclaims against Defendants described below are properly brought by the Liquidation Trust pursuant to the above provisions of the aforementioned documents. Each of the counterclaims are Claims or Causes of Action with which the Liquidation Trust was vested as of the Effective Date, and which the Liquidation Trust has full right and title to prosecute, compromise, and/or settle.

**B.      Defendants.**

10.      <u>Defendant Credit Suisse First Boston</u> is a Swiss banking corporation ("CSFB-Swiss"). CSFB-Swiss is identified in a certain note purchase agreement dated February 9, 2001, as the agent. Plaintiff is informed and believes, and on that basis alleges, that CSFB-Swiss is the indirect parent of Defendant Credit Suisse First Boston (USA), Inc. and certain of its subsidiaries and affiliates. Plaintiff is informed and believes, and on that basis alleges, that CSFB-Swiss, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below. Plaintiff is informed and believes, and on that basis alleges, that each and all of the Credit Suisse First Boston entities named as defendants or involved in any fashion in this adversary proceeding are related to CSFB-Swiss under the umbrella designation of the Credit Suisse Group. If that understanding is error, these pleadings shall be amended to correct this information.

Defendant Credit Suisse First Boston, LLC ("CSFB-LLC"), the successor to Credit Suisse First Boston Corporation, is the "creditor" identified on the proofs of claim to which the Liquidation Trust hereby objects. Plaintiff is informed and believes, and on that basis alleges, that CSFB-LLC, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant Credit Suisse First Boston (USA), Inc. ("CSFB-USA"), a Delaware corporation, and its subsidiaries and affiliates, is an integrated investment bank serving institutional, corporate, government and high-net worth individual clients. This Defendant provides its clients with a broad range of products and services that includes securities underwriting, sales and trading, financial advisory services, restructuring advisory services, private equity investments, full-service brokerage services, derivatives and risk management products and investment research. Plaintiff is informed and believes, and on that basis alleges, that Defendant CSFB-USA is the parent of various subsidiaries relevant to this adversary proceeding. Plaintiff is informed and believes, and on that basis alleges, that CSFB-USA, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant Credit Suisse First Boston, Inc. ("CSFBI") owns all of the outstanding voting Common Stock of Credit Suisse First Boston (USA), Inc. Plaintiff is informed and believes, and on that basis alleges, that CSFBI, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below. Collectively, the Credit Suisse Group of Defendants shall be referred to throughout as "CSFB" or "Defendant" unless specific delineation is known and otherwise material.

Defendants, Does 1 through 100 ("Does") are believed to be the subsidiaries or affiliates of the CSFB defendants. Plaintiff is informed and believes, and on that basis alleges, that the Doe defendants acted in concert with and at the direction of the CSFB defendants as CSFB agents. Throughout this complaint, by this reference, the conduct ascribed to CSFB shall also be ascribed to the Doe defendants. Should there be an error or mistake as to the name of the entities for which culpable conduct may be ascribed, these pleadings will be amended to correct that mistake by correctly identifying a Doe defendant.

11.    Since at least 1994, CSFB was the Oakwood Companies' securities underwriter. In this capacity, CSFB wrote more than approximately $7.5 billion in Oakwood Companies' securities, including underwriting more than $1.5 billion in Oakwood Companies' securities while also serving as the Oakwood Companies' primary lender and the Debtors' restructuring and financial advisor. In or about February 2001, CSFB became a secured lender to the Oakwood Companies pursuant to what is commonly referred to as the $200 million "CSFB Warehouse Facility." In connection with becoming the Oakwood Companies' warehouse lender, CSFB demanded and received, in or about February 2001, warrants to purchase OHC's common stock (the "CSFB Warrants"), which, if exercised by CSFB, would have a value of just under 20% of the then-outstanding common stock of OHC. Plaintiff is informed and believes, and on that basis alleges, that CSFB stood in the role of restructuring and financial advisor since at least in or about 2000. On or about August 19, 2002, CSFB formalized a role it had held implicitly for some time and, pursuant to a letter agreement, CSFB became the Debtors' exclusive restructuring and financial advisor. As described in more detail below, in these various capacities, Defendants occupied both a fiduciary position, and that of an "insider" of the Debtors as that term is defined in Bankruptcy Code section 101(31) and applicable state law. Moreover, because the Debtors were

within the vicinity or zone of insolvency since at least 2000, and because CSFB occupied both a

fiduciary position and that of an insider vis-à-vis the Debtors, CSFB also occupied a fiduciary

position and duty to the Debtors' creditors.

### III.

### INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS AND COUNTERCLAIMS FOR RELIEF

**A.    Brief background of the Debtors' business.**

12.    From their origin in 1947, the Oakwood Companies provided modest or

affordably priced housing.  The Debtors designed and manufactured a number of models of

homes, including single- and double-wide units.  As of September 30, 2002, the Debtors sold

manufactured homes through 224 company-owned and -operated sales centers located in 26 states,

primarily in the Southeast and Southwest United States.  The Debtors also sold their homes to

approximately 600 independent retailers located throughout the United States.

**B.    The financing of retail home sales.**

13.    The Oakwood Companies served as the mortgage lender, or "bank," for the

majority of the homes sold through the Debtors' retail sales centers and a portion of the homes sold

through independent dealers.  During the Debtors' fiscal year 2002, approximately 72% of the

units sold through the Debtors' retail centers were financed by mortgage loans provided to the

purchaser of the home by the Debtors.

14.    The Oakwood Companies' ability to offer their customers mortgage

financing or retail installment sales contracts (collectively, "RICs") was dependent on the amount

of funds available to the Debtors.  The Debtors obtained the funds necessary to provide their

customers with financing primarily through a two-step, asset-backed securitization process

conceived, arranged, controlled, implemented and underwritten by CSFB. Initially, the Debtors

obtained financing on the RICs by using the RICs as collateral to borrow against the warehouse

facility (beginning in 2001 CSFB, was a lender and agent on the CSFB Warehouse Facility).

Once the Warehouse Facility had accumulated a sufficient amount of RICs (typically $150 million

to $200 million), the RICs would be bundled through a series of complex transfers and

transactions involving various of the Oakwood Companies which included both Debtor and non-

Debtor affiliates and others[1] for sale to private and institutional investors through a real estate

mortgage investment trust ("REMIC") which issued "REMIC Certificates." For example, during

fiscal 2001, $854 million of the Oakwood Companies' REMIC Certificates were sold and

underwritten by CSFB, and during 2002, $853 million of the Oakwood Companies' REMIC

Certificates were sold and underwritten by CSFB. In theory, the Debtors were not to have credit

exposure with respect to these securitized contracts, REMIC Certificates, except (i) with respect to

breaches of representations and warranties, (ii) to the extent of any retained interest in a REMIC,

(iii) with respect to required servicer advances, (iv) with respect to the servicing fee (which was

subordinated), and (v) with respect to any REMIC security the Debtors had guaranteed. In

practice, under the loan assumption program, described below, the Debtors shouldered a much

greater credit exposure.

15.    Payments of principal and interest on the REMIC Certificates were funded

by payments of principal and interest that were made by obligors on the underlying RICs (i.e., the

---

[1]    Oakwood Acceptance Corporation ("OAC"), one of the Debtors, sold the RICs to Ginkgo
Corporation. Ginkgo Corporation, in turn, sold them to Oak Leaf Holdings, LLC. Oak Leaf
Holdings, LLC then sold them to OMI Note Trust, which pledged them to OMI Note Trustee
under the terms of an indenture, to secure the trust's debt to CSFB and its affiliates under the
2001-A Class A Notes. Ginkgo Corporation, Oak Leaf Holdings, LLC and OMI Note Trust

purchasers of the homes).[2] Each REMIC trust typically issued various tranches of REMIC Certificates, each with a different level of seniority and credit quality. Although the entire pool of RICs owned by a particular REMIC trust would fund payments on all REMIC Certificates issued by that trust, the credit quality and seniority of a particular tranche of REMIC Certificates would vary; that was determined in advance of purchase by a "waterfall" of payment priorities. In exchange for higher risk that followed from agreeing to subordinate their payment priority to senior tranches, holders of subordinated tranches generally received higher interest rates. Generally speaking, the Debtors, with CSFB's assistance and participation, would sell the higher-rated tranches of REMIC Certificates in a public offering and sell the most subordinated tranches of REMIC Certificates (collectively, the "B-Piece REMIC Certificates") in a private offering. When the underwriters were unable to sell the B-Piece REMIC Certificate resulting from a particular securitization, that piece would be transferred to a special purpose subsidiary, Oakwood Financial Corporation ("OFC"), in exchange for cash in the amount of its fair market value.

16.    To enhance the marketability of the B-Piece REMIC Certificates, OHC provided a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees"). Under the terms of the B-2 Guarantees, generally, if the underlying RICs owned by the REMIC trust did not generate enough cash to make all required payments on the B-Piece REMIC Certificates (i.e. if the default rates on the underlying mortgages reached a level that resulted in

---

were all special purpose entities.

[2]    As will be discussed in greater detail herein, in certain circumstances where the customers or obligors defaulted on their loan payments, the Debtors' made the necessary payments on the securitized RICs.

insufficient cash available to service all of the tranches), OHC was obligated to eventually make up the difference by making payments directly to the holders of B-2 Guarantees. As of 2001, National Indemnity Company, an affiliate of Berkshire Hathaway, Inc., and, therefore, directly or indirectly Berkshire, was one of the largest institutional holders of B-Piece REMIC Certificates. As further inducement to sell certain REMIC Certificates, the Debtors provided an additional guarantee that, upon default, all payments would be accelerated.

## C.     Funding for short-term liquidity needs.

17.     In order to provide financing for its products and meet cash needs for operations, the Oakwood Companies maintained three lines of credit that were used to meet short-term liquidity needs.

a.     The Revolving Line of Credit: Plaintiff is informed and believes, and on that basis, alleges that initially, First Union National Bank ("First Union") provided a revolving line of credit. However, when First Union sought to be replaced, beginning in about January 2002, the Debtors obtained a Sixty-Five Million Dollar ($65,000,000) revolving line of credit ("Revolving Line") with a group of syndicated lenders, the agent of which was Foothill Capital Corporation ("Foothill"), one of the syndicated lenders. This Revolving Line was supposed to be used predominantly to meet the capital operating needs of OHC; however, during all material time periods, this line was also, at times, used to fund the loan assumption program ("LAP"). All borrowings under the Revolving Line were secured by substantially all of the Debtors' assets, tangible and intangible, real and personal, excluding loans held for sale by the Debtors.

b.   The Warehouse Facility:  The second source of funding was what the Debtors referred to as their "Warehouse Facility."  Unlike the Revolving Line, which was used to fund the Debtors' general capital operating needs on a short-term basis, the Warehouse Facility was a short-term facility used to fund the mortgages that were made available to manufactured home buyers.  The Warehouse Facility was initially provided by an affiliate of Bank of America ("BofA"), Enterprise Funding Corporation.  Plaintiff is informed and believes, and on that basis, alleges that when BofA determined not to renew the Warehouse Facility, in or about February 2001, CSFB stepped into the role of agent and lender on the "CSFB Warehouse Facility" in addition to maintaining its lucrative position as securities underwriter.  The Warehouse Facility acted much like the revolving line of credit, but with important differences that are discussed in greater detail herein below.

c.   The Servicer Advance Facility:  OAC, a wholly owned subsidiary of OHC, financed the performance of certain of its principal and interest advance ("P&I Advance") obligations under the Pooling and Servicing Agreements pertaining to each REMIC trust and the Warehouse Facility agreements by securitizing the receivable represented by its right to reimbursement of P&I Advances from the REMIC trusts through a devoted "Advance Line" provided by Prudential Investment Management, Inc.

**D.   CSFB encouraged the Debtors to ramp-up the loan assumption program.**

**1.   Manufactured housing faced challenging market conditions.**

18.   Since at least 1999, the manufactured housing industry has faced challenging market conditions.  For example, industry shipments in 2001 were approximately half the industry's peak in 1998.  For the Oakwood Companies, these challenging market conditions

translated into declining revenues and cash flows. The Oakwood Companies' total revenues of

$1.1 billion for fiscal 2001 fell relative to fiscal year 2000 total revenues. This decline in revenue

reflected weakness in both retail and wholesale sales as well as a decline in financial services

income. Economic conditions, among other factors, contributed to a rise in delinquencies and

repossessions during this period as well. One of the biggest challenges the Debtors faced was to

maintain sufficient liquidity during the downturn in order to position themselves to take advantage

of the hoped-for upturn.

19.    Plaintiff is informed and believes, and on that basis alleges that, fully aware

of the challenges facing the Debtors and the manufactured housing industry, armed with insider

information, and in breach of its fiduciary duties, CSFB sought to further enrich itself, through

exorbitant fees and other remuneration, by at a minimum negligently prolonging the life of the

Debtors' securitization program that not only deepened the insolvency of the Debtors but,

eventually drove them into bankruptcy.

## 2.    CSFB encouraged Debtors to aggressively use the loan assumption program.

20.    One of the key statistics for purchasers of REMICs is the repossession and

default rates on the RICs. For example, the higher the Debtors' historical repossession or default

rates, the larger the discount to par or corporate guarantee from the Debtors necessary to

successfully securitize the RICs. Additionally, repossessions usually resulted in a shortfall in cash

flow available to service all of the tranches of the REMIC Certificates. By way of example, upon

a borrower default, and before the LAP was used as aggressively as it was between 2000 and

2002, OAC (as servicer of the RICs) would repossess, refurbish and resell the home. Usually the

cash received from the sale of the repossessed home was less than the outstanding balance on the

defaulted loan. When OAC believed it had collected everything it could to satisfy the underlying,

defaulted loan, the loan was removed from the REMIC trust and replaced with the cash realized by

OAC from the sale of the repossessed home. Repossessed manufactured homes, even when sold at

retail rather than wholesale, typically sell for less than a new manufactured home and usually less

than the outstanding balance on the defaulted loan. The REMIC trust recorded, as a loss, the

shortfall between the outstanding balance on the defaulted loan and the cash received from the sale

of the repossessed home. This shortfall in turn meant that there would be less, and perhaps

insufficient, cash available to pay the obligations of the REMIC trusts (including OAC's Servicing

Fees and the interest-only certificates retained by the Debtors, which had been subordinated).

21.    As a result of the increased loan defaults, and with either CSFB's implicit or

explicit encouragement, the Debtors ramped up the use of a program called the loan assumption

program ("LAP"). A distant variant of the LAP had been used infrequently by the Debtors prior to

2000 and only in those cases where the existing obligor found a third-party with satisfactory credit

to assume its loan at a minimum cost. Accordingly, instead of the Debtors repossessing the home

once the borrower became delinquent on its loan payments, the original obligor would find a third-

party to purchase the home and assume the remaining payments on the underlying RIC. However,

during the period the Debtors were insolvent or in the zone of insolvency, the LAP morphed into a

grossly overused program that became not only unsustainable, but also resulted in the expenditure

of a significant amount of cash that could otherwise have been used in the Debtors' operations.

22.    CSFB knew of and/or encouraged the Debtors use of LAP to subsidize the

cash flows to the REMICs resulting from increasing defaults on the underlying mortgages or

RICs. CSFB knew or should have known that the Debtors increasing use of LAP was not

sustainable in light of the continued decline in the Debtors operations and the manufactured home

market as a whole. The Debtors use of LAP to subsidize the REMIC cash flows served to, among other things, delay the calling of the B-2 Guarantees and the acceleration of the guarantee payments under the Lotus B-Piece Certificates. During the Debtors' extensive use of LAP, the Debtors' were clearly insolvent or in the zone of insolvency; therefore, the calling of the B-2 Guarantees or the acceleration of the guarantee payments under the Lotus B-Piece Certificates would have had a number of negative effects in light of the Debtors' tenuous position; including limiting if not eliminating the Oakwood Companies' ability to continue to access the asset backed securities market which CSFB had developed into a continuous and very lucrative business with respect to the Oakwood Companies and, upon information and belief, other companies in the manufactured home industry. If evidence is discovered that CSFB deliberately overlooked or concealed material information, in order keep the Debtors' business afloat and to pocket fees, or generate other internal profit taking, for securitizations and loans that should not have been permitted to occur, these allegations will be amended.

23.    As discussed briefly above, over the years, CSFB developed a multi-layered relationship with the Debtors in which trust and confidence was bestowed upon and accepted by CSFB. The relationship began as early as 1994 when CSFB became the Debtors' securities underwriter. Over the course of at least 25 securitizations in excess of $7 billion, CSFB gained a thorough understanding of the manufactured home industry and the Debtors' business as well as the strengths and weaknesses of each. This relationship between the Oakwood Companies, including Debtors, on the one hand, and CSFB, on the other, grew to that of an insider and a fiduciary when CSFB became the agent and the lender on the CSFB Warehouse Facility, a substantial and powerful warrant holder, and the Debtors' restructuring and financial advisor. Despite its position as both a fiduciary and an insider, CSFB breached the duties associated with

the Debtors' repose of trust and confidence, and failed in its role as restructuring and financial advisor, causing the Debtors' irreparable financial harm.

**3.    CSFB provided underwriting services in connection with the Debtors' public term securitizations from 1994 through 2002.**

24.    In or about 1994, CSFB assumed the obligation to provide securities underwriting services to the Oakwood Companies. During the life of this relationship, CSFB participated in more than 25 offerings and collected underwriting fees of at least $30 million. CSFB's services included, but were not limited to, advising and assisting management and the directors of the Oakwood Companies with setting the terms of the sales of securities, effecting the sale, and conducting reasonable due diligence into the accuracy of written representations in the prospectus, testing the financial information contained in the prospectus by examining the basis for reporting that information directly relevant to the likelihood of default or stress testing the asset pools (the "Underwriting Services"). Pursuant to the underwriting agreement standard provisions dated May 1999 (the "Standard Provisions Underwriting Agreement"), CSFB and other underwriters, agreed to purchase, from Debtor Oakwood Mortgage Investors ("OMI") the aggregate outstanding principal amount of the underwritten certificates. The certificates would be issued by the trust established by OMI pursuant to a Pooling and Servicing Agreement and for which Chase Manhattan Trust Company, National Association would act as trustee. These certificates would be resold in the capital markets.

25.    In connection with each asset-backed securitization ("ABS") offering, with a great deal of assistance from, if not under the direction of CSFB personnel, a prospectus was prepared that provided prospective investors with information pertaining to each asset in the securitized pool of assets. Prior to issuing the prospectus, Plaintiff is informed and believes, and

on that basis, alleges that the Debtors provided CSFB personnel with enormous amounts of confidential information. This detailed information, included among other things, the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each manufactured home buyer. As part of the process of preparing the prospectus, CSFB thoroughly examined, the data for public dissemination. In addition, CSFB provided the rating agencies (e.g., Standard & Poors and Moody's and Fitch) with information sufficient to obtain bond ratings for each tranche of REMIC Certificates to be issued. Plaintiff is informed and believes, and on that basis alleges that CSFB was given access to all deal files and closing binders on all RICs to be included in each securitized asset pool. It had access to prior deal files and monthly tracking reports. CSFB had access to information not otherwise publicly available.

4.    **Beginning in 2001, CSFB took on the added role of the Oakwood Companies' lead lender on the warehouse facility.**

26.    In the second half of 2000, at a critical time for the Oakwood Companies, when the Oakwood Companies' current warehouse lender was abandoning them which would have led to the immediate collapse of its securitization business, CSFB began negotiations to assume the role of lender and agent on the Warehouse Facility. Pursuant to the (a) Custodial Agreement dated February 9, 2001, (b) the Class A Note Purchase Agreement dated February 9, 2001, (c) the Sale and Servicing Agreement dated February 9, 2001, (d) the Trust Agreement dated February 9, 2001, and (e) the Indenture dated February 9, 2001 (all as amended from time to time, collectively, the "CSFB Warehouse Facility Documents"), the Oakwood Companies obtained a receivables purchase facility from CSFB (called the "CSFB Warehouse Facility" or "CSFB Warehouse Line") for interim liquidity needs primarily related to their mortgage financing operations. Pursuant to the Class A Note Purchase Agreement, CSFB, as agent, agreed with the

Oakwood Companies (in various roles as issuer, depositor, and transferor) to provide the borrowing necessary to ensure the Debtors had sufficient liquidity to access the asset-backed securitization markets and maintain their pre-securitization financing operations in connection with the sale of manufactured housing. Plaintiff is informed and believes, and on that basis alleges that CSFB was paid significant fees in its role as lender under the CSFB Warehouse Facility in addition to the fees paid to CSFB with respect to its role as underwriter and restructuring advisor.

27.    The CSFB Warehouse Facility operated effectively like the Revolving Line. OAC would originate a home loan by selling a manufactured home to a buyer and agreeing to finance it through RICs. In principle, CSFB would advance funds to the Debtors based on the size of the RIC, so long as the RIC fell within the definition of an "eligible" receivable described in the Sale and Servicing Agreement, and so long as the aggregated total of these home loans did not exceed the available "borrowing base" also defined contractually in the Sale and Servicing Agreement. CSFB's advances on the RICs were secured by issuer notes secured by loans and funneled through a series of Debtor-affiliated and non-Debtor entities, e.g., from OAC (the Seller and Servicer, and a wholly owned subsidiary of OHC) to Ginkgo Corporation (the Transferor, and an unaffiliated special-purpose entity owned by Lord Securities, secretly recommended by CSFB), to Oak Leaf Holdings LLC (the Depositor, and 100% owned by Oakwood Capital Corporation), to OMI Note Trust (the Issuer, and special-purpose entity wholly owned by Oak Leaf), until it arrived back at OAC for financing. Plaintiff is informed and believes, and on that basis alleges, that the notes issued by OMI Note Trust and secured by the RICs were "purchased" by Alpine Securitization Corp. ("Alpine"), owned by Global Securitization LLC, on an "uncommitted" basis, and CSFB on a "committed" basis. Plaintiff is informed and believes, and on that basis, alleges

that Alpine is a CSFB affiliate. CSFB acted as the ultimate decision maker with respect to shutting down the CSFB Warehouse Facility in the event of a default of the loan indenture or a termination event. In other words, CSFB acted as agent for Alpine as well as lender and agent for the Oakwood Companies.

28.    Central to this continuous funding activity was the availability of advances based on the loan commitment and a calculation of the borrowing base under the CSFB Warehouse Facility. Once the loan commitment was reached or the available borrowing base was exhausted, the CSFB Warehouse Line had to be "cleared" so that further borrowing could take place. Plaintiff is informed and believes, and on that basis, alleges that Alpine would continue to build its purchase of notes for a period of about three months, until CSFB was ready to market the next securitization. Once cleared, the CSFB Warehouse Facility was again available for borrowings, and the process started again.

29.    Plaintiff is informed and believes, and on that basis, alleges that just before the bankruptcy filing, CSFB suddenly, and surprisingly suspended the CSFB Warehouse Facility. Then days following the bankruptcy filing, CSFB attempted to collect a $3 million-dollar fee but this time said it was to "restart" the CSFB Warehouse Facility it had unexpectedly shut down the day the Debtors sought bankruptcy protection.

5.    **In exchange for agreeing to provide the warehouse facility, among other things, CSFB demanded and received warrants in the Debtors with a value just under 20%.**

30.    In addition to the other various fees and reimbursements requested by CSFB in connection with the Warehouse Line, CSFB demanded that it receive warrants covering a significant number of shares of OHC's common stock as additional compensation. On or about

December 20, 2000, OHC's board of directors ("OHC Board") voted to approve the Debtors' entry

into the CSFB Warehouse Facility. On or about December 20, 2000, the OHC Board entered a

resolution providing that the warrant and registration rights agreement ("CSFB Warrant

Agreement") that had been described in the Warehouse Facility term sheet with CSFB was

authorized and approved. The OHC Board further resolved, authorized and approved all deeds

necessary to issue and register the warrants under both State and Federal securities laws. Finally,

OHC reserved approximately 9.5 million shares of common stock for issuance upon exercise of

the warrants without the need for further resolutions from the OHC Board. The number of shares

described in the CSFB Warrant, if and when exercised, provided CSFB with an ownership interest

in OHC of just under 20%, which, pursuant to New York Stock Exchange regulations, was the

largest amount that could be granted by the Debtors without obtaining general shareholder

approval. Thereafter, on or about February 26, 2001, the CSFB Warrant Agreement was executed.

31.     CSFB's Warrant, exercisable at any time through 2009, for just under 20%

of OHC's common stock, provided CSFB with enormous leverage by the shear magnitude of its

potential ownership interest. Together with its role as restructuring and financial advisor, lender

on the CSFB Warehouse Facility, and the Debtors' primary underwriter of its securitization

program, Plaintiff is informed and believes, and on that basis, alleges that CSFB was a controlling

force and literally had the ability to shut down the Debtors' business.

6.     **At all relevant times, CSFB provided the Debtors with restructuring
and financial advisory services.**

32.     The Debtors' financial problems were a result of, among other factors,

CSFB's encouragement of the continued use of LAP, a downturn in the manufactured housing

industry, a weakened economy, and, as it turns out, at least in part from borrowing, lending, loan

servicing and financing practices that led to an increasingly large number of delinquent loans and

repossessions that in turn lead to the Debtors' insolvency, deepening insolvency, and bankruptcy.

CSFB knew or should have known about the Debtors' borrowing, lending, liquidity, loan servicing

and financing practices since at all relevant times it played a critical role in each activity and was

the Debtors' restructuring and financial advisor.  Furthermore, once CSFB officially took the title

of the Debtors' exclusive restructuring and financial advisor with respect to the Debtors' significant

liquidity constraints in 2002, CSFB provided restructuring advice that was negligent and

ultimately led to a myriad of unnecessary expenses and obligations incurred by the Debtors.

Among other things, CSFB's woefully deficient restructuring and financial advisory services

ultimately resulted in the Debtors' termination of CSFB as restructuring and financial advisor.

> 33.     Plaintiff is informed and believes, and on that basis alleges, that well prior

to its formalized restructuring advisory letter agreement in August 2002, the Debtors regularly

consulted CSFB on financial and restructuring advisory matters.  But clearly, in the midst of the

Debtors' downward financial spiral, the Debtors relied on CSFB—an insider and fiduciary to the

Debtors – for restructuring and financial advice.  On or about August 19, 2002, CSFB and certain

of the Debtors (collectively, the "Debtor Signatories") formalized the *de facto* relationship that had

existed for years and entered into that certain letter agreement pursuant to which CSFB was

retained to provide restructuring and financial advisory services to the Debtors and their non-

Debtor affiliates in connection with certain potential restructuring transactions (the "Financial

Advisory Agreement").  CSFB was rewarded for its efforts as the Debtors' *de facto*, and then

actual, restructuring and financial advisor with enormous fees embedded into its underwriting and

lending fees and profit, and with the intangible benefit of power and control over the Debtors'

business.  At all relevant times before the actual execution of the Financial Advisory Agreement,

Plaintiff is informed and believes, and on that basis alleges that CSFB was already conducting itself in a fashion consistent with that of a party to the "inner-circle" by providing restructuring and financial advisory services.

34.    The Financial Advisory Agreement provided that CSFB would render restructuring advisory services to OHC in connection with any sale transaction and any restructuring transaction.  In addition, the Financial Advisory Agreement provides that CSFB will assist the Debtors in connection with those activities as well as performing other advisory services. CSFB further agreed to act as dealer/manager with respect to any restructuring transaction commencing on or prior to the termination date, and to act as the exclusive placement agent for the Debtors in connection with any sale of its securities.  In light of the Debtors' dire liquidity position at that time, which CSFB was aware of, or should have been well aware of, relative to CSFB's role as, at a minimum, secured lender and underwriter, CSFB's role as restructuring and financial advisor was to advise and prepare the Debtors for an eventual chapter 11 filing, including arranging for debtor-in-possession ("DIP") financing that would allow the Debtors the flexibility to continue to operate in chapter 11 and maximize the value of their business for the benefit of their creditors.  Indeed, the Financial Advisory Agreement expressly required that the Debtors attempt to employ CSFB as their excusive financial advisor in any chapter 11 case it filed. However, CSFB's failures as restructuring and financial advisor resulted in the termination of CSFB at or around the Petition Date, the Debtor filing for chapter 11 without a material amount of DIP financing[3] or the CSFB Warehouse Facility in place, and a resultant disruptive and

---

[3]    The Debtors did not obtain permanent DIP financing until January 2003 approximately 2 months after the Petition Date.

unnecessarily expensive post-petition process to find a DIP lender. CSFB dropped the ball, which resulted in the Debtors' incurring unnecessary fees and expenses.

35.    Pursuant to the Financial Advisory Agreement, CSFB received $1,811,129.54 in advisory fees from August 19, 2002 through November 15, 2002 - the dates of termination of CSFB and the corresponding Financial Advisory Agreement. And, in one of its last acts of self-dealing toward the companies to which it owed fiduciary duties, CSFB, on the eve of Debtors' bankruptcy filing, using its position as a trusted advisor and member of the inner-circle attempted to leverage a multi-million dollar payout from the Debtors as its advisor on an unperformed, and therefore, unearned contract fee.

**E.    Debtors' road to bankruptcy**

36.    Since CSFB had access to virtually all of the Oakwood Companies' financial information, CSFB knew or should have known:

- the dramatic decline in sales for the entire manufactured homes industry since at least 1998,

- the continued decline in the Debtors' operations from at least 2000 through 2002,

- that the Debtors' use of the LAP was growing at an unsustainable rate and that the LAP was draining the Debtors of precious financial resources that would otherwise have been available for use in the Debtors' operations,

- that the Debtors' LAP expenditures were subordinated to the end of the term of the affected RIC, and that the Debtors knew some advances would never be collected,

- that some of the credit quality of the borrowers was deteriorating over the life of the LAP and that the same homes were being placed into LAP three or four times, and

- that once the Debtors discontinued LAP in July 2002, the Debtors' liquidity and financial position was tenuous at best and that the Debtors needed to implement a strategy immediately to gain short-term liquidity as well as accomplish the much broader goal of restructuring its untenable capital structure.

37.    Plaintiff is informed and believes, and on that basis alleged, that CSFB, a fiduciary and insider, deliberately chose to tacitly, if not expressly, encourage Debtors' continued use of a program that CSFB knew, or should have known, was unsustainable and draining the Debtors of precious liquidity. It is believed, and on that basis alleged, that CSFB did that to enrich itself at the expense of the Debtors and their creditors. On or about November 15, 2002, certain Debtors filed for protection under chapter 11 of the United States Bankruptcy Code.

F.    **CSFB's proofs of claim.**

38.    CSFB-LLC is listed in the Debtors' Schedule of Assets and Liabilities (the "Schedules") as holding a claim in excess of $3,288,391.54 (the "Scheduled Claims").

39.    Defendant CSFB-LLC filed an identical proof of claim in the jointly-administered cases of Debtor Oakwood Homes Corporation, Debtor Oakwood Mobile Homes, Inc., Debtor HBOS Manufacturing, LP, and Debtor OAC in a partially contingent and

unliquidated amount of $2,082,588.04, which claims have been assigned claim numbers 6118,

6119, 6120, and 6121, respectively, for purposes of the docketing system in the Bankruptcy Cases

(collectively, the "Filed Claims" and together with the Scheduled Claims, the "CSFB-LLC

Claims").

   40.  Despite Defendants' breach of the Financial Advisory Agreement, its

facilitation of the securitization process that brought about deepening insolvency, its breach of

fiduciary duty, its self-dealing, and its inequitable conduct, Defendant seeks payment for certain

fees and expenses allegedly due and owing under the Financial Advisory Agreement.

**G.**  **Transfers to CSFB.**

   41.  Within 90 days of the Petition Date, the Oakwood Companies transferred to

CSFB a total of at least $166,811,129.54 (the "90 Day Transfers"). Below is a chart depicting the

90 Day Transfers to CSFB.

| Parent Name | Amount | Check Number | Date |
|---|---|---|---|
| Credit Suisse First Boston | $129,000,000.00 | 100533 | 08/31/02 |
| Credit Suisse First Boston | 36,000,000.00 | 100536 | 09/13/02 |
| Credit Suisse First Boston | 1,205,833.50 | 100584 | 11/01/02 |
| Credit Suisse First Boston | 300,000.00 | 100604 | 10/01/02 |
| Credit Suisse First Boston | 150,000.00 | 100288 | 11/15/02 |
| Credit Suisse First Boston | 150,000.00 | 100053 | 10/15/02 |
| Credit Suisse First Boston | 4,595.08 | 100028 | 10/15/02 |
| Credit Suisse First Boston | 700.96 | 100289 | 11/15/02 |
| Total | $166,811,129.54 | | |
| Total Fees Under Financial Advisory Agreement | $ 1,811,129.54 | | |

42.    Within one year of the Petition Date, the Oakwood Companies transferred to CSFB a total of at least $595,845,398.42 (the "One Year Transfers" and together with any and all transfers to any and all CSFB entity or for the benefit of such entity, including but not limited to expenses associated with LAP, the "Transfers").  Below is a chart depicting the One Year Transfers to CSFB.

| Transferee | Transfer Amount | Date |
|---|---|---|
| CSFB | 546,920.14 | 11/15/2001 |
| CSFB | 562,905.23 | 12/17/2001 |
| CSFB | 423,809.21 | 1/15/2002 |
| CSFB | 520,204.17 | 2/15/2002 |
| CSFB | 507,080.00 | 3/15/2002 |
| CSFB | 482,471.75 | 4/15/2002 |
| CSFB | 588,702.92 | 5/15/2002 |
| CSFB | 599,053.76 | 6/17/2002 |
| CSFB | 470,063.68 | 7/15/2002 |
| CSFB | 602,556.22 | 8/15/2002 |
| CSFB | 587,143.61 | 9/16/2002 |
| CSFB | 511,847.52 | 10/15/2002 |
| CSFB | 633,876.15 | 11/15/2002 |
| CSFB | 627,243.90 | 12/7/2001 |
| CSFB | 345,840.00 | 2/14/2002 |
| CSFB | 513,612.67 | 2/28/2002 |
| CSFB | 179,860.00 | 3/12/2002 |
| CSFB | 839,728.30 | 5/31/2002 |
| CSFB | 286,300.00 | 6/14/2002 |
| CSFB | 705,049.65 | 8/30/2002 |
| CSFB | 117,500,000.00 | 12/7/2001 |
| CSFB | 5,000,000.00 | 12/19/2001 |
| CSFB | 88,000,000.00 | 2/28/2002 |
| CSFB | 22,000,000.00 | 3/14/2002 |
| CSFB | 144,000,000.00 | 5/31/2002 |
| CSFB | 42,000,000.00 | 6/14/2002 |
| CSFB | 129,000,000.00 | 8/31/2002 |
| CSFB | 36,000,000.00 | 9/13/2002 |
| CSFB | 300,000.00 | 10/1/2002 |
| CSFB | 154,595.08 | 10/15/2002 |
| CSFB | 1,205,833.50 | 11/1/2002 |
| CSFB | 150,700.96 | 11/15/2002 |

| Transferee | Transfer Amount | Date |
|---|---|---|
|  | $595,845,398.42 |  |

43.    Each of the above transfers is a "transfer" as that term is defined in Bankruptcy Code section 101(54).

## IV.

## OBJECTIONS TO CSFB-LLC CLAIMS

44.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 43, inclusive, as though fully set out.

45.    The Plaintiff objects to the CSFB-LLC Claims on each of the following grounds:

a.    The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(b)(1) for the reasons set forth in the Counterclaims below;

b.    The CSFB Claims should be disallowed in their entirety pursuant to 502(b)(4) based on the conduct above. CSFB-LLC's claim exceeds the reasonable value of its purported services;

c.    The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(d), because CSFB-LLC is an entity from which property is recoverable under Bankruptcy Code section 550, and is a transferee of a transfer avoidable under Bankruptcy Code sections 544, 547 and 548, and applicable state law, for the reasons set forth in the Counterclaims below, and CSFB-LLC has not paid the

amount or turned over any such property for which it is liable pursuant to those Bankruptcy Code sections to the Debtors;

        d.    The CSFB-LLC Claims should be disallowed in their entirety because CSFB breached the Financial Advisory Agreement and caused significant harm to the Debtors including, but not limited to, grossly unnecessary fees, expenses and interest on the alternate DIP financing and other expenses. Alternatively, the contingency under which a fee for Financial Advisory Services would be paid was not satisfied; and/or

        e.    As the Debtors' cases have been substantively consolidated for distribution purposes pursuant to the Plan as confirmed, the duplicative CSFB-LLC Claims must be disallowed as CSFB-LLC is only entitled to recover for one claim against the substantively consolidated estates.

      46.    In the alternative, the Plaintiff requests that the CSFB-LLC Claims, in part or in total, be equitably subordinated to all other claims against the Debtors, pursuant to Bankruptcy Code section 510(c) for the reasons set forth in the Counterclaims below.

**V.**

**COUNTERCLAIMS**

**FIRST COUNTERCLAIM FOR RELIEF**

**(Breach Of Fiduciary Duty Against All Defendants)**

      47.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 46 inclusive as thought fully set out.

48.     As a result of this multi-layered and multi-faceted relationship with the Debtors, CSFB owed the Debtors a fiduciary duty of loyalty and care. Moreover, because the Debtors were within the zone or vicinity of insolvency for much of the period pre-petition, CSFB owed the Debtors' creditors fiduciary duties.

49.     CSFB had access to and knowledge of confidential and inside information. Despite its knowledge of the Debtors failing financial health, CSFB continued to underwrite ABS offerings and wrongly facilitated those offerings through the extension of credit from the CSFB Warehouse Facility. These actions were a breach of fiduciary duty and took place at a time when the Debtors' financial health left Debtors in the zone of insolvency, then financially distressed, and, then, actually deepened the Debtors' insolvency. The net effect of CSFB's knowing activity was to cause the Debtors to remain in business solely for the purpose of generating lender, investment banking, and restructuring and financial advisory fees for the benefit of CSFB.

50.     Negligently, grossly negligently, recklessly or intentionally, CSFB failed to perform its fiduciary duties, causing deepening insolvency and damages and unjustly enriching itself at the expense of the Debtors.

51.     The Liquidation Trust is entitled to demand CSFB's disgorgement of all fees and other remuneration unjustly paid to CSFB in its multiple conflicting capacities from at least 2000 through the Petition Date and to recover consequential and actual damages, and damages for deepening insolvency.

## SECOND COUNTERCLAIM FOR RELIEF

### (Negligence Against All Defendants)

52.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 51 inclusive as though fully set out.

53.    CSFB owed Oakwood Companies, including Debtors, a duty of care. CSFB breached that duty of care.  CSFB's conduct as alleged above was negligent, falling well below the standards of care for a reasonable person, caused Oakwood Companies, including Debtors damages that were foreseeable in nature.

54.    As a result of CSFB's conduct as alleged above, and because of it, Debtors suffered damages in an amount to be proved at trial.

## THIRD COUNTERCLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

55.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 54 inclusive as though fully set out.

56.    CSFB has benefited, directly or indirectly, in each and every act alleged herein, and has benefited, directly or indirectly, from the retention, use, investment, and reinvestment of proceeds of such acts.  Through the conduct alleged above, CSFB has been unjustly enriched to the detriment of the Debtors and their estate, which did not derive benefit from the acts alleged herein.

57.    Because the remedy at law is inadequate, the Liquidation Trust is entitled to disgorgement of all fees and other remuneration paid to CSFB and to all benefits derived from

such unjust enrichment from in or about 2001 through the Petition Date and/or to recover damages including, but not limited to, deepening insolvency.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Equitable Subordination Against Defendant CSFB-LLC)

58.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 57 inclusive as though fully set out.

59.    CSFB-LLC has engaged in inequitable conduct, including, without limitation, breach of fiduciary duties, and breach of contract.  CSFB-LLC used its position as underwriter, lender, equity holder, and restructuring and financial advisor to the Oakwood Companies and Debtors to serve its own interests garnering enormous fees and other advantages unjustly enriching itself.

60.    CSFB-LLC's misconduct resulted in injury to the estate, the Debtors, and other creditors and conferred an unfair advantage on CSFB-LLC.

61.    Equitable subordination of the CSFB-LLC Claims is not inconsistent with the provisions of the Bankruptcy Code.

62.    As a result of CSFB-LLC's inequitable conduct, the CSFB-LLC Claims should be equitably subordinated pursuant to Bankruptcy Code section 510(c).

## FIFTH COUNTERCLAIM FOR RELIEF

### (Avoidance And Recovery Of
### Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All
### Defendants)

63.     Plaintiff incorporates by this reference the allegations of paragraphs 1 through 62 inclusive as though fully set out.

64.     At least some, if not all, of the 90 Day Transfers were transfers of an interest of one or more of the Debtors in property.  This claim for relief applies to all of the 90 Day Transfers that are determined to be transfers of an interest of the Debtors in property.

65.     Each of such 90 Day Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the 90 Day Transfers was made.

66.     Such 90 Day Transfers were made while the Debtors were insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

67.     Such 90 Day Transfers were made or perfected by the Debtors to or for the benefit of Defendants on or within the period of ninety (90) days before the Petition Date.

68.     Such 90 Day Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtors' chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the 90 Day Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

69.     Such 90 Day Transfers constitute an avoidable preference under 11 U.S.C. § 547.

70.     Such 90 Day Transfers were made to or for the benefit of the Defendants, and consequently, Plaintiff is entitled to recover such avoided 90 Day Transfers from Defendants under 11 U.S.C. § 550.

## SIXTH COUNTERCLAIM FOR RELIEF

### (Avoidance and Recovery of Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All Defendants)

71.     Plaintiff incorporates by this reference the allegations of paragraphs 1 through 70 inclusive as though fully set out.

72.     At least some, if not all, of the One Year Transfers were transfers of an interest of one or more of the Debtors in property.  This claim for relief applies to all of the One Year Transfers that are determined to be transfers of an interest of the Debtors in property.

73.     Each of such One Year Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the One Year Transfers was made.

74.     Such One Year Transfers were made while the Debtor was insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

75.     Such One Year Transfers were made or perfected by the Debtors to or for the benefit of the Defendants on or within the period of one year before the Petition Date.

76.     Such One Year Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtor's chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the One Year Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

77.   Such One Year Transfers constitute an avoidable preference under 11 U.S.C. § 547.

78.   Such One Year Transfers were made to or for the benefit of the Defendants, and consequently, Plaintiff may recover the avoided One Year Transfers from Defendants under 11 U.S.C. § 550.

## SEVENTH COUNTERCLAIM

### (Recovery of Fraudulent Transfer,
### 11 U.S.C. §§ 548 and 550 Against All Defendants)

79.   Plaintiff incorporates by this reference the allegations of paragraphs 1 through 78 inclusive as though fully set out.

80.   At least some, if not all, of the Transfers were transfers of an interest of one or more Debtors in property. This claim for relief applies to all of the Transfers that are determined to be transfers of an interest of one or more of the Debtors in property.

81.   The Transfers were made by one or more of the Debtors for less than reasonably equivalent value.

82.   The Debtors (i) were insolvent on the date of the Transfers, or became insolvent as a result of such Transfers, (ii) engaged in a business or transaction, or were about to engage in a business or transaction, for which the property that remained with the Debtors after the Transfers was an unreasonably small capital; or (iii) intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

83.    The Transfers represent an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

84.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to 11 U.S.C. § 550 the avoidable Transfers or the value of the avoidable Transfers.

## EIGHTH COUNTERCLAIM

### (Fraudulent Transfer Under 11 U.S.C. § 544 And State Law Against All Defendants)

85.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 84, inclusive, as though fully set out.

86.    Pursuant to 11 U.S.C. § 544(b), a debtor may avoid any transfer of any interest of the debtor or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e). At least some, if not all, of the Transfers were transfers of an interest of one or more Debtors in property. This claim for relief applies to all of the Transfers that are determined to be transfers of an interest of one or more of the Debtors in property.

87.    There exist unsecured creditors of the Debtors' holding allowable claims under 11 U.S.C. § 502, and these unsecured creditors were creditors of the Debtors at the time of the Transfers, which are voidable under applicable state law by such unsecured creditors.

88.    Transfers were made by one or more of the Debtors without such Debtors receiving a reasonably equivalent value in exchange for such Transfers.

89.    The Debtors (i) were insolvent on the date of such Transfers, or became insolvent as a result of such Transfers; (ii) engaged or were about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction, or (iii) intended to incur, or believed that they would incur, debts beyond the Debtors' ability to pay as such debts became due.

90.    The Transfers represent an avoidable fraudulent transfer under applicable state law.

91.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to applicable state law and 11 U.S.C. §§ 544(b)(1) and 550 the avoidable Transfers or the value of the avoidable Transfers.

## NINTH COUNTERCLAIM

### (Breach of Implied and Express Contract Against All Defendants)

92.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 91, inclusive, as though fully set out.

93.    At all relevant times, CSFB was either explicitly engaged as the Oakwood Companies' restructuring and financial advisor or advised the Oakwood Companies as if it had been explicitly engaged as their restructuring and financial advisor.

94.    The Debtors performed all conditions precedent to CSFB's obligations to perform restructuring and financial advisory services both implied, and under the express Financial Advisory Agreement.  Alternatively, the Debtors 'performance was excused or as a result of CSFB's own conduct.

95.    CSFB breached its obligation to provide restructuring and financial advisory services under its implied agreement to do so, as well as under the express Financial Advisory Agreement, including the covenant of good faith and fair dealing implied in both.

96.    As a proximate result of CSFB's breach, the Debtors suffered damages in an amount to be proved at trial.

## TENTH COUNTERCLAIM

### (Deepening Insolvency Against All Defendants In The Event This Is Determined To Be A Separate Claim For Relief Rather Than A Form Of Damages)

97.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 96, inclusive, as though fully set out.

98.    CSFB induced the Debtors to continue their costly borrowing and financing policies and practices, despite knowledge that the Debtors were insolvent, or in the vicinity or zone of insolvency since at least as of 2000 or 2001.

99.    Moreover, as the Debtors' fiduciary, insider, and restructuring advisor, among other things, CSFB should have been preparing the Debtors for bankruptcy by attempting to conserve all assets.  CSFB breached these and its fiduciary duties;

100.    Accordingly, because of CSFB's *de facto* control of the Debtors, and CSFB's role as facilitator, if not more, of the Oakwood Companies securitization process well after insolvency, CSFB has violated the doctrine of deepening insolvency and is liable for damages in amounts to be proved at trial.

## VI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter a judgment for Plaintiff on this Complaint:

A.    For disallowance in its entirety of the CSFB-LLC Claims.

B.    That CSFB-LLC's Claims be subordinated for all purposes to the claims of all other creditors in the Bankruptcy Case.

C.    For a determination that:

(i) the 90 Day Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the 90 Day Transfers under 11 U.S.C. § 550,

(ii) the One Year Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the One Year Transfers under 11 U.S.C. § 550,

(iii) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 548, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550,

(iv) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 544 and applicable state law, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550, and

(v) the Transfers, or the value thereof, should be preserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

D.    Disgorgement of all fees, sums, payments to CSFB and any profits derived unjustly thereon by all the Oakwood Companies.

E.    For damages according to proof.

F.    For prejudgment interest, post judgment interest, attorneys fees, and costs as allowable by applicable law.

G.    And for such further relief as is just.

Dated: November 13, 2004
      Wilmington, Delaware

              /s/ Marla R. Eskin
              MARLA R. ESKIN (#2989)
              CAMPBELL & LEVINE, LLC
              800 N. King Street, Suite 300
              Wilmington, DE 19801

              AND
              TONY CASTANARES(CA SBN 47564)
              STEPHAN M. RAY (CA SBN 89853),
              PAMALA J. KING (CA SBN 125786), and
              MARGRETA M. SUNDELIN (CA SBN 224950),
              Members of STUTMAN, TREISTER & GLATT
              PROFESSIONAL CORPORATION
              1901 Avenue of the Stars
              12th Floor
              Los Angeles, CA 90067

              Special Counsel for the OHC Liquidation Trust

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable.

Dated: November 13, 2004
Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (#2989)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

AND

TONY CASTANARES(CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853),
PAMALA J. KING (CA SBN 125786), and
MARGRETA M. SUNDELIN (CA SBN 224950),
Members of STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Special Counsel for the OHC Liquidation Trust

# TABLE OF CONTENTS

**Page(s)**

I. JURISDICTION AND VENUE ................................................................................. 1

II. THE PARTIES ....................................................................................................... 1

    A.    Plaintiff. ........................................................................................................ 1

    B.    Defendants. ................................................................................................... 3

III. INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS
AND COUNTERCLAIMS FOR RELIEF ............................................................. 6

    A.    Brief background of the Debtors' business. ............................................... 6

    B.    The financing of retail home sales. ........................................................... 6

    C.    Funding for short-term liquidity needs. .................................................... 9

    D.    CSFB encouraged the Debtors to ramp-up the loan assumption
program. .................................................................................................. 10

        1.    Manufactured housing faced challenging market conditions. .................... 10

        2.    CSFB encouraged Debtors to aggressively use the loan
assumption program. .......................................................................... 11

        3.    CSFB provided underwriting services in connection with the
Debtors' public term securitizations from 1994 through 2002. ................. 14

        4.    Beginning in 2001, CSFB took on the added role of the
Oakwood Companies' lead lender on the warehouse facility. .................... 15

        5.    In exchange for agreeing to provide the warehouse facility,
among other things, CSFB demanded and received warrants
in the Debtors with a value just under 20%. ............................................. 17

        6.    At all relevant times, CSFB provided the Debtors with
restructuring and financial advisory services. ........................................... 18

    E.    Debtors' road to bankruptcy .................................................................... 21

    F.    CSFB's proofs of claim. ........................................................................... 22

    G.    Transfers to CSFB. ................................................................................... 23

IV. OBJECTIONS TO CSFB-LLC CLAIMS ............................................................. 25

V. COUNTERCLAIMS ............................................................................................................ 26

    FIRST COUNTERCLAIM FOR RELIEF   (Breach Of Fiduciary Duty
    Against All Defendants) ..................................................................................... 26

    SECOND COUNTERCLAIM FOR RELIEF   (Negligence Against All
    Defendants) ........................................................................................................ 28

    THIRD COUNTERCLAIM FOR RELIEF   (Unjust Enrichment Against
    All Defendants) .................................................................................................. 28

    FOURTH COUNTERCLAIM FOR RELIEF  (Equitable Subordination
    Against Defendant CSFB-LLC) ......................................................................... 29

    FIFTH COUNTERCLAIM FOR RELIEF   (Avoidance And Recovery Of
    Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All Defendants) ...................... 30

    SIXTH COUNTERCLAIM FOR RELIEF  (Avoidance and Recovery of
    Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All
    Defendants) ........................................................................................................ 31

    SEVENTH COUNTERCLAIM  (Recovery of Fraudulent Transfer,
    11 U.S.C. §§ 548 and 550 Against All Defendants) ........................................... 32

    EIGHTH COUNTERCLAIM  (Fraudulent Transfer Under 11 U.S.C. § 544
    And State Law Against All  Defendants) ............................................................ 33

    NINTH COUNTERCLAIM  (Breach of Implied and Express Contract
    Against All Defendants) ..................................................................................... 34

    TENTH COUNTERCLAIM  (Deepening Insolvency Against All
    Defendants In The Event This Is Determined To Be A Separate Claim For
    Relief Rather Than A Form Of Damages) ........................................................... 35

VI. PRAYER FOR RELIEF ................................................................................................ 36

DEMAND FOR JURY TRIAL .......................................................................................... 38

V. COUNTERCLAIMS ................................................................................................ 26

FIRST COUNTERCLAIM FOR RELIEF   (Breach Of Fiduciary Duty
Against All Defendants) ...................................................................................... 26

SECOND COUNTERCLAIM FOR RELIEF   (Negligence Against All
Defendants) ........................................................................................................ 28

THIRD COUNTERCLAIM FOR RELIEF   (Unjust Enrichment Against
All Defendants) .................................................................................................. 28

FOURTH COUNTERCLAIM FOR RELIEF   (Equitable Subordination
Against Defendant CSFB-LLC) .......................................................................... 29

FIFTH COUNTERCLAIM FOR RELIEF   (Avoidance And Recovery Of
Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All Defendants) .................... 30

SIXTH COUNTERCLAIM FOR RELIEF   (Avoidance and Recovery of
Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All
Defendants) ........................................................................................................ 31

SEVENTH COUNTERCLAIM   (Recovery of Fraudulent Transfer,
11 U.S.C. §§ 548 and 550 Against All Defendants) ............................................ 32

EIGHTH COUNTERCLAIM   (Fraudulent Transfer Under 11 U.S.C. § 544
And State Law Against All Defendants) ............................................................. 33

NINTH COUNTERCLAIM   (Breach of Implied and Express Contract
Against All Defendants) ...................................................................................... 34

TENTH COUNTERCLAIM   (Deepening Insolvency Against All
Defendants In The Event This Is Determined To Be A Separate Claim For
Relief Rather Than A Form Of Damages) ........................................................... 35

VI. PRAYER FOR RELIEF ....................................................................................... 36

DEMAND FOR JURY TRIAL .................................................................................. 38

**EXHIBIT C**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. 04-57060 (PJW) |
| v. | ) | |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF OHC LIQUIDATION TRUST'S SUPPLEMENT TO
ITS RULE 26(a)(1) INITIAL DISCLOSURES**

Plaintiff OHC Liquidation Trust ("Trust" or "Plaintiff"), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby submits the following supplement to its Rule 26(a)(1) initial disclosures to Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.) (collectively, "CSFB" or "Defendants") as follows:

## I.    INTRODUCTION

The Court, in its Memorandum Opinion entered on March 31, 2006, ordered the Trust to provide additional information regarding its preliminary damage calculations pursuant to Federal Rule of Civil Procedure 26(a)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7026. For convenience, the Trust has created the following categories for its computation of damages: (a) Preferential and Fraudulent Transfers (the Fifth, Sixth, Seventh, and Eighth Counterclaims); (b) Breach of Fiduciary Duty and Negligence (the First and Second Counterclaims); (c) Unjust Enrichment (the Third Counterclaim); (d) Breach of Implied and Express Contract (the Ninth Counterclaim); (e) Deepening Insolvency (the Tenth Counterclaim); and (f) Objection to CSFB's Claim and Equitable Subordination (the Fourth Counterclaim). Calculations of damages set forth herein are initial estimates based upon the best information currently available to the Trust

and are subject to modification. Fact discovery is still on-going in this adversary proceeding, and no depositions have taken place.  Expert discovery will follow the completion of fact discovery.  The Trust, therefore, reserves the right to amend, supplement, or modify its initial estimated damage calculations from time to time as additional information becomes available and additional analyses are performed.

The Trust either has already produced or will produce all documents in its possession, which are not privileged or protected from disclosure, on which its computation of damages is based, including material bearing on the nature and extent of damages suffered.  The Trust, however, will reproduce certain principal documents bearing on its damage calculations shortly after service of this supplement.[1]

## II.  CALCULATION OF DAMAGES

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| I. Preferential and Fraudulent Transfers | | |
| | Fifth Counterclaim (90 Day Transfers) | Subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within 90 days of the petition date (the "90 Day Transfers") as preferential transfers pursuant to section 547(b) of Title 11 of the United States Code (the |

---

[1]  There are other documents that may bear on the Trust's damage calculations.  The Trust is merely grouping together and reproducing certain material documents as a courtesy to CSFB.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | "Bankruptcy Code"), plus interest. The 90 Day Transfers, the sum of which is approximately $166,811,129.54, are described in paragraph 41 of the Trust's objection to claim and counterclaims (the "Objection/Counterclaims"). |
| | Sixth Counterclaim (One Year Transfers) | The Trust asserts that CSFB was an insider of the Debtors. Accordingly, subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within one year of the petition date (the "One Year Transfers") as preferential transfers pursuant to Bankruptcy Code section 547(b), plus interest. The One Year Transfers, the sum of which is approximately $595,845,154.45, are described in paragraph 42 of the Objection/Counterclaims.[2] |
| | Seventh Counterclaim (Fraudulent Transfers under Bankruptcy Code section 548) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB as fraudulent transfers under Bankruptcy Code section 548(a)(1)(B), plus interest. |
| | Eighth Counterclaim (Bankruptcy Code section 544(b) and Applicable State Law) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB under applicable state fraudulent transfer and/or conveyance laws, plus interest. The Trust may also be entitled to recover transfers made to CSFB more than one year prior to the petition date |

---

[2]    In paragraph 42 of the Objection/Counterclaims, the Trust listed $595,845,398.42 in transfers, which contains a minor mathematical error. The proper sum of the One Year Transfers is $595,845,154.45.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | pursuant to applicable state laws. |
| II.<br><br>Breach of Fiduciary Duty and Negligence | | |
| | First Counterclaim (Breach of Fiduciary Duty) | The Trust asserts that as a result of the multi-layered and multi-faceted relationship with the Debtors (as the lender, underwriter, powerful warrant holder, and financial/restructuring advisor), CSFB was an insider and owed the Debtors fiduciary duties. Moreover, because the Debtors were insolvent or within the zone or vicinity of insolvency up to two or more years prior to bankruptcy, CSFB owed the Debtors' creditors fiduciary duties.  CSFB had access to and knowledge of confidential and inside information.<br><br>Despite its knowledge of the Debtors' failing financial health, the Trust asserts that CSFB continued to underwrite asset-backed securitization offerings and facilitated those offerings through extensions of credit under the warehouse facility.  In addition, CSFB encouraged the Debtors' use of the Loan Assumption Program ("LAP").  CSFB acted for its own benefit, and at the detriment of the Debtors.  As a result of these and other breaches of fiduciary duties, CSFB unjustly enriched itself, and so the Trust is entitled to recover from CSFB all fees and other remuneration paid to CSFB and to recover consequential and actual damages, |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | including, but not limited to: |
| | | 1.   Fees, costs, and expenses incurred by the Debtors for the LAP. The Trust estimates that the LAP cost the Debtors approximately $56.5 million. |
| | | 2.   In order to fund the LAP, the Debtors were forced to borrow more under their credit facilities. |
| | | a.   CSFB Warehouse Facility |
| | |    i.   Fees for establishing the warehouse facility with CSFB – approximately $2.5 million. |
| | |    ii.   Approximately twenty-one payments of $416,666.67 in monthly maintenance fees to CSFB for the warehouse facility, for a total of approximately $8,750,000. |
| | |    iii. Interest payments for the warehouse facility for the period from February 2001 to the petition date – approximately $3,464,767.90. |
| | |    iv.   Other professional fees and costs incurred in connection with this facility. |
| | | b.   Servicer Advance Facility: costs of approximately $2.4 million. |
| | | 3.   Fees and Costs of Securitizations |
| | | a.   Underwriting fees paid to CSFB (for the 1999-E; 2000- A, B, C, & D; 2001- B, C, D, & E; LOTUS II, III, & IV; and 2002- A, B, & C series of securitizations): approximately $11.93 million. |
| | | b.   Fees and costs paid to various |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | professionals related to securitizations and credit facilities, including, but not limited to, fees and costs paid to Hunton & Williams; Loeb & Loeb; Rayburn Cooper & Durham; Richards Layton & Finger; Simpson Thacher & Bartlett; Sullivan & Worcester; and Wachtell, Lipton, Rosen & Katz.<br><br>c.    Fees paid to Chase Manhattan Bank (later JP Morgan Chase) as indenture trustee for REMICs: to be determined.<br><br>d.    Cost of running the Loan Origination Department for the LAP: approximately $44.2 million.<br><br>4.    The Debtors' obligations, including guarantee payments made, on account of defaults on REMICs: to be determined.<br><br>5.    Prejudgment interest. |
| | Second Counterclaim (Negligence) | Damages for this Counterclaim are substantially similar to the damages sought for breach of fiduciary duty, which are discussed above.  The same facts that support the breach of fiduciary Counterclaim may support this Counterclaim.  Nevertheless, this Counterclaim is a separate Cause of Action on which the Trust may recover damages. |
| **III.**<br><br>**Unjust Enrichment** | | |
| | Third Counterclaim (Unjust Enrichment) | For this Counterclaim, the Trust seeks restitution and disgorgement of profits from CSFB.  With respect to the restitution component, the damages sought are substantially similar to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | the damages sought for the breach of fiduciary duty and negligence Counterclaims, which are discussed above. With respect to the second component, the Trust seeks the disgorgement of profits CSFB earned by using the funds that it illicitly received from the Debtors. As a result of CSFB's refusal to respond to interrogatories or produce documents related to its profits (including collateral profits, or so-called "profits on profits"), the Trust is unable to calculate this component of damages. If the Trust prevails on its unjust enrichment claim, it may request that the Court order CSFB to disgorge its profits calculated based on the annual rate of return to CSFB's equity on a global/consolidated basis as reported in CSFB's SEC and other additional filings, compounded annually. |
| IV. Breach of Implied and Express Contract | | |
| | Ninth Counterclaim (Breach of Implied and Express Contract) | The Trust asserts that CSFB breached both its implied and express contract with the Debtors to act as their restructuring and financial advisors. The Trust alleges that CSFB breached its contractual obligations to the Debtors by, among other things, improperly prolonging the prepetition operations of the Debtors, failing to find a suitable debtor-in-possession financing and/or warehouse line prior to the petition date, failing to adequately prepare the Debtors for the bankruptcy filing, and failing to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
|  |  | adequately advise the Debtors that CSFB could not act as a restructuring and financial advisor to the Debtors once in bankruptcy as a result of CSFB's role as underwriters for the Debtors.  The Trust seeks to recover the following damages, plus interest, from CSFB: <br><br>1.    Express Contracts – approximately $1,811,129.54 paid by the Debtors to CSFB under the Financial Advisory Agreement. <br><br>2.    Excess cost of the debtor-in-possession financing ("DIP Financing"): approximately $7.8 million. <br><br>3.    Amounts paid to FTI Consulting to arrange the DIP Financing as a result of CSFB's failure: at least $323,290 pursuant to FTI Consulting's fee application.  The Debtors and/or bankruptcy estates also incurred additional fees and costs to Rayburn Cooper & Durham; Morris Nichols; Deloitte & Touche; Hunton & Williams; and Akin Gump. <br><br>4.    All other expenses of reorganization:  to be determined. <br><br>5.    Postpetition Warehouse Facility. It cost the Debtors approximately $2 million in fees to restart the warehouse facility post-petition. <br><br>6.    Implied contract damages.  The Trust asserts that well before the date of its written contract, CSFB acted as the financial advisor to the Debtors.  The damages for breaching this implied contract include consequential damages suffered by the Debtors as a result of CSFB's failure |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | to advise the Debtors to stop the asset-backed securitizations, which did not benefit the Debtors but only deepened their insolvency.  The amount sought for CSFB's breach of the implied contract is substantially similar to the damage calculation for the Tenth Counterclaim (i.e., Deepening Insolvency), which is discussed below. |
| **V.**<br><br>**Deepening Insolvency** | | |
| | Tenth Counterclaim (Deepening Insolvency) | Existing case law provides the Trust with several different methods for calculating its damages for deepening insolvency, and the Trust's expert witness has not yet concluded his analysis.  Although the Trust has not yet completed its calculation of damages for this Counterclaim, one way to measure the damages would be to calculate the amount needed to pay the Trust's constituents (i.e., the general unsecured creditors) in full, plus pre- and post-judgment interest and reimbursement of expenses.  As of the date of this supplement, the shortfall to general unsecured creditors is approximately 59% of the value of the claims against the Debtors' estates.[3] |

---

[3]  Due to active trading of claims filed in these cases and instruments issued prior to bankruptcy, the Trust believes that it is unable to provide additional information regarding the shortfall without an agreement with CSFB that: (a) the information to be provided will be covered by the Agreed Protective Order entered by the Court on October 21, 2005; and (b) CSFB will not use the information provided to engage in buying, selling, or trading of any claims and/or instruments.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| **VI.**<br><br>**Objection to Claim and Equitable Subordination** | | |
| | Objection to Claim and Fourth Counterclaim (Equitable Subordination) | The Trust seeks to disallow CSFB's claim in the amount of $3,288,391.54 (including a contingent claim asserted by CSFB) on the grounds that such amount was not due or earned, pursuant to Bankruptcy Code section 502(d), and based on the facts supporting the Counterclaims. Alternatively, the Trust seeks to subordinate CSFB's claim to the other general unsecured creditors as a result of CSFB's inequitable conduct and unfair advantage, and the damages caused to the Debtors, all as discussed above. |

Dated:  May 1, 2006
        Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

and

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
CAROL CHOW (CA SBN 169299)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the OHC
Liquidation Trust

**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| OAKWOOD HOMES CORPORATION, | . | Case No. 02-13396(PJW) |
| *et al.,* | . | Jointly Administered |
| | . | |
| Debtors. | . | Sept. 25, 2006 (11:30 a.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: Please rise.

2            THE COURT: Please be seated.  Sorry for the delay.

3            MR. MILLER: No problem.  Good afternoon, Your

4   Honor.  For the record, Curtis Miller from Morris, Nichols,

5   Arsht & Tunnell, on behalf of the OHC Liquidation Trust.

6   We're here today for the omnibus hearing in this matter.

7   Does Your Honor have a copy of the agenda?

8            THE COURT: Yes.

9            MR. MILLER: Okay.  The first six items on the

10  agenda are all continued to a future omnibus hearing, so

11  unless Your Honor has questions, we'll just move to 7.

12           THE COURT: Okay.

13           MR. MILLER: Agenda item number 7 was the motion of

14  the Liquidation Trust to extend the claims and the claims

15  objection deadline, and I understand from speaking with Your

16  Honor's clerk that you've entered that order?

17           THE COURT: Yes.

18           MR. MILLER: Okay.  Thank you, Your Honor.  Agenda

19  item number 8 is the first of two contested matters listed as

20  going forward.  Agenda item number 8 is the Liquidation

21  Trust's ninety-sixth omnibus objection to claims.  This was a

22  substantive omnibus objection and is going forward today with

23  respect to a response received from Rudolph Rambo who is also

24  in court today, Your Honor.  The Trust objected to Mr.

25  Rambo's claim on the basis of § 502(d) of the Bankruptcy

1    Code.  The Liquidation Trust filed a preference action

2    against Mr. Rambo and received a judgment against him on

3    March 28th of 2006.  As set forth in the affidavit attached to

4    the ninety-sixth omnibus objection, Mr. Rambo has not paid

5    back the avoided transfers to these estates.  Thus § 502(d)

6    of the Bankruptcy Code requires their disallowance.  Mr.

7    Rambo has raised with me a question of whether or not he

8    received adequate notice of the preference action, and I just

9    wanted to briefly go through that with Your Honor to

10   establish a record.  First, the complaint and the summons

11   were served to Mr. Rambo at the same address at which the

12   Trust served the ninety-sixth omnibus objection, thus, the

13   Trust admits that if he was able to respond to the ninety-

14   sixth omnibus objection, he also received adequate notice of

15   the complaint and summons.  Despite this notice, Your Honor,

16   Mr. Rambo never complied with the ADR requirements that were

17   entered.  He never responded to the Liquidation Trust

18   discovery requests, and he never responded to the Trust's

19   request for entry of default judgment.  In addition, Mr.

20   Rambo's attorney, an attorney by the name of John Ethridge,

21   sent various letters to the Trust's former counsel

22   demonstrating that he did actually have notice of the

23   preference action, and I have copies of those letters.

24           THE COURT: Was an answer filed?

25           MR. MILLER: No answer was ever filed, and that's

1    why a default judgment was eventually entered.  And I have

2    copies of those letters from his counsel, if you would like

3    to see those, Your Honor.

4              THE COURT: Yes, let me see them.

5              MR. MILLER: May I approach?

6              THE COURT: Yes.

7              MR. MILLER: The first three letters are from Mr.

8    John Ethridge from the Gardner Law Firm in Florence, South

9    Carolina, and the letters are dated October 21, December 3rd,

10   and December 28th of 2004.  The fourth letter in that packet,

11   Your Honor, is a letter from King & Spalding, the Liquidation

12   Trust's former counsel that was handling the preference

13   actions and was sent to both Mr. Ethridge and Mr. Rambo

14   letting them know that he was in default by failing to

15   respond to the complaint or file and otherwise respond to the

16   pleading, and that was sent on December 31 of 2005.  Despite

17   these notices, he never answered the complaint, never filed -

18             THE COURT: I'm sorry, when was the complaint filed?

19             MR. MILLER: The complaint was filed on November

20   12th, 2004.

21             THE COURT: Let's see.  I'm looking at the first

22   letter.

23             MR. MILLER: Yes, Your Honor.

24             THE COURT: Was this in response to a demand letter?

25             MR. MILLER: I believe so, Your Honor.  Our firm was

1    not handling the preference actions, but I was forwarded

2    these by counsel that was.

3            THE COURT: Okay.

4            MR. MILLER: And just a final note, Your Honor, the

5    order that's previously been entered for other claims that

6    were disallowed pursuant to § 502(d) provides a mechanism for

7    the reinstatement of the claims if Mr. Rambo subsequently

8    pays back the ordered transfers, and that's the same order,

9    the proposed order that we have here.

10           THE COURT: Okay, and how much was the judgment for?

11           MR. MILLER: I believe it was in the range of

12    $164,000, but I'm not sure if I have it with me.  I don't

13    think I brought a copy of the complaint, but I think it was

14    around $164,000, Your Honor.

15           THE COURT: Okay, and what is this claim?

16           MR. MILLER: There are two proofs of claims -

17           THE COURT: Okay, I see them.

18           MR. MILLER:  - that he filed.  I think there's only

19    actually one that's in the agenda binder.  I have the second

20    one if you'd like to see it.  The claims are 3868 and 3869,

21    and I can bring up the second one if you'd like to see it,

22    Your Honor.

23           THE COURT: Okay.  Okay.  I already have 3868 in the

24    book, and then there's a smaller one; isn't there?

25           MR. MILLER: Yes, I -

1              THE COURT: Okay, I see both of them.

2              MR. MILLER: 3869 is the -

3              THE COURT: I see both of them, the other one for

4    3,165.

5              MR. MILLER: Yes, Your Honor.

6              THE COURT: Okay.  And that's essentially it from

7    the Trust.  Mr. Rambo, I believe, would like to make some

8    comments to the Court.

9              THE COURT: Mr Rambo?

10             MR. RAMBO: Yes, Your Honor.

11             THE COURT: Do you wish to be heard?

12             MR. RAMBO: Yes, sir if you don't mind.

13             THE COURT: Yes.

14             MR. RAMBO: How are you doing this morning?  All

15   right, Your Honor, as you can see, they put a judgment

16   against me, to start with.  I'm just a little uncomfortable

17   because I don't know too much about all this, and my lawyer,

18   he's a good friend of mine.  He's a criminal lawyer, so he

19   don't know too much about it, but he's just doing it to help

20   me out is all he can.  As you see, with the first three

21   pages, of these here letters that we've been writing, we've

22   been pleading with Spalding to help us out, but the matters,

23   you know, before all this judgment stuff come about, and if

24   you'll read the letters, you'll see how hard that we was

25   trying to work with these people, trying to get them to, you

1    know, help us out, and all of a sudden, they send us this

2    paper, and that was the end of it.  We didn't know how to

3    respond to this line.  My lawyer said we didn't receive this

4    here, but, you know, they got it here, so undoubtedly we must

5    have got it somewhere, and it got mixed up or lost.  But we

6    still don't know for this here.  They filed a judgment on for

7    $164,000, that's for the last 90 days prior to them filing

8    for bankruptcy.  But they hadn't paid me for the following 45

9    days.  You know, I worked strictly labor for them.  I worked

10   in them hot mobile homes trashing them out, fixing them back

11   up, you know, degree weather, you know 120, 140 degrees.  Oh

12   my gosh, they're small people.  They work by the hour, and

13   the only thing was, we just worked, you know, strictly labor,

14   and for them to try to do us - I talked to a lady named Betty

15   Jones that was handling this thing, and she told me the only

16   way I could get out of this right here is to give her the

17   social security numbers, the addresses, and the names of my

18   employees so she could file a judgment on them.  Well, where

19   I come from, we don't do things like that.  I'm responsible

20   for my guys that work for me.  Therefore, owe was responsible

21   for me.  That's the way my granny always told me, an honest

22   dollar for an honest hour, and that's the way we always done

23   it with them.  I don't see it right, you know, for them

24   putting a judgment on me for $164,000 because it will take

25   20 years for me to pay that off.  I work by the hour, you

1    know, and that's just the way it is, and they owe me $72,000

2    - well, minus the little over 10,000 they've already paid me,

3    you know, over the last four years, and this is just not

4    right, and my lawyer told me I'm at the mercy of your

5    judgment, whatever you want to do to me that's what we have

6    to live with, but right's right, and wrong's wrong, and what

7    they're trying to do to me is wrong.

8          THE COURT: Well, you were represented by counsel,

9    and counsel was certainly put on notice that if they didn't

10   respond default judgment would be entered.

11         MR. RAMBO: He does have a phone number for you to

12   call in -

13         THE COURT: Pardon?

14         MR. RAMBO: He can be reached right now where he

15   says he doesn't have a copy of this default letter in the

16   file at all.

17         THE COURT: Well, but he certainly had knowledge of

18   the claim being asserted and - let me just look at the second

19   letter.

20         MR. RAMBO: Yes, sir, if you're reading it, it's

21   like we're trying to ask for all the help we can get, and

22   they don't want to help us because we wrote them three

23   different times, and they never wrote us back, and then all

24   of a sudden we get this here default letter thing.  We still

25   don't know what to do with it, you know, we're still a shot

1  in the dark here.

2          THE COURT: Well, I'm looking at the December 3

3  letter which was after the November 12 complaint was filed.

4  So, I have to assume that your counsel received that

5  complaint, and the address is on all the - all the letters

6  are consistent with your attorney having knowledge -

7          MR. RAMBO: Yeah, just my attorney's, mine it's not.

8          THE COURT: Pardon?

9          MR. RAMBO: I said, my address was not correct on

10  here, and they do know my correct one because they sent it to

11  my post office box all the time.  Well, the only thing I'm

12  telling you, Your Honor, we tried to talk - even after I left

13  from here, I even tried to contact the people.  I went

14  through his office to start with, I do believe.  I talked to

15  the guys that was up here.  I can't exactly remember the name

16  because I didn't write them down, for some reason, but none

17  of them wants to help us out whatsoever, at all.  You know,

18  they told me, don't do nothing here, the last time I was

19  here.  Don't say nothing or anything, we'll just get it

20  postponed.  Here I am again.  I'm 600 miles from home, still

21  don't know what I'm doing.  My lawyer don't even know what

22  we're doing here.  All in fact we want -

23          THE COURT: It's your lawyer's responsibility to

24  know what's going on.

25          MR. RAMBO: He's just a good friend.  He's not

1    getting paid.  He's doing it for me free because I can't

2    afford an attorney, and the guys up here at Delaware that

3    called me and they said, for the $164,000 judgment, that they

4    got on me, which is incorrect to start with, because they

5    don't - I didn't receive $164,000 in three months from them.

6    That's only in 45 days, you know, if you count the time -

7    unless they're counting the money they owed me too, you know,

8    against it, but it's not money they paid me for the 90 days,

9    because that's incorrect.  If you see their record you'd find

10   that out because I only made - in the last 90 days I worked

11   for him, Your Honor, I think I cleared about $100,000 - Well,

12   I didn't clear it, but that's what we turn, plus what they

13   owed us, but I had to pay off all my guys, and I went

14   bankrupt myself, you know, but I didn't file bankruptcy.  I

15   just went out of business, and I'm out of business.  So,

16   therefore, them putting a judgment on me and me worrying

17   about our, that means I can't own nothing the rest of my life

18   for my three kids or nothing, for my wife, or anything.  This

19   is just wrong.  Please just help me, that's all I ask.

20        THE COURT: Yeah, I can't help you out.  Your lawyer

21   was on notice and a default judgment was entered.

22        MR. RAMBO: We didn't never see this default

23   judgment, Your Honor.  We wrote these letters, and they never

24   responded o none of them.  If not for that one little old

25   lady, and she just told me how I was.  The only way for me to

1  get out of this here is to give her the names and numbers of

2  all the guys that worked for me, and they'll file a judgment

3  against them, and I couldn't do that.  Because those guys

4  have got families too.  This is not humanly right.  You know,

5  we slaved for Oakwood.  You know I didn't go to Oakwood

6  asking them for a job.  They tracked me down for three weeks

7  to ask me to do this, to help them out.  They asked me to do

8  everything for them, and I did, and the last 30 days prior to

9  them filing bankruptcy, this was the notice I got for me.

10  Rambo, something's coming up, within 30 days.  We need every

11  house we got in the field finished up.   Please work as hard

12  as you can and get it done.  My guys worked anywhere from 12

13  to 16 hours a day in this hot, heat and cold where they was

14  at.  This is not right, you know, and I don't know why people

15  think it is, but it's not.  You know, this is ridiculous.

16  You know, I can understand not paying me my money that you

17  owed me, for them not paying money they owed me.  Don't go

18  back and try to get me to pay them something that I don't owe

19  them, that I earned, hard.  I didn't show up for pay before.

20  I worked and I sweated and I froze my butt off for it, that's

21  all there is to it.  I just ask for mercy.

22          THE COURT: Okay, well, I'm sorry.  I can't help you

23  out.  You were represented by counsel, and -

24          MR. RAMBO: Well, would you mind calling him?

25          THE COURT: Pardon?

1          MR. RAMBO: You can reach him by phone.  He'll show

2    you there's nothing, we never did get this default paper.

3    Notice of default.  I got 16 stacks of paper, this here high,

4    where they sent me, and I've looked through every one of

5    them, and it's not in them.  I mean, literally, stacks and

6    stacks of paper.  And I've saved everyone of them.

7          THE COURT: Okay.  The only comment I can add, Mr.

8    Rambo, is that in bankruptcies, a lot of people get hurt,

9    including a lot of small businesses.

10         MR. RAMBO: So, it's all right for them to come back

11   on me like that?  I can understand not paying me the money

12   they owe me, which is small compared to what they want.  They

13   want $164,000, which is not correct.  I'm telling you, Your

14   Honor, it's not correct.  If they want to call it even

15   straight right now, I done took my lick, I done wrote mine

16   off.  I know I'll never get it, but don't go after me and my

17   future for my family just because it's not right.

18         THE COURT: Okay. The only thing I can suggest to

19   you is maybe you ought to file a motion to lift the default

20   judgment and to reconsider your case on the merits.

21         MR. RAMBO: How do I do that?

22         THE COURT: You'll have to consult with a lawyer to

23   file that.

24         MR. RAMBO: So I have to come to Delaware lawyer for

25   this here.

1          THE COURT: Not necessarily.

2          MR. RAMBO: So, just tell them I want to file it,

3    well, it's already put against me.

4          THE COURT: Well, you're going to need legal advise

5    to do what I'm suggesting you do.

6          MR. RAMBO: Okay, Your Honor.

7          MR. MILLER: Your Honor, I have a proposed order, if

8    I may approach?

9          THE COURT: Yes.

10          MR. MILLER: Your Honor, the next item on the agenda

11    -

12          THE COURT: Let me hand these documents back to you.

13          MR. MILLER: Sure.

14          MR. RAMBO: Excuse me, Your Honor, can I say one

15    more thing . . . (microphone not recording).  That's also

16    part of this too?  So they're going to expunge what they owed

17    me and then I still got to turn around . . . right?

18          THE COURT: If you file an application to have the

19    default judgment vacated and if you have a meritorious

20    defense, and I allow you to make that defense, then that

21    judgment will be vacated or dismissed and that will also

22    trigger a reinstatement of your proof of claim.  I don't know

23    what other objection they would have to your claim, but that

24    issue would also come back for reconsideration.  Yes.

25          MR. MILLER: Thank you, Your Honor.  And just for

1    the record, the order, the proposed order for the ninety-

2    eighth omnibus objection does provide for a reinstatement of

3    the claim.  It set certain time provisions on the

4    reinstatement so that the Trust can continue to try to wind

5    down the estate.

6            THE COURT: Okay.  Well, make sure Mr. Rambo gets a

7    copy of this order.

8            MR. MILLER: I will, Your Honor.  Thank you.

9            THE COURT: Okay.

10           MR. MILLER: The next agenda item is the ninety-

11   eighth omnibus objection, this is agenda item number 9.  This

12   was a non-substantive claims objection.  The Liquidation

13   Trust received three responses to this omnibus objection, one

14   of which is going forward, and this is a response - It's

15   listed as response (a) from a Michael Asby.  The Trust

16   objected to his claims being late filed, and the debtors did

17   provide Mr. Asby with actual notice of the claims bar date,

18   and I have an affidavit from the claims agent, BSI -

19           THE COURT: I'm sorry, when was the bar date?

20           MR. MILLER: The bar date was January 7 of 2003,

21   Your Honor, and this claim was filed on June 5 of 2006, over

22   three years past the claims bar date.

23           THE COURT: And you say actual notice was served on

24   this?

25           MR. MILLER: Yes, Your Honor, and I have an

1    affidavit for you if you'd like to see it.

2              THE COURT: Yes.

3              MR. MILLER: May I approach?

4              THE COURT: Yes.

5              MR. MILLER: It 's the affidavit of Cathy Gerber of

6    Bankruptcy Services, LLC, and I've highlighted the page for

7    you, Your Honor.  I also spoke with -

8              THE COURT: Let me ask you a question.

9              MR. MILLER: Sure.

10             THE COURT: The bar date notice was sent out

11   February 12 of '03, and looking at the claimant's response,

12   it appears that he didn't notice the problems until October

13   of '05.  Why would you have him on the mailing list in

14   January of '03?

15             MR. MILLER: I'm not exactly sure of the reason why

16   he was on the original claims or on the bar date notice

17   mailing list, but he did also file a prior proof of claim,

18   and he filed that claim on March 13th of '03, and that claim

19   was disallowed pursuant to another order, Your Honor, not on

20   the basis of late filed but on a substantive claim objection.

21             THE COURT: Okay, that was filed when?

22             MR. MILLER: March 13th of 2003, Your Honor.

23             THE COURT: Of '03?

24             MR. MILLER: Of '03.

25             THE COURT: I gather it was for a different amount.

1          MR. MILLER: It was.  But the Trust admits that that

2   clearly shows that he had notice of the bar date.

3          THE COURT: And what was the basis for disallowing

4   the first proof of claim?

5          MR. MILLER: The first proof of claim was - the

6   asserted basis on the proof of claim was that the interest

7   rate that he was being charged was not the correct interest

8   rate amount, and there was an allegation that the loan

9   documents were forged.  It was settled, essentially, out of

10  court, and pursuant to that, he agreed to withdraw the claim

11  or just let the Trust move on with the objection, which is

12  what happened.  The basis -

13         THE COURT: I'm sorry, when was the settlement

14  reached regarding the first proof of claim?

15         MR. MILLER: It would have been right around March

16  13th of '03, Your Honor.  I didn't handle it, and that was

17  based on looking at the omnibus objection.  It essentially

18  said that the claim had been settled out of court, and that

19  was the basis for it.  Unfortunately, I didn't bring a copy

20  of the order which had the claims that were disallowed on it.

21         THE COURT: But in opposition, he indicates that he

22  first discovered this problem in October of '05.

23         MR. MILLER: Yes, Your Honor.

24         THE COURT: Which obviously he didn't have a claim

25  until October of '05, and the bar date had long since passed.

1          MR. MILLER: Well, that is what he says in his

2    response, Your Honor.  My understanding is that he filed a

3    claim against his insurance company for water damage.  His

4    insurance company came out, inspected it, and said it was a

5    manufacturer's defect.  Because of that, his claim was

6    denied, I believe it was American Bankers, and then he filed

7    this proof of claim.  I discussed it with him.  I think he

8    purchased the home in 1997, and so he's asserting a warranty

9    claim against Oakwood for a home that he purchased in '97.

10   My understanding is Oakwood never gave a manufacturer's

11   warranty longer than one year, so he wouldn't have a

12   manufacturer's warranty claim anyways, and I discussed both

13   this and the fact that it was late filed with him and told

14   him he could appear by phone, and I don't believe he did

15   choose to be on the phone today.

16         THE COURT: Okay, so you say there was only a one-

17   year warranty on this?

18         MR. MILLER: I believe the manufacturer's actual

19   warranty was only one year.  Sometimes the independent third

20   party retailers would give longer warranties, maybe like a

21   five-year warranty or something like that, but the

22   manufacturer themselves gave one-year warranties on the

23   homes.

24         THE COURT: Okay, well, I think the - I don't think

25   this claim should be disallowed as time barred.  I think, if

1    anything, it should be disallowed on the basis of no

2    liability.

3            MR. MILLER: Well, the Trust is more than willing to

4    file a second objection to the claim on the basis of no

5    warranty.

6            THE COURT: Why don't you do that.

7            MR. MILLER: Okay.

8            THE COURT: And then you can spell it out in writing

9    to the claimant.

10           MR. MILLER: Yes, Your Honor.

11           THE COURT: Okay.

12           MR. MILLER: The last item on the agenda is a status

13   conference in the adversary proceeding with OHC Liquidation

14   Trust versus Credit Suisse First Boston, and this matter is

15   being handled by Marla Eskin for the Trust, and so I'll just

16   hand this over to her, Your Honor.

17           THE COURT: Okay.

18           MS. ESKIN: Good morning, Your Honor.  Marla Eskin,

19   Campbell & Levin for OHC Liquidation Trust.  This matter will

20   be handled by Tony Castanaris.  He has already been admitted

21   *pro hac vice* to the Court.

22           THE COURT: Okay.

23           MR. CASTANARIS: Good morning, Your Honor.  I am

24   Tony Castanaris of Stutman, Treister & Glatt for the OHC

25   Liquidation Trust, and, Your Honor, my associate Whitmon Holt

1    who is a recent admittee to the bar happened to be in the

2    neighborhood on another matter and came to court this

3    morning.  It's my pleasure to introduce him to the Court this

4    morning.

5              THE COURT: Okay.

6              MR. CASTANARIS: Thank you, Your Honor.  Your Honor,

7    we have - I think counsel for Credit Suisse should probably

8    appear as well.

9              MR. OSNATO: Good morning, Your Honor.  Michael

10   Osnato from Linklakers on behalf of Credit Suisse.

11             THE COURT: Okay.

12             MR. CASTANARIS: Has Your Honor had an opportunity

13   to review our joint status report?

14             THE COURT: Yes, I did, briefly.

15             MR. CASTANARIS: And, Your Honor, I think we are

16   pleased to report that we've resolved most of the matters

17   that - the discovery disputes before now.

18             THE COURT: So I can get rid of 50 pounds of paper.

19             MR. CASTANARIS: You're going to get rid of 50 -

20             MR. OSNATO: You can recycle that.

21             MR. CASTANARIS: - and I think you've got a few that

22   - We tried to summarize the one remaining dispute in our

23   joint submissions that are Exhibits A and B, and aside from

24   those matters, I don't know how Your Honor would like us to

25   address those, if at all, this morning, but aside from those

1    matters there are two other matters that we would like the

2    Court's guidance on.  As Your Honor may see from the joint

3    statement, we have agreed to additional schedule, if it's

4    agreeable to the Court, through the briefing of dispositive

5    motions in the case.  We, on behalf of the Trust, would like,

6    if it's possible, to get additional schedule of pretrial and

7    trial, if it's convenient to the Court.  I'm prepared to

8    address the reasons for that, if the Court would like.  The

9    defendant would prefer to defer that matter till later, and

10   then there's one other issue regarding the number of

11   depositions, which I think we're very close to agreement on.

12   I would like to address that very, very briefly.  I think

13   probably counsel would like to address it as well, and I

14   think that it's not a matter that's been the subject of a

15   discovery dispute, but we raised it because we didn't want to

16   come here to Your Honor and tell you we resolved everything

17   and then find out we had another dispute later and have to

18   file another motion, and I believe that if the Court gives us

19   a few words of guidance, it will help us reach an actual

20   agreement on the matter rather than having a dispute.

21            THE COURT: Okay.  So you want more depositions?

22            MR. CASTANARIS: Your Honor, I don't know - It's

23   confusing to us whether the FRCP rule limiting depositions to

24   10 applies in the Bankruptcy Court in Delaware or not.  By

25   District Court Local Rule it doesn't apply at all.  It's

1    unclear to us whether it applies here.  We are in the

2    following position:  We are considering taking a few

3    depositions.  We have taken four, and I believe the defense

4    has taken two at this point -

5         MR. OSNATO: Two.

6         MR. CASTANARIS:  - and has two more scheduled for -

7    one more scheduled this week and then two more scheduled in a

8    couple of weeks.  We are looking at about, something between

9    four and six additional depositions of the defendant and

10   probably something like three or four potentially of third

11   parties.  So, we're looking at probably 13 or 14.  I'm not

12   quite sure what the defense plans.  I raised this with the

13   defense because I thought it might possibly become a subject

14   of dispute and we'd try to resolve it, and we've gotten this

15   far with it, Your Honor.  We ask that we just agree that we

16   be able to take a maximum of 15 each.  I don't think, if

17   there's an agreement to that, that I'm going to use them, but

18   just would avoid the need to come back here if there's a

19   dispute.  The defense has agreed to let us take 12 and then

20   if there's anything else, to address it on a case-by-case

21   basis.  My dissatisfaction with that is, I don't think any

22   lawyer wants to be in a position of having to ask the other

23   side for permission to take a deposition or to explain why,

24   and I think in good faith, Your Honor, we've resolved almost

25   everything, and I don't think that we're going to have any

1    bad faith on anybody's side, and I think we have a very good

2    relationship at this point.  I don't intend to take any

3    depositions I don't need to take, but I don't want to have to

4    come back here with a dispute about it, so I would ask for

5    the latitude within 15.  I don't think I'll use them all, and

6    if the Court would give us some guidance on this, I think we

7    will resolve it ourselves.

8             MR. OSNATO: And, Your Honor, to provide some

9    context to what Mr. Castanaris has put forth.  The reason why

10   we have settled on 12, Your Honor, is although this is a

11   complex case, admittedly, the cast of characters in this case

12   is relatively small, and our concern is that if the number

13   sets at 15, Your Honor, inexorably that will be the number of

14   depositions taken when it's not necessary.  So we propose to

15   go above the ten limit, give them two additional depositions,

16   and, Your Honor, we fully would entertain any request in good

17   faith for depositions beyond 12, but we would prefer to have

18   a firm cap so that between now and November 30th, which is

19   when fact discovery is closed, the parties focus on discovery

20   at hand, conduct very focused depositions, and move on into

21   expert discovery.  That, Your Honor, is the basis for our

22   willingness to settle at 12.

23             MR. CASTANARIS: Your Honor, I only say in response

24   that if you told me that the ten deposition rule doesn't

25   apply at all because of the local rules, or you said you can

1    take a thousand if you want to, Mr. Castanaris.  I'm only

2    probably going to take 12 or 13 or 14, but I can't be certain

3    today whether it is 12 or 13 or 14, and I just don't want to

4    have to come back here with that, Judge.  I'm not going to

5    take any depositions I don't think I need to take, but I must

6    say, Your Honor, within my office, it's under discussion

7    right now of what additional depositions we need to take.  We

8    really haven't come to a final conclusion on it.  I just

9    don't want to have to come back to Your Honor with a motion.

10   That's where we are.

11        THE COURT: Well, there's not much difference

12   between 12 and 15.  So I'll allow 15, but with the

13   observation that I would hope that to the extent you're

14   taking needless depositions, your client would step in and

15   say, What are you doing?

16        MR. CASTANARIS: I think that's clear, Your Honor.

17   We have a very active client in the case, and I think that

18   that would occur.

19        THE COURT: Okay.

20        MR. CASTANARIS: That leaves us then with the other

21   two matters, Your Honor.  The one that we provided the two

22   four-page submissions on and the issue of what additional

23   scheduling should occur.

24        THE COURT: Okay, let me hear from you briefly on

25   the remaining issue that you summarized.

1           MR. CASTANARIS: All right, Your Honor.  I think

2    I'll go first.  The issue, Your Honor, is our attempt to take

3    some discovery on affirmative defenses provided by defendant,

4    and I want to focus - there are a lot of affirmative

5    defenses, but I want to focus and our submission basically

6    focuses on specific ones because a number of them are really

7    sort of legal defenses, and a number of them are basically

8    denials of insolvencies.

9           THE COURT: Are there any affirmative defenses that

10   were not asserted?

11          MR. CASTANARIS: I'm not certain, Your Honor.

12          THE COURT: I mean, in the universe of affirmative

13   defenses?

14          MR. CASTANARIS: Well, I mean, there's no

15   contributory negligence or no assumption of risk, but on the

16   other hand - okay.  I mean there are some affirmative

17   defenses that do exist, but I think Your Honor's observation

18   implicitly shows that some of these may be kitchen sink sort

19   of affirmative defenses, and I think all lawyers have thrown

20   in waiver, estoppel, and latches in answers, and if there's -

21   I think one of two things is true.  Either there is substance

22   behind these allegations or there is not, and if there's not,

23   then I think the defendant should say so forthrightly.  If

24   there is any substance behind them, for example, if somebody

25   said at some point, we waived these claims or did something

1    that would constitute an implicit waiver of these claims, all

2    I really want to know is what it is they're claiming it was

3    so I can go take discovery on it, and I think what their

4    position is, is they're not going to tell us that until all

5    fact discovery is closed and all expert discovery is closed,

6    and therefore, I'm never going to take discovery on it.  So

7    if somebody claims to have heard, for example, the trustee of

8    my trust, or an officer of Oakwood say, We waive these

9    claims, some of these claims we've heard that said, I'm never

10   going to know who it was.  Or if somebody claims that - if

11   they claim that by reason of estoppel, they acted in

12   detrimental reliance and were damaged by it, I'm never going

13   to know what that detrimental reliance was or who claims to

14   know about it until after discovery, and I simply think that

15   the rule - the spirit of the rules is that one takes

16   discovery of claims and defenses during the discovery period

17   and not after discovery is closed, and it applies as much to

18   claims as defenses, and to me it's just as much as if we had

19   alleged in this case that they trespassed upon land, and they

20   have now asked us what land, who committed the trespass, and

21   when did it happen, and we said, we're not going to tell you

22   until discovery is closed.  I don't think that's the way

23   discovery is supposed to work.  They have put up a big

24   strawman that we're asking them to supplement this every five

25   minutes.  We have never asked them to supplement it.  All I

1    really want to know is, what they now know so that I can take

2    discovery on it.  That is essentially our position on this

3    dispute, and it applies, really, to waiver, estoppel,

4    latches, and the 547©) defenses that speak, for example, of,

5    to the extent that they have knowledge of their own ordinary

6    course of business, they should have that knowledge now, and

7    I want to know who it is at their place of business, if we

8    dispute it, that I can take that deposition or I can find out

9    what documents support it.  Whatever they know about it now,

10   they don't tell us, but they should know something about it

11   now if they pled it.  Thank you, Your Honor.

12           THE COURT: Okay.

13           MR. OSNATO: Your Honor, at the risk of stating the

14   obvious, this is not a complicated issue, and if I may, just

15   take a step back, the motion before the Court that this issue

16   pertains to does not go to these four affirmative defenses

17   alone.  It goes to a contention interrogatory that says to

18   defendants, Marshal all of the facts that underpin your

19   affirmative defenses and tell us what they are.  And in

20   conjunction with that, give us a 30(b)(6) deponent, a fact

21   witness that you will prepare as to all of the legal

22   arguments that underpin it, narrow the facts, and also give

23   us that witness.  So the reason why we objected is because we

24   thought that was extraordinarily burdensome and a duplicative

25   way to proceed, and instead, consistent with the cases in

1    this Circuit and in fact leading treatises, we said, There

2    will be no surprises here.  The parties know what the claims

3    are and they know what the defenses are.  They're perfectly

4    capable of going out and conducting discovery.  They've done

5    that, and if there are particular claims or defenses that

6    either party is concerned about, they have the wherewithal to

7    make targeted requests or ask specific questions in

8    depositions, Your Honor.  Now, if we can, and I'm pleased

9    that the dispute has crystalized around these three - or

10   excuse me, four defenses.  We can talk for a moment about

11   them.  I think that there's a fundamental disconnect here,

12   Your Honor, between how affirmative defenses get pleaded and

13   therefore proven or not proven in the course of discovery.

14   Our job as defendants is to look at the claims in the

15   complaint and make an informed assessment about what we think

16   discovery could yield and then to go out and attempt to gain

17   facts to either support or not support those defenses.  We do

18   that for a couple of reasons, chief among them, Your Honor,

19   is the notion of waiver.  If at some point in this case we

20   learn that someone from Oakwood waived this claim, we would

21   have done our client a great disservice by not having put it

22   in as an affirmative defense, and to draw an analogy, Your

23   Honor, to claims.  When Your Honor decided the motion to

24   dismiss in this claim Your Honor rightfully cited notice

25   pleading.  It's enough to put the other party on notice of

1     your claims so they can go and conduct discovery, and as to

2     these four affirmative defenses, we're not stonewalling, Your

3     Honor.  We're happy to entertain discovery requests that go

4     to these issues.  If counsel is concerned that the chief

5     executive officer of Oakwood waived the right to one of my

6     client's employees, there's nothing that constrains him from

7     in a deposition saying, Did anyone from Oakwood ever waive a

8     right?  If not, cross it off and you move onto the next

9     witness.  The reason, Your Honor, why we think what we're

10    proposing is fair and that is to answer consolidated mutual

11    contention interrogatories at the close of discovery is, it's

12    sensible and efficient, and importantly, Your Honor, the

13    parties in this case have an agreement that if this case

14    proceeds to trial, no witness will be put on by either side

15    unless the adversary has an opportunity at pretrial to depose

16    them.  So there's not a package of affirmative defenses that

17    we're keeping off to the side to spring on them at trial.  At

18    trial every witness will have had the opportunity to be

19    deposed, and if there are particular questions about

20    defenses, we will gladly let plaintiff's counsel inquire into

21    them.  Finally, Your Honor, if I could just speak to the

22    ordinary course issue.  Discovery on that point is underway.

23    We've produced a massive amount of documentation that goes to

24    payment terms in the course of dealing between the parties.

25    The reason why we hesitate at answering a contention

1   interrogatory at this point, Your Honor, is really twofold:

2   (A) we anticipate that we may use experts to help establish

3   that defense in a particular industry standard.  We can't

4   answer an interrogatory on that point because that discovery

5   is many months away, and to the extent we put a witness on at

6   trial who will speak to ordinary course, they will have had

7   the opportunity to have deposed that individual, and we will

8   tell them in advance -

9          THE COURT: Well, in response to that interrogatory

10  on ordinary course, I think an appropriate response would be,

11  We're going to retain an expert who will testify to these

12  facts.

13         MR. OSNATO: Couldn't agree more, Your Honor.

14         THE COURT: At some point we'll identify that

15  expert, show you his report, and you can depose him.

16         MR. OSNATO: Could not agree more, Your Honor, and

17  ultimately where we end up is, the parties should go through

18  comprehensive and fair discovery, both fact and expert, and

19  at some point, well in advance of trial, 60 days, 90 days,

20  120 days, exchange comprehensive mutual contention

21  interrogatories that say, List all the facts that you intend

22  to prove at trial as to each claim or defense.  At that

23  point, Your Honor, if in good faith we conclude the record

24  has not yielded evidence of latches, of course, we're going

25  to withdraw that claim.  We're merely pleading those

1    affirmative defenses because we think, in good faith, the
2    record could yield something to support them, and if we don't
3    we waive them.  So, Your Honor, our proposal is that the
4    parties mutually respond at some date in advance of trial
5    rather than do it now, and I do appreciate counsel's point
6    about not wanting us to supplement our responses, but the
7    federal rules require us to do so, and so if we begin the
8    process now, it becomes an endless loop where after every
9    depositions we have to consider, Did someone say something
10   that spoke to *in pari delicto*, yes, we need to supplement.
11   So, we'd rather defer it and do it in a consolidated uniform
12   way, Your Honor.  Thank you.
13            MR. CASTANARIS: May I respond very briefly, Your
14   Honor?
15            THE COURT: Yes.
16            MR. CASTANARIS: First, Your Honor, I want to dispel
17   any sense that we have been imposing some sort of cumulative
18   discovery.  We attempted to do this by sending out an
19   interrogatory to try to find out what the facts were and who
20   the witnesses were to the alleged waiver, or what the facts
21   were or who the witnesses were to their alleged detrimental
22   reliance, or what the facts were or who the witnesses were to
23   whatever their own records show on ordinary course, not
24   industry standards generally which may be the subject of
25   expert testimony, but their own records.  They refused to

1     answer that on the ground that it was contention

2     interrogatory.  Then, we sent out an 30(b)(6) to try to find

3     out what those were.  They refused to produce a witness on a

4     30(b)(6) or to move for a protective order, which is the

5     appropriate procedure, on the ground that that was a waiver -

6     an end-run around their contention interrogatory and said,

7     Ask our witnesses.  When we attempted to ask their witnesses,

8     they instructed the witness not to answer on the ground that

9     that was an end-run around their contention interrogatory.

10    Second point, I'd like.  So all we really want is one method

11    of finding out what these alleged facts are if in fact there

12    are any.  Secondly, Your Honor, we have not demanded that

13    they endlessly supplement the answer to interrogatory every

14    time there is a deposition taken.  If there's a deposition

15    taken, we're going to be there, and we're going to know those

16    facts.  In fact, we have said in numerous meet and confers

17    and in writing, what we want to know is what you now know;

18    okay?  And I have never known a party to be excused from the

19    obligation to make discovery if it exists simply because

20    there's also an obligation to supplement it.  If they give us

21    a 30(b)(6) witness, they don't have any obligation at all to

22    supplement what a 30(b)(6) witness says.  But if somebody

23    once said or did something that constituted a waiver, I just

24    want to know about it now while I can still take discovery on

25    it and not after my experts can't look at it, the time has

1   already run, my experts have prepared their report and been

2   deposed, and then they tell us about it.  And I don't think,

3   really, I don't want to agree to some procedure where we

4   exchange these lengthy interrogatories after the close of the

5   discovery period.  It doesn't solve this problem, and it's a

6   whole different issue altogether, which I think we ought to

7   address if, as, and when we get to it.  But I do think that a

8   party has an obligation to make discovery on affirmative

9   defenses because of the third point I want to raise.  By the

10  very same logic that they say, Well, we have an obligation to

11  our client to raise these things because something here might

12  constitute a waiver or an estoppel or latches.  Can't I make

13  the same argument, Your Honor, and say that I have the

14  obligation to allege trespass to land because something here

15  might constitute trespass to land?  And then when they ask

16  me, What are you talking about?  What land did they trespass

17  on?  Who did it?  Who saw it?  When did it happen?  I say,

18  No, no, those are contention interrogatories, and I'm not

19  going to tell you until discovery is over, and you'll never

20  get to take discovery on it.  That's really where we are

21  right now, and I think that the federal rules have the same

22  obligations to parties for defenses that they have to

23  affirmative claims.  And if there are any facts that underlie

24  these asserted defenses, they should be made known to us now

25  so that we can take discovery on them in a timely way.  Thank

1    you, Your Honor.

2              THE COURT: Okay, I'm going to allow the plaintiff

3    to proceed with the contention interrogatories.  I don't

4    accept the argument of the defendant that substantially all

5    the discovery has to be completed and then you back up and

6    talk about affirmative defenses.  I don't think that's what

7    the federal rules suggest, but I do believe that the better

8    way to proceed is for the plaintiff to take 30(b)(6)

9    depositions first and that may enable the plaintiff to have

10   more focused interrogatories or production requests.

11             MR. CASTANARIS: Thank you.  Your Honor, I think

12   based upon Your Honor's ruling, we'll confer with counsel.

13   I'm sure we'll find a way that's mutually acceptable to

14   accomplish this, whether it's by 30(b)(6) or interrogatory, I

15   expect counsel and I will be able to work it out.

16             THE COURT: Okay, and with respect to trial dates,

17   I'm not sure we can set those today.  I gather the parties

18   are agreed upon a schedule with respect to the experts.

19             MR. OSNATO: That's correct, Your Honor.

20             MR. CASTANARIS: Yes, Your Honor.  We agree all the

21   way through the briefing of dispositive motions.  The only

22   things that aren't scheduled really are pretrial and trial,

23   and the only reason the plaintiff really would like to do

24   this is that we don't have any employees that live within the

25   jurisdiction and we don't have any employees that are still

1    employed.  All the people - I have to ask people to come up

2    to Delaware for trial, and the more notice I can give them of

3    when it's going to be, the more likelihood I have of getting

4    them here.  So, that is the main reason that I was hopeful of

5    getting a trial date.

6              THE COURT: How much time do you think you'll need?

7              MR. CASTANARIS: Your Honor, I - I thought Your

8    Honor might ask me that question.  I think - My guess in this

9    case is I would say probably three days aside?  I don't know

10   if that's -

11             MR. OSNATO: That sounds approximately correct, Your

12   Honor.

13             MR. CASTANARIS: I suspect we'll get it done in a

14   little bit less, Your Honor, but I hate to commit to that

15   because we haven't seen any experts yet, so - I suspect that

16   the fact testimony will take probably less than half of that

17   and the experts are likely to take the other half, but I

18   think that's a pretty fair estimate.

19             THE COURT: Does the defendant have any objection to

20   setting a trial date?

21             MR. OSNATO: Your Honor, our reluctance to do so is

22   that this is a large case and summary judgment pleadings will

23   probably flow both ways, and I anticipate they will be quite

24   voluminous.  The benefits of setting a date under that kind

25   of circumstances, it seems hard to understand how you can

1    pick a date without seeing the summary judgment motions and

2    the strength and breadth of them.

3            THE COURT: Well,

4            MR. SILBURGLIED: Your Honor, might we have one

5    moment before you pick a date?

6            THE COURT: Okay.

7            MR. OSNATO: Your Honor, my colleague alerted me

8    here the requirement that the deposition testimony be read

9    into the record by a live witness, and based on what will be

10   voluminous fact and expert deposition testimony in this case,

11   the defendant's view is that three days may be a bit

12   conservative.  So, we'd prefer, at least from our

13   perspective, for planning purpose, to propose at least five

14   and perhaps six days, Your Honor.

15           MR. CASTANARIS: Your Honor, the defense may need

16   five or six days to put on its defense, but I don't think I

17   need more than three to put on the plaintiff's case in this

18   case.

19           THE COURT: Well, it says you've agreed summary

20   judgment pleadings are due September, that's a year from now.

21   Why don't we, for planning purposes, set aside the week of

22   November 5, five days for a trial, but let's revisit that

23   issue at the end of September.  So we'll have a status

24   conference, let's say Tuesday, December 25 -

25           MR. CASTANARIS: September 25, Your Honor?

1           THE COURT: Yes, September 25 at 9:30.

2           MR. CASTANARIS: Would it make sense, Your Honor, to

3    set a pretrial date at the same time?  Perhaps at that time?

4           THE COURT: We'll set it at that time.  Typically, I

5    have a pretrial conference the week before the trial.

6           MR. CASTANARIS: All right, thank you, Your Honor.

7           MR. OSNATO: Your Honor, if I could raise one

8    additional point.

9           THE COURT: Let me just mark my calendar.

10          MR. OSNATO: Certainly.

11          THE COURT: Okay, November 5; right?  And the -

12   September 25, the time is 9:30.

13          MR. CASTANARIS: Thank you, Your Honor.

14          MR. OSNATO: Your Honor, one additional point which

15   I think is implicit in the Court's ruling on a contention

16   interrogatory point, and for purposes of clarification and to

17   insure we don't have to come back.  I merely ask the Court

18   confirm that that obligation is viewed as a two-way street.

19   So to the extent defendants wish to serve contention

20   interrogatories that target particular claims, they, under

21   the Court's ruling, have the ability to do so.

22          THE COURT: Yes.

23          MR. OSNATO: Okay.  Thank you, Your Honor.

24          THE COURT: Okay, is there anything else?

25          MR. MILLER: There's not, Your Honor.

1            THE COURT: Okay, we stand in recess.

2            MR. CASTANARIS: Thank you, Your Honor.

3            MR. OSNATO: Thank you.

4            (Whereupon at 12:22 p.m. the hearing in this matter

5    was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                    September 28, 2006
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221

**EXHIBIT E**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Hearing Date: October 4, 2007 |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF AND DEFENDANTS' JOINT STATUS CONFERENCE REPORT**

In the time since the last status conference before this Court (the "2006 Status Conference"), the parties have accomplished the following:

- Completion of the contention interrogatory process approved by the Court at the 2006 Status Conference.

- Completion of all remaining aspects of the discovery process other than expert discovery (*see infra*).

- Participation in discussions regarding a possible settlement of this adversary proceeding, which discussions have been unsuccessful to date.

- Following this Court's September 13, 2007 Letter Ruling [Docket No. 194], the parties have resolved their disagreements regarding expert discovery and have agreed to the following schedule:

-The Plaintiff shall produce copies of Dr. Tennenbaum's working file to the Defendants during the final calendar week of September 2007.

-The Defendants shall have until October 22, 2007 to depose Dr. Tennenbaum.

-Following receipt and review of Dr. Tennenbaum's documents, the Defendants shall determine whether they intend to submit any rebuttal expert report(s). Such decision shall be communicated to the Plaintiff's counsel in writing prior to the October 4, 2007 Status Conference.

-In the event that the Defendants choose to submit any rebuttal expert report(s), such report(s) shall

be served on the Plaintiff's counsel no later than
October 10, 2007.

-In the event that the Defendants choose to submit
any rebuttal expert report(s), the Plaintiff may
conduct a deposition of such rebuttal expert
witness(es) any time after the Defendants have
deposed Dr. Tennenbaum.

\* \* \*

Following the completion of the expert discovery
process outlined above, the parties believe that this adversary
proceeding will be nearly "trial ready."

The Plaintiff has timely demanded a jury trial on all
issues triable by jury.  The Plaintiff consents to a jury trial
conducted by this Court pursuant to 28 U.S.C. § 157(e) and
Federal Rule of Bankruptcy Procedure 9015(b).  The Defendants do
not consent to a jury trial conducted by this Court.

The Defendants are prepared to proceed to trial before
this Court on November 5, 2007, and object to any delay.

The Plaintiff is likewise prepared to proceed to trial
before this Court on November 5, 2007; however, the Plaintiff
believes that certain threshold issues must be properly resolved
before then for that trial date to be realistic.  First, expert
discovery, including with respect to any "rebuttal" experts the
Defendants choose to use, must be completed.  Based upon the
above-agreed schedule, the Plaintiff believes this process will
be completed in time.  Second, the right to a jury trial must be
resolved.  Since the Defendants will not consent to this Court's

conducting a jury trial, the Plaintiff believes it must move to
withdraw the reference once discovery is completed.  The
Plaintiff also believes, however, that the predicate question of
its right to a jury trial *vel non* may be remanded by the
District Court for this Court to decide.  Accordingly, even
though the Defendants have not moved to strike the Plaintiff's
jury demand, the Plaintiff will soon file its opening brief on
the matter and requests that the Court set an expedited schedule
for the parties to brief and resolve this issue.

* * *

The parties jointly request that, once it is
determined whether this adversary proceeding is to be tried
before this Court, the Court (i) set a date on which a pre-trial
conference will be held pursuant to Local Bankruptcy Rule 7016-2
and (ii) finalize the trial dates for this action.

The parties further request instruction from the Court
as to whether, if this adversary proceeding is to be tried
before this Court, their proposed pre-trial order – which shall
be submitted by the date set pursuant to the prior paragraph –
should include any information beyond that recited in, or should
exclude any information recited in, Local Bankruptcy Rule 7016-
2(d).

Respectfully submitted,

Dated:  September 27, 2007
Wilmington, Delaware

| By: _____ | By: _____ |
|---|---|
| MARLA R. ESKIN (No. 2989) | MARK D. COLLINS (No. 2981) |
| KATHLEEN CAMPBELL DAVIS (No. 4229) | RUSSELL C. SILBERGLIED (No. 3462) |
| Campbell & Levine, LLC | LEE E. KAUFMAN (No. 4877) |
| 800 N. King Street, Suite 300 | Richards, Layton & Finger, P.A. |
| Wilmington, DE 19801 | One Rodney Square |
| (302) 426-1900 | 920 North King Street |
| | Wilmington, DE 19801 |
| -and- | (302) 651-7700 |
| | |
| TONY CASTAÑARES (CA SBN 47564) | -and- |
| STEPHAN M. RAY (CA SBN 89853) | |
| SCOTT H. YUN (CA SBN 185190) | R. PAUL WICKES |
| WHITMAN L. HOLT (CA SBN 238198) | MARY K. WARREN |
| Stutman, Treister & Glatt, P.C. | MICHAEL J. OSNATO, JR. |
| 1901 Avenue of the Stars, | J. JUSTIN WILLIAMSON |
| 12th Floor | Linklaters LLP |
| Los Angeles, CA 90067 | 1345 Avenue of the Americas |
| (310) 228-5600 | New York, NY 10105 |
| | (212) 903-9000 |
| Special Counsel for the | |
| OHC Liquidation Trust | Attorneys for the Defendants |

{D0092993.1 }4

**EXHIBIT F**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

In re:                              ) Chapter 11
                                    )
Oakwood Homes Corporation,          ) Case No. 02-13396 (PJW)
et al.,                             )
                                    ) Jointly Administered
                    Debtors.        )
_____      )
OHC Liquidation Trust,              )
                                    )
                    Plaintiff,      )
                                    )
          vs.                       ) Adv. Proc. No. 04-57060 (PJW)
                                    )
Credit Suisse (f/k/a Credit         )
Suisse First Boston, a Swiss        )
banking corporation), Credit        )
Suisse Securities (USA), LLC        )
(f/k/a Credit Suisse First          )
Boston LLC), Credit Suisse          )
Holdings (USA), Inc. (f/k/a         )
Credit Suisse First Boston,         )
Inc.), and Credit Suisse (USA),     )
Inc. (f/k/a Credit Suisse First     )
Boston (USA), Inc.), the            )
subsidiaries and affiliates of      )
each, and Does 1 through 100,       )
                                    )
                    Defendants.     )

**ORDER**

For the reasons set forth in the Court's memorandum opinion of this date, the motion of OHC Liquidation Trust for determination of Plaintiff's rights to a jury trial (Doc. # 198) is granted to the extent that three of the 10 counts in the complaint are entitled to a jury trial.

Peter J. Walsh
United States Bankruptcy Judge

Date: November 15, 2007

**EXHIBIT G**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, | ) Case No. 02-13396 (PJW) |
| et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adv. Proc. No. 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit | ) |
| Suisse First Boston, a Swiss | ) |
| banking corporation), Credit | ) |
| Suisse Securities (USA), LLC | ) |
| (f/k/a Credit Suisse First | ) |
| Boston LLC), Credit Suisse | ) |
| Holdings (USA), Inc. (f/k/a | ) |
| Credit Suisse First Boston, | ) |
| Inc.), and Credit Suisse (USA), | ) |
| Inc. (f/k/a Credit Suisse First | ) |
| Boston (USA), Inc.), the | ) |
| subsidiaries and affiliates of | ) |
| each, and Does 1 through 100, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

| | |
|---|---|
| Mark D. Collins | Marla Rosoff Eskin |
| Russell C. Silberglied | Kathleen Campbell Davis |
| Lee E. Kaufman | Campbell & Levine, LLC |
| Christopher M. Samis | 800 N. King Street, Suite 300 |
| Richards, Layton & Finger, P.A. | Wilmington, DE 19801 |
| 920 North King Street | |
| Wilmington, DE 19801 | |

2

R. Paul Wickes                          Tony Castanares
Mary K. Warren                          Stephan M. Ray
Michael J. Osnato, Jr.                  Scott H. Yun
J. Justin Williamson                    Whitman L. Holt
LINKLATERS                              Stutman, Treister & Glatt P.C.
1345 Avenue of the Americas             1901 Avenue of the Stars
New York, New York 10105                12th Floor
                                        Los Angeles, CA 90067
Attorneys for Defendants,
                                        Special Counsel for the OHC
                                        Liquidation Trust


Date: November 15, 2007

3

**Walsh, J.**

This opinion is regarding the motion of OHC Liquidation Trust ("Plaintiff" or "Trust") for determination of Plaintiff's right to a jury trial (Doc. # 198) in this adversary proceeding. Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC,(f/k/a Credit Suisse First Boston LLC), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants") oppose the motion. For the reasons stated below, the Court will grant the motion.

## Background

Oakwood Homes Corporation ("OHC") together with its subsidiaries and affiliates ("Debtors" or "Oakwood Companies") designed and manufactured various models of homes at a modest or affordable price. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 12). As part of their business, Oakwood Companies also provided their customers with mortgage financing or retail installment sales contracts (collectively "installment contracts"). Oakwood Companies obtained the necessary funds for the installment contracts through a two-step, asset-backed securitization process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). Defendants were the underwriter for this process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). The asset-backed securitization process was commenced by Oakwood Companies using the installment contracts as collateral to

4

borrow against the warehouse facility ("Warehouse Facility")[1]. Warehouse Facility was a short-term facility used specifically to fund the mortgages for manufactured home buyers. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 17.b). Once the Warehouse Facility had accumulated a sufficient amount of installment contracts, usually about $150 million to $200 million, the installment contracts were bundled and sold to private and institutional investors through a real estate mortgage investment trust. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14).

The Warehouse Facility was one of three lines of credit Oakwood Companies used to finance their operations; they also had a revolving line of credit and a servicer advance facility. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 17.a-c). The Warehouse Facility was provided by an affiliate of Bank of America until 2001. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 17.b).

Starting in 1999 the manufactured home industry was going through a difficult period, and Oakwood Companies' businesses were struggling. By the second half of 2000, Bank of America wanted to cease its role as the warehouse lender. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 26). This was a critical junction for Oakwood Companies, if they did not have the Warehouse Facility, their securitization business would have collapsed. (Doc. # 202, Decl. Murphy, Ex. A,

---

[1] Defendants refer to the Warehouse Facility as the Loan Purchase Facility.

5

¶ 26).  Eventually after some negotiations, Defendants agreed to assume the role of lender and agent on the Warehouse Facility.  On February 9, 2001, Oakwood Companies and Defendants signed various documents to finalize Defendants' new role.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 26).  The main document was a Class A Note Purchase Agreement ("Note Purchase Agreement").

The business continued to slump.  On November 15, 2002, Oakwood Companies filed petition for bankruptcy protection under chapter 11 of title 11 of the United State Code, 11 U.S.C. §§ 101 et seq. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 37).  Defendants filed four proofs of claim, seeking payments of fees and expenses stemming from an August 19, 2002 letter agreement ("Engagement Letter").  Pursuant to the Engagement Letter, Oakwood Companies employed Defendants as the exclusive financial advisor for the contemplated restructuring transaction.  (Doc. # 202, Decl. Murphy, Ex. B, ¶ 3).

On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims.  The objections and counterclaims are: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) equitable subordination; (5) avoidance and recovery of 90 day preferential transfers pursuant to 11 U.S.C. §§ 547, 550; (6) avoidance and recovery of one year preferential transfer pursuant to 11 U.S.C. §§ 547, 550; (7) avoidance and recovery of fraudulent

6

transfers pursuant to 11 U.S.C. §§ 544, 550, and applicable state law; (9) breach of implied and express contract; and (10) deepening insolvency. (Doc. # 201, pp. 2-3). The alleged facts giving rise to this extensive list occurred both prior to and after the Engagement Letter. (Doc. # 198, p. 2).

Plaintiff is prepared to litigate various causes of action arising from two sets of distinct nucleus of operative facts. The first set of facts is centered around the parties' relationship pre-Engagement Letter. According to Plaintiff: (1) Prior to the Engagement Letter, Oakwood Companies and Defendants "enjoyed a close and intimate relationship," (Doc. # 198, p. 2), which presumably is because of Defendants' role as the underwriter and then a secured lender to Oakwood Companies. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 11). (2) Plaintiff alleged that the trust and confidence between the parties created both a fiduciary duty and an implied advisory contract. (Doc. # 198, p. 2). (3) Defendants, however, did not exercise reasonable care in carrying out their obligations. (Doc. # 198, p. 3).

For Defendants' alleged failures, Plaintiff claims that they earned massive fees and caused substantial economic damage to the Oakwood Companies. (Doc. # 198, p. 3). For Defendants' alleged breach of fiduciary duty, negligence, and breach of implied contract claims, Plaintiff is requesting recovery of all fees and other remuneration paid to Defendants, _and_ actual and consequential

7

damages.  (See Doc. # 201, pp. 4-5).

The second set of facts is based on the performance under the Engagement Letter.  Plaintiff accuses Defendants of not fulfilling their obligations under the Engagement Letter; therefore their claim should be disallowed.  Plaintiff wants to be awarded additional damages, and recovery under 11 U.S.C. §§ 547 & 548. (Doc. # 198, p. 3).

Plaintiff's complaint asserts a right to a jury trial. Plaintiff has moved to have a jury trial for the causes of action related to the first set of operative facts. (Doc. # 198, pp. 3-4). The causes of action related to the second set of facts are not covered by the motion because they relate to the allowance of Defendants' claims.  (Doc. # 198, pp. 3-4).

## Discussion

Generally, "the bankruptcy court is an appropriate tribunal for determining whether there is a right to a trial by jury of issues for which a jury trial is demanded." Official Comm. Of Unsecured Creditors v. TSG Equity Fund L.P. (In re EnvisionNet Computer Servs.), 276 B.R. 1, 6-7 (D. Me. 2002); In re Wash. Mfg. Co., 128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991).

Defendants put forth a number of grounds contesting Plaintiff's motion.  First, the types of claims and forms of relief Plaintiff is raising are equitable rights, thus there is no right to a jury trial attached.  Second, even if Plaintiff has the right

8

to jury trial it is unenforceable because the claims are part of the "claims-allowance process." Third, in connection with the Note Purchase Agreement, several of the Oakwood Companies executed contracts in which they waived the right to a jury trial. Finally, Defendants argue that because Plaintiff brought these actions in a court of equity, Plaintiff has forfeited its right to a jury trial.

<u>Right To a Jury Trial</u>

The right to a jury trial in a civil case is preserved in the Seventh Amendment of the U.S. Constitution. It states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." <u>U.S. Const. amend. VII</u>. As for the meaning of "suits at common law," the Supreme Court has interpreted it to mean "'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" <u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33, 40-41 (1989) (quoting <u>Parsons v. Bedford</u>, 3 Pet. 433, 447 (1830)). In other words, a right to a jury trial attaches to those cases involving legal right and not those involving only equitable claims and remedies. <u>Billing v. Ravin, Greenberg & Zackin, P.A.</u>, 22 F.3d 1242, 1245 (3d Cir. 1994).

The Supreme Court in <u>Granfinanciera</u> provided the analytical framework to determine whether there is a right to a

jury trial:

> First, we compare the statutory action to
> 18th-century actions brought in the courts of
> England prior to the merger of the courts of
> law and equity.  Second, we examine the remedy
> sought and determine whether it is legal or
> equitable in nature.  The second stage of this
> analysis is more important than the first.
> If, on balance, these two factors indicate
> that a party is entitled to a jury trial under
> the Seventh Amendment, we must decide whether

Congress may assign and has assigned resolution of the relevant
claim to a non-Article III adjudicative body that does not use a
jury as fact finder.

Granfinanciera, 492 U.S. at 43.  The determination is a matter of
federal law.  Simler v. Conner, 372 U.S. 221, 222 (1963); Byrd v.
Blue Ridge Rural Elec. Coop., 365 U.S. 525, 537-39 (1958).  When a
court is deciding if there is a right to a jury trial, it must
remember that because "the right to jury trial is a constitutional
one, . . . while no similar requirement protects trials by the
court, [the court's] discretion is very narrowly limited and must,
wherever possible, be exercised to preserve jury trial.  Beacon
Theatres, Inc. v. Westover, 359 U.S. 500, 510 (1959); Turner v.
Johnson & Johnson, 809 F.2d 90,99 (1st Cir. 1986)("[I]f we must
err, we choose to do so on the side of preserving plaintiffs' right
to a jury trial."); Prudential Oil Corp. v. Phillips Petrol. Co.,
392 F.Supp. 1018, 1022 (S.D.N.Y. 1975)("[T]he inescapable teaching
of recent Supreme Court decisions is that there is a clear federal
policy in light of the Seventh Amendment favoring jury trials and
that, in doubtful cases, that policy should be favored.").

First Stage: Legal or Equitable Claims

        For the first stage of the <u>Granfinanciera</u> analysis, this
Court must determine whether Plaintiff's claims of negligence,
breach of implied contract, and breach of fiduciary duty would have
been considered legal or equitable claims in 18th century English
courts.   Plaintiff characterizes the negligence and breach of
implied contract claims as historically legal actions, while the
breach of fiduciary claim as an equitable claim.  (Doc. # 198, p.
10)   Defendants do not challenge the characterization in their
brief.  (Doc. # 201, pp. 7-8).   They do, however, contest that
because the negligence and breach of implied contract claims arose
from the same nucleus of operative facts as the breach of fiduciary
duty claim they are not separate and independent causes of action.
(Doc. # 202, p. 11-12).   Rather, they are just breach of fiduciary
duty claim in different names, hence, are equitable claims.

        I disagree.  The notion that a single act of malfeasance
can violate several distinct equitable and legal duties is a
fundamental principle of Anglo-American jurisprudence. <u>See</u> Germain
v. Conn. Nat'l Bank, 988 F.2d 1323, 1329 (2nd Cir. 1993) (stating
that both legal and equitable claims can arise from the same fact).
For example, it is possible that a jury could conclude that
although the parties enjoyed a close relationship, it was not
enough to create a fiduciary duty.  Such a finding would not
preclude a finding of negligence or of breach of contract with

11

respect to an implied advisory contract.  Likewise, Defendants always owed Oakwood Companies a duty of reasonable care in rendering their services, the breach of which could give rise to damages even in the absence of any fiduciary relationship.  See, e.g., Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.), 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996).  Thus, the claims are each separate and independent, and must be characterized individually.

Plaintiff's characterization of each claim is accurate. It has been well settled that tort claims, such as negligence, are legal actions.  See City of Monterey v. Del Monte Dunes, 526 U.S. 687, 710 (stating that the Seventh Amendment covers all actions that "sound basically in tort"); Arkwright Mut. Ins. Co. v. Phila. Elec. Co., 427 F.2d 1273, 1275 (3d Cir. 1970)(stating in common law a jury is required for negligence cases);  8-38 MOORE'S FED. PRACTICE § 38.30.  This is applicable to persons as well as to corporate parties.  See, e.g., Ross v. Bernhad, 396 U.S. 531, 542 (1970)(explaining how a corporation "would have been entitled to a jury's determination, at a minimum, . . . of its rights against its own directors because of their negligence").

Claims for breach of contract, expressed or implied, are also legal rights under the common law.  Donovan v. Robbins, 579 F.Supp. 817, 822 (N.D. Ill. 1984) (claims seeking "money damages for breach of express or implied contracts . . . are clearly legal and [] the Seventh Amendment would require a jury trial as to

them"); 8-38 MOORE'S FED. PRACTICE § 38.30 ("Actions for money damages for breach of contract are legal in nature and are triable to a jury.").

Claims for breach of fiduciary duty, however, are historically equitable rights. Pereira v. Farace, 413 F.3d 330, 338 (2d Cir. 2005), cert denied, 126 S. Ct. 2286 (2006); In re Hutchinson, 5 F.3d 750, 757 (4th Cir. 1993). The best evidence in support, as Defendants point out in their brief, is that the Delaware Chancery Court still has exclusive jurisdiction to hear breach of fiduciary duty cases. Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163 (Del. Ch. 2002).

With two legal rights and one equitable right Plaintiff has a mixture of claims. In such situation "a party will not be denied a jury trial just because other claims arising out of the same facts are equitable." Germain, 988 F.2d at 1329. The "right to jury trial on the legal claims . . . must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." Ross, 396 U.S. at 538. Meaning, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 422-23 (5th Cir. 1998); Mirant Corp. v. Southern Co., 337 B.R. 107, 120 (N.D. Tex. 2006)("[J]oinder of

equitable claims with legal claims does not deprive a party of the right to a jury trial on the legal claim."). Consequently, even though Plaintiff asserts an equitable right, under the first prong of the <u>Granfinanciera</u> analysis it still retains its right to a jury trial as to the two legal rights.

<u>Second Stage: Legal or Equitable Relief</u>

The second stage of the <u>Granfinanciera</u> analysis requires this Court to characterize the type of remedy sought. This stage is more important than the first stage. <u>Granfinanciera</u>, 492 U.S. at 42. Plaintiff argues that the relief it seeks is a legal remedy because it is for compensatory money damages. (Doc. # 198, pp. 11-12). Even though Plaintiff has a mix of legal and equitable claims, he argues that when the relief for the breach of fiduciary duty claim is a legal remedy, the "action assumes legal attributes." <u>Mirant</u>, 337 B.R. at 120.

Plaintiff cites the Second Circuit Court of Appeals's <u>Pereira</u> case in support. In <u>Pereira</u>, the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. 413 F.3d at 335-37. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace under the defendants' watch. <u>Id.</u> at 336. The defendants maintained "that they were entitled to a jury trial on the [t]rustee's beach of fiduciary duty claim because

14

the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution." <u>Id.</u> at 337. The district court rejected this argument.    It classified the remedy as restitution, thus, equitable, and the defendants were not entitled to a jury trial.    <u>See id.</u> at 339.    The Second Circuit reversed the district court's holding.  Applying the <u>Granfinanciera</u> test, the court concluded that for the first stage the breach of fiduciary duty claim "would have been equitable in 18th century England." <u>Id.</u> at 339.  For the second stage, the Second Circuit looked to <u>Great-West Life & Annuity Insurance Company v. Knudson</u>, 534 U.S. 204 (2002), for guidance.    In <u>Great-West</u>, the Supreme Court stated that "'for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.'" <u>Pereira</u>, 413 F.3d at 340 (quoting <u>Great-West</u>, 534 U.S. at 214).  Because the trustee's claim was for compensatory damages, rather than any particular property in the defendants' possession, the second prong of the <u>Granfinanciera</u> test rendered his suit legal in nature and required a jury trial.  <u>Id.</u> at 341.

Here, Defendants contend that the relief sought is  a mix of legal and equitable remedies, thus Plaintiff is not entitled to a jury trial.  (Doc. # 202, pp. 8-11).  Defendants try to distinguish the <u>Pereira</u> case from the present case on account that

the defendants in <u>Pereira</u> were not personally enriched from the breach of fiduciary duty, therefore, the relief was for damage. Whereas, in the present case Defendants enriched themselves and Plaintiff is seeking "classically equitable remedies, including disgorgement and equitable subordination." (Doc. # 201, p. 9).

          For support, Defendants offer <u>Cantor v. Perelman</u>, No. Civ.A.97-586-KAJ, 2006 WL 318666 (D. Del. Feb.6, 2006). In <u>Cantor</u>, the trustee sued the directors of a corporation for breach of fiduciary duty and aiding and abetting in the breach. <u>Id.</u> at *2. The trustee sought to recover "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." <u>Id.</u> The court applied the <u>Granfinanciera</u> test. The first prong weighed against right to a jury trial because both of the plaintiff's claims were historically equitable. <u>Id.</u> at *7. The second prong resulted in a mix of equitable and legal remedy. <u>Id.</u> at *9. The court concluded, after commenting on the <u>Pereira</u> decision, that "compensatory damages" was legal in nature, while "benefits obtained by defendants" was an equitable remedy. <u>Id.</u> at *8-9. In its final balancing the court held that where the claims were equitable and the relief sought were both legal and equitable, it weighed against right to jury trial.

        The <u>Cantor</u> case is not the proper comparison for the

16

present case.  First, in Cantor there were only two historically equitable claims at issue; breach of fiduciary duty and aiding and abetting the same.  The court noted that its analysis would have been impacted "if at least one of Plaintiff's claims [had been] legal rather than equitable."  Id. at *7 n.7.  That is the case here.  Plaintiff has two causes of action that have always been legal in nature and one that is historically equitable.  Second, the trustee in Cantor was clearly focused on recovering specific sums received by the directors in connection with certain transactions, see id. at *1, which made the remedy equitable.  See id. at *9.  Here, in contrast, the thrust of Plaintiff's case is on remedying the alleged harm incurred by the Debtors, rather than on merely recovering illicit gains.  Thus, Cantor is distinguishable from the present case.

The more appropriate case for this Court to look to is Pereira.  Plaintiff is seeking to recover fees and other remuneration paid to Defendants, and actual and consequential damages.  This relief is very similar to the relief the trustee in Pereira sought; for monetary damage and improperly transferred fees. The Second Circuit held that to be legal relief.  Applying the Great-West test, the relief that Plaintiff is seeking is to impose personal liability on Defendants for the damage they have caused, it is not to recover any particular fund that Defendants have in their possession.  Thus, the relief Plaintiff seeks is

compensatory monetary damages, which is "the classic form of legal relief." Great-West, 534 U.S. at 210 (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 255 (1993)); see also, e.g., Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed."); Billing, 22 F.3d at 1245.

Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has right to a jury trial.  Plaintiff in this case has presented two legal and one equitable claim and is seeking legal relief.  Thus, the weighing clearly favors Plaintiff having the right to a jury trial.  In sum, after balancing the two prongs of the Granfinanciera analysis, this Court holds that Plaintiff has the right to a jury trial.

Third Stage: Claim-allowance Process or Not

The third step in the Granfinanciera analysis is to determine whether this is a matter that Congress has assigned to a non-Article III court for adjudication without a jury.  The Third Circuit has extrapolated from this prong an embedded limitation on the Seventh Amendment right.  Billing, 22 F.3d at 1247.  The limitation arises when a cause of action "falls within the process of the allowance and disallowance of claims." Id. at 1253.  There, neither the debtor's estate nor the defendant has a Seventh

Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." Id.; Germain, 988 F.2d at 1330 ("For waiver to occur, the dispute must be part of the claims-allowance process.... Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue."). This limitation originated from Katchen v. Landy, 382 U.S. 323 (1966). The Supreme Court in Katchen noted that part of Congress's intent for the Bankruptcy Act of 1898 was to place the resolution of disputed claims in summary proceeding in the bankruptcy court rather than proceeding at law. Id. at 329; see Billing, 22 F.3d at 1247. It was intended to promote expediency and judicial efficiency. See Katchen,382 U.S. at 328.

Plaintiff asserts that the subject counterclaims are not part of the claim-allowance process and offers two reasons in support. First, the causes of action are unrelated to the Engagement Letter and are not products of the Bankruptcy Code. Instead, they are state law claims that could have been asserted by Oakwood Companies against Defendants prior to the Engagement Letter. (Doc. # 198, p. 18). Second, the success or failure of Plaintiff's counterclaims would not affect the allowance or disallowance of Defendants' claims under 11 U.S.C. § 502(d). (Doc. # 198, p. 18). If Plaintiff succeeds or fails on its non-bankruptcy legal claims, only the size of the Debtors' estate would

be affected.

Defendants hold the opposing view.  They contend that Plaintiff's counterclaims are in response to Defendants' proofs of claim, and the relief Plaintiff seeks is a resolution of Defendants claims.  (Doc. # 201, p. 18).  They also argue that when Plaintiff requested the Court to disallow or otherwise equitably subordinate Defendants' proofs of claim it has invoked and submitted to the equitable jurisdiction of this Court.  (Doc. # 201, p. 15).  According to Defendants, the fact that Plaintiff seeks affirmative recovery on his counterclaims and could have brought his counterclaims in other forum does not affect their conclusion. (Doc. # 201 pp. 15, 18).

Claim-allowance process means that "the resolution of the dispute in which a jury trial is sought must affect the allowance of the creditors's claim in order to be part of that process." Germain, 988 F.2d at 1327.  An action that "would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process." Id. The action is only augmenting the estate "if [the trustee] wins, the estate is enlarged, and this may affect the amount . . . creditors ultimately recover on their claims, but it has no effect whatever on the allowance of the [defendant's] claim." Id. Generally, lender liability actions augment the estate. Id.

The Court is persuaded that the subject counterclaims are

20

not part of the claim-allowance process.  As Plaintiff carefully
points out in its motion, the claims that Defendants assert arise
from the Engagement Letter, whereas the subject counterclaims that
Plaintiff asserts originate from the period prior to the Engagement
Letter.  The subject counterclaims are based on the financial
institutions' alleged misconduct, separate from Defendants' proofs
of claim for services performed pursuant to the Engagement Letter.
Furthermore, Plaintiff's subject counterclaims only augment the
estate.  Plaintiff may raise the counterclaims in a separate trial,
under applicable state law, and succeed on some or all of the
counterclaims, yet it would not affect the allowance of Defendants'
claims.  The only effect that will result is that if it wins, the
estate will be augmented by the compensatory monetary damage from
Defendants.  Thus, Plaintiff's counterclaims are not part of the
claim-allowance process, and do not limit its right to a jury
trial.

Legal Claims in a Court of Equity

         As for Defendants' argument that Plaintiff submitted
itself to the equitable jurisdiction of this Court by raising these
counterclaims, the Court does not agree.  Defendants argue that the
Trust's choice to combine claim objections with affirmative
litigation before this Court somehow makes the entire adversary
proceeding part of the claims-allowance process or otherwise
triggered a categorical submission to the equitable jurisdiction of

this Court.

Circuits are split on Defendants' core proposal - that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates any and all of the estate's jury trial rights forever. See Germain, 988 F.2d 1330 ("We conclude that neither precedent nor logic supports the proposition that either the creditor or the debtor automatically waives all right to a jury trial whenever a proof of claim is filed."); In re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (debtor's petition in the bankruptcy court does not affect its right to a jury trial). But see N.I.S Corp. v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th Cir. 1991) (holding debtor consented to jurisdiction by filing bankruptcy petition and thereby waived right to jury trial); Bayless v. Crabtree Through Adams, 108 B.R. 299, 305 (Bankr. W.D. Okla. 1998), aff'd, 930 F.2d 32 (10th Cir. 1991) (holding legal assertions, otherwise subject to jury trial, brought by trustee or debtor are "open to adjudication in equity by Bankruptcy Judges under their power to afford complete relief").

> The Third Circuit has not adopted Defendant's position.
>
> The fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis.  A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims.  See Katchen, 382 U.S. at 336, 86 S.Ct. at 476.

<u>Billing</u>, 22 F.3d at 1252, n. 14.   This Court believes that Defendants' core proposal flies in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." <u>Ross</u>, 396 U.S. at 538.   Thus, the Court rejects Defendants' position.

<u>Contractual Waiver of Jury Trial</u>

The last ground that Defendants raise in opposition is that Plaintiff contractually waived its right to a jury trial.  In connection with the Note Purchase Agreement, on February 9, 2001, two Oakwood Companies (OHC and Oakwood Acceptance Corporation, LLC) executed agreements with a Credit Suisse entity.  Those agreements contain a jury trial waiver whereby each party

> HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PRECEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Doc. # 202, Decl. Murphy, Ex. E, p. 6).  According to Defendants, Plaintiff, in charge of liquidating the Debtors' estates, is the successor in interest to these two Oakwood Companies, and is prohibited by the waiver from seeking a jury trial on any claims "related directly or indirectly to the Note Purchase Agreement or any of the contracts related thereto under the loan purchase facility."  (Doc. # 201, p. 22).

There are several reasons why this contractual waiver does not apply here. The first is the identity of the contracting parties. The purported waiver only involves two of the Debtors. The Trust succeeded to the rights of fifteen Debtor entities[2] pursuant to a plan of reorganization that effected a substantive consolidation of all the Debtors. The Credit Suisse entity that is a party to the two agreements bears the name of "Credit Suisse First Boston, New York Branch," as agent for the warehouse facility. (Doc. # 202, Decl. Murphy, Ex. "D" at signature page, Ex. "E" at signature page.) None of Defendants here bear that name.

In their answer to the complaint (Doc. # 132), Defendants very carefully note their separateness. Footnote 1 on p. 2 of the answer states:

> The Defendants' use of "Defendants" to refer to the named Credit Suisse affiliated defendants is used for convenience only and is not an admission that any one of the Defendants is not a distinct and separate entity, or that any one of the Defendants is responsible for the liabilities of any other Defendant. Nor is any reference to "Defendants" an admission that any Defendant named or referenced in the Complaint

---

[2] These are: Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, and Oakwood MHD4, LLC.

24

> participated in any of the acts alleged in the
> complaint, except as specifically admitted
> herein.

In their response to the motion, Defendants specifically identify "Credit Suisse Securities (USA), LLC" as the target of the jury trial counts: "The remaining claims - on which the Trust now seeks a jury trial - are claims arising out of the relationship between Oakwood and [Credit Suisse Securities (USA), LLC] prior to August, 2002." (Doc. # 201, p. 7). Obviously, Credit Suisse Securities (USA), LLC is not a party to the two agreements containing the jury trial waiver and thus it has no standing to enforce the waiver even if the Trust were bound by the commitment of two of the fifteen Debtors.

_____It is fundamental that, "[g]enerally, a jury waiver provision in a contract or lease affects only the rights of the parties to that contract or lease," Hulsey v. West, 966 F.2d 579, 581 (10th Cir. 1992) (guarantor of corporate loan was not bound by jury waiver in an agreement that he did not execute in his personal capacity). Thus, Defendants, including Credit Suisse Securities (USA), LLC, cannot all claim shelter in a waiver signed only by Credit Suisse First Boston, New York Branch. Nor can that waiver diminish the rights of thirteen Debtors that did not sign it - rights that now belong to the Trust.

Even if one were to ignore the "New York Branch"

25

identification, the result remains the same.  If the two agreements are read to intend that the Credit Suisse entity is simply "Credit Suisse First Boston, a Swiss banking corporation," the caption of this case identifies "Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation)" as a Defendant, but Defendants acknowledge that the target of the jury trial counts is the Defendant "Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC)."

The second problem relates to the scope of the waiver itself.  At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the Warehouse Facility.  But the legal claims are not about any breach of those agreements, or about whether Credit Suisse First Boston, New York Branch adequately performed thereunder.  Rather, it is about whether Defendants breached far broader duties, not arising from any written contract, by partaking a myriad of alleged illicit transactions with the Oakwood Companies.

Because this action is about much more than the Warehouse Facility and related agreements, it falls outside the scope of the purported waiver.  Other courts have reached the same conclusion in similar circumstances.  See, e.g., Nichols Motorcyle Supply Inc. v. Dunlop Tire Corp., 913 F. Supp. 1088, 1146-47 (N.D. Ill. 1995) (broad jury waiver in "Distributor Agreement" did not encompass any "claims that do not directly arise or have their basis in the

26

Distributor Agreement"); <u>Nat'l Acceptance Co. v. Myca Prods., Inc.</u>, 381 F. Supp. 269, 269-70 (W.D. Pa. 1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); see also <u>OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)</u>, 340 B.R. 510, 519-20 (Bankr. D. Del. 2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties).  The purported contractual waiver is far too limited to apply here.

      The final problem with Defendants' contractual waiver theory is that Defendants have not proffered any evidence to meet their burden of showing that there was no gross disparity in power between the two Oakwood Companies and Credit Suisse First Boston, New York Branch.

      The Supreme Court and the Third Circuit all agree that "because the 'right of jury trial [in a civil case] is fundamental, courts [should] indulge every reasonable presumption against waiver.'" <u>Tracinda Corp. V. DaimlerChrysler AG.</u>, 2007 U.S. App. LEXIS 22221, *22-23 (3d Cir. Sept. 18, 2007) (quoting <u>Aetna, Inc. v. Kennedy</u>, 301 U.S. 3890, 393 (1937)); <u>Collins v. Gov't of Virgin Islands</u>, 366 F.2d 279, 284 (3d Cir. 1966).  A valid, enforceable waiver clause must meet the knowing and voluntary standard, which requires that: (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business

27

entities; (3) the parties had opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous.  First Union Nat'l Bank v. United States, 164 F.Supp. 2d 660, 663 (E.D. Pa, 2001); Tracinda Corp., 2007 U.S. App. LEXIS 22221 at *23.  Given the presumption against waiver "the burden of proving that a waiver was done knowingly and intelligently falls upon the party seeking enforcement of a waiver . . . clause."  First Union Nat'l Bank, 164 F.Supp. 2d at 663.

In this case Defendants bear the burden of proving the waiver clause is enforceable.  Looking at the factors, there is no question as to the sophistication and intelligence of the parties who entered into the agreements.  Question arises, however, regarding the bargaining positions of the parties when they entered into the Note Purchase Agreement.

Plaintiff points to a video deposition by Mr. Douglas R. Muir, a officer of OHC.  In the deposition Mr. Muir stated that finding a successor facility to its then credit providers, Bank of America, was critical and had to be done.  (Doc. # 204, Decl. Holt, Ex. B, at 52:13-16).  However, there was not "a half a dozen credit providers lined up at the door, each of which was offering to do [the] transaction.  At the time [Defendants] w[ere] the only game in town."  (Doc. # 204, Decl. Holt, Ex. B, at 51:13-16).  Additionally, there was pressure from Bank of America to take it out of the facility, or it would have charged Oakwood Companies

28

large fees.   (Doc. # 204, Decl. Holt, Ex. B, at 52:6-12).   Given

the critical nature of the transaction, the lack of candidates, and

the pressure from Bank of America, there is a good argument that

the  two  Oakwood  Companies  were  at  a  severely  disadvantaged

bargaining  possession.    Thus,  they  did  not  have  any  leverage  to

fairly negotiate the terms of the Note Purchase Agreement.  Because

Defendants did not offer any evidence to the contrary, Defendants

failed  to  meet  its  burden  of  proof  that  the  parties  had  equal

bargaining  position.     Consequently,  because  this  Court  must

construe  the  waiver  narrowly  and  any  ambiguity  is  to  be  decided

against the waiver, the waiver is not enforceable here.

## **Conclusion**

For  the  reasons  stated  above,  Plaintiff's  motion  for

determination  of  Plaintiff's  rights  to  a  jury  trial  is  granted.

Plaintiff does have the right to a jury trial on three of its 10

counts.

**EXHIBIT H**

EXECUTION COPY

CLASS A NOTE PURCHASE AGREEMENT

Dated as of February 9, 2001

among

OMI NOTE TRUST 2001-A
as Issuer,

OAKWOOD ACCEPTANCE CORPORATION
as Seller and Servicer,

OAK LEAF HOLDINGS, LLC
as Depositor,

GINKGO CORPORATION
as Transferor,

THE PURCHASERS PARTIES HERETO,
and

CREDIT SUISSE FIRST BOSTON, NEW YORK BRANCH,
as Agent

---

Relating to
OMI Note Trust 2001-A
Class A Asset Backed Notes, Series 2001-A

---

CSFB-00092240

Table of Contents

Page

SECTION 1.  DEFINITIONS..................................................................2
   1.1  Definitions.........................................................................2
   1.2  Other Definitional Provisions ........................................11
SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS ...............11
   2.1  Purchases.........................................................................11
   2.2  Reductions, Increases and Extensions of Commitments ...........13
   2.3  Fees, Expenses, Payments, Etc ......................................14
   2.4  Indemnification ..............................................................15
   2.5  Events of Default ...........................................................17
   2.6  Notification of Note Interest Rate ..................................17
SECTION 3.  CONDITIONS PRECEDENT ..................................18
   3.1  Condition to Initial Purchase .........................................18
   3.2  Condition to Borrowings ................................................20
SECTION 4.  REPRESENTATIONS AND WARRANTIES...............20
   4.1  Representations and Warranties of OAC.......................20
   4.2  Representations and Warranties of the Issuer ...............23
SECTION 5.  COVENANTS ............................................................25
   5.1  Covenants........................................................................29
SECTION 6.  INCREASED COSTS, INCREASED CAPITAL, ETC.............33
   6.1  Increased Costs ..............................................................35
   6.2  Increased Capital............................................................36
   6.3  Taxes ..............................................................................36
   6.4  Nonrecourse Obligations; Limited Recourse................38
SECTION 7.  THE AGENT .............................................................40
   7.1  Appointment ...................................................................40
   7.2  Delegation of Duties ......................................................40
   7.3  Exculpatory Provisions ..................................................40
   7.4  Reliance by Agent ..........................................................41
   7.5  Notices ............................................................................41
   7.6  Non-Reliance on Agent and Other Purchasers .............41
   7.7  Indemnification ..............................................................42
   7.8  Agent in Its Individual Capacities.................................42
   7.9  Successor Agent..............................................................43
SECTION 8.  SECURITIES LAWS; TRANSFERS.........................43
   8.1  Transfers of Notes...........................................................43
SECTION 9.  MISCELLANEOUS ..................................................47
   9.1  Amendments and Waivers ..............................................47
   9.2  Notices ............................................................................48
   9.3  No Waiver; Cumulative Remedies .................................49
   9.4  Successors and Assigns...................................................49
   9.5  Successors to Servicer.....................................................50
   9.6  Counterparts ...................................................................51
   9.7  Severability .....................................................................51

i

<u>Table of Contents</u>
(continued)

|  |  | <u>Page</u> |
|---|---|---|
| 9.8 | Integration | 51 |
| 9.9 | Governing Law | 51 |
| 9.10 | Termination | 51 |
| 9.11 | Limited Recourse; No Proceedings | 51 |
| 9.12 | Survival of Representations and Warranties | 52 |
| 9.13 | Submission to Jurisdiction; Waivers | 52 |
| 9.14 | Waivers of Jury Trial | 53 |

CSFB-00092242

## LIST OF EXHIBITS

| EXHIBIT A | Form of Investment Letter |
| EXHIBIT B | Form of Joinder Supplement |
| EXHIBIT C | Form of Transfer Supplement |
| EXHIBIT D | Form of CSFBi Warrant |
| EXHIBIT E | Form of CSFBi Warrant Registration Rights Agreement |
| EXHIBIT F | Form of Agreement re Bankruptcy |

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092243

CLASS A NOTE PURCHASE AGREEMENT, dated as of February 9, 2001, by and among OMI NOTE TRUST 2001-A, a Delaware business trust (the "Issuer"), OAKWOOD ACCEPTANCE CORPORATION, a North Carolina corporation ("OAC"), OAK LEAF HOLDINGS, LLC, a Delaware limited liability company (the "Depositor"), GINKGO CORPORATION, a Delaware corporation (the "Transferor"), the PURCHASERS from time to time parties hereto (collectively, the "Purchasers") and CREDIT SUISSE FIRST BOSTON, a Swiss banking corporation acting through its New York Branch, as agent for the Purchasers (together with its successors in such capacity, the "Agent").

## WITNESSETH:

WHEREAS, the Issuer, and The Chase Manhattan Bank, a New York banking corporation, as Indenture Trustee (together with its successors in such capacity, the "Indenture Trustee"), are parties to a certain Indenture, dated as of February 9, 2001 (as the same may from time to time be amended or otherwise modified, the "Indenture"), pursuant to which the Issuer has issued its Class A Asset Backed Notes, Series 2001-A (the "Notes"); and

WHEREAS, the Purchasers are willing to have the Agent acquire the Notes on their behalf on the Closing Date and from time to time thereafter to make Borrowings (as defined in the Indenture) available thereunder on the terms and conditions provided for herein;

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

1.1    Definitions.  All capitalized terms used herein as defined terms and not defined herein shall have the meanings given to them in the Indenture or the Sale and Servicing Agreement, as applicable.  If a term used herein is defined in both the Indenture and the Sale and Servicing Agreement, it shall have the meaning set forth in the Indenture.  Additionally, the terms defined in the preamble to this Agreement shall have the meanings set forth therein and the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affected Party" shall mean, with respect to any Structured Purchaser, any Support Party of such Structured Purchaser.

"Agent" has the meaning specified in the preamble to this Agreement.

"Agreement" shall mean this Class A Note Purchase Agreement, as amended, supplemented or otherwise modified from time to time.

- 2 -

CSFB-00092244

"Agreement re Bankruptcy" has the meaning specified in subsection 3.1(k) of the Agreement.

"Applicable Treasury Yield" shall mean, as of any date, the per annum rate of interest for "on-the-run" United States Treasury obligations having the maturity which corresponds to the weighted average life of the Receivables, as selected by the Agent and the underwriters or other Persons submitting bids as to spread-to-treasuries in determining the Term Out Rate.

"Assignee" and "Assignment" have the respective meanings specified in subsection 8.1(e) of this Agreement.

"Available Commitment" shall mean, on any day for a Committed Purchaser, such Purchaser's Commitment in effect on such day minus the sum of (i) such Purchaser's Percentage Interest of the Class A Outstanding Amount of the Notes on such day plus (ii) if such Purchaser is a Liquidity Provider for a Noncommitted Purchaser, such Purchaser's Liquidity Percentage multiplied by such Noncommitted Purchaser's Percentage Interest of the Class A Outstanding Amount of the Notes on such day.

"Base Rate" means, for any day, a rate *per annum* (in no event higher than the maximum rate permitted by applicable law) equal to the higher of (a) the rate of interest publicly announced or, if not publicly announced, quoted internally from time to time by the Agent at its principal office in New York, New York as its prime commercial lending rate in effect in the United States of America, such prime rate not intended to be the lowest rate of interest charged by the Agent to any class of debtors and (b) the rate quoted to the Agent at approximately 11:00 A.M., New York City time, by dealers in the New York Federal Funds Market for the overnight offering of dollars to the Agent for deposit, from time to time in effect, plus 0.50%, calculated based on the actual days elapsed in a year of 365 or 366 days, as applicable.

"Closing Date" shall mean February 20, 2001.

"Commitment" shall mean, for any Committed Purchaser, the maximum amount of such Committed Purchaser's commitment to make advances to the Issuer, as set forth in the Joinder Supplement or the Transfer Supplement by which such Committed Purchaser became a party to this Agreement or assumed the Commitment (or a portion thereof) of another Committed Purchaser, as such amount may be adjusted from time to time pursuant to Transfer Supplement(s) executed by such Committed Purchaser and its Assignee(s) and delivered pursuant to Section 8.1 of this Agreement or pursuant to Section 2.2 of this Agreement. In the event that a Committed Purchaser maintains a portion of its Commitment hereunder in its capacity as a Liquidity Provider for one or more Noncommitted Purchasers, such Committed Purchaser shall be deemed to hold separate Commitments hereunder (i) in each such capacity

- 3 -

CSFB-00092245

and (ii) if applicable, to the extent its Commitment does not relate to any Noncommitted Purchaser.

"Commitment Expiration Date" shall mean February 15, 2004.

"Commitment Percentage" shall mean, for a Committed Purchaser, such Purchaser's Commitment as a percentage of the aggregate Commitments of all Committed Purchasers.

"Committed Purchaser" shall mean any Purchaser which has a Commitment, as set forth in its respective Joinder Supplement, and any Assignee of such Purchaser to the extent of the portion of such Commitment assumed by such Assignee pursuant to its respective Transfer Supplement.

"Committed Purchaser Percentage" shall mean, with respect to a Committed Purchaser, its Commitment (exclusive of any portion thereof held by it in its capacity as a Liquidity Provider), as a percentage of the aggregate Commitments of all Committed Purchasers.

"CSFBi Warrant Registration Rights Agreement" has the meaning specified in subsection 3.1(j) of the Agreement.

"Default" shall mean any of the events specified in the definition of Event of Default, whether or not any requirement for the giving of notice, the lapse of time, or both has been satisfied.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" shall mean any of the following events:

(a) An "Event of Default" shall occur under, and as defined in, the Indenture; or

(b) Any representation or warranty made or deemed made by the Issuer, the Depositor, the Transferor, the Seller or the Servicer herein or in any other Related Document or which is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Related Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made (except where such representation or warranty relates to any earlier date, in which case such representation and warranty shall have been true and correct in all material respects as of such earlier date) and the incorrectness of such representation or warranty has a material adverse effect on the interest of the Agent or any Purchaser, provided that the incorrectness of any

- 4 -

CSFB-00092246

representation or warranty under the Sale and Servicing Agreement which causes the Seller to be required to cure such incorrectness or repurchase a Receivable or Receivables shall not constitute an Event of Default unless the Seller shall have failed to cure such incorrectness or repurchase such Receivable or Receivables on or before the end of any grace period applicable pursuant to Section 2.1, 2.2 or 2.4 of the Sale and Servicing Agreement; or

(c) The Issuer, the Depositor, the Transferor, the Seller or the Servicer shall default in any material respect in the observance or performance of any other agreement contained in this Agreement or any other Related Document (other than as provided in paragraphs (a) and (b) of this Section), and such default shall continue unremedied for a period of 10 Business Days after the Issuer, the Depositor, the Transferor, the Seller or the Servicer becomes aware of or is notified of such default; or

(d) (i) The Indenture shall cease, for any reason, to be in full force and effect, or the Issuer shall so assert or (ii) the Lien created by the Indenture shall cease to be enforceable and of the same effect and priority purported to be created thereby.

"Excluded Taxes" has the meaning assigned to such term in subsection 6.3(a).

"Facility Termination Date" shall mean, the first to occur of (i) the Commitment Expiration Date (ii) the date of any termination by the Issuer of the Commitments pursuant to Section 2.2, and (iii) the date the Commitments are terminated pursuant to Section 2.5 of this Agreement.

"Fee Letter" shall mean that certain letter agreement, designated therein as the Fee Letter and dated as of the date hereof, among the Agent, the Issuer and the Seller, as such letter agreement may be amended or otherwise modified from time to time.

"Fees" shall mean the fees payable to the Agent or the Purchasers in the amounts and on the dates set forth in the Fee Letter.

"Fixed Rate" shall mean, as of any date, a per annum rate equal to the greater of (i) the weighted average Receivable Rate of the Eligible Receivables as of such date less 1.5% and (ii) the Term Out Rate.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indemnitee" has the meaning specified in subsection 2.4(a) of this Agreement.

"Indemnitor" has the meaning specified in subsection 2.4(a) of this Agreement.

- 5 -

CSFB-00092247

"Indenture" has the meaning specified in the recitals to this Agreement.

"Indenture Trustee" has the meaning specified in the recitals to this Agreement.

"Interest Period" means, with respect to any Payment Date, (a) with respect to the principal amount of the Notes outstanding on the first day of the related Accrual Period, the related Accrual Period and (b) with respect to any Borrowing during such Accrual Period, the period from and including the related Borrowing Date through and including the last day of such Accrual Period.

"Interpretation" as used in Sections 6.1 and 6.2 hereof with respect to any law or regulation means the interpretation or application of such law or regulation by any governmental authority (including, without limitation, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government), central bank, accounting standards board or any comparable entity.

"Investing Office" shall mean initially, the office of any Purchaser (if any) designated as such, in the case of any initial Purchaser, in its Joinder Supplement and, in the case of any Assignee, in the related Transfer Supplement, and thereafter, such other office of such Purchaser or such Assignee as may be designated in writing to the Agent, the Issuer, the Servicer and the Indenture Trustee by such Purchaser or Assignee.

"Investment Letter" has the meaning specified in subsection 8.1(a) of this Agreement.

"Joinder Supplement" has the meaning specified in subsection 2.2(d) of this Agreement.

"LIBO Business Day" means any day (a) other than (i) a Saturday, Sunday or (ii) other day on which banks are required or authorized to close in London or New York City and (b) on which dealings in foreign currency and exchange are carried on in the London interbank market

"LIBO Rate" means, for any Interest Period, a rate *per annum* equal to the London interbank offered rate for one month United States dollar deposits (rounded upward, if necessary, to the nearest whole multiple of 1/16 of one percent), that appears on the display page of the Bridge Telerate Capital Markets Report currently designated as Telerate Page 3750 (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices), as of 11:00 a.m., London time, on the second LIBO Business Day preceding the commencement of such Interest Period (or portion thereof). ). In the event no such rate appears, the LIBO Rate shall be, with respect to any Interest Period, the per annum rate of

- 6 -

CSFB-00092248

interest at which one month Dollar deposits in immediately available funds are offered to the Agent by prime banks in the interbank eurodollar market at or about 10:00 a.m., London time, on the second LIBO Business Day before (and for value on) the first day of such Interest Period (or portion thereof) and in an amount of not less than $1,000,000. The establishment of the LIBO Rate hereunder shall (in the absence of manifest error) be conclusive.

"LIBO Rate Disruption Event" means, for any Interest Period and any Purchaser, any of the following: (a) a determination by such Purchaser that it would be contrary to law applicable to such Purchaser or to the directive of any central bank or other governmental authority having jurisdiction over such Purchaser to obtain United States dollars in the London interbank market to fund its investment in its interest in the Notes for such Interest Period or (b) the inability of such Purchaser by reason of circumstances affecting the London interbank market generally, to obtain United States dollars in such market to fund its investment in its interest in the Notes for such Interest Period.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity Percentage" shall mean, for a Committed Purchaser which is a Liquidity Provider for a Noncommitted Purchaser, such Purchaser's Commitment held in such capacity as a percentage of the aggregate Commitments of all Liquidity Providers (held in their capacities as such) for such Noncommitted Purchaser.

"Liquidity Provider" shall mean, with respect to a Noncommitted Purchaser, each Committed Purchaser identified as a Liquidity Provider for such Noncommitted Purchaser in the Joinder Supplement or Transfer Supplement pursuant to which such Noncommitted Purchaser became a party hereto, and any Assignee of such Committed Purchaser to the extent such Assignee has assumed, pursuant to a Transfer Supplement, the Commitment of such Committed Purchaser held in its capacity as a Liquidity Provider. In the event that a Liquidity Provider acquires a portion of the Class A Outstanding Amount of Notes from its Noncommitted Purchaser by Assignment, a corresponding portion of its Commitment shall thereupon cease to be held by it in its capacity as a Liquidity Provider for such Noncommitted Purchaser (but shall otherwise remain in effect, subject to the terms and conditions of this Agreement, as a portion of the Commitment of such Committed Purchaser).

"Noncommitted Purchaser" shall mean a Purchaser which is not a Committed Purchaser.

- 7 -

CSFB-00092249

"Noncommitted Purchaser Percentage" shall mean for each Noncommitted Purchaser, the aggregate Commitments of its Liquidity Providers from time to time as a percentage of the aggregate Commitments of all Committed Purchasers.

"Notes" has the meaning specified in the recitals to this Agreement.

"Note Interest Rate" shall mean, for any Interest Period and any portion of the outstanding principal amount of the Notes, (a) except when an Event of Default shall have occurred and be continuing, a rate *per annum* equal to the LIBO Rate for such Interest Period plus 0.375%; *provided, however*, that

(i) if any Purchaser shall notify the Agent that a LIBO Rate Disruption Event has occurred and is continuing, then the Note Interest Rate for such Interest Period shall be a rate *per annum* equal to the Base Rate in effect from time to time during such Interest Period; and

(ii) without limiting the foregoing, if with respect to such Interest Period such Purchaser shall have notified the Agent that the rate at which deposits of United States dollars are being offered to such Purchaser in the London interbank market does not accurately reflect the cost to such Purchaser of funding its interest in the Notes for such Interest Period, then the Note Interest Rate for such Interest Period shall be a rate *per annum* equal to the Base Rate in effect from time to time during such Interest Period;

and (b) when an Event of Default shall have occurred and be continuing, the Base Rate plus 1%, provided that upon the occurrence of an Event of Default, the Purchasers may, by written notice sent to the Issuer, the Seller, the Servicer and the Depositor not less than 30 nor more than 90 days after such Event of Default shall have commenced, convert the Note Interest Rate to a fixed interest rate equal to the Fixed Rate.

"Note Monthly Interest" means, with respect to any Accrual Period, the sum of (a) the amount of interest accrued on the outstanding amount of the Notes on the preceding Payment Date calculated at the Note Interest Rate with respect to the Interest Period equivalent to such Accrual Period and (b) with respect to the amount of each Borrowing during such Accrual Period, the amount of interest accrued on the amount of each such Borrowing calculated at the Note Interest Rate with respect to the Interest Period relating to such Borrowing, provided that if any principal amount described in clause (a) or (b) together with interest accrued thereon to the date of payment is paid prior to the end of such Accrual Period pursuant to Section 3.8 of the Sale and Servicing Agreement, then (x) Note Monthly Interest with respect to such Accrual Period shall not include the amount of interest so prepaid and (y) such principal amount shall cease accruing interest as of the date preceding such prepayment. Amounts prepaid pursuant to such Section 3.8 shall be allocated among the amounts set forth in clauses (a) and (b) of the preceding sentence by the Agent, after consultation with the Servicer.

- 8 -

CSFB-00092250

"OAC" has the meaning specified in the preamble to this Agreement.

"Owners" shall mean the Purchasers that are owners of record of the Notes or, with respect to any Note held by the Agent hereunder as nominee on behalf of Purchasers, the Purchasers that are owners of the Class A Outstanding Amount represented by such Note as reflected on the books of the Agent in accordance with this Agreement.

"Other Parties" has the meaning assigned to such term in subsection 6.4(b).

"Owner Trustee" means Wilmington Trust Company, a Delaware banking company, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor thereto.

"Participant" has the meaning specified in subsection 8.1(d) of this Agreement.

"Participation" has the meaning specified in subsection 8.1(d) of the Agreement.

"Percentage Interest" shall mean, for a Purchaser on any day, the percentage equivalent of (a) the sum of (i) the aggregate of the portions of each Borrowing (if any) funded by such Purchaser prior to such day pursuant to Section 10.1 of the Indenture, plus (ii) any portion of the Class A Outstanding Amount of the Notes acquired by such Purchaser as an Assignee from another Purchaser pursuant to a Transfer Supplement executed and delivered pursuant to Section 8.1 of this Agreement, minus (iii) the aggregate amount of principal payments made to such Purchaser prior to such day, minus (iv) any portion of the Class A Outstanding Amount of the Notes assigned by such Purchaser to an Assignee pursuant to a Transfer Supplement executed and delivered pursuant to Section 8.1 of this Agreement, divided by (b) the Class A Outstanding Amount of the Notes on such day.

"Purchase Limit" shall mean for any date the aggregate Commitments of the Purchasers on such date.

"Purchaser" has the meaning specified in the preamble to this Agreement.

"Related Documents" shall mean, collectively, this Agreement (including the Fee Letter and all Joinder Supplements and Transfer Supplements), the Indenture, the Custodial Agreement, the Notes, the Trust Agreement, the Certificates, the CSFBi Warrant, the CSFBi Warrant Registration Rights Agreement, the Agreement re Bankruptcy and the Sale and Servicing Agreement.

"Required Owners" shall mean, at any time, Owners having Percentage Interests aggregating greater than 50%.

- 9 -

CSFB-00092251

"Required Purchasers" shall mean, at any time, Committed Purchasers having Commitments aggregating greater than 50% of the aggregate Commitments of all Committed Purchasers.

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule or regulation, or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, state or local (including usury laws, the Federal Truth in Lending Act and Regulation Z and Regulation B of the Board of Governors of the Federal Reserve System).

"Sale and Servicing Agreement" means the sale and servicing agreement, dated as of February 9, 2001, among the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Backup Servicer, the Custodian and the Indenture Trustee, as amended, supplemented or otherwise modified from time to time.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Structured Purchaser" shall mean any Purchaser which is a special purpose corporation, the principal business of which consists of issuing commercial paper, medium term notes or other securities to fund its acquisition and maintenance of receivables, accounts, instruments, chattel paper, general intangibles and other similar assets or interests therein, and which is identified as a Structured Purchaser in the Joinder Agreement or Transfer Supplement by which such Committed Purchaser became a party to this Agreement.

"Support Facility" shall mean any liquidity or credit support agreement with a Structured Purchaser which relates to this Agreement (including any agreement to purchase an assignment of or participation in Notes).

"Support Party" shall mean any bank or other financial institution extending or having a commitment to extend funds to or for the account of a Structured Purchaser (including by agreement to purchase an assignment of or participation in Notes) under a Support Facility. Each Liquidity Provider for a Noncommitted Purchaser which is a Structured Purchaser shall be deemed to be a Support Party for such Structured Purchaser.

"Taxes" has the meaning assigned to such term in subsection 6.3(a).

"Term Out Rate" shall mean, as of any date, the sum of (i) the Applicable Treasury Yield as of such date, (ii) 7% and (iii) to the extent that the then-current "spread-to-treasuries" for manufactured housing backed notes with a comparable average life and a comparable issue size (calculated by taking the average of two bids for such spread-to-treasuries as determined by the Agent and two of the then ten top ranked lead underwriters for such

- 10 -

CSFB-00092252

securities or such other Persons as may be agreed to from time to time by the Issuer and the Purchasers) exceeds the spread set forth in clause (ii), such excess.

"Transfer" has the meaning specified in subsection 8.1(c) of this Agreement.

"Transferee" has the meaning specified in subsection 8.1(c) of this Agreement.

"Transfer Supplement" has the meaning specified in subsection 8.1(e) of this Agreement.

"Trust Agreement" means the trust agreement, dated as of February 9, 2001, between the Depositor and the Owner Trustee.

"written" or "in writing" (and other variations thereof) shall mean any form of written communication or a communication by means of telex, telecopier device, telegraph or cable.

1.2    Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(b)    The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, subsection and Exhibit references are to this Agreement, unless otherwise specified. The words "including" and "include" shall be deemed to be followed by the words "without limitation".

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1    Purchases. (a) The Purchasers hereby direct that the Notes be registered in the name of the Agent, as nominee on behalf of the Purchasers from time to time hereunder. On and subject to the terms and conditions of this Agreement, one or more of the Purchasers shall advance to the Issuer, as the purchase price for the Notes, an amount equal to the Original Class A Note Principal Balance on the Closing Date. Such payment shall constitute a Borrowing for the purposes hereof and the Related Documents.

(b)    On and subject to the terms and conditions of this Agreement and prior to the Facility Termination Date, (i) each Noncommitted Purchaser may advance its Noncommitted Purchaser Percentage of any Borrowing made pursuant to Section 10.1 of the Indenture, (ii) each Liquidity Provider, severally, agrees to acquire its respective Liquidity Percentage of each Borrowing not so acquired by its related Noncommitted Purchaser, and (iii) each Committed Purchaser, severally, agrees to advance its Committed Purchaser Percentage of each Borrowing

- 11 -

CSFB-00092253

so made; provided that in no event shall a Committed Purchaser be required on any date to make an advance exceeding its aggregate Available Commitment, determined prior to giving effect to such advance; provided, further that in no event shall Borrowings occur more frequently than twice every calendar week unless otherwise consented to by the Agent, in its sole discretion. Such advance shall be made available to the Issuer, subject to the satisfaction of the conditions specified in Section 3.2 hereof, at or prior to 2:00 p.m. New York City time on the applicable Borrowing Date by deposit of immediately available funds to the account specified by the Issuer.

(c)    Each Borrowing on the applicable Borrowing Date shall be made on prior notice from the Issuer received by the Agent not later than 2:00 p.m. New York City time on the Business Day immediately preceding such Borrowing Date. Each such notice shall be irrevocable and shall specify (i) the aggregate amount of the Borrowing, and (ii) the applicable Borrowing Date (which shall be a Business Day). The Agent shall promptly forward a copy of such notice to each Purchaser. Each Noncommitted Purchaser shall notify the Agent by 9:30 a.m., New York City time, on the applicable Borrowing Date whether it has determined to make the advance requested pursuant to this subsection 2.1. In the event that a Noncommitted Purchaser shall not have timely provided such notice such Noncommitted Purchaser shall be deemed to have determined not to make such purchase. The Agent shall notify the Issuer, the Servicer and each Liquidity Provider for such Noncommitted Purchaser on or prior to 10:00 a.m., New York City time, on the applicable Borrowing Date of whether such Noncommitted Purchaser has so determined to advance its share of the Borrowing, and, in the event that Noncommitted Purchasers have not determined to advance the Borrowing, the Agent shall specify in such notice (i) the portion of the Borrowing to be advanced by each Liquidity Provider, and (ii) the applicable Borrowing Date (which shall be a Business Day). The Agent shall notify the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Indenture Trustee and each Purchaser not later than the Business Day following the applicable Borrowing Date of the identity of each Purchaser which advanced any portion of the Borrowing on such day, whether such Purchaser was a Noncommitted Purchaser or a Committed Purchaser and the portion of the Borrowing advanced by such Purchaser.

(d)    In no event may any Borrowing be made hereunder or under Section 10.1 of the Indenture, nor shall any Committed Purchaser be obligated to advance any portion of any Borrowing, to the extent that such Borrowing would exceed the aggregate Available Commitments.

(e)    The Notes shall be paid as provided in the Indenture, and the Agent shall allocate to the Owners each payment in respect of the Notes received by the Agent in its capacity as Noteholder as provided therein. Payments in reduction of the Class A Outstanding Amount of the Notes shall be applied to Owners pro rata based on their respective Percentage Interests of the Class A Outstanding Amount of Notes.

- 12 -

CSFB-00092254

(f)    The Agent shall keep records of each Borrowing, each Interest Period applicable thereto, the interest rate(s) applicable to the Notes and each payment of principal and interest thereon. Such records shall be rebuttably presumptive evidence of the subject matter thereof absent manifest error.

2.2    Reductions of Commitments. (a) At any time the Issuer may, upon at least three Business Days' prior written notice to the Agent, terminate the Commitments or reduce the aggregate Commitments or, with the consent of the Agent, terminate or reduce the Commitment of one or more Purchasers. Each such partial reduction shall be in an aggregate amount of $10,000,000 or integral multiples of $1,000,000 in excess thereof (or such other amount requested by the Issuer to which the Agent consents). Reductions of the aggregate Commitments of all Purchasers pursuant to this subsection 2.2(a) shall be allocated (i) to the Commitment of each Committed Purchaser, other than a Commitment held as a Liquidity Provider, pro rata based on the Commitment Percentage represented by such Commitment, and (ii) to the aggregate Commitments of Liquidity Providers for each Noncommitted Purchaser pro rata based on the Noncommitted Purchaser Percentage of such Noncommitted Purchaser, and the portion of any such reduction which is so allocated to the aggregate Commitments of Liquidity Providers for a Noncommitted Purchaser shall be allocated to the Commitment of each such Liquidity Provider pro rata based on its respective Liquidity Percentage. No reduction or termination of the Commitments shall reduce the aggregate Commitments below the outstanding principal amount of the Notes.

(b)    On the Facility Termination Date, the Commitment of each Committed Purchaser shall be automatically reduced to zero.

(c)    Subject to the provisions of subsections 8.1(a) and 8.1(b), any Person may from time to time with the consent of the Agent and the Issuer become a party to this Agreement as an initial Noncommitted Purchaser or an initial Committed Purchaser by (i) delivering to the Issuer an Investment Letter and (ii) entering into an agreement substantially in the form attached hereto as Exhibit B hereto (a "Joinder Supplement"), with the Agent and the Issuer, acknowledged by the Servicer, which shall specify (A) the name and address of such Person for purposes of Section 9.2 hereof, (B) whether such Person will be a Noncommitted Purchaser or Committed Purchaser and, if such Person will be a Committed Purchaser, and its Commitment, (C) if such Person is a Noncommitted Purchaser, the identity of its Liquidity Providers and their respective Liquidity Percentages, (D) if such Person is a Liquidity Provider, the Noncommitted Purchaser for which it is acting as such and the portion of such Person's Commitment which.is held by it in its capacity as Liquidity Provider, and (E) the other information provided for in such form of Joinder Supplement. Upon its receipt of a duly executed Joinder Supplement, the Agent shall on the effective date determined pursuant thereto give notice of such effectiveness to the Issuer, the Servicer and the Indenture Trustee.

- 13 -

CSFB-00092255

2.3    Fees, Expenses, Payments, Etc. (a) The Issuer and Seller agree to pay to the Agent for the account of the Purchasers, the Fees and other amounts payable by them set forth in the Fee Letter at the times specified therein.

(b)    The Seller further agrees to pay within 30 days following receipt of an invoice therefor to the Agent and the initial Purchasers all reasonable costs and expenses in connection with the preparation, execution, delivery, administration (including any amendments, waivers or consents of any of the Related Documents requested by the Seller or its Affiliates) of this Agreement and each related Support Facility to the extent related to the Notes, and the other documents to be delivered hereunder or in connection herewith, including the reasonable fees and out-of-pocket expenses of counsel for the Agent and each of the initial Purchasers with respect thereto.

(c)    The Issuer agrees to pay to the Agent and, following the occurrence and during the continuance of an Event of Default, each Purchaser, promptly following presentation of an invoice therefor, all reasonable costs and expenses (including reasonable fees and expenses of counsel), if any, in connection with the enforcement of any of the Related Documents, and the other documents delivered thereunder or in connection therewith.

(d)    The Seller further agrees to pay on demand any and all stamp, transfer and other taxes and governmental fees payable in connection with the execution, delivery, filing and recording of any of the Related Documents or the other documents and agreements to be delivered hereunder and thereunder or otherwise in connection with the issuance of the Notes, and agrees to save each Purchaser and the Agent harmless from and against any liabilities with respect to or resulting from any delay in paying or any omission to pay such taxes and fees.

(e)    Interest, periodic fees or other periodic amounts payable hereunder shall be calculated, unless otherwise specified in the Fee Letter, on the basis of a 360-day year and for the actual days elapsed, provided that interest paid based on the rate set forth in clause (a) of the definition of Base Rate shall be calculated on the basis of a 365 or 366-day year, as the case may be, and for actual days elapsed.

(f)    All payments to be made hereunder or under the Indenture, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 2:30 p.m., New York City time, on the due date thereof to the Agent's account specified in subsection 9.2(b) hereof, in United States dollars and in immediately available funds. Payments received by the Agent after 2:30 p.m. New York City time shall be deemed to have been made on the next Business Day. Notwithstanding anything herein to the contrary, if any payment due hereunder becomes due and payable on a day other than a Business Day, the payment date thereof shall be extended to the next succeeding Business Day and in the case of principal, interest shall accrue thereon at the applicable rate during such extension. To

- 14 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092256

the extent that (i) the Indenture Trustee, the Depositor, the Transferor, the Seller, the Issuer or the Servicer makes a payment to the Agent or a Purchaser or (ii) the Agent or a Purchaser receives or is deemed to have received any payment or proceeds for application to an obligation, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a Indenture Trustee, receiver or any other party under any bankruptcy or insolvency law, state or Federal law, common law, or for equitable cause, then, to the extent such payment or proceeds are set aside, the obligation or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received or deemed received by the Agent or the Purchasers, as the case may be.

    2.4    Indemnification. (a) OAC (the "Indemnitor") agrees to indemnify and hold harmless the Agent, each Purchaser and each Affected Party and any directors, officers, employees or agents, of the Agent, the Purchasers or the Affected Parties (each such Person being referred to as an "Indemnitee") from and against any and all claims, damages, losses, liabilities, costs or expenses whatsoever (including reasonable fees and expenses of legal counsel) which such Indemnitee may incur (or which may be claimed against such Indemnitee) arising out of, by reason of or in connection with the execution and delivery of, or payment or other performance under, or the failure by a Person other than an Indemnitee to make payments or perform under, any Related Document or the issuance of the Notes (including in connection with the preparation for defense of any investigation, litigation or proceeding arising out of, related to or in connection with such execution, delivery, payment, performance or issuance), except (i) to the extent that any such claim, damage, loss, liability, cost or expense shall be caused by the willful misconduct, bad faith, recklessness or gross negligence of, or breach of any representation or warranty in any Related Document or Support Facility by, any Indemnitee, (ii) to the extent that any such claim, damage. loss, liability, cost or expense is covered  or addressed by subsection 2.3(c) or (d) hereof, (iii) to the extent that any such claim, damage, loss, liability, cost or expense relates to disclosure made by an Indemnitee, the Owner Trustee or the Indenture Trustee in connection with an Assignment or Participation pursuant to Section 8.1 of this Agreement which disclosure is not based on information given to such Indemnitee by or on behalf of the Seller, the Servicer, the Transferor or the Depositor, or any affiliate thereof or by or on behalf of the Indenture Trustee, (iv) to the extent that such claim, damage, loss, liability, cost or expense shall be caused by any default in payment of any Receivable, (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any act or default of a successor Servicer which is not an Affiliate of OAC, (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any mismatch between the interest rate paid on the Notes and the cost to any Purchaser of obtaining funds to maintain its investment the Notes or (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any increase in the LIBO Rate. The foregoing indemnity shall include any claims, damages, losses, liabilities, costs or expenses to which any such Indemnitee may become subject under Securities Act, the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as

- 15 -

CSFB-00092257

amended, or other federal or state law or regulation arising out of or based upon any untrue statement or alleged untrue statement of a material fact in any disclosure document relating to the Notes or any amendments thereof or supplements thereto, in any case, provided or approved by the Issuer (other than statements provided by the Indemnitee expressly for inclusion therein) or arising out of, or based upon, the omission or the alleged omission to state a material fact necessary to make the statements therein or any amendment thereof or supplement thereto, in light of the circumstances in which they were made, not misleading (other than with respect to statements provided by the Indemnitee expressly for inclusion therein).

(b)     Promptly after the receipt by an Indemnitee of a notice of the commencement of any action against an Indemnitee, such Indemnitee will notify the Agent and the Agent will, if a claim in respect thereof is to be made against the Indemnitor pursuant to subsection 2.4(a), notify such Indemnitor in writing of the commencement thereof; but the omission so to notify such party will not relieve such party from any liability which it may have to such Indemnitee pursuant to the preceding paragraph except to the extent the Indemnitor is materially prejudiced by such failure. If any such action is brought against an Indemnitee and it notifies the Indemnitor of its commencement, the Indemnitor will be entitled to participate in and, to the extent that it so elects by delivering written notice to the Indemnitee after receiving notice of the commencement of the action from the Indemnitee, to assume the defense of any such action, with counsel mutually satisfactory to such Indemnitor and each affected Indemnitee. After delivery of such notice by an Indemnitor to an Indemnitee, the Indemnitor will not be liable to such Indemnitee for any legal or other expenses except as provided below and except for the reasonable costs of investigation incurred by the Indemnitee in connection with the defense of such action. Each Indemnitee will have the right to employ its own counsel in any such action, but the fees, expenses and other charges of such counsel will be at the expense of the such Indemnitee unless (i) the employment of such counsel by such Indemnitee has been authorized in writing by the Indemnitor, (ii) the Indemnitor shall have failed to assume the defense and employ counsel, (iii) the named parties to any such action or proceeding (including any impleaded parties) include both such Indemnitee and either the Indemnitor or another person or entity that may be entitled to indemnification from the Indemnitor (by virtue of this Section 2.4 or otherwise) and such Indemnitee and the Indemnitor shall have been advised by counsel to the Indemnitor that there are one or more legal defenses available to such Indemnitee which are different from or additional to those available to an Indemnitor or such other party and which present a conflict of interest or shall otherwise have reasonably determined that the co-representation would present a conflict of interest (in which case the Indemnitor will not have the right to direct the defense of such action on behalf of the Indemnitee). In any such case described in clauses (i) through (iii) of the preceding sentence, the reasonable fees, disbursements and other charges of counsel to such Indemnitee will be at the expense of the Indemnitor; it being understood that in no event shall the Indemnitor be liable for the fees, disbursements and other charges of more than one counsel (in addition to any local counsel) for all Indemnitees in connection with any one action or separate but similar or related actions

- 16 -

CSFB-00092258

arising out of the same general allegations or circumstances. The Indemnitor shall not be liable for any settlement of any such action, suit or proceeding effected without its written consent, which shall not be unreasonably withheld, but if settled with the written consent of the Indemnitor or if there shall be a final judgment for the plaintiff in any such action, suit or proceeding, the Indemnitor agrees to indemnify and hold harmless any Indemnitee to the extent set forth herein from and against any loss, claim, damage, liability or reasonable expense by reason of such settlement or judgment. The Indemnitor shall not, without the prior written consent of an Indemnitee (not to be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder, if such settlement, compromise or consent includes an admission of culpability or wrong-doing on the part of such Indemnitee or the entry or an order, injunction or other equitable or nonmonetary relief (including any administrative or other sanctions or disqualifications) against such Indemnitee or if such settlement, compromise or consent does not includes an unconditional release of such Indemnitee from all liability arising out of such claim, action, suit or proceeding.

(c)    The obligations of OAC under this Section 2.4 shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement. Without limiting the foregoing, neither the lack of validity or enforceability of, or any modification to, any Related Document nor the existence of any claim, setoff, defense (other than a defense of payment) or other right which OAC may have at any time against the Agent any Purchaser, any Affected Party or any other Person, whether in connection with any Related Document or any unrelated transactions, shall constitute a defense to such obligations.

(d)    Each Affected Party shall be entitled to receive indemnification pursuant to this Section 2.4 as though it were a Purchaser and this Section 2.4 applied to its interest in or commitment to acquire an interest in the Notes.

2.5    Events of Default. If any Event of Default shall occur and be continuing, (A) if such event is an Event of Default specified in paragraph (d) of the definition thereof with respect to the Issuer, automatically the Commitments shall immediately terminate, and (B) if such event is any other Event of Default, with the consent of the Required Purchasers and the Required Owners, the Agent may, or upon the request of the Required Purchasers and the Required Owners, the Agent shall, by notice to the Issuer, declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate.

2.6    Notification of Note Monthly Interest. On the third Business Day immediately preceding each Payment Date, the Agent shall calculate the Note Monthly Interest applicable to all Notes for the applicable Accrual Period and shall notify the Indenture Trustee and the Servicer of such amount by written notice in the form of Exhibit C hereto. Such rate and amount

- 17 -

CSFB-00092259

shall be calculated using an estimate of the Note Interest Rate, if necessary, for the remaining days in such Accrual Period.

## SECTION 3.  CONDITIONS PRECEDENT

3.1     <u>Condition to Initial Purchase</u>.  The following shall be conditions precedent to the initial purchase by any Purchaser of the Notes unless waived by the Agent with the consent of the Required Purchasers:

(a)     This Agreement shall have been executed and delivered, and the Related Documents shall have been executed and delivered and shall have become effective in accordance with their respective terms.

(b)     All of the terms, covenants, agreements and conditions of this Agreement, the Fee Letter and the Related Documents to be complied with and performed by OAC, the Seller, the Servicer, the Issuer, the Depositor, the Transferor, the Owner Trustee or the Indenture Trustee, as the case may be, by the Closing Date shall have been complied with in all material respects or otherwise waived by the Agent.

(c)     Each of the representations and warranties of each of OAC, the Seller, the Servicer, the Issuer, the Depositor, the Transferor, the Owner Trustee or the Indenture Trustee, as the case may be, made in this Agreement and in the Related Documents shall be true and correct in all material respects as of the time of the Closing Date as though made as of such time (except to the extent that they expressly relate to an earlier or later time).

(d)     No Default or Event of Default shall have occurred and be continuing

(e)     The Agent shall have received:

(i)     Certified copies of the resolutions of the Board of Directors or comparable body of each of OAC, OHC, the Transferor and the Depositor approving this Agreement and the other Related Documents to which it is a party and any other documents contemplated thereby and certified copies of all documents evidencing other necessary corporate action and governmental approvals, if any, with respect to this Agreement and the other Related Documents to which it is a party and any other documents contemplated thereby;

(ii)     An officer's certificate of each of OAC, OHC, the Transferor, the Depositor and the Owner Trustee, certifying the names and true signatures of the officers authorized to sign this Agreement and the other Related Documents and any other documents to be delivered by it hereunder or thereunder;

- 18 -

CSFB-00092260

       (iii)    A copy of the bylaws of each of OAC and OHC, certified by an officer thereof;

       (iv)    A certified copy of the charter or limited liability company agreement of each of OAC, OHC, the Transferor and the Depositor, a certificate as to the good standing of each of OAC and OHC from the Secretary of State of the State of North Carolina and a certificate as to the good standing of each of the Transferor and the Depositor from the Secretary of State of the State of Delaware, in each case dated as of a recent date;

       (v)    Proper financing statements under the UCC of all jurisdictions that the Agent may deem necessary or desirable in order to perfect the ownership and security interests contemplated by the Sale and Servicing Agreement, the Indenture and this Agreement;

       (vi)    Executed copies of proper financing statements, if any, necessary to release all security interests and other rights, if any, of any Person in the Trust Estate previously granted by the Transferor, the Seller, the Depositor or the Issuer;

       (vii)    Completed requests for information, dated on or before the Closing Date, in all jurisdictions referred to in subsection (vi) above that name the Issuer, the Transferor, the Depositor or OAC as debtor, together with copies of such other financing statements;

       (viii)    An opinion of Hunton & Williams, special counsel to OAC, dated the Closing Date, in form and substance satisfactory to the Agent;

       (ix)    An opinion of Richards, Layton & Finger, counsel to the Owner Trustee and special Delaware counsel to the Issuer, dated the Closing Date, in form and substance satisfactory to the Agent;

       (x)    An opinion of internal counsel for the Indenture Trustee, Custodian and Backup Servicer, dated the Closing Date, in form and substance satisfactory to the Agent;

       (xi)    A favorable written opinion of Loeb & Loeb, counsel for the Transferor, dated the Closing Date, in form and substance satisfactory to the Agent;

       (xii)    A copy of the documentation evidencing the release of all liens attaching to the Receivables pursuant to previous financings; and

       (xiii)    Such other documents, instruments, certificates and opinions as the Agent may reasonably request.

       (f)    No action, suit, proceeding or investigation by or before any Governmental Authority shall have been instituted to restrain or prohibit the consummation by

CSFB-00092261

the Agent or the Purchasers of, or to invalidate, the transactions contemplated by this Agreement or the other Related Documents in any material respect.

        (g)    Each of the Structured Purchasers shall have entered into total return swaps with Credit Suisse First Boston International in form and substance satisfactory to such Structured Purchaser.

        (h)    OHC shall have issued the CSFBi Warrant, in substantially the form of Exhibit D hereto, to CSFBi.

        (i)    OHC and CSFBI shall have entered into a Registration Rights Agreement, in substantially the form of Exhibit E hereto (the "CSFBi Warrant Registration Rights Agreement"), with respect to the CSFBi Warrant.

        (j)    OHC, OAC and Oakwood Capital Corporation shall have executed and delivered to the Agent the Agreement re Bankruptcy (the "Agreement re Bankruptcy"), in substantially the form of Exhibit F hereto.

    3.2    Condition to Borrowings. The following shall be conditions precedent to each Borrowing hereunder unless waived by the Agent with the consent of the Required Purchasers:

        (a)    the Issuer shall have timely delivered a notice of Borrowing pursuant to subsection 2.1(b) of this Agreement;

        (b)    no Default or Event of Default shall have occurred and be continuing on such date;

        (c)    both immediately prior to and after giving effect to such Borrowing and the application of the proceeds thereof as provided herein and in the Indenture, the Class A Outstanding Amount of the Notes shall not exceed the Borrowing Base;

        (d)    the conditions set forth in proviso (ii) of Section 10.1 of the Indenture with respect to such Borrowing shall have been satisfied.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES

    4.1    Representations and Warranties of OAC . OAC hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

        (a)    It is a validly existing and in good standing under the laws of its jurisdiction of organization, with full power and authority under such laws to own its properties

- 20 -

CSFB-00092262

and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)      It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect.  The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)      No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)      The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its organizational documents, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, documents, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)      Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance

- 21 -

CSFB-00092263

of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that is expected by it to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)     It has delivered to the Agent complete and correct copies of OHC's audited financial statements for the years ended September 30, 1998, September 30, 1999 and September 30, 2000.

(g)     No report, statement, exhibit or other written information required to be furnished by OAC or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(h)     Each of the Related Documents to which it is a party is in full force and effect with respect to it and no Default or Event of Default has occurred with respect to it.

(i)     OAC repeats and reaffirms to the Agent and the Owners each of the representations and warranties of OAC in the Section 2.1 of the Sale and Servicing Agreement and each other document delivered in connection therewith or herewith, and represents that such representations and warranties are true and correct in all material respects.

(j)     As of the Closing Date, based upon, among other things, the representations and warranties and covenants of the Agent and the Purchasers hereunder, the sale of the Notes by the Issuer pursuant to the terms of this Agreement and the Indenture will not require the registration of such Notes under the Securities Act.

(k)     All tax returns (federal, state and local) required to be filed with respect to OAC have been filed (which filings may be made by an Affiliate of OAC on a consolidated basis covering OAC and other Persons) and there has been paid or adequate provision made for the payment of all taxes, assessments and other governmental charges in respect of OAC (or in the event consolidated returns have been filed, with respect to the Persons subject to such returns) and any taxes for which adequate provision has not been made would not have a material adverse effect on OAC's ability to perform its obligations hereunder.

(l)     The Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended, and none of OAC, the Depositor, the Transferor or the Issuer is required to be registered under the Investment Company Act of 1940, as amended.

- 22 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092264

(m)     There has not been any material adverse change in the business, operations, financial condition, properties or assets of OAC since the year ended September 30, 2000.

(n)     As of the Closing Date, the chief executive office of OAC is at the address indicated in Section 9.2 hereof.

(o)     Since the Closing Date (except as approved by the Agent in writing), there have been no material changes in the Credit and Collection Policy.

(p)     As of the date hereof: (i) OAC has only the subsidiaries and divisions listed on Schedule IV to the Sale and Servicing Agreement; and (ii) OAC has, within the last five (5) years, operated only under the tradenames identified in Schedule IV to the Sale and Servicing Agreement, and, within the last five (5) years, has not changed its name, merged with or into or consolidated with any other corporation or been the subject of any proceeding under Title 11, United States Code (Bankruptcy), except as disclosed in such Schedule IV.

(q)     OAC and each Affiliate thereof is in compliance in all material respects with ERISA and no lien in favor of the Pension Benefit Guaranty Corporation on any of the Contracts or Receivables shall exist.

(r)     The names and addresses of all the Lock-Box Banks, together with the account numbers of the Lock-Box Accounts at such Lock-Box Banks, are specified in Schedule III to the Sale and Servicing Agreement (or have been notified to the Indenture Trustee).

4.2     _Representations and Warranties of the Issuer_.  The Issuer hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a)     It is a business trust validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)     It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it

- 23 -

CSFB-00092265

in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect. The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)     No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)     The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, the Trust Agreement, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)     Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)     No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which

- 24 -

CSFB-00092266

such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(g)    The Notes have been duly and validly authorized, and, when executed and authenticated in accordance with the terms of the Indenture and delivered to the Agent and paid for in accordance with this Agreement, will be duly and validly issued and outstanding, and will be entitled to the benefits of the Indenture, this Agreement and the other Related Documents.

(h)    Each of the Related Documents to which it is a party is in full force and effect and no Default or Event of Default with respect to it has occurred and is continuing.

(i)    The Issuer repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in each other document delivered in connection therewith, and represents that such representations and warranties are true and correct in all material respects.

(j)    Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

4.3    Representations and Warranties of the Transferor.  The Transferor hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a) It is a corporation validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)    It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect.  The enforceability of its obligations under such

- 25 -

CSFB-00092267

agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)     No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)     The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its charter or By-laws, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)     Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)     No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

- 26 -

CSFB-00092268

(g)    Each of the Related Documents to which it is a party is in full force and effect and Default or Event of Default with respect to it has occurred and is continuing.

(h)    The Transferor repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in Section 2.1 of the Sale and Servicing Agreement and each other document delivered in connection therewith or herewith, and represents that such representations and warranties are true and correct in all material respects.

(i)    Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

(j)    As of the Closing Date, the chief executive office of the Transferor is at the address indicated in Section 9.2 hereof.

4.4    <u>Representations and Warranties of the Depositor</u>.  The Depositor hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a) It is a limited liability company validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)    It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect.  The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

- 27 -

CSFB-00092269

(c)     No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained by it and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)     The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its limited liability company agreement, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)     Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)     No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(g)     Each of the Related Documents to which it is a party is in full force and no Default or Event of Default with respect to it has occurred and is continuing.

(h)     The Depositor repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in Section 2.1 of the Sale and Servicing Agreement and in the Trust Agreement and each other document delivered in connection therewith or

- 28 -

CSFB-00092270

herewith, and represents that such representations and warranties are true and correct in all material respects.

(i)    Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

(j)    As of the Closing Date, the chief executive office of the Depositor is at the address indicated in Section 9.2 hereof.

## SECTION 5.  COVENANTS

5.1    Covenants .  Each of the Seller, the Servicer, the Depositor, the Transferor, and the Issuer, each as to itself, covenants and agrees with the Agent and the Purchasers, through the Facility Termination Date and thereafter so long as any amount of the Notes shall remain outstanding or any monetary obligation arising hereunder shall remain unpaid, unless the Required Owners and the Required Purchasers shall otherwise consent in writing, that:

(a)    it shall perform in all material respects each of the respective covenants and other agreements made by it and comply in all material respects with each of the respective terms and provisions applicable to it under any of the other Related Documents to which it is party; it shall take all reasonable action to enforce the obligations of each of the other parties (other than the Note Agent and the Purchasers) to such Related Documents which are contained therein;

(b)    the Issuer and the Servicer shall furnish to the Agent a copy of each opinion, certificate, report, statement, notice or other communication (other than investment instructions) relating to the Notes which is furnished by or on behalf of it to the other or to the Indenture Trustee and furnish to the Agent, after receipt thereof, a copy of each notice, demand or other communication relating to the Notes, this Agreement or the Indenture received by the Issuer or the Servicer from the Indenture Trustee, the Depositor, the Transferor or the Seller; and (ii) such other information, documents records or reports respecting the Collateral, the Seller, the Depositor, the Transferor, the Issuer or the Servicer as the Agent may from time to time reasonably request;

(c)    the Issuer shall furnish to the Agent on or before the date such reports are due under the Indenture copies of each of the reports and certificates required by Sections 3.9 and 3.14 of the Indenture;

- 29 -

CSFB-00092271

(d)     Each of the Seller and the Servicer shall pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including tax obligations), except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and appropriate reserves with respect thereto have been provided on the books of the Seller or the Servicer, as applicable;

(e)     Each of the Seller and the Servicer shall continue to engage in business of the same general type as now conducted by it and preserve, renew and keep in full force and effect its existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business and comply with all Requirements of Law, except where the failure to be so qualified or comply could not reasonably be expected to have a material adverse affect on the Seller or the Servicer, as applicable ;

(f)     the Issuer, the Depositor, the Transferor, the Seller and the Servicer shall at any time from time to time during regular business hours, on reasonable notice to the Issuer, the Depositor, the Transferor, the Seller or the Servicer, as the case may be, permit the Agent, or its agents or representatives to:

(i)     examine all books, records and documents (including computer tapes and disks) in its possession or under its control with respect to the Related Documents or the Receivables; and

(ii)     visit its offices and property for the purpose of examining such materials described in clause (i) above.

(g)     the Issuer and the Servicer shall furnish to the Agent, promptly after obtaining actual knowledge of the occurrence of any Default or Event of Default, a certificate of the Issuer or an appropriate officer of the Servicer, as the case may be, setting forth the circumstances of such Default or Event of Default and any action taken or proposed to be taken by the Issuer or the Servicer with respect thereto;

(h)     it shall timely make all payments, deposits or transfers to be made by it and give all instructions to transfer required to be given by it under this Agreement and the Indenture;

(i)     the Seller, the Depositor, the Transferor, Issuer and the Servicer shall execute and deliver to the Agent or the Indenture Trustee all such documents and instruments and do all such other acts and things as may be necessary or reasonably required by the Agent or the Indenture Trustee to enable any of them to exercise and enforce their respective rights under the Related Documents and to realize thereon, and record and file and rerecord and refile all such

- 30 -

CSFB-00092272

documents and instruments, at such time or times, in such manner and at such place or places, all as may be necessary or required by the Indenture Trustee or the Agent to validate, preserve, perfect and protect the position of the Indenture Trustee under the Indenture, provided no such action shall be inconsistent with the Indenture or contrary to instructions of the Indenture Trustee;

(j)     neither the Seller, the Depositor, the Transferor, the Issuer nor the Servicer will consolidate with or merge into any other Person or convey or transfer its properties and assets substantially as an entirety to any Person, except in the case of the Depositor, the Transferor, the Servicer or the Seller, (i) in accordance with Section 5.2 of the Sale and Servicing Agreement and (ii) with the prior written consent of the Required Owners and the Required Purchasers, provided that, without such consent, OAC may merge into Oakwood Acceptance Corporation, LLC, a Delaware limited liability company;

(k)     OAC will not resign as Servicer, unless (A) the performance of its duties under the Sale and Servicing Agreement is no longer permissible pursuant to Requirements of Law and there is no reasonable action which it could take to make the performance of such duties permissible under such Requirements of Law, or (B) the Required Owners and the Required Purchasers shall have consented thereto;

(l)     OAC shall furnish to the Agent:

(i)     (1) as soon as available and in any event within 45 days after the end of each fiscal quarter of Oakwood Homes Corporation, a North Carolina corporation ("OHC"), the balance sheet of OHC and its consolidated subsidiaries as of the end of such quarter and statements of income and retained earnings of OHC and its consolidated subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, certified by the chief financial officer of OHC and (2) as soon as available and in any event within 90 days after the end of each fiscal year of OHC, a copy of the annual report on Form 10-K for such year for OHC and its consolidated subsidiaries, containing financial statements for such year accompanied by an audit report of a nationally recognized firm of independent certified public accountants (or such other firm of independent certified public accountants acceptable to the Agent) which report shall be unqualified as to going concern and scope of audit and shall state the opinion that such consolidated financial statements present fairly the financial position of OHC and each of its consolidated subsidiaries at the dates indicated and the results of their operations and their cash flow for the periods indicated in conformity with generally accepted accounting principles and that the examination had been made in accordance with generally accepted auditing standards; and

- 31 -

CSFB-00092273

(ii)    Such other information (including financial information), documents, records or reports respecting the Notes, the Trust Estate, the Seller, the Servicer, the Depositor or the Issuer as the Agent may from time to time reasonably request.

(m)    Neither the Seller nor the Servicer shall make, or permit any Person to make, any material amendment, modification or change to, or provide any material waiver under, the Indenture or the other Related Documents without the prior written consent of the Agent.

(n)    Each of the Seller and the Servicer will comply in all material respects with the Credit and Collection Policy in regard to each Receivable and the related Contract. Each of the Seller and the Servicer shall (i) notify the Agent ten (10) days prior to any amendment of or change in the Credit and Collection Policy and (ii) obtain the Agent's consent prior to any such amendment or change; provided that the Seller and the Servicer may immediately implement any changes (and provide notice to the Agent subsequent thereto) as may be required under applicable law from time to time upon the reasonable determination of the Seller or the Servicer, as the case may be. The underwriting, credit scoring, approval, servicing and collection policies and procedures applied to Receivables and the related Contracts originated by independent third parties shall be in accordance with the Credit and Collection Policy and in no event shall such Receivables and related Contracts be underwritten, credit scored, approved, serviced and collected more leniently or less stringently than those procedures applied to Receivables and related Contracts originated by the Seller or an Affiliate. The Seller and the Servicer shall (i) notify the Agent ten (10) days prior to the use of any retail installment sales contract related to the Financed Housing that contains material changes from the form of the Contract as of the Closing Date and (ii) obtain the Agent's consent prior to using such retail installment sales contract; provided that the Seller and the Servicer may immediately implement any changes (and provide notice to the Agent subsequent thereto) as may be required under applicable law from time to time upon the reasonable determination of the Seller or the Servicer, as the case may be.

(o)    The Seller shall cause to be delivered to the Agent, within thirty (30) days following receipt of a written request from the Agent, at the expense of the Seller, the written report of a review conducted by an independent auditor acceptable to the Agent of a random sampling of Contracts that are held by the Custodian, together with all related Contract Documents held by the Custodian.

(p)    The Servicer shall instruct all Obligors to cause all Collections to be deposited directly to a Lock-Box Account. In the event either the Seller or the Servicer receives any Collections, the Seller or the Servicer, as the case may be, shall hold in trust, and deposit, immediately, but in any event not later than one (1) Business Day of its receipt thereof, to a Lock-Box Account all such Collections.

- 32 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092274

(q)     The Seller and the Servicer shall notify the Agent within five (5) Business Days of obtaining knowledge thereof, of any fraudulent activity or theft in the origination or servicing of Receivables or the related Contracts that results or may result in a loss of at least $250,000.

(r)     Except as otherwise provided herein, neither the Seller, the Servicer, the Depositor, the Transferor nor the Issuer will sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Lien upon .(or the filing of any financing statement) or with respect to, any Receivable or related Contract, or upon or with respect to any Lock-Box Account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof.

(s)     Except as otherwise permitted in the Sale and Servicing Agreement or with the prior written consent of the Agent, neither the Seller nor the Servicer will extend, amend or otherwise modify the terms of any Receivable, or amend, modify or waive any term or condition of any Contract related thereto.

(t)     Neither the Seller nor the Servicer will add or terminate any bank as a Lock-Box Bank or any account as a Lock-Box Account to or from those listed in Schedule III to the Sale and Servicing Agreement or make any change in its instructions to Obligors regarding payments to be made to any Lock-Box Account, unless (i) such instructions are to deposit such payments to another existing Lock-Box Account or (ii) the Agent shall have received written notice of such addition, termination or change at least 30 days prior thereto.

(u)     Neither the Seller, the Depositor, the Transferor nor the Issuer will change its name, identity or structure or its chief executive office, unless at least 30 days prior to the effective date of any such change such person delivers to the Indenture Trustee and the Agent UCC financing statements, executed by such Person necessary to reflect such change and to continue the perfection of the Indenture Trustee's interest in the Receivables.

(v)     Each of the Depositor and the Transferor covenants and agrees with the Agent and the Purchasers that, unless the Agent shall otherwise consent in writing:

(i)     It shall conduct its business solely in its own name through its duly authorized officers or agents so as not to mislead others as to the identity of the entity with which such persons are concerned, and shall avoid the appearance that it is conducting business on behalf of any Affiliate thereof or that its assets are available to pay the creditors of OHC or any Affiliate thereof (other than as expressly provided herein).

(ii)    It shall maintain corporate records and books of account separate from those of OHC and any Affiliate (other than, in the case of the Depositor, itself) thereof.

- 33 -

CSFB-00092275

(iii)    It shall obtain proper authorization for all action requiring such authorization.

(iv)    It shall pay its own operating expenses and liabilities from its own funds.

(v)    In the case of the Depositor, the annual financial statements of OHC shall disclose the effects of the transactions contemplated hereby in accordance with generally accepted accounting principles.

(vi)    Its resolutions, agreements and other instruments underlying the transactions described in this Agreement shall be continuously maintained by it as part of its official records.

(vii)    It shall maintain an arm's-length relationship with OHC and its Affiliates (other than, in the case of the Depositor, itself), and shall not hold itself out as being liable for the debts of OHC or any of its Affiliates (other than, in the case of the Depositor, itself).

(viii)    It shall keep its assets and liabilities separate from those of all other entities other than as permitted herein.

(ix)    It shall not maintain bank accounts or other depository accounts to which any Affiliate is an account party or from which any Affiliate has the power to make withdrawals.

(x)    It shall not amend, supplement or otherwise modify its organizational documents, except in accordance therewith and with the prior written consent of the Agent.

(xi)    It shall not create, incur, assume or suffer to exist any indebtedness on which it is obligated, except as contemplated by this Agreement and the other Related Documents. It shall not assume, guarantee, endorse or otherwise be or become directly or contingently liable for the obligations of any Person by, among other things, agreeing to purchase any obligation of another Person (other than the Receivables), agreeing to advance funds to such Person or causing or assisting such Person to maintain any amount of capital. It shall not be party to any indenture, agreement, mortgage, deed of trust or other instrument other than this Agreement and the other Related Documents.

(xii)    It shall not enter into, or be a party to any transaction with any of its Affiliates, except as contemplated by this Agreement and the other Related Documents.

- 34 -

T:\Corp\dtc\csuis535\rpa_v12.doc
last saved on 2/27/2001

CSFB-00092276

(xiii)    It shall observe all procedures required by its organizational documents and preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its formation and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualifications would materially adversely affect the interests hereunder of the Purchasers or the Agent or its ability to perform its obligations hereunder.

(xiv)    It shall not form, or cause to be formed, any subsidiaries; or make or suffer to exist any loans or advances to, or extend any credit to, or make any investments (by way of transfer of property, contributions to capital, purchase of stock or securities or evidences of indebtedness (other than the Receivables), acquisition of the business or assets, or otherwise) in, any Affiliate or any other Person except as otherwise permitted herein.

## SECTION 6.   INCREASED COSTS, INCREASED CAPITAL, ETC.

6.1    Increased Costs.  Subject to the provisions of Section 6.4, if, due to the introduction of or any change (including any change by way of imposition or increase of reserve requirements generally) in or in the Interpretation of any law or regulation or the general imposition of any guideline or general request from any central bank or other governmental authority after the date hereof, there shall be an increase in the cost to an Affected Party of making, funding or maintaining any investment in the Notes or any interest therein or of agreeing to purchase or invest in the Notes or any interest therein, as the case may be (other than by reason of any Interpretation of or change in laws or regulations relating to Taxes or Excluded Taxes), the Issuer shall, upon written demand by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights) (with a copy to the Agent), direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Affected Party (as a third party beneficiary, in the case of an Affected Party that is not also a Purchaser hereunder) that portion of such increased costs incurred which such Affected Party reasonably determines is attributable to making, funding or maintaining any investment in the Notes or any interest therein or agreeing to purchase or invest in the Notes or any interest therein, as the case may be.  In determining such amount, such Affected Party may use any reasonable averaging and attribution methods, consistent with the averaging and attribution methods generally used by such Affected Party in determining amounts of this type. A certificate as to such increased costs incurred submitted to the Servicer, the Issuer and the Agent, setting forth the calculation thereof in reasonable detail, shall be prima facie evidence as to the amount of such increased costs.  Any Affected Party that incurs such increased costs as described in this Section 6.1 (or, if such Affected Party is not a Purchaser, the Purchaser from whom such Affected Party derives its rights) shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such increased costs; provided that no such steps shall be required to be taken if, in

- 35 -

CSFB-00092277

the reasonable judgment of such Affected Party, such steps would be materially disadvantageous to such Affected Party.

6.2    <u>Increased Capital</u>.  Subject to the provisions of Section 6.4, if the introduction of or any change in or in the Interpretation of any law or regulation or the general imposition of any guideline or general request from any central bank or other governmental authority after the date hereof, affects or would affect the amount of capital required to be maintained by any Affected Party after the date hereof, and such Affected Party determines that the amount of such capital is increased as a result of (i) the existence of such Affected Party's agreement to make or maintain an investment in the Notes or any interest therein or (ii) the existence of any agreement by such Affected Party to make or maintain an investment in the Notes or any interest therein or to fund any such investment after the date hereof, then, upon written demand by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights) (with a copy to the Agent), the Issuer shall direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Affected Party (as a third party beneficiary, in the case of an Affected Party that is not also a Purchaser hereunder), additional amounts, as specified by such Affected Party, sufficient to compensate such Affected Party in light of such circumstances, to the extent that such Affected Party reasonably determines such increase in capital to be allocated to the existence of such Affected Party's agreement described in clause (i) above or the commitments of such Affected Party described in clause (ii) above.  In determining such amounts, such Affected Party may use any reasonable averaging and attribution methods, consistent with the averaging and distribution methods generally used by such Affected Party in determining amounts of this type.  A certificate as to such amounts submitted to the Servicer, the Issuer and the Agent by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights), setting forth the calculation thereof in reasonable detail, shall be <u>prima facie</u> evidence of the amounts so owed.  Any Affected Party that is entitled to compensation for increases in capital as described in this Section 6.2 shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such compensation; provided that no such steps shall be required to be taken if, in the reasonable judgment of such Affected Party, such steps would be materially disadvantageous to such Affected Party.

6.3    <u>Taxes</u>.  (a) Any and all payments and deposits required to be made hereunder or under the Indenture or the Sale and Servicing Agreement to or for the benefit of a Purchaser shall be made, to the extent allowed by law, free and clear of and without deduction for any and all present or future United States taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes, levies, imposts, deductions, charges or withholdings imposed on, or measured by reference to, the net income of such Purchaser, franchise taxes imposed on such Purchaser, and taxes (other than withholding taxes), levies, imposts, deductions, charges or withholdings imposed on the receipts or gross receipts of such

- 36 -

CSFB-00092278

Purchaser by any of (i) the United States or any State thereof, (ii) the state or foreign jurisdiction under the laws of which such Purchaser is organized, with which it has a present or former connection (other than solely by reason of this Agreement), or in which it is otherwise doing business, (iii) any political subdivision thereof or (iv) any state or other jurisdiction (or any political subdivision thereof) in which any commitment with respect to, or investment in, the Notes is held or with which any such income or receipts are otherwise connected (all such excluded items being referred to as "Excluded Taxes" and all such taxes, levies, imposts, deductions, charges, withholdings and liabilities other than Excluded Taxes being referred to as "Taxes"). If the Indenture Trustee, as directed by the Agent, shall be required by law to deduct any Taxes from or in respect of any sum required to be paid or deposited hereunder or under any instrument delivered hereunder to or for the benefit of a Purchaser (A) subject to Section 6.4 below, such sum shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums required to be paid or deposited under this Section 6.3) the amount received by such Purchaser, or otherwise deposited hereunder or under such instrument, shall be equal to the sum which would have been so received or deposited had no such deductions been made, (B) the Indenture Trustee, as directed by the Agent, shall make such deductions and (C) the Indenture Trustee, as directed by the Agent, shall pay the full amount of such deductions to the relevant taxation authority or other authority in accordance with applicable laws.

    (b)    Subject to the limitations set forth in subsection 6.3(d) and Section 6.4 below, the Issuer shall indemnify each Owner for, and shall direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Owner, the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 6.3) paid by such Owner due to the modification of or any change in or in the Interpretation or administration by any governmental or regulatory agency or body charged with the Interpretation or administration of any law or regulation relating to Taxes after the date hereof (including interest) arising therefrom or required to be paid with respect thereto. Each Owner (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) agrees to promptly notify the Servicer, the Agent and the Issuer of any payment of such Taxes made by it and, if practicable, any request, demand or notice received in respect thereof prior to such payment. Each Owner shall be entitled to payment of this indemnification within 30 days from the date such Owner (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) makes written demand therefor to the Servicer, the Agent and the Issuer. A certificate as to the amount of such indemnification submitted to the Issuer and the Agent by such Owner setting forth in reasonable detail the basis for and the calculation thereof, shall be prima facie evidence of the amounts so owed.

    (c)    Within 30 days after the date of any payment of Taxes, the Issuer will furnish to the Agent the original or a certified copy of a receipt evidencing payment thereof.

- 37 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092279

(d)     Each Owner thereof hereby agrees to complete, execute and deliver to the Indenture Trustee from time to time prior to the date on which such Owner will be entitled to receive distributions pursuant to the Indenture, the Sale and Servicing Agreement or this Agreement, Internal Revenue Service W-8IMY, W-9, W-8EXP, W-8ECI or W-8BEN (or any successor form), as applicable, or such other forms or certificates as may be required under the laws of any applicable jurisdiction in order to permit the Indenture Trustee to make payments to, and deposit funds to or for the account of, such Owner hereunder and under the Indenture and the Sale and Servicing Agreement without any deduction or withholding for or on account of any Taxes. Each Owner agrees to provide, to the extent permitted by law, like additional subsequent duly executed forms on or before the date that any such form expires or becomes obsolete, or upon the occurrence of any event requiring an amendment, resubmission or change in the most recent form previously delivered by it and to provide such extensions or renewals as may be reasonably requested by the Issuer. Each Owner further agrees that compliance with this subsection 6.3(d) (including by reason of Section 8.1 in the case of any assignment, sale or other transfer of any interest in the Notes) is a condition to the payment of any amount otherwise due pursuant to subsections 6.3(a) and (b) hereof.

(e)     Each Purchaser, as of the date hereof, and each other Owner, as of the date such Person becomes an Owner entitled to receive distributions pursuant to this Agreement, the Sale and Servicing Agreement or the Indenture, hereby represents and warrants to the Issuer that it is not subject to gross-up or indemnity of Taxes under subsection 6.3(a) or (b) from or in any respect of any sum required to be paid or deposited under this Agreement, the Indenture, the Sale and Servicing Agreement or under any instrument delivered pursuant to any of them to or for the benefit of any Owner.

(f)     Any Owner entitled to the payment of any additional amount pursuant to this Section 6.3 (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such payment; provided that no such steps shall be required to be taken if, in the reasonable judgment of such Owner, such steps would be materially disadvantageous to such Owner.

6.4     Nonrecourse Obligations; Limited Recourse. (a) Notwithstanding any provision in any other Section of this Agreement to the contrary, the obligation of the Issuer to pay any amounts payable to the Purchasers or any Owner pursuant to this Agreement shall be without recourse to the Issuer (or its assignee, if applicable), the Indenture Trustee or any Affiliate, officer, director, employee or other representative of any of them and the obligation to pay any amounts hereunder shall be limited solely to the application of the Trust Estate, to the extent that such amounts are available therefrom for distribution on any Payment Date.

- 38 -

CSFB-00092280

(b)     Other than in respect of the payment of the Purchase Price or any Borrowings it elects to fund, notwithstanding any provision in any other Section of this Agreement to the contrary, all payments to be made by a Structured Purchaser under this Agreement shall be made by such Structured Purchaser solely from available cash, which shall be limited to collections and other amounts payable to such Structured Purchaser pursuant to this Agreement, the Sale and Servicing Agreement and the Indenture and other cash of such Structured Purchaser that, in each case, is not designated to pay any other amount. The parties to this Agreement other than each Structured Purchaser (the "Other Parties") hereby acknowledge that, pursuant to the terms of this Agreement, each Structured Purchaser is or may be required from time to time to make certain payments to one or more of the Other Parties, either as compensation for services rendered, reimbursement for out-of-pocket expenses, indemnification or otherwise. The Other Parties hereby agree, notwithstanding any provision in any other Section of this Agreement to the contrary, other than in respect of the payment of the Purchase Price or any Borrowings it elects to fund, that (i) no Structured Purchaser shall make any such payment to any Other Party, (ii) no Structured Purchaser shall have any duty, liability or obligation to make any such payment to any Other Party, (iii) no such payment shall be due from any Structured Purchaser and (iv) no Other Party shall have any right to enforce any claim against any Structured Purchaser in respect of any such payment, in each case at any time that any commercial paper notes issued by such Structured Purchaser are outstanding and no Bankruptcy Event (as defined below) has occurred and is continuing, in each case, unless and to the extent that (x) the making of such payment by such Structured Purchaser would not render such Structured Purchaser insolvent and (y) such Structured Purchaser has received funds with respect to such obligations which may be used to make such payment and such funds are not required to pay commercial paper notes of such Purchaser when due. As used in this subsection 6.4(b), "Bankruptcy Event" means (A) the entry against a Structured Purchaser of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, or the institution of any proceeding against such Structured Purchaser seeking any of the foregoing, and the continuance of any such decree or order, or any such proceeding, in each case unstayed and in effect for a period of 60 consecutive days, or (B) the consent by such Structured Purchaser to the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Structured Purchaser or the filing by such Structured Purchaser of a petition seeking to adjudicate it a bankrupt or insolvent or seeking liquidation, winding up, reorganization or relief of debtors or seeking the entry of any order for relief or the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, (C) a Structured Purchaser's admission of its inability to

-39-

CSFB-00092281

pay its debts as they become due or (D) the entry into an assignment for the benefit of creditors by any Structured Purchaser.

## SECTION 7.  THE AGENT

7.1    Appointment.  Each Purchaser hereby irrevocably designates and appoints the Agent as the agent of such Purchaser under this Agreement, and each such Purchaser irrevocably authorizes the Agent, as the agent for such Purchaser, to take such action on its behalf under the provisions of the Related Documents and to exercise such powers and perform such duties thereunder as are expressly delegated to the Agent by the terms of the Related Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Agent.

7.2    Delegation of Duties.  The Agent may execute any of its duties under any of the Related Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

7.3    Exculpatory Provisions.  Neither the Agent nor its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable to any of the Purchasers for any action lawfully taken or omitted to be taken by it or such Person under or in connection with any of the other Related Documents (except for its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Purchasers for any recitals, statements, representations or warranties made by the Seller, the Depositor, the Transferor, the Issuer, the Servicer or the Indenture Trustee or any officer thereof contained in any of the other Related Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, any of the other Related Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the other Related Documents or for any failure of the Seller, the Depositor, the Transferor, the Issuer, the Servicer or the Indenture Trustee to perform its obligations thereunder.  The Agent shall not be under any obligation to any Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any of the other Related Documents, or to inspect the properties, books or records of the Seller, the Depositor, the Transferor, the Issuer, the Servicer, or the Indenture Trustee.

- 40 -

CSFB-00092282

7.4    Reliance by Agent. The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, written statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Agent), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under any of the Related Documents unless it shall first receive such advice or concurrence of the Required Owners and the Required Purchasers as it deems appropriate or it shall first be indemnified to its satisfaction by the Purchasers or by the Committed Purchasers against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under any of the Related Documents in accordance with a request of the Required Owners and the Required Purchasers and such request and any action taken or failure to act pursuant thereto shall be binding upon all present and future Purchasers.

7.5    Notices. The Agent shall not be deemed to have knowledge or notice of the occurrence of any breach of this Agreement or the occurrence of any Default or any Event of Default unless the Agent has received notice from the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Indenture Trustee or any Purchaser referring to this Agreement, describing such event. In the event that the Agent receives such a notice, the Agent promptly shall give notice thereof to the Purchasers. The Agent shall take such action with respect to such event as shall be reasonably directed by the Required Owners and the Required Purchasers; provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such event as it shall deem advisable in the best interests of the Purchasers.

7.6    Non-Reliance on Agent and Other Purchasers. Each Purchaser expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of the Seller, the Depositor, the Transferor, the Issuer, the Servicer or the Indenture Trustee shall be deemed to constitute any representation or warranty by the Agent to any Purchaser. Each Purchaser represents to the Agent that it has, independently and without reliance upon the Agent or any other Purchaser, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer and the Servicer and made its own decision to purchase its interest in the Notes hereunder and enter into this Agreement. Each Purchaser also represents that it will, independently and without reliance upon the Agent or any other Purchaser, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions

- 41 -

CSFB-00092283

in taking or not taking action under any of the Related Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer and the Servicer. Except, in the case of the Agent, for notices, reports and other documents received by the Agent under Section 5 hereof, the Agent shall not have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer or the Servicer which may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

7.7    Indemnification. The Committed Purchasers agree to indemnify the Agent in its capacity as such (without limiting the obligation (if any) of the Seller, the Depositor, the Transferor, the Issuer, or the Servicer to reimburse the Agent for any such amounts), ratably according to their respective Commitment Percentages (or, if the Commitments have terminated, Percentage Interests), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the obligations under this Agreement, including the Class A Outstanding Amount of the Notes) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Agreement, or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Purchaser shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of the Agent resulting from its own gross negligence or willful misconduct. The agreements in this subsection shall survive the payment of the obligations under this Agreement, including the principal of the Notes.

7.8    Agent in Its Individual Capacities. The Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Indenture Trustee, the Seller, the Servicer, the Owner Trustee, the Depositor, the Transferor and the Issuer and their respective Affiliates and other associated Persons as though the Agent was not the agent hereunder. Each Purchaser acknowledges that Credit Suisse First Boston may act (i) as administrator and agent for one or more Structured Purchasers and in such capacity acts and may continue to act on behalf of each such Structured Purchaser in connection with its business and (ii) as the agent for certain financial institutions under the liquidity and credit enhancement agreements relating to this Agreement to which any such Structured Purchaser is party and in various other capacities relating to the business of any such Structured Purchaser under various agreements. Credit Suisse First Boston in its capacity as the Agent shall not, by virtue of its acting in any such other capacities, be deemed to have duties or responsibilities hereunder or be held to a standard of care in connection with the performance of its duties as the Agent other than

- 42 -

CSFB-00092284

as expressly provided in this Agreement. Credit Suisse First Boston may act as the Agent without regard to and without additional duties or liabilities arising from its role as such administrator or agent or arising from its acting in any such other capacity.

7.9    Successor Agent. The Agent may resign as Agent upon ten days' notice to the Purchasers, the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller and the Servicer with such resignation becoming effective upon a successor agent succeeding to the rights, powers and duties of the Agent pursuant to this subsection 7.9(a).  If the Agent shall resign as Agent under this Agreement, then the Required Purchasers and the Required Owners shall appoint from among the Committed Purchasers a successor agent for the Purchasers.  The successor agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After the retiring Agent's resignation as Agent, the provisions of this Section 7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  The retiring Agent shall transfer any Notes issued in its name to the successor Agent. The successor Agent shall give the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller and the Servicer written notice of its appointment as Agent.

## SECTION 8.  SECURITIES LAWS; TRANSFERS

8.1    Transfers of Notes.  (a) Each of the Agent and the Owners agrees that any interest in the Notes purchased or otherwise acquired by it will be acquired for investment only and not with a view to any distribution thereof, and that it will not offer to sell or otherwise dispose of any Note acquired by it (or any interest therein) in violation of any of the registration requirements of the Securities Act or the registration or qualification requirements of any applicable state or other securities laws.  Each of the Agent and the Owners acknowledges that it has no right to require the Issuer to register, under the Securities Act or any other securities law, the Notes (or any interest therein) acquired by it pursuant to this Agreement, any Joinder Supplement or any Transfer Supplement.  Each of the Agent and the Owners hereby confirms and agrees that in connection with any transfer or syndication by it of an interest in the Notes, it has not engaged and will not engage in a general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.  Each Purchaser which executes a Joinder Agreement agrees that it will execute and deliver to the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Indenture Trustee and the Agent on or before the effective date of its Joinder Agreement a letter in the form attached hereto as Exhibit A (an "Investment Letter") with respect to the purchase by such Purchaser of an interest in the Notes.

- 43 -

CSFB-00092285

(b)    Each initial purchaser of a Note or any interest therein and any Assignee thereof or Participant therein shall certify to the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Indenture Trustee and the Agent that it is either (A)(i) a citizen or resident of the United States, (ii) a corporation or partnership (or any other entity treated as a corporation or a partnership for federal income tax purposes) organized in or under the laws of the United States or any political subdivision thereof which, if such entity is a tax-exempt entity, recognizes that payments with respect to the Notes may constitute unrelated business taxable income or (iii) a person not described in (i) or (ii) whose income from the Notes is and will be effectively connected with the conduct of a trade or business within the United States (within the meaning of the Code) and whose ownership of any interest in a Note will not result in any withholding obligation with respect to any payments with respect to the Notes by any Person and who will furnish to the Agent, the Seller, the Servicer and the Indenture Trustee, and to the Owner making the Transfer a properly executed U.S. Internal Revenue Service Form W-8ECI or W-8BEN (or any successor form) (and to agree (to the extent legally able) to provide a new Form W-8ECI or W-8BEN (or any successor form) upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable United States laws), (B) an estate the income of which is includible in gross income for United States federal income tax purposes or (C) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust.

(c)    Any sale, transfer, assignment, participation, pledge, hypothecation or other disposition (a "Transfer") of a Note or any interest therein may be made only in accordance with this Section 8.1. Any Transfer of a Note, an interest in a Note, a Commitment or any Noncommitted Purchaser Percentage shall be in respect of (i) in the case of a Committed Purchaser, at least $5,000,000 in the aggregate, which may be composed of (A) outstanding principal under the Notes or (B) to the extent in excess of the outstanding principal subject to such Transfer, its Commitment hereunder, or (ii) in the case of a Noncommitted Purchaser, at least $5,000,000 in the aggregate, which may be composed of (A) outstanding principal under the Notes or (B) to the extent in excess of the outstanding principal subject to such Transfer, the product of the Noncommitted Purchaser Percentage subject to such Transfer times the aggregate Commitments hereunder. Any Transfer of an interest in a Note otherwise permitted by this Section 8.1 will be permitted only if it consists of a pro rata percentage interest in all payments made with respect to the Purchaser's beneficial interest in such Note. No Note or any interest therein may be Transferred by Assignment or Participation to any Person (each, a "Transferee") unless prior to the transfer the Transferee shall have executed and delivered to the Agent and the Issuer an Investment Letter.

Each of the Issuer, the Depositor, the Transferor, the Seller and the Servicer authorizes each Purchaser to disclose to any Transferee and Support Party and any prospective Transferee or Support Party any and all financial information in the Purchaser's

- 44 -

CSFB-00092286

possession concerning the Seller, the Servicer, the Depositor, the Transferor and the Issuer which has been delivered to the Agent or such Purchaser pursuant to the Related Documents (including information obtained pursuant to rights of inspection granted hereunder) or which has been delivered to such Purchaser by or on behalf of the Seller, the Issuer, the Depositor, the Transferor or the Servicer in connection with such Purchaser's credit evaluation of the Seller, the Issuer, the Depositor, the Transferor or the Servicer prior to becoming a party to, or purchasing an interest in this Agreement or the Notes, provided that each such Transferee, prospective Transferee and Support Party agrees to maintain the confidentiality of such information pursuant to the following paragraph.

The Agent and each Purchaser, severally and with respect to itself only, covenants and agrees that any information obtained by the Agent or such Purchaser pursuant to, or otherwise in connection with, this Agreement or the other Related Documents shall be held in confidence (it being understood that documents provided to the Agent hereunder may in all cases be distributed by the Agent to the Purchasers) except that the Agent or such Purchaser may disclose such information (i) to its officers, directors, employees, agents, counsel, accountants, auditors, advisors or representatives who have an obligation to maintain the confidentiality of such information, (ii) to the extent such information has become available to the public other than as a result of a disclosure by or through the Agent or such Purchaser, (iii) to the extent such information was available to the Agent or such Purchaser on a nonconfidential basis prior to its disclosure to the Agent or such Purchaser hereunder, (iv) with the consent of the Servicer, (v) to the extent permitted by the preceding paragraph, (vi) to the extent the Agent or such Purchaser should be (A) required in connection with any legal or regulatory proceeding or (B) requested by any Governmental Authority to disclose such information or (vii) in the case of any Purchaser that is a Structured Purchaser, to rating agencies, placement agents and providers of liquidity and credit support who agree to hold such information in confidence; provided, that, in the case of clause (vi), the Agent or such Purchaser, as the case may be, will (unless otherwise prohibited by law or in connection with regular regulatory reviews) notify the Servicer of its intention to make any such disclosure as early as practicable prior to making such disclosure and cooperate with the Servicer in connection with any action to obtain a protective order with respect to such disclosure.

(d)    Each Purchaser may, in accordance with applicable law, at any time grant participations in all or part of its Commitment or its interest in the Notes, including the payments due to it under this Agreement and the Indenture (each, a "Participation"), to any Person (each, a "Participant"); provided, however, that no Participation shall be granted to any Person unless and until the Agent shall have consented thereto and the conditions to Transfer specified in this Agreement, including in this subsection 8.1(d), shall have been satisfied and that such Participation consists of a pro rata percentage interest in all payments made with respect to such Purchaser's beneficial interest (if any) in the Notes. In connection with any such Participation, the Agent shall maintain a register of each Participant and the amount of each Participation.

- 45 -

CSFB-00092287

Each Purchaser hereby acknowledges and agrees that (A) any such Participation will not alter or affect such Purchaser's direct obligations hereunder, and (B) neither the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller nor the Servicer shall have any obligation to have any communication or relationship with any Participant. No Participant shall be entitled to Transfer all or any portion of its Participation, without the prior written consent of the Agent. Each Purchaser shall give the Agent notice of the consummation of any sale by it of a Participation and the Agent (upon receipt of notice from the related Purchaser) shall promptly notify the Issuer, the Seller, the Depositor, the Servicer and the Indenture Trustee. No Participant shall have the right to approve any amendment or waiver of the terms of this Agreement except with respect to those matters set forth in clauses (i) and (ii) of the proviso to Section 9.1.

(e)    Each Purchaser may, with the consent of the Agent and in accordance with applicable law, sell or assign (each, an "Assignment"), to any Person (each, an "Assignee") all or any part of its Commitment or its interest in the Notes and its rights and obligations under this Agreement and the Indenture pursuant to an agreement substantially in the form attached hereto as Exhibit C hereto (a "Transfer Supplement"), executed by such Assignee and the Purchaser and delivered to the Agent for its acceptance and consent; provided, however, that no such assignment or sale shall be effective unless and until the conditions to Transfer specified in this Agreement, including in this subsection 8.1(d), shall have been satisfied. From and after the effective date determined pursuant to such Transfer Supplement, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Transfer Supplement, have the rights and obligations of a Purchaser hereunder as set forth therein and (y) the transferor Purchaser shall, to the extent provided in such Transfer Supplement, be released from its Commitment and other obligations under this Agreement; provided, however, that after giving effect to each such Assignment, the obligations released as to any such Purchaser shall have been assumed by an Assignee or Assignees. Such Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Assignee and the resulting adjustment of Percentage Interests, Committed Purchaser Percentages, Noncommitted Purchaser Percentages, Liquidity Percentages or Commitment Percentages arising from the Assignment. Upon its receipt and acceptance of a duly executed Transfer Supplement, the Agent shall on the effective date determined pursuant thereto give notice of such acceptance to the Issuer, the Seller, the Depositor, the Servicer and the Indenture Trustee.

Upon instruction to register a transfer of a Purchaser's beneficial interest in the Notes (or portion thereof) and surrender for registration of transfer such Purchaser's Note(s) (if applicable) and delivery to the Issuer, the Seller, the Servicer, the Depositor and the Indenture Trustee of an Investment Letter, executed by the registered owner (and the beneficial owner if it is a Person other than the registered owner), and receipt by the Indenture Trustee of a copy of the duly executed related Transfer Supplement and such other documents as may be required under this Agreement, such beneficial interest in the Notes (or portion thereof) shall be

- 46 -

CSFB-00092288

transferred in the records of the Agent and, if requested by the Assignee, new Notes shall be issued to the Assignee and, if applicable, the transferor Purchaser in amounts reflecting such Transfer as provided in the Indenture. Such Transfers of Notes (and interests therein) shall be subject to this Section 8.1 in lieu of any regulations which may be prescribed under Section 2.10 of the Indenture. Successive registrations of Transfers as aforesaid may be made from time to time as desired, and each such registration of a transfer to a new registered owner shall be noted on the Agent's records.

(f)     Each Purchaser may pledge its interest in the Notes to any Federal Reserve Bank as collateral in accordance with applicable law.

(g)     Any Purchaser shall have the option to change its Investing Office, provided that no increased costs or other additional amounts shall be payable as a result of any such change.

## SECTION 9.  MISCELLANEOUS

9.1     Amendments and Waivers.  This Agreement may not be amended, supplemented or modified nor may any provision hereof be waived except in accordance with the provisions of this Section 9.1.  With the written consent of the Required Owners and the Required Purchasers, the Agent, the Seller, the Servicer, the Depositor, the Transferor and the Issuer may, from time to time, enter into written amendments, supplements, waivers or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of any party hereto or waiving, on such terms and conditions as may be specified in such instrument, any of the requirements of this Agreement; provided, however, that no such amendment, supplement, waiver or modification shall (i) reduce the amount of or extend the maturity of any Note or reduce the rate or extend the time of payment of interest thereon, or reduce or alter the timing of any other amount payable to any Purchaser hereunder or under the Indenture or the Sale and Servicing Agreement, in each case without the consent of the Purchasers affected thereby, (ii) amend, modify or waive any provision of this Section 9.1 without the written consent of all Purchasers, or reduce the percentage specified in the definition of Required Owners or Required Purchasers without the written consent of all Required Owners or Required Purchasers, respectively, or (iii) amend, modify or waive any provision of Section 7 of this Agreement without the written consent of the Agent.  Any waiver of any provision of this Agreement shall be limited to the provisions specifically set forth therein for the period of time set forth therein and shall not be construed to be a waiver of any other provision of this Agreement.

The Agent may cast any vote or give any direction under the Indenture on behalf of the Noteholders if it has been directed to do so by (i) the Required Owners and (ii) the Required Purchasers.

- 47 -

CSFB-00092289

9.2    <u>Notices</u>. (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of mail or telecopy notice, when received, addressed as follows or, with respect to a Purchaser, as set forth in its respective Joinder Supplement or Transfer Supplement, or to such other address as may be hereafter notified by the respective parties hereto:

|  |  |
|---|---|
| The Issuer: | OMI Note Trust 2001-A<br>c/o Wilmington Trust Company<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890<br><br>Attention: Corporate Trust Administration/<br>  OMI Note Trust 2001-A<br>Telecopier No.: (302) 651-8882 |
| OAC | Oakwood Acceptance Corporation<br>7800 McCloud Road<br>Greensboro, NC 27425-7081<br><br>Attention: Treasurer<br>Telecopier No.: (336) 664-3224 |
| The Depositor | Oak Leaf Holdings, LLC<br>7800 McCloud Road<br>Greensboro, NC 27425-7081<br><br>Attention: Treasurer<br>Telecopier No.: (336) 664-3224 |
| The Indenture Trustee: | The Chase Manhattan Bank<br>450 West 33rd Street<br>New York, NY 10001<br><br>Attention: Institutional Trust Services<br>Telecopier No.: (212) |
| The Transferor: | Ginkgo Corporation<br>c/o Lord Securities<br>2 Wall Street<br>New York, NY 10001 |

- 48 -

CSFB-00092290

Attention:
Telecopier No.: (212)

The Agent

Credit Suisse First Boston, New York Branch
Eleven Madison Avenue
New York, New York  10010

Attention:  Asset Finance Department
Telecopier No.:  (212) 325-6677

(b)    All payments to be made to the Agent or any Purchaser hereunder shall be made in United States dollars and in immediately available funds not later than 2:30 p.m. New York City time on the date payment is due, and, unless otherwise specifically provided herein, shall be made to the Agent, for the account of one or more of the Purchasers or for its own account, as the case may be.  Unless otherwise directed by the Agent, all such payments shall be made to the following account:

Bank of New York, NY
SWIFT: IRVTUS3SN
ABA# 021-000-018 (or CHIPS 0001)
A/C# 890-038-7025
A/C Name: Alpine Iss/Red
Ref. Oakwood

with telephone notice (including federal wire number) to the Asset Finance Department of Credit Suisse First Boston (212-325-9076).

9.3    No Waiver: Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent or any Purchaser, any right, remedy, power or privilege under any of the Related Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under any of the Related Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided in the Related Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

9.4    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Seller, the Servicer, the Depositor, the Transferor, the Issuer, the Agent, the Purchasers, any Assignee, any Participant and their respective successors and assigns, except that the Seller, the Servicer, the Depositor, the Transferor and the Issuer may not assign or transfer any of their respective rights or obligations under this Agreement except as provided herein and

- 49 -

in the Indenture, without the prior written consent of the Required Owners and the Required Purchasers and the Purchasers, Agent, Assignee and Participants may not assign or transfer any of their respective rights or obligations except as provided herein..

9.5    Successors to Servicer. (a) In the event that a change in Servicer occurs under Section 6.2 of the Sale and Servicing Agreement, (i) from and after the effective date of such transfer, the successor Servicer shall be the successor in all respects to the Servicer and shall be responsible for the performance of all functions to be performed by the Servicer from and after such date and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof, and all references in this Agreement to the Servicer shall be deemed to refer to the successor Servicer, and (ii) as of the date of such transfer, the successor Servicer shall be deemed to have made with respect to itself the representations and warranties made in Section 4.2 (in the case of subsection 4.2(a) with appropriate factual changes); provided, however, that the references to the Servicer contained in Section 5.1 of this Agreement shall be deemed to refer to the Servicer with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the Servicer was Servicer under this Agreement and shall be deemed to refer to the Successor Servicer with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the Successor Servicer acts as Servicer under this Agreement; provided, however, to the extent that an obligation to indemnify the Purchasers under Section 2.4 arises as a result of any act or failure to act of any successor Servicer in the performance of obligations under the Sale and Servicing Agreement, such indemnification obligation shall be of the successor Servicer and not its predecessor. Upon a transfer to a successor Servicer, such successor Servicer shall furnish to the Agent copies of its audited annual financial statements for each of the three preceding fiscal years or if the Indenture Trustee or any other banking institution becomes the successor Servicer, such successor Servicer shall provide, in lieu of the audited financial statements required in the immediately preceding clause, complete and correct copies of the publicly available portions of its Consolidated Reports of Condition and Income as submitted to the FDIC for the two most recent year end periods.

(b)    In the event that any Person becomes the successor to the Seller pursuant to Section 5.2 of the Sale and Servicing Agreement, from and after the effective date of such transfer, such successor to the Seller shall be the successor in all respects to the Seller and shall be responsible for the performance of all functions to be performed by the Seller from and after such date, except as provided in the Sale and Servicing Agreement, and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Seller by the terms and provisions hereof, and all references in this Agreement to the Seller shall be deemed to refer to the successor to the Seller; provided, however, that the references to the Seller contained in Sections 2.4 and 5.1 of this Agreement shall be deemed to refer to OAC with respect to

- 50 -

CSFB-00092292

responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that OAC was Seller under this Agreement and shall be deemed to refer to the successor to OAC as Seller with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the successor to Seller acts as Seller under this Agreement.

9.6    <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

9.7    <u>Severability</u>. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

9.8    <u>Integration</u>. This Agreement and the Fee Letter represent the agreement of the Agent, the Seller, the Depositor, the Transferor, the Issuer, the Servicer and the Purchasers with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Purchasers or the Agent relative to subject matter hereof not expressly set forth or referred to herein or therein.

9.9    <u>Governing Law</u>. **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

9.10    <u>Termination</u>. This Agreement shall remain in full force and effect until the later to occur of (a) payment in full of the principal of and interest on the Notes and all other amounts payable to the Purchasers or the Agent hereunder and the termination of all Commitments and (b) the Facility Termination Date; <u>provided, however</u>, that the provisions of Sections 2.4, 6.1, 6.2, 7.7, 9.11, 9.13 and 9.14 shall survive termination of this Agreement and any amounts payable to the Agent, Purchasers or any Affected Party thereunder shall remain payable thereto.

9.11    <u>Limited Recourse: No Proceedings</u>. (a) The obligations of the Issuer, the Transferor and the Depositor under this Agreement are solely the obligations of the Issuer, the Transferor and the Depositor, as applicable. No recourse shall be had for the payment of any fee or other obligation or claim arising out of or relating to this Agreement or any other agreement, instrument, document or certificate executed and delivered or issued by the Issuer, the Transferor and the Depositor, or any officer of any of them in connection therewith, against any partner,

- 51 -

CSFB-00092293

member, stockholder, employee, officer, director or incorporator of the Issuer, the Transferor and the Depositor. With respect to obligations of the Issuer, neither the Agent nor any Purchaser shall look to any property or assets of the Issuer, other than to the Trust Estate. Each Purchaser and the Agent hereby agrees that to the extent such funds are insufficient or unavailable to pay any amounts owing to it by the Issuer pursuant to this Agreement, prior to the commencement of a bankruptcy or insolvency proceeding by or against the Issuer, it shall not constitute a claim against the Issuer. Each of the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Agent and each Purchaser agrees that it shall not institute or join against the Depositor, the Transferor or the Issuer any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy law, for one year and a day after the termination of the Indenture. Nothing in this paragraph shall limit or otherwise affect the liability of the Servicer and the Seller with respect to any amounts owing by the Servicer or the Seller, respectively, hereunder or the right of the Agent or any Purchaser to enforce such liability against the Servicer or the Seller, respectively, or any of its respective assets.

(b)    Each of the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Agent and each Purchaser hereby agrees that it shall not institute or join against any Structured Purchaser any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one year and a day after the latest maturing commercial paper note, medium term note or other debt security issued by such Structured Purchaser is paid.

9.12    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the purchase of the Notes hereunder.

9.13    Submission to Jurisdiction; Waivers.  EACH OF THE SELLER, THE ISSUER, THE DEPOSITOR, THE SERVICER, THE TRANSFEROR, THE AGENT AND EACH PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN MANHATTAN AND THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

- 52 -

CSFB-00092294

**(B) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;**

**(C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH IN SECTION 9.2 OR AT SUCH OTHER ADDRESS OF WHICH THE AGENT SHALL HAVE BEEN NOTIFIED PURSUANT THERETO; AND**

**(D) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.**

9.14    **WAIVERS OF JURY TRIAL. EACH OF THE SELLER, THE SERVICER, THE ISSUER, THE DEPOSITOR, THE TRANSFEROR, THE AGENT AND THE PURCHASERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.**

9.15    Limitation of Liability of Owner Trustee. Notwithstanding anything contained herein or in any other Related Document to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as Owner Trustee, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking or agreement by Wilmington Trust Company but is made and intended for the purpose for binding only the Issuer and the Trust Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of

- 53 -

CSFB-00092295

any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Agreement or any other related documents.

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092296

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
   not in its individual capacity, but solely as Owner Trustee

By:_____
        Name:         JAMES P. LAWLER
        Title:         Vice President.

OAKWOOD ACCEPTANCE CORPORATION,
    as Seller and Servicer

By:_____
        Name:
        Title:

GINKGO CORPORATION,
    as Transferor

By:_____
        Name:
        Title:

OAK LEAF HOLDINGS, LLC,
    as Depositor

By:_____
        Name:
        Title:

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092297

STATE OF   **Delaware**        )
                              : ss.:
COUNTY OF  **New Castle**      )

    On the _8th_ day of February, 2001, before me, a notary public in and for the State of **Delaware**, personally appeared **James P. Lawler** known to me who, being by me duly sworn, did depose and say that he resides at _____**Delaware**_____; that he is **Vice President**_____ of Wilmington Trust Company, a Delaware banking corporation; one of the parties that executed the foregoing instrument; that he/she knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he/she signed his/her name thereto by like order..

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

_Leigh Ennis_
            Notary Public

Notary Public, State of _____ **LEIGH EMM**
My Commission Expires:        **NOTARY PUBLIC**
        **My Commission Expires August 1, 2002**

CSFB-00092298

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
 not in its individual capacity, but solely as Owner Trustee

By:_____
        Name:
        Title:

OAKWOOD ACCEPTANCE CORPORATION,
    as Seller and Servicer

By:_____
        Name:  Douglas R. Muir
        Title:  Vice President

GINKGO CORPORATION,
    as Transferor

By:_____
        Name:
        Title:

OAK LEAF HOLDINGS, LLC,
    as Depositor

By:  Oakwood Capital Corp., Member

By:_____
        Name:  Douglas R. Muir
        Title:  Assistant Secretary

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092299

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
 not in its individual capacity, but solely as Owner Trustee

By:_____
            Name:
            Title:

OAKWOOD ACCEPTANCE CORPORATION,
       as Seller and Servicer

By:_____
            Name:
            Title:

GINKGO CORPORATION,
       as Transferor

By: _____
            Name:   Albert J. Fioravanti
            Title:   Vice President

OAK LEAF HOLDINGS, LLC,
       as Depositor

By:_____
            Name:
            Title:

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092300

CREDIT SUISSE FIRST BOSTON, NEW YORK
 BRANCH, as Agent

By:_____
    Name:    ALBERTO ZONCA
    Title:   VICE PRESIDENT

By:_____
    Name:
    Title:   Matthew J. Monaco
             Associate

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092301

●

●

●

<u>EXHIBIT A</u>

<u>FORM OF INVESTMENT LETTER</u>

[Date]

OMI Note Trust 2001-A
c/o Wilmington Trust Company
Rodney Square North
1100 N. Market Street
Wilmington, DE 19890

Oak Leaf Holdings, LLC
7800 McCloud Road
Greensboro, NC 27425-7081

Oakwood Acceptance Corporation
7800 McCloud Road
Greensboro, NC 27425-7081

The Chase Manhattan Bank, as Indenture Trustee
450 West 33rd Street
New York. NY 10001

Ginkgo Corporation
c/o Lord Securities
5 Wall Street
New York. NY 10001

Credit Suisse First Boston, New York Branch
Eleven Madison Avenue
New York. New York  10010

      Re    OMI Note Trust 2001-A
           <u>Asset Backed Notes. Series 2001-A</u>

Ladies and Gentlemen:

      This letter (the "Investment Letter") is delivered by the undersigned (the "Acquiror") pursuant to subsection 8.1[(a)][(c)] of the Class A Note Purchase Agreement dated

- 1 -

CSFB-00092302

as of February 9, 2001 (as in effect, the "Class A Note Purchase Agreement"), among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch, as Agent. Capitalized terms used herein without definition shall have the meanings set forth in the Class A Note Purchase Agreement. The Acquiror represents to and agrees with the Issuer as follows:

(a) The Acquiror is authorized [to enter into the Class A Note Purchase Agreement and to perform its obligations thereunder and to consummate the transactions contemplated thereby] [to purchase a Participation in obligations under the Class A Note Purchase Agreement].

(b) The Acquiror has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment with respect to the Notes and is able to bear the economic risk of such investment. The Acquiror has been afforded the opportunity to ask such questions as it deems necessary to make an investment decision, and has received all information it has requested in connection with making such investment decision. The Acquiror has, independently and without reliance upon the Agent or any Purchaser, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Issuer, the Depositor, the Transferor, the Seller and the Servicer and made its own decision to make its investment with respect to the Notes, and will, independently and without reliance upon the Agent or any Purchaser, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action, if any, that it may take under the Class A Note Purchase Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer, the Seller, the Depositor, the Transferor and the Servicer.

(c) The Acquiror is an "accredited investor ,"as defined in Rule 501, promulgated by the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act"), and (except as otherwise agreed to by the Issuer in its sole discretion) is a "qualified institutional buyer" (within the meaning of Rule 144A thereunder) and is making its investment with respect to the Notes for its own account for investment purposes. The Acquiror understands that the offering and sale of the Notes has not been and will not be registered under the Securities Act and has not and will not be registered or qualified under any applicable "Blue Sky" or other securities law, and that the offering and sale of the Note has not been reviewed by, passed on or submitted to any federal or state agency or commission, securities exchange or other regulatory body.

- 2 -

CSFB-00092303

(d)     The Acquiror is "a qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")), a company each of whose beneficial owners is a qualified purchaser, a "knowledgeable employee" with respect to the Issuer (within the meaning of Rule 3c-5 and the Investment Company Act) or a company owned exclusively by knowledgeable employees.

(e)     The Acquiror is not an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") (each such plan, an "Employee Plan"), an entity whose underlying assets include the assets of any Employee Plan, or a governmental plan that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and the Acquiror's purchase, holding and disposition of the Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available.

(f)     The Acquiror is acquiring an interest in Notes without a view to any distribution, resale or other transfer thereof.  The Acquiror will not resell or otherwise transfer any interest or participation in the Notes, except in accordance with Section 8.1 of the Class A Note Purchase Agreement and (i) in a transaction exempt from the registration requirements of the Securities Act of 1933, as amended, and applicable state securities or "blue sky" laws; (ii) to the Issuer or any affiliate of the Issuer; or (iii) to a person who the Acquiror reasonably believes is a qualified institutional buyer (within the meaning thereof in Rule 144A under the Securities Act) that is aware that the resale or other transfer is being made in reliance upon Rule 144A.  In connection therewith, the Acquiror hereby agrees that it will not resell or otherwise transfer any interest in the Notes unless the purchaser thereof provides to the addressee hereof a letter substantially in the form hereof.

(g)     The Acquiror hereby confirms and agrees that in connection with any transfer or syndication by it of an interest in the Notes, it shall not engage in a general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

(h)     This Investment Letter has been duly executed and delivered by and constitutes the legal, valid and binding obligation of the Acquiror, enforceable against the Acquiror in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

- 3 -

CSFB-00092304

Very truly yours,

[NAME OF ACQUIROR]

By:_____
  Name:
  Title:

- 4 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092305

EXHIBIT B

### FORM OF JOINDER SUPPLEMENT

JOINDER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among OMI Note Trust 2001-A (the "Issuer"), Oakwood Acceptance Corporation, as Seller (in such capacity, the "Seller") [if Oakwood is the Servicer:] and Servicer (in such capacity, the "Servicer"), Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchaser set forth in Item 2 of Schedule I hereto (the "Additional Purchaser"), and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers under, and as defined in, the Class A Note Purchase Agreement described below (in such capacity, the "Agent").

## WITNESSETH

WHEREAS, this Supplement is being executed and delivered in accordance with subsection 2.2(c) of the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto, and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Class A Note Purchase Agreement"; unless otherwise defined herein, terms defined in the Class A Note Purchase Agreement are used herein as therein defined); and

WHEREAS, the Additional Purchaser (if it is not already a Purchaser party to the Class A Note Purchase Agreement) wishes to become a Purchaser party to the Class A Note Purchase Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)    Upon receipt by the Agent of five counterparts of this Supplement, to each of which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Additional Purchaser, the Issuer and the Agent, the Agent will transmit to the Servicer, the Issuer, the Seller, the Depositor, the Indenture Trustee and the Additional Purchaser a Joinder Effective Notice, substantially in the form of Schedule III to this Supplement (a "Joinder Effective Notice"). Such Joinder Effective Notice shall be executed by the Agent and shall set forth, inter alia, the date on which the transfer effected by this Supplement shall become effective (the "Joinder Effective Date"). From and after the Joinder Effective Date, the Additional Purchaser shall be a Purchaser party to the Class A Note Purchase Agreement for all purposes thereof and shall be a Noncommitted Purchaser or Committed Purchaser, as specified

- 1 -

CSFB-00092306

on such Schedule II, and, if applicable, a Liquidity Provider as set forth in Schedule II hereto, having an initial Noncommitted Purchaser Percentage or Commitment Percentage, as applicable, and a Liquidity Percentage, if applicable, and a Commitment, if applicable, as set forth in such Schedule II. If the Additional Purchaser is a Noncommitted Purchaser, then (i) such Schedule II identifies its Liquidity Providers and (ii) each such Liquidity Provider has executed and delivered (or is concurrently herewith executing and delivering) its own Joinder Supplement with respect to such Additional Purchaser.

(b)     Concurrently with the execution and delivery hereof, the Additional Purchaser will deliver to the Issuer, the Seller, the Servicer, the Agent, the Transferor, the Depositor and the Indenture Trustee an executed Investment Letter in the form of Exhibit A to the Class A Note Purchase Agreement.

(c)     Each of the parties to this Supplement agrees and acknowledges that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement.

(d)     By executing and delivering this Supplement, the Additional Purchaser confirms to and agrees with the Agent and the Purchaser as follows: (i) neither the Agent nor any other Purchaser makes any representation or warranty or assumes any responsibility with respect to any statements, warranties or representations made in or in connection with the Class A Note Purchase Agreement (other than representations or warranties made by such respective parties) or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Class A Note Purchase Agreement or any other instrument or document furnished pursuant thereto, or with respect to the financial condition of the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee, or the performance or observance by the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee of any of their respective obligations under the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture or any other instrument or document furnished pursuant hereto; (ii) the Additional Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iii) the Additional Purchaser will, independently and without reliance upon the Agent or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Class A Note Purchase Agreement; (iv) the Additional Purchaser appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Class A Note Purchase Agreement, the Sale and Servicing Agreement and the Indenture as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Section 7 of the Class A Note Purchase Agreement; and (vi) the Additional Purchaser agrees (for the benefit of the Agent, the other Purchasers, the

- 2 -

CSFB-00092307

Indenture Trustee, the Seller, the Servicer, the Depositor, the Transferor and the Issuer) that (x) if it is a Noncommitted Purchaser, it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser which is a Noncommitted Purchaser, or (y) if it is a Committed Purchaser, it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser which is a Committed Purchaser and, if specified in Schedule II hereto, as a Liquidity Provider.

(e)    Schedule II hereto sets forth the Commitment and the initial Investing Office of the Additional Purchaser, as well as administrative information with respect to the Additional Purchaser.

(f)    **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

(g)    Notwithstanding anything contained herein or in any other Related Document to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Supplement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as Owner Trustee, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking or agreement by Wilmington Trust Company but is made and intended for the purpose for binding only the Issuer and the Trust Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Supplement or any other related documents.

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

- 3 -

CSFB-00092308

COMPLETION OF INFORMATION AND
SIGNATURES FOR JOINDER SUPPLEMENT

Re:    Class A Note Purchase Agreement, dated as of February 9, 2001, among
       OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as
       Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo
       Corporation, as Transferor, the Purchasers party thereto and Credit Suisse
       First Boston, New York Branch, as Agent.

Item 1: Date of Joinder Supplement:

Item 2: Additional Purchaser:

Item 3: Signatures of Parties to Agreement:

 

 

as Additional Purchaser

By:_____
  Name:
  Title:

[By:_____
  Name:
  Title:]

OMI NOTE TRUST 2001-A
as Issuer

By Wilmington Trust Company,
not in its individual capacity, but solely as Owner

Trustee

By:_____
  Name:
  Title:

T:\Corp\dto\csuis535\npa_v12.doc

CREDIT SUISSE FIRST BOSTON, NEW YORK
BRANCH, as Agent

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

- 2 -

CSFB-00092310

LIST OF INVESTING OFFICES, ADDRESSES
FOR NOTICES AND COMMITMENT

[Additional Purchaser]

Noncommitted Purchaser:    Yes/No

     Initial Noncommitted Purchaser Percentage:            _____ %
     (if applicable)

     Liquidity Providers and Initial Liquidity Percentage:
         (if applicable)

     _____                    _____ %

     _____                    _____ %

     _____                    _____ %

     Aggregate Commitments of Liquidity Providers      $_____

Committed Purchaser:  Yes/No

     Initial Commitment Percentage:                      _____ %
         (if applicable)

     Commitment:                              $_____

Liquidity Provider (if applicable):

     Related Noncommitted Purchaser:          _____

     Liquidity Percentage:                      _____ %

     Amount of Commitment Held in
     capacity as Liquidity Provider           $_____

Address for Notices:

Investing Office:

- 3 -

CSFB-00092311

FORM OF
JOINDER EFFECTIVE NOTICE

To:    [Names and addresses of
       Issuer, Seller, Servicer, Indenture Trustee, Depositor, the Transferor
       Agent and Additional Purchaser]

       The undersigned, as Agent under the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers thereunder, acknowledges receipt of five executed counterparts of a completed Joinder Supplement with respect to _____, a copy of which is attached hereto. [Note: attach copies of Schedules I and II from such Agreement.]   Terms defined in such Supplement are used herein as therein defined.

       Pursuant to such Supplement, you are advised that the Joinder Effective Date will be _____, 200_.

Very truly yours,

CREDIT SUISSE FIRST BOSTON,
  NEW YORK BRANCH, as Agent


By:_____
     Name:
     Title:


By:_____
     Name:
     Title:

- 4 -

CSFB-00092312

EXHIBIT C

## FORM OF TRANSFER SUPPLEMENT

TRANSFER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among the transferor Purchaser set forth in Item 2 of Schedule I hereto (the "Transferor Purchaser"), the Purchasing Purchaser set forth in Item 3 of Schedule I hereto (the "Purchasing Purchaser"), and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers under, and as defined in, the Class A Note Purchase Agreement described below (in such capacity, the "Agent").

### WITNESSETH:

WHEREAS, this Supplement is being executed and delivered in accordance with subsection 8.1(e) of the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Class A Note Purchase Agreement"; unless otherwise defined herein, terms defined in the Class A Note Purchase Agreement are used herein as therein defined);

WHEREAS, the Purchasing Purchaser (if it is not already a Purchaser party to the Class A Note Purchase Agreement) wishes to become a Purchaser party to the Class A Note Purchase Agreement and the Purchasing Purchaser wishes to acquire and assume from the Transferor Purchaser, certain of the rights, obligations and commitments under the Class A Note Purchase Agreement; and

WHEREAS, the Transferor Purchaser wishes to sell and assign to the Purchasing Purchaser, certain of its rights, obligations and commitments under the Class A Note Purchase Agreement and be released from its obligations with respect thereto.

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)     Upon receipt by the Agent of five counterparts of this Supplement, to each of which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Transferor Purchaser, the Purchasing Purchaser and the Agent, the Agent will transmit to the Servicer, the Seller, the Issuer, the Depositor, the Transferor, the Indenture Trustee, the Transferor Purchaser and the Purchasing Purchaser a Transfer Effective Notice, substantially in the form of Schedule III to this Supplement (a "Transfer Effective Notice"). Such Transfer Effective Notice shall be executed by the Agent and shall set forth, inter alia, the date on which the transfer effected by this Supplement shall become effective (the "Transfer Effective Date"). From and after the Transfer Effective Date the Purchasing Purchaser shall be a Purchaser party to the Class A Note Purchase Agreement for all purposes thereof as a

- 1 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

Noncommitted Purchaser or Committed Purchaser and, if applicable, a Liquidity Provider, as specified on Schedule II to this Supplement.

(b)    At or before 12:00 Noon, local time of the Transferor Purchaser, on the Transfer Effective Date, the Purchasing Purchaser shall pay to the Transferor Purchaser, in immediately available funds, an amount equal to the purchase price, as agreed between the Transferor Purchaser and such Purchasing Purchaser (the "Purchase Price"), of the portion set forth on Schedule II hereto being purchased by such Purchasing Purchaser of the outstanding advances under the Note owned by the Transferor Purchaser (such Purchasing Purchaser's "Purchase Percentage") and such other amounts as are agreed and are owing to the Transferor Purchaser under the Class A Note Purchase Agreement or otherwise in respect of the Notes. Effective upon receipt by the Transferor Purchaser of the Purchase Price and such other amounts from the Purchasing Purchaser, the Transferor Purchaser hereby irrevocably sells, assigns and transfers to the Purchasing Purchaser, without recourse, representation or warranty, and the Purchasing Purchaser hereby irrevocably purchases, takes and assumes from the Transferor Purchaser, the Purchasing Purchaser's Purchase Percentage of (i) the presently outstanding principal amount under the Notes owned by the Transferor Purchaser and such other amounts as are agreed between the Transferor Purchaser and the Purchasing Purchaser and are owing to the Transferor Purchaser under the Note Purchase Agreement or otherwise in respect of the Notes, and (ii) the Purchasing Purchaser's Purchase Percentage of (A) if the Transferor Purchaser is a Noncommitted Purchaser, the Noncommitted Purchaser Percentage of the Transferor Purchaser and the other rights, duties and obligations of the Transferor Purchaser under the Class A Note Purchase Agreement, or (B) if the Transferor Purchaser is a Committed Purchaser, the Commitment Percentage, the Liquidity Percentage, if applicable, and the Commitment of the Transferor Purchaser and the other rights, duties and obligations of the Transferor Purchaser under the Class A Note Purchase Agreement. This Supplement is intended by the parties hereto to effect a purchase by the Purchasing Purchaser and sale by the Transferor Purchaser of the Transferor Purchaser's interests in the Notes, the other amounts agreed by them and the other rights, duties and obligations of the Transferor Purchaser under the Note Purchase Agreement and it is not to be construed as a loan or a commitment to make a loan by the Purchasing Purchaser to the Transferor Purchaser. The Transferor Purchaser hereby confirms that the amount of the Class A Outstanding Amount of the Notes is $_____ and its Percentage Interest thereof is ___%, which equals $_____ as of _____, 200_. Upon and after the Transfer Effective Date (until further modified in accordance with the Class A Note Purchase Agreement), the Noncommitted Purchaser Percentage or Commitment Percentage, as applicable of the Transferor Purchaser and the Purchasing Purchaser and the Commitment and the Liquidity Percentage, if applicable, of the Transferor Purchaser and the Purchasing Purchaser, if any, shall be as set forth in Schedule II to this Supplement. From and after the Transfer Effective Date the Transferor Purchaser shall be released from its duties and obligations under the Note Purchase Agreement to the extent of the Purchase Percentage thereof transferred to the Purchasing Purchaser.

(c)    The Transferor Purchaser has made arrangements with the Purchasing Purchaser with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by

- 2 -

CSFB-00092314

the Transferor Purchaser to the Purchasing Purchaser of any fees heretofore received by the Transferor Purchaser pursuant to the Class A Note Purchase Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by the Purchasing Purchaser to the Transferor Purchaser of fees or interest received by the Purchasing Purchaser pursuant to the Class A Note Purchase Agreement or otherwise in respect of the Notes from and after the Transfer Effective Date.

(d)    (i)All principal, interest and other amounts that would otherwise be payable from and after the Transfer Effective Date to or for the account of the Transferor Purchaser in respect of the Notes shall, instead, be payable to or for the account of the Transferor Purchaser and the Purchasing Purchaser, as the case may be, in accordance with their respective interests as reflected in this Supplement.

(ii)    In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in or excluded from the Purchase Price or any other sum paid by the Purchasing Purchaser, the Transferor Purchaser and the Purchasing Purchaser have made appropriate arrangements for the allocation of such amounts between the Transferor Purchaser and the Purchasing Purchaser and the payment thereof, as so allocated, upon receipt of such amounts from the Agent.

(e)    Concurrently with the execution and delivery hereof, the Purchasing Purchaser will deliver to Agent, the Issuer, the Servicer, the Seller, the Depositor and the Indenture Trustee an executed Investment Letter in the form of Exhibit A to the Class A Note Purchase Agreement.

(f)    Each of the parties to this Supplement agrees and acknowledges that (i) at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement, and (ii) the Agent shall apply each payment made to it under the Class A Note Purchase Agreement, whether in its individual capacity or as Agent, in accordance with the provisions of the Class A Note Purchase Agreement, as appropriate.

(g)    By executing and delivering this Supplement, the Transferor Purchaser and the Purchasing Purchaser confirm to and agree with each other and the Agent and the Purchaser as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, the Transferor Purchaser makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Class A Note Purchase Agreement or any other instrument or document furnished pursuant thereto; (ii) the Transferor Purchaser makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee, or the performance or observance by the Seller, the Servicer, the

- 3 -

CSFB-00092315

Depositor, the Transferor, the Issuer or the Indenture Trustee of any of their respective obligations under the Class A Note Purchase Agreement, the Indenture or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iv) each Purchasing Purchaser will, independently and without reliance upon the Agent, the Transferor Purchaser or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture; (v) each Purchasing Purchaser appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Class A Note Purchase Agreement, the Sale and Servicing Agreement and the Indenture as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Section 7 of the Class A Note Purchase Agreement; and (vi) each Purchasing Purchaser agrees (for the benefit of the Transferor Purchaser, the Agent, the Purchasers, the Indenture Trustee, the Depositor, the Transferor, the Seller, the Servicer and the Issuer) that it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser.

(h)     Schedule II hereto sets forth the revised Noncommitted Purchaser Percentage or the revised Commitment Percentage, the revised Liquidity Percentage, if applicable, and Commitment of the Transferor Purchaser, as applicable, the Noncommitted Purchaser Percentage or the Commitment Percentage, the Liquidity Percentage, if applicable, and Commitment of the Purchasing Purchaser, as applicable, and the initial Investing Office of the Purchasing Purchaser, as well as administrative information with respect to the Purchasing Purchaser.

(i)     **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

T.\Corp\dio\csuis535\nps_v12.doc
last saved on 2/27/2001

CSFB-00092316

## COMPLETION OF INFORMATION AND
## SIGNATURES FOR TRANSFER SUPPLEMENT

Re:    Class A Note Purchase Agreement, dated as of February 9, 2001, among
OMI Note Trust 2001-A, Oakwood Acceptance Corporation, as Seller and
Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as
Transferor, the Purchasers party thereto and Credit Suisse First Boston,
New York Branch, as Agent.

Item 1. :    Date of Transfer Supplement:

Item 2. :    Transferor Purchaser:

Item 3: Purchasing Purchaser:

Item 4: Signatures of Parties to Agreement:

_____
as Transferor Purchaser

By:_____
  Name:
  Title:

By:_____
  Name:
  Title:

_____
as Purchasing Purchaser

By:_____
  Name:
  Title:

- 1 -

CSFB-00092317

By:_____
   Name:
   Title:

CONSENTED TO AND ACCEPTED BY:

CREDIT SUISSE FIRST BOSTON,
  NEW YORK BRANCH, as Agent

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

- 2 -

CSFB-00092318

SCHEDULE II TO
TRANSFER SUPPLEMENT

LIST OF INVESTING OFFICES, ADDRESSES
FOR NOTICES, ASSIGNED INTERESTS, PURCHASE
AND COMMITMENT PERCENTAGES AND PURCHASE PRICE

[Transferor Purchaser]

A.    Noncommitted Purchaser:      Yes/No

If applicable:

Noncommitted Purchaser Percentage:

Transferor Purchaser
Noncommitted Purchaser Percentage
Prior to Sale:                                                                    _____%

Noncommitted Purchaser Percentage Sold:                                  _____%

Noncommitted Purchaser Percentage Retained:                            _____%

Liquidity Providers and Liquidity Percentages after Sale:

_____                                          _____%

_____                                          _____%

_____                                          _____%

Aggregate Commitments of Liquidity Providers after Sale      $_____

B.    Committed Purchaser:  Yes/No

If applicable:

Commitment Percentage:

Transferor Purchaser Commitment Percentage
Prior to Sale:                                                                    _____%

Commitment Percentage Sold:                                              _____%

Commitment Percentage Retained:                                        _____%

- 3 -

CSFB-00092319

Commitment:

Transferor Purchaser Commitment
Prior to Sale:                                            $_____

Commitment Sold:                                         $_____

Commitment Retained:                                     $_____

C.    Liquidity Commitment:

Related Noncommitted Purchaser:          _____

Liquidity Percentage Prior to Sale:                      ____%

Liquidity Percentage Sold:                               ____%

Liquidity Percentage Retained:                           ____%

Amount of Commitment Held in
capacity as Liquidity Provider after sale     $_____

D.    Class A Outstanding Amount of Notes:

Transferor Purchaser
Class A Outstanding Amount of Notes Prior to Sale:       $_____

Class A Outstanding Amount of Notes Sold:                $_____

Class A Outstanding Amount of Notes Retained:            $_____

E.    Purchase Percentage:                               ____%

[Purchasing Purchaser]

A.    Noncommitted Purchaser:    __Yes/No__

If applicable:

Initial Noncommitted Purchaser Percentage:           ____%

Liquidity Providers and Liquidity Percentages after Sale:

_____                            ____%

_____                            ____%

- 4 -

CSFB-00092320

_____    _____%

       Aggregate Commitments of Liquidity Providers after Sale    $_____

B.    Committed Purchaser:  Yes/No

    If applicable:

       Commitment Percentage:    _____%

       Commitment:    $_____

       Related Noncommitted Purchaser:    _____

       Liquidity Percentage:    _____%

    Amount of Commitment Held in
    capacity as Liquidity Provider after sale    $_____

C.    Class A Outstanding Amount of Notes Owned Immediately
    After Sale:    $_____

Address for Notices:

Investing Office:

- 5 -

CSFB-00092321

SCHEDULE III TO
TRANSFER SUPPLEMENT

Form of
Transfer Effective Notice

To:     [Name and address of
        Issuer, Servicer, Indenture Trustee, the Transferor
        Purchaser and the Purchasing Purchaser]

The undersigned, as Agent under the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers thereunder, acknowledges receipt of five executed counterparts of a completed Transfer Supplement with respect to a transfer from _____ to _____, a copy of which is attached hereto. [Note: attach copies of Schedules I and II from such Agreement.] Terms defined in such Supplement are used herein as therein defined.

Pursuant to such Transfer Supplement, you are advised that the Transfer Effective Date will be _____, 200_.

Very truly yours,

CREDIT SUISSE FIRST BOSTON,
   NEW YORK BRANCH, as Agent

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:

- 6 -

CSFB-00092322

**EXHIBIT I**

THIS AGREEMENT is made as of February 9, 2001, by and among OAKWOOD ACCEPTANCE CORPORATION, a North Carolina corporation ("OAC"), OAKWOOD HOMES CORPORATION, a North Carolina corporation ("OHC"), Oakwood Capital Corporation, a Nevada corporation ("OCC" and with OAC and OHC, the "Oakwood Entities"), and CREDIT SUISSE FIRST BOSTON, a Swiss banking corporation acting through its New York Branch, as agent for the Purchasers parties to the Note Purchase Agreement referred to below (together with its successors in such capacity, the "Agent"). This AGREEMENT is being executed by the following officers on behalf of the Oakwood Entities, to evidence their consent to, and acknowledgment of, the Oakwood Entities obligations hereunder: DUANE D. DAGGETT ("Daggett"); SUZANNE H. WOOD ("Wood"); ROBERT A. SMITH ("Smith"); MYLES E. STANDISH ("Standish"); and DOUGLAS R. MUIR (together, Daggett, Wood, Smith, Standish and Muir are hereinafter referred to as the "Officers").

## WITNESSETH:

WHEREAS, OMI Note Trust 2001-A, a Delaware business trust (the "Issuer"), and The Chase Manhattan Bank, a New York banking corporation, as Indenture Trustee (together with its successors in such capacity, the "Indenture Trustee"), are parties to a certain Indenture, dated as of February 9, 2001 (as the same may from time to time be amended or otherwise modified, the "Indenture"), pursuant to which the Issuer has issued its Class A Asset Backed Notes, Series 2001-A (the "Notes"); and

WHEREAS, pursuant to the Class A Note Purchase Agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"), among the Purchasers parties thereto, the Agent, OAC, as Seller and as Servicer, Oak Leaf Holdings, LLC, a Delaware limited liability company, as Depositor (together with its successors in such capacity, "Depositor"), Ginkgo Corporation, a Delaware corporation, as Transferor (together with its successors in such capacity, "Transferor"), and Issuer, Purchasers have agreed to purchase Notes from Issuer to provide financing for the purchase by Issuer of retail installment sale contracts for certain manufactured housing and of certain mortgage loans; and

WHEREAS, pursuant to the Sale and Servicing Agreement, dated as of the date hereof (the "Sale and Servicing Agreement"), among Seller, Servicer, Depositor, Transferor, The Chase Manhattan Bank, as Backup Servicer, Indenture Trustee and Custodian, Seller has transferred to Transferor, Transferor has transferred to Depositor, and Depositor has transferred to the Issuer, such retail installment sale contracts and mortgage loans; and

WHEREAS, the Oakwood Entities indirectly own all or substantially all of the beneficial interests in the Depositor and the Issuer; and

WHEREAS, Daggett, Wood, Smith, Standish and Muir are directors and/or principal officers of the Oakwood Entities and their subsidiaries; and

DC: #197172 v.4



CSFB-00092385

WHEREAS, the Purchasers are willing to have the Agent acquire the Notes on the Closing Date and from time to time thereafter to make Borrowings (as defined in the Indenture) available on the condition that this Agreement is entered into with the Agent;

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

1.1     Definitions.  All capitalized terms used herein as defined terms and not defined herein shall have the meanings given to them in the Note Purchase Agreement.

1.2     Other Definitional Provisions.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(b)     The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, subsection and Exhibit references are to this Agreement, unless otherwise specified. The words "including" and "include" shall be deemed to be followed by the words "without limitation".

## SECTION 2.  OAKWOOD ENTITY OBLIGATIONS

2.1     Oakwood Entity Obligations.  Each of the Oakwood Entities agrees, jointly and severally, to take no action that would cause:

(a) .    the Depositor or the Issuer to file a voluntary petition under the United States Bankruptcy Code (the "Bankruptcy Code") or any other federal or state bankruptcy or insolvency law;

(b)     the Depositor or the Issuer to file an answer consenting to or acquiescing in any involuntary petition filed against it under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law;

(c)     the Depositor or the Issuer to make an assignment for the benefit of creditors or admit its insolvency or inability to pay its debts as they become due.

2.2     Amendments/Release.  Each of the Oakwood Entities hereby consents and agrees that Agent, the Purchasers and the Indenture Trustee may at any time, and from time to time, without notice to or further consent from any of the Oakwood Entities, and either with or without consideration, do any one or more of the following, all without affecting the agreements

CSFB-00092386

contained herein or the obligations of any of the Oakwood Entities for its obligations (the "Obligations") hereunder: (a) release any of the Oakwood Entities hereunder; (b) surrender without substitution any property or other collateral of any kind or nature whatsoever held by it, or by any person, firm or corporation on its behalf or for its account, securing the Notes or the Obligations; (c) modify the terms of any document evidencing, securing or setting forth the terms of the Notes; (d) grant releases, compromises and/or indulgences with respect to Notes, the Obligations or any Persons now or hereafter liable thereon; or (e) take or fail to take any action of any type whatsoever with respect to Notes or the Obligations.

2.3    Waiver of Defenses. Each of the Oakwood Entities hereby waives and agrees not to assert or take advantage of any defense based upon:

(a)    the incapacity, lack of authority, death or disability of Issuer or any other Person;

(b)    the failure of Agent, Indenture Trustee or any Purchaser to commence an action against Issuer or to proceed against or exhaust any security held by Agent, Indenture Trustee or any Purchaser at any time or to pursue any other remedy whatsoever at any time;

(c)    any duty on the part of Agent, Indenture Trustee or any Purchaser to disclose to any of the Oakwood Entities or the Officers any facts it may now or hereafter know regarding Issuer;

(d)    lack of notice of default, demand of performance or notice of acceleration to Issuer, any of the Officers or any other Person with respect to the Notes or the Obligations;

(e)    the consideration for this Agreement;

(f)    any acts or omissions of Agent, Indenture Trustee or any Purchaser which vary, increase or decrease the risk to any Oakwood Entity;

(g)    any statute of limitations affecting the liability of Issuer or any guarantor under the Related Documents, or the enforcement hereof, to the extent permitted by law;

(h)    the application by Issuer of the proceeds of the Notes for purposes other than the purposes represented by Issuer to Agent, Indenture Trustee or any Purchaser or intended or understood by Agent, Indenture Trustee or any Purchaser;

(i)    an election of remedies by Agent, Indenture Trustee or any Purchaser, including any election to proceed against any collateral by judicial or non-judicial foreclosure, whether real property or personal property, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable;

(j)    any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other aspects more burdensome than that of Issuer;

CSFB-00092387

(k)     Agent's, Indenture Trustee's or any Purchaser's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code or any successor statute; and/or

(l)     any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code.

## SECTION 3.  MISCELLANEOUS

3.1     Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of mail or telecopy notice, when received, addressed as set forth in the preamble or as follows or to such other address as may be hereafter notified by the respective parties hereto:

OAC:     Oakwood Acceptance Corporation
         7800 McCloud Road
         Greensboro, NC 27425-7081

         Attention:        Treasurer
         Telecopier No.:   (336) 664-3224

OHC:     Oakwood Homes Corporation
         7800 McCloud Road
         Greensboro, NC 27425-7081

         Attention:        Treasurer
         Telecopier No.:   (336) 664-3224

OCC:     Oakwood Capital Corporation
         [P.O. Box 50401
         Henderson, NV 89016]
         [Bank of America Center
         Suite 850
         101 Convention Center Drive
         Las Vegas, NV 89109]

         Attention:        Monte Miller, Secretary

CSFB-00092388

The Agent:    Credit Suisse First Boston, New York Branch
Eleven Madison Avenue
New York, NY  10010

Attention:        Asset Finance Department
Telecopier No.:    (212) 325-6677

Any notice to the Officers shall be given to OHC or OAC, to the attention of the General Counsel.

3.2    Binding Effect. This Agreement shall bind each of the Oakwood Entities and its successors and assigns, and shall inure to the benefit of Agent and the Purchasers and their respective successors and assigns. The Officers have executed this Agreement on behalf of the Oakwood Entities and in their capacities as officers and directors of the Oakwood Entities.

3.3    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

3.4    Severability. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

**3.5    Governing Law.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

3.6    Survival. Notwithstanding anything to the contrary contained in this Agreement or in any other Related Document, this Agreement shall continue in full force and effect until the indefeasible payment in full of the Notes.

3.7    Entire Agreement. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and may not be amended except in a writing signed by the parties. Should any one of more provisions of this Agreement be determined to be illegal or unenforceable, all other provisions hereof shall remain in full force and effect.

**3.8    Submission to Jurisdiction; Waivers.    EACH OF PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

DC: #197172 v.4                                    5

CSFB-00092389

(a)    SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN MANHATTAN AND THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

(b)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(c)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH IN SECTION 3.1 OR AT SUCH OTHER ADDRESS OF WHICH THE AGENT SHALL HAVE BEEN NOTIFIED PURSUANT THERETO; AND

(d)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

3.9    **WAIVERS OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.**

3.10    Limitation of Liability.  Each of the Parties hereto hereby acknowledges and agrees that the Officers are executing this Agreement only in a representative capacity on behalf of the Oakwood Entities, and no Officer shall have any personal liability in connection herewith or in the performance or nonperformance of this Agreement by the Oakwood Entities.

DC: #197172 v.4                    6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

OAKWOOD HOMES CORPORATION

By: _____
Name:  Duane D. Daggett
Its Chief Executive Officer and President

By: _____
Name:  Suzanne H. Wood
Its Executive Vice President

By: _____
Name:  Robert A. Smith
Its Executive Vice President

By: _____
Name:  Myles E. Standish
Its Executive Vice President

By: _____
Name:  Douglas R. Muir
Its Executive Vice President

OAKWOOD ACCEPTANCE CORPORATION

By: _____
Name:  Duane D. Daggett
Its President

By: _____
Name:  Suzanne H. Wood
Its Vice President

[AGREEMENT]

CSFB-00092391

By: _____
     Name:  Robert A. Smith
     Its Vice President

By: _____
     Name:  Myles E. Standish
     Its Vice President

By: _____
     Name:  Douglas R. Muir
     Its Vice President


OAKWOOD CAPITAL CORP.

By: _____
     Name:  Douglas R. Muir
     Its Assistant Secretary


CREDIT SUISSE FIRST BOSTON, NEW YORK
BRANCH, AS AGENT

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:


[AGREEMENT]

CSFB-00092392

By: _____
    Name:  Robert A. Smith
    Its Vice President


By: _____
    Name:  Myles E. Standish
    Its Vice President


By: _____
    Name:  Douglas R. Muir
    Its Vice President


OAKWOOD CAPITAL CORP.


By: _____
    Name:  Douglas R. Muir
    Its Assistant Secretary


CREDIT SUISSE FIRST BOSTON, NEW YORK
BRANCH, AS AGENT

By: _____
    Name:  ALBERTO ZONCA
    Title:  VICE PRESIDENT

By: _____
    Name:  ANTHONY GIORDANO
    Title:  VICE PRESIDENT


[AGREEMENT]

CSFB-00092393

**EXHIBIT J**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT OF ALAN C. SHAPIRO, PH.D.

### April 30, 2007

### CONFIDENTIAL

# Table of Contents

I.     **Scope of Engagement** .................................................................................... 1

II.    **Credentials** ................................................................................................... 1

III.   **Basis for Opinions** ....................................................................................... 3

IV.   **Summary of Opinions** .................................................................................. 3

V.     **Assumptions** ................................................................................................ 4

      V.A   CSFB Owed Oakwood and its Creditors a Fiduciary Duty ................................... 4

      V.B   Oakwood Was Insolvent in September 2001 .......................................................... 4

VI.   **Background** .................................................................................................. 4

      VI.A  Manufactured Housing Industry ............................................................................ 4

      VI.B  Business Overview of Oakwood ............................................................................. 5

      VI.C  Financial Performance of the Industry Prior to 1999 ............................................ 5

      VI.D  Industry Downturn Beginning in 1999 .................................................................. 6

      VI.E  Oakwood's Downturn and Bankruptcy .................................................................. 7

            VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

            VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ...................... 9

            VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported

                   Losses in 2002 ...................................................................................... 10

            VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ................................ 11

VII.  **CSFB Did Not Behave In a Prudent Manner** ........................................... 12

      VII.A  CSFB Had Access to Public and Private Information Concerning

            Oakwood's Financial Condition ................................................................... 12

            VII.A.1  Investment Banks Have Unique Access to Information ....................... 12

            VII.A.2  Relationship between Oakwood and CSFB .......................................... 14

            VII.A.3  CSFB Obtained Both Public and Inside Information about

                    Oakwood's Financial Condition ........................................................... 22

      VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy

            Risk ............................................................................................................ 24

            VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial

                    Condition ............................................................................................. 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood ............................................................................ 26

VII.C  CSFB's Own Guidelines Require a High Standard of Care to its Clients ........... 27

VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors ................................................................ 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy ................................................................... 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives ............................................................. 34

VII.E  The Advice CSFB Provided to Oakwood was Inappropriate .............................. 35

VII.F  The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition ............................... 36

VII.G  CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value .................................................... 37

VIII.  **CSFB Had a Financial Incentive to Keep Oakwood Operating** ................................... 39

VIII.A CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood ............................................................................................................ 39

VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood ................................................................................. 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor ................................................................................... 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern .......................................... 41

VIII.B CSFB's Equity Interest provided it with a Financial Interest in Oakwood Continuing Operations ........................................................................................ 42

VIII.B.1 Agency Conflict between Equity and Debt Holders .......................... 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C Even Though CSFB was a Lender, Its Interests Differed from Those of Other Debt Holders ........................................................................................... 45

VIII.D Conclusion Regarding CSFB's Incentives ........................................................ 47

# List of Tables

Table 7.1: CSFB's Roles and Fees Earned.......................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB ......................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects ....................................44

# List of Figures

Figure 7.1: Oakwood's Securitization Process ...........................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.    Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance*. In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis*, (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management*.

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

2

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.    Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.    Summary of Opinions

My opinions in this matter are as follow:

- ▪ ***CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.*** CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

3

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V.    Assumptions

### V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B    Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI.    Background

### VI.A    Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

## VI.B  Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C  Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.
[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.
[3] *Ibid.*, p. 2.

5

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D   Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*

[5] *Ibid.*, p. 7.

[6] *Ibid.*, p. 3.

[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.

[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks … [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E    Oakwood's Downturn and Bankruptcy

### VI.E.1    Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.

[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000. p. 1.

[12] Ibid.

[13] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

[14] Ibid.

7

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13. Issue 26.
[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.
[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2  Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] *Ibid*.

[21] *Ibid*.

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

### VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.
[26] *Ibid.*
[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.
[28] *Ibid.*
[29] *Ibid.*, p. 2.

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4  Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.
[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.
[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.
[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A   CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

#### VII.A.1   Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 59.
[35] *Ibid.*, p.183.

12

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid*.
[40] *Ibid*.
[41] *Ibid*.

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

### VII.A.2    Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

### VII.A.2.a    Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than $7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;

- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;

- Testing the financial information contained in the prospectuses; and

- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

### VII.A.2.b   Role as Provider of Loan Purchase Facility

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

16

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[t]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, December 12, 2006, p. 73.
[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 89.
[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 64-5.
[53] *Ibid.*, p. 194-5.

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

### VII.A.2.d    Role as Financial Advisor for Restructuring Purposes

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 … We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

   The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.

[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

**Table 7.1:  CSFB's Roles and Fees Earned**

| Role | Description | Fees Earned |
|---|---|---|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | ▪ Warrants of 19.9% of Oakwood's Common Stock<br>▪ Upfront fee of $2.5 million<br>▪ Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 163.

[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 152.

21

This section and section VII.A.1 demonstrate that investment banks are in a unique position to access information concerning the financial conditions of their clients and that CSFB's professional responsibilities with respect to Oakwood went beyond its role of underwriter. In light of the numerous roles CSFB served for Oakwood, CSFB had access to both public and private information about the Company's financial condition. In the following section I show that CSFB did in fact obtain public and inside information about Oakwood's financial condition and outlook.

### VII.A.3    CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition

Given its roles as underwriter, lender, and financial advisor, CSFB obtained both public and private information from Oakwood, credit-rating agencies, and other market analysts. Oakwood provided CSFB personnel with substantial amounts of confidential information, including the historical loss experience of the securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. This information was relevant to an assessment of whether the manufactured housing industry in general was experiencing a significant downturn, and whether Oakwood in particular was suffering from an insolvent financial position from which it would not likely recover.

As early as June 1999, Moody's and S&P rated Oakwood's unsecured senior notes as Baa3 and BBB-, respectively – the lowest investment-grade ratings. Any downgrade would result in a junk bond status. Both Moody's and S&P placed the Company on a negative credit watch given that Oakwood's third-quarter results were anticipated to be as much as 50 percent lower than expectations.[64] By November 1999, Moody's and S&P had downgraded Oakwood's ratings on its corporate credit and long-term senior debt securities to below investment grade with a negative outlook.[65] In late 2000, the credit-rating agencies continued to downgrade Oakwood's credit rating. In lowering the credit rating of the Company's senior notes from BB- to CCC, S&P viewed Oakwood as having the highest-risk junk bond rating possible before entering default status. S&P maintained a negative outlook on Oakwood based on its belief that the Company's "current operating loss position will continue well into [2001], due to lower volumes at manufacturing, continued pricing pressures at retail, and higher costs within its captive finance

---

[64] CSFB New Customer Credit Review dated July 16, 1999. Document # CSFB-00250093.
[65] Email from David Caspar to Douglass Muir dated November 2, 1999. Document # CSFB-00175025.

unit."[66] By June 2001, Fiachra O'Driscoll noted that Oakwood "was rated Baa3/BBB- two years ago and is now Caa1/CCC."[67] In closely monitoring the actions taken by the credit-rating agencies, CSFB knew Oakwood had fallen below investment-grade status in 1999 and continued to be downgraded through 2002 to a level just above default junk bond status.

Through its own information processing, CSFB identified a number of credit issues and concerns with Oakwood in late 1999. In particular, CSFB noted that Oakwood was in a "poor financial condition."[68] Based on estimates provided by CSFB's Manufactured Housing analysts, CSFB projected in 2000 that Oakwood would realize a gross operating margin of 26.1 percent, resulting in a net loss of $1.8 million. CSFB further projected that Oakwood's EBIT would be about $15 million in 2000, significantly less than the level needed to cover its anticipated interest expense of $50 million in that year.[69] In estimating Oakwood's free cash flows in 2000, which included the repayment of interest expense and a $125 million revolver, CSFB's Credit Risk Management ("CRM") Team predicted negative cash flows ranging from losses of $75 million to $110 million.[70]

In addition to obtaining publicly available information about Oakwood, CSFB also had access to private, inside information. As discussed, as part of preparing the securitization prospectuses, Oakwood provided CSFB with inside information, including the historical loss experience of a securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectuses for securitizations. CSFB was given access to all deal files and closing binders on all retail installment sales contracts ("RICs") to be included in each securitized asset pool and had access to prior deal files and monthly tracking reports. Furthermore, Oakwood consulted with CSFB as to which customer would be approved to determine how those decisions would affect the market's perception of the collateral.[71]

---

[66] Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus dated October 30. 2000. Document # CSFB-00170815.
[67] Email from Fiachra O'Driscoll to Phil Jacob dated June 6, 2001. Document # CSFB-00154641.
[68] CSFB Credit Issues/Concerns with Oakwood Homes Corp. Document # CSFB-00250130.
[69] *Ibid*.
[70] *Ibid*.
[71] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 45.

## VII.B   In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1   Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a   Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] *Ibid*.
[74] *Ibid*., Document # CSFB-00250116.

24

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] *Ibid.*
[76] *Ibid.*, Document # CSFB-00250117.
[77] *Ibid.*, Document # CSFB-00250121.
[78] *Ibid.*, Document # CSFB-00250118.
[79] *Ibid.*, Document # CSFB-00250117.

### VII.B.1.b   March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2   Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.
[81] *Ibid.*, Document # CSFB-00250132.
[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventor levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C   CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] *Ibid*., Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] *Ibid*.
[88] *Ibid*.

Furthermore, with respect to handling customer accounts, CSFB's compliance manual requires adherence to the New York Stock Exchange's ("NYSE") "Know your Customer" rule. This rule mandates "every member organization to learn the essential facts concerning every customer, every account and every order executed on behalf of a customer,"[89] and is intended to protect customers of NYSE members in cases where "investors who suffer losses in securities transactions often allege that their loss resulted from recommendations made by brokers which were unsuitable for them in light of their financial situation and investment objectives."[90] Given CSFB's access to both public and inside information about Oakwood, CSFB was in a position in which it could have known all the essential facts concerning the Company's insolvent financial condition. Yet its recommendations and advice to Oakwood to maintain its operations were inappropriate given that both public and inside information about Oakwood indicated that the Company was in an irreversible spiral to bankruptcy.

## VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors

The previous sections demonstrate that, given its roles as financial advisor, lender, and underwriter, CSFB had access to public and private information about Oakwood's financial condition and outlook and was concerned about Oakwood's bankruptcy risk. Further, in addition to the fiduciary duty CSFB owed Oakwood and its creditors, its own internal guidelines required that it know its customers and avoid conducting transactions harmful to its clients. Nevertheless, CSFB's advice and conduct with respect to Oakwood were inconsistent with the Company's bleak financial condition and outlook, and thus in violation of the duties it owed.

Although Oakwood was insolvent by the fall of 2001, CSFB continued until August 2002 to provide advice and arrange transactions that did not properly consider the Company's financial condition and outlook and that served to exacerbate its insolvency. No evidence exists that CSFB performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that CSFB considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.

---

[89] CSFB Compliance Manual. Section 5- Customer Accounts. Document # CSFB-0053089.
[90] *Ibid.*

In the rest of Section VII.D, I assess the advice CSFB provided to Oakwood. As I discuss, no evidence exists that CSFB suggested filing for bankruptcy as an option for Oakwood until August 2002. In Section VII.E, I demonstrate that CSFB's advice to Oakwood did not duly consider the Company's financial situation. In Section VII.F, I show that the transactions CSFB engaged in with Oakwood were value-destroying and exacerbated the Company's financial problems. In Section VII.G, I explain that CSFB should have advised Oakwood to curtail its operations and should not have enabled the Company to continue to destroy value to its creditors.

### VII.D.1   CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy

As discussed, between 2001 and August 19, 2002, the date CSFB signed a formal advisory agreement with Oakwood, CSFB was acting as a financial advisor to Oakwood. Based on the documents I have examined, CSFB never advised Oakwood of its insolvency or to even consider bankruptcy. Rather, the financial advice CSFB offered Oakwood centered on refinancing its outstanding debt to prolong the business. The objective of the CSFB presentations was to pitch certain financing schemes as a way to continue earning fees. I will now highlight the financial advice CSFB offered Oakwood throughout this period.

### VII.D.1.a   CSFB Presentation to Oakwood on June 26, 2001

On June 26, 2001, in a presentation made by CSFB to Oakwood, CSFB claimed that its equity research analysts "believed that signals exist which may point to a bottom for the manufactured housing industry"[91] and that the industry "will rebound."[92] Whereas CSFB's CRM Team believed that there was great uncertainty as to whether the manufactured housing industry had reached a bottom yet, its Investment Banking Division provided Oakwood with information that expressed optimism that industry trends would soon begin to work in the Company's favor. This had the effect of prolonging Oakwood's financing activities rather than encouraging Oakwood to consider bankruptcy in light of its unrecoverable, insolvent financial condition.

Without discussing the option of bankruptcy, CSFB maintained that it was "uniquely suited to advise Oakwood [and that its] restructuring expertise [was] complemented by its #1 position in the High Yield market, strength in the asset-backed market and #1 ranked research."[93] CSFB also provided an update on its view of Oakwood's financial health. In particular, it forecasted the

---

[91] CSFB Presentation to Oakwood Homes Corporation dated June 26, 2001. Document # CSFB-00052958.
[92] *Ibid*.
[93] *Ibid*., Document # CSFB-00052956.

Company's net income to increase from -$120.9 million in fiscal year 2000, to -$59.7 million in FY 2001, to -$23.3 million in FY 2002, and forecasted its EBITDA margin to increase from -0.3% in FY 2000, to 1.9% in FY 2001, to 4.6% in FY 2002. CSFB further claimed Oakwood had made great progress in addressing its capital structure and operating strategy issues and believed more could be accomplished to reduce the capital structure's drag on the business with the following key objectives: reducing the cash interest burden on Oakwood, shortening the time to a positive cash flow, reducing the book value of debt and increasing the common share price, and improving Oakwood's credit profile, thereby facilitating Oakwood's future access to the capital markets.[94]

When Oakwood's senior notes were trading at a combined discount of $150 million, CSFB recommended three strategies to Oakwood. The first strategy was called the "B-2 Sale and Bond Buyback." CSFB claimed Oakwood could capture a significant portion of the $150 million discount by monetizing its retained B-2 securities and using the proceeds to quietly buy back and retire some of its outstanding senior notes. CSFB's recommendation was based on the assumption that the industry had bottomed out and the Company's financial condition was going to improve, resulting in an increase in the prices of Oakwood's bonds in the near future. The second strategy was called the "Package Exchange Offer." Under this alternative, CSFB recommended that Oakwood offer its bondholders a package of new debt and common shares in exchange for old notes to capture more of the current bond discount. The third strategy was called "One-Off Equity for Debt Exchange." CSFB claimed that Oakwood could chip away at its debt by quietly offering individual bondholders common shares in exchange for senior notes. CSFB advised Oakwood that individual bondholders would be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time.

Rather than advise Oakwood to cut its losses and file for bankruptcy, CSFB encouraged Oakwood to continue to engage in financing activities based on uncertain assumptions that industry-wide and company-specific conditions would improve. This advice only accelerated the Company's insolvent financial position.

---

[94] *Ibid.*, Document # CSFB-00052978.

### VII.D.1.b   CSFB Presentation to Oakwood on August 9, 2001

On August 9, 2001, CSFB made another presentation to Oakwood to provide further restructuring alternatives to the Company. Although Oakwood's bankruptcy appeared to be imminent, CSFB stated that "Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current trading level of its outstanding Notes."[95] Again, CSFB stated that it believed signals existed indicating that the manufactured housing industry had reached its bottom and that Oakwood should aggressively pursue strategies to capitalize on the trading levels of its public bonds.[96]

In stating that recent liquidity transactions had successfully positioned Oakwood to pursue restructuring options, CSFB recommended that the Company proceed with a three-step process. First, CSFB believed Oakwood should proceed with the application of the B-2 and receivables purchase facility proceeds that it proposed in its June 26, 2001, presentation. The second step was for Oakwood to refinance its credit facility with a new facility of $50 million. The goal of this strategy was to replace the current senior lenders with non-traditional lenders to allow Oakwood greater latitude. Third, CSFB advised Oakwood, as it did in its previous presentation, to further reduce its debt by considering a "Package Exchange Offer" and a "One-off Equity for Debt Exchange."[97] At the end of the presentation, CSFB listed more than one hundred "distressed finance assignments" it had performed for companies in which CSFB acted as a financial advisor to companies suffering from precarious financial and operating conditions.

Interestingly, shortly before making these presentations to Oakwood in 2001, CSFB issued a negative equity research report about the Company on April 26, 2001. In that report, CSFB lowered its fiscal 2001 estimate to a loss of $2.00 per share "based on the company's latest results and the continued softness in the manufactured housing industry."[98] In addition, the report maintained a Hold rating "given [Oakwood's] recent losses and excessive leverage (51% debt to capital and negative interest coverage) as well as the continued soft industry conditions."[99] While CSFB's equity research analysts were pessimistic about the condition of both Oakwood and the entire manufactured housing industry, CSFB's investment banking division was optimistic about the future prospects of the Company and the industry as a whole as a way to solicit more business from Oakwood.

---

[95] CSFB Presentation to Oakwood Homes Corporation dated August 9, 2001. Document # CSFB-00052854.
[96] *Ibid*., Document # CSFB-00052855.
[97] *Ibid*., Document # CSFB-00052873.
[98] CSFB Equity Research. "Oakwood Homes Corporation." April 26, 2001. Document # CSFB 001555802.
[99] *Ibid*.

### VII.D.1.c  CSFB Presentation to Oakwood in March 2002

In a March 2002 presentation to Oakwood, CSFB advised Oakwood that it could reduce its March 2004 refinancing risk by exchanging the notes coming due in 2004 for a package of new notes and cash. CSFB noted that at that time notes coming due in 2004 had a face value of $125 million. CSFB recommended that these notes be exchanged for notes with a face value of $125 million with the same coupon and maturity as its notes coming due in 2009, with the cash portion of the exchange being sized to provide a modest premium to the trading levels of the 2004 notes.[100]

Table 7.2 below provides a summary of the strategic options and alternatives provided by CSFB in its presentations to Oakwood prior to August 2002.

**Table 7.2: Summary of Strategic Options Provided by CSFB**

| Presentation Date | Key Company Objectives Identified by CSFB in the Presentation | Strategic Alternatives Provided by CSFB |
|---|---|---|
| June 26, 2001 | ▪ Reduce cash interest burden on Oakwood<br>▪ Shorten the time to positive cash flow levels<br>▪ Reduce book value of debt and increase common share price<br>▪ Improve Oakwood's credit profile<br>▪ Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty | ▪ B-2 sale and open-market bond buyback<br>▪ Package exchange offer<br>▪ One-off equity for debt exchange<br>▪ Negotiate a flip-up transaction with a non-traditional senior lender |
| August 9, 2001 | ▪ Avoid a going-concern issue<br>▪ Replace current bank group<br>▪ Better utilize assets to raise non-traditional capital<br>▪ Reduce cash interest burden on Company<br>▪ Reduce debt & increase common share price<br>▪ Improve Oakwood's credit profile, thereby facilitating future access to the capital markets | ▪ Proceed with application of B-2 and Receivables Purchase Facility Proceeds<br>▪ Refinance credit facility with a new facility of $50 million or more<br>▪ Consider reducing debt through package exchange offer and one-off equity for debt exchange |
| March 2002 | Reduce Oakwood's March 2004 refinancing risk by exchanging the 2004 Notes for a package of new notes and cash | ▪ 2004 notes exchanged for $125M face value of new notes structured with the same coupon and maturity as 2009 notes<br>▪ Package exchange offer<br>▪ Flip-up transaction |

---

[100] CSFB Presentation to Oakwood Homes Corporation dated March 2002. Document # CSFB-00033246.

In providing a number of strategic alternatives for Oakwood to pursue to address its capital structure, at no point prior to August 2002 did CSFB advise Oakwood to consider filing for bankruptcy or that industry fundamentals were unlikely to improve soon enough for Oakwood to maintain its operations through the industry downturn. While CSFB's investment banking division failed to discuss the probability of bankruptcy with Oakwood until August 2002, its equity research group concluded that Oakwood posed a significant chance of bankruptcy throughout that time. On June 11, 2001, CSFB released a manufactured housing industry report stating that "[Oakwood] is still operating well in the red and the industry is not reaccelerating at this time."[101] In light of the weakness in Oakwood and the manufactured housing industry, CSFB explicitly asserted in the June 2001 report:

> Our probability that Oakwood does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with Oakwood, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares.[102]

On September 20, 2001, CSFB released another analyst report that stated verbatim its beliefs about the likelihood of Oakwood having to file for bankruptcy. CSFB still maintained a Hold rating on Oakwood, based again on its opinion that the "probability that Oakwood does not file for bankruptcy is now 50%."[103] While CSFB's investment banking division continued to present strategic options to Oakwood in 2001 and 2002 without discussing the possibility of bankruptcy, CSFB's research analysts contemporaneously published reports reflecting its concern that Oakwood posed a significant probability of bankruptcy. Not only did CSFB's research analysts believe that Oakwood had a fifty percent chance of filing for bankruptcy in June 2001, it believed that the probability of this occurrence had been even higher six months prior. Thus, CSFB's investment banking division continued to engage in activities that exacerbated Oakwood's insolvent financial condition and never advised the Company about the option of filing for bankruptcy until August 2002, even though its research analysts explicitly opined that the Company posed at least a 50 percent chance of filing for bankruptcy throughout 2001.

---

[101] CSFB Equity Research. "Manufactured Housing Industry Outlook: Approaching Bottom of Cycle; Not Out of the Woods Yet." June 11, 2001. Document # CSFB-00266476.

[102] *Ibid.*

[103] CSFB Equity Research. "Manufactured Housing- Retail Inventory Update: Second Quarter 2001." September 20, 2001. Document # CSFB 00266317.

### VII.D.2  CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise Oakwood that its best course of action might have been a restructuring. CSFB discussed Oakwood's capital structure and the potential courses of action it felt Oakwood should have considered pursuing to meet its liquidity and capital needs "in light of the sustained losses suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB stated that "while many thought that the industry had bottomed, there continues to be a downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's current state of operations and its short- and long-term prospects. Of particular concern was the maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that the factors threatening Oakwood's short-term liquidity position were $24 million in annual interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving, which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default rates and a structural change in the industry would place additional stress on Oakwood and that the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood chose should be based on its degree of optimism or pessimism as to its ability to grow into its capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views, CSFB offered a number of strategic alternatives. An optimistic view was seen as having a moderate-to-high probability of being able to service and refinance debt capitalization. If this were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid*.
[106] *Ibid*., Document # MNAT006735.

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

## VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid*., Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 201.
[109] *Ibid*., pp. 169-170.
[110] *Ibid*. p. 16.

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F   The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006, Vol. 2, p. 232.

[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 19.

[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

## VII.G    CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.
[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.
[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

Committee in December 2002, Oakwood provided details of a rationalization plan ("the Plan") that sought to address the difficulties surrounding the Company's operations. The strategy of the Plan was to downsize Oakwood's operations, reduce fixed operating expenses, and improve the Company's cash flow and profitability.[118] In particular, the Plan proposed that Oakwood eliminate poorly performing retail stores, increase its focus on wholesales sales, adjust manufacturing capacity to a level in line with expected future sales, and reduce corporate overhead in line with the downsized company.[119] The Plan proposed accomplishing these objectives by eliminating Oakwood's presence in high-default states as well as closing seventy-four retail centers, five manufacturing plants and its Austin, Texas loan origination office. These actions alone were predicted to increase Oakwood's 2002 manufacturing and retail operating income by $30 million.[120] In light of the fact that the downturn in the manufactured housing industry was due in large part to overcapacity and excessive growth by companies like Oakwood, the advice CSFB provided should have entailed operational improvement strategies which focused upon downsizing the Company's operations. Rather, CSFB proposed alternative financing options which resulted in losses on securitization transactions and further impairment charges on Oakwood's REMIC valuations.

In addition, similar to providing the optimistic and pessimistic scenarios set forth in its presentation to Oakwood's board of directors after it was formally retained as a financial advisor for restructuring purposes, CSFB should have provided the Company with certain alternative courses of action if Oakwood's management believed it could not turn around its insolvent financial condition prior to mid-2002. Throughout its relationship with Oakwood, CSFB should have emphasized that the Company was confronted with both immediate and future liquidity-draining issues. Over the long term, CSFB should have advised that additional stress was going to be placed on the Company if the trends in default rates and industry structural change continued.[121] On further pointing out that Oakwood's securities were trading at distressed levels, its annual interest expense was high, and the servicing fees it earned on its REMIC securities were insufficient to cover the associated servicing costs, CSFB should have informed Oakwood of its unlikely prospect of improving its capital structure and provided more comprehensive restructuring solutions prior to August 2002 based on the assumption that the downturn in the manufactured housing industry was going to continue.

---

[118] Oakwood Homes Corporation. Creditors Committee Meeting dated December 9, 2002. Document # MNAT024088.
[119] *Ibid.*
[120] *Ibid.*, Document # MNAT024090.
[121] CSFB Presentation to Oakwood Board of Directors dated August 19, 2002. Document # OHCLT-01706.

Further, CSFB should have advised Oakwood that if the Company was pessimistic about the future prospects of its financial and operating conditions, it should not continue to employ a wait-and-see approach or take advantage of the discounted trading levels of its debt. Assuming Oakwood was insolvent in the fall of 2001, CSFB should have recognized and considered early in its relationship with Oakwood that the Company's outstanding indebtedness exceeded its fundamental value and that a sale of the Company or a filing for bankruptcy were options Oakwood should have thoroughly evaluated. Prior to August 2002, CSFB should have been recommending that Oakwood scale back its operations or begin implementing a pre-arranged or pre-packaged bankruptcy strategy. Both of these options would have been in the best interests of the Company and its credit holders. Instead, CSFB's recommendations were centered on its financial incentive to keep Oakwood operational to earn exorbitant fees through its roles as an underwriter, lender, and advisor.

## VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating

In this section, I describe the financial incentives CSFB had to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy. I first describe the fees CSFB was earning, and stood to continue earning, from its relationship with Oakwood. I then explain how CSFB's equity interest in Oakwood allowed it to share in the upside of an Oakwood recovery. Finally, I describe how, despite being a lender to Oakwood, CSFB did not share in the costs of the turnaround attempt because its debt was bankruptcy protected. In short, because of its unique position as a bankruptcy-insulated lender and equity owner, CSFB would enjoy the upside of an Oakwood recovery without facing the consequences of the attempt (that continuing operations was further exacerbating Oakwood's insolvent financial condition), and because of its relationships with Oakwood, CSFB would earn more fees the longer the attempt continued.

### VIII.A   CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood

As I described in Section VII, CSFB provided several services and played varying roles over the course of its relationship with Oakwood from the early 1990s through 2002. During this period, CSFB acted as Oakwood's general financial advisor, primary underwriter of its securitization program, secured lender, and as of August 19, 2002, its financial advisor for restructuring purposes. As discussed below, CSFB earned significant fees for providing these services to Oakwood.

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility.[126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.

[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.

[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.

[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.

[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

### VIII.A.3  Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:
    - The face amount of the old securities;
    - One third of the face amount of the securitization guarantees; and
    - One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

### VIII.A.4  Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.
[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

### VIII.B  CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1  Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.

[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.
[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

**Table 8.1: Illustration of Payoffs and Probabilities of Projects**

| Cash Flow | Project A | | Project B | |
|---|---|---|---|---|
| | Unsuccessful | Successful | Unsuccessful | Successful |
| | Payoff (80% Prob.) | Payoff (20% Prob.) | Payoff (50% Prob.) | Payoff (50% Prob.) |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

### VIII.B.2   CSFB Had a Conflict of Interest with Oakwood's Debt Holders

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

### VIII.C   Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.
[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989.301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection to lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict – that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

### VIII.D   Conclusion Regarding CSFB's Incentives

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.

Dated:    April 30, 2007

Alan C. Shapiro, Ph.D.

47

**Appendix A:  Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California  90089-1427

## EDUCATION
Ph. D.        Economics, Carnegie Mellon University, 1971
B.A.          Mathematics, Rice University, 1967

## CURRENT POSITION
1991-Present:     Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

## PAST POSITIONS
1993-1997:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:     Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:     Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:     Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:     Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:     Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:     Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

## VISITING APPOINTMENTS
Spring 2003:     U.S. Naval Academy

Spring 1990:     Yale School of Management, Yale University

1

1984-1985:        Anderson Graduate School of Management, UCLA

Spring 1981:      Faculty of Commerce, University of British Columbia

Spring 1977:      Stockholm School of Economics

## TEACHING EXPERIENCE

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

## EXECUTIVE PROGRAMS: UNIVERSITIES

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

**EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS**

CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy; O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

<u>Editorial Positions</u>

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

<u>Boards of Directors</u>

Academy of International Business
Western Finance Association
American Finance Association

<u>Reviewer for</u>

| | |
|---|---|
| *Journal of Financial Economics* | *Journal of Banking and Finance* |
| *Journal of Political Economy* | *Financial Review* |
| *Journal of Finance* | *International Trade Journal* |
| *Management Science* | *Financial Management* |
| *Journal of International Economics* | *Urban Economics* |
| *Journal of Money, Credit, and Banking* | *Journal of International Business Studies* |
| *Journal of Financial and Quantitative Analysis* | *Journal of Economics and Business* |
| *National Science Foundation* | *Journal of Financial Services Research* |
| *Journal of International Money and Finance* | |

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management Association, 1986.

5

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

> Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

> Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

8

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

**WORKING PAPERS**

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

**CONSULTING AND PROFESSIONAL ACTIVITIES**

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

11

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

12

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

13

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

**AWARDS AND SPECIAL RECOGNITION**

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

**SPEECHES**

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

14

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

## EXPERT WITNESSING

1. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2. Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3. Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4. New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6. O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7. IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8. IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9. Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

17

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

18

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

19

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Hafif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton:  Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

22

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

23

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:**
**1994-2006**

1. Fleet Funding, Inc. and Fleet Funding 11, Inc., Appellants v. Commissioner of Revenue, Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

2. K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc., Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the County of Santa Clara: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages. I was deposed on February 3, 2006 on behalf of the defendant.

3. Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior Court of the State of California for the County of Santa Clara: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the plaintiff.

4. Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C, United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004 (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5. Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6. TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7. Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8. Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9. Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

27

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

**20.** Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

29

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

# Appendix B:  List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*.

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

**EXHIBIT K**

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

# Minute Entry

## *Hearing Information:*

| | |
|---|---|
| **Debtor:** | Oakwood Homes Corporation |
| **Case Number:** | 02-13396-PJW    **Chapter:** 11 |
| **Date / Time / Room:** | THURSDAY, OCTOBER 04, 2007 09:30 AM   CRT#2, 6TH FL. |
| **Bankruptcy Judge:** | PETER J. WALSH |
| **Courtroom Clerk:** | LORA JOHNSON |
| **Reporter / ECR:** | LESLIE MURIN |

## *Matter:*

**ADV: 1-04-57060**

**OHC Liquidation Trust, by and through Al vs Credit Suisse First Boston LLC**

Status conference -moved from 9/25/07

**R / M #:**   196 /  0

## *Appearances:*

See attached Court sign-in sheet

## *Proceedings:*

Status conference held.
Briefing requested on whether a Bankruptcy Judge has authority to decide jury trial issues.  Opening statement due on 10/5/07, response due on 10/12/07 and reply due on 10/17/07.
Five day trial scheduled for 11/5/07, pretrial conference set for 10/31/07 @ 11:30 a.m. and pretrial order due on 10/26/07.
Scheduling order due.

**EXHIBIT L**

# APPENDIX OF UNPUBLISHED DECISIONS

1.  Andrews v. AmSouth Bank (In re Andrews),
    No. 06-40016, 2007 WL 2819523 (Bankr. N.D. Ala. Sept. 26, 2007)

2.  Cantor v. Perelman,
    No. Civ. A. 97-586-KAJ, 2006 WL 318666 (D. Del Feb. 10, 2006)

3.  Dimitri v. Granville Semmes,
    Civ. No. 00-2448, 2000 WL 1843495 (E.D. La. Dec. 14, 2000)

4.  Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),
    Civ. No. 04-928 (JJF) 2004 WL 2713101 (D. Del. Nov. 16, 2004)

5.  Schwartz v. Prudential Ins. Co. of Am. (In re Kridlow),
    No. 97-35168DAS, 1999 WL 97939 (Bankr. E.D. Pa. Feb. 19, 1999)

6.  Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.),
    Civ. No. A 00-993-JJF, 2003 WL 22769051 (D. Del. Nov. 19, 2003), aff'd,
    502 F.3d 212 (3d Cir. 2007)

(C) 2008 West
Group
Page 10
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

Only the Westlaw citation is currently available.

United States Bankruptcy Court,

N.D. Alabama,

Southern Division.

In re William F. ANDREWS and Virginia L. Andrews,
Debtor.
Virginia L. Andrews, Plaintiff,
v.
AmSouth Bank; Life Insurance Company of Alabama,
Defendants.
Bankruptcy No. 01-42562-JJR-13.
Adversary No. 06-40016-BGC.

Sept. 26, 2007.

Harvey B. Campbell, Jr., Talladega, AL, Lloyd W. Gathings, Gathings Law, Birmingham, AL, for Plaintiff.

James H. Greer, Key, Greer, Frawley, Key & Harrison, Pelham, AL, Stewart M. Cox, Bradley Arant Rose & White LLP, Birmingham, AL, Robert D. McWhorter, Jr., Gadsden, AL, for Defendant.

Memorandum Opinion on Motions to Strike Jury Demand

BENJAMIN COHEN, United States Bankruptcy Judge.

**\*1** This Memorandum Opinion was not submitted by the Court for publication.

The matters before the Court are:
    1. The *Motion to Strike* filed on November 17, 2006, by the defendant AmSouth Bank (Proceeding No. 52); and
    2. The *Motion to Strike Jury Demand* filed on April 5, 2007, by the defendant, Life Insurance Company of Alabama (Proceeding No. 69).

After notice, a hearing was held on May 5, 2007. Appearing were: Harvey B. Campbell, Jr. and Lloyd W. Gathings, attorneys for the plaintiff; James H. Greer and Stewart M. Cox, attorneys for AmSouth Bank (AmSouth); Robert D. McWhorter, Jr., the attorney for Life Insurance Company of Alabama (LICOA); and Linda B. Gore, the standing Chapter 13 trustee.

The matters were submitted on stipulations, briefs, arguments of counsel, and the records in this case and adversary proceeding.

As discussed below, the Court concludes that the plaintiff is not entitled to a jury trial.

I. Findings of Fact
A. The Debtors' Petition and Plan

The debtors filed a joint Chapter 13 petition on July 13, 2001. Along with the petition, they filed a proposed Chapter 13 plan. On February 14, 2002, they filed a modification to that proposed plan. The plan as modified was confirmed on February 25, 2002.

The confirmed plan required the Andrews to make monthly payments of $210.00 to the Chapter 13 trustee for 60 months. After receiving those funds, the trustee was ordered to disburse those funds: (1) first to administrative expense holders; (2) second to other priority claimants, if any; (3) third in satisfaction of secured arrearage claims; and (4) fourth to creditors holding unsecured claims.

In regard to one secured creditor, when the debtors' filed their petition, they owned real property located in Jacksonville, Alabama. That property was encumbered by a mortgage held by AmSouth. The confirmed plan required the debtors to make their regular monthly mortgage payments on that debt directly to AmSouth.

In an unrelated provision, paragraph 6 of the confirmation order following the heading "Order by the Court" provided, "The property of the estate shall not vest in the debtor(s) until a discharge is granted under Chapter 13 or this case is dismissed out of Court...." *Findings of Fact and Order Confirming Chapter 13 Plan and Providing For Related Matters* (Proceeding No. 22).

B. AmSouth's Proofs of Claim

AmSouth filed three proofs of claim in this case relating to its mortgage claim. Those proofs of claim represent that AmSouth was owed $17,177.38 on the principal amount of its debt as of January 7, 2002 (claim no. 11); $3,859.28 for prepetition arrears as of January 7, 2002 (claim no. 11); and $1,274.44 for postpetition arrears as of January 25, 2001 (claim no. 12). [FN1]

    FN1. The third claim, claim number 10, was filed on November 30, 2001, for prepetition arrears of $1,300. The Court assumes that amount was included in the $3,859 requested through claim number 11 filed on January 11, 2002.

C. Mr. Andrews' Death

During the course of this case, the parties' attorneys informed the Court that Mr. Andrews died on October 30, 2003.

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 11
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

### D. AmSouth's Motion for Relief

*2 AmSouth filed a motion for relief from the automatic stay on March 30, 2005. The bank contended that Mrs. Andrews failed to make her mortgage payments which became due during the 11 months from May 2003 through March 2005. *Motion for Relief From Automatic Stay* (Proceeding No. 34, Main Case No. 01-42562-BGC-13). AmSouth withdrew that motion on May 10, 2005.

### E. Mrs. Andrews' Complaint Against AmSouth and LICOA

On January 13, 2006, Mrs. Andrews filed the pending adversary proceeding. In her complaint Mrs. Andrews alleged that: (1) she acquired credit life insurance through AmSouth which insurance was designed to pay off the balance of the mortgage debt if Mr. Andrews died; (2) AmSouth purportedly contracted with LICOA to provide that insurance; (3) subsequent to Mr. Andrews' death, AmSouth refused to acknowledge satisfaction in full of the mortgage debt, contending that the insurance had lapsed because of nonpayment of premiums; and (4) LICOA refused to pay off the remainder of the debt which she owed to AmSouth.

In Count I of her amended complaint, Mrs. Andrews alleges that LICOA, "breached its insurance contract with ... [her]." *Amended and Recast Complaint* at 4, ï 21 (Proceeding No. 61, A .P. No. 06-40016) (parenthetical added). She concludes that as a proximate result of that breach, "[she] was denied the benefits due to her on said life insurance policy in that the debt that was insured has not been paid...." *Id.* at 4-5, ï 22 (parenthetical added).

In Count II of her amended complaint, Mrs. Andrews alleges that she, "made a timely claim pursuant to the terms of the credit life insurance policy for the amount of the indebtedness remaining unpaid at the time of Mr. Andrews' death." *Amended and Recast Complaint* at 5, ï 24 (Proceeding No. 61, A.P. No. 06-40016). She contends that LICOA denied that claim, "in bad faith...." *Id.* She concludes that as a proximate result of LICOA's bad faith, "[she] was denied the benefits due to her on said life insurance policy in that the debt that was insured has not been paid...." *Id.* at 6, ï 25 (parenthetical added).

In Count III of her amended complaint, Mrs. Andrews alleges that LICOA "negligently or wantonly hired and/or supervised its agents ... resulting in the wrongful conduct of its agents as set forth in Count IV and Count V." *Amended and Recast Complaint,* at 6-7, ï 27 (Proceeding No. 61, A.P. No. 06- 40016). She concludes that as a proximate result of that conduct, "[she] was denied the

benefits due to her on said life insurance policy in that the debt that was insured has not been paid...." *Id.* at 7, ï 28 (parenthetical added).

In Count IV of her amended complaint, Mrs. Andrews alleges that AmSouth is, "guilty of fraud, fraudulent suppression, and deceit in the sale and/or servicing of the insurance policy ... [when it represented to her], that the premiums paid by Plaintiff were paid for a credit life insurance policy ... which would pay the remaining unpaid indebtedness on Plaintiff's mortgage loan in the event of the death of William F. Andrews...." *Amended and Recast Complaint* at 8, ï 30 (Proceeding No. 61, A.P. No. 06-40016) (parenthetical added). She also alleges that the defendants failed "to disclose to Plaintiff that the premiums, although paid, were not used to keep a credit life insurance policy in force and effect...." *Id.* She concludes that as a proximate result of that conduct, "[she] was denied the benefits due to her on said life insurance policy in that the debt that was insured has not been paid ..." *Id.* at 9, ï 34 (parenthetical added).

*3 In Count V of her amended complaint, Mrs. Andrews alleges that AmSouth, "continued to negligently or wantonly collect credit life insurance premiums from the plaintiff for a period of years after the credit life insurance policy had allegedly been terminated due to a 60 day delay in payment." *Amended and Recast Complaint* at 9, ï 36 (Proceeding No. 61, A.P. No. 06-40016). She concludes that as a proximate result of that conduct, "[she] was denied the benefits due to her on said life insurance policy in that the debt that was insured has not been paid...." *Id.* at 10, ï 37 (parenthetical added).

It is apparent from the complaint that the focal point of Mrs. Andrews' lawsuit is that AmSouth and LICOA wrongfully failed to satisfy, from the credit life insurance policy and its proceeds, the remainder of AmSouth's claim when Mr. Andrews died. This conclusion is supported by the fact that in paragraph 2 of her complaint, as amended, Mrs. Andrews concedes that her lawsuit is a "core proceeding" and "is a counterclaim based on the claim filed by the defendant, AmSouth Bank." *Amended and Recast Complaint* at 1, ï 2 (Proceeding No. 61, A.P. No. 06-40016).

### F. Request for a Jury Trial

The debtor requested a jury trial on her claims against both defendants. Neither AmSouth nor LICOA requested a jury trial, and both contend the debtor is not entitled to one.

### G. AmSouth's *Motion to Suspend Payments*

Following her husband's death, and despite filing the

(C) 2008 West
Group
Page 12
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

pending adversary proceeding, Mrs. Andrews continued to make her Chapter 13 plan payments and payments to AmSouth. AmSouth continued to accept payments both from the trustee and Mrs. Andrews until February 7, 2007, when it filed a motion to have the trustee suspend payments on its claims pending resolution of Mrs. Andrews' lawsuit. *Motion to Suspend Payments From Trustee on AmSouth Banks Claims* (Proceeding No. 54, Main Case No. 01-42562).

## II. Issue

Is the debtor entitled to a jury trial against either AmSouth or LICOA?

## III. CONCLUSIONS OF LAW
### A. AmSouth

As discussed above, AmSouth filed three claims in this Chapter 13 case. The filing of those claims had a significant impact on the debtor's right to a jury trial before this Court. This Court has considered three lines of cases in that regard. Those are: (1) the "Claims Adjudication Process"; (2) "Submission to a Court of Equitable Jurisdiction"; and (3) "Combination Theory." [FN2]

FN2. For another discussion of a debtor's right to a jury trial, see this Court's opinion in *Sharpe v. Wells Fargo Home Mortgage (In re Sharpe),* Case No. 03-04644, 2007 WL 1876368, (Bankr.N.D. Ala. Jun 27, 2007) where this Court considered whether the debtor was entitled to a jury trial in a wrongful foreclosure action and related causes of action for breach of contract, conversion, trespass, violation of the automatic stay, estoppel, fraud, unjust enrichment, and breach of fiduciary duty.

### 1. "Claims Adjudication Process"

The "Claims Adjudication Process" theory requires a creditor to have filed a proof of claim, or its functional equivalent, and that the debtor's claims be interconnected to that creditor's claim.

Under the "Claims Adjudication Process" theory, Courts have universally held that a debtor is not entitled to a jury trial in an adversary proceeding filed in the bankruptcy court against a creditor who has filed a proof of claim, or its functional equivalent, such as a dischargeability complaint, the removal of an action pending against the debtor in a nonbankruptcy forum to the bankruptcy court, an administrative expense request, or a counterclaim against the debtor in an action commenced by the latter. See *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242 (3rd Cir.1994) (request for administrative expense); *Longo v. McLaren (In re McLaren),* 3 F.3d 958 (6th Cir.1993)(dischargeability

complaint); *N.I.S. Corp. v. Hallahan (In re Hallahan),* 936 F.2d 1496 (7th Cir. 1991)(dischargeability complaint and proof of claim); *Tanzi v. Shulkin,* Adversary No. 04-4166, 2006 WL 2927660 (W.D.Wash., Oct. 12, 2006)(request for administrative expense); *Smith-Lyon v. Trustmark National Bank (In re Gunsmith's Inc.),* 271 B.R. 487 (S.D.Miss.2000)(proof of claim); *Dimitri v. Granville Semmes,* 2000 WL 1843495 (E.D.La., Dec. 14, 2000)(proof of claim); *Brownlee v. Joe Cotton Ford,* Inc., 1999 WL 65053 (N.D.Ill., Feb. 5, 1999)(unclear from opinion); *Jefferson Nat'l Bank v. I.A. Durbin, Inc. (In re I.A. Durbin, Inc.),* 62 B.R. 139 (S.D.Fla.1986)(removed case); *Turner v. Bolduc (In re Crowe Rope Industries, LLC),* 307 B.R. 1 (Bankr.D.Me.2004)(proof of claim); *Charlotte Commercial Group, Inc. v. Fleet Nat'l Bank (In re Charlotte Commercial Group, Inc.),* 288 B.R. 715 (Bankr.M.D.N.C.2003)(proof of claim); *W.S.C., Inc. v. The Home Depot Inc. (In re W.S.C., Inc.),* 286 B.R. 321 (Bankr.M.D.Tenn.2002)(proof of claim); *Heater v. Household Realty Corp. (In re Heater),* 261 B.R. 145 (Bankr.W.D.Pa.2001)(no asset case, no proof of claim filed); *Hutchins v. Fordyce Bank & Trust Co. (In re Hutchins),* 211 B.R. 322 (Bankr.E.D.Ark.1997)(proof of claim); *Aaron Gleich, Inc. v. Housing Authority of the City of New Haven (In re Aaron Gleich, Inc.),* 200 B.R. 464 (Bankr.D.Me.1996)(proof of claim); *Crews v. Lyons (In re Lyons),* 200 B.R. 459 (Bankr.S.D.Ga.1994)(unclear from opinion); *Romar Int'l Georgia, Inc. v. Southtrust Bank of Alabama, N.A. (In re Romar Int'l Georgia, Inc.),* 198 B.R. 407 (Bankr.M.D.Ga.1996)(proof of claim); *Auto Imports, Inc. v. Verres Financial Corp. (In re Auto Imports, Inc.),* 162 B.R. 70 (Bankr.D.N.H.1993)(proof of claim); *Martinson v. Towe (In re Towe),* 151 B.R. 262 (Bankr.D.Mont.1993)(proof of claim); *Frost, Inc. v. Miller, Canfield, Paddock & Stone, P.C. (In re Frost),* 145 B.R. 878 (Bankr .W.D.Mich.1992)(proof of claim); *Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile Co.),* 132 B.R. 979 (Bankr.S.D.Ga.1991)(proof of claim); *Longo v. McLaren (In re McLaren),* 129 B.R. 480 (Bankr.N.D.Ohio 1991)(dischargeability complaints); *Leslie Salt Co. v. Marshland Development, Inc. (In re Marshland Development, Inc.),* 129 B.R. 626 (Bankr.N.D.Cal.1991)(removed case); *Splash v. Irvine Co. (In re Lion Country Safari, Inc.),* 124 B.R. 566 (Bankr . C.D.Cal.1991)(removed case); *Wes-Mar Group, Inc. v. Womack (In re Malkove & Womack, Inc.),* 122 B.R. 444 (Bankr.N.D.Ala.1990) (proof of claim); *Kroh Bros. Dev. Co. v. Bazan (In re Kroh Bros. Dev. Co.),* 91 B.R. 889 (Bankr.W.D.Mo.1988)(proof of claim); *Pro Machine, Inc. v. Hardinge Bros., Inc. (In re Pro Machine, Inc.),* 87 B.R. 998 (Bankr.D.Minn.1988)(proof of claim); *Taubman Western Assocs., No. 2 v. Beugen (In re Beugen),* 81 B.R. 994 (Bankr.N.D.Cal.1988) (removed case); *In re Manning,* 71 B.R. 981 (Bankr.N.D.Ala.1987)(proof of claim).

(C) 2008 West
Group
    Page 13
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

**\*4** Many of the courts reaching that conclusion relied on the United States Supreme Court's decisions in *Katchen v. Landy,* 382 U.S. 323 (1966), *Granfinanciera v. Nordberg,* 492 U.S. 33 (1989) and *Langenkamp v. Culp,* 498 U.S. 42 (1990). Those courts reasoned that since the bankruptcy claims adjudication process is equitable in nature, the legal claims of the creditor, (by filing a proof of claim), and those of the debtor, (by submitting a lawsuit which is interconnected with the creditor's claim for resolution by the bankruptcy court), are transformed into an equitable dispute over a share of the bankruptcy estate, to which there is no right to a jury trial. So, when a debtor files a lawsuit involving issues which are interrelated to the allowance of the creditor's claim, that is, where the merits of that lawsuit must be decided before the creditor's claim can be resolved, that lawsuit becomes part of the claims allowance process. Hence, neither the debtor nor the creditor has a right to a jury trial. *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d at 1252-1253; *W.S.C., Inc. v. The Home Depot Inc. (In re W.S.C., Inc.),* 286 B.R. at 329; *Heater v. Household Realty Corp. (In re Heater),* 261 B.R. at 150; *Aaron Gleich, Inc. v. Housing Authority of the City of New Haven (In re Aaron Gleich, Inc.),* 200 B.R. at 466-467; *Romar Int'l Georgia, Inc. v. Southtrust Bank of Alabama, N.A. (In re Romar Int'l Georgia, Inc.),* 198 B.R. at 411-412; *Frost, Inc. v. Miller, Canfield, Paddock & Stone, P.C. (In re Frost),* 145 B.R. at 882-883; *Leslie Salt Co. v. Marshland Development, Inc. (In re Marshland Development, Inc.),* 129 B.R. at 630-631; *Longo v. McLaren (In re McLaren),* 129 B.R. at 483; *Pro Machine, Inc. v. Hardinge Bros., Inc. (In re Pro Machine, Inc.),* 87 B.R. at 1003-1004; *Taubman Western Assocs., No. 2 v. Beugen (In re Beugen),* 81 B.R. at 997-999.

**2. "Submission to a Court of Equitable Jurisdiction"**
    The "Submission to a Court of Equitable Jurisdiction" theory, does not, by definition, require the filing of a proof of claim by a creditor or that the debtor's claims be interconnected to a creditor's claim, although those elements were present in the cases cited below. However, court's applying this theory do reach the same result as the "Claims Adjudication Process" cases, but through different reasoning. That reasoning is that the Seventh Amendment accords no right to a jury trial to a litigant who submits his cause of action to a court of equitable jurisdiction for resolution. Specifically, the Seventh Amendment provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S. Const. amend. VII. The Supreme Court of the United States has consistently interpreted the phrase "Suits at common law" to refer to, "suits in which legal rights were to be

ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered...." *Parsons v. Bedford,* 3 Pet. 433, 447, 7 L.Ed. 732 (1830)." *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41 (1989).

**\*5** Consequently, a debtor who submits a legal claim to the bankruptcy court is not entitled to a jury trial on that claim. *Longo v. McLaren (In re McLaren),* 3 F.3d at 961; *N.I.S. Corp. v. Hallahan (In re Hallahan),* 936 F.2d at 1505; *Dimitri v. Granville Semmes,* 2000 WL 1843495, \*2; *Brownlee v. Joe Cotton Ford, Inc.,* 1999 WL 65053, \*3; *Hutchins v. Fordyce Bank & Trust Co. (In re Hutchins),* 211 B.R. at 324; *Crews v. Lyons (In re Lyons),* 200 B.R. at 460; *Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile Co.),* 132 B.R. at 980-981. *See also In re Kridlow,* 1999 WL 97939, \*5 (Bankr.E.D.Pa., Feb. 19, 1999)(debtor not entitled to jury trial in action brought in bankruptcy court against noncreditor insurance company for bad faith refusal of coverage); *Mid American Concrete Construction, Inc. v. Sears Roebuck & Co.,* 1993 WL 177140, \*3 (Bankr.N.D.Ill., May 6, 1993)(debtor not entitled to jury trial in action brought in bankruptcy court against non-creditor third party).

**3. "Combination Theory"**
    The two theories discussed above are not necessarily antagonistic or exclusive. A third line of cases, referred to as the "Combination Theory" cases illustrate that point. These cases discuss a mix of the other two theories.

    Court's applying a "Combination Theory" have held that a debtor is not entitled to a jury trial where he has submitted his action to the equitable jurisdiction of the bankruptcy court for resolution *and* the action implicates the claims allowance process. See *Dunmore v. United States,* 358 F.3d 1107, 1116 (9th Cir.2004)(under the circumstances, debtor did not waive right to jury trial on tax refund claims against United States by seeking the trustee's abandonment of the refund claims, however, "If [the debtor] were to submit himself to the bankruptcy court's equity jurisdiction, he would waive any right to a jury trial for the resolution of those disputes 'vital to the bankruptcy process,' including disputes that are part of the claims-allowance process and the hierarchical reordering of his creditors' claims."). *Id.* (parenthetical added).

    See also *Tanzi v. Shulkin,* 2006 WL 2927660 at \*4-5 ("The Bankruptcy Court properly struck the Debtors' jury demand. The legal malpractice claim implicated the claims allowance process and the Debtors submitted the claim to the Bankruptcy Court's equitable claims allowance process."); *Parsons v. United States (In re Parsons),* 153 B.R. at 588:

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 14
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

The Parsonses voluntarily filed an adversary complaint in the bankruptcy court. Moreover, because the Parsonses asked the bankruptcy court to determine the dischargeability of the United States tax claims and James Parsons's liability for the tax penalty, the Parsonses' adversary complaint is integral to the claims allowance process. Accordingly, this court finds that the Parsonses submitted their adversary action to the equitable jurisdiction of the bankruptcy court, and thus, had no right to a jury trial.

*6 *Id.; Charlotte Commercial Group, Inc. v. Fleet Nat'l Bank (In re Charlotte Commercial Group, Inc.),* 288 B.R. at 720:

Rather than defend itself in the Pennsylvania action, CCG clearly sought out the protection of the bankruptcy court and chose an equitable forum in which to assert its claims against Fleet. Furthermore, CCG's cause of action against Fleet is integrally related to Fleet's proof of claim.... Because CCG voluntarily filed a bankruptcy petition and commenced an adversary proceeding in bankruptcy court that is patently related to Fleet's proof of claim, CCG is not entitled to a jury trial.

*Id.; Auto Imports, Inc. v. Verres Financial Corp. (In re Auto Imports, Inc.),* 162 B.R. at 72:

By filing for bankruptcy protection, the Debtor submits itself to the Court's equitable determination of the claims against it. By voluntarily submitting itself to the Court's equitable power in the determination of claims against the bankruptcy estate, the Debtor thereby waives its jury trial right on the resolution of those claims.

*Id.* (citations omitted); *Martinson v. Towe (In re Towe),* 151 B.R. at 264 ("[S]ince creditors such as the I.R.S. lose a jury trial right upon filing of a Proof of Claim, ... so does the Debtor, Towe, upon the filing of the bankruptcy petition."); *Splash v. Irvine Co. (In re Lion Country Safari, Inc.),* 124 B.R. at 571-572:

The lesson there, is that a court faced with the question of entitlement to trial by jury in the bankruptcy court, at least in so far as it is a creditor's right at stake, should examine first the question of whether the one who would invoke the right has submitted itself to the equitable jurisdiction of that court. If the answer to that question is affirmative, the next inquiry is whether the action in which the right would be exercised 'arises as part of the process of allowance and disallowance of claims' or is otherwise "integral to the restructuring of debtor-creditor relations." I can find no justification in law or reason why the same analytical process should not be applied to the determination of a debtor's right to trial by jury in actions before this court.

*Id.; Wes-Mar Group, Inc. v. Womack (In re Malkove & Womack, Inc.),* 122 B.R. at 445

By electing to be an active 'player' in this civil action and having removed it to the bankruptcy court, the debtor has, in effect, waived the stay and has treated the civil action as including or encompassing the core proceedings described in 28 U.S.C. § 157(b)(2)(B) and (C)). Insofar as concerns only the plaintiff and the debtor, this proceeding has become a core proceeding for allowance or disallowance of the plaintiff's claim against the debtor and the counterclaims by the estate against an entity filing a claim against the estate. To date, the debtor confesses an indebtedness of $111,274.51, and the plaintiff confesses an offset of $5,335.20; but, the dispute continues as to the aspects of the debtor's counterclaim which relate to a "walk-in-cooler" which the plaintiff took from the debtor on or about January 29, 1990. The debtor demanded a jury trial of these aspects of the counterclaim but has no right to a jury trial.

*7 *Id.; In re Manning,* 71 B.R. at 987:

While the debtor's counterclaim is related to the loans made to him by the bank, it did not arise out of the transactions whereby the loans were made. On the contrary, the counterclaim is alleged to have arisen from a fiduciary and confidential relationship which arose thereafter. The debtor then may be said to have elected to assert his counterclaim in equity's realm, where trial is by the chancellor or court rather than by jury. In this sense, the debtor waived any right to trial by a jury of the demand couched in the counterclaim.

*Id.*

B. The Request for a Jury Trial against AmSouth

AmSouth filed three proofs of claim in Mrs. Andrews' bankruptcy case. The focal point of the lawsuit filed by Mrs. Andrews is the allowance or disallowance of what remained of AmSouth's claim when Mr. Andrews died. In fact, the primary theory of the lawsuit is that AmSouth breached a legal duty to apply insurance proceeds, (which Mrs. Andrews allegedly became entitled to when Mr. Andrews died) to the full satisfaction of what remained of its claim. Mrs. Andrews' base theory is that AmSouth breached its duty to satisfy its claim upon Mr. Andrews' death, ostensibly through the application of credit

(C) 2008 West
Group
Page 15
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

insurance for which the Andrews had allegedly paid AmSouth. All other theories in her complaint hinge on that theory. Indeed, Mrs. Andrews admitted in her complaint that her lawsuit constitutes, "a counterclaim based on the claim filed by the defendant, AmSouth Bank," *(Amended and Recast Complaint* at 1, ï 2 (Proceeding No. 61, A.P. No. 06-40016). That alone makes the complaint an integral part of the claims allowance process. Consequently, regardless of which analytical theory applied, Mrs. Andrews is not entitled to a jury trial on her claims against AmSouth.

In contrast, Mrs. Andrews contends that because she did not file an objection to AmSouth's claim before confirmation, her action cannot possibly constitute an objection to claim. She argues that she does not technically object to the allowance of AmSouth's claim. She relies on the fact that she did not object to the claim prior to confirmation and continued to pay the claim following Mr. Andrews' death. In contrast, the *compensatory damages* which Mrs. Andrews now seeks constitute the same relief to which she would have been entitled had she objected to the continued payment of AmSouth's claim, or if she had sought to modify her plan to eliminate further payments on that claim immediately after her husband died. The only difference would be that if she had acted before, she could have avoided having to make those payments rather than having to recoup them from AmSouth now.

Attempting to do now what could have been done immediately after Mr. Andrews died does not change the nature of the action. The action is still one to avoid the payment of what remained of AmSouth's claim at that point. A simple objection to claim timely brought after Mr. Andrews' death could have resulted in the relief which Mrs. Andrews' asserts in her complaint, that is--she, "was denied the benefits due to her on said life insurance policy in that the debt that was insured has not been paid...." *Id.* (passim).

**8** Application of section 502(j) of the Bankruptcy Code confirms these conclusions. Section 502(j) specifically provides for reconsidering an allowed claim, and disallowing that claim, based on the equities of the case. That section reads:

A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not

reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

11 U.S.C. §   502(j).

Therefore, despite her protests to the contrary, Mrs. Andrews' lawsuit constitutes an objection to AmSouth's claim pursuant to section 502(j). Satisfaction of a claim from sources other than the payments being made by a debtor under a Chapter 13 plan is always grounds for reconsidering, and disallowing, a previously allowed claim.

How Mrs. Andrews elects to label her present lawsuit, or the fact that she elected to make additional payments to AmSouth before filing it, does not change the nature of the action. And whether the present suit is technically an "objection to claim" or not, it is, by Mrs. Andrews' own admission, in page 1, paragraph 2 of her *Amended and Recast Complaint,* a counterclaim to AmSouth's claim, which places it squarely in the "claims allowance process." That precludes any argument that she is entitled to a jury trial against AmSouth in this case.

But even if it does not, the Court finds:

1. Mrs. Andrews is not entitled to a jury trail against AmSouth under the "Claims Adjudication Process" because Mrs. Andrews' lawsuit involves issues which are interrelated to the allowance of AmSouth's claim because the merits of that lawsuit must be decided before AmSouth's claim can be resolved;

2. Mrs. Andrews is not entitled to a jury trial against AmSouth under the "Submission to a Court of Equitable Jurisdiction" theory because she submitted her legal cause of action for resolution by a court of equitable jurisdiction for resolution; and

3. Mrs. Andrews is not entitled to a jury trial against AmSouth under the "Combination Theory" because she submitted her cause of action to the equitable jurisdiction of the bankruptcy court *and* that action implicates the claims allowance process.

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
    Page 16
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

## C. LICOA

The situation involving LICOA is a bit more problematic. LICOA is not a creditor of the debtor. It did not file a proof of claim in Mrs. Andrews' bankruptcy case.

**\*9** Under similar circumstances, court have reached different results on the issue of whether a debtor is entitled to a jury trial against a non-creditor defendant. A few have allowed a jury trial. *In re Jensen,* 946 F.2d 369, 374 (5th Cir.1991); *W.S.C., Inc. v. The Home Depot Inc. (In re W.S.C., Inc.),* 286 B.R. 321, 332 (Bankr.M.D .Tenn.2002).

A few have not allowed a jury trial. *In re Kridlow,* 1999 WL 97939, *5 (Bankr.E.D.Pa., Feb. 19, 1999); *Hutchins v. Fordyce Bank & Trust Co. (In re Hutchins),* 211 B.R. 322, 324 (Bankr.E.D.Ark.1997); *Mid American Concrete Construction, Inc. v. Sears Roebuck & Co.,* 1993 WL 177140, *3 (Bankr.N.D.Ill., May 6, 1993). See also *Dunmore v. United States,* 358 F.3d 1107, 1116 (9th Cir.2004)(under the circumstances, debtor did not waive right to jury trial on tax refund claims against United States by seeking the trustee's abandonment of the refund claims, however, "[i]f [the debtor] were to submit himself to the bankruptcy court's equity jurisdiction, he would waive any right to a jury trial for the resolution of those disputes 'vital to the bankruptcy process,' including disputes that are part of the claims-allowance process and the hierarchical reordering of his creditors' claims.") (parenthetical added).

As might be expected, the courts allowing a jury trial relied on the "Claims Allowance Process" theory, and those not allowing a jury trial relied on the "Submission to a Court of Equitable Jurisdiction" theory. It is significant however that the courts allowing a jury trial emphasized that under the particular circumstances before them, the debtor's claims against the non- creditor defendant were not connected to or interrelated to the allowance or disallowance of a claim filed by *any* creditor. The court in *Jenson* wrote:

> As in *Granfinanciera,* the debtors' claims do not here "arise as part of the process of allowance and disallowance of claims." 492 U.S. at 58, 109 S.Ct. at 2799. Nor are they "integral *to* the restructuring of debtor-creditor relations." *Id.* Rather they are essentially claims brought by the debtor (in possession) against non-creditor third parties to augment the bankruptcy estate. Under these circumstances, we are unable to conclude that the debtor's petition for bankruptcy subjected his claims to the equitable jurisdiction of the bankruptcy court.

*In re Jensen,* 946 F.2d at 374. And the court in *W.S.C.* wrote,

> With respect to these other defendants, the Debtor's actions are brought to augment the bankruptcy estate and are in no way related-integrally or otherwise-to the hierarchal ordering of claims against this estate.
>
> ....
>
> The logic of the alternative holding in *Hallahan* breaks down when the debtor demands a jury in a private right of action that does not engage the process of allowing or disallowing claims against the bankruptcy estate.

*W.S.C., Inc. v. The Home Depot Inc. (In re W.S.C., Inc.),* 286 B.R. at 332.

**\*10** It is not apparent that the courts in *Jensen* and *W.S.C., Inc.* would not have reached the opposite conclusion if the debtors' claims against the non-creditors had been interconnected with a claim filed by *a* creditor. Otherwise, why would each have discussed and emphasized the non- interrelatedness of the debtor's claim to any claim filed by a creditor? Thus, it cannot be concluded from those two cases that the "Claims Allowance Process" theory necessarily requires that the debtor's lawsuit be against the *actual* creditor filing the claim connected with the debtor's claim.

Analysis under the "Submission to a Court of Equitable Jurisdiction" theory however, produces an *unqualified* result. Application of that theory *emphatically mandates* denial of Mrs. Andrews' request for a jury trial against LICOA. Since she submitted her claims against LICOA to the equitable jurisdiction of the bankruptcy court, the Seventh Amendment accords her no right to a jury trial on those claims.

The same result is reached when applying the "Claims Allowance Process" theory. Mrs. Andrews' claims against LICOA integrally involve and effect the "Claims Allowance Process." Again, the insurance which LICOA was purportedly obligated to provide the Andrews was credit life insurance, designed and intended to specifically pay the balance of AmSouth's debt upon the death of Mr. Andrews. The basic legal duty owed by LICOA to Mrs. Andrews, according to her complaint, was to pay off AmSouth's debt if Mr. Andrews died. It was not obligated to pay anything directly to her. And all of the claims in Mrs. Andrews' complaint against LICOA are based on the primary, basic contention that LICOA wrongfully failed to pay off the balance owed on AmSouth's debt when Mr. Andrews died. Therefore, those claims against LICOA must be resolved before the remainder of AmSouth's claim can be disallowed, and before Mrs. Andrews can

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 17
(Cite as: 2007 WL 2819523 (Bankr.N.D.Ala.))

recoup the payments which she made, allegedly unnecessarily, to AmSouth subsequent to her husband's death. And certainly, the claims against LICOA must be resolved before it can be determined which defendant, if either, owes her for those payments.

Based on the above, this Court must conclude that the payment of AmSouth's claim, and consequent disallowance *vel non* of what remained of the same following Mr. Andrews' death, is the focal point of Mrs. Andrews' claims against LICOA. Indeed, that point is conceded by Mrs. Andrews in her complaint by her assertion that her entire lawsuit, including the claims against LICOA, constitutes, "a counterclaim based on the claim filed by the defendant, AmSouth Bank ." *Amended and Recast Complaint* at 1 ï 2 (Proceeding No. 61, A .P. No. 06- 40016) (passim).

But even if it is not, the Court finds, because the debtor's lawsuit against LICOA is inextricably interwoven with AmSouth's claim, Mrs. Andrews is not entitled to a jury trial in the present case on her claims against LICOA, in accordance with both the "Claims Allowance Process" theory and the "Combination Theory".

### IV. Conclusion

**\*11** Based on the foregoing, the Court concludes that the plaintiff is not entitled to a jury trial on her claims against either AmSouth or LICOA.

A separate order will be entered in conformity with this memorandum opinion.

2007 WL 2819523 (Bankr.N.D.Ala.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 42
(Cite as: 2006 WL 318666 (D.Del.))

☞

Only the Westlaw citation is currently available.

United States District Court,

D. Delaware.

**Ronald CANTOR, Ivan Snyder and James A.
Scarpone, as Trustees of the Mafco
Litigation Trust, Plaintiffs,**
**v.**
**Ronald O. PERELMAN, et al., Defendants.**
No. Civ.A. 97-586-KAJ.

Feb. 10, 2006.

Lawrence C. Ashby, Philip Trainer, Jr., Tiffany Geyer
Lydon, Ashby & Geddes, Wilmington, Delaware, for
Plaintiffs, Edward A. Friedman, Andrew W. Goldwater,
Daniel B. Rapport, Emily A. Stubbs, Jonathan Gottfried,
Friedman Kaplan Seiler & Adelman LLP, New York,
New York, of counsel.

Thomas J. Allingham, II, Anthony W. Clark, Paul J.
Lockwood, Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** This case involves alleged breaches of fiduciary
duty by former directors of Marvel Entertainment Co., Inc.
("Marvel"). The original complaint was filed by Marvel,
which was then a debtor-in-possession in bankruptcy,
against Ronald O. Perelman, William C. Bevins, Donald
G. Drapkin, MAFCO Holdings Inc., MacAndrews &
Forbes Holdings Inc., and Andrews Group Incorporated
(collectively, "Defendants"). (Docket Item ["D.I."] 1.)
Pursuant to the reorganization plan from the bankruptcy
proceeding, Marvel assigned the claims in this case to the
MAFCO Litigation Trust, and the trustees ("Plaintiffs")
have been substituted as the plaintiffs in this action
(D.I.120). In their Second Amended Complaint (D.I. 149,
Ex. A; the "Complaint"), Plaintiffs alleged (1) that
Perelman, Bevins, and Drapkin breached their fiduciary
duties as directors of Marvel and (2) that the remaining
defendants aided and abetted those breaches. Jurisdiction
is proper under 28 U.S.C. § 1334. Before me now is
Defendants' Motion to Strike Plaintiffs' Jury Demand.
(D.I. 433; the "Motion.") For the reasons that follow, the

Motion will be granted.

II. BACKGROUND

The background of this case has been set forth in earlier
opinions. Cantor v. Perelman, 414 F.3d 430, 433-35 (3d
Cir.2005); Cantor v. Perelman, 235 F.Supp.2d 377,
378-80 (D.Del.2002). Because the analysis of Plaintiffs'
demand for a jury requires a careful consideration of
Plaintiffs' claims, I will discuss that background in some
detail again here.

A. Allegations in the Complaint

Perelman was a director of Marvel and Chairman of
Marvel's board. Cantor, 414 F.3d at 433. He also owned a
controlling interest in Marvel through the following
"chain of wholly-owned corporations": Perelman owned
100% of defendant MAFCO Holdings Inc., which owned
100% of defendant MacAndrews & Forbes Holdings Inc.,
which owned 100% of Marvel III Holdings Inc. ("Marvel
III"), which owned 100% of Marvel (Parent) Holdings Inc.
("Marvel Parent"), which owned 100% of Marvel
Holdings Inc. ("Marvel Holdings") (collectively, those
five companies are referred to herein as the "Marvel
Holding Companies"). Id. (Complaint, at ¶¶ 18-19, 25.)
The remaining defendant, Andrews Group Incorporated,
was a wholly-owned subsidiary of MacAndrews & Forbes
Holdings Inc. (Id. at ¶ 20.) "Marvel Parent and Marvel
Holdings together held 60% to 80% of Marvel's publicly
traded, outstanding shares during the relevant period."
Cantor, 414 F.3d at 433. Bevins and Drapkin were also
directors of Marvel, and Perelman, Bevins, and Drapkin
comprised the entire board of each of the Marvel Holding
Companies. Id.

Plaintiffs alleged that, in 1993 and 1994, Defendants
caused Marvel Holdings, Marvel Parent, and Marvel III to
issue three tranches of notes. Id. Defendants received
$553.3 million in proceeds and pledged all of their stock
in Marvel as collateral. Id. "None of the proceeds went to
Marvel or were used for Marvel's benefit." Id.
Furthermore, in the note indentures, the issuing
companies agreed, through Perelman's control of Marvel,
to prevent Marvel from (1) issuing debt or preferred stock
except under specified circumstances, (2) issuing stock
that might dilute the holding companies' stake in Marvel,
and (3) making "restricted payments," which were defined
to include dividends and stock buybacks. Id. According to
Plaintiffs, "[a]s a result of Perelman's agreement to these
restrictions, Marvel's future access to the capital markets
was inhibited, with no corresponding benefit to Marvel."
(Complaint, at ¶ 34.)

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 43
(Cite as: 2006 WL 318666 (D.Del.))

*2 Plaintiffs further alleged that Defendants artificially inflated Marvel's earnings by making licensing agreements, booking the entire amount of the guaranteed license fees as income at the time the agreements were made, and later writing the fees off and never collecting them. (Id. at ïï 40-45.) According to Plaintiffs, Defendants' accounting methods allowed them to maintain the price of Marvel stock, the only asset of the Marvel Holding Companies. (Id. at ï 36.) By artificially holding off a major decline in the price of Marvel stock, Defendants allegedly held off the bankruptcy of the Marvel Holding Companies and prevented the $553.5 million in note proceeds from being treated as preferential payments. (Id.) Plaintiffs further allege that, in executing that plan, Marvel employees made misrepresentations to potential licensees. (Id. at ïï 41-45.)

Eventually, "Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 27, 1996. The Note holders have not been repaid." Cantor, 414 F.3d at 434. Marvel's bankruptcy was followed by the bankruptcy of Marvel Holdings, Marvel Parent, and Marvel III. (Complaint, at ï 36.)

Plaintiffs set forth two "Causes of Action" in their Complaint. First, Plaintiffs alleged that Perelman, Bevins, and Drapkin "breached their fiduciary duties of loyalty, care, and good faith, and are liable to plaintiffs for damages, including all benefits received as a result of their breaches of fiduciary duty, in an amount to be determined at trial, but believed to be not less than $553.3 million plus pre-judgment interest." (Id. at ï 49.) Second, Plaintiffs alleged that the other defendants "knowingly participated in and aided and abetted those breaches by, inter alia, facilitating the receipt and distribution of the improperly obtained bond proceeds for the benefit of Perelman, Bevins and Drapkin." (Id. at ï 54.) As a result, those Defendants "are liable for knowingly participating in and aiding and abetting the foregoing breaches of duty in amounts to be determined at trial, but believed to be not less than $553.5 million plus pre-judgment interest." (Id. at ï 55.)

Plaintiffs requested the following remedies:
    (i) compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.3 million plus pre-judgment interest, and punitive damages in an amount to be determined at trial; and
    (ii) such other and further relief as the Court deems just and proper.

(Id. at 16-17.)

  B. Procedural History

  1. District Court Proceedings

This case was referred to Magistrate Judge Mary Pat Thynge on March 21, 2002. [FN1] (D.I.262.) In response to the parties' motions, Judge Thynge issued a Memorandum and Order recommending that summary judgment be granted for Defendants on the claims of breach of fiduciary duty related to the note transactions and the accompanying restrictions on Marvel. Cantor, 235 F.Supp.2d at 381-83. Judge Thynge determined that Delaware law required Plaintiffs to show "that Perelman caused Marvel to take action which benefitted Perelman and harmed Marvel." Id. at 382 (citing Bragger v. Budacz, C.A. No. 13376, 1994 WL 698609, at *4 (Del. Ch. Dec. 7, 1994)). "Since Marvel was not a party to the note agreements, and did not attempt to perform or refrain from one of the prohibited acts, Perelman's potential conflicting loyalties between Marvel and the holding companies never materialized and cannot form the basis of a breach of fiduciary duty claim." Cantor, 235 F.Supp.2d at 382-83.

    FN1. This case was originally assigned to the Honorable Roderick R. McKelvie. When he retired from the court in 2002, the case was referred to Magistrate Judge Thynge. (D.I.262.) On January 6, 2003, the case was reassigned to me. (D.I.387.)

*3 While Plaintiffs argued that Marvel had been harmed because the note restrictions prevented it "from restructuring its debt, and ultimately contributed to its bankruptcy," Judge Thynge found that the evidence showed that Marvel was prevented from financial restructuring by covenants in other credit agreements that "were more restrictive than those in the note agreements." Id. at 383. Thus, Plaintiffs had failed to show that Marvel was harmed, and the potential conflicts raised by the note restrictions never materialized and so could not support a claim for breach of fiduciary duty. Id.

As to the claimed breaches of fiduciary duty based on Defendants' alleged inflation of Marvel's earnings, Judge Thynge recommended that summary judgment be granted for the Defendants, because, by relying on the expertise of professional accountants, the directors "met [their] fiduciary duties with regard to accounting." Id. at 387-88. However, for claims related to misrepresentations by Marvel employees, Judge Thynge recommended that summary judgment be denied, id. at 388-89, noting that the record lacked sufficient evidence to decide whether

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 44
(Cite as: 2006 WL 318666 (D.Del.))

Defendants had failed in their oversight duties pursuant to In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch.1996).

I adopted Judge Thynge's recommendations in all respects and issued an order granting summary judgment in part for Defendants, pursuant to those recommendations. (D.I.404.) Summary judgment was later granted for Defendants on the Caremark claim as well. (D.I.417.)

FN2. Plaintiffs acknowledged (D.I. 415; D.I. 419) that they could not adduce any evidence to support the remaining Caremark claim. Thus, summary judgment was granted for the Defendants on that claim. (D.I.417.)

2. Third Circuit Decision

Plaintiffs appealed the decision as to the alleged breaches of fiduciary duty related to the note restrictions, [FN3] and the United States Court of Appeals for the Third Circuit reversed in part. Cantor, 414 F.3d at 442. First, in a discussion section entitled "The Unjust Enrichment Claim," the Third Circuit held that it was not necessary for Plaintiffs to show that Marvel was harmed by the note restrictions. Id. at 435-37. Instead, if Defendants "exploited their fiduciary position for personal gain," that would support a claim for breach of fiduciary duty, as well as a remedy for unjust enrichment, even if Defendants' gain did not come at Marvel's expense. Id. at 435. The Court noted that an unjust enrichment award for the entire $553.5 million benefit "could result in a windfall," suggesting that an award would be appropriately based on "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." Id. at 437 (citing Boyer v. Wilmington Materials, Inc., 754 A.2d 881 (Del. Ch.1999)).

FN3. The Caremark claim was not addressed by the Third Circuit.

Second, in a discussion section entitled "The Damages Claims," the Third Circuit held that there was a genuine issue of material fact as to whether the note restrictions harmed Marvel. Cantor, 414 F.3d at 437-38. While Defendants presented evidence that Marvel's credit agreements had restrictions that were more constraining than those accompanying the notes, the record also contained evidence from Plaintiffs' expert that Marvel's capital structure would have been different without the note restrictions and that Marvel was indeed prevented from pursuing more favorable financing by those restrictions. Id. That evidence was sufficient to raise a

genuine issue for trial. Id. at 438.

*4 Finally, in a discussion that again used the titles "The Unjust Enrichment Claims" and "The Damages Claims," the Court held that the Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings, because this action was filed after the limitations period. Id. at 439-41. Plaintiffs' remaining claims [FN4] were remanded. Id. at 442.

FN4. Because the damages remedy based on the Marvel Holdings notes was time-barred, the remaining claims relate to the Marvel Parent and Marvel III notes and to remedies other than damages for the Marvel Holdings notes. Cantor, 414 F.3d at 442.

III. APPLICABLE LAW

Plaintiffs base their demand for a jury trial on the Seventh Amendment, which provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. "[T]he thrust of the Amendment was to preserve the right to jury trial as it existed in 1791." Curtis v. Loether, 415 U.S. 189, 193 (1974). In defining the scope of that protection, the Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." ' Granfinanciera, S.A. v. Nordberg, 492 U.S. 31, 41 (1989) (emphasis in original) (quoting Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 447 (1830)). Whether a suit is legal or equitable is a question of federal law, even in a diversity case based on substantive state law. Simler v. Conner, 372 U.S. 221, 222 (1963).

In addition to causes of action that were decided in courts of law in 1791, the Seventh Amendment protects the right to a jury trial for causes of action that did not exist at that time but "are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." Granfinanciera, 492 U.S. at 42 (citing Curtis, 415 U.S. at 193). To decide whether a jury trial is required for a modern cause of action, [FN5] courts must balance two factors:

FN5. By its literal terms, the Granfinanciera test applies to statutory actions. I will use that test here, in a case based on Delaware common-law, because the parties, as well as courts in other cases, have so framed their

(C) 2008 West
Group
Page 45
(Cite as: 2006 WL 318666 (D.Del.))

analyses. See Pereira v. Farace, 413 F.3d 330, 337 (2d Cir.2005) (using Granfinanciera factors to decide whether the Seventh Amendment requires a jury for a claim of breach of fiduciary duty under Delaware law); Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 327 B.R. 537, 543-45 (D.Del.2005) (same).

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.
>
> Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first.

Granfinanciera, 492 U.S. at 42 (citing Tull v. United States, 481 U.S. 412, 417-18, 421 (1987)) (internal quotations and citations omitted). [FN6]

> FN6. "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment," the court must then decide whether Congress has properly assigned the claim "to a non-Article III adjudicative body that does not use a jury as a factfinder." Granfinanciera, 492 U.S. at 42. Because I conclude, after balancing the two factors, that Plaintiffs have no right to a jury trial in this case, the third prong is not relevant here.

## IV. DISCUSSION

### A. Definition of Plaintiffs' Claims

Before I analyze Plaintiffs' claims according to the Granfinanciera factors, I must address a preliminary dispute as to what those claims are. Plaintiffs contend that they have set forth separate claims for unjust enrichment and for compensatory damages, (D.I. 444 at 2-3, 5-6.) Because that contention is not supported by the law or by the Complaint itself, I conclude that the claims to be analyzed are the two claims set forth as causes of action in the Complaint, one for breach of fiduciary duty and one for aiding and abetting that breach.

**\*5** Plaintiffs note (id. at 6) that, "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." Ross v. Bernhard, 396 U.S. 531, 537-38 (1970). That proposition, while undisputed, does not settle the question as to whether there are indeed separate legal and equitable claims in this action. In Ross, the Court held that a legal claim does not transform into

an equitable one simply because it is presented in the form a derivative suit, a procedure with historical roots in equity. Id. at 538-43. That case does not stand for the proposition that a particular remedy is an issue that must be examined separately to determine whether it is legal or equitable.

While Plaintiffs' right to a jury will not be denied based on a lack of precision in their pleadings, a careful reading of the Complaint as a whole shows that there are not separate claims for unjust enrichment and compensatory damages. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477-78 (1962) ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."). First, Plaintiffs have stated two claims in their First and Second Causes of Action, one for breach of fiduciary duty and one for aiding and abetting a breach of fiduciary duty, (Complaint at ¶¶ 47- 56.) Second, Plaintiffs' request for relief for unjust enrichment is intertwined with the request for compensatory damages. Plaintiffs ask for "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." (Id. at 16.) The unjust enrichment, i.e., the "benefits obtained by defendants," is affirmatively included as a part of the "compensatory damages." (Id.) Third, beyond the wording and organization of the Complaint, Plaintiffs do not allege separate breaches, some of which support an award for unjust enrichment and some of which support an award of compensatory damages. Rather, the alleged breach is based on the note transactions as a group. (Id. at ¶¶ 30-35, 49, 54-55.) Therefore, the Complaint appears to state a claim for breach of fiduciary duty and a claim for aiding and abetting that breach, with multiple forms of possible relief. It does not state separate claims for unjust enrichment and compensatory damages.

When read as a whole, the Third Circuit's decision is not to the contrary. According to Plaintiffs, because the Third Circuit entitled part of its discussion "The Damages Claims," Cantor, 414 F.3d at 437, the Complaint states a claim for compensatory damages that must be analyzed separately under the Seventh Amendment. (D.I. 444 at 5.) I disagree, since the issue of whether a compensatory damages claim exists separately from the unjust enrichment claim does not appear to have been addressed to or by the Court of Appeals. Indeed, there are other more reasonable explanations for the Court's choice of section titles.

**\*6** First, Judge Thynge's report made two conclusions: (1) that Plaintiffs needed to show that Marvel was forced to act to its detriment as a result of the note restrictions,

(C) 2008 West
Group
Page 46
(Cite as: 2006 WL 318666 (D.Del.))

and (2) that the evidence failed to show such harm. Cantor, 235 F.Supp.2d at 382-83. The Third Circuit disagreed with both conclusions, stating (1) that Plaintiffs did not need to show harm to recover a remedy based on unjust enrichment, and (2) that a genuine issue of material fact remained as to whether Marvel was harmed. Cantor, 414 F.3d at 435-38. Thus, the Third Circuit's discussion appears to have simply tracked the issues on appeal, with corresponding section titles to organize that discussion.

Second, the Third Circuit partially affirmed the summary judgment, because Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings. Id. at 440. The Court followed the Delaware rule that the statute of limitations, rather than the doctrine of laches, applies when the action is for "damages or other relief which is legal in nature." Id. at 439 (quoting Laventhol, Krekstein, Horwath & Horwath v. Tuckman, 372 A.2d 168, 169-70 (Del.1976)). But the application of the statute of limitations only indicates that the relief is legal in nature and not that the claim is legal. Under Delaware law, "whether the claim asserted is legal in nature or equitable, whenever plaintiff seeks money in a derivative suit, her claim is subject to the statute of limitations." Kahn v. Seaboard Corp., 625 A.2d 269, 274 (Del. Ch.1993). Thus, since the Third Circuit held that some money damages were time-barred, the discussion appears to have been separated and titled to reflect the different treatment of the types of relief and not to say anything at all about the nature of the claims themselves.

I conclude that the Complaint does not state separate claims for compensatory damages and unjust enrichment. Furthermore, the Third Circuit likely did not intend to decide that issue when it placed titles on its discussion sections. The Plaintiffs' claims are for breach of fiduciary duty and for aiding and abetting a breach, and the Granfinanciera test will be applied to those claims. Since the legal or equitable nature of the aiding and abetting claim appears to be indistinguishable from that of the underlying claim for breach, and since the parties make no distinction between the two claims for purposes of this Motion, the following analysis focuses on the breach of fiduciary duty claim, and the conclusions apply to the aiding and abetting claim as well.

B. Historical Roots of a Corporate Fiduciary Duty Claim

Defendants argue (D.I. 434 at 7-9; D.I. 450 at 12), and Plaintiffs apparently concede (D.I. 444 at 9-10), that Plaintiffs' breach of fiduciary claim under Delaware corporate law is historically equitable. Plaintiffs' concession is understandable, since the point is inarguable.

"Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders." Skeen v. Jo-Ann Stores, Inc ., 750 A.2d 1170, 1172 (Del.2000) (citing Malone v. Brincat, 722 A.2d 5, 10 (Del.1998)). "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders." Guth v. Loft, Inc., 5 A.2d 503, 510 (Del.1939). Thus, a violation of those duties is treated as a breach of fiduciary duty analogous to that owed by a trustee to a beneficiary. Here, the Complaint alleges such a breach.

*7 That type of claim was historically "within the exclusive jurisdiction of courts of equity." Chauffeurs, Local No. 391 v. Terry, 494 U.S. 558, 567 (1990) (citing 2 J. Story, Commentaries on Equity Jurisprudence § 960, p. 266 (13th ed. 1886)). Because they "are almost uniformly actions 'in equity,' 'such claims historically carry with them "no right to trial by jury." In re Evangelist, 760 F.2d 27, 29 (1st Cir.1985); accord In re Hechinger, 327 B.R. at 544. That treatment is consistent with the fact that, "[i]n Delaware, breach of fiduciary duty claims are routinely heard in chancery court, which is a court of equity." In re Hechinger, 327 B.R. at 544. Thus, "[w]hile federal, not state law, governs whether ... [a] claim is entitled to a jury trial, the well-established precedent in Delaware ... reinforces the common law tradition affording courts of equity jurisdiction over these matters." Id.

Plaintiffs point to several cases (D.I. 444 at 5) where courts looked underneath the claim for breach of fiduciary duty claim and found an underlying legal claim, based, for example, on fraud or negligence. [FN7] Design Strategies, Inc. v. Davis, 367 F.Supp.2d 630, 638 (S.D.N.Y.2005); Resnick v. Resnick, 763 F.Supp. 760, 767 (S.D.N.Y.1991); Doyle v. Mellon Bank (East) Nat'l Ass'n (In re Globe Parcel Serv.), 75 B.R. 381, 385 n. 9 (E.D.Pa.1987); Stalford v. Blue Mack Transp., Inc. (In re Lands End Leasing, Inc.), 193 B.R. 426, 433 (Bankr.D.N.J.1996); Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.), 118 B.R. 544, 549 (Bankr.S.D.Ohio 1990). According to those analyses, a breach of fiduciary duty claim may be historically legal. The Second Circuit recently rejected that approach, reasoning that to analyze claims that way "would effectively permit every breach of fiduciary duty claim to be recast as an action at law such that parties seemingly would be entitled to a jury trial on any and all breach of fiduciary duty claims." Pereira v. Farace, 413 F.3d 330, 338 (2d Cir.2005) (internal quotations omitted). Given the deep historical roots of such claims in equity, that result

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 47
(Cite as: 2006 WL 318666 (D.Del.))

seems contrary to the Seventh Amendment mandate to "preserve the right to jury trial as it existed in 1791." Curtis, 415 U.S. at 193. Therefore, like the Second Circuit, I decline to parse Plaintiffs' fiduciary duty claims in search of legal elements.

FN7. In the same string of citations, Plaintiffs point to two other cases where courts refused to strike a jury demand because legal claims were joined with equitable claims. Hays v. Equitex, Inc. (In re RDM Sports Group, Inc.), 260 B.R. 915, 919-20 (Bankr.N.D.Ga.2001); Miller v. Weber (In re Anchor/Davis-Jay Container Co.), Bankr.No. 92-11720S, Adv. No. 93-0042S, 1993 WL 119818, at *2 (Bankr.E.D.Pa. Apr. 15, 1993). Those cases are only relevant here if at least one of Plaintiffs' claims is legal rather than equitable, and Plaintiffs' reliance on them simply begs that question.

Instead, I conclude that Plaintiffs' claims are historically equitable, which weighs against Plaintiffs' right to a jury.

C. Balancing History with Remedies

The second Granfinanciera factor focuses on the remedy sought for Plaintiffs' claims. Since that factor is more important than the first, Granfinanciera, 492 U.S. at 42, the parties spend considerable effort to show that the compensatory damages sought here constitute the type of relief, legal or equitable, that favors their respective positions. (D.I. 434 at 9-12; D.I. 444 at 5-8; D.I. 450 at 3-12.) I conclude, for purposes of this Motion, that, even if Plaintiffs are correct that such relief is legal, Plaintiffs' claims nevertheless seek both equitable and legal relief.

**\*8** Defendants argue that the remedy for a Delaware breach of fiduciary duty claim is equitable, regardless of whether it includes compensatory damages. (D.I. 450 at 3-12.) They point out that, under Delaware law, "significant discretion is given to the Court in fashioning an appropriate remedy" for a breach of fiduciary duty. Bomarko, Inc. v. Int'l Telecharge, Inc., 794 A.2d 1161, 1184 (Del. Ch.1999); see also Cantor Fitzgerald, L.P. v. Cantor, C.A. No. 16297, 2001 WL 536911, at *5 (Del. Ch. May 11, 2001) ("[T]he Court has broad discretion to craft a remedy for a breach of the duty of loyalty."). Thus, according to Defendants, the remedy here is equitable, even if it compensates Plaintiffs for harm done to Marvel.

Plaintiffs argue (D.I. 444 at 7-8) that under federal law, which must apply to this analysis, Simler, 372 U.S. at 222, equitable relief is narrowly defined as remedies that "restore to the plaintiff particular funds or property in the defendant's possession" and not those remedies that "impose personal liability on the defendant." Pereira, 413 F.3d at 340 (emphasis in original) (quoting Great-West Life & Annuity Ins. Co. v. Knudsen, 534 U.S. 204, 214 (2002)). So, according to Plaintiffs, a remedy for the harm done to Marvel is a legal remedy, regardless of how it is treated in Delaware.

In Pereira, the Second Circuit agreed with that proposition. In that case, the Court used the narrow definition of "equitable relief" from the Supreme Court's decision in Great-West to show that the plaintiff's claims for breach of fiduciary duty under Delaware law sought a legal remedy, because that remedy was not for money that was unjustly possessed by defendants, but was instead a measure of the harm to the corporation. Pereira, 413 F.3d at 340 (applying Great-West, 534 U.S. at 214). Because the remedy was legal, the Court reasoned, and because the second Granfinanciera factor must be afforded greater weight, the factors weighed in favor of a Seventh Amendment jury right, even though the claims were historically equitable. Id. Plaintiffs argue for a similar conclusion here, but I cannot agree.

To begin with, there is some reason to doubt whether the Second Circuit's conclusion is correct. The Supreme Court's Great-West decision, on which the Second Circuit's opinion in Pereira depends, defined the term "equitable relief" as it is found in section 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(3). The Supreme Court's analysis began with the statement that, because ERISA is a "comprehensive and reticulated statute," the Court has been "especially reluctant to tamper with the enforcement scheme ... by extending remedies not specifically authorized by its text." Great-West, 534 U.S. at 209 (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993); Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985)) (internal quotations omitted). Applying the narrow definition of "equitable relief" crafted in that particular context to a common law breach of fiduciary duty claim such as this tears that definition from a key logical underpinning. Moreover, in deciding that "equitable relief" in that case only applied when the plaintiff sought "particular funds or property in the defendant's possession," Great-West, 534 U.S. at 214, the Supreme Court expressly held that trust remedies did not apply to "define the reach of § 502(a)(3)." Id. at 219. By contrast, the claims here are directly analogous to claims against a trustee by a beneficiary. See supra Section IV.B. It thus appears that the Second Circuit may have taken the Great-West decision out of context.

**\*9** However, I need not decide here whether Pereira was correctly decided. Even if Plaintiffs are correct that

(C) 2008 West
Group
    Page 48
(Cite as: 2006 WL 318666 (D.Del.))

compensatory damages are a form of legal relief under federal law, both claims here also seek equitable relief for Defendants' alleged unjust enrichment.

Plaintiffs seek to recover "the benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.5 million." (Complaint at 16.) The dollar amount here refers directly to the proceeds received by Defendants from the note transactions at issue. That remedy for unjust enrichment is equitable even under the narrow definition used in Great-West.

Thus, even under a narrow definition of equitable relief, the second Granfinanciera factor leads to a mixed result: the claims seek both legal and equitable relief. When I consider the long history of treating breach of fiduciary duty claims as equitable and balance that with the mixed equitable and legal remedies sought here, the scales tip in favor of Plaintiffs' claims being judged equitable. To weigh the factors differently would effectively ignore the historical factor, contrary both to the Seventh Amendment's purpose to "preserve the right to jury trial as it existed in 1791," Curtis, 415 U.S. at 193, and to the express holding of Granfinanciera, 492 U.S. at 42, that history is to be accorded weight in the balancing. Therefore, I will strike Plaintiffs' demand for a jury trial of their claims. [FN8]

FN8. Because I conclude there is no right to a jury in this case, I need not address the parties' arguments over whether Plaintiffs have waived that right. (D.I. 434 at 12-14; D.I. 444 at 11-15; D.I. 450 at 16-17.)

V. CONCLUSION

For the reasons set forth herein, I will grant Defendants' Motion (D.I.433). An appropriate order will issue.

ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today.

IT IS HEREBY ORDERED that the Motion to Strike Plaintiffs' Jury Demand (D.I.433) is GRANTED.

2006 WL 318666 (D.Del.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 77
45 Collier Bankr.Cas.2d 650
(Cite as: 2000 WL 1843495 (E.D.La.))

**H**

United States District Court, E.D. Louisiana.

**Josephine DIMITRI**
v.
**GRANVILLE SEMMES, et al.**
**No. Civ.A.00-2448.**

Dec. 14, 2000.

PORTEOUS, J.

**\*1** Before the Court is a Motion to Withdraw the Reference pursuant to 28 U.S.C. § 157(d) filed on behalf of the plaintiff, Josephine Dimitri. Oral argument was entertained by the Court on October 11, 2000, and the matter was taken under submission for further consideration. The Court, having considered the arguments of counsel, the evidence submitted, the law and applicable jurisprudence, is fully advised in the premises and ready to rule.

ORDER AND REASONS
I. BACKGROUND:

In April 2000, the Succession of William Garrett was opened in St. Tammany Parish. In conjunction with this succession proceeding, a petition for executory process seeking foreclosure of several parcels of real estate owned by Josephine Dimitri and her late husband Frank Dimitri, was filed along with an ordinary proceeding and request for writ of sequestration on movable property which served as collateral for the Dimitri loan. Dimitri in turn filed suit in Civil District Court for the Parish of Orleans ("CDC") for emotional distress following the seizure of the property. On May 30, 2000, Dimitri filed a Chapter 11 Bankruptcy in the Eastern District of Louisiana in her individual capacity and as the administratrix of her husband's succession, which was allotted to Judge Brahney. Subsequently on June 27, 2000, two things occurred, Dimitri voluntarily dismissed the Chapter 11 proceeding filed on May 30 th and filed a new Chapter 11 proceeding in the Eastern District of Louisiana in her individual capacity only which was allotted to Judge Brown. On June 30,th the CDC suit was transferred to the 24 th Judicial District Court ("JDC"). On August 10, 2000, Dimitri filed a Motion to Dismiss the action in the 24 th JDC stating that she intended to bring an adversary action pursuant to 28 U.S.C. § 1334 in that her claims are "related to" her bankruptcy and constitute core proceedings. On August 18, 2000, suit was filed in the Eastern District. Josephine Dimitri sets forth seven counts

in her federal suit. The first three counts allege that the contracts entered into are void based upon unconscionability, vitiated by duress, and the adhesion contract principle. The fourth count is for wrongful and excessive seizure. Count five of the complaint is for abuse of right and the sixth count alleges intentional infliction of emotional distress. Finally, count seven asserts a claim for negligent acts on the part of the executrices of the Garrett Succession. On August 22, 2000, this Court entered an order referring this matter to the bankruptcy court as it was related to a matter in bankruptcy. Dimitri now requests that this Court withdraw that reference.

II. ARGUMENTS IN SUPPORT:

Dimitri contends first that this suit is a "non-core" proceeding. It is argued that none of the categories delineated as "core" proceedings in subparts (A) through (O) in § 157(b)(2) apply to this claim for damages arising prior to the filing of the bankruptcy. Plaintiff contends that this is a "private" claim upon which the bankruptcy court does not have Article III jurisdiction to decide it, or to oversee a jury trial. For this reason alone, plaintiff contends the reference should be withdrawn.

**\*2** Next, Dimitri concedes that this case does not involve a situation where mandatory withdrawal is required, but instead argues that permissive withdrawal is appropriate. It is argued that the case is a non-core proceeding, the bankruptcy court cannot enter judgment, state law predominates the issues, and withdrawal would serve judicial economy; as such, withdrawal should be granted.

III. ARGUMENTS IN OPPOSITION:

First, defendants argue that the motion to withdraw is not timely. It is submitted that the present motion was filed only after Garrett had filed its Answer and Counterclaim, Dimitri filed an Answer to the Counterclaim, and after discovery has been taken. As such, defendants contend that Dimitri has been on notice as to the existence of a basis for the withdrawal and failed to file the motion within a reasonable time.

Moreover, defendants assert that the factors for withdrawal are not present. The defendants argue that this is a core proceeding whereby Garrett and Dimitri are making claims and counterclaims against each other which concern the validity, priority, and extent of Garrett's security agreement and mortgages on Dimitri's property. Garrett filed a proof of claim against the bankruptcy estate based on the loan and security

(C) 2008 West
Group
    Page 78
45 Collier Bankr.Cas.2d 650
(Cite as: 2000 WL 1843495 (E.D.La.))

agreement and mortgages securing it. Dimitri has attacked the validity of the security agreement and mortgages of Garrett, while Garrett seeks enforcement of the security agreement and mortgages affecting Dimitri's property. An action to invalidate mortgages on the debtor's property is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Because this is a core proceeding, the bankruptcy court can enter a final judgment. 28 U.S.C. § 157(b)(1). Furthermore, it is argued that withdrawal would not serve judicial economy. Withdrawal would result in both the bankruptcy court and the district court determining the validity, priority and extent of Garrett's security agreement and mortgages which could result in conflicting decisions and further complicate this litigation. Additionally, defendants contend that this is an egregious case of forum shopping on the part of the plaintiff which should not be allowed. Moreover, it is argued that by availing herself of the benefits of a Chapter 11 bankruptcy filing, plaintiff waived her right to trial by jury. Case law holds that when the debtor seeks to have the reference withdrawn because the debtor wants a jury trial of an adversary proceeding that the debtor filed, the debtor is found to have waived its right to a jury trial. Finally, it is asserted that Dimitri waived its right to a jury by contract. The Forbearance Agreement entered into by the parties clearly waives the right to a jury trial. Therefore, for these reasons the defendants request that the motion to withdraw the reference be denied.

IV. LAW AND ANALYSIS:

28 U.S.C. § 157(d) provides:

The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

*3 The plaintiff has conceded that this is not a case which requires mandatory withdrawal, as such, the issue before this Court is whether or not the plaintiff has shown "good cause" for the withdrawal of this suit from the bankruptcy court. In deciding whether to grant a motion for permissive withdrawal of reference, the factors the Court should consider include: (1) whether it is a core or non-core proceeding; (2) judicial economy; (3) prevention of forum shopping; (4) economical use of debtor's and creditor's resources; (5) uniformity in administration of

bankruptcy laws; and (6) presence of jury trial demand. In re C-TC 9th Ave. Partnership, 177 B.R. 760 (N.D.N.Y.1995), reconsideration denied 182 B.R. 1 (N.D.N.Y.1995), Holland America Ins. Co. v. Succession of Roy, 777 F.2d 992 (5th Cir.1985).

This Court notes that there has not been an adjudication by the bankruptcy judge as to whether or not this matter is a core or non-core proceeding, pursuant to the authority granted by 28 U.S.C. § 157(b)(3). Core proceedings are those matters which arise under the Bankruptcy Code; whereas, a matter that arises under non-bankruptcy law and happens to be an issue in a bankruptcy proceeding merely because of the accidental fact that one of the parties to the dispute is a debtor in the bankruptcy case, in most instances, is a non-core proceeding. In re Sokol 60 B.R. 294 (N.D.Ill.1986). Moreover, the Fifth Circuit has stated that a proceeding is core "if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." In re Wood, 825 F.2d 90 (5th Cir.1987). In this case, the plaintiff contests the validity and priority of the notes, mortgages, and related documents entered into between the parties which gave rise to the execution of the seizures of property. Counts One, Two and Three of the complaint seek to have the contracts found unenforceable as unconscionable, vitiated by duress, and based upon the theory of "contract of adhesion". Count Four of the complaint alleges wrongful and excessive seizure. Count Five asserts abuse of right. The Sixth Count is a claim for intentional infliction of emotional distress. While Count Seven alleges negligent acts on the part of the executrices of the Garrett Succession for breach of the duty of diligence. This suit was filed well after the Succession of William Garrett was opened, foreclosure proceedings were begun, property was seized based upon writs of sequestration, and following petitioner's filing for bankruptcy protection.

28 U.S.C. § 157(b)(2) provides that a matter is a core proceeding if it involves the determination of the validity, extent, or priority of liens, at section K, or in section O, other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship. The claims set forth by Ms. Dimitri in Counts One, Two, and Three, relate to the claim that certain notes and mortgages are invalid and unenforceable. This clearly concerns the validity, priority and extent of Garrett's security agreement and mortgages on Dimitri's property, as well as the administration of the estate and the liquidation of assets. As such, it is the opinion of this Court that at least as to Counts One, Two, and Three, the claims are core matters for which the Bankruptcy Court

(C) 2008 West
Group
Page 79
45 Collier Bankr.Cas.2d 650
(Cite as: 2000 WL 1843495 (E.D.La.))

has full jurisdiction. This Court further finds that Counts Four, Five, Six, and Seven, while "related to" the other counts, are state law claims that do not arise out of the bankruptcy proceeding but are merely incidental to it. As such, these claims would not be considered as core proceedings and any ruling made by the Bankruptcy Court would be subject to final disposition by the District Court. However, this Court believes that these claims are inextricably interwoven with Counts One, Two and Three, such that judicial economy would be served by the Bankruptcy Court taking up all counts of the petitioner's claim.

**\*4** This ruling is supported by the case of Shell Material, Inc. v. First Bank of Pinellas County, 50 B.R. 44 (M.D.Fla.1985), in which a very similar situation was presented. In that case, the debtor claimed that certain notes and mortgages were invalid and unenforceable. The Bankruptcy Court determined that Counts I, II, and IV which sought a determination that the notes and mortgages violated state statutes and thus were invalid and unenforceable were core matters which would affect the administration of the estate and liquidation of assets, but also the determination of the extent and validity of certain liens. The Court further found that Counts III and V of the complaint seeking treble damages based on alleged violations of federal law were not core matters while they were "related to" a Title 11 case. In that case, as here, the Court determined that, as the claims were so interrelated, judicial economy compelled one court to take up both the core and non-core matters rather than splitting the claims. Id.

The second factor to be considered by the Court is judicial economy. As there have been adversary complaints and counterclaims filed in the bankruptcy proceeding which will require a determination as to the validity of the security agreement and mortgages of Garrett affecting Dimitri's property, it is in the interest of judicial economy to have one court adjudicate this matter. This determination must be determined in connection with completing a plan of reorganization and is best left to the Bankruptcy Court for disposition. As such, the interests of judicial economy favor denying a withdrawal of the reference.

Forum shopping is the third factor to which this Court must look. While the defendants have argued that the petitioner has demonstrated a pattern of forum shopping, it is this Court's opinion that the motion for withdrawal is not an attempt to forum shop. The parties have been involved in protracted litigation surrounding this matter which have taken them to at least five different

jurisdictions. It is this Court's opinion that the bankruptcy court is vested with the appropriate expertise for adjudicating the parties rights in the litigation's current posture. As such, there should be no further need to move from courthouse to courthouse.

As such, based upon the above discussion, the fourth and fifth factors for the Court's consideration, namely, economical use of debtor's and creditor's resources and uniformity in administration of bankruptcy laws, likewise show cause for withdrawal.

Finally, the last factor to be considered is the presence of a jury trial demand. In this case, the petitioner is the party who has filed the jury demand. The waiver principle developed in the case of Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) in which it was stated that:

> by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, even though the debtor's opposing counterclaims are legal in nature and the Seventh Amendment would have entitled creditors to a jury trial had they not tendered claims against the estate.

**\*5** The Court in Haile Company v. R.J. Reynolds Tobacco Company, 132 B.R. 979 (S.D.Ga.1991) found that:

> [t]he waiver principle logically extends to a debtor who, in addition to petitioning the court for protection under title 11, voluntarily brings an adversary proceeding seeking affirmative relief from the court.\*\*\*
>
> By voluntarily selecting the bankruptcy court rather than state court as the forum in which to assert its state-law cause of action, plaintiff consented to [the Bankruptcy] court's equitable jurisdiction and thereby waived its right to trial by jury.

Under the facts of this case, this Court finds that Dimitri voluntarily subjected herself to the jurisdiction of the bankruptcy court. This is not a situation where she was involuntarily joined as a party by another participant in the bankruptcy proceeding. As such, this Court finds that she effectively waived her right to a jury trial. However, even if this was not the case, based upon the other factors, as discussed above, this Court finds that a denial of the motion to withdraw the reference is appropriate.

Accordingly,

IT IS ORDERED that the Motion to Withdraw the Reference to the Bankruptcy Court, filed on behalf of the

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
  Page 80
 45 Collier Bankr.Cas.2d 650
(Cite as: 2000 WL 1843495 (E.D.La.))

plaintiff, Josephine Dimitri, be and the same is hereby
DENIED.

  2000 WL 1843495 (E.D.La.), 45 Collier Bankr.Cas.2d
650

END OF DOCUMENT

.

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 340
(Cite as: 2004 WL 2713101 (D.Del.))



Only the Westlaw citation is currently available.

United States District Court,

D. Delaware.

In re: WINSTAR COMMUNICATIONS, INC., et al.,
Debtors.
Christine C. SHUBERT, Chapter 7 Trustee of
Winstar Communications, Inc. and
Winstar Wireless, Inc., Plaintiff,
v.
LUCENT TECHNOLOGIES, INC., Defendant.
No. 01-01430, 01-01063, Civ.A.04-928-JJF.

Nov. 16, 2004.

Sheldon K. Rennie, of Fox, Rothschild LLP,
Wilmington, Delaware, Stephen M. Rathkopf, and David
R. King, of Herrick, Feinstein LLP, New York, New York;
Richard G. Smolev, of Kaye Scholer LLP, New York,
New York, for Plaintiff, of counsel.

Daniel J. DeFranceschi, Rebecca L. Booth, and Jason
M. Madron, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware, Paul C. Saunders, and Daniel
Slifkin, of Cravath, Swaine & Moore LLP, New York,
New York, for Defendant, of counsel.

MEMORANDUM OPINION

FARNAN, J.

*1 Presently before the Court is the Motion Of
Defendant Lucent Technologies, Inc. To Withdraw The
Reference To The Bankruptcy Court (D.I.1). For the
reasons discussed, Lucent's motion will be denied.

Background
On April 18, 2001, Winstar Communications, Inc. and
Winstar Wireless, Inc. (collectively, "Winstar") filed a
voluntary petition for relief under Chapter 11 of the
Bankruptcy Code. Winstar concurrently commenced an
Adversary Proceeding alleging that Lucent Technologies,
Inc. ("Lucent") breached several of the contracts between
Winstar and Lucent, allegedly forcing Winstar to file its
bankruptcy petition. Lucent filed several proofs of claim,
asserting claims against Winstar that include secured and
unsecured claims for sums alleged due under agreements
between Lucent and Winstar.

In January 2002, the Court converted the bankruptcy to

Chapter 7 and the bulk of Winstar's assets were
subsequently liquidated. Following the conversion,
Christine C. Shubert ("the Trustee") interceded to
prosecute this action as Plaintiff and filed the Second
Amended Complaint (A.D.I.69).

In the Second Amended Complaint, the Trustee
demanded a "trial by jury as to all issues so triable," and
added Count XI, a claim seeking to equitably subordinate
Lucent's claims. Two other claims remain in the
case--Count VII for Breach of the Parties' Subcontracting
Arrangement and Count X for Return of Preferential
Transfer.

After the Bankruptcy Court decided the Motion of
Lucent Technologies Inc. to Dismiss Certain Claims Of
The Second Amended Complaint (A.D.I.70), Lucent
made a demand for a jury trial and asserted four
counterclaims for fraud and negligent misrepresentation.
(A.D.I.156.) Lucent asserted these counterclaims with
regard to financial information that Winstar allegedly
provided to Lucent during due diligence that Lucent
conducted in November and December 2000.

There is currently a Motion For Summary Judgment
(A.D.I.210) filed by Lucent pending in the Bankruptcy
Court.

The Bankruptcy Court has not determined whether this
matter is a core or non- core proceeding.

Parties' Contentions
By its motion, Lucent seeks to withdraw the reference
of the Adversary Proceeding from the Bankruptcy Court.
Lucent contends that "cause" for permissive withdrawal
exists for several reasons related to its alleged right to a
jury trial in the district court.

First, Lucent contends that it is entitled to a trial by jury
based on the Trustee's demand for a jury trial, which,
pursuant to Federal Rule of Civil Procedure 38, may not
be revoked without Lucent's consent.

Second, Lucent contends that it did not waive its right
to a jury trial before the district court as to all claims
when Lucent filed its proof of claim. Lucent contends that
filing a proof of claim waives only the right to a jury trial
in the district court as to claims that are necessarily part of
the disallowance or allowance of the proof of claim.
Lucent contends that Counts VII and X and Lucent's
counterclaims are not necessary elements in the allowance
or disallowance of Lucent's proofs of claim. Furthermore,
Lucent contends that the district court should hear the
Trustee's claim for equitable subordination, not triable to

(C) 2008 West
Group
Page 341
(Cite as: 2004 WL 2713101 (D.Del.))

a jury as of right, because it arises from the same facts, transactions, and issues raised by Counts VII and X.

**\*2** Third, Lucent contends that it would be more efficient for the district court to decide the pending motion for summary judgment in this action because it reviews de novo any such ruling made by the Bankruptcy Court.

Finally, Lucent argues that, because the Court need not determine whether the remaining claims in this lawsuit are core or non-core, Local Bankruptcy Court Rule 5011-1 should be waived.

In response, the Trustee contends that Lucent waived any right to a jury trial when it filed proofs of claim against the estate. The Trustee specifically contends that by filing the claims, Lucent submitted itself to the Bankruptcy Court's equitable powers and conferred jurisdiction upon the Bankruptcy Court to consider its counterclaims as a core matter. The Trustee further contends that, should the Court determine the matter is non-core and that Lucent has a right to a jury trial, Lucent's motion should be denied because: 1) Lucent's jury demand was defective; 2) Lucent's demand to withdraw the reference is untimely; and 3) Lucent's motion to withdraw the reference is procedurally defective because Lucent has failed to move before the Bankruptcy Court for a core/non-core determination.

Discussion
I. Legal Standard For Discretionary Withdrawal Of A Reference

Under 28 U.S.C. § 1334(b), district courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Pursuant to 28 U.S.C. § 157(a), each district court may refer cases under title 11 to the Bankruptcy Court for disposition. However, under Section 157(d), the referred proceeding can be withdrawn from the Bankruptcy Court and returned to the district court. Section 157(d) provides for both mandatory withdrawal and discretionary withdrawal. In this case, Lucent seeks withdrawal only under the standards for discretionary withdrawal.

In providing for discretionary withdrawal, Section 157(d) states: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). This Court has acknowledged that the requirement that cause be shown "creates a 'presumption that Congress intended to

have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy." ' Hatzel & Buehler, Inc. V. Central Hudson Gas & Elec., 106 B.R. 367, 371 (D.Del.1989) (citations omitted).

The Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal. These factors include: 1) promoting uniformity in bankruptcy administration; 2) reducing forum shopping and confusion; 3) fostering economical use of debtor/creditor resources; 4) expediting the bankruptcy process; and 5) timing of the request for withdrawal. In re Pruitt, 910 F .2d 1160, 1168 (3d Cir.1990) (citing Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 999 (5th Cir.1985)).

**\*3** Local Rules for the United States Bankruptcy Court for the District of Delaware state that the movant for withdrawal shall concurrently file with the Clerk a motion for a determination by the Bankruptcy Court with respect to whether the matter or proceeding is core or non-core. Bankr.D. Del. R. 5011-1.

II. Lucent's Right To A Jury Trial

The sole reason for "cause" for permissive withdrawal that Lucent cites in its briefs is Lucent's right to a jury trial on Counts VII and X of the Trustee's Second Amended Complaint and on Lucent's counterclaims for fraud and negligent misrepresentation. The parties do not dispute that these issues may, by right, be triable by a jury.

A. Count X, Preferential Payment Claim

Count X seeks to recover $194 million paid by Winstar to Lucent in December 2000. The Court finds that Lucent may have been entitled to a jury trial on the issue of preferential payment had it presented no claim in the bankruptcy proceeding and awaited a federal action by the Trustee. See Schoenthal v. Irving Trust Co., 287 U.S. 92, 94-95 (1932). However, a creditor who submits a proof of claim against a bankruptcy estate has no right to a jury trial on issues raised in defense of such a claim. Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242, 1250 (3d Cir.1994) (citing Langenkamp v. Culp, 498 U.S. 42, 45 (1990)).

The Court finds that, in view of the holdings in Billing and Langenkamp, Lucent's filing proofs of claim triggered the process of allowance and disallowance of those claims, thereby subjecting Lucent to the equity power of the Bankruptcy Court. Thus, the Court finds that the Trustee's

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 342
(Cite as: 2004 WL 2713101 (D.Del.))

subsequent preference action is now part of the claims allowance process, and is triable only in equity. Id. For these reasons, the Court concludes that there is no right to a jury trial on the issue of the alleged preferential transfer.

Lucent contends that Langenkamp is inapplicable in these circumstances because the Trustee made a jury demand and, pursuant to Federal Rule of Civil Procedure 38, cannot withdraw that jury demand without Lucent's consent. Rule 38(d), which states that a jury demand "may not be withdrawn without the consent of the parties," ensures that one party may rely on another's jury demand. Fed.R.Civ.P. 38. However, the Court finds that because Lucent waived its right to a jury trial as to the alleged preferential transfer, its consent to the Trustee's withdrawal of her jury trial demand is not required. See Moore, Federal Practice 3d § 38.50[10][d].

B. Count VII, Subcontract Claim

In Count VII, the Trustee alleges that Lucent breached the subcontract between Lucent and Winstar Wireless, Inc. and/or breached a legally-binding course of conduct between Lucent and Winstar. Lucent contends that whether it is found to have breached an alleged obligation to lend additional money to Winstar has no bearing on Lucent's ability to recover on its proofs of claim. The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, is now part of the claims allowance process, triable only in equity. For this reason, the Court concludes that there is no right to a jury trial on the issue of the Subcontract Claim.

C. Lucent's Counterclaims

*4 Similarly, the Court is not persuaded that Lucent's Fraud and Negligent Misrepresentation Counterclaims will not affect the allowance or disallowance of Lucent's proofs of claim. The Court finds that Lucent's Fraud and Negligent Misrepresentation Counterclaims involve a decision regarding the distribution of the bankruptcy estate and, thus, are now part of the claims allowance process, triable only in equity. For this reason, the Court concludes that there is no right to a jury trial on the issue of the Fraud and Negligent Misrepresentation Counterclaims.

III. In Re Pruitt Factors For Cause

Although Lucent has not addressed the standards for

"cause" for a permissive withdrawal of a reference set forth in In re Pruitt, 910 F.2d at 1168, the Court does not find that the factors as a whole support the Court's withdrawing the reference to the Bankruptcy Court for several reasons.

First, the Court finds that the timing of the request for withdrawal supports the proceeding remaining in Bankruptcy Court. The Adversary Proceeding has already been in Bankruptcy Court for over two years, and the Bankruptcy Court has overseen extensive discovery and pretrial matters, and has decided a motion to dismiss filed by Lucent.

Next, the Court finds that considerations of uniformity in bankruptcy administration support the proceeding being heard in the Bankruptcy Court. The preferential payment and equitable subordination claims are purely bankruptcy- related in nature and the resolution of these claims will affect the distribution to creditors within the proceeding.

Finally, the Court finds that maintaining the proceeding in Bankruptcy Court will diminish the risk of forum shopping and will lessen confusion by fostering consistent administration of the estate.

For these reasons, the Court concludes that the Pruitt factors do not support withdrawing the reference from the Bankruptcy Court.

IV. Local Bankruptcy Rule 5011-1

The record does not show that Lucent has filed a motion for determination by the Bankruptcy Court as to whether the matter or proceeding is core or non- core. Thus, the Court finds that Lucent did not follow Local Bankruptcy Court Rule 5011-1. For this additional reason, the Court will maintain the proceeding before the Bankruptcy Court.

Conclusion
In sum, the Court concludes that discretionary withdrawal of the instant adversary proceeding is not warranted because: 1) Lucent has waived its right to a jury trial with regard to the claims at issue; 2) the factors set forth in In re Pruitt do not support a finding of cause; and 3) Lucent has not followed Local Bankruptcy Rule 5011-1. Accordingly, the Court will deny the Motion Of Defendant Lucent Technologies, Inc. To Withdraw The Reference To The Bankruptcy Court (D.I.1).

An appropriate Order will be entered.

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
   Page 343
(Cite as: 2004 WL 2713101 (D.Del.))

ORDER

  At Wilmington, this 16th day of November 2004, for
the reasons set forth in the Memorandum Opinion issued
this date,

  **\*5** IT IS HEREBY ORDERED that the Motion Of
Defendant Lucent Technologies, Inc. To Withdraw The
Reference To The Bankruptcy Court (D.I.1) is DENIED.

  2004 WL 2713101 (D.Del.)

END OF DOCUMENT

(C) 2008 West
Group
Page 345
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

☞

Only the Westlaw citation is currently available.

United States Bankruptcy Court, E.D. Pennsylvania.

**In re: Patricia Anne KRIDLOW Debtor**
**Andrew N. SCHWARTZ, Trustee, Patricia Anne**
**Kridlow, Plaintiffs**
v.
**PRUDENTIAL INSURANCE COMPANY OF**
**AMERICA, Prudential Property and Casualty**
**Insurance Company, Pruco, Inc and Their Affiliates,**
**Defendants**
**Nos. 97-35168DAS, 98-0833.**

Feb. 19, 1999.

F. Emmet Ciccone, Havertown, PA, for Debtor.

H. Joseph Byron, Phila., PA, for Defendants.

Gary McCafferty, Phila., PA, for Wells Fargo Bank,
Interested Creditor.

*MEMORANDUM*

SCHOLL, Chief Bankruptcy J.

**\*1** The instant adversary proceeding ("the Proceeding"),
arising out of the individual voluntary Chapter 7
bankruptcy case of PATRICIA ANNE KRIDLOW ("the
Debtor"), presently presents us with several pre-trial
motions filed by the Defendants, PRUDENTIAL
INSURANCE COMPANY OF AMERICA,
("Prudential"), PRUDENTIAL PROPERTY AND
CASUALTY INSURANCE COMPANY ("Prupac"), and
PRUCO, INC. ("Pruco"). These include motions (1) to
dismiss the claims against prudential and Pruco ("the
Dismissal Motion"); (2) to disqualify Harris R. Rosen,
Esquire, special counsel ("Counsel") appointed for
ANDREW SCHWARTZ ("the Trustee") ("the
Disqualification Motion"); and (3) to strike the Plaintiffs'
jury demand ("the Jury Motion"). Adhering to the tenor of
our decisions touching on the issues raised in the motions,
we grant the Jury Motion and deny the other Motions in
readiness for the scheduled date of a non-jury trial of the
Proceeding in this court on March 23, 1999.

This case was filed on December 12, 1997,
undoubtedly prompted by a judgment of over $4.3 million
entered against the Debtor as the result of a March 9,
1991, motor vehicle accident which she struck a
pedestrian. The Defendants, who insured the Debtor

under a policy limited to $100,000 liability and $10,000
first party benefits, allegedly improperly and in bad faith,
refused her any coverage for the accident. The Trustee, by
application of November 17, 1998, obtained the
appointment of Counsel, who had previously represented
the guardian of the injured pedestrian in obtaining the
verdict against the Debtor, in an Order of December 2,
1998. The Complaint, naming the Trustee and the Debtor
as Plaintiffs and all three Defendants and "their affiliates,"
was filed on December 16, 1998.

After a colloquy with interested counsel at a January 7,
1999, hearing on a discovery motion, at which the
Defendants raised issues regarding improper service and
expressed an intention to file the Dismissal Motion and
Disqualification Motion, we entered an Order of January
8, 1999, which, *inter alia,* directed the Defendants to file
and brief any such Motions by January 29, 1999, and for
the Plaintiffs to file responses by February 12, 1999.
Noting the Debtor's January 29, 1999, jury demand and
the absence of an answer to the Complaint, we entered a
further Order of February 2, 1999, directing the
Defendants to file Answers to the Complaint and for both
parties to address the validity of the jury demand and
indicate whether they consented to our conducting any
permissible jury trial by February 12, 1999, as well. The
latter aspect of this Order prompted the filing of the Jury
Motion by the Defendants among the filings on February
12, 1999. The Plaintiffs also filed an Amended Complaint
on February 11, 1999, which it is alleged only changed
the allegation that the Proceeding is core to one that it is
either core or non-core.

As we noted at the outset, all of the pre-trial motions
are addressed herein. The first that we will address is the
Disqualification Motion. This Motion is based upon the
following premises:

**\*2** 1. Counsel represented the pedestrian's guardian in
the suit against the Debtor, thus allegedly creating a
conflict as described in *In re BH & P, Inc.,* 949 F.2d 1300
(3d Cir.1991).

2. The Bankruptcy Code provision relating to
appointment of special counsel, 11 U.S.C. § 327(e),
provides as follows:

(e) The trustee, with the court's approval, may
employ, for a specified special purpose, other
than to represent the trustee in conducting the
case, an attorney that has represented the debtor,
if in the best interest of the estate, and if such
attorney does not represent or hold any interest
adverse to the debtor or to the estate with respect
to the matter on which such attorney is to be

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
    Page 346
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

employed.

3. Since this section purportedly requires that special counsel "has represented the debtor" in the past, and Counsel had not, his appointment is inappropriate under this statutory provision.

4. Furthermore, alleging that "it is expected" that Counsel will be a witness in the trial of the Proceeding, his appointment violated Rule 3.7 of the Rules of Professional Conduct.

In *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 476 (3d Cir.1998), the court, discussing the provisions of § 327 generally, clarified and narrowed its holdings in *BH & P* regarding analysis of measuring the effect of conflicts of counsel as follows:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion-- pursuant to § 327(a) and consistent with § 327(c)--disqualify an attorney who has a potential conflict of interest and (3) the district court may disqualify an attorney on the appearance of conflict alone.

Although they note that Counsel has represented a creditor of the Debtor prior to his appointment to represent the Trustee, the Defendants fail to identify any actual conflict of interest between the creditor and the Trustee. *See also In re ATR Development Co.,* 1997 WL 607553, at *1- *2 (Bankr.E.D.Pa. Sept. 29, 1997). To the contrary, it appears that both have a common interest in vigorously pursuing any insurance benefits to which the Debtor is entitled from the Defendants.

The Defendants cite *In re Greater Pottstown Community Church of the Evangelical Congregational Church,* 80 B.R. 706, 711 (Bankr.E.D.Pa.1987), for the principle that simultaneous representation of a creditor and debtor is impermissible because counsel for a debtor, under 11 U.S.C. § 327(a), must be disinterested. However, the "disinterestedness" requirement applies only to general counsel appointed pursuant to § 327(a), not to special counsel appointed, as was Counsel here, for the "specified special purpose" of pursuing this litigation, pursuant to 11 U.S.C. § 327(e). *See In re G & H Steel Service, Inc.,* 76 B.R. 508, 510 (Bankr.E.D.Pa.1987).

Although there is some support for the Defendants' reading of § 327(e) as limiting appointment of special counsel to counsel who previously represented the debtor, *e.g. Meespierson, Inc. v. Strategic Telecom, Inc.,* 202 B.R. 845, 848-49 (D.Del.1996), and cases cited therein, that

interpretation of § 327(e) has not been accepted by this court. *See In re Jefsaba, Inc.,* Bankr.No. 91-23043DWS (Bankr.E.D.Pa. Dec. 1, 1994); and *In re Renninger Mason Contractors, Inc.,* 58 B.R. 516, 517 (Bankr.E.D.Pa.1986). *See also In re Fondiller,* 15 B.R. 890, 892-93 (Bankr.9 th Cir.1981).

**\*3** We note the presence of 11 U.S.C. § 327(c), which provides that,

> [i]n a case under chapter 7, 12 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States Trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

This section allows a creditor's attorney to be appointed as special or general counsel for a trustee, as long as there is no actual conflict between the representation of the creditor and the trustee or debtor, as was the case in *Greater Pottstown, supra.*

There is, moreover, no logical reason to limit the appointment of special counsel to an attorney who previously represented a debtor. Indeed, in some of the more memorable cases in this court, prosecuting special counsel was simultaneously counsel for a creditor. *See In re Schachter,* 228 B.R. 359, 362 (Bankr.E.D.Pa.1999); and *In re Main, Inc.,* 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998); and *In re Clayton,* 1996 WL 537852 (Bankr.E.D.Pa. Sept. 17, 1996). In all of these cases, as in the instant case, counsel for a very active creditor was appointed as special counsel to the trustee by this court and vigorously represented the trustees' interests on behalf or against the respective debtors.

Finally, we note that Counsel had already *been* appointed as the Trustee's special counsel without objection prior to his commencing the Proceeding. The more appropriate time for raising an objection to Counsel's appointment would have been at the time of appointment rather than after significant services pursuant to the appointment have already been undertaken by Counsel. *See In re Engle,* 124 F.3d 567, 580-90 (3d Cir.1997) (conc. & dis. ops.).

We therefore conclude that Counsel was properly appointed as the Trustee's special counsel under § 327(e) and that there is no actual conflict between Counsel's former representation of a creditor against the Debtor and his present representation of the Trustee requiring his disqualification. We also reject the argument that because they may call counsel as a witness, he should be for that

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 347
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

reason, disqualified. As we noted in *G & H, supra,* 76 B.R. at 511-12, we are skeptical of this argument. It is not clear whom the Defendants actually anticipate calling as witnesses. The Plaintiffs indicate in their reply brief that they will not call Counsel, but would call his co-counsel for any testimony otherwise adducable from Counsel. The Defendants may insist on calling Counsel, but should not, for that reason, be able to eliminate him as the Trustee's chosen representative. *Id.* at 512. The Disqualification Motion will therefore be denied.

Next, we address the Jury Motion. This issue arises in what is an unusual posture. In most instances, a jury demand is interposed in a bankruptcy court proceeding by a defendant creditor who either wishes to exit the bankruptcy forum, or delay litigation against it, or both. Here, the jury demand is made by the Plaintiffs, the Trustee and the Debtor, who have consented to our conducting the requested jury trial in this court. The Defendants, meanwhile, have made no counter-jury demand and they declined to consent to our conducting the jury trial requested by the Plaintiffs.

**\*4** This state of affairs has unusual consequences. Because all parties do not consent to our doing so, even though the non-consenting party is not the party demanding the jury trial, this court could not conduct any jury trial to which the Plaintiffs might be entitled by the terms of 28 U.S.C. § 157(e). In any event the Proceeding, as a complex cause of action arising solely from pre-petition events, is clearly non-core, *see Beard v. Braunstein,* 914 F.2d 434, 443-45 (3d Cir.1991), which status would also preclude our conducting a jury trial without the Defendants' consent. *Id.* at 442-43. The non-core status of the Proceeding will also preclude us from finally determining the Proceeding, if not from hearing it, even if the jury demand is stricken. *See* 28 U.S.C. § 157(c)(1).

The Defendants contend that the Plaintiffs have no right to a jury trial on their bad faith insurance claims under 42 Pa.C.S. § 8371 in any forum, citing *Younis Brothers & Co. v. CIGNA Worldwide Ins. Co.,* 882 F.Supp. 1468 (E.D.Pa.1994); *Coyne v. Allstate Ins. Co.,* 771 F.Supp. 673 (E.D.Pa.1991); and *Terletsky v. Prudential Property & Casualty Ins. Co.,* 437 Pa.Super. 108, 649 A .2d 680 (1994), *allocatur denied,* 540 Pa. 641, 659 A.2d 560. We find, however, that, among these cases, only *Younis* actually discusses the jury trial issue and that decision concludes that a right to a jury trial *does* exist for most § 8371 claims, the only exemptions being potential claims for interest, court costs, and attorneys fees. 882 F.Supp. at 1474-77. This result is consistent with the authorities cited by the Plaintiffs which support a right to

a jury trial of most § 8371 claims, *Kraeger v. Nationwide Mutual Ins. Co.,* 1997 WL 30627 (E.D.Pa. Jan. 27, 1997); and *Fahy v. Nationwide Mutual Fire Ins. Co.,* 885 F.Supp. 678, 680-81 (M.D.Pa.1985). Since the Plaintiffs would, out of bankruptcy court, have a right to a jury trial as to at least part of their claims, they would appear to retain a right to a jury trial in the Proceeding, were same not otherwise precluded. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469 (1962); and *Beacon Theatres v. Westover,* 359 U.S. 500, 510 (1959) (cases presenting intermingled jury and non-jury issues must be first tried to a jury except in narrowly-limited circumstances).

However, in our Order of February 2, 1999, we drew the parties' attentions to the decision in *In re Hutchins,* 211 B.R. 322, 324 (Bankr.E.D.Ark.1997), which cites what it terms

> [t]he vast majority of cases [which] hold that a debtor in bankruptcy has submitted his claims to the equitable jurisdiction of the bankruptcy court such that there is no entitlement to trial by jury. *See Longo v. McLaren (In re McLaren),* 3 F.3d 958 (6 th Cir.1993); *N.I.S. Corp. v. Hallahan (Matter of Hallahan),* 936 F.2d 1496, 1505 (7 th Cir.1991) ("Even if we were to assume that the dischargeability action was legal in nature, however, Hallahan cannot claim a right to jury trial because, as a Chapter 7 debtor, he voluntarily submitted his case to bankruptcy court."); *Parsons v. United States (In re Parsons),* 153 B.R. 585 (M.D.Fla.1993); *Romar International Georgia, Inc. v. Southtrust Bank of Alabama, National Association (In re Romar International Georgia, Inc.),* 198 B.R. 407, 412 (Bankr.M.D.Ga.1996) ("The Court is persuaded that, by filing this adversary proceeding, Plaintiff has subjected its lender liability action to this Court's equitable powers to allow, disallow, and offset mutual debts, even though Plaintiff's claims are legal in nature."); *Crews v. Lyons (In re Lyons),* 200 B.R. 459 (Bankr.S.D.Ga.1994); *Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile Co.),* 132 B.R. 979 (Bankr.S.D.Ga.1991); *Leslie Salt Co. v. Marshland Development, Inc. (In re Marshland Development, Inc.),* 129 B.R. 626 (Bankr.N.D.Cal.1991); *The Splash v. Irvine Co. (In re Lion Country Safari, Inc. California),* 124 B .R. 566 (Bankr.C.D.Cal.1991); *In re Beugen,* 81 B.R. 994 (Bankr.N.D.Cal.1988).

**\*5** *Accord, In re Scotland Guard Services, Inc.,* 179 B.R. 764, 767-68 (Bankr.D.P.R.1993); *In re Cummins,* 174 B.R. 1005, 1007 n. 1 (Bankr.W.D.Ark.1994); *In re Auto Imports, Inc.,* 162 B.R. 70, 71-72 (Bankr.D.N.H.1003); and *In re Oggi's Int'l Foods, Inc.*

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 348
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

*Oggi's Int'l Foods, Inc. v. Hibernation,* Bankr.No. 89-11683F, Adv. No. 90-0087 (Bankr.E.D. Pa. April 30, 1990).

Despite this authority, the principle that the debtor waives a jury trial by maintaining, in the bankruptcy court, a proceeding triable in alternative forums was expressly rejected in *Germain v. Connecticut Nat'l Bank,* 988 F.2d 1323, 1330 (2d Cir.1993); and *In re Jensen,* 946 F.2d 369, 373-74 (5 th Cir.1991). The Third Circuit discussed but did not resolve the split of the Circuits in light of the contrary decisions in *McLoren* and *Hallahan,* in *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1250-52 (3d Cir.1994). The *Billing* court ultimately held that no jury trial was permissible in the proceeding before it because it concluded that the malpractice claims asserted there by a trustee against the debtor's bankruptcy counsel were equitable in nature. *Id.* at 1252-53.

This court has consistently held that the assertion of counterclaims against a debtor in the course of bankruptcy court litigation by even creditors who have not filed proofs of claim effects a waiver of any right to a jury trial by the creditor asserting the counterclaims. *See In re Labrum & Doak, LLP,* 1998 WL 233749, at *3 (Bankr.E.D.Pa. May 8, 1998); *In re Pocono Springs Co.,* 1997 WL 695617, at *2 *3 (Bankr.E.D.Pa. Nov. 6, 1997); and *In re Lloyd's Securities, Inc.,* 156 B.R. 750, 752-55 (Bankr.E.D.Pa.1993). *Cf. In re Brown,* 219 B.R. 373, 381 (Bankr.E.D.Pa.1998) (pleading counterclaims renders a proceeding as core under 28 U.S.C. § 157(b)(2)(B)). We have thus supported the principle that a party who chooses, when alternatives are available to it, to lay its claims at the door of the bankruptcy court submits itself to the equitable processes therein, as does a creditor who chooses to file a proof of claim. *See Langenkamp v. Culp,* 498 U.S. 42, 44 (1990); and *Travelers Int'l, A.G. v. Robinson,* 982 F.2d 96, 98-100 (3d Cir.1992).

The same principles which apply to creditors should apply to a debtor or a trustee. Thus, if such parties choose the bankruptcy forum when alternative forums exist, they should be prepared to forfeit their right to a jury trial in this forum. The claims asserted in the instant Proceeding clearly could have been asserted in state court and possibly also in federal district court in the first instance. Moreover, even if we reorganized the Plaintiffs' assertion of a jury demand, we would be compelled to relegate the Plaintiffs to the federal district court forum for trial as a result of our determination that this Proceeding is non-core. *See Beard, supra,* 914 F.2d at 442-43. The only means for us to retain the Plaintiffs' chosen forum in this court is thus for us to strike their jury demand. We therefore conclude that it is appropriate for us to do so

and we will so order.

**\*6** The final matter remaining before us for disposition is the Dismissal Motion. In support of this Motion, the Defendants argue that the Debtor's policy was issued solely by Prupac and that the only theory under which Prudential and Pruco could possibly be held liable is by an impermissible application of vicarious liability. *See Kasprzak v. American General Life & Accident Ins. Co.,* 914 F.Supp. 144, 146-47 (E.D.Tex.1996); and *Local 397, Int'l Union of Electronics, etc. Workers v. Midwest Fasteners, Inc.,* 779 F.Supp. 788, 792-93 (D.N.J.1992).

However, it is not clear on what theory the Plaintiffs are suing Prudential and Pruco. The Amended Complaint identifies all of the Defendants collectively as the Debtor's insurer, and therefore it appears that the Plaintiffs are suing all three (and their affiliates) on the theory that one or more of them is the Debtor's actual insurer, and not on any applicable theory of vicarious liability.

> We have consistently held that Motions such as these, "based upon Federal Rule of Bankruptcy Procedure 7012(b), incorporating Federal Rule of Civil Procedure ("F.R.Civ.P.") 12(b)(6), since they seek dismissal of the Proceeding for failure to state a cause of action ....can be granted only if
> " "the plaintiff includes allegations which show on the face of the complaint that there is some "insuperable bar" to relief.' *In re Katz,* 1998 WL 85165, at *1 (Bankr.E.D.Pa. February 26, 1998) (citations omitted). Rule 12(b)(6) thus imposes a very substantial burden of proof upon the moving party because the factual allegations contained in the nonmovant's pleading at issue are presumed to be true and all factual inference must be drawn in favor of the nonmoving party and against the movant. *Id.* Thus, courts will not dismiss a complaint under F.R.Civ.P. 12(b)(6) unless the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." " *Id.,* quoting *Conley v. Gibson,* 355 U.S. 41, 45- 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *In re Main, Inc.,* 1998 WL 156684 at * 1 (Bankr.E.D.Pa. March 31, 1998)." *In re Labrum & Doak, LLP,* 1998 WL 184413, at *1 (Bankr.E.D. Pa. April 13, 1998) ...'
>
> *In re Labrum & Doak, LLP,* 1998 WL 295542 at *2 (Bankr.E .D. Pa. June 1, 1998) ("Labrum III")."

*In re Labrum & Doak, LLP,* 1998 WL 404301, at *2 (Bankr.E.D.Pa. July 15, 1998).

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 349
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

The Complaint does not, on its face, reveal any "insuperable bar" to the Plaintiffs' obtaining relief from any of the named Defendants. It is only when we add the Defendants' apparently-disputed factual assertion that Prupac alone is the Debtor's insurer to the facts that dismissal of Prudential and Pruco is justified. If the Defendants' factual averments are in fact correct, it will be simple enough to mold a judgment holding only the correctly-identified insurer liable to the Plaintiffs. We perceive no hardship to the Defendants from deferring a decision as to which is (are) liable to the Plaintiffs because they are all represented by the same counsel. We note that we view with disfavor a pre-trial motion such as the Dismissal Motion which is of limited usefulness in shortening trials or sharpening or narrowing the issues presented at trial. *See In re Jackson,* 92 B.R. 987, 989, 1000 (Bankr.E.D.Pa.1988).

**\*7** We will therefore proceed to deny the Dismissal Motion. We add to our Order a directive that the Defendants, if necessary, promptly amend their Answers in light of the Plaintiffs' filing an Amended Complaint in order that the Proceeding can be readied for trial on March 23, 1999. The underlying bankruptcy case of the Debtor is now quite dated. The final audit papers were due to be filed on December 31, 1998, per our Order of May 11, 1998. However, it is now apparent that resolution of the Proceeding must precede completion of this case's administration. As a result, any further continuances of the trial are most unlikely. We also will schedule a status hearing in the Debtor's main case on the date of the trial to attempt to ascertain when the final audit papers will in fact be filed.

### ORDER

AND NOW, this 19 th day of February, 1999, upon consideration of the Defendants' Motion to Dismiss certain aspects of the Plaintiffs' Complaint ("the Dismissal Motion"), their Motion to Disqualify the Plaintiffs' Counsel ("the Disqualification Motion"), and their Motion to strike the Plaintiffs' Demand for Jury Trial ("the Jury Motion") in the above-entitled proceeding ("the Proceeding"), and the parties' submissions addressing these Motions, and noting that the Plaintiffs have filed a slightly Amended Complaint, which may require slightly amended Answers prior to the scheduled trial of the Proceeding on March 23, 1999, it is hereby ORDERED as follows:

1. The Dismissal Motion and the Disqualification Motion are DENIED.

2. The Jury Motion is GRANTED.

3. The Defendants shall file and serve any necessary Amended Answers to the Amended Complaint on or before February 26, 1999.

4. The trial of the Proceeding remains scheduled on

TUESDAY, MARCH 23, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107. No further continuances will be favored.

5. A status hearing to determine when the final audit papers in this case must be filed and how our Order of May 11, 1998, should be amended is also scheduled on March 23, 1999.

1999 WL 97939 (Bankr.E.D.Pa.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
Page 368
(Cite as: 2003 WL 22769051 (D.Del.))

# H

Only the Westlaw citation is currently available.

United States District Court,

D. Delaware.

**In re: DAIMLERCHRYSLER AG SECURITIES
LITIGATION
TRACINDA CORPORATION, a Nevada Corporation,
Plaintiff,
v.
DAIMLERCHRYSLER AG, a Federal Republic of
Germany corporation; Daimler-Benz AG,
a Federal Republic of Germany corporation; J urgen
Schrempp, a citizen of the
Federal Republic of Germany; and Manfred Gentz, a
citizen of the Federal
Republic of Germany, Defendants.
No. Civ.A. 00-993-JJF.**

Nov. 19, 2003.

A. Glichrist Sparks, III, Alan J. Stone, and Brian J.
McTear, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware. William G. McGuinness, and
Julie E. Kamps, of Fried, Frank, Harris, Shriver &
Jacobson, New York, New York. Terry Christensen,
Mark G. Krum, of Christensen, Miller, Fink, Jacobs,
Glaser, Well & Shapiro, LLP, Los Angeles, California,
for Plaintiff Tracinda Corporation, of counsel.

Thomas J. Allingham II, Robert S. Saunders, and
Stephen D. Dargitz, of Skadden, ARPS, Slate, Meagher &
Flom LLP, Wilmington, Delaware. Jonathan J. Lerner,
Lea Haber Kuck, Joseph N. Sacca, and Jacob E. Hollinger,
of Skadden, ARPS, Slate, Meagher & Flom LLP, New
York, New York, for Defendants DaimlerChryler AG,
Daimler-Benz AG, J urgen Schrempp and Manfred Gentz,
of counsel.

## MEMORANDUM OPINION

FARNAN, J.

*1 Defendants DaimlerChrysler AG, Daimler-Benz AG,
J urgen Schrempp and Manfred Gentz (collectively,
"Defendants") have filed a Motion To Strike Tracinda's
Jury Demand (D.I.802) pursuant to Federal Rule of Civil
Procedure 39(a)(2) requesting that the jury trial demanded
by Plaintiff Tracinda Corporation ("Tracinda") be stricken
as it pertains to its claims against the Individual
Defendants, Defendants Schrempp and Gentz, and the

Corporate Defendants, Defendants DaimlerChrysler AG
("DaimlerChrysler) and Daimler-Benz AG
("Daimler-Benz"). For the reasons discussed, I will grant
Defendants' Motion and strike Tracinda's jury demand.

I. The Parties' Contentions

By their Motion, Defendants contend that Tracinda
waived, expressly and in writing, any rights it may have
had to a jury trial in connection with claims arising out of
the merger between Daimler-Benz and Chrysler
Corporation ("Chrysler") to form DaimlerChrysler.
Defendants' argument is rooted in the provisions of the
Stockholder Agreement entered into by Daimler-Benz,
Chrysler, Tracinda and Kirk Kerkorian in connection with
the Business Combination Agreement ("BCA") which
effectuated the merger. The Stockholder Agreement
specifically recites that Tracinda and Kerkorian entered
into the Stockholder Agreement to induce Daimler-Benz
to enter into the BCA and waives the parties' rights to a
jury trial "with respect to any claim, counterclaim or
action arising out of or in connection with [the
Stockholder Agreement] or the transactions contemplated
hereby." Stockholder Agreement § 4.7.

Defendants contend that the jury waiver provision of
the Stockholder Agreement is valid and enforceable and
that Tracinda has recognized the validity of this provision
because it demanded a jury trial against the Individual
Defendants, and not against the Corporate Defendants.
Defendants also contend that the express language of the
waiver is broad and encompasses all of Tracinda's claims
in this action. Although Defendants recognize that the
Individual Defendants did not sign the Stockholder
Agreement, Defendants contend that the Individual
Defendants are entitled to enforce the waiver clause as
agents of the Corporate Defendants and third party
beneficiaries of the Stockholder Agreement. In addition,
Defendants contend that Tracinda is equitably estopped
from denying the scope of the waiver clause.

In response, Tracinda contends that Defendants
Schrempp and Gentz cannot invoke the jury waiver
provision of the Stockholder Agreement, because they
were not parties to that agreement. Tracinda contends that,
in order to effectuate the right to a jury trial guaranteed by
the Seventh Amendment of the United States Constitution,
every reasonable presumption against waiver should be
indulged and the waiver provision should be narrowly
construed. Tracinda further contends that if it is entitled to
a jury trial with respect to its claims against Defendants
Schrempp and Gentz, then the entire case should be tried
to a jury to prevent any conflict with Tracinda's Seventh
Amendment rights which may arise as a result of a

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(C) 2008 West
Group
    Page 369
(Cite as: 2003 WL 22769051 (D.Del.))

simultaneous bench and jury trial.

## II. DISCUSSION

**\*2** The right to a jury trial is a fundamental right guaranteed by the Seventh Amendment of the United States Constitution and governed by federal law. Simler v. Conner, 372 U.S. 221, 221-222 (1963). However, this right can be waived by contract if the waiver is knowing, voluntary and intelligent. See e.g. Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 837 (10th Cir.1988) (recognizing that "[a]greements waiving the right to trial by jury are neither illegal nor contrary to public policy"); First Union Nat'l Bank v. United States, 164 F.Supp.2d 660, 663 (E.D.Pa.2001). As a general matter, courts construe jury trial waivers narrowly and "indulge every reasonable presumption against waiver." Collins v. Government of Virgin Islands, 366 F.2d 279, 284 (3d Cir.1966). Nevertheless, courts routinely enforce jury trial waivers. See e.g. Wechsler v. Hunt Health Sys., Ltd., 2003 WL 21878815, \*2 (S.D.N.Y. Aug. 8, 2003); Today's Man, Inc. v. Nationsbank, N.A., 2000 WL 822500, \*4 (E.D. Pa. June 23, 2000).

Examining the jury trial waiver provision of the Stockholder Agreement in light of these principles and the facts and circumstances of this case, I conclude that Tracinda waived its right to a jury trial. In pertinent part, Section 4.7 of the Stockholder Agreement provides:

Each of the parties hereto ... agrees to waive any right to a trial by jury with respect to any claim, counterclaim or action arising out of or in connection with this Agreement or the transactions contemplated hereby.

(emphasis added). Reading the plain and unambiguous language of the Stockholder Agreement, I find, without question, that the jury trial waiver is enforceable as to the Corporate Defendants. With regard to the Individual Defendants, I am likewise persuaded that the plain language of the Stockholder Agreement supports Tracinda's waiver of its right to a jury trial. The waiver is broadly worded and applies to any claim or any action "arising out of or in connection with this Agreement or the transactions contemplated hereby" without limitation as to whom that action is brought against. See e.g. Curtis Center L.P. v. Sumitomo Trust & Banking Co., 1995 WL 365411, \*2 (E.D. Pa. June 15, 1995) (recognizing that waiver of all claims "arising out of or relating to this Agreement or the transactions contemplated hereby" was "sweeping" waiver which encompassed claims for fraud, bad faith, tortious interference and misappropriation of trade secrets). Because Tracinda's claims against the Individual Defendants arise out of and in connection with the Stockholder Agreement and the merger, which is the

major transaction contemplated by the Stockholder Agreement, I conclude that they are encompassed by the plain language of the waiver.

Tracinda suggests that Defendants have offered no proof that Tracinda knowingly, voluntarily or intelligently waived its right to a jury trial against Defendants Schrempp and Gentz. In the circumstances of this case, I am not persuaded by Tracinda's argument. In determining whether a waiver was entered into knowingly, intentionally and voluntarily, courts consider such factors as: (1) the negotiability of the contract terms; (2) any disparity in bargaining power between the parties; (3) the business acumen of the party opposing the waiver; and (4) the conspicuousness of the jury waiver provision. See e.g., Wechsler v. Hunt Health Systems, Ltd., 2003 WL 21878815 at \*3 (citations omitted). Tracinda is a sophisticated and experienced business entity that was represented by sophisticated counsel during the negotiation of the Stockholder Agreement. The jury waiver clause is plainly worded and there is no suggestion that Tracinda lacked any bargaining power during the negotiations. Accordingly, I cannot find that Tracinda entered into the jury trial waiver unknowingly, unintelligently or involuntarily. See e.g. Telum, 859 F.2d at 838; Russell-Stanley Holdings, Inc. v. Buonanno, 2002 WL 655162, \*4 (S.D.N.Y. Apr. 22, 2002); Phoenix Four Grantor Trust # 1 v. 642 N. Broad St. Assocs., 2000 WL 1717261, \*2 (E.D.Pa. Nov. 15, 2000).

**\*3** Tracinda also contends that the waiver is unenforceable as to Defendants Gentz and Schrempp, because they are not parties to the Stockholder Agreement. In support of its position, Tracinda advances the Third Circuit's decision in Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1296 (3d Cir.1996), a case involving an arbitration clause. In Dayhoff, the Third Circuit held that arbitration clauses "can be enforced only by the signatories to those agreements." Id. at 1296. However, the Third Circuit also recognized the continuing validity of its decision in Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110 (3d Cir.1993) that " '[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." ' Dayhoff, 86 F.3d at 1296-1297 (citing Pritzker, 7 F.3d at 1121).

In this case, I am persuaded that the jury trial waiver is enforceable as to Defendants Schrempp and Gentz. Defendants Schrempp and Gentz are agents of the Corporate Defendants, and Tracinda's Complaint is based upon the actions of those Defendants as agents of the Corporate Defendants. See e.g. Pritzer, 7 F.3d at 1121; Arnold v. Arnold Corp., 920 F.2d 1269, 1281 (6th

(C) 2008 West
Group
Page 370
(Cite as: 2003 WL 22769051 (D.Del.))

Cir.1990) (applying arbitration clause to securities claims against nonsignatory officers of corporation). In addition, Tracinda has alleged that all Defendants acted in concert with each other, and therefore, I conclude that Tracinda is equitably estopped from arguing that the jury waiver applies to only certain defendants. See e.g. MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947-948 (11th Cir.1999) (acknowledging in context of arbitration provision that equitable estoppel applies where signatory to contract raises allegations of substantially interdependent and concerted misconduct by both nonsignatories and signatories to contract and holding that non-signatory could enforce arbitration agreement); Hoffman v. Deloitte & Touche, LLP, 143 F.Supp.2d 995, 1004 (N.D.Ill.2001) (holding that plaintiffs were equitably estopped from avoiding arbitration where they raised "allegations of substantially interdependent and concerted misconduct by both the signatory ... and the non-signatories").

Tracinda disputes the applicability of the aforementioned cases on the basis that those cases involve arbitration clauses and not jury trial waiver clauses. However, Tracinda itself raises Dayhoff, a case which involves an arbitration clause. While there are certainly differences between arbitration clauses and jury waiver clauses, courts have also recognized the interrelatedness of arbitration and jury waiver clauses, because an agreement to arbitrate necessarily results in the loss of the right to a jury trial. See e.g. Snowden v. Checkpoint Check Cashing, 290 F.3d 631, 638 (4th Cir.) (rejecting argument that an agreement to arbitrate did not constitute a jury waiver), cert. denied, 537 U .S.1987 (2002); In re Currency Conversion Fee Antitust Litig., 265 F.Supp.2d 385, 414 (S.D.N.Y.2003) (holding that plaintiff who enters into arbitration agreement is deemed to have forgone right to jury trial). Thus, courts have found cases involving arbitration clauses to be instructive in matters pertaining to jury waiver clauses. See Telum, 859 F.2d 838 (analogizing jury waiver clauses to arbitration clauses); Gurfein v. Sovereign Group, 826 F.Supp. 890, 921 (E.D.Pa.1993) (recognizing the propriety of analogy to arbitration clauses in context of cases involving jury waiver provisions).

*4 In this case, I find that the above-referenced arbitration cases have particular relevance here, because of the position of Defendants as agents of the Corporate Defendants involved in an action which directly relates to the Stockholder Agreement and the merger transaction expressly contemplated by the Agreement. To allow the Individual Defendants to be subject to a jury trial on the same claims and issues related to the Corporate Defendants would, in my view, deprive the Corporate

Defendants of the benefit that the jury trial waiver provision of the Stockholder Agreement was intended to provide. This view is not inconsistent with the law as it pertains to jury trial waivers, despite the legal differences between jury waiver provisions and arbitration provisions. See Okura & Co. v. Careau Group, 783 F.Supp. 482, 488-490 (C.D.Cal.1991) (holding that contractual jury waiver clause applied to counterclaims against non-signatories of contract where counterclaims were related to or derived from agreement in question); Leav v. Weitzner, 51 N.Y.S.2d 775, 777 (N.Y.App.Div.1944) (holding that jury trial waiver in lease agreement applied to nonsignatory defendants where action arose out of lease agreement).

In sum, I conclude that the jury demand should be stricken as it pertains to the Individual Defendants, as well as the Corporate Defendants. Tracinda has recognized the validity of the jury waiver clause as it pertains to the Corporate Defendants, and I conclude that Defendants Schrempp and Gentz as agents of the Corporate Defendants should be encompassed in that waiver. The waiver is broadly worded and applies without restriction to all claims and actions relating to the Stockholder Agreement and the merger contemplated by the Stockholder Agreement.

III. CONCLUSION

For the reasons discussed, Defendants' Motion To Strike Tracinda's Jury Demand will be granted.

An appropriate Order will be entered.

ORDER
At Wilmington, this 19th day of November 2003, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion To Strike Tracinda's Jury Demand (D.I.802) is GRANTED.

2003 WL 22769051 (D.Del.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2008, I caused to be served by electronic service and hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Marla R. Eskin, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

I hereby certify that on February 6, 2008, the foregoing document was sent via electronic mail, hand delivery (local) and first class mail (non-local) to the following non-registered participants:

Kathleen Campbell Davis, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Lee E. Kaufman (#4877)
kaufman@rlf.com

RLF1-3251161-1