## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re:  Civil Docket No. 35** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DECLARATION OF WHITMAN L. HOLT
## IN SUPPORT OF THE ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S JURY TRIAL DEMAND

I, Whitman L. Holt, declare as follows:

1.      I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.      I submit this declaration in support of the *Answering Brief in Opposition to Defendants' Motion to Strike Plaintiff's Jury Trial Demand* filed by the OHC Liquidation Trust ("**Plaintiff**") in the above-captioned proceeding.

3.      I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for Plaintiff in this proceeding.

4.      Attached hereto as Exhibit "A" is a true and correct copy of the *Defendants' Response to Motion for Determination of Plaintiff's Rights to a Jury Trial*, which the defendants in this proceeding (collectively, "**Credit Suisse**") filed before the Bankruptcy Court on October 12, 2007 [Adv. Proc. No. 04-57060 (PJW), Docket No. 201].

5.      Plaintiff's counsel deposed Mr. Jared Felt – an employee of the entity formerly known as Credit Suisse First Boston LLC, and the signatory of the proofs of claim underlying portions of this proceeding – on June 15-16, 2006. True and correct copies of relevant excerpts from the transcript of Mr. Felt's deposition, as well as the attendant errata sheets, are attached hereto as Exhibit "B."

6.      Credit Suisse's counsel deposed Mr. Douglas R. Muir – a former officer of the Debtors in these bankruptcy cases, and an individual directly involved with the Debtors' securitization programs – on September 26-27, 2006. True and correct copies of relevant excerpts from the transcript of Mr. Muir's deposition, as well as the attendant errata sheet, are attached hereto as Exhibit "C."

7.    During the week of October 21-27, 2007, I assisted in the preparation of various pre-trial materials in anticipation of a possible bench trial before the United States Bankruptcy Court for the District of Delaware, Walsh, *J*.  Among those pre-trial materials was a statement of Plaintiff's case, which made clear that Plaintiff intends to seek compensatory damages of at least $50,000,000 at trial.  On October 24, 2007, I transmitted certain of these materials, including the aforementioned statement, to, among others, Mary K. Warren, Esq. of Linklaters LLP, who is co-counsel for Credit Suisse.

8.    During the course of the pre-trial preparation described in paragraph 7, an issue arose about whether the sole signatory/beneficiary of the purported contractual jury waiver – i.e., "Credit Suisse First Boston, New York Branch" ("**NY Branch**") – is among the defendant entities in this proceeding.  Seeking clarity on the issue, my colleague, Scott H. Yun, Esq., and I had a telephone conference with two attorneys from Linklaters LLP (Mary K. Warren, Esq. and J. Justin Williamson, Esq.) on October 23, 2007.  During the course of this call, I expressly asked Ms. Warren whether NY Branch is or is not a defendant entity in this proceeding.  Ms. Warren refused to answer the question.  In fact, Credit Suisse has, to date, steadfastly refused to adopt any definite position about whether NY Branch is or is not a party to this litigation.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 19, 2008, at Los Angeles, California.

Whitman L. Holt

# Exhibit "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>Oakwood Homes Corporation,<br>et al.,<br><br>    Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br><br>                        Plaintiff,<br><br>        v.<br><br>Credit Suisse (f/k/a Credit<br>Suisse First Boston, a Swiss<br>banking corporation), Credit<br>Suisse Securities (USA), LLC<br>(f/k/a Credit Suisse First<br>Boston LLC), Credit Suisse<br>Holdings (USA), Inc. (f/k/a<br>Credit Suisse First Boston,<br>Inc.), and Credit Suisse (USA),<br>Inc. (f/k/a Credit Suisse First<br>Boston (U.S.A.), Inc.), the<br>subsidiaries and affiliates of<br>each, and Does 1 through 100,<br><br>                        Defendants. | <br><br><br><br><br><br><br>Adversary Proceeding<br>No. 04-57060<br><br>Re:  Adv. Dkt. No. 198 |

**DEFENDANTS' RESPONSE TO MOTION FOR DETERMINATION
OF PLAINTIFF'S RIGHTS TO A JURY TRIAL**


Dated:   October 12, 2007
         Wilmington, Delaware

LINKLATERS
R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000

Attorneys for the Defendants

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Lee E. Kaufman (No. 4877)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 1980
(302) 651-7700

Attorneys for Defendants

TABLE OF CONTENTS

Page

TABLE OF AUTHORITY ............................................ii

INTRODUCTION ................................................... 1

STATEMENT OF FACTS ............................................. 2

    A.   The Proof of Claim and the Objections and
        Counterclaims......................................... 2

    B.   The Damages Disclosure ............................... 4

ARGUMENT ....................................................... 5

I.   PROCEDURE ................................................... 5

II. PLAINTIFF IS NOT ENTITLED TO A JURY TRIAL ON ANY
    CLAIMS ..................................................... 6

    A.   None of Plaintiff's Claims Give Rise to a Jury
        Trial ................................................. 7

    B.   The Trust's Adversary Proceeding is Part and
        Parcel of the Claims Allowance Process ............... 13

III.   PLAINTIFF HAS WAIVED ALL JURY TRIAL RIGHTS ............ 19

    A.   PLAINTIFF WAIVED ANY JURY TRIAL RIGHTS BY
        FILING THIS PROCEEDING BEFORE THE BANKRUPTCY COURT .... 19

    B.   PLAINTIFF HAS WAIVED ITS JURY TRIAL RIGHT BY
        CONTRACT.............................................. 21

CONCLUSION ....................................................25

i

TABLE OF AUTHORITIES

Page

CASES

Andrews v. AmSouth Bank (In re: Andrews),
No. 06-40016, 2007 WL 2819523
(Bankr. N.D. Ala. Sept. 26, 2007) ............................. 19

Baltimore & Carolina Line, Inc. v. Redman,
295 U.S. 654 (1935) ............................................. 6

Billing v. Ravin, Greenberg & Zackin,
22 F.3d 1242 (3d Cir. 1994) ........................... 13, 14, 15

Cantor v. Perelman,
No. Civ. A. 97-586-KAJ, 2006 WL 318666
(D. Del Feb. 6, 2006) ................................... 9, 10, 11

Citicorp N. Am. v. Finley (In re Wash. Mfg. Co.),
133 B.R. 113 (M.D. Tenn. 1991) ............................... 14

Clark v. Teeven Holding Co., Inc.,
625 A.2d 869 (Del. Ch. 1992) ................................. 8

Dairy Queen, Inc. v. Wood,
369 U.S. 469 (1962) .......................................... 11

Dimitri v. Granville Semmes,
Civ. No. 00-2448, 2000 WL 1843495
(E.D. La. Dec. 14, 2000) ................................. 19, 20

Doyle v. Mellon Bank Nat'l Ass'n (In re Globe Parcel Serv.,
Inc.),
75 B.R. 381 (Bankr. E.D. Pa.1987) ............................. 8

EXDS, Inc. v. RK Elec., Inc.,
301 B.R. 436 (Bankr. D. Del. 2003) .......................... 18

In re Evangelist,
760 F.2d 27 (1st Cir.1985) .................................... 7

Frost, Inc. v. Miller, Canfield, Paddock & Stone
(In re Frost), 145 B.R. 878 (Bankr. W.D. Mich. 1992) .......... 14

Germain v. Conn. Nat'l Bank,
988 F.2d 1323 (2d Cir. 1993) .......................... 16, 17, 20

ii

Granfinanciera, S.A. v. Nordberg,
492 U.S. 33 (1989) ..................................... 6, 7, 14

Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile Co.),
132 B.R. 979 (Bankr. S.D. Ga. 1991) ...................... 19, 21

Harman v. Masoneilan Int'l, Inc.,
442 A. 2d 487 (Del. 1982) ..................................... 8

Hays v. Equitex, Inc. (In re RDM Sports Group),
260 B.R. 915 (Bankr. N.D. Ga. 2001) .......................... 17

Hopkins v. Pusey,
475 F. Supp. 2d 479 (D. Del. 2007) ........................... 12

In re Hutchinson,
5 F.3d 750 (4th Cir.1993) ..................................... 7

In re Jensen,
946 F.2d 369 (5th Cir. 1991) ................................. 20

Katchen v. Landy,
382 U.S. 323 (1966) ...................................... 14, 17

Langenkamp v. Culp,
498 U.S. 42 (1990) ....................................... 14, 17

Liquidation Trust  of Hechinger Inv. Co. v. Fleet Retail
Fin. Group (In re Hechinger Inv. Co.),
327 B.R. 537 (D. Del. 2005) ................................ 6, 21

Longo v. McLaren (In re McLaren),
3 F.3d 958 (6th Cir. 1993) ................................... 20

Markman v. Westview Instruments, Inc.,
517 U.S. 370 (1996) ........................................... 6

Mirant Corp. v. Southern Co.,
337 B.R. 107 (N.D. Tex. 2006) ................................ 16

NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),
203 B.R. 905 (D. Del. 1996) ................................. 18

N.I.S. Corp v. Hallahan (In re Hallahan),
936 F.2d 1496 (7th Cir. 1991) ............................... 20

Official Committee of Unsecured Creditors of Integrated
Health Srvcs. v. Elkins (In re: Integrated Health Srvcs.),
291 B.R. 615 (Bankr. D. Del. 2003) ............................. 2

Omnicare, Inc. v. NCS Healthcare, Inc.,
809 A.2d 1163 (Del. Ch. 2002) .................................. 8

Parrot v. Wells, Fargo & Co. (The Nitro-Glycerine Case),
82 U.S. 524 (1872) ............................................ 12

Parsons v. United States (In re Parsons),
153 B.R. 585 (M.D. Fla. 1993) ................................. 19

Pereira v. Farace,
413 F.3d 330 (2d Cir. 2005) .................................... 8

R&F Intellectual Prop. Acquisition, Inc. v. Hantover, Inc.
(In re Dynamic Tooling Sys.),No. 06-5476,
2007 Bankr. LEXIS 2090 (Bankr. D. Kan. June 12, 2007) ......... 16

Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs.,
Inc.),
320 B.R. 513 (Bankr. S.D.N.Y. 2005) .......................... 16

Schwartz v. Prudential Ins. Co. of Am. (In re Kridlow),
No. 97-3516DAS, 1999 WL 97939
(Bankr. E.D. Pa. Feb. 19, 1999) .......................... 19, 20

Stalford v. Blue Mack Transp.(In re Lands End Leasing,
Inc.),
193 B.R. 426 (Bankr. D. N.J. 1996) ......................... 7, 8

Telum, Inc. v. E.F. Hutton Credit Corp.,
859 F.2d 835 (10th Cir. 1988) ................................ 21

Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler
AG Sec. Litig.), Civ. No. A 00-993-JJF,
2003 WL 22769051 (D. Del. Nov. 19, 2003), aff'd,
-- F.3d --, 2007 WL 2701965 (3d Cir. Sept. 18, 2007) ......... 21

WSC, Inc. v. Home Depot, Inc. (In re WSC, Inc.),
286 B.R. 321 (Bankr. M.D. Tenn. 2002) .................... 16, 17

STATUTES & RULES
11 U.S.C. § 544 ............................................... 3

11 U.S.C. § 547 ............................................... 3

iv

11 U.S.C. § 548 .............................................. 3

11 U.S.C. § 550 .............................................. 3

Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants" or "Credit Suisse"), respectfully submit this Response to Plaintiff's Motion for Determination of Plaintiff's Rights to a Jury Trial.

