## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, <u>et al.</u>,<br><br>        Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC Liquidation Trust,<br><br>        Plaintiff,<br><br>    v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>        Defendants. | Adv. Proc. No. 04-57060 (PJW)<br><br>Civil Action No. 07-799 (JJF) |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 903-9000

Dated: February 29, 2008

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION.............................................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS .................................................................. 2

STATEMENT OF UNDISPUTED FACTS ...................................................................... 2

BACKGROUND ............................................................................................................... 3

        A.     Oakwood's Business............................................................................... 3

        B.     Oakwood's Securitization Model ........................................................... 5

        C.     The Downturn In Oakwood's Business .................................................. 6

        D.     Oakwood's Efforts To Manage Its Business Difficulties ....................... 8

        E.     Oakwood's Post-Petition Filings and Court Approval to
                Engage in Securitizations...................................................................... 10

ARGUMENT.................................................................................................................... 12

I.     SUMMARY OF ARGUMENT .............................................................................. 12

II.    THE SUMMARY JUDGMENT STANDARD....................................................... 12

III.   *IN PARI DELICTO*:  THE BOARD AND SENIOR MANAGEMENT
      WERE RUNNING THE COMPANY ................................................................... 13

IV.   IF CREDIT SUISSE OWED A FIDUCIARY DUTY, IT WAS TO THE
      COMPANY, NOT TO SOME PARTICULAR GROUP OF CREDITORS ........... 20

V.    CREDIT SUISSE WAS NOT OAKWOOD'S FINANCIAL ADVISOR UNTIL
      AUGUST 19, 2002 .............................................................................................. 23

VI.   THERE IS NO EVIDENCE THAT CREDIT SUISSE WAS NEGLIGENT IN
      PROVIDING IT SECURITIZATION SERVICES ............................................... 24

VII.  THE RECORD DOES NOT SHOW THAT THE DELAY IN FILING
      OAKWOOD'S BANKRUPTCY PROXIMATELY CAUSED ANY
      DAMAGE TO OAKWOOD .................................................................................. 24

CONCLUSION................................................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*390 West End Ave. Assos. v. Youngstein,*
634 N.Y.S.2d 112 (App. Div. 1995) .................................................................. 15

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ......................................................................................... 12

*Baena v. KPMG LLP,*
453 F.3d 1 (1st Cir. 2006) ......................................................................... 14, 19

*Barry v. Gorecki,*
833 N.Y.S.2d 329 (App. Div. 2007) ................................................................ 28

*Bean v. Home Detective Co.,*
173 S.E. 5 (N.C. 1934) ..................................................................................... 15

*Buechner v. Avery,*
836 N.Y.S.2d 1 (App. Div. 2007) .................................................................... 15

*Byers v. Byers,*
25 S.E.2d 466 (N.C. 1943) ............................................................................... 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ......................................................................................... 13

*Claybrook v. Broad & Cassel, P.A. (In re Scott Acquisition Corp.),*
364 B.R. 562 (Bankr. D. Del. 2007) ................................................................ 19

*Creech v. Melnik,*
495 S.E.2d 907 (N.C. 1998) ............................................................................. 23

*Donovan v. Rothman,*
756 N.Y.S.2d 514 (App. Div. 2003) ................................................................ 15

*Drabkin v. Alexander Grant & Co.,*
905 F.2d 453 (D.C. Cir. 1990) ........................................................................ 25

*In re Dublin Sec., Inc.,*
133 F.3d 377 (6th Cir. 1997) ........................................................................... 14

*Farndale Co. v. Gibellini,*
628 S.E.2d 15 (N.C. Ct. App. 2006) ............................................................... 25

*Forum Ins. Co. v. Zeitman,*
No. 91 Civ. 7980, 1995 WL 546949 (S.D.N.Y. Sept. 13, 1995) ........................................... 25

*Francis H. Leggett & Co. v. Feldman,*
268 N.Y.S. 340 (Civ. Ct. 1934) ...................................................................................... 23

*Grassmueck v. Am. Shorthorn Ass'n,*
402 F.3d 833 (8th Cir. 2005) .................................................................................. 14, 15

*Guthrie v. Conroy,*
567 S.E.2d 403 (N.C. Ct. App. 2002) ................................................................................ 25

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
885 F.2d 1149 (3d Cir. 1989) ......................................................................................... 13

*In re Hedged-Invs. Assocs., Inc.,*
84 F.3d 1281 (10th Cir. 1996) ........................................................................................ 15

*Hirsch v. Arthur Andersen & Co.,*
72 F.3d 1085 (2d Cir. 1995) .......................................................................................... 19

*John S. Clark Co. v. Travelers Indem. Co. of Ill.,*
359 F. Supp. 2d 429 (M.D.N.C 2004) ................................................................................ 25

*Klinger v. Yamaha Motor Corp., U.S.A.,*
738 F. Supp. 898 (E.D. Pa. 1990) .............................................................................. 27, 28

*LaSalle Nat'l Bank v. Perelman,*
82 F. Supp. 2d 279 (D.Del 2000) ..................................................................................... 21

*Laub v. Faessel,*
745 N.Y.S.2d 534 (App. Div. 2002) .................................................................................. 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ....................................................................................................... 13

*Mediators, Inc. v. Manney,*
105 F.3d 822 (2d Cir. 1997) .......................................................................................... 19

*Money v. Manville Corp. Asbestos Disease Comp. Fund,*
596 A.2d 1372 (Del. Sup. Ct. 1991) ................................................................................. 25

*Odyssey Partners v. Fleming Cos.,*
735 A.2d 386 (Del Ch. 1999) .......................................................................................... 21

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*,
267 F.3d 340 (3d Cir. 2001)..................................................................................14, 18

*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found.*
*v. PricewaterhouseCoopers LLP*,
No. 2:00CV684, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007) ...............................14, 19, 20

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
80 F. Supp. 2d 129 (S.D.N.Y. 1998), *aff'd*, 322 F.3d 147 (2d Cir. 2003) ......................29

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
437 F.3d 1145 (11th Cir.), *cert. denied, Laddin v. Reliance Trust Co.*,
127 S. Ct. 45 (2006)........................................................................................................15

*Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum*
*Capital Partners, LLC (In re Radnor Holdings Corp.)*,
353 B.R. 820 (Bankr. D. Del. 2006).............................................................................22

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.*
*(In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)..........................................19

*In re Parmalat Sec. Litig.*,
383 F. Supp. 2d 587 (S.D.N.Y. 2005)...............................................................................18

*Paul v. Monts*,
906 F.2d 1468 (10th Cir. 1990) ......................................................................................20

*Phifer v. Du Pont Country Club, Inc.*,
138 F. App'x 446 (3d Cir. 2005) ......................................................................................28

*RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC.*,
156 F. App'x 349 (2d Cir. 2005) ......................................................................................25

*Robert S. Nusinov, Inc. v. Principal Mut. Life Ins. Co.*,
80 F. Supp. 2d 101 (W.D.N.Y. 2000), *aff'd*, 229 F.3d 1136 (2d Cir. 2000) ...................23

*Robertson v. Allied Signal, Inc.*,
914 F.2d 360 (3d Cir. 1990).............................................................................................25

*Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.*
*(In re Winstar Commc'ns, Inc.)*, 348 B.R. 234 (Bankr. D.Del. 2005), *aff'd*,
No. 01 01063, 2007 WL 1232185 (D. Del. Apr. 26, 2007)..........................................15

*Skinner v. E.F. Hutton & Co.*,
333 S.E.2d 236 (N.C. 1985)..........................................................................................15

*In re South Beach Sec., Inc.,*
376 B.R. 881 (Bankr. N.D.Ill. 2007) ............................................................... 13

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
906 A.2d 168 (Del. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. Ch. 2007) ................... 1, 21, 22

*Wagner v. Olmedo,*
365 A.2d 643 (Del. Sup. Ct. 1976) ................................................................. 25

*Whiteland Woods, L.P. v. Twp. of W. Whiteland,*
193 F.3d 177 (3d Cir.1999) ........................................................................... 13

*Williams v. Borough of W. Chester,*
891 F.2d 458 (3d Cir.1989) ........................................................................... 13

## STATUTES & RULES

11 U.S.C. § 365 (2007) ................................................................................ 12

Fed. R. Civ. P. 56 ................................................................................... 12, 13

## OTHER AUTHORITIES

*Black's Law Dictionary* 794 (7th ed.1999) ...................................................... 14

Stephen L. Schwarcz, *Commercial Trusts as Business Organizations: An Invitation to
Comparatists,* 13 Duke J. Comp. & Int'l L. 321 (2003) ......................................... 21

## INTRODUCTION

Credit Suisse, one of Oakwood's banks, had a duty to force Oakwood into bankruptcy at a time when the Company was intent upon trying to survive. That is the proposition on which Plaintiff's claims rest. But the proposition is simply wrong, and summary judgment should be granted.

