# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------x

In re

Oakwood Homes Corporation,

et al.,

                        Debtors.

Chapter 11

Case No. 02-13396 (PJW)

OHC Liquidation Trust,

       Plaintiff,

v.

Credit Suisse (f/k/a Credit Suisse First Boston, a
Swiss banking corporation), Credit Suisse Securities
(USA), LLC (f/k/a Credit Suisse First Boston LLC),
Credit Suisse Holdings (USA), Inc. (f/k/a Credit
Suisse First Boston, Inc.), and Credit Suisse (USA),
Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.),
the subsidiaries and affiliates of each, and Does 1
through 100,

       Defendants.

Adversary Proceeding
No. 04-57060 (PJW)

Civil Action No. 07-799 (JJF)

----------------------------------------

## DECLARATION OF KATE Z. MACHAN
## IN SUPPORT OF DEFENDANTS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT

### VOLUME I

I, Kate Z. Machan, declare as follows:

     1.     I am an attorney associated with the law firm of Linklaters LLP, counsel to

Defendants in this action. I submit this Declaration in connection with Defendants' Motion for

Partial Summary Judgment.

     2.     Attached hereto as Exhibit A is a true and correct copy of the Objection to the

Proof of Claim filed by Credit Suisse First Boston LLC; Plaintiff's Counterclaims for (1) Breach

of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5)

Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550;

(G) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547

and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and

550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550

and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening

Insolvency; and Demand for Jury Trial dated November 13, 2004.

      3.     Attached hereto as Exhibit B are true and correct copies of the Debtors' Motion

Pursuant to §§ 365 and/or 363 of the Bankruptcy Code for Authority for Oakwood Acceptance

Corporation to (I) Assume and Assign Servicing Agreements and Related Advance Receivables

to, and Enter into Subservicing Agreement with, an Affiliate or, in the Alternative, (II) Reject

Servicing Agreements dated November 18, 2002 and the Order Pursuant to §§ 365 and/or 363 of

the Bankruptcy Code Authorizing Oakwood Acceptance Corporation to (I) Assume the OMI

Note Trust 2001-A Sale and Servicing Agreement, (II) Assign its Rights as "Servicer" Under the

Sale and Servicing Agreement to an Affiliate, and (III) Enter into a Subservicing Agreement

with an Affiliate dated January 7, 2003.

      4.     Attached hereto as Exhibit C are true and correct copies of the Debtors' Motion

for Authority to (I) Honor Certain Pre-Petition Servicing and Related Obligations, (II) Continue

Securitizing Advance Reimbursement Rights in the Ordinary Course of Business, (III) Continue

Funding and Purchasing Retail Installment Sales Contracts and Other Loans Originated by the

Debtors in the Ordinary Course of Business, and (IV) Continue Securitizing Such Contracts and

Loans in the Ordinary Course of Business dated November 18, 2002 and the First Amended and

Restated Order Authorizing Debtors to (I) Honor Certain Pre-Petition Servicing and Related

Obligations, (II) Continue Securitizing Advance Reimbursement Rights in the Ordinary Course

of Business, (III) Continue Funding and Purchasing Retail Installment Sales Contracts and Other

Loans Originated by the Debtors in the Ordinary Course of Business, and (IV) Continue

Securitizing Such Contracts and Loans in the Ordinary Course of Business dated November 26,

2002.

      5.      Attached hereto as Exhibit D is a true and correct copy of the Presentation to

Lotus (Berkshire Hathaway) dated October 15, 2002.

      6.      Attached hereto as Exhibit E is a true and correct copy of the SEC Form 10-K

filed by Oakwood Homes Corp. dated December 29, 2000.

      7.      Attached hereto as Exhibit F is a true and correct copy of the SEC Form 8-K filed

by Oakwood Homes Corp. dated August 9, 2002.

      8.      Attached hereto as Exhibit G is a true and correct copy of the Declaration of

Douglas R. Muir in Support of First Day Relief dated November 18, 2002.

      9.      Attached hereto as Exhibit H is a true and correct copy of the Disclosure

Statement for Revised First Amended Joint Consolidated Plan of Reorganization of Oakwood

Homes Corporation and its Affiliated Debtors and Debtors-in-Possession dated September 9,

2003.

      10.      Attached hereto as Exhibit I is a true and correct copy of the Class A Note

Purchase Agreement dated as of February 9, 2001.

      11.      Attached hereto as Exhibit J is a true and correct copy of the Sale and Servicing

Agreement dated as of February 9, 2001.

      12.      Attached hereto as Exhibit K is a true and correct copy of the Credit Suisse First

Boston Manufactured Housing Industry Outlook, dated June 11, 2001.

13.    Attached hereto as Exhibit L is a true and correct copy of the Report of Alan C. Shapiro, Ph.D. dated April 30, 2007.

14.    Attached hereto as Exhibit M is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated August 10, 1999.

15.    Attached hereto as Exhibit N is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated September 20, 2000.

16.    Attached hereto as Exhibit O is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated October 16, 2000.

17.    Attached hereto as Exhibit P is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated November 15, 2000.

18.    Attached hereto as Exhibit Q is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated January 30-31, 2001.

19.    Attached hereto as Exhibit R is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated July 23, 2001.

20.    Attached hereto as Exhibit S is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated July 24, 2001.

21.    Attached hereto as Exhibit T is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated November 15, 2001.

22.    Attached hereto as Exhibit U is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated May 6, 2002.

23.    Attached hereto as Exhibit V is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated July 29, 2002.

24.    Attached hereto as Exhibit W is a true and correct copy of the Oakwood Board of Directors Meeting Minutes dated November 12, 2002.

25.    Attached hereto as Exhibit X is a true and correct copy of testimony from the deposition of Mark D. Millard dated September 24, 2007.

26.    Attached hereto as Exhibit Y is a true and correct copy of testimony from the deposition of Douglas R. Muir dated September 26-27, 2006.

27.    Attached hereto as Exhibit Z is a true and correct copy of testimony from the deposition of Fiachra O'Driscoll dated June 29-30, 2006.

28.    Attached hereto as Exhibit AA is a true and correct copy of testimony from the deposition of Alan C. Shapiro dated September 5, 2007.

29.    Attached hereto as Exhibit BB is a true and correct copy of testimony from the deposition of Myles Standish dated September 21, 2006.

29.    Attached hereto as Exhibit CC is a true and correct copy of testimony from the deposition Michael Tennenbaum dated October 22, 2007.

16.    Attached hereto as Exhibit DD is a true and correct copy of testimony from the deposition of Clarence Walker dated December 12, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 29, 2008
       New York, New York

Kate Z. Machan, Esq.

5

*EXHIBIT A*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | Adversary Proceeding No. 04-57060 (PBL) |
| Credit Suisse First Boston, a Swiss banking | ) | |
| corporation, Credit Suisse First Boston LLC, a | ) | |
| Delaware limited liability corporation, Credit | ) | |
| Suisse First Boston, Inc., Credit Suisse First | ) | |
| Boston (U.S.A.), Inc., a Delaware corporation | ) | |
| and a wholly owned subsidiary of Credit Suisse | ) | |
| First Boston Inc., the subsidiaries and affiliates | ) | |
| of each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OBJECTION TO PROOFS OF CLAIM FILED BY CREDIT SUISSE FIRST
BOSTON LLC; COUNTERCLAIMS FOR (1) BREACH OF FIDUCIARY DUTY;
(2) NEGLIGENCE; (3) UNJUST ENRICHMENT; (4) EQUITABLE SUBORDINATION;
(5) AVOIDANCE AND RECOVERY OF 90 DAY PREFERENTIAL TRANSFERS
PURSUANT TO 11 U.S.C. §§ 547 AND 550; (6) AVOIDANCE AND RECOVERY OF ONE
YEAR PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550;
(7) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO
11 U.S.C. §§ 548 AND 550; (8) AVOIDANCE AND RECOVERY OF FRAUDULENT
TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND APPLICABLE STATE
LAW; (9) BREACH OF IMPLIED AND EXPRESS CONTRACT; AND (10) DEEPENING
INSOLVENCY; AND DEMAND FOR JURY TRIAL**

{D0039990 11}

In support of its objection to the proofs of claim filed by Credit Suisse First Boston LLC, successor to Credit Suisse First Boston Corporation, and counterclaims against those and other entities within the Credit Suisse Group (as defined below), the OHC Liquidation Trust ("Liquidation Trust" or "Plaintiff") by and through its duly appointed trustee Alvarez & Marsal, LLC, hereby alleges as follows:

## I.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1334 and 157, in that this adversary proceeding is a civil proceeding arising under and/or relating to cases arising under title 11 of the United States Code, jointly administered under In re Oakwood Homes Corporation, et al., Case No. 02-13396 (PJW) (collectively, the "Bankruptcy Cases").

2.      Venue in this District is proper under 28 U.S.C. § 1409 because the Bankruptcy Cases to which this action relates are pending before this Court.

3.      This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff demands a jury trial of any issue triable by a jury.

## II.

## THE PARTIES

**A.      Plaintiff.**

4.      Oakwood Homes Corporation ("OHC," and together with all of its subsidiaries and affiliates the "Oakwood Companies") and certain of its subsidiaries and affiliates are the above-captioned reorganized debtors (collectively, the "Debtors") in the Bankruptcy Cases

currently pending in the United States Bankruptcy Court for the District of Delaware (the

"Court"). The Debtors' Bankruptcy Cases are jointly administered under Case Number 02-13396

(PJW). OHC Liquidation Trust, defined earlier as "Liquidation Trust" is Plaintiff and is

authorized to bring and prosecute this adversary proceeding, as described below.

5.    OHC was a North Carolina corporation with its principal place of business

in Greensboro, North Carolina. At all times relevant to this adversary proceeding, the Debtors

designed, manufactured, marketed, and, in some instances, financed, manufactured and modular

homes. At the time of the chapter 11 filing, the Debtors·had manufacturing plants in multiple

states including Texas, North Carolina, Georgia, Indiana, Oregon, Arizona, Pennsylvania,

California, Colorado, Kansas, Minnesota and Tennessee. The homes manufactured by the Debtors

were sold under the registered trademarks "Oakwood," "Freedom," "House Smart," "Golden

West," "Schult," "Crest," "Marlette," and the trade name "Victory."

6.    On November 15, 2002 (the "Petition Date") certain of the Debtors filed

with Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The remaining

Debtors filed for chapter 11 protection on March 5, 2004.

7.    By order ("Confirmation Order") entered on March 31, 2004, the Court

confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood

Homes Corporation and Its Affiliated Debtors and Debtors in Possession" ("Plan"). The Plan

became effective as to all but one of the Debtors on April 13, 2004 (the "Effective Date"), and for

the remaining Debtor on April 27, 2004.

8.    Pursuant to Paragraph 40 of the Confirmation Order, Section 6.3(b) of the

Plan, and the Liquidation Trust Agreement dated April 13, 2004 (the "LTA"), the executed version

of which was annexed to the Plan Supplement filed on April 14, 2002 [Docket No. 3972], the Liquidation Trust was deemed established as of the Plan's Effective Date.

        9.     Pursuant to the Confirmation Order, the Plan, and the LTA, the Liquidation Trust holds the right to prosecute, compromise, and settle all of the Debtors' Estate's Claims and Causes of Action (as defined in Sections 1.1(54) and 1.1(52) of the Plan, respectively). This objection and the related counterclaims against Defendants described below are properly brought by the Liquidation Trust pursuant to the above provisions of the aforementioned documents. Each of the counterclaims are Claims or Causes of Action with which the Liquidation Trust was vested as of the Effective Date, and which the Liquidation Trust has full right and title to prosecute, compromise, and/or settle.

**B.**    **Defendants.**

        10.    <u>Defendant Credit Suisse First Boston</u> is a Swiss banking corporation ("CSFB-Swiss"). CSFB-Swiss is identified in a certain note purchase agreement dated February 9, 2001, as the agent. Plaintiff is informed and believes, and on that basis alleges, that CSFB-Swiss is the indirect parent of Defendant Credit Suisse First Boston (USA), Inc. and certain of its subsidiaries and affiliates. Plaintiff is informed and believes, and on that basis alleges, that CSFB-Swiss, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below. Plaintiff is informed and believes, and on that basis alleges, that each and all of the Credit Suisse First Boston entities named as defendants or involved in any fashion in this adversary proceeding are related to CSFB-Swiss under the umbrella designation of the Credit Suisse Group. If that understanding is error, these pleadings shall be amended to correct this information.

Defendant <u>Credit Suisse First Boston, LLC</u> ("CSFB-LLC"), the successor to Credit Suisse First Boston Corporation, is the "creditor" identified on the proofs of claim to which the Liquidation Trust hereby objects. Plaintiff is informed and believes, and on that basis alleges, that CSFB-LLC, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant <u>Credit Suisse First Boston (USA), Inc.</u> ("CSFB-USA"), a Delaware corporation, and its subsidiaries and affiliates, is an integrated investment bank serving institutional, corporate, government and high-net worth individual clients. This Defendant provides its clients with a broad range of products and services that includes securities underwriting, sales and trading, financial advisory services, restructuring advisory services, private equity investments, full-service brokerage services, derivatives and risk management products and investment research. Plaintiff is informed and believes, and on that basis alleges, that Defendant CSFB-USA is the parent of various subsidiaries relevant to this adversary proceeding. Plaintiff is informed and believes, and on that basis alleges, that CSFB-USA, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant <u>Credit Suisse First Boston, Inc.</u> ("CSFBI") owns all of the outstanding voting Common Stock of Credit Suisse First Boston (USA), Inc. Plaintiff is informed and believes, and on that basis alleges, that CSFBI, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below. Collectively, the Credit Suisse Group of Defendants shall be referred to throughout as "CSFB" or "Defendant" unless specific delineation is known and otherwise material.

Defendants, Does 1 through 100 ("Does") are believed to be the subsidiaries or affiliates of the CSFB defendants. Plaintiff is informed and believes, and on that basis alleges, that the Doe defendants acted in concert with and at the direction of the CSFB defendants as CSFB agents. Throughout this complaint, by this reference, the conduct ascribed to CSFB shall also be ascribed to the Doe defendants. Should there be an error or mistake as to the name of the entities for which culpable conduct may be ascribed, these pleadings will be amended to correct that mistake by correctly identifying a Doe defendant.

11.    Since at least 1994, CSFB was the Oakwood Companies' securities underwriter. In this capacity, CSFB wrote more than approximately $7.5 billion in Oakwood Companies' securities, including underwriting more than $1.5 billion in Oakwood Companies' securities while also serving as the Oakwood Companies' primary lender and the Debtors' restructuring and financial advisor. In or about February 2001, CSFB became a secured lender to the Oakwood Companies pursuant to what is commonly referred to as the $200 million "CSFB Warehouse Facility." In connection with becoming the Oakwood Companies' warehouse lender, CSFB demanded and received, in or about February 2001, warrants to purchase OHC's common stock (the "CSFB Warrants"), which, if exercised by CSFB, would have a value of just under 20% of the then-outstanding common stock of OHC. Plaintiff is informed and believes, and on that basis alleges, that CSFB stood in the role of restructuring and financial advisor since at least in or about 2000. On or about August 19, 2002, CSFB formalized a role it had held implicitly for some time and, pursuant to a letter agreement, CSFB became the Debtors' exclusive restructuring and financial advisor. As described in more detail below, in these various capacities, Defendants occupied both a fiduciary position, and that of an "insider" of the Debtors as that term is defined in Bankruptcy Code section 101(31) and applicable state law. Moreover, because the Debtors were

within the vicinity or zone of insolvency since at least 2000, and because CSFB occupied both a

fiduciary position and that of an insider vis-à-vis the Debtors, CSFB also occupied a fiduciary

position and duty to the Debtors' creditors.

### III.

### INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS AND COUNTERCLAIMS FOR RELIEF

A.    **Brief background of the Debtors' business.**

12.    From their origin in 1947, the Oakwood Companies provided modest or

affordably priced housing. The Debtors designed and manufactured a number of models of

homes, including single- and double-wide units. As of September 30, 2002, the Debtors sold

manufactured homes through 224 company-owned and -operated sales centers located in 26 states,

primarily in the Southeast and Southwest United States. The Debtors also sold their homes to

approximately 600 independent retailers located throughout the United States.

B.    **The financing of retail home sales.**

13.    The Oakwood Companies served as the mortgage lender, or "bank," for the

majority of the homes sold through the Debtors' retail sales centers and a portion of the homes sold

through independent dealers. During the Debtors' fiscal year 2002, approximately 72% of the

units sold through the Debtors' retail centers were financed by mortgage loans provided to the

purchaser of the home by the Debtors.

14.    The Oakwood Companies' ability to offer their customers mortgage

financing or retail installment sales contracts (collectively, "RICs") was dependent on the amount

of funds available to the Debtors. The Debtors obtained the funds necessary to provide their

customers with financing primarily through a two-step, asset-backed securitization process

conceived, arranged, controlled, implemented and underwritten by CSFB. Initially, the Debtors

obtained financing on the RICs by using the RICs as collateral to borrow against the warehouse

facility (beginning in 2001 CSFB, was a lender and agent on the CSFB Warehouse Facility).

Once the Warehouse Facility had accumulated a sufficient amount of RICs (typically $150 million

to $200 million), the RICs would be bundled through a series of complex transfers and

transactions involving various of the Oakwood Companies which included both Debtor and non-

Debtor affiliates and others[1] for sale to private and institutional investors through a real estate

mortgage investment trust ("REMIC") which issued "REMIC Certificates." For example, during

fiscal 2001, $854 million of the Oakwood Companies' REMIC Certificates were sold and

underwritten by CSFB, and during 2002, $853 million of the Oakwood Companies' REMIC

Certificates were sold and underwritten by CSFB. In theory, the Debtors were not to have credit

exposure with respect to these securitized contracts, REMIC Certificates, except (i) with respect to

breaches of representations and warranties, (ii) to the extent of any retained interest in a REMIC,

(iii) with respect to required servicer advances, (iv) with respect to the servicing fee (which was

subordinated), and (v) with respect to any REMIC security the Debtors had guaranteed. In

practice, under the loan assumption program, described below, the Debtors shouldered a much

greater credit exposure.

       15.     Payments of principal and interest on the REMIC Certificates were funded

by payments of principal and interest that were made by obligors on the underlying RICs (i.e., the

---

[1]   Oakwood Acceptance Corporation ("OAC"), one of the Debtors, sold the RICs to Ginkgo
Corporation. Ginkgo Corporation, in turn, sold them to Oak Leaf Holdings, LLC. Oak Leaf
Holdings, LLC then sold them to OMI Note Trust, which pledged them to OMI Note Trustee
under the terms of an indenture, to secure the trust's debt to CSFB and its affiliates under the
2001-A Class A Notes. Ginkgo Corporation, Oak Leaf Holdings, LLC and OMI Note Trust

purchasers of the homes).[2] Each REMIC trust typically issued various tranches of REMIC Certificates, each with a different level of seniority and credit quality. Although the entire pool of RICs owned by a particular REMIC trust would fund payments on all REMIC Certificates issued by that trust, the credit quality and seniority of a particular tranche of REMIC Certificates would vary; that was determined in advance of purchase by a "waterfall" of payment priorities. In exchange for higher risk that followed from agreeing to subordinate their payment priority to senior tranches, holders of subordinated tranches generally received higher interest rates. Generally speaking, the Debtors, with CSFB's assistance and participation, would sell the higher-rated tranches of REMIC Certificates in a public offering and sell the most subordinated tranches of REMIC Certificates (collectively, the "B-Piece REMIC Certificates") in a private offering. When the underwriters were unable to sell the B-Piece REMIC Certificate resulting from a particular securitization, that piece would be transferred to a special purpose subsidiary, Oakwood Financial Corporation ("OFC"), in exchange for cash in the amount of its fair market value.

16.    To enhance the marketability of the B-Piece REMIC Certificates, OHC provided a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees"). Under the terms of the B-2 Guarantees, generally, if the underlying RICs owned by the REMIC trust did not generate enough cash to make all required payments on the B-Piece REMIC Certificates (i.e. if the default rates on the underlying mortgages reached a level that resulted in

---

were all special purpose entities.

[2]    As will be discussed in greater detail herein, in certain circumstances where the customers or obligors defaulted on their loan payments, the Debtors' made the necessary payments on the securitized RICs.

insufficient cash available to service all of the tranches), OHC was obligated to eventually make up the difference by making payments directly to the holders of B-2 Guarantees. As of 2001, National Indemnity Company, an affiliate of Berkshire Hathaway, Inc., and, therefore, directly or indirectly Berkshire, was one of the largest institutional holders of B-Piece REMIC Certificates. As further inducement to sell certain REMIC Certificates, the Debtors provided an additional guarantee that, upon default, all payments would be accelerated.

## C.    Funding for short-term liquidity needs.

17.    In order to provide financing for its products and meet cash needs for operations, the Oakwood Companies maintained three lines of credit that were used to meet short-term liquidity needs.

a.    The Revolving Line of Credit:  Plaintiff is informed and believes, and on that basis, alleges that initially, First Union National Bank ("First Union") provided a revolving line of credit. However, when First Union sought to be replaced, beginning in about January 2002, the Debtors obtained a Sixty-Five Million Dollar ($65,000,000) revolving line of credit ("Revolving Line") with a group of syndicated lenders, the agent of which was Foothill Capital Corporation ("Foothill"), one of the syndicated lenders. This Revolving Line was supposed to be used predominantly to meet the capital operating needs of OHC; however, during all material time periods, this line was also, at times, used to fund the loan assumption program ("LAP"). All borrowings under the Revolving Line were secured by substantially all of the Debtors' assets, tangible and intangible, real and personal, excluding loans held for sale by the Debtors.

b.     The Warehouse Facility:  The second source of funding was what the Debtors referred to as their "Warehouse Facility."  Unlike the Revolving Line, which was used to fund the Debtors' general capital operating needs on a short-term basis, the Warehouse Facility was a short-term facility used to fund the mortgages that were made available to manufactured home buyers.  The Warehouse Facility was initially provided by an affiliate of Bank of America ("BofA"), Enterprise Funding Corporation.  Plaintiff is informed and believes, and on that basis, alleges that when BofA determined not to renew the Warehouse Facility, in or about February 2001, CSFB stepped into the role of agent and lender on the "CSFB Warehouse Facility" in addition to maintaining its lucrative position as securities underwriter.  The Warehouse Facility acted much like the revolving line of credit, but with important differences that are discussed in greater detail herein below.

c.     The Servicer Advance Facility:  OAC, a wholly owned subsidiary of OHC, financed the performance of certain of its principal and interest advance ("P&I Advance") obligations under the Pooling and Servicing Agreements pertaining to each REMIC trust and the Warehouse Facility agreements by securitizing the receivable represented by its right to reimbursement of P&I Advances from the REMIC trusts through a devoted "Advance Line" provided by Prudential Investment Management, Inc.

**D.     CSFB encouraged the Debtors to ramp-up the loan assumption program.**

**1.     Manufactured housing faced challenging market conditions.**

18.     Since at least 1999, the manufactured housing industry has faced challenging market conditions.  For example, industry shipments in 2001 were approximately half the industry's peak in 1998.  For the Oakwood Companies, these challenging market conditions

translated into declining revenues and cash flows. The Oakwood Companies' total revenues of

$1.1 billion for fiscal 2001 fell relative to fiscal year 2000 total revenues. This decline in revenue

reflected weakness in both retail and wholesale sales as well as a decline in financial services

income. Economic conditions, among other factors, contributed to a rise in delinquencies and

repossessions during this period as well. One of the biggest challenges the Debtors faced was to

maintain sufficient liquidity during the downturn in order to position themselves to take advantage

of the hoped-for upturn.

19.    Plaintiff is informed and believes, and on that basis alleges that, fully aware

of the challenges facing the Debtors and the manufactured housing industry, armed with insider

information, and in breach of its fiduciary duties, CSFB sought to further enrich itself, through

exorbitant fees and other remuneration, by at a minimum negligently prolonging the life of the

Debtors' securitization program that not only deepened the insolvency of the Debtors but,

eventually drove them into bankruptcy.

2.    **CSFB encouraged Debtors to aggressively use the loan assumption program.**

20.    One of the key statistics for purchasers of REMICs is the repossession and

default rates on the RICs. For example, the higher the Debtors' historical repossession or default

rates, the larger the discount to par or corporate guarantee from the Debtors necessary to

successfully securitize the RICs. Additionally, repossessions usually resulted in a shortfall in cash

flow available to service all of the tranches of the REMIC Certificates. By way of example, upon

a borrower default, and before the LAP was used as aggressively as it was between 2000 and

2002, OAC (as servicer of the RICs) would repossess, refurbish and resell the home. Usually the

cash received from the sale of the repossessed home was less than the outstanding balance on the

defaulted loan. When OAC believed it had collected everything it could to satisfy the underlying, defaulted loan, the loan was removed from the REMIC trust and replaced with the cash realized by OAC from the sale of the repossessed home. Repossessed manufactured homes, even when sold at retail rather than wholesale, typically sell for less than a new manufactured home and usually less than the outstanding balance on the defaulted loan. The REMIC trust recorded, as a loss, the shortfall between the outstanding balance on the defaulted loan and the cash received from the sale of the repossessed home. This shortfall in turn meant that there would be less, and perhaps insufficient, cash available to pay the obligations of the REMIC trusts (including OAC's Servicing Fees and the interest-only certificates retained by the Debtors, which had been subordinated).

21.    As a result of the increased loan defaults, and with either CSFB's implicit or explicit encouragement, the Debtors ramped up the use of a program called the loan assumption program ("LAP"). A distant variant of the LAP had been used infrequently by the Debtors prior to 2000 and only in those cases where the existing obligor found a third-party with satisfactory credit to assume its loan at a minimum cost. Accordingly, instead of the Debtors repossessing the home once the borrower became delinquent on its loan payments, the original obligor would find a third-party to purchase the home and assume the remaining payments on the underlying RIC. However, during the period the Debtors were insolvent or in the zone of insolvency, the LAP morphed into a grossly overused program that became not only unsustainable, but also resulted in the expenditure of a significant amount of cash that could otherwise have been used in the Debtors' operations.

22.    CSFB knew of and/or encouraged the Debtors use of LAP to subsidize the cash flows to the REMICs resulting from increasing defaults on the underlying mortgages or RICs. CSFB knew or should have known that the Debtors increasing use of LAP was not sustainable in light of the continued decline in the Debtors operations and the manufactured home

market as a whole. The Debtors use of LAP to subsidize the REMIC cash flows served to, among other things, delay the calling of the B-2 Guarantees and the acceleration of the guarantee payments under the Lotus B-Piece Certificates. During the Debtors' extensive use of LAP, the Debtors' were clearly insolvent or in the zone of insolvency; therefore, the calling of the B-2 Guarantees or the acceleration of the guarantee payments under the Lotus B-Piece Certificates would have had a number of negative effects in light of the Debtors' tenuous position; including limiting if not eliminating the Oakwood Companies' ability to continue to access the asset backed securities market which CSFB had developed into a continuous and very lucrative business with respect to the Oakwood Companies and, upon information and belief, other companies in the manufactured home industry. If evidence is discovered that CSFB deliberately overlooked or concealed material information, in order keep the Debtors' business afloat and to pocket fees, or generate other internal profit taking, for securitizations and loans that should not have been permitted to occur, these allegations will be amended.

23.    As discussed briefly above, over the years, CSFB developed a multi-layered relationship with the Debtors in which trust and confidence was bestowed upon and accepted by CSFB. The relationship began as early as 1994 when CSFB became the Debtors' securities underwriter. Over the course of at least 25 securitizations in excess of $7 billion, CSFB gained a thorough understanding of the manufactured home industry and the Debtors' business as well as the strengths and weaknesses of each. This relationship between the Oakwood Companies, including Debtors, on the one hand, and CSFB, on the other, grew to that of an insider and a fiduciary when CSFB became the agent and the lender on the CSFB Warehouse Facility, a substantial and powerful warrant holder, and the Debtors' restructuring and financial advisor. Despite its position as both a fiduciary and an insider, CSFB breached the duties associated with

the Debtors' repose of trust and confidence, and failed in its role as restructuring and financial advisor, causing the Debtors' irreparable financial harm.

3.    CSFB provided underwriting services in connection with the Debtors' public term securitizations from 1994 through 2002.

24.    In or about 1994, CSFB assumed the obligation to provide securities underwriting services to the Oakwood Companies. During the life of this relationship, CSFB participated in more than 25 offerings and collected underwriting fees of at least $30 million. CSFB's services included, but were not limited to, advising and assisting management and the directors of the Oakwood Companies with setting the terms of the sales of securities, effecting the sale, and conducting reasonable due diligence into the accuracy of written representations in the prospectus, testing the financial information contained in the prospectus by examining the basis for reporting that information directly relevant to the likelihood of default or stress testing the asset pools (the "Underwriting Services"). Pursuant to the underwriting agreement standard provisions dated May 1999 (the "Standard Provisions Underwriting Agreement"), CSFB and other underwriters, agreed to purchase, from Debtor Oakwood Mortgage Investors ("OMI") the aggregate outstanding principal amount of the underwritten certificates. The certificates would be issued by the trust established by OMI pursuant to a Pooling and Servicing Agreement and for which Chase Manhattan Trust Company, National Association would act as trustee. These certificates would be resold in the capital markets.

25.    In connection with each asset-backed securitization ("ABS") offering, with a great deal of assistance from, if not under the direction of CSFB personnel, a prospectus was prepared that provided prospective investors with information pertaining to each asset in the securitized pool of assets. Prior to issuing the prospectus, Plaintiff is informed and believes, and

on that basis, alleges that the Debtors provided CSFB personnel with enormous amounts of confidential information. This detailed information, included among other things, the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each manufactured home buyer. As part of the process of preparing the prospectus, CSFB thoroughly examined, the data for public dissemination. In addition, CSFB provided the rating agencies (e.g., Standard & Poors and Moody's and Fitch) with information sufficient to obtain bond ratings for each tranche of REMIC Certificates to be issued. Plaintiff is informed and believes, and on that basis alleges that CSFB was given access to all deal files and closing binders on all RICs to be included in each securitized asset pool. It had access to prior deal files and monthly tracking reports. CSFB had access to information not otherwise publicly available.

4. **Beginning in 2001, CSFB took on the added role of the Oakwood Companies' lead lender on the warehouse facility.**

26.    In the second half of 2000, at a critical time for the Oakwood Companies, when the Oakwood Companies' current warehouse lender was abandoning them which would have led to the immediate collapse of its securitization business, CSFB began negotiations to assume the role of lender and agent on the Warehouse Facility. Pursuant to the (a) Custodial Agreement dated February 9, 2001, (b) the Class A Note Purchase Agreement dated February 9, 2001, (c) the Sale and Servicing Agreement dated February 9, 2001, (d) the Trust Agreement dated February 9, 2001, and (e) the Indenture dated February 9, 2001 (all as amended from time to time, collectively, the "CSFB Warehouse Facility Documents"), the Oakwood Companies obtained a receivables purchase facility from CSFB (called the "CSFB Warehouse Facility" or "CSFB Warehouse Line") for interim liquidity needs primarily related to their mortgage financing operations. Pursuant to the Class A Note Purchase Agreement, CSFB, as agent, agreed with the

Oakwood Companies (in various roles as issuer, depositor, and transferor) to provide the borrowing necessary to ensure the Debtors had sufficient liquidity to access the asset-backed securitization markets and maintain their pre-securitization financing operations in connection with the sale of manufactured housing. Plaintiff is informed and believes, and on that basis alleges that CSFB was paid significant fees in its role as lender under the CSFB Warehouse Facility in addition to the fees paid to CSFB with respect to its role as underwriter and restructuring advisor.

27.    The CSFB Warehouse Facility operated effectively like the Revolving Line. OAC would originate a home loan by selling a manufactured home to a buyer and agreeing to finance it through RICs. In principle, CSFB would advance funds to the Debtors based on the size of the RIC, so long as the RIC fell within the definition of an "eligible" receivable described in the Sale and Servicing Agreement, and so long as the aggregated total of these home loans did not exceed the available "borrowing base" also defined contractually in the Sale and Servicing Agreement. CSFB's advances on the RICs were secured by issuer notes secured by loans and funneled through a series of Debtor-affiliated and non-Debtor entities, e.g., from OAC (the Seller and Servicer, and a wholly owned subsidiary of OHC) to Ginkgo Corporation (the Transferor, and an unaffiliated special-purpose entity owned by Lord Securities, secretly recommended by CSFB), to Oak Leaf Holdings LLC (the Depositor, and 100% owned by Oakwood Capital Corporation), to OMI Note Trust (the Issuer, and special-purpose entity wholly owned by Oak Leaf), until it arrived back at OAC for financing. Plaintiff is informed and believes, and on that basis alleges, that the notes issued by OMI Note Trust and secured by the RICs were "purchased" by Alpine Securitization Corp. ("Alpine"), owned by Global Securitization LLC, on an "uncommitted" basis, and CSFB on a "committed" basis. Plaintiff is informed and believes, and on that basis, alleges

that Alpine is a CSFB affiliate. CSFB acted as the ultimate decision maker with respect to

shutting down the CSFB Warehouse Facility in the event of a default of the loan indenture or a

termination event. In other words, CSFB acted as agent for Alpine as well as lender and agent for

the Oakwood Companies.

28.    Central to this continuous funding activity was the availability of advances

based on the loan commitment and a calculation of the borrowing base under the CSFB

Warehouse Facility. Once the loan commitment was reached or the available borrowing base was

exhausted, the CSFB Warehouse Line had to be "cleared" so that further borrowing could take

place. Plaintiff is informed and believes, and on that basis, alleges that Alpine would continue to

build its purchase of notes for a period of about three months, until CSFB was ready to market the

next securitization. Once cleared, the CSFB Warehouse Facility was again available for

borrowings, and the process started again.

29.    Plaintiff is informed and believes, and on that basis, alleges that just before

the bankruptcy filing, CSFB suddenly, and surprisingly suspended the CSFB Warehouse Facility.

Then days following the bankruptcy filing, CSFB attempted to collect a S3 million-dollar fee but

this time said it was to "restart" the CSFB Warehouse Facility it had unexpectedly shut down the

day the Debtors sought bankruptcy protection.

5.    **In exchange for agreeing to provide the warehouse facility, among
other things, CSFB demanded and received warrants in the Debtors
with a value just under 20%.**

30.    In addition to the other various fees and reimbursements requested by CSFB

in connection with the Warehouse Line, CSFB demanded that it receive warrants covering a

significant number of shares of OHC's common stock as additional compensation. On or about

December 20, 2000, OHC's board of directors ("OHC Board") voted to approve the Debtors' entry into the CSFB Warehouse Facility. On or about December 20, 2000, the OHC Board entered a resolution providing that the warrant and registration rights agreement ("CSFB Warrant Agreement") that had been described in the Warehouse Facility term sheet with CSFB was authorized and approved. The OHC Board further resolved, authorized and approved all deeds necessary to issue and register the warrants under both State and Federal securities laws. Finally, OHC reserved approximately 9.5 million shares of common stock for issuance upon exercise of the warrants without the need for further resolutions from the OHC Board. The number of shares described in the CSFB Warrant, if and when exercised, provided CSFB with an ownership interest in OHC of just under 20%, which, pursuant to New York Stock Exchange regulations, was the largest amount that could be granted by the Debtors without obtaining general shareholder approval. Thereafter, on or about February 26, 2001, the CSFB Warrant Agreement was executed.

31.    CSFB's Warrant, exercisable at any time through 2009, for just under 20% of OHC's common stock, provided CSFB with enormous leverage by the shear magnitude of its potential ownership interest. Together with its role as restructuring and financial advisor, lender on the CSFB Warehouse Facility, and the Debtors' primary underwriter of its securitization program, Plaintiff is informed and believes, and on that basis, alleges that CSFB was a controlling force and literally had the ability to shut down the Debtors' business.

6.    **At all relevant times, CSFB provided the Debtors with restructuring and financial advisory services.**

32.    The Debtors' financial problems were a result of, among other factors, CSFB's encouragement of the continued use of LAP, a downturn in the manufactured housing industry, a weakened economy, and, as it turns out, at least in part from borrowing, lending, loan

servicing and financing practices that led to an increasingly large number of delinquent loans and repossessions that in turn lead to the Debtors' insolvency, deepening insolvency, and bankruptcy. CSFB knew or should have known about the Debtors' borrowing, lending, liquidity, loan servicing and financing practices since at all relevant times it played a critical role in each activity and was the Debtors' restructuring and financial advisor. Furthermore, once CSFB officially took the title of the Debtors' exclusive restructuring and financial advisor with respect to the Debtors' significant liquidity constraints in 2002, CSFB provided restructuring advice that was negligent and ultimately led to a myriad of unnecessary expenses and obligations incurred by the Debtors. Among other things, CSFB's woefully deficient restructuring and financial advisory services ultimately resulted in the Debtors' termination of CSFB as restructuring and financial advisor.

33.    Plaintiff is informed and believes, and on that basis alleges, that well prior to its formalized restructuring advisory letter agreement in August 2002, the Debtors regularly consulted CSFB on financial and restructuring advisory matters. But clearly, in the midst of the Debtors' downward financial spiral, the Debtors relied on CSFB—an insider and fiduciary to the Debtors – for restructuring and financial advice. On or about August 19, 2002, CSFB and certain of the Debtors (collectively, the "Debtor Signatories") formalized the *de facto* relationship that had existed for years and entered into that certain letter agreement pursuant to which CSFB was retained to provide restructuring and financial advisory services to the Debtors and their non-Debtor affiliates in connection with certain potential restructuring transactions (the "Financial Advisory Agreement"). CSFB was rewarded for its efforts as the Debtors' *de facto*, and then actual, restructuring and financial advisor with enormous fees embedded into its underwriting and lending fees and profit, and with the intangible benefit of power and control over the Debtors' business. At all relevant times before the actual execution of the Financial Advisory Agreement,

Plaintiff is informed and believes, and on that basis alleges that CSFB was already conducting itself in a fashion consistent with that of a party to the "inner-circle" by providing restructuring and financial advisory services.

34.    The Financial Advisory Agreement provided that CSFB would render restructuring advisory services to OHC in connection with any sale transaction and any restructuring transaction.  In addition, the Financial Advisory Agreement provides that CSFB will assist the Debtors in connection with those activities as well as performing other advisory services. CSFB further agreed to act as dealer/manager with respect to any restructuring transaction commencing on or prior to the termination date, and to act as the exclusive placement agent for the Debtors in connection with any sale of its securities.  In light of the Debtors' dire liquidity position at that time, which CSFB was aware of, or should have been well aware of, relative to CSFB's role as, at a minimum, secured lender and underwriter, CSFB's role as restructuring and financial advisor was to advise and prepare the Debtors for an eventual chapter 11 filing, including arranging for debtor-in-possession ("DIP") financing that would allow the Debtors the flexibility to continue to operate in chapter 11 and maximize the value of their business for the benefit of their creditors.  Indeed, the Financial Advisory Agreement expressly required that the Debtors attempt to employ CSFB as their excusive financial advisor in any chapter 11 case it filed. However, CSFB's failures as restructuring and financial advisor resulted in the termination of CSFB at or around the Petition Date, the Debtor filing for chapter 11 without a material amount of DIP financing[3] or the CSFB Warehouse Facility in place, and a resultant disruptive and

---

[3]    The Debtors did not obtain permanent DIP financing until January 2003 approximately 2 months after the Petition Date.

unnecessarily expensive post-petition process to find a DIP lender. CSFB dropped the ball, which resulted in the Debtors' incurring unnecessary fees and expenses.

35.    Pursuant to the Financial Advisory Agreement, CSFB received $1,811,129.54 in advisory fees from August 19, 2002 through November 15, 2002 - the dates of termination of CSFB and the corresponding Financial Advisory Agreement. And, in one of its last acts of self-dealing toward the companies to which it owed fiduciary duties, CSFB, on the eve of Debtors' bankruptcy filing, using its position as a trusted advisor and member of the inner-circle attempted to leverage a multi-million dollar payout from the Debtors as its advisor on an unperformed, and therefore, unearned contract fee.

**E.    Debtors' road to bankruptcy**

36.    Since CSFB had access to virtually all of the Oakwood Companies' financial information, CSFB knew or should have known:

- the dramatic decline in sales for the entire manufactured homes industry since at least 1998,

- the continued decline in the Debtors' operations from at least 2000 through 2002,

- that the Debtors' use of the LAP was growing at an unsustainable rate and that the LAP was draining the Debtors of precious financial resources that would otherwise have been available for use in the Debtors' operations,

- that the Debtors' LAP expenditures were subordinated to the end of the term of the affected RIC, and that the Debtors knew some advances would never be collected,

- that some of the credit quality of the borrowers was deteriorating over the life of the LAP and that the same homes were being placed into LAP three or four times, and

- that once the Debtors discontinued LAP in July 2002, the Debtors' liquidity and financial position was tenuous at best and that the Debtors needed to implement a strategy immediately to gain short-term liquidity as well as accomplish the much broader goal of restructuring its untenable capital structure.

37.    Plaintiff is informed and believes, and on that basis alleged, that CSFB, a fiduciary and insider, deliberately chose to tacitly, if not expressly, encourage Debtors' continued use of a program that CSFB knew, or should have known, was unsustainable and draining the Debtors of precious liquidity. It is believed, and on that basis alleged, that CSFB did that to enrich itself at the expense of the Debtors and their creditors. On or about November 15, 2002, certain Debtors filed for protection under chapter 11 of the United States Bankruptcy Code.

**F.    CSFB's proofs of claim.**

38.    CSFB-LLC is listed in the Debtors' Schedule of Assets and Liabilities (the "Schedules") as holding a claim in excess of $3,288,391.54 (the "Scheduled Claims").

39.    Defendant CSFB-LLC filed an identical proof of claim in the jointly-administered cases of Debtor Oakwood Homes Corporation, Debtor Oakwood Mobile Homes, Inc., Debtor HBOS Manufacturing, LP, and Debtor OAC in a partially contingent and

unliquidated amount of $2,082,588.04, which claims have been assigned claim numbers 6118, 6119, 6120, and 6121, respectively, for purposes of the docketing system in the Bankruptcy Cases (collectively, the "Filed Claims" and together with the Scheduled Claims, the "CSFB-LLC Claims").

40.    Despite Defendants' breach of the Financial Advisory Agreement, its facilitation of the securitization process that brought about deepening insolvency, its breach of fiduciary duty, its self-dealing, and its inequitable conduct, Defendant seeks payment for certain fees and expenses allegedly due and owing under the Financial Advisory Agreement.

**G.    Transfers to CSFB.**

41.    Within 90 days of the Petition Date, the Oakwood Companies transferred to CSFB a total of at least $166,811,129.54 (the "90 Day Transfers").  Below is a chart depicting the 90 Day Transfers to CSFB.

| Parent Name | Amount | Check Number | Date |
|---|---|---|---|
| Credit Suisse First Boston | $129,000,000.00 | 100533 | 08/31/02 |
| Credit Suisse First Boston | 36,000,000.00 | 100536 | 09/13/02 |
| Credit Suisse First Boston | 1,205,833.50 | 100584 | 11/01/02 |
| Credit Suisse First Boston | 300,000.00 | 100604 | 10/01/02 |
| Credit Suisse First Boston | 150,000.00 | 100288 | 11/15/02 |
| Credit Suisse First Boston | 150,000.00 | 100053 | 10/15/02 |
| Credit Suisse First Boston | 4,595.08 | 100028 | 10/15/02 |
| Credit Suisse First Boston | 700.96 | 100289 | 11/15/02 |
| Total | $166,811,129.54 | | |
| Total Fees Under Financial Advisory Agreement | $   1,811,129.54 | | |

42.    Within one year of the Petition Date, the Oakwood Companies transferred to CSFB a total of at least $595,845,398.42 (the "One Year Transfers" and together with any and all transfers to any and all CSFB entity or for the benefit of such entity, including but not limited to expenses associated with LAP, the "Transfers"). Below is a chart depicting the One Year Transfers to CSFB.

| Transferee | Transfer Amount | Date |
|---|---|---|
| CSFB | 546,920.14 | 11/15/2001 |
| CSFB | 562,905.23 | 12/17/2001 |
| CSFB | 423,809.21 | 1/15/2002 |
| CSFB | 520,204.17 | 2/15/2002 |
| CSFB | 507,080.00 | 3/15/2002 |
| CSFB | 482,471.75 | 4/15/2002 |
| CSFB | 588,702.92 | 5/15/2002 |
| CSFB | 599,053.76 | 6/17/2002 |
| CSFB | 470,063.68 | 7/15/2002 |
| CSFB | 602,556.22 | 8/15/2002 |
| CSFB | 587,143.61 | 9/16/2002 |
| CSFB | 511,847.52 | 10/15/2002 |
| CSFB | 633,876.15 | 11/15/2002 |
| CSFB | 627,243.90 | 12/7/2001 |
| CSFB | 345,840.00 | 2/14/2002 |
| CSFB | 513,612.67 | 2/28/2002 |
| CSFB | 179,860.00 | 3/12/2002 |
| CSFB | 839,728.30 | 5/31/2002 |
| CSFB | 286,300.00 | 6/14/2002 |
| CSFB | 705,049.65 | 8/30/2002 |
| CSFB | 117,500,000.00 | 12/7/2001 |
| CSFB | 5,000,000.00 | 12/19/2001 |
| CSFB | 88,000,000.00 | 2/28/2002 |
| CSFB | 22,000,000.00 | 3/14/2002 |
| CSFB | 144,000,000.00 | 5/31/2002 |
| CSFB | 42,000,000.00 | 6/14/2002 |
| CSFB | 129,000,000.00 | 8/31/2002 |
| CSFB | 36,000,000.00 | 9/13/2002 |
| CSFB | 300,000.00 | 10/1/2002 |
| CSFB | 154,595.08 | 10/15/2002 |
| CSFB | 1,205,833.50 | 11/1/2002 |
| CSFB | 150,700.96 | 11/15/2002 |

| Transferee | Transfer Amount | Date |
|---|---|---|
| | $595,845,398.42 | |

43. Each of the above transfers is a "transfer" as that term is defined in Bankruptcy Code section 101(54).

## IV.

## OBJECTIONS TO CSFB-LLC CLAIMS

44. Plaintiff incorporates by this reference the allegations of paragraphs 1 through 43, inclusive, as though fully set out.

45. The Plaintiff objects to the CSFB-LLC Claims on each of the following grounds:

a. The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(b)(1) for the reasons set forth in the Counterclaims below;

b. The CSFB Claims should be disallowed in their entirety pursuant to 502(b)(4) based on the conduct above. CSFB-LLC's claim exceeds the reasonable value of its purported services;

c. The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(d), because CSFB-LLC is an entity from which property is recoverable under Bankruptcy Code section 550, and is a transferee of a transfer avoidable under Bankruptcy Code sections 544, 547 and 548, and applicable state law, for the reasons set forth in the Counterclaims below, and CSFB-LLC has not paid the

amount or turned over any such property for which it is liable pursuant to those Bankruptcy Code sections to the Debtors;

        d.    The CSFB-LLC Claims should be disallowed in their entirety because CSFB breached the Financial Advisory Agreement and caused significant harm to the Debtors including, but not limited to, grossly unnecessary fees, expenses and interest on the alternate DIP financing and other expenses. Alternatively, the contingency under which a fee for Financial Advisory Services would be paid was not satisfied; and/or

        e.    As the Debtors' cases have been substantively consolidated for distribution purposes pursuant to the Plan as confirmed, the duplicative CSFB-LLC Claims must be disallowed as CSFB-LLC is only entitled to recover for one claim against the substantively consolidated estates.

        46.    In the alternative, the Plaintiff requests that the CSFB-LLC Claims, in part or in total, be equitably subordinated to all other claims against the Debtors, pursuant to Bankruptcy Code section 510(c) for the reasons set forth in the Counterclaims below.

## V.

## COUNTERCLAIMS

### FIRST COUNTERCLAIM FOR RELIEF

#### (Breach Of Fiduciary Duty Against All Defendants)

        47.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 46 inclusive as thought fully set out.

48.     As a result of this multi-layered and multi-faceted relationship with the Debtors, CSFB owed the Debtors a fiduciary duty of loyalty and care. Moreover, because the Debtors were within the zone or vicinity of insolvency for much of the period pre-petition, CSFB owed the Debtors' creditors fiduciary duties.

49.     CSFB had access to and knowledge of confidential and inside information. Despite its knowledge of the Debtors failing financial health, CSFB continued to underwrite ABS offerings and wrongly facilitated those offerings through the extension of credit from the CSFB Warehouse Facility. These actions were a breach of fiduciary duty and took place at a time when the Debtors' financial health left Debtors in the zone of insolvency, then financially distressed, and, then, actually deepened the Debtors' insolvency. The net effect of CSFB's knowing activity was to cause the Debtors to remain in business solely for the purpose of generating lender, investment banking, and restructuring and financial advisory fees for the benefit of CSFB.

50.     Negligently, grossly negligently, recklessly or intentionally, CSFB failed to perform its fiduciary duties, causing deepening insolvency and damages and unjustly enriching itself at the expense of the Debtors.

51.     The Liquidation Trust is entitled to demand CSFB's disgorgement of all fees and other remuneration unjustly paid to CSFB in its multiple conflicting capacities from at least 2000 through the Petition Date and to recover consequential and actual damages, and damages for deepening insolvency.

## SECOND COUNTERCLAIM FOR RELIEF

### (Negligence Against All Defendants)

52.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 51 inclusive as though fully set out.

53.    CSFB owed Oakwood Companies, including Debtors, a duty of care. CSFB breached that duty of care. CSFB's conduct as alleged above was negligent, falling well below the standards of care for a reasonable person, caused Oakwood Companies, including Debtors damages that were foreseeable in nature.

54.    As a result of CSFB's conduct as alleged above, and because of it, Debtors suffered damages in an amount to be proved at trial.

## THIRD COUNTERCLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

55.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 54 inclusive as though fully set out.

56.    CSFB has benefited, directly or indirectly, in each and every act alleged herein, and has benefited, directly or indirectly, from the retention, use, investment, and reinvestment of proceeds of such acts. Through the conduct alleged above, CSFB has been unjustly enriched to the detriment of the Debtors and their estate, which did not derive benefit from the acts alleged herein.

57.    Because the remedy at law is inadequate, the Liquidation Trust is entitled to disgorgement of all fees and other remuneration paid to CSFB and to all benefits derived from

such unjust enrichment from in or about 2001 through the Petition Date and/or to recover damages including, but not limited to, deepening insolvency.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Equitable Subordination Against Defendant CSFB-LLC)

58.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 57 inclusive as though fully set out.

59.    CSFB-LLC has engaged in inequitable conduct, including, without limitation, breach of fiduciary duties, and breach of contract.  CSFB-LLC used its position as underwriter, lender, equity holder, and restructuring and financial advisor to the Oakwood Companies and Debtors to serve its own interests garnering enormous fees and other advantages unjustly enriching itself.

60.    CSFB-LLC's misconduct resulted in injury to the estate, the Debtors, and other creditors and conferred an unfair advantage on CSFB-LLC.

61.    Equitable subordination of the CSFB-LLC Claims is not inconsistent with the provisions of the Bankruptcy Code.

62.    As a result of CSFB-LLC's inequitable conduct, the CSFB-LLC Claims should be equitably subordinated pursuant to Bankruptcy Code section 510(c).

## FIFTH COUNTERCLAIM FOR RELIEF

### (Avoidance And Recovery Of
Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All
Defendants)

63.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 62 inclusive as though fully set out.

64.    At least some, if not all, of the 90 Day Transfers were transfers of an interest of one or more of the Debtors in property. This claim for relief applies to all of the 90 Day Transfers that are determined to be transfers of an interest of the Debtors in property.

65.    Each of such 90 Day Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the 90 Day Transfers was made.

66.    Such 90 Day Transfers were made while the Debtors were insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

67.    Such 90 Day Transfers were made or perfected by the Debtors to or for the benefit of Defendants on or within the period of ninety (90) days before the Petition Date.

68.    Such 90 Day Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtors' chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the 90 Day Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

69.    Such 90 Day Transfers constitute an avoidable preference under 11 U.S.C. § 547.

30

{D0036990:1}

70.    Such 90 Day Transfers were made to or for the benefit of the Defendants, and consequently, Plaintiff is entitled to recover such avoided 90 Day Transfers from Defendants under 11 U.S.C. § 550.

## SIXTH COUNTERCLAIM FOR RELIEF

### (Avoidance and Recovery of Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All Defendants)

71.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 70 inclusive as though fully set out.

72.    At least some, if not all, of the One Year Transfers were transfers of an interest of one or more of the Debtors in property.  This claim for relief applies to all of the One Year Transfers that are determined to be transfers of an interest of the Debtors in property.

73.    Each of such One Year Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the One Year Transfers was made.

74.    Such One Year Transfers were made while the Debtor was insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

75.    Such One Year Transfers were made or perfected by the Debtors to or for the benefit of the Defendants on or within the period of one year before the Petition Date.

76.    Such One Year Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtor's chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the One Year Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

77.    Such One Year Transfers constitute an avoidable preference under 11

U.S.C. § 547.

78.    Such One Year Transfers were made to or for the benefit of the Defendants,

and consequently, Plaintiff may recover the avoided One Year Transfers from Defendants under

11 U.S.C. § 550.

## SEVENTH COUNTERCLAIM

### (Recovery of Fraudulent Transfer,
### 11 U.S.C. §§ 548 and 550 Against All Defendants)

79.    Plaintiff incorporates by this reference the allegations of paragraphs 1

through 78 inclusive as though fully set out.

80.    At least some, if not all, of the Transfers were transfers of an interest of one

or more Debtors in property. This claim for relief applies to all of the Transfers that are

determined to be transfers of an interest of one or more of the Debtors in property.

81.    The Transfers were made by one or more of the Debtors for less than

reasonably equivalent value.

82.    The Debtors (i) were insolvent on the date of the Transfers, or became

insolvent as a result of such Transfers, (ii) engaged in a business or transaction, or were about to

engage in a business or transaction, for which the property that remained with the Debtors after the

Transfers was an unreasonably small capital; or (iii) intended to incur, or believed that they would

incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

83.    The Transfers represent an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

84.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to 11 U.S.C. § 550 the avoidable Transfers or the value of the avoidable Transfers.

## EIGHTH COUNTERCLAIM

### (Fraudulent Transfer Under 11 U.S.C. § 544 And State Law Against All Defendants)

85.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 84, inclusive, as though fully set out.

86.    Pursuant to 11 U.S.C. § 544(b), a debtor may avoid any transfer of any interest of the debtor or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e). At least some, if not all, of the Transfers were transfers of an interest of one or more Debtors in property. This claim for relief applies to all of the Transfers that are determined to be transfers of an interest of one or more of the Debtors in property.

87.    There exist unsecured creditors of the Debtors' holding allowable claims under 11 U.S.C. § 502, and these unsecured creditors were creditors of the Debtors at the time of the Transfers, which are voidable under applicable state law by such unsecured creditors.

88.    Transfers were made by one or more of the Debtors without such Debtors receiving a reasonably equivalent value in exchange for such Transfers.

89.    The Debtors (i) were insolvent on the date of such Transfers, or became insolvent as a result of such Transfers; (ii) engaged or were about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction, or (iii) intended to incur, or believed that they would incur, debts beyond the Debtors' ability to pay as such debts became due.

90.    The Transfers represent an avoidable fraudulent transfer under applicable state law.

91.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to applicable state law and 11 U.S.C. §§ 544(b)(1) and 550 the avoidable Transfers or the value of the avoidable Transfers.

## NINTH COUNTERCLAIM

### (Breach of Implied and Express Contract Against All Defendants)

92.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 91, inclusive, as though fully set out.

93.    At all relevant times, CSFB was either explicitly engaged as the Oakwood Companies' restructuring and financial advisor or advised the Oakwood Companies as if it had been explicitly engaged as their restructuring and financial advisor.

94.    The Debtors performed all conditions precedent to CSFB's obligations to perform restructuring and financial advisory services both implied, and under the express Financial Advisory Agreement.  Alternatively, the Debtors 'performance was excused or as a result of CSFB's own conduct.

95.    CSFB breached its obligation to provide restructuring and financial

advisory services under its implied agreement to do so, as well as under the express Financial

Advisory Agreement, including the covenant of good faith and fair dealing implied in both.

96.    As a proximate result of CSFB's breach, the Debtors suffered damages in an

amount to be proved at trial.

## TENTH COUNTERCLAIM

### (Deepening Insolvency Against All Defendants
### In The Event This Is Determined To'Be A Separate Claim For
### Relief Rather Than A Form Of Damages)

97.    Plaintiff incorporates by this reference the allegations of paragraphs 1

through 96, inclusive, as though fully set out.

98.    CSFB induced the Debtors to continue their costly borrowing and financing

policies and practices, despite knowledge that the Debtors were insolvent, or in the vicinity or

zone of insolvency since at least as of 2000 or 2001.

99.    Moreover, as the Debtors' fiduciary, insider, and restructuring advisor,

among other things, CSFB should have been preparing the Debtors for bankruptcy by attempting

to conserve all assets.  CSFB breached these and its fiduciary duties;

100.    Accordingly, because of CSFB's *de facto* control of the Debtors, and

CSFB's role as facilitator, if not more, of the Oakwood Companies securitization process well

after insolvency, CSFB has violated the doctrine of deepening insolvency and is liable for

damages in amounts to be proved at trial.

VI.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter a judgment for Plaintiff on this Complaint:

    A.    For disallowance in its entirety of the CSFB-LLC Claims.

    B.    That CSFB-LLC's Claims be subordinated for all purposes to the claims of all other creditors in the Bankruptcy Case.

    C.    For a determination that:

    (i) the 90 Day Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the 90 Day Transfers under 11 U.S.C. § 550,

    (ii) the One Year Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the One Year Transfers under 11 U.S.C. § 550,

    (iii) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 548, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550,

    (iv) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 544 and applicable state law, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550, and

    (v) the Transfers, or the value thereof, should be preserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

36

{D:\030990:1 }

D.    Disgorgement of all fees, sums, payments to CSFB and any profits derived unjustly thereon by all the Oakwood Companies.

E.    For damages according to proof.

F.    For prejudgment interest, post judgment interest, attorneys fees, and costs as allowable by applicable law.

G.    And for such further relief as is just.

Dated: November 13, 2004
        Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (#2989)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

AND
TONY CASTANARES(CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853),
PAMALA J. KING (CA SBN 125786), and
MARGRETA M. SUNDELIN (CA SBN 224950),
Members of STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Special Counsel for the OHC Liquidation Trust

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable.

Dated:  November 13, 2004
        Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (#2989)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

AND

TONY CASTANARES(CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853),
PAMALA J. KING (CA SBN 125786), and
MARGRETA M. SUNDELIN (CA SBN 224950),
Members of STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Special Counsel for the OHC Liquidation Trust

{D0030990.1}

# TABLE OF CONTENTS

Page(s)

I. JURISDICTION AND VENUE ................................................................................ 1

II. THE PARTIES ...................................................................................................... 1

    A.    Plaintiff. ........................................................................................................ 1

    B.    Defendants. .................................................................................................. 3

III. INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS
     AND COUNTERCLAIMS FOR RELIEF............................................................ 6

    A.    Brief background of the Debtors' business. ................................................ 6

    B.    The financing of retail home sales. ............................................................ 6

    C.    Funding for short-term liquidity needs. ..................................................... 9

    D.    CSFB encouraged the Debtors to ramp-up the loan assumption
           program. .................................................................................................. 10

          1.    Manufactured housing faced challenging market conditions. .................... 10

          2.    CSFB encouraged Debtors to aggressively use the loan
              assumption program................................................................................. 11

          3.    CSFB provided underwriting services in connection with the
              Debtors' public term securitizations from 1994 through 2002. .................. 14

          4.    Beginning in 2001, CSFB took on the added role of the
              Oakwood Companies' lead lender on the warehouse facility. ..................... 15

          5.    In exchange for agreeing to provide the warehouse facility,
              among other things, CSFB demanded and received warrants
              in the Debtors with a value just under 20%. ............................................ 17

          6.    At all relevant times, CSFB provided the Debtors with
              restructuring and financial advisory services................................................ 18

    E.    Debtors' road to bankruptcy ...................................................................... 21

    F.    CSFB's proofs of claim. ............................................................................ 22

    G.    Transfers to CSFB...................................................................................... 23

    IV. OBJECTIONS TO CSFB-LLC CLAIMS .......................................................... 25

V. COUNTERCLAIMS......................................................................................26

FIRST COUNTERCLAIM FOR RELIEF  (Breach Of Fiduciary Duty
Against All Defendants) ..............................................................................26

SECOND COUNTERCLAIM FOR RELIEF  (Negligence Against All
Defendants).................................................................................................28

THIRD COUNTERCLAIM FOR RELIEF  (Unjust Enrichment Against
All Defendants)...........................................................................................28

FOURTH COUNTERCLAIM FOR RELIEF  (Equitable Subordination
Against Defendant CSFB-LLC) ..................................................................29

FIFTH COUNTERCLAIM FOR RELIEF  (Avoidance And Recovery Of
Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All Defendants) ......................30

SIXTH COUNTERCLAIM FOR RELIEF  (Avoidance and Recovery of
Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All
Defendants) ................................................................................................31

SEVENTH COUNTERCLAIM  (Recovery of Fraudulent Transfer,
11 U.S.C. §§ 548 and 550 Against All Defendants)........................................32

EIGHTH COUNTERCLAIM  (Fraudulent Transfer Under 11 U.S.C. § 544
And State Law Against All  Defendants) ........................................................33

NINTH COUNTERCLAIM  (Breach of Implied and Express Contract
Against All Defendants) ..............................................................................34

TENTH COUNTERCLAIM  (Deepening Insolvency Against All
Defendants In The Event This Is Determined To Be A Separate Claim For
Relief Rather Than A Form Of Damages).....................................................35

VI. PRAYER FOR RELIEF ..............................................................................36

DEMAND FOR JURY TRIAL ...........................................................................38

V. COUNTERCLAIMS..................................................................................................26

    FIRST COUNTERCLAIM FOR RELIEF  (Breach Of Fiduciary Duty
    Against All Defendants) ..........................................................................................26

    SECOND COUNTERCLAIM FOR RELIEF  (Negligence Against All
    Defendants)..............................................................................................................28

    THIRD COUNTERCLAIM FOR RELIEF  (Unjust Enrichment Against
    All Defendants)........................................................................................................28

    FOURTH COUNTERCLAIM FOR RELIEF  (Equitable Subordination
    Against Defendant CSFB–LLC) ..............................................................................29

    FIFTH COUNTERCLAIM FOR RELIEF   (Avoidance And Recovery Of
    Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All Defendants) .....................30

    SIXTH COUNTERCLAIM FOR RELIEF  (Avoidance and Recovery of
    Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All
    Defendants) .............................................................................................................31

    SEVENTH COUNTERCLAIM  (Recovery of Fraudulent Transfer,
    11 U.S.C. §§  548 and 550 Against All Defendants)....................................................32

    EIGHTH COUNTERCLAIM  (Fraudulent Transfer Under 11 U.S.C. § 544
    And State Law Against All  Defendants) ...................................................................33

    NINTH COUNTERCLAIM  (Breach of Implied and Express Contract
    Against All Defendants) ..........................................................................................34

    TENTH COUNTERCLAIM  (Deepening Insolvency Against All
    Defendants In The Event This Is Determined To Be A Separate Claim For
    Relief Rather Than A Form Of Damages)..................................................................35

VI. PRAYER FOR RELIEF ............................................................................................36

DEMAND FOR JURY TRIAL .......................................................................................38

*EXHIBIT B*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |

**DEBTORS' MOTION PURSUANT TO §§ 365 AND/OR 363 OF THE
BANKRUPTCY CODE FOR AUTHORITY FOR OAKWOOD ACCEPTANCE
CORPORATION TO (I) ASSUME AND ASSIGN SERVICING AGREEMENTS
AND RELATED ADVANCE RECEIVABLES TO, AND ENTER INTO
SUBSERVICING AGREEMENT WITH, AN AFFILIATE OR,
IN THE ALTERNATIVE, (II) REJECT SERVICING AGREEMENTS**

Oakwood Acceptance Corporation, LLC ("OAC"), together with its affiliated debtors

and debtors in possession in the above-referenced bankruptcy cases (collectively, the "Debtors"),

hereby move the Court for the entry of an order pursuant to sections 365 and 363(f) of title 11 of

the United States Code (the "Bankruptcy Code"), authorizing OAC to (i) assume the servicing

agreements included in the Pooling and Servicing Agreements identified on Exhibit A hereto

(collectively, the "Pooling and Servicing Agreements"), (ii) assume the servicing agreement

included in that certain Sale and Servicing Agreement, dated as of February 9, 2001 (the "Sale

and Servicing Agreement"; together with the Pooling and Servicing Agreements, the "Servicing

Agreements"), by and among OAC, Ginkgo Corporation ("Ginkgo"), OMI Note Trust 2001-A

(the "Warehouse Trust"), Oak Leaf Holdings, LLC ("Oak Leaf"), and The Chase Manhattan

Bank, as backup servicer, indenture trustee, and custodian ("Chase"), (iii) assign OAC's

servicing rights under the Servicing Agreements and certain advance receivables to Oakwood

Servicing Holdings Co., LLC, a newly created limited purpose wholly-owned subsidiary of OAC

("OSHC"), free and clear of all liens, claims, interests, causes of action, rights of setoff, recoupment and any similar defenses, and other defenses (collectively, "Encumbrances"), and (iv) enter into a subservicing agreement with OSHC. In the alternative, if the Court denies any or all of the relief requested in the preceding sentence, OAC moves the Court for entry of an order authorizing it to reject the Servicing Agreements effective as of the date hereof pursuant to § 365 of the Bankruptcy Code. In support of this Motion, the Debtors rely upon the Declaration of Douglas R. Muir in Support of First Day Relief (the "Muir Declaration"), filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtors respectfully represent as follows:

## Introduction

1.       On November 15, 2002 (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No creditors' committee has yet been appointed in these cases by the United States Trustee. The Debtors are operating their respective businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.       The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

4.       The Debtors and their non-Debtor affiliates manufacture, market, and finance manufactured housing. Collectively, they constitute the third largest manufacturer and one of the largest retailers of manufactured housing in the United States, with annual sales currently approaching one billion dollars.

2

## The Debtors' Securitization Transactions

5.    Because traditional financing sources are insufficient to sustain the manufacturing and sales volume the Debtors historically have experienced, the Debtors with retail sales operations and various independent dealers (collectively, the "Retailers") provide financing options to their customers through OAC, which purchases on a non-recourse basis certain of the retail installment sales contracts and mortgage loans (collectively, "RICs") originated by the Retailers. OAC itself originates the RICs that are mortgage loans. OAC funds its purchases and originations of RICs by participating in public and private asset securitization transactions as described herein.

6.    Historically, securitization transactions have provided the most effective and least expensive financing technique for satisfying OAC's tremendous liquidity needs. In fact, OAC historically made a material profit on its securitization transactions. Although that profit has been reduced or even eliminated, the securitization transactions engaged in by the Debtors pre-petition still remain the least expensive method for financing for the Debtors' operations. Accordingly, the Debtors believe that continuing to participate in the securitization transactions described herein and other similar transactions in the ordinary course of business is critical to the Debtors' ability to reorganize successfully under Chapter 11.

### *The Warehouse Facility*

7.    As noted above, when one of the Retailers originates a non-mortgage loan RIC through the sale of a manufactured home, OAC finances the RIC by taking a non-recourse assignment of the RIC from the applicable Retailer in exchange for OAC's payment of the face amount of the RIC, plus or minus various agreed upon adjustments, if any. OAC funds the originations of mortgage loan RICs itself. Merely holding the RICs it obtains from the Retailers and collecting payments on the RICs until they are securitized in a public or private term

3

securitization, however, does not leave OAC with sufficient liquidity to sustain its financing operations. Most companies in the manufactured housing industry achieve the necessary pre-securitization liquidity through a traditional asset-based secured "warehouse" line of credit. OAC, in contrast, achieves the necessary liquidity at a much lower cost through a securitized warehouse facility (the "Warehouse Facility") established pursuant to the Sale and Servicing Agreement and various related documents.

8.      Under the Warehouse Facility, OAC sells each RIC it acquires to Ginkgo in exchange for cash in an amount equal to 100% of their fair market value of the RICs (the "Cash Purchase Price"). Ginkgo simultaneously sells the RICs acquired from OAC to Oak Leaf, a non-debtor indirect subsidiary of OAC ("Oak Leaf"), in exchange for the Cash Purchase Price. Oak Leaf simultaneously sells the RICs to the Warehouse Trust, the residual interest in which is owned by Oak Leaf. The Warehouse Trust periodically issues notes (the "Warehouse Trust Notes") with an aggregate face amount of up to 81% of the aggregate face amount of the RICs and distributes the resulting proceeds to Oak Leaf as consideration for the RICs. The remaining difference, if any, between the fair market value of the RICs and the proceeds of the Warehouse Trust Notes distributed to Oak Leaf constitutes a capital contribution to the Warehouse Trust and increases the value of Oak Leaf's residual interest in the Trust and with it, Oakwood's indirect ownership interest in Oak Leaf. A diagram displaying the ownership structure and flow of funds in connection with the Warehouse Facility is annexed hereto as <u>Exhibit B</u>.

9.      Each sale of the RICs in connection with the Warehouse Facility is structured to constitute a "true sale" for bankruptcy purposes and, therefore, is effective to extricate the RICs from each seller's bankruptcy estate. The net economic effect of the transactions effected by the Warehouse Facility is the monetization of up to 81% of OAC's investment in RICs acquired

4

from the Retailers. The residual value, if any, of the RICs remains non-monetized as an investment in the Warehouse Trust (which redounds to the benefit of OAC through its ownership of Oakwood Capital Corporation, the parent corporation of Oak Leaf) pending a conventional public term securitization as described below. Following such a public term securitization, any residual value of the RICs in the Warehouse Trust is monetized and the resulting proceeds distributed upstream through Oak Leaf and Oakwood Capital Corp. to OAC.

### *Public Term Securitizations*

10.     Once a sufficient face amount of RICs have accumulated in the Warehouse Trust (typically $150-300 million per quarter), the Warehouse Trust securitizes the RICs as part of a conventional public term securitization (an "OMI Securitization"). The net proceeds of each OMI Securitization are used first to pay off the then-outstanding Warehouse Trust Notes. Any additional proceeds are distributed upstream to Oak Leaf and ultimately to OAC. The net economic effect of an OMI Securitization is to monetize OAC's indirect residual interest in the Warehouse Trust.

11.     Each OMI Securitization involves the true sale, for bankruptcy and accounting purposes, of warehoused RICs by the Warehouse Trust to Oakwood Mortgage Investors, Inc., a non-debtor limited purpose wholly-owned subsidiary of OAC ("OMI"), pursuant to a sales agreement. OMI simultaneously sells the acquired RICs to a securitization trust established for each OMI Securitization pursuant to a Pooling and Servicing Agreement (a "Securitization Trust") in exchange for multiple tranches of "pass-through" asset-backed securities ("Pass-Through Certificates") collectively representing 100% of the beneficial ownership interest in the securitized RICs.

12.     Payments of principal and interest on the securitized RICs constitute the principal and frequently sole source of payment for amounts due to holders of the Pass-Through

5

Certificates.[1] The higher rated "AAA" tranches of the Pass-Through Certificates are generally entitled to be paid prior to the lower rated or "B-piece" Pass-Through Certificates. Residual Pass-Through Certificates are entitled to paid if and only if all other Pass-Through Certificates have been paid in full and, therefore, are frequently non-economic. OMI sells the higher-rated tranches of the Pass-Through Certificates it issues to one or more underwriters (the "Underwriters"), who resell them to third-party investors in connection with one or more public offerings (the "Certificate Owners"). OMI then sells the lower rated or B-piece tranches of the Pass-Through Certificates either to a third-party investor or to Oakwood Financial Corporation, a non-debtor limited purpose sister subsidiary of OAC ("OFC"). OFC then either holds such B-piece Pass-Through Certificates, sells or securitizes them. The Residual Certificates also are typically sold to OFC. OFC funds its acquisition of B-piece and residual Pass-Through Certificates with the proceeds of capital contributions from its parent corporation, Oakwood Homes. A diagram depicting the ownership structure and flow of funds in each OMI Securitization is annexed hereto as Exhibit C.

### OAC's Servicing Rights and Obligations

13.     OAC currently acts as the "Servicer" with respect to the securitized RICs owned by each Trust[2]. In that capacity, OAC is required to (i) collect payments of principal and interest from obligors and remit them to the appropriate Securitization Trusts, (ii) escrow payments of taxes and interest and remit them to the appropriate recipients, (iii) enforce the Trusts' rights

---

[1]     Certain of the B-piece Pass-Through Certificates have a "stapled" limited guarantee from the Debtor Oakwood Homes Corporation that may provide an additional source of payment for such certificates.

[2]     OAC also services a very small portfolio of owned RICs that for a variety of reasons (principally ineligibility) have not been pooled and sold into the Warehouse Facility or an OMI Securitization.

6

under the securitized RICs when they fall into default, including commencing and prosecuting replevin and foreclosure actions, and (iv) otherwise monitor and report on the status of the RICs for the benefit of the Trusts as the holders of the securitized RICs.

14.    As and when necessary to perform its servicing duties, OAC, as the Servicer, is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations, including without limitation, (i) advances for taxes, insurance and other charges against property securing the RICs, (ii) enforcement or judicial proceedings, including foreclosures, and (iii) the management of foreclosed property through liquidation ("Servicing Advances"). OAC is obligated to make Servicing Advances, however, only if OAC deems the Servicing Advance to be recoverable. Servicing Advances are designed to be temporary and solely for the sake of convenience and expediency. Accordingly, OAC, as servicer, is entitled to reimbursement for all Servicing Advances from subsequent tax and insurance escrow payments, insurance proceeds, and liquidation proceeds collected by the related Trust. In addition, if at any point OAC, as the Servicer, deems certain kinds of Servicing Advance to be non-recoverable, OAC is entitled to reimbursement for that Servicing Advance immediately from any available funds in the related Trust.

15.    Currently, OAC has approximately $47,970,000 of outstanding Servicing Advances owed by the Trusts (collectively, the "Servicing Advance Receivables"). Of that amount, $16,120,000 represents advances for taxes and insurance escrow payments and $31,850,000 represents advances for repossession costs.

16.    In addition, to the extent obligors on the securitized RICs are delinquent in the payment of principal or interest, OAC, as the "Servicer" under the Servicing Agreements, in

7

most cases must advance the amount of such delinquent principal and interest ("P&I Advances," together with Servicing Advances, the "Advances"), generally on the 15th of each month. Like Servicing Advances, OAC is obligated to make a P&I Advance only if it deems the P&I Advance to be recoverable. P&I Advances are temporary and for liquidity purposes only. Accordingly, OAC, as Servicer, is entitled to reimbursement from the applicable Trusts for all P&I Advances made, either from subsequent collections on the related delinquent RICs or subsequent collections on the entire pool of RICs in a particular Trust, depending upon the terms of the Applicable Servicing Agreement. Also, if OAC at any point deems a previously made P&I Advance to be non-recoverable in any particular month, OAC may reimburse itself for that P&I Advance from any funds in the related Trust.

17.    OAC typically advances between $35 to $45 million in P&I Advances to the Trusts each month and books a receivable in the aggregate amount of such P&I Advances ("P&I Advance Receivables," together with the Servicing Advance Receivables, the "Advance Receivables"), then generally reimburses itself for such P&I Advances over the course of the following month.

18.    In exchange for servicing the securitized RICs at a cost of approximately [$30] million per year, OAC is entitled to a monthly fee in amounts ranging from 1/12th of .75% to 1/12th of 1% of the outstanding balance of the RICs in each Trust (the "Servicing Fee"). The right to payment of the Servicing Fee from most of the Trusts, however, is contractually subordinate to the payment of amounts due on the particular Trust's outstanding Pass-Through Certificates (or notes, with respect to the Warehouse Trust) in a given month for so long as OAC remains the "Servicer" under the Servicing Agreements. Because of this subordination provision and the losses experienced by the Trusts on the securitized RICs, OAC currently is not receiving

8

any significant payments on account of the Servicing Fee from the Trusts.  If and when any party other than OAC[3] becomes the "Servicer" under the Servicing Agreements, however, the priority of the Servicing Fee is elevated, and in many cases, the amount of the monthly Servicing Fee is increased to $1/12^{th}$ of 1.5% of the outstanding balance of the RICs.

19.     Accordingly, in order to elevate the priority and in many cases increase the amount of the Servicing Fee, OAC formed OSHC, a wholly-owned limited purpose entity, and entered into an Assignment, Contribution, and Assumption Agreement in substantially the form annexed hereto as Exhibit D (the "Assumption Agreement").  Pursuant to the Assumption Agreement, OAC has agreed to assume the Servicing Agreements and assign them and the Advance Receivables to OSHC. Contemporaneously with that assignment, OAC and OSHC have agreed to enter into a Subservicing Agreement in substantially the form annexed hereto as Exhibit E, pursuant to which OAC will perform OSHC's obligations under the Servicing Agreements.  Under this structure, OSHC will become the "Servicer" of record for the purposes of the Servicing Agreements, thereby elevating the priority and in many cases increasing the amount of the Servicing Fees, while OAC will continue to perform  day-to-day servicing of the RICs in accordance with the terms of the Servicing Agreements, thereby assuring the non-debtor parties to the Servicing Agreements of continued performance of the Servicing Agreements.

**Relief Requested**

20.     By this Motion, OAC seeks entry of an order authorizing OAC to (i) assume the Servicing Agreements, (ii) assign the Servicing Agreements and the Advance Receivables to

---

[3]     Pooling and servicing agreements underlying securitization transactions often provide that the related servicing fee is elevated only if another party *that is not a wholly-owned affiliate of the originating servicer* takes over as the servicer of the loan portfolio.  Such a restriction was *not included in* the Servicing Agreements to which OAC is a party.

9

OSHC, free and clear of all Encumbrances and otherwise in accordance with the terms of the Assumption Agreement, and (iii) contemporaneously enter into and perform under the Subservicing Agreement.

21.    In the alternative, if the Court denies any or all of the relief requested paragraph 18 above, OAC seeks entry of an order authorizing the rejection of the Servicing Agreements effective as of the date hereof.

### Basis for Relief Requested

22.    Section 365(a) of the Bankruptcy Code provides, in relevant part that: "the trustee, subject to court approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Numerous courts, including this Court, have determined that agreements substantially similar to the Servicing Agreements constitute executory contracts subject to assumption or rejection under § 365. See, e.g., In re United Companies Financial Corp., Case No. 99-450 (MFW) (Bankr. D. Del. 1999); In re Helig Meyers Company, Case No. 0-34533 (DOT) (Bankr. E.D. Va. 2000); In re Cityscape Financial Corp. and Cityscape Corp., Case Nos. 98-B-22569 and 98-B-22570 (ASH) (Bankr. S.D.N.Y. 1998). Accordingly, provided that the Debtors (i) first cure any outstanding defaults under the Servicing Agreements and (ii) provide adequate assurance of OSHC's future performance under the Servicing Agreements, the Debtors may assign the Servicing Agreements to OSHC following assumption. 11 U.S.C. § 365(b)(1), (f)(1).

23.    A debtor's motion to assume, assume and assign, or reject an executory contract should be approved if the debtor has demonstrated that rejection or assumption and assignment is warranted and represents a valid exercise of the Debtors' business judgment. E.g., Sharon Steel, 872 F.2d at 40 (adopting business judgment test for determining propriety of trustee's decision to reject an executory contract); In re ANC Rental Corp., 277 B.R. 226, 238 (Bankr. D. Del. 2002)

10

("In order to assume and assign an executory contract . . . under section 365(f), the debtor must establish that the decision is one made in its sound business judgment."); In re Pinnacle Brands, Inc., 259 B.R. 46 (Bankr. D. Del. 2001) (same).

24.    As set forth above, assumption and assignment of the Servicing Agreements to OSHC clearly represents a valid exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and creditors.  Currently, OAC believes that there are no outstanding defaults under the Servicing Agreements, and thus, no cure costs associated with the proposed assumption.  Moreover, given the Debtors' current liquidity situation, OAC cannot continue to spend over $30 million annually servicing the RICs without receiving any material compensation.  Accordingly, the assumption and assignment of the Servicing Agreements to OSHC, and the resulting elevation in priority and increase in amount of some of the Servicing Fees, will provide for the payment of approximately $50-60 million per year in Servicing Fees to the Debtors' estates.

25.    Moreover, assumption and assignment of the Servicing Agreements to OSHC, with the Subservicing Agreement back to OAC, ensures that the RICs will continue to be serviced without disruption and that the Trusts are assured of future performance.  As previously stated, OAC cannot continue to service the RICs without adequate compensation.  If the Debtors' request to assume and assign the Servicing Agreements is not approved, the Debtors must reject the Servicing Agreements immediately because of the more than $2.5 million in monthly costs currently incurred in servicing the RICs.  The Debtors estimate that the rejection of the Servicing Agreements, followed by an immediate disruptive transfer of the servicing to a third party unfamiliar with the securitized RICs portfolio and without OAC's experience, would result in a permanent material decline in the overall value of the securitized RICs.  Thus, while the Trusts

11

will be required to pay market rates for the servicing going forward, the proposed assumption and assignment remains in their best interest.

26.    For all of these reasons, the assumption and assignment of the Servicing Agreements to OSHC, together with OAC's entry into the Subservicing Agreement, represents a sound and reasoned exercise of the OAC's business judgment and is in the best interests of the Debtors' estates and creditors. Alternatively, absent the assumption and assignment of the Servicing Agreements as requested above, immediate rejection is in the best interests of the Debtors' estates and will allow them to avoid the needless expenses related to continuing to honor OAC's obligations under the Servicing Agreements.

**Notice**

27.    No trustee, examiner or creditors' committee has been appointed in the Debtors' Chapter 11 cases. Notice of the hearing on this Motion has been provided to the United States Trustee, counsel to the Debtors' principal prepetition secured lenders and the holders of the forty (40) largest unsecured claims of the Debtors on a consolidated basis. The Debtors submit that under the circumstances no further notice is necessary.

**No Previous Request**

28.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request the entry of an order entry of an order (a)(i) authorizing OAC to assume Servicing Agreements, (ii) assign the Servicing Agreements and the Advance Receivables to OSHC, free and clear of all claims, liens and other encumbrances and otherwise in accordance with the terms of the Assumption Agreement, and (iii) contemporaneously enter into the Subservicing Agreement or, alternatively, (b) if the Court

12

denies any or all of the relief requested in the previous sentence, authorizing the rejection of the

Servicing Agreements effective as of the date hereof and (c) granting such other and further

relief to the Debtors as is just.

Dated:    Wilmington, Delaware
          November 1Υ , 2002

                              HUNTON & WILLIAMS


                              Peter S. Partee, VSB No. 34140
                              Michael G. Wilson, VSB No. 48927, DE Bar No. 4022
                              Riverfront Plaza, East Tower
                              951 East Byrd Street
                              Richmond, Virginia  23219-4074
                              Tel. (804) 788-8200
                              Fax. (804) 788-8218

                              Proposed Special Bankruptcy Securitization Counsel to
                              Oakwood Homes Corporation, et al., Debtors and
                              Debtors in Possession


                              - and -


                              MORRIS, NICHOLS, ARSHT & TUNNELL


                              Robert J. Dehney (No. 3578)
                              Derek C. Abbott (No. 3376)
                              Michael G. Busenkell (No. 3933)
                              1201 North Market Street
                              P.O. Box 1347
                              Wilmington, Delaware 19899-1347
                              (302) 658-9200


                              Proposed Co-Counsel for Oakwood Homes
                              Corporation, et al., Debtors and Debtors In Possession


                              13

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |

## ORDER PURSUANT TO §§ 365 AND/OR 363 OF THE BANKRUPTCY CODE AUTHORIZING OAKWOOD ACCEPTANCE CORPORATION TO (i) ASSUME AND ASSIGN SERVICING AGREEMENTS AND RELATED ADVANCE RECEIVABLES TO, AND ENTER INTO SUBSERVICING AGREEMENT WITH, AN AFFILIATE OR, IN THE ALTERNATIVE, (ii) REJECT SERVICING AGREEMENTS

Upon the motion (the "Motion") of Oakwood Homes Corporation and its affiliated debtors and debtors in possession in the above-referenced bankruptcy cases (together, the "Debtors") for entry of an order pursuant to sections 365 and 363 of title 11 of the Untied States Code (the "Bankruptcy Code") authorizing Debtor Oakwood Acceptance Corporation, LLC ("OAC") to (i) assume the servicing agreements included in the Pooling and Servicing Agreements (collectively, the "Pooling and Servicing Agreements"), (ii) assume the servicing agreement included in that certain Sale and Servicing Agreement, dated as of February 9, 2001 (the "Sale and Servicing Agreement"; together with the Pooling and Servicing Agreements, the "Servicing Agreements"), (iii) assign OAC's servicing rights under the Servicing Agreements and certain advance receivables to Oakwood Servicing Holdings Co., LLC ("OSHC") pursuant to the terms of that certain Assignment, Contribution, and Assumption Agreement (the "Assumption Agreement"), free and clear of all claims, liens and other encumbrances, and (iv) enter into a subservicing agreement (the "Subservicing Agreement") with OSHC; the Court having reviewed the Motion and the Declaration of Douglas Muir in Support of First Day Relief

(the "Muir Declaration"); and the Court having conducted a hearing (the "Hearing") to consider, among other things, the relief requested in the Motion; the Court having determined that the legal and factual bases set forth in the Motion and the Muir Declaration and the argument at the Hearing establish just cause for the relief granted herein; therefore, it is hereby FOUND and DETERMINED that:

     A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

     B.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

     C.     Notice of the Motion was sufficient under the circumstances.

     D.     The Debtors have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Servicing Agreements

     E.     There are no defaults under the Servicing Agreements and thus, no cure payments required to be paid.

     F.     The Debtors' decision to assume and assign the Servicing Agreements to OSHC is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

     G.     The Debtors' decision to enter into and perform their obligations under the Subservicing Agreement is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

     Accordingly, it is hereby ORDERED that:

     1.     The Motion is GRANTED.

2

2.      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3.      OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assume and assign the Servicing Agreements to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

4.      OAC is hereby authorized, pursuant to Bankruptcy Code § 363(f), to assign the Advance Receivables to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

5.      OAC is authorized, pursuant to Bankruptcy Code § 363(b)(1), to enter into and perform all obligations under the Subservicing Agreement.

6.      Each of the Debtors is hereby authorized to take such other and further actions as may be reasonably required or appropriate to effectuate the transactions contemplated by the Assumption Agreement and the Subservicing Agreement.

Dated: Wilmington, Delaware
           November _____, 2002

_____
UNITED STATES BANKRUPTCY JUDGE

320190

3

## EXHIBIT A

## Pooling and Servicing Agreements

Note: All Pooling and Servicing Agreements listed below include all amendments thereto as of the date hereof.

| Agreement | Date |
|---|---|
| Oakwood Acceptance Corporation REMIC Trust 1992-1 Pooling and Servicing Agreement | July 1, 1992 |
| Oakwood Acceptance Corporation REMIC Trust 1994-1 Pooling and Servicing Agreement | July 1, 1994 |
| Merrill Lynch Mortgage Investors, Inc. Series 1994-G Pooling and Servicing Agreement | April 1, 1994 |
| Oakwood Mortgage Investors, Inc. Series 1994-A Pooling and Servicing Agreement | November 1, 1994 |
| Oakwood Acceptance Corporation REMIC Trust 1995-1 Pooling and Servicing Agreement | February 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1995-A Pooling and Servicing Agreement | June 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1995-B Pooling and Servicing Agreement | October 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1996-A Pooling and Servicing Agreement | February 1, 1996 |
| Oakwood Acceptance Corporation Series 1996-1 Pooling and Servicing Agreement | April 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1996-B Pooling and Servicing Agreement | July 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1996-C Pooling and Servicing Agreement | October 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1997-A Pooling and Servicing Agreement | February 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-B Pooling and Servicing Agreement | May 1, 1997 |

| Agreement | Date |
|---|---|
| Deutsche Financial Capital Securitization, LLC Series 1997-I Pooling and Servicing Agreement | June 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-C Pooling and Servicing Agreement | August 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-D Pooling and Servicing Agreement | November 1, 1997 |
| Deutsche Financial Capital Securitization, LLC Series 1998-I Pooling and Servicing Agreement | January 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-A Pooling and Servicing Agreement | February 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-B Pooling and Servicing Agreement | May 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-C Pooling and Servicing Agreement | August 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-D Pooling and Servicing Agreement | October 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1999-A Pooling and Servicing Agreement | January 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-B Pooling and Servicing Agreement | April 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-C Pooling and Servicing Agreement | June 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-D Pooling and Servicing Agreement | August 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-E Pooling and Servicing Agreement | November 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 2000-A Pooling and Servicing Agreement | March 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2000-B Pooling and Servicing Agreement | June 1, 2000 |

| Agreement | Date |
|---|---|
| Oakwood Mortgage Investors, Inc. Series 2000-C Pooling and Servicing Agreement | September 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2000-D Pooling and Servicing Agreement | December 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2001-B Pooling and Servicing Agreement | February 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-C Pooling and Servicing Agreement | May 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-D Pooling and Servicing Agreement | August 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-E Pooling and Servicing Agreement | November 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2002-A Pooling and Servicing Agreement | February 1, 2002 |
| Oakwood Mortgage Investors, Inc. Series 2002-B Pooling and Servicing Agreement | May 1, 2002 |
| Oakwood Mortgage Investors, Inc. Series 2002-C Pooling and Servicing Agreement | August 1, 2002 |

**EXHIBIT B**

**Warehouse Facility Structure**



## EXHIBIT C

## OMI Securitization



## EXHIBIT D

## ASSIGNMENT, CONTRIBUTION AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("**Agreement**"), is made and entered into as of November [__], 2002, between Oakwood Acceptance Corporation, LLC, a Delaware limited liability company ("**Assignor**"), and Oakwood Servicing Holdings Co., LLC, a Nevada limited liability company ("**Assignee**").

## WITNESSETH

WHEREAS, Assignee is a wholly-owned subsidiary of the Assignor;

WHEREAS, Assignor is the servicer under the pooling and servicing agreements set forth on Schedule 1 hereto (collectively, the "**Pooling Agreements**") and the sale and servicing agreement dated February 9, 2001 (as amended from time to time, the "**Sale and Servicing Agreement**" and together with the Pooling Agreements, the "**Servicing Agreements**");

WHEREAS, Assignor desires to assign, transfer, grant and convey to Assignee, as a contribution to the Assignee, all of its right, title and interest under the Assets (defined below); and

WHEREAS Assignee desires to accept all right, title and interest of Assignor in and to the Assets and to assume all of the Assignor's obligations under the Servicing Agreements.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby act and agree as follows:

## ARTICLE I

## DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

SECTION 1.1       Definitions.  For all purposes of this Agreement, capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreements.  The following words shall have the following meanings:

"**Advance Company**" Oakwood Advance Receivables Company, L.L.C., a Nevada limited liability company.

"**Assets**" means all of the right, title and interest of Assignor in and  to the Servicing Agreements other than receivables arising from any Liquidation Expenses, provided that, for the avoidance of doubt, Assets shall not include certain receivables created by the advance of principal and interest that the Assignor previously conveyed to the Advance Company under the First Amended and Restated Receivables Contribution Agreement, dated as of April 1, 2002, between the Assignor and the Advance Company.

SECTION 1.2        Principles of Construction  The principles of construction set forth or referred to in the Pooling Agreements apply to this Agreement as if set forth herein, *mutatis mutandis*.

## ARTICLE II

## ASSIGNMENT OF INTERESTS

SECTION 2.1        Assignment and Contribution  As a capital contribution to the Assignee, Assignor hereby irrevocably grants, conveys, assigns, transfers, bargains, delivers and sets over to Assignee and its successors and assigns, without recourse and forever, all of Assignor's right, title and interest in and to the Assets.

SECTION 2.2        Assumption  Assignee hereby accepts the foregoing assignment, transfer and conveyance of Assignor's right, title, interest and obligations in and to the Assets and agrees and confirms that it shall be bound by all the terms of the Servicing Agreements. Assignee hereby accepts and assumes and undertakes to perform all of the obligations and liabilities of Assignor under the Servicing Agreements, whether arising before, on or after the date of this Agreement, to the extent not paid or performed by Assignor prior to the date of this Agreement.

SECTION 2.3        Trustee Acknowledgments and Rating Agency Letters.  The Assignee shall endeavor to obtain the written acknowledgment of each Trustee under the Servicing Agreements substantially in the form of Schedule 2 to this Agreement to the transactions effected under this Agreement,  and (ii) letters from each Rating Agency that the transactions effected under this Agreement, in and of themselves will not result in a downgrading of the ratings initially assigned by the Rating Agency to any Class of Certificates issued pursuant to the Pooling Agreements.

## ARTICLE III

## GENERAL PROVISIONS

SECTION 3.1        Further Assurances.  Assignor and Assignee shall each take any and all further actions and execute and deliver any and all such further documents and undertakings as are necessary or reasonably requested by any other party to effectuate the purposes of this Agreement.  The undertakings set forth in this section shall survive the execution and delivery of this Agreement.

SECTION 3.2        Notices.  Any notice, request, demand or other communication to be given or made under the Servicing Agreements shall be as provided to the following addresses:

Assignor:    Oakwood Acceptance Corporation, LLC
             P.O. Box 27081
             Greensboro, NC  27425-7081
             Attn:  Douglas R. Muir
             Phone:  (336) 664-2360

2

Fax: (336) 664-3224

Assignee:     Oakwood Servicing Holdings Co., LLC
              Bank of America Center
              101 Convention Center Drive, Suite 850
              Las Vegas, NV 89109
              Attn: Susan J. Miller
              Phone: (702) 598-3738
              Fax: (702) 598-3651

SECTION 3.3      Successors and Assigns.  This Agreement shall bind and inure to the benefit of Assignor, Assignee and their respective successors and assigns.

SECTION 3.4      No Waiver.  The execution, delivery and performance of this Agreement shall not, except to the extent expressly set forth herein, constitute a waiver, amendment or modification of any provision of the Servicing Agreements.

SECTION 3.5      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to choice of law principles.

SECTION 3.6      Counterparts.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

SECTION 3.7      Captions.  The section headings appearing in this Agreement are included solely for ease of reference and are not intended to and shall not affect the interpretation of any provision of this Agreement or the Servicing Agreements.

SECTION 3.8      Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of any provision in any other jurisdiction.  Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the parties to this Agreement to the full extent permitted by law so that this Agreement shall be deemed a valid, binding agreement, enforceable in accordance with its terms.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

3

IN WITNESS WHEREOF, the parties hereto, acting by and through their respective duly authorized officers or representatives, have executed this Agreement as of the day and year first written above.

**Oakwood Acceptance Corporation, LLC**

By:_____
Name:
Title:

**Oakwood Servicing Holdings Co., LLC**

By:_____
Name:
Title:

[ASSIGNMENT, CONTRIBUTION AND ASSUMPTION AGREEMENT]

SCHEDULE I
TO ASSIGNMENT AND
ACCEPTANCE AGREEMENT

**Pooling Agreements**

## Form of Trustee Acknowledgment

Oakwood Acceptance Corporation, LLC
P.O. Box 27081
Greensboro, NC  27425-7081

Oakwood Servicing Holdings Co., LLC
Bank of America Center
101 Convention Center Drive, Suite 850
Las Vegas, NV 89109

Re:    Assignment and Assumption Agreement, dated as of November __, 2002 (the "Assignment and Assumption Agreement"), between Oakwood Acceptance Corporation, LLC ("OAC") and Oakwood Servicing Holdings Co., LLC ("OSH").

Dear Sirs:

      The undersigned hereby acknowledges that, pursuant to the terms of the Assignment and Acceptance Agreement, (a) OAC has assigned of all its right, title and interest to the Servicing Agreements to OSH, (b) OSH has accepted such right, title and interest in the Servicing Agreements, and (c) OSH has assumed all of OAC's obligations under the Servicing Agreements and has agreed to be bound by each of the servicer's obligations thereunder. The undersigned further acknowledges that OSH subseqently has delegated its duties and obligations under the Servicing Agreements and OAC has agreed to perform such duties and obligations pursuant to a Subservicing Agreement, dated as of November __, 2002, by and between OAC and OSH. The undersigned further acknowledges that the servicing fees under the Servicing Agreements have been adjusted in accordance with the terms of the Servicing Agreements.

**[Trustee]**

By:_____
Name:
Title:

## EXHIBIT E

## SUBSERVICING AGREEMENT

This Subservicing Agreement ("**Agreement**"), is made and entered into as of November [__], 2002, between Oakwood Acceptance Corporation, LLC, a Delaware limited liability company ("**OAC**" or '**Subservicer**"), and Oakwood Servicing Holdings Co., LLC, a Nevada limited liability company ("**Owner**").

## WITNESSETH

WHEREAS, pursuant to the Assignment, Contribution and Assumption Agreement, dated as of November __, 2002 (the "**Assignment Agreement**"), the Owner acquired from OAC all of the rights and obligations of the servicer under the pooling and servicing agreements set forth on Schedule 1 hereto (collectively, the "**Pooling Agreements**") and under the sale and servicing agreement, dated as of February 9, 2001 (as amended from time to time, the "**Sale and Servicing Agreement**" and together with the Pooling Agreements, the "**Servicing Agreements**");

WHEREAS, Owner desires to engage the Subservicer as its agent to perform all of the duties and obligations of the servicer under the Servicing Agreements; and

WHEREAS, Subservicer desires to perform, as agent of the Owner, all of the duties and obligations of the servicer under the Servicing Agreements.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subservicer and Owner hereby act and agree as follows:

## ARTICLE I

## DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

SECTION 1.1      Definitions. For all purposes of this Agreement, capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreements. The following words shall have the following meanings:

"Advance Receivables" means all Extension Receivables and Servicing Advance Receivables due to OAC and assigned to the Owner pursuant to the Assignment Agreement.

"Extension Receivables" means all amounts due to OAC as a result of OAC having made certain corporate advances made under the Loan Assumption Program or related programs.

"Servicing Advance Receivables" means all amounts due to OAC as a result of OAC having made certain Servicing Advances under the Servicing Agreements; provided that for the avoidance of doubt, Servicing Advance Receivables shall not include any receivables arising

from any Liquidation Expenses.

SECTION 1.2    Principles of Construction. The principles of construction set forth or referred to in the Pooling Agreements apply to this Agreement as if set forth herein, *mutatis mutandis*.

## ARTICLE II

## ENGAGEMENT

SECTION 2.1    General. The Owner hereby delegates to the Subservicer, and the subservicer hereby agrees to perform, the Owner's duties and obligations under the Servicing Agreements. Subservicer shall service and administer each Contract or Mortgage Loan in accordance with the terms of the applicable Servicing Agreement, as such terms may be supplemented hereby, and shall have full power and authority, acting alone, to do or cause to be done any and all actions in connection with such servicing and administration that the Subservicer reasonably may deem necessary or desirable and consistent with the terms of the applicable Servicing Agreement, as such terms may be supplemented hereby. The Subservicer shall service each Contract or Mortgage Loan in its own name and shall be under no obligation, unless required by law, to disclose that it will service such Contract or Mortgage Loan on behalf of the Owner.

SECTION 2.2    Advancing. The Subservicer, on behalf of the Owner, will make all advances required under the Servicing Agreements; provided that, upon instruction and notification from the Owner that the Owner will off-set a specified advancing obligation with an Advance Receivable, the Subservicer shall not make or cause to be made the specified advance.

SECTION 2.3    Title; Possession of Documents,. This Agreement shall be an agency agreement. The Subservicer hereby acknowledges that the Owner will retain ownership of the right to service Contracts and Mortgage Loans under the Servicing Agreements, and agrees that this Agreement shall not convey any title to such rights. The Owner will deliver into the possession of the Subservicer all documentation related to the Contracts and the Mortgage Loans, and the Subservicer hereby agrees to hold such documentation as custodian for the Owner. The Subservicer will deliver any and all documentation to the Owner as the Owner may request upon five calendar days prior written notice.

SECTION 2.4    Compensation As on-going consideration for its performance under the Servicing Agreements and this Agreement, the Subservicer shall be entitled to [1/4] of all amounts paid to the servicer as "Servicing Fees" under the Servicing Agreements (the "**Subservicing Fee**"). The Subservicer may retain the Subservicing Fee from all amounts remitted to the Owner under Section 2.4 of this Agreement.

SECTION 2.5    Remittance to Owner. On each Distribution Date, the Subservicer shall remit to Owner all amounts paid to the servicer under the Servicing Agreements less amounts equal to the Subservicing Fee. All amounts remitted to the Owner shall be made in Dollars in immediately available funds to the Administrative Agent by wire or electronic transfer

2

to [Bank Name], [Bank Address], ABA #[___], Account # [___], Ref: OSH/OAC Subservicing Agreement.

SECTION 2.6        Reports to Owner.  Except as requested by the Owner in writing, the Subservicer shall not be required to furnish any reports to the Owner; provided that the Subservicer shall make available any and all reports provided to or received from the Trustee under a Servicing Agreement.

SECTION 2.7        Term.  The Owner may terminate this Agreement only upon the Subservicers failure to perform under the Servicing Agreements and upon thirty Business Days' prior written notice to the Subservicer of the Owner's intent to terminate this Agreement.  The Subservicer may resign, assign or otherwise terminate its obligations so long as the Subservicer has provided to the Owner sixty Business Days' prior written notice of its intent to resign, assign or terminate this Agreement.

SECTION 2.8        Actions Required of Owner.  To the extent required in the course of servicing any Contract or Mortgage Loan, the Owner will provide a corporate officer, who shall have full authority to act by on behalf of the Owner, to execute and deliver documents, and otherwise handle matters that require actions by the Owner that cannot be delegated to or performed by the Subservicer.

SECTION 2.9        Trustee Acknowledgments and Rating Agency Letters.  The Owner shall endeavor to obtain (i) the written acknowledgment of each Trustee under the Servicing Agreements substantially in the form of Schedule 2 to this Agreement to the subservicing arrangement established pursuant to this Agreement, and (ii) letters from each Rating Agency that the subservicing arrangement established pursuant to this Agreement will not result in a downgrading of the ratings in and of itself, initially assigned by the Rating Agency to any Class of Certificates issued pursuant to the Pooling Agreements.

## ARTICLE III

## GENERAL PROVISIONS

SECTION 3.1        Further Assurances.  Subservicer and Owner shall each take any and all further actions and execute and deliver any and all such further documents and undertakings as are necessary or reasonably requested by any other party to effectuate the purposes of this Agreement.  The undertakings set forth in this section shall survive the execution and delivery of this Agreement.

SECTION 3.2        Notices.  Any notice, request, demand or other communication to be given or made under the Servicing Agreements shall be as provided to the following addresses:

Subservicer:    Oakwood Acceptance Corporation, LLC
                P.O. Box 27081
                Greensboro, NC  27425-7081
                Attn:  Douglas R. Muir
                Phone:  (336) 664-2360

3

Fax: (336) 664-3224

Owner:        Oakwood Servicing Holdings Co., LLC
              Bank of America Center
              101 Convention Center Drive, Suite 850
              Las Vegas, NV 89109
              Attn: Susan J. Miller
              Phone: (702) 598-3738
              Fax: (702) 598-3651

SECTION 3.3        Successors and Assigns. This Agreement shall bind and inure to the benefit of Subservicer, Owner and their respective successors and assigns.

SECTION 3.4        No Waiver. The execution, delivery and performance of this Agreement shall not, except to the extent expressly set forth herein, constitute a waiver, amendment or modification of any provision of the Servicing Agreements.

SECTION 3.5        Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to choice of law principles.

SECTION 3.6        Counterparts. This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

SECTION 3.7        Captions. The section headings appearing in this Agreement are included solely for ease of reference and are not intended to and shall not affect the interpretation of any provision of this Agreement or the Servicing Agreements.

SECTION 3.8        Severability. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of any provision in any other jurisdiction. Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the parties to this Agreement to the full extent permitted by law so that this Agreement shall be deemed a valid, binding agreement, enforceable in accordance with its terms.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto, acting by and through their respective duly authorized officers or representatives, have executed this Agreement as of the day and year first written above.

**Oakwood Acceptance Corporation, LLC**

By:_____
Name:
Title:

**Oakwood Servicing Holdings Co., LLC**

By:_____
Name:
Title:

[SUBSERVICING AGREEMENT]

SCHEDULE 1
TO SUBSERVICING AGREEMENT

**Pooling Agreements**

[See schedule attached to Assignment Agreement]

SCHEDULE 2
TO SUBSERVICING AGREEMENT

**Form of Trustee Acknowledgements**

[See form attached to Assignment Agreement]

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | *related docket # 20* |
| | ) | |

**ORDER PURSUANT TO §§ 365 AND 363 OF THE BANKRUPTCY CODE
AUTHORIZING OAKWOOD ACCEPTANCE CORPORATION TO (i) ASSUME THE
OMI NOTE TRUST 2001-A SALE AND SERVICING AGREEMENT, (ii) ASSIGN ITS
RIGHTS AS "SERVICER" UNDER THE SALE AND SERVICING AGREEMENT TO
AN AFFILIATE, AND (iii) ENTER INTO A SUBSERVICING AGREEMENT
WITH AN AFFILIATE**

Upon the motion (the "Motion") of Oakwood Homes Corporation and its affiliated

debtors and debtors-in-possession in the above-referenced bankruptcy cases (collectively, the

"Debtors") for entry of an order pursuant to sections 365 and 363(b) and (f) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), authorizing Debtor

Oakwood Acceptance Corporation, LLC ("OAC") to, among other things, (i) assume that certain

Sale and Servicing Agreement, dated as of February 9, 2001 (as previously amended and as

hereafter amended, supplemented or modified from time to time, the "Sale and Servicing

Agreement"), and (ii) assign all of OAC's right, title and interest as "Servicer" in, to and under

the Sale and Servicing Agreement to a wholly-owned subsidiary of OAC, Oakwood Servicing

Holdings Co., LLC ("OSHC"), pursuant to an assignment, contribution, and assumption

agreement, free and clear of all Encumbrances (as defined in the Motion), and (iv) enter into and

perform its obligations under a subservicing agreement with OSHC; the Debtors having filed

with the court (x) an Assignment, Contribution and Assumption Agreement (Sale and Servicing

Agreement), a copy of which is annexed hereto as Exhibit A (as amended, supplemented or

1

otherwise modified from time to time, the "Assumption Agreement"), and (y) a Subservicing Agreement (Sale and Servicing Agreement), a copy of which is annexed hereto as Exhibit B (as amended, supplemented or otherwise modified from time to time, the "Subservicing Agreement"); the Court having reviewed the Motion and the Declaration of Douglas Muir in Support of First Day Relief (the "Muir Declaration"); and the Court having conducted a hearing on December 12, 2002 (the "Hearing") to consider, among other things, the relief requested in the Motion; the Court having determined that the legal and factual bases set forth in the Motion and the Muir Declaration and the argument at the Hearing establish just cause for the relief granted herein; therefore, it is hereby FOUND and DETERMINED that:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.      Notice of the Motion was sufficient under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the surrounding facts and circumstances.

D.      OAC has satisfied the applicable requirements of § 365 of the Bankruptcy Code in connection with its assumption of the Sale and Servicing Agreement, and OAC's decision to so assume the Sale and Servicing Agreement constitutes a reasonable exercise of OAC's business judgment and is in the best interest of the Debtors' bankruptcy estates.

E.      OAC has satisfied the applicable requirements of § 365 of the Bankruptcy Code in connection with its assignment of all of its right, title and interest as "Servicer" in, to and under the Sale and Servicing Agreement to OSHC, and OAC's decision to so assign such right, title and interest constitutes a reasonable exercise of OAC's business judgment and is in the best interest of the Debtors' bankruptcy estates.

2

F.    The Debtors' decision to enter into and perform their obligations under the Subservicing Agreement is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

Accordingly, it is hereby ORDERED that:

1.    The Motion is GRANTED.

2.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3.    OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assume the Sale and Servicing Agreement.

4.    OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assign all of OAC's right, title and interest as "Servicer" in, to and under the Sale and Servicing Agreement to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

5.    OAC is hereby authorized, pursuant to Bankruptcy Code § 363(b)(1), to enter into deliver the Assumption Agreement substantially in the form annexed hereto, and to perform its obligations thereunder.

6.    OAC is authorized, pursuant to Bankruptcy Code § 363(b)(1), and to enter into deliver the Subservicing Agreement substantially in the form annexed hereto, and to perform its obligations thereunder.

7.    OAC shall perform its obligations under the Assumption Agreement, the Subservicing Agreement, the Sale and Servicing Agreement and any and all prepetition agreements governing the sale of RICs to the Warehouse Trust, the purchase of notes issued by the Warehouse Trust and the servicing of such notes (the Assumption Agreement, the Subservicing Agreement, the Sale and Servicing Agreement and all such other agreements, each

as previously amended and as hereafter amended, supplemented or otherwise modified from time to time, the "Warehouse Facility Agreements", all as identified more specifically on Exhibit C annexed hereto) and any and all liability of OAC arising from or related to any failure to perform such obligations shall be an allowed administrative expense pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

8.    Each non-Debtor party to the Warehouse Facility Agreements, and each of the Indenture Trustee and the Class A Note Agent (in their capacity as express third-party beneficiaries to the Assumption Agreement and the Subservicing Agreement), shall be entitled to enforce its respective rights and remedies thereunder against OAC (and any other applicable Debtor) (subject to the immediately following sentence) and each non-Debtor party thereto and against all property subject thereto, and in the case of rights and remedies against OAC (or such other Debtor), shall be entitled to appropriate relief from this Court in furtherance of such enforcement. Each non-Debtor party to the Warehouse Facility Agreements shall be entitled to enforce its rights and remedies thereunder against OAC (or such other Debtor) free from the automatic stay imposed by § 362(a) of the Bankruptcy Code or by any stay or other relief issued under § 105 of the Bankruptcy Code or otherwise in any of the Debtors' cases, provided that, if any stay or other relief would otherwise be applicable absent the provisions of this Order, such non-Debtor party shall not exercise such rights and remedies until five business days after it has provided written notice of the event of default or other circumstance or condition giving rise to such rights and remedies to the Debtors' special bankruptcy securitization counsel and counsel to any official committee appointed in the Debtors' bankruptcy cases (it being hereby ordered that the only issue that may be raised by any party-in-interest seeking to oppose or otherwise affect

4

the exercise of such rights and remedies is the non-existence of such event of default or other circumstance or condition).

9.      Each of the Debtors is hereby authorized to take such other and further actions as may be reasonably required or appropriate to effectuate the transactions contemplated by, and to perform its obligations under, the Sale and Servicing Agreement, the Assumption Agreement and the Subservicing Agreement.

10.      This Court retains jurisdiction to resolve any disputes relating to the relief granted in this Order.

Dated: Wilmington, Delaware
~~December ____, 2002~~
Jan. 7, 2003

_____
UNITED STATES BANKRUPTCY JUDGE

5

*EXHIBIT C*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DEBTORS' MOTION FOR AUTHORITY TO (i) HONOR CERTAIN PRE-PETITION SERVICING AND RELATED OBLIGATIONS, (ii) CONTINUE SECURITIZING ADVANCE REIMBURSEMENT RIGHTS IN THE ORDINARY COURSE OF BUSINESS, (iii) CONTINUE FUNDING AND PURCHASING RETAIL INSTALLMENT SALES CONTRACTS AND OTHER LOANS ORIGINATED BY THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS, AND (iv) CONTINUE SECURITIZING SUCH CONTRACTS AND LOANS IN THE ORDINARY COURSE OF BUSINESS**

Oakwood Homes Corporation, together with its affiliated debtors and debtors-in-possession in the above-referenced bankruptcy cases (collectively, the "Debtors"), hereby move the Court pursuant to sections 105 and 363 of Title 11 of the Untied States Code (the "Bankruptcy Code") for entry of an order authorizing one of the Debtors, Oakwood Acceptance Corporation ("OAC"), to (i) honor certain pre-petition servicing and related advance obligations to (a) various securitization trusts (collectively, the "Securitization Trusts") under the pooling and servicing agreements listed on Exhibit A hereto (collectively, the "Pooling and Servicing Agreements") and (b) the OMI Note Trust 2001-A, a limited purpose trust owned by an indirect downstream affiliate of OAC (the "Warehouse Trust"; together with the Securitization Trusts, the "Trusts"), under the agreements listed on Exhibit B hereto (collectively, the "Warehouse Facility Agreements"), pending the resolution of the Debtors' concurrently filed motion for authority to assume and assign the Pooling and Servicing Agreements and the Warehouse Facility Agreements, (ii) continue securitizing by selling and contributing to Oakwood Advance

Receivables Company, L.L.C., a non-debtor limited purpose entity wholly-owned by OAC ("Oakwood ARC"), in the ordinary course of the Debtors' business and substantially in accordance with the agreements listed on Exhibit C (collectively, the "Advance Facility Agreements"), OAC's right to be reimbursed for advances of delinquent principal and interest ("P&I Advances") made by OAC to the Trusts as part of its servicing obligations under the Pooling and Servicing Agreements and the Warehouse Facility Agreements, (iii) continue funding and purchasing retail installment sales contracts and mortgage loans originated by certain of the Debtors and third-party retailers (collectively, "RICs") in the ordinary course of OAC's business, (iv) continue securitizing all RICs acquired by OAC by selling them initially to Ginkgo Corporation, a limited purpose entity owned by an unaffiliated third-party ("Ginkgo"), and ultimately to the Warehouse Trust in the ordinary course of OAC's business and substantially in accordance with the Warehouse Facility Agreements, and (v) engaging in such other and further securitization-related activities as are within the ordinary course of the Debtors' businesses. In support of this Motion, the Debtors rely upon the Declaration of Douglas R. Muir in Support of First Day Relief (the "Muir Declaration"), filed contemporaneously herewith and incorporated herein by reference.[1] In further support of this Motion, the Debtors respectfully represent as follows:

## I.  General Background

1.    On November 15, 2002 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their property and operate their business as debtors in possession in accordance with §§ 1107 and

---

[1]    Copies of the Pooling and Servicing Agreements, the Advance Facility Agreements, and the Warehouse Facility Agreements are available in electronic form and will be provided by the Debtors' proposed special bankruptcy securitization counsel upon written request.

1108 of the Bankruptcy Code. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district in accordance with 28 U.S.C. §§ 1408 and 1409. No trustee or examiner has been appointed in these cases.

    2.    The statutory predicates for the relief requested herein are §§ 105 and 363 of the Bankruptcy Code.

    3.    The Debtors and their non-Debtor affiliates manufacture, market, and finance manufactured housing. Collectively, they constitute the third largest manufacturer and one of the largest retailers of manufactured housing in the United States, with annual sales currently approaching one billion dollars.

    4.    Because traditional financing sources are insufficient to sustain the tremendous manufacturing and sales volume the Debtors historically have experienced, the Debtors with retail sales operations and various independent dealers (collectively, the "Retailers") provide financing options to their customers through OAC, which purchases on a non-recourse basis certain of the RICs originated by the Retailers. OAC itself originates the RICs that are mortgage loans. OAC funds its purchases and originations by participating in public and private asset securitization transactions as described herein.

    5.    Historically, securitization transactions have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs. In fact, OAC historically made a material profit on its securitization transactions. Although that profit has been reduced or even eliminated, the securitization transactions engaged in by OAC pre-petition still remain the least expensive method for financing for the Debtors' operations. Accordingly, the Debtors believe that continuing to participate in the securitization transactions described herein and other similar transactions in the ordinary course of business is absolutely essential to the Debtors' ability to reorganize successfully under Chapter 11.

3

6.    As part of the securitization process, OAC retains the contractual right to service all securitized RICs in exchange for a monthly fee.  As part of its servicing duties, pursuant to the Pooling and Servicing Agreements and the Warehouse Facility Agreements, OAC is required to make P&I Advances to the Trusts.  OAC also is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations, including without limitation, (i) any recoverable advances for taxes, insurance and other charges against property securing the RICs, (ii) enforcement or judicial proceedings, including foreclosures, and (iii) management of foreclosed property through liquidation ("Servicing Advances"; together with P&I Advances, "Advances").  OAC finances P&I Advances through the securitization transactions effected under the Advance Facility Agreements as described below.

7.    OAC believes that continuing to service securitized RICs, including making Advances when and if required, substantially decreases the costs of securitization transactions and increases the liquidity available to the Debtors through securitization.  As a result, OAC's continued performance of its servicing and related Advance obligations is critical to ensuring the Debtors' ability to continue engaging in securitization transactions on favorable terms.  In addition to that benefit, OAC believes that once the priority of its servicing fee is restructured as described below, OAC's servicing rights will have substantial independent economic value.

## II.  The Debtors' Securitization Transactions

### A.    The Warehouse Facility

8.    As noted above, when one of the Retailers originates a non-mortgage loan RIC through the sale of a manufactured home, OAC funds the RIC by taking an individual non-recourse assignment of the RIC in exchange for OAC's payment of the face amount of the RIC,

4

plus or minus various agreed upon adjustments, if any.[2]  OAC funds the origination or mortgage

loan RICs itself.  Merely holding the RICs and collecting payments thereunder until the RICs are

securitized in a public or private term securitization, however, does not leave OAC with

sufficient liquidity to sustain its financing operations.  Most companies in the manufactured

housing industry achieve the necessary pre-securitization liquidity through a traditional asset-

based secured "warehouse" line of credit.  OAC, in contrast, achieves the necessary liquidity at a

much lower cost through a securitized warehouse facility established pursuant to the Warehouse

Facility Agreements (the "Warehouse Facility").

      9.     Under the Warehouse Facility, OAC sells each RIC it acquires to Ginkgo in

exchange for cash in an amount equal to 100% of the fair market value of the RICs (the "Cash

Purchase Price").  Ginkgo simultaneously sells the RICs acquired from OAC to Oak Leaf

Holdings, LLC, a limited purpose, non-debtor indirect subsidiary of OAC ("Oak Leaf"), in

exchange for the Cash Purchase Price.  Oak Leaf simultaneously sells the RICs to the Warehouse

Trust, the residual interest in which is owned by Oak Leaf.  The Warehouse Trust periodically

issues notes with an aggregate face amount of up to 81% of the aggregate face amount of the

RICs and distributes the resulting proceeds to Oak Leaf as consideration for the RICs.  The

remaining difference, if any, between the fair market value of the RICs and the note proceeds

distributed to Oak Leaf constitutes a capital contribution to the Warehouse Trust and increases

the value of Oak Leaf's residual interest in the Trust and with it, Oakwood's indirect ownership

---

[2]    In the process of originating and funding the RICs, both the Retailers and OAC incur
certain "pre-funding obligations" in the ordinary course.  Contemporaneously herewith,
the Debtors have filed their motion for authority to continue to honor such pre-funding
obligations in the ordinary course of business, even if such obligations arose prior to the
Petition Date.

interest in Oak Leaf. A diagram displaying the ownership structure and flow of funds in connection with the Warehouse Facility is annexed hereto as Exhibit D.

10.    Each sale of the RICs in connection with the Warehouse Facility is structured as true sale" for bankruptcy purposes and, therefore, is effective to extricate the RICs from each seller's bankruptcy estate. The net economic effect of the transactions effected by the Warehouse Facility is the monetization of up to 81% of OAC's investment in RICs acquired from the Retailers. The residual value, if any, of the RICs remains non-monetized as an investment in the Warehouse Trust (which redounds to the benefit of OAC through its ownership of Oakwood Capital Corp., the parent corporation of Oak Leaf) pending a conventional public term securitization as described below. Following such a public term securitization, any residual value of the RICs in the Warehouse Trust is monetized and the resulting proceeds issued as dividends and distributed upstream through Oak Leaf and Oakwood Capital Corp. to OAC.

11.    Although the Warehouse Facility terminates by its terms upon the commencement of the Debtors' bankruptcy cases, OAC has requested and expects to receive from the holder of notes issued by the Warehouse Trust a waiver of that termination and an agreement to continue the Warehouse Facility under the same or substantially the same terms and conditions as in the Warehouse Facility Agreements, provided that the Court grants the relief requested in this Motion.

**B.    Public Term Securitizations**

12.    Once a sufficient face amount of RICs have accumulated in the Warehouse Trust (typically $150-300 million per quarter), the Warehouse Trust securitizes the RICs as part of a conventional public term securitization (an "OMI Securitization"). The net proceeds of each OMI Securitization are used first to pay off the then-outstanding notes issued by the Warehouse Trust. Any additional proceeds are distributed upstream to Oak Leaf and ultimately to OAC.

6

The net economic effect of an OMI Securitization is to monetize OAC's indirect residual interest in the Warehouse Trust.

13.    Each OMI Securitization involves the true sale (for bankruptcy and accounting purposes) of warehoused RICs by the Warehouse Trust to Oakwood Mortgage Investors, Inc., a non-debtor limited purpose wholly-owned subsidiary of OAC ("OMI"), pursuant to a sales agreement.  OMI simultaneously sells the acquired RICs to a Securitization Trust established for each OMI Securitization pursuant to a Pooling and Servicing Agreement in exchange for multiple tranches of "pass-through" asset-backed securities that collectively represent 100% of the beneficial ownership interest in the securitized RICs ("Pass-Through Certificates").

14.    Payments of principal and interest on the securitized RICs constitute the primary, and frequently sole, source of payment for amounts due to holders of the Pass-Through Certificates.  The higher rated "AAA" tranches of the Pass-Through Certificates generally are entitled to be paid prior to the lower rated or "B-piece" tranches of the Pass-Through Certificates.  Residual Pass-Through Certificates are entitled to paid if and only if all other Pass-Through Certificates have been paid in full and, therefore, are frequently non-economic.  OMI sells the higher-rated or "AAA" tranches of Pass-Through Certificates it issues to one or more underwriters (the "Underwriters"), who resell them to third-party investors in connection with one or more public or private offerings.  OMI then sells the lower rated or B-piece tranches of the Pass-Through Certificates either to a third-party investor or to Oakwood Financial Corporation, a non-debtor limited purpose sister subsidiary of OAC ("OFC").  OFC then either holds the B-piece Pass-Through Certificates it acquires, sells, or securitizes them.  The residual tranches of Pass-Through Certificates also typically are sold to OFC.  OFC funds its acquisition of B-piece and residual Pass-Through Certificates with the proceeds of capital contributions from

7

its parent corporation, Oakwood Homes. A diagram depicting the ownership structure and flow of funds in each OMI Securitization is annexed hereto as Exhibit E.

15.    Certain of the B-piece Pass-Through Certificates issued in OMI Securitizations carry with them "stapled" guarantees by Oakwood Homes of the RICs underlying such Pass-Through Certificates (the "B-2 Guarantees"), but the B-2 Guarantees are limited in amount to shortfalls in distributions on the related B-piece Pass-Through Certificates. Because those Pass-Through Certificates represent a very low percentage of each pool of securitized RICs (typically 6% or less), they do not represent a material level of recourse relative to the total amount of Pass-Through Certificates issued in OMI Securitizations, nor do they exceed or even equal the level of losses historically experienced on RICs. Currently, there are over $4 billion of outstanding Pass-Through Certificates that were issued in OMI Securitizations. Other than Oakwood Homes' contingent liability on the B-2 Guarantees, none of the Debtors has any liability—recourse or non-recourse--on any of the Pass-Through Certificates. OAC has no liability whatsoever on any of the Pass-Through Certificates.

C.    **OAC's Servicing Obligations**

16.    OAC currently acts as the servicer with respect to the securitized RICs owned by the Trusts. "Servicing" securitized RICs entails (i) collecting payments of principal and interest from obligors and remitting them to the appropriate Securitization Trusts, (ii) escrowing payments of taxes and interest and remitting them to the appropriate recipients, (iii) enforcing the securitized RICs when they fall into default, including commencing and prosecuting replevin and foreclosure actions, and (iv) otherwise monitoring and reporting on the status of the RICs for the benefit of the Trusts as the owners of the securitized RICs.

17.    In exchange for servicing the securitized RICs, OAC is entitled to a monthly fee ranging from $1/12^{th}$ of .75% to $1/12^{th}$ of 1% of the outstanding balance of the RICs in each Trust

8

(the "Servicing Fee"). The right to the payment of the Servicing Fee from each Trust, however, is subordinate to the payment of all amounts due on that Trust's outstanding Pass-Through Certificates (or notes, with respect to the Warehouse Trust) in a given month for so long as OAC remains the "Servicer" under the Pooling and Servicing Agreements and the Warehouse Facility Agreements. Because of this subordination provision and the losses experienced by the Trusts on the securitized RICs, OAC currently is not receiving significant payments on account of the Servicing Fee. If and when any party other than OAC becomes the "Servicer" under the Pooling and Servicing Agreements and the Warehouse Facility Agreements, however, the priority of the Servicing Fee is elevated, and in many cases, the amount of the Servicing Fee is increased by a material amount.

18.    Contemporaneously with this Motion, therefore, OAC is filing a motion (the "Assumption Motion") for authority to assume and assign its servicing rights under the Pooling and Servicing Agreement and the Warehouse Facility Agreements to Oakwood Servicing Holdings Co., LLC, a newly-formed wholly-owned limited purpose subsidiary of OAC ("OSHC"). As explained in greater depth in the Assumption Motion, OSHC intends to perform the servicing obligations imposed by the Pooling and Servicing Agreements and the Warehouse Facility Agreements through a subservicing agreement with OAC.

19.    As and when necessary to perform its servicing duties, OAC, as the servicer, has the obligation to make Servicing Advances, but only if OAC reasonably deems the Servicing Advance to be recoverable. Servicing Advances are designed to be temporary and solely for the sake of convenience and expediency.    Accordingly, OAC, as servicer, is entitled to reimbursement for all Servicing Advances from subsequent collections of tax and insurance escrow payments, insurance proceeds and liquidation proceeds collected by the Trusts that received the Servicing Advances. In addition, if at any point OAC, as the servicer, deems a

9

previously made Servicing Advance to be non-recoverable, OAC generally is entitled to reimbursement for that Servicing Advance immediately from any funds in the related Trust.

20.    In addition, to the extent obligors on the securitized RICs are delinquent in the payment of principal or interest, OAC, as the servicer, in most cases must make a P&I Advance, generally on the 15th of each month, but only if OAC reasonably deems the P&I Advance to be recoverable. P&I Advances are temporary and for liquidity purposes only. Accordingly, OAC, as servicer, is entitled to reimbursement from the Trusts, as applicable, for all P&I Advances made, either from subsequent collections on the related delinquent RICs or subsequent collections on the entire pool of RICs in a particular Trust. Moreover, if OAC at any point deems a previously made P&I Advance to be non-recoverable in any particular month, OAC may reimburse itself immediately for that P&I Advance from any funds in the related Trust. OAC advances between $35 to $45 million in P&I Advances to the Trusts each month, then generally reimburses itself for substantially the same amount over the course of the following month.

**D.    The Advance Facility**

21.    OAC finances the performance of certain of its P&I Advance obligations under the Pooling and Servicing Agreements and the Warehouse Facility Agreements by securitizing the receivable represented by its right to reimbursement of P&I Advances from the Trusts ("Advance Receivables"). OAC securitizes the Advance Receivables by selling them to Oakwood ARC in exchange for cash in an amount equal to 90% - 99% of the face value of the Advance Receivables pursuant to the Advance Facility Agreements. The difference, if any, between the fair market value of the Advance Receivables and the cash consideration received by OAC from Oakwood ARC constitutes a capital contribution to Oakwood ARC, which is a direct wholly-owned subsidiary of OAC. Each sale of an Advance Receivable is structured as a

10

true sale for bankruptcy and accounting purposes and, therefore, is effective both to extricate the Advances Recievables from OAC's bankruptcy estate and remove them from OAC's financial statements.

22.    Oakwood ARC funds its purchases of Advance Receivables from OAC using proceeds of notes issued to Prudential Investment Management, Inc. and certain other investors (collectively, the "Advance Facility Investors") and pledges the Advance Receivables as collateral for such notes (the "Advance Facility"). A diagram depicting the ownership structure and flow of funds in connection with the Advance Facility is annexed hereto as Exhibit F.

23.    Although the Advance Facility terminates by its terms upon the Debtors' bankruptcy, OAC has requested and hopes to receive from the Advance Facility Investors a waiver of that termination and an agreement to continue the Advance Facility on the same or substantially the same terms and conditions as in the Advance Facility Agreements, provided that the Court grants the relief requested in this Motion.

### III.  Relief Requested

24.    By this Motion, OAC seeks authority to (i) honor its existing servicing and Advance obligations to the Trusts under the Pooling and Servicing Agreements and the Warehouse Facility Agreements pending a disposition of the Assumption Motion, (ii) continue funding and purchasing RICs originated by the Retailers in accordance with OAC's pre-petition practices, (iii) continue funding its financing activities and the performance of its Advance obligations through securitization transactions in accordance with OAC's pre-petition practices and the terms of the Warehouse Facility Agreements and the Advance Facility Agreements, and (iv) engaging in such other and further securitization-related activities as are within the ordinary course of the Debtors' business.

11

## IV. <u>Basis For Relief Requested</u>

A.    <u>Necessity of Honoring Securitization Obligations</u>

25.    As set forth above, the warehousing and sale of the RICs pursuant to the Pooling and Servicing Agreements and the Warehouse Facility Agreements is a vital aspect of the Debtors' business, allowing the Debtors to convert future revenue streams into immediate cash to support their cash-intensive manufacturing and retail operations.    Without the ability to warehouse and securitize RICs in the ordinary course and consistent with their past practices as described above, the Debtors will not have access to sufficient liquidity to continue those operations at appropriate levels. Such a cash shortfall will cause immediate and irreparable harm to the Debtors' estates and their ability to reorganize.

26.    Similarly, any failure by the Debtors to honor their obligations under the Pooling and Servicing Agreements or the Warehousing Facility Agreement, including their obligations to make the Advances, is likely to cause irreversible harm to the Debtors' business.

27.    First, the Debtors have filed the Assumption Motion pursuant to which they seek to assume and assign the Pooling and Servicing Agreements and the Warehouse Facility Agreements to OSHC and contemporaneously enter into a subservicing agreement with OSHC. The net effect of the Assumption Motion, if granted, will be to raise the priority and increase the amount of the Servicing Fees payable to OSHC, most or all of which will be paid over to OAC as OSHC's subservicer. Any material breach of such servicing agreements by the Debtors will constitute a default that will have to be cured pursuant to § 365 of the Bankruptcy Code before the servicing agreements can be assumed and the economic benefit of the restructured Servicing Fees realized by the Debtors' estates. Continued performance of the Debtors' servicing and related obligations under the Pooling and Servicing Agreements and the Warehouse Facility

12

Agreements pending a disposition of the Assumption Motion, therefore, is critical   to the Debtors' reorganization efforts.

28.    Of even more concern, a breach of the Debtors' obligations under the Pooling and Servicing Agreements or the Warehouse Facility Agreements is likely to limit the Debtors' access to the securitization markets.  Such a breach is likely to cause irreparable damage to the reputation the Debtors currently enjoy with the institutional purchasers and other investors who purchase Pass-Through Certificates generated by OMI Securitizations.  The Debtors believe that any perception in those markets that the Debtors will not continue to honor their existing obligations under the Pooling and Servicing Agreements and the Warehouse Facility Agreements pending the disposition of the Assumption Motion could result in a refusal by such investors to purchase Pass-Through Certificates or, at best, could cause the purchase of the Pass-Through Certificates to be on far less attractive terms.

29.    Accordingly, because of the potential impact on the Debtors' ability to realize the benefit of the Assumption Motion and because access to the securitization markets remains the most effective and cost-efficient way for the Debtors to satisfy their liquidity needs, the Debtors submit that honoring their servicing and related obligations under the Pooling and Servicing Agreements and the Warehouse Facility Agreements is essential to their ability to continue to operate their business.

30.    Finally, the Debtors' submit it is necessary and in the best interests of their estates to continue securitizing Advance Receivables by selling them to Oakwood ARC under the names or substantially similar terms as in the Advance Receivables Agreement in the ordinary course. Those sales ensure the Debtors' further liquidity to support their business operations.  By utilizing the Advance Receivables structure described above, the Debtors avoid the necessity of having to fund over $40 million in average monthly P&I Advances, instead accessing low cost

13

non-recourse financing for 90-99% of that amount. To discontinue that practice would place an unnecessary and costly burden on the Debtors and provide no benefit to their estates, nor any protections to the Debtors' creditors.

31.    All of the relief the Debtors have requested herein involves actions taken in the ordinary course of the Debtors' business within the meaning of § 363(c)(1) of the Bankruptcy Code. Thus, the Debtors seek a court order authorizing the relief requested herein solely to provide comfort to participants in the Warehouse Facility, the Servicing Advance Facility, future OMI Securitizations, and other parties that engage in financing transactions with the Debtors on a day-to-day basis. The relief requested is essential to the preservation of the Debtors as a going concern. In comparable cases in this Court and elsewhere, such relief has been recognized as serving the rehabilitative purposes of the Bankruptcy Code. See, e.g., In re United Companies Financial Corp., Case No. 99-450 (MFW) (Bankr. D. Del. 1999); In re Cityscape Financial Corp. and Cityscape Corp., Case Nos. 98-B-22569 and 98-B-22570 (ASH) (Bankr. S.D.N.Y. 1998) (authorizing debtors to honor pre-petition commitments to fund loans, to continue advancing funds under securitization agreements, to sell portfolios of loans, and honor representations and warranties).

32.    The relief requested herein also is supported by analogy to the "doctrine of necessity" to the extent that courts have authorized honoring a debtor's pre-petition obligations to customers and key service providers where such obligations are essential to a debtor's operations. The Debtors, therefore, respectfully direct the Court to the Memorandum of Law in Support of Debtors' Motions for Orders, Under 11 U.S.C. § 105(A) and Necessity of Payment Doctrine, Authorizing Debtors and Debtors in Possession to Pay Certain Prepetition Claims filed contemporaneously herewith for further support for the relief requested herein. For all of these

14

reasons, the Debtors submit that relief requested herein is essential to the Debtors' continued operations, and therefore should be granted.

## V.  No Assumption Of Contracts

33.     Nothing herein is intended to constitute a request to assume any contract or agreement under § 365 of the Bankruptcy Code; nor is anything herein intended to constitute a request to create any rights in favor of, or to enhance the status of any claim held by, any entity.

## VI. Notice

34.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  Notice of this motion has been given to the Office of the United States Trustee, counsel to the Debtors' pre- and post-petition lenders, and the forty largest unsecured creditors of the Debtors on a consolidated basis.  Because of the nature of the relief requested in this motion, the Debtors submit that no other notice need be given.

(REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

15

WHEREFORE, the Debtors respectfully request the entry of an order granting the relief requested herein and such other and further relief as is just.


Dated:    Wilmington, Delaware
          November ( 8  , 2002


                         HUNTON & WILLIAMS


                         Peter S. Partee, VSB No. 34140
                         Michael G. Wilson, VSB No. 48927, DE Bar No. 4022
                         Riverfront Plaza, East Tower
                         951 East Byrd Street
                         Richmond, Virginia  23219-4074
                         Tel. (804) 788-8200
                         Fax. (804) 788-8218

                         Proposed Special Bankruptcy Securitization Counsel to
                         Oakwood Homes Corporation, et al., Debtors and
                         Debtors in Possession


                         - and -


                         MORRIS, NICHOLS, ARSHT & TUNNELL



                         _____
                         Robert J. Dehney (No. 3578)
                         Derek C. Abbott (No. 3376)
                         Michael G. Busenkell (No. 3933)
                         1201 North Market Street
                         P.O. Box 1347
                         Wilmington, Delaware 19899-1347
                         (302) 658-9200


                         Proposed Co-Counsel for Oakwood Homes
                         Corporation, et al., Debtors and Debtors In Possession


                                  16

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

Related Docket No. 21

### FIRST AMENDED AND RESTATED ORDER AUTHORIZING DEBTORS TO (I) HONOR CERTAIN PRE-PETITION SERVICING AND RELATED OBLIGATIONS, (II) CONTINUE SECURITIZING ADVANCE REIMBURSEMENT RIGHTS IN THE ORDINARY COURSE OF BUSINESS, (III) CONTINUE FUNDING AND PURCHASING RETAIL INSTALLMENT SALES CONTRACTS AND OTHER LOANS ORIGINATED BY THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS, AND (IV) CONTINUE SECURITIZING SUCH CONTRACTS AND LOANS IN THE ORDINARY COURSE OF BUSINESS

UPON the motion (the "Motion") of Oakwood Homes Corporation and its affiliated debtors and debtors-in-possession in the above-referenced bankruptcy cases (collectively, the "Debtors") dated November 19, 2002 for entry of an order pursuant to §§ 365 and 363(b) and (f) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), authorizing one of the Debtors, Oakwood Acceptance Corporation, LLC ("OAC"), to (i) honor certain pre-petition servicing and related advance obligations to (a) various securitization trusts (collectively, the "Securitization Trusts") under various pooling and servicing agreements (collectively, the "Pooling and Servicing Agreements") and (b) the OMI Note Trust 2001-A, a limited purpose trust owned by an indirect downstream affiliate of OAC (the "Warehouse Trust"; together with the Securitization Trusts, the "Trusts"), pursuant to certain agreements, pending a disposition of the Debtors' concurrently filed motion for authority to assume and assign the Pooling and Servicing Agreements and the Warehouse Facility Agreements referred to below (the "Assumption Motion"), (ii) continue

securitizing by selling and contributing to Oakwood Advance Receivables Company, L.L.C., a non-debtor limited purpose entity wholly-owned by OAC ("Oakwood ARC"), in the ordinary course of the Debtors' business and substantially in accordance with the relevant agreements (collectively, the "Advance Facility Agreements"), OAC's right to be reimbursed for advances of delinquent principal and interest ("P&I Advances") made by OAC to the Trusts as part of its servicing obligations under the Pooling and Servicing Agreements and the Warehouse Facility Agreements, (iii) continue funding and purchasing retail installment sales contracts and mortgage loans originated by certain of the Debtors and third-party retailers ("RICs") in the ordinary course of OAC's business, (iv) continue securitizing all RICs acquired by OAC by selling such RICs initially to Ginkgo Corporation, a limited purpose entity owned by an unaffiliated third-party ("Ginkgo"), which in turn sells such RICs to Oak Leaf Holdings, LLC ("Oakleaf"), and which in turn sells the RICs to the Warehouse Trust in the ordinary course of OAC's business and in accordance with the Warehouse Facility Agreements, and (v) engaging in such other and further securitization-related activities as are within the ordinary course of the Debtors' businesses; the Court having reviewed the Motion and the Declaration of Douglas Muir in Support of First Day Relief (the "Muir Declaration"); the Court having conducted a hearing (the "Hearing") on November 19, 2002 to consider, among other things, the relief requested in the Ordinary Course Motion; the Court having determined that the legal and factual bases set forth in the Ordinary Course Motion and the Muir Declaration and the argument at the Hearing established just cause for the relief granted therein, the Court signed an order dated November 19, 2002 (the "Original Ordinary Course Securitization Order") granting such relief; and it appearing that OAC proposes to enter into amendments among OAC, the Warehouse Trust and the other parties to the various prepetition agreements governing the sale of RICs to the Warehouse Trust, the purchase of notes issued by the Warehouse Trust, and the

servicing of such notes (such amendments, the "Warehouse Facility Amendments," and such agreements after giving effect to the Warehouse Facility Amendments, the "Warehouse Facility Agreements," all as identified more specifically on Exhibit A annexed hereto), and requesting that the decretal paragraphs of the Original Ordinary Course Securitization Order be amended and restated as set forth below, it is accordingly hereby ORDERED, ADJUDGED, and DECREED that:

1.     The Motion is GRANTED.

2.     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3.     Debtor OAC is hereby authorized to continue funding and purchasing RICs from the Retailers in the ordinary course of the Debtors' business and substantially in accordance with the Debtors' prepetition practices, without further order of the Court.

4.     OAC is hereby authorized to continue securitizing the RICs it acquires from the Retailers by selling such RICs to Ginkgo (which in turns sells the RICs to Oakleaf, which in turn further sells the RICs to the Warehouse Trust) pursuant to §363(b) and (f) of the Bankruptcy Code, under terms and conditions the same or substantially the same as those in the Warehouse Facility Agreements and substantially in accordance with the Debtors' prepetition practices, without further order of the Court. In connection therewith, OAC is hereby authorized to execute and deliver the Warehouse Facility Amendments and, following such execution and delivery, OAC shall perform its obligations under the Warehouse Facility Agreements and any and all liability of OAC arising from or related to any failure to perform such obligations shall be an allowed administrative expense pursuant to § 503(b)(1)(A) of the Bankruptcy Code. All RICs transferred to the Warehouse Trust under or in connection with the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims, charges, encumbrances and

adverse claims, with any such liens, claims, charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under § 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by § 362(a) of the Bankruptcy Code or by any stay or other relief issued under § 105 of the Bankruptcy Code or otherwise in any of the Debtors' cases.

5.    Pending OAC's assumption of the Sale and Servicing Agreement, which constitutes one of the Warehouse Facility Agreements (the "Sale and Servicing Agreement"), in accordance with the Assumption Motion or otherwise, (a) OAC is hereby authorized and directed to honor and perform its obligations under the Sale and Servicing Agreement, including without limitation, (i) collecting principal, interest, tax and insurance payments from obligors under the securitized RICs, (ii) remitting collections to the Warehouse Trust or appropriate escrow accounts, as applicable, (iii) making advances when and if required by the Sale and Servicing Agreement, (iv) transferring servicing under the terms and conditions set forth in the Sale and Servicing Agreement and (v) maintaining lock-box arrangements required under the Sale and Servicing Agreement, all without further order of the Court, and (b) each non-Debtor party to the Warehouse Facility Agreements shall be entitled to enforce its rights and remedies thereunder against OAC (subject to the immediately following sentence) and each non-Debtor party thereto and against all property subject thereto, and in the case of rights and remedies against OAC, shall be entitled to appropriate relief from this Court in furtherance of such enforcement. Each non-Debtor party to the Warehouse Facility Agreements shall be entitled to enforce its rights and remedies thereunder against OAC free from the automatic stay imposed by § 362(a) of the Bankruptcy Code or by any stay or other relief issued under § 105 of the Bankruptcy Code or otherwise in any of the Debtors' cases, provided that, if any stay or other relief would otherwise be applicable absent the provisions

of this Order, such non-Debtor party shall not exercise such rights and remedies until five business days after it has provided written notice of the event of default or other circumstance or condition giving rise to such rights and remedies to the Debtors' special bankruptcy securitization counsel and counsel to any official committee appointed in the Debtors' bankruptcy cases (it being hereby ordered that the only issue that may be raised by any party-in-interest seeking to oppose or otherwise affect the exercise of such rights and remedies is the non-existence of such event of default or other circumstance or condition).

6.    Pending a disposition of the Assumption Motion, OAC is hereby authorized, but not directed, to honor, in its sole discretion, any or all obligations imposed on OAC by the Pooling and Servicing Agreements with respect to securitized RICs, including without limitation, (i) collecting principal, interest, tax and insurance payments from obligors under the securitized RICs, (ii) remitting collections to the Securitization Trusts and appropriate escrow accounts, as applicable, and (iii) making Advances as required by the Pooling and Servicing Agreements, all in the ordinary course of the Debtors' business and without further order of the Court.

7.    OAC is hereby authorized, in its sole discretion, to continue securitizing the Advance Receivables by selling them to Oakwood ARC under terms and conditions the same or substantially the same as those in the Advance Facility Agreements and substantially in accordance with the Debtors' prepetition practices, without further order of the Court.    All Advance Receivables securitized pursuant to the Advance Facility Agreement (i) shall be deemed sold by OAC free and clear of all liens, claims, charges, encumbrances and adverse claims, with any such liens, claims, charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under § 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by § 362(a) of the

Bankruptcy Code or by any stay or other relief issued under § 105 of the Bankruptcy Code or otherwise in any of the Debtors' cases.

8.     The Debtors are hereby authorized but not directed, in their sole discretion, to honor and pay any and all prepetition claims essential to the Debtors' abilities to honor the obligations referenced herein and in the Motion.

9.     The Debtors are hereby authorized, in their sole discretion, to enter into and perform their obligations under such other and further securitization-related agreements and engage in such other and further securitization-related activities, including without limitation effectuating the sale of repossessed units and all related activities, as are substantially similar to the securitization-related agreements and activities entered into and engaged in by the Debtors prior to the Petition Date in the ordinary course of the Debtors' business.

10.     None of the relief granted herein or any action taken pursuant to this Order, including, without limitation, the making of any payments hereunder, shall constitute an assumption of any executory contract pursuant to § 365 of the Bankruptcy Code.

Dated: Wilmington, Delaware
       November 2 6, 2002

UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

### Warehouse Facility Agreements

1. Indenture dated as of February 9, 2001 between the Warehouse Trust and JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank, "JPMorgan Chase"), as indenture trustee, as amended by the First Amendment and Waiver executed and delivered by the parties postpetition.

2. Sale and Servicing Agreement dated as of February 9, 2001 among Oak Leaf, the Warehouse Trust, Gingko, OAC and JPMorgan Chase, as backup servicer, indenture trustee and custodian, as amended by the parties prepetition and as amended by the Third Amendment and Waiver executed and delivered by the parties postpetition.

3. Class A Note Purchase Agreement dated as of February 9, 2001 among the Warehouse Trust, OAC, Oak Leaf, Gingko, the purchasers from time to time party thereto, and Credit Suisse First Boston, as agent for the purchasers (the "Agent"), as amended by First Amendment and Waiver executed and delivered by the parties postpetition.

4. Fee Letter dated as of February 9, 2001 among the Warehouse Trust, OAC and the Agent, as amended by First Amendment executed and delivered by the parties postpetition.

5. All agreements and documents executed and/or delivered pursuant to or in connection with the agreements listed above.

# *EXHIBIT D*



# OAKWOOD HOMES CORPORATION

PRESENTATION TO LOTUS

CONFIDENTIAL | OCTOBER 15, 2002





DEFENDANT'S
EXHIBIT

210
9/21/06 KDN

CONFIDENTIAL

CSFB-00063112



CONFIDENTIAL

CONFIDENTIAL

# Executive Summary

We have undertaken a thorough analysis of our business to reposition Oakwood with the appropriate operational scale and balance sheet to weather the current market conditions and capitalize on the eventual industry rebound

As a result, we would like to discuss the following strategic actions with you today:

▷ Reduce operating costs and scope through a series of plant and store closings

    ◻ Leaving the Company with a core of highly profitable sales centers primarily in states with traditionally better credit performance

    ◻ Close plants that are marginal at current sales levels and which will be unprofitable after the store closings

▷ Substantially de-leverage our balance sheet and reduce debt service obligations

    ◻ Convert the Company's debt and REMIC guarantees into equity

We hope to work cooperatively with Lotus to refine our strategy to create value for all of our constituencies



We are pleased to have this opportunity to discuss Oakwood's strategy with Lotus

CSFB-00063113

CONFIDENTIAL

CONFIDENTIAL

OAKWOOD HOMES CORPORATION

# Current Highlights

Fully Integrated operations

► Manufacturing, retail, financial services and insurance

  ▫ While competitors begin to vertically integrate, Oakwood has established financing capabilities

  ▫ One-stop shopping source

Coast-to-coast presence

Industry's third largest manufacturer, with 19 plants operating

Growing modular business with 11 plants building modular products, including two which are dedicated exclusively to modular

Quality reputation

▵ Owner of four of the oldest, premier brands in the industry

Network of 19 plants, approximately 200 Company-owned retail locations after 40 recently announced store closings and 700 independent retailers over a 48-state marketing region

2

CSFB-00063114

1

CONFIDENTIAL

CSFB-00063115

Industry Overview

CONFIDENTIAL

CONFIDENTIAL

CSFB-00063116

CONFIDENTIAL

CONFIDENTIAL



# Industry Cycles

Manufactured Housing Shipments, Retail Locations and Manufacturing Plants (1975 - 2002 YTD)



Source: Manufactured Housing Institute and Company
Note: YTD 2002 figure as of May 31.

Manufactured housing shipments are near record lows.

CONFIDENTIAL

OAKWOOD HOMES CORPORATION

# Industry Conditions Remain Challenging

**Decreasing shipments**

- July manufactured housing shipments decreased 8% from prior year to 13,700 units
- August figures suggest a decline of 20%
- 2002 shipments projected to be approximately 160,000, down 17% from 2001 and 57% from 1998
  - Lowest since the passage of the HUD Code in 1974

Retailer count down to approximately 5,000 from over 8,000 in mid-1999

**Floor plan lender exodus and shrinkage in retail financing sources**

- Conseco and Deutsche Financial have announced exits in 2002, which will disrupt business in the short-term and increase liquidity pressure
- Associates, Bombardier, CIT and Greenpoint, among others, have ceased originating loans and Conseco, the largest historical lender, has substantially ceased originations

Industry transitioning from chattel to real estate lending

**Excess manufacturing capacity**

Projected 90,000 repossessed units this year

**Poor market conditions in the manufactured housing industry continue**

CONFIDENTIAL

CSFB-00063118

CONFIDENTIAL

CONFIDENTIAL

OAKWOOD HOMES CORPORATION

6

# Industry Highlights

Manufactured housing remains a critical component of the US housing industry

▷ Represents approximately one-sixth of all new homes sold

Manufactured housing provides significant benefits relative to other alternatives

▷ More efficient manufacturing process

▷ Lower material costs

　□ Volume purchasing discounts

　□ Centralized delivery

▷ Customer's all-in cost per square foot is substantially lower than that of site built homes

▷ Comparable quality to site-built homes

▷ Faster construction time saves construction interest

　□ Approximately 5 days from the beginning of the manufacturing process to delivery

2

CONFIDENTIAL

CSFB-00063120

Rationalization Plan

CONFIDENTIAL

CONFIDENTIAL

CSFB-00063121

CONFIDENTIAL

# Proposed Rationalization Plan Summary



| | Current | | Rationalized |
|---|---|---|---|
| Exit High Default States | Present in 36 States | (42%) | Present in 21 States |
| Close 116 Retail Centers | 239 Retail Centers | (49%) | 123 Retail Centers |
| Close 5 Manufacturing Plants | 19 Manufacturing Plants | (26%) | 14 Manufacturing Plants |
| Close Austin, Texas Loan Origination Office | Adjust to reflect decreased level of loan origination | | |

On a pro forma basis, historical retail and manufacturing operating results would have improved by an estimated $36 million, $18 million and $45 million in 2000, 2001, and 2002 respectively under the Rationalization Plan.

OAKWOOD HOMES CORPORATION

8

CONFIDENTIAL

CSFB-00063122



CONFIDENTIAL

# Rationalization Plan Goals

Exit states that produced consistently poor operating results, poor credit performance and high instances of consumer litigation

- Deep South, Tennessee, Kentucky, Arkansas and Texas
- States exited comprise 63% of current outstanding litigation

Remain in states where Oakwood has a competitive advantage and is generating positive operating results

Review of retail centers in remaining states on a store by store basis

▷ Close those centers that consistently generate poor operating results or are in areas that will be negatively impacted by tightening credit standards

Increase wholesale sales to independent dealers

▶ Less fixed overhead and capital requirements

Adjust manufacturing capacity in line with expected future sales

▷ Close plants that are marginal at current sales levels and will be unprofitable after the store closings

Reduce corporate overhead in line with downsized company, including closing one loan origination location



Oakwood's management comprehensively analyzed of its business model seeking to improve cash flow and profitability.

CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

(O) OAKWOOD HOMES CORPORATION

10

# Improved Credit Profile

Default percentages in exited states have been and are projected to remain high

▷ For new loans originated in the first half of 2000, the default percentages to date in Tennessee, Missouri, Florida, Georgia, South Carolina, Kentucky, Arkansas, Texas, Oklahoma, Louisiana, Alabama and Mississippi are over 18%

   □ Over this same period, the remaining states have a default percentage to date of 8%

▲ Based on retail fundings in fiscal 2002, exited states are projected to have a default rate more than 30% higher than the remaining states

   ■ Generally, the default rate in exited states is higher than the scorecard predicted, and the default rate in the remaining states is lower than the scorecard predicted

Closing the Georgia and Tennessee plants would have the positive effect of minimizing OAC's business in the Deep South states, including Alabama and Mississippi

Management anticipates closing all but 15% of the stores in the bad credit states

▷ The remaining 15% of stores are in areas where the Company has had good experience (e.g., Greenville-Spartanburg) or areas that can still be profitable with a significant credit tightening (e.g., Charleston, SC)

The selected stores being closed in the remaining open states generally have experienced poor credit performance


The Company is exiting states in which all or a majority of its stores have experienced poor credit results.

CSFB-00063124

CONFIDENTIAL

CONFIDENTIAL

# Pro Forma Oakwood Footprint



Source: Oakwood Homes

Oakwood will continue to maintain its national presence.

CONFIDENTIAL

(◎) OAKWOOD HOMES CORPORATION

12

# Projection Assumptions

Consistent with the Rationalization Plan, our projections intend to capture the impact of a leaner Oakwood

Key assumptions underlying the retail and manufacturing projections are as follows:

▷ Close approximately 40 sales centers on October 1, 2002 and approximately 75 more sales centers on December 1, 2002

  ▫ 2,840 floors at closed stores will be sold at an average recovery of 75% by the end of March 2003 through a combination of bulk sales and retail close-outs

▷ Close five manufacturing plants in the following states effective December 1, 2002: two in Texas and one each in North Carolina, Georgia and Tennessee

  ▫ 2003 unit sales volume is relatively unchanged from 2002 levels at remaining stores

  ▫ 5% unit volume growth rate per year after 2003

  ▪ Modest improvement in gross margins during 2003 through elimination of low-margin sales centers and plants

▷ Adequate retail and floor plan financing is available to support wholesale sales to independent dealers

The Company's projections assume that industry conditions do not improve in the near-term and remaining plants and sales centers do not benefit from future exit of other retailers and manufacturers.

CONFIDENTIAL

CSFB-00063126

CONFIDENTIAL

CONFIDENTIAL

(O) **OAKWOOD HOMES CORPORATION**

13

# Projection Assumptions (Cont'd)

Key assumptions underlying the consumer finance projections are as follows:

▷ Realized cash servicing fees on REMIC portfolio

   □ 20 basis points on existing REMIC portfolio

   □ 60 basis points on new securitizations

▷ Cash proceeds from REMIC securitizations

   □ Limited to 90% of the underlying collateral in 2003

   ■ Return to normal levels (100%) in 2004

▷ REMIC securitization gains

   □ No gains during 2003

   □ 2% gain beginning in 2004 due to reducing originations in weaker credit states in order to create sustained loan origination profitability

▷ Repossessed home refinancings are limited to 23% of total loan originations

▷ Oakwood continues to finance through its REMICs approximately 38% of wholesale unit sales volume and approximately 85% of retail sales dollars

Oakwood's projections assume essentially no near-term improvement in REMIC performance.

CSFB-00063127

CONFIDENTIAL

# 5 Year Projections -
# Excluding Financial Restructuring

**OAKWOOD HOMES CORPORATION**

($ millions)

| | Quarter Ending | | | | | Fiscal Year Ending September 30, | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/02 | 3/31/03 | 6/30/03 | 9/30/03 | 2003 | PF 2003 [1] | 2004 | 2005 | 2006 | 2007 |
| **Housing & Corporate** | | | | | | | | | | |
| Retail | $107.0 | $84.6 | $82.2 | $88.0 | $361.8 | $307.4 | $325.1 | $344.8 | $365.6 | $387.7 |
| Wholesale | 93.0 | 78.8 | 94.5 | 98.3 | 364.7 | 364.7 | 373.3 | 395.9 | 419.8 | 445.2 |
| Total Housing & Corporate | 200.0 | 163.3 | 176.8 | 186.3 | 726.4 | 672.1 | 698.4 | 740.6 | 785.5 | 833.0 |
| **Financial Services** | | | | | | | | | | |
| Finance | 11.1 | 10.6 | 11.2 | 11.7 | 44.6 | 43.7 | 55.1 | 56.7 | 59.5 | 62.6 |
| Insurance | 6.4 | 6.4 | 6.4 | 6.4 | 25.6 | 25.4 | 25.5 | 25.9 | 26.7 | 27.8 |
| Total Financial Services | 17.5 | 17.0 | 17.5 | 18.1 | 70.1 | 69.1 | 80.5 | 82.6 | 86.2 | 90.3 |
| Other | 1.3 | 1.1 | 1.2 | 1.2 | 4.8 | 4.3 | 4.6 | 4.8 | 5.1 | 5.4 |
| **Total Revenues** | $218.8 | $181.4 | $195.5 | $205.6 | $801.3 | $745.5 | $783.5 | $828.0 | $876.8 | $928.7 |
| Cost of Sales | 163.0 | 132.6 | 126.9 | 134.2 | 556.7 | 490.1 | 514.1 | 542.4 | 572.3 | 503.9 |
| SG&A | 51.2 | 45.6 | 46.3 | 47.2 | 190.3 | 181.1 | 186.7 | 196.6 | 204.9 | 213.6 |
| Financial Services Operating Expense | | | | | | | | | | |
| Consumer Finance | 13.9 | 13.7 | 13.8 | 13.9 | 55.3 | 54.6 | 55.6 | 56.6 | 58.1 | 59.9 |
| Insurance | 3.9 | 3.8 | 3.8 | 3.8 | 15.3 | 15.2 | 15.1 | 15.2 | 15.7 | 16.5 |
| Provisions For Loss on Credit Sales | 1.2 | 1.2 | 1.2 | 1.2 | 4.8 | 4.7 | 4.8 | 4.8 | 4.9 | 5.1 |
| **EBITDA** [1] | ($13.1) | ($14.5) | $2.4 | $6.5 | ($18.8) | ($5.1) | $16.4 | $23.8 | $32.4 | $41.5 |
| EBITDA Margin | (6.0%) | (8.0%) | 1.2% | 3.1% | (2.3%) | (0.7%) | 2.1% | 2.8% | 3.7% | 4.5% |
| Interest Expense | 11.3 | 10.7 | 11.2 | 12.2 | 45.4 | 49.8 | 46.8 | 47.9 | 52.1 | 56.0 |
| Capex | 2.6 | 2.6 | 2.6 | 2.6 | 10.2 | 10.2 | 9.5 | 9.9 | 10.2 | 10.8 |
| Net Income | ($25.7) | ($25.2) | ($9.8) | ($6.7) | ($58.3) | ($59.1) | ($41.5) | ($35.5) | ($31.2) | ($26.2) |

(1) Consolidated EBITDA depicts the sum of business unit EBITDA from manufacturing and retail, insurance, and consumer finance.
(2) Pro forma figures remove the costs associated with the retail store and plant closings.
Source: Company estimates.

14

CONFIDENTIAL

CSFB-00063128

CONFIDENTIAL

# Significant Upside Potential

($ millions)

| | | Fiscal Year Ending September 30, | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| **Housing & Corporate** | | | | | |
| Retail | $397.4 | $351.2 | $383.1 | $406.2 | $430.8 |
| Wholesale | 400.7 | 411.5 | 436.4 | 462.9 | 490.9 |
| Total Housing & Corporate | 798.1 | 772.8 | 819.5 | 869.1 | 921.7 |
| **Financial Services** | | | | | |
| Finance | 45.7 | 58.1 | 60.0 | 63.3 | 66.8 |
| Insurance | 25.7 | 26.1 | 25.9 | 28.0 | 29.5 |
| Total Financial Services | 71.4 | 84.2 | 86.9 | 91.3 | 96.3 |
| Other | 5.3 | 5.1 | 5.4 | 5.7 | 6.0 |
| Total Revenues | $874.8 | $862.0 | $911.8 | $966.1 | $1,024.0 |
| | | | | | |
| Cost of Sales | 605.4 | 560.1 | 591.1 | 624.0 | 658.8 |
| SG&A | 195.5 | 195.8 | 204.2 | 213.0 | 222.3 |
| Financial Services Operating Expense | | | | | |
| Consumer Finance | 56.1 | 55.7 | 58.2 | 60.0 | 62.2 |
| Insurance | 15.4 | 15.5 | 15.9 | 16.7 | 17.6 |
| Provision For Loss on Credit Sales | 4.8 | 4.9 | 5.0 | 5.1 | 5.3 |
| **EBITDA**[1] | $0.9 | $40.3 | $49.0 | $59.2 | $69.6 |
| *EBITDA Margin* | 0.1% | 4.7% | 5.4% | 6.1% | 6.8% |
| Interest Expense | 47.7 | 45.3 | 43.6 | 43.6 | 43.1 |
| Capex | 10.2 | 9.5 | 9.9 | 10.2 | 10.6 |
| Net Income | ($51.1) | ($16.3) | ($6.2) | $3.7 | $14.7 |

(1)  Consolidated EBITDA depicts the sum of business unit EBITDA from manufacturing and retail, insurance, and consumer finance.
Source: Company estimates.

The above projections demonstrate the significant upside potential resulting from modest growth in unit volume.

CONFIDENTIAL

CSFB-00063129

3

CONFIDENTIAL

16

# Proposed Restructuring

CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

**OAKWOOD HOMES CORPORATION**

17

# Proposed Restructuring

In the absence of a restructuring, Oakwood will face difficulties servicing its debt and existing guarantee obligations

△ Approximately $24 million in annual interest expense on Senior Notes

△ $125 million principal repayment on 7.875% Senior Notes due in March 2004

△ Estimated future REMIC guarantee payments

We would like to work with Lotus to accomplish the following:

△ Change the priority of Oakwood's servicing fee from the "bottom" to the "top of the waterfall"

  □ Increases cash flow by approximately $40 million per year

△ Exchange the Company's senior unsecured debt and REMIC guarantees for equity

  □ Requires a determination of the attributable value of Oakwood's future REMIC guarantee payments to understand the relative size of the guarantee and debt claims

A comprehensive "debt" for equity exchange could permanently address Oakwood's capitalization issues and increase overall value.



CONFIDENTIAL

CSFB-00063132

CONFIDENTIAL

CONFIDENTIAL

# Pro Forma Capitalization

(⊚) OAKWOOD HOMES CORPORATION

18

## Pro Forma Capitalization

($ in millions)

| | Actual | September 30, 2002 Adjustments | Pro Forma |
|---|---|---|---|
| Cash | $18.0 | – | $18.0 |
| | | | |
| Foothill Facility | $10.0 | – | $10.0 |
| IRBs and Other | 7.8 | – | 7.8 |
| 7.875% Senior Notes due 2004 | 125.0 | (125.0) | – |
| 8.125% Senior Notes due 2009 | 175.0 | (175.0) | – |
| Reset Debentures | 2.6 | (2.6) | – |
| Total Debt | 320.4 | | 17.8 |
| Contingent Liabilities (shown at estimated debt equivalents) | | | |
| Guaranteed REMICs [1] | 92.0 | (92.0) | – |
| Floor Plan Repurchase Obligations [2] | 4.0 | – | 4.0 |
| Total Debt and Contingent Liabilities | 416.4 | | 21.8 |
| Shareholders' Equity | 136.6 | 394.6 | 531.3 |
| Total Capitalization | $553.1 | | $553.1 |

(1) For illustrative purposes, attributable value on Guaranteed REMIC trust securities is assumed to be one-third of the gross amount. The gross amount was $275 million on 9/30/02.

(2) For illustrative purposes, attributable value on floor plan recourse debt was based on the assumption that 20% of the homes are repossessed and the Company recovers 75% of their respective value. The gross amount was $83 million on 9/30/02.

Note: September 30, 2002 figures are estimated.

CSFB-00063133

CONFIDENTIAL

CONFIDENTIAL

19

(⊙) OAKWOOD
HOMES
CORPORATION

# Restructuring Projection Assumptions

The assumptions underlying the restructuring scenario mirror the Company's Rationalization Plan except for the following:

- ▷ High yield notes are converted into equity

- ▷ Expected REMIC guarantee payments are converted into equity

- ▷ 100 basis points of cash servicing fees are received on existing REMIC portfolio and new originations

- ▷ Expenses associated with repossession sales centers are recovered from REMIC trusts

The restructuring projections assume that the high yield notes and REMIC guarantees are exchanged for equity and that all of servicing fees are received by Oakwood.

CSFB-00063134

CONFIDENTIAL

# 5 Year Projections -
# Including Financial Restructuring

 OAKWOOD HOMES CORPORATION

20

($ millions)

| | Quarter Ending | | | | 2003 | Fiscal Year Ending September 30, | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/02 | 3/31/03 | 6/30/03 | 9/30/03 | | 2004 | 2005 | 2006 | 2007 |
| **Housing & Corporate** | | | | | | | | | |
| Retail | $107.0 | $84.5 | $82.2 | $88.0 | $361.8 | $325.1 | $344.8 | $365.6 | $387.7 |
| Wholesale | 93.0 | 78.8 | 94.5 | 98.3 | 364.7 | 373.3 | 395.9 | 419.8 | 445.2 |
| Total Housing & Corporate | 200.0 | 163.3 | 176.8 | 186.3 | 726.4 | 698.4 | 740.6 | 785.5 | 833.0 |
| **Financial Services** | | | | | | | | | |
| Finance | 21.4 | 20.7 | 21.1 | 21.5 | 84.7 | 92.9 | 92.7 | 94.3 | 96.6 |
| Insurance | 6.4 | 6.4 | 6.4 | 6.4 | 25.6 | 25.5 | 25.9 | 26.7 | 27.8 |
| Total Financial Services | 27.8 | 27.1 | 27.5 | 27.9 | 110.2 | 118.4 | 118.6 | 121.0 | 124.3 |
| Other | 1.3 | 1.1 | 1.2 | 1.2 | 4.8 | 4.6 | 4.8 | 5.1 | 5.4 |
| Total Revenues | $229.1 | $191.5 | $205.4 | $215.4 | $841.4 | $821.3 | $864.1 | $911.6 | $962.7 |
| | | | | | | | | | |
| Cost of Sales | 163.0 | 132.6 | 128.9 | 134.2 | 558.7 | 514.1 | 542.4 | 572.3 | 603.9 |
| SG&A | 49.0 | 43.4 | 44.2 | 45.0 | 181.6 | 179.7 | 187.3 | 195.3 | 203.8 |
| Financial Services Operating Expense | | | | | | | | | |
| Consumer Finance | 13.9 | 13.7 | 13.8 | 13.9 | 55.3 | 55.6 | 56.6 | 58.1 | 59.9 |
| Insurance | 3.9 | 3.8 | 3.8 | 3.8 | 15.3 | 15.1 | 15.2 | 15.7 | 16.5 |
| Provisions For Loss on Credit Sales | 1.2 | 1.2 | 1.2 | 1.2 | 4.8 | 4.8 | 4.8 | 4.9 | 5.1 |
| **EBITDA** [1] | $(0.6) | $(2.3) | $14.5 | $18.4 | $30.0 | $63.2 | $69.1 | $76.8 | $85.3 |
| *EBITDA Margin* | (0.3%) | (1.2%) | 7.1% | 8.6% | 3.6% | 7.7% | 8.0% | 8.4% | 8.8% |
| | | | | | | | | | |
| Interest Expense | 5.2 | 4.1 | 4.1 | 4.5 | 17.9 | 12.4 | 7.9 | 6.3 | 4.7 |
| Capex | 2.6 | 2.6 | 2.6 | 2.6 | 10.2 | 9.5 | 9.9 | 10.2 | 10.6 |
| Net Income | $(37.1) | $(7.3) | $9.4 | $12.9 | $6.0 | $39.7 | $49.8 | $58.9 | $59.0 |

(1)  Consolidated EBITDA depicts the sum of business unit EBITDA (from manufacturing and retail, insurance, and consumer finance.
Note:  Financial services revenue adjusted for increase in cash due to assumed senior priority of servicing fees.
Source: Company estimates.

> "Oakwood could generate substantial free cash flow after the recapitalization"

CONFIDENTIAL

*EXHIBIT E*

Knowledge Mosaic®

# REORGANIZED SALE OKWD INC

## FORM 10-K
### (Annual Report)

## Filed 12/29/00 for the Period Ending 09/30/00

| | |
|---|---|
| Address | PO DRAWER 2252-A |
| | DURHAM, NC 27702 |
| Telephone | 9196831561 |
| CIK | 0000073609 |
| Symbol | OKWHQ |
| SIC Code | 2451 - Mobile Homes |
| Industry | Construction Services |
| Sector | Technology |
| Fiscal Year | 06/30 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# FORM 10-K

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (FEE REQUIRED)**

For the fiscal year ended September 30, 2000

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)**

For the transition period from _____ to _____

*Commission file number 1-7444*

# OAKWOOD HOMES CORPORATION

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| NORTH CAROLINA | 56-0985879 |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| 7800 McCloud Road, Greensboro, NC | 27409-9634 |
| (Address of principal executive offices) | (Zip Code) |

Company's telephone number, including area code: (336) 664-2400

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, Par Value $.50 Per Share | New York Stock Exchange, Inc. |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark whether the Company: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Company was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Company's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

The aggregate market value of shares of the Company's $.50 par value Common Stock, its only outstanding class of common equity, held by non-affiliates as of December 8, 2000 was $22,600,883.

The number of issued and outstanding shares of the Company's $.50 par value Common Stock, its only outstanding class of common stock, as of December 8, 2000 was 47,104,704 shares.

The indicated portions of the following documents are incorporated by reference into the indicated parts of this Annual Report on Form 10-K:

| Incorporated Documents | Parts Into Which Incorporated |
|---|---|
| Annual Report to Shareholders for the Fiscal Year Ended September 30, 2000 | Parts I and II |
| Proxy Statement for the Annual Meeting of Shareholders to be held January 31, 2001 | Part III |

2

### Item 1. Business.

Oakwood Homes Corporation, a North Carolina corporation (the "Company"), which was founded in 1946, designs, manufactures and markets manufactured and modular homes and finances the majority of its retail sales. The Company also provides a variety of insurance products to its customers. The Company operates five manufacturing lines in Texas, four in each of North Carolina, Georgia, Oregon and Indiana, two in each of Arizona and Pennsylvania, and one in each of California, Colorado, Kansas, Minnesota and Tennessee. The foregoing includes nine idled lines. The Company's manufactured homes are currently sold at retail through 378 Company owned and operated sales centers located primarily in the southeastern and southwestern United States and to approximately 700 independent retailers located throughout the United States. The Company sells insurance for customers choosing to purchase insurance and assumes a portion of the related underwriting risk through its captive reinsurance business.

### Manufactured Homes

The Company designs and manufactures a number of models of homes. Each home contains a living room, dining area, kitchen, one, two, three or four bedrooms and one or two bathrooms, and is equipped with a hot water heater and central heating. Some homes are furnished with a sofa and matching chairs, dinette set, coffee and end tables, carpeting, lamps, draperies, curtains and screens. Optional furnishings and equipment include a range and oven, refrigerator, beds, a fireplace, washing machine, dryer, microwave oven, dishwasher, air conditioning, intercom, stereo systems, wet bar, vaulted ceilings, skylights, hardwood cabinetry and energy conservation items. The homes manufactured by the Company are primarily sold under the registered trademarks "Oakwood," "Freedom," "House Smart," "Golden West," "Schult," "Crest," "Marlette" and the trade name "Victory."

The Company's manufactured homes are constructed and furnished at the Company's manufacturing facilities and transported on wheels to the homesite. The Company's manufactured homes are normally occupied as permanent residences but can be transported on wheels to new homesites. The Company's homes are defined as "manufactured homes" under the United States Code, and formerly were defined as "mobile homes."

The Company manufactures 14-foot and 16-foot wide single-section homes and multi-section homes consisting of two floors that are joined at the homesite and are 24, 28 or 32 feet wide. The Company also manufactures a limited number of multi-section homes consisting of three or four floors. The Company's homes range from 40 feet to 80 feet in length. The Company's homes are sometimes placed on rental lots in communities of similarly constructed homes.

The Company manufactures homes at thirty lines located in Hillsboro (2), Killeen and Navasota (2), Texas; Richfield, Rockwell (2) and Pine Bluff, North Carolina; Moultrie, Georgia (4); Etna Green (2) and Middlebury (2), Indiana; Buckeye, Arizona (2); Albany (2) and Hermiston (2), Oregon; Lewistown and Milton, Pennsylvania; Perris, California; Fort Morgan, Colorado; Plainville, Kansas; Redwood Falls, Minnesota; and Pulaksi, Tennessee. The foregoing includes nine idled lines.

3

The Company purchases components and materials used in the manufacture of its homes on the open market and is not dependent upon any particular supplier. The principal raw materials purchased by the Company for use in the construction of its homes are lumber, steel, aluminum, galvanized pipe, insulating materials, drywall and plastics. Steel I-beams, axles, wheels and tires, roof and ceiling materials, home appliances, plumbing fixtures, furniture, floor coverings, windows, doors and decorator items are purchased or fabricated by the Company and are assembled and installed at various stages on the assembly line. Construction of the manufactured homes and the plumbing, heating and electrical systems installed in them must comply with the standards set by the Department of Housing and Urban Development ("HUD") under the National Manufactured Home Construction and Safety Standards Act of 1974. See "Regulation."

The Company furnishes to each purchaser of a new home manufactured by the Company a one- or five-year limited warranty against defects in materials and workmanship, except for equipment and furnishings supplied by other manufacturers which are frequently covered by the manufacturers' warranties.

### Modular Homes

In addition to traditional manufactured homes, the Company also manufactures modular homes which are built in accordance with state or local building codes and therefore are similar in specifications and design to site-built homes. The Company's modular homes range in size from 960 square feet to 3,355 square feet and include a variety of single story ranch homes, one and a half story homes, two story homes, townhouses and duplex units, all of which can include attached garages built at the site by others.

### Sales

At September 30, 2000, the Company sold manufactured homes through 378 Company owned and operated sales centers located in 29 states primarily in the southeastern and southwestern United States. See "Properties - Manufactured Home Sales Centers." The Company opened 11 new sales centers and closed 45 sales centers in fiscal 2000. Each of the Company's sales centers hires and trains sales personnel. Generally, each salesperson is paid a commission based on the gross margin of his or her sales and certain volume targets, and each general manager is paid a commission based on the profits of the sales center.

The Company operates its sales centers under the names Oakwood(R) Mobile Homes, Freedom Homes(R), House Smart(R), Victory Homes, Schult(R) Homes and Golden West Homes(R). At its sales centers, the Company sells homes manufactured by it as well as, to a substantially lesser extent, by other manufacturers. During fiscal 2000, substantially all the Company's retail dollar sales of new homes were homes manufactured by the Company.

The Company also sells used homes acquired in trade-ins. At September 30, 2000, the Company's inventory of used homes was 1,211 homes as compared to 1,384 homes at September 30, 1999. Used homes in inventory do not include repossessed units.

The Company also sells its homes to approximately 700 independent retailers located throughout the United States. Sales to independent retail dealers accounted for approximately 35% of the Company's total dollar volume of sales in fiscal 2000 as compared to 31% in fiscal 1999.

During recent years, the Company has placed increased emphasis on the sale of multi-section homes. In fiscal 2000, the Company's retail sales of new multi-section homes represented 64% of the total number of new homes sold at retail, as compared to 58% in fiscal 1999.

4

The retail sales price for new single-section homes sold by the Company in fiscal 2000 generally ranged from $16,000 to $58,000 with a mean sales price of approximately $31,300. The retail sales price of multi-section homes sold by the Company in fiscal 2000 generally ranged from $27,000 to $136,000, with a mean sales price of approximately $55,200.

The Company's sales have traditionally been higher in the period from late spring through early fall than in the winter months. Because a majority of the homes manufactured by the Company are sold directly to retail customers, the Company does not believe its backlog of orders is material.

## Company Retail Sales Financing

A significant factor affecting sales of manufactured homes is the availability and terms of financing. Approximately 80% of the Company's retail unit sales in fiscal 2000 were financed by installment sale contracts or loans arranged by the Company, each of which provided for monthly payments generally over a period of 5 to 30 years. The remaining 20% of retail unit sales were paid for with cash or financing obtained from other sources.

In fiscal 2000, 96% of the aggregate loan originations relating to retail unit sales and dispositions of repossessed homes were installment sales or loans financed and warehoused by the Company for investment or later sale and 4% were installment sales or loans financed by others without recourse to the Company. At September 30, 2000, the Company held installment sale contracts or loans with a principal balance of approximately $190 million and serviced an additional $4.412 billion principal balance of installment sale contracts or loans, the substantial majority of which it originated and securitized. A substantial majority of the installment sale contracts owned by the Company are pledged to financial institutions as collateral for loans to the Company.

The Company processes credit applications with respect to customers seeking financing. The Company uses a credit scoring system, updated in fiscal 1998, to improve its credit decision-making process. The most significant criteria in the system are the stability, income and credit history of the borrower. This system requires a minimum credit score before the Company will consider underwriting a contract. This system allows the Company a greater ability to standardize the process by which it decides whether to extend credit to a customer.

The Company retains a security interest in all homes it finances. In certain circumstances, the Company also obtains a security interest in the real property on which a home is located.

The Company is responsible for all collection and servicing activities with respect to installment sale contracts it owns, as well as with respect to certain contracts that the Company originated and sold. The Company receives servicing fees with respect to installment sale contracts that it has sold but continues to service.

The Company's ability to finance installment sale contracts is dependent on the availability of funds to the Company. The Company obtains funds to finance installment sale contracts primarily through sales of real estate mortgage investment conduit ("REMIC") trust certificates to institutional investors. During fiscal 2000, the Company sold $1.11 billion of REMIC securities. The Company generally has no credit exposure with respect to securitized contracts except (i) with respect to breaches of representations and warranties, (ii) to the extent of any retained interests in a REMIC, (iii) with respect to required servicer

5

advances, (iv) with respect to the servicing fee (which is subordinated) and (v) with respect to any REMIC security the Company has guaranteed.

The Company also obtains financing from time to time from loans insured by the Federal Housing Administration ("FHA"). These installment sale contracts are permanently funded primarily through the Government National Mortgage Association ("GNMA") pass-through program, under which the Company issues obligations guaranteed by GNMA. During fiscal 2000, the Company issued no obligations guaranteed by GNMA. FHA insurance minimizes the Company's exposure to losses on these credit sales.

The Company uses short-term credit facilities and internally generated funds to support installment sale contracts until a pool of installment sale contracts is accumulated to provide for permanent financing generally at fixed rates.

In the past, the Company sold a significant number of installment sale contracts to unrelated financial institutions with full recourse to the Company in the event of default by the buyer. The Company receives endorsement fees from financial institutions for installment sale contracts it has placed with them on such a basis. Such fees totaled $140,000 in fiscal 2000. The Company's contingent liability on installment sale contracts sold with full and limited recourse was approximately $17 million at September 30, 2000.

### Independent Dealer Retail Sales Financing

The Company provides permanent financing for homes sold by certain independent dealers that sell Company manufactured homes. During fiscal 2000, the Company financed approximately $121 million of the retail sales of these independent dealers.

The Company from time to time considers the purchase of manufactured home installment sale portfolios originated by others as well as servicing rights to such portfolios. In fiscal 2000, the Company made no significant purchases.

### Delinquency and Repossession

In the event an installment sale contract or loan becomes delinquent, the Company, either as owner or as servicer, normally contacts the customer within 8 to 25 days thereafter in an effort to have the default cured. The Company, as owner or servicer, generally repossesses the home after payments have become 60 to 90 days delinquent if the Company is not able to work out a satisfactory arrangement with the customer. After repossession, the Company generally transports the home to a Company owned and operated sales center where the Company attempts to resell the home or contracts with an independent party to remarket the home. The Company also sells repossessed homes at wholesale.

The Company maintains a reserve for estimated credit losses on installment sale contracts held prior to securitization and loans owned by the Company or sold to third parties with full or limited recourse. The Company provides for losses on credit sales in amounts necessary to maintain the reserves at levels the Company believes are sufficient to provide for probable losses based on the Company's historical loss experience, current economic conditions and portfolio performance measures. For fiscal 2000, 1999 and 1998, as a result of expenses incurred due to defaults and repossessions, $3,359,000, $3,678,000 and $3,491,000, respectively, was charged to the reserve for losses on credit sales. The Company's reserve

6

for losses on credit sales at September 30, 2000 was $3,983,000, as compared to $3,546,000 at September 30, 1999 and $2,067,000 at September 30, 1998.

In fiscal 2000, 1999 and 1998, the Company repossessed 8,666, 7,830 and 5,475 homes, respectively, including 732, 854 and 534, respectively, originated on behalf of Deutsche Financial Capital ("DFC"), a formerly 50% owned joint venture engaged in providing consumer financing to customers of independent retail dealers of manufactured housing in which the Company ceased participation during the year ended September 30, 1998. At September 30, 2000 the Company had a total of 2,603 unsold properties in repossession or foreclosure compared to 2,417 and 1,430 at September 30, 1999 and 1998, respectively. Of the total number of unsold properties in repossession or foreclosure, 301, 417 and 295 relate to loans originated on behalf of DFC at September 30, 2000, 1999 and 1998, respectively. The estimated net realizable value of unsold properties in repossession or foreclosure at September 30, 2000 was approximately $60 million.

The net losses resulting from repossessions on Company originated loans as a percentage of the average principal amount of such loans outstanding for fiscal 2000, 1999 and 1998 was 2.03%, 1.72% and 1.52%, respectively.

At September 30, 2000 and September 30, 1999, delinquent installment sale contracts and loans expressed as a percentage of the total number of installment sale contracts and loans that the Company (a) services or (b) has sold with full recourse and that are serviced by others were as follows:

| | Total Number Of Contracts And Loans | Delinquency Percentage September 30, 2000 | | | |
|---|---|---|---|---|---|
| | | 30 days | 60 days | 90 days | Total |
| Company-serviced contracts and loans | 128,036 (1) | 2.0% | 0.9% | 1.6% | 4.5% |
| Contracts and loans sold with full recourse and serviced by others | 781 | 5.0% | 1.9% | 2.3% | 9.2% |

| | Total Number Of Contracts And Loans | Delinquency Percentage September 30, 1999 | | | |
|---|---|---|---|---|---|
| | | 30 days | 60 days | 90 days | Total |
| Company-serviced contracts and loans | 125,115 (1) | 2.8% | 0.8% | 1.5% | 5.1% |
| Contracts and loans sold with full recourse and serviced by others | 1,236 | 3.0% | 1.2% | 1.6% | 5.8% |

(1) Excludes certain contracts and loans originated in September of each year that were being processed at year end and not entered into the loan servicing system until October of such year.

7

At September 30, 2000 and September 30, 1999, delinquent installment sale contracts and loans expressed as a percentage of the total outstanding principal balance of installment sale contracts and loans that the Company (a) services or (b) has sold with full recourse and that are serviced by others were as follows:

| | Total Value of Contracts | Delinquency Percentage September 30, 2000 | | | |
|---|---|---|---|---|---|
| | | 30 days | 60 days | 90 days | Total |
| Company-serviced contracts and loans | $4,543,560,000 (1) | 1.7% | 0.8% | 1.6% | 4.1% |
| Contracts and loans sold with full recourse and serviced by others | $4,428,000 | 5.1% | 1.2% | 1.1% | 7.4% |

| | Total Value Of Contracts | Delinquency Percentage September 30, 1999 | | | |
|---|---|---|---|---|---|
| | | 30 days | 60 days | 90 days | Total |
| Company-serviced contracts and loans | $4,210,908,000 (1) | 2.4% | 0.9% | 1.5% | 4.8% |
| Contracts and loans sold with full recourse and serviced by others | $7,927,000 | 2.8% | 1.2% | 1.7% | 5.7% |

(1) Excludes certain contracts and loans originated in September of each year that were being processed at year end and not entered into the loan servicing system until October of such year.

**Independent Retailer Repurchase Obligations**

Substantially all of the independent retailers who purchase homes from the Company finance new home inventories through wholesale credit lines provided by third parties under which a financial institution provides the retailer with a credit line for the purchase price of the home and maintains a security interest in the home as collateral. A wholesale credit line is used by the retailer to finance the acquisition of its display models, as well as to finance the initial purchase of a home from a manufacturer until the home buyers obtain permanent financing or otherwise pay the dealer for the installed home. In connection with the wholesale financing arrangement, the financial institution generally requires the Company to enter into a repurchase agreement with the financial institution under which the Company is obligated, upon default by the retailer, to repurchase its homes. Under the terms of such repurchase agreements, the Company agrees to repurchase homes at declining prices depending upon the age of the units. At September 30, 2000, the Company estimates that its contingent liability under these repurchase agreements was approximately $138 million. The Company's losses under these arrangements to date have not been significant.

8

On June 1, 1997, the Company ceased receiving commission income for acting as an agent for certain insurance companies with respect to homeowners insurance, credit life insurance and service contracts written for its customers, and entered the reinsurance business directly through its own captive reinsurer. This shift in activities enables the Company to participate more fully in what management believes to be the profitable income streams associated with the property and casualty insurance and service contract business than was possible under the commission-based insurance agency arrangement which preceded its formation. As an insurance underwriter, the Company recognizes insurance premium revenues over the life of the related policies as a component of financial services revenue, with the associated claims expenses reflected in financial services operating expenses. Previously, insurance commission revenue was reported upon the sale of the policies by Oakwood's retail operations, and was included in other income.

Due to this fundamental change in the Company's insurance business, earnings from insurance operations are now spread over the lives of the policies rather than being recognized in full when the policies were sold. Because reinsurance claims costs are recorded as insured events occur, underwriting reinsurance risk may increase the volatility of the Company's earnings, particularly with respect to property and casualty reinsurance. The Company has purchased catastrophe reinsurance to reduce its underwriting exposure to natural disasters.

Effective June 1, 2000 the Company entered into a quota share agreement that will reduce the volatility of the Company's earnings by lowering its underwriting exposure to natural disasters such as hurricanes and floods. The agreement will reduce the levels of credit support, which currently take the form of letters of credit and cash, to secure the reinsurance subsidiary's obligations to pay claims and to meet regulatory capital requirements. Under the new arrangement, which covers physical damage policies, the Company will retro-cede 50% of the Company's physical damage premiums and losses on an ongoing basis. In return, the Company will receive a nonrefundable commission with the potential to receive an incremental commission based on favorable loss experience.

In order to further reduce volatility and the required levels of credit support, effective August 1, 2000 the Company entered into a commission-based arrangement for its extended service contract line of business. Policies in force on August 1, 2000 will continue to earn out over the policy term, while the Company will earn a commission on all new business written.

## Manufactured Housing Communities

The Company has under development a manufactured housing subdivision in Hendersonville, North Carolina. The Company also owns land on which it intended to develop a manufactured housing subdivision in Pinehurst, North Carolina. The Pinehurst subdivision surrounds an existing golf course which the Company sold in fiscal 1998. The Company intends to attempt to sell its remaining interests in the Pinehurst subdivision. The Company does not intend to commit any material resources to the land development business in the future, but may become involved in land development or lot purchases from time to time to facilitate retail sales.

9

Case 1:07-cv-00799-JJF    Document 47-6    Filed 03/06/2008    Page 12 of 81

The Company sold its 50% interest to the managing partner during fiscal 2000.

## Competition

The manufactured housing industry is highly competitive with particular emphasis on price, financing terms and features offered. There are numerous retail dealers in most locations where the Company conducts retail and financing operations. This has served to intensify competitive conditions as well as result in higher inventory levels across the industry. Several of the financing sources in the industry are larger than the Company and have greater financial resources. There are numerous firms producing manufactured homes in the Company's market area, many of which are in direct competition with the Company. Several of these manufacturers, which sell the majority of their homes through independent dealers, are larger than the Company and have greater financial resources. The Company competes with other manufacturers and retailers on the basis of reputation, quality, financing ability, service, features offered and price.

Manufactured homes are a form of permanent, low-cost housing and are therefore in competition with other forms of housing, including site-built and prefabricated homes and apartments. Historically, manufactured homes have been financed as personal property with financing that has shorter maturities and higher interest rates than have been available for site-built homes. In recent years, however, there has been a growing trend toward financing manufactured housing with maturities more similar to the financing of real estate, especially when the manufactured housing is attached to permanent foundations on individually-owned lots. Multi-section homes are often attached to permanent foundations on individually-owned lots. As a result, maturities for certain manufactured housing loans have moved closer to those for site-built housing.

## Regulation

A variety of laws affect the financing of manufactured homes by the Company. The Federal Consumer Credit Protection Act (Truth-in-Lending) and Regulation Z promulgated thereunder require written disclosure of information relating to such financing, including the amount of the annual percentage rate and the finance charge. The Federal Fair Credit Reporting Act also requires certain disclosures to potential customers concerning credit information used as a basis to deny credit. The Federal Equal Credit Opportunity Act and Regulation B promulgated thereunder prohibit discrimination against any credit applicant based on certain specified grounds. The Federal Trade Commission has adopted or proposed various Trade Regulation Rules dealing with unfair credit and collection practices and the preservation of consumers' claims and defenses. The Federal Trade Commission's regulations also require disclosure of a manufactured home's insulation specification. Installment sale contracts and loans eligible for inclusion in the GNMA Program are subject to the credit underwriting requirements of the FHA. A variety of state laws also regulate the form of the installment sale contracts and loan documents and the allowable deposits, finance charge and fees chargeable pursuant to installment sale contracts and loan documents. The sale of insurance products by the Company is subject to various state insurance laws and regulations which govern allowable charges and other insurance practices.

The Company is also subject to the provisions of the Fair Debt Collection Practices Act, which regulates the manner in which the Company collects payments on installment sale contracts, and the Magnuson-Moss Warranty
- Federal Trade Commission Improvement Act, which regulates descriptions of

10

warranties on products. The descriptions and substance of the Company's warranties are also subject to state laws and regulations.

The Company's manufacture of homes generally is subject to the National Manufactured Housing Construction and Safety Standards Act of 1974. In 1976, the Department of Housing and Urban Development ("HUD") promulgated regulations, which have been amended from time to time, under this Act establishing comprehensive national construction standards covering many aspects of manufactured home construction and installation, including structural integrity, fire safety, wind loads and thermal protection. The Company's modular homes are subject to state and local building codes.

The transportation of manufactured homes on highways is subject to regulation by various federal, state and local authorities. Such regulations may prescribe size and road use limitations and impose lower than normal speed limits and various other requirements. Manufactured homes are also subject to local zoning and other regulations.

The Company's operations are subject to a variety of other statutes and regulations.

**Financial Information About Industry Segments**

Financial information for each of the three fiscal years in the period ended September 30, 2000 with respect to the Company's operating segments is incorporated herein by reference to page 31 of the Company's 2000 Annual Report to Shareholders.

**Employees**

At September 30, 2000, the Company employed 9,535 persons, of which 2,983 were engaged in sales and service, 5,474 in manufacturing, 546 in consumer finance, and 532 in executive, administrative and clerical positions.

**Item 2. Description of Properties.**

**Offices**

The Company owns its executive office space in Greensboro, North Carolina. The Company also owns two additional office buildings, which formerly served as its executive office space, located in two adjacent three-story buildings in Greensboro, North Carolina. The Company leases office space in Texas, Arizona, Indiana, Washington and Florida.

**Manufacturing Facilities**

The location and ownership of the Company's production lines, including idled lines, are as follows:

| Location | Owned/Leased |
|---|---|
| Hillsboro, Texas (2 lines) | Owned |
| Killeen, Texas | Owned |
| Navasota, Texas (2 lines) | Owned |

11

| | |
|---|---|
| Richfield, North Carolina | Owned |
| Rockwell, North Carolina (2 lines) | Owned |
| Pinebluff, North Carolina | Owned |
| Moultrie, Georgia (4 lines) | Owned |
| Etna Green, Indiana (2 lines) | Owned |
| Middlebury, Indiana (2 lines) | Owned |
| Buckeye, Arizona (2 lines) | Owned |
| Albany, Oregon (2 lines) | Leased/Owned |
| Hermiston, Oregon (2 lines) | Owned |
| Lewiston, Pennsylvania | Owned |
| Milton, Pennsylvania | Owned |
| Perris, California | Owned |
| Fort Morgan, Colorado | Owned |
| Plainville, Kansas | Owned |
| Redwood Falls, Minnesota | Owned |
| Pulaski, Tennessee | Leased |

The Company also has two manufacturing facilities that are currently being held for sale located in Gainsville and Ennis, Texas.

The Company's manufacturing facilities are generally one story metal prefabricated structures. The Company believes its facilities are in good condition. These facilities are located on tracts of land generally ranging from 10 to 50 acres. The production area in these facilities ranges from approximately 50,000 to 250,000 square feet. In addition, the Company owns a 112,000 square foot warehouse in Elkhart, Indiana.

The land and buildings at all of the facilities owned by the Company were subject to mortgages with an aggregate balance of $10,572,000 at September 30, 2000.

Based on the Company's normal manufacturing schedule of one shift per day for a five-day week, the Company believes that its manufacturing lines, including those idled, have the capacity to produce approximately 70,000 floors annually, depending on product mix. During fiscal 2000, the Company manufactured 43,442 floors at its plants.

**Manufactured Home Sales Centers**

The Company's manufactured home retail sales centers consist of tracts of from 3/4 to 4 1/2 acres of land on which manufactured homes are displayed, each with a sales office containing from approximately 600 to 1,300 square feet of floor space. The Company operated 378 sales centers at September 30, 2000 located in 29 states distributed as follows: Texas (66), North Carolina (62), South

12

Carolina (22), Tennessee (20), Georgia (19), Virginia (18), Alabama (14), Arizona (14), Washington (13), Kentucky (12), Mississippi (12), New Mexico (12), Florida (10), Ohio (10), Oregon (9), Colorado, (8), Louisiana (8), West Virginia (8), Arkansas (7), Missouri (7), Idaho (6), Oklahoma (5), Nevada (4), Delaware (3), Utah (3), California (2), Kansas (2), Michigan (1) and Wyoming (1).

Thirty-seven sales centers are on property owned by the Company and the other locations are leased by the Company for a specified term of from one to ten years or on a month-to-month basis. Rents paid by the Company during the year ended September 30, 2000 for the leased sales centers totaled approximately $14,596,000.

**Manufactured Housing Communities**

The Company has under development a manufactured housing subdivision in Hendersonville, North Carolina. The Company also owns property in Pinehurst, North Carolina on which it intended to develop a manufactured housing subdivision. The Company intends to offer the property for sale.

The Company also owned a 50% interest in a recreational vehicle campground and adjoining undeveloped land located in Deltaville, Virginia. The Company sold its 50% interest to the managing partner during fiscal 2000.

**Item 3. Legal Proceedings.**

In November 1998 the Company and certain of its present and former officers and directors were named as defendants in lawsuits filed on behalf of purchasers of the Company's common stock for various periods between April 11, 1997 and July 21, 1998 (the "Class Period"). In June 1999 a consolidated amended complaint was filed in the United States Middle District Court in Guilford County, North Carolina. The amended complaint, which seeks class action certification, alleges violations of federal securities law based on alleged fraudulent acts, false and misleading financial statements, reports filed by the Company and other representations during the Class Period and seeks the loss of value in class members' stockholdings. The Company filed a motion to dismiss the amended complaint. In July 2000, the magistrate submitted a recommended order dismissing the complaint with prejudice. This order was affirmed by the District Court judge in October 2000 and has not yet been appealed.

During 2000 two lawsuits were filed against the Company's subsidiaries, Oakwood Mobile Homes, Inc. and Oakwood Acceptance Corporation, and certain of their employees in the Circuit Court of Jefferson County, Mississippi. These lawsuits generally allege that the Company's subsidiaries and their employees engaged in various improper business practices including false advertising and misrepresentation of material facts relating to financing and insurance matters. In October 2000 the attorneys for the plaintiffs filed a motion to consolidate the two cases, add a large number of additional plaintiffs residing in various parts of the United States to the case and add the Company as a defendant. As the lawsuits are in the early stages of discovery, the Company is unable to determine the effect, if any, on its financial position or results of operations. The Company intends to defend these lawsuits vigorously.

The Company is a defendant in a number of other lawsuits that are incidental to the conduct of its business.

**Item 4. Submission of Matters to a Vote of Security Holders.**

Not applicable.

13

Information as to executive officers of the Company who are directors and nominees of the Company is incorporated herein by reference to the section captioned "Election of Directors" of the Company's Proxy Statement for the Annual Meeting of Shareholders to be held January 31, 2001. Information as to the executive officers of the Company who are not directors or nominees is as follows:

```
Name                      Age   Information About Officer
----                      ---   -------------------------

Douglas R. Muir           46    Executive Vice President since  September  2000;  Senior Vice President
                                from 1994 to September  2000;  Secretary  since 1994;  Treasurer  since
                                1993; Partner, Price Waterhouse LLP from 1988 to 1993.



Suzanne H. Wood           40    Executive Vice President and Chief  Financial  Officer since  September
                                2000; Vice President,  Investor Relations and Financial Risk Management
                                of the Company from November  1998 to September  2000;  Vice  President
                                and Chief  Financial  Officer of Tultex  Corporation  (a  manufacturer,
                                marketer and distributor of activewear)  from February 1996 to November
                                1998;  Controller  of Tultex  Corporation  from 1993 to February  1996.
                                Audit  Senior  Manager,  Price  Waterhouse  LLP from  1991 to 1993.  In
                                December  1999,  Tultex  Corporation  filed  for  reorganization  under
                                Chapter 11 of the bankruptcy code.
```

Each officer holds office until his or her death, resignation, retirement, removal or disqualification or until his or her successor is elected and qualified.

14

**Items 5-8.**

Items 5, 7, 7A and 8 are incorporated herein by reference to pages 5 to 32 of the Company's 2000 Annual Report to Shareholders and to the sections captioned "Securities Exchange Listing" and "Shareholders" on the inside back cover page of the Company's 2000 Annual Report to Shareholders. Item 6 is incorporated herein by reference to the information captioned "Net sales," "Total revenues," "Net income (loss)," "Earnings (loss) per common share--Basic and Diluted," "Total assets," "Notes and bonds payable" and "Cash dividends per common share" for each of the five fiscal years in the period ended September 30, 2000 on page 1 of the Company's 2000 Annual Report to Shareholders.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosures.**

Not applicable.

## PART III

**Items 10-13.**

Items 10-13 are incorporated herein by reference to the sections captioned "Principal Holders of Common Stock and Holdings of Management," "Election of Directors," "Compensation Committee Interlocks and Insider Participation," "Certain Relationships and Related Party Transactions," "Compensation Committee Report," "Shareholder Return Performance Graph" ""Executive Compensation," "Director Compensation," "Employment Arrangements" and "Section 16(a) Beneficial Ownership Reporting Compliance" of the Company's Proxy Statement for the Annual Meeting of Shareholders to be held January 31, 2001 and to the separate item in Part I of this Annual Report on Form 10-K captioned "Executive Officers of the Company." Such Proxy Statement will be filed with the Commission prior to January 28, 2001.

## PART IV

**Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K.**

(a) Financial Statements, Financial Statement Schedules and Exhibits.

List the following documents filed as part of this report:

1. Financial Statements.

The following financial statements of the Company are included as part of Exhibit 13 hereof:

### Report of PricewaterhouseCoopers LLP

Consolidated Statements of Operations for the Years
ended September 30, 2000, 1999 and 1998

15

Consolidated Balance Sheets as of September 30, 2000 and 1999

Consolidated Statements of Cash Flows for the Years ended September 30, 2000, 1999 and 1998

Consolidated Statement of Changes in Shareholders' Equity and Other Comprehensive Income for the Years ended September 30, 2000, 1999 and 1998

### Notes to Consolidated Financial Statements

2. Financial Statement Schedules

See the accompanying Index to Financial Statement Schedules at page F-1.

3. Exhibits

3.1 Restated Charter of the Company dated January 25, 1984 (Exhibit 3.2 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1984)

3.2 Amendment to Restated Charter of the Company dated February 18, 1988 (Exhibit 3 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1988)

3.3 Amendment to Restated Charter of the Company dated April 23, 1992 (Exhibit 3.3 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1992)

3.4 Amended and Restated Bylaws of the Company adopted February 1, 1995 (Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 1994)

4.1 Shareholder Protection Rights Agreement between the Company and Wachovia Bank of North Carolina, N.A., as Rights Agent (Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1991)

4.2 Agreement to Furnish Copies of Instruments With Respect to Long Term Debt (filed herewith)

4.3 Indenture dated as of March 2, 1999 between the Company and The First National Bank of Chicago, as Trustee (Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999)

4.4 First Supplemental Indenture dated as of March 2, 1999 between the Company and The First National Bank of Chicago, as Trustee (Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999)

16

|   |      | Oakwood Homes Corporation 1985 Non-Qualified |
|---|------|----|
|   | 10.1 | Stock Option Plan (Exhibit 10.1 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1985) |
| * | 10.2 | Oakwood Homes Corporation 1986 Nonqualified Stock Option Plan for Nonemployee Directors (Exhibit 10.1 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1986) |
| * | 10.3 | Oakwood Homes Corporation 1990 Director Stock Option Plan (Exhibit 10.24 to the Company's Registration Statement on Form S-2 filed on April 13, 1991) |
| * | 10.4 | Oakwood Homes Corporation Executive Incentive Compensation Plan (Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1996) |
| * | 10.5 | Oakwood Homes Corporation Key Employee Stock Plan (Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1996) |
| * | 10.6 | Oakwood Homes Corporation 1997 Director Stock Option Plan (Exhibit 10 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998) |
| * | 10.7 | Oakwood Homes Corporation Director Deferral Plan (Exhibit 10.18 to the Company's Annual Report on Form 10-K for the year ended September 30, 1998) |
| * | 10.8 | Form of Employment Agreement between the Company and each of Robert A. Smith and Myles E. Standish (Exhibit 10.19 to the Company's Annual Report on Form 10-K for the year ended September 30, 1998) |
| * | 10.9 | Employment Agreement dated as of September 27, 1999 by and between the Company and Nicholas J. St. George (Exhibit 10.13 to the Company's Annual Report on Form 10-K for the year ended September 30, 1999) |
|   | 13 | Portions of the Company's 2000 Annual Report to Shareholders incorporated herein by reference. (filed herewith) |
|   | 21 | List of the Company's subsidiaries (filed herewith) |
|   | 23.1 | Consent of PricewaterhouseCoopers LLP (filed herewith) |

17

Financial Data Schedule filed in electronic format only). This schedule is furnished for the information of the Commission and shall not be deemed "filed" for purposes of Section 11 of the Securities Act of 1933, Section 18 of the Securities Exchange Act of 1934 and Section 323 of the Trust Indenture Act.

-------------

* Indicates a management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form 10-K.

(b) Reports on Form 8-K. On September 25, 2000, the Company filed a Current Report on Form 8-K in which it reported, pursuant to Item 5 thereof (Other Events), that it had issued a press release relating to certain executive management changes. No financial statements were filed as part of such Current Report on Form 8-K.

(c) Exhibits. See Item 14(a)(3).

(d) Financial Statement Schedules. See Item 14(a)(2)

18

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized.

## OAKWOOD HOMES CORPORATION

```
                              By:  /s/ Suzanne H. Wood
                                   ----------------------------
                                   Suzanne H. Wood
                                   Executive Vice President and
                                   Chief Financial Officer
```

        Dated:  December 29, 2000

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed below by the following persons on behalf of the Company and in the capacities and on the date indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ Duane D. Daggett <br> -------------------------------- <br> Duane D. Daggett | Director, Chief Executive Officer and President (Principal Executive Officer) | December 29, 2000 |
| /s/ Dennis I. Meyer <br> -------------------------------- <br> Dennis I. Meyer | Director and Chairman | December 29, 2000 |
| /s/ Kermit G. Phillips, II <br> -------------------------------- <br> Kermit G. Phillips, II | Director | December 29, 2000 |
| /s/ Roger W. Schipke <br> -------------------------------- <br> Roger W. Schipke | Director | December 29, 2000 |

19

```
/s/ Sabin C. Streeter                   Director                        December 29, 2000
-------------------------------------
Sabin C. Streeter


/s/ Francis T. Vincent, Jr.             Director                        December 29, 2000
-------------------------------------
Francis T. Vincent, Jr.


/s/ Clarence W. Walker                  Director                        December 29, 2000
-------------------------------------
Clarence W. Walker


/s/ H. Michael Weaver                   Director                        December 29, 2000
-------------------------------------
H. Michael Weaver


/s/ Robert A. Smith                     Director, Executive Vice President,   December 29, 2000
-------------------------------------  Financial Operations
Robert A. Smith


/s/ Myles E. Standish                   Director, Executive Vice President,   December 29, 2000
-------------------------------------  Operations and General Counsel
Myles E. Standish


/s/ Suzanne H. Wood                     Executive Vice President and     December 29, 2000
-------------------------------------  Chief Financial Officer
Suzanne H. Wood                         (Principal Financial and
                                        Accounting Officer)
```

20

OAKWOOD HOMES CORPORATION

## INDEX TO FINANCIAL STATEMENT SCHEDULES

The financial statements, together with the report thereon of PricewaterhouseCoopers LLP dated November 28, 2000, except for the information presented in the third paragraph of Note 10 for which the date is December 27, 2000, appearing on pages 13 to 32 of the Company's 2000 Annual Report to Shareholders, are incorporated by reference in this Annual Report on Form 10-K. With the exception of the aforementioned information and the information incorporated in Items 1, 5, 6, 7, 7A and 8, the 2000 Annual Report to Shareholders is not deemed to be filed as part of this report. Financial statement schedules not included in this Annual Report on Form 10-K have been omitted because they are not applicable or the required information is shown in the financial statements or notes thereto.

### PAGE

Supplementary information to notes to consolidated financial statements F-2

F-1

OAKWOOD HOMES CORPORATION
AND CONSOLIDATED SUBSIDIARIES
SUPPLEMENTARY INFORMATION TO NOTES TO
CONSOLIDATED FINANCIAL STATEMENTS

The components of inventories are as follows:

|  | September 30, 2000 | September 30, 1999 | September 30, 1998 |
|---|---|---|---|
| New manufactured homes | $261,336,000 | $364,770,000 | $234,606,000 |
| Used manufactured homes | 11,492,000 | 18,047,000 | 8,261,000 |
| Homes in progress | 5,495,000 | 6,924,000 | 6,119,000 |
| Land/Homes under development | 14,328,000 | 14,318,000 | 6,417,000 |
| Raw materials and supplies | 30,352,000 | 39,539,000 | 35,949,000 |
|  | $323,003,000 | $443,598,000 | $291,352,000 |

F-2

SECURITIES AND EXCHANGE COMMISSION
Washington, D. C.

**EXHIBITS**

**ITEM 14(a)(3)**

**ANNUAL REPORT ON FORM 10-K**

For the fiscal year ended
September 30, 2000

Commission
File Number
1-7444

OAKWOOD HOMES CORPORATION

EXHIBIT INDEX

| Exhibit No. | Exhibit Description |
|-------------|--------------------|
| 3.1 | Restated Charter of the Company dated January 25, 1984 (Exhibit 3.2 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1984) |
| 3.2 | Amendment to Restated Charter of the Company dated February 18, 1988 (Exhibit 3 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1988) |
| 3.3 | Amendment to Restated Charter of the Company dated April 23, 1992 (Exhibit 3.3 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1992) |
| 3.4 | Amended and Restated Bylaws of the Company adopted February 1, 1995 (Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended December 31, 1994) |
| 4.1 | Shareholder Protection Rights Agreement between the Company and Wachovia Bank of North Carolina, N.A., as Rights Agent (Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1991) |
| 4.2 | Agreement to Furnish Copies of Instruments With Respect to Long Term Debt (filed herewith) |
| 4.3 | Indenture dated as of March 2, 1999 between the Company and The First National Bank of Chicago, as Trustee (Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999) |
| 4.4 | First Supplemental Indenture dated as of March 2, 1999 between the Company and The First National Bank of Chicago, as Trustee (Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999) |

| | |
|---|---|
| 10.1 | Oakwood Homes Corporation 1985 Non-Qualified Stock Option Plan (Exhibit 10.1 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1985) |
| 10.2 | Oakwood Homes Corporation 1986 Nonqualified Stock Option Plan for Nonemployee Directors (Exhibit 10.1 to the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 1986) |
| 10.3 | Oakwood Homes Corporation 1990 Director Stock Option Plan (Exhibit 10.24 to the Company's Registration Statement on Form S-2 filed on April 13, 1991) |
| 10.4 | Oakwood Homes Corporation Executive Incentive Compensation Plan (Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1996) |
| 10.5 | Oakwood Homes Corporation Key Employee Stock Plan (Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1996) |
| 10.6 | Oakwood Homes Corporation 1997 Director Stock Option Plan (Exhibit 10 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998) |
| 10.7 | Oakwood Homes Corporation Director Deferral Plan (Exhibit 10.18 to the Company's Annual Report on Form 10-K for the year ended September 30, 1998) |
| 10.8 | Form of Employment Agreement between the Company and each of Robert A. Smith and Myles E. Standish (Exhibit 10.19 to the Company's Annual Report on Form 10-K for the year ended September 30, 1998) |
| 10.9 | Employment Agreement dated as of September 27, 1999 by and between the Company and Nicholas J. St. George (Exhibit 10.13 to the Company's Annual Report on Form 10-K for the year ended September 30, 1999) |
| 13 | Portions of the Company's 2000 Annual Report to Shareholders incorporated herein by reference (filed herewith). |

21                          List of the Company's subsidiaries (filed
                            herewith)

23.1                        Consent of PricewaterhouseCoopers LLP (filed
                            herewith)

27                          Financial Data Schedule (filed in electronic
                            format only). This schedule is furnished for
                            the information of the Commission and shall
                            not be deemed "filed" for purposes of
                            Section 11 of the Securities Act of 1933,
                            Section 18 of the Securities Exchange Act of
                            1934 and Section 323 of the Trust Indenture
                            Act.

**EXHIBIT 4.2**

Agreement to Furnish Copies of Instruments <u>With Respect to Long Term Debt</u>

The Company has entered into certain agreements with respect to long-term indebtedness which do not exceed ten percent of the total assets of the Company and its subsidiaries on a consolidated basis. The Company hereby agrees to furnish a copy of such agreements to the Commission upon request of the Commission.

**OAKWOOD HOMES CORPORATION**

By:    /s/ Suzanne H. Wood
       -------------------------------
       Suzanne H. Wood
       Executive Vice President and
       Chief Financial Officer

[PORTIONS OF THE COMPANY'S 2000 ANNUAL REPORT TO SHAREHOLDERS

INCORPORATED BY REFERENCE INTO THE ANNUAL REPORT ON FORM 10-K]

### Financial Highlights

| | Year ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| (in thousands, except per share data) | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 |
| Net sales | $1,189,885 | $1,496,419 | $1,404,432 | $ 952,704 | $862,079 | $741,521 |
| Total revenues | $1,284,132 | $1,589,225 | $1,482,553 | $ 1,070,051 | $973,922 | $821,412 |
| Net income (loss) | $ (120,865) | $ (31,320) | $ 55,353 | $ 81,913 | $ 68,255 | $ 45,318 |
| Earnings (loss) per common share | | | | | | |
|     Basic | $ (2.60) | $ (0.67) | $ 1.20 | $ 1.79 | $ 1.53 | $ 1.03 |
|     Diluted | $ (2.60) | $ (0.67) | $ 1.17 | $ 1.75 | $ 1.47 | $ 0.99 |
| Total assets | $1,148,772 | $1,437,847 | $1,283,376 | $ 904,506 | $841,977 | $782,640 |
| Notes and bonds payable | $ 329,929 | $ 352,164 | $ 61,875 | $ 78,815 | $134,379 | $198,812 |
| Cash dividends per common share | $ 0.03 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 | $ 0.04 |

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Oakwood Homes Corporation and Subsidiaries**

Unless otherwise indicated, all references to annual periods refer to fiscal years ended September 30.

### RESULTS OF OPERATIONS
Total sales decreased 20% to $1.2 billion in fiscal 2000 from $1.5 billion last year, following a 7% increase in 1999 from the $1.4 billion reported in 1998. Total revenues declined 19% to $1.3 billion from $1.6 billion last year, compared to $1.5 billion reported for 1998.

The following table summarizes certain key sales statistics for each of the last three years:

|                                                        | 2000     | 1999     | 1998     |
|--------------------------------------------------------|----------|----------|----------|
| Retail sales (in millions)                             | $ 769    | $ 1,037  | $ 1,140  |
| Wholesale sales (in millions)                          | $ 421    | $ 459    | $ 264    |
| Total sales (in millions)                              | $ 1,190  | $ 1,496  | $ 1,404  |
| Gross profit %-- integrated operations                 | 26.5%    | 33.0%    | 33.7%    |
| Gross profit %-- wholesale operations                  | 14.0%    | 15.8%    | 17.7%    |
| New single-section homes sold--retail                  | 5,761    | 9,256    | 12,390   |
| New multi-section homes sold--retail                   | 10,333   | 12,810   | 13,669   |
| Used homes sold--retail                                | 1,587    | 2,190    | 2,349    |
| New single-section homes sold--wholesale               | 2,867    | 3,087    | 1,638    |
| New multi-section homes sold--wholesale                | 9,307    | 10,153   | 6,145    |
| Average new single-section sales price--retail         | $31,300  | $32,400  | $31,400  |
| Average new multi-section sales price--retail          | $55,200  | $56,100  | $53,300  |
| Average new single-section sales price--wholesale      | $21,200  | $21,800  | $20,900  |
| Average new multi-section sales price--wholesale       | $38,300  | $38,000  | $37,000  |
| Weighted average retail sales centers open during the year | 384  | 383      | 330      |
| Average dollar sales per sales center (in millions)    | $ 2.0    | $ 2.7    | $ 3.5    |

### 2000 COMPARED TO 1999

Net sales
The Company's sales volume continued to be adversely affected by extremely competitive industry conditions in 2000. Retail sales dollar volume decreased 26%, reflecting a 27% decrease in new unit volume and decreases of 3% and 2% in the average new unit sales prices of single-section and multi-section homes, respectively. These decreases were partially offset by a shift in product mix toward multi-section homes, which have higher average selling prices than single-section homes. Average retail sales prices declined as a result of competitive pricing pressure and various promotional programs targeted at selling older inventory models. Multi-section homes accounted for 64% of retail new unit sales compared to 58% in 1999.

During 2000 the Company opened or acquired 11 new sales centers compared to 60 sales centers during 1999. The Company also closed 45 underperforming sales centers during the year, primarily as part of its restructuring plans announced during the fourth quarter of fiscal 1999. During 1999 seven sales centers were closed. Total new retail sales dollars at sales centers open more than one year decreased 33% during 2000.

Wholesale sales dollar volume decreased 8% due to an 8% decrease in wholesale unit volume and a 3% decrease in the average new unit sales price of single-section homes. These decreases were partially offset by a 1% increase in the average new unit sales price of multi-section homes.

Gross profit
Gross profit margin-integrated operations reflects gross profit earned on all sales at retail as well as the manufacturing gross profit on retail sales of units manufactured by the Company. Gross profit margin-integrated operations decreased from 33.0% in 1999 to 26.5% primarily as a result of competitive pricing pressures, various promotional programs and unfavorable manufacturing variances caused by reduced production schedules experienced during fiscal year 2000.

Wholesale gross profit margins decreased from 15.8% in 1999 to 14.0% in 2000 as a result of competitive pricing pressures and unfavorable manufacturing variances as described above.

Consumer finance revenues

Consumer finance revenues are summarized as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Interest income | $ 36,993 | $ 41,655 |
| Servicing fees | 23,464 | 25,632 |
| REMIC residual income | 16,055 | 7,955 |
| Losses on loans sold or held for sale: | | |
| Loss on sale of loans | (12,360) | (10,790) |
| Valuation provision on loans held for sale | (11,951) | (3,662) |
| | (24,311) | (14,452) |
| Loss on sale of securities | (4,463) | -- |
| Impairment and valuation provisions | (21,627) | (32,097) |
| Other | 1,852 | 1,054 |
| | $ 27,963 | $ 29,747 |

The decrease in interest income primarily reflects lower average outstanding balances of loans held for sale prior to securitization, as well as lower interest income on loans held for investment, the principal balance of which is declining as these loans are liquidated. These decreases were partially offset by incremental interest income on retained regular REMIC interests from certain of the Company's post-1997 securitizations.

Loan servicing fees, which are reported net of amortization of servicing assets, declined as a result of increased servicing asset amortization and lower servicing cash flows from the Company's securitizations. Servicing fees did not increase commensurately with the growth of the Company's securitized loan portfolio because certain securitizations did not generate sufficient cash flows to enable the Company to receive its full servicing fee. The Company has not recorded revenues or receivables for these shortfalls, because the Company's right to receive servicing fees generally is subordinate to the holders of regular REMIC interests.

**Oakwood Homes Corporation 5**

**Oakwood Homes Corporation and Subsidiaries**

The increase in REMIC residual income reflects higher yields on retained residual interests in REMIC securitizations primarily due to favorable cash flow performance on certain interests whose values were previously written down.

The loss on sale of loans reflects the completion of four securitizations for both 2000 and 1999. In addition, during fiscal 2000 and 1999 the Company recorded provisions of $12.0 million and $3.7 million, respectively, to reduce the carrying value of loans held for sale to the lower of cost or market, resulting in aggregate losses on loans sold or held for sale of $24.3 million in 2000, compared to $14.5 million in 1999. The increase in securitization losses reflects principally a significant decline in the spread between the yield on loans originated by the Company and the cost of funds obtained when the loans were securitized.

The loss on sale of securities reflects the sale in the quarter ending March 31, 2000 of all BBB rated asset-backed securities retained by the Company from securitizations prior to December 31, 1999.

Impairment and valuation provisions are summarized as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Impairment writedowns of residual REMIC interests | $   103 | $18,217 |
| Impairment writedowns of regular REMIC interests | 3,690 | 1,373 |
| Valuation provisions on servicing contracts | 5,979 | 8,713 |
| Provisions for potential guarantee obligations on REMIC securities sold | 11,855 | 3,794 |
| | $21,627 | $32,097 |

Except for the impairment charge relating to regular REMIC interests, these charges and credits generally resulted from changes in assumptions of credit losses and recovery rates on securitized loans. The impairment writedown of regular REMIC interests reflects the Company's determination that the decline in fair value of a retained REMIC regular interest below its amortized cost was other than temporary.

For the year ended September 30, 2000 total credit losses on loans originated by the Company, including losses relating to assets securitized by the Company, loans held for investment, loans held for sale and loans sold with full or partial recourse, amounted to approximately 2.03% of the average principal balance of the related loans, compared to approximately 1.72% one year ago. Because losses on repossessions are reflected in the loss ratio principally in the period during which the repossessed property is disposed of, fluctuations in the number of repossessed properties disposed of from period to period may cause variations in the charge-off ratio. At September 30, 2000 the Company had a total of 2,603 unsold properties in repossession or foreclosure (approximately 2.06% of the total number of Oakwood originated serviced assets) compared to 2,417 and 1,430 at September 30, 1999 and 1998, respectively (approximately 1.97% and 1.28%, respectively, of the total number of Oakwood originated serviced assets). Of the total number of unsold properties in repossession or foreclosure, 301, 417 and 295 relate to loans originated on behalf of Deutsche Financial Capital ("DFC"), the Company's former consumer finance joint venture, at September 30, 2000, 1999 and 1998, respectively.

At September 30, 2000 the delinquency rate on Company originated loans, excluding loans originated on behalf of DFC, was 4.4%, compared to 4.9% at September 30, 1999.

Insurance revenues
Insurance revenues from the Company's captive reinsurance business increased 14% to $56.4 million in 2000 from $49.6 million in 1999. A substantial portion of insurance revenues is derived from insurance policies sold in connection with new home sales by the Company's retail operations. If the adverse retail sales trends experienced in fiscal 2000 continue, insurance revenues should decline in future periods.

Effective June 1, 2000 the Company entered into a quota share agreement that will reduce the volatility of the Company's earnings by lowering its underwriting exposure to natural disasters such as hurricanes and floods. The agreement will reduce the levels of credit support, which currently take the form of letters of credit and cash, to secure the reinsurance subsidiary's obligations to pay claims and to meet regulatory capital requirements. Under the new arrangement, which covers physical damage policies, the Company will retro-cede 50% of the Company's physical damage premiums and losses on an ongoing basis. In return, the Company will receive a nonrefundable commission with the potential to receive an incremental commission based on favorable loss experience. The Company estimates that this quota share arrangement reduced insurance revenues and expenses by $7.1 million and $5.6 million, respectively, in the last four months of fiscal 2000.

In order to further reduce volatility and the required levels of credit support, effective August 1, 2000 the Company entered into a commission-based arrangement for its extended service contract line of business. Policies in force on August 1, 2000 will continue to earn out over the

policy term, while the Company will earn a commission on all new business written.

Other income

Other income decreased from $13.4 million in 1999 to $9.9 million in 2000. Results for 1999 included a $1.1 million insurance settlement gain and a $1.4 million gain on sale, as more fully described in the "1999 Compared to 1998--Other income" discussion below.

Selling, general and administrative expenses Selling, general and administrative expenses decreased $76.2 million, or 19%, in fiscal 2000 compared to 1999. This decrease resulted from cost reduction initiatives undertaken during the prior twelve months, particularly at retail, as well as lower sales volumes. However, as a percentage of net sales, selling, general and administrative expenses increased to 28.2% of net sales for the year ended September 30, 2000, from 27.5% of net sales in 1999 as a result of a lower sales base over which to spread the Company's fixed portion of distribution and overhead costs and higher service costs.

Consumer finance operating expenses

Consumer finance operating expenses rose $5.7 million, or 15%, during 2000. Of the total dollar increase, approximately $3.7 million represents higher compensation costs, including headcount additions to the loan servicing functions in order to improve the performance of the loan servicing portfolio over the long term.

**6 2000 Annual Report**

Occupancy and telecommunications costs increased by approximately $1.0 million. During 2000 the average number of loans serviced increased 8%.

Insurance operating expenses

Insurance operating costs decreased 16% to $32.3 million during 2000 despite an increase in insurance revenues. Expenses did not increase commensurately with the increase in insurance revenues because a larger percentage of insurance revenues were derived from products with lower expense ratios, as well as more favorable loss ratios across all products in 2000. In addition, insurance operating costs in 1999 included estimated losses, net of recoveries from the Company's reinsurers, of approximately $5.6 million associated with flooding and other storm damage claims from Hurricane Floyd. Because reinsurance claims costs are recorded as insured events occur, reinsurance underwriting risk may increase the volatility of the Company's earnings, particularly with respect to property and casualty reinsurance. However, the reinsurance agreement described previously, as well as the Company's purchase of catastrophe reinsurance, should reduce the Company's underwriting exposure to natural disasters.

Restructuring charges

During the fourth quarter of 1999 the Company recorded restructuring charges of approximately $25.9 million, as more fully described in the "1999 Compared to 1998--Restructuring charges" section below. During 2000 the Company reevaluated its restructuring plans and determined that the losses associated with the closing of retail sales centers and the idling or closing of manufacturing plants were less than anticipated, and a portion of the charges was reversed. During 2000 the Company recorded additional restructuring provisions of $3.8 million, primarily related to severance costs associated with a reduction in headcount of approximately 250 people and the closure of certain offices and facilities.

Interest expense

Interest expense increased $9.6 million, or 24%, during 2000 primarily due to interest expense associated with the Company's March 1999 $300 million senior note offering. A portion of the proceeds from the senior note offering was used to retire $100 million of debt incurred in connection with the April 1, 1998 Schult acquisition. This increase was partially offset by lower interest expense on declining and retired long-term debt balances. Interest expense on short-term lines of credit declined slightly, reflecting an approximate $104 million reduction in average balances outstanding offset by higher interest rates and fees.

Income taxes

During 2000 the Company charged against earnings a valuation allowance of $66.4 million related to deferred income tax assets in accordance with the provisions of Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("FAS 109"). Because the Company has operated at a loss in its two most recent fiscal years and because management believes difficult competitive conditions will continue for the foreseeable future, management believes that under the technical provisions of FAS 109, it is not appropriate to record income tax benefits on current losses in excess of anticipated refunds of taxes previously paid. Accordingly, the Company established valuation allowances against the tax benefits of substantially all its net operating loss carryforwards and deductible temporary differences between financial and taxable income. As a consequence, the Company's results for fiscal 2000 reflect income tax expense, notwithstanding the fact that the Company reported losses for the year. The valuation allowance will be reversed to income in future periods to the extent that the related deferred income tax assets are realized as a reduction of taxes otherwise payable on any future earnings or the valuation allowances are otherwise no longer required.

**1999 COMPARED TO 1998**

Net sales

The Company's sales volume was adversely affected by competitive industry conditions in 1999. Retail sales dollar volume decreased 9%, reflecting a 15% decrease in new unit volume partially offset by increases of 3% and 5% in the average new unit sales prices of single-section and multi-section homes, respectively, and a shift in product mix toward multi-section homes, which have higher average selling prices than single-section homes. Average retail sales prices rose due to price increases and a shift in product mix toward higher price points. Multi-section homes accounted for 58% of retail new unit sales compared to 52% in 1998.

During 1999 the Company opened or acquired 60 new sales centers compared to 62 sales centers during 1998. The Company also closed seven underperforming sales centers during the year compared to three in 1998. Total new retail sales dollars at sales centers open more than one year decreased 20% during 1999. During September 1999 the Company announced plans to close approximately 40 additional sales centers that were not meeting profitability targets. The then anticipated effects of such actions are more fully described in "Restructuring charges" below.

Wholesale sales dollar volume increased 74% due to an increase in wholesale unit volume related to the acquisition of Schult on April 1, 1998. Schult sold 10,464 units, representing $366.8 million of sales, to independent dealers during 1999 compared to 5,386 units, representing $185.9 million of sales, in 1998 subsequent to the acquisition. Excluding the effects of the Schult acquisition, wholesale sales dollars increased 18% during 1999, reflecting primarily higher sales volume.

Gross profit

Gross profit margin-integrated operations decreased from 33.7% in 1998 to 33.0% primarily as a result of competitive pricing and unfavorable manufacturing variances caused by reduced production schedules experienced during the fourth quarter of 1999.

Wholesale gross profit margins decreased from 17.7% in 1998 to 15.8% in 1999 as a result of the acquisition of Schult, whose gross profit margins are lower than those of the Company's other wholesale sales, and unfavorable manufacturing variances caused by reduced production schedules experienced during the fourth quarter of 1999. Schult represented approximately 80% of wholesale sales dollars during 1999

**Oakwood Homes Corporation 7**

**Oakwood Homes Corporation and Subsidiaries**

Consumer finance revenues
Consumer finance revenues are summarized as follows:

| (in thousands) | 1999 | 1998 |
|---|---|---|
| Interest income | $ 41,655 | $ 30,918 |
| Servicing fees | 25,632 | 27,662 |
| REMIC residual income | 7,955 | 10,282 |
| Gains/(losses) on loans sold or held for sale: | | |
| Gain/(loss) on sale of loans | (10,790) | 20,058 |
| Valuation provision on loans held for sale | (3,662) | -- |
| | (14,452) | 20,058 |
| Impairment and valuation provisions | (32,097) | (53,712) |
| Other | 1,054 | (1,814) |
| | $ 29,747 | $ 33,394 |

The increase in interest income primarily reflects higher average outstanding balances of loans held for sale prior to securitization due to increased origination volume and the timing of securitizations. The increase also reflects incremental interest income on retained regular REMIC interests from certain of the Company's 1998 and 1999 securitizations. These increases were partially offset by lower interest income on loans held for investment, the principal balance of which is declining as these loans are liquidated.

Loan servicing fees, which are reported net of amortization of servicing assets, declined as a result of increased servicing asset amortization and lower servicing cash flows from the Company's securitizations. Servicing fees did not increase commensurately with the growth of the Company's securitized loan portfolio because certain securitizations did not generate sufficient cash flows to enable the Company to receive its full servicing fee. The Company has not recorded revenues or receivables for these shortfalls, because the Company's right to receive servicing fees generally is subordinate to the holders of regular REMIC interests.

The decrease in REMIC residual income primarily reflects a decline in the average balance of residual interests.

The substantial decline in securitization gains reflects principally a significant decline in the spread between the yield on loans originated by the Company and the cost of funds obtained when the loans were securitized. The decline in spread reflects lower loan yields resulting from both a shift in product mix toward multi-section loans, which generally carry lower coupons than single-section loans, and from generally lower interest rates prevailing in the marketplace when the loans were originated as compared to when they were securitized. The decline in spread also reflects higher securitization funding costs resulting from an increase in the spread over treasurys required by institutional purchasers of the Company's asset-backed securities.

Impairment and valuation provisions are summarized as follows:

| (in thousands) | 1999 | 1998 |
|---|---|---|
| Impairment writedowns of residual REMIC interests | $18,217 | $41,871 |
| Impairment writedowns of regular REMIC interests | 1,373 | -- |
| Impairment writedowns of DFC REMIC interests | -- | 7,541 |
| Valuation provisions on servicing contracts | 8,713 | -- |
| Provisions for potential guarantee obligations on REMIC securities sold | 3,794 | -- |
| Provision for loss on investment in DFC joint venture | -- | 4,300 |
| | $32,097 | $53,712 |

Except for impairment writedowns of regular REMIC interests, the impairment and valuation provisions generally reflect higher than anticipated credit losses on securitized loans and, in 1998, an increase in the assumed rate of voluntary loan prepayments.

For the year ended September 30, 1999 total credit losses on loans originated by the Company, including losses relating to assets securitized by

the Company, loans held for investment, loans held for sale and loans sold with full or partial recourse, amounted to approximately 1.72% of the average principal balance of the related loans, compared to approximately 1.52% the prior year. Because losses on repossessions are reflected in the loss ratio principally in the period during which the repossessed property is disposed of, fluctuations in the number of repossessed properties disposed of from period to period may cause variations in the charge-off ratio. At September 30, 1999 the Company had a total of 2,417 unsold properties in repossession or foreclosure (approximately 1.97% of the total number of Oakwood originated serviced assets) compared to 1,430 and 1,016 at September 30, 1998 and 1997, respectively (approximately 1.28% and 1.14%, respectively, of the total number of Oakwood originated serviced assets). Of the total number of unsold properties in repossession or foreclosure, 417, 295 and 54 relate to loans originated on behalf of DFC, at September 30, 1999, 1998 and 1997, respectively.

At September 30, 1999 the delinquency rate on Company originated loans, excluding loans originated on behalf of DFC, was 4.9%, compared to 3.9% at September 30, 1998.

Insurance revenues
Insurance revenues from the Company's captive reinsurance business increased 46% to $49.6 million in 1999 from $34.0 million in 1998. The increase is due to the increased size of the Company's portfolio, offset by an increase in catastrophe reinsurance premium expense recorded during the fourth quarter of 1999 of approximately $1.8 million associated with Hurricane Floyd. See additional discussion below under "Insurance operating expenses."

8 2000 Annual Report

Other income
Other income increased from $10.8 million during 1998 to $13.4 million in 1999. During 1999 the Company settled an insurance claim relating to homes at a manufacturing facility which were damaged by a hail storm. The net gain of $1.1 million resulting from this settlement is included in other income. During 1999 the Company also sold two airplanes for a gain of $1.4 million.

Selling, general and administrative expenses Selling, general and administrative expenses increased to 27.5% of net sales for the year ended September 30, 1999, from 24.3% of net sales in 1998. The most significant component of the increase was higher retail selling expenses, both in absolute terms and as a percentage of retail sales. Higher retail selling expenses reflect increased fixed costs associated with additional sales centers as well as higher retail compensation costs.

Consumer finance operating expenses
Consumer finance operating expenses rose $13.3 million, or 55%, during 1999. Of the total dollar increase, approximately $5.3 million represents higher compensation costs, including headcount additions in the loan origination and servicing functions. In addition, allocations of parent company costs, principally occupancy and telecommunications, increased by approximately $2.4 million. During 1999 the average number of loans serviced and applications processed increased 15% and 10%, respectively.

Insurance operating expenses
Insurance operating costs increased 40% during 1999 principally due to higher claims costs associated with the increased size of the business. Insurance operating costs in 1999 also include estimated losses, net of recoveries from the Company's reinsurers, of approximately $5.6 million associated with flooding and other storm damage claims from Hurricane Floyd.

Restructuring charges
During the fourth quarter of 1999 the Company recorded restructuring charges of approximately $25.9 million, or $.35 per share, after tax. These charges relate primarily to the closing of four manufacturing lines, the temporary idling of five others and the closing of approximately 40 sales centers that were not meeting profitability targets. The charges include approximately $7.4 million related to severance and other termination costs, approximately $11.2 million related to asset writedowns and approximately $7.4 million related to estimated costs to close the manufacturing lines and sales centers.

Interest expense
Interest expense increased $16.2 million, or 66%, during 1999 primarily due to interest expense associated with the Company's March 1999 $300 million senior note offering. A portion of the proceeds from the senior note offering was used to retire $100 million of debt incurred in connection with the Schult acquisition. Interest expense on short-term lines of credit also increased due to an increase in the average balances outstanding offset by slightly lower interest rates.

Income taxes
The Company's effective income tax rate was 37.0% in 1999 compared to 38.6% in 1998. The decrease reflects primarily limited state income tax benefits associated with certain losses and charges.

## LIQUIDITY AND CAPITAL RESOURCES
For the year ended September 30, 2000 the Company reported a net loss of $120.9 million. The net loss included pre-tax restructuring charges of $3.8 million, noncash charges of $50.4 million related to the financial services business and a $66.4 million noncash charge to establish valuation allowances against deferred income tax assets as more fully described in Note 15 to the Consolidated Financial Statements. For the year ended September 30, 1999 the Company reported a net loss of $31.3 million. The net loss included pre-tax restructuring charges of $25.9 million related to closing or idling certain production facilities and retail sales centers and a reduction in workforce. The loss also included noncash charges of $46.6 million related to the financial services business.

The financial results reported by the Company during 2000 and 1999 reflect business conditions within the manufactured housing industry. The Company is currently operating in a highly competitive environment caused principally by the industry's aggressive expansion in the retail channel, excessive amounts of finished goods inventory and a general reduction in the availability of financing at both the wholesale and retail levels. The industry estimates that shipments of manufactured homes from production facilities has declined by approximately 25% during the first ten months of calendar 2000.

The Company began to experience the effect of these cyclical industry factors during late fiscal 1999 and took steps to begin to lower inventory levels, reduce operating expenses and maximize cash flow. These efforts continued during 2000 as the Company maintained its focus on areas considered to be within its span of control, principally cost control and inventory management. Many of the actions taken, most notably plant and sales center closings, curtailed production schedules and competitive pricing to effect a $120.6 million reduction in inventories, negatively affected the Company's reported earnings for 2000. However, cash flow improved significantly as a result of such initiatives, and the Company generated $145.6 million in cash flow from operating activities, including the sale of previously retained subordinated asset-backed securities of $37.8 million, for the year ended September 30, 2000. Because the Company expects competitive market conditions to continue during 2001, it does not expect to generate income from operations; however, it plans to manage operations to generate positive cash flow. The Company believes that operating cash flow, coupled with borrowings under its credit facilities, as amended and extended on December 27, 2000 and further described in Note 10 to the Consolidated Financial Statements, will provide sufficient liquidity to meet obligations and execute its business plan during 2001.

During 2000 and 1999 the Company violated certain covenants included in its credit facilities but was able to obtain waivers or amendments as

needed. The Company is currently negotiating new multi-year credit facilities, which would replace both of its existing facilities. One of the proposed facilities could

**Oakwood Homes Corporation 9**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (continued)

include the issuance of a significant number of stock warrants to the prospective lender. However, there can be no assurance that the Company will be able to finalize such facilities.

In the event of further deterioration in market conditions, the Company would take additional steps to protect liquidity and manage cash flow. Among other things, these actions might include further production curtailments, closing of additional retail sales centers or the selective sale of operating or financial assets.

The Company operates its plants to support its captive retail sales centers and its independent retailer base. The Company has, and will continue to, adjust production capacity in line with demand, producing at a rate that will allow the Company to lower its inventories. At September 30, 2000 the Company was operating approximately 20 plants, though many were operating at reduced production schedules. Should market conditions worsen from that anticipated, the Company will continue to curtail production by lowering production speed or idling additional production facilities.

Retail financing of sales of the Company's products is an integral part of the Company's integration strategy. Such financing consumes substantial amounts of capital, which the Company has obtained principally by regularly securitizing such loans through the asset-backed securities market. Should the Company's ability to access the asset-backed securities market become impaired, the Company would be required to seek additional sources of funding for its finance business. Such sources might include, but would not be limited to, the sale of whole loans to unrelated third parties and the increased utilization of FHA financing.

Beginning in 1994, the Company generally sold to investors securities having a principal balance approximately equal to the principal balance of the loans securitized, and accordingly was not required to seek the permanent capital required to fund its finance business outside of the asset-backed securities market. Over the last two years, demand for subordinated securities, particularly securities rated below BBB, has decreased. As a result, the Company has retained certain subordinated asset-backed securities rated below BBB. The aggregate principal balance of the retained securities rated below BBB (including any initial overcollateralization) represents approximately 9% of the aggregate principal balance of the loans securitized in transactions during fiscal 2000.

At September 30, 2000 the Company owned subordinate asset-backed securities rated below BBB having a carrying value of approximately $74.2 million associated with certain of the Company's 1998, 1999 and 2000 securitizations, as well as subordinate asset-backed securities having a carrying value of approximately $3.0 million retained from securitization transactions prior to 1994. The Company considers these securities to be available for sale, and would consider opportunities to liquidate these securities based upon market conditions. Continued decreased demand for subordinate asset-backed securities at prices acceptable to the Company would be likely to require the Company to seek alternative sources of financing for the loans originated by the consumer finance business, or require the Company to seek alternative long-term financing for subordinate asset-backed securities. There can be no assurance that such alternative financing can be obtained.

The Company estimates that in 2001 capital expenditures will approximate $24 million, comprised principally of improvements at existing facilities, computer equipment and the replacement of certain computer information systems.

During the year ended September 30, 2000 the Company decreased inventories by $121 million as a result of inventory reduction measures described previously.

The decrease in loans and investments from September 30, 1999 principally reflects a decrease in loans held for sale from $280 million at September 30, 1999 to $211 million at September 30, 2000. The Company originates loans and warehouses them until sufficient receivables have been accumulated for a securitization. Changes in loan origination volume, which is significantly affected by retail sales, and the timing of loan securitization transactions affect the amount of loans held for sale at any point in time.

**MARKET RISK**
Certain of the Company's financial instruments are subject to market risk, including interest rate risk. The Company's financial instruments are not currently subject to foreign currency risk or commodity price risk. The Company has no financial instruments held for trading purposes.

The Company originates loans, most of which are at fixed rates of interest, in the ordinary course of business and periodically securitizes them to obtain permanent financing for such loan originations. Accordingly, the Company's loans held for sale are exposed to risk from changes in interest rates between the times loans are originated and the time at which the Company obtains permanent financing, generally at fixed rates of interest, in the asset-backed securities market. The Company attempts to manage this risk by minimizing the warehousing period of unsecuritized loans. Loans held for sale are excluded from the table below as they primarily represent recent originations which are intended for securitization in fiscal 2001.

Loans held for investment act as collateral for certain of the Company's debt obligations and also are subject to interest rate risk. The Company currently does not originate any loans with the intention of holding them for investment.

Retained regular and residual REMIC interests are held as available for sale securities; the value of these securities may change in response to, among other things, changes in interest rates. Such interests in REMIC securitizations are valued as described in Notes 1 and 5 to the

All of the Company's revolving credit facilities provide for interest at variable rates. Accordingly, an increase in short-term interest rates would adversely affect interest expense on such revolving facilities. In addition, certain of the Company's notes and bonds payable bear interest at floating rates, and interest expense on such obligations would be adversely affected by an increase in short-term interest rates.

**10 2000 Annual Report**

The following table sets forth the Company's financial instruments that are sensitive to changes in interest rates as at September 30, 2000:

| (dollar amounts in thousands) | Weighted average interest rate at year end(1) | Assumed cash flows | | | | | | | Estimated fair value |
|---|---|---|---|---|---|---|---|---|---|
| | | 2001 | 2002 | 2003 | 2004 | 2005 | Thereafter | Total | |
| Loans held for investment(2) | | | | | | | | | |
| Fixed rate loans | 12.23% | $ 3,964 | $ 3,048 | $ 1,587 | $ 1,105 | $ 625 | $ 1,907 | $ 12,236 | $ 8,418 |
| Retained REMIC interests(3) | | | | | | | | | |
| Regular interests | 8.0% | 10,172 | 10,113 | 10,584 | 13,749 | 11,630 | 158,169 | 214,417 | 77,229 |
| Residual Interests | 16.9% | 9,975 | 3,106 | 11,219 | 6,850 | 1,489 | 34,558 | 67,197 | 28,685 |

(1) For REMIC residual interests represents the weighted average interest rate used to discount assumed cash flows.
(2) Assumed cash flows represent contractual cash flows reduced by the effects of estimated prepayments.
(3) Assumed cash flows reflect the assumed prepayment rates used in estimating the fair values of the related REMIC interests.

| (dollar amounts in thousands) | Weighted average interest rate at year end | Maturities | | | | | | | Estimated fair value |
|---|---|---|---|---|---|---|---|---|---|
| | | 2001 | 2002 | 2003 | 2004 | 2005 | Thereafter | Total | |
| Short-term borrowings | 8.2% | $65,500 | $ -- | $ -- | $ -- | $-- | $ -- | $ 65,500 | $65,500 |
| Notes and bonds payable | | | | | | | | | |
| Fixed rate | 8.0% | 318 | 17,085 | 67 | 124,822 | 72 | 174,328 | 316,692 | 87,026 |
| Variable rate | 7.2% | 4,663 | 2,068 | 632 | 632 | 573 | 4,669 | 13,237 | 13,237 |

## NEW ACCOUNTING STANDARDS

In June 1998 the Financial Accounting Standards Board (the "Board") issued Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS 133"), which establishes accounting and reporting standards for derivative instruments and hedging activities. In June 2000 the Board issued Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" ("FAS 138"), which amends FAS 133 and addresses a limited number of implementation issues related to FAS 133. FAS 133, as amended by FAS 138, is effective for the Company as of October 1, 2000 and is not expected to have a material impact on the Company's financial condition or results of operations.

In December 1999 the Securities and Exchange Commission (the "SEC") issued Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"), which summarizes the SEC's views in applying generally accepted accounting principles to selected revenue recognition issues. SAB 101, as amended, will be effective for the Company no later than the fourth quarter of fiscal 2001. The Company plans to adopt SAB 101 in the fourth quarter of fiscal 2001. SAB 101 allows companies to report any changes in revenue recognition related to adopting its provisions as an accounting change at the time of implementation in accordance with APB Opinion No. 20, "Accounting Changes." Upon adoption, the Company will record a cumulative effect of change in accounting principle, effective October 1, 2000. Under its current policy, the Company recognizes revenue for the majority of retail sales upon closing, which includes, for the great majority of retail sales, execution of loan documents and related paperwork and receipt of the customer's down payment. To adopt the provisions of SAB 101, the Company currently plans to change its revenue recognition policy on these retail sales to a method based upon placement of the home at the customer's site. The Company has not yet determined the effect of this change on its consolidated financial position and results of operations.

In September 2000 the Board issued Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-- A Replacement of FASB Statement No. 125" ("FAS 140"), which revises the standards of accounting for securitizations and other transfers of financial assets and collateral and requires certain disclosures. FAS 140 is effective for transfers occurring after March 31, 2001 and for disclosures relating to securitization transactions and collateral for fiscal years ended after December 15, 2000. The Company is in the process of evaluating the potential effect of FAS 140 on its financial statements.

In October 2000 the Emerging Issues Task Force of the Board (the "EITF") reached a consensus on a new accounting requirement for the recognition of other than temporary impairments on purchased and retained beneficial interests resulting from securitization transactions. This requirement is summarized in EITF Issue No. 99-20, "Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets" ("EITF 99-20"). Under previously

**Oakwood Homes Corporation 11**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (continued)**

existing accounting requirements, declines in the fair value of such beneficial interests were recognized as other than temporary impairment when the present value of the underlying cash flows discounted at a risk-free rate using current assumptions were less than the carrying value of such assets. Pursuant to EITF Issue No. 99-20, declines in fair value are to be considered other than temporary when: (i) the carrying value of the beneficial interests exceeds the fair value of such beneficial interests using current assumptions and (ii) the timing and/or extent of cash flows expected to be received on the beneficial interests has adversely changed from the previous valuation date. Initial adoption of this new accounting guidance will be required for the Company's fiscal year beginning October 1, 2001, although early adoption is permitted, and is to be reflected as a cumulative effect of an accounting change at the time of adoption. The Company is currently determining the timing of adoption of this new accounting requirement and its potential impact on the accounting for the Company's REMIC interests retained at the time of its securitization transactions.

## FORWARD-LOOKING STATEMENTS

This annual report contains certain forward-looking statements and information based on beliefs of the Company's management as well as assumptions made by, and information currently available to, the Company's management. These statements include, among others, statements relating to our ability to reduce our inventory levels, our ability to generate positive cash flow, the adequacy of our existing credit facilities together with our operating cash flow to provide us with sufficient liquidity to meet our obligations and execute our business plan during 2001, and the ability of the quota share agreement to reduce the Company's underwriting exposure to natural disasters. Words like "believe," "expect," "should" and similar expressions used in this Annual Report are intended to identify other such forward-looking statements.

These forward-looking statements reflect the current views of the Company with respect to future events and are subject to a number of risks, including, among others, the following: competitive industry conditions could further adversely affect sales and profitability; we may be unable to access sufficient capital to fund our operations; we may recognize special charges or experience increased costs in connection with our securitization or other financing activities; adverse changes in governmental regulations applicable to our business could negatively impact us; we could suffer losses resulting from litigation (including shareholder class actions or other class action suits); our captive Bermuda reinsurance subsidiary could experience significant losses; we could experience increased credit losses or higher delinquency rates on loans that we originate; negative changes in general economic conditions in our markets could adversely impact us; we could lose the services of our key management personnel; and any other factors that generally affect companies in our lines of business could also adversely impact us. Should our underlying assumptions prove incorrect or should one or more of the risks and uncertainties materialize, actual events or results may vary materially and adversely from those described herein as anticipated, expected, believed or estimated.

**12 2000 Annual Report**

CONSOLIDATED STATEMENT OF OPERATIONS

**Oakwood Homes Corporation and Subsidiaries**

| (in thousands except per share data) | Year ended September 30, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| **Revenues** | | | |
| Net sales | $1,189,885 | $1,496,419 | $1,404,432 |
| Financial services | | | |
| Consumer finance, net of impairment and | | | |
| valuation provisions | 27,963 | 29,747 | 33,394 |
| Insurance | 56,430 | 49,643 | 33,965 |
| | 84,393 | 79,390 | 67,359 |
| Other income | 9,854 | 13,416 | 10,762 |
| Total revenues | 1,284,132 | 1,589,225 | 1,482,553 |
| **Costs and expenses** | | | |
| Cost of sales | 927,517 | 1,081,716 | 973,434 |
| Selling, general and administrative expenses | 335,123 | 411,344 | 341,441 |
| Financial services operating expenses | | | |
| Consumer finance | 43,220 | 37,530 | 24,204 |
| Insurance | 32,316 | 38,463 | 27,554 |
| | 75,536 | 75,993 | 51,758 |
| Restructuring charges (reversals) | (2,597) | 25,926 | -- |
| Provision for losses on credit sales | 3,000 | 3,261 | 1,281 |
| Interest expense | 50,289 | 40,709 | 24,549 |
| Total costs and expenses | 1,388,868 | 1,638,949 | 1,392,463 |
| Income (loss) before income taxes | (104,736) | (49,724) | 90,090 |
| Provision for income taxes | 16,129 | (18,404) | 34,737 |
| Net income (loss) | $ (120,865) | $ (31,320) | $ 55,353 |
| Earnings (loss) per share | | | |
| Basic | $ (2.60) | $ (0.67) | $ 1.20 |
| Diluted | $ (2.60) | $ (0.67) | $ 1.17 |

The accompanying notes are an integral part of the financial statements.

**Oakwood Homes Corporation 13**

**Oakwood Homes Corporation and Subsidiaries**

| (in thousands except share and per share data) | September 30, 2000 | 1999 |
|---|---|---|
| Assets | | |
| Cash and cash equivalents | $ 22,523 | $ 26,939 |
| Loans and investments | 322,166 | 430,865 |
| Other receivables | 113,460 | 98,317 |
| Inventories | 323,003 | 443,598 |
| Properties and facilities | 241,107 | 251,069 |
| Deferred income taxes | -- | 30,712 |
| Other assets | 126,513 | 156,347 |
| | $1,148,772 | $1,437,847 |
| Liabilities and shareholders' equity | | |
| Short-term borrowings | $ 65,500 | $ 199,800 |
| Notes and bonds payable | 329,929 | 352,164 |
| Accounts payable and accrued liabilities | 261,888 | 243,525 |
| Insurance reserves and unearned premiums | 44,602 | 89,404 |
| Deferred income taxes | 6,169 | -- |
| Other long-term obligations | 35,400 | 26,962 |
| Shareholders' equity | | |
| Common stock, $.50 par value; 100,000,000 shares authorized; | | |
| 47,105,000 and 47,107,000 shares issued and outstanding | 23,552 | 23,554 |
| Additional paid-in capital | 169,742 | 171,185 |
| Retained earnings | 204,546 | 326,825 |
| | 397,840 | 521,564 |
| Accumulated other comprehensive income | 7,625 | 7,021 |
| Unearned compensation | (181) | (2,593) |
| Total shareholders' equity | 405,284 | 525,992 |
| Commitments and contingencies (Notes 5, 11 and 19) | | |
| | $1,148,772 | $1,437,847 |

The accompanying notes are an integral part of the financial statements.

**14 2000 Annual Report**

CONSOLIDATED STATEMENT OF CASH FLOWS

**Oakwood Homes Corporation and Subsidiaries**

|  | Year ended September 30, | | |
|---|---|---|---|
| (in thousands) | 2000 | 1999 | 1998 |
| **Operating activities** | | | |
| Net income (loss) | $ (120,865) | $ (31,320) | $ 55,353 |
| Adjustments to reconcile net income to cash provided by operating activities | | | |
| Depreciation and amortization | 50,328 | 45,559 | 24,950 |
| Deferred income taxes | 36,881 | (21,992) | (4,406) |
| Provision for losses on credit sales | 3,000 | 3,261 | 1,281 |
| (Gain) loss on loans sold or held for sale | 24,311 | 14,452 | (20,058) |
| Loss on sale of securities | 4,463 | -- | -- |
| Impairment and valuation provisions | 21,627 | 32,097 | 53,712 |
| Excess of cash receipts over REMIC residual income recognized | 6,776 | 29,338 | 19,934 |
| Reversal of restructuring charges | (6,366) | -- | -- |
| Noncash restructuring charges | 1,190 | 10,455 | -- |
| Other | (8,611) | (10,663) | (2,089) |
| Changes in assets and liabilities, net of effect of business acquisition | | | |
| Other receivables | (15,804) | (31,832) | (4,027) |
| Inventories | 120,595 | (152,346) | (62,705) |
| Deferred insurance policy acquisition costs | 10,379 | (3,323) | (4,260) |
| Other assets | (11,911) | (9,190) | 344 |
| Accounts payable and accrued liabilities | 9,265 | (439) | 48,621 |
| Insurance reserves and unearned premiums | (44,802) | 31,985 | 26,884 |
| Other long-term obligations | (3,417) | 1,626 | 8,968 |
| Cash provided (used) by operations | 77,039 | (92,332) | 142,502 |
| Loans originated | (1,037,872) | (1,364,133) | (1,232,292) |
| Purchase of loans and securities | (3,536) | (108,297) | (5,045) |
| Sales of loans | 1,088,487 | 1,469,134 | 1,061,517 |
| Principal receipts on loans | 21,480 | 33,282 | 53,048 |
| Cash provided (used) by operating activities | 145,598 | (62,346) | 19,730 |
| **Investing activities** | | | |
| Business acquisition | -- | -- | (101,829) |
| Acquisition of properties and facilities | (20,964) | (46,936) | (51,411) |
| Investment in and advances to joint venture | -- | 22,150 | (24,454) |
| Other | 28,453 | (27,526) | (20,797) |
| Cash provided (used) by investing activities | 7,489 | (52,312) | (198,491) |
| **Financing activities** | | | |
| Net borrowings (repayments) on short-term credit facilities | (134,300) | (175,223) | 94,223 |
| Proceeds from borrowings related to business acquisition | -- | -- | 100,000 |
| Proceeds from issuance of notes and bonds payable | -- | 305,275 | 4,472 |
| Payments on notes and bonds | (22,126) | (17,182) | (22,540) |
| Cash dividends | (1,414) | (1,880) | (1,861) |
| Proceeds from exercise of stock options | 337 | 1,636 | 4,721 |
| Cash provided (used) by financing activities | (157,503) | 112,626 | 179,015 |
| Net increase (decrease) in cash and cash equivalents | (4,416) | (2,032) | 254 |
| Cash and cash equivalents | | | |
| Beginning of year | 26,939 | 28,971 | 28,717 |
| End of year | $  22,523 | $ 26,939 | $ 28,971 |

The accompanying notes are an integral part of the financial statements.

**Oakwood Homes Corporation 15**

# CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY AND OTHER COMPREHENSIVE INCOME

## Oakwood Homes Corporation and Subsidiaries

| (in thousands except per share data) | Common shares outstanding | Common stock | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income | Unearned compensation | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| Balance at September 30, 1997 | 46,299 | $23,149 | $159,281 | $ 306,533 | $-- | $(5,081) | $ 483,882 |
| Net income | -- | -- | -- | 55,353 | -- | -- | 55,353 |
| Exercise of stock options | 352 | 176 | 4,545 | -- | -- | -- | 4,721 |
| Issuance of restricted stock | 9 | 5 | 278 | -- | -- | (188) | 95 |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | 1,517 | 1,517 |
| ESOP shares committed to be released | -- | -- | 614 | -- | -- | 480 | 1,094 |
| Stock options issued in connection with business acquisition | -- | -- | 2,874 | -- | -- | -- | 2,874 |
| Cash dividends ($.04 per share) | -- | -- | -- | (1,861) | -- | -- | (1,861) |
| Balance at September 30, 1998 | 46,660 | 23,330 | 167,592 | 360,025 | -- | (3,272) | 547,675 |
| Comprehensive income: | | | | | | | |
| Net loss | -- | -- | -- | (31,320) | -- | -- | (31,320) |
| Unrealized gain on securities available for sale | -- | -- | -- | -- | 7,021 | -- | 7,021 |
| Total comprehensive income (loss) | -- | -- | -- | (31,320) | 7,021 | -- | (24,299) |
| Exercise of stock options | 99 | 50 | 1,586 | -- | -- | -- | 1,636 |
| Issuance of restricted stock | 348 | 174 | 1,924 | -- | -- | (2,096) | 2 |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | 2,295 | 2,295 |
| ESOP shares committed to be released | -- | -- | 83 | -- | -- | 480 | 563 |
| Cash dividends ($.04 per share) | -- | -- | -- | (1,880) | -- | -- | (1,880) |
| Balance at September 30, 1999 | 47,107 | 23,554 | 171,185 | 326,825 | 7,021 | (2,593) | 525,992 |
| Comprehensive income: | | | | | | | |
| Net loss | -- | -- | -- | (120,865) | -- | -- | (120,865) |
| Unrealized gain on securities available for sale | -- | -- | -- | -- | 604 | -- | 604 |
| Total comprehensive income (loss) | -- | -- | -- | (120,865) | 604 | -- | (120,261) |
| Exercise of stock options | 18 | 8 | 329 | -- | -- | -- | 337 |
| Forfeiture of restricted stock | (20) | (10) | (1,523) | -- | -- | -- | (1,533) |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | 2,172 | 2,172 |
| ESOP shares committed to be released | -- | -- | (249) | -- | -- | 240 | (9) |
| Cash dividends ($.03 per share) | -- | -- | -- | (1,414) | -- | -- | (1,414) |
| Balance at September 30, 2000 | 47,105 | $23,552 | $169,742 | $ 204,546 | $7,625 | $ (181) | $ 405,284 |

The accompanying notes are an integral part of the financial statements.

16 2000 Annual Report

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
Oakwood Homes Corporation and Subsidiaries

## NOTE 1--SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Description of business
Oakwood Homes Corporation and its subsidiaries (collectively, the "Company") are engaged in the production, sale, financing and insuring of manufactured housing throughout the United States.

Principles of consolidation
The consolidated financial statements include the accounts of Oakwood Homes Corporation and its subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

Revenue recognition--manufactured housing Passage of title and risk of loss in a retail sale occur upon the closing of the sale, which includes, for the great majority of retail sales, execution of loan documents and related paperwork and receipt of the customer's down payment.

For those sales in which the home remains personal property, rather than being converted to real property (i.e., sales under retail installment contracts), the closing generally takes place before the home is delivered to and installed on the customer's site. For such sales, delivery and installation typically are straightforward, involve minimal preparation of the customer's site and typically occur shortly after closing.

Sales transactions in which the home is converted from personal property to real property are financed as traditional mortgages rather than under retail installment contracts. Such sales typically involve significant preparation of the customer's site, which may include installation of utilities, wells, extensive foundations, etc., and also require completion of mortgage financing documentation, including title searches and appraisals. As a consequence, the closing of these transactions occurs after the home has been delivered and installed.

Consumer finance
A substantial majority of the Company's retail customers purchase homes on credit. The related loans are evidenced by either installment sale contracts or mortgages originated by the Company's finance subsidiary, Oakwood Acceptance Corporation ("Oakwood Acceptance"), or, to a lesser extent, by third party financial institutions.

Interest income
Interest income on loans is recognized in accordance with the terms of the loans (principally 30-day accrual).

Loan securitization
The Company finances its lending activities primarily by securitizing the loans it originates using Real Estate Mortgage Investment Conduits ("REMICs") or, for certain FHA-insured loans, using collateralized mortgage obligations issued under authority granted to the Company by the Government National Mortgage Association ("GNMA").

The Company allocates the sum of its basis in the loans conveyed to each REMIC and the costs of forming the REMIC among the REMIC interests retained and the REMIC interests sold to investors based upon the relative estimated fair values of such interests.

The Company estimates the fair value of retained REMIC interests, including regular and residual interests and servicing contracts, as well as guarantee liabilities, based, in part, upon default and prepayment assumptions which management believes market participants would use for similar instruments.

Income on retained REMIC regular and residual interests is recorded using the level yield method over the period such interests are outstanding. The rate of voluntary prepayments and the amount and timing of credit losses affect the Company's yield on retained REMIC regular and residual interests and the fair value of such interests and of servicing contracts in periods subsequent to the securitization; the actual rate of voluntary prepayments and credit losses typically varies over the life of each transaction and from transaction to transaction. If over time the Company's prepayment and credit loss experience is more favorable than that assumed, the Company's yield on its REMIC residual interests will be enhanced. Similarly, if over time the Company's actual experience is less favorable than that assumed, such yield will be reduced and the carrying value of the Company's investment may be impaired. The yield to maturity of regular REMIC interests may be influenced by prepayment rates and credit losses, but is less likely to be influenced by such factors because cash distributions on regular REMIC interests are senior to distributions on residual REMIC interests. If the estimated yield to maturity of a REMIC regular or residual interest is less than a risk free rate, the Company considers the asset to be impaired and records a charge to earnings equal to the excess of the asset's amortized cost over its estimated fair value.

REMIC residual and regular interests retained by the Company following securitization are considered available for sale and are carried at their estimated fair value. The Company has no securities held for trading or investment purposes.

Servicing contracts and fees
Servicing fee income is recognized as earned, net of amortization of servicing assets and liabilities, which are amortized in proportion to and over the period of estimated net servicing income. If the estimated fair value of a servicing contract is less than its carrying value, the Company records a valuation allowance by a charge to earnings to reduce the carrying value of the contract to its estimated fair value.

Guarantee liabilities

The Company estimates the fair value of guarantee liabilities as the greater of the estimated price differential between guaranteed and substantially similar unguaranteed securities offered for sale by the Company and the present value of payments, if any, estimated to be made as a result of such guarantees. Guarantee liabilities are amortized to income over the period during which the guarantee is outstanding.

If the present value of any estimated guarantee payments exceeds the amount recorded with respect to such guarantee, the Company records a charge to earnings to increase the guarantee liability to such present value.

Interest rate risk management

The Company periodically enters into off-balance sheet financial agreements, principally forward contracts to enter into interest rate swaps and options on such contracts, in order to hedge the sales price of REMIC interests to be sold in securitization transactions. The net settlement proceeds or cost from termination

**Oakwood Homes Corporation 17**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
**Oakwood Homes Corporation and Subsidiaries**

of the agreements is included in the determination of gain or loss on the sale of the REMIC interests.

Loans held for sale or investment
Loans held for sale are carried at the lower of cost or market. Loans held for investment are carried at their outstanding principal amounts, less unamortized discounts and plus unamortized premiums.

Reserve for credit losses
The Company maintains reserves for estimated credit losses on loans held for investment, on loans warehoused prior to securitization and on loans sold to third parties with full or limited recourse. The Company provides for losses in amounts necessary to maintain the reserves at amounts the Company believes are sufficient to provide for probable losses based upon the Company's historical loss experience, current economic conditions and an assessment of current portfolio performance measures.

Acquired loan portfolios
The Company periodically purchases portfolios of loans. The Company adds to the reserve for credit losses an estimate of future credit losses on such loans and includes such amount as a component of the purchase price of the acquired portfolios. The difference between the aggregate purchase price of the acquired portfolios and the aggregate principal balance of the loans included therein, representing discount or premium on the loans, is amortized to income over the life of the loans using the level yield method.

Insurance underwriting
On June 1, 1997 the Company formed a captive reinsurance underwriting subsidiary, domiciled in Bermuda, for property and casualty and credit life insurance and service contract business. Premiums from reinsured insurance policies are deferred and recognized as revenue over the term of the contracts, generally ranging from one to five years. Claims expenses are recorded as insured events occur. Policy acquisition costs, which consist principally of sales commissions and ceding fees, are deferred and amortized over the terms of the contracts.

The Company estimates liabilities for reported unpaid insurance claims, which are reflected at undiscounted amounts, based upon reports from adjusters with respect to adjusted claims and based on historical average costs per claim for similar claims with respect to unadjusted claims. Adjustment expenses are accrued based on contractual rates with the ceding company. Liabilities for claims incurred but not reported are estimated by the ceding company using a development factor that reflects historical average costs per claim and historical reporting lag trends. The Company does not consider anticipated investment income in determining whether premium deficiencies exist. The Company accounts for catastrophe reinsurance ceded in accordance with Emerging Issues Task Force Issue No. 93-6, "Accounting for Multi-Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises."

Effective June 1, 2000 the Company entered into a quota share agreement that will reduce the levels of credit support to secure the reinsurance subsidiary's obligations to pay claims and to meet regulatory capital requirements. Under the new arrangement, which covers physical damage policies, the Company will retro-cede 50% of the Company's physical damage premiums and losses on an ongoing basis. In return, the Company will receive a nonrefundable commission with the potential to receive an incremental commission based on favorable loss experience.

In order to further reduce volatility and the required levels of credit support, effective August 1, 2000 the Company entered into a commission-based arrangement for its extended service contract line of business. Policies in force on August 1, 2000 will continue to earn out over the policy term, while the Company will earn a commission on all new business written.

Inventories
Inventories are valued at the lower of cost or market, with cost determined using the specific identification method for new and used manufactured homes and the first-in, first-out method for all other items.

Properties and facilities
Properties and facilities are carried at cost less accumulated depreciation and amortization. The Company provides depreciation and amortization using principally the straight-line method over the assets' estimated useful lives, which are as follows:

| Classification | Estimated useful lives |
|---|---|
| Land improvements | 3-20 years |
| Buildings and field sales offices | 5-39 years |
| Furniture, fixtures and equipment | 3-12 years |
| Leasehold improvements | 1-10 years |

In accordance with Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets to be Disposed Of," the Company records assets to be disposed of at the lower of historical cost less accumulated depreciation or amortization or estimated net realizable value. Depreciation of such assets is terminated at the time the assets are determined to be held for sale.

Goodwill and other intangible assets

Goodwill represents the excess of cost over the fair value of net assets of businesses acquired and is amortized on a straight-line basis over periods ranging from approximately seven years for retail sales centers to 40 years for manufacturing operations. Costs assigned to assembled workforces and dealer distribution networks in business combinations are amortized using the straight-line method over five years. The Company reevaluates goodwill and other intangible assets based on undiscounted operating cash flows whenever significant events or changes occur which might impair recovery of recorded costs, and writes down recorded costs to the assets' fair value (based on discounted cash flows or fair values) when recorded costs, prior to impairment, are in excess of amounts estimated to be recoverable.

Advertising costs

Advertising costs are generally expensed as incurred and totaled approximately $17.2 million, $30.4 million and $18.6 million in 2000, 1999 and 1998, respectively.

Income taxes

The Company accounts for deferred income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are based on the temporary differences between the

18 2000 Annual Report

financial reporting basis and tax basis of the Company's assets and liabilities at enacted tax rates expected to be in effect when such amounts are realized or settled. Valuation allowances are provided against assets if it is anticipated that it is more likely than not that some or all of a deferred tax asset may not be realized.

Warranty obligations
The Company provides consumer warranties against manufacturing defects in all new homes it sells. Estimated future warranty costs are accrued at the time of sale.

Stock-based compensation
The Company accounts for stock-based compensation plans under the provisions of Accounting Principles Board Opinion No. 25 ("APB 25").

Cash and cash equivalents
Short-term investments having initial maturities of three months or less are considered cash equivalents.

Use of estimates in the preparation of financial statements The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Accumulated other comprehensive income
Accumulated other comprehensive income is presented net of income taxes and is comprised of unrealized gains and losses on securities available for sale. There were no items of accumulated other comprehensive income in 1998.

Fiscal year
Unless otherwise indicated, all references to annual periods refer to fiscal years ended September 30.

Reclassifications
Certain amounts previously reported for 1999 and 1998 have been reclassified to conform to classifications used in 2000.

New accounting pronouncements
In June 1998 the Financial Accounting Standards Board (the "Board") issued Statement of Financial Accounting Standards No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS 133"), which establishes accounting and reporting standards for derivative instruments and hedging activities. In June 2000 the Board issued Statement of Financial Accounting Standards No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities" ("FAS 138"), which amends FAS 133 and addresses a limited number of implementation issues related to FAS 133. FAS 133, as amended by FAS 138, is effective for the Company as of October 1, 2000 and is not expected to have a material impact on the Company's financial condition or results of operations.

In December 1999 the Securities and Exchange Commission (the "SEC") issued Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"), which summarizes the SEC's views in applying generally accepted accounting principles to selected revenue recognition issues. SAB 101, as amended, will be effective for the Company no later than the fourth quarter of fiscal 2001. The Company plans to adopt SAB 101 in the fourth quarter of fiscal 2001. SAB 101 allows companies to report any changes in revenue recognition related to adopting its provisions as an accounting change at the time of implementation in accordance with APB Opinion No. 20, "Accounting Changes." Upon adoption, the Company will record a cumulative effect of change in accounting principle, effective October 1, 2000. Under its current policy, the Company recognizes revenue for the majority of retail sales upon closing, which includes, for the great majority of retail sales, execution of loan documents and related paperwork and receipt of the customer's down payment. To adopt the provisions of SAB 101, the Company currently plans to change its revenue recognition policy on these retail sales to a method based upon placement of the home at the customer's site. The Company has not yet determined the effect of this change on its consolidated financial position and results of operations.

In September 2000 the Board issued Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-- A Replacement of FASB Statement No. 125" ("FAS 140"), which revises the standards of accounting for securitizations and other transfers of financial assets and collateral and requires certain disclosures. FAS 140 is effective for transfers occurring after March 31, 2001 and for disclosures relating to securitization transactions and collateral for fiscal years ended after December 15, 2000. The Company is in the process of evaluating the potential effect of FAS 140 on its financial statements.

In October 2000 the Emerging Issues Task Force of the Board (the "EITF") reached a consensus on a new accounting requirement for the recognition of other than temporary impairments on purchased and retained beneficial interests resulting from securitization transactions. This requirement is summarized in EITF Issue No. 99-20, "Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets" ("EITF 99-20"). Under previously existing accounting requirements, declines in the fair value of such beneficial interests were recognized as other than temporary impairment when the present value of the underlying cash flows discounted at a risk-free rate using current assumptions were less than the carrying value of such assets. Pursuant to EITF Issue No. 99-20, declines in fair value are to be considered other than temporary when: (i) the carrying value of the beneficial interests exceeds the fair value of such beneficial interests using current assumptions and (ii) the timing and/or extent of cash flows expected to be received on the beneficial interests has adversely changed from the previous valuation date. Initial adoption of this new accounting guidance will be required for the Company's fiscal year beginning October 1, 2001, although early adoption is permitted, and is to be reflected as a cumulative effect of an accounting change at the time of adoption. The Company is currently determining the timing of adoption of this new accounting requirement and its potential impact

on the accounting for the Company's REMIC interests retained at the time of its securitization transactions.

**Oakwood Homes Corporation 19**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
Oakwood Homes Corporation and Subsidiaries

## NOTE 2–BUSINESS CONDITIONS AND LIQUIDITY CONSIDERATIONS

For the year ended September 30, 2000 the Company reported a net loss of $120.9 million. The net loss included pre-tax restructuring charges of $3.8 million, noncash charges of $50.4 million related to the financial services business and a $66.4 million noncash charge to establish valuation allowances against deferred income tax assets as more fully described in Note 15. For the year ended September 30, 1999 the Company reported a net loss of $31.3 million. The net loss included pre-tax restructuring charges of $25.9 million related to closing or idling certain production facilities and retail sales centers and a reduction in workforce. The loss also included noncash charges of $46.6 million related to the financial services business.

The financial results reported by the Company reflect business conditions within the manufactured housing industry. The Company is currently operating in a highly competitive environment caused principally by the industry's aggressive expansion in the retail channel, excessive amounts of finished goods inventory and a general reduction in the availability of financing at both the wholesale and retail levels. The industry estimates that shipments of manufactured homes from production facilities has declined by approximately 25% during the first ten months of calendar 2000.

The Company began to experience the effect of these cyclical industry factors during late fiscal 1999 and took steps to begin to lower inventory levels, reduce operating expenses and maximize cash flow. These efforts continued during 2000 as the Company maintained its focus on areas considered to be within its span of control, principally cost control and inventory management. Many of the actions taken, most notably plant and sales center closings, curtailed production schedules and competitive pricing to effect a $120.6 million reduction in inventories, negatively affected the Company's reported earnings for 2000. However, cash flow improved significantly as a result of such initiatives, and the Company generated $145.6 million in cash flow from operating activities, including the sale of previously retained subordinated asset-backed securities of $37.8 million, for the year ended September 30, 2000. Because the Company expects competitive market conditions to continue during 2001, it does not expect to generate income from operations; however, it plans to manage operations to generate positive cash flow. The Company believes that operating cash flow, coupled with borrowings under its credit facilities, as amended and extended on December 27, 2000 and further described in Note 10, will provide sufficient liquidity to meet obligations and execute its business plan during 2001.

During 2000 and 1999 the Company violated certain covenants included in its credit facilities but was able to obtain waivers or amendments as needed. The Company is currently negotiating new multi-year credit facilities, which would replace both of its existing facilities. One of the proposed facilities could include the issuance of a significant number of stock warrants to the prospective lender. However, there can be no assurance that the Company will be able to finalize such facilities.

In the event of further deterioration in market conditions, the Company would take additional steps to protect liquidity and manage cash flow. Among other things, these actions might include further production curtailments, closing of additional retail sales centers or the selective sale of operating or financial assets.

The Company operates its plants to support its captive retail sales centers and its independent retailer base. The Company has, and will continue to, adjust production capacity in line with demand, producing at a rate that will allow the Company to lower its inventories. At September 30, 2000 the Company was operating approximately 20 plants, though many were operating at reduced production schedules. Should market conditions worsen from that anticipated, the Company will continue to curtail production by lowering production speed or idling additional production facilities.

Retail financing of sales of the Company's products is an integral part of the Company's integration strategy. Such financing consumes substantial amounts of capital, which the Company has obtained principally by regularly securitizing such loans through the asset-backed securities market. Should the Company's ability to access the asset-backed securities market become impaired, the Company would be required to seek additional sources of funding for its finance business. Such sources might include, but would not be limited to, the sale of whole loans to unrelated third parties and the increased utilization of FHA financing.

## NOTE 3–ACQUISITION

On April 1, 1998 the Company acquired Schult Homes Corporation ("Schult"), a producer of manufactured and modular housing headquartered in Middlebury, Indiana. Each outstanding common share of Schult was converted into the right to receive $22.50 in cash, or approximately $101 million in the aggregate. In addition, the Company issued options to acquire common stock of the Company in exchange for certain options to acquire common shares of Schult which were outstanding as of the acquisition date. The estimated fair value of Company stock options issued was approximately $2.9 million, which has been included as part of the cost of the acquisition, together with costs incurred in effecting the acquisition of approximately $750,000.

The acquisition has been accounted for using the purchase method of accounting. A summary of the consideration paid in the acquisition and the allocation thereof to the net assets acquired is as follows:

```
(in thousands)
------------------------------------------------------------------------

Cash paid to selling shareholders                        $101,079
```

```
Acquisition costs                                             750
Estimated fair value of stock options issued               2,874
------------------------------------------------------------------------
  Total consideration issued                             104,703
Long-term debt assumed                                     1,608
Deferred income taxes                                      2,550
------------------------------------------------------------------------
                                                         $108,861
------------------------------------------------------------------------

Allocated to:
  Properties and facilities                            $ 66,794
  Working capital and other assets and
    liabilities, excluding intangibles                  (15,585)
  Intangible assets:
    Assembled workforce                                    5,562
    Dealer distribution network                            6,000
    Goodwill                                              46,090
------------------------------------------------------------------------
                                                         $108,861
------------------------------------------------------------------------
```

Schult's results of operations are included with those of the Company from the April 1, 1998 acquisition date.

**20 2000 Annual Report**

Summarized below is unaudited pro forma financial data of the Company assuming the Schult acquisition had taken place at the beginning of the year presented. The pro forma results are not necessarily indicative of future earnings or earnings that would have been reported had the acquisition been completed when assumed.

| (in thousands except per share data) | 1998 |
| --- | --- |
| | (unaudited) |
| Net sales | $1,572,579 |
| Net income | $ 52,431 |
| Earnings per share--diluted | $ 1.11 |

## NOTE 4—FINANCIAL SERVICES BUSINESSES

The Company's financial services businesses are as follows: Oakwood Acceptance purchases a substantial portion of the loans originated by the Company's retail operations. Oakwood Acceptance also purchases loans from unrelated retailers and from time to time purchases portfolios of loans from third parties. Oakwood Acceptance retains servicing on substantially all loans held for investment or securitized by Oakwood Acceptance or its subsidiary, Oakwood Mortgage Investors, Inc. Oakwood Capital Corporation is a special-purpose subsidiary of Oakwood Acceptance which facilitates borrowings under the revolving warehouse financing credit facility. Oakwood Funding Corporation ("Oakwood Funding") is a special-purpose subsidiary of Oakwood Acceptance which has issued nonrecourse notes secured by specific pools of loans. Oakwood Funding was dissolved during 2000 when the nonrecourse notes held were repaid. Oakwood Acceptance has from time to time also issued notes in its own name secured by loans. Oakwood Financial Corporation is a subsidiary of Oakwood Homes Corporation which holds the Company's retained interests in REMIC trusts. Tarheel Insurance Company, Ltd. ("Tarheel") reinsures risk on property and casualty and credit life insurance policies and extended service contracts written by an unrelated insurance company in connection with sales of Company products.

The aggregate principal balance of loans sold to third parties, including securitization transactions, was approximately $1.1 billion, $1.5 billion and $1.1 billion in 2000, 1999 and 1998, respectively.

Oakwood Acceptance's servicing portfolio totaled approximately $4.6 billion and $4.2 billion at September 30, 2000 and 1999, respectively, of which approximately $4.4 billion and $4.0 billion, respectively, represented loans owned by REMIC trusts and other loans sold to third parties.

Condensed financial information for the Company's financial services businesses is set forth below:

| (in thousands) | 2000 | 1999 | 1998 |
| --- | --- | --- | --- |
| **Statement of operations** | | | |
| **Revenues** | | | |
| Consumer finance | | | |
| Interest income | $ 36,993 | $ 41,655 | $ 30,918 |
| Servicing fees | 23,464 | 25,632 | 27,662 |
| REMIC residual income | 16,055 | 7,955 | 10,282 |
| Gain (loss) on loans sold or held for sale | (24,311) | (14,452) | 20,058 |
| Loss on sale of securities | (4,463) | -- | -- |
| Impairment and valuation provisions | (21,627) | (32,097) | (53,712) |
| Other | 1,852 | 1,054 | (1,814) |
| Total consumer finance revenues | 27,963 | 29,747 | 33,394 |
| Insurance | | | |
| Premiums earned | 55,625 | ⁻52,018 | 35,226 |
| Catastrophe reinsurance premiums ceded | (1,120) | (3,575) | (1,791) |
| Investment income | 8,258 | 5,167 | 2,515 |
| Less: intercompany interest income | (6,333) | (3,967) | (1,985) |
| Total insurance revenues | 56,430 | 49,643 | 33,965 |
| Total revenues | 84,393 | 79,390 | 67,359 |
| **Cost and expenses** | | | |
| Consumer finance | | | |
| Interest expense | 38,534 | 30,129 | 18,579 |
| Operating expenses | 43,220 | 37,530 | 24,204 |
| Provision for losses on credit sales | 3,000 | 3,261 | 1,281 |
| Total consumer finance costs and expenses | 84,754 | 70,920 | 44,064 |
| Insurance | | | |
| Gross claims expenses | 19,338 | 35,059 | 18,546 |
| Catastrophe reinsurance | | | |

|                                        |            |            |            |
|----------------------------------------|-----------:|-----------:|-----------:|
| recoveries                             | --         | (7,600)    | --         |
| Commissions and ceding fees            | 10,845     | 9,299      | 8,063      |
| Other expenses                         | 2,133      | 1,705      | 945        |
| Total insurance costs and expenses     | 32,316     | 38,463     | 27,554     |
| Total costs and expenses               | 117,070    | 109,383    | 71,618     |
| Loss before income taxes               | $(32,677)  | $(29,993)  | $ (4,259)  |

**Oakwood Homes Corporation 21**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
Oakwood Homes Corporation and Subsidiaries

Impairment and valuation provisions recorded in 2000, 1999 and 1998 are summarized as follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Impairment writedowns of residual and regular REMIC interests (exclusive of DFC residuals) | $ 3,793 | $19,590 | $41,871 |
| Valuation provisions on servicing contracts | 5,979 | 8,713 | -- |
| Additional provisions for potential guarantee obligations on REMIC securities sold | 11,855 | 3,794 | -- |
| Impairment writedowns of DFC REMIC interests | -- | -- | 7,541 |
| Provision for loss on investment in DFC joint venture | -- | -- | 4,300 |
| | $21,627 | $32,097 | $53,712 |

The assumptions used in the valuation of retained REMIC interests are described in Note 5.

During the year ended September 30, 1998 the Company decided to cease its participation in Deutsche Financial Capital ("DFC"), a 50% owned joint venture engaged in providing consumer financing to customers of independent retail dealers of manufactured housing, and recorded provisions to reduce the carrying value of the investment in and advances to the joint venture to their estimated net realizable values and to reduce the carrying value of REMIC residual assets related to DFC to their estimated fair values. During 1999 the Company and its joint venture partner each purchased from DFC approximately one-half of DFC's warehouse of unsecuritized loans, which enabled DFC to retire the indebtedness incurred to finance the warehouse. The Company subsequently securitized the substantial majority of loans it acquired from DFC.

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Balance sheet | | |
| Loans | $209,899 | $318,123 |
| REMIC regular interests | 77,229 | 69,325 |
| REMIC residual interests | 28,685 | 36,630 |
| Loan servicing assets | 11,863 | 8,731 |
| Restricted cash | 10,849 | 40,376 |
| Catastrophe reinsurance claims receivable | -- | 11,400 |
| Other assets | 92,744 | 78,767 |
| Total assets | $431,269 | $563,352 |
| Short-term borrowings | $ 64,000 | $144,800 |
| Notes payable secured by loans | 3,560 | 23,758 |
| Insurance reserves, including unearned premiums of $33,945 and $70,764, respectively | 44,602 | 89,404 |
| Due to affiliates | 118,455 | 125,106 |
| Loan servicing liabilities | 14,930 | 4,759 |
| Other liabilities | 50,150 | 29,126 |
| Parent company's investment | 135,572 | 146,399 |
| Total liabilities and parent company's investment | $431,269 | $563,352 |

Gross insurance premiums written, which consist entirely of reinsurance assumed from the ceding company, were approximately $55.9 million, $69.8 million and $59.8 million in 2000, 1999 and 1998, respectively. The amounts reflected in the preceding balance sheet for catastrophe reinsurance claims receivable exceeds the related amount credited to financial services expenses because a portion of such claims receivable arose from losses relating to risks of the Company's domestic subsidiaries insured by Tarheel, the premiums and claims with respect to which have been eliminated in consolidation.

The Company cedes catastrophe reinsurance premiums to minimize its loss exposure from natural disasters (principally hurricane and flood related risks). The Company significantly amended the structure of this catastrophe coverage program. Effective June 1, 2000 the Company shares 50% of all risks on a quota share basis with American Bankers Insurance Company ("ABI"). Both the Company and ABI jointly share in the cost of, and jointly share in the protection provided by, a reinsurance placement that generally provides protection in excess of a single aggregate loss occurrence of $5 million from a single insured event. The reinsurers bear 95% of the next $25 million of losses. The Company and ABI share any aggregate loss in excess of $30 million from a single loss occurrence arising from a single insured event on a 50/50 basis.

The catastrophe reinsurance is ceded with a number of reinsurers; approximately 80% of the catastrophe reinsurance is ceded on a multi-year basis with three reinsurers, with the balance placed annually with other reinsurers.

Condensed financial information for Oakwood Homes Corporation with its financial services businesses accounted for using the equity method is as follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Statement of operations | | | |
| Revenues | | | |
| Net sales | $1,189,885 | $1,496,419 | $1,404,432 |
| Equity in losses of financial services businesses | (32,677) | (29,993) | (4,259) |
| Other income | 9,854 | 13,416 | 10,762 |
| Total revenues | 1,167,062 | 1,479,842 | 1,410,935 |
| Costs and expenses | | | |
| Cost of sales | 927,517 | 1,081,716 | 973,434 |
| Selling, general and administrative expenses | 335,123 | 411,344 | 341,441 |
| Restructuring charges (reversals) | (2,597) | 25,926 | -- |
| Interest expense | 11,755 | 10,580 | 5,970 |
| Total costs and expenses | 1,271,798 | 1,529,566 | 1,320,845 |
| Income (loss) before income taxes | (104,736) | (49,724) | 90,090 |
| Provision for income taxes | 16,129 | (18,404) | 34,737 |
| Net income (loss) | $ (120,865) | $ (31,320) | $ 55,353 |

**22 2000 Annual Report**

| (in thousands) | 2000 | 1999 |
|---|---|---|
| **Balance sheet** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 18,130 | $ 19,096 |
| Receivables | 69,773 | 64,299 |
| Inventories | 323,003 | 443,598 |
| Prepaid expenses | 12,276 | 4,312 |
| Total current assets | 423,182 | 531,305 |
| Properties and facilities | 233,036 | 245,824 |
| Investment in and advances to | | |
| financial services businesses | 254,027 | 271,505 |
| Other assets | 83,097 | 97,366 |
| | $993,342 | $1,146,000 |
| **Current liabilities** | | |
| Short-term borrowings | $ 1,500 | $ 55,000 |
| Current maturities of long-term debt | 2,834 | 1,133 |
| Accounts payable and accrued liabilities | 196,537 | 209,358 |
| Total current liabilities | 200,871 | 265,491 |
| Long-term debt | 323,534 | 327,273 |
| Other long-term obligations | 63,653 | 27,244 |
| Shareholders' equity | 405,284 | 525,992 |
| | $993,342 | $1,146,000 |

## NOTE 5--LOANS AND INVESTMENTS

The components of loans and investments are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Loans held for sale, net of valuation | | |
| allowance of $2,563 and $3,662 | | |
| in 2000 and 1999, respectively | $211,296 | $279,927 |
| Loans held for investment | 8,512 | 48,015 |
| Less: reserve for uncollectible receivables | (3,556) | (3,032) |
| Total loans receivable | 216,252 | 324,910 |
| Retained interests in REMIC | | |
| securitizations, exclusive of loan | | |
| servicing assets and liabilities | | |
| Regular interests | 77,229 | 69,325 |
| Residual interests | 28,685 | 36,630 |
| Total retained REMIC interests | 105,914 | 105,955 |
| | $322,166 | $430,865 |

The estimated principal receipts, including estimated prepayments, on loans held for investment are $3.0 million in 2001, $2.4 million in 2002, $1.2 million in 2003, $860,000 in 2004, $464,000 in 2005 and the balance thereafter.

Loans in which the Company retains an interest, either directly by owning them or indirectly through the Company's retained interests in REMIC securitizations, are located in over forty states, with North Carolina, Texas, South Carolina and Virginia accounting for the majority of the loans. Because of the nature of the Company's retail business, loans are not concentrated with any single customer or among any group of customers.

Substantially all the loans included in the Company's GNMA securitizations are covered by FHA insurance which generally limits the Company's risk to 10% of credit losses incurred on such loans. The Company's credit risk associated with nonrecourse debt secured by loans is limited to the Company's equity in the underlying collateral. The Company retains all of the credit risk associated with loans used to secure debt issued by the Company and with respect to which creditors have recourse to the general credit of the Company in addition to the collateral for the indebtedness. The Company's contingent liability as guarantor of loans sold to third parties on a recourse basis was approximately $17 million and $24 million as of September 30, 2000 and 1999, respectively.

The following table summarizes the transactions reflected in the reserve for credit losses:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Balance at beginning of year | $ 3,546 | $ 2,067 | $ 4,277 |

|                                            | 2000     | 1999     | 1998     |
|--------------------------------------------|----------|----------|----------|
| Provision for losses on credit sales       | 3,000    | 3,261    | 1,281    |
| Reserve recorded related to acquired portfolios | 796 | 1,896 | -- |
| Losses charged to the reserve              | (3,359)  | (3,678)  | (3,491)  |
| Balance at end of year                     | $ 3,983  | $ 3,546  | $ 2,067  |

The reserve for credit losses is reflected in the consolidated balance sheet as follows:

| (in thousands)                                                              | 2000    | 1999    |
|-----------------------------------------------------------------------------|---------|---------|
| Reserve for uncollectible receivables (included in loans and investments)   | $3,556  | $3,032  |
| Reserve for contingent liabilities (included in accounts payable and accrued liabilities) | 427 | 514 |
|                                                                             | $3,983  | $3,546  |

The Company also retains credit risk on REMIC securitizations because the related trust agreements provide that all losses incurred on REMIC loans are charged to REMIC interests retained by the Company (including the Company's right to receive servicing fees) before any losses are charged to REMIC interests sold to third party investors. The Company also has guaranteed payment of principal and interest on subordinated securities issued by REMIC trusts having an aggregate principal amount outstanding of approximately $123 million as of September 30, 2000 and 1999. Liabilities recorded with respect to such guarantees in accordance with FAS 125 were approximately $30.8 million and $19.0 million at September 30, 2000 and 1999, respectively, and are included in other long-term obligations.

The valuation of residual interests is affected not only by the projected level of prepayments of principal and net credit losses, but also by the projected timing of such prepayments and net credit losses. Should such timing differ materially from the Company's projections, it could have a material effect on the valuation of the Company's residual interests. Additionally, such valuation is determined by discounting cash flows over the entire expected life of the receivables sold.

**Oakwood Homes Corporation 23**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**
**Oakwood Homes Corporation and Subsidiaries**

The following table sets forth certain data with respect to securitized loans in which the Company retains a residual interest, and with respect to the assumptions used by the Company in estimating the fair value of such residual interests, as of the end of 2000 and 1999:

| (dollar amounts in thousands) | 2000 | 1999 |
|---|---|---|
| Aggregate unpaid principal balance of loans | $4,639,507 | $3,925,317 |
| Weighted average interest rate of loans at year end | 10.3% | 10.7% |
| Approximate assumed weighted average constant prepayment rate as a percentage of unpaid principal balance of loans | 17.5% | 17.7% |
| Approximate remaining assumed nondiscounted credit losses as a percentage of unpaid principal balance of loans | 12.9% | 13.0% |
| Approximate weighted average interest rate used to discount assumed residual cash flows | 16.9% | 17.1% |

The following table sets forth certain data with respect to retained REMIC interests at September 30, 2000 and 1999:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Regular interests | | |
| Amortized cost | $79,034 | $71,451 |
| Gross unrealized gains | 1,244 | 486 |
| Gross unrealized losses | (3,049) | (2,612) |
| Estimated fair value | $77,229 | $69,325 |
| Residual interests | | |
| Amortized cost | $15,473 | $23,702 |
| Gross unrealized gains | 13,212 | 12,934 |
| Gross unrealized losses | -- | (6) |
| Estimated fair value | $28,685 | $36,630 |
| Gross unrealized gains | $14,456 | $13,420 |
| Gross unrealized losses | (3,049) | (2,618) |
| Deferred income taxes | (3,782) | (3,781) |
| Accumulated other comprehensive income | $ 7,625 | $ 7,021 |

**NOTE 6—OTHER RECEIVABLES**
The components of other receivables are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Trade receivables | $ 29,701 | $30,843 |
| Federal income taxes refundable | 18,228 | 11,728 |
| Receivable from REMICs | 17,668 | 7,366 |
| Extensions receivable | 16,955 | 8,299 |
| Escrow advances receivable | 10,674 | 5,825 |
| Insurance premiums receivable | 2,181 | 3,027 |
| Accrued interest | 493 | 1,952 |
| Catastrophe reinsurance claims receivable | -- | 11,400 |
| Other receivables | 17,560 | 17,877 |
| | $113,460 | $98,317 |

Trade receivables represent amounts due from independent manufactured housing dealers, which are located throughout the United States.

**NOTE 7—INVENTORIES**
The components of inventories are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|

| Manufactured homes | $272,825 | $382,461 |
| Work-in-progress, materials and supplies | 35,847 | 46,463 |
| Land/homes under development | 14,328 | 14,318 |
| | $323,003 | $443,598 |

## NOTE 8–PROPERTIES AND FACILITIES

The components of properties and facilities are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Land and land improvements | $ 46,267 | $ 42,254 |
| Buildings and field sales offices | 144,758 | 145,668 |
| Furniture, fixtures and equipment | 126,995 | 118,056 |
| Leasehold improvements | 35,304 | 33,483 |
| | 353,324 | 339,461 |
| Less: accumulated depreciation and amortization | (112,217) | (88,392) |
| | $ 241,107 | $251,069 |

Depreciation and amortization of properties and facilities was approximately $29.5 million, $28.2 million and $20.2 million in 2000, 1999 and 1998, respectively.

At September 30, 2000 the Company held for sale two manufacturing facilities. Included in the restructuring provision for 2000 and 1999 were charges of approximately $1.2 million and $1.3 million, respectively, to reduce the carrying value of the facilities to their estimated net realizable value.

## NOTE 9–OTHER ASSETS

The components of other assets are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Goodwill, net of accumulated amortization of $7,603 and $4,703, respectively | $ 53,434 | $ 55,832 |
| Restricted cash and investments | 25,758 | 50,342 |
| Prepaid expenses | 13,848 | 5,847 |
| Loan servicing assets | 11,863 | 8,731 |
| Deferred insurance policy acquisition costs | 5,672 | 16,051 |
| Identifiable intangibles acquired in Schult acquisition, net of accumulated amortization of $5,458 and $3,282, respectively | 5,443 | 7,620 |
| Other | 10,495 | 11,924 |
| | $126,513 | $156,347 |

Amortization expense of goodwill and identifiable intangibles was approximately $5.1 million, $5.2 million and $2.7 million in 2000, 1999 and 1998, respectively.

Restricted cash and investments include custodial cash balances used to secure a portion of obligations to pay reinsurance claims, trust account cash balances required by certain OAC servicing agreements and trust account balances required by certain states for custody of customer deposits until a retail sale is consummated.

24 2000 Annual Report

A reconciliation of amounts recorded for loan servicing contracts follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Balance at beginning of year | $ 3,972 | $ 9,261 | $ 3,786 |
| Servicing assets recorded | 10,054 | 11,082 | 6,630 |
| Amortization of servicing contracts | (11,114) | (7,658) | (1,155) |
| Valuation allowances recorded | (5,979) | (8,713) | -- |
| Balance at end of year | $ (3,067) | $ 3,972 | $ 9,261 |

Amounts recorded for servicing contracts are recorded in the consolidated balance sheet as follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Loan servicing assets | $ 11,863 | $ 8,731 | $9,261 |
| Loan servicing liabilities (Note 12) | (14,930) | (4,759) | -- |
| | $ (3,067) | $ 3,972 | $9,261 |

## NOTE 10—SHORT-TERM CREDIT FACILITIES

The Company has a $250 million revolving warehouse financing facility with a conduit commercial paper issuer, collateralized by loans held for sale. At September 30, 2000 and 1999, $64.0 million and $144.8 million, respectively, was outstanding under the facility. The weighted average interest rate on borrowings outstanding at September 30, 2000 was 8.12%, compared to an average rate of 5.80% at September 30, 1999.

The Company also has a $75 million syndicated revolving credit facility, borrowings under which bear interest at LIBOR plus 2.5%. At September 30, 2000 and 1999, $1.5 million and $55.0 million, respectively, was outstanding under the facility. Borrowings under the revolving credit facility are collateralized by substantially all assets of the Company excluding raw materials and loans held for sale.

On December 27, 2000 the Company completed agreements with its lenders to amend and extend both its credit facilities and related financial covenants. Both facilities will mature on October 1, 2001 and contain financial covenants which, among other things, specify minimum levels of tangible net worth and earnings before interest, tax and depreciation expenses (EBITDA) as adjusted in the agreements for certain noncash charges and limit capital expenditures.

## NOTE 11—NOTES AND BONDS PAYABLE

The components of notes and bonds payable are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| **Nonfinancial services debt** | | |
| 81/8% senior notes due March 2009 | $174,120 | $174,050 |
| 77/8% senior notes due March 2004 | 124,754 | 124,693 |
| 8% reset debentures due 2007 | 16,783 | 16,925 |
| Industrial revenue bonds due in installments through 2011, with interest payable at 5.8% at September 30, 2000 | 6,700 | 7,099 |
| Industrial revenue bond due in installments through 2001, with interest payable at 73% of the lender's prime rate | 1,825 | 1,925 |
| 401(k) note paid in 2000 | -- | 240 |
| Other notes payable | 2,187 | 3,474 |
| Total nonfinancial services debt | 326,369 | 328,406 |
| **Financial services debt collateralized by loans** | | |
| Nonrecourse debt | | |
| Note issued by Oakwood Funding | -- | 231 |
| Subordinated note payable issued by Oakwood Funding bearing interest payable monthly at 12.58%, amortizing through 2000 | -- | 2,075 |
| Total nonrecourse debt | -- | 2,306 |
| Recourse debt | | |
| Term loan payable in monthly installments through April 2002, with interest payable at LIBOR (6.6% and 5.3% at September 30, 2000 and 1999, | | |

| | | |
|---|---|---|
| respectively) plus 2.50% | 3,560 | 12,615 |
| Subordinated note with interest payable<br>monthly at 10.51% payable on demand | -- | 8,837 |
| Total recourse debt | 3,560 | 21,452 |
| Total financial services debt | 3,560 | 23,758 |
| | $329,929 | $352,164 |

The interest rate on the reset debentures will reset on June 1, 2002 to a rate to be determined by the Company. The reset debentures are redeemable at par at the option of the holders thereof upon the occurrence of certain events, the most significant of which, generally, involve a substantial recapitalization of the Company, merger or consolidation of the Company, or acquisition of more than 30% of the beneficial ownership in the Company by any person. In addition, the holders of the reset debentures may call for their redemption as of the interest reset date. The reset debentures are callable at par at the option of the Company.

The payment of notes collateralized by loans generally is based on the scheduled monthly payment and actual prepayments of principal on the loans collateralizing the notes. Under the provisions of certain note agreements, the notes are secured solely by the underlying collateral, which consists principally of the loans collateralizing the debt. Such collateral had an aggregate carrying value of approximately $5.5 million at September 30, 2000. Land, land improvements, buildings and equipment with a net book value of approximately $31.5 million are pledged as collateral for the industrial revenue bonds and certain other notes payable.

**Oakwood Homes Corporation 25**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
**Oakwood Homes Corporation and Subsidiaries**

In connection with the issuance of certain indebtedness, the Company incurred certain costs which are being amortized over the life of the related obligations using the level yield method.

The estimated principal payments under notes and bonds payable, assuming the reset debentures are redeemed by the holders on the June 1, 2002 redemption date, are $5.0 million in 2001, $19.2 million in 2002, $700,000 in 2003, $125.5 million in 2004, $600,000 in 2005 and the balance thereafter. Interest paid by the Company on all outstanding debt, including both short-term and long-term borrowings, was approximately $50.1 million, $39.0 million and $24.3 million in 2000, 1999 and 1998, respectively.

Various of the Company's debt agreements contain covenants which, among other things, require the Company to comply with certain financial and other covenants. The Company has complied with or obtained compliance waivers for all financial covenants with respect to which any failure to comply would have a material adverse effect on the Company's liquidity.

At September 30, 2000 commercial banks, at the request of the Company, had outstanding letters of credit of approximately $35 million in favor of various creditors of the Company. Approximately $7 million of such letters of credit secure certain industrial revenue bonds and approximately $26 million relates to the Company's reinsurance business. Such letters of credit have been issued to secure the reinsurance subsidiary's obligations to pay reinsurance claims and to meet regulatory capital requirements.

## NOTE 12—ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

The components of accounts payable and accrued liabilities are as follows:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Accounts payable | $129,898 | $119,575 |
| Accrued self-insurance reserves | 24,792 | 24,849 |
| Accrued compensation | 17,949 | 15,526 |
| Accrued warranty | 17,232 | 18,554 |
| Servicing liabilities (Note 9) | 14,930 | 4,759 |
| Accrued dealer volume rebates | 11,569 | 14,558 |
| Restructuring accrual (Note 13) | 1,811 | 12,886 |
| Income taxes payable | -- | 2,263 |
| Other accrued liabilities | 43,707 | 30,555 |
| | $261,888 | $243,525 |

## NOTE 13—RESTRUCTURING PROVISIONS

During 1999 the Company recorded restructuring charges of approximately $25.9 million, related primarily to the closing of four manufacturing lines, the temporary idling of five others and the closing of approximately 40 sales centers. During 2000 the Company reevaluated its restructuring plans and determined that the losses associated with the closing of retail sales centers and the idling or closing of manufacturing plants were less than anticipated and a portion of the charges was reversed. During 2000 the Company recorded an additional $3.8 million charge, primarily related to severance costs associated with a reduction in headcount of 250 people and the closure of certain offices and facilities. The charges in 1999 include severance and other termination costs related to approximately 2,250 employees, costs associated with closing plants and sales centers, and asset writedowns of certain affected assets. The restructuring plan including plant and sales center closings was substantially complete at September 30, 2000.

The components of the restructuring provisions are as follows:

| (in thousands) | Severance and other termination charges | Plant, sales center and office closings | Asset write-downs | Total |
|---|---|---|---|---|
| Original provision | $ 7,350 | $ 7,384 | $ 11,192 | $ 25,926 |
| Payments and balance sheet charges in 1999 | (1,707) | (141) | (11,192) | (13,040) |
| Balance at September 30, 1999 | 5,643 | 7,243 | -- | 12,886 |
| Reversal of restructuring charges | (3,912) | (2,076) | (378) | (6,366) |
| Additional provision | 1,974 | 1,780 | 15 | 3,769 |
| Payments and balance sheet charges in 2000 | (2,946) | (5,895) | 363 | (8,478) |

```
--------------------------------------------------------------------
Balance at
  September 30, 2000      $ 759  $ 1,052      $ --   $ 1,811
--------------------------------------------------------------------
```

## NOTE 14—SHAREHOLDERS' EQUITY

The Company has adopted a Shareholder Protection Rights Plan (the "Plan") to protect shareholders against unsolicited attempts to acquire control of the Company that do not offer what the Company believes to be an adequate price to all shareholders. Under the Plan, each outstanding share of the Company's common stock has associated with it a right to purchase (each, a "Right" and, collectively, the "Rights"), upon the occurrence of certain events, one two-hundredth of a share of junior participating Class A preferred stock ("Preferred Stock") at an exercise price of $20. The Rights will become exercisable only if a person or group (an "Acquiring Person"), without the Company's consent, commences a tender or exchange offer for, or acquires 20% or more of the voting power of, the Company.

In such event, each holder of Preferred Stock, other than the Acquiring Person, will be entitled to acquire that number of shares of the Company's common stock having a fair value of twice the exercise price. Similarly, if, without the Company's consent, the Company is acquired in a merger or other business combination transaction, each holder of Preferred Stock, other than the Acquiring Person, will be entitled to acquire voting shares of the acquiring company having a value of twice the exercise price. The Rights may be redeemed at a price of $.005 per Right by the Company at any time prior to any person or group acquiring 20% or more of the Company's voting power or certain other triggering events, and will expire on August 22, 2001.

The Company's authorized capital stock includes 500,000 shares of $100 par value preferred stock. The preferred stock may be issued in one or more series with such terms, preferences, limitations and relative rights as the Board of Directors shall determine. No preferred stock has been issued.

**26 2000 Annual Report**

**NOTE 15—INCOME TAXES**

The components of the provision for income taxes are as follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Current | | | |
| Federal | $(18,344) | $ 2,657 | $35,854 |
| State | (918) | 931 | 3,289 |
| | (19,262) | 3,588 | 39,143 |
| Deferred | | | |
| Federal | 29,439 | (18,163) | (5,406) |
| State | 5,952 | (3,829) | 1,000 |
| | 35,391 | (21,992) | (4,406) |
| | $ 16,129 | $(18,404) | $34,737 |

A reconciliation of a provision for income taxes computed at the statutory federal income tax rate to the Company's actual provision for income taxes follows:

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Tax at statutory federal income tax rate | $(36,658) | $(17,403) | $31,531 |
| State income taxes, less federal income tax benefit | (11,059) | (1,884) | 2,787 |
| Nondeductible goodwill amortization | 536 | 509 | 202 |
| Valuation allowances | 66,447 | -- | -- |
| Other | (3,137) | 374 | 217 |
| Total provision for income taxes | $ 16,129 | $(18,404) | $34,737 |

Deferred income taxes include the following components:

| (in thousands) | 2000 | 1999 |
|---|---|---|
| Deferred income tax assets | | |
| Inventories | $ 3,706 | $ 3,876 |
| REMIC interests | 24,551 | 15,860 |
| Accrued liabilities | 12,366 | 19,230 |
| Insurance reserves and unearned premiums | 2,540 | 7,173 |
| Net operating loss carryforwards | 32,565 | 4,216 |
| Warranty reserves | 6,742 | 7,094 |
| Accrued dealer bonuses and incentives | 608 | 115 |
| Other | 4,855 | 2,869 |
| Gross deferred income tax assets | 87,933 | 60,433 |
| Valuation allowances | (71,930) | (5,483) |
| Deferred income tax assets, net of valuation allowances | 16,003 | 54,950 |
| Deferred income tax liabilities | | |
| Properties and facilities | (15,101) | (15,657) |
| Prepaid expenses | (2,597) | -- |
| Deferred insurance policy acquisition costs | (1,497) | (5,498) |
| Acquired intangible assets | (2,278) | (2,972) |
| Other | (699) | (111) |
| Gross deferred income tax liabilities | (22,172) | (24,238) |
| Net deferred income tax asset (liability) | $(6,169) | $ 30,712 |

At September 30, 2000 an additional valuation allowance of $66.4 million was established, in accordance with the requirements of Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("FAS 109"). Realization of the deferred tax assets (net of recorded valuation allowances) is largely dependent upon future profitable operations and future reversals of existing taxable temporary differences. Because the Company has operated at a loss in its two most recent fiscal years and because it believes difficult competitive conditions will continue for the foreseeable future, the Company believes that under the standards of FAS 109 it is not appropriate to record income tax benefits on current losses in excess of anticipated refunds of taxes previously paid. The valuation allowance may be reversed to

income in future periods to the extent that the related deferred income tax assets are realized as a reduction of taxes otherwise payable on any future earnings or the valuation allowances are otherwise no longer required.

At September 30, 2000 a deferred tax benefit of $1.5 million was allocated directly to shareholders' equity for the income tax benefits of employee stock option compensation expense for tax purposes in excess of amounts recognized for financial reporting purposes, the effect of which reduces the net decrease in deferred income tax assets to $35.4 million.

The Company's federal income tax returns for the fiscal years ended 1997 and 1998 are currently under examination. While the Company cannot predict the final outcome of this examination, management believes that such outcome will not have a material adverse effect on the Company's consolidated financial condition or results of operations.

Income tax payments were approximately $1.1 million, $17.6 million and $35.8 million in 2000, 1999 and 1998, respectively.

## NOTE 16—EARNINGS PER SHARE

The following table displays the derivation of the number of weighted average shares outstanding used in the computation of basic and diluted earnings per share ("EPS"):

| (in thousands except per share data) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Numerator for basic and diluted EPS--net income (loss) | $(120,865) | $(31,320) | $55,353 |
| Denominator | | | |
| Weighted average number of common shares outstanding | 46,572 | 46,502 | 46,320 |
| Unearned shares | (3) | (40) | (81) |
| Denominator for basic EPS | 46,569 | 46,462 | 46,239 |
| Dilutive effect of stock options and restricted shares, computed using the treasury stock method | -- | -- | 1,185 |
| Denominator for diluted EPS | 46,569 | 46,462 | 47,424 |
| Basic earnings (loss) per share | $ (2.60) | $ (0.67) | $ 1.20 |
| Diluted earnings (loss) per share | $ (2.60) | $ (0.67) | $ 1.17 |

Stock options to purchase 4,140,703 and 3,844,750 shares of common stock and 535,797 and 568,412 unearned restricted shares were not included in the computation of diluted earnings per share for 2000 and 1999, respectively, because their inclusion would have been antidilutive. Options to purchase 1,604,996 shares of common stock were not included in the computation of diluted earnings per share for the fourth quarter of 1998 because their inclusion would have been antidilutive.

**Oakwood Homes Corporation 27**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
Oakwood Homes Corporation and Subsidiaries

## NOTE 17—STOCK OPTION AND AWARD PLANS

The Company has a Key Employee Stock Plan (the "Stock Plan") under which 5,450,918 common shares were reserved for issuance to key employees at September 30, 2000. The Stock Plan provides that an additional number of common shares shall be reserved for issuance under the Stock Plan each October 1 equal to 1.5% of the number of common shares outstanding on such date. Awards or grants under the plan may be made in the form of stock options, stock appreciation rights, restricted stock and performance shares.

The Company also has a Director Stock Option Plan under which 180,000 shares of the Company's common stock were reserved for grant to nonemployee directors of the Company. The exercise price of options granted is the fair value of the Company's common stock on the date of grant. Options granted under the plan become exercisable six months from the date of grant and expire 10 years from the date of grant.

The table to the immediate right summarizes the changes in the number of shares under option pursuant to the plans described above and pursuant to certain earlier plans under which options may no longer be granted:

| | Number of shares | Weighted average exercise price |
|---|---|---|
| Outstanding at September 30, 1997 | 2,979,583 | $13.26 |
| Granted | 1,235,500 | 28.50 |
| Exercised | (351,744) | 6.79 |
| Terminated | (126,482) | 18.36 |
| Outstanding at September 30, 1998 | 3,736,857 | 18.74 |
| Granted | 1,199,953 | 16.10 |
| Exercised | (98,682) | 4.24 |
| Terminated | (993,378) | 27.65 |
| Outstanding at September 30, 1999 | 3,844,750 | 15.98 |
| Granted | 1,413,500 | 3.99 |
| Exercised | (17,500) | 1.74 |
| Terminated | (1,100,047) | 13.91 |
| Outstanding at September 30, 2000 | 4,140,703 | $12.50 |
| | | |
| Exercisable at September 30, 1998 | 1,129,438 | $ 8.89 |
| Exercisable at September 30, 1999 | 2,110,825 | $14.06 |
| Exercisable at September 30, 2000 | 1,965,004 | $14.40 |

The following is a summary of stock options outstanding at September 30, 2000:

| | Options outstanding | | | Options exercisable | |
|---|---|---|---|---|---|
| Range of exercise price | Number of shares | Weighted average contractual life remaining (in years) | Weighted average exercise price | Number of shares | Weighted average exercise price |
| $ 1.41-$ 2.97 | 221,983 | 5.5 | $ 2.05 | 101,483 | $ 2.29 |
| 4.05- 6.25 | 1,422,233 | 5.9 | 4.33 | 342,513 | 4.78 |
| 10.72- 11.31 | 36,900 | 3.7 | 11.02 | 36,900 | 11.02 |
| 12.16- 15.04 | 361,500 | 3.9 | 13.36 | 288,168 | 13.11 |
| 15.38- 18.72 | 1,479,564 | 5.4 | 16.81 | 984,917 | 17.53 |
| 19.78- 22.57 | 286,500 | 5.9 | 20.48 | 86,500 | 20.73 |
| 23.00- 25.94 | 81,496 | 6.1 | 24.29 | 73,996 | 24.12 |
| 26.69- 29.14 | 250,527 | 7.1 | 28.63 | 50,527 | 27.76 |
| All options | 4,140,703 | 5.6 | $12.50 | 1,965,004 | $14.40 |

The following table summarizes restricted stock issued under the Stock Plan:

| | Number of shares | Weighted average fair value per share |
|---|---|---|
| 1998 | 14,439 | $28.25 |
| 1999 | 350,903 | $12.91 |

As of September 30, 2000 there were a total of 1,731,279 shares of common stock reserved for future grants under the Company's stock option plans.

The aggregate compensation expense for stock-based compensation plans, computed under the provisions of APB 25, was approximately $1.9 million, $2.1 million and $1.4 million in 2000, 1999 and 1998, respectively. Such compensation expense relates entirely to accruals for restricted stock awards under the Stock Plan (charged to income over the vesting periods of the related awards).

The Financial Accounting Standards Board has adopted Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("FAS 123"), which permits, but does not require, the Company to utilize a fair-value based method of accounting for stock-based compensation. The Company has elected to continue use of the APB 25 accounting principles for its stock option plans and accordingly has recorded no compensation cost for grants of stock options. Had compensation cost for the Company's stock option plans been determined based on the estimated fair value at the grant dates for awards in 2000, 1999 and 1998 consistent with the provisions of FAS 123, the Company's net income and earnings per share would have been reduced to the pro forma amounts indicated below:

| (in thousands except per share data) | 2000 | 1999 | 1998 |
|---|---|---|---|
| Net income (loss)--as reported | $(120,865) | $(31,320) | $55,353 |
| Net income (loss)--pro forma | (124,959) | (34,470) | 52,321 |
| Basic earnings (loss) per share-- as reported | $ (2.60) | $ (0.67) | $ 1.20 |
| Basic earnings (loss) per share-- pro forma | (2.68) | (0.74) | 1.13 |
| Diluted earnings (loss) per share-- as reported | $ (2.60) | $ (0.67) | $ 1 .17 |
| Diluted earnings (loss) per share-- pro forma | (2.68) | (0.74) | 1.10 |

28 2000 Annual Report

The pro forma information set forth in the preceding table does not reflect application of the FAS 123 measurement principles to options granted prior to October 1, 1995. Accordingly, the pro forma information does not necessarily reflect the Company's results of operations on a pro forma basis assuming the FAS 123 measurement principles had been applied to all stock options granted prior to October 1, 1995 and which were not vested at that date, and is not necessarily representative of the pro forma effects on the results of operations of future years had the Company adopted the measurement principles of FAS 123.

The pro forma information set forth in the preceding table reflects a weighted average estimated fair value of stock options granted in 2000, 1999 and 1998 respectively, of $3.99, $6.54 and $11.72 per share. Such estimated fair values were computed using the Black-Scholes option-pricing model with the following weighted average assumptions used for grants issued in 2000, 1999 and 1998, respectively: dividend yield of .00%, .26% and .14%; expected volatility of 46.90%, 41.83% and 36.28%; weighted average risk-free interest rate of 6.10%, 4.54% and 5.75%; and expected lives of 5 years for 2000, 1999 and 1998.

## NOTE 18—EMPLOYEE BENEFIT PLANS

The Company maintains a 401(k) plan in which substantially all employees who have met certain age and length of service requirements may participate. On January 1, 1998 the Company's employee stock ownership plan ("ESOP") was merged with the 401(k) plan. Employee contributions to the 401(k) plan are limited to a percentage of their compensation and are matched 100% by the Company for the first 6% of compensation contributed. The Company's match consists of a 67% cash contribution and a 33% Company stock contribution if certain targets are met.

During 1995 the Company loaned approximately $2.4 million to the ESOP to enable the ESOP to purchase Company common stock on the open market. The ESOP refinanced the Company's loan with the proceeds of a loan from a commercial bank which the Company has guaranteed; the Company has reflected the note payable, now held by the 401(k) plan, as a liability in the accompanying consolidated September 30, 1999 balance sheet. The bank loan provides that shares are released ratably upon repayment of the principal of the loan. Compensation cost relating to shares acquired with the proceeds of the loan is measured by reference to the fair value of the shares committed to be released during the period, in accordance with Statement of Position 93-6.

At September 30, 2000 the 401(k) plan held a total of 1,156,477 shares of the Company's common stock having a fair value of approximately $1.7 million.

Total compensation cost under the 401(k) and ESOP plans was approximately $4.7 million, $9.2 million and $6.5 million in 2000, 1999 and 1998, respectively.

## NOTE 19—CONTINGENCIES

In November 1998 the Company and certain of its present and former officers and directors were named as defendants in lawsuits filed on behalf of purchasers of the Company's common stock for various periods between April 11, 1997 and July 21, 1998 (the "Class Period"). In June 1999 a consolidated amended complaint was filed in the United States Middle District Court in Guilford County, North Carolina. The amended complaint, which seeks class action certification, alleges violations of federal securities law based on alleged fraudulent acts, false and misleading financial statements, reports filed by the Company and other representations during the Class Period and seeks the loss of value in class members' stockholdings. The Company filed a motion to dismiss the amended complaint. In July 2000 the magistrate submitted a recommended order dismissing the complaint with prejudice. This order was affirmed by the District Court judge in October 2000 and has not yet been appealed.

During 2000 two lawsuits were filed against the Company's subsidiaries, Oakwood Mobile Homes, Inc. and Oakwood Acceptance Corporation, and certain of their employees in the Circuit Court of Jefferson County, Mississippi. These lawsuits generally allege that the Company's subsidiaries and their employees engaged in various improper business practices including false advertising and misrepresentation of material facts relating to financing and insurance matters. In October 2000 the attorneys for the plaintiffs filed a motion to consolidate the two cases, add a large number of additional plaintiffs residing in various parts of the United States to the case and add the Company as a defendant. As the lawsuits are in the early stages of discovery, the Company is unable to determine the effect, if any, on its financial position or results of operations. The Company intends to defend these lawsuits vigorously.

In addition, the Company is also subject to legal proceedings and claims which have arisen in the ordinary course of its business and have not been finally adjudicated. In management's opinion, the ultimate resolution of these matters is not expected to have a material effect on the Company's results of operations or financial condition.

The Company is contingently liable under terms of repurchase agreements with financial institutions providing inventory financing for retailers of their products. These arrangements, which are customary in the industry, provide for the repurchase of products sold to retailers in the event of default on payments by the retailer. The risk of loss under these agreements is spread over numerous retailers and is further reduced by the resale value of repurchased homes. The estimated potential obligations under such agreements approximated $138 million at September 30, 2000. Losses under these agreements have not been significant.

## NOTE 20—FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company is a party to on-balance sheet financial instruments as a result of its financing and funding activities. On-balance sheet financial assets include loans originated in conjunction with retail home sales, loans purchased from third parties, trade receivables arising from sales of homes to independent dealers and other receivables. The Company has estimated the fair value of loans held for sale by reference to the gain or loss estimated to have resulted had the loans been securitized at period end. The Company has estimated the fair value of loans held for

investment by discounting the estimated future cash flows relating thereto using interest rates which approximate the interest rates charged by Oakwood Acceptance as of year end for loans of similar character and duration. Due to their short-term nature, the fair values of trade and other receivables approximates their carrying values.

**Oakwood Homes Corporation 29**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)
Oakwood Homes Corporation and Subsidiaries

The Company estimates the fair value of retained regular and residual interests in REMIC securitizations and any related guarantee obligations as described in Notes 1 and 5. However, there exists no active market for manufactured housing residual REMIC interests or uniformly accepted valuation methodologies.

On-balance sheet financial obligations consist of amounts outstanding under the Company's short-term credit facilities and notes and bonds payable. The Company estimates the fair values of debt obligations using rates currently offered to the Company for borrowings having similar character, collateral and duration or, in the case of the Company's outstanding senior notes and reset debentures, by reference to quoted market prices.

The following table sets forth the carrying amounts and estimated fair values of the Company's financial instruments at September 30, 2000 and 1999:

| | 2000 | | 1999 | |
|---|---|---|---|---|
| (in thousands) | Estimated fair value | Carrying amount | Estimated fair value | Carrying amount |
| **Assets** | | | | |
| Cash and cash equivalents, including restricted cash and investments | $ 48,281 | $ 48,281 | $ 77,281 | $ 77,281 |
| Loans and investments | | | | |
| Loans held for sale | 211,296 | 211,296 | 279,927 | 279,927 |
| Loans held for investment | | | | |
| Fixed rate loans | 8,418 | 8,512 | 43,271 | 42,312 |
| Variable rate loans | -- | -- | 5,703 | 5,703 |
| Less: reserve for uncollectible receivables | -- | (3,556) | -- | (3,032) |
| Retained REMIC regular interests | 77,229 | 77,229 | 69,325 | 69,325 |
| Retained REMIC residual interests | 28,685 | 28,685 | 36,630 | 36,630 |
| Other receivables | 113,460 | 113,460 | 98,317 | 98,317 |
| **Liabilities** | | | | |
| Short-term borrowings | 65,500 | 65,500 | 199,800 | 199,800 |
| Notes and bonds payable | | | | |
| Fixed rate obligations | 87,026 | 316,692 | 239,065 | 328,793 |
| Variable rate obligations | 13,237 | 13,237 | 23,371 | 23,371 |
| Guarantee liabilities on subordinated REMIC securities sold | 26,807 | 30,809 | 18,954 | 18,954 |

## NOTE 21--QUARTERLY FINANCIAL DATA (UNAUDITED)

A summary of quarterly financial information follows:

| (in thousands except per share data) | First quarter | Second quarter | Third quarter | Fourth quarter | Year |
|---|---|---|---|---|---|
| **2000** | | | | | |
| Net sales | $297,494 | $271,349 | $310,558 | $310,484 | $1,189,885 |
| Gross profit | $ 61,245 | $ 55,838 | $ 74,042 | $ 71,243 | $ 262,368 |
| Net loss | $ (14,852) | $ (11,976) | $(11,125) | $ (82,912) | $ (120,865) |
| Loss per share | | | | | |
| Basic | $ (0.32) | $ (0.26) | $ (0.24) | $ (1.78) | $ (2.60) |
| Diluted | $ (0.32) | $ (0.26) | $ (0.24) | $ (1.78) | $ (2.60) |
| **1999** | | | | | |
| Net sales | $359,814 | $ 367,095 | $404,346 | $365,164 | $1,496,419 |
| Gross profit | $104,633 | $ 107,091 | $116,540 | $ 86,439 | $ 414,703 |
| Net income (loss) | $ 11,459 | $ 9,673 | $ 7,854 | $ (60,306) | $ (31,320) |
| Earnings (loss) per share | | | | | |
| Basic | $ 0.25 | $ 0.21 | $ 0.17 | $ (1.30) | $ (0.67) |
| Diluted | $ 0.24 | $ 0.21 | $ 0.17 | $ (1.30) | $ (0.67) |

30 2000 Annual Report

The sum of quarterly earnings per share amounts do not necessarily equal earnings per share for the year. In the fourth quarter of fiscal 2000 the Company recorded valuation provisions against its previously recorded deferred tax assets of $66.4 million or $1.43 per share.

## NOTE 22—BUSINESS SEGMENT INFORMATION

Effective September 30, 1999 the Company adopted Statement of Financial Accounting Standards No. 131, "Disclosures About Segments of an Enterprise and Related Information" ("FAS 131"). The Company operates in four major business segments. Management has determined these segments, in the case of housing operations, based upon the principal business activities conducted by housing business units, which are retail distribution of homes to consumers in the case of retail operations, and manufacturing of homes for distribution to the Company's retail operations and to independent dealers in the case of manufacturing operations. For financial services operations, management determined segments based upon the principal products offered to consumers:
retail financing in the case of consumer finance and insurance products in the case of insurance operations. The business segments identified by management are consistent with organization structure used by the Company to manage its business.

The Company's retail business purchases homes primarily from the Company's manufacturing operations but supplements these purchases in certain markets with purchases from third party manufacturers. The Company's manufacturing operations sell a majority of their homes to the Company's retail operations, with a portion distributed through independent dealers. The consumer finance segment provides retail financing to customers of the manufactured housing segment, as well as to customers of independent retail dealers. This segment both originates and services loans, and securitizes the loans in the public and private markets as a source of capital. The insurance segment reinsures insurance risk on property and casualty insurance, extended service contracts and credit life insurance sold to retail customers.

Segment operating income is income before general corporate expenses, nonfinancial interest expense, investment income and income taxes. Identifiable assets include those assets directly related to the Company's operations in the different segments; general corporate assets consist principally of cash, certain property and other investments.

| (in thousands) | 2000 | 1999 | 1998 |
|---|---|---|---|
| **Revenues** | | | |
| Retail | $ 778,479 | $1,047,035 | $1,149,438 |
| Manufacturing | 821,429 | 1,088,447 | 912,632 |
| Consumer finance | 27,963 | 29,747 | 33,414 |
| Insurance | 67,503 | 61,482 | 36,834 |
| Eliminations/other | (411,242) | (637,486) | (649,765) |
| | $1,284,132 | $1,589,225 | $1,482,553 |
| **Income (loss) from operations** | | | |
| Retail | $ (60,074) | $ (39,285) | $ 43,934 |
| Manufacturing | 45,772 | 76,064 | 101,383 |
| Consumer finance | (57,647) | (41,173) | (10,651) |
| Insurance | 24,114 | 11,181 | 6,409 |
| Eliminations/other | (45,647) | (46,525) | (45,602) |
| | (93,482) | (39,738) | 95,473 |
| Nonfinancial services interest expense | (11,755) | (10,580) | (5,970) |
| Investment income | 501 | 594 | 587 |
| **Income (loss) before income taxes** | $ (104,736) | $ (49,724) | $ 90,090 |
| **Identifiable assets** | | | |
| Retail | $ 475,227 | $ 560,253 | |
| Manufacturing | 604,946 | 1,038,673 | |
| Consumer finance | 637,264 | 491,585 | |
| Insurance | 115,959 | 132,691 | |
| Eliminations/other | (684,624) | (785,355) | |
| | $1,148,772 | $1,437,847 | |
| **Depreciation and amortization** | | | |
| Retail | $ 10,247 | $ 9,149 | $ 6,154 |
| Manufacturing | 17,240 | 19,847 | 10,083 |
| Consumer finance | 12,378 | 8,760 | 2,413 |
| Insurance | -- | -- | -- |
| Eliminations/other | 10,463 | 7,803 | 6,300 |
| | $ 50,328 | $ 45,559 | $ 24,950 |
| **Capital expenditures** | | | |
| Retail | $ 7,632 | $ 24,267 | $ 19,831 |
| Manufacturing | 6,092 | 20,459 | 24,432 |
| Consumer finance | 3,741 | 268 | 2,878 |
| Insurance | -- | -- | -- |
| General corporate | 3,499 | 1,942 | 4,270 |

$ 20,964      $ 46,936    $ 51,411

---

**Oakwood Homes Corporation 31**

**REPORT OF INDEPENDENT ACCOUNTANTS**

To the Board of Directors and Shareholders of Oakwood Homes Corporation

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of operations, of cash flows and of changes in shareholders' equity and other comprehensive income present fairly, in all material respects, the financial position of Oakwood Homes Corporation and its subsidiaries at September 30, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2000, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

As more fully described in Notes 2 and 10, on December 27, 2000 the Company amended and extended its credit facilities and related financial covenants through October 1, 2001. These credit facilities are necessary to fund continuing operations. The Company has incurred net losses in each of the two fiscal years ended September 30, 2000. The Company does not expect to generate income from operations during 2001.

```
/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
Greensboro, North Carolina
November 28, 2000, except for the information presented in the third paragraph
of Note 10 for which the date is December 27, 2000.
```

## COMMON STOCK PRICES
**Oakwood Homes Corporation and Subsidiaries**

| Quarter | 2000 High | 2000 Low | 1999 High | 1999 Low | 1998 High | 1998 Low | 1997 High | 1997 Low | 1996 High | 1996 Low |
|---|---|---|---|---|---|---|---|---|---|---|
| First | 4 7/8 | 1 3/16 | 16 7/8 | 11 7/16 | 33 3/16 | 24 7/8 | 29 7/8 | 21 | 21 | 16 5/8 |
| Second | 4 7/8 | 2 5/16 | 20 | 13 5/16 | 41 3/4 | 33 1/8 | 23 | 17 3/8 | 25 3/4 | 18 1/2 |
| Third | 3 15/16 | 1 13/16 | 15 3/16 | 12 1/16 | 38 13/16 | 26 5/16 | 24 3/4 | 16 3/4 | 25 | 20 |
| Fourth | 2 7/16 | 1 3/16 | 13 1/16 | 4 1/2 | 31 7/8 | 13 1/16 | 30 | 23 7/16 | 28 | 20 3/8 |

## DIVIDEND INFORMATION
**Oakwood Homes Corporation and Subsidiaries**

The Company's Board of Directors suspended the payment of cash dividends on common stock in August 2000. Prior to that time, the Company declared a cash dividend of $.01 per common share during each of the seven quarters in the period ended June 30, 2000.

**32 2000 Annual Report**

Securities Exchange Listing
New York Stock Exchange
Ticker Symbol--OH

Shareholders
At December 8, 2000, the Company has
an estimated 26,000 shareholders, including beneficial owners holding shares in nominee

and "street" name.

LIST OF MATERIAL SUBSIDIARIES OF THE COMPANY

| Name of Subsidiary (1) | Jurisdiction of Incorporation |
| --- | --- |
| Destiny Industries, Inc. | Georgia |
| Golden Circle Financial Services | California |
| Golden West Homes | California |
| Homes by Oakwood, Inc. | North Carolina |
| Marlette Homes, Inc. | Indiana |
| Oakwood Acceptance Corporation (2) | North Carolina |
| Oakwood Capital Corporation | Nevada |
| Oakwood Financial Corporation | Nevada |
| Oakwood Mobile Homes, Inc. (3) | North Carolina |
| Oakwood Mortgage Investors, Inc. | Nevada |
| Oakwood Realty Services, Inc. | North Carolina |
| OFC, LLC | Nevada |
| Schult Homes Corporation | Indiana |
| Schult Operating Company (4) | Indiana |
| Suburban Homes Sales, Inc. | Michigan |
| Tarheel Insurance Company, Ltd. | Bermuda |

(1) Each subsidiary does business under its corporate name.

(2) Also does business under the names "Nationwide Mortgage" and "Golden Circle Financial Services."

(3) Also does business under the names "Freedom Homes," "Victory Homes," "Golden West Homes" and "Schult Homes."

(4) Also does business under the name "Crest Homes."

## CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in (a) the Registration Statements on Form S-8 (Nos. 2-81624, 33-3797, 33-50414, 33-50416, 333-01023 and 333-52569) of Oakwood Homes Corporation, (b) the Registration Statement on Form S-3 (No. 333-47053) of Oakwood Homes Corporation and (c) the Registration Statement on Form S-3 (No. 333-72621) of Oakwood Mortgage Investors, Inc., of our report dated November 28, 2000, except for the information presented in the third paragraph in Note 10 for which the date is December 27, 2000, appearing on page 32 of the Annual Report to Stockholders which is incorporated in this Annual Report on Form 10-K.

/s/ PricewaterhouseCoopers LLP

PRICEWATERHOUSECOOPERS LLP

Greensboro, North Carolina

December 27, 2000

**ARTICLE 5**

THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE REGISTRANT'S CONSOLIDATED FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2000 FILED AS A PART OF THE REGISTRANT'S FORM 10-K FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2000 AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FORM 10-K

MULTIPLIER: 1,000

CURRENCY: U.S. DOLLARS

| | |
|---|---|
| PERIOD TYPE | 12 MOS |
| FISCAL YEAR END | SEP 30 2000 |
| PERIOD START | OCT 01 1999 |
| PERIOD END | SEP 30 2000 |
| EXCHANGE RATE | 1 |
| CASH | 22,523 |
| SECURITIES | 0 |
| RECEIVABLES | 439,182 |
| ALLOWANCES | 3,556 |
| INVENTORY | 323,003 |
| CURRENT ASSETS | 0 |
| PP&E | 353,324 |
| DEPRECIATION | 112,217 |
| TOTAL ASSETS | 1,148,772 |
| CURRENT LIABILITIES | 326,961 |
| BONDS | 329,929 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 23,552 |
| OTHER SE | 381,732 |
| TOTAL LIABILITY AND EQUITY | 1,148,772 |
| SALES | 1,189,885 |
| TOTAL REVENUES | 1,284,132 |
| CGS | 927,517 |
| TOTAL COSTS | 1,338,176 |
| OTHER EXPENSES | (2,597) |
| LOSS PROVISION | 3,000 |
| INTEREST EXPENSE | 50,289 |
| INCOME PRETAX | (104,736) |
| INCOME TAX | 16,129 |
| INCOME CONTINUING | 0 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | (120,865) |
| EPS BASIC | (2.60) |
| EPS DILUTED | (2.60) |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

*EXHIBIT F*

# REORGANIZED SALE OKWD INC

## FORM 8-K
### (Current report filing)

## Filed 08/09/02 for the Period Ending 08/06/02

| | |
|---|---|
| Address | PO DRAWER 2252-A |
| | DURHAM, NC 27702 |
| Telephone | 9196831561 |
| CIK | 0000073609 |
| Symbol | OKWHQ |
| SIC Code | 2451 – Mobile Homes |
| Industry | Construction Services |
| Sector | Technology |
| Fiscal Year | 06/30 |

Powered By EDGAR Online
http://www.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

---

**FORM 8-K**

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported): August 6, 2002

OAKWOOD HOMES CORPORATION
(Exact name of registrant as specified in charter)

| North Carolina | 1-7444 | 56-0985879 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission file number) | (IRS Employer Identification Number) |

| 7800 McCloud Road, Greensboro, North Carolina | 27409-9634 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (336) 664-2400

**Item 5. Other Events.**

    On August 6, 2002, the Registrant issued a press release in which it reported its results for the third quarter of fiscal 2002 and other developments. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

**Item 7. Financial Statements, *Pro Forma* Financial Information and Exhibits.**

    (a) *Financial Statements* . Not applicable.

    (b) *Pro Forma Financial Information* . Not applicable.

    (c) *Exhibits.* The following exhibit is filed herewith :

        99.1    Press release issued on August 6, 2002.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OAKWOOD HOMES CORPORATION

Date: August 9, 2002                    By:    /s/ Suzanne H. Wood

Name: Suzanne H. Wood
Title: Executive Vice President and Chief Financial Officer

SECURITIES AND EXCHANGE COMMISSION
Washington, DC

EXHIBITS

CURRENT REPORT
ON
FORM 8-K

Date of Event Reported:                               Commission File No:
August 6, 2002                                              1-7444

OAKWOOD HOMES CORPORATION

EXHIBIT INDEX

| Exhibit No. | Exhibit Description |
| --- | --- |
| 99.1 | Press release issued on August 6, 2002. |

EXHIBIT 99.1

Contact:       Suzanne H. Wood
               (336) 664-2400

# OAKWOOD HOMES CORPORATION REPORTS
## THIRD QUARTER 2002 RESULTS

GREENSBORO, N.C., August 6, 2002 —— Oakwood Homes Corporation (NYSE - OH) today reported results of operations for the quarter ended June 30, 2002.

For the three months ended June 30, 2002, the Company reported a net loss of $119.8 million, or $12.61 per share, compared with a net loss of $50.2 million, or $5.33 per share, for the quarter ended June 30, 2001. The current quarter net loss included an $86.5 million charge related to previously securitized loans and loans held for sale and reflected the estimated effect of higher future credit losses. The results for the quarter also included an $18.9 million charge related principally to the closure of a manufacturing facility in Texas and the reduction in net book value of certain retail division assets. Approximately $14.3 million of the $18.9 million charge was non-cash in nature and has been disclosed separately in the accompanying consolidated statement of operations. The remaining $4.6 million has been included in cost of sales. The net loss for the quarter also included $7.4 million of expenses related to the loan assumption program.

At June 30, 2002, the Company was in compliance with the covenants contained in its debt agreements or had obtained waivers or amendments for any violations.

For the nine months ended June 30, 2002, the Company reported a net loss of $99.5 million, or $10.49 per share, compared with a net loss of $126.5 million, or $13.44 per share, in the comparable period of 2001.

The net loss for the nine months ended June 30, 2002 included an income tax benefit of $72.2 million resulting from the enactment of the Job Creation and Worker Assistance Act of 2002 on March 8, 2002, as discussed in the Company's second quarter press release. After filing its 2001 income tax return, the Company received in April 2002 a cash refund of $46.6 million. The remaining tax benefit and cash refund of approximately $26 million are expected to be realized after the Company files its income tax return for the year ending September 30, 2002. As described in the Company's 2001 Annual Report, the Company has restated its previously reported results of operations for the second quarter of 2001 to apply the provisions of Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements."

Myles E. Standish, President and Chief Executive Officer, stated: "The $86.5 million financial services charge resulted principally from the Company's decisions in late June to substantially increase the percentage of repossessed homes sold through the wholesale

distribution channel, which typically carries much lower recovery rates than those sold through the retail channel, and to substantially curtail the Company's loan assumption program. The Company has historically sold most repossession units through its captive retail sales center network, thus minimizing the loss incurred on the sale of such units. However, the oversupply of repossessions in the market, largely a reflection of the weakened economy and less restrictive industry underwriting standards in the mid-to-late 1990's, the reduction in the number of the Company's retail sales centers and the industry's reduced ability to provide consumer financing for re-sales of repossessed units have made it difficult to continue to sell such units through retail channels. The majority of all units pending assumption at June 30, 2002 were converted to repossession status and will be disposed of through normal retail and wholesale channels of distribution.

"These changes in business going forward should improve our cash position and results of operations and should also improve the performance of our future securitizations. The decision to sell through the wholesale distribution channel a greater percentage of repossessions should decrease future repossessions because the Company will not provide consumer financing for those sales. During the first nine months of 2002, the Company expended cash approximating $47.6 million related to the loan assumption program. Given the curtailment of this program, such expenditures should be minor going forward."

Mr. Standish continued: "With respect to housing operations, we saw improvement in operating results during the quarter and continue to be encouraged by year-over-year positive comparisons in both manufacturing and retail gross margins, excluding the $4.6 million charge associated with the closure of the Texas manufacturing facility and the writedown of certain retail division assets. Wholesale sales continued to show strength. For the first time in a number of quarters, we experienced a modest improvement in year-over-year total sales, despite operating 104 fewer retail outlets than last year. Our wholesale sales increased by 26.9%, while same store sales at retail increased by 15.7%. We are particularly gratified by these improvements given the current industry and economic downturn.

"Retail sales for the third quarter of 2002 were $137.0 million compared with $150.9 million in the third quarter of 2001. At June 30, 2002, the Company was operating 236 retail sales centers selling new product compared to 340 at June 30, 2001.

"The increase in wholesale sales compared favorably to recent manufacturing shipment data for the industry and represented the third consecutive quarter of year-over-year wholesale sales improvements.

"Gross profit margin increased to 22.3% in the quarter ended June 30, 2002 compared to 20.3% in the quarter ended June 30, 2001. Excluding the $4.6 million charge mentioned previously, the gross profit margin for the quarter ended June 30, 2002 would have been 24.2%. The increase was a result of improved manufacturing efficiencies and reduced promotional pricing associated with the Company's inventory reduction, offset by a higher percentage of wholesale sales, which typically carry lower margins. At June 30,

2002, the Company was operating 19 plants, and 13 plants remained closed or temporarily idled.

"At June 30, 2002, our inventory levels declined to $199.8 million or 8,976 floors. This represents a reduction of $28.8 million since the beginning of fiscal 2002. During the fourth quarter, we expect the number of floors on hand to decline further.

"Selling, general and administrative expenses as a percentage of sales were 26.5% compared to 31.5% in the quarter ended June 30, 2001. The decrease as a percentage of sales resulted principally from ongoing cost containment measures and the closure of underperforming sales centers having a high ratio of fixed costs to sales. Selling, general and administrative expenses for the June 2001 quarter included a $2.1 million charge associated with the closure of 12 retail sales centers. Selling, general and administrative expenses for the quarter ended June 30, 2002 included $4.8 million of operating costs related to the Company's sales centers that are dedicated to selling repossessed homes. The comparable amount in the quarter ended June 30, 2001 was $1.8 million.

"The results for the quarter ended June 30, 2002 also included a loss of $0.6 million on the securitization of approximately $249.0 million of installment sale contracts and mortgage loans compared to a gain of $2.9 million on the securitization completed during the third quarter of 2001. The net loss for the quarter ended June 30, 2001 included a $20.7 million charge related to the closed and pending sales of subordinated securities retained from prior loan securitizations.

"The delinquency rate on the loan portfolio was 5.5% at June 30, 2002 compared to 5.1% at March 31, 2002 and 5.5% at June 30, 2001. At June 30, 2002, repossessions on hand (including former pending assumption or equity transfer units that were converted to repossession status at June 30) totaled 6,772 compared to 5,033 repossessions and assumption units one year ago.

"During the quarter, the Company redeemed $12.9 million of its reset debentures due 2007 pursuant to redemption provisions in the related trust indenture."

Oakwood Homes Corporation and its subsidiaries are engaged in the production, sale, financing and insuring of manufactured housing throughout the United States. The Company's products are sold through Company-owned stores and an extensive network of independent retailers.

This press release contains certain forward-looking statements and information based on the beliefs of the Company's management as well as assumptions made by, and information currently available to, the Company's management. These statements include, among others, statements relating to the expectation that the Company will reduce its inventory levels during the fourth quarter of 2002, the belief that the Company will realize an additional $26 million of income tax benefits after the Company files its income tax return for the year ending September 30, 2002, the belief that the decisions to curtail the loan assumption program and to sell a higher percentage of repossessions

through the wholesale channel of distribution will improve the Company's cash position and results of operations and should also improve the future performance of the Company's securitizations and the belief that expenditures associated with the loan assumption program should be minor in the future.

These forward-looking statements reflect the current views of the Company with respect to future events and are subject to a number of risks, including, among others, the following: competitive industry conditions could further adversely affect sales and profitability; the Company may be unable to access sufficient capital and liquidity to fund its operations; it may recognize special charges or experience increased costs in connection with its securitization or other financing activities; the Company may be required to provide various forms of credit enhancement to its vendors, lenders or others; the Company may recognize special charges or experience increased costs in connection with restructuring activities; the Company may not realize anticipated benefits associated with its restructuring activities (including the closing of underperforming sales centers); adverse changes in governmental regulations applicable to its business could negatively impact the Company; it could suffer losses resulting from litigation (including shareholder class actions or other class action suits); the captive Bermuda reinsurance subsidiary could experience significant losses; the Company could experience increased credit losses or higher delinquency rates on loans originated; the Company could experience lower recovery rates than anticipated on the sale of repossessions, negative changes in general economic conditions or the industry could adversely impact the Company; it could lose the services of key management personnel; and any other factors that generally affect companies in these lines of business could also adversely impact the Company. Should the Company's underlying assumptions prove incorrect or should one or more of the risks and uncertainties materialize, actual events or results may vary materially and adversely from those described herein as anticipated, expected, believed or estimated.

(Comparative tables attached)

OAKWOOD HOMES CORPORATION
Consolidated Statement of Operations (Unaudited)
(Amounts in thousands, except per share data)

| | Three months ended June 30, | | Nine months ended June 30, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Revenues** | | | | |
| Net sales | | | | |
| Retail | $ 136,980 | $150,916 | $ 383,635 | $ 490,949 |
| Wholesale | 113,889 | 89,713 | 301,294 | 249,231 |
| | 250,869 | 240,629 | 684,929 | 740,180 |
| Financial services income | | | | |
| Consumer finance, net of impairment and valuation provisions | (70,010) | 3,203 | (35,340) | 27,489 |
| Insurance | 7,709 | 10,385 | 22,683 | 29,874 |
| | (62,301) | 13,588 | (12,657) | 57,363 |
| Other income | 1,912 | 3,010 | 5,702 | 7,493 |
| Total revenues | 190,480 | 257,227 | 677,974 | 805,036 |
| **Costs and expenses** | | | | |
| Cost of sales | 194,854 | 191,665 | 526,418 | 589,964 |
| Selling, general and administrative expenses | 66,489 | 75,733 | 194,261 | 228,831 |
| Restructuring charges (reversals) | — | — | (2,071) | — |
| Asset impairment charges | 14,255 | — | 14,255 | — |
| Financial services operating expenses | | | | |
| Consumer finance | 12,289 | 15,038 | 39,022 | 34,585 |
| Insurance | 3,801 | 4,443 | 9,973 | 12,177 |
| | 16,090 | 19,481 | 48,995 | 46,762 |
| Provision for losses on credit sales | 8,544 | 1,450 | 44,956 | 4,450 |
| Interest expense | 10,065 | 16,856 | 29,395 | 44,671 |
| Total costs and expenses | 310,297 | 305,185 | 856,209 | 914,678 |
| Loss before income taxes and cumulative effect of accounting change | (119,817) | (47,958) | (178,235) | (109,642) |
| Provision for income taxes | — | — | (78,729) | — |
| Loss before cumulative effect of accounting change | (119,817) | (47,958) | (99,506) | (109,642) |
| Cumulative effect of accounting change, net of income taxes | — | (2,276) | — | (16,866) |
| Net loss | $(119,817) | $ (50,234) | $ (99,506) | $(126,508) |
| **Earnings per share:** | | | | |
| Loss before cumulative effect of accounting change | | | | |
| Basic | $ (12.61) | $ (5.09) | $ (10.49) | $ (11.65) |
| Diluted | $ (12.61) | $ (5.09) | $ (10.49) | $ (11.65) |
| Net loss | | | | |
| Basic | $ (12.61) | $ (5.33) | $ (10.49) | $ (13.44) |
| Diluted | $ (12.61) | $ (5.33) | $ (10.49) | $ (13.44) |

| Weighted average number of common shares outstanding | | | | |
|---|---|---|---|---|
| Basic | 9,498 | 9,422 | 9,485 | 9,415 |
| Diluted | 9,498 | 9,422 | 9,485 | 9,415 |

OAKWOOD HOMES CORPORATION
Consolidated Balance Sheet (Unaudited)
(Amounts in thousands)

|  | June 30, 2002 | September 30, 2001 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 45,248 | $ 44,246 |
| Loans and investments | 152,860 | 199,403 |
| Other receivables | 166,526 | 124,807 |
| Inventories | 199,753 | 228,572 |
| Properties and facilities | 184,939 | 208,798 |
| Other assets | 92,759 | 116,464 |
|  | $842,085 | $922,290 |
| **Liabilities** | | |
| Short-term borrowings | $ 30,000 | $ 47,500 |
| Notes and bonds payable | 309,214 | 323,120 |
| Accounts payable and accrued liabilities | 270,899 | 250,658 |
| Insurance reserves and unearned premiums | 15,027 | 17,322 |
| Deferred income taxes | 6,169 | 6,169 |
| Other long-term obligations | 74,132 | 38,750 |
| **Shareholders' equity** | | |
| Common stock | 4,769 | 4,764 |
| Additional paid-in capital | 199,857 | 199,761 |
| Retained earnings (accumulated deficit) | (71,010) | 28,497 |
|  | 133,616 | 233,022 |
| Accumulated other comprehensive income | 3,097 | 5,912 |
| Unearned compensation | (69) | (163) |
| Total shareholders' equity | 136,644 | 238,771 |
|  | $842,085 | $922,290 |

**OAKWOOD HOMES CORPORATION**
Consolidated Statement of Cash Flows (Unaudited)
(Amounts in thousands)

|  | Nine months ended June 30, | |
|---|---|---|
|  | 2002 | 2001 |
| **Operating activities** | | |
| Net loss | $ (99,506) | $(126,508) |
| Adjustments to reconcile net loss to cash provided by operating activities | | |
| Cumulative effect of accounting change | — | 16,866 |
| Depreciation and amortization | 24,321 | 46,277 |
| Deferred income taxes | — | — |
| Provision for losses on credit sales, net of charge offs | 500 | (1,496) |
| Gain on securities sold and loans sold or held for sale | (1,155) | (7,041) |
| Impairment and valuation provisions | 85,170 | 30,735 |
| Excess of cash receipts over REMIC residual income recognized (income recognized over cash received) | 1,787 | (41) |
| Reversal of restructuring charges | (2,071) | — |
| Noncash asset impairment charges | 14,255 | — |
| Other | (6,070) | (4,960) |
| Changes in assets and liabilities | | |
| Other receivables | (40,963) | 17,568 |
| Inventories | 28,819 | 94,682 |
| Deferred insurance policy acquisition costs | 913 | 952 |
| Other assets | 2,806 | (13,244) |
| Accounts payable and accrued liabilities | (7,282) | (35,707) |
| Insurance reserves and unearned premiums | (2,295) | (27,270) |
| Other long-term obligations | (1,931) | (2,500) |
| Cash used by operations | (2,702) | (11,687) |
| Loans originated | (579,512) | (633,870) |
| Sale of loans | 622,427 | 656,654 |
| Purchase of loans and securities | (9,405) | — |
| Principal receipts on loans | 9,249 | 12,564 |
| Cash provided by operating activities | 40,057 | 23,661 |
| | | |
| **Investing activities** | | |
| Acquisition of properties and facilities | (7,094) | (9,420) |
| Other | — | 801 |
| Cash used by investing activities | (7,094) | (8,619) |
| | | |
| **Financing activities** | | |
| Net repayments on short-term credit facilities | (17,500) | (12,500) |
| Payments on notes and bonds | (14,471) | (4,401) |
| Proceeds from exercise of stock options | 10 | — |
| Cash used by financing activities | (31,961) | (16,901) |
| | | |
| Net increase (decrease) in cash and cash equivalents | 1,002 | (1,859) |
| Cash and cash equivalents | | |
| Beginning of period | 44,246 | 22,523 |
| End of period | $  45,248 | $  20,664 |

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

*EXHIBIT G*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:                               ) | Chapter 11 |
|                                      ) | |
| NEW DIMENSION HOMES, INC.,           ) | Case No. 02-13390 (PJW) |
|                                      ) | |
|        Debtor.                       ) | |
|                                      ) | |
| Tax I.D. No. 38-3070192              ) | |
| ———————————————————————) | |
|                                      ) | |
| IN RE:                               ) | |
|                                      ) | Chapter 11 |
| DREAM STREET COMPANY, LLC,           ) | |
|                                      ) | Case No. 02-13391 (PJW) |
|        Debtor.                       ) | |
|                                      ) | |
| Tax I.D. No. 52-2281698              ) | |
| ———————————————————————) | |
|                                      ) | |
| IN RE:                               ) | |
|                                      ) | Chapter 11 |
| OAKWOOD SHARED SERVICES, LLC,        ) | |
|                                      ) | Case No. 02-13392 (PJW) |
|        Debtor.                       ) | |
|                                      ) | |
| Tax I.D. No. 56-2211751              ) | |
| ———————————————————————) | |
|                                      ) | |
| IN RE:                               ) | |
|                                      ) | Chapter 11 |
| HBOS MANUFACTURING, LP,              ) | |
|                                      ) | Case No. 02-13393 (PJW) |
|        Debtor.                       ) | |
|                                      ) | |
| Tax I.D. No. 56-2211938              ) | |
| ———————————————————————) | |

IN RE:                                    )
                                          )    Chapter 11
OAKWOOD MHD4, LLC,                        )
                                          )    Case No. 02-13394 (PJW)
                Debtor.                   )
                                          )
Tax I.D. No. 56-2271726                   )
————————————————————————)
                                          )
IN RE:                                    )
                                          )    Chapter 11
OAKWOOD ACCEPTANCE                        )
CORPORATION, LLC,                         )
                                          )    Case No. 02-13395 (PJW)
                Debtor.                   )
                                          )
Tax I.D. No. 56-2211924                   )
————————————————————————)
                                          )
IN RE:                                    )
                                          )    Chapter 11
OAKWOOD HOMES CORPORATION,                )
                                          )    Case No. 02-13396 (PJW)
                                          )
                Debtor.                   )
                                          )
Tax I.D. No. 56-0985879                   )
————————————————————————)
                                          )
IN RE:                                    )
                                          )    Chapter 11
OAKWOOD MOBILE HOMES, INC.,               )
                                          )    Case No. 02-13397 (PJW)
                Debtor.                   )
                                          )
Tax I.D. No. 56-0574589                   )
————————————————————————)
IN RE:                                    )
                                          )    Chapter 11
SURBURBAN HOME SALES, INC.,               )
                                          )    Case No. 02-13398 (PJW)
                Debtor.                   )
                                          )
Tax I.D. No. 38-2134305                   )
————————————————————————)

2

IN RE:                                    )
                                          )        Chapter 11
FSI FINANCIAL SERVICES, INC.,             )
                                          )        Case No. 02-13399 (PJW)
            Debtor.                       )
                                          )
Tax I.D. No. 38-2632769                   )
_____ )
                                          )
IN RE:                                    )
                                          )        Chapter 11
HOME SERVICE CONTRACT, INC.,              )
                                          )        Case No. 02-13400 (PJW)
            Debtor.                       )
                                          )
Tax I.D. No. 38-2627907                   )
_____ )
                                          )
IN RE:                                    )
                                          )        Chapter 11
TRI-STATE INSURANCE AGENCY, INC.,)
                                          )        Case No. 02-13401 (PJW)
            Debtor.                       )
                                          )
Tax I.D. No. 38-2170935                   )
_____ )
                                          )
IN RE:                                    )
                                          )        Chapter 11
GOLDEN WEST LEASING, LLC,                 )
                                          )        Case No. 02-13402 (PJW)
            Debtor.                       )
                                          )
Tax I.D. No. 56-2211749                   )
_____ )
                                          )
IN RE:                                    )
                                          )        Chapter 11
CREST CAPITAL, LLC,                       )
                                          )        Case No. 02-13403 (PJW)
            Debtor.                       )
                                          )
Tax I.D. No. 88-0475518                   )
_____ )

3

IN RE:                                    )
                                          )
PREFERRED HOUSING SERVICES, LP,  )
                                          )
           Debtor.                       )
                                          )
Tax I.D. No. 56-2207613                  )
                                          )

Chapter 11

Case No. 02-13404 (PJW)

## DECLARATION OF DOUGLAS R. MUIR
## IN SUPPORT OF FIRST DAY RELIEF

I, Douglas R. Muir, hereby declare under penalty of perjury:

1.     I am Executive Vice President, Secretary and Treasurer of Oakwood Homes Corporation ("Oakwood"), one of the above-captioned debtors, and hold a variety of offices in certain other Debtors (collectively, the "Debtors"). In connection with my duties for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.     On November 15, 2002 (the "Petition Date"), each of the Debtors commenced a reorganization case by filing a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3.     To enable the Debtors to minimize any adverse effects of the commencement of their Chapter 11 cases on their businesses, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Relief"). The First Day Relief seeks, among other things, to: (a) preserve customer relationships; (b) maintain employee morale and confidence; (c) maintain critical vendor/supplier relationships and confidence; (d) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; and (e)

4

establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtors' customers, employees, vendors, service providers and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the Debtors' reorganization efforts.

4.    I submit this Declaration in support of the First Day Relief. Any capitalized terms not expressly defined herein have the meanings given to them in the applicable motion or application. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition or information provided to me by company employees. If I were called upon to testify, I could and would testify to each of the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors. Part I of this Declaration describes the Debtors' businesses, capital structure and the circumstances giving rise to the commencement of these Chapter 11 cases. Part II of this Declaration sets forth relevant facts in support of the First Day Relief.

## BACKGROUND

### General

5.    Oakwood, which was founded in 1946, together with its debtor and non-debtor affiliates and related parties (collectively, the "Oakwood Companies") designs, manufactures and markets manufactured and modular homes and finances the majority of its retail sales and a portion of the retail sales of its homes by its independent dealer network. The Debtors also provide a variety of insurance products to their customers.

5

Prior to closures announced concurrently with this petition, the Debtor's manufactured homes were being sold at retail through 199 owned and operated sales centers located primarily in the southeastern and southwestern United States and sold at wholesale to over 700 independent retailers located throughout the United States. The Company also sells insurance for customers choosing to purchase insurance and historically assumed a portion of the related underwriting risk through its non-debtor captive reinsurance business.

Manufactured Homes

6.    The Debtors manufacture a number of models of single-section homes, multi-section and modular homes consisting of two or more component parts that are joined at the home site. Each home contains a living room, dining area, kitchen, one, two, three or four bedrooms and one or two bathrooms, and is equipped with a hot water heater and central heating. Some homes are furnished with a sofa and matching chairs, dinette set, coffee and end tables, carpeting, lamps, draperies, curtains and screens.    Optional furnishings and equipment include a range and oven, refrigerator, beds, a fireplace, washing machine, dryer, microwave oven, dishwasher, air conditioning, intercom, stereo systems, wet bar, vaulted ceilings, skylights, hardwood cabinetry and energy conservation items. The homes manufactured by the Company are primarily sold under the registered trademarks "Oakwood®," "Freedom®," "Golden West®," "Schult®," "Crest®," and "Marlette®".

7.    The Debtors' manufactured homes are constructed and furnished at the Debtors' manufacturing facilities and transported on wheels to the homesite. The Debtors' manufactured homes are normally occupied as permanent residences but can be transported on wheels to new homesites.

6

8.    In addition to traditional manufactured homes, the Debtors also manufacture modular homes that are built in accordance with state or local building codes and therefore are similar in specifications and design to site-built homes. The Debtors' modular homes range in size from 960 square feet to 3,355 square feet and include a variety of single story ranch homes, one and a half story homes, two story homes, townhouses and duplex units, all of which can include attached garages built at the site by others.

9.    The Debtors historically manufactured homes at twenty-seven plants located in North Carolina, Texas, Georgia, Indiana, Oregon, Pennsylvania, California, Minnesota, and Tennessee. Thirteen of these are idle plants.

10.    The Debtors purchase components and materials used in the manufacture of its homes on the open market and is not dependent upon any particular new material supplier although due to the scarcity of certain raw materials, the Debtors may face supplier allocation issues. The principal raw materials purchased by the Debtors for use in the construction of its homes are lumber, steel, aluminum, galvanized pipe, insulating materials, drywall and plastics. Steel I-beams, axles, wheels and tires, roof and ceiling materials, home appliances, plumbing fixtures, furniture, floor coverings, windows, doors and decorator items are purchased or fabricated by the Debtors and are assembled and installed at various stages on the assembly line. Construction of the manufactured homes and the plumbing, heating and electrical systems installed in them must comply with the standards set by the Department of Housing and Urban Development ("HUD") under the National Manufactured Home Construction and Safety Standards Act of 1974 or, with respect to modular homes, local building codes.

11.    The Debtors furnish to each purchaser of a new home manufactured by the Debtors a five year limited warranty against defects in materials and workmanship, except for equipment and furnishings supplied by others which are frequently covered by the supplier's warranties.

Sales

12.    The Debtors operate their sales centers primarily under the names Oakwood® Mobile Homes and Freedom Homes®. At September 30, 2002, the Company also operated 36 Factory Certified Homes sales centers that sell primarily repossessed homes. The majority of the Factory Certified Homes locations will be closed as part of the reorganization. During the fiscal year ended September 30, 2002, substantially all the Debtors' retail sales of new homes were homes manufactured by the Debtors.

13.    Each of the Debtors' sales centers hires and trains sales personnel. Generally, each salesperson is paid a commission based on the gross margin of his or her sales and certain volume targets, and each general manager is paid performance based compensation keyed to the profits of the sales center.

14.    Since 1999 the Debtors have been scaling back operations, closing both sales centers and manufacturing facilities. Most recently, the Debtors closed forty sales centers beginning in early October and announced contemporaneously herewith approximately seventy-five additional sales center closures and five plant closings.

15.    The Debtors also sell their homes to approximately 700 independent retailers located throughout the United States. Sales to independent retail dealers accounted for approximately 44% of sales in fiscal 2002, up from 35% in fiscal 2001. The Debtors'

8

sales have traditionally been higher in the period from late spring through early fall than in the winter months.

Securitization

16.    A significant factor affecting sales of manufactured homes is the availability and terms of financing.  Approximately 77% of the units sold through the Debtors' retail centers in  fiscal 2002 were financed by installment sale contracts or loans arranged by the Debtors, each of which provided for monthly payments generally over a period of 5 to 30 years.  The remaining 23% of retail unit sales were paid for with cash or financing obtained from other sources.

17.    The Debtors retain a security interest in all homes they finance with loans documented either as installment sales contacts or traditional mortgages (collectively, "RICs").

18.    Because traditional financing sources are insufficient to sustain the tremendous manufacturing and sales volume the Debtors historically have experienced, the Debtors with retail sales operations and various independent dealers (collectively, the "Retailers") provide financing options to their customers through OAC, which originates the mortgage loan RICs itself and purchases on a non-recourse basis the other RICs originated by the Retailers.  OAC funds its originations and purchases of RICs by participating in public and private asset securitization transactions as described herein.

19.    Historically, securitization transactions have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs.  In fact, OAC historically made a material profit on its securitization transactions.  Although that profit has been reduced or even eliminated, the securitization transactions engaged in

9

by OAC pre-petition still remain the least expensive method for financing for the Debtors' operations. Continuing to participate in the securitization transactions described herein and other similar transactions in the ordinary course of business is absolutely essential to the Debtors' ability to reorganize successfully under Chapter 11.

20.    As part of the securitization process, OAC retains the contractual right to service all securitized RICs in exchange for a monthly fee. As part of its servicing duties, the Pooling and Servicing Agreements (as defined below) require OAC to make P&I Advances to the Securitization Trusts. OAC also is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations.

21.    Continuing to service securitized RICs, including making advances when and if required, substantially decreases the costs of securitization transactions and increases the liquidity available to the Debtors through securitization. As a result, OAC's continued performance of its servicing and related advance obligations is critical to ensuring the Debtors' ability to continue engaging in securitization transactions on favorable terms. In addition to that benefit, once the priority of its servicing fee is restructured as described below, OAC's servicing rights will have substantial independent economic value.

Independent Dealer Retail Sales Financing

22.    The Debtors provide permanent financing for homes sold by certain independent dealers that sell the Debtors' manufactured homes. During fiscal 2002, the Debtors financed approximately 38% of the Company manufactured units sold by its independent dealers.

10

Delinquency and Repossession

23.    In the event an installment sale contract or loan becomes delinquent, the Debtors typically contact the customer in an effort to have the default cured. The Debtors generally repossess the home after payments have become a number of days delinquent if they are not able to work out a satisfactory arrangement with the customer. A growing number of defaults over the last three years has led to a reduction in servicing fees received (due to their subordination) and greater liquidity demand for amounts necessary to make advances under the applicable service agreements.

Independent Retailer Repurchase Obligations

24.    Substantially all of the independent retailers who purchase homes from the Debtors finance new home inventories through wholesale credit lines ("Floor Plans") provided by third parties. In these arrangements, typically a financial institution provides the retailer with a credit line for the purchase price of the home and maintains a security interest in the home as collateral. The retailer uses a Floor Plan to finance the acquisition of its display models, as well as to finance the initial purchase of a home from a manufacturer until the home buyers obtain permanent financing or otherwise pay the dealer for the installed home. The Floor Plan Lenders generally require the Debtors to enter into a repurchase agreement under which the Debtors are obligated, upon default by the retailer, to repurchase any of the homes financed by the Floor Plan Lender. Under the terms of such repurchase agreements, the Debtors typically agree to repurchase homes at prices scaled to the age of the units. As of the Petition Date, the Debtors estimate that their contingent liability under these repurchase agreements was approximately $101 million. The Debtors' losses under these arrangements to date have not been significant.

11

Insurance

25.    In order to, among other things, facilitate retail purchases of its homes, the Debtors historically have sold, as an agent for an unrelated domestic insurance company, property and casualty insurance to certain customers in connection with their purchase of a home.    In addition, the Debtors entered the reinsurance business directly through their own captive, Bermuda-based reinsurer during 1997, when it, as a reinsurer, accepted certain risk of policies it had written as agent, in exchange for standard reinsurance premiums.    This venture allowed the Debtors to participate more fully in the profitable income streams associated with the property and casualty insurance and service contract business.    Shortly before the Petition Date, the Debtors exited the third party reinsurance business in order to relocate capital to the Debtors' core businesses, and are arranging an orderly wind down of their insurance subsidiary.

Competition

26.    The Debtors face stiff competition in three major aspects of their operations:  manufacturing, marketing and finance.    There are numerous firms producing manufactured homes in the Debtors' market areas, many of which are direct competitors. Several of these manufacturers, which sell the majority of their homes through independent dealers, are larger than the Debtors and have greater financial resources.    Similarly, several of the financing sources in the industry are larger than the Debtors and have greater financial resources.    Finally, there are numerous retail dealers in most locations where the Debtors conduct retail and financing operations.    The Debtors compete with other manufacturers, retailers and finance companies on the basis of reputation, quality, financing ability, service, features offered and price.

27.    In addition, manufactured homes are a form of permanent, low-cost housing and therefore compete with other forms of housing, including site-built and prefabricated homes and apartments. Historically, manufactured homes have been financed as personal property with shorter term and higher interest financing than has been available for site-built homes. In recent years, however, there has been a growing trend toward financing manufactured housing with maturities equal to those in traditional residential real estate finance, especially when the manufactured housing is attached to permanent foundations on individually-owned lots, as is frequently the case in the Debtors' growing multi-section or modular homes market. As a result, maturities for certain manufactured housing loans have moved closer to those for site-built housing.

Employees

28.    The Debtors employ approximately 7,400 persons, of which approximately 2,200 were engaged in sales and service, 4,400 in manufacturing, 600 in consumer finance, and 200 in executive, administrative and clerical positions.

Financial Information

29.    For the fiscal year ended September 30, 2002, the Oakwood Companies, on a consolidated basis, generated net sales of approximately $927 million. As of September 30,  2002, the Oakwood Companies, on a consolidated basis, had approximately $$820 million in assets, and approximately $731 million in liabilities.

Current Capital Structure

30.    The Oakwood Companies are comprised of a number of direct and indirect subsidiaries, certain of which are party to several financing arrangements. An organizational chart of the Oakwood Companies is attached hereto.

13

## Summary of Certain Lending Facilities

A.    Loan and Security Agreement

31.    Prior to the Petition Date, the Oakwood Companies partially funded their operations through a $65 million credit facility (the "Prepetition Bank Facility") established under that certain Loan and Security Agreement, dated as of January 22, 2002, by and among the Debtors, as borrowers, Foothill Capital Corporation, as a lender and agent for the lenders ("Foothill"), and certain other lenders specified therein (as amended by that certain First Amendment to Loan Agreement dated July 2002 and that certain Second Amendment to Loan Agreement dated July 31, 2002, the "Credit Agreement"). As of November 15, 2002, borrowings and letters of credit under this facility totaled approximately $52 million. The Prepetition Bank Facility is secured by substantially all of the assets of the Company.

B.    Senior Notes

32.    The Company issued 7.875% Senior Notes in the aggregate principal amount of $125 million due March 2004, and 8.125% Senior Notes in the aggregate principal amount of $175 million due March 2009 (collectively the "Notes") pursuant to an Indenture and First Supplemental Indenture, both dated March 2, 1999, between the Company and Bank One, N.A., f/k/a The First National Bank of Chicago.  U.S. Bank National Association was substituted as Indenture Trustee on January 10, 2000.

C.    Reset Debentures

33.    The Company issued 8% Reset Debentures (the "Debentures") in the original principal amount of $17 million due June 1, 2007 pursuant to an Indenture and a

14

First Supplemental Indenture both dated March 1, 1992, and Debentures in the original principal amount of $23 million due June 1, 2007 pursuant to a Second Supplemental Indenture dated July 15, 1992, between the Company and First Union National Bank, fka Delaware Trust Company.  U.S. Bank Trust National Association was substituted as Indenture Trustee on April 2, 2001.  Of the original Debentures, $2.6 million remains outstanding as of November 15, 2002.

        D.      Guarantees

        34.      Prior to the Petition Date Oakwood Homes Corporation provided limited guarantees of the collateral pools backing payments under the B-2 certificates in twenty REMIC Securitization Trusts.  The undiscounted guaranteed balances as of November 2002 equaled approximately $274.8 million plus any accrued and unpaid interest. Chase Manhattan Bank is the Trustee for each of the Securitization Trust for which an Oakwood Homes Corporation guarantee has been issued.

        E.      IRB Bonds for plants in Kosciusko County, and Elkhart County, IN

        35.      The Debtors are obligated under a Loan Agreement dated February 1, 1998, between Kosciusko County, Indiana and Schult Operating Company (now HBOS Manufacturing, LP) for $6,200,000 Variable Rate Demand Economic Development Revenue Bonds Series 1998 (the "1998 Bonds"). The 1998 Bonds are secured by a Letter of Credit in the amount of $4,766,356.16 issued by Wells Fargo Bank, NA and a Letter of Credit Mortgage secured by the Debtor's plant in Kosciusko County, IN.  Fifth Third Bank, Indiana is the Trustee under the Trust Indenture pursuant to which the Loan Agreement was issued.

36.    The Debtors are also obligated under a Loan Agreement dated October 1, 1997, between Elkhart County, IN and Schult Operating Company (now HBOS Manufacturing, LP) for $1,500,000 Variable Rate Demand Economic Development Revenue Bonds, Series 1997 (the "1997 Bonds"). The 1997 Bonds are secured by a Letter of Credit in the amount of $896,282.19 issued by Wells Fargo Bank, N.A. and a Letter of Credit Mortgage secured by one of the Debtor's plants in Elkhart County, IN. Fifth Third Bank, Indiana is the Trustee under the Trust Indenture pursuant to which the Loan Agreement was issued.

## EVENTS LEADING TO CHAPTER 11 FILING

37.    Recently, the Debtors have faced increasing financial stress brought on by a sustained downturn in the manufactured housing industry, a weakened economy and an increasing number of delinquent loans and repossessions. Over the last several years, the Debtors expanded into a contracting market and leveraged themselves aggressively to support the rapid growth, leaving more debt load than current performance can support. Despite proactive measures to counter these negative pressures, the Company has continued to experience financial stress. There are three primary problems that must be overcome: poor customer credit performance, poor operating performance in certain parts of the country and high debt service.

38.    Aggressive underwriting standards in the late 1990s coupled with the current economic slowdown have led to an unsustainable level of loan defaults. The Debtors have generally been in a first loss position on these default losses as it guaranteed the performance of the collateral pools securing the payment rights of the B-2 (i.e., most junior) certificate holders in twenty REMIC trusts. Making matters worse, the Debtors also

16

subordinated the servicing fees for those pools to the rights of these security holders. As a result of high credit losses, the Debtors are currently receiving substantially less in servicing income than anticipated when the securitizations were closed. As the Debtors are currently incurring in excess of $30 million per year in servicing costs, this subordination of the servicing fees is a serious financial drain on current operations.

39.    As part of its rapid expansion in the 1990s, the Debtors entered markets that ultimately exhibited poor consumer credit performance. As credit standards have been tightened, these markets have experienced a disproportionate reduction in sales volume. As a result, these markets have grown increasingly unprofitable.

General Economic and Retail Downturn

40.    In addition to these debt structure issues, the Debtors have experienced slowing retail sales, gross profit margin contraction due to increased competition and lower operating rates at manufacturing plants, and increasing loan servicing costs.

Increasing Competitive Pressures in Industry

41.    The industry expanded aggressively into a severe economic downturn, a downturn especially severe for its traditional customer of modest means. At the same time, mortgage rates for site built homes are at a thirty-year low which has offset many of the cost advantages of manufactured homes as cost savings were offset by the traditionally higher interest rates for manufactured home buyers. Finally, aggressive lending for several years has led to a high level of repossessed homes, estimated by some to be 90,000 in the current year. These homes must be remarketed, which depresses new home sales volume.

42.    Many of the traditional industry lenders, including both Floor Plan Lenders and retail lenders who provide financing to homebuyers, have left the industry over

17

the last few years or have significantly curtailed operations. This reduction in available financing has led to a contraction of the dealer network and a sharp reduction in chattel home sales.

43.    The Company incurred substantial debt during the mid to late 1990s to support its rapid retail expansion and fund acquisitions of manufacturing operations which management at the time believed would position the Company to take advantage of the industry's then rapid growth. Instead of the continuing growth that was anticipated, the industry in early 1999 entered a severe economic downturn that continues today. This economic downturn, coupled with aggressive lending standards, has caused a substantial increase in loan defaults, for which the Company has been in a first loss position. As a result of the impact of the recession on operations coupled with increased credit losses, the Company has incurred substantial operating losses over each of the last four years which have rendered it unable to meet its current obligations when due and will make it impossible for the Company to repay the $125 million of Senior Notes due in March 2004.

Initiatives to Counter Financial Stress

44.    For over three years, the Oakwood Companies have undertaken specific, proactive efforts designed to counter the deteriorating financial performance. The Debtors developed a strategy to reduce overhead and create and improve their cash flow. The principal element of these efforts was a contraction of operations from a peak of over 425 sales centers and 34 plants to the current planned 119 sales centers and 14 plants. Additionally, the Company aggressively cut costs, tightened underwriting standards, deferred capital spending wherever practicable and embarked on a significant inventory reduction program.

18

45.    Outside of bankruptcy, the Debtors have been unable to accomplish all the restructuring needed due to its current high debt load, poor operating performance in certain geographic markets, high credit losses coupled with subordination of the loan servicing revenue. The Debtors have been negotiating for an extended period of time with their principal lenders and largest bondholder to develop a consensual, pre-negotiated bankruptcy process designed to allow the Debtors to emerge as a leaner, profitable enterprise.

46.    Holders of approximately 39% of the combined value of (a) Oakwood Home Corporation's $303 million face value of senior unsecured debt and (b) the net present value, as described above, of future payment obligations under the Company's guarantees of principal and interest on $275 million face value of subordinated B-2 REMIC securities (the "REMIC Guarantees"), have agreed to a non-binding termsheet detailing their treatment in a Chapter 11 Plan, subject to (a) evidence satisfactory to the Holders that the financial information previously provided to them is correct (b) acceptable financing during the pendency of the bankruptcy proceeding.

### FIRST DAY PLEADINGS

47.    Concurrently with the filing of their Chapter 11 cases, the Debtors are filing a number of motions and applications seeking First Day Relief. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 cases (the "First Day Hearing"), at which the Court will hear certain of those matters. The Debtors also anticipate that the Court will consider other such matters after an appropriate notice period. Generally, the First Day Relief has been designed to facilitate: (a) continuing the Debtors' operations in Chapter 11 with as little disruption and

19

loss of productivity as possible; (b) maintaining the confidence and support of customers, employees, critical venders and service providers and certain other key constituencies; (c) obtaining necessary postpetition financing; and (d) establishing procedures for the smooth and efficient administration of these cases. I have reviewed the First Day Relief, including the exhibits thereto and supporting memoranda, and I believe that the relief sought therein is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

### Joint Administration

48.    The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their Chapter 11 cases. Such an order is a necessary administrative convenience for the Court, the Office of the Clerk of the Court (the "Clerk's Office") and all parties in interest.

### Consolidated Largest Creditors List

49.    The Debtors also will seek the entry of an order authorizing them to file (a) consolidated lists of creditor and equity holders (collectively, the "Lists") and (b) a consolidated list of the Debtors' 40 largest unsecured creditors (the "Top 40 List"). The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors and equity security holders that are entitled to receive notices and other documents in these cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with notices and other similar documents filed in these Chapter

20

11 cases, as contemplated by Rule 1007-1(a) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The consolidated list of creditors is used by the United States Trustee (the "U.S. Trustee") in appointing an official committee of unsecured creditors (the "Committee") in the Debtors' Chapter 11 cases. The Top 40 List will provide the U.S. Trustee with the information necessary to appoint a Committee.

Claims Agent

50.    The Debtors will seek authority to retain and employ Bankruptcy Services LLC ("BSI") as Claims, Noticing and Balloting Agent to, among other things: (i) serve as the Court's noticing agent to mail notices to the estates' creditors and parties in interest, (ii) provide computerized claims, objection and balloting database services, and (iii) provide expertise and consultation and assistance in claim and ballot processing and other administrative information, and (iv) provide disbursement services with respect to the Debtors' bankruptcy cases. The number of creditors and other parties in interest in the Debtors' Chapter 11 cases may impose administrative and other burdens upon the Court and the Clerk's Office. It is for the purpose of relieving the Court and the Clerk's Office of these burdens that the Debtors seek to engage BSI. BSI is a data processing firm that specializes in claims processing, noticing, balloting disbursement and other administrative tasks in Chapter 11 cases, and has extensive experience with large Chapter 11 cases such as this one.

21

Employee Wages and Benefits

51.    The Debtors' workforce includes approximately 6,400 full- and part-time employees and a number of independent contractors (collectively, the "Employees"). The continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations and their ability to reorganize.  Any delay in the provision of prepetition compensation, employee benefits, reimbursement of employee business expenses or payments for which employee payroll deductions were made (collectively, the "Prepetition Employment Payments") will substantially impair the Debtors' relationship with the Employees and destroy Employee morale at the very time when the dedication, confidence and cooperation of these Employees is most critical.  At this critical early stage, the Debtors simply cannot risk the substantial disruption of business operations that would inevitably result from any decline in workforce morale attributable to the Debtors' failure to make Prepetition Employment Payments in the ordinary course of their businesses.

52.    Accordingly, the Debtors will seek the entry of an order authorizing, among other things, the Debtors, in the Debtors' sole discretion, to pay (a) Prepetition Employment Claims to or for the benefit of their Employees and (b) all costs and expenses incident to the Prepetition Employment Claims.  The Debtors estimate that the aggregate payment authority requested by this motion is approximately $13 million.

Ordinary Course Professionals

53.    The Debtors' employees, in the day-to-day performance of their duties, regularly call upon certain professionals, including attorneys; accountants; actuaries;

22

financial, environmental and other consultants; and other professionals (collectively, the "Ordinary Course Professionals"), to assist them in carrying out their assigned responsibilities. Because of the magnitude and breadth of the Debtors' businesses and the geographic diversity of the professionals regularly retained by the Debtors, it would be costly, time-consuming and administratively cumbersome for the Debtors and this Court to require each Ordinary Course Professional to apply separately for approval of its employment and compensation. Accordingly, the Debtors will seek the entry of an order authorizing them to retain, employ and pay the Ordinary Course Professionals without further order of the Court. Nonetheless, if the monthly fees of any Ordinary Course Professional exceeds $25,000 during any month, the Debtors will seek to retain the Ordinary Course Professional under section 327 of the Bankruptcy Code.

Utilities Motion

54.    Utility services are essential to the ability of the Debtors to sustain their operations while their Chapter 11 cases are pending. In the normal conduct of their businesses, the Debtors use gas, water, electric, telephone, and other services provided by the Utility Companies at their various plants and retail locations, as well as at the Debtors' corporate headquarters and regional office facilities. The Debtors' facilities are dependent on electricity for lighting, heating and cooling, security and general office use, including their telecommunications infrastructure. In addition, maintenance of telephone service is imperative because the Debtors' businesses use telephones to communicate with customers, vendors and headquarters. Continued water service is necessary to maintain sanitary lavatory facilities for employees. Finally, maintenance of gas service is essential to provide

23

heating to certain of the Debtors' facilities. Any interruption of these services would severely disrupt the Debtors' day-to-day operations and result in the spoilage and loss of a significant portion of the Debtors' inventory.

55.    If the utilities are permitted to terminate service, the Debtors will be forced to cease operation of their facilities and offices, resulting in substantial disruption and loss of revenue and profits. To avert the loss of business, the Debtors would be required to pay whatever amounts are demanded by the utilities to avoid the cessation of necessary services and, ultimately, the demise of their businesses.

### Cash Management System/Business Forms/Bank Accounts

56.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date. The Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens, causing unnecessary expense and utilization of resources. Additionally, the Debtors, in the ordinary course of their business, use many checks, invoices, stationery and other business forms. In order to continue their operations in an orderly fashion, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Although it is possible to change these forms, the Debtors submit that this would create confusion and delay among their employees and third-parties. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms.

57.    The Debtors are affiliated entities and, prior to the commencement of these Chapter 11 cases, utilized a centralized cash management system, as described in

24

detail below, in the ordinary course of their businesses. The Debtors' centralized cash management system is coordinated through the Debtors' corporate offices in Greensboro, North Carolina. The Debtors manage their cash through approximately 170 bank accounts set forth on Exhibit A attached to the Cash Management Motion and incorporated herein by reference (the "Accounts") and generally illustrated on the diagram attached thereto as Exhibit B. The primary operating accounts utilized in the system are maintained at First Union National Bank ("First Union").

58.     The Debtors seek a waiver of the requirement that new bank accounts replacing all of their existing Accounts be opened as of the Petition Date. The Debtors believe that this requirement would unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of the Debtors' estates and reorganize successfully. The Debtors believe that only if the Accounts are continued in their current form can the transition through Chapter 11 be smooth and orderly.   The Debtors' personnel can distinguish between prepetition and post-petition obligations and disbursements without closing existing Accounts and opening new ones. Accordingly, the Debtors respectfully request that the Accounts be maintained in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate order of this Court.

59.     The Debtors' cash management system allows the Debtors to effectively and efficiently run their businesses. The Debtors believe that to maximize the value of their businesses there must be minimal disruption to their administrative affairs,

25

and that the maintenance of their current cash management system, as provided herein, is essential to limiting disruptions to the Debtors' operations.

60.    Additionally, prior to the Petition Date, the Debtors have provided a number of services to and engaged in intercompany financial transactions with each other in the ordinary course of their respective businesses. Such transactions are appropriately reflected in the books and records of each of the Debtors.

61.    The Debtors believe that the continuation of the provision of intercompany services is beneficial to their estates and creditors and, thus, that corresponding transfers among the appropriate intercompany books and records (collectively, the "Intercompany Transactions") should be permitted. Accordingly, the Debtors seek authority to continue the Intercompany Transactions postpetition. The Debtors' operating and cash management depends on the Debtors' ability to continue to engage in such Intercompany Transactions. The Debtors therefore submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors.

Investment Guidelines

62.    As described in more detail above, the Debtors have a comprehensive cash management system (the "Cash Management System") consisting of more than 170 bank accounts across the United States through which the Debtors manage their cash receipts and disbursements (the "Bank Accounts"). The Debtors believe that the Bank Accounts are held by large, well-established, stable banking or financing institutions. As set forth in the Cash Management Motion, most of the Bank Accounts are protected by

applicable government-sponsored insurance, such as FDIC or FSLIC insurance, and are maintained in the ordinary course of business as minimum or zero balance accounts that do not carry significant overnight balances, except for funds in the Debtors' concentration account at First Union (the "Concentration Account").

1.    The Debtors believe that the Bank Accounts are held by large, well-established, stable banking or financing institutions. As set forth in the Cash Management Motion, all of the Bank Accounts are protected by applicable government-sponsored insurance, such as FDIC or FSLIC insurance. The Debtors' depository and trust accounts are swept on a weekly basis into the Debtors' concentration account (the "Concentration Account") at First Union National Bank ("First Union"). Wachovia Corporation, parent to First Union currently maintains a A+/Stable rating from Standard & Poor's, a widely recognized rating agency. The funds resident in the Concentration Account are automatically invested overnight in extremely liquid commercial paper by First Union and redeposited in the Concentration Account the following morning. The Concentration Account is the only interest bearing account that is invested in overnight investments. The Debtors primary disbursement accounts are zero-balance accounts funded from the Concentration Account on demand, and thus carry no overnight balances. The Debtors' minor disbursement checking accounts maintain relatively low balances; while these accounts are not paid interest on the resident funds, such interest would be minimal. These minor disbursement accounts allow plant managers to have instant access to funds to pay certain miscellaneous expenses that arise and are necessary for the continuation of operations.

27

Sales and Use Taxes

63.    "Sales and Use Taxes") to federal and various state and local taxing authorities (each, a "Taxing Authority," and collectively, the "Taxing Authorities"). Prior to the Petition Date, the Debtors paid these obligations in a timely fashion in accordance with and subject to applicable grace periods, if any. Sales and Use Taxes accrue and generally are calculated based upon a statutorily mandated percentage of the price at which homes are sold at retail by the Debtors. For the most part, Sales and Use Taxes are paid in arrears. The Debtors prepare and file the Sales and Use Tax returns for obligations incurred in connection with the retail sale of mobile homes in over thirty states. The Debtors estimate that monthly Sales and Use Taxes total approximately $850,000. The Debtors seek authority, but not direction, to pay in the ordinary course of business all Sales and Use Taxes accrued as of the Petition Date.

Rejection of Certain Executory Contracts, Nonresidential Real Property Leases and Personal Property Leases

64.    The Debtors seek the authority, as of the Petition Date, to reject certain executory contracts, nonresidential real property leases and personal property leases that they have determined, in the exercise of their business judgment, to have carrying costs that outweigh any benefit that might accrue to the Debtors through their maintenance. These executory contracts and leases primarily concern under performing assets and locations that have constituted a net drain on the assets of the Debtors for a period of time. While most of

28

the leases to be rejected are primary leases between the Debtors and third party lessors, certain of the leases are (i) subleases or (ii) leases that have already been assigned to another party but as to which the Debtors may risk some degree of financial exposure. In the business judgment of the Debtors, continued performance under these executory contracts and leases is not in the best interests of the Debtors' estates or creditors. Accordingly, the Debtors wish to reject them immediately.

Establishing Procedures for the Rejection or Assumption of Executory

Contracts and Unexpired Leases

65.     The Debtors are parties to numerous executory contracts and unexpired leases that they are not prepared to assume or reject as of the Petition Date. To enable the Debtors to be able to quickly reject those deemed to be, in the business judgment of the Debtors, non-productive and further reduce the burden on their estates from their continued carrying expenses, the Debtors propose to establish procedures by which the Debtors may notify the other parties to the contracts or leases of their assumption or rejection, and allow those parties to either be cured as to past arrearages or regain possession of their property and be allowed to mitigate their potential damages in a commercially reasonable manner. These procedures seek to maximize the value of the leases and contracts for the benefit of the Debtors' estates and their creditors, minimize the Debtors administrative expense burden associated with the post-petition, pre- rejection period, mitigate potential damages from rejection and, particularly with respect to assumptions, capitalize quickly on market opportunities.

29

Cash Collateral/Debtor in Possession Financing?

66.    The Debtors have insufficient cash to meet ongoing obligations necessary to allow them to operate their businesses while they implement their financial and operational restructuring. Specifically, without the use of Cash Collateral, the Foothill DIP Facility, and additional financing, the Debtors cannot purchase the components and finance the services that they need to maintain their business operations, nor can the Debtors pay the wages, salaries, rent, utilities and other expenses associated with operating their manufacturing, retail and financing businesses.

67.    Through the Foothill DIP Facility, the Debtors have obtained the commitment of the Foothill DIP Lenders to provide an $80,000,000 facility with $15,000,000 available under an interim order, which represents availability over and above the Prepetition Facility. In addition to the Foothill DIP Lenders, the Debtors are working with two additional parties to obtain the balance of funds they require to operate. The Debtors anticipate that one of those other parties, Greenwich Capital Corporation ("Greenwich"), will provide a $60,000,000 facility with $15,000,000 available under an interim order to the Debtors (the "Greenwich DIP Facility"), for which relief will be requested in a companion financing motion (the "Greenwich DIP Motion") to this Motion.

68.    Over approximately the next thirteen (13) weeks, the Debtors anticipate requiring approximately $57 million to continue operations in accordance with their operating budget (the "Budget"). To fund the operating expenditures, the Debtors will require, in addition to normal receipts, access to the Foothill DIP Facility and the use of Cash Collateral. The Debtors were unable to locate a lender that would fund the Debtors'

30

postpetition operations on terms as good as or better than the terms offered by the Lenders. In essence, the Foothill DIP Facility is the only realistic vehicle today for accomplishing the Debtors' goal of a successful reorganization and maximization of creditor recoveries.

69.    The Debtors believe the Foothill DIP Facility and the use of Cash Collateral is integral to the Debtors' ability to allow them to operate and reorganize. The Debtors' access to the Foothill DIP Facility and use of Cash Collateral is critical to the success of these cases and to preserve the going concern value of the Debtors' businesses. Absent such financing, the Debtors would have little or no working capital, even on an interim basis, with which to meet their ongoing obligations to employees, customers and others.

70.    In sum, without immediate access to postpetition financing, the Debtors will continue to suffer the acute liquidity crisis that existed prepetition and that threatens the Debtors' ability to maintain operations in the short term. Moreover, even if the Debtors' businesses survive this difficult period, it faces a substantial and devastating loss of revenue and other irreparable harm from the cancellation of sales orders, delayed production schedules, loss of employees and employee morale and deteriorating relationships with its suppliers and independent retailers if cash and credit support are not immediately available to jumpstart the Debtors' operations -- all of which will adversely impact the value of the Debtors as going concerns. The ability of the Debtors to remain viable entities and reorganize under Chapter 11 of the Bankruptcy Code therefore depends upon obtaining the interim and final relief requested in this Motion.

31

Workers Compensation

71.    The Debtors, in the ordinary course of their business, must provide workers compensation benefits for its employees pursuant to various state laws and regulations.    Prior to the Petition Date, the Debtors paid these obligations in a timely fashion in accordance with and subject to applicable grace periods, if any, and provided bonds to some states.    The Debtors request the authority, in their sole discretion, to continue payment of their obligations for workers compensation in states in which they will continue to incur such obligations.

72.    It is critical that the Debtors be permitted to continue the Insured Programs and ensure that any outstanding Prepetition Insurance Costs and Prepetition Insured Claims are paid.  If the Insured Programs are not maintained, the Debtors could be required to make alternative arrangements for workers' compensation coverage — at a much higher cost — because such coverage is required under all applicable state workers' compensation laws, with severe penalties if an employer fails to comply with such laws.  In fact, if workers' compensation coverage is not maintained as required by such laws, without interruption, (a) employees could bring lawsuits for potentially unlimited damages, (b) the Debtors' ongoing business operations in certain states could be enjoined and (c) the Debtors' officers could be subject to criminal prosecution.[1]

---

[1]    See, e.g., N.C. Gen. Stat. §§ 97-94, 97-95 (1999) (providing for civil and criminal penalties and expanded liability against non-complying employers); Va. Code Ann. §§ 65.2-805, 65.2-806 (1995) (permitting employee lawsuits against non-complying employers for on-the-job injuries and providing for a deemed waiver of certain common law defenses and civil and criminal penalties).

73.    Moreover, the Debtors anticipate that their failure to pay the Prepetition Self-Insured Claims (a) would result in North Carolina and Georgia drawing on the bonds securing their obligations, and (b) could endanger the Debtors' ability to continue to operate in those states.  Similarly, if the Debtors fail to pay the Prepetition Current Claims or the Prepetition Prior Claims, the Debtors anticipate that the Current Providers and Lumbermens, being the primary insurers for such claims, would draw down the collateral securing the Debtors obligations under the Current and Prior Programs and cancel the policies.

74.    Furthermore, the Debtors believe that any delay in the timely payment of the Prepetition Insured Claims would have a negative impact on the morale of the Debtors' current employees at a time when the support of such employees is most critical. In contrast, (a) the payment of the Prepetition Insured Claims will not harm the Debtors' estates because any amount not paid by the Debtors on account of the Prepetition Insured Claims would come out of collateral posted by the Debtors and (b) the payment of the Prepetition Insured Claims will permit the Debtors to continue their operations without interruption.

Transportation and Installation Vendors

75.    The Debtors, in the ordinary course of their business, incur obligations to various transportation and installation/set up vendors.  These vendors supply critical services to the Debtors, without which the Debtors would be unable to perform the obligations that buyers of their homes expect, such as moving a home to its site, preparing the site for home placement and installation and hookup of the home to the site and utilities.

33

In addition, certain vendors expedite and facilitate the shipment of parts and supplies necessary to allow the Debtors to meet their warranty obligations.  Without the continued services, these few and specialized vendors provide, the Debtors will not be able to meet their customers' expectations and such a failure will effectively eliminate their ability to sell homes.

### Establish Bar Date & Approve Form and Manner of Notice

76.    The Debtors are currently trying to determine, among other things, the extent, validity, priority, aggregate amount and identity of holders of claims that may be asserted against the Debtors' bankruptcy estates.  In order to facilitate such a determination, the Debtors request that the Court enter an order establishing the following deadlines and procedures regarding the filing of proofs of claims in these cases.  For general unsecured creditors, the bar date will be not less than 45 days from the date of service of a bar date notice package sent out by the Debtors or their agent, BSI.  For governmental entities, the bar date shall be 180 days from the Petition Date.

### Retail Customer Practices and Programs

77.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in many practices to facilitate retail sales and to develop and sustain positive reputations in the marketplace for their products and services.  Among these practices are warranties, field and sales problem resolution, parts and service support, customer deposit and other similar programs, practices and commitments directed at customers (collectively, the "Customer Practices").  The common goals of the Customer Practices have been to meet competitive pressures, ensure customer satisfaction, and

34

generate goodwill for the Debtors -- thereby retaining current customers, attracting new ones, and ultimately increasing sales.

78.     The great majority of the Customer Practices constitute services that are provided to customers under existing contracts. The Debtors believe that it is the most prudent and cost-efficient course of action to ensure that the Debtors continue to perform under such contracts, in order to maintain goodwill and reputation in the marketplace. Failure to honor the Customer Practices will destroy that goodwill and reputation, effectively eliminates the Debtors' ability to continue to sell homes.

### Wholesale Customer Practices and Programs

79.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in many practices to develop and sustain positive reputations and relationships in the manufactured home dealer community for their products and services. Among these practices are the financing of consumer loans to retail customers of the Debrors' independent dealers, incentive plans, rebates, and other similar programs, practices and commitments directed at customers (the "Wholesale Customers") who buy homes from the Debtors at wholesale for later retail sale to consumers (collectively, the "Wholesale Customer Practices"). As illustrations, several of the Wholesale Customer Practices are described with greater detail below. The common goals of the Wholesale Customer Practices have been to meet competitive pressures, ensure the continuance of distribution channels, and generate goodwill for the Debtors on the wholesale side of the business -- thereby retaining current Wholesale Customers, attracting new ones, and ultimately increasing sales.

35

80.     When Wholesale Customers, who purchase manufactured homes from the Debtors with the intent of selling those homes on the retail market, make purchasing decisions between the Debtors' manufactured homes and services and that of the Debtors' competitors, they closely evaluate the deals and incentives offered to the Wholesale Customers by the various manufacturers. As a result, wholesale buyers will only consider purchasing product from manufacturers with a proven record of supporting their dealer network through various incentive programs. If a manufacturer fails to gain and retain the loyalty of the Wholesale Customers, then the manufacturer risks losing its dealer network and whatever sales value that distribution channel produces.

81.     The Debtors seek to continue the Wholesale Customer Practices because they have historically allowed the Debtors to attract and retain independent dealers, ultimately increasing wholesale sales volume. The Debtors believe that maintaining relationships with certain of these dealers throughout these bankruptcy cases is essential to the continued vitality of their businesses – and ultimately to their prospects for a successful reorganization. In particular, the Debtors' goodwill and ongoing business relationships may erode if the Wholesale Customers perceive that the Debtors are unable or unwilling to continue the Wholesale Customer Practices. The same would be true if the Wholesale Customers perceive that the Debtors will not offer the full package of services the wholesale customers demand – and receive – from other manufacturers.

### Continuing the Sale and Securitization of RICs

82.     Historically, securitization transactions as described above have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs. In fact, until recently, OAC made a material profit on its securitization

transactions. Although that profit has been reduced or even eliminated, the securitization transactions engaged in by OAC pre-petition remain the least expensive method for financing for the Debtors' operations. Accordingly, the Debtors believe that continuing to participate in the securitization transactions described herein in the ordinary course of business is absolutely essential to the Debtors' ability to reorganize successfully under Chapter 11.

<u>Assumption and Assignment/Rejection of Various Pooling and Servicing Agreements</u>

83.    OAC currently acts as the "Servicer" with respect to the securitized RICs owned by each Trust[2]. In that capacity, OAC is required to (i) collect payments of principal and interest from obligors and remit them to the appropriate Securitization Trusts, (ii) escrow payments of taxes and interest and remit them to the appropriate recipients, (iii) enforce the Trusts' rights under the securitized RICs when they fall into default, including commencing and prosecuting replevin and foreclosure actions, and (iv) otherwise monitor and report on the status of the RICs for the benefit of the Trusts as the holders of the securitized RICs.

84.    As and when necessary to perform its servicing duties, OAC, as the Servicer, is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations ("Servicing Advances"). OAC is obligated to make Servicing Advances, however, only if OAC deems the Servicing Advance to be recoverable. Servicing Advances are designed to be temporary and solely for the sake of convenience

---

[2]    OAC also services a very small portfolio of owned RICs that for a variety of reasons (principally ineligibility) have not been pooled and sold into the Warehouse Facility or an OMI Securitization.

37

and expediency. Accordingly, OAC, as servicer, is entitled to reimbursement for all Servicing Advances from subsequent tax and insurance escrow payments, insurance proceeds, and liquidation proceeds collected by the related Trust. In addition, if at any point OAC, as the Servicer, deems certain kinds of Servicing Advance to be non-recoverable, OAC is entitled to reimbursement for that Servicing Advance immediately from any available funds in the related Trust.

85.    Currently, OAC has approximately $47,970,000 of outstanding Servicing Advances owed by the Trusts (collectively, the "Servicing Advance Receivables"). Of that amount, $16,120,000 represents advances for taxes and insurance escrow payments and $31,850,000 represents advances for repossession costs.

86.    In addition, to the extent obligors on the securitized RICs are delinquent in the payment of principal or interest, OAC, as the "Servicer" under the Servicing Agreements, in most cases must advance the amount of such delinquent principal and interest ("P&I Advances," together with Servicing Advances, the "Advances"), generally on the 15th of each month. Like Servicing Advances, OAC is obligated to make a P&I Advance only if it deems the P&I Advance to be recoverable. P&I Advances are temporary and for liquidity purposes only. Accordingly, OAC, as Servicer, is entitled to reimbursement from the applicable Trusts for all P&I Advances made, either from subsequent collections on the related delinquent RICs or subsequent collections on the entire pool of RICs in a particular Trust, depending upon the terms of the Applicable Servicing Agreement. Also, if OAC at any point deems a previously made P&I Advance to be non-recoverable in any particular month, OAC may reimburse itself for that P&I Advance from any funds in the related Trust.

38

87.    OAC typically advances between $35 to $45 million in P&I Advances to the Trusts each month and books a receivable in the aggregate amount of such P&I Advances ("P&I Advance Receivables," together with the Servicing Advance Receivables, the "Advance Receivables"), then generally reimburses itself for such P&I Advances over the course of the following month.

88.    In exchange for servicing the securitized RICs at a cost of over $30 million per year, OAC is entitled to a monthly fee in amounts ranging from $1/12^{th}$ of .75% to $1/12^{th}$ of 1% of the outstanding balance of the RICs in each Trust (the "Servicing Fee"). The right to payment of the Servicing Fee from most of the Trusts, however, is contractually subordinate to the payment of amounts due on the particular Trust's outstanding Pass-Through Certificates (or notes, with respect to the Warehouse Trust) in a given month for so long as OAC remains the "Servicer" under the Servicing Agreements. Because of this subordination provision and the losses experienced by the Trusts on the securitized RICs, OAC currently is not receiving any significant payments on account of the Servicing Fee from the Trusts.    If and when any party other than OAC[3] becomes the "Servicer" under the Servicing Agreements, however, the priority of the Servicing Fee is elevated, and in many cases, the amount of the monthly Servicing Fee is increased to $1/12^{th}$ of 1.5% of the outstanding balance of the RICs.

89.    Accordingly, in order to elevate the priority and in many cases increase the amount of the Servicing Fee, OAC formed OSHC, a wholly-owned limited purpose

---

[3]    Pooling and servicing agreements underlying securitization transactions often provide that the related servicing fee is elevated only if another party *that is not a wholly-owned affiliate of the originating servicer* takes over as the servicer of the loan portfolio. Such a restriction was *not included in* the Servicing Agreements to which OAC is a party.

39

entity, and entered into an Assignment, Contribution, and Assumption Agreement in substantially the form annexed hereto as <u>Exhibit D</u> (the "Assumption Agreement"). Pursuant to the Assumption Agreement, OAC has agreed to assume the Servicing Agreements and assign them and the Advance Receivables to OSHC. Contemporaneously with that assignment, OAC and OSHC have agreed to enter into a Subservicing Agreement in substantially the form annexed hereto as <u>Exhibit E</u>, pursuant to which OAC will perform OSHC's obligations under the Servicing Agreements.   Under this structure, OSHC will be come the "Servicer" of record for the purposes of the Servicing Agreements, thereby elevating the priority and in many cases increasing the amount of the Servicing Fees, while OAC will continue to perform  day-to-day servicing of the RICs in accordance with the terms of the Servicing Agreements, thereby assuring the non-debtor parties to the Servicing Agreements of continued performance of the Servicing Agreements.

### Payment of Escrowed Funds

90.     Debtor Oakwood Acceptance Corporation, LLC ("OAC") continues to act as servicer for loans owned by the Securitization Trusts.  As servicer, OAC receives and escrows funds remitted by borrowers in order to pay certain taxing authorities and homeowner's insurance providers (the "T&I Obligations"). A fraction of the loans serviced by the Debtors carry an escrow balance; that is, the mortgagors have escrowed funds with the Debtors for the payment of the T&I Obligations.  OAC, as servicer, routinely transfers these funds on a timely basis to the entities for which these funds where escrowed.  Like trust fund taxes that are collected by the Debtors and held on behalf of a taxing authority, equitable title to these funds never passes to the Debtors, thus these funds are not property

40

of the estate. As such, use of these funds to pay the T&I Obligations does not prejudice the estates nor the creditors of the Debtors.

91.    A similar obligation of the Debtors as loan servicer includes the advancement of funds to pay certain obligations on behalf of the Securitization Trusts in connection with the individual mortgages being serviced (the "Servicing Advances"). Under the various pooling and servicing agreements, the Debtors are entitled to be reimbursed by the Securitization Trusts for all Servicing Advances made by the Debtors on their behalf in the event that the delinquent borrower does not pay or the repossession proceeds are insufficient to cover the advances. The only cost to the Debtors' estates from the Servicing Advances is the interest lost from the time the funds are advanced to the time when the funds are reimbursed. This loss is offset, to some extent, by the servicing fees that the Debtors earn for servicing these loans.

92.    The T&I Obligations described above are paid from checks drawn on a single disbursement account (the "EDA") the Debtors maintain at Wachovia. If it were possible to pay only the checks already drawn on the EDA for T&I Obligations, and dishonor all existing non-T&I Obligations Servicing Advance checks, that is what the Debtors would seek authority from this Court to do. Unfortunately, the Debtors understand that the only way to be able to honor the prepetition checks for the T&I Obligations, which constitute a vast majority of the checks drawn on the EDA, is to also honor the limited number of checks drawn on the EDA for non-T&I Obligation Servicing Advances. The Debtors estimate that there are approximately 3,500 checks outstanding on the EDA, totaling approximately $2.3 million. Of this amount, the Debtors estimate only 10-15% is attributable to non-T&I Obligations.

41

93.    Due to the highly complex nature of the Debtors' cash management and inventory accounting systems, certain of the individuals who perform work on the repossessed units are paid from the Debtors' accounts payable account (the "AP Account") while others are paid from the EDA.  This accounting difference is rooted in how the Debtors' track and allocate costs associated with their servicing portfolio.  Specifically, the source of payment for such services depends on whether an account is formally categorized as "in repossession."  Unfortunately, this system is not executed to perfection, and some overlap applies.

94.    In light of the fact that the estates of the Debtors will not be prejudiced by the payment of all of the T&I Obligations and outstanding non-T&I Servicing Advances, the Debtors submit that the preferential treatment afforded the a limited number of creditors who will receive full payment is an acceptable trade-off in comparison to the potential damage which could befall the Debtors' borrowers if the T&I Obligations are not paid.

Treatment of Reclamation Claims

95.    The Debtors purchase substantial amounts of goods on a daily basis. During calendar year 2001, the Debtors' total purchases aggregated approximately $394 million.  Moreover, the Debtors estimate that their more recent purchases have been approximately $29.5 million on a monthly basis.  Given this volume of purchases, the Debtors anticipate receiving demands during the early days of these cases from numerous vendors asserting such vendors' purported rights of reclamation (each a "Reclamation Claim" and, collectively, the "Reclamation Claims").  The Reclamation Claims, if properly asserted, will request that the Debtors either return, or pay in full, certain goods identified in the Reclamation Claims (the "Goods").

42

96.     The Debtors believe that procedures to govern the Reclamation Claims will simplify the process of addressing such claims while adequately safeguarding the reclamation rights of the creditors asserting them.

## Administrative Expense Status For And Authority To Pay Vendors

97.     In the ordinary operation of the Debtors' businesses, numerous vendors provide the Debtors with goods every month.  These goods are essential to the sustained operations of the Debtors during the reorganization period.  As of the Petition Date, and in the ordinary course of their businesses, the Debtors had numerous pending outstanding orders with the vendors for such goods.  As of the Debtors' filing of their Chapter 11 cases, many of the vendors may be concerned that delivery or shipment of goods after the Petition Date pursuant to a prepetition purchase order will render a Vendor who makes such shipment a general unsecured creditor of the Debtors' estates.

98.     Accordingly, vendors may decline to ship, or may instruct their shippers not to deliver, goods destined for the Debtors unless the Debtors issue substitute purchase orders postpetition or obtain an order of this Court confirming that all obligations of the Debtors arising from prepetition purchase orders, delivery or satisfaction of which occurs postpetition, are to be paid by the Debtors in the ordinary course of business.

99.     The Debtors' relationship with their vendors is so essential that it is important to give them the utmost reassurance that they will continue to be paid by the Debtors in the ordinary course of business.

## Authority to Pay Warehousing and Transportation in the Ordinary Course of Business

100.    In the normal course of business, the Debtors rely on particular common carriers (the "Shippers") to ship, transport, and deliver various goods, materials,

43

finished inventory and supplies (the "Goods") between their various manufacturing facilities, sales centers, independent dealers and customer sites. The Debtors depend on the Shippers for timely, consistent deliveries, and the Shippers' services are key to the Debtors' operations. Goods which are in transit are often stored at locations that are not owned or otherwise controlled by the Debtors, but rather are owned and/or controlled by independent third parties (the "Warehousemen"). The Debtors estimate that they rely on approximately 862 Shippers and Warehousemen in the ordinary course of their businesses.

101.    As a result of the commencement of these Chapter 11 cases, some Shippers and Warehousemen who hold Goods may refuse to release such goods pending payment of prepetition shipping charges (the "Shipping and Warehousing Charges"), thereby disrupting the Debtors' operations. Unless the Debtors continue to receive delivery of, and ship, Goods on a timely and uninterrupted basis, their manufacturing operations will shut down within a matter of days, thereby causing irreparable damage to the Debtors' business and reorganization efforts. As of the Petition Date, the Debtors accrued Shipping and Warehousing Charges to and from manufacturing facilities are approximately $3.2 million.

102.    Additionally, the Debtors use certain vendors to complete the final installation and assembly at the customer's site (the "Delivery and Setup"). The Delivery and Setup process includes but is not limited to grading the land to receive the home, setting the foundation piers, placing the home on the foundation, fastening the modular components, connecting the utilities make the necessary improvements to their customers' property for installation of homes. For example, in connection with the installation of a home, the Debtors may construct sidewalks, install well and septic systems or make other

44

improvements to the customers' property. In the ordinary course of their businesses, the Debtors use approximately 1,300 vendors across the country to facilitate the timely delivery of the Debtors' product to their customers (the "Delivery and Setup Vendors"). The Delivery and Setup Vendors are often the only providers of services in a particular region.

103. As a result of the commencement of these Chapter 11 cases, some Delivery and Setup Vendors may refuse to continue performing set-up services pending payment of prepetition delivery charges (the "Delivery and Setup Charges"), thereby unnecessarily disrupting the Debtors' operations. Unless the Debtors continue to receive the services of the Delivery and Setup Vendors on a timely and uninterrupted basis, their sales operations will experience significant delays, thereby causing irreparable damage to the Debtors' businesses, cash flow and reorganization efforts. Essentially, the failure to pay certain of the Delivery and Setup Vendors will severely impair the Debtors' ability to sell homes in certain regions. On average, the Debtors incur approximately $10 million in Delivery and Setup Charges per month. As of the Petition Date, the Debtors' accrued Delivery and Setup Charges are approximately $11.5 million. The Debtors expect that certain of the prepetition accrued and unpaid Delivery and Setup Charges will not have to be paid due to the availability of alternative Delivery and Setup Vendors.

104. Finally, as part of their customary business practices, the Debtors provide their customers with product warranties. Prior to the Petition Date, the Debtors used certain delivery services dedicated to the delivery of warranty parts to their customers (the "Parts Shippers" and, collectively with the Shippers and Warehousemen and Delivery and Setup Vendors, the "Transportation Vendors") in satisfaction of their warranty obligations. Unless the Debtors continue to receive the services of the Parts Shippers on a

45

timely and uninterrupted basis, their ability to promptly and efficiently service their outstanding warranties will be severely impaired, thereby causing irreparable damage to the Debtors' operations, customer goodwill and overall reorganization efforts. As of the Petition Date, the Debtors' accrued Parts Shipper obligations totaled approximately $70,000 (the "Parts Shippers Charges").

CONCLUSION

To preserve the value of their businesses to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 cases by minimizing any adverse impact of the Chapter 11 filings on the Debtors' operations. For the reasons described herein and in the First Day Pleadings, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 18 , 2002.

_____

Douglas R. Muir, Executive Vice President
Oakwood Homes Corporation

319231

47

*EXHIBIT H*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, et al.,[1] | ) ) | Case No. 02-13396 (PJW) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR REVISED FIRST AMENDED JOINT CONSOLIDATED PLAN OF REORGANIZATION OF OAKWOOD HOMES CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION**

Dated: September 9, 2003

**MORRIS, NICHOLS, ARSHT & TUNNELL**
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

- and -

**RAYBURN COOPER & DURHAM, P.A.**
C. Richard Rayburn, Jr.
Albert F. Durham
Patricia B. Edmondson
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina 28202-1675
(704) 334-0891

Co-Counsel for Oakwood Homes Corporation, et al., Debtors and Debtors In Possession

---

[1]  The Debtors are the following entities: Oakwood Homes Corporation, New Dimension Homes, Inc., Dream Street Company, LLC, Oakwood Shared Services, LLC, HBOS Manufacturing, LP, Oakwood MHD4, LLC, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc., Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., Golden West Leasing, LLC, Crest Capital, LLC and Preferred Housing Services, LP.

<u>**TABLE OF CONTENTS**</u>

| I. | | **INTRODUCTION AND SUMMARY INFORMATION.** | 1 |
|---|---|---|---|
| | A. | Purpose Of This Document. | 1 |
| | B. | Summary Information. | 3 |
| | C. | The Confirmation Hearing, Voting Procedures, Bar Dates, And Other Important Deadlines. | 11 |
| | D. | Important Notice And Cautionary Statement. | 16 |
| II. | | **DESCRIPTION OF THE DEBTORS, THEIR BUSINESS OPERATIONS, AND THEIR FINANCIAL CONDITION.** | 17 |
| | A. | General. | 17 |
| | B. | Manufactured Homes. | 18 |
| | C. | Retail Home Sales. | 19 |
| | D. | Retail Financing And Servicing. | 19 |
| | E. | Independent Dealer Retail Sales Financing. | 20 |
| | F. | Independent Retailer Repurchase Obligations. | 20 |
| | G. | Insurance. | 21 |
| | H. | Competition. | 21 |
| | I. | Regulation. | 21 |
| III. | | **PREPETITION DEBT AND EQUITY STRUCTURE OF THE DEBTORS.** | 22 |
| | A. | Description Of Prepetition Debt Structure Of Debtors. | 22 |
| | B. | Description Of Prepetition Equity Structure Of The Debtors. | 25 |
| IV. | | **THE CHAPTER 11 CASES AND SIGNIFICANT POSTPETITION EVENTS.** | 26 |
| | A. | Significant Events Leading To The Commencement Of The Chapter 11 Cases. | 26 |
| | B. | The Chapter 11 Filings. | 27 |

i

C.      "First Day" Motions.                                                27

D.      Appointment Of The Official Committee Of Unsecured
        Creditors.                                                          28

E.      Employment Of Professionals.                                        28

F.      Postpetition Debtor-In-Possession Financing And Use Of
        Cash Collateral.                                                    29

G.      Restructuring The Debtors' Servicing Fees On RICs.                  29

H.      Creation Of Alternate Warehouse Trust.                             30

I.      Filing Of Schedule Of Assets And Liabilities And
        Statement Of Affairs.                                              31

J.      Actions Implemented To Restructure The Debtors'
        Business Operations.                                               31

K.      Senior Management Retention Plan.                                  32

L.      Claims Bar Date And Analysis.                                      32

M.      Filing Of The First Plan And Disclosure Statement.                32

N.      Extension Of The DIP Financing.                                    33

O.      The WARN Act Litigation.                                           33

P.      The Objection Of David L. Babson & Company, Inc. As
        Investment Advisor To Proposed Disclosure Statement For
        Revised First Amended Joint Consolidated Plan Of
        Reorganization Of Oakwood Homes Corporation And Its
        Affiliated Debtors And Debtors-In-Possession (D.I. 1990).         34

Q.      Alternatives and Exit Financing.                                  34

V.      SUBSTANTIVE CONSOLIDATION.                                         35

A.      Substantive Consolidation For Purposes Of The Plan.               35

B.      The Substantive Consolidation Of The Debtors' Estates.            35

C.      Order Granting Substantive Consolidation.                         36

VI.     THE PLAN OF REORGANIZATION.                                        36

A.      Funding Of Distributions Under The Plan.                          36

| | | | |
|---|---|---|---|
| B. | Considerations Concerning Causes Of Action Under The Plan. | 37 |
| C. | Considerations Concerning The Board Of Directors Of The Reorganized Debtors. | 37 |
| D. | Considerations Concerning The Management Of The Reorganized Debtors. | 38 |
| E. | Considerations Concerning The Issuance Of The New Common Stock. | 38 |
| F. | Considerations Concerning The Issuance Of The New Warrants. | 38 |
| G. | Considerations Concerning The REMIC Guarantee Claims. | 39 |
| H. | Considerations Concerning Holders Of Claims In Class 4D. | 39 |
| I. | Considerations Concerning The Claims Objection Deadline. | 39 |
| J. | Considerations Concerning The Releases, Waivers, Injunctions And Exculpation Under The Plan. | 40 |
| VII. | FINANCIAL PROJECTIONS. | 43 |
| VIII. | ADDITIONAL CONSIDERATIONS REGARDING RISK. | 44 |
| IX. | CERTAIN TAX CONSEQUENCES OF THE PLAN. | 47 |
| A. | General. | 47 |
| B. | Federal Income Tax Consequences To The Debtors. | 48 |
| C. | Federal Income Tax Consequences To Holders Of Claims. | 51 |
| D. | Federal Income Tax Consequences To Holders Of Non-Debtor-Held Interests [Class 6A]. | 53 |
| E. | Information Reporting And Backup Withholding. | 53 |
| X. | CONFIRMATION PROCEDURES. | 54 |
| A. | Voting And Right To Be Heard At Confirmation. | 54 |
| B. | Hypothetical Liquidation Analysis. | 56 |
| C. | Feasibility. | 58 |

D.    Alternatives To The Plan.                                          58

XI.    **RECOMMENDATION AND CONCLUSION.**                    59

EX. A REVISED FIRST AMENDED JOINT CONSOLIDATED PLAN
OF     REORGANIZATION     OF     OAKWOOD     HOMES
CORPORATION  AND  ITS  AFFILIATED  DEBTORS  AND
DEBTORS-IN-POSSESSION                                                      A1

EX. B FINANCIAL ANALYSIS

Introduction                                                              B3

Basis Of Presentation                                                     B4

Sales Volume And Pricing – Retail And Manufacturing                       B5

Finance Revenue – Oakwood Acceptance Corporation                          B6

Insurance Commissions                                                     B7

Cost Of Goods Sold And Gross Margin                                       B7

Selling And General Administrative Expenses                               B7

Whole Loan Sales / Securitizations                                        B8

Federal Income Taxes                                                      B8

Working Capital                                                           B8

Capital Expenditures                                                      B9

Financial Analysis                                                        B10

Schedule 1 – Income Statement                                            B11

Schedule 2 – Pro Forma Fresh Start Balance Sheet                         B12

Schedule 3 – Balance Sheet                                               B13

Schedule 4 – Debt Balance Summary                                        B14

Schedule 5 – Statements Of Cash Flows                                    B15

Schedule 6 – Consolidated Recovery                                       B16

EX. C. LIQUIDATION ANALYSIS

Introduction                                         C3

Basis Of Presentation                                C4

Principal Assumptions – Asset Recoveries             C5

Recoveries And Distributions                         C6

I.      **INTRODUCTION AND SUMMARY INFORMATION.**

Oakwood Homes Corporation ("Oakwood"), a North Carolina corporation, and fourteen of its direct and indirect subsidiaries and affiliated partnerships (the "Affiliated Debtors" and collectively with Oakwood, the "Debtors") are debtors and debtors-in-possession in jointly-administered Chapter 11 cases that currently are pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors commenced their respective Chapter 11 Cases[2] by filing voluntary petitions in the Bankruptcy Court on November 15, 2002.

The Debtors are joint proponents of the Revised First Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors-in-Possession (the "Plan"), dated September 9, 2003, a copy of which is attached to this Disclosure Statement as Exhibit A. The purpose of the Plan is to, among other things, (a) restructure, compromise and discharge creditors' Claims against, and stockholders' Interests in, the Debtors, (b) reorganize the Debtors' financial affairs and (c) permit the Reorganized Debtors to emerge from the Chapter 11 Cases as ongoing businesses.

A.      **Purpose Of This Document.**

The purpose of this Disclosure Statement is to enable the Debtors' creditors and stockholders to make an informed judgment about whether to vote to accept or reject the Plan. This Disclosure Statement summarizes the provisions of the Plan and provides certain information relating to the Debtors, their Chapter 11 Cases, the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.

The Bankruptcy Court has reviewed this Disclosure Statement and on October 3, 2003, determined that it contains adequate information and may be sent to you [Docket No. 2056]. The Bankruptcy Court, however, has not yet made a determination as to whether the Plan should be confirmed, and has not conducted an independent investigation of the factual and financial matters described herein.

---

[2]      Capitalized terms that are not defined in this Disclosure Statement shall have the meaning assigned to them in the Plan.

*READ THIS DISCLOSURE STATEMENT CAREFULLY TO FIND OUT:*

1.  HOW THE PLAN WILL AFFECT YOUR CLAIMS OR INTERESTS,

2.  WHAT RIGHTS YOU HAVE WITH RESPECT TO VOTING FOR OR AGAINST THE PLAN,

3.  HOW AND WHEN TO VOTE FOR OR AGAINST THE PLAN, AND

4.  WHAT RIGHTS YOU HAVE WITH RESPECT TO SUPPORTING OR OBJECTING TO THE PLAN.

YOU SHOULD READ BOTH THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS) AND THE PLAN (INCLUDING THE PLAN SUPPLEMENT AND THE EXHIBITS) IN THEIR ENTIRETY. HOWEVER, THIS DISCLOSURE STATEMENT CANNOT TELL YOU EVERYTHING ABOUT YOUR RIGHTS. YOU SHOULD CONSULT YOUR OWN LEGAL, FINANCIAL AND TAX ADVISORS TO OBTAIN MORE SPECIFIC ADVICE ON HOW THE PLAN WILL AFFECT YOU AND WHAT IS THE BEST COURSE OF ACTION FOR YOU.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AT THE TIME OF THE FILING OF THE DISCLOSURE STATEMENT BASED UPON THE BEST INFORMATION THEN CURRENTLY AVAILABLE TO THE DEBTORS. ONCE APPROVED BY THE BANKRUPTCY COURT, THIS DISCLOSURE STATEMENT WILL NOT BE UPDATED BASED UPON SUBSEQUENT EVENTS. NO INFORMATION PROVIDED BY ANY PERSON OR ENTITY (INCLUDING THE DEBTORS' AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, ACCOUNTANTS, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES) CONCERNING THE DEBTORS, THEIR OPERATIONS, FUTURE REVENUES, PROFITABILITY, VALUATIONS, OR OTHERWISE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT, HAS BEEN AUTHORIZED. ANY INFORMATION, REPRESENTATION, PROMISE, STATEMENT OR INDUCEMENT MADE TO SECURE OR OBTAIN ACCEPTANCES OR REJECTIONS OF THE PLAN THAT ARE OTHER THAN, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PERSON IN ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN. ANY SUCH ADDITIONAL INFORMATION, REPRESENTATIONS, AND INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO THE ATTENTION OF THE DEBTORS AND THE BANKRUPTCY COURT.

B.    **Summary Information.**

The following information summarizes the terms of the Plan and describes your rights to be heard and vote with respect to the Plan.

**THE FOLLOWING INFORMATION IS A SUMMARY ONLY AND DOES NOT FULLY ADDRESS ALL OF YOUR RIGHTS, ALL PROVISIONS OF THE PLAN OR ALL OF THE CONSEQUENCES CONFIRMATION OF THE PLAN MAY HAVE ON YOUR RIGHTS.    YOU ARE STRONGLY ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND TO CONSULT WITH YOUR LEGAL, FINANCIAL AND TAX ADVISORS PRIOR TO DECIDING WHETHER TO SUPPORT OR OPPOSE THE PLAN.**

| | |
|---|---|
| **The Debtors and Their Businesses:** | The Debtors design, manufacture and market manufactured and modular homes. In addition, they arrange financing for a portion of their retail sales and, as agent, provide a variety of insurance products to customers.    The Debtors are among the major producers and retailers of manufactured homes and historically have originated consumer loans secured by the manufactured homes. The Debtors' consolidated financial statements reflect that, for the fiscal year ended September 30, 2002, the Debtors, on a consolidated basis, generated net sales of approximately $927 million. As of December 31, 2002, the Debtors, on a consolidated basis, had approximately $812 million in assets and approximately $1.1 billion in liabilities. |
| **Purpose of the Plan:** | The Plan provides for a recapitalization of the Debtors through the restructure, compromise and discharge of the Debtors' existing creditor Claims and stockholder Interests in a manner intended to enable the Debtors to emerge from their Chapter 11 Cases as an integrated viable business in the form of the Reorganized Debtors. |
| **Basic Structure of the Plan:** | Unless otherwise noted, most of the Debtors' creditors will receive distributions of New Common Stock in the Reorganized Debtors or other consideration on or after the Plan's Effective Date in satisfaction of their Claims.  Only those parties that have Allowed Claims against the Debtors will receive consideration under the Plan. The amount and type of consideration a creditor will receive may depend upon whether the creditor's Allowed Claim is (a) entitled to special priority under the Bankruptcy Code, (b) a Secured Claim, (c) an Unsecured Claim or (d) otherwise separately classified under the Plan. |

3

The Plan groups most creditors and stockholders into various Classes of Claims and Interests and provides for the treatment of each Class. Certain creditors, such as Holders of Administrative Claims arising after the commencement of the Chapter 11 Cases, Holders of Fee Claims, and Holders of Allowed Priority Tax Claims, are not grouped in any Class, but nonetheless will be treated under the Plan.

Upon the Plan's Effective Date, all Junior Notes, Senior Notes, B-2 REMIC Guarantees, the Resecuritization Note Put Option and Interests will be cancelled and the obligations represented by such instruments will be discharged. The new stockholders of the Reorganized Debtors after the Effective Date initially will consist of certain of the Debtors' prepetition creditors, including, but not limited to, Holders of Senior Note Claims, Holders of Junior Note Claims, Holders of REMIC Guarantee Claims and Holders of Other Unsecured Claims.

Under the Plan, all of the Debtors' assets and liabilities are deemed substantively consolidated for purposes of distributions to the Debtors' creditors and stockholders. Thus, Holders of Unsecured Claims of one of the consolidated Debtors will receive the same treatment as Holders of Unsecured Claims of any of the other Debtors. Additionally, Holders of Claims against multiple Debtors on account of affiliate guarantees and co-obligations of multiple Debtors will be entitled to only one distribution from the Debtors' consolidated Estates.

The Plan contains numerous other provisions governing, among other things, (a) the assumption, assumption and assignment and rejection of executory contracts and unexpired leases, (b) the continuation of management and the designation of new boards of directors for the Reorganized Debtors, (c) the restructuring of the Debtors' various legal entities, (d) the resolution of Disputed Claims against the Debtors, (e) the Bankruptcy Court's retention of jurisdiction following confirmation of the Plan and (f) the scope and nature of the Debtors' discharge following confirmation. Please refer to the Plan itself for more detailed information.

**Classifications and Treatment of Creditors' Claims and Stockholders' Interests Under the Plan:** The following Summary Table sets forth the classification and treatment of creditors' Claims and stockholders' Interests under the Plan. The descriptions in the Summary Table are only summaries and do not include all terms and conditions of the Plan. You are strongly advised to consult the relevant Plan provisions for a full description of the respective Classes and corresponding treatments under the Plan.

4

## SUMMARY TABLE – CLAIMS

| | | | | |
|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept | 100.0% |
| Class 2A | Secured Tax Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept | 100.0% |
| Class 2B | 1997 Bonds Secured Claim | Unimpaired | Not Entitled to Vote; Deemed to Accept | 100.0% |
| Class 2C | 1998 Bonds Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2D | Auto Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2E | Carolina Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2F | First American Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2G | Foothill Secured Claim | Impaired | Entitled to Vote | 100.0% |
| Class 2H | Pulaski Bonds Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2I | Schmittauer Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2J | Thomas Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2K | U.S. Bank Secured Claim | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 2L | Other Secured and Setoff Claims | Unimpaired | Not entitled to Vote; Deemed to Accept | 100.0% |
| Class 3 | Convenience Claims | Impaired | Entitled to Vote | 15.0% |
| Class 4A | Senior Note Claims | Impaired | Entitled to Vote | 50.3% |
| Class 4B | Junior Note Claims | Impaired | Entitled to Vote | 50.3% |
| Class 4C | REMIC Guarantee Claims | Impaired | Entitled to Vote | 50.3% |
| Class 4D | Litigation Claims | Impaired | Entitled to Vote | 50.3% |

[3] Schedule 6 to Exhibit B to this Disclosure Statement provides an analysis of the recoveries to each class of Claims and Interests and provides this estimate of their respective percentage recovery.

| Class 4E | Other Unsecured Claims | Impaired | Entitled to Vote | 50.3% |
|---|---|---|---|---|
| Class 5 | Intercompany Claims | Substantively Consolidated | Not Entitled to Vote | N/A |
| Class 6A | Non-Debtor-Held Interests | Impaired | Entitled to Vote | Unknown |
| Class 6B | Debtor-Held Interests | Substantively Consolidated | Not Entitled to Vote | N/A |

## SUMMARY TABLE – TREATMENTS

| | |
|---|---|
| **Class 1 (Priority Non-Tax Claims)**<br><br>Number of Filed Claims: 495<br>Amount of Filed Claims: $13,852,000<br>Amount of Scheduled Claims: $137,000<br>Estimated Amount of Allowed Claims: $7,400,000 | Subject to the terms herein, and unless the Holder of an Allowed Priority Non-Tax Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall be paid 100% of the unpaid amount of such Allowed Priority Non-Tax Claim in Cash from the Administrative/Priority Claims Reserve on or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Claim becomes an Allowed Claim.<br><br>Class 1 is an Unimpaired Class, and Holders of Class 1 Claims are not entitled to vote. |
| **Classes 2A, B, C, D, E, F, H, I, J, K, L (Secured Claims)[5]**<br><br>Number of Filed Claims: 65<br>Amount of Filed Claims: $2,250,000<br>Amount of Scheduled Claims: $59,341,000<br>Estimated Amount of Allowed Claims: $7,515,000 | Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, each Holder of a Secured Claim shall receive, at the option of the Debtors or the Disbursing Agent, as appropriate, and to the extent such Claim is secured by collateral in the possession of the Debtors or the Disbursing Agent: (a) 100% of the Net Proceeds from the sale of the relevant |

---

[4]    The numbers included in this table have been prepared based on the following:

      1) The claims have been reflected based on where the company believes the claims should be classified. The company is currently in the process of reconciling the claims.
      2) All expunged claims are excluded.
      3) All withdrawn claims are excluded.
      4) All claims to be expunged as a result of the 5th, 6th, 7th and 8th Omnibus Objections are excluded.
      5) Any scheduled liability that has been paid-in-full as allowed by the First Day Motions is excluded.
      6) All cross-case duplicates are excluded.

[5]    These amounts include all Secured Claims (Classes 2A through 2L). These amounts include the pre-petition funded credit facility which has since been replaced by the DIP financing. Also included in the scheduled liability is the contingent liability resulting from the outstanding letters of credit as of the filing.

| | |
|---|---|
| | collateral, up to the unpaid amount of such Allowed Claim (with such payments to be made, if applicable, from accounts set up by the Debtors, during the Chapter 11 Cases, in connection with the sale of such collateral), subject to applicable inter-creditor lien priorities (subject, if applicable, to the receipt by the Debtors or the Disbursing Agent of the proceeds of the sale of the relevant collateral); (b) the return of the relevant collateral; (c) the reinstatement of the Claim in accordance with the provisions of 11 U.S.C. § 1124(2); (d) such other, less favorable, treatment as shall be agreed to between the Holder of such Claim and the Debtors or the Disbursing Agent, as appropriate; or (e) such other, less favorable, treatment as is determined by Final Order of the Bankruptcy Court. Such Distribution shall be made on or as soon as reasonably practicable after the relevant Distribution Date. Upon receipt by the relevant Holder of such Distributions, such Holder's Lien, offset right or other security interest in the relevant collateral shall be deemed released. To the extent a Claim is partially a Secured Claim based on an offset right and partially an Allowed Claim of another type, such Secured Claim shall be deemed to have been (x) setoff only to the extent of the allowed amount of the allowed, liquidated, nondisputed, noncontingent claim owing to the Debtors or the Reorganized Debtor, and (y) a Claim classified in another relevant Class for any excess of such Claim over the amount so set off. If a Claim is fully a Secured Claim based on an offset right, the allowance of such Claim shall not affect any obligations or liabilities due and payable (at such time) to the Debtors that are in an amount in excess of the amount validly offset and the payment, in full and in cash, of all amounts due and owing as of the Effective Date to the Debtors and the turnover of any property of the Debtors held by such claimant on account of any unliquidated, disputed or contingent right of setoff shall be a precondition of the allowance of such Secured Claim.

These Claims are Unimpaired Classes, and Holders of these Class 2 Claims are not entitled to vote. |
| **Class 2G (Foothill Secured Claims)** | Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code and herein, the Holder of the Allowed Foothill Secured Claim shall receive, at the option of the Debtors or the Disbursing Agent, as appropriate, and to the extent such Claim is secured by collateral in the possession of the Debtors or the Disbursing Agent, the relevant collateral, up to the unpaid amount of such Allowed Claim; provided, however, that such Distribution will only take place after the expiration of the letters of credit secured by such collateral. Upon receipt by the relevant Holder of |

| | |
|---|---|
| | such Distributions, such Holder's Lien, offset right or other security interest in the relevant collateral shall be deemed released.<br><br>Class 2G is an Impaired Class, and the Holder of the Class 2G Claim is entitled to vote. |
| **Class 3 (Convenience Claims)**[6] | Subject to the terms herein, unless the Holder of an Allowed Class 3 Claim agrees to receive other, less favorable treatment, each Holder of an Allowed Class 3 Claim shall receive the lesser of (i) 15% of the unpaid amount of such Allowed Class 3 Claim and (ii) such Holder's pro-rata share of $3,000,000.00 in Cash, in two equal installments, on the next two Distribution Dates, or as soon as reasonably practicable thereafter, at the election of the Debtors upon reasonable notice to the relevant Holders from the Convenience Class Reserve.<br><br>Class 3 is an Impaired Class, and Holders of Class 3 Claims are entitled to vote. |
| **Class 4A (Senior Note Claims)**<br><br>Number of Filed Claims: 1<br>Amount of Filed Claims: $304,580,000<br>Amount of Scheduled Claims: $303,800,000<br>Estimated Amount of Allowed Claims: $303,837,000 | Subject to the terms herein and unless the Holder of an Allowed Class 4A Claim who is the beneficial holder of such Class 4A Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 4A Claim who is the beneficial holder of such Class 4A Claim shall receive on account of such Allowed Claim its Ratable share of the proceeds of the General Distribution Trust on the Effective Date. All Senior Notes shall be deemed canceled.<br><br>Class 4A is an Impaired Class, and Holders of Allowed Class 4A Claims who are the beneficial holders of such Class 4A Claims are entitled to vote. |
| **Class 4B (Junior Note Claims)**<br><br>Number of Filed Claims: 1<br>Amount of Filed Claims: $2,701,000<br>Amount of Scheduled Claims: $2,700,000<br>Estimated Amount of Allowed Claims: $2,702,000 | Subject to the terms herein and unless the Holder of an Allowed Class 4B Claim who is the beneficial holder of such Class 4B Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 4B Claim who is the beneficial |

---

[6]     For the purpose of this chart, Convenience Class Claims (Class 3) are included in the Class 4E Other Unsecured Claims.

| | |
|---|---|
| | holder of such Class 4B Claim shall receive on account of such Allowed Claim its Ratable share of the proceeds of the General Distribution Trust on the Effective Date. All Junior Notes shall be deemed canceled.<br><br>Class 4B is an Impaired Class, and Holders of Allowed Class 4B Claims who are the beneficial holders of such Class 4B Claims are entitled to vote. |
| **Class 4C (REMIC Guarantee Claims)**<br><br>Number of Filed Claims: 9<br>Amount of Filed Claims: $1,016,778,938.12<br>Amount of Scheduled Claims: $274,764,000<br>Estimated Amount of Allowed Claims: $274,764,000 | Subject to the terms herein and unless the Holder of an Allowed Class 4C Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 4C Claim shall receive on account of such Allowed Claim its Ratable share of the proceeds of the General Distribution Trust on the Effective Date. All B-2 REMIC Guarantees and the Resecuritization Note Put Option shall be deemed canceled.<br><br>Class 4C is an Impaired Class, and Holders of Allowed Class 4C Claims who are the beneficial holders of such Class 4C Claims are entitled to vote. |
| **Class 4D (Litigation Claims)**<br><br>Number of Filed Claims: 1,314<br>Amount of Filed Claims: $315,581,000<br>Amount of Scheduled Claims: $292,000,000<br>Estimated Amount of Allowed Claims: $35,000,000 | Subject to the terms herein and unless the Holder of an Allowed Class 4D Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 4D Claim shall receive on account of such Allowed Claim its Ratable share of the proceeds of the General Distribution Trust on the Effective Date.<br><br>Class 4D is an Impaired Class, and Holders of Allowed Class 4D Claims are entitled to vote. |

9

| | |
|---|---|
| **Class 4E (Other Unsecured Claims)**[7]<br><br>Number of Filed Claims: 4,523<br>Amount of Filed Claims: $289,859,000<br>Amount of Scheduled Claims: $179,852,000<br>Estimated Amount of Allowed Claims: $75,330,000 | Subject to the terms herein and unless the Holder of an Allowed Class 4E Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 4E Claim shall receive on account of such Allowed Claim its Ratable share of the proceeds of the General Distribution Trust on the Effective Date.<br><br>Class 4E is an Impaired Class, and Holders of Allowed Class 4E Claims are entitled to vote. |
| **Class 6A (Non-Debtor-Held Interest)** | Subject to the terms herein and unless the Holder of an Allowed Class 6A Claim agrees to receive other, less favorable treatment, on or as soon as reasonably practicable after the Initial Distribution Date and each Quarterly Distribution Date thereafter, each Holder of an Allowed Class 6A Claim in Oakwood shall receive its Ratable share of (a) the New Warrants for the New Common Stock of the New Holdco paid from the General Distribution Trust if eligible under section 1129(b)(2)(B)(ii) of the Bankruptcy Code or (b) the Equity Compensation, if available. All Interests in Oakwood shall be deemed canceled. If the Distributions for all Allowed Claims in Class 4A, Class 4B, Class 4C, Class 4D and Class 4E from the General Distribution Trust result in 100% recovery for such Holders prior to the earlier of the exercise or expiration of the New Warrants, the Holders of New Warrants shall receive a Distribution, with such Distribution being an amount up to the value of the New Warrants as determined in the agreement concerning the New Warrants.<br><br>Class 6A is an Impaired Class, and all Holders of Allowed Class 6A Claims are entitled to vote. |

---

[7]    The claimed and scheduled totals for Class 4E include various contingent claims (floorplan guarantees and other guarantees). The claimed and scheduled amounts are generally stated at the maximum potential liability of the contingent claim. The Debtors' belief that the actual liquidated claim will be less than the maximum potential liability is reflected in the lower claim estimate per the disclosure statement.

10

C.    **The Confirmation Hearing, Voting Procedures, Bar Dates, And Other Important Deadlines.**

1.    **Time And Place Of The Confirmation Hearing.**

The Plan cannot become effective until after it has been confirmed by the Bankruptcy Court and the conditions to the Effective Date set forth in the Plan have either been satisfied or waived.

The hearing to determine whether the Bankruptcy Court will enter the Confirmation Order to confirm the Plan will take place on November 26, 2003 at 10:30 a.m. in the Courtroom of the Honorable Peter J. Walsh, United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice.

2.    **Entities Entitled To Vote On The Plan.**

Prior to the Confirmation Hearing, certain Holders of Claims and Interests will have an opportunity to vote to accept or reject the Plan. Pursuant to the Bankruptcy Code, only Holders of Allowed Claims and Interests in Classes 2G, 3, 4D, 4E and 6A and those Holders who are the beneficial holders of Allowed Claims in Classes 4A, 4B, and 4C (the "Voting Classes") are entitled to vote on the Plan because these Classes are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, but will nonetheless receive Distributions under the Plan. The impairment of a Claim or Interest generally occurs if the legal, equitable, or contractual rights of the Holder are altered. Classes 1, 2A, 2B, 2C, 2D, 2E, 2F, 2H, 2I, 2J, 2K and 2L are not Impaired and, therefore, are not entitled to vote and are deemed to have accepted the Plan. Holders of Claims and Interests in Classes 5 and 6B are Insiders whose Claims or Interests will be substantively consolidated pursuant to the Substantive Consolidation Order. Holders of Claims or Interests in these Classes are not entitled to vote on the Plan.

The Plan may be confirmed even if it is not accepted by each Voting Class. The Bankruptcy Code defines "acceptance" with respect to a Class of Impaired Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class whose Holders cast Ballots. In the event that a Voting Class does not accept the Plan, the Debtors nonetheless will seek to have the Plan confirmed, provided that the Plan is "fair and equitable" and does not "unfairly discriminate" against the non-accepting Class of creditors or stockholders, as provided in section 1129 of the Bankruptcy Code.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF SUCH HOLDERS. THEY THEREFORE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

3.    **Deadline For Voting For Or Against The Plan.**

The Debtors are providing copies of this Disclosure Statement and Ballots, which include detailed voting instructions, to all known Holders of Claims in the Voting Classes. If you are entitled to vote as the Holder of an Allowed Claim in one of the Voting Classes, you may vote by completing the enclosed Ballot and returning the Ballot by the Ballot Deadline in the enclosed envelope to the Balloting Agent at the address identified on your Ballot. Initially, the Balloting Agent is BSI. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Person acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing.

**TO BE COUNTED, YOUR BALLOT (OR, IN THE CASE OF PUBLICLY HELD INSTRUMENTS, THE MASTER BALLOT CAST ON YOUR BEHALF) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RETURNED IN ACCORDANCE WITH THE ACCOMPANYING INSTRUCTIONS AND RECEIVED BY THE BALLOTING AGENT NO LATER THAN NOVEMBER 19, 2003 AT 4:00 P.M., EASTERN TIME, OR IT WILL NOT BE COUNTED IN CONNECTION WITH CONFIRMATION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED EITHER TO THE BANKRUPTCY COURT OR TO THE DEBTORS OR THEIR ATTORNEYS. ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION SHALL NOT BE COUNTED.**

A Ballot cast with respect to the Plan does not result in the filing or allowance of a Claim. Nor does the casting of a Ballot relieve a creditor of the obligation to file a proof of Claim in a timely manner. The Debtors reserve the right to object to any Claims until the Claims Objection Deadline; provided, however, that Distributions may be made to Holders of Allowed Claims prior to the expiration of the Claims Objection Deadline upon agreement of the Reorganized Debtors and the Disbursing Agent. Notwithstanding any of the foregoing, the Debtors, the Reorganized Debtors or the Disbursing Agent may request from the Bankruptcy Court an extension of the Claims Objection Deadline.

    4.    **Deadline For Objecting To Confirmation Of The Plan.**

As noted, all Holders of Claims or Interests are entitled to be heard with respect to confirmation of the Plan, even if they are not eligible to vote to accept or reject the Plan. Objections to confirmation of the Plan must be filed with the Bankruptcy Court and served upon (a) counsel for the Debtors (Morris, Nichols, Arsht & Tunnell, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware, 19899-1347, attention: Robert J. Dehney, Esq.; and Rayburn Cooper & Durham, P.A., 1200 Carillon, 227 West Trade Street, Charlotte, North Carolina, 28202-1675, attention: Albert F. Durham, Esq.); (b) counsel for the Committee (McCarter & English, 919 North Market Street, Suite 1800, Wilmington, Delaware, 19899, attention: William F. Taylor, Jr., Esq.; and King & Spalding LLP, 1185 Avenue of the Americas, New York, New York 10036, attention: Robert J. Stark, Esq.); (c) counsel for Greenwich (Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 919 North Market Street, Suite 1600, P.O. Box 8705, Wilmington, Delaware, 19899, attention: Laura Davis Jones, Esq.; and Kirkland & Ellis, 777 South Figueroa Street, Los Angeles, California, 90017, attention: Bennet L. Spiegel, Esq.); and (d) such other parties as are identified in the accompanying notice of the Confirmation Hearing so that they are received by no later than November 19, 2003, at 4:00 p.m., Eastern Time.

5.    **Deadlines For Parties To Executory Contracts And Unexpired Leases To Assert Damage Claims And To Object To The Terms Of Assumption.**

Section 365 of the Bankruptcy Code allows the Debtors to assume, assume and assign, or reject executory contracts and unexpired leases to which the Debtors were parties as of the Petition Date. In order to assume, or assume and assign, a contract or lease, the Debtors must make provision for the cure of certain outstanding defaults as required by Section 365 of the Bankruptcy Code. If the Debtors reject a contract or lease, the contract or lease is deemed to have been breached by the Debtors immediately before the Petition Date, and the non-debtor party to the contract or lease may be entitled to an Unsecured Claim for damages resulting from such breach.

Under the Plan, on the Effective Date, the Debtors will assume all executory contracts and unexpired real or personal property leases to which they are a party, excluding (a) any and all executory contracts or unexpired leases which are the subject of separate motions filed pursuant to section 365 of the Bankruptcy Code by the Debtors prior to the commencement of the Confirmation Hearing, (b) such contracts or leases as are listed on the Executory Contract Schedule filed by the Debtors, which may be modified by the Debtors up to ninety (90) days after the Effective Date, all of which contracts or leases shall be deemed rejected pursuant to the provisions of section 365 and section 1123 of the Bankruptcy Code, and (c) any and all executory contracts or unexpired leases rejected prior to entry of the Confirmation Order. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtors in the ordinary course of their businesses.

If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 4E; provided, however, that the Unsecured Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the Disbursing Agent, their successors or properties, unless a proof of such Claim is filed and served on the Disbursing Agent and the Claims Agent within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executory contract or unexpired lease which may include, if applicable, the Confirmation Order. **Failure to comply with this deadline shall forever bar the holder of a Claim from seeking payment thereof.** See Article IX of the Plan for more information about how to comply with this deadline and to determine whether this deadline applies to you.

6.    **Administrative Claims Bar Date.**

An Administrative Claim includes: (a) a Secured Claim entitled to superpriority pursuant to section 364(c) of the Bankruptcy Code and the Final DIP Agreement; (b) an Unsecured Claim, other than a Fee Claim, for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation: (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for

13

services rendered, and personal injury claims); and (ii) all fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code; or (c) a Reclamation Claim that either has been granted priority under section 546(c)(2)(A) of the Bankruptcy Code or which the Debtors elect to treat as though such priority has been granted.

All parties seeking payment of Administrative Expenses must file with the Bankruptcy Court and serve upon the Debtors a request for payment of such Administrative Claims prior to the applicable deadline set forth below, provided, however, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of the Debtors' postpetition business and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request.

With respect to Administrative Claims relating to the period from the Petition Date through September 30, 2003, except to the extent set forth in the Administrative Claim Bar Date Order, a Holder of such Administrative Claim must have filed a request for payment of such Claim by the applicable bar date in order to be eligible to receive Distributions under the Plan on account of such Administrative Claim. **Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim from seeking payment thereof.** See the Administrative Claim Bar Date Order for more information about how to comply with this deadline and to determine whether this deadline applies to you.

To be eligible to receive Distributions under the Plan on account of an Administrative Claim not subject to the Administrative Claim Bar Date Order, all requests for payment of such Administrative Claims (other than Fee Claims) incurred before the Effective Date and not subject to the Administrative Claim Bar Date Order must be filed with the Claims Agent so as to be received on or before 4:00 p.m. (Eastern Time) on the date that is the first Business Day after the date that is 20 days after the Effective Date, unless otherwise agreed to by the Debtors. **Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim from seeking payment thereof.** See Section 2.9 of the Plan for more information about how to comply with this deadline and to determine whether this deadline applies to you.

7.    **Fee Claims Bar Date.**

A Fee Claim includes: (a) a Claim of a professional person retained by order of the Bankruptcy Court for compensation and/or reimbursement of expenses pursuant to section 327, 328, 330 or 331 of the Bankruptcy Code in connection with the Chapter 11 Cases or (b) a Claim of any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to sections 503(b)(3) or 503(b)(4) of the Bankruptcy Code in which the Holder of the Claim files a timely request unless otherwise agreed to by the Debtors or the Reorganized Debtors.

Prior to the Effective Date, all applications for payment of Fee Claims must be filed with the Bankruptcy Court and served in accordance with the Fee Order. After the Effective Date, all applications for payment of Fee Claims must be sent to the Reorganized Debtors and the Disbursing Agent and will be paid by the Reorganized Debtors or the Disbursing Agent, as appropriate, in the ordinary course, without further approval by the Bankruptcy Court.

14

**Failure to comply with any deadlines shall forever bar the holder of a Fee Claim from seeking payment thereof.** See Section 2.10 of the Plan for more information about how to comply with this deadline and to determine whether this deadline applies to you.

### 8. Unsecured Claims Bar Date.

An Unsecured Claim includes any claim that is not: (a) an Administrative Claim; (b) a Priority Non-Tax Claim; (c) a Priority Tax Claim; (d) a Fee Claim; (e) a Secured Claim; (f) an Intercompany Claim; or (g) an Interest. All proofs of Claim for Unsecured Claims must have been filed with the Claims Agent by the general claims bar date established by the Bankruptcy Court, which was March 27, 2003. The Claims Agent is currently BSI.

### 9. Materials To Be Filed In Support Of Confirmation.

In support of confirmation of the Plan, the Debtors will file the Plan Supplement, to the extent not filed simultaneously with the Plan and the Disclosure Statement, at least five (5) Business Days prior to the deadline established for voting on the Plan. The Plan Supplement may be inspected in the offices of the Clerk of the Bankruptcy Court during normal business hours. A copy of the Plan Supplement shall be mailed to the Creditors' Committee, the members of the Creditors' Committee and any Holder of a Claim or Interest that makes a written request for such Plan Supplement to the Debtors. At confirmation, the Debtors will ask the Bankruptcy Court to approve substantially the forms of the documents contained in the Plan Supplement pursuant to the Confirmation Order.

### 10. Information Regarding The Plan.

**NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO OR INCORPORATED HEREIN BY REFERENCE, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS OR APPROVED BY THE BANKRUPTCY COURT.**

### 11. Effective Date Of The Plan.

The Effective Date of the Plan will occur on: (a) if no stay of the Confirmation Order is in effect, the date designated by the Debtors that is after the date all of the conditions set forth in the Plan have been satisfied or waived pursuant to the Plan; or (b) if a stay of the Confirmation Order is in effect, on the date designated by the Debtors that is after the later of: (i) the date such stay is vacated; and (ii) the date each condition set forth in the Plan has been satisfied or waived pursuant to the Plan (or such later date as may reasonably be agreed by the Debtors and the Creditors' Committee after the Debtors have issued notice of the Effective Date).

D.    **Important Notice And Cautionary Statement.**

The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based on the Debtors' books and records. The hypothetical liquidation analysis, projections, and other financial information have been developed by the Debtors with the assistance of their financial advisors. Nevertheless, the hypothetical liquidation analysis, projections, and other financial information are estimates only, and the timing, amount, and value of actual Distributions to creditors may be affected significantly by many factors that cannot be predicted.

ALTHOUGH THE PROFESSIONAL ADVISORS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, REGULATORY, AND ACCOUNTING DATA PROVIDED BY THE DEBTORS AND THIRD PARTIES, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. IN ADDITION, MUCH OF THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION, OR THAT ACTUAL VALUES OR FINANCIAL PERFORMANCE WILL COMPORT WITH THE ESTIMATES HEREIN.

THE DEBTORS' ACTUAL RESULTS OF OPERATIONS AND THE TIMING, AMOUNT, AND VALUE OF DISTRIBUTIONS UNDER THE PLAN MAY DIFFER MATERIALLY AND ADVERSELY FROM THOSE PROJECTED HEREIN. THE DEBTORS' FUTURE OPERATIONS MAY BE AFFECTED BY NUMEROUS ECONOMIC, COMPETITIVE, REGULATORY, LEGISLATIVE, LEGAL, OPERATIONAL, AND OTHER FACTORS THAT CANNOT BE PREDICTED.

THIS DISCLOSURE STATEMENT CONTAINS A DISCUSSION OF CERTAIN RISK FACTORS RELATING TO THE PLAN AND THE DEBTORS' ONGOING BUSINESS OPERATIONS. THE DEBTORS STRONGLY ADVISE THAT ALL PARTIES IN INTEREST REVIEW THESE RISK FACTORS CAREFULLY AND CONSULT WITH THEIR ADVISORS BEFORE VOTING ON THE PLAN OR OTHERWISE DECIDING TO SUPPORT OR OPPOSE CONFIRMATION.

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR OWN LEGAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

THE NEW COMMON STOCK AND NEW WARRANTS TO BE ISSUED
PURSUANT TO THE PLAN WILL NOT HAVE BEEN, AT THE TIME OF ISSUANCE,
THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE
SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF
1933, AS AMENDED, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW,
AND WILL BE ISSUED IN RELIANCE UPON THE EXEMPTION FROM THE
SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION PROVIDED
BY BANKRUPTCY CODE SECTION 1145(a)(1).

CAUTIONARY STATEMENT:

INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT
REGARDING THE DEBTORS CONTAINS STATEMENTS THAT MAY CONSTITUTE
"FORWARD-LOOKING INFORMATION," AS THAT TERM IS DEFINED BY THE
PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 ("REFORM ACT"),
INCLUDING INFORMATION CONCERNING THE DEBTORS' PLAN AND
PROJECTED FINANCIAL PERFORMANCE FOLLOWING THEIR EMERGENCE
FROM BANKRUPTCY. THE FORWARD-LOOKING STATEMENTS MADE IN THIS
DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY THE RISK
FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE BEING
MADE PURSUANT TO THE PROVISIONS OF THE REFORM ACT AND WITH THE
INTENTION OF OBTAINING THE BENEFITS OF THE "SAFE HARBOR"
PROVISIONS OF THE REFORM ACT.

II.    DESCRIPTION OF THE DEBTORS, THEIR BUSINESS
       OPERATIONS, AND THEIR FINANCIAL CONDITION.

       A.    General.

       Oakwood, which was founded in 1946, together with its debtor and non-debtor
affiliates and related parties, designs, manufactures and markets manufactured and modular
homes and arranges financing for a portion of its retail sales and of the retail sales of its homes
by its independent dealer network. The Debtors also act as agent in locating a variety of
insurance products for their customers. Following their emergence from these Chapter 11 Cases,
the Debtors expect to retail their manufactured homes at centers operated by the Debtors located
primarily in the southeastern and southwestern United States and at wholesale to independent
retailers located throughout the United States. For customers choosing to purchase insurance,
the Debtors historically assumed a portion of the related underwriting risk through their non-
debtor captive reinsurance business. As part of their restructuring effort, the Debtors exited this
aspect of the insurance business.

B.    **Manufactured Homes.**

The Debtors manufacture a number of models of single-section homes as well as multi-section and modular homes consisting of two or more component parts that are joined at the home site. Each home contains a living room, dining area, kitchen, one, two, three or four bedrooms and one or two bathrooms, and is equipped with a hot water heater and central heating. Some homes are furnished with a sofa and matching chairs, dinette set, coffee and end tables, carpeting, lamps, draperies, curtains and screens. Optional furnishings and equipment include a range and oven, refrigerator, beds, a fireplace, washing machine, dryer, microwave oven, dishwasher, air conditioning, intercom, stereo systems, wet bar, vaulted ceilings, skylights, hardwood cabinetry and energy conservation items. The homes manufactured by the Debtors are primarily sold under the registered trademarks "Oakwood®," "Golden West©," "Schult®," "Crest©," "Marlette®," "Freedom©" and as other private label homes.

The Debtors purchase components and materials used in the manufacture of their homes on the open market and are not dependent upon any particular raw material supplier. However, if faced with a scarcity of certain raw materials, the Debtors may experience supplier allocation issues. The principal raw materials purchased by the Debtors for use in the construction of its homes are lumber, steel, aluminum, insulating materials, drywall and plastics. Steel I-beams, axles, wheels and tires, roof and ceiling materials, home appliances, plumbing fixtures, furniture, floor coverings, windows, doors and decorator items are purchased or fabricated by the Debtors and are assembled and installed at various stages on the assembly line.

The Debtors' manufactured homes are constructed and furnished at the Debtors' manufacturing facilities and transported on wheels to the home sites. These homes are normally occupied as permanent residences but can be transported on wheels to new home sites. The Debtors' modular homes are built in accordance with state or local building codes and therefore are similar in specifications and design to site-built homes. The Debtors' modular homes range in size from 960 square feet to 3,355 square feet and include a variety of single story ranch homes, one-and-a-half-story homes, two-story homes, townhouses and duplex units, all of which can include attached garages built at the site by others.

The Debtors formerly manufactured homes at thirty-two plants located in North Carolina, Texas, Georgia, Indiana, Oregon, Pennsylvania, Arizona, California, Colorado, Kansas, Minnesota, and Tennessee. Pursuant to the Plan, the Debtors will continue to operate plants located in North Carolina, Indiana, Oregon, Pennsylvania, Arizona, California, Kansas and Minnesota. As part of their restructuring efforts, the Debtors have closed a number of plants. Certain of the closed plants are currently being marketed for sale, while others have been sold. Currently, the Debtors are operating 14 plants.

The Debtors furnish to each purchaser of a new home manufactured by the Debtors a limited warranty against defects in materials and workmanship, excluding equipment and furnishings supplied by others, which are frequently covered by the supplier's warranties.

C.    **Retail Home Sales.**

The Debtors operate their sales centers primarily under the names Oakwood® Mobile Homes and Freedom Homes©. Additionally, the Debtors operated Factory Certified Homes sales centers that sold primarily repossessed homes. Since 1999, the Debtors have been scaling back operations, closing both sales centers and manufacturing facilities. Although the Debtors will retain many of their sales centers pursuant to the Plan, some of the sales centers, including the substantial majority of the Factory Certified Homes locations, will be or are in the process of being closed as part of the Debtors' reorganization. During the fiscal year ended September 30, 2002, substantially all of the Debtors' retail sales of new homes were homes manufactured by the Debtors. The Debtors' sales have traditionally been higher in the period from late spring through early fall than in the winter months.

Each of the Debtors' sales centers hires and trains sales personnel. Generally, each salesperson is paid a commission based on the gross margin of his or her sales and certain volume targets, and each general manager is paid compensation based on performance as measured by the profits of the sales center.

The Debtors also sell their homes to independent retailers located throughout the United States. Sales to independent retail dealers accounted for approximately 70% of sales in fiscal 2003, 44% of sales in fiscal 2002, and 35% in fiscal 2001. The Debtors expect such sales to increase in the future because this market channel is less capital intensive.

D.    **Retail Financing And Servicing.**

Significant factors affecting sales of manufactured homes are the availability and terms of financing. Through its finance subsidiary, the Debtors financed approximately 72% of units sold by their captive retail organization in 2002. During fiscal 2003, in an effort to maintain satisfactory liquidity and improve loan performance, the Debtors sharply curtailed internal financing and substantially raised credit standards for customers they were willing to finance. As a result, the internal financing percentage has been reduced drastically and is currently estimated to be less than 15% of homes sold via the Debtors' own retail channel. The Debtors anticipate that this percentage will decline further in fiscal 2004. The sales reductions caused by credit tightening and the necessity to reduce internal financing have been reflected in the Debtors' year to date operating results as well as their five-year forecast.

The Debtors retain a security interest in all homes they finance with loans documented as either retail installment sales contracts or traditional mortgages (collectively, "RICs"). Debtor Oakwood Acceptance Corporation, LLC ("OAC") funds its originations and purchases of RICs by participating in public and private asset securitization transactions. Securitization transactions historically have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs and may remain the least expensive method of financing for the Debtors' operations. Interruptions in the public markets for these securitizations were a key reason for management's decision to limit loan originations.

19

As part of the securitization process, OAC historically retained the contractual right to service all securitized RICs in exchange for a monthly fee. As part of its servicing duties, the governing pooling and servicing agreements require OAC to make P & I Advances to the securitization trusts. OAC also is required to make recoverable advances to the trusts for taxes and insurance to the extent not paid by an obligor of a RIC and to advance liquidation expenses incurred in connection with the repossession of homes collateralizing loans that default. Continuing to service securitized RICs with the enhanced priority of their servicing fee in the securitization proceeds as restructured pursuant to a Final Order of the Bankruptcy Court has substantial independent economic value. As a result of the reduction in loan origination volume, the size of the loan portfolio serviced by the Debtors will diminish, which will result in reduced servicing income in future years.

Recent developments in the market for asset backed securities, and particularly those involving manufactured housing loans, have caused the Debtors to pursue other outlets for the sale of their loans. In March 2003, the Debtors, through their non-Debtor special purpose affiliates, completed a whole-loan sale and are currently pursuing a whole loan sale to a different purchaser. In addition, the Debtors have taken steps to reduce reliance on financings provided by securitizations, including moving most of their mortgage originations to the conforming loan market with outside lenders.

E.    **Independent Dealer Retail Sales Financing.**

The Debtors provide some permanent financing for homes sold by certain independent dealers that sell the Debtors' manufactured homes. During fiscal 2002, the Debtors financed approximately 38% of their manufactured units sold by independent dealers. During fiscal 2003, this percentage has dropped below 10%.

F.    **Independent Retailer Repurchase Obligations.**

Substantially all of the independent retailers who purchase homes from the Debtors finance new home inventories through wholesale credit lines (the "Floor Plans") provided by third parties. In these arrangements, a floor plan lender typically provides the retailer with a credit line for the purchase price of the home and maintains a security interest in the home as collateral. The retailer uses a Floor Plan to finance the acquisition of its display models, as well as to finance the initial purchase of a home from a manufacturer until a home buyer obtains permanent financing or otherwise pays the dealer for the installed home. Many of the Floor Plan lenders require the Debtors to enter into repurchase agreements under which the Debtors are obligated, upon default by the retailer, to repurchase any of the homes financed by the Floor Plan lender. Under the terms of such repurchase agreements, the Debtors typically agree to repurchase homes at prices scaled to the age of the units. As of the Petition Date, the Debtors estimate that their contingent liability under these repurchase agreements was approximately $101 million. Historically, the Debtors' losses under these arrangements have not been significant. Since the Petition Date, the Debtors have assumed approximately $50 million in repurchase obligations.

G.    **Insurance.**

In order to, among other things, facilitate retail purchases of their homes, the Debtors historically have sold, as agent for an unrelated domestic insurance company, property and casualty insurance to certain customers in connection with their purchase of a home. In addition, the Debtors entered the reinsurance business directly through their own captive, Bermuda-based reinsurer during 1997, when it, as a reinsurer, accepted certain risk of policies it had written or placed as agent, in exchange for standard reinsurance premiums. The Debtors began this in an attempt to allow the Debtors to participate more fully in the profitable income streams associated with the property and casualty insurance and service contract business. Shortly before the Petition Date, the Debtors exited the third party reinsurance business, and are arranging an orderly wind-down of their non-Debtor insurance subsidiary.

H.    **Competition.**

The Debtors face serious competition in three major aspects of their operations: manufacturing, marketing and finance. There are numerous firms producing manufactured homes in the Debtors' market areas, many of which are direct competitors. Some of these manufacturers, which sell the majority of their homes through independent dealers, are larger than the Debtors and have greater financial resources. Historically, certain of the financing sources in the industry were also larger than the Debtors and also had greater financial resources. Finally, there are numerous retail dealers in most locations where the Debtors conduct retail and financing operations. The Debtors compete with other manufacturers, retailers and finance companies on the basis of reputation, quality, financing ability, services, features offered and price.

In addition, manufactured homes are a form of permanent, low-cost housing and therefore compete with other forms of housing, including site-built and prefabricated homes and apartments. Historically, manufactured homes have been financed as personal property with shorter term and higher interest financing than was available for site-built homes. In recent years, however, there has been a growing trend toward financing manufactured housing with maturities equal to those in traditional residential real estate finance, especially when the manufactured housing is attached to permanent foundations on individually-owned lots, as is frequently the case in the Debtors' growing multi-section and modular homes markets. As a result, maturities for certain manufactured housing loans have moved closer to those for site-built housing.

I.    **Regulation.**

A variety of laws affect the financing of manufactured homes by the Debtors. The Federal Consumer Credit Protection Act (Truth-in-Lending) and Regulation Z promulgated thereunder require written disclosure of information relating to such financing, including the amount of the annual percentage rate and the finance charge. The Federal Fair Credit Reporting Act also requires certain disclosures to potential customers concerning credit information used as a basis to deny credit. The Federal Equal Credit Opportunity Act and Regulation B promulgated thereunder prohibit discrimination against any credit applicant based on certain specified

21

grounds. The Federal Trade Commission has adopted or proposed various Trade Regulation Rules dealing with unfair credit and collection practices and the preservation of consumer claims and defenses. The Federal Trade Commission's Rules also require disclosure of a manufactured home's insulation specification. Installment sale contracts and loans eligible for inclusion in the GNMA Program are subject to the credit underwriting requirements of the FHA. A variety of state laws also regulate the form of the installment sale contracts and loan documents and the allowable deposits, finance charges and fees chargeable pursuant to installment sale contracts and loan documents. The provision of insurance products as agent by the Debtors is subject to various state insurance laws and regulations which govern allowable charges and other insurance practices.

While not subject to such, the Debtors model the manner in which they collect payments on RICs on the provisions of the Fair Debt Collection Practices Act. The Debtors are also subject to the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, which regulates descriptions of warranties on products. The descriptions and substance of the Debtors' warranties are also subject to state laws and regulations. The Debtors' manufacture of homes generally is subject to the National Manufactured Housing Construction and Safety Standards Act of 1974. In 1976, the Department of Housing and Urban Development promulgated regulations, which have been amended from time to time, under this Act establishing comprehensive national construction standards covering many aspects of manufactured home construction and installation, including structural integrity, fire safety, wind loads and thermal protection. The Debtors' modular homes are subject to state and local building codes.

The Debtors' transportation of manufactured homes on highways, which is provided by unrelated third-party vendors, is subject to regulation by various federal, state and local authorities. Such regulations may prescribe size and road use limitations and impose lower than normal speed limits and various other requirements. Manufactured homes are also subject to local zoning and other regulations.

III.    **PREPETITION DEBT AND EQUITY STRUCTURE OF THE DEBTORS.**

A.    **Description Of Prepetition Debt Structure Of Debtors.**

1.    **Foothill Prepetition Bank Facility.**

Prior to the Petition Date, the Debtors partially funded their operations through a $65 million credit facility established under the Prepetition Loan Agreement, dated January 22, 2002, by and among the Debtors, as borrowers, Foothill, as a lender and agent for the lenders, and certain other lenders specified therein (as amended by the First Amendment to Loan Agreement, dated July 2002 and the Second Amendment to Loan Agreement, dated July 31, 2002). As of the Petition Date, borrowings and letters of credit under this facility totaled approximately $52 million. The credit facility under the Prepetition Loan Agreement was secured by substantially all of the Debtors' assets both tangible and intangible, real and personal, excluding loans held for sale. Pursuant to the Final Order [Docket No. 328] entered on

December 31, 2002, the Bankruptcy Court approved debtor-in-possession financing which, among other things, paid off the majority of this prepetition credit facility.

2.    Senior Notes.

The Debtors issued 7.875% Senior Notes in the aggregate principal amount of $125 million due March 2004, and 8.125% Senior Notes in the aggregate principal amount of $175 million due March 2009 pursuant to an Indenture and First Supplemental Indenture, both dated March 2, 1999, between the Debtors and Bank One, N.A., f/k/a The First National Bank of Chicago.  The debt under the Senior Notes is unsecured.  U.S. Bank National Association was substituted as Indenture Trustee on January 10, 2000.

3.    Junior Notes.

The Debtors issued 8% Junior Notes in the original principal amount of $17 million due June 1, 2007 pursuant to an Indenture and a First Supplemental Indenture, both dated March 1, 1992, and Junior Notes in the original principal amount of $23 million due June 1, 2007 pursuant to a Second Supplemental Indenture dated July 15, 1992, between the Debtors and First Union National Bank, f/k/a Delaware Trust Company.  U.S. Bank Trust National Association was substituted as Indenture Trustee on April 2, 2001.  Of the original Junior Notes, $2.6 million remained outstanding as of November 15, 2002, the balance having been retired in accordance with their terms.  The debt evidenced by the Junior Notes is unsecured.  The Junior Notes are not subordinate to the Senior Notes under the relevant Indentures.

4.    Industrial   Revenue   Bonds   For   Plants   In
Kosciusko   County,   And   Elkhart   County,
Indiana.

The Debtors are obligated under a loan agreement dated February 1, 1998, between Kosciusko County, Indiana and Schult Operating Company (now HBOS Manufacturing, LP) to pay all amounts equal to the principal and interest due under $6,200,000 Variable Rate Demand Economic Development Revenue Bonds Series 1998 (the "1998 Bonds").  The 1998 Bonds are secured by a letter of credit in the amount of $4,766,356.16 issued by Wells Fargo Bank, N.A.  Repayment of claims arising from the letter of credit is secured by a mortgage from the Debtors on the plant constructed with 1998 Bond proceeds in Kosciusko County, Indiana.  Fifth Third Bank, Indiana is the trustee under the trust indenture pursuant to which the 1998 Bonds were issued.  At the Petition Date, the amount outstanding on the 1998 Bonds was $4.6 million.

The Debtors are also obligated under a loan agreement dated October 1, 1997, between Elkhart County, Indiana and Schult Operating (now HBOS Manufacturing, LP) to pay all amounts equal to the principal and interest due under $1,500,000 Variable Rate Demand Economic Development Revenue Bonds, Series 1997 (the "1997 Bonds").  The 1997 Bonds are secured by a letter of credit in the amount of $896,282.19 issued by Wells Fargo Bank, N.A.  Repayment of claims arising from the letter of credit is secured by a mortgage from the Debtors on the plant constructed with 1997 Bond proceeds in Elkhart County, Indiana.  Fifth Third Bank,

Indiana is the trustee under the trust indenture pursuant to which the 1997 Bonds were issued. At the Petition Date, the amount outstanding on the 1997 Bonds was $865,000.

5.    <strong>Other Secured Debt.</strong>

There are a number of other creditors who assert that they are allegedly secured by certain discrete real and personal property assets of the Debtors.

6.    <strong>REMIC Guarantees And The Resecuritization<br/>Note Put Option.</strong>

Oakwood, through its wholly-owned finance subsidiary, OAC, originates RICs to finance the purchase of manufactured homes. Historically, when the aggregate number of RICs OAC had originated reached a critical mass, typically once every three months, the RICs were securitized and sold into the asset-backed market through non-Debtor Real Estate Mortgage Investment Conduit Securitization Trusts ("REMIC Trusts"). The REMIC Trusts are the issuers of pass-through certificates ("REMIC Certificates") that may pay cash interest on a fixed or floating rate basis and represented undivided ownership interests in a pool of underlying RICs in the REMIC Trusts. Each REMIC Trust issues REMIC Certificates in multiple tranches. Typically, a series identifier will indicate the year and sequential issue number within each calendar year. For example, "1997-A" would indicate the first OAC securitization in 1997 and "1997-B" would indicate the second securitization in 1997.

As previously noted, within a given series, the REMIC Certificates are separated into tranches, each having specific seniority and payment terms. While there is no distinction of collateral, as all tranches within a series are supported by the same pool of loans, the credit quality of a particular tranche is determined by a payment priority structure. Accordingly, holders of subordinated tranches generally receive higher interest rates, but will only receive principal payments after the principal of senior tranches has been paid in part or in full.

In order to enhance the marketability of one of the most subordinated tranches of REMIC Certificates, Oakwood, in certain cases, provided a corporate guarantee (the "B-2 REMIC Guarantees") that effectively guaranteed distributions on these tranches of REMIC Certificates (the "B-Piece REMIC Certificates"). The provisions of the REMIC Guarantees are complex, but, in general, if the underlying RICs held by the REMIC Trusts do not generate enough cash to service the B-Piece REMIC Certificates, Oakwood is obligated to fund the shortfalls.

Prior to the Petition Date, Oakwood provided corporate guarantees of the collateral pools backing payments under the B-Piece REMIC Certificates in twenty REMIC Trusts. Oakwood's B-2 REMIC Guarantees apply to the issues of B-Piece REMIC Certificates in the following REMIC Trusts: OMI Trust 1997-A, OMI Trust 1997-B, OMI Trust 1997-C, OMI Trust 1997-D, OMI Trust 1998-B, OMI Trust 1998-C, OMI Trust 1998-D, OMI Trust 1999-A, OMI Trust 1999-B, OMI Trust 1999-C, OMI Trust 1999-D, OMI Trust 1999-E, OMI Trust 2000-A, OMI Trust 2000-B, OMI Trust 2001-B, OMI Trust 2001-C, OMI Trust 2001-D, OMI Trust 2001-E, OMI Trust 2002-A and OMI Trust 2002-B. The B-2 REMIC Guarantees guaranteed payment of any shortfalls in principal and interest due to holders of B-Piece REMIC

24

Certificates on any monthly payment date by Oakwood. As of November 2002, the principal amount outstanding on the B-Piece REMIC Certificates guaranteed by the B-2 REMIC Guarantees was approximately $274.8 million. Oakwood provided B-2 tranche guarantees for approximately two-thirds of Oakwood's securitizations.

JPMorgan is the REMIC Trustee for individual REMIC Trusts and the Resecuritization Trust for which Oakwood has issued B-2 REMIC Guarantees. There were nine proofs of claim filed relating to the B-2 REMIC Guarantees. The REMIC Guarantee Claims, which include amounts for actual and contingent shortfalls of principal and interest payable from the non-debtor REMIC Trusts for the B-Piece REMIC Certificates, aggregate in excess of $1 billion. Set forth below is a list of the proofs of claim and the total amount asserted therein:

| REMIC Guarantee Claims | Total Amount Asserted in Proofs of Claim |
|---|---|
| OMI Trust 1997-A | $ 27,359,854.79 |
| OMI Trust 1997-B | $ 26,658,007.02 |
| OMI Trust 1997-C | $ 33,295,434.18 |
| OMI Trust 1997-D | $ 29,276,262.89 |
| OMI Trust 1998-B | $ 44,542,296.31 |
| OMI Trust 1998-D | $ 78,565,879.52 |
| OMI Trust 1999-A | $ 76,062,994.08 |
| OMI Trust 1999-B | $ 95,906,495.67 |
| The Resecuritization Trust | $ 605,111,713.66 |
| **Total REMIC Guarantee Claims** | **$ 1,016,778,938.12** |

Whether, and to what extent, there ultimately are Allowed REMIC Guarantee Claims will depend on various factors, including the extent of payments of principal and interest received by holders of B-Piece REMIC Certificates from the non-debtor REMIC Trusts, and the resolution by the Bankruptcy Court of any objections to the allowance of the REMIC Guarantee Claims. The Debtors' believe that the actual allowed amount of the REMIC Guarantee Claims could range anywhere from $0.00 to the claimed amount of $ 1,016,778,938.12. For the purposes of the Plan and the Disclosure Statement, the Debtors have used the approximate outstanding principal amount of $274.8 million for voting and estimated distribution purposes. The Debtors' and all other parties' rights to challenge or contest the allowance of the REMIC Guarantee Claims or their allowed amount are preserved in full. Included in the above claimed amounts is Oakwood's obligation to the holder of a note secured, in part, by certain B-Piece REMIC Certificates and X REMIC Certificates (the "Resecuritization Note") to purchase the Resecuritization Note on each payment date under the Resecuritization Note (the "Payment Date"), beginning with the Payment Date occurring in September 2011 and ending with the Payment Date occurring in September 2012 (the "Resecuritization Note Put Option").

### B.    Description Of Prepetition Equity Structure Of The Debtors.

As of December 1, 2002, Oakwood had issued and outstanding 9,537,000 shares of Old Common Stock, par value $0.50 per share. Oakwood also granted options to purchase

shares of Old Common Stock and other equity related securities. On or about the Petition Date, the New York Stock Exchange, Inc. (the "NYSE") announced that trading of the Old Common Stock on the NYSE should be suspended immediately based upon the failure to meet certain financial criteria. Subsequently, the NYSE submitted an application to the Securities and Exchange Commission to delist the Old Common Stock from the NYSE. The delisting of the Old Common Stock became effective on December 30, 2002. Oakwood has not paid dividends on the Old Common Stock during the past two fiscal years and the Old Common Stock is currently traded in the over-the-counter market. As of December 1, 2002, the Debtors estimate that there are 21,000 beneficial holders of Old Common Stock.

## IV.    THE CHAPTER 11 CASES AND SIGNIFICANT POSTPETITION EVENTS.

### A.    Significant Events Leading To The Commencement Of The Chapter 11 Cases.

The manufactured housing industry as a whole expanded aggressively into an economic downturn that has been particularly severe for its traditional customer of modest means. At the same time, mortgage rates for site-built homes were, and still are, at a thirty-year low, which offset many of the cost advantages of manufactured homes because interest rates for manufactured housing loans exceed rates for conventional housing loans by an amount substantially greater than has historically been the case. Additionally, aggressive lending led to a high level of repossessed homes. The remarketing of these homes in competition with new homes depresses new home sales volume.

In addition, many traditional industry lenders, including both Floor Plan lenders and retail lenders which provide financing to homebuyers, have left the industry over the last few years or have significantly curtailed operations. This includes leading industry lenders such as Conseco Finance Corporation, which filed for relief under Chapter 11 on December 18, 2002, and Deutsche Financial Services Corporation, which exited the industry. This reduction in available financing has led to a contraction of the dealer network and a sharp reduction in manufactured home sales.

Through 1999, the Debtors expanded and leveraged themselves aggressively to support their rapid growth, which resulted in a heavier debt load than performance in declining markets after 1999 could support. Aggressive underwriting coupled with the current economic slowdown led to an unsustainable level of loan defaults on securitized RICs. The cost of servicing and the liquidity requirements for performing servicing duties increased with the defaults. At the same time, servicing receipts were decreasing due to credit losses because the servicing fees were subordinated to principal and interest on the B-Piece REMIC Certificates. Despite taking measures to counter negative pressures, the Debtors continued to experience financial difficulties.

The Debtors decided to file for reorganization under Chapter 11 in order to protect and preserve their assets for the benefit of their stakeholders, restructure their balance sheet and access new working capital while continuing to operate as a going concern. This decision was based primarily upon the continued poor performance of loans originated, the extremely weak conditions in the manufactured housing industry and the deteriorating financial

terms in the asset-backed securitization market into which the Debtors sell their loans. Other factors contributing to the decision to commence these Chapter 11 Cases included the general economic recession, declining recovery rates in the repossession market, the substantial reduction in loan servicing fees received and the withdrawal of manufactured housing Floor Plan lenders offering financing to many of the Debtors' wholesale dealers. Prepetition litigation was not a major factor in the Debtors' decision to commence these Chapter 11 Cases.

### B.    The Chapter 11 Filings.

The Debtors commenced their respective Chapter 11 Cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on November 15, 2002 (the aforementioned "Petition Date"). The Debtors' Chapter 11 Cases are jointly administered and assigned to the Honorable Peter J. Walsh, United States Bankruptcy Judge for the District of Delaware.

The Debtors have made progress toward their goal of reorganization during their respective Chapter 11 Cases. Among other things, the Debtors have: (a) maintained operations and negotiated new agreements with vendors and suppliers of critical goods and services; (b) obtained debtor-in-possession financing to enable the Debtors to continue operations; (c) developed a new business plan, which has been discussed extensively with the Debtors' principal creditor constituencies and forms the basis for the Plan; (d) implemented significant improvements to the Debtors' business operations, including reducing overhead and greatly improving the priority of servicing fees; (e) substantially completed the closure of certain plants, retail sales centers and offices; (f) negotiated the sale of certain surplus assets to reduce costs and generate cash; and (g) negotiated for additional or substitute Floor Plan financing. Moreover, the Debtors have devoted significant efforts to the development, negotiation, and filing of the Plan that is the subject of this Disclosure Statement, which Plan the Debtors believe provides for the fair and equitable treatment of creditors and will enable the Debtors to emerge from their Chapter 11 Cases as viable businesses.

### C.    "First Day" Motions.

On or after the Petition Date, the Debtors filed several "first day" motions relating to the ordinary course operations of their businesses. The Bankruptcy Court has entered Final Orders granting the Debtors' motions either as requested or modified to some extent, but in either event permitting the Debtors to continue operations during the Chapter 11 Cases. The "first day" orders enable the Debtors to, among other things: (a) preserve customer relationships by authorizing the Debtors to honor certain obligations and continue certain programs and practices; (b) maintain employee morale and confidence by authorizing the Debtors to pay prepetition employment Claims and all costs and expenses incident thereto; (c) maintain critical vendor and supplier relationships and confidence by authorizing the Debtors to pay certain prepetition Claims; (d) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; and (e) establish certain other administrative procedures to promote a smooth transition into Chapter 11.

D.    **Appointment Of The Official Committee Of Unsecured Creditors.**

On December 2, 2002, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") pursuant to section 1002 of the Bankruptcy Code [Docket No. 97]. To date, the United States Trustee has appointed no other committees. The members of the Creditors' Committee currently are:

| | |
|---|---|
| JPMorgan Chase Bank (as Indenture Trustee for REMIC Certificates and noteholders) | James R. Lewis |
| U.S. Bank National Association (as Indenture Trustee for holders of Senior Notes) | Timothy J. Sandell |
| Absolute Recovery Hedge Funds, Ltd. | Wilbur L. Ross, Jr. and Joseph Mullin |
| Aegon USA Investment Management, LLC | James K. Baskin |
| Patrick Industries, Inc. | Michael W. Bakers |
| Carriage Industries, Inc. | Bradley J. Ellingson |
| LaSalle Bristol LP | James Montague |
| D.E. Shaw & Co., *ex officio member* | Max Holmes and Marc Sole |

E.    **Employment Of Professionals.**

1.    **Reorganization And Other Professionals Employed Pursuant To Bankruptcy Code Section 327.**

Pursuant to section 327 of the Bankruptcy Code, a debtor in possession or creditors' committee may employ, after notice and a hearing, attorneys, financial advisors, and other professionals at the expense of the bankruptcy estate. The Debtors and the Creditors' Committee have employed the following professionals in the Chapter 11 Cases with the Bankruptcy Court's approval:

| | | |
|---|---|---|
| Morris, Nichols, Arsht & Tunnell | Bankruptcy Counsel to the Debtors | 11/15/2002 |
| Rayburn, Cooper & Durham, P.A. | Bankruptcy Counsel to the Debtors | 11/15/2002 |
| Hunton & Williams | Special Counsel to the Debtors | 11/15/2002 |
| Kennedy Covington Lobdell & Hickman L.L.P. | Special Counsel to the Debtors | 11/15/2002 |
| FTI Consulting, Inc. | Restructuring Advisors for the Debtors | 11/15/2002 |
| PricewaterhouseCoopers LLP | Accountants for the Debtors | 11/15/2002 |
| Akin Gump Strauss Hauer & Feld LLP | Former Counsel to the Creditors' Committee | 12/02/2002 |

28

| McCarter & English, LLP | Counsel to the Creditors' Committee | 12/02/2002 |
|---|---|---|
| Deloitte & Touche LLP | Financial Advisors for the Creditors' Committee | 12/04/2002 |
| Prime Locations, LLC | Real Estate Consultants for the Debtors | 02/27/2003 |
| The Core Network | Real Estate Consultants for the Debtors | 02/27/2003 |
| Andrew Davidson & Co., Inc. | Valuation Consultants for the Debtors | 04/22/2003 |
| Miller Buckfire Lewis Ying & Co., LLC | Financial Advisor and Investment Banker for the Debtors | 07/21/2003 |
| King & Spalding LLP | Replacement Counsel to the Creditors' Committee | 08/25/2003 |

Pursuant to Final Orders, each of the professionals employed at the expense of the Debtors' Estates are able to file monthly fee applications seeking payment of 80% of the fees and reimbursement for 100% of the expenses incurred during the applicable month. If no objection to a fee application is received on or before the applicable objection deadline, the Debtors are permitted to make payment of 80% of the fees and 100% of the expenses incurred by the relevant professional. The Bankruptcy Court may schedule a hearing to determine whether payment of the fees and the expenses incurred is appropriate. All fees and expenses paid to professionals are subject to final review and allowance, after notice and a hearing, in accordance with Bankruptcy Code section 330.

2.     **Ordinary Course Professionals.**

Additionally, on December 18, 2002, the Bankruptcy Court entered a Final Order [Docket No. 271] permitting the Debtors to employ professionals utilized in the ordinary course of business.

F.     **Postpetition Debtor-In-Possession Financing And Use Of Cash Collateral.**

Pursuant to a Final Order [Docket No. 328] entered on December 31, 2002, the Bankruptcy Court approved debtor-in-possession financing in the form of the Final DIP Agreement in the amount of $215 million from Greenwich secured by all of the assets of the Estates. This facility provides needed liquidity and expands the borrowing base by including in it certain financial assets created by OAC in servicing the REMIC Trusts. Under the Final DIP Agreement, the facility matures in November and must be paid in full once the Plan is confirmed and consummated.

The Final DIP Agreement contains provisions that have required and continue to require the Debtors to meet certain goals in these Chapter 11 Cases, including various sales of RICs, the filing of the First Plan and First Disclosure Statement, the filing of this Disclosure Statement and Plan and the confirmation of the Plan by November 15, 2003.

G.     **Restructuring The Debtors' Servicing Fees On RICs.**

Prior to the Petition Date, the Debtors were not receiving most of their servicing fee from the REMIC Trusts because, in accordance with the Servicing Agreements, the rights to

29

receive those fees were subordinate to payments on the REMIC Certificates. As their annual servicing costs were substantial—in excess of $30 million—the Debtors needed to modify these arrangements in order to sustain their servicing operations. As a result, the Debtors sought to maintain their servicing operations while moving the payment of servicing fees to a priority position.

After the Petition Date, the Debtors filed a motion for entry of an order pursuant to Sections 365 and 363(b) and (f) of the Bankruptcy Code authorizing OAC to, inter alia, (a) assume certain servicing agreements within the Pooling and Servicing Agreements (the "Servicing Agreements"), (b) assign its servicing rights under the Pooling and Servicing Agreements to Oakwood Servicing Holdings, Co., LLC ("OSHC"), a wholly-owned non-debtor subsidiary of OAC, and (c) enter into and perform its obligations as Subservicer under a Subservicing Agreement with OSHC.

Because the Servicing Agreements provided that the servicing fee payable thereunder was subordinate to the right of holders of REMIC Certificates to receive payments of principal and interest only for so long as OAC was the Servicer, the assumption and assignment of the Servicing Agreements to OSHC elevated the servicing fee payable under the Servicing Agreements to senior status. Because OAC's subservicing fee is payable from OSHC's servicing fees, OAC's subservicing fees effectively also are senior. In addition, the assumption and assignment of the Servicing Agreements increased the amount of the servicing fee payable under certain of the Servicing Agreements.

Oakwood has acknowledged that the elevation of servicing fees to a senior position in the distribution of cash received by the REMIC trusts "has the effect of decreasing cash available to pay security holders in the REMIC trusts." As a result, Oakwood "expects its obligations under the guarantees of [the B-2 REMIC Certificates] to increase substantially." See Oakwood's Form 10-Q filed with the Securities and Exchange Commission for the quarterly period ending December 31, 2002.

By Orders dated December 12, 2002, and January 15, 2003, this Court granted the relief sought in the above-referenced motion. Nothing in the Plan shall affect those Orders, the rights granted or preserved under those Orders, or the Servicing Agreements referenced in those Orders, including, but not limited to, the rights of the securitization trustees under the Servicing Agreements or the holders of certificates or notes issued by the resecuritization trusts whose assets are serviced pursuant to the Servicing Agreements.

H.     **Creation Of Alternate Warehouse Trust.**

Pursuant to a Final Order [Docket No. 473] entered on January 23, 2003, the Bankruptcy Court granted the Debtors the authority to sell RICs to a limited purpose trust owned by an indirect downstream affiliate of OAC. This loan warehousing arrangement provides interim funding for RICs generated by OAC and is intended to help preserve the Debtors' access to the securitization markets and other potential financing sources.

I.      **Filing Of Schedule Of Assets And Liabilities And Statement Of Affairs.**

Sections 521(1) and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007 require the Debtors to file a schedule of assets and liabilities and statement of financial affairs, which contain information regarding the Debtor's assets, liabilities, income, and other matters. The Debtors, individually, filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on January 31, 2003.

J.      **Actions Implemented To Restructure The Debtors' Business Operations.**

Leading up to and after the Petition Date, the Debtors and their professionals evaluated the Debtors' operations and financial condition in order to develop and implement a reorganization strategy that enables the Debtors to emerge from Chapter 11 as a profitable enterprise. Going forward, the Debtors are focused on enhancing the profitability of all their operations.

On October 4, 2002, the Debtors announced the closing of forty retail sales centers. These closures continued a downsizing from a peak of 412 retail sales centers reached in 1999. At or around the same time, the Debtors idled or closed a number of manufacturing facilities, reducing the number of active plants to nineteen from a peak of thirty-two in 1999. Historically, the Debtors operated the plants to support the demand of both their captive retail centers and the independent retailer base. From the middle of 1999 until the end of fiscal 2002, the Debtors operated the plants at a reduced level in order to reduce inventory and to reflect lower demand.

Pursuant to the operational restructuring plan implemented on the Petition Date, the Debtors announced the closing of seventy-five additional retail sales centers in eighteen states and the closing of five additional manufacturing facilities. The Debtors have hired two real estate firms to dispose of the properties and leases related to the closings. With the completion of these closings, the Debtors have turned their focus to those regions that hold the most promise for the Debtors' long-term success.

In April 2003, the Debtors substantially tightened their credit standards for retail installment financing and took other steps to reduce the amount of loans originated. As a result, internal financing of retail sales has fallen from 72% of unit sales in 2002 to a run rate of less than 15% of sales in 2003. This trend reduces the Debtors' reliance on securitizations and their exposure to losses in the sale of retail installment contracts, but reduces the potential for servicing revenue.

The implementation of the Debtors' operational restructuring plan is ongoing and entails the following: (a) the closing of most, if not all, retail sales centers that have demonstrated consistently poor operating performance, poor credit performance and high incidence of customer litigation, as well as the manufacturing facilities that supply these stores; (b) the review of remaining retail sales centers on a store-by-store basis followed by the closing of those stores that consistently generate poor operating results or are located in areas that will be negatively impacted by tightening credit standards; (c) the adjustment of manufacturing capacity to a level

31

commensurate with expected future sales and the closing of plants with marginal current sales levels and the potential to become unprofitable following the closing of certain retail sales centers; (d) the closing of one loan origination location in Austin, Texas; (e) a significant reduction in the number of employees; and (f) a reduction of corporate overhead commensurate with a downsized company.

### K.     Senior Management Retention Plan.

On May 22, 2003, the Bankruptcy Court authorized the Debtors to implement a management retention plan, indemnification plan and severance program for certain of the Debtors' officers. The retention plan for these officers consists of two types of merit-based retention payments: (i) payment of the officers' previously unpaid performance-based bonuses, as set by the Debtors' board of directors, for the fiscal 2002 year; and (ii) payment of the officers' quarterly performance-based bonuses, as set by the Debtors' board of directors with the consent of the Creditors' Committee. The Creditors' Committee has agreed to the officers' performance-based bonuses for the second half of 2003. These retention payments are the continuation of the ordinary practice of the Debtors to award the Debtors' officers merit-based incentive compensation. The severance program is designed to provide these officers with severance benefits in the event of their termination for any reason other than for cause. The severance benefits are to be held in an escrow account until the officers are entitled to receive them. The indemnification plan consists of $50,000 placed in an escrow account to cover the fees and expenses of defending the officers pursuant to Oakwood's Articles of Incorporation and Section 9.5 of Oakwood's By-Laws, if necessary. Pursuant to the Bankruptcy Court's prior authorization, the Creditors' Committee has also agreed to an emergence bonus payment.

### L.     Claims Bar Date And Analysis.

Pursuant to the Bar Date Order, the Bankruptcy Court established a general claims bar date in the Debtors' Chapter 11 Cases of March 27, 2003. The Debtors also have scheduled certain Claims with respect to which no proofs of Claim have been filed. The Debtors believe that the total amount of Allowed Claims against their respective estates will be significantly lower than the amount asserted. Because of the large number of proofs of Claim filed, the complexity of many of these Claims, and the fact that many of the Claims are disputed and/or unliquidated, the Debtors will not have completed their analysis of all Claims prior to the Plan's Effective Date.

**The Debtors reserve all rights and defenses with respect to the allowance or disallowance of any Claim not previously allowed by a Final Order of the Bankruptcy Court or pursuant to the terms of the Plan, and further with respect to the secured or priority status thereof.**

### M.     Filing Of The First Plan And Disclosure Statement.

On February 18, 2003, the Debtors filed the [Proposed] Disclosure Statement For Joint Consolidated Plan Of Reorganization Of Oakwood Homes Corporation And Its Affiliated Debtors And Debtors-In-Possession (the "First Disclosure Statement") and the Joint Consolidated Plan Of Reorganization Of Oakwood Homes Corporation And Its Affiliated

Debtors And Debtors-In-Possession (the "First Plan"). The First Disclosure Statement and First Plan were filed by the Debtor in compliance with certain provisions of the Final DIP Agreement, which required that the Debtors file a plan of reorganization and a disclosure statement on or before February 18, 2003. On June 19, 2003, the Debtors initially filed this current Plan and Disclosure Statement. The substance of the Debtors' plan of reorganization has not significantly changed between the Plan and the First Plan. The revision of the Plan and Disclosure Statement since June 19, 2003, contains no material changes, just the addition of certain exhibits and disclosures.

## N.     Extension Of The DIP Financing.

On July 14, 2003, the Debtors and the DIP Lenders entered into Amendment No. 4 to the Debtor-in-Possession Financing Agreement (the "DIP Amendment"). The DIP Amendment replaces all references to the Debtors' original budget with references to the updated forecast dated July 1, 2003, reduces the total commitment from $140 million to $90 million, makes corresponding adjustments to the borrowing base, and extends the deadline for a final order of confirmation of a Plan of Reorganization to November 15, 2003. The Debtors believe that this amended facility provides adequate liquidity for the Debtors' operations under its current business plan and adequate time for the confirmation of the Plan.

## O.     The WARN Act Litigation.

On March 27, 2003, certain former employees (the "WARN Act Claimants" or "Plaintiffs") initiated a putative class action adversary proceeding in the bankruptcy cases alleging that the Debtors had violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et seq. (the "WARN Act") at two facilities located in Texas and alleging a basis to maintain the adversary proceeding as a class action (Adv. Pro. No. 03-52178 (PJW)). On May 3, 2003, Plaintiffs filed an amended complaint which, inter alia, alleged that the WARN Act was violated by the Debtors at three additional locations: in Tennessee, Georgia and North Carolina. On May 5, 2003, the Debtors filed their answer to the complaint and again on May 15, 2003, filed their answer to the amended complaint. By Order dated July 17, 2003 (D.I. 20 in Adv. Pro. No. 03-52178 (PJW)), the Court certified the class and appointed class counsel for all purposes.

Additionally, on March 26, 2003, the WARN Act Claimants filed a proof of claim, styled as a "class proof of claim" in the Debtors' bankruptcy cases (the "Claim"). By the Claim, the WARN Act Claimants assert total damages in the amount of $10,187,082.56. Of this amount, the WARN Act Claimants assert a priority claim of $7,440,000 under section 507 of the Bankruptcy Code.

On June 4, 2003, the Debtors moved to transfer venue of the WARN Act litigation to the Middle District of North Carolina. At the hearing held on September 11, 2003, the Bankruptcy Court indicated that it would order the transfer of venue of the WARN Act litigation to the Western District of Texas. The WARN Act litigation has not been fully adjudicated.

The Debtors believe that the Claim is significantly overstated. The Debtors have asserted certain affirmative defenses and are contesting liability for the claimed WARN Act violations. The Debtors intend to vigorously defend against the contentions asserted in the Claim and the WARN Act litigation.

The law firm of Constangy, Brooks & Smith, LLC is representing the Debtors in the litigation.

P.   **The Objection Of David L. Babson & Company, Inc. As Investment Advisor To Proposed Disclosure Statement For Revised First Amended Joint Consolidated Plan Of Reorganization Of Oakwood Homes Corporation And Its Affiliated Debtors And Debtors-In-Possession (D.I. 1990).**

David L. Babson & Company, Inc. ("DLB"), as investment advisor and agent to certain beneficial owners of OMI Trust 2001-C certificates, has filed a request for allowance and immediate payment of an administrative expense claim (D.I. 1991) and a related objection to the disclosure statement (D.I. 1990). The Debtors dispute the allegations that the Debtors owe any such administrative expenses to this claimant, and the Debtors intend to vigorously defend this position. More specifically, the Debtors contend that the claimant has not incurred any damages due to OAC's alleged failure properly to allocate and remit certain payments allegedly due to the beneficial owners of OMI Trust 2001-C certificates. DLB has served discovery on the Debtors, and the parties are attempting to resolve the request of DLB and its attendant objection. In the event that the claimants prevail with their administrative expense request, the Debtors believe that any administrative claim ultimately awarded to DLB would not be large enough to affect the feasibility of the Plan.

Q.   **Alternatives and Exit Financing.**

In furtherance of the Debtors' fiduciary duties, the Debtors considered alternatives to the stand-alone recapitalization as presented in this Disclosure Statement and Plan. In that regard, the Debtors engaged Miller Buckfire Lewis Ying & Co., LLC ("MBLY") to, among other things, analyze and evaluate the Debtors' business, find potential lenders for the Exit Facility and gauge the interest of various parties to purchase all or substantially all of the assets of the Debtors. To this end, certain parties expressed an interest in purchasing the Debtors. However, the Debtors ultimately decided, in consultation with the Creditors' Committee, that these expressions of interest failed to yield a recovery to Holders of Allowed Unsecured Claims commensurate with that under a stand-alone reorganization, due to the cash-flow positive nature of the Debtors newly-restructured business.

While several parties expressed an interest in purchasing the Debtors' assets, the Debtors, in consultation with their advisor MBLY and the Committee, concluded that pursuing a sale at this time was not in the best interests of the Debtors and their various constituencies.

## V.    SUBSTANTIVE CONSOLIDATION.

### A.    Substantive Consolidation For Purposes Of The Plan.

Substantive consolidation is an equitable remedy which a bankruptcy court may be asked to apply in certain Chapter 11 cases involving affiliated debtors. As contrasted with procedural consolidation,[8] substantive consolidation may affect the substantive rights and obligations of creditors and debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors; all of the debtors in the substantively consolidated group are treated as if they were a single corporate/economic entity. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored. However, substantive consolidation does not affect the debtors' separate corporate existence or independent ownership of property for any purposes other than for making distributions of property under a plan of reorganization or otherwise as necessary to implement such plan.

Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for all purposes related to the Plan including, without limitation, for purposes of voting, confirmation and distribution. For purposes of distributions on account of Allowed Claims, the Debtors will be considered to be a single legal entity. This substantive consolidation has three major effects. First, it eliminates Intercompany Claims and Debtor-Held Interests from the treatment scheme. Second, it eliminates guarantees of the obligations of one Debtor by another Debtor. Finally, each Claim filed against any of the Debtors will be considered to be a single Claim against the consolidated Debtors.

### B.    The Substantive Consolidation Of The Debtors' Estates.

The Plan contemplates and is predicated upon entry of the Substantive Consolidation Order, which shall effect the substantive consolidation of the Chapter 11 Cases into a single Chapter 11 Case solely for the purposes of all actions associated with confirmation and consummation of the Plan. Pursuant to the Substantive Consolidation Order, on the Confirmation Date or such other date as may be set by a final order of the Court, but subject to the occurrence of the Effective Date: (a) all Intercompany Claims shall be eliminated; (b) all assets and liabilities of the Debtors shall be merged or treated as though they were merged; (c) all prepetition and postpetition cross-corporate guarantees of the Debtors shall be eliminated; (d) all Claims based upon guarantees of collection, payment or performance made by one or more

---

[8]    Procedural consolidation is the administrative process (contemplated by Bankruptcy Rule 1015(b)) whereby the proceedings of two or more affiliated debtors are conducted as part of a single proceeding for the convenience of the bankruptcy court and parties in interest. Procedural consolidation does not affect the substantive rights of debtors or their respective creditors and interest holders.

Debtors as to the obligations of another Debtor or of any other Person shall be discharged, released and of no further force and effect; (e) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of Reorganized Oakwood; (f) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against Reorganized Oakwood; (g) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed filed against Reorganized Oakwood in the consolidated Chapter 11 Cases and shall be deemed a single obligation of Reorganized Oakwood under the Plan on and after the Confirmation Date; and (h) the Chapter 11 Cases of the Affiliate Debtors shall be closed.

The Debtors, in consultation with their professionals, have concluded that the substantive consolidation of these Chapter 11 Cases is necessary to avoid harm or prejudice to multiple groups of creditors and to ensure an efficient Distribution of the Estates' assets to Holders of Allowed Claims. In the Debtors' business judgment, no one subsidiary can exist individually without the existence and support of at least one of its related parent subsidiaries since the operation of the Debtors' businesses is interdependent upon the integrated relationships among the various Debtors.

C.    **Order Granting Substantive Consolidation.**

Unless substantive consolidation has been approved by a prior order of the Bankruptcy Court, the Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases. Unless an objection to substantive consolidation is made in writing by any creditor affected by the Plan as provided in the Plan on or before the Ballot Deadline, or such other date as may be fixed by the Bankruptcy Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

VI.    **THE PLAN OF REORGANIZATION.**

Attached hereto as Exhibit A, in its entirety, is the Revised First Amended Joint Consolidated Plan Of Reorganization Of Oakwood Homes Corporation And Its Affiliated Debtors And Debtors-In-Possession, which is fully incorporated herein and shall be considered a portion of this Disclosure Statement. Certain notable provisions of the Plan are recited or described below. **HOLDERS OF CLAIMS AND INTERESTS AND OTHER INTERESTED PARTIES MUST READ THE PLAN IN ITS ENTIRETY TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. FOR AN ANALYSIS OF ESTIMATED RECOVERIES UNDER THE PLAN, HOLDERS OF CLAIMS AND INTERESTS SHOULD READ SCHEDULE 6 TO EXHIBIT B TO THIS PLAN.**

A.    **Funding Of Distributions Under The Plan.**

The Distributions to be made pursuant to the Plan will be available from (a) funds realized in connection with past operations of the Debtors and their non-debtor affiliates, (b) existing Cash assets of the Debtors including the Net Proceeds, (c) the liquidation of certain non-

36

Cash assets of the Debtors, and (d) the Exit Facility, the New Common Stock and the New Warrants.

Debtors are currently negotiating an Exit Facility with $75.0 million in availability. As described in Exhibit B to this Disclosure Statement, this Exit Facility will be utilized to fund the estimated Cash exit requirements, including those Distributions to be made on the Initial Distribution Date, of $49.2 million. The balance of availability under the Exit Facility along with the estimated $20.0 million of Cash on hand will be available to the Reorganized Debtors for working capital purposes.

B. **Considerations Concerning Causes Of Action Under The Plan.**

All Causes of Action, including Avoidance Actions, shall be and hereby are preserved. Prosecution and settlement of such Causes of Action, including Avoidance Actions, shall be the sole responsibility of the Reorganized Debtors or the Disbursing Agent, pursuant to this Plan, and the Confirmation Order, and the Reorganized Debtors or the Disbursing Agent, as the case may be, shall pursue those Causes of Action, including Avoidance Actions, as appropriate, in accordance with their respective judgments, of what is in the best interests, and for the benefit of the Creditors and of the Estates. To the extent that any Avoidance Actions are allocated to the Disbursing Agent, such Disbursing Agent shall have all rights, powers, and interests of the Debtors, as debtors in possession, to pursue such Avoidance Actions as a representative of the Estates pursuant to section 1123(b)(3) of the Bankruptcy Code. The determination of whether the Causes of Action will remain with the Reorganized Debtors or will be transferred to the General Distribution Trust, under the supervision of the Disbursing Agent, has not been made at this time. This determination, once it is made by the Debtors in consultation with the Creditors' Committee, will be so reflected in the Plan Supplement.

C. **Considerations Concerning The Board Of Directors Of The Reorganized Debtors.**

The initial Board of Directors for Reorganized Oakwood shall be comprised of seven (7) directors designated by the Creditors' Committee. If the Creditors' Committee does not so designate an initial Board of Directors, or designates an incomplete initial Board of Directors, the existing members of the Board of Directors of the Debtors shall so designate those remaining undesignated directorships. The initial boards of directors of the Reorganized Subsidiaries shall be the same as that of Reorganized Oakwood unless otherwise designated by the Board of Directors of Reorganized Oakwood. All such directors shall be deemed elected, and those directors not continuing in office shall be deemed removed therefrom, effective on the Effective Date, pursuant to the Confirmation Order. Such directors' tenure and the manner of selection of new directors shall be initially as provided in the Amended and Restated Certificates of Incorporation and the Amended and Restated Bylaws. The Board of Directors of Reorganized Oakwood will have the full authority to remove or replace the management of any of the Reorganized Debtors as of the Effective Date.

37

D.    **Considerations Concerning The Management Of The Reorganized Debtors.**

As described in Section 6.9 of the Plan, the initial officers of the Reorganized Debtors will be the existing officers of the Debtors. The purpose of keeping the existing officers is to maintain continuity and ensure that the Reorganized Debtors are able to smoothly operate in the ordinary course of business immediately after the Effective Date.

Certain parties, including certain Holders of Class 4D Claims, have objected to the retention of the current officers as they allege that it was the mismanagement of the Debtors by the current officers that gave rise to their Claims. The Debtors believe that the interruption in the normal business operations of the Reorganized Debtors that would be created by mandating a new set of officers for the Reorganized Debtors on the Effective Date far outweighs the concerns raised by these objecting parties. Furthermore, as mentioned directly above, the new Boards of Directors of the Reorganized Debtors will have the full authority to remove or replace the officers on or after the Effective Date.

E.    **Considerations Concerning The Issuance Of The New Common Stock.**

Under the Plan, 20,000,000 shares of common stock of Reorganized Oakwood, having a par value of $1.00 per share, will be authorized pursuant to Reorganized Oakwood's Amended and Restated Certificate of Incorporation. Under the Plan, 10,000,000 shares are to be issued and distributed, which will constitute 100% of the total number of shares of such New Common Stock to be issued and outstanding on or immediately after the Effective Date with two exceptions. These exceptions are (i) an amount of New Common Stock may be set aside for certain performance-based compensation for the officers, directors and key employees of the Debtors; and (ii) an amount of New Common Stock may be set aside to pay the Exit Facility Lender pursuant to an agreement for an Exit Facility.

F.    **Considerations Concerning The Issuance Of The New Warrants.**

The New Warrants to be issued under the Plan are devised so that holders of these New Warrants will only be able to exercise the New Warrants for New Common Stock once the New Common Stock held by the Holders of Senior Notes, Holders of Junior Notes, Holders of REMIC Guarantee Claims, Litigation Claims and Holders of Other Unsecured Claims reaches a value that results in a 100% recovery for such Holders of Claims. The New Warrants will have a maturity of seven years.

G.    **Considerations Concerning The REMIC Guarantee Claims.**

The Debtors believe that due to certain negative tax consequences regarding Distributions to holders of B-2 REMIC Certificates on account of their status as Holders of Allowed REMIC Guarantee Claims, all Holders of Allowed REMIC Guarantee Claims arising from the B-2 REMIC Guarantees may be required to tender the underlying B-Piece REMIC Certificate, and thereby assign any future payments thereunder, to the Debtors in exchange for an Allowed REMIC Guarantee Claim in an Allowed Amount equal to the face amount of the B-Piece REMIC Certificate plus Allowed Interest. This would result in a slightly diluted recovery to Holders of Allowed Claims in Class 4A, Class 4B, Class 4D and Class 4E. The REMIC Trustees and Creditors' Committee do not agree with the Debtors' belief that such a tendering of the underlying B-Piece REMIC Certificate is either necessary or appropriate under the Bankruptcy Code. In any event the REMIC Trustees and Creditors' Committee have made it clear that, at this time, they will not consent to such treatment.

H.    **Considerations Concerning Holders Of Claims In Class 4D.**

Holders of Class 4D Claims include all Holders of (a) Claims against the Debtors asserted under lawsuits or complaints which are pending as of the commencement of the Chapter 11 Cases in any court, including, without limitation, state or federal court; (b) Claims against the Debtors subject to mediation or arbitration which are pending as of the commencement of the Chapter 11 Cases that could potentially be asserted under lawsuits or complaints in any court; or (c) Claims raised or made to the Debtors by any Person, including, without limitation, offices of state attorneys general, related to matters arising prior to commencement of the Chapter 11 Cases that could have been asserted under lawsuits or complaints in any court or could have been subject to mediation or arbitration.

This definition includes all parties both currently litigating with the Debtors and all parties whose Claims are subject to the alternative dispute resolution process ("ADR") approved by the Bankruptcy Court in the Order Approving Alternative Dispute Resolution Procedures (D.I. 850) entered on March 21, 2003. The Debtors expect litigation and ADR to continue after the confirmation of the Plan. As these Class 4D Claims are settled or otherwise decided by the relevant litigation or ADR, such Claims will become Allowed Claims and will be entitled to their Ratable share of the General Distribution Trust.

I.    **Considerations Concerning The Claims Objection Deadline.**

To allow the Reorganized Debtors, whose Board of Directors is to be chosen by the Creditors' Committee, as described above and in the Plan, a full and complete opportunity to analyze Claims, the Claims Objection Deadline is defined as the last day for filing objections to Claims and Interests, which day shall be the later of (a) one year after the Effective Date or (b) sixty (60) days after the filing of a proof of claim for, or request for payment of, such Claim or Interest, or such other date as the Bankruptcy Court may order; provided, however, that Distributions may be made to Holders of Allowed Claims prior to the expiration of the Claims

Objection Deadline upon agreement of the Reorganized Debtors and the Disbursing Agent. Notwithstanding any of the foregoing, the Debtors, the Reorganized Debtors or the Disbursing Agent may request from the Bankruptcy Court a further extension of the Claims Objection Deadline.

J.    **Considerations Concerning The Releases, Waivers, Injunctions And Exculpation Under The Plan.**

The Plan provides for the following releases and exculpations:

1.    **Limited Releases By Holders In Section 7.4 Of The Plan.**

**Except as otherwise expressly provided in the Plan, on the Effective Date, in consideration for, or as part of, the treatment accorded to the Holders of Claims and Interests under the Plan, each Holder of a Claim or Interest that votes in favor of this Plan shall be deemed to (a) have released the Released Parties from any and all causes of action and claims, in law or in equity, whether based on tort, fraud, contract or otherwise, which they individually or collectively theretofore or thereafter possessed or may possess related to or arising from the Debtors' Chapter 11 Cases and (b) have agreed, pursuant to section 1123(a)(4) of the Bankruptcy Code, to the treatment received as a member of their Class under the Plan, unless such Holder of a Claim or Interest affirmatively opts out from granting such a release. Notwithstanding anything to the contrary in the Plan, the Plan shall not release or discharge any Claims held by the Securities and Exchange Commission (the "SEC") against any non-debtors, or enjoin or restrain the SEC from instituting or enforcing any such Claims against any non-debtors.**

At least one group of Holders of Class 4D Claims has objected to this release by Holders provided under Section 7.4 of the Plan, on the grounds that such releases are impermissible under the Bankruptcy Code. The parties acknowledge that this is a confirmation issue to be resolved or determined at or before the Confirmation Hearing.

2.    **Limited Releases By Debtors In Section 7.5 Of The Plan.**

**As of the Effective Date, the Debtors shall be deemed to have waived and released the Released Parties from any and all Causes of Action, including Avoidance Actions, of the Debtors (including Claims which the Debtors otherwise have legal power to assert, compromise or settle in connection with their Chapter 11 Cases) arising on or prior to the Effective Date; provided, however, that this provision shall not operate as a waiver or release of any Claim (a) in respect to any loan, advance or similar payment by the Debtors to any Released Party, (b) in respect of any contractual obligation owed by such Released Party to any of the Debtors, (c) in respect to any Claim based upon the willful misconduct of such Released Party, or (d) to the extent based upon or attributable to such Released Party gaining in fact a personal profit to which such Released Party was not legally entitled, including, without limitation, profits made from the purchase or sale of**

equity securities of Oakwood which are recoverable by Oakwood pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended.

### 3.    Exculpation In Section 7.7 Of The Plan.

The Released Parties and the Senior Indenture Trustee, the Junior Indenture Trustee, the individual REMIC Trustees and the Resecuritization Trustee shall neither have nor incur any liability, in any form, to any Holder of a Claim or Interest, or a governmental entity on behalf of a Holder of a Claim or Interest, for any act or omission in connection with or arising out of their involvement in the filing and conduct of the Chapter 11 Cases, including the payment or partial payment of Claims arising prior to the Petition Date, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except for any liabilities which may arise under the statutes or regulations under the Securities and Exchange Commission or from any willful misconduct, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and applicable law.

### 4.    Injunction In Section 7.8 Of The Plan.

The Confirmation Order shall provide, among other things, that all Persons who have held, hold or may hold Claims against or Interests in any of the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates, the Reorganized Debtors, the Disbursing Agent, the General Distribution Trust or any of their property, including Self-Insurance Policies; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estates, the Reorganized Debtors, the Disbursing Agent, the General Distribution Trust or any of their property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates, the Reorganized Debtors, the Disbursing Agent, the General Distribution Trust or any of their property; (d) asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the Estates, the Reorganized Debtors, the Disbursing Agent, the General Distribution Trust or any of their property, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to the Plan.

At least one group of Holders of Class 4D Claims has objected to this injunction provided under Section 7.8 of the Plan, on the grounds that such injunctions are impermissible under the Bankruptcy Code. The parties acknowledge that this is a confirmation issue to be resolved or determined at or before the Confirmation Hearing.

41

5.  **Waiver Of Certain Claims In Section 7.9 In The Plan.**

Subject to Section 6.4 of the Plan, but subject to the occurrence of the Initial Distribution Date, and except as otherwise expressly provided in the Confirmation Order or herein, all Holders of Junior Note Claims, Senior Note Claims and REMIC Guarantee Claims and Junior Indenture Trustees, the Senior Indenture Trustees, the REMIC Trustees and the Resecuritization Trustee shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever covenanted with each other to waive, release and not to assert, sue, or otherwise seek any recovery from each other or the Released Parties, whether for tort, contract, violations of federal or state securities laws, or otherwise, based upon any claim, right or cause of action related to the construction and enforcement of the Junior Indenture, the Senior Indenture or any obligations under the B-2 REMIC Guarantees and the Resecuritization Note Put Option or any alleged priority or subordination in respect of Distributions received on account of Junior Note Claims, Senior Note Claims or REMIC Guarantee Claims.

6.  **Release of Liens And Perfection Of Liens In Section 7.10 Of The Plan.**

Except as otherwise specifically provided in the Plan or in any agreement, instrument or document created in connection with the Plan: (a) each Holder of (i) a Secured Claim, (ii) a Claim that is purportedly secured and/or (iii) a judgment, personal property or ad valorem tax, mechanics' or similar Lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed: (1) turn over and release to the Estates, the Reorganized Debtors, the General Distribution Trust or the Disbursing Agent, as the case may be, any and all property of the Debtors or the Estates that secures or purportedly secures such Claim, or such Lien and/or Claim which shall automatically, and without further action by the Debtors, the Estates, the Reorganized Debtors, the General Distribution Trust or the Disbursing Agent, be deemed released; and (2) execute such documents and instruments as the Disbursing Agent or the Reorganized Debtors require(s) to evidence such Claim Holder's release of such property or Lien, and if such Holder violates the Confirmation Order by refusing to execute appropriate documents or instruments, the Disbursing Agent or the Reorganized Debtors may, in its or their discretion, file a copy of the Confirmation Order which shall serve to release any Claim Holder's rights in such property; and (b) on the Effective Date, all right, title and interest in such property shall revert to the Reorganized Debtors or the Estates, to be transferred to the Reorganized Debtors, the General Distribution Trust or Disbursing Agent, free and clear of all Claims and Interests, including, without limitation, Liens, escrows, charges, pledges, encumbrances and/or security interests of any kind.

Without limiting the automatic release provisions of the immediately preceding paragraph: (a) no Distribution hereunder shall be made to or on behalf of any Claim Holder unless and until such Holder executes and delivers to the Debtors, the Estates, the Reorganized Debtors, the General Distribution Trust or the Disbursing Agent (as applicable) such release of Liens or otherwise turns over and releases such Cash, pledge

42

or other possessory Liens; (b) such Holder that fails to execute and deliver such release of Liens within ninety (90) days after the Effective Date shall be deemed to have no Claim against the Debtors, the Estates, the Reorganized Debtors, the General Distribution Trust or the Disbursing Agent or their assets or property in respect of such Claim and shall not participate in any Distribution hereunder; and (c) the Debtors, the Reorganized Debtors or the Disbursing Agent (as appropriate), who shall be deemed to be appointed as attorney-in-fact for all such Holders of Lien Claims for the purpose of releasing such Liens, shall be authorized to use, and all authorities shall be required to accept, the Confirmation Order and the notice of Effective Date as satisfaction of all Liens.

7.    **Explanation    Of    The    Releases,    Waivers, Injunctions And Exculpation Under The Plan.**

As set forth in detail above, the Plan includes broad releases and waivers of claims and causes of action that may be held by the Debtors or their Estates against the directors, officers and professionals of the Debtors, the Committee and the Committee's professionals. The Plan also provides for the broad release and waiver of claims and causes of action held by Holders of Claims against the Released Parties.

It is the intent of the Debtors that the scope of the releases, waivers, injunctions and exculpations granted cover those parties who have or may have any claims against the Debtors for contribution or indemnification either by contract, under the Debtors' charters and/or bylaws, or under applicable law. The Debtors believe that such releases, waivers, injunctions and exculpations are both necessary and in the Debtors' best interests due, in part, to the fact that certain of the parties have filed proofs of claim against various Debtor entities to ensure that they would be able to recover pursuant to those rights of indemnification or contribution. At this time, the Debtors have consulted with the Committee and the Debtors are unaware of any specific claims against the parties which are being released nor have there been any allegations of such claims which would be released; as such, the Debtors have undertaken no investigation regarding such potential claims.

The Debtors believe that the releases, waivers, injunctions and exculpations being given to the Released Parties under the Plan are supported by valuable consideration and are consistent with applicable law. Any Person who accepts the Plan, either by affirmative vote or by the acceptance of the Plan by the consolidated Class in which such Person is a member, shall be deemed to have given the releases to the fullest extent provided by law, unless such Holder of a Claim or Interest affirmatively opts out from granting such a release.

Various parties have contested the propriety of these Plan provisions under prevailing statutory and case authority. To the extent there is any objection to the propriety or scope of the releases, waivers, exculpations or injunctions under the Plan, these issues will be addressed in connection with the Plan confirmation.

VII.    **FINANCIAL PROJECTIONS.**

Attached hereto as Exhibit B are financial projections of the consolidated Debtors containing, among other things: (a) a projected income statement; (b) a projected balance sheet; and (c) a projected cash flow statement (together, the "Projections"). All of the Projections are

43

presented on a consolidated basis for the Debtors, and project financial information on an annual basis for years 2003 through 2008.

The Projections have been prepared by or under the direction of the Debtors' management and have not been audited. The Projections present, to the best of the Debtors' management's current belief, the expected financial results for the periods projected, subject to the various assumptions set forth therein. Readers are urged to review carefully all of the notes and assumptions included in the Projections and to consult with their own financial, legal, and tax advisors regarding the same.

THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH THOUGH CONSIDERED REASONABLE BY THE DEBTORS AT THE TIME THEY WERE PREPARED, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY, LEGISLATIVE, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS WILL INEVITABLY NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED, OR THAT WERE NOT THEN KNOWN TO THE DEBTORS, MAY BE MATERIALLY DIFFERENT FROM THOSE ASSUMED. THE PROJECTIONS THEREFORE MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

INFORMATION INCLUDED IN THE PROJECTIONS CONTAINS FORWARD LOOKING STATEMENTS WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. SUCH FORWARD LOOKING INFORMATION IS BASED ON INFORMATION AVAILABLE WHEN SUCH STATEMENTS ARE MADE AND IS SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN THE STATEMENTS.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS AT ANY TIME PRIOR TO OR AFTER THE EFFECTIVE DATE.

VIII.    ADDITIONAL CONSIDERATIONS REGARDING RISK.

The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the Exhibits

hereto. You should consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder.

> *Risks Associated with Concentrated Ownership of the New Common Stock and New Warrants:* If the Plan is confirmed, ownership of a substantial number and percentage of shares of the New Common Stock will be concentrated among a relatively small number of holders. Sales of or offers to sell a substantial number of shares of New Common Stock, or the perception by investors, investment professionals, and securities analysts of the possibility of such sales, could affect adversely the market for and price of the New Common Stock to be issued under the Plan.

> *Lack of Trading; Market Volatility:* There can be no assurance that a market will develop for the New Common Stock issued pursuant to the Plan (or for any other security issued pursuant to the Plan). Although the Debtors will use reasonable efforts to cause the New Common Stock to be listed on a national securities exchange, it is unlikely that initial listing requirements will be satisfied on the Effective Date. Even if such securities are subsequently listed, there is no assurance that an active market for such New Common Stock will develop or, if any such market does develop, that it will continue to exist, or as to the degree of price volatility in any such market that does develop. Accordingly, no assurance can be given as to the liquidity of the market for the New Common Stock or the price at which any sales may occur. Finally, any creditor or stockholder who may be considered an "underwriter" under section 1145(b) of the Bankruptcy Code may not be able to resell the New Common Stock (or any other securities received under the Plan) without registration under securities laws, except in certain "ordinary course" transactions.

> *Certain Risks Associated with the Chapter 11 Cases:* The Debtors are parties to various material contractual arrangements under which the commencement of transactions contemplated by the Plan could, subject to the Debtors' rights and powers under sections 362 and 365 of the Bankruptcy Code: (a) result in a breach, violation, default, or conflict; (b) give other parties thereto rights of termination or cancellation; or (c) have other adverse consequences on the operations of the Debtors or the Reorganized Debtors. The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which the other parties to such contracts may seek to assert any such rights and pursue any such remedies in respect to such matters, and the ability of the Debtors or Reorganized Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

> *Risks Relating to the Projections:* The Debtors have prepared projections in connection with the development of the Plan and to present the projected effects of the Plan and the projected results of operations following the Effective Date of the Plan. These projections assume the Plan and transactions contemplated thereby will be implemented in accordance with their terms. The assumptions and estimates underlying such projections are inherently uncertain and are subject to, among other factors, business, economic, legislative, and competitive risks and uncertainties that could cause actual results to differ materially from those projected. Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan and potential objections of third parties. Accordingly, the projections herein are not necessarily indicative of the future financial condition, results of operations, or equity value of the

Reorganized Debtors, which may vary materially from those projections. Consequently, the projections contained herein should not be regarded as a representation or guarantee by the Debtors, the Debtors' advisors, or any other person that the projections herein can or will be achieved.

*Assumptions Regarding Value of Debtors' Assets:* It has been assumed in the preparation of the projections included in this Disclosure Statement that the historical book value of the Debtors' assets generally approximates the fair value thereof, except for specific adjustments discussed in the notes thereto. For financial reporting purposes, the fair value of the assets of the Debtors (including deferred tax assets) must be determined as of the Effective Date. Although such valuation is not presently expected to result in values that are materially different than the values assumed in the preparation of the projections herein, there can be no assurance with respect thereto.

*Leverage, Liquidity, and Capital Requirements:* In addition to Cash generated by operations, the Debtors' principal sources of liquidity following their emergence from bankruptcy will be the proceeds of loan dispositions, exit financing in amounts necessary to repay the debtor-in-possession financing and Cash accumulated by the Debtors during the Chapter 11 Cases. After the Effective Date of the Plan, the Debtors expect that in addition to working capital requirements, repayment of the Debtors' obligations under the exit financing and any notes issued pursuant to the Plan will impose liquidity requirements on the Debtors. Any increase in the interest rate pertaining to this indebtedness may reduce the funds available to the Debtors for their future operations. While the Debtors believe that they will have adequate liquidity to meet requirements following the Effective Date of the Plan, no assurances can be had in this regard. Any inability of the Debtors to service their indebtedness, obtain additional financing, as needed, or comply with the financial covenants contained in the debt instruments issued pursuant to the Plan could have a material adverse effect on the Debtors.

*Rising Cost and Availability of Labor:* There can be no assurances that rising labor costs will not have a material adverse effect on the Debtors in the future.

*Rising Cost and Availability of Suppliers and Raw Materials:* There can be no assurances that rising supplier and raw material costs will not have a material adverse effect on the Debtors in the future.

*Highly Competitive Industry:* There can be no assurance that increased competition in the future will not adversely affect the Debtors' financial condition and results of operations.

*Certain Risks of Non-confirmation:* There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of Claims or Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code and/or Bankruptcy Rules. Even if the Bankruptcy Court were to determine that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it

were to find that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of Distributions to non-accepting Holders of Claims or Interests within a particular Class under the Plan will not be less than the value of Distributions such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation pursuant to Chapter 7 of the Bankruptcy Code when taking into consideration all administrative expenses and costs associated with any such Chapter 7 case, as set forth further in the discussion of the Liquidation Analysis in Section X of the Disclosure Statement.

The confirmation and consummation of the Plan are also subject to certain conditions. If the Plan were not to be confirmed, it is unclear whether the restructuring could be implemented and what distribution Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If an alternative plan of reorganization could not be agreed to and confirmed, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that it is likely that Holders of Claims or Interests would receive substantially less than the treatment they will receive pursuant to the Plan.

IX.     **CERTAIN TAX CONSEQUENCES OF THE PLAN.**

A.     **General.**

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Claims and Interests. This description is for informational purposes only and, due to the lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims and Interests who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The following United States federal income tax consequences are based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof

may occur, possibly with retroactive effect, and could significantly affect the United States federal income tax consequences described below.

This summary does not address foreign, state or local tax consequences or any non-income tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in REMICs and pass-through entities).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, FOREIGN, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

B.    **Federal Income Tax Consequences To The Debtors.**

1.    **Cancellation Of Indebtedness Income.**

Upon implementation of the Plan, the amount of the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the debtor. However, COD income that arises in a Title 11 bankruptcy case is not taxable. Instead, such COD income reduces certain of the debtor's tax attributes, generally in the following order: (a) net operating losses ("NOLs") for the year of the discharge and NOL carryforwards to such year; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the debtor's depreciable and non-depreciable assets (but not below the amount of the debtor's liabilities immediately after the discharge); and (f) foreign tax credit carryforwards. To the extent the amount of COD income exceeds the tax attributes available for reduction, the excess COD income is forgiven. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets and, possibly, the depreciable assets of its subsidiaries. The reduction in tax attributes occurs after the end of the tax year in which the debt discharge occurs.

On August 29, 2003, the IRS issued temporary and proposed regulations providing rules regarding the reduction of tax attributes of a group of affiliated corporations filing a consolidated tax return (such as the Debtors) when one or more members of the group has COD income. In general, these regulations provide that the COD income of a member of an affiliated group first will reduce the NOLs and other tax attributes allocable to that member. If the amount of COD income exceeds such member's tax attributes, the excess will be applied to reduce NOLs and certain other tax attributes (other than basis in assets) allocable to other

48

members of the affiliated group, on a pro rata basis. To the extent the COD income has the effect of reducing a member's basis in the stock of a subsidiary, the subsidiary also will be required to reduce its tax attributes (including basis in assets). The Debtors have not yet determined what impact these new regulations will have on its NOLs and other tax attributes.

In certain circumstances, COD income realized by a consolidated subsidiary that has an "excess loss account" ("ELA") may cause the consolidated group to recognize taxable income. The Debtors have not determined the existence or amounts of any ELAs, or whether such ELAs would become taxable income upon implementation of the Plan.

As a result of the discharge of Claims pursuant to the Plan, the Debtors expect to realize significant COD income. The amount of such COD income and the extent of the resulting tax attribute reduction will depend, in part, on the fair market value, as of the Effective Date, of the New Common Stock distributed to holders of Allowed Claims. Given the magnitude of the expected COD income, it is possible that the Debtors' NOL and capital loss carryforwards could be significantly reduced or eliminated and that the respective Debtors' tax basis in their assets also may be reduced.

### 2.    IRC Section 382 – Limitations On NOL Carryforwards.

The Debtors anticipate that they will experience an "ownership change" (within the meaning of IRC Section 382) on the Effective Date as a result of the issuance of New Common Stock to holders of Allowed Claims pursuant to the Plan.

Under IRC Section 382, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation. In general, the amount of the annual limitation to which the losses are subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.74% for ownership changes occurring in October 2003). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change, also with certain adjustments. The stock value in this case would take into account any increase in value resulting from the surrender of creditors' claims. In the case of "built-in" losses and deductions (such as depreciation), the annual limitation applies only for five years after the ownership change and only to the extent of the "net" unrealized built-in loss as of the ownership change.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

49

The operation and effect of IRC Section 382 will be materially different from that just described if the Debtors are subject to the special rule for corporations in bankruptcy provided in IRC Section 382(l)(5). This special rule may apply where, immediately after a corporation's emergence from bankruptcy, its shareholders and certain "qualified" creditors own at least 50% of the stock of the corporation. If this rule were to apply, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described above. However, several other limitations would apply to the Debtors under IRC Section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged for New Common Stock pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' IRC Section 382 annual limitation with respect to that ownership change would be zero. A corporation that qualifies for IRC Section 382(l)(5) may elect not to have its provisions apply, in which case the annual limitation rules described above would apply. The Debtors have not determined whether they would qualify for IRC Section 382(l)(5), or if they would elect to have the IRC Section 382(l)(5) rules apply to the ownership change that is expected to arise from the consummation of the Plan.

       3.       **Net Unrealized Built-in Loss Or Gain.**

As indicated above, IRC Section 382 can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a "net unrealized built-in loss" at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gains in addition to its regular annual allowance. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. Thus, a consolidated group can be considered to have both a net unrealized built-in loss and a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. It is expected that the Debtors will have a net unrealized built-in loss on the Effective Date.

4.    **Alternative Minimum Tax.**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards.

In addition, if a corporation (or consolidated group) undergoes an ownership change within the meaning of IRC Section 382 and has a net unrealized built-in loss (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

C.    **Federal Income Tax Consequences To Holders Of Claims.**

The United States federal income tax consequences of the transactions contemplated by the Plan to a holder of Allowed Claims (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim and the consideration received in respect thereof are "securities" for federal income tax purposes; (2) the manner in which a holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year.

1.    **Accrued Interest.**

Under the Plan, cash or other property may be distributed or deemed distributed to certain holders of Claims with respect to their Claims for accrued interest. Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary interest income equal to the amount of cash or other property received with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the

51

distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any property received in exchange for a Claim for accrued interest will equal the fair market value of such property of the Effective Date, and the holding period for the property will begin on the day after the Effective Date. The extent to which consideration distributable under the Plan is allocable to interest is not clear. Holders of Claims are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### 2.     Market Discount.

The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less) that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Gain recognized by a creditor with respect to a "market discount bond" generally will be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently. A holder of a market discount bond that is required under the market discount rules of the IRC to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

### 3.     Holders Of Class Four Claims.

A Holder of a Class Four Claim that receives New Common Stock in exchange for its Claim pursuant to the Plan will realize income, gain or loss for United States federal income tax purposes in an amount generally equal to the difference between (1) the fair market value on the Effective Date of the New Common Stock received in exchange for the Claim and (2) the holder's adjusted tax basis in its Claim.

Whether such income, gain or loss will be recognized will depend upon whether the exchange is treated as a "reorganization" for United States federal income tax purposes. In turn, this depends upon, among other things, whether any component of the Claim constitutes a "security" for United States federal income tax purposes. The determination of whether a debt instrument constitutes a security depends upon an evaluation of the term and nature of the debt instrument. Generally, corporate debt instruments with maturities of less than five years when issued are not considered securities, while corporate debt instruments with maturities of ten years or more when issued are considered securities.

If an exchange of a Claim for New Common Stock is not treated as a reorganization, a holder of such Claim generally should, except as described in the next sentence, recognize gain or loss for United States federal income tax purposes in an amount equal to the difference, if any, between (1) the fair market value of the New Common Stock (determined as

52

of the Effective Date) received in respect of its Claim and (2) the holder's adjusted tax basis in its Claim. A holder should, however, recognize interest income to the extent it receives New Common Stock in respect of accrued interest or accrued market discount that have not already been included in income under the holder's method of accounting (as described above under the headings "Accrued Interest" and "Market Discount"). A holder's tax basis in the New Common Stock received in respect of its Claim generally should be equal to the fair market value of such New Common Stock on the Effective Date.   The holding period for New Common Stock received pursuant to the Plan should begin on the day after the Effective Date. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to its Claim.

If, on the other hand, a Claim is treated as a "security" and the receipt of New Common Stock in respect of such Claim were treated as a "reorganization" then, except as described below, (1) a holder would not recognize any gain or loss, with respect to all or part of its Claim, (2) its tax basis in the consideration received would reflect its tax basis in its Claim, and (3) its holding period with respect to such consideration would include the holding period of its Claim. A holder should, however, recognize interest income to the extent it receives New Common Stock in respect of accrued interest or accrued market discount that have not already been included in income under the holder's method of accounting (as described above under the headings "Accrued Interest" and "Market Discount").   The precise treatment of the exchange would depend, in part, on which components of the Claim were treated as "securities" for federal income tax purposes.

D.    **Federal Income Tax Consequences To Holders Of Non-Debtor-Held Interests [Class 6A].**

Ordinarily, the exchange of common stock in a corporation for warrants in that corporation is treated as a "recapitalization" for United States federal income tax purposes. Accordingly, if the receipt of New Warrants in exchange for Non-Debtor-Held Interests pursuant to the Plan is treated as a recapitalization, (i) a Holder of a Non-Debtor-Held Interest would not recognize gain or loss for federal income tax purposes as a result of the exchange of such Interests pursuant to the Plan, (ii) such a holder's tax basis in the New Warrants received pursuant to the Plan would be equal to the aggregate tax basis in its Non-Debtor-Held Interests surrendered in exchange therefore and (iii) such a holder's holding period for its New Warrants received pursuant to the Plan would include the holding period of its Non-Debtor-Held Interests surrendered in exchange therefor.

E.    **Information Reporting And Backup Withholding.**

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless

the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate Claim for refund with the IRS.

## X.    CONFIRMATION PROCEDURES.

PERSONS CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about certain basic Plan confirmation issues, which they may wish to consider. The Debtors CANNOT and DO NOT represent that the discussion contained below is a comprehensive summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the Voting Classes, whether the Plan can be confirmed even if one or more classes do not accept the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements, however, are not the only requirements for confirmation.

### A.    Voting And Right To Be Heard At Confirmation.

#### 1.    Who May Support Or Object To Confirmation Of The Plan.

Any party in interest may support or object to the confirmation of the Plan. As explained in further detail below, entities that may not have a right to vote (e.g., entities whose Claims or Interests belong to an Unimpaired Class or to a Class that will receive no Distribution under the Plan) may still have a right to support or object to the confirmation of the Plan.

#### 2.    Who May Vote To Accept Or Reject The Plan.

A creditor generally has a right to vote for or against the Plan if that creditor has a Claim that is both "allowed" for purposes of voting and classified in an Impaired Class. Notwithstanding the foregoing, under section 1126(g) of the Bankruptcy Code, impaired classes that will neither receive nor retain any consideration under a plan are deemed to have rejected the plan and do not vote.

54

Under the Plan, only Holders of Allowed Claims and Interests in Classes 2G, 3, 4D, 4E and 6A and those Holders who are the beneficial holders of Allowed Claims in Classes 4A, 4B, and 4C (the aforementioned "Voting Classes") are entitled to vote on the Plan. Holders of Claims in Classes 1, 2A, 2B, 2C, 2D, 2E, 2F, 2H, 2I, 2J, 2K and 2L are Unimpaired and deemed to have accepted the Plan. Holders of Claims and Interests in Classes 5 and 6B are Insiders whose Claims or Interests will be substantively consolidated pursuant to the Substantive Consolidation Order and are not entitled to vote on the Plan.

3.    **What Is An Allowed Claim For Voting Purposes.**

As noted above, a creditor's Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote. Generally, for voting purposes a Claim is deemed "allowed," absent an objection to the Claim, if: (a) a proof of Claim was timely filed, or (b) if no proof of Claim was filed, the Claim is identified in the Debtors' Schedule of Assets and Liabilities as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules of Assets and Liabilities, in which case the Claim will be deemed allowed for the specified amount. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes. Moreover, Bankruptcy Rule 3018(a) provides that, with respect to Holders of Senior Notes, Junior Notes, B-Piece Certificates and Old Common Stock, such Holders must be of record on the date that the Disclosure Statement is approved under section 1125 of the Bankruptcy Code in order to vote on the Plan.

Note that the definition of "Allowed Claim" used in the Plan for purposes of determining whether creditors are entitled to receive Distributions thereunder may differ materially from that used by the Bankruptcy Court to determine whether a particular Claim is "allowed" for purposes of voting. Holders of Claims are advised to review the definitions of "Allowed Claim" and "Disputed Claim" in the Plan to determine whether they may be entitled to receive distributions under the Plan.

4.    **What Is An Impaired Class Of Claims Or Interests.**

As noted above, a Claim or Interest that is "allowed" for voting purposes only has the right to vote if it is in a Class that is Impaired under the Plan and if that Class will receive or retain any consideration under the Plan. A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the Holders of Claims or Interests of that Class. As noted, under the Plan, all Classes are Impaired except Classes 1, 2A, 2B, 2C, 2D, 2E, 2F, 2H, 2I, 2J, 2K and 2L.

5.    **Who Is Not Entitled To Vote.**

The Holders of the following types of Claims are not entitled to vote: (a) Claims that have been disallowed; (b) Claims that are subject to a pending objection and that have not been allowed for voting purposes; (c) Claims in Unimpaired Classes; (d) Claims entitled to priority pursuant to sections 507(a)(1), 507(a)(2), and 507(a)(7) of the Bankruptcy Code; and (e)

55

Claims in Classes that do not receive or retain any property under the Plan. Holders of Claims and Interests in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Holders of Claims entitled to priority pursuant to sections 507(a)(1), 507(a)(2), and 507(a)(7) of the Bankruptcy Code are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims and Interests in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. Even if your Claim or Interest is of the type described above, you may still have a right to support or object to the confirmation of the Plan.

### 6.    Votes Necessary To Confirm The Plan.

The Court cannot confirm the Plan unless: (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class; and (b) either all Impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting Impaired Class as discussed in section 1129(b) of the Bankruptcy Code.

### 7.    Votes Necessary For A Class To Accept The Plan.

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims that actually voted have voted in favor of the Plan.

### 8.    Treatment Of Non-Accepting Classes.

As noted above, even if all Impaired Classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code. The process by which a Plan is confirmed despite rejections by non-accepting Classes and made binding on those Classes is commonly referred to as a "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Interests if the Plan meets the requirements of section 1129(a)(1) through (a)(7) and 1129(a)(9) through (a)(13) of the Bankruptcy Code and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to non-accepting Classes as those terms are defined in section 1129(b) of the Bankruptcy Code section.

### 9.    Request For Confirmation Despite Non-Acceptance By Impaired Classes.

The Debtors have asked the Bankruptcy Court to confirm this Plan by cramdown on any Classes that are deemed to have rejected the Plan and on any Impaired Voting Class that does not vote to accept the Plan.

### B.    Hypothetical Liquidation Analysis.

Another confirmation requirement is the "Best Interest Test" or "Hypothetical Liquidation Test" incorporated in section 1129(a)(7) of the Bankruptcy Code. The test applies to

56

individual Holders of Unsecured Claims and Holders of Interests that are <u>both</u> (i) in Impaired Classes under the Plan, <u>and</u> (ii) do not vote to accept the Plan. Section 1129(a)(7) of the Bankruptcy Code requires that such Holders of Unsecured Claims and Holders of Interests receive or retain an amount under the Plan not less than the amount that such Holders would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

The Debtors do not intend that their Chapter 11 Cases actually will be converted to Chapter 7 liquidations. However, in order to apply the Best Interest Test, the Debtors have prepared a hypothetical liquidation analysis attached hereto as Exhibit C. The hypothetical liquidation analysis projects an estimate of what Holders of Unsecured Claims and Holders of Interests might receive in the event the Debtors' Chapter 11 Cases were to be converted to Chapter 7 cases and the Debtors' assets subsequently liquidated. **The Debtors' hypothetical liquidation analysis is based upon assumptions that the Debtors believe to be reasonable based upon the best information available to them. However, there are numerous economic, legal, operational, and other uncertainties that could dramatically change the results in an actual liquidation. Moreover, because the businesses in which the Debtors' operate are highly regulated, there may be significant regulatory consequences and restrictions in a liquidation that cannot be predicted with any certainty. Thus, there can be no guaranty that an actual liquidation of the Debtors would result in the projected recoveries for Holders of Unsecured Claims and Holders of Interests.**

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estates after the satisfaction of secured creditors' claims from their collateral, administrative expenses generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

The hypothetical liquidation analysis included in Exhibit C to this Disclosure Statement projects that Holders of Unsecured Claims and Holders of Interests would receive less consideration in the event the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code than under this Plan. Moreover, it is projected that Holders of Secured Claims would receive less than payment in full. Under the Plan, Holders of Priority Non-Tax Claims will receive payment in full, and most Holders of Unsecured Claims will receive Distributions of New Common Stock or Cash. Thus, the Debtors believe that all creditors will receive at least as favorable treatment under the Plan as they would in a hypothetical liquidation, and in fact, most creditors will receive far better treatment under the Plan. Holders of Old Common Stock will receive New Warrants under either the Plan or in a hypothetical liquidation, and thus would not be better off in a liquidation.

C.    **Feasibility.**

The Bankruptcy Code requires that, in order for the Plan to be confirmed, the Debtors must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. Based upon the Projections set forth in Exhibit B hereto, which show continued availability under the Debtors' revolving line of credit and net operating income in years 2003 through 2008, the Debtors believe that the Plan is feasible and that they will be able to make all payments required to be made pursuant to the Plan. **HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE CAUTIONARY STATEMENTS INCLUDED IN SECTION I OF THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS INCLUDED IN THE PROJECTIONS IN CONNECTION WITH THEIR REVIEW OF THE SAME.    AS NOTED THEREIN, ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PROJECTED.**

D.    **Alternatives To The Plan.**

If the Plan is not confirmed, in which case the Debtors default under the terms of the Final DIP Agreement, the Debtors (or if the Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve a sale or an orderly liquidation of the Debtors' assets. The Debtors have explored various alternatives in connection with the formulation and development of the Plan. They believe that the Plan, as described herein, enables creditors to realize the most value under the circumstances. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in a Chapter 7 case, and the expenses for professional fees would most likely be lower than those incurred in a Chapter 7 case.    Although preferable to a Chapter 7 liquidation, the Debtors believe that a liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater returns potentially provided by the Plan.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in liquidation are not likely to afford Holders of Claims as great a realization potential as does the Plan.

## XI.    RECOMMENDATION AND CONCLUSION.

The Debtors believe that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for creditors. **Accordingly, the Debtors urge Holders of Impaired Claims to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement and on the Ballots.**

Dated: September 9, 2003
Wilmington, Delaware

**NEW DIMENSION HOMES, INC.**

By: /s/ Robert A. Smith
     Name: Robert A. Smith
     Title:  Vice President

**DREAM STREET COMPANY, LLC**

By: /s/ Robert A. Smith
     Name: Robert A. Smith
     Title:  Vice President

**OAKWOOD SHARED SERVICES, LLC**

By: /s/ Robert A. Smith
     Name: Robert A. Smith
     Title:  Vice President

**HBOS MANUFACTURING, LP**

By: Oakwood Mobile Homes, Inc., General
     Partner

By: /s/ Robert A. Smith
     Name: Robert A. Smith
     Title:  Vice President

**FSI FINANCIAL SERVICES, INC.**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**HOME SERVICE CONTRACT, INC.**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**TRI-STATE INSURANCE AGENCY, INC.**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**GOLDEN WEST LEASING, LLC**

By: /s/ Randelle R. Smith
    Name: Randelle R. Smith
    Title:  Vice President


**CREST CAPITAL, LLC**

By: /s/ Randelle R. Smith
    Name: Randelle R. Smith
    Title:  Vice President

**OAKWOOD MHD4, LLC**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**OAKWOOD ACCEPTANCE CORPORATION, LLC**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**OAKWOOD HOMES CORPORATION**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Executive Vice President


**OAKWOOD MOBILE HOMES, INC.**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President


**SUBURBAN HOME SALES, INC.**

By: /s/ Robert A. Smith
    Name: Robert A. Smith
    Title:  Vice President

**PREFERRED HOUSING SERVICES, LP**

By: Oakwood Mobile Homes, Inc., General
    Partner

    By: /s/ Robert A. Smith
        Name:  Robert A. Smith
        Title:  Vice President

        - and -

**MORRIS, NICHOLS, ARSHT & TUNNELL**

/s/ Daniel B. Butz
Robert J. Dehney (No. 3578)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

        - and -

**RAYBURN COOPER & DURHAM, P.A.**
C. Richard Rayburn, Jr.
Albert F. Durham
Patricia B. Edmondson
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina 28202-1675
(704) 334-0891

328699

## *EXHIBIT I*

EXECUTION COPY

CLASS A NOTE PURCHASE AGREEMENT

Dated as of February 9, 2001

among

OMI NOTE TRUST 2001-A
as Issuer,

OAKWOOD ACCEPTANCE CORPORATION
as Seller and Servicer,

OAK LEAF HOLDINGS, LLC
as Depositor,

GINKGO CORPORATION
as Transferor,

THE PURCHASERS PARTIES HERETO,
and

CREDIT SUISSE FIRST BOSTON, NEW YORK BRANCH,
as Agent

---

Relating to
OMI Note Trust 2001-A
Class A Asset Backed Notes, Series 2001-A

---

T:\Corp\dtr\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092240

Table of Contents

Page

SECTION 1. DEFINITIONS..................................................................2
    1.1 Definitions..........................................................................2
    1.2 Other Definitional Provisions ...........................................11
SECTION 2. AMOUNT AND TERMS OF COMMITMENTS .............11
    2.1 Purchases...........................................................................11
    2.2 Reductions, Increases and Extensions of Commitments ...........13
    2.3 Fees, Expenses, Payments, Etc ...........................................14
    2.4 Indemnification...................................................................15
    2.5 Events of Default ..............................................................17
    2.6 Notification of Note Interest Rate ......................................17
SECTION 3. CONDITIONS PRECEDENT .....................................18
    3.1 Condition to Initial Purchase ............................................18
    3.2 Condition to Borrowings ...................................................20
SECTION 4. REPRESENTATIONS AND WARRANTIES ....................20
    4.1 Representations and Warranties of OAC............................20
    4.2 Representations and Warranties of the Issuer .....................23
SECTION 5. COVENANTS .........................................................25
    5.1 Covenants...........................................................................29
SECTION 6. INCREASED COSTS, INCREASED CAPITAL, ETC. ......33
    6.1 Increased Costs .................................................................35
    6.2 Increased Capital...............................................................36
    6.3 Taxes ................................................................................36
    6.4 Nonrecourse Obligations; Limited Recourse.......................38
SECTION 7. THE AGENT ...........................................................40
    7.1 Appointment .....................................................................40
    7.2 Delegation of Duties ..........................................................40
    7.3 Exculpatory Provisions .....................................................40
    7.4 Reliance by Agent .............................................................41
    7.5 Notices ..............................................................................41
    7.6 Non-Reliance on Agent and Other Purchasers ...................41
    7.7 Indemnification..................................................................42
    7.8 Agent in Its Individual Capacities.......................................42
    7.9 Successor Agent.................................................................43
SECTION 8. SECURITIES LAWS; TRANSFERS .............................43
    8.1 Transfers of Notes.............................................................43
SECTION 9. MISCELLANEOUS ..................................................47
    9.1 Amendments and Waivers .................................................47
    9.2 Notices ..............................................................................48
    9.3 No Waiver; Cumulative Remedies .....................................49
    9.4 Successors and Assigns.....................................................49
    9.5 Successors to Servicer.......................................................50
    9.6 Counterparts .....................................................................51
    9.7 Severability .......................................................................51

i

CSFB-00092241

## Table of Contents
(continued)

|  | | Page |
|---|---|---|
| 9.8 | Integration | 51 |
| 9.9 | Governing Law | 51 |
| 9.10 | Termination | 51 |
| 9.11 | Limited Recourse; No Proceedings | 51 |
| 9.12 | Survival of Representations and Warranties | 52 |
| 9.13 | Submission to Jurisdiction; Waivers | 52 |
| 9.14 | Waivers of Jury Trial | 53 |

CSFB-00092242

## LIST OF EXHIBITS

EXHIBIT A          Form of Investment Letter
EXHIBIT B          Form of Joinder Supplement
EXHIBIT C          Form of Transfer Supplement
EXHIBIT D          Form of CSFBi Warrant
EXHIBIT E          Form of CSFBi Warrant Registration Rights Agreement
EXHIBIT F          Form of Agreement re Bankruptcy

- 3 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092243

CLASS A NOTE PURCHASE AGREEMENT, dated as of February 9, 2001, by and among OMI NOTE TRUST 2001-A, a Delaware business trust (the "Issuer"), OAKWOOD ACCEPTANCE CORPORATION, a North Carolina corporation ("OAC"), OAK LEAF HOLDINGS, LLC, a Delaware limited liability company (the "Depositor"), GINKGO CORPORATION, a Delaware corporation (the "Transferor"), the PURCHASERS from time to time parties hereto (collectively, the "Purchasers") and CREDIT SUISSE FIRST BOSTON, a Swiss banking corporation acting through its New York Branch, as agent for the Purchasers (together with its successors in such capacity, the "Agent").

## WITNESSETH:

WHEREAS, the Issuer, and The Chase Manhattan Bank, a New York banking corporation, as Indenture Trustee (together with its successors in such capacity, the "Indenture Trustee"), are parties to a certain Indenture, dated as of February 9, 2001 (as the same may from time to time be amended or otherwise modified, the "Indenture"), pursuant to which the Issuer has issued its Class A Asset Backed Notes, Series 2001-A (the "Notes"); and

WHEREAS, the Purchasers are willing to have the Agent acquire the Notes on their behalf on the Closing Date and from time to time thereafter to make Borrowings (as defined in the Indenture) available thereunder on the terms and conditions provided for herein;

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

1.1    Definitions. All capitalized terms used herein as defined terms and not defined herein shall have the meanings given to them in the Indenture or the Sale and Servicing Agreement, as applicable. If a term used herein is defined in both the Indenture and the Sale and Servicing Agreement, it shall have the meaning set forth in the Indenture. Additionally, the terms defined in the preamble to this Agreement shall have the meanings set forth therein and the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affected Party" shall mean, with respect to any Structured Purchaser, any Support Party of such Structured Purchaser.

"Agent" has the meaning specified in the preamble to this Agreement.

"Agreement" shall mean this Class A Note Purchase Agreement, as amended, supplemented or otherwise modified from time to time.

- 2 -

CSFB-00092244

"Agreement re Bankruptcy" has the meaning specified in subsection 3.1(k) of the Agreement.

"Applicable Treasury Yield" shall mean, as of any date, the per annum rate of interest for "on-the-run" United States Treasury obligations having the maturity which corresponds to the weighted average life of the Receivables, as selected by the Agent and the underwriters or other Persons submitting bids as to spread-to-treasuries in determining the Term Out Rate.

"Assignee" and "Assignment" have the respective meanings specified in subsection 8.1(e) of this Agreement.

"Available Commitment" shall mean, on any day for a Committed Purchaser, such Purchaser's Commitment in effect on such day minus the sum of (i) such Purchaser's Percentage Interest of the Class A Outstanding Amount of the Notes on such day plus (ii) if such Purchaser is a Liquidity Provider for a Noncommitted Purchaser, such Purchaser's Liquidity Percentage multiplied by such Noncommitted Purchaser's Percentage Interest of the Class A Outstanding Amount of the Notes on such day.

"Base Rate" means, for any day, a rate *per annum* (in no event higher than the maximum rate permitted by applicable law) equal to the higher of (a) the rate of interest publicly announced or, if not publicly announced, quoted internally from time to time by the Agent at its principal office in New York, New York as its prime commercial lending rate in effect in the United States of America, such prime rate not intended to be the lowest rate of interest charged by the Agent to any class of debtors and (b) the rate quoted to the Agent at approximately 11:00 A.M., New York City time, by dealers in the New York Federal Funds Market for the overnight offering of dollars to the Agent for deposit, from time to time in effect, plus 0.50%, calculated based on the actual days elapsed in a year of 365 or 366 days, as applicable.

"Closing Date" shall mean February 20, 2001.

"Commitment" shall mean, for any Committed Purchaser, the maximum amount of such Committed Purchaser's commitment to make advances to the Issuer, as set forth in the Joinder Supplement or the Transfer Supplement by which such Committed Purchaser became a party to this Agreement or assumed the Commitment (or a portion thereof) of another Committed Purchaser, as such amount may be adjusted from time to time pursuant to Transfer Supplement(s) executed by such Committed Purchaser and its Assignee(s) and delivered pursuant to Section 8.1 of this Agreement or pursuant to Section 2.2 of this Agreement. In the event that a Committed Purchaser maintains a portion of its Commitment hereunder in its capacity as a Liquidity Provider for one or more Noncommitted Purchasers, such Committed Purchaser shall be deemed to hold separate Commitments hereunder (i) in each such capacity

- 3 -

CSFB-00092245

and (ii) if applicable, to the extent its Commitment does not relate to any Noncommitted Purchaser.

"Commitment Expiration Date" shall mean February 15, 2004.

"Commitment Percentage" shall mean, for a Committed Purchaser, such Purchaser's Commitment as a percentage of the aggregate Commitments of all Committed Purchasers.

"Committed Purchaser" shall mean any Purchaser which has a Commitment, as set forth in its respective Joinder Supplement, and any Assignee of such Purchaser to the extent of the portion of such Commitment assumed by such Assignee pursuant to its respective Transfer Supplement.

"Committed Purchaser Percentage" shall mean, with respect to a Committed Purchaser, its Commitment (exclusive of any portion thereof held by it in its capacity as a Liquidity Provider), as a percentage of the aggregate Commitments of all Committed Purchasers.

"CSFBi Warrant Registration Rights Agreement" has the meaning specified in subsection 3.1(j) of the Agreement.

"Default" shall mean any of the events specified in the definition of Event of Default, whether or not any requirement for the giving of notice, the lapse of time, or both has been satisfied.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" shall mean any of the following events:

(a) An "Event of Default" shall occur under, and as defined in, the Indenture; or

(b) Any representation or warranty made or deemed made by the Issuer, the Depositor, the Transferor, the Seller or the Servicer herein or in any other Related Document or which is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Related Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made (except where such representation or warranty relates to any earlier date, in which case such representation and warranty shall have been true and correct in all material respects as of such earlier date) and the incorrectness of such representation or warranty has a material adverse effect on the interest of the Agent or any Purchaser, provided that the incorrectness of any

- 4 -

CSFB-00092246

representation or warranty under the Sale and Servicing Agreement which causes the Seller to be required to cure such incorrectness or repurchase a Receivable or Receivables shall not constitute an Event of Default unless the Seller shall have failed to cure such incorrectness or repurchase such Receivable or Receivables on or before the end of any grace period applicable pursuant to Section 2.1, 2.2 or 2.4 of the Sale and Servicing Agreement; or

(c) The Issuer, the Depositor, the Transferor, the Seller or the Servicer shall default in any material respect in the observance or performance of any other agreement contained in this Agreement or any other Related Document (other than as provided in paragraphs (a) and (b) of this Section), and such default shall continue unremedied for a period of 10 Business Days after the Issuer, the Depositor, the Transferor, the Seller or the Servicer becomes aware of or is notified of such default; or

(d) (i) The Indenture shall cease, for any reason, to be in full force and effect, or the Issuer shall so assert or (ii) the Lien created by the Indenture shall cease to be enforceable and of the same effect and priority purported to be created thereby.

"Excluded Taxes" has the meaning assigned to such term in subsection 6.3(a).

"Facility Termination Date" shall mean, the first to occur of (i) the Commitment Expiration Date (ii) the date of any termination by the Issuer of the Commitments pursuant to Section 2.2, and (iii) the date the Commitments are terminated pursuant to Section 2.5 of this Agreement.

"Fee Letter" shall mean that certain letter agreement, designated therein as the Fee Letter and dated as of the date hereof, among the Agent, the Issuer and the Seller, as such letter agreement may be amended or otherwise modified from time to time.

"Fees" shall mean the fees payable to the Agent or the Purchasers in the amounts and on the dates set forth in the Fee Letter.

"Fixed Rate" shall mean, as of any date, a per annum rate equal to the greater of (i) the weighted average Receivable Rate of the Eligible Receivables as of such date less 1.5% and (ii) the Term Out Rate.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indemnitee" has the meaning specified in subsection 2.4(a) of this Agreement.

"Indemnitor" has the meaning specified in subsection 2.4(a) of this Agreement.

- 5 -

CSFB-00092247

"Indenture" has the meaning specified in the recitals to this Agreement.

"Indenture Trustee" has the meaning specified in the recitals to this Agreement.

"Interest Period" means, with respect to any Payment Date, (a) with respect to the principal amount of the Notes outstanding on the first day of the related Accrual Period, the related Accrual Period and (b) with respect to any Borrowing during such Accrual Period, the period from and including the related Borrowing Date through and including the last day of such Accrual Period.

"Interpretation" as used in Sections 6.1 and 6.2 hereof with respect to any law or regulation means the interpretation or application of such law or regulation by any governmental authority (including, without limitation, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government), central bank, accounting standards board or any comparable entity.

"Investing Office" shall mean initially, the office of any Purchaser (if any) designated as such, in the case of any initial Purchaser, in its Joinder Supplement and, in the case of any Assignee, in the related Transfer Supplement, and thereafter, such other office of such Purchaser or such Assignee as may be designated in writing to the Agent, the Issuer, the Servicer and the Indenture Trustee by such Purchaser or Assignee.

"Investment Letter" has the meaning specified in subsection 8.1(a) of this Agreement.

"Joinder Supplement" has the meaning specified in subsection 2.2(d) of this Agreement.

"LIBO Business Day" means any day (a) other than (i) a Saturday, Sunday or (ii) other day on which banks are required or authorized to close in London or New York City and (b) on which dealings in foreign currency and exchange are carried on in the London interbank market

"LIBO Rate" means, for any Interest Period, a rate *per annum* equal to the London interbank offered rate for one month United States dollar deposits (rounded upward, if necessary, to the nearest whole multiple of 1/16 of one percent), that appears on the display page of the Bridge Telerate Capital Markets Report currently designated as Telerate Page 3750 (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices), as of 11:00 a.m., London time, on the second LIBO Business Day preceding the commencement of such Interest Period (or portion thereof). ). In the event no such rate appears, the LIBO Rate shall be, with respect to any Interest Period, the per annum rate of

- 6 -

CSFB-00092248

interest at which one month Dollar deposits in immediately available funds are offered to the Agent by prime banks in the interbank eurodollar market at or about 10:00 a.m., London time, on the second LIBO Business Day before (and for value on) the first day of such Interest Period (or portion thereof) and in an amount of not less than $1,000,000. The establishment of the LIBO Rate hereunder shall (in the absence of manifest error) be conclusive.

"LIBO Rate Disruption Event" means, for any Interest Period and any Purchaser, any of the following: (a) a determination by such Purchaser that it would be contrary to law applicable to such Purchaser or to the directive of any central bank or other governmental authority having jurisdiction over such Purchaser to obtain United States dollars in the London interbank market to fund its investment in its interest in the Notes for such Interest Period or (b) the inability of such Purchaser by reason of circumstances affecting the London interbank market generally, to obtain United States dollars in such market to fund its investment in its interest in the Notes for such Interest Period.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity Percentage" shall mean, for a Committed Purchaser which is a Liquidity Provider for a Noncommitted Purchaser, such Purchaser's Commitment held in such capacity as a percentage of the aggregate Commitments of all Liquidity Providers (held in their capacities as such) for such Noncommitted Purchaser.

"Liquidity Provider" shall mean, with respect to a Noncommitted Purchaser, each Committed Purchaser identified as a Liquidity Provider for such Noncommitted Purchaser in the Joinder Supplement or Transfer Supplement pursuant to which such Noncommitted Purchaser became a party hereto, and any Assignee of such Committed Purchaser to the extent such Assignee has assumed, pursuant to a Transfer Supplement, the Commitment of such Committed Purchaser held in its capacity as a Liquidity Provider. In the event that a Liquidity Provider acquires a portion of the Class A Outstanding Amount of Notes from its Noncommitted Purchaser by Assignment, a corresponding portion of its Commitment shall thereupon cease to be held by it in its capacity as a Liquidity Provider for such Noncommitted Purchaser (but shall otherwise remain in effect, subject to the terms and conditions of this Agreement, as a portion of the Commitment of such Committed Purchaser).

"Noncommitted Purchaser" shall mean a Purchaser which is not a Committed Purchaser.

- 7 -

T:\Corp\dto\csuis535\nps_v12.doc
last saved on 2/27/2001

CSFB-00092249

"Noncommitted Purchaser Percentage" shall mean for each Noncommitted Purchaser, the aggregate Commitments of its Liquidity Providers from time to time as a percentage of the aggregate Commitments of all Committed Purchasers.

"Notes" has the meaning specified in the recitals to this Agreement.

"Note Interest Rate" shall mean, for any Interest Period and any portion of the outstanding principal amount of the Notes, (a) except when an Event of Default shall have occurred and be continuing, a rate *per annum* equal to the LIBO Rate for such Interest Period plus 0.375%; *provided, however*, that

(i) if any Purchaser shall notify the Agent that a LIBO Rate Disruption Event has occurred and is continuing, then the Note Interest Rate for such Interest Period shall be a rate *per annum* equal to the Base Rate in effect from time to time during such Interest Period; and

(ii) without limiting the foregoing, if with respect to such Interest Period such Purchaser shall have notified the Agent that the rate at which deposits of United States dollars are being offered to such Purchaser in the London interbank market does not accurately reflect the cost to such Purchaser of funding its interest in the Notes for such Interest Period, then the Note Interest Rate for such Interest Period shall be a rate *per annum* equal to the Base Rate in effect from time to time during such Interest Period;

and (b) when an Event of Default shall have occurred and be continuing, the Base Rate plus 1%, provided that upon the occurrence of an Event of Default, the Purchasers may, by written notice sent to the Issuer, the Seller, the Servicer and the Depositor not less than 30 nor more than 90 days after such Event of Default shall have commenced, convert the Note Interest Rate to a fixed interest rate equal to the Fixed Rate.

"Note Monthly Interest" means, with respect to any Accrual Period, the sum of (a) the amount of interest accrued on the outstanding amount of the Notes on the preceding Payment Date calculated at the Note Interest Rate with respect to the Interest Period equivalent to such Accrual Period and (b) with respect to the amount of each Borrowing during such Accrual Period, the amount of interest accrued on the amount of each such Borrowing calculated at the Note Interest Rate with respect to the Interest Period relating to such Borrowing, provided that if any principal amount described in clause (a) or (b) together with interest accrued thereon to the date of payment is paid prior to the end of such Accrual Period pursuant to Section 3.8 of the Sale and Servicing Agreement, then (x) Note Monthly Interest with respect to such Accrual Period shall not include the amount of interest so prepaid and (y) such principal amount shall cease accruing interest as of the date preceding such prepayment. Amounts prepaid pursuant to such Section 3.8 shall be allocated among the amounts set forth in clauses (a) and (b) of the preceding sentence by the Agent, after consultation with the Servicer.

- 8 -

CSFB-00092250

"OAC" has the meaning specified in the preamble to this Agreement.

"Owners" shall mean the Purchasers that are owners of record of the Notes or, with respect to any Note held by the Agent hereunder as nominee on behalf of Purchasers, the Purchasers that are owners of the Class A Outstanding Amount represented by such Note as reflected on the books of the Agent in accordance with this Agreement.

"Other Parties" has the meaning assigned to such term in subsection 6.4(b).

"Owner Trustee" means Wilmington Trust Company, a Delaware banking company, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor thereto.

"Participant" has the meaning specified in subsection 8.1(d) of this Agreement.

"Participation" has the meaning specified in subsection 8.1(d) of the Agreement.

"Percentage Interest" shall mean, for a Purchaser on any day, the percentage equivalent of (a) the sum of (i) the aggregate of the portions of each Borrowing (if any) funded by such Purchaser prior to such day pursuant to Section 10.1 of the Indenture, plus (ii) any portion of the Class A Outstanding Amount of the Notes acquired by such Purchaser as an Assignee from another Purchaser pursuant to a Transfer Supplement executed and delivered pursuant to Section 8.1 of this Agreement, minus (iii) the aggregate amount of principal payments made to such Purchaser prior to such day, minus (iv) any portion of the Class A Outstanding Amount of the Notes assigned by such Purchaser to an Assignee pursuant to a Transfer Supplement executed and delivered pursuant to Section 8.1 of this Agreement, divided by (b) the Class A Outstanding Amount of the Notes on such day.

"Purchase Limit" shall mean for any date the aggregate Commitments of the Purchasers on such date.

"Purchaser" has the meaning specified in the preamble to this Agreement.

"Related Documents" shall mean, collectively, this Agreement (including the Fee Letter and all Joinder Supplements and Transfer Supplements), the Indenture, the Custodial Agreement, the Notes, the Trust Agreement, the Certificates, the CSFBi Warrant, the CSFBi Warrant Registration Rights Agreement, the Agreement re Bankruptcy and the Sale and Servicing Agreement.

"Required Owners" shall mean, at any time, Owners having Percentage Interests aggregating greater than 50%.

- 9 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

"Required Purchasers" shall mean, at any time, Committed Purchasers having Commitments aggregating greater than 50% of the aggregate Commitments of all Committed Purchasers.

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule or regulation, or determination of an arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or to which such Person is subject, whether federal, state or local (including usury laws, the Federal Truth in Lending Act and Regulation Z and Regulation B of the Board of Governors of the Federal Reserve System).

"Sale and Servicing Agreement" means the sale and servicing agreement, dated as of February 9, 2001, among the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Backup Servicer, the Custodian and the Indenture Trustee, as amended, supplemented or otherwise modified from time to time.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Structured Purchaser" shall mean any Purchaser which is a special purpose corporation, the principal business of which consists of issuing commercial paper, medium term notes or other securities to fund its acquisition and maintenance of receivables, accounts, instruments, chattel paper, general intangibles and other similar assets or interests therein, and which is identified as a Structured Purchaser in the Joinder Agreement or Transfer Supplement by which such Committed Purchaser became a party to this Agreement.

"Support Facility" shall mean any liquidity or credit support agreement with a Structured Purchaser which relates to this Agreement (including any agreement to purchase an assignment of or participation in Notes).

"Support Party" shall mean any bank or other financial institution extending or having a commitment to extend funds to or for the account of a Structured Purchaser (including by agreement to purchase an assignment of or participation in Notes) under a Support Facility. Each Liquidity Provider for a Noncommitted Purchaser which is a Structured Purchaser shall be deemed to be a Support Party for such Structured Purchaser.

"Taxes" has the meaning assigned to such term in subsection 6.3(a).

"Term Out Rate" shall mean, as of any date, the sum of (i) the Applicable Treasury Yield as of such date, (ii) 7% and (iii) to the extent that the then-current "spread-to-treasuries" for manufactured housing backed notes with a comparable average life and a comparable issue size (calculated by taking the average of two bids for such spread-to-treasuries as determined by the Agent and two of the then ten top ranked lead underwriters for such

- 10 -

CSFB-00092252

securities or such other Persons as may be agreed to from time to time by the Issuer and the Purchasers) exceeds the spread set forth in clause (ii), such excess.

"Transfer" has the meaning specified in subsection 8.1(c) of this Agreement.

"Transferee" has the meaning specified in subsection 8.1(c) of this Agreement.

"Transfer Supplement" has the meaning specified in subsection 8.1(e) of this Agreement.

"Trust Agreement" means the trust agreement, dated as of February 9, 2001, between the Depositor and the Owner Trustee.

"written" or "in writing" (and other variations thereof) shall mean any form of written communication or a communication by means of telex, telecopier device, telegraph or cable.

1.2    Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(b)    The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, subsection and Exhibit references are to this Agreement, unless otherwise specified. The words "including" and "include" shall be deemed to be followed by the words "without limitation".

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1    Purchases. (a) The Purchasers hereby direct that the Notes be registered in the name of the Agent, as nominee on behalf of the Purchasers from time to time hereunder. On and subject to the terms and conditions of this Agreement, one or more of the Purchasers shall advance to the Issuer, as the purchase price for the Notes, an amount equal to the Original Class A Note Principal Balance on the Closing Date. Such payment shall constitute a Borrowing for the purposes hereof and the Related Documents.

(b)    On and subject to the terms and conditions of this Agreement and prior to the Facility Termination Date, (i) each Noncommitted Purchaser may advance its Noncommitted Purchaser Percentage of any Borrowing made pursuant to Section 10.1 of the Indenture, (ii) each Liquidity Provider, severally, agrees to acquire its respective Liquidity Percentage of each Borrowing not so acquired by its related Noncommitted Purchaser, and (iii) each Committed Purchaser, severally, agrees to advance its Committed Purchaser Percentage of each Borrowing

- 11 -

CSFB-00092253

so made; provided that in no event shall a Committed Purchaser be required on any date to make an advance exceeding its aggregate Available Commitment, determined prior to giving effect to such advance; provided, further that in no event shall Borrowings occur more frequently than twice every calendar week unless otherwise consented to by the Agent, in its sole discretion. Such advance shall be made available to the Issuer, subject to the satisfaction of the conditions specified in Section 3.2 hereof, at or prior to 2:00 p.m. New York City time on the applicable Borrowing Date by deposit of immediately available funds to the account specified by the Issuer.

        (c)    Each Borrowing on the applicable Borrowing Date shall be made on prior notice from the Issuer received by the Agent not later than 2:00 p.m. New York City time on the Business Day immediately preceding such Borrowing Date. Each such notice shall be irrevocable and shall specify (i) the aggregate amount of the Borrowing, and (ii) the applicable Borrowing Date (which shall be a Business Day). The Agent shall promptly forward a copy of such notice to each Purchaser. Each Noncommitted Purchaser shall notify the Agent by 9:30 a.m., New York City time, on the applicable Borrowing Date whether it has determined to make the advance requested pursuant to this subsection 2.1. In the event that a Noncommitted Purchaser shall not have timely provided such notice such Noncommitted Purchaser shall be deemed to have determined not to make such purchase. The Agent shall notify the Issuer, the Servicer and each Liquidity Provider for such Noncommitted Purchaser on or prior to 10:00 a.m., New York City time, on the applicable Borrowing Date of whether such Noncommitted Purchaser has so determined to advance its share of the Borrowing, and, in the event that Noncommitted Purchasers have not determined to advance the Borrowing, the Agent shall specify in such notice (i) the portion of the Borrowing to be advanced by each Liquidity Provider, and (ii) the applicable Borrowing Date (which shall be a Business Day). The Agent shall notify the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Indenture Trustee and each Purchaser not later than the Business Day following the applicable Borrowing Date of the identity of each Purchaser which advanced any portion of the Borrowing on such day, whether such Purchaser was a Noncommitted Purchaser or a Committed Purchaser and the portion of the Borrowing advanced by such Purchaser.

        (d)    In no event may any Borrowing be made hereunder or under Section 10.1 of the Indenture, nor shall any Committed Purchaser be obligated to advance any portion of any Borrowing, to the extent that such Borrowing would exceed the aggregate Available Commitments.

        (e)    The Notes shall be paid as provided in the Indenture, and the Agent shall allocate to the Owners each payment in respect of the Notes received by the Agent in its capacity as Noteholder as provided therein. Payments in reduction of the Class A Outstanding Amount of the Notes shall be applied to Owners pro rata based on their respective Percentage Interests of the Class A Outstanding Amount of Notes.

- 12 -

T:\Corp\cto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092254

(f)      The Agent shall keep records of each Borrowing, each Interest Period applicable thereto, the interest rate(s) applicable to the Notes and each payment of principal and interest thereon.  Such records shall be rebuttably presumptive evidence of the subject matter thereof absent manifest error.

2.2     Reductions of Commitments.  (a) At any time the Issuer may, upon at least three Business Days' prior written notice to the Agent, terminate the Commitments or reduce the aggregate Commitments or, with the consent of the Agent, terminate or reduce the Commitment of one or more Purchasers.  Each such partial reduction shall be in an aggregate amount of $10,000,000 or integral multiples of $1,000,000 in excess thereof (or such other amount requested by the Issuer to which the Agent consents).  Reductions of the aggregate Commitments of all Purchasers pursuant to this subsection 2.2(a) shall be allocated (i) to the Commitment of each Committed Purchaser, other than a Commitment held as a Liquidity Provider, pro rata based on the Commitment Percentage represented by such Commitment, and (ii) to the aggregate Commitments of Liquidity Providers for each Noncommitted Purchaser pro rata based on the Noncommitted Purchaser Percentage of such Noncommitted Purchaser, and the portion of any such reduction which is so allocated to the aggregate Commitments of Liquidity Providers for a Noncommitted Purchaser shall be allocated to the Commitment of each such Liquidity Provider pro rata based on its respective Liquidity Percentage.  No reduction or termination of the Commitments shall reduce the aggregate Commitments below the outstanding principal amount of the Notes.

(b)      On the Facility Termination Date, the Commitment of each Committed Purchaser shall be automatically reduced to zero.

(c)      Subject to the provisions of subsections 8.1(a) and 8.1(b), any Person may from time to time with the consent of the Agent and the Issuer become a party to this Agreement as an initial Noncommitted Purchaser or an initial Committed Purchaser by (i) delivering to the Issuer an Investment Letter and (ii) entering into an agreement substantially in the form attached hereto as Exhibit B hereto (a "Joinder Supplement"), with the Agent and the Issuer, acknowledged by the Servicer, which shall specify (A) the name and address of such Person for purposes of Section 9.2 hereof, (B) whether such Person will be a Noncommitted Purchaser or Committed Purchaser and, if such Person will be a Committed Purchaser, and its Commitment, (C) if such Person is a Noncommitted Purchaser, the identity of its Liquidity Providers and their respective Liquidity Percentages, (D) if such Person is a Liquidity Provider, the Noncommitted Purchaser for which it is acting as such and the portion of such Person's Commitment which.is held by it in its capacity as Liquidity Provider, and (E) the other information provided for in such form of Joinder Supplement.  Upon its receipt of a duly executed Joinder Supplement, the Agent shall on the effective date determined pursuant thereto give notice of such effectiveness to the Issuer, the Servicer and the Indenture Trustee.

- 13 -

T:\Corp\dto\csuit535\nps_v12.doc
last saved on 2/27/2001

CSFB-00092255

2.3    <u>Fees. Expenses. Payments. Etc.</u> (a) The Issuer and Seller agree to pay to the Agent for the account of the Purchasers, the Fees and other amounts payable by them set forth in the Fee Letter at the times specified therein.

(b)    The Seller further agrees to pay within 30 days following receipt of an invoice therefor to the Agent and the initial Purchasers all reasonable costs and expenses in connection with the preparation, execution, delivery, administration (including any amendments, waivers or consents of any of the Related Documents requested by the Seller or its Affiliates) of this Agreement and each related Support Facility to the extent related to the Notes, and the other documents to be delivered hereunder or in connection herewith, including the reasonable fees and out-of-pocket expenses of counsel for the Agent and each of the initial Purchasers with respect thereto.

(c)    The Issuer agrees to pay to the Agent and, following the occurrence and during the continuance of an Event of Default, each Purchaser, promptly following presentation of an invoice therefor, all reasonable costs and expenses (including reasonable fees and expenses of counsel), if any, in connection with the enforcement of any of the Related Documents, and the other documents delivered thereunder or in connection therewith.

(d)    The Seller further agrees to pay on demand any and all stamp, transfer and other taxes and governmental fees payable in connection with the execution, delivery, filing and recording of any of the Related Documents or the other documents and agreements to be delivered hereunder and thereunder or otherwise in connection with the issuance of the Notes, and agrees to save each Purchaser and the Agent harmless from and against any liabilities with respect to or resulting from any delay in paying or any omission to pay such taxes and fees.

(e)    Interest, periodic fees or other periodic amounts payable hereunder shall be calculated, unless otherwise specified in the Fee Letter, on the basis of a 360-day year and for the actual days elapsed, <u>provided</u> that interest paid based on the rate set forth in clause (a) of the definition of Base Rate shall be calculated on the basis of a 365 or 366-day year, as the case may be, and for actual days elapsed.

(f)    All payments to be made hereunder or under the Indenture, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 2:30 p.m., New York City time, on the due date thereof to the Agent's account specified in subsection 9.2(b) hereof, in United States dollars and in immediately available funds. Payments received by the Agent after 2:30 p.m. New York City time shall be deemed to have been made on the next Business Day. Notwithstanding anything herein to the contrary, if any payment due hereunder becomes due and payable on a day other than a Business Day, the payment date thereof shall be extended to the next succeeding Business Day and in the case of principal, interest shall accrue thereon at the applicable rate during such extension. To

- 14 -

CSFB-00092256

the extent that (i) the Indenture Trustee, the Depositor, the Transferor, the Seller, the Issuer or the Servicer makes a payment to the Agent or a Purchaser or (ii) the Agent or a Purchaser receives or is deemed to have received any payment or proceeds for application to an obligation, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a Indenture Trustee, receiver or any other party under any bankruptcy or insolvency law, state or Federal law, common law, or for equitable cause, then, to the extent such payment or proceeds are set aside, the obligation or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received or deemed received by the Agent or the Purchasers, as the case may be.

2.4  Indemnification.  (a) OAC (the "Indemnitor") agrees to indemnify and hold harmless the Agent, each Purchaser and each Affected Party and any directors, officers, employees or agents, of the Agent, the Purchasers or the Affected Parties (each such Person being referred to as an "Indemnitee") from and against any and all claims, damages, losses, liabilities, costs or expenses whatsoever (including reasonable fees and expenses of legal counsel) which such Indemnitee may incur (or which may be claimed against such Indemnitee) arising out of, by reason of or in connection with the execution and delivery of, or payment or other performance under, or the failure by a Person other than an Indemnitee to make payments or perform under, any Related Document or the issuance of the Notes (including in connection with the preparation for defense of any investigation, litigation or proceeding arising out of, related to or in connection with such execution, delivery, payment, performance or issuance), except (i) to the extent that any such claim, damage, loss, liability, cost or expense shall be caused by the willful misconduct, bad faith, recklessness or gross negligence of, or breach of any representation or warranty in any Related Document or Support Facility by, any Indemnitee, (ii) to the extent that any such claim, damage, loss, liability, cost or expense is covered  or addressed by subsection 2.3(c) or (d) hereof, (iii) to the extent that any such claim, damage, loss, liability, cost or expense relates to disclosure made by an Indemnitee, the Owner Trustee or the Indenture Trustee in connection with an Assignment or Participation pursuant to Section 8.1 of this Agreement which disclosure is not based on information given to such Indemnitee by or on behalf of the Seller, the Servicer, the Transferor or the Depositor, or any affiliate thereof or by or on behalf of the Indenture Trustee, (iv) to the extent that such claim, damage, loss, liability, cost or expense shall be caused by any default in payment of any Receivable, (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any act or default of a successor Servicer which is not an Affiliate of OAC, (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any mismatch between the interest rate paid on the Notes and the cost to any Purchaser of obtaining funds to maintain its investment the Notes or (v) to the extent such claim, damage, loss, liability, cost or expense shall be caused by any increase in the LIBO Rate. The foregoing indemnity shall include any claims, damages, losses, liabilities, costs or expenses to which any such Indemnitee may become subject under Securities Act, the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as

- 15 -

amended, or other federal or state law or regulation arising out of or based upon any untrue statement or alleged untrue statement of a material fact in any disclosure document relating to the Notes or any amendments thereof or supplements thereto, in any case, provided or approved by the Issuer (other than statements provided by the Indemnitee expressly for inclusion therein) or arising out of, or based upon, the omission or the alleged omission to state a material fact necessary to make the statements therein or any amendment thereof or supplement thereto, in light of the circumstances in which they were made, not misleading (other than with respect to statements provided by the Indemnitee expressly for inclusion therein).

       (b)    Promptly after the receipt by an Indemnitee of a notice of the commencement of any action against an Indemnitee, such Indemnitee will notify the Agent and the Agent will, if a claim in respect thereof is to be made against the Indemnitor pursuant to subsection 2.4(a), notify such Indemnitor in writing of the commencement thereof; but the omission so to notify such party will not relieve such party from any liability which it may have to such Indemnitee pursuant to the preceding paragraph except to the extent the Indemnitor is materially prejudiced by such failure. If any such action is brought against an Indemnitee and it notifies the Indemnitor of its commencement, the Indemnitor will be entitled to participate in and, to the extent that it so elects by delivering written notice to the Indemnitee after receiving notice of the commencement of the action from the Indemnitee, to assume the defense of any such action, with counsel mutually satisfactory to such Indemnitor and each affected Indemnitee. After delivery of such notice by an Indemnitor to an Indemnitee, the Indemnitor will not be liable to such Indemnitee for any legal or other expenses except as provided below and except for the reasonable costs of investigation incurred by the Indemnitee in connection with the defense of such action. Each Indemnitee will have the right to employ its own counsel in any such action, but the fees, expenses and other charges of such counsel will be at the expense of the such Indemnitee unless (i) the employment of such counsel by such Indemnitee has been authorized in writing by the Indemnitor, (ii) the Indemnitor shall have failed to assume the defense and employ counsel, (iii) the named parties to any such action or proceeding (including any impleaded parties) include both such Indemnitee and either the Indemnitor or another person or entity that may be entitled to indemnification from the Indemnitor (by virtue of this Section 2.4 or otherwise) and such Indemnitee and the Indemnitor shall have been advised by counsel to the Indemnitor that there are one or more legal defenses available to such Indemnitee which are different from or additional to those available to an Indemnitor or such other party and which present a conflict of interest or shall otherwise have reasonably determined that the co-representation would present a conflict of interest (in which case the Indemnitor will not have the right to direct the defense of such action on behalf of the Indemnitee). In any such case described in clauses (i) through (iii) of the preceding sentence, the reasonable fees, disbursements and other charges of counsel to such Indemnitee will be at the expense of the Indemnitor; it being understood that in no event shall the Indemnitor be liable for the fees, disbursements and other charges of more than one counsel (in addition to any local counsel) for all Indemnitees in connection with any one action or separate but similar or related actions

- 16 -

CSFB-00092258

arising out of the same general allegations or circumstances. The Indemnitor shall not be liable for any settlement of any such action, suit or proceeding effected without its written consent, which shall not be unreasonably withheld, but if settled with the written consent of the Indemnitor or if there shall be a final judgment for the plaintiff in any such action, suit or proceeding, the Indemnitor agrees to indemnify and hold harmless any Indemnitee to the extent set forth herein from and against any loss, claim, damage, liability or reasonable expense by reason of such settlement or judgment. The Indemnitor shall not, without the prior written consent of an Indemnitee (not to be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder, if such settlement, compromise or consent includes an admission of culpability or wrong-doing on the part of such Indemnitee or the entry or an order, injunction or other equitable or nonmonetary relief (including any administrative or other sanctions or disqualifications) against such Indemnitee or if such settlement, compromise or consent does not includes an unconditional release of such Indemnitee from all liability arising out of such claim, action, suit or proceeding.

          (c)     The obligations of OAC under this Section 2.4 shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement. Without limiting the foregoing, neither the lack of validity or enforceability of, or any modification to, any Related Document nor the existence of any claim, setoff, defense (other than a defense of payment) or other right which OAC may have at any time against the Agent any Purchaser, any Affected Party or any other Person, whether in connection with any Related Document or any unrelated transactions, shall constitute a defense to such obligations.

          (d)     Each Affected Party shall be entitled to receive indemnification pursuant to this Section 2.4 as though it were a Purchaser and this Section 2.4 applied to its interest in or commitment to acquire an interest in the Notes.

          2.5     **Events of Default.** If any Event of Default shall occur and be continuing, (A) if such event is an Event of Default specified in paragraph (d) of the definition thereof with respect to the Issuer, automatically the Commitments shall immediately terminate, and (B) if such event is any other Event of Default, with the consent of the Required Purchasers and the Required Owners, the Agent may, or upon the request of the Required Purchasers and the Required Owners, the Agent shall, by notice to the Issuer, declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate.

          2.6     **Notification of Note Monthly Interest.** On the third Business Day immediately preceding each Payment Date, the Agent shall calculate the Note Monthly Interest applicable to all Notes for the applicable Accrual Period and shall notify the Indenture Trustee and the Servicer of such amount by written notice in the form of Exhibit C hereto. Such rate and amount

- 17 -

T:\Corp\dko\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092259

shall be calculated using an estimate of the Note Interest Rate, if necessary, for the remaining days in such Accrual Period.

## SECTION 3.  CONDITIONS PRECEDENT

3.1    Condition to Initial Purchase.  The following shall be conditions precedent to the initial purchase by any Purchaser of the Notes unless waived by the Agent with the consent of the Required Purchasers:

(a)    This Agreement shall have been executed and delivered, and the Related Documents shall have been executed and delivered and shall have become effective in accordance with their respective terms.

(b)    All of the terms, covenants, agreements and conditions of this Agreement, the Fee Letter and the Related Documents to be complied with and performed by OAC, the Seller, the Servicer, the Issuer, the Depositor, the Transferor, the Owner Trustee or the Indenture Trustee, as the case may be, by the Closing Date shall have been complied with in all material respects or otherwise waived by the Agent.

(c)    Each of the representations and warranties of each of OAC, the Seller, the Servicer, the Issuer, the Depositor, the Transferor, the Owner Trustee or the Indenture Trustee, as the case may be, made in this Agreement and in the Related Documents shall be true and correct in all material respects as of the time of the Closing Date as though made as of such time (except to the extent that they expressly relate to an earlier or later time).

(d)    No Default or Event of Default shall have occurred and be continuing

(e)    The Agent shall have received:

(i)    Certified copies of the resolutions of the Board of Directors or comparable body of each of OAC, OHC, the Transferor and the Depositor approving this Agreement and the other Related Documents to which it is a party and any other documents contemplated thereby and certified copies of all documents evidencing other necessary corporate action and governmental approvals, if any, with respect to this Agreement and the other Related Documents to which it is a party and any other documents contemplated thereby;

(ii)    An officer's certificate of each of OAC, OHC, the Transferor, the Depositor and the Owner Trustee, certifying the names and true signatures of the officers authorized to sign this Agreement and the other Related Documents and any other documents to be delivered by it hereunder or thereunder;

- 18 -

CSFB-00092260

          (iii)    A copy of the bylaws of each of OAC and OHC, certified by an officer thereof;

          (iv)    A certified copy of the charter or limited liability company agreement of each of OAC, OHC, the Transferor and the Depositor, a certificate as to the good standing of each of OAC and OHC from the Secretary of State of the State of North Carolina and a certificate as to the good standing of each of the Transferor and the Depositor from the Secretary of State of the State of Delaware, in each case dated as of a recent date;

          (v)    Proper financing statements under the UCC of all jurisdictions that the Agent may deem necessary or desirable in order to perfect the ownership and security interests contemplated by the Sale and Servicing Agreement, the Indenture and this Agreement;

          (vi)    Executed copies of proper financing statements, if any, necessary to release all security interests and other rights, if any, of any Person in the Trust Estate previously granted by the Transferor, the Seller, the Depositor or the Issuer;

          (vii)    Completed requests for information, dated on or before the Closing Date, in all jurisdictions referred to in subsection (vi) above that name the Issuer, the Transferor, the Depositor or OAC as debtor, together with copies of such other financing statements;

          (viii)    An opinion of Hunton & Williams, special counsel to OAC, dated the Closing Date, in form and substance satisfactory to the Agent;

          (ix)    An opinion of Richards, Layton & Finger, counsel to the Owner Trustee and special Delaware counsel to the Issuer, dated the Closing Date, in form and substance satisfactory to the Agent;

          (x)    An opinion of internal counsel for the Indenture Trustee, Custodian and Backup Servicer, dated the Closing Date, in form and substance satisfactory to the Agent;

          (xi)    A favorable written opinion of Loeb & Loeb, counsel for the Transferor, dated the Closing Date, in form and substance satisfactory to the Agent;

          (xii)    A copy of the documentation evidencing the release of all liens attaching to the Receivables pursuant to previous financings; and

          (xiii)    Such other documents, instruments, certificates and opinions as the Agent may reasonably request.

          (f)    No action, suit, proceeding or investigation by or before any Governmental Authority shall have been instituted to restrain or prohibit the consummation by

- 19 -

CSFB-00092261

the Agent or the Purchasers of, or to invalidate, the transactions contemplated by this Agreement or the other Related Documents in any material respect.

(g)    Each of the Structured Purchasers shall have entered into total return swaps with Credit Suisse First Boston International in form and substance satisfactory to such Structured Purchaser.

(h)    OHC shall have issued the CSFBi Warrant, in substantially the form of Exhibit D hereto, to CSFBi.

(i)    OHC and CSFBI shall have entered into a Registration Rights Agreement, in substantially the form of Exhibit E hereto (the "CSFBi Warrant Registration Rights Agreement"), with respect to the CSFBi Warrant.

(j)    OHC, OAC and Oakwood Capital Corporation shall have executed and delivered to the Agent the Agreement re Bankruptcy (the "Agreement re Bankruptcy"), in substantially the form of Exhibit F hereto.

3.2    Condition to Borrowings. The following shall be conditions precedent to each Borrowing hereunder unless waived by the Agent with the consent of the Required Purchasers:

(a)    the Issuer shall have timely delivered a notice of Borrowing pursuant to subsection 2.1(b) of this Agreement;

(b)    no Default or Event of Default shall have occurred and be continuing on such date;

(c)    both immediately prior to and after giving effect to such Borrowing and the application of the proceeds thereof as provided herein and in the Indenture, the Class A Outstanding Amount of the Notes shall not exceed the Borrowing Base;

(d)    the conditions set forth in proviso (ii) of Section 10.1 of the Indenture with respect to such Borrowing shall have been satisfied.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties of OAC . OAC hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a)    It is a validly existing and in good standing under the laws of its jurisdiction of organization, with full power and authority under such laws to own its properties

- 20 -

CSFB-00092262

and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)    It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party. When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect. The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)    No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)    The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its organizational documents, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, documents, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)    Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance

- 21 -

CSFB-00092263

of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that is expected by it to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)    It has delivered to the Agent complete and correct copies of OHC's audited financial statements for the years ended September 30, 1998, September 30, 1999 and September 30, 2000.

(g)    No report, statement, exhibit or other written information required to be furnished by OAC or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(h)    Each of the Related Documents to which it is a party is in full force and effect with respect to it and no Default or Event of Default has occurred with respect to it.

(i)    OAC repeats and reaffirms to the Agent and the Owners each of the representations and warranties of OAC in the Section 2.1 of the Sale and Servicing Agreement and each other document delivered in connection therewith or herewith, and represents that such representations and warranties are true and correct in all material respects.

(j)    As of the Closing Date, based upon, among other things, the representations and warranties and covenants of the Agent and the Purchasers hereunder, the sale of the Notes by the Issuer pursuant to the terms of this Agreement and the Indenture will not require the registration of such Notes under the Securities Act.

(k)    All tax returns (federal, state and local) required to be filed with respect to OAC have been filed (which filings may be made by an Affiliate of OAC on a consolidated basis covering OAC and other Persons) and there has been paid or adequate provision made for the payment of all taxes, assessments and other governmental charges in respect of OAC (or in the event consolidated returns have been filed, with respect to the Persons subject to such returns) and any taxes for which adequate provision has not been made would not have a material adverse effect on OAC's ability to perform its obligations hereunder.

(l)    The Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended, and none of OAC, the Depositor, the Transferor or the Issuer is required to be registered under the Investment Company Act of 1940, as amended.

- 22 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092264

(m)    There has not been any material adverse change in the business, operations, financial condition, properties or assets of OAC since the year ended September 30, 2000.

(n)    As of the Closing Date, the chief executive office of OAC is at the address indicated in Section 9.2 hereof.

(o)    Since the Closing Date (except as approved by the Agent in writing), there have been no material changes in the Credit and Collection Policy.

(p)    As of the date hereof: (i) OAC has only the subsidiaries and divisions listed on Schedule IV to the Sale and Servicing Agreement; and (ii) OAC has, within the last five (5) years, operated only under the tradenames identified in Schedule IV to the Sale and Servicing Agreement, and, within the last five (5) years, has not changed its name, merged with or into or consolidated with any other corporation or been the subject of any proceeding under Title 11, United States Code (Bankruptcy), except as disclosed in such Schedule IV.

(q)    OAC and each Affiliate thereof is in compliance in all material respects with ERISA and no lien in favor of the Pension Benefit Guaranty Corporation on any of the Contracts or Receivables shall exist.

(r)    The names and addresses of all the Lock-Box Banks, together with the account numbers of the Lock-Box Accounts at such Lock-Box Banks, are specified in Schedule III to the Sale and Servicing Agreement (or have been notified to the Indenture Trustee).

4.2    Representations and Warranties of the Issuer.    The Issuer hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a)    It is a business trust validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)    It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party. When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it

- 23 -

CSFB-00092265

in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect. The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)    No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)    The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, the Trust Agreement, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)    Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)    No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which

- 24 -

CSFB-00092266

such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(g)     The Notes have been duly and validly authorized, and, when executed and authenticated in accordance with the terms of the Indenture and delivered to the Agent and paid for in accordance with this Agreement, will be duly and validly issued and outstanding, and will be entitled to the benefits of the Indenture, this Agreement and the other Related Documents.

(h)     Each of the Related Documents to which it is a party is in full force and effect and no Default or Event of Default with respect to it has occurred and is continuing.

(i)     The Issuer repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in each other document delivered in connection therewith, and represents that such representations and warranties are true and correct in all material respects.

(j)     Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

4.3     <u>Representations and Warranties of the Transferor</u>.  The Transferor hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a)     It is a corporation validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)     It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect.  The enforceability of its obligations under such

- 25 -

CSFB-00092267

agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

(c)    No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained by it in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)    The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its charter or By-laws, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)    Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)    No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

- 26 -

T:\Corp\dto\csuis535\mpa_v12.doc
last saved on 2/27/2001

(g)     Each of the Related Documents to which it is a party is in full force and effect and Default or Event of Default with respect to it has occurred and is continuing.

(h)     The Transferor repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in Section 2.1 of the Sale and Servicing Agreement and each other document delivered in connection therewith or herewith, and represents that such representations and warranties are true and correct in all material respects.

(i)     Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

(j)     As of the Closing Date, the chief executive office of the Transferor is at the address indicated in Section 9.2 hereof.

4.4     Representations and Warranties of the Depositor.  The Depositor hereby represents and warrants to the Agent and the Purchasers that as of the date hereof and the Closing Date and each Borrowing Date:

(a)     It is a limited liability company validly existing and in good standing under the laws of the State of Delaware, with full power and authority under such laws to own its properties and conduct its business as such properties are currently owned and such business is currently conducted and to execute, deliver and perform its obligations under this Agreement and the other Related Documents to which it is a party.

(b)     It has the power, authority and right to make, execute, deliver and perform this Agreement and the other Related Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Related Documents to which it is a party.  When executed and delivered, each of this Agreement and the other Related Documents to which it is a party will constitute its legal, valid and binding obligations, enforceable against it in accordance with its terms, subject, as to such enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium and other laws relating to or affecting creditors' rights generally from time to time in effect.  The enforceability of its obligations under such agreements may also be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and no representation or warranty is made with respect to the enforceability of its obligations under any indemnification provisions in such agreements to the extent that indemnification is sought in connection with securities laws violations.

- 27 -

CSFB-00092269

(c)    No consent, license, approval or authorization of, or registration with, any Governmental Authority is required to be obtained in connection with the execution, delivery or performance of each of this Agreement and the other Related Documents to which it is a party that has not been duly obtained by it and that is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant to the Indenture or mortgage recordings required following an Assignment Event.

(d)    The execution, delivery and performance of each of this Agreement and the other Related Documents to which it is a party do not violate any provision of any existing law or regulation applicable to it, any order or decree of any court to which it is subject, its limited liability company agreement, or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements that, individually or in the aggregate, would not have a material adverse effect on its ability to perform its obligations under this Agreement or the other Related Documents to which it is a party).

(e)    Except as disclosed in writing to the Agent prior to the Closing Date, there is no litigation or administrative proceeding before any court, tribunal or governmental body pending or, to its knowledge, threatened against it, with respect to this Agreement, the other Related Documents to which it is a party, the transactions contemplated hereby or thereby or the issuance of the Notes, and there is no such litigation or proceeding against it or any significant portion of its properties that it expects to have a material adverse effect on the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the other Related Documents to which it is a party.

(f)    No report, statement, exhibit or other written information required to be furnished by it or any of its Affiliates to the Agent or any Purchaser pursuant to this Agreement or the other Related Documents is or shall be inaccurate in any material respect, or contains or shall contain any material misstatement of fact, or omits or shall omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements were made, not misleading, in each case, as of the date it is or shall be dated or (except as otherwise disclosed to the Agent at such time) as of the date so furnished.

(g)    Each of the Related Documents to which it is a party is in full force and no Default or Event of Default with respect to it has occurred and is continuing.

(h)    The Depositor repeats and reaffirms to the Agent and the Owners each of the representations and warranties made by it in Section 2.1 of the Sale and Servicing Agreement and in the Trust Agreement and each other document delivered in connection therewith or

- 28 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092270

herewith, and represents that such representations and warranties are true and correct in all material respects.

(i)      Any taxes, fees and other charges of Governmental Authorities applicable to it, except for franchise or income taxes, in connection with the execution, delivery and performance by it of this Agreement and the other Related Documents to which it is a party or otherwise applicable to it in connection with the transactions contemplated hereby or thereby have been paid or will be paid at or prior to the Closing Date to the extent then due.

(j)      As of the Closing Date, the chief executive office of the Depositor is at the address indicated in Section 9.2 hereof.

## SECTION 5.  COVENANTS

5.1      Covenants . Each of the Seller, the Servicer, the Depositor, the Transferor, and the Issuer, each as to itself, covenants and agrees with the Agent and the Purchasers, through the Facility Termination Date and thereafter so long as any amount of the Notes shall remain outstanding or any monetary obligation arising hereunder shall remain unpaid, unless the Required Owners and the Required Purchasers shall otherwise consent in writing, that:

(a)      it shall perform in all material respects each of the respective covenants and other agreements made by it and comply in all material respects with each of the respective terms and provisions applicable to it under any of the other Related Documents to which it is party; it shall take all reasonable action to enforce the obligations of each of the other parties (other than the Note Agent and the Purchasers) to such Related Documents which are contained therein;

(b)      the Issuer and the Servicer shall furnish to the Agent a copy of each opinion, certificate, report, statement, notice or other communication (other than investment instructions) relating to the Notes which is furnished by or on behalf of it to the other or to the Indenture Trustee and furnish to the Agent, after receipt thereof, a copy of each notice, demand or other communication relating to the Notes, this Agreement or the Indenture received by the Issuer or the Servicer from the Indenture Trustee, the Depositor, the Transferor or the Seller; and (ii) such other information, documents records or reports respecting the Collateral, the Seller, the Depositor, the Transferor, the Issuer or the Servicer as the Agent may from time to time reasonably request;

(c)      the Issuer shall furnish to the Agent on or before the date such reports are due under the Indenture copies of each of the reports and certificates required by Sections 3.9 and 3.14 of the Indenture;

- 29 -

CSFB-00092271

(d)      Each of the Seller and the Servicer shall pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including tax obligations), except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and appropriate reserves with respect thereto have been provided on the books of the Seller or the Servicer, as applicable;

(e)      Each of the Seller and the Servicer shall continue to engage in business of the same general type as now conducted by it and preserve, renew and keep in full force and effect its existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business and comply with all Requirements of Law, except where the failure to be so qualified or comply could not reasonably be expected to have a material adverse affect on the Seller or the Servicer, as applicable ;

(f)      the Issuer, the Depositor, the Transferor, the Seller and the Servicer shall at any time from time to time during regular business hours, on reasonable notice to the Issuer, the Depositor, the Transferor, the Seller or the Servicer, as the case may be, permit the Agent, or its agents or representatives to:

(i)      examine all books, records and documents (including computer tapes and disks) in its possession or under its control with respect to the Related Documents or the Receivables; and

(ii)      visit its offices and property for the purpose of examining such materials described in clause (i) above.

(g)      the Issuer and the Servicer shall furnish to the Agent, promptly after obtaining actual knowledge of the occurrence of any Default or Event of Default, a certificate of the Issuer or an appropriate officer of the Servicer, as the case may be, setting forth the circumstances of such Default or Event of Default and any action taken or proposed to be taken by the Issuer or the Servicer with respect thereto;

(h)      it shall timely make all payments, deposits or transfers to be made by it and give all instructions to transfer required to be given by it under this Agreement and the Indenture;

(i)      the Seller, the Depositor, the Transferor, Issuer and the Servicer shall execute and deliver to the Agent or the Indenture Trustee all such documents and instruments and do all such other acts and things as may be necessary or reasonably required by the Agent or the Indenture Trustee to enable any of them to exercise and enforce their respective rights under the Related Documents and to realize thereon, and record and file and rerecord and refile all such

- 30 -

T:\Corp\dox\csuls535\npa_v12.doc
last saved on 2/27/2001

documents and instruments, at such time or times, in such manner and at such place or places, all as may be necessary or required by the Indenture Trustee or the Agent to validate, preserve, perfect and protect the position of the Indenture Trustee under the Indenture, provided no such action shall be inconsistent with the Indenture or contrary to instructions of the Indenture Trustee;

(j)    neither the Seller, the Depositor, the Transferor, the Issuer nor the Servicer will consolidate with or merge into any other Person or convey or transfer its properties and assets substantially as an entirety to any Person, except in the case of the Depositor, the Transferor, the Servicer or the Seller, (i) in accordance with Section 5.2 of the Sale and Servicing Agreement and (ii) with the prior written consent of the Required Owners and the Required Purchasers, <u>provided that</u>, without such consent, OAC may merge into Oakwood Acceptance Corporation, LLC, a Delaware limited liability company;

(k)    OAC will not resign as Servicer, unless (A) the performance of its duties under the Sale and Servicing Agreement is no longer permissible pursuant to Requirements of Law and there is no reasonable action which it could take to make the performance of such duties permissible under such Requirements of Law, or (B) the Required Owners and the Required Purchasers shall have consented thereto;

(l)    OAC shall furnish to the Agent:

(i)    (1) as soon as available and in any event within 45 days after the end of each fiscal quarter of Oakwood Homes Corporation, a North Carolina corporation ("OHC"), the balance sheet of OHC and its consolidated subsidiaries as of the end of such quarter and statements of income and retained earnings of OHC and its consolidated subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, certified by the chief financial officer of OHC and (2) as soon as available and in any event within 90 days after the end of each fiscal year of OHC, a copy of the annual report on Form 10-K for such year for OHC and its consolidated subsidiaries, containing financial statements for such year accompanied by an audit report of a nationally recognized firm of independent certified public accountants (or such other firm of independent certified public accountants acceptable to the Agent) which report shall be unqualified as to going concern and scope of audit and shall state the opinion that such consolidated financial statements present fairly the financial position of OHC and each of its consolidated subsidiaries at the dates indicated and the results of their operations and their cash flow for the periods indicated in conformity with generally accepted accounting principles and that the examination had been made in accordance with generally accepted auditing standards; and

- 31 -

CSFB-00092273

(ii)    Such other information (including financial information), documents, records or reports respecting the Notes, the Trust Estate, the Seller, the Servicer, the Depositor or the Issuer as the Agent may from time to time reasonably request.

(m)    Neither the Seller nor the Servicer shall make, or permit any Person to make, any material amendment, modification or change to, or provide any material waiver under, the Indenture or the other Related Documents without the prior written consent of the Agent.

(n)    Each of the Seller and the Servicer will comply in all material respects with the Credit and Collection Policy in regard to each Receivable and the related Contract. Each of the Seller and the Servicer shall (i) notify the Agent ten (10) days prior to any amendment of or change in the Credit and Collection Policy and (ii) obtain the Agent's consent prior to any such amendment or change; provided that the Seller and the Servicer may immediately implement any changes (and provide notice to the Agent subsequent thereto) as may be required under applicable law from time to time upon the reasonable determination of the Seller or the Servicer, as the case may be. The underwriting, credit scoring, approval, servicing and collection policies and procedures applied to Receivables and the related Contracts originated by independent third parties shall be in accordance with the Credit and Collection Policy and in no event shall such Receivables and related Contracts be underwritten, credit scored, approved, serviced and collected more leniently or less stringently than those procedures applied to Receivables and related Contracts originated by the Seller or an Affiliate. The Seller and the Servicer shall (i) notify the Agent ten (10) days prior to the use of any retail installment sales contract related to the Financed Housing that contains material changes from the form of the Contract as of the Closing Date and (ii) obtain the Agent's consent prior to using such retail installment sales contract; provided that the Seller and the Servicer may immediately implement any changes (and provide notice to the Agent subsequent thereto) as may be required under applicable law from time to time upon the reasonable determination of the Seller or the Servicer, as the case may be.

(o)    The Seller shall cause to be delivered to the Agent, within thirty (30) days following receipt of a written request from the Agent, at the expense of the Seller, the written report of a review conducted by an independent auditor acceptable to the Agent of a random sampling of Contracts that are held by the Custodian, together with all related Contract Documents held by the Custodian.

(p)    The Servicer shall instruct all Obligors to cause all Collections to be deposited directly to a Lock-Box Account. In the event either the Seller or the Servicer receives any Collections, the Seller or the Servicer, as the case may be, shall hold in trust, and deposit, immediately, but in any event not later than one (1) Business Day of its receipt thereof, to a Lock-Box Account all such Collections.

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092274

(q)    The Seller and the Servicer shall notify the Agent within five (5) Business Days of obtaining knowledge thereof, of any fraudulent activity or theft in the origination or servicing of Receivables or the related Contracts that results or may result in a loss of at least $250,000.

(r)    Except as otherwise provided herein, neither the Seller, the Servicer, the Depositor, the Transferor nor the Issuer will sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Lien upon .(or the filing of any financing statement) or with respect to, any Receivable or related Contract, or upon or with respect to any Lock-Box Account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof.

(s)    Except as otherwise permitted in the Sale and Servicing Agreement or with the prior written consent of the Agent, neither the Seller nor the Servicer will extend, amend or otherwise modify the terms of any Receivable, or amend, modify or waive any term or condition of any Contract related thereto.

(t)    Neither the Seller nor the Servicer will add or terminate any bank as a Lock-Box Bank or any account as a Lock-Box Account to or from those listed in Schedule III to the Sale and Servicing Agreement or make any change in its instructions to Obligors regarding payments to be made to any Lock-Box Account, unless (i) such instructions are to deposit such payments to another existing Lock-Box Account or (ii) the Agent shall have received written notice of such addition, termination or change at least 30 days prior thereto.

(u)    Neither the Seller, the Depositor, the Transferor nor the Issuer will change its name, identity or structure or its chief executive office, unless at least 30 days prior to the effective date of any such change such person delivers to the Indenture Trustee and the Agent UCC financing statements, executed by such Person necessary to reflect such change and to continue the perfection of the Indenture Trustee's interest in the Receivables.

(v)    Each of the Depositor and the Transferor covenants and agrees with the Agent and the Purchasers that, unless the Agent shall otherwise consent in writing:

(i)    It shall conduct its business solely in its own name through its duly authorized officers or agents so as not to mislead others as to the identity of the entity with which such persons are concerned, and shall avoid the appearance that it is conducting business on behalf of any Affiliate thereof or that its assets are available to pay the creditors of OHC or any Affiliate thereof (other than as expressly provided herein).

(ii)    It shall maintain corporate records and books of account separate from those of OHC and any Affiliate (other than, in the case of the Depositor, itself) thereof.

- 33 -

CSFB-00092275

(iii)    It shall obtain proper authorization for all action requiring such authorization.

(iv)    It shall pay its own operating expenses and liabilities from its own funds.

(v)    In the case of the Depositor, the annual financial statements of OHC shall disclose the effects of the transactions contemplated hereby in accordance with generally accepted accounting principles.

(vi)    Its resolutions, agreements and other instruments underlying the transactions described in this Agreement shall be continuously maintained by it as part of its official records.

(vii)    It shall maintain an arm's-length relationship with OHC and its Affiliates (other than, in the case of the Depositor, itself), and shall not hold itself out as being liable for the debts of OHC or any of its Affiliates (other than, in the case of the Depositor, itself).

(viii)    It shall keep its assets and liabilities separate from those of all other entities other than as permitted herein.

(ix)    It shall not maintain bank accounts or other depository accounts to which any Affiliate is an account party or from which any Affiliate has the power to make withdrawals.

(x)    It shall not amend, supplement or otherwise modify its organizational documents, except in accordance therewith and with the prior written consent of the Agent.

(xi)    It shall not create, incur, assume or suffer to exist any indebtedness on which it is obligated, except as contemplated by this Agreement and the other Related Documents. It shall not assume, guarantee, endorse or otherwise be or become directly or contingently liable for the obligations of any Person by, among other things, agreeing to purchase any obligation of another Person (other than the Receivables), agreeing to advance funds to such Person or causing or assisting such Person to maintain any amount of capital. It shall not be party to any indenture, agreement, mortgage, deed of trust or other instrument other than this Agreement and the other Related Documents.

(xii)    It shall not enter into, or be a party to any transaction with any of its Affiliates, except as contemplated by this Agreement and the other Related Documents.

- 34 -

CSFB-00092276

(xiii)   It shall observe all procedures required by its organizational documents and preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its formation and qualify and remain qualified in good standing in each jurisdiction where the failure to preserve and maintain such existence, rights, franchises, privileges and qualifications would materially adversely affect the interests hereunder of the Purchasers or the Agent or its ability to perform its obligations hereunder.

(xiv)   It shall not form, or cause to be formed, any subsidiaries; or make or suffer to exist any loans or advances to, or extend any credit to, or make any investments (by way of transfer of property, contributions to capital, purchase of stock or securities or evidences of indebtedness (other than the Receivables), acquisition of the business or assets, or otherwise) in, any Affiliate or any other Person except as otherwise permitted herein.

## SECTION 6.   INCREASED COSTS, INCREASED CAPITAL, ETC.

6.1   Increased Costs. Subject to the provisions of Section 6.4, if, due to the introduction of or any change (including any change by way of imposition or increase of reserve requirements generally) in or in the Interpretation of any law or regulation or the general imposition of any guideline or general request from any central bank or other governmental authority after the date hereof, there shall be an increase in the cost to an Affected Party of making, funding or maintaining any investment in the Notes or any interest therein or of agreeing to purchase or invest in the Notes or any interest therein, as the case may be (other than by reason of any Interpretation of or change in laws or regulations relating to Taxes or Excluded Taxes), the Issuer shall, upon written demand by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights) (with a copy to the Agent), direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Affected Party (as a third party beneficiary, in the case of an Affected Party that is not also a Purchaser hereunder) that portion of such increased costs incurred which such Affected Party reasonably determines is attributable to making, funding or maintaining any investment in the Notes or any interest therein or agreeing to purchase or invest in the Notes or any interest therein, as the case may be. In determining such amount, such Affected Party may use any reasonable averaging and attribution methods, consistent with the averaging and attribution methods generally used by such Affected Party in determining amounts of this type. A certificate as to such increased costs incurred submitted to the Servicer, the Issuer and the Agent, setting forth the calculation thereof in reasonable detail, shall be prima facie evidence as to the amount of such increased costs. Any Affected Party that incurs such increased costs as described in this Section 6.1 (or, if such Affected Party is not a Purchaser, the Purchaser from whom such Affected Party derives its rights) shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such increased costs; provided that no such steps shall be required to be taken if, in

- 35 -

CSFB-00092277

the reasonable judgment of such Affected Party, such steps would be materially disadvantageous to such Affected Party.

6.2    Increased Capital. Subject to the provisions of Section 6.4, if the introduction of or any change in or in the Interpretation of any law or regulation or the general imposition of any guideline or general request from any central bank or other governmental authority after the date hereof, affects or would affect the amount of capital required to be maintained by any Affected Party after the date hereof, and such Affected Party determines that the amount of such capital is increased as a result of (i) the existence of such Affected Party's agreement to make or maintain an investment in the Notes or any interest therein or (ii) the existence of any agreement by such Affected Party to make or maintain an investment in the Notes or any interest therein or to fund any such investment after the date hereof, then, upon written demand by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights) (with a copy to the Agent), the Issuer shall direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Affected Party (as a third party beneficiary, in the case of an Affected Party that is not also a Purchaser hereunder), additional amounts, as specified by such Affected Party, sufficient to compensate such Affected Party in light of such circumstances, to the extent that such Affected Party reasonably determines such increase in capital to be allocated to the existence of such Affected Party's agreement described in clause (i) above or the commitments of such Affected Party described in clause (ii) above. In determining such amounts, such Affected Party may use any reasonable averaging and attribution methods, consistent with the averaging and distribution methods generally used by such Affected Party in determining amounts of this type. A certificate as to such amounts submitted to the Servicer, the Issuer and the Agent by such Affected Party (or, if such Affected Party is not a Purchaser, by the Purchaser from whom such Affected Party derives its rights), setting forth the calculation thereof in reasonable detail, shall be prima facie evidence of the amounts so owed. Any Affected Party that is entitled to compensation for increases in capital as described in this Section 6.2 shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such compensation; provided that no such steps shall be required to be taken if, in the reasonable judgment of such Affected Party, such steps would be materially disadvantageous to such Affected Party.

6.3    Taxes. (a) Any and all payments and deposits required to be made hereunder or under the Indenture or the Sale and Servicing Agreement to or for the benefit of a Purchaser shall be made, to the extent allowed by law, free and clear of and without deduction for any and all present or future United States taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes, levies, imposts, deductions, charges or withholdings imposed on, or measured by reference to, the net income of such Purchaser, franchise taxes imposed on such Purchaser, and taxes (other than withholding taxes), levies, imposts, deductions, charges or withholdings imposed on the receipts or gross receipts of such

- 36 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092278

Purchaser by any of (i) the United States or any State thereof, (ii) the state or foreign jurisdiction under the laws of which such Purchaser is organized, with which it has a present or former connection (other than solely by reason of this Agreement), or in which it is otherwise doing business, (iii) any political subdivision thereof or (iv) any state or other jurisdiction (or any political subdivision thereof) in which any commitment with respect to, or investment in, the Notes is held or with which any such income or receipts are otherwise connected (all such excluded items being referred to as "Excluded Taxes" and all such taxes, levies, imposts, deductions, charges, withholdings and liabilities other than Excluded Taxes being referred to as "Taxes"). If the Indenture Trustee, as directed by the Agent, shall be required by law to deduct any Taxes from or in respect of any sum required to be paid or deposited hereunder or under any instrument delivered hereunder to or for the benefit of a Purchaser (A) subject to Section 6.4 below, such sum shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums required to be paid or deposited under this Section 6.3) the amount received by such Purchaser, or otherwise deposited hereunder or under such instrument, shall be equal to the sum which would have been so received or deposited had no such deductions been made, (B) the Indenture Trustee, as directed by the Agent, shall make such deductions and (C) the Indenture Trustee, as directed by the Agent, shall pay the full amount of such deductions to the relevant taxation authority or other authority in accordance with applicable laws.

(b)    Subject to the limitations set forth in subsection 6.3(d) and Section 6.4 below, the Issuer shall indemnify each Owner for, and shall direct the Servicer and the Indenture Trustee in writing to pay to the Agent for the benefit of such Owner, the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 6.3) paid by such Owner due to the modification of or any change in or in the Interpretation or administration by any governmental or regulatory agency or body charged with the Interpretation or administration of any law or regulation relating to Taxes after the date hereof (including interest) arising therefrom or required to be paid with respect thereto. Each Owner (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) agrees to promptly notify the Servicer, the Agent and the Issuer of any payment of such Taxes made by it and, if practicable, any request, demand or notice received in respect thereof prior to such payment. Each Owner shall be entitled to payment of this indemnification within 30 days from the date such Owner (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) makes written demand therefor to the Servicer, the Agent and the Issuer. A certificate as to the amount of such indemnification submitted to the Issuer and the Agent by such Owner setting forth in reasonable detail the basis for and the calculation thereof, shall be prima facie evidence of the amounts so owed.

(c)    Within 30 days after the date of any payment of Taxes, the Issuer will furnish to the Agent the original or a certified copy of a receipt evidencing payment thereof.

- 37 -

CSFB-00092279

(d)     Each Owner thereof hereby agrees to complete, execute and deliver to the Indenture Trustee from time to time prior to the date on which such Owner will be entitled to receive distributions pursuant to the Indenture, the Sale and Servicing Agreement or this Agreement, Internal Revenue Service W-8IMY, W-9, W-8EXP, W-8ECI or W-8BEN (or any successor form), as applicable, or such other forms or certificates as may be required under the laws of any applicable jurisdiction in order to permit the Indenture Trustee to make payments to, and deposit funds to or for the account of, such Owner hereunder and under the Indenture and the Sale and Servicing Agreement without any deduction or withholding for or on account of any Taxes. Each Owner agrees to provide, to the extent permitted by law, like additional subsequent duly executed forms on or before the date that any such form expires or becomes obsolete, or upon the occurrence of any event requiring an amendment, resubmission or change in the most recent form previously delivered by it and to provide such extensions or renewals as may be reasonably requested by the Issuer. Each Owner further agrees that compliance with this subsection 6.3(d) (including by reason of Section 8.1 in the case of any assignment, sale or other transfer of any interest in the Notes) is a condition to the payment of any amount otherwise due pursuant to subsections 6.3(a) and (b) hereof.

(e)     Each Purchaser, as of the date hereof, and each other Owner, as of the date such Person becomes an Owner entitled to receive distributions pursuant to this Agreement, the Sale and Servicing Agreement or the Indenture, hereby represents and warrants to the Issuer that it is not subject to gross-up or indemnity of Taxes under subsection 6.3(a) or (b) from or in any respect of any sum required to be paid or deposited under this Agreement, the Indenture, the Sale and Servicing Agreement or under any instrument delivered pursuant to any of them to or for the benefit of any Owner.

(f)     Any Owner entitled to the payment of any additional amount pursuant to this Section 6.3 (or, if such Owner is not a Purchaser, the Purchaser from whom such Owner derives its rights) shall use its best efforts (consistent with its internal policy and legal and regulatory restrictions) to take such steps as would eliminate or reduce the amount of such payment; provided that no such steps shall be required to be taken if, in the reasonable judgment of such Owner, such steps would be materially disadvantageous to such Owner.

6.4     Nonrecourse Obligations; Limited Recourse. (a) Notwithstanding any provision in any other Section of this Agreement to the contrary, the obligation of the Issuer to pay any amounts payable to the Purchasers or any Owner pursuant to this Agreement shall be without recourse to the Issuer (or its assignee, if applicable), the Indenture Trustee or any Affiliate, officer, director, employee or other representative of any of them and the obligation to pay any amounts hereunder shall be limited solely to the application of the Trust Estate, to the extent that such amounts are available therefrom for distribution on any Payment Date.

- 38 -

CSFB-00092280

(b)    Other than in respect of the payment of the Purchase Price or any Borrowings it elects to fund, notwithstanding any provision in any other Section of this Agreement to the contrary, all payments to be made by a Structured Purchaser under this Agreement shall be made by such Structured Purchaser solely from available cash, which shall be limited to collections and other amounts payable to such Structured Purchaser pursuant to this Agreement, the Sale and Servicing Agreement and the Indenture and other cash of such Structured Purchaser that, in each case, is not designated to pay any other amount. The parties to this Agreement other than each Structured Purchaser (the "Other Parties") hereby acknowledge that, pursuant to the terms of this Agreement, each Structured Purchaser is or may be required from time to time to make certain payments to one or more of the Other Parties, either as compensation for services rendered, reimbursement for out-of-pocket expenses, indemnification or otherwise. The Other Parties hereby agree, notwithstanding any provision in any other Section of this Agreement to the contrary, other than in respect of the payment of the Purchase Price or any Borrowings it elects to fund, that (i) no Structured Purchaser shall make any such payment to any Other Party, (ii) no Structured Purchaser shall have any duty, liability or obligation to make any such payment to any Other Party, (iii) no such payment shall be due from any Structured Purchaser and (iv) no Other Party shall have any right to enforce any claim against any Structured Purchaser in respect of any such payment, in each case at any time that any commercial paper notes issued by such Structured Purchaser are outstanding and no Bankruptcy Event (as defined below) has occurred and is continuing, in each case, unless and to the extent that (x) the making of such payment by such Structured Purchaser would not render such Structured Purchaser insolvent and (y) such Structured Purchaser has received funds with respect to such obligations which may be used to make such payment and such funds are not required to pay commercial paper notes of such Purchaser when due. As used in this subsection 6.4(b), "Bankruptcy Event" means (A) the entry against a Structured Purchaser of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, or the institution of any proceeding against such Structured Purchaser seeking any of the foregoing, and the continuance of any such decree or order, or any such proceeding, in each case unstayed and in effect for a period of 60 consecutive days, or (B) the consent by such Structured Purchaser to the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Structured Purchaser or the filing by such Structured Purchaser of a petition seeking to adjudicate it a bankrupt or insolvent or seeking liquidation, winding up, reorganization or relief of debtors or seeking the entry of any order for relief or the appointment of a trustee, conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, (C) a Structured Purchaser's admission of its inability to

- 39 -

CSFB-00092281

pay its debts as they become due or (D) the entry into an assignment for the benefit of creditors by any Structured Purchaser.

## SECTION 7.  THE AGENT

7.1    Appointment.  Each Purchaser hereby irrevocably designates and appoints the Agent as the agent of such Purchaser under this Agreement, and each such Purchaser irrevocably authorizes the Agent, as the agent for such Purchaser, to take such action on its behalf under the provisions of the Related Documents and to exercise such powers and perform such duties thereunder as are expressly delegated to the Agent by the terms of the Related Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Agent.

7.2    Delegation of Duties.  The Agent may execute any of its duties under any of the Related Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

7.3    Exculpatory Provisions.  Neither the Agent nor its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable to any of the Purchasers for any action lawfully taken or omitted to be taken by it or such Person under or in connection with any of the other Related Documents (except for its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Purchasers for any recitals, statements. representations or warranties made by the Seller, the Depositor, the Transferor, the Issuer, the Servicer or the Indenture Trustee or any officer thereof contained in any of the other Related Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, any of the other Related Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the other Related Documents or for any failure of the Seller, the Depositor, the Transferor, the Issuer, the Servicer or the Indenture Trustee to perform its obligations thereunder.  The Agent shall not be under any obligation to any Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in. or conditions of, any of the other Related Documents, or to inspect the properties, books or records of the Seller, the Depositor, the Transferor, the Issuer, the Servicer, or the Indenture Trustee.

- 40 -

CSFB-00092282

7.4    Reliance by Agent. The Agent shall be entitled to rely, and shall be fully
protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter,
cablegram, telegram, telecopy, telex or teletype message, written statement, order or other
document or conversation believed by it to be genuine and correct and to have been signed, sent
or made by the proper Person or Persons and upon advice and statements of legal counsel
(including counsel to the Agent), independent accountants and other experts selected by the
Agent. The Agent shall be fully justified in failing or refusing to take any action under any of
the Related Documents unless it shall first receive such advice or concurrence of the Required
Owners and the Required Purchasers as it deems appropriate or it shall first be indemnified to its
satisfaction by the Purchasers or by the Committed Purchasers against any and all liability and
expense which may be incurred by it by reason of taking or continuing to take any such action.
The Agent shall in all cases be fully protected in acting, or in refraining from acting, under any
of the Related Documents in accordance with a request of the Required Owners and the Required
Purchasers and such request and any action taken or failure to act pursuant thereto shall be
binding upon all present and future Purchasers.

7.5    Notices. The Agent shall not be deemed to have knowledge or notice of the
occurrence of any breach of this Agreement or the occurrence of any Default or any Event of
Default unless the Agent has received notice from the Issuer, the Depositor, the Transferor, the
Seller, the Servicer, the Indenture Trustee or any Purchaser referring to this Agreement,
describing such event. In the event that the Agent receives such a notice, the Agent promptly
shall give notice thereof to the Purchasers. The Agent shall take such action with respect to such
event as shall be reasonably directed by the Required Owners and the Required Purchasers;
provided that unless and until the Agent shall have received such directions, the Agent may (but
shall not be obligated to) take such action, or refrain from taking such action, with respect to
such event as it shall deem advisable in the best interests of the Purchasers.

7.6    Non-Reliance on Agent and Other Purchasers. Each Purchaser expressly
acknowledges that neither the Agent nor any of its officers, directors, employees, agents,
attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by
the Agent hereafter taken, including any review of the affairs of the Seller, the Depositor, the
Transferor, the Issuer, the Servicer or the Indenture Trustee shall be deemed to constitute any
representation or warranty by the Agent to any Purchaser. Each Purchaser represents to the
Agent that it has, independently and without reliance upon the Agent or any other Purchaser, and
based on such documents and information as it has deemed appropriate, made its own appraisal
of and investigation into the business, operations, property, financial and other condition and
creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer and
the Servicer and made its own decision to purchase its interest in the Notes hereunder and enter
into this Agreement. Each Purchaser also represents that it will, independently and without
reliance upon the Agent or any other Purchaser, and based on such documents and information as
it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions

- 41 -

CSFB-00092283

in taking or not taking action under any of the Related Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer and the Servicer. Except, in the case of the Agent, for notices, reports and other documents received by the Agent under Section 5 hereof, the Agent shall not have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Indenture Trustee, the Seller, the Depositor, the Transferor, the Issuer or the Servicer which may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

7.7    Indemnification. The Committed Purchasers agree to indemnify the Agent in its capacity as such (without limiting the obligation (if any) of the Seller, the Depositor, the Transferor, the Issuer, or the Servicer to reimburse the Agent for any such amounts), ratably according to their respective Commitment Percentages (or, if the Commitments have terminated, Percentage Interests), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the obligations under this Agreement, including the Class A Outstanding Amount of the Notes) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Agreement, or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Purchaser shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of the Agent resulting from its own gross negligence or willful misconduct. The agreements in this subsection shall survive the payment of the obligations under this Agreement, including the principal of the Notes.

7.8    Agent in Its Individual Capacities. The Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Indenture Trustee, the Seller, the Servicer, the Owner Trustee, the Depositor, the Transferor and the Issuer and their respective Affiliates and other associated Persons as though the Agent was not the agent hereunder. Each Purchaser acknowledges that Credit Suisse First Boston may act (i) as administrator and agent for one or more Structured Purchasers and in such capacity acts and may continue to act on behalf of each such Structured Purchaser in connection with its business and (ii) as the agent for certain financial institutions under the liquidity and credit enhancement agreements relating to this Agreement to which any such Structured Purchaser is party and in various other capacities relating to the business of any such Structured Purchaser under various agreements. Credit Suisse First Boston in its capacity as the Agent shall not, by virtue of its acting in any such other capacities, be deemed to have duties or responsibilities hereunder or be held to a standard of care in connection with the performance of its duties as the Agent other than

- 42 -

CSFB-00092284

as expressly provided in this Agreement. Credit Suisse First Boston may act as the Agent without regard to and without additional duties or liabilities arising from its role as such administrator or agent or arising from its acting in any such other capacity.

7.9     Successor Agent. The Agent may resign as Agent upon ten days' notice to the Purchasers, the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller and the Servicer with such resignation becoming effective upon a successor agent succeeding to the rights, powers and duties of the Agent pursuant to this subsection 7.9(a). If the Agent shall resign as Agent under this Agreement, then the Required Purchasers and the Required Owners shall appoint from among the Committed Purchasers a successor agent for the Purchasers. The successor agent shall succeed to the rights, powers and duties of the Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After the retiring Agent's resignation as Agent, the provisions of this Section 7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. The retiring Agent shall transfer any Notes issued in its name to the successor Agent. The successor Agent shall give the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller and the Servicer written notice of its appointment as Agent.

## SECTION 8.   SECURITIES LAWS; TRANSFERS

8.1     Transfers of Notes. (a) Each of the Agent and the Owners agrees that any interest in the Notes purchased or otherwise acquired by it will be acquired for investment only and not with a view to any distribution thereof, and that it will not offer to sell or otherwise dispose of any Note acquired by it (or any interest therein) in violation of any of the registration requirements of the Securities Act or the registration or qualification requirements of any applicable state or other securities laws. Each of the Agent and the Owners acknowledges that it has no right to require the Issuer to register, under the Securities Act or any other securities law, the Notes (or any interest therein) acquired by it pursuant to this Agreement, any Joinder Supplement or any Transfer Supplement. Each of the Agent and the Owners hereby confirms and agrees that in connection with any transfer or syndication by it of an interest in the Notes, it has not engaged and will not engage in a general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising. Each Purchaser which executes a Joinder Agreement agrees that it will execute and deliver to the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Indenture Trustee and the Agent on or before the effective date of its Joinder Agreement a letter in the form attached hereto as Exhibit A (an "Investment Letter") with respect to the purchase by such Purchaser of an interest in the Notes.

- 43 -

CSFB-00092285

(b)    Each initial purchaser of a Note or any interest therein and any Assignee thereof or Participant therein shall certify to the Issuer, the Seller, the Servicer, the Depositor, the Transferor, the Indenture Trustee and the Agent that it is either (A)(i) a citizen or resident of the United States, (ii) a corporation or partnership (or any other entity treated as a corporation or a partnership for federal income tax purposes) organized in or under the laws of the United States or any political subdivision thereof which, if such entity is a tax-exempt entity, recognizes that payments with respect to the Notes may constitute unrelated business taxable income or (iii) a person not described in (i) or (ii) whose income from the Notes is and will be effectively connected with the conduct of a trade or business within the United States (within the meaning of the Code) and whose ownership of any interest in a Note will not result in any withholding obligation with respect to any payments with respect to the Notes by any Person and who will furnish to the Agent, the Seller, the Servicer and the Indenture Trustee, and to the Owner making the Transfer a properly executed U.S. Internal Revenue Service Form W-8ECI or W-8BEN (or any successor form) (and to agree (to the extent legally able) to provide a new Form W-8ECI or W-8BEN (or any successor form) upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable United States laws), (B) an estate the income of which is includible in gross income for United States federal income tax purposes or (C) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust.

(c)    Any sale, transfer, assignment, participation, pledge, hypothecation or other disposition (a "Transfer") of a Note or any interest therein may be made only in accordance with this Section 8.1. Any Transfer of a Note, an interest in a Note, a Commitment or any Noncommitted Purchaser Percentage shall be in respect of (i) in the case of a Committed Purchaser, at least $5,000,000 in the aggregate, which may be composed of (A) outstanding principal under the Notes or (B) to the extent in excess of the outstanding principal subject to such Transfer, its Commitment hereunder, or (ii) in the case of a Noncommitted Purchaser, at least $5,000,000 in the aggregate, which may be composed of (A) outstanding principal under the Notes or (B) to the extent in excess of the outstanding principal subject to such Transfer, the product of the Noncommitted Purchaser Percentage subject to such Transfer times the aggregate Commitments hereunder. Any Transfer of an interest in a Note otherwise permitted by this Section 8.1 will be permitted only if it consists of a pro rata percentage interest in all payments made with respect to the Purchaser's beneficial interest in such Note. No Note or any interest therein may be Transferred by Assignment or Participation to any Person (each, a "Transferee") unless prior to the transfer the Transferee shall have executed and delivered to the Agent and the Issuer an Investment Letter.

Each of the Issuer, the Depositor, the Transferor, the Seller and the Servicer authorizes each Purchaser to disclose to any Transferee and Support Party and any prospective Transferee or Support Party any and all financial information in the Purchaser's

- 44 -

CSFB-00092286

possession concerning the Seller, the Servicer, the Depositor, the Transferor and the Issuer which has been delivered to the Agent or such Purchaser pursuant to the Related Documents (including information obtained pursuant to rights of inspection granted hereunder) or which has been delivered to such Purchaser by or on behalf of the Seller, the Issuer, the Depositor, the Transferor or the Servicer in connection with such Purchaser's credit evaluation of the Seller, the Issuer, the Depositor, the Transferor or the Servicer prior to becoming a party to, or purchasing an interest in this Agreement or the Notes, provided that each such Transferee, prospective Transferee and Support Party agrees to maintain the confidentiality of such information pursuant to the following paragraph.

The Agent and each Purchaser, severally and with respect to itself only, covenants and agrees that any information obtained by the Agent or such Purchaser pursuant to, or otherwise in connection with, this Agreement or the other Related Documents shall be held in confidence (it being understood that documents provided to the Agent hereunder may in all cases be distributed by the Agent to the Purchasers) except that the Agent or such Purchaser may disclose such information (i) to its officers, directors, employees, agents, counsel, accountants, auditors, advisors or representatives who have an obligation to maintain the confidentiality of such information, (ii) to the extent such information has become available to the public other than as a result of a disclosure by or through the Agent or such Purchaser, (iii) to the extent such information was available to the Agent or such Purchaser on a nonconfidential basis prior to its disclosure to the Agent or such Purchaser hereunder, (iv) with the consent of the Servicer, (v) to the extent permitted by the preceding paragraph, (vi) to the extent the Agent or such Purchaser should be (A) required in connection with any legal or regulatory proceeding or (B) requested by any Governmental Authority to disclose such information or (vii) in the case of any Purchaser that is a Structured Purchaser, to rating agencies, placement agents and providers of liquidity and credit support who agree to hold such information in confidence; provided, that, in the case of clause (vi), the Agent or such Purchaser, as the case may be, will (unless otherwise prohibited by law or in connection with regular regulatory reviews) notify the Servicer of its intention to make any such disclosure as early as practicable prior to making such disclosure and cooperate with the Servicer in connection with any action to obtain a protective order with respect to such disclosure.

(d)     Each Purchaser may, in accordance with applicable law, at any time grant participations in all or part of its Commitment or its interest in the Notes, including the payments due to it under this Agreement and the Indenture (each, a "Participation"), to any Person (each, a "Participant"); provided, however, that no Participation shall be granted to any Person unless and until the Agent shall have consented thereto and the conditions to Transfer specified in this Agreement, including in this subsection 8.1(d), shall have been satisfied and that such Participation consists of a pro rata percentage interest in all payments made with respect to such Purchaser's beneficial interest (if any) in the Notes. In connection with any such Participation, the Agent shall maintain a register of each Participant and the amount of each Participation.

- 45 -

CSFB-00092287

Each Purchaser hereby acknowledges and agrees that (A) any such Participation will not alter or affect such Purchaser's direct obligations hereunder, and (B) neither the Indenture Trustee, the Issuer, the Depositor, the Transferor, the Seller nor the Servicer shall have any obligation to have any communication or relationship with any Participant. No Participant shall be entitled to Transfer all or any portion of its Participation, without the prior written consent of the Agent. Each Purchaser shall give the Agent notice of the consummation of any sale by it of a Participation and the Agent (upon receipt of notice from the related Purchaser) shall promptly notify the Issuer, the Seller, the Depositor, the Servicer and the Indenture Trustee. No Participant shall have the right to approve any amendment or waiver of the terms of this Agreement except with respect to those matters set forth in clauses (i) and (ii) of the proviso to Section 9.1.

(e)    Each Purchaser may, with the consent of the Agent and in accordance with applicable law, sell or assign (each, an "Assignment"), to any Person (each, an "Assignee") all or any part of its Commitment or its interest in the Notes and its rights and obligations under this Agreement and the Indenture pursuant to an agreement substantially in the form attached hereto as Exhibit C hereto (a "Transfer Supplement"), executed by such Assignee and the Purchaser and delivered to the Agent for its acceptance and consent; provided, however, that no such assignment or sale shall be effective unless and until the conditions to Transfer specified in this Agreement, including in this subsection 8.1(d), shall have been satisfied. From and after the effective date determined pursuant to such Transfer Supplement, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Transfer Supplement, have the rights and obligations of a Purchaser hereunder as set forth therein and (y) the transferor Purchaser shall, to the extent provided in such Transfer Supplement, be released from its Commitment and other obligations under this Agreement; provided, however, that after giving effect to each such Assignment, the obligations released as to any such Purchaser shall have been assumed by an Assignee or Assignees. Such Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Assignee and the resulting adjustment of Percentage Interests, Committed Purchaser Percentages, Noncommitted Purchaser Percentages, Liquidity Percentages or Commitment Percentages arising from the Assignment. Upon its receipt and acceptance of a duly executed Transfer Supplement, the Agent shall on the effective date determined pursuant thereto give notice of such acceptance to the Issuer, the Seller, the Depositor, the Servicer and the Indenture Trustee.

Upon instruction to register a transfer of a Purchaser's beneficial interest in the Notes (or portion thereof) and surrender for registration of transfer such Purchaser's Note(s) (if applicable) and delivery to the Issuer, the Seller, the Servicer, the Depositor and the Indenture Trustee of an Investment Letter, executed by the registered owner (and the beneficial owner if it is a Person other than the registered owner), and receipt by the Indenture Trustee of a copy of the duly executed related Transfer Supplement and such other documents as may be required under this Agreement, such beneficial interest in the Notes (or portion thereof) shall be

- 46 -

CSFB-00092288

transferred in the records of the Agent and, if requested by the Assignee, new Notes shall be issued to the Assignee and, if applicable, the transferor Purchaser in amounts reflecting such Transfer as provided in the Indenture. Such Transfers of Notes (and interests therein) shall be subject to this Section 8.1 in lieu of any regulations which may be prescribed under Section 2.10 of the Indenture. Successive registrations of Transfers as aforesaid may be made from time to time as desired, and each such registration of a transfer to a new registered owner shall be noted on the Agent's records.

        (f)     Each Purchaser may pledge its interest in the Notes to any Federal Reserve Bank as collateral in accordance with applicable law.

        (g)     Any Purchaser shall have the option to change its Investing Office, provided that no increased costs or other additional amounts shall be payable as a result of any such change.

## SECTION 9.  MISCELLANEOUS

        9.1    Amendments and Waivers. This Agreement may not be amended, supplemented or modified nor may any provision hereof be waived except in accordance with the provisions of this Section 9.1. With the written consent of the Required Owners and the Required Purchasers, the Agent, the Seller, the Servicer, the Depositor, the Transferor and the Issuer may, from time to time, enter into written amendments, supplements, waivers or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of any party hereto or waiving, on such terms and conditions as may be specified in such instrument, any of the requirements of this Agreement; provided, however, that no such amendment, supplement, waiver or modification shall (i) reduce the amount of or extend the maturity of any Note or reduce the rate or extend the time of payment of interest thereon, or reduce or alter the timing of any other amount payable to any Purchaser hereunder or under the Indenture or the Sale and Servicing Agreement, in each case without the consent of the Purchasers affected thereby, (ii) amend, modify or waive any provision of this Section 9.1 without the written consent of all Purchasers, or reduce the percentage specified in the definition of Required Owners or Required Purchasers without the written consent of all Required Owners or Required Purchasers, respectively, or (iii) amend, modify or waive any provision of Section 7 of this Agreement without the written consent of the Agent. Any waiver of any provision of this Agreement shall be limited to the provisions specifically set forth therein for the period of time set forth therein and shall not be construed to be a waiver of any other provision of this Agreement.

        The Agent may cast any vote or give any direction under the Indenture on behalf of the Noteholders if it has been directed to do so by (i) the Required Owners and (ii) the Required Purchasers.

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092289

9.2    Notices. (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of mail or telecopy notice, when received, addressed as follows or, with respect to a Purchaser, as set forth in its respective Joinder Supplement or Transfer Supplement, or to such other address as may be hereafter notified by the respective parties hereto:

|  |  |
|---|---|
| The Issuer: | OMI Note Trust 2001-A<br>c/o Wilmington Trust Company<br>Rodney Square North<br>1100 N. Market Street<br>Wilmington, DE 19890 |
|  | Attention: Corporate Trust Administration/<br> OMI Note Trust 2001-A<br>Telecopier No.: (302) 651-8882 |
| OAC | Oakwood Acceptance Corporation<br>7800 McCloud Road<br>Greensboro, NC 27425-7081 |
|  | Attention: Treasurer<br>Telecopier No.: (336) 664-3224 |
| The Depositor | Oak Leaf Holdings, LLC<br>7800 McCloud Road<br>Greensboro, NC 27425-7081 |
|  | Attention: Treasurer<br>Telecopier No.: (336) 664-3224 |
| The Indenture Trustee: | The Chase Manhattan Bank<br>450 West 33rd Street<br>New York, NY 10001 |
|  | Attention: Institutional Trust Services<br>Telecopier No.: (212) |
| The Transferor: | Ginkgo Corporation<br>c/o Lord Securities<br>2 Wall Street<br>New York, NY 10001 |

- 48 -

T:\Corp\dto\csuis535\spa_v12.doc
last saved on 2/27/2001

Attention:
Telecopier No.: (212)

The Agent               Credit Suisse First Boston, New York Branch
Eleven Madison Avenue
New York, New York 10010

Attention: Asset Finance Department
Telecopier No.: (212) 325-6677

(b)     All payments to be made to the Agent or any Purchaser hereunder shall be made in United States dollars and in immediately available funds not later than 2:30 p.m. New York City time on the date payment is due, and, unless otherwise specifically provided herein, shall be made to the Agent, for the account of one or more of the Purchasers or for its own account, as the case may be. Unless otherwise directed by the Agent, all such payments shall be made to the following account:

Bank of New York, NY
SWIFT: IRVTUS3SN
ABA# 021-000-018 (or CHIPS 0001)
A/C# 890-038-7025
A/C Name: Alpine Iss/Red
Ref. Oakwood

with telephone notice (including federal wire number) to the Asset Finance Department of Credit Suisse First Boston (212-325-9076).

9.3    No Waiver: Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent or any Purchaser, any right, remedy, power or privilege under any of the Related Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under any of the Related Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided in the Related Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

9.4    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Seller, the Servicer, the Depositor, the Transferor, the Issuer, the Agent, the Purchasers, any Assignee, any Participant and their respective successors and assigns, except that the Seller, the Servicer, the Depositor, the Transferor and the Issuer may not assign or transfer any of their respective rights or obligations under this Agreement except as provided herein and

- 49 -

CSFB-00092291

in the Indenture, without the prior written consent of the Required Owners and the Required Purchasers and the Purchasers, Agent, Assignee and Participants may not assign or transfer any of their respective rights or obligations except as provided herein..

9.5    Successors to Servicer. (a) In the event that a change in Servicer occurs under Section 6.2 of the Sale and Servicing Agreement, (i) from and after the effective date of such transfer, the successor Servicer shall be the successor in all respects to the Servicer and shall be responsible for the performance of all functions to be performed by the Servicer from and after such date and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof, and all references in this Agreement to the Servicer shall be deemed to refer to the successor Servicer, and (ii) as of the date of such transfer, the successor Servicer shall be deemed to have made with respect to itself the representations and warranties made in Section 4.2 (in the case of subsection 4.2(a) with appropriate factual changes); provided, however, that the references to the Servicer contained in Section 5.1 of this Agreement shall be deemed to refer to the Servicer with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the Servicer was Servicer under this Agreement and shall be deemed to refer to the Successor Servicer with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the Successor Servicer acts as Servicer under this Agreement; provided, however, to the extent that an obligation to indemnify the Purchasers under Section 2.4 arises as a result of any act or failure to act of any successor Servicer in the performance of obligations under the Sale and Servicing Agreement, such indemnification obligation shall be of the successor Servicer and not its predecessor. Upon a transfer to a successor Servicer, such successor Servicer shall furnish to the Agent copies of its audited annual financial statements for each of the three preceding fiscal years or if the Indenture Trustee or any other banking institution becomes the successor Servicer, such successor Servicer shall provide, in lieu of the audited financial statements required in the immediately preceding clause, complete and correct copies of the publicly available portions of its Consolidated Reports of Condition and Income as submitted to the FDIC for the two most recent year end periods.

(b)    In the event that any Person becomes the successor to the Seller pursuant to Section 5.2 of the Sale and Servicing Agreement, from and after the effective date of such transfer, such successor to the Seller shall be the successor in all respects to the Seller and shall be responsible for the performance of all functions to be performed by the Seller from and after such date, except as provided in the Sale and Servicing Agreement, and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Seller by the terms and provisions hereof, and all references in this Agreement to the Seller shall be deemed to refer to the successor to the Seller; provided, however, that the references to the Seller contained in Sections 2.4 and 5.1 of this Agreement shall be deemed to refer to OAC with respect to

- 50 -

CSFB-00092292

responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that OAC was Seller under this Agreement and shall be deemed to refer to the successor to OAC as Seller with respect to responsibilities, duties and liabilities arising out of an act or acts, or omission, or an event or events giving rise to such responsibilities, duties and liabilities and occurring during such time that the successor to Seller acts as Seller under this Agreement.

9.6    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

9.7    Severability. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

9.8    Integration. This Agreement and the Fee Letter represent the agreement of the Agent, the Seller, the Depositor, the Transferor, the Issuer, the Servicer and the Purchasers with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Purchasers or the Agent relative to subject matter hereof not expressly set forth or referred to herein or therein.

9.9    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.10    Termination. This Agreement shall remain in full force and effect until the later to occur of (a) payment in full of the principal of and interest on the Notes and all other amounts payable to the Purchasers or the Agent hereunder and the termination of all Commitments and (b) the Facility Termination Date; provided, however, that the provisions of Sections 2.4, 6.1, 6.2, 7.7, 9.11, 9.13 and 9.14 shall survive termination of this Agreement and any amounts payable to the Agent, Purchasers or any Affected Party thereunder shall remain payable thereto.

9.11    Limited Recourse; No Proceedings. (a) The obligations of the Issuer, the Transferor and the Depositor under this Agreement are solely the obligations of the Issuer, the Transferor and the Depositor, as applicable. No recourse shall be had for the payment of any fee or other obligation or claim arising out of or relating to this Agreement or any other agreement, instrument, document or certificate executed and delivered or issued by the Issuer, the Transferor and the Depositor, or any officer of any of them in connection therewith, against any partner,

- 51 -

T:\Corp\cto\csuis535\upa_v12.doc
last saved on 2/27/2001

CSFB-00092293

member, stockholder, employee, officer, director or incorporator of the Issuer, the Transferor and the Depositor. With respect to obligations of the Issuer, neither the Agent nor any Purchaser shall look to any property or assets of the Issuer, other than to the Trust Estate. Each Purchaser and the Agent hereby agrees that to the extent such funds are insufficient or unavailable to pay any amounts owing to it by the Issuer pursuant to this Agreement, prior to the commencement of a bankruptcy or insolvency proceeding by or against the Issuer, it shall not constitute a claim against the Issuer. Each of the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Agent and each Purchaser agrees that it shall not institute or join against the Depositor, the Transferor or the Issuer any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or similar proceeding under any federal or state bankruptcy law, for one year and a day after the termination of the Indenture. Nothing in this paragraph shall limit or otherwise affect the liability of the Servicer and the Seller with respect to any amounts owing by the Servicer or the Seller, respectively, hereunder or the right of the Agent or any Purchaser to enforce such liability against the Servicer or the Seller, respectively, or any of its respective assets.

(b)     Each of the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Agent and each Purchaser hereby agrees that it shall not institute or join against any Structured Purchaser any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one year and a day after the latest maturing commercial paper note, medium term note or other debt security issued by such Structured Purchaser is paid.

9.12    Survival of Representations and Warranties. All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the purchase of the Notes hereunder.

9.13    Submission to Jurisdiction; Waivers. EACH OF THE SELLER, THE ISSUER, THE DEPOSITOR, THE SERVICER, THE TRANSFEROR, THE AGENT AND EACH PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN MANHATTAN AND THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

- 52 -

CSFB-00092294

(B)  CONSENTS THAT ANY SUCH ACTION OR PROCEEDING
MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY
OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO
THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY
SUCH COURT OR THAT SUCH ACTION OR PROCEEDING
WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES
NOT TO PLEAD OR CLAIM THE SAME;

(C)  AGREES THAT SERVICE OF PROCESS IN ANY SUCH
ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING
A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL
(OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL),
POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET
FORTH IN SECTION 9.2 OR AT SUCH OTHER ADDRESS OF
WHICH THE AGENT SHALL HAVE BEEN NOTIFIED
PURSUANT THERETO; AND

(D)  AGREES THAT NOTHING HEREIN SHALL AFFECT THE
RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER
MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT
TO SUE IN ANY OTHER JURISDICTION.

9.14    WAIVERS OF JURY TRIAL. EACH OF THE SELLER, THE SERVICER,
THE ISSUER, THE DEPOSITOR, THE TRANSFEROR, THE AGENT AND THE
PURCHASERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO
THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO
TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING
DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER
DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY
COUNTERCLAIM THEREIN.

9.15    Limitation of Liability of Owner Trustee.  Notwithstanding anything contained
herein or in any other Related Document to the contrary, it is expressly understood and agreed by
the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust
Company, not individually or personally but solely as Owner Trustee, in the exercise of the
powers and authority conferred and vested in it under the Trust Agreement, (b) each of the
representations, undertakings and agreements herein made on the part of the Issuer is made and
intended not as a personal representation, undertaking or agreement by Wilmington Trust
Company but is made and intended for the purpose for binding only the Issuer and the Trust
Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for
the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of

- 53 -

CSFB-00092295

any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Agreement or any other related documents.

T:\Corp\dz\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092296

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
  not in its individual capacity, but solely as Owner Trustee

By:_____
    Name:    **JAMES P. LAWLER**
    Title:     Vice President

OAKWOOD ACCEPTANCE CORPORATION,
  as Seller and Servicer

By:_____
    Name:
    Title:

GINKGO CORPORATION,
  as Transferor

By:_____
    Name:
    Title:

OAK LEAF HOLDINGS, LLC,
  as Depositor

By:_____
    Name:
    Title:

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092297

STATE OF **Delaware**        )
                            : ss.:
COUNTY OF **New Castle**     )

On the 8th day of February, 2001, before me, a notary public in and for the State of **Delaware**, personally appeared **James P. Lawler** known to me who, being by me duly sworn, did depose and say that he resides at _____**Delaware**_____ ; that he is **Vice President**_____ of Wilmington Trust Company, a Delaware banking corporation; one of the parties that executed the foregoing instrument; that he/she knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he/she signed his/her name thereto by like order..

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

_Leigh Emmi_
Notary Public

Notary Public, State of _____ **LEIGH EMMI**
My Commission Expires:        **NOTARY PUBLIC**
                    **My Commission Expires August 1, 2002**

- N-5 -

CSFB-00092298

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
  not in its individual capacity, but solely as Owner Trustee

By:_____
              Name:
              Title:

OAKWOOD ACCEPTANCE CORPORATION,
    as Seller and Servicer

By:_____
              Name:  Douglas R. Muir
              Title:  Vice President

GINKGO CORPORATION,
    as Transferor

By:_____
              Name:
              Title:

OAK LEAF HOLDINGS, LLC,
    as Depositor

By:  Oakwood Capital Corp., Member

By:_____
              Name:  Douglas R. Muir
              Title:  Assistant Secretary

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092299

IN WITNESS WHEREOF, the parties hereto have caused this Class A Note Purchase Agreement to be duly executed by their respective officers as of the day and year first above written.

OMI NOTE TRUST 2001-A

By Wilmington Trust Company,
  not in its individual capacity, but solely as Owner Trustee

By:_____
        Name:
        Title:

OAKWOOD ACCEPTANCE CORPORATION,
     as Seller and Servicer

By:_____
        Name:
        Title:

GINKGO CORPORATION,
     as Transferor

By: _____
        Name:  Albert J. Fioravanti
        Title:    Vice President

OAK LEAF HOLDINGS, LLC,
     as Depositor

By:_____
        Name:
        Title:

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

CSFB-00092300

CREDIT SUISSE FIRST BOSTON, NEW YORK
BRANCH, as Agent

By:_____
    Name:  ALBERTO ZONCA
    Title:   VICE PRESIDENT

By:_____
    Name:
    Title:   Matthew J. Monaco
               Associate

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

EXHIBIT A

FORM OF INVESTMENT LETTER

[Date]

OMI Note Trust 2001-A
c/o Wilmington Trust Company
Rodney Square North
1100 N. Market Street
Wilmington, DE 19890

Oak Leaf Holdings, LLC
7800 McCloud Road
Greensboro, NC 27425-7081

Oakwood Acceptance Corporation
7800 McCloud Road
Greensboro, NC 27425-7081

The Chase Manhattan Bank, as Indenture Trustee
450 West 33rd Street
New York. NY 10001

Ginkgo Corporation
c/o Lord Securities
5 Wall Street
New York, NY 10001

Credit Suisse First Boston, New York Branch
Eleven Madison Avenue
New York, New York  10010

> Re    OMI Note Trust 2001-A
>        Asset Backed Notes, Series 2001-A

Ladies and Gentlemen:

This letter (the "Investment Letter") is delivered by the undersigned (the "Acquiror") pursuant to subsection 8.1[(a)][(c)] of the Class A Note Purchase Agreement dated

- 1 -

CSFB-00092302

as of February 9, 2001 (as in effect, the "Class A Note Purchase Agreement"), among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch, as Agent.  Capitalized terms used herein without definition shall have the meanings set forth in the Class A Note Purchase Agreement. The Acquiror represents to and agrees with the Issuer as follows:

(a)     The Acquiror is authorized [to enter into the Class A Note Purchase Agreement and to perform its obligations thereunder and to consummate the transactions contemplated thereby] [to purchase a Participation in obligations under the Class A Note Purchase Agreement].

(b)     The Acquiror has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment with respect to the Notes and is able to bear the economic risk of such investment. The Acquiror has been afforded the opportunity to ask such questions as it deems necessary to make an investment decision, and has received all information it has requested in connection with making such investment decision. The Acquiror has, independently and without reliance upon the Agent or any Purchaser, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Issuer, the Depositor, the Transferor, the Seller and the Servicer and made its own decision to make its investment with respect to the Notes, and will, independently and without reliance upon the Agent or any Purchaser, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action, if any, that it may take under the Class A Note Purchase Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer, the Seller, the Depositor, the Transferor and the Servicer.

(c)     The Acquiror is an "accredited investor ,"as defined in Rule 501, promulgated by the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act"), and (except as otherwise agreed to by the Issuer in its sole discretion) is a "qualified institutional buyer" (within the meaning of Rule 144A thereunder) and is making its investment with respect to the Notes for its own account for investment purposes. The Acquiror understands that the offering and sale of the Notes has not been and will not be registered under the Securities Act and has not and will not be registered or qualified under any applicable "Blue Sky" or other securities law, and that the offering and sale of the Note has not been reviewed by, passed on or submitted to any federal or state agency or commission, securities exchange or other regulatory body.

- 2 -

T:\Corp\dto\csuls535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092303

      (d)     The Acquiror is "a qualified purchaser" (as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act")), a company each of whose beneficial owners is a qualified purchaser, a "knowledgeable employee" with respect to the Issuer (within the meaning of Rule 3c-5 and the Investment Company Act) or a company owned exclusively by knowledgeable employees.

      (e)     The Acquiror is not an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") (each such plan, an "Employee Plan"), an entity whose underlying assets include the assets of any Employee Plan, or a governmental plan that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and the Acquiror's purchase, holding and disposition of the Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available.

      (f)     The Acquiror is acquiring an interest in Notes without a view to any distribution, resale or other transfer thereof. The Acquiror will not resell or otherwise transfer any interest or participation in the Notes, except in accordance with Section 8.1 of the Class A Note Purchase Agreement and (i) in a transaction exempt from the registration requirements of the Securities Act of 1933, as amended, and applicable state securities or "blue sky" laws; (ii) to the Issuer or any affiliate of the Issuer; or (iii) to a person who the Acquiror reasonably believes is a qualified institutional buyer (within the meaning thereof in Rule 144A under the Securities Act) that is aware that the resale or other transfer is being made in reliance upon Rule 144A. In connection therewith, the Acquiror hereby agrees that it will not resell or otherwise transfer any interest in the Notes unless the purchaser thereof provides to the addressee hereof a letter substantially in the form hereof.

      (g)     The Acquiror hereby confirms and agrees that in connection with any transfer or syndication by it of an interest in the Notes, it shall not engage in a general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

      (h)     This Investment Letter has been duly executed and delivered by and constitutes the legal, valid and binding obligation of the Acquiror, enforceable against the Acquiror in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

- 3 -

CSFB-00092304

Very truly yours,

[NAME OF ACQUIROR]

By:_____
  Name:
  Title:

- 4 -

T:\Corp\dto\csuits535\npa_v12.doc
last saved on 2/27/2001

<u>EXHIBIT B</u>

FORM OF JOINDER SUPPLEMENT

JOINDER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among OMI Note Trust 2001-A (the "<u>Issuer</u>"), Oakwood Acceptance Corporation, as Seller (in such capacity, the "Seller") [if Oakwood is the Servicer:] and Servicer (in such capacity, the "<u>Servicer</u>"), Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchaser set forth in Item 2 of Schedule I hereto (the "<u>Additional Purchaser</u>"), and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers under, and as defined in, the Class A Note Purchase Agreement described below (in such capacity, the "<u>Agent</u>").

W I T N E S S E T H

WHEREAS, this Supplement is being executed and delivered in accordance with subsection 2.2(c) of the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto, and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "<u>Class A Note Purchase Agreement</u>"; unless otherwise defined herein, terms defined in the Class A Note Purchase Agreement are used herein as therein defined); and

WHEREAS, the Additional Purchaser (if it is not already a Purchaser party to the Class A Note Purchase Agreement) wishes to become a Purchaser party to the Class A Note Purchase Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)    Upon receipt by the Agent of five counterparts of this Supplement, to each of which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Additional Purchaser, the Issuer and the Agent, the Agent will transmit to the Servicer, the Issuer, the Seller, the Depositor, the Indenture Trustee and the Additional Purchaser a Joinder Effective Notice, substantially in the form of Schedule III to this Supplement (a "<u>Joinder Effective Notice</u>"). Such Joinder Effective Notice shall be executed by the Agent and shall set forth, <u>inter alia</u>, the date on which the transfer effected by this Supplement shall become effective (the "<u>Joinder Effective Date</u>"). From and after the Joinder Effective Date, the Additional Purchaser shall be a Purchaser party to the Class A Note Purchase Agreement for all purposes thereof and shall be a Noncommitted Purchaser or Committed Purchaser, as specified

- 1 -

T:\Corp\ditd\csuit535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092306

on such Schedule II, and, if applicable, a Liquidity Provider as set forth in Schedule II hereto, having an initial Noncommitted Purchaser Percentage or Commitment Percentage, as applicable, and a Liquidity Percentage, if applicable, and a Commitment, if applicable, as set forth in such Schedule II. If the Additional Purchaser is a Noncommitted Purchaser, then (i) such Schedule II identifies its Liquidity Providers and (ii) each such Liquidity Provider has executed and delivered (or is concurrently herewith executing and delivering) its own Joinder Supplement with respect to such Additional Purchaser.

(b)    Concurrently with the execution and delivery hereof, the Additional Purchaser will deliver to the Issuer, the Seller, the Servicer, the Agent, the Transferor, the Depositor and the Indenture Trustee an executed Investment Letter in the form of Exhibit A to the Class A Note Purchase Agreement.

(c)    Each of the parties to this Supplement agrees and acknowledges that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement.

(d)    By executing and delivering this Supplement, the Additional Purchaser confirms to and agrees with the Agent and the Purchaser as follows: (i) neither the Agent nor any other Purchaser makes any representation or warranty or assumes any responsibility with respect to any statements, warranties or representations made in or in connection with the Class A Note Purchase Agreement (other then representations or warranties made by such respective parties) or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Class A Note Purchase Agreement or any other instrument or document furnished pursuant thereto, or with respect to the financial condition of the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee, or the performance or observance by the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee of any of their respective obligations under the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture or any other instrument or document furnished pursuant hereto; (ii) the Additional Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iii) the Additional Purchaser will, independently and without reliance upon the Agent or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Class A Note Purchase Agreement; (iv) the Additional Purchaser appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Class A Note Purchase Agreement, the Sale and Servicing Agreement and the Indenture as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Section 7 of the Class A Note Purchase Agreement; and (vi) the Additional Purchaser agrees (for the benefit of the Agent, the other Purchasers, the

- 2 -

CSFB-00092307

Indenture Trustee, the Seller, the Servicer, the Depositor, the Transferor and the Issuer) that (x) if it is a Noncommitted Purchaser, it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser which is a Noncommitted Purchaser, or (y) if it is a Committed Purchaser, it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser which is a Committed Purchaser and, if specified in Schedule II hereto, as a Liquidity Provider.

(e)    Schedule II hereto sets forth the Commitment and the initial Investing Office of the Additional Purchaser, as well as administrative information with respect to the Additional Purchaser.

(f)    **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

(g)    Notwithstanding anything contained herein or in any other Related Document to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Supplement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as Owner Trustee, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking or agreement by Wilmington Trust Company but is made and intended for the purpose for binding only the Issuer and the Trust Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Supplement or any other related documents.

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

- 3 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092308

SCHEDULE I TO
<u>JOINDER SUPPLEMENT</u>

COMPLETION OF INFORMATION AND
SIGNATURES FOR JOINDER SUPPLEMENT

Re:    Class A Note Purchase Agreement, dated as of February 9, 2001, among
OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as
Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo
Corporation, as Transferor, the Purchasers party thereto and Credit Suisse
First Boston, New York Branch, as Agent.

Item 1: Date of Joinder Supplement:

Item 2: Additional Purchaser:

Item 3: Signatures of Parties to Agreement:

_____
as Additional Purchaser

By:_____
   Name:
   Title:

[By:_____
   Name:
   Title:]

OMI NOTE TRUST 2001-A
   as Issuer

By Wilmington Trust Company,
   not in its individual capacity, but solely as Owner

Trustee

By:_____
   Name:
   Title:

T:\Corp\dto\csuis535\npa_v12.doc

CSFB-00092309

CREDIT SUISSE FIRST BOSTON, NEW YORK
BRANCH, as Agent

By:_____
  Name:
  Title:


By:_____
  Name:
  Title:

- 2 -

CSFB-00092310

LIST OF INVESTING OFFICES, ADDRESSES
FOR NOTICES AND COMMITMENT

[Additional Purchaser]

Noncommitted Purchaser:    Yes/No

    Initial Noncommitted Purchaser Percentage:        _____%
    (if applicable)

    Liquidity Providers and Initial Liquidity Percentage:
        (if applicable)

    _____        _____%

    _____        _____%

    _____        _____%

    Aggregate Commitments of Liquidity Providers    $_____

Committed Purchaser:   Yes/No

    Initial Commitment Percentage:        _____%
        (if applicable)

    Commitment:    $_____

Liquidity Provider (if applicable):

    Related Noncommitted Purchaser:    _____

    Liquidity Percentage:    _____%

    Amount of Commitment Held in
    capacity as Liquidity Provider    $_____

Address for Notices:

Investing Office:

- 3 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092311

SCHEDULE III TO
JOINDER SUPPLEMENT

FORM OF
JOINDER EFFECTIVE NOTICE

To:    [Names and addresses of
        Issuer, Seller, Servicer, Indenture Trustee, Depositor, the Transferor
        Agent and Additional Purchaser]

            The undersigned, as Agent under the Class A Note Purchase Agreement, dated as
of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance
Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation,
as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch,
as Agent for the Purchasers thereunder, acknowledges receipt of five executed counterparts of a
completed Joinder Supplement with respect to _____, a copy of which is attached hereto.
[Note: attach copies of Schedules I and II from such Agreement.]   Terms defined in such
Supplement are used herein as therein defined.

            Pursuant to such Supplement, you are advised that the Joinder Effective Date will
be _____, 200_.

Very truly yours,

CREDIT SUISSE FIRST BOSTON,
  NEW YORK BRANCH, as Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

- 4 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092312

EXHIBIT C

## FORM OF TRANSFER SUPPLEMENT

TRANSFER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among the transferor Purchaser set forth in Item 2 of Schedule I hereto (the "Transferor Purchaser"), the Purchasing Purchaser set forth in Item 3 of Schedule I hereto (the "Purchasing Purchaser"), and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers under, and as defined in, the Class A Note Purchase Agreement described below (in such capacity, the "Agent").

## WITNESSETH:

WHEREAS, this Supplement is being executed and delivered in accordance with subsection 8.1(e) of the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and the Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Class A Note Purchase Agreement"; unless otherwise defined herein, terms defined in the Class A Note Purchase Agreement are used herein as therein defined);

WHEREAS, the Purchasing Purchaser (if it is not already a Purchaser party to the Class A Note Purchase Agreement) wishes to become a Purchaser party to the Class A Note Purchase Agreement and the Purchasing Purchaser wishes to acquire and assume from the Transferor Purchaser, certain of the rights, obligations and commitments under the Class A Note Purchase Agreement; and

WHEREAS, the Transferor Purchaser wishes to sell and assign to the Purchasing Purchaser, certain of its rights, obligations and commitments under the Class A Note Purchase Agreement and be released from its obligations with respect thereto.

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)     Upon receipt by the Agent of five counterparts of this Supplement, to each of which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Transferor Purchaser, the Purchasing Purchaser and the Agent, the Agent will transmit to the Servicer, the Seller, the Issuer, the Depositor, the Transferor, the Indenture Trustee, the Transferor Purchaser and the Purchasing Purchaser a Transfer Effective Notice, substantially in the form of Schedule III to this Supplement (a "Transfer Effective Notice"). Such Transfer Effective Notice shall be executed by the Agent and shall set forth, inter alia, the date on which the transfer effected by this Supplement shall become effective (the "Transfer Effective Date"). From and after the Transfer Effective Date the Purchasing Purchaser shall be a Purchaser party to the Class A Note Purchase Agreement for all purposes thereof as a

- 1 -

T:\Corp\do\csuis535\npa_v12.doc
last saved on 2/27/2001

Noncommitted Purchaser or Committed Purchaser and, if applicable, a Liquidity Provider, as specified on Schedule II to this Supplement.

(b)     At or before 12:00 Noon, local time of the Transferor Purchaser, on the Transfer Effective Date, the Purchasing Purchaser shall pay to the Transferor Purchaser, in immediately available funds, an amount equal to the purchase price, as agreed between the Transferor Purchaser and such Purchasing Purchaser (the "Purchase Price"), of the portion set forth on Schedule II hereto being purchased by such Purchasing Purchaser of the outstanding advances under the Note owned by the Transferor Purchaser (such Purchasing Purchaser's "Purchase Percentage") and such other amounts as are agreed and are owing to the Transferor Purchaser under the Class A Note Purchase Agreement or otherwise in respect of the Notes. Effective upon receipt by the Transferor Purchaser of the Purchase Price and such other amounts from the Purchasing Purchaser, the Transferor Purchaser hereby irrevocably sells, assigns and transfers to the Purchasing Purchaser, without recourse, representation or warranty, and the Purchasing Purchaser hereby irrevocably purchases, takes and assumes from the Transferor Purchaser, the Purchasing Purchaser's Purchase Percentage of (i) the presently outstanding principal amount under the Notes owned by the Transferor Purchaser and such other amounts as are agreed between the Transferor Purchaser and the Purchasing Purchaser and are owing to the Transferor Purchaser under the Note Purchase Agreement or otherwise in respect of the Notes, and (ii) the Purchasing Purchaser's Purchase Percentage of (A) if the Transferor Purchaser is a Noncommitted Purchaser, the Noncommitted Purchaser Percentage of the Transferor Purchaser and the other rights, duties and obligations of the Transferor Purchaser under the Class A Note Purchase Agreement, or (B) if the Transferor Purchaser is a Committed Purchaser, the Commitment Percentage, the Liquidity Percentage, if applicable, and the Commitment of the Transferor Purchaser and the other rights, duties and obligations of the Transferor Purchaser under the Class A Note Purchase Agreement. This Supplement is intended by the parties hereto to effect a purchase by the Purchasing Purchaser and sale by the Transferor Purchaser of the Transferor Purchaser's interests in the Notes, the other amounts agreed by them and the other rights, duties and obligations of the Transferor Purchaser under the Note Purchase Agreement and it is not to be construed as a loan or a commitment to make a loan by the Purchasing Purchaser to the Transferor Purchaser. The Transferor Purchaser hereby confirms that the amount of the Class A Outstanding Amount of the Notes is $_____ and its Percentage Interest thereof is ___%, which equals $_____ as of _____, 200_. Upon and after the Transfer Effective Date (until further modified in accordance with the Class A Note Purchase Agreement), the Noncommitted Purchaser Percentage or Commitment Percentage, as applicable of the Transferor Purchaser and the Purchasing Purchaser and the Commitment and the Liquidity Percentage, if applicable, of the Transferor Purchaser and the Purchasing Purchaser, if any, shall be as set forth in Schedule II to this Supplement. From and after the Transfer Effective Date the Transferor Purchaser shall be released from its duties and obligations under the Note Purchase Agreement to the extent of the Purchase Percentage thereof transferred to the Purchasing Purchaser.

(c)     The Transferor Purchaser has made arrangements with the Purchasing Purchaser with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by

- 2 -

CSFB-00092314

the Transferor Purchaser to the Purchasing Purchaser of any fees heretofore received by the Transferor Purchaser pursuant to the Class A Note Purchase Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by the Purchasing Purchaser to the Transferor Purchaser of fees or interest received by the Purchasing Purchaser pursuant to the Class A Note Purchase Agreement or otherwise in respect of the Notes from and after the Transfer Effective Date.

      (d)   (i)All principal, interest and other amounts that would otherwise be payable from and after the Transfer Effective Date to or for the account of the Transferor Purchaser in respect of the Notes shall, instead, be payable to or for the account of the Transferor Purchaser and the Purchasing Purchaser, as the case may be, in accordance with their respective interests as reflected in this Supplement.

      (ii)   In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in or excluded from the Purchase Price or any other sum paid by the Purchasing Purchaser, the Transferor Purchaser and the Purchasing Purchaser have made appropriate arrangements for the allocation of such amounts between the Transferor Purchaser and the Purchasing Purchaser and the payment thereof, as so allocated, upon receipt of such amounts from the Agent.

      (e)   Concurrently with the execution and delivery hereof, the Purchasing Purchaser will deliver to Agent, the Issuer, the Servicer, the Seller, the Depositor and the Indenture Trustee an executed Investment Letter in the form of Exhibit A to the Class A Note Purchase Agreement.

      (f)   Each of the parties to this Supplement agrees and acknowledges that (i) at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement, and (ii) the Agent shall apply each payment made to it under the Class A Note Purchase Agreement, whether in its individual capacity or as Agent, in accordance with the provisions of the Class A Note Purchase Agreement, as appropriate.

      (g)   By executing and delivering this Supplement, the Transferor Purchaser and the Purchasing Purchaser confirm to and agree with each other and the Agent and the Purchaser as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, the Transferor Purchaser makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Class A Note Purchase Agreement or any other instrument or document furnished pursuant thereto; (ii) the Transferor Purchaser makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Seller, the Servicer, the Depositor, the Transferor, the Issuer or the Indenture Trustee, or the performance or observance by the Seller, the Servicer, the

- 3 -

CSFB-00092315

Depositor, the Transferor, the Issuer or the Indenture Trustee of any of their respective obligations under the Class A Note Purchase Agreement, the Indenture or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iv) each Purchasing Purchaser will, independently and without reliance upon the Agent, the Transferor Purchaser or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Class A Note Purchase Agreement, the Sale and Servicing Agreement or the Indenture; (v) each Purchasing Purchaser appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Class A Note Purchase Agreement, the Sale and Servicing Agreement and the Indenture as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Section 7 of the Class A Note Purchase Agreement; and (vi) each Purchasing Purchaser agrees (for the benefit of the Transferor Purchaser, the Agent, the Purchasers, the Indenture Trustee, the Depositor, the Transferor, the Seller, the Servicer and the Issuer) that it will perform in accordance with their terms all of the obligations which by the terms of the Class A Note Purchase Agreement are required to be performed by it as a Purchaser.

(h)     Schedule II hereto sets forth the revised Noncommitted Purchaser Percentage or the revised Commitment Percentage, the revised Liquidity Percentage, if applicable, and Commitment of the Transferor Purchaser, as applicable, the Noncommitted Purchaser Percentage or the Commitment Percentage, the Liquidity Percentage, if applicable, and Commitment of the Purchasing Purchaser, as applicable, and the initial Investing Office of the Purchasing Purchaser, as well as administrative information with respect to the Purchasing Purchaser.

(i)     **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

- 4 -

T:\Corp\dtch\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092316

SCHEDULE I TO
TRANSFER SUPPLEMENT

COMPLETION OF INFORMATION AND
SIGNATURES FOR TRANSFER SUPPLEMENT

Re:    Class A Note Purchase Agreement, dated as of February 9, 2001, among
       OMI Note Trust 2001-A, Oakwood Acceptance Corporation, as Seller and
       Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as
       Transferor, the Purchasers party thereto and Credit Suisse First Boston,
       New York Branch, as Agent.

Item 1. :    Date of Transfer Supplement:

Item 2. :    Transferor Purchaser:

Item 3: Purchasing Purchaser:

Item 4: Signatures of Parties to Agreement:

                                   _____
                                   as Transferor Purchaser

                                   By:_____
                                     Name:
                                     Title:


                                   By:_____
                                     Name:
                                     Title:


                                   _____
                                   as Purchasing Purchaser

                                   By:_____
                                     Name:
                                     Title:

- 1 -

T:\Corp\dtc\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092317

By:_____
   Name:
   Title:

CONSENTED TO AND ACCEPTED BY:

CREDIT SUISSE FIRST BOSTON,
  NEW YORK BRANCH, as Agent

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

- 2 -

T:\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092318

SCHEDULE II TO
<u>TRANSFER SUPPLEMENT</u>

LIST OF INVESTING OFFICES, ADDRESSES
FOR NOTICES, ASSIGNED INTERESTS, PURCHASE
<u>AND COMMITMENT PERCENTAGES AND PURCHASE PRICE</u>

[Transferor Purchaser]

A.    Noncommitted Purchaser:    <u>Yes/No</u>

      If applicable:

           <u>Noncommitted Purchaser Percentage</u>:

           Transferor Purchaser
           Noncommitted Purchaser Percentage
           Prior to Sale:                      _____%

           Noncommitted Purchaser Percentage Sold:     _____%

           Noncommitted Purchaser Percentage Retained:   _____%

           Liquidity Providers and Liquidity Percentages after Sale:

           _____        _____%

           _____        _____%

           _____        _____%

           Aggregate Commitments of Liquidity Providers after Sale   $_____

B.    Committed Purchaser:  <u>Yes/No</u>

      If applicable:

           <u>Commitment Percentage</u>:

           Transferor Purchaser Commitment Percentage
           Prior to Sale:                      _____%

           Commitment Percentage Sold:          _____%

           Commitment Percentage Retained:        _____%

- 3 -

T:\Corp\dto\csuis535\rpa_v12.doc
last saved on 2/27/2001

CSFB-00092319

<u>Commitment:</u>

Transferor Purchaser Commitment
Prior to Sale:                                          $_____

Commitment Sold:                                        $_____

Commitment Retained:                                    $_____

C.    <u>Liquidity Commitment:</u>

Related Noncommitted Purchaser:                 _____

Liquidity Percentage Prior to Sale:                     ____%

Liquidity Percentage Sold:                              ____%

Liquidity Percentage Retained:                          ____%

Amount of Commitment Held in
capacity as Liquidity Provider after sale       $_____

D.    <u>Class A Outstanding Amount of Notes:</u>

Transferor Purchaser
Class A Outstanding Amount of Notes Prior to Sale:      $_____

Class A Outstanding Amount of Notes Sold:               $_____

Class A Outstanding Amount of Notes Retained:           $_____

E.    <u>Purchase Percentage:</u>                               ____%

[Purchasing Purchaser]

A.    Noncommitted Purchaser:    __Yes/No__

      If applicable:

            Initial Noncommitted Purchaser Percentage:       ____%

            Liquidity Providers and Liquidity Percentages after Sale:

            _____                         ____%

            _____                         ____%

- 4 -

CSFB-00092320

_____    ____%

Aggregate Commitments of Liquidity Providers after Sale    $_____

B.    Committed Purchaser:  Yes/No

If applicable:

Commitment Percentage:    ____%

Commitment:    $_____

Related Noncommitted Purchaser:    _____

Liquidity Percentage:    ____%

Amount of Commitment Held in
capacity as Liquidity Provider after sale    $_____

C.    Class A Outstanding Amount of Notes Owned Immediately
After Sale:    $_____

Address for Notices:

Investing Office:

- 5 -

CSFB-00092321

SCHEDULE III TO
TRANSFER SUPPLEMENT

Form of
Transfer Effective Notice

To:    [Name and address of
       Issuer, Servicer, Indenture Trustee, the Transferor
       Purchaser and the Purchasing Purchaser]

        The undersigned, as Agent under the Class A Note Purchase Agreement, dated as of February 9, 2001, among OMI Note Trust 2001-A, as Issuer, Oakwood Acceptance Corporation, as Seller and Servicer, Oak Leaf Holdings, LLC, as Depositor, Ginkgo Corporation, as Transferor, the Purchasers parties thereto and Credit Suisse First Boston, New York Branch, as Agent for the Purchasers thereunder, acknowledges receipt of five executed counterparts of a completed Transfer Supplement with respect to a transfer from _____ to _____, a copy of which is attached hereto. [Note: attach copies of Schedules I and II from such Agreement.] Terms defined in such Supplement are used herein as therein defined.

        Pursuant to such Transfer Supplement, you are advised that the Transfer Effective Date will be _____, 200_.

Very truly yours,

CREDIT SUISSE FIRST BOSTON,
  NEW YORK BRANCH, as Agent

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

- 6 -

T.\Corp\dto\csuis535\npa_v12.doc
last saved on 2/27/2001

CSFB-00092322

*EXHIBIT J*

EXECUTION COPY

## SALE AND SERVICING AGREEMENT

Dated as of February 9, 2001

Among

**OAK LEAF HOLDINGS, LLC,**
as Depositor

**OMI NOTE TRUST 2001-A,**
as Issuer

**GINKGO CORPORATION,**
as Transferor

**OAKWOOD ACCEPTANCE CORPORATION,**
as Seller and Servicer

and

**THE CHASE MANHATTAN BANK,**
as Backup Servicer, Indenture Trustee and Custodian

**OMI NOTE TRUST 2001-A**
**ASSET BACKED NOTES, SERIES 2001-A**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092153

SALE AND SERVICING AGREEMENT dated as of February 9, 2001 by and among OMI NOTE TRUST 2001-A, a Delaware business trust (the "Issuer"), OAK LEAF HOLDINGS, LLC, a Delaware limited liability company (the "Depositor"), GINKGO CORPORATION, a Delaware corporation, in its capacity as Transferor (the "Transferor"), OAKWOOD ACCEPTANCE CORPORATION, a North Carolina corporation, in its capacities as the Seller and the Servicer (respectively, together with its permitted successors and assigns in such capacities, the "Seller" or the "Servicer"), and THE CHASE MANHATTAN BANK, a New York banking corporation, in its capacity as backup servicer (together with its successors and assigns in such capacity, the "Backup Servicer"), in its capacity as the indenture trustee on behalf of the Owners of the Notes (together with its successors and assigns in such capacity, the "Indenture Trustee") and in its capacity as Custodian under the Custodial Agreement (together with its successors and assigns in such capacity, the "Custodian").

WHEREAS, the Seller is engaged in the business of originating, purchasing and servicing contracts and mortgage loans secured by manufactured homes and related real estate;

WHEREAS, the Seller desires to sell to the Transferor and the Transferor desires to purchase from the Seller, the Transferor desires to sell to the Depositor and the Depositor desires to purchase from the Transferor, and the Depositor desires to sell to the Issuer and the Issuer desires to purchase from the Depositor certain contracts and mortgage loans and certain monies received with respect thereto after the applicable Cut-Off Date or Additional Cut-Off Date;

WHEREAS, the Servicer has agreed to service the Receivables, in accordance with the terms of this Agreement; and

WHEREAS, The Chase Manhattan Bank is willing to serve as Backup Servicer hereunder, Custodian under the Custodial Agreement and Indenture Trustee under the Indenture.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the Issuer, the Depositor, the Transferor, the Seller, the Servicer, the Backup Servicer, the Custodian, and the Indenture Trustee hereby agree as follows:

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

Section 1.1.  Definitions.  For all purposes of this Agreement, the following terms shall have the meanings set forth below, unless the context clearly indicates otherwise:

"Account":  Any account established in accordance with Section 3.1 hereof.

"Accrual Period":  With respect to any Payment Date, the period commencing on the immediately preceding Payment Date (or the Closing Date in the case of the first Payment Date) to and including the day prior to such Payment Date.

"Additional Cut-Off Date":  With respect to any Addition Date, such Addition Date, such date not to be later than one Business Day prior to the Final Addition Date.

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092154

"Addition Date": Any date on which Additional Receivables are conveyed to the Issuer pursuant to Section 2.5, such date not to be later than the Final Addition Date.

"Additional Receivable": Each Receivable which pursuant to Section 2.5 is included as an Additional Receivable.

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Outstanding Loan Balance" means, with respect to any group of Receivables as of any date, the sum of the outstanding Loan Balances of all such Receivables as of such date.

"Agreement": This Sale and Servicing Agreement, as it may be amended from time to time, including the Exhibits and Schedules hereto.

"Amended and Restated Schedule of Receivables": As defined in Section 2.5.

"Appraised Value": The appraised value of any Mortgaged Property based upon the appraisal made at the time of the origination of the related Receivable.

"Assignment Event": OHC's long term unsecured senior debt rating is below "Baa3" by Moody's or "BBB-" by Standard & Poor's or is withdrawn by Moody's or Standard & Poor's.

"Assignment of Mortgage": With respect to any Mortgage Loan, an assignment, notice of transfer or equivalent instrument, in blank, with recording information left blank and otherwise in recordable form, sufficient, at the time such instrument is created, under the laws of the jurisdiction in which the related Mortgaged Property is located to reflect the transfer of the related Mortgage to the Indenture Trustee, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering the Receivables secured by Mortgaged Properties located in the same jurisdiction.

"Authorized Officer": With respect to any Person, any officer of such Person who is authorized to act for such Person in matters relating to this Agreement, and whose action is binding upon, such Person; with respect to the Depositor or the Servicer, initially including those individuals whose names appear on the lists of Authorized Officers delivered on the Closing Date; with respect to the Indenture Trustee or Custodian, any officer assigned to the Corporate Trust Division (or any successor thereto), including any Vice President, Assistant Vice President, Trust Officer, any Assistant Secretary, any trust officer or any other officer of the Indenture Trustee customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Agreement.

"Available Funds": As to any Payment Date, the sum of all amounts described in clauses (i) through (viii) inclusive, of Section 4.2(b) received by the Servicer (including any amounts paid by the Servicer and the Seller and excluding any amounts not required to be deposited in the Note Account pursuant to Section 4.2(b) or withdrawn by the Indenture Trustee or the Servicer

- 2 -

CSFB-00092155

pursuant to Sections 4.3 (b), (c), (d), (e) or (f) in respect of the Receivables) during the related Collection Period or, in the case of Delinquency Advances or payments of Loan Purchase Prices, on or prior to the close of business on the Business Day preceding such Payment Date, and deposited into the Note Account. No amount included in this definition by virtue of being described by any component of the definition thereof shall be included twice by virtue of also being described by any other component or otherwise.

"Backup Servicer": The Chase Manhattan Bank, a New York banking corporation, and any successor hereunder.

"Backup Servicing Fee" means, with respect to any Payment Date, the greater of (i) the product of (x) one-twelfth of 0.0275% and (y) the Aggregate Outstanding Loan Balance of all Receivables held by the Issuer as of the first day of the preceding Collection Period, and (ii) $2,750 for each Payment Date; provided, however, that if the Backup Servicer becomes the successor servicer, such fee shall no longer be paid.

"BIF": The Bank Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enhancement Act of 1989, or, if at any time after the execution of this Agreement the Bank Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

"Borrowing Base" means, on any day, the sum of (i) the product of (x) the Borrowing Base Percentage and (y) the Aggregate Outstanding Loan Balance of Eligible Receivables as of the close of business on the preceding Business Day minus the Excluded Receivables Balance as of the close of business on the preceding Business Day plus (ii) the amount, if any, on deposit in the Note Account as of the close of business on preceding Business Day.

"Borrowing Base Percentage" means, on any day, the lower of (i) 81% and (ii) (x) 100% minus (y) the percentage credit enhancement required by any two of Standard & Poor's, Moody's and Fitch, as selected by the Seller, to achieve a rating of AA, Aa2 or AA, respectively, from such Rating Agencies with respect to a securitization by the Seller or its Affiliates of Eligible Receivables similar to those included in the Trust Estate. Such percentage credit enhancement shall be evidenced by the credit enhancement required with respect to the most recent such securitization or pursuant to special request of the Agent or the Servicer to such Rating Agencies.

"Borrowing Base Deficiency" means, on any date, the excess, if any, of the sum of the Class A Note Principal Balance as of such date plus the amount of interest accrued on the Notes as of such date over the Borrowing Base as of such date.

"Business Day": Any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banking institutions in the states of Delaware, New York, North Carolina or the state in which the Corporate Trust Office is located are authorized or obligated by law or executive to be closed.

"Civil Relief Act": The Soldiers' and Sailors' Civil Relief Act of 1940, as amended.

"Class A Carry-Forward Amount": As to any Payment Date, the sum of (i) the amount, if any, by which (x) the Class A Current Interest for the immediately preceding Payment Date

- 3 -

CSFB-00092156

exceeded (y) the amount of the actual distribution made to the Owners of the Class A Notes on such immediately preceding Payment Date pursuant to Section 3.2(iii) hereof plus (ii) 30 days' interest on such excess at the Base Rate (as defined and calculated in the Note Purchase Agreement) plus 1.0% per annum to the extent permitted by law.

"Class A Current Interest": With respect to any Payment Date, the Class A Note Monthly Interest with respect to the related Accrual Period plus any Fees then due and payable to the holders of the Class A Notes on such date plus the related Class A Carry-Forward Amount.

"Class A Note Agent": Credit Suisse First Boston, New York Branch, in its capacity as agent for the purchasers parties to the Note Purchase Agreement and its successors and assigns in such capacity.

"Class A Note Monthly Interest": The "Note Monthly Interest" as defined in the Note Purchase Agreement.

"Class A Note Principal Balance": As of any time of determination, the Original Class A Note Principal Balance plus the aggregate principal amount of all additional Borrowings pursuant to Section 10.1 of the Indenture less the aggregate of all amounts actually distributed to the holders of the Class A Notes on account of principal pursuant to Section 3.2 or 3.8 prior to such date.

"Closing Date": February 20, 2001.

"Code": The Internal Revenue Code of 1986, as amended.

"Collection Period": With respect to each Payment Date, the preceding calendar month, provided that the Collection Period with respect to the initial Payment Date shall commence on the Closing Date and end on February 28, 2001.

"Collections": with respect to any Receivable, all cash collections and other cash proceeds of such Receivable, including, without limitation, all Finance Charges, rebates of insurance premiums and property taxes, insurance proceeds (except to the extent applied in accordance with the Seller's normal procedures to repair the property securing such Receivable), if any, and any cash proceeds of Related Security with respect to such Receivable, excluding, however, funds received with respect to such Receivable which by the terms of such Receivable or by applicable law are required to be escrowed by the Seller for the payment of real estate or other similar taxes or for the payment of insurance premiums on insurance contracts insuring property securing such Receivable.

"Contract": Each retail installment sales contract and security agreement or installment loan agreement and security agreement that has been executed by an Obligor and pursuant to which such Obligor (i) purchased the Manufactured Home described therein, (ii) agreed to pay the deferred purchase price or amount borrowed, together with Finance Charges, as therein provided in connection with such purchase or loan, (iii) granted a security interest in such Manufactured Home to the originator of such contract and (iv) undertook to perform certain other obligations as specified in such contract or loan agreement.

"Contract Documents": With respect to each Contract:

- 4 -

CSFB-00092157

(a)     the original Contract;

(b)     either (1) the original title document for the related Manufactured Home, a duplicate certified by the appropriate governmental authority that issued the original thereof or, if such original is not yet available, a copy of the application filed with the appropriate governmental authority pursuant to which the original title document will issue (which copy may be on microfilm or optical disk or other media maintained by the Servicer in its records separate from the other related Contract Documents), or (2) if the laws of the jurisdiction in which the related Manufactured Home is located do not provide for the issuance of title documents for manufactured housing units, other evidence of ownership of the related Manufactured Home that is customarily relied upon in such jurisdiction as evidence of title to a manufactured housing unit;

(c)     evidence of one or more of the following types of perfection of the security interest in the related Manufactured Home granted by such Contract (or, if such evidence is not yet available, a copy of the application or other filing used to obtain such security interest (which copy may be on microfilm or optical disk or other media maintained by the Servicer in its records separate from the other related Contract Documents)), as appropriate in the applicable jurisdiction: (1) notation of such security interest on the title document, (2) a financing statement meeting the requirements of the UCC, with evidence of recording indicated thereon, (3) a fixture filing in accordance with the UCC, with evidence of filing indicated thereon, or (4) such other evidence of perfection of a security interest in a manufactured housing unit as is customarily relied upon in the jurisdiction in which the related Manufactured Home is located;

(d)     an original assignment of the Contract from the initial named payee thereunder to the Seller (unless the Seller is the initial named payee for such Contract);

(e)     originals of any assumption agreements relating to such Contract, together with originals of any surety or guaranty agreement relating to such Contract or to any such assumption agreement, payable to the order of the Indenture Trustee, or, if not so payable, endorsed to the order of, or assigned to, the Indenture Trustee by the holder/payee thereunder without recourse;

(f)     originals of any extension, modification or waiver agreement(s) relating to such Contract; and

(g)     proof of maintenance of a Standard Hazard Insurance Policy for the related Manufactured Home.

"Contract File": With respect to any Contract, (i) on the Closing Date or related Addition Date, as the case may be, until the 120th day thereafter, a file containing the items set forth in clause (a) of the definition of Contract Documents and (ii) from and after the 120th day after the Closing Date or such Addition Date, as the case may be, a file containing all of the related Contract Documents.

"Contract Loan-to-Value Ratio": (i) As to each Contract with respect to which a lien on land is required for underwriting purposes, the ratio, expressed as a percentage, of the principal

- 5 -

CSFB-00092158

amount of such Contract to the sum of the purchase price of the home (including taxes, insurance and any land improvements), the tax value or appraised value of the land and the amount of any prepaid Finance Charges or closing costs that are financed; and (ii) as to each other Contract, the ratio, expressed as a percentage, of the principal amount of such Contract to the purchase price of the home (including taxes, insurance and any land improvements) and the amount of any prepaid Finance Charges or closing costs that are financed.

"Contract Rate": With respect to a Contract, as of any date of determination, the annual interest rate required to be paid by an Obligor under the terms of such Contract.

"Corporate Trust Office": The meaning specified in the Indenture.

"Credit and Collection Policy": the Seller's credit and collection policy or policies and practices relating to manufactured housing and mobile home installment sales contracts, existing on the date hereof and referred to in Schedule II attached hereto, as amended, supplemented or otherwise modified and in effect from time to time in compliance with the terms of the Note Purchase Agreement.

"CSFBi": Credit Suisse First Boston International.

"CSFBi Equity Warrants": the warrants for common stock of OHC issued by OHC to CSFBi or an Affiliate of CSFBi as of the date hereof, as such warrants may be amended, supplemented or otherwise modified from time to time.

"CSFBi Equity Warrant Documents": the CSFBi Equity Warrants and the Registration Rights Agreement between OHC and CSFBi with respect to the CSFBi Equity Warrants.

"Custodial Agreement": that certain Custodial Agreement dated as of February 9, 2001 by and among the Indenture Trustee, the Class A Note Agent, the other Persons from time to time parties thereto, the Issuer, the Custodian and Oakwood Acceptance Corporation, as the same may be amended, supplemented or otherwise modified from time to time.

"Custodian": As defined in recitals.

"Cut-Off Date": January 31, 2001.

"Cut-off Date Principal Balance": As to any Receivable, the original principal amount of such Receivable (minus any amount added to the principal balance related to any forceplaced insurance), minus all payments applied to reduce such original principal amount on or before the Cut-off Date or Additional Cut-Off Date, as the case may be.

"Defaulted Contract": A Contract (i) as to which any related Monthly Payment has been delinquent and remains delinquent at the close of business on the third Due Date after the Due Date therefor, (ii) as to which the Servicer is notified that the related Obligor is in bankruptcy proceedings (except those Contracts as to which the Obligors are current at any time of determination on all payments during the related bankruptcy proceedings), or (iii) where the related Manufactured Home has been repossessed.

- 6 -

CSFB-00092159

"Defaulted Mortgage Loan": A Mortgage Loan (i) as to which any related Monthly Payment has been delinquent and remains delinquent at the close of business on the third Due Date after the Due Date therefor, (ii) as to which the Servicer is notified that the related Obligor is in bankrupt proceedings (except those Mortgage Loans as to which the Obligors are current at any time of determination on all payments during the related bankruptcy proceedings), or (iii) where the related Mortgaged Property has been or is in the process of being foreclosed.

"Defaulted Receivable": A Defaulted Contract or a Defaulted Mortgage Loan.

"Defective Receivable": Any Receivable subject to repurchase by the Seller pursuant to Section 2.1 or 2.2.

"Delinquency Advance": As defined in Section 4.20 hereof.

"Delinquent": A Receivable is "Delinquent" if any payment due thereon is not made by the Obligor by the close of business on the related Due Date. A Receivable is "30 days Delinquent" if such payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such payment was due, or, if there is no such corresponding day (e.g., as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month) then on the last day of such immediately succeeding month. Similarly for "60 days Delinquent," "90 days Delinquent" and so on.

"Depositor": Oak Leaf Holdings, LLC, a Delaware limited liability company, or any permitted successor or assign.

"Determination Date": With respect to any Payment Date, the last day of the preceding calendar month.

"Documented Receivables": As of any date of determination, Receivables with respect to which the Seller has delivered the Required Documentation to the Custodian.

"Due Date": With respect to any Receivable, the day of the month on which the Monthly Payment is due from the Obligor exclusive of any days of grace.

"Eligible Account": A segregated account that is (i) maintained with a depository institution whose debt obligations at the time of any deposit therein have the highest short-term debt rating by a Rating Agency and the deposits in whose accounts are insured to the applicable limits of deposit insurance provided by either the SAIF or the BIF of the Federal Deposit Insurance Corporation and whose long-term unsecured debt at the time of any deposit therein has a rating of at least "A2" by Moody's and "A" by Standard & Poor's, and which is any of (a) a federal savings and loan association duly organized, validly existing and in good standing under the federal banking laws, (b) an institution duly organized, validly existing and in good standing under the applicable banking laws of any state, (c) a national banking association duly organized, validly existing and good standing under the federal banking laws, or (d) a principal subsidiary of a bank holding company; or (ii) a segregated trust account maintained with the corporate trust department of a federal or state chartered depository institution or trust company, having capital and surplus of not less than $50,000,000, acting in its fiduciary capacity.

"Eligible Investments": One or more of the following:

- 7 -

CSFB-00092160

(a)    Federal funds, certificates of deposit, time deposits, and bankers' acceptances (having original maturities of not more than 365 days) of any domestic bank, the short-term debt obligations of which have been rated at least A-1 by Standard & Poor's and P-1 by Moody's (a "Qualified Bank");

(b)    Deposits of any bank or savings and loan association (the long-term deposit rating of which is Baa2 or better by Moody's and BBB or better by Standard & Poor's) which has combined capital, surplus and undivided profits of at least $50,000,000 which deposits are insured by the FDIC and made in aggregate amounts less than the limits insured by the FDIC;

(c)    Commercial paper (having original maturities of not more than 270 days) rated in the highest short-term rating categories of Standard & Poor's and Moody's;

(d)    Investments in no-load money market funds registered under the Investment Company Act of 1940 whose shares are registered under the Securities Act and rated AAAm or AAAm-G by Standard & Poor's and Aaa by Moody's;

(e)    direct obligations of, and obligations fully guaranteed by, the United States of America;

(f)    repurchase agreements fully collateralized by possession of obligations of the type specified in clause (e) above; provided, however, that investments in such repurchase agreements shall mature within three days of the acquisition thereof and; provided further, that such agreements shall be entered into with a Qualified Bank; and

(g)    money market accounts or money market mutual funds investing primarily in obligations of the United States government, and further investing exclusively in debt obligations, provided, however, that such money market accounts or money market mutual funds shall be rated at least A-1 by Standard & Poor's and P-1 by Moody's;

provided that no instrument described above shall evidence either the right to receive (i) only interest with respect to the obligations underlying such instrument or (ii) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provided a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations; and provided, further, that all instruments described hereunder shall mature at par on or prior to the next succeeding Payment Date unless otherwise provided in this Agreement and that no instrument described hereunder may be purchased at a price greater than par if such instrument may be prepaid or called at a price less than its purchase price prior to stated maturity.

"Eligible Receivable" means, at any time, any Receivable which satisfies the following conditions:

(i) it shall have been (A) originated by an Affiliate of the Seller or originated by an independent third party and reunderwritten and purchased by the Seller in the ordinary course of its business, and in either case shall have been validly assigned by such Affiliate or by such independent third party to the Seller;

- 8 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092161

or (B) originated by the Seller; and in any event it shall be the legal, valid, binding and enforceable obligation of the Obligor thereunder to the Seller;

(ii) the principal and interest due thereunder shall at all times be secured by the manufactured housing financed under the terms of the Contract or Mortgage Note and related Mortgage related to such Receivable and in the case of a Receivable secured by a mortgage or deed of trust, is secured by the real property on which such housing is or will be located, in each case pursuant to a valid and binding first priority lien and security interest therein enforceable by the Seller;

(iii) in the good faith determination of Seller (A)(1) such Receivable shall be eligible as collateral to secure notes or pass-through certificates issued by, or loans made to, the Seller, or a special purpose entity created by the Seller or a Subsidiary of the Seller, to or by nationally recognized insurance companies, pension plans and other institutional purchasers or lenders and public markets and (2) one or more such institutional purchasers, public markets or lenders shall be likely to purchase such notes or make such loans, or (B) such Receivable shall satisfy all requirements for FHA or VA insurance;

(iv) the creditworthiness of the Obligor thereunder shall have been reviewed, and the Receivable shall have been underwritten, by the Seller or an Affiliate of the Seller in accordance with the Credit and Collection Policy; provided, however, that the requirement of this subsection (iv) shall not apply to a Receivable which had previously been sold or permanently financed in a securitized transaction and has been repurchased by the Seller or an Affiliate of the Seller pursuant to a "clean-up call" under such transaction;

(v) the date such Receivable was first recorded in the Servicer's Alltel system is not more than nine (9) months prior to such time, unless such Receivable had previously been sold or permanently financed in a securitized transaction and has been repurchased by the Seller or an Affiliate of the Seller pursuant to "a clean-up call" under such transaction;

(vi) which, together with the Contract or Mortgage Note and related Mortgage related thereto, does not contravene in any material respect any laws, rules or regulations applicable thereto (including, without limitation, laws, rules and regulations relating to usury laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Regulation B and Z of the Federal Reserve Board, various state adaptations of the National Consumer Act and of the Uniform Consumer Credit Code, and other consumer credit laws and equal opportunity and disclosure laws) and with respect to which no part of the Contract or Mortgage Note and related Mortgage related thereto is in violation of any such law, rule or regulation in any material respect;

- 9 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092162

(vii) which is evidenced by one original note or executed purchase contract, which is in existence and (a) in the case of a Contract, secured by a valid perfected first lien on the property securing such Receivable, or (b) in the case of a Mortgage Loan, is secured by a valid first lien on the property securing such Receivable;

(viii) other than Receivables originated or as to which an application for financing was submitted on or prior to the Closing Date and Mortgage Loans for which the related credit score, computed using the Seller's proprietary Fair, Isaac credit scorecards, was equal to or greater than 230, the Obligor with respect to such Receivable shall have either (A) paid to the Seller, an Affiliate of the Seller or the third party originator of such Receivable in immediately available funds a minimum down payment of $499 with respect to single section homes and $999 with respect to multi-section homes, or (B) granted to the Seller, an Affiliate of the Seller or the third party originator of such Receivable, pursuant to acceptable documentation, a first priority lien on and security interest in real property owned by such purchaser in fee simple, without any consensual liens or encumbrances thereon, which has been independently appraised by an appraiser acceptable to the Class A Note Agent in its reasonable discretion as having a fair market value of not less than five percent (5%) of the purchase price of such manufactured housing which will be located on such real property; provided, however, that the requirements of this subsection (viii) shall not apply to a Receivable of the type described in the proviso to subsection (iv) of this definition;

(ix) it shall require payments not less frequently than monthly of principal and interest amortized over a term of not more than thirty (30) years from the first payment date thereon sufficient to fully amortize the principal balance of such Receivable on its maturity date;

(x) no payment required thereunder shall be (A) on the Closing Date or the Addition Date on which such Receivable is transferred pursuant hereto, 30 days or more Delinquent or (B) at any time thereafter, more than 60 days Delinquent, notwithstanding any grace period or waiver therefor extended by the Seller, an Affiliate of the Seller or a third party originator of such Receivable or any amendment or modification thereof by the Seller, an Affiliate of the Seller or a third party originator of such Receivable to extend the payment date;

(xi) it shall not be subject to any security interest or lien other than the security interest granted to the Indenture Trustee;

(xii) which is denominated and payable only in United States dollars in the United States and the related property which secures such Receivable is located in the United States;

(xiii) which will at all times be the legal, valid, and binding payment obligation of the related Obligor enforceable against such Obligor in accordance with its terms and which Receivable is not the subject of any litigation other than bankruptcy litigation if, as of the close of business on such day, such Obligor has

- 10 -

CSFB-00092163

made all payments due on such Receivable or subject to any bankruptcy plan or workout or forbearance agreement other than any such plan or agreement if, as of the close of business on such day, such Obligor has made all payments due on such Receivable;

(xiv) as to which the Seller has satisfied all obligations to be fulfilled at the time it is transferred to the Transferor, and by the Transferor to the Depositor, and by the Depositor to the Issuer;

(xv) which has been originated and serviced in accordance with the Credit and Collection Policy and the Servicing Standard and, with respect to Receivables secured by a new Manufactured Home and first recorded in the Servicer's Alltel system after March 31, 2001, either (A) is subject to FHA Insurance, (B) at the time of origination, did not have a Loan-to-Value Ratio of more than 70% or (C) has a FICO credit score of at least 560;

(xvi) the Obligor of which has been directed to make all payments to a specified account, post office box or lockbox maintained with a Person which is not an Affiliate of the Seller;

(xvii) which has not been released from the lien granted under the Indenture;

(xviii) for which the Seller has completed Required Documentation upon the related closing, and has certified that it has sent the Required Documentation with respect to such Receivable to the Custodian by common carrier on or prior to the date of determination of eligibility;

(xix) which is not related to a Repo Property or an REO Property;

(xx) which, at the time of origination, did not have a Loan-to-Value Ratio of more than 100%;

(xxi) as to which the representations and warranties set forth in Section 2.2 are true and correct;

(xxii) which has been recorded in the Servicer's Alltel system;

(xxiii) that has the following legend set forth in bold-faced letters (the "Legend") on a separate sheet that is stapled or similarly attached (but in no event attached by paper clip or other less permanent means) to the front page of such Contract or Mortgage Note:

"This Contract/Mortgage Note has been sold by Oakwood Acceptance Corporation to Ginkgo Corporation, by Gingko Corporation to Oak Leaf Holdings, LLC and by Oak Leaf Holdings LLC to OMI Note Trust 2001-A and is subject to a security interest granted in favor of, and has been collaterally assigned to, The Chase Manhattan Bank, as Indenture Trustee, by OMI Note Trust 2001-A pursuant to an Indenture

- 11 -

CSFB-00092164

dated as of February 9, 2001 and for which a Uniform Commercial
Code Financing Statement has properly been filed."

In the event there are multiple originally executed copies of any Contract, the
Seller shall cause such Contracts either to (i) have the Legend attached to each
copy or (ii) clearly identify one original copy and all others as duplicate or
triplicate copies as appropriate.    Notwithstanding anything to the contrary
contained herein, Contracts or Mortgage Loans in the possession of The Chase
Manhattan Bank, as custodian for Bank of America, N.A, and/or Enterprise
Funding Corporation, on the Closing Date shall not be required to have the
foregoing legend until the seventh day after the Closing Date;

(xxiv) There is no mechanics' lien or claim for work, labor or material
affecting any related Mortgaged Property which is or may be a Lien prior to, or
equal or coordinate with, the Lien of such Receivable, and no rights are
outstanding that under law could give rise to such a Lien except those which are
insured against by a title insurance policy;

(xxv) It is not a Land Secured Contract; and

(xxvi) It has not previously been included in the Trust Estate or been
included in the Trust Estate for more than nine (9) months, except for Receivables
described in the proviso to clause (iv) of this definition of Eligible Receivable,
which have not been included in the Trust Estate for more than six (6) months.

For purposes of this definition and the calculation of the Borrowing Base, the eligibility of
Receivables will be determined from time to time, such that a Receivable that was an Eligible
Receivable at one time but that subsequently fails to meet all applicable eligibility requirements
will no longer be an Eligible Receivable (unless and until it again meets all applicable eligibility
requirements).

"Excluded Receivables Balance" means, with respect to any day, the sum, without
duplication, of the following amounts: (i) the amount by which the aggregate Loan Balance of
Eligible Receivables relating to Receivables which have had their maturity date extended (except
Receivables rescheduled other than as a collections measure) exceeds 3% of the Loan Balance of
total Eligible Receivables plus (ii) the amount by which the aggregate Loan Balance of Eligible
Receivables relating to Receivables the Obligors of which are located in one zip code exceeds
1% of the Loan Balance of total Eligible Receivables plus (iii) the amount by which the
aggregate Loan Balance of Eligible Receivables secured by manufactured homes previously
purchased by the Seller or any of its Affiliates as trade-in properties exceeds 17.5% of the Loan
Balance of total Eligible Receivables plus (iv) the amount by which the aggregate Loan Balance
of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or
any of its Affiliates exceeds 17.5% of the Loan Balance of total Eligible Receivables plus (v) the
amount by which the aggregate Loan Balance of Eligible Receivables with respect to which the
Seller or any other party (except the Obligor) has an obligation to make future payments in
respect thereof exceeds (A) prior to September 1, 2001, 15% or (B) on or after September 1,
2001, 7.5% of the Loan Balance of total Eligible Receivables plus (vi) the amount by which the
aggregate Loan Balance of Eligible Receivables relating to Receivables the Obligors of which

- 12 -

CSFB-00092165

are located in one state exceeds 20% of the Loan Balance of total Eligible Receivables plus (vii) the aggregate amount of the Loan Balance of Eligible Receivables which must be disregarded in calculating the Loan-to-Value Ratio of the pool of Eligible Receivables in order to cause the remaining pool of Eligible Receivables to have a weighted average Loan-to-Value Ratio not exceeding 94% plus (viii) the amount by which the aggregate Loan Balance of Eligible Receivables which are not Mortgage Loans exceeds 85% of the Loan Balance of total Eligible Receivables plus (ix) the amount by which the aggregate Loan Balance of Eligible Receivables not secured by multisection manufactured homes exceeds 50% of the Loan Balance of total Eligible Receivables plus (x) the amount by which the aggregate Loan Balance of Eligible Receivables secured by manufactured homes previously purchased by the Seller or any of its Affiliates as trade-in properties or secured by manufactured homes previously repossessed by the Seller or any of its Affiliates exceeds 30% of the Loan Balance of total Eligible Receivables plus (xi) the amount by which the aggregate Loan Balance of Eligible Receivables relating to Receivables for which the Indenture Trustee has not received a written confirmation or written confirmations from the Custodian that the Custodian has received the Required Documentation with respect to such Receivable as of the date of determination of eligibility exceeds (A) prior to the 90th day after the Closing Date, 6.25% of the aggregate Commitments (as defined in the Note Purchase Agreement) or (B) on or after the 90th day after the Closing Date, $0, plus (xii) the amount by which the aggregate Loan Balance of Eligible Receivables (a) secured by manufactured homes previously repossessed by the Seller or any of its Affiliates and (b) with a "beacon" or other Fair Isaacs score as shown on the credit bureau report relied upon in underwriting such Receivable of 400 or greater is less than 67% of the aggregate Loan Balance of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates plus (xiii) the aggregate amount of the Loan Balance of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates which must be disregarded in order to cause the remaining pool of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates to have a weighted average borrower's Fair Isaacs score of 185 or greater.

"FDIC": The Federal Deposit Insurance Corporation, a corporate instrumentality of the United States, or any successor thereto.

"Fees": as defined in the Note Purchase Agreement.

"FHA": The Federal Housing Administration.

"FHA Insurance": As to any FHA Receivable, FHA's agreement to reimburse the owner of such Receivable for the amount of certain losses incurred upon the liquidation of such Receivable.

"FHA Receivable ": A Receivable that is insured by the FHA.

"FHLMC": Federal Home Loan Mortgage Corporation.

"Files": Contract Files and/or Mortgage Loan Files, as the context may require.

"Final Addition Date": the third anniversary of the Closing Date, or, if not a Business Day, the preceding Business Day.

- 13 -

CSFB-00092166

"Final Recovery Determination": With respect to any defaulted Receivable or REO Property or Repo Property (other than a Receivable purchased by the Seller or the Servicer), a determination made by the Servicer that all Liquidation Proceeds which the Servicer, in its reasonable business judgment expects to be finally recoverable in respect thereof have been so recovered or that the Servicer believes in its reasonable business judgment the cost of obtaining any additional recoveries therefrom would exceed the amount of such recoveries. The Servicer shall maintain records of each Final Recovery Determination.

"Finance Charges": with respect to a Receivable, any finance, interest, or similar charges owing by an Obligor or another Person pursuant to such Receivable.

"Fitch": Fitch, Inc.

"Foreclosure Profits": With respect to a Liquidated Receivable, the amount, if any, by which (i) the aggregate of its Net Liquidation Proceeds exceeds (ii) the related Loan Balance (plus accrued and unpaid interest thereon at the applicable Receivable Rate from the date interest was last paid through the date of receipt of the final Liquidation Proceeds) of such Liquidated Loan immediately prior to the final recovery of its Liquidation Proceeds.

"Highest Lawful Rate": As defined in Section 8.13 hereof.

"Indenture": The Indenture, dated as of February 9, 2001, between the Issuer and the Indenture Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Indenture Trustee": The Chase Manhattan Bank, a New York banking corporation, the Corporate Trust Office of which is located on the date of execution of this Agreement at 450 West 33rd Street, New York, NY 10001, not in its individual capacity but solely as Indenture Trustee under the Indenture, and any successor hereunder.

"Initial Receivables": Each Receivable identified on the Schedule of Receivables delivered on the Closing Date.

"Insurance Policy": Any insurance policy covering any Receivable (or the related Manufactured Home or Mortgaged Property), including, without limitation, any Standard Hazard Insurance Policy or Primary Mortgage Insurance Policy or FHA Insurance or VA Guaranty.

"Insurance Proceeds": Any proceeds received by the Servicer as a result of the payment of a claim on an Insurance Policy.

"Insured Expenses": Expenses incurred by the Servicer in connection with a Contract or Mortgage Loan under which the Obligor is in default, which expenses are covered by a Standard Hazard Insurance Policy and are paid by an insurer under any such policy.

"Issuer" or "Trust": OMI Note Trust 2001-A, a Delaware business trust.

"Land Secured Contract": A Contract secured at origination by a parcel of real estate in addition to a Manufactured Home.

- 14 -

CSFB-00092167

"Lien": As defined in Section 2.2(a)(iv).

"Liquidated Loan": A Receivable as to which a Final Recovery Determination has been made.

"Liquidation Expenses": All reasonable, out-of-pocket costs and expenses (exclusive of the Servicer's overhead costs) incurred by the Servicer in connection with liquidation of any Receivable or disposition of any related Repo Property or REO Property, including, but not limited to, the cost of all notices sent in connection with such liquidation, expenses, including reasonable attorney's fees, incurred in connection with the commencement and pursuit of proceedings against Obligors or guarantors or sureties of Obligors or in the pursuit of foreclosure or other similar remedies, expenses incurred in repossessing and refurbishing the related Manufactured Home or preparing the related REO Property for sale and sales commissions paid in connection with the resale of the related Manufactured Home or REO Property.

"Liquidation Proceeds": With respect to any Liquidated Loan, all proceeds (including the proceeds of any Insurance Policy) recovered by the Servicer in connection with such Liquidated Loan, whether through trustee's sale, foreclosure sale or otherwise (including rental income).

"Loan Balance": With respect to any Receivable and any day, the Cut-Off Date Principal Balance less all collections of principal credited or advanced and not previously reimbursed against such Receivable after the related Cut-Off Date or Additional Cut-Off Date, provided, however, that the Loan Balance for any Receivable that has become a Liquidated Loan shall be zero as of the first day of the Collection Period following the Collection Period in which such Receivable becomes a Liquidated Loan, and at all times thereafter.

"Loan Purchase Price": With respect to any Receivable purchased from the Issuer on any date pursuant to Section 2.2, 2.4 or 4.15 hereof, an amount equal to the sum of (i) the Loan Balance of such Receivable as of the date of purchase; (ii) all accrued and unpaid interest on such Receivable to the end of the Collection Period preceding the Payment Date on which such Loan Purchase Price is included in Available Funds; and (iii) all unreimbursed Delinquency Advances and Servicing Advances related thereto.

"Loan-to-Value Ratio": The Contract Loan-to-Value Ratio or the Mortgage Loan-to-Value Ratio of a Receivable, as applicable.

"Lock-Box Account": An account maintained in the name of the Indenture Trustee at a Lock-Box Bank for the purpose of receiving Collections from Receivables.

"Lock-Box Bank": Each of the banks set forth in Schedule III hereto and such banks as may be added thereto or deleted therefrom pursuant to Section 2.8 (b).

"London Business Day": Any Business Day other than a day on which commercial banking institutions in London are authorized or obligated by law or executive order to be closed.

"Majority Noteholders": As defined in Section 6.3 hereof.

- 15 -

CSFB-00092168

"Manufactured Home":  A unit of manufactured housing (within the meaning of Code section 25(e)(10)), a single family modular home or a single family house together with all accessions thereto securing the indebtedness of the Obligor under any Contract or constituting a portion of the Mortgaged Property securing the indebtedness of the Obligor under any Mortgage Loan.

"Monthly Payment":  With respect to each Receivable and any Collection Period, the payment of principal, if any, and interest due on the Due Date in such Collection Period with respect thereto.

"Monthly Report":  The meaning provided in Section 4.16.

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Mortgage":  A written instrument creating a valid first lien on a Mortgaged Property, in the form of a mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto.

"Mortgage Insurer":  The insurance company or companies which issue any Primary Mortgage Insurance Policies with respect to any Mortgage Loans.

"Mortgage Loan":  A mortgage loan secured by a first lien on a one- to four-family residential real property (which may be the real estate to which a Manufactured Home is deemed by the Seller to have become permanently affixed as of the related Cut-off Date or Additional Cut-Off Date).

"Mortgage Loan Documents":  With respect to each Mortgage Loan, the following documents:

(a)    the original Mortgage Note bearing a complete chain of endorsements, if necessary, from the initial payee thereunder to the Seller, with a further endorsement without recourse from the Seller in blank, together with all related riders and addenda and any related surety or guaranty agreement, power of attorney and buydown agreement;

(b)    the original recorded Mortgage (or a copy thereof certified to be a true and correct reproduction of the original thereof by the appropriate public recording office) with evidence of recordation noted thereon or attached thereto, or, if the Mortgage is in the process of being recorded, a photocopy of the Mortgage, certified by an officer of the related Seller or the originator, the related title insurance company, the related closing/settlement/escrow agent or the related closing attorney to be a true and correct copy of the Mortgage submitted for recordation;

(c)    the original assignment of the Mortgage from the Seller in blank, provided that if an Assignment Event has occurred and is continuing, such assignment of the Mortgage shall be made to the Indenture Trustee or its Custodian and shall have evidence of recordation noted thereon or attached thereto, or, if the assignment is in the process of being recorded, a photocopy of the assignment, certified by an officer of the Seller to be a true and correct copy of the assignment submitted for recordation, may be substituted, provided, further that, if recording information for the related Mortgage is not available, such assignment of the Mortgage may have such recording information left blank and such assignment need not be recorded until such

- 16 -

CSFB-00092169

recording information is received by the Servicer, whereupon, if an Assignment Event has occurred and is continuing, the Servicer shall promptly submit such assignment for recordation;

(d)     each original recorded intervening assignment of the Mortgage as is necessary to show a complete chain of title from the initial mortgagee (or beneficiary, in the case of a deed of trust) to the Seller (or a copy of each such assignment certified to be a true and correct reproduction of the original thereof by the appropriate public recording office) with evidence of recordation noted thereon or attached thereto, or, if an assignment is in the process of being recorded, a photocopy of the assignment, certified by an officer of the Seller to be a true and correct copy of the assignment submitted for recordation, provided, that, if recording information for the related Mortgage is not available, such assignment of the Mortgage may have such recording information left blank and such assignment need not be recorded until such recording information is received by the Servicer, whereupon the Servicer shall promptly submit such assignment for recordation;

(e)     an original Title Insurance Policy or, if such policy has not yet been issued or is otherwise not available, (1) a written commitment to issue such policy issued by the applicable title insurance company and an officer's certificate of the Seller certifying that all of the requirements specified in such commitment have been satisfied, (2) a preliminary title report if the related Mortgaged Property is located in a state in which preliminary title reports are acceptable evidence of title insurance or (3) a certificate of an officer of the Seller certifying that a Title Insurance Policy is in full force and effect as to the related Mortgage and that such Title Insurance Policy is freely assignable to and will inure to the benefit of the Indenture Trustee (subject to recordation of the related Assignment of Mortgage) or (4) an opinion of counsel with respect to the title of the related Mortgaged Property;

(f)     for each Mortgage Loan having in place a Primary Mortgage Insurance Policy, a Primary Mortgage Insurance Policy or a certificate of primary mortgage insurance issued by the related Mortgage Insurer or its agent indicating that such a policy is in effect as to such Mortgage Loan or, if neither a policy nor a certificate of insurance from the related Mortgage Insurer is available, a certificate of an officer of the Seller certifying that a Primary Mortgage Insurance Policy is in effect as to such Mortgage Loan;

(g)     each related assumption agreement, modification, written assurance or substitution agreement, if any; and

(h)     proof of the maintenance of a Standard Hazard Insurance Policy (and a flood insurance policy, if applicable) as to the related Mortgaged Property.

"Mortgage Loan File": With respect to any Mortgage Loan, (i) on the Closing Date or related Addition Date, as the case may be, until the 30th day thereafter, a file containing the items set forth in clause (a) of the definition of Mortgage Loan Documents and (ii) from and after the 30th day after the Closing Date or such Addition Date, as the case may be, a file containing all of the related Mortgage Loan Documents (other than any assignment of Mortgage described in clause (c) or (d) of the definition of Mortgage Loan Documents which may, pursuant to such clause (c) or (d), be delivered or submitted for recording on a delayed basis, so long as such assignment is included in such file as soon as reasonably practicable.)

- 17 -

CSFB-00092170

"Mortgage Loan-to-Value Ratio": As to a Mortgage Loan, the ratio, expressed as a percentage, of the original principal amount of such Mortgage Loan, to either (i) the sum of the appraised value of the land and improvements, and the amount of any prepaid Finance Charges or closing costs that are financed or (ii) the sum of the purchase price of the home (including taxes, insurance and any land improvements), the appraised value of the land and the amount of any prepaid Finance Charges or closing costs that are financed.

"Mortgage Note": A manually executed written instrument evidencing a Mortgagor's promise to repay a stated sum of money, plus interest, to the holder of such instrument on or before a specific date according to a schedule of principal and interest payments.

"Mortgage Rate": With respect to each Mortgage Loan, the interest rate specified in the related Mortgage Note.

"Mortgaged Property": The mortgaged property securing a Mortgage Loan.

"Mortgagor": The obligor on a Mortgage Note.

"Net Liquidation Proceeds": As to any Liquidated Loan, Liquidation Proceeds net of expenses incurred by the Servicer in connection with the liquidation of any defaulted Receivable and unreimbursed Delinquency Advances relating to such Receivable. In no event shall Net Liquidation Proceeds with respect to any Liquidated Loan be less than zero.

"Nonrecoverable Advances": With respect to any Receivable, any Delinquency Advance which, in the good faith business judgment of the Servicer, would not be ultimately recoverable pursuant to Section 3.2.

"Note": Any one of the notes substantially in the form attached to the Indenture as Exhibit A.

"Note Account": The segregated note account established in accordance with Section 3.1 hereof and maintained at the Corporate Trust Office.

"Note Purchase Agreement": The Class A Note Purchase Agreement dated as of February 9, 2001, among the Issuer, the Depositor, the Seller, the Servicer, the Transferor, the Purchasers parties thereto and the Class A Note Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"Obligor": A person who is indebted under a Contract or who has acquired a Manufactured Home subject to a Contract or a person who is the Mortgagor or borrower under a Mortgage Loan or who has acquired a Mortgaged Property subject to a Mortgage Loan.

"Officer's Certificate": A certificate signed by any Authorized Officer of any Person delivering such certificate and delivered to the Indenture Trustee.

"OHC": Oakwood Homes Corporation, a North Carolina corporation.

"Operative Documents": Collectively, this Agreement, the Indenture, the Certificate of Trust, the Trust Agreement, the Note Purchase Agreement (including the related Fee Letter and

- 18 -

CSFB-00092171

all Joinder Supplements and Transfer Supplements), the Custodial Agreement, the Notes, the Certificates, and the Agreement re Bankruptcy (as defined in the Note Purchase Agreement).

"Opinion of Counsel": One or more written opinions of counsel who may, except as otherwise expressly provided herein, be counsel to the Seller or an affiliate of the Seller and who shall be satisfactory to the Indenture Trustee and the Majority Noteholders.

"Original Aggregate Loan Balance": The aggregate Cut-Off Date Principal Balance of all Initial Receivables, which is $179,748,597.

"Original Class A Note Principal Balance": $130,500,000.

"Outstanding": The meaning provided in the Indenture.

"Owner Trustee": Wilmington Trust Company, as owner trustee under the Trust Agreement, and any successor owner trustee under the Trust Agreement.

"Owner": The Person in whose name a Note is registered in the Register.

"Payment Date": The fifteenth day of each month or, if such day is not a Business Day, the next Business Day thereafter, commencing in March, 2001.

"Percentage Interest": With respect to any Class A Note at any time, a fraction, expressed as a decimal, the numerator of which is the Class A Note Principal Balance represented by such Class A Note and the denominator of which is the aggregate Class A Note Principal Balance represented by all the Class A Notes. With respect to the Certificates, the portion evidenced thereby, expressed as a percentage, as stated on the face of such Certificate, all of which shall total 100% with respect to the Certificates.

"Permitted Encumbrances": In respect of any Mortgaged Property

(a)    the lien of current real property taxes and assessments not yet due and payable;

(h)    covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy or title opinion delivered to the related originator and referred to or otherwise considered in the appraisal made for the originator; and

(i)    other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.

"Person": Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092172

"Primary Mortgage Insurance": The insurance provided under any Primary Mortgage Insurance Policy.

"Primary Mortgage Insurance Policy": A primary mortgage insurance policy, if applicable, covering certain amounts in respect of conventional Mortgage Loans for which the initial Mortgage Loan-to-Value Ratios exceeded 80%.

"Principal Cramdown" means, as to any Receivable, either (a) a decree by a bankruptcy court to the effect that the portion of such Receivable that is secured by the underlying Manufactured Home or Mortgaged Property is less than its Loan Balance due to the fact that the value of such Manufactured Home or Mortgaged Property is less than such Loan Balance or (b) the permanent forgiveness by a bankruptcy court of some or all of the Loan Balance owed by the related Obligor.

"Principal Cramdown Amount" means, with respect to any Collection Period as to any Receivable that has been the subject of a Principal Cramdown, the amount by which (a) the Loan Balance of such Receivable (excluding any reductions of such Loan Balance for amounts advanced with respect to such Receivable) exceeds (b) as applicable, depending upon the type of Principal Cramdown that was applied to such Receivable, either (1) the portion of such Loan Balance that remains secured by the related Manufactured Home or Mortgaged Property after taking the related Principal Cramdown into account or (2) such Loan Balance after taking into account the permanent forgiveness of debt ordered by the bankruptcy court in connection with the related Principal Cramdown.

"Purchase Price" means, with respect to a Receivable, the fair market value of such Receivable as mutually agreed by the Seller, the Transferor, the Depositor and the Issuer, provided that, upon the request of the Class A Note Agent, from time to time the Seller, the Transferor, the Depositor and the Issuer shall discuss the basis for establishing such fair market value.

"Qualified Insurer" means any insurance company or surety or bonding company licensed to do business and issue insurance in all relevant jurisdictions (including, in the case of an insurer under a Standard Hazard Insurance Policy, the jurisdiction in which each Manufactured Home or Real Property or Mortgaged Property covered by such policy is located).

"Rating Agency": Fitch, Moody's or Standard & Poor's.

"Receivable Documents": Collectively, the Contract Documents and Mortgage Loan Documents.

"Receivable File": With respect to any Receivable, the related Contract File or Mortgage Loan File, as applicable.

"Receivable Rate": As to any Receivable, the related Contract Rate or Mortgage Rate, as applicable.

"Receivables": indebtedness owed to the Seller by an Obligor (without giving effect to any transfer hereunder) under a Contract or Mortgage Loan, whether constituting an account, chattel paper, instrument, mortgage, deed of trust or general intangible, arising out of or in

- 20 -

CSFB-00092173

connection with the sale of manufactured housing or mobile homes including the rendering of services by the originating dealer in connection therewith, and includes the right of payment of any Finance Charges and other obligations of the Obligor with respect thereto and transferred and assigned to the Issuer pursuant to Section 2.3 or 2.5 hereof, as from time to time are held as a part of the Trust Estate, the Receivables originally so held being identified in the Schedule of Receivables. The term "Receivable" includes any Receivable which is Delinquent, which relates to a foreclosure or which relates to a Mortgaged Property which is REO Property or Related Security which is a Repo Property prior to such Mortgaged Property's or Repo Property's disposition by the Issuer.

"Register": The note register maintained by the Registrar in accordance with Section 2.3 of the Indenture, in which the names of the Owners are set forth.

"Registrar": The Indenture Trustee, acting in its capacity as Registrar appointed pursuant to the Indenture, or any duly appointed and eligible successor thereto.

"Related Proceeds": As defined in Section 4.22 hereof.

"Related Security" shall mean with respect to any Receivable:

(i)    all of the Issuer's interest in the Manufactured Home (including repossessed housing) or in any document, mortgage, deed of trust or other instrument encumbering a fee, simple interest in real property, together with improvements thereto, or writing evidencing any security interest in any Manufactured Home and all of the Issuer's interest in all rights to payment under all insurance contracts with respect to related real estate or a Manufactured Home, including, without limitation, any monies collected from whatever source in connection with any default of an Obligor with respect to a Receivable and any proceeds from claims or refunds of premiums on any title insurance, physical damage, credit life, disability and hospitalization insurance policies covering real estate, Manufactured Home or Obligors;

(ii)    all of the Issuer's interest in all other security interests or liens and property subject thereto from time to time, if any, purporting to secure payment of such Receivable, whether pursuant to such Receivable or otherwise, together with all financing statements signed by an obligor and security agreements describing any collateral securing such Receivable;

(iii)    all of the Issuer's interest in all guaranties, and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable, whether pursuant to the Contract or Mortgage Note and Mortgage related to such Receivable or otherwise;

(iv)    all of the Issuer's interest in all records, documents and writings evidencing or related to such Receivables; and

(v)    all proceeds of the foregoing.

"Released Mortgaged Property Proceeds": As to any Receivable, proceeds received by the Servicer in connection with (a) a taking of an entire Mortgaged Property by exercise of the

- 21 -

CSFB-00092174

power of eminent domain or condemnation or (b) any release of part of the Mortgaged Property from the lien of the related Mortgage, whether by partial condemnation, sale or otherwise, which are not released to the Obligor in accordance with applicable law, mortgage servicing standards the Servicer would use in servicing mortgage loans for its own account and this Agreement.

"REO Property": A Property acquired by the Servicer on behalf of the Issuer through foreclosure or deed-in-lieu of foreclosure in connection with a Defaulted Mortgage Loan.

"Repo Property": A Manufactured Home (and any Related Real Property) acquired by the Servicer on behalf of the Issuer pursuant to repossession, foreclosure or similar proceeding in connection with a Defaulted Contract.

"Required Documentation": As of any date of determination, (a) with respect to Contracts, the Contract File, and (b) with respect to Mortgage Loans, the Mortgage Loan File.

"SAIF": The Savings Association Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enhancement Act of 1989 or, if at any time after the execution of this Agreement the Savings Association Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

"Schedule of Receivables": The schedule of Receivables listing each Receivable to be conveyed on the Closing Date, as amended and restated from time to time by Amended and Restated Schedules of Receivables, which schedule shall (i) identify each Receivable, (ii) be in physical or electronic form, as elected by the Class A Note Agent, (iii) set forth (or describe the method of determining) as to each such Receivable (a) the Loan Balance thereof, (b) the amount of each Monthly Payment due from the Obligor thereunder, (c) the Receivable Rate thereof, (d) the original term to maturity thereof, (e) the date of the related Contract or Mortgage Note, (f) the original Loan-to-Value Ratio thereof, (g) the state in which the related Manufactured Home is located, (h) whether the related Manufactured Home is a used, repossessed, new or transferred home, and (i) whether or not the related Receivable is a Contract or a Mortgage Loan, and (iv) contain all information necessary for the recipient to calculate the Excluded Receivables Balance.

"Securities Act": The Securities Act of 1933, as amended.

"Seller": As defined in the preamble.

"Servicer": As defined in the preamble.

"Servicer Extension Notice": As defined in Section 4.19 hereof.

"Servicer Termination Event": As defined in Section 6.1 hereof.

"Servicing Advances": Advances made by the Servicer as described in Section 4.21 hereof, including, but not limited to, advances for the payment of personal property taxes, real estate taxes and premiums for Standard Hazard Insurance Policies.

"Servicing Certificate": A certificate completed and executed by a Servicing Officer on behalf of the Servicer.

CSFB-00092175

"Servicing Fee Rate": (a) if OAC is the Servicer, 0.5% per annum, or (b) if any other Person is the Servicer, 1.5% (or such lesser percentage as may be agreed by such other Person and the Majority Noteholders).

"Servicing Fee": With respect to any Payment Date, an amount equal to the product of (i) 1/12, (ii) the Servicing Fee Rate, and (iii) the Aggregate Outstanding Loan Balance of all Receivables held by the Issuer as of the first day of the preceding Collection Period.

"Servicing Officer": Any officer of the Servicer involved in, or responsible for, the administration and servicing of the Receivables whose name and specimen signature appear on a list of servicing officers furnished to the Indenture Trustee by the Servicer, as such list may be amended from time to time, initially set forth in Exhibit B hereto.

"Servicing Standard": As defined in Section 4.1(e) hereof.

"Servicing Transition Account" means the account designated as the Servicing Transition Account in, and which is established and maintained pursuant to, Section 3.1.

"Standard Hazard Insurance Policy": With respect to each Receivable, the policy of fire and extended coverage insurance (and any federal flood insurance, if and to the extent applicable) required to be maintained for the related Manufactured Home as provided herein.

"Standard & Poor's": Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor thereto.

"Subservicer": Any Person with whom the Servicer has entered into a Subservicing Agreement and who satisfies any requirements set forth in Section 4.1(b) hereof in respect of the qualification of a Subservicer.

"Subservicing Agreement": Any written contract between the Servicer and any Subservicer relating to servicing and/or administration of certain Receivables as permitted by Section 4.1, a copy of which shall be delivered to the Indenture Trustee.

"Title Insurance Policy": For any Mortgage Loan, an American Land Title Association mortgagee's mortgage loan title policy form 1970, or other form of mortgagee's title insurance acceptable to FNMA or FHLMC for the jurisdiction in which the subject property is located, including all riders and endorsements thereto, insuring, in an amount no less than 95% of such Mortgage Loan, that the related Mortgage creates a valid first lien on the underlying Mortgaged Property subject only to Permitted Encumbrances.

"Transferor": Ginkgo Corporation, a Delaware corporation, or any permitted successor or assign.

"Trust Agreement": The Trust Agreement dated as of February 9, 2001 between the Depositor and the Owner Trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"Trust Estate": As defined in the Indenture.

- 23 -

CSFB-00092176

"UCC": The Uniform Commercial Code as in effect in any relevant jurisdiction.

"Undocumented Receivables": Receivables with respect to which the Seller is in possession of delivered complete Required Documentation and has not delivered such Required Documentation to the Custodian.

"VA": The United States Department of Veterans Affairs.

"VA Receivable": A Receivable guaranteed in whole or in part by the VA.

"VA Guaranty": As to any VA Receivable, VA's full or partial guaranty of payment of amounts due thereunder.

Except as otherwise specified herein or as the context may otherwise require, for all purposes of this Agreement, capitalized terms used but not otherwise defined herein have the meanings set forth in the Indenture.

Section 1.2    Use of Words and Phrases. "Herein", "hereby", "hereunder", "hereof", "hereinbefore", "hereinafter" and other equivalent words refer to this Agreement as a whole and not solely to the particular section of this Agreement in which any such word is used. The definitions set forth in Section 1.1 hereof include both the singular and the plural. Whenever used in this Agreement, any pronoun shall be deemed to include both singular and plural and to cover all genders. The words "including" and "include" shall be deemed to be followed by the words "without limitation."

Section 1.3    Captions: Table of Contents. The captions or headings in this Agreement and the Table of Contents are for convenience only and in no way define, limit or describe the scope and intent of any provisions of this Agreement. Section references are to this Agreement unless otherwise stated.

Section 1.4    Opinions. Each opinion with respect to the validity, binding nature and enforceability of documents or Notes may be qualified to the extent that the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law) and may state that no opinion is expressed on the availability of the remedy of specific enforcement, injunctive relief or any other equitable remedy. Any opinion required to be furnished by any Person hereunder must be delivered by counsel upon whose opinion the addressee of such opinion may reasonably rely, and such opinion may state that it is given in reasonable reliance upon an opinion of another, a copy of which must be attached, concerning the laws of a foreign jurisdiction. Any opinion delivered hereunder shall be addressed to the Indenture Trustee in addition to other addressees.

END OF ARTICLE I

- 24 -

CSFB-00092177

ARTICLE II

REPRESENTATIONS AND WARRANTIES OF
THE DEPOSITOR, THE TRANSFEROR
THE SERVICER, THE SELLER AND CONVEYANCE
OF THE RECEIVABLES

Section 2.1    Representations and Warranties of the Depositor, the Transferor, the Seller and the Servicer.    (a)    Each of the Depositor, the Seller, the Transferor and the Servicer individually, and not jointly and severally, represents and warrants as to itself that, as of the Closing Date:

(i)    It is duly organized, validly existing and in good standing under the laws of its state of incorporation and has the power and authority to own its assets and to transact the business in which it is currently engaged. It is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned or leased by it requires such qualification and in which the failure so to qualify would have a material adverse effect on (a) its business, properties, assets or condition (financial or other), (b) its performance of its obligations under this Agreement and the other Operative Documents to which it is a party, (c) the enforceability of the Receivables or (d) the ability to foreclose on the related Mortgaged Properties;

(ii)    It has the power and authority to make, execute, deliver and perform this Agreement and the other Operative Documents to which it is a party and to consummate all of the transactions contemplated under this Agreement and the other Operative Documents to which it is a party, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Operative Documents to which it is a party.    When executed and delivered, this Agreement and the other Operative Documents to which it is a party will constitute its legal, valid and binding obligation enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies;

(iii)    It holds all necessary licenses, certificates and permits from all government authorities necessary for conducting its business as it is presently conducted except where the failure to hold such a license, certificate or permit would not have a material adverse effect on (a) its business, properties, assets or condition (financial or other), (b) its performance of its obligations under this Agreement and the other Operative Documents to which it is a party, (c) the enforceability of the Receivables or (d) the ability to foreclose on the related Mortgaged Properties or repossess Manufactured Homes.    It is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement and the other Operative

- 25 -

CSFB-00092178

Documents to which it is a party, except for such consents, licenses, approvals or authorizations, or registrations or declarations, as shall have been obtained or filed, as the case may be, prior to the Closing Date except such that may be required by the blue sky laws of any state and except for any UCC filings necessary to perfect the Liens granted pursuant hereto or mortgage recordings required following an Assignment Event;

(iv) The execution, delivery and performance of this Agreement and the other Operative Documents to which it is a party by it will not conflict with or result in a breach of, or constitute a default under, any provision of any existing law or regulation or any order or decree of any court applicable to it or any of its properties or any provision of its organizational documents, or constitute a material breach of, or result in the creation or imposition of any lien, charge or encumbrance upon any of its properties pursuant to, any mortgage, indenture, contract or other agreement to which it is a party or by which it may be bound;

(v) No certificate of an officer, statement furnished in writing or report delivered pursuant to the terms hereof by it for use in connection with the purchase of the Receivables and the transactions contemplated hereunder and by the other Operative Documents will contain any untrue statement of a material fact, or omit a material fact necessary to make the certificate, statement or report in light of the circumstances in which they were given not misleading;

(vi) The transactions contemplated by this Agreement and the other Operative Documents to which it is a party are in the ordinary course of its respective businesses;

(vii) It is not insolvent, nor will it be made insolvent by the transfer of the Receivables, nor is it aware of any pending insolvency as to itself;

(viii) It is not in violation of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction, which violation would materially and adversely affect its condition (financial or otherwise) or operations or any of its properties or materially and adversely affect the performance of any of its duties hereunder;

(ix) There are no actions or proceedings against, or investigations of it, pending or, to its knowledge, threatened, before any court, administrative agency or other tribunal (A) that, if determined adversely, would prohibit it from entering into this Agreement and the other Operative Documents to which it is a party, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (C) that, if determined adversely, would prohibit or materially and adversely affect its performance of its obligations under, or the validity or enforceability of, this Agreement and the other Operative Documents to which it is a party;

(x) The Servicer is a direct wholly-owned subsidiary of OHC;

- 26 -

CSFB-00092179

(xi) The Seller represents and warrants that it did not and will not sell the Receivables to the Transferor, the Transferor represents and warrants that it did not and will not sell Receivables to the Depositor and the Depositor represents and warrants that it did not and will not sell the Receivables to the Issuer with any intent to hinder, delay or defraud any of their respective creditors;

(xii) Each of the Depositor, the Transferor and the Seller represents and warrants that it acquired title to the Receivables in good faith, without notice of any adverse claim; and

(xiii) Each of the Depositor, the Transferor and the Seller represents and warrants that the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller, the Transferor and the Depositor pursuant to this Agreement are not subject to the bulk transfer laws or any similar statutory provisions in effect in any applicable jurisdiction.

(xiv) All pension or profit sharing plans of the Seller have been fully funded in accordance with applicable obligations.

(xv) Neither the Depositor, the Transferor nor the Seller has dealt with any broker, banker, agent or other person (other than the Class A Note Agent and its Affiliates, the Indenture Trustee and the Custodian and their respective counsel) that may be entitled to any commission or compensation in connection with the sale of the Receivables.

(xvi) The names and addresses of all the Lock-Box Banks, together with the account numbers of the lock-box accounts of Servicer at such Lock-Box Banks, are specified in Schedule III (or have been notified to the Indenture Trustee in accordance with Section 8.10).

(b)    The representations and warranties set forth in this Section shall survive each sale and assignment of Receivables to the Issuer. Upon discovery of a breach of any representations and warranties which materially and adversely affects the interests of the Owners, the Person discovering such breach shall give prompt written notice to the other parties. Within 30 days of its discovery or its receipt of notice of breach or, with the prior written consent of the Class A Note Agent, such longer period specified in such consent, the Depositor, the Seller or the Servicer, as appropriate, shall cure such breach in all material respects or repurchase any Receivable as to which the interests of the Owners are materially and adversely affected pursuant to Section 2.4 of this Agreement.

Section 2.2    Representations and Warranties of the Seller Regarding the Receivables. (a) The Seller represents and warrants to the Issuer and the Indenture Trustee for the benefit of the Owners, as follows, with respect to each Initial Receivable as of the Closing Date and, with respect to each Additional Receivables, as of the related Addition Date (each such date, a "Relevant Date") that:

(i) As of the Relevant Date, the information relating to the Receivables set forth in the Schedule of Receivables is true and correct in all material respects as

- 27 -

CSFB-00092180

of the Cut-Off Date or the related Additional Cut-Off Date, as the case may be, and each Receivable included in the Borrowing Base is an Eligible Receivable;

(ii) Each Mortgage is a valid and subsisting first lien of record on the Mortgaged Property subject in all cases to the exceptions to title set forth in the title insurance policy with respect to the related Receivable, which exceptions are generally acceptable to manufactured housing lending companies, and such other exceptions to which similar properties are commonly subject and which do not individually, or in the aggregate, materially and adversely affect the benefits of the security intended to be provided by such Mortgage. Any security agreement, chattel mortgage or equivalent document related to the Mortgage and delivered to the Indenture Trustee or Custodian establishes a valid and subsisting lien on the property described therein, and, as of the Closing Date or the Addition Date, as applicable, the Seller has full right to assign the same to the Transferor, the Transferor has full right to assign the same to the Depositor and the Depositor has full right to assign the same to the Issuer.

(iii) Except with respect to liens released immediately prior to the transfers herein contemplated, each Receivable has not been assigned or pledged and immediately prior to the transfers and assignments herein contemplated, the Seller held good, marketable and indefeasible title to, and was the sole owner and holder of, each Receivable subject to no liens, charges, mortgages, claims, participation interests, equities, pledges or security interests of any nature, encumbrances or rights of others (collectively, a "Lien"); the Seller has full right and authority under all governmental and regulatory bodies having jurisdiction over the Seller, subject to no interest or participation of, or agreement with, any party, to sell and assign the same pursuant to this Agreement; and immediately upon the transfers and assignments herein contemplated, the Seller shall have transferred all of its right, title and interest in and to each Receivable to the Transferor, the Transferor shall have transferred all of its right, title and interest in and to each Receivable to the Depositor and the Depositor shall have transferred all of its right, title and interest in and to each Receivable to the Issuer and the Issuer will hold good, marketable and indefeasible title, to, and be the sole owner of, each Receivable subject to no Liens other than the Lien of the Indenture;

(iv) There is no delinquent tax, fee or assessment Lien on any Mortgaged Property, and no notice has been received by it to the effect that any Mortgaged Property is not free of material damage;

(v) Except with respect to any funds held in a temporary buy-down fund for a buy-down loan, no Receivable is subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of any Receivable, or the exercise of any right thereunder, render such Receivable unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

- 28 -

CSFB-00092181

(vi) Each Receivable at the time it was made complied with, and each Receivable at all times was serviced in compliance with, in each case, in all material respects, applicable state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, consumer credit, truth-in-lending and disclosure laws;

(vii) Each Contract, Mortgage Note and the related Mortgage are genuine, and each Contract, Mortgage and Mortgage Note is the legal, valid and binding obligation of the related Obligor and is enforceable in accordance with its terms, including any extensions or modifications thereof, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law), and all borrower parties to each Receivable and the mortgagor had full legal capacity to execute all Receivable documents and to convey the estate therein purported to be conveyed. The Obligor is one or more natural persons who are party to the Contract, the Mortgage Note and/or the Mortgage in an individual capacity, and not in the capacity of a trustee or otherwise;

(viii) The Seller has directed the Servicer to perform any and all acts required to be performed to preserve the rights and remedies of the Indenture Trustee in any insurance policies applicable to the Receivables including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of co-insured, joint loss payee and mortgagee rights in favor of the Indenture Trustee;

(ix) The terms of the related Contract, Mortgage Note and/or Mortgage have not been impaired, altered or modified in any material respect, except by a written instrument which has been recorded or is in the process of being recorded, if necessary, to protect the interests of the Owners and which, in the case of a Mortgage Loan, has been or will be delivered to the Custodian. The substance of any such alteration or modification is reflected on the Schedule of Receivables and was approved, if required, by the related primary mortgage guaranty insurer, if any. Each original Mortgage was recorded, and, if an Assignment Event shall have occurred, all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller, or, except as provided in Section 2.3 hereof, are in the process of being recorded, provided, that, if recording information for the related original Mortgage is not available, such subsequent assignments of the Mortgage may have such recording information left blank and need not be recorded until such recording information is received by the Servicer, whereupon, if an Assignment Event shall have occurred, the Servicer shall promptly submit such assignments for recordation;

(x) No instrument of release or waiver has been executed in connection with any Receivable, and no Obligor has been released, in whole or in part, except in accordance with the Credit and Collection Policy;

- 29 -

CSFB-00092182

(xi) Except for payment defaults, there are no defaults in complying with the terms of the related Contract or Mortgage, and any taxes, governmental assessments, insurance premiums, water, sewer and municipal charges or ground rents which previously became due and owing have been paid except where failure to so pay would not result in a prior lien or other adverse effect. Except for any Delinquency Advance or Servicing Advance, the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Obligor, directly or indirectly, for the payment of any amount required by the related Contract or Mortgage, except for interest accruing from the date of the Contract or Mortgage Note or date of disbursement of the Contract or Mortgage Note proceeds, whichever is later, to the day which precedes by one month the Due Date of the first installment of principal and interest;

(xii) There is no proceeding pending or, to the best of the Seller's knowledge, threatened for the total or partial condemnation of any Manufactured Home;

(xiii) As of the date of origination of the related Mortgage Loan, no improvement located on or being part of any Mortgaged Property was in violation of any applicable zoning law or regulation, and all inspections, licenses and certificates required to be made or issued at such time with respect to all occupied portions of each Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, had been made or obtained from the appropriate authorities and each Mortgaged Property was lawfully occupied under applicable law;

(xiv) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Obligor;

(xv) No Receivable has a shared appreciation feature, or other contingent interest feature;

(xvi) The Seller and any Affiliates thereof (other than the Depositor and the Issuer) which have had any interest in the Receivable, whether as originator, mortgagee, assignee, pledgee, servicer or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) (A) organized under the laws of such state, or (B) qualified to do business in such state, or (C) federal savings and loan associations or national banks having principal offices in such state, or (D) not doing business in such state so as to require qualification or licensing;

(xvii) Each Mortgage contains a provision for the acceleration of the payment of the unpaid principal balance of the Receivable in the event the related

- 30 -

CSFB-00092183

security for the Receivable is sold without the prior consent of the mortgagee thereunder;

(xviii) As of the Relevant Date, any future advances made prior to the Cut-Off Date or the related Additional Cut-Off Date, as the case may be, with respect to such Receivable have been consolidated with the outstanding principal amount of such Receivable, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Schedule of Receivables. The Contract or Mortgage Note does not permit or obligate the Seller to make future advances to the Obligor at the option of the Obligor;

(xix) Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the related Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by repossession and sale or judicial or non-judicial foreclosure;

(xx) The Receivables were not selected by the Seller for sale pursuant hereto on any basis intended to adversely affect the Issuer;

(xxi) No Obligor has requested relief under the Civil Relief Act;

(xxii) Each of the documents and instruments included in a File were at the time prepared in a form generally acceptable to prudent institutional mortgage lenders that regularly originate or purchase loans or contracts of the same type. Upon delivery of an Assignment of Mortgage to the Indenture Trustee, such assignment will be in recordable form for the applicable jurisdiction where the related Mortgaged Property is located, provided that such Assignment of Mortgage may be delivered in blank and with recording information left blank;

(xxiii) The Servicer is in possession of a complete File, except those documents delivered as directed by the Depositor, and there are no custodial agreements in effect adversely affecting the right or ability of the Seller to make the document deliveries required hereby;

(xxiv) The collection practices used by the Servicer with respect to the Receivables have been, in all material respects, legal, proper, prudent and customary in the manufactured housing loan servicing businesses;

(xxv) There is no pending action or proceeding directly involving a Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to a Mortgaged Property; and Seller has not received any notice of any environmental hazard on a Mortgaged Property and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property; and

- 31 -

CSFB-00092184

(xxvi) Except for payment defaults, there exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made.

(b)    It is understood and agreed that the representations and warranties set forth in this Section shall survive the conveyance of the Receivables and the delivery of the respective Files to the Custodian or Indenture Trustee and the termination of the rights and obligations of the Servicer pursuant to Section 5.4 and 6.1. Upon discovery by the Depositor, the Transferor, the Seller, the Servicer, the Custodian or the Indenture Trustee of a breach of any of the foregoing representations and warranties, which materially and adversely affects the interest of the Indenture Trustee in the related Receivable, the party discovering such breach shall give prompt written notice to the other parties. Within 60 days of its discovery or its receipt of notice of breach, the Seller shall cure such breach in all material respects or shall purchase such Receivable from the Issuer. Any such purchase by the Seller shall be at the Loan Purchase Price and in each case shall be accomplished in the manner set forth in Section 2.4. It is understood and agreed that the obligation of the Seller to cure or purchase any Receivable as to which such a breach has occurred and is continuing shall constitute the sole remedies against the Seller respecting such breach available to the Issuer, the Transferor, the Depositor, the Owners or the Indenture Trustee on behalf of Owners.

Section 2.3    Conveyance of the Receivables. By execution of this Agreement, the Seller does hereby transfer, assign, set over and otherwise convey to the Transferor, and the Transferor does hereby transfer, assign, set-over and otherwise convey to the Depositor and the Depositor does hereby transfer, assign, set over and otherwise convey to the Issuer, (i) all of its respective right, title and interest in and to each Receivable identified on the Schedule of Receivables, including the related Files and related Documents, from time to time existing (x) at the close of business on the Cut-Off Date, in the case of the Initial Receivables and (y) at the close of business on each Additional Cut-Off Date, in the case of Additional Receivables, provided that the related Contract or Mortgage Note has been delivered to the Custodian, (ii) the Related Security and any other property which secured such Receivable and which has been acquired by foreclosure or deed in lieu of foreclosure or otherwise; (iii) the portions of its interest in any Insurance Policies relating to such Receivable; and (iv) all payments on and proceeds of any of the foregoing. The transfer by the Seller to the Transferor, by the Transferor to the Depositor and by the Depositor to the Issuer of the Receivables set forth herein is absolute and is intended by all parties hereto to be treated as a sale by the Seller to the Transferor, by the Transferor to the Depositor and by the Depositor to the Issuer. Pursuant to the Indenture, the Issuer will pledge the Trust Estate to the Indenture Trustee for the benefit of the Owners of the Notes. The foregoing does not constitute and is not intended to result in the creation or assumption by the Issuer, the Custodian, the Indenture Trustee or any Owner of any obligation of the Seller, the Servicer, OAC or any other Person in connection with the Receivable Documents or under any agreement or instrument relating thereto, including any obligation to make future advances.

In consideration of such transfers, the Transferor will pay to the Seller in cash a purchase price equal to the Purchase Price of each Receivable transferred, the Depositor will pay to the Transferor in cash a purchase price equal to the Purchase Price of each Receivable transferred and the Issuer will pay to the Depositor in cash a purchase price equal to the Purchase Price of each Receivable transferred. The purchase price due with respect to Receivables transferred on

- 32 -

CSFB-00092185

the Closing Date will be payable on the Closing Date. The purchase price due with respect to Receivables transferred on any Addition Date will be payable as and when agreed by the Issuer, the Depositor, the Transferor and the Seller, but not later than the seventh day after such Addition Date.

In the event that any such conveyance is deemed to be a loan, the parties intend that such conveyance be deemed to constitute a security interest granted by the Person described above as selling the Trust Estate pursuant to such conveyance in favor of the Person described above as purchasing the Trust Estate in such conveyance, that with respect to such conveyance this Agreement shall constitute a security agreement under applicable law, and that any subsequent conveyances pursuant to this Agreement shall be deemed to be assignments of such secured party's security interest.

In connection with the sale, transfer, assignment, and conveyance from the Seller to the Transferor, the Seller has filed, in the appropriate office or offices in the State of North Carolina, a UCC-1 financing statement executed by the Seller as debtor, naming the Transferor as secured party, naming the Indenture Trustee as assignee of the secured party and listing the Receivables and the other property described above as collateral. The characterization of the Seller as the debtor and the Transferor as the secured party in such financing statements is solely for protective purposes and shall in no way be construed as being contrary to the intent of the parties that this transaction be treated as a sale of the Seller's entire right, title and interest in the Receivables. In connection with such filing, the Seller agrees that it shall cause to be filed all necessary continuation statements thereof and to take or cause to be taken such actions and execute such documents as are necessary to perfect and protect the Transferor's interest in the Receivables.

In connection with the sale, transfer, assignment, and conveyance from the Transferor to the Depositor, the Transferor has filed, in the appropriate office or offices in the State of New York, a UCC-1 financing statement executed by the Transferor as debtor, naming the Depositor as secured party, naming the Indenture Trustee as assignee of the secured party and listing the Receivables and the other property described above as collateral. The characterization of the Transferor as the debtor and the Depositor as the secured party in such financing statements is solely for protective purposes and shall in no way be construed as being contrary to the intent of the parties that this transaction be treated as a sale of the Transferor's entire right, title and interest in the Receivables. In connection with such filing, the Transferor agrees that it shall cause to be filed all necessary continuation statements thereof and to take or cause to be taken such actions and execute such documents as are necessary to perfect and protect the Depositor's interest in the Receivables.

In connection with the sale, transfer, assignment, and conveyance from the Depositor to the Issuer, the Depositor has filed, in the appropriate office or offices in the States of North Carolina, a UCC-1 financing statement executed by the Depositor as debtor, naming the Issuer as secured party, naming the Indenture Trustee as assignee of the secured party and listing the Receivables and the other property described above as collateral. The characterization of the Depositor as the debtor and the Issuer as the secured party in such financing statements is solely for protective purposes and shall in no way be construed as being contrary to the intent of the parties that this transaction be treated as a sale of the Depositor's entire right, title and interest in the Trust Estate. In connection with such filing, the Depositor agrees that it shall cause to be

- 33 -

CSFB-00092186

filed all necessary continuation statements thereof and to take or cause to be taken such actions and execute such documents as are necessary to perfect and protect the Issuer's interest in the Trust Estate.

In connection with the pledge of the Trust Estate from the Issuer to the Indenture Trustee, on behalf of the Owners of the Notes, the Issuer has filed, in the appropriate office or offices in the State of Delaware, a UCC-1 Financing Statement executed by the Issuer as debtor, naming the Indenture Trustee, for the benefit of the Owners of the Notes, as the secured party and listing the Receivables and the other property described above as collateral. In connection with such filing, the Issuer agrees that it shall cause to be filed all necessary continuation statements thereof and to take or cause to be taken such actions and execute such documents as are necessary to perfect and protect the Indenture Trustee's interest in the Trust Estate for the benefit of the Owners of the Notes.

(a)    Each of the Depositor, the Transferor and the Seller hereby agrees (i) on or prior to the Closing Date, in the case of the Initial Receivables and (ii) on or prior to the applicable Addition Date, in the case of Additional Receivables, to make the appropriate entries in its general accounting records, to indicate that Receivables have been transferred to the Indenture Trustee and constitute part of the Issuer in accordance with the terms of the trust created thereunder.

(b)    Upon the occurrence of an Assignment Event, as promptly as practicable but in no event more than 45 days thereafter, the Servicer shall, at its expense, with respect to each Mortgage Loan as to which an Assignment of Mortgage has not already been recorded, record an Assignment of Mortgage in favor of the Indenture Trustee (which may be a blanket assignment if permitted by applicable law) in the appropriate real property or other records, provided, further that, if recording information for the related Mortgage is not available, such assignment of the Mortgage need not be recorded until such recording information is received by the Servicer, whereupon, if an Assignment Event has occurred and is continuing, the Servicer shall promptly submit such assignment for recordation. The Indenture Trustee or the Custodian shall deliver to the Servicer any Assignments of Mortgage held in the Files and required by the Servicer for such filings. The Indenture Trustee is hereby appointed as the attorney-in-fact of the Servicer with the power to prepare, execute and record such Assignments of Mortgages in the event that the Servicer fails to do so on a timely basis as provided in this paragraph.

(c)    Neither the Custodian nor Indenture Trustee shall have any responsibility for reviewing any File except as expressly provided in this Section 2.3 or the Custodial Agreement. In reviewing any File pursuant to this Section, the Custodian shall have no responsibility for determining whether any document is valid and binding, whether the text of any assignment or endorsement is in proper or recordable form (except, if applicable, to determine if the Indenture Trustee is the assignee or endorsee), whether any document has been recorded in accordance with the requirements of any applicable jurisdiction, or whether a blanket assignment is permitted in any applicable jurisdiction, whether any Person executing any document is authorized to do so or whether any signature thereon is genuine, but shall only be required to determine whether a document has been executed, that it appears to be what it purports to be, and, where applicable, that it purports to be recorded.

- 34 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092187

Section 2.4    <u>Acceptance by Indenture Trustee</u>.    The Indenture Trustee hereby acknowledges the sale and assignment of the Receivables. If the Seller or the Servicer is given notice under Section 2.1(b) or 2.2(b) of a breach of a representation as provided therein and if the Seller does not correct or cure such omission or defect within the 30-day or 60-day period specified in Section 2.1(b) or 2.2(b), as the case may be, the Seller shall purchase such Receivable from the Issuer as of the Determination Date in the month in which such period expired at the Loan Purchase Price of such Receivable if the failure to so purchase such Receivable would cause a Borrowing Base Deficiency to exist. In addition, pursuant to Section 4.15, the Servicer may, but shall have no obligation to, repurchase certain other Receivables by paying to the Indenture Trustee for deposit to the Note Account the Loan Purchase Price therefor. The Loan Purchase Price for the purchased Receivable shall be deposited in the Note Account no later than the Business Day prior to the succeeding Payment Date after the obligation to purchase such Receivable arises or the Seller elects to repurchase such Receivable; provided that, upon receipt by the Indenture Trustee of written notification of such deposit signed by an officer of the Seller or the Servicer, the Indenture Trustee or the Custodian shall release to the Seller or the Servicer, as applicable, the related File and the Indenture Trustee shall execute and deliver a release of lien in the form of Exhibit D hereto. It is understood and agreed that the obligation of the Seller to purchase any Receivable as to which a material defect in or breach exists shall constitute the sole remedy against the Seller respecting such defect or omission available to the Depositor, the Issuer, the Transferor, the Owners and the Indenture Trustee on behalf of Owners.

The Servicer, promptly following the transfer of a Defective Receivable from the Issuer pursuant to this Section 2.4 shall deliver an Amended and Restated Schedule of Receivables and make appropriate entries in its records to reflect such transfer.

Section 2.5    <u>Additional Receivables</u>.    Without further action on the part of any party hereto, on each Business Day on or prior to the Final Addition Date, subject to and in compliance with the conditions set forth below and in Section 2.3, all Contracts and Mortgage Loans originated or acquired by the Seller and identified on a Schedule of Receivables shall be included as Receivables as of the applicable Additional Cut-Off Date, <u>provided</u> that the related Contract or Mortgage Note has been delivered to the Custodian. On the Addition Date with respect to any such Additional Receivables, the Transferor shall purchase from the Seller, and the Seller will sell to the Transferor, and the Depositor shall purchase from the Transferor, and the Transferor will sell to the Depositor, and the Issuer shall purchase from the Depositor, and the Depositor will sell to the Issuer, such Additional Receivables, in each case the Loan Balance sold being established as of the close of business on the applicable Additional Cut-Off Date. In connection with the Additional Receivables:

(i) on or before the Business Day immediately preceding each Borrowing Date or on the date any Monthly Report is delivered and together with each notice of Borrowing, the Seller shall give the Depositor, the Custodian, the Indenture Trustee and the Class A Note Agent an amended and restated Schedule of Receivables (an "Amended and Restated Schedule of Receivables"); and

(ii) if necessary, the Seller shall deliver to the Depositor, the Indenture Trustee and the Class A Note Agent copies of UCC-1 financing statements covering the Additional Receivables and perfecting the Transferor's, the

- 35 -

CSFB-00092188

Depositor's, the Issuer's and the Indenture Trustee's respective interests therein; and

(iii) neither the Transferor, the Depositor nor the Issuer shall purchase, nor shall the Seller, the Transferor or the Depositor sell, Contracts or Mortgage Loans if, prior to giving effect to such sale, the Borrowing Base exceeds $200,000,000, the Issuer is unable to borrow under Section 10.1 of the Indenture or an Event of Default has occurred and is continuing under the Indenture, provided that the obligation of the Transferor, the Depositor and the Issuer to purchase, and the obligation of the Seller, the Transferor and the Depositor to sell, Receivables shall resume immediately if the Borrowing Base is less than $200,000,000, the Issuer may borrow under Section 10.1 of the Indenture and no Event of Default has occurred and is continuing.

Section 2.6    Books and Records. The sale of each Receivable shall be reflected in the Seller's, the Transferor's and the Depositor's balance sheets and other financial statements as a sale of assets by the Seller, the Transferor and the Depositor, as the case may be, under generally accepted accounting principles. The consolidated financial statements of OHC will contain a note in substantially the following form:

In February 2001 the Company entered into a sale and servicing agreement and certain related agreements pursuant to which Oakwood Acceptance Corporation ("OAC") sells consumer loans to an unaffiliated entity, which in turn sells the loans to Oak Leaf Holdings, LLC ("Oak Leaf"), a special-purpose entity majority owned by Oakwood Capital Corporation, a subsidiary of OAC. Oak Leaf then sells the loans to OMI Note Trust 2001-A (the "Trust"). A majority of the purchase price for the loans purchased by the Trust from Oak Leaf is paid in cash, using the proceeds of debt obligations of the Trust sold by the Trust to a financial institution pursuant to a note purchase agreement expiring in February 2004. Such consumer loans (i) are carried on the financial statements of OAC and OHC solely as a result of the consolidation of the financial statements of the Oak Leaf with OAC, (ii) are no longer owned by OAC for state law purposes, and (iii) are not available to satisfy the claims of creditors of OAC.

**END OF ARTICLE II**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092189

ARTICLE III

ACCOUNTS, DISBURSEMENTS AND RELEASES

Section 3.1    Establishment of Accounts.  The Indenture Trustee shall establish and maintain, at the Corporate Trust Office, a separate trust account (the "Note Account") titled "The Chase Manhattan Bank, as Indenture Trustee of OMI Note Trust 2001-A, Note Account" and a separate trust account (the "Servicing Transition Account") titled "The Chase Manhattan Bank, as Indenture Trustee of OMI Note Trust 2001-A, Servicing Transition Account".  Each of the Note Account and the Servicing Transition Account shall be an Eligible Account.

Section 3.2    Flow of Funds.   On each Payment Date, after giving effect to (i) Borrowings on such day and the disbursements of the proceeds of such Borrowings, (ii) the purchase of Receivables and the payment of the Purchase Price for Receivables transferred pursuant hereto as reflected in the Amended and Restated Schedule of Receivables delivered on such day and (iii) any purchases or repurchases of Receivables by the Seller or Servicer pursuant to the terms hereof on such day and the payment of the Loan Purchase Price therefor, the Indenture Trustee shall withdraw Available Funds from the Note Account and make the following allocations or disbursements from such Available Funds in the following order of priority, and each such disbursement shall be treated as having occurred only after all preceding allocations or disbursements have occurred:

(i) First, to the Backup Servicer, the Backup Servicing Fee then due, and to the Owner Trustee, the Indenture Trustee and the Custodian, the related accrued and unpaid fees then due, and, to the Owner Trustee, the Indenture Trustee and the Custodian, in an amount not to exceed $500,000 in any calendar year, for the reimbursement of the accrued and unpaid expenses of, and, to the extent not paid by the Seller or the Servicer, amounts due under indemnification provisions to. the Owner Trustee, the Indenture Trustee and Custodian incurred in connection with their duties and obligations under the Operative Documents;

(ii) Second, to the Servicer, if not OAC. the Servicing Fee;

(iii) Third, for distribution pursuant to the Indenture, the Class A Current Interest;

(iv) Fourth, for distribution pursuant to the Indenture, the principal amount of Class A Notes which are required to be repaid to prevent the existence of a Borrowing Base Deficiency after giving effect to all distributions under this Section 3.2 on such Payment Date;

(v) Fifth, for distribution pursuant to the Indenture, any other amounts then due and payable to the Owners of the Class A Notes under this Agreement, any Class A Note or the Note Purchase Agreement;

(vi) Sixth, after the Final Addition Date, for distribution pursuant to the Indenture, the Class A Note Principal Balance;

- 37 -

CSFB-00092190

(vii) <u>Seventh</u>, to the Owner Trustee, the Indenture Trustee and the Custodian, to the extent not paid pursuant to clause "<u>First</u>", for the reimbursement of the fees and expenses of, and, to the extent not paid by the Seller or the Servicer, the payment of amounts due under indemnification provisions to, the Owner Trustee, the Indenture Trustee and Custodian incurred in connection with their duties and obligations under the Operative Documents;

(viii) <u>Eighth</u>, for distribution pursuant to the Indenture, any amount which the Issuer (acting at the direction of a majority of the Percentage Interests of the Certificates), by prior written notice to the Indenture Trustee, elects to have applied to reduce the principal amount of Class A Notes;

(ix) <u>Ninth</u>, to the Servicer, if OAC, the Servicing Fee;

(x) <u>Tenth</u>, to the Certificate Distribution Account, the remainder or such lesser amount as the Issuer (acting at the direction of a majority of the Percentage Interests of the Certificates), by prior written notice to the Indenture Trustee, elects to have distributed to the Certificateholders; and

(xi) <u>Eleventh</u>, any remainder to remain on deposit in the Note Account..

Section 3.3     <u>Investment of Accounts</u>.

(a)     Consistent with any requirements of the Code, all or a portion of any Account held by the Indenture Trustee for the benefit of the Owners shall be invested and reinvested by the Indenture Trustee in trust for the benefit of the Owners, as directed in writing by the Servicer, in one or more Eligible Investments. The bank serving as Indenture Trustee or any Affiliate thereof may be the obligor on any investment which otherwise qualifies as an Eligible Investment. No investment in any Account shall mature later than the Business Day immediately preceding the next Payment Date (except that if such Eligible Investment is an obligation of the Indenture Trustee, then such Eligible Investment shall mature not later than such Payment Date).

(b)     If any amounts are needed for disbursement from any Account held by the Indenture Trustee and sufficient uninvested funds are not available to make such disbursement, the Indenture Trustee shall cause to be sold or otherwise converted to cash a sufficient amount of the investments in such Account. No investments will be liquidated prior to maturity unless the proceeds thereof are needed for disbursement.

(c)     Subject to the terms of the Indenture, the Indenture Trustee shall not in any way be held liable by reason of any insufficiency in any Account held by the Indenture Trustee resulting from any loss on any Eligible Investment included therein (except to the extent that the bank serving as Indenture Trustee is the obligor thereon).

(d)     If the Servicer shall have failed to give investment directions to the Indenture Trustee as specified in section (a) above then the Indenture Trustee shall invest in federal funds described in clause (a) of the definition of "Eligible Investments" to be redeemable without penalty no later than the Business Day immediately preceding the next Payment Date.

- 38 -

CSFB-00092191

(e)    All income or other gain from investments in any Account held by the Indenture Trustee shall be deposited in such Account immediately on receipt, and any loss resulting from such investments shall be charged to such Account.

Section 3.4    Payment of Issuer Expenses.

(a)    The Servicer shall promptly pay the amount of the fees and expenses of the Indenture Trustee, Backup Servicer, the Owner Trustee and the Custodian not covered or paid by Section 3.2.

(b)    The Seller shall pay directly on the Closing Date the reasonable fees and expenses of counsel to the Indenture Trustee, the Custodian, the Backup Servicer and the Owner Trustee.

(c)    Each of the Seller and Servicer accepts its obligations and agrees to perform the duties assigned to it in the Trust Agreement and the Indenture.

Section 3.5    Accounting and Directions by Servicer.  By 12:00 noon, New York time, on the Business Day preceding each Payment Date (or such earlier date as shall be agreed by the Servicer and the Indenture Trustee), the Servicer shall notify the Depositor, the Seller, the Indenture Trustee and the Class A Note Agent, of the following information with respect to such Payment Date (which notification may be given by facsimile):

(1)    The aggregate amount on deposit in the Note Account as of the close of business on the preceding Determination Date;

(2)    The Class A Current Interest; and

(3)    The Class A Note Principal Balance before giving effect to payments on such Payment Date

Section 3.6    Reports by the Servicer to Class A Note Agent.

(a)    On each Payment Date, the Servicer shall prepare and transmit to the Owner Trustee, the Indenture Trustee and the Class A Note Agent a report that contains the following:

(i) the amount of all distributions allocable to principal on the Class A Notes;

(ii) the amount of all distributions allocable to interest on the Class A Notes;

(iii) the amount of the distribution of any other amounts with respect to the Owners of the Class A Notes;

(iv) all other amounts distributed pursuant to Section 3.2;

- 39 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092192

(v) if the interest amount portion paid to the Owners of the Class A Notes on such Payment Date was less than the Class A Current Interest on such Payment Date, the Class A Carry Forward Amount resulting therefrom;

(vi) the principal amount of the Class A Notes which will be Outstanding after giving effect to any payment of principal on such Payment Date and the Borrowing Base as of the close of business on the second preceding Business Day;

(vii) the weighted average Receivable Rate of the Receivables based on the Loan Balances of the Receivables as of the close of business on the second preceding Business Day; and

(viii) any other information reasonably requested by the Class A Note Agent.

(b)    In addition, on each Payment Date, the Servicer will furnish to the Owner Trustee, the Indenture Trustee and the Class A Note Agent, together with the information described in subsection (a) preceding, the following information:

(i) the number and aggregate principal balances of Receivables (a) 30-59 days Delinquent, (b) 60-89 days Delinquent and (c) 90 or more days Delinquent, as of the close of business on the last day of the related Collection Period, (d) the numbers and aggregate Loan Balances of all Receivables as of the last day of the related Collection Period and (e) the percentage that each of the amounts represented by clauses (a), (b) and (c) represent as a percentage of the respective amounts in clause (d);

(ii) all Loan Repurchase Prices paid with respect to the preceding Collection Period; and

(iii) the Loan Balance of any REO Property or Repo Properties as of the last day of the related Collection Period, together with such other information thereto as the Class A Note Agent may reasonably request.

Section 3.7    Reports by Servicer.

(a)    The Servicer shall report to the Indenture Trustee, the Depositor, the Seller and the Class A Note Agent, with respect to the amount on deposit in the Note Account and the identity of the investments included therein, as any of them may from time to time reasonably request. Without limiting the generality of the foregoing, the Servicer shall, at the reasonable request of the Issuer, the Indenture Trustee, the Depositor, the Seller or the Class A Note Agent transmit promptly to each of them copies of all accountings of receipts in respect of the Receivables.

(b)    The Indenture Trustee shall report to the Class A Note Agent, the Servicer, the Seller and the Depositor with respect to any written notices it may from time to time receive which provide an Authorized Officer with actual knowledge that any of the statements set forth in Section 2.2(a) hereof are inaccurate.

- 40 -

CSFB-00092193

Section 3.8    Sale of Receivables. The Issuer (acting with the consent of a majority of the Percentage Interests of the Certificates) may from time to time sell Receivables for a purchase price not less than an amount equal to (A) the sum of (i) the Loan Balance of such Receivables as of the date of purchase; (ii) all accrued and unpaid interest on such Receivables to the Payment Date or Interim Payment Date (as defined below) on which such amount is included in Available Funds; and (iii) all unreimbursed Delinquency Advances and Servicing Advances related thereto or (B) such other price as the Indenture Trustee (acting at the direction of the Class A Note Agent (acting at the direction of a majority of the Percentage Interests of the Notes)) and the Issuer (acting at the direction of a majority of the Percentage Interests of the Certificates) shall approve. With prior written notice to the Indenture Trustee, the Issuer may apply the proceeds of any such purchase on a date (an "Interim Payment Date") prior to the succeeding Payment Date pursuant to Section 3.2 to the repayment of some or all of the outstanding principal of the Class A Notes and interest accrued thereon to such Interim Payment Date and to make payments to the Certificateholders, provided that amounts sufficient in the sole judgment of the Class A Note Agent (acting at the direction of the Required Purchasers (as defined in the Note Purchase Agreement)) to make any payments of interest, fees and expenses due on such succeeding Payment Date are already on deposit or are deposited from the proceeds of such purchase in the Note Account.

Section 3.9    The Servicing Transition Reserve Account.

(a)    On the Closing Date, the Servicer shall deposit $150,000 in the Servicing Transition Account.

(b)    The Indenture Trustee shall release amounts on deposit in the Servicing Transition Account to the successor Servicer to OAC, if any, from time to time upon the receipt of written certification of such successor Servicer that OAC has not reimbursed to such successor Servicer costs and expenses incurred by such successor Servicer pursuant to the last sentence of Section 6.1. Each such certification shall list such reimbursable expenses in reasonable detail..

(c)    On the earlier of (i) the date that this Agreement is terminated and (ii) the date the long-term unsecured senior debt rating of OHC is rated at least "Baa3" by Moody's and "BBB-" by Standard & Poor's, the Indenture Trustee shall withdraw (or direct the holder of the applicable account to withdraw) all amounts on deposit in the Servicing Transition Reserve Account and pay such amounts to OAC and at such time the Servicing Transition Account shall be closed.

**END OF ARTICLE III**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092194

ARTICLE IV

ADMINISTRATION AND SERVICING
OF RECEIVABLES

Section 4.1    The Servicer.

(a)    The Servicer, as independent contract servicer, shall, for the period described in Section 4.19, service and administer the Receivables and shall have full power and authority, acting alone (except as provided by Section 5.5), to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable and consistent with the terms of this Agreement, the terms of the Receivables and applicable law. The Servicer, upon receipt of the consent of the Majority Noteholders (such consent not to be unreasonably withheld) may enter into Subservicing Agreements for any servicing and administration of Receivables with any institution which is in compliance with the laws of each state necessary to enable it to perform its obligations under such Subservicing Agreement. The Servicer shall give written notice to the Indenture Trustee of the appointment of any Subservicer. Any such Subservicing Agreement shall be consistent with and not violate the provisions of this Agreement. The Servicer shall be entitled to terminate any Subservicing Agreement in accordance with the terms and conditions of such Subservicing Agreement and either itself directly service the related Receivables or enter into a Subservicing Agreement with a successor Subservicer which qualifies hereunder.

(b)    Notwithstanding any Subservicing Agreement or any of the provisions of this Agreement relating to agreements or arrangements between the Servicer and a Subservicer or reference to actions taken through a Subservicer or otherwise, the Servicer shall remain obligated and primarily liable for the servicing and administering of the Receivables in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if the Servicer alone were servicing and administering the Receivables. For purposes of this Agreement, the Servicer shall be deemed to have received payments on Receivables when the Subservicer has received such payments. The Servicer shall be entitled to enter into any agreement with a Subservicer for indemnification of the Servicer by such Subservicer, and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

(c)    Any Subservicing Agreement that may be entered into and any transactions or services relating to the Receivables involving a Subservicer in its capacity as such and not as an originator shall be deemed to be between the Subservicer and the Servicer alone, and the Indenture Trustee and Owners shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer except as set forth in Section 4.1(d). The Servicer shall be solely liable for all fees owed by it to any Subservicer irrespective of whether the Servicer's compensation pursuant to this Agreement is sufficient to pay such fees.

(d)    In the event the Servicer shall for any reason no longer be the Servicer (including by reason of a Servicer Termination Event), the Backup Servicer or the designee of

- 42 -

CSFB-00092195

the Indenture Trustee shall thereupon assume all of the rights and obligations of the Servicer under each Subservicing Agreement that the Servicer may have entered into, unless the Indenture Trustee or the Backup Servicer elects to terminate any Subservicing Agreement. Any fee payable in connection with such a termination will be payable by the outgoing Servicer. If the Indenture Trustee or the Backup Servicer does not terminate a Subservicing Agreement, the Backup Servicer, the Indenture Trustee or the successor servicer for the Indenture Trustee shall be deemed to have assumed all of the Servicer's interest therein and to have replaced the Servicer as a party to each Subservicing Agreement to the same extent as if the Subservicing Agreements had been assigned to the assuming party, except that the Servicer shall not thereby be relieved of any liability or obligations under the Subservicing Agreements with regard to events that occurred prior to the date the Servicer ceased to be the Servicer hereunder. The Servicer, at its expense and without right of reimbursement therefor, shall, upon the request of the Indenture Trustee or the Backup Servicer, deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Receivables then being serviced and an accounting of amounts collected and held by it and otherwise effect the orderly and efficient transfer of the Subservicing Agreements to the assuming party.

(e)    Consistent with the terms of this Agreement, the Servicer may waive, modify or vary any term of any Receivable or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Obligor if in the Servicer's good faith determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Owners, provided, however, that (unless the Obligor is in default with respect to the Receivable, or such default is, in the judgment of the Servicer, imminent) the Servicer may not permit any modification with respect to any Receivable that would change the Receivable Rate, forgive the payment of any principal or interest (unless in connection with the liquidation of the related Receivable) or extend, whether pursuant to one or more extensions, the final maturity date on the Receivable more than twelve months beyond the final maturity date of the Receivable as of the Cut-Off Date or Additional Cut-Off Date with respect to such Receivable. Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby authorized and empowered to execute and deliver on behalf of the Indenture Trustee and the Issuer, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments with respect to the Receivables and with respect to the Manufactured Homes and the Mortgaged Properties. If reasonably required by the Servicer, the Indenture Trustee shall furnish the Servicer with limited powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

Notwithstanding anything to the contrary contained herein, the Servicer, in servicing and administering the Receivables, shall employ or cause to be employed procedures (including collection, repossession and sale, foreclosure and REO Property/Repo Property management procedures) and exercise the same care that it customarily employs and exercises in servicing and administering Mortgage Loans and Contracts for its own account, and shall otherwise service and administer the Receivables in accordance with accepted servicing practices of prudent lending institutions servicing loans similar to the Receivables in the related jurisdictions and giving due consideration to the Owners' reliance on the Servicer (the "Servicing Standard").

(f)    On and after such time as the Indenture Trustee receives the resignation of, or notice of the removal of, the Servicer from its rights and obligations under this Agreement,

- 43 -

CSFB-00092196

and with respect to resignation pursuant to Section 5.4, after receipt by the Indenture Trustee of the Opinion of Counsel required pursuant to Section 5.4, the Backup Servicer or the Indenture Trustee's designee shall assume all of the rights and obligations of the Servicer, subject to Section 6.2. Upon any such resignation or removal, the Servicer shall, upon request of the Indenture Trustee but at the expense of the Servicer, deliver to the Backup Servicer or the Indenture Trustee all documents and records relating to the Receivables and an accounting of amounts collected and held by the Servicer and otherwise effect the orderly and efficient transfer of servicing rights and obligations to the assuming party.

(g)    The Servicer shall deliver a list of Servicing Officers to the Indenture Trustee on or before the Closing Date and shall revise such list from time to time, as appropriate, and shall deliver all revisions promptly to the Indenture Trustee.

Section 4.2    Collection of Certain Receivable Payments.

(a)    The Servicer shall make reasonable efforts consistent with the Servicing Standards to collect all payments called for under the terms and provisions of the Receivables and shall follow such collection procedures as shall be consistent with the Servicing Standard and without limiting the generality of the foregoing, the Servicer may in its discretion (i) waive any prepayment penalty or late payment charge or any assumption fees or other fees which may be collected in the ordinary course of servicing such Receivable and (ii) arrange with an Obligor a schedule for the payment of interest, principal and other amounts due and unpaid; provided that such arrangement is consistent with the Servicer's policies with respect to the mortgage loans and contracts it owns or services and with Section 4.1; provided, further, that notwithstanding such arrangement such Receivables will be included in the monthly information delivered by the Servicer to the Indenture Trustee pursuant to Section 4.16.

(b)    Within two Business Days following receipt thereof the Servicer shall instruct Lock-Box Banks to transfer into the Note Account the following payments and collections received or made by it with respect to each Receivable (without duplication):

(i) all payments received after the applicable Cut-Off Date or Additional Cut-Off Date on account of principal on the Receivables, including any amounts received pursuant to Section 3.8 and any Delinquency Advances;

(ii) all payments received after the applicable Cut-Off Date or Additional Cut-Off Date on account of interest on the Receivables, including any amounts received pursuant to Section 3.8 and any Delinquency Advances;

(iii) all Net Liquidation Proceeds net of related Foreclosure Profits;

(iv) all Insurance Proceeds;

(v) any amounts payable in connection with the repurchase of any Receivable pursuant to Sections 2.1, 2.2, and 4.15;

(vi) all Released Mortgaged Property Proceeds;

- 44 -

CSFB-00092197

(vii) to the extent not set forth above, any amount required to be deposited in the Note Account pursuant to Sections 3.3(e) or 4.6 or any other provision of this Agreement; and

(viii) any amounts deposited by the Issuer in the Note Account pursuant to the last sentence of this Section 4.2(b).

The foregoing requirements respecting deposits to the Note Account are exclusive, it being understood that, without limiting the generality of the foregoing, the Servicer need not deposit, or instruct the Lock-Box Banks to deposit, in the Note Account amounts representing Foreclosure Profits, fees (including annual fees), late charge penalties or other amounts to which the Servicer is entitled pursuant hereto or other amounts received by the Servicer for the accounts of Obligors for application toward the payment of taxes, insurance premiums, assessments and similar items. On any day, the Issuer may deposit such amounts as it may elect, in its sole discretion, in the Note Account.

(c)    All funds in the Note Account shall be invested as provided in Section 3.3.

(d)    Each of the Servicer and Seller will instruct all Obligors to cause all Collections of Receivables to be deposited directly to a Lock-Box Account with a Lock-Box Bank. Each Lock-Box Account will be maintained in the name of the Indenture Trustee, in trust for, among others, the Indenture Trustee. Neither the Servicer nor Seller will add or terminate any bank as a Lock-Box Bank from those listed in Schedule III or make any change in its instructions to Obligors regarding payments to be made in respect of the Receivables or payments to be made to any Lock-Box Account, unless the Indenture Trustee and the Class A Note Agent shall have received notice of, and the Class A Note Agent shall have consented in writing to, such addition, termination or change and duly executed copies of agreements with each new Lock-Box Bank. If there shall be any dispute as the application of funds in the Lock-Box Account allocable to the Receivables among any of the Seller, the Servicer, the Depositor, the Owners or the Class A Note Agent, the Indenture Trustee shall follow the instructions of the Class A Note Agent with respect thereto.

Section 4.3    Withdrawals from the Note Account. The Indenture Trustee and, to the extent provided by the last sentence of this Section 4.3, the Servicer shall withdraw or cause to be withdrawn funds from the Note Account for the following purposes pursuant to the written direction of the Servicer:

(a)    to make distributions pursuant to Section 3.2;

(b)    pursuant to the last sentence of this Section 4.3, to reimburse the Servicer for any unreimbursed Servicing Advances or Delinquency Advances;

(c)    to withdraw any amount received from a Obligor that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court having competent jurisdiction;

(d)    subject to Section 3.3 hereof, to make investments in Eligible Investments;

- 45 -

CSFB-00092198

(e)    to withdraw any funds deposited in the Note Account that were not required to be deposited therein or were deposited therein in error and to pay such funds to the appropriate Person;

(f)    to withdraw funds necessary for the conservation and disposition of REO Property or Repo Property pursuant to Section 4.6 to the extent not advanced by the Servicer or for any other purpose permitted by any other provision hereof; and

(g)    to clear and terminate the Note Account upon the termination of this Agreement and to pay any amounts remaining therein to the Certificate Distribution Account.

The Servicer shall be permitted to withdraw amounts from the Note Account for the purposes set forth in clauses (c), (d), (e), and (f) and to reimburse itself for any Servicing Advances or Delinquency Advances previously made by the Servicer, which Servicing Advances or Delinquency remain unreimbursed to the Servicer, out of Related Proceeds or, if such Servicing Advances or Delinquency Advances have been determined by the Servicer to have become Non-Recoverable Advances, out of any funds on deposit in the Note Account pursuant to clause (b).

Section 4.4    Maintenance of Hazard Insurance; Property Protection Expenses.

(a)    Standard Hazard Insurance. Except as otherwise provided in this Section 4.4(a), the Servicer shall cause to be maintained with respect to each Contract and Mortgage Loan one or more Standard Hazard Insurance Policies that provide, at a minimum, the same coverage as that provided by a standard form fire and extended coverage insurance policy that is customary for manufactured housing or residential real property (as applicable), providing coverage in an amount at least equal to the lesser of (1) the maximum insurable value of the related Manufactured Home or Mortgage Property or (2) the principal balance due from the Obligor under such Contract or Mortgage Loan; provided, however, that in any event the amount of coverage provided by each Standard Hazard Insurance Policy must be sufficient to avoid the application of any co-insurance clause contained therein.    As part of its collection responsibilities, the Servicer shall proceed to collect the premiums due on the Standard Hazard Insurance Policies from the Obligors in accordance with the degree of skill and care that is customarily used for such purpose in the manufactured home loan servicing industry (in the case of Contracts) and the residential mortgage loan servicing industry (in the case of Mortgage Loans). Each Standard Hazard Insurance Policy caused to be maintained by the Servicer shall contain a standard loss payee clause in favor of the Servicer and its successors and assigns. Any amounts received under any such policies shall be deposited initially into the Note Account within two Business Days of receipt.

In lieu of causing individual Standard Hazard Insurance Policies to be maintained with respect to each Manufactured Home and Mortgaged Property pursuant to subsection (a) of this Section 4.4, the Servicer may, and with respect to each Repo Property and REO Property shall, maintain one or more blanket insurance policies, each issued by a Qualified Insurer, covering losses on the Obligors' interests in the Receivables relating to such Manufactured Homes and Mortgaged Properties resulting from the absence or insufficiency of such individual Standard Hazard Insurance Policies. The Servicer shall pay the premium for any such policy on the basis described therein and shall pay any deductible amount with respect to claims under such policy relating to the Receivables covered thereby. All amounts collected by the Servicer under any

- 46 -

CSFB-00092199

such blanket policy and any payments by the Servicer of deductible amounts thereunder, in each case relating to an asset covered thereby, shall be deposited into the Note Account within two Business Days of Receipt, after payment to (or retention by) the Servicer of all Insured Expenses and Liquidation Expenses incurred by it with respect to the Manufactured Home or Mortgaged Property to which such recovery relates, as well as the amount of any Servicing Advances or Delinquency Advances made by the Servicer with respect to the related Receivable that have not been reimbursed to the Servicer.

(b)    Primary Mortgage Insurance.    The Servicer must maintain a Primary Mortgage Insurance Policy in full force and effect on each Mortgage Loan, if any, which is identified in the Schedule of Receivables as being covered by a Primary Mortgage Insurance Policy. Any such Primary Mortgage Insurance Policy must insure the portion of the Loan Balance of the related Mortgage Loan that exceeds 75% of the value of the related Mortgaged Property (as set forth in the appraisal obtained in connection with origination of the Mortgage Loan) (the Mortgaged Property's "Initial Value") unless such Primary Mortgage Insurance coverage has been waived in writing by the Seller at the time it purchases the Mortgage Loan or such Primary Mortgage Insurance is canceled under the circumstances described below. If a covered Mortgage Loan provides for negative amortization or the potential for negative amortization, the Primary Mortgage Insurance Policy must also insure any increase in the Loan Balance of the Mortgage Loan from the original principal balance of the related Mortgage Note. In the event that the rating assigned by any Rating Agency to the claims-paying ability of any related Mortgage Insurer is reduced, the Servicer will use its best efforts to replace each Primary Mortgage Insurance Policy issued by the downgraded Mortgage Insurer with a new Primary Mortgage Insurance Policy issued by an insurer whose claims-paying ability is acceptable to the Note Agent. The premium for any replacement policy shall not exceed the premium for any replaced policy.

The Servicer may cancel the Primary Mortgage Insurance Policy maintained with respect to any Mortgage Loan at the related Mortgagor's request if (subject to applicable law) the following conditions are met:

(1)    The current Mortgage Loan-to-Value Ratio of the Mortgage Loan must be 80% or less;

(2)    The Mortgage Loan may not have been 30 days or more delinquent at any time within the preceding twelve months; and

(3)    There may not have been any other default under the terms of the Mortgage Loan at any time during the preceding twelve months.

The Servicer must take all steps necessary to ensure the payment by each Mortgage Insurer of the maximum benefits available under the terms of the related Primary Mortgage Insurance Policy. The Servicer must work diligently with the Mortgage Insurer to determine whether such insurer will settle a claim under a Primary Mortgage Insurance Policy by taking title to the related Mortgaged Property or in some other manner. Upon receipt of any proceeds of a Primary Mortgage Insurance Policy, the Servicer must deposit such proceeds into the Note Account within two Business Days of receipt.

- 47 -

CSFB-00092200

Section 4.5    Fidelity Bond. The Servicer shall keep in force throughout the term of this Agreement a policy or policies of insurance issued by a Qualified Insurer covering errors and omissions in the performance of its obligations as Servicer hereunder, including failure to maintain insurance as required by this Agreement, and a fidelity bond covering the Servicer's performance under this Agreement. Such policy or policies and bond shall be in such form and amount as is generally customary among Persons that service a portfolio of manufactured housing installment sales contracts and installment loans having an aggregate principal amount of $100 million or more and which Persons are generally regarded as servicers acceptable to institutional investors. The Servicer shall cause to be delivered to the Indenture Trustee and the Class A Note Agent a certificate of insurance with respect to such fidelity bond and insurance policy.

Section 4.6    Management and Realization Upon Defaulted Receivables. The Servicer shall manage, conserve, protect and operate each REO Property and Repo Property solely for the purpose of its prudent and prompt disposition and sale. The Servicer shall, either itself or through an agent selected by the Servicer, manage, conserve, protect and operate the REO Property or Repo Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property or Repo Property is managed. The Servicer shall attempt to sell the same (and may temporarily rent the same) on such terms and conditions as the Servicer deems to be in the best interest of the Owners.

The Servicer shall cause to be deposited, within one Business Day of receipt thereof, in the Note Account, all revenues received with respect to the related REO Property or Repo Property and shall retain, or cause the Indenture Trustee to withdraw therefrom, funds necessary for the proper operation, management and maintenance of the REO Property or Repo Property and the fees of any managing agent acting on behalf of the Servicer.

The disposition of REO Property and Repo Property shall be carried out by the Servicer for cash at such price, and upon such terms and conditions, as the Servicer deems to be in the best interest of the Owners and, as soon as practicable thereafter, the expenses of such sale shall be paid. The net cash proceeds of sale of the REO Property or Repo Property shall be promptly deposited in the Note Account in accordance with Section 4.2, net of Foreclosure Profits, for distribution to the Owners in accordance with Section 3.2.

The Servicer shall foreclose upon or otherwise comparably convert to ownership Mortgaged Properties or Manufactured Homes securing such of the Receivables as come into and continue in default when no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 4.1 subject to the provisions contained in the last paragraph of this Section.

In the event that title to any Mortgaged Property or Manufactured Homes is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to the Servicer or its nominee or as otherwise agreed among the Note Agent, the Servicer and the Indenture Trustee in writing.

Section 4.7    Indenture Trustee to Cooperate. Upon any payment of the outstanding principal balance thereof in full or other satisfaction of a Receivable in accordance with the

- 48 -

T:\Corp'dto\csuis535\ssa__V17.doc

Credit and Collection Policy, the Servicer is authorized to execute, pursuant to the authorization contained in Section 4.1(e), an instrument of satisfaction regarding the related Mortgage or Contract, which instrument of satisfaction shall be recorded by the Servicer if required by applicable law and be delivered to the Person entitled thereto. It is understood and agreed that no expenses incurred in connection with such instrument of satisfaction or transfer shall be reimbursed from amounts deposited in the Note Account. If the Indenture Trustee or the Custodian is holding the Files, from time to time and as appropriate for the servicing or foreclosure of any Receivable, the Indenture Trustee or the Custodian, as the case may be, shall, upon request of the Servicer and delivery to the Indenture Trustee or the Custodian, as the case may be, of a Request for Release, in the form attached as Exhibit D to the Custodial Agreement, signed by a Servicing Officer, release the related File to the Servicer, and the Indenture Trustee shall execute such documents in the forms provided by the Servicer, as shall be necessary for the prosecution of any such proceedings or the taking of other servicing actions. Such Request for Release shall obligate the Servicer to return the File to the Indenture Trustee or the Custodian when the need therefor by the Servicer no longer exists unless the Receivable shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer similar to that herein above specified, the Request for Release shall be released by the Indenture Trustee or the Custodian holding such Request for Release to the Servicer.

In order to facilitate the foreclosure of the Mortgage securing any Receivable that is in default following recordation of the related Assignment of Mortgage in accordance with the provisions hereof, the Indenture Trustee shall, if so requested in writing by the Servicer, execute an appropriate assignment in the form provided to the Indenture Trustee by the Servicer to assign such Receivable for the purpose of collection to the Servicer (any such assignment shall unambiguously indicate that the assignment is for the purpose of collection only) and, upon such assignment, such assignee for collection will thereupon bring all required actions in its own name and otherwise enforce the terms of the Receivable and deposit or credit the Net Liquidation Proceeds, exclusive of Foreclosure Profits, received with respect thereto in the Note Account. In the event that all delinquent payments due under any such Receivable are paid by the Obligor and any other defaults are cured then the assignee for collection shall promptly reassign such Receivable to the Indenture Trustee and return it to the place where the related File was being maintained.

Section 4.8    Servicing Compensation; Payment of Certain Expenses by Servicer. The Servicer shall be entitled to receive the Servicing Fee as compensation for its services in connection with servicing the Receivables. Moreover, additional servicing compensation in the form of prepayment penalties, late payment charges, bad check charges or assumption fees or other receipts not required to be deposited in the Note Account, including, without limitation, Foreclosure Profits and, subject to Section 4.2(b), investment income on the Note Account shall be retained by the Servicer. The Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder (including payment of all other fees and expenses not expressly stated hereunder to be for the account of the Issuer or the Owners) and shall not be entitled to reimbursement therefor except as specifically provided herein.

Section 4.9    Annual Statement as to Compliance.

(a)    The Servicer will deliver to the Indenture Trustee on or before the last day of the fourth month following the end of the Servicer's fiscal year ended September 30,

- 49 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092202

beginning in January, 2002, an Officer's Certificate stating that (i) a review of the activities of the Servicer during the preceding fiscal year (or such shorter period as is applicable in the case of the first report) and of its performance under this Agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such fiscal year in all material respects or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof.    The Servicer shall promptly notify the Seller and the Indenture Trustee upon any change in the basis on which its fiscal year is determined.

(b)    The Servicer shall deliver to the Indenture Trustee, promptly after having obtained knowledge thereof, but in no event later than five Business Days thereafter, written notice by means of an Officer's Certificate of any event which, with the giving of notice or the lapse of time or both, would become a Servicer Termination Event.

Section 4.10    Annual Servicing Report.  On or before the last day of the fourth month following the end of the Servicer's fiscal year ended September 30, beginning in January, 2002, the Servicer, at its expense, shall cause a firm of independent public accountants to furnish a letter or letters to the Depositor and the Indenture Trustee to the effect that such firm has, with respect to the Servicer's overall servicing operations, examined such operations in accordance with the requirements of the Uniform Single Attestation Program for Mortgage Bankers, and stating such firm's conclusions relating thereto.

Section 4.11    Access to Certain Documentation and Information Regarding the Receivables.  The Servicer shall provide to the Indenture Trustee, the Backup Servicer and the Class A Note Agent access to the documentation regarding the Receivables, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices of the Servicer.  Nothing in this Section shall derogate from the obligation of the Servicer to observe any applicable law prohibiting disclosure of information regarding the Obligors and the failure of the Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.

Section 4.12    Reports of Foreclosures and Abandonments of Mortgaged Properties. The Servicer shall make reports of foreclosures and abandonments of any Receivable for each year beginning with the year 2001.  The Servicer shall file reports relating to each instance occurring during the previous calendar year in which the Servicer (i) on behalf of the Issuer acquires an interest in any Receivable through foreclosure or other comparable conversion in full or partial satisfaction of a Receivable or (ii) knows or has reason to know that any Receivable has been abandoned.

Section 4.13    Assumption Agreements.  When a Mortgaged Property or Manufactured Home has been or is about to be conveyed by the Obligor, to the extent it has knowledge of such conveyance or prospective conveyance, the Servicer is authorized to enter into an assumption and modification agreement with the person to whom such property has been or is about to be conveyed, pursuant to which either (i) such person shall become liable under the Contract or Mortgage Note and related Mortgage, and the Obligor shall remain liable thereon or (ii) such person is substituted as Obligor and becomes liable under the Contract or Mortgage Note and related Mortgage.  The Servicer shall notify the Indenture Trustee that any such substitution or

- 50 -

CSFB-00092203

assumption agreement has been completed by forwarding to the Custodian the original of such substitution or assumption agreement, which original shall be added by the Custodian to the related File and shall, for all purposes, be considered a part of such File to the same extent as all other documents and instruments constituting a part thereof. In connection with any assumption or substitution agreement entered into pursuant to this Section, the Servicer shall not change the Receivable Rate or the Monthly Payment, defer or forgive the payment of principal or interest, reduce the outstanding principal amount or extend the final maturity date on such Receivable. Any fee collected by the Servicer for consenting to such conveyance or entering into such modification shall be retained by or paid to the Servicer as additional servicing compensation.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Receivable by operation of law or any assumption which the Servicer may be restricted by law from preventing, for any reason whatsoever.

Section 4.14  Payment of Taxes. Insurance and Other Charges. With respect to each Receivable, the Servicer shall not be required to maintain records relating to payment of taxes or insurance.

Section 4.15  Optional Purchase of Defaulted Receivables. The Servicer, in its sole discretion, shall have the right, but not an obligation, to elect (by written notice sent to the Indenture Trustee) to purchase for its own account from the Issuer in the manner and at the price specified in Section 2.4 any Receivable which is 60 days or more past due, any Defaulted Receivable or any Receivable which previously was but is not then an Eligible Receivable other than because of clause (v) of the definition of such term. The Loan Purchase Price for any Receivable purchased hereunder shall be deposited in the Note Account. The Indenture Trustee, upon receipt of such deposit, shall release or cause to be released to the purchaser of such Receivable the related File and shall a release of lien in the form of Exhibit D hereto and the purchaser of such Receivable shall succeed to all the Issuer's right, title and interest in and to such Receivable and all security and documents related thereto. Such assignment shall be an assignment outright and not for security. The purchaser of such Receivable shall thereupon own such Receivable, and all security and documents, free of any further obligation to the Indenture Trustee or the Owners with respect thereto.

Section 4.16  Statements. Not later than 12:00 noon, New York time, on the Business Day prior to each Payment Date, the Servicer shall deliver to the Indenture Trustee and the Backup Servicer a monthly report (the "Monthly Report") in a form and format (which may be an electronic form) mutually agreeable to the Servicer, the Backup Servicer and the Indenture Trustee containing the information set forth in Exhibit A hereto (with such changes the Class A Note Agent may approve from time to time) as to each Receivable as of the end of the preceding Collection Period and such other information as the Indenture Trustee or the Backup Servicer shall reasonably require, provided that each such Monthly Report shall contain a detailed calculation (such calculation to be performed by the Issuer) of the Borrowing Base as of latest practicable date, but in any event as of a date no earlier than the third Business Day prior to such Payment Date, showing, among other things, deductions for each type of overconcentration set forth in the definition of Excluded Receivables Balance and for any failure to satisfy eligibility criteria. Each Monthly Report shall be an Officer's Certificate.

- 51 -

CSFB-00092204

Section 4.17    Administrative Duties of the Issuer.  The Servicer will monitor all of the administrative duties of the Issuer pursuant to the Operative Documents, and advise the Issuer of all actions required to be taken pursuant thereto.  In this regard, the Servicer will prepare or cause to be prepared for execution and deliver to the Issuer any and all forms, reports, notices or other documents required of the Issuer pursuant to the Operative Documents.  The Backup Servicer shall have no responsibility for any duties under this Section 4.17; the Depositor shall assume the duties of the Servicer under this Section 4.17 upon any termination of the Servicer pursuant to Section 6.1.

Section 4.18    Backup Servicer.

(a)    Prior to assuming any of the Servicer's rights and obligations hereunder the Backup Servicer shall only be responsible to perform those duties specifically imposed upon it by the provisions hereof and shall have no obligations or duties under any agreement to which it is not a party, including but not limited to the various agreements named herein.  Such duties generally relate to following the provisions herein which would permit the Backup Servicer to assume some or all of the Servicer's rights and obligations hereunder with reasonable dispatch, following notice.

The Backup Servicer, prior to assuming any of the Servicer's duties hereunder, may not resign hereunder unless it gives not less than 60 days' prior written notice to the Class A Note Agent, the Servicer and the Seller.  No such resignation shall be effective until a successor Backup Servicer shall have been appointed pursuant hereto.

In the event of the resignation of the Backup Servicer, the Servicer shall appoint a successor Backup Servicer reasonably acceptable to the Class A Note Agent and the Seller.  If no Backup Servicer shall have been appointed on the scheduled date of the Backup Servicer's resignation, the Backup Servicer may petition a court of competent jurisdiction to appoint any established housing and home finance institution, bank or other mortgage loan or contract servicer having a net worth of not less than $25,000,000 as the successor to the Backup Servicer hereunder.

(b)    The Backup Servicer shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if the repayment of such funds or adequate written indemnity against such risk or liability is not reasonably assured to it in writing prior to the expenditure or risk of such funds or incurrence of financial liability.  Notwithstanding any provision to the contrary, the Backup Servicer, in its capacity as such, and not in its capacity as Successor Servicer, shall not be liable for any obligation of the Servicer contained in this Agreement, and the parties shall look only to the Servicer to perform such obligations.

(c)    The Servicer shall have no liability, direct or indirect, to any party, for the acts or omissions of the Backup Servicer, whenever such acts or omissions occur whenever such liability is imposed.

(d)    Notwithstanding anything to the contrary herein, the Class A Note Agent shall have the right to remove the Backup Servicer for cause at any time and replace the Backup Servicer.  In the event that the Class A Note Agent exercises its right to remove and replace The

- 52 -

T:\Corp\dto\csuis535\ssa__V17.doc

Chase Manhattan Bank as Backup Servicer, The Chase Manhattan Bank shall have no further obligation to perform the duties of the Backup Servicer under this Agreement.

(e)    The Servicer shall provide monthly, or as otherwise requested, to the Backup Servicer, or its agent, information on the Receivables sufficient to enable the Backup Servicer to assume the responsibilities as successor servicer and collect on the Receivables.

(f)    Except as provided in this Agreement, the Backup Servicer may accept and reasonably rely on all accounting, records and work of the Servicer without audit, and the Backup Servicer shall have no liability for the acts or omissions of the Servicer.  If any error, inaccuracy or omission (collectively, "Errors") exists in any information received from the Servicer, and such Errors should cause or materially contribute to the Backup Servicer making or continuing any Errors (collectively, "Continued Errors"), the Backup Servicer shall have no liability for such Continued Errors; provided, however, that this provision shall not protect the Backup Servicer against any liability that would otherwise be imposed by reason of willful misconduct, bad faith or gross negligence in discovering or correcting any Error or in the performance of its or their duties hereunder or under this Agreement.

(g)    The Backup Servicer and its officers, directors, employees, representatives and agents shall be indemnified by the Servicer from and against all claims, damages, losses or expenses incurred by the Backup Servicer (including reasonable attorney's fees and expenses) arising out of claims asserted against the Backup Servicer by third parties on any matter arising out of this Agreement to the extent the act or omission giving rise to the claim relates to an act or omission of the Servicer, the Seller, the Depositor or any of their Affiliates and accrues before the date on which the Backup Servicer assumes the duties of Servicer hereunder, and all claims, expenses, obligations, liabilities, losses, damages, injuries, penalties, stamp or other similar taxes, actions, suits, judgments, reasonable costs and expenses (including reasonable attorney's and agent's fees and expenses) of whatever kind or nature regardless of their merit, demanded, asserted or claimed against the Backup Servicer directly or indirectly relating to, or arising from, claims against the Backup Servicer by reason of its participation in the transactions contemplated hereby, including without limitation all reasonable costs required to be associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and expenses and court costs except for any claims, damages, losses or expenses arising from the Backup Servicer's own gross negligence, bad faith or willful misconduct.  The obligations of the Servicer under this Section 4.18(g) shall survive the satisfaction and discharge of this Agreement or the earlier resignation or removal of the Backup Servicer

In the absence of bad faith on the part of the Backup Servicer, the Backup Servicer may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or pinions furnished to the Backup Servicer which conform to the requirements of this Agreement.

The Backup Servicer shall not be liable for any error of judgment made in good faith by an officer or officers of the Backup Servicer, unless it shall be conclusively determined by a court of competent jurisdiction that the Backup Servicer was grossly negligent in ascertaining the pertinent facts.

- 53 -

CSFB-00092206

Whenever in the administration of the provisions of this Agreement the Backup Servicer shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action to be taken hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of gross negligence or bad faith on the part of the Backup Servicer, be deemed to be conclusively proved and established by a certificate signed by one of the Servicer's officers, and delivered to the Backup Servicer and such certificate, in the absence of gross negligence or bad faith on the part of the Backup Servicer, shall be full warrant to the Backup Servicer of any action taken, suffered or omitted by it under the provisions of this Agreement upon the faith thereof.

The Backup Servicer, in its capacity as such, may consult with counsel and the advice or any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or opinion of counsel.

The Backup Servicer, in its capacity as such, shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement order, approval or other paper or document.

The Backup Servicer, in its capacity as such, may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees appointed with due care, and shall not be responsible for any willful misconduct or negligence on the part of any agent, attorney, custodian or nominee so appointed.

Section 4.19    Retention of Servicer.    OAC hereby covenants and agrees to act as Servicer under this Agreement for an initial term, commencing on the Closing Date and ending on the initial Payment Date, which term shall be extendible by the Class A Note Agent, acting at the direction of a majority of the Percentage Interests of the Notes, for successive monthly terms ending on each successive Payment Date (or, pursuant to revocable written standing instructions from time to time to OAC, for any specified number of terms greater than one).  Each such notice (including each notice pursuant to standing instructions, which shall be deemed delivered at the end of successive monthly terms for so long as such instructions are in effect) (a "Servicer Extension Notice") shall be delivered by the Class A Note Agent to the Servicer and shall be in substantially the form of Exhibit E hereto.  OAC hereby agrees that, as of the date hereof and upon its receipt of any such Servicer Extension Notice, OAC shall become bound, for the initial term beginning on the Closing Date and for the duration of the term covered by such notice, to continue as the Servicer subject to and in accordance with the other provisions of this Agreement.

Section 4.20    Advances by the Servicer.

Not later than the close of business on the Business Day prior to each Payment Date, the Servicer may, at its option, remit to the Indenture Trustee for deposit in the Note Account an amount to be distributed on such Payment Date pursuant to Section 3.2, equal to the amount due and payable on each Receivable through the related Payment Date, but not received as of the close of business on the last day of the related Collection Period or, with respect to any newly originated Receivable, interest accrued thereon for the period from the date of origination to the Due Date related to such Payment Date; such amount being defined herein as the "Delinquency

- 54 -

CSFB-00092207

Advance". Notwithstanding anything herein to the contrary, no Delinquency Advance shall be made hereunder if the Servicer determines in its good faith business judgment, that such Delinquency Advance would, if made, constitute a Nonrecoverable Advance.

Section 4.21  Servicing Advances.  If any Obligor is in default in the payment of premiums on its Standard Hazard Insurance Policy or Policies or if any Obligor is in default in the payment of personal property taxes or real estate taxes due in respect of its Manufactured Home or Mortgaged Property, the Servicer may pay such premiums or taxes out of its own funds. If any Obligor is in default in the payment of premiums on its Standard Hazard Insurance Policy or Policies and coverage is not provided in respect of the related Asset under a blanket policy maintained by the Servicer, or if any Obligor is in default in the payment of personal property taxes or real estate taxes due in respect of its Manufactured Home or Mortgaged Property, the Servicer may pay such premiums or taxes out of its own funds in a timely manner, as Servicing Advances, unless the Servicer, in its reasonable judgment, determines that any such Servicing Advance would be a Non-Recoverable Advance. In addition, the Servicer may pay in a timely manner, as Servicing Advances, any and all personal property taxes and real estate taxes due in respect of any Repo Property or REO Property it holds on behalf of the Issuer and all premiums for any Standard Hazard Insurance Policy maintained for such Repo Property or REO Property (except as similar coverage may be provided under a blanket policy maintained by the Servicer) unless the Servicer, in its reasonable judgment, determines that any such Servicing Advance would be a Non-Recoverable Advance.

Section 4.22  Recovery of Advances.  The Servicer shall be entitled to reimbursement for any Delinquency Advances or Servicing Advances made by it in respect of any Receivable out of subsequent collections in respect of the Receivables, including late collections from the related Obligor or from Insurance Proceeds, Liquidation Proceeds or a Loan Purchase Price recovered by it in respect of such Receivable ("Related Proceeds") and shall be entitled to reimburse itself for unreimbursed Delinquency Advances and Servicing Advances made that have become Non-Recoverable Advances in accordance with Section 3.2.

Section 4.23  Continuation of Servicing.  Upon any sale or other disposition of some or all of the Receivables by the Indenture Trustee following an Event of Default under the Indenture, if requested by the Indenture Trustee (acting at the direction of the Majority Noteholders) in writing, the Servicer will continue to service such Receivables in accordance with the terms hereof in consideration for continued payment of the Servicing Fee to the Servicer in accordance with the terms hereof.

**END OF ARTICLE IV**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092208

ARTICLE V

THE SELLER, THE DEPOSITOR, THE TRANSFEROR AND THE SERVICER

Section 5.1    Liability.  The Seller, the Depositor, the Transferor and the Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by the Seller, the Depositor or the Servicer, as the case may be herein.

Section 5.2    Merger or Consolidation.  Any Person into which the Depositor, the Transferor, the Seller or the Servicer may be merged or consolidated, or any Person resulting from any merger, conversion or consolidation to which the Depositor, the Transferor, the Seller or the Servicer shall be a party, or any Person succeeding to the business of the Depositor, the Transferor, the Seller or the Servicer shall be the successor of the Depositor, the Seller, the Transferor or the Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; *provided, however,* that the successor Servicer shall satisfy all the requirements of Section 6.2(a) with respect to the qualifications of a successor Servicer; *provided, further, however,* that the Majority Noteholders shall have consented in writing to any such merger or consolidation with respect to the Servicer or the Depositor; *provided, further, however,* that no such consent shall be required in order for OAC to merge into Oakwood Acceptance Corporation, LLC.  The Depositor, the Seller, the Transferor and the Servicer shall provide the Class A Note Agent with 30 days' prior notice of any such merger or consolidation.

Section 5.3    Limitation on Liability of the Servicer and Others.  Neither the Servicer, the Seller, the Depositor, the Transferor nor any of their respective directors or officers or employees or agents shall be under any liability to the Issuer, the Indenture Trustee, the Owner Trustee, the Certificateholders or the Owners for any action taken or for refraining from the taking of any action by such Person in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Seller, the Depositor or the Transferor or any of their respective directors or officers or employees or agents against any liability which would otherwise be imposed by reason of its willful misfeasance, bad faith or negligence in the performance of its duties hereunder or by reason of its reckless disregard of its obligations and duties hereunder and that this provision shall not protect the Servicer or any of their respective directors or officers or employees or agents against any liability which would otherwise be imposed by reason of its willful misfeasance, bad faith or gross negligence in the performance of its duties hereunder or by reason of its reckless disregard of its obligations and duties hereunder.  The Servicer and any director or officer or employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

Section 5.4    Servicer Not to Resign.  Subject to the provisions of Sections 4.19 and 5.2, the Servicer shall not resign from the obligations and duties hereby imposed on it except (i) upon determination that the performance of its obligations or duties hereunder are no longer permissible under applicable law or are in material conflict by reason of applicable law with any other activities carried on by it or its subsidiaries or Affiliates, the other activities of the Servicer so causing such a conflict being of a type and nature carried on by the Servicer or its subsidiaries

- 56 -

CSFB-00092209

or Affiliates at the date of this Agreement or (ii) the Servicer has proposed a successor servicer to the Indenture Trustee and the Owners in writing and such proposed successor servicer is reasonably acceptable to the Majority Noteholders; provided, however, that no such resignation by the Servicer shall become effective until such successor servicer or, in the case of (i) above, the Backup Servicer shall have assumed the Servicer's responsibilities and obligations hereunder or the Indenture Trustee shall have designated a successor servicer in accordance with Section 6.2. Any such resignation shall not relieve the Servicer of responsibility for any of the obligations specified in Sections 6.1 and 6.2 as obligations that survive the resignation or termination of the Servicer. Any such determination permitting the resignation of the Servicer pursuant to clause (i) above shall be evidenced by an Opinion of Counsel to such effect delivered to the Indenture Trustee.

Section 5.5    Delegation of Duties. In the ordinary course of business, the Servicer at any time may delegate any of its duties hereunder to any Person, including any of its Affiliates, who agrees to conduct such duties in accordance with standards comparable to those set forth in Section 4.1. Such delegation shall not relieve the Servicer of its liabilities and responsibilities with respect to such duties and shall not constitute a resignation within the meaning of Section 5.4. The Servicer shall provide the Indenture Trustee and the Backup Servicer with written notice prior to the delegation of any of its duties to any Person other than any of the Servicer's Affiliates or their respective successors and assigns.

Section 5.6    Indemnification of the Issuer by the Servicer.    The Servicer shall indemnify and hold harmless the Issuer, the Owners, the Custodian and the Indenture Trustee for the benefit of the Owners and their respective officers, directors, agents and employees from and against any loss, liability, expense, damage or injury suffered or sustained by reason of the Servicer's willful misfeasance, bad faith or gross negligence in the performance of its activities in servicing or administering the Receivables pursuant to this Agreement, including, but not limited to, any judgment, award, settlement, reasonable fees of counsel of its selection and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim related to the Servicer's willful misfeasance, bad faith or gross negligence. Any such indemnification shall not be payable from the assets of the Issuer. The provisions of this indemnity shall run directly to and be enforceable by an injured party subject to the limitations hereof. The provisions of this Section 5.6 shall survive termination of the Agreement or the earlier of the resignation or removal of the Indenture Trustee. To the Extent not paid in accordance with Article VIII of the Trust Agreement, the Seller shall be secondarily liable for amounts owing under such Article VIII.

ARTICLE VI

DEFAULT

Section 6.1    Servicer Termination Events.

(a)    If any one of the following events ("Servicer Termination Events") shall occur and be continuing:

(i) The failure by the Servicer to deposit in the Note Account any deposit required to be made by it under the terms of this Agreement which continues

- 57 -

CSFB-00092210

unremedied for a period of one Business Day after the date upon which such deposit is required to be made; or

(ii) The failure by the Servicer duly to observe or perform, in any material respect, any other covenants, obligations or agreements of the Servicer as set forth in this Agreement, which failure continues unremedied for a period of 30 days, after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or to the Servicer and the Indenture Trustee by any holder of a Note evidencing an aggregate undivided interest in the Notes of a Percentage Interest of at least 25%; or

(iii) The entry against the Servicer or the Seller (if an Affiliate of the Servicer) of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a trustee, conservator, receiver or liquidator in any insolvency, conservatorship, receivership, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs and the failure of such decree or order to be discharged or stayed for 60 days; or

(iv) The Servicer or the Seller (if an Affiliate of the Servicer) shall voluntarily go into liquidation, consent to the appointment of a conservator or receiver or liquidator or similar person in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or the Seller or of or relating to all or substantially all of its property, or the Servicer or the Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(v) So long as the Seller is the Servicer, any failure of the Seller to repurchase any Receivable as required by Section 2.4; or

(vi) Either of the Servicer or the Depositor shall consolidate or merge with or into any other Person other than as contemplated in Section 5.2.; or

(vii) Any default of a payment or performance obligation under any other loan facility, debt instrument or any similar financing arrangement (such facility, instrument or financing arrangement to be an obligation of $10,000,000 or greater) of the Servicer and the lapse of all relevant grace periods thereunder if the effect of the default is to cause, or permit the holders of such obligation to cause, such loan facility, debt instrument or any similar financing arrangement to become due and payable; or

(viii) At any time after September 30, 2001 OHC shall not have in full force and effect a working capital borrowing facility with a commitment termination date after the Final Addition Date and in an amount greater than or equal to $75,000,000 and in form and substance satisfactory to the Class A Note

- 58 -

CSFB-00092211

Agent or OHC shall default in the performance of its covenants (other than its covenant to pay principal and interest) under such working capital borrowing facility; or

(ix) There shall have occurred any material adverse change in the operations of the Servicer since September 30, 2000, or any other event shall have occurred which materially affects the Servicer's ability to either collect the Receivables or to perform under this Agreement; or

(x) The Indenture Trustee shall not have delivered a Servicer Extension Notice pursuant to Section 4.19.

(b)    then, and in each and every such case, so long as a Servicer Termination Event shall not have been remedied within the applicable grace period, the Indenture Trustee shall, at the direction of the Majority Noteholders, by notice then given in writing to the Servicer, terminate all of the rights and obligations of the Servicer as servicer under this Agreement. Any such notice to the Servicer shall also be given to the Seller, the Issuer, the Depositor and the Backup Servicer. On or after the receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Notes or the Receivables or otherwise, shall pass to and be vested in the Backup Servicer pursuant to and under this Section; and, without limitation, the Backup Servicer is hereby authorized and empowered to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement of each Receivable and related documents or otherwise. The Servicer agrees to cooperate with the Backup Servicer in effecting the termination of the responsibilities and rights of the Servicer hereunder, including, without limitation, the transfer to the Backup Servicer for the administration by it of all cash amounts that shall at the time be held by the Servicer and to be deposited by it in the Note Account, or that have been deposited by the Servicer in the Note Account or thereafter received by the Servicer with respect to the Receivables.    All reasonable costs and expenses (including attorneys' fees) incurred in connection with transferring the Files to the successor servicer and amending this Agreement to reflect such succession as servicer pursuant to this Section shall be paid by the Servicer (or if the Servicer is the Backup Servicer, the initial Servicer) upon presentation of reasonable documentation of such costs and expenses.

Section 6.2    Trustee to Act: Appointment of Successor.

(a)    On and after the time the Servicer receives a notice of termination pursuant to Section 6.1 or 5.4, the Backup Servicer shall be the successor in all respects to the Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms and provisions hereof arising on and after its succession.    As compensation therefor, the Backup Servicer shall be entitled to such compensation as the Servicer would have been entitled to hereunder if no such notice of termination had been given. Notwithstanding the above, if the Backup Servicer is legally unable so to act, the Indenture Trustee shall appoint or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, bank or other mortgage loan or

- 59 -

CSFB-00092212

contract servicer having a net worth of not less than $50,000,000 as the successor to the Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Servicer hereunder. In the event that The Chase Manhattan Bank, as Backup Servicer, is legally unable to act as Servicer under this Agreement and another entity is appointed as successor servicer under this Section, The Chase Manhattan Bank shall have no further obligation to perform the obligations of Servicer or Backup Servicer under this Agreement.  Pending appointment of a successor to the Servicer hereunder, unless the Backup Servicer is prohibited by law from so acting, the Backup Servicer shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the successor shall be entitled to receive compensation out of payments on Receivables in an amount equal to the compensation which the Servicer would otherwise have received pursuant to Section 4.8 (or such lesser compensation as the Indenture Trustee and such successor shall agree).  The appointment of a successor servicer shall not affect any liability of the Servicer which may have arisen under this Agreement prior to its termination as Servicer, to pay any deductible under an insurance policy pursuant to Section 4.5 or to indemnify the Indenture Trustee pursuant to Section 5.6, nor shall any successor servicer be liable for any acts or omissions of the Servicer or for any breach by the Servicer of any of its representations or warranties contained herein or in any related document or agreement.  The Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

(b)  Any successor, including the Backup Servicer, to the Servicer as servicer shall during the term of its service as servicer (i) continue to service and administer the Receivables for the benefit of the Issuer and the Indenture Trustee, for the benefit of the Owners, and (ii) maintain in force a policy or policies of insurance covering errors and omissions in the performance of its obligations as Servicer hereunder and a fidelity bond in respect of its officers, employees and agents to the same extent as the Servicer is so required pursuant to Section 4.5.

Section 6.3    Waiver of Defaults.  The Owners of a majority of the Percentage Interests of the Notes (the "Majority Noteholders") may, on behalf of all Owners, waive any events permitting removal of the Servicer as servicer pursuant to this Article VI, provided, however, that the Majority Noteholders may not waive a default in making a required distribution on a Note without the consent of the Owner of such Note. Upon any waiver of a past default, such default shall cease to exist and any Servicer Termination Event arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereto except to the extent expressly so waived.

Section 6.4    Notification to Owners.  Upon any termination or appointment of a successor to the Servicer pursuant to this Article VI or Section 5.4, the Indenture Trustee shall give prompt written notice thereof to the Owners at their respective addresses appearing in the Register.

Notwithstanding anything else herein to the contrary, in no event shall the Indenture Trustee or the Backup Servicer be liable for any servicing fee or for any differential in the amount of the servicing fee paid hereunder and the amount necessary to induce any successor Servicer to act as successor Servicer under this Agreement and the transactions set forth or provided for herein.

- 60 -

CSFB-00092213

**END OF ARTICLE VI**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092214

# ARTICLE VII

## TERMINATION

Section 7.1    <u>Termination</u>.  This Agreement will terminate upon notice to the Indenture Trustee of the later of (i) the satisfaction and discharge of the Indenture pursuant to Section 4.1 of the Indenture or (ii) the disposition of all funds with respect to the last Receivable and the remittance of all funds due hereunder and the payment of all amounts due and payable to the Indenture Trustee, the Custodian, the Owner Trustee and the Issuer.

**END OF ARTICLE VII**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092215

ARTICLE VIII

MISCELLANEOUS

Section 8.1    Acts of Owners.    Except as otherwise specifically provided herein, whenever Owner action, consent or approval is required under this Agreement, such action, consent or approval shall be deemed to have been taken or given on behalf of, and shall be binding upon, all Owners if the Majority Noteholders agree to take such action or give such consent or approval.

Section 8.2    Recordation of Agreement.    To the extent permitted by applicable law, this Agreement, or a memorandum thereof if permitted under applicable law, is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the Owners' expense on direction of the Majority Noteholders, but only when accompanied by an opinion of counsel to the effect that such recordation materially and beneficially affects the interests of the Owners or is necessary for the administration or servicing of the Receivables.

Section 8.3    Duration of Agreement.    This Agreement shall continue in existence and effect until terminated as herein provided.

Section 8.4    Successors and Assigns.    All covenants and agreements in this Agreement by any party hereto shall bind its successors and assigns, whether so expressed or not.

Section 8.5    Severability.    In case any provision in this Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 8.6    Governing Law; Submission to Jurisdiction.

(a)    This Agreement and each Note shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.

(b)    The parties hereto hereby irrevocably submit to the jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it or in connection with this Agreement or any of the related documents or the transactions contemplated hereunder or for recognition or enforcement of any judgment, and the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York State court or, to the extent permitted by law, in such federal court. The parties hereto agree that a final judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any

- 63 -

CSFB-00092216

claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(c)    Nothing contained in this Agreement shall limit or affect the right of the Depositor, the Transferor, the Issuer, the Seller or the Servicer or third-party beneficiary hereunder, as the case may be, to start legal proceedings relating to any of the Receivables against any Obligor in the courts of any jurisdiction.

Section 8.7    Counterparts.    This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 8.8    Amendment.    The Indenture Trustee, the Custodian, the Depositor, the Issuer, the Seller and the Servicer, may at any time and from time to time, with the prior written consent of the Majority Noteholders, amend this Agreement, and the Indenture Trustee shall consent to the amendment for the purposes of (i) curing any ambiguity, (ii) correcting or supplementing any provisions of this Agreement which are inconsistent with any other provisions of this Agreement or adding provisions to this Agreement which are not inconsistent with the provisions of this Agreement, or (iii) adding any other provisions with respect to matters or questions arising under this Agreement. Notwithstanding anything to the contrary, no such amendment shall (A) change in any manner the amount of, or delay the timing of, payments which are required to be distributed to any Owner without the consent of the Owner of such Note or (B) change the percentages of Percentage Interest which are required to consent to any such amendments, without the consent of the Owners of all Notes then outstanding.

Prior to the execution of any amendment to this Agreement, the Indenture Trustee and the Backup Servicer shall be entitled to receive and conclusively rely upon an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Agreement and that all conditions precedent to such execution and delivery have been satisfied. The Indenture Trustee and the Backup Servicer may, but shall not be obligated to enter into any such amendment which affects the Indenture Trustee's and the Backup Servicer's own rights, duties or immunities under this Agreement.

Section 8.9    Specification of Certain Tax Matters.    Each Owner shall provide the Indenture Trustee with a completed and executed Form W-8IMY, W-9, W-8EXP, W-8ECI or W-8BEN (or any successor form), as applicable, prior to purchasing a Note. The Indenture Trustee shall comply with all requirements of the Code, and applicable state and local law, with respect to the withholding from any distributions made to any Owner of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

Section 8.10    Notices.    Except as provided below, all communications and notices provided for hereunder shall be in writing (including bank wire, telex, telecopy or electronic facsimile transmission or similar writing) and shall be given to the other party at its address or telecopy number set forth below or at such other address or telecopy number as such party may

- 64 -

CSFB-00092217

hereafter specify for the purpose of notice to such party. All notices hereunder shall be given as follows, until any superseding instructions are given to all other Persons listed below:

The Indenture Trustee
Backup Servicer                 The Chase Manhattan Bank
                                450 West 33rd Street
                                New York, NY 10001
                                Attention: Institutional Trust Services
                                Telecopier No.:

Custodian:                      The Chase Manhattan Bank
                                1111 Fannin Street, 12th floor
                                Houston, TX 77002
                                Attention: Custody Manager
                                Telecopier No.: 713-427-6420

The Issuer:                     OMI Note Trust 2001-A
                                c/o Wilmington Trust Company
                                Rodney Square North
                                1100 N. Market Street
                                Wilmington, DE 19890
                                Attention: Corporate Trust Administration/
                                  OMI Note Trust 2001-A
                                Telecopier No.: (302) 651-8882

The Depositor:                  Oak Leaf Holdings, LLC
                                7800 McCloud Road
                                Greensboro, NC 27425-7081
                                Attention: Treasurer
                                Telecopier No.: (336) 664-3224

The Transferor:                 Ginkgo Corporation
                                c/o Lord Securities Corporation
                                Two Wall Street, 7th floor
                                New York, NY 10005
                                Attention: Dwight Jenkins
                                Telecopier No.: (212) 346-9012

The Servicer
and Seller:                     Oakwood Acceptance Corporation
                                7800 McCloud Road
                                Greensboro, NC 27425-7081
                                Attention: Treasurer
                                Telecopier No.: (336) 664-3224

Section 8.11  Benefits of Agreement.  Nothing in this Agreement or in the Notes, expressed or implied, shall give to any Person, other than the Owners, the Owner Trustee and the parties hereto and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Agreement.

- 65 -

CSFB-00092218

Section 8.12   Legal Holidays.  In any case where the date of any Payment Date, any other date on which any distribution to any Owner is proposed to be paid, or any date on which a notice is required to be sent to any Person pursuant to the terms of this Agreement shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Agreement) payment or mailing need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made or mailed on the nominal date of any such Payment Date, or such other date for the payment of any distribution to any Owner or the mailing of such notice, as the case may be, and no interest shall accrue for the period from and after any such nominal date, provided such payment is made in full on such next succeeding Business Day.

Section 8.13   No Petition.  The Indenture Trustee, the Custodian, the Depositor, the Seller and the Servicer, by entering into this Agreement, and each Owner, by accepting a Note, hereby covenant and agree that they will not institute against the Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Agreement or any of the Operative Documents for one year and one day after the payment in full of the Notes.

Section 8.14   Limitation of Liability of Owner Trustee.  Notwithstanding anything contained herein or in any other Operative Document to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as Owner Trustee, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuer is made and intended not as a personal representation, undertaking or agreement by Wilmington Trust Company but is made and intended for the purpose for binding only the Issuer and the Trust Estate, and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Agreement or any other related documents.

**END OF ARTICLE VIII**

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092219

IN WITNESS WHEREOF, the Issuer, the Depositor, the Seller, the Servicer, the Backup Servicer, the Custodian and the Indenture Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the day and year first above written.

OMI NOTE TRUST 2001-A

By:    Wilmington Trust Company, not
       individually, but solely in its capacity as
       Owner Trustee

By:    _____
Name:
Title:         JAMES P. LAWLER
                 Vice President

GINKGO CORPORATION,
       as Transferor

By:    _____
Name:  _____
Title: _____

OAK LEAF HOLDINGS, LLC,
       as Depositor

By:    _____
Name:  _____
Title: _____

OAKWOOD ACCEPTANCE CORPORATION,
as Seller and Servicer

By:    _____
Name:  _____
Title: _____

- S-1 -

STATE OF _____ **Delaware** _____ )
                                                    : ss.:
COUNTY OF _____ **New Castle** _____ )

BEFORE ME, the undersigned authority, a Notary Public in and for said county and state, on this day personally appeared **James P. Lawler** known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Wilmington Trust Company, not in its individual capacity, but solely as Owner Trustee on behalf of OMI Note Trust 2001-A, a Delaware business trust, and that such person executed the same as the act of said business trust for the purpose and consideration therein expressed, and in the capacities therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 8 day of February, 2001.

_Leigh Ermi_
_____
Notary Public in and for the State of __Delaware__
(Seal)

My commission expires:
**LEIGH ERMI**
**NOTARY PUBLIC**
**My Commission Expires August 1, 2002**

- N-1 -

CSFB-00092221

IN WITNESS WHEREOF, the Issuer, the Depositor, the Seller, the Servicer, the Backup Servicer, the Custodian and the Indenture Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the day and year first above written.

OMI NOTE TRUST 2001-A

By:    Wilmington Trust Company, not
individually, but solely in its capacity as
Owner Trustee

By:    _____
Name:  _____
Title:   _____

GINKGO CORPORATION,
    as Transferor

By:    _____
Name:  Albert J. Fioravanti
Title:   Vice President

OAK LEAF HOLDINGS, LLC,
    as Depositor

By:    _____
Name:  _____
Title:   _____

OAKWOOD ACCEPTANCE CORPORATION,
as Seller and Servicer

By:    _____
Name:  _____
Title:   _____

- S-1 -

CSFB-00092222

STATE OF    NEW YORK          )
                             : ss.:
COUNTY OF NEW YORK           )


On the _16th_ day of February, 2001, before me, a notary public in and for the State of New York, personally appeared Albert J. Fioravanti, known to me who, being by me duly sworn, did depose and say that he resides at Two Wall Street, New York, NY 10005; that he is Vice President of Ginkgo Corporation, a Delaware corporation; one of the parties that executed the foregoing instrument; that he knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

                                        Dwight Jenkins
                                        Notary Public


Notary Public, State of New York
My Commission Expires:

DWIGHT JENKINS
NOTARY PUBLIC, State of New York
No. 02JE5074297
Qualified in New York County
Commission Expires March 10, _03_

- N-4 -

IN WITNESS WHEREOF, the Issuer, the Depositor, the Seller, the Servicer, the Backup Servicer, the Custodian and the Indenture Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the day and year first above written.

OMI NOTE TRUST 2001-A

By:   Wilmington Trust Company, not individually, but solely in its capacity as Owner Trustee

By: _____
Name: _____
Title: _____

GINKGO CORPORATION,
    as Transferor

By: _____
Name: _____
Title: _____

OAK LEAF HOLDINGS, LLC,
    as Depositor
By: *Oakwood Capital Corp., Member*

By: _____
Name: Douglas R. Muir
Title:   Assistant Secretary

OAKWOOD ACCEPTANCE CORPORATION,
as Seller and Servicer

By: _____
Name: ~~Douglas~~ R. Muir
Title:   Vice President

- S-1 -

STATE OF NORTH CAROLINA    )
                                               : ss.:
COUNTY OF GUILFORD         )

On the *16th* day of February, 2001, before me, a notary public in and for the State of North Carolina, personally appeared Douglas R. Muir, known to me who, being by me duly sworn, did depose and say that he resides at 7800 McCloud Road, Greensboro, North Carolina; that he is Assistant Secretary of Oakwood Capital Corp., member of Oak Leaf Holdings, LLC, a Delaware limited liability company, one of the parties that executed the foregoing instrument; that he knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the members or board of managers of said company; and that he signed his name thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

> OFFICIAL SEAL
> DENA E. BAILEY
> Notary Public - North Carolina
> COUNTY OF GUILFORD
> My Commission Expires _____

*Dena E. Bailey*
Notary Public

Notary Public, State of *NC*
My Commission Expires: *11-30-05*

- N-7 -

CSFB-00092225

STATE OF NORTH CAROLINA )
                        ): ss.:
COUNTY OF GUILDORD      )

   On the _16th_ day of February, 2001, before me, a notary public in and for the State of North Carolina, personally appeared Douglas R. Muir, known to me who, being by me duly sworn, did depose and say that he resides at 7800 McCloud Road, Greensboro, North Carolina; that he is Vice President of Oakwood Acceptance Corporation, a North Carolina corporation, one of the parties that executed the foregoing instrument; that he knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

OFFICIAL SEAL
DENA E. BAILEY
Notary Public - North Carolina
COUNTY OF GUILFORD
My Commission Expires

_Dena E. Bailey_
Notary Public

Notary Public, State of _NC_
My Commission Expires: _11-30-05_

- N-3 -

THE   CHASE   MANHATTAN   BANK,   as
Backup Servicer, Indenture Trustee, and Custodian

By: _____

Name:  Craig M. Kantor
Title:   Vice President

- S-2 -

CSFB-00092227

STATE OF New York)

                : ss.:

COUNTY OF New York)


On the 8 day of February, 2001, before me, a notary public in and for the State of New York, personally appeared Craig M. Kantor, known to me who, being by me duly sworn, did depose and say that he resides at 13 Fieldstone Drive, Livingston, NJ 07039; that he is a Vice President of The Chase Manhattan Bank, a New York banking corporation; one of the parties that executed the foregoing instrument; that he/she knows the seal of said company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he/she signed his/her name thereto by like order..

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

NOTARIAL SEAL

_____
Notary Public

Notary Public, State of New York
My Commission Expires: August 7, 2002

- N-6 -

CSFB-00092228

- I-1 -

T:\Corp\dto\csuis535\ssa__V17.doc

CSFB-00092229

## SCHEDULE I

## SCHEDULE OF RECEIVABLES

A copy of this Schedule is maintained by the Indenture Trustee at the Corporate Trust Office.

- I-1 -

CSFB-00092230

## SCHEDULE II

### LOCK-BOX BANK

First Union National Bank Account Numbers

2000000733346 and 2000000733605

- II-1 -

CSFB-00092231

# EXHIBIT A

## FORM OF MONTHLY REPORT

- A-1 -

CSFB-00092232

**EXHIBIT B**

_____

February 20, 2001

[Indenture Trustee]

[address]

Re:    OMI Note Trust 2001-A Asset Backed Notes,
       Series 2001-A

Ladies and Gentlemen:

      This is to advise you that the officers listed on the attached schedule are Servicing Officers as such term is defined in Article I of the Sale and Servicing Agreement, dated as of February 9, 2001 (the "Agreement"), among you, as Indenture Trustee, Backup Servicer and Custodian, OMI Note Trust 2001-A, as Issuer, Ginkgo Corporation, as Transferor, Oak Leaf Holdings, LLC, as Depositor, and the undersigned, as Seller and Servicer and relating to the above-referenced Notes, and such officers are authorized to take all action and sign all documents described in the Agreement. The list of Servicing Officers may be amended from time to time by delivery to you of an amended schedule.

                        Very truly yours,

                        _____

                        By:    _____
                        Name: _____
                        Title:  _____

- B-1 -

CSFB-00092233

## LIST OF SERVICING OFFICERS

February 9, 2001

| Name | Title | Signature |
|------|-------|-----------|
|      |       | _____ |
|      |       | _____ |
|      |       | _____ |
|      |       | _____ |

- B-2 -

CSFB-00092234

Exhibit D

FORM OF LIEN RELEASE

_____, 20__

OMI Note Trust 2001-A
c/o Wilmington Trust Company
Rodney Square North
1100 N. Market Street
Wilmington, DE 19890
Attention: Corporate Trust Administration/
  OMI Note Trust 2001-A
Telecopier No.: (302) 651-8882


Oakwood Acceptance Corporation
7800 McCloud Road
Greensboro, NC 27425-7081


Oak Leaf Holdings, LLC
7800 McCloud Road
Greensboro, NC 27425-7081

The Chase Manhattan Bank,
  as Custodian under the Custodial Agreement
  referred to below
450 West 33rd Street
New York, NY 10001

Ladies and Gentlemen:


      Reference is hereby made to (1) the Indenture (as such agreement may be amended, restated, supplemented or modified from time to time, the "Agreement"), dated as of February 9, 2001, between OMI Note Trust 2001-A (the "Issuer") and the undersigned Indenture Trustee, and (2) the Custodial Agreement, dated as of February 9, 2001, among the Issuer , the Note Agent, Oakwood Acceptance Corporation and The Chase Manhattan Bank, as custodian (in such capacity, the "Custodian") and Indenture Trustee, and the other persons from time to time parties thereto.

      The undersigned, as the Indenture Trustee, hereby confirms that it consents to the release from the security interest created by the Agreement relating to the Contracts and Mortgage Loans identified on the schedule attached hereto (the "Released Receivables").


- D-1 -

T:\Corp\dio\csuis535\ssa__V17.doc

CSFB-00092235

In accordance with section 3 of the Custodial Agreement, the undersigned hereby releases the Released Receivables, as well as all related Documents and all proceeds of such Released Receivables and Documents, and any other documents, rights or items of property relating to the Released Receivables heretofore included in the collateral covered by the Agreement, from the security interest that was granted in such items of Collateral to the Indenture Trustee pursuant to the Agreement, and that, from the date of delivery of this letter to you in accordance with the terms of the Custodial Agreement henceforward, such Contracts and Mortgage Loans do not and shall not constitute Contracts and Mortgage Loans held under the provisions of the Custodial Agreement. Notwithstanding anything herein to the contrary, in the event this letter hereinabove refers to the Released Receivables as those identified on schedule attached hereto, and such schedule is not so attached, this release is without effect and such Released Receivables remain subject to the security interest granted under the Agreement unless and until such a schedule is prepared and attached hereto.

In addition, notwithstanding (1) the UCC-1 Financing Statement filed on _____, 2001 with the North Carolina Secretary of State bearing file number _____, (2) the UCC-1 Financing Statement filed on _____, 2001 with the Guilford County, North Carolina Register of Deeds bearing file number _____, (3) the UCC-1 Financing Statement filed on _____, 2001 with the New York Secretary of State bearing file number _____, (4) the UCC-1 Financing Statement filed on _____, 2001 with the New York County, New York bearing file number _____, (5) the UCC-1 Financing Statement filed on _____, 2001 with the North Carolina Secretary of State bearing file number _____, (6) the UCC-1 Financing Statement filed on _____, 2001 with the Guilford County, North Carolina Register of Deeds bearing file number _____, (7) the UCC-1 Financing Statement filed on _____, 2001 with the Delaware Secretary of State bearing file number _____, (8) the UCC-1 Financing Statement filed on _____, 2001 with the North Carolina Secretary of State bearing file number _____, (9) the UCC-1 Financing Statement filed on _____, 2001 with the Guilford County, North Carolina Register of Deeds bearing file number _____, and (10) the UCC-1 Financing Statement filed on _____, 2001 with the Delaware Secretary of State bearing file number _____, (collectively with any further financing statements filed relating to such UCC-1 Financing Statements, the "Financing Statements"), the undersigned, as secured party or assignee of the secured party pursuant to each of the Financing Statements, acknowledges that neither the Released Receivables, nor any document or collateral relating to any of such Released Receivables, is now or hereafter will be collateral subject to any of the Financing Statements.

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement, or, if not defined therein, in the Custodial Agreement.

Sincerely yours,

_____, as Indenture Trustee

By: _____

Name: _____

- D-2 -

CSFB-00092236

Title: _____

- D-3 -

CSFB-00092237

Table of Contents

Page

SCHEDULE I          SCHEDULE OF RECEIVABLES
SCHEDULE II         CREDIT AND COLLECTION POLICY
SCHEDULE III        LOCK-BOX BANKS
SCHEDULE IV         TRADENAMES, ETC.
EXHIBIT A           FORM OF MONTHLY REPORT
EXHIBIT B           LIST OF SERVICING OFFICERS
EXHIBIT C           FORM OF BORROWING BASE CERTIFICATE
EXHIBIT D           FORM OF LIEN RELEASE
EXHIBIT E           FORM OF SERVICER EXTENSION NOTICE

i

CSFB-00092238

*EXHIBIT K*



**CREDIT SUISSE | FIRST BOSTON**

CREDIT SUISSE FIRST BOSTON CORPORATION

**Equity Research**

Americas                U.S./Housing/Manufactured Housing                June 11, 2001

# Manufactured Housing Industry Outlook

## Approaching Bottom of Cycle; Not Out of the Woods Yet

Ivy L. Zelman
1 212 325 2443
ivy.zelman@csfb.com

D. Andrew Shipman, CFA
1 212 325 2476
andrew.shipman@csfb.com

Carlos Ribeiro
1 212 325 3561
carlos.ribeiro@csfb.com

Jason Putman
1 216 766 5770
jason.putman@csfb.com

- The manufactured housing industry has experienced a dramatic, primarily self-inflicted downturn over the last several years. Since 1997, wholesale shipments are down 39% and new retail sales are down 28%. However, signs are emerging that may point to a bottom for the manufactured housing industry.

- On the positive side, new home retail inventories per outlet (UIPO) were down 17% in 1Q01 to the lowest point in this cycle. Wholesale shipments appear to be near trough levels at 214,000 LTM (170,700 units in 1991) and are nearing equilibrium with retail sales. Also, there is evidence that lenders are becoming more accommodating towards manufacturers, which reduces the probability of another major manufacturing bankruptcy in this downturn. Furthermore, delinquency rates are down sequentially, but still up year over year, and the securitization market is showing signs of support for manufacturers whose paper was once deemed too risky.

- On the other hand, the month's supply of inventory based on sales levels is actually increasing as retail sales continue to be weak year over year. Furthermore, we anticipate there will be more plant and retail closings in the industry as it continues to search for equilibrium. Finally, although delinquency rates were down sequentially, more than 7,000 repos are still coming in per month equating to approximately 27% of the sales volume. We attribute the sequential decline in delinquencies to the elimination of foreclosed loans and the refinancing delinquent loans.

- While we believe the industry may be nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of the downturn and the potential for more short term pain due to a further shakeout in retail outlets and continued inventory issues surrounding sales volume and repos. Therefore, given our belief that the stocks (up 36%) already reflect the notion that the industry is close to a bottom, we prefer to sit on the sidelines until we see evidence of reacceleration in demand.

## Investment Summary

The manufactured housing industry has experienced a dramatic downturn over the last several years. This period marks the fourth time in the last 30 years that the industry has experienced a significant downturn, as industry declines also occurred during 1973 – 1975, 1980 – 1981 and 1985 – 1992. However, unlike previous declines, this downturn was self-inflicted as manufactured housing companies expanded manufacturing capacity and retail distribution well beyond the demand of the market. Since 1997, when the industry experienced its first negative year-over-year comparison for wholesale shipments due to excess retail inventory, we have witnessed numerous plant and retail store closings. Wholesale shipments are down 39% and new retail sales are down 28% from 1997 levels. Repossessions have flooded the market and today make up an estimated 27% of the homes sold per month, mainly in lieu of new homes.

In this report, we discuss some positives that are emerging in the industry that suggest we may be at or nearing a bottom. On the positive side, new home retail inventories per outlet (UIPO) were down 17% in 1Q01 to the lowest point in this cycle. Wholesale shipments appear to be near trough levels at 214,000 LTM (170,700 units in 1991) and are nearing equilibrium with retail sales. Also, there is evidence that lenders are becoming more accommodating towards manufacturers which reduces the probability of another major manufacturing bankruptcy in this downturn. Furthermore, delinquency rates are down sequentially, but still up year over year, and the securitization market is showing signs of support for manufacturers whose paper was once deemed too risky

However, we also outline some ongoing industry negatives that suggest that the amount of time before we see reacceleration from the bottom is unknown. For example, the month's supply of inventory based on sales levels is actually increasing as retail sales continue to be weak year over year. In addition, we anticipate there will be more plant and retail closings in the industry as it continues to search for equilibrium. Finally, although delinquency rates were down sequentially, more than 7,000 repos are still coming in per month equating to approximately 27% of the sales volume. We attribute the sequential decline in delinquencies to the elimination of foreclosed loans and the refinancing delinquent loans. Furthermore, given that the downturn has been predominantly self inflicted, the industry hasn't felt the potential negative macro effects of a slowing economy which could place continued pressure on manufacturing and retail levels causing the industry to search for a new bottom.

While we believe the industry may be nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of the downturn and the potential for more short term pain due to a further shakeout in retail outlets and continued inventory issues surrounding sales volume and repos. Therefore, given our belief that the stocks (up 36%) already reflect the notion that the industry is close to a bottom, we prefer to sit on the sidelines until we see evidence of reacceleration in demand.

CSFB– 00050118

## Industry Positives

The manufactured housing industry continues to exhibit weakness due to high inventory levels, specifically surrounding repos and dealer failures, excess capacity, and the soft economy. However, some positive signs are emerging that indicate we may be nearing the bottom of the downturn.

- Wholesale shipments appear to be nearing trough levels experienced in previous cycles and are approaching equilibrium with demand.

- Major industry players continue to decrease their new unit inventories per outlet (UIPO) dramatically to the lowest levels in this cycle amidst a weak overall economic environment.

- Delinquency rates were down sequentially in the first quarter across the board.

- Lenders appear to be working closely with companies to keep them from defaulting on their loans leading us to believe that a large, detrimental bankruptcy can be avoided.

- The financial markets appear to be loosening their credit standards and the securitization market is showing signs of support.

While these signs may indicate the industry is nearing a bottom, there is no indication that the industry is turning upwards at this point or how long the downturn might last. Nevertheless, there are several positives mentioned above which we will now detail.

### Wholesale Shipments at Lowest Point In Cycle

Wholesale shipments for the latest twelve months ended April were 214,900 homes, 42% below peak shipments in 1997 of 372,000 homes and 22% below the median shipment level of 274,766 homes. (See Chart 1) Year to date shipments through April were 51,345 homes, which is down 38.3% from the same period in 2000 as detailed in Table 1. If we assume a similar decrease for the remainder of 2001, we estimate that annual shipments will approach 160,000 homes, a level 6% below the last cycle's trough shipment level of 170,700 homes (1991). If you apply the same logic to current retail sales figures, which are down 38.8% year to date (see Table 2), we estimate that retail sales could be 155,000 homes for the year. While not quite in equilibrium, the industry is getting closer than it has been during this downturn in the cycle. At the peak in 1998 and 1999, shipments were outpacing new home sales by 11%. We would point out that for both manufacturing shipments and retail sales, the comparisons get easier in the second half of the year, so we believe the numbers mentioned would be very conservative.

CSFB– 00050119

**Chart 1**
**Trailing Twelve Months Housing Shipments, Dec 1970 through April 2001**



Source: Manufactured Housing Institute, CSFB.

Given that the shipment numbers are approaching equilibrium with retail sales, i.e. the industry is getting close to producing what it sells per year, one of two things need to happen in order for inventory levels to shrink and demand for shipments to accelerate. Either retail sales need to accelerate ahead of shipment levels or the manufacturing companies need to scale back production to below retail sales levels. It is not clear which of these will occur first; however, it appears the industry is near trough shipments which we believe is a positive sign that we are nearing the bottom of this cycle.

***Inventories Hit New Lows***

The companies under coverage have continued to reduce their inventory levels, measured by the number of new units per store, to their lowest point thus far in the cycle. According to the Census Bureau, 103,800 homes were in retail inventory as of February (the latest available data), which is down 17% from the peak inventory level for the industry of 125,500 homes in February 2000. On average, the number of new units per sales center for the companies under coverage decreased 17% during 1Q01 versus 1Q00. UIPO for CMH declined 15% YOY to 16.0 homes from 18.8 homes. Sequentially, UIPO for CMH declined 8% and is 26% less than peak UIPO of 22 units. UIPO for CHB decreased 7% to 18 homes from 19.3 homes a year ago. CHB has maintained the current inventory level of 18 new homes per center for the past four quarters. OH's UIPO decreased 29% YOY to 21.1 homes versus 29.6 homes. This level represents a decrease of 5% and 45% for sequential and peak UIPO, respectively

Although these companies have continued to reduce their inventory levels substantially, they have experienced decreasing average new unit sales per store of 24% and increasing inventory days outstanding of 11%. Charts 7-12 beginning on page 20 show the historical values for UIPO, inventory days outstanding and average new sales per center (ANSC) for the companies under coverage. Also, Tables 3, 5 and 7 provide the supporting numerical information for those charts.

CSFB– 00050120

Manufactured Housing: Industry Outlook – June 2001    CREDIT SUISSE | FIRST BOSTON

**Table 1**
**Manufactured Housing Shipments and Floor Shipments, 1980 through April 2001**

| | Home Shipments | | | | Home Shipments Mix | | Floor Shipments* | |
|---|---|---|---|---|---|---|---|---|
| | Singles | Multis | Total | YOY % | Singles | Multis | Floors | YOY % |
| Apr-01 YTD | 14,435 | 42,910 | 57,345 | -38.3% | 24% | 76% | 101,705 | -35.4% |
| Apr-01 | 4,106 | 11,609 | 15,715 | -30.7% | 26% | 74% | 27,702 | -27.8% |
| Mar-01 | 4,013 | 12,097 | 16,110 | -38.8% | 25% | 75% | 28,613 | -35.5% |
| Feb-01 | 3,318 | 9,808 | 13,124 | -42.5% | 25% | 75% | 23,229 | -40.0% |
| Jan-01 | 2,998 | 9,398 | 12,396 | -41.5% | 24% | 76% | 22,161 | -38.5% |
| Dec-00 | 2,774 | 8,788 | 11,562 | -47.1% | 24% | 76% | 20,672 | -44.1% |
| Nov-00 | 5,389 | 14,569 | 19,958 | -22.3% | 27% | 73% | 34,980 | -18.2% |
| Oct-00 | 5,097 | 14,117 | 19,214 | -32.0% | 27% | 73% | 33,783 | -29.6% |
| Sep-00 | 6,946 | 17,388 | 24,334 | -15.7% | 29% | 71% | 42,241 | -13.4% |
| Aug-00 | 6,665 | 16,972 | 23,637 | -23.8% | 28% | 72% | 41,123 | -20.7% |
| Jul-00 | 5,345 | 12,736 | 18,081 | -32.5% | 30% | 70% | 31,285 | -30.8% |
| Jun-00 | 7,315 | 17,115 | 24,430 | -25.7% | 30% | 70% | 42,105 | -23.5% |
| May-00 | 7,682 | 17,101 | 24,783 | -20.7% | 31% | 69% | 42,405 | -16.4% |
| Apr-00 | 7,430 | 15,232 | 22,662 | -31.8% | 33% | 67% | 38,370 | -30.0% |
| Mar-00 | 8,804 | 17,537 | 26,341 | -23.6% | 33% | 67% | 44,308 | -21.2% |
| Feb-00 | 7,351 | 15,455 | 22,806 | -20.7% | 32% | 68% | 38,713 | -18.7% |
| Jan-00 | 6,808 | 14,372 | 21,180 | -20.9% | 32% | 68% | 36,059 | -19.2% |
| Dec-99 | 7,137 | 14,712 | 21,849 | -19.8% | 33% | 67% | 36,997 | -18.2% |
| Nov-99 | 9,129 | 16,546 | 25,675 | -14.7% | 36% | 64% | 42,763 | -14.0% |
| Oct-99 | 9,284 | 18,955 | 28,239 | -19.7% | 33% | 67% | 47,985 | -17.8% |
| Sep-99 | 9,815 | 19,260 | 29,075 | -11.7% | 33% | 67% | 48,786 | -9.6% |
| Aug-99 | 10,638 | 20,252 | 30,890 | -5.1% | 34% | 66% | 51,827 | -3.1% |
| Jul-99 | 9,074 | 17,725 | 26,799 | -13.8% | 34% | 66% | 45,205 | -10.9% |
| Jun-99 | 11,525 | 21,362 | 32,887 | -2.0% | 35% | 65% | 55,054 | 0.5% |
| May-99 | 11,861 | 19,382 | 31,243 | -0.5% | 38% | 62% | 50,698 | -0.3% |
| Apr-99 | 12,266 | 20,882 | 33,148 | -0.4% | 37% | 63% | 54,799 | 1.8% |
| Mar-99 | 12,904 | 21,301 | 34,205 | 7.5% | 38% | 62% | 56,319 | 10.3% |
| Feb-99 | 10,652 | 18,118 | 28,770 | 4.4% | 37% | 63% | 47,640 | 6.1% |
| Jan-99 | 9,534 | 17,250 | 26,784 | 1.6% | 36% | 64% | 44,601 | 4.2% |
| 2000 | 77,606 | 181,382 | 258,988 | -25.9% | 30% | 70% | 446,124 | -23.4% |
| 1999 | 123,619 | 225,745 | 349,364 | -4.3% | 35% | 65% | 582,674 | -4.3% |
| 1998 | 144,328 | 228,515 | 372,843 | 5.5% | 39% | 61% | 608,922 | 7.8% |
| 1997 | 148,809 | 204,568 | 353,377 | -2.8% | 42% | 58% | 565,102 | 1.0% |
| 1996 | 173,674 | 189,737 | 363,411 | 7.0% | 48% | 52% | 559,288 | 9.9% |
| 1995 | 173,785 | 165,816 | 339,601 | 12.0% | 51% | 49% | 508,733 | 12.2% |
| 1994 | 156,171 | 147,161 | 303,332 | 19.3% | 51% | 49% | 453,436 | 20.4% |
| 1993 | 134,440 | 119,836 | 254,276 | 20.8% | 53% | 47% | 376,509 | 20.9% |
| 1992 | 112,117 | 98,670 | 210,787 | 23.5% | 53% | 47% | 311,430 | 23.6% |
| 1991 | 91,050 | 79,663 | 170,717 | -9.3% | 53% | 47% | 251,969 | -9.9% |
| 1990 | 98,585 | 89,587 | 188,172 | -5.1% | 52% | 48% | 279,551 | -5.3% |
| 1989 | 103,347 | 94,907 | 198,254 | -9.2% | 52% | 48% | 295,059 | -6.7% |
| 1988 | 122,416 | 96,013 | 218,429 | -6.1% | 56% | 44% | 316,362 | -3.5% |
| 1987 | 139,134 | 93,464 | 232,598 | -4.9% | 60% | 40% | 327,931 | -2.9% |
| 1986 | 153,423 | 91,237 | 244,660 | -13.7% | 63% | 37% | 337,722 | -10.9% |
| 1985 | 189,778 | 93,711 | 283,489 | -3.9% | 67% | 33% | 379,074 | -1.2% |
| 1984 | 206,226 | 86,767 | 294,993 | 0.0% | 71% | 29% | 383,495 | 2.1% |
| 1983 | 215,952 | 79,127 | 295,079 | 23.6% | 73% | 27% | 375,789 | 29.2% |
| 1982 | 187,719 | 51,089 | 238,808 | -0.6% | 79% | 21% | 290,919 | -2.6% |
| 1981 | 183,187 | 57,126 | 240,313 | 8.7% | 76% | 24% | 298,582 | 5.4% |
| 1980 | 160,224 | 60,867 | 221,091 | NA | 72% | 28% | 283,175 | NA |

* Floor shipments from 1980 to 1995 are estimated by Credit Suisse First Boston

Source: Manufactured Housing Institute

97's 2.8% decline is attributed to inventory buildup at retail.

First time multi-sections surpassed single-sections.

CSFB- 00050121

Manufactured Housing: Industry Outlook – June 2001    CREDIT SUISSE | FIRST BOSTON

**Table 2**
**Manufactured Housing Retail Sales, 1996 through March 2001**

| | Retail Sales | | | | | | Mix | |
|---|---|---|---|---|---|---|---|---|
| | Singles | % Chg. | Multi's | % Chg. | Total | % Chg. | Singles | Multi's |
| Mar-01 YTD | 14,103 | -43.5% | 27,671 | -36.1% | 41,774 | -38.8% | 34% | 66% |
| Mar-01 | 4,772 | -50.0% | 8,659 | -42.3% | 13,431 | -45.3% | 36% | 64% |
| Feb-01 | 4,390 | -43.9% | 8,171 | -40.7% | 12,561 | -41.8% | 35% | 65% |
| Jan-01 | 4,941 | -35.1% | 10,841 | -25.5% | 15,782 | -28.8% | 31% | 69% |
| Dec-00 | 5,179 | -37.5% | 10,345 | -26.0% | 15,524 | -30.3% | 33% | 67% |
| Nov-00 | 5,891 | -31.7% | 11,971 | -18.0% | 17,862 | -23.1% | 33% | 67% |
| Oct-00 | 7,094 | -33.2% | 13,518 | -24.7% | 20,612 | -27.8% | 34% | 66% |
| Sep-00 | 7,181 | -38.3% | 13,518 | -24.9% | 20,699 | -30.1% | 35% | 65% |
| Aug-00 | 8,014 | -29.5% | 14,620 | -15.6% | 22,634 | -21.1% | 35% | 65% |
| Jul-00 | 7,648 | -34.6% | 13,524 | -23.0% | 21,172 | -27.6% | 36% | 64% |
| Jun-00 | 8,922 | -25.6% | 15,687 | -14.3% | 24,609 | -18.7% | 36% | 64% |
| May-00 | 8,945 | -15.9% | 14,718 | -5.3% | 23,663 | -9.6% | 38% | 62% |
| Apr-00 | 8,317 | -22.3% | 12,782 | -12.5% | 21,099 | -16.6% | 39% | 61% |
| Mar-00 | 9,544 | -15.4% | 15,012 | 3.6% | 24,556 | -4.7% | 39% | 61% |
| Feb-00 | 7,826 | -12.3% | 13,768 | -2.1% | 21,594 | -6.0% | 36% | 64% |
| Jan-00 | 7,611 | -11.4% | 14,542 | -2.6% | 22,153 | -5.8% | 34% | 66% |
| Dec-99 | 8,293 | -9.0% | 13,979 | -6.6% | 22,272 | -7.5% | 37% | 63% |
| Nov-99 | 8,620 | -21.0% | 14,602 | -7.1% | 23,222 | -12.8% | 37% | 63% |
| Oct-99 | 10,615 | -21.5% | 17,943 | -6.7% | 28,558 | -12.9% | 37% | 63% |
| Sep-99 | 11,631 | -12.1% | 18,002 | -2.1% | 29,633 | -6.3% | 39% | 61% |
| Aug-99 | 11,372 | -13.5% | 17,315 | -2.5% | 28,687 | -7.2% | 40% | 60% |
| Jul-99 | 11,696 | -14.8% | 17,555 | -5.4% | 29,251 | -9.4% | 40% | 60% |
| Jun-99 | 11,984 | -6.7% | 18,299 | 8.0% | 30,283 | 1.7% | 40% | 60% |
| May-99 | 10,640 | -16.2% | 15,548 | -1.0% | 26,188 | -7.8% | 41% | 59% |
| Apr-99 | 10,700 | -16.9% | 14,607 | -3.0% | 25,307 | -9.4% | 42% | 58% |
| Mar-99 | 11,275 | -6.4% | 14,484 | 1.0% | 25,759 | -2.4% | 44% | 56% |
| Feb-99 | 8,920 | -9.1% | 14,057 | 12.5% | 22,977 | 3.0% | 39% | 61% |
| Jan-99 | 8,590 | -11.7% | 14,935 | 5.1% | 23,525 | -1.8% | 37% | 63% |
| Dec-98 | 9,110 | -2.7% | 14,964 | 13.5% | 24,074 | 6.8% | 38% | 62% |
| Nov-98 | 10,909 | 5.3% | 15,722 | 13.7% | 26,631 | 11.0% | 41% | 59% |
| Oct-98 | 13,529 | 3.0% | 19,240 | 19.5% | 32,769 | 12.1% | 41% | 59% |
| Sep-98 | 13,230 | -9.2% | 18,385 | 9.9% | 31,615 | 1.0% | 42% | 58% |
| Aug-98 | 13,151 | 2.0% | 17,762 | 20.2% | 30,913 | 11.7% | 43% | 57% |
| Jul-98 | 13,734 | -3.4% | 18,555 | 14.1% | 32,289 | 5.9% | 43% | 57% |
| Jun-98 | 12,844 | -1.7% | 16,943 | 7.4% | 29,787 | 3.3% | 43% | 57% |
| May-98 | 12,697 | -8.6% | 15,706 | 5.8% | 28,403 | -1.2% | 45% | 55% |
| Apr-98 | 12,877 | 0.8% | 15,065 | 16.7% | 27,942 | 8.8% | 46% | 54% |
| Mar-98 | 12,044 | -2.3% | 14,345 | 16.3% | 26,389 | 7.0% | 46% | 54% |
| Feb-98 | 9,813 | -4.4% | 12,498 | 10.8% | 22,311 | 3.6% | 44% | 56% |
| Jan-98 | 9,733 | -11.6% | 14,212 | 9.5% | 23,945 | -0.2% | 41% | 59% |
| 2000 | 90,513 | -27.2% | 162,063 | -15.3% | 252,576 | -20.0% | 36% | 64% |
| 1999 | 124,336 | -13.5% | 191,326 | -1.1% | 315,662 | -6.4% | 39% | 61% |
| 1998 | 143,671 | -2.8% | 193,397 | 13.1% | 337,068 | 5.7% | 43% | 57% |
| 1997 | 147,862 | -4.5% | 171,045 | 12.2% | 318,907 | 3.6% | 46% | 54% |
| 1996 | 154,907 | NA | 152,454 | NA | 307,832 | 7.8% | 50% | 50% |

Full year totals for 1996 exclude sales in the state of New York, which we estimate were 2,500-3,500 units.
Source: Statistical Surveys, Inc.

> Despite a 2.8% decline
> in industry shipments,
> retail demand remained healthy.

CSFB– 00050122

### Sequential Drop in Delinquency Rates

Delinquency rates dropped sequentially during the first quarter across the board; however, this appears to be a seasonal adjustment as they are still higher YOY. Sequentially, delinquency rates for CMH, OH and Conseco (CNC) fell 80, 200 and 20 basis points, respectively to 2.1%, 3.8% and 2.0% (See Chart 2). Compared to the same period last year, these rates were up 40 basis points for CMH, 30 basis points for OH and 60 basis points for CNC. Peak delinquency rates for the three companies were 2.9% (+80 basis points), 5.1% (+130 basis points) and 2.2% (+20 basis points), respectively. Typically, delinquency rates increase in the fourth quarter of the year as borrowers shift income away from necessary payments and toward gift purchases. A rebound in delinquency rates is traditionally observed in the first quarter of the year as people who let their bills lapse during the holiday season begin paying their bills again. Therefore, while the decrease could signal a positive outlook for the repo market, it more than likely is a regular seasonal occurrence. We would become more convinced of a bottom when/if delinquencies begin to improve on a YOY basis.

**Chart 2**
**Quarterly Delinquency Rates, June 1997 through March 2001**



Source: Company Reports

### Lenders Working Closely with Manufacturers

Several manufacturers, including Champion and Oakwood, have recently worked out new loan covenants with lenders to more adequately reflect the current industry environment. This is important for two reasons. First, it suggests the lenders are willing to work with the manufacturers through this downturn to keep them from defaulting on loans. During this point in the cycle, it is unlikely lenders believe they could do much better liquidating assets themselves in the event of a major default. Second, it keeps the banks from dumping product on the market in a liquidation that could continue to adversely affect inventories of existing sales centers and average new unit sales per center.

### Financing Slowly Becoming More Attractive

During this recent downturn, several consumer finance companies such as Access, Deutsche, Associates, IndyMac and United Cos. exited the market. While we have not seen evidence of increased financing options yet, we believe we will see more lenders enter the market over the next twelve months, given the lack of

CSFB– 00050123

potential competition and the notion that the industry is close to a bottom. As these lenders enter the market, competition for origination volume should help ease financing which should help boost sales. In addition, a slightly more lenient lending program could help to more quickly reduce the oustanding repo inventory, thereby clearing the way for more new home sales and more demand from manufacturing facilities.

We would caution, however, that excessively lenient lending practices were a significant reason for the current downturn. Many homes were sold in the period 1994 through 1998 that should not have been. For example, Oakwood and other companies were offering zero down or $500 down pre-approved loans for homes. In addition, given that the industry began offering consumers 30-year mortgages compared to the normal 7 and 8-year loans, consumers were able to purchase double-wides while maintaining smaller monthly payments. Nevertheless, these mortgages, with the lack of internal lending controls, resulted in homes that were sold to poor credit quality consumers that have now come back as repossesions. Therefore, while somewhat more lenient lending practices would help stimulate sales, we don't want to see financing become too lenient and will be watching it closely. Lastly mortgage rates for manufactured homes continue to run approxi- mately in the 11-13% range, with multisection homes at the lower end of the range. This represents roughly a 150 to 200 basis point decline from year ago levels. Nevertheless, these mortgage rates remain well above the standard 30 year "A" mortgage rate, which is approximately at 7.2%.

On the securitization side, however, all of the players have continued to securitize loans in the market. The size and number of transactions backed by these loans have been smaller than in the past as lenders have tightened credit standards leading to a smaller number of loans to securitize. Access to the markets is key because the ability to sell these loans frees up capital to make new loans. While the companies have been able to access the market, the pricing on the securiti- zations has not been necessarily favorable for most players as concerns over delinquency rates and repossessions have plagued the market and created wider spreads.

On a positive note, OH recently completed a securitization that was well received. It was oversold across the board and was priced with tighter spreads over treas- uries and the interest rate swap curve than previous OH deals. For example, the spread for AAA rated 10 year paper during this last securitization improved to 130 basis points over 10 year interest rate swaps versus a 140 basis points spread during its March securitization. Although Vanderbilt and Conseco have yet to is- sue paper in the second quarter, the spreads for their first quarter securitizations for AAA 10 year paper were 117 and 132 basis points, respectively. Currently, the generic manufactured housing spread for AAA 10-year paper is 115 basis points. This compares to a peak and trough of 135 basis points in March 2001 and 37 basis points in June 1997, respectively. It should be noted that spreads for AAA 10-year paper reached a high of 163 basis points during October 1998 primarily due to the Russian Crisis.

While the improving spreads by no means suggest that the market has turned, we believe it signals a renewed confidence that OH will be around to service them. Furthermore, if we see similar confidence in other company's securitiza- tions in the coming months, that kind of renewed strength in the securitization market could make entry into the industry for other finance companies more at- tractive thereby increasing the number of lenders and competition for originations as explained above.

CSFB– 00050124

### Industry Negatives

Although we believe the lower new unit inventories per outlet (UIPO) and delinquency levels bode well for the industry, we remain cautious about the industry fundamentals. For these companies to drastically reduce UIPO while decreasing the number of stores and average new unit sales per center (ANSC) indicates that there are little manufacturing deliveries to the retail store. While both manufacturing and retail should benefit with an increase in demand given the current inventory levels, it is uncertain how long the current downturn will last before we begin to see a meaningful increase in demand. Also, despite the absolute inventory reduction taking place, several negative trends continue to plague the industry.

- Inventories measured as a function of sales, i.e. months' supply of inventory, are actually increasing.

- While there has been many closures in retail and manufacturing, we believe that more are on the horizon.

- The amount of repo units per month, while shrinking, is still significant and causing substantial drag on the industry.

- Spring sales were weak heading into the summer season.

- Delinquency rates are still up year over year.

#### *Month's Supply of Inventory Increasing*

According to the Census Bureau, 103,800 homes were in retail inventory as of February (the latest available data), which is down 17% from the peak inventory level for the industry of 125,500 homes in February 2000. However, because of declining retail sales, inventories are at an all-time high on a months' supply basis at roughly 5.2 months. As Chart 3 indicates, the supply of inventory has spiked up significantly over the past two years.

**Chart 3**
**Months' Supply of Retail Inventory, January 1996 through February 2001**



Source: U.S. Census, Statistical Surveys Inc., CSFB.

CSFB–  00050125

***More Potential Plant Closings***

While we applaud the ability of the companies under coverage to drastically lower their UIPO in this environment, the only way to do so has been to effectively shut down manufacturing capacity. The companies have cut manufacturing to below 50% of capacity in some cases to allow the retail outlets to focus on clearing out excess inventory. As of February, there were 271 plants in operation, down 20% from the peak of 337 in June 1999 and 25% above the lowest level during the last cycle in 1991 of 216 plants.

Clayton Homes has actually bucked the trend over the last several years by adding one plant for a total of 20. Nobility (NOBH) and Palm Harbor (PHHM) both managed to maintain the same number of plants during the period with 2 and 15, respectively. On the other hand, Oakwood closed 7 (21 remaining), Cavalier (CAV) closed 4 (15 remaining, 9 idle), Fleetwood (FLE) closed 12 (26 remaining), Champion closed 14 (51 remaining) and Southern Energy (SEHI) closed 4 (5 remaining).

In 1991, the manufactured housing industry shipped just over 170,700 units, the lowest level since 1970 and 21% below the LTM shipments of 214,900 as of April 2001 (See Charts 1 and 4). As mentioned in the positives, year-to-date shipments are down 38% from the same period in 2000. While we believe shipments are nearing trough levels, we anticipate that further plant closings could take place as the market continues to decrease overall inventory and find a solid bottom. Table 1 outlines in more detail historical industry shipments from 1980 through April 2001.

**Chart 4**
**Manufactured Housing Shipments, January 1989 through April 2001**



Source: Manufactured Housing Institute, CSFB.

CSFB- 00050126

### Retail Shakeout Continues

Although the inventory levels per store appear to be bottoming, we still believe there may be more retail bankruptcies this year. Our sources indicate there are close to 7,000 retailers in the marketplace, which is 22% below the peak of over 9,000 retailers. With retail inventory of 103,000 units, that equates to approximately 15 units per store on average. Also, new retail sales for the trailing twelve months ended March 31 were 229,000 homes or 19,000 new home sales per month for the industry. Unfortunately, used inventory and sales numbers are not available. According to our sources, a typical manufactured housing dealer needs to sell approximately 4 homes per month to break even. If we divide the new retail sales of 19,000 by 4 homes, the industry can support approximately 4,750 retail centers with new sales at break even levels. Of course, there will be some used and repo inventory that increases this number. Nevertheless, there will be above average operators and below average operators. Those who perform below average may find it harder to reach break even sales, even after including used and repo homes.

Also, year-to-date retail sales are well below the run rate mentioned above. For the three months ended March 2001, year-to-date sales were down 39% over 2000 at only 41,774 homes versus 68,303 homes. A similar decrease for the remainder of 2001 generates a run rate of approximately 160,000 new homes. (See Table 2) Using the same logic above, this level of retail sales could support only 3,333 retail centers excluding used and repo sales. Again, this number is only breakeven. At this point, we are not hearing any indication of a pickup in sales, other than a slight improvement expected due to seasonal factors. Given these assumptions, we believe there will be a further industry shakeout in the retail sector.

### Repo Inventory Still Signifcant

According to our sources, approximately 7,000 new repos enter the market each month, 84,000 per year; however, current repo inventory is slowly declining which means that more than 7,000 repos are being sold per month. If you tack that on to the 19,000 new home sales per month, repos make up close to 27% of the overall industry sales in lieu of new sales. Our sources indicate that retailers have not yet resorted to meaningful discounting and incentives to move repo inventory; however, some retailers may begin to offer incentives as it becomes their only option to stay afloat in this difficult environment. Until this number is reduced significantly, we believe the industry will have a difficult time ramping up new sales.

### Turnaround Is Elusive

Manufacturers have already stated that the spring show was slow and the small improvement in April and May is likely due to seasonal factors rather than improving fundamentals, which likely won't occur before the spring of 2002. All of the industry pains so far have been self-inflicted by industry players, who knowingly expanded manufacturing capacity and retail stores at a pace that wasn't sustainable by the market. At the same time, extremely lenient lenders and relaxed lending restrictions helped bring many customers to the table sooner than later. Unfortunately, this shift helped create the capacity, inventory and repo problems the market is experiencing today. The point being that the industry downturn over the last several years has not been macro related, but industry specific. Now, we are in a questionable economic environment while the industry is trying to find a sustainable bottom. Our concern is that should the economy continue to weaken and unemployment continue to rise, the manufactured housing market could continue to decline towards a much lower bottom. As we mentioned earlier, the industry is 25% ahead of the trough shipment levels of the last cycle, which was macro driven. Therefore, even though the industry appears to be nearing a bottom after attempting to correct its own mistakes, that bottom may be challenged if economic conditions worsen.

CSFB– 00050127

**CREDIT SUISSE** | FIRST BOSTON

### *Delinquency Rates are Still Up Year over Year.*

Although delinquency rates declined sequentially during the first quarter, they continue to run above the year ago levels. We are concerned that current delinquency rates are being artificially driven down by two factors: 1) the elimination of foreclosures, and 2) aggressive practices by sales people to repackage loans that are near or at delinquent levels. Therefore, we would become more convinced of a bottom when/if delinquencies begin to improve on a YOY basis.

CSFB– 00050128

## Valuation and Conclusion

The manufactured housing group is currently trading at a median multiple of 1.8 times (See Table 9) book value relative to its historical average (1980 through April 2001) of 1.7 times (See Chart 5). It is up from a low in this cycle of 0.6 times. The prior two troughs, during 1980 and 1990, posted P/B ratios of 0.8 (April 1980) and 0.7 (September 1990), which were followed a year later by median P/B ratios of 1.4 times for each period. The peaks occurred in May 1983 and June 1996 with P/B ratios of 5.0 and 3.7, respectively. In these cases, the peak was 625% and 529% greater than trough levels and was achieved in three and six years, respectively. Of course, we don't know how long it could take to reach peak levels in this environment, but the industry continues to trade near the historical average of 1.7 times; therefore, we believe there could be upside for longer term investors as the market accelerates. However, we are unsure of the timing and believe there could be more short-term pain for the industry as described earlier in this report.

**Chart 5**
**Historical Price/Book Valuation for Public Companies  1980 - April 2001**



Source: Factset, CSFB

Although the timing of this reacceleration is uncertain, we believe the stocks already reflect a belief that the industry is close to a bottom given a 36% rally since the beginning of the year for manufactured housing stocks. (See Chart 6) In our opinion, the rally has priced in the positive aspects we mentioned earlier; however, this may be premature given our belief that earnings expectations for 2002 are suspect. Most consensus earnings estimates for 2002 show a dramatic increase YOY (CMH:19%, CHB:86%, OH:75%); however, we are uncertain that these results are achievable or that the industry will recover in 2002.

CSFB– 00050129

Manufactured Housing: Industry Outlook — June 2001    **CREDIT SUISSE** | FIRST BOSTON

In addition, there may be more short-term pain as more plant and retail closings continue. Therefore, we are maintaining our neutral outlook for the manufactured housing sector awaiting more positive signals from the industry. However, any pullbacks in manufactured housing stocks could provide long term investors with an attractive entry point during the trough in the cycle. Currently, CMH trades at 18.7 times our 2001 earnings estimate and 1.8 times book value. CHB and OH trade at 1.9 and 0.2 times book value, respectively.

**Chart 6**
**Manufactured Housing Index, January 1998 through May 2001**



Source: Factset, CSFB

CSFB- 00050130

## Clayton Homes - Hold

- Clayton recently reported fiscal 3Q01 earnings of $0.17 per share, down 35% from a year ago. The results exceeded the consensus estimate of $0.16, a 6% surprise, and our estimate of $0.15 per share.

- Total revenues fell 11% to $272.1 million, due to sales declines of 27% and 11% in manufacturing and retail respectively, partially offset by a 4% increase in financial services and other revenue.

- For 3Q01, backlog rose 72% to $21.3 million, primarily due to seasonality and lower capacity. However, delinquencies on loans originated and on total loans rose to 2.10% and 2.53% from 1.65% and 2.36% a year ago, respectively. Sequentially, delinquencies declined 80 basis points on originated loans.

- New unit inventories per outlet (UIPO) declined 15% YOY to 16.0 homes from 18.8 homes. Sequentially, UIPO declined 8% sequentially and is 26% less than peak UIPO of 22 units. Retail outlets are down 2% to 307 from 312 last year. Average new sales per center (ANSC) decreased 10% to 9.5 homes (51% of peak ANSC) from 10.6 homes a year ago and just above the 9.4 homes last quarter. Inventory days increased 14% to 137.7 days versus 120.8 days a year ago. (See Table 3)

- Clayton's biggest advantage during this downturn has been its business model. Clayton, through its Vanderbilt finance division, has created an annuity of approximately 45% of its total revenues each year through servicing loans in its portfolio, rent from its communities and premiums on insurance. Also, Clayton has maintained extremely conservative lending practices which has insulated in from the significant increases in delinquencies seen by other industry participants. This business model has helped to insulate CMH somewhat from the decrease in revenues and earnings that some of its competitors have experienced due to soft manufacturing and retail revenues. For example, we are estimating a decrease in revenues for OH and CHB of 30% and 40%, respectively, from 1999 to 2001. We are only expecting a 14% decline in revenues for CMH for the same time frame along with positive EBITDA and earnings results.

- CMH, which we believe is the premier company in the industry, is currently trading at 16.9 times our 2002 estimate of $0.85 per share. This represents a large premium to the company's 3-year forward average of 10.0 times. On a price to book basis, CMH is trading at 1.8 times compared with its three year median multiple of 1.6 times. On average the industry has traded at a multiple range of 12-14 times peak earnings. Assuming these multiples times peak earnings for Clayton, which were $1.06 per share (1999), we believe CMH is currently fairly valued. (See Table 4) We don't believe CMH, or any other company in the group will return to peak earnings in either 2001 or 2002; however, we believe CMH would be able to achieve those results before any of its competitors. While we believe the long-term outlook for CMH is above average, we would prefer to remain on the sidelines in the short-term until fundamentals show a definitive sign of bottoming out or the valuation becomes more compelling. Therefore, we maintain our Hold rating.

CSFB– 00050131

## Champion Enterprises - Hold

- CHB recently reported a 1Q01 loss from operations of $0.45 per share versus a gain of $0.03 in 1Q00. While in line with our estimate, the quarterly EPS were $0.03 better than consensus. The results do not include $0.10 of non-recurring charges related to the closing of two manufacturing facilities and 30 sales centers. Total sales fell 39% to $326 million based on a 40% decline in manufacturing (71% of revenues) and a 35% decline in retail (29% of revenues).

- At quarter end, CHB's backlog was $19 million (close to one week), down 47% YOY from $36 million. The backlog was 27% better than the $15 million at year end, however, that increase reflects typical seasonal increases for the industry. CHB reported that its contingent liability for inventory repurchases from dealers declined by 44% YOY to $360 million from $640 million.

- The company is currently operating within its debt covenants, which are centered primarily around EBITDA and capital expenditures. Champion only spent $1.4 million on capital expenditures during the quarter versus $4.9 million a year ago, a decrease of 71%. For the year, management expects capital expenditures to come in below the $15 million spent last year and well below the $20 million limit on the debt covenants. In terms of coverage ratios, the covenants are built on a rolling three month EBITDA number and is calculated each month. Currently the company is within the guidelines for the debt covenants, even though EBITDA is negative, and expects to remain in compliance with those going forward. However, we would state that without a significant turnaround in either Champion's business or the industry as a whole, these tests may get tougher to pass as the year continues and the hurdles increase. The following table shows the rolling three month EBITDA numbers the company must meet to stay within compliance.

| Month | $ in millions |
|---|---|
| April | ($14) |
| May | ($5) |
| June | $5 |
| July | $10.50 |
| August | $14.50 |
| September | $18.50 |
| October | $14.50 |
| November | $11.50 |
| December | $8.80 |

- UIPO decreased 7% to 18 homes from 19.3 homes a year ago. The company has maintained the current inventory level of 18 new homes per center for the past four quarters. Retail outlets decreased during the quarter 19% to 230 from 260 representing the largest decline in sales centers since Champion entered the retail business in 1997. ANSC decreased 37% YOY to 7.4 homes (36% of peak ANSC) versus 11.7 homes. (See Table 5)

- While management indicated that retail traffic and industry wide inventories are showing signs of improvement, the uncertain outlook for the economy, low consumer confidence and more potential job losses make a potential turn around for the industry over the next several quarters less likely. If we value CHB on peak earnings potential of $1.91 per share (realized in 1998 mostly through acquisition) and assume an earnings multiple range of 8-10 times (a haircut to peak industry multiples of 12-14 times given its financial risk), we generate a value of $15-$19 per share, which is roughly 40-80% higher than the current level (See Table 6). Nevertheless, we maintain our Hold rating on

**CSFB-  00050132**

CHB, given its leveraged balance sheet and lingering concerns surrounding its ability to meet its lending requirements, which in our view, neutralizes most of the potential upside.

CSFB– 00050133

### Oakwood Homes - Hold

- OH recently reported a FY2Q01 loss of $0.60 per share compared with a loss of $0.26 per share in the year–ago quarter and $0.25 lower than our estimate. Management indicated that the market is still exhibiting severe weakness and that it is focused on reducing overhead and managing for cash. Specifically, management stated the following five initiatives that it is pursuing at this time: Closely manage liquidity needs, reduce inventories, downsize the organization, reorganize the retail division and improve customer care and service by implementing new centralized customer controls.

- Retail sales decreased 26% from a year ago to $131 million and wholesale sales dropped 19% to $77 million, resulting in a 23% decline in total sales to $208 million. OH's gross margin declined 150 basis points to 19 reflecting competitive pricing, aggressive promotional programs used to lower inventories and under-utilization of plant capacity. SG&A expense as a percent of sales increased 590 basis points YOY to 34.9% due primarily to higher sales expenses through fixed costs and incentives paid to move inventory.

- UIPO decreased 29% YOY to 21.1 homes versus 29.6 homes. This level represents a decrease of 5% for sequential and 45% for peak UIPO, respectively. ANSC decreased 24% to 7.5 homes (29% of Peak ANSC) versus 9.9 a year ago. Inventory days increased 8% to 147.7 days. Total number of Oakwood owned stores decreased 5% YOY to 355 stores versus 375 stores. (See Table 7)

- While Oakwood has continued to participate in the securitization market, it has not done so under very favorable conditions. However, during the current quarter, OH completed a securitization that was oversold and saw tightening spreads over last quarter. While this is not an indication that OH is seeing a turnaround, we believe the increased demand for OH deals and the tightening spreads support a more positive long-term outlook for the company.

- OH is currently trading at only 0.2 times tangible book value, well below the group average of 1.8 times and OH's historical peak of 3.2 in 1996. Despite the difficulty OH has had in the last three years, the company appears to be making progress by reducing inventories and implementing several cost cutting initiatives. However, OH is not out of the woods yet. The company is still operating well in the red and the industry is not reaccelerating at this time. In addition, OH is in the process of renegotiating bank lines that will enable itself to stay afloat. If we value OH based on its peak earnings ($1.83) along with a multiples range of 8-10 times (a haircut to industry peak multiples of 12-14 times given its financial risk), we generate a target of $14-19 per share, which is 7-10 times the current stock price. (See Table 8).

  Although we admit that this type of operational performance for OH is several years off at best depending on quite a few variables, we believe the probability that OH will emerge from this downturn has improved. Our probability that OH does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with OH, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares. However, for more speculative investors – "no guts, no glory type of investor", – OH may provide an attractive long term investment barring a further slowdown in the economy and continued progress by the company toward break even operating results.

CSFB– 00050134

Manufactured Housing: Industry Outlook – June 2001                    **CREDIT SUISSE** | FIRST BOSTON

**Chart 7**
**New Inventory Units Per Sales Center**



Source: Company reports.

**Chart 8**
**Year-over-Year Percent Change in New Inventory Units Per Sales Center**



Source: Company reports.

CSFB– 00050135

Manufactured Housing: Industry Outlook – June 2001                    **CREDIT SUISSE** | FIRST BOSTON

**Chart 9**
**Inventory Days Outstanding**



Source: Company reports.

**Chart 10**
**Year-over-Year Percent Change in Inventory Days Outstanding**



Source: Company reports.

CSFB– 00050136

Manufactured Housing: Industry Outlook -- June 2001

**CREDIT SUISSE** | **FIRST BOSTON**

**Chart 11**
**New Unit Sales Per Outlet, Quarterly**



Source: Company reports.

**Chart 12**
**Year-over-Year Percent Change in New Unit Sales Per Outlet, Quarterly**



Source: Company reports.

**CSFB— 00050137**

Manufactured Housing: Industry Outlook – June 2001

CREDIT SUISSE | FIRST BOSTON

**Table 3**
**Clayton—Inventory and Sales Center Data**

| Date | Average New Units per Center | YOY % Change | Inventory Days (1) | YOY % Change | Outlets | YOY % Change | New Sales per Outlet | YOY % Change |
|---|---|---|---|---|---|---|---|---|
| 3/01 | 16.0 | -15% | 137.7 | 14% | 307 | -2% | 9.5 | -10% |
| 12/00 | 17.3 | -10% | 136.7 | 23% | 310 | 0% | 9.4 | -10% |
| 9/00 | 17.7 | 4% | 126.6 | 38% | 318 | 3% | 10.5 | -13% |
| 6/00 | 19.3 | 8% | 110.7 | 43% | 318 | 4% | 12.0 | -18% |
| 3/00 | 18.8 | 2% | 120.8 | 24% | 312 | 6% | 10.6 | -5% |
| 12/99 | 19.2 | 4% | 111.5 | 33% | 310 | 9% | 10.5 | -17% |
| 9/99 | 17.0 | -3% | 92.0 | 11% | 310 | 12% | 12.0 | -11% |
| 6/99 | 17.8 | -7% | 77.6 | 0% | 306 | 12% | 14.7 | -3% |
| 3/99 | 18.5 | -3% | 97.1 | 9% | 295 | 10% | 11.2 | -7% |
| 12/98 | 18.5 | -8% | 83.7 | -1% | 285 | 11% | 12.6 | 19% |
| 9/98 | 17.5 | 0% | 83.0 | 14% | 278 | 11% | 13.5 | 2% |
| 6/98 | 19.2 | 8% | 77.9 | 32% | 273 | 11% | 15.1 | -14% |
| 3/98 | 19.1 | 5% | 88.8 | 2% | 268 | 17% | 12.1 | -12% |
| 12/97 | 20.0 | 9% | 84.7 | 3% | 257 | 14% | 10.6 | -23% |
| 9/97 | 17.5 | -6% | 73.1 | -12% | 250 | 13% | 13.3 | -4% |
| 6/97 | 17.8 | -15% | 59.0 | | 245 | 13% | 17.6 | 0% |
| 3/97 | 18.2 | | 86.8 | | 229 | | 13.7 | |
| 12/96 | 18.3 | | 82.2 | | 225 | | 13.8 | |
| 9/96 | 18.7 | | 82.8 | | 222 | | 13.9 | 14% |
| 6/96 | 21.0 | -1% | | | 216 | | 17.6 | |
| 3/96 | | | | | | | | |
| 12/95 | | | | | | | | |
| 9/95 | | | | | | | | |
| 6/95 | 21.3 | -2% | | | 190 | | 15.5 | -18% |
| 3/95 | | | | | | | | |
| 12/94 | | | | | | | | |
| 9/94 | | | | | | | | |
| 6/94 | 21.7 | | | | 154 | | 18.8 | |

(1) 90 / (Cost of Goods Sold / average inventory (including manufacturing operations)
Source: Company reports

– 22 –

CSFB– 00050138

Manufactured Housing: Industry Outlook – June 2001

CREDIT SUISSE | FIRST BOSTON

Table 4
Clayton—Historical Financial Performance and Valuation, Fiscal 1988 – Fiscal 3Q01

| Date | Total Sales | YOY % Change | HB EBIT % | YOY BP Change | EPS | YOY % Change | Stock Price | YOY % Change | Price to Earnings (1) | Price to Sales | Price to Book |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3Q01 | 272.1 | -11% | 14.2% | (430) | $0.17 | -35% | $12.05 | 19% | 14.5 | 1.39 | 1.8 |
| 2Q01 | 284.9 | -8% | 16.0% | (200) | $0.20 | -20% | $11.50 | 25% | 11.3 | 1.29 | 1.5 |
| 1Q01 | 300.8 | -11% | 15.1% | (160) | $0.21 | -16% | $10.00 | 15% | 9.8 | 1.10 | 1.3 |
| FY00 | 1,293.4 | -4% | 17.6% | (770) | $1.03 | -3% | $8.00 | -30% | 8.2 | 0.86 | 1.1 |
| 4Q00 | 339.9 | -15% | 17.2% | (350) | $0.27 | -25% | $8.00 | -30% | 8.2 | 0.86 | 1.1 |
| 3Q00 | 307.0 | 0% | 18.5% | (10) | $0.26 | 8% | $10.13 | -8% | 8.9 | 0.99 | 1.4 |
| 2Q00 | 309.2 | -5% | 18.0% | 20 | $0.25 | 4% | $9.19 | -33% | 8.4 | 0.97 | 1.3 |
| 1Q00 | 337.3 | 7% | 18.7% | (30) | $0.25 | 14% | $8.69 | -38% | 8.0 | 0.91 | 1.3 |
| FY99 | 1,344.3 | 18% | 18.7% | (50) | $1.06 | 15% | $11.44 | -25% | 10.7 | 1.24 | 1.7 |
| 4Q99 | 402.2 | 16% | 20.7% | (10) | $0.36 | 20% | $11.44 | -25% | 10.7 | 1.24 | 1.7 |
| 3Q99 | 308.3 | 15% | 18.6% | 30 | $0.24 | 14% | $11.06 | -32% | 10.0 | 1.26 | 1.7 |
| 2Q99 | 319.1 | 27% | 17.8% | (150) | $0.24 | 14% | $13.81 | -4% | 13.4 | 1.63 | 2.2 |
| 1Q99 | 314.7 | 20% | 17.0% | (80) | $0.22 | 10% | $14.00 | -6% | 13.5 | 1.78 | 2.3 |
| FY98 | 1,127.8 | 10% | 19.2% | 80 | $0.92 | 15% | $15.20 | 32% | 15.1 | 2.00 | 2.6 |
| 4Q98 | 345.6 | 7% | 20.8% | 120 | $0.30 | 11% | $15.20 | 32% | 15.1 | 2.00 | 2.6 |
| 3Q98 | 286.4 | 18% | 18.3% | (20) | $0.21 | 11% | $16.20 | 32% | 16.5 | 2.18 | 2.9 |
| 2Q98 | 251.1 | 7% | 19.3% | 140 | $0.21 | 17% | $14.40 | 33% | 15.0 | 2.01 | 2.6 |
| 1Q98 | 262.7 | 11% | 17.8% | 80 | $0.20 | 11% | $14.85 | 5% | 16.1 | 2.11 | 2.8 |
| FY97 | 1,021.7 | 11% | 18.4% | 30 | $0.80 | 11% | $11.50 | -10% | 13.2 | 1.88 | 2.3 |
| 4Q97 | 324.2 | 13% | 19.6% | (410) | $0.27 | 10% | $11.50 | -10% | 13.2 | 1.88 | 2.3 |
| 3Q97 | 228.6 | 7% | 18.5% | (360) | $0.18 | 13% | $10.20 | -24% | 12.3 | 1.54 | 2.1 |
| 2Q97 | 228.7 | 11% | 17.8% | (230) | $0.18 | 18% | $10.80 | -21% | 12.9 | 1.66 | 2.3 |
| 1Q97 | 236.2 | 10% | 17.0% | (330) | $0.18 | 20% | $14.08 | 18% | 17.0 | 2.22 | 3.1 |
| FY96 | 924.0 | 22% | 18.1% | 70 | $0.72 | 22% | $12.80 | 53% | 16.3 | 2.06 | 2.9 |
| 4Q96 | 288.1 | 23% | 23.7% | 190 | $0.25 | 32% | $12.80 | 53% | 16.3 | 2.06 | 2.9 |
| 3Q96 | 211.4 | 18% | 22.1% | (300) | $0.18 | 27% | $13.36 | 52% | 19.0 | 2.29 | 3.2 |
| 2Q96 | 211.2 | 19% | 20.2% | 180 | $0.15 | 25% | $13.68 | 70% | 19.5 | 2.42 | 3.4 |
| 1Q96 | 215.3 | 28% | 20.3% | 70 | $0.15 | 25% | $12.16 | 56% | 17.4 | 2.24 | 3.2 |
| FY95 | 758.2 | 20.7% | 17.4% | 70 | $0.59 | 25.5% | $8.38 | 16.1% | 13.2 | 1.84 | 2.3 |
| FY94 | 628.2 | 31.9% | 17.3% | (20) | $0.47 | 27.0% | $7.22 | -4.2% | 13.7 | 1.85 | 2.3 |
| FY93 | 424.3 | 28.3% | 17.5% | 120 | $0.37 | 23.3% | $7.54 | 49.3% | 17.6 | 2.21 | 3.0 |
| FY92 | 371.2 | 15.8% | 16.3% | 200 | $0.30 | 25.0% | $5.05 | 36.5% | 14.9 | 1.80 | 2.3 |
| FY91 | 320.6 | 23.2% | 14.3% | 190 | $0.24 | 33.3% | $3.70 | 107.3% | 16.0 | 1.26 | 2.3 |
| FY90 | 280.3 | 7.6% | 12.5% | 130 | $0.18 | na | $1.78 | 23.2% | 11.3 | 0.66 | 1.6 |
| FY89 | 241.9 | 19.1% | 11.2% | na | na | na | $1.45 | 0.3% | na | na | na |
| FY88 | 203.1 | na | na | na | na | na | $1.44 | na | na | na | na |

(1)Based on next 12 months of earnings according to First Call.

N/A Not available
Source: Company reports, Computstat.

CSFB– 00050139

CREDIT | FIRST
SUISSE | BOSTON

Manufactured Housing: Industry Outlook -- June 2001

**Table 5**
**Champion—Inventory and Sales Center Data**

| Date | Average New Units per Center | YOY % Change | Inventory Days | YOY % Change | Outlets | YOY % Change | New Sales per Outlet | YOY % Change |
|------|------|------|------|------|------|------|------|------|
| 3/01 | 18.0 | -6.7% | 68.6 | 26% | 230 | -19.3% | 7.4 | -36.8% |
| 12/00 | 18.0 | -10.0% | 64.0 | 28% | 260 | -7.1% | 8.4 | -28.8% |
| 9/00 (1) | 18.0 | -10.0% | 60.2 | 26% | 270 | -7.2% | 9.9 | -34.0% |
| 6/00 (1) | 18.0 | -18.2% | 55.5 | 18% | 291 | 3.2% | 11.0 | -30.4% |
| 3/00 (1) | 19.3 | -16.1% | 54.6 | 20% | 285 | 6.3% | 11.7 | -21.5% |
| 12/99 (1) | 20.0 | -13.0% | 50.1 | 13% | 280 | 13.8% | 11.8 | -21.9% |
| 9/99 (1) | 20.0 | 0.0% | 47.7 | 21% | 291 | 24.9% | 15.0 | -11.7% |
| 6/99 | 22.0 | NM | 47.0 | 29% | 282 | 50.0% | 15.8 | -14.6% |
| 3/99 | 23.0 | NM | 45.6 | 54% | 268 | 87.4% | 14.9 | -28.2% |
| 12/98 | 23.0 | NM | 44.3 | 119% | 246 | NM | 15.1 | NM |
| 9/98 | 20.0 | NM | 39.5 | 88% | 233 | NM | 17.0 | NM |
| 6/98 | NM | NM | 36.5 | 81% | 188 | NM | 18.5 | NM |
| 3/98 | NM | NM | 29.6 | 21% | 143 | NM | 20.8 | NM |

(1) All measures exclude Parker. Including Parker, Inventory Days were 53.6, 50.4, 61.7, 61.1 and 63.9 for 3Q99, 4Q99, 1Q00, 2Q00 and 3Q00, respectively. Parker inventory totaled $70 million, $40 million, $29 million, $24 million and $7 million as of 3Q99, 4Q99, 1Q00, 2Q00 and 3Q00, respectively.
Source: Company reports

– 24 –

CSFB– 00050140

CREDIT SUISSE | FIRST BOSTON

Manufactured Housing: Industry Outlook – June 2001

Table 6
Champion— Historical Financial Performance and Valuation, 1992 – 1Q01

| Date(1) | Total Sales | YOY % Change | HB EBIT % | YOY BP Change | EPS (3) | YOY % Change | Stock Price | YOY % Change | Price to Earnings (2) | Price to Sales | Price to Book |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1Q01 | $326.3 | -39% | -9.0% | (1,080) | ($0.48) | -1700% | $5.15 | -10% | NM | 0.14 | 0.8 |
| FY00 | $1,921.7 | -23% | -0.2% | (590) | ($0.41) | -128% | $2.75 | -68% | NM | 0.07 | 0.5 |
| 4Q00 | $387.1 | -32% | -6.5% | (930) | ($0.42) | -450% | $2.75 | -88% | NM | 0.07 | 0.5 |
| 3Q00 | $496.1 | -26% | 0.1% | (470) | ($0.08) | -127% | $4.25 | -53% | NM | 0.10 | 0.5 |
| 2Q00 | $533.2 | -20% | 2.4% | (570) | $0.06 | -90% | $4.88 | -74% | 18.8 | 0.10 | 0.5 |
| 1Q00 | $535.3 | -14% | 1.8% | (470) | $0.03 | -93% | $5.75 | -70% | 8.3 | 0.12 | 0.6 |
| FY99 | $2,488.6 | 10% | 5.7% | (190) | $1.44 | -25% | $8.50 | -69% | 7.8 | 0.17 | 0.9 |
| 4Q99 | $568.3 | -4% | 2.8% | (430) | $0.12 | -74% | $8.50 | -69% | 7.8 | 0.17 | 0.9 |
| 3Q99 | $631.1 | 3% | 4.8% | (360) | $0.30 | -47% | $9.00 | -61% | 5.8 | 0.17 | 1.0 |
| 2Q99 | $664.6 | 14% | 8.1% | 10 | $0.59 | 13% | $18.63 | -37% | 8.6 | 0.36 | 2.0 |
| 1Q99 | $624.6 | 35% | 6.5% | (10) | $0.43 | 19% | $19.38 | -27% | 8.9 | 0.39 | 2.2 |
| FY98 | $2,254.2 | 35% | 7.8% | 60 | $1.91 | 32% | $27.38 | 33% | 13.2 | 0.58 | 3.3 |
| 4Q98 | $593.8 | 38% | 7.1% | 0 | $0.46 | 18% | $27.38 | 33% | 13.2 | 0.58 | 3.3 |
| 3Q98 | $614.9 | 40% | 8.4% | 80 | $0.57 | 38% | $23.25 | 22% | 11.5 | 0.57 | 3.2 |
| 2Q98 | $582.5 | 32% | 8.0% | 120 | $0.52 | 41% | $29.38 | 96% | 15.7 | 0.72 | 4.0 |
| 1Q98 | $463.0 | 28% | 6.5% | 40 | $0.36 | 33% | $26.69 | 79% | 16.0 | 0.71 | 4.0 |
| FY97 | $1,675.1 | 6% | 7.0% | (20) | $1.45 | 32% | $20.56 | 5% | 12.9 | 0.58 | 3.4 |
| 4Q97 | $429.7 | 5% | 7.1% | 40 | $0.39 | 15% | $20.56 | 5% | 12.9 | 0.58 | 3.4 |
| 3Q97 | $440.0 | 2% | 7.6% | (10) | $0.42 | 2% | $19.13 | -15% | 12.0 | 0.55 | 3.4 |
| 2Q97 | $442.4 | 7% | 6.8% | (70) | $0.37 | -3% | $15.00 | -28% | 9.9 | 0.44 | 2.9 |
| 1Q97 | $363.0 | 10% | 6.2% | (50) | $0.27 | 0% | $14.88 | 4% | 9.1 | 0.44 | 2.9 |
| FY96 | $1,582.8 | 17% | 7.2% | 50 | $1.40 | 27% | $19.50 | 26% | 12.7 | 0.59 | 4.1 |
| 4Q96 | $409.7 | 20% | 6.7% | 10 | $0.34 | 21% | $19.50 | 26% | 12.7 | 0.59 | 4.1 |
| 3Q96 | $430.5 | 22% | 7.7% | 60 | $0.41 | 28% | $22.63 | 128% | 16.3 | 0.72 | 4.7 |
| 2Q96 | $414.0 | 19% | 7.5% | 50 | $0.38 | 27% | $20.88 | 163% | 16.4 | 0.71 | 4.8 |
| 1Q96 | $328.6 | 5% | 6.7% | 70 | $0.27 | 13% | $14.31 | 47% | 12.4 | 0.54 | 3.7 |
| FY95 | $1,355.1 | 23.1% | 6.7% | 40 | $1.10 | 22.2% | $16.44 | 102.5% | 13.9 | 0.62 | 4.2 |
| FY94 | $1,100.5 | 48.8% | 6.3% | 240 | $0.90 | 109.3% | $7.63 | 73.0% | 9.2 | 0.38 | 2.9 |
| FY93 | $739.6 | 22.9% | 3.9% | 120 | $0.43 | 126.3% | $4.41 | 67.9% | 5.1 | 0.38 | 2.8 |
| FY92 | $601.6 | NA | 2.7% | NA | $0.19 | NA | $2.63 | NA | 6.8 | 0.28 | 2.2 |

(1) Fiscal Year ended in Feburary up until 1992
(2) Based on next 12 months of earnings according to First Call.
(3) 4q96 and FY96 EPS exclude merger related charges of $0.34 per share for the Redman acquisition.

N/A Not available
Source: Company reports, Compustat.
Financial data have been restated to include the Redman acquisition, which was accounted for as a pooling of interests, as well as the sale of the Commercial Vehicles division in 1998.

CSFB- 00050141

CREDIT | FIRST
SUISSE | BOSTON

Manufactured Housing: Industry Outlook – June 2001

Table 7
Oakwood—Inventory and Sales Center Data

| Date | Average New Units per Center (1) | YOY % Change | Inventory Days | YOY % Change | Outlets | YOY % Change | New Sales per Outlet | YOY % Change |
|---|---|---|---|---|---|---|---|---|
| 3/01 | 21.1 | -29% | 147.7 | -8% | 355 | -5% | 7.5 | -24% |
| 12/00 | 22.1 | -28% | 133.9 | -17% | 376 | 1% | 9.2 | -2% |
| 9/00 | 25.4 | -26% | 127.4 | -13% | 377 | -8% | 11.2 | -7% |
| 6/00 | 28.1 | -26% | 137.9 | -1% | 377 | -6% | 11.9 | -24% |
| 3/00 | 29.6 | -21% | 160.8 | 19% | 375 | -3% | 9.9 | -38% |
| 12/99 | 30.7 | -8% | 160.6 | 41% | 373 | 3% | 9.4 | -32% |
| 9/99 | 34.5 | 20% | 146.5 | 86% | 412 | 15% | 12.1 | -49% |
| 6/99 | 38.1 | 13% | 138.6 | 57% | 400 | 18% | 15.7 | -30% |
| 3/99 | 37.4 | 14% | 134.6 | -3% | 387 | 19% | 16.0 | -12% |
| 12/98 | 33.3 | 12% | 114.2 | -14% | 362 | 17% | 13.8 | -11% |
| 9/98 | 28.7 | 7% | 78.6 | -14% | 359 | 20% | 23.5 | -9% |
| 6/98 | 33.8 | -3% | 88.1 | -22% | 339 | 23% | 22.3 | -4% |
| 3/98 | 32.8 | -10% | 139.4 | -4% | 324 | 21% | 18.2 | 8% |
| 12/97 | 29.8 | -2% | 133.5 | 6% | 309 | 21% | 15.5 | 3% |
| 9/97 | 26.8 | 10% | 91.0 | | 300 | 22% | 25.9 | 8% |
| 6/97 | 34.8 | 30% | 113.1 | | 275 | 18% | 23.2 | -3% |
| 3/97 | 36.5 | 30% | 144.8 | | 268 | 24% | 16.8 | -17% |
| 12/96 | 30.4 | 2% | 125.6 | | 255 | 29% | 15.0 | -19% |
| 9/96 | 24.3 | -20% | | | 246 | 32% | 23.9 | -9% |
| 6/96 | 26.8 | -23% | | | 234 | 33% | 23.8 | -8% |
| 3/96 | 28.1 | | | | 216 | | 20.2 | |
| 12/95 | 29.8 | | | | 198 | | 18.5 | |
| 9/95 | 30.4 | | | | 186 | | 26.2 | |
| 6/95 | 34.7 | | | | 176 | | 26.0 | |

Source: Company reports
(1) Includes inventory at plants. Excluding warehoused inventory, OH had 25.0, 28.3, 25.3, 23.7, 23.4, 21.7 and 19.4
units per retail center as of 6/99, 9/99, 12/99, 3/00, 6/00, 9/00 and 12/00, respectively.

– 26 –

CSFB– 00050142

CREDIT SUISSE | FIRST BOSTON

Manufactured Housing: Industry Outlook – June 2001

Table 8
Oakwood— Historical Financial Performance and Valuation, Fiscal 1990 – 2Q01

| Date | Sales | YOY % Change | EBIT % | YOY BP Change | EPS from Ops. | YOY % Change | Stock Price | YOY % Change | Price to Earnings | Price to Sales | Price to Book |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2Q10 | $ 243 | -20% | -10.3% | (340) | ($0.38) | 19% | $1.06 | -72% | NM | 0.04 | 0.1 |
| 1Q01 | $ 268 | -17% | -14.9% | (840) | ($0.58) | 81% | $0.63 | -80% | NM | 0.02 | 0.1 |
| FY00 | $ 1,301 | -20% | -6.0% | (740) | ($1.22) | -863% | $1.50 | -67% | NM | 0.05 | 0.2 |
| 4Q00 | $ 338 | -14% | -6.1% | 210 | ($0.32) | -30% | $1.50 | -67% | NM | 0.05 | 0.2 |
| 3Q00 | $ 336 | -24% | -4.8% | (840) | ($0.26) | -253% | $1.81 | -86% | NM | 0.06 | 0.4 |
| 2Q00 | $ 303 | -24% | -6.9% | (1150) | ($0.32) | -252% | $3.81 | -73% | NM | 0.09 | 0.3 |
| 1Q00 | $ 323 | -17% | -6.5% | (1190) | ($0.32) | -233% | $3.19 | -79% | NM | 0.09 | 0.3 |
| FY99 | $ 1,618 | 5% | 1.4% | (820) | $0.16 | -91% | $4.50 | -86% | 22.5 | 0.13 | 0.4 |
| 4Q99 | $ 391 | -25% | -8.2% | (1650) | ($0.46) | -187% | $4.50 | -68% | 22.5 | 0.13 | 0.8 |
| 3Q99 | $ 441 | -7% | 3.6% | (600) | $0.17 | -70% | $13.13 | -55% | 11.6 | 0.35 | 1.1 |
| 2Q99 | $ 396 | 41% | 4.6% | (580) | $0.21 | -43% | $14.00 | -62% | 7.9 | 0.37 | 1.2 |
| 1Q99 | $ 389 | 53% | 5.4% | (520) | $0.24 | -37% | $15.19 | -54% | 8.7 | 0.42 | 1.3 |
| FY98 | $ 1,534 | 43% | 9.6% | (320) | $1.83 | 5% | $13.13 | -54% | 8.1 | 0.40 | 1.1 |
| 4Q98 | $ 523 | 49% | 8.3% | (420) | $0.53 | -5% | $13.13 | -54% | 8.1 | 0.40 | 1.1 |
| 3Q98 | $ 476 | 63% | 9.6% | (320) | $0.56 | 17% | $30.00 | 25% | 14.5 | 1.04 | 2.7 |
| 2Q98 | $ 281 | 28% | 10.4% | (300) | $0.37 | -3% | $36.63 | 108% | 17.4 | 1.46 | 3.3 |
| 1Q98 | $ 255 | 23% | 11.6% | (80) | $0.38 | 15% | $33.19 | 45% | 16.0 | 1.40 | 3.1 |
| FY97 | $ 1,070 | 10% | 12.8% | 110 | $1.75 | 19% | $28.38 | 5% | 14.3 | 1.28 | 2.7 |
| 4Q97 | $ 350 | 23% | 12.5% | 70 | $0.56 | 27% | $28.38 | 5% | 14.3 | 1.28 | 2.7 |
| 3Q97 | $ 292 | 11% | 12.8% | 150 | $0.48 | 28% | $24.00 | 16% | 12.6 | 1.13 | 2.5 |
| 2Q97 | $ 220 | 0% | 13.4% | 120 | $0.38 | 9% | $17.63 | -27% | 9.8 | 0.85 | 1.9 |
| 1Q97 | $ 207 | 1% | 12.4% | 90 | $0.33 | 10% | $22.88 | 19% | 13.1 | 1.10 | 2.6 |
| FY96 | $ 974 | 19% | 11.7% | 230 | $1.47 | 50% | $27.13 | 54% | 16.5 | 1.30 | 3.2 |
| 4Q96 | $ 285 | 19% | 11.8% | 220 | $0.44 | 38% | $27.13 | 54% | 16.5 | 1.30 | 3.2 |
| 3Q96 | $ 264 | 15% | 11.3% | 180 | $0.38 | 41% | $20.63 | 61% | 14.1 | 1.03 | 2.5 |
| 2Q96 | $ 221 | 18% | 12.2% | 320 | $0.35 | 67% | $24.19 | 83% | 19.9 | 1.28 | 3.2 |
| 1Q96 | $ 205 | 22% | 11.5% | 320 | $0.30 | 67% | $19.19 | 57% | 16.1 | 1.03 | 2.6 |
| FY95 | $ 821 | 24% | 9.4% | (10) | $0.98 | 26% | $17.63 | 40% | 15.6 | 0.99 | 2.5 |
| FY94 | $ 665 | 37% | 9.5% | (70) | $0.78 | 28% | $12.56 | -3% | 14.4 | 0.87 | 2.0 |
| 1993 | $ 484 | 34% | 10.2% | NA | $0.61 | 36% | $13.00 | 73% | 20.6 | 1.60 | 2.3 |
| 1992 | $ 360 | 26% | NA | NA | $0.45 | 25% | $7.50 | 71% | 17.2 | 0.92 | 1.9 |
| 1991 | $ 286 | 3% | NA | NA | $0.36 | 29% | $4.38 | 115% | 13.1 | 0.63 | 1.3 |
| 1990 | $ 277 | 177% | NA | NA | $0.28 | 100% | $2.03 | 2% | 10.2 | 0.30 | 0.7 |

Source: Company reports, Compustat.

CSFB– 00050143

CREDIT SUISSE | FIRST BOSTON

Manufactured Housing: Industry Outlook – June 2001

Table 9
Manufactured Housing—Summary Comparable Analysis for Selected Manufactured Housing Companies
$ in millions, except per share data

| Company | Ticker | Rating | Price as of 11-Jun-01 | Return on Equity | Return on Capital | Inv. Turns | Tot Debt to Cap | 52 Week High | 52 Week Low | LTM Int Coverage | Market Cap | Firm Value | Price to Book | Insider Ownership | 2001E Op CF/ Mkt Cap | 3 Yr. Med Price to Book |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cavalier | CAV | NR | $3.17 | -34.5% | -19.8% | 6.9 | 25.8% | $3.50 | $0.75 | -12.7 | $55.8 | $71.3 | 0.7 | 12% | 6.7% | 0.6 |
| Champion* | CHB | HOLD | $10.61 | -11.8% | -3.4% | 5.7 | 54.8% | $11.35 | $2.31 | 0.0 | $504.0 | $813.4 | 1.9 | 6% | 6.6% | 1.0 |
| Clayton* | CMH | HOLD | $14.37 | 11.1% | 10.1% | 3.0 | 8.0% | $15.30 | $7.94 | NA | $1,979.7 | $1,879.3 | 1.8 | 28% | | 1.5 |
| Fleetwood | FLE | NR | $12.75 | -47.5% | -2.1% | 7.0 | 59.0% | $18.00 | $8.10 | 0.1 | $417.6 | $807.0 | 1.3 | 4% | | 1.2 |
| Nobility Homes | NOBH | NR | $8.94 | 11.3% | 6.2% | 2.8 | 0.0% | $9.00 | $4.75 | NA | $37.5 | $29.6 | 1.9 | 54% | | 1.4 |
| Oakwood | OH | HOLD | $2.02 | -11.9% | -5.7% | 2.4 | 44.4% | $2.80 | $0.50 | -3.5 | $95.1 | $455.6 | 0.2 | 7% | 81.0% | 0.3 |
| Palm Harbor | PHHM | NR | $21.75 | 9.7% | 8.0% | 3.7 | 37.4% | $23.05 | $11.50 | 5.0 | $493.1 | $573.8 | 2.1 | 28% | | 1.9 |
| Median | | | | -11.8% | -2.1% | 3.7 | 37.4% | | | (0.0) | $493.1 | $573.8 | 1.8 | | | 1.2 |

| Company | FV to LTM Sales | FV to LTM EBITDA | FV to 2001 EBITDA | SALES LTM | SALES 3 Yr CAGR | SALES 5 Yr CAGR | EBIT Margin | EBIT BP CH. | Market Share Retail | Market Share Manuf. | Div Yield % | No. of Plants |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cavalier | 0.3 | (2.2) | | $283.2 | -17% | 3% | -15.1% | (1,270) | <1% | 7% | 0.0% | 14 |
| Champion* | 0.5 | (1,395.2) | 69.5 | $1,712.7 | 5% | 19% | -2.4% | (680) | 5% | 21% | NM | 51 |
| Clayton* | 1.8 | 9.0 | 9.7 | $1,197.6 | 8% | 11% | 15.7% | (290) | 5% | 8% | 0.4% | 20 |
| Fleetwood | 0.3 | 212.4 | | $2,856.4 | 9% | 5% | -1.1% | (620) | 3% | 21% | 1.3% | 28 |
| Nobility Homes | 1.0 | 12.9 | | $29.2 | -11% | -1% | 7.2% | - | <1% | <1% | NM | 2 |
| Oakwood | 0.3 | (11.1) | | $1,354.0 | 7% | 10% | -8.6% | (1,230) | 7% | 10% | 0.0% | 21 |
| Palm Harbor | 0.9 | 9.0 | 17.0 | $550.5 | 11% | 19% | 7.5% | (110) | 3% | 4% | NM | 15 |
| Median | 0.5 | 9.0 | 17.0 | $550.5 | 7% | 10% | -1.1% | | | | | |

| Company | EPS 2001 | EPS YOY% | EPS Cons. | EPS 2002 | EPS YOY% | PE Ratios 2001 | PE Ratios 2002 | 2001 PE Rel. To S&P 500 | Median Forward PEs 3 YR. | Median Forward PEs 5 YR. | Mix Single | Mix Multi | Avg Daily Volume | Stock Perf. 2000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cavalier | ($0.05) | -96% | ($0.05) | $0.65 | 1400% | NM | NM | NM | 9.5 | 9.8 | 38% | 62% | 58,200 | -75% |
| Champion* | ($0.70) | -119% | ($0.61) | ($0.10) | 85% | NM | NM | NM | 9.3 | 11.8 | 29% | 71% | 242,100 | -68% |
| Clayton(cal.) | $0.78 | -17% | $0.78 | $0.85 | 9% | 18.4 | 16.9 | 86% | 10.0 | 12.9 | 51% | 49% | 422,390 | 25% |
| Fleetwood(cal.) | ($2.32) | -295% | ($2.32) | NA | N/A | NM | NA | NM | 9.2 | 11.5 | 37% | 63% | 276,700 | -49% |
| Nobility Homes | $0.58 | 18% | $0.58 | $0.71 | 22% | 15.4 | 12.6 | 72% | 10.4 | 12.4 | 8% | 92% | 8,090 | 10% |
| Oakwood* | ($2.00) | -33% | ($2.00) | NA | NA | NM | NM | NM | 9.8 | 13.1 | 24% | 76% | 289,500 | -80% |
| Palm Harbor(cal.) | $1.16 | 4% | $1.16 | NA | NA | 18.8 | 12.6 | 87% | 12.2 | 14.9 | 22% | 78% | 21,950 | -13% |
| Median | -75% | | | | 379% | 18.4 | 12.6 | 86% | 9.8 | 12.3 | | | | -49% |

| S&P 500 → | 2000 |
|---|---|
| | -10.1% |

Retail Sales by State Breakdown:
Champion: TX 27%, NC 12%, SC 8%, KY 5%, WA 5%, OR 5%, VA 3%, OK 3%, Other 32%.
Clayton: NC 21%, TX 14%, TN 13%, SC 13%, KY 9%, VA 4%, FL 3%, LA 3%, GA 3%, AZ 2%, NM 2%, Other 23%.
Oakwood: TX 18%, NC 9%, SC 7%, GA 6%, TN 5%, VA 5%, AL 4%, Other 37%.

Note 1: Estimates for all companies rated NR are First Call estimates as they are not covered by CSFBC.
Note 2: Sector year over year EPS growth rates are an average calculation, and not a median calculation.
* Company is repurchasing its shares. Current authorization remaining: CHB-1.1MM shares (suspended), CMH-5.7MM shares.
Source: First Call, Compustat, Company Reports and Credit Suisse First Boston.

CSFB- 00050144

# CREDIT SUISSE | FIRST BOSTON

| | | |
|---|---|---|
| AMSTERDAM .........31 20 5754 890 | MADRID ..............34 91 423 16 00 | SEOUL ..............82 2 3707 3700 |
| ATLANTA................1 404 656 9500 | MELBOURNE ..........61 3 9280 1666 | SHANGHAI...........86 21 6881 8418 |
| AUCKLAND ...............64 9 302 5500 | MEXICO ..............52 5 283 89 00 | SINGAPORE ............... 65 212 2000 |
| BALTIMORE ..........1 410 223 3000 | MILAN...................39 02 7702 1 | SYDNEY................61 2 8205 4400 |
| BEIJING ...............86 10 6410 6611 | MOSCOW ...........7 501 967 8200 | TAIPEI ........... 886 2 2715 6388 |
| BOSTON ..............1 617 556 5500 | MUMBAI..........91 22 230 6333 | TOKYO ...............81 3 5404 9000 |
| BUDAPEST................36 1 202 2188 | NEW YORK...........1 212 325 2000 | TORONTO............... 1 416 352 4500 |
| BUENOS AIRES ....54 11 4394 3100 | PALO ALTO............1 650 614 5000 | VIENNA ..................... 43 1 512 3023 |
| CHICAGO..............1 312 750 3000 | PARIS ..............33 1 40 76 8888 | WARSAW............ 48 22 695 0050 |
| FRANKFURT..............49 69 75 38 0 | PASADENA ...........1 626 395 5100 | WASHINGTON........ 1 202 354 2600 |
| GENEVA.................41 22 394 70 00 | PHILADELPHIA....1 215 851 1000 | WELLINGTON........... 64 4 474 4400 |
| HOUSTON............1 713 220 6700 | PRAGUE................420 2 210 83111 | ZUG ....................... 41 41 727 97 00 |
| HONG KONG ..........852 2101 6000 | SAN FRANCISCO ...1 415 836 7600 | ZURICH ................. 41 1 333 55 55 |
| LONDON ............44 20 7888 8888 | SÃO PAULO .....55 11 3841 6000 | |

Copyright Credit Suisse First Boston, and its subsidiaries and affiliates, 2001. All rights reserved.

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Credit Suisse First Boston or its subsidiaries or affiliates (collectively "CSFB") to any registration or licensing requirement within such jurisdiction. All material presented in this report, unless specifically indicated otherwise, is under copyright to CSFB. None of the material, nor its content, nor any copy of it, may be altered in any way, transmitted to, or distributed to any other party, without the prior express written permission of CSFB. All trademarks, service marks and logos used in this report are trademarks or service marks or registered trademarks or service marks of CSFB.

The information, tools and material presented in this report are provided to you for information purposes only and are not to be used or considered as an offer or the solicitation of an offer to sell or to buy or subscribe for securities or other financial instruments. CSFB has not taken any steps to ensure that the securities referred to in this report are suitable for any particular investor.

Information and opinions presented in this report have been obtained or derived from sources believed by CSFB to be reliable, but CSFB makes no representation as to their accuracy or completeness and CSFB accepts no liability for loss arising from the use of the material presented in this report where permitted by law and/or regulation. This report is not to be relied upon in substitution for the exercise of independent judgment. CSFB may have issued other reports that are inconsistent with, and reach different conclusions from, the information presented in this report. Those reports reflect the different assumptions, views and analytical methods of the analysts who prepared them.

CSFB may, to the extent permitted by law, participate or invest in financing transactions with the issuer(s) of the securities referred to in this report, perform services for or solicit business from such issuers, and/or have a position or effect transactions in the securities or options thereon. In addition, it may make markets in the securities mentioned in the material presented in this report. CSFB may, to the extent permitted by law, act upon or use the information or opinions presented herein, or the research or analysis on which they are based, before the material is published. CSFB may have, within the last three years, served as manager or co-manager of a public offering of securities for, or currently may make a primary market in issues of, any or all of the companies mentioned in this report. Additional information is available on request.

Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgment at its original date of publication by CSFB and are subject to change. The value and income of any of the securities or financial instruments mentioned in this report can fall as well as rise, and is subject to exchange rate fluctuation that may have a positive or adverse effect on the price or income of such securities or financial instruments. Investors in securities such as ADRs, the values of which are influenced by currency fluctuation, effectively assume this risk.

Structured securities are complex instruments, typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. The market value of any structured security may be affected by changes in economic, financial and political factors (including, but not limited to, spot and forward interest and exchange rates), time to maturity, market conditions and volatility, and the credit quality of any issuer or reference issuer. Any investor interested in purchasing a structured product should conduct its own investigation and analysis of the product and consult with its own professional advisers as to the risks involved in making such a purchase.

This report is distributed in Europe by Credit Suisse First Boston (Europe) Limited, which is regulated in the United Kingdom by The Securities and Futures Authority ("SFA"). It is not for distribution to private customers as defined by the rules of The SFA. This report is distributed in the United States by Credit Suisse First Boston Corporation; in Canada by Credit Suisse First Boston Securities Canada, Inc.; in Brazil by Banco de Investimentos Credit Suisse First Boston Garantia S.A.; in Japan by Credit Suisse First Boston Securities (Japan) Limited; elsewhere in Asia/Pacific by Credit Suisse First Boston (Hong Kong) Limited;. Credit Suisse First Boston Australia Equities Limited; Credit Suisse First Boston NZ Securities Limited, Credit Suisse First Boston Singapore Branch and elsewhere in the world by an authorized affiliate.

In jurisdictions where CSFB is not already registered or licensed to trade in securities, transactions will only be effected in accordance with applicable securities legislation, which will vary from jurisdiction to jurisdiction and may require that the trade be made in accordance with applicable exemptions from registration or licensing requirements. Non-U.S. customers wishing to effect a transaction should contact a CSFB entity in their local jurisdiction unless governing law permits otherwise. U.S. customers wishing to effect a transaction should do so only by contacting a representative at Credit Suisse First Boston Corporation in the U.S.

Industry Update 0601.doc

*EXHIBIT L*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ──────────────────────────── | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |


# REPORT OF ALAN C. SHAPIRO, PH.D.

**April 30, 2007**


**CONFIDENTIAL**

# Table of Contents

I.      Scope of Engagement ........................................................................... 1

II.     Credentials ......................................................................................... 1

III.    Basis for Opinions .............................................................................. 3

IV.     Summary of Opinions ......................................................................... 3

V.      Assumptions ....................................................................................... 4

      V.A     CSFB Owed Oakwood and its Creditors a Fiduciary Duty .................... 4

      V.B     Oakwood Was Insolvent in September 2001 ...................................... 4

VI.     Background ......................................................................................... 4

      VI.A    Manufactured Housing Industry ........................................................ 4

      VI.B    Business Overview of Oakwood ........................................................ 5

      VI.C    Financial Performance of the Industry Prior to 1999 ........................... 5

      VI.D    Industry Downturn Beginning in 1999 ................................................ 6

      VI.E    Oakwood's Downturn and Bankruptcy ................................................ 7

            VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

            VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ...................... 9

            VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002 .................................................................................. 10

            VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ............................... 11

VII.    CSFB Did Not Behave In a Prudent Manner ......................................... 12

      VII.A   CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition ........................................................ 12

            VII.A.1  Investment Banks Have Unique Access to Information ....................... 12

            VII.A.2  Relationship between Oakwood and CSFB .......................................... 14

            VII.A.3  CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition ......................................................... 22

      VII.B   In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk .......................................................................................................... 24

            VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial Condition ........................................................................................ 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood .......................................................................................... 26

VII.C  CSFB's Own Guidelines Require a High Standard of Care to its Clients ............ 27

VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors ................................................................................. 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy .................................................................................... 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives ....................................................................... 34

VII.E  The Advice CSFB Provided to Oakwood was Inappropriate ............................... 35

VII.F  The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition .................... 36

VII.G  CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value ........................................ 37

VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating .................................. 39

VIII.A  CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood ................................................................................................................ 39

VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood ....................................................................................... 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor ........................................................................................... 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern ............................................... 41

VIII.B  CSFB's Equity Interest provided it with a Financial Interest in Oakwood Continuing Operations ........................................................................... 42

VIII.B.1 Agency Conflict between Equity and Debt Holders ............................ 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C  Even Though CSFB was a Lender, Its Interests Differed from Those of Other Debt Holders ......................................................................................... 45

VIII.D  Conclusion Regarding CSFB's Incentives ............................................................. 47

# List of Tables

Table 7.1: CSFB's Roles and Fees Earned.................................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB .....................................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects .....................................................44

# List of Figures

Figure 7.1: Oakwood's Securitization Process .............................................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.    Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance.* In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis,* (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management.*

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

2

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.    Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.    Summary of Opinions

My opinions in this matter are as follow:

- *CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.* CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

3

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V.     Assumptions

### V.A     CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B     Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI.     Background

### VI.A     Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

4

## VI.B    Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C    Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.
[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.
[3] *Ibid.*, p. 2.

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D  Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*
[5] *Ibid.*, p. 7.
[6] *Ibid.*, p. 3.
[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.
[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks ... [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E   Oakwood's Downturn and Bankruptcy

### VI.E.1   Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.
[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000. p. 1.
[12] Ibid.
[13] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[14] Ibid.

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13. Issue 26.
[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.
[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2  Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] *Ibid.*

[21] *Ibid.*

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

**VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002**

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.
[26] *Ibid.*
[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.
[28] *Ibid.*
[29] *Ibid.*, p. 2.

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4  Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.

[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A    CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

#### VII.A.1    Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 59.
[35] *Ibid.*, p.183.

12

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

### VII.A.2   Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

### VII.A.2.a   Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than $7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;

- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;

- Testing the financial information contained in the prospectuses; and

- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

14

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

15

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

### VII.A.2.b   Role as Provider of Loan Purchase Facility

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

16

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

17

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[t]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006, p. 73.
[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006, p. 89.
[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1, p. 64-5.
[53] *Ibid.,* p. 194-5.

18

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

### VII.A.2.d     Role as Financial Advisor for Restructuring Purposes

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 ... We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

    The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.
[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.
[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

**Table 7.1:  CSFB's Roles and Fees Earned**

| Role | Description | Fees Earned |
|---|---|---|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | ▪ Warrants of 19.9% of Oakwood's Common Stock<br>▪ Upfront fee of $2.5 million<br>▪ Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 163.
[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 152.

21

This section and section VII.A.1 demonstrate that investment banks are in a unique position to access information concerning the financial conditions of their clients and that CSFB's professional responsibilities with respect to Oakwood went beyond its role of underwriter. In light of the numerous roles CSFB served for Oakwood, CSFB had access to both public and private information about the Company's financial condition. In the following section I show that CSFB did in fact obtain public and inside information about Oakwood's financial condition and outlook.

### VII.A.3  CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition

Given its roles as underwriter, lender, and financial advisor, CSFB obtained both public and private information from Oakwood, credit-rating agencies, and other market analysts. Oakwood provided CSFB personnel with substantial amounts of confidential information, including the historical loss experience of the securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. This information was relevant to an assessment of whether the manufactured housing industry in general was experiencing a significant downturn, and whether Oakwood in particular was suffering from an insolvent financial position from which it would not likely recover.

As early as June 1999, Moody's and S&P rated Oakwood's unsecured senior notes as Baa3 and BBB-, respectively – the lowest investment-grade ratings. Any downgrade would result in a junk bond status. Both Moody's and S&P placed the Company on a negative credit watch given that Oakwood's third-quarter results were anticipated to be as much as 50 percent lower than expectations.[64] By November 1999, Moody's and S&P had downgraded Oakwood's ratings on its corporate credit and long-term senior debt securities to below investment grade with a negative outlook.[65] In late 2000, the credit-rating agencies continued to downgrade Oakwood's credit rating. In lowering the credit rating of the Company's senior notes from BB- to CCC, S&P viewed Oakwood as having the highest-risk junk bond rating possible before entering default status. S&P maintained a negative outlook on Oakwood based on its belief that the Company's "current operating loss position will continue well into [2001], due to lower volumes at manufacturing, continued pricing pressures at retail, and higher costs within its captive finance

---

[64] CSFB New Customer Credit Review dated July 16, 1999. Document # CSFB-00250093.
[65] Email from David Caspar to Douglass Muir dated November 2, 1999. Document # CSFB-00175025.

unit."[66] By June 2001, Fiachra O'Driscoll noted that Oakwood "was rated Baa3/BBB- two years ago and is now Caa1/CCC."[67] In closely monitoring the actions taken by the credit-rating agencies, CSFB knew Oakwood had fallen below investment-grade status in 1999 and continued to be downgraded through 2002 to a level just above default junk bond status.

Through its own information processing, CSFB identified a number of credit issues and concerns with Oakwood in late 1999. In particular, CSFB noted that Oakwood was in a "poor financial condition."[68] Based on estimates provided by CSFB's Manufactured Housing analysts, CSFB projected in 2000 that Oakwood would realize a gross operating margin of 26.1 percent, resulting in a net loss of $1.8 million. CSFB further projected that Oakwood's EBIT would be about $15 million in 2000, significantly less than the level needed to cover its anticipated interest expense of $50 million in that year.[69] In estimating Oakwood's free cash flows in 2000, which included the repayment of interest expense and a $125 million revolver, CSFB's Credit Risk Management ("CRM") Team predicted negative cash flows ranging from losses of $75 million to $110 million.[70]

In addition to obtaining publicly available information about Oakwood, CSFB also had access to private, inside information. As discussed, as part of preparing the securitization prospectuses, Oakwood provided CSFB with inside information, including the historical loss experience of a securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectuses for securitizations. CSFB was given access to all deal files and closing binders on all retail installment sales contracts ("RICs") to be included in each securitized asset pool and had access to prior deal files and monthly tracking reports. Furthermore, Oakwood consulted with CSFB as to which customer would be approved to determine how those decisions would affect the market's perception of the collateral.[71]

---

[66] Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus dated October 30. 2000. Document # CSFB-00170815.
[67] Email from Fiachra O'Driscoll to Phil Jacob dated June 6, 2001. Document # CSFB-00154641.
[68] CSFB Credit Issues/Concerns with Oakwood Homes Corp. Document # CSFB-00250130.
[69] *Ibid.*
[70] *Ibid.*
[71] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006, p. 45.

23

### VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a  Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] Ibid.
[74] Ibid., Document # CSFB-00250116.

24

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] *Ibid.*

[76] *Ibid.*, Document # CSFB-00250117.

[77] *Ibid.*, Document # CSFB-00250121.

[78] *Ibid.*, Document # CSFB-00250118.

[79] *Ibid.*, Document # CSFB-00250117.

25

### VII.B.1.b   March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2   Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.

[81] *Ibid.*, Document # CSFB-00250132.

[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventor levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C    CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] *Ibid.*, Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] *Ibid.*
[88] *Ibid.*

27

Furthermore, with respect to handling customer accounts, CSFB's compliance manual requires adherence to the New York Stock Exchange's ("NYSE") "Know your Customer" rule. This rule mandates "every member organization to learn the essential facts concerning every customer, every account and every order executed on behalf of a customer,"[89] and is intended to protect customers of NYSE members in cases where "investors who suffer losses in securities transactions often allege that their loss resulted from recommendations made by brokers which were unsuitable for them in light of their financial situation and investment objectives."[90] Given CSFB's access to both public and inside information about Oakwood, CSFB was in a position in which it could have known all the essential facts concerning the Company's insolvent financial condition. Yet its recommendations and advice to Oakwood to maintain its operations were inappropriate given that both public and inside information about Oakwood indicated that the Company was in an irreversible spiral to bankruptcy.

## VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors

The previous sections demonstrate that, given its roles as financial advisor, lender, and underwriter, CSFB had access to public and private information about Oakwood's financial condition and outlook and was concerned about Oakwood's bankruptcy risk. Further, in addition to the fiduciary duty CSFB owed Oakwood and its creditors, its own internal guidelines required that it know its customers and avoid conducting transactions harmful to its clients. Nevertheless, CSFB's advice and conduct with respect to Oakwood were inconsistent with the Company's bleak financial condition and outlook, and thus in violation of the duties it owed.

Although Oakwood was insolvent by the fall of 2001, CSFB continued until August 2002 to provide advice and arrange transactions that did not properly consider the Company's financial condition and outlook and that served to exacerbate its insolvency. No evidence exists that CSFB performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that CSFB considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.

---

[89] CSFB Compliance Manual. Section 5- Customer Accounts. Document # CSFB-0053089.
[90] *Ibid.*

In the rest of Section VII.D, I assess the advice CSFB provided to Oakwood. As I discuss, no evidence exists that CSFB suggested filing for bankruptcy as an option for Oakwood until August 2002. In Section VII.E, I demonstrate that CSFB's advice to Oakwood did not duly consider the Company's financial situation. In Section VII.F, I show that the transactions CSFB engaged in with Oakwood were value-destroying and exacerbated the Company's financial problems. In Section VII.G, I explain that CSFB should have advised Oakwood to curtail its operations and should not have enabled the Company to continue to destroy value to its creditors.

**VII.D.1    CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy**

As discussed, between 2001 and August 19, 2002, the date CSFB signed a formal advisory agreement with Oakwood, CSFB was acting as a financial advisor to Oakwood. Based on the documents I have examined, CSFB never advised Oakwood of its insolvency or to even consider bankruptcy. Rather, the financial advice CSFB offered Oakwood centered on refinancing its outstanding debt to prolong the business. The objective of the CSFB presentations was to pitch certain financing schemes as a way to continue earning fees. I will now highlight the financial advice CSFB offered Oakwood throughout this period.

**VII.D.1.a    CSFB Presentation to Oakwood on June 26, 2001**

On June 26, 2001, in a presentation made by CSFB to Oakwood, CSFB claimed that its equity research analysts "believed that signals exist which may point to a bottom for the manufactured housing industry"[91] and that the industry "will rebound."[92] Whereas CSFB's CRM Team believed that there was great uncertainty as to whether the manufactured housing industry had reached a bottom yet, its Investment Banking Division provided Oakwood with information that expressed optimism that industry trends would soon begin to work in the Company's favor. This had the effect of prolonging Oakwood's financing activities rather than encouraging Oakwood to consider bankruptcy in light of its unrecoverable, insolvent financial condition.

Without discussing the option of bankruptcy, CSFB maintained that it was "uniquely suited to advise Oakwood [and that its] restructuring expertise [was] complemented by its #1 position in the High Yield market, strength in the asset-backed market and #1 ranked research."[93] CSFB also provided an update on its view of Oakwood's financial health. In particular, it forecasted the

---

[91] CSFB Presentation to Oakwood Homes Corporation dated June 26, 2001. Document # CSFB-00052958.
[92] *Ibid.*
[93] *Ibid.*, Document # CSFB-00052956.

Company's net income to increase from -$120.9 million in fiscal year 2000, to -$59.7 million in FY 2001, to -$23.3 million in FY 2002, and forecasted its EBITDA margin to increase from -0.3% in FY 2000, to 1.9% in FY 2001, to 4.6% in FY 2002. CSFB further claimed Oakwood had made great progress in addressing its capital structure and operating strategy issues and believed more could be accomplished to reduce the capital structure's drag on the business with the following key objectives: reducing the cash interest burden on Oakwood, shortening the time to a positive cash flow, reducing the book value of debt and increasing the common share price, and improving Oakwood's credit profile, thereby facilitating Oakwood's future access to the capital markets.[94]

When Oakwood's senior notes were trading at a combined discount of $150 million, CSFB recommended three strategies to Oakwood. The first strategy was called the "B-2 Sale and Bond Buyback." CSFB claimed Oakwood could capture a significant portion of the $150 million discount by monetizing its retained B-2 securities and using the proceeds to quietly buy back and retire some of its outstanding senior notes. CSFB's recommendation was based on the assumption that the industry had bottomed out and the Company's financial condition was going to improve, resulting in an increase in the prices of Oakwood's bonds in the near future. The second strategy was called the "Package Exchange Offer." Under this alternative, CSFB recommended that Oakwood offer its bondholders a package of new debt and common shares in exchange for old notes to capture more of the current bond discount. The third strategy was called "One-Off Equity for Debt Exchange." CSFB claimed that Oakwood could chip away at its debt by quietly offering individual bondholders common shares in exchange for senior notes. CSFB advised Oakwood that individual bondholders would be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time.

Rather than advise Oakwood to cut its losses and file for bankruptcy, CSFB encouraged Oakwood to continue to engage in financing activities based on uncertain assumptions that industry-wide and company-specific conditions would improve. This advice only accelerated the Company's insolvent financial position.

---

[94] *Ibid.*, Document # CSFB-00052978.

**VII.D.1.b   CSFB Presentation to Oakwood on August 9, 2001**

On August 9, 2001, CSFB made another presentation to Oakwood to provide further restructuring alternatives to the Company. Although Oakwood's bankruptcy appeared to be imminent, CSFB stated that "Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current trading level of its outstanding Notes."[95] Again, CSFB stated that it believed signals existed indicating that the manufactured housing industry had reached its bottom and that Oakwood should aggressively pursue strategies to capitalize on the trading levels of its public bonds.[96]

In stating that recent liquidity transactions had successfully positioned Oakwood to pursue restructuring options, CSFB recommended that the Company proceed with a three-step process. First, CSFB believed Oakwood should proceed with the application of the B-2 and receivables purchase facility proceeds that it proposed in its June 26, 2001, presentation. The second step was for Oakwood to refinance its credit facility with a new facility of $50 million. The goal of this strategy was to replace the current senior lenders with non-traditional lenders to allow Oakwood greater latitude. Third, CSFB advised Oakwood, as it did in its previous presentation, to further reduce its debt by considering a "Package Exchange Offer" and a "One-off Equity for Debt Exchange."[97] At the end of the presentation, CSFB listed more than one hundred "distressed finance assignments" it had performed for companies in which CSFB acted as a financial advisor to companies suffering from precarious financial and operating conditions.

Interestingly, shortly before making these presentations to Oakwood in 2001, CSFB issued a negative equity research report about the Company on April 26, 2001. In that report, CSFB lowered its fiscal 2001 estimate to a loss of $2.00 per share "based on the company's latest results and the continued softness in the manufactured housing industry."[98] In addition, the report maintained a Hold rating "given [Oakwood's] recent losses and excessive leverage (51% debt to capital and negative interest coverage) as well as the continued soft industry conditions."[99] While CSFB's equity research analysts were pessimistic about the condition of both Oakwood and the entire manufactured housing industry, CSFB's investment banking division was optimistic about the future prospects of the Company and the industry as a whole as a way to solicit more business from Oakwood.

---

[95] CSFB Presentation to Oakwood Homes Corporation dated August 9, 2001. Document # CSFB-00052854.
[96] *Ibid.*, Document # CSFB-00052855.
[97] *Ibid.*, Document # CSFB-00052873.
[98] CSFB Equity Research. "Oakwood Homes Corporation." April 26, 2001. Document # CSFB 001555802.
[99] *Ibid.*

**VII.D.1.c  CSFB Presentation to Oakwood in March 2002**

In a March 2002 presentation to Oakwood, CSFB advised Oakwood that it could reduce its March 2004 refinancing risk by exchanging the notes coming due in 2004 for a package of new notes and cash. CSFB noted that at that time notes coming due in 2004 had a face value of $125 million. CSFB recommended that these notes be exchanged for notes with a face value of $125 million with the same coupon and maturity as its notes coming due in 2009, with the cash portion of the exchange being sized to provide a modest premium to the trading levels of the 2004 notes.[100]

Table 7.2 below provides a summary of the strategic options and alternatives provided by CSFB in its presentations to Oakwood prior to August 2002.

**Table 7.2: Summary of Strategic Options Provided by CSFB**

| Presentation Date | Key Company Objectives Identified by CSFB in the Presentation | Strategic Alternatives Provided by CSFB |
|---|---|---|
| June 26, 2001 | ▪ Reduce cash interest burden on Oakwood<br>▪ Shorten the time to positive cash flow levels<br>▪ Reduce book value of debt and increase common share price<br>▪ Improve Oakwood's credit profile<br>▪ Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty | ▪ B-2 sale and open-market bond buyback<br>▪ Package exchange offer<br>▪ One-off equity for debt exchange<br>▪ Negotiate a flip-up transaction with a non-traditional senior lender |
| August 9, 2001 | ▪ Avoid a going-concern issue<br>▪ Replace current bank group<br>▪ Better utilize assets to raise non-traditional capital<br>▪ Reduce cash interest burden on Company<br>▪ Reduce debt & increase common share price<br>▪ Improve Oakwood's credit profile, thereby facilitating future access to the capital markets | ▪ Proceed with application of B-2 and Receivables Purchase Facility Proceeds<br>▪ Refinance credit facility with a new facility of $50 million or more<br>▪ Consider reducing debt through package exchange offer and one-off equity for debt exchange |
| March 2002 | Reduce Oakwood's March 2004 refinancing risk by exchanging the 2004 Notes for a package of new notes and cash | ▪ 2004 notes exchanged for $125M face value of new notes structured with the same coupon and maturity as 2009 notes<br>▪ Package exchange offer<br>▪ Flip-up transaction |

---

[100] CSFB Presentation to Oakwood Homes Corporation dated March 2002. Document # CSFB-00033246.

32

In providing a number of strategic alternatives for Oakwood to pursue to address its capital structure, at no point prior to August 2002 did CSFB advise Oakwood to consider filing for bankruptcy or that industry fundamentals were unlikely to improve soon enough for Oakwood to maintain its operations through the industry downturn. While CSFB's investment banking division failed to discuss the probability of bankruptcy with Oakwood until August 2002, its equity research group concluded that Oakwood posed a significant chance of bankruptcy throughout that time. On June 11, 2001, CSFB released a manufactured housing industry report stating that "[Oakwood] is still operating well in the red and the industry is not reaccelerating at this time."[101] In light of the weakness in Oakwood and the manufactured housing industry, CSFB explicitly asserted in the June 2001 report:

> Our probability that Oakwood does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with Oakwood, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares.[102]

On September 20, 2001, CSFB released another analyst report that stated verbatim its beliefs about the likelihood of Oakwood having to file for bankruptcy. CSFB still maintained a Hold rating on Oakwood, based again on its opinion that the "probability that Oakwood does not file for bankruptcy is now 50%."[103] While CSFB's investment banking division continued to present strategic options to Oakwood in 2001 and 2002 without discussing the possibility of bankruptcy, CSFB's research analysts contemporaneously published reports reflecting its concern that Oakwood posed a significant probability of bankruptcy. Not only did CSFB's research analysts believe that Oakwood had a fifty percent chance of filing for bankruptcy in June 2001, it believed that the probability of this occurrence had been even higher six months prior. Thus, CSFB's investment banking division continued to engage in activities that exacerbated Oakwood's insolvent financial condition and never advised the Company about the option of filing for bankruptcy until August 2002, even though its research analysts explicitly opined that the Company posed at least a 50 percent chance of filing for bankruptcy throughout 2001.

---

[101] CSFB Equity Research. "Manufactured Housing Industry Outlook: Approaching Bottom of Cycle; Not Out of the Woods Yet." June 11, 2001. Document # CSFB-00266476.
[102] Ibid.
[103] CSFB Equity Research. "Manufactured Housing- Retail Inventory Update: Second Quarter 2001." September 20, 2001. Document # CSFB 00266317.

### VII.D.2    CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise Oakwood that its best course of action might have been a restructuring. CSFB discussed Oakwood's capital structure and the potential courses of action it felt Oakwood should have considered pursuing to meet its liquidity and capital needs "in light of the sustained losses suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB stated that "while many thought that the industry had bottomed, there continues to be a downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's current state of operations and its short- and long-term prospects. Of particular concern was the maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that the factors threatening Oakwood's short-term liquidity position were $24 million in annual interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving, which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default rates and a structural change in the industry would place additional stress on Oakwood and that the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood chose should be based on its degree of optimism or pessimism as to its ability to grow into its capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views, CSFB offered a number of strategic alternatives. An optimistic view was seen as having a moderate-to-high probability of being able to service and refinance debt capitalization. If this were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid.*
[106] *Ibid.*, Document # MNAT006735.

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

## VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid.*, Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 201.
[109] *Ibid.*, pp. 169-170.
[110] *Ibid.* p. 16.

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006, Vol. 2, p. 232.
[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 19.
[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.
[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

## VII.G    CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.

[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.

[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

Committee in December 2002, Oakwood provided details of a rationalization plan ("the Plan") that sought to address the difficulties surrounding the Company's operations. The strategy of the Plan was to downsize Oakwood's operations, reduce fixed operating expenses, and improve the Company's cash flow and profitability.[118] In particular, the Plan proposed that Oakwood eliminate poorly performing retail stores, increase its focus on wholesales sales, adjust manufacturing capacity to a level in line with expected future sales, and reduce corporate overhead in line with the downsized company.[119] The Plan proposed accomplishing these objectives by eliminating Oakwood's presence in high-default states as well as closing seventy-four retail centers, five manufacturing plants and its Austin, Texas loan origination office. These actions alone were predicted to increase Oakwood's 2002 manufacturing and retail operating income by $30 million.[120] In light of the fact that the downturn in the manufactured housing industry was due in large part to overcapacity and excessive growth by companies like Oakwood, the advice CSFB provided should have entailed operational improvement strategies which focused upon downsizing the Company's operations. Rather, CSFB proposed alternative financing options which resulted in losses on securitization transactions and further impairment charges on Oakwood's REMIC valuations.

In addition, similar to providing the optimistic and pessimistic scenarios set forth in its presentation to Oakwood's board of directors after it was formally retained as a financial advisor for restructuring purposes, CSFB should have provided the Company with certain alternative courses of action if Oakwood's management believed it could not turn around its insolvent financial condition prior to mid-2002. Throughout its relationship with Oakwood, CSFB should have emphasized that the Company was confronted with both immediate and future liquidity-draining issues. Over the long term, CSFB should have advised that additional stress was going to be placed on the Company if the trends in default rates and industry structural change continued.[121] On further pointing out that Oakwood's securities were trading at distressed levels, its annual interest expense was high, and the servicing fees it earned on its REMIC securities were insufficient to cover the associated servicing costs, CSFB should have informed Oakwood of its unlikely prospect of improving its capital structure and provided more comprehensive restructuring solutions prior to August 2002 based on the assumption that the downturn in the manufactured housing industry was going to continue.

---

[118] Oakwood Homes Corporation. Creditors Committee Meeting dated December 9, 2002. Document # MNAT024088.
[119] Ibid.
[120] Ibid., Document # MNAT024090.
[121] CSFB Presentation to Oakwood Board of Directors dated August 19, 2002. Document # OHCLT-01706.

Further, CSFB should have advised Oakwood that if the Company was pessimistic about the future prospects of its financial and operating conditions, it should not continue to employ a wait-and-see approach or take advantage of the discounted trading levels of its debt. Assuming Oakwood was insolvent in the fall of 2001, CSFB should have recognized and considered early in its relationship with Oakwood that the Company's outstanding indebtedness exceeded its fundamental value and that a sale of the Company or a filing for bankruptcy were options Oakwood should have thoroughly evaluated. Prior to August 2002, CSFB should have been recommending that Oakwood scale back its operations or begin implementing a pre-arranged or pre-packaged bankruptcy strategy. Both of these options would have been in the best interests of the Company and its credit holders. Instead, CSFB's recommendations were centered on its financial incentive to keep Oakwood operational to earn exorbitant fees through its roles as an underwriter, lender, and advisor.

## VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating

In this section, I describe the financial incentives CSFB had to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy. I first describe the fees CSFB was earning, and stood to continue earning, from its relationship with Oakwood. I then explain how CSFB's equity interest in Oakwood allowed it to share in the upside of an Oakwood recovery. Finally, I describe how, despite being a lender to Oakwood, CSFB did not share in the costs of the turnaround attempt because its debt was bankruptcy protected. In short, because of its unique position as a bankruptcy-insulated lender and equity owner, CSFB would enjoy the upside of an Oakwood recovery without facing the consequences of the attempt (that continuing operations was further exacerbating Oakwood's insolvent financial condition), and because of its relationships with Oakwood, CSFB would earn more fees the longer the attempt continued.

### VIII.A  CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood

As I described in Section VII, CSFB provided several services and played varying roles over the course of its relationship with Oakwood from the early 1990s through 2002. During this period, CSFB acted as Oakwood's general financial advisor, primary underwriter of its securitization program, secured lender, and as of August 19, 2002, its financial advisor for restructuring purposes. As discussed below, CSFB earned significant fees for providing these services to Oakwood.

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility. [126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.
[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.
[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.
[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.
[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.
[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

**VIII.A.3  Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor**

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:
  - The face amount of the old securities;
  - One third of the face amount of the securitization guarantees; and
  - One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

**VIII.A.4  Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern**

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.
[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

## VIII.B    CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1    Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.

[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

42

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.
[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

43

Table 8.1: Illustration of Payoffs and Probabilities of Projects

| Cash Flow | Project A | | Project B | |
|---|---|---|---|---|
| | Unsuccessful | Successful | Unsuccessful | Successful |
| | Payoff (80% Prob.) | Payoff (20% Prob.) | Payoff (50% Prob.) | Payoff (50% Prob.) |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

**VIII.B.2  CSFB Had a Conflict of Interest with Oakwood's Debt Holders**

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

**VIII.C  Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders**

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.
[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989.301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection for lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

46

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict -- that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

## VIII.D   Conclusion Regarding CSFB's Incentives

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.


Dated:    April 30, 2007


_____

Alan C. Shapiro, Ph.D.

47

**Appendix A:  Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California 90089-1427

### EDUCATION
| | |
|---|---|
| Ph. D. | Economics, Carnegie Mellon University, 1971 |
| B.A. | Mathematics, Rice University, 1967 |

### CURRENT POSITION
1991-Present:     Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

### PAST POSITIONS
1993-1997:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:     Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:     Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:     Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:     Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:     Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:     Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

### VISITING APPOINTMENTS
Spring 2003:     U.S. Naval Academy

Spring 1990:     Yale School of Management, Yale University

1

1984-1985:      Anderson Graduate School of Management, UCLA

Spring 1981:    Faculty of Commerce, University of British Columbia

Spring 1977:    Stockholm School of Economics

**TEACHING EXPERIENCE**

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

**EXECUTIVE PROGRAMS: UNIVERSITIES**

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

2

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

## EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS
CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

3

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy; O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

### Editorial Positions

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

### Boards of Directors

Academy of International Business
Western Finance Association
American Finance Association

### Reviewer for

*Journal of Financial Economics*
*Journal of Political Economy*
*Journal of Finance*
*Management Science*
*Journal of International Economics*
*Journal of Money, Credit, and Banking*
*Journal of Financial and Quantitative Analysis*
*National Science Foundation*
*Journal of International Money and Finance*

*Journal of Banking and Finance*
*Financial Review*
*International Trade Journal*
*Financial Management*
*Urban Economics*
*Journal of International Business Studies*
*Journal of Economics and Business*
*Journal of Financial Services Research*

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management Association, 1986.

5

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

> Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

> Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

6

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

8

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

10

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

## WORKING PAPERS

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

## CONSULTING AND PROFESSIONAL ACTIVITIES

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

11

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

12

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

13

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

**AWARDS AND SPECIAL RECOGNITION**

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

**SPEECHES**

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

14

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

**EXPERT WITNESSING**
1.  Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2.  Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3.  Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4.  New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5.  Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6. O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7. IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8. IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9. Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

16

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

17

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

18

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

19

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

20

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Hafif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton: Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

22

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

24

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:**
**1994-2006**

1. Fleet Funding, Inc. and Fleet Funding 11, Inc., Appellants v. Commissioner of Revenue, Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

2. K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc., Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the County of Santa Clara: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages. I was deposed on February 3, 2006 on behalf of the defendant.

3. Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior Court of the State of California for the County of Santa Clara: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the plaintiff.

4. Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C, United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004 (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5. Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6. TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7. Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8. Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9. Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

20. Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

29

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

30

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

31

# Appendix B:  List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.*

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

*EXHIBIT M*

OAKWOOD HOMES CORPORATION

Minutes of Special Meeting of the Board of Directors
Held Tuesday, August 10, 1999

Pursuant to written notice sent to all the directors of Oakwood Homes Corporation (the "Corporation"), a special meeting of the Board of Directors of the Corporation was held at the executive offices of the Corporation on Tuesday, August 10, 1999, beginning at 11:00 A.M. eastern time.

### Part One

Nicholas J. St. George, Chairman and Chief Executive Officer of the Corporation, called the meeting to order and served as Chairman of the meeting. Mr. St. George, William G. Edwards, Kermit G. Phillips, II, Clarence W. Walker and H. Michael Weaver were present at the meeting in person. Dennis I. Meyer, Roger W. Schipke, Sabin C. Streeter and Francis T. Vincent, Jr. participated in the meeting via telephonic conference call. Also present in person at the request of the Chairman were Myles E. Standish, Executive Vice President, Chief Administrative Officer and General Counsel of the Corporation, Robert A. Smith, Executive Vice President and Chief Financial Officer of the Corporation, and Stephen K. Rhyne and Mark R. Busch, of Kennedy Covington Lobdell & Hickman, LLP, counsel to the Corporation. At the request of the Chairman, Brian Sterling and Lisa Donohoe of Merrill Lynch & Co., financial advisor to the Board of Directors and the Special Committee, and Matthew Nimetz of Paul, Weiss, Rifkind, Wharton & Garrison, special counsel to the Special Committee and the disinterested members of the Board, participated in the meeting via telephonic conference call. Mr. Rhyne served as Secretary of the meeting.

The Chairman declared that a quorum was present and the meeting was therefore organized and constituted for the transaction of business.

Mr. St. George began the meeting with a discussion of current industry conditions and the status of the Corporation's strategic and tactical plan to respond to it. Mr. St. George advised the Board that industry conditions had not materially changed since the Board meeting held August 2, 1999, with retail overcapacity continuing and aggressive sales incentives depressing margins. Mr. St. George stated that while the impact might vary from company to company, all of Oakwood's competitors would be affected by adverse industry conditions, and that although predicting the length of the downturn was difficult, management's current estimate was that it would continue for at least another six to twelve months.

Mr. St. George then began a discussion of the status of management's strategic and tactical plan addressing these industry conditions. He stated that the sales incentive programs (including Rate Busters) introduced in July were beginning to take hold, the restructuring of the Corporation's commission structure had been implemented and a

1724416.01
LIB:

national television advertising campaign was about to begin. Mr. St. George concluded by stating that he was confident the Corporation's plan would be effective but that market conditions were currently difficult.

Mr. St. George then recognized Mr. Edwards for a more detailed discussion about management's response to the adverse industry conditions. Mr. Edwards informed the Board that the first part of management's strategy was to improve sales at the retail level and that, to that end, the Corporation had introduced a rebate program (featuring standard financing rates with cash discounts). He said that the rebate program was in addition to the "Rate Busters" program and that the idea was to provide customers a choice of incentives. Mr. Edwards continued that initial test responses to the combined programs had been good and that the sales force was generally optimistic. Mr. Edwards noted, however, that competition was intense.

Mr. Edwards stated that in addition to focusing on improving retail sales, the Corporation was committed to improving wholesale sales and as a result the Corporation's Schult subsidiary was developing plans to sell homes at a lower price point. Mr. Phillips then asked Mr. Edwards about the information the Corporation had regarding the financial condition of independent dealers with whom the Corporation does business. Mr. Edwards responded that the Corporation works very closely with its independent dealers and that it was not aware of any of them being in serious trouble. He noted that the Corporation did face some risk of independent dealer failure but that unlike the situation that Champion Homes faced with Ted Parker Homes, the Corporation's sales to independent dealers represent a small portion of the Corporation's total sales and the impact of any such dealer failures was not expected to be substantial.

Mr. St. George then asked Mr. Smith to brief the Board on the status of the cost reduction measures in the Corporation's plan. Mr. Smith informed the Board that the Corporation had closed a total of three plants and reduced headcount by 1,000 since May. Mr. Smith indicated the Corporation was on target to meet its goal of reducing inventory in the fourth quarter by 5,000 floors and that specific cost reductions of $30 million had been identified for the fiscal year beginning October 1.

Mr. St. George then reiterated the central components of management's plan as follows: (a) increasing retail sales through introduction of incentive programs; (b) increasing sales to independent dealers; (c) reducing inventory; (d) realigning the Corporation's cost structure; (e) curtailing expansion plans; (f) focusing on existing assets; and (g) reorganizing the finance company to improve efficiency. Mr. St. George concluded by stating that the full effects of the Corporation's strategic and tactical plan would not be felt until the next fiscal year.

Mr. Streeter then asked Mr. Smith to address the Corporation's liquidity position. Mr. Smith responded that in order to insure adequate liquidity, the Corporation intended to do two things: reduce inventory and explore options for financing retail sales other than through REMIC securitizations. Mr. Smith emphasized that current market conditions for the Corporation's REMIC certificates were unfavorable as a result of

2

1724416.01
LIB:

spreads being very wide and uncertainty with regard to the Corporation existing in the marketplace. Mr. Smith continued that management was in the process of evaluating the optimal capital structure for the Corporation. Mr. Smith was then asked how fourth quarter earnings looked and Mr. Smith responded that while it was early in the quarter, it appeared that operating results for the quarter would likely be similar to those for the third quarter, with an increase in sales likely to be offset by charges for plant closings and other restructuring costs.

**[End of Part One]**

3

1724416.01
LIB:

KCLH    0963

## Part Two

At approximately 12:00 p.m., Messrs. St. George, Edwards, Smith and Standish left the meeting and the disinterested directors continued the meeting without members of management present. Mr. Meyer, Chairman of the disinterested directors, recognized Mr. Sterling for a report on the status of Merrill Lynch's current contacts with potential strategic partners and financial buyers.

Mr. Sterling informed the disinterested directors that not much had occurred since the last meeting of the Board of Directors on August 2, 1999, other than that Champion's financial advisor had called to indicate that notwithstanding Champion's announcement regarding the charges it had incurred related to Ted Parker Homes, Champion should still be allowed to participate in any sale process regarding the Corporation. Mr. Sterling stated that industry stock prices continued to be depressed and that comparable companies are trading at an average of 8 times earnings per share whereas the Corporation is trading at 11 times earnings per share. According to Mr. Sterling, the Corporation's trading premium was probably due at least in part to the June 18 public announcement regarding the Corporation's exploration of strategic alternatives. Mr. Sterling then informed the disinterested directors that Merrill Lynch had recently rated the Corporation as a long term buy and that as a general proposition Merrill Lynch was optimistic about the manufactured housing industry for the long term. Mr. Sterling continued that since August 1998 the Corporation's stock price trend had roughly corresponded with the trend for the industry.

Mr. Sterling was then asked whether the view of Merrill Lynch expressed by Mr. Sterling at the Board's previous meeting on August 2, that now is not a good time for the Corporation to be exploring strategic alternatives, was still the same. Mr. Sterling responded that given current industry conditions and other factors previously discussed with the disinterested directors, it was still Merrill Lynch's conclusion that now is not an opportune time to pursue strategic alternatives and that as a result Merrill Lynch would agree with a determination by the Board to terminate exploration of strategic alternatives. Mr. Sterling cautioned, however, that the disinterested directors in doing so should be confident in management's ability to implement its strategic and tactical plan.

Mr. Vincent asked Mr. Sterling whether Merrill Lynch's conclusion assumed that the Corporation would not experience a liquidity crisis during the next year and Mr. Sterling responded that Merrill Lynch had not looked at the issue. A discussion of the Corporation's liquidity position then followed, with Mr. Phillips noting that the cash flow statements he had recently received looked good and Mr. Meyer expressing his confidence in Mr. Smith's ability to oversee the Corporation's liquidity position.

Mr. Meyer then asked Mr. Nimetz and Mr. Rhyne to discuss with the Board legal considerations in evaluating the Board's next step with regard to exploration of strategic alternatives. Mr. Nimetz noted that whether or not management had sought to put together a management buyout, the relevant question for the independent directors was the same: whether or not given current industry conditions and all other factors, it was in

4

KCLH    0964

the best interests of the shareholders for the Corporation to proceed to explore strategic alternatives at this time. Mr. Nimetz stated that it was his sense that the consensus of the disinterested directors was that as a result of the factors that had been previously discussed, a continued exploration of strategic alternatives at this time was not in the best interest of the shareholders, which he felt was a reasonable conclusion.

Mr. Rhyne then informed the Board that in evaluating whether to continue or terminate the exploration of strategic alternatives the disinterested directors had three duties: good faith, due care and loyalty. He continued by stating he believed that the Board had been acting in good faith during its proceedings and that through the numerous meetings and briefings held during this time, particularly in light of the discussions at these meetings and as a result of the advice received from the Board's advisors, the Board had demonstrated that it was acting with due care, deliberately and after being fully informed. Mr. Rhyne said that in his view the Board had observed its duty of loyalty by keeping the interests of the shareholders paramount and that in making its final decision the disinterested directors should consider only the best interests of the shareholders.

The disinterested directors then engaged in a discussion of considerations concerning whether the Board should adopt the previously distributed resolutions that would terminate the Board's further exploration of potential strategic alternatives. In previous meetings a number of factors had been discussed indicating that it was not an appropriate time to be considering strategic alternatives, and Mr. Vincent suggested that, in addition, the disinterested directors should hear from Mr. Edwards and be assured that he believed in management's plan and management's ability to successfully implement the plan. Mr. Schipke concurred it would be helpful for the independent directors to hear directly from Mr. Edwards and to determine also his intentions regarding his tenure with the Corporation. After further discussion, Mr. Edwards was asked to return to the meeting to discuss with the Board his strategic vision for the Corporation's future and his intentions with regard to retirement. Mr. Edwards then returned to the meeting, and in response to the inquiry of the disinterested directors, he informed the disinterested directors that he was committed to staying with the Corporation for a least another five years. Mr. Edwards then discussed in detail his vision of the Corporation's long-term strategy and prospects. Mr. Edwards added that he believed that the current executive management team was the best in the Corporation's history.

At this point Mr. Edwards again recused himself from the meeting. Mr. Streeter expressed his view that Mr. Edwards had made a very strong presentation of his vision for the future of the Corporation and his enthusiasm for guiding the Corporation through its current difficulties. A discussion of Mr. Edwards and the other members of management then followed, with various disinterested directors expressing their confidence in the abilities of the Corporation's management. Mr. Meyer then asked if there were considerations in addition to those previously discussed which should be considered at this time. There being none, upon motion duly made and seconded, the following resolutions were unanimously adopted:

1724416.01
LIB:

KCLH    0965

WHEREAS, at a Special Meeting of the Board of Directors held June 18, 1999, the Board determined that it was in the best interests of the Corporation and its shareholders that the Board consider strategic alternatives to enhance shareholder value, including the possible merger or sale or management led buyout of the Corporation;

WHEREAS, at a Special Meeting of the Board of Directors held June 30, 1999, the Board of Directors approved the formation of a Special Committee (the "Special Committee") for the purpose of representing the interests of the Corporation and its shareholders in connection with the exploration and pursuit of strategic alternatives available to the Corporation;

WHEREAS, the Special Committee on its behalf and behalf of the Board of Directors has engaged Merrill Lynch & Co. as a financial advisor and Paul, Weiss, Rifkind, Wharton & Garrison as special counsel; and

WHEREAS, during several meetings and briefings, including those on June 30, July 9, July 16, July 21, August 2, and August 10, 1999, disinterested members of the Board of Directors had heard reports on industry conditions and the Corporation's financial performance and considered and discussed the strategic alternatives available to the Corporation and the advisability of continuing to explore such alternatives in light of conditions in the manufactured housing industry, the recent financial performance of the Corporation and other factors affecting the Corporation and potential strategic and financial buyers.

NOW, THEREFORE, BE IT RESOLVED, that after an extensive review of a number of factors and considerations and taking into account the advice of Merrill Lynch & Co., financial advisor to the Board of Directors and the Special Committee, the disinterested members of the Board of Directors have determined that it is in the best interests of the shareholders of the Corporation that the Corporation continue its operations as an independent entity, and that to that end this Board of Directors' exploration and pursuit of strategic alternatives be terminated;

FURTHER RESOLVED, that the Special Committee be, and it hereby is, dissolved; and

FURTHER RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized to take such all such further actions as may be necessary or desirable or appropriate in their judgment to carry out the full intent and purposes of the foregoing resolutions.

**[End of Part Two]**

6

1724416.01
LEB:

## Part Three

At the request of Mr. Meyer, Messrs. St. George, Edwards, Standish and Smith rejoined the meeting and Mr. Meyer then briefed the full Board on the actions taken by the disinterested directors. After Mr. Meyer reviewed the factors that had been considered by the disinterested directors in deciding to terminate the exploration of strategic alternatives, upon motion duly made and seconded, the following resolutions which had been previously furnished to the Board of Directors were unanimously adopted:

> WHEREAS, the disinterested members of the Board of Directors have determined that it is in the best interests of the shareholders of the Corporation that the Corporation continue its operations as an independent entity and that the Board of Directors terminate its exploration and pursuit of strategic alternatives;

> NOW, THEREFORE BE IT RESOLVED, that the full Board of Directors hereby approves, ratifies and confirms the resolutions of the disinterested directors terminating the Board of Directors' exploration of strategic alternatives and dissolving the Special Committee formed for the purpose of representing the interests of the Corporation and its shareholders in connection therewith.

Mr. Meyer then briefed the Board on the Compensation Committee's earlier deliberations concerning employment arrangements to be entered into between the Corporation and Mr. St. George following Mr. St. George's retirement as Chairman and Chief Executive Officer. Mr. St. George then recused himself from the meeting so that the Board of Directors could consider these arrangements. After further discussion and upon motion duly made and seconded, the following resolutions were unanimously adopted:

> WHEREAS, Nicholas J. St. George, Chairman and Chief Executive Officer of the Corporation, has informed the Board of Directors that he will limit his active service with the Corporation on September 30, 1999, including resigning from the Board of Directors and as Chairman and Chief Executive Officer; and

> WHEREAS, the Compensation Committee of the Board of Directors has recommended to the Board that in connection with Mr. St. George's retirement, it approve the Corporation's entering into the certain employment arrangements with Mr. St. George on the terms outlined to the Board of Directors;

> NOW, THEREFORE BE IT RESOLVED, that the Board of Directors hereby accepts Mr. St. George's retirement effective as of September 30,

7

172441601
LIB:

1999, as Chairman and Chief Executive Officer of the Corporation and as a member of the Board of Directors of the Corporation;

FURTHER RESOLVED, that the Board of Directors hereby approves the Corporation's entering into the arrangements with Mr. St. George approved by the Compensation Committee of the Board of Directors, and hereby authorizes and directs Dennis I. Meyer, Chairman of the Compensation Committee, to negotiate with Mr. St. George definitive agreements in connection therewith; and

FURTHER RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized to take such all such further actions as may be necessary or desirable or appropriate in their judgment to carry out the full intent and purpose of the foregoing resolutions.

The Board then discussed the potential appointment of Mr. Edwards to succeed Mr. St. George following his retirement on September 30, 1999. Mr. Edwards then recused himself from the meeting so the Board of Directors could consider his election as Chairman and Chief Executive Officer of the Corporation. Mr. Walker observed that Mr. Edwards had made an effective presentation earlier in the meeting regarding his strategic vision for the Corporation and his resolve to implement management's plan. After further discussion, upon motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, the Board of Directors has on the date hereof accepted the resignation of Nicholas J. St. George as Chairman and Chief Executive Officer of the Corporation effective as of September 30, 1999, and has determined to elect William G. Edwards, President and Chief Operating Officer of the Corporation, to succeed Mr. St. George as Chairman and Chief Executive Officer of the Corporation;

NOW, THEREFORE BE IT RESOLVED, that William G. Edwards be, and he hereby is, elected to the offices of Chairman and Chief Executive Officer of the Corporation, effective October 1, 1999, to serve, subject to the provisions of the Bylaws of the Corporation, until his successor shall have been duly elected and qualified; and

FURTHER RESOLVED, that the proper officers of the Corporation be, and they hereby are, authorized to take such all such further actions as may be necessary or desirable or appropriate in their judgment to carry out the full intent and purpose of the foregoing resolutions.

Mr. Edwards then rejoined the meeting.

The Board then discussed the draft press release that had been distributed to the members of the Board. Mr. St. George asked whether any Board member had any

8

1724416.01
LIB:

comments. Mr. Streeter suggested that the language in the draft press release concerning Mr. St. George's retirement and giving him "considerable credit" for his services on behalf of the Corporation understated the Board's appreciation for all Mr. St. George had done for the Corporation. Mr. Standish responded that management would work on adding some additional language to the press release concerning Mr. St. George's accomplishments as Chief Executive Officer of the Corporation.

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned at approximately 1:30 p.m.

Stephen K. Rhyne
Secretary

APPROVED AS TO PARTS ONE AND THREE:
(WITHOUT REVIEW OF PART TWO)

Nicholas J. St. George
Chairman of the Board


APPROVED AS TO PART TWO:

Dennis I. Meyer
Chairman of the Independent Directors

9

1724416.01
LIB:

KCLH    0969