INTRODUCTION

More than six years ago, Oakwood agreed by contract to waive a jury trial in any claims against Credit Suisse in connection with one of the transactions that lies at the heart of this dispute. Nearly three years ago the OHC Liquidation Trust (the "Trust") – the successor to Oakwood - chose to invoke the equitable claims resolution and adjustment powers of this Court to assert its defenses to Credit Suisse's proofs of claim and to assert "counterclaims" against Credit Suisse. More than a year ago the Trust asked this Court – not the District Court - to set a trial date. Now, on the eve of trial, the Trust, through their Motion for Determination of Plaintiff's Rights to a Jury Trial (the "Motion"), has recalled its "sacrosanct" right to a trial by jury and seeks to remove the case from this Court.

The Trust has no right to a jury trial on the claims it has brought against Credit Suisse which are, overwhelmingly,

1

equitable in nature. It certainly may not be heard at this late stage of the proceeding to demand a jury trial three years after invoking the equitable powers of this Bankruptcy Court. While we can well understand why the Trust might now regret the tactical choices it made when it filed these counterclaims, the fact that the Trust is abandoning large parts of the case it filed does not create a right to a jury trial where none exists.[1]

## STATEMENT OF FACTS

## A.   The Proof of Claim and the Objections and Counterclaims

Defendant Credit Suisse Securities (USA), LLC ("CSS") filed four identical proofs of claim in the Oakwood Homes Corporation bankruptcy proceeding (the "Proof of Claim").[2]   The Proof of Claim sought payment of fees and expenses under an agreement between CSS and Oakwood Homes that was executed on August 19, 2002 (the "Financial Advisory Agreement").

On November 15, 2004, the Trust filed an Objection to the Proof of Claim and Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable

---

[1]    Although the Trust continues to assert that Defendants will not consent to a jury trial in this Court (Motion at 4), there can be no dispute that jury trials cannot be conducted in the Bankruptcy Courts for the District of Delaware because the District Court has not specially designated the Bankruptcy Courts to hold jury trials. Official Committee of Unsecured Creditors of Integrated Health Servs. v. Elkins (In re Integrated Health Srvcs.), 291 B.R. 615, 622 (Bankr. D. Del. 2003) ("In this District, the Bankruptcy Judges have not been specially designated by the District Court to conduct a jury trial. Therefore, even if the parties consent, we may not conduct a jury trial.").

[2]    Exhibit B to the Declaration of Brendan J. Murphy filed herewith (hereinafter cited "Murphy Decl. Ex. __.").

2

Subordination; (5) Avoidance and Recovery of 90 Day Preferential

Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (6) Avoidance and

Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C.

§§ 547 and 550; (7) Avoidance and Recovery of Fraudulent

Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and

Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and

550 and Applicable State Law; (9) Breach of Implied and Express

Contract; and (10) Deepening Insolvency (the "Objections and

Counterclaims").[3] (Murphy Decl. Ex. A. hereinafter cited as

"Objections/Counterclaims ¶ __.".)

        The Objections and Counterclaims sought recovery of

almost $600 million in alleged preferential payments and

fraudulent transfers, and sought disallowance or equitable

subordination of CSS's claims.

        The Objections and Counterclaims specified the relief

sought as: (A) "For disallowance in its entirety of the CSFB

Claims"; (B) "That CSFB's Claims be subordinated for all purposes

to the claims of all other creditors in the Bankruptcy Case"; (C)

"Disgorgement of all fees, sums, payments to CSFB an any profits

---

[3]    The Trust elected to bring its Objections and Counterclaims as one
action seeking the disallowance or equitable subordination of the Proof of
Claim based on the Counterclaims, and chose to name multiple Credit Suisse
entities as defendants.  Those Credit Suisse Defendants were not named as
separate entities providing separate and distinct services, but rather were
alleged to be one unitary institution operating through its affiliates and
subsidiaries.  (Objections/Counterclaims ¶¶ 10-11.)  Defendants deny such a
characterization, but it was the Trust's choice to bring its Objections and
Counterclaims in this posture, and it may not now at this late stage disavow
that choice.

3

derived unjustly thereon by all the Oakwood Companies"; and (D)
"Damages according to proof"; as well as avoidance of certain
preferences and fraudulent transfers.

## B.    The Damages Disclosures

On May 1, 2006, pursuant to an order of this Court, the
Trust served a supplemental damages disclosure pursuant to
Federal Rule 26(a)(1).  With respect to its fiduciary duty claim,
the Trust asserted it was "entitled to recover from Credit Suisse
all fees and other remuneration paid to Credit Suisse and to
recover actual and consequential damages" and listed millions of
dollars worth of fees paid to Credit Suisse, including fees
associated with the Loan Assumption Program, fees paid in order
to maintain the CSFB Warehouse Facility and the Servicer Advance
Facility and the fees and costs of securitizations. (Murphy Decl.
Ex. C at 4-6.)

With respect to damages associated with its claim for
negligence, the Trust stated:

> Damages for this Counterclaim are substantially
> similar to the damages sought for breach of
> fiduciary duty, which are discussed above.   The
> same facts that support the breach of fiduciary
> Counterclaim   may   support   this   Counterclaim.
> Nevertheless, this Counterclaim is a separate Cause
> of Action on which the Trust may recover damages.

(Murphy Decl. Ex. C at 6.)

With respect to the breach of implied contract claim,
the Trust stated:

4

The Trust asserts that well before the date of its written contract, CSFB acted as the financial advisor to the Debtors. The damages for breaching this implied contract include consequential damages suffered by the Debtors as a result of CSFB's failure to advise the Debtors to stop the asset-backed securitizations, which did not benefit the Debtors but only deepened their insolvency. The amount sought for CSFB's breach of the implied contract is substantially similar to the damage calculation for the Tenth Counterclaim (i.e., Deepening Insolvency), which is discussed below.

(Murphy Decl. Ex. C at 8.)

### ARGUMENT

#### I.    PROCEDURE

Defendants recognize that a number of courts have found it appropriate for the bankruptcy court to determine in the first instance whether a party is entitled to a jury trial. (See Motion at 5-6.) However, should this Court determine that there should be a jury trial, this issue will necessarily be addressed again by the District Court in the subsequent motion to withdraw the reference by Plaintiff. The District Court will decide the jury trial question *de novo*, as it is an issue of law. For reasons of efficiency and judicial economy, Defendants believe this issue should have been addressed in one motion to withdraw the reference. Notwithstanding this belief, Defendants do not object to the Trust's request for an initial determination of its jury trial rights by this Court. It should also be noted that, in footnote 1 of its Motion, Plaintiff waived any right to have its

5

Motion considered by the District Court should this Court rule against it.[4]

## II.  PLAINTIFF IS NOT ENTITLED TO A JURY TRIAL ON ANY CLAIMS

The Seventh Amendment preserves the right to a jury trial as it "existed under the English common law when the amendment was adopted." Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996)(quoting Baltimore & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657 (1935)).  The Supreme Court has adopted a three part test to determine whether a right to a jury trial exists in the bankruptcy context.  Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 42 (1989).  First, the court compares the cause of action to 18th Century actions in England prior to the merger of the courts of law and equity.  Id.  Second, the court examines the remedy sought and determines whether it is legal or equitable in nature.  Id.  If the court determines that the cause of action and the remedy are both equitable in nature, the moving party has no right to a jury trial.  See, e.g. Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.), 327 B.R. 537, 543 – 46 (D. Del. 2005).  If, however, on balance, the analysis of the first two factors indicates that a party is entitled to a jury trial, the court must decide whether Congress may or has assigned resolution of the relevant

---

[4]      "If the Court determines the Trust has no right to a jury trial, the Trust will proceed to trial before this Court."  (Motion at 7, fn 1.)

6

claim to a non-Article III court that does not use a jury as a
fact finder. Granfinanciera, 492 U.S. at 42.

A.   None of Plaintiff's Claims Give Rise to a Jury Trial

        The Trust concedes that it is not entitled to a jury
trial on its objection to CSS's Proof of Claim or issues directly
related thereto, including breach of contract and the recovery of
pre-petition payments relating to the financial advisory contract
on which the Proof of Claim was based. (Motion at 3-4.)  As for
all of the other preference and fraudulent conveyance claims
pleaded in the Objection and Counterclaims, the Trust has
elected, at this late stage of the proceeding, to abandon them.