In 2007, the Delaware Supreme Court, the country's leading authority on the governance and management of corporations, affirmed that a troubled company's board, trying in good faith to steer the company through difficult times, is not the guarantor of the success of its efforts. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. Ch. 2007). Plaintiff, however, proposes that the troubled company's *bank* does become the guarantor of that success if it does not affirmatively act to prevent the board from executing its plans. Neither the law nor common sense supports such a result.

## NATURE AND STAGE OF PROCEEDINGS

From the very start, this case has been about an attempt by Plaintiff to find some theory, any theory, on which the former bondholders of Oakwood could reach into the pockets of Credit Suisse. Theories have come and gone, causes of action have appeared and disappeared, but one thing has remained constant – the bondholders hope to increase their Oakwood recovery at Credit Suisse's expense.

The case began when Credit Suisse filed proofs of claim in the Oakwood bankruptcy cases, for fees it earned as financial advisor to Oakwood as it prepared for and entered bankruptcy in 2002. Those claims were based on services provided pursuant to an engagement letter signed on August 19, 2002 (the "Engagement Letter").

Plaintiff objected to those claims, and filed eleven counterclaims. The bulk of those counterclaims addressed some $600 million of payments made under securitization transactions during the year before the bankruptcy filings. Those claims were abandoned when Plaintiff finally acknowledged what has been obvious from the beginning – the payments at issue were not made by the debtors.

What remains, according to Plaintiff, are three causes of action relating to Credit Suisse's performance under the Engagement Letter, and three causes of action relating to events occurring prior to that. This motion is addressed to the claims relating to the pre-contract services, which give rise to Plaintiff's purported claim to a jury trial right. The remaining claims – those relating to Credit Suisse's claim and its services under the Engagement letter – will be tried to the bench.

## STATEMENT OF UNDISPUTED FACTS

For the purpose of this motion, the following facts may be taken as undisputed and are sufficient to support summary judgment:

1. All financing services provided by Credit Suisse to Oakwood were approved by Oakwood's Management and Board of Directors.

2. Oakwood's Management and Board of Directors implemented a strategy for dealing with the downturn in the Company's business which began in 1999, and determined that a bankruptcy filing was necessary and appropriate only in mid-2002 when the Company faced an unanticipated liquidity shortage.

3. The continuation of the securitization program (including the Warehouse Facility) was necessary to the implementation of the turnaround strategy set by the Management and Board.

2

4. The work Credit Suisse did on the securitization transactions (including the Warehouse Facility) was done properly and well.

5. Prior to August, 2002, Credit Suisse provided financial services to Oakwood only in connection with securitizations of assets arising from Oakwood's consumer finance business.

6. Oakwood had continuing relationships with a number of financial institutions and financial advisors in addition to Credit Suisse.

7. At the conclusion of Oakwood's bankruptcy proceeding, the Company was sold for an amount greater than the $350 million which Plaintiff's expert says was the value of the Company in September, 2001.

## BACKGROUND

### A.    Oakwood's Business

Oakwood operated three separate businesses – manufacturing, retailing and financing the purchase of manufactured housing. (Standish Dep. 71:6 – 72:7 (Exhibit ("Ex.") BB).)[1] During most of the 1990's the manufactured housing business was strong, and Oakwood grew and prospered. (*See, e.g.* October 15, 2002 Presentation to Lotus, p. 4 (Ex. D).)

Oakwood was a substantial business – its 1999 revenues were $1.6 billion. (Oakwood 10-K, filed December 29, 2000.) It was a sophisticated company with complex financing needs which it met in a variety of ways. It had significant banking relationships with, among others, Merrill Lynch, Soles Brower Smith and Co., Bank of America, First Union (later Wachovia), First Bank of Chicago, Foothill Capital Corporation and Credit Suisse. (Muir Dep. 34:14 – 39:5 (Ex. Y); Standish Dep. 110:8 – 112:7 (Ex. BB).) Its Board of Directors was active

---

[1]     All exhibits referenced herein are attached to the Declaration of Kate Z. Machan, dated February 29, 2008, and filed contemporaneously herewith.

and engaged and comprised of highly qualified, experienced business and legal professionals.[2]
From 1999 until the bankruptcy filing the Board met formally about once every six weeks.
(Oakwood Bd. of Dirs. Mtng. Mins., dated 1999-2002 (Exs. M – W).)

Oakwood's capital structure included common stock, traded on the New York
Stock Exchange, after an IPO in 1971. In 1999, Oakwood issued $125 million in 7.875% Senior
Notes due March, 2004 and $175 million in 8.125% Senior Notes due March 2009, both
underwritten by Bank One, N.A. f/k/a First Bank of Chicago. (Declaration of Doug Muir in
Support of First Day Filings, p. 14 (Ex. G).) It had a $65 million revolving credit facility with
Foothill Capital Corporation. (Disclosure Statement, dated September 9, 2003, p. 22 (Ex. H).)
That facility was put in place in January 2002 and replaced an earlier revolving credit
arrangement among a group of banks led by First Union (Wachovia). Douglas Muir, Oakwood's
Executive Vice President, Secretary and Treasurer, had primary responsibility for managing
Oakwood's financial and banking relationships. He was experienced and knowledgeable about
the markets relevant to Oakwood's finances. (Muir Dep. 7:23-8:20; 11:19-12:8; 17:3-18:11 (Ex.
Y).)

---

[2] From the mid-1990s until the time of Oakwood's bankruptcy filing, the Independent
Directors included Kermit G. Phillips, II, a board member from 1979-2002, President of
Philips Management Group, Inc. (a real estate development and management company);
Clarence W. Walker, 1971-2002, former corporate and business law partner at Kennedy
Covington Lobdell & Hickman, L.L.P.; H. Michael Weaver, 1991 – 2002, Chairman of
the Board of Weaver Investment Group (a real estate development company); Francis T.
Vincent, Jr., 1993-2002, Chairman of Major League Baseball, 1989 – 1992; Sabin C.
Streeter, 1993 – 2002, Executive-in-Residence at Columbia University Graduate School
of Business, former Managing Director at Donaldson Lufkin & Jenrette Securities
Corporation; Dennis I. Meyer, 1983 – 2002, partner at Baker & McKenzie, Attorneys
at Law; Roger W. Schipke, 1996 – 2002, President of Colts Ltd.(a thoroughbred horse
breeder); and, Lanty L. Smith, 1997 – 2000, Chairman of Soles Brower Smith and Co.
(investment banking firm).

**B.    Oakwood's Securitization Model**

In 1994, Merrill Lynch underwrote the first securitization for Oakwood's financing business. Shortly thereafter, Merrill Lynch, at the request of another client who was a competitor of Oakwood, ceased underwriting securitizations for Oakwood. (Muir Dep. 14:4 – 14:22 (Ex. Y); Standish Dep. 87:4 – 88:12 (Ex. BB).) Mr. Muir then sought out Credit Suisse, which had a reputation in the securitization field. Starting in 1994, Credit Suisse served as the lead underwriter of Oakwood's securitizations, and assisted Oakwood with related transactions. Beginning in 1996, Fiachra O'Driscoll, a Managing Director in Credit Suisse's securitization group in New York, became the lead banker for Credit Suisse's securitization-related work with Oakwood. (O'Driscoll Dep. 4:22 – 5:8 (Ex. Z).) He dealt mostly with Mr. Muir. (O'Driscoll Dep. 23:4 – 23:7 (Ex. Z).)