        The remaining claims - on which the Trust now seeks a
jury trial - are claims arising out of the relationship between
Oakwood and CSS prior to August, 2002.  Essentially, the Trust
asserts that by virtue of providing underwriting services
relating to Oakwood's securitization program, CSS took on
"duties" - fiduciary or otherwise - to Oakwood and its creditors,
and breached those duties by not forcing Oakwood into bankruptcy
before its Board of Directors decided to file.  It is undisputed
that "actions for breach of fiduciary duty, historically
speaking, are almost uniformly actions 'in equity'--carrying with
them no right to trial by jury." In re Evangelist, 760 F.2d 27,
29, 31 (1st Cir. 1985) (Breyer, J.); In re Hutchinson, 5 F.3d
750, 757 (4th Cir. 1993); Stalford v. Blue Mack Transp.(In re

7

Lands End Leasing, Inc.), 193 B.R. 426, 433 (Bankr. D. N.J.
1996); Doyle v. Mellon Bank Nat'l Ass'n (In re Globe Parcel
Serv., Inc.), 75 B.R. 381, 385 n.9 (Bankr. E.D. Pa.1987).[5]

      Plaintiff's application of the second prong of
Granfinanciera – the remedy sought – is simply wrong.  By
analogizing to the Second Circuit's opinion in Pereira, a case in
which the plaintiff sought exclusively legal damages, Plaintiff
misunderstands a critical distinction between the purely legal
relief sought by the plaintiffs in that case and the mixed relief
the Trust is seeking here.  Pereira v. Farace, 413 F.3d 330, 339
(2d Cir. 2005).  In Pereira, the defendants were directors who
had allegedly permitted the CEO to enrich himself (the CEO was
not a defendant).  Id. at 334.  The Second Circuit's holding
depended entirely on the fact that since the director defendants
has not themselves been enriched, the damages remedy was purely
legal.  Id. at 339 – 341.  Here, in contrast, the Objection and
Counterclaims and subsequent pleadings are replete with

---

[5]    When assessing courts' traditional reluctance to convert classic
equitable claims (such as breach of fiduciary duty) into legal claims, the law
of Delaware is instructive.  In Delaware, breach of fiduciary duty claims are
exclusively heard in its Chancery Court, which is a constitutionally ordained
court of equity.  Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163
(Del.Ch.2002); Clark v. Teeven Holding Co., Inc., 625 A.2d 869, 878
(Del.Ch.1992) (Chancery "still retains jurisdiction to hear nearly all the
claims for breach of a fiduciary duty").    The Chancery Court is charged with
resolving breach of fiduciary duty claims because the broad, flexible and
discretionary remedy analysis mandated by Delaware law upon a finding a breach
of fiduciary duty is far removed from the traditional province of the jury.
Id. Given this degree of discretion, any remedy imposed for a breach of
fiduciary duty claim will inherently be equitable, even if it takes the form
of a money judgment.  Harman v. Masoneilan Int'l, Inc., 442 A.2d 487, 498 (Del.
1982).

allegations that the Defendants enriched themselves, and seeks classically equitable remedies, including disgorgement and equitable subordination.

The District of Delaware's opinion in Cantor v. Perelman is particularly illustrative of this distinction and should guide this Court's reasoning rather than Plaintiff's misapplication of Pereira. No. Civ. A. 97-586-KAJ, 2006 WL 3186666 (D. Del Feb. 6, 2006)(Jordan, J.). In Cantor, the court examined the plaintiff's pleadings and prayer for relief and determined that its prayer for "compensatory damages, including all benefits obtained by Defendants as a result of their breach of fiduciary duty" constituted a request for at least two forms of relief. One, "compensatory damages," was legal in nature, while the other, "unjust enrichment, i.e., the 'benefits obtained by the defendants,'" was equitable. Cantor, at * 5. Applying Granfinanciera, the court determined that plaintiff's breach of fiduciary duty claim was equitable and its requested relief was mixed law and equity. The district court further held that where a party seeks both equitable and legal relief for an equitable claim, the party's entire claim must be judged equitable, and no right to a jury trial should attach: "to weigh the factors differently would effectively ignore the historical factor, contrary to both the Seventh Amendment's purpose to preserve the right to a jury trial as it existed in 1791, and to the express

9

holding of <u>Granfinanciera</u> that history is to be accorded weight

in the balancing." <u>Cantor</u>, at *9(internal citations omitted).[6]

Here, the Trust has alleged that Credit Suisse's breach

of its fiduciary duty resulted in Credits Suisse "unjustly

enrich[ing] itself at the expense of [Oakwood]" and as such, the

Trust has "demand[ed] [CS]'s disgorgement of all fees and other

remuneration unjustly paid to [CS] ... and to recover consequential

and actual damages." (Murphy Decl. Ex. A at ¶ 51.)  In its

Supplement to its Rule 26 (a)(1) Initial Disclosures the Trust

further emphasized the mixed nature of the relief it seeks,

stating that the Trust is "entitled to recover from [CS] all fees

and other remuneration paid to [CS] and to recover actual and

consequential damages." (Murphy Decl., Ex. C at 4.) As to its

disgorgement relief, the Trust listed millions of dollars worth

of fees paid to CS including fees associated with the Loan

Assumption Program, fees paid in order to maintain the CSFB

Warehouse Facility and the Servicer Advance Facility and the fees

and costs of securitizations. (Murphy Decl. Ex. C at 4.)

Plaintiff has expressly conceded its mixed relief while

fruitlessly attempting to distinguish the holding of <u>In re

Hechinger</u>. (Motion at 14.)  The Trust argues that it seeks much:

---

[6]    The <u>Cantor</u> court also questioned the wisdom of the Second Circuit's
overly expansive reasoning in <u>Pereira</u>, stating that its limited view of the
scope of equitable relief "tears that definition from [its] key logical
underpinning[s]." <u>Cantor</u>, 2006 WL 318666, at *8.  Plaintiff seeks to do the
very same thing here.

> broader damages from Credit Suisse. While
> quantification may *include* Credit Suisse's ill-
> gotten fees, those fees are not the entirety of
> the Trust's damages claims; the Trust also seeks
> damages for harm caused by Credit Suisse's
> misconduct (such as the extent to which certain
> transactions – including the so-called 'Lotus
> Transactions' – increased the Oakwood entities
> indebtedness and caused significant losses).

(Motion at 14.) Under any reading of the record, the Trust seeks

a mixed form of relief here, which forecloses a jury trial on its

breach of fiduciary duty claim. See Cantor, at *9.

        As to Plaintiff's other claims that purportedly carry

jury trial rights, the Court must look to the true nature of

these claims to determine jury trial rights rather than

Plaintiff's unsupported characterization of the claims. Dairy

Queen, Inc. v. Wood, 369 U.S. 469, 477-78 (1962)("[T]he

constitutional right to trial by jury cannot be made to depend

upon the choice of words used in the pleadings.") Plaintiff's

claims for breach of implied contract and negligence are not

separate causes of action but rather are duplicative and

superfluous reiterations of Plaintiff's breach of fiduciary duty

claim.

        As for the negligence claim, in its damages

disclosures, Plaintiff made no attempt to segregate the

negligence claim from its breach of fiduciary duty claim, stating

"damages for this [negligence] counterclaim are substantially

similar to the damages sought for breach of fiduciary duty ….

11

the same facts that support the breach of fiduciary [sic]
Counterclaim may support this Counterclaim." (Murphy Decl. Ex. C
at 6.)  Moreover, it is black letter law that a negligence claim
cannot exist without a duty running from defendant to plaintiff.
Parrot v. Wells, Fargo & Co. (The Nitro-Glycerine Case),82 U.S.
524, 537 (1872) (stating that a party charging negligence must
prove it by showing the defendant has violated some duty
incumbent upon him); Hopkins v. Pusey, 475 F. Supp. 2d 479, 482
(D. Del. 2007) (finding that in order to state a claim for
negligence under Delaware law one must allege that defendant owed
plaintiff a duty of care).  Here, the only duty that Credit
Suisse could conceivably have owed to Oakwood was an alleged
fiduciary duty, as no other duty has been plead or even implied
by Plaintiff.

         Plaintiff's breach of implied contract claim is
similarly duplicative.  The parties' relationship for the period
after August 19, 2002 is governed by the Financial Advisory
Agreement and, as the Trust concedes in its opening papers, any
breach of that agreement is not triable to a jury.  Therefore,
the only implied contract that could exist, and any damages
flowing from a breach of that implied contract, would necessarily
exactly track the allegations of the breach of fiduciary duty
claim.

B.   The Trust's Adversary Proceeding is Part and Parcel of
     the Claims Allowance Process

Even if the first two prongs of the Granfinanciera test

pointed to a jury right – and they do not – Plaintiff must still

contend with the third prong.  The Supreme Court recognized that

certain matters which might have carried entitlement to a jury

can still be "assigned" by Congress to a non-Article III court

for resolution without a jury as, for instance, when they must be

resolved as part of the "core" bankruptcy functions.

The jury trial limitation embedded in the third prong

of the Granfinanciera test "has [typically arisen] in connection

with a creditor's demands for a jury trial in actions brought by

the trustee in bankruptcy."  Billing v. Ravin, Greenberg &

Zackin, 22 F.3d 1242, 1247 (3d Cir. 1994).  That limitation

arises from the fact that "when a cause of action 'falls within

the process of the allowance and disallowance of claims,' neither

the debtor's estate nor the defendant has a Seventh Amendment

right to trial by jury 'because [the] claim has been converted

from a legal one into an equitable dispute over a share of the

estate.'" (Motion at 15 (quoting Billing v. Ravin, Greenberg &

Zackin, 22 F.3d 1242, 1253 (3d Cir. 1994).)  From this general

principle, courts have concluded that counterclaims filed by a

liquidation trust in response to a proof of claim that affect the

allowance of a proof of claim are inextricably linked to the

13

claims allowance process, and are therefore subject to the
bankruptcy court's equitable jurisdiction.[7]  See id., at 1252;
See also Frost, Inc. v. Miller, Canfield, Paddock & Stone (In re
Frost), 145 B.R. 878, 882 (Bankr. W.D.Mich. 1992); Citicorp N.
Am. v. Finley (In re Wash. Mfg. Co.), 133 B.R. 113, 115-17 (M.D.
Tenn. 1991).

        The Trust therefore concedes that if this Adversary
Proceeding is interrelated with the equitable claims allowance
process, it has no right to a jury trial. (Motion at 3-4.) The
sole issue is thus whether this action implicates the claims
allowance process. (Motion at 15.)  The answer to that question
is clear: The Objections and Counterclaims as filed by the Trust
unquestionably invoked the equitable jurisdiction of this Court
and submitted all of its claims to the claims allowance process
for adjudication.

        The Trust specifically objected to the Proof of Claim
on the following grounds:

- "The CSFB-LLC Claims should be disallowed in their
  entirety pursuant to Bankruptcy Code section 502(b)(1) for

---

[7]     The Supreme Court has squarely endorsed this proposition in the context
of fraudulent conveyance or preference claims in an adversary proceeding. See
Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990); Granfinanciera, S.A.,492 U.S.
at 58-59; Katchen v. Landy, 382 U.S. 323, 330 (1966). This Circuit has
applied this principle to actions beyond preference and fraudulent conveyance
claims, specifically to a legal malpractice action. Billing v. Ravin,
Greenberg & Zackin, 22 F.3d 1242, 1253 (3d Cir. 1994). Other bankruptcy
courts have also held that an affirmative claim that arises in or implicates
the claims allowance process holds no jury trial rights. Frost, Inc. v.
Miller, Canfield, Paddock & Stone (In re Frost), 145 B.R. 878, 882 (Bankr.
W.D. Mich. 1992); Citicorp N. Am. v. Finley (In re Wash. Mfg. Co.), 133 B.R.
113, 115-17 (M.D. Tenn. 1991).