Securitization was a financing technique used to produce current liquidity from the long-term mortgage notes signed by purchasers of manufactured houses at the time of purchase. The underwriter bundled together a large number of those consumer notes (known as Retail Installment Contracts, or "RICs"), and sold them to investors for cash. The investors looked to the mortgage payments by the retail consumers for repayment. Oakwood only produced enough RICs to do a securitization about four times a year. Between securitizations, liquidity was provided to Oakwood through interim facilities. Until 2001 that interim facility was a loan from Bank of America, secured by RICs awaiting securitization. Beginning in February, 2001 the interim financing was arranged by Credit Suisse through an arrangement known as the "Warehouse Facility" (which held RICs in a "warehouse" until there were enough to do another securitization). A full description of the securitization and warehouse structure, quoted from a declaration of Douglas Muir, is attached as Exhibit G.

As a matter of course, after the securitizations, Oakwood retained the right to "service" the RICs (essentially, to see to collection from the consumers). In certain circumstances Oakwood was required to make cash advances in connection with its servicing obligations (costs of foreclosure, for example), and had the right to be repaid those advances from the securitization trust that held the underlying notes. As there were often delays in recovering those advances, Oakwood eventually held a large number of these servicing advance receivables. (Muir First Day Decl., pp. 37 – 40 (Ex. Y).) Credit Suisse helped Oakwood sell these receivables to Prudential Insurance, beginning in 2001, as an additional source of liquidity. (Muir Dep. 39:6 – 42:11 (Ex. Y).)

The most subordinated tranches of the securitizations were often difficult to sell, and, by 2001, Oakwood owned a substantial inventory of these so-called "B Pieces." Beginning in 2001, Credit Suisse assisted Oakwood in selling the B-Pieces to Berkshire Hathaway or its subsidiaries. (Millard Dep. 15:13 – 15:19 (Ex. X); O'Driscoll Dep. 61:2 – 61:18 (Ex. Z); Standish Dep. 112:8 – 114:19, 115:20 – 116:18 (Ex. BB).) Those sales included, in certain cases, a guarantee by Oakwood of payment of principal and interest on the B-Piece securities.

## C.    The Downturn In Oakwood's Business

Beginning in 1999, Oakwood's business came under a variety of pressures, and Oakwood began to struggle. In its Court-approved Disclosure Statement, Oakwood described its difficulties this way:

> The manufactured housing industry as a whole expanded aggressively into an economic downturn that has been particularly severe for its traditional customer of modest means. At the same time, mortgage rates for site-built homes were, and still are, at a thirty-year low, which offset many of the cost advantages of manufactured homes because interest rates for manufactured housing loans exceed rates for conventional housing loans by an amount substantially greater than has historically been the case. Additionally, aggressive lending led to a high level of repossessed homes. The remarketing of these homes in competition with new homes depresses new home sales volume.

In addition, many traditional industry lenders, including both Floor Plan lenders and retail lenders which provide financing to homebuyers, have left the industry over the last few years or have significantly curtailed operations. This includes leading industry lenders such as Conseco Finance Corporation, which filed for relief under Chapter 11 on December 18, 2002, and Deutsche Financial Services Corporation, which exited the industry. This reduction in available financing has led to a contraction of the dealer network and a sharp reduction in manufactured home sales.

Through 1999, the Debtors expanded and leveraged themselves aggressively to support their rapid growth, which resulted in a heavier debt load than performance in declining markets after 1999 could support. Aggressive underwriting coupled with the current economic slowdown led to an unsustainable level of loan defaults on securitized RICs. The cost of servicing and the liquidity requirements for performing servicing duties increased with the defaults. At the same time, servicing receipts were decreasing due to credit losses because the servicing fees were subordinated to principal and interest on the B-Piece REMIC Certificates. Despite taking measures to counter negative pressures, the Debtors continued to experience financial difficulties.

(Disclosure Statement, dated September 9, 2003, p.26 (Ex. H).) As business worsened, Oakwood faced a variety of financial pressures. Oakwood's longtime primary bank group, led by Wachovia, indicated that it wanted to end the relationship. (Muir Dep. 34:14 – 36:20 (Ex. Y).) After some effort (in which Credit Suisse played no role), Oakwood was able to arrange a replacement revolving $65 million credit facility with Foothill Capital Corporation, which was put into place on January 22, 2002, bringing Oakwood's long relationship with the banks in the Wachovia group to an end. (Muir Dep. 38:23 – 39:5 (Ex. Y).)

Separately, Bank of America took the position that it wanted to end the arrangement by which it provided interim liquidity by lending against RICs before they were securitized. (Standish Dep.128:1 – 129:24 (Ex. BB); Muir Dep. 52:23 – 54:22 (Ex. Y).) If the Bank of America liquidity arrangement could not be replaced, Oakwood would have gone out of business. (Shapiro Report, p. 17 (Ex. AA).) At Oakwood's request, and with the approval of its board, Credit Suisse was able to replace the old Bank of America structure with the new

7

Warehouse Facility, which went in to effect in February 2001. (Muir Dep. 34:10 – 34:13 (Ex. Y); Note Purchase Agreement (Ex. I); Sale and Servicing Agreement (Ex. J).)

**D.    Oakwood's Efforts To Manage Its Business Difficulties**

Meanwhile, Oakwood's Management and Board were focused on surviving the downturn in the business. Three CEOs were replaced. William G. Edwards replaced Nicholas St. George in October 1999 (Oakwood Bd. of Dirs. Mtng. Mins., dated August 10, 1999 (Ex. M).); Duane D. Daggett replaced William G. Edwards in September 2000 (Oakwood Bd. of Dirs. Mtng. Mins. dated September 20, 2000 (Ex. N).); Myles Standish replaced Duane Daggett in July of 2001 (Oakwood Bd. of Dirs. Mtng. Mins., dated July 24, 2001 (Ex. S).). Factories were closed. Retail outlets were closed. (Muir First Day Decl., p. 8 (Ex. G).) Underwriting standards for consumer loans were tightened. (Standish Dep. 96:21 – 97:15 (Ex. BB).) The Company gave up its business of writing insurance for purchasers of its homes. (Standish Dep. 71:6 – 71:19 (Ex. BB).) The Board hired Merrill Lynch to consider selling the Company, but Merrill advised the Board to wait until business improved. (Oakwood Bd. of Dirs. Mtng. Mins., dated August 10, 1999 (Part II) (Ex. M).) Some consideration was given to a management buyout, because management believed the Company was under valued. (Muir Dep. 130:20 – 133:23 (Ex. Y).)

The increasing number of homes being repossessed as a result of purchasers defaulting on their loans was a significant obstacle for Oakwood. This was a double hit because Oakwood incurred expenses in repossessing and reselling the homes *and* the underlying loan had to be purchased out of its securitization trust. In an effort to lessen the burden of these repossessions, in 2000 – 2001, Oakwood dramatically increased its use of its Loan Assumption Program, in which a defaulting borrower could arrange to have someone take over ownership of the home and assume the loan. (Standish Dep. 28:15 – 28:20 (Ex. BB); Muir Dep. 59:1 – 62:6, 62:7 – 64:10, 78:20 – 79:23 (Ex. Y).) Unfortunately, Oakwood did not have in place the systems

8

necessary to manage this program effectively or to understand fully its effect on costs. By the time it understood what was happening, in June of 2002, the Loan Assumption Program had cost the Company some $50 million in critical liquidity. (Standish Dep. 28:6 – 37:2 (Ex. BB); Muir Dep. 58:22 – 64:10 (Ex. Y); Oakwood 8-K, filed August 9, 2002 (Ex. F).)

Oakwood's difficulties were no secret and were publicly disclosed in its SEC filings. Equity analysts covering the Company (including one from Credit Suisse) reported in detail about the Company's problems, and openly speculated about the likelihood of a bankruptcy filing as early as June 2001. (CSFB Manufactured Housing Outlook, dated June 11, 2001, p. 18 (Ex. K).) Observers were of many views about whether the industry downturn was temporary or permanent, which companies would avoid bankruptcy, and what Oakwood's future would look like. Until the collapse of the Loan Assumption Program in June of 2002, Oakwood's Management and Board believed there would be sufficient liquidity to survive at least through the next major liquidity challenge – the $125 million in bonds due in March of 2004. Management and the Board firmly believed the steps they were taking to restructure would reduce expenses enough to allow the Company to emerge from the downturn. (Walker Dep. 29:3 – 32:20; 63:25 – 65:24 (Ex. DD).)