14

the reasons set forth in the Counterclaims below;" (Objections/Counterclaims ¶ 45.a.)

- "The CSFB Claims should disallowed in their entirety pursuant to 502(b)(4) based on the conduct above. CSFB-LLC's claim exceeds the reasonable value of its purported services;" (Objections/Counterclaims ¶ 45.b.)

- "The CSFB LLC Claims should be disallowed in their entirety because CSFB breached the Financial Advisory Agreement and caused significant harm to the Debtors including, but not limited to, grossly unnecessary fees, expenses and interest on the alternate DIP financing and other expenses. Alternatively, the contingency under which a fee for Financial Advisory Services would be paid was not satisfied;" (Objections/Counterclaims ¶ 45.d.)

- "In the alternative, the Plaintiff requests that the CSFB-LLC Claims, in part or in total, be equitably subordinated to all other claims against the Debtors, pursuant to the Bankruptcy Code section 510(c) for the reasons set forth in the Counterclaims below." (Objections/Counterclaims ¶ 45.e.)

There can be thus be no dispute that the Objections and Counterclaims invoked the equitable jurisdiction of this Court to disallow or otherwise equitably subordinate CSS's Proof of Claim. Plaintiff itself chose to use the claims process – by means of a purported "counterclaim" – to sue several defendants which had not filed claims. Plaintiff's case, as pleaded, is therefore inextricably linked to the claims allowance process insofar as allowance or disallowance of CSS's Proof of Claim cannot be resolved without reference to the conduct and claims underlying the counterclaims. The fact that Plaintiff seeks affirmative recovery on certain of those Counterclaims does not affect this conclusion. See Billing, at 1252 n.17.

15

Plaintiff's reliance on the handful of cases holding that a debtor or trustee is entitled to a jury trial on certain counterclaims is fundamentally misplaced, as the claims at issue in those cases were determined to be wholly unrelated to the claims allowance process.[8]  Specifically, in <u>Germain v. Conn. Nat'l Bank</u>, 988 F.2d 1323 (2d Cir. 1993), the court found that, although the creditor had filed a proof of claim, the trustee's action was "not part of the claims-allowance process" and was not "integral to the reordering of relations among the parties."[9]  <u>Id.</u>

---

[8]     Plaintiff's reliance on authority finding that a creditor maintained a right to a jury trial on certain counterclaims asserted by debtors or trustees is equally misplaced.  The Trust seeks to explain away the difference between a creditor-defendant seeking to preserve its jury trial right and a trustee-plaintiff by arguing that a "happenstance of pleading" should not make "legal claims" part of the claims allowance process. (Motion at 24.)  However, this difference in procedural posture is fundamental.  The cases addressing a creditors' right to a jury trial on claims unrelated to the proof of claim are focused on whether a creditor can be denied its constitutional right to a jury trial with respect to claims it never intended to resolve through the equitable powers of the bankruptcy court.  By contrast, the Trust, as the counterclaims-plaintiff, is the master of its own proceeding, and it chose to pursue an adversary proceeding in this Court by objecting to CSS's Proof of Claim and seeking equitable subordination based on certain counterclaims.  The Trust affirmatively chose to bundle its counterclaims into the objection to the Proof of Claim and to submit the entire controversy to the bankruptcy court for resolution in connection with the claims allowance process, knowing not only that it was invoking equity but that it filed the case in a court that is not permitted to conduct jury trials.  The creditors in the cases cited by Plaintiff had no similar ability to select a forum or style of relief with respect to claims unrelated to a proof of claim.  Authority addressing this issue is therefore inapposite.  See <u>Mirant Corp. v. Southern Co.</u>, 337 B.R. 107, 121 (N.D. Tex. 2006) (finding creditor's right to jury trial not forfeited for claims unrelated to the proof of claim and claims allowance process); <u>R&F Intellectual Prop. Acquisition, Inc. v. Hantover, Inc. (In re Dynamic Tooling Sys.)</u>, No. 06-5476, 2007 Bankr. LEXIS 2090, at *19 (Bankr. D. Kan. June 12, 2007) (analyzing whether creditor forfeited jury trial rights on claims not related to the creditor's proof of claim); <u>Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)</u>, 320 B.R. 513, 518 (Bankr. S.D.N.Y. 2005) (analyzing creditor's proof of claim on creditor's right to a jury trial on claims against it).

[9]     Plaintiff's additional authority finding a jury trial right held by a debtor or trustee are grounded in similar reasoning.  See <u>WSC, Inc. v. Home</u>

16

at 1329.    The court reached this conclusion because the claims at

issue were common law causes of action originally filed in an

entirely separate state court proceeding, were not the underlying

basis for the trustee's objection to a proof of claim,[10] and

therefore did not implicate the claims allowance process.[11]    Id.

at 1325.

     By contrast, the Trust freely elected to bring this

Adversary Proceeding in the form of "Objections and

Counterclaims" seeking to disallow or equitably subordinate the

Proof of Claim based on the counterclaims.    In so doing, the

Trust unquestionably invoked the equitable jurisdiction of this

---

Depot, Inc. (In re WSC, Inc.), 286 B.R. 321, 329 (Bankr. M.D. Tenn. 2002)
(finding claims asserted against non-creditor defendants were properly triable
to jury, but claims asserted against creditor defendant that filed a proof of
claim were not triable to jury because they were integrally related to the
proof of claim); Hays v. Equitex, Inc. (In re RDM Sports Group), 260 B.R. 915,
925 (Bankr. N.D. Ga. 2001) (finding jury trial right held by trustee where
claims "have [nothing] to do with the claims process and/or the restructuring
of the debtor-creditor relationship" because they were asserted against third
party non-creditor defendants solely to augment the estate).

[10]    Moreover, as an emphasis on the importance that the trustee's claims
were not interrelated with objections or subordination of claims, the Germain
court went out of its way to establish that the trustee's claims had no effect
on the claims allowance process, noting in a separate holding that it felt
compelled to assume that the trustee would bring no claim for equitable
subordination because such an action would be inconsistent with the trustee's
demand for a jury trial on the affirmative claims. Id. at 1332.    The court
noted that if the trustee wished to seek equitable subordination of the proof
of claim based on the facts alleged in the counterclaim, it could do so and
waive any jury trial rights on the underlying claims. Id.

[11]    This distinction was in fact critical to the court's analysis, as it
distinguished the Supreme Court precedent in Katchen and Langenkamp on that
basis. Id. at 1327.    The Germain court reasoned that "[t]he very phrase
'claims-allowance process' suggests that the resolution of the dispute in
which a jury trial is sought must affect the allowance of the creditor's claim
in order to be part of that process." Id. at 1327.    The court concluded that
the common law affirmative claims, which were not tied to any objection to a
claim, were entirely unrelated to the claims allowance process.

Court and submitted its claims against Defendants for resolution within the claims allowance process. We need not be concerned with whether there would be a different result had the Trust initially brought its affirmative claims in some other forum. It did not do so, and the Trust cannot walk away from its initial tactical choice to assert all of these causes of action as part of the claims process.[12]

---

[12]    The Trust's Motion attempts to walk away from vast swaths of its Objections and Counterclaims to validate an otherwise groundless jury demand. However, once a dispute has been submitted to the equitable jurisdiction of the bankruptcy court in the claims allowance process, the party cannot revive any jury trial rights by disavowing its submission of the controversy to the bankruptcy court's jurisdiction. EXDS, Inc. v. RK Elec., Inc., 301 B.R. 436 (Bankr. D. Del. 2003) (creditor having filed proof of claim cannot withdraw claim to obtain jury trial in later adversary proceeding). In the context of a creditor seeking to revive jury trial rights by withdrawing a proof of claim, this Court has concluded that once a party has submitted a controversy to the equitable jurisdiction of the bankruptcy court, that jurisdiction is exclusive. The same must be true here. For strategic reasons, more than three years after the filing of the Objections and Counterclaims, and raising the issue for the first time less than 30 days before the scheduled trial date, Plaintiff now wishes to invoke an illusory right to a jury trial on certain claims and to remove the action from this Court. Plaintiff simply cannot do so. See EXDS, Inc., at 443 (holding that "by filing its proof claims [creditor] has caused its disputes . . . to be subject to the exclusive jurisdiction of this bankruptcy court and withdrawal of the proof of claim would not change that result"). In any event, the Trust has not moved to amend its Objections and Counterclaims so all of its counts remain on file, weeks before trial. Courts that have disagreed with the concept of waiver have primarily done so in the context of a third-party, non-creditor defendant that files counterclaims to an adversary proceeding brought by a debtor. In such cases, the critical distinction – which is plainly not at issue here – is the fact that no action, such as the filing of a proof of claim, has triggered the equitable claims allowance process. See e.g., NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.), 203 B.R. 905, 912 (D. Del. 1996)(Concluding non-creditor defendant had not waived jury trial right by asserting counterclaims where no proof of claim had been filed and case would have no effect on claims allowance or equitable distribution of estate).

III. PLAINTIFF HAS WAIVED ALL JURY TRIAL RIGHTS

   A.   PLAINTIFF WAIVED ANY JURY TRIAL RIGHTS BY FILING THIS
        PROCEEDING BEFORE THE BANKRUPTCY COURT

        The Trust has waived any jury trial rights it might

have had by asserting what the Trust now calls separate and

distinct legal claims before the equitable jurisdiction of this

Court.  See, e.g., Schwartz v. Prudential Ins. Co. of Am. (In re:

Kridlow), No. 97-35168DAS, 1999 WL 97939 (Bankr. E.D. Pa. Feb.