One thing Oakwood's Board did not do was seek advice from Credit Suisse about its business difficulties. O'Driscoll and his team were intensely focused on the need to provide liquidity from the Company's financing activities through the securitizations and related products described above. Not a scrap of evidence in this record indicates that Oakwood sought advice from Credit Suisse about its problems more generally. No one at Oakwood asked Credit Suisse how many factories or retail outlets Credit Suisse thought Oakwood should close, what its

9

production targets should be, how it might restructure its debt, or anything else outside of the securitizations.[3]

O'Driscoll recognized, as did the Company, that his expertise was in securitizations, not in providing more general financial advice. Rather than offer Oakwood unsolicited advice which he was not qualified to give, he introduced the Company to bankers from the Restructuring Group at Credit Suisse who did have that expertise. Starting in June of 2001, representatives of the Restructuring Group repeatedly made pitches to Oakwood to be retained as the Company's financial advisors. Repeatedly Oakwood declined. Plaintiff points to the written materials delivered to Oakwood by the Restructuring Group as the "advice" that Credit Suisse was giving the Company. (Shapiro Report p. 19 (Ex. L).) But these were, unmistakably, pitches for new business, as Plaintiff's own expert Dr. Shapiro recognized. (Shapiro Dep. 117:15 – 120:15 (Ex. AA).) Not until August 19, 2002, did these pitches bear fruit. That is when Oakwood first engaged Credit Suisse to be its financial advisor. (Countercl. ¶ 33 (Ex. A).) On November 15, 2002, Oakwood filed for bankruptcy. (*Id.* ¶ 6 (Ex. A).)

**E.      Oakwood's Post-Petition Filings and Court Approval to Engage in Securitizations**

Shortly after filing its Bankruptcy Petition, Oakwood filed the Assumption and Ordinary Course Motions, two similar Motions that together represented to the Bankruptcy Court that Oakwood should be granted authority to assume the Warehouse Facility and continue engaging in securitizations, i.e., the very conduct it now labels improper and the basis for Credit Suisse's purported liability.

---

[3]      In May of 2001, O'Driscoll passed on to Muir and Standish a suggestion from colleagues in Credit Suisse's real estate group that Oakwood consider a sale-and-leaseback transaction for its headquarters building. Oakwood was not interested.

Oakwood sought authority from the Bankruptcy Court to continue to securitize RICs and to obtain liquidity through the Warehouse Facility as transactions falling within the ordinary course of Oakwood's business, and through the assumption of the Warehouse Facility agreements. (Bkrtcy D.I. Nos. 20, 21; Machan Decl. Exs. B, C.) By so doing, Oakwood represented that these transactions were not only ordinary business activities of Oakwood, but that the continued use of this form of financing was in the best interests of Oakwood and its bankruptcy estate. On the basis of Oakwood's representations, the Bankruptcy Court entered the Assumption and Ordinary Course Orders, which specifically authorized Oakwood to assume the Warehouse Facility and to continue to engage in securitization transactions. (Bkrtcy D.I. Nos. 86, 228; Machan Decl. Exs. B, C.)

As to the Warehouse Facility and its vital role in supporting Oakwood's securitization program – an arrangement Plaintiff now claims was inherently harmful to the Company – Oakwood represented to the Bankruptcy Court in its Ordinary Course Motion that a closure of its securitization program would fatally compromise its reorganization:

> [T]he warehousing and sale of the RICs pursuant to the Pooling and Servicing Agreements and the Warehouse Facility Agreements is a vital aspect of the Debtors' business, allowing the Debtors to convert future revenue streams into immediate cash to support their cash-intensive manufacturing and retail operations. Without the ability to warehouse and securitize RICs in the ordinary course and consistent with their past practices . . . the Debtors will not have access to sufficient liquidity to continue those operations at appropriate levels. Such a cash shortfall will cause immediate and irreparable harm to the Debtors' estates and their ability to reorganize.

(Bkrtcy D.I. No. 86; Machan Decl. Ex. C)

In the Assumption Motion, Oakwood sought to assume the Warehouse Facility pursuant to Section 365 of the Bankruptcy Code, which authorizes assumption or rejection of any executory contracts subject to court approval. 11 U.S.C. § 365(a) (2007). Oakwood asserted that the assumption of the Warehouse Facility represented "a valid exercise of the Debtors'

11

business judgment and is in the best interests of the Debtors' estates and creditors." (Bkrtcy D.I.
No. 20; Machan Decl. Ex. B.)   In addition, to receive authority to assume the Warehouse
Facility, Oakwood was required to cure any and all pre-petition defaults and provide assurance
of future performance. 11 U.S.C. § 365(b)(1) (2007).

## ARGUMENT

### I.    SUMMARY OF ARGUMENT

1. Because Credit Suisse provided its securitization services at the direction of
Oakwood's Board and Management, the Litigation Trust, as Oakwood's successor, is
barred by the doctrine of *in pari delicto* from asserting any claim for damages arising
out of those services.

2. If Credit Suisse had a fiduciary duty, it ran to the Company, acting through its
Management and Board, and not to any particular class of stakeholders.

3. Credit Suisse did not assume an implied contractual duty to provide general financial
advice to Oakwood by virtue of its role in connection with securitizations, where the
Company had relationships with many financial institutions and did not seek such
general advice from Credit Suisse until August, 2002.

4. Plaintiff cannot meet its burden of proving that a delay in Oakwood's bankruptcy
proximately caused any damage to the Company, because of the speculative nature of
the alleged causal link.

### II.   THE SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be
granted when there are no genuine issues of material fact in dispute and the movant is entitled to
judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When
resolving a motion for summary judgment, the court may not weigh the evidence or engage in

credibility determinations, and must limit its inquiry to whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*; *see also Whiteland Woods, L.P. v Twp. of W. Whiteland*, 193 F.3d 177, 180 (3d Cir.1999).

To defeat the entry of summary judgment, Plaintiff must do more than raise a "metaphysical doubt" as to the material facts, *see Matsushita Electric Industrial Co. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and must instead put before the Court "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Nor can Plaintiff rely upon conjecture or conclusory factual assertions in avoiding summary judgment. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## III.    *IN PARI DELICTO*:    THE BOARD AND SENIOR MANAGEMENT WERE RUNNING THE COMPANY

Plaintiff is a trust, created by confirmation of Oakwood's Plan of Reorganization. It stands in the shoes of the Debtors (Oakwood Homes Corporation and some of its subsidiaries). It has, by assignment, only claims which the Debtors had prior to the assignment, and it is subject to any and all defenses to which the Debtors would have been subject had they sued in their own names. It does not have, nor may it bring, claims that belong to creditors or other parties. *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989) ("[I]n actions brought by the trustee as successor to the debtor's interest under section 541, the 'trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor.'") The trust is, for purposes of this litigation, Oakwood.

This is important, because what really lies behind this case is a sectarian view by one set of the Company's creditors that they would have been advantaged (to the detriment of

13

others) had Oakwood filed for bankruptcy a year earlier than it did. But those creditors have not sued Credit Suisse, and the Litigation Trust may not prosecute their claims.

Plaintiff says that Credit Suisse should have forced the Company into bankruptcy in about September of 2001 by refusing to continue to provide its securitization services to the Company after it was "insolvent." But the continuation of the securitization program (including the Warehouse Facility) and the attempt to keep Oakwood out of bankruptcy were decisions made by the Company, acting properly through its Board and Management. Credit Suisse had no information that the Company did not have. (Shapiro Dep. 85:23-86:4; 107:16 – 107:23 (Ex. AA).) The decisions about which the Company now complains were its own. That takes us directly to the doctrine of *in pari delicto*.