19, 1999) (a debtor/trustee plaintiff that chooses the bankruptcy

forum when alternatives exist forfeits right to a jury trial).[13]

        In Schwartz, the Bankruptcy Court for the Eastern

District of Pennsylvania addressed a request by a debtor/trustee

plaintiff for a jury trial on certain claims in an adversary

proceeding brought in the bankruptcy court.  Relying upon

authority that a creditor who asserts counterclaims against a

debtor in an adversary proceeding waives its jury trial rights by

_____

[13]    Other courts outside this Circuit have agreed with the reasoning or
conclusion of the Schwartz court. Andrews v. AmSouth Bank (In re Andrews), No.
06-40016, 2007 WL 2819523, at *8 (Bankr. N.D. Ala. Sept. 26, 2007) (holding
debtor not entitled to jury trial on counterclaims for, among other reasons,
she "submitted her legal cause of action for resolution by a court of
equitable jurisdiction"); Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile
Co.), 132 B.R. 979, 981 (Bankr. S.D. Ga. 1991) ("By voluntarily selecting the
bankruptcy court rather than state court as the forum in which to assert its
state-law cause of action, plaintiff consented to this court's equitable
jurisdiction and thereby waived its right to trial by jury."); Parsons v.
United States (In re Parsons), 153 B.R. 585, 588 (M.D. Fla. 1993) (debtor
voluntarily submitted adversary action to equitable jurisdiction of bankruptcy
court relinquishing right to jury trial); Dimitri v. Granville Semmes, Civ.
No. 00-2448, 2000 WL 1843495 (E.D. La. Dec. 14, 2000) (debtor-plaintiff
voluntarily brought adversary proceeding in bankruptcy court thereby waiving
right to trial by jury).

                                    19

electing the bankruptcy court for resolution of such claims, the

court concluded:

> The same principles which apply to creditors should
> apply to a debtor or a trustee. Thus, if such
> parties choose the bankruptcy forum when
> alternative forums exist, they should be prepared
> to forfeit their right to a jury trial in this
> forum. The claims asserted in the instant
> Proceeding clearly could have been asserted in
> state court and possibly also in federal district
> court in the first instance. Moreover, even if we
> reorganized the Plaintiffs' assertion of a jury
> demand, we would be compelled to relegate the
> Plaintiffs to the federal district court forum for
> trial as a result of our determination that this
> Proceeding is non-core. The only means for us to
> retain the Plaintiffs' chosen forum in this court
> is thus for us to strike their jury demand. [14]

Schwartz, at *5 (citations omitted). The result here is the

same: The Trust voluntarily elected[15] to bring state-law-based

---

[14]   In Schwartz, the court acknowledged the split among the Circuit Courts
of Appeal concerning whether a debtor, by filing a voluntary petition for
bankruptcy and seeking equitable resolution of the claims against it,
effectively waives jury trial rights for its claims against other parties.
Compare Longo v. McLaren (In re McLaren), 3 F.3d 958 (6th Cir. 1993) (filing
of petition waives jury trial rights in debtor's claims against third
parties); N.I.S. Corp v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th
Cir. 1991) (same); with Germain v. Conn. Nat'l Bank, 988 F.2d 1323, 1330 (2d
Cir. 1993) (filing of petition does not waive debtor's jury trial rights); In
re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (same). The Third Circuit has
discussed but not resolved this split. This issue, however, is not implicated
here because Plaintiff's waiver of its jury trial rights in connection with
this action arises not from the general filing of a voluntary petition for
bankruptcy, but rather from the Plaintiff's election to invoke the equitable
jurisdiction of the bankruptcy court by asserting the very state-law-based
claims in this forum as part of the claims allowance process.

[15]   Assuming Plaintiff's new characterization of its claims was permissible,
it is of critical importance that Plaintiff controlled the process of when,
how, and where to file its state-law-based claims. Plaintiff chose to present
those claims to this court for resolution in the claims allowance process and
having done so, is charged with the knowledge of all implications of its
choice of forum. See, e.g., Dimitri v. Granville Semmes, at *5 (finding
debtor's waiver of jury trial rights and noting importance that "[t]his is not
a situation where [debtor] was involuntarily joined as a party by another
participant in the bankruptcy proceeding").

claims before this Bankruptcy Court for resolution even though alternative forums that would permit a jury trial on such claims were available. Having done so, Plaintiff waived its right to a jury trial on such claims. Id.; Haile Co., 132 B.R. at 981 ("By voluntarily selecting the bankruptcy court rather than state court as the forum in which to assert its state-law cause of action, plaintiff consented to this court's equitable jurisdiction and thereby waived its right to trial by jury.").[16]

B.    **PLAINTIFF HAS WAIVED ITS JURY TRIAL RIGHT BY CONTRACT**

It is well settled that a jury trial right can be waived by contract if the waiver is knowing, voluntary and intelligent. Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.), Civ. No. A 00-993-JJF, 2003 WL 22769051, at *2 (D. Del. Nov. 19, 2003), aff'd -- F.3d --, 2007 WL 2701965 (3d Cir. Sept. 18, 2007). See also Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 837 (10th Cir. 1988) (recognizing that "[a]greements waiving the right to trial by jury are neither illegal nor contrary to public policy").

---

[16]    Nor is this a case of an inadvertent waiver, as sometimes happens when a creditor submits to the jurisdiction of the bankruptcy court by filing a proof of claim. At the very time the Objections and Counterclaims was being prepared, and the Trust was making its strategic choices about forum and venue, the Trust's own counsel was deeply involved in the case of In re Hechinger Investment Co. in this Court, where the very issues at stake here - the ability of the bankruptcy court to hold a jury trial in a breach of fiduciary duty case - were being furiously litigated. In re Hechinger, 327 B.R. at 544-45. Of course, in that case Judge Robinson held that there was no right to a jury trial on a breach of fiduciary duty claim. Id.

21

In connection with the execution of the Loan Purchase
Facility, Oakwood Acceptance Corporation, a debtor, agreed to be
bound by the terms of the Class A Note Purchase Agreement dated
February 8, 2001.  That Agreement, which set forth the manner in
which a Credit Suisse defendant would lend funds to a bankruptcy
remote trust that would in turn purchase loans from Oakwood
Acceptance Company, was crucial to the flow of funds under the
Loan Purchase Facility.  Section 9.14 of the Note Purchase
Agreement - which is entitled "WAIVERS OF JURY TRIAL" - provides:

> EACH OF THE SELLER, THE SERVICER, THE ISSUER, THE DEPOSITOR,
> THE TRANSFEROR, THE AGENT AND THE PURCHASERS HEREBY
> IRREVOCABLE AND UNCONDITIONALLY WAIVES, TO THE EXTENT
> PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL
> BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING DIRECTLY
> OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR
> INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Murphy Decl. Ex. D at 53.)  In a side agreement dated February
9, 2001, Oakwood Homes Corporation - the principal debtor here -
acknowledged its obligations in connection with the Loan Purchase
Facility and related documents, and agreed to the express terms
of an identical jury trial waiver.   (Murphy Decl. Ex. E at 6.)

The Trustee, as successor in interest to the debtors,
is therefore foreclosed from seeking a jury trial on any claims
"relating directly or indirectly to the Note Purchase Agreement
or any of the contracts related thereto under the loan purchase
facility." As outlined below, even assuming that Plaintiff's
equitable claims carried a jury trial right (they do not), they

22

nonetheless cannot be tried to a jury because Plaintiff has
plainly waived such a right as against a Defendant in this
action.

        This contractual waiver is most germane to the breach
of fiduciary duty claim, which, as noted above, subsumes the
other claims of negligence and breach of implied contract.
Although Plaintiff's fiduciary duty claim has mutated
substantially over time, one allegation has remained constant:
by providing Oakwood with financing, Credit Suisse wrongfully
perpetuated Oakwood's life and breached a "duty" to cause it to
file for bankruptcy before it actually did so.
(Objections/Counterclaims ¶¶ 19, 49, 53)  The cornerstone of this
theory is the Loan Purchase Facility, which Plaintiff's "standard
of care" expert characterizes as so "vital to providing liquidity
for Oakwood's securitization business" that if Credit Suisse "did
not take over the role as lender, [Oakwood's] securitization
business would have immediately collapsed."  (Murphy Decl. Ex. F
at 16-17, 36-39.)

        Plaintiff thus alleges that at the moment Credit Suisse
replaced Bank of America as provider of the Loan Purchase
Facility in early 2001, Credit Suisse breached its duty by
providing Oakwood with harmful and "value destructive" financing.
Id.  In addition to the "breach" at the inception of the Loan
Purchase Facility, Credit Suisse breached its "duties" every time

23

it allowed Oakwood to use the facility to enable another

securitization.   (Murphy Decl. Ex. F at 16-17, 36-39.)    So

central to plaintiff's fiduciary duty claim is the Loan Purchase

Facility that there could be no such claim absent these

allegations.   Consequently, the Trust must and should be held to

the jury trial waiver contained in the Loan Purchase Facility

documentation.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that this Court determine that Plaintiff has no jury trial rights with respect to any claim in this action.

DATED:    October 12, 2007
          Wilmington, Delaware

_____
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Lee E. Kaufman (No. 4877)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700

            -and-

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9000

Attorneys for Defendants

25

# Exhibit "B"

CERTIFIED
COPY

1            IN THE UNITED STATES BANKRUPTCY COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    IN RE:

5    OAKWOOD HOMES CORPORATION, ET AL.,)
                                        )
6               DEBTORS,                )
     _____)
7                                       )
     OHC LIQUIDATION TRUST,             )    No. 02-13396(PJW)
8                                       )
                PLAINTIFF,              )    VOLUME 1
9    VS.                                )    PAGES 1 THROUGH 292
                                        )
10                                      )
     CREDIT SUISSE FIRST BOSTON, A      )
11   SWISS BANKING CORPORATION, CREDIT  )
     SUISSE FIRST BOSTON LLC, A         )
12   DELAWARE LIMITED LIABILITY         )
     CORPORATION, CREDIT SUISSE FIRST   )
13   BOSTON, INC., CREDIT SUISSE FIRST  )
     BOSTON (USA), INC., A DELAWARE     )
14   CORPORATION AND A WHOLLY OWNED     )
     SUBSIDIARY OF CREDIT SUISSE FIRST  )
15   BOSTON, INC., THE SUBSIDIARIES AND )
     AFFILIATES OF EACH, AND DOES 1     )
16   THROUGH 100,                       )
                                        )
17              DEFENDANTS.             )
     _____)
18

19

20   VIDEOTAPED
     DEPOSITION OF:
21               JARED FELT
                 THURSDAY, JUNE 15, 2006
22               LOS ANGELES, CALIFORNIA

23

24
     REPORTED BY:
25   FELIPE F. CARRILLO, CSR 9555



**LEGALINK®**
A MERRILL COMPANY

20750 Ventura Blvd          tel (818) 593-2300          www.merrillcorp.com
Suite 205                   tel (800) 826-0277
Woodland Hills, CA 91364    fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1

1       Q.   In what way?   How did they help OAC do that?

2       A.   Credit Suisse had served as underwriter for those

3   REMIC securities.

4       Q.   What is your understanding of what services

5   Credit Suisse had performed in its capacity as

6   underwriter?