*In pari delicto* is an equitable doctrine providing "that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.* 267 F.3d 340, 354 (3d Cir. 2001) ("*Lafferty*"). The doctrine is straightforward in its application: if a plaintiff has "participated in wrongdoing," the plaintiff may not "recover damages resulting from the wrongdoing." Black's Law Dictionary 794 (7th ed.1999). *Lafferty*, 267 F.3d at 361 (citations omitted). The doctrine applies to both contract and tort claims. *See Lafferty*, 267 F.3d at 355 (citations omitted); *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers LLP*, No. 2:00CV684, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007) ("*AHERF*"). The doctrine applies to "a bankruptcy trustee, standing in the shoes of [the wrongdoing] debtor," thus bringing Plaintiff squarely within its application. *Lafferty*, 267 F.3d at 358; *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir 2006); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 102 (2d Cir. 2003); *In re Dublin Sec., Inc.*, 133 F.3d 377, 380 (6th Cir. 1997); *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833,

837 (8th Cir. 2005); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1284-85 (10th Cir. 1996);

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th

Cir.), *cert. denied, Laddin v. Reliance Trust Co.*, 127 S. Ct. 45 (2006).[4]

      At the motion to dismiss stage in this case, Judge Walsh stated that the *in pari*

*delicto* doctrine would not apply if, as alleged in the Counterclaims, Defendants were "insiders"

of Oakwood. While Judge Walsh was obligated to credit the conclusory allegations of "insider"

status in the Counterclaims, the discovery record before this Court establishes that Credit Suisse

was not an "insider" of Oakwood.[5]

---

[4]    Although *in pari delicto* is a creature of state law, no choice of law analysis is required in this case, as the two possible choices – New York (the location of Credit Suisse) or North Carolina (the location of Oakwood) – have long recognized the doctrine. *See, e.g., Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236, 239 (N.C. 1985) (recognizing viability of *in pari delicto* doctrine under North Carolina state law); *Byers v. Byers*, 25 S.E.2d 466, 469-70 (N.C. 1943); *Bean v. Home Detective Co.*, 173 S.E. 5, 6 (N.C. 1934); *see also Buechner v. Avery*, 836 N.Y.S.2d 1, 2-3 (App. Div. 2007) (holding that "trustee was precluded from bringing [] tort claims by the doctrine of *in pari delicto* based upon the cooperation of the management of the bankrupt corporation with defendant third parties in committing the alleged wrongs."); *390 West End Ave. Assocs. v. Youngstein*, 634 N.Y.S.2d 112, 114 (App. Div. 1995) (holding that "plaintiff's status as a wrongdoer, *in pari delicto*, justifies the equitable denial of any affirmative relief to it in this action."); *Donovan v. Rothman*, 756 N.Y.S.2d 514 (App. Div. 2003).

[5]    Under the Bankruptcy Code, in order to be deemed an "insider," a corporation "must exercise sufficient authority" over the debtor so as to "dictate corporate policy and the disposition of corporate assets." *In re South Beach Sec., Inc.*, 376 B.R. 881, 889 (Bankr. N.D.Ill. 2007). Courts have looked, in the context of insider status with respect to preference claims, to "whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses". *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 279 (Bankr. D.Del. 2005), *aff'd*, No. 0101063, 2007 WL 1232185 (D. Del. Apr. 26, 2007). The record in this case makes clear that Credit Suisse did not qualify as an "insider." (See Walker Dep. 36:8 – 38:8 (testifying that Credit Suisse did not dictate corporate policy to Oakwood's Board, had no representatives on the Board, and never had day-to-day control over Oakwood's decisions); Muir Dep. 194:8-196:14 (Ex. Y) (testifying that Credit Suisse never told the management of Oakwood how to operate the Company and never attempted to dictate changes in key officers or directors); Standish Dep. 17:9 – 22:2 (Ex. BB) (testifying that

Plaintiff's theory of "wrongdoing" is that Credit Suisse continued to facilitate securitization transactions, including through advances under the Warehouse Facility, when it knew Oakwood was in financial distress or insolvent, thus allowing the Company to continue doing business without reorganizing:

> 49.     . . . . Despite its knowledge of the Debtors failing financial health, CSFB continued to underwrite ABS offerings and wrongly facilitated those offerings through the extension of credit from the CSFB Warehouse Facility. These actions were a breach of fiduciary duty and took place at a time when the Debtors' financial health left Debtors in the zone of insolvency, then financially distressed and, then, actually deepened the Debtors' insolvency.

(Countercl. ¶ 49 (Ex. A).) Plaintiff further alleges that "CSFB should have been preparing the Debtors for bankruptcy by attempting to conserve all assets." (*Id.* ¶ 99 (Ex. A).) These are the allegations of harm in each of the claims for breach of fiduciary duty, negligence, breach of express and implied contract and unjust enrichment. (*Id.* ¶¶ 36-37, 49-51, 52-54, 55-57, 92-96 (Ex. A).)

Plaintiff's liability expert, Dr. Alan Shapiro, opines that Credit Suisse "encouraged Oakwood to engage in financing activities based on uncertain assumptions that industry-wide and Company -specific conditions would improve [which] advice only accelerated the Company's insolvent position." Consistent with the "deepening insolvency" theory of the Counterclaims, Dr. Shapiro asserts that Credit Suisse's continued provision of securitization-related services was the prime factor in causing harm to Oakwood:

> For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide temporary liquidity used to fund the loans. . . . Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities

---

Credit Suisse did not dictate policy to Oakwood's Board and had never demanded the hiring or firing of any Oakwood employee or removal of any directors.)

> and a loan purchase facility, it continued to perform these functions. . . . Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood . . . . By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses . . . which effectively drove the Company further into insolvency, destroyed value and worsened the position of Oakwood's debt holders.

(Shapiro Rep. pp. 30, 37 (Ex. L); *see also* Shapiro Dep. 91:2 – 91:25; 143:15 – 145:2 (Ex. AA).) (testifying that it was unreasonable and improper for Credit Suisse to take on role of warehouse facility provider to Oakwood; testifying that it was unreasonable for Credit Suisse to continue with the "securitization program and the "warehouse lending" when it became aware of Oakwood's financial distress.).) In short, Plaintiff's case is that Credit Suisse was duty-bound to force Oakwood into bankruptcy a year or more before it actually filed. (*See, e.g., Id.* (Exs. L, AA; Countercl. ¶¶ 49, 53, 56, 99 (Ex. A).)

   The *in pari delicto* analysis sometimes requires courts to consider whether the actions of an individual or a small group of insiders can be "imputed" to the Company in order to determine whether the Company participated in the wrongdoing. No such inquiry is required here, however, because it was Oakwood's Board that made the very decisions about which Plaintiff now complains.

   The minutes of Oakwood's Board meetings unequivocally establish that the Board and Management were fully informed and in control of the conduct that allegedly harmed Oakwood by deepening its insolvency.[6] The minutes, which reflect the deliberations of a thoughtful and sophisticated board (*see* discussion *supra,* p. 3 n. 2) demonstrate that Oakwood's Board was fully apprised of the nature and purpose of the securitization-related services provided

---

[6]    Relevant copies of the minutes are attached as exhibits M - W to the Machan Declaration.

by Credit Suisse, including the use of the Warehouse Facility as an integral party of Oakwood's securitization program. (Oakwood Bd. of Dirs. Mtng. Mins., dated October 16, 2000 (Ex. O); November 15, 2000 (Ex. P); January 30-31, 2001 (Ex. Q); July 23-24, 2001 (Exs. R, S); Nov. 15, 2001 (Ex. T); May 6, 2002 (Ex. U); November 12, 2002 (Ex. W).); Walker Dep. 32:15 – 34:9 (Ex. DD).) Following discussion and consideration of the proposed Warehouse Facility to be provided by Credit Suisse (Oakwood Bd. of Dirs. Mtng. Mins., dated October 16, 2000 (Ex. O), November 15, 2000 (Ex. P)), Oakwood's Board formally "ratified, confirmed and approved" the facility on December 20, 2000. (*Id* ; *see also* Walker Dep. 40:21 – 43:12 (Ex. DD).) Likewise, Oakwood's Board was fully informed of and approved Oakwood's use of asset-backed securitizations as a method of generating liquidity. (Oakwood Bd. of Dirs. Mtng. Mins., dated October 16, 2000 (Ex. O), November 15, 2000 (Ex. P); January 30-31, 2001 (Ex. Q); July 23-24, 2001 (Exs. R, S); Nov. 15, 2001 (Ex. T); May 6, 2002 (Ex. U); November 12, 2002 (Ex. W); Walker Dep. 32:15 – 34:9 (Ex. DD).)