7       A.   I just assumed that it was a typical underwriting

8   relationship.

9       Q.   In a typical underwriting relationship for a

10   REMIC security, what does the underwriter do?

11           MS. WARREN:   Objection to the form.

12   BY MR. CASTANARES:

13       Q.   You may answer.

14       A.   In understanding -- I've not underwritten a REMIC

15   security, so I'll have to use my experience in

16   underwriting other securities, but we primarily help to

17   structure and sell those securities, we provide contact

18   with buyers, and we help the company in understanding

19   the process, and help assist them in preparing the

20   documents to sell those securities.   I'm struggling with

21   what you are asking.

22       Q.   I'm attempting to ask you the question using as

23   closely as possible --

24       A.   Uh-huh.

25       Q.   -- the language you have used.   So I'm not trying

69

1    to confuse you.

2        A.   I think your shorthand is pretty broad sometimes.

3        Q.   Did you have an understanding that, at that

4    time -- I'm speaking now of the spring of 2001 up until

5    the June 26th presentation -- that CSFB had any other

6    kind of relationship with the Oakwood family of

7    companies besides underwriting the REMIC securities?

8            MS. WARREN:   Well, let me object to the form

9    of this.   Earlier in the deposition you said you were

10   asking him about CSFB, which in your mind was the entity

11   that signed the August 19th contract.

12           MR. CASTANARES:   I'll rephrase the question.

13           MS. WARREN:   Now you are asking about

14   underwriting securities, and you are moving on to other

15   relationships.   So you need to be specific about your

16   entity.

17           MR. CASTANARES:   All right.

18       Q.   Did you come to have any understanding in the

19   spring of 2001 that any entity within the Credit Suisse

20   or CSFB umbrella had any relationship with any entity in

21   the Oakwood umbrella besides the underwriting of REMIC

22   securities?

23       A.   I work for Credit Suisse First Boston

24   Corporation.   I worked for CSFBC at the time.   A

25   separate legal entity CSFBI, CSFB, International, which

70

1    is separate, had provided a loan purchase facility to

2    OAC.

3        Q.  Is that commonly referred to as a warehouse line?

4        A.  Yes, it is.

5        Q.  All right.  And what entity in the CSFB family

6    was it that did the underwriting?

7        A.  I'm not sure.

8        Q.  Okay.  Did you once know and have just forgotten

9    or --

10       A.  I assume that it's CSFBC, but I'm not sure.  I'm

11   not in that department.

12       Q.  Okay.  All right.  Did you --

13       A.  I only wish we were part of CSFBI.  They were

14   pretty profitable.

15           MS. WARREN:  Mr. Felt, wait until there's a

16   question pending.

17           THE WITNESS:  Okay.

18           MR. CASTANARES:  She wouldn't have let you

19   answer that one if I asked it, so ...

20       Q.  In the course of your preparation of the

21   presentation and your making of that presentation, did

22   you gather information from any sources outside of the

23   Credit Suisse family of companies besides what was

24   publicly available?

25           MS. WARREN:  Could you read that back.

71

1              MR. CASTANARES:   I'll rephrase it.

2       Q.   In preparing for the June 26 presentation, you

3    looked at publicly available information; correct?

4       A.   Yes.

5       Q.   Okay.   And you don't recall whether or not you

6    made any direct contact with the company to gather

7    information; correct?

8       A.   Yes.

9       Q.   My question to you is, do you recall whether you

10   had any other sources of information at that time?

11      A.   I don't recall specifically, but typically I

12   would have looked for research reports and other

13   analyses from third-party sources about the company.

14      Q.   Okay.   And the research reports, are these the

15   ones that Merrill Lynch or Barrister might issue

16   recommending buy, sell or hold on the stock?  Is that

17   the kind of research reports you are talking about?

18      A.   Those research reports that -- both stock and

19   bond research reports as well as reports from rating

20   agencies.

21      Q.   Okay.   Anything else you can think of that you

22   looked at?

23      A.   Again, I don't recall what I looked at for this

24   situation.   I'm instead speaking to broadly what we do.

25      Q.   All right.

72

1      the fixed income department.

2         Q.   Okay.  And you're investment banking, and he's

3      fixed income?

4         A.   Yes.

5         Q.   Okay.  And you just can't remember what the

6      percentages were or anything?  Do you remember anything

7      about that at all?

8         A.   There's not that level of clarity.

9         Q.   Okay.  But I suppose if we went back and looked

10     at the books, there are probably numbers written

11     someplace; correct?

12              MS. WARREN:  Objection to the form.

13              THE WITNESS:  I don't know.

14     BY MR. CASTANARES:

15        Q.   Okay.  Did your group ever receive an allocation

16     of revenue from any other group within CSFB, such as,

17     for example, Mr. O'Driscall's group or the group that

18     CSFBI did the warehouse loan with?

19        A.   There was no -- I'm not aware of any allocations

20     from fixed income or from CSFBI to investment banking

21     for any prior transactions.  There was a -- I didn't

22     know whether or not our -- whatever the fees we did

23     receive in 2002, if those were going to be held in

24     abeyance for some reason, but I never fully understood

25     what happened with the fees.

                                                        171

1      Q.   Did you have any expectation at the time of the

2   filing of the petition in bankruptcy that if the

3   warehouse line were extended by CSFBI, your group would

4   receive any allocation of income that CSFBI derived from

5   that line of business?

6               MS. WARREN:   Objection to the form.

7               THE WITNESS:   First of all, the CSFBI was

8   not the provider of the loan purchase facility.

9   BY MR. CASTANARES:

10      Q.   Okay.

11      A.   It was New York branch.

12      Q.   Okay.  So let me start again with my question.

13      A.   That's fine.

14      Q.   Okay.  Okay.

15      A.   But it wasn't CSFB.  It was the New York branch,

16   and I didn't know whether investment banking would

17   receive any allocation of fees or monies earned from

18   providing that loan purchase facility.  I was hopeful,

19   of course, but I did not know.

20      Q.   Did it, in fact, do so?

21      A.   I don't know.

22      Q.   Okay.  Is there --

23      A.   (Inaudible) --

24      Q.   If you wanted to know the answer to that

25   question, how would you go about getting it?

172

1    A.  You are asking about the magic hand within the

2    firm.  I don't know how it was.

3    Q.  No, no.  I'm only wanting to know whether

4    accounting entries were made someplace or another, and I

5    just want to know where to go -- I don't know where to

6    ask your lawyer.

7    A.  I don't know.  It's not transparent within the

8    firm.

9    Q.  There is no piece of paper or electronic record

10   that's made of these allocations?

11   A.  I'm sure there must be.

12          MS. WARREN:  Don't speculate if you don't

13   know.

14          THE WITNESS:  I don't know.

15   BY MR. CASTANARES:

16   Q.  Have you seen such documents in the past?

17   A.  I have not.

18   Q.  You have never seen any allocation of income;

19   correct?

20   A.  I have not seen allocation of income.

21   Q.  Okay.  Would -- in the ordinary course, would

22   Mr. Jacob be the one who saw such allocations in your

23   group?

24   A.  What he would know is the revenue for which we

25   receive credit.

173

```
1                    ERRATA SHEET

2      PAGE    LINE    CHANGE CORRECTION

3      16      20      "was" to "of" (incorrect)

4      19      12      "spending" to "pending" (typo)

5      20      21      "asset" to "asset in" (omitted word)

6      29      14      "Fihchra" to "Fiachra" (typo)

7      30      7       "F-I-H-C-H-R-A" to "F-I-A-C-H-R-A" (typo)

8      32      19      "Felt" to "felt" (incorrect)

9      47      21      "Felt" to "felt" (incorrect)

10     48      25      "Felt" to "felt" (incorrect)

11     59      2       "approaches the company or" to "approaches or" (incorrect)

12     65      9       "his" to "its" (incorrect)

13     91      13      "accept" to "except" (incorrect)

14     91      21      "at" to "that" (typo)

15     96      4       "hope" to "hoped" (typo)

16     97      10      "FCC" to "SEC" (incorrect)

17     103     16      "Felt" to "felt" (incorrect)

18     113     8       "Felt" to "felt" (incorrect)

19     129     9       "theses" to "these" (typo)

20     132     1       "suspected" to "suspect" (typo)

21     140     20      "sign" to "signed" (typo)

22     143     21      "15.th" to "15th" (typo)

23     156     2       "Not in" to "Not" (incorrect)

24     161     12      "GM2" to "GMT" (typo)

25     171     9       "want" to "went" (typo)
```

```
1                    ERRATA SHEET

2       PAGE   LINE   CHANGE CORRECTION

3       190    21     "GAP" to "GAAP" (incorrect)

4       191    7      "GAP" to "GAAP" (incorrect)

5       203    7      "sister" to "sisters" (typo)

6       213    15     "loan" to "loans" (incorrect)

7       217    19     "secularization" to "securitization" (incorrect)

8       238    23     "graft" to "graph" (incorrect)

9       238    24     "graft" to "graph" (incorrect)

10      240    8      "decline" to "declined" (typo)

11      259    18     "range capital" to "Ranch Capital" (upper case)

12      259    24     "last" to "least" (typo)

13      260    6      "advise" to "advisor" (incorrect)

14      269    7      "non0critical" to "non-critical" (typo)

15      ____   ____   _____

16      ____   ____   _____

17      ____   ____   _____

18      ____   ____   _____

19      ____   ____   _____

20      ____   ____   _____

21      ____   ____   _____

22      ____   ____   _____

23      ____   ____   _____

24      ____   ____   _____

25      ____   ____   _____
```

1

2                                    * * *

3                     ACKNOWLEDGEMENT OF DEPONENT

4        I, Jared Felt, do hereby acknowledge

5        that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14        _Nov 15, 2006_                    _____

15        (DATE)                            (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

LegaLink, a Merrill Company
800-826-0277  818-593-2300  Fax  818-593-2301  www.legalink.com

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                FOR THE DISTRICT OF DELAWARE        CERTIFIED
                                                       COPY
 3