The documentary evidence and testimony plainly demonstrate that Oakwood was responsible for the financing methods and strategy that Plaintiff now labels improper. This conclusion brings Plaintiff's allegations squarely within the long line of cases, including the Third Circuit's decision in *Lafferty*, holding that a debtor's participation in alleged wrongdoing requires dismissal under the *in pari delicto* doctrine. *See Lafferty*, 267 F.3d 340; *see also In re Parmalat Sec Litig* , 383 F. Supp. 2d 587, 598 (S.D.N.Y. 2005) (citations omitted) (holding that the *in pari delicto* doctrine barred recovery against Bank of America, where the company's bankruptcy trustee sued Bank of America for engaging in financial transactions with Parmalat that facilitated the company's fraud, because the "Parmalat entities were crucial actors" in the disputed transactions).

In another recent case in which a court rejected claims similar to those at issue here, the trustee of a bankrupt hospital group sued PricewaterhouseCoopers ("PwC") in tort and contract for providing "clean" audit opinions that failed to flag the company's weak financial condition and which allegedly enabled it to consummate a series of misguided mergers. *AHERF*, 2007 WL 141059, at *4. The Court rejected the trustee's effort to shift the focus away from the company's *own* role in its financial decline, and granted summary judgment for PwC. The *AHERF* Court's rationale for invoking the *in pari delicto* doctrine to grant summary judgment is apt here:

> Despite the averments of the Committee regarding the decade long business strategy consisting of ill conceived, ill-advised mergers and acquisitions . . . the Committee lays the AHERF's entire bankruptcy at the feet of its outside auditors. The very harm allegedly suffered at the hands of PwC, however, presupposes the Board approved business strategy, as well as the imputable wrongdoing of AHERF's management. The Court, therefore, finds no equitable bar to . . . the application of the doctrine of *in pari delicto*.[7]

---

[7] See also *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir 2006) (affirming dismissal on *in pari delicto* grounds of claim that auditor was responsible for fraud because the approval and oversight of the company's financial statements was solely the province of senior management); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) (affirming dismissal on motion of the trustee's claim against audit firm because debtor had participated in wrongdoing at issue); *Mediators, Inc. v. Manney*, 105 F.3d 822, 824 (2d Cir. 1997) (affirming dismissal and holding that "the Committee, standing in the shoes of the debtor, could not recover from third parties for their participation in a scheme that the debtor had itself initiated and joined in."); *Claybrook v. Broad & Cassel, P.A. (In re Scott Acquisition Corp.)*, 364 B.R. 562 (Bankr. D. Del. 2007) (dismissing claim on *in pari delicto* grounds where debtor initiated and participated in allegedly wrongful transactions); *Official Comm. of Unsecured Creditors of Verestar v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 478-79 (Bankr. S.D.N.Y. 2006) (rejecting claim against investment bank under *in pari delicto* doctrine when debtor participated in allegedly improper transactions).

*Id.*, at *15.  In short, there is simply no dispute that Oakwood is responsible for the allegedly harmful financing methods it employed.  Summary judgment should be granted on *in pari delicto* grounds.[8]

\* \* \*

*In pari delicto* is a full and sufficient reason to grant summary judgment in favor of defendants on all of the pre-contract claims.  The remaining sections of the Brief explain additional reasons why the judgment should be granted.

\* \* \*

## IV.    IF CREDIT SUISSE OWED A FIDUCIARY DUTY, IT WAS TO THE COMPANY, NOT TO SOME PARTICULAR GROUP OF CREDITORS.

The fallacy of Plaintiff's breach of fiduciary duty argument is revealed most plainly in the deposition of Plaintiff's proffered duty of care expert, Dr. Shapiro.[9]  Dr. Shapiro testified that, once Oakwood was insolvent, Credit Suisse owed a duty to Oakwood's bondholders, and its bondholders alone.  (Shapiro Dep. 33:24 – 40:25 (Ex. AA).)  This is a proposition which has no support whatsoever in the law, nor even, as Dr. Shapiro admitted, in

---

[8]    In granting summary judgment, the Court will be recognizing what has been apparent all along from the face of Plaintiff's Counterclaims, *i.e.*, the allegations of Credit Suisse's involvement in Oakwood's securitization program uniformly allege Oakwood's active and knowing engagement in the very conduct giving rise to the claims.  (Countercl. ¶ 15 (Ex. A) ("with CSFB's assistance and participation," *Oakwood* would sell certain REMIC certificates in a public offering); ¶ 25 (Ex. A) ("In connection with each asset-backed securitization . . . offering [*by Oakwood*], with a great deal of assistance from, if not under the direction of [Defendants'] personnel, a prospectus was prepared that provided prospective investors with information pertaining to each asset in the securitized pool of assets."); ¶ 37 (Ex. A) (Credit Suisse "deliberately chose to tacitly, if not expressly, encourage *Debtors'* continued use of a program that [Defendants] knew, or should have known, was unsustainable and draining the Debtors of precious liquidity.").

[9]    Credit Suisse denies that it had a fiduciary duty to Oakwood, but this motion does not require a determination of that question.

the academic literature. (Shapiro Dep. 40:16 – 40:25 (Ex.AA).) Dr. Shapiro's theory of fiduciary liability is wrong, and would cause great mischief if it were to become the law.

By contrast, there is a great deal of discussion in the relevant cases and treatises about what happens to the fiduciary duty of *directors* when a company is insolvent, or nearly so. It is well-established that the responsibilities of directors of insolvent companies encompass more than just a duty to shareholders, requiring the Board to take account of a wider group of the company's stakeholders. *See LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) (holding that officers and directors of an insolvent corporation have a "fiduciary duty to act in the best interests of the estate as a whole, including its creditors, equity interest holders and other parties in interest"); *Odyssey Partners v. Fleming Cos.*, 735 A.2d 386, 420 (Del. Ch. 1999) (rejecting stockholder complaints that the Board should have filed for bankruptcy, rather than allowing foreclosure action, because the Board of an insolvent corporation was "obligated to consider and protect interests other than those of the stockholders."); *see also* Stephen L. Schwarcz, *Commercial Trusts as Business Organizations: An Invitation to Comparatists,* 13 Duke J. Comp. & Int'l L. (Special Issue) 321, 331 n. 58 (2003) ("[I]ndeed, directors of an insolvent corporation have been held to owe a fiduciary duty to the corporation's creditors (senior claimants) as well as shareholders (residual claimants)"). It is now clear, however, that what that means in a particular situation is neither mechanical nor proscriptive. *See, e.g., Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. Sup. Ct. 2007) ("If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a

21

guarantor of that strategy's success....[I]n such a scenario the directors are protected by the business judgment rule.")

The deposition of Clarence Walker, a three decade-long director of Oakwood, in particular established that Oakwood's officers and directors acted in what they believed were the best interests of the Company, including in their decision to continue to generate liquidity through securitizations during an attempted "turnaround" plan and the decision to file for bankruptcy in November 2002. (Walker Dep. 31:12- 20; 33:15-34:20; 35:10-36:7 (Ex. DD).) Oakwood's Board would plainly be protected from liability for its decisions by virtue of judicial decisions holding that a board is entitled, in the exercise of its business judgment, to incur debt in an attempt to return a company to financial health. *Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 842 (Bankr. D. Del. 2006). (holding that "a board is not required to wind down operations simply because a company is insolvent but rather may conclude to take on additional debt in the hopes of turning operations around."); *see also, Trenwick,* 906 A.2d at 205 ("[I]n such a scenario the directors are protected by the business judgment rule.").

It is commonplace that, as a company experiences financial difficulty, the interests of its various stakeholders diverge. Shareholders want the business to continue, in the hope of a turnaround. Secured creditors may want recourse to their collateral. Some unsecured creditors may prefer an immediate liquidation, while others, such as trade suppliers and employees, may want the company to stay in business. Navigating and balancing these competing interests is the fundamental responsibility of the board. Yet Plaintiffs propose that, as a board struggles with its responsibilities, an outside lender not only *may* but *must* substitute its own judgment for that of the board, and dictate the company's strategy in the interests of one

particular type of creditor. It is not surprising that Dr. Shapiro finds no support for this proposition in the academic literature.