 4    IN RE:

 5    OAKWOOD HOMES CORPORATION, ET AL.,)
                                        )
 6              DEBTORS,                )
      _____)
 7                                      )
      OHC LIQUIDATION TRUST,            )No. 02-13396(PJW)
 8                                      )
                PLAINTIFF,              )VOLUME 2
 9                                      )PAGES 292 THROUGH 497
      vs.                               )
10                                      )
      CREDIT SUISSE FIRST BOSTON, A     )
11    SWISS BANKING CORPORATION, CREDIT )
      SUISSE FIRST BOSTON LLC, A        )
12    DELAWARE LIMITED LIABILITY        )
      CORPORATION, CREDIT SUISSE FIRST  )
13    BOSTON, INC., CREDIT SUISSE FIRST )
      BOSTON (USA), INC., A DELAWARE    )
14    CORPORATION AND A WHOLLY OWNED    )
      SUBSIDIARY OF CREDIT SUISSE FIRST )
15    BOSTON, INC., THE SUBSIDIARIES AND)
      AFFILIATES OF EACH, AND DOES 1    )
16    THROUGH 100,                      )
                                        )
17              DEFENDANTS.             )
      _____)
18

19

20    VIDEOTAPED
      DEPOSITION OF:
21                   JARED FELT
                     FRIDAY, JUNE 16, 2006
22                   LOS ANGELES, CALIFORNIA

23

24

      REPORTED BY:
25    FELIPE F. CARRILLO, CSR 9555
```

292


LEGALINK®
A MERRILL COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
11:47:16    1    was the warehouse?

11:47:17    2        A.   Could you restate that question.

11:47:18    3        Q.   Yes.   In the week leading up to the filing of the

11:47:25    4    petition in bankruptcy, for there to be a prearranged as

11:47:29    5    distinguished from a free fall, there were three pieces

11:47:33    6    that had to be put into place, correct, the DIP, the

11:47:36    7    warehouse and Berkshire Hathaway?

11:47:38    8            MS. WARREN:   Objection to the form.

11:47:41    9            THE WITNESS:   Those are your words.

11:47:43   10    BY MR. CASTANARES:

11:47:43   11        Q.   Are they correct?

11:47:44   12        A.   No.

11:47:45   13        Q.   How are they wrong?

11:47:46   14        A.   Three things were important for the company to --

11:47:52   15    would be helpful to the company, but they could file at

11:47:58   16    any time.   Three things that would be helpful, we

11:48:00   17    believed, and management believed, was a deal in

11:48:02   18    principal, a DIP facility and access to a loan purchase

11:48:08   19    facility, not necessarily on that day, but those were

11:48:13   20    things that were important to the ongoing operations of

11:48:15   21    the company.

11:48:16   22        Q.   Okay.   Well, you recall that the letter of intent

11:48:28   23    that was signed by Berkshire Hathaway sometime on the

11:48:33   24    15th of November was made conditional on both a DIP and

11:48:39   25    a warehouse; correct?
```

388

| | | |
|---|---|---|
| 11:48:40 | 1 | A.  In order for -- as points that were highlighted |
| 11:48:50 | 2 | by Berkshire Hathaway as important for an ultimate |
| 11:48:53 | 3 | reorganization along these lines, Berkshire Hathaway |
| 11:48:57 | 4 | indicated that a DIP and a loan purchase facility were |
| 11:49:01 | 5 | important, yes. |
| 11:49:02 | 6 | Q.  And the DIP lender was telling you that important |
| 11:49:07 | 7 | to it was a warehouse line; correct? |
| 11:49:13 | 8 | A.  A loan purchase facility, yes. |
| 11:49:16 | 9 | Q.  Okay.  And the provider of the loan purchase |
| 11:49:19 | 10 | facility was telling you that important to it was a deal |
| 11:49:23 | 11 | with Mark, Berkshire Hathaway; correct? |
| 11:49:25 | 12 | A.  Yes. |
| 11:49:26 | 13 | Q.  So -- |
| 11:49:27 | 14 | A.  Actually, I don't know that.  I really don't know |
| 11:49:30 | 15 | that. |
| 11:49:30 | 16 | Q.  But that is what Exhibit 30 says, isn't it? |
| 11:49:32 | 17 | A.  Exhibit 30 says that we thought that it was going |
| 11:49:35 | 18 | to be helpful.  I don't know if New York branch ever |
| 11:49:39 | 19 | indicated that that was a condition. |
| 11:49:40 | 20 | Q.  Okay.  Well, it says that the warehouse will be |
| 11:49:42 | 21 | in question. |
| 11:49:44 | 22 | A.  Again -- |
| 11:49:45 | 23 | Q.  That's what No. 30 says.  Those are your words; |
| 11:49:47 | 24 | right? |
| 11:49:47 | 25 | A.  My words now are that we thought that it would be |

389

| | | |
|---|---|---|
| 11:49:50 | 1 | helpful, and Fihchra thought that it would be helpful, |
| 11:49:53 | 2 | in gaining approval from New York branch if there was a |
| 11:49:56 | 3 | deal in principal, yes. |
| 11:49:58 | 4 | Q.  So each of these things was important or helpful |
| 11:50:04 | 5 | to the others; correct? |
| 11:50:04 | 6 | A.  Yes. |
| 11:50:04 | 7 | Q.  One of them was entirely within the control of |
| 11:50:07 | 8 | CSFB, wasn't it? |
| 11:50:07 | 9 | MS. WARREN:  Objection to the form. |
| 11:50:07 | 10 | THE WITNESS:  It was not. |
| 11:50:08 | 11 | BY MR. CASTANARES: |
| 11:50:10 | 12 | Q.  Credit Suisse could have waived any conditions |
| 11:50:12 | 13 | and provided this warehouse line if it wanted to, |
| 11:50:15 | 14 | couldn't it? |
| 11:50:15 | 15 | MS. WARREN:  Objection to the form. |
| 11:50:17 | 16 | THE WITNESS:  You asked a specific question. |
| 11:50:19 | 17 | Was it within the control of CSFBC?  It was absolutely |
| 11:50:22 | 18 | not. |
| 11:50:22 | 19 | BY MR. CASTANARES: |
| 11:50:23 | 20 | Q.  All right.  I will -- allow me to rephrase the |
| 11:50:25 | 21 | question. |
| 11:50:25 | 22 | One of them was entirely within the control of |
| 11:50:27 | 23 | the Credit Suisse family of companies; true? |
| 11:50:29 | 24 | MS. WARREN:  Objection to the form. |
| 11:50:31 | 25 | THE WITNESS:  Yes. |

390

| | | |
|---|---|---|
| 11:50:31 | 1 | BY MR. CASTANARES: |
| 11:50:32 | 2 | Q.  And that was the warehouse line; right? |
| 11:50:34 | 3 | A.  Yes. |
| 11:50:34 | 4 | Q.  And that's the one thing that CSFBC didn't get a |
| 11:50:40 | 5 | signed letter of intent or term sheet on before |
| 11:50:42 | 6 | bankruptcy; correct? |
| 11:50:43 | 7 | MS. WARREN:  Objection to the form. |
| 11:50:44 | 8 | THE WITNESS:  It was provided. |
| 11:50:46 | 9 | BY MR. CASTANARES: |
| 11:50:46 | 10 | Q.  It didn't get a term sheet signed up before |
| 11:50:49 | 11 | bankruptcy, did it? |
| 11:50:50 | 12 | A.  It did not. |
| 11:50:51 | 13 | Q.  Would you please refer to Exhibit 1.  I believe |
| 11:51:02 | 14 | it's still in front of you. |
| 11:51:09 | 15 | A.  (Complies). |
| 11:51:12 | 16 | I'd like to go back.  You stated that it was a |
| 11:51:16 | 17 | requirement of a deal in principal.  It was not. |
| 11:51:22 | 18 | Exhibit 1? |
| 11:51:23 | 19 | Q.  Yes.  We talked about this briefly yesterday.  I |
| 11:51:26 | 20 | believe -- |
| 11:51:26 | 21 | MS. WARREN:  Could I have a copy, please? |
| 11:51:28 | 22 | MR. CASTANARES:  Pardon me? |
| 11:51:28 | 23 | MS. WARREN:  Could I have a copy, please? |
| 11:51:30 | 24 | MR. CASTANARES:  Do we have an extra copy of |
| 11:51:32 | 25 | one here? |

391

| | | |
|---|---|---|
| 11:51:36 | 1 | THE WITNESS:  I'd like a break. |
| 11:51:38 | 2 | MR. CASTANARES:  Oh, certainly. |
| 11:51:39 | 3 | THE WITNESS:  Thank you. |
| 11:51:40 | 4 | THE VIDEOGRAPHER:  We're going off the |
| 11:51:42 | 5 | record.  The time is 11:51. |
| 11:51:42 | 6 | (WHEREUPON, AT THE HOUR OF 11:51 NOON, |
| 11:51:42 | 7 | THE LUNCH RECESS WAS TAKEN UNTIL |
| 11:51:42 | 8 | 1:00 P.M. OF THE SAME DAY.) |
| 13:06:08 | 9 | THE VIDEOGRAPHER:  We're back on the record. |
| 13:06:10 | 10 | The time is 13:06. |
| 13:06:12 | 11 | BY MR. CASTANARES: |
| 13:06:12 | 12 | Q.  Do you have Exhibit 1 in front of you, Mr. Felt? |
| 13:06:14 | 13 | A.  I do. |
| 13:06:15 | 14 | Q.  Okay.  And you had an opportunity to review that |
| 13:06:19 | 15 | document yesterday.  Have you reviewed it again since |
| 13:06:23 | 16 | then? |
| 13:06:23 | 17 | A.  I have not. |
| 13:06:23 | 18 | Q.  Okay.  I honestly don't recall whether you read |
| 13:06:27 | 19 | through the document entirely yesterday.  It's a |
| 13:06:30 | 20 | relatively long one, and I want to focus now on the |
| 13:06:34 | 21 | minutes, not the presentation and memoranda attached. |
| 13:06:41 | 22 | Did you read through the entire set of minutes |
| 13:06:44 | 23 | yesterday? |
| 13:06:44 | 24 | A.  I did not. |
| 13:06:45 | 25 | Q.  Okay.  I'm going to ask you some -- I'll want to |