It defies reason – but is Plaintiff's position – that even though Oakwood's board cannot be liable for damages caused by delaying the Company's bankruptcy, Credit Suisse can. Oakwood's directors were not only never accused of violating their fiduciary duties, they were released from any such claims in Oakwood's Confirmed Plan of Reorganization. Those releases were presumably granted after the Debtor and its Creditors' Committee discharged their own fiduciary duties to determine that there were no claims to be pursued against the directors.

## V.    CREDIT SUISSE WAS NOT OAKWOOD'S FINANCIAL ADVISOR UNTIL AUGUST 19, 2002

On August 19, 2002, Oakwood retained Credit Suisse to be its financial advisor in anticipation of its bankruptcy. Plaintiff suggests that Credit Suisse somehow entered into an implied contract to serve as Oakwood's financial advisor before that. Nowhere in the record is there so much as a hint as to what the terms of that implied contract might have been, when it began, what the duties of the parties were or what consideration was exchanged.

A contract may, in certain circumstances, be implied from the conduct of parties who behave as if they have a contract. *See Robert S. Nusinov, Inc. v. The Principal Mut. Life Ins. Co.*, 80 F. Supp. 2d 101, 107 (W.D.N.Y.), *aff'd*, 229 F.3d 1136 (2d Cir. 2000); *see also Francis H. Leggett & Co. v. Feldman*, 268 N.Y.S. 340, 341 (Civ. Ct. 1934); *Creech v. Melnik*, 495 S.E.2d 907, 912 (N.C. 1998). This is not one of those circumstances.

The conduct of Oakwood and Credit Suisse plainly demonstrates that they did *not* believe they had entered into a contract for Credit Suisse to provide the Company financial advisory services prior to August 19, 2002. Credit Suisse repeatedly attempted to convince Oakwood to hire it to provide precisely those services that Oakwood now claims Credit Suisse

was already contractually obliged to be providing. On four separate occasions, starting in June of 2001, representatives from Credit Suisse's Restructuring Group (which is not Mr. O'Driscoll's department) approached Oakwood to pitch their qualifications as financial advisors. (Shapiro Dep. 114:9 – 117:5; 127:5 – 129:23; 130:18 – 132:21 (Ex. AA).) On three separate occasions Oakwood rejected these offers. On July 29, 2002 Mr. Standish reported to the Board that he had begun discussions with Credit Suisse about retaining them as financial advisors. (Oakwood Bd. of Dirs. Mtng. Mins., dated July 29, 2002 (Ex. V).) And finally, on August 19, 2002, Oakwood and Credit Suisse entered into a contract for the provision of financial advisory services. Plaintiff's claim for breach of implied contract must therefore be dismissed.

## VI.    THERE IS NO EVIDENCE THAT CREDIT SUISSE WAS NEGLIGENT IN PROVIDING IT SECURITIZATION SERVICES

Aside from Dr. Shapiro's theory that Credit Suisse should have refused to continue securitizations in order to put the Company out of business, no witness who has been deposed has said that Credit Suisse's provision of securitization services was anything other than highly professional and capable. See Section III above. There is simply no support whatever in the record for a claim of negligence, and summary judgment is required.

## VII.   THE RECORD DOES NOT SHOW THAT THE DELAY IN FILING OAKWOOD'S BANKRUPTCY PROXIMATELY CAUSED ANY DAMAGE TO OAKWOOD

Whether cast in terms of negligence, breach of implied contract or breach of fiduciary duty, the core harm alleged by the Counterclaims is a delay of approximately one year in the filing of Oakwood's bankruptcy. Plaintiff's expert, Dr. Tennenbaum, testifies that during that year, the value of Oakwood declined by $50 million. That, apparently, is Plaintiff's measure of damages. The essential question that must be answered is what caused that damage?

In order to recover under its tort and contract claims, Plaintiff must prove that Credit Suisse's conduct caused the damages suffered by Oakwood. *See RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC.*, 156 F. App'x 349, 351 (2d Cir. 2005) ("[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages.'") (citation omitted); *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 455 (D.C. Cir. 1990) (finding that a "causal link is necessary regardless of whether [defendant] failed some test of professional care, and it applies to all three theories of recovery," *i.e.*, fraud, negligence, and breach of contract).[10]

Plaintiff may not rely upon speculation or conjecture. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("[A]n inference" consisting of mere "speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."); *Wagner v. Olmedo*, 365 A.2d 643, 647 (Del. Sup. Ct. 1976) (affirming summary judgment on causation grounds because "proximate cause cannot be based on mere speculation"). Rather, Plaintiff must produce competent evidence which establishes at least a "*prima facie* case on the issue of causation." *See Money v. Manville Corp. Asbestos Disease Comp. Fund*, 596 A.2d 1372, 1377-78 (Del. Sup. Ct. 1991).

Plaintiff's theory of causation, to the extent one can be inferred, is premised on a series of speculative hypotheses that lack any evidentiary support in the record. To begin with, the Counterclaims plead causation with nothing more than boilerplate, *i.e.*, "as a proximate result

---

[10]    As with the law governing application of the *in pari delicto* doctrine, the Court need not determine what state's law governs the adequacy of Plaintiff's proximate cause allegations because causation is an essential element of negligence, breach of fiduciary duty and breach of contract claims in New York and North Carolina. *Forum Ins. Co. v. Zeitman*, No. 91 Civ. 7980, 1995 WL 546949 (S.D.N.Y. Sept. 13, 1995); *Farndale Co. v. Gibellini*, 628 S.E.2d 15 (N.C. Ct. App. 2006); *Laub v. Faessel*, 745 N.Y.S.2d 534, 536-37 (App. Div. 2002); *Guthrie v. Conroy*, 567 S.E.2d 403, 411 (N.C. Ct. App. 2002); *John S. Clark Co. v. Travelers Indem. Co. of Ill.*, 359 F. Supp. 2d 429, 439 (M.D.N.C 2004).

of Credit Suisse's breach, the Debtors suffered damages in an amount to be proved at trial."
(*Countercl*. ¶ 96 (Ex. A).)  The causation allegations underlying the breach of fiduciary duty and
negligence claims are similarly conclusory.  (*Countercl*. ¶¶ 50, 53, 57 (Ex. A).)  To the extent
Plaintiff can be said to have a causation theory at all, it is derived from Plaintiff's experts Drs.
Tennenbaum and Shapiro.

Dr. Tennenbaum says that the value of Oakwood declined from $350 million on
September 1, 2001 to $300 million a year later.  Dr. Shapiro would have the Court believe that
this damage was caused by the Company having survived for an additional year, which Dr.
Shapiro claims would have been prevented had Credit Suisse advised the Company to curtail its
operations and downsize, or file for bankruptcy. (Shapiro Rep. pp. 29-35 (Ex. L).)  But Oakwood
was already downsizing, and the Board and management were trying to avoid a bankruptcy
filing.  (Muir 35:23-37:18 (Ex. Y); Walker 60:12 – 62:24 (Ex. DD).)  Notwithstanding that his
opinion is contradicted by the people who ran Oakwood, Dr. Shapiro thinks that Credit Suisse
should have cut off the securitization program and the Warehouse Facility. (Shapiro Dep. 92:16 -
93:22 (Ex. AA).)  That would, of course, have led to an immediate liquidation of the Company –
everyone agrees that without the liquidity provided by the securitizations and the Warehouse
Facility, Oakwood would have gone out of business. (Shapiro Rep., pp. 16-17 (Ex. L); Shapiro
Dep. 94:6-20 (Ex. AA).)  However, the $350 million value Dr. Tennenbaum found in Oakwood
could only have been realized if the Company had been sold *as a going concern* in September
2001. (Tennenbaum Dep. 44:19 – 48:24 (Ex. CC).)  Clearly, this would have required that some
other institution step in to prevent Oakwood from an immediate liquidation once Credit Suisse
cut off its securitization program and the Warehouse Facility.

Plaintiff's chain of causation is thus as follows:

- Credit Suisse should have told Oakwood to do something different.