392

```
1                    ERRATA SHEET

2    PAGE    LINE    CHANGE CORRECTION (REASON)

3    298     17      "16th department" to "Fixed Income Department" (incorrect)

4    323     10      "It may have been a" to "It may have been" (incorrect)

5    327     16      "Bane" to "Bain" (incorrect)

6    327     19      "leverage to buy out" to " leveraged buyout" (incorrect)

7    327     24      "Bane" to "Bain" (incorrect)

8    327     25      "Bane" to "Bain" (incorrect)

9    328     10      "Bane" to "Bain" (incorrect)

10   344     23      "The color" to "Color" (incorrect)

11   345     11      "our" to "any" (incorrect)

12   363     21      "Felt" to "felt" (lower case)

13   364     22      "Felt" to "felt" (lower case)

14   376     11      "Weaver" to "Weber" (incorrect)

15   376     16      "Weaver" to "Weber" (incorrect)

16   395     8       "in" to "and" (incorrect)

17   405     11      "Felt" to "felt" (lower case)

18   408     11      "believe" to "believed" (incorrect)

19   412     4       "understand" to "understand," (omitted coma)

20   423     13      "Felt" to "felt" (lower case)

21   427     25      "didn't to be" to "didn't want to be" (omitted word)

22   446     21      "spectrum" to "Spectrum" (capitalize)

23   453     18      "GAP" to "GAAP"

24   482     7       "talk" to "talked" (incorrect)

25   489     3       "economic basis" to "economics based" (incorrect)
```

1                    ERRATA SHEET

2        PAGE   LINE   CHANGE CORRECTION

3        490    11     "concepts" to "consents" (incorrect)

4        491    5      "Tyco" to "Taiko" (incorrect)

5        491    7      "Donaldson" to "Donaldson," (omitted coma)

6        491    8      "Lefton and Generat" to "Lufkin and Jenrette" (incorrect)

7        ____   ____   _____

8        ____   ____   _____

9        ____   ____   _____

10       ____   ____   _____

11       ____   ____   _____

12       ____   ____   _____

13       ____   ____   _____

14       ____   ____   _____

15       ____   ____   _____

16       ____   ____   _____

17       ____   ____   _____

18       ____   ____   _____

19       ____   ____   _____

20       ____   ____   _____

21       ____   ____   _____

22       ____   ____   _____

23       ____   ____   _____

24       ____   ____   _____

25       ____   ____   _____

1

2                                    * * *

3                        ACKNOWLEDGEMENT OF DEPONENT

4        I, Jared Felt, do hereby acknowledge

5        that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14      Nov 15, 2006                    _____

15      (DATE)                          (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

# Exhibit "C"

DOUGLAS R. MUIR

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -X
                               :  Chapter 11
In Re:                         :  Case No. 02-13396
OAKWOOD HOMES CORPORATION,     :  (PJW)
et al.,                           Jointly Administered
                               :
        Debtors.               :
_____    :
OHC LIQUIDATION TRUST,         :

        Plaintiff,             :

        v.                     :  Adv. Proc. No.
                               :  04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation,   :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited        :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,     :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware     :
corporation and a wholly
owned subsidiary of CREDIT     :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and           :
affiliates of each, and
DOES 1 through 100,            :

        Defendants.            :

- - - - - - - - - - - - - - -X

COPY

      Videotape Deposition of DOUGLAS R. MUIR, VOLUME I
               (Taken by Defendants)
          Winston-Salem, North Carolina
               September 26, 2006


Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public



**LEGALINK**

A MERRILL
COMMUNICATIONS
COMPANY

420 Lexington Ave    tel (212) 557-7400    www.merrillcorp.com
Suite 2108           tel (800) 325-3376
New York, NY 10170   fax (212) 692-9171

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

DOUGLAS R. MUIR

49

1    guy, the only company out issuing asset backed

2    securities with mobile home assets.  The number of

3    people doing it declined over time, but I could see

4    what -- it's publicly available, what Clayton was

5    paying CSFB or somebody else, what Greentree was

6    paying, what Greenpoint was paying, other

7    securitizers.  So you could benchmark.  That was the

8    principal tool.

9            And again, a billion dollar deal probably

10   has fees that in percentage terms are lower than a

11   $500 million deal, but on balance you can benchmark

12   and find out where the market is, not only what CSFB

13   was charging but what other banks were charging.

14       Q.    And you could find this information from

15   what appeared in the public documents, for instance,

16   on the -- on the face of the offering memorandum?

17       A.    Yes.  If it's a public document, they'd

18   file the prospectus with the SEC.  You could go look

19   it up.

20       Q.    Is that how you got your information to

21   benchmark?

22       A.    Generally, yes.  It's publicly available.

23            MR. CASTANARES:  Just like to caution the

24       witness to let the question finish before

25       beginning to answer, please.  Thank you.

DOUGLAS R. MUIR

50

1    Q.    (By Ms. Warren)   Were you generally

2  successful in -- in setting a fee that you thought

3  was appropriate for -- to compensate Credit Suisse

4  for its underwriting services?

5    A.    Yes.

6    Q.    How was Credit Suisse compensated for

7  providing the OMI Note Trust facility?

8    A.    There were several elements.  I'm doing

9  this from memory, but I think I have this right.

10  There was a rate of interest applied to amounts that

11  OMI Trust borrowed from CSFB.  So we paid them

12  interest on the outstandings as a form of

13  compensation.

14         There was a fee letter or more than one

15  fee letter that specified a monthly fee that was to

16  be paid to CSFB, and it was a fixed fee.  And then in

17  addition when the transaction was first put together

18  in February of 2001, part of the consideration was

19  CSFB received a warrant to acquire Oakwood shares.

20    Q.    I didn't hear the last part.  A warrant to

21  acquire --

22    A.    Shares, common shares of Oakwood.

23    Q.    Common shares.  Did you negotiate the

24  compensation arrangement with Credit Suisse for the

25  OMI Note Trust?

DOUGLAS R. MUIR

51

1      A.    I discussed it with Fiachra.  We discussed

2   it a lot internally.  We discussed it with the board.

3      Q.    Were you the point person for dealing with

4   Credit Suisse on this issue?

5      A.    I was involved.  I think -- I think Bob

6   Smith was also involved.

7      Q.    What were Oakwood management's criteria

8   for determining how much they thought it would be

9   appropriate to pay Credit Suisse for the OMI Note

10  Trust facility?

11     A.    Well, I can't speak for others.  It was an

12  interesting negotiation in that it was not a

13  transaction in which there were a half a dozen credit

14  providers lined up at the door, each of which was

15  offering to do this transaction.  At the time CSFB

16  was the only game in town.

17         It's difficult to negotiate with someone

18  when you are trying to get them to bid against

19  themselves.  So we did the best we could and

20  ultimately agreed on a package that we agreed was in

21  our best interests to do and that our board agreed

22  that it was in our best interests to do it.

23     Q.    How did Oakwood's management determine

24  that the package was acceptable?

25     A.    Again, I can't speak for anyone else, but

DOUGLAS R. MUIR

52

1    at the time --

2        Q.    Well, I'm asking for your understanding

3    based on your conversations with others.  I'm not

4    asking to go into their heads, but that's the basis

5    of my question.

6        A.    I don't have a recollection of

7    conversations with others.  At the time the Bank of

8    America facility was due to expire.  There was

9    immense pressure from Bank of America to take them

10    out, to retire that facility.  There were tremendous

11    fees being charged by Bank of America for failing to

12    take them out.

13            CSFB was the only game in town.  It was a

14    critical facility, had to get done.  And on -- in

15    that -- in the light of those circumstances I

16    concluded that it was a deal that should get done.

17        Q.    Were the fees for the Credit Suisse loan

18    purchase facility approximately what B of A had been

19    charging?

20        A.    No.

21        Q.    Were they higher?

22        A.    Yes.

23        Q.    Did you apply any pressure on Credit

24    Suisse to take over the loan purchase facility from

25    Bank of America when Bank of America informed you

DOUGLAS R. MUIR

53

1   that it wanted out?

2       A.   I wouldn't characterize it as pressure,

3   but we certainly -- having a successor facility to

4   the Bank of America warehousing facility was of

5   critical importance.  While I don't remember any

6   specific conversations with CSFB, I know there were a

7   number of them in which, you know, I was hopeful that

8   CSFB working through Fiachra would be able to serve

9   up a proposal to provide that liquidity that would

10  work for them and would work for us.

11      Q.   Well, how was the subject raised with

12  Credit Suisse?  Did you raise it?

13      A.   Again, I don't have any recollection of

14  any specific conversations with CSFB during the time

15  we were contemplating that agreement.  My

16  recollection at the time was I was clearly aware that

17  we were under pressure from B of A and I would have

18  discussed that with Fiachra.

19      Q.   Did you ever tell Mr. O'Driscoll in words

20  or substance that Credit Suisse had better help out

21  on this bank facility or Oakwood would terminate all

22  or part of the securitization relationship?

23      A.   I don't remember ever telling him that.  I

24  do remember but I can't tell you when there were --

25  there was a conversation with Fiachra somewhere along

1    DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN
2    I do hereby certify that I have read all
questions propounded to me and all answers given by
3    me on the 26th day of September, 2006, taken before
K. Denise Neal, and that:

4

    1)  There are no changes noted.
5    2)  The following changes are noted:
6    Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure, which reads in part:  Any changes in
7    form or substance which you desire to make shall be
entered upon the deposition...with a statement of the
8    reasons given...for making them.  Accordingly, to
assist you in effecting corrections, please use the
9    form below:
10

Page No. **44**    Line No. **5**    should read: "an advance
11                                                Company" should
12    Page No.    Line No.    should read: read "in
13                                          a finance
                                            Company"
Page No.    Line No.    should read:
14
15    Page No. **145**    Line No. **22**    should read: "liquidated"
16                                                should be
                                                "unliquidated"
Page No.    Line No.    should read:
17
18    Page No. **150**    Line No. **44**    should read: "in Durham"
19                                                should be
                                                "of Durham"
Page No.    Line No.    should read:
20
21    Page No. **159**    Line No. **3**    should read: "nonbonding"
22                                                should be
                                                "nonbinding"
Page No.    Line No.    should read:
23
24    Page No.    Line No.    should read:
25

DOUGLAS R. MUIR

203

1      DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN

2    Page No.        Line No.        should read:

3

     Page No.        Line No.        should read:

4

5    Page No.        Line No.        should read:

6

     Page No.        Line No.        should read:

7

8    Page No.        Line No.        should read:

9

     Page No.        Line No.        should read:

10

11   Page No.        Line No.        should read:

12

     Page No.        Line No.        should read:

13

14

     If supplemental or additional pages are necessary,

15   please furnish same in typewriting annexed to this

     deposition.

16

17

          DOUGLAS R. MUIR

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on February 19,

2008, I caused a copy of the **Declaration of Whitman L. Holt in Support of the Answering**

**Brief in Opposition to Defendants' Motion to Strike Plaintiff's Jury Trial Demand**, to be

served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: February 19, 2008                CAMPBELL & LEVINE, LLC


*/s/ Kathryn S. Keller*
Kathryn S. Keller (No. 4660)
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900