- Oakwood would have done what Credit Suisse suggested, despite the fact that the Board had embarked on its own strategy for managing through its difficulties.

- If the Company ignored Credit Suisse's advice, Credit Suisse should have shut down the Warehouse Facility and the securitization program, provoking an immediate free-fall bankruptcy.

- Some other financial institution would have been located to provide the liquidity which Credit Suisse had been providing, so that the Company could have continued as a going concern, while the Company looked for a buyer.

- A buyer would have been found, and would have paid $350 million for the Company.

- That sale would have been a better result than what actually happened – that the Company went into bankruptcy a year later, and was sold for $373 million.

This wholly speculative and attenuated chain of causation, requiring the Court to consider one contingent step after another, fails to establish proximate causation.[11]  *See Klinger*

---

[11]  In fact, not only can Plaintiff point to no evidence indicating the Board would have undertaken the measures recommended by Dr. Shapiro, all of the evidence in the record contradicts this opinion and indicates the Board would *not* have agreed to downsize operations more rapidly than it was or to file for bankruptcy prior to August 2002 because it, and Management, believed (i) that the Company could avoid bankruptcy or just before then, (ii) that the financing measures provided by Credit Suisse were beneficial to the Company, and (iii) that the Company would survive the larger downturn in the industry. (Standish Dep. 144:1-9 (Ex. BB) ("I didn't in 2001 believe that Oakwood

*v. Yamaha Motor Corp., U.S.A.*, 738 F. Supp. 898, 908 (E.D. Pa. 1990) (holding that "whether proximate cause exists may be decided as a matter of law where the proposed chain of causation is so attenuated, so dependent upon unprovable contingencies."); *Barry v. Gorecki*, 833 N.Y.S.2d 329, 332 (App. Div. 2007) (affirming dismissal of plaintiff's claim on the ground that the "lengthy and tenuous chain of causation" precluded proximate cause); *see also Phifer v. Du Pont Country Club, Inc.*, 138 F. App'x 446, 448 (3d Cir. 2005) ("Such a causal connection is too tenuous…to meet the proximate causation test.").

Dr. Shapiro's deposition underscored the speculative nature of Plaintiff's causation story. He testified that Credit Suisse *could* have refused to provide the Warehouse Facility to Oakwood in February 2001, but when asked what result this *would* have had, he replied:

> *I don't know exactly what would have happened. Maybe* Oakwood would have been sold, maybe it would have gotten into bankruptcy. *Possibly* it might have gotten some type of secured loan to restructure its operations….*I'm not sure what would have happened…* (Shapiro Dep. 90:17-23 (Ex. AA) (emphasis added).)

Dr. Shapiro further admitted that, if Credit Suisse had stopped providing the warehouse and securitization services, he did not "know if somebody *would* have stepped in" to take its place. (Shapiro Dep. Tr. 162:4-18 (Ex. AA).) Dr. Shapiro also testified that Credit Suisse *should* have

---

should file for bankruptcy at that time….there was no event in 2000 that caused me to think that we would need to file for bankruptcy at time…there was …consideration of a possibility that we might have to file for bankruptcy at some point in time in the future."); Walker Dep. 29:12-29:21 (Ex. DD)("Early in 2002 as I recall the board was getting reports from management that the past position was sufficient, that the programs that the company had put in place for downsizing, that is, for closing sales centers, for closing manufacturing plants, and for continuing the securitization program, were sufficient that we could weather the severe conditions that the industry was facing, and Oakwood maybe more than some others."), 60:21-24 (Ex. DD) ("Everybody were seeing during this period signs of improvement in the industry as whole, and the thought was that we could weather the storm."), 43:23-44:5 (Ex. DD) (agreeing that "the board would not have approved the CSFB facility if it did not believe the facility was in the best interests of Oakwood.").)

suggested to the Company, around June 2001, "some type of a dramatic restructuring" but admitted that could not say whether this *would* have brought about a better outcome for the Company. (*Id.* 125:9-127:25 (Ex. AA).)   He testified that Credit Suisse *should* have recommended that the Company file for bankruptcy much sooner, but also conceded that he didn't "know how the company *would* have responded" to such a recommendation. (Shapiro Dep. 120:16-22 (Ex. AA).)

Sheer speculation as to what Credit Suisse *should* have done and what steps the Company *could* have taken are, however, insufficient to show causation. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 134 (S.D.N.Y. 1998), *aff'd*, 322 F.3d 147 (2d Cir. 2003). In *Investcorp*, the Court dismissed negligence claims against an accounting firm, holding that plaintiffs had failed to establish a causal connection between defendant's allegedly negligent audits and the plaintiffs' losses. In order to satisfy its burden of establishing causation, plaintiffs alleged that the company "could have taken steps that would have preserved whatever value of the company was salvageable" if the firm had exercised reasonable care in the course of its audit work. *Id.* at 139. The court rejected this argument, stating that "[s]uch an allegation is plainly insufficient....the Committee must show that Color Tile not only 'could' have taken steps to salvage itself but that it *would* have done so..." *Id.*[12]

---

[12]    Plaintiff's other purported expert, Dr. Tennenbaum, also attempts to opine how, under one particular alternative scenario, the company might have fared. Dr. Tennenbaum theorizes that if Credit Suisse had refused to provide further securitizations as of late 2001, "the [C]ompany would have filed [for bankruptcy]" and "[h]opefully they would have sought to engage in an orderly sale of...the assets on a going concern value basis and would have been able to generate in September '01 dollars $350 million for potential distribution to the creditors." (Tennenbaum Dep. 73:4-15 (Ex. CC).) He admitted, however, that this theory was contingent upon the company actually finding a willing purchaser, as well as being able to find a source of liquidity other than the securitizations, which were at the time its principal source of liquidity. (*Id.* at 47:3-25, 73:20-74:16 (Ex CC).) But Dr. Tennenbaum never considered whether an actual purchaser or any

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court grant Defendants' Motion and enter summary judgment in their favor dismissing the breach of fiduciary duty, negligence and implied contract counterclaims.

DATED:     February 29, 2008
           Wilmington, Delaware

_____
Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

---

alternative sources of liquidity existed. (*Id.* at 73:20-74:21 (Ex. CC).)  Furthermore, he never analyzed what would have been the result had the company not found an alternative source of financing. (*Id.* at 75:6-15 (Ex. CC).) As a result, Dr. Tennenbaum was forced to admit in his deposition that "I don't know" what would have happened if Credit Suisse had in late 2001 ceased providing securitization services to Oakwood. Like Dr. Shapiro, Dr. Tennenbaum has done no more than assemble an attenuated chain of hypothetical assumptions which could link Credit Suisse to the losses suffered by the Oakwood, *e.g.*, if Credit Suisse had advised Oakwood to file for bankruptcy in late 2001, and the company had acted on that advice, and had obtained an alternative source of liquidity, and the company had been able to find a purchaser, then its losses might have been prevented.  No cognizable theory of causation can be found here.

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 903-9000
Facsimile: (212) 903-9100

*Attorneys for Defendants*

31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

In re:                                          | Chapter 11

Oakwood Homes Corporation, et al.,              | Case No. 02-13396 (PJW)

          Debtors.

OHC Liquidation Trust,

          Plaintiff,
   v.                                       | Adv. Proc. No. 04-57060 (PJW)

Credit Suisse (f/k/a Credit Suisse First Boston, a  | Civil Action No. 07-799 (JJF)
Swiss banking corporation), Credit Suisse Securities
(USA), LLC (f/k/a Credit Suisse First Boston LLC),
Credit Suisse Holdings (USA), Inc. (f/k/a Credit
Suisse First Boston, Inc.), and Credit Suisse (USA),
Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.),
the subsidiaries and affiliates of each, and Does 1
through 100,

          Defendants.

------------------------------------------------x

### CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2008, I caused the **Opening Brief in Support of Defendants' Motion for Partial Summary Judgment** to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following party, who was also served via hand delivery and via electronic mail:

Marla R. Eskin, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

RLF1-3258557-1

I hereby certify that on February 29, 2008, the foregoing document was sent via electronic mail and via federal express to the following non-registered participant:

Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA  90067

Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Phone:  302-651-7700
Fax:  302-651-7701
kaufman@rlf.com