IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| Oakwood Homes Corporation, | Chapter 11 |
| et al., | Case No. 02-13396 (PJW) |
| Debtors. | |
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Adversary Proceeding No. 04-57060 (PJW)  Civil Action No. 07-799 (JJF) |
| Defendants. | |

**DOCUMENTS
IN SUPPORT OF DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**VOLUME II**

*EXHIBIT N*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Wednesday, September 20, 2000

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Wednesday, September 20, 2000 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Prior to addressing the formal business of the meeting, Mr. Edwards met with the non-employee directors of the Corporation. The non-employee directors attending the meeting were Clarence W. Walker, Dennis I. Meyer, Sabin C. Streeter, Kermit G. Phillips, II and H. Michael Weaver, in person; Roger W. Schipke and Francis T. Vincent, Jr. attended the meeting by telephonic conference call such that all directors could simultaneously hear each other.

At the conclusion of the meeting with the non-employee directors, Mr. Edwards offered his resignation as Chief Executive Officer and a director of the Corporation and as an officer and director of the Corporation's subsidiaries. Mr. Edwards' resignation was accepted by the non-employee directors. Mr. Edwards left the meeting.

Duane D. Daggett, President of the Corporation, Robert A Smith, Executive Vice President and a director of the Corporation, and Myles E. Standish, Executive Vice President of the Corporation, joined the meeting.

The first order of business was election of a Chairman of the Board. After discussion, upon motion duly made and seconded, the following resolution was adopted.

RESOLVED, that Dennis I. Meyer be, and he hereby is, elected Chairman of the Board of Directors of the Corporation to serve, subject to the provisions of the Bylaws of the Corporation, until his successor is duly elected and qualified.

The next item of business was consideration of electing directors to fill vacancies on the Board. After discussion, upon motion duly made and seconded, the following preambles and resolutions were adopted:

WHEREAS, there are three vacancies on the Board of Directors and it is desirable and in the best interest of the Corporation and its shareholders that two of such vacancies on the Board be filled; and

WHEREAS, Section 3.6 of the Bylaws of the Corporation permits the Board to fill a vacancy not sooner filled by the shareholders; and

RCDA 033115

WHEREAS, Duane D. Daggett and Myles E. Standish are qualified to serve as directors of the Corporation and have expressed a willingness to serve.

NOW, THEREFORE, BE IT RESOLVED, that Duane D. Daggett be elected a director of the Corporation, to serve until the 2001 Annual Meeting of the Corporation's shareholders, as a member of the class of directors to serve until the 2002 Annual Meeting of shareholders, and until his successor is elected and qualified; and

FURTHER RESOLVED, that Myles E. Standish be elected a director of the Corporation, to serve until the 2001 Annual Meeting of the Corporation's shareholders, as a member of the class of directors to serve until the 2003 Annual Meeting of shareholders, and until his successor is elected and qualified; and

FURTHER RESOLVED, that Duane D. Daggett and Myles E. Standish receive no additional compensation for services rendered to the Corporation as directors, inasmuch as they are already adequately compensated for services rendered as executive officers of the Corporation.

The next item of business was to reconstitute the Executive Committee of the Board. After discussion, upon motion duly made and seconded, the following resolutions were adopted:

RESOLVED, that Dennis I. Meyer, Kermit G. Phillips, II, H. Michael Weaver, Duane D. Daggett and Myles E. Standish be, and they hereby are, elected to the Executive Committee of this Board of Directors, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

FURTHER RESOLVED, that Dennis I. Meyer be, and he hereby is, elected as Chairman of the Executive Committee of this Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor shall be elected.

The next item of business was to consider establishment of a Management Committee of the Board of Directors. After discussion, upon motion duly made and seconded, the following resolutions were adopted:

RESOLVED, that Robert A. Smith, Duane D. Daggett and Myles E. Standish be, and they hereby are, elected to the Management Committee of this Board of Directors, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

2

RCDA 033116

FURTHER RESOLVED, that Duane D. Daggett be, and he hereby is, elected as Chairman of the Management Committee of this Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor shall be elected; and

FURTHER RESOLVED, that pursuant to Section 55-8-25 of the North Carolina Business Corporation Act (the "Act"), the Management Committee shall have and may exercise all of the authority of the Board of Directors to do the following:

1.  Organize subsidiaries of the Corporation;

2.  Make investments in and advances to subsidiaries of the Corporation;

3.  Acquire or dispose of assets of the Corporation in amounts not greater than $5,000,000 with respect to any single transaction;

4.  Enter into contracts for borrowed money or lease agreements;

5.  Guarantee the obligations of subsidiaries of the Corporation;

6.  Cause subsidiaries of the Corporation to enter into contract to which the Corporation or any subsidiary of the Corporation is already a party; and

7.  Amend any employee benefit plan.

The next item of business was consideration of election of a chief executive officer of the Corporation. After discussion, upon motion duly made and seconded, the following resolution was adopted:

RESOLVED, that Duane D. Daggett be, and he hereby is, elected Chief Executive Officer of the Corporation to serve, subject to the provisions of the Bylaws of the Corporation, until his successor is duly elected and qualified.

There followed a discussion among the directors of a number of issues facing the Corporation and the current status of the Corporation's businesses and operations.

3

RCDA 033117

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

_____
Dennis I. Meyer
Chairman

4

RCDA 033118

*EXHIBIT O*

## OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Monday, October 16, 2000

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Monday, October 16, 2000 at the offices of Baker & McKenzie in New York City.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting. Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.

Members of the Board present at the meeting were as follows: Dennis I. Meyer, Kermit G. Phillips, II, Sabin C. Streeter, Roger W. Schipke, H. Michael Weaver, Francis T. Vincent, Jr., Clarence W. Walker, Duane D. Daggett, Robert A. Smith and Myles E. Standish.

The Chairman then declared that a quorum was present and the meeting was therefore duly organized and constituted for the transaction of business.

The first order of business to come before the meeting was a discussion of potential financial arrangements with Mr. William G. Edwards, the former Chairman and Chief Executive Officer of the Corporation who had recently left the employment of the Corporation, and Mr. J. Michael Stidham, who is resigning his position as an Executive Vice President of the Corporation's principal retail subsidiary, as well as the consulting arrangement between the Corporation and Mr. Nicholas J. St. George, the Corporation's former Chairman and Chief Executive Officer. Following discussion, it was the consensus of the directors that the Executive Committee of the Board should make such financial arrangements with Messrs. Edwards, Stidham and St. George as in their judgment were in the best interest of the Corporation and its shareholders.

The next item of business was a report by Mr. Meyer on the meeting the preceding week of the Executive Committee of the Corporation, at which were discussed in considerable detail, among other things, the items on the agenda for today's meeting of the Board.

The next item of business was a briefing by Mr. Smith on the highlights of the Corporation's financial budget for the fiscal year ending September 30, 2001. An extensive discussion about the budget and related business issues ensued.

The next item of business was a report by Mr. Daggett on his activities and actions since becoming Chief Executive Officer of the Corporation. Among other things, Mr. Daggett discussed his actions to strengthen the retail organization, enhance revenues, improve retail training, reorganize management and establish performance measurement and related compensation systems.

In response to a question, Mr. Muir gave a brief report on the Corporation's asset-backed securities program, the ABS market generally and ABS-related risks affecting the Corporation.

The next item of business was a report by Mr. Smith on the status of management's efforts to obtain replacement financing for the Corporation's existing warehouse and revolving credit facilities.

The next item of business was a presentation by Mr. Daggett on the elements of the Performance Improvement Plan he has crafted and implemented to improve the Corporation's results of operations and financial strength.

The final item of business was a proposal by Mr. Daggett to promote certain officers of the Corporation. Following discussion, the following resolution was unanimously adopted:

RESOLVED, that the following persons be, and they hereby are, elected to the offices set forth opposite their respective names below, each to serve, subject to the provisions of the Bylaws of the Corporation, until his or her respective successor is duly elected and qualified:

| Name | Office |
| --- | --- |
| Robert A. Smith | Executive Vice President – Financial Operations and Assistant Secretary |
| Myles E. Standish | Executive Vice President -- Operations, General Counsel and Assistant Secretary |
| Douglas R. Muir | Executive Vice President – Treasury and Strategic Planning, Secretary and Treasurer |
| Suzanne H. Wood | Executive Vice President and Chief Financial Officer and Assistant Secretary |
| Timothy J. Graff | Senior Vice President -- Customer Service |

Mr. Daggett briefed the Board on personnel decisions and related promotions affecting other persons employed by various of the Corporation's subsidiaries which had been made in support of the Performance Improvement Plan and asked that the record of the meeting reflect the Board's approval of same. The Board unanimously indicated its approval.

KCLII    1060

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

3

KCLH   1061

# *EXHIBIT P*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Wednesday, November 15, 2000

---

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Wednesday, November 15, 2000 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting. Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.

Members of the Board present at the meeting were as follows: Dennis I. Meyer, Kermit G Phillips, II, Roger W. Schipke, Clarence W. Walker, Duane D. Daggett and Robert A. Smith, in person; Sabin C. Streeter, H. Michael Weaver, Francis T. Vincent, Jr and Myles E. Standish participated in the meeting by means of a telephonic conference call such that all directors could simultaneously hear each other. Also present were Raylen W Gritton, Forrest R. Quesenberry, Michael E. Taylor and Macy W. Foster of the Corporation's retail operations, Michael D. Rutherford of the Corporation's consumer finance operations and Suzanne H. Wood, Executive Vice President and Chief Financial Officer of the Corporation.

The first item of business to come before the meeting was a presentation by Mr. Rutherford on the Corporation's consumer finance operations, including credit performance trends, origination trends and matters receiving particular attention from management, including credit quality, repossessions, delinquency and training of retail personnel on consumer finance programs. After a question and answer session, Mr Rutherford left the meeting

The next item of business to come before the meeting was a presentation by Mr. Gritton and the other members of management of the Corporation's retail operations on initiatives being undertaken in retail, including retails sales initiatives, implementation of the Results Management System and changes in the retail compensation system, including the goals and objectives of the new plan being designed and implemented. After a question and answer session, Messrs. Gritton, Foster, Taylor and Quesenberry left the meeting.

The next item of business to come before the meeting was consideration of approval of the minutes of Board meetings held on June 30, August 8 and October 16. Upon motion duly made and seconded, the minutes were approved

The next item of business was a report from Mr. Walker on the Audit Committee meeting held on November 7. Mr. Walker reported that it was possible the Corporation's independent accountants would issue a "going concern" report with respect to the Corporation's financial statements as of and for the year ended September 30, 2000, but that

the ultimate decision by the accountants was dependent upon their evaluation of all the relevant facts and circumstances, including the Corporation's projected future results of operations and the Corporation's continued access to short-term credit. Mr. Walker also reported that the committee concurred with the conclusion of management and the independent accountants that a valuation allowance should be provided for substantially all of the Corporation's deferred income tax assets. He also reported that the Committee, after extensive consideration, had decided to endorse management's decision not to obtain independent valuations of retained REMIC interests, and noted that the independent accountants had been complementary of improvements implemented by management in its processes for valuing such interests. Finally, Mr. Walker reported that the Committee had reviewed the potential effects of prospective changes in the Corporation's revenue recognition practices as a result of adoption of the provisions of Staff Accounting Bulletin No. 101 in fiscal 2001.

The next item of business was a review by Mrs. Wood of drafts of the Corporation's financial statements as of and for the year ended September 30, 2000. A discussion ensued.

The next item of business was a report by Mr. Smith on the status of new short-term credit facilities which management currently was negotiating. Mr. Smith reported that the planned facilities were a revolving facility of approximately $175 million in size (subject to sufficient appraisals on the assets securing the facility) with Foothill Capital and a loan purchase facility of approximately $200 million with Credit Suisse First Boston. Mr. Smith indicated he believed that CSFB would require a warrant covering a significant number of shares of the Corporation's common stock as part of the consideration for the facility. Mr. Muir then gave a report on the status of efforts to monetize some or all of the Corporation's inventory of subordinated asset-backed securities, as well as the liquidity issues associated with providing retail financing for customers desiring to purchase repossessed homes.

The next item of business was a report by Mr. Daggett on the Performance Improvement Plan for fiscal 2001 drafted by Messrs. Daggett, Smith and Standish  A discussion ensued.

The next item of business was election of officers of the Corporation. Upon motion duly made and seconded, the following resolution was adopted:

RESOLVED, that the following persons be, and they hereby are, elected to the offices set forth opposite their respective names below, each to serve, subject to the provisions of the Bylaws of the Corporation, until his or her respective successor is duly elected and qualified:

| Name | Office |
|------|--------|
| Dennis I  Meyer | Chairman |
| Duane D. Daggett | President and Chief Executive Officer |
| Robert A. Smith | Executive Vice President - Financial Operations and Assistant Secretary |

2

MNAT006718

| Myles E. Standish | Executive Vice President - Operations, General Counsel and Assistant Secretary |
| Douglas R. Muir | Executive Vice President, Secretary and Treasurer |
| Suzanne H. Wood | Executive Vice President and Chief Financial Officer and Assistant Secretary |
| Chris J. Paul | Senior Vice President - Information Technology |
| Timothy J. Graff | Senior Vice President - Customer Service |
| John Herndandez, Jr. | Vice President - Information Technology |
| David C. Lyle | Vice President - Applications Development |
| Paul W. Macksood | Vice President - Human Resources |
| Earl C. Brewer, Jr. | Vice President - Tax |
| Lisa K. Carter | Vice President |

The next item of business was designation of executive officers of the Corporation. Upon motion duly made and seconded, the following preamble and resolution were adopted:

WHEREAS, its is desirable and in the best interest of the Corporation, for the purpose of various filings with the Securities and Exchange Commission and for internal matters, that the Corporation determine and state its executive officers.

NOW, THEREFORE, BE IT RESOLVED, that the following persons be considered executive officers of the Corporation:

> Duane D. Daggett
> Robert A. Smith
> Myles E. Standish
> Douglas R. Muir
> Suzanne H. Wood

The next item of business was consideration of the date of the annual meeting of the shareholders of the Corporation and the record date for same. Upon motion duly made and seconded, the following preambles and resolutions were adopted:

WHEREAS, Section 2.2 of Article II of the Bylaws of the Corporation provides that the Annual Meeting of Shareholders shall be at 2:00 p.m. on the fifth Wednesday of the calendar year; and

WHEREAS, it is appropriate of the Board of Directors to designate January 31, 2001 as the date of the 2001 Annual Meeting of Shareholders and to fix the record date for determination of shareholders entitled to notice of and to vote at the 2001 Annual Meeting of Shareholders.

NOW, THEREFORE, BE IT RESOLVED, that the 2001 Annual Meeting of shareholders of the Corporation be held at 2:00 p.m., Local Time, at the

3

MNAT006719

Joseph S. Koury Convention Center, Greensboro, North Carolina, on Wednesday, January 31, 2001; and

FURTHER RESOLVED, that the close of business on December 8, 2000 be, and it hereby is, fixed as the record date for the determination of shareholders entitled to notice of and to vote at the 2001 Annual Meeting of Shareholders of the Corporation to be held January 31, 2001 and that only those shareholders of the Corporation of record at the close of business on December 8, 2000 shall be entitled to notice of and to vote as said meeting.

The next item of business was consideration of the persons to be recommended to the shareholders for election to the Board of Directors and of the persons to be designated as proxies for the annual meeting of shareholders. Upon motion duly made and seconded, the following preambles and resolutions were adopted:

WHEREAS, the Board of Directors has designated January 31, 2001 as the date of the 2001 Annual Meeting of Shareholders and December 8, 2000 as the record date for said Annual Meeting; and

WHEREAS, Section 3.2 of the Bylaws of the Corporation provides that the number of members of the Board of Directors shall be a maximum of fifteen and a minimum of seven with the exact number fixed by resolution of the Board of Directors; and

WHEREAS, it is appropriate for the Board of Directors to (i) designate individuals to be suggested to the shareholders as proxies for the 2001 Annual Meeting of Shareholders, (ii) fix the number of members of the Board of Directors, (iii) name the nominees for election as Directors and (iv) direct the mailing of the Annual Report to Shareholders, Proxy Statement and Notice of Annual Meeting.

NOW, THEREFORE, BE IT RESOLVED, that Duane D. Daggett and Myles E. Standish, and each of them and their respective substitutes, be, and they hereby are, designated as the individuals to be suggested to the shareholders of the Corporation as proxies for such shareholders at the Annual Meeting of Shareholders to be held Wednesday, January 31, 2001 and any adjournment thereof, and that the names of said individuals also be included in the form of proxy to be solicited by the Board of Directors of this Corporation for use at said Annual Meeting of Shareholders and any adjournment thereof; and

FURTHER RESOLVED, that the number of members of the Board of Directors be fixed at eleven, and

FURTHER RESOLVED, that the Board of Directors proposes that the following persons be nominated for election to membership of the Board of Directors of the Corporation at the Annual Meeting of Shareholders to be held on January 31, 2001: Clarence W. Walker, Dennis L Meyer and Robert A. Smith for terms ending in 2004; Myles E. Standish for a term ending in 2003; and Duane D. Daggett for a term ending in 2002, and that there be a vacancy on the Board to be filled by this

4

MNAT006720

Board of Directors or the shareholders when an appropriate candidate for the vacancy is identified; and

FURTHER RESOLVED, that this Corporation's Annual Report to Shareholders for the fiscal year ended September 30, 2000, and the Notice of the 2001 Annual Meeting, Proxy Statement and form of proxy be mailed on December 27, 2000 or as soon thereafter as possible, to all of the shareholders of record of this Corporation on December 8, 2000.

The next item of business was consideration of a resolution to establish the compensation of non-employee directors of the Corporation. Upon motion duly made and seconded, the following preamble and resolutions were adopted:

WHEREAS, it is desirable to set the compensation of directors of the Corporation.

NOW, THEREFORE, BE IT RESOLVED, that the directors of the Corporation who are not also employed by the Corporation receive compensation as directors in the amount of $8,500 per quarter and that they also receive a fee of $1,000 for each meeting of the Board of Directors attended, $1,500 for each committee meeting of the Board of Directors attended and not held on the same day as a meeting of the Board of Directors, and $500 for each meeting participated in by conference telephone; and

FURTHER RESOLVED, that the directors of the Corporation who are not also employed by the Corporation and who are chairmen of committees of the Board of Directors receive compensation in the amount of $1,000 per quarter.

The next item of business was a report by Mr. Meyer on a proposal received from Mr. Lee Posey, Chairman of Palm Harbor Homes, for Mr. Posey to become chairman and chief executive officer of the Corporation and for the Corporation to hire Mr. Ladd Dawson, formerly of American Homestar, to assist Mr. Posey. Mr. Meyer reported that Mr. Posey's proposal had been carefully considered by the Executive Committee and had been declined.

The next item of business was a report by Mr. Meyer on the status of negotiations with Mr. St. George with respect to the existing consulting arrangement with Mr. St. George as well as the office expenses for Mr. St. George currently being paid by the Corporation, as well as the negotiations with Mr. Stidham, a former officer of a subsidiary of the Corporation, who was to become a independent retailer selling homes built by the Corporation.

The next item of business was a report by Mr. Meyer on a meeting held with Mr. Joseph H. Stegmayer, who previously was associated with Clayton Homes and Champion Industries and who now is responsible for the manufactured housing operations of Centex, the subject of which was ways in which the Corporation and Centex might enter into business arrangements regarding sale of sale of repossessed homes and performance of service work.

MNAT006721

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

. 6

MNAT006722

*EXHIBIT Q*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Tuesday and Wednesday, January 30 and 31, 2001

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Tuesday, January 30, 2001 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting. Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.

Members of the Board present at the meeting were as follows: Duane D. Daggett, Robert A. Smith, Myles E. Standish, Dennis I. Meyer, Sabin C. Streeter and Clarence W. Walker, in person; Francis T. Vincent, Jr. attended the meeting by means of a telephonic conference call by which all directors could simultaneously hear each other. Also present was Suzanne H. Wood, Executive Vice President and Chief Financial Officer.

The Chairman then declared that a quorum was present and the meeting was therefore duly organized and constituted for the transaction of business.

The first item of business was a report by Mr. Daggett on the status of the Corporation's businesses and the implementation of the Performance Improvement Plan. A discussion followed.

Kermit G. Phillips, II, a director of the Corporation, joined the meeting in person

The next item of business was a report by Messrs. Smith and Muir on the status of negotiations on the proposed new loan warehouse purchase and revolving credit facilities as well as the status of relations with the Corporation's existing lenders. Messrs. Smith and Muir also reported that management had attempted to have further discussions with representatives of Moody's Investors Service, who had almost peremptorily taken an ill-informed rating action in late December. However, with the exception of Mr. Meyer's and Mr. Muir's conversations with a Moody's representative shortly following the proposed December 2000 rating action (which did not take place), there had been no communication with the agency. Mr. Muir reported that management had continued to keep Moody's informed of the status of the business by means of voice mail messages and email, but that no messages had been returned or inquiries received.

H. Michael Weaver, a director of the Corporation, joined the meeting in person.

The next item of business was a report by Mr. Muir on his efforts to monetize some or all of the Corporation's inventory of subordinated asset-backed securities.

The next item of business was a report by Mr. Walker on the Audit Committee meeting held the preceding week. Mr. Walker reported that the Committee had reviewed the Corporation's first quarter results with management and the independent accountants and that there were no items that the Committee believed should be reported to the Board.

The next item of business was a report from Mr. Meyer on recent actions taken by the Compensation Committee. Mr. Meyer reported that the Committee had granted stock options and made restricted stock awards to a substantial number of employees of the Corporation. Mr. Meyer reported that the vesting schedule for the options and awards was considerably more rapid than typically had been the case in the past, which the Committee believed would be advantageous to the Corporation in its efforts to retain key employees, retention being a more significant issue currently than in the past due to difficult business conditions. Mr. Meyer also reported that the Committee had established target bonus amounts to employees whose compensation is subject to determination by the Committee, and had been informed of bonus amounts for a substantial number of other executives and key employees whose compensation is determined by management. Mr. Meyer reported that in each case payment of the bonuses was linked to achievement of each employee's objectives set forth in the memoranda prepared as part of the Results Management System implemented by Mr. Daggett; the timing of payment of bonuses earned varied among employees, from lower level employees having the ability to receive payment of a portion of annual targeted bonuses on an interim basis to Mr. Daggett, all of whose bonus, if earned, would be paid following the end of the Corporation's fiscal year.

The next item of business was a report by Mr. Smith concerning a communication from the New York Stock Exchange in which the Exchange advised that the Corporation's shares were subject to delisting if they continued to trade for less than $1 per share. Mr. Smith reported that no action was possible by the exchange until at least June 2001, and then only if the shares continued to trade at less than $1.

The next item of business was a report by Mr. Smith on the level of unsold repossessed properties. A discussion ensued.

The next item of business was a report by Mr. Daggett, in which he covered, among other things, current industry conditions, important issues being addressed in the retail operations, sales levels currently and projected for the near term, gross margins, selling costs and delinquencies and repossessions in the loan portfolio.

Roger W. Schipke, a director of the Corporation, joined the meeting.

Following Mr. Daggett's presentation, an extensive discussion ensued dealing with a number of significant business issues facing the Corporation.

The next item of business was a report by Mr. Standish on the organizational changes he planned to implement in the retail organization. The Board expressed approval of the planned changes and of changes in the retail compensation plans designed to support the reorganization and other changes Mr. Standish intends to implement in the retail operations.

2

The next item of business was a report by Mr. Smith on the range of possible results of operations for the balance of the Corporation's fiscal year, together with an overview of many of the uncertainties which make prediction of results difficult.

The next item of business was a report by Mr. Standish on the status of the HouseSmart operations in the Texas and Arizona markets. Mr. Standish reported that he intended to close the HouseSmart sales centers or convert them to traditional Oakwood sales centers.

Mr. Vincent left the meeting.

There followed the formal business of the meeting an extensive discussion on a wide range of topics affecting various areas of the business, in which additional questions from the directors were answered by management.

The meeting then recessed until the following day.

. . . . .

The meeting reconvened on January 31, 2001.

Members of the Board present at the meeting were as follows: Duane D. Daggett, Robert A. Smith, Myles E. Standish, Dennis I. Meyer, Sabin C. Streeter, Clarence W. Walker, Roger W. Schipke, Kermit G. Phillips, II and H. Michael Weaver, in person; Francis T. Vincent, Jr. attended the meeting by means of a telephonic conference call by which all directors could simultaneously hear each other.

The next item of business was election of the Compensation Committee of the Board of Directors. After discussion, the following resolutions were adopted:

RESOLVED, that Francis T. Vincent, Jr., Roger W. Schipke and Dennis I. Meyer be, and they hereby are, elected to the Compensation Committee of this Board of Directors, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

FURTHER RESOLVED, that Roger W. Schipke be, and he hereby is, elected Chairman of the Compensation Committee of the Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor is elected.

The next item of business was election of the Audit Committee of the Board of Directors. After discussion, the following resolutions were adopted:

RESOLVED, that Clarence W. Walker, Kermit G. Phillips, II, Sabin C. Streeter and H. Michael Weaver be, and they hereby are, elected to the Audit Committee of this Board of Directors, to serve, subject to the Bylaws of this

3

Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

FURTHER RESOLVED, that Clarence W. Walker be, and he hereby is, elected Chairman of the Audit Committee of this Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor shall be elected.

The next item of business was election of the Executive Committee of the Board of Directors. After discussion, the following resolutions were adopted:

RESOLVED, that Dennis I. Meyer, Kermit G. Phillips, II, H. Michael Weaver, Duane D. Daggett, Myles E. Standish and Robert A. Smith be, and they hereby are, elected to the Executive Committee of this Board of Directors, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

FURTHER RESOLVED, that Dennis I. Meyer be, and he hereby is, elected as Chairman of the Executive Committee of this Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor shall be elected.

The next item of business was election of the Management Committee of the Board of Directors. After discussion, the following resolutions were adopted:

RESOLVED, that Duane D. Daggett, Myles E. Standish and Robert A. Smith be, and they hereby are, elected to the Management Committee of this Board of Directors, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected; and

FURTHER RESOLVED, that Duane D. Daggett be, and he hereby is, elected as Chairman of the Management Committee of this Board of Directors of this Corporation, to serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until his successor shall be elected.

4

KCLII    1127

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

5

KCLH    1128

*EXHIBIT R*

OAKWOOD HOMES CORPORATION

Minutes of Meeting of Audit Committee of Board of Directors
Held July 23, 2001

Pursuant to notification given to all members of the Audit Committee of the Board of Directors of Oakwood Homes Corporation (the "Company"), a meeting of the Audit Committee (the "Committee") was held at 2:00 p.m. on Monday, July 23, 2001 at the offices of the Company, 7800 McCloud Road, Greensboro, North Carolina.

Members of the Committee were present as follows: Clarence W. Walker, Kermit G. Phillips, II, and H. Michael Weaver. Participating via conference call was Sabin C. Streeter.

Also present from the Company at the request of the Committee were Robert A. Smith, Executive Vice President – Financial Operations, Suzanne H. Wood, Executive Vice President and Chief Financial Officer, Duane D. Daggett, President and Chief Executive Officer, and during a certain portion of the meeting, Douglas R. Muir, Executive Vice President, Secretary and Treasurer and Wallace C. Tyser, Director of Compliance. Timothy G. Morgan, Charles L. Melman and Stephen P. Jackson of PricewaterhouseCoopers LLP (PwC) were also present; and Michael J. Stork with PwC participated via conference call.

Mr. Walker, Chairman of the Committee, presided and called the meeting to order. Gwendalyn C. Scott, Human Resources Manager, acted as Secretary.

Minutes of the April 19 and April 25, 2001 meetings of the Committee were approved as distributed.

The Committee was advised that as a result of a Comment Letter from the Securities and Exchange Commission regarding fiscal 1999 and 2000 annual and quarterly financial statements, the contents of which appeared to be relatively minor in nature, the Company has amended the 10-Q for the period ending March 31, 2001 to reflect the additional historical disclosures requested by the Commission.

Ms. Wood led a review of the Amended Corporate Disclosure Policy (Policy). The Committee suggested one minor change. On the third page under the section "Distributing analysts' report" the Committee agreed to amend the last sentence in that section to now read: However, upon request, the company will provide the names and addresses of all analysts who follow the company as shown on First Call. Subject to this change, Mr. Weaver moved that the Policy be adopted, Mr. Phillips seconded and the motion unanimously carried.

The next topic of discussion was an annual report to the Committee given by Wallace C. Tyser, Jr., Director of Compliance for Oakwood Acceptance Corporation (OAC), relating to legal and regulatory requirements and internal policies and procedures concerning loan origination and services. The report was discussed in detail and Mr. Tyser addressed various questions by the Committee. The Committee agreed to place on the agenda of the next day's Board of Directors meeting a discussion regarding a possible name change for OAC. The

OHC 045530

Committee asked that by its next Committee meeting Candy H. Grose, Vice President of Loan Origination and Risk Review, provide a report on the Compliance function for which she is responsible to include the number of people in this department, their areas of responsibility and the general results of their Compliance testing.

Ms. Wood then conducted a review of the preliminary results of operations and balance sheet for the quarter ending June 30, 200, which included a summary of impairment charges during this period. An in depth discussion ensued. Ms. Wood was asked to include the EBITDA calculation in future financials. The manufactured housing industry and its continuing deteriorated state were discussed. PwC has substantially completed their review of the quarter. No major adjustments for the quarter were anticipated. A status report was given on the relationships with our banks regarding the financial covenants for our line of credit. Management informed the Committee that preliminary results indicate that the Company may not be in compliance with certain debt covenants. If it is determined that that is the case, management will seek to obtain waivers and modifications for the current period and for the remainder of fiscal 2001. The press release on the results of the quarter and the analysts' conference call are scheduled to take place Thursday, July 26, 2001.

There followed a discussion concerning the REMIC default and recovery rate sensitivity analysis. Management responded to various questions by the Committee.

The next topic of discussion was a review of the Company's loan extension policy and procedures. Ms. Wood led the group through an analysis of the various situations that would qualify for loan extension. The Committee then reviewed an analysis of the loan assumptions program and a report on the methodology associated with the REMIC gain (or loss) on sale calculation. Mr. Walker asked that Ms. Wood provide the Committee with a list of all policies that we presently have in written form.

Ms. Wood then presented a complete summary of REMIC valuations. The recent B-piece sale in July was discussed, as was the timing of the potential sale of the remaining B-pieces and, specifically, an offer in aggregate from an unnamed buyer. The Committee agreed to continue discussions on the latter at the Board of Directors meeting the following day. It is anticipated that another securitization may take place in August. The Committee asked PwC what procedures they performed as part of their assessment of going concern relative to REMIC market conditions and the possibility that the Company be unable to access the market. Se Specifically, the Committee is interested in an analysis of the market today and its anticipated direction in the future, to include a sensitivity report regarding Oakwood and the impact to the Company should it go for an extended period without the funding from a securitization's deal. PwC noted that they conferred with Doug Muir and First Boston relative to the market and the marketability of Oakwood's paper relative to perceptions of the Company's ability to continue as a going concern. It was noted that the forecast and stress case assumptions reviewed in the FY 2000 audit included consideration of the percentage of par which the Company would be able to receive in Securitizations transactions and the consequences of a short term disruption in the market. An underlying assumption in the Company's forecasts is the ability to access the market and receive approximately 95% of par. The Committee asked to be informed of PwC's considerations of this assumption as part of their FY 2001 audit.

2

OHC 045531

PwC then presented information regarding the process it will follow in order to form a conclusion on the type of opinion to be rendered during its audit of the September 30, 2001 financials, including authoritative literature and guidance governing auditors' work, industry and Company-specific factors that could influence the conclusion, timing of the review and information needed from the Company. A lengthy discussion followed. PwC will closely monitor Company developments during the fourth quarter and be in close contact with Management in preparations for the evaluation of the financial statements and audit opinion.

Deferred to the next Committee meeting was the topic of Asset Protection in terms of other areas in the Company that are exposed to risk in light of the most recent reorganization of the Internal Audit function.

Company representatives were excused from the meeting, whereupon the committee went into Executive session with the outside auditors.

There being no further business to come before the meeting, motion was made, seconded and carried that it be adjourned.

Gwendalyn C. Scott, Secretary

APPROVED:

Clarence W. Walker, Chairman

3

OHC 045532

# *EXHIBIT S*

'

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Tuesday, July 24, 2001

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Tuesday, July 24, 2001 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Members of the Board present at the meeting were as follows:  Duane D. Daggett, Robert A. Smith, H. Michael Weaver, Myles E. Standish, Dennis I. Meyer, Sabin C. Streeter, Kermit G. Phillips, II and Clarence W. Walker; Francis T. Vincent participated by means of telephonic conference call such that all directors could simultaneously hear each other.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting.  Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.  Also present at the request of the Chairman were Suzanne H. Wood, Executive Vice President and Chief Financial Officer of the Corporation, and Stephen K. Rhyne and Debra M. Ingraham of Kennedy Covington Lobdell & Hickman, L.L.P.

The Chairman declared that a quorum was present and the meeting was therefore duly organized and constituted for the transaction of business

The first item of business was a briefing from Mr. Muir on a proposed securitization of the Corporation's inventory of subordinated REMIC securities.  Mr. Muir noted that the securitization would also include the securitization of substantially all the retained residual or interest-only securities owned by the Corporation; would result in the creation of an approximately $111 million bond to be sold at a dollar price of about 55% of par for an effective yield of approximately 20%; would involve a guarantee by the Corporation of timely payment of principal and interest on each of the subordinated securities; and would include granting to the investor a put option pursuant to which the investor could require the Corporation to purchase the new $111 million bond in ten years at its then outstanding principal balance plus accrued interest.  It was the unanimous consensus of the Board that the transaction be completed.  There followed a general discussion of broader corporate liquidity and cash flow issues.

The next item of business was a report from Mr. Standish on the plan discussed at the last Board meeting to substantially reduce the size of the retail organization.  Mr. Smith distributed copies of the presentation materials regarding the plan that had been used at management's meeting with the Corporation's bank group on Friday, July 20  Following discussion, the Board unanimously approved the retail restructuring plan.

The next item of business was a report by Mrs. Wood on the results of the Corporation's operations for the quarter ended June 30, 2001.  A discussion ensued, following which Mrs. Wood left the meeting.

KCLH    1176

The next item of business was a report from Mr. Standish on current industry conditions.

All persons other than the non-employee directors left the meeting. The non-employee directors then discussed succession planning for top management of the Corporation. Following that discussion, Mr. Vincent left the meeting.

The next item of business was a discussion, led by Mr. Walker assisted by Mr. Rhyne, concerning potential renewal of the shareholder rights agreement which was scheduled to expire shortly. After discussion, upon motion duly made and seconded, the following preambles and resolutions were adopted:

WHEREAS, the Board of Directors of the Corporation has determined that continuation of the Shareholder Protection Rights Agreement dated August 8, 1991 (the "Rights Agreement") is in the best interests of the Corporation and its shareholders, inasmuch as the Rights Agreement is designed to encourage potential acquirors to deal directly with the Corporation's Board of Directors, to provide the Board of Directors, in such circumstances, with an opportunity to consider alternatives to and examine the merits of an acquisition proposal, and to enhance the Board's ability to oppose a takeover offer that is inadequate, unfair, abusive or otherwise not in the best interests of the shareholders of the Corporation;

WHEREAS, the Rights Agreement expires by its terms on August 22, 2001, and the Board of Directors believes that amending the Rights Agreement to extend the expiration date and revise certain other provisions of the Rights Agreement that the Board has determined to be in the best interest of the Corporation and its shareholders, substantially in the form as attached hereto as Exhibit A (the "Amendment"), will further the objectives set forth in the preceding preamble; and

WHEREAS, the Rights Agreement provides that it may be amended without the approval of the rights holders, including to extend the Expiration Time, prior to the occurrence of a Flip-Over or Flip-In Event (as such terms are defined in the Rights Agreement)

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors hereby approves and confirms in all respects the Amendment;

FURTHER RESOLVED, that the proper officers of the Corporation are hereby authorized and directed to execute the Amendment on behalf of the Corporation;

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized, jointly and severally, in the name and on behalf of the Corporation, to take all such action, including filing an amendment to the

2

registration statement on Form 8-A filed by the Corporation on August 23, 1991, and to execute all such documents as they may deem necessary or appropriate in connection with the Amendment in order to comply with any federal, state and local laws, including without limitation the Securities Exchange Act of 1934, as amended;

FURTHER RESOLVED, that the officers are hereby authorized and directed, for and in the name and on behalf of the Corporation, to execute personally or by attorney-in-fact and cause to be filed with the Securities and Exchange Commission ("SEC") any amendments to any registration statements under the Securities Act of 1933, as amended (the "Securities Act"), for the registration of the Rights and of the shares of stock issuable upon exercise of the Rights, at such time as they deem such registration to be necessary and appropriate, and thereafter to execute personally or by attorney-in-fact and to cause to be filed any amended registration statement or registration statements and amended prospectus or prospectuses, or amendments or supplements to any of the foregoing, and to cause said registration statement and any amendments thereto to become effective in accordance with the Securities Act and the general rules and regulations of the SEC thereunder;

FURTHER RESOLVED, that the officers are hereby authorized, jointly and severally, in the name and on behalf of the Corporation, to execute and file such application or applications, and amendments and supplements thereto, and take such other action as may be necessary to cause the Rights and the shares of stock issuable upon exercise of the Rights to be listed on the New York Stock Exchange and on any other stock exchanges deemed by them to be appropriate, and that the officers, and each of them hereby is, authorized to appear before the Securities and Exchange Commission and the New York Stock Exchange, and to execute such papers and agreements as may be necessary to conform with the requirements of the Securities and Exchange Commission and the New York Stock Exchange and to effectuate such listing and registration;

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized and empowered, jointly and severally, for and in the name and on behalf of the Corporation, to execute and deliver any and all certificates, agreements and other documents, take any and all steps and do any and all things which they, or any of them, may deem necessary or advisable in order to effectuate the purposes of each and all of the foregoing resolutions; and

FURTHER RESOLVED, that any actions taken by such officers prior to the date of the foregoing resolutions adopted at this meeting that are within the authority conferred hereby are hereby ratified, confirmed and approved as the act and deed of the Corporation

3

KCLH    1178

The next item of business was a report from Mr. Walker on the Audit Committee meeting held the preceding day. Mr. Walker reported that the Committee had reviewed the Corporation's results of operations for the quarter ended June 30, 2001; been advised that there was a possibility that the restructuring charge expected to be recorded in the fourth quarter relating to the restructuring of the retail operations may include a write off of goodwill associated with underperforming sales centers; received a report from Mr. Tyser of the Corporation's consumer finance business on regulatory compliance in that business; reviewed a report on the sensitivity of the valuation of the Corporation's retained REMIC interests to changes in default and recovery rate assumptions; and discussed issues associated with the going concern analysis to be conducted by the independent accountants in connection with the annual audit of the Corporation's financial statements.

The next item of business was a report from Mr. Meyer, who stated that Mr. Lee Posey, Chairman of Palm Harbor Homes, had expressed interest in potentially acquiring the Corporation's retail and manufacturing operations in the Southwest and Pacific Northwest. Mr. Standish noted that the retail restructuring currently in process of finalization included closure of underperforming retail locations in these markets. Mr. Standish stated that after the retail restructuring was announced, he would contact Mr. Posey to determine the extent of Mr. Posey's interest in the Corporation's operations in these areas.

Mr. Walker left the meeting.

Mr. Meyer next informed the Board that he had been informed by Mr. Schipke that because of the significant logistical problems in traveling from Mr. Schipke's home to Greensboro, Mr. Schipke did not intend to stand for reelection to the Board at the 2002 annual meeting of shareholders. Mr. Meyer stated that he believed that for the time being it was not essential that Mr. Schipke's seat be filled, and the Board agreed with that judgment.

The next item of business was a report from Mr. Standish on the retail organization and the effects of the retail restructuring on the organization. Mr. Standish indicated that he intended to reduce the number of geographic regions in the retail operating structure from ten to eight as a consequence of the restructuring.

The next item of business was a report from Mr. Standish on the Corporation's manufacturing operations and the effects of the retail restructuring on those operations. Mr. Standish noted that the stores to be closed in the restructuring represented only about 8% of the Corporation's total unit volume, and that the Corporation had in June decided to close one of the Hillsboro, Texas plants. After giving effect to the Hillsboro closing, there exists a gap of about 3,000 to 4,000 floors between existing manufacturing capacity and preliminary estimates of fiscal 2002 floor needs, and that the stores to be closed in the restructuring would approximately eliminate that gap. Mr. Standish noted that the Pulaski, Tennessee and Moultrie, Georgia plants would bear the brunt of the effects of the retail restructuring; he believed volumes would remain sufficient to operate Pulaski at a profit, but Moultrie was questionable and would require ongoing monitoring. Mr. Standish concluded with a general overview of the wholesale sales environment.

The next item of business was a report from Mr. Smith on the consumer finance operations and how the retail restructuring would likely affect the consumer finance business.

4

KCLH    1179

The next item of business was a report from Mr. Smith on the status of new credit facilities and liquidity issues in light of the pending securitization of retained REMIC securities, including the proposed servicing advance facility, revolver and a sale/leaseback or mortgage on the McCloud Road building.

The next item of business was implementation of the management succession plan discussed earlier by the non-employee directors. Upon motion duly made and seconded, the following resolutions were adopted:

> RESOLVED, that Myles E. Standish be, and he hereby is, elected President and Chief Executive Officer of the Corporation to serve, subject to the provisions of the Bylaws of the Corporation, until his successor is duly elected and qualified; and

> FURTHER RESOLVED, that Duane D. Daggett be, and he hereby is, elected Vice Chairman of the Board of Directors of the Corporation to serve, subject to the provisions of the Bylaws of the Corporation, until his successor is duly elected and qualified.

Mr. Meyer then thanked Mr. Daggett for his efforts and accomplishments during his tenure as Chief Executive Officer, noting that Mr. Daggett had been an agent of change at a time when the Corporation needed those skills. Mr. Meyer presented Mr. Daggett with a memento from the Board commemorating Mr. Daggett's service.

The next item of business to come before the meeting was consideration of the composition of the Management Committee of the Board of Directors of the Corporation. Following discussion, upon motion duly made and seconded, the following preambles and resolution were adopted.

> WHEREAS, Section 3.8 of the Bylaws of the Corporation provides that members of committees of the Board of Directors serve at the pleasure of the Board; and

> WHEREAS, it is in the best interest of the Corporation that the membership of the Management Committee of the Corporation be reconstituted.

> NOW, THEREFORE, BE IT RESOLVED, that the membership of the Management Committee be reconstituted to consist solely of Myles E. Standish and Robert A. Smith, who shall serve, subject to the Bylaws of this Corporation, until the next annual meeting of this Board of Directors and until their successors shall be elected.

5

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

6

KCLH    1181

*EXHIBIT T*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Thursday, November 15, 2001

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Thursday, November 15, 2001 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting  Douglas R  Muir, Secretary of the Corporation, served as Secretary of the meeting.

Members of the Board present at the meeting were as follows:  Dennis I  Meyer, Kermit G. Phillips. II, Roger W. Schipke, Clarence W. Walker, Duane D. Daggett, Myles E. Standish, Robert A. Smith and Sabin C. Streeter  Also present at the request of the Chairman was Suzanne H. Wood, Chief Financial Officer of the Corporation

The first item of business was a review by Mrs. Wood of the Corporation's results of operations for the fourth quarter and year ended September 30, 2001  Questions were asked and answered.

Messrs. Tim Morgan, Chuck Melman and Matt Brockwell of PricewaterhouseCoopers, LLP, the Corporation's independent accountants, joined the meeting and made a presentation concerning the "going concern" analysis the accountants were undertaking in connection with their audit of the Corporation's consolidated financial statements for the year ended September 30, 2001  The presentation discussed, among other things, the accountants' approach to the analysis and the inherent uncertainties involved therein.  Significant discussion followed the presentation, after which the independent accountants left the meeting.

The next item of business to come before the meeting was the approval of the minutes of earlier meetings of the Board.  Upon motion duly made, seconded and carried, the Board approved the minutes of meetings held on April 19, June 8, July 24 and August 20, 2001.

The next item of business was authorization of officers of the Corporation to repurchase reset debentures issued by the Corporation in 1992.  Holders of such debentures have the option to require the Corporation to repurchase them at par on June 1, 2002, and from time to time the Corporation may have the opportunity to repurchase some of the debentures at a discount to par.  After discussion, the following resolution was adopted:

BE IT RESOLVED, that Myles E. Standish, Robert A. Smith, Douglas R. Muir and Suzanne H  Wood be, and each of them hereby is, authorized to cause the Corporation to repurchase any of the Corporation's outstanding Class A and

Class B Reset Debentures due 2007 at such prices and on such terms and conditions as they deem appropriate and in the best interests of the Corporation.

The next item of business was a report by Mr. Standish on conditions in the manufactured housing industry and the effects of the September 11, 2001 events on the Corporation's business.

The next item of business was a review by Mrs. Wood of the Corporation's results of operations for October 2001. Mr. Standish commented on the results, and discussion followed.

The next item of business was a report by Mr. Standish on the progress to date on the sale and closure of retail sales centers and an update on potential sales of manufacturing facilities. Mr. Standish reviewed the status of each of the currently operating manufacturing facilities in terms of order flow and of the wholesale business generally. A discussion followed.

The next item of business was a report by Mr. Smith on the status of the pending Foothill loan transaction, the resecuritization of subordinated ABS securities closed in August and the upcoming regular loan securitization.

The next item of business was a report from Mr. Standish on the status of the Corporation's modular housing business and the possibilities for expanding that business.

The next item of business was a briefing by Mr. Smith on a potential purchase of a portfolio of manufactured housing consumer loans from IndyMac, a former consumer lender to the manufactured housing industry which has exited the business. Mr. Smith indicated that he did not consider it likely that the portfolio could be acquired on a basis that would be attractive to the Corporation. Following this briefing, Mr. Smith updated the Board on the status of incoming loan repossessions and the number of problem loans being placed into the loan assumption program.

The next item of business was a report from Mr. Walker on the Audit Committee meeting held earlier in the day. Mr. Walker reported that there were no items of business taken up by the Committee which he believed should be reported to the Board.

The next item of business was a briefing by Mr. Meyer on the proposed separation financial arrangements with Mr. Daggett. Mr. Meyer proposed that Mr. Daggett receive a payment of $500,000 cash and that his existing stock options and stock appreciation rights be terminated and replaced with a phantom stock plan covering the same number of shares as did the terminated options and SARs. The phantom stock award would be payable in cash in an amount equal to (1) the excess, if any, of the average price of the Corporation's common stock for the 15 trading days ending December 31, 2004 over $3.15 per share with respect to 24,000 notional shares; (2) the excess, if any, of the average price of the Corporation's common stock for the 15 trading days ending December 31, 2004 over $7.05 per share with respect to 12,000 notional shares; and (3) the excess, if any, of the average price of the Corporation's common stock for the 15 trading days ending July 31, 2002 over $15.94 per share with respect to 5,000 notional shares. In addition, the Corporation would look into paying for Mr. Daggett's health insurance and certain life insurance premiums through

2

KCLH    1202

December 31, 2004, but this was not a commitment. After discussion, upon motion duly made and seconded, the Board approved the foregoing, with Mr. Daggett abstaining from the vote.

The next item of business to come before the meeting was an update by Mr. Standish on the Bloomquist defalcation matter.

The next item of business was consideration of compensation for non-employee directors. After discussion, upon motion duly made and seconded, the following preamble and resolutions were adopted:

WHEREAS, it is desirable to set the compensation of directors of the Corporation.

NOW, THEREFORE, BE IT RESOLVED, that the directors of the Corporation who are not also employed by the Corporation receive compensation as directors in the amount of $9,000 per quarter and that they also receive a fee of $1,000 for each meeting of the Board of Directors attended, $1,500 for each committee meeting of the Board of Directors attended and not held on the same day as a meeting of the Board of Directors, and $500 for each meeting participated in by telephone conference call; and

FURTHER RESOLVED, that the directors of the Corporation who are not also employed by the Corporation and who are chairmen of committees of the Board of Directors receive compensation in the amount of $1,000 per quarter.

The next item of business was consideration of appointment of independent accountants for the Corporation for fiscal 2002. Mr. Walker reported that it was the recommendation of the Audit Committee that PricewaterhouseCoopers, LLP be reappointed. After discussion, upon motion duly made and seconded, the following preamble and resolution were adopted:

WHEREAS, the Audit Committee of the Board of Directors of this Corporation has recommended that PricewaterhouseCoopers LLP be appointed as certified public accountants to examine the financial statements of the Corporation and its subsidiaries for the fiscal year ending September 30, 2002.

NOW, THEREFORE, BE IT RESOLVED, that pursuant to the recommendation of the Audit Committee of this Board of Directors, PricewaterhouseCoopers LLP be, and they hereby are, appointed as certified public accountants to examine the financial statements of the Corporation and its subsidiaries for the fiscal year ending September 30, 2002, subject, however, to approval by the shareholders of this Corporation at the Annual Meeting of Shareholders to be held on January 30, 2002.

The next item of business was the election of officers of the Corporation. After discussion, upon motion duly made and seconded, the following resolution was adopted:

KCLH     1203

RESOLVED, that the following persons be, and they hereby are, elected to the offices set forth opposite their respective names below, each to serve, subject to the provisions of the Bylaws of the Corporation, until his or her respective successor is duly elected and qualified:

| Name | Office |
|---|---|
| Myles E. Standish | President, Chief Executive Officer and General Counsel |
| Robert A. Smith | Executive Vice President - Financial Operations and Assistant Secretary |
| Douglas R. Muir | Executive Vice President, Secretary and Treasurer |
| Suzanne H. Wood | Executive Vice President and Chief Financial Officer and Assistant Secretary |
| Timothy J. Graff | Executive Vice President - Customer Operations |
| Chris J. Paul | Senior Vice President - Information Technology |
| David C. Lyle | Vice President - Applications Development |
| Steven D. Hendershot | Vice President - Information Technology |
| Paul W. Macksood | Vice President - Human Resources |
| Lisa K. Carter | Vice President |
| Randelle R. Smith | Assistant Treasurer |

The next item of business was designation of executive officers of the Corporation and/or its subsidiaries. After discussion, upon motion duly made and seconded, the following preamble and resolution were adopted.

WHEREAS, its is desirable and in the best interest of the Corporation, for the purpose of various filings with the Securities and Exchange Commission and for internal matters, that the Corporation determine and state its executive officers.

NOW, THEREFORE, BE IT RESOLVED, that the following persons be considered executive officers of the Corporation:

Myles E. Standish
Robert A. Smith
Douglas R. Muir
Suzanne H. Wood
Timothy J. Graff
Macy A. Foster
Michael D. Rutherford
Donald C. Davis

4

The next item of business to come before the meeting was nomination of directors and designation of proxies for the 2002 annual meeting of shareholders. After discussion, upon motion duly made and seconded, the following preambles and resolutions were adopted:

WHEREAS, the Board of Directors has designated January 30, 2002 as the date of the 2002 Annual Meeting of Shareholders and December 7, 2001 as the record date for said Annual Meeting; and

WHEREAS, Section 3.2 of the Bylaws of the Corporation provides that the number of members of the Board of Directors shall be a maximum of fifteen and a minimum of seven with the exact number fixed by resolution of the Board of Directors; and

WHEREAS, it is appropriate for the Board of Directors to (i) designate individuals to be suggested to the shareholders as proxies for the 2002 Annual Meeting of Shareholders, (ii) fix the number of members of the Board of Directors, (iii) name the nominees for election as Directors and (iv) direct the mailing of the Annual Report to Shareholders, Proxy Statement and Notice of Annual Meeting.

NOW, THEREFORE, BE IT RESOLVED, that Myles E. Standish and Robert A. Smith, and each of them and their respective substitutes, be, and they hereby are, designated as the individuals to be suggested to the shareholders of the Corporation as proxies for such shareholders at the Annual Meeting of Shareholders to be held Wednesday, January 30, 2002 and any adjournment thereof, and that the names of said individuals also be included in the form of proxy to be solicited by the Board of Directors of this Corporation for use at said Annual Meeting of Shareholders and any adjournment thereof; and

FURTHER RESOLVED, that the number of members of the Board of Directors be fixed at eleven; and

FURTHER RESOLVED, that the Board of Directors proposes that Sabin C. Streeter be nominated for election to membership of the Board of Directors of the Corporation at the Annual Meeting of Shareholders to be held on January 30, 2002 for a term ending in 2005, and that there be three vacancies on the Board to be filled by this Board of Directors or the shareholders when appropriate candidates for the vacancies are identified; and

FURTHER RESOLVED, that this Corporation's Annual Report to Shareholders for the fiscal year ended September 30, 2001, and the Notice of the 2002 Annual Meeting, Proxy Statement and form of proxy be mailed on December 26, 2001 or as soon thereafter as possible, to all of the shareholders of record of this Corporation on December 7, 2001.

The next item of business was the introduction by Mr. Meyer of the following resolutions:

WHEREAS, Roger W. Schipke has served as a director of the Corporation since 1996; and

5

KCLH    1205

WHEREAS, for reasons unrelated to his service as a director of the Corporation Mr. Schipke has decided not to stand for reelection to the Board of Directors.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors recognizes the contributions of Roger W. Schipke as a director of the Corporation; and

FURTHER RESOLVED, that the Board of Directors expresses its thanks and appreciation for Roger W. Schipke's dedicated and thoughtful service to the Corporation as a member of the Board of Directors of the Corporation, and

FURTHER RESOLVED, that the Secretary of the Corporation is hereby directed to place the foregoing preambles and resolutions in the permanent minute book of the Board of Directors of the Corporation.

The other directors joined Mr. Meyer in expressing appreciation to Mr. Schipke and, upon motion duly made and seconded, unanimously adopted the resolutions.

The next item of business was the introduction by Mr. Meyer of the following resolutions:

WHEREAS, Duane D. Daggett has served as President, as Chief Executive Officer and as a director of the Corporation; and

WHEREAS, Mr. Daggett has accomplished the objectives set out for him upon his election as Chief Executive Officer and has relinquished the office of President and Chief Executive Officer; and

WHEREAS, Mr. Daggett, having completed his objectives, has decided not to stand for reelection to the Board of Directors.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors recognizes the contributions of Duane D. Daggett as President, Chief Executive Officer and as a director of the Corporation; and

FURTHER RESOLVED, that the Board of Directors expresses its thanks and appreciation for Duane D. Daggett's dedicated and thoughtful service to the Corporation as a member of the Board of Directors of the Corporation, and for his efforts as an agent of change in leading the Corporation in difficult circumstances; and

FURTHER RESOLVED, that the Secretary of the Corporation is hereby directed to place the foregoing preambles and resolutions in the permanent minute book of the Board of Directors of the Corporation.

The other directors joined Mr. Meyer in expressing appreciation to Mr. Daggett and, upon motion duly made and seconded, unanimously adopted the resolutions.

6

The last item of business was a report to the Board from Mr. Meyer regarding a call he had received from representatives of a firm called Unaprop, who had expressed interest in the Corporation's business; Mr. Meyer reported that he had agreed to meet with the representatives after Thanksgiving and would report to the Board the substance of that meeting.

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis Meyer
Chairman

7

*EXHIBIT U*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Monday, May 6, 2002

---

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Monday, May 6, 2002 at the offices of the Corporation located at 7800 McCloud Road, Greensboro, North Carolina.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting. Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.

The following members of the Board attended the meeting in person: Dennis I. Meyer, Kermit G. Phillips, II, Clarence W. Walker, H. Michael Weaver, Myles E. Standish and Robert A. Smith. In addition, Francis T. Vincent, Jr. and Sabin C. Streeter participated by means of a telephonic conference call such that all directors could simultaneously hear each other. Also present at the request of the Chairman was Suzanne H. Wood, Chief Financial Officer of the Corporation.

The first item of business was a review by Mrs. Wood of the Corporation's results of operations for the quarter and year-to-date periods ended March 31, 2002. Questions were asked and answered.

The next item of business was a report from Mr. Standish on industry conditions as well as the Corporation's manufacturing and retail operations, including traffic levels at retail and his sense of the level of business at the Corporation's independent dealers. A discussion ensued.

The next item of business was a report from Mr. Smith on the Corporation's consumer finance operations, particularly the status of repossession and loan assumption inventories as well as the rate of incoming repossessions and assumptions. A discussion ensued.

Mr. Vincent left the meeting.

The next item of business was a report from Mr. Walker on the recent Audit Committee meetings. Mr. Walker reported that no significant items had been discussed at the meeting held two weeks earlier to review the results of operation for the second quarter, and that there were no items appearing on the independent accountants' schedule of unadjusted errors. Mr. Walker reported that at the meeting held earlier on May 6, the Committee had reviewed the valuation of assets and liabilities associated with the Corporation's loan securitizations and had received a report on process and personnel improvements that had recently been implemented to prevent the recurrence of a recently discovered accounting error; the Committee had concluded that the magnitude of the error was not such that any restatement of previously reported result was necessary. Mr. Walker also reported the Committee reviewed management's responses to the internal control recommendations made by the

OHC 020467



independent accountants, noting that the recommendations did not concern material items and that in any case management generally agreed with the recommendations and was taking steps to implement them.  In addition, the Committee received a report from the independent accountants on their plans for the audit of the Corporation's financial statements for 2002. Finally, Mr. Walker reported that the Committee had reexamined its charter and reaffirmed its appropriateness, but would continue to investigate corporate best practices in this area.

The next item of business was a discussion of the Corporation's liquidity outlook and credit facilities, including reports from management on the Foothill revolving credit facility and the amount and purpose of letters of credit supported by the Foothill facility, the potential additional financing facility for servicing advances, the current ABS market and the proposed sale of subordinated asset-backed securities into the Lotus resecuritization transaction, and a potential transaction which might be undertaken under which the Corporation could offer to exchange some or all of the Corporation's outstanding senior notes due in 2004 for a combination of cash and notes identical to the senior notes due in 2009, the last of these items being a proposal crafted by Credit Suisse First Boston in response to management's inquiry of CSFB as to possible ways to refinance the 2004 senior notes.

Mr. Muir was excused.

The next item of business was a discussion of the Oakwood Homes Corporation Director Deferral Plan.  After discussion, the following preamble and resolution were adopted:

WHEREAS, it is in the best interests of the Corporation and its shareholders that the Oakwood Homes Corporation Director Deferral Plan be terminated.

NOW, THEREFORE, BE IT RESOLVED, that the Director Deferral Plan be terminated as of May 6, 2002; and

FURTHER RESOLVED, that the appropriate officers of the Corporation are hereby authorized and directed to cause the accounts of participants in the plan to be paid to them in a single lump sum as soon as practicable.

2.

OHC 020468

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

3.

OHC 020469

*EXHIBIT V*

OAKWOOD HOMES CORPORATION

Minutes of the Meeting of the Board of Directors
Held Monday, July 29, 2002

Pursuant to written notice mailed to all of the Directors of Oakwood Homes Corporation (the "Corporation"), a meeting of the Board of Directors of the Corporation (the "Board") was held on Monday, July 29, 2002 at the offices of Baker & McKenzie located in New York City.

Dennis I. Meyer, Chairman of the Corporation, called the meeting to order and served as Chairman of the meeting. Douglas R. Muir, Secretary of the Corporation, served as Secretary of the meeting.

Members of the Board present at the meeting were as follows: Dennis I. Meyer, Kermit G Phillips, II, Clarence W. Walker, H. Michael Weaver, Francis T. Vincent, Jr., Myles E. Standish, Robert A. Smith and Sabin C. Streeter. Also present at the request of the Chairman was Suzanne H. Wood, Chief Financial Officer of the Corporation.

The first item of business was a review by Mrs. Wood of the Corporation's results of operations for the third quarter and year-to-date periods ended June 30, 2002. Questions were asked and answered.

The next item of business was a report from Mr. Standish on industry conditions, including the level of industry shipments to dealers, the financial difficulties at Conseco, Inc., weak employment levels and high bankruptcies in many of the Corporation's markets and the overhang of repo inventories (both the Corporation's and other lenders') in most markets.

The next item of business was a discussion of the Corporation's liquidity position, its access to capital, the problem of large numbers of non-performing loans and related repossessions and potential solutions to the ongoing performance and financial issues facing the Corporation.

The next item of business was a report by Mr. Standish on the recent meeting between himself, Mr. Smith, Mr. Muir and two representatives of Credit Suisse First Boston with representatives of the investor code-named LOTUS, who is a large investor in non-investment grade asset-backed securities issued by REMIC trusts formed by a subsidiary of the Corporation and a large investor in the Corporation's senior notes.

Mr. Standish next briefed the Board on the steps taken by management in preparing for any potential financial reorganization of the Corporation that might be required. While management has not concluded that such steps are necessary, Mr. Standish reported that, as previously disclosed to the Board, management believed preparedness for such action was prudent so that it could be well managed if such action became necessary, and that he had undertaken discussions with Credit Suisse First Boston about retaining that firm as a financial advisor, as well as considered other potential financial advisors.

**MNAT006776**

A thorough discussion ensued.  Following discussion, the Board assigned to the Executive Committee of the Board the task of consulting with management to develop a list of alternative strategies to deal with the financial issues facing the Corporation (including guarantees of asset-backed securities, the senior notes and the potential further shortfalls in servicing fee receipts as a consequence of increasing credit losses) with a view toward developing a comprehensive solution to those issues.  The Board directed that management return with a preliminary action plan at a Board meeting to be held on August 19.

The next item of business was a report from Mr. Standish on the Corporation's housing business, both retail and wholesale, including the reasons the wholesale business appeared to be performing better than the industry in terms of sales, changes to retail salesperson and general manager compensation plans recently implemented or to be implemented on October 1, and planned headcount reductions in the retail sales force to better align headcount with business volume.

The next item of business was a report from Mr. Walker on the Audit Committee meeting held earlier in the day.  Mr. Walker reported that the principal item of discussion was the "going concern opinion" issues that were being addressed by the Corporation's independent accountants and by management.  Mr. Walker also reported that the Committee received several reports concerning compliance with regulations and policy and procedure in the consumer finance business, none of which noted any areas of particular concern.

The next item of business was consideration of an amendment to the Corporation's 401(k) plan. Following discussion, the following resolution was adopted:

BE IT RESOLVED, that the Instrument of Amendment to the Oakwood
Savings Plan attached hereto as Exhibit A be, and it hereby is, adopted.

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned.

Douglas R. Muir
Secretary

APPROVED:

Dennis I. Meyer
Chairman

2

MNAT006777

*EXHIBIT W*

MINUTES OF THE MEETING
OF THE BOARD OF DIRECTORS
OAKWOOD HOMES CORPORATION, A NORTH CAROLINA CORPORATION
NOVEMBER 12, 2002

A meeting of the Board of Directors of Oakwood Homes Corporation was held on November 12, 2002 at the offices of the corporation in Greensboro, North Carolina. Present at the meeting were Directors:

Myles E. Standish
Robert A. Smith
Sabin C. Streeter
Dennis I. Meyer,
Clarence W. Walker
Kermit G. Phillips, II
and, by telephone, H. Michael Weaver

Also present at the meeting were:
Suzanne H. Wood, Chief Financial Officer
Douglas R. Muir, Executive VP, Secretary & Treasurer
Fiachra O'Driscoll, Managing Director, Credit Suisse First Boston
Jared Felt, Investment Banker, Credit Suisse First Boston
Robert J. Dehney of Morris, Nichols, Arsht & Tunnell, Delaware Bankruptcy Counsel, and C. Richard Rayburn of Rayburn, Cooper & Durham, Special Insolvency Counsel, who acted as Secretary of the meeting

## Management's Report

The meeting began with a report from President Standish on the current status of the Company's plans with respect to a prospective Chapter 11 reorganization. Mr. Standish reported:

1.    The Company is preparing to file a Chapter 11 reorganization proceeding in Delaware on Friday, November 15, 2002.

2.    The Company is preparing for the closing of plants outlined in its restructuring plan on Thursday, November 14, 2002.

3.    The Company is planning for the closing of approximately 75 sales centers outlined in its restructuring plan on Friday, November 15, 2002

4.    With respect to the principal and interest advance due by Oakwood Acceptance Corporation, as Servicer, to various REMICs on Thursday, November 14, 2002, the advance will be made to the extent funding is available through the Prudential facility, but will not be made in cash for the approximately 20 securitizations for which no advance funding is available through the Prudential facility. As to these

MNAT006829

securitizations, the advance may be made by offset of certain sums due to Oakwood Acceptance Corporation by the REMICs.

5. In connection with the filing, the Company is seeking a waiver from the Credit Suisse First Boston warehouse facility for new loans, which the Company expects to have by Friday.

6. The Company also expects on Friday to have a DIP facility available to fund its operations in its Chapter 11 proceeding. The leading candidate for that facility is Foothill Capital, the current lender.

7. The Company is continuing its ongoing discussions with Berkshire Hathaway and its affiliates through CSFB with a draft term sheet having been sent to Berkshire Hathaway on the evening of November 11, 2002. With respect to items 5, 6, and 7 above, the Company's goal is to announce on Friday, November 15, 2002 that it has a facility arranged with Credit Suisse First Boston for funding of its warehouse, that it has a DIP facility available with additional liquidity, and that it has the support of Berkshire Hathaway in its reorganization efforts. At this point, Jared Felt of CSFB reported that it is possible that the Company would have a non-binding Term Sheet approved that could be filed as an attachment to a Form 8-K with the SEC on Friday, November 15, 2002.

8. Two of the major floor plan lenders supplying credit to independent dealers who buy homes from Oakwood will stop credit approvals for home shipments next week. Those lenders have demanded Letters of Credit to support the Oakwood repurchase exposure and the Company presently does not have the capacity under its Foothill facility to provide those Letters of Credit.

9. The Bermuda reinsurance subsidiary, Tarheel Insurance Company, Ltd., is in a windup of its affairs. The risk ceded to Tarheel is fully collateralized by Foothill/Wells Fargo letters of credit (of which American Bankers Insurance is the beneficiary), but the Company also has self-insurance insured by Tarheel as well. The concern is that the windup of its affairs is necessary in order to avoid the appointment of a receiver or similar official by the Bermuda authorities who might either trigger an involuntary bankruptcy against Oakwood Homes Corporation (to collect Tarheel's outstanding receivable from Oakwood Homes) or otherwise interfere with the Company's reorganization efforts.

## Counsel's Analysis

After this presentation, Mr. Standish called on Mr. Rayburn to provide a legal analysis of the Company's options with respect to a Chapter 11 reorganization. Mr. Rayburn delivered a memorandum, a copy which is attached as **Exhibit A** to these minutes, prepared by Rayburn, Cooper & Durham concerning the Duties of Directors of a North Carolina Corporation. Mr. Rayburn advised that, under the present circumstances of the Company, a Chapter 11 reorganization clearly offers benefit to the Company in effecting its restructuring plan through

the rejection of leases, the rejection of certain contracts, the closing of facilities, and the potential to renegotiate the servicing agreements for its REMICs. Having recommended that the Company file a Chapter 11 proceeding, Mr. Rayburn further spoke to the relative desirability of filing a "free fall" Chapter 11 proceeding (that is, one without a prior agreement with major creditors for a restructuring) versus filing a pre-agreed or pre-arranged bankruptcy proceeding with major creditor support. His advice was that the filing of a pre-arranged bankruptcy proceeding is less risky and therefore more beneficial to the preservation of the corporate enterprise and the preservation of the corporate enterprise value for all constituents within the Company, including its stockholders, than the filing of a "free fall" bankruptcy, which risks the loss of value from the enterprise and the complete elimination of any value for the most junior constituents.

Mr. Walker and Mr. Phillips asked specific questions about the necessity of filing a reorganization proceeding on Friday, November 15, 2002 as opposed to some later time. Mr. Standish answered that while the Company could possibly manage its liquidity past Friday, it could only do so for one to two weeks; that during that period, the Company could not ship to any independent dealers because of the cut-off of floor plan financing by Bombardier and Textron; and that the Company would possibly trigger Warn Act liability for the plant closings. In conclusion, Mr. Standish reported that in his opinion, the value of the enterprise would be less if the filing were delayed for a week from Friday.

Mr. Meyer observed that a Berkshire Hathaway agreement is the keystone of a plan of reorganization, but that the Company appears to have no significant leverage in negotiations with Berkshire other than the risk of a "free fall" bankruptcy. Therefore, Mr. Meyer expressed the opinion that it might be very risky to take a chance of losing the agreement with Berkshire by continuing negotiations on behalf of any specific constituency. Mr. Meyers' remark was followed by a lengthy discussion in which every Director present participated, and consensus developed around Mr. Meyer's assessment of the risk.

At the conclusion of this discussion, Mr. Streeter asked Mr. Rayburn whether the Directors had entered an area where their duty had "shifted" from one owed to shareholders to one owed to creditors under applicable law. Mr. Rayburn advised that under North Carolina law, there is no "shift" of duties recognized until the corporation makes a decision to windup or liquidate its affairs. In North Carolina, the duty always lies to the corporation, (and, through it, to its shareholders) but, upon a decision to liquidate, the duty shifts to include creditors. Mr. Rayburn distinguished this model from the Delaware construct in which the general rule is that the duty of Directors goes to shareholders, but "shifts" when the corporation enters "the zone of insolvency".

<u>Credit Suisse First Boston Presentation</u>

The Board next received a presentation from Credit Suisse First Boston presented jointly by Messrs. Felt and O'Driscoll. The text of that presentation began with a "Board Update Presentation Confidential/November 12, 2002" which is attached to these minutes as **Exhibit B**. The CSFB presentation began with the Executive Summary on Page 3 of the Board Update and highlighted the various issues set forth there. Mr. Felt reported that the Company's bonds had

MNAT006831

dropped by a significant amount in trading, including drop-offs within the last week. He then described the various negotiations that had been undertaken to achieve the first goal in the restructuring plan, i.e., reaching an agreement in principle with "Lotus", the code name used for Berkshire Hathaway and its affiliates in connection with this project. Mr. Felt reported that the responses by Mr. Warren Buffett and his deputy, Mark Millard, to various offers made by the Company in previous terms sheets and telephone conversations had, in large part, adamantly opposed any equity retention programs for existing shareholders. Mr. Felt said that, in his opinion, this issue had cost time in the negotiation of the term sheet because of the reaction of Lotus to the initial proposal that the Company's shareholders retain 5% of the equity.

During the presentation, Mr. Walker asked what degree of certainty existed that the Company would be able to emerge from a bankruptcy proceeding pursuant to a plan that would afford equity to the common shareholders if it filed without an agreement with Lotus. Mr. Felt responded that in his view, and not necessarily that of CSFB, it would be extremely unlikely that equity would retain any ownership if the Company filed without a plan and that he would quantify that chance as less than 5% if the Company filed without an agreement with Lotus. Mr. Felt then continued through the presentation and pointed out, among other things, that the holdings of Lotus had increased to the point that under the restructuring plan it would now own 31% of the equity in the reorganized debtor, as illustrated on Page 13 of the Board Update. He also indicated that Citigate is going to update the list of bondholders to try to provide additional information about the extent of Lotus' holdings and the holdings of others.

After Mr. Felt finished this phase of the CSFB presentation, Mr. Streeter asked how CSFB evaluated its ability to accomplish a securitization for the Company's loans during a Chapter 11 process. Mr. O'Driscoll addressed this question by stating:

1.    Being in bankruptcy is not the issue;

2.    Having clarity around a plan showing where the Company is going "is" the issue;

3.    The market is open for ABS paper if there is such clarity; and

4.    There is generally good liquidity and enthusiasm in the ABS market today. For example, Vanderbilt is not having problems.

Mr. O'Driscoll further reported, that for the next few months, an outside servicer might be necessary to accomplish a securitization, but in the longer term, Oakwood should be able to obtain access to the market. With respect to the priority of servicing fees, Mr. O'Driscoll stated that one hundred basis points (100 bps) "senior" in the "waterfall" is more the market now, rather than the subordinated servicing fee featured in many of the Company's REMICs. Mr. O'Driscoll stated that the plan is to go to the ABS investors in a month or two, report that "here is the way Oakwood is going to operate," and attempt to persuade those investors to buy into the plan.

With respect to the objective of obtaining a debtor in-possession ("DIP") financing facility, Mr. Felt reported that contact had been made with GE, CIT, Bank of America, Back Bay

Capital and others to discuss possible DIP facilities and that the Company had met with its existing revolving credit lender, Foothill Capital. Mr. Felt expressed the opinion that most DIP financing facilities come from existing lenders, in part because it is difficult to have a "priming fight". Mr. Streeter asked, "what is a 'priming fight'?" Mr. Felt explained that the concept of "priming" is that the new lender obtains "super priority" over the pre-petition lender and therefore has a right to be paid first. He also explained that finding a lender willing to make such a loan is difficult because of the relations among the various members of the lending community.

Mr. O'Driscoll then addressed the third objective set forth in the Executive Summary of the Board Update, that of maintaining access to the warehouse facility and securitization market. He reported that under the current loan purchase facility with CSFB (referred to as the "warehouse"), the filing of a reorganization proceeding is a default. He further explained that, in connection with a request for a waiver of that default, the Credit Risk Management Division of CSFB wants to see (1) a DIP facility; (2) the absence of a "free fall" bankruptcy, i.e. a plan with Lotus; and (3) the prospect of access to the ABS market for the loans. Mr. O'Driscoll reported that a further call with the Credit Risk Management Division was scheduled for 1:00 p.m., after the Board meeting. Mr. Streeter asked whether these discussions were focused only on a waiver of the ipso facto default or also included the terms of the loan facility. Mr. O'Driscoll answered that they were focused only a waiver. Mr. Felt then discussed the possibility of a bridge facility generally, and Mr. Streeter asked when we would know about securitization. Mr. O'Driscoll reported that a servicing entity called C-Bass is looking to get into the servicing of bonds and was discussing with the Company a securitization of the existing warehouse loans in which C-Bass would buy the most junior bonds and take over servicing.

Mr. Standish then reported that the Company would run out of capacity in its current warehouse facility, if no securitization is accomplished, in approximately the middle of December.

CSFB then reported on discussions about the servicing fee issue in a meeting on Friday, November 8, 2002 with JP Morgan Chase, the trustee under most of the REMICs. That discussion was originally intended to obtain the consent of JP Morgan Chase, as trustee, to the reprioritization of the servicing fee at the "top of the waterfall" in the existing REMICs. Unfortunately, JP Morgan Chase reported that it now wants to obtain bondholder consent to any change in priority of the servicing fee, presumably as a result of recently announced litigation brought against Chase and Bank One as trustees of securitizations involving National Century. In order to accomplish the goal of increasing the priority of the servicing fee, Mr. Felt reported that the strategy would be to immediately reject the existing servicing agreements, offer interim servicing for one hundred basis points paid currently, and then attempt to negotiate a long term work-out of a servicing fee priority agreement, with JP Morgan Chase being able to obtain bondholder approval. Mr. Felt reported that the Prudential facility, which provides the servicer advance, is available to continue to provide servicer advances for the Company inside a bankruptcy proceeding. With respect to the servicing revenue issue, Mr. Felt summed it up as follows: the Company has a $5 billion portfolio of loans it services; it is entitled to receive $50 million in annual servicing fees at 1%; its cost for providing the servicing is approximately $25 million; and the Company is today is receiving only approximately $5 million in servicing fees annually.

MNAT006833

Mr. Felt then described the sale process, which had been instituted by the Company at the request of Lotus to test the marketplace for an acquisition of the Company. Referring to the sales process update on Page 19 of the Board Update, Mr. Felt indicated that the Clayton Homes, Inc. "offer" translates into approximately $75M plus the loans on the books of the Company; that the Kelso valuation range is $120 – 150M; the TPG valuation range is $275M -$300M and the Warburg aggregate valuation range is approximately $225 - $275M. In response to a question by Mr. Streeter, Mr. Felt reported that all these offers were based on 100 basis points of senior servicing fee.

At approximately 10:45 a.m. the Directors took a 10-minute break and reconvened at approximately 10:55 a.m. At this point, Mr. Felt presented to the Company the term sheet that had been provided to Lotus, the "Restructuring Term Sheet Confidential/November 11, 2002", which is attached to these minutes as **Exhibit C**. Mr. Felt briefly went through the Term Sheet and pointed out the issue, which he had flagged before as being most difficult, i.e., the allocation of post-restructuring common equity. In order to break the ice between the Company's insistence on some value for the shareholders and Lotus' insistence on no value for the shareholders, CSFB had introduced the concept in this Term Sheet of warrants, as detailed in the Term Sheet. The warrants as specified are based upon a construction requiring the Company to achieve a $450 million valuation, a construction which Mr. Felt observed is very common with such deals.

Mr. Walker then asked Mr. Felt whether CSFB could have a "Black-Scholes analysis performed for these warrants". Mr. Felt said that, in fact, one had been done and proceeded to hand out the Black-Scholes "warrant analysis" attached to these minutes as **Exhibit D**. As Mr. Felt explained the key indicators of value in a Black-Scholes analysis are the maturity date of the warrants and the volatility of the Company's underlying stock. Mr. Felt then discussed various possible assumptions and focused the Directors on assuming a volatility of 50%. Highlighting the fact that "years to maturity" appears in the left column of the sheet, he pointed out that increases in volatility cause the value of the warrants to go up. Mr. Felt suggested that using an implied initial equity value from the auction process, as well as the current market value for the Company's securities, and using this Black Scholes model as a guideline, the value indicated by this model for the warrants described in the Term Sheet would be approximately 46 cents per share, not taking into account the "flip protection" described in the Term Sheet. In addition, Mr. Felt spoke to the terms of comparable recoveries by the equity holders in companies in bankruptcy proceedings. He handed out a document called "Comparable Equity Recovery Analysis", attached to these minutes as **Exhibit E**, which outlines a series of outcomes for common stockholders for companies that have filed Chapter 11 proceedings over years ranging from 1991 through 2001. As he pointed out in this analysis, the warrants described in the Term Sheet would relate to approximately 9% of the fully diluted common equity, which would represent a very substantial recovery in comparison with other bankruptcy proceedings.

Mr. Felt then expressed his opinion that in the negotiation with Lotus, the risk of a "free fall" is not a very great risk at all because Berkshire Hathaway could provide DIP financing, could make a press release saying that it was going to do so, and could essentially stop the "free fall" nature of the bankruptcy immediately. Mr. Walker asked if we knew whether Mr. Buffett

had done this in the past and Mr. Felt answered, "yes" that in his experience, Mr. Buffett, i.e., Berkshire Hathaway, had in fact come in and done this in other matters. Mr. Felt expressed his opinion that the threat to Lotus is in the prioritization of the servicing fee, because that has a direct impact upon the losses sustained by the junior REMIC securities that he holds.

Mr. Phillips asked about the liquidity of the new stock and warrants. Mr. Felt responded that the estimate was that the newly issued common equity would be tradable in the market at $10-30 per share, and that it would be listed in the NYSE or NASD or some other exchange. Mr. Felt expressed the opinion that the warrants would probably be traded over the counter rather than on the exchange itself.

Mr. Felt then outlined the following timetable for a reorganization proceeding:

1. Filing the bankruptcy proceeding on Friday, November 15, 2002;

2. Filing a plan and disclosure statement approximately one month thereafter;

3. Having a hearing on the plan and disclosure statement one month later;

4. Having a confirmation hearing approximately one month following that, and, finally;

5. Emerging from bankruptcy one month after confirmation.

As he described it, the process would take four to five months. Mr. Dehney and Mr. Rayburn confirmed the reasonableness of that estimate. A brief discussion ensued of one of the obstacles in the bankruptcy process, that is, that discontinued floor plan lenders may have claims against the manufacturing entity, HBOS, and may object to the underlying consolidation concept embodied in the reorganization Term Sheet.

Several Directors asked about the value of a non-binding agreement with Lotus. Mr. Felt responded that, based on his own experience in the NTL case, a non-binding agreement in principle for a restructuring deal is honored in the marketplace. Mr. Streeter asked whether the timing was sufficient to obtain a deal with Berkshire Hathaway by Friday. Mr. Felt's answer was that we can get to a deal by Friday because Mr. Buffett is in town and can make decisions, and Berkshire Hathaway has already said that they can work with a Friday decision date. Mr. Phillips asked whether the stock would trade after a proceeding and CSFB's answer is that it should trade somewhere above $10 per share because the Company would be "fixed" and would be the only Company in the industry without serious debt. Mr. Walker asked if the reorganized Company would have zero leverage; Mr. Felt responded that it would not have much leverage, but the number would not be zero.

Mr. Felt then reviewed the difficulties in getting negotiations to this point and the timing problem with respect to Friday. He stated that the original position taken by Lotus in response to the October 15, 2002 proposal for a 5% equity retention was that there could be no equity retention, and that there was then a period of "radio silence" when Lotus broke off discussions.

MNAT006835

Given that fact, Mr. Phillips observed that attempting to negotiate for a greater equity retention would probably be an equivalent to "bluffing" under the circumstances and would be unjustifiable given both the dynamic of the discussions with Berkshire Hathaway to date and the tight timetable under which the Company is proceeding.

Mr. Phillips then moved that the Board approve a restructuring of Oakwood Homes Corporation along the lines of the Confidential Restructuring Term Sheet of November 11, 2002 presented at this meeting by CSFB. That motion was seconded by Mr. Walker and passed by unanimous vote.

The Board then agreed to meet again at 2:00 p.m., November 14, 2002 to deal further with the restructuring and reorganizing issues.

The Directors then asked management to provide a discussion of the business plan going forward. Mr. Standish outlined that the business plan contemplated a quick closing of plants, a quick closing of retails centers, aggressive wholesale sales of inventory and aggressive sales of repossessed inventory, with the intent of reducing inventory. Mr. Standish reported that as of November 10, 2002, there would be no more repossession or refinance loan approvals and very few repossession refinances would be closed. Once the current pipeline is completed, there would be no more such refinancing during the proceeding. In the future new deals for repossession financing or financing of a repossessed home would be examined as if it were a credit application for a new customer and would be tested against more realistic values. Mr. Smith referred to this as to "putting a wall between the Company and its repossession expiries". Mr. Phillips observed that the Company must also cut its overhead. Mr. Standish reported that the Company will go after every cost including its overhead. Mr. Phillips stated that the Company needed to get its overhead down to the sales level that the Company would experience.

Mr. Walker asked management when the next securitization would occur assuming there was a deal with C-Bass at the end of November. The answer was February or March of 2003. Mr. Phillips asked when the Directors would receive a budget forecast for the upcoming operations, and Mr. Standish reported "within one week". Mr. Streeter asked what role the Board would play once the bankruptcy proceeding was commenced, and Mr. Felt responded that the Board would continue to operate the business and that it would formulate a plan for the Company and would hold on to the exclusive right to form a plan during the proceeding. The current Board would continue to put the plan and disclosure statement forward until the Company emerged from bankruptcy and then the Board Members would probably have the option to leave the Board. Questions were asked as whether to call a shareholders' meeting or to schedule the shareholders' meeting at its usual time and Mr. Rayburn advised that it was probably desirable to have a shareholders' meeting, but to have it late in the process rather than at its presently scheduled time. Mr. Streeter asked whether procedurally it would be acceptable to go forward using telephonic board meetings and Mr. Rayburn responded that telephonic board meetings were fine so long as the material to be reviewed by the Directors was provided to them in advance of the meeting.

Finally a question was asked about SEC filings with respect to the events of this week. The advice from Mr. Rayburn was that the Company needed to file an 8-K as soon as it had an

MNAT006836

agreement with Lotus. The Board then adjourned its informal meeting at approximately 12:00 noon.

Mr. O'Driscoll returned to the Board Room thereafter and reported that the conversations with Berkshire Hathaway were progressing, that the issue outstanding on the warrants was only on the percent of the equity underlying the warrants, not "flip protection" or other features, and that the real issue was the question of how much of the servicing fee would be senior in the REMICs with Lotus preferring 50 bps plus some "upside" as opposed to 100 bps. Mr. O'Driscoll also indicated that Lotus had expressed an interest or willingness to discuss DIP financing should the Company feel that it was unfairly treated by its existing lender. This general Q & A session continued until approximately 12:30 p.m. at which point it was adjourned for lunch.

Approved:  _____
                  Myles E. Standish, Chairman

*EXHIBIT X*

0001

```
 1                    UNITED STATES BANKRUPTCY COURT
 2                       DISTRICT OF DELAWARE
 3                            - - -
 4
 5          In re:                         )
                                           )
 6          OAKWOOD HOMES CORPORATION,     )   Chapter 11
            et al.,                        )
 7                                         )
                    Debtors.               )
 8          -------------------------------)   Case No.
            OHC LIQUIDATION TRUST,         )
 9                                         )   02-13396 (PJW)
                         Plaintiff,        )
10                                         )
                    vs.                    )
11                                         )   Pages 1 - 82
            CREDIT SUISSE FIRST BOSTON,    )
12          et al.,                        )
                                           )
13                  Defendants.            )
            -------------------------------)
14          AND RELATED CROSS-ACTION.      )
                                           )
15
16
17          TELEPHONIC DEPOSITION OF:
18                         MARK D. MILLARD
19                         MONDAY, SEPTEMBER 24, 2007
20                         1:03 P.M.
21
22
23          Reported by:
24                  ALFRED J. LONG
25                  CSR No. 2024
```

1      TELEPHONIC DEPOSITION OF MARK D.
2   MILLARD, the witness, taken on behalf of the
3   Plaintiff at 1901 Avenue of the Stars, Twelfth Floor,
4   Los Angeles, California, commencing at 1:03 p.m.,
5   Monday, September 24, 2007, before Alfred J. Long,
6   CSR No. 2024.
7
8   APPEARANCES OF COUNSEL:
9
10  FOR THE PLAINTIFF:
11      STUTMAN TREISTER & GLATT, PC
12      BY:  SCOTT H. YUN, ESQ.
13      1901 Avenue of the Stars
14      Twelfth Floor
15      Los Angeles, California 90067-6013
16      (310) 228-5750
17
18  FOR THE WITNESS (TELEPHONICALLY):
19      MUNGER TOLLES & OLSEN LLP
20      BY:  KELLY M. KLAUS, ESQ.
21      355 South Grand Avenue
22      35th Floor
23      Los Angeles, California 90071-1560
24      (213) 683-9100
25

2

1   APPEARANCES OF COUNSEL (Continued)
2
3   FOR DEFENDANT CREDIT SUISSE FIRST BOSTON
4   (TELEPHONICALLY):
5       LINKLATERS LLP
6       BY:  MICHAEL OSNATO, ESQ.
7            JUSTIN WILLIAMSON, ESQ.
8       1345 Avenue of the Americas
9       New York, New York 10105
10      (212) 903-9000
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1              I N D E X
2
3   WITNESS          EXAMINATION            PAGE
4   MARK D. MILLARD    (By Mr. Yun)           5
5                      (By Mr. Osnato)       68
6
7
8              E X H I B I T S
9
10  NO.      PAGE   DESCRIPTION
11  Exhibit 153   51   E-mail from Mr. Standish to
12                Mr. Muir, 11/29/02, re Additional Thoughts
13
14  PREVIOUSLY MARKED/PAGE FIRST REFERENCED
15  Exhibit 9     41
16  Exhibit 19    31
17  Exhibit 30    59
18  Exhibit 33    60
19  Exhibit 86    56
20  Exhibit 90    58
21  Exhibit 118   54
22  Exhibit 119   57
23  Exhibit 127   65
24  Exhibit 130   45
25

4

1          LOS ANGELES, CALIFORNIA;
2   MONDAY, SEPTEMBER 24, 2007; 1:03 P.M.
3
4
5
6          MARK D. MILLARD,
7   having been first duly sworn, was
8   examined and testified as follows:
9
10          EXAMINATION
11
12  BY MR. YUN:
13      Q.  Mr. Millard, my name is Scott Yun.  I'm one
14  of the attorneys for ONC Liquidation Trust, the
15  plaintiff in this action.  Before we begin, I'd like
16  to direct the stipulation to the attorneys.
17          Can we stipulate on the record here today
18  that this deposition may be taken over the telephone,
19  including the administration of the oath by phone,
20  and that once transcribed, this shall act as our
21  stipulation for a telephonic deposition required
22  under the applicable rules?
23          MR. WILLIAMSON:  Linklaters agrees.
24          MR. KLAUS:  That's fine with us.
25  /  /  /  /  /  /

5

BY MR. YUN:

Q. Mr. Millard, thank you once again for making yourself available for this deposition. You're not a party to this action, so I know we're infringing on your time. I will try to make this as short a deposition as possible.

Before we begin, Mr. Millard, can I confirm that you have a packet of documents my office sent to Munger Tolles?

A. I do have a package of documents in front of me.

Q. In addition, on Friday, counsel for Credit Suisse e-mailed to me, which then I forwarded to Mr. Klaus, three documents that Credit Suisse may ask you questions about at this deposition.

Do you have that e-mail and the documents?

A. I believe I do, yes.

Q. During this deposition, I am going to refer to OHC Liquidation Trust as either the Trust or the plaintiff. And also, for convenience sake, when I refer to Oakwood Homes, I mean Oakwood Homes Corporation and its affiliates. And also, just for convenience, when I refer to Credit Suisse, I mean the Credit Suisse entities that are the defendants in this action.

6

I think this is particularly important, since this is a telephonic deposition, and everyone's in a different location today. Do you understand?

A. Yes.

Q. From time to time, your attorney or counsel for Credit Suisse may object. However, unless your attorney instructs you not to answer, you're required to respond to the best of your abilities.

Do you understand?

A. Yes.

Q. One suggestion. Because this is a telephonic deposition, it's probably a good idea to wait a little before responding to any question, in order to give your attorney, and also counsel for Credit Suisse, to interpose their objections.

Is there any reason why you cannot testify accurately and to the best of your abilities at today's deposition?

A. No.

Q. All right. Can you briefly describe for me your formal education since high school.

A. I've got a bachelor of science in economics from the University of Redlands, California.

Q. Have you ever obtained any professional licenses such as a CPA?

8

Let's get started. Anything else, Mr. Millard? Do you have any questions?

A. No.

Q. Can you please state your full name for the record.

A. Mark David Millard.

Q. Have you ever been deposed, Mr. Millard?

A. One time prior to this.

Q. Let me briefly go over some of the ground rules for this deposition.

If you do not understand a question, please say so, so that I can correct any ambiguities. If you do answer my question, I will assume that you understood the question. Do you understand?

A. Yes.

Q. Please provide verbal responses so that the court reporter can take down your response accurately, and so that I can hear your response.

Do you understand?

A. Yes.

Q. Please let me complete my question before answering so that we don't talk over each other, and I will try to do the same and not talk over your answers. That makes it easier for the court reporter to take down the questions and the responses.

7

A. No.

Q. Who is your current employer?

A. Berkshire Hathaway.

Q. How long have you worked for Berkshire Hathaway?

A. I've worked for Berkshire Hathaway, or one of various subsidiaries, since 1984.

Q. Can you describe for me your duties and responsibilities at Berkshire Hathaway.

A. My title is director of financial assets, and as such, my duties include investing the excess cash for Berkshire and/or various fixed income instruments.

Q. Were your duties and responsibilities similar in the year 2000 to 2002 time period?

A. Yes.

Q. Do you know Tom Connors of Credit Suisse?

A. Yes.

Q. How did you first become acquainted with Mr. Connors?

A. Mr. Connors was our sales coverage for Credit Suisse when he was -- I believe it was on the mortgage side, the mortgage desk.

Q. Have you worked with Mr. Connors in the Oakwood Homes matter?

9

1    A.  Yes.

2    Q.  In what particular ways have you worked with

3  Mr. Connors in the Oakwood Homes matter?

4        MR. KLAUS:  I object to the question as

5  vague and ambiguous.  If the witness understands, he

6  can answer, but maybe counsel can rephrase that.

7        And Mr. Millard, you can answer the question

8  if you understand it, or if you'd like counsel to

9  rephrase it, you can request that.

10        THE WITNESS:  Would you rephrase that

11  question, please.

12  BY MR. YUN:

13    Q.  Sure.  How was Mr. Connors involved in the

14  Oakwood Homes case related to your work on behalf of

15  Berkshire Hathaway?

16    A.  As I recall, Mr. Connors presented a number

17  of opportunities over the course of a long period of

18  time.  He was the base person, if you will, from

19  Credit Suisse to Berkshire, to myself, so he and I

20  would have discussed many aspects of the case,

21  including the bonds, the public debt of the company,

22  as well as other potential investments in the firm

23  Oakwood.

24    Q.  Have you worked with Mr. Connors on another

25  matter involving a mobile home or manufactured home

10

1    A.  It was similar to Mr. O'Driscoll's, in that

2  it was somewhat down the road that he became involved

3  in, I believe, the restructuring of the firm, and he

4  and I first met.

5    Q.  So you never worked with Mr. Felt before

6  Oakwood Homes?

7    A.  No, sir.

8    Q.  Have you worked with Mr. Felt on another

9  matter involving a mobile home or manufactured home

10  company?

11    A.  No, sir.

12    Q.  Do you know Susan Menkhaus of Credit Suisse?

13    A.  Susan Menkhaus?  Yes.

14    Q.  How did you first become acquainted with

15  Ms. Menkhaus?

16    A.  Very similar to the prior responses with

17  Jared and Piachra.  She was working for Credit Suisse

18  on the Oakwood Homes case, and we exchanged numerous

19  e-mails and phone calls and whatnot.

20    Q.  Have you worked with Ms. Menkhaus on another

21  matter involving a mobile home or manufactured home

22  company?

23    A.  No, I don't believe so, although she's --

24  no, the answer is no.

25    Q.  How would you describe your responsibility

12

24/09/2007 MILLARD, MARK D.

1  company besides Oakwood Homes?

2    A.  I don't believe so, no.

3    Q.  Do you know Piachra O'Driscoll of Credit

4  Suisse?

5    A.  Yes.

6    Q.  How did you first become acquainted with

7  Mr. O'Driscoll?

8    A.  Piachra, at some point during the

9  conversations that Mr. Connors and I had, presented

10  another opportunity for an investment in Oakwood

11  Homes that included some of the firm's B-2 bonds from

12  prior securitizations.

13    Q.  Had you worked with Mr. O'Driscoll before

14  the Oakwood Homes matter?

15    A.  I don't believe so.  That's the first

16  recollection that I have that he and I worked

17  together.

18    Q.  Have you worked with Mr. O'Driscoll on

19  another matter involving a mobile home or

20  manufactured home company?

21    A.  I don't believe I have, no.

22    Q.  Do you know Jared Felt of Credit Suisse?

23    A.  Jared Felt, yes.

24    Q.  How did you first become acquainted with

25  Mr. Felt?

11

24/09/2007 MILLARD, MARK D.

1  in Berkshire Hathaway's dealings with Oakwood Homes

2  in the time period 2000 to 2002?

3    A.  I'm sorry, would you repeat that.

4    Q.  How would you describe your responsibility,

5  or the role, in dealing with Oakwood Homes back in

6  2000 to 2002?

7    A.  Well --

8        MR. WILLIAMSON:  Objection to form.

9        MR. KLAUS:  I think Mr. Millard -- this is

10  Mr. Clause -- you can answer.  That was an attorney

11  for Credit Suisse making the objection, I believe, to

12  the form to preserve his record.

13        If the question is too general for you to

14  answer, you can ask counsel to rephrase it.  If you

15  would like to give a general description of your role

16  in the process, you can do that, too.

17        THE WITNESS:  Okay.  My response would be, I

18  was responsible for performing some research on

19  potential investments in this firm and presenting it

20  to my superior.

21  BY MR. YUN:

22    Q.  Who were your superiors?

23    A.  Warren Buffett, B-u-f-f-e-t-t.

24    Q.  When did Berkshire Hathaway first become

25  involved with Oakwood Homes?

13

A. To the best of my knowledge, it was sometime
back in 2001. I don't have the specific date in
front of me, but it seems like around that 2001 time
frame.

Q. Were you involved in that first transaction
or involvement?

A. Which specific first transaction are you
speaking of?

Q. The one that you mentioned, the one in 2001,
Berkshire Hathaway's first involvement with Oakwood
Homes.

A. Yes.

Q. Can you describe for me that first
transaction in 2001.

A. I believe the first investment in Oakwood
Homes securities was just the market purchase of
their outstanding public debt of bonds.

Q. What was Berkshire Hathaway's interest in
purchasing the corporate bonds of Oakwood Homes?

A. Similar to other purchases that we've made.
We were hoping to buy them at a point where we could
earn a fair return for the risk involved.

Q. Was that transaction brought to Berkshire
Hathaway by Oakwood Homes or Credit Suisse?

MR. WILLIAMSON: Objection to form.

---

question that you believe need clarification, you can
point that out, too.

THE WITNESS: Okay. My recollection is that
this proposed transaction was brought to us by Credit
Suisse.

BY MR. YUN:

Q. At the time Credit Suisse brought this
opportunity to Berkshire Hathaway, were you looking
to invest more in Oakwood Homes independently?

A. We had the willingness to continue
purchasing public debt of Oakwood Homes, but at that
time had not considered, you know, this Lotus-type
purchase.

Q. What was Berkshire Hathaway's objective in
investing in the Oakwood Homes B-2 securities?

MR. KLAUS: I'm sorry, Mr. Yun, I missed the
tail end of that question. Could you repeat it.

MR. YUN: Sure.

Q. What was Berkshire Hathaway's objective in
investing in Oakwood Homes B-2 securities?

A. The response would be very similar to the
one I gave regarding our purchase of the public debt.
It was to purchase them at such a price that we
thought we would make a fair return on our
investment.

---

24/09/2007 MILLARD, MARK D.

MR. KLAUS: I join the objection.

Mr. Millard, if you recall how it was you
first became aware of the opportunity, you can
testify to that.

THE WITNESS: I don't specifically recall
this coming to us from Credit Suisse, but I do not
have that specific a recollection of the dealer we
used to purchase the bonds.

BY MR. YUN:

Q. Mr. Millard, are you familiar with what are
described as the Lotus transactions?

A. Yes.

Q. Can you describe for me, generally, what the
Lotus transactions were.

A. Generally speaking, that was a transaction
that included the purchase, by Berkshire Hathaway or
its subsidiaries, of collateral that included the B-2
tranches from prior securitizations, prior Oakwood
securitizations.

Q. Who contacted Berkshire Hathaway about the
opportunity to purchase the B-2 securities?

MR. WILLIAMSON: Objection to form.

MR. KLAUS: And again, Mr. Millard, if you
understand the question, you can certainly respond to
it. If there are assumptions that are made in the

---

24/09/2007 MILLARD, MARK D.

Q. Were you the person at Berkshire Hathaway
who negotiated the Lotus transactions?

A. I was certainly heavily involved, yes. My
boss would be included in that, and I would have
relayed, you know, whatever information to Credit
Suisse.

Q. Who did you negotiate the terms of the Lotus
transactions with?

A. The question is, who did I negotiate the
terms with?

Q. Yes.

A. With various personnel at Credit Suisse,
including Tom Connors.

Q. Did you talk to anyone from Oakwood Homes
directly while negotiating the Lotus transactions?

A. To the best of my recollection, I did not.

Q. Did Fiachra O'Driscoll make any
representations to you that he had the authority to
negotiate the terms of the Lotus transactions on
behalf of Oakwood Homes?

MR. WILLIAMSON: Objection to form.

THE WITNESS: Well, I'll just answer as best
I can. Fiachra was certainly one of the point
persons I dealt with in this transaction.

But to answer the question, did he, you

1  know, indicate that he had authority, I had known by
2  that time that he -- you know, was working with
3  the company, but I don't have a specific recollection
4  of, you know, what authority he was under.
5  BY MR. YUN:
6     Q.  Did Mr. Tom Connors make any representations
7  to you regarding his authority to negotiate on behalf
8  of Oakwood Homes?
9          MR. WILLIAMSON:  Objection to form.
10          THE WITNESS:  The way I viewed Tom Connors'
11  responsibility was, he was a go-between between us
12  and/or other personnel at his firm and/or the
13  company, so I did not take Tom's relationship as
14  meaning that he had the authority to get a deal done.
15  BY MR. YUN:
16     Q.  Did you believe Fiachra O'Driscoll had the
17  authority to negotiate the terms of the Lotus
18  transactions on behalf of Oakwood Homes?
19          MR. WILLIAMSON:  Objection.
20          MR. KLAUS:  I'm sorry. I didn't -- is the
21  question, Mr. Yun, did he believe that at the time?
22          MR. YUN:  Yes, did he believe that at the
23  time?
24          THE WITNESS:  I believed at the time Fiachra
25  was working with the company in structuring a deal

18

1  that ultimately became the Lotus transaction.
2  BY MR. YUN:
3     Q.  During the negotiations over the Lotus
4  transactions, did Fiachra O'Driscoll, or anyone else
5  at Credit Suisse, mention that he or she knew about
6  Berkshire Hathaway's existing investment in Oakwood
7  Homes?
8          MR. WILLIAMSON:  Objection.
9          THE WITNESS:  At some point it became known
10  to me that they were aware of, you know, our
11  ownership of the public debt. I don't recall the
12  specific conversation, but generally speaking, the
13  company and/or Credit Suisse was aware of the size of
14  our investment.
15  BY MR. YUN:
16     Q.  Do you recall if you mentioned anything
17  about Berkshire Hathaway's prior investment in
18  Oakwood Homes during those negotiations?
19     A.  I would answer this way:  I wouldn't have
20  volunteered it, but if they came -- you know, my
21  recollection is, at some point, they came and, you
22  knew, it was with the idea that we had purchased a
23  fair amount of bonds, and at some point, I had the
24  authority to confirm that with them.
25     Q.  During the negotiations over the Lotus

19

1  transactions, were there any discussions about the
2  financial health of Oakwood Homes?
3          MR. WILLIAMSON:  Objection.
4          THE WITNESS:  There were numerous
5  discussions throughout the term of our investment
6  regarding the financial health of Oakwood.
7  BY MR. YUN:
8     Q.  What were your concerns about the financial
9  health of Oakwood?
10          MR. WILLIAMSON:  Objection to form.
11          THE WITNESS:  First and foremost, my first
12  question at the time was whether or not they were
13  going to survive, and if so, in what form.
14  BY MR. YUN:
15     Q.  During those negotiations, were there any
16  discussions about Oakwood Homes filing for
17  bankruptcy?
18     A.  Certainly, at some point, those discussions
19  took place. Certainly, later. You know, certainly,
20  as the filing date approached.
21     Q.  During the negotiations over the Lotus
22  transactions, were there any discussions about what
23  is known as the Loan Assumption Program, or the LAP?
24          MR. WILLIAMSON:  Objection to form.
25          THE WITNESS:  I don't -- I don't recall

20

1  specifically discussions over the Loan Assumption
2  Program that you mentioned.
3  BY MR. YUN:
4     Q.  Did you believe -- strike that.
5          While negotiating the Lotus transactions,
6  were there any discussions about what Oakwood Homes
7  would do with the proceeds from the Lotus
8  transactions?
9          MR. WILLIAMSON:  Objection.
10          THE WITNESS:  I don't specifically recall,
11  but it's certainly possible.
12  BY MR. YUN:
13     Q.  How did the parties, during the Lotus
14  transactions, arrive at the 2 percent fee for Credit
15  Suisse?
16          MR. WILLIAMSON:  Objection.
17          THE WITNESS:  Whatever fee was negotiated
18  between -- would have been negotiated between Credit
19  Suisse and Oakwood Homes. We were not a party to
20  that.
21  BY MR. YUN:
22     Q.  So it's your understanding that Oakwood
23  Homes had agreed to the 2 percent fee?
24          MR. WILLIAMSON:  Objection.
25          MR. KLAUS:  I would object to it, too.

21

1      if you have an understanding, one way or the
2    other, Mr. Millard, you can say that, but if you
3    don't have an understanding as to how it came about,
4    you can say that, too.
5        THE WITNESS:  I don't recall what it was,
6    because I wasn't a party to it, so I -- if I did at
7    one point, I don't recall now.
8    BY MR. YUN:
9      Q.  Mr. Millard, it's my understanding, as part
10   of the Lotus transactions, Oakwood Homes provided to
11   Berkshire Hathaway a guarantee of 100 percent of the
12   face value.  Is this correct?
13      MR. WILLIAMSON:  Objection.
14      THE WITNESS:  Included in the Lotus
15   transaction were a corporate guarantee, that is
16   correct.
17   BY MR. YUN:
18      Q.  Were the guarantees important to Berkshire
19   Hathaway?
20      MR. WILLIAMSON:  Objection.
21      THE WITNESS:  Certainly.
22   BY MR. YUN:
23      Q.  What were your concerns?
24      MR. WILLIAMSON:  Objection to form.
25      MR. KLAUS:  Related to the guarantee?

22

1   sound correct to you, Mr. Millard?
2      A.  The 55 percent price does sound correct.
3      Q.  Did Credit Suisse perform financial analyses
4   on the B-2 securities to determine the price?
5      MR. WILLIAMSON:  Objection to form.
6      THE WITNESS:  We did receive numerous
7   documents from Credit Suisse and analytics pertaining
8   to these transactions.
9   BY MR. YUN:
10     Q.  Were you relying on Credit Suisse to provide
11  you those financial analyses?
12     MR. WILLIAMSON:  Objection to form.
13     THE WITNESS:  We did certainly rely on the
14   analytics to help us decide whether or not to
15   participate in this transaction, yes.
16   BY MR. YUN:
17     Q.  Did you believe Credit Suisse was obligated
18   to provide the analyses to Berkshire Hathaway?
19     MR. WILLIAMSON:  Objection to form.
20     THE WITNESS:  I would put it this way:
21   There would be no discussions of entering into this
22   type of transaction without much of the information
23   that was provided.
24   BY MR. YUN:
25     Q.  You mentioned a few minutes ago that certain

24

1      MR. YUN:  Yes, related to the guarantee.
2      THE WITNESS:  Well, it was an added
3   security, if you will, to the structure of the deal,
4   that being that if the cash flows were not as great
5   as anticipated, then the corporate entity would
6   guarantee those cash flows and would give us one more
7   layer of protection.
8   BY MR. YUN:
9      Q.  Mr. Millard, it's my understanding that
10   Credit Suisse -- strike that.
11     Mr. Millard, it's my understanding there
12   were four Lotus transactions.  Was Credit Suisse
13   involved in all four Lotus transactions?
14     A.  Credit Suisse was involved in all of the
15   Lotus transactions that we purchased.  Four sounds
16   right, but I know that they were involved in each of
17   them.
18     Q.  Can you generally describe the pricing
19   structure of each of the Lotus transactions.
20     MR. WILLIAMSON:  Objection.
21     THE WITNESS:  My recollection is, we paid
22   the same percentage of par amount for each of those
23   four.
24   BY MR. YUN:
25     Q.  Was the par amount 55 percent?  Does that

23

1   financial data were provided.  Can you describe them
2   for me again.
3      MR. WILLIAMSON:  Objection to form.
4      THE WITNESS:  I'm sorry, would you repeat
5   that question.
6   BY MR. YUN:
7      Q.  Certainly.  I previously asked, did Credit
8   Suisse perform financial analyses on the B-2
9   securities to determine the price?  I believe you
10   mentioned that Credit Suisse provided to Berkshire
11   Hathaway certain financial data.
12     Could you describe them for me again.
13     MR. WILLIAMSON:  Objection.
14     MR. KLAUS:  And again, Mr. Millard,
15   obviously, it's to the best of your recollection of
16   what the data was.
17     THE WITNESS:  Right.  I don't believe I
18   described the data, but I believe the question is
19   that, you know, what documents were given us to look
20   at, and I would say, generally speaking, there were
21   numerous cash flow scenarios run, some what-ifs.
22     Certain loss expectations were thrown in
23   there to see what the cash flows would be; and
24   basically, just, you know, a whole host of data to
25   try to come to grips of how this security, you know,

25

1    would pay out over time.
2    BY MR. YUN:
3        Q.  Did you believe that the cash flow scenarios
4    and documents provided to you by Credit Suisse were
5    being updated periodically?
6            MR. WILLIAMSON:  Objection to form.
7            THE WITNESS:  Yes.
8    BY MR. YUN:
9        Q.  Was there --
10       A.  Certainly, as it relates to ongoing
11   delinquencies, weekly delinquency reports, loss
12   reports, et cetera.
13       Q.  Did you receive updated cash flow scenarios
14   or models from Credit Suisse during the Lotus
15   transactions?
16           MR. WILLIAMSON:  Objection to form.
17           THE WITNESS:  Yes, I believe we got periodic
18   updates of numerous reports and data.
19   BY MR. YUN:
20       Q.  As part of the Lotus transactions, were you
21   provided with any valuation or appraisal of the B-2
22   securities?
23       A.  To help explain the matter, part of the
24   issue was that the B-2s were, I believe, on the
25   balance sheet of the corporation -- they effectively

26

1    owned them -- and there was little liquidity in this
2    marketplace.  Nobody would buy them, so this was a
3    way to monetize, if you will, those securities.
4            So I don't believe that there were many fair
5    market value estimates around at the time.  So, to my
6    knowledge, I guess the answer is, I don't believe so.
7        Q.  We previously discussed that there were
8    multiple Lotus transactions.  My recollection is that
9    there were four.  You weren't sure whether there were
10   four, but you thought that was about right.
11           Why were all the Lotus transactions priced
12   the same?  And by "price," I mean 55 percent of par
13   value.
14           MR. KLAUS:  And again, if you have an
15   understanding, Mr. Millard.
16           THE WITNESS:  My general recollection is
17   that we would earn a certain return if losses were
18   less than a certain number, and that, generally
19   speaking, these transactions were very similar.
20   BY MR. YUN:
21       Q.  You may have answered this question, but
22   this will be a little more specific.
23           Between the first Lotus transaction and the
24   last Lotus transaction, did Credit Suisse provide you
25   with updated cash flow models or financial models?

27

1            MR. WILLIAMSON:  Objection to form.
2            THE WITNESS:  I'm sure they did, as we would
3    have wanted to stay on top of not only what we had
4    already purchased, but also to help us gauge whether
5    or not an additional investment would be warranted.
6    BY MR. YUN:
7        Q.  Were the financial data and models provided
8    by Credit Suisse good?  Did you think they were good
9    or poor?
10           MR. WILLIAMSON:  Objection to form.
11           MR. KLAUS:  I'd say it's a little vague and
12   ambiguous.
13           Mr. Millard, if you understand the question,
14   you can answer it.  If you'd like more clarification,
15   you can ask for it.
16           THE WITNESS:  My response would be:  There
17   were certainly errors in the figures over time, as we
18   found out and discovered, you know, unfortunately, a
19   little later.
20   BY MR. YUN:
21       Q.  If you can, can you describe for me the
22   errors that you alluded to in your response.
23       A.  One area of concern became some documents
24   that were provided as to how the Lotus transactions
25   would work.  In fact, I don't believe they were

28

1    accurately modeled, in that there were some triggers
2    on certain classes that were not ultimately met, and
3    we certainly didn't realize that, and weren't told,
4    to my knowledge, up front about that.
5            And then, you know, there were many figures
6    involved, and they were various corrections that
7    would -- you know, we would find, you know,
8    throughout the course of the review and try to get
9    those corrected.
10       Q.  Mr. Millard, do you recall a meeting on
11   July 24, 2002, between Oakwood Homes, Berkshire
12   Hathaway and Credit Suisse in Nebraska?
13       A.  I believe there were a couple of meetings
14   that were, you know, met -- that we had with those
15   parties.  But yes, that sounds correct.
16       Q.  Who contacted Berkshire Hathaway about
17   setting up this particular meeting in July 2002?
18           MR. WILLIAMSON:  Objection to form.
19           THE WITNESS:  As with most of the meetings
20   and calls, I believe that was set up through -- Tom
21   Connors would have tried to at least help schedule
22   that.
23   BY MR. YUN:
24       Q.  What did you think the purpose of the
25   meeting was?

29

1    MR. KLAUS:  And by that do you mean, does
2   Mr. Hillard have a recollection of what he thought
3   the meeting was going to be prior to the meeting?
4        MR. YUN:  Yes.
5        MR. KLAUS:  Okay.
6        THE WITNESS:  Again, it's been a while, but
7   my recollection is that the management team wanted to
8   meet with, quite frankly, my boss and myself, but
9   probably more my boss, and to perhaps give us a
10  summary or recap of what was happening in the
11  manufactured housing industry, you know, and with
12  Oakwood in particular.
13       It was my recollection that by this time,
14  they had already known that we had, you know, made a
15  significant investment in their public debt, and I
16  believe we had made several or numerous -- well, I
17  don't know how many of the four of the Lotus
18  transactions we had already done, but we had probably
19  done a majority of them by then, certainly.
20  BY MR. YUN:
21       Q.  During the July 2002 meeting, was there any
22  discussion of the Loan Assumption Program?
23       A.  I don't recall that specifically.  I don't
24  remember the exact details of the meeting itself.
25       Q.  Mr. Hillard, I'd like to refer you, if you

30

1   can do for me, a document that I sent to you.  It was
2   previously marked as Exhibit 19, or CSFB Exhibit 19.
3        MR. KLAUS:  Mr. Yun?
4        MR. YUN:  Yes?
5        MR. KLAUS:  This will probably speed things
6   along for both you and for Credit Suisse's counsel.
7        My understanding is that Mr. Hillard has two
8   stacks of documents in front of him.
9        MR. YUN:  Uh-huh.
10       MR. KLAUS:  The shorter stack, I think, is
11  the several documents that were sent us on Friday by
12  Credit Suisse's counsel, and the only marginally
13  larger stack are the documents that I think your
14  office had previously identified, and Mr. Hillard, I
15  think, has those two stacks in date order.
16       So, for both counsel, if you first say the
17  date of the document, that may be the easiest way for
18  him to fish it out of the stack that he has.
19  BY MR. YUN:
20       Q.  Okay, Exhibit 19.  It's an e-mail from
21  Fiachra O'Driscoll to Jared Pelt, dated October 18,
22  2002, but it's actually an e-mail stream.
23       A.  Okay, I have that in front of me now.
24       Q.  And it bears Bates-stamp No. CSFB-3514) to
25  35151.

31

1        Mr. Hillard, can you go to page number
2   CSFB-35147 of that document.
3        A.  I'm there.
4        Q.  This document appears to be a presentation
5   with Credit Suisse First Boston's name on it, and it
6   states it's a Berkshire Hathaway presentation, dated
7   July 2002.
8        This specific page I refer you to,
9   Mr. Hillard, states:
10           "LAP expense grew to $51 million
11           in 2002 Q2."
12       Does this refresh your recollection about
13  whether LAP was discussed at the July 2002 meeting?
14       MR. WILLIAMSON:  Objection.
15       THE WITNESS:  I don't recall any specific
16  conversations on it today, but it is certainly
17  possible that it was a topic of discussion.
18  BY MR. YUN:
19       Q.  Do you recall if someone, specifically at
20  the July 2002 meeting, went over this page?
21       MR. WILLIAMSON:  Objection.
22       MR. KLAUS:  And again, by "this page,"
23  Mr. Yun, are you asking whether Mr. Hillard has a
24  recollection of actually seeing this line at the July
25  2002 meeting?

32

1        MR. YUN:  Yes.
2        MR. KLAUS:  Okay.
3        THE WITNESS:  I just don't recall it.
4   Again, I'm not making a statement whether or not it
5   was discussed.  You know, if it was part of the
6   package, it most likely was.  I just don't have
7   specific recollection of it.
8   BY MR. YUN:
9        Q.  From Berkshire Hathaway's perspective, what
10  was the outcome of the July 2002 meeting?
11       MR. WILLIAMSON:  Objection to form.
12       THE WITNESS:  My take-away, again, based on
13  my recollection today, was certainly that we became
14  hopefully more familiar with the trends in the
15  marketplace in general, and also with this company,
16  and that, you know, I think it became clear at some
17  point that, you know, this company had some issues,
18  some financial issues and concerns, but it just --
19  I'm sorry, I don't have much more of a
20  recollection -- you know, specific recollection of
21  the conversation at the meeting.
22  BY MR. YUN:
23       Q.  As a result of learning -- strike that.
24       As a result of the information provided to
25  Berkshire Hathaway at the July 2002 meeting, did you

33

1  have any concerns about the Lotus transactions?

2        MR. WILLIAMSON: Objection to form.

3        THE WITNESS: I think my concerns were

4  throughout the whole time of the investment. I was

5  concerned, you know, how everything would hold up.

6  But yes, the answer is, I was certainly, you know,

7  concerned about how it would do.

8  BY MR. YUN:

9     Q. At this time I'd like to move on to another

10  meeting. Do you recall a meeting on October 15,

11  2002, between Oakwood Homes, Berkshire Hathaway and

12  Credit Suisse?

13     A. That sounds about right where another

14  meeting took place.

15     Q. Who contacted Berkshire Hathaway about

16  setting up the meeting?

17        MR. WILLIAMSON: Objection to form.

18        THE WITNESS: My guess today would be that

19  it was, again, Tom Connors. He would have been,

20  probably, the one to schedule the meeting, working

21  with others that attended.

22  BY MR. YUN:

23     Q. If someone from Oakwood Homes contacted you

24  directly, would Berkshire Hathaway have met with the

25  company --

34

1        MR. WILLIAMSON: Objection.

2  BY MR. YUN:

3     Q. -- in October 2002?

4        MR. WILLIAMSON: Objection to form.

5        THE WITNESS: I'm sorry, is the question,

6  would we have met with Oakwood Homes if someone from

7  management had requested the meeting?

8  BY MR. YUN:

9     Q. Yes.

10        MR. KLAUS: Mr. Millard, if you have a basis

11  for answering, you can answer. I think the question

12  as phrased does call for speculation.

13        THE WITNESS: That's a tough -- it's a tough

14  question for me. We -- I certainly -- it's not my

15  habit or nature to meet with management of the

16  investments that we make. However, this was a little

17  bit different, as we had, you know, certainly gotten

18  knee deep in with them, not only with Lotus, but the

19  bonds themselves.

20        But I guess the best way to put it is, I

21  don't typically meet with the management. And in

22  fact, you know, I had tried to avoid, you know,

23  having -- meeting here in Omaha, or meeting in

24  general, because we just don't do it.

25        We ultimately relented and went ahead as

35

1  kind of a -- I would say, it's my recollection, as a

2  favor to Credit Suisse to have them, you know, bring

3  the company out.

4  BY MR. YUN:

5     Q. Do you recall what the purpose of the

6  October 2002 meeting was?

7        MR. WILLIAMSON: Objection to form.

8        THE WITNESS: You know, I believe -- I

9  believe it not only was an update on where they

10  stand, but my recollection was, they came to us to

11  describe how poorly things were going, and that, you

12  know, a reorganization of some sort was probably

13  going to be in order.

14  BY MR. YUN:

15     Q. During the October 2002 meeting, was

16  bankruptcy specifically discussed?

17        MR. WILLIAMSON: Objection.

18        THE WITNESS: Again, the exact details are a

19  little fuzzy for me, but I would -- you know, my

20  belief was that that was certainly on the table as

21  the viable outcome.

22  BY MR. YUN:

23     Q. Did Oakwood Homes or Credit Suisse present

24  to Berkshire Hathaway any specific plan of

25  restructuring or recapitalization during the

36

1  October 2002 meeting?

2     A. My recollection is that there was some

3  documentation of different -- or at least one

4  reorganizational alternative. But yeah, my guess

5  would be that there was some form of documentation of

6  that effect.

7     Q. Do you recall if Berkshire Hathaway approved

8  or consented to any restructuring plan or

9  recapitalization plan during the October 2002

10  meeting?

11        MR. WILLIAMSON: Objection.

12        THE WITNESS: I do have a specific

13  recollection on this one, and I would say that it

14  became clear our thoughts for the best way to respond

15  to the financial pressure they were under was much

16  different than the company's or the dealer, Credit

17  Suisse.

18  BY MR. YUN:

19     Q. During the October 2002 meeting, do you

20  recall if you or anyone else at Berkshire Hathaway

21  who participated in the meeting knew that Credit

22  Suisse held warrants of Oakwood Homes?

23        MR. WILLIAMSON: Objection to form.

24        THE WITNESS: I'm sorry, that Credit Suisse

25  held warrants?

37

BY MR. YUN:

    Q. Yeah, warrants of Oakwood Homes.

    A. I think I recall it that, you know, that was a disclosure statement in one of their filings; maybe a 10-K or a 10-Q. At some point in time, I became aware of that, certainly. I don't know if, you know, it was right during that meeting or not.

    Q. At the conclusion of the October 2002 meeting, was it clear to you that Oakwood Homes was going to file for bankruptcy?

    MR. WILLIAMSON: Objection to form.

    THE WITNESS: It was evident that I believe that -- you know, looking back now, I believe that that was more likely than not. They were just struggling too much, and the market was not getting any better, and I would say we walked away -- my boss and I walked away thinking that, you know, they probably would have to file Chapter 11.

BY MR. YUN:

    Q. During the October 2002 meeting, did Credit Suisse discuss any bankruptcy planning or preparations that Oakwood Homes was going to do?

    MR. WILLIAMSON: Objection to form.

    THE WITNESS: My guess -- my recollection is that they, Credit Suisse, that is, and the company

believe.

    MR. KLAUS: Mr. Yun?

    MR. YUN: Yes.

    MR. KLAUS: If you're about to move on, would now be an okay time for a -- we've been going for about an hour. Would now be an okay time for a break?

    MR. YUN: Sure. How long?

    MR. KLAUS: I would say five minutes or so, if that works for you.

    MR. YUN: Yeah.

    MR. KLAUS: I really need a stretch break.

    MR. YUN: That's fine.

    (A recess was taken.)

    MR. WILLIAMSON: Scott, no, this is Justin in New York, and now that we're back on the record, and we're about an hour in, when we had set this up, Tony and I had come to an agreement that you guys anticipated using an hour and a half of time, which would allow for us to have an hour and a half, if we needed it, at the tail end. So I understand that to still be the case, even though, obviously, Tony is not taking this, and you are.

    MR. YUN: That's correct. I don't have that much to go before finishing, and I can't --

felt that it would be better to have a -- again, I can't say for certainty that it was right at this meeting, but my guess is that it was, a preplanned, you know, reorganization plan would be better than just going into Chapter 11 without having a reorg plan in place.

BY MR. YUN:

    Q. But there were no specific discussions of times and responsibility or specific planning for bankruptcy during the October 2002 meeting?

    A. I just didn't hear quite the last part about -- I heard the part about planning for bankruptcy. What was right before that?

    Q. Let me reask you the question.

    During the October 2002 meeting, were there any specific discussions about bankruptcy planning, such as times and responsibility for who had to do certain things in order to get the company ready for bankruptcy filing?

    A. I don't have a great answer. It's certainly possible, but I don't recall specifically. I didn't -- I don't recall having a great understanding of when the bankruptcy would occur, but it's possible. I just don't recall specifically.

    Q. Now I'm going to move on to a term sheet. I

    MR. WILLIAMSON: Okay. I meant to say that at the beginning, and I didn't, and I just wanted to confirm that we were on the same page.

    MR. YUN: Right. I can't specifically promise 30 minutes, but I don't think it would take too much time.

    MR. KLAUS: And just for the record, my understanding was that we were -- that the parties had anticipated the total deposition time lasting approximately two, and not more than three hours total. So we're as anxious as you guys are to move things along.

    MR. WILLIAMSON: I think we're all on the same page, Scott. We will anticipate that you will be drawing to a close around the 5:30 mark, if not very shortly thereafter.

    MR. YUN: Okay. Let's just get started, so we'll get there quicker.

BY MR. YUN:

    Q. Mr. Millard, can I refer you to a document. It's dated November 15, 2002. The subject line is "Affirmation of Restructuring Term Sheet." It was previously Exhibit 9, marked as Exhibit 9.

    A. I believe I have it here.

    Q. Are you familiar with this document,

1    Mr. Millard?

2      A.  Yes.

3      Q.  Can you describe for me what this document

4  is

5      MR. WILLIAMSON:  Objection to form.

6      THE WITNESS:  This document was provided

7  late November 15th, '02.  Actually, it just -- it is

8  what it is.  I mean, it's a letter about a

9  restructuring of Oakwood Homes, and whether or not we

10  would consider and acknowledge this restructuring

11  potential.

12  BY MR. YUN:

13      Q.  Was the term sheet binding?

14      MR. KLAUS:  Objection, calls for a legal

15  conclusion.

16      MR. WILLIAMSON:  Join the objection.

17      MR. KLAUS:  If you have an understanding,

18  Mr. Millard, you're entitled to say that.  If you'd

19  like to refer to the document, you can do that, too.

20      THE WITNESS:  My understanding was that, you

21  know, nothing was binding as to an agreement at this

22  stage.

23  BY MR. YUN:

24      Q.  Did you have any discussions with Credit

25  Suisse that the term sheet was nonbinding?

42

---

24/09/2007 MILLARD, MARK D.

1      MR. WILLIAMSON:  Objection to form.

2      THE WITNESS:  My recollection was that,

3  you know, it was made clear in the document that it

4  would not be a bind -- we just didn't have enough

5  information, so it would not be -- put us in a

6  situation that we were bound by any, you know,

7  restructuring.  That would come later.

8  BY MR. YUN:

9      Q.  What did you think Berkshire Hathaway was

10  committing to under the term sheet?

11      MR. WILLIAMSON:  Objection.

12      MR. KLAUS:  And again, Mr. Millard, if you

13  have an understanding in that regard and you can

14  recall it, you can testify to it.

15      THE WITNESS:  My understanding was that we

16  were willing to consider a restructuring of the

17  company, but that we weren't bound by anything as

18  yet.  There were still a lot of moving parts at the

19  time, and I believe that we, you know, made that

20  clear in the document.

21  BY MR. YUN:

22      Q.  Mr. Millard, was it your understanding that

23  the term sheet was contingent on the debtor-in-

24  possession financing being in place?

25      MR. WILLIAMSON:  Objection to form.

43

---

1      THE WITNESS:  I don't recall all the

2  contingencies that would have to have been met before

3  we would have participated in a restructuring, so I

4  don't know if that particular contingency made this

5  agreement or not.  I'd have to reread it now in front

6  of me, but...

7  BY MR. YUN:

8      Q.  Let me ask this question, then.  Would

9  Berkshire Hathaway have proceeded under the term

10  sheet if the debtor-in-possession financing was not

11  in place?

12      MR. WILLIAMSON:  Objection to form.

13      MR. KLAUS:  And again, Mr. Millard, if you

14  have a basis for providing an answer to that, you

15  can.

16      THE WITNESS:  I would say the debtor-in-

17  possession financing was clearly a significant fact

18  that would have to take place for us to agree to a

19  restructuring.

20  BY MR. YUN:

21      Q.  Before my next question, I wanted to inform

22  you, Mr. Millard, that I'm going to use the term

23  "warehouse facility" or "the loan purchase facility."

24      The Trust refers to it as a warehouse

25  facility, Credit Suisse has informed us that it's a

44

---

24/09/2007 MILLARD, MARK D.

1  loan purchase facility, but we are talking about the

2  same facility that Credit Suisse provided to Oakwood

3  Homes prior to bankruptcy.

4      So I may use the term "warehouse facility"

5  or "the loan purchase facility," but I mean the same

6  thing.

7      A.  Okay.

8      Q.  Would Berkshire Hathaway -- strike that.

9      Would Berkshire Hathaway have proceeded with

10  the term sheet if it knew that the warehouse facility

11  was not in place?

12      MR. WILLIAMSON:  Objection to form.

13      THE WITNESS:  No, I'm confident in saying

14  that we would not have proceeded with the

15  restructuring.

16  BY MR. YUN:

17      Q.  Were there problems with the warehouse

18  facility on November 15th, the date Oakwood Homes

19  filed for bankruptcy?

20      MR. WILLIAMSON:  Objection to form.

21      THE WITNESS:  I don't specifically recall,

22  on that particular date, the status of the warehouse

23  facility or the loan purchase facility.  I do recall,

24  you know, a problem with it, but I couldn't tell you

25  the exact time of that.

45

1    BY MR. YUN:
2        Q.  Whose responsibility was it to obtain
3    debtor-in-possession financing for Oakwood Homes?
4            MR. WILLIAMSON:  Objection.
5            THE WITNESS:  Well, my recollection is that
6    that would be the company itself and their financial
7    advisors.
8    BY MR. YUN:
9        Q.  Do you recall who the financial advisors
10   were for Oakwood Homes at that time?
11       A.  I believe that that was Credit Suisse.
12       Q.  Whose responsibility was it to have the
13   warehouse facility or the loan purchase facility in
14   place on the petition date?
15           MR. WILLIAMSON:  Objection to form.
16           THE WITNESS:  I would respond that, again,
17   that would be something between the company and/or
18   its -- and its financial advisors.
19   BY MR. YUN:
20       Q.  Did Credit Suisse inform you that there were
21   problems with the debtor-in-possession financing or
22   restarting the warehouse facility?
23           MR. WILLIAMSON:  Objection.
24           THE WITNESS:  I became aware of some
25   problems regarding both at some point in time.

46

24/09/2007 MILLARD, MARK D.

1    BY MR. YUN:
2        Q.  Do you recall when?
3        A.  I wouldn't be able to tell you the date of
4    where I first became aware of them as the debtor-in-
5    possession, which I'll refer to as DIP.
6            As I recall that, there were several issues
7    and concerns that cropped up, you know, right around
8    that filing period or just after -- again, I don't
9    specifically recall -- issues such as the cost of the
10   facility itself.
11           I believe there was another bank involved
12   that had thrown the company some curve balls late in
13   the game.  And then, of course, the warehouse.  I
14   received notification from, I believe, Tom Connors
15   and Credit Suisse that they were going to pull that
16   line.
17       Q.  Do you recall whether there was a dispute
18   about a restart fee for the warehouse facility?
19           MR. WILLIAMSON:  Objection to form.
20           THE WITNESS:  Yes, that was clearly an issue
21   and concern.
22   BY MR. YUN:
23       Q.  Can you describe for me the $3 million
24   restart fee issue?
25           MR. KLAUS:  I'm sorry, Scott, I didn't hear

47

1    that question.
2    BY MR. YUN:
3        Q.  Can you describe for me the $3 million
4    restart fee issue.
5            MR. WILLIAMSON:  Objection.
6            THE WITNESS:  The fact that there was a
7    reopening fee that Credit Suisse had requested was
8    certainly not met favorably from my perspective.  I
9    don't know how much more detail you want or what
10   you're getting at there, but...
11   BY MR. YUN:
12       Q.  When did you first become aware of the
13   restart fee issue?
14           MR. WILLIAMSON:  Objection to form.
15           THE WITNESS:  The restructuring fee?
16   BY MR. YUN:
17       Q.  The $3 million restart for the warehouse
18   facility fee.
19           MR. WILLIAMSON:  Objection.
20           THE WITNESS:  Well, perhaps a little
21   background would be helpful here.
22           When, you know, I found out that this dealer
23   was considering pulling the warehouse line, again, I
24   did not take it favorably.  I was very, very upset,
25   so much so that we -- you know, I requested our

48

24/09/2007 MILLARD, MARK D.

1    salesperson, Tom Connors, to go up the chain of
2    command, if you will, to make sure that it stays
3    open.
4            At some point, you know, after some heated
5    discussions and conversations, they indicated -- they
6    being Credit Suisse -- that they would leave it open
7    if we would share part of that line.  And though that
8    wasn't -- you know, we had never done that before, I
9    participated in that way, I felt like that way, you
10   know, such an important issue for this company that
11   they had to have it, so that I agreed.
12           Days later -- you know, days or longer, you
13   know, we found out about several issues that were
14   going on unbeknownst to us, including a reopening fee
15   that was not previously negotiated between Credit
16   Suisse and Berkshire Hathaway.
17   BY MR. YUN:
18       Q.  Do you recall whether the debtor-in-
19   possession financing was in place on the petition
20   date?
21       A.  I don't recall specifically whether or not
22   it was in place.  I don't believe it -- you know,
23   certainly not in its final form, and I don't recall
24   at what stage it was when they actually filed.
25       Q.  Do you recall whether the warehouse or the

49

| | |
|---|---|
| 1  loan purchase facility was in place or restarted on | 1  was not met. That the -- in other words, that the |
| 2  the petition date? | 2  document that we signed -- or Marc Hanberg signed on |
| 3      A. I'm sorry, I don't recall the date that that | 3  November 15th of '02, was not a commitment on our |
| 4  was finally -- you know, I don't recall the date that | 4  part, but just a willingness to consider |
| 5  that was finally operational. It might have been | 5  infrastructure. |
| 6  after that date, but I don't know that for a fact. | 6  BY MR. YUN: |
| 7      Q. Now, Mr. Millard, I'm going to go through | 7      Q. In the second paragraph, you state that |
| 8  some of the other documents that I sent you, but not | 8  Credit Suisse has already been paid for its services. |
| 9  all of them. | 9      Can you describe for me what you meant by |
| 10      The first document I would like you to take | 10  that statement. |
| 11  a look at is an e-mail from Myles Standish to Doug | 11      MR. WILLIAMSON: Objection to the form. |
| 12  Muir, dated November 29, 2002. It's a string of | 12      THE WITNESS: For better or worse, I think |
| 13  e-mails, which includes your e-mail to Myles Standish | 13  that my views were pretty well made known in that |
| 14  on November 28 of 2002. | 14  paragraph and in this document. |
| 15      MR. KLAUS: I'm sorry. Scott, what's the | 15      But in general, as a summary, they received |
| 16  exhibit number of that? | 16  more fees, if you will, by some amendments that they |
| 17      MR. YUN: That doesn't have an exhibit . | 17  made to the warehouse loan purchase program, and |
| 18  number. I'm going to ask that it be marked as an | 18  that, you know, net/net, you know, the better part of |
| 19  exhibit. That's the one document that I circulated | 19  valor would be to let them have that, but, you know, |
| 20  which does not have an exhibit number. | 20  as an offset to what they thought that they were |
| 21      MR. KLAUS: Is this the one with the Bates | 21  worth. |
| 22  numbers in the bottom -- or I guess at the bottom | 22      I was not happy with the way they negotiated |
| 23  center -- 2967) to 29672? | 23  that, threw it in there, and I was very upset with |
| 24      MR. YUN: That's correct. | 24  them at the time. But it was my opinion, as I |
| 25      THE WITNESS: I have that. | 25  recall, that, you know, it was pretty much a wash, |

24/09/2007 MILLARD, MARK D.

24/09/2007 MILLARD, MARK D.

| | |
|---|---|
| 1      MR. YUN: And I'm requesting that the court | 1  and if we'd let them have that -- if they were |
| 2  reporter mark this as Exhibit 153. | 2  allowed, you know, those additional fees, that that |
| 3      (Whereupon, Exhibit 153 was marked | 3  would be a pretty good offset to what they thought |
| 4  for identification.) | 4  they might be owed under the restructuring agreement. |
| 5  BY MR. YUN: | 5  BY MR. YUN: |
| 6      Q. Mr. Millard, are you ready for some | 6      Q. Now I'd like to refer you to paragraph No.3 |
| 7  questions? | 7  in your e-mail. |
| 8      A. Yes. | 8      A. Uh-huh. |
| 9      Q. Do you recognize this document, Mr. Millard? | 9      Q. There, you refer to the $3 million fee to |
| 10      A. Yes. | 10  open the warehouse line as a clearly disguised |
| 11      Q. Part of it -- | 11  investment banking fee. |
| 12      MR. KLAUS: And by "this document," do you | 12      Can you explain to me what you meant by that |
| 13  mean, just for purposes of your question, Scott, the | 13  statement. |
| 14  e-mail from Mr. Millard to Mr. Standish? | 14      MR. WILLIAMSON: Objection to form. |
| 15      MR. YUN: That's correct. | 15      THE WITNESS: It was my opinion that this |
| 16      MR. KLAUS: I'm sorry. I didn't mean to | 16  firm was trying to make up for any -- or for some |
| 17  interrupt you. Go ahead. | 17  lost investment fees as a result of the firm filing |
| 18  BY MR. YUN: | 18  bankruptcy. That their understanding and mine were |
| 19      Q. In the first paragraph, Mr. Millard, you | 19  different, but that they were just -- they would try, |
| 20  state that the trigger has not been met. Can you | 20  however they would, to obtain these investment |
| 21  describe what you meant by that statement. | 21  banking fees, and in this case, I felt that that's |
| 22      MR. WILLIAMSON: Objection to form. | 22  what they were trying to do by attaching a reopening |
| 23      THE WITNESS: It was my opinion that the fee | 23  fee to the warehouse line. |
| 24  that Credit Suisse was trying to receive as part of a | 24  BY MR. YUN: |
| 25  prior agreement between the company and themselves | 25      Q. I would like to refer you to the next |

1 document. It's been previously marked as
2 Exhibit 118. It's an e-mail dated July 25th, 2001.
3       Let me know when you have that document in
4 front of you.
5    A. I believe I have it now.
6    Q. Do you recognize this e-mail?
7    A. It does appear to be an e-mail that I sent
8 to Tom Connors and Fiachra O'Driscoll.
9    Q. In paragraph 2 and 2A of your e-mail, you
10 ask for cash flows and yield tables from Credit
11 Suisse. Did Credit Suisse provide you with what you
12 requested?
13   A. I believe they did. I don't necessarily
14 have a recollection of this particular document, but
15 my understanding is that, you know, I would have
16 followed up until I got something to this effect.
17   Q. By the way, going back one step, what is
18 this e-mail regarding? The subject line reads
19 "Project Lotus."
20      MR. WILLIAMSON: Objection.
21      THE WITNESS: The e-mail pertains to the
22 Lotus document or the Lotus transaction that we
23 previously discussed in this deposition. In other
24 words, the purchase of B-2 bonds.
25   / / / / / /

54

1 be audited in order to have a third party make sure
2 that they were correct, and those assumptions would
3 include the loss runs, based on different loss
4 assumptions, so that the cash flows, you know, would
5 be verified.
6 BY MR. YUN:
7    Q. Did Credit Suisse perform the audits?
8    A. I don't specifically recall who was
9 responsible for those audits. My guess is -- well, I
10 don't recall. I wouldn't think it would be them, but
11 I don't recall that's a fact.
12   Q. Were you provided with audited assumptions?
13   A. Again, I don't specifically recall that. My
14 understanding was, that would be part of the deal,
15 and they would have been done and would have been
16 part of the package.
17   Q. Let's move on to another document. The next
18 document is a document marked as Exhibit 96. It's an
19 e-mail from Doug Muir to Susan Menkhaus, dated
20 September 10th, 2001. It bears Bates stamp number
21 CSFB-186652.
22   A. I have that.
23   Q. Have you had a chance to review this
24 document?
25   A. I have it in front of me. I can take a few

56

24/09/2007 MILLARD, MARK D.

1 BY MR. YUN:
2    Q. In paragraph 4 of this document, there is a
3 discussion about whether the investment vehicle could
4 qualify as a bankruptcy remote structure.
5       Did you have a concern at that time whether
6 Oakwood Homes would file for bankruptcy?
7       MR. WILLIAMSON: Objection to form.
8       THE WITNESS: I don't specifically recall
9 what my concern was at that time, whether or not that
10 was something that our attorneys, Berkshire's
11 attorneys, and I had discussed.
12      But back in July of '01, you know, from the
13 get-go, you know, it was clear that bankruptcy was,
14 you know, certainly a potential for this firm. It
15 wasn't what we'd hoped it would be, but we knew it
16 was a viab- -- you know, it was certainly a good
17 possibility.
18 BY MR. YUN:
19   Q. In paragraph 7 of this same e-mail, you
20 wrote that the deal is subject to an audit of the
21 assumption. What did you mean by an audit?
22      MR. WILLIAMSON: Objection.
23      THE WITNESS: By that time, Credit Suisse, I
24 believe, had offered to have the assumptions that
25 were used as part of the agreement -- that they would

55

24/09/2007 MILLARD, MARK D.

1 minutes to do so, if you'd like.
2    Q. Why don't you do that.
3    A. (Pause.) All right.
4    Q. Do you recall whether there was an interest
5 shortfall in the first months of the Lotus
6 transaction?
7       MR. WILLIAMSON: Objection to form
8       THE WITNESS: I believe that is accurate.
9 BY MR. YUN:
10   Q. Now, in paragraph 2 of this e-mail, Doug
11 Muir states that this particular B-2 security has not
12 been paid because it's subordinated.
13      Were you aware that some of the B-2
14 securities in the Lotus transactions were
15 subordinated?
16      MR. WILLIAMSON: Objection.
17      THE WITNESS: I was not aware of that fact
18 prior to the purchase of those B-2s.
19 BY MR. YUN:
20   Q. I'd like to move on to another document.
21 It's a document previously marked as Exhibit 119.
22 It's an e-mail dated September 27, 2001. It's an
23 e-mail from you to Susan Menkhaus and signed by
24 Fiachra O'Driscoll.
25   A. I have that now.

57

Q. Do you recognize this e-mail, Mr. Millard?

A. It does appear to be an e-mail that I sent, yes.

Q. In the last paragraph, you requested monthly reports for delinquencies, losses and prepayments.

Did you get monthly reports from Credit Suisse?

A. Yes, we did ultimately receive monthly reports.

Q. You stated "ultimately." Does that mean there was some delay in getting the monthly reports?

MR. WILLIAMSON: Objection to form.

THE WITNESS: My recollection is is that we may not have received the first month. We ultimately received them, but -- there was some error in terms of getting them to us, but we ultimately started receiving monthly reports.

BY MR. YUN:

Q. I'd like to have you take a look at Exhibit 90. It's an e-mail from Mark Henkhaus to Fiachra O'Driscoll, dated December 3rd, 2001. It's Bates-stamped CSFB-188026 to -27.

A. I have that.

Q. Have you had a chance to look at this e-mail?

A. I went through several of the documents. I did not go through them all, so I have them in front of me. If there's a specific section you'd like to discuss, that would be fine.

Q. In the top paragraph, Susan Henkhaus refers to the LAP, and explains that the LAP is causing the delinquencies.

Was this information shared with you in December 2001?

MR. WILLIAMSON: Objection.

THE WITNESS: December 2001? I don't recall talking about that either way.

BY MR. YUN:

Q. Let's move on to another document. Can you find Exhibit 30. It's an e-mail from Jared Pelt to Fiachra O'Driscoll, dated November 7th, 2002, and it's stamped CSFirstBoston-4114).

MR. KLAUS: November 7, 2002?

MR. YUN: That's correct.

THE WITNESS: I have it.

MR. KLAUS: Okay.

THE WITNESS: I do have that.

BY MR. YUN:

Q. Have you had a chance to review this e-mail?

A. I will. It's short. If you'd give me just

a few seconds.

Q. Sure.

A. (Pause.) All right.

Q. Were you aware, on November 7, 2002, that there was a problem with the debtor-in-possession financing?

MR. WILLIAMSON: Objection to form.

THE WITNESS: I don't recall I was aware of a problem on that date, no.

BY MR. YUN:

Q. Did Jared Pelt or Fiachra O'Driscoll contact you about Foothill's issues with the debtor-in-possession financing on November 7, 2002, or shortly thereafter?

MR. WILLIAMSON: Objection.

THE WITNESS: Unfortunately, I don't specifically recall the conversation with them regarding that issue.

BY MR. YUN:

Q. Let's then move on to the next document. It's a document previously marked as Exhibit 33. It's an e-mail from Jared Pelt to Fiachra O'Driscoll, dated November 14, 2002, and it's Bates-stamped CSFB-41242.

A. All righty.

Q. Have you had a chance to review this e-mail?

A. Yes, just now.

Q. Now, in the last paragraph, Jared Pelt states: "I would like to call Mark."

Did Jared Pelt or Fiachra O'Driscoll call you on November 14, 2002, to discuss Foothill's debtor-in-possession financing?

MR. WILLIAMSON: Objection.

MR. KLAUS: I'm sorry, I missed the question.

BY MR. YUN:

Q. Did Jared Pelt or Fiachra O'Driscoll, on November 14, 2002, call you to discuss debtor-in-possession financing from Foothill?

MR. WILLIAMSON: Objection.

THE WITNESS: I do recall, at some point, we talked about the DIP facility. Whether or not it was on that date or the -- I don't recall, and I'm sorry, I just couldn't tell you, one way or the other.

BY MR. YUN:

Q. Now, in the e-mail, Mr. Pelt states: "It has a couple of unacceptable provisions...."

Do you have any recollection of what those unacceptable provisions were?

1    MR. WILLIAMSON:  Objection.

2    MR. KLAUS:  Yeah, I would object to the form

3  as well.  It does assume facts for this witness.

4    But I assume that you use it, if Mr. Millard

5  has any recollection of any unacceptable provisions

6  in a term sheet that's referenced here -- your

7  question is if he explain those?

8    MR. YUN:  That's correct.

9    THE WITNESS:  I don't recall what the

10  specific issues were, the unacceptable provisions.  I

11  was not on point with the DIP at this time, so I

12  would -- I don't recall what those unacceptable

13  provisions might have been.

14    Again, at some point in time, we actually

15  were part of the ultimate DIP facility that was

16  accepted by the Court, but the timing of that is

17  just -- I'm struggling with it, you know, what we

18  knew and when, I guess.

19  BY MR. YUN:

20    Q.  Let's move on to another document.

21    MR. WILLIAMSON:  Scott, this is Justin.  I'm

22  just going to interject here that it's about 5:44,

23  and, you know, taking into account the fact that we

24  took about a ten-minute break in the middle, we've

25  gone a little over an hour and a half here, and in an

62

1  now, there's not an issue, so we're wasting more time

2  by fighting over this.

3    Why don't you give me about five to ten

4  minutes to finish, you ask your questions.  If it

5  turns out we run out of time, and that becomes an

6  issue for Mr. Millard, we will try to work it out,

7  but right now, it's not really an issue.

8    MR. OSNATO:  It's not an issue, because

9  you've missed the point of what I said.  I don't want

10  to get into a disagreement and waste anyone's time

11  here.  My point is simply that we had a prior

12  commitment to divide this deposition equally, and

13  you've since gone over that.

14    I'm willing to give you a few minutes to

15  wrap up, but I'm not willing to give you ten minutes,

16  and then say it's up to you to use whatever time you

17  need, and we'll deal with the issue later if you, in

18  fact, need more time.

19    But I would respectfully ask that you wind

20  up your questions in the next three minutes, we'll

21  move very expeditiously through ours, and we can

22  conclude this deposition.

23    MR. YUN:  Sure.  Why don't I just start,

24  then.

25    Q.  Mr. Millard, I would like to refer you to a

64

24/09/2007 MILLARD, MARK D.

1  effort to try and -- we actually do have some

2  questions we'd like to ask Mr. Millard, and I'm

3  cognizant that we've promised he and his counsel that

4  we would try for two hours, although we do have the

5  ability to go longer.  So we'd like to begin with our

6  side.

7    MR. YUN:  Yeah, I'm almost finished.

8    MR. OSNATO:  Well, Scott, I'm sorry.  This

9  is Mr. Osnato speaking.  Almost finished,

10  unfortunately, is not good enough, because the

11  agreement we had with your colleague was that each

12  side would be allocated 90 minutes, and you've gone

13  over your 90 minutes.

14    I appreciate there's more ground you may

15  wish to cover, but in the interest of fairness, I

16  don't know how many minutes I will need, but until I

17  begin my questioning, I can't give you time that I've

18  already reserved to Credit Suisse.

19    So therefore, we're going to insist that

20  you -- we'll give you the benefit of finishing

21  whatever line of questioning you have open, but we're

22  not going to allow you to take our time.

23    MR. YUN:  Whether or not you run out of time

24  is still hypothetical right now.  Maybe that becomes

25  an issue at the end of this deposition, but right

63

24/09/2007 MILLARD, MARK D.

1  document previously marked as Exhibit 127.  It's an

2  e-mail dated November 19, 2002, from you to

3  Mr. O'Driscoll, Connors and Susan Menkhaus, and it's

4  Bates-stamped CSFB-58243.

5    A.  I have it.

6    Q.  It mentions Mr. Davidson in a paragraph

7  designated as paragraph A.  Can you tell me who

8  Mr. Davidson is.

9    MR. KLAUS:  I'm sorry, Scott, can you give

10  me the exhibit number.  We missed that.

11    MR. YUN:  Oh, sorry.  It's 127.

12    MR. KLAUS:  Thank you.

13    THE WITNESS:  Mr. Davidson is, I believe,

14  Andrew Davidson, who was at a company that provided

15  cash flow information, certainly, in the

16  manufacturing housing space.  And I believe he was

17  actually hired and worked in the bankruptcy case, if

18  memory serves.

19  BY MR. YUN:

20    Q.  I'd like to refer you to Exhibit 130.  It's

21  an e-mail from you, dated November 23rd, 2002, to

22  Fiachra O'Driscoll --

23    A.  Yes.

24    Q.  -- on November 23rd, 2002.  It's

25  Bates-stamped CSFB-514175 to -76.

65

1    A.  Okay.

2    Q.  On the second page of that document, towards

3  the bottom, there's a paragraph marked paragraph "1.

4  Andrew Davidson," and it states:

5          "Someone needs to figure out how

6          badly his model may have misrepresented

7          the Lotus cash flows."

8  Can you describe for me your statement.

9    MR. KLAUS:  Objection.  Do you mean -- I'm

10  sorry, describe -- I think the document speaks for

11  itself.  Do you mean to ask him what he meant by it?

12    MR. YUN:  Yes.

13    THE WITNESS:  At this point in time, I

14  believe it became clear that there were concerns over

15  the validity of the models run by Mr. Davidson, and

16  at some point in time, we found out that his model

17  really did not accurately represent the cash flows

18  with the corporate guarantees, and that there were,

19  you know, concerns that there might be larger

20  problems.

21  BY MR. YUN:

22    Q.  Do you recall whether Andrew Davidson's

23  model was created before or after the Lotus

24  transactions?

25    A.  I don't recall that.

66

---

1               EXAMINATION

2

3  BY MR. OSNATO:

4    Q.  Mr. Millard, I will try and be very brief,

5  and if not measured in seconds, certainly minutes.

6    The first question I have for you, sir,

7  relates to your testimony concerning the initial

8  meeting between representatives of Oakwood Homes,

9  Credit Suisse and Berkshire Hathaway in July 2002.

10    And do you recall testifying, sir, that it

11  was highly unusual, if not unprecedented, for --

12    MR. KLAUS:  I'm sorry, somebody's moving

13  papers around, and I just can't hear anything.

14    MR. YUN:  Oh, sorry about that.

15    MR. OSNATO:  That's fine.  Let me begin the

16  phrase again.

17    Q.  In connection with the July 2002 meeting in

18  Omaha involving the company Oakwood Homes, Credit

19  Suisse and Berkshire Hathaway, am I correct, sir,

20  that you testified that it was highly unusual, if not

21  unprecedented, for Berkshire Hathaway to grant an

22  audience to management of companies in which it had

23  purchased an interest?

24    A.  That was -- from my perspective, the ones

25  that I was involved in, that was not our normal

68

---

24/09/2007 MILLARD, MARK D.

1    Q.  I just have two questions, and then I'm

2  done.

3    Mr. Millard, did you believe Credit Suisse

4  had any conflict of interest in dealing with the

5  Lotus transactions?

6    MR. WILLIAMSON:  Objection.

7    THE WITNESS:  Credit Suisse was a financial

8  advisor to the company, and also working with us to

9  get us information.

10    I believe it was made clear, in one of the

11  e-mails that I sent, that, you know, I thought that

12  they were in a conflict of interest as it results --

13  or as it pertained to that warehouse line being

14  pulled at the same time they were a financial

15  advisor, without having a replacement line available.

16  BY MR. YUN:

17    Q.  Mr. Millard, I thank you very much for

18  taking the time for this deposition.  I am now going

19  go turn this over to counsel for Credit Suisse.

20    MR. OSNATO:  Thank you, Mr. Yun.  This is

21  Mr. Osnato, speaking from Linklaters.

22  /  /  /  /  /  /

23  /  /  /  /  /  /

24  /  /  /  /  /  /

25  /  /  /  /  /  /

67

---

24/09/2007 MILLARD, MARK D.

1  course, that's correct.

2    Q.  And am I correct, sir, that an audience was

3  granted to management of Oakwood Homes on at least

4  two occasions, the first being July 2002, the second

5  being October 2002?

6    A.  I believe that's correct.

7    Q.  And would I, therefore, be correct -- well,

8  strike that.

9    Do you believe, sir, that in your view,

10  Credit Suisse provided good service to its client,

11  Oakwood Homes, in delivering an audience with

12  yourself and Mr. Buffett?

13    MR. KLAUS:  Objection, lacks foundation,

14  calls for speculation and opinion testimony.

15    Mr. Millard, if you had a belief, one way or

16  the other, with respect to that, you're free to

17  testify to it.

18  BY MR. OSNATO:

19    Q.  The question, to be clear, sir, is

20  predicated on your own view of the matter, and

21  whether, in your opinion or view, Credit Suisse

22  served its client, Oakwood Homes, well in managing to

23  procure not one, but two audiences with yourself and

24  Mr. Buffett?

25    MR. KLAUS:  And I will just say, Counsel, my

69

1    only objection is that the witness is here to testify
2    to his own understanding and his own views that they
3    had at the time. He's not here to be an expert
4    witness for either side.
5         So I would say, Mr. Millard, if you had an
6    opinion, one way or the other, in that regard, that
7    you can remember at this time, you're certainly free
8    to testify to it.
9         Otherwise, if it's a question to ask you to
10   sit here today and offer your opinion on that, I
11   would object, and I'd need a little more foundation
12   before I'd let the witness answer.
13   BY MR. OSNATO:
14        Q. Mr. Millard, you can go ahead and answer,
15   please.
16        A. As I recall the way that came about, just
17   for the record, was, my relationship with Tom Connors
18   was pushing for that meeting, and I granted that as a
19   favor to him, you know. And my recollection is is
20   that, you know, I asked my boss, Mr. Buffett, would
21   he be available for that, again as a favor to Tom,
22   since Tom's relationship with me went back quite a
23   ways.
24        Q. Thank you. You also testified, Mr. Millard,
25   that in the course of the initial negotiations over

70

1    the Lotus I transaction, which is the same summer of
2    2001, you don't recall having any interaction or
3    direct communications with representatives of Oakwood
4    Homes; is that correct?
5         A. That's my recollection.
6         Q. Is that uncommon in your business; i.e., for
7    you to negotiate directly with a dealer such as
8    Credit Suisse when you're negotiating the terms of
9    the purchase of securities?
10        A. I would say -- is that -- I'm sorry, one
11   more time.
12        Q. That's fine. Let me then begin at the
13   beginning again.
14        Your testimony, as I understand it, was that
15   in the course of your negotiations in July of 2001,
16   you did not communicate directly with representatives
17   or management of Oakwood Homes. Is that correct?
18        A. Right.
19        Q. My question, simply, is: Is that
20   arrangement unusual in your line of business?
21        A. No, I don't believe it is.
22        MR. KLAUS: And Mr. Millard, I'm sorry. You
23   can again testify to your experience.
24   BY MR. OSNATO:
25        Q. Correct. That's all I'm looking for.

71

1    A. In my experience, that is not unusual. That
2    is not an unusual event.
3         Q. Mr. Millard, in the course of all of your
4    dealings with Credit Suisse involving Oakwood Homes
5    in any capacity, did anyone from Credit Suisse ever
6    tell you that they were providing you with
7    information that Oakwood Homes had provided Credit
8    Suisse in confidence and had asked it not to share
9    with Berkshire?
10        A. I don't recall that being the case. I don't
11   recall a case of that.
12        Q. Thank you. And then finally, sir, I just
13   want to briefly touch upon your testimony concerning
14   the fee that Credit Suisse proposed as a condition
15   for making the warehouse line available following the
16   bankruptcy.
17        Do you recall your testimony to that effect?
18        A. Yes, for the most part.
19        Q. And you testified that you were displeased
20   that Credit Suisse was seeking to impose a $3 million
21   fee; is that right?
22        A. Yes, sir.
23        Q. What was the basis for your conclusion or
24   belief that Credit Suisse was simply using the
25   $3 million fee as a back door to procure some of its

72

1    investment banking fees?
2         A. The first part of my response is, because it
3    was not something that Credit Suisse and Berkshire
4    negotiated. We negotiated to be a part of the -- to
5    keep the line open. We came to an agreement on that,
6    and then only afterwards, days afterwards, did it
7    become clear to me that they were trying to add a lot
8    more cost to the company.
9         Q. Uh-huh.
10        A. The second part of the response is that I
11   knew that they were not -- you know, I knew that they
12   had concerns over the investment banking fees that
13   they might not otherwise obtain, and when the fee on
14   the warehouse reopening line came up, again, as I
15   stated, it was my opinion that that was just a way to
16   back-door the fees.
17        Q. Were you aware at the time, Mr. Millard --
18   the time being approximately November of 2002 -- that
19   under the existing warehouse line, the event of
20   bankruptcy was a default under the warehouse
21   agreement?
22        A. Prior to their coming to us with that whole
23   warehouse issue, I was not aware of the warehouse
24   language at all.
25        Q. Do you recall any discussions, with

73

1    Mr. O'Driscoll or anyone else at Credit Suisse, about
2    Credit Suisse's concern about taking on additional
3    risk and exposure to Oakwood Homes following the
4    bankruptcy?
5         A.  Are we talking specifically about the
6    warehouse line or any exposure?
7         Q.  Yes, I am.  And thank you for that
8    clarification.  So let me, with that caveat in mind,
9    rephrase and put a direct question to you.
10        A.  Sure.
11        Q.  In connection with your discussions with
12   Credit Suisse over the reopening of the warehouse
13   line, did anyone from Credit Suisse express to you
14   concerns that Credit Suisse had about taking on
15   additional exposure or risk by making the warehouse
16   available post bankruptcy?
17        A.  My specific recollection is that Credit
18   Suisse had a concern over all warehouse lines, not
19   just Oakwood Homes -- and in fact, I believe John
20   Mack's picture was in The Wall Street Journal that
21   same day we discussed it -- and that they were
22   looking to reduce exposures -- these types of
23   exposures overall, not just necessarily Oakwood.
24        So I am familiar with -- my recollection is
25   that there was concern over warehouse lines in

74

24/09/2007 MILLARD, MARK D.

1    general.  Does that answer your question?
2         Q.  It does.  Thank you very much.
3         Was that concern put to you directly by
4    either Mr. Connors or Mr. O'Driscoll?
5         A.  Yes, sir.  I don't recall which, but it was
6    certainly, you know, made clear to me.
7         Q.  With that piece of context in place, is it
8    possible, sir, that some or all of the $3 million fee
9    was proposed by Credit Suisse in order to compensate
10   it for the risk of taking on the warehouse line post
11   bankruptcy?
12        MR. KLAUS:  I object that the question calls
13   for speculation.
14        MR. YUN:  I join the objection.
15   BY MR. OSNATO:
16        Q.  You can answer, sir.
17        MR. KLAUS:  If you have a basis for an
18   understanding one way or the other, you can answer,
19   Mr. Millard.
20        THE WITNESS:  I do, and I would say no.
21   BY MR. OSNATO:
22        Q.  And why is that?
23        A.  The line that was ultimately renegotiated
24   was a very solid warehouse line, that the ability to
25   allow the company to borrow cash was changed such

75

1    that there had to be even more collateral than there
2    was prior.  And in fact, I believe Credit Suisse
3    would also agree that that line was a very, very
4    solid line.
5         They were not really, you know, allowing
6    much cash to go out of the collateral, much less so
7    than it was prior.  So I would say that there was
8    very, very little risk on that end.  In fact, less so
9    than there was prior.
10        Q.  Now I'd like to ask you, sir, just one or
11   two more general questions before I conclude, and the
12   first question is this:
13        In the course of arranging for this
14   deposition, have you had any conversations with
15   counsel for the Trust, Stutman Treister, about any
16   matters other than scheduling your deposition or
17   providing documents?
18        A.  I believe any conversation we've had was
19   regarding scheduling more than -- regarding the
20   scheduling of said deposition and rescheduling same.
21        Q.  So am I therefore correct, you've had no
22   discussions of any substance concerning the
23   allegations of the lawsuit with counsel for the
24   Trust?
25        A.  Yes, I believe that to be correct.

76

24/09/2007 MILLARD, MARK D.

1         Q.  Okay.  Now, shifting gears for a moment to
2    the topic of settlement discussions in this case.
3         Have you, in your capacity as an officer or
4    employee of Berkshire Hathaway, any discussions with
5    either the Creditors' Committee for the Oakwood
6    Estate or the Advisory Committee for the Liquidation
7    Trust on the topic of settlement of this lawsuit?
8         A.  I've spoken with a gentleman named Matt
9    Kvarda, who is, I think, on the Liquida- -- or
10   involved in this case from time to time, and that's
11   pretty much the one that I've spoken to, other than
12   my counsel.
13        Q.  Fair enough.  Could you please tell us what
14   you recall about your discussions with Mr. Kvarda on
15   the topic of settlement of this adversary proceeding.
16        A.  From time to time, I would just send an
17   e-mail to Matt to find out what was going on with the
18   open case, the open claims, and I would generally
19   receive information back that would get me some
20   documentation -- not documentation, but information
21   about how many claims are open, et cetera.
22        Specifically to your question, you know, I
23   was aware that there were some ongoing negotiations
24   and meetings to take place, but I kind of stayed out
25   of it at that point in time.

77

1    Q. And so am I therefore correct that you never
2  expressed a view or an opinion that the case should
3  settle for a certain amount?
4    A. I never expressed a view in terms of a
5  dollar amount. You know, I tried to let that be
6  their decision.
7    Q. And am I correct, sir, that the reason for
8  your general discussions about the progress of
9  settlement with Mr. Kvarda were prompted by Berkshire
10  Hathaway's status as a creditor in this matter?
11    A. Yes.
12    Q. At any point in time, has Mr. Kvarda
13  indicated to you whether he believed Credit Suisse
14  would settle this matter?
15    A. I don't know if that was through Matt or Tom
16  Connors, but at one point in time, I got involved to
17  see if Tom would -- Tom Connors would get the
18  "business folks" together to see if this thing could
19  be settled. Ultimately, I believe a meeting took
20  place, but it did not settle.
21    Q. All right, thank you. Thank very much for
22  that response. That concludes all the questions I
23  have, so on behalf of Credit Suisse, I thank you very
24  much for your time.
25      MR. YUN: Can we go off the record for a

78

1    MR. YUN: Okay, that's the way it's going to
2  be. Thank you, everyone.
3        (At the hour of 3:05 p.m. the
4        deposition was adjourned.)

80

---

24/09/2007 MILLARD, MARK D.

1  minute?
2      MR. KLAUS: Yes, we can.
3        (Discussion off the record.)
4      MR. YUN: The parties stipulate that the
5  reporter is relieved of his responsibilities under
6  the Federal Rules with respect to the original
7  deposition transcript; that the original deposition
8  transcript should be transmitted to counsel for
9  Mr. Millard, who will arrange to get it to the
10  witness; and the witness will have three weeks from
11  the time the transcript is received to review it,
12  correct it, sign it under penalty of perjury;
13      Mr. Millard will notify me and counsel for
14  Credit Suisse by facsimile if there are any changes;
15  if there are no changes, a certified copy may be used
16  for any purpose that the original could be used.
17      And Mike...
18      MR. OSNATO: Yes?
19      MR. YUN: Mr. Osnato, I forget who keeps the
20  original in this case. What's our -- do you guys
21  keep your depositions, and we keep our original
22  depositions?
23      MR. OSNATO: I think that's right, Scott.
24  And let's plan on that, and if I learn otherwise,
25  I'll let you know.

79

24/09/2007 MILLARD, MARK D.

1          D E C L A R A T I O N
2
3      I hereby declare I am the deponent in
4  the within matter; that I have read the foregoing
5  deposition and know the contents thereof, and I
6  declare that the same is true of my knowledge
7  except as to the matters which are therein stated
8  upon my information or belief, and as to those
9  matters, I believe it to be true.
10      I declare under the penalties of
11  perjury of the State of California that the foregoing
12  is true and correct.
13      Executed this      day of      ,
14  2007, at            , California.
15
16
17
18
19
20          W I T N E S S
21
22
23
24
25

81

```
 1    STATE OF CALIFORNIA      )
 2                             )   ss.
 3    COUNTY OF LOS ANGELES    )
 4               I, Alfred J. Long, CSR No. 2924 for the
 5    State of California, do hereby certify:
 6               That prior to being examined, the witness
 7    named in the foregoing deposition was duly sworn to
 8    testify the truth, the whole truth, and nothing but
 9    the truth;
10               That said deposition was taken down by me in
11    shorthand at the time and place herein named and
12    thereafter reduced by me to typewritten form, and
13    that the same is a true, correct and complete
14    transcript of said proceedings.
15               Before completion of the deposition, review
16    of the transcript [ x ] was [  ] was not requested.
17    If requested, any changes made by the deponent (and
18    provided to the reporter) during the period allowed
19    are appended hereto.
20               I further certify that I am not interested
21    in the outcome of the action.
22               WITNESS my hand this 28th day of September,
23    2007.
24
25                    ALFRED J. LONG  CSR No. 2024
```

82

24/09/2007  MILLARD, MARK D.

$

$3 [47:23] [48:3,17] [53:9]
 [72:20,25] [75:8]
$51 [32:10]

0

01 [55:12]
02 [42:7] [52:3]

1

1 [66:3]
1:03 [2:4] [5:2]
10 [38:5]
100 [22:11]
10105 [3:9]
10k [38:5]
10-k [38:5]
10q [38:5]
10-q [38:5]
10th [56:20]
11 [38:18] [39:5]
11/29/02 [4:12]
118 [4:21] [54:2]
119 [4:22] [57:21]
127 [4:23] [65:1,11]
130 [4:24] [65:20]
1345 [3:8]
14 [60:23] [61:6,13]
15 [34:10] [41:21]
153 [4:11] [51:2,3]
15th [42:7] [45:18] [52:3]
18 [31:21]
19 [4:16] [31:2,20] [65:2]
1901 [2:3,13]
1984 [9:7]

2

2 [21:14,23] [54:9] [57:10]
2000 [9:15] [13:2,6]
2001 [14:2,3,9,14] [54:2]
 [56:20] [57:22] [58:21]
 [59:9,11] [71:2,15]
2002 [9:15] [13:2,6] [29:11
 ,17] [30:21] [31:22] [32:7,11
 ,13,20,25] [33:10,25]
 [34:11] [35:3] [36:6,15]
 [37:1,9,19] [38:8,20]
 [39:10,15] [41:21] [50:12,14]
 [59:16,18] [60:4,13,23]
 [61:6,13] [65:2,21,24]
 [68:9,17] [69:4,5] [73:18]
2007 [2:5] [5:2] [81:14]
 [82:23]
2024 [2:6] [82:4,25]
212 [3:10]
213 [2:24]
228 [2:16]
2285750 [2:16]
228-5750 [2:16]

23rd [65:21,24]
24 [2:5] [5:2] [29:11]
25th [54:2]
27 [57:22] [58:22]
28 [50:14]
28th [82:22]
29 [50:12]
29671 [50:23]
29672 [50:23]
2a [54:9]

3

3:05 [80:3]
30 [4:17] [41:5] [59:15]
31 [4:16]
310 [2:16]
33 [4:18] [60:21]
35153 [31:25]
355 [2:21]
35th [2:22]
3rd [58:21]

4

4 [55:2]
41 [4:15]

5

5 [4:4]
5:30 [41:15]
5:44 [62:22]
51 [4:11]
54 [4:21]
55 [23:25] [24:2] [27:12]
56 [4:19]
57 [4:22]
58 [4:20]
59 [4:17]

6

60 [4:18]
65 [4:23,24]
68 [4:5]
683 [2:24]
6839100 [2:24]
683-9100 [2:24]

7

7 [55:19] [59:18] [60:4,13]
76 [65:25]
7th [59:16]

8

86 [4:19] [56:18]

9

9 [4:15] [41:23]
90 [4:20] [58:20] [63:12,13]

90067 [2:15]
900676013 [2:15]
90067-6013 [2:15]
90071 [2:23]
900711560 [2:23]
90071-1560 [2:23]
903 [3:10]
9039000 [3:10]
903-9000 [3:10]

A

abilities [8:8,17]
ability [63:5] [75:24]
able [47:3]
accepted [62:16]
account [62:23]
accurate [57:8]
accurately [7:18] [8:17]
 [29:1] [66:17]
acknowledge [42:10]
acquainted [9:19] [11:6,24]
 [12:14]
act [5:20]
action [5:15] [6:4,25] [82:21]
actually [31:22] [32:24]
 [42:7] [49:24] [62:14]
 [63:1] [65:17]
add [73:7]
added [23:2]
addition [6:12]
additional [4:12] [28:5]
 [53:2] [74:2,15]
adjourned [80:4]
administration [5:19]
adversary [77:15]
advisor [67:8,15]
advisors [46:7,9,18]
advisory [77:6]
affiliates [6:22]
affirmation [41:22]
afterwards [73:6]
again [6:2] [15:23] [25:2,12
 ,14] [27:14] [30:6] [32:22]
 [33:4,12] [34:19] [36:18]
 [39:1] [43:12] [44:13]
 [46:16] [47:8] [48:23]
 [56:13] [62:14] [68:16]
 [70:21] [71:13,23] [73:14]
ago [24:25]
agree [44:18] [76:3]
agreed [21:23] [49:11]
agreement [40:18] [42:21]
 [44:5] [51:25] [53:4] [55:25]
 [63:11] [73:5,21]
agrees [5:23]
ahead [35:25] [51:17]
 [70:14]
alfred [2:5] [82:4,25]
allegations [76:23]
allocated [63:12]
allow [40:20] [63:22] [75:25]
allowed [53:2] [82:18]
allowing [76:5]

alluded [28:22]
almost [63:7,9]
along [31:6] [41:12]
already [28:4] [30:14,18]
 [52:8] [63:18]
alternative [37:4]
although [12:23] [63:4]
am [6:18] [67:18] [68:19]
 [69:2] [74:7,24] [76:21]
 [78:1,7] [81:3] [82:20]
ambiguities [7:12]
ambiguous [10:5] [28:12]
amendments [52:16]
americas [3:8]
amount [19:23] [23:22,25]
 [78:3,5]
analyses [24:3,11,18]
 [25:8]
analytics [24:7,14]
and/or [9:12] [18:12] [19:13]
 [46:17]
andrew [65:14] [66:4,22]
angeles [2:4,15,23] [5:1]
 [82:3]
answer [7:13] [8:7] [10:6,7]
 [12:24] [13:10,14] [17:22,25]
 [19:19] [27:6] [28:14]
 [34:6] [35:11] [39:20]
 [44:14] [70:12,14] [75:1,16
 ,18]
answered [27:21]
answering [7:22] [35:11]
answers [7:24]
anticipate [41:14]
anticipated [23:5] [40:19]
 [41:9]
anxious [41:11]
anyone [17:14] [19:4]
 [37:20] [72:5] [74:1,13]
anyones [64:10]
anything [7:1] [19:16]
 [43:17] [68:13]
appear [54:7] [58:2]
appearances [2:8] [3:1]
appears [32:4]
appended [82:19]
applicable [5:22]
appraisal [26:21]
appreciate [63:14]
approached [20:20]
approved [37:7]
approximately [41:10]
 [73:18]
area [28:23]
around [14:3] [27:5] [41:15]
 [47:7] [68:13]
arrange [79:9]
arrangement [71:20]
arranging [76:13]
arrive [21:14]
ask [6:14] [13:14] [28:15]
 [44:8] [50:18] [54:10]
 [63:2] [64:4,19] [66:11]
 [70:9] [76:10]

24/09/2007 MILLARD, MARK D.

asked [25:7] [70:20] [72:8]
asking [32:23]
aspects [10:20]
assets [9:10]
assume [7:13] [62:3,4]
assumption [20:23] [21:1]
[30:22] [55:21]
assumptions [15:25]
[55:24] [56:2,4,12]
attaching [53:22]
attended [34:21]
attorney [8:5,7,14] [13:10]
attorneys [5:14,16] [55:10
,11]
audience [68:22] [69:2,11]
audiences [69:23]
audit [55:20,21]
audited [56:1,12]
audits [56:7,9]
authority [17:18] [18:1,4,7
,14,17] [19:24]
available [6:3] [67:15]
[70:21] [72:15] [74:16]
avenue [2:3,13,21] [3:8]
avoid [35:22]
aware [15:3] [19:10,13]
[38:6] [46:24] [47:4] [48:12]
[57:13,17] [60:4,8] [73:17
,23] [77:23]
away [38:16,17]

B

b2 [11:11] [15:17,21] [16:15
,20] [24:4] [25:8] [26:21]
[54:24] [57:11,13]
b-2 [11:11] [15:17,21]
[16:15,20] [24:4] [25:8]
[26:21] [54:24] [57:11,13]
b2s [26:24] [57:18]
b-2s [26:24] [57:18]
bachelor [8:22]
back [13:5] [14:2] [38:13]
[40:16] [54:17] [55:12]
[70:22] [72:25] [73:16]
[77:19]
backdoor [73:16]
back-door [73:16]
background [48:21]
badly [66:6]
balance [26:25]
balls [47:12]
bank [47:11]
banking [53:11,21] [73:1,12]
bankruptcy [20:17] [36:16]
[38:10,21] [39:10,13,16,19
,23] [45:3,19] [53:18]
[55:4,6,13] [65:17] [72:16]
[73:20] [74:4,16] [75:11]
base [10:18]
based [33:12] [56:3]
basically [25:24]
basis [35:10] [44:14] [72:23]
[75:17]

bates [31:24] [50:21] [56:20]
[58:22] [60:23] [65:4,25]
batesstamp [31:24]
bates-stamp [31:24]
batesstamped [58:22]
[60:23] [65:4,25]
bates-stamped [58:22]
[60:23] [65:4,25]
bears [31:24] [56:20]
became [12:2] [15:3] [19:1
,9] [28:23] [33:13,16]
[37:14] [38:5] [46:24]
[47:4] [66:14]
become [9:19] [11:6,24]
[12:14] [13:24] [48:12]
[73:7]
becomes [63:24] [64:5]
begin [5:15] [6:7] [63:5,17]
[68:15] [71:12]
beginning [41:2] [71:13]
behalf [2:2] [10:14] [17:20]
[18:7,18] [78:23]
belief [36:20] [69:15] [72:24]
[81:8]
believe [6:17] [9:22] [11:2,15
,21] [12:3,23] [13:11]
[14:15] [16:1] [18:16,21,22]
[21:4] [24:17] [25:9,17,18]
[26:3,17,24] [27:4,6]
[28:25] [29:13,20] [30:16]
[36:8,9] [38:12,13] [40:1]
[41:24] [43:19] [46:11]
[47:11,14] [49:22] [54:5,13]
[55:24] [57:8] [65:13,16]
[66:14] [67:3,10] [69:6,9]
[71:21] [74:19] [76:2,18,25]
[78:19] [81:9]
believed [18:24] [78:13]
benefit [63:20]
berkshire [9:3,4,6,9,12]
[10:15,19] [13:1,24] [14:10
,18,23] [15:16,20] [16:8,14
,19] [17:1] [19:6,17] [22:11
,18] [24:18] [25:10] [29:11
,16] [32:6] [33:9,25] [34:11
,15,24] [36:24] [37:7,20]
[43:9] [44:9] [45:8,9]
[49:16] [68:9,19,21] [72:9]
[73:3] [77:4] [78:9]
berkshires [55:10]
besides [11:1]
best [8:8,17] [14:1] [17:16,22]
[25:15] [35:20] [37:14]
better [38:16] [39:1,4]
[52:12,18]
bind [43:4]
binding [42:13,21]
bit [35:17]
bonds [10:21] [11:11]
[14:17,19] [15:8] [19:23]
[35:19] [54:24]
borrow [75:25]
boss [17:4] [30:8,9] [38:16]
[70:20]

boston [3:3]
bostons [32:5]
bottom [50:22] [66:3]
bound [43:6,17]
break [40:7,12] [62:24]
brief [68:4]
briefly [7:9] [8:20] [72:13]
bring [36:2]
brought [14:23] [16:4,7]
buffett [13:23] [69:12,24]
[70:20]
b-u-f-f-e-t-t [13:23]
business [71:6,20] [78:18]
buy [14:21] [27:2]

C

california [2:4,15,23] [5:1]
[8:23] [81:11,14] [82:1,5]
call [35:12] [61:4,5,13]
calls [12:19] [29:20] [42:14]
[69:14] [75:12]
cannot [8:16]
cant [39:2] [40:25] [41:4]
[63:17] [68:13]
capacity [72:5] [77:3]
case [10:14,20] [12:18]
[40:22] [53:21] [65:17]
[72:10,11] [77:2,10,18]
[78:2] [79:20]
cash [9:12] [23:4,6] [25:21
,23] [26:3,13] [27:25]
[54:10] [56:4] [65:15]
[66:7,17] [75:25] [76:6]
causing [59:6]
caveat [74:8]
center [50:23]
certain [24:25] [25:11,22]
[27:17,18] [29:2] [39:18]
[78:3]
certainly [15:24] [17:3,23]
[20:18,19] [21:11] [22:21]
[24:13] [25:7] [26:10]
[28:17] [29:3] [30:19]
[32:16] [33:13] [34:6]
[35:14,17] [36:20] [38:6]
[39:20] [48:8] [49:23]
[55:14,16] [65:15] [68:5]
[70:7] [75:6]
certainty [39:2]
certified [79:15]
certify [82:5,20]
cetera [26:12] [77:21]
chain [49:1]
chance [56:23] [58:24]
[59:24] [61:1]
changed [75:25]
changes [79:14,15] [82:17]
chapter [38:18] [39:5]
circulated [50:19]
claims [77:18,21]
clarification [16:1] [28:14]
[74:8]
classes [29:2]

clause [13:10]
clear [33:16] [37:14] [38:9]
[43:3,20] [55:13] [66:14]
[67:10] [69:19] [73:7]
[75:6]
clearly [44:17] [47:20]
[53:10]
client [69:10,22]
close [41:15]
cognizant [63:3]
collateral [15:17] [76:1,6]
colleague [63:11]
coming [15:6] [73:22]
command [49:2]
commencing [2:4]
commitment [52:3] [64:12]
committee [77:5,6]
committing [43:10]
communicate [71:16]
communications [71:3]
companies [68:22]
company [10:21] [11:1,20]
[12:10,22] [18:3,13,25]
[19:13] [33:15,17] [34:25]
[36:3] [38:25] [39:18]
[43:17] [46:6,17] [47:12]
[49:10] [51:25] [65:14]
[67:8] [68:18] [73:8] [75:25]
companys [37:16]
compensate [75:9]
complete [7:21] [82:13]
completion [82:15]
concern [28:23] [47:21]
[55:5,9] [74:2,18,25]
[75:3]
concerned [34:5,7]
concerning [68:7] [72:13]
[76:22]
concerns [20:8] [22:23]
[33:18] [34:1,3] [47:7]
[66:14,19] [73:12] [74:14]
conclude [64:22] [76:11]
concludes [78:22]
conclusion [38:8] [42:15]
[72:23]
condition [72:14]
confidence [72:8]
confident [45:13]
confirm [6:7] [19:24] [41:3]
conflict [67:4,12]
connection [68:17] [74:11]
connors [9:17,20,21,24]
[10:3,13,16,24] [11:9]
[17:13] [18:6,10] [29:21]
[34:19] [47:14] [49:1]
[54:8] [65:3] [70:17] [75:4]
[78:16,17]
consented [37:8]
consider [42:10] [43:16]
[52:4]
considered [16:12]
considering [48:23]
contact [60:11]
contacted [15:20] [29:16]

24/09/2007  MILLARD, MARK D.

contents [81:5]
context [75:7]
contingencies [44:2]
contingency [44:4]
contingent [43:23]
continue [16:10]
continued [3:1]
convenience [6:20,23]
conversation [19:12]
[33:21] [60:17] [76:18]
conversations [11:9]
[32:16] [49:5] [76:14]
copy [79:15]
corporate [14:19] [22:15]
[23:5] [66:18]
corporation [6:22] [26:25]
correct [7:12] [22:12,16]
[24:1,2] [29:15] [40:24]
[50:24] [51:15] [56:2]
[59:19] [62:8] [68:19]
[69:1,2,6,7] [71:4,17,25]
[76:21,25] [78:1,7] [79:12]
[81:12] [82:13]
corrected [29:9]
corrections [29:6]
cost [47:9] [73:8]
couldnt [45:24] [61:19]
counsel [2:8] [3:1] [6:12]
[8:5,14] [10:6,8] [13:14]
[31:6,12,16] [63:3] [67:19]
[69:25] [76:15,23] [77:12]
[79:8,13]
county [82:3]
couple [29:13] [61:22]
course [10:17] [29:8] [47:13]
[69:1] [70:25] [71:15]
[72:3] [76:13]
court [7:17,24] [51:1] [62:16]
cover [63:15]
coverage [9:21]
cpa [8:25]
created [66:23]
credit [3:3] [6:12,14,23,24]
[8:6,15] [9:17,22] [10:19]
[11:3,22] [12:12,17] [13:11]
[14:24] [15:6] [16:4,7]
[17:5,12] [19:5,13] [21:14]
,18] [23:10,12,14] [24:3,7,10
,17] [25:7,10] [26:4,14]
[27:24] [28:8] [29:12]
[31:6,12] [32:5] [34:12]
[36:2,23] [37:16,21,24]
[38:20,25] [42:24] [44:25]
[45:2] [46:11,20] [47:15]
[48:7] [49:6,15] [51:24]
[52:8] [54:10,11] [55:23]
[56:7] [58:6] [63:18] [67:3
,7,19] [68:9,18] [69:10,21]
[71:8] [72:4,5,7,14,20,24]
[73:3] [74:1,2,12,13,14,17]
[75:9] [76:2] [78:13,23]
[79:14]
creditor [78:10]
creditors [77:5]
cropped [47:7]
csfb [31:2,24] [32:2] [56:21]
[58:22] [60:24] [65:4,25]
csfb186652 [56:21]
csfb-186652 [56:21]
csfb188026 [58:22]
csfb-188026 [58:22]
csfb35143 [31:24]
csfb-35143 [31:24]
csfb35147 [32:2]
csfb-35147 [32:2]
csfb41242 [60:24]
csfb-41242 [60:24]
csfb514175 [65:25]
csfb-514175 [65:25]
csfb58243 [65:4]
csfb-58243 [65:4]
csfirstboston [59:17]
csfirstboston41143 [59:17]
csfirstboston-41143
[59:17]
csr [2:6] [82:4,25]
current [9:2]
curve [47:12]

D

data [25:1,11,16,18,24]
[26:18] [28:7]
date [14:2] [20:20] [31:15,17]
[45:18,22] [46:14] [47:3]
[49:20] [50:2,3,4,6] [60:9]
[61:18]
dated [31:21] [32:6] [41:21]
[50:12] [54:2] [56:19]
[57:22] [58:21] [59:16]
[60:23] [65:2,21]
david [7:6]
davidson [65:6,8,13,14]
[66:4,15]
davidsons [66:22]
day [74:21] [81:13] [82:22]
days [49:12] [73:6]
deal [18:14,25] [23:3]
[55:20] [56:14] [64:17]
dealer [15:7] [37:16] [48:22]
[71:7]
dealing [13:5] [67:4]
dealings [13:1] [72:4]
dealt [17:24]
debt [10:21] [14:17] [16:11
,22] [19:11] [30:15]
debtor [43:23] [44:10,16]
[46:3,21] [47:4] [49:18]
[60:5,12] [61:7,13]
debtorin [43:23] [44:16]
[47:4] [49:18] [60:12]
[61:13]
debtor-in [43:23] [44:16]
[47:4] [49:18] [60:12]
[61:13]
debtorinpossession
[44:10] [46:3,21] [60:5]
[61:7]
debtor-in-possession
[44:10] [46:3,21] [60:5]
[61:7]
december [58:21] [59:9,11]
decide [24:14]
decision [78:6]
declare [81:3,6,10]
deep [35:18]
default [73:20]
defendant [3:3]
defendants [6:24]
delay [58:11]
delinquencies [26:11]
[58:5] [59:7]
delinquency [26:11]
delivering [69:11]
deponent [81:3] [82:17]
deposed [7:7]
deposition [2:1] [5:18,21]
[6:3,6,15,18] [7:10] [8:2,12
,18] [41:9] [54:23] [63:25]
[64:12,22] [67:18] [76:14,16
,20] [79:7] [80:4] [81:5]
[82:7,10,15]
depositions [79:21,22]
describe [8:20] [9:8] [12:25]
[13:4] [14:13] [15:13]
[23:18] [25:1,12] [28:21]
[36:11] [42:3] [47:23]
[48:3] [51:21] [52:9] [66:8
,10]
described [15:11] [25:18]
description [4:10] [13:15]
designated [65:7]
desk [9:23]
detail [48:9]
details [30:24] [36:18]
determine [24:4] [25:9]
didnt [18:20] [29:3] [39:11
,22] [41:2] [43:4] [47:25]
[51:16]
different [8:3] [35:17]
[37:3,16] [53:19] [56:3]
dip [47:5] [61:17] [62:11,15]
direct [5:16] [71:3] [74:9]
directly [17:15] [34:24]
[71:7,16] [75:3]
director [9:10]
disagreement [64:10]
disclosure [38:4]
discovered [28:18]
discuss [38:21] [59:4]
[61:6,13]
discussed [10:20] [27:7]
[32:13] [33:5] [36:16]
[54:23] [55:11] [74:21]
discussion [30:22] [32:17]
[55:3] [79:3]
discussions [20:1,5,16,18
,22] [21:1,6] [24:21] [39:8,16]
[42:24] [49:5] [73:25]
[74:11] [76:22] [77:2,4,14]
[78:8]
[61:7]
debtor-in-possession
[44:10] [46:3,21] [60:5]
[61:7]
disguised [53:10]
displeased [72:19]
dispute [47:17]
divide [64:12]
document [31:1,17] [32:2,4]
[41:20,25] [42:3,6,19]
[43:3,20] [50:10,19] [51:9
,12] [52:2,14] [54:1,3,14,22]
[55:2] [56:17,18,24] [57:20
,21] [59:14] [60:20,21]
[62:20] [65:1] [66:2,10]
documentation [37:3,5]
[77:20]
documents [6:8,10,14,16]
[24:7] [25:19] [26:4] [28:23]
[31:8,11,13] [50:8] [59:1]
[76:17]
doesnt [50:17]
dollar [78:5]
done [18:14] [30:18,19]
[49:8] [56:15] [67:2]
dont [7:22] [11:2,15,21]
[12:23] [14:2] [15:5] [18:3]
[19:11] [20:25] [21:10]
[22:3,5,7] [25:17] [27:4,6]
[28:25] [30:17,23] [32:15]
[33:3,6,19] [35:21,24]
[38:6] [39:20,21,22,24]
[40:24] [41:5] [44:1,4]
[45:21] [47:8] [48:9] [49:21
,22,23] [50:3,4,6] [54:13]
[55:8] [56:8,10,11,13]
[57:2] [59:11] [60:8,16]
[61:18] [62:9,12] [63:16]
[64:3,9,23] [66:25] [71:2,21]
[72:10] [75:5] [78:15]
door [72:25]
doug [50:11] [56:19] [57:10]
down [7:17,25] [12:2]
[82:10]
drawing [41:15]
duly [5:7] [82:7]
during [6:18] [11:8] [19:3,18
,25] [20:15,21] [21:13]
[26:14] [30:21] [36:15,25]
[37:9,19] [38:7,20] [39:10
,15] [82:18]
duties [9:8,11,14]

E

earn [14:22] [27:17]
easier [7:24]
easiest [31:17]
economics [8:22]
education [8:21]
effect [37:6] [54:16] [72:17]
effectively [26:25]
effort [63:1]
either [6:19] [59:12] [70:4]
[75:4] [77:5]
else [7:1] [19:4] [37:20]
[74:1]
email [4:11] [6:16] [31:20,22]

24/09/2007 MILLARD, MARK D.

[50:11,13] [51:14] [53:7]
[54:2,6,7,9,18,21] [55:19]
[56:19] [57:10,22,23]
[58:1,2,20,25] [59:15,24]
[60:22] [61:1,21] [65:2,21]
[77:17]
e-mail [4:11] [6:16] [31:20,22]
[50:11,13] [51:14] [53:7]
[54:2,6,7,9,18,21] [55:19]
[56:19] [57:10,22,23]
[58:1,2,20,25] [59:15,24]
[60:22] [61:1,21] [65:2,21]
[77:17]
emailed [6:13]
e-mailed [6:13]
emails [12:19] [50:13]
[67:11]
e-mails [12:19] [50:13]
[67:11]
employee [77:4]
employer [9:2]
end [16:17] [40:21] [63:25]
[76:8]
enough [43:4] [63:10]
[77:13]
entering [24:21]
entities [6:24]
entitled [42:18]
entity [23:5]
equally [64:12]
error [58:15]
errors [28:17,22]
esq [2:12,20] [3:6,7]
estate [77:6]
estimates [27:5]
et [26:12] [77:21]
even [40:22] [76:1]
event [72:2] [73:19]
ever [7:7] [8:24] [72:5]
everyone [80:2]
everyones [8:2]
everything [34:5]
evident [38:12]
exact [30:24] [36:18] [45:25]
examination [4:3] [5:10]
[68:1]
examined [5:8] [82:6]
except [81:7]
excess [9:11]
exchanged [12:18]
executed [81:13]
exhibit [4:11,15,16,17,18,19
,20,21,22,23,24] [31:2,20]
[41:23] [50:16,17,19,20]
[51:2,3] [54:2] [56:18]
[57:21] [58:20] [59:15]
[60:21] [65:1,10,20]
existing [19:6] [73:19]
expectations [25:22]
expeditiously [64:21]
expense [32:10]
experience [71:23] [72:1]
expert [70:3]
explain [26:23] [53:12]

[62:7]
explains [59:6]
exposure [74:3,6,15]
exposures [74:22,23]
express [74:13]
expressed [78:2,4]

F

face [22:12]
facility [44:23,25] [45:1,2,4
,5,10,18,23] [46:13,22]
[47:10,18] [48:18] [50:1]
[61:17] [62:15]
facsimile [79:14]
fact [28:25] [35:22] [44:17]
[48:6] [50:6] [56:11] [57:17]
[62:23] [64:18] [74:19]
[76:2,8]
facts [62:3]
fair [14:22] [16:24] [19:23]
[27:4] [77:13]
fairness [63:15]
familiar [15:10] [33:14]
[41:25] [74:24]
favor [36:2] [70:19,21]
favorably [48:8,24]
federal [79:6]
fee [21:14,17,23] [47:18,24]
[48:4,7,13,15,18] [49:14]
[51:23] [53:9,11,23] [72:14
,21,25] [73:13] [75:8]
fees [52:16] [53:2,17,21]
[73:1,12,16]
felt [11:22,23,25] [12:5,8]
[31:21] [39:1] [49:9] [53:21]
[59:15] [60:11,22] [61:3,5
,12,21]
few [24:25] [56:25] [60:1]
[64:14]
fiachra [11:3,8] [12:17]
[17:17,23] [18:16,24]
[19:4] [31:21] [54:8] [57:24]
[58:21] [59:16] [60:11,22]
[61:5,12] [65:22]
fighting [64:2]
figure [66:5]
figures [28:17] [29:5]
file [38:10,18] [55:6]
filed [45:19] [49:24]
filing [20:16,20] [39:19]
[47:8] [53:17]
filings [38:4]
final [49:23]
finally [50:4,5] [72:12]
financial [9:10] [20:2,6,8]
[24:3,11] [25:1,8,11]
[27:25] [28:7] [33:18]
[37:15] [46:6,9,18] [67:7,14]
financing [43:24] [44:10,17]
[46:3,21] [49:19] [60:6,13]
[61:7,14]
find [29:7] [59:15] [77:17]
fine [5:24] [40:13] [59:4]

[68:15] [71:12]
finish [64:4]
finished [63:7,9]
finishing [40:25] [63:20]
firm [10:22] [12:3] [13:19]
[18:12] [53:16,17] [55:14]
firms [11:11]
first [3:3] [4:14] [5:7] [9:19]
[11:6,15,24] [12:4,14]
[13:24] [14:5,7,10,13,15]
[15:3] [20:11] [27:23]
[31:16] [32:5] [47:4] [48:12]
[50:10] [51:19] [57:5]
[58:14] [68:6] [69:4] [73:2]
[76:12]
fish [31:18]
five [40:9] [64:3]
fixed [9:12]
floor [2:3,14,22]
flow [25:21] [26:3,13]
[27:25] [65:15]
flows [23:4,6] [25:23]
[54:10] [56:4] [66:7,17]
folks [78:18]
followed [54:16]
following [72:15] [74:3]
follows [5:8]
foothill [61:14]
foothills [60:12] [61:6]
foregoing [81:4,11] [82:7]
foremost [20:11]
forget [79:19]
form [13:8,12] [14:25]
[15:22] [17:21] [18:9]
[20:10,13,24] [22:24]
[24:5,12,19] [25:3] [26:6,16]
[28:1,10] [29:18] [33:11]
[34:2,17] [35:4] [36:7]
[37:5,23] [38:11,23] [42:5]
[43:1,25] [44:12] [45:12,20]
[46:15] [47:19] [48:14]
[49:23] [51:22] [52:11]
[53:14] [55:7] [57:7] [58:12]
[60:7] [62:2] [82:12]
formal [8:21]
forwarded [6:13]
found [28:18] [48:22]
[49:13] [66:16]
foundation [69:13] [70:11]
four [23:12,13,15,23]
[27:9,10] [30:17]
frame [14:4]
frankly [30:8]
free [69:16] [70:7]
friday [6:12] [31:11]
front [6:10] [14:3] [29:4]
[31:8,23] [44:5] [54:4]
[56:25] [59:2]
full [7:4]
further [82:20]
fuzzy [36:19]

G

game [47:13]
gauge [28:4]
gave [16:22]
gears [77:1]
general [13:13,15] [27:16]
[33:15] [35:24] [52:15]
[75:1] [76:11] [78:8]
generally [15:13,15] [19:12]
[23:18] [25:20] [27:18]
[77:18]
gentleman [77:8]
getgo [55:13]
get-go [55:13]
getting [38:15] [48:10]
[58:11,16]
give [8:14] [13:15] [23:6]
[30:9] [59:25] [63:17,20]
[64:3,14,15] [65:9]
given [25:19]
glatt [2:11]
go [7:9] [18:11] [32:1]
[40:25] [49:1] [50:7] [51:17]
[59:2] [63:5] [67:19] [70:14]
[76:6] [78:25]
gobetween [18:11]
go-between [18:11]
going [6:18] [20:13] [30:3]
[36:11,13] [38:10,22]
[39:5,25] [40:5] [44:22]
[47:15] [49:14] [50:7,18]
[54:17] [62:22] [63:19,22]
[67:18] [77:17] [80:1]
gone [62:25] [63:12] [64:13]
good [8:12] [28:8] [53:3]
[55:16] [63:10] [69:10]
gotten [35:17]
grand [2:21]
grant [68:21]
granted [69:3] [70:18]
great [23:4] [39:20,22]
grew [32:10]
grips [25:25]
ground [7:9] [63:14]
guarantee [22:11,15,25]
[23:1,6]
guarantees [22:18] [66:18]
guess [27:6] [34:18] [35:20]
[37:4] [38:24] [39:3] [50:22]
[56:9] [62:18]
guys [40:18] [41:11] [79:20]

H

habit [35:15]
half [40:19,20] [62:25]
hanberg [52:2]
hand [82:22]
happening [30:10]
happy [52:22]
hathaway [9:3,5,6,9] [10:15]
[13:24] [14:24] [15:16,20]
[16:8] [17:1] [22:11,19]
[24:18] [25:11] [29:12,16]
[32:6] [33:25] [34:11,15,24]

A.4

24/09/2007 MILLARD, MARK D.

[36:24] [37:7,20] [43:9]
[44:9] [45:8,9] [49:16]
[68:9,19,21] [77:4]
hathaways [13:1] [14:10,18]
[16:14,19] [19:6,17] [33:9]
[78:10]
having [5:7] [35:23] [39:5,22]
[67:15] [71:2]
health [20:2,6,9]
hear [7:18] [39:11] [47:25]
[68:13]
heard [39:12]
heated [49:4]
heavily [17:3]
held [37:22,25]
help [24:14] [26:23] [28:4]
[29:21]
helpful [48:21]
hereby [81:3] [82:5]
herein [82:11]
hereto [82:19]
hes [70:3]
high [8:21]
highly [68:11,20]
hired [65:17]
hold [34:5]
home [10:25] [11:19,20]
[12:9,21]
homes [6:21] [9:25] [10:3,14]
[11:1,11,14] [12:6,18]
[13:1,5,25] [14:11,16,19,24]
[16:9,11,15,20] [17:14,20]
[18:8,18] [19:7,18] [20:2,16]
[21:6,19,23] [22:10] [29:11]
[34:11,23] [35:6] [36:23]
[37:22] [38:2,9,22] [42:9]
[45:3,18] [46:3,10] [55:6]
[68:8,18] [69:3,11,22]
[71:4,17] [72:4,7] [74:3,19]
hoped [55:15]
hopefully [33:14]
hoping [14:21]
host [25:24]
hour [40:6,17,19,20] [62:25]
[80:3]
hours [41:10] [63:4]
housing [30:11] [65:16]
however [8:6] [35:16]
[53:20]
hypothetical [63:24]

I

i.e [71:6]
id [5:15] [28:11] [30:25]
[34:9] [44:5] [53:6] [57:20]
[58:19] [65:20] [70:11,12]
[76:10]
idea [8:12] [19:22]
identification [51:4]
identified [31:14]
ill [17:22] [47:5] [79:25]
im [5:13] [13:3] [16:16]
[18:20] [25:4] [28:2] [32:3]

[33:4,19] [35:5] [37:24]
[39:25] [44:22] [45:13]
[47:25] [50:3,7,15,18]
[51:1,16] [61:9,18] [62:17
,21] [63:2,7,8] [64:14,15]
[65:9] [66:9] [67:1] [68:12]
[71:10,22,25]
important [8:1] [22:18]
[49:10]
impose [72:20]
include [9:11] [56:3]
included [11:11] [15:16,17]
[17:4] [22:14]
includes [50:13]
including [5:19] [10:21]
[17:13] [49:14]
income [9:12]
independently [16:9]
indicate [18:1]
indicated [49:5] [78:13]
industry [30:11]
inform [44:21] [46:20]
information [17:5] [24:22]
[33:24] [43:5] [59:8] [65:15]
[67:9] [72:7] [77:19,20]
[81:8]
informed [44:25]
infrastructure [52:5]
infringing [6:4]
initial [68:7] [70:25]
insist [63:19]
instructs [8:7]
instruments [9:13]
interaction [71:2]
interest [14:18] [57:4]
[63:15] [67:4,12] [68:23]
interested [82:20]
interject [62:22]
interpose [8:15]
interrupt [51:17]
invest [16:9]
investing [9:11] [16:15,20]
investment [11:10] [14:15]
[16:25] [19:6,14,17] [20:5]
[28:5] [30:15] [34:4] [53:11
,17,20] [55:3] [73:1,12]
investments [10:22] [13:19]
[35:16]
involved [10:13] [12:2]
[13:25] [14:5,22] [17:3]
[23:13,14,16] [29:6] [47:11]
[68:25] [77:10] [78:16]
involvement [14:6,10]
involving [10:25] [11:19]
[12:9,21] [68:18] [72:4]
issue [26:24] [47:20,24]
[48:4,13] [49:10] [60:18]
[63:25] [64:1,6,7,8,17]
[73:23]
issues [33:17,18] [47:6,9]
[49:13] [60:12] [62:10]
itself [30:24] [46:6] [47:10]
[66:11]
ive [8:22] [9:6] [63:17]

[77:8,11]

J

jared [11:22,23] [12:17]
[31:21] [59:15] [60:11,22]
[61:3,5,12]
john [74:19]
join [15:1] [42:16] [75:14]
journal [74:20]
july [29:11,17] [30:21]
[32:7,13,20,24] [33:10,25]
[54:2] [55:12] [68:9,17]
[69:4] [71:15]
justin [3:7] [40:15] [62:21]

K

keep [73:5] [79:21]
keeps [79:19]
kelly [2:20]
kind [36:1] [77:24]
klaus [2:20] [5:24] [6:14]
[10:4] [13:9] [15:1,23]
[16:16] [18:20] [21:25]
[22:25] [25:14] [27:14]
[28:11] [30:1,5] [31:3,5,10]
[32:22] [33:2] [35:10]
[40:2,4,9,12] [41:7] [42:14
,17] [43:12] [44:13] [47:25]
[50:15,21] [51:12,16]
[59:18,21] [61:9] [62:2]
[65:9,12] [66:9] [68:12]
[69:13,25] [71:22] [75:12,17]
[79:2]
knee [35:18]
knew [19:5] [37:21] [45:10]
[55:15] [62:18] [73:11]
know [6:4] [9:17] [11:3,22]
[12:12] [16:12] [17:5]
[18:1,2,4] [19:10,20,22]
[20:19] [23:16] [25:19,24,25]
[28:18] [29:5,7,14] [30:1
,14,17] [33:5,16,17,20]
[34:5,6] [35:17,22] [36:2,8
,12,19] [38:3,6,13,17]
[39:4] [42:21] [43:3,6,19]
[44:4] [45:24] [47:7] [48:9
,22,25] [49:4,8,10,12,13,22]
[50:4,6] [52:18,19,25]
[53:2] [54:3,15] [55:12,13
,14,16] [56:4] [62:17,23]
[63:16] [66:19] [67:11]
[70:19,20] [73:11] [75:6]
[76:5] [77:22] [78:5,15]
[79:25] [81:5]
knowledge [14:1] [27:6]
[29:4] [81:6]
known [18:1] [19:9] [20:23]
[30:14] [52:13]
kvarda [77:9,14] [78:9,12]

L

lacks [69:13]
language [73:24]
lap [20:23] [32:10,13]
[59:6]
larger [31:13] [66:19]
last [27:24] [39:11] [58:4]
[61:3]
lasting [41:9]
late [42:7] [47:12]
later [20:19] [28:19] [43:7]
[49:12] [64:17]
lawsuit [76:23] [77:7]
layer [23:7]
learn [79:24]
learning [33:23]
least [29:21] [37:3] [69:3]
leave [49:6]
legal [42:14]
less [27:18] [76:6,8]
let [7:9,21] [39:14] [44:8]
[52:19] [53:1] [54:3] [68:15]
[70:12] [71:12] [74:8]
[78:5] [79:25]
lets [7:1] [41:17] [56:17]
[59:14] [60:20] [62:20]
[79:24]
letter [42:8]
licenses [8:25]
likely [33:6] [38:14]
line [32:24] [41:21] [47:16]
[48:23] [49:7] [53:10,23]
[54:18] [63:21] [67:13,15]
[71:20] [72:15] [73:5,14,19]
[74:6,13] [75:10,23,24]
[76:3,4]
lines [74:18,25]
linklaters [3:5] [5:23] [67:21]
liquida [77:9]
liquidation [5:14] [6:19]
[77:6]
liquidity [27:1]
little [8:13] [27:1,22] [28:11
,19] [35:16] [36:19] [48:20]
[62:25] [70:11] [76:8]
llp [2:19] [3:5]
loan [20:23] [21:1] [30:22]
[44:23] [45:1,5,23] [46:13]
[50:1] [52:17]
location [8:3]
long [2:5] [9:4] [10:17]
[40:8] [82:4,25]
longer [49:12] [63:5]
look [25:19] [50:11] [58:19
,24]
looking [16:8] [38:13]
[71:25] [74:22]
los [2:4,15,23] [5:1] [82:3]
loss [25:22] [26:11] [56:3]
losses [27:17] [58:5]
lost [53:17]
lot [43:18] [73:7]
lotus [15:11,14] [16:12]
[17:2,7,15,19] [18:17]
[19:1,3,25] [20:21] [21:5,7

A.5

24/09/2007 MILLARD, MARK D.

,13] [22:10,14] [23:12,13,15
,19] [26:14,20] [27:8,11,23
,24] [28:24] [30:17] [34:1]
[35:18] [54:19,22] [57:5,14]
[66:7,23] [67:5] [71:1]
lotustype [16:12]
lotus-type [16:12]

M

macks [74:20]
majority [30:19]
making [6:2] [13:11] [33:4]
[72:15] [74:15]
management [30:7] [35:7,15
,21] [68:22] [69:3] [71:17]
managing [69:22]
manufactured [10:25]
[11:20] [12:9,21] [30:11]
manufacturing [65:16]
marc [52:2]
marginally [31:12]
mark [2:1] [4:4] [5:6] [7:6]
[41:15] [51:2] [61:4]
marked [31:2] [41:23]
[50:18] [51:3] [54:1] [56:18]
[57:21] [60:21] [65:1]
[66:3]
marked/page [4:14]
market [14:16] [27:5] [38:15]
marketplace [27:2] [33:15]
matt [77:8,17] [78:15]
matter [9:25] [10:3,25]
[11:14,19] [12:9,21] [26:23]
[69:20] [78:10,14] [81:4]
matters [76:16] [81:7,9]
may [5:18] [6:14] [8:6]
[27:21] [31:17] [45:4]
[58:14] [63:14] [66:6]
[79:15]
maybe [10:6] [38:4] [63:24]
mean [6:21,23] [27:12]
[30:1] [42:8] [45:5] [51:13
,16] [55:21] [58:10] [66:9,11]
meaning [18:14]
meant [41:1] [51:21] [52:9]
[53:12] [66:11]
measured [68:5]
meet [30:8] [35:15,21]
meeting [29:10,17,25]
[30:3,21,24] [32:13,20,25]
[33:10,21,25] [34:10,14,16
,20] [35:7,23] [36:6,15]
[37:1,10,19,21] [38:7,9,20]
[39:3,10,15] [68:8,17]
[70:18] [78:19]
meetings [29:13,19] [77:24]
memory [65:18]
menkhaus [12:12,13,15,20]
[56:19] [57:23] [58:20]
[59:5] [65:3]
mention [19:5]
mentioned [14:9] [19:16]
[21:2] [24:25] [25:10]

mentions [65:6]
met [12:4] [29:2,14] [34:24]
[35:6] [44:2] [48:8] [51:20]
[52:1]
michael [3:6]
middle [62:24]
mike [79:17]
millard [2:2] [4:4] [5:6,13]
[6:2,7] [7:2,6,7] [10:7]
[13:9] [15:2,10,23] [22:2,9]
[23:9,11] [24:1] [25:14]
[27:15] [28:13] [29:10]
[30:2,25] [31:7,14] [32:1,9
,23] [35:10] [41:20] [42:1,18]
[43:12,22] [44:13,22]
[50:7] [51:6,9,14,19]
[58:1] [62:4] [63:2] [64:6,25]
[67:3,17] [68:4] [69:15]
[70:5,14,24] [71:22] [72:3]
[73:17] [75:19] [79:9,13]
million [32:10] [47:23]
[48:3,17] [53:9] [72:20,25]
[75:8]
mind [74:8]
mine [53:18]
minute [79:1]
minutes [24:25] [40:9]
[41:5] [57:1] [63:12,13,16]
[64:4,14,15,20] [68:5]
misrepresented [66:6]
missed [16:16] [61:9]
[64:9] [65:10]
mobile [10:25] [11:19]
[12:9,21]
model [66:6,16,23]
modeled [29:1]
models [26:14] [27:25]
[28:7] [66:15]
moment [77:1]
monday [2:5] [5:2]
monetize [27:3]
month [58:14]
monthly [58:4,6,8,11,17]
months [57:5]
mortgage [9:23]
move [34:9] [39:25] [40:4]
[41:11] [56:17] [57:20]
[59:14] [60:20] [62:20]
[64:21]
moving [43:18] [68:12]
mr [4:4,5,11,12] [5:12,13,23
,24] [6:1,2,7,14] [7:2,7]
[9:20,21,24] [10:3,4,7,12,13
,16,24] [11:7,9,13,18,25]
[12:1,5,8] [13:8,9,10,21]
[14:25] [15:1,2,9,10,22,23]
[16:6,16,18] [17:21] [18:5
,6,9,15,19,20,21,22] [19:2
,8,15] [20:3,7,10,14,24]
[21:3,9,12,16,21,24,25]
[22:2,8,9,13,17,20,22,24,25]
[23:1,8,9,11,20,24] [24:1,5
,9,12,16,19,24] [25:3,6,13
,14] [26:2,6,8,16,19] [27:14

,15,20] [28:1,6,10,11,13,20]
[29:10,18,23] [30:1,2,4,5,20
,25] [31:3,4,5,7,9,10,14,19]
[32:1,9,14,18,21,22,23]
[33:1,2,8,11,22] [34:2,8,17
,22] [35:1,2,4,8,10] [36:4,7
,14,17,22] [37:11,18,23]
[38:1,11,19,23] [39:7]
[40:2,3,4,8,9,11,12,13,15
,24] [41:1,4,7,13,17,19,20]
[42:1,5,12,14,16,17,18,23]
[43:1,8,11,12,21,22,25]
[44:7,12,13,20,22] [45:12
,16,20] [46:1,4,8,15,19,23]
[47:1,19,22,25] [48:2,5,11
,14,16,19] [49:17] [50:7,15
,17,21,24] [51:1,5,6,9,12,14
,15,16,18,19,22] [52:6,11]
[53:5,14,24] [54:20] [55:1
,7,18,22] [56:6] [57:7,9,16
,19] [58:1,12,18] [59:10,13
,18,19,21,23] [60:7,10,15,19]
[61:8,9,11,15,20,21]
[62:1,2,4,8,19,21] [63:2,7
,8,9,23] [64:6,8,23,25]
[65:3,6,8,9,11,12,13,19]
[66:9,12,15,21] [67:3,6,16
,17,20,21] [68:3,4,12,14,15]
[69:12,13,15,18,24,25]
[70:5,13,14,20,24] [71:22
,24] [72:3] [73:17] [74:1]
[75:4,12,14,15,17,19,21]
[77:14] [78:9,12,25] [79:2
,4,9,13,18,19,23] [80:1]
ms [12:15,20]
muir [4:12] [50:12] [56:19]
[57:11]
multiple [27:8]
munger [2:19] [6:9]
myles [50:11,13]
myself [10:19] [30:8]

N

name [5:13] [7:4] [32:5]
named [77:8] [82:7,11]
nature [35:15]
nebraska [29:12]
necessarily [54:13] [74:23]
need [16:1] [40:12] [63:16]
[64:17,18] [70:11]
needed [40:21]
needs [66:5]
negotiate [17:7,9,19]
[18:7,17] [71:7]
negotiated [17:2] [21:17,18]
[49:15] [52:22] [73:4]
negotiating [17:15] [21:5]
[71:8]
negotiations [19:3,18,25]
[20:15,21] [70:25] [71:15]
[77:23]
net/net [52:18]
new [3:9] [40:16]

,15,20] [28:1,6,10,11,13,20]
[29:10,18,23] [30:1,2,4,5,20
,25] [31:3,4,5,7,9,10,14,19]
[32:1,9,14,18,21,23]
[33:1,2,8,11,22] [34:2,8,17
,22] [35:1,2,4,8,10] [36:4,7
,14,17,22] [37:11,18,23]
[38:1,11,19,23] [39:7]
[40:2,3,4,9,11] [45:2,18]
[46:3,10] [55:6] [68:8,18]
[69:3,11,22] [71:3,17]
[72:4,7] [74:3,19,23]
[77:5]
oath [5:19]
object [8:6] [10:4] [21:25]
[62:2] [70:11] [75:12]
objection [13:8,11] [14:25]
[15:1,22] [17:21] [18:9,19]
[19:8] [20:3,10,24] [21:9,16
,24] [22:13,20,24] [23:20]
[24:5,12,19] [25:3,13]
[26:6,16] [28:1,10] [29:18]
[32:14,21] [33:11] [34:2,17]
[35:1,4] [36:7,17] [37:11,23]
[38:11,23] [42:5,14,16]
[43:1,11,25] [44:12] [45:12
,20] [46:4,15,23] [47:19]
[48:5,14,19] [51:22] [52:11]
[53:14] [54:20] [55:7,22]
[57:7,16] [58:12] [59:10]
[60:7,15] [61:8,15] [62:1]
[66:9] [67:6] [69:13] [70:1]
[75:14]

Column 5 (top right):

next [44:21] [53:25] [56:17]
[60:20] [64:20]
no [2:6] [4:10] [7:3] [8:19]
[9:1] [11:2,21] [12:7,11,23
,24] [24:21] [31:24] [39:8]
[40:15] [45:13] [60:9]
[71:21] [75:20] [76:21]
[79:15] [82:4,25]
no.3 [53:6]
nobody [27:2]
nonbinding [42:25]
normal [68:25]
nothing [42:21] [82:8]
notification [47:14]
notify [79:13]
november [41:21] [42:7]
[45:18] [50:12,14] [52:3]
[59:16,18] [60:4,13,23]
[61:6,13] [65:2,21,24]
[73:18]
number [10:16] [27:18]
[32:1] [50:16,18,20] [56:20]
[65:10]
numbers [50:22]
numerous [12:18] [20:4]
[24:6] [25:21] [26:18]
[30:16]

O

oakwood [6:21] [9:25]
[10:3,14,23] [11:1,10,14]
[12:6,18] [13:1,5,25]
[14:10,15,19,24] [15:18]
[16:9,11,15,20] [17:14,20]
[18:8,18] [19:6,18] [20:2,6
,9,16] [21:6,19,22] [22:10]
[29:11] [30:12] [34:11,23]
[35:6] [36:23] [37:22]
[38:2,9,22] [42:9] [45:2,18]
[46:3,10] [55:6] [68:8,18]
[69:3,11,22] [71:3,17]
[72:4,7] [74:3,19,23]
[77:5]
oath [5:19]
object [8:6] [10:4] [21:25]
[62:2] [70:11] [75:12]
objection [13:8,11] [14:25]
[15:1,22] [17:21] [18:9,19]
[19:8] [20:3,10,24] [21:9,16
,24] [22:13,20,24] [23:20]
[24:5,12,19] [25:3,13]
[26:6,16] [28:1,10] [29:18]
[32:14,21] [33:11] [34:2,17]
[35:1,4] [36:7,17] [37:11,23]
[38:11,23] [42:5,14,16]
[43:1,11,25] [44:12] [45:12
,20] [46:4,15,23] [47:19]
[48:5,14,19] [51:22] [52:11]
[53:14] [54:20] [55:7,22]
[57:7,16] [58:12] [59:10]
[60:7,15] [61:8,15] [62:1]
[66:9] [67:6] [69:13] [70:1]
[75:14]

objections [8:15]
objective [16:14,19]
obligated [24:17]
obtain [46:2] [53:20] [73:13]
obtained [8:24]
obviously [25:15] [40:22]
occasions [69:4]
occur [39:23]
october [31:21] [34:10]
[35:3] [36:6,15] [37:1,9,19]
[38:8,20] [39:10,15] [69:5]
odriscoll [11:3,7,13,18]
[17:17] [18:16] [19:4]
[31:21] [54:8] [57:24]
[58:21] [59:16] [60:11,22]
[61:5,12] [65:3,22] [74:1]
[75:4]
odriscolls [12:1]
off [78:25] [79:3]
offer [70:10]
offered [55:24]
office [6:8] [31:14]
officer [77:3]
offset [52:20] [53:3]
oh [65:11] [68:14]
ohc [5:14] [6:19]
okay [13:17] [16:3] [30:5]
[31:20,23] [33:2] [40:5,6]
[41:1,17] [45:7] [59:21]
[66:1] [77:1] [80:1]
olsen [2:19]
omaha [35:23] [68:18]
once [5:20] [6:2]
one [5:13] [7:8] [8:11]
[9:6] [14:9] [16:22] [17:23]
[22:1,7] [23:6] [28:23]
[34:20] [37:3,13] [38:4]
[50:19,21] [54:17] [61:19]
[67:10] [69:15,23] [70:6]
[71:10] [75:18] [76:10]
[77:11] [78:16]
ones [68:24]
ongoing [26:10] [77:23]
open [49:3,6] [53:10] [63:21]
[73:5] [77:18,21]
operational [50:5]
opinion [51:23] [52:24]
[53:15] [69:14,21] [70:6,10]
[73:15] [78:2]
opportunities [10:17]
opportunity [11:10] [15:3,21]
[16:8]
order [8:14] [31:15] [36:13]
[39:18] [56:1] [75:9]
original [79:6,7,16,20,21]
osnato [3:6] [4:5] [63:8,9]
[64:8] [67:20,21] [68:3,15]
[69:18] [70:13] [71:24]
[75:15,21] [79:18,19,23]
otherwise [70:9] [73:13]
[79:24]
outcome [33:10] [36:21]
[82:21]
outstanding [14:17]

overall [74:23]
owed [53:4]
own [69:20] [70:2]
owned [27:1]
ownership [19:11]

P

p.m [2:4] [5:2] [80:3]
package [6:10] [33:6]
[56:16]
packet [6:8]
page [4:3,10] [32:1,8,20,22]
[41:3,14] [66:2]
paid [23:21] [52:8] [57:12]
papers [68:13]
par [23:22,25] [27:12]
paragraph [51:19] [52:7,14]
[53:6] [54:9] [55:2,19]
[57:10] [58:4] [59:5] [61:3]
[65:6,7] [66:3]
part [22:9] [26:20,23] [33:5]
[39:11,12] [49:7] [51:11,24]
[52:4,18] [55:25] [56:14,16]
[62:15] [72:18] [73:2,4,10]
participate [24:15]
participated [37:21] [44:3]
[49:9]
particular [10:2] [29:17]
[30:12] [44:4] [45:22]
[54:14] [57:11]
particularly [8:1]
parties [21:13] [29:15]
[41:8] [79:4]
parts [43:18]
party [6:4] [21:19] [22:6]
[56:1]
pause [57:3] [60:3]
pay [26:1]
pc [2:11]
penalties [81:10]
penalty [79:12]
percent [21:14,23] [22:11]
[23:25] [24:2] [27:12]
percentage [23:22]
perform [24:3] [25:8] [56:7]
performing [13:18]
perhaps [30:9] [48:20]
period [9:15] [10:17] [13:2]
[47:8] [82:18]
periodic [26:17]
periodically [26:5]
perjury [79:12] [81:11]
person [10:18] [17:1]
personnel [17:12] [18:12]
persons [17:24]
perspective [33:9] [48:8]
[68:24]
pertained [67:13]
pertaining [24:7]
pertains [54:21]
petition [46:14] [49:19]
[50:2]
phone [5:19] [12:19]

phrase [68:16]
phrased [35:12]
picture [74:20]
piece [75:7]
place [20:19] [34:14] [39:6]
[43:24] [44:11,18] [45:11]
[46:14] [49:19,22] [50:1]
[75:7] [77:24] [78:20]
[82:11]
plaintiff [2:3,10] [5:15]
[6:20]
plan [36:24] [37:8,9] [39:4,6]
[79:24]
planning [38:21] [39:9,12,16]
please [7:4,11,16,21]
[10:11] [70:15] [77:13]
point [11:8] [14:21] [16:2]
[17:23] [19:9,21,23] [20:18]
[22:7] [33:17] [38:5] [46:25]
[49:4] [61:16] [62:11,14]
[64:9,11] [66:13,16] [77:25]
[78:12,16]
poor [28:9]
poorly [36:11]
possession [43:24] [44:17]
[47:5] [49:19] [60:13]
[61:14]
possibility [55:17]
possible [6:6] [21:11]
[32:17] [39:21,24] [75:8]
post [74:16] [75:10]
potential [10:22] [13:19]
[42:11] [55:14]
predicated [69:20]
preparations [38:22]
prepayments [58:5]
preplanned [39:3]
present [36:23]
presentation [32:4,6]
presented [10:16] [11:9]
presenting [13:19]
preserve [13:12]
pressure [37:15]
pretty [52:13,25] [53:3]
[77:11]
previously [4:14] [25:7]
[27:7] [31:2,14] [41:23]
[49:15] [54:1,23] [57:21]
[60:21] [65:1]
price [16:23] [24:2,4] [25:9]
[27:12]
priced [27:11]
pricing [23:18]
prior [7:8] [11:12] [12:16]
[15:18] [19:17] [30:3]
[45:3] [51:25] [57:18]
[64:11] [73:22] [76:2,7,9]
[82:6]
probably [8:12] [30:9,18]
[31:5] [34:20] [36:12]
[38:18]
problem [45:24] [60:5,9]
problems [45:17] [46:21,25]
[66:20]

proceeded [44:9] [45:9,14]
proceeding [77:15]
proceedings [82:14]
proceeds [21:7]
process [13:16]
procure [69:23] [72:25]
professional [8:24]
program [20:23] [21:2]
[30:22] [52:17]
progress [78:8]
project [54:19]
promise [41:5]
promised [63:3]
prompted [78:9]
proposed [16:4] [72:14]
[75:9]
protection [23:7]
provide [7:16] [24:10,18]
[27:24] [54:11]
provided [22:10] [24:23]
[25:1,10] [26:4,21] [28:7,24]
[33:24] [42:6] [45:2] [56:12]
[65:14] [69:10] [72:7]
[82:18]
providing [44:14] [72:6]
[76:17]
provisions [61:23,25]
[62:5,10,13]
public [10:21] [14:17]
[16:11,22] [19:11] [30:15]
pull [47:15]
pulled [67:14]
pulling [48:23]
purchase [14:16] [15:8,16
,21] [16:13,22,23] [44:23]
[45:1,5,23] [46:13] [50:1]
[52:17] [54:24] [57:18]
[71:9]
purchased [19:22] [23:15]
[28:4] [68:23]
purchases [14:20]
purchasing [14:19] [16:11]
purpose [29:24] [36:5]
[79:16]
purposes [51:13]
pushing [70:18]
put [24:20] [35:20] [43:5]
[74:9] [75:3]

Q

q2 [32:11]
qualify [55:4]
question [7:11,13,14,21]
[8:13] [10:4,7,11] [13:13]
[15:24] [16:1,17] [17:9,25]
[18:21] [20:12] [25:5,18]
[27:21] [28:13] [35:5,11,14]
[39:14] [44:8,21] [48:1]
[51:13] [61:10] [62:7]
[68:6] [69:19] [70:9] [71:19]
[74:9] [75:1,12] [76:12]
[77:22]
questioning [63:17,21]

24/09/2007 MILLARD, MARK D.

questions [6:15] [7:2,25]
[51:7] [63:2] [64:4,20]
[67:1] [76:11] [78:22]
quicker [41:18]
quite [30:8] [39:11] [70:22]

R

re [4:12]
read [81:4]
reads [54:18]
ready [39:18] [51:6]
realize [29:3]
really [40:12] [64:7] [66:17]
[76:5]
reask [39:14]
reason [8:16] [78:7]
recall [10:16] [15:2,5]
[19:11,16] [20:25] [21:10]
[22:5,7] [29:10] [30:23]
[32:15,19] [33:3] [34:10]
[36:5] [37:7,20] [38:3]
[39:21,22,24] [43:14]
[44:1] [45:21,23] [46:9]
[47:2,6,9,17] [49:18,21,23
,25] [50:3,4] [52:25] [55:8]
[56:8,10,11,13] [57:4]
[59:11] [60:8,17] [61:16,18]
[62:9,12] [66:22,25] [68:10]
[70:16] [71:2] [72:10,11,17]
[73:25] [75:5] [77:14]
recap [30:10]
recapitalization [36:25]
[37:9]
receive [24:6] [26:13]
[51:24] [58:8] [77:19]
received [47:14] [52:15]
[58:14,15] [79:11]
receiving [58:17]
recess [40:14]
recognize [51:9] [54:6]
[58:1]
recollection [11:16] [15:7]
[16:3] [17:16] [18:3] [19:21]
[23:21] [25:15] [27:8,16]
[30:2,7,13] [32:12,24]
[33:7,13,20] [36:1,10]
[37:2,13] [38:24] [43:2]
[46:5] [54:14] [58:13]
[61:24] [62:5] [70:19]
[71:5] [74:17,24]
record [5:17] [7:5] [13:12]
[40:16] [41:7] [70:17]
[78:25] [79:3]
redlands [8:23]
reduce [74:22]
reduced [82:12]
refer [6:18,21,23] [30:25]
[32:8] [41:20] [42:19]
[47:5] [53:6,9,25] [64:25]
[65:20]
referenced [4:14] [62:6]
refers [44:24] [59:5]
refresh [32:12]

regard [43:13] [70:6]
regarding [16:22] [18:7]
[20:6] [46:25] [54:18]
[60:18] [76:19]
related [10:14] [22:25]
[23:1]
relates [26:10] [68:7]
relationship [18:13] [70:17
,22]
relayed [17:5]
relented [35:25]
relieved [79:5]
rely [24:13]
relying [24:10]
remember [30:24] [70:7]
remote [55:4]
renegotiated [75:23]
reopening [48:7] [49:14]
[53:22] [73:14] [74:12]
reorg [39:5]
reorganization [36:12]
[39:4]
reorganizational [37:4]
repeat [13:3] [16:17] [25:4]
rephrase [10:6,9,10] [13:14]
[74:9]
replacement [67:15]
reporter [7:17,24] [51:2]
[79:5] [82:18]
reports [26:11,12,18]
[58:5,6,9,11,17]
represent [66:17]
representations [17:18]
[18:6]
representatives [68:8]
[71:3,16]
request [10:9]
requested [35:7] [48:7,25]
[54:12] [58:4] [82:16,17]
requesting [51:1]
required [5:21] [8:7]
reread [44:5]
rescheduling [76:20]
research [13:18]
reserved [63:18]
respect [69:16] [79:6]
respectfully [64:19]
respond [8:8] [15:24]
[37:14] [46:16]
responding [8:13]
response [7:17,18] [13:17]
[16:21] [28:16,22] [73:2,10]
[78:22]
responses [7:16,25] [12:16]
responsibilities [9:9,14]
[79:5]
responsibility [12:25]
[13:4] [18:11] [39:9,17]
[46:2,12]
responsible [13:18] [56:9]
restart [47:18,24] [48:4,13
,17]
restarted [50:1]
restarting [46:22]

restructuring [12:3] [36:25]
[37:8] [41:22] [42:9,10]
[43:7,16] [44:3,19] [45:15]
[48:15] [53:4]
result [33:23,24] [53:17]
results [67:12]
return [14:22] [16:24]
[27:17]
review [29:8] [56:23] [59:24]
[61:1] [79:11] [82:15]
right [8:20] [23:16] [25:17]
[27:10] [34:13] [38:7]
[39:2,13] [41:4] [47:7]
[57:3] [60:3] [63:24,25]
[64:7] [71:18] [72:21]
[78:21] [79:23]
righty [60:25]
risk [14:22] [74:3,15] [75:10]
[76:8]
road [12:2]
role [13:5,15]
rules [5:22] [7:10] [79:6]
run [25:21] [63:23] [64:5]
[66:15]
runs [56:3]

S

sake [6:20]
sales [9:21]
salesperson [49:1]
say [7:12] [22:2,4] [25:20]
[28:11] [31:16] [36:1]
[37:13] [38:16] [39:2]
[40:9] [41:1] [42:18] [44:16]
[64:16] [69:25] [70:5]
[71:10] [75:20] [76:7]
saying [45:13]
scenarios [25:21] [26:3,13]
schedule [29:21] [34:20]
scheduling [76:16,19,20]
school [8:21]
science [8:22]
scott [2:12] [5:13] [40:15]
[41:14] [47:25] [50:15]
[51:13] [62:21] [63:8]
[65:9] [79:23]
second [52:7] [66:2] [69:4]
[73:10]
seconds [60:1] [68:5]
section [59:3]
securities [14:16] [15:21]
[16:15,20] [24:4] [25:9]
[26:22] [27:3] [57:14]
[71:9]
securitizations [11:12]
[15:18,19]
security [23:3] [25:25]
[57:11]
seeing [32:24]
seeking [72:20]
seems [14:3]
send [77:16]
sent [6:8] [31:1,11] [50:8]

[54:7] [58:2] [67:11]
september [2:5] [5:2]
[56:20] [57:22] [82:22]
served [69:22]
serves [65:18]
service [69:10]
services [52:8]
set [29:20] [40:17]
setting [29:17] [34:16]
settle [78:3,14,20]
settled [78:19]
settlement [77:2,7,15]
[78:9]
several [30:16] [31:11]
[47:6] [49:13] [59:1]
shall [5:20]
share [49:7] [72:8]
shared [59:8]
sheet [26:25] [39:25] [41:22]
[42:13,25] [43:10,23]
[44:10] [45:10] [62:6]
shes [12:23]
shifting [77:1]
short [6:5] [59:25]
shorter [31:10]
shortfall [57:5]
shorthand [82:11]
shortly [41:16] [60:13]
side [9:23] [63:6,12] [70:4]
sign [79:12]
signed [52:2] [57:23]
significant [30:15] [44:17]
similar [9:15] [12:1,16]
[14:20] [16:21] [27:19]
simply [64:11] [71:19]
[72:24]
sir [12:7,11] [68:6,10,19]
[69:2,9,19] [72:12,22]
[75:5,8,16] [76:10] [78:7]
sit [70:10]
situation [43:6]
size [19:13]
solid [75:24] [76:4]
somebodys [68:12]
someone [32:19] [34:23]
[35:6] [66:5]
something [46:17] [54:16]
[55:10] [73:3]
sometime [14:1]
somewhat [12:2]
sorry [13:3] [16:16] [18:20]
[25:4] [33:19] [35:5] [37:24]
[47:25] [50:3,15] [51:16]
[61:9,18] [63:8] [65:9,11]
[66:10] [68:12,14] [71:10,22]
sort [36:12]
sound [24:1,2]
sounds [23:15] [29:15]
[34:13]
south [2:21]
space [65:16]
speaking [14:8] [15:15]
[19:12] [25:20] [27:19]
[63:9] [67:21]

A.8

24/09/2007  MILLARD, MARK D.

speaks [66:10]
specific [14:2,7] [15:7]
  [18:3] [19:12] [27:22]
  [32:8,15] [33:7,20] [36:24]
  [37:12] [39:8,9,16] [59:3]
  [62:10] [74:17]
specifically [15:5] [21:1,10]
  [30:23] [32:19] [36:16]
  [39:21,24] [41:4] [45:21]
  [47:9] [49:21] [55:8] [56:8
  ,13] [60:17] [74:5] [77:22]
speculation [35:12] [69:14]
  [75:13]
speed [31:5]
spoken [77:8,11]
ss [82:2]
stack [31:10,13,18]
stacks [31:8,15]
stage [42:22] [49:24]
stamp [56:20]
stamped [59:17]
stand [36:10]
standish [4:11] [50:11,13]
  [51:14]
stars [2:3,13]
start [64:23]
started [7:1] [41:17] [58:16]
state [7:4] [51:20] [52:7]
  [81:11] [82:1,5]
stated [58:10] [73:15]
  [81:7]
statement [33:4] [38:4]
  [51:21] [52:10] [53:13]
  [66:8]
states [32:6,9] [57:11]
  [61:4,21] [66:4]
status [45:22] [78:10]
stay [28:3]
stayed [77:24]
stays [49:2]
step [54:17]
stipulate [5:17] [79:4]
stipulation [5:16,21]
stream [31:22]
street [74:20]
stretch [40:12]
strike [21:4] [23:10] [33:23]
  [45:8] [69:8]
string [50:12]
structure [23:3,19] [55:4]
structuring [18:25]
struggling [38:15] [62:17]
stutman [2:11] [76:15]
subject [41:21] [54:18]
  [55:20]
subordinated [57:12,15]
subsidiaries [9:7] [15:17]
substance [76:22]
suggestion [8:11]
suisse [3:3] [6:13,14,23,24]
  [8:6,15] [9:17,22] [10:19]
  [11:4,22] [12:12,17] [13:11]
  [14:24] [15:6] [16:5,7]
  [17:6,12] [19:5,13] [21:15

  ,19] [23:10,12,14] [24:3,7,10
  ,17] [25:8,10] [26:4,14]
  [27:24] [28:8] [29:12]
  [32:5] [34:12] [36:2,23]
  [37:17,22,24] [38:21,25]
  [42:25] [44:25] [45:2]
  [46:11,20] [47:15] [48:7]
  [49:6,16] [51:24] [52:8]
  [54:11] [55:23] [56:7]
  [58:7] [63:18] [67:3,7,19]
  [68:9,19] [69:10,21] [71:8]
  [72:4,5,8,14,20,24] [73:3]
  [74:1,12,13,14,18] [75:9]
  [76:2] [78:13,23] [79:14]
suisses [31:6,12] [74:2]
summary [30:10] [52:15]
summer [71:1]
superior [13:20]
superiors [13:22]
sure [10:13] [16:18] [27:9]
  [28:2] [40:8] [49:2] [56:1]
  [60:2] [64:23] [74:10]
survive [20:13]
susan [12:12,13] [56:19]
  [57:23] [58:20] [59:5]
  [65:3]
sworn [5:7] [82:7]

                 T

table [36:20]
tables [54:10]
tail [16:17] [40:21]
takeaway [33:12]
take-away [33:12]
taken [2:2] [5:18] [40:14]
  [82:10]
taking [40:23] [62:23]
  [67:18] [74:2,14] [75:10]
talk [7:22,23] [17:14]
talked [61:17]
talking [45:1] [59:12] [74:5]
team [30:7]
telephone [5:18]
telephonic [2:1] [5:21]
  [8:2,12]
telephonically [2:18] [3:4]
tell [45:24] [47:3] [61:19]
  [65:7] [72:6] [77:13]
ten [62:24] [64:3,15]
tenminute [62:24]
ten-minute [62:24]
term [20:5] [39:25] [41:22]
  [42:13,25] [43:10,23]
  [44:9,22] [45:4,10] [62:6]
terms [17:7,10,19] [18:17]
  [58:15] [71:8] [78:4]
testified [5:8] [68:20] [70:24]
  [72:19]
testify [8:16] [15:4] [43:14]
  [69:17] [70:1,8] [71:23]
  [82:8]
testifying [68:10]
testimony [68:7] [69:14]

[71:14] [72:13,17]
thank [6:2] [65:12] [67:17,20]
  [70:24] [72:12] [74:7]
  [75:2] [78:21,23] [80:2]
thats [5:24] [11:15] [35:13]
  [40:13,24] [50:19,24]
  [51:15] [53:21] [56:11]
  [59:19] [62:6,8] [68:15]
  [69:1,6] [71:5,12,25]
  [77:10] [79:23] [80:1]
themselves [35:19] [51:25]
thereafter [41:16] [60:14]
  [82:12]
therefore [63:19] [69:7]
  [76:21] [78:1]
therein [81:7]
thereof [81:5]
theres [59:3] [63:14] [64:1]
  [66:3]
thing [45:6] [78:18]
things [31:5] [36:11] [39:18]
  [41:12]
think [8:1] [13:9] [28:8]
  [29:24] [31:10,13,15]
  [33:16] [34:3] [35:11]
  [38:3] [41:5,13] [43:9]
  [52:12] [56:10] [66:10]
  [77:9] [79:23]
thinking [38:17]
third [56:1]
though [40:22] [49:7]
thought [16:24] [27:10]
  [30:2] [52:20] [53:3] [67:11]
thoughts [4:12] [37:14]
three [6:14] [41:10] [64:20]
  [79:10]
threw [52:23]
throughout [20:5] [29:8]
  [34:4]
thrown [25:22] [47:12]
time [6:5] [7:8] [8:5] [9:15]
  [10:18] [13:2] [14:3] [16:7
  ,12] [18:2,21,23,24] [20:12]
  [26:1] [27:5] [28:17] [30:13]
  [34:4,9] [38:5] [40:5,6,19]
  [41:6,9] [43:19] [45:25]
  [46:10,25] [52:24] [55:5,9
  ,23] [62:11,14] [63:17,22,23]
  [64:1,5,10,16,18] [66:13,16]
  [67:14,18] [70:3,7] [71:11]
  [73:17,18] [77:10,16,25]
  [78:12,16,24] [79:11]
  [82:11]
times [39:9,17]
timing [62:16]
title [9:10]
today [5:17] [8:3] [32:16]
  [33:13] [34:18] [70:10]
todays [8:18]
together [11:17] [78:18]
told [29:3]
tolles [2:19] [6:9]
tom [9:17] [17:13] [18:6,10]
  [29:20] [34:19] [47:14]

[49:1] [54:8] [70:17,21]
  [78:15,17]
toms [18:13] [70:22]
tony [40:18,22]
took [20:19] [34:14] [62:24]
  [78:19]
top [28:3] [59:5]
topic [32:17] [77:2,7,15]
total [41:9,11]
touch [72:13]
tough [35:13]
towards [66:2]
tranches [15:18]
transaction [14:5,7,14,23]
  [15:15] [16:4] [17:24]
  [19:1] [22:15] [24:15,22]
  [27:23,24] [54:22] [57:6]
  [71:1]
transactions [15:11,14]
  [17:2,8,15,19] [18:18]
  [19:4] [20:1,22] [21:5,8,14]
  [22:10] [23:12,13,15,19]
  [24:8] [26:15,20] [27:8,11
  ,19] [28:24] [30:18] [34:1]
  [57:14] [66:24] [67:5]
transcribed [5:20]
transcript [79:7,8,11]
  [82:14,16]
transmitted [79:8]
treister [2:11] [76:15]
trends [33:14]
tried [29:21] [35:22] [78:5]
trigger [51:20]
triggers [29:1]
true [81:6,9,12] [82:13]
trust [5:14] [6:19] [44:24]
  [76:15,24] [77:7]
truth [82:8,9]
try [6:5] [7:23] [25:25]
  [29:8] [53:19] [63:1,4]
  [64:6] [68:4]
trying [51:24] [53:16,22]
  [73:7]
turn [67:19]
turns [64:5]
twelfth [2:3,14]
type [24:22]
types [74:22]
typewritten [82:12]
typically [35:21]

                 U

uh [31:9] [53:8] [73:9]
uhhuh [31:9] [53:8] [73:9]
uh-huh [31:9] [53:8] [73:9]
ultimate [62:15]
ultimately [19:1] [29:2]
  [35:25] [58:8,10,14,16]
  [75:23] [78:19]
unacceptable [61:22,25]
  [62:5,10,12]
unbeknownst [49:14]
uncommon [71:6]

A.9

24/09/2007  MILLARD, MARK D.

understand [7:11,14,19] [8:3,9] [10:8] [15:24] [28:13] [40:21] [71:14]
understanding [21:22] [22:1,3,9] [23:9,11] [27:15] [31:7] [39:22] [41:8] [42:17,20] [43:13,15,22] [53:18] [54:15] [56:14] [70:2] [75:18]
understands [10:5]
understood [7:14]
unfortunately [28:18] [60:16] [63:10]
university [8:23]
unless [8:6]
unprecedented [68:11,21]
until [54:16] [63:16]
unusual [68:11,20] [71:20] [72:1,2]
update [36:9]
updated [26:5,13] [27:25]
updates [26:18]
upon [72:13] [81:8]
upset [48:24] [52:23]
us [5:24] [15:6] [16:4] [18:11] [23:6] [24:14] [25:19] [28:4] [30:9] [31:11] [36:10] [40:20] [43:5] [44:18,25] [49:14] [58:16] [67:8,9] [73:22] [77:13]
use [44:22] [45:4] [62:4] [64:16]
used [15:8] [55:25] [79:15,16]
using [40:19] [72:24]

V

vague [10:5] [28:11]
validity [66:15]
valor [52:19]
valuation [26:21]
value [22:12] [27:5,13]
various [9:7,12] [17:12] [29:6]
vehicle [55:3]
verbal [7:16]
verified [56:5]
viab [55:16]
viable [36:21]
view [69:9,20,21] [78:2,4]
viewed [18:10]
views [52:13] [70:2]
volunteered [19:20]

W

wait [8:13]
walked [38:16,17]
wall [74:20]
want [48:9] [64:9] [72:13]
wanted [28:3] [30:7] [41:2] [44:21]
warehouse [44:23,24] [45:4,10,17,22] [46:13,22]

[47:13,18] [48:17,23] [49:25] [52:17] [53:10,23] [67:13] [72:15] [73:14,19,20,23] [74:6,12,15,18,25] [75:10,24]
warranted [28:5]
warrants [37:22,25] [38:2]
warren [13:23]
wash [52:25]
wasnt [22:6] [49:8] [55:15]
waste [64:10]
wasting [64:1]
ways [10:2] [70:23]
wed [53:1] [55:15] [63:2,5]
weekly [26:11]
weeks [79:10]
well [10:22] [13:7] [17:22] [23:2] [30:16] [41:18] [46:5] [48:20] [52:13] [56:9] [62:3] [63:8,20] [64:17,20] [69:7,22]
went [32:20] [35:25] [59:1] [70:22]
werent [27:9] [29:3] [43:17]
weve [14:20] [40:5] [62:24] [63:3] [76:18]
whatever [17:5] [21:17] [63:21] [64:16]
whatifs [25:21]
what-ifs [25:21]
whatnot [12:19]
whats [50:15] [79:20]
whereupon [51:3]
whether [20:12] [24:14] [27:9] [28:4] [32:13,23] [33:4] [42:9] [47:17] [49:18,21,25] [55:3,5,9] [57:4] [61:17] [63:23] [66:22] [69:21] [78:13]
whole [25:24] [34:4] [73:22] [82:8]
whose [46:2,12]
why [8:16] [27:11] [57:2] [64:3,23] [75:22]
will [6:5] [7:13,23] [10:18] [23:3] [27:3,22] [31:5] [41:14] [49:2] [52:16] [59:25] [63:16] [64:6] [68:4] [69:25] [79:9,10,13]
williamson [3:7] [5:23] [13:8] [14:25] [15:22] [17:21] [18:9,19] [19:8] [20:3,10,24] [21:9,16,24] [22:13,20,24] [23:20] [24:5,12,19] [25:3,13] [26:6,16] [28:1,10] [29:18] [32:14,21] [33:11] [34:2,17] [35:1,4] [36:7,17] [37:11,23] [38:11,23] [40:15] [41:1,13] [42:5,16] [43:1,11,25] [44:12] [45:12,20] [46:4,15,23] [47:19] [48:5,14,19] [51:22] [52:11] [53:14] [54:20] [55:7,22] [57:7,16]

[58:12] [59:10] [60:7,15] [61:8,15] [62:1,21] [67:6]
willing [43:16] [64:14,15]
willingness [16:10] [52:4]
wind [64:19]
wish [63:15]
within [81:4]
without [44:22] [39:5] [67:15]
witness [2:2,18] [4:3] [10:5,10] [13:17] [15:5] [16:3] [17:22] [18:10,24] [19:9] [20:4,11,25] [21:10,17] [22:5,14,21] [23:2,21] [24:6,13,20] [25:4,17] [26:7,17] [27:16] [28:2,16] [29:19] [30:6] [32:15] [33:3,12] [34:3,18] [35:5,13] [36:8,18] [37:12,24] [38:12,24] [42:6,20] [43:2,15] [44:1,16] [45:13,21] [46:5,16,24] [47:20] [48:6,15,20] [50:25] [51:23] [52:12] [53:15] [54:21] [55:8,23] [57:8,17] [58:13] [59:11,20,22] [60:8,16] [61:16] [62:3,9] [65:13] [66:13] [67:7] [70:1,4,12] [75:20] [79:10] [82:6,22]
words [52:1] [54:24]
work [10:14] [28:25] [64:6]
worked [9:4,6,24] [10:2,24] [11:13,16,18] [12:5,8,20] [65:17]
working [12:17] [18:2,25] [34:20] [67:8]
works [40:10]
worse [52:12]
worth [52:21]
wouldnt [19:19] [47:3] [56:10]
wrap [64:15]
wrote [55:20]

Y

yeah [37:4] [38:2] [40:11] [62:2] [63:7]
year [9:15]
yes [6:17] [7:15,20] [8:4,10] [9:16,18] [10:1] [11:5,23] [12:13] [14:12] [15:12] [17:3,11] [18:22] [23:1] [24:15] [26:7,17] [29:15] [30:4] [31:4] [33:11] [34:6] [35:9] [40:3] [42:2] [47:20] [51:8,10] [58:3,8] [61:2] [65:23] [66:12] [72:18,22] [74:7] [75:5] [76:25] [78:11] [79:2,18]
yet [43:18]
yield [54:10]
york [3:9] [40:16]
youd [10:8] [28:14] [42:18]

[57:1] [59:3,25]
youre [6:3] [8:7] [40:4] [42:18] [48:10] [69:16] [70:7] [71:8]
yourself [6:3] [69:12,23]
youve [63:12] [64:9,13] [76:21]
yun [2:12] [4:4] [5:12,13] [6:1] [10:12] [13:21] [15:9] [16:6,16,18] [18:5,15,21,22] [19:2,15] [20:7,14] [21:3,12,21] [22:8,17,22] [23:1,8,24] [24:9,16,24] [25:6] [26:2,8,19] [27:20] [28:6,20] [29:23] [30:4,20] [31:3,4,9,19] [32:18,23] [33:1,8,22] [34:8,22] [35:2,8] [36:4,14,22] [37:18] [38:1,19] [39:7] [40:2,3,8,11,13,24] [41:4,17,19] [42:12,23] [43:8,21] [44:7,20] [45:16] [46:1,8,19] [47:1,22] [48:2,11,16] [49:17] [50:17,24] [51:1,5,15,18] [52:6] [53:5,24] [55:1,18] [56:6] [57:9,19] [58:18] [59:13,19,23] [60:10,19] [61:11,20] [62:8,19] [63:7,23] [64:23] [65:11,19] [66:12,21] [67:16,20] [68:14] [75:14] [78:25] [79:4,19] [80:1]

*EXHIBIT Y*

# In The Matter Of:

*In re: OAKWOOD HOMES CORPORATION/OHC LIQUIDATION v. CREDIT SUISSE FIRST BOSTON*

## DOUGLAS R. MUIR
### September 26, 2006

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

MUIR, DOUGLAS R. - Vol. 1



LEGALINK
A MERRILL COMPANY

APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.

Stutman, Treister & Glatt

1901 Avenue of the Stars

Twelfth Floor

Los Angeles, California  90067-6013

(310) 228-5755

(310) 228-5788 FAX

TCastanres@stutman.com

For the Defendants:

MARY K. WARREN, Esq.

J  JUSTIN WILLIAMSON, Esq.

Linklaters

1345 Avenue of the Americas

New York, New York  10105

(212) 903 9000

(212) 903-9041 FAX

Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

. . . . .

INDEX OF EXHIBITS

For the Defendants:                                    Page

212   Oakwood Homes Corporation
      corporate record tickler              9

213   Sale and servicing agreement
      - 2-9-01                              80

214   Letter - 2-26-01                      86

215   Account statement - 9-2002            87

216   Prospectus supplement - 5-20-02       97

217   Prospectus supplement - 8-27-02      112

218   Inter-office memo - 9-12-02          112

219   Meeting minutes - 6-30-99            126

220   Meeting minutes - 8-2-99             128

221   E mail printout and attachment
      - 3-28-01                            133

222   Project coconut briefing book       137

223   E mail printouts                    138

224   Meeting minutes - 7-29-02            140

225   Proof of claim - 3-27-03             148

226   E mail printout - 10-18-02           168

227   Meeting minutes - 10-28-02           184

228   Meeting minutes - 11-4-02            186

Videotape Deposition of DOUGLAS MUIR, VOLUME I,

taken by the Plaintiff, at the Marriott Hotel, 425

R..t   ..rty Street, Winston-Salem, North Carolina,

on the  th  day of September, 2006 at 8:40 a.m.,

before a  Denise Neal, Registered Professional

Reporter and Notary Public.

. . . . .

CONTENTS

THE WITNESS:  DOUGLAS R. MUIR          EXAMINATION

    BY MS. WARREN                          6

. . . . .

1       THE VIDEOGRAPHER:  We're on the record at

2   9:26 -- I mean, sorry -- 8:40.  I'm sorry.

3   Today's date is 9-26, September 26th, 2006.

4   This is the deposition of Douglas Muir taken in

5   the matter of In Re: Oakwood Homes Corporation,

6   et al., Debtors, and DHC Liquid Trust,

7   Plaintiff, versus Credit Suisse First Boston, et

8   al., Defendants, in the United States Bankruptcy

9   Court, District of Delaware.

10      This deposition is being held at 425 North

11  Cherry Street, Winston-Salem, North Carolina.

12  My name is Donald Graves.  The court reporter is

13  Denise Neal.  Will counsel introduce themselves

14  for the record, please?

15      MS. WARREN:  Mary Warren of Linklaters for

16  the Defendants.  And with me is my colleague,

17  Justin Williamson.

18      MR. CASTANARES:  Tony Castanares of

19  Stutman, Triester & Glatt for the Plaintiff.

20      THE VIDEOGRAPHER:  Will the court reporter

21  please place the witness under oath?

22          DOUGLAS R. MUIR,

23  having been first duly sworn, was examined and

24  testified as follows:

25  ///

**Page 6**

```
1              EXAMINATION
2    BY MS. WARREN:
3        Q.    Good morning, Mr. Muir.  My name is Mary
4    Warren.  I'm from the law firm of Linklaters and I'll
5    be asking you questions today on behalf of the
6    Defendants in the litigation brought by the
7    Liquidation Trust of Oakwood Homes.  Have you had
8    your deposition taken before?
9        A.    Yes.
10       Q.    Then I think you know the ground rules, so
11   I'll just repeat them briefly.  If at any time you
12   don't understand a question that I ask you, let me
13   know and I'll repeat it or restate it for you.  If
14   you answer a question, I'll assume that you
15   understood it.  If at any time you need a break in
16   the proceedings, just let us know and you'll have
17   one.  Is that all right with you?
18       A.    Yes.
19       Q.    Are you feeling competent today to
20   testify?  You're not on any medication or anything
21   that might interfere with your ability to testify?
22       A.    Not that I know of.
23       Q.    Would you please state your full name and
24   your address for the record?
25       A.    Douglas Robertson Muir.  4200 Cranleigh
```

**Page 7**

```
1    Drive, Greensboro, North Carolina 27407.
2        Q.    Mr. Muir, let's start with talking about
3    you a little bit.  Would you tell me about your
4    education beginning with college?
5        A.    I went to Washington and Lee University in
6    Virginia and graduated in 1976.
7        Q.    And what did you do after that?
8        A.    I went to work for Price Waterhouse.
9        Q.    How long were you at Price Waterhouse?
10       A.    Seventeen years.
11       Q.    Would you take me through your positions
12   briefly if you can?
13       A.    I began as a staff accountant in 1976.
14   Over the next 12 years I had a series of positions.
15   I was admitted as a partner in nineteen ninety --
16   excuse me -- 1988 and I left in 1993.
17       Q.    Which office were you working in?
18       A.    Three offices.  Winston-Salem first, then
19   briefly in Johnson City, Tennessee, and finally in
20   Charlotte
21       Q.    And you left in 1994?
22       A.    1993.
23       Q.    Was Oakwood Homes one of your clients when
24   you were at Price Waterhouse?
25       A.    Yes.
```

**Page 8**

```
1        Q.    When did Oakwood become your client?
2        A.    As best I can recall, 1977
3        Q.    What services did you perform for Oakwood?
4        A.    Well, a number of them.  The ones in which
5    I was directly involved were audit services
6        Q.    Why did you leave Price Waterhouse?
7        A.    I got tired of being an auditor.
8        Q.    What did you do after you left?
9        A.    I went to work for Oakwood Homes.
10       Q.    What position did you start in at Oakwood?
11       A.    As best I recall, treasurer.
12       Q.    Who were you reporting to?
13       A.    Mike Kilbourne.
14       Q.    Before you joined Oakwood had you had any
15   management experience before?
16       A.    I had had management experience at Price
17   Waterhouse.
18       Q.    By virtue of being a partner there?
19       A.    And a manager, and a senior manager and
20   other supervisory positions.
21       Q.    Did you have any other manufactured homes
22   clients when you were at Price Waterhouse?
23       A.    No.
24             (Discussion off the record.)
25             MS. WARREN:  I'm asking the court reporter
```

**Page 9**

```
1    to mark a document Bates numbered KCLH-1100 to
2    1101.  It's called a corporate record tickler.
3             (Exhibit Number 212 was marked for
4    identification.)
5             MR. CASTANARES:  What is that?
6             THE COURT REPORTER:  Two twelve.
7             MR. CASTANARES:  Two twelve.  Thank you.
8             MS. WARREN:  Let's see if it tickles you.
9             MR. CASTANARES:  Counsel, my copy doesn't
10   seem to have Bates numbers on it.  Is that --
11            MR. WILLIAMSON:  We just ran a copy of
12   that and for some reason the copy down stairs is
13   not picking up the bottom, the Bates number.
14            MR. CASTANARES:  Okay.
15       Q.    (By Ms. Warren)  Do you recognize this
16   document?
17       A.    No.
18       Q.    Defendant's Exhibit 212 is called a
19   corporate record tickler and it's just an effort to
20   speed up the process of identifying who is running
21   Oakwood at various times.  Would you please look at
22   the columns for 1999, 2000 and 2001 and let me know
23   if the listings for the board of directors and the
24   officers look correct to you?
25       A.    It's hard to remember over an extended
```

1  period of time, but it looks substantially correct to
2  the best of my recollection.
3      Q.    Did you start at Oakwood Homes in 1993 or
4  1994?
5      A.    1993.
6      Q.    And you started in the position of
7  treasurer; correct?
8      A.    Correct.
9      Q.    What was your next position at Oakwood?
10     A.    There were a number of title changes over
11  the year.  At some point, I can't remember when, I
12  think the title senior vice president was added.  At
13  some point it was changed to executive vice
14  president.  Somewhere along the line I became the
15  corporate secretary, but I had all of those titles at
16  different times over the 12 or so -- 11 years I was
17  there.
18     Q.    Focusing on the period 1999 to the
19  petition date, and by petition date I mean the date
20  when Oakwood filed for chapter 11 relief, what were
21  your positions during that period?
22     A.    Most of that time I think the title at all
23  of those times was executive vice president,
24  secretary and treasurer.
25     Q.    Who did you report to during that time?

10

1      A.    And this is 1999 through the petition
2  date?
3      Q.    That's right.
4      A.    Different people at different times, but
5  to the best of my recollection initially I reported
6  to Bob Smith for a brief period of time and then may
7  have reported to Duane Daggett.  I definitely
8  reported to Myles Standish.  The reporting lines
9  became a little blurred.
10     Q.    Did you generally report to whoever was
11  the chief operating officer?
12     A.    No.  I generally reported to whoever was
13  the CFO if I -- at some points I was the CFO later or
14  I reported to the CEO.
15     Q.    So it's fair to say that during the period
16  1999 to the petition date you reported either to the
17  CFO or the CEO or perhaps both?
18     A.    To the best of my recollection, yes.
19     Q.    During that same period, 1999 to the
20  petition date, what were generally your
21  responsibilities?
22     A.    I was principally involved in financing
23  the business.
24     Q.    What did that involve?
25     A.    Among other things, negotiating bank

11

1  credit lines, secured credit facilities, unsecured
2  credit facilities, supervising the process of
3  securitizing loan production out of the mortgage
4  company, creating asset backed securities to liquify
5  those assets, arranging warehousing facilities to
6  finance those assets pending securitization, treasury
7  management, cash flow management and similar
8  functions.
9      Q.    Who was responsible for selecting the
10  underwriters and investment banks that Oakwood would
11  retain for given financings?
12     A.    I think I could best characterize that as
13  saying it was a group decision.  It wasn't a decision
14  I made exclusively.  I'd discuss it with Bob, I'd
15  discuss it with Myles and we would collectively make
16  a decision as to which underwriters would be involved
17  in a particular transaction.
18     Q.    And focusing again on the period 1999 to
19  the petition date, what were management's criteria
20  for choosing an investment bank to underwrite a
21  securitization?
22     A.    There were two principal criteria as best
23  I can recollect, the first and most important being
24  we wanted an investment banker that could
25  successfully market the securities, achieve the

12

1  highest dollar price for the securities given the
2  collateral that was in them, insure, you know, a
3  seamless execution of the transaction, gain broad
4  distribution for the bonds, basically a skills based
5  approach of who had the best capabilities to perform
6  the work.
7          Secondarily, we awarded at times some
8  position in the underwriting group to investment
9  banking firms whose parent banks had a credit
10  relationship with the company.
11     Q.    And what was the purpose of awarding that
12  business to a bank whose parent company had a credit
13  relationship with the company?
14     A.    It was principally to reward the credit
15  providers, that is, banks which provided credit to
16  the company, to reward them for their financial
17  support of the company in the form of a credit
18  arrangement, credit facilities with some fee based
19  investment banking work.
20     Q.    During the 1990s, and I realize it's a
21  broad time period, but after you started at Oakwood
22  who generally underwrote Oakwood's securitizations?
23     A.    On substantially all of the transactions
24  CSFB was the lead manager and book runner.  There was
25  I believe one transaction about 1996 in which they

13

*EXHIBIT Y*

# In The Matter Of:

*In re: OAKWOOD HOMES CORPORATION/OHC LIQUIDATION v.*
*CREDIT SUISSE FIRST BOSTON*

---

## DOUGLAS R. MUIR
### September 26, 2006

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

MUIR, DOUGLAS R. - Vol. 1



APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.

Stutman, Treister & Glatt

1901 Avenue of the Stars

Twelfth Floor

Los Angeles, California  90067-6013

(310) 228-5755

(310) 228-5788 FAX

TCastanres@stutman.com

For the Defendants:

MARY K. WARREN, Esq.

J  JUSTIN WILLIAMSON, Esq.

Linklaters

1345 Avenue of the Americas

New York, New York  10105

(212) 903 9000

(212) 903-9041 FAX

Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

· · · · ·

INDEX OF EXHIBITS

For the Defendants:                                          Page

212   Oakwood Homes Corporation
      corporate record tickler                                9
213   Sale and servicing agreement
      - 2-9-01                                                80
214   Letter - 2-26-01                                        86
215   Account statement - 9-2002                              87
216   Prospectus supplement - 5-20-02                         97
217   Prospectus supplement - 8-27-02                        112
218   Inter-office memo - 9-12-02                            112
219   Meeting minutes - 6-30-99                              126
220   Meeting minutes - 8-2-99                               128
221   E mail printout and attachment
      - 3-28-01                                              133
222   Project coconut briefing book                         137
223   E mail printouts                                       138
224   Meeting minutes - 7-29-02                              140
225   Proof of claim - 3-27-03                               148
226   E mail printout - 10-18-02                             168
227   Meeting minutes - 10-28-02                             184
228   Meeting minutes - 11-4-02                              186

2

4

Videotape Deposition of DOUGLAS MUIR, VOLUME I,
taken by the Plaintiff, at the Marriott Hotel, 425
N... ...rry Street, Winston-Salem, North Carolina,
on the 2 ( day of September, 2006 at 8:40 a.m.,
before s  Denise Neal, Registered Professional
Reporter and Notary Public.

· · · · ·

CONTENTS

THE WITNESS:  DOUGLAS R. MUIR          EXAMINATION

         BY MS. WARREN                      6

· · · · ·

1        THE VIDEOGRAPHER:  We're on the record at
2     9:26 -- I mean, sorry -- 8:40.  I'm sorry.
3     Today's date is 9-26, September 26th, 2006.
4     This is the deposition of Douglas Muir taken in
5     the matter of In Re: Oakwood Homes Corporation,
6     et al., Debtors, and OHC Liquid Trust,
7     Plaintiff, versus Credit Suisse First Boston, et
8     al., Defendants, in the United States Bankruptcy
9     Court, District of Delaware.
10        This deposition is being held at 425 North
11     Cherry Street, Winston-Salem, North Carolina.
12     My name is Donald Graves.  The court reporter is
13     Denise Neal.  Will counsel introduce themselves
14     for the record, please?
15        MS. WARREN:  Mary Warren of Linklaters for
16     the Defendants.  And with me is my colleague,
17     Justin Williamson.
18        MR. CASTANARES:  Tony Castanares of
19     Stutman, Triester & Glatt for the Plaintiff.
20        THE VIDEOGRAPHER:  Will the court reporter
21     please place the witness under oath?
22           DOUGLAS R. MUIR,
23     having been first duly sworn, was examined and
24     testified as follows:
25     ///

3

5

EXAMINATION

BY MS. WARREN:

Q.    Good morning, Mr. Muir.  My name is Mary Warren.  I'm from the law firm of Linklaters and I'll be asking you questions today on behalf of the Defendants in the litigation brought by the Liquidation Trust of Oakwood Homes.  Have you had your deposition taken before?

A.    Yes.

Q.    Then I think you know the ground rules, so I'll just repeat them briefly.  If at any time you don't understand a question that I ask you, let me know and I'll repeat it or restate it for you.  If you answer a question, I'll assume that you understood it.  If at any time you need a break in the proceedings, just let us know and you'll have one.  Is that all right with you?

A.    Yes.

Q.    Are you feeling competent today to testify?  You're not on any medication or anything that might interfere with your ability to testify?

A.    Not that I know of.

Q.    Would you please state your full name and your address for the record?

A.    Douglas Robertson Muir, 4200 Cranleigh

---

Q.    When did Oakwood become your client?

A.    As best I can recall, 1977

Q.    What services did you perform for Oakwood?

A.    Well, a number of them.  The ones in which I was directly involved were audit services

Q.    Why did you leave Price Waterhouse?

A.    I got tired of being an auditor.

Q.    What did you do after you left?

A.    I went to work for Oakwood Homes.

Q.    What position did you start in at Oakwood?

A.    As best I recall, treasurer.

Q.    Who were you reporting to?

A.    Mike Kilbourne.

Q.    Before you joined Oakwood had you had any management experience before?

A.    I had had management experience at Price Waterhouse.

Q.    By virtue of being a partner there?

A.    And a manager, and a senior manager and other supervisory positions.

Q.    Did you have any other manufactured homes clients when you were at Price Waterhouse?

A.    No.

        (Discussion off the record.)

        MS. WARREN:  I'm asking the court reporter

---

6

---

Drive, Greensboro, North Carolina 27407.

Q.    Mr. Muir, let's start with talking about you a little bit.  Would you tell me about your education beginning with college?

A.    I went to Washington and Lee University in Virginia and graduated in 1976.

Q.    And what did you do after that?

A.    I went to work for Price Waterhouse.

Q.    How long were you at Price Waterhouse?

A.    Seventeen years.

Q.    Would you take me through your positions briefly if you can?

A.    I began as a staff accountant in 1976.  Over the next 12 years I had a series of positions.  I was admitted as a partner in nineteen ninety -- excuse me -- 1988 and I left in 1993.

Q.    Which office were you working in?

A.    Three offices, Winston-Salem first, then briefly in Johnson City, Tennessee, and finally in Charlotte

Q.    And you left in 1994?

A.    1993.

Q.    Was Oakwood Homes one of your clients when you were at Price Waterhouse?

A.    Yes.

---

to mark a document Bates numbered KCLH-1100 to 1101.  It's called a corporate record tickler.

        (Exhibit Number 212 was marked for identification.)

        MR. CASTANARES:  What is that?

        THE COURT REPORTER:  Two twelve.

        MR. CASTANARES:  Two twelve.  Thank you.

        MS. WARREN:  Let's see if it tickles you.

        MR. CASTANARES:  Counsel, my copy doesn't seem to have Bates numbers on it.  Is that --

        MR. WILLIAMSON:  We just ran a copy of that and for some reason the copy down stairs is not picking up the bottom, the Bates number.

        MR. CASTANARES:  Okay.

Q.    (By Ms. Warren)  Do you recognize this document?

A.    No.

Q.    Defendant's Exhibit 212 is called a corporate record tickler and it's just an effort to speed up the process of identifying who is running Oakwood at various times.  Would you please look at the columns for 1999, 2000 and 2001 and let me know if the listings for the board of directors and the officers look correct to you?

A.    It's hard to remember over an extended

---

7

---

8

---

9

1    period of time, but it looks substantially correct to

2    the best of my recollection.

3        Q.    Did you start at Oakwood Homes in 1993 or

4    1994?

5        A.    1993.

6        Q.    And you started in the position of

7    treasurer; correct?

8        A.    Correct.

9        Q.    What was your next position at Oakwood?

10       A.    There were a number of title changes over

11    the year.  At some point, I can't remember when, I

12    think the title senior vice president was added.  At

13    some point it was changed to executive vice

14    president.  Somewhere along the line I became the

15    corporate secretary, but I had all of those titles at

16    different times over the 12 or so -- 11 years I was

17    there.

18        Q.    Focusing on the period 1999 to the

19    petition date, and by petition date I mean the date

20    when Oakwood filed for chapter 11 relief, what were

21    your positions during that period?

22       A.    Most of that time I think the title at all

23    of those times was executive vice president,

24    secretary and treasurer.

25       Q.    Who did you report to during that time?

1    credit lines, secured credit facilities, unsecured

2    credit facilities, supervising the process of

3    securitizing loan production out of the mortgage

4    company, creating asset backed securities to liquify

5    those assets, arranging warehousing facilities to

6    finance those assets pending securitization, treasury

7    management, cash flow management and similar

8    functions.

9        Q.    Who was responsible for selecting the

10    underwriters and investment banks that Oakwood would

11    retain for given financings?

12       A.    I think I could best characterize that as

13    saying it was a group decision.  It wasn't a decision

14    I made exclusively.  I'd discuss it with Bob, I'd

15    discuss it with Myles and we would collectively make

16    a decision as to which underwriters would be involved

17    in a particular transaction.

18        Q.    And focusing again on the period 1999 to

19    the petition date, what were management's criteria

20    for choosing an investment bank to underwrite a

21    securitization?

22       A.    There were two principal criteria as best

23    I can recollect, the first and most important being

24    we wanted an investment banker that could

25    successfully market the securities, achieve the

1       A.    And this is 1999 through the petition

2    date?

3        Q.    That's right.

4       A.    Different people at different times, but

5    to the best of my recollection initially I reported

6    to Bob Smith for a brief period of time and then may

7    have reported to Duane Daggett.  I definitely

8    reported to Myles Standish.  The reporting lines

9    became a little blurred.

10        Q.    Did you generally report to whoever was

11    the chief operating officer?

12       A.    No.  I generally reported to whoever was

13    the CFO if I -- at some points I was the CFO later or

14    I reported to the CEO.

15        Q.    So it's fair to say that during the period

16    1999 to the petition date you reported either to the

17    CFO or the CEO or perhaps both?

18       A.    To the best of my recollection, yes.

19        Q.    During that same period, 1999 to the

20    petition date, what were generally your

21    responsibilities?

22       A.    I was principally involved in financing

23    the business.

24        Q.    What did that involve?

25       A.    Among other things, negotiating bank

1    highest dollar price for the securities given the

2    collateral that was in them, insure, you know, a

3    seamless execution of the transaction, gain broad

4    distribution for the bonds, basically a skills based

5    approach of who had the best capabilities to perform

6    the work.

7        Secondarily, we awarded at times some

8    position in the underwriting group to investment

9    banking firms whose parent banks had a credit

10    relationship with the company.

11        Q.    And what was the purpose of awarding that

12    business to a bank whose parent company had a credit

13    relationship with the company?

14       A.    It was principally to reward the credit

15    providers, that is, banks which provided credit to

16    the company, to reward them for their financial

17    support of the company in the form of a credit

18    arrangement, credit facilities with some fee based

19    investment banking work.

20        Q.    During the 1990s, and I realize it's a

21    broad time period, but after you started at Oakwood

22    who generally underwrote Oakwood's securitizations?

23       A.    On substantially all of the transactions

24    CSFB was the lead manager and book runner.  There was

25    I believe one transaction about 1996 in which they

1 had no role, but to the best of my recollection they
2 were the lead bank on every transaction from at least
3 '96 forward.
4     Q.     What was Merrill Lynch's role in relation
5 to Oakwood?
6     A.     Merrill in 1994 led the first Oakwood
7 securitization -- where the securities were publicly
8 offered.  Oakwood was fired by Merrill Lynch.  They
9 declined to continue to do business with us and we
10 went off in search of a new underwriter.  Subsequent
11 dates we occasionally invited Merrill to be a
12 comanager on subsequent transactions.
13    Q.     That was nice of you considering they
14 fired you.  When did Merrill Lynch fire Oakwood?
15    A.     1994.
16    Q.     Why to the best of your knowledge?
17    A.     The best of my understanding, they were
18 told by Greentree, which was another finance company,
19 that if Merrill wanted to continue to underwrite and
20 be the lead underwriter on Greentree transactions
21 that they should not be a lead underwriter on any
22 other manufactured housing transactions.
23    Q.     Did Merrill ever serve as a financial
24 advisor to Oakwood?
25    A.     To the best of my recollection we never

14

1 supervising the financial institutions who assisted
2 Oakwood with securitizations and other financing?
3         MR. CASTANARES:  Objection to form.
4         THE WITNESS:  I was.
5     Q.     (By Ms. Warren)  Mr. Muir, what was
6 Oakwood Acceptance Corporation?
7     A.     It was a subsidiary of the parent company
8 that was in the loan origination, mortgage loan
9 business.
10    Q.     And what, if any, was your role with
11 respect to Oakwood Acceptance Corporation or OAC?
12    A.     My involvement with OAC was limited to the
13 process of obtaining interim financing for -- to
14 finance loan production, that is, the origination of
15 mortgage loans.  We needed interim financing to be
16 able to undertake that activity.  I arranged that or
17 participated in arranging it.
18        We needed permanent financing for those
19 mortgage loans.  That was the ABS securitization
20 program.  I ran that.  Once the loans had been
21 securitized, you had ongoing loan servicing
22 activities, collect -- collection of payments,
23 servicing of the securities.  I didn't have anything
24 to do with the loan servicing side, but I did have
25 responsibility for all of the administrative aspects

16

1 signed any engagement letter with Merrill with
2 respect to any transactions.  Merrill clearly was in
3 the picture.  We talked to them frequently.  There
4 were a number of occasions, I only have a general
5 recollection of them, where Merrill did a fair amount
6 of work I assume in the expectation that a
7 transaction might be forthcoming and ideas we kicked
8 around.
9         And so they were -- they offered us
10 advice.  They talked to us about ideas, but I don't
11 recall that we ever signed an engagement letter with
12 them where we agreed to pay them money for a
13 transaction other than investment banking that
14 related to the ABS program.
15    Q.     During your tenure at Oakwood until
16 Oakwood signed the financial advisor engagement
17 letter with Credit Suisse in August of 2002, had
18 Oakwood ever retained any financial institution to be
19 a financial advisor?
20    A.     I'm trying to search my memory here.
21 Again, other than underwriting activities related to
22 the sale of securities, be they ABS securities or
23 corporate securities, I don't think we ever engaged a
24 financial institution as a financial advisor.
25    Q.     Who was in charge at Oakwood of

15

1 of servicing of the securities, investor reporting,
2 for example.
3     Q.     And what was your role, if any, with
4 respect to Oakwood Mortgage Investors?
5     A.     Oakwood Mortgage Investors, I think
6 effectively I ran it.
7     Q.     And what was Oakwood Mortgage Investors?
8     A.     Oakwood Mortgage Investors was a special
9 purpose subsidiary of Oakwood Acceptance whose sole
10 function was to purchase mortgage loans from Oakwood
11 Acceptance that had been originated in the OAC,
12 Oakwood Acceptance business, and securitize those
13 mortgage loans and create asset backed securities out
14 of them.  Those securities then in turn were sold to
15 the public market.
16    Q.     What was your role, if any, with respect
17 to the OMI Note Trust 2001-A?
18    A.     I participated in the putting together the
19 broad series of entities and transaction structure of
20 which OMI Note Trust 01-A was a part.
21    Q.     Okay.  Is that what you called it, OMI
22 Note Trust?
23    A.     Some people -- it had a lot of names.
24 That was one of them.
25    Q.     We'll use that one then.  What was OMI

17

1   Note Trust?
2        A.    OMI Note Trust was a special purpose
3   entity whose purpose was to acquire indirectly
4   mortgage loans that had been originated by Oakwood
5   Acceptance and having acquired them, to pledge them
6   as collateral to secure notes that OMI Note Trust
7   issued to an investor.
8        Q.    And what was OMI Note Trust?  What was its
9   corporate form?
10       A.    It was a Delaware business trust, I
11  believe.
12       Q.    Did it have any relationship to Oakwood?
13       A.    Yes, in that all of the beneficial
14  ownership interests of OMI Trust were directly or
15  indirectly owned by Oakwood.
16       Q.    And was there a certain contract or form
17  of incorporation or any particular document that
18  described how the beneficial interests were in the
19  possession of Oakwood?
20       A.    There would be more than one.  I think if
21  we -- we could look at the records and look at the
22  legal documents by which OMI Note Trust was created
23  and I think we could sort through who owned those
24  interests and then ultimately work our way down and
25  look at that first level of entities and I think it

18

---

26/09/2006  MUIR, Douglas R. (vol.1)

1   could be traced back through the corporate records,
2   but I don't think there's a single document that
3   shows it all.
4        Q.    Do you remember under what conditions the
5   beneficial interests in the trust would revert to
6   Oakwood?
7              MR. CASTANARES:  Objection to form.
8              THE WITNESS:  Let me answer that this way.
9        I don't want to practice lawyer because I'm not
10       a lawyer and I'm not sure I know what a
11       beneficial interest is, although I -- in plain
12       English Oakwood owned the equity if you will
13       interest in OMI Note trust.  OMI Note Trust, the
14       right-hand side of its balance sheet had debt on
15       it, it had equity, and Oakwood owned the equity.
16       Q.    (By Ms. Warren)  And what was the equity?
17       A.    I think it could be fairly described as --
18  as Oakwood's ownership in OMI Note Trust entitled
19  Oakwood or an Oakwood entity to receive all of the
20  proceeds of all of the assets of OMI Note Trust that
21  weren't required to pay the indebtedness of the
22  trust, interest on that indebtedness and fees and
23  expenses related to that indebtedness.
24       Q.    Is it fair to say that there was - strike
25  that.  Is it fair to say that under the instruments

19

---

1   which set up OMI Note Trust there was a payment
2   priority by which OMI Note Trust was supposed to
3   dispose of its assets?
4              MR. CASTANARES:  Objection to form.
5              THE WITNESS:  One or more of the documents
6        to which OMI Note Trust was a party, I don't
7        remember which one, specified how the cash
8        proceeds of all of OMI Note Trust's assets were
9        to be distributed.
10       Q.    (By Ms. Warren)  Do you remember generally
11  where Oakwood stood in that hierarchy of priorities?
12             MR. CASTANARES:  Same objection.
13             THE WITNESS:  In general to the best of my
14       recollection the first obligation -- back up.
15       The underlying documents provided that
16       periodically cash would be distributed and I
17       think that was a monthly process.
18             To the best of my recollection the first
19       person to get paid was the trustee.  The second
20       person to be paid as I recall were the persons
21       that owned the notes issued by Oakwood, OMI Note
22       Trust.
23       Q.    (By Ms. Warren)  And who were those people
24  or entities?
25       A.    They were to the best of my knowledge most

20

---

26/09/2006  MUIR, Douglas R. (vol.1)

1   of the time CSFB or some CSFB related entity.  And
2   then when those obligations had been satisfied, I
3   believe there was an obligation to pay Oakwood a
4   servicing fee for servicing the assets owned by the
5   trust.  Then as I recall any residual cash left over
6   at that point went back to another Oakwood entity.
7        Q.    And that's the beneficial interest that
8   you were talking about?
9        A.    Yes.
10       Q.    Do you remember which entity that would go
11  to?
12       A.    Now you are testing my memory.  I'm not a
13  hundred percent sure, but I think it's correct to say
14  that the entity which received that residual cash
15  flow if you will out of OMI Note Trust was an entity
16  called Oak Leaf Holdings.
17       Q.    You anticipated my next question, which
18  was what was Oak Leaf Holdings?
19       A.    It was yet another special purpose entity
20  who I believe had no function other than to own what
21  I loosely call the beneficial interest in OMI Note
22  Trust.
23       Q.    And what -- what was the ownership of Oak
24  Leaf?  Who was its parent, if any?
25       A.    My recollection is that if not the sole

21

1   owner, the owner of the substantial majority of the
2   interest in Oak Leaf were owned by a company called
3   Oakwood Capital Corp.
4       Q.   Did you say Oakwood Capital Corp?
5       A.   Yes, ma'am.
6       Q.   And what was the parent of Oakwood Capital
7   Corp?
8       A.   Oakwood Acceptance.
9       Q.   What was your role, if any, with respect
10  to Oakwood Capital Corp and Oak Leaf?
11      A.   None directly because they were passive
12  entities that were very important from a -- a legal
13  structure point of view, but not important at all
14  from a business point of view in terms of daily
15  operation.
16      Q.   What's your understanding of a special
17  purpose entity?  What is that?
18      A.   Generically I think of a special purpose
19  entity as some entity that is created for some
20  singular purpose in some unique transaction or series
21  of unique transactions rather than, for example,
22  being a corporation that might be organized and
23  entitled to do anything that was lawful, for example.
24      Q.   What was Ginkgo?
25      A.   Ginkgo was an entity that was part of the

22

26/09/2006 MUIR, Douglas R. (vol.1)

1   group of entities surrounding OMI Note Trust.
2   Ginkgo's was not owned by Oakwood.  We had no equity
3   interest in it at all.
4       Q.   What was its purpose?
5       A.   Its purpose was to purchase mortgage loans
6   from Oakwood Acceptance and then simultaneously sell
7   those mortgage loans to Oak Leaf Holdings.
8       Q.   Who set up Ginkgo?
9       A.   To the best of my recollection, counsel to
10  the company did or I'm not sure.  Either our counsel
11  did or a service provider who's in the business of
12  setting up special purpose entities set it up at
13  our -- at our request.
14      Q.   What was Alpine?
15      A.   Here I'm a little less certain.  My
16  general understanding is that Alpine was a commercial
17  paper conduit sponsored by CSFB, but I have no direct
18  knowledge of that.
19      Q.   What's conduit financing?
20      A.   Again, I'm not a corporate finance expert.
21  Conduit transactions in which I have been involved
22  have generally been what's called multi-seller
23  conduits in which an entity, often a trust, that is
24  sponsored by a financial institution, typically a
25  bank, acquires assets from a number of sellers,

23

1   different entities, and then sells commercial paper
2   in the CP market backed by those various assets that
3   the conduit has acquired from the various sellers.
4       I think it may -- often I thought of it as
5   being called conduit because that entity provides
6   access to the commercial paper market to a broad
7   range of sellers who might not otherwise be able to
8   access the CP market directly.
9       Q.   During the period 1999 to the petition
10  date how did Oakwood finance its business?  And I
11  realize that's a broad question so if you want to
12  break it down into pieces, that's fine.
13      A.   Okay.  Several sources.  First, operating
14  cash flow to the extent that it existed.  Second,
15  bank credit facilities which were borrowings made to
16  Oakwood or Oakwood entities by financial
17  institutions, typically banks, and direct obligations
18  of Oakwood.  Might have been secured or unsecured at
19  various points in time.
20      By 1999, if they weren't secured at the
21  beginning of '99, they certainly were by the end.
22  There were what we called warehousing facilities, and
23  these are the facilities that I described earlier
24  when I said that we needed short-term financing to
25  finance mortgage loans that had been originated by

24

26/09/2006 MUIR, Douglas R. (vol.1)

1   OAC.
2       Q.   I'm sorry to stop you there.  We're just
3   trying to minimize the outside noise.  Do you
4   consider warehousing facilities to be a subcategory
5   of bank credit facilities or something different?
6       A.   They're a cousin.  I wouldn't characterize
7   them as a subcategory.
8       Q.   Okay.  So we have operating cash flow,
9   bank credit facilities, warehousing facilities and
10  what else?
11      A.   Corporate debt.  We had about $300 million
12  of senior unsecured debt of the parent that was
13  issued I believe in 1999.  We had -- I can't remember
14  the timing on this, but along about 2001 had a
15  structured finance facility that was called a
16  servicing advance facility whose purpose was to
17  borrow money from investors and use that money to
18  acquire from Oakwood servicing advance assets that
19  had been created by Oakwood in connection with its
20  loan servicing.
21      Q.   So it was a way of borrowing on your
22  future servicing income?
23      A.   Not exactly.
24      Q.   How was that wrong, what I just said?
25      A.   The servicing advance facility was

25

1    designed to provide liquidity to Oakwood Acceptance
2    to enable it to make advances of monies which Oakwood
3    was required to make under its servicing contracts.
4        Q.    What other forms of financing did Oakwood
5    use?
6        A.    The ABS market was the source of the
7    permanent financing for mortgage production, and
8    there were a number of different types of ABC
9    transactions that we did over the years.
10       Q.    Any other source of financing?
11       A.    There may be some others, but off the top
12   of my head that's all I can think of.
13       Q.    Let's focus on the corporate debt for a
14   moment. Whose decision was it to issue the bonds due
15   in 2004 and 2009?
16       A.    Ultimately the board of directors made the
17   decision and that we were -- we were required board
18   approval to do it. So ultimately I think the board
19   did it.
20       Q.    Whose idea was it?
21       A.    I don't remember specifically, but -- I
22   don't remember.
23       Q.    Was it someone in Oakwood's management?
24       A.    I think that's a safe assumption. At the
25   time the debt was issued there was a fair amount of

26

---

26/09/2006 MUIR, Douglas R. (vol.1)

1    short duration credit on Oakwood's balance sheet,
2    money that had to be paid back in the relatively near
3    term. So to the best of my recollection our thinking
4    at the time was that one shouldn't finance long-term
5    capital needs exclusively with short-term money.
6             And, therefore, it might be a prudent
7    business decision to term out if you would some
8    short-term money and raise some five and ten-year
9    money that would be consistent with where the cash
10   had been deployed.
11       Q.    Was Mr. St. George a proponent of issuing
12   the senior notes?
13       A.    I assume that he was because they were --
14   they were issued when he was chief executive of the
15   company.
16       Q.    Well, you were an executive vice president
17   of Oakwood at the time in 1999; correct?
18       A.    Correct.
19       Q.    So you must have some idea of who decided
20   that issuing these bonds would be a good idea and how
21   they came to that decision?
22       A.    Well, I don't have a specific recollection
23   of any -- of any comment - conversations with
24   anyone, but my recollection of our thinking at the
25   time and our thinking meaning mine, Nick's, Myles',

27

---

1    Bob's, was that the smart person would not rely
2    exclusively on short-term credit and that if there
3    were an opportunity to raise some long-term money,
4    it's an opportunity that we should take advantage of,
5    and we did.
6        Q.    And that's what you recommended to the
7    board?
8        A.    Yes. We did recommend it to the board.
9        Q.    Who underwrote those bonds?
10       A.    To the best of my recollection they were
11   underwritten by Bank of America Securities as the
12   lead manager and book runner. And I believe First
13   Union Securities and Merrill had small roles as
14   comanagers.
15       Q.    Did Credit Suisse have any role in the
16   bond issuance or a decision to issue the bonds?
17       A.    Not that I recall.
18       Q.    Let's turn to the warehousing facilities
19   that you described earlier. During the period 1999
20   to the petition date what kind of warehousing
21   facilities did Oakwood use?
22       A.    We had two, the first of which was
23   provided as I recall by Bank of America and the
24   second of which was the OHI Note Trust facility that
25   was created in February of 2001 and was provided by

28

---

26/09/2006 MUIR, Douglas R. (vol.1)

1    CSFB.
2        Q.    When was the B of A facility put into
3    place?
4        A.    To the best of my recollection along about
5    1997, 1998, somewhere in there. There were actually
6    two Bank of America facilities, the first of which
7    was not a bankruptcy remote true sale structure, and
8    then a successor to it which was bankruptcy remote
9    and true sale, but I think the initial inception was
10   probably sometime in '97 as best I can recall
11   roughly.
12       Q.    Why was the change made from the facility
13   that was not a bankruptcy remote true sale structure
14   to a facility that was?
15             MR. CASTANARES:  To the extent that that
16   requires the witness to speculate about somebody
17   else's motivations, I object to it as -- I
18   object to its form.
19             MS. WARREN:  Well, that's fair enough,
20   Tony.
21       Q.    (By Ms. Warren)  Whose idea was it to
22   change the structure of the Bank of America facility?
23       A.    It was Bank of America's.
24       Q.    And what is your understanding of why that
25   change was made?

29

**Page 30**

```
 1      A.    They told me at the time that they asked
 2   us to make the change that they were making similar
 3   changes to sellers into all of their conduits and
 4   basically moving the technology if you will, changing
 5   the technology from direct lending relationships to
 6   bankruptcy remote and true sale relationships.
 7      Q.    And was it your understanding based on
 8   what they told you that this was sort of an
 9   industry-wide change?
10      A.    Yes.
11      Q.    And what was your understanding of the
12   purpose of that change in structure?
13      A.    I would have to speculate.  I think I
14   know, but they never told me what their purpose was.
15      Q.    Well, I'm just asking for your
16   understanding, so give it the best you've got.
17            MR. CASTANARES:  I'll object to the form
18      of the question.
19            THE WITNESS:  What people typically desire
20      to achieve in going to the bankruptcy remote
21      true sale structure as opposed to a direct
22      lending arrangement is they seek to avoid
23      entanglement of their collateral in the event
24      that the borrower files for bankruptcy.  So that
25      is the typical motive.  And so I am speculating,
```

**Page 31**

```
 1      but I assume that was Bank of America's motive
 2      as well.
 3      Q.    (By Ms. Warren)  How did the Bank of
 4   America facility work in its second iteration?
 5      A.    Could you tell me what you mean by work?
 6      Q.    How was it set up to enable you to have
 7   more liquidity?
 8      A.    Well, I could certainly describe for you
 9   how the transaction worked, whether that's more
10   liquidity or less liquidity, but if that's what
11   you're looking for I'd be glad -- I could tell you
12   that.
13      Q.    Sure.
14      A.    It was basically a structure.  I can't
15   remember all the entities.  It's been a long time
16   ago, but there was a special purpose entity created
17   which was Oakwood -- ultimately an Oakwood owned
18   entity that purchased loans from Oakwood Acceptance
19   then pledged those loans under some agreement, I
20   don't remember what it was called or what it looked
21   like, but pledged those loans to secure indebtedness
22   that was issued by the special purpose entity.  The
23   special purpose entity issued a note for cash and
24   then used the cash to purchase the loans from Oakwood
25   Acceptance.
```

**Page 32**

```
 1      Q.    When the OMI or OMI Note Trust was set up
 2   in February of '01, did it work in substantially the
 3   same way?
 4      A.    It was more elaborate structurally, but
 5   the fundamentals of the transaction which is you have
 6   a SPE, special purpose entity, removed from Oakwood,
 7   acquires assets in a transaction that lawyers opine
 8   would be found to be a true sale at law and then
 9   pledged those assets to secure indebtedness issued to
10   a lender for cash with that cash being passed back up
11   to Oakwood.  The fundamentals were the same.  Again,
12   the OMI Note Trust was considerably more elaborate in
13   terms of structural features.
14      Q.    What was more elaborate?
15      A.    In the -- compared to the Bank of America
16   facility?
17      Q.    Yes.
18      A.    Bank of America facility had a fairly --
19   what I would characterize as a fairly straightforward
20   structure in which Oakwood Acceptance sold loans to a
21   special purpose entity, which then used the loans to
22   secure indebtedness issued for cash, gave the cash
23   back to OAC.  Fairly straightforward structure.  OMI
24   Note Trust was a little more elaborate in that rather
25   than Oakwood Acceptance selling loans directly to a
```

**Page 33**

```
 1   special purpose entity that Oakwood controlled, the
 2   loans were sold to the company we discussed a moment
 3   ago, Ginkgo, in which Oakwood had no financial
 4   interest whatsoever.
 5            Ginkgo then sold the loans to Oak Leaf.
 6   Oak Leaf then deposited the loans into OMI Note
 7   Trust.  The trust issued the indebtedness, received
 8   the cash and then passed that cash ultimately
 9   upstream back to Oakwood.
10            MS. WARREN:  Thank you.  Would you read
11      that back, please?
12            (The record was read by the reporter.)
13            MS. WARREN:  Thank you, Denise.
14      Q.    (By Ms. Warren)  What was your
15   understanding of the purpose of inserting Ginkgo into
16   this structure?
17      A.    I would have to speculate.  That was
18   something that we didn't suggest but was served up by
19   CSFB.
20      Q.    How long was the OMI Note Trust facility
21   in place?  I think you said it started in
22   February '01?
23      A.    And it terminated in February of '04.
24   Excuse me.  That's technically inaccurate but
25   substantively accurate.  OMI Note Trust 2001-A
```

26/09/2006 MUIR, Douglas R. (vol.1)

1  terminated in -- I'm searching for the date -- along
2  about February of 2003. But simultaneously with that
3  termination there was a successor entity whose
4  purpose was identical called OMI Note Trust 2003-A
5  and it ultimately terminated in February of '04.
6  Q.   Did Credit Suisse provide OMI Note Trust
7  2003-A?
8  A.   Yes. They were ultimately the lender in
9  it just as they were in 01-A.
10  Q.   So Oakwood used Credit Suisse to provide
11  the warehousing or loan purchase facility from
12  approximately February '01 to February '04?
13  A.   That's correct.
14  Q.   Let's turn to the bank credit facilities
15  that you mentioned earlier. During the period 1999
16  to the petition date what sort of bank credit
17  facilities was Oakwood using?
18  A.   There were two significant ones, the first
19  of which was a syndicated facility that -- of which
20  First Union was the lead investor and syndication
21  agent. There were four other banks in the
22  transaction. As I recall that was when it -- at its
23  inception, which again was along around '97 time
24  frame was originally about $125 million three-year
25  facility.

34

1  It was thereafter enlarged to
2  $175 million. And that was the principal bank credit
3  facility until it was retired along about January of
4  '02 using the proceeds of a secured credit facility
5  provided by Foothill.
6  Q.   And the Foothill facility is the second
7  bank credit facility that you were referring to?
8  A.   Yes. I may have misspoke. Foothill I
9  don't think is actually a bank, but --
10  Q.   We'll call it a financial institution.
11  A.   Fine.
12  Q.   Why was the decision made to retire the
13  syndicated facility in favor of the facility offered
14  by Foothill?
15  A.   It was not our decision. It was the
16  bank's decision.
17  Q.   Which bank?
18  A.   The five banks that provided the credit
19  under the First Union syndicated facility because I
20  think I testified that First Union-led bank facility
21  was put in place sometime around 1997 thereabouts,
22  had a three-year term. It was scheduled to expire in
23  2000. Because of the financial difficulties at
24  Oakwood, it was not possible for us to retire that
25  facility when it was scheduled to retire and we

35

1  ultimately worked an accommodation with the bank and
2  then ultimately retired it in January of '02 with the
3  Foothill facility.
4  Q.   Did the bank syndicate require more in
5  fees in order to work out an arrangement with you?
6  A.   I'm trying to answer that this way and I
7  don't have a lot of direct recollection, but I can
8  tell you from the point at which we first had an
9  event of default. I don't remember when that was,
10  under the Wachovia facility, the deteriorating
11  financial condition of Oakwood, the banks were very
12  attentive to the situation as one would expect.
13  From time to time we paid fees to the bank
14  group for -- of two kinds. Occasionally we paid the
15  bank group a fee to accomplish an amendment that was
16  necessary to cure a default. We may have from time
17  to time paid the syndication agent a separate work
18  fee for the work they did to kind of pull that --
19  that amendment together. So yeah, from time to time
20  there were -- there were fees.
21  Q.   In your understanding is that fairly
22  typical when a borrower needs a waiver, an amendment,
23  that the lender will charge a fee for that?
24  A.   My experience is varied. I think it
25  depends on the borrower, depends on the situation.

36

1  I've gotten lots of amendments at bank facilities
2  without paying a fee, but I've paid for some.
3  Q.   Well, when the amendments or waivers
4  involve an event of default, has anyone ever given
5  you that for free?
6  A.   Yes.
7  Q.   In what situation?
8  A.   I can't recall specific ones, but they
9  tend to be relatively minor defaults. For example,
10  you were a week late getting a report that you were
11  obligated to provide. Relatively small defaults of
12  little consequence can usually be cured for a small
13  fee or no fee. Larger defaults more often require a
14  fee.
15  Q.   You referred to the facility as the
16  Wachovia facility and earlier I thought you had said
17  First Union was the --
18  A.   I've confused you --
19  Q.   -- agent?
20  A.   -- and myself as well. The transaction
21  was originally put together by First Union. First
22  Union was acquired by Wachovia sometime between '97
23  and -- I can't remember exactly when. And we had to
24  get used to calling First Union Wachovia, but it's
25  I'm referring to what's now Wachovia corporation and

37

1   its predecessor, First Union.
2       Q.   Why did Oakwood's management decide on
3   Foothill as the provider of the second bank credit
4   facility?
5       A.   I don't know.
6       Q.   Who made the decision to use Foothill?
7       A.   I don't know.
8       Q.   No one consulted you about that?
9       A.   I was only very tangentially involved in
10  the Foothill transaction.
11      Q.   But how could that be if you were the
12  person who was really in charge of financing for the
13  company?
14           MR. CASTANARES:  I object to the form of
15      the question.
16           THE WITNESS:  At that particular time for
17      whatever reason I was not running the train on
18      Foothill.  I did not negotiate with Foothill.  I
19      did review drafts of Foothill documents.  So, I
20      mean, I knew what the transaction was about, but
21      I didn't negotiate it.  Bob Smith handled that
22      negotiation with Foothill.
23      Q.   (By Ms. Warren)  To the best of your
24  recollection did Credit Suisse have anything to do
25  with either the First Union syndicated facility or

38

1   the Foothill facility?
2       A.   They weren't in the lender group for
3   either of them.  I can think of no relationship at
4   all between Credit Suisse and either of those
5   facilities.
6       Q.   Let's talk about the servicing advance
7   facility that you referred to earlier.  Was that
8   something that Oakwood set up using a financial
9   institution?
10      A.   Well, the idea for the servicing advance
11  facility came from First Boston and they helped us
12  set it up, helped us structure it, work with the
13  rating agencies on it.
14      Q.   And forgive me because I know you
15  described this briefly before, but what was the
16  purpose of that facility?
17      A.   It was as follows:  In the mortgage
18  servicing business the servicing contract typically
19  requires the servicer of a mortgage loan to make a
20  mortgage payment on behalf of delinquent obligors.
21           So if an obligor's loan payment is due on
22  the 1st and is past due on the 15th and on the 20th
23  of the month when the -- when the proceeds of the
24  loans in a particular securitization vehicle are
25  scheduled to be passed through to investors, if that

39

1   person hasn't made their mortgage payment, the pot of
2   money is going to be light if you will because that
3   payment isn't there.  The servicing agreement
4   requires the servicer to advance that delinquent
5   payment on behalf of the obligor.
6           That requires the servicer to have the
7   money to do so, to make the advance on behalf of the
8   delinquent obligor.  The servicer again has to make
9   that advance in virtually all circumstances.  There
10  are certain exceptions, but having made the advance,
11  the servicer's right to be repaid the advance from
12  the assets of the trust is a very senior obligation
13  of the trust even ahead of the bondholders.
14           So the whole idea with the servicing
15  advance facility was to provide Oakwood additional
16  liquidity to enable it to make advances on behalf of
17  delinquent obligors and finance the cash required to
18  make those advances from an investor using a true
19  sale bankruptcy remote special purpose entity type
20  structure.
21      Q.   When did Credit Suisse propose the
22  servicing advance facility?
23      A.   As best I can recall it was probably
24  sometime in the summer of 2001, roughly that vintage.
25  I think Fiachra O'Driscoll and I first discussed the

40

1   concept of in essence securitizing these advance
2   receivables in a way not terribly dissimilar to how
3   once securitizes loans and we said, gee, that would
4   be neat and it would be a neat transaction that could
5   be done.  We knew an investor who we thought would be
6   interested and so we proceeded to think about it.  It
7   was relatively new technology at the time that it was
8   done.
9       Q.   And when you say we knew an investor who
10  might be interested, who's the we?
11      A.   It was at least -- at least me and I think
12  CSFB as well.
13      Q.   And who was that investor?
14      A.   Prudential Insurance.
15      Q.   And how did you come to know or believe
16  that Prudential would be interested in this
17  transaction?
18      A.   Oakwood had done a series of
19  securitization transactions with Prudential going
20  back to 1989.  There had been ten of them at least.
21  We knew them very well.  The people at Prudential
22  knew us very well, knew our operation very well, and
23  we felt we could create an instrument that would be
24  attractive to them.
25      Q.   And they went for it?

41

Case 1:07-cv-00700-WJF    Document 48-13    Filed 03/06/2008    Page 18 of 61

**Page 42**

1    A.    We ultimately closed a transaction that
2    was -- that worked for everyone.
3    Q.    And did you or someone else in Oakwood
4    management direct Credit Suisse to approach
5    Prudential about this facility?
6    A.    I probably did.  I don't have an explicit
7    recollection but, I mean, I would imagine I had a
8    conversation with Fiachra and we said gee, this is a
9    good fit for Pru.  Why don't you call up Mike, call
10   up Mike Bozzo and draw him a picture of it and see if
11   he wants to talk about it.  Probably how it happened.
12   Q.    You also spoke about the ABS market, which
13   was the securitization of the loans; right?
14   A.    Uh-huh, correct.
15   Q.    Would you just describe generally how that
16   worked?
17   A.    Yes.  You'd like me to describe the
18   securitization process generally?
19   Q.    Yes.
20   A.    Okay.  The process is basically this:
21   Step one is assemble a pool of loans, a pool simply
22   being a number of loans, could be a hundred, more
23   likely 5,000, that you had originated over a period
24   of time.  You tested the loans to make sure that they
25   met certain criteria that you felt were important,

**Page 43**

26/09/2006 MUIR, Douglas R. (vol.1)

1    that you thought that the rating agencies would think
2    was important, thought that potential buyers of the
3    securities would think was important.  You ultimately
4    arrived at a pool of loans.
5          You basically take those -- that pool of
6    loans and deposit them into a securitization vehicle.
7    Typically we use trusts.  Doesn't have to be trusts.
8    You convey title of the loans to a trust.  You
9    appoint a trustee.  Trustee now is the record owner
10   of all of those assets and the trustee is entitled to
11   receive all the proceeds of those assets.  Then the
12   trust then issues a series of securities.
13         Typically they look like debt.  They have
14   principal balances.  They have rates of interest that
15   accrue on them, sometimes fixed, sometimes variable.
16   Sometimes the securities have no principal.  They may
17   be interest only securities.  You basically create a
18   set of securities that ultimately capture all of the
19   cash that is thrown off by the assets and then you go
20   into the market and sell some or all of the
21   securities that you've created.
22         Sometimes you do it pure private deal.
23   Sometimes you do it exempt transaction.  Sometimes
24   you do it in the public market off a registration
25   statement.  And at the end of the day after you've

**Page 44**

1    sold the securities, you receive the proceeds and
2    that's how you ultimately complete the cycle of way
3    back when, building a home, selling a home, creating
4    a loan.  That's how you ultimately realize the value
5    of those loans that you create an advance company.
6    Q.    During the period 1999 to 2000 who set
7    Oakwood's credit standards for the loans that it
8    originated?
9    A.    I don't know that a single individual did.
10   It certainly would be discussed by people in Oakwood
11   Acceptance.  Again, I didn't have anything to do
12   really with the origination or an origination side of
13   Oakwood Acceptance.  I was strictly on the servicing
14   and securitization side.
15         So credit would be involved, the CEO of
16   the company would be involved, Bob Smith would be
17   involved because he was operationally in charge of
18   Oakwood Acceptance.  Occasionally I might be
19   consulted particularly if something were contemplated
20   that might influence the securitization process.
21   Q.    To your knowledge did Credit Suisse have
22   any role in determining or setting Oakwood's credit
23   standards?
24   A.    They had a role that I would describe as
25   this.  At all times we desired to originate loans

**Page 45**

26/09/2006 MUIR, Douglas R. (vol.1)

1    that could be packaged and securitized because if
2    we're unable to securitize them, we had no
3    alternative means to obtain the permanent financing
4    to originate those loans.  So we were very interested
5    in coming up and originating loans that could be
6    securitized.
7          So in the event that someone was thinking
8    about making a decision that affected which customers
9    got approved and which didn't or the terms under
10   which loans were originated in terms of downpayment,
11   interest rate, credit score, real property versus
12   personal property, we would often consult with CSFB
13   on that to get their view on how that would affect
14   the market's perception of the collateral.
15   Q.    Did management consult anyone else outside
16   of the company about credit standards?
17   A.    Besides CSFB?  Not that I recall.  I'd
18   have to think about it, but off the top of my head I
19   can't recall anyone.
20   Q.    Who had the final decision over the credit
21   standards for loan origination?  Was that Bob Smith?
22   A.    I'm not sure I always know the answer and
23   here's why.  Again, I wasn't directly in the loop.
24   We did not have, for example, a credit committee as
25   some financial institutions do to make those

1   decisions. I'm sure there were decisions that Bob
2   made by himself. I know there were other decisions
3   that were made by the chief executive of the company.
4       Q.   In connection with the ABS
5   securitizations, how did Credit Suisse get
6   compensated?
7       A.   In -- when we marketed each transaction
8   the underwriters were paid an underwriting fee that
9   was a percentage of the principal balance of the
10  securities. The percentage typically was not uniform
11  across all the securities, but it -- in its simplest
12  terms they got paid a percentage of the principal
13  balance of the securities that they sold.
14      Q.   Who decided what that percentage would be?
15      A.   We negotiated it.
16      Q.   Who negotiated it?
17      A.   I did.
18      Q.   With whom at CS?
19      A.   Generally Fiachra O'Driscoll.
20      Q.   How physically did the compensation occur?
21  Did Credit Suisse purchase securities at face value
22  and then sell them -- or I'm sorry -- purchase them
23  at a discount and then sell them at face value?
24      A.   It worked like this. CSFB marketed the
25  bonds. CSFB told us where the market was, where the

46

1   bonds could be traded. We said okay, these prices
2   are acceptable on these bonds. That could be their
3   aggregate principal balance. Generally bonds were
4   sold at a slight discount.
5       Sometimes bonds were sold at a big
6   discount depending on the bond, but ultimately a
7   price was agreed upon that investors would pay. When
8   CSFB remitted to us the proceeds of the sale, they
9   deducted their fee from -- that we had agreed upon
10  from those gross proceeds and remitted to us the net.
11      Q.   And where can one find the record of what
12  you agreed upon for Credit Suisse's fee for any given
13  securitization?
14      A.   Several places. If the securities were
15  publicly offered, the underwriting fee appears on the
16  face of the prospectus so you can go look there. If
17  the -- similarly, there's a closing memo. Sometimes
18  people call it a flow of funds memo.
19      It's the document that shows how money
20  moves the day the transaction closes, where the money
21  comes from, who gets it, where it goes. The
22  underwriting fee computations are attached as an
23  exhibit to the closing memo.
24      Q.   So either on the face of the securities in
25  a flow of funds memo or attached to the closing memo?

47

1       A.   Yes. Again, there's an attachment to the
2   flow of funds memo. The closing memo I think we
3   typically called it, the front of the prospectus.
4   It's probably also in the underwriting agreement. I
5   hadn't thought about that but I bet if we opened the
6   underwriting agreement, I bet it's in there, too.
7   There's a unique underwriting agreement for each
8   transaction.
9       Q.   Just to make sure I'm clear, are you
10  considering the flow of funds memo and the closing
11  memo to be the same thing?
12      A.   Yes.
13      Q.   Did Oakwood generally keep its own copies
14  of the closing memo, the underwriting agreement, the
15  other transaction documents?
16      A.   Yes.
17      Q.   Who was the custodian of those documents?
18      A.   I think probably I had the bulk of them,
19  if not all of them.
20      Q.   What were your criteria when you were
21  negotiating with Mr. O'Driscoll about underwriting
22  fees for how much you thought Credit Suisse should be
23  compensated?
24      A.   The thing I did most often was benchmark
25  against other issuers. I mean, we were not the only

48

1   guy, the only company out issuing asset backed
2   securities with mobile home assets. The number of
3   people doing it declined over time, but I could see
4   what -- it's publicly available, what Clayton was
5   paying CSFB or somebody else, what Greentree was
6   paying, what Greenpoint was paying, other
7   securitizers. So you could benchmark. That was the
8   principal tool.
9       And again, a billion dollar deal probably
10  has fees that in percentage terms are lower than a
11  $500 million deal, but on balance you can benchmark
12  and find out where the market is, not only what CSFB
13  was charging but what other banks were charging.
14      Q.   And you could find this information from
15  what appeared in the public documents, for instance,
16  on the -- on the face of the offering memorandum?
17      A.   Yes. If it's a public document, they'd
18  file the prospectus with the SEC. You could go look
19  it up.
20      Q.   Is that how you got your information to
21  benchmark?
22      A.   Generally, yes. It's publicly available.
23      MR. CASTANARES: Just like to caution the
24  witness to let the question finish before
25  beginning to answer, please. Thank you.

49

1    Q.    (By Ms. Warren)  Were you generally
2  successful in -- in setting a fee that you thought
3  was appropriate for -- to compensate Credit Suisse
4  for its underwriting services?
5    A.    Yes.
6    Q.    How was Credit Suisse compensated for
7  providing the OMI Note Trust facility?
8    A.    There were several elements.  I'm doing
9  this from memory, but I think I have this right.
10  There was a rate of interest applied to amounts that
11  OMI Trust borrowed from CSFB.  So we paid them
12  interest on the outstandings as a form of
13  compensation.
14        There was a fee letter or more than one
15  fee letter that specified a monthly fee that was to
16  be paid to CSFB, and it was a fixed fee.  And then in
17  addition when the transaction was first put together
18  in February of 2001, part of the consideration was
19  CSFB received a warrant to acquire Oakwood shares.
20    Q.    I didn't hear the last part.  A warrant to
21  acquire --
22    A.    Shares, common shares of Oakwood.
23    Q.    Common shares.  Did you negotiate the
24  compensation arrangement with Credit Suisse for the
25  OMI Note Trust?

50

1    A.    I discussed it with Fiachra.  We discussed
2  it a lot internally.  We discussed it with the board.
3    Q.    Were you the point person for dealing with
4  Credit Suisse on this issue?
5    A.    I was involved.  I think -- I think Bob
6  Smith was also involved.
7    Q.    What were Oakwood management's criteria
8  for determining how much they thought it would be
9  appropriate to pay Credit Suisse for the OMI Note
10  Trust facility?
11    A.    Well, I can't speak for others.  It was an
12  interesting negotiation in that it was not a
13  transaction in which there were a half a dozen credit
14  providers lined up at the door, each of which was
15  offering to do this transaction.  At the time CSFB
16  was the only game in town.
17        It's difficult to negotiate with someone
18  when you are trying to get them to bid against
19  themselves.  So we did the best we could and
20  ultimately agreed on a package that we agreed was in
21  our best interests to do and that our board agreed
22  that it was in our best interests to do it.
23    Q.    How did Oakwood's management determine
24  that the package was acceptable?
25    A.    Again, I can't speak for anyone else, but

51

1  at the time --
2    Q.    Well, I'm asking for your understanding
3  based on your conversations with others.  I'm not
4  asking to go into their heads, but that's the basis
5  of my question.
6    A.    I don't have a recollection of
7  conversations with others.  At the time the Bank of
8  America facility was due to expire.  There was
9  immense pressure from Bank of America to take them
10  out, to retire that facility.  There were tremendous
11  fees being charged by Bank of America for failing to
12  take them out.
13        CSFB was the only game in town.  It was a
14  critical facility, had to get done.  And on -- in
15  that -- in the light of those circumstances I
16  concluded that it was a deal that should get done.
17    Q.    Were the fees for the Credit Suisse loan
18  purchase facility approximately what B of A had been
19  charging?
20    A.    No.
21    Q.    Were they higher?
22    A.    Yes.
23    Q.    Did you apply any pressure on Credit
24  Suisse to take over the loan purchase facility from
25  Bank of America when Bank of America informed you

52

1  that it wanted out?
2    A.    I wouldn't characterize it as pressure,
3  but we certainly -- having a successor facility to
4  the Bank of America warehousing facility was of
5  critical importance.  While I don't remember any
6  specific conversations with CSFB, I know there were a
7  number of them in which, you know, I was hopeful that
8  CSFB working through Fiachra would be able to serve
9  up a proposal to provide that liquidity that would
10  work for them and would work for us.
11    Q.    Well, how was the subject raised with
12  Credit Suisse?  Did you raise it?
13    A.    Again, I don't have any recollection of
14  any specific conversations with CSFB during the time
15  we were contemplating that agreement.  My
16  recollection at the time was I was clearly aware that
17  we were under pressure from B of A and I would have
18  discussed that with Fiachra.
19    Q.    Did you ever tell Mr. O'Driscoll in words
20  or substance that Credit Suisse had better help out
21  on this bank facility or Oakwood would terminate all
22  or part of the securitization relationship?
23    A.    I don't remember ever telling him that.  I
24  do remember but I can't tell you when there were --
25  there was a conversation with Fiachra somewhere along

53

1    the line and it was probably in the '98 to '01 time

2    frame. Again, I can't tell you when in there, but

3    the gist of the conversation with Piachra was that

4    the company was receiving a lot of pressure from

5    banks who had extended credit to the company.

6         The pressure was in so many words banks

7    saying to us we have been supportive of your company.

8    We have extended credit to you. We would like you to

9    give us a fair share of the underwriting business and

10    the fee income that goes with it in your ABS program

11    to recognize the support we've given you in your

12    business through the extension of credit.

13         And I told Piachra somewhere along the

14    line, I said it would -- you know, CSFB is getting a

15    boatload of fees here and CSFB is not participating

16    in the credit. And he needed to understand that I

17    was getting a lot of pressure and the company would

18    appreciate CSFB coming up with some credit. I didn't

19    threaten him to take away any business.

20    Q.    But you let him know that there were

21    competitors who wanted in on the ABS business?

22    A.    Yes.

23    Q.    How did the notion of compensating Credit

24    Suisse with a warrant come up?

25    A.    They asked for it.

54

1    Q.    And did you say in words or substance to

2    Credit Suisse this is the most you're going to get?

3    A.    I don't have any recollection of

4    discussing the size of the warrant with them. I'm

5    certain that we did. I'm certain we'd have told them

6    about the Stock Exchange rule if they didn't already

7    know, but I have no direct recollection of it.

8    Q.    And when you said you weren't going to get

9    shareholder approval for a warrant for a greater

10    amount of shares, why is that?

11    A.    Well, my theory was that if CSFB would go

12    away with 20 percent, the company would be better

13    off. And I was hoping they wouldn't push me to go

14    get shareholder approval for more.

15    Q.    You thought the company was better off if

16    the number stayed -- if the percentage stayed below

17    20 percent that Credit Suisse could exercise the

18    warrant for?

19    A.    Yes. I thought at the time that the fewer

20    number of shares covered by the warrant, the better

21    from the company's point of view.

22    Q.    And why is that? Why was that better?

23    A.    Dilutive effect. I ought to finish that

24    answer. Warrants by their nature can be dilutive.

25    The greater the number of shares subject to the

56

26/09/2006  MUIR, Douglas R. (vol.1)

1    Q.    And what was your understanding of why

2    Credit Suisse wanted the warrant?

3    A.    I would have to speculate. Presumably the

4    warrant had the potential to be valuable and that's

5    why they wanted it.

6    Q.    How was the percentage of the warrant --

7    let me restate that. How was the percentage of

8    common shares that could be acquired under the

9    warrant determined?

10    A.    There is a limitation on the number of

11    shares that could be covered by the warrant. Let me

12    try again. Under either -- I think it's the New York

13    Stock Exchange has a rule. I'm not a lawyer so I

14    don't know, but somebody has a rule and I think it's

15    the Stock Exchange that says a company can't issue a

16    warrant or similar security involving more than

17    20 percent of its outstanding shares without getting

18    shareholder approval.

19         Well, we were not going to get shareholder

20    approval on this. So I did the math and I computed

21    the number of shares and I went and looked at the

22    number of outstanding shares of Oakwood and

23    multiplied by 20 percent, rounded down and then

24    deducted one share to remove all doubt, and that's

25    how we came up with it.

55

26/09/2006  MUIR, Douglas R. (vol.1)

1    warrant, the greater the potential dilution. And

2    dilution was adverse to the existing shareholders.

3    Q.    I understand. Shall we take a short

4    break?

5    A.    Sure.

6         THE VIDEOGRAPHER: We're off the record at

7    10:07.

8         (A recess was taken.)

9         THE VIDEOGRAPHER: This is tape number

10    two. We're on the record at 10:16.

11    Q.    (By Ms. Warren) Mr. Muir, in your opinion

12    what caused Oakwood to have to file for chapter 11

13    relief?

14    A.    The most immediate cause is we exhausted

15    our liquidity. We ran out of cash.

16    Q.    What were the greater causes?

17         MR. CASTANARES: I object to the form of

18    the question.

19         THE WITNESS: There were several.

20    Contributors were --

21    Q.    (By Ms. Warren) I'm sorry. Before you go

22    on, your lawyer objected to the form of the question

23    so I'll ask the question differently. In your

24    opinion what were the root causes of Oakwood's filing

25    for chapter 11?

57

A.   There were several.  The highlights that
come to mind, and I haven't sat back to think about
this in years, but there were several.  Number one is
a very deep and sustained downturn in our industry
that roughly from the peak of the industry in 1998 to
the trough cut the industry by about 60 percent in
terms of its shipments.  It's a very deep and
sustained downturn in the industry generally is one
factor.

The company expanded more rapidly than it
should have in retrospect.  You're expanding a
business perhaps more rapidly than your ability to
run it and to some extent expanding into the
beginnings of a downturn in the industry generally.
And insufficiently stringent underwriting standards
in the finance company.

Q.   In Oakwood Acceptance Corporation?

A.   Correct.

Q.   Is there anything else that comes to mind?

A.   I'm sure if I thought about it some others
would, but those are key contributors.

Q.   Did what was known as the loan assumptions
program or the increased use of assumptions
contribute at all to Oakwood's difficulties?

A.   I think that it did.

58

Q.   Did he report to Mr. Smith?

A.   He did.

Q.   And what was the substance of the
conversation about the expansion of the loan
assumptions program?

A.   And I remember the conversation, but I
don't remember the particulars.  The gist of it was
was it possible to make enhanced use of the loan
assumption program as an alternative to repossession
in dealing with delinquent obligors.

Q.   And was Mr. Rutherford asking you that
question or was it -- did he convey this as an issue
that was being discussed with Mr. Smith or something
else?

A.   He conveyed it -- my recollection is he
conveyed it to me at the time as an idea, a what if,
let's talk about this, is there something that makes
sense.

Q.   What was the next thing you learned about
the expansion of the loan assumption program?

A.   Again, I don't remember any specific
events, but a discussion must have ensued at some
point because we did, in fact, undertake to expand
the use of the loan assumption concept as an
alternative to repossession.

60

Q.   Whose idea was the loan assumptions
program?

A.   Let me answer that this way.  There was a
long standing servicing technique at Oakwood and at
other servicers in the manufactured housing finance
business to use a loan assumption as a way to deal
with a troubled credit.  It's not uncommon.  It's
been used for years and had been used at Oakwood for
years.

The first I recall hearing about a
significant expansion in the loan assumption program
was along about -- and I'm -- I'm sorry I can't be
more precise, but probably in the summer of 2000 or
thereabouts.  And the first person I remember
speaking about it was a gentleman by the name of Mike
Rutherford.

MS. WARREN:  Would you read that back,
please?

(The record was read by the reporter.)

Q.   (By Ms. Warren)  Who was Mike Rutherford?

A.   Mike Rutherford was the person in charge
of Oakwood Acceptance on a day-to-day basis.

Q.   Did he have a particular title?

A.   He did, and he was at least a vice
president, might have been a senior vice president.

59

Q.   How was that decision taken?  Who made the
decision?

A.   I don't know that any one individual did,
but certainly Mike and I discussed it.  Bob and I
would have discussed it.  Myles and I.  We talked to
the people in our retail organization.

The reason they were important is they
were part of the process of helping sell repossessed
properties and they had a significant role in the
loan assumption program.  So we all discussed it and
discussed the merits and thought that -- that it was
possible to run a program that made sense.

Q.   Do you remember approximately when
Oakwood, in fact, implemented the expansion of the
loan assumption program?

A.   I don't remember exactly, but my best
recollection is it's sometime in the summer or
perhaps the fall of 2000.  I could be off.

Q.   Who was in charge, if anyone, of
monitoring the expansion -- the expanded assumptions
program to see if it was doing what it was supposed
to do?

A.   I don't know.

Q.   Was there anyone monitoring the loan
assumptions program at Oakwood?

61

**Column 1 (page 62)**

1    A.   I don't know of anyone who was tasked
2 specifically with monitoring it.  There was
3 information available including some available to me
4 that enabled me to get an understanding of how many
5 loans were being put through the program.  What
6 information others had, I don't know.
7    Q.   Am I correct that at some point it come to
8 your attention that the assumptions program was not
9 having the desired effect?
10   A.   I would -- I would characterize it as
11 having come to my attention that it had some side
12 effects.
13   Q.   Explain that to me.
14   A.   The information came to my attention that
15 caused me to believe that we were doing too many loan
16 assumptions, that the loan assumption process was
17 being applied to delinquent loans that were not good
18 candidates for it, and that as a consequence that
19 running the program was having some significant
20 adverse liquidity effects.  It was eating up cash.
21   Q.   When did that come to your attention?
22   A.   As best I can recall would be sometime in
23 the spring, late winter, early spring, early summer
24 of 2001, certainly by July of that year.
25   Q.   And do you remember when you informed

62

**Column 2 (page 63)**

1 Credit Suisse that the expanded loan assumption
2 program was having difficulties or side effects?
3   A.   I don't.
4   Q.   To your knowledge was Credit Suisse
5 involved in the decision to expand the loan
6 assumptions program?
7   A.   I don't think they - to my knowledge they
8 were not involved in the decision.  They were
9 certainly informed of it.
10   Q.   Was the loan assumption program eventually
11 terminated?
12   A.   Yes.
13   Q.   And around when was that?
14   A.   Around July of 2001 I believe is the
15 correct date.
16   Q.   Who made the decision to terminate the
17 loan assumption program?
18   A.   As best I recall, Bob and Myles and I
19 collectively discussed it.  Myles was very much in
20 favor of terminating it and so was I.  So I guess
21 ultimately Myles, who was CEO of the company, made
22 the decision.
23   Q.   Do you remember when or if Credit Suisse
24 was informed of the decision to terminate the loan
25 assumption program?

63

**Column 3 (page 64)**

1   A.   No.  I'm sorry.  Did you say -- was the
2 question when or if?
3   Q.   Yes.
4   A.   I know we told them.  When we told them, I
5 don't know.
6   Q.   Do you remember any reaction from the
7 Credit Suisse people about being informed that the
8 loan assumption program had terminated?
9   A.   I don't because, again, I don't have a
10 specific recollection of calling and telling anyone.
11   Q.   We've touched on this a bit in passing,
12 but what services did Credit Suisse provide for
13 Oakwood during the period 1999 to the petition date?
14   A.   Two or three depending on how you count.
15 The ones that I remember are they were the ongoing
16 lead underwriter for the ABS transactions, which was
17 a -- generally a quarterly type event.  They were the
18 arranger of the servicing advance facility in the
19 fall of 2001 as I recall, around October.
20      There were a number of occasions when
21 people from CSFB outside the investment banking side,
22 for example, perhaps from the investment banking side
23 or the financial advisory side came and talked to us
24 about ideas.  These were not engagements where there
25 was an engagement letter and they were getting a fee.

64

**Column 4 (page 65)**

1 They'd just come down and say hey, we've been
2 thinking about you.  Here's an idea.  Why don't you
3 consider this.
4   Q.   Did you consider they were pitching for
5 more business from you with those ideas?
6   A.   Yes.  If they were hoping to get an
7 engagement, yeah.  I thought that's what they were
8 doing, sure.  And then ultimately we signed an
9 engagement letter with them in August of 2002 to
10 provide financial advisory services.
11   Q.   So have I understood you correctly to say
12 that the services that Credit Suisse provided to
13 Oakwood during the period 1999 to the petition date
14 were serving as lead underwriter for the asset backed
15 securities, being the arranger of the servicing
16 advance facility and eventually beginning in 2002
17 serving as financial advisor?
18   A.   All of those and I forgot the loan
19 purchase facility, the warehouse facility.  That was
20 pretty important.
21   Q.   And when Credit Suisse came and pitched
22 for your business by giving you ideas, you didn't
23 compensate them for that; right?
24   A.   No.
25   Q.   I mean, they were hoping that they could

65

**Page 66**

1  get more business from you to the best of your
2  knowledge; right?
3      A.    That was --
4      Q.    You weren't paying them to come and just
5  give you ideas?
6      A.    We were not paying them for ideas.  I
7  assume they hoped to land an engagement.
8      Q.    In your view did Credit Suisse perform its
9  services as lead underwriter for the securitizations
10  competently?
11      A.    Yes.
12      Q.    Did Credit Suisse perform its services in
13  providing the loan purchase facility competently?
14      A.    Yes.  I believe so.
15      Q.    Did Credit Suisse perform the financial
16  advisory services beginning in August of 2002
17  competently?
18      A.    Of that I'm a little less certain.
19      Q.    And why do you say that?
20      A.    There are a couple of reasons.  And by
21  saying I'm not certain they were competent, I'm not
22  saying they were incompetent.
23      Q.    I understand.  Is it fair to say that
24  you're saying that there were some problems?
25      A.    There were what I perceived to be some

**Page 67**

1  problems.
2      Q.    And what were those?
3      A.    My recollection is that the financial
4  advisory people did an immense focus and attention on
5  one of a number of elements that were part of that
6  engagement.  The one that they had tremendous focus
7  on was working with us and the company that turned
8  out to be the major creditor of the bankruptcy case
9  to obtain at least an indication of support from that
10  creditor as we entered the bankruptcy process.
11      Q.    That creditor was Berkshire Hathaway?
12      A.    Correct.
13      Q.    And did you think that that focus was
14  appropriate?  Did you think it was important to get
15  an indication of support from Berkshire Hathaway for
16  whatever plan of reorganization the company was going
17  to come up with?
18      A.    I did.
19      Q.    So what was the problem?
20      A.    The things that perhaps didn't go so well
21  where there were some other elements that I felt
22  should have been part of the engagement.  Number one
23  was working with us to help arrange DIP financing,
24  which again, I didn't have visibility to everything
25  that CSFB was doing, but I seldom if ever discussed

**Page 68**

1  DIP financing with anybody from CSFB.  And, in fact,
2  we ultimately entered bankruptcy without a DIP.
3  Another area of focus was CSFB was the lender under
4  the warehouse facility.  And not having been told by
5  CSFB to the contrary, you know, I expected that when
6  we entered bankruptcy there wouldn't be any surprises
7  in terms of continued access to that source of
8  financing.
9          And, in fact, there were some significant
10  surprises.  And third, there was a -- I had a
11  frustration if you will in that the item that did
12  have tremendous focus, that is, obtaining an
13  indication of support from Berkshire while it was
14  critically important, they seemed to have a
15  perception that we had an infinite amount of time to
16  achieve that objective.
17      Q.    They meaning Credit Suisse?
18      A.    Correct.
19      Q.    Uh-huh.
20      A.    When, in fact, we informed them repeatedly
21  that the amount of time fixed or available to
22  accomplish that was fixed.  I was frustrated that
23  they never seemed to understand that there was going
24  to come a point in time where we were going to be
25  compelled to file whether we had Berkshire on board

**Page 69**

1  or not.  They may have understood that, but they gave
2  me indications that they did not and I did find that
3  frustrating.
4      Q.    Who was the point person if there was one
5  at Oakwood dealing with Credit Suisse in their
6  capacity as financial advisor?
7      A.    I think there were three of us that talked
8  to CSFB, perhaps not always about -- together or
9  always about the same matters, but the principal
10  players were Myles Standish, the chief executive, Bob
11  Smith, who was the -- at the time the executive vice
12  president of financial operations, and me.
13      Q.    Who was the point person from Credit
14  Suisse on the financial advisory engagement?
15      A.    Jared Pelt.
16      Q.    Who at Oakwood was responsible for getting
17  DIP financing?
18      A.    I don't know that we ever sat down and
19  delegated tasks.  I was not focusing on that piece.
20  Bob Smith spent a lot of time focusing on it.  I
21  think perhaps Myles may have been involved as well,
22  but Bob pretty much had the ball on the DIP.
23      Q.    From the period 1999 to -- well, strike
24  that.  Going back in time, how did the relationship
25  between Oakwood and Credit Suisse begin?  Do you

remember?

A.    Yes.

Q.    How?

A.    We called them up in New York and asked to come visit with them.

Q.    Who did you call?

A.    It was one of two people.  It was either Fred Terrell or Pilar Esperon.

Q.    Who were they?

A.    They were asset backed investment bankers at CSFB.

Q.    How did it come about that you decided to call them and ask them to come see you?

A.    We called them and asked to come visit them --

Q.    Sorry.  I heard that wrong.

A.    -- to understand their capabilities in underwriting manufactured housing asset backed securities.  That was motivated by the fact that we had been fired by Merrill Lynch.

Q.    How did Credit Suisse come to your attention as another provider of this kind of service?

A.    At the time there were three banks that were the major players in manufactured housing asset

70

backed to the virtual exclusion of all the other investment banks.  And they were    gee, i'm doing this from memory -- CSFB, Merrill and Lehman Brothers.

We didn't know anybody or really had had a lot of exposure to anybody at Lehman, but we had heard good things about CSFB.  And having been fired by Merrill they seemed, you know, a logical candidate to go at least have a visit with and discuss a relationship.

Q.    And did the relationship -- did that visit happen?

A.    It did.

Q.    And did the securitization relationship begin soon after?

A.    It did.

Q.    When did Fiachra O'Driscoll enter the picture?

A.    About 1996 to the best of my recollection.

Q.    And do you remember how that happened?

A.    Yes.  Pilar Esperon and Fred Terrell with whom we had been working from the inception of the relationship in 1994 decided to leave CSFB as I recall in 1996.  And I had a discussion with Pilar, who -- on the phone one day and she said I have

71

picked an outstanding successor for me.  I want to bring him down and introduce him to you because you're going to really like him.

Q.    And that was Fiachra?

A.    That was Fiachra.

Q.    I take it you did like him?

A.    I liked him a lot.

Q.    Why?

A.    A lot of reasons.  Fiachra is extremely bright.  He works very, very hard.  He delivers results.  He doesn't surprise you.  He's unquestionably honest and I trusted him.  I mean, I could think of other -- he's just an absolutely first rate person.

Q.    And do you believe that as firmly now as you did at the beginning of the relationship?

A.    Absolutely.

Q.    Could I ask you to take a look back at Exhibit 212?  Looking at the first page of the list of officers, tell me why did Nicholas St. George leave the company?

A.    He retired.

Q.    And Bill Edwards took over as chairman from Mr. St. George, correct, and chief executive officer?

72

A.    I think that's correct, yes.

Q.    Okay.  Why did Mr. Edwards leave the company?

A.    The board asked him to.

Q.    Why?

A.    I wasn't consulted, but I thought Bill was the wrong man for the job and the board did the right thing.

Q.    Is it your understanding that the board terminated Mr. Edwards for general underperformance or was there any specific incident that caused this?

A.    Again, I wasn't privy to the conversation.  I didn't attend the meeting.  I know the meeting was going to take place before it took place.  I know what the subject matter was and I knew from discussions with others in the company at least some of the reasons that other members of management had cited to the board as a reason for getting rid of Bill.

Q.    And what were the reasons?

A.    There's one in particular that sticks in my mind, and it was a -- interestingly, a credit underwriting related issue.  There was a program called DPAP that Mr. Edwards insisted on running against the advice of others in the company.

73

1    Q.   What's DPAP?

2    A.   It stood for downpayment assistance

3    program.

4    Q.   Why did he want to run that program?

5    A.   It requires me to speculate, but I'm

6    fairly confident that Bill wanted to run it because

7    he thought it would have a positive effect on sales

8    of mobile homes.

9    Q.   What was it?

10   A.   It was a program which involved a third

11   party vendor that enabled a prospective customer who

12   wanted to buy a mobile home to give to the vendor two

13   or three, three as I recall, postdated checks each in

14   the amount of approximately a third of the required

15   downpayment for the mobile home.

16        Then the third party vendor in turn then

17   wrote Oakwood a check for the full amount of the

18   downpayment.  It was in essence a downpayment

19   financing program.

20   Q.   So why was Mr. Edwards terminated over

21   this?

22   A.   Well, again, I don't know that that was

23   the deciding factor, but it was an extremely poorly

24   designed play.  It was foolish.  It was bad

25   underwriting.  And the board may have -- once they

1    found out about it may have concluded that that was

2    indicative of the wrong person in the CEO chair.

3    Again, I wasn't there.

4    Q.   How long was the DPAP running?

5    A.   A matter of months.

6    Q.   Was this part of the insufficiently

7    stringent underwriting standards that you referred to

8    earlier?

9    A.   Yes.

10   Q.   Was this part of the cause of Oakwood's

11   difficulties?

12   A.   If by difficulties you mean the

13   bankruptcy, I would say no.  It was a foolish

14   program.  It was not something that had the ability

15   or so widespread as to bring down the company.

16   Q.   So just so I'm clear, had Mr. Edwards been

17   running the DPAP without the board's knowledge or

18   consent?

19   A.   I believe the answer is yes.

20   Q.   Who was Duane Daggett?

21   A.   Duane was Bill's successor as chief

22   executive.

23   Q.   And how was he selected for that position?

24        MR. CASTANARES:  Object to the form of the

25        question.

1         THE WITNESS:  That decision was made by

2    the board.  I don't know how they arrived at it.

3    Q.   (By Ms. Warren)  Was he a professor?

4    A.   He was.

5    Q.   He hadn't had any management experience

6    before?

7    A.   My understanding is Duane was a professor

8    of business at Appalachian State University.  Prior

9    to that I believe he had been up there maybe seven,

10   eight, nine years before he -- and had retired from

11   that in approximately 2000, at which time he began to

12   do some consulting work for Oakwood.  But to answer

13   your question, prior to his professorship at

14   Appalachian Duane had had a number of management

15   positions in a number of companies.

16   Q.   I was just curious.  It seemed like an

17   unusual choice.  Why did Mr. Daggett step down as

18   chief executive officer?

19   A.   Again, I wasn't involved directly, but in

20   about September of '01 Duane stepped down as chief

21   executive.  I think he remained on the board for a

22   period of time and Myles was elected chief executive

23   of the company.

24   Q.   How did Mr. Daggett perform in your

25   opinion as CEO?

1    A.   Duane did some good things and -- and

2    accomplished some things, was a very thoughtful guy,

3    tried hard to do the right thing, but he was not the

4    guy that the company needed at the time.

5    Q.   What kind of guy did the company need at

6    the time?

7    A.   We needed a disciplined turnaround guy at

8    the time, and that was not what Duane was.

9    Q.   And what was your view of Mr. Edwards'

10   performance as chief executive officer?

11   A.   Bill's heart was in the right place, but

12   Bill was in way over his head.

13   Q.   In what sense?

14   A.   I don't think Bill appreciated the risks

15   associated with a number of his decisions.

16   Q.   What decisions besides the DPAP?

17   A.   Well, we could go back and look at the

18   financial statements, but in -- Bill came up from a

19   manufacturing background, running manufacturing

20   plants.  Manufacturing plants are at their most

21   efficient when they are running as fast as they can

22   go.

23        Therefore, your unit cost goes down, which

24   is good if you're a manufacturer.  We did build way

25   more inventory than we needed during the period of

1    time when Bill was CEO and when he was president of
2    the company prior to being CEO.  In the face of
3    falling sales we continued to build and we had --
4    wound up with vastly excessive inventories under
5    Bill's direction.
6        Q.    And in your opinion how did Mr. Standish
7    perform as chief executive officer?
8        A.    I think he did a great job in a tough
9    situation.  Ultimately he didn't succeed.  I didn't
10   succeed.  We all didn't succeed, but I thought Myles
11   did a fine job, a really very excellent job.
12           MS. WARREN:  Let's take a short break.
13           MR. CASTANARES:  Sure.
14           THE VIDEOGRAPHER:  We're off the record at
15   10:56.
16           (A recess was taken and Exhibit Numbers
17   213 through 218 were marked for identification.)
18           THE VIDEOGRAPHER:  We're on the record at
19   11:38.
20           MR. CASTANARES:  Would you give Mr. Muir
21   an opportunity to make his correction, please?
22       Q.    (By Ms. Warren)  I understand from Mr.
23   Muir's counsel that he wishes to make a correction to
24   prior testimony.  Is that right, sir?
25       A.    That's correct.  I believe you asked me a

78

1    flow worked in terms of the different securitization
2    transactions.  So first I'm showing you Defendant's
3    Exhibit 213, which is entitled a sale and servicing
4    agreement dated as of February 9th, 2001.  It's Bates
5    numbered CSFB-92153 to 92238.  Would you take a quick
6    look at that and just tell me if you recognize it?
7        A.    I do.
8        Q.    And what is it?
9        A.    This is one of a series of documents which
10   collectively document the loan purchase facility,
11   what we sometimes referred to as the warehouse
12   facility.  This is one of the key documents in that
13   documentation trail.
14       Q.    Okay.  What does this document do?
15       A.    Take a look and -- they varied from deal
16   to deal, but --
17           MR. CASTANARES:  Just a sec.  I wish to
18   object to the form of the question, but go
19   ahead.  Counsel, you're obviously asking him to
20   look at a document of some 80 pages, 85 pages in
21   length.  Could you perhaps be a bit more
22   specific in what you'd like him to answer?
23       Q.    (By Ms. Warren)  Sure.  All I'm asking is
24   that you tell me generally what the purpose of this
25   document was?

80

1    question to the effect of when did I become aware
2    that perhaps the LAP program was being used
3    excessively and when did we terminate the program.
4    And I think I testified that that was -- both of
5    those events were like spring or summer of 2001.  It
6    was, in fact, 2002.
7        Q.    So you became aware that the loan
8    assumption program was terminated sometime in the
9    summer of 2002?
10       A.    Right.  We terminated the program in the
11   summer of 2002, which was shortly after coming to a
12   conclusion that it had been used excessively.
13       Q.    And when did you have the conversation
14   with Mr. Rutherford in which you learned that the
15   expansion of the loan assumption program was being
16   contemplated?
17       A.    Well, I don't think I ever heard that from
18   -- well, let me answer that this way.  The
19   conversation I recall with Mr. Rutherford in which we
20   first discussed the idea of expanding the loan
21   assumption program, I'm pretty certain that was in
22   the summer of 2000.
23       Q.    Okay.  Thank you.  Mr. Muir, I'm going to
24   show you some documents that I want to go over with
25   you just to help us understand better how the funds

79

1        A.    I'm pretty sure if I reviewed it to tell,
2    I could tell you for certain, but I think this is the
3    basic document that describes how loans are conveyed
4    from Oak Leaf Holdings or deposited by Oak Leaf
5    Holdings into the OMI Note Trust and how the senior
6    notes that are issued by the trust are created, what
7    they're -- some of their terms are, how they get
8    paid.
9           There are some other documents that
10   collectively accomplish some of the other objectives
11   of the transaction, but this is one of the key ones
12   that I think covers the depositing of the assets and
13   the creation of the debt as I remember.
14       Q.    Take a look at the page that's Bates
15   numbered at the bottom CSFB-92190.
16       A.    92190.
17       Q.    And that should say article three at the
18   top.
19       A.    It does.
20       Q.    Taking a look in section 3.1, what is your
21   understanding -- and I'm just asking for your
22   understanding as a business person     of what the
23   note account was that's referred to in this section?
24       A.    Again, if I read the rest of the document
25   I could figure it out, but I'm speculating because

81

it's been a while; but I think the note account is a
bank account maintained at Chase by the trustee of
the trust into which was deposited the proceeds of
the assets of the trust, collections on the loans,
for example.

Q.    And section 3.2 below it entitled flow of
funds sets out priorities to which those funds were
to be devoted.  Is that generally correct?

A.    Yeah.  I think so.

Q.    And looking at those priorities from the
first one on page 37 of the document to the last one,
the 11th on page 38 of the document, do these
generally accord with your recollection of the
priorities for the flow of funds in the note account?

A.    Yes.

Q.    And do you ever recollect the flow of
funds from the note account being different from
what's set forth in section 3.2?

A.    I have no reason to think that they were
ever different.

Q.    Where in this section 3.2 is there a
description of any residual interest that Oakwood may
have had in these funds in the note account?

MR. CASTANARES:  Object to the form of the
question.

---

of the proceeds of those assets and disbursed
all of those assets in accordance with this
agreement, perhaps with other agreements; but at
the end of the day to the extent once everybody
ahead of Oakwood in the payment priority was
paid, any cash that was left over ultimately
made its way back to Oakwood.

Q.    (By Ms. Warren)  And is it your
recollection that that, in fact, would happen over
the course of the existence of this OMI Note Trust?

A.    It did happen.

Q.    And do you remember approximately how much
in funds would come back to Oakwood eventually?

A.    A lot of money, but I couldn't give you a
dollar amount.  It is derivable if we were to take
the records and look, but it's a substantial amount
of money.

Q.    Take a look at section 3.8, please, which
is entitled sale of receivables.  And that's at page
CSPB-92194 of Exhibit 212 -- I'm sorry -- 213.  Does
this provision concern the sale of mortgages into the
REMIC trust?

MR. CASTANARES:  Objection to form.

THE WITNESS:  It certainly could.

Q.    (By Ms. Warren)  What's your --

---

26/09/2006 MUIR, Douglas R. (vol.1)

THE WITNESS:  Could you repeat the
question, please?

MS. WARREN:  Sure.  Why don't you read it
back.

(The record was read by the reporter.)

THE WITNESS:  I'm trying to find a
definition.  I'm not sure without reviewing the
documents taken as a whole, but I suspect
Romanette ten will accomplish that goal.

Q.    (By Ms. Warren)  And that's the section
that refers to the certificate distribution account?

A.    Yes.  I was trying to find the definition
of certificates to refresh my recollection of what
that means.

Q.    When you testified earlier that it's your
belief that Oakwood had a beneficial interest in
funds in the note account, was this what you were
referring to?

MR. CASTANARES:  Object to the form of the
question.

THE WITNESS:  This provision may be part
of it, but if you look at the agreements taken
as a whole and we were to dissect them, I think
what we would find is that the trustee was the
owner of the assets in the trust, collected all

---

26/09/2006 MUIR, Douglas R. (vol.1)

A.    And often did.

Q.    Is it your understanding that this
provision allows the OMI Note Trust to use proceeds
to pay note holders?

A.    Proceeds of sale of assets?

Q.    Yes.

A.    Yes.

Q.    Do you know of any claim that Oakwood
could assert over funds that were to be paid to note
holders pursuant to this agreement, Exhibit 213?

A.    I'm not sure I understand the question.
I'm sorry.

Q.    Do you know of any reason why Oakwood
would have any right to proceeds that were paid to
note holders out of the OMI Note Trust account
pursuant to this agreement, Exhibit 213?

A.    Let me say it another way to make sure I
understand the question.  If you're asking me if the
class A note holders received money pursuant to this
agreement and there wasn't some error made, does
Oakwood have any claim to that money.  I think the
answer -- so far as I know the answer is no, but I'm
not a lawyer.

Q.    Understood.  I'm just asking for your
understanding as the business person who dealt with

1    these agreements and operated some of the facilities.
2    Take a look back at section 3.2 of Exhibit 213 and in
3    particular Bates page 92191, and you'll see the ninth
4    priority payment in this waterfall is to the servicer
5    if OAC the servicing fee. That's Romanette nine. Do
6    you see that?
7        A.    I do.
8        Q.    What is your understanding of why the
9    servicing fee was ninth in priority?
10           MR. CASTANARES:  I'll object to the form
11       of the question.
12           THE WITNESS:  Well, it's the -- it's in
13       the priority it is because that's where we
14       negotiated it.  I'd have to speculate as to
15       CSFB's motives in why they negotiated it for it
16       to be where it is.
17       Q.    (By Ms. Warren)  Would you have preferred
18    it to be higher up in the waterfall?
19       A.    Well, to the extent that I was
20    representing OAC and I have a right to money, I'd
21    always rather have my priority higher than others,
22    yes.
23       Q.    Sure.  I'm showing you now, Mr. Muir,
24    Defendant's Exhibit 214, which is on letterhead of
25    Hunton & Williams and it's Bates numbered CSFB-225678

1        A.    I don't -- excuse me.  I don't recognize
2    this particular document, but I think I know what it
3    is.
4        Q.    What is it?
5        A.    I think it's the bank statement if you
6    will for the note account for the OMI Trust that was
7    -- or we discussed briefly in that section of the
8    sale and servicing agreement we looked at a minute
9    ago.
10       Q.    In the course of your duties at Oakwood
11    would you have occasion to review statements from the
12    OMI note account?
13       A.    Not on a regular basis, no.
14       Q.    Was Oakwood Homes able to make any
15    withdrawals from this account?
16       A.    Only to the extent that Oakwood controlled
17    one of the entities that was a party to that sale and
18    servicing agreement.  And by causing one of those
19    parties that was an Oakwood entity to act, we might
20    have been able to cause a withdrawal because we were
21    entitled to under the agreement.  But if you're
22    asking me could I call up the trustee and say just
23    please wire me a million dollars, the answer is no.
24       Q.    And why not?
25       A.    Because I believe the sale and servicing

1    to 225702 dated February 26th, 2001.  Take a look at
2    that and let me know if you've seen it before.
3        A.    I don't specifically recall this, but I
4    think it's highly likely that I have seen it before.
5        Q.    Do you remember what Hunton & Williams'
6    role was?
7        A.    In what?  I'm sorry.
8        Q.    In setting up the OMI Note Trust?
9        A.    They were counsel to Oakwood.
10       Q.    Do you remember whether Hunton & Williams
11    produced this document, Defendant's Exhibit 214, at
12    Oakwood's direction?
13       A.    I'm certain that they did.
14       Q.    Would you review legal opinions like this
15    in the course of your duties at Oakwood?
16       A.    Occasionally.
17       Q.    But you don't really have a memory of this
18    one?
19       A.    I do not.
20       Q.    I'm showing you a document that's been
21    marked Defendant's Exhibit 215.  It appears -- the
22    first page appears to be an account statement issued
23    by J.P. Morgan and this is Bates numbered
24    OHCLT-428297 through 428397.  Take a look at that and
25    let me know if you recognize it?

1    agreement which binds the trustee instructs the
2    trustee when and how distributions from this account
3    are to be made.
4        Q.    And the trustee was not permitted to
5    deviate from those instructions?
6        A.    Certainly wasn't expected to.
7        Q.    Which entity that Oakwood Homes controlled
8    had any ability to make withdrawals from the note
9    account?
10       A.    Again, as I testified a minute ago, I
11    don't think except by operation of these agreements
12    we had any ability to make withdrawals.
13       Q.    So is it fair to say that Oakwood Homes
14    could not use the funds in this account for general
15    corporate purposes?
16       A.    It absolutely could not do so.
17       Q.    And is it fair to say that if any money
18    came out of this account and ended up at Oakwood
19    Homes, that would have to be a decision of the
20    trustee?
21           MR. CASTANARES:  Object to the form of the
22       question.
23           THE WITNESS:  I don't think that's fair.
24       In my experience trustees don't decide much of
25       anything.  Trustees like to be directed.  And so

1    in making disbursements out of accounts like
2    this in my experience trustees look to the
3    underlying documents in the transaction,
4    determine who is authorized to direct them and
5    then take the direction they are given.  Not
6    trying to put -- play games with you, but
7    trustees generally in my experience don't decide
8    things.
9        Q.    (By Ms. Warren)  Please take a look at the
10   page that's Bates numbered 428300 in this exhibit.
11   Do you see the line entry for approximately 170,000
12   at the top?
13       A.    I do.
14       Q.    And there's a reference in the same row of
15   the table on this page to note account transfer.  Do
16   you see that?
17       A.    That's the third line?
18       Q.    Yes.
19       A.    Yes.  Where it says ORN and then some
20   numbers, note account transfer?
21       Q.    Yes.
22       A.    I see that.
23       Q.    What's your understanding of what this
24   entry refers to?
25             MR. CASTANARES:  Object to the form of the

1    question.
2             THE WITNESS:  I don't know what it refers
3    to.
4        Q.    (By Ms. Warren)  Do you know generally
5    what the term note account transfer refers to?
6        A.    I don't.
7        Q.    Who at Oakwood would know that?
8        A.    Looking solely at this piece of paper, I'm
9    not sure anyone would know.  There are -- exist or
10   did exist, probably still exist records that would
11   tell us what these numbers are, but -- and we could
12   figure it out, but I don't have them.
13            And I don't know that there's anybody that
14   I can think of that will have a recollection about
15   what that specific line item is, although again, I
16   think it's derivable from the record or the documents
17   that should exist.
18       Q.    What kind of records are there that would
19   explain what this entry means?
20       A.    My recollection is one of the duties of
21   the servicer under the OMI trust agreement was to
22   keep track of the collections on the loans.  We had
23   computer systems that enabled Oakwood to do that.
24   That was Oakwood's job.  I believe that in the
25   monthly remittance report for OMI Trust that was

1    conveyed to the trustee and to the note holders on a
2    monthly basis I believe one of the elements of that
3    document is a reconciliation of the balances that are
4    in this note account starting with the balance at the
5    beginning of the month, showing the collections,
6    showing the disbursements and arriving at the ending
7    balance.
8             I believe that reconciliation is in the
9    monthly remittance reports and that would summarize
10   all of this activity that is in this bank statement
11   in a little less granular fashion.  So I think if we
12   had those, we could go through and match it up.
13       Q.    The monthly remittance reports were
14   generated by OAC?
15       A.    They were.
16       Q.    And they were sent to the trustee and to
17   the note holders?
18       A.    And possibly to others.
19       Q.    During the period 1999 to the petition
20   date, who reported to you?
21       A.    Gee, different people at different times.
22   In terms of everything we've talked about here today,
23   the people that first come to mind are people that
24   worked in loan servicing and prepared these
25   remittance reports we spoke of and people who had to

1    do with selecting loans to go in pools of loans to be
2    securitized, but the person in charge of that group
3    reported to me.  His name was Clark Beeson and he had
4    people that worked for him that did some of those
5    tasks.
6        Q.    Were there different departments or groups
7    that reported to you by specific names?  For
8    instance, was there a securitizations department, a
9    loan servicing department, et cetera?
10       A.    Well, there was -- there was broadly one
11   big department or one significant department that had
12   to do with the things we've discussed today, and
13   that's a group that included investor accounting or
14   investor reporting.
15            And a second part of that group consisted
16   of -- I don't know that we had a title for it, but
17   securitization support, people that did leg work when
18   it was time to put an ABS deal together, people who
19   worked with folks on the other side at CSFB, people
20   who did work for me.  And that was really basically
21   one big group during the time frame you asked about.
22   And Clark Beeson was the leader of that group,
23   principally what I would call ministerial-type
24   functions.
25       Q.    Were there any other groups that reported

1    to you?
2         A.     '99 to -- not during that time frame, I
3    don't think.
4         Q.     Were there a series of vice presidents who
5    reported to you?  What were the titles of the people
6    who directly reported to you?
7         A.     I think Clark's -- he was -- he was
8    probably in that time frame my only direct report and
9    I think his title was like director of securitization
10   or something.
11        Q.     Uh-huh.  And then who was the next level
12   down from Mr. Beeson?
13        A.     It varied at times.  There were -- Clark
14   did most of the securitization support work himself.
15   On the investor reporting side in this time frame
16   there were probably two managers of investor
17   reporting.  One of them was Dawn Lippard.  The other
18   one who preceded Dawn, his name I can't recall.  And
19   there were generally four investor reporting
20   accountants that reported either to Dawn or to her
21   predecessor.
22        Q.     Take a look down this same page,
23   OHCLT-428300 of this exhibit, and you'll see there's
24   an entry for approximately $416,000.  Do you see
25   that?

94

1         Q.     (By Ms. Warren)  All right.  I guess we
2    have a copying error, but fortunately --
3         A.     Would you like one of mine?
4         Q.     -- you have the right one.  Can I borrow
5    it back from you a moment?  No, you don't have to --
6         A.     Sure.
7         Q.     -- rip it up.  Let's see.
8                MR. CASTANARES:  And counsel, I'm just
9        fine if you'll furnish us with a full copy of
10       this document by mail or whatever when you get
11       back to New York.
12               MS. WARREN:  Yes.  We're happy to do that.
13               MR. CASTANARES:  Thank you.  We probably
14       have it someplace, too, but let's just have the
15       official one from the depo if we could, please.
16               MS. WARREN:  Sure.
17               MR. CASTANARES:  I'll just look over the
18       witness's shoulder if you want to question him
19       about the pages I don't have.
20        Q.     (By Ms. Warren)  I'll show you both this
21   page together.  The question is very simple, which is
22   do you recognize this page and can you tell us what
23   it is?
24        A.     I am not certain, but I think -- I don't
25   know what this is.  I don't know if this is a Chase

96

1         A.     Yes.
2         Q.     The third one down?  And the reference in
3    the same row on the left-hand side is to CSFB Alpine
4    program fees?
5         A.     Yes.
6         Q.     Do you understand what this entry refers
7    to?
8         A.     I do.
9         Q.     What's that?
10        A.     This is the trustee paying to Alpine,
11   CSFB, the monthly fee that was provided for in the
12   fee letter for the OMI Trust transaction.
13        Q.     And is it correct that the program fees
14   for this facility were always paid by the trust from
15   the OMI note account?
16        A.     I believe that's correct.
17        Q.     Take a look at page 428309 of this --
18   actually, it looks like there is no such thing.
19        A.     428309?
20        Q.     I'm directing you to a --
21        A.     I have it.
22               MS. WARREN:  Do you have it?
23               MR. CASTANARES:  Yeah.  My copy ends at
24       07.
25               THE WITNESS:  I have two copies of it.

95

1    document or an Oakwood Homes document.  I just don't
2    know.
3         Q.     All right.  Fair enough.  I'm showing you
4    a document that's been marked Defendant's
5    Exhibit 216.  It's Bates numbered OHCLT -- well, let
6    me take that back.  The first page just bears the
7    Bates number 007100014 and the document ends at page
8    OHCLT-428078.
9                This appears to be a number of different
10   documents put together and we tried to put this
11   together in the order that seemed right because the
12   way we received them is they were produced -- there
13   was no -- there were no attachments.  It was just all
14   pages, but perhaps you can take a look and tell us if
15   you recognize any of the pages in this document and
16   then we'll go from there into whether they belong
17   together.
18        A.     Sure.  I recognize the first page.
19        Q.     What's that?
20        A.     That is the front cover of a prospectus
21   for the 2002-B ABS offering.
22        Q.     And can you flip through and tell us what
23   the ensuing pages are?
24        A.     I recognize the second page.  That is the
25   one ending in 057.

97

Q.   What's that?

A.   This is the computation of the amount of
money to be paid by CSFB to Oakwood Mortgage on the
closing date of this transaction.

Q.   And which transaction are you referring
to?

A.   2002-B.

Q.   That's a securitization?

A.   Correct.

Q.   Let's skip over the next two pages for the
time being, which are an E mail, and look at page
428052.

A.   I have it.

Q.   Do you recognize this page?

A.   Well, I don't have a recollection of this
particular page, but I can tell you what this
document is.

Q.   What is it?

A.   It's the closing memo for the 2002-B
transaction.

Q.   And I believe you testified earlier that
the fees were attached to the -- to the closing
memorandum?

A.   Generally or I always attach the
calculations to my copy of the closing memorandum.

document I would have attached to my copy of the
closing memo.  If we reorder them, it will make
more sense.

Q.   (By Ms. Warren)  Okay.  Thank you.  And
then looking at the remainder of the document on page
059, we have an account statement from the note
account; correct?

A.   That's what it appears to be.

Q.   And that appears to end at page 064?

MR. CASTANARES:  Counsel, I don't mean to
interrupt, but I may be incorrect but these
appear to relate to two entirely different
transactions.  Is this all one document?  For
example, page 059 appears to be the DMI Note
Trust 2001-A note account --

MS. WARREN:  Yes.

THE WITNESS:  -- whereas the prior part of
the document appeared to relate to a
securitization.

MS. WARREN:  Yes.  You're entirely
correct, but the way that these were produced to
us made it hard to figure out what went with
what, so --

MR. CASTANARES:  Okay.  I just want to --
I just want to make sure the witness isn't

yes.

Q.   I see.  Where does the closing memorandum
end in this collection of documents?

A.   I believe I'm correct in saying that pages
057 through -- some may be missing, so I'm going to
read you the numbers:  052, 053, 054, 055, 056 are
all part of the closing memo.  My copy has no 058 --
or excuse me -- has no 057.

MR. CASTANARES:  Nor does mine.

THE WITNESS:  058 appears to be -- is
labeled appendix.  I think in all probability
that was an attachment to the closing memo.

MS. WARREN:  Okay.  Thank you.

THE WITNESS:  057?

MS. WARREN:  I don't have that in my copy.

MR. CASTANARES:  Nor do I.

MR. WILLIAMSON:  It's the second page of
the --

THE WITNESS:  It's the second page.  It's
out of order.

MS. WARREN:  I see.  It's out of order.

THE WITNESS:  Okay.  Now we've found 057.

MS. WARREN:  Mystery solved.

THE WITNESS:  This is the calculation of
the money due to Oakwood from CSFB.  This is the

inadvertently misled.  I don't ascribe any
intention to do so, but I -- I just --

MS. WARREN:  This is why I'm asking him
what each page is so --

MR. CASTANARES:  Okay.  We understand it.
Thank you, counsel.

MS. WARREN:  -- that we can learn.

Q.   (By Ms. Warren)  Turning to page 428073,
do you recognize that page?

MR. CASTANARES:  I hate to keep
interrupting, but my copy doesn't have that page
in it unless it's out of order someplace, but
no.

THE WITNESS:  I don't recognize 073.

MS. WARREN:  Tony, it should be behind the
last page of the note account statement.

MR. CASTANARES:  Okay.  All right.  Excuse
me, I'm sorry.  It must be out of order also
somehow or another because it's ahead of 077,
but I do have 428073 now.  Thank you.  Sorry.

Q.   (By Ms. Warren)  Mr. Muir, take a look at
the next page, 428077.  Do you recognize that page?

A.   Again, I don't have a recollection of this
particular page, but I think I know what this
document is generically if that's helpful.

26/09/2006 MUIR, Douglas R. (vol.1)

1     Q.   Yes.  Please tell me.

2     A.   This appears to be the top worksheet in an

3  Excel file and in that Excel file was summarized the

4  cash transactions in Oakwood Homes' concentration

5  bank account at Wachovia or First Union, depending on

6  the time period we're speaking of.  So this is a

7  summary by day of the inflows and outflows of the

8  master top level if you will Oakwood bank account.

9     Q.   And you anticipated my next question.  I

10  was going to ask you to tell us what the

11  concentration account is.

12     A.   Yeah.  The concentration account is the

13  master account if you will into which ultimately

14  deposits into all other First Union accounts that

15  were Oakwood accounts would ultimately flow into that

16  concentration account.  That concentration account

17  also funded withdrawals against any number of Oakwood

18  bank accounts, but they were all funded out of this

19  one master concentration account.

20     Q.   What was the purpose of having an account

21  like that?

22     A.   Companies frequently set up bank accounts

23  for specific purposes.  For example, we had a bank

24  account out of which we wrote checks and accounts

25  payable.  It was helpful to have an accounts payable

102

26/09/2006 MUIR, Douglas R. (vol.1)

1  bank account separate from an account from which you

2  wrote payroll checks and it was helpful to have those

3  accounts separate from an account you used to make

4  disbursements on construction loans, but it's very

5  inefficient to maintain cash balances in all of those

6  different bank accounts.

7     So what one does is you set up those

8  subsidiary accounts if you will, accounts payable,

9  payroll, construction loan funding, you set them up

10  as what are called ZBAs, zero balance accounts.  It's

11  a mechanical technique that the banks make available

12  to us that all of Oakwood's cash is kept in the

13  concentration account.

14     At the end of every business day all of

15  the checks drawn or presented against any of those

16  other accounts which have no money in them, the

17  computers at the bank automatically make a transfer

18  out of the concentration account into each of those

19  other accounts to enable those fundings to take

20  place, but it enables different pieces of the company

21  to have their own bank accounts without maintaining

22  cash in anything but one single account.

23     Q.   And if money came into one of the

24  subaccounts, say the construction account, would it

25  in turn flow into the concentration account or would

103

1  it stay in the subaccount?

2     A.   Unless we had it set up to the contrary,

3  which we seldom did, at the end of the day any debit

4  position in the zero bank account -- zero balance

5  account would be funded from the concentration

6  account.  If the net transactions for the day were

7  positive, more deposits than withdrawals, the net

8  credit balance at the end of the day would be swept

9  and would be moved to the concentration account, so

10  yes.

11     Q.   And I take it that the concentration

12  account and the subaccounts were all Oakwood Homes

13  Corporation accounts; is that right?

14     A.   All of the ZBA accounts -- make sure I'm

15  saying this correctly.  Yes.  All of the ZBA accounts

16  that were linked to the concentration account would

17  have been Oakwood Homes' accounts or an Oakwood

18  subsidiary.

19     Q.   Well, that's what I was getting at.  Were

20  any of Oakwood's subsidiaries able to have their

21  accounts backed by the concentration account if you

22  will?

23     A.   Yes.

24     Q.   And which subsidiaries?

25     A.   Oakwood Acceptance, Homes by Oakwood,

104

26/09/2006 MUIR, Douglas R. (vol.1)

1  Oakwood Mobile Homes, a lot of them.

2     Q.   Please take a look at the next page,

3  OHCLT-428070.  Do you recognize this page?

4     A.   No.  I don't.

5     Q.   Do you recognize the handwriting on it?

6     A.   No.  I don't.

7     Q.   Please take a look at the last page of

8  this exhibit, OHCLT-428078.  Do you recognize this

9  page?

10     A.   No.  I don't recognize this.

11     Q.   Do you recognize the handwriting on the

12  page?

13     A.   It looks familiar, but no.  I don't

14  remember whose handwriting that is.

15     Q.   It's very neat.

16     A.   It is.

17     Q.   And looking back at page 428054 of

18  Exhibit 216, do you recognize the handwriting on that

19  page?

20     A.   I do not.

21     Q.   Please take a look back at the two pages

22  of Exhibit 216 that appear to be an E mail, and those

23  are pages OHCLT-428050 to 051.  Just take a minute

24  and read it over.  It's from Doug Muir apparently to

25  Susan Monkhaus dated Thursday, May 30th, 2002.  Do

105

1  you have any recollection what this E mail exchange
2  was all about?
3      A.      I don't have any recollection of this E
4  mail, but I can read it and I know what it's about.
5      Q.      What's it about?
6      A.      This is -- there's two messages here.  The
7  first one which is in about the middle of the page is
8  a memo from Susan Menkhaus at CSFB to a number of
9  people, including me, in which she is transmitting
10 the closing memo for the 02-B transaction that
11 according to this was scheduled to close May 31.
12     Q.      And that was a securitization; correct?
13     A.      It was.  And it appears that Susan was
14 seeking confirmation that the dollar amounts inserted
15 in the closing memo were correct just based on
16 reading what she has written here.
17             And then I'm replying and indicating to
18 Susan let's pay Alpine 144 million.  Whether that
19 represented a change from what she had in the
20 documents she sent, I don't know, but I'm discussing
21 with her the amount by which the warehouse
22 indebtedness would be reduced on the closing of this
23 transaction.
24     Q.      The loan purchase facility indebtedness?
25     A.      Correct.

1  First Boston.  So certainly by being asked to sign
2  this -- I didn't sign this version -- I would be
3  asked to say that on behalf of Oakwood I was okay
4  with these instructions.
5      Q.      And who else would have to be okay with
6  the instructions?
7      A.      Well, Alpine would have to be okay.
8      Q.      Would CSFB have to be okay?
9      A.      CSFB presumably as well.  It's my
10 understanding that Alpine is sponsored by CSFB.  So I
11 think the class A note agent which was CSFB, yes,
12 they would have to be satisfied as well.
13     Q.      Take a look at page 054, please.  And at
14 the top you'll see a reference to $234,165,842.01.
15 Do you see that?
16     A.      I do.
17     Q.      Is that the discounted purchase price for
18 the full securitization as it was purchased by the
19 underwriters?
20     A.      That number is the sum of the following
21 amounts.
22     Q.      And you're referring to which page?
23     A.      Page 057, which is the second page in your
24 exhibit.
25     Q.      Thank you.  Go ahead.

1      Q.      So was the 144 million a payment on the
2  principal of the class A notes?
3      A.      Yes.
4      Q.      And where was the 144 million going to
5  come from?
6      A.      From CSFB as part of a larger amount of
7  money.
8      Q.      The money was going to go from CSFB to
9  Alpine?
10     A.      Indirectly.
11     Q.      How?
12     A.      The proceeds of the securitization were
13 paid by CSFB to the REMIC trustee.  The REMIC trustee
14 then took those proceeds and disbursed them in
15 accordance with the instructions in the closing memo.
16     Q.      So why are you saying let's pay Alpine 144
17 million?  That suggests that it's you doing it, not
18 the trustee.
19     A.      Well, it's me suggesting that the trustee
20 be instructed to repay CSFB $144 million.
21     Q.      And who would be doing the instructing of
22 the trustee?
23     A.      Well, the trustee was instructed by the
24 closing memo, so let's see who signed that.  There
25 was a place for me to sign it.  It was prepared by

1      A.      Page 057 displays the bonds that were sold
2  on the closing date.  It displays their coupon rates
3  of interest and, importantly, their selling prices.
4  It also displays the underwriting discount, the fee
5  to which CSFB was entitled for selling the
6  securities.  And the sum -- it also finally includes
7  interest which had accrued on the securities through
8  -- or to but not including the closing date.
9              So the grand total of all of that if you
10 take the selling price of the bonds plus the accrued
11 interest minus the underwriting fee, the grand total
12 is two hundred and thirty-four million one hundred
13 sixty-five thousand and change.  That is the amount
14 of money that CSFB wired to Chase as the trustee of
15 the REMIC.
16     Q.      And I'm sorry.  Did you say that this page
17 was usually the type of page found in the closing
18 memorandum?
19     A.      It's the page that I usually attach to my
20 copy of the closing memorandum.
21     Q.      And so was this a page that Oakwood would
22 generate?
23     A.      This was a page that CSFB would generate.
24     Q.      Okay.  Take a look back at the account
25 statement that's in Defendant's Exhibit 216.  For

1  what it's worth, it starts at page 059.  And if you
2  take a look at page 063 of the account statement,
3  you'll see that at the bottom of that page there's a
4  credit entry for $144 million and a debit entry or
5  that's what it appears to be.  Do you see that?
6      A.    I do.
7      Q.    What's going on with those two entries?
8      A.    It calls for a little speculation, but not
9  much.  Trying to explain this this way.  If we go
10 back and look at 054 --
11     Q.    Got it.
12     A.    -- Chase received a wire on the closing
13 date from CSFB for 234 million and change.  In step
14 two, same page, Chase is being instructed to wire 144
15 million of that to an account at the Bank of New
16 York.  That's Alpine's bank account.  Now, what Chase
17 appears to be doing here is in character for a bank
18 trust department is they are saying that that
19 $144,000 is a payment to Oakwood --
20     Q.    Million?
21     A.    I'm sorry.  Thank you.  One hundred
22 forty-four million is a payment to OMI Note Trust,
23 and so they have reflected apparently over here on
24 OMI Note Trust's bank account, which is page 063, the
25 receipt of $144 million.  Then step two, they are

110

26/09/2006 MUIR, Douglas R. (vol.1)

1  then taking the $144,000,000 out of the OMI Note
2  Trust bank account and sending it to the class A note
3  holder, who is Alpine.
4           So while the closing memo contemplated a
5  single step on the part of Chase, Chase as all good
6  trustees do follow every step of the transaction and
7  reflect the money going in and out of OMI Note
8  Trust's bank account.  So there's really two
9  transactions, money going to pay OMI Note Trust and,
10 second, a distribution by OMI Note Trust to retire
11 its indebtedness to Alpine.
12          I think that's why this shows up like it
13 does.  In fact, if you look at the very bottom of
14 page 063 and look at the ABA and account numbers or
15 the ABA number, you can see that it lines up, 144
16 million out to Bank of New York, Alpine.
17          MS. WARREN:  All right.  Thank you.  Let's
18 take a little break.  I'm going to see if I need
19 to ask you about these others, which are
20 somewhat similar to the document we've just been
21 through, and then we'll come back on the record.
22          THE WITNESS:  Okay.
23          THE VIDEOGRAPHER:  We're off the record at
24 12:41.
25          (A luncheon recess was taken.)

111

1  THE VIDEOGRAPHER:  This is tape number
2  three.  We're on the record at 1:53.
3      Q.    (By Ms. Warren)  We had previously marked
4  an exhibit as Defendant's Exhibit 217.  Mr. Muir,
5  since you so helpfully explained the last one to us,
6  we're going to skip over this one and we're going to
7  show you Defendant's Exhibit 218, which is Bates
8  numbered OMCLT-428291 to 428313 and at the top it
9  says Credit Suisse First Boston interoffice
10 memorandum.  Please take a look at that.
11          MR. CASTANARES:  Thank you.
12     Q.    (By Ms. Warren)  In particular please look
13 at page Bates numbered 428305 of Exhibit 218.
14          MR. CASTANARES:  Counsel, I notice this
15 document seems to be missing some pages, too, or
16 at least on my copy.  Is that intentional?
17          MS. WARREN:  I'm only going to be asking
18 him about this one page.
19          MR. CASTANARES:  Okay.  I mean, I have no
20 problem with your marking anything you'd like to
21 mark, but I just -- if it does purport to be one
22 document, I just don't want the witness to be
23 inadvertently misled again.  So my copy of this
24 document skips from 294 to 305.  Is that also
25 the case with the original or at least with the

112

26/09/2006 MUIR, Douglas R. (vol.1)

1  copy that's been marked?  Does yours go from 294
2  to 305 or is there --
3          THE WITNESS:  It does.
4          MR. CASTANARES:  Oh, okay.  All right.  As
5  long as I have the same copy that's been marked,
6  have at it.
7          MS. WARREN:  Yeah.  I think this was how
8  it was produced, so we can --
9          MR. CASTANARES:  Okay.
10         MS. WARREN:  -- only give as well as we
11 got.  And actually, I'm going to ask you about
12 the three pages in a row, I'm correcting myself,
13 not the one page.
14         MR. CASTANARES:  Okay.
15     Q.    (By Ms. Warren)  So 305, 304 and 303.  Do
16 you recognize these three pages?
17     A.    Not necessarily these three specific
18 pages, but I know what these -- what they are, yes.
19     Q.    And what are they?
20     A.    These three pages constitute the monthly
21 remittance report for OMI Trust 01-A for looks like
22 the September 16th, '02 payment date.
23     Q.    And this is the kind of monthly remittance
24 report that you were testifying about earlier today;
25 right?

113

A.    This is the one.

Q.    And what was the purpose of this report?

A.    Well, the primary purpose was to summarize the receipts on the collateral in the month, and it's all based on the preceding calendar month, to summarize any disbursements made out of the note account and to summarize the amount of money that was to be paid on the payment date and to whom it was to be paid.

Q.    And were these disbursements made pursuant to the sales and servicing agreement that we looked at earlier?

A.    I believe that they were.

Q.    And to your recollection was that the case with all of the disbursements made from the note account? They were in accordance with the sales and servicing agreement?

A.    I'm not aware of any disbursements that were not in accordance with either the sale and servicing agreement or the transaction agreements broadly.

Q.    Mr. Muir, it's been alleged in this case that transfers of money from the OHI Note Trust to Credit Suisse are actually property of the debtor, property of Oakwood. Can you think of any reason why

114

remember the exact form or how it worked out, but they were paying me an equivalent annual rate of about $400,000. And they put in on a number of occasions bonus arrangements, tasks that they wanted me to accomplish and to the extent that I accomplished the task, I could earn incentive comp.

Q.    What were the various tasks that were subject to a potential bonus?

A.    Gosh, there were -- at least a couple were three different lists, but I'll tell you the ones I can remember off the top of my head, they were things like closing bank accounts that had been in the Oakwood Homes name

Negotiating the purchase price adjustments with Clayton Homes, the buyer of the business, was a very, very big element of it because there were many items that had to be negotiated in terms of how formulas operated, how accounting rules operated, how to interpret what the transaction documents said in the context of accounting principles.

There were a number of tasks related to claims matters, getting certain claims matters resolved, getting certain claims matters resolved in certain ways, realizing on certain assets of the trust that were not in cash the day the trustee took

116

that would be the case?

MR. CASTANARES:    I object to the form of the question.  I also have substantive objections to the question, but I want to preserve my form objection.

THE WITNESS:    I don't think I have a view on that.

Q.    (By Ms. Warren)  You can't think of a reason why that would be the case?

A.    I can't, but I'm not also the world's most creative thinker either.

Q.    Fair enough.  Mr. Muir, did there come a time when you were retained or employed by the liquidation trust in this case?

A.    Yes.

Q.    And when was that?

A.    On or about August 13th or so of '04.

Q.    How did that come about?

A.    We had sold the business to Berkshire Hathaway and the trustee that took over immediately after that occurred needed some people to handle various affairs for the trust.  And they made me an offer to stay around and help them do that.

Q.    What was the agreed compensation?

A.    Oh, gosh.  They were paying me -- I can't

115

over.  Those come to mind there.  I'm certain there were more.

Q.    Did you -- strike that.  Were you given any particular goals with respect to this litigation, the trust litigation against Credit Suisse?

A.    Only to cooperate with the trust and assist them in dealing with the matter.  There were no goals set for the amount of CSFB's claim, the amount of any dollar amounts at all.

Q.    Is there any financial incentive for you that's related to the total recovery of the trust?

A.    There is an incentive under the terms of a performance agreement that the bankruptcy court and the creditors' committee signed off that -- under which if the ultimate dollar distributions to unsecured creditors goes over a certain dollar amount -- excuse me -- then I'm entitled to incentive compensation, and I think that it's actually stair stepped.

Q.    Do you remember what the trigger numbers are?

A.    There's -- I'm pretty certain that there's a trigger at 250 million distribution to unsecured creditors.  If that is achieved, I think I'm entitled to $100,000.  There's another trigger I think at 275

117

1    million and I'm entitled to something if that
2    happens, but I don't know what it is.
3    Q.    More than a hundred thousand?
4    A.    You know, I don't remember.

18    Q.    Did anyone interview you to collect
19    information for this lawsuit?
20          MR. CASTANARES:  At any time?
21          MS. WARREN:  Yes.
22          THE WITNESS:  I had lots of discussions
23    with the trustee, the trustee's personnel, with
24    counsel of the trustee about our relationship
25    with CSFB, the kinds of things that CSFB did for

1          THE WITNESS:  In fact, would you repeat
2    the question or read it back?
3          MS. WARREN:  I think he did answer the
4    question.
5          MR. CASTANARES:  I think you did.  It was
6    at some point you were told there was going to
7    be a claims objection filed, is that right, and
8    I think you said yes?
9          THE WITNESS:  Yes
10    Q.    (By Ms. Warren)  Were you given a copy of
11    the claims objection in a draft form to review before
12    it was filed?
13    A.    No.
14    Q.    Did you ever have occasion to see the
15    final filed version of the claims objection?
16    A.    I was given a -- a version which I assume
17    was the filed version, but my understanding is when
18    it was given to me it had already been filed.
19    Q.    And do you remember approximately when you
20    were given the copy?
21    A.    My recollection is it wasn't that long
22    after it was filed, but I don't remember when it was
23    filed so I can't be more precise.
24    Q.    At some point in time did your retention
25    by the trust end?

1    us, the nature of the transactions, how
2    transactions were structured.  I don't know when
3    somebody told me it was for the purpose of
4    filing a claims objection, but I've discussed,
5    obviously, a lot of matters with the trustee and
6    its counsel related to the CSFB-Oakwood
7    relationship.
8    Q.    (By Ms. Warren)  So at some point you were
9    told that a claims objection would be made against
10    Credit Suisse?
11    A.    Yes.
12          MR. CASTANARES:  I'm going to caution the
13    witness not to reveal -- I don't know.  I have
14    no problem.  Let me ask you this.  Assuming that
15    that came from counsel and would otherwise be
16    privileged, will you stipulate that his
17    answering, my refraining from instructing him
18    not to answer it will not be opening the door to
19    any kind of broader waiver but just to simply
20    this question?
21          MS. WARREN:  I wouldn't argue a waiver
22    based on that question.  It's just a piece of
23    factual information.
24          MR. CASTANARES:  Okay, fine.  Go ahead and
25    answer.

1    A.    Yes.
2    Q.    When was that?
3    A.    I sent the trustee's representative an E
4    mail around the end of June of 2005 terminating the
5    contract as I recall
6    Q.    Why did you want to terminate the
7    contract?
8    A.    That I had gone to work for an employer
9    and the company's employment policies prohibit me
10    from having other employment outside my employment
11    for my existing employer.  So I wanted the record to
12    be clear that I was terminating that employment
13    relationship and that employment contract.
14    Q.    Who was your new employer?
15    A.    A company called Krispy Kreme Doughnuts,
16    Inc.
17    Q.    And you're still employed by Krispy Kreme?
18    A.    I am.
19    Q.    What's your role there?
20    A.    I'm the chief accountant.
21    Q.    Do you have any other employment now?
22    A.    I do not.
23    Q.    Mr. Muir, we had talked earlier about the
24    reasons why Oakwood Homes and its subsidiaries filed
25    for bankruptcy.  And I believe you told me, and

1    correct me if I'm wrong, that the three primary
2    factors in your mind were a downturn in the industry,
3    that the company expanded more rapidly than it should
4    have and the company was using insufficiently
5    stringent underwriting standards; is that correct?
6         A.    I think those were the three factors that
7    I cited as most readily coming to mind.  If I thought
8    about it some more I might come up with some others
9    equally important, but those are three that are
10   etched in my memory.
11        Q.    All right.  Well, we'll talk a little bit
12   about those and if anything else comes to mind, feel
13   free to let me know.  A downturn in the industry,
14   when did that begin?
15        A.    I think most people would date the
16   beginning of the industry decline as probably 1998,
17   1999, certainly by '99.
18        Q.    What was the nature of the downturn?
19        A.    By 1999 there was a -- began to be a
20   pronounced decline in sales.  And while retail sales
21   statistics, the number of homes sold at retail are
22   hard to come by, data about the number of homes sold
23   by manufacturers to retailers is pretty readily
24   available.  So we began to see a fairly pronounced
25   down tick in terms of shipments from manufacturers to

122

1    industry to us and to others.  And I think in
2    retrospect we probably built the business more
3    rapidly than we should have and more rapidly than our
4    ability to effectively manage it.
5         Q.    Did Credit Suisse have any role in the
6    decisions to build more sales centers and to expand
7    rapidly?
8         A.    Not to my knowledge.
9         Q.    The other factor that you mentioned was
10   insufficiently stringent underwriting standards.
11   Explain that to me.
12        A.    I think the record shows over the
13   long-term that a lot more loans that were
14   underwritten at that time that were -- consumer
15   loans that we did for people to buy houses, a more
16   than acceptable number of those failed to perform.
17   That certainly wasn't limited to Oakwood.
18             It was limited to a lot of lenders.  There
19   were certainly many poor lending practices that
20   developed in the industry during the '90s and we
21   adopted our fair share of some poor practices.
22        Q.    What were the poor practices?
23        A.    There were a number.  I testified about
24   DPAP.
25        Q.    Yes.

124

1    retailers that's usually indicative of slower retail
2    demand, you know, from retail consumers.  We saw
3    companies that loaned money to consumers to enable
4    them to buy homes, we saw lenders exiting the
5    business.  Just generally, you know, slower consumer
6    demand, less lending availability and reduced rates
7    of operation in factories generally.
8         Q.    How long did that downturn continue?  How
9    long did it last?
10        A.    It may still be going on.  When I was last
11   involved in the industry in I guess theoretically in
12   '04, we were still operating the business before we
13   sold it and it had not corrected then.
14        Q.    The next factor was that the company
15   expanded more rapidly than it should have.  Explain
16   that to me.
17        A.    I think in retrospect our ability to build
18   sales centers, put inventory on sales centers was
19   perhaps greater than our ability to successfully
20   operate sales centers profitably for the long-term.
21   I think we probably built too many sales centers.  I
22   think we probably built too many factories.
23             And the industry had a very sustained
24   run-up prior to 1998, 1999.  Credit was easily
25   available.  Money was easily available in the

123

1         A.    That was a very small one.  It was very
2    useful in enabling us to bring about some management
3    change, but in absolute terms it was not a big deal.
4    The worst decision that was made in the industry in
5    which we participated in my view was the decision
6    that was made by Greentree, who is the largest lender
7    in the industry, along about 1994 to reduce the
8    minimum downpayment level that customers were
9    generally required to make in order to purchase a
10   home.  Prior to 1994 this had been always at least a
11   minimum ten percent cash down business.
12             In what I think was a move to gain market
13   share, Greentree, the largest player, virtually
14   overnight changed it to a five percent down business
15   and that ultimately proved to be a very poor decision
16   in which we participated.
17        Q.    So Oakwood's management followed suit as
18   to your lending practices after Greentree instituted
19   this change?
20        A.    We did.
21        Q.    And I think I can guess what the effect
22   was, but tell me what the effect of that change was.
23        A.    Well, I think the -- I haven't studied a
24   lot of the statistics, but there are plenty of them
25   out there that show that relatively lower downpayment

125

1    loans tend to perform relatively poorly compared to
2    loans where customers had higher cash downpayments.
3    Q.    Did Credit Suisse have any role with
4    respect to the change to the lower downpayment?
5    A.    Not to my knowledge.
6    (Exhibit Number 219 was marked for
7    identification.)
8    Q.    (By Ms. Warren)  I've asked the court
9    reporter to mark as Exhibit 219 a document entitled
10    Oakwood Homes Corporation minutes of special meeting
11    of the board of directors held Wednesday, June 30th,
12    1999.  It's Bates numbered KCLH-0938 to 0943.  No
13    page is missing that I can see.  Do you recognize
14    this document?
15    A.    I don't.
16    Q.    Does it appear to you to be board minutes
17    from Oakwood Homes Corporation?
18    A.    Yes.
19    Q.    I want to refer you to the bottom
20    paragraph of the first page of Exhibit 219 and the
21    paragraph that follows, and just let me know if you
22    -- if you generally agree with what's in those
23    paragraphs?
24    A.    This is the paragraph beginning Mr. St.
25    George began the meeting?

126

1    of pocket to pay for it.  The deal in the MH business
2    at the time was that the company would finance the
3    points for you.
4    So if you -- if you get -- customer gets a
5    lower rate of interest but gets a higher up front
6    loan balance.  That's the distinction.  That was
7    going on.  It was a poor lending practice in my
8    judgment.  So yeah, that was going on.  I think what
9    Nick said here is consistent with my recollection of
10    what life was like at the time.
11    (Exhibit Number 220 was marked for
12    identification.)
13    Q.    (By Ms. Warren)  I'm showing you a
14    document that's entitled Oakwood Homes Corporation
15    minutes of special meeting of the board of directors
16    held Monday, August 2, 1999.  It's Bates number
17    KCLH-956 to 959.  Mr. Muir, does this appear to you
18    to be minutes of Oakwood Homes Corporation's board
19    meeting?
20    A.    Yes.  It does.
21    Q.    Would you take a look, please, at the
22    second page of the document, specifically the third
23    paragraph down, that begins Mr. St. George then
24    began?  Would you read that over and let me know when
25    you're finished?

128

---

1    Q.    Yes.
2    A.    And running to the first paragraph on the
3    next page?
4    Q.    Yes.  Ending at key markets.
5    A.    This all sounds pretty familiar.
6    Q.    Do those paragraphs strike you as a
7    generally accurate account of what was going on at
8    the time in the industry and with the company?
9    A.    More so the first paragraph than the
10    second one.  I mean, the second one is Edwards
11    talking about what he's going to do about it.  I
12    mean, he does talk about what competitors are doing,
13    discounting homes, rate buy-downs.  I remember that.
14    Q.    What's a rate buy-down?
15    A.    A rate buy-down is a -- is like discount
16    points in the mortgage world in which the customer is
17    offered a rate of interest on a loan that is less
18    than the currently prevailing fixed rate in exchange
19    for an up front payment, like a mortgage discount
20    point.
21    The difference between what was going on
22    in the industry and the conventional mortgage world
23    at the time is if you wanted to buy down a rate at
24    mortgage world, you showed up with the cash to pay
25    the discount point at closing.  You had to come out

127

1    A.    I've read it.
2    Q.    Does that paragraph generally comport with
3    your recollection of what was going on in the
4    industry at the time?
5    A.    I remember all these events.  I mean, at
6    the time, yeah.  The answer is yes.
7    Q.    Would you explain to me the reference to
8    widening spreads in the securitization markets at the
9    bottom of the paragraph?
10    A.    Yes.  That is referring to the -- an
11    expansion in the rate of interest that must be paid
12    on an asset backed security in order to induce a
13    customer to buy it in that rate that the customer
14    demands, the buyer of the bond demands over
15    prevailing risk-free rates in the capital markets.
16    Frequently in talking about interest rates
17    on asset backed securities or corporates for that
18    matter, rather than speak in absolute -- terms of
19    absolute rates which change from day to day, you
20    speak of them in terms of spread to treasuries.
21    You can get a ten-year bond sold at
22    treasuries plus 200 or you can get a LIBOR floater
23    done at L plus 39, but it's referring to the spread
24    between the necessary rate to attract a buyer and the
25    rate of an underlying risk-free security of

129

1   comparable duration.  So what Nick is saying is
2   spreads are widening out.  Investors are demanding a
3   higher spread over a risk-free rate in order to
4   purchase the securities.
5        Q.    And was this particularly relevant to the
6   2004 and 2009 bonds?
7        A.    This is not talking about corporates.
8   This is talking about the asset backed securities
9   that we were buying -- or we were selling.
10       Q.    And what impact did that have on Oakwood?
11       A.    It adversely -- all things being equal, it
12   adversely affects profitability because the cost of
13   permanent financing for your loans is -- increases
14   when credit spreads widen.  And unless you're able to
15   raise the rates you're charging to customers to
16   correspond for that, you have a profit margin
17   squeeze.
18       Q.    Turning to the first page of Exhibit 220,
19   there's a reference in the last paragraph to
20   management's pursuit of a management led buy-out of
21   the corporation.  Do you see that?
22       A.    Yes.  I see that.
23       Q.    Was that something that you were involved
24   in?
25       A.    To some extent, yes.

130

---

1        Q.    Why was consideration being given to a
2   management led buy-out of the corporation?
3                 MR. CASTANARES:  Counsel, could you
4             specify by whom or I'll just object to the form
5             of the question.
6                 MS. WARREN:  You can go ahead and answer.
7                 THE WITNESS:  I'm sorry.  What was the
8             question again, please?
9        Q.    (By Ms. Warren)  The question was what is
10   your understanding of why a management led buy-out of
11   the corporation was being considered?
12       A.    My understanding at the time was that Nick
13   St. George, who was then the CEO, observing that the
14   stock price had been under considerable pressure,
15   that it was way, way off its highs that were reached
16   early in '98 and having watched, you know, LBO-type
17   transactions happen in other industries, wondered if
18   there was an opportunity that would be in the
19   interests of the shareholders for management to try
20   and buy the company and take it private.
21       Q.    To your knowledge were any outside
22   financial advisors consulted about this possibility
23   of a management led buy-out?
24       A.    Yes.
25       Q.    And who was that?

131

---

1        A.    To the best of my recollection a firm by
2   the name of Soles Brower Smith was involved in that
3   potential transaction.  I guess Lanty Smith, who was
4   the Smith name in that firm, happened to be a
5   director of Oakwood.  So as I recall, Soles Brower
6   was involved in talking to management, mainly to
7   Nick, but also to me and to others about, you know,
8   whether a deal could be put together and that would
9   make sense.
10       Q.    Did Oakwood Homes use Soles Brower to
11   advise on any other potential transactions or
12   financings?
13       A.    Let me clarify one point.  I'm not sure --
14   and again, my recollection of this is a little hazy,
15   but I'm not sure Soles Brower Smith was working for
16   the company when we were talking about a management
17   buy-out.  I think they were talking to management.
18   So I'm not sure Soles -- you see my point?
19                 At some point I believe -- and I'm certain
20   that it's prior to the time when we filed for
21   bankruptcy -- we had some additional discussions with
22   Soles Brower Smith about the state of the industry,
23   the state of the company, what we might do about it.
24   I don't believe we ever signed an engagement letter
25   with respect to, you know, rendering financial

132

---

1   advice; but they -- Soles Brower was involved
2   profiling as I remember in helping us put together
3   some financial projections.  I wasn't directly
4   involved in that.  That was more Bob Smith's thing.
5                 They may have been involved in -- I
6   believe they were if my memory serves, in making some
7   informal inquiries around the industry to see if
8   there were strategic buyers that might be interested
9   in buying the company.  Again, whether there was a
10   formal engagement letter signed on that, I don't
11   know, but I think there must have been because I know
12   they were paid money for services at least in respect
13   to putting together some financial projections.
14       Q.    Who was the point person dealing with
15   Soles Brower in the 2002 time frame?
16       A.    I think Suzanne Wood.  She was running the
17   accounting operation at that time, was involved with
18   them.  Bob Smith, probably Myles.  I really had very
19   little to do with it.  I was trying to manage the
20   liquidity side of the game and keep the place
21   organized and running, but I think each of those
22   three probably were involved with Soles Brower and
23   the work that they did.
24             (Exhibit Number 221 was marked for
25             identification.)

133

1    Q.    (By Ms. Warren)  Changing topics a bit,

2    I'm showing you a document that the court reporter

3    has marked Defendant's Exhibit 221.  It's an E mail

4    attaching what looks like a presentation.  The E mail

5    is from Susan Monkhaus to you dated Wednesday, March

6    28th, 2001.  Would you just take a look through this

7    document briefly and let me know when you're

8    finished?

9    A.    Okay.  I've reviewed it.

10   Q.    Does this document refer to the servicing

11   advance facility that eventually Oakwood implemented?

12   A.    It certainly refers to a concept for a

13   facility.  This doesn't appear to be the exact form

14   in which it was ultimately implemented, but it's the

15   same basic transaction.

16   Q.    Okay.  And as I think you testified

17   earlier about a version of this structure or

18   transaction was implemented by Oakwood?

19   A.    That's correct.

20   Q.    And you thought this was a helpful idea

21   from Credit Suisse?

22   A.    I did.

23   Q.    What -- in the course of particularly 1999

24   to 2001 what, if any, other ideas that Credit Suisse

25   proposed to the company did you find helpful?

134

1    A.    That would require an inventory of the

2    ideas.  Could you ask the reporter to read back the

3    question?  I just want to make sure I'm answering the

4    question that you asked.

5          MS. WARREN:  Absolutely.

6          (The record was read by the reporter.)

7    Q.    (By Ms. Warren)  And let me just amend

8    that to say I meant to say through the petition date.

9    A.    There were -- one that comes to mind is

10   Fiachra or his team came up with a structural change

11   to the ABS transactions that we had not previously

12   employed that was beneficial to us economically.

13         And it was a very creative idea in terms

14   of playing off an arbitrage between the rating

15   agencies and the fixed income markets, but the basic

16   concept was taking a chunk of the excess spread in

17   the transaction, the difference between the rate of

18   interest on the loans and the rate of interest

19   accruing on the bonds that is of limited value from a

20   rating agency point of view, and taking something

21   that they didn't think was worth very much and

22   creating a security out of it and creating an IO that

23   was -- that investors were willing to pay a lot of

24   cash for in the bond market.  What you gave up with

25   the agencies was not nearly so valuable as the cash

135

you got from the purchaser of the IO, and it was a

2    very creative idea and we employed it in a number of

3    deals.  That's one.

4          I'm sure if I -- if you have an inventory

5    of neat things we did during that time frame, I could

6    give you some more, but there were some very

7    innovative ideas that came out of First Boston.

8    Q.    Okay.  Were there any ideas floated to you

9    by Credit Suisse that management rejected?

10   A.    I'm sure there were.  There were -- there

11   had to have been.

12   Q.    And when you say there had to have been,

13   why do you say that?

14   A.    Well, I can remember one and there were no

15   doubt more because we'd hear from CSFB.  I think they

16   were thinking about us, thinking about our situation,

17   thinking about our industry, thinking about how they

18   could be helpful, thinking how they could make some

19   fees and they pitched ideas.

20         I remember some of them being really bad

21   ideas or at least one, but there may have been some

22   -- you know, some good ones.  Certainly I've already

23   testified there were some good ideas as well.

24   Q.    Shall we take a short break?

25   A.    Sure.

136

1          THE VIDEOGRAPHER:  We're off the record at

2    2:36.

3          (A recess was taken.)

4          THE VIDEOGRAPHER:  We are on the record at

5    2:47.

6    Q.    (By Ms. Warren)  Mr. Muir, are you aware

7    of something called Project Coconut?

8    A.    Gee, I remember the name.

9    Q.    And I will tell you there's a document in

10   the files called Project Coconut and it has the Soles

11   Brower firm name on it.

12   A.    Okay.  That -- that might have been the

13   management buy-out secret code name.  I remember we

14   had that code name for something, but I can't connect

15   the dots.  I'm sorry.

16         MS. WARREN:  Well, let me try and dig that

17   out for you.

18         (Discussion off the record and Exhibit

19   Number 222 was marked for identification.)

20   Q.    (By Ms. Warren)  I'm showing you a

21   document that the court reporter has marked

22   Defendant's Exhibit 222.  It's entitled Project

23   Coconut briefing book dated September 18th, 2001 with

24   the Soles Brower name on it and it's Bates numbered

25   RCDA-010432 to 01432.42.

137

And if you would just page through it
briefly. I'm not going to ask you any details about
the document, but I just want to see if it refreshes
your recollection about what the project was and what
Soles Brower's role was?

A.    Looks like something -- it had something
to do with some plan to do something with Albany,
Oregon and the Buckeye, Arizona plant. There may be
some sales centers out there. This is vaguely
familiar, but I'm honestly drawing a blank.

MS. WARREN: That's fine. We won't spend
any more time on it then.

(Exhibit Number 223 was marked for
identification.)

Q.    (By Ms. Warren) Mr. Muir, we had spoken
earlier about the loan assumption program and I'm
showing you a document that I think is related to
that. It's now been marked as Defendant's
Exhibit 223.

It's an E-mail chain starting with one
from Jeff Hinshaw to Suzanne Wood dated Monday,
March 25th, 2002, and the document is Bates numbered
32599 to 32575 OHC. I should correct that. I think
we want the Bates number -- I think we want the Bates
range is OHCLT-07303.

---

MR. CASTANARES. And once again, counsel,
I only inquire here to make sure we've got the
same copies, et cetera. The next page I have is
07284.

MS. WARREN: Yes, yeah. It's 07303,
07284, 07285 and 07286. So it could be two
documents.

Q.    (By Ms. Warren) And Mr. Muir, you are --
your name appears in the to chain further down on the
first and second pages. So I'm just wondering
whether you're familiar with the correspondence in
this document or whether it rings a bell?

A.    This is vaguely familiar, but I can't say
I have a clear recollection of it.

Q.    I was going to ask if this was around the
time when the company was beginning to learn that the
increased loan assumption program wasn't working out?

A.    I would infer from this that we were
clearly revisiting the effectiveness of the loan
assumption program. And I draw that conclusion
because he's comparing the expenses incurred on homes
that went through the LAP program versus expenses
that went through on repos. One of the drivers
behind the decision to do LAP to begin with was that
the expenses per unit would be materially lower than

---

going through repos. This appears to me to be an
attempt to try and see if that's true.

MR. CASTANARES: Are we through with this
one, counsel?

MS. WARREN: Yes.

MR. CASTANARES: Thank you.

(Exhibit Number 224 was marked for
identification.)

Q.    (By Ms. Warren) I'm showing you a
document marked as Defendant's Exhibit 224 entitled
Oakwood Homes Corporation minutes of the meeting of
the board of directors held Monday, July 29, 2002.
And I note that the document states Douglas R. Muir,
secretary of the corporation, served as secretary of
the meeting. Do you see that?

A.    I do.

Q.    Do you recognize this document?

A.    No, but I'll -- that's my signature on the
second page of it, so I'm probably its author.

Q.    All right. Take a look at the bottom
paragraph on the first page. And by the way, this
document is Bates numbered MWAT-006776 to 6777. In
the last paragraph Mr. Standish is reporting -- the
last paragraph on the first page Mr. Standish is
reporting among other things that he had undertaken

---

discussions with Credit Suisse First Boston about
retaining that firm as a financial advisor as well as
considered other potential financial advisors. Do
you see that in the document?

A.    I do.

Q.    What other financial advisors were being
considered around this time?

A.    There were other names that were in the
pot. Gosh, I've got to think back. Houlihan Lokey
was one I recall. Gosh, been a long time. There
were a handful of others, you know, on a list to be
talked about and considered. Houlihan Lokey I know
comes to mind. I can't remember who the others were.

Q.    And how -- what was the process for
considering these other firms as well as for Credit
Suisse?

A.    In terms of how they came to be on the
list to be evaluated or --

Q.    How were they evaluated? How did you make
the decision?

A.    Myles and I discussed financial advisors
in this time frame and kind of debated pros and cons.
One thing that I remember particularly was that
Oakwood had a fairly complex business model and I
think Myles and I agreed that if we hired a financial

1   advisor, it was going to need to be somebody that was
2   capable of understanding and coordinating the
3   constituencies associated with three rather different
4   businesses. And we had trade credit, traditional
5   commercial industrial-type business in the
6   manufacturing side of the house.
7       We had a multi-unit retail operation that
8   had its own set of issues. We had a seven or eight
9   hundred million dollar a year production finance
10  company with a $5 billion servicing portfolio and a
11  whole set of constituents associated with that
12  business, ABS security holders, investment bankers,
13  rating agencies, then three businesses that operated
14  together but that had very different liquidity needs
15  and a fairly long cycle between buying 2 x 4s up here
16  at the front end of the process and securitizing a
17  loan on the back end.
18      And it was going to take a fairly
19  sophisticated and talented firm to be able to
20  understand all those constituencies that were
21  involved, B2 guarantee holders, corporate debt
22  holders, liquidity providers. And that was a big
23  consideration at the time when we talked about the
24  relative merits of the people that were on the list.
25      Q.    Did you have pitches from any of those

142

1   other potential financial advisors?
2       A.    I don't remember if we did or not. I
3   don't recall any, but that's not to say that we
4   didn't get a pitch book, have a sit down. I just --
5   I can't say that there weren't any, but I don't
6   remember any.
7       Q.    And why ultimately did you and Mr.
8   Standish decide on Credit Suisse to be the financial
9   advisor?
10      A.    I think there were probably others
11  involved in the decision, but I was in favor of CSFB
12  and I think Myles shared this view for a couple of
13  reasons, maybe three. First, they had a very, very
14  long history with the company going back to 1994, so
15  we had had a chance to see a lot of them. We knew
16  the caliber of the people they typically brought to
17  the table.
18      We liked them. We trusted them. So that
19  was important to us. Number two, they had a good
20  reputation from what we had been able to glean in
21  some tough, complex bankruptcy or financial
22  restructuring situations. So it had a good
23  reputation. Third, we thought they had the skill
24  sets to bring together and understand the different
25  facets of the business because if you're going to

143

1   bankrupt Oakwood and run it through that process, if
2   that were the decision, what you were going to do
3   about warehousing credit, what you were going to do
4   about your ABS bondholders, guarantees in place for
5   those, were you going to be able to successfully
6   securitize and finance your business in bankruptcy,
7   CSFB was in a unique position to advise us on that
8   because they were just -- that's what they did for
9   us.
10      They had done that to the virtual
11  exclusion of all others, you know, for eight years.
12  So we thought, you know, they had the horsepower to
13  do the job and were uniquely suited to do it. At
14  least that was my view.
15      Q.    And was the hiring of Credit Suisse to be
16  the financial advisor approved by the board?
17      A.    I don't specifically remember it. The
18  minutes would show, but we would never have signed
19  onto a letter like that without getting the blessing
20  of the board formally or informally.
21      Q.    And when you say you wouldn't have signed
22  onto a letter like that, what do you mean?
23      A.    The August contract.
24      Q.    Right. But what do you mean a letter like
25  that?

144

1       A.    It was a significant contract for very
2   important services in a very difficult time of the
3   business. And we would not have engaged someone to
4   render services that were that important without
5   getting at least the implicit approval of the board.
6       Q.    Who is Andrew Davidson?
7       A.    Andy is I think the owner or the principal
8   owner of a company called Andrew Davidson and Co. He
9   is a former Merrill Lynch research person. I think
10  he's a Ph.D. in economics and in the Andrew Davidson
11  business runs quantitative analysis typically on
12  asset backed securities.
13      Q.    Was the -- was Andrew Davidson's company
14  retained by Oakwood?
15      A.    Yes.
16      Q.    How did that come about?
17      A.    We -- my recollection is in consultation
18  with CSFB we concluded that because the potential
19  claims in the bankruptcy by the holders of corporate
20  guarantees on certain B2 securities, because those
21  claims were apt to be very large but were contingent
22  I think the word the lawyers use is liquidated and,
23  therefore, you know, determining exactly what the
24  size of their claims were going to be in any
25  bankruptcy was going to be important and potentially

145

1  a contested matter.  I think we concluded that while
2  the company had the modeling technology to forecast
3  the amount and timing of payments that might become
4  due under the B2 guarantees, that perhaps the
5  debtor's judgment might be called into question in
6  the bankruptcy.
7        So we concluded that somebody independent
8  of the company needed to take a stab at putting a
9  value on the B2 guarantee claims so that we would
10  know how big a player the holder of those claims was
11  going to be in the case if we decided to file it.
12    Q.  How was the choice made to use Andrew
13  Davidson's company as opposed to another company?
14    A.  My recollection is they were the only name
15  on the table.  And we got the name from CSFB and they
16  were recommended as being somebody who was good at
17  this kind of thing and sufficiently independent, you
18  know, from management and from CSFB for that matter.
19    Q.  Did you ask Credit Suisse for
20  recommendations for this -- to fill this role?
21    A.  We did, because I remember we discussed
22  whether it was something CSFB could do and I think we
23  all just concluded that CSFB was too close, that we
24  needed somebody without a dog in the hunt so to speak
25  to render an expert's opinion we could hold out as a

146

1  disinterested expert.
2    Q.  Who at Oakwood worked most directly with
3  Andrew Davidson?
4    A.  I did.
5    Q.  And did he report to you on his work?
6    A.  We had -- let's talk about what report
7  means.  I had loads of conversations with Andy, with
8  people that worked for Andy.  We provided them reams
9  of data, answered zillions of questions about it.
10  And so to the extent that constitutes reporting, I
11  heard a lot of reports generally in the forms of
12  questions and why this, why that.
13        I don't know if Andrew Davidson ever
14  issued a final written report.  I think there were
15  drafts of numbers that were passed around that maybe
16  that I looked at.  My recollection is that if a draft
17  report existed, it was intentionally not given to me.
18    Q.  Why would it be intentionally not given to
19  you?
20    A.  I may need to talk to my counsel about
21  whether answering that question violates privilege if
22  that's okay.
23      MS. WARREN:  That's fine.
24      MR. CASTANARES:  Do you want us to recess
25  and do that or do you want to go on to something

147

1  else and we'll talk about it at a break?
2      MS. WARREN:  We can go on.  Will you just
3  mark that question?
4      MR. CASTANARES:  Yes.  Would you just read
5  the question back to me again, please, so I'll
6  have it in my --
7      THE COURT REPORTER:  Sure.
8      (The record was read by the reporter.)
9      MR. CASTANARES:  It could be we could just
10  take a break in the corner here for a second and
11  answer the question.  I suspect it's probably he
12  got that information from counsel, but if that's
13  what it is, we'll see if we can get around it
14  somehow.
15      MS. WARREN:  Well, I mean, if you want to
16  break --
17      MR. CASTANARES:  No.  I don't need a break
18  otherwise unless the witness does.
19      MS. WARREN:  All right.  Let's just handle
20  it at the next break.
21      MR. CASTANARES:  Okay.  That's fine.
22      MS. WARREN:  And the court reporter has
23  marked where the question is so we can find it
24  if we need to.
25      (Exhibit Number 225 was marked for

148

1  identification.)
2    Q.  (By Ms. Warren)  I'm showing you a
3  document that the court reporter has marked
4  Defendant's Exhibit 225.
5      MR. CASTANARES:  Thanks.
6    Q.  (By Ms. Warren)  It's a proof of claim
7  filed by Credit Suisse First Boston in the bankruptcy
8  case of Oakwood Homes Corporation.  And attached as
9  exhibit A to this proof of claim is the engagement
10  letter between Oakwood Homes and Credit Suisse for
11  financial advisory services.  And I've just noticed
12  there is a blank page in between pages three and four
13  of the letter although it looks otherwise complete.
14      MR. CASTANARES:  Should we just tear the
15  blank page out?  My blank page is in a different
16  place, but it's a blank page, too.  Why don't we
17  just tear the blank page out of it?  Why don't
18  we do that?
19      MS. WARREN:  That's fine.
20      MR. CASTANARES:  So would you do that with
21  yours, Mr. Muir?  This has also been previously
22  marked in different numbers in two other
23  depositions, so we can --
24      MS. WARREN:  So we all know what the full
25  letter looks like.

149

1    MR. CASTANARES:  We all know what it is.
2    Q.    (By Ms. Warren)  Mr. Muir, did you
3  negotiate -- were you the primary negotiator from the
4  Oakwood side on this letter?
5    A.    I don't think I was the prime negotiator.
6  I saw it in draft.  I commented on drafts, but I
7  think Myles was in on it, Bob as well, Suzanne maybe;
8  but I think probably Bob and Myles, particularly
9  Myles.
10    Q.    And you had counsel assisting you in
11  negotiating this agreement?
12    A.    They certainly looked at the drafts.
13    Q.    And who was your counsel at that point?
14    A.    On this, Rayburn Cooper in Durham.
15    Q.    Do you remember any particular negotiation
16  disputes over any parts of this letter?  Were there a
17  lot of disputes?  Were there a lot of back and
18  forths?
19    A.    I don't remember any particular disputes.
20  There was some back and forth.  My recollection, and
21  it was more about trying to define what terms meant
22  than any real back and forth business negotiation as
23  to magnitude of fees or something like that.  It's
24  not a model of clarity.
25    Q.    What was your reaction to the fee

1  to get, you know, into bankruptcy successfully with
2  the minimum amount of pain and suffering, minimum
3  amount of damage to the business, maximum ability to
4  operate the business once we filed.
5    We needed somebody who knew the ropes,
6  knew the water.  The subsets of that involved we
7  needed to have DIP financing squared away so that
8  financing was available going in.  We needed to have
9  warehousing financing facility for the finance
10  company going in or that business was going to shut
11  down in short order.
12    And three, we needed a reasonable plan to
13  run once we got into bankruptcy.  Although the
14  company largely could figure out what it wanted to
15  accomplish in terms of a restructuring from a
16  business point of view, but we wanted -- we certainly
17  needed help in putting that to paper to communicate
18  with the constituencies.
19    And fourth, we knew by the time we signed
20  the letter that we had one entity that was in a
21  blocking position with respect to the case, had a big
22  enough position in the claims that one could not
23  confirm a plan around them.  And further, given who
24  they were, you know, we wanted to go into bankruptcy
25  with a plan that they were supportive of.  And so I

1  structure proposed by Credit Suisse?
2    A.    I thought it was pretty rich.
3    Q.    Did you negotiate to try to make it less
4  rich?
5    A.    I don't remember.
6    Q.    Did you talk to any other financial --
7  potential financial advisors about whether they could
8  do better in terms of the cost than Credit Suisse?
9    A.    I don't remember having any -- any
10  competitive bids or, again, I think I previously
11  testified I don't remember seeing any pitch books.
12  So while those conversations might have taken place,
13  I don't think I was involved in them.
14    Q.    So when you say you think it was pretty
15  rich, what are you comparing it to?
16    A.    I don't have an objective benchmark, but
17  in -- at the time it seemed like a lot of money for
18  what they were assigned to do.
19    Q.    What was your understanding of what --
20  strike that.  What was your understanding of what
21  Oakwood was assigning Credit Suisse to do in entering
22  into this agreement?
23    A.    I guess my view of the assignment would be
24  probably three or four principal elements.  Number
25  one, we needed an effective advisor to advise us how

1  think those kind of four elements are what I was
2  looking for from CSFB in this project.
3    Q.    Did you put those elements into the
4  engagement letter?
5    A.    Yeah.  I haven't read the letter in close
6  to four years.  I'd be glad to go back and read it
7  and try and figure it out, but I don't know the
8  answer to that without reviewing the letter.
9    Q.    What you said reminded me of something.
10  Did you attend any meetings with Berkshire Hathaway
11  in 2002?
12    A.    Yes.
13    Q.    Which one or    did you attend one or two?
14    A.    Two.
15    Q.    Okay.  Tell me about the first one.
16    A.    The first one took place I believe in July
17  and we were invited to Omaha to meet with Mark
18  Millard and Warren Buffett.  And we went up there and
19  had a very positive, frank and interesting discussion
20  with Warren Buffett at their offices, at Berkshire
21  Hathaway's offices in Omaha.  So we had some company
22  people and we had some CSF people and we had Mark
23  Millard and Warren Buffett.
24    Q.    And who -- did someone make a presentation
25  to Mr. Buffett and Mr. Millard about Oakwood?

1    A.    As I recall we did, the company did.

2    Q.    You and Mr. Standish?

3    A.    And Mr. Smith was on that trip as well.

4    Q.    And what did you find positive and

5    encouraging about the meeting?

6    A.    I was encouraged that somebody that smart

7    was interested in the company. I figure only good

8    things can come out of that. They were very -- they

9    were very encouraging. They gave us some advice.

10   They were appreciative of our coming.

11        We went there to deliver them bad news. I

12   think they were glad that we had come to do that and

13   were straightforward with them and candid with them

14   about what the news was.

15   Q.    What was the bad news?

16   A.    The bad news was that we had decided to

17   discontinue the LAP program.

18   Q.    And how did they react to that?

19   A.    They understood it. I think they quickly

20   understood how it could affect them in terms of their

21   position in the Lotus bonds, what we've called the

22   Lotus bonds and the Lotus transaction. And that part

23   of the meeting probably didn't last more than about

24   ten minutes, but the comment from Warren Buffett was

25   something -- I mean, he said, you know, you've done

1    the right thing. We always want to know bad news at

2    the earliest possible date and good news you can put

3    in a slow boat is what he told us. And then we spent

4    another hour talking about other things having to do

5    with the business, mainly taking questions from

6    Buffett.

7    Q.    What advice did Mr. Buffett and Mr.

8    Millard give you?

9    A.    I don't think Mark had much to say. I

10   don't remember -- I mean, Warren Buffett never looked

11   at us and said here's what you guys ought to do.

12        He's keenly bright, asked the most

13   intelligent questions I've ever seen of anyone, could

14   distill instantly, asked all the right questions

15   extremely efficiently, got the answers and, again,

16   said you did the right thing, glad you came and told

17   me. I think you're doing the right things to

18   straighten your business out, good luck to you. And

19   that transpired over about give or take 90 minutes.

20   Q.    What follow-up was there after that

21   meeting?

22   A.    There may have been -- there may have been

23   some E mail correspondence maybe between me and Mark

24   Millard because Mark was obviously interested on a

25   more granular level at what the LAP program

1    discontinuance might mean to the Lotus transaction

2    because he was the fixed income department at

3    Berkshire. I don't remember.

4        There may have been but I don't remember

5    any - there was no new periodic reporting to them of

6    anything. I think we left them with an understanding

7    that if going forward there was something that we

8    were contemplating that might have a material effect

9    on the transaction, you know, we'd try and give them

10   a heads up just as we had on this occasion.

11        I remember learning from somewhere that

12   they really didn't want a tremendous amount of

13   ex parte communication because it could obviously

14   impede his ability to trade if he was so inclined to

15   do so.

16   Q.    How did the second meeting come about?

17   A.    The second meeting like the first was set

18   up with a discussion, us to CSFB, CSFB to Berkshire.

19   And we went out on the second meeting in October of

20   2002.

21        MS. WARREN:  I'm sorry. Would you read

22   that back so far?  I'm not sure if I heard you

23   right.

24        (The record was read by the reporter.)

25        MS. WARREN:  Sorry. Go ahead.

1        THE WITNESS:  Went out in October of 2002

2    to tell Berkshire that we had concluded that it

3    was in the company's best interests to file for

4    bankruptcy and to describe what we wanted to

5    accomplish by the bankruptcy and to solicit his

6    support for the plan such that when we filed, we

7    could say we had done so with the largest

8    creditor. That was the purpose of the meeting.

9    Q.    (By Ms. Warren)  How did that meeting go?

10   What was their reaction?

11   A.    Gosh, it was a broad ranging discussion.

12   There were some elements of the plan contemplating

13   that were nonstarters for Buffett.

14   There were other parts of it he liked. There were

15   alternatives that we had considered that he felt we

16   should give further consideration and we went away

17   with our to do list if you will.

18   Q.    Did he or Mr. Millard express the view

19   that you should shop the company around before

20   bankruptcy?

21   A.    Yes.

22   Q.    What was his basis for saying that as

23   articulated to you?

24   A.    Why he wanted us to shop it?

25   Q.    Yeah. What reasons did he give is the

1  better question?

2      A.    Well, I'll tell you what he said.  And he

3  may have said more than this, but this is how he

4  summed it up.  He said -- we walked him through the

5  book.  There was some give and take and he said -- he

6  said, you know, we like you guys.  You know, we trust

7  you guys.

8          He said we think you're smart guys and

9  you're the kind of people we'd like to bank and do

10  business with if you had a good business, but you

11  don't.  And he wanted us to try and sell it, and so

12  we did.

13      Q.    In the situation that the company was in

14  at that time, did you consider it of primary

15  importance to try to satisfy Warren Buffett?

16      A.    Well, let me try and answer that this way.

17  We had concluded that there was no alternative but to

18  file the company for bankruptcy.  We thought getting

19  into bankruptcy is easier if you have all of your

20  financing lined up.

21          And while you're not doing a prepackaged

22  or prearranged transaction, to go into bankruptcy and

23  say we have the support of Berkshire Hathaway, who

24  owns roughly 40 percent of the claims in this case,

25  was a very positive thing to be able to say and was a

26/09/2006 MUIR, Douglas R. (vol.1)

1  very stabilizing.  So we felt it was very valuable to

2  have Warren Buffett's support at least even on an

3  nonbonding basis.  Hey, I see what I see and based on

4  what I've seen, you know, I'm okay with doing this.

5  We thought that was very positive.

6          Was it required?  No, but I think the

7  estate benefited ultimately by having not battling

8  with your primary largest creditor in the midst of

9  your bankruptcy filing.

10      Q.    What was the outcome if you will of

11  shopping the company around?

12      A.    There were not any really attractive bids.

13  There were indications of interest.  No one had time

14  to do all the due diligence.  Some of the buyers --

15  we looked at strategic buyers and financial buyers.

16  Some of these had been contacted before.

17          This was not the first time that we had

18  sent out feelers to sell the company.  So while there

19  were some indications of interest, there was nothing

20  you could -- nothing in terms of pricing that was any

21  firmer than Jello, which is to say not very firm.

22          And there was no interest as I recall by

23  anyone in buying the company outside of a bankruptcy.

24  They wanted a cleansing process.  So by filing we did

25  not have any interest that I can remember from people

1  ready to commence due diligence instantaneously on

2  the filing, at the time we filed, but we certainly

3  hadn't foreclosed that option.  We were willing to do

4  whatever had the best outcome, you know, for the

5  constituencies in the case, sell the company, emerge

6  it stand alone.  You know, we were willing to do

7  whatever the creditors wanted us to do.

8      Q.    Did you find Credit Suisse helpful in

9  arranging these sessions with Berkshire Hathaway and

10  being one conduit of communication?

11      A.    Yeah.  I think Jared in particular, you

12  know, had had a good deal of experience making

13  presentations to creditors.  He told me he had never

14  made a presentation to Buffett, but yeah.

15          Yeah.  I think it was helpful to have

16  them -- have them along.  We had a relationship.  We

17  probably could have called up ourselves, but -- and

18  maybe could we have done it without them?  I don't

19  know, but were they helpful, sure.  They were

20  helpful.

21      Q.    When you say Oakwood had its own

22  relationship with Berkshire Hathaway independent of

23  Credit Suisse, how did that come about?

24      A.    We didn't have a relationship independent

25  of Credit Suisse, but at the time -- by the time

26/09/2006 MUIR, Douglas R. (vol.1)

1  October came around we had -- and again, through the

2  Lotus transaction which had been brokered by CSFB, I

3  mean, we knew who Buffett was, Buffett knew who we

4  were.  We had met him face to face.

5          Mark Millard knew exactly who we were.  We

6  had done four transactions with them, so we were well

7  acquainted with them.  They'd have known who we were

8  if they'd gotten the message.  I mean, we had the E

9  mails.

10      Q.    So you felt that you could have dealt

11  directly with them if you'd wanted to?

12      A.    Yeah, but if given that, you know, we

13  had -- we concluded for a lot of reasons that I

14  discussed it was wise to have an FA, financial

15  advisor, to guide us through the bankruptcy process,

16  it would have been silly not to have used them.

17      Q.    Turning back to the engagement letter in

18  Defendant's Exhibit 225, you'll see that there is an

19  exhibit B to Defendant's 225 and behind exhibit B

20  there is an invoice.  I would direct to you a page

21  number, but there isn't one.

22      A.    Yes.  You're talking about this page?

23      Q.    Do you see that?  Yes.

24      A.    Okay.

25      Q.    Do you remember being told that this was

1    -- that these amounts were what Credit Suisse was
2    seeking in terms of compensation for the -- for the
3    restructuring transaction fee and the phase two
4    restructuring transaction fee?
5    A.    That they're seeking in their claim now,
6    that they were seeking then or --
7    Q.    Well, I guess I'm asking you if you have
8    any recollection of Credit Suisse saying to you oh, X
9    event or events have happened so now we're entitled
10   to the phase two restructuring transaction fee?
11   A.    The $2 million?
12   Q.    Uh-huh.
13   A.    Yeah.  I remember a discussion on the day
14   we filed having to do with paying CSFB $2 million.  I
15   remember that.
16   Q.    And that was with Jared Felt?
17   A.    I had a discussion with Jared and I had a
18   discussion with others at Oakwood.
19   Q.    Did you tell Mr. Felt in words or
20   substance that Credit Suisse intended -- strike that.
21   Did you tell Mr. Felt in words or substance that
22   Oakwood intended to pay to Credit Suisse the
23   approximately $2 million phase two fee?
24   A.    I don't remember it specifically, but I
25   very well may have.

162

1    Q.    And to the best of your recollection at
2    that point did Credit Suisse intend -- did Oakwood
3    intend to pay to Credit Suisse that $2 million fee?
4    A.    There was a period of time on
5    November 15th when this discussion took place when I
6    intended to pay First Boston based upon what I knew
7    at the time.  I certainly wasn't going to do it
8    entirely on my own.  I had a discussion with counsel
9    about it.  I had a discussion with Myles about it.
10   Q.    And without asking you any details of the
11   conversation with counsel, what were the up -- what
12   was the upshot of those conversations?
13         MR. CASTANARES:  Wait a minute, just a
14   second.  Why don't you ask him about the
15   question -- about the conversations one at a
16   time so we don't -- you're not asking
17   implicitly?
18         His conversation with Mr. Standish is not
19   privileged, but when he's asked about the upshot
20   of a conversation with counsel, it seems to me
21   it's very difficult to separate out privileged
22   communications from that.
23         So just to try to make this neat and to
24   get you what you're entitled to but without --
25   without getting off into privileged stuff, could

163

1    you break up your question a bit?
2         MS. WARREN:  That's fine.
3         MR. CASTANARES.  Okay.
4         MS. WARREN:  I was just trying to do it
5    faster.
6    Q.    (By Ms. Warren)  Mr. Muir, what was the
7    substance of your conversation with Mr. Standish
8    about the phase two fee?
9    A.    He told me not to pay them.
10   Q.    And did he say why?
11   A.    Yes, as I remember.
12   Q.    What did he say?
13   A.    My recollection is that in a conversation
14   in Myles' office, this is late in the day on Friday,
15   November 15th, I went in to touch base with Myles on
16   this subject.  And Myles said no, don't pay them.  He
17   said something to the effect that he had had a
18   discussion with Jared.
19         And Jared was in our office that day, as
20   was Fiachra, and that -- my recollection is Myles --
21   Myles told me that he had had a discussion with Jared
22   and Jared had said in terms of paying them, said
23   don't pay us anything until we have earned it under
24   the contract.  And so I was a little confused because
25   I had been in so many words asked by Jared to pay

164

1    them $2 million, and then I'm hearing from Myles that
2    no, no, no, Myles has spoken to Jared and Jared had
3    said no, in fact, don't pay us anything until we have
4    earned it under the terms of the contract.
5    Q.    And was anything else said during this
6    conversation with Mr. Standish?
7    A.    Not that I remember because in order to
8    have it, he was in the midst of a telephone
9    conference call with a bunch of manufactured housing
10   dealers.  And so it was not a long conversation.
11         It probably lasted less than the time that
12   it's taken me to tell you about it, but I clearly got
13   the word from Myles that he had had a discussion with
14   Jared about the timing of the payment of this fee and
15   that his understanding of what Jared was looking for
16   was not the same as mine.  And so, not surprisingly
17   to you, I went with Myles' world view and I did not
18   send the wire to CSFB.
19   Q.    And just very generally what was the
20   subject matter of your conversation with counsel on
21   the -- on the issue of paying Credit Suisse?  I'm not
22   looking for any details.
23         MR. CASTANARES:  Can he answer that
24   question without your arguing that my failure to
25   instruct him otherwise is a waiver?  I mean, all

165

1    I want to do, all I want you to say is I'm not
2    opening the door by failing to instruct him not
3    to answer.
4         MS. WARREN:  Well, maybe I can make this a
5    little easier.
6         MR. CASTANARES:  Okay.
7    Q.    (By Ms. Warren)  Did you consult with your
8    counsel about the issue of paying Credit Suisse --
9    let me put it this way.  Why did you talk to counsel
10   about the issue of paying Credit Suisse or not?
11   A.    Two reasons.  Number one, when Jared first
12   raised the subject he didn't just come into my office
13   and say would you wire me $2 million.  It was a very
14   peculiar conversation in which he came in and he
15   started talking I want to say in parables, but that's
16   not the right word.
17        He basically said words to the effect of
18   very disjointed sentence fragments to the --
19   something along the lines of gee, you know, there are
20   times when -- around when people file bankruptcy that
21   they owe money to somebody or at the time at which
22   they owe the money the banks have already closed and
23   they can't pay the money.  And I'm -- and sometimes
24   there are agreements that people execute.  And I'm
25   going you're speaking to me in code.

166

1         I said look, Jared, if you've got some
2    sort of agreement you want me to sign -- he said,
3    well, yeah, maybe.  I said great.  Serve it up.  You
4    know, I've got an office building full of lawyers.
5    You've got an agreement, show it to me and I'll be
6    glad to have a lawyer look at it.  If you want to get
7    paid two million bucks, at a minimum you're going to
8    have to give me an invoice because I'm not just going
9    to wire two million bucks out of here without
10   something besides just this contract to go with it.
11        So after that discussion Jared went away
12   and I wasn't sure quite where we were headed.  So it
13   seemed like a good time to go talk to a bankruptcy
14   lawyer given that at the time this conversation took
15   place we either had already filed for bankruptcy or
16   the filing was imminent.  So it seemed smart to get
17   some legal advice.
18   Q.    Sitting here today do you have an opinion
19   about whether or not Credit Suisse earned the $2
20   million phase two fee?
21   A.    I really don't.
22   Q.    Do you have an opinion about any other
23   money that might be owed to Credit Suisse under the
24   letter agreement?
25   A.    I don't.  It's been almost four years

167

1    since I looked at this contract and November 15 was a
2    busy day and I just honestly haven't given it any
3    thought since then.
4         (Exhibit Number 226 was marked for
5    identification.)
6    Q.    (By Ms. Warren)  Mr. Muir, I'm showing you
7    a document that the court reporter has marked as
8    Defendant's Exhibit 226.  It's an E mail chain and in
9    the chain there appears a forward or an E mail
10   forwarded from Myles Standish to Fiachra O'Driscoll.
11   The document is Bates numbered CSFB-35137 to 35142.
12   And the E mail at the top of the chain is dated
13   Friday, October 18th, 2002.
14        Would you take a few moments, Mr. Muir,
15   and read the first three pages of this exhibit?  It's
16   the first three pages and the last three pages are
17   very similar.  Have you ever seen this document
18   before, Mr. Muir?
19   A.    I'm not certain, but I think I saw a draft
20   of this or maybe this exact document about the time
21   it was prepared.
22   Q.    Did Mr. Standish show it to you?
23   A.    Again, I don't remember him doing so, but
24   I would have been surprised if he were to testify
25   that he hadn't shown it to me.  I think I've seen

168

1    this.
2    Q.    Did you have a reaction to it at the time?
3    A.    Again, I don't remember the circumstances
4    or even for certain if I did see it.  So I don't know
5    if I had a reaction then.  I certainly do now.
6    Q.    Reading it now, do you agree with the
7    substance of it?
8    A.    Yes.
9    Q.    Do you have any other reactions to it?
10   A.    No.
11   Q.    Do you know whether, in fact, it was ever
12   sent --
13   A.    No.
14   Q.    -- to Lotus?
15   A.    I do not know.
16   Q.    And I realize you might not remember this
17   at all, but do you remember having any conversations
18   with anyone at Credit Suisse about Mr. Standish's
19   draft letter or the contents of it?
20   A.    I do not.
21   Q.    I want to go back a minute to underwriting
22   standards just to make sure that we all understand
23   what they are and where they came from.  I'm sorry.
24   I know we went through this a little bit before, but
25   I'll try not to be repetitive.  Who at Oakwood set

169

1  what Oakwood's underwriting standards would be for
2  originating loans?
3      MR. CASTANARES:  That's been asked and
4  answered.
5      THE WITNESS:  On a day-to-day basis people
6  on the underwriting side who would report to
7  Mike Rutherford in the time frame you're
8  speaking of, you know, if somebody wanted to
9  change something in terms of anything involving
10  decisioning, a credit app, you know, small
11  changes could be made down in the bowels of OAC.
12  Bigger decisions would go up to Bob Smith.
13      Really important decisions on things like
14  cut-off scores, I'd be involved in, Myles would
15  be involved in and we'd all discuss because they
16  potentially have huge impact.  There wasn't one
17  person who had the yes/no stamp in other words.
18      Q.  (By Ms. Warren)  Okay.  What are FICO
19  rates?
20      A.  FICO scores.
21      Q.  I'm sorry.  FICO scores.
22      A.  FICO is shorthand for Fair Isaac.  They're
23  what I think most people would tell you is the
24  nation's preeminent designer of credit scoring
25  systems.

170

1      applicant or a person.
2      Q.  (By Ms. Warren)  What factors are
3  considered in coming up with a FICO score?
4      A.  I don't know.  You would have to ask Fair
5  Isaac.  Let me complete the rest of the answer.  I'm
6  sorry.  I didn't.
7      Q.  I'm sorry.  I thought you were at a pause.
8      A.  I know.  I'm sorry.  The second kind of
9  term that people will sometimes use to refer to a
10  FICO score is a score derived from a custom score
11  card that Fair Isaac or another similar vendor has
12  constructed and sold to a particular user.  At
13  Oakwood we had custom FICO cards, custom scoring
14  systems developed for Oakwood from Oakwood data and
15  done for us by Fair Isaac.
16      Sometimes we refer to those as the
17  proprietary score, meaning derived off a proprietary
18  Oakwood card as compared to the generic score, which
19  is called the FICO score, sometimes called the Beacon
20  scores, but they're both basically numerical
21  representations of applicant creditworthiness, be
22  they developed generically or for a specific user,
23  say a particular financial institution.
24      Q.  How do you get a FICO score, whether
25  proprietary or not, for a given individual loan

172

26/09/2006  MUIR, Douglas R. (vol.1)

1      Q.  How do you spell Fair Isaac?
2      A.  F-a-i-r.  I don't know if there's one R or
3      two.
4      MR. CASTANARES:  There's one.
5      THE WITNESS:  Thank you.  It's a
6  California firm.  That's --
7      MR. CASTANARES:  I thought it was
8  Connecticut, but okay.
9      THE WITNESS:  I-s-a-a-c-s, I think.
10      MR. CASTANARES:  I think it's a single
11  Isaac.
12      THE WITNESS:  Counsel knows better than I.
13  You can Google it.  You'll find out.  There
14  are -- and people use the term differently.
15  There's a couple of possibilities.  There is a
16  -- each of the three major credit bureaus used
17  to and I assume still do purchase from Fair
18  Isaac a scoring system that assigns a generic
19  creditworthiness score to every person in the
20  data base.
21      Some people call it the bureau score,
22  referring to short for credit bureau.  Some
23  people call them the FICO scores, but it is a
24  numerical score that purports to be an overall
25  representation of the creditworthiness of an

171

26/09/2006  MUIR, Douglas R. (vol.1)

1      applicant?
2      A.  Okay.  If when you take a loan
3  application, you retrieve almost always
4  electronically these days the applicant's credit
5  bureau file from one or more credit bureaus.  Most
6  every lender will retrieve as well as the raw data in
7  the file, will also retrieve the bureau score or the
8  FICO score with the credit file.  You pay a little
9  extra for it, but you can obtain the results of
10  application of the generic score card to that
11  customer's data.  You can buy that together with the
12  credit bureau data file itself.
13      In the case of the custom cards that were
14  used at Oakwood, data from the customer's credit
15  application was extracted and certain of that data
16  was used and scored by the score card and then the
17  score cards electronically through our software would
18  spit out the credit score derived from the Fair Isaac
19  score card on the Oakwood custom score card.
20      THE VIDEOGRAPHER:  Can we take a break to
21  change tapes?
22      MS. WARREN:  Sure.
23      THE VIDEOGRAPHER:  We're off the record at
24  3:53.
25      (A recess was taken.)

173

1    THE VIDEOGRAPHER:  Tape number four.
2    We're on the record at 4:12.
3    Q.    (By Ms. Warren)  Mr. Muir, I believe your
4    counsel said you had something you'd like to correct?
5    A.    Well, or at least amend.  You asked me
6    whether I had any current employment relationships
7    other than Krispy Kreme, and I don't.  You asked me
8    if my contract with the Trust had terminated and I
9    told you that it did in June of 2005.
10    Just so the record is clear, my contract
11    with the Trust provided for compensation for work
12    done on behalf of the Trust after the termination of
13    the contract.  Now, to this point I have not sent any
14    bills for any of that to the trustee, but I have had
15    a communication with the trustee confirming that the
16    terms of my contract for post-employment compensation
17    apply to this deposition and the preparation for it.
18    Q.    Does your post-termination agreement
19    provide for you to provide any other services or to
20    assist the Trust in any other way?
21    A.    You know, honestly, I hadn't gone to look
22    at it.  My recollection is it's one of these best
23    efforts kind of thing, but I don't think I'm
24    compelled to do anything for the trust, no, is my
25    best recollection.

174

1    called low side override where you can approve an
2    application that fails to meet the minimum score if
3    certain other conditions are met.  Conversely --
4    well, I think I've answered your question.
5    Q.    During the 1990s was your FICO cut-off
6    score lowered within the company?
7    A.    In the '90s?
8    Q.    Uh-huh.
9    A.    Was the cut-off score lowered?
10    Q.    Yes.  In other words, the threshold under
11    which you'd have to have an override to approve a
12    loan?
13    A.    Yeah.  It changed from time to time, and
14    I'm not trying to be evasive.  I'm just trying to
15    characterize it correctly.  Initially there was only
16    one kind of loan offered.  There was only essentially
17    one loan product.  And you had one loan product, you
18    theoretically had one minimum cut-off score.
19    As time went on lenders got a little bit
20    more sophisticated or so they thought and they
21    designed additional loan programs, the eligibility
22    criteria for which may be different in some respects
23    than what they would be for the standard loan
24    program.  For example, there were programs run at
25    Oakwood, lending programs at times that would provide

176

26/09/2006 MUIR, Douglas R. (vol.1)                                26/09/2006 MUIR, Douglas R. (vol.1)

1    Q.    Have you been asked to testify at any
2    trial in this matter if there is a trial?
3    A.    Yes.
4    Q.    And if you are asked, will you appear to
5    testify?
6    A.    I will.
7    MR. CASTANARES:  If I ask him, anyway.  I
8    don't know if he will if you ask him.
9    MS. WARREN:  Interesting point.
10    MR. CASTANARES:  Interesting point.
11    MS. WARREN:  I'll ask the court reporter
12    to go back and read the question and answer
13    where we were when we took the break just so I
14    know we're picking up in the right place.
15    (The record was read by the reporter.)
16    Q.    (By Ms. Warren)  Was there a certain FICO
17    score that was a cut-off score for deciding to lend
18    or not?
19    A.    Through the entire time I was at Oakwood
20    we had theoretical minimum scores that were required
21    in order to approve an app.  Again, these are all
22    scores derived off the proprietary Oakwood card and
23    not the generic card.  So there was -- yes, in theory
24    there's a minimum score.  In practice at Oakwood as
25    with all lenders there's a provision for what's

175

1    that instead of the minimum cut-off score being say
2    210, the minimum score might be 190; but the customer
3    scoring between 190 and 210 while they might be
4    accepted in certain circumstances even though they
5    were below the 210 score, if they were accepted would
6    be accepted at a rate in a program that required a
7    higher rate of interest on the loan to compensate
8    Oakwood for the greater risk of default.
9    So yes, cut-offs change from time to time.
10    They sometimes in connection with the introduction of
11    a new loan program, sometimes because people wanted
12    to approve more loan applications.
13    Q.    You also mentioned something earlier
14    called cut-down rates or something like that?
15    A.    Buy-down rates.
16    Q.    Buy-down rates.
17    A.    You asked me about buy-down rates.
18    Q.    Yes.  What's a buy-down rate?
19    A.    A buy-down is, for example, a program in
20    which the customer is offered an interest rate on the
21    loan, on their loan that is less than the prevailing
22    rate on a standard loan.  In exchange for the lower
23    rate the customer pays discount points as a
24    percentage of the loan balance but was not required
25    to pay those discount points in cash.  Rather, they

177

1  were added to the amount financed.

2      Q.      And you don't think this was a good

3  lending practice?

4      A.      No.

5      Q.      Why not?

6      A.      I look at it as a -- as a free option for

7  your relatively less creditworthy borrowers.  You're

8  going to offer the customer a lower rate and the

9  amount of points that a customer was required to pay

10  in the entire industry, not just at Oakwood, was

11  mispriced.  You failed to charge them enough money to

12  make up the yield differential from the lower rate,

13  so they were -- number one, the product was

14  mispriced.

15      Number two, it tended to attract

16  relatively lower scoring customers and customers who

17  ultimately defaulted, never paid the points.  They

18  got the lower coupon, the lower monthly payment, and

19  they never had to pay the points.  If we had required

20  the customer to show up with the points in cash at

21  the closing table, I would have been all for it, but

22  we didn't.

23      Q.      And did the practice of buy-down rates

24  increase during the 1990s?

25      A       Yes.

1      Q.      What steps, if any, did management take

2  other than the increased use of the assumptions which

3  we've already talked about to try to compensate for

4  the less stringent or perhaps more lax lending

5  standards in the 1990s?

6      A.      I think if we -- I don't have any

7  statistics on this to share with you, but we clearly

8  spent more money on servicing loans than we did

9  before credit got relatively weaker.  If you have

10  weaker obligors, they're going to be delinquent more

11  frequently and they need more intense servicing

12  supervision if you will to minimize your default

13  rate.

14      At times we charged -- we had risk based

15  pricing if you will and we tended to charge people

16  who had lower scores and, therefore, a greater

17  probability of default, we charge them more money in

18  the form of higher rates.  Those are a couple that

19  come to mind.

20      Q.      Is it fair to say that most of the damage

21  done by insufficiently stringent lending standards in

22  the '90s was really not possible to undo in the early

23  2000s?

24      A.      If by damage you mean what I think you do,

25  and I think you mean once you have originated a group

1  of loans that have relatively weaker underlying

2  credit characteristics than you would prefer, once

3  you've originated them is there something you can do

4  about it.  And there's not a whole lot you can do

5  about it except attempt to service those assets very,

6  very effectively.

7      You can on -- similarly, there are other

8  things that affect performance, for example,

9  recession, unemployment, particularly as relates to

10  certain industries that despite the best servicing

11  you will have a significant default problem.  And we

12  encountered that a lot at Oakwood when we had a

13  sustained economic downturn affecting the typical

14  mobile home buyer late '90s, early part of this

15  century.

16      Q.      You saw a lot of what?

17      A.      Saw a lot of defaults, including defaults

18  that could not have been normally predicted by the

19  score card.

20      Q.      How does servicing -- or strike that.  In

21  what ways can servicing improve the default rate or

22  reduce the risk of default?

23      A.      I think relatively high caliber servicing

24  operations particularly in a subprime type product,

25  which is what mobile home lending generally is, does

1  a good deal more than just call up customers and

2  hound them for the payment.  The good operators, and

3  I think we had some good ones at Oakwood, will

4  attempt to help the customer deal with the root cause

5  of the problem.

6      Customers don't make payments for a lot of

7  reasons, sometimes death, sometimes divorce, job.

8  Really good collectors if they're trained properly

9  and supervised properly if a customer is willing to

10  have a dialogue and wants to keep the house will try

11  and get information from the customer, help the

12  customer figure out what his obligations are and try

13  and figure out ways that you may be able to work with

14  the customer, figuring out what his budget is so that

15  he can ultimately stay in the house if that's what he

16  wants to do so, if that's what he, you know, wants to

17  do.

18      Some customers just give up and there's

19  not a lot you can do about them other than just repo

20  or foreclose, but there are techniques with good

21  servicing using technology to help you identify early

22  who your problem customers are going to be, automatic

23  dialers, predictive dialers.  There's a lot of good

24  technology out there that will help you do a good

25  job.  It's expensive, but it's been proven to be

1    effective.
2        Q.    Going back to your meeting with Mr.
3    Buffett when he said you've got a bad business, did
4    you agree with him in your own mind?
5        A.    I don't think he said we had a bad
6    business. He said we didn't have a good one. It was
7    not a pristine, wonderful, well operated historically
8    business. I mean, there had been a load of mistakes
9    made in a that company. I mean, Myles had said so in
10   the exhibit we looked at a few minutes ago.
11       It struck me at first as a little harsh,
12   but on reflection it was probably a reasonably fair
13   characterization. I think the assessment, the
14   difference between the company and Warren Buffett
15   might have been in the probability and time line for
16   improving it. And business as it was, Warren Buffett
17   ultimately bought it.
18       Q.    He did. Absent the management mistakes
19   that you've referred to and we've talked about, do
20   you think that Oakwood was a good business as of
21   2002?
22       A.    The industry -- you know, I don't know how
23   you can divorce, you know, some bad business
24   decisions because they put you in the position you're
25   in. I don't think management decisions, you know,

182

1        MS. WARREN:    Yes. That's fine. That's
2    agreed.
3        MR. CASTANARES:    Thank you.
4        (Exhibit Number 227 was marked for
5    identification.)
6        Q.    (By Ms. Warren) Mr. Muir, I'm showing you
7    a document the court reporter has marked as
8    Exhibit 227. It's entitled Oakwood Homes Corporation
9    minutes of the meeting of the board of directors held
10   Monday, October 28th, 2002. It's Bates numbered
11   MNAT-6827 and 6828. Do you recognize this document?
12       A.    Yes.
13       Q.    And are these the minutes of the board
14   meeting from October 28, 2002?
15       A.    They are.
16       Q.    I wanted to ask you about something on the
17   second page of Exhibit 227, the first full paragraph
18   beginning Mr. Standish next. Would you just read
19   that briefly?
20       A.    Yes.
21       Q.    What work was Mr. Standish doing in
22   conjunction with FTI or not to find prospective DIP
23   lenders?
24       A.    I don't know exactly what Myles is doing
25   and, again, Bob Smith was principally the person

184

26/09/2006 MUIR, Douglas R. (vol.1)

1    were the sole cause of the trouble we ultimately got
2    into. I think you asked me early in this deposition,
3    you know, why I thought Oakwood went bankruptcy and I
4    cited some reasons, and one you've reminded me of
5    recently is the economy did not help us.
6        We had about the time or on the heels of
7    some lending practices which at Oakwood and others in
8    the industry proved to be too lenient, we had a very
9    difficult time economically in a recession and a
10   recession that was particularly hard hit or hit very
11   hard the relatively lower end of the income spectrum.
12       By way of example, in a period of
13   two-and-a-half years we lost 30,000 textile jobs in
14   North Carolina. A large number of those people lived
15   in mobile homes, and no amount of servicing and no
16   amount of scoring is ever going to predict that. So
17   there were contributing factors.
18       And so I don't know how to quite say, gee,
19   if none of that had happened, would we have had a
20   great business. I don't know quite how to answer it.
21       MR. CASTANARES:    If we're at a break in
22   your train, can we put on the record at this
23   point that you have decided based upon our
24   conversation in the hall not to pursue the open
25   question regarding Andrew Davidson?

183

26/09/2006 MUIR, Douglas R. (vol.1)

1    running the DIP exercise; but among the things as I
2    recall that FTI worked on were, you know, helping us
3    size the DIP, how much that DIP credit was needed.
4        That involved doing some financial
5    projections and we didn't have a huge internal staff
6    to work on a lot of that. And when -- and that's why
7    we brought FTI in sometime in 2002 is we were
8    preparing to file to help us figure some of that out,
9    but I was not directly involved in the particulars.
10       Q.    Do you know which DIP lenders were
11   contacted by FTI or by other members of management?
12       A.    I do not.
13       Q.    And remind me. Did you have -- what was
14   your role with respect to DIP financing?
15       A.    I was -- I went to a meeting or two with
16   Foothill, one of which was in Atlanta I think the
17   week before we filed, but I basically didn't have a
18   lot of direct involvement with it.
19       You know, Bob Smith was pretty much
20   carrying the ball in terms of lining up the DIP
21   financing whereas I had more of the logistical issues
22   of trying to get ready to get into bankruptcy,
23   briefing some important constituencies that needed to
24   be briefed so they didn't get surprised, banks, other
25   credit providers and so forth.

185

1    Q.    So the point person for DIP financing was
2  Bob Smith?
3    A.    In terms of Oakwood people, I think Bob
4  had more to do with it than anybody else.
5    Q.    And was he also supervising Credit Suisse
6  in efforts to get DIP financing?
7    A.    I don't know if Bob was or not or Myles
8  was.  I was not supervising CSFB or at least insofar
9  as Jared Felt's role was concerned.  I had a lot of
10  discussions with Piachra about what we were going to
11  do on a post filing basis, but not on the DIP and not
12  on the Berkshire side of it.
13    Q.    So that was more Bob and Myles?
14    A.    It wasn't me.
15          (Exhibit Number 228 was marked for
16          identification.)
17    Q.    (By Ms. Warren)  I'm showing you a
18  document that the court reporter has marked
19  Defendant's Exhibit 228 titled Oakwood Homes
20  Corporation minutes of the meeting of the board of
21  directors held Monday, November 4th, 2002.  It's
22  Bates numbered OHCLT-2761 and 2762.  Do you recognize
23  this document, Mr. Muir?
24    A.    I don't.  I just note that I was not the
25  secretary at this meeting, but I may have seen this

186

1  the various parts of CSFB to get continued access to
2  the -- to the loan purchase facility?
3    A.    Yeah.  I don't remember that there were
4  any negotiations.  My recollection is that I didn't
5  have any sense that there were really any issues
6  around getting the warehousing facility reopened post
7  bankruptcy until those that developed right at the
8  time that we filed.
9    Q.    And what issues developed around the time
10  that you filed?
11    A.    A demand for a sizable fee for one thing.
12    Q.    Were you surprised to be asked for a fee
13  to continue the warehouse -- the loan purchase
14  facility?
15    A.    I was.
16    Q.    Why?
17    A.    A couple of reasons.  Number one, the
18  warehousing facility was extremely well structured in
19  2001 and it was the most elaborate structure of its
20  kind I had seen in terms of providing protection to
21  lenders.  It was well structured from a credit
22  enhancement point of view such that the credit
23  quality of Oakwood should have been largely
24  irrelevant.  It was intended to be and structured
25  that way.

188

26/09/2006 MUIR, Douglas R. (vol.1)

1  document before and probably did.
2    Q.    Do you remember if you were present at
3  this meeting?
4    A.    I don't remember and would just note that
5  the minutes don't seem to indicate that I was.  I
6  don't know where I was that day.
7    Q.    Well, why don't you read through it
8  because I just -- I really want to just get your
9  sense of whether what's described here comports with
10  your recollection of what the state of play was at
11  the time.
12    A.    In reading this I don't see anything in
13  here that strikes me as inconsistent with my
14  recollection.
15    Q.    Thank you.  Looking at the first page of
16  Defendant's Exhibit 228, there's a reference towards
17  the bottom of the page in that last paragraph about
18  discussions with CSFB regarding continued access to
19  the warehouse loan purchase facility.  Do you see
20  that?
21    A.    I do.
22    Q.    What were the state of discussions with
23  CSFB at this point, if you remember?
24    A.    Yeah.  I don't remember what they were.
25    Q.    Were you involved in the negotiations with

187

26/09/2006 MUIR, Douglas R. (vol.1)

1        So from a risk point of view I didn't see
2  that this bankruptcy had any risk to speak of
3  incrementally to the lender.  And second, I was
4  surprised that if a fee was going to be demanded, I
5  was surprised they didn't tell me about it
6  substantially before they did.  It just surprised me
7  to be hit with it at the end.
8    Q.    At this point were you making efforts to
9  talk to any other potential providers of a loan
10  purchase facility?
11    A.    No.
12    Q.    Did you have any information against which
13  you could compare the size of the fee that Credit
14  Suisse was asking about or asking for and determine
15  whether it was a fee that you thought was reasonable
16  or not or according to industry standards or not?
17    A.    No.  I had no benchmarks.
18    Q.    What is your understanding of how the --
19  how the issue got resolved?
20    A.    Ultimately we effectively agreed to a
21  higher -- to pay them a fee.  The original proposal
22  was the company would pay them a fee up front upon
23  the reopening of the facility.  That ultimately
24  didn't turn out to be the deal, but there was
25  negotiated an amended fee letter which provided for

189

1    an increase in the monthly fees of some amount that
2    totaled up at the end of the day as I recall to be
3    very similar in magnitude to the front end fee that
4    had been requested but albeit payable over time
5    instead of up front.
6        Q.    So the proposal from Credit Suisse
7    initially was pay us all this money up front and the
8    company pushed back and it was changed into a monthly
9    payment?
10            MR. CASTANARES:    Objection to form.
11            THE WITNESS:    My recollection is that CSFB
12       wanted an up front fee.    That surprised us.    If
13       there was pushing back if you will or an
14       expression of discomfort with that plan, I think
15       it came as much from Berkshire Hathaway as it
16       did from the company because we clearly
17       discussed it with Berkshire and got their view
18       on it.
19       Q.    (By Ms. Warren)  Do you remember -- and
20    you might not since I understand you weren't the
21    point person on this, but do you remember how the
22    efforts to put together DIP financing were finally
23    resolved?
24       A.    I can tell you about the DIP financing
25    that ultimately got put together.  You know, I'm not

190

26/09/2006 MUIR, Douglas R.(vol.1)

1    sure I remember a lot about the specifics of how we
2    got to it, but I know where we ultimately got to if
3    that's helpful.  I'm not sure that's the question
4    you're asking, though.
5        Q.    Well, tell me what you remember about the
6    structure that was put together or the facility that
7    was put together?
8        A.    And how we got to it?
9        Q.    Yes.
10       A.    Okay.  As best I recall we found out on
11    the 13th or the 14th of November that Foothill was
12    not willing to provide any DIP financing other than
13    into a liquidating 11.  They were not willing to do a
14    DIP to reorganize the business.  At that point FTI
15    got on the telephone in a big way and started calling
16    people they knew.
17            And by the day before we filed, the day we
18    filed, certainly by the weekend after we filed, the
19    16th, the day after, some representatives of two
20    firms were in our office expressly to talk about DIP
21    financing.  And we had very good conversations with
22    them, with those parties, and proceeded to negotiate
23    with them over a DIP.  They disclosed to us up front
24    that Berkshire Hathaway was in essence part of their
25    consortium to do the transaction.

191

1    So we felt like Berkshire was okay with
2    this and they were the largest creditor.  There was
3    some unhappiness at the official committee of
4    unsecured creditors with certain of the terms that
5    were included in the proposed DIP financing and that
6    the committee found objectionable.
7            And so considerable discussion and debate
8    about DIP providers and the conditions under which
9    DIP credit would be granted ensued among the
10    potential DIP providers, the committee, the company
11    and Berkshire.
12            Ultimately I think in late December or
13    early January there was a meeting of the minds and we
14    ultimately proceeded with the DIP proposal from the
15    people that showed up the day after bankruptcy, that
16    is, the Ranch Capital, Greenwich Capital, Berkshire
17    consortium, and we ultimately concluded that
18    transaction.  In the meantime while all that was
19    being negotiated, we had an interim DIP facility from
20    Foothill.
21       Q.    Is it fair to say that FTI provided
22    Oakwood with substantial assistance in putting
23    together the DIP financing?
24       A.    In terms of what happened after Greenwich
25    and Ranch showed up in the door, I don't recall them

192

26/09/2006 MUIR, Douglas R.(vol.1)

1    having a whole lot to do with it.  At that point it
2    was the company and Greenwich and Ranch.
3        Q.    Right, but before that?
4        A.    Again, I had -- had limited visibility to
5    what was going on in the preparation for the DIP.  I
6    know again that FTI worked on helping Suzanne and Bob
7    and principally Bob I think do some financial
8    projections trying to size the DIP; but in terms of
9    who they may have contacted, the extent of any
10    contact they may have had with potential lenders, I
11    did not recall that FTI had been involved in that at
12    all other that in terms of contacting lenders, but I
13    knew they had been involved in preparatory work.
14            And they were not involved at all that I
15    can remember, at least not in any material way, in
16    the negotiation with Greenwich and Ranch.  They did
17    bring them to the table, however.
18            MS. WARREN:    Excuse me.
19            (Discussion off the record.)
20       Q.    (By Ms. Warren)  Did anyone from Credit
21    Suisse tell you in words or substance before the
22    bankruptcy filing that Credit Suisse would waive any
23    event of default in the credit facility?
24       A.    I don't recall anybody saying that.
25       Q.    Did you expect that there would need to be

193

1  some negotiation over a waiver?

2      A.   I knew that we were going to have to

3  document something with the warehouse lender because

4  the transaction by its terms terminated with the

5  bankruptcy filing.  So I knew there was going to be

6  an amendment, a redo or something, but I expected it

7  to be in essence ministerial in nature.

8      Q.   Mr. Muir, did Credit Suisse ever try to

9  tell management what to do in terms of operating the

10  company?

11     A.   Not that I can remember.  That's not to

12  say they wouldn't weigh in with an opinion when asked

13  and on a number of matters they were asked fairly

14  frequently; but did they ever attempt to direct us,

15  no.

16     Q.   Did Credit Suisse ever dictate or try to

17  dictate changes in key officers or directors?

18     A.   Not that I know of.

19     Q    Did Credit Suisse try to weigh in on your

20  day-to-day management decisions?

21     A.   Let me answer that this way.  It was not

22  unusual and, in fact, it was practice for me anytime

23  we made any substantive business decision that might

24  have a material impact or even a less than material

25  but significant impact on anything having to do with

194

1  loan originations, the ABS program, loan servicing,

2  it was my practice always to inform CSFB of what we

3  were doing and why we were doing it and solicit

4  feedback.  So to the extent that's weighing in, yeah,

5  they sure did.  They were asked to weigh in.

6      Q.   But you were asking Credit Suisse to weigh

7  in on matters that might affect the fate of

8  securitizations on the market; right?

9      A.   That might -- things that might affect the

10  performance of securitizations that had already been

11  done, things that might have the ability -- an effect

12  on our ability to do securitizations in the future.

13          Things that might have had an effect on if

14  not whether or not a future transaction would get

15  done but the terms on which it would get done,

16  marketplace reception to securities that had certain

17  loans in them, rating agency views on underwriting

18  decisions, all of those kinds of things were

19  routinely discussed.

20     Q.   And did you always do whatever Credit

21  Suisse told you to do when you consulted with them?

22     A.   I don't ever recall being told to do

23  anything by CSFB.  There were decisions that were

24  made that CSFB and I think thought were good

25  decisions and said so.  And I think there are things

195

1  we did that CSFB, meaning Piachra, thought were not

2  so good.  And I thought highly of Piachra's opinion

3  and if Piachra thought we were making a mistake in

4  something, I certainly conveyed that back.  And we

5  valued and trusted him and valued his judgment.

6      Q.   So is it fair to say that sometimes Credit

7  Suisse agreed with what you were doing and sometimes

8  Credit Suisse didn't, but management did what it

9  thought was best?

10     A.   I think in retrospect and even at the time

11  CSFB would tell you we did some things that we told

12  them we were doing that they didn't think were very

13  smart and some things that conversely they thought

14  probably were smart.

15     Q.   Do you think Credit Suisse tried to serve

16  Oakwood to the best of its professional ability?

17     A.   I don't know quite how to -- how to answer

18  that other than to answer it this way.  I had a

19  tremendous amount of experience over the years

20  dealing with Piachra O'Driscoll and his team.  They

21  worked extremely hard on our behalf, did a lot of

22  wonderful things.

23          From time to time with their assistance we

24  avoided making some business mistakes.  And so did

25  they -- did they try?  Based on observations I saw a

196

1  lot of trying over a lot of years, and more

2  particularly I saw a lot of results.  And I'm much

3  more interested in results than how hard somebody

4  tries.  I had a much more limited opportunity to

5  observe that in the financial advisory role, but I

6  saw a lot less in terms of results than I expected to

7  see.

8      Q.   Did you think that the folks providing

9  financial advisory services were doing what they

10  thought was their best even if you weren't getting

11  the results that you might have liked?

12     A.   You know, it's hard for me to assess what

13  they thought.  I think maybe you'd have to ask them.

14     Q.   Well, but I'm asking you what you

15  perceived.  Did you think that the financial advisory

16  folks were working hard?

17     A.   Often, no.  I didn't.

18     Q.   And was this because you weren't getting

19  -- some things weren't accomplished that you thought

20  should have been accomplished?

21     A.   In part, but more particularly I never

22  felt Jared felt had a sense of urgency.  We had I

23  don't know how many discussions and it was a source

24  of frustration for me that I think I earlier

25  testified there was not an unlimited amount of time

197

1    to accomplish what needed to be accomplished.  And I
2    shared with CSFB very early in the game what that
3    time period was.  And I was frustrated routinely that
4    I don't -- by what I perceived at least as Jared's
5    failure completely to grasp the fact that we were
6    going to be compelled to file on a date certain
7    whether we were ready to or not.
8              I had an impression that his view was that
9    we will file when we get Berkshire on board and it's
10   just unthinkable to file before then.  And I was
11   frustrated that he seemed unwilling and unable to
12   come to grips that filing was inevitable at a date
13   certain.  And that's what by I mean at least in my
14   perception as, you know, a lack of focus and a lack
15   of sense of urgency.
16         Q.    Did you convey your feelings on that topic
17   to anyone at CS?
18         A.    I conveyed them to Fiachra on a -- and to
19   Jared on a number of occasions.  The most vivid was
20   on the way back from the second trip to Omaha.
21   Fiachra assured me that they understood the
22   situation.  I was still not convinced that Jared
23   understood the situation.
24         Q.    Leaving aside the financial advisory work,
25   which I understand did not accomplish everything you

1    would have liked, did you have any issues with the
2    other services provided by Credit Suisse during the
3    period 1999 to the petition date?
4         A.    No, not at all.
5         Q.    Do you think the people at Credit Suisse
6    were honest with you?
7         A.    I had no reason to think that anybody from
8    CSFB ever lied to me.
9         Q.    Did you in words or substance ever tell
10   anyone at Credit Suisse that you thought Credit
11   Suisse had done a good job in a very difficult
12   situation in getting through the bankruptcy filing
13   during that whole period, pre and post bankruptcy?
14         A.    I don't recall doing so, but I may have.
15   We were just glad to be done.  It was a -- it was a
16   wrenching process and I know when we finally got into
17   bankruptcy I was glad to have arrived there, painful
18   though it may have been.  And I -- and again, while I
19   wasn't totally satisfied with all aspects of that
20   engagement by CSFB, they helped us get there and it
21   was difficult.
22              MS. WARREN:  Let's take a break for a
23   minute.
24              THE VIDEOGRAPHER:  We're off the record at
25   5:04.

1              (Deposition adjourned at 5:04 p.m.)
2                   * * * * *

1    STATE OF NORTH CAROLINA        C E R T I F I C A T E
2    COUNTY OF GUILFORD
3              I, K. Denise Neal, RPR, Registered
4    Professional Reporter and Notary Public, do hereby
5    certify that DOUGLAS R. MUIR, VOLUME 1 was duly sworn
6    by me prior to the taking of the Deposition; that
7    said Deposition was taken and transcribed under my
8    supervision; and that the foregoing 200 pages are a
9    true and accurate transcription of the testimony of
10   the said deponent.
11             I further certify that review and signing
12   of the transcript by the witness was reserved.
13             I further certify that the persons were
14   present as stated.
15             I further certify that I am not related
16   to, of counsel for or in the employment of any of the
17   parties to this action.
18             IN WITNESS WHEREOF, I have hereunto
19   subscribed my name, this the 3rd day of October,
20   2006.
21                   K. Denise Neal, RPR
22                   Registered Professional Reporter
23                   and Notary Public
24   My Commission Expires
25   June 23, 2010.

1    DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN

2        I do hereby certify that I have read all

3    questions propounded to me and all answers given by

4    me on the 26th day of September, 2006, taken before

5    K. Denise Neal, and that:

6        1)  There are no changes noted.

7        2)  The following changes are noted:

8        Pursuant to Rule 30(e) of the Federal Rules of

9    Civil Procedure, which reads in part:  Any changes in

10   form or substance which you desire to make shall be

11   entered upon the deposition...with a statement of the

12   reasons given...for making them.  Accordingly, to

13   assist you in effecting corrections, please use the

14   form below:

15   Page No.        Line No.        should read:

16   Page No.        Line No.        should read:

17   Page No.        Line No.        should read:

18   Page No.        Line No.        should read:

19   Page No.        Line No.        should read:

20   Page No.        Line No.        should read:

21   Page No.        Line No.        should read:

22   Page No.        Line No.        should read:

23   Page No.        Line No.        should read:

24   Page No.        Line No.        should read:

202

26/09/2006  MUIR, Douglas R. (vol.1)

1        DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN

2    Page No.        Line No.        should read:

3    Page No.        Line No.        should read:

4    Page No.        Line No.        should read:

5    Page No.        Line No.        should read:

6    Page No.        Line No.        should read:

7    Page No.        Line No.        should read:

8    Page No.        Line No.        should read:

9    Page No.        Line No.        should read:

10   If supplemental or additional pages are necessary,

11   please furnish same in typewriting annexed to this

12   deposition.

13               DOUGLAS R. MUIR

26/09/2006  MUIR, Douglas R. (vol.1)

**$**

**$100,000** [117:25]
**$125** [34:24]
**$144** [107:20] [110:4,25]
**$144,000** [110:19]
**$144,000,000** [111:1]
**$175** [35:2]
**$2** [162:11,14,23] [163:3]
  [165:1] [166:13] [167:19]
**$234,165,842.01** [108:14]
**$300** [25:11]
**$400,000** [116:3]
**$416,000** [94:24]
**$5** [142:10]
**$500** [49:11]

**0**

**007100014** [97:7]
**01** [17:20] [32:2] [33:22]
  [34:9,12] [54:1] [76:20]
  [113:21]
**01432.42** [137:25]
**01a** [17:20] [34:9] [113:21]
**01-a** [17:20] [34:9] [113:21]
**02** [35:4] [36:2] [106:10]
  [113:22]
**02b** [106:10]
**02-b** [106:10]
**04** [33:23] [34:5,12] [115:17]
  [123:12]
**051** [105:23]
**052** [99:5,6]
**053** [99:6]
**054** [99:6] [108:13] [110:10]
**055** [99:6]
**056** [99:6]
**057** [97:25] [99:8,14,22]
  [108:23] [109:1]
**058** [99:7,10]
**059** [100:6,14] [110:1]
**063** [110:2,24] [111:14]
**064** [100:9]
**07** [95:24]
**07284** [139:4,6]
**07285** [139:6]
**07286** [139:6]
**073** [101:14]
**07303** [139:5]
**077** [101:19]
**0943** [126:12]

**1**

**1** [202:6]
**1:53** [112:2]
**10** [4:]
**10:07** [57:7]
**10:16** [57:10]
**10:56** [78:15]
**10105** [2:]
**101802** [4:]

**10-18-02** [4:]
**102802** [4:]
**10-28-02** [4:]
**11** [4:] [10:16,20] [57:12,25]
  [191:13]
**11:38** [78:19]
**1101** [9:2]
**112** [4:]
**11402** [4:]
**11-4-02** [4:]
**11th** [82:12]
**12** [4:] [7:14] [10:16]
**12:41** [111:24]
**126** [4:]
**128** [4:]
**133** [4:]
**1345** [2:]
**137** [4:]
**138** [4:]
**13th** [115:17] [191:11]
**140** [4:]
**144** [106:18] [107:1,4,16]
  [110:14] [111:15]
**148** [4:]
**14th** [191:11]
**15** [168:1]
**15th** [39:22] [163:5] [164:15]
**168** [4:]
**16th** [113:22] [191:19]
**170,000** [90:11]
**18** [4:]
**184** [4:]
**186** [4:]
**18th** [137:23] [168:13]
**190** [177:2,3]
**1901** [2:]
**1976** [7:6,13]
**1977** [8:2]
**1988** [7:16]
**1989** [41:20]
**1990s** [13:20] [176:5]
  [178:24] [179:5]
**1993** [7:16,22] [10:3,5]
**1994** [7:21] [10:4] [14:6,15]
  [71:23] [125:7,10] [143:14]
**1996** [13:25] [71:19,24]
**1997** [29:5] [35:21]
**1998** [29:5] [58:5] [122:16]
  [123:24]
**1999** [9:22] [10:18] [11:1,16]
  ,19] [12:18] [24:9,20]
  [25:13] [27:17] [28:19]
  [34:15] [44:6] [64:13]
  [65:13] [69:23] [92:19]
  [122:17,19] [123:24]
  [126:12] [128:16] [134:23]
  [199:3]
**1st** [39:22]

**2**

**2** [4:] [128:16] [142:15]
  [202:7]
**2:36** [137:2]

**2:47** [137:5]
**20** [4:] [55:17,23] [56:12,17]
**200** [129:22] [201:8]
**2000** [9:22] [35:23] [44:6]
  [59:13] [61:18] [76:11]
  [79:22]
**2000s** [179:23]
**2001** [9:22] [17:17] [25:14]
  [28:25] [33:25] [40:24]
  [50:18] [62:24] [63:14]
  [64:19] [79:5] [80:4] [87:1]
  [100:15] [134:6,24] [137:23]
  [188:19]
**2001a** [17:17] [33:25]
  [100:15]
**2001-a** [17:17] [33:25]
  [100:15]
**2002** [15:17] [65:9,16]
  [66:16] [79:6,9,11] [97:21]
  [98:7,19] [105:25] [133:15]
  [138:22] [140:12] [153:11]
  [156:20] [157:1] [168:13]
  [182:21] [184:10,14]
  [185:7] [186:21]
**2002b** [97:21] [98:7,19]
**2002-b** [97:21] [98:7,19]
**2003** [34:2,4,7]
**2003a** [34:4,7]
**2003-a** [34:4,7]
**2004** [26:15] [130:6]
**2005** [121:4] [174:9]
**2006** [3:] [5:3] [201:20]
  [202:4]
**2009** [26:15] [130:6]
**2010** [201:25]
**20th** [39:22]
**210** [177:2,3,5]
**212** [2:] [4:] [9:3,18] [72:19]
  [84:20]
**213** [4:] [78:17] [80:3] [84:20]
  [85:10,16] [86:2]
**214** [4:] [86:24] [87:11]
**215** [4:] [87:21]
**216** [4:] [97:5] [105:18,22]
  [109:25]
**217** [4:] [112:4]
**218** [4:] [78:17] [112:7,13]
**219** [4:] [126:6,9,20]
**220** [4:] [128:11] [130:18]
**221** [4:] [133:24] [134:3]
**222** [4:] [137:19,22]
**223** [4:] [138:13,19]
**224** [4:] [140:7,10]
**225** [4:] [148:25] [149:4]
  [161:18,19]
**225702** [87:1]
**226** [4:] [168:4,8]
**22601** [4:]
**2-26-01** [4:]
**227** [4:] [184:4,8,17]
**228** [2:] [4:] [186:15,19]
  [187:16]
**2285755** [2:]
**228-5755** [2:]

**2285788** [2:]
**228-5788** [2:]
**23** [201:25]
**234** [110:13]
**246** [118:16]
**250** [117:23]
**25th** [138:22]
**26** [4:]
**26th** [3:] [5:3] [87:1] [202:4]
**27** [4:]
**27407** [7:1]
**275** [117:25]
**2762** [186:22]
**28** [4:] [184:14]
**28th** [134:6] [184:10]
**29** [4:] [140:12]
**2901** [4:]
**2-9-01** [4:]
**294** [112:24] [113:1]

**3**

**3** [4:]
**3.1** [81:20]
**3.2** [82:6,18,21] [86:2]
**3.8** [84:18]
**3:53** [173:24]
**30** [4:] [202:8]
**30,000** [183:13]
**303** [113:15]
**304** [113:15]
**305** [112:24] [113:2,15]
**30th** [105:25] [126:11]
**31** [106:11]
**310** [2:]
**32575** [138:23]
**32599** [138:23]
**32703** [4:]
**3-27-03** [4:]
**32801** [4:]
**3-28-01** [4:]
**35142** [168:11]
**37** [82:11]
**38** [82:12] [118:9] [129:23]
**3rd** [201:19]

**4**

**4** [4:]
**4:12** [174:2]
**40** [158:24]
**4200** [6:25]
**425** [3:] [5:10]
**428052** [98:12]
**428054** [105:17]
**428073** [101:8,20]
**428077** [101:22]
**428300** [90:10]
**428305** [112:13]
**428307** [87:24]
**428309** [95:17,19]
**428313** [112:8]
**4s** [142:15]
**4th** [186:21]

5

5 [4:]
5,000 [42:23]
5:04 [199:25] [200:1]
52002 [4:]
5-20-02 [4:]

6

6 [3:] [4:]
60 [58:6]
63099 [4:]
6-30-99 [4:]
6777 [140:22]
6828 [184:11]

7

7 [4:]
72902 [4:]
7-29-02 [4:]

8

8 [4:]
8:40 [3:] [5:2]
80 [4:] [80:20]
82702 [4:]
8-27-02 [4:]
8299 [4:]
8-2-99 [4:]
85 [80:20]
86 [4:]
87 [4:]

9

9 [4:] [5:3]
9:26 [5:2]
90 [155:19]
90067 [2:]
900676013 [2:]
90067-6013 [2:]
903 [2:]
9039000 [2:]
903-9000 [2:]
9039041 [2:]
903-9041 [2:]
90s [124:20] [176:7] [179:22]
    [180:14]
91202 [4:]
9-12-02 [4:]
92002 [4:]
9-2002 [4:]
92190 [81:16]
92191 [86:3]
92238 [80:5]
926 [5:3]
9-26 [5:3]
959 [128:17]
96 [14:3]
97 [4:] [29:10] [34:23] [37:22]

98 [54:1] [131:16]
99 [24:21] [94:2] [122:17]
9th [80:4]

A

a.m [3:]
aba [111:14,15]
abc [26:8]
ability [6:21] [58:12] [75:14]
    [89:8,12] [123:17,19]
    [124:4] [152:3] [156:14]
    [195:11,12] [196:16]
able [16:16] [24:7] [53:8]
    [88:14,20] [104:20] [130:14]
    [142:19] [143:20] [144:5]
    [158:25] [181:13]
abs [15:14,22] [16:19]
    [26:6] [42:12] [46:4] [54:10
    ,21] [64:16] [93:18] [97:21]
    [135:11] [142:12] [144:4]
    [195:1]
absent [182:18]
absolute [118:12] [125:3]
    [129:18,19]
absolutely [72:13,17]
    [89:16] [135:5]
acceptable [47:2] [51:24]
    [124:16]
acceptance [16:6,11]
    [17:9,11,12] [18:5] [22:8]
    [23:6] [26:1] [31:18,25]
    [32:20,25] [44:11,13,18]
    [58:17] [59:22] [104:25]
accepted [177:4,5,6]
access [24:6,8] [68:7]
    [187:18] [188:1]
accommodation [36:1]
accomplish [36:15] [68:22]
    [81:10] [83:9] [116:5]
    [152:15] [157:5] [198:1,25]
accomplished [77:2]
    [116:6] [197:19,20] [198:1]
accord [82:13]
accordance [84:2] [107:15]
    [114:16,19]
according [106:11] [189:16]
accordingly [202:12]
account [4:] [81:23] [82:1,2
    ,14,17,23] [83:11,17]
    [85:15] [87:22] [88:6,12,15]
    [89:2,9,14,18] [90:15,20]
    [91:5] [92:4] [95:15] [100:
    6,7,15] [101:16] [102:5,8,11
    ,12,13,16,19,20,24] [103:1
    ,3,13,18,22,24,25] [104:4,5
    ,6,9,12,16,21] [109:24]
    [110:2,15,16,24] [111:2,8
    ,14] [114:7,16] [127:7]
accountant [7:13] [121:20]
accountants [94:20]
accounting [93:13] [116:18
    ,20] [133:17]
accounts [90:1] [102:14,15

,18,22,24,25] [103:3,6,8,10
    ,16,19,21] [104:13,14,15,17
    ,21] [116:12]
accrue [43:15]
accrued [109:7,10]
accruing [135:19]
accurate [33:25] [127:7]
    [201:9]
achieve [12:25] [30:20]
    [68:16]
achieved [117:24]
acquainted [161:7]
acquire [18:3] [25:18]
    [50:19,21]
acquired [18:5] [24:3]
    [37:22] [55:8]
acquires [23:25] [32:7]
across [46:11]
act [88:19]
action [201:17]
activities [15:21] [16:22]
activity [16:16] [92:10]
actually [29:5] [35:9] [95:18]
    [113:11] [114:24] [117:18]
added [10:12] [178:1]
addition [50:17]
additional [40:15] [132:21]
    [176:21] [203:10]
address [6:24]
adjourned [200:1]
adjustments [116:14]
administrative [16:25]
admitted [7:15]
adopted [124:21]
advance [25:16,18,25]
    [39:6,10] [40:4,7,9,10,11,15
    ,22] [41:1] [44:5] [64:18]
    [65:16] [134:11]
advances [26:2] [40:16,18]
advantage [28:4]
adverse [57:2] [62:20]
adversely [130:11,12]
advice [15:10] [73:25]
    [133:1] [154:9] [155:7]
    [167:17]
advise [132:11] [144:7]
    [151:25]
advisor [14:24] [15:16,19,24]
    [65:17] [69:6] [141:2]
    [142:1] [143:9] [144:16]
    [151:25] [161:15]
advisors [131:22] [141:3,6
    ,21] [143:1] [151:7]
advisory [64:23] [65:10]
    [66:16] [67:4] [69:14]
    [149:11] [197:5,9,15]
    [198:24]
affairs [115:22]
affect [45:13] [154:20]
    [180:8] [195:7,9]
affected [45:8]
affecting [180:13]
affects [130:12]
again [12:18] [15:21] [23:20]

[32:11] [34:23] [40:8] [44:11]
    [45:23] [48:1] [49:9] [51:25]
    [53:13] [54:2] [55:12]
    [60:21] [64:9] [67:24]
    [73:12] [74:22] [75:3]
    [76:19] [81:24] [89:10]
    [91:15] [101:23] [112:23]
    [131:8] [132:14] [133:9]
    [139:1] [148:5] [151:10]
    [155:15] [161:1] [168:23]
    [169:3] [175:21] [184:25]
    [193:4,6] [199:18]
against [48:25] [51:18]
    [73:25] [102:17] [103:15]
    [117:5] [119:9] [189:12]
agencies [39:13] [43:1]
    [135:15,25] [142:13]
agency [135:20] [195:17]
agent [34:21] [36:17] [37:19]
    [108:11]
aggregate [47:3]
ago [31:16] [33:3] [88:9]
    [89:10] [182:10]
agree [126:22] [169:6]
    [182:4]
agreed [15:12] [47:7,9,12]
    [51:20,21] [115:24] [141:25]
    [184:2] [189:20] [196:7]
agreement [4:] [31:19]
    [40:3] [48:4,6,7,14] [53:15]
    [80:4] [84:3] [85:10,16,20]
    [88:8,18,21] [89:1] [91:2]
    [114:11,17,20] [117:13]
    [150:11] [151:22] [167:2,5
    ,24] [174:18]
agreements [83:22] [84:3]
    [86:1] [89:11] [114:20]
    [166:24]
ahead [40:13] [80:19]
    [84:5] [101:19] [108:25]
    [119:24] [131:6] [156:25]
al [5:6,8]
albany [138:7]
albeit [190:4]
alleged [114:22]
allows [85:3]
almost [167:25] [173:3]
alone [160:6]
along [10:14] [25:14] [29:4]
    [34:1,23] [35:3] [53:25]
    [54:13] [59:12] [125:7]
    [160:16] [166:19]
alpine [23:14,16] [95:3,10]
    [106:18] [107:9,16] [108:7
    ,10] [111:3,11,16]
alpines [110:16]
already [56:6] [120:18]
    [136:22] [166:22] [167:15]
    [179:3] [195:10]
alternative [45:3] [60:9,25]
    [158:17]
alternatives [157:15]
although [19:11] [91:15]
    [149:13] [152:13]

A.2

always [45:22] [69:8,9] [86:21] [95:14] [98:24] [125:10] [155:1] [173:3] [195:2,20]
am [30:25] [62:7] [96:24] [121:18] [201:15]
amend [135:7] [174:5]
amended [189:25]
amendment [36:15,19,22] [194:6]
amendments [37:1,3]
america [28:11,23] [29:6,22] [31:4] [32:15,18] [52:8,9,11,25] [53:4]
americas [2:] [29:23] [31:1]
among [11:25] [140:25] [185:1] [192:9]
amount [15:5] [26:25] [56:10] [68:15,21] [74:14,17] [84:15,16] [98:2] [106:21] [107:6] [109:13] [114:7] [117:8,9,16] [146:3] [152:2,3] [156:12] [178:1,9] [183:15,16] [190:1] [196:19] [197:25]
amounts [50:10] [106:14] [108:21] [117:9] [162:1]
analysis [145:11]
andrew [145:6,8,10,13] [146:12] [147:3,13] [183:25]
andy [145:7] [147:7,8]
angeles [2:]
annexed [203:11]
annual [116:2]
answer [6:14] [19:8] [36:6] [45:22] [49:25] [56:24] [59:3] [75:19] [76:12] [79:18] [80:22] [85:22] [88:23] [119:18,25] [120:3] [129:6] [131:6] [148:11] [153:8] [158:16] [165:23] [166:3] [172:5] [175:12] [183:20] [194:21] [196:17,18]
answered [147:9] [170:4] [176:4]
answering [119:17] [135:3] [147:21]
answers [155:15] [202:3]
anticipated [21:17] [102:9]
anybody [68:1] [71:5,6] [91:13] [186:4] [193:24] [199:7]
anyone [27:24] [37:4] [45:15,19] [51:25] [61:19,24] [62:1] [64:10] [91:9] [118:18] [155:13] [159:23] [169:18] [193:20] [198:17] [199:10]
anything [6:20] [16:23] [22:23] [38:24] [44:11] [58:19] [89:25] [103:22] [112:20] [122:12] [156:6] [164:23] [165:3,5] [170:9]

anytime [194:22]
anyway [175:7]
app [170:10] [175:21]
appalachian [76:8,14]
apparently [105:24] [110:23]
appear [100:12] [105:22] [126:16] [128:17] [134:13] [175:4]
appearance [2:]
appeared [49:15] [100:18]
appears [47:15] [87:21,22] [97:9] [99:10] [100:8,9,14] [102:2] [106:13] [110:5,17] [139:9] [140:1] [168:9]
appendix [99:11]
applicant [172:1,21] [173:1]
applicants [173:4]
application [173:3,10,15] [176:2]
applications [177:12]
applied [50:10] [62:17]
apply [52:23] [174:17]
appoint [43:9]
appreciate [54:18]
appreciated [77:14]
appreciative [154:10]
approach [13:5] [42:4]
appropriate [50:3] [51:9] [67:14]
approval [26:18] [55:18,20] [56:9,14] [145:5]
approve [175:21] [176:1,11] [177:12]
approved [45:9] [144:16]
approximately [34:12] [52:18] [61:13] [74:14] [76:11] [84:12] [90:11] [94:24] [120:19] [162:23]
apt [145:21]
arbitrage [135:14]
area [68:3]
argue [119:21]
arguing [165:24]
arizona [138:8]
around [15:8] [34:23] [35:21] [63:13,14] [64:19] [115:23] [118:9] [121:4] [133:7] [139:15] [141:7] [147:15] [148:13] [152:23] [157:19] [159:11] [161:1] [166:20] [188:6,9]
arrange [67:23]
arranged [16:16]
arrangement [13:18] [30:22] [36:5] [50:24]
arrangements [116:4]
arranger [64:18] [65:15]
arranging [12:5] [16:17] [160:9]
arrived [43:4] [76:2] [199:17]
arriving [92:6]

article [81:17]
articulated [157:23]
ascribe [101:1]
aside [198:24]
ask [6:12] [57:23] [70:13] [72:18] [102:10] [111:19] [113:11] [119:14] [135:2] [138:2] [139:15] [146:19] [163:14] [172:4] [175:7,8,11] [184:16] [197:13]
asked [30:1] [54:25] [70:4,14] [73:4] [78:25] [93:21] [108:1,3] [126:8] [135:4] [155:12,14] [163:19] [164:25] [170:3] [174:5,7] [175:1,4] [177:17] [183:2] [188:12] [194:12,13] [195:5]
asking [6:5] [8:25] [30:15] [52:2,4] [60:11] [80:19,23] [81:21] [85:18,24] [88:22] [101:3] [112:17] [162:7] [163:10,16] [189:14] [191:4] [195:6] [197:14]
aspects [16:25] [199:19]
assemble [42:21]
assert [85:9]
assess [197:12]
assessment [182:13]
asset [12:4] [17:13] [49:1] [65:14] [70:10,18,25] [129:12,17] [130:8] [145:12]
assets [12:5,6] [19:20] [20:3,8] [21:4] [23:25] [24:2] [25:18] [32:7,9] [40:12] [43:10,11,19] [49:2] [81:12] [82:4] [83:25] [84:1,2] [85:5] [116:24] [180:5]
assigned [151:18]
assigning [151:21]
assignment [151:23]
assigns [171:18]
assist [117:7] [174:20] [202:13]
assistance [74:2] [192:22] [196:23]
assisted [16:1]
assisting [150:10]
associated [77:15] [142:3,11]
assume [6:14] [15:6] [27:13] [31:1] [66:7] [120:16] [171:17]
assuming [119:14]
assumption [26:24] [59:6,11] [60:9,20,24] [61:10,15] [62:16] [63:1,10,17,25] [64:8] [79:8,15,21] [138:16] [139:17,20]
assumptions [58:22,23] [59:1] [60:5] [61:20,25] [62:8,16] [63:6] [179:2]
assured [198:21]

atlanta [185:16]
attach [98:24] [109:19]
attached [47:22,25] [98:22] [100:1] [149:8]
attaching [134:4]
attachment [4:] [48:1] [99:12]
attachments [97:13]
attempt [140:2] [180:5] [181:4] [194:14]
attend [73:13] [153:10,13]
attention [62:8,11,14,21] [67:4] [70:22]
attentive [36:12]
attract [129:24] [178:15]
attractive [41:24] [159:12]
audit [8:5]
auditor [8:7]
august [15:17] [65:9] [66:16] [115:17] [128:16] [144:23]
author [140:19]
authorized [90:4]
automatic [181:22]
automatically [103:17]
availability [123:6]
available [49:4,22] [62:3] [68:21] [103:11] [122:24] [123:25] [152:8]
avenue [2:]
avoid [30:22]
avoided [196:24]
awarded [13:7]
awarding [13:11]
aware [53:16] [79:1,7] [114:18] [137:6]
away [54:19] [56:12] [152:7] [157:16] [167:11]

B

b2 [142:21] [145:20] [146:4,9]
back [19:1] [20:14] [21:6] [27:2] [32:10,23] [33:9,11] [41:20] [44:3] [58:2] [59:17] [69:24] [72:18] [77:17] [83:4] [84:7,13] [86:2] [96:5,11] [97:6] [105:17,21] [109:24] [110:10] [111:21] [120:2] [135:2] [141:9] [142:17] [143:14] [148:5] [150:17,20,22] [153:6] [156:22] [161:17] [169:21] [175:12] [182:2] [190:8,13] [196:4] [198:20]
backed [12:4] [17:13] [24:2] [49:1] [65:14] [70:10,18] [71:1] [104:21] [129:12,17] [130:8] [145:12]
background [77:19]
bad [74:24] [136:20] [154:11,15,16] [155:1] [182:3,5,23]
balance [19:14] [27:1] [46:9,13] [47:3] [49:11]

A.3

[92:4,7] [103:10] [104:4,8]
[128:6] [177:24]
balances [43:14] [92:3]
[103:5]
ball [69:22] [185:20]
bank [11:25] [12:20] [13:12]
[14:2] [23:25] [24:15]
[25:5,9] [28:11,23] [29:6,22
,23] [31:1,3] [32:15,18]
[34:14,16] [35:2,7,9,17,20]
[36:1,4,13,15] [37:1]
[38:3] [52:7,9,11,25]
[53:4,21] [82:2] [88:5]
[92:10] [102:5,8,18,22,23]
[103:1,6,17,21] [104:4]
[110:15,16,17,24] [111:2,8
,16] [116:12] [158:9]
banker [12:24]
bankers [70:10] [142:12]
banking [13:9,19] [15:13]
[64:21,22]
bankrupt [144:1]
bankruptcy [5:8] [29:7,8,13]
[30:6,20,24] [40:19] [67:8
,10] [68:2,6] [75:13] [117:13]
[121:25] [132:21] [143:21]
[144:6] [145:19,25] [146:6]
[149:7] [152:1,13,24]
[157:4,5,20] [158:18,19,22]
[159:9,23] [161:15] [166:20]
[167:13,15] [183:3] [185:22]
[188:7] [189:2] [192:15]
[193:22] [194:5] [199:12,13
,17]
banks [12:10] [13:9,15]
[24:17] [34:21] [35:16,18]
[36:11] [49:13] [54:5,6]
[70:24] [71:2] [103:11]
[166:22] [185:24]
base [164:15] [171:20]
based [13:4,18] [30:7]
[52:3] [106:15] [114:5]
[118:11,12] [119:22]
[159:3] [163:6] [179:14]
[183:23] [196:25]
basic [81:3] [134:15] [135:
15]
basically [13:4] [30:4]
[31:14] [42:20] [43:5,17]
[93:20] [166:17] [172:20]
[185:17]
basis [52:4] [59:22] [88:13]
[92:2] [157:22] [159:3]
[170:5] [186:11]
bates [9:1,10,13] [80:4]
[81:14] [86:3,25] [87:23]
[90:10] [97:5,7] [112:7,13]
[126:12] [128:16] [137:24]
[138:22,24] [140:22]
[168:11] [184:10] [186:22]
battling [159:7]
beacon [172:19]
bears [97:6]
became [10:14] [11:9]

[79:7]
become [8:1] [79:1] [146:3]
beeson [93:3,22] [94:12]
began [7:13] [76:11] [122:19
,24] [126:25] [128:24]
begin [69:25] [71:15] [122:
14] [139:24]
beginning [7:4] [24:21]
[49:25] [65:16] [66:16]
[72:16] [92:5] [122:16]
[126:24] [139:16] [184:18]
beginnings [58:14]
begins [128:23]
behalf [6:5] [39:20] [40:5,7
,16] [108:3] [174:12] [196:
21]
behind [101:15] [139:24]
[161:19]
belief [83:16]
believe [13:25] [18:11]
[21:3,20] [25:13] [28:12]
[41:15] [62:15] [63:14]
[66:14] [72:15] [75:19]
[76:9] [78:25] [88:25]
[91:24] [92:2,8] [95:16]
[98:21] [99:4] [114:13]
[121:25] [132:19,24]
[133:6] [153:16] [174:3]
bell [139:12]
belong [97:16]
below [56:16] [82:6] [177:5]
[202:14]
benchmark [48:24] [49:7,11
,21] [151:16]
benchmarks [189:17]
beneficial [18:13,18] [19:5
,11] [21:7,21] [83:16]
[135:12]
benefited [159:7]
berkshire [67:11,15] [68:13
,25] [115:19] [153:10,20]
[156:3,18] [157:2] [158:23]
[160:9,22] [186:12] [190:15
,17] [191:24] [192:1,11,16]
[198:9]
besides [45:17] [77:16]
[167:10]
best [8:2,11] [10:2] [11:5,18]
[12:12,22] [13:5] [14:1,16
,17,25] [20:13,18,25]
[23:9] [27:3] [28:10] [29:4
,10] [30:16] [38:23] [40:23]
[51:19,21,22] [61:16]
[62:22] [63:18] [66:1]
[71:19] [132:1] [157:3]
[160:4] [163:1] [174:22,25]
[180:10] [191:10] [196:9,16]
[197:10]
bet [48:5,6]
better [53:20] [56:12,15,20
,22] [79:25] [151:8] [158:1]
[171:12]
bid [51:18]
bids [151:10] [159:12]

big [47:5] [93:11,21] [116:16]
[125:3] [142:22] [146:10]
[152:21] [191:15]
bigger [170:12]
bill [72:23] [73:6,19] [74:6]
[77:12,14,18] [78:1]
billion [49:9] [142:10]
bills [75:21] [77:11] [78:5]
[174:14]
binds [89:1]
bit [7:3] [64:11] [80:21]
[122:11] [134:1] [164:1]
[169:24] [176:19]
blank [138:10] [149:12,15,16
,17]
blessing [144:19]
blocking [152:21]
blurred [11:9]
board [9:23] [26:16,17,18]
[28:7,8] [51:2,21] [68:25]
[73:4,7,9,18] [74:25]
[76:2,21] [126:11,16]
[128:15,18] [140:12]
[144:16,20] [145:5] [184:9
,13] [186:20] [198:9]
boards [75:17]
boat [155:3]
boatload [54:15]
bob [11:6] [12:14] [38:21]
[44:16] [45:21] [46:1]
[51:5] [61:4] [63:18] [69:10
,20,22] [133:4,18] [150:7,8]
[170:12] [184:25] [185:19]
[186:2,3,7,13] [193:6,7]
bobs [28:1]
bond [28:16] [47:6] [129:14
,21] [135:24]
bondholders [40:13] [144:
4]
bonds [13:4] [26:14] [27:20]
[28:9,16] [46:25] [47:1,2,3
,5] [109:1,10] [130:6]
[135:19] [154:21,22]
bonus [116:4,8]
book [4:] [13:24] [28:12]
[137:23] [143:4] [158:5]
books [151:11]
borrow [25:17] [96:4]
borrowed [50:11]
borrower [30:24] [36:22,25]
borrowers [178:7]
borrowing [25:21]
borrowings [24:15]
boston [5:7] [39:11] [108:1]
[112:9] [136:7] [141:1]
[149:7] [163:6]
bottom [9:13] [81:15]
[110:3] [111:13] [126:19]
[129:9] [140:20] [187:17]
bought [182:17]
bowels [170:11]
bozzo [42:10]
break [6:15] [24:12] [57:4]
[78:12] [111:18] [136:24]

[148:1,10,16,17,20] [164:1]
[173:20] [175:13] [183:21]
[199:22]
brief [11:6]
briefed [185:24]
briefing [4:] [137:23] [185:
23]
briefly [6:11] [7:12,19]
[39:15] [88:7] [134:7]
[138:2] [184:19]
bright [72:10] [155:12]
bring [72:2] [75:15] [125:2]
[143:24] [193:17]
broad [13:3,21] [17:19]
[24:6,11] [157:11]
broader [119:19]
broadly [93:10] [114:21]
brokered [161:2]
brothers [71:4]
brought [6:6] [143:16]
[185:7]
brower [132:2,5,10,15,22]
[133:1,15,22] [137:11,24]
browers [138:5]
buckeye [138:8]
bucks [167:7,9]
budget [181:14]
buffett [153:18,20,23,25]
[154:24] [155:6,7,10]
[157:13] [158:15] [160:14]
[161:3] [182:3,14,16]
buffetts [159:2]
build [77:24] [78:3] [123:17]
[124:6]
building [44:3] [167:4]
built [123:21,22] [124:2]
bulk [48:18]
bunch [165:9]
bureau [171:21,22] [173:5
,7,12]
bureaus [171:16] [173:5]
business [11:23] [13:12]
[14:9] [16:9] [17:12] [18:10]
[22:14] [23:11] [24:10]
[27:7] [39:18] [54:9,12,19
,21] [58:12] [59:6] [65:5,22]
[66:1] [76:8] [81:22] [85:25]
[103:14] [115:19] [116:15]
[123:5,12] [124:2] [125:11
,14] [128:1] [141:24] [142:
5,12] [143:25] [144:6]
[145:3,11] [150:22] [152:3
,4,10,16] [155:5,18] [158:10]
[182:3,6,8,16,20,23]
[183:20] [191:14] [194:23]
[196:24]
businesses [142:4,13]
busy [168:2]
buy [74:12] [123:4] [124:15]
[127:13,14,15,23] [129:13]
[130:20] [131:2,10,20,23]
[132:17] [137:13] [173:11]
[177:15,16,17,18,19]
[178:23]

buydown [127:14,15]
[177:15,16,17,18,19]
[178:23]
buy-down [127:14,15]
[177:15,16,17,18,19]
[178:23]
buydowns [127:13]
buy-downs [127:13]
buyer [116:15] [129:14,24]
[180:14]
buyers [43:2] [133:8] [159:
14,15]
buying [130:9] [133:9]
[142:15] [159:23]
buyout [130:20] [131:2,10
,23] [132:17] [137:13]
buy-out [130:20] [131:2,10
,23] [132:17] [137:13]

C

calculation [99:24]
calculations [98:25]
calendar [114:5]
caliber [143:16] [180:23]
california [2:] [171:6]
call [21:21] [35:10] [42:9]
[47:18] [70:6,13] [88:22]
[93:23] [165:9] [171:21,23]
[181:1]
called [9:2,18] [17:21]
[21:16] [22:2] [23:22]
[24:5,22] [25:15] [31:20]
[34:4] [48:3] [70:4,14]
[73:24] [103:10] [121:15]
[137:7,10] [145:8] [146:5]
[154:21] [160:17] [172:19]
[176:1] [177:14]
calling [37:24] [64:10]
[191:15]
calls [110:8]
candid [154:13]
candidate [71:8]
candidates [62:18]
cant [10:11] [25:13] [31:14]
[37:8,23] [45:19] [51:11,25]
[53:24] [54:2] [55:15]
[59:12] [94:18] [115:8,10,25]
[120:23] [137:14] [139:13]
[141:13] [143:5] [166:23]
capabilities [13:5] [70:17]
capable [142:2]
capacity [69:6]
capital [22:3,4,6,10] [27:5]
[129:15] [192:16]
capture [43:18]
card [172:11,18] [173:10,16
,19] [175:22,23] [180:19]
cards [172:13] [173:13,17]
carolina [3:] [5:11] [7:1]
[183:14] [201:1]
carrying [185:20]
case [67:8] [112:25] [114:14
,22] [115:1,9,14] [146:11]

[149:8] [152:21] [158:24]
[160:5] [173:13]
cash [12:7] [20:7,16] [21:5
,14] [24:14] [25:8] [27:9]
[31:23,24] [32:10,22]
[33:8] [40:17] [43:19]
[57:15] [62:20] [84:6]
[102:4] [103:5,12,22]
[116:25] [125:11] [126:2]
[127:24] [135:24,25]
[177:25] [178:20]
castanares [2:] [5:18]
[9:5,7,9,14] [16:3] [19:7]
[20:4,12] [29:15] [30:17]
[38:14] [49:23] [57:17]
[75:24] [78:13,20] [80:17]
[82:24] [83:19] [84:23]
[86:10] [89:21] [90:25]
[95:23] [96:8,13,17] [99:9
,16] [100:10,24] [101:5,10
,17] [112:11,14,19] [113:4
,9,14] [115:2] [118:20]
[119:12,24] [120:5] [131:3]
[139:1] [140:3,6] [147:24]
[148:4,9,17,21] [149:5,14
,20] [150:1] [163:13] [164:
3] [165:23] [166:6] [170:3]
[171:4,7,10] [175:7,10]
[183:21] [184:3] [190:10]
cause [57:14] [75:10]
[88:20] [181:4] [183:1]
caused [57:12] [62:15]
[73:11]
causes [57:16,24]
causing [88:18]
caution [49:23] [119:12]
centers [123:18,20,21]
[124:6] [138:9]
century [180:15]
ceo [11:14,17] [44:15]
[63:21] [75:2] [76:25]
[78:1,2] [131:13]
certain [18:16] [23:15]
[40:10] [42:25] [56:5]
[66:18,21] [79:21] [81:2]
[87:13] [96:24] [116:22,23
,24] [117:1,16,22] [132:19]
[145:20] [168:19] [169:4]
[173:15] [175:16] [176:3]
[177:4] [180:10] [192:4]
[195:16] [198:6,13]
certainly [24:21] [31:8]
[44:10] [53:3] [61:4] [62:24]
[63:9] [84:24] [89:6] [108:
1] [122:17] [124:17,19]
[134:12] [136:22] [150:12]
[152:16] [160:2] [163:7]
[169:5] [191:18] [196:4]
certificate [83:11]
certificates [83:13]
certify [201:5,11,13,15]
[202:2]
cetera [93:9] [139:3]
cfo [11:13,17]

chain [138:20] [139:9]
[168:8,9,12]
chair [75:2]
chairman [72:23]
chance [143:15]
change [29:12,22,25]
[30:2,9,12] [106:19] [109:
13] [110:13] [125:3,19,22]
[126:4] [129:19] [135:10]
[170:9] [173:21] [177:9]
changed [10:13] [125:14]
[176:13] [190:8]
changes [10:10] [30:3]
[170:11] [194:17] [202:6,7
,9]
changing [30:4] [134:1]
chapter [10:20] [57:12,25]
character [110:17]
characteristics [180:2]
characterization [182:13]
characterize [12:12] [25:6]
[32:19] [53:2] [62:10]
[176:15]
charge [15:25] [36:23]
[38:12] [44:17] [59:21]
[61:19] [93:2] [178:11]
[179:15,17]
charged [52:11] [179:14]
charging [49:13] [52:19]
[130:15]
charlotte [7:20]
chase [82:2] [96:25] [109:14]
[110:12,14,16] [111:5]
check [74:17]
checks [74:13] [102:24]
[103:2,15]
cherry [3:] [5:11]
chief [11:11] [27:14] [46:3]
[69:10] [72:24] [75:21]
[76:18,20,22] [77:10]
[78:7] [121:20]
choice [76:17] [146:12]
choosing [12:20]
chunk [135:16]
circumstances [40:9]
[52:15] [169:3] [177:4]
cited [73:18] [122:7] [183:4]
city [7:19]
civil [202:9]
claim [4:] [85:8,21] [117:8]
[149:6,9] [162:5]
claims [116:22,23] [118:9]
[119:4,9] [120:7,11,15]
[145:19,21,24] [146:9,10]
[152:22] [158:24]
clarify [132:13]
clarity [150:24]
clark [93:3,22] [94:13]
clarks [94:7]
class [85:19] [107:2] [108:
11] [111:2]
clayton [49:4] [116:15]
cleansing [159:24]
clear [48:9] [75:16] [121:12]

[139:14] [174:10]
clearly [15:2] [53:16] [139:
19] [165:12] [179:7] [190:16]
client [8:1]
clients [7:23] [8:22]
close [106:11] [146:23]
[153:5]
closed [42:1] [166:22]
closes [47:20]
closing [47:17,23,25]
[48:2,10,14] [98:4,19,22,25]
[99:2,7,12] [100:2] [106:10
,15,22] [107:15,24] [109:2
,8,17,20] [110:12] [111:4]
[116:12] [127:25] [178:21]
co [145:8]
coconut [4:] [137:7,10,23]
code [137:13,14] [166:25]
collateral [13:2] [18:6]
[30:23] [45:14] [114:4]
colleague [5:16]
collect [16:22] [118:18]
collected [83:25]
collection [16:22] [99:3]
collections [82:4] [91:22]
[92:5]
collectively [12:15] [63:19]
[80:10] [81:10]
collectors [181:8]
college [7:4]
columns [9:22]
comanager [14:12]
comanagers [28:14]
coming [45:5] [54:18]
[79:11] [122:7] [154:10]
[172:3]
commence [160:1]
comment [27:23] [154:24]
commented [150:6]
commercial [23:16] [24:1,6]
[142:5]
commission [201:24]
committee [45:24] [117:14]
[192:3,6,10]
common [50:22,23] [55:8]
communicate [152:17]
communication [156:13]
[160:10] [174:15]
communications [163:22]
comp [116:6]
companies [76:15] [102:22]
[123:3]
company [12:4] [13:10,12
,13,16,17] [14:18] [16:7]
[22:2] [23:10] [27:15]
[33:2] [38:13] [44:5,16]
[45:16] [46:3] [49:1] [54:4
,5,7,17] [55:15] [56:12,15]
[58:10,16] [63:21] [67:7,16]
[72:21] [73:3,16,25] [75:15]
[76:23] [77:4,5] [78:2]
[103:20] [121:15] [122:3,4]
[123:14] [127:8] [128:2]
[131:20] [132:16,23]

[133:9] [134:25] [139:16] [142:10] [143:14] [145:8,13] [146:2,8,13] [152:10,14] [153:21] [154:1,7] [157:19] [158:13,18] [159:11,18,23] [160:5] [176:6] [182:9,14] [189:22] [190:8,16] [192:10] [193:2] [194:10]

companys [56:21] [121:9] [157:3]

comparable [130:1]

compare [189:13]

compared [32:15] [126:1] [172:18]

comparing [139:21] [151:15]

compelled [68:25] [174:24] [198:6]

compensate [50:3] [65:23] [177:7] [179:3]

compensated [46:6] [48:23] [50:6]

compensating [54:3]

compensation [46:20] [50:13,24] [115:24] [117:18] [118:10,11] [162:2] [174:11 ,16]

competent [6:19] [66:21]

competently [66:10,13,17]

competitive [151:10]

competitors [54:21] [127:12]

complete [44:2] [149:13] [172:5]

completely [198:5]

complex [141:24] [143:21]

comport [129:2]

comports [187:9]

computation [98:2]

computations [47:22]

computed [55:20]

computer [91:23]

computers [103:17]

concentration [102:4,11,12 ,16,19] [103:13,18,25] [104:5,9,11,16,21]

concept [41:1] [60:24] [134:12] [135:16]

concern [84:21]

concerned [186:9]

concluded [52:16] [75:1] [145:18] [146:1,7,23] [157:2] [158:17] [161:13] [192:17]

conclusion [79:12] [139:20]

condition [36:11]

conditions [19:4] [176:3] [192:8]

conduit [23:17,19,21] [24:3,5] [160:10]

conduits [23:23] [30:3]

conference [165:9]

confident [74:6]

confirm [152:23]

confirmation [106:14]

confirming [174:15]

confused [37:18] [164:24]

conjunction [184:22]

connect [137:14]

connecticut [171:8]

connection [25:19] [46:4] [177:10]

cons [141:22]

consent [75:18]

consequence [37:12] [62:18]

consider [25:4] [65:3,4] [158:14]

considerable [131:14] [192:7]

considerably [32:12]

consideration [50:18] [131:1] [142:23] [157:16]

considered [131:11] [141: 3,7,12] [157:15] [172:3]

considering [14:13] [48:10] [141:15]

consisted [93:15]

consistent [27:9] [128:9]

consortium [191:25] [192: 17]

constituencies [142:3,20] [152:18] [160:5] [185:23]

constituents [142:11]

constitute [113:20]

constitutes [147:10]

constructed [172:12]

construction [103:4,9,24]

consult [45:12,15] [166:7]

consultation [145:17]

consulted [38:8] [44:19] [73:6] [131:22] [195:21]

consulting [76:12]

consumer [123:5] [124:14]

consumers [123:2,3]

contact [193:10]

contacted [159:16] [185:11] [193:9]

contacting [193:12]

contemplated [44:19] [79:16] [111:4]

contemplating [53:15] [156:8] [157:13]

contents [3:] [169:19]

contested [146:1]

context [116:20]

contingent [145:21]

continue [14:9,19] [123:8] [188:13]

continued [68:7] [78:3] [187:18] [188:1]

contract [18:16] [39:18] [121:5,7,13] [144:23] [145:1] [164:24] [165:4] [167:10] [168:1] [174:8,10 ,13,16]

contracts [26:3]

contrary [68:5] [104:2]

contribute [58:24]

contributing [183:17]

contributors [57:20] [58:21]

controlled [33:1] [88:16] [89:7]

conventional [127:22]

conversation [42:4] [53:25] [54:3] [60:4,6] [73:12] [79:13,19] [163:11,18,20] [164:7,13] [165:6,10,20] [166:14] [167:14] [183:24]

conversations [27:23] [52:3,7] [53:6,14] [147:7] [151:12] [163:12,15] [169:17] [191:21]

conversely [176:3] [196:13]

convey [43:8] [60:12] [198:16]

conveyed [60:15,16] [81:3] [92:1] [196:4] [198:18]

convinced [198:22]

cooper [150:14]

cooperate [117:6]

coordinating [142:2]

copies [48:13] [95:25] [139:3]

copy [9:9,11,12] [95:23] [96:9] [98:25] [99:7,15] [100:1] [101:11] [109:20] [112:16,23] [113:1,5] [120:10,20]

copying [96:2]

corner [148:10]

corp [22:3,4,7,10]

corporate [4:] [9:2,19] [10:15] [15:23] [18:9] [19:1] [23:20] [25:11] [26:13] [89:15] [142:21] [145:19]

corporates [129:17] [130:7]

corporation [4:] [5:5] [16:6 ,11] [22:22] [37:25] [58:17] [104:13] [126:10,17] [128:14] [130:21] [131:2,11] [140:11,14] [149:8] [184:8] [186:20]

corporations [128:18]

correct [9:24] [10:1,7,8] [21:13] [27:17,18] [34:13] [42:14] [58:18] [62:7] [63:15] [67:12] [68:18] [72:24] [73:1] [78:25] [82:8] [95:13,16] [98:9] [99:4] [100:7,21] [106:12,15 ,25] [122:1,5] [134:19] [138:23] [174:4]

corrected [123:13]

correcting [113:12]

correction [78:21,23]

corrections [202:13]

correctly [65:11] [104:15] [176:15]

correspond [130:16]

correspondence [139:11] [155:23]

cost [77:23] [130:12] [151:

8]

couldnt [84:14]

counsel [2:] [5:13] [9:9] [23:9,10] [78:23] [80:19] [87:9] [96:8] [100:10] [101:6] [112:14] [118:24] [119:6,15] [131:3] [139:1] [140:4] [147:20] [148:12] [150:10,13] [163:8,11,20] [165:20] [166:8,9] [171:12] [174:4] [201:16]

count [64:14]

county [201:2]

couple [66:20] [116:9] [143:12] [171:15] [179:18] [188:17]

coupon [109:2] [178:18]

course [84:10] [87:15] [88:10] [134:23]

court [5:9,12,20] [8:25] [9:6] [117:13] [126:8] [134:2] [137:21] [148:7,22] [149:3] [168:7] [175:11] [184:7] [186:18]

cousin [25:6]

cover [97:20]

covered [55:11] [56:20]

covers [81:12]

cp [24:2,8]

cranleigh [6:25]

create [17:13] [41:23] [43:17] [44:5]

created [18:22] [22:19] [25:19] [28:25] [31:16] [43:21] [81:6]

creating [12:4] [44:3] [135: 22]

creation [81:13]

creative [115:11] [135:13] [136:2]

credit [5:7] [12:1,2] [13:9,12 ,14,15,17,18] [15:17] [24:15] [25:5,9] [27:1] [28:2,15] [34:6,10,14,16] [35:2,4,7,18] [38:3,24] [39:4] [40:21] [42:4] [44:7 ,15,21,22] [45:11,16,20,24] [46:5,21] [47:12] [48:22] [50:3,6,24] [51:4,9,13] [52:17,23] [53:12,20] [54:5,8,12,16,18,23] [55:2] [56:2,17] [59:7] [63:1,4,23] [64:7,12] [65:12,21] [66:8,12,15] [68:17] [69:5,13,25] [70:21] [73:22] [104:8] [110:4] [112:9] [114:24] [117:5] [119:10] [123:24] [124:5] [126:3] [130:14] [134:21,24] [136:9] [141:1,15] [142:4] [143:8] [144:3,15] [146:19] [149:7,10] [151:1,8,21] [160:8,23,25] [162:1,8,20 ,22] [163:2,3] [165:21]

[166:8,10] [167:19,23]
[169:18] [170:10,24]
[171:16,22] [173:4,5,8,12
,14,18] [179:9] [180:2]
[185:3,25] [186:5] [188:21
,22] [189:13] [190:6] [192:
9] [193:20,22,23] [194:8,16
,19] [195:6,20] [196:6,8,15]
[199:2,5,10]
creditor [67:8,10,11] [157:
8] [159:8] [192:2]
creditors [117:14,16,24]
[118:8] [160:7,13] [192:4]
creditworthiness [171:19
,25] [172:21]
creditworthy [178:7]
criteria [12:19,22] [42:25]
[48:20] [51:7] [176:22]
critical [52:14] [53:5]
critically [68:14]
cs [46:18] [198:17]
csf [153:22]
csfb [13:24] [21:1] [23:17]
[29:1] [33:19] [41:12]
[45:12,17] [46:24,25]
[47:8] [49:5,12] [50:11,16
,19] [51:15] [52:13] [53:6,8
,14] [54:14,15,18] [56:11]
[64:21] [67:25] [68:1,3,5]
[69:8] [70:11] [71:3,7,23]
[80:5] [81:15] [84:20]
[86:25] [93:19] [95:3,11]
[98:3] [99:25] [106:8]
[107:6,8,13,20] [108:8,9,10
,11] [109:5,14,23] [110:13]
[118:25] [119:6] [136:15]
[143:11] [144:7] [145:18]
[146:15,18,22,23] [153:2]
[156:18] [161:2] [162:14]
[165:18] [168:11] [186:8]
[187:18,23] [188:1] [190:11]
[195:2,23,24] [196:1,11]
[198:2] [199:8,20]
csfb225678 [86:25]
csfb-225678 [86:25]
csfb35137 [168:11]
csfb-35137 [168:11]
csfb92153 [80:5]
csfb-92153 [80:5]
csfb92190 [81:15]
csfb-92190 [81:15]
csfb92194 [84:20]
csfb-92194 [84:20]
csfboakwood [119:6]
csfb-oakwood [119:6]
csfbs [86:15] [117:8]
cumulative [118:15]
cumulatively [118:8]
cure [36:16]
cured [37:12]
curious [76:16]
current [118:5] [174:6]
currently [127:18]
custodian [48:17]

custom [172:10,13] [173:13
,19]
customer [74:11] [127:16]
[128:4] [129:13] [177:2,20
,23] [178:8,9,20] [181:4,9,11
,12,14]
customers [45:8] [125:8]
[126:2] [130:15] [173:11,14]
[178:16] [181:1,6,18,22]
cut [58:6] [170:14] [175:17]
[176:5,9,18] [177:1,9,14]
cutdown [177:14]
cut-down [177:14]
cutoff [170:14] [175:17]
[176:5,9,18] [177:1]
cut-off [170:14] [175:17]
[176:5,9,18] [177:1]
cutoffs [177:9]
cut-offs [177:9]
cycle [44:2] [142:15]

—————————

D

daggett [11:7] [75:20]
[76:17,24]
daily [22:14]
damage [152:3] [179:20,24]
data [122:22] [147:9] [171:
20] [172:14] [173:6,11,12,14
,15]
date [5:3] [10:19] [11:2,16,20]
[12:19] [24:10] [28:20]
[34:1,16] [63:15] [64:13]
[65:13] [92:20] [98:4]
[109:2,8] [110:13] [113:22]
[114:8] [118:17] [122:15]
[135:8] [155:2] [198:6,12]
[199:3]
dated [80:4] [87:1] [105:25]
[134:5] [137:23] [138:21]
[168:12]
dates [14:11]
davidson [145:6,8,10]
[147:3,13] [183:25]
davidsons [145:13] [146:13]
dawn [94:17,18,20]
day [3:] [43:25] [47:20]
[59:22] [71:25] [84:4]
[102:7] [103:14] [104:3,6,8]
[116:25] [129:19] [162:13]
[164:14,19] [168:2] [170:5]
[187:6] [190:2] [191:17,19]
[192:15] [194:20] [201:19]
[202:4]
days [173:4]
daytoday [59:22] [170:5]
[194:20]
day-to-day [59:22] [170:5]
[194:20]
deal [43:22] [49:9,11]
[52:16] [59:6] [80:15,16]
[93:18] [125:3] [128:1]
[132:8] [160:12] [181:1,4]
[189:24]

dealers [165:10]
dealing [51:3] [60:10]
[69:5] [117:7] [133:14]
[196:20]
deals [136:3]
dealt [85:25] [161:10]
death [181:7]
debate [192:7]
debated [141:22]
debit [104:3] [110:4]
debt [19:14] [25:11,12]
[26:13,25] [43:13] [81:13]
[142:21]
debtor [114:24]
debtors [5:6] [146:5]
december [192:12]
decide [38:2] [89:24] [90:7]
[143:8]
decided [27:19] [46:14]
[70:12] [71:23] [146:11]
[154:16] [183:23]
deciding [74:23] [175:17]
decision [12:13,16] [26:14
,17] [27:7,21] [28:16]
[35:12,15,16] [38:6] [45:8
,20] [61:1,2] [63:5,8,16,22
,24] [76:1] [89:19] [125:4,5
,15] [139:24] [141:20]
[143:11] [144:2] [194:23]
decisioning [170:10]
decisions [46:1,2] [77:15,16]
[124:6] [170:12,13] [182:24
,25] [194:20] [195:18,23,25]
decline [122:16,20]
declined [14:9] [49:3]
deducted [47:9] [55:24]
deep [58:4,7]
default [36:9,16] [37:4]
[177:8] [179:12,17] [180:11
,21,22] [193:23]
defaulted [178:17]
defaults [37:9,11,13] [180:
17]
defendants [2:] [4:] [5:8,16]
[6:6] [9:18] [80:2] [86:24]
[87:11,21] [97:4] [109:25]
[112:4,7] [134:3] [137:22]
[138:18] [140:10] [149:4]
[161:18,19] [168:8] [186:19]
[187:16]
define [150:21]
definitely [11:7]
definition [83:7,12]
delaware [5:9] [18:10]
delegated [69:19]
delinquent [39:20] [40:4,8
,17] [60:10] [62:17] [179:10]
deliver [154:11]
delivers [72:10]
demand [123:2,6] [188:11]
demanded [189:4]
demanding [130:2]
demands [129:14]
denise [3:] [5:13] [33:13]

[201:3,21] [202:5]
department [93:8,9,11]
[110:18] [156:2]
departments [93:6]
depending [47:6] [64:14]
[102:5]
depends [36:25]
deployed [27:10]
depo [96:15]
deponent [201:10]
deposit [43:6]
deposited [33:6] [81:4]
[82:3]
depositing [81:12]
deposition [3:] [5:4,10]
[6:8] [174:17] [183:2]
[200:1] [201:6,7] [202:1]
[203:1,12]
deposition...with [202:11]
depositions [149:23]
deposits [102:14] [104:7]
derivable [84:15] [91:16]
derived [172:10,17] [173:18]
[175:22]
describe [31:8] [42:15,17]
[44:24] [157:4]
described [18:18] [19:17]
[24:23] [28:19] [39:15]
[187:9]
describes [81:3]
description [82:22]
designed [26:1] [74:24]
[176:21]
designer [170:24]
desire [30:19] [202:10]
desired [44:25] [62:9]
despite [180:10]
details [138:2] [163:10]
[165:22]
deteriorating [36:10]
determine [51:23] [90:4]
[189:14]
determined [55:9]
determining [44:22] [51:8]
[145:23]
developed [124:20] [172:14
,22] [188:7,9]
deviate [89:5]
devoted [82:8]
dialers [181:23]
dialogue [181:10]
dictate [194:16,17]
didnt [16:23] [33:18] [38:21]
[44:11] [45:9] [50:20]
[54:18] [56:6] [65:22]
[67:20,24] [71:5] [73:13]
[78:9,10] [108:2] [135:21]
[143:4] [154:23] [156:12]
[160:24] [166:12] [172:6]
[178:22] [182:6] [185:5,17
,24] [188:4] [189:1,5,24]
[196:8,12] [197:17]
difference [127:21] [135:17]
[182:14]

different [10:16] [11:4]
[24:1] [25:5] [26:8] [80:1]
[82:17,20] [92:21] [93:6]
[97:9] [100:12] [103:6,20]
[116:10] [142:3,14] [143:24]
[149:15,22] [176:22]
differential [178:12]
differently [57:23] [171:14]
difficult [51:17] [145:2]
[163:21] [183:9] [199:11,21]
difficulties [35:23] [58:24]
[63:2] [75:11,12]
dig [137:16]
diligence [159:14] [160:1]
dilution [57:1,2]
dilutive [56:23,24]
dip [67:23] [68:1,2] [69:17,22]
[152:7] [184:22] [185:1,3,10
,14,20] [186:1,6,11] [190:22
,24] [191:12,14,20,23]
[192:5,8,9,10,14,19,23]
[193:5,8]
direct [23:17] [24:17] [30:5
,21] [36:7] [42:4] [56:7]
[90:4] [94:8] [161:20]
[185:18] [194:14]
directed [89:25]
directing [95:20]
direction [78:5] [87:12]
[90:5]
directly [8:5] [18:14] [22:11]
[24:8] [32:25] [45:23]
[76:19] [94:6] [133:3]
[147:2] [161:11] [185:9]
director [94:9] [132:5]
directors [9:23] [26:16]
[126:11] [128:15] [140:12]
[184:9] [186:21] [194:17]
disbursed [84:1] [107:14]
disbursements [90:1]
[92:6] [103:4] [114:6,10,15
,18]
disciplined [77:7]
disclosed [191:23]
discomfort [190:14]
discontinuance [156:1]
discontinue [154:17]
discount [46:23] [47:4,6]
[109:4] [127:15,19,25]
[177:23,25]
discounted [108:17]
discounting [127:13]
discuss [12:14,15] [71:9]
[170:15]
discussed [33:2] [40:25]
[44:10] [51:1,2] [53:18]
[60:13] [61:4,5,10,11]
[63:19] [67:25] [79:20]
[88:7] [93:12] [119:4]
[141:21] [146:21] [161:14]
[190:17] [195:19]
discussing [56:4] [106:20]
discussion [8:24] [60:22]
[71:24] [137:18] [153:19]

[156:18] [157:11] [162:13,17
,18] [163:5,8,9] [164:18,21]
[165:13] [167:11] [192:7]
[193:19]
discussions [73:16] [118:
22] [132:21] [141:1] [186:10]
[187:18,22] [197:23]
disinterested [147:1]
disjointed [166:18]
displays [109:1,2,4]
dispose [20:3]
disputes [150:16,17,19]
dissect [83:23]
dissimilar [41:2]
distill [155:14]
distinction [128:6]
distributed [20:9,16] [118:
13]
distribution [13:4] [83:11]
[111:10] [117:23]
distributions [89:2] [117:15]
[118:8,16]
district [5:9]
divorce [181:7] [182:23]
document [9:1,16] [18:17]
[19:2] [47:19] [49:17]
[80:10,14,20,25] [81:3,24]
[82:11,12] [87:11,20]
[88:2] [92:3] [96:10] [97:1
,4,7,15] [98:17] [100:1,5,13
,18] [101:25] [111:20]
[112:15,22,24] [126:9,14]
[128:14,22] [134:2,7,10]
[137:9,21] [138:3,17,22]
[139:12] [140:10,13,17,22]
[141:4] [149:3] [168:7,11,17
,20] [184:7,11] [186:18,23]
[187:1] [194:3]
documentation [80:13]
documents [18:22] [20:5,15]
[38:19] [48:15,17] [49:15]
[79:24] [80:9,12] [81:9]
[83:8] [90:3] [91:16] [97:10]
[99:3] [106:20] [116:19]
[139:7]
doesnt [9:9] [43:7] [72:11]
[101:11] [134:13]
dog [146:24]
doing [49:3] [50:8] [61:21]
[62:15] [65:8] [67:25]
[71:2] [107:17,21] [110:17]
[127:12] [155:17] [158:21]
[159:4] [168:23] [184:21,24]
[185:4] [195:3] [196:7,12]
[197:9] [199:14]
dollar [13:1] [49:9] [84:15]
[106:14] [117:9,15,16]
[142:9]
dollars [88:23] [118:13]
donald [2:1] [5:12]
done [41:5,8,18] [52:14,16]
[129:23] [144:10] [154:25]
[157:7] [160:18] [161:6]
[172:15] [174:12] [179:21]

[195:11,15] [199:11,15]
dont [6:12] [15:10,23]
[19:2,9] [20:6] [26:21,22]
[27:22] [31:20] [35:9]
[36:7,9] [38:5,7] [42:6,9]
[44:9] [52:6] [53:5,13,23]
[55:14] [56:3] [60:7,21]
[61:3,16,23] [62:1,6]
[63:3,7] [64:5,9] [65:2]
[69:18] [74:22] [76:2]
[77:14] [79:17] [83:3]
[87:3,17] [88:1] [89:11,23
,24] [90:7] [91:2,6,12,13]
[93:16] [94:3] [96:5,19,24
,25] [97:1] [98:15] [99:15]
[100:10] [101:1,14,23]
[105:4,6,10,13] [106:3,20]
[112:22] [115:6] [118:2,4,7]
[119:2,13] [120:22] [126:15]
[132:24] [133:10] [143:2,3
,5] [144:17] [147:13] [148:
17] [149:16,17] [150:5,19]
[151:5,9,11,13,16] [153:7]
[155:9,10] [156:3,4] [158:
11] [160:18] [162:24]
[163:14,16] [164:16,23]
[165:3] [167:21,25] [168:23]
[169:3,4] [171:2] [172:4]
[174:7,23] [175:8] [178:2]
[179:6] [181:6] [182:5,22,25]
[183:18,20] [184:24]
[186:7,24] [187:4,5,6,7,12
,24] [188:3] [192:25] [193:
24] [195:22] [196:17]
[197:23] [198:4] [199:14]
door [51:14] [119:18]
[166:2] [192:25]
dots [137:15]
doubt [55:24] [136:15]
doug [105:24]
doughnuts [121:15]
douglas [3:] [5:4,22] [6:25]
[140:13] [201:5] [202:1]
[203:1,13]
down [9:12] [18:24] [24:12]
[55:23] [65:1] [69:18]
[72:2] [75:15] [76:17,20]
[77:23] [94:12,22] [95:2]
[122:25] [125:11,14]
[127:23] [128:23] [139:9]
[143:4] [152:11] [170:11]
downpayment [45:10]
[74:2,15,18] [125:8,25]
[126:4]
downpayments [126:2]
downturn [58:4,8,14]
[122:2,13,18] [123:8]
[180:13]
dozen [51:13]
dpap [73:24] [74:1] [75:4,17]
[77:16] [124:24]
draft [120:11] [147:16]
[150:6] [168:19] [169:19]
drafts [38:19] [147:15]

[150:6,12]
draw [42:10] [139:20]
drawing [138:10]
drawn [103:15]
drive [7:1]
drivers [139:23]
duane [11:7] [75:20,21]
[76:7,14,20] [77:1,8]
due [26:14] [39:21,22]
[52:8] [99:25] [146:4]
[159:14] [160:1]
duly [5:23] [201:5]
duration [27:1] [130:1]
durham [150:14]
during [10:21,25] [11:15,19]
[13:20] [15:15] [24:9]
[28:19] [34:15] [44:6]
[53:14] [64:13] [65:13]
[77:25] [92:19] [93:21]
[94:2] [124:20] [136:5]
[165:5] [176:5] [178:24]
[199:2,13]
duties [87:15] [88:10]
[91:20]
—————————————
E
—————————————
earlier [24:23] [28:19]
[34:15] [37:16] [39:7]
[75:8] [83:15] [98:21]
[113:24] [114:12] [121:23]
[134:17] [138:16] [177:13]
[197:24]
earliest [155:2]
early [62:23] [131:16]
[179:22] [180:14] [181:21]
[183:2] [192:13] [198:2]
earn [116:6]
earned [164:23] [165:4]
[167:19]
easier [158:19] [166:5]
easily [123:24,25]
eating [62:20]
economic [180:13]
economically [135:12]
[183:9]
economics [145:10]
economy [183:5]
education [7:4]
edwards [72:23] [73:2,10,24]
[74:20] [75:16] [77:9]
[127:10]
effect [56:23] [62:9] [74:7]
[79:1] [125:21,22] [156:8]
[164:17] [166:17] [195:11
,13]
effecting [202:13]
effective [151:25] [182:1]
effectively [17:6] [124:4]
[180:6] [189:20]
effectiveness [139:19]
effects [62:12,20] [63:2]
efficient [77:21]
efficiently [155:15]

effort [9:19]
efforts [174:23] [186:6]
  [189:8] [190:22]
eight [76:10] [142:8] [144:11]
either [11:16] [23:10] [38:25]
  [39:3,4] [47:24] [55:12]
  [70:7] [94:20] [114:19]
  [115:11] [167:15]
elaborate [32:4,12,14,24]
  [188:19]
elected [76:22]
electronically [173:4,17]
element [116:16]
elements [50:8] [67:5,21]
  [92:2] [151:24] [153:1,3]
  [157:12]
eligibility [176:21]
else [25:10] [42:3] [45:15]
  [49:5] [51:25] [58:19]
  [60:14] [108:5] [122:12]
  [148:1] [165:5] [186:4]
elses [29:17]
emerge [160:5]
employed [115:13] [121:17]
  [135:12] [136:2]
employer [121:8,11,14]
employment [121:9,10,12
  ,13,21] [174:6] [201:16]
enable [26:2] [31:6] [40:16]
  [103:19] [123:3]
enabled [62:4] [74:11]
  [91:23]
enables [103:20]
enabling [125:2]
encountered [180:12]
encouraged [154:6]
encouraging [154:5,9]
end [24:21] [43:25] [84:4]
  [99:3] [100:9] [103:14]
  [104:3,8] [120:25] [121:4]
  [142:16,17] [183:11]
  [189:7] [190:2,3]
ended [89:18]
ending [92:6] [97:25] [127:
  4]
ends [95:23] [97:7]
engaged [15:23] [145:3]
engagement [15:1,11,16]
  [64:25] [65:7,9] [66:7]
  [67:6,22] [69:14] [132:24]
  [133:10] [149:9] [153:4]
  [161:17] [199:20]
engagements [64:24]
english [19:12]
enhanced [60:8]
enhancement [188:22]
enlarged [35:1]
enough [29:19] [97:3]
  [115:12] [152:22] [178:11]
ensued [60:22] [192:9]
ensuing [97:23]
entanglement [30:23]
enter [71:17]
entered [67:10] [68:2,6]

[202:11]
entering [151:21]
entire [175:19] [178:10]
entirely [100:12,20] [163:8]
entities [17:19] [18:25]
  [20:24] [22:12] [23:1,12]
  [24:1,16] [31:15] [88:17]
entitled [19:18] [22:23]
  [43:10] [80:3] [82:6] [84:19]
  [88:21] [109:5] [117:17,24]
  [118:1] [126:9] [128:14]
  [137:22] [140:10] [162:9]
  [163:24] [184:8]
entity [18:3] [19:19] [21:1,6
  ,10,14,15,19] [22:17,19,25]
  [23:23] [24:5] [31:16,18,22
  ,23] [32:6,21] [33:1] [34:3]
  [40:19] [88:19] [89:7]
  [152:20]
entries [110:7]
entry [90:11,24] [91:19]
  [94:24] [95:6] [110:4]
equal [130:11]
equally [122:9]
equity [19:12,15,16] [23:2]
equivalent [116:2]
error [85:20] [96:2]
esperon [70:8] [71:21]
esq [2:]
essence [41:1] [74:18]
  [191:24] [194:7]
essentially [176:16]
estate [159:7]
et [5:6,7] [93:9] [139:3]
etched [122:10]
evaluated [141:18,19]
evasive [176:14]
even [40:13] [159:2] [169:4]
  [177:4] [194:24] [196:10]
  [197:10]
event [30:23] [36:9] [37:4]
  [45:7] [64:17] [162:9]
  [193:23]
events [60:22] [79:5] [129:
  5] [162:9]
eventually [63:10] [65:16]
  [84:13] [134:11]
ever [14:23] [15:11,18,23]
  [37:4] [53:19,23] [67:25]
  [69:18] [79:17] [82:16,20]
  [120:14] [132:24] [147:13]
  [155:13] [168:17] [169:11]
  [183:16] [194:8,14,16]
  [195:22] [199:8,9]
every [14:2] [103:14] [111:
  6] [171:19] [173:6]
everybody [84:4]
everyone [42:2]
everything [67:24] [92:22]
  [198:25]
ex [156:13]
exact [116:1] [134:13]
  [168:20]
exactly [25:23] [37:23]

[61:16] [145:23] [161:5]
  [184:24]
examination [3:] [6:1]
examined [5:23]
example [17:2] [22:21,23]
  [37:9] [45:24] [64:22]
  [82:5] [100:14] [102:23]
  [176:24] [177:19] [180:8]
  [183:12]
excel [102:3]
excellent [78:11]
except [89:11] [180:5]
exceptions [40:10]
excess [135:16]
excessive [78:4]
excessively [79:3,12]
exchange [55:13,15] [56:6]
  [106:1] [127:18] [177:22]
exclusion [71:1] [144:11]
exclusively [12:14] [27:5]
  [28:2]
excuse [7:16] [33:24]
  [88:1] [99:8] [101:17]
  [117:17] [193:18]
execute [166:24]
execution [13:3]
executive [10:13,23] [27:14
  ,16] [46:3] [69:10,11]
  [72:24] [75:22] [76:18,21,22]
  [77:10] [78:7]
exempt [43:23]
exercise [56:17] [185:1]
exhausted [57:14]
exhibit [9:3,18] [47:23]
  [72:19] [78:16] [80:3]
  [84:20] [85:10,16] [86:2,24]
  [87:11,21] [90:10] [94:23]
  [97:5] [105:8,18,22] [108:
  24] [109:25] [112:4,7,13]
  [126:6,9,20] [128:11]
  [130:18] [133:24] [134:3]
  [137:18,22] [138:13,19]
  [140:7,10] [148:25] [149:4
  ,9] [161:18,19] [168:4,8,15]
  [182:10] [184:4,8,17]
  [186:15,19] [187:16]
exhibits [4:]
exist [91:9,10,17]
existed [24:14] [147:17]
existence [84:10]
existing [57:2] [121:11]
exiting [123:4]
expand [60:23] [63:5]
  [124:6]
expanded [58:10] [61:20]
  [63:1] [122:3] [123:15]
expanding [58:11,13]
  [79:20]
expansion [59:11] [60:4,20]
  [61:14,20] [79:15] [129:11]
expect [36:12] [193:25]
expectation [15:6]
expected [68:5] [89:6]
  [194:6] [197:6]

expenses [19:23] [139:21,22
  ,25]
expensive [181:25]
experience [8:15,16] [36:24]
  [76:5] [89:24] [90:2,7]
  [160:12] [196:19]
expert [23:20] [147:1]
experts [146:25]
expire [35:22] [52:8]
expires [201:24]
explain [62:13] [91:19]
  [110:9] [123:15] [124:11]
  [129:7]
explained [112:5]
explicit [42:6]
exposure [71:6]
express [157:18]
expression [190:14]
expressly [191:20]
extended [9:25] [54:5,8]
extension [54:12]
extent [24:14] [29:15]
  [58:13] [84:4] [86:19]
  [88:16] [116:5] [130:25]
  [147:10] [193:9] [195:4]
extra [173:9]
extracted [173:15]
extremely [72:9] [74:23]
  [155:15] [188:18] [196:21]

F

fa [161:14]
face [46:21,23] [47:16,24]
  [49:16] [78:2] [161:4]
facets [143:25]
facilities [12:1,2,5] [13:18]
  [24:15,22,23] [25:4,5,9]
  [28:18,21] [29:6] [34:14,17]
  [37:1] [39:5] [86:1]
facility [25:15,16,25] [28:24]
  [29:2,12,14,22] [31:4]
  [32:16,18] [33:20] [34:11,19
  ,25] [35:3,4,6,7,13,19,20,25]
  [36:3,10] [37:15,16] [38:4
  ,25] [39:1,7,11,16] [40:15,22]
  [42:5] [50:7] [51:10] [52:8
  ,10,14,18,24] [53:3,4,21]
  [64:18] [65:16,19] [66:13]
  [68:4] [80:10,12] [95:14]
  [106:24] [134:11,13]
  [152:9] [187:19] [188:2,6,14
  ,18] [189:10,23] [191:6]
  [192:19] [193:23]
fact [60:23] [61:14] [68:1,9
  ,20] [70:19] [79:6] [84:9]
  [111:13] [120:1] [165:3]
  [169:11] [194:22] [198:5]
factor [58:9] [74:23] [123:14]
  [124:9]
factories [123:7,22]
factors [122:2,6] [172:2]
  [183:17]
factual [119:23]

failed [124:16] [178:11]
failing [52:11] [166:2]
fails [176:2]
failure [165:24] [198:5]
fair [11:15] [15:5] [19:24,25]
    [26:25] [29:19] [54:9]
    [66:23] [89:13,17,23]
    [97:3] [115:12] [124:21]
    [170:22] [171:1,2,17]
    [172:4,11,15] [173:18]
    [179:20] [182:12] [192:21]
    [196:6]
f-a-i-r [171:2]
fairly [19:17] [32:18,19,23]
    [36:21] [74:6] [122:24]
    [141:24] [142:15,18]
    [194:13]
fall [61:18] [64:19]
falling [78:3]
familiar [105:13] [127:5]
    [138:10] [139:11,13]
far [85:22] [156:22]
fashion [92:11]
fast [77:21]
faster [164:5]
fate [195:7]
favor [35:13] [63:20] [143:
    11]
fax [2:]
features [32:13]
february [28:25] [32:2]
    [33:22,23] [34:2,5,12]
    [50:18] [80:4] [87:1]
federal [202:8]
fee [13:18] [21:4] [36:15,18
    ,23] [37:2,13,14] [46:8]
    [47:9,12,15,22] [50:2,14,15
    ,16] [54:10] [64:25] [86:5,9]
    [95:11,12] [109:4,11]
    [150:25] [162:3,4,10,23]
    [163:3] [164:8] [165:14]
    [167:20] [188:11,12]
    [189:4,13,15,21,22,25]
    [190:3,12]
feedback [195:4]
feel [122:12]
feelers [159:18]
feeling [6:19]
feelings [198:16]
fees [19:22] [36:5,13,20]
    [48:22] [49:10] [52:11,17]
    [54:15] [95:4,13] [98:22]
    [136:19] [150:23] [190:1]
felt [41:23] [42:25] [67:21]
    [69:15] [157:15] [159:1]
    [161:10] [162:16,19,21]
    [192:1] [197:22]
felts [186:9]
few [168:14] [182:10]
fewer [56:19]
fiachra [40:25] [42:8] [46:19]
    [51:1] [53:8,18,25] [54:3,13]
    [71:17] [72:4,5,9] [135:10]
    [164:20] [168:10] [186:10]

    [196:1,3,20] [198:18,21]
fiachras [196:2]
fico [170:18,20,21,22]
    [171:23] [172:3,10,13,19,24]
    [173:8] [175:16] [176:5]
figure [81:25] [91:12] [100:
    22] [152:14] [153:7] [154:7]
    [181:12,13] [185:8]
figuring [181:14]
file [49:18] [57:12] [68:25]
    [102:3] [146:11] [157:3]
    [158:18] [166:20] [173:5,7
    ,8,12] [185:8] [198:6,9,10]
filed [10:20] [120:7,12,15,17
    ,18,22,23] [121:24] [132:20]
    [149:7] [152:4] [157:6]
    [160:2] [162:14] [167:15]
    [185:17] [188:8,10] [191:17
    ,18]
files [30:24] [137:10]
filing [57:24] [119:4] [159:9
    ,24] [160:2] [167:16] [186:
    11] [193:22] [194:5] [198:12]
    [199:12]
fill [146:20]
final [45:20] [120:15] [147:
    14]
finally [7:19] [109:6] [190:22]
    [199:16]
finance [12:6] [14:18]
    [16:14] [23:20] [24:10,25]
    [25:15] [27:4] [40:17]
    [58:16] [59:5] [128:2]
    [142:9] [144:6] [152:9]
financed [178:1]
financial [13:16] [14:23]
    [15:16,18,19,24] [16:1]
    [23:24] [24:16] [33:3]
    [35:10,23] [36:11] [39:8]
    [45:25] [64:23] [65:10,17]
    [66:15] [67:3] [69:6,12,14]
    [77:18] [117:10] [131:22]
    [132:25] [133:3,13] [141:2
    ,3,6,21,25] [143:1,8,21]
    [144:16] [149:11] [151:6,7]
    [159:15] [161:14] [172:23]
    [185:4] [193:7] [197:5,9,15]
    [198:24]
financing [11:22] [16:2,13
    ,15,18] [23:19] [24:24]
    [26:4,7,10] [38:12] [45:3]
    [67:23] [68:1,8] [69:17]
    [74:19] [130:13] [152:7,8,9]
    [158:20] [185:14,21]
    [186:1,6] [190:22,24]
    [191:12,21] [192:5,23]
financings [12:11] [132:12]
find [47:11] [49:12,14]
    [69:2] [83:6,12,24] [134:25]
    [148:23] [154:4] [160:8]
    [171:13] [184:22]
fine [24:12] [35:11] [78:11]
    [96:9] [119:24] [138:11]
    [147:23] [148:21] [149:19]

    [164:2] [184:1]
finish [49:24] [56:23]
finished [128:25] [134:8]
fire [14:14]
fired [14:8,14] [70:20]
    [71:7]
firm [6:4] [132:1,4] [137:11]
    [141:2] [142:19] [159:21]
    [171:6]
firmer [159:21]
firmly [72:15]
firms [13:9] [141:15] [191:20]
first [5:7,23] [7:18] [12:23]
    [14:6] [18:25] [20:14,18]
    [24:13] [28:12,22] [29:6]
    [34:18,20] [35:19,20]
    [36:8] [37:17,21,24] [38:1
    ,25] [39:11] [40:25] [50:17]
    [59:10,14] [72:13,19]
    [79:20] [80:2] [82:11]
    [87:22] [92:23] [97:6,18]
    [102:5,14] [106:7] [108:1]
    [112:9] [126:20] [127:2,9]
    [130:18] [136:7] [139:10]
    [140:21,24] [141:1] [143:13]
    [149:7] [153:15,16] [156:17]
    [159:17] [163:6] [166:11]
    [168:15,16] [182:11]
    [184:17] [187:15]
fit [42:9]
five [27:8] [35:18] [125:14]
fixed [43:15] [50:16] [68:21
    ,22] [127:18] [135:15]
    [156:2]
flip [97:22]
floated [136:8]
floater [129:22]
floor [2:]
flow [12:7] [21:15] [24:14]
    [25:8] [47:18,25] [48:2,10]
    [80:1] [82:6,14,16] [102:15]
    [103:25]
focus [26:13] [67:4,6,13]
    [68:3,12] [198:14]
focusing [10:18] [12:18]
    [69:19,20]
folks [93:19] [197:8,16]
follow [111:6] [155:20]
followed [125:17]
following [108:20] [202:7]
follows [5:24] [39:17]
    [126:21]
followup [155:20]
follow-up [155:20]
foolish [74:24] [75:13]
foothill [35:5,6,8,14] [36:3]
    [38:3,6,10,18,19,22]
    [39:1] [185:16] [191:11]
    [192:20]
forecast [146:2]
foreclose [181:20]
foreclosed [160:3]
foregoing [201:8]
forgive [39:14]

forgot [65:18]
form [13:17] [16:3] [18:9,16]
    [19:7] [20:4] [29:18] [30:17]
    [38:14] [50:12] [57:17,22]
    [75:24] [80:18] [82:24]
    [83:19] [84:23] [86:10]
    [89:21] [90:25] [115:2,5]
    [116:1] [120:11] [131:4]
    [134:13] [179:18] [190:10]
    [202:10,14]
formal [133:10]
formally [144:20]
former [145:9]
forms [26:4] [147:11]
formulas [116:18]
forth [82:18] [150:20,22]
    [185:25]
forthcoming [15:7]
forths [150:18]
fortunately [96:2]
forty [110:22]
fortyfour [110:22]
forty-four [110:22]
forward [14:3] [156:7]
    [168:9]
forwarded [168:10]
found [32:8] [75:1] [99:22]
    [109:17] [191:10] [192:6]
four [34:21] [94:19] [149:12]
    [151:24] [153:1,6] [161:6]
    [167:25] [174:1]
fourth [152:19]
fragments [166:18]
frame [34:24] [54:2] [93:21]
    [94:2,8,15] [133:15] [136:
    5] [141:22] [170:7]
frank [153:19]
fred [70:8] [71:21]
free [37:5] [122:13] [178:6]
frequently [15:3] [102:22]
    [129:16] [179:11] [194:14]
friday [164:14] [168:13]
front [48:3] [97:20] [127:19]
    [128:5] [142:16] [189:22]
    [190:3,5,7,12] [191:23]
frustrated [68:22] [198:3,11]
frustrating [69:3]
frustration [68:11] [197:24]
fti [184:22] [185:2,7,11]
    [191:14] [192:21] [193:6,11]
full [6:23] [74:17] [96:9]
    [108:18] [149:24] [167:4]
    [184:17]
function [17:10] [21:20]
functions [12:8] [93:24]
fundamentals [32:5,11]
funded [102:17,18] [104:5]
funding [103:9]
fundings [103:19]
funds [47:18,25] [48:2,10]
    [79:25] [82:7,14,17,23]
    [83:17] [84:13] [85:9]
    [89:14]
furnish [96:9] [203:11]

further [139:9] [152:23]
[157:16] [201:11,13,15]
future [25:22] [195:12,14]

G

gain [13:3] [125:12]
game [51:16] [52:13] [133:
20] [198:2]
games [90:6]
gave [32:22] [69:1] [135:24]
[154:9]
gee [41:3] [42:8] [71:2]
[92:21] [137:8] [166:19]
[183:18]
general [15:4] [20:13]
[23:16] [73:10] [89:14]
generally [11:10,12,20]
[13:22] [20:10] [23:22]
[42:15,18] [46:19] [47:3]
[48:13] [49:22] [50:1]
[58:8,14] [64:17] [80:24]
[82:8,13] [90:7] [91:4]
[94:19] [98:24] [123:5,7]
[125:9] [126:22] [127:7]
[129:2] [147:11] [165:19]
[180:25]
generate [109:22,23]
generated [92:14]
generic [171:18] [172:18]
[173:10] [175:23]
generically [22:18] [101:25]
[172:22]
gentlemen [59:15]
george [27:11] [72:20,24]
[126:25] [128:23] [131:13]
gets [47:21] [128:4,5]
getting [37:10] [54:14,17]
[55:17] [64:25] [69:16]
[73:18] [104:19] [116:22,23]
[144:19] [145:5] [158:18]
[163:25] [188:6] [197:10,18]
[199:12]
ginkgo [22:24,25] [23:8]
[33:3,5,15]
ginkgos [23:2]
gist [54:3] [60:7]
give [30:16] [54:9] [66:5]
[74:12] [78:20] [84:14]
[113:10] [136:6] [155:8,19]
[156:9] [157:16,25] [158:5]
[167:8] [181:18]
given [12:11] [13:1] [37:4]
[47:12] [54:11] [90:5]
[117:3] [120:10,16,18,20]
[131:1] [147:17,18] [152:23]
[161:12] [167:14] [168:2]
[172:25] [202:3]
given...for [202:12]
giving [65:22]
glad [31:11] [153:6] [154:12]
[155:16] [167:6] [199:15,17]
glatt [2:] [5:19]
glean [143:20]

go [21:10] [43:19] [47:16]
[49:18] [52:4] [56:11,13]
[57:21] [67:20] [71:9]
[77:17,22] [79:24] [80:18]
[92:12] [93:1] [97:16]
[107:8] [108:25] [110:9]
[113:1] [119:24] [131:16]
[147:25] [148:2] [152:24]
[153:6] [156:25] [157:9]
[158:22] [167:10,13]
[169:21] [170:12] [175:12]
goal [83:9]
goals [117:4,8]
goes [47:21] [54:10] [77:23]
[117:16]
going [30:20] [40:2] [41:19]
[55:19] [56:2,8] [67:16]
[68:23,24] [69:24] [72:3]
[73:14] [79:23] [99:5]
[102:10] [107:4,8] [110:7]
[111:7,9,18] [112:6,17]
[113:11] [119:12] [120:6]
[123:10] [127:7,11,21]
[128:7,8] [129:3] [138:2]
[139:15] [140:1] [142:1,18]
[143:14,25] [144:2,3,5]
[145:24,25] [146:11]
[152:8,10] [156:7] [163:7]
[166:25] [167:7,8] [178:8]
[179:10] [181:22] [182:2]
[183:16] [186:10] [189:4]
[193:5] [194:2,5] [198:6]
gone [121:8] [174:21]
good [6:3] [27:20] [42:9]
[62:17] [71:7] [77:1,24]
[111:5] [136:22,23] [143:19
,22] [146:16] [154:7] [155:
2,18] [158:10] [160:12]
[167:13] [178:2] [181:1,2,3
,8,20,23,24] [182:6,20]
[191:21] [195:24] [196:2]
[199:11]
google [171:13]
gosh [115:25] [116:9]
[141:9,10] [157:11]
gotten [37:1] [161:8]
graduated [7:6]
grand [109:9,11]
granted [192:9]
granular [92:11] [155:25]
grasp [198:5]
graves [2:] [5:12]
great [78:8] [167:3] [183:20]
greater [56:9,25] [57:1,16]
[123:19] [177:8] [179:16]
greenpoint [49:6]
greensboro [7:1]
greentree [14:18,20] [49:5]
[125:6,13,18]
greenwich [192:16,24]
[193:2,16]
grips [198:12]
gross [47:10]
ground [6:10]

group [12:13] [13:8] [23:1]
[36:14,15] [39:2] [93:2,13
,15,21,22] [179:25]
groups [93:6,25]
guarantee [142:21] [146:9]
guarantees [144:4] [145:20]
[146:4]
guess [63:20] [96:1] [123:11]
[125:21] [132:3] [151:23]
[162:7]
guide [161:15]
guilford [201:2]
guy [49:1] [77:2,4,5,7]
guys [155:11] [158:6,7,8]

H

hadnt [48:5] [76:5] [160:3]
[168:25] [174:21]
half [51:13]
hall [183:24]
handful [141:11]
handle [115:21] [148:19]
handled [38:21]
handwriting [105:5,11,14,18]
happen [71:12] [84:9,11]
[131:17]
happened [42:11] [71:20]
[132:4] [162:9] [183:19]
[192:24]
happens [118:2]
happy [96:12]
hard [9:25] [72:10] [77:3]
[100:22] [122:22] [183:10
,11] [196:21] [197:3,12,16]
harsh [182:11]
hasnt [40:1]
hate [101:10]
hathaway [67:11,15] [115:
20] [153:10] [158:23]
[160:9,22] [190:15] [191:24]
hathaways [153:21]
havent [58:2] [125:23]
[153:5] [168:2]
having [5:23] [18:5] [40:10]
[53:3] [62:9,11,19] [63:2]
[68:4] [71:7] [102:20]
[121:10] [131:16] [151:9]
[155:4] [159:7] [162:14]
[169:17] [193:1] [194:25]
hazy [132:14]
head [26:12] [45:18] [77:12]
[116:11]
headed [167:12]
heads [52:4] [156:10]
hear [50:20] [136:15]
heard [70:16] [71:7] [79:17]
[147:11] [156:22]
hearing [59:10] [165:1]
heart [77:11]
heels [183:6]
held [5:10] [126:11] [128:16]
[140:12] [184:9] [186:21]
help [53:20] [67:23] [79:25]

[115:23] [152:17] [181:4,11
,21,24] [183:5] [185:8]
helped [39:11,12] [199:20]
helpful [101:25] [102:25]
[103:2] [134:20,25] [136:18]
[160:8,15,19,20] [191:3]
helpfully [112:5]
helping [61:8] [133:2]
[185:2] [193:6]
hereby [201:4] [202:2]
heres [45:23] [65:2] [155:11]
hereunto [201:18]
hes [72:11,13] [127:11]
[139:21] [145:10] [155:12]
[163:19]
hey [65:1] [159:3]
hierarchy [20:11]
high [180:23]
higher [52:21] [86:18,21]
[126:2] [128:5] [130:3]
[177:7] [179:18] [189:21]
highest [13:1]
highlights [58:1]
highly [87:4] [196:2]
highs [131:15]
hinshaw [138:21]
hired [141:25]
hiring [144:15]
historically [182:7]
history [143:14]
hit [183:10] [189:7]
hold [146:25]
holder [111:3] [146:10]
holders [85:4,10,15,19]
[92:1,17] [142:12,21,22]
[145:19]
holdings [21:16,18] [23:7]
[81:4,5]
home [44:3] [49:2] [74:12,15]
[125:10] [180:14,25]
homes [4:] [5:5] [6:7] [7:23]
[8:9,21] [10:3] [74:8]
[88:14] [89:7,13,19] [97:1]
[102:4] [104:12,17,25]
[105:1] [116:13,15] [121:24]
[122:21,22] [123:4] [126:10
,17] [127:13] [128:14,18]
[132:10] [139:21] [140:11]
[149:8,10] [183:15] [184:8]
[186:19]
honest [72:12] [199:6]
honestly [138:10] [168:2]
[174:21]
hoped [66:7]
hopeful [53:7]
hoping [56:13] [65:6,25]
horsepower [144:12]
hotel [3:]
houlihan [141:9,12]
hound [181:2]
hour [155:4]
house [142:6] [181:10,15]
houses [124:15]
housing [14:22] [59:5]

[70:18,25] [165:9]
however [193:17]
huge [170:16] [185:5]
hundred [21:13] [42:22]
   [109:12] [110:21] [118:3]
   [142:9]
hunt [146:24]
hunton [86:25] [87:5,10]

I

i/kdn [202:1] [203:1]
id [12:14] [31:11] [45:17]
   [86:14,20] [153:6] [170:14]
idea [26:20] [27:19,20]
   [29:21] [39:10] [40:14]
   [59:1] [60:16] [65:2] [79:20]
   [134:20] [135:13] [136:2]
ideas [15:7,10] [64:24]
   [65:5,22] [66:5,6] [134:24]
   [135:2] [136:7,8,19,21,23]
identical [34:4]
identification [9:4] [78:17]
   [126:7] [128:12] [133:25]
   [137:19] [138:14] [140:8]
   [149:1] [168:5] [184:5]
   [186:16]
identify [181:21]
identifying [9:20]
ill [6:4,11,13,14] [30:17]
   [57:23] [86:10] [96:17,20]
   [116:10] [131:4] [140:18]
   [148:5] [158:2] [167:5]
   [169:25] [175:11]
im [5:2] [6:4] [8:25] [15:20]
   [19:9,10] [21:12] [23:10,15
   ,20] [25:2] [30:15] [34:1]
   [36:6] [37:25] [45:22]
   [46:1,22] [48:9] [50:8]
   [52:2,3] [55:13] [56:4,5]
   [57:21] [58:20] [59:12]
   [64:1] [66:18,21] [71:2]
   [74:5] [75:16] [79:21,23]
   [80:2,23] [81:1,21,25]
   [83:6,7] [84:20] [85:11,12
   ,22,24] [86:23] [87:7,13,20]
   [91:8] [95:20] [96:8] [97:3]
   [99:4,5] [101:3,18] [104:14]
   [106:17,20] [109:16]
   [110:21] [111:18] [112:17]
   [113:11,12] [114:18]
   [115:10] [117:1,17,22,24]
   [118:1] [119:12] [121:20]
   [122:1] [128:13] [131:7]
   [132:13,15,18,19] [134:2]
   [135:3] [136:4,10] [137:15
   ,20] [138:2,10,16] [139:10]
   [140:9,19] [149:2] [156:21
   ,22] [159:4] [162:7] [165:1
   ,21] [166:1,23,24] [167:8]
   [168:6,19] [169:23] [170:21]
   [172:5,7,8] [174:23] [176:
   14] [184:6] [186:17] [190:25]
   [191:3] [197:2,14]

imagine [42:7]
immediate [57:14]
immediately [115:20]
immense [52:9] [67:4]
imminent [167:16]
impact [130:10] [170:16]
   [194:24,25]
impede [156:14]
implemented [61:14]
   [134:11,14,18]
implicit [145:5]
implicitly [163:17]
importance [53:5] [158:15]
important [12:23] [22:12,13]
   [42:25] [43:2,3] [61:7]
   [65:20] [67:14] [68:14]
   [122:9] [143:19] [145:2,4,25]
   [170:13] [185:23]
importantly [109:3]
impression [198:8]
improve [180:21]
improving [182:16]
inaccurate [33:24]
inadvertently [101:1]
   [112:23]
inc [121:16]
incentive [116:6] [117:10,12
   ,17]
inception [29:9] [34:23]
   [71:22]
incident [73:11]
inclined [156:14]
included [93:13] [192:5]
includes [109:6]
including [62:3] [106:9]
   [109:8] [180:17]
income [25:22] [54:10]
   [135:15] [156:2] [183:11]
incompetent [66:22]
inconsistent [187:13]
incorporation [18:17]
incorrect [100:11]
increase [178:24] [190:1]
increased [58:23] [139:17]
   [179:2]
increases [130:13]
incrementally [189:3]
incurred [139:21]
indebtedness [19:21,22,23]
   [31:21] [32:9,22] [33:7]
   [106:22,24] [111:11]
independent [146:7,17]
   [160:22,24]
index [4:]
indicate [187:5]
indicating [106:17]
indication [67:9,15] [68:13]
indications [69:2] [159:13
   ,19]
indicative [75:2] [123:1]
indirectly [18:3,15] [107:10]
individual [44:9] [61:3]
   [172:25]
induce [129:12]

industrial [142:5]
industrialtype [142:5]
industrial-type [142:5]
industries [131:17] [180:10]
industry [30:9] [58:4,5,6,8
   ,14] [122:2,13,16] [123:11
   ,23] [124:1,20] [125:4,7]
   [127:8,22] [129:4] [132:22]
   [133:7] [136:17] [178:10]
   [182:22] [183:8] [189:16]
industrywide [30:9]
industry-wide [30:9]
inefficient [103:5]
inevitable [198:12]
infer [139:18]
infinite [68:15]
inflows [102:7]
influence [44:20]
inform [195:2]
informal [133:7]
informally [144:20]
information [49:14,20]
   [62:3,6,14] [118:19] [119:
   23] [148:12] [181:11]
   [189:12]
informed [52:25] [62:25]
   [63:9,24] [64:7] [68:20]
initial [29:9]
initially [11:5] [176:15]
   [190:7]
innovative [136:7]
inquire [139:2]
inquiries [133:7]
inserted [106:14]
inserting [33:15]
insisted [73:24]
insofar [186:8]
instance [49:15] [93:8]
instantaneously [160:1]
instantly [155:14]
instead [177:1] [190:5]
instituted [125:18]
institution [15:18,24]
   [23:24] [35:10] [39:9]
   [172:23]
institutions [16:1] [24:17]
   [45:25]
instruct [165:25] [166:2]
instructed [107:20,23]
   [110:14]
instructing [107:21] [119:17]
instructions [89:5] [107:15]
   [108:4,6]
instructs [89:1]
instrument [41:23]
instruments [19:25]
insufficiently [58:15]
   [75:6] [122:4] [124:10]
   [179:21]
insurance [41:14]
insure [13:2]
intelligent [155:13]
intend [163:2,3]
intended [162:20,22]

[163:6] [188:24]
intense [179:11]
intention [101:2]
intentional [112:16]
intentionally [147:17,18]
inter [4:]
interest [19:11,13,22]
   [21:7,21] [22:2] [23:3]
   [33:4] [43:14,17] [45:11]
   [50:10,12] [82:22] [83:16]
   [109:3,7,11] [127:17]
   [128:5] [129:11,16] [135:18]
   [159:13,19,22,25] [177:7,20]
   [182:2]
interested [41:6,10,16]
   [45:4] [133:8] [154:7]
   [155:24] [197:3]
interesting [51:12] [153:19]
   [175:9,10]
interestingly [73:22]
interests [18:14,18,24]
   [19:5] [51:21,22] [131:19]
   [157:3]
interfere [6:21]
interim [16:13,15] [192:19]
internal [185:5]
internally [51:2]
interoffice [4:] [112:9]
inter-office [4:]
interpret [116:19]
interrupt [100:11]
interrupting [101:11]
interview [118:18]
introduce [5:13] [72:2]
introduction [177:10]
inventories [78:4]
inventory [77:25] [123:18]
   [135:1] [136:4]
investment [12:10,20,24]
   [13:8,19] [15:13] [64:21,22]
   [70:10] [71:2] [142:12]
investor [17:1] [18:7] [34:20]
   [40:18] [41:5,9,13] [93:13
   ,14] [94:15,16,19]
investors [17:4,5,7,8]
   [25:17] [39:25] [47:7]
   [130:2] [135:23]
invited [14:11] [153:17]
invoice [161:20] [167:8]
involve [11:24] [37:4]
involved [8:5] [11:22]
   [12:16] [23:21] [38:9]
   [44:15,16,17] [51:5,6]
   [63:5,8] [69:21] [74:10]
   [76:19] [123:11] [130:23]
   [132:2,6] [133:1,4,5,17,22]
   [142:21] [143:11] [151:13]
   [152:6] [170:14,15] [185:4
   ,9] [187:25] [193:11,13,14]
involvement [16:12] [185:
   18]
involving [55:16] [170:9]
io [135:22] [136:1]
irrelevant [188:24]
isaac [170:22] [171:1,11,18]

[172:5,11,15] [173:18]
isaacs [171:9]
i-s-a-a-c-s [171:9]
isnt [40:3] [100:25] [118:10]
[161:21]
issuance [28:16]
issue [26:14] [28:16] [51:4]
[55:15] [60:12] [73:23]
[165:21] [166:8,10] [189:19]
issued [18:7] [20:21] [25:13]
[26:25] [27:14] [31:22,23]
[32:9,22] [33:7] [81:6]
[87:22] [147:14]
issuers [48:25]
issues [43:12] [142:8]
[185:21] [188:5,9] [199:1]
issuing [27:11,20] [49:1]
item [68:11] [91:15]
items [116:17]
iteration [31:4]
itself [173:12]
ive [37:1,2,18] [119:4]
[126:8] [129:1] [134:9]
[136:22] [141:9] [149:11]
[155:13] [159:4] [167:4]
[168:25] [176:4]

J

j.p [87:23]
january [35:3] [36:2] [192:13]
jared [69:15] [160:11]
[162:16,17] [164:18,19,21
,22,25] [165:2,14,15]
[166:11] [167:1,11] [186:9]
[197:22] [198:19,22]
jareds [198:4]
jeff [138:21]
jello [159:21]
job [73:7] [78:8,11] [91:24]
[144:13] [181:7,25] [199:11]
jobs [183:13]
johnson [7:19]
joined [8:14]
judgment [128:8] [146:5]
[196:5]
july [62:24] [63:14] [140:12]
[153:16]
june [121:4] [126:11] [174:
9] [201:25]
justin [2:] [5:17]

K

kclh [9:1] [126:12] [128:17]
kclh0938 [126:12]
kclh-0938 [126:12]
kclh1100 [9:1]
kclh-1100 [9:1]
kclh956 [128:17]
kclh-956 [128:17]
keenly [155:12]
keep [48:13] [91:22] [101:10]
[133:20] [181:10]
kept [103:12]
key [58:21] [80:12] [81:11]
[127:4] [194:17]
kicked [15:7]
kilbourne [8:13]
kind [28:20] [36:18] [70:22]
[77:5] [91:18] [113:23]
[119:19] [141:22] [146:17]
[153:1] [158:9] [172:8]
[174:23] [176:16] [188:20]
kinds [36:14] [118:25]
[195:18]
knew [38:20] [41:5,9,21,22]
[73:13,14,15] [143:15]
[152:5,6,19] [161:3,5]
[163:6] [191:16] [193:13]
[194:2,5]
know [6:10,13,16,22]
[9:22] [13:2] [19:10] [30:14]
[38:5,7] [39:14] [41:15]
[44:9] [45:22] [46:2] [53:6
,7] [54:14,20] [55:14]
[56:7] [61:3,23] [62:1,6]
[64:4,5] [68:5] [69:18]
[71:5,8] [74:22] [76:2]
[85:8,13,22] [87:2,25]
[88:2] [91:2,4,7,9,13]
[93:16] [96:25] [97:2]
[101:24] [106:4,20] [113:18]
[118:2,4,5] [119:2,13]
[122:13] [123:2,5] [126:21]
[128:24] [131:16] [132:7,25]
[133:11] [134:7] [136:22]
[141:11,12] [144:11,12]
[145:23] [146:10,18]
[147:13] [149:24] [150:1]
[152:1,24] [153:7] [154:25]
[155:1] [156:9] [158:6]
[159:4] [160:4,6,12,19]
[161:12] [166:19] [167:4]
[169:4,11,15,24] [170:8,10]
[171:2] [172:4,8] [174:21]
[175:8,14] [181:16] [182:22
,23,25] [183:3,18,20]
[184:24] [185:2,10,19]
[186:7] [187:6] [190:25]
[191:2] [193:6] [194:18]
[196:17] [197:12,23]
[198:14] [199:16]
knowledge [14:16] [20:25]
[23:18] [44:21] [63:4,7]
[66:2] [75:17] [124:8]
[126:5] [131:21]
known [58:22] [161:7]
knows [171:12]
kreme [121:15,17] [174:7]
krispy [121:15,17] [174:7]

L

labeled [99:11]
lack [198:14]
land [66:7]
lanty [132:3]
lap [79:2] [139:22,24]
[154:17] [155:25]
large [145:21] [183:14]
largely [152:14] [188:23]
larger [37:13] [107:6]
largest [125:6,13] [157:7]
[159:8] [192:2]
last [50:20] [82:11] [101:16]
[105:7] [112:5] [118:14]
[123:9,10] [130:19] [140:23
,24] [154:23] [168:16]
[187:17]
lasted [165:11]
late [37:10] [62:23] [164:14]
[180:14] [192:12]
later [11:13]
law [6:4] [32:8]
lawful [22:23]
lawsuit [118:19]
lawyer [19:9,10] [55:13]
[57:22] [85:23] [167:6,14]
lawyers [32:7] [145:22]
[167:4]
lax [179:4]
lbo [131:16]
lbotype [131:16]
lbo-type [131:16]
lead [13:24] [14:2,20,21]
[28:12] [34:20] [64:16]
[65:14] [66:9]
leader [93:22]
leaf [21:16,18,24] [22:2,10]
[23:7] [33:5,6] [81:4]
learn [101:7] [139:16]
learned [60:19] [79:14]
learning [156:11]
least [14:2] [41:11,20]
[59:24] [67:9] [71:9] [73:16]
[112:16,25] [116:9] [125:10]
[133:12] [136:21] [144:14]
[145:5] [159:2] [174:5]
[186:8] [193:15] [198:4,13]
leave [8:6] [71:23] [72:21]
[73:2]
leaving [198:24]
led [14:6] [130:20] [131:2,10
,23]
lee [7:5]
left [7:16,21] [8:8] [21:5]
[84:6] [95:3] [156:6]
lefthand [95:3]
left-hand [95:3]
leg [93:17]
legal [18:22] [22:12] [87:14]
[167:17]
lehman [71:3,6]
lend [175:17]
lender [32:10] [34:8] [36:23]
[39:2] [68:3] [125:6] [173:
6] [189:3] [194:3]
lenders [123:4] [124:18]
[175:25] [176:19] [184:23]
[185:10] [188:21] [193:10
,12]
lending [30:5,22] [123:6]
[124:19] [125:18] [128:7]
[176:25] [178:3] [179:4,21]
[180:25] [183:7]
length [80:21]
lenient [183:8]
less [23:15] [31:10] [66:18]
[92:11] [123:6] [127:17]
[151:3] [165:11] [177:21]
[178:7] [179:4] [194:24]
[197:6]
let [6:12,16] [9:22] [19:8]
[49:24] [54:20] [55:7,11]
[59:3] [79:18] [85:17]
[87:2,25] [97:5] [119:14]
[122:13] [126:21] [128:24]
[132:13] [134:7] [135:7]
[137:16] [158:16] [166:9]
[172:5] [194:21]
lets [7:2] [9:8] [26:13]
[28:18] [34:14] [39:6]
[60:17] [78:12] [96:7,14]
[98:10] [106:18] [107:16,24]
[111:17] [147:6] [148:19]
[199:22]
letter [4:] [15:1,11,17]
[50:14,15] [64:25] [65:9]
[95:12] [132:24] [133:10]
[144:19,22,24] [149:10,13
,25] [150:4,16] [152:20]
[153:4,5,8] [161:17] [167:
24] [169:19] [189:25]
letterhead [86:24]
level [18:25] [94:11] [102:8]
[118:5] [125:8] [155:25]
libor [129:22]
lied [199:8]
life [128:10]
light [40:2] [52:15]
liked [72:7] [143:18] [157:14]
[197:11] [199:1]
likely [42:23] [87:4]
limitation [55:10]
limited [16:12] [124:17,18]
[135:19] [193:4] [197:4]
line [10:14] [54:1,14] [90:11
,17] [91:15] [182:15] [202:
15,16,17,18,19,20,21,22,23
,24] [203:2,3,4,5,6,7,8,9]
lined [51:14] [158:20]
lines [11:8] [12:1] [111:15]
[166:19]
lining [185:20]
linked [104:16]
linklaters [2:] [5:15] [6:4]
lippard [94:17]
liquid [5:6]
liquidated [145:22]
liquidating [191:13]
liquidation [6:7] [115:14]
liquidity [26:1] [31:7,10]
[40:16] [53:9] [57:15]
[62:20] [133:20] [142:14,22]
liquify [12:4]

list [72:19] [141:11,18]
[142:24] [157:17]
listings [9:23]
lists [116:10]
litigation [6:6] [117:4,5]
little [7:3] [11:9] [23:15]
[32:24] [37:12] [66:18]
[92:11] [110:8] [111:18]
[122:11] [132:14] [133:19]
[164:24] [166:5] [169:24]
[173:8] [176:19] [182:11]
lived [183:14]
load [182:8]
loads [147:7]
loan [12:3] [16:8,14,21,24]
[25:20] [34:11] [39:19,21]
[44:4] [45:21] [52:17,24]
[58:22] [59:1,6,11] [60:4,8
,20,24] [61:10,15,24]
[62:15,16] [63:1,5,10,17,24]
[64:8] [65:18] [66:13]
[79:7,15,20] [80:10] [92:24]
[93:9] [103:9] [106:24]
[127:17] [128:6] [138:16]
[139:17,19] [142:17]
[172:25] [173:2] [176:12,16
,17,21,23] [177:7,11,12,21
,22,24] [187:19] [188:2,13]
[189:9] [195:1]
loaned [123:3]
loans [16:15,19,20] [17:10
,13] [18:4] [23:5,7] [24:25]
[31:18,19,21,24] [32:20,21
,25] [33:2,5,6] [39:24]
[41:3] [42:13,21,22,24]
[43:4,6,8] [44:5,7,25]
[45:4,5,10] [62:5,17]
[81:3] [82:4] [91:22] [93:1]
[103:4] [124:13,14,15]
[126:1,2] [130:13] [135:18]
[170:2] [179:8] [180:1]
[195:17]
logical [71:8]
logistical [185:21]
lokey [141:9,12]
long [7:9] [27:4] [28:3]
[31:15] [33:20] [59:4]
[75:4] [113:5] [120:21]
[123:8,9,20] [124:13]
[141:10] [142:15] [143:14]
[165:10]
longterm [27:4] [28:3]
[123:20] [124:13]
long-term [27:4] [28:3]
[123:20] [124:13]
look [9:21,24] [18:21,25]
[43:13] [47:16] [49:18]
[72:18] [77:17] [80:6,15,20]
[81:14,20] [83:22] [84:16,18]
[86:2] [87:1,24] [90:2,9]
[94:22] [95:17] [96:17]
[97:14] [98:11] [101:21]
[105:2,7,21] [108:13]
[109:24] [110:2,10] [111:13

,14] [112:10,12] [128:21]
[134:6] [140:20] [167:1,6]
[174:21] [178:6]
looked [31:20] [55:21]
[88:8] [114:11] [147:16]
[150:12] [155:10] [159:15]
[168:1] [182:10]
looking [31:11] [72:19]
[82:10] [91:8] [100:5]
[105:17] [153:2] [165:15,22]
[187:15]
looks [10:1] [95:18] [105:13]
[113:21] [134:4] [138:6]
[149:13,25]
loop [45:23]
loosely [21:21]
los [2:]
lost [183:13]
lot [17:23] [36:7] [51:2]
[54:4,17] [69:20] [71:6]
[72:7,9] [84:14] [105:1]
[119:5] [124:13,18] [125:24]
[135:23] [143:15] [147:11]
[150:17] [151:17] [161:13]
[180:4,12,16,17] [181:6,19
,23] [185:6,18] [186:9]
[191:1] [193:1] [196:21]
[197:1,2,6]
lots [37:1] [118:22]
lotus [154:21,22] [156:1]
[161:2] [169:14]
low [176:1]
lower [49:10] [125:25]
[126:4] [128:5] [139:25]
[177:22] [178:8,12,16,18]
[179:16] [183:11]
lowered [176:6,9]
luck [155:18]
luncheon [111:25]
lynch [14:8,14] [70:20]
[145:9]
lynchs [14:4]
_____

M
_____

maam [22:5]
magnitude [150:23] [190:3]
mail [4:] [96:10] [98:11]
[105:22] [106:1,4] [121:4]
[134:3,4] [138:20] [155:23]
[168:8,9,12]
mails [161:9]
mainly [132:6] [155:5]
maintain [103:5]
maintained [82:2]
maintaining [103:21]
major [67:8] [70:25] [171:16]
majority [22:1]
making [30:2] [45:8] [90:1]
[133:6] [160:12] [189:8]
[196:3,24] [202:12]
man [73:7]
manage [124:4] [133:19]
management [8:15,16]

[12:7] [26:23] [38:2] [42:4]
[45:15] [51:23] [73:17]
[76:5,14] [125:2,17] [130:
20] [131:2,10,19,23] [132:
6,16,17] [136:9] [137:13]
[146:18] [179:1] [182:18,25]
[185:11] [194:9,20] [196:8]
managements [12:19]
[51:7] [130:20]
manager [8:19] [13:24]
[28:12]
managers [94:16]
manufactured [8:21] [14:22]
[59:5] [70:18,25] [165:9]
manufacturer [77:24]
manufacturers [122:23,25]
manufacturing [77:19,20]
[142:6]
march [134:5] [138:22]
margin [130:16]
mark [9:1] [112:21] [126:9]
[148:3] [153:17,22] [155:9
,23,24] [161:5]
marked [9:3] [78:17] [87:21]
[97:4] [112:3] [113:1,5]
[126:6] [128:11] [133:24]
[134:3] [137:19,21] [138:13
,18] [140:7,10] [148:23,25]
[149:3,22] [168:4,7] [184:
4,7] [186:15,18]
market [12:25] [17:15]
[24:2,6,8] [26:6] [42:12]
[43:20,24] [46:25] [49:12]
[125:12] [135:24] [195:8]
marketed [46:7,24]
marketplace [195:16]
markets [45:14] [127:4]
[129:8,15] [135:15]
marking [112:20]
marriott [3:]
mary [2:] [5:15] [6:3]
master [102:8,13,19]
match [92:12]
material [156:8] [193:15]
[194:24]
materially [139:25]
math [55:20]
matter [5:5] [73:15] [75:5]
[117:7] [129:18] [146:1,18]
[165:20] [175:2]
matters [69:9] [116:22,23]
[119:5] [194:13] [195:7]
maximum [152:3]
may [11:6] [24:4] [26:11]
[35:8] [36:16] [43:16]
[69:1,21] [74:25] [75:1]
[82:22] [83:21] [99:5]
[100:11] [105:25] [106:11]
[123:10] [133:5] [136:21]
[138:8] [147:20] [155:22]
[156:4] [158:3] [162:25]
[176:22] [181:13] [186:25]
[193:9,10] [199:14,18]
maybe [76:9] [143:13]

[147:15] [150:7] [155:23]
[160:18] [166:4] [167:3]
[168:20] [197:13]
mean [5:2] [10:19] [31:5]
[38:20] [42:7] [48:25]
[65:25] [72:12] [75:12]
[100:10] [112:19] [127:10
,12] [129:5] [144:22,24]
[148:15] [154:25] [155:10]
[156:1] [161:3,8] [165:25]
[179:24,25] [182:8,9]
[198:13]
meaning [27:25] [68:17]
[172:17] [196:1]
means [45:3] [83:14] [91:19]
[147:7]
meant [135:8] [150:21]
meantime [192:18]
mechanical [103:11]
medication [6:20]
meet [153:17] [176:2]
meeting [4:] [73:13] [126:10
,25] [128:15,19] [140:11,15]
[154:5,23] [155:21] [156:16
,17,19] [157:8,9] [182:2]
[184:9,14] [185:15] [186:20
,25] [187:3] [192:13]
meetings [153:10]
members [73:17] [185:11]
memo [4:] [47:17,18,23,25]
[48:2,10,11,14] [98:19]
[99:7,12] [100:2] [106:8,10
,15] [107:15,24] [111:4]
memorandum [49:16]
[98:23,25] [99:2] [109:18,20]
[112:10]
memory [15:20] [21:12]
[50:9] [71:3] [87:17] [122:
10] [133:6]
menkhaus [105:25] [106:8]
[134:5]
mentioned [34:15] [124:9]
[177:13]
merits [61:11] [142:24]
merrill [14:4,6,8,11,14,19,23]
[15:1,2,5] [28:13] [70:20]
[71:3,8] [145:9]
message [161:8]
messages [106:6]
met [42:25] [161:4] [176:3]
mh [128:1]
michael.osnato@linklaters.com
[2:]
middle [106:7]
midst [159:8] [165:8]
mike [8:13] [42:9,10] [59:15
,20,21] [61:4] [170:7]
millard [153:18,23,25]
[155:8,24] [157:18] [161:5]
million [25:11] [34:24]
[35:2] [49:11] [88:23]
[106:18] [107:1,4,17,20]
[109:12] [110:4,13,15,20,22
,25] [111:16] [117:23]

[118:1,16] [142:9] [162:11
,14,23] [163:3] [165:1]
[166:13] [167:7,9,20]
mind [58:2,19] [73:22]
[92:23] [117:1] [122:2,7,12]
[135:9] [141:13] [179:19]
[182:4]
minds [192:13]
mine [27:25] [96:3] [99:9]
[165:16]
minimize [25:3] [179:12]
minimum [125:8,11] [152:
2] [167:7] [175:20,24]
[176:2,18] [177:1,2]
ministerial [93:23] [194:7]
ministerialtype [93:23]
ministerial-type [93:23]
minor [37:9]
minus [109:11]
minute [88:8] [89:10] [105:
23] [163:13] [169:21]
[199:23]
minutes [4:] [126:10,16]
[128:15,18] [140:11]
[144:18] [154:24] [155:19]
[182:10] [184:9,13] [186:20]
[187:5]
misled [101:1] [112:23]
mispriced [178:11,14]
missing [99:5] [112:15]
[126:13]
misspoke [35:8]
mistake [196:3]
mistakes [182:8,18] [196:24]
mnat [140:22] [184:11]
mnat006776 [140:22]
mnat-006776 [140:22]
mnat6827 [184:11]
mnat-6827 [184:11]
mobile [49:2] [74:8,12,15]
[105:1] [180:14,25] [183:15]
model [141:24] [150:24]
modeling [146:2]
moment [26:14] [33:2]
[96:5]
moments [168:14]
monday [126:18] [138:21]
[140:12] [184:10] [186:21]
money [15:12] [25:17]
[27:2,5,8,9] [28:3] [40:2,7]
[47:19,20] [84:14,17]
[85:19,21] [86:20] [89:17]
[98:3] [99:25] [103:16,23]
[107:7,8] [109:14] [111:7,9]
[114:7,23] [123:3,25]
[133:12] [151:17] [166:21
,22,23] [167:23] [178:11]
[179:8,17] [190:7]
monies [26:2]
monitoring [61:20,24]
[62:2]
month [39:23] [92:5] [114:
4,5]
monthly [20:17] [50:15]

months [75:5]
morgan [87:23]
morning [6:3]
mortgage [12:3] [16:8,15,19]
[17:4,5,7,8,10,13] [18:4]
[23:5,7] [24:25] [26:7]
[39:17,19,20] [40:1] [98:3]
[127:16,19,22,24]
mortgages [84:21]
motivated [70:19]
motivations [29:17]
motive [30:25] [31:1]
motives [86:15]
move [125:12]
moved [104:9]
moves [47:20]
moving [30:4]
mr [2:] [5:18] [6:3] [7:2]
[9:5,7,9,11,14] [16:3,5]
[19:7] [20:4,12] [27:11]
[29:15] [30:17] [38:14]
[48:21] [49:23] [53:19]
[57:11,17] [60:1,11,13]
[72:24] [73:2,10,24] [74:20]
[75:16,24] [76:17,24]
[77:9] [78:6,13,20,22]
[79:14,19,23] [80:17]
[82:24] [83:19] [84:23]
[86:10,23] [89:21] [90:25]
[94:12] [95:23] [96:8,13,17]
[99:9,16,17] [100:10,24]
[101:5,10,17,21] [112:4,11
,14,19] [113:4,9,14] [114:22]
[115:2,12] [118:20] [119:12
,24] [120:5] [121:23] [126:
24] [128:17,23] [131:3]
[137:6] [138:15] [139:1,8]
[140:3,6,23,24] [143:7]
[147:24] [148:4,9,17,21]
[149:5,14,20,21] [150:1,2]
[153:25] [154:2,3] [155:7]
[157:18] [162:19,21]
[163:13,18] [164:3,6,7]
[165:6,23] [166:6] [168:6,14
,18,22] [169:18] [170:3]
[171:4,7,10] [174:3] [175:
7,10] [182:2] [183:21]
[184:3,6,18,21] [186:23]
[190:10] [194:8]
ms [3:] [5:15] [6:2] [8:25]
[9:8,15] [16:5] [19:16]
[20:10,23] [29:19,21]
[31:3] [33:10,13,14] [38:23]
[50:1] [57:11,21] [59:17,20]
[76:3] [78:12,22] [80:23]
[83:3,10] [84:8,25] [86:17]
[90:9] [91:4] [95:22] [96:1
,12,16,20] [99:13,15,21,23]
[100:4,16,20] [101:3,7,8,15
,21] [111:17] [112:3,12,17]
[113:7,10,15] [115:8]

[118:21] [119:8,21] [120:3
,10] [126:8] [128:13] [131:
6,9] [134:1] [135:5,7]
[137:6,16,20] [138:11,15]
[139:5,8] [140:5,9] [147:23]
[148:2,15,19,22] [149:2,6
,19,24] [150:2] [156:21,25]
[157:9] [164:2,4,6] [166:4
,7] [168:6] [170:18] [172:2]
[173:22] [174:3] [175:9,11
,16] [184:1,6] [186:17]
[190:19] [193:18,20]
[199:22]
muir [3:] [5:4,22] [6:3,25]
[7:2] [16:5] [57:11] [78:20]
[79:23] [86:23] [101:21]
[105:24] [112:4] [114:22]
[115:12] [121:23] [128:17]
[137:6] [138:15] [139:8]
[140:13] [149:21] [150:2]
[164:6] [168:6,14,18]
[174:3] [184:6] [186:23]
[194:8] [201:5] [202:1]
[203:1,13]
muirs [78:23]
multi [23:22] [142:7]
multiplied [55:23]
multiseller [23:22]
multi-seller [23:22]
multiunit [142:7]
multi-unit [142:7]
myles [11:8] [12:15] [27:25]
[61:5] [63:18,19,21] [69:10
,21] [76:22] [78:10] [133:18]
[141:21,25] [143:12]
[150:7,8,9] [163:9] [164:14
,15,16,20,21] [165:1,2,13,17]
[168:10] [170:14] [182:9]
[184:24] [186:7,13]
myself [37:20] [113:12]
mystery [99:23]

—————————

N

name [5:12] [6:3,23] [59:15]
[93:3] [94:18] [116:13]
[132:2,4] [137:8,11,13,14
,24] [139:9] [146:14,15]
[201:19]
names [17:23] [93:7] [141:
8]
nations [170:24]
nature [56:24] [119:1]
[122:18] [194:7]
neal [3:] [5:13] [201:3,21]
[202:5]
near [27:2]
nearly [135:25]
neat [41:4] [105:15] [136:5]
[163:23]
necessarily [113:17]
necessary [36:16] [129:24]
[203:10]
need [6:15] [77:5] [111:18]

[142:1] [147:20] [148:17,24]
[179:11] [193:25]
needed [16:15,18] [24:24]
[54:16] [77:4,7,25] [115:21]
[146:8,24] [151:25] [152:5
,7,8,12,17] [185:3,23]
[198:1]
needs [27:5] [36:22] [142:14]
negotiate [38:18,21] [50:23]
[51:17] [150:3] [151:3]
[191:22]
negotiated [46:15,16]
[86:14,15] [116:17] [189:25]
[192:19]
negotiating [11:25] [48:21]
[116:14] [150:11]
negotiation [38:22] [51:12]
[150:15,22] [193:16]
[194:1]
negotiations [187:25]
[188:4]
negotiator [150:3,5]
net [47:10] [104:6,7]
new [2:] [14:10] [41:7]
[55:12] [70:4] [96:11]
[110:15] [111:16] [121:14]
[156:5] [177:11]
news [154:11,14,15,16]
[155:1,2]
next [7:14] [10:9] [21:17]
[60:19] [94:11] [98:10]
[101:22] [102:9] [105:2]
[123:14] [127:3] [139:3]
[148:20] [184:18]
nice [14:13]
nicholas [72:20]
nick [128:9] [130:1] [131:12]
[132:7]
nicks [27:25]
nine [76:10] [86:5]
nineteen [7:15]
ninety [7:15]
ninth [86:3,9]
no [8:23] [9:17] [11:12]
[14:1] [21:20] [23:2,17]
[33:3] [37:13] [38:8] [39:3]
[43:16] [45:2] [52:20]
[56:7] [64:1] [65:24] [75:13]
[82:19] [85:22] [88:13,23]
[95:18] [96:5] [97:13]
[99:7,8] [101:13] [103:16]
[105:4,6,10,13] [112:19]
[117:8] [119:14] [120:13]
[126:12] [136:14] [140:18]
[148:17] [156:5] [158:17]
[159:6,13,22] [164:16]
[165:2,3] [169:10,13]
[174:24] [178:4] [183:15]
[189:11,17] [194:15]
[197:17] [199:4,7] [202:6,15
,16,17,18,19,20,21,22,23
,24] [203:2,3,4,5,6,7,8,9]
noise [25:3]
nonbonding [159:3]

26/09/2006  MUIR, Douglas R. (vol.1)

none [22:11] [183:19]
nonstarters [157:13]
nor [99:9,16]
normally [180:18]
north [3:] [5:10,11] [7:1]
  [183:14] [201:1]
notary [3:] [201:4,23]
note [17:17,20,22] [18:1,2,6
  ,8,22] [19:13,18,20] [20:1,2
  ,6,8,21] [21:15,21] [23:1]
  [28:24] [31:23] [32:1,12,24]
  [33:6,20,25] [34:4,6]
  [50:7,25] [51:9] [81:5,23]
  [82:1,14,17,23] [83:17]
  [84:10] [85:3,4,9,15,19]
  [87:8] [88:6,12] [89:8]
  [90:15,20] [91:5] [92:1,4,17]
  [95:15] [100:6,14,15]
  [101:16] [108:11] [110:22
  ,24] [111:1,2,7,9,10] [114:
  6,15,23] [140:13] [186:24]
  [187:4]
noted [202:6,7]
notes [18:6] [20:21] [27:12]
  [81:6] [107:2]
nothing [159:19,20]
notice [112:14]
noticed [149:11]
notion [54:23]
november [163:5] [164:15]
  [168:1] [186:21] [191:11]
number [8:4] [9:3,13]
  [10:10] [15:4] [23:25]
  [26:8] [42:22] [49:2] [53:7]
  [55:10,21,22] [56:16,20,25]
  [57:9] [58:3] [64:20] [67:5
  ,22] [76:14,15] [77:15]
  [97:7,9] [102:17] [106:8]
  [108:20] [111:15] [112:1]
  [116:3,21] [122:21,22]
  [124:16,23] [126:6] [128:11
  ,16] [133:24] [136:2] [137:
  19] [138:13,24] [140:7]
  [143:19] [148:25] [151:24]
  [161:21] [166:11] [168:4]
  [174:1] [178:13,15] [183:14]
  [184:4] [186:15] [188:17]
  [194:13] [198:19]
numbered [9:1] [80:5]
  [81:15] [86:25] [87:23]
  [90:10] [97:5] [112:8,13]
  [126:12] [137:24] [138:22]
  [140:22] [168:11] [184:10]
  [186:22]
numbers [9:10] [78:16]
  [90:20] [91:11] [99:6]
  [111:14] [117:20] [147:15]
  [149:22]
numerical [171:24] [172:20]

O

oac [16:11,12] [17:11]
  [25:1] [32:23] [86:5,20]

[92:14] [170:11]
oak [21:16,18,23] [22:2,10]
  [23:7] [33:5,6] [81:4]
oakwood [4:] [5:5] [6:7]
  [7:23] [8:1,3,9,10,14]
  [9:21] [10:3,9,20] [12:10]
  [13:21] [14:5,6,8,14,24]
  [15:15,16,18,25] [16:2,6,11]
  [17:4,5,7,8,9,10,12] [18:4
  ,12,15,19] [19:6,12,15,19]
  [20:11,21] [21:3,6] [22:3,4
  ,6,8,10] [23:2,6] [24:10,16
  ,18] [25:18,19] [26:1,2,4]
  [27:17] [28:21] [31:17,18,24]
  [32:6,11,20,25] [33:1,3,9]
  [34:10,17] [35:24] [36:11]
  [39:8] [40:15] [41:18]
  [42:3] [44:10,13,18] [48:13]
  [50:19,22] [51:7] [53:21]
  [55:22] [57:12] [58:17]
  [59:4,8,22] [61:14,25]
  [64:13] [65:13] [69:5,16,25]
  [74:17] [76:12] [82:22]
  [83:16] [84:5,7,13] [85:8,13
  ,21] [87:9,15] [88:10,14,16
  ,19] [89:7,13,18] [91:7,23]
  [97:1] [98:3] [99:25] [102:
  4,8,15,17] [104:12,17,25]
  [105:1] [108:3] [109:21]
  [110:19] [114:25] [116:13]
  [121:24] [124:14,17]
  [126:10,17] [128:14,18]
  [130:10] [132:5,10] [134:11
  ,18] [140:11] [141:24]
  [144:1] [145:14] [147:2]
  [149:8,10] [150:4] [151:21]
  [153:25] [160:21] [162:18
  ,22] [163:2] [169:25] [172:
  13,14,18] [173:14,19]
  [175:19,22,24] [176:25]
  [177:8] [178:10] [180:12]
  [181:3] [182:20] [183:3,7]
  [184:8] [186:3,19] [188:23]
  [192:22] [196:16]
oakwoods [13:22] [19:18]
  [26:23] [27:1] [38:2] [44:7
  ,22] [51:23] [57:24] [58:24]
  [75:10] [87:12] [91:24]
  [103:12] [104:20] [125:17]
  [170:1]
oath [5:21]
object [29:17,18] [30:17]
  [38:14] [57:17] [75:24]
  [80:18] [82:24] [83:19]
  [86:10] [89:21] [90:25]
  [115:2] [131:4]
objected [57:22]
objection [16:3] [19:7]
  [20:4,12] [84:23] [115:5]
  [119:4,9] [120:7,11,15]
  [190:10]
objectionable [192:6]
objections [115:4]
objective [68:16] [151:16]

objectives [81:10]
obligated [37:11]
obligation [20:14] [21:3]
  [40:12]
obligations [21:2] [24:17]
  [181:12]
obligor [40:5,8]
obligors [39:20,21] [40:17]
  [60:10] [179:10]
observations [196:25]
observe [197:5]
observing [131:13]
obtain [45:3] [67:9] [173:9]
obtaining [16:13] [68:12]
obviously [80:19] [119:5]
  [155:24] [156:13]
occasion [88:11] [120:14]
  [156:10]
occasionally [14:11] [36:14]
  [44:18] [87:16]
occasions [15:4] [64:20]
  [116:4] [198:19]
occur [46:20]
occurred [115:21]
october [64:19] [156:19]
  [157:1] [161:1] [168:13]
  [184:10,14] [201:19]
odriscoll [40:25] [46:19]
  [48:21] [53:19] [71:17]
  [168:10] [196:20]
off [8:24] [14:10] [26:11]
  [43:19,24] [45:18] [56:13,15]
  [57:6] [61:18] [78:14]
  [111:23] [116:11] [117:14]
  [131:15] [135:14] [137:1,18]
  [163:25] [172:17] [173:23]
  [175:22] [193:19] [199:24]
offer [115:23] [178:8]
offered [14:8] [15:9] [35:13]
  [47:15] [127:17] [176:16]
  [177:20]
offering [49:16] [51:15]
  [97:21]
office [7:17] [164:14,19]
  [166:12] [167:4] [191:20]
officer [11:11] [72:25]
  [76:18] [77:10] [78:7]
officers [9:24] [72:20]
  [194:17]
offices [7:18] [153:20,21]
official [96:15] [192:3]
often [23:23] [24:4] [37:13]
  [45:12] [48:24] [85:1]
  [197:17]
oh [113:4] [115:25] [162:8]
ohc [5:6] [138:23]
ohclt [87:24] [94:23] [97:5,8]
  [105:3,8,23] [112:8] [138:
  25] [186:22]
ohclt07303 [138:25]
ohclt-07303 [138:25]
ohclt2761 [186:22]
ohclt-2761 [186:22]
ohclt428050 [105:23]

ohclt-428050 [105:23]
ohclt428070 [105:3]
ohclt-428070 [105:3]
ohclt-428078 [97:8] [105:8]
ohclt-428078 [97:8] [105:8]
ohclt428291 [112:8]
ohclt-428291 [112:8]
ohclt428297 [87:24]
ohclt-428297 [87:24]
ohclt428300 [94:23]
ohclt-428300 [94:23]
okay [9:14] [17:21] [24:13]
  [25:8] [42:20] [47:1] [73:2]
  [79:23] [80:14] [99:13,22]
  [100:4,24] [101:5,17]
  [108:3,5,7,8] [109:24]
  [111:22] [112:19] [113:4,9
  ,14] [119:24] [134:9,16]
  [136:8] [137:12] [147:22]
  [148:21] [153:15] [159:4]
  [161:24] [164:3] [166:6]
  [170:18] [171:8] [173:2]
  [191:10] [192:1]
omaha [153:17,21] [198:20]
omi [17:17,20,21,25] [18:2
  ,6,8,14,22] [19:13,18,20]
  [20:1,2,6,8,21] [21:15,21]
  [23:1] [28:24] [32:1,12,23]
  [33:6,20,25] [34:4,6]
  [50:7,11,25] [51:9] [81:5]
  [84:10] [85:3,15] [87:8]
  [88:6,12] [91:21,25] [95:12
  ,15] [100:14] [110:22,24]
  [111:1,7,9,10] [113:21]
  [114:23]
once [16:20] [41:3] [74:25]
  [84:4] [139:1] [152:4,13]
  [179:25] [180:2]
one [6:17] [7:23] [13:25]
  [17:24,25] [18:20] [20:5,7]
  [27:4] [36:12] [38:8] [42:21]
  [47:11] [50:14] [55:24]
  [58:3,8] [61:3] [67:5,6,22]
  [69:4] [70:7] [71:25] [73:21]
  [80:9,12] [81:11] [82:11]
  [87:18] [88:17,18] [91:20]
  [92:2] [93:10,11,21] [94:17
  ,18] [95:2] [96:3,4,15]
  [97:25] [100:13] [102:19]
  [103:7,22,23] [106:7]
  [109:12] [110:21] [112:5,6
  ,18,21] [113:13] [114:1]
  [125:1] [127:10] [132:13]
  [135:9] [136:3,14,21]
  [138:20] [139:23] [140:4]
  [141:10,23] [151:25]
  [152:20,22] [153:13,15,16]
  [159:13] [160:10] [161:21]
  [163:15] [166:11] [170:16]
  [171:2,4] [173:5] [174:22]
  [176:16,17,18] [178:13]
  [182:6] [183:4] [185:16]
  [188:11,17]
ones [8:4] [34:18] [37:8]

[64:15] [81:11] [116:10]
[136:22] [181:3]
ongoing [16:21] [64:15]
onto [144:19,22]
open [183:24]
opened [48:5]
opening [119:18] [166:2]
operate [123:20] [152:4]
operated [86:1] [116:18]
[142:13] [182:7]
operating [11:1] [24:13]
[25:8] [123:12] [194:9]
operation [22:15] [41:22]
[89:11] [123:7] [133:17]
[142:7]
operationally [44:17]
operations [69:12] [180:24]
operators [181:2]
opine [32:7]
opinion [57:11,24] [76:25]
[78:6] [146:25] [167:18,22]
[194:12] [196:2]
opinions [87:14]
opportunity [28:3,4] [78:21]
[131:18] [197:4]
opposed [30:21] [146:13]
option [160:3] [178:6]
order [36:5] [97:11] [99:20
,21] [101:12,18] [125:9]
[129:12] [130:3] [152:11]
[165:7] [175:21]
oregon [138:8]
organization [61:6]
organized [22:22] [133:21]
original [112:25] [189:21]
originally [34:24] [37:21]
originate [44:25] [45:4]
originated [17:11] [18:4]
[24:25] [42:23] [44:8]
[45:10] [179:25] [180:3]
originating [45:5] [170:2]
origination [16:8,14] [44:12]
[45:21]
originations [195:1]
orn [90:19]
otherwise [24:7] [119:15]
[148:18] [149:13] [165:25]
ought [56:23] [155:11]
ourselves [160:17]
outcome [159:10] [160:4]
outflows [102:7]
outside [25:3] [45:15]
[64:21] [121:10] [131:21]
[159:23]
outstanding [55:17,22]
[72:1]
outstandings [50:12]
overall [171:24]
overnight [125:14]
override [176:1,11]
owe [166:21,22]
owed [167:23]
own [21:20] [48:13] [103:21]
[142:8] [160:21] [163:8]

[182:4]
owned [18:15,23] [19:12,15]
[20:21] [21:4] [22:2] [23:2]
[31:17]
owner [22:1] [43:9] [83:25]
[145:7,8]
ownership [18:14] [19:18]
[21:23]
owns [158:24]
—————————
P
—————————
p.m [200:1]
package [51:20,24]
packaged [45:1]
page [4:] [72:19] [81:14]
[82:11,12] [84:19] [86:3]
[87:22] [90:10,15] [94:22]
[95:17] [96:21,22] [97:6,7
,18,24] [98:11,14,16]
[99:17,19] [100:5,9,14]
[101:4,8,9,11,16,22,24]
[105:2,3,7,9,12,17,19]
[106:7] [108:13,22,23]
[109:1,16,17,19,21,23]
[110:1,2,3,14,24] [111:14]
[112:13,18] [113:13]
[126:13,20] [127:3] [128:22]
[130:18] [138:1] [139:3]
[140:19,21,24] [149:12,15
,16,17] [161:20,22] [184:17]
[187:15,17] [202:15,16,17
,18,19,20,21,22,23,24]
[203:2,3,4,5,6,7,8,9]
pages [80:20] [96:19]
[97:14,15,23] [98:10]
[99:4] [105:21,23] [112:15]
[113:12,16,18,20] [139:10]
[149:12] [168:15,16]
[201:8] [203:10]
paid [20:19,20] [27:2]
[36:13,14,17] [37:2] [46:8
,12] [50:11,16] [81:8]
[84:6] [85:9,14] [95:14]
[98:3] [107:13] [114:8,9]
[129:11] [133:12] [167:7]
[178:17]
pain [152:2]
painful [199:17]
paper [23:17] [24:1,6]
[91:8] [152:17]
parables [166:15]
paragraph [126:20,21,24]
[127:2,9] [128:23] [129:2,9]
[130:19] [140:21,23,24]
[184:17] [187:17]
paragraphs [126:23] [127:
6]
parent [13:9,12] [16:7]
[21:24] [22:6] [25:12]
part [17:20] [22:25] [50:18
,20] [53:22] [61:8] [67:5,22]
[75:6,10] [83:21] [93:15]
[99:7] [100:17] [107:6]

[111:5] [154:22] [180:14]
[191:24] [197:21] [202:9]
parte [156:13]
participated [16:17] [17:18]
[125:5,16]
participating [54:15]
particular [12:17] [18:17]
[38:16] [39:24] [59:23]
[73:21] [86:3] [88:2] [98:16]
[101:24] [112:12] [117:4]
[150:15,19] [160:11]
[172:12,23]
particularly [44:19] [130:5]
[134:23] [141:23] [150:8]
[180:9,24] [183:10] [197:2
,21]
particulars [60:7] [185:9]
parties [88:19] [191:22]
[201:17]
partner [7:15] [8:18]
parts [150:16] [157:14]
[188:1]
party [20:6] [74:11,16]
[88:17]
passed [32:10] [33:8]
[39:25] [147:15]
passing [64:11]
passive [22:11]
past [39:22]
pause [172:7]
pay [15:12] [19:21] [21:3]
[47:7] [51:9] [85:4] [106:18]
[107:16] [111:9] [127:24]
[128:1] [135:23] [162:22]
[163:3,6] [164:9,16,23,25]
[165:3] [166:23] [173:8]
[177:25] [178:9,19] [189:21
,22] [190:7]
payable [102:25] [103:8]
[190:4]
paying [37:2] [49:5,6]
[66:4,6] [95:10] [115:25]
[116:2] [162:14] [164:22]
[165:21] [166:8,10]
payment [20:1] [39:20,21]
[40:1,3,5] [84:5] [86:4]
[107:1] [110:19,22] [113:22]
[114:8] [127:19] [165:14]
[178:18] [181:2] [190:9]
payments [16:22] [146:3]
[181:6]
payroll [103:2,9]
pays [177:23]
peak [58:5]
peculiar [166:14]
pending [12:6]
people [11:4] [17:23] [20:23]
[30:19] [41:21] [44:10]
[47:18] [49:3] [61:6] [64:7
,21] [67:4] [70:7] [92:21,23
,25] [93:4,17,18,19] [94:5]
[106:9] [115:21] [122:15]
[124:15] [142:24] [143:16]
[147:8] [153:22] [158:9]

[159:25] [166:20,24] [170:
5,23] [171:14,21,23] [172:
9] [177:11] [179:15] [183:14]
[186:3] [191:16] [192:15]
[199:5]
per [139:25]
perceived [66:25] [197:15]
[198:4]
percent [21:13] [55:17,23]
[56:12,17] [58:6] [118:9]
[125:11,14] [158:24]
percentage [46:9,10,12,14]
[49:10] [55:6,7] [56:16]
[118:12] [177:24]
perception [45:14] [68:15]
[198:14]
perform [8:3] [13:5] [66:8,12
,15] [76:24] [78:7] [124:16]
[126:1]
performance [77:10] [117:
13] [180:8] [195:10]
perhaps [11:17] [58:12]
[61:18] [64:22] [67:20]
[69:8,21] [79:2] [80:21]
[84:3] [97:14] [123:19]
[146:4] [179:4]
period [10:1,18,21] [11:6,15
,19] [12:18] [13:21] [24:9]
[28:19] [34:15] [42:23]
[44:6] [64:13] [65:13]
[69:23] [76:22] [77:25]
[92:19] [102:6] [163:4]
[183:12] [198:3] [199:3,13]
periodic [156:5]
periodically [20:16]
permanent [16:18] [26:7]
[45:3] [130:13]
permitted [89:4]
person [20:19,20] [28:1]
[38:12] [40:1] [51:3] [59:14
,21] [69:4,13] [72:14]
[75:2] [81:22] [85:25]
[93:2] [133:14] [145:9]
[170:17] [171:19] [172:1]
[184:25] [186:1] [190:21]
personal [45:12]
personnel [118:23]
persons [20:20] [201:13]
petition [10:19] [11:1,16,20]
[12:19] [24:9] [28:20]
[34:16] [64:13] [65:13]
[92:19] [135:8] [199:3]
ph.d [145:10]
phase [162:3,10,23] [164:8]
[167:20]
phone [71:25]
physically [46:20]
picked [72:1]
picking [9:13] [175:14]
picture [15:3] [42:10] [71:18]
piece [69:19] [91:8] [119:22]
pieces [24:12] [103:20]
pilar [70:8] [71:21,24]
pitch [143:4] [151:11]

pitched [65:21] [136:19]
pitches [142:25]
pitching [65:4]
place [5:21] [29:3] [33:21]
    [35:21] [73:14] [77:11]
    [103:20] [107:25] [133:20]
    [144:4] [149:16] [151:12]
    [153:16] [163:5] [167:15]
    [175:14]
places [47:14]
plain [19:11]
plaintiff [2:] [3:] [5:7,19]
plan [67:16] [138:7] [152:12
    ,23,25] [157:6,12] [190:14]
plant [138:8]
plants [77:20]
play [74:24] [90:6] [187:10]
player [125:13] [146:10]
players [69:10] [70:25]
playing [135:14]
please [5:14,21] [6:23]
    [9:21] [33:11] [49:25]
    [59:18] [78:21] [83:2]
    [84:18] [88:23] [90:9]
    [96:15] [102:1] [105:2,7,21]
    [108:13] [112:10,12]
    [128:21] [131:8] [148:5]
    [202:13] [203:11]
pledge [18:5]
pledged [31:19,21] [32:9]
plenty [125:24]
plus [109:10] [129:22,23]
pocket [128:1]
point [10:11,13] [21:6]
    [22:13,14] [36:8] [51:3]
    [56:21] [60:23] [62:7]
    [68:24] [69:4,13] [119:8]
    [120:6,24] [127:20,25]
    [132:13,18,19] [133:14]
    [135:20] [150:13] [152:16]
    [163:2] [174:13] [175:9,10]
    [183:23] [186:1] [187:23]
    [188:22] [189:1,8] [190:21]
    [191:14] [193:1]
points [11:13] [24:19]
    [127:16] [128:3] [177:23,25]
    [178:9,17,19,20]
policies [121:9]
pool [42:21] [43:4,5]
pools [93:1]
poor [124:19,21,22] [125:15]
    [128:7]
poorly [74:23] [126:1]
portfolio [142:10]
position [8:10] [10:6,9]
    [13:8] [75:23] [104:4]
    [144:7] [152:21,22] [154:21]
    [182:24]
positions [7:11,14] [8:20]
    [10:21] [76:15]
positive [74:7] [104:7]
    [153:19] [154:4] [158:25]
    [159:5]
possession [18:19]

possibilities [171:15]
possibility [131:22]
possible [35:24] [60:8]
    [61:12] [155:2] [179:22]
possibly [92:18]
post [174:16,18] [186:11]
    [188:6] [199:13]
postdated [74:13]
postemployment [174:16]
post-employment [174:16]
posttermination [174:18]
post-termination [174:18]
pot [40:1] [141:9]
potential [43:2] [55:4]
    [57:1] [116:8] [132:3,11]
    [141:3] [143:1] [145:18]
    [151:7] [189:9] [192:10]
    [193:10]
potentially [145:25] [170:16]
practice [19:9] [128:7]
    [175:24] [178:3,23] [194:22]
    [195:2]
practices [124:19,21,22]
    [125:18] [183:7]
pre [199:13]
prearranged [158:22]
preceded [94:18]
preceding [114:5]
precise [59:13] [120:23]
predecessor [38:1] [94:21]
predict [183:16]
predicted [180:18]
predictive [181:23]
preeminent [170:24]
prefer [180:2]
preferred [86:17]
prefiling [133:2]
prepackaged [158:21]
preparation [174:17] [193:
    5]
preparatory [193:13]
prepared [92:24] [107:25]
    [168:21]
preparing [185:8]
present [187:2] [201:14]
presentation [134:4] [153:
    24] [160:14]
presentations [160:13]
presented [103:15]
preserve [115:5]
president [10:12,14,23]
    [27:16] [59:25] [69:12]
    [78:1]
presidents [94:4]
pressure [52:9,23] [53:2,17]
    [54:4,6,17] [131:14]
presumably [55:3] [108:9]
pretty [65:20] [69:22] [79:21]
    [81:1] [117:22] [122:23]
    [127:5] [151:2,14] [185:19]
prevailing [127:18] [129:15]
    [177:21]
previously [112:3] [135:11]
    [149:21] [151:10]

price [7:8,9,24] [8:6,16,22]
    [13:1] [47:7] [108:17]
    [109:10] [116:14] [131:14]
prices [47:1] [109:3]
pricing [159:20] [179:15]
primary [114:3] [122:1]
    [150:3] [158:14] [159:8]
prime [150:5]
principal [12:22] [35:2]
    [43:14,16] [46:9,12] [47:3]
    [49:8] [69:9] [107:2] [145:
    7] [151:24]
principally [11:22] [13:14]
    [93:23] [184:25] [193:7]
principles [116:20]
printout [4:]
printouts [4:]
prior [76:8,13] [78:2,24]
    [100:17] [123:24] [125:10]
    [132:20] [201:6]
priorities [20:11] [82:7,10,14]
priority [20:2] [84:5] [86:4,9
    ,13,21]
pristine [182:7]
private [43:22] [131:20]
privilege [147:21]
privileged [119:16] [163:19
    ,21,25]
privy [73:12]
probability [99:11] [179:17]
    [182:15]
probably [29:10] [40:23]
    [42:6,11] [48:4,18] [49:9]
    [54:1] [59:13] [91:10]
    [94:8,16] [96:13] [122:16]
    [123:21,22] [124:2] [133:18
    ,22] [140:19] [143:10]
    [148:11] [150:8] [151:24]
    [154:23] [160:17] [165:11]
    [182:12] [187:1] [196:14]
problem [67:19] [112:20]
    [119:14] [180:11] [181:5,22]
problems [66:24] [67:1]
procedure [202:9]
proceeded [41:6] [191:22]
    [192:14]
proceedings [6:16]
proceeds [19:20] [20:8]
    [35:4] [39:23] [43:11]
    [44:1] [47:8,10] [82:3]
    [84:1] [85:3,5,14] [107:12
    ,14]
process [9:20] [12:2] [16:13]
    [20:17] [42:18,20] [44:20]
    [61:8] [62:16] [67:10]
    [141:14] [142:16] [144:1]
    [159:24] [161:15] [199:16]
produced [87:11] [97:12]
    [100:21] [113:8]
product [176:17] [178:13]
    [180:24]
production [12:3] [16:14]
    [26:7] [142:9]
professional [3:] [196:16]

[201:4,22]
professor [76:3,7]
professorship [76:13]
profit [130:16]
profitability [130:12]
profitably [123:20]
program [15:14] [16:20]
    [54:10] [58:23] [59:2,11]
    [60:5,9,20] [61:10,12,15,21
    ,25] [62:5,8,19] [63:2,6,10
    ,17,25] [64:8] [73:23]
    [74:3,4,10,19] [75:14]
    [79:2,3,8,10,15,21] [95:4,13]
    [138:16] [139:17,20,22]
    [154:17] [155:25] [176:24]
    [177:6,11,19] [195:1]
programs [176:21,24,25]
prohibit [121:9]
project [4:] [137:7,10,22]
    [138:4] [153:22]
projections [133:3,13]
    [185:5] [193:8]
pronounced [122:20,24]
proof [4:] [149:6,9]
properly [181:8,9]
properties [61:9]
property [45:11,12] [114:24
    ,25]
proponent [27:11]
proposal [53:9] [189:21]
    [190:6] [192:14]
propose [40:21]
proposed [134:25] [151:1]
    [192:5]
propounded [202:3]
proprietary [172:17,25]
    [175:22]
pros [141:22]
prospective [74:11] [184:22]
prospectus [4:] [47:16]
    [48:3] [49:18] [97:20]
protection [188:20]
proved [125:15] [183:8]
proven [181:25]
provide [26:1] [34:6,10]
    [37:11] [40:15] [53:9]
    [64:12] [65:10] [174:19]
    [176:25] [191:12]
provided [13:15] [20:15]
    [28:23,25] [35:5,18] [65:12]
    [95:11] [147:8] [174:11]
    [189:25] [192:21] [199:2]
provider [23:11] [38:3]
    [70:22]
providers [13:15] [51:14]
    [142:22] [185:25] [189:9]
    [192:8,10]
provides [24:5]
providing [50:7] [66:13]
    [188:20] [197:8]
provision [83:21] [84:21]
    [85:3] [175:25]
pru [42:9]
prudent [27:6]

prudential [41:14,16,19,21] [42:5]
public [3:] [17:15] [43:24] [49:15,17] [201:4,23]
publicly [14:7] [47:15] [49:4,22]
pull [36:18]
purchase [17:10] [23:5] [31:24] [34:11] [46:21,22] [52:18,24] [65:19] [66:13] [80:10] [106:24] [108:17] [116:14] [125:9] [130:4] [171:17] [187:19] [188:2,13] [189:10]
purchased [31:18] [108:18]
purchaser [136:1]
pure [43:22]
purport [112:21]
purports [171:24]
purpose [13:11] [17:9] [18:2,3] [21:19] [22:17,18 ,20] [23:4,5,12] [25:16] [30:12,14] [31:16,22,23] [32:6,21] [33:1,15] [34:4] [39:16] [40:19] [80:24] [102:20] [114:2,3] [119:3] [157:8]
purposes [89:15] [102:23]
pursuant [85:10,16,19] [114:10] [202:8]
pursue [183:24]
pursuit [130:20]
push [56:13]
pushed [190:8]
pushing [190:13]
put [29:2] [35:21] [37:21] [50:17] [62:5] [90:6] [93:18] [97:10] [116:3] [123:18] [132:8] [133:2] [153:3] [155:2] [166:9] [182:24] [183:22] [190:22,25] [191:6,7]
putting [17:18] [133:13] [146:8] [152:17] [192:22]

Q

quality [188:23]
quantitative [145:11]
quarterly [64:17]
question [6:12,14] [21:17] [24:11] [30:18] [38:15] [49:24] [52:5] [57:18,22,23] [60:12] [64:2] [75:25] [76:13] [79:1] [80:18] [82:25] [83:2,20] [85:11,18] [86:11] [89:22] [91:1] [96:18,21] [102:9] [115:3,4] [119:20,22] [120:2,4] [131:5,8,9] [135:3,4] [146:5] [147:21] [148:3,5,11 ,23] [158:1] [163:15] [164: 1] [165:24] [175:12] [176:4] [183:25] [191:3]

questions [6:5] [147:9,12] [155:5,13,14] [202:3]
quick [80:5]
quickly [154:19]
quite [167:12] [183:18,20] [196:17]

R

raise [27:8] [28:3] [53:12] [130:15]
raised [53:11] [166:12]
ran [9:11] [16:20] [17:6] [57:15]
ranch [192:16,25] [193:2,16]
range [24:7] [138:25]
ranging [157:11]
rapidly [58:10,12] [122:3] [123:15] [124:3,7]
rate [45:11] [50:10] [72:14] [116:2] [127:13,14,15,17,18 ,23] [128:5] [129:11,13,24 ,25] [130:3] [135:17,18] [177:6,7,18,20,22,23] [178:8,12] [179:13] [180:21]
rates [43:14] [109:2] [123:6] [129:15,16,19] [130:15] [170:19] [177:14,15,16,17] [178:23] [179:18]
rather [22:21] [32:24] [86:21] [129:18] [142:3] [177:25]
rating [39:13] [43:1] [135:14 ,20] [142:13] [195:17]
raw [173:6]
rayburn [150:14]
rcda [137:25]
rcda010432 [137:25]
rcda-010432 [137:25]
re [5:5]
reached [131:15]
react [154:18]
reaction [64:6] [150:25] [157:10] [169:2,5]
reactions [169:9]
read [33:10,12] [59:17,19] [81:24] [83:3,5] [99:6] [105:24] [106:4] [120:2] [128:24] [129:1] [135:2,6] [148:4,8] [153:5,6] [156:21 ,24] [168:15] [175:12,15] [184:18] [187:7] [202:2,15 ,16,17,18,19,20,21,22,23 ,24] [203:2,3,4,5,6,7,8,9]
readily [122:7,23]
reading [106:16] [169:6] [187:12]
reads [202:9]
ready [160:1] [185:22] [198:7]
real [45:11] [150:22]
realize [13:20] [24:11] [44:4] [169:16]
realizing [116:24]

really [38:12] [44:12] [71:5] [72:3] [78:11] [87:17] [93:20] [111:8] [133:18] [136:20] [156:12] [159:12] [167:21] [170:13] [179:22] [181:8] [187:8] [188:5]
reams [147:8]
reason [9:12] [38:17] [61:7] [73:18] [82:19] [85:13] [114:25] [115:9] [199:7]
reasonable [152:12] [189: 15]
reasonably [182:12]
reasons [66:20] [72:9] [73:17,20] [121:24] [143:13] [157:25] [161:13] [166:11] [181:7] [183:4] [188:17] [202:12]
recall [8:2,11] [15:11] [20:20] [21:5] [28:17,23] [29:10] [34:22] [37:8] [40:23] [45:17,19] [59:10] [62:22] [63:18] [64:19] [71:24] [74:13] [79:19] [87:3] [94:18] [121:5] [132:5] [141:10] [143:3] [154:1] [159:22] [185:2] [190:2] [191:10] [192:25] [193:11,24] [195:22] [199:14]
receipt [110:25]
receipts [114:4]
receivables [41:2] [84:19]
receive [19:19] [43:11] [44:1]
received [21:14] [33:7] [50:19] [85:19] [97:12] [110:12]
receiving [54:4]
recently [183:5]
reception [195:16]
recess [57:8] [78:16] [111: 25] [137:3] [147:24] [173:25]
recession [180:9] [183:9,10]
recognize [9:15] [54:11] [80:6] [87:25] [88:1] [96:22] [97:15,18,24] [98:14] [101:9,14,22] [105:3,5,8,10 ,11,18] [113:16] [126:13] [140:17] [184:11] [186:22]
recollect [12:23] [82:16]
recollection [10:2] [11:5,18] [14:1,25] [15:5] [20:14,18] [21:25] [23:9] [27:3,22,24] [28:10] [29:4] [36:7] [38:24] [42:7] [52:6] [53:13,16] [56:3,7] [60:15] [61:17] [64:10] [67:3] [71:19] [82:13] [83:13] [84:9] [91:14,20] [98:15] [101:23] [106:1,3] [114:14] [120:21] [128:9] [129:3] [132:1,14] [138:4] [139:14] [145:17] [146:14] [147:16] [150:20]

[162:8] [163:1] [164:13,20] [174:22,25] [187:10,14] [188:4] [190:11]
recommend [28:8]
recommendations [146:20]
recommended [28:6] [146:16]
reconciliation [92:3,8]
record [4:] [5:1,14] [6:24] [8:24] [9:2,19] [33:12] [43:9] [47:11] [57:6,10] [59:19] [78:14,18] [83:5] [91:16] [111:21,23] [112:2] [121:11] [124:12] [135:6] [137:1,4,18] [148:8] [156: 24] [173:23] [174:2,10] [175:15] [183:22] [193:19] [199:24]
records [18:21] [19:1] [84:16] [91:10,18]
recovery [117:11] [118:6,12]
redo [194:6]
reduce [125:7] [180:22]
reduced [106:22] [123:6]
refer [126:19] [134:10] [172:9,16]
reference [90:14] [95:2] [108:14] [129:7] [130:19] [187:16]
referred [37:15] [39:7] [75:7] [80:11] [81:23] [182:19]
referring [35:7] [37:25] [83:18] [98:5] [108:22] [129:10,23] [171:22]
refers [83:11] [90:24] [91:2 ,5] [95:6] [134:12]
reflect [111:7]
reflected [110:23]
reflection [182:12]
refraining [119:17]
refresh [83:13]
refreshes [138:3]
regarding [183:25] [187:18]
registered [3:] [201:3,22]
registration [43:24]
regular [88:13]
rejected [136:9]
relate [100:12,18]
related [15:14,21] [19:23] [21:1] [73:23] [116:21] [117:11] [119:6] [138:17] [201:15]
relates [180:9]
relation [14:4]
relationship [13:10,13] [18:12] [39:3] [53:22] [69:24] [71:10,11,14,23] [72:16] [118:24] [119:7] [121:13] [160:16,22,24]
relationships [30:5,6] [174:6]
relative [142:24]
relatively [27:2] [37:9,11]

[41:7] [125:25] [126:1]
 [178:7,16] [179:9] [180:1,23]
 [183:11]
relevant [118:10] [130:5]
relief [10:20] [57:13]
rely [28:1]
remainder [100:5]
remained [76:21]
remember [9:25] [10:11]
 [19:4] [20:7,10] [21:10]
 [25:13] [26:21,22] [31:15,20]
 [36:9] [37:23] [53:5,23,24]
 [59:14] [60:6,7,21] [61:13
 ,16] [62:25] [63:23] [64:6,15]
 [70:1] [71:20] [81:13]
 [84:12] [87:5,10] [105:14]
 [116:1,11] [117:20] [118:4]
 [120:19,22] [127:13]
 [129:5] [133:2] [136:14,20]
 [137:8,13] [141:13,23]
 [143:2,6] [144:17] [146:21]
 [150:15,19] [151:5,9,11]
 [155:10] [156:3,4,11]
 [159:25] [161:25] [162:13
 ,15,24] [164:11] [165:7]
 [168:23] [169:3,16,17]
 [187:2,4,23,24] [188:3]
 [190:19,21] [191:1,5]
 [193:15] [194:11]
remic [84:22] [107:13]
 [109:15]
remind [185:13]
reminded [153:9] [183:4]
remittance [91:25] [92:9,13
 ,25] [113:21,23]
remitted [47:8,10]
remote [29:7,8,13] [30:6,20]
 [40:19]
remove [55:24]
removed [32:6]
render [145:4] [146:25]
rendering [132:25]
reopened [188:6]
reopening [189:23]
reorder [100:2]
reorganization [67:16]
reorganize [191:14]
repaid [40:11]
repay [107:20]
repeat [6:11,13] [83:1]
 [120:1]
repeatedly [68:20]
repetitive [169:25]
replying [106:17]
repo [140:1] [181:19]
report [10:25] [11:10]
 [37:10] [60:1] [91:25]
 [94:8] [113:21,24] [114:2]
 [147:5,6,14,17] [170:6]
reported [11:5,7,8,12,14,16]
 [92:20] [93:3,7,25] [94:5,6
 ,20]
reporter [3:] [5:12,20]
 [8:25] [9:6] [33:12] [59:19]

[83:5] [126:9] [134:2] [135:
 2,6] [137:21] [148:7,8,22]
 [149:3] [156:24] [168:7]
 [175:11,15] [184:7] [186:18]
 [201:4,22]
reporting [8:12] [11:8]
 [17:1] [93:14] [94:15,17,19]
 [140:23,25] [147:10]
 [156:5]
reports [92:9,13,25] [147:11]
repos [139:23]
repossessed [61:8]
repossession [60:9,25]
representation [171:25]
representations [172:21]
representative [118:15]
 [121:3]
representatives [191:19]
represented [106:19]
representing [86:20]
reputation [143:20,23]
request [23:13]
requested [190:4]
require [36:4] [37:13]
 [135:1]
required [19:21] [26:3,17]
 [40:17] [74:14] [125:9]
 [159:6] [175:20] [177:6,24]
 [178:9,19]
requires [29:16] [39:19]
 [40:4,6] [74:5]
research [145:9]
reserved [201:12]
residual [21:5,14] [82:22]
resolved [116:23] [189:19]
 [190:23]
respect [15:2] [16:11]
 [17:4,16] [22:9] [117:4]
 [126:4] [132:25] [133:12]
 [152:21] [185:14]
respects [176:22]
responsibilities [11:21]
responsibility [16:25]
responsible [12:9] [69:16]
rest [81:24] [172:5]
restate [6:13] [55:7]
restructuring [143:22]
 [152:15] [162:3,4,10]
results [72:11] [173:9]
 [197:2,3,6,11]
retail [61:6] [122:20,21]
 [123:1,2] [142:7]
retailers [122:23] [123:1]
retain [12:11]
retained [15:18] [115:13]
 [145:14]
retaining [141:2]
retention [120:24]
retire [35:12,24,25] [52:10]
 [111:10]
retired [35:3] [36:2] [72:22]
 [76:10]
retrieve [173:3,6,7]
retrospect [58:11] [123:17]

[124:2] [196:10]
reveal [119:13]
revert [19:5]
review [38:19] [87:14]
 [88:11] [120:11] [201:11]
reviewed [81:1] [134:9]
reviewing [83:7] [153:8]
revisiting [139:19]
reward [13:14,16]
rich [151:2,4,15]
rid [73:18]
right [6:17] [11:3] [19:14]
 [40:11] [42:13] [50:9]
 [65:23] [66:2] [73:7] [77:3
 ,11] [78:24] [79:10] [85:14]
 [86:20] [96:1,4] [97:3,11]
 [101:17] [104:13] [111:17]
 [113:4,25] [120:7] [122:11]
 [140:20] [144:24] [148:19]
 [155:1,14,16,17] [156:23]
 [166:16] [175:14] [188:7]
 [193:3] [195:8]
righthand [19:14]
right-hand [19:14]
rings [139:12]
rip [96:7]
risk [129:15,25] [130:3]
 [177:8] [179:14] [180:22]
 [189:1,2]
riskfree [129:15,25] [130:3]
risk-free [129:15,25] [130:
3]
risks [77:14]
robertson [6:25]
role [14:1,4] [16:10] [17:3,16]
 [22:9] [28:15] [44:22,24]
 [61:9] [87:6] [121:19]
 [124:5] [126:3] [138:5]
 [146:20] [185:14] [186:9]
 [197:5]
roles [28:13]
romanette [83:9] [86:5]
root [57:24] [181:4]
ropes [152:5]
roughly [29:11] [40:24]
 [58:5] [158:24]
rounded [55:23]
routinely [195:19] [198:3]
row [90:14] [95:3] [113:12]
rpr [201:3,21]
rule [55:13,14] [56:6] [202:
8]
rules [6:10] [116:18] [202:8]
run [58:13] [61:12] [74:4,6]
 [123:24] [144:1] [152:13]
 [176:24]
runner [13:24] [28:12]
running [9:20] [38:17]
 [62:19] [73:24] [75:4,17]
 [77:19,21] [127:2] [133:16
 ,21] [185:1]
runs [145:11]
runup [123:24]
run-up [123:24]

rutherford [59:16,20,21]
 [60:11] [79:14,19] [170:7]
_____

S
_____

safe [26:24]
sale [4:] [15:22] [29:7,9,13]
 [30:6,21] [32:8] [40:19]
 [47:8] [80:3] [84:19,21]
 [85:5] [88:8,17,25] [114:19]
sales [74:7] [78:3] [114:11
 ,16] [122:20] [123:18,20,21]
 [124:6] [138:9]
sat [58:2] [69:18]
satisfied [21:2] [108:12]
 [199:19]
satisfy [158:15]
saw [123:2,4] [150:6] [168:
 19] [180:16,17] [196:25]
 [197:2,6]
say [11:15] [19:24,25]
 [21:13] [22:4] [41:9] [56:1]
 [64:1] [65:1,11] [66:19,23]
 [75:13] [81:17] [85:17]
 [88:22] [89:13,17] [103:24]
 [108:3] [109:16] [135:8]
 [136:12,13] [139:13]
 [143:3,5] [144:21] [151:14]
 [155:9] [157:7] [158:23,25]
 [159:21] [160:21] [164:10
 ,12] [166:1,13,15] [172:23]
 [177:1] [179:20] [183:18]
 [192:21] [194:12] [196:6]
saying [12:13] [54:7] [66:21
 ,22,24] [99:4] [104:15]
 [107:16] [110:18] [130:1]
 [157:22] [162:8] [193:24]
says [55:15] [90:19] [112:9]
scheduled [35:22,25]
 [39:25] [106:11]
score [45:11] [171:19,21,24]
 [172:3,10,17,18,19,24]
 [173:7,8,10,16,17,18,19]
 [175:17,24] [176:2,6,9,18]
 [177:1,2,5] [180:19]
scored [173:16]
scores [170:14,20,21]
 [171:23] [172:20] [175:20
 ,22] [179:16]
scoring [170:24] [171:18]
 [172:13] [177:3] [178:16]
 [183:16]
seamless [13:3]
search [14:10] [15:20]
searching [34:1]
sec [49:18] [80:17]
second [20:19] [24:14]
 [28:24] [31:4] [35:6] [38:3]
 [93:15] [97:24] [99:17,19]
 [108:23] [111:10] [127:10]
 [128:22] [139:10] [140:19]
 [148:10] [156:16,17,19]
 [163:14] [172:8] [184:17]
 [189:3] [198:20]

A.20

secondarily [13:7]
secret [137:13]
secretary [10:15,24] [140:14] [186:25]
section [81:20,23] [82:6,18,21] [83:10] [84:18] [86:2] [88:7]
secure [18:6] [31:21] [32:9,22]
secured [12:1] [24:18,20] [35:4]
securities [12:4,25] [13:1] [14:7] [15:22,23] [16:23] [17:1,13,14] [28:11,13] [43:3,12,16,17,18,21] [44:1] [46:10,11,13,21] [47:14,24] [49:2] [65:15] [70:19] [109:6,7] [129:17] [130:4,8] [145:12,20] [195:16]
securitization [12:6,21] [14:7] [16:19] [39:24] [41:19] [42:13,18] [43:6] [44:14,20] [47:13] [53:22] [71:14] [80:1] [93:17] [94:9,14] [98:8] [100:19] [106:12] [107:12] [108:18] [129:8]
securitizations [13:22] [16:2] [46:5] [66:9] [93:8] [195:8,10,12]
securitize [17:12] [45:2] [144:6]
securitized [16:21] [45:1,6] [93:2]
securitizers [49:7]
securitizes [41:3]
securitizing [12:3] [41:1] [142:16]
security [55:16] [129:12,25] [135:22] [142:12]
seeing [151:11]
seek [30:22]
seeking [106:14] [162:2,5,6]
seem [9:10] [187:5]
seemed [68:14,23] [71:8] [76:16] [97:11] [151:17] [167:13,16] [198:11]
seems [112:15] [163:20]
seen [87:2,4] [155:13] [159:4] [168:17,25] [186:25] [188:20]
seldom [67:25] [104:3]
selected [75:23]
selecting [12:9] [93:1]
sell [23:6] [43:20] [46:22,23] [61:8] [158:11] [159:18] [160:5]
sellers [23:25] [24:3,7] [30:3]
selling [32:25] [44:3] [109:3,5,10] [130:9]
sells [24:1]
send [165:18]

sending [111:2]
senior [8:19] [10:12] [25:12] [27:12] [40:12] [59:25] [81:5]
sense [60:18] [61:12] [77:13] [100:3] [132:9] [187:9] [188:5] [197:22] [198:15]
sent [92:16] [106:20] [121:3] [159:18] [169:12] [174:13]
sentence [166:18]
separate [36:17] [103:1,3] [163:21]
september [3:] [5:3] [76:20] [113:22] [137:23] [202:4]
series [7:14] [17:19] [22:20] [41:18] [43:12] [80:9] [94:4]
serve [14:23] [53:8] [167:3] [196:15]
served [33:18] [140:14]
serves [133:6]
service [23:11] [70:23] [180:5]
servicer [39:19] [40:4,6,8] [86:4] [91:21]
servicers [40:11] [59:5]
services [8:3,5] [50:4] [64:12] [65:10,12] [66:9,12,16] [133:12] [145:2,4] [149:11] [174:19] [197:9] [199:2]
servicing [4:] [16:21,23,24] [17:1] [21:4] [25:16,18,20,22,25] [26:3] [39:6,10,18] [40:3,14,22] [44:13] [59:4] [64:18] [65:15] [80:3] [86:5,9] [88:8,18,25] [92:24] [93:9] [114:11,17,20] [134:10] [142:10] [179:8,11] [180:10,20,21,23] [181:21] [183:15] [195:1]
serving [65:14,17]
sessions [160:9]
set [20:1] [23:8,12] [31:6] [32:1] [39:8,12] [43:18] [44:6] [82:18] [102:22] [103:7,9] [104:2] [117:8] [142:8,11] [156:17] [169:25]
sets [82:7] [143:24]
setting [23:12] [44:22] [50:2] [87:8]
seven [76:9] [142:8]
seventeen [7:10]
several [24:13] [47:14] [50:8] [57:19] [58:1,3]
shall [57:3] [136:24] [202:10]
share [54:9] [55:24] [124:21] [125:13] [179:7]
shared [143:12] [198:2]
shareholder [55:18,19] [56:9,14]
shareholders [57:2] [131:19]
shares [50:19,22,23] [55:8]

,11,17,21,22] [56:10,20,25]
sheet [19:14] [27:1]
shipments [58:7] [122:25]
shop [157:19,24]
shopping [159:11]
short [24:24] [27:1,5,8] [28:2] [57:3] [78:12] [136:24] [152:11] [171:22]
shorthand [170:22]
shortly [79:11]
shortterm [24:24] [27:5,8] [28:2]
short-term [24:24] [27:5,8] [28:2]
shoulder [96:18]
shouldnt [27:4]
show [79:24] [96:20] [112:7] [125:25] [144:18] [167:5] [168:22] [178:20]
showed [127:24] [192:15,25]
showing [80:2] [86:23] [87:20] [92:5,6] [97:3] [128:13] [134:2] [137:20] [138:17] [140:9] [149:2] [168:6] [184:6] [186:17]
shown [168:25]
shows [19:3] [47:19] [111:12] [124:12]
shut [152:10]
side [16:24] [19:14] [44:12,14] [62:11] [63:2] [64:21,22,23] [93:19] [94:15] [95:3] [133:20] [142:6] [150:4] [170:6] [176:1] [186:12]
sign [107:25] [108:1,2] [167:2]
signature [140:18]
signed [15:1,11,16] [65:8] [107:24] [117:14] [132:24] [133:10] [144:18,21] [152:19]
significant [34:18] [59:11] [61:9] [62:19] [68:9] [93:11] [145:1] [180:11] [194:25]
signing [201:11]
silly [161:16]
similar [12:7] [30:2] [55:16] [111:20] [168:17] [172:11] [190:3]
similarly [47:17] [180:7]
simple [96:21]
simplest [46:11]
simply [42:21] [119:19]
simultaneously [23:6] [34:2]
single [19:2] [44:9] [103:22] [111:5] [171:10]
singular [22:20]
sir [78:24]
sit [143:4]
sitting [167:18]
situation [36:12,25] [37:7] [78:9] [136:16] [158:13] [198:22,23] [199:12]

situations [143:22]
sixty [109:13]
sixtyfive [109:13]
sixty-five [109:13]
sizable [188:11]
size [56:4] [145:24] [185:3] [189:13] [193:8]
skill [143:23]
skills [13:4]
skip [98:10] [112:6]
skips [112:24]
slight [47:4]
slow [155:3]
slower [123:1,5]
small [28:13] [37:11,12] [125:1] [170:10]
smart [28:1] [154:6] [158:8] [167:16] [196:13,14]
smith [11:6] [38:21] [44:16] [45:21] [51:6] [60:1,13] [69:11,20] [132:2,3,4,15,22] [133:18] [154:3] [170:12] [184:25] [185:19] [186:2]
smiths [133:4]
software [173:17]
sold [17:14] [32:20] [33:2,5] [44:1] [46:13] [47:4,5] [109:1] [115:19] [122:21,22] [123:13] [129:21] [172:12]
sole [17:9] [21:25] [183:1]
solely [91:8]
soles [132:2,5,10,15,18,22] [133:1,15,22] [137:10,24] [138:5]
solicit [157:5] [195:3]
solved [99:23]
somebody [29:16] [49:5] [55:14] [119:3] [142:1] [146:7,16,24] [152:5] [154:6] [166:21] [170:8] [197:3]
somehow [101:19] [148:14]
someone [26:23] [42:3] [45:7] [51:17] [145:3] [153:24]
someplace [96:14] [101:12]
something [25:5] [33:18] [39:8] [44:19] [60:13,17] [75:14] [94:10] [118:1,9,16] [130:23] [135:20] [137:7,14] [138:6,7] [146:22] [147:25] [150:23] [153:9] [154:25] [156:7] [164:17] [166:19] [167:10] [170:9] [174:4] [177:13,14] [180:3] [184:16] [194:3,6] [196:4]
sometime [29:10] [35:21] [37:22] [40:24] [61:17] [62:22] [79:8] [185:7]
sometimes [43:15,16,22,23] [47:5,17] [80:11] [166:23] [172:9,16,19] [177:10,11] [181:7] [196:6,7]
somewhat [111:20]

somewhere [10:14] [29:5]
[53:25] [54:13] [156:11]
soon [71:15]
sophisticated [142:19]
[176:20]
sorry [5:2] [25:2] [46:22]
[57:21] [59:12] [64:1]
[70:16] [84:20] [85:12]
[87:7] [101:18,20] [109:16]
[110:21] [131:7] [137:15]
[156:21,25] [169:23]
[170:21] [172:6,7,8]
sort [18:23] [30:8] [34:16]
[167:2]
sounds [127:5]
source [26:6,10] [68:7]
[197:23]
sources [24:13]
spe [32:6]
speak [51:11,25] [129:18,20]
[146:24] [189:2]
speaking [59:15] [102:6]
[166:25] [170:8]
special [17:8] [18:2] [21:19]
[22:16,18] [23:12] [31:16,22
,23] [32:6,21] [33:1] [40:19]
[126:10] [128:15]
specific [27:22] [37:8]
[53:6,14] [60:21] [64:10]
[73:11] [80:22] [91:15]
[93:7] [102:23] [113:17]
[172:22]
specifically [26:21] [62:2]
[87:3] [128:22] [144:17]
[162:24]
specifics [191:1]
specified [20:7] [50:15]
specify [131:4]
spectrum [183:11]
speculate [29:16] [30:13]
[33:17] [55:3] [74:5] [86:14]
speculating [30:25] [81:25]
speculation [110:8]
speed [9:20]
spell [171:1]
spend [138:11]
spent [69:20] [155:3] [179:
8]
spit [173:18]
spoke [42:12] [92:25]
[118:14]
spoken [138:15] [165:2]
sponsored [23:17,24]
[108:10]
spread [129:20,23] [130:3]
[135:16]
spreads [129:8] [130:2,14]
spring [62:23] [79:5]
squared [152:7]
squeeze [130:17]
st [27:11] [72:20,24] [126:24]
[128:23] [131:13]
stab [146:8]
stabilizing [159:1]

staff [7:13] [185:5]
stair [117:18]
stairs [9:12]
stamp [170:17]
stand [160:6]
standard [176:23] [177:22]
standards [44:7,23] [45:16
,21] [58:15] [75:7] [122:5]
[124:10] [169:22] [170:1]
[179:5,21] [189:16]
standing [59:4]
standish [11:8] [69:10]
[78:6] [140:23,24] [143:8]
[154:2] [163:18] [164:7]
[165:6] [168:10,22] [184:18
,21]
standishs [169:18]
stars [2:]
start [7:2] [8:10] [10:3]
started [10:6] [13:21] [33:21]
[166:15] [191:15]
starting [92:4] [138:20]
starts [110:1]
state [6:23] [76:8] [132:22,23]
[187:10,22] [201:1]
stated [201:14]
statement [4:] [43:25]
[87:22] [88:5] [92:10]
[100:6] [101:16] [109:25]
[110:2] [202:11]
statements [77:18] [88:11]
states [5:8] [140:13]
statistic [118:10]
statistics [122:21] [125:24]
[179:7]
stay [104:1] [115:23] [181:
15]
stayed [56:16]
step [42:21] [76:17] [110:13
,25] [111:5,6]
stepped [76:20] [117:19]
steps [179:1]
sticks [73:21]
stipulate [119:16]
stock [55:13,15] [56:6]
[131:14]
stood [20:11] [74:2]
stop [25:2]
straighten [155:18]
straightforward [32:19,23]
[154:13]
strategic [133:8] [159:15]
street [3:] [5:11]
strictly [44:13]
strike [19:24] [69:23] [117:
3] [127:6] [151:20] [162:20]
[180:20]
strikes [187:13]
stringent [58:15] [75:7]
[122:5] [124:10] [179:4,21]
struck [182:11]
structural [32:13] [135:10]
structurally [32:4]
structure [17:19] [22:13]

[29:7,13,22] [30:12,21]
[31:14] [32:20,23] [33:16]
[39:12] [40:20] [134:17]
[151:1] [188:19] [191:6]
structured [25:15] [119:2]
[188:18,21,24]
studied [125:23]
stuff [163:25]
stutman [2:] [5:19]
subaccount [104:1]
subaccounts [103:24]
[104:12]
subcategory [25:4,7]
subject [53:11] [56:25]
[73:15] [116:8] [164:16]
[165:20] [166:12]
subprime [180:24]
subscribed [201:19]
subsequent [14:10,12]
subsets [152:6]
subsidiaries [104:20,24]
[121:24]
subsidiary [16:7] [17:9]
[103:8] [104:18]
substance [53:20] [56:1]
[60:3] [162:20,21] [164:7]
[169:7] [193:21] [199:9]
[202:10]
substantial [22:1] [84:16]
[192:22]
substantially [10:1] [13:23]
[32:2] [189:6]
substantive [115:3] [194:23]
substantively [33:25]
succeed [78:9,10]
successful [50:2]
successfully [12:25] [123:
19] [144:5] [152:1]
successor [29:8] [34:3]
[53:3] [72:1] [75:21]
suffering [152:2]
sufficiently [146:17]
suggest [33:18]
suggesting [107:19]
suggests [107:17]
suisse [5:7] [15:17] [28:15]
[34:6,10] [38:24] [39:4]
[40:21] [42:4] [44:21]
[46:5,21] [48:22] [50:3,6,24]
[51:4,9] [52:17,24] [53:12
,20] [54:24] [55:2] [56:2,17]
[63:1,4,23] [64:7,12]
[65:12,21] [66:8,12,15]
[68:17] [69:5,4,25] [70:21]
[112:9] [114:24] [117:5]
[119:10] [124:5] [126:3]
[134:21,24] [136:9] [141:1
,16] [143:8] [144:15] [146:
19] [149:7,10] [151:1,8,21]
[160:8,23,25] [162:1,8,20
,22] [163:2,3] [165:21]
[166:8,10] [167:19,23]
[169:18] [186:5] [189:14]
[190:6] [193:21,22] [194:8

,16,19] [195:6,21] [196:7,8
,15] [199:2,5,10,11]
suisses [47:12]
suit [125:17]
suited [144:13]
sum [108:20] [109:6]
summarize [92:9] [114:3,6
,7]
summarized [102:3]
summary [102:7]
summed [158:4]
summer [40:24] [59:13]
[61:17] [62:23] [79:5,9,11
,22]
supervised [181:9]
supervising [12:2] [16:1]
[186:5,8]
supervision [179:12]
[201:8]
supervisory [8:20]
supplement [4:]
supplemental [203:10]
support [13:17] [54:11]
[67:9,15] [68:13] [93:17]
[94:14] [157:6] [158:23]
[159:2]
supportive [54:7] [152:25]
supposed [20:2] [61:21]
sure [19:10] [21:13] [23:10]
[31:13] [42:24] [45:22]
[46:1] [48:9] [57:5] [58:20]
[65:8] [78:13] [80:23]
[81:1] [83:3,7] [85:11,17]
[86:23] [91:9] [96:6,16]
[97:18] [100:25] [104:14]
[132:13,15,18] [135:3]
[136:4,10,25] [139:2]
[148:7] [156:22] [160:19]
[167:12] [169:22] [173:22]
[191:1,3] [195:5]
surprise [72:11]
surprised [168:24] [185:24]
[188:12] [189:4,5,6] [190:
12]
surprises [68:6,10]
surprisingly [165:16]
surrounding [23:1]
susan [105:25] [106:8,13,18]
[134:5]
suspect [83:8] [148:11]
sustained [58:4,8] [123:23]
[180:13]
suzanne [133:16] [138:21]
[150:7] [193:6]
swept [104:8]
sworn [5:23] [201:5]
syndicate [36:4]
syndicated [34:19] [35:13
,19] [38:25]
syndication [34:20] [36:17]
system [171:18]
systems [91:23] [170:25]
[172:14]

T

table [90:15] [143:17]
[146:15] [178:21] [193:17]
taken [3:] [5:4] [6:8] [57:8]
[61:1] [78:16] [83:8,22]
[111:25] [137:3] [151:12]
[165:12] [173:25] [201:7]
[202:4]
taking [81:20] [111:1]
[135:16,20] [155:5] [201:6]
talented [142:19]
talk [39:6] [42:11] [60:17]
[122:11] [127:12] [147:6,20]
[148:1] [151:6] [166:9]
[167:13] [189:9] [191:20]
talked [15:3,10] [61:5]
[64:23] [69:7] [92:22]
[121:23] [141:12] [142:23]
[179:3] [182:19]
talking [7:2] [21:8] [127:11]
[129:16] [130:7,8] [132:6,16
,17] [155:4] [161:22] [166:
15]
tangentially [38:9]
tape [57:9] [112:1] [174:1]
tapes [173:21]
task [116:6]
tasked [62:1]
tasks [69:19] [93:5] [116:4
,7,21]
tcastanres@stutman.com
[2:]
team [135:10] [196:20]
tear [149:14,17]
technically [33:24]
technique [59:4] [103:11]
techniques [181:20]
technology [30:4,5] [41:7]
[146:2] [181:21,24]
telephone [165:8] [191:15]
tell [7:3] [31:5,11] [36:8]
[53:19,24] [54:2] [72:20]
[80:6,24] [81:1,2] [91:11]
[96:22] [97:14,22] [98:16]
[102:1,10] [116:10] [125:22]
[137:9] [153:15] [157:2]
[158:2] [162:19,21] [165:12]
[170:23] [189:5] [190:24]
[191:5] [193:21] [194:9]
[196:11] [199:9]
telling [53:23] [64:10]
ten [27:8] [41:20] [83:9]
[125:11] [129:21] [154:24]
tend [37:9] [126:1]
tended [178:15] [179:15]
tennessee [7:19]
tenure [15:15]
tenyear [27:8] [129:21]
ten-year [27:8] [129:21]
term [27:3,7] [35:22] [91:5]
[171:14] [172:9]
terminate [53:21] [63:16,24]

[79:3] [121:6]
terminated [33:23] [34:1,5]
[63:11] [64:8] [73:10]
[74:20] [79:8,10] [174:8]
[194:4]
terminating [63:20] [121:4
,12]
termination [34:8] [174:12]
terms [22:14] [32:13] [45:9
,10] [46:12] [49:10] [58:7]
[68:7] [80:1] [81:7] [92:22]
[116:17] [117:12] [122:25]
[125:3] [129:18,20] [135:13]
[141:17] [150:21] [151:8]
[152:15] [154:20] [159:20]
[162:2] [164:22] [165:4]
[170:9] [174:16] [185:20]
[186:3] [188:20] [192:4,24]
[193:8,12] [194:4,9] [195:
15] [197:6]
terrell [70:8] [71:21]
terribly [41:2]
tested [42:24]
testified [5:24] [35:20]
[79:4] [83:15] [89:10]
[98:21] [124:23] [134:16]
[136:23] [151:11] [197:25]
testify [6:20,21] [168:24]
[175:1,5]
testifying [113:24]
testimony [78:24] [201:9]
testing [21:12]
textile [183:13]
thank [9:7] [33:10,13]
[49:25] [79:23] [96:13]
[99:13] [100:4] [101:6,20]
[108:25] [110:21] [111:17]
[112:11] [140:6] [171:5]
[184:3] [187:15]
thanks [149:5]
thats [11:3] [21:7] [24:11,12]
[26:12,24] [28:6] [29:19]
[31:9,10] [33:24] [34:13]
[44:2,4] [52:4] [55:4,24]
[65:7] [73:1] [78:25] [81:14
,23] [83:10] [84:19] [86:5,13]
[87:20] [89:23] [90:10,17]
[93:13] [95:16] [97:4]
[98:8] [100:8] [101:25]
[104:19] [109:25] [110:5,16]
[111:12] [113:1,5] [117:11]
[123:1] [128:6,14] [134:19]
[136:3] [138:11] [140:2,18]
[143:3] [144:8] [147:22,23]
[148:12,21] [149:19]
[164:2] [166:15] [170:3]
[171:6] [181:15,16] [184:1]
[185:6] [191:3] [194:11]
[195:4] [198:13]
themselves [5:13] [51:19]
theoretical [175:20]
theoretically [123:11]
[176:18]
theory [56:11] [175:23]

thereabouts [35:21] [59:14]
thereafter [35:1]
therefore [27:6] [77:23]
[145:23] [179:16]
theres [19:2] [47:17] [48:1
,7] [73:21] [90:14] [91:13]
[94:23] [106:6] [110:3]
[111:8] [117:22,25] [130:19]
[137:9] [171:2,4,15] [175:
24,25] [180:4] [181:18,23]
[187:16]
theyd [49:17] [65:1] [161:7
,8]
theyre [25:6] [81:7] [162:5]
[170:22] [172:20] [179:10]
[181:8]
thing [48:11,24] [60:19]
[73:8] [77:3] [95:18] [133:
4] [141:23] [146:17] [155:1
,16] [158:25] [174:23]
[188:11]
things [11:25] [67:20]
[71:7] [77:1,2] [90:8]
[93:12] [116:12] [118:25]
[130:11] [136:5] [140:25]
[154:8] [155:4,17] [170:13]
[180:8] [185:1] [195:9,11,13
,18,25] [196:11,13,22]
[197:19]
think [6:10] [10:12,22]
[12:12] [15:23] [17:5]
[18:20,23,25] [19:2,17]
[20:17] [21:13] [22:18]
[24:4] [26:12,18] [24] [29:9]
[30:13] [33:21] [35:9,20]
[36:24] [39:3] [40:25]
[41:6,11] [43:1,3] [45:18]
[48:2,18] [50:9] [51:5]
[55:12,14] [58:2,25] [63:7]
[67:13,14] [69:7,21] [72:13]
[73:1] [76:21] [77:14]
[78:8] [79:4,17] [81:2,12]
[82:1,9,19] [83:23] [85:21]
[87:4] [88:2,5] [89:11,23]
[91:14,16] [92:11] [94:3,7
,9] [96:24] [99:11] [101:24]
[108:11] [111:12] [113:7]
[114:25] [115:6,8] [117:18
,24,25] [118:15] [120:3,5,8]
[122:6,15] [123:17,21,22]
[124:1,12] [125:12,21,23]
[128:8] [132:17] [133:11,16
,21] [134:16] [135:21]
[136:15] [138:17,23,24]
[141:9,25] [143:10,12]
[145:7,9,22] [146:1,22]
[147:14] [150:5,7,8] [151:
10,13,14] [153:1] [154:12,19]
[155:9,17] [156:6] [158:8]
[159:6] [160:11,15] [168:19
,25] [170:23] [171:9,10]
[174:23] [176:4] [178:2]
[179:6,24,25] [180:23]
[181:3] [182:5,13,20,25]

[183:2] [185:16] [186:3]
[190:14] [192:12] [193:7]
[195:24,25] [196:10,12,15]
[197:8,13,15,24] [199:5,7]
thinker [115:11]
thinking [27:3,24,25]
[45:7] [65:2] [136:16,17,18]
third [68:10] [74:10,14,16]
[90:17] [95:2] [128:22]
[143:23]
thirty [109:12]
thirtyfour [109:12]
thirty-four [109:12]
though [177:4] [191:4]
[199:18]
thought [24:4] [37:16]
[41:5] [43:1,2] [48:5,22]
[50:2] [51:8] [56:15,19]
[58:20] [61:11] [65:7]
[73:6] [74:7] [78:10] [122:
7] [134:20] [143:23] [144:12]
[151:2] [158:18] [159:5]
[168:3] [171:7] [172:7]
[176:20] [183:3] [189:15]
[195:24] [196:1,2,3,9,13]
[197:10,13,19] [199:10]
thoughtful [77:2]
thousand [109:13] [118:3]
threaten [54:19]
three [7:18] [34:24] [35:22]
[64:14] [69:7] [70:24]
[74:13] [81:17] [112:2]
[113:12,16,17,20] [116:10]
[122:1,6,9] [133:22] [142:
3,13] [143:13] [149:12]
[151:24] [152:12] [168:15
,16] [171:16]
threeyear [34:24] [35:22]
three-year [34:24] [35:22]
threshold [176:10]
thrown [43:19]
thursday [105:25]
tick [122:25]
tickler [4:] [9:2,19]
tickles [9:8]
time [6:11,15] [10:1,22,25]
[11:6] [13:21] [21:1] [24:19]
[26:25] [27:4,17,25] [30:1]
[31:15] [34:23] [36:13,16,17
,19] [38:16] [41:7] [42:24]
[49:3] [51:15] [52:1,7]
[53:14,16] [54:1] [56:19]
[60:16] [68:15,21,24]
[69:11,20,24] [70:24]
[76:11,22] [77:4,6,8]
[78:1] [93:18,21] [94:2,8,15]
[98:11] [102:6] [115:13]
[118:14,20] [120:24]
[127:8,23] [128:2,10]
[129:4,6] [131:12] [132:20]
[133:15,17] [136:5] [138:12]
[139:16] [141:7,10,22]
[142:23] [145:2] [151:17]
[152:19] [158:14] [159:13

26/09/2006  MUIR, Douglas R. (vol.1)

,17] [160:2,25] [163:4,7,16]
[165:11] [166:21] [167:13
,14] [168:20] [169:2] [170:
7] [175:19] [176:13,19]
[177:9] [182:15] [183:6,9]
[187:11] [188:8,9] [190:4]
[196:10,23] [197:25]
[198:3]
times [9:21] [10:16,23]
[11:4] [13:7] [44:25] [92:21]
[94:13] [166:20] [176:25]
[179:14]
timing [25:14] [146:3]
[165:14]
tired [8:7]
title [10:10,12,22] [43:8]
[59:23] [93:16] [94:9]
titled [186:19]
titles [10:15] [94:5]
today [6:5,19] [92:22]
[93:12] [113:24] [167:18]
todays [5:3]
together [17:18] [36:19]
[37:21] [50:17] [69:8]
[93:18] [96:21] [97:10,11,17]
[132:8] [133:2,13] [142:14]
[143:24] [173:11] [190:22
,25] [191:6,7] [192:23]
told [14:18] [30:1,8,14]
[46:25] [54:13] [56:5]
[64:4] [68:4] [119:3,9]
[120:6] [121:25] [155:3,16]
[160:13] [161:25] [164:9,21]
[174:9] [195:21,22] [196:11]
tony [2:] [5:18] [29:20]
[101:15]
took [72:23] [73:14] [107:14]
[115:20] [116:25] [153:16]
[163:5] [167:14] [175:13]
tool [49:8]
top [26:11] [45:18] [81:18]
[90:12] [102:2,8] [108:14]
[112:8] [116:11] [168:12]
topic [198:16]
topics [134:1]
total [109:9,11] [117:11]
totaled [190:2]
totally [199:19]
touch [164:15]
touched [64:11]
tough [78:8] [143:21]
towards [187:16]
town [51:16] [52:13]
traced [19:1]
track [91:22]
trade [142:4] [156:14]
traded [47:1]
traditional [142:4]
trail [80:13]
train [38:17] [183:22]
trained [181:8]
transaction [12:17] [13:3,25]
[14:2] [15:7,13] [17:19]
[22:20] [31:9] [32:5,7]

[34:22] [37:20] [38:10,20]
[41:4,17] [42:1] [43:23]
[46:7] [47:20] [48:8,15]
[50:17] [51:13,15] [81:11]
[90:3] [95:12] [98:4,5,20]
[106:10,23] [111:6] [114:20]
[116:19] [132:3] [134:15,18]
[135:17] [154:22] [156:1,9]
[158:22] [161:2] [162:3,4,10]
[191:25] [192:18] [194:4]
[195:14]
transactions [13:23] [14:12
,20,22] [15:2] [22:21]
[23:21] [26:9] [41:19]
[64:16] [80:2] [100:13]
[102:4] [104:6] [111:9]
[119:1,2] [131:17] [132:11]
[135:11] [161:6]
transcribed [201:7]
transcript [201:12]
transcription [201:9]
transfer [90:15,20] [91:5]
[103:17]
transfers [114:23]
transmitting [106:9]
transpired [155:19]
treasurer [8:11] [10:7,24]
treasuries [129:20,22]
treasury [12:6]
treister [2:]
tremendous [52:10] [67:6]
[68:12] [156:12] [196:19]
trial [175:2]
tried [77:3] [97:10] [196:15]
tries [197:4]
triester [5:19]
trigger [117:20,23,25]
trip [154:3] [198:20]
trouble [183:1]
troubled [59:7]
trough [58:6]
true [29:7,9,13] [30:6,21]
[32:8] [40:18] [140:2]
[201:9]
trust [5:6] [6:7] [17:17,20,22]
[18:1,2,6,8,10,14,22]
[19:5,13,18,20,22] [20:1,2
,6,22] [21:5,15,22] [23:1,23]
[28:24] [32:1,12,24] [33:7
,20,25] [34:4,6] [40:12,13]
[43:8,12] [50:7,11,25]
[51:10] [81:5,6] [82:3,4]
[83:25] [84:10,22] [85:3,15]
[87:8] [88:6] [91:21,25]
[95:12,14] [100:15] [110:18
,22] [111:2,9,10] [113:21]
[114:23] [115:14,22]
[116:25] [117:5,6,11]
[120:25] [158:6] [174:8,11
,12,20,24]
trusted [72:12] [143:18]
[196:5]
trustee [20:19] [43:9,10]
[82:2] [83:24] [88:22]

[89:1,2,4,20] [92:1,16]
[95:10] [107:13,18,19,22,23]
[109:14] [115:20] [116:25]
[118:15,23,24] [119:5]
[174:14,15]
trustees [89:24,25] [90:2,7]
[111:6] [118:23] [121:3]
trusts [20:8] [43:7] [110:24]
[111:8] [118:6]
try [55:12] [131:19] [137:16]
[140:2] [151:3] [153:7]
[156:9] [158:11,15,16]
[163:23] [169:25] [179:3]
[181:10,12] [194:8,16,19]
[196:25]
trying [15:20] [25:3] [36:6]
[51:18] [83:6,12] [90:6]
[110:9] [133:19] [150:21]
[164:4] [176:14] [185:22]
[193:8] [197:1]
turn [17:14] [28:18] [34:14]
[74:16] [103:25] [189:24]
turnaround [77:7]
turned [67:7]
turning [101:8] [130:18]
[161:17]
twelfth [2:]
twelve [9:6,7]
twoandahalf [183:13]
two-and-a-half [183:13]
type [40:19] [64:17] [109:17]
[180:24]
types [26:8]
typewriting [203:11]
typical [30:25] [36:22]
[180:13]
typically [23:24] [24:17]
[30:19] [39:18] [43:7,13]
[46:10] [48:3] [143:16]
[145:11]
_____
U
_____
uh [42:14] [68:19] [94:11]
[162:12] [176:8]
uhhuh [42:14] [68:19]
[94:11] [162:12] [176:8]
uh-huh [42:14] [68:19]
[94:11] [162:12] [176:8]
ultimate [117:15]
ultimately [18:24] [26:16,18]
[31:17] [33:8] [34:5,8]
[36:1,2] [42:1] [43:3,18]
[44:2,4] [47:6] [51:20]
[63:21] [65:8] [68:2] [78:9]
[84:6] [102:13,15] [125:15]
[134:14] [143:7] [159:7]
[178:17] [181:15] [182:17]
[183:1] [189:20,23] [190:25]
[191:2] [192:12,14,17]
unable [45:2] [198:11]
uncommon [59:7]
underlying [20:15] [90:3]
[129:25] [180:1]

underperformance [73:10]
understand [6:12] [54:16]
[57:3] [66:23] [68:23]
[70:17] [78:22] [79:25]
[85:11,18] [95:6] [101:5]
[142:20] [143:24] [169:22]
[190:20] [198:25]
understanding [14:17]
[22:16] [23:16] [29:24]
[30:7,11,16] [33:15] [36:21]
[52:2] [55:1] [62:4] [73:9]
[76:7] [81:21,22] [85:2,25]
[86:8] [90:23] [108:10]
[118:7] [120:17] [131:10,12]
[142:2] [151:19,20] [156:6]
[165:15] [189:18]
understood [6:15] [65:11]
[69:1] [85:24] [154:19,20]
[198:21,23]
undertake [16:16] [60:23]
undertaken [140:25]
underwrite [12:20] [14:19]
underwriter [14:10,20,21]
[64:16] [65:14] [66:9]
underwriters [12:10,16]
[46:8] [108:19]
underwriting [13:8] [15:21]
[46:8] [47:15,22] [48:4,6,7
,14,21] [50:4] [54:9] [58:15]
[70:18] [73:23] [74:25]
[75:7] [109:4,11] [122:5]
[124:10] [169:21] [170:1,6]
[195:17]
underwritten [28:11] [124:
14]
underwrote [13:22] [28:9]
undo [179:22]
unemployment [180:9]
unhappiness [192:3]
uniform [46:10]
union [28:13] [34:20] [35:19
,20] [37:17,21,22,24]
[38:1,25] [102:5,14]
unionled [35:20]
union-led [35:20]
unique [22:20,21] [48:7]
[144:7]
uniquely [144:13]
unit [77:23] [139:25]
united [5:8]
university [7:5] [76:8]
unless [101:12] [104:2]
[130:14] [148:18]
unlimited [197:25]
unquestionably [72:12]
unsecured [12:1] [24:18]
[25:12] [117:16,23] [118:8]
[192:4]
unthinkable [198:10]
until [15:15] [35:3] [164:23]
[165:3] [188:7]
unusual [76:17] [194:22]
unwilling [198:11]
upon [47:7,9,12] [118:12]

[163:6] [183:23] [189:22]
  [202:11]
upshot [163:12,19]
upstream [33:9]
urgency [197:22] [198:15]
us [6:16] [14:9] [15:9,10]
  [30:2] [35:24] [39:11,12]
  [41:22] [46:25] [47:8,10]
  [53:10] [54:7,9] [64:23]
  [67:7,23] [69:7] [79:25]
  [91:11] [96:9,22] [97:14,22]
  [100:22] [102:10] [103:12]
  [112:5] [119:1] [124:1]
  [125:2] [133:2] [135:12]
  [136:16] [143:19] [144:7,9]
  [147:24] [151:25] [154:9]
  [155:3,11] [156:18] [157:24]
  [158:11] [160:7] [161:15]
  [164:23] [165:3] [172:15]
  [183:5] [185:2,8] [190:7,12]
  [191:23] [194:14] [199:20]
use [17:25] [25:17] [26:5]
  [28:21] [38:6] [43:7] [58:23]
  [59:6] [60:8,24] [85:3]
  [89:14] [132:10] [145:22]
  [146:12] [171:14] [172:9]
  [179:2] [202:13]
used [31:24] [32:21] [34:10]
  [37:24] [59:8] [79:2,12]
  [103:3] [161:16] [171:16]
  [173:14,16]
useful [125:2]
user [172:12,22]
using [34:17] [35:4] [39:8]
  [40:18] [122:4] [181:21]
usually [37:12] [109:17,19]
  [123:1]

V

vaguely [138:9] [139:13]
valuable [55:4] [135:25]
  [159:1]
value [44:4] [46:21,23]
  [135:19] [146:9]
valued [196:5]
variable [43:15]
varied [36:24] [80:15]
  [94:13]
various [9:21] [24:2,3,19]
  [115:22] [116:7] [188:1]
vastly [78:4]
vehicle [39:24] [43:6]
vendor [74:11,12,16]
  [172:11]
version [108:2] [120:15,16
  ,17] [134:17]
versus [5:7] [45:11] [139:22]
vice [10:12,13,23] [27:16]
  [59:24,25] [69:11] [94:4]
videographer [2:] [5:1,20]
  [57:6,9] [78:14,18] [111:23]
  [112:1] [137:1,4] [173:20,23]
  [174:1] [199:24]

videotape [3:]
view [22:13,14] [45:13]
  [56:21] [66:8] [77:9] [115:
  6] [125:5] [135:20] [143:12]
  [144:14] [151:23] [152:16]
  [157:18] [165:17] [188:22]
  [189:1] [190:17] [198:8]
views [195:17]
vintage [40:24]
violates [147:21]
virginia [7:6]
virtual [71:1] [144:10]
virtually [40:9] [125:13]
virtue [8:18]
visibility [67:24] [193:4]
visit [70:5,14] [71:9,11]
vivid [198:19]
volume [3:] [201:5] [202:1]
  [203:1]

W

wachovia [36:10] [37:16,22
  ,24,25] [102:5]
wait [163:13]
waive [193:22]
waiver [36:22] [119:19,21]
  [165:25] [194:1]
waivers [37:3]
walked [158:4]
want [19:9] [24:11] [72:1]
  [74:4] [79:24] [96:18]
  [100:24,25] [112:22]
  [115:4] [121:6] [126:19]
  [135:3] [138:3,24] [147:24
  ,25] [148:15] [155:1] [156:
  12] [166:1,15] [167:2,6]
  [169:21] [187:8]
wanted [12:24] [14:19]
  [53:1] [54:21] [55:2,5]
  [74:6,12] [116:4] [121:11]
  [127:23] [152:14,16,24]
  [157:4,24] [158:11] [159:24]
  [160:7] [161:11] [170:8]
  [177:11] [184:16] [190:12]
wants [42:11] [181:10,16]
warehouse [65:19] [68:4]
  [80:11] [106:21] [187:19]
  [188:13] [194:3]
warehousing [12:5] [24:22]
  [25:4,9] [28:18,20] [34:11]
  [53:4] [144:3] [152:9]
  [188:6,18]
warrant [50:19,20] [54:24]
  [55:2,4,6,9,11,16] [56:4,9
  ,18,20] [57:1]
warrants [56:24]
warren [2:] [3:] [5:15] [6:2,4]
  [8:25] [9:8,15] [16:5]
  [19:16] [20:10,23] [29:19,21]
  [31:3] [33:10,13,14] [38:23]
  [50:1] [57:11,21] [59:17,20]
  [76:3] [78:12,22] [80:23]
  [83:3,10] [84:8,25] [86:17]

[90:9] [91:4] [95:22] [96:1,12
  ,16,20] [99:13,15,21,23]
  [100:4,16,20] [101:3,7,8,15
  ,21] [111:17] [112:3,12,17]
  [113:7,10,15] [115:8]
  [118:21] [119:8,21] [120:3
  ,10] [126:8] [128:13] [131:
  6,9] [134:1] [135:5,7]
  [137:6,16,20] [138:11,15]
  [139:5,8] [140:5,9] [147:23]
  [148:2,15,19,22] [149:2,6
  ,19,24] [150:2] [153:18,20
  ,23] [154:24] [155:10]
  [156:21,25] [157:9] [158:15]
  [159:2] [164:2,4,6] [166:4
  ,7] [168:6] [170:18] [172:2]
  [173:22] [174:3] [175:9,11
  ,16] [182:14,16] [184:1,6]
  [186:17] [190:19] [193:18
  ,20] [199:22]
washington [7:5]
wasnt [12:13] [45:23]
  [73:6,12] [75:3] [76:19]
  [85:20] [89:6] [120:21]
  [124:17] [133:3] [139:17]
  [163:7] [167:12] [170:16]
  [186:14] [199:19]
watched [131:16]
water [152:6]
waterfall [86:4,18]
waterhouse [7:8,9,24]
  [8:6,17,22]
ways [116:24] [180:21]
  [181:13]
weaker [179:9,10] [180:1]
wed [56:5] [136:15] [156:9]
  [158:9] [170:15]
wednesday [126:11] [134:
  5]
week [37:10] [185:17]
weekend [191:18]
weigh [194:12,19] [195:5,6]
weighing [195:4]
well [8:4] [17:25] [27:16,22]
  [29:19] [30:15] [31:2,8]
  [35:10] [37:3,20] [39:10]
  [41:12,21,22] [51:1] [65:2]
  [52:2] [53:11] [55:19]
  [56:11] [67:20] [69:21,23]
  [74:22] [77:17] [79:17,18]
  [86:12,19] [93:10] [97:5,16]
  [98:15] [104:19] [107:19,23]
  [108:7,9,12] [111:21]
  [113:10] [114:3] [118:7]
  [122:11] [125:23] [136:14
  ,23] [137:16] [141:2,15]
  [148:1,13,15] [150:7]
  [154:3] [158:2,16] [161:6]
  [162:7,25] [166:4] [167:3]
  [173:6] [174:5] [176:4]
  [182:7] [187:7] [188:18,21]
  [191:5] [197:14]
went [7:5,8] [8:9] [14:10]
  [21:6] [41:25] [55:21]

[100:22] [139:22,23] [153:
  18] [154:11] [156:19]
  [157:1,16] [164:15] [165:17]
  [167:11] [169:24] [176:19]
  [183:3] [185:15]
werent [19:21] [24:20]
  [39:2] [56:8] [66:4] [143:5]
  [190:20] [197:10,18,19]
weve [54:11] [64:11] [65:1]
  [92:22] [93:12] [99:22]
  [111:20] [139:2] [154:21]
  [179:3] [182:19]
whatever [38:17] [67:16]
  [96:10] [160:4,7] [195:20]
whats [22:16] [23:19,22]
  [37:25] [74:1] [82:18]
  [84:25] [90:23] [95:9]
  [97:19] [98:1] [106:5]
  [110:7] [121:19] [126:22]
  [127:14] [175:25] [177:18]
  [187:9]
whatsoever [33:4]
whereas [100:17] [185:21]
whereof [201:18]
whether [31:9] [68:25]
  [87:10] [97:16] [106:18]
  [132:8] [133:9] [139:11,12]
  [146:22] [147:21] [151:7]
  [167:19] [169:11] [172:24]
  [174:6] [187:9] [189:15]
  [195:14] [198:7]
whoever [11:10,12]
whole [40:14] [83:8,23]
  [142:11] [180:4] [193:1]
  [199:13]
whom [46:18] [71:22]
  [114:8] [131:4]
whos [23:11] [41:10]
whose [13:9,12] [17:9]
  [18:3] [25:16] [26:14,20]
  [29:21] [34:3] [59:1] [105:
  14]
why [8:6] [14:16] [29:12,24]
  [35:12] [38:2] [42:9] [45:23]
  [55:1,5] [56:10,22] [65:2]
  [66:19] [72:8,20] [73:2,5]
  [74:4,20] [76:17] [83:3]
  [85:13] [86:8,15] [88:24]
  [101:3] [107:16] [111:12]
  [114:25] [115:9] [121:6,24]
  [131:1,10] [136:13] [143:7]
  [147:12,18] [149:16,17]
  [157:24] [163:14] [164:10]
  [166:9] [178:5] [183:3]
  [185:6] [187:7] [188:16]
  [195:3]
widen [130:14]
widening [129:8] [130:2]
widespread [75:15]
will [5:13,20] [19:12] [21:15]
  [30:4] [36:23] [40:2] [68:11]
  [83:9] [88:6] [91:14] [100:
  2] [102:8,13] [103:8] [104:
  22] [119:16,18] [137:9]

[148:2] [157:17] [159:10] [172:9] [173:6,7] [175:4,6 ,8] [179:12,15] [180:11] [181:3,10,24] [190:13] [198:9]
**williams** [86:25] [87:5,10]
**williamson** [2:] [5:17] [9:11] [99:17]
**willing** [135:23] [160:3,6] [181:9] [191:12,13]
**winston** [3:] [5:11] [7:18]
**winstonsalem** [3:] [5:11] [7:18]
**winston-salem** [3:] [5:11] [7:18]
**winter** [62:23]
**wire** [88:23] [110:12,14] [165:18] [166:13] [167:9]
**wired** [109:14]
**wise** [161:14]
**wish** [80:17]
**wishes** [78:23]
**withdrawal** [88:20]
**withdrawals** [88:15] [89:8,12] [102:17] [104:7]
**within** [176:6]
**without** [37:2] [55:17] [68:2] [75:17] [83:7] [103: 21] [144:19] [145:4] [146:24] [153:8] [160:18] [163:10,24 ,25] [165:24] [167:9]
**witness** [3:] [5:21] [16:4] [19:8] [20:5,13] [29:16] [30:19] [38:16] [49:24] [57:19] [76:1] [83:1,6,21] [84:24] [86:12] [89:23] [91:2] [95:25] [99:10,14,19 ,22,24] [100:17,25] [101:14] [111:22] [112:22] [113:3] [115:6] [118:22] [119:13] [120:1,9] [131:7] [148:18] [157:1] [170:5] [171:5,9,12] [190:11] [201:12,18]
**witnesss** [96:18]
**wondered** [131:17]
**wonderful** [182:7] [196:22]
**wondering** [139:10]
**wont** [138:11]
**wood** [133:16] [138:21]
**word** [145:22] [165:13] [166:16]
**words** [53:19] [54:6] [56:1] [162:19,21] [164:25] [166:17] [170:17] [176:10] [193:21] [199:9]
**work** [7:8] [8:9] [13:6,19] [15:6] [18:24] [31:4,5] [32:2] [36:5,17,18] [39:12] [53:10] [76:12] [93:17,20] [94:14] [121:8] [133:23] [147:5] [174:11] [181:13] [184:21] [185:6] [193:13] [198:24]
**worked** [31:9] [36:1] [42:2,16]

[46:24] [80:1] [92:24] [93:4 ,19] [116:1] [147:2,8] [185:2] [193:6] [196:21]
**working** [7:17] [53:8] [67:7 ,23] [71:22] [132:15] [139: 17] [197:16]
**works** [72:10]
**worksheet** [102:2]
**world** [127:16,22,24] [165: 17]
**worlds** [115:10]
**worst** [125:4]
**worth** [110:1] [135:21]
**wouldnt** [25:6] [53:2] [56:13] [68:6] [119:21] [144:21] [194:12]
**wound** [78:4]
**wrenching** [199:16]
**written** [106:16] [147:14]
**wrong** [25:24] [70:16] [73:7] [75:2] [122:1]
**wrote** [74:17] [102:24] [103:2]

---

Y

---

**yeah** [36:19] [65:7] [82:9] [95:23] [102:12] [113:7] [128:8] [129:6] [139:5] [153:5] [157:25] [160:11,14 ,15] [161:12] [162:13] [167:3] [176:13] [187:24] [188:3] [195:4]
**year** [10:11] [62:24] [142:9]
**years** [7:10,14] [10:16] [26:9] [58:3] [59:8,9] [76:10] [144:11] [153:6] [167:25] [183:13] [196:19] [197:1]
**yes** [6:9,18] [7:25] [11:18] [18:13] [21:9] [22:5] [28:8] [30:10] [32:17] [34:8] [35:8] [37:6] [42:17,19] [48:1,12,16] [49:17,22] [50:5] [52:22] [54:22] [56:19] [63:12] [64:3] [65:6] [66:11,14] [70:2] [71:21] [73:1] [75:9,19] [82:15] [83:12] [85:6,7] [86:22] [90:18,19,21] [95:1,5] [96:12] [99:1] [100:16,20] [102:1] [104:10 ,15,23] [107:3] [108:11] [113:18] [115:15] [118:21] [119:11] [120:8,9] [121:1] [124:25] [126:18] [127:1,4] [128:20] [129:6,10] [130:22 ,25] [131:24] [139:5] [140: 5] [145:15] [148:4] [153:12] [157:21] [161:22,23] [164:11] [169:8] [175:3,23] [176:10] [177:9,18] [178:25] [184:1,12,20] [191:9]
**yes/no** [170:17]

**yet** [21:19]
**yield** [178:12]
**york** [2:] [55:12] [70:4] [96:11] [110:16] [111:16]
**youd** [42:17] [80:22] [112:20] [161:11] [174:4] [176:11] [197:13]
**youll** [6:16] [86:3] [94:23] [96:9] [108:14] [110:3] [161:18] [171:13]
**youre** [6:20] [31:11] [56:2] [58:11] [66:24] [72:3] [77:24] [80:19] [85:18] [88:21] [100:20] [108:22] [121:17] [128:25] [130:14 ,15] [134:7] [139:11] [143: 25] [155:17] [158:8,9,21] [161:22] [163:16,24] [166:25] [167:7] [170:7] [178:7] [182:24] [191:4]
**youve** [30:16] [43:21,25] [87:2] [154:25] [167:1,5] [180:3] [182:3,19] [183:4]

---

Z

---

**zba** [104:14,15]
**zbas** [103:10]
**zero** [103:10] [104:4]
**zillions** [147:9]

# In The Matter Of:

*In re:* OAKWOOD HOMES CORPORATION/OHC LIQUIDATION *v.*
CREDIT SUISSE FIRST BOSTON, *et al.*

---

## DOUGLAS R. MUIR
### September 27, 2006

---

# LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

**MUIR, DOUGLAS R. - Vol. 2**



LEGALINK
A MERRILL COMPANY

APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.
Stutman, Treister & Glatt
1901 Avenue of the Stars
Twelfth Floor
Los Angeles, California  90067-6013
(310) 228-5755
(310) 228-5788 FAX
TCastanres@stutman.com

For the Defendants:

MARY K. WARREN, Esq.
J. JUSTIN WILLIAMSON, Esq.
Linklaters
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9000
(212) 903-9041 FAX
Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

* * * * *

INDEX OF EXHIBITS

For the Defendants:                                     Page

229    Meeting minutes - 11-15-00              211
230    Meeting minutes - 12-20-00              214
231    Meeting minutes - 6-8-01                216
232    Meeting minutes - 7-24-01               221
233    Meeting minutes - 5-6-02                228
234    Meeting minutes - 6-25-02               233
235    E mail printout - 3-13-02               240
236    Employment agreement - 4-13-04          246
237    Letter - 10-8-03                        248
238    Declaration of Douglas R. Muir
       in support of first day relief          255
239    Objection to proofs of claim
       by CSFB and counterclaims               261

* * * * *

2

---

27/09/2006 MUIR, Douglas R. (vol. 2)

Continuation of the Videotape Deposition of
DOUGLAS R. MUIR, Volume II, taken by the Defendants,
at the Marriott Hotel, 425 North Cherry Street,
Winston-Salem, North Carolina, on the 27th day of
September, 2006 at 9:00 a.m., before K. Denise Neal,
Registered Professional Reporter and Notary Public.

* * * * *

CONTENTS

THE WITNESS:  DOUGLAS MUIR          EXAMINATION

        BY MS. WARREN                  208
        BY MR. CASTANARES              264

* * * * *

3

---

27/09/2006 MUIR, Douglas R. (vol. 2)

1       THE VIDEOGRAPHER:  We're on the record at
2    9:00 o'clock.  This is tape number five.
3          DOUGLAS R. MUIR,
4    having been previously sworn, was further examined
5    and testified as follows:
6          FURTHER EXAMINATION
7    BY MS. WARREN:
8       Q.   Good morning, Mr. Muir.
9       A.   Good morning.
10      Q.   One of the financing facilities used by
11   Oakwood that we didn't talk much about yesterday was
12   the revolver.  Would you tell me generally why did
13   Oakwood need a revolving credit facility?
14      A.   The facility was initially put in place to
15   finance the expansion of the business, principally
16   construction of factories and construction and
17   inventory at new sales centers.  And at the time bank
18   credit seemed on a three-year deal, it was a
19   three-year duration deals, you know, seemed a cost
20   effective way to finance that.
21      Q.   Do you remember when the revolver was
22   first put into place?
23      A.   It was approximately 1997.  I could be off
24   more likely a year earlier than that, than a year
25   later, but sometime in the '96, '97 time frame.

5

1  Q.   And who was the provider of that facility?
2  A.   There were five banks participating.
3  First Union was the largest investor and syndication
4  agent.  The other banks in the deal were Bank of
5  America, PNC, National City and First Chicago.
6  Q.   How did Oakwood choose those particular
7  providers?
8  A.   As follows:  Prior to the creation of the
9  Bank America -- Bank of America warehousing facility
10  that we discussed yesterday, we had preceding that
11  facility a warehousing facility that was provided by
12  the five banks I just mentioned.  At some time around
13  1996 or '97 Bank of America approached us and said
14  gee, we have a more cost effective way for you to
15  finance your warehouse borrowings and using our
16  commercial paper conduit and it will save you some
17  money.  So we said gee, sounds great to us.
18          And so we terminated the bank warehousing
19  facility and converted that warehousing facility or
20  really replaced it with a new conduit facility
21  sponsored by Bank of America.
22          What we didn't have to lose in the process
23  of doing that was the relationships we had built up
24  with the other banks.  And so we went to Wachovia or
25  again at the time First Union and we said gee, we'd

1  obtaining replacement credit facilities to take out
2  the banks.
3  Q.   Do you know if consideration was given to
4  using Credit Suisse for the revolving facility?
5  A.   I have a vague recollection that we -
6  there were discussions during the '99 to '02 time
7  frame about our desire for Credit Swiss to come up
8  with some credit.  Whether we had a discussion with
9  them about a pure revolving facility, secured or
10  unsecured, I just don't remember.
11  Q.   And this is when you let Credit Suisse
12  know that there was competition and you wanted them
13  to step up?
14  A.   I can't remember when that discussion took
15  place, but it -- I definitely did have that
16  discussion with Fischra about the pressure we were
17  receiving from credit providers who were providing
18  credit and not sharing in what they would view to be
19  their fair share of the underwriting fee income.
20          MS. WARREN:  Denise, are we on 229?
21          THE COURT REPORTER:  Yes.
22          (Exhibit Number 229 was marked for
23      identification.)
24  Q.   (By Ms. Warren)  I'm showing you a
25  document the court reporter has marked as Defendant's

1  like to keep our bank group together because they've
2  been with us, they know us.  Would you go out and
3  syndicate a revolving credit facility for us that
4  each of those five banks could participate in so that
5  we would retain our relationship with those banks.
6  Q.   And did there come a time where you
7  changed your service provider on the revolver to
8  another bank?
9  A.   No.  Well, let me -- I'm sorry.  By its
10  terms that First Union revolving credit facility
11  expired three years after it was set up and was
12  ultimately retired in January of 2002 with the
13  Foothill facility just so the record is clear.
14  Q.   Why did Oakwood change the provider to
15  Foothill after the original facility expired?
16  A.   The banks didn't want to renew the credit.
17  The banks had extended the maturity of the credit
18  beyond its initial three years and they wanted out of
19  the credit.  They wanted us to find a new lender.
20  Q.   How did management come to choose
21  Foothill?
22  A.   I don't know exactly.  I was not really
23  involved in seeking alternative financing.
24  Q.   Who was involved with that?
25  A.   Bob Smith principally drove the train on

1  Exhibit 229, minutes of the meeting of the board of
2  directors held Wednesday, November 15th, 2000.  And I
3  see you are noted as being the secretary for this
4  meeting.  Take a look at the second page of
5  Exhibit 229, which by the way, the Bates numbers are
6  MNAT 6717 to 6718.
7          On the second page, 6718, there's a report
8  on -- in the third paragraph there's a report on
9  efforts to secure the revolving facility.  Do you see
10  that?
11  A.   I do.
12  Q.   At this point was the revolving facility
13  close to a done deal, do you remember?
14  A.   Meaning the Foothill facility?
15  Q.   Yes.
16  A.   You know, I don't remember.  I think we
17  ultimately closed the Foothill deal in January of
18  '01.  I think I'm right about that.  You know, how
19  fully baked that deal was on November 15th, I just
20  don't remember.
21  Q.   Looking further down the same paragraph,
22  there's a notation that Mr. Muir gave a report on the
23  status of efforts to monetize some or all of the
24  corporation's inventory of subordinated asset backed
25  securities.  Do you see that?

1    A.    I do.

2    Q.    What's that refer to?

3    A.    I don't recall specifically. There were a

4    couple of things that we were working on in this time

5    frame or ideas that we were contemplating that I

6    might have been referring to, but I'd be glad to tell

7    you what they were but I can't definitely connect the

8    dots to specific things to these words on this piece

9    of paper.

10    Q.    Do you remember whether this was an idea

11    of management to help improve liquidity?

12    A.    We were -- I don't see the words improve

13    liquidity in the language here, but clearly at the

14    time we were accumulating an inventory of

15    subordinated REMIC certificates and we would have

16    felt it was in our best interests to convert those to

17    cash if we could on a reasonable basis and we

18    certainly would have been seeking to do so.

19    Q.    Do you know if Credit Suisse had any role

20    in this planned or contemplated is perhaps a better

21    word effort to monetize the corporation's REMIC

22    inventory?

23    A.    You know, I don't remember specifically

24    the discussions that I was referring to in this

25    report to the board. The most likely candidate I

1    would have been speaking to about how to monetize the

2    B2s, you know, would have been Credit Suisse. At

3    some point in the time frame '99 to 2002 that we've

4    been discussing I recall that as best I can remember

5    that I discussed with Piachra the possibility of CSFB

6    doing some sort of repo deal on the B2s.

7    Now, that never ultimately happened, but I

8    know he and I discussed it at least conceptually.

9    That would have been one way to at least in the short

10    term have monetized the B2s, albeit on a temporary

11    basis.

12    Q.    Why did the repo deal not happen?

13    A.    I don't remember. It was discussed but,

14    you know, it never matured to the point where Piachra

15    came to me and said here is a term sheet that's been

16    signed off on by Credit. Whether he ever said gee,

17    Credit won't do it or it just kind of faded away, I

18    just don't recall.

19    MS. WARREN: Let me have that back for a

20    minute. I need to correct what I said earlier

21    about this exhibit. Exhibit 229 is Bates

22    numbered 6717 to 6722. I had an unstapled copy,

23    but that's all I'm going to ask you about.

24    (Exhibit Number 219 was marked for

25    identification.)

1    Q.    (By Ms. Warren) I'm showing you a

2    document the court reporter has marked Exhibit 230

3    Bates numbered MNAT-6712 to 6716. It's entitled

4    Oakwood Homes Corporation minutes of the meeting of

5    the board of directors held Wednesday, December 20th,

6    2000, and I note that Mr. Muir is listed as secretary

7    of the meeting.

8    Mr. Muir, if you look through the bottom

9    of the first page of Exhibit 230 and the following

10    pages, it shows the board approving the Foothill

11    Capital revolving credit facility and the CSFB loan

12    purchase facility. Do you see that?

13    A.    Yeah. I see resolutions on both of those,

14    yes.

15    Q.    Was entering into these facilities a

16    proposal of management to the board?

17    A.    I think that's a fair characterization,

18    yes.

19    Q.    And the board approved both facilities?

20    A.    They did.

21    Q.    Why was it important for the board to

22    approve entering into both of those facilities?

23    A.    My recollection is that proof of corporate

24    authority was a condition of the lender. And so in

25    order to document the trail of corporate authority,

1    we went to the board and memorialized in these

2    resolutions the board's approval of the transactions.

3    Q.    And during the meeting when you asked for

4    the board to approve these facilities, was there a

5    discussion of the pros and cons?

6    A.    Well, I'm just reading from the minutes on

7    page one in the paragraph immediately preceding the

8    beginning of the resolution with regard to the

9    Foothill facility. It says a discussion of both

10    transactions followed, at the conclusion of which the

11    following preambles and resolutions were unanimously

12    adopted. So I assume from this there was a

13    discussion. I don't remember what the discussion

14    was.

15    Q.    You don't have any independent

16    recollection of the discussion?

17    A.    I don't.

18    (Exhibit Number 231 was marked for

19    identification.)

20    Q.    (By Ms. Warren) I'm showing you a

21    document the court reporter has been marked -- that

22    the court reporter has marked Exhibit 231. It's

23    entitled Oakwood Homes Corporation minutes of the

24    meeting of the board of directors held Friday, June

25    8th, 2001.

**[Page 14]**

```
 1        It's Bates numbered KCLH-1172 to 1174, and
 2   I note that Mr. Muir is listed as secretary of the
 3   meeting.  Looking at the last page of Exhibit 231, at
 4   the top of the page there's a mention of a report
 5   from Mr. Smith on the current status of discussions
 6   with Foothill regarding a potential revolving credit
 7   facility and Mr. Muir's work on it.  Well, let's take
 8   it one at a time.
 9        First of all, since the revolving credit
10   facility with Foothill had been or a revolving credit
11   facility with Foothill was approved by the board in
12   December of 2000 as we just saw, what was going on in
13   terms of discussions with Foothill on June 8th, on or
14   around June 8th, 2001?
15   A.   There was -- there was a delay, an
16   extended delay between the time we went to the board
17   to approve both the Foothill transaction and the CSFB
18   transaction and the time those transactions closed.
19   CSFB closed within a month or so.  There was
20   something up with Foothill that caused it to be
21   delayed really by a year.  And for the life of me
22   today I don't remember what the issue was, but there
23   was one.
24   Q.   And did that cause you some irritation?
25   A.   Again, at the time I wasn't really -- I
```

**[Page 15]**

27/09/2006 MUIR, Douglas R. (vol. 2)

```
 1   was trying to make sure the servicing of the advance
 2   facility got done, the CSFB deal was working.  I
 3   wasn't focusing on the revolving credit.  Bob was
 4   dealing with it.  So when you're not focusing on it
 5   day-to-day, I really didn't think about it.
 6   Q.   What was done in the interim during this
 7   delay period to make sure that you still had access
 8   to the credit line?
 9   A.   We spent a lot of time talking to First
10   Union.  Again, the banks wanted out of the credit.
11   If we went back and looked at the record from say
12   about the time we first lost our investment credit
13   rating to the point at which the Wachovia syndicated
14   facility was retired, you'll see a moving picture if
15   you will that shows a company with deteriorating
16   credit profile, periodic defaults under the credit
17   facility.
18        And the reactions to that in the history
19   of amendments to that facility over time is what you
20   see as lenders charging more money in terms of fees
21   and reducing the credit availability under the
22   facility.  That's what banks do when they want out of
23   a facility but they don't want to just cut you off
24   because of potential flack to them for doing so.  And
25   that's what you see in the Wachovia facility.  So
```

**[Page 16]**

```
 1   while the banks didn't cut us off, the banks worked
 2   very steadily to reduce their exposure to the credit.
 3   Q.   And did they raise your fees as well?
 4   A.   I don't think -- we could go back and look
 5   at the documents, but I don't think that they did.
 6   They periodically did charge us some fees for
 7   amendments, but as I recall I don't have a memory of
 8   any kind of imposition of any kind of monthly fees
 9   because there were none in the agreement to begin
10   with.
11        They -- we simply paid them a rate of
12   interest on their outstanding borrowings and maybe an
13   unused fee on the unused commitments, but I don't
14   remember anything -- that there were any monthly fees
15   of any kind for them to have increased.
16   Q.   Did the First Union bank group charge you
17   for waivers?
18   A.   From time to time they charged us either
19   for waivers or amendments.  Sometimes we got
20   amendments to avoid defaults so we didn't need a
21   waiver.  We paid them some fees over the term of the
22   agreement.  How much and when, I just don't remember.
23   Q.   When the deal was finally done with
24   Foothill, were they charging higher fees than the
25   First Union bank group had done?
```

**[Page 17]**

27/09/2006 MUIR, Douglas R. (vol. 2)

```
 1   A.   I don't remember what the amount of any
 2   front end commitment fee paid to Foothill was if
 3   there, in fact, was one or what the rate of interest
 4   was compared to Wachovia.  You know, we have the
 5   documents and we could research it, but off the top
 6   of my head I don't remember.
 7   Q.   Going back to the third page of
 8   Exhibit 231, there's the reference at the top of the
 9   page to Mr. Muir's work on a new credit facility
10   secured by servicing advances.  Do you see that?
11   A.   I do.
12   Q.   And what does that refer to?
13   A.   This refers to what ultimately wound up
14   being the servicing advance facility that we closed
15   in October in which Prudential was the investor.
16   Q.   Looking back at the same page in the next
17   paragraph, there's a reference to a report from Mr.
18   Smith on the assumptions program that we talked about
19   yesterday.  Do you see that?
20   A.   I've read it, but I've lost track of the
21   question.  Could you ask the reporter to read it
22   back, please?
23   Q.   The question was just do you see the
24   reference to Mr. Smith reporting on the assumption
25   program?
```

A. I do.

Q. Do you remember if this was the first time the board had been apprised of the increased use of the assumption program?

A. I don't remember specifically, but I doubt it.

Q. Why do you doubt it?

A. Because I can remember -- I attend virtually all of the board meetings and a topic that was often discussed was the level of incoming repo properties, how to go about effectively and efficiently disposing of them.

And I know from time to time the loan assumption program came up for discussion as one of the things that we were doing trying to deal with that issue, but I don't have a recollection of exactly when but it was more than once.

(Exhibit Number 232 was marked for identification.)

Q. (By Ms. Warren) I'm showing you a document that the court reporter has marked as Exhibit 232. It's entitled Oakwood Homes Corporation minutes of the meeting of the board of directors held Tuesday, July 24th, 2001. It's Bates numbered KCLH-1176 to 1181 and I note that Mr. Muir is listed

18

rings a bell, but I do know, for example, what states we were talking about when Myles was reporting about states being particularly problematic from a litigation point of view. I know exactly what regions we were talking about exiting for that very reason, but this doesn't help me remember the particulars of what Myles was talking about in these particular reports.

Q. Do you remember whose idea this plan was to reduce the operations in certain states?

A. That would be Myles.

Q. Looking back at Exhibit 232, there's a reference on the first page of Exhibit 232 to Mr. Smith giving copies of presentation materials regarding the plan during a management meeting with the corporation's bank group. Do you see that?

A. I don't just yet, but I'm looking.

Q. It's in the second paragraph from the bottom.

A. Yes. I see it.

Q. Were you present at that management meeting with the corporation's bank group?

A. I probably was, but I have no specific recollection of it.

Q. Is it fair to say that you were usually

20

is secretary of the meeting. Looking at the first page of Exhibit 232, the second paragraph from the bottom references a report from Mr. Standish on the plan discussed at the last board meeting to substantially reduce the size of the retail organization. Do you see that reference?

A. I do.

Q. We can certainly look back at the last board meeting minutes if that would help you, but do you remember generally what that plan involved?

A. I do not.

Q. Do you know why the plan to substantially reduce the size of the retail organization was contemplated?

A. Again, without referring back to a more detailed report of which plan this was, I don't remember.

Q. Take a look back at Exhibit 231. On the second page of Exhibit 231 in the center of the page there's a reference to Mr. Standish's leading a discussion about the company's retail and manufacturing operations. Why don't you look at that paragraph and see if it refreshes your memory and let me know when you're finished?

A. This language on page two of Exhibit 231

19

present when management met with the corporation's bank group?

A. Yes, usually.

Q. During the 2000 to 2002 period do you remember approximately how often management would meet with the corporation's bank group?

A. We met with the bank group from time to time let me say, and the extent to which we did so varied. There were a handful of meetings usually held in Charlotte which representatives of all of the banks in the group attended.

Q. And this was still at the stage where you were dealing with the five banks?

A. Yes.

Q. Five banks we talked about earlier?

A. In the syndicated Wachovia facility. So periodically there would be a bank group meeting usually in Charlotte hosted by Wachovia or First Union and we'd go down there and meet with them. We'd have a presentation. We'd have Q&A.

At other times we had meetings just between management and First Union as the syndicate manager. And it seems like we talked to representatives of the syndicate manager at least weekly on the phone and sometimes far more than

21

weekly. So there were -- there's a lot of
communication.

Q.    What was the purpose of sharing
management's operational plans such as this plan to
reduce the size of the retail organization with your
bank group?

A.    We felt it was important that we keep the
bank group fully advised of what we were intending to
do with the business.  The bank group was spending a
lot of money, our money, monitoring what we were
doing so they understood where the business was
headed, and they wanted to be kept informed of our
plans and we certainly tried to do that.

Q.    Did the bank group members ever make
suggestions to you or comment on what management's
plans were?

A.    Yes.

Q.    Do you remember any of those comments?  I
know that's a broad question.

A.    I remember there were plenty of -- there
was plenty of input from the banks.  One thing in
particular that sticks out, and if I thought about it
I could probably think of more, we had a fair amount
of capital deployed in an insurance business in
Bermuda.

22

27/09/2006 MUIR, Douglas R. (vol. 2)

It was a consistently profitable business,
but by deployed capital I mean letters of credit
issued by members of this bank group and, therefore,
represented a credit exposure to them.  There was
considerable discussion and they tried to reduce
their exposure to Oakwood.  They gave us plenty of
encouragement to reduce the amount of capital
deployed into the insurance business.

Q.    Did management accept that suggestion?

A.    We did.  And just so you can get the full
flavor of it, if we found ourselves in a default
situation it was not unusual for the banks to say to
us we'll waive this default and not make your
indebtedness due and payable under the following
conditions.  And they -- there would be one, two,
three.

Generally one of those conditions was we
reduce their credit commitments under the facility.
So if you want to do that, something has to go.  So
it's not so much that they necessarily told us we
want you to get out of the insurance business, but
they from time to time as a condition to not calling
the credit wanted to reduce their exposure, and we
had to figure out ways to do that to avoid having the
facility called.

23

Q.    And did you think that the banks -- the
bank group's use of their leverage in that way was
unfair?

A.    No.

Q.    Why not?

A.    I didn't think the banks were trying to do
anything that our original agreement with them didn't
permit them to do.  They were looking out for their
best interests and we were looking out for ours.
They certainly could have been much more draconian
than they were.

They had plenty of opportunities to call
the credit, which would have been to our great
disadvantage.  So no, I don't think they were unfair.

Q.    I think I know the answer to this
question, but to get your view on it, why would the
bank group's calling the credit have been bad for
Oakwood Homes?

A.    We would have been unable to repay them.

Q.    And what would have been the consequences?

A.    That would have been very interesting.
Presumably -- presumably we would have had to file
for bankruptcy.  Presumably they could have seized
the assets if they'd cared to.  They had a security
interest in virtually everything we owned.  I don't

24

27/09/2006 MUIR, Douglas R. (vol. 2)

think the banks wanted to do that, but that's not an
outcome we had to deal with at the end of the day.

Q.    By not calling the credit, did you think
that the bank group was trying to artificially
prolong the life of Oakwood Homes Corporation for the
sake of getting more fees from you?

A.    No.

MR. CASTANARES:  Mary, if you're about to
move on, can I request a very brief break,
please?

MS. WARREN:  Sure.

THE VIDEOGRAPHER:  We're off the record at
9:34.

(A recess was taken.)

THE VIDEOGRAPHER:  We're on the record at
9:38.

(Exhibit Number 23) was marked for
identification.)

Q.    (By Ms. Warren)  I'm showing you a
document the court reporter has marked Defendant's
Exhibit 23).  It's entitled Oakwood Homes Corporation
minutes of the meeting of the board of directors held
Monday, May 6th, 2002, and Mr. Muir is listed as
secretary of the meeting.  Taking a look at the
second page of this exhibit, in the second paragraph

25

1  there's a discussion on the corporation's liquidity
2  outlook and credit facilities. Would you just read
3  that paragraph to yourself briefly?
4      A.    I've read it.
5      Q.    The paragraph notes a potential
6  transaction to exchange some or all of the
7  corporation's outstanding senior notes due in 2000.
8  Do you see that?
9      A.    Due in 2004?
10     Q.    Yeah. You're right.
11     A.    Right.
12     Q.    Sorry. 2004.
13     A.    Yeah. I see that.
14     Q.    Were you part of considering that
15  potential transaction?
16     A.    Yes.
17     Q.    Did you ask Credit Suisse to give you
18  ideas on how to refinance the 2004 senior notes?
19     A.    I don't remember doing so.
20     Q.    Do you know who in management did so?
21     A.    I infer that someone did because these
22  minutes indicate that we did, but no, I don't
23  remember who did it. It may have been -- may have
24  been me.
25     Q.    Why did management want to refinance the

1  liquidity to service this debt.
2      Q.    The board minutes that are Exhibit 233
3  referenced the proposal being crafted by Credit
4  Suisse First Boston in response to management's
5  inquiry. Was that proposal ever implemented?
6      A.    It was not.
7      Q.    Why not?
8      A.    I don't recall why we didn't pursue it. I
9  thought about it. Myles thought about it. Bob
10  thought about it. We ultimately didn't pursue it. I
11  don't remember sitting down to have a discussion
12  among the three of us or any subset as to exactly how
13  we apparently all came to that conclusion.
14     Q.    Is it fair to say that it was management's
15  decision not to proceed with the CSFB proposal?
16     A.    Yes. Counsel, I just might have left that
17  last -- question before last a little bit unfinished
18  when you asked me --
19     Q.    What was that?
20     A.    When you asked me why we decided not to
21  implement the plan and I indicated truthfully that I
22  didn't remember having a discussion among Myles or
23  Bob and I about how we came to that conclusion or
24  remember coming to the conclusion.
25     Q.    All right.

1  2004 senior notes?
2      A.    Well, I'm not certain necessarily that we
3  did, but one of the things that we were thinking
4  about in May of 2002 was the state of the business,
5  the near term prospects for improvement in the
6  business and the fact that we had $125 million of
7  indebtedness that was due March 1, '04 and that was
8  less than two years away. And one of the things that
9  was on our mind was how we were potentially going to
10  deal with that.
11     Q.    Was the maturity of the 2004 senior notes
12  seen by management as a large problem?
13     A.    It was seen as a -- certainly as a
14  potential problem and it was something that one is
15  aware of in a business this size. A $125 million
16  obligation is substantial and you would not want to
17  wait until the last minute to try and figure out how
18  you were going to refinance that or repay it.
19     Q.    Were the senior notes -- and I'm including
20  both the 2004 and the 2009 maturity dates -- a drain
21  on the company's liquidity?
22     A.    Well, to the extent that any indebtedness
23  is interest bearing, yes, because the coupon was
24  around -- around eight-and-a-half percent on 300
25  million was 24 million a year. So yes, it consumed

1      A.    I didn't want you to think that I didn't
2  have a view and I didn't tell you what it was. And
3  I'll be glad to tell you if you want to ask me, and
4  if you don't, that's fine.
5      Q.    Well, this is a first for a witness coming
6  up with questions for me to ask, but since you've
7  invited me, all right. Why did you - what was your
8  opinion on the Credit Suisse proposal to refinance
9  the 2004 bonds?
10     A.    I wasn't in favor of it. I thought it was
11  a very -- I thought it was kind of a neat plan
12  actually. I didn't think it was a neat plan for us.
13     Q.    Why not?
14     A.    And the reason was it would have consumed
15  a fair amount of cash to implement and it would -- I
16  didn't think that knowing what I knew about the
17  business and where I thought things were heading, I
18  didn't think it was smart to trade off liquidity
19  today that would have been a fair amount of money to
20  defer a liquidity problem that might loom two years
21  down the road.
22     Q.    Is it your recollection that other members
23  of management came around to your view and that's why
24  Credit Suisse's proposal was rejected?
25     A.    You know, I don't remember what Bob said

27/09/2006 MUIR, Douglas R. (vol. 2)

1    he thought of it, what Myles said.  For whatever
2    reason, they didn't overrule me.
3         (Exhibit Number 234 was marked for
4         identification.)
5         Q.   (By Ms. Warren)  I'm showing you a
6    document that the court reporter has marked as
7    Defendant's Exhibit 234 Bates numbered MNAT-6726 to
8    6728 that's entitled Oakwood Homes Corporation
9    meeting of the -- minutes of the meeting of the board
10   of directors held Tuesday, June 25th, 2002.  Mr. Muir
11   is noted as being secretary of the meeting.
12        Please take a look at the last paragraph
13   on the first page of Exhibit 234.  It continues on to
14   the second page, and just read it over to yourself.
15        A.   I've reviewed this.
16        Q.   I take it this was the occasion on which
17   management informed the board that the loan
18   assumption program was going to be discontinued?
19        A.   We were certainly telling them we intend
20   to discontinue it.
21        Q.   Do you recollect anything about the
22   discussion during this meeting concerning the loan
23   assumption program?
24        A.   I don't.
25        Q.   Is it your recollection that the loan

30

27/09/2006 MUIR, Douglas R. (vol. 2)

1    assumption program was, in fact, ended soon
2    thereafter?
3         A    It was.
4         Q.   Take a look at the second page of
5    Exhibit 234.  In the middle paragraph beginning Mr.
6    Standish commented there's a notation about a
7    potential restructuring or reorganization I should
8    say.  Would you just read that to yourself?
9         A.   I've read it.
10        Q.   To your recollection was this the first
11   time that management had raised the idea of a
12   financial reorganization with the board?
13        A.   I don't remember if it was or not.  And
14   again, financial reorganization, financial
15   reorganization in this context means bankruptcy.  We
16   may have discussed although I don't have a specific
17   recollection with the board from time to time other
18   things that might be considered financial
19   restructurings, for example, swapping out the '04s
20   for the '09 notes.
21        That was, you know, an idea CSFB came up
22   with.  We discussed things like that with our board
23   from time to time, so I just wanted you to understand
24   that this referred to bankruptcy and this is what we
25   were telling the board we were doing is we were

31

27/09/2006 MUIR, Douglas R. (vol. 2)

1    beginning to get ready to put in motion that which
2    needed to be done if we determined we needed to file.
3         Q.   Was this the first time -- well, strike
4    that.  Did the company go ahead and engage counsel to
5    assist in developing a plan of reorganization?
6         A.   I don't recall engaging in 2002 any legal
7    counsel relating to financial restructuring, any
8    counsel that we had not already engaged.  In other
9    words, I don't remember any new lawyers showing up
10   until the time that we engaged Morris Nichols to
11   represent us as Delaware counsel and until the time
12   we entered into a separate engagement with Hunton &
13   Williams to represent us as special securitization
14   counsel in the bankruptcy.
15        Q.   Do you remember approximately when Morris
16   Nichols was retained?
17        A.   Gee, it would have been -- I don't
18   remember exactly.  Probably -- probably after August.
19   I think it was actually fairly close to the filing
20   when we -- when we selected the venue.  We did not
21   know where we were going to file at this point if we
22   filed at all and until we knew, had selected venue,
23   we didn't know where to hire lawyers, so -- we did
24   have lawyers that represented us in the bankruptcy as
25   North Carolina counsel that we had engaged and had

32

27/09/2006 MUIR, Douglas R. (vol. 2)

1    been working with for several years.
2         Q.   Was this the Rayburn firm?
3         A.   It was.
4         Q.   Take a look at the second page again of
5    Exhibit 234.  There's a paragraph near the top of the
6    page beginning Mr. Standish reported  Would you just
7    read that paragraph over to yourself?
8         A.   I've read it.
9         Q.   Is it fair to say that what Mr. Standish
10   said during this meeting was essentially that in a
11   perfect world we could meet the maturity date for the
12   2004 bonds, but it's very unlikely?
13        A.   Well, what I wrote in the minutes was, and
14   maybe I ought to just let my words speak for
15   themselves, that cash flow projections indicated that
16   adequate liquidity was in place to fund operations
17   until the March 1, '04 maturity of 125 million of
18   senior notes if one assumes the most favorable
19   outcome with regard to some key uncertainties.  I
20   don't have any recollection beyond that of what he
21   said.
22        Q.   Well, then he goes on according to your
23   notes to say that  -- to list all of the key
24   assumptions, including that the company -- that the
25   corporation would meet all of its operating

33

1    projections and emphasized the inherent uncertainties
2    in such projections. Did the corporation have a
3    history of meeting its operating projections?
4        A.    I think on balance if we went and looked
5    from 1999 to mid-2002, we probably more often fell
6    short of projections than we exceeded them.
7        Q.    So isn't the gist here that if everything
8    went completely according to plan, the company could
9    meet the maturity date for the 2004 bonds, but that
10   what Mr. Standish is saying here is that it's
11   unlikely?
12           MR. CASTANARES:  I object to this question
13       as badgering the witness.  He's testified he has
14       no recollection beyond what's on the page, and
15       to ask him to interpret the page further other
16       than asking for his recollection if he has any
17       is inappropriate
18           MS. WARREN:  I disagree.  You can go ahead
19       and answer.
20           THE WITNESS:  I don't see any expression
21       here of likelihood.  He's saying as I read it if
22       we meet our projections and these events occur,
23       then we'll get to March 1, '04.  I think if
24       Myles had said he thought it was unlikely, I'd
25       have probably written that down.

34

1    2002 to March of '04, one of which is we would
2    get there just fine if things fell into place,
3    if the market improved, if we implemented some
4    plans we had in mind.  At the time I thought
5    there was a possibility we might not get there
6    and that the wise course of action was to
7    prepare for a bankruptcy if you concluded that
8    that was in the best interests of the company to
9    take that course.
10       Q.    (By Ms. Warren)  When you say that we
11   could get there, do you mean that the company -- you
12   thought it was a possibility at this point in time
13   that the company could get to March 1st, 2004 without
14   the need to file for bankruptcy?
15       A.    I thought it was a possibility, yes.
16       Q.    Do you remember any particular point in
17   time after June 25th, 2002 where you no longer
18   thought it was a possibility that the company could
19   avoid bankruptcy?
20       A.    Certainly by November 15th.  I can't fix a
21   date for you, but certainly by the time we went to
22   Berkshire Hathaway in October we had concluded that a
23   bankruptcy was the right thing to do.  How far in
24   advance of that meeting we concluded that, I don't
25   recall.  Might have been as early or earlier than the

36

1        Q.    (By Ms. Warren)  In the next paragraph
2    after the discussion of the bonds Mr. Standish then
3    starts to talk about financial reorganization; right?
4        A.    He does discuss potential for a financial
5    reorganization, yes.
6        Q.    In your mind is there any relation between
7    the two discussions, namely, the March 1st, 2004
8    maturity of the 2004 bonds and the possibility of
9    financial reorganization?
10           MR. CASTANARES:  Counsel, are you asking
11       him if he has a recollection of thinking that
12       then or are you asking him to interpret this
13       document now?
14           MS. WARREN:  I'm asking for his
15       recollection.
16           MR. CASTANARES:  Thank you.
17           THE WITNESS:  Could you repeat the
18       question, please, or ask the reporter to read it
19       back?
20           MS. WARREN:  Could you read it back,
21       please?
22           (The record was read by the reporter.)
23           THE WITNESS:  My recollection is that at
24       the time I thought there were potentially a
25       number of outcomes over the period from May of

35

1    date on which we engaged CSFB, but I don't have a
2    recollection of it.
3        Q.    At this point in time on or around
4    June 25th, 2002 why did you believe it was a
5    possibility that the company could avoid bankruptcy?
6        A.    You know, I don't have any direct
7    recollection other than what I see in these minutes.
8    We apparently had done some cash flow projections,
9    projected our operations, made some prognostications
10   as to sales and forecasted our liquidity needs and if
11   certain events occurred as we had forecasted, we
12   would get to March 1, '04; but other than what's on
13   this piece of paper, I don't remember.
14       Q.    Do you remember if you believed that the
15   operational changes that were being contemplated
16   around that time by management could be successful?
17       A.    Again, I don't have a recollection of even
18   exactly what they were at that time.
19           MS. WARREN:  Denise, are we on 235?
20           THE COURT REPORTER:  Yes.
21           (Exhibit Number 235 was marked for
22       identification.)
23       Q.    (By Ms. Warren)  I've asked the court
24   reporter to mark as the next exhibit, is Defendant's
25   235, a two-page document Bates numbered OHCLT-1676 to

37

1    1677   It appears to be an E mail from Fiachra
2    O'Driscoll to Douglas Muir dated Wednesday, March
3    13th, 2002.  Would you take a few moments and read
4    that over, please?  It's really just the first page.
5    A.    I've reviewed it.
6    Q.    Do you remember any discussion with Mr.
7    O'Driscoll about his negotiating with the credit guys
8    at Credit Suisse?
9        MR. CASTANARES:  At any time, counsel,
10    or --
11        MS. WARREN:  In relation to this.  Sorry.
12        MR. CASTANARES:  Thank you.
13        THE WITNESS:  I don't have any
14    recollection, you know, other than what I read
15    on this piece of paper.
16    Q.    (By Ms. Warren)  Do you have any
17    recollection of discussions about this having to do
18    with this E mail?
19    A.    About this particular E mail?
20    Q.    Uh-huh.
21    A.    About this particular E mail, no.  About
22    the subject matter of this E mail, I know we had a
23    number of conversations with Fiachra.  I don't know
24    what conversations he had with his credit people.
25    Q.    What was the nature of the conversations?

38

1    A.    I think we did get some -- some minor
2    relief on that.  There was some, but as I remember it
3    was helpful.
4    Q.    When Oakwood Homes wanted some kind of
5    change to its credit facilities with Credit Suisse,
6    would that request typically go through Fiachra or
7    would you go directly to the credit people at Credit
8    Suisse or something else?
9    A.    We would discuss it with Fiachra.
10    Q.    And why is that?
11    A.    He was our CSFB point man.
12    Q.    So management didn't think it would be
13    helpful to go directly to Credit without talking to
14    Fiachra first?
15    A.    I wouldn't have been in favor of doing
16    that.
17    Q.    And why not?
18    A.    I didn't know the credit people.  Credit
19    people are unique individuals and it's best to let
20    the investment banker people have those discussions
21    with his credit people.
22    Q.    And what do you mean credit people are
23    unique individuals?
24    A.    They have -- they tend to be very
25    disciplined.  They tend to have things they want to

40

27/09/2006 MUIR, Douglas R. (vol. 2)

1    A.    Well, the gist of it was we had a lot of
2    incoming repo properties to deal with.  Our
3    historical method of dealing with repo properties was
4    at least in part to remarket them through retail
5    channels to a retail customer who required a loan in
6    order to purchase the repo property.  We had more
7    repos to deal with than we had in the past and,
8    hence, to increase selling homes at retail we needed
9    to do more retail financing for repo properties.
10        At the same time our sales of new homes
11    were tending to fall.  So the percentage of all the
12    loans we were doing in the finance company,
13    relatively more of them were for repo properties and
14    relatively fewer of them were for new properties.
15        There were limitations in the loan
16    purchase facility that limited the number of repo
17    refi loans, loans for sales of repossessions that
18    could be included in essence a borrowing-based
19    computation that was built into the warehouse
20    document.  And we asked CSFB if there was a way to
21    get that limit raised to permit us to finance more of
22    those repo refi loans through the loan purchase
23    facility.
24    Q.    Do you remember what the outcome of that
25    request was?

39

27/09/2006 MUIR, Douglas R. (vol. 2)

1    see, ways they look at things.  Fiachra would have
2    much more knowledge of how they look at the world
3    than I do, so I thought it was best to let him deal
4    with the credit people.
5    Q.    In your experience are credit people
6    generally fairly tough on borrowers?
7    A.    I'm not sure I know what tough means.
8    Credit people tend to look out for credit risk, and
9    that's their job.  Some of it -- some of them
10    undoubtedly do a better job of that than others.
11    Q.    In your experience do you find that credit
12    people tend to be more pessimistic about a borrower's
13    prospects than say the investment bankers or other
14    financial people in an institution?
15        MR. CASTANARES:  Objection to form.
16        THE WITNESS:  You asked me if they were
17    more pessimistic?
18    Q.    (By Ms. Warren)  If you found -- if you
19    would find them to be more pessimistic in your
20    experience than others in a financial institution?
21    A.    I'm trying to think how to give you a fair
22    answer to the question.  Let me answer that this way
23    because I think it's the best I can do.  We're
24    speaking about credit people generally, not
25    necessarily Credit Suisse credit people?

41

1  Q.  We're speaking generally, yes.
2  A.  Generally, generally credit people are
3  from Missouri.  They want to see the results and not
4  hear about them coming.  Let me put it to you this
5  way.  I'm not sure that's necessarily pessimistic,
6  but they like results that have been achieved in
7  preference to results that hope to be achieved.
8  Q.  I get you.  Did you find the credit people
9  at Credit Suisse to be in that vein or something
10  different?
11    MR. CASTANARES:  Objection to form.
12    THE WITNESS:  With very limited exceptions
13    I had virtually -- I had no contact with credit
14    people at CSFB, again with just very limited
15    exceptions.
16  Q.  (By Ms. Warren)  So you're telling me you
17  don't have an opinion on that one way or another?
18  A.  I've lost track of the question.  I'm
19  sorry.  Opinion on what?
20  Q.  Well, you told me earlier, and correct me
21  if I'm wrong, that you find that credit people in
22  financial institutions tend to like results that they
23  have seen, that have been achieved rather than be
24  told about what might be achieved.  Is that fair?
25  A.  Yes.

42

1  Q.  So my question was did you find the credit
2  people at Credit Suisse to be like that or not?
3    MR. CASTANARES:  Objection to form.
4    THE WITNESS:  I'm not sure I had enough
5    exposure to have an opinion about Credit Suisse
6    credit people.
7    (Exhibit Number 236 was marked for
8    identification.)
9    MR. CASTANARES:  Counsel, I would just
10    like to if I'm not interrupting a line of
11    questioning at the moment to say that I notice
12    you're bringing out his employment agreement and
13    subject matters came up yesterday that had also
14    come up in the Kvarda deposition regarding
15    potential funds distributable to creditors in
16    the case.
17    And in the course of that Kvarda
18    deposition we stipulated that since those claims
19    in the case are trading actively and predictions
20    about possible distributions are material
21    nonpublic information, that we would designate
22    those portions of the transcript, the total of
23    those matters as confidential pursuant to our
24    confidentiality agreement.  I'd like to make
25    sure that what we did yesterday and anything you

43

1  intend to go into today regarding that I have
2  properly now made the record to designate as
3  confidential for that purpose.
4    MS. WARREN:  That's fine, but just clarify
5    for me regarding which.
6    MR. CASTANARES:  You asked him yesterday,
7    for example, about potential distributions to
8    creditors in the case.
9    MS. WARREN:  Right.
10    MR. CASTANARES:  Okay.  And how much has
11    been distributed to creditors may be a public
12    record.  I'm not sure, but how much might later
13    be distributed to creditors may be material
14    nonpublic information regarding -- and I'm not
15    sure he even has any, but to the extent that he
16    comments upon such questions at all, I want to
17    make sure that I'm -- that I'm adequately making
18    the record of confidentiality under our
19    confidentiality order.
20    MS. WARREN:  That's fine.
21    MR. CASTANARES:  Okay.
22    MS. WARREN:  You're not saying that --
23    MR. CASTANARES:  I have no objection to
24  you asking about it.
25    MS. WARREN:  And you're not saying that

44

1  Mr. Muir's compensation is confidential?
2    MR. CASTANARES:  No, no, no, no.
3    MS. WARREN:  You're just saying that any
4    commentary about potential distributions to
5    creditors should be kept confidential?
6    MR. CASTANARES:  No, right.  But since you
7    have asked about certain benchmark incentive
8    portions of his compensation arrangements that
9    relate to distributions to creditors, that is
10    what may elicit information that it's material
11    nonpublic information, claims that are now
12    trading.
13    MS. WARREN:  That's fine.
14    MR. CASTANARES:  Okay.  This is 236?
15    MS. WARREN:  The employment agreement is
16    236 and the second document is 237.  And I'm
17    sorry, we're out of -- don't seem to have
18    staplers or paper clips, but 237.
19    (Exhibit Number 237 was marked for
20    identification.)
21    MR. CASTANARES:  Counsel, may I inquire
22    about -- just to make sure that what I have is
23    actually -- I'm just a little confused with my
24    copy of Exhibit 236.  It appears that my copy, a
25    couple of pages may be out of order, and I'm not

45

**Page 46**

```
 1   sure whether that's true in the original or not.
 2   I go 456666 through --
 3       MS. WARREN:  Yeah.  I see what you mean.
 4       MR. CASTANARES:  Yeah.  Through 72.  And
 5   then the next page is 456665 followed by 456662,
 6   three and four followed by 456661 and then 60.
 7   Is that the way the original is?
 8       THE WITNESS:  It's the way -- I think the
 9   way mine is.
10       MS. WARREN:  It's the way mine is, too.
11       MR. CASTANARES:  Okay.  As long as I have
12   a copy of what has been marked as the original
13   exhibit, I'm fine with it, but just want to make
14   sure that that's the case.  Thank you.
15       MS. WARREN:  Yes.  Well, I apologize.
16   Today seems to be random copying day in terms of
17   our exhibits.
18       MR. CASTANARES:  No apology necessary.  I
19   just want to make sure we're at least literally
20   on the same page.
21       Q.   (By Ms. Warren)  Exhibit 236 is entitled
22   employment agreement and I believe that Mr.
23   Castanares has just read the Bates numbers of it in
24   detail, so I don't need to.  It appears to be an
25   employment agreement by and among Douglas R. Muir and
```

**Page 47**

```
 1   the OHC Liquidation Trust.  There are various
 2   exhibits and items attached to the actual employment
 3   agreement.  Mr. Muir, would you just look through
 4   this document and disregarding the various cover
 5   letters, can you just verify that this is, in fact,
 6   your employment agreement with the liquidation trust?
 7       A.   It is.
 8       Q.   Turning to Exhibit 237 --
 9       MR. CASTANARES:  I don't have a copy of
10   that, counsel.  Thank you.
11       Q.   (By Ms. Warren)  Turning to Exhibit 237,
12   this appears to be a letter from counsel for the
13   official committee of unsecured creditors of Oakwood
14   and counsel to Oakwood, Rayburn Cooper, dated
15   October 8th, 2003 and it's Bates numbered
16   OHCLT-456928 to 456930.  Have you seen Exhibit 237
17   before, Mr. Muir?
18       A.   I have.
19       Q.   And what -- what is this document to your
20   recollection?
21       A.   The second and third pages of it, those
22   two pages appear to be identical.
23       Q.   Yes.  They do.
24       A.   But the second page is the success bonus
25   agreement that management reached with the official
```

**Page 48**

```
 1   committee of unsecured creditors.  And this letter on
 2   the front my understanding is simply a letter to
 3   counsel to the committee asking them to confirm on
 4   behalf of the committee that this is the agreement
 5   that we reached.
 6       Q.   What was the process by which management
 7   came to an agreement with the committee of unsecured
 8   creditors concerning success bonuses?
 9       A.   I don't know.
10       Q.   You were not involved?
11       A.   I was not.
12       Q.   Who negotiated on behalf of management?
13       A.   I don't know.
14       Q.   There's a little confusion about what your
15   potential compensation actually would be.  I believe
16   you said that -- I believe you said yesterday that
17   assuming distributions to unsecured creditors hit 250
18   million but less than 275 million, you get something
19   like $100,000 or maybe $200,000; is that right?
20       A.   I think I said that a hundred thousand was
21   the number.
22       Q.   Perhaps you can just explain to us in the
23   middle column on page 456929 of Exhibit 237 there's a
24   reference to a base salary for three top executives
25   and it looks like the number is 1,025,000.  And as
```

**Page 49**

```
 1   you can see in one of the bullet points at the
 2   bottom, you are considered to be a top -- one of the
 3   top three executives.
 4       There's also mention of a -- in the next
 5   column the target annual bonus that looks like it's
 6   $650,000.  And my question is can you explain this
 7   chart in light of your testimony yesterday about your
 8   expectation was you would get about $100,000?
 9       A.   I think so.  Let me try.  And it's been a
10   while since I've seen this chart, so I need to go
11   back and review the bidding.
12       Q.   That's fine.  Take your time.
13       A.   Okay.  First of all, the amounts in this
14   chart are aggregate amounts for three individuals.
15   And to the best of my recollection the first number
16   you referred to, the million twenty-five thousand,
17   represents the aggregate base salary of those three
18   individuals.
19       The amount shown as 650,000 represents the
20   aggregate target bonus of each of those - of those
21   three individuals taken together.  And the million
22   six seventy-five is the sum of the two.  Does that
23   help?
24       Q.   That certainly does help, although if you
25   take the base salary and the target annual bonus and
```

**Page 50**

1  divide them by three, it comes out to a lot more than

2  $100,000?

3  A.    I think I see what the problem is.  This

4  piece of paper contemplated three potential outcomes

5  of the bankruptcy case.  The first two listed on this

6  page didn't occur.  We didn't go straight liquidation

7  of the assets and we didn't emerge stand alone.

8  Therefore, we were under sale of the business option.

9        By virtue of selling the business, which

10  closed on April 13th of '04, the three of us earned

11  in full the million six seventy-five that is shown on

12  the line that says less than or equal to 250 million.

13  Q.    I see.

14  A.    Earnings of that amount were no longer

15  contingent, and so the trust paid us.  However,

16  whether or not the trust ultimately distributes an

17  amount of money to the unsecured creditors greater

18  than 250 million is uncertain.

19        In the event that that amount -- excuse

20  me.  In the event that that amount ultimately

21  distributed to unsecureds exceeds 250 million but is

22  ultimately less than 275 million, then the trust will

23  pay the three of us the excess of two million oh

24  ninety-four, which is the amount ultimately earned

25  over the million six seventy-five they have already

**Page 51**

1  paid us, and my share of that is a hundred grand.

2  Q.    And you'll receive those amounts

3  regardless of your current employment with Krispy

4  Kreme?

5  A.    That's correct.

6  Q.    Thank you.  The next thing I'm going to

7  show you, Mr. Muir, is your affidavit from the

8  bankruptcy proceedings in connection with first day

9  orders.  And I'm not going to ask you much about it,

10  but I am going to ask you a few things about it.

11        So what I suggest is that we take a break

12  and you can read it over to yourself and then we'll

13  come back on the record.  Is that fair?

14  MR. CASTANARES:  Sure.  If you're really

15  only going to ask him about a few things about

16  it, he probably has a pretty good memory of some

17  of it anyway, but if you'd like to point out

18  things to him that you'd like him to focus on,

19  it might save a little time, so --

20  MS. WARREN:  Well, one of the things I'm

21  going to ask is whether he still stands by the

22  affidavit --

23  MR. CASTANARES:  Okay.

24  MS. WARREN:  -- or whether he'd like to

25  change it in any respect.  And if I'm going to

**Page 52**

1  ask a question like that, then I think he will

2  want to have read the whole thing.

3  MR. CASTANARES:  Right.  If you're going

4  to ask a question like that, I'll object to it.

5  Be a little more specific than that.

6  MS. WARREN:  You can do whatever you want

7  to do.

8  MR. CASTANARES:  Okay.  That's fine.

9  MS. WARREN:  We're going off the record.

10  THE VIDEOGRAPHER:  Off the record at

11  10:27.

12  (A recess was taken and Exhibit Number 238

13  was marked for identification.)

14  THE VIDEOGRAPHER:  This is tape number

15  six.  We're on the record at 11:08.

16  Q.    (By Ms. Warren)  Mr. Muir, I'm showing you

17  a document that the court reporter has marked

18  Defendant's Exhibit 238.  It's your affidavit in the

19  bankruptcy proceedings of Oakwood Homes and related

20  companies in relation to first day motions and during

21  the break you had a chance to read it over; correct?

22  A.    I did.

23  Q.    Let me direct your attention to page five

24  of your affidavit and specifically the background

25  section that starts on page five and continues to

**Page 53**

1  page 16.  What I wanted to ask you is to your

2  recollection was this section a generally accurate

3  statement of Oakwood's business at the time that you

4  filed this affidavit?

5  A.    I'm sorry.  Can you say the question

6  again?

7  Q.    Yes.  Looking at the background section

8  from pages five to sixteen of this exhibit, is it a

9  generally accurate statement of Oakwood's business at

10  the time you filed the affidavit?

11  A.    Yes.  I think that it is.

12  Q.    Turning now to the section beginning page

13  16 and ending page 19 that's entitled events leading

14  to chapter 11 filing, was that a generally accurate

15  recounting of the key events that caused Oakwood to

16  file for bankruptcy as of the time you filed the

17  affidavit?

18  A.    I think so.

19  Q.    Now I want to turn your attention to page

20  36 of the affidavit.  Paragraph 82, which starts on

21  page 36 and continues to page 37, describes the

22  securitization transactions that Oakwood historically

23  entered into for financing purposes.  Do you see

24  that?

25  A.    I do

1    Q.    Did the Court approve Oakwood continuing
2    with those securitization transactions after the
3    bankruptcy filing?
4    A.    I believe that it did.
5    Q.    And who did Oakwood use as underwriter on
6    those transactions?
7    A.    I'm trying to think.  To the best of my
8    recollection while we were authorized to securitize
9    assets post securitization --
10    Q.    Post bankruptcy?
11    A.    I'm sorry.  Post bankruptcy, I don't think
12    that we ever did so.  I don't think that we had an
13    underwriter.
14    Q.    Why was that?
15    A.    Gosh, I'll have to think back.  To the
16    best of my memory, and this has been a long time ago,
17    we considered putting together a securitization
18    transaction post bankruptcy and took a number of
19    steps toward that end.
20         As I remember, the principal stumbling
21    block was -- and there may have been others aside
22    from this one, but one that sticks in my mind was the
23    credit enhancement levels that were demanded by the
24    rating agencies in order to achieve the desired
25    ratings of the securities made it just very difficult

54

27/09/2006 MUIR, Douglas R. (vol. 2)

1    to come up with a deal that made sense economically.
2    And as a consequence we ultimately rather than
3    securitizing the loans, we sold a large number of
4    them on a whole loan basis.
5    Q.    And did any financial institution assist
6    you with that sale?
7    A.    The sale of the whole loans to the
8    investor?
9    Q.    Yes.
10    A.    I don't think so.  I think we handled that
11    directly with the investor is the best of my
12    recollection.
13    Q.    Who was the investor?
14    A.    Greenwich Capital Markets.
15    Q.    Did the Court ultimately allow Oakwood to
16    continue with the loan purchase facility?
17    A.    Yeah.  I believe that it did.
18    Q.    And who were the parties to the loan --
19    who was providing the loan purchase facility after
20    the bankruptcy?
21    A.    The same people that provided it
22    prebankruptcy, that is, CSFB or entities sponsored or
23    affiliated with it.
24    Q.    How long did the loan purchase facility
25    remain in existence after the bankruptcy?

55

27/09/2006 MUIR, Douglas R. (vol. 2)

1    A.    Until sometime in February of 2004.
2    Q.    Why was it terminated?
3    A.    It expired by its terms.
4    Q.    When did the sale to Clayton Homes
5    Berkshire take place?
6    A.    Speaking of the sale of the entire
7    company?
8    Q.    Yes.
9    A.    On or about April 13th, 2004.
10    Q.    Did you have any role in that transaction?
11    A.    I did.
12    Q.    What was your role?
13    A.    I participated with others in negotiating
14    the terms of the sale, in negotiating the documents
15    that memorialized the sale, in preparing
16    administratively for the transition and sale of the
17    company in April.
18         As an employee of the trust I participated
19    extensively in post closing negotiation with Clayton
20    having to do with purchase price adjustments.  There
21    were probably some other things as well.
22    Q.    Do you remember what the sale price was?
23    A.    Precisely, no.  It seems like it was
24    somewhere between 200 and $300 million, but it's been
25    a while.  I can't remember.

56

27/09/2006 MUIR, Douglas R. (vol. 2)

1    Q.    At the time did you think it was a fair
2    price?
3    A.    I think that it was and from the
4    standpoint -- a couple of observations.  It was
5    negotiated between, you know, two parties who were
6    unrelated and we were negotiating for our side and I
7    think they were negotiating for their side.  It was
8    interesting that the largest member if you will of
9    our side was Berkshire Hathaway, which also owned the
10    purchaser.
11         That didn't have any effect on anything I
12    did in negotiating the transaction, but the deal was
13    negotiated between I think parties looking out for
14    their own interests.  Rather than selling the
15    company, we had a plan in place and financing to
16    emerge the company stand alone.
17         So I don't feel that we were compelled to
18    sell, although we were certainly encouraged to by the
19    official committee.  So on the basis on which it was
20    negotiated, yeah, I think it was fair.
21    Q.    Do you think the company could have
22    emerged from bankruptcy and survived as a stand alone
23    company absent the sale to Berkshire Hathaway?
24    A.    I think we could have, yes.
25    Q.    Why do you think that?

57

1    A.    I think we had financing. I think we had
2    the right leader. I think we had a commitment to do
3    the things that needed to be done to strengthen the
4    company over the long term. Would it have been easy?
5    No. Could we have accomplished it? I think there's
6    a reasonable likelihood that we could have.
7        Q.    Do you think Berkshire Hathaway got a good
8    deal in buying Oakwood Homes?
9        A.    I think they got a fair deal based on what
10   I know then. I don't know how they've done with the
11   business since they've owned it.
12       MS. WARREN: I think we're done with this.
13   Thank you.
14       (Exhibit Number 239 was marked for
15   identification.)
16       Q.    (By Ms. Warren) I'm showing you a
17   document that the court reporter has marked as
18   Defendant's Exhibit 239. It's the objection and
19   counterclaims filed by the liquidation trust in this
20   case. Have you ever seen this before, Mr. Muir?
21       A.    I believe that I received a copy of this
22   sometime after it was filed. I'm pretty sure that's
23   true
24       Q.    You did not see any part of it before it
25   was filed?

1    A    I did not. And I'm not entirely certain I
2    saw the final version after it was filed, but it was
3    my understanding that what I was looking at was the
4    final version.
5        Q    When you received the objection and
6    counterclaims, did you read it?
7        A.    I did.
8        Q.    Take a look at paragraph 19 of the
9    complaint, which is on page 11, and just take a
10   minute and read that to yourself.
11       A.    I've read it.
12       Q.    Do you believe that Credit Suisse sought
13   to enrich itself through fees by negligently
14   prolonging the life of Oakwood's securitization
15   program?
16       MR. CASTANARES: Objection to form.
17       THE WITNESS: You know, I'm not sure I'm
18   qualified to, you know, have an opinion as to
19   whether or not CSFB was negligent. I mean, that
20   has legal meanings. I'm not trained in the law.
21   I'm not something -- sure that that's something
22   I ought to have an opinion on.
23       Q.    (By Ms. Warren) Well, do you think that
24   Credit Suisse intentionally advised Oakwood to
25   artificially prolong the life of its securitization

1    program just for the sake of getting fees?
2        A.    I have no reason to believe that.
3        MR. CASTANARES: I didn't get to make a
4    form objection before the answer came, but --
5        Q.    (By Ms. Warren) Do you believe that
6    Credit Suisse intentionally advised Oakwood so as to
7    artificially prolong its life outside of bankruptcy
8    for the sake of fees?
9        MR. CASTANARES: Objection to form.
10       THE WITNESS: Well, again, I don't know
11   what their intentions were. I don't -- I'm not
12   sure I know what artificial means, but I
13   don't -- I don't recall ever having a sense that
14   CSFB took or failed to take any action or gave
15   us any advice with the principal objective of
16   earning them a fee.
17       Q.    (By Ms. Warren) Do you believe in the end
18   that Piachra O'Driscoll and the folks working in his
19   group at Credit Suisse merited your trust?
20       A.    We're talking about the people in the ABS
21   group?
22       Q.    Yes.
23       A.    I trusted them, yes.
24       Q.    And do you think they did their best for
25   Oakwood?

1    A.    I think as I testified yesterday, they
2    worked very hard. I thought they had our interests
3    at heart and they achieved very, very good results in
4    my opinion.
5        MS. WARREN: Thank you. I think we're
6    through here.
7        MR. CASTANARES: Thank you. I'd just like
8    the witness to clarify one thing that occurred
9    to me.
10       EXAMINATION
11   BY MR. CASTANARES:
12       Q.    Mr. Muir, yesterday you testified I
13   believe you went to work for the trust in August of
14   2004. Did you mean to say April?
15       A.    I did mean to say April. Thank you.
16       MR. CASTANARES: Thank you, sir. No
17   further questions.
18       MS. WARREN: Thank you, Mr. Muir.
19       THE WITNESS: Thank you.
20       THE VIDEOGRAPHER: We're off the record
21   at --
22       MR. CASTANARES: Before we go off the
23   record -- we can go off videotape. Before we go
24   off the reported record, I presume we'll
25   stipulate to the same thing we've stipulated to

1  regarding signatures.

2      MS. WARREN:  Yes.

3      MR. CASTANARES:  The court reporter will

4  then send the original to the witness, who will

5  then transmit it to me.  The court reporter is

6  relieved of any obligation with respect to the

7  original transcript.  I will hold it subject to

8  the same agreement we have with respect to the

9  transcripts.  Thank you, counsel.

10      MS. WARREN:  Fair enough.

11      (Deposition concluded at 11:20 a.m.)

12          * * * * *

1  STATE OF NORTH CAROLINA       C E R T I F I C A T E

2  COUNTY OF GUILFORD

3      I, K. Denise Neal, RPP, Registered

4  Professional Reporter and Notary Public, do hereby

5  certify that DOUGLAS R. MUIR, VOLUME I was duly sworn

6  by me prior to the taking of the Deposition; that

7  said Deposition was taken and transcribed under my

8  supervision; and that the foregoing pages 204 through

9  265 are a true and accurate transcription of the

10  testimony of the said deponent.

11      I further certify that review and signing

12  of the transcript by the witness was reserved.

13      I further certify that the persons were

14  present as stated.

15      I further certify that I am not related

16  to, of counsel for or in the employment of any of the

17  parties to this action.

18      IN WITNESS WHEREOF, I have hereunto

19  subscribed my name, this the 5th day of October,

20  2006.

21          K. Denise Neal, RPP

22          Registered Professional Reporter

23          and Notary Public

24  My Commission Expires

25  June 23, 2010.

DEPOSITION OF DOUGLAS R. MUIR, VOLUME II/KDN

1      I do hereby certify that I have read all

2  questions propounded to me and all answers given by

3  me on the 27th day of September, 2006, taken before

4  K. Denise Neal, and that:

5      1)  There are no changes noted.

6      2)  The following changes are noted:

7      Pursuant to Rule 30(e) of the Federal Rules of

8  Civil Procedure, which reads in part:  Any changes in

9  form or substance which you desire to make shall be

10  entered upon the deposition...with a statement of the

11  reasons given...for making them.  Accordingly, to

12  assist you in effecting corrections, please use the

13  form below:

14  Page No.      Line No.      should read:

15  Page No.      Line No.      should read:

16  Page No.      Line No.      should read:

17  Page No.      Line No.      should read:

18  Page No.      Line No.      should read:

19  Page No.      Line No.      should read:

20  Page No.      Line No.      should read:

21  Page No.      Line No.      should read:

22  Page No.      Line No.      should read:

23  Page No.      Line No.      should read:

DEPOSITION OF DOUGLAS R. MUIR, VOLUME II/KDN

2  Page No.      Line No.      should read:

3  Page No.      Line No.      should read:

4  Page No.      Line No.      should read:

5  Page No.      Line No.      should read:

6  Page No.      Line No.      should read:

7  Page No.      Line No.      should read:

8  Page No.      Line No.      should read:

9  Page No.      Line No.      should read:

10  If supplemental or additional pages are necessary,

11  please furnish same in typewriting annexed to this

12  deposition.

13          DOUGLAS R. MUIR

$

$100,000 [48:19] [49:8]
 [50:2]
$125 [27:6,15]
$200,000 [48:19]
$300 [56:24]
$650,000 [49:6]

0

01 [9:18]
02 [8:6]
04 [27:7] [33:17] [34:23]
 [36:1] [37:12] [50:10]
04s [31:19]
09 [31:20]

1

1 [27:7] [33:17] [34:23]
 [37:12] [64:6]
1,025,000 [48:25]
10 [4:]
10:27 [52:11]
10105 [2:]
10803 [4:]
10-8-03 [4:]
11 [4:] [53:14] [59:9]
11:08 [52:15]
11:20 [62:11]
111500 [4:]
11-15-00 [4:]
1174 [14:1]
1181 [18:25]
12 [4:]
122000 [4:]
12-20-00 [4:]
125 [33:17]
13 [4:]
1345 [2:]
13th [38:3] [50:10] [56:9]
15 [4:]
15th [9:2,19] [36:20]
16 [53:1,13]
1677 [38:1]
19 [53:13] [59:8]
1901 [2:]
1996 [6:13]
1997 [5:23]
1999 [34:5]
1st [35:7] [36:13]

2

2 [64:7]
20 [4:]
200 [56:24]
2000 [9:2] [12:6] [14:12]
 [21:4] [26:7]
2001 [13:25] [14:14] [18:24]
2002 [7:12] [11:3] [21:4]
 [25:23] [27:4] [30:10]

[32:6] [36:1,17] [37:4]
 [38:3]
2003 [47:15]
2004 [26:9,12,18] [27:1,11
 ,20] [29:9] [33:12] [34:9]
 [35:7,8] [36:13] [56:1,9]
 [61:14]
2006 [3:] [63:20] [64:4]
2009 [27:20]
2010 [63:25]
204 [63:8]
208 [3:]
20th [12:5]
211 [4:]
212 [2:]
214 [4:]
216 [4:]
221 [4:]
228 [2:] [4:]
2285755 [2:]
228-5755 [2:]
2285788 [2:]
228-5788 [2:]
229 [4:] [8:20,22] [9:1,5]
 [11:21]
23 [63:25]
230 [4:] [11:24] [12:2,9]
231 [4:] [13:18,22] [14:3]
 [17:8] [19:18,19,25]
232 [4:] [18:18,22] [19:2
 [20:12,13]
233 [4:] [25:17,21] [28:2]
234 [4:] [30:3,7,13] [31:5]
 [33:5]
235 [4:] [37:19,21,25]
236 [4:] [43:7] [45:14,16,24]
 [46:21]
237 [4:] [45:16,18,19]
 [47:8,11,16] [48:23]
238 [4:] [52:12,18]
239 [4:] [58:14,18]
24 [4:] [27:25]
240 [4:]
246 [4:]
248 [4:]
24th [18:24]
25 [4:]
250 [48:17] [50:12,18,21]
255 [4:]
25th [30:10] [36:17] [37:4]
261 [4:]
264 [3:]
265 [63:9]
275 [48:18] [50:22]
27th [3:] [64:4]

3

3 [4:]
30 [64:8]
300 [27:24]
310 [2:]
31302 [4:]
3-13-02 [4:]

36 [53:20,21]
37 [53:21]

4

4 [4:]
41304 [4:]
4-13-04 [4:]
425 [3:]
456661 [46:6]
456662 [46:5]
456665 [46:5]
456666 [46:2]
456929 [48:23]
456930 [47:16]

5

5 [4:]
5602 [4:}
5-6-02 [4:]
5th [63:19]

6

6 [4:]
60 [46:6]
62502 [4:]
6-25-02 [4:]
650,000 [49:19]
6716 [12:3]
6717 [11:22]
6718 [9:6,7]
6722 [11:22]
6728 [30:8]
6801 [4:]
6-8-01 [4:]
6th [25:23]

7

7 [4:]
72 [46:4]
72401 [4:]
7-24-01 [4:]

8

8 [4:]
82 [53:20]
8th [13:25] [14:13,14]
 [47:15]

9

9:00 [3:] [5:2]
9:34 [25:13]
9:38 [25:16]
90067 [2:]
900676013 [2:]
90067-6013 [2:]
903 [2:]
9039000 [2:]
903-9000 [2:]

9039041 [2:]
903-9041 [2:]
96 [5:25]
97 [5:25] [6:13]
99 [8:6] [11:3]

A

a.m [3:] [62:11]
abs [60:20]
absent [57:23]
accept [23:9]
access [15:7]
accomplished [58:5]
according [33:22] [34:8]
accordingly [64:12]
accumulating [10:14]
accurate [53:2,9,14] [63:9]
achieve [54:24]
achieved [42:6,7,23,24]
 [61:3]
action [36:6] [60:14] [63:17]
actively [43:19]
actual [47:2]
actually [29:12] [32:19]
 [45:23] [48:15]
additional [65:10]
adequate [33:16]
adequately [44:17]
adjustments [56:20]
administratively [56:16]
adopted [13:12]
advance [15:1] [17:14]
 [36:24]
advances [17:10]
advice [60:15]
advised [22:8] [59:24]
 [60:6]
affidavit [51:7,22] [52:18,24]
 [53:4,10,17,20]
affiliated [55:23]
again [6:25] [14:25] [15:10]
 [19:15] [31:14] [33:4]
 [37:17] [42:14] [53:6]
 [60:10]
agencies [54:24]
agent [6:4]
aggregate [49:14,17,20]
ago [54:16]
agreement [4:] [16:9,22]
 [24:7] [43:12,24] [45:15]
 [46:22,25] [47:3,6,25]
 [48:4,7] [62:8]
ahead [32:4] [34:18]
albeit [11:10]
allow [55:15]
alone [50:7] [57:16,22]
already [32:8] [50:25]
alternative [7:23]
although [31:16] [49:24]
 [57:18]
am [51:10] [63:15]
amendments [15:19]
 [16:7,19,20]

america [6:5,9,13,21]
americas [2:]
among [28:12,22] [46:25]
amount [17:1] [22:23]
  [23:7] [29:15,19] [49:19]
  [50:14,17,19,20,24]
amounts [49:13,14] [51:2]
angeles [2:]
annexed [65:11]
annual [49:5,25]
answer [24:15] [34:19]
  [41:22] [60:4]
answers [64:3]
anything [16:14] [24:7]
  [30:21] [43:25] [57:11]
anyway [51:17]
apologize [46:15]
apology [46:18]
apparently [28:13] [37:8]
appear [47:22]
appearance [2:]
appears [38:1] [45:24]
  [46:24] [47:12]
apprised [18:3]
approached [6:13]
approval [13:2]
approve [12:22] [13:4]
  [14:17] [54:1]
approved [12:19] [14:11]
approving [12:10]
approximately [5:23]
  [21:5] [32:15]
april [50:10] [56:9,17]
  [61:14,15]
around [6:12] [14:14]
  [27:24] [29:23] [37:3,16]
arrangements [45:8]
artificial [60:12]
artificially [25:4] [59:25]
  [60:7]
aside [54:21]
ask [11:23] [17:21] [26:17]
  [29:3,6] [34:15] [35:18]
  [51:9,10,15,21] [52:1,4]
  [53:1]
asked [13:3] [28:18,20]
  [37:23] [39:20] [41:16]
  [44:6] [45:7]
asking [34:16] [35:10,12,14]
  [44:24] [48:3]
asset [9:24]
assets [24:24] [50:7] [54:9]
assist [32:5] [55:5] [64:13]
assume [13:12]
assumes [33:18]
assuming [48:17]
assumption [17:24] [18:4,14]
  [30:18,23] [31:1]
assumptions [17:18]
  [33:24]
attached [47:2]
attend [18:8]
attended [21:11]
attention [52:23] [53:19]

B

b2s [11:2,6,10]
back [11:19] [15:11] [16:4]
  [17:7,16,22] [19:8,15,18]
  [20:12] [35:19,20] [49:11]
  [51:13] [54:15]
backed [9:24]
background [52:24] [53:7]
bad [24:17]
badgering [34:13]
baked [9:19]
balance [34:4]
bank [5:17] [6:4,9,13,18,21]
  [7:1,8] [16:16,25] [20:16,22]
  [21:2,6,7,17] [22:6,8,9,14]
  [23:3] [24:2,17] [25:4]
banker [40:20]
bankers [41:13]
bankruptcy [24:23] [31:15
  ,24] [32:14,24] [36:7,14,19
  ,23] [37:5] [50:5] [51:8]
  [52:19] [53:16] [54:3,10,11
  ,18] [55:20,25] [57:22]
  [60:7]
banks [6:2,4,12,24] [7:4,5,16
  ,17] [8:2] [15:10,22] [16:1]
  [21:11,13,15] [22:21]
  [23:12] [24:1,6] [25:1]
base [48:24] [49:17,25]
based [58:9]
basis [10:17] [11:11] [55:4]
  [57:19]
bates [9:5] [11:21] [12:3]
  [14:1] [18:24] [30:7] [37:25]
  [46:23] [47:15]
bearing [27:23]
begin [16:9]
beginning [13:8] [31:5]
  [32:1] [33:6] [53:12]
behalf [48:4,12]
believe [37:4] [46:22]
  [48:15,16] [54:4] [55:17]
  [58:21] [59:12] [60:2,5,17]
  [61:13]
believed [37:14]
bell [20:1]
below [64:14]
benchmark [45:7]
berkshire [36:22] [56:5]
  [57:9,23] [58:7]
bermuda [22:25]
best [10:16] [11:4] [24:9]
  [36:8] [40:19] [41:3,23]

august [32:18] [61:13]
authority [12:24,25]
authorized [54:8]
availability [15:21]
avenue [2:]
avoid [16:20] [23:24] [36:19]
  [37:5]
aware [27:15]
away [11:17] [27:8]

[49:15] [54:7,16] [55:11]
  [60:24]
better [10:20] [41:10]
beyond [7:18] [33:20]
  [34:14]
bidding [49:11]
bit [28:17]
block [54:21]
board [9:1] [10:25] [12:5,10
  ,16,19,21] [13:1,4,24]
  [14:11,16] [18:3,9,23]
  [19:4,9] [25:22] [28:2]
  [30:9,17] [31:12,17,22,25]
boards [13:2]
bob [7:25] [15:3] [28:9,23]
  [29:25]
bonds [29:9] [33:12] [34:9]
  [35:2,8]
bonus [47:24] [49:5,20,25]
bonuses [48:8]
borrowers [41:6,12]
borrowing [39:18]
borrowingbased [39:18]
borrowing-based [39:18]
borrowings [6:15] [16:12]
boston [28:4]
bottom [12:8] [19:3] [20:19]
  [49:2]
break [25:9] [51:11] [52:21]
brief [25:9]
briefly [26:3]
bringing [43:12]
broad [22:19]
built [6:23] [39:19]
bullet [49:1]
business [5:15] [22:9,11,24]
  [23:1,8,21] [27:4,6,15]
  [29:17] [50:8,9] [53:3,9]
  [58:11]
buying [58:8]

C

california [2:]
call [24:12]
called [23:25]
calling [23:22] [24:17]
  [25:3]
candidate [10:25]
cant [8:14] [10:7] [36:20]
  [56:25]
capital [12:11] [22:24]
  [23:2,7] [55:14]
cared [24:24]
carolina [3:] [32:25] [63:1]
case [43:16,19] [44:8]
  [46:14] [50:5] [58:20]
cash [10:17] [29:15] [33:15]
  [37:8]
castanares [2:] [3:] [25:8]
  [34:12] [35:10,16] [38:9,12]
  [41:15] [42:11] [43:3,9]
  [44:6,10,21,23] [45:2,6,14
  ,21] [46:4,11,18,23] [47:9]

[51:14,23] [52:3,8] [59:16]
  [60:3,9] [61:7,11,16,22]
  [62:3]
cause [14:24]
caused [14:20] [53:15]
center [19:19]
centers [5:17]
certain [20:10] [27:2] [37:11]
  [45:7] [59:1]
certainly [10:18] [19:8]
  [22:13] [24:10] [27:13]
  [30:19] [36:20,21] [49:24]
  [57:18]
certificates [10:15]
certify [63:5,11,13,15]
  [64:2]
chance [52:21]
change [7:14] [40:5] [51:25]
changed [7:7]
changes [37:15] [64:6,7,9]
channels [39:5]
chapter [53:14]
characterization [12:17]
charge [16:6,16]
charged [16:18]
charging [15:20] [16:24]
charlotte [21:10,18]
chart [49:7,10,14]
cherry [3:]
chicago [6:5]
choose [6:6] [7:20]
city [6:5]
civil [64:9]
claim [4:]
claims [43:18] [45:11]
clarify [44:4] [61:8]
clayton [56:4,19]
clear [7:13]
clearly [10:13]
clips [45:18]
close [9:13] [32:19]
closed [9:17] [14:18,19]
  [17:14] [50:10]
closing [56:19]
column [48:23] [49:5]
coming [28:24] [29:5]
  [42:4]
comment [22:15]
commentary [45:4]
commented [31:6]
comments [22:18] [44:16]
commercial [6:16]
commission [63:24]
commitment [17:2] [58:2]
commitments [16:13]
  [23:18]
committee [47:13] [48:1,3
  ,4,7] [57:19]
communication [22:2]
companies [52:20]
company [15:15] [32:4]
  [33:24] [34:8] [36:8,11,13
  ,18] [37:5] [39:12] [56:7,17]
  [57:15,16,21,23] [58:4]

companys [19:21] [27:21]
compared [17:4]
compelled [57:17]
compensation [45:1,8]
  [48:15]
competition [8:12]
complaint [59:9]
completely [34:8]
computation [39:19]
conceptually [11:8]
concerning [30:22] [48:8]
concluded [36:7,22,24]
  [62:11]
conclusion [13:10] [28:13
  ,23,24]
condition [12:24] [23:22]
conditions [23:15,17]
conduit [6:16,20]
confidential [43:23] [44:3]
  [45:1,5]
confidentiality [43:24]
  [44:18,19]
confirm [48:3]
confused [45:23]
confusion [48:14]
connect [10:7]
connection [51:8]
cons [13:5]
consequence [55:2]
consequences [24:20]
considerable [23:5]
consideration [8:3]
considered [31:18] [49:2]
  [54:17]
considering [26:14]
consistently [23:1]
construction [5:16]
consumed [27:25] [29:14]
contact [42:13]
contemplated [10:20]
  [19:14] [37:15] [50:4]
contemplating [10:5]
contents [3:]
context [31:15]
contingent [50:15]
continuation [3:]
continue [39:8] [55:16]
continues [30:13] [52:25]
  [53:21]
continuing [54:1]
conversations [38:23,24,25]
convert [10:16]
converted [6:19]
cooper [47:14]
copies [20:14]
copy [11:22] [45:24] [46:12]
  [47:9] [58:21]
copying [46:16]
corporate [12:23,25]
corporation [12:4] [13:23]
  [18:22] [25:5,21] [30:8]
  [33:25] [34:2]
corporations [9:24] [10:21]
  [20:16,22] [21:1,6] [26:1,7]

correct [11:20] [42:20]
  [51:5] [52:21]
corrections [64:13]
cost [5:19] [6:14]
counsel [2:] [28:16] [32:4,7
  ,8,11,14,25] [35:10] [38:9]
  [43:9] [45:21] [47:10,12,14]
  [48:3] [62:9] [63:16]
counterclaims [4:] [58:19]
  [59:6]
county [63:2]
couple [10:4] [45:25] [57:4]
coupon [27:23]
course [36:6,9] [43:17]
court [8:21,25] [12:2] [13:21
  ,22] [18:21] [25:20] [30:6]
  [37:20,23] [52:17] [54:1]
  [55:15] [58:17] [62:3,5]
cover [47:4]
crafted [28:3]
creation [6:8]
credit [5:13,18] [7:3,10,16
  ,17,19] [8:1,4,7,8,11,17,18]
  [10:19] [11:2,16,17] [12:11]
  [14:6,9,10] [15:3,8,10,12,16
  ,21] [16:2] [17:9] [23:2,4,18
  ,23] [24:13,17] [25:3]
  [26:2,17] [28:3] [29:8,24]
  [38:7,8,24] [40:5,7,13,18,21
  ,22] [41:4,5,8,11,24,25]
  [42:2,8,9,13,21] [43:1,2,5
  ,6] [54:23] [59:12,24]
  [60:6,19]
creditors [43:15] [44:8,11,13]
  [45:5,9] [47:13] [48:1,8,17]
  [50:17]
csfb [4:] [11:5] [12:11]
  [14:17,19] [15:2] [28:15]
  [31:21] [37:1] [39:20]
  [40:11] [42:14] [55:22]
  [59:19] [60:14]
current [14:5] [51:3]
customer [39:5]
cut [15:23] [16:1]


D

date [33:11] [34:9] [36:21]
  [37:1]
dated [38:2] [47:14]
dates [27:20]
day [3:] [4:] [15:5] [25:2]
  [46:16] [51:8] [52:20]
  [63:19] [64:4]
daytoday [15:5]
day-to-day [15:5]
deal [5:18] [6:4] [9:13,17,19]
  [11:6,12] [15:2] [16:23]
  [18:15] [25:2] [27:10]
  [39:2,7] [41:3] [55:1]
  [57:12] [58:8,9]
dealing [15:4] [21:13]
  [39:3]
deals [5:19]

debt [28:1]
december [12:5] [14:12]
decided [28:20]
decision [28:15]
declaration [4:]
default [23:11,13]
defaults [15:16] [16:20]
defendants [2:] [3:] [4:]
  [8:25] [25:20] [30:7] [37:24]
  [52:18] [58:18]
defer [29:20]
definitely [8:15] [10:7]
delaware [32:11]
delay [14:15,16] [15:7]
delayed [14:21]
demanded [54:23]
denise [3:] [8:20] [37:19]
  [63:3,21] [64:5]
deployed [22:24] [23:2,8]
deponent [63:10]
deposition [3:] [43:14,18]
  [62:11] [63:6,7] [64:1]
  [65:1,12]
deposition...with [64:11]
describes [53:21]
designate [43:21] [44:2]
desire [8:7] [64:10]
desired [54:24]
detail [46:24]
detailed [19:16]
deteriorating [15:15]
determined [32:2]
developing [32:5]
didnt [5:11] [6:22] [7:16]
  [15:5] [16:1,20] [24:6,7]
  [28:8,10,22] [29:1,2,12,16
  ,18] [30:2] [32:23] [40:12,18]
  [50:6,7] [57:11] [60:3]
different [42:10]
difficult [54:25]
direct [37:6] [52:23]
directly [40:7,13] [55:11]
directors [9:2] [12:5] [13:24]
  [18:23] [25:22] [30:10]
disadvantage [24:14]
disagree [34:18]
disciplined [40:25]
discontinue [30:20]
discontinued [30:18]
discuss [35:4] [40:9]
discussed [6:10] [11:5,8,13]
  [18:10] [19:4] [31:16,22]
discussing [11:4]
discussion [8:8,14,16]
  [13:5,9,13,16] [18:14]
  [19:21] [23:5] [26:1] [28:11
  ,22] [30:22] [35:2] [38:6]
discussions [8:6] [10:24]
  [14:5,13] [35:7] [38:17]
  [40:20]
disposing [18:12]
disregarding [47:4]
distributable [43:15]
distributed [44:11,13]

[50:21]
distributes [50:16]
distributions [43:20] [44:7]
  [45:4,9] [48:17]
divide [50:1]
document [8:25] [12:2,25]
  [13:21] [18:21] [25:20]
  [30:6] [35:13] [37:25]
  [39:20] [45:16] [47:4,19]
  [52:17] [58:17]
documents [16:5] [17:5]
  [56:14]
doesnt [20:6]
doing [6:23] [11:6] [15:24]
  [18:15] [22:11] [26:19]
  [31:25] [39:12] [40:15]
donald [2:]
done [9:13] [15:2,6] [16:23
  ,25] [32:2] [37:8] [58:3,10,12]
dont [7:22] [8:10] [9:16,20]
  [10:3,12,23] [11:13,18]
  [13:13,15,17] [14:22]
  [15:23] [16:4,5,7,13,22]
  [17:1,6] [18:5,16] [19:16,22]
  [20:17] [24:14,25] [26:19,22]
  [28:8,11] [29:4,25] [30:24]
  [31:13,16] [32:6,9,17]
  [33:20] [34:20] [36:24]
  [37:1,6,13,17] [38:13,23]
  [42:17] [45:17] [46:24]
  [47:9] [48:9,13] [54:11,12]
  [55:10] [57:17] [58:10]
  [60:10,11,13]
dots [10:8]
doubt [18:5,7]
douglas [3:] [4:] [5:3] [38:2]
  [46:25] [63:5] [64:1] [65:1
  ,13]
down [9:21] [21:19] [28:11]
  [29:21] [34:25]
draconian [24:10]
drain [27:20]
drove [7:25]
due [23:14] [26:7,9] [27:7]
duly [63:5]
duration [5:19]
during [8:6] [13:3] [15:6]
  [20:15] [21:4] [30:22]
  [33:10] [52:20]


E

earlier [5:24] [11:20] [21:15]
  [36:25] [42:20]
early [36:25]
earned [50:10,24]
earning [60:16]
earnings [50:14]
easy [58:4]
economically [55:1]
effect [57:11]
effecting [64:13]
effective [5:20] [6:14]
effectively [18:11]

efficiently [18:12]
effort [10:21]
efforts [9:9,23]
eight [27:24]
eightandahalf [27:24]
eight-and-a-half [27:24]
either [16:18]
elicit [45:10]
else [40:8]
emerge [50:7] [57:16]
emerged [57:22]
emphasized [34:1]
employee [56:18]
employment [4:] [43:12]
  [45:15] [46:22,25] [47:2,6]
  [51:3] [63:16]
encouraged [57:18]
encouragement [23:7]
end [17:2] [25:2] [54:19]
  [60:17]
ended [31:1]
ending [53:13]
engage [32:4]
engaged [32:8,10,25]
  [37:1]
engagement [32:12]
engaging [32:6]
enhancement [54:23]
enough [43:4] [62:10]
enrich [59:13]
entered [32:12] [53:23]
  [64:11]
entering [12:15,22]
entire [56:6]
entirely [59:1]
entities [55:22]
entitled [12:3] [13:23]
  [18:22] [25:21] [30:8]
  [46:21] [53:13]
equal [50:12]
esq [2:]
essence [39:18]
essentially [33:10]
even [37:17] [44:15]
event [50:19,20]
events [34:22] [37:11]
  [53:13,15]
ever [11:16] [22:14] [28:5]
  [54:12] [58:20] [60:13]
everything [24:25] [34:7]
exactly [7:22] [18:17]
  [20:4] [28:12] [32:18]
  [37:18]
examination [3:] [5:6]
  [61:10]
examined [5:4]
example [20:1] [31:19]
  [44:7]
exceeded [34:6]
exceeds [50:21]
exceptions [42:12,15]
excess [50:23]
exchange [26:6]
excuse [50:19]

executives [48:24] [49:3]
exhibit [8:22] [9:1,5] [11:21
  ,24] [12:2,9] [13:18,22]
  [14:3] [17:8] [18:18,22]
  [19:2,18,19,25] [20:12,13]
  [25:17,21,25] [28:2] [30:3
  ,7,13] [31:5] [33:5] [37:21,24]
  [43:7] [45:19,24] [46:13,21]
  [47:8,11,16] [48:23] [52:12
  ,18] [53:8] [58:14,18]
exhibits [4:] [46:17] [47:2]
existence [55:25]
exiting [20:5]
expansion [5:15]
expectation [49:8]
experience [41:5,11,20]
expired [7:11,15] [56:3]
expires [63:24]
explain [48:22] [49:6]
exposure [16:2] [23:4,6,23]
  [43:5]
expression [34:20]
extended [7:17] [14:16]
extensively [56:19]
extent [21:8] [27:22] [44:15]

F

facilities [5:10] [8:1] [12:15
  ,19,22] [13:4] [26:2] [40:5]
facility [5:13,14] [6:1,9,11,19
  ,20] [7:3,10,13,15] [8:4,9]
  [9:9,12,14] [12:11,12]
  [13:9] [14:7,10,11] [15:2,14
  ,17,19,22,23,25] [17:9,14]
  [21:16] [23:18,25] [39:16,23]
  [55:16,19,24]
fact [17:3] [27:6] [31:1]
  [47:5]
factories [5:16]
faded [11:17]
failed [60:14]
fair [8:19] [12:17] [20:25]
  [22:23] [28:14] [29:15,19]
  [33:9] [41:21] [42:24]
  [51:13] [57:1,20] [58:9]
  [62:10]
fairly [32:19] [41:6]
fall [39:11]
far [21:25] [36:23]
favor [29:10] [40:15]
favorable [33:18]
fax [2:]
february [56:1]
federal [64:8]
fee [8:19] [16:13] [17:2]
  [60:16]
feel [57:17]
fees [15:20] [16:3,6,8,14,21
  ,24] [25:6] [59:13] [60:1,8]
fell [34:5] [36:2]
felt [10:16] [22:7]
few [38:3] [51:10,15]
fewer [39:14]

fiachra [8:16] [11:5,14]
  [38:1,23] [40:6,9,14]
  [41:1] [60:18]
figure [23:24] [27:17]
file [24:22] [32:2,21] [36:14]
  [53:16]
filed [32:22] [53:4,10,16]
  [58:19,22,25] [59:2]
filing [32:19] [53:14] [54:3]
final [59:2,4]
finally [16:23]
finance [5:15,20] [6:15]
  [39:12,21]
financial [31:12,14,18]
  [32:7] [35:3,4,9] [41:14,20]
  [42:22] [55:5]
financing [5:10] [7:23]
  [39:9] [53:23] [57:15]
  [58:1]
find [7:19] [41:11,19] [42:8
  ,21] [43:1]
fine [29:4] [36:2] [44:4,20]
  [45:13] [46:13] [49:12]
  [52:8]
finished [19:24]
firm [33:2]
first [4:] [5:22] [6:3,5,25]
  [7:10] [12:9] [14:9] [15:9,12]
  [16:16,25] [18:2] [19:11]
  [20:13] [21:18,22] [28:4]
  [29:5] [30:13] [31:10]
  [32:3] [38:4] [40:14] [49:13
  ,15] [50:5] [51:8] [52:20]
five [5:2] [6:2,12] [7:4]
  [21:13,15] [52:23,25]
  [53:8]
fix [36:20]
flack [15:24]
flavor [23:11]
floor [2:]
flow [33:15] [37:8]
focus [51:18]
focusing [15:3,4]
folks [60:18]
followed [13:10] [46:5,6]
following [12:9] [13:11]
  [23:14] [64:7]
follows [5:5] [6:8]
foothill [7:13,15,21] [9:14,17]
  [12:10] [13:9] [14:6,10,11
  ,13,17,20] [16:24] [17:2]
forecasted [37:10,11]
foregoing [63:8]
form [41:15] [42:11] [43:3]
  [59:16] [60:4,9] [64:10,14]
found [23:11] [41:18]
four [46:6]
frame [5:25] [8:7] [10:5]
  [11:3]
friday [13:24]
front [17:2] [48:2]
full [63:10] [50:11]
fully [9:19] [22:8]
fund [33:16]

funds [43:15]
furnish [65:11]
further [5:4,6] [9:21] [34:15]
  [61:17] [63:11,13,15]

G

gave [9:22] [23:6] [60:14]
gee [6:14,17,25] [11:16]
  [32:17]
generally [5:12] [19:10]
  [23:17] [41:6,24] [42:1,2]
  [53:2,9,14]
getting [25:6] [60:1]
gist [34:7] [39:1]
give [26:17] [41:21]
given [8:3] [64:3]
given...for [64:12]
giving [20:14]
glad [10:6] [29:3]
glatt [2:]
go [7:2] [16:4] [18:11]
  [21:19] [23:19] [32:4]
  [34:18] [40:6,7,13] [44:1]
  [46:2] [49:10] [50:6] [61:22
  ,23]
goes [33:22]
going [11:23] [14:12] [17:7]
  [27:9,18] [30:18] [32:21]
  [51:6,9,10,15,21,25]
  [52:3,9]
good [5:8,9] [51:16] [58:7]
  [61:3]
gosh [54:15]
grand [51:1]
graves [2:]
great [6:17] [24:13]
greater [50:17]
greenwich [55:14]
group [7:1] [16:16,25]
  [20:16,22] [21:2,6,7,11,17]
  [22:6,8,9,14] [23:3] [25:4]
  [60:19,21]
groups [24:2,17]
guilford [63:2]
guys [38:7]

H

handful [21:9]
handled [55:10]
happen [11:12]
happened [11:7]
hard [61:2]
hathaway [36:22] [57:9,23]
  [58:7]
having [5:4] [23:24] [28:22]
  [38:17] [56:20] [60:13]
head [17:6]
headed [22:12]
heading [29:17]
hear [42:4]
heart [61:3]
hed [51:24]

27/09/2006  MUIR, Douglas R. (vol. 2)

held [9:2] [12:5] [13:24]
[18:23] [21:10] [25:22]
[30:10]
help [10:11] [19:9] [20:6]
[49:23,24]
helpful [40:3,13]
hence [39:8]
hereby [63:4] [64:2]
hereunto [63:18]
hes [34:13,21]
higher [16:24]
hire [32:23]
historical [39:3]
historically [53:22]
history [15:18] [34:3]
hit [48:17]
hold [62:7]
homes [12:4] [13:23] [18:22]
[24:18] [25:5,21] [30:8]
[39:8,10] [40:4] [52:19]
[56:4] [58:8]
hope [42:7]
hosted [21:18]
hotel [3:]
however [50:15]
hundred [48:20] [51:1]
hunton [32:12]

I

id [10:6] [34:24] [43:24]
[61:7]
idea [10:10] [20:9] [31:11,21]
ideas [10:5] [26:18]
identical [47:22]
identification [8:23] [11:25]
[13:19] [18:19] [25:18]
[30:4] [37:22] [43:8] [45:20]
[52:13] [58:15]
ii [3:]
ii/kdn [64:1] [65:1]
ill [29:3] [52:4] [54:15]
im [7:9] [8:24] [9:18] [11:23]
[12:1] [13:6,20] [18:20]
[20:17] [25:19] [27:2,19]
[30:5] [35:14] [41:7,21]
[42:5,18,21] [43:4,10]
[44:12,14,17] [45:16,23,25]
[46:13] [51:6,9,20,25]
[52:16] [53:5] [54:7,11]
[58:16,22] [59:1,17,20,21]
[60:11]
immediately [13:7]
implement [28:21] [29:15]
implemented [28:5] [36:3]
important [12:21] [22:7]
imposition [16:8]
improve [10:11,12]
improved [36:3]
improvement [27:5]
inappropriate [34:17]
incentive [45:7]
included [39:18]
including [27:19] [33:24]

income [8:19]
incoming [18:10] [39:2]
increased [16:15] [18:3]
indebtedness [23:14]
[27:7,22]
independent [13:15]
index [4:]
indicate [26:22]
indicated [28:21] [33:15]
individuals [40:19,23]
[49:14,18,21]
infer [26:21]
information [43:21] [44:14]
[45:10,11]
informed [22:12] [30:17]
inherent [34:1]
initial [7:18]
initially [5:14]
input [22:21]
inquire [45:21]
inquiry [28:5]
institution [41:14,20]
[55:5]
institutions [42:22]
insurance [22:24] [23:8,21]
intend [30:19] [44:1]
intending [22:8]
intentionally [59:24] [60:6]
intentions [60:11]
interest [16:12] [17:3]
[24:25] [27:23]
interesting [24:21] [57:8]
interests [10:16] [24:9]
[36:8] [57:14] [61:2]
interim [15:6]
interpret [34:15] [35:17]
interrupting [43:10]
inventory [5:17] [9:24]
[10:14,22]
investment [15:12] [40:20]
[41:13]
investor [6:3] [17:15] [55:8
,11,13]
invited [29:7]
involved [7:23,24] [19:10]
[48:10]
irritation [14:24]
isnt [34:7]
issue [14:22] [18:16]
issued [23:3]
items [47:2]
itself [59:13]
ive [17:20] [26:4] [30:15]
[31:9] [33:8] [37:23] [38:5]
[42:18] [49:10] [59:11]

J

january [7:12] [9:17]
job [41:9,10]
july [18:24]
june [13:24] [14:13,14]
[30:10] [36:17] [37:4]
[63:25]

justin [2:]

K

kclh [14:1] [18:25]
kclh1172 [14:1]
kclh-1172 [14:1]
kclh1176 [18:25]
kclh-1176 [18:25]
keep [7:1] [22:7]
kept [22:12] [45:5]
key [33:19,23] [53:15]
kind [11:17] [16:8,15]
[29:11] [40:4]
knew [29:16] [32:22] [58:10]
know [5:19] [7:2,22] [8:3,12]
[9:16,18] [10:19,23] [11:2
,8,14] [17:4] [18:13] [19:12
,24] [20:1,4] [22:19] [24:15]
[26:20] [29:25] [31:21]
[32:21,23] [37:6] [38:14,22
,23] [40:18] [41:7] [48:9,13]
[57:5] [58:10] [59:17,18]
[60:10,12]
knowing [29:16]
knowledge [41:2]
kreme [51:4]
krispy [51:3]
kvarda [43:14,17]

L

language [10:13] [19:25]
large [27:12] [55:3]
largest [6:3] [57:8]
last [14:3] [19:4,8] [27:17]
[28:17] [30:12]
later [5:25] [44:12]
law [59:20]
lawyers [32:9,23,24]
leader [58:2]
leading [19:20] [53:13]
least [11:8,9] [21:24] [39:4]
[46:19]
left [28:16]
legal [32:6] [59:20]
lender [7:19] [12:24]
lenders [15:20]
less [27:8] [48:18] [50:12,22]
let [7:9] [8:11] [11:19]
[19:23] [21:8] [33:14]
[40:19] [41:3,22] [42:4]
[49:9] [52:23]
lets [14:7]
letter [4:] [47:12] [48:1,2]
letters [23:2] [47:5]
level [18:10]
levels [54:23]
leverage [24:2]
life [14:21] [25:5] [59:14,25]
[60:7]
light [49:7]
likelihood [34:21] [58:6]
likely [5:24] [10:25]

limit [39:21]
limitations [39:15]
limited [39:16] [42:12,14]
line [15:8] [43:10] [50:12]
[64:15,16,17,18,19,20,21
,22,23,24] [65:2,3,4,5,6,7,8
,9]
linklaters [2:]
liquidation [47:1,6] [50:6]
[58:19]
liquidity [10:11,13] [26:1]
[27:21] [28:1] [29:18,20]
[33:16] [37:10]
list [33:23]
listed [12:6] [14:2] [18:25]
[25:23] [50:5]
literally [46:19]
litigation [20:4]
little [28:17] [45:23] [48:14]
[51:19] [52:5]
loan [12:11] [18:13] [30:17
,22,25] [39:5,15,22] [55:4,14
,18,19,24]
loans [39:12,17,22] [55:3,7]
long [46:11] [54:16] [55:24]
[58:4]
longer [36:17] [50:14]
look [9:4] [12:8] [16:4]
[19:8,18,22] [25:24] [30:12]
[31:4] [33:4] [41:1,2,8]
[47:3] [59:8]
looked [15:11] [34:4]
looking [9:21] [14:3] [17:16]
[19:1] [20:12,17] [24:8,9]
[53:7] [57:13] [59:3]
looks [48:25] [49:5]
loom [29:20]
los [2:]
lose [6:22]
lost [15:12] [17:20] [42:18]
lot [15:9] [22:1,10] [39:1]
[50:1]

M

mail [4:] [38:1,18,19,21,22]
making [44:17] [64:12]
man [40:11]
management [7:20] [10:11]
[12:16] [20:15,21] [21:1,5
,22] [23:9] [26:20,25]
[27:12] [29:23] [30:17]
[31:11] [37:16] [40:12]
[47:25] [48:6,12]
managements [22:4,15]
[28:4,14]
manager [21:23,24]
manufacturing [19:22]
march [27:7] [33:17] [34:23]
[35:7] [36:1,13] [37:12]
[38:2]
mark [37:24]
marked [8:22,25] [11:24]
[12:2] [13:18,21,22] [18:18

,21] [25:17,20] [30:3,6]
  [37:21] [43:7] [45:19]
  [46:12] [52:13,17] [58:14,17]
market [36:3]
markets [55:14]
marriott [3:]
mary [2:] [25:8]
material [43:20] [44:13]
  [45:10]
materials [20:14]
matter [38:22]
matters [43:13,23]
matured [11:14]
maturity [7:17] [27:11,20]
  [33:11,17] [34:9] [35:8]
may [25:23] [26:23] [27:4]
  [31:16] [35:25] [44:11,13]
  [45:10,21,25] [54:21]
maybe [16:12] [33:14]
  [48:19]
mean [23:2] [36:11] [40:22]
  [46:3] [59:19] [61:14,15]
meaning [9:14]
meanings [59:20]
means [31:15] [41:7] [60:12]
meet [21:6,19] [33:11,25]
  [34:9,22]
meeting [4:] [9:1,4] [12:4,7]
  [13:3,24] [14:3] [18:23]
  [19:1,4,9] [20:15,22]
  [21:17] [25:22,24] [30:9,11
  ,22] [33:10] [34:3] [36:24]
meetings [18:9] [21:9,21]
member [57:8]
members [22:14] [23:3]
  [29:22]
memorialized [13:1] [56:15]
memory [16:7] [19:23]
  [51:16] [54:16]
mention [14:4] [49:4]
mentioned [6:12]
merited [60:19]
met [21:1,7]
method [39:3]
michael.osnato@linklaters.con
  [2:]
mid [34:5]
mid2002 [34:5]
mid-2002 [34:5]
middle [31:5] [48:23]
million [27:6,15,25] [33:17]
  [48:18] [49:16,21] [50:11,12
  ,18,21,22,23,25] [56:24]
mind [27:9] [35:6] [36:4]
  [54:22]
mine [46:9,10]
minor [40:1]
minute [11:20] [27:17]
  [59:10]
minutes [4:] [9:1] [12:4]
  [13:6,23] [18:23] [19:9]
  [25:22] [26:22] [28:2]
  [30:9] [33:13] [37:7]
missouri [42:3]

mnat [9:6] [12:3] [30:7]
mnat6712 [12:3]
mnat-6712 [12:3]
mnat6717 [9:6]
mnat-6717 [9:6]
mnat6726 [30:7]
mnat-6726 [30:7]
moment [43:11]
moments [38:3]
monday [25:23]
monetize [9:23] [10:21]
  [11:1]
monetized [11:10]
money [6:17] [15:20] [22:10]
  [29:19] [50:17]
monitoring [22:10]
month [14:19]
monthly [16:8,14]
morning [5:8,9]
morris [32:10,15]
motion [32:1]
motions [52:20]
move [25:9]
moving [15:14]
mr [2:] [3:] [5:8] [9:22]
  [12:6,8] [14:2,5,7] [17:9,17
  ,24] [18:25] [19:3,20]
  [20:13] [25:8,23] [30:10]
  [31:5] [33:6,9] [34:10,12]
  [35:2,10,16] [38:6,9,12]
  [41:15] [42:11] [43:3,9]
  [44:6,10,21,23] [45:1,2,6,14
  ,21] [46:4,11,18,22] [47:3,9
  ,17] [51:7,14,23] [52:3,8,16]
  [58:20] [59:16] [60:3,9]
  [61:7,11,12,16,18,22]
  [62:3]
ms [3:] [5:7] [8:20,24]
  [11:19] [12:1] [13:20]
  [18:20] [25:11,19] [30:5]
  [34:18] [35:1,14,20] [36:10]
  [37:19,23] [38:11,16]
  [41:18] [42:16] [44:4,9,20
  ,22,25] [45:3,13,15] [46:3,10
  ,15,21] [47:11] [51:20,24]
  [52:6,9,16] [58:12,16]
  [59:23] [60:5,17] [61:5,18]
  [62:2,10]
muir [3:] [4:] [5:3,8] [9:22]
  [12:6,8] [14:2] [18:25]
  [25:23] [30:10] [38:2]
  [46:25] [47:3,17] [51:7]
  [52:16] [58:20] [61:12,18]
  [63:5] [64:1] [65:1,13]
muirs [14:7] [17:9] [45:1]
myles [20:2,7,11] [28:9,22]
  [30:1] [34:24]

N

name [63:19]
namely [35:7]
national [6:5]
nature [38:25]

neal [3:] [63:3,21] [64:5]
near [27:5] [33:5]
neat [29:11,12]
necessarily [23:20] [27:2]
  [41:25] [42:5]
necessary [46:18] [65:10]
need [5:13] [11:20] [16:20]
  [36:14] [46:24] [49:10]
needed [32:2] [39:8] [58:3]
needs [37:10]
negligent [59:19]
negligently [59:13]
negotiated [48:12] [57:5,13
  ,20]
negotiating [38:7] [56:13,14]
  [57:6,7,12]
negotiation [56:19]
new [2:] [5:17] [6:20] [7:19]
  [17:9] [32:9] [39:10,14]
next [17:16] [35:1] [37:24]
  [46:5] [49:4] [51:6]
nichols [32:10,16]
ninety [50:24]
ninetyfour [50:24]
ninety-four [50:24]
no [7:9] [20:23] [24:4,14]
  [25:7] [26:22] [34:14]
  [36:17] [38:21] [42:13]
  [44:23] [45:2,6] [46:18]
  [50:14] [56:23] [58:5]
  [60:2] [61:16] [64:6,15,16
  ,17,18,19,20,21,22,23,24]
  [65:2,3,4,5,6,7,8,9]
none [16:9]
nonpublic [43:21] [44:14]
  [45:11]
north [3:] [32:25] [63:1]
notary [3:] [63:4,23]
notation [9:22] [31:6]
note [12:6] [14:2] [18:25]
noted [9:3] [30:11] [64:6,7]
notes [26:5,7,18] [27:1,11,19]
  [31:20] [33:18,23]
notice [43:11]
november [9:2,19] [36:20]
number [5:2] [8:22] [11:24]
  [13:18] [18:18] [25:17]
  [30:3] [35:25] [37:21]
  [38:23] [39:16] [43:7]
  [45:19] [48:21,25] [49:15]
  [52:12,14] [54:18] [55:3]
  [58:14]
numbered [11:22] [12:3]
  [14:1] [18:24] [30:7] [37:25]
  [47:15]
numbers [9:5] [46:23]

O

oakwood [5:11,13] [6:6]
  [7:14] [12:4] [13:23] [18:22]
  [23:6] [24:18] [25:5,21]
  [30:8] [40:4] [47:13,14]
  [52:19] [53:15,22] [54:1,5]

[55:15] [58:8] [59:24] [60:6
  ,25]
oakwoods [53:3,9] [59:14]
object [34:12] [52:4]
objection [4:] [41:15] [42:11]
  [43:3] [44:23] [58:18]
  [59:5,16] [60:4,9]
objective [60:15]
obligation [27:16] [62:6]
observations [57:4]
obtaining [8:1]
occasion [30:16]
occur [34:22] [50:6]
occurred [37:11] [61:8]
oclock [5:2]
october [17:15] [36:22]
  [47:15] [63:19]
odriscoll [38:2,7] [60:18]
off [5:23] [11:16] [15:23]
  [16:1] [17:5] [25:12] [29:18]
  [52:9,10] [61:20,22,23,24]
official [47:13,25] [57:19]
often [18:10] [21:5] [34:5]
oh [50:23]
ohc [47:1]
ohclt [37:25] [47:16]
ohclt1676 [37:25]
ohclt-1676 [37:25]
ohclt456928 [47:16]
ohclt-456928 [47:16]
okay [44:10,21] [45:14]
  [46:11] [49:13] [51:23]
  [52:8]
once [18:17]
one [5:10] [11:9] [13:7]
  [14:8,23] [17:3] [18:14]
  [22:21] [23:15,17] [27:3,8
  ,14] [33:18] [36:11] [42:17]
  [49:1,2] [51:20] [54:22]
  [61:8]
operating [33:25] [34:3]
operational [22:4] [37:15]
operations [19:22] [20:10]
  [33:16] [37:9]
opinion [29:8] [42:17,19]
  [43:5] [59:18,22] [61:4]
opportunities [24:12]
option [50:8]
order [12:25] [39:6] [44:19]
  [45:25] [54:24]
orders [51:9]
organization [19:6,13]
  [22:5]
original [7:15] [24:7] [46:1
  ,7,12] [62:4,7]
ought [33:14] [59:22]
ourselves [23:11]
outcome [25:2] [33:19]
  [39:24]
outcomes [35:25] [50:4]
outlook [26:2]
outside [60:7]
outstanding [16:12] [26:7]
overrule [30:2]

own [57:14]
owned [24:25] [57:9] [58:11]

**P**

page [4:] [9:4,7] [12:9]
 [13:7] [14:3,4] [17:7,9,16]
 [19:2,19,25] [20:13] [25:25]
 [30:13,14] [31:4] [33:4,6]
 [34:14,15] [38:4] [46:5,20]
 [47:24] [48:23] [50:6]
 [52:23,25] [53:1,12,13,19
 ,21] [59:9] [64:15,16,17,18
 ,19,20,21,22,23,24] [65:2,3
 ,4,5,6,7,8,9]
pages [12:10] [45:25]
 [47:21,22] [53:8] [63:8]
 [65:10]
paid [16:11,21] [17:2]
 [50:15] [51:1]
paper [6:16] [10:9] [37:13]
 [38:15] [45:18] [50:4]
paragraph [9:8,21] [13:7]
 [17:17] [19:2,23] [20:18]
 [25:25] [26:3,5] [30:12]
 [31:5] [33:5,7] [35:1]
 [53:20] [59:8]
part [26:14] [39:4] [58:24]
 [64:9]
participate [7:4]
participated [56:13,18]
participating [6:2]
particular [6:6] [20:8]
 [22:22] [36:16] [38:19,21]
particularly [20:3]
particulars [20:7]
parties [55:18] [57:5,13]
 [63:17]
past [39:7]
pay [50:23]
payable [23:14]
people [38:24] [40:7,18,19
 ,20,21,22] [41:4,5,8,12,14
 ,24,25] [42:2,8,14,21]
 [43:2,6] [55:21] [60:20]
percent [27:24]
percentage [39:11]
perfect [33:11]
perhaps [10:20] [48:22]
period [15:7] [21:4] [35:25]
periodic [15:16]
periodically [16:6] [21:17]
permit [24:8] [39:21]
persons [63:13]
pessimistic [41:12,17,19]
 [42:5]
phone [21:25]
picture [15:14]
piece [10:8] [37:13] [38:15]
 [50:4]
place [5:14,22] [8:15]
 [33:16] [36:2] [56:5] [57:15]
plaintiff [2:]
plan [19:4,10,12,16] [20:9,15]

[22:4] [28:21] [29:11,12]
 [32:5] [34:8] [57:15]
planned [10:20]
plans [22:4,13,16] [36:4]
please [17:22] [25:10]
 [30:12] [35:18,21] [38:4]
 [64:13] [65:11]
plenty [22:20,21] [23:6]
 [24:12]
pnc [6:5]
point [9:12] [11:3,14] [15:13]
 [20:4] [32:21] [36:12,16]
 [37:3] [40:11] [51:17]
points [49:1]
portions [43:22] [45:8]
possibility [11:5] [35:8]
 [36:5,12,15,18] [37:5]
possible [43:20]
post [54:9,10,11,18] [56:19]
potential [14:6] [15:24]
 [26:5,15] [27:14] [31:7]
 [35:4] [43:15] [44:7] [45:4]
 [48:15] [50:4]
potentially [27:9] [35:24]
preambles [13:11]
prebankruptcy [55:22]
preceding [6:10] [13:7]
precisely [56:23]
predictions [43:19]
preference [42:7]
prepare [36:7]
preparing [56:15]
present [20:21] [21:1]
 [63:14]
presentation [20:14] [21:20]
pressure [8:16]
presumably [24:22,23]
presume [61:24]
pretty [51:16] [58:22]
previously [5:4]
price [56:20,22] [57:2]
principal [54:20] [60:15]
principally [5:15] [7:25]
printout [4:]
prior [6:8] [63:6]
probably [20:23] [22:23]
 [32:18] [34:5,25] [51:16]
 [56:21]
problem [27:12,14] [29:20]
 [50:3]
problematic [20:3]
procedure [64:9]
proceed [28:15]
proceedings [51:8] [52:19]
process [6:22] [48:6]
professional [3:] [63:4,22]
profile [15:16]
profitable [23:1]
prognostications [37:9]
program [17:18,25] [18:4,14]
 [30:18,23] [31:1] [59:15]
 [60:1]
projected [37:9]
projections [33:15] [34:1,2

,3,6,22] [37:8]
prolong [25:5] [59:25]
 [60:7]
prolonging [59:14]
proof [12:23]
proofs [4:]
properly [44:2]
properties [18:11] [39:2,3,9
 ,13,14]
property [39:6]
proposal [12:16] [28:3,5,15]
 [29:8,24]
propounded [64:3]
pros [13:5]
prospects [27:5] [41:13]
provided [6:11] [55:21]
provider [6:1] [7:7,14]
providers [6:7] [8:17]
providing [8:17] [55:19]
prudential [17:15]
public [3:] [44:11] [63:4,23]
purchase [12:12] [39:6,16
 ,22] [55:16,19,24] [56:20]
purchaser [57:10]
pure [8:9]
purpose [22:3] [44:3]
purposes [53:23]
pursuant [43:23] [64:8]
pursue [28:8,10]
put [5:14,22] [32:1] [42:4]
putting [54:17]

**Q**

q&a [21:20]
qualified [59:18]
question [17:21,23] [22:19]
 [24:16] [28:17] [34:12]
 [35:18] [41:22] [42:18]
 [43:1] [49:6] [52:1,4]
 [53:5]
questioning [43:11]
questions [29:6] [44:16]
 [61:17] [64:3]

**R**

raise [16:3]
raised [31:11] [39:21]
random [46:16]
rate [16:11] [17:3]
rather [42:23] [55:2] [57:14]
rating [15:13] [54:24]
ratings [54:25]
rayburn [33:2] [47:14]
reached [47:25] [48:5]
reactions [15:18]
read [17:20,21] [26:2,4]
 [30:14] [31:8,9] [33:7,8]
 [34:21] [35:18,20,22]
 [38:3,14] [46:23] [51:12]
 [52:2,21] [59:6,10,11]
 [64:2,15,16,17,18,19,20,21
 ,22,23,24] [65:2,3,4,5,6,7,8

,9]
reading [13:6]
reads [64:9]
ready [32:1]
really [6:20] [7:22] [14:21,25]
 [15:5] [38:4] [51:14]
reason [20:6] [29:14] [30:2]
 [60:2]
reasonable [10:17] [58:6]
reasons [64:12]
recall [10:3] [11:4,18]
 [16:7] [28:8] [32:6] [36:25]
 [60:13]
receive [51:2]
received [58:21] [59:5]
receiving [8:17]
recess [25:14] [52:12]
recollect [30:21]
recollection [8:5] [12:23]
 [13:16] [18:16] [20:24]
 [29:22] [30:25] [31:10,17]
 [33:20] [34:14,16] [35:11,15
 ,23] [37:2,7,17] [38:14,17]
 [47:20] [49:15] [53:2]
 [54:8] [55:12]
record [5:1] [7:13] [15:11]
 [25:12,15] [35:22] [44:2,12
 ,18] [51:13] [52:9,10,15]
 [61:20,23,24]
recounting [53:15]
reduce [16:2] [19:5,13]
 [20:10] [22:5] [23:5,7,18,23]
reducing [15:21]
refer [10:2] [17:12]
reference [17:8,17,24]
 [19:6,20] [20:13] [48:24]
referenced [28:3]
references [19:3]
referred [31:24] [49:16]
referring [10:6,24] [19:15]
refers [17:13]
refi [39:17,22]
refinance [26:18,25] [27:18]
 [29:8]
refreshes [19:23]
regard [13:8] [33:19]
regarding [14:6] [20:15]
 [43:14] [44:1,5,14] [62:1]
regardless [51:3]
regions [20:5]
registered [3:] [63:3,22]
rejected [29:24]
relate [45:9]
related [52:19] [63:15]
relating [32:7]
relation [35:6] [38:11]
 [52:20]
relationship [7:5]
relationships [6:23]
relatively [39:13,14]
relief [4:] [40:2]
relieved [62:6]
remain [55:25]
remarket [39:4]

remember [5:21] [8:10,14] [9:13,16,20] [10:10,23] [11:4,13] [13:13] [14:22] [16:14,22] [17:1,6] [18:2,5,8] [19:10,17] [20:6,9] [21:5] [22:18,20] [26:19,23] [28:11,22,24] [29:25] [31:13] [32:9,15,18] [36:16] [37:13,14] [38:6] [39:24] [40:2] [54:20] [56:22,25]
remic [10:15,21]
renew [7:16]
reorganization [31:7,12,14,15] [32:5] [35:3,5,9]
repay [24:19] [27:18]
repeat [35:17]
replaced [6:20]
replacement [8:1]
repo [11:6,12] [18:10] [39:2,3,6,9,13,16,22]
report [9:7,8,22] [10:25] [14:4] [17:17] [19:3,16]
reported [33:6] [61:24]
reporter [3:] [8:21,25] [12:2] [13:21,22] [17:21] [18:21] [25:20] [30:6] [35:18,22] [37:20,24] [52:17] [58:17] [62:3,5] [63:4,22]
reporting [17:24] [20:2]
reports [20:8]
repos [39:7]
repossessions [39:17]
represent [32:11,13]
representatives [21:10,24]
represented [23:4] [32:24]
represents [49:17,19]
request [25:9] [39:25] [40:6]
required [39:5]
research [17:5]
reserved [63:12]
resolution [13:8]
resolutions [12:13] [13:2,11]
respect [51:25] [62:6,8]
response [28:4]
restructuring [31:7] [32:7]
restructurings [31:19]
results [42:3,6,7,22] [61:3]
retail [19:5,13,21] [22:5] [39:4,5,8,9]
retain [7:5]
retained [32:16]
retired [7:12] [15:14]
review [49:11] [63:11]
reviewed [30:15] [38:5]
revolver [5:12,21] [7:7]
revolving [5:13] [7:3,10] [8:4,9] [9:9,12] [12:11] [14:6,9,10] [15:3]
right [9:18] [26:10,11] [28:25] [29:7] [35:3] [36:23] [44:9] [45:6] [48:19] [52:3] [58:2]

rings [20:1]
risk [41:8]
road [29:21]
role [10:19] [56:10,12]
rpr [63:3,21]
rule [64:8]
rules [64:8]

S

sake [25:6] [60:1,8]
salary [48:24] [49:17,25]
sale [50:8] [55:6,7] [56:4,6,14,15,16,22] [57:23]
sales [5:17] [37:10] [39:10,17]
save [6:16] [51:19]
saw [14:12] [59:2]
say [15:11] [20:25] [21:8] [23:12] [28:14] [31:8] [33:9,23] [36:10] [41:13] [43:11] [53:5] [61:14,15]
saying [34:10,21] [44:22,25] [45:3]
says [13:9] [50:12]
second [9:4,7] [19:2,19] [20:18] [25:25] [30:14] [31:4] [33:4] [45:16] [47:21,24]
secretary [9:3] [12:6] [14:2] [19:1] [25:24] [30:11]
section [52:25] [53:2,7,12]
secure [9:9]
secured [8:9] [17:10]
securities [9:25] [54:25]
securitization [32:13] [53:22] [54:2,9,17] [59:14,25]
securitize [54:8]
securitizing [55:3]
security [24:24]
seeking [7:23] [10:18]
seem [45:17]
seemed [5:18,19]
seems [21:23] [46:16] [56:23]
seen [27:12,13] [42:23] [47:16] [49:10] [58:20]
seized [24:23]
selected [32:20,22]
sell [57:18]
selling [39:8] [50:9] [57:14]
send [62:4]
senior [26:7,18] [27:1,11,19] [33:18]
sense [55:1] [60:13]
separate [32:12]
september [3:] [64:4]
service [7:7] [28:1]
servicing [15:1] [17:10,14]
set [7:11]
seventy [49:22] [50:11,25]
seventyfive [49:22] [50:11,25]

seventy-five [49:22] [50:11,25]
several [33:1]
shall [64:10]
share [8:19] [51:1]
sharing [8:18] [22:3]
sheet [11:15]
short [11:9] [34:6]
show [51:7]
showing [8:24] [12:1] [13:20] [18:20] [25:19] [30:5] [32:9] [52:16] [58:16]
shown [49:19] [50:11]
shows [12:10] [15:15]
side [57:6,7,9]
signatures [62:1]
signed [11:16]
signing [63:11]
simply [16:11] [48:2]
sir [61:16]
sitting [28:11]
situation [23:12]
six [49:22] [50:11,25] [52:15]
sixteen [53:8]
size [19:5,13] [22:5] [27:15]
smart [29:18]
smith [7:25] [14:5] [17:18,24] [20:14]
sold [55:3]
someone [26:21]
something [14:20] [23:19] [27:14] [40:8] [42:9] [48:18] [59:21]
sometime [5:25] [56:1] [58:22]
sometimes [16:19] [21:25]
somewhere [56:24]
soon [31:1]
sorry [7:9] [26:12] [38:11] [42:19] [45:17] [53:5] [54:11]
sort [11:6]
sought [59:12]
sounds [6:17]
speak [33:14]
speaking [11:1] [41:24] [42:1] [56:6]
special [32:13]
specific [10:8] [20:23] [31:16] [52:5]
specifically [10:3,23] [18:5] [52:24]
spending [22:9]
spent [15:9]
sponsored [6:21] [55:22]
stage [21:12]
stand [50:7] [57:16,22]
standish [19:3] [31:6] [33:6,9] [34:10] [35:2]
standishs [19:20]
standpoint [57:4]
stands [51:21]
staplers [45:18]

stars [2:]
starts [35:3] [52:25] [53:20]
state [27:4] [63:1]
stated [63:14]
statement [53:3,9] [64:11]
states [20:1,3,10]
status [9:23] [14:5]
steadily [16:2]
step [8:13]
steps [54:19]
sticks [22:22] [54:22]
stipulate [61:25]
stipulated [43:18] [61:25]
straight [50:6]
street [3:]
strengthen [58:3]
strike [32:3]
stumbling [54:20]
stutman [2:]
subject [38:22] [43:13] [62:7]
subordinated [9:24] [10:15]
subscribed [63:19]
subset [28:12]
substance [64:10]
substantial [27:16]
substantially [19:5,12]
success [47:24] [48:8]
successful [37:16]
suggest [51:11]
suggestion [23:9]
suggestions [22:15]
suisse [8:4,11] [10:19] [11:2] [26:17] [28:4] [29:8] [38:8] [40:5,8] [41:25] [42:9] [43:2,5] [59:12,24] [60:6,19]
suisses [29:24]
sum [49:22]
supervision [63:8]
supplemental [65:10]
support [4:]
sure [15:1,7] [25:11] [41:7] [42:5] [43:4,25] [44:12,15,17] [45:22] [46:1,14,19] [51:14] [58:22] [59:17,21] [60:12]
survived [57:22]
swapping [31:19]
swiss [8:7]
sworn [5:4] [63:5]
syndicate [7:3] [21:22,24]
syndicated [15:13] [21:16]
syndication [6:3]

T

taken [3:] [25:14] [49:21] [52:12] [63:7] [64:4]
taking [25:24] [63:6]
talk [5:11] [35:3]
talked [17:18] [21:15,23]
talking [15:9] [20:2,5,7] [40:13] [60:20]

A.8

tape [5:2] [52:14]
target [49:5,20,25]
tcastanres@stutman.com [2:]
tell [5:12] [10:6] [29:2,3]
telling [30:19] [31:25] [42:16]
temporary [11:10]
tend [40:24,25] [41:8,12] [42:22]
tending [39:11]
term [11:10,15] [16:21] [27:5] [58:4]
terminated [6:18] [56:2]
terms [7:10] [14:13] [15:20] [46:16] [56:3,14]
testified [5:5] [34:13] [61:1,12]
testimony [49:7] [63:10]
thank [35:16] [38:12] [46:14] [47:10] [51:6] [58:13] [61:5,7,15,16,18,19] [62:9]
thats [11:15,23] [12:17] [15:22,25] [22:19] [25:1] [29:4,23] [30:8] [41:9] [42:5] [44:4,20] [45:13] [46:1,14] [49:12] [51:5] [52:8] [53:13] [58:22] [59:21]
themselves [33:15]
thereafter [31:2]
therefore [23:3] [50:8]
theres [9:7,8,22] [14:4] [17:8,17] [19:20] [20:12] [22:1] [26:1] [31:6] [33:5] [48:14,23] [49:4] [58:5]
theyd [24:24]
theyve [7:1] [58:10,11]
thing [22:21] [36:23] [51:6] [52:2] [61:8,25]
things [10:4,8] [18:15] [27:3,8] [29:17] [31:18,22] [36:2] [40:25] [41:1] [51:10,15,18,20] [56:21] [58:3]
think [9:16,18] [12:17] [15:5] [16:4,5] [22:23] [24:1,6,14,15] [25:1,3] [29:1,12,16,18] [32:19] [34:4,23] [40:1,12] [41:21,23] [46:8] [48:20] [49:9] [50:3] [52:1] [53:11,18] [54:7,11,12,15] [55:10] [57:1,3,7,13,20,21,24,25] [58:1,2,5,7,9,12] [59:23] [60:24] [61:1,5]
thinking [27:3] [35:11]
third [9:8] [17:7] [47:21]
thought [22:22] [28:9,10] [29:10,11,17] [30:1] [34:24] [35:24] [36:4,12,15,18] [41:3] [61:2]
thousand [48:20] [49:16]
three [5:18,19] [7:11,18]

[23:16] [28:12] [46:6] [48:24] [49:3,14,17,21] [50:1,4,10,23]
threeyear [5:18,19]
three-year [5:18,19]
time [5:17,25] [6:12,25] [7:6] [8:6] [10:4,14] [11:3] [14:8,16,18,25] [15:9,12,19] [16:18] [18:2,13] [21:7,8] [23:22] [31:11,17,23] [32:3,10,11] [35:24] [36:4,12,17,21] [37:3,16,18] [38:9] [39:10] [49:12] [51:19] [53:3,10,16] [54:16] [57:1]
times [21:21]
today [14:22] [29:19] [44:1] [46:16]
together [7:1] [49:21] [54:17]
told [23:20] [42:20,24]
tony [2:]
took [8:14] [54:18] [60:14]
top [14:4] [17:5,8] [33:5] [48:24] [49:2,3]
topic [18:9]
total [43:22]
tough [41:6,7]
toward [54:19]
track [17:20] [42:18]
trade [29:18]
trading [43:19] [45:12]
trail [12:25]
train [7:25]
trained [59:20]
transaction [14:17,18] [26:6,15] [54:18] [56:10] [57:12]
transactions [13:2,10] [14:18] [53:22] [54:2,6]
transcribed [63:7]
transcript [43:22] [62:7] [63:12]
transcription [63:9]
transcripts [62:9]
transition [56:16]
transmit [62:5]
treister [2:]
tried [22:13] [23:5]
true [46:1] [58:23] [63:9]
trust [47:1,6] [50:15,16,22] [56:18] [58:19] [60:19] [61:13]
trusted [60:23]
truthfully [28:21]
try [27:17] [49:9]
trying [15:1] [18:15] [24:6] [25:4] [41:21] [54:7]
tuesday [18:24] [30:10]
turn [53:19]
turning [47:8,11] [53:12]
twelfth [2:]
twenty [49:16]
twentyfive [49:16]

twenty-five [49:16]
twopage [37:25]
two-page [37:25]
typewriting [65:11]
typically [40:6]

---

U

uh [38:20]
uhhuh [38:20]
uh-huh [38:20]
ultimately [7:12] [9:17] [11:7] [17:13] [28:10] [50:16,20,22,24] [55:2,15]
unable [24:19]
unanimously [13:11]
uncertain [50:18]
uncertainties [33:19] [34:1]
understand [31:23]
understanding [48:2] [59:3]
understood [22:11]
underwriter [54:5,13]
underwriting [8:19]
undoubtedly [41:10]
unfair [24:3,14]
unfinished [28:17]
union [6:3,25] [7:10] [15:10] [16:16,25] [21:19,22]
unique [40:19,23]
unlikely [33:12] [34:11,24]
unrelated [57:6]
unsecured [8:10] [47:13] [48:1,7,17] [50:17]
unsecureds [50:21]
unstapled [11:22]
until [27:17] [32:10,11,22] [33:17] [56:1]
unused [16:13]
unusual [23:12]
upon [44:16] [64:11]
us [6:13,17] [7:2,3,19] [16:1,6,18] [23:6,13,20] [28:12] [29:12] [32:11,13,24] [39:21] [48:22] [50:10,15,23] [51:1] [60:15]
use [18:3] [24:2] [54:5] [64:13]
used [5:10]
using [6:15] [8:4]
usually [20:25] [21:3,9,18]

---

V

vague [8:5]
varied [21:9]
various [47:1,4]
vein [42:9]
venue [32:20,22]
verify [47:5]
version [59:2,4]
videographer [2:] [5:1] [25:12,15] [52:10,14]

[61:20]
videotape [3:] [61:23]
view [8:18] [20:4] [24:16] [29:2,23]
virtually [18:9] [24:25]
virtue [50:9]
volume [3:] [63:5] [64:1] [65:1]

---

W

wachovia [6:24] [15:13,25] [17:4] [21:16,18]
wait [27:17]
waive [23:13]
waiver [16:21]
waivers [16:17,19]
want [6:22] [7:16] [15:22,23] [23:19,21] [26:25] [27:16] [29:1,3] [40:25] [42:3] [44:16] [46:13,19] [52:2,6] [53:19]
wanted [7:18,19] [8:12] [15:10] [22:12] [23:23] [25:1] [31:23] [40:4] [53:1]
warehouse [6:15] [39:19]
warehousing [6:9,11,18,19]
warren [2:] [3:] [5:7] [8:20,24] [11:19] [12:1] [13:20] [18:20] [25:11,19] [30:5] [34:18] [35:1,14,20] [36:10] [37:19,23] [38:11,16] [41:18] [42:16] [44:4,9,20,25] [45:3,13,15] [46:3,10,15,21] [47:11] [51:20,24] [52:6,9,16] [58:12,16] [59:23] [60:5,17] [61:5,18] [62:2,10]
wasnt [14:25] [15:3] [29:10]
ways [23:24] [41:1]
wed [6:25] [21:19,20]
wednesday [9:2] [12:5] [38:2]
weekly [21:25] [22:1]
well [7:9] [13:6] [14:7] [16:3] [23:13] [27:2,22] [29:5] [32:3] [33:13,22] [34:23] [39:1] [42:20] [46:15] [51:12,20] [56:21] [59:23] [60:10] [61:24]
went [6:24] [13:1] [14:16] [15:11] [34:4,8] [36:21] [61:13]
weve [11:3] [61:25]
whatever [30:1] [52:6]
whats [10:2] [34:14] [37:12]
whereof [63:18]
whether [8:8] [10:10] [11:16] [46:1] [50:16] [51:21,24] [59:19]
whole [52:2] [55:4,7]
whose [20:9]
why [5:12] [7:14] [11:12]

[12:21] [18:7] [19:12,22]
  [24:5,16] [26:25] [28:7,8,20]
  [29:7,13,23] [37:4] [40:10
  ,17] [54:14] [56:2] [57:25]
**will** [6:16] [15:15] [50:22]
  [52:1] [57:8] [62:3,4,7]
**williams** [32:13]
**williamson** [2:]
**winston** [3:]
**winstonsalem** [3:]
**winston-salem** [3:]
**wise** [36:6]
**within** [14:19]
**without** [19:15] [36:13]
  [40:13]
**witness** [3:] [29:5] [34:13,20]
  [35:17,23] [38:13] [41:16]
  [42:12] [43:4] [46:8] [59:17]
  [60:10] [61:8,19] [62:4]
  [63:12,18]
**wont** [11:17]
**word** [10:21]
**words** [10:8,12] [32:9]
  [33:14]
**work** [14:7] [17:9] [61:13]
**worked** [16:1] [61:2]
**working** [10:4] [15:2] [33:1]
  [60:18]
**world** [33:11] [41:2]
**wouldnt** [40:15]
**wound** [17:13]
**written** [34:25]
**wrong** [42:21]
**wrote** [33:13]

Y

**yeah** [12:13] [26:10,13]
  [46:3,4] [55:17] [57:20]
**year** [5:24] [14:21] [27:25]
**years** [7:11,18] [27:8]
  [29:20] [33:1]
**yes** [8:21] [9:15] [12:14,18]
  [20:20] [21:3,14] [22:17]
  [26:16] [27:23,25] [28:16]
  [35:5] [36:15] [37:20]
  [42:1,25] [46:15] [47:23]
  [53:7,11] [55:9] [56:8]
  [57:24] [60:22,23] [62:2]
**yesterday** [5:11] [6:10]
  [17:19] [43:13,25] [44:6]
  [48:16] [49:7] [61:1,12]
**yet** [20:17]
**york** [2:]
**youd** [51:17,18]
**youll** [15:14] [51:2]
**youre** [15:4] [19:24] [25:8]
  [26:10] [42:16] [43:12]
  [44:22,25] [45:3] [51:14]
  [52:3]
**yourself** [26:3] [30:14]
  [31:8] [33:7] [51:12] [59:10]
  **youve** [29:6]

A.10

*EXHIBIT Z*

1

2    UNITED STATES BANKRUPTCY COURT
          DISTRICT OF DELAWARE

3    -----------------------------x
    In Re:               )Chapter 11
4    OAKWOOD HOMES CORPORATION, )Case No. 02-13396
    et. al.,            ) (PJW)
5               Debtors. )Jointly Administered
    -----------------------------x
6    OHC LIQUIDATION TRUST,    )
              Plaintiff, )
7          vs.         )Adv. Proc. No.
    CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
8    Swiss banking corporation,  )
    CREDIT SUISSE FIRST BOSTON  )
9    LLC, a Delaware limited    )
    liability corporation, CREDIT)
10   SUISSE FIRST BOSTON, INC.,  )
    CREDIT SUISSE FIRST BOSTON  )
11   (U.S.A.), INC., a Delaware   )
    corporation and a wholly    )
12   owned subsidiary of CREDIT  )
    SUISSE FIRST BOSTON, INC.,the)
13   subsidiaries and affiliates  )
    of each, and DOES 1 through  )
14   100,                  )
              Defendants.)
15   -----------------------------x

16             June 29, 2006

17             9:22 a.m.

18

19         Deposition of FIACHRA O'DRISCOLL, held

20   at the law offices of Linklaters, 1345 Avenue of

21   the Americas, New York, New York, pursuant to

22   notice, before Donald R. DePew, an RPR, CRR and

23   Notary Public within and for the State of

24   New York.

25

**Page 3**

```
 1
 2   A P P E A R A N C E S:
 3
 4   Attorneys for Plaintiff
 5        STUTMAN TREISTER & GLATT
 6        1901 Avenue of the Stars, Twelfth Floor
 7        Los Angeles, California 90067-6013
 8   BY:  TONY CASTANARES, ESQ.
 9        WHITMAN L. HOLT, ESQ.
10
11   Attorneys for Defendants and the Witness
12        LINKLATERS
13        1345 Avenue of the Americas
14        New York, New York 10105
15   BY:  MICHAEL J. OSNATO, JR., ESQ.
16        J. JUSTIN WILLIAMSON, ESQ.
17        R. PAUL WICKES, ESQ.
18
19   ALSO PRESENT:
20        ELIZABETH SORENSON, Summer Associate,
21        Linklaters (p.m. only)
22        DAVID PELOZA, Videographer
23
24
25
```

**Page 4**

```
 1
 2        THE VIDEOGRAPHER:  Here begins volume
 3   No. 1, videotape No. 1 of the deposition of
 4   Mr. O'Driscoll, in the matter of OHC
 5   Liquidation Trust versus Credit Suisse First
 6   Boston.  Today's date is June 29th, 2006.
 7   The time is 9:22.
 8        I'm the videographer, David Peloza,
 9   from VideoLink in Los Angeles, at
10   Linklaters, 1345 Avenue of the Americas,
11   New York City.
12        I'd like the attorneys to introduce
13   themselves starting with the plaintiffs
14   first.
15        MR. CASTANARES:  Tony Castanares,
16   Stutman Treister & Glatt, for the plaintiff.
17        MR. HOLT:  Whitman Holt, Stutman
18   Treister & Glatt, for the Liquidation Trust.
19        MR. OSNATO:  Michael Osnato of
20   Linklaters on behalf of the defendants.
21        MR. WILLIAMSON:  Justin Williamson of
22   Linklaters on behalf of the defendants.
23        MR. WICKES:  Paul Wickes of Linklaters
24   on behalf of the defendants.
25        THE VIDEOGRAPHER:  You may now swear in
```

**Page 5**

```
 1              Fiachra O'Driscoll
 2   the witness.
 3   F I A C H R A   O ' D R I S C O L L,    called
 4   as a witness, having been duly sworn by the
 5   Notary Public, was examined and testified as
 6   follows:
 7   EXAMINATION BY
 8   MR. CASTANARES:
 9        Q.   Good morning, Mr. O'Driscoll.
10        A.   Good morning.
11        Q.   Are you aware that the oath you've just
12   taken is the same oath you would have taken if you
13   were testifying in a court of law today?
14        A.   I am now.
15        Q.   Okay.  And are -- either because of any
16   medication you may be taking or for any other
17   reason, are you impaired in any way today from
18   being able to remember events that I'll ask you
19   about or from being able to relate your memory of
20   them to me?
21        A.   Not that I know of.
22        Q.   Okay.  When was the first time you ever
23   had any contact with any Oakwood company?
24        A.   1996.
25        Q.   And tell me how that came about,
```

**Page 6**

```
 1              Fiachra O'Driscoll
 2   please.
 3        A.   I was asked to work on the 1996-A, I
 4   believe it was, securitization for Oakwood
 5   Acceptance, which was a securitization of their
 6   manufactured housing mortgage production.  And I
 7   was asked by two of my senior colleagues to
 8   participate in that.
 9        Q.   What were their names, please?
10        A.   Fred Terrell and Pilar Esperon.
11        Q.   Could you spell those two names,
12   please.
13        A.   Fred, F-r-e-d, T-e-r-r-e-l-l, and
14   Pilar, P-i-l-a-r, Esperon, E-s-p-e-r-o-n.
15        Q.   And who were they?
16        A.   They were employees of Credit Suisse.
17        Q.   And were they your superiors?
18        A.   Yes.
19        Q.   What was Mr. Terrell's position?
20        A.   I don't recall.
21        Q.   And what was Ms. Esperon's?
22        A.   When you mean "position" do you mean
23   title?
24        Q.   Title -- title would be good.
25        A.   Yeah, I don't remember the title.
```

**[Page 7]**

Fiachra O'Driscoll

2    Q.    And what about Ms. Esperon?

3    A.    I don't remember her title either.

4    It's a long time ago.

5    Q.    Okay.  And what was your position at

6    that time?

7    A.    I was an associate.

8    Q.    And is that something below the level

9    of director?

10   A.    Yes.

11   Q.    Is that the position immediately below

12   the level of director?

13   A.    It's two positions below.

14   Q.    All right.  What's the intermediate

15   one, please?

16   A.    Vice president.

17   Q.    And how long had you then been working

18   for any entity in the Credit Suisse or First

19   Boston organization?

20   A.    Three and a half years.

21   Q.    When was the merger of Credit Suisse

22   and First Boston?

23   A.    There were a number of mergers at

24   different points in time.

25   Q.    Okay.  What was the entity you first

---

**[Page 9]**

Fiachra O'Driscoll

2    MR. OSNATO:  Objection as to form.

3    You can answer.

4    A.    Yes.

5    Q.    Describe it, please.

6    A.    I had worked with another manufactured

7    housing company, whose name I now forget.

8    Q.    All right.  And were you doing a

9    securitization for them as well?

10   A.    We were putting together a loan

11   purchase facility for them.

12   Q.    All right.  And that was --

13   Would it be correct for me to infer

14   that these were --

15   A.    The company in question is no longer in

16   existence anyway.

17   Q.    All right.  This is a loan purchase

18   facility of loans generated by the purchase of

19   homes by end users?

20   A.    Can you rephrase your question?

21   Q.    Yeah.  This is a loan purchase

22   facility, I believe you said.

23   A.    Yup.

24   Q.    And the loans that were being purchased

25   were loans that were generated by the sale of

---

**[Page 8]**

1    Fiachra O'Driscoll

2    went to work for that now has become --

3    A.    It was called Credit Suisse First

4    Boston Ltd.

5    Q.    All right.  And what -- strike that.

6    Is that the same entity that you were

7    working for in 1999, 2000, 2001, 2002?

8    A.    It would have been a sister entity.

9    Q.    All right.  At what point did you

10   work -- did you go to work for the second entity

11   then?

12   MR. OSNATO:  Objection as to form.

13   You can answer if you understand the

14   question.

15   A.    In -- I think the -- I became an

16   employee of Credit Suisse First Boston

17   Corporation, which was at that time the U.S.

18   entity, in January of 1995 --

19   Q.    All right.

20   A.    -- if that answers your question.

21   Q.    It does.

22   Had you -- at the time you first were

23   assigned to work on the Oakwood securitization had

24   you had any prior experience in the manufactured

25   housing industry?

---

**[Page 10]**

1    Fiachra O'Driscoll

2    manufactured housing product --

3    A.    Correct.

4    Q.    -- to end users on credit, correct?

5    A.    Yup.

6    Q.    And what was CSFB's role in that

7    transaction?

8    MR. OSNATO:  Let me interject here.

9    Your question is directed to work done for

10   companies other than Oakwood?

11   MR. CASTANARES:  I'm asking what CSFB's

12   role was in a transaction for the company he

13   has not yet identified with respect to the

14   securitization.

15   MR. OSNATO:  And we have, as you know,

16   a pending dispute before the court as to the

17   propriety of discovery into work done by

18   Credit Suisse for entities other than

19   Oakwood.

20   I'm happy to have Mr. O'Driscoll

21   testify to the identities of companies other

22   than Oakwood that he worked with and the

23   subject matter of the work he did, but the

24   substance in our view is inappropriate.

25   MR. CASTANARES:  My question is the

**Page 11 (top-left column)**

                    Fiachra O'Driscoll
 1
 2      role that CSFB played in this.  I think the
 3      record is clear, either instruct the witness
 4      not to answer the question or permit him to
 5      do so, please.
 6          MR. OSNATO:  I'm happy to have the
 7      witness answer as to role.
 8          But in your answer please do not
 9      divulge any nonpublic information or
10      confidential advice you may have given to
11      that company.
12      A.    In that case I better not answer,
13  because I'm just not sure whether it -- it's a
14  long time ago and I don't know whether it remains
15  confidential or not.
16      Q.    Did CSFB underwrite that transaction?
17      A.    Which transaction?
18      Q.    The transaction you've been describing
19  that was the subject of my last question.
20      A.    The Oakwood '96-A or --
21      Q.    No.  The prior manufactured housing
22  transaction you --
23      A.    No.
24      Q.    I'm sorry?
25      A.    No.

11

**Page 12 (bottom-left column)**

 1                  Fiachra O'Driscoll
 2      Q.    Was CSFB the purchaser in the loan
 3  purchase facility?
 4      A.    Yes.
 5      Q.    And was that the CSFB entity that you
 6  then worked for?
 7      A.    No.
 8      Q.    What CSFB entity was it?
 9      A.    I actually don't recall.  It was a
10  Credit Suisse entity.
11      Q.    What is your current office address?
12      A.    11 Madison Avenue, New York, NY, 10010.
13      Q.    And you're still currently employed by
14  CSFB?
15      A.    Yes.
16      Q.    Are you employed now by the same entity
17  you were employed by in 2001?
18      A.    I am employed by -- yes, actually.  The
19  name has changed, but the entity is the same.
20      Q.    All right.  Other than the one
21  transaction consisting of a loan purchase facility
22  that you've identified, did you have any other
23  experience in the manufactured housing industry at
24  that time?
25      A.    Prior to that?

12

**Page 13 (top-right column)**

 1                  Fiachra O'Driscoll
 2      Q.    Yes.
 3      A.    No.
 4      Q.    I'm sorry, prior to the first contact
 5  you had with Oakwood.
 6      A.    Other than the one I've described, no.
 7      Q.    All right.  And did you have any other
 8  experience in ABS transactions at that time?
 9      A.    Yes.
10      Q.    Describe it briefly for me, please.
11      A.    I had worked on a number of ABS
12  transactions for some years prior to that, both
13  mortgage securitizations, auto securitizations,
14  rental car fleet financing securitizations, and
15  probably a number of others in a minor way.  Those
16  would have been the primary ones.
17      Q.    All right.  And were all of those done
18  as an employee of CSFB?
19      A.    Yes.
20      Q.    Had you had any experience in ABS
21  transactions other than as an employee of CSFB?
22      A.    No.
23      Q.    When did you first do to work for CSFB?
24      A.    June 1992.
25      Q.    And was it your understanding that you

13

**Page 14 (bottom-right column)**

 1                  Fiachra O'Driscoll
 2  were -- when you first were assigned to work with
 3  Oakwood that you were replacing somebody else who
 4  had been fulfilling that function before?
 5      A.    I don't recall, actually.
 6      Q.    Did you, in fact, work on that first
 7  1996 securitization for Oakwood?
 8      A.    Yes.
 9      Q.    Did anybody else at CSFB do so?
10      A.    Yes.
11      Q.    Who else?
12      A.    The supervisors in question that I
13  named.  Another gentleman by the name of
14  Howard Dent and another gentleman by the name of
15  Dane Matthews.
16      Q.    And were these people superiors to you,
17  equals to you?
18      A.    Howard and Dane would have been --
19  Howard would have been -- was also an associate.
20  His role was the structuring and financial
21  engineering of these transactions specifically.
22  And Dane Matthews was an analyst who worked with
23  us on the transaction.
24      Q.    Tell me what you mean by "structuring
25  and financial engineering."

14

Fiachra O'Driscoll

1
2  A.    When you put together a mortgage
3  securitization transaction of the type that I
4  specialized in really throughout my career there's
5  two aspects -- there's a number of aspects to it,
6  but the pieces that fall most directly within the
7  scope of the work that we pursue in these
8  transactions really can be broken into a few
9  parts.
10      The first is the analysis and the
11 understanding of the pool of loans that are to be
12 securitized themselves. Which means understanding
13 for each of the loans in question its
14 characteristics, its coupon amount -- which is
15 obviously very important -- its legal maturity
16 date, the date on which the mortgage loan matures,
17 the parameters as to the credit of those loans,
18 loan-to-value ratios, down payments, who the
19 borrower is, the nature of that borrower, the
20 borrower's credit scores, things of that sort.
21      Beyond that one also needs to
22 understand the performance characteristics of the
23 loan. What I really mean by that is loans, of
24 course -- even though none of us have to make a
25 mortgage payment beyond what we're legally

Fiachra O'Driscoll

1
2  required to, typically people have the ability in
3  some shape or form to prepay a loan or, indeed, to
4  occasionally defer payments on loans.
5      So the -- so one of the most important
6  things from an investor's point of view in
7  understanding the nature of these instruments is
8  that they should be able to examine scenarios as
9  to how these loans will subsequently behave. In
10 other words, when they can expect to see principal
11 payments, when they will expect to see -- when
12 they will expect to see them mature in all
13 probability.
14      And then beyond that, with regard to
15 the actual securities that they purchase.
16 Because, you know, typically it's the case that
17 people are not buying the raw loans themselves.
18 In other words, unsecuritized loans. Typically,
19 instead, they're buying securities that are issued
20 by a trust or another legal entity which divides
21 up the cash flows that come from the underlying
22 instruments in ways that are kind of tailored to
23 the investors in question.
24      So one of the things that they'll want
25 to understand is how the actual payments on the

Fiachra O'Driscoll

1
2  loans themselves are distributed among the
3  investors and how that can change depending on
4  what the changes are in the underlying loans.
5      So if you characterize say my role
6  during that period of time versus say a financial
7  engineer's role, their role in the transaction
8  would be to do the analysis of the loans
9  themselves, the characteristics of the loans, the
10 performance of the loans, to do the analysis of
11 the securities to put together scenarios for those
12 securities that are commonly referred to in the
13 industry as what's known as computational
14 materials.
15      Q.    I'm sorry?
16      A.    Computational materials is the term of
17 art that's used for these things.
18      Q.    All right.
19      A.    What -- and that really would have been
20 the role that Howard would have pursued.
21      The other piece, and this really gets
22 to the interface between his role or a financial
23 engineer's role in general and then my role, is
24 that if a -- one would also have to work with the
25 rating agencies. Because typically almost all the

Fiachra O'Driscoll

1
2  securities issued by these kinds of things are
3  rated by one, or two, or three rating agencies,
4  usually Moody's, S&P, Fitch, and so on.
5      So what one would actually do in the
6  course of a mortgage securitization is you would
7  go approach the rating agencies, explain the
8  nature of the transaction that you wanted to
9  conduct. You would have to send financial models
10 to the rating agencies. They would typically ask
11 for more financial models. They would ask for
12 stresses to be run. They might run their own
13 stresses.
14      And they would -- using that
15 information they would assign ratings to the
16 securities. And generally those ratings -- in a
17 typical securitization there would be securities
18 that were rated from AAA to AA to A to BBB and
19 often to BB or even below to B, and down to an
20 unrated piece perhaps at the bottom of the
21 transaction.
22      The interface between the financial
23 engineer's role and my role would be that both he
24 and I -- or she and I on occasion -- would work
25 with the rating agencies on those kind of pieces

Fiachra O'Driscoll

1 Fiachra O'Driscoll
2 to prepare the rating agencies for the rating
3 process and to prepare the materials, offering
4 circulars, red herring, sales points and sales
5 materials for purely internal consumption, and so
6 on.
7        And then my role, as distinct from the
8 financial engineer's role, would be to ensure that
9 the transaction was put together in a timely
10 fashion, to make sure that the questions of the
11 sales force were answered, to make sure that
12 investors questions were answered, to make sure
13 that the legal structure of the mortgage
14 securitization itself worked as it probably -- or
15 properly should do, and to make sure that the
16 transaction got closed, processed, and that it was
17 dealt with in the after market in a timely
18 fashion.
19        And that's really -- apologies for the
20 long answer, but that's really the two things that
21 would have distinguished the financial engineering
22 role from the asset securitization underwriting
23 role.
24    Q.   All right.  And I take it that your
25 role throughout your time with Oakwood was the

19

1        Fiachra O'Driscoll
2 latter?
3    A.   In summary, yes.
4    Q.   Yes.  You were never in the financial
5 engineer's role?
6    A.   That would be correct.
7    Q.   But there were other people at CSFB who
8 fulfilled that function?
9    A.   Yes.
10    Q.   They were always internal to CSFB?
11    A.   Correct.
12    Q.   And did those people report to you?
13    A.   No.
14    Q.   To whom did they report?
15    A.   Different people at different points in
16 time.  But as a general rule there was a distinct
17 kind of career progression and hierarchy for those
18 financial engineering people.
19        It changed, frankly, numerous times
20 over a decade as to how that was organized, as was
21 true I think of most Street firms.  There were
22 different approaches to how that financial
23 engineering function would have been organized.
24 But I don't think that there was ever a point at
25 which the financial engineering role was

20

1        Fiachra O'Driscoll
2 integrated in with the mortgage securitization and
3 the underwriting role.
4    Q.   All right.  Tell me please in the
5 underwriting role, I believe you said that certain
6 financial information was supplied by you to the
7 rating agencies; is that correct?
8    A.   No.
9    Q.   What kind of information was supplied
10 by you to the rating agencies?
11    A.   That would come in three forms, and
12 none of which could be characterized as financial,
13 I think, as you understand it.  If you'll forgive
14 me --
15    Q.   Just tell me what --
16    A.   -- making assumptions.
17    Q.   Just tell me what information you gave
18 them.
19    A.   The information would have been
20 information as to the loans themselves.  What we
21 would do is we would get a loan tape from the
22 company or from wherever the loans were residing
23 at a given point in time.  We would use that
24 information to compile a summary form of
25 information on the loan pool itself.  What that

21

1        Fiachra O'Driscoll
2 would be is, for instance, the total principal
3 balance of the loans on usually the first day of
4 the preceding month, the original principal
5 balance of the loans, the weighted average coupon
6 on the loans, the loan-to-value ratio on average
7 for all of the loans, and similar kinds of
8 characteristics, that would be the first thing.
9        The second thing we'd supply the rating
10 agencies with would be information on the
11 performance of similar loans in the past.
12 Generally speaking, those similar loans would be
13 the performance of Oakwood's prior
14 securitizations.  Under certain circumstances, if
15 it was not Oakwood, you might also share with the
16 rating agencies other information about loan
17 performance in general.
18        But typically in the Oakwood
19 transaction you'd supply them for every
20 securitization with a summary of the prepayment
21 performance, delinquency performance, loss
22 performance, changes in the coupon rate, changes
23 in the characteristics of the loan pools in
24 question, and that would be the information you'd
25 supply the rating agencies.

22

Fiachra O'Driscoll

2   Q.   And was there a third category?

3   A.   I think that summarizes it.

4   Q.   All right.  Did you in the course of

5   these -- your underwriting function supply the

6   rating agencies with financial information about

7   Oakwood itself or any company in the Oakwood

8   family?

9   A.   When you say "Oakwood," any company in

10   the Oakwood family?

11   Q.   Right.

12   A.   No.

13   Q.   So as far as you know, the rating

14   agencies were relying upon information that was

15   publicly available?

16   A.   I don't know.

17   Q.   Okay.  Did you ever receive requests

18   from rating agencies for information about the

19   creditworthiness of Oakwood itself or any company

20   in the Oakwood family?

21   A.   Not to my recollection.  That was

22   actually a separate function within the rating

23   agencies.  They typically made their own

24   inquiries.

25   Q.   All right.  But to your knowledge were

---

Fiachra O'Driscoll

2   us or would arrange to have us sent a tape with

3   the loans in question that they intended to be

4   part of this mortgage securitization at any given

5   point in time, and that would be the first thing

6   that they would send us.

7      The second thing that they would send

8   us is they would often be the ones who would

9   prepare the information on the prior

10   securitizations characteristics, performance, and

11   so on, and they would send us that, too.  And that

12   would be most typically the case.

13   Q.   All right.  And did you typically

14   receive from the company any information about its

15   financial statement?

16      MR. OSNATO:  The same objection.

17      But you can go ahead and answer.

18   A.   I don't think there's a typical answer.

19   Q.   Did the company consult with -- strike

20   that.

21      Did any of the companies in the Oakwood

22   family ever consult with you or to your knowledge

23   anybody else at CSFB on whether or not it was

24   advisable to engage in a particular

25   securitization?

---

Fiachra O'Driscoll

2   those inquiries ever made of anybody at CSFB?

3   A.   I don't know.

4   Q.   Whom did you first deal with when you

5   were introduced to Oakwood?

6   A.   Doug Muir, who was the treasurer of the

7   company.

8   Q.   Anyone else?

9   A.   At first, no.

10   Q.   Okay.  And just tell me as a typical

11   matter what the exchange -- well, let's strike it

12   out.

13      In that first securitization that you

14   participated in with Oakwood what kind of

15   information passed between you and Mr. Muir?

16   A.   You know, it's a decade ago, I don't

17   think I can give you an answer.

18   Q.   All right.  Let me then ask you, in a

19   typical underwriting situation what kind of

20   information passes between the client company and

21   the person who was in your underwriting function?

22      MR. OSNATO:  I'm going to object as to

23   the form.

24      But you can answer.

25   A.   Typically the company would either send

---

Fiachra O'Driscoll

2   A.   Can you be a little bit more precise

3   about what you mean.

4   Q.   Did they ever seek your advice on

5   whether or not to --

6   A.   Whether to proceed with a particular

7   securitization?

8   Q.   Correct.

9   A.   They would -- the dialogue that we

10   would have with the company on an ongoing basis

11   between securitizations would largely consist of

12   us briefing them on what the securitization market

13   was at any given point in time, what trends were,

14   what investors were doing, how spreads

15   essentially -- which is how interest rates are

16   measured in that kind of market -- were moving at

17   any given point in time.  And whether this month,

18   or next month, or the month after would be a good

19   time to do a securitization.

20   Q.   So would it be correct for me to

21   characterize that kind of advice as to the

22   economic feasibility of doing a securitization?

23      MR. OSNATO:  Objection as to form.

24      You can answer.

25   A.   No.

Fiachra O'Driscoll

2    Q.   Did the company ever seek advice from
3  you or to your knowledge anybody else at CSFB on
4  whether or not it was in the best interests of the
5  company to engage in a particular securitization?
6                MR. OSNATO:  The same objection.
7                You can go ahead and answer.
8      A.   Can you narrow it down to a narrower
9  time interval.  That's -- you're talking about a
10  decade here, so...
11      Q.   All right.  Let's --
12      A.   It's a little hard for me to give such
13  a sweeping answer.
14      Q.   Well, I'm really interested in knowing
15  whether it ever happened or not, but I'll --
16      A.   The answer may be you may have to
17  refresh my memory.
18      Q.   All right.  Well, let me ask you this,
19  beginning with -- all right.
20          Are you aware that there was a downturn
21  in the manufactured housing industry that began
22  sometime in the neighborhood of 1999?
23      A.   Yes.
24      Q.   At any time since the commencement of
25  that downturn did the company ever ask your advice

Fiachra O'Driscoll

2  on whether it was in the company's best interests
3  to engage in a particular securitization
4  transaction?
5                MR. OSNATO:  Objection as to form.
6      A.   What they would -- what they would ask
7  me was whether a particular securitization should
8  get done, for instance, this month or next month.
9          Suppose, for instance, the company was
10  to approach me and say, you know, we're thinking
11  about doing the securitization next week.  What I
12  would tell them is that next week is not a good
13  week, this is a holiday weekend, July 4th is going
14  to be on Tuesday.  It's going to be a difficult
15  week to get investors attention.
16          So can I suggest we put it off until
17  the following week, or perhaps until August, or
18  perhaps until after Labor Day.  That would be the
19  nature of the advice that they would have.
20          We would also discuss the form of the
21  securities to be offered and how we'd tailor those
22  securities to what market conditions were at any
23  given point in time.
24          At no point did they actually ever come
25  to us and say should we be doing securitizations

2  at all, if that's your question.
3      Q.   All right.  That's a good question to
4  answer.  That's one question I intended to ask
5  you.
6          Did the company ever come to you and
7  ask you whether it was a good idea for it to
8  guarantee any of the tranches of the
9  securitizations?
10                MR. OSNATO:  Objection as to form.
11                You can answer that.
12      A.   They -- we had a discussion, which to
13  my recollection -- and this would have been in
14  early 1998 -- centered around the feasibility of
15  selling their B2 securities with a guarantee, and
16  what the market reception would be for such a
17  security, and the feasibility of selling their
18  securities without a guarantee.
19      Q.   Okay.  Who was involved in that
20  discussion?
21      A.   Doug Muir at least, probably others.
22      Q.   Okay.  Anybody else on the CSFB side?
23      A.   I don't recall.
24      Q.   Tell me what you can remember about
25  that discussion.

Fiachra O'Driscoll

2      A.   Very little, to tell you the truth.
3      Q.   Tell me what you can remember, please.
4      A.   I remember we put a presentation
5  together on the subject.
6      Q.   All right.  And this was a slide show
7  type presentation?
8      A.   I would guess it probably -- that would
9  have been typical.
10      Q.   All right.  And tell me, as well as you
11  can recall, what the subject matter of that
12  presentation was.
13      A.   The market for B2 securities with or
14  without a guarantee.
15      Q.   And did it in any way cover potential
16  effects of these guarantees on the company's
17  liquidity in the near or distant future?
18      A.   I don't recall.  You'd have to show me
19  it.
20      Q.   All right.  And did it in any way
21  attempt to assess the company's ability to pay on
22  those guarantees if it should ever be called upon
23  to do so?
24      A.   All I remember was that there was a
25  presentation.

Fiachra O'Driscoll

Q.    And if you wanted to look for that
presentation today can you tell me what document
you would look for?

A.    I wouldn't have access to that
information today.

Q.    But if you wanted to find it...

A.    I wouldn't be allowed to.

Q.    What I would like you to tell me is the
name of the document involved so that I can ask
your lawyers for it.

A.    I don't remember the name of the
document. It's eight years ago. I'm on the other
side of a Chinese wall now and I no longer have
access to that.

Q.    Tell me about that.

A.    Now I work within the CDO group, the
collateralized debt obligations group, which is
outside the Chinese wall of the securitization
group.

Q.    What are you doing now?

A.    Can you rephrase your question?

Q.    What does the CDO group do?

A.    The CDO group takes securities
typically -- typically mortgage securities,

Fiachra O'Driscoll

asset-backed securities, similar kinds of things
and pools them together into transactions that
investors then purchase and invest in.

Q.    Would --

A.    So it's almost like a resecuritization,
if you will, of the underlying securities.

Q.    Are any Oakwood securities involved in
any transactions you're involved in now?

A.    No.

Q.    Have they ever been since you've been
working with the CDO group?

A.    I would need to check.

Q.    But the kinds of securities issued by
Oakwood in the securitizations prior to its
bankruptcy are the kinds of securities that the
CDO group now deals in; is that correct?

A.    Correct.

Q.    And you just can't remember whether any
Oakwood ones have been involved in your deals or
not; is that right?

A.    You're talking about a span of
thousands of securities.

Q.    So you don't remember one way or the
other?

Fiachra O'Driscoll

A.    I don't recall.

Q.    And because of that Chinese wall you're
not permitted to access your own records of
transactions that you engaged in with Oakwood
prior to its bankruptcy?

A.    I think they're all in the hands of our
legal people and probably in the hands of our
counsel as well.

Q.    But you're not allowed to access them?

A.    Correct.

Q.    Okay. Now, before the time of
Oakwood's bankruptcy did you have any personal
experience in any other companies in the
manufactured housing industry, other than what
you've told me about already?

A.    Yes.

Q.    Tell me about that, please. Just give
me a brief summary without --

THE WITNESS: Is this something I'm
permitted to get into?

MR. OSNATO: Yes. Again, repeating my
earlier instruction, you're permitted to
identify companies other than Oakwood in its
industry that provide a subject matter

Fiachra O'Driscoll

description of the services that
Credit Suisse provided to those companies,
without divulging any confidential business
information or any nonpublic information that
you may have had.

MR. CASTANARES: And Mr. O'Driscoll, if
I could, just for the sake of the court
reporter, both of us have a tendency to cut
each other off a little bit at the end of our
statements --

THE WITNESS: Oh, I'm sorry.

MR. CASTANARES: And there's a good
example of it. So if you'll try to let me
finish, I'll try to let you finish.

THE WITNESS: Very good.

Q.    Okay. So what I'm interested in my
question, Mr. O'Driscoll, is not any confidential
information. I'm interested in what personal
experience you have in the manufactured housing
industry before Oakwood's bankruptcy.

A.    I also worked with Green Tree
Financial, which then became known as
Conseco Finance; I worked with Bank America
Housing Services, which later was known as

**Page 35**

          Fiachra O'Driscoll
GreenPoint Financial; I worked with
United Companies, which is now bankrupt; I worked
with Bombardier Capital, which has terminated its
manufactured housing business.  I worked with --
United Companies, Bombardier, GreenPoint...
          I worked with Clayton Homes and its --
specifically its mortgage activities was in a
company called Vanderbilt, Vanderbilt Finance,
Vanderbilt Financial.
          I'm sure I'm leaving somebody off the
list there.
     Q.   Okay.  That's a good start.
          Were you doing asset-backed
securitizations for any of these entities?
     A.   Yes.
     Q.   Which?
     A.   At one point or another all of them.
In other words, over a seven or eight-year time
span at some point we did securitizations for
every one of that -- every one of those companies.
     Q.   All right.  Now, which of those
companies were actually engaged in the manufacture
of manufactured homes?
     A.   Clayton Homes.

**Page 36**

          Fiachra O'Driscoll
          Sorry, there's one more I need to add
to the list.
     Q.   Okay.
     A.   Champion Enterprises.
     Q.   Okay.  Was it also a manufacturer?
     A.   Yes.
     Q.   Okay.  And were you doing ABS
transactions for Clayton and Champion similar in
nature to the ones you were going for Oakwood?
     A.   For Clayton, very similar.  For
Champion we put together a loan purchase facility
or a warehouse.  One or the other, I don't recall.
     Q.   What's the difference between a loan
purchase facility and a warehouse?
     A.   A warehouse typically is an
arrangement, essentially a secured loan of some
sort.  They'll follow different forms -- and in
truth there's been various legal fashions in what
made for a good form over the last decade or so
within the area, these things come and go in
fashion -- under which a secured loan is made to a
company that's secured by typically loans as they
are originated.
     Q.   All right.

**Page 37**

          Fiachra O'Driscoll
     A.   The reason they call them a warehouse
is because it's essentially a place to -- for a
company to put their loans before doing something
else with them.
          A loan purchase facility is usually a
flow purchase arrangement whereby you buy loans
from the company, either one at a time or in small
bulk amounts.  And they -- and they're held there
until such time as you either securitize them
yourself or that there's some other outlet for
them.
     Q.   "Or," I'm sorry?
     A.   Or there's some other outlet for those
loans.
     Q.   All right.  And I believe -- did you
say they're a flow purchase facility, did I hear
that correctly?
     A.   Flow in the sense that a -- what
characterizes those kind of loan purchase
facilities and, indeed, the warehouses is that
companies in either of the two situations can
usually deliver loans either literally one loan at
a time, but more frequently can call up every two
or three days, maybe every week and to deliver a

**Page 38**

          Fiachra O'Driscoll
small amount of loans into -- into that purchase
arrangement or into that warehouse.
     Q.   All right.  And is it correct for me to
infer from your description of these two
transactions that each of them is intended to be
temporary in one form or another?
          MR. OSNATO:  Objection as to the form.
          You can answer that.
     A.   Not necessarily.
     Q.   The loan purchase facility can involve
a permanent purchase of the loans?
     A.   Yes.
     Q.   The warehouse, however, would always be
a temporary facility?
     A.   Not necessarily.
     Q.   Tell me of the situations in which it
might not be.
     A.   Literally it might or might not be.  It
could be temporary, it could be permanent.
     Q.   How would a permanent warehouse
facility operate?
     A.   A permanent warehouse facility would be
one that was -- rather than being in place for a
short, finite period was in place for like what I

Fiachra O'Driscoll

1 might call a long finite period.

2     Shall I carry on?

3     Q.    Please.

4     A.    You could have a warehouse situation,

5 which is literally a three-month facility, for

6 instance. A -- what I might characterize as a

7 more permanent facility might be one that's in

8 place for a fixed term of perhaps one years, or

9 two years, or three years.

10     Q.    I notice that in a number of e-mails in

11 this case you refer to the facility that was set

12 up for Oakwood prior to its bankruptcy by CSFB

13 New York branch as both an asset purchase facility

14 and as a warehouse facility.  And that also other

15 members of the CSFB team refer to them in both

16 such ways.

17     Are the terms used relatively

18 interchangeably?

19     MR. OSNATO:  Objection as to form.

20     Are you talking specifically now about

21 the Oakwood facility?

22     Q.    I'm talking about do you personally use

23 those two terms interchangeably on occasion?

24     A.    If speaking correctly, I don't.

Fiachra O'Driscoll

1 bankruptcy by the New York branch was one in which

2 CSFB was compensated by a rate of interest,

3 correct?

4     A.    I would need to go back and read the

5 documents.

6     Q.    You have no independent memory one way

7 or the other?

8     A.    I'd prefer just to refresh my

9 recollection.

10     Q.    Were you involved in any way in the

11 negotiation of that facility?

12     A.    Yes.

13     Q.    How so?

14     MR. OSNATO:  Before you answer, you can

15     testify as to your negotiations with Oakwood,

16     its counsel, its advisers.  But in giving

17     your answer do not disclose any

18     conversations, communications that you may

19     have had with Credit Suisse's lawyers that

20     reflect legal advice.

21     Q.    My question is not intended to ask you

22 what advice did Credit Suisse get from its

23 lawyers.

24     My question is, what was your role in

Fiachra O'Driscoll

1     Have I never done?

2     I'm sure out there somewhere there's an

3 e-mail somewhere that says warehouse.

4     The -- ultimately either of those two

5 forms of facility have the same effect from the

6 company's point of view, which is that the company

7 is seeking funding for its loans on a basis that's

8 more frequent than waiting the three months or

9 four months for a trade to do a securitization,

10 so...

11     Q.    And in either case the company is

12 paying compensation to either the lender in a

13 warehouse facility or the purchaser in an asset

14 purchase facility that is measured by a rate of

15 interest; is that correct?

16     MR. OSNATO:  Objection as to the form.

17     Can we clarify if we're talking

18     specifically about Oakwood here or is this --

19     are you seeking industry commentary?

20     MR. CASTANARES:  At the moment my

21     question is broad.

22     A.    It might be or it might not be.

23     Q.    In the Oakwood situation the facility

24 that was set up for Oakwood prior to its

Fiachra O'Driscoll

1 the negotiation of the facility?

2     A.    I was one of the people most closely

3 involved in the putting together of the facility

4 itself and the term sheet that was proprietary to

5 that facility.

6     Q.    And is that something that you normally

7 did in the course of your employment at that time

8 or was Oakwood the first time you had done that?

9     A.    Nope.  No and no.

10     Q.    All right.  So you didn't normally do

11 that, but you had --

12     A.    No, sorry.  Okay.  Let me say yes and

13 no.

14     Q.    The negotiation of the terms of a

15 warehouse or asset purchase facility was something

16 that you normally did in the course of your

17 employment?

18     A.    That I frequently did.

19     Q.    Okay.  And you did that on behalf of

20 the provider of that facility, the New York

21 branch?

22     A.    The provider was not necessarily always

23 the same.

24     Q.    Okay.  In the negotiation of the

Fiachra O'Driscoll

1         Fiachra O'Driscoll
2  Oakwood prebankruptcy facility were you the CSFB
3  person who had the authority to say yea or nay?
4    A.    Which facility exactly?
5    Q.    It is the facility that was established
6  in early 2001 in which a warrant was given to CSFB
7  for 20 percent of the shares of Oakwood, are you
8  familiar with that transaction?
9    A.    Yes.
10        MR. OSNATO:  And I'm going to object to
11    the form of the question.
12    Q.    I have sufficiently familiarized you
13  with the transaction in question, you have it in
14  mind now?
15    A.    Yes.
16    Q.    All right.  Were you the person at CSFB
17  who had the authority to say yea or nay to that
18  facility on behalf of the New York branch?
19    A.    No.
20    Q.    Who was?
21    A.    I don't think that there was one single
22  person.
23    Q.    Did somebody from the New York branch
24  participate in the negotiation of the terms of
25  that transaction also?

1         Fiachra O'Driscoll
2    A.    Yes.
3    Q.    Who was that?
4    A.    I don't recall.
5    Q.    Do you know whether anybody at the
6  New York branch had direct contact with Oakwood
7  personnel in negotiating the terms of that
8  facility or was it always you?
9    A.    I don't recall.
10    Q.    Other than the CRM department, was
11  there somebody at the New York branch who had the
12  authority to say yea or nay?
13        MR. OSNATO:  Objection as to the form.
14    You can answer that.
15    A.    Can you -- do you want to rephrase the
16  question?
17    Q.    Yeah.  I just want to know who was the
18  person who had the authority on behalf of the
19  Credit Suisse family of companies to say yea or
20  nay to that facility?
21        I understand it had to go through a CRM
22  process.
23    A.    I don't think there's one person.
24    Q.    Can you tell me any of the people who
25  were responsible?

1         Fiachra O'Driscoll
2    A.    I think your question is a little
3  sweeping.
4    Q.    Well, I want to know who had authority
5  to make this decision.
6    A.    As I said, I don't think there was any
7  one person, though it -- these -- many of these
8  things require a number of people to sign off on
9  such a thing before it goes forward.
10    Q.    And do you know the names of any of
11  those people?
12    A.    Yes.
13    Q.    Tell me them, please.
14    A.    Well, do you want to kind of identify
15  some of the -- you know, specifically who signed
16  off on that one, I don't know.
17    Q.    Did you have -- personally have any
18  interface with the people who had authority to say
19  yea or nay to this transaction?
20        MR. OSNATO:  Objection as to the form.
21    A.    Yes.
22    Q.    Describe that interface, please.
23    A.    What do you mean by the word
24  "interface"?
25    Q.    Did you have contact with the people

1         Fiachra O'Driscoll
2  who had the authority --
3    A.    What do you mean by "contact"?
4    Q.    Did you ever speak orally --
5    A.    Yes.
6    Q.    -- to any person who had the authority
7  to say yea or nay to this transaction?
8    A.    Yes.
9    Q.    Did you ever have any written
10  communication with any such person?
11    A.    Again, I don't think there is one
12  person.  There is no one person who had the
13  authority to simply say yea or nay.
14    Q.    Okay.  Well, so far my -- we're all
15  digressing from the point where I've asked you the
16  names of those persons who did have that
17  authority, okay?
18    A.    Again, I think you're -- you're making
19  a mistake of fact, which is that there was no one
20  person who had the ability to say yea or nay as
21  you've phrased it to such a transaction.
22    Q.    I would like to know the names of any
23  person or persons.  I don't care whether there was
24  two of them or a thousand of them.  I just want
25  names from you, please.

Fiachra O'Driscoll

1
2    A.    Okay. Can you rephrase your question?
3    Q.    Who were the persons who had the
4    authority to say yea or nay to that facility?
5          MR. OSNATO:  And I'm going to object
6    as --
7    A.    You know --
8          MR. OSNATO:  -- to the -
9          Let me finish, please.
10         THE WITNESS:  Yeah.
11         MR. OSNATO:  -- as to -- I think we
12   could move forward a lot more expeditiously
13   if we used a term other than yea or nay.
14   Because, as Mr. O'Driscoll has testified,
15   there are multiple approvals.
16         And if you are asking specifically
17   about a credit approval it may be useful to
18   phrase your question accordingly, rather than
19   across the board.
20         MR. CASTANARES:  You may answer.
21   A.    Within -- let me try to answer your
22   question as follows, on any transaction of this
23   sort, which I think is probably the easier way to
24   explain it, we would make a submission, which
25   might be in writing or might be a verbal

47

Fiachra O'Driscoll

1
2    of Credit Suisse to a given counterparty.
3    Q.    All right. Maybe we can cut this
4    short.
5          Were the people that had the ultimate
6    decision-making authority on whether or not to
7    grant this facility in the CRM department?
8          Because -- let me try to distinguish
9    this for you. There are certain companies in
10   which a credit manager will make a recommendation.
11   And there is some executive who has the authority
12   to make the decision, irrespective of whether he's
13   following the credit manager's recommendation or
14   not. I'm just trying to find out who the ultimate
15   decision-making authorities were on this
16   particular facility.
17   A.    The -- Tom Irwin, who is a credit
18   officer for the Oakwood facility, technically had
19   the authority to say yea or nay for the
20   transaction on his own. In this particular
21   instance he chose not to, which was not an unusual
22   thing. That was actually fairly common, because
23   even though people had this theoretical capability
24   to approve things, a lot of stuff got done by
25   committee, if you will, within credit risk

49

Fiachra O'Driscoll

1
2    submission to credit risk management, usually only
3    after we had discussed the matter with our
4    supervisors.
5          And that that submission to credit risk
6    management would detail the nature of the company
7    in question to whom we would be entering into the
8    loan purchase facility, or the warehouse, or the
9    reverse repo agreement, or whatever the form of it
10   was.
11         Individual people within credit risk
12   management had formally the authority to commit to
13   transactions with exposures up to certain limits.
14   And that -- there was kind of a hierarchy, if you
15   will, of the exposure limits that somebody would
16   be allowed to enter into.
17         How that exposure was measured varied
18   significantly, depending upon the nature of the
19   transaction in question, because you would have to
20   approach CRM for transactions not merely ones that
21   would be things such as, say, a warehouse loan or
22   something of that sort. But things such as
23   credit -- such as, for instance, interest rate
24   swaps, things such as delayed settlement, really
25   anything that could give rise to a credit exposure

48

Fiachra O'Driscoll

1
2    management.
3          And he -- the ultimate approval for it
4    came not just from him, but I know for certain
5    that his supervisor, which was a gentleman by the
6    name of David Malletta --
7    Q.    Spell that, please.
8    A.    David Malletta, M-a- -- I'm not so sure
9    I'm going to have the spelling right. I'm going
10   to have a crack at it. M-a-l-l-e-t-t-a.
11   Q.    All right.
12   A.    Give or take.
13         And in turn his supervisor,
14   Robert O'Brien, were involved in the
15   transaction, as well as his supervisor, which
16   was Dick Thornburgh, Richard Thornburgh.
17   Q.    How does James Xanthos, X-a-n-t-h-o-s,
18   fit into that hierarchy?
19   A.    He was an associate who worked for
20   Tom Irwin.
21   Q.    All right. Had you completed your
22   answer?
23   A.    Yes.
24   Q.    Thank you.
25         All right. And do I take it then, sir,

50

Fiachra O'Driscoll

1
2  that to the extent that you had contact with CSFB
3  New York branch regarding this facility your
4  contact was with somebody in the CRM department?
5      A.    Not necessarily, because CRM covered
6  not just the New York branch, but it also covered
7  Credit Suisse First Boston Corporation, the
8  broker-dealer.  I would also have talked to
9  Tony Giordano, who is the -- one of the officers
10 at least during that period of time within the
11 New York branch, and probably to other people as
12 well.
13     Q.    All right.  And Mr. Giordano was
14 employed by the broker-dealer?
15     A.    I believe he was employed by the
16 branch.
17     Q.    Is that the broker-dealer?
18     A.    No, the branch.
19     Q.    The branch.  Okay.
20           All right.  And what was his role in
21 that -- this facility?
22     A.    His role was to represent the branch.
23     Q.    On issues other than CRM issues?
24     A.    Precisely.
25     Q.    Okay.  And what was the nature of his

Fiachra O'Driscoll

1
2  responsibility?
3      A.    Ensuring that from the point of view of
4  the branch that the transaction was put together
5  correctly.
6      Q.    All right.  Now, had this cast of
7  characters changed -- or strike that.
8            Did this cast of characters change with
9  respect to the transaction or proposed transaction
10 that was referred to as the warehouse facility in
11 the weeks leading up to and shortly following
12 Oakwood's bankruptcy?
13           MR. OSNATO:  Objection as to the form.
14           You can answer.
15     A.    Now, what do you mean --
16     Q.    Was it the same people?
17     A.    When you refer to the warehouse
18 facility are you referring to the loan purchase
19 facility?
20     Q.    I'm talking about --
21           You are aware, sir, that in the weeks
22 preceding up to the bankruptcy of Oakwood on
23 November 15th, 2002 CSFB was acting as financial
24 advisor to Oakwood?
25           MR. OSNATO:  Objection as to the form.

Fiachra O'Driscoll

1
2            You can answer.
3      A.    I believe that's correct.
4      Q.    And one of the things that CSFB was
5  attempting to do was to put into place what it
6  referred to at the time as a warehouse facility,
7  correct?
8            MR. OSNATO:  Same objection.
9      A.    I don't think that's correct.
10     Q.    Do you think it referred to it at the
11 time as a loan purchase facility?
12     A.    I don't recall us putting together
13 anything in that period of time.
14     Q.    I'm sure you didn't, but the question
15 is whether you were attempting to do so.
16     A.    Not that I recall.
17     Q.    So is it your testimony that during the
18 period leading up to Oakwood's bankruptcy CSFB was
19 not making any effort to put together some sort of
20 warehouse or loan purchase facility for Oakwood?
21           MR. OSNATO:  Same objection.
22           You can answer.
23     A.    During that period of time there was a
24 loan purchase facility in place.  There -- I was
25 never asked to put together any type of warehouse,

Fiachra O'Driscoll

1
2  that I can recall.
3      Q.    Or loan purchase facility?
4      A.    Or a loan purchase facility.
5      Q.    Were you asked to obtain a waiver from
6  CSFB New York branch of the provision in that
7  facility that created a right to suspend it upon
8  Oakwood's bankruptcy?
9            MR. OSNATO:  Objection as to the form.
10           Asked by whom?
11           MR. CASTANARES:  You may answer.
12     A.    Yes.
13     Q.    Who asked you to do that?
14     A.    An Oakwood officer.  Precisely whom, I
15 don't recall.
16     Q.    And did you make any such efforts?
17     A.    Yes.
18     Q.    And at any time after the putting into
19 place of the facility of early 2001 that we have
20 been talking about, as distinguished from
21 obtaining a waiver of a provision in that
22 facility, was there any effort to put together a
23 new facility of that type?
24           MR. OSNATO:  Objection as to the form.
25     Q.    Including after Oakwood's bankruptcy.

Fiachra O'Driscoll

MR. OSNATO: You can answer it.

A. Not that I'm aware of.

Q. So do I take it then, sir, that you never made any effort to go out to any other potential provider of warehouse or loan purchase facilities outside of CSFB to attempt to put one into place on Oakwood's behalf?

A. I was never asked to.

Q. And you never did it, right?

A. I was never asked to.

Q. You never did it?

A. I never did it either.

Q. Were the people who were involved in deciding whether or not to waive the provision that I've described of the 2001 loan purchase facility the same people who were involved in its approval in the first instance?

A. Some of them would have been the same.

Q. Who changed?

A. I don't recall, but certainly some of them would have been the same.

Q. Was Irwin still involved?

A. Yes.

Q. And was Xanthos still involved?

Fiachra O'Driscoll

A. I don't recall.

Q. Was anybody else from CRM still involved?

A. Bob O'Brien was still involved, for sure. I think David Malletta was involved as well.

Q. Who was your main interface in CRM on that transaction?

A. My main interface on any of those kind of transactions was Tom Irwin.

Q. And were you the person principally charged with attempting to get that waiver?

MR. OSNATO: Object to the form.

A. By whom?

Q. By your employer.

A. No.

Q. Who was?

A. Nobody was.

You asked "by my employer."

Q. By anybody in the Credit Suisse family.

Was there somebody else who was --

A. Well, to be precise, the company were the people who asked us to go and get that waiver.

Q. "The company" was Oakwood?

Fiachra O'Driscoll

A. Yes.

Q. And when you say "us" are you referring to CSFB?

A. Credit Suisse, yes, exactly.

Q. And were you the person who took that responsibility principally for Credit Suisse?

A. Yes.

Q. Did anybody else work with you in that regard?

A. I would have been the person responsible for it.

Q. All right. At the time you first had contact with Oakwood --

I believe you said 1996, am I correct?

A. Correct.

Q. -- was Oakwood engaging in any other method of monetizing its RIC paper, other than ABS securitizations?

A. Its "RIC paper"?

Q. Yes, retail installment contracts.

A. Oh, okay. I never heard of them.

Q. Okay.

A. I never heard that euphemism in a decade in this business before, but...

Fiachra O'Driscoll

Q. How shall we call the paper that's generated by end users when they purchase homes from Oakwood?

A. Probably just calling them mortgages, you see.

A portion of them were retail installment sales contracts, particularly at the beginning of that period of time. I think the term used almost universally in the industry is simply mortgages, without regard to the precise legal form of the instrument. From the point of view of the borrower they call them that.

Q. If we want to talk about this paper generated by end users in the course of this deposition, if I call them mortgages is that --

A. I'm sure no one will object.

Q. -- that's fine?

As long as you and I are talking --

A. We'll all be on the same page.

Q. Good. At least -- that will be fine.

Was Oakwood using any other method to monetize those assets, other than ABS securitizations at the time you first came on board?

```
 1              Fiachra O'Driscoll
 2      A.    From time to time they sold loans also.
 3      Q.    Was CSFB involved in any of those
 4   sales?
 5      A.    We might have been involved in one or
 6   two --
 7      Q.    Right.
 8      A.    -- along the way.
 9            As a general rule, no.
10            And I don't have a specific
11   recollection.
12      Q.    All right.  Were there any such
13   transactions after you came on board?
14      A.    In other words, were there any hold-on
15   sales by Oakwood?
16            Yes.  Yes, there were.
17      Q.    Let me ask a broader question.  What
18   I'm interested in knowing is whether after you
19   came on board in 1996 Oakwood engaged in any
20   transactions to monetize its mortgages, other than
21   ABS securitizations.  And let me exclude from this
22   the B2 transaction, the Berkshire transaction.
23      A.    Which was really a securities
24   transaction anyway.
25      Q.    Okay.  We'll come to that.
```

```
 1              Fiachra O'Driscoll
 2            But do you have my question in mind
 3   now?
 4      A.    Yeah.  Well, if I -- forgive me if I
 5   give you a slightly more expansive answer.
 6      Q.    Fine.
 7      A.    At different points in time my
 8   recollection is that Oakwood did so and was able
 9   to sell a small number of loans on a kind of a
10   local retail basis, not huge amounts, at
11   relatively good prices.
12            In other words, a price approximating
13   to par, sometimes maybe a little bit more than
14   par, sometimes a fraction less than par, but in
15   the context of the face value of the mortgage
16   itself to a number of different people.
17            I don't have specific recollections,
18   but I think that Bombardier purchased some from
19   Oakwood in '98 or '99.  I think there were a few
20   others as well, where there were small
21   transactions of that sort.
22            Sometimes also the local sales centers
23   would sell some of their mortgage product on their
24   own initiative, if you will, to other parties as
25   well.
```

```
 1              Fiachra O'Driscoll
 2            By and large there wasn't a very
 3   efficient market for bulk sales of mortgages in
 4   the way that -- for instance, today there is in
 5   what one would consider conventional prime
 6   mortgages, where you can actually take a portfolio
 7   of raw mortgages and sell that for a very
 8   efficient price to a very broad market.  Back at
 9   that point in time whole loan sales when they were
10   conducted were, A, usually done at a fairly sharp
11   discount to par, significantly less than the
12   proceeds that one could get out of a
13   securitization, irrespective of whether you sold
14   the B2 security or not.
15            And beyond that it was generally a
16   fairly long -- a fairly long, drawn out process.
17   So it wasn't really seen in the industry as being
18   a viable, long-term approach to selling anything
19   other than a one-off pool of mortgages.
20      Q.    All right.  And with respect to -- to
21   the extent that Oakwood engaged in any such
22   transactions was CSFB involved in any way in them?
23      A.    I think we might have had a tangential
24   involvement with a Bombardier discussion, but
25   frankly my -- my recollection is pretty hazy.
```

```
 1              Fiachra O'Driscoll
 2      Q.    All right.  And I believe you described
 3   the Berkshire transaction as a securities
 4   transaction.
 5      A.    Yes.
 6      Q.    What did you mean by that?
 7      A.    The Berkshire transaction was a -- you
 8   may see it in the documents as -- I think it was
 9   called the Lotus Resecuritization Trust.  And it
10   was a transaction in which a collection of the B2
11   securities, which were at the -- essentially the
12   bottom securities within each of the mortgage
13   securitizations were taken, put into a new trust,
14   a single new trust.  And a single note was issued
15   that was collateralized by all of those B2s.  And
16   that note was then sold to Berkshire Hathaway
17   after a guarantee was wrapped around the entire
18   note by -- by I think Oakwood Homes.
19      Q.    All right.  Now, these B2s, did they
20   carry an Oakwood guarantee before these Berkshire
21   transactions occurred?
22      A.    When you say "these B2s," the B2s that
23   were the subject of the Lotus transaction?
24      Q.    Correct.
25      A.    Some of them did, some of them didn't.
```

Fiachra O'Driscoll

2  Q.  And what was the nature of the
3  guarantee that Oakwood issued at the time of this
4  transaction?
5  A.  It was a guarantee that in the event
6  that the B2s failed to pay the stated interest
7  coupon on the security, on their security, or
8  failed to pay the principal amounts when they
9  became due, that Oakwood Homes Corporation would
10 make a payment to the -- I believe to the
11 securitization trust equal to the difference
12 between what was due and what was actually paid.
13 Q.  Okay.  And was Berkshire the sole
14 holder of that securitization trust?
15 MR. OSNATO:  Objection as to the form.
16 A.  I believe so.
17 Q.  Okay.  So did this have the effect of
18 increasing the total amount of Oakwood's guarantee
19 liability?
20 A.  Yes.
21 Q.  Do you have any figure in mind as to
22 the amount by which that increased?
23 A.  I think it -- it changed over time,
24 because there were actually a number of different
25 transactions that bundled -- bundled the guarantee

63

Fiachra O'Driscoll

2  liability together into one.
3  Q.  All right.  And did all these
4  transactions take place at 55?
5  A.  At dollar price of 55?
6  I don't believe so, but it was around
7  that level.  I'm pretty sure, in fact, that there
8  were small differences from 55.
9  Q.  And do I correctly understand your
10 prior answer as being that Oakwood's guarantee was
11 effectively at par on both principal and coupon?
12 A.  Correct.
13 Q.  So the economic effect of this
14 transaction was that Oakwood was getting a price
15 which was roughly 55 and guaranteeing 100; is that
16 correct, plus interest?
17 A.  That is correct.
18 Q.  And before that transaction occurred
19 the holder of the B2 securities that were packaged
20 into it was Oakwood or one of the companies in its
21 family; is that correct?
22 A.  I believe that it's generally correct,
23 yes.
24 Q.  This was a securitization of assets
25 that were held by Oakwood and then essentially

64

Fiachra O'Driscoll

2  sold into the securitization trust to Berkshire?
3  A.  Correct.
4  Q.  Okay.  When you first came upon the
5  scene at Oakwood in 1996 did you make any changes
6  in the way that Oakwood was handling these
7  securitization transactions or in the way that
8  CSFB was acting in connection with them?
9  MR. OSNATO:  Objection as to the form.
10 You can answer that.
11 A.  Can you be more specific about what you
12 mean by "handling."
13 Q.  Did you cause any changes to occur in
14 the transactions themselves or in CSFB's
15 relationship with Oakwood regarding the
16 securitization transactions?
17 MR. OSNATO:  The same objection.
18 A.  The answer is, yes.
19 Q.  What changes?
20 A.  You -- I think we would need to break
21 it down into smaller time intervals.  Because over
22 seven or eight years that passed there were quite
23 a number of small changes in one way or another.
24 Q.  All right.  Let's --
25 A.  There were changes, for instance, to a

65

Fiachra O'Driscoll

2  degree in the nature of the information that we
3  provided to investors.  In the early part of that
4  period it was before computational materials were
5  provided, for instance.
6  At that time, back in 1996, the norm
7  was that you would deliver to an investor at the
8  initiation really of the offering a red herring,
9  much as you would with an equities offering or
10 with anything else at that point in time.  And
11 that red herring would have really everything
12 within the document, apart from the coupon rates
13 on the individual REMIC securities that were being
14 issued out of, et cetera, et cetera.
15 Then computational materials came into
16 common acceptance in the period kind of after
17 that, probably sometime in 1997.  And it was
18 during that period of time that we tended to shift
19 over in terms of the nature of the offering
20 materials that were shown out to that kind of mode
21 in the first instance and simply proceeded
22 directly to a final prospectus without recourse to
23 preparing a red herring in advance.
24 Part of it was that the documents were
25 sufficiently stable and sufficiently well

66

Fiachra O'Driscoll

2 understood during that period of time, that
3 investors were content to dispense with needing a
4 red herring. And, in fact, were generally looking
5 for a shorter form summary of what the
6 characteristics of the loans and what the
7 individual characteristics of the securities
8 themselves were.
9          Then practically every securitization
10 in truth had small changes to it in the nature and
11 the form of the securities themselves that were
12 offered, changes in the average lives, changes in
13 the precise ratings, changes in which rating
14 agencies might be used on the transactions, might
15 rate the transaction, things of that sort.
16     Q.    All right. Let me ask you to clarify a
17 point in a couple of answers you've given before
18 where you've talked about information given to
19 purchasers.
20          In these securitization transactions
21 did you have personal -- personally have contact
22 with any potential purchasers of the securities
23 being issued?
24     A.    Of -- of which securities, of the REMIC
25 securities generally?

Fiachra O'Driscoll

2     Q.    Yes.
3     A.    Yes.
4     Q.    And was that something you commonly
5 did?
6     A.    Absolutely.
7     Q.    And describe for me who --
8          Was it a certain body of people that
9 you dealt with, institutional investors or --
10     A.    Yes. There were uniformly
11 institutional investors. I never had occasion to
12 deal with a non-institutional investor.
13 Technically these things are -- can be sold to
14 non-institutional, but it's really an exclusive
15 institutional market.
16          Generally speaking, within those
17 institutions there would be one specific team of
18 portfolio managers whose job it was to invest in
19 exactly these kind of securities. In other words,
20 maybe not just manufactured housing, but more
21 typically in ABS securities and MBS -- non-agency
22 insured MBS securities in general. And that would
23 be the team that you would maintain a dialogue
24 with.
25     Q.    All right. Tell me please in addition

2 to the financial engineering function that you've
3 described and in addition to the contact with the
4 rating agencies and the contacts with the
5 purchasers that you just described what, if any,
6 other services did CSFB perform for Oakwood as the
7 underwriter of its ABS transactions.
8          MR. OSNATO: Objection as to the form.
9          You can answer.
10     A.    Can you go back over the list that you
11 went through already?
12     Q.    Yeah. Well, I think you've identified
13 for me that there was the financial engineering --
14     A.    Yup.
15     Q.    -- stuff.
16          I think you've told me that in the
17 underwriting process you dealt with the rating
18 agencies.
19     A.    Yup.
20     Q.    And I think you've told me that you
21 dealt with purchasers.
22     A.    Yup.
23     Q.    And I'm just trying to find out whether
24 in the course of an underwriting CSFB performed
25 other services for Oakwood.

Fiachra O'Driscoll

2     A.    I think I've also described the way in
3 which we would brief the company as to the market,
4 the market reception, investors response to other
5 manufactured housing offers, and to the likely
6 response to the given -- to the particular
7 instrument in question.
8          And that was the essence of what we
9 did.
10     Q.    All right. Did CSFB have anything to
11 do with the pricing of the securities offered?
12     A.    Absolutely.
13     Q.    Tell me about that, please.
14     A.    What we would -- what we would do, and
15 the very essence of what we did in many ways, was
16 to go out to find investors, to find out at what
17 level, what the clearing level was for the
18 securities in question. And how that would really
19 work would be that you would -- just as you would
20 really in an equities offering or something of
21 that sort -- you would work with the sales force
22 and with other members of the team to see where
23 people had been purchasing similar securities in
24 the weeks running up to that.
25          You take your best shot at what an

Fiachra O'Driscoll

1  appropriate price talk was or price range at which
2  you could offer these securities at. Then you'd
3  go out and you would try to -- you'd work with the
4  sales force to find investors for these
5  securities. You'd put together essentially a book
6  in the same sense as an equities offering book of
7  investors who wished to subscribe to the
8  transaction.
9  
10  Some of them would come in and say they
11  will simply invest at whatever the price talk is,
12  as the euphemism goes in the industry. Some would
13  have a strong opinion of their own as to what the
14  right price was at which they would invest.
15  Usually technically the price itself was a par
16  price or a near par price. So when I use the term
17  price in that context what I really actually mean
18  is the spread on the securities in question.
19  Now, how that spread was measured
20  changed over time. In the early part of the time
21  it was almost always spread over treasuries.
22  Later on it was quoted as spread over LIBOR or
23  spread over swaps, or even perhaps other things.
24  But when we talk about price talk in
25  essence what we mean is a security that's going to

71

Fiachra O'Driscoll

1  be priced at par. But the coupon that's going to
2  be set is going to be a function of two things,
3  one being the level of treasuries or the level of
4  swap rates. And the second thing, the spread over
5  treasuries that investors are demanding for such a
6  security.
7  
8  MR. OSNATO: And can I interrupt for a
9  second?
10  When you finish this line can we take a
11  quick break?
12  MR. CASTANARES: We can take a quick
13  break right now.
14  MR. OSNATO: Okay. Thank you.
15  THE VIDEOGRAPHER: Going off the
16  record, 10:28, tape 1.
17  (Recess taken.)
18  THE VIDEOGRAPHER: Back on the record,
19  it's 10:37, tape 1.
20  BY MR. CASTANARES:
21  Q.   Mr. O'Driscoll, we have talked about
22  CSFB's role in the REMIC securitizations for
23  Oakwood and we have also briefly discussed the
24  asset purchase facility in early 2001, including
25  the warrant that was issued. And we also very

72

Fiachra O'Driscoll

1  briefly touched upon the financial services
2  advisory contract of August 2002.
3  
4  With the exception of those three
5  relationships, in the time that you have been --
6  the time you were associated with the Oakwood
7  contact for CSFB was there any other business
8  relationship between CSFB and any Oakwood company?
9  A.   Not to my knowledge.
10  Q.   Now, you named a number of other
11  companies in the manufactured housing area. And
12  let me preface what I'm about to ask you by saying
13  I'm not looking for confidential information about
14  transactions, but I am looking for your own
15  personal -- what personal experience you brought
16  to the table when you came to Oakwood. And so I
17  want to ask rather tailored questions not designed
18  to go any farther than the way they're phrased.
19  A.   Uh-huh.
20  Q.   Was Green Tree or Conseco ever a client
21  of CSFB?
22  A.   I know the term client is one that has
23  a specific legal meaning, can you explain what you
24  mean by that?
25  Q.   Was there a business relationship of

73

Fiachra O'Driscoll

1  any kind between --
2  A.   Yes.
3  Q.   Describe it, please.
4  A.   Very similar to that with Oakwood,
5  which is that with either of those we both
6  undertook mortgage securitizations and we also --
7  we also for Conseco at least provided -- in that
8  case there was both a direct credit relationship.
9  In other words, we were participant in their bank
10  revolving credit facility. And we also provided
11  to them a reverse repurchase facility akin to the
12  warehouse, is one of the forms of those type of
13  warehouse agreements that went in and out of
14  fashion as I described.
15  Q.   All right. And were you personally
16  involved in those transactions?
17  A.   Yes.
18  Q.   Okay. When did those transactions
19  occur?
20  A.   At different points in time from 1997,
21  '98, '99, 2000, 2001.
22  Q.   All right. And was CSFB compensated
23  for its role in those transactions?
24  A.   Yes.

74

Fiachra O'Driscoll

1    Fiachra O'Driscoll
2    Q.    Was Conseco in the business of
3    manufactured homes?
4    A.    They were not in the business of
5    manufacturing homes, if that's your question.
6    Q.    They had acquired this paper from
7    somebody who was in the business of manufacturing
8    homes?
9    A.    Conseco Finance was in the business of
10    originating loans through retailers of
11    manufactured homes and accumulating them and
12    securitizing them.
13    Q.    All right.  And CSFB's role was in one
14    fashion or another monetizing those loans for
15    Conseco?
16    A.    Yes.
17    Q.    And had you engaged in any of those
18    transactions before 1996 when you first contacted
19    Oakwood?
20    A.    Manufactured housing securitizations?
21    Q.    For Conseco or --
22    A.    For Conseco, yes, we had.
23    Q.    And you personally had been involved in
24    those?
25    A.    No.

75

1    Fiachra O'Driscoll
2    A.    Less than a dozen with GreenPoint
3    specific instances.
4    Q.    Okay.  And what about
5    United Companies --
6    A.    Uh-huh.
7    Q.    -- which I think you just said is
8    bankrupt, what was their role in this history?
9    A.    They, too, were a lender.  They
10    actually had two businesses.  One was
11    non-conforming mortgage lending in general on not
12    manufactured homes, but on site-built homes.  And
13    also they had a manufactured housing lending
14    operation as well, which worked very similarly to
15    Conseco Finance.
16    Q.    All right.  So they were not
17    manufacturers, but they were also -- they somehow
18    or other acquired this paper?
19    A.    They were a finance company, yeah.
20    Q.    All right.  And would you explain the
21    term non-conforming as you've used it.
22    A.    In other words, a mortgage that because
23    of something about its character makes it
24    ineligible for a purchase by Fannie Mae, or
25    Freddie Mac, or Ginnie Mae, or the FHA, or VA.

77

1    Fiachra O'Driscoll
2    Q.    Now, you mentioned B of A/GreenPoint.
3    A.    Uh-huh.
4    Q.    Was that similar to the Conseco
5    situation, in that they were not manufacturers of
6    home, but they had acquired the paper in some
7    other manner?
8    A.    Correct.
9    Q.    And you were monetizing that for them
10    in the same way?
11    A.    Precisely.
12    Q.    Had that occurred prior to your first
13    involvement with Oakwood?
14    A.    I had --
15           Can you rephrase your question?
16    Q.    Had CSFB participated in any such
17    transactions prior to your --
18    A.    I don't believe so.
19    Q.    And were you personally involved in
20    such transactions after you became involved with
21    Oakwood?
22    A.    Yes.
23    Q.    How many such transactions?
24    A.    I would need to check.  A number.
25    Q.    All right.  In excess of a dozen?

76

1    Fiachra O'Driscoll
2    Q.    Is that typically related to the
3    creditworthiness of the loan itself or is it some
4    other formal characteristic, or something else?
5    A.    It can be either of the two.
6    Q.    And Bombardier Capital, was it also a
7    lender?
8    A.    Yes, exactly.
9    Q.    Okay.  So similar transaction?
10    A.    Very similar.
11    Q.    Okay.  And how about
12    Clayton/Vanderbilt?
13    A.    Clayton was a manufacturer as well as
14    having a finance company.
15    Q.    And did its finance company finance
16    home purchases with respect to transactions for
17    other manufactured housing builders or just simply
18    Clayton?
19    A.    It -- to be precise, it had a
20    50 percent owned affiliate whose name I -- whose
21    name was 20th Century Mortgage, I think, which
22    would originate paper outside of Oakwood -- sorry,
23    outside of the Clayton retailer network.  The
24    paper that was originated by Vanderbilt was done
25    exclusively from Clayton dealers.

78

Fiachra O'Driscoll

1
2     Q.     All right.  And on behalf of Clayton
3  and Vanderbilt were the transactions similar to
4  those that were done for either Oakwood or the
5  other lenders that you've described, or both?
6     A.     Almost indistinguishable.
7     Q.     Okay.  And I take it CSFB was
8  compensated for its role in all these transactions
9  for all of these clients --
10    A.     Yes.
11    Q.     -- is that correct?
12    A.     Yup.
13    Q.     Did CSFB have any equity position in
14 any of these companies, ever?
15    A.     I don't know.
16    Q.     Do you know whether CSFB ever obtained
17 a warrant for an equity position in any of these
18 other companies?
19    A.     I don't know.  I don't know.  It was a
20 form of compensation that was used during that
21 period of time with a number of finance companies
22 in a number of different situations that I can
23 recall.  I don't know specifically whether it was
24 with any of those guys.
25    Q.     Compensation for what?

79

Fiachra O'Driscoll

1
2     A.     Usually for the provision of credit
3  services was typically the case.
4     Q.     When you say "credit service" do you
5  mean an extension of credit?
6     A.     In some shape or form.
7     Q.     So it's essentially compensation for
8  the forbearance of money?
9     A.     "For the forbearance of money"?
10    Q.     Yeah, for the use of money.
11    A.     For the provision of money?
12    Q.     Yes.
13    A.     I think it's probably more useful to go
14 through specific examples.
15    Q.     Can you?
16    A.     I'm sorry?
17    Q.     Can you?
18    A.     One example was Conseco, where we
19 didn't have any such arrangement, but
20 Lehman Brothers, for instance, did receive
21 warrants from Conseco Finance at -- I think on two
22 occasions for providing a subordinate debt
23 facility is my recollection was one.
24    Q.     Essentially for lending money?
25    A.     For some form of credit advance,

80

Fiachra O'Driscoll

1
2  anyway.  I don't remember the precise details
3  because it's sometime ago.  Credit Suisse also did
4  similar things with other people, and damned if I
5  can remember the details at this point.
6     Q.     All right.  Did you or anybody else in
7  1999 at CSFB have a belief that the
8  manufacturing -- manufactured housing industry had
9  bottomed out and would soon turn around?
10    A.     In 1999?
11    Q.     Yes.
12    A.     1999 the manufactured housing market
13 was still doing relatively well.
14    Q.     All right.  Did you at some point come
15 to the conclusion that the industry had bottomed
16 out and would soon turn around?
17    A.     Yes.
18    Q.     When was that?
19    A.     Probably in the summer of 2001.
20    Q.     And what led you to that belief?
21    A.     There was a period of time in which
22 sales improved for an interval of time,
23 particularly year into year sales.  And the
24 downturn, which had really begun in '98 or '99,
25 depending on how you measured it, seemed to be

81

Fiachra O'Driscoll

1
2  bottoming out for a period of time.
3     Q.     And what period of time was that?
4            How long did it last?
5     A.     Specifically, I don't recall.  But
6  there certainly was a period of time in 2001 where
7  sales did seem to be improving.
8     Q.     Was that more than a quarter?
9     A.     You know, I don't recall.
10    Q.     And did that seem to be the case across
11 the industry or just in the case of Oakwood or --
12    A.     It seemed to be industry wide.
13    Q.     So the top line was improving?
14           MR. OSNATO:  Objection as to the form.
15    A.     What do you mean by "top line"?
16    Q.     Revenues.
17    A.     Revenues of a specific --
18    Q.     Of manufactured housing.
19    A.     -- manufactured housing?
20           They appeared to be.
21           These things can be hard to measure
22 because it's a very seasonal business.  Not
23 surprisingly, these homes tend to sell more in the
24 summertime than in the wintertime.  So by its
25 necessity you're having to make comparisons.

82

Fiachra O'Driscoll

And also the number of, for instance, stores, dealerships, and so on that a particular company has opened at a particular point in time vary, but trends seemed to be positive in the industry, sales trends specifically.

Q. And sales trends, were these positive sales trends applicable to new product only or to repossessed product only, or both?

A. I -- it was with respect to new sales.

Q. And what was happening at the same time as these positive trends in new sales with regard to repossessions?

MR. OSNATO: Can I interject?

Are we talking about the industry as a whole --

MR. CASTANARES: Yes.

MR. OSNATO: -- still, and not Oakwood specifically?

So address this to the industry.

A. Repossessions were continuing to get somewhat worse.

Q. I'm sorry?

A. Reposessions were continuing to get somewhat worse.

Fiachra O'Driscoll

Q. And did you make any assessment of the reasons for that?

A. The reason, in essence, was because usually you see a degree of pattern to when delinquencies, and defaults, and repossessions occur, or foreclosures occur with really any kind of mortgage product. Which is to say that by its nature when somebody takes out a mortgage they rarely fail to make the first few mortgage payments.

Generally speaking, you know, they've gotten a mortgage because they have a job that's a well-compensated job, they see no reason why it's going to terminate, they don't think that their financial circumstances are going to change. And they've convinced a banker, a lender, a finance company of that. So usually it's only after a period of time in which you actually see the -- you see delinquencies in mortgages start to rise.

Now, of course, that's a fairly statistical business, because by and large most people do make their payments every month. Some people, of course, do not. And what you typically will see is that that percentage of people who

Fiachra O'Driscoll

have failed to make payments in a timely fashion rises over time. And as a consequence, the number of people who become seriously delinquent, to the point where a bank or a finance company chooses to foreclose on the mortgage loan, is something that will rise over time as well.

And by its nature, I think '98 was -- '98 or '99 was the peak year. I don't remember which one of the two it was, but it was around that time that it was the peak year. So by its nature you are going to see some years after that, three, four years after that a peak in repossessions coming off those loans that had been originated in 1998.

Now, the question was whether, you know, whether those -- whether that pattern of repossessions was going to increase, decrease, or stay the same.

Q. And did you reach an opinion on that subject?

A. It was hard to reach an opinion on that subject, and I don't recall reaching an opinion on that subject.

Q. All right. And was Oakwood's

Fiachra O'Driscoll

experience typical of the general industry trends that you've described in both sales of new product and repossessions at about this time or did it differ in any way?

A. It might have done. To be honest, I don't recall specifically in that time interval.

Q. All right. Did you discuss these trends with Oakwood?

A. The -- I'm sure we did.

Q. Did you personally do so?

A. I'm sure I did.

Q. All right. And when you say "we," would there have been somebody else at CSFB that you recall --

A. In other words, Credit Suisse.

Q. Okay.

A. Certainly -- I certainly did at some point in that period of time.

Q. Are you aware of whether anybody else at Credit Suisse --

A. I'm not.

Q. -- did so?

Can you tell me, was it Doug Muir that you talked to about that?

Fiachra O'Driscoll

1        Fiachra O'Driscoll
2    A.    I don't recall a single specific
3  conversation.
4    Q.    Can you recall any of the discussions
5  you had?
6    A.    Not with any specificity.
7    Q.    All you can recall is that you did
8  discuss --
9    A.    That we did have discussions about
10 that.
11   Q.    But you can't recall anything either of
12 you said?
13   A.    That was certainly an inevitable topic
14 of conversation with anybody in the manufactured
15 housing industry throughout those entire years.
16   Q.    Did the increase in repossessions on
17 earlier securitizations in any way influence the
18 practicality, or the feasibility, or the pricing
19 of continuing new securitizations that were
20 occurring?
21        MR. OSNATO:  Objection as to the form.
22        You can answer that in components if
23 you like or you can try and answer all three
24 at the same time.
25        MR. CASTANARES:  Yeah, I recognize it's

87

1        Fiachra O'Driscoll
2  a customer who perhaps didn't qualify for a new
3  home to instead a repo home instead.
4        So the average credit scores on those
5  repossessed homes of the borrowers -- of the
6  borrowers purchasing those repossessed homes, if I
7  can be precise, tended to be a little bit lower.
8  So as a consequence, when the rating agencies saw
9  a pool that had a higher than average or higher
10 than previous percentage of repo refinances they
11 tended to -- they tended to require that the
12 degree of subordination that people owe any
13 particular tranche, in other words, the degree of
14 losses that would be absorbed before that tranche
15 would experience any credit losses, needed to be
16 somewhat higher.
17        So what that would do is it would
18 reduce the amount of AAA securities to be sold
19 within a transaction and it would increase the
20 amount of BB, or BBB, or A securities to be sold
21 in a transaction.
22        By their nature, the AAA securities
23 tended to price at a tighter spread than the more
24 subordinate securities.  So even if it didn't
25 impact the pricing on the individual securities,

89

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1        Fiachra O'Driscoll
2    compound.  I'll break it out if you like.
3        THE WITNESS:  Yes, please.
4    Q.    Did the trends in defaults and
5  repossessions have any effect upon the feasibility
6  of future securitizations for Oakwood at any time
7  that you were involved?
8    A.    No.
9    Q.    Did it have any effect upon the
10 pricing?
11   A.    It had an indirect impact on the
12 pricing.  The rating agencies and, indeed,
13 investors recognized that the credit standards on
14 which -- what were called repo refis in the
15 vernacular -- in other words, refinancing of
16 repossessed homes -- by their nature would tend to
17 be somewhat weaker credits.  These homes were, of
18 course, preowned homes.  They were by their nature
19 cheaper homes, which usually would be lent
20 borrowers on lower -- would be extended to
21 borrowers on somewhat lower incomes who
22 statistically tended to have a somewhat higher
23 probability of default.
24        And furthermore, they also tended --
25 there tended to be an industry practice to direct

88

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1        Fiachra O'Driscoll
2  the aggregate costs within the securities would
3  tend to -- of the pieces sold would tend to be
4  higher.
5    Q.    Did this trend in increasing repo-refi
6  rates in any way affect -- I'm speaking now of
7  Oakwood -- in any way affect the amount of credit
8  enhancement or guarantees that Oakwood would need
9  to provide for some of the lower tranches?
10   A.    It could.  It would cause the B2
11 tranche, which was the tranche guaranteed at times
12 during that period of time, to be become a larger
13 tranche as a percentage of the entire transaction.
14   Q.    So the effect would be to increase the
15 dollar amount of Oakwood's guarantee exposure?
16   A.    Yes.  Typically it wasn't a huge
17 change.  It would be a small change, but it would
18 increase that amount.
19   Q.    Is there any way you could quantify
20 that for me?
21   A.    It's difficult for me to recall
22 precisely at this point in time, but it might be a
23 change such that a -- say a B2 tranche that was
24 4 percent of the entire transaction might go to be
25 4 and a quarter percent of the entire transaction.

90

Fiachra O'Driscoll

1  Fiachra O'Driscoll
2  It might go to be 4 and a half percent of the
3  transaction, that kind of thing.
4    Q.    All right. We've talked about the
5  packaging together of some of these B2 securities
6  in the --
7         THE WITNESS:  Thank you.
8    Q.    -- Berkshire transactions that we've
9  talked about before the break.
10   A.    Yeah.
11   Q.    Was CSFB making any effort to sell the
12  B2 securities or was Oakwood intentionally holding
13  onto those?
14   A.    No.  We were making efforts to try to
15  sell the B2s.
16   Q.    And to what extent had those efforts
17  been successful on prior securitizations before
18  Oakwood's bankruptcy?
19   A.    Up until Oakwood lost its investment
20  grade rating, generally speaking we were able to
21  sell those B2 securities fairly readily and
22  without any difficulty.  From that date onwards,
23  which was I think late 2000, it became more
24  difficulty to sell it.  In part, because of the
25  rising -- the fall in sales in the industry and

91

1  Fiachra O'Driscoll
2  the rising number of repossessions in the
3  industry, and then in part because Oakwood had
4  lost its investment grade rating.
5    Q.    And at some point did it become
6  basically impossible to sell those?
7    A.    We were on occasion successful, but
8  overall Oakwood was generating more B2s from its
9  securitizations than we were able to find buyers
10  for it.
11   Q.    And did Oakwood continue, nonetheless,
12  to attempt to sell these B2 securities or did it
13  ever -- strike that.  Let me ask a better
14  question.
15        To your knowledge, did Oakwood ever
16  consider simply not offering the B2 securities as
17  part of the securitizations?
18   A.    From their perspective it really wasn't
19  an option.  Because if you didn't offer the B2
20  securities, then you would effectively have to
21  hold on to what would be implicitly the component
22  within the securitization itself.
23        So in effect all you would be doing
24  was -- if you didn't kind of create and offer
25  these securities, instead of having a B2 as a

92

1  Fiachra O'Driscoll
2  security on your balance sheet, instead you would
3  have an interest within the securitization itself
4  that would be a highly illiquid interest that you
5  would need to package up in some shape or form
6  before you could find an institutional buyer for
7  it.
8    Q.    Well, if you didn't offer the B2
9  securities at all you would basically continue to
10  hold the mortgages; is that correct?
11   A.    No, not quite.
12   Q.    Oh, okay.  Please tell me how I'm
13  wrong.
14   A.    If you, for instance, have a REMIC, a
15  REMIC trust of the form in which these things were
16  securitized typically, there is usually some
17  component at the very bottom of the transaction
18  that the company retains.  In most of these
19  transactions it was simply the excess interest
20  within the transaction.  In other words, the
21  difference between the coupon rate on the
22  securities themselves and the weighted average
23  coupon rate on the securities that were sold to
24  the investor community.
25        On some transactions as well there was

93

1  Fiachra O'Driscoll
2  what was called overcollateralization.  And that
3  would be where there was an element in the
4  transaction structure below the lowest security,
5  which was also not sold to investors.  Now, by its
6  nature, if you have $500 million of mortgage loans
7  and you sell $450 million of securities you're
8  only getting $450 million in for what you've
9  lent -- you know, you've lent out $500 million out
10  the door.  So the net result is you're $50 million
11  out of pocket.
12        Now you can either do it in that form
13  in such a way that you've got a very large
14  overcollateralization piece or alternatively you
15  can turn part of that overcollateralization piece
16  into a B2 security, as we're kind of calling it
17  B2s here for purpose of the exercise.  They were
18  called various things, but that was the name most
19  typically used for them in the Oakwood program.
20        And the only real difference between
21  the two is if you had a B2 on your books then you
22  could in principle simply take that B2 security
23  and sell it to an institutional investor who came
24  along on a particular date.  And, indeed, that did
25  happen on a number of occasions.

94

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1            Fiachra O'Driscoll

2       If you instead had constructed the

3    REMIC such that you had $500 millions of loans in

4    the REMIC and you'd only sold $450 million of

5    securities, you're $50 million out of pocket every

6    time we do a securitization.

7      Q.   I'm a little -- a bit confused by this.

8    I'm just going to ask you to clarify.

9       In either case you're selling the

10   $500 million space for 450; is that correct?

11      A.   The distinction between the two

12   situations is, in the first situation where you've

13   got the $50 million overcollateralization piece,

14   it will be relatively difficult to monetize that

15   top piece within the transaction. Because

16   generally speaking you're not going to get an

17   institutional investor who's going to come along

18   and simply purchase an interest in such a

19   instrument that does -- that isn't in the form of

20   a security.

21       If you instead create a B2 security,

22   even if you can't sell it immediately, then you've

23   got something that you can within two to three

24   business days sell to an investor who is prepared

25   to purchase the instrument in question.

95

---

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1            Fiachra O'Driscoll

2      Q.   What advantage does a company like

3   Oakwood derive at all from selling $500 million

4   worth of something for 450 million?

5      A.   It's -- from Oakwood's perspective,

6   it's better than selling it for nothing or simply

7   holding onto it.

8      Q.   Why is it better than holding onto it?

9      A.   Because if Oakwood -- Oakwood was still

10   going to need to finance its loan production in

11   some way. During the period of time -- I've

12   forgotten the total loan originations of Oakwood,

13   but I'm going to assume it was 3, 4, $5 billion,

14   somewhere in that ballpark area. So the total

15   outstandings under the REMIC at any given point in

16   time, let's call it 4 billion for the sake of

17   argument.

18       If Oakwood had -- Oakwood's choices in

19   principle were to sell the loans on a flow basis,

20   which was not really practical for the reasons

21   that I mentioned, which was that generally

22   speaking it was only possible to sell those loans

23   at a fairly steep discount to face.

24       The second alternative was to go the

25   securitization route, which I think we've

96

---

1            Fiachra O'Driscoll

2   discussed.

3       And the third alternative was to hold

4   those loans on its balance sheet and to go out and

5   to negotiate, probably from banks, other financial

6   institutions, but typically banks, what would have

7   been a very, very large credit facility of the

8   order of $3 billion to finance all of its

9   underlying loan production.

10      Q.   What was the disadvantage of the third

11   alternative?

12      A.   The disadvantage of the third was that

13   for a company that was rated investment grade, but

14   only barely investment grade, it wouldn't have

15   been possible for them to get financing from banks

16   for a $3 billion credit line.

17      Q.   Just for creditworthiness reasons?

18      A.   Part creditworthiness and part just

19   sheer size. Like the size of that relative to the

20   size Oakwood, which was sure a substantial

21   corporation, you know, $2 billion market cap at

22   the peak, 9,000 employees, it was a fairly big

23   corporation. But $3 billion even today, and

24   certainly during that period of time, was an

25   enormous credit line.

97

---

1            Fiachra O'Driscoll

2      Q.   What -- once Oakwood lost its

3   investment grade rating what percentage of the B2s

4   and securitizations thereafter was CSFB able to

5   sell in the initial offerings?

6      A.   We sold some and we didn't sell others.

7   I'm not sure I can recall a percentage.

8      Q.   Can you quantify it for me at all?

9      A.   We did sell some.

10      Q.   Okay. You can't tell me whether it was

11   10 percent or 90?

12      A.   It would have been closer to 10 than to

13   90.

14      Q.   Okay. And what kind of records would

15   show that?

16      A.   I don't know.

17      Q.   You were not involved in the actual

18   sales of these instruments?

19      A.   I typically would have been, but I'm

20   trying to think what -- what records -- what

21   records there would be.

22      Q.   You just can't think of them?

23      A.   And I can't think of them, that would

24   be correct.

25      Q.   All right. Now, did your belief in

98

Fiachra O'Driscoll

mid-2001 that the industry had bottomed out and
would soon turn around prove to be correct?

    A.   Can you repeat the question again?

        Did you say 2002?

        I think you said 2002, didn't you?

    Q.   I believe you said 2001, did you not?

    A.   2001, yeah. I thought you said 2002
there.

        MR. OSNATO:  Why don't we just --

        MR. CASTANARES:  Let me start with a
clean question.

        THE WITNESS:  Shall we go again?

    Q.   Did the belief that you held in
mid-2001 that the manufactured housing industry
had bottomed out and would soon turn around prove
to be correct?

    A.   That wasn't my belief.

    Q.   Have I misunderstood something you said
earlier?

    A.   No. You've put words into my mouth,
respectfully.

    Q.   All right. Let me start again then
with where I thought we were a few minutes ago.

        Was there ever a time in the -- after

Fiachra O'Driscoll

1999 where you believed that the manufactured
housing industry had bottomed out and would soon
turn around?

    A.   What I did believe was that there was a
clear period in 2001 where sales were improving.
I'm not sure that I ever went as far as believing
that necessarily it had bottomed out.

    Q.   All right. Are you aware of whether
anybody else at CSFB believed that the industry
had bottomed out at any time after 1999?

    A.   I am not.

    Q.   Okay. Now, in your deals with the
rating agencies in the underwriting function for
Oakwood, were you communicating information to
them regarding the creditworthiness of any Oakwood
entity itself as distinguished from information
about the securities or collateral in the pool?

    A.   I would think not. That wasn't my
role.

    Q.   Did the B2 tranches get rated?

    A.   Yes.

    Q.   And in the course of the rating was the
guarantee a subject of discussion in the rating
and pricing process?

Fiachra O'Driscoll

    A.   Can you --

        By whom?

    Q.   Between you and the rating agency or
between you and purchasers.

    A.   As a general rule the rating agencies
had two teams internally. They had a team that
focused on the rating of mortgage securitization
products of one sort, quite a large team, and they
had a separate team that dealt with the rating of
corporate -- corporations.

        The mortgage securitization team within
all three, Moody's, S&P, Fitch, would when there
was a guaranteed security, would deal internally
with their own people on the corporate side to
determine what the rating of the B2 securities was
going to be. If there was a guarantee put around
it, I think in every instance the guarantee was
the same as the general senior unsecured -- was
rated the same as the senior unsecured rating of
Oakwood Homes.

    Q.   Okay. So if --

        Am I correct to infer from what you've
told me that you don't recall having any
discussion with any of the rating agencies

Fiachra O'Driscoll

specifically on the creditworthiness of Oakwood?

    A.   I don't recall any discussions.

    Q.   And did you have any such discussions
with any purchasers or potential purchasers?

    A.   On occasion I'm sure I did. I don't
recall any specific instances.

    Q.   Can you recall whether you provided any
kind of written information to such parties at any
time?

    A.   I provided written information to
parties at different points in time.

    Q.   To potential purchasers?

    A.   Yes.

    Q.   And can you recall whether you provided
any information to them about the creditworthiness
of Oakwood or any of the companies in its family?

    A.   I cannot recall.

    Q.   Okay. Did you communicate with the
rating agencies at any time on Oakwood's two
issuances of notes?

    A.   Oakwood's?

    Q.   Two note issuances or bond issuances.

    A.   Two bond issuances?

        We were not part of those transactions.

```
 1              Fiachra O'Driscoll
 2       Q.    So you didn't communicate with the
 3  rating agencies about them?
 4       A.    Nope.
 5       Q.    Now, was there more than one
 6  underwriter involved in any of the REMIC
 7  securizations that you were involved in with
 8  respect to Oakwood?
 9       A.    Yes.
10       Q.    Was that true of all of them?
11       A.    Almost all.
12       Q.    Okay.  Right up to the end?
13       A.    Right up to the end.  I think there
14  was -- there were at least two that were solely
15  Credit Suisse.  Other than that, it was typically
16  the case that there was more than one.
17       Q.    Okay.  In the situations in which there
18  was more than one what was the respective role of
19  the participants in the underwriting?
20       A.    On occasion we would be designated the
21  lead underwriter.  On occasion the -- one or more
22  of the other broker-dealers would be designated
23  the lead underwriter.
24       Q.    Okay.  And what does the lead
25  underwriter do that the others don't?
```

```
 1              Fiachra O'Driscoll
 2       A.    The lead underwriter typically takes
 3  the lead in putting together the transaction, its
 4  form, working with the rating agencies, working
 5  with both the underwriter's counsel and with
 6  Oakwood's counsel on preparing the transaction
 7  documents, all of the pieces that I have
 8  described.
 9       Q.    And what do the other ones who are not
10  the leads do?
11       A.    The other ones would focus on the
12  selling of the securities themselves, at which all
13  of the banks would be expected to participate.
14  And would also be jointly liable to purchase any
15  of the securities that they had agreed to purchase
16  if they couldn't find buyers for them.
17       Q.    All right.  And was that feature part
18  of all of the underwritings you did, that is to
19  say a commitment to purchase facilities you
20  couldn't find -- I'm sorry, purchase securities
21  you couldn't find buyers for?
22       A.    Not all.
23       Q.    Okay.  Were there some underwritings in
24  which there was no such commitment given to
25  Oakwood?
```

```
 1              Fiachra O'Driscoll
 2       A.    I believe that's correct.
 3       Q.    And did the -- was there a trend over
 4  time in whether or not there would be such a
 5  commitment given, for example, or if you
 6  understand my question?
 7       A.    Yeah, I do.
 8             And I don't think so.
 9       Q.    Okay.  So it wasn't just the ones at
10  the end where you didn't get that kind of
11  commitment?
12       A.    I think in 1998 as well, you know,
13  right after the Russia crisis there was similarly
14  a period of time when we did it on what's called
15  in the industry a best efforts basis.
16       Q.    Okay.  The what crisis?
17       A.    The Russia crisis.
18       Q.    What did the Russia crisis have to do
19  with manufactured housing securitizations?
20       A.    One may well ask.
21             In the fall of -- people
22  euphemistically call it the Russia crisis, but in
23  truth it was more the long-term capital management
24  crisis in reality.
25             Do you recall the failure of LTCM, the
```

```
 1              Fiachra O'Driscoll
 2  big hedge fund?
 3       Q.    I read about it in the newspapers.
 4       A.    Which precipitated a sharp dislocation
 5  in the securities markets in general for a period
 6  of a few months directly after that.
 7       Q.    Aside from -- well, let me -- let me
 8  start a question differently.
 9             In a transaction where there is no
10  commitment given to purchase securities you can't
11  sell, and speaking of the transaction between CSFB
12  and Oakwood, what risk, if any, did CSFB take as
13  an underwriter?
14       A.    In the transactions where we didn't
15  give a commitment of that sort?
16       Q.    Correct.
17       A.    Well, essentially the distinction is
18  that we -- by doing that we were declining to act
19  as an underwriter.  In other words, we were simply
20  acting as an agent seeking to place the
21  securities, but not providing a commitment to
22  purchase those in the event that we couldn't find
23  a buyer for the securities in question.
24       Q.    So is the answer to my question zero?
25       A.    No.
```

Fiachra O'Driscoll

Q.   Okay.  What risk did CSFB undertake in
those transactions?

A.   Well, was -- there would have been --
there would still have been a legal document with
reps and warranties, and so on.

Q.   Made by the underwriter?

A.   Between the underwriter and the
institution in question.  But from an economic
point of view it was obviously a very weak
commitment.

Q.   Right.  What economic risk --
If CSFB wasn't guaranteeing to buy
unsold securities what economic risks, if any, was
CSFB undertaking?

A.   You were taking none.

Q.   And in those transactions where CSFB
did agree to purchase unsold securities was its
economic risks -- was its economic risk simply
that or was there any additional economic risk?

A.   I'm not sure I understand your
question, sir.

Q.   Well, okay.  I think you've told me
that where CSFB didn't guarantee to buy unsold
securities it took zero economic risk.

Fiachra O'Driscoll

A.   Uh-huh.

Q.   Okay.  So in those situations where it
did guarantee to buy certain unsold securities,
aside from that risk were there any economic risks
to CSFB in those transactions?

A.   I follow you.  I think that was the
nature of the economic risk.

Q.   All right.

A.   No.

Q.   Was there any difference in the
compensation package that CSFB received in these
transactions depending on whether it took that
economic risk or not?

A.   You know, I don't recall.

Q.   Did you personally participate in any
negotiations of CSFB's compensation for acting in
the role it acted in in any of these
securitizations?

A.   Yes.

Q.   Did you do so in all of them?

A.   Probably.

Q.   Did those negotiations happen on an
individual securitization basis, term by term, or
was it pretty much the same deal as the last time?

Fiachra O'Driscoll

A.   It was frequently the same deal as the
last time.  But from time to time it would not be
the same as the last time.  So on occasion it
would be literally whatever it was the last time,
does that still work for everybody?
On other occasions the company would
come to us and say, you know, we believe that
these deals are getting somewhat easier.  We think
that Conseco is paying a little bit less for its
services, will you reduce your fees to match what
we see over there?

Q.   Do you recall that that specific event
actually occurred?

A.   I recall that that did occur.  I don't
recall the dates or the specific securitizations
to which it relate, but it certainly -- I do
recall having gone through that conversation on a
number of occasions.

Q.   Okay.  And did CSFB provide that
accommodation?

A.   We certainly negotiated to a
satisfactory fee.

Q.   All right.  I think you've given me a
brief description of some of the structure in

Fiachra O'Driscoll

tranches of securitizations that's been done.  And
the question -- I want to confine this question to
this.
If we looked at the structure of the
tranches in the Oakwood securitizations, is that
typical of structures of ABS transactions
generally, or is this done on an
industry-by-industry basis, or is it done on a
company-by-company basis?
Can you enlighten me on that?

A.   The nature of the securities that
Oakwood was offering were very, very similar to
those offered by the other manufactured housing
securitizers, and generally actually pretty
similar to those offered by non-conforming
mortgage securitizers generally.

Q.   All right.  Was the -- were the
characteristics of the B2 securities similar to
most other ABS transaction?

A.   They were certainly very similar to
other manufactured housing transactions.

Q.   Okay.  And were they similar in respect
of the amount of the guarantee given?

A.   Yes.

Fiachra O'Driscoll

2    Q.    Were they similar in the amount -- in
3    respect of the amount of guarantee given to a
4    similar tranche in other ABS transactions outside
5    the manufactured housing industry?
6    A.    They were much more common in the
7    manufactured housing area than they were in other
8    areas.
9    Q.    Why is that?
10   A.    Quite frequently you would be able
11   to -- in, for instance, a subprime mortgage
12   transaction, where for substantial periods of time
13   interest rates were a great deal higher than they
14   were in the manufactured housing space, for
15   instance, you -- the rating agencies would take
16   into account the ability of that excess spread.
17   In other words, the difference between the coupon
18   rate on the underlying loans and the coupon that
19   you're paying out to the investors in each of the
20   securities. Take that excess spread and apply
21   that to absorb the losses that might occur from
22   repossessions, the liquidation of repossessions,
23   and so on.
24       So having a thicker cushion, as you
25   actually did for substantial periods of time,

Fiachra O'Driscoll

2    meant that you could very frequently on a
3    non-performing mortgage transaction get a bottom
4    piece rated in the transaction that was rated
5    investment grade, without the benefit of a
6    guarantee. And that would go maybe not right to
7    100 percent, but it would get you to maybe
8    99 percent, or 99 and a quarter, or 98 and a half,
9    or somewhere into that ballpark area.
10       So the net result is that many of
11   these -- many of the kind of non-conforming
12   mortgage lenders that Oakwood was effectively
13   competing with, in the sense that while it was
14   selling manufactured homes, these guys were
15   financing the sale of site-built homes. Many of
16   them had the advantage that they could get
17   99 cents on the dollar, give or take, out of a
18   transaction where Oakwood could only really get
19   95, for instance, by virtue of that difference in
20   the interest rates in one sector of the housing
21   market versus in the other sector of the housing
22   market.
23       Frankly, as well, while quite a few of
24   the companies -- most of the major companies in
25   the manufactured housing industry were investment

Fiachra O'Driscoll

2    grade during much of that period of time, many of
3    the non-conforming mortgage lenders were actually
4    not. So they didn't necessarily have the - have
5    a guarantee that was as readily monetized and as
6    well understood as the investment grade guarantee
7    that Oakwood, and Clayton, and Conseco, and the
8    Associates, Associates Financial, was able to put
9    in these transactions.
10   Q.    What explains the effect of Oakwood's
11   loss of investment grade status on future
12   securitizations, given that Oakwood was not
13   guaranteeing anything higher than the B2 tranche?
14   A.    Can you rephrase your question?
15       I'm not sure I follow.
16   Q.    Okay.  If Oakwood itself wasn't
17   guaranteeing the higher tranches than B2 why did
18   its loss of investment grade status have any
19   effect on those non-guaranteed tranches?
20   A.    It didn't.
21   Q.    So its loss of investment grade status
22   didn't have any effect on your ability to sell out
23   the tranches higher than B2 on future
24   securitizations?
25   A.    We were able to sell the tranches that

Fiachra O'Driscoll

2    were not guaranteed, the tranches above the
3    guarantee, if you will.  I won't say not without
4    difficulty, because on occasions like in the fall
5    of 1998, you know, after the Russia crisis, LTCM
6    crisis, et cetera, et cetera, I think there were
7    some delays.  But by and large, you know, you were
8    able to sell the pieces that weren't dependent on
9    the guarantee.
10   Q.    And that continued to be the case after
11   Oakwood's loss of investment status?
12   A.    Yes.
13   Q.    Investment grade status?
14   A.    Yup.
15   Q.    In the course of your involvement with
16   Oakwood did you notice any trends in loan
17   underwriting standards by either sellers or
18   financiers of the manufactured housing
19   transactions, either at Oakwood or in the industry
20   generally?
21   A.    Yes.
22   Q.    Describe them for me, please.
23       MR. OSNATO:  If I can interrupt, if you
24   can do it in pieces because the question is
25   really calling for two answers.  You can

Fiachra O'Driscoll

1  Fiachra O'Driscoll
2   start if you'd like with Oakwood or the
3   industry, but make sure your answer is clear
4   as to which you're referring to.
5     A.    It's a fairly long period of time, so
6   my apologies if my answer is somewhat general.
7   But by and large from the -- from the time at
8   which I would have got involved in the very -- in
9   the first securitization for Oakwood that I worked
10  on, credit standards were generally improving.
11    Q.    From the beginning till the end?
12    A.    Pretty much actually, yeah.
13    Q.    And when you say "improving" you mean
14  they were tightening?
15    A.    In other words, yes.  Higher credit
16  standards were applied to the underwriting of the
17  securities in question -- of the loans in
18  question.
19    Q.    And this was true --
20          Was this true of Oakwood?
21    A.    And this was true of Oakwood and of
22  other people as well.
23    Q.    True throughout the industry?
24    A.    Yes.
25    Q.    And this continued through '99, 2000,

115

1  Fiachra O'Driscoll
2   and up until Oakwood's bankruptcy?
3     A.    Right till the bitter end.
4           MR. CASTANARES:  We need to change the
5   videotape, so...
6           THE WITNESS:  So I see.
7           MR. OSNATO:  Five minutes?
8           THE VIDEOGRAPHER:  Going off the
9   record --
10          MR. CASTANARES:  Do you want to take
11  five?
12          MR. OSNATO:  Yeah, if you wouldn't
13  mind.
14          MR. CASTANARES:  Not at all.
15          THE VIDEOGRAPHER:  Off the record,
16  11:24.  This is the end of tape 1.
17          (Recess taken.)
18          THE VIDEOGRAPHER:  Back on the record,
19  it's 11:32.  This is tape 2.
20  BY MR. CASTANARES:
21    Q.    Mr. O'Driscoll, did CSFB ever make any
22  analysis of the effect of the REMIC
23  securitizations on Oakwood's long-term liquidity?
24    A.    Not to my knowledge.
25    Q.    Did it ever make an analysis of the

116

1  Fiachra O'Driscoll
2   effect of the B2 guarantees on Oakwood's long-term
3   liquidity?
4     A.    Not to my knowledge.
5     Q.    Did CSFB ever attempt to place a value
6   on the Oakwood exposure to the guaranteed B2s?
7     A.    I don't know.
8     Q.    Did CSFB ever make any effort to
9   evaluate the REMIC securities that Oakwood held?
10    A.    Yes.
11    Q.    Did it do so on more than one occasion?
12    A.    I believe so.
13    Q.    Were you involved in it in any way?
14    A.    Yes.
15    Q.    Was anybody else?
16    A.    I don't recall.
17    Q.    What did you do?
18    A.    Well, what we were specifically asked
19  for on occasions was for some of the securities
20  that were on Oakwood's books, to -- which they
21  needed to have market valuations on for accounting
22  purposes primarily.  We were asked to provide
23  valuations for those.
24    Q.    All right.  Can you recall when that
25  first such occasion occurred?

117

1  Fiachra O'Driscoll
2     A.    I can't, actually.
3     Q.    And can you recall how many such
4   occasions it occurred?
5     A.    I can't, but more than one.
6     Q.    And did you comply?
7     A.    Yes.
8     Q.    What process did you go through to make
9   that analysis?
10    A.    We valued the securities against
11  similar securities in the market, taking account
12  of the ratings, the nature of the instruments,
13  treasury rates, swap rates, LIBOR rates,
14  et cetera, et cetera.  And the market clearing
15  spreads or what we thought in our judgment was the
16  market clearing spreads by comparison with the
17  actual coupon on the security itself.
18    Q.    Do I take it there was not a sufficient
19  amount of trading of these securities in the open
20  market to reach conclusions that way?
21    A.    These -- for the retained securities,
22  that's correct.
23    Q.    Were you ever aware of a request by the
24  company's auditors that it obtain an independent
25  valuation of the retained securities?

118

Fiachra O'Driscoll

2    A.    No.

3    Q.    I'm sorry, did you say --

4    A.    No.

5    Q.    Okay.  Were you ever aware of any

6 statement or discussion by any Oakwood person to

7 the effect that he or she believed it would be a

8 good idea to get an independent evaluation of

9 those securities outside of CSFB?

10    A.    What do you mean by "an independent

11 evaluation," do you mean a valuation or an

12 evaluation?

13    Q.    I guess I was using the term, you know,

14 interchangeably --

15    A.    Interchangeably.

16    Q.    -- perhaps I was wrong in doing so.

17         Independent valuation is what I was --

18    A.    As part of the financial advisory

19 assignment that began in August of --

20         What was the date?

21         -- August of 2002 --

22    MR. OSNATO:    Correct.

23    A.    -- if my memory serves.  One of the

24 things that we actually did was we actually found

25 an outside valuation agent whose role it was to

Fiachra O'Driscoll

2 evaluate specifically the value of the B2

3 guarantee, the guarantee independently of the

4 value of the securities themselves.

5    Q.    All right.  So this, rather than being

6 the value of the guarantee, this is the present

7 value of Oakwood's exposure on those guarantees;

8 is that correct?

9    A.    I believe that's correct.

10    Q.    Okay.  This was not an evaluation, such

11 as one would make of a security, but of a

12 liability; is that right?

13    A.    Just so.

14    Q.    And had CSFB been performing that role

15 for Oakwood before Andrew Davidson got involved in

16 it?

17    A.    No.

18    Q.    Do you know how Oakwood had arrived at

19 the figures that it carried that exposure for on

20 its financial statements before Andrew Davidson

21 did this work?

22    A.    I do not.

23    Q.    Do you have any knowledge of why

24 it was that the latest figure before the

25 Andrew Davidson work showed that at $75 million,

Fiachra O'Driscoll

2 but Andrew Davidson comes in two months later with

3 133 to 170 million?

4    A.    I do not.

5    Q.    Did you participate in

6 Andrew Davidson's work in any way?

7    A.    I did not.

8    Q.    Did somebody else from CSFB do so?

9    A.    We supplied information to

10 Andrew Davidson about the securities, the list of

11 the securities, the documents themselves, the -- I

12 think some of the financial models and information

13 of that sort.

14    Q.    And who did that on behalf of CSFB?

15    A.    I don't recall, to tell the truth.

16    Q.    Did CSFB, to your knowledge, engage in

17 any role of supervising, or monitoring, or

18 assisting Andrew Davidson in running its models?

19    A.    On the contrary.

20    Q.    When you say "on the contrary," what do

21 you mean by that?

22    A.    Absolutely not.

23    Q.    Did CSFB personnel have any role in

24 working with Andrew Davidson on the modeling that

25 it was doing?

Fiachra O'Driscoll

2    A.    Yes.

3    Q.    What was it?

4    A.    At least one of the members of the

5 financial engineering group -- and I don't recall

6 which one -- worked with Mickey Storms, who was

7 one of Andrew Davidson's associates, to gather

8 information to clarify information and I think to

9 get access to what are called in the industry

10 Intext models.  In other words, financial models

11 of REMICs that are provided on a -- how would --

12 well, I guess a database by a company called

13 Intext, which is kind of the mortgage industry

14 standard for how you exchange information on the

15 modeling of these kind of deals.

16    Q.    All right.  And I think you said this

17 person was a financial engineer.

18    A.    Yes.

19    Q.    Somebody that worked at your group?

20    A.    Well, no.  Do you remember I --

21         You're trying to catch me out here,

22 aren't you?

23    Q.    No.  I'm trying to find out what group

24 he worked for.

25    A.    I mean...

Fiachra O'Driscoll

2  MR. OSNATO:  Provide whatever

3  clarification you need.

4  A.  You may recall back I described this

5  gentleman, Howard Dent, who was long gone by this

6  stage of the proceedings, but his role was within

7  that financial engineering team.  And their -- the

8  financial engineering team was the team that you

9  went to with assignments or projects of that sort.

10  And they were at -- as I think I mentioned earlier

11  on, they had a kind of an independent career

12  hierarchy of their own.

13  Q.  All right.  And they weren't part of

14  your ABS group?

15  A.  They were not part of my ABS group,

16  correct.

17  Q.  What was the name of the group they

18  belonged to?

19  A.  It was called -- generally it was just

20  called financial engineering.

21  Q.  Okay.  It wasn't part of Mr. Felt's

22  group, either?

23  A.  No.

24  Q.  And do you know whether anybody in

25  Mr. Felt's group had any interface with

1  Fiachra O'Driscoll

2  Andrew Davidson of any kind with respect to the

3  modeling?

4  A.  I do not.

5  Q.  And do you remember the name of the

6  financial engineering person who did so with

7  Andrew Davidson?

8  A.  I don't.

9  Q.  Now, in the course of the ABS

10  securitizations that you did for -- or that CSFB

11  underwrote for Oakwood, were any new entities

12  created by any party?

13  MR. OSNATO:  Objection to the form.

14  A.  Can you break it down into shorter --

15  What do you mean by --

16  Well, can you break it down into

17  smaller than "any party" and any period of time.

18  It's a very long period of time.  There

19  are many parties and it's probably easier to

20  refresh my recollection if we break it down a bit.

21  Q.  Can we speak of the period of around

22  2001, 2000, 2001, 2002 as a --

23  A.  Yup.

24  Q.  -- is that a time frame that works for

25  you?

Fiachra O'Driscoll

2  A.  Sure.

3  Q.  In the typical securitization, REMIC

4  securitization, did Oakwood create a new entity of

5  any kind?

6  A.  Yes.

7  Q.  Did CSFB create a new entity of any

8  kind?

9  A.  No.

10  Q.  Did any other party create a new entity

11  of any kind?

12  A.  Yes.

13  Q.  Who else?

14  A.  Typically the attorneys would do it.

15  Q.  The attorneys for Oakwood?

16  A.  For Oakwood.

17  Q.  Okay.  So -- I know that Oakwood acted

18  through its attorneys in doing this.

19  Did any other party to the transaction

20  create a new entity beside Oakwood through its

21  attorneys?

22  A.  Generally not.

23  Q.  On some occasions did that happen?

24  A.  It might have done.  I'm not sure.

25  Q.  All right.  And what was the

1  Fiachra O'Driscoll

2  function -- strike that.

3  In the typical transaction at that time

4  frame did Oakwood create more than one new entity?

5  A.  Sometimes yes, sometimes no.

6  Q.  What function or functions did this or

7  these new entities have in the securitizations?

8  A.  You'll forgive me here because I'm --

9  you're asking me, actually, a legal question.  I'm

10  going to try to give you a layman's answer to it.

11  Q.  Fine.

12  A.  So you'll hopefully bear with me if I

13  don't get it quite right.

14  Q.  Let me rephrase the question.

15  What economic function did these

16  entities have?

17  A.  The entities were there to hold the --

18  to hold the mortgages or alternatively to pass on

19  the mortgages to another entity that would then

20  hold the mortgages.  And that ultimate entity

21  which then held the mortgages would then -- would

22  then issue the securities in question, the

23  so-called REMIC securities that were sold to a

24  variety of other people.

25  But very often there would be actually

Fiachra O'Driscoll

1  kind of a daisy chain of an entity that purchased
2  the loans from Oakwood, or from the warehouse, or
3  from the loan purchase facility, or whatever was
4  the particular source of funding at that point in
5  time, would have no function other than to pass
6  them on to the trust. Sometimes there was another
7  intervening entity that would hold the securities
8  that were issued by the trust and then distribute
9  those out to the investors.
10     But in essence it was to purchase the
11  securities and either pass them on to another
12  entity or hold the securities and issue the
13  REMIC -- sorry, hold the loans then issue the
14  REMIC securities.
15     Q.  Where did these entities get the money
16  to purchase the securities?
17     A.  From the issuance of the securities
18  themselves.
19     Q.  So it basically all happened
20  simultaneously?
21     A.  Just so.
22     Q.  That was, the buyers of the REMIC
23  securities put in their money and that money
24  flowed through to these entities, which then used

127

Fiachra O'Driscoll

1     Some were corporations, some were
2  trusts.
3     Q.  All right. Do you know if these
4  entities had any business other than acting in the
5  capacity you've described?
6     A.  Some would, some wouldn't.
7     Q.  Okay. Are you aware of entities that
8  acted in this capacity that had an additional
9  business of some sort?
10     A.  There were -- yes.
11     Q.  Describe that for me, please.
12     A.  There was at least one, which was a
13  Nevada entity, which had an ongoing existence.
14  And I think actually had some sort of physical
15  presence in Nevada as well.
16     Q.  All right. And was it usually --
17     A.  I'd need to look at the documents to
18  refresh my recollection.
19     Q.  Did it have some business, other than
20  acting in this capacity in securitizations or was
21  it -- is it just simply the case that it was used
22  on more than one occasion?
23     A.  It did hold securities from time to
24  time.

129

Fiachra O'Driscoll

1  them to purchase them from Oakwood, or the
2  warehouse, or asset purchase facility, wherever
3  they were coming from?
4     A.  Precisely.
5     Q.  Okay. And it was basically handled
6  like a simultaneous escrow type transaction?
7     A.  Exactly.
8     Q.  Do you know whether these entities
9  issued stock?
10     A.  Some would, some wouldn't.
11     Q.  Okay. What influenced that, if you
12  know?
13     A.  Legal form.
14     Q.  Okay. Do you know whether they ever --
15  whether they had offices?
16     A.  Some of them would have had offices,
17  some of them wouldn't have had offices.
18     Q.  And what influenced that, if you know?
19     A.  Legal form.
20     Q.  Okay. Did they have officers and
21  directors?
22     A.  Some would, some wouldn't.
23     Q.  Did they hold meetings?
24     A.  Some were corporations -- I don't know.

128

Fiachra O'Driscoll

1     Q.  And was it an Oakwood subsidiary, or
2  sister, or something in the Oakwood family?
3     A.  I -- it was something in the Oakwood
4  family.
5     Q.  Not something that CSFB held any
6  interest in?
7     A.  Correct.
8     Q.  Do you know who ran these companies?
9     A.  No.
10     Q.  Did you ever speak to anybody that
11  purported to speak on behalf of those companies?
12     A.  I don't recall.
13     Q.  Do you know what those companies did
14  with the revenues?
15     A.  Can you be more specific.
16     Q.  What did they do with the money they
17  got in these securitizations?
18     A.  Typically they were using them to --
19  they were using the money that they got from the
20  securitizations to purchase the loans that
21  actually went into them.
22     Q.  Okay. Did you have any understanding
23  as to whether they had any discretion to spend any
24  money that they received on anything other than

130

Fiachra O'Driscoll

that?

A. Some of them may have done, some of them may not have done.

Q. And you just don't know?

A. I don't know.

Q. Did CSFB ever model future cash flows with respect to any given securitization?

A. Yes.

Q. Did it do so with respect to every one of them?

A. Yes.

Q. Did it share that information with Oakwood?

A. On occasion, yes.

Q. What influenced whether it would or would not share it?

A. Usually there'd be some specific request or some specific need. I'm not sure I can recall any specific instances, but I certainly do recall occasions when we would share the cash flows with the company.

Q. What was CSFB's purpose in modeling future cash flows of these securitizations?

A. Primarily to give investors a better

Fiachra O'Driscoll

understanding of the securities that they were considering purchasing.

Q. What was --

Other than information that it received from Oakwood, did CSFB have any other source of information for modeling these cash flows?

A. I don't think so, no.

Q. Did you have any understanding that in the securitizations that you did for Oakwood some Oakwood entity would have responsibilities as a servicer?

A. Yes.

Q. Describe what you understood, please.

A. Part of the essential process of dealing with any -- any pool of mortgages is the need to actually service the payment on that collection of mortgages. And what that means -- really, in a sense a collection of loans. And what that means in essence is doing a number of different tasks. The first and the simplest is that investors -- sorry, borrowers need somewhere to send their monthly payments, and to send their payments more generally.

Often that was actually handled by a

Fiachra O'Driscoll

lock box arrangement. Most of the time that was handled by First Union, who was the company's commercial bankers through most of that period of time. Sometimes I think it wasn't handled by First Union, but I think the bulk of the time it was a First Union lock box.

But then those payments would be taken and information would be gathered on those payments and it would be forwarded to the servicer in question. Now if all of the payments for any of the loans for the payments were being made in a timely fashion, then you had no issue.

With borrowers who hadn't made their payments in a timely fashion, then what the servicer would do is to attempt to contact the borrower by telephone, by letter, by personal visit sometimes. If they couldn't get ahold of them by telephone or by -- or -- right, you know, some other form of communication, and try to basically tell the borrower politely in the first instance, and we haven't received your payment yet and I just want to check it's in the mail.

If the borrower continued to be more and more delinquent, then the role of the servicer

Fiachra O'Driscoll

would be to become somewhat more clear with the borrower in question as to what the implications were of their continuing delinquencies. And frankly, to kind of look into the matter of exactly why the borrower was delinquent, was it because of some transient problem, was it something that was more fundamental, was it -- or more permanent, in the sense of somebody having lost a job and being unable to get a new job, things of that sort.

If that didn't work out and that wasn't successful, then the servicer would be responsible for sending a notice of foreclosure or sending a notice of repossession on the property in question. Typically it varied by state, but there would be a notice process at a minimum. You couldn't simply go and bolt somebody's home.

So there'd be both the legal aspect to it, which is actually following the correct legal form for the area in question. There would also be a more human aspect to it, which is simply trying to work with the borrower to either bring the borrower back on track, to do something to mitigate the borrower's problem if it was a

Fiachra O'Driscoll

1   Fiachra O'Driscoll
2   transient problem or failing that -- to actually
3   arrange for the physical repossession of the
4   property in question.
5       Q.   All right.  Was a compensation
6   structure for Oakwood's servicing function built
7   into these securitizations?
8       A.   Yes.
9       Q.   And did that structure include a
10  priority of the fees for that compensation
11  vis-a-vis other payments to be made out of the
12  trust?
13      A.   Yes.
14      Q.   Describe that, please.
15      A.   Typically Oakwood was paid for its --
16  its servicing or was paid a fee for its servicing
17  on behalf of the REMIC.  And that fee would be
18  paid below the payments of fees to the investment
19  grade rated investors within the deal itself.
20      Q.   When you say "fees" to those you're
21  talking about --
22      A.   In other words, what Oakwood didn't get
23  was to say a specific loan-by-loan reimbursement
24  for its servicing activities.  What Oakwood
25  instead got was essentially an interest strip.

135

1   Fiachra O'Driscoll
2   That interest strip, if my memory serves, was not
3   always, but it was typically 1 percent.  In other
4   words, of the -- you know, call it 10 percent of
5   total interest that was paid in the transaction,
6   Oakwood would be entitled to 1 percentage point of
7   the total interest.  But only after each of the
8   other investors in the transaction, the AAA, AA, A
9   investors, and so on, had received their interest
10  payment in full during that period of time.
11      Q.   So Oakwood's servicing fee was
12  subordinate to all of the securities and -- all of
13  the principal and interest payments to holders of
14  REMIC securities; is that correct?
15      A.   That isn't necessarily always correct,
16  but it was correct in the majority, in fact, the
17  vast majority of the time, yes.
18      Q.   Now, did that situation change after
19  bankruptcy?
20      A.   Yes.
21      Q.   And Oakwood's position was given a
22  higher priority at that point?
23      A.   Yes.
24      Q.   Why didn't it change before bankruptcy?
25      A.   Because Oakwood contractually under the

136

1   Fiachra O'Driscoll
2   securitization itself was subordinated in its
3   right and didn't have the ability to change that
4   until -- with the bankruptcy it rejected, the
5   servicing contracts that it held in the REMICs.
6       Q.   Okay.  Let me put a slightly different
7   question.  Let's put ourselves in the year 2000.
8   Why wouldn't Oakwood have been able to
9   put that same provision in its contract for future
10  securitizations thereafter that it managed to do
11  after bankruptcy?
12      A.   Part of the challenge at that stage was
13  that one of the effects that that would have had
14  was to increase the size of the B2.
15      But beyond that there was also a belief
16  by Oakwood that because its credit standards had
17  been rising fairly steadily, that for transactions
18  out into the future some of the problems that it
19  had experienced in years slightly earlier than
20  that where it wasn't getting paid the full
21  1 percent, it was getting paid some number less
22  than the full 1 percent, weren't going to arise in
23  the future because of the improving standard of
24  the lending that Oakwood had been doing.
25      Q.   And was that proving to be the case as

137

1   Fiachra O'Driscoll
2   the company approached bankruptcy?
3       A.   My recollection was that as the company
4   approached bankruptcy that was actually proving to
5   be the case.
6       Q.   It was getting more remuneration for
7   its servicing fees than it had been getting before
8   expenses?
9       A.   By and large it was -- on most of the
10  2002 deals, I may be wrong on this, but my
11  recollection was that Oakwood was actually getting
12  the full servicing fee.
13      Q.   Okay.  On earlier deals it was getting
14  less than that?
15      A.   Precisely.
16      Q.   Did you ever hear the term toxic or
17  toxicity used in relation to any of the lower
18  tranches of Oakwood securitizations?
19      A.   By whom?
20      Q.   Anybody.
21      A.   I may have done, but I don't recall.
22      Q.   Do you recall whether you ever heard
23  that within CSFB?
24      A.   I don't recall.
25      MR. CASTANARES:  I'd like to mark --

138

Piachra O'Driscoll

1  have the reporter mark as Exhibit 50 CSFB
2  174305 through 307.
3  (CSFB Exhibit 50, Three-page document,
4  bearing Bates stamp Nos. CSFB-00174305
5  through CSFB-00174307, marked for
6  identification, as of this date.)
7  MR. OSNATO:  I take it it's 50 --
8  Yes, if you have a copy for me, please.
9  MR. CASTANARES:  Yes, sure.
10  MR. OSNATO:  -- 50 because 49 was the
11  last Felt exhibit?
12  MR. CASTANARES:  You've got it.
13  MR. OSNATO:  Okay.  Here we go.
14  Do you have a copy --
15  Your copy is being marked --
16  MR. CASTANARES:  Yes.
17  MR. OSNATO:  -- but while we wait...
18  (Witness looks at document.)
19  Q.  If you wish to read the entire
20  document, you certainly may, but I don't -- I
21  think that my questions are not ones that will
22  require you to do so.
23  But let me put a question to you and
24  see if you think you can --

139

29/06/2006 O'DRISCOLL, Piachra (vol. 1)

Piachra O'Driscoll

1  A.  Do you mind if I --
2  Q.  Oh, not at all.
3  A.  -- read it?
4  Thank you.
5  (Witness looks at document.)
6  A.  Okay.  Thank you.
7  Q.  Speaking of the message that appears on
8  page 174307 from Mr. Muir to various parties,
9  including yourself, sir, did you understand
10  Mr. Muir to be relating legal advice that he had
11  received from the company's lawyers?
12  A.  Which sentence specifically?
13  Q.  He says, "I talked to David Rich at
14  Hunton & Williams."
15  Did you understand David Rich to be one
16  of the company's lawyers?
17  A.  Correct.
18  Q.  For example, the third sentence -- the
19  third paragraph begins with "Due to REMIC
20  regulations."
21  A.  Yeah.
22  Q.  Did you understand that in that
23  paragraph he was communicating advice that he had
24  received from the company's lawyers?

140

Piachra O'Driscoll

1  (Witness looks at document.)
2  A.  It's probably not right for me to
3  speculate as to what Doug might or might not
4  have -- I'm not sure Doug could even tell you
5  himself right now.
6  Q.  Well, let's talk about the first
7  message that appears here addressed to Mr. Rich
8  and to yourself.
9  MR. OSNATO:  To be clear, are we
10  talking about 174305?
11  A.  305?
12  Q.  Yes, we are.
13  And it says, "Credit operations has
14  raised two questions as to which I think we need
15  your thoughts."
16  To the extent that this was addressed
17  to Mr. Rich, did you understand that Mr. Muir was
18  seeking legal advice from him?
19  A.  You know, I -- I recall the IndyMac
20  office purchase and, indeed, I recall the "'credit
21  builder' loan program."
22  Indeed, I don't recall this specific
23  e-mail and I probably shouldn't guess.
24  Q.  So you had no view as to whether

141

29/06/2006 O'DRISCOLL, Piachra (vol. 1)

Piachra O'Driscoll

1  Mr. Muir was seeking legal advice in one message
2  or communicating it in another?
3  MR. OSNATO:  Objection as to form.
4  A.  You're going beyond my jurisdiction
5  here.
6  Q.  All right.  At the time of this --
7  these e-mails in June of 1999, am I correct that
8  the only relationship that existed between CSFB
9  and Oakwood was the REMIC securitizations?
10  A.  Yes.
11  Q.  How many other underwriters or
12  co-underwriters were involved in communications
13  such as this, Exhibit 50, between the company and
14  its lawyers, to your knowledge?
15  A.  I don't know.
16  Q.  Were you ever aware of any other
17  underwriters being involved in communications
18  between the company and its lawyers?
19  A.  Yes.
20  Q.  On what occasions?
21  A.  I don't have specific instances that I
22  can identify.  But certainly Bank of America for
23  one and Prudential Securities for a second.  And I
24  believe First Union as well at different points in

142

**Page 143**

Fiachra O'Driscoll

1 time.

3 Q. Do you believe those entities were

4 parties to the communication of legal advice from

5 the company's lawyers to the company?

6 A. You're going beyond my pay grade.

7 Q. You don't know one way or the other?

8 A. Nope.

9 MR. CASTANARES: Okay. Exhibit 51 will

10 be CSFB 174907 and 8.

11 (CSFB Exhibit 51, Two-page document,

12 bearing Bates stamp Nos. CSFB-00174907 and

13 CSFB-00174908, marked for identification, as

14 of this date.)

15 MR. CASTANARES: And I would like the

16 witness to focus simply on his message at the

17 bottom. I'm not going to ask him about the

18 reply at the top.

19 MR. OSNATO: If you do need to review

20 the reply at the top to understand the

21 context, however, you should feel free to do

22 so.

23 THE WITNESS: Sure.

24 (Witness looks at document.)

25 THE WITNESS: I need to start at the

---

**Page 144**

1 Fiachra O'Driscoll

2 bottom here.

3 (Witness looks at document.)

4 A. Great. Thank you.

5 Q. What motivated you to state that

6 Oakwood had 'done a bad job of managing 'bad

7 news''?

8 A. Well, it's seven years ago now so it's

9 a little hard for me to speculate at this point.

10 Q. You have no recollection?

11 A. I can identify one thing. For

12 instance, this was -- well, I can't tell you about

13 this e-mail specifically, but I can tell you maybe

14 a small amount about what my thoughts might have

15 been at the time. This was right around the time

16 that Nick St. George, who was the CEO, who had

17 led, you know, what one might characterize as

18 the -- you know, the grow, grow or bust phase of

19 Oakwood Homes history. First proposed to do a

20 management buyout of the company after its stock

21 price had come downwards and then departed the

22 company rather quickly.

23 Q. And that's -- is that the only thing

24 you can recall about what you meant by saying the

25 company had 'done a bad job of managing 'bad

---

**Page 145**

Fiachra O'Driscoll

1 news''?

3 A. I -- in truth I -- this is darn near

4 seven years ago, so I'm not sure I remember the

5 e-mail specifically, but that's the context to

6 what would have been the 'managing 'bad news'' at

7 that point in time.

8 Q. Okay. And how did that have an effect

9 on fixed income investors?

10 A. I think the description here, I think

11 that the phrase was "spooked" --

12 Q. Yes.

13 A. -- is pretty accurate, which is that

14 the fixed income investors, specifically the fixed

15 income investors in the guaranteed B2 securities,

16 were significantly concerned about the prospect

17 for a management buyout, because, of course, what

18 that would have meant by its nature, that the

19 company which was sure, you know, an investment

20 grade company with a couple of billion dollars in

21 market cap, $600 million in shareholders equity,

22 investment grade rated would suddenly become a

23 much more leveraged entity with much thinner

24 shareholders equity, almost certainly not an

25 investment grade rating, which would have two

---

**Page 146**

1 Fiachra O'Driscoll

2 effects.

3 First of all, it would reduce the

4 rating and have a direct economic consequence on

5 all of the B2 securities, which still at that

6 point were trading at par, give or take, and it

7 would have a downstream effect possibly of

8 changing the nature of the way the company was

9 run.

10 So, you know, it upset investors fairly

11 significantly largely -- largely because of the

12 uncertainty around what Oakwood was going to look

13 like.

14 Q. At the time Oakwood filed bankruptcy

15 did you personally have a view as to what caused

16 its demise?

17 MR. OSNATO: Objection as to the form.

18 You can answer.

19 A. Yes.

20 Q. What was it?

21 A. There were a number of factors. The --

22 the first was -- while I said that from the time

23 that I was involved with Oakwood, which was the

24 1996-A securitization, if my memory is clear,

25 Oakwood was on a flat to improving -- generally

Fiachra O'Driscoll

improving credit trend with most of its lending.

With the exception of the occasional
situation in which the overall quality of the
credit might improve somewhat, but there might be
particular programs that were weaker credits. By
and large the credit was improving.

But in the period from September 1994
on the standards of credit in the industry took a
significant turn for the worse. What happened was
that in September 1994 Conseco Finance or at least
its precursor at that time, which was called
Green Tree Financial, introduced as its standard
5 percent down payment loans.

And what that essentially meant was
that borrowers were able to get a home making only
a 5 percent down payment, whereas before for many
years 10 percent had been the tradition in the
industry. Now, that didn't mean that all of the
loans were being done as 5 percent down payments,
but I think fairly quickly the 5 percent down
payments rose to be probably -- I would guess at
the peak in probably late '95 somewhere -- maybe
50 percent of total production, give or take.

And if you look at many of the problems

Fiachra O'Driscoll

that the industry had, an astonishingly high
percentage of the repossessions came -- really two
things happened. First was that the -- the reason
for the 5 percent down payment lending was largely
to maintain the loan origination volume growth.
And one way in which it did that was it probably
brought forward a lot of sales that would have
been spread over the following decade, perhaps by
making borrowers who wouldn't have been --
wouldn't have had the wherewithal to put
10 percent down enabled them to buy a home with
only 5 percent down. Secondly, many of those
loans were among the loans that subsequently got
repossessed.

Now, the problem was such, even though
credit was improving after a measure, but, you
know, by and large steady pace from 1996 on, there
was still plenty of 5 percent down payment loans
out there. And I don't think that they finally
were eliminated entirely until probably 2002.
They'd come down to a very small percentage by the
time of this e-mail, for instance. But the net
result was -- of that 5 percent down payment
lending was that there was a significant drawing

Fiachra O'Driscoll

forward of loans -- of sales being made that
otherwise would have been made out further into
the future. And secondarily, there was a
significant number of loans made that three, four,
five, six years down the load turned into
repossessions where the company made a loss.

There's a second very significant
factor with us, which was that the industry had
done a great deal to reduce, I think, its credit
problems by that continual tightening in credit
that I talked about. And when I mean "continual
tightening in credit," I mean a far smaller
percentage of loans being done at 5 percent down
payment. Those 5 percent down payment loans only
being made to people with far higher credit
histories, as measured by their credit scores, by
their information companies, generally would have
gathered from them more exact documentation as to
people's incomes, people's financial resources,
where the source of those down payments were
coming from, all of those kind of factors.

But the other factor that had a very
significant impact, which isn't as clear, was that
one of the great changes that happened in the U.S.

Fiachra O'Driscoll

housing market, is if you go back to the early
1990s for a low income family their choices really
for a low income family with poor credit, as many
low income families necessarily did do, their
choices as to where to live were really narrowed
down to three things. No. 1, they could either
rent a place; No. 2, they could continue to live
with their families or wait to inherit property
from their families; or No. 3, they could buy a
manufactured home. Because this kind of lending
was routinely, you know, the kind of lending that
was done to low income families.

The big change that happened -- and it
wasn't really -- you know, hindsight is a
wonderful thing, because it's easy to do this
diagnosis now. And frankly, this wasn't a
diagnosis that would have been clear to me even at
the time of the company's bankruptcy, but it was
becoming fairly clear then.

The big change that happened was the
emergence of the subprime mortgage market. People
like -- you'll have heard of all the household
names. Ameriquest is probably the most prominent
of them, but also people like Countrywide,

Fiachra O'Driscoll

1  GreenPoint here in New York.
2  There's many, many people within that
3  space who make loans to people whose credit
4  quality is less than that required to meet the
5  standards of the federal agencies, which again is
6  what I    is one segment of what I referred to
7  earlier on as being the non-conforming mortgage
8  market.
9  And one of the things that actually did
10  was it meant there was a much broader array of
11  credit available out there for lower income
12  families with weaker credit histories. And in
13  particular, one of the things that happened was,
14  that as that form of lending became more -- better
15  understood, more competitive, the interest rates
16  on those kind of loans fell pretty sharply. If
17  you look at what they were at say 1990, they were
18  probably 13 or 14 percent. If you look at what
19  they were in 1995, '96, they were probably 10,
20  11 percent still.
21  By the year 2000 people with
22  surprisingly shaky credit histories could borrow
23  at a -- you know, 5 and a half percent interest
24  rate loan. The kind of thing we'd -- you know,

Fiachra O'Driscoll

1  thing that matters is what their monthly payment
2  is on the home. And the fact that these subprime
3  mortgage loans could -- were extended at so much a
4  lower rate, it meant that even though the purchase
5  price of the home might be higher the net monthly
6  payment that a borrower could get was the same or
7  better than was the case for the manufactured
8  housing area.
9  So the net result of that was that --
10  really, those two factors. First the credit
11  factor and then, you know, just a phenomenon that
12  frankly is not a bad one for America, because it's
13  given a lot more people access, people on regular,
14  ordinary middle class incomes access to home
15  ownership who didn't have that kind of access
16  before.
17  And the net result of that,
18  unfortunately, was that it was without a doubt,
19  with the benefit of hindsight, a key factor in the
20  manufactured housing market not recovering as
21  quickly as it would have done, I think, in an
22  environment where the subprime market hadn't
23  opened up.
24  Q.  Oakwood failed while not every other

Fiachra O'Driscoll

1  any of us trying to refinance our mortgages right
2  now would be very happy to see, indeed.
3  And in the meantime manufactured
4  housing mortgage rates in part, because of the
5  greater stress that the manufactured housing was
6  under by that stage and the higher spreads that
7  people were having to pay for financing,
8  manufactured housing rates were much higher, were
9  at 8, 9, 10 percent. And as a consequence it
10  became much more difficult for the manufactured
11  housing industry to be competitive with that type
12  of regular site-built lending.
13  Because, you know, if one thinks about
14  it, the advantage the manufactured housing
15  industry had was that its price per square foot to
16  a homeowner was significantly less than the price
17  per square foot for a regular -- what they call
18  stick-built house or a site-built house. Largely
19  because of the economies that one can achieve by
20  instead of building the entire thing on site,
21  doing it in an assembly line in a factory.
22  But the difficulty is that from the
23  point of view of most people, frankly what their
24  mortgage rate is neither here nor there. The

Fiachra O'Driscoll

1  manufactured housing manufacturer failed.
2  Why do you think that these factors
3  brought about Oakwood's failure, but not that of
4  other players in the industry?
5  A.  Very few of the manufacturers in the
6  industry survived without financial distress, and
7  more of the manufacturers failed than did not.
8  Oakwood's result was more typical than atypical.
9  Q.  Okay. What -- why did some of them
10  survive?
11  A.  Clayton Homes was the most close
12  comparison to Oakwood Homes.
13  I'm -- forgive me, I'm cognizant of my
14  counsel's advice here to stick to what's in the
15  public record.
16  Clayton's results also got worse and
17  worse. Their repo problems became tougher and
18  tougher. And in the end Clayton, the company, was
19  not quite controlled by the Clayton family, but
20  they had a -- I think a 35 percent ownership of
21  the total equity in the thing. Clayton in the end
22  sold out to Mr. Buffett at a price that was
23  subsequently very aggressively contested by its
24  institutional investors, who felt that the family

Fiachra O'Driscoll

1      Fiachra O'Driscoll
2  was selling out the company at a distressed price.
3      Q.  And it was --
4      A.  Which is --
5      Q.  -- the additional capital that
6  Mr. Buffett had that enabled Clayton to survive,
7  is that what you're saying?
8      A.  We know nothing about Clayton's
9  financial results from that day to this.  It is
10  stuck in the bowels of Berkshire Hathaway.
11      Q.  All right.  Somehow the sale of Clayton
12  to Berkshire Hathaway managed to prevent it from
13  failing?
14      A.  It's -- again, I probably just
15  should --
16      MR. OSNATO:  Speak only to what you
17      know --
18      A.  -- speak to the public record.
19      MR. OSNATO:  -- from the public record,
20      exactly right.
21      A.  Well, okay.  Let me toss out this one
22  fact that is in the public record, which is that
23  one of the things that the Berkshire Hathaway did,
24  in fact, in the interval of time between the
25  announcement of their initial agreement to

1      Fiachra O'Driscoll
2  purchase Clayton and the time when it closed,
3  which was a very vexed period of time because of
4  all of these investor problems, Berkshire provided
5  a $2 billion facility, if my -- I think it was
6  $2 billion -- specifically to allow the company to
7  take its loans, and to hold the loans, and to
8  provide working capital for the company for such a
9  period of time as it was going to need.  And I
10  think that was -- again, if my memory serves, and
11  I'm not certain of this -- but I believe it was a
12  ten year -- a ten-year facility.
13      Q.  Okay.  This was a --
14      A.  All of that's in the public record.
15      Q.  Okay.  This is a traditional lending
16  facility, such as you described earlier on when I
17  asked you why Oakwood couldn't just hold the paper
18  it generated, rather than securitizing it.
19      A.  It wouldn't be appropriate for me to
20  get into the details.
21      Q.  But what you're talking about is a
22  lending facility, correct, a line of credit?
23      A.  A line of credit is probably a
24  reasonable characterization, yes.
25      Q.  All right.  And the effect of that line

1      Fiachra O'Driscoll
2  of credit was it enabled Clayton to hold onto the
3  paper that is generated by -- the mortgages that
4  it generated by selling homes as distinguished
5  from monetizing them somehow?
6      A.  That was correct.  Basically they were
7  able to use those facilities to finance their
8  working capital, to finance their inventory of
9  loans, to finance their -- to finance their needs
10  in that regard.
11      Q.  Would that kind of solution have worked
12  for Oakwood and enabled it to avoid filing
13  bankruptcy eventually?
14      A.  It's probably not right for me to
15  speculate.
16      Q.  Okay.  Do you believe that there were
17  any measures that Oakwood could have taken in
18  response to the market forces that you've
19  described as having brought about its bankruptcy
20  that would have prevented its bankruptcy?
21      A.  No, I do not.
22      Q.  Did you believe at the time that --
23      Let's say in 2001 did you believe that
24  Oakwood's bankruptcy was inevitable?
25      A.  In 2001?

1      Fiachra O'Driscoll
2      No, I did not.
3      Q.  When you brought Mr. Felt's group on
4  board in 2001 you did not then believe that
5  Oakwood's bankruptcy was inevitable?
6      A.  Not at all.
7      Q.  Did you believe that by 2002, when
8  the -- by the time the contract was signed?
9      MR. OSNATO:  To be clear, the contract
10      you're referring to is the financial advisory
11      contract which was signed in August of 2002,
12      to give you a reference point.
13      THE WITNESS:  Understood.
14      A.  To be honest with you, I don't recall.
15      MR. CASTANARES:  All right.  As 52 I'll
16      ask the reporter to mark 174239.
17      (CSFB Exhibit 52, One-page document,
18      bearing Bates stamp No. CSFB-00174239, marked
19      for identification, as of this date.)
20      (Witness looks at document.)
21      THE WITNESS:  Thank you.
22      Q.  Do you have a recollection of these
23  discussions with GreenPoint?
24      A.  In general terms, yes, I do.
25      Q.  How did they originate?

Fiachra O'Driscoll

1  
2   A.   I don't recall, actually.  
3   Q.   Do you recall whether you originated  
4   them as distinguished from either Oakwood or  
5   GreenPoint doing so?  
6   A.   I know you were going to ask me that  
7   and I'm afraid I really don't recall.  
8   Q.   All right.  GreenPoint was -- became  
9   Conseco; is that correct?  
10  A.   No.  
11  Q.   Oh, I'm sorry.  That was Green Tree?  
12  A.   Green Tree.  
13  Q.   Okay.  
14  A.   It's easy to get confused.  
15  Q.   Okay.  
16  A.   GreenPoint was what had been known as  
17  Bank America Housing Services.  
18  Q.   Okay.  And that entity was a competitor  
19  of Oakwood Acceptance essentially?  
20  A.   Yes.  
21  Q.   Okay.  And was it --  
22  A.   But let me -- sorry, let me just add to  
23  my answer by saying not necessarily a competitor  
24  of Oakwood Homes.  Because, for instance, the  
25  retail sales centers could and would -- I think I  

159

Fiachra O'Driscoll

1  
2   mentioned that the retail sales centers did  
3   occasionally, in fact, more than occasionally,  
4   sometimes sell individual loans on a one at a time  
5   basis to other lenders.  And one of those lenders  
6   was, indeed, GreenPoint.  So, you know, they were  
7   a competitor of Oakwood Acceptance, but not  
8   necessarily perceived as being a competitor of  
9   Oakwood Homes.  It was kind of -- something of a  
10  dual relationship.  
11  Q.   All right.  What became of these  
12  discussions?  
13  A.   In the end, nothing that I can recall.  
14  Q.   Okay.  And can you recall why it is  
15  that nothing came of them?  
16  A.   I can't, actually.  
17  Q.   This happened simultaneously with the  
18  submission to your CRM department of a proposed  
19  $75 million reverse repurchase facility, correct?  
20  A.   If you say so.  
21       MR. OSNATO:  Well, no, no.  Don't  
22  assume.  
23       Do you recall that to be a fact?  
24  A.   I don't --  
25       MR. OSNATO:  If you don't know, say you  

160

Fiachra O'Driscoll

1  
2   don't know.  
3   A.   I actually don't recall that to be a  
4   fact.  
5   Q.   Did one thing have anything to do with  
6   another?  
7   A.   No.  
8   Q.   They're entirely separate?  
9   A.   Either -- I'm pretty sure, now that I  
10  think it over again, that either it was initiated  
11  by Chuck Richardson, who is the person referred to  
12  here as being "C. Richardson," or it was initiated  
13  by Bob Smith, one or the other.  
14  Q.   Okay.  Was GreenPoint then a client of  
15  CSFB?  
16  A.   In the terms we've discussed before,  
17  yes.  
18  Q.   I'm sorry, I don't understand that  
19  qualification.  
20  A.   In other words, we did mortgage  
21  securitization underwritings for them in -- much  
22  as we did with Oakwood.  
23  Q.   Okay.  And was there any other  
24  relationship between GreenPoint and CSFB other  
25  than that one?  

161

Fiachra O'Driscoll

1  
2   A.   Yes.  
3   Q.   What was it?  
4   A.   There was an investment banking  
5   relationship as well.  
6   Q.   And describe it, please.  
7   A.   I don't know enough about it to be able  
8   to describe it.  But suffice it to say that there  
9   was -- unlike with Oakwood where there generally  
10  speaking wasn't an investment banking officer  
11  covering Oakwood for most of that period of time.  
12  There was an investment banking officer who had a  
13  close relationship with some of the senior  
14  executives at GreenPoint along the way.  
15       I know you're going to ask me his name  
16  and he's -- unfortunately he's retired and I've  
17  forgotten his name.  
18  Q.   All right.  But it was somebody who  
19  worked in --  
20  A.   It was an ongoing relationship anyway.  
21  Q.   It was somebody who worked in the same  
22  department that Mr. Felt did?  
23  A.   No.  
24  Q.   What department did this gentleman work  
25  for?  

162

```
1              Fiachra O'Driscoll
2       A.    He was in the financial institutions
3   advisory group.
4       Q.    All right.  And just generally
5   speaking, what kind of services did that group
6   perform for GreenPoint?
7       A.    I don't know.
8       Q.    Okay.  Who runs that group now?
9       A.    It's run by two gentlemen, Eric Varvel
10  and Mark Granetz.
11      Q.    And they're both here in New York?
12      A.    I am not sure, actually.
13      Q.    Okay.  Do you recall that at some point
14  or another there was a proposition put to CRM
15  about a $75 million reverse repurchase facility?
16      A.    Yes.
17      Q.    I believe in earlier testimony you
18  talked about a reverse repurchase facility as
19  being similar in some respect to a warehouse or
20  asset purchase facility, am I correct?
21      A.    It might be or it might not be
22  depending on the circumstances.
23      Q.    Okay.
24      A.    In this particular instance that
25  reverse repurchase facility was actually pretty
```

```
1              Fiachra O'Driscoll
2   some shape or form as well.
3       Q.    And did he say why they felt that way?
4       A.    I don't recall enough about the
5   conversation to say.
6       Q.    Based upon your knowledge of the
7   industry trends, et cetera, was there any -- did
8   you need him to tell you why they felt that way or
9   did you --
10      A.    No.
11      Q.    Did you understand why they felt that
12  way?
13      A.    Yes.
14      Q.    What was it?
15      A.    At that period of time, that was a
16  period of time in which Bank of America in
17  particular was, quote, unquote, making a big push
18  into the investment banking industry, into a
19  variety of different things, into straight
20  investment banking advisory activities, M&A,
21  corporate bond offerings like the one that they
22  did right around that time.  But also mortgaged
23  securitizations and my piece of the business, if
24  you will.
25            And they were very aggressive at that
```

```
1              Fiachra O'Driscoll
2   dissimilar.
3       Q.    "Pretty dissimilar"?
4       A.    Pretty dissimilar.
5       Q.    In what respects was it dissimilar?
6             Now, we're not talking --
7       A.    For one thing --
8       Q.    -- about 75 million --
9       A.    -- in truth, I think I'd need to see
10  the documents to refresh my recollection of
11  exactly what was in there.  I know one of the
12  things it provided for was financing securities as
13  well as financing loans.
14      Q.    Okay.  And whose idea was it to --
15            Who brought up this potential facility,
16  was it you, or was it Oakwood, or was it some
17  third party?
18      A.    Oakwood on a couple of occasions,
19  specifically Doug Muir, made it clear to us that
20  their other banking relationships, in particular
21  Bank of America and First Union, who were -- had a
22  broader relationship with Oakwood and were also
23  providing direct credit to Oakwood, were putting
24  him under a good deal of pressure and saying that
25  Credit Suisse should also provide financing in
```

```
1              Fiachra O'Driscoll
2   point in time.  And while I don't want to suggest
3   that they complied with the law, they skirted very
4   close to the fed rules about linking together the
5   provision of credit together with seeking other
6   banking services to come their way.
7             So they had made it very clear to not
8   just Oakwood, but I saw the same thing with
9   Conseco, I saw the same thing I think with
10  Clayton Homes as well, that they were putting
11  companies under a good deal of pressure to -- in
12  exchange for credit give them further assignments
13  and further opportunities to earn fees from either
14  underwriting, securities underwriting businesses,
15  or from investment banking advisory businesses.
16      Q.    Okay.  I may have misunderstood what
17  you said before.  I hope you'll clarify this for
18  me.
19            I had understood that you told me that
20  B of A was pressuring Oakwood to get Credit Suisse
21  First Boston to lend money, did I misunderstand
22  you?
23      A.    May I rephrase myself?
24      Q.    Yeah.  And let me phrase this a little
25  broader.
```

Fiachra O'Driscoll

2    A.   Yeah.

3    Q.   Because -- and I think what I
4  understood you to say in response was that B of A
5  was trying to get investment banking business, so
6  I'm confused by the two answers.

7    A.   No.  And I'm not sure if I misspoke or
8  whether alternatively it could easily be
9  misunderstood.

10       Doug's response to that pressure that
11  was clearly being applied to him was to say, well,
12  the counter to that is that Credit Suisse has to
13  step up.  At which point it's harder for Bank of
14  America to be demanding a bigger share of the
15  services if Credit Suisse is also seen as
16  providing the same sort of facilities.

17    Q.   Okay.  Now I'm probably even more
18  confused.

19       Are you telling me that you understood
20  what Mr. Muir said to be that in order for CSFB to
21  continue to get --

22       THE WITNESS:  I hate to interrupt, but
23  weren't we going to take a pit stop at 12:30?

24       MR. OSNATO:  We are going to break for
25  lunch.  Why don't we finish this line of

1       Fiachra O'Driscoll

2  questioning.

3       THE WITNESS:  And then we'll take a
4  break?

5       MR. OSNATO:  If that's okay.  And then
6  it is -- we are at about the three hour mark,
7  so...

8       MR. CASTANARES:  Now that the question
9  stands where it is interrupted, I don't care
10  whether we do it before lunch or after.

11       MR. OSNATO:  Are you sure?

12       MR. CASTANARES:  So if you want to
13  break, that's fine with me.

14       THE WITNESS:  If I may, can I clarify
15  the point?

16       MR. OSNATO:  Let's leave a clean record
17  and then pick up after lunch.

18       MR. CASTANARES:  Fine.

19       MR. OSNATO:  Do you need the question
20  read back?  I mean, are you clear what you're
21  answering?

22       THE WITNESS:  Yeah, I'm clear as to the
23  question.

24       MR. CASTANARES:  Okay.

25    A.   Bank of America's approach to

1       Fiachra O'Driscoll

2  customers, generally speaking at that point in
3  time is -- back in the days when we were a pure
4  commercial bank we simply extended credit to you.

5       Now -- and I'm not suggesting that they
6  didn't stay within the law.  But they were making
7  it very clear to customers that their continued
8  provision of credit in whatever shape or form it
9  was provided was going to be contingent on getting
10  a bigger share of the assignments, both advisory
11  assignments and also securities underwriting
12  business that that company had to offer.

13    Q.   Okay.  So now I think perhaps I
14  understand.  Let me see if I've got it.

15       And so Muir's reaction was that if CSFB
16  wants to keep B of A from horning in on its
17  investment banking service it's got to lend some
18  money?

19       MR. OSNATO:  Objection as to the form.

20       I'm not sure that accurately
21  characterizes his testimony.

22       But you can tell us if that's right.

23    A.   For clarity, at that point in time we
24  weren't providing what in the industry would be
25  regarded as being investment banking services,

1       Fiachra O'Driscoll

2  which would typically be seen as -- the euphemism
3  for investment banking advisory services.  What we
4  were providing, of course, was securities
5  underwriting services.

6       And what Doug made is fairly clear was
7  that he was going to have to give larger
8  assignments and more, perhaps, lead assignments,
9  and perhaps sole assignments to Bank of America if
10  it was not possible for him to counter argue
11  to Bank of America that, in fact, Credit Suisse
12  First Boston was also committing credit on a
13  comparable basis.

14    Q.   All right.  And that's what gave rise
15  to this requested $75 million reverse repurchase
16  facility?

17    A.   I think that that is -- that is the
18  assumption that I drew at the time.

19       MR. CASTANARES:  Okay.  Great.  This is
20  a good place to break for lunch.

21       MR. OSNATO:  It is good?

22       Thank you.

23       THE VIDEOGRAPHER:  Okay.  We'll go off
24  the record at 12:35, tape 2.

25       (Luncheon recess:  12:35 p.m.)

Fiachra O'Driscoll

```
 1                   A F T E R N O O N   S E S S I O N
 2                   (Time noted:  1:28 p.m.)
 3   F I A C H R A   O ' D R I S C O L L,    resumed
 4        as a witness, having been previously sworn by
 5        the Notary Public, was examined and testified
 6        as follows:
 7            THE VIDEOGRAPHER:  Okay.  We're back on
 8        the record.  It's 1:28.  This is tape 2.
 9   EXAMINATION BY
10   MR. CASTANARES:
11        Q.    Mr. O'Driscoll, at about the time that
12   the $75 million reverse repurchase facility was
13   being made, was being discussed, that was late '00
14   or early '01; is that right?
15            I'm sorry, late '99 or early '00; is
16   that correct?
17        A.    Probably late 1999 I think would be
18   accurate.
19        Q.    Okay.  Were other lenders leaving the
20   industry at that time?
21        A.    Other manufactured housing lenders?
22        Q.    Right.
23        A.    Let me just think through.
24            I -- oddly enough during that time
```

Fiachra O'Driscoll

```
 1   interval, no, I don't think so.
 2        Q.    Had there been a period earlier than
 3   that when lenders were leaving the manufactured
 4   housing industry?
 5        A.    Yes.  Back a little while earlier than
 6   that, in late 1998 or early 1999, we saw a number
 7   of people either go bankrupt or simply get out of
 8   the business.
 9        Q.    Lenders went bankrupt, you mean, or
10   their --
11        A.    Lenders.
12        Q.    Okay.  And what had happened to change
13   that in later '99, either that all of the ones
14   that were going to leave had done so or did some
15   new people get back into the industry at that
16   point?
17        A.    I don't know.
18        Q.    All right.  But in any event, as of
19   late '99, when the $75 million facility was being
20   discussed, that was not a time when lenders were
21   actually leaving then; is that right?
22        A.    I - yeah, I can't say I was watching
23   the clock, but that I believe is correct.
24        Q.    Did there come a later time when
```

Fiachra O'Driscoll

```
 1   lenders left the industry once again?
 2        A.    Yes.
 3        Q.    When did that commence?
 4        A.    In 2002, 2000 -- really into 2002,
 5   perhaps 2001 as well.
 6        Q.    Okay.  And what, if you know, motivated
 7   those departures?
 8        A.    A number of people ended up in
 9   bankruptcy.  And other people whose, perhaps, sole
10   business wasn't manufactured housing decided to
11   retrench, to get out of the manufactured housing
12   business, to shut it down, close those businesses
13   down and proceed on with the other parts of the
14   business that were working well.
15        Q.    Okay.  And when you speak of people in
16   bankruptcy you're talking about lenders in
17   bankruptcy as distinguished from manufacturers?
18        A.    I beg your pardon.
19            Lenders, yes.
20        Q.    Now, can you explain to me the
21   structure of a reverse repurchase facility.
22        A.    Certainly.  A reverse repurchase
23   facility is an arrangement whereby -- you have two
24   parties to it.  One party, the party that holds a
25
```

Fiachra O'Driscoll

```
 1   particular security, or in more recent times in
 2   the last decade or so, perhaps holds a loan, sells
 3   it to another party.  But they simultaneously
 4   enter into an arrangement whereby that other --
 5   that other party agrees to resell that security to
 6   them at a fixed future date in time, at a
 7   specified price or at usually -- or very often
 8   within a certain time interval at a price that's
 9   adjusted to a degree for the time interval at
10   which the thing is sold.
11            So effectively what you've got is
12   you've got a paired immediate sale of a security
13   and a future repurchase of that security within a
14   time window that's agreed upon and identified.
15   And that's something that's been a really common
16   feature of the U.S. securities industry for many
17   decades.  I wouldn't care to say exactly how many,
18   but it has some specific -- I know that there's
19   some specific provisions in the bankruptcy code
20   that specifically treat and to a degree privilege
21   some of those kind of arrangements.
22            There's also a very extensive body of
23   literature on the accounting for these things,
24   because they're actually accounted for not as a
25
```

Fiachra O'Driscoll

1  sale under the repurchase.  But because it's not
2  an optional repurchase, because it's a compulsory
3  repurchase the accounting profession has always
4  viewed these things as being financing from an
5  accounting point of view, without regard to the
6  legal form in which these things are taken.
7
8        And if you go back to -- you know,
9  historically these things were typically -- and if
10  you look at the core of the market for this kind
11  of stuff it's mostly treasuries and other highly
12  liquid securities.  But probably over the last
13  decade or so there's been a tendency to use these
14  kind of facilities for raw loans, particularly
15  mortgage loans and things of that sort as well.
16  And that would have been the kind of thing that
17  was contemplated here.
18        And again, from a structure point of
19  view it's one of these things that -- particularly
20  with regard to the financing of loans that are
21  being aggregated for securitization, it's kind of
22  come in and out of fashion.  I'd have to say that
23  it was somewhat in vogue as a style.  These vogues
24  are ones selected by the lawyers, rather than
25  anybody else, but it was somewhat in vogue during

175

Fiachra O'Driscoll

1  A.    Yes.
2        Q.    And what benefit would Oakwood derive
3  from this transaction?
4        A.    Because it would get cash from the
5  arrangement in much the same way as it would
6  through a straightforward loan arrangement.
7        Q.    And how would CSFB be compensated in
8  such a transaction?
9        A.    It would earn the difference between
10  the price at which it purchased the security and
11  the price at which it sold back the security.  And
12  usually that was calculated such as to be a
13  spread, a spread over some form of bank price,
14  usually LIBOR or something of that sort.  So in
15  essence you're earning -- in the difference
16  between the two prices you're earning an interest
17  rate.
18        Q.    Right.  Okay.  Thank you.
19        Now, were you the person at CSFB who
20  carried this proposal within the company
21  primarily?
22        A.    What do you mean by "carried"?
23        Q.    Well, I mean somebody submitted
24  presumably --

177

Fiachra O'Driscoll

1  that period of time.
2        And these days something more like the
3  kind of mechanisms that were put in place for the
4  Oakwood loan purchase facility is probably more
5  typical than what's there now.
6        Q.    Okay.  And you may have answered this
7  question in the course of the answer you've just
8  given, but I'm not -- I just want to make certain
9  of it.
10        Were the securities which were to be
11  the subject of the -- or strike that.
12        Well, let's call it securities.
13        Were the securities or loans which were
14  to be the subject of this particular facility the
15  mortgages, as you referred to them, or were they
16  REMIC securities held by Oakwood?
17        A.    They were definitely REMIC securities
18  held by Oakwood, for sure.  As to the other, I
19  don't recall.
20        Q.    Okay.  And just to put names to the
21  structure you've just described, Oakwood would
22  sell a security to CSFB and at the same time
23  promise to buy it back at a specified price at a
24  later date?

176

Fiachra O'Driscoll

1  A.    Yeah.
2        Q.    -- some sort of proposal to CRM on this
3  transaction.  Somebody may have -- if somebody at
4  CRM or else the New York branch wanted to know
5  about it, know about Oakwood, whatever, they'd
6  probably turn to someone, was that person you?
7        A.    Well, can I separate those two things
8  into one --
9        Q.    Definitely.  Uh-huh.
10        A.    -- one part?
11        Q.    Tell me what your role was.
12        A.    The answer for the first part was, yes,
13  I was the one, if I recall, responsible for
14  submitting that thing to credit, either directly
15  or someone at my instruction.  As for the second
16  part, it wouldn't necessarily be me.
17        Q.    Okay.  Do you recall whether anybody
18  from CRM inquired of you in any way regarding this
19  proposed transaction?
20        A.    I do not recall a specific instance.
21        Q.    Do you recall furnishing any
22  information to CRM about Oakwood, or its
23  transactions, or business?
24        A.    I don't recall it.  Again, I don't

178

Fiachra O'Driscoll

1   recall a specific instance.
2   
3   Q.   And would this have been done by way of
4   some sort of loan application that you prepared or
5   something equivalent to that, some formal
6   documentary application?
7   A.   No.
8   Q.   How was it submitted to CRM?
9   A.   Usually something would be submitted to
10  CRM that might be as simple as a telephone call.
11  The thing could be done really entirely verbally,
12  depending upon the circumstances.
13  More often you prepare a term sheet.
14  The term sheet might have been something that you
15  had shared with the company beforehand to get the
16  gist of what the company was looking for, on the
17  basis that the term sheet was one that you were
18  then going to submit to the credit risk manager,
19  to LCD, and to everybody else.  Or it might be
20  something that you would just deliver to LCD in
21  the first instance saying, you know, I want to
22  discuss this with you before I show it to the
23  company.  Either of the two routes.
24  Q.   Let me see if I can clarify also what
25  you understood the process to be for the approval

179

Fiachra O'Driscoll

1   Did the process on this one follow
2   anything other than the general pattern?
3   A.   No.
4   Q.   Okay.  So what was it?
5   A.   Very standard.
6   I do recall that actually the specific
7   CRM officer to whom I submitted the proposal at
8   the time was Tom Irwin, as was the case with
9   really not absolutely anything, but almost
10  anything that we were doing within the space
11  during that period of time.  Not just for
12  manufactured housing, but he was also responsible
13  for counterparty risk with respect to really any
14  of the people within the non-conforming mortgage
15  space, the counterparties within the
16  non-conforming mortgage space.  So I do recall
17  that the proposal was submitted to him
18  specifically.
19  From there, depending on the
20  quantification of the potential exposure to the
21  company from that counterparty, if it was within
22  his threshold he could seek to approve it himself.
23  If it was -- if it exceeded that threshold what
24  would typically happen is he would review it,

181

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1   or disapproval of a proposal such as this.
2   I presume you submitted material
3   directly to CRM; is that correct?
4   A.   Yes.
5   Q.   Now, did you understand when you did
6   that, that the powers that be at the New York
7   branch had made the decision to go forward with
8   this transaction if it had CRM's stamp of
9   approval?
10  Or on the other hand, that CRM first
11  would decide whether to approve it or not.  And if
12  it did so, it then would be submitted for
13  decision?
14  Or what was the process?
15  A.   You're going to have to break that down
16  into a couple of different questions.  There's
17  about four questions in there, with respect.
18  Q.   I'm just trying -- I'm trying to
19  understand what the process was, so...
20  MR. OSNATO:  Is the process question
21  directed generally or are we talking now
22  specifically about the proposed reverse
23  repurchase facility?
24  Q.   Did this --

180

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1   gather information, make a recommendation, and
2   submit it to his superior.  His superior, again,
3   would have some sort of credit exposure limit, and
4   so on.
5   Q.   Okay.  Assuming for the purposes of
6   discussion that the exposure was within
7   Mr. Irwin's credit limit or authority limit, was
8   it your understanding that if he gave it his go
9   ahead the transaction was a go or did it still
10  have to go to a committee of some sort for some
11  final approval that evaluated something beyond
12  there were some credit risk issues?
13  A.   Can you break that down into a couple
14  of different questions.
15  Q.   Was it your understanding that if CRM
16  gave its approval that the transaction was a done
17  deal?
18  A.   No.
19  Q.   Okay.  What else had to happen?
20  A.   As a practical matter Tom -- Tom rarely
21  would take a decision to approve a credit or
22  otherwise on his own.  So as a practical matter,
23  while there wasn't a committee process within CRM
24  there was to a degree a certain measure of

182

Fiachra O'Driscoll

1  collegial consultation. Which was as a practical
2  matter, he would normally, almost invariably
3  consult with his superiors before making a credit
4  decision.
5
6  Q.    All right. Let me -- maybe I've asked
7  this question inartfully. As a matter of fact,
8  I'm sure I have. So let me try it again.
9        Did this transaction need any form of
10 approval other than credit risk management
11 approval in order for it to be --
12 A.    Yeah.
13 Q.    -- to move forward?
14 A.    Typically I would need to get my
15 supervisor's approval for the transaction before
16 it would appear. And depending on the specific
17 entity that was actually going to provide the
18 finance, I might also need to get approval from
19 the head of that business unit.
20       You -- if you'll forgive me, one of the
21 earlier questions you asked, the reason I was a
22 little confused was you said the New York branch
23 with respect to the reverse repo. And technically
24 it wouldn't have been the New York branch.
25 Because the New York branch had a certain kind of

183

Fiachra O'Driscoll

1  And from that date till the date of the bankruptcy
2  a guy called Joe Donovan was my supervisor.
3
4  Q.    All right. Do you know whether
5  Mr. Weingord or Mr. Donovan ever interacted
6  directly or had any communication with any Oakwood
7  people?
8  A.    I don't recall.
9  Q.    Now, in terms of economic risks --
10 which I'm trying to separate that out from any
11 legal questions involved -- what is the difference
12 on the Credit Suisse side between reverse
13 repurchase and the asset purchase facility that
14 was done a year later?
15       MR. OSNATO:  I'm going to object to the
16       form of the question.
17 A.    It would depend on the circumstances.
18 Q.    Were there different economic risk
19 characteristics between the -- I mean, aside from
20 the size of the line --
21 A.    Uh-huh.
22 Q.    -- were there different economic risk
23 characteristics from CSFB's perspective in the
24 $75 million reverse repurchase proposal and the
25 proposal a year later that resulted in the asset

185

Fiachra O'Driscoll

1
2  financings that it would do and could do, whereas
3  a reverse repo would have been something that
4  was done out of the broker-dealer, out of
5  Credit Suisse First Boston Corporation.
6  Q.    Okay.
7  A.    So I would have had to potentially go
8  to not just my supervisor, but also to somebody
9  within the business unit who handled those things
10 on a day to day to get their approval as well.
11 Q.    Who was your supervisor at that time?
12 A.    What date was that?
13       That was 1999?
14 Q.    So it's late '99, early 2000.
15 A.    It was a gentleman by the name of
16 Phil Weingord.
17 Q.    Phil Weingart?
18 A.    Gord, g-o-r-d.
19 Q.    Oh, gord. Okay.
20       And did that change before Oakwood's
21 bankruptcy, the identity of your supervisor?
22 A.    Yes.
23 Q.    Who -- just tell me what happened in
24 that regard.
25 A.    He left to go to Deutsche Bank in 2000.

184

Fiachra O'Driscoll

1
2  purchase line?
3  A.    There would have been, yes.
4  Q.    And what were they?
5  A.    The reverse repo line was intended, if
6  I recall -- and I don't have the documents in
7  front of me so I don't -- you know, you'll have to
8  forgive me. If you refresh my recollection, we'll
9  put the documents in front of me, it may be
10 somewhat different.
11       But the reverse repo line had a fairly
12 significant element of loans -- sorry, of
13 securities within it, maybe the whole lot, as a
14 way of financing those loans. It was also a much
15 shorter term. Typically these things were not
16 three-year committed lines. Typically these
17 things were at three month, or six month, or some
18 shorter period of time.
19       I don't recall what the period of time
20 was that the commitment was for this reverse repo,
21 but it would have been very short. So both the
22 assets were different and the maturity of the
23 exposure was very different.
24 Q.    Would the shorter maturity of the
25 exposure have tended to increase or decrease the

186

Fiachra O'Driscoll

1  risk characteristics of the line from the
2  perspective of CSFB?
3      A.    Decrease.
4      Q.    And would the asset mix have tended to
5  increase or decrease that exposure?
6      A.    As opposed to outright loans?
7      Q.    As opposed -- I'm trying to contrast
8  the CSFB risk in the proposed reverse repo
9  proposal with the risk in the asset purchase
10 proposal, which was adopted approximately a year
11 later. And I believe you told me that the one
12 aspect was the difference in maturity and the
13 other had to do with the securities themselves.
14      So I'm asking you if the difference in
15 the securities themselves was greater or presented
16 greater risks to CSFB in one transaction than the
17 other or lesser ones?
18      A.    No. Because they weren't
19 contemporaneous in time, I didn't have occasion to
20 make such comparison at that time. And to be
21 honest, I'd need to go back and look at the nature
22 of the instruments in a good deal, more detail now
23 to make an honest assessment.
24      Q.    Do you have any knowledge of why it was

Fiachra O'Driscoll

1  or not approved.
2      Q.    Did you ever receive a copy --
3      Did you ever see a copy of the report
4  that Xanthos wrote in January of 2000 turning this
5  down?
6      A.    No.
7      MR. OSNATO:  Objection to the form.
8      Let me -- please, before you answer,
9  let me get my objection in.
10     I'm going to --
11     THE WITNESS:  Sorry.
12     MR. OSNATO:  -- object to the form of
13 the question.
14     You can answer.
15     Do you want the question read back?
16     THE WITNESS:  Yeah. Well, actually let
17 me --
18     MR. OSNATO:  Can you read back the
19 question, please?
20     THE WITNESS:  Let me rephrase my
21 answer.
22     MR. OSNATO:  Well, just listen to the
23 original question and then provide an answer.
24     THE WITNESS:  Let me rephrase my -- if

Fiachra O'Driscoll

1  that CRM turned one down and approved the other?
2      MR. OSNATO:  Objection to the form.
3      A.    No.
4      Q.    Okay. Did you have any knowledge of
5  why CRM turned the first one down?
6      A.    I was never actually informed that they
7  had turned it down.
8      Q.    So as far as you know, it was still an
9  open proposal a year later when the asset purchase
10 facility was being discussed?
11     A.    It hadn't been discussed at that point.
12     What frequently happened was that --
13 was one of three things. Either a credit
14 situation would be approved, a credit situation
15 would be declined, or very frequently a credit
16 situation would have been left open.
17 Particularly -- and I don't want to cast
18 aspersions towards my colleagues here --
19 Tom Irwin, though, is one of the people who -- and
20 again, I don't want to, you know, draw comments on
21 somebody's professional capabilities, and so on --
22 would very often leave something open. So he
23 would sometimes -- he would sometimes never quite
24 tell one whether the thing was actually approved

Fiachra O'Driscoll

1  I may, rephrase my answer.
2      A.    In the first place it wouldn't have
3  been James place to turn a facility down in
4  isolation. He didn't have any authority to
5  approve or disprove credit that I'm aware. In the
6  second place, actually I didn't know there was
7  such a report.
8      Q.    To this moment, when I asked you this
9  question, you didn't know it?
10     THE WITNESS:  Can I answer that?
11     MR. OSNATO:  You can absolutely answer
12 the question.
13     I, again, am going to object to the
14 lack of foundation in the question.
15     But you can answer the question.
16     A.    I was shown a piece of paper by our
17 counsel yesterday to that effect, that was the
18 first I'd ever seen or heard of it.
19     Q.    Okay. Now, there was another reverse
20 repurchase facility proposed just a few months
21 later, wasn't there, in the amount of $50 million?
22     A.    I don't recall.
23     MR. CASTANARES:  Let me see if I can
24 help refresh your memory.

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1 I'll ask the reporter to mark
2 CSFB 5:2903 as 53.
3 (CSFB Exhibit 53, One-page Memorandum,
4 bearing Bates stamp No. CSFB-00512903, marked
5 for identification, as of this date.)
6 THE WITNESS: Uh-huh.
7 Q. Does this document help refresh your
8 memory as to whether there was a proposal for a
9 $50 million reverse repurchase facility in
10 approximately March of 2000?
11 A. Actually, no.
12 No. 1, there was never a second
13 proposal. I don't think that there was ever
14 anything that -- to the best of my knowledge,
15 there was only ever one proposal for a reverse
16 repo. I don't recall its exact dollar amount at
17 the time. I thought it was a $75 million
18 proposal. There may have been revised term
19 sheets. It wasn't unusual actually to have
20 revisions of term sheets of that sort during that
21 period of time. So I don't think that there was
22 ever multiple proposals, certainly from my
23 perspective.
24 Q. So if it was all one proposal you were

191

Fiachra O'Driscoll

1 you'd get an outright turndown. Much more often
2 it was the case that their answer was, well, can
3 you think about whether or not you, you know, can
4 approach this thing differently?
5 So term sheets would have been revised,
6 term sheets would have been transformed in their
7 nature, and you would see if there was a meeting
8 of the minds.
9 Q. Okay. Now, yesterday for the first
10 time you saw Xanthos's January 2000
11 recommendation; is that correct?
12 A. Yes.
13 Q. Is that the type of document, speaking
14 as of that time, January 2000, that would have
15 evidenced a complete turndown of a proposal?
16 A. I never saw evidence of a complete
17 turndown of a proposal.
18 Q. Okay. Were you ever aware that CSFB
19 had turned down any proposals ever?
20 MR. OSNATO: Objection as to the form.
21 Q. Whether they related to Oakwood or
22 anything else?
23 A. Yes, absolutely.
24 Q. Okay. And were those communicated to

193

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1 informed on approximately March 21, 2000 that it
2 was turned down, right?
3 A. No.
4 Q. So this, the statement here that Irwin
5 and Xanthos informed you of, this decision is
6 incorrect?
7 A. It's incorrect.
8 Q. They never did tell you that?
9 A. Nope.
10 Q. Okay.
11 A. The first I heard about this was
12 yesterday.
13 Q. So as far as you know, that reverse
14 repo facility was still under consideration as of
15 the time of Oakwood's bankruptcy in 2002?
16 A. There hadn't been significant
17 discussions about it and it would -- those
18 discussions were from my perspective superseded by
19 the later loan purchase facility discussions.
20 Q. A year later?
21 A. Yeah. And it wasn't unusual for
22 discussions to change in their form. Because more
23 typically, as I said, rather than -- sometimes
24 you'd get an outright approval. Very occasionally

192

Fiachra O'Driscoll

1 you orally always?
2 A. They were always communicated orally.
3 Q. Okay. Now, in the course of the next
4 few months after the $75 million proposal was
5 being made to CRM, did anybody at Oakwood ask you
6 what was going on with it?
7 A. I'm sure they did, but I don't have any
8 specific recollection.
9 Q. Okay. Did it ever occur to you to
10 wonder why you hadn't heard from CRM on this?
11 A. There was never a situation where I
12 hadn't heard from CRM.
13 Q. Well, this was one, wasn't it?
14 A. No.
15 Q. And you hadn't heard from CRM on this
16 proposal until yesterday, right?
17 A. I hadn't seen a formal written
18 submission from CRM, but I -- on the various
19 things that we worked on, of which Oakwood was
20 only a component, I probably talked to Tom Irwin
21 every two or three days.
22 Q. All right. Well, my question to you is
23 did CRM ever communicate to you the turndown of
24 any proposal relating to Oakwood?

194

29/06/2006 O'DRISCOLL, Fiachra (vol 1)

Fiachra O'Driscoll

2    A.    No.

3    Q.    And did it ever -- did you ever inquire
4    as to the status of the reverse repurchase
5    facility, in terms of whether CRM was going to
6    approve it or not?

7    A.    I don't recall, but I'm sure I would
8    have done.

9    Q.    And you can't -- I presume you can't
10   remember what answer you got.

11   A.    I cannot remember the answer I got, no.

12   Q.    To the best of your knowledge, the way
13   CRM worked at that time when it either approved or
14   disapproved a proposed transaction, did it prepare
15   some form of memorandum or report of its reasons
16   for doing so?

17   A.    Yes.

18   Q.    So in the ordinary course you'd have
19   expected CRM to have prepared some form of report
20   regarding the $75 million reverse repo facility,
21   correct?

22   A.    I don't know, to tell you the truth.

23   Q.    But in the ordinary course it would
24   have done so, right?

25   A.    They typically prepared internally some

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2    sort of credit application.

3    Q.    And was there some sort of Chinese wall
4    that would prevent you from getting the report?

5    A.    I never saw such a report.

6    Q.    Was there some particular reason you
7    didn't, other than the fact that you just didn't
8    happen to?

9          I mean, was there some rule against it
10   or...

11   A.    I wasn't aware of anybody within my
12   business unit ever seeing such a report.

13   Q.    Okay.  And so as far as you know then,
14   sir, Oakwood was never advised that the facility
15   had been turned down; is that correct?

16   A.    I don't know.

17   Q.    Did you have a chance to read
18   Mr. Xanthos's report yesterday when you saw it?

19         MR. OSNATO:  Can we be specific as to
20   what report you're referring to by date or
21   Bates range.

22   Q.    How does 250116 sound?

23         MR. OSNATO:  May we have a date so the
24   witness can get oriented?

25         MR. CASTANARES:  We have it here

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2    someplace.  I don't want to give it to the
3    witness and have him read it --

4          MR. OSNATO:  I understand.  There are
5    multiple Xanthos documents.  I want to be
6    sure we're talking about the right one.

7          MR. CASTANARES:  All right.  I'll be
8    happy to put in front of him --

9          MR. HOLT:  January 19th.

10         MR. OSNATO:  January 19th?

11         MR. HOLT:  2000.

12         MR. OSNATO:  2000.

13         MR. CASTANARES:  And I'll just --

14         MR. OSNATO:  So we're talking about
15   2000.

16         MR. CASTANARES:  Let me just speak to
17   counsel for a second, if I might.

18         MR. OSNATO:  Sure.

19         MR. CASTANARES:  I'll be happy to put
20   it in front of him.  I am choosing not to do
21   so because I don't -- and I'm not questioning
22   him about the contents of it and I don't want
23   to spend the time having him read the entire
24   document.

25         MR. OSNATO:  Understood.

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2          MR. CASTANARES:  If it would -- if you
3    would like him to have it in front of him to
4    help refresh his memory, that's fine with me.

5          MR. OSNATO:  That's not my point.  My
6    point is there are multiple Xanthos
7    documents --

8          MR. CASTANARES:  Fine.  Okay.

9          MR. OSNATO:  -- written at different
10   points in time.

11         MR. CASTANARES:  We understand each
12   other.

13         MR. OSNATO:  I just want to make sure
14   we're on the same page.

15         MR. CASTANARES:  We understand each
16   other.  We are at least literally on the same
17   page.

18   Q.    Did you read it yesterday?

19   A.    I don't know.

20   Q.    You can't remember whether you read it
21   or not?

22   A.    You haven't showed it to me.

23         MR. CASTANARES:  Well, all right.
24   Let's show it to him.

25         MR. OSNATO:  There you have it.

Fiachra O'Driscoll

2   A.   What can I tell you?

3        There were multiple ones, right?

4   Q.   Okay.  I would like you to look at this

5   document long enough to know whether you read it

6   yesterday or not.  That's the question.  I hope

7   you won't have to read the entire document to do

8   so.

9        MR. CASTANARES:  And I'll ask the

10   reporter to mark it as Exhibit 54.

11        (CSFB Exhibit 54, Multipage Memorandum,

12   bearing Bates stamp Nos. CSFB-00250116

13   through CSFB-00250129, marked for

14   identification, as of this date.)

15        MR. OSHATO:  You don't need to read it.

16   Just get a little bit of the context.  The

17   question is whether you recall reviewing

18   that.

19        (Witness looks at document.)

20   A.   I don't believe I read it yesterday.  I

21   think I saw it yesterday, but I don't believe I

22   read it.

23   Q.   So as you sit here, you've never read

24   this document; is that right?

25   A.   No.

199

Fiachra O'Driscoll

1        I don't think so, anyway.

3   Q.   Okay.  "No," you haven't read it or

4   "no," that is not right?

5   A.   I do not believe that I read this one

6   yesterday.

7   Q.   Okay.  Or this morning or ever, right?

8   A.   Or this morning or ever.

9   Q.   Right.  Okay.  Good.

10        Who is Kareem, K-r-e-e-m --

11   K-a-r-e-e-m, Serageldin?

12        I'm pronouncing that phonetically and I

13   thought you could tell me how to pronounce it,

14   S-e-r-a-g-e-l-d-i-n?

15   A.   Serageldin.

16   Q.   Serageldin.  Okay.  Who is he?

17   A.   He is a gentleman who used to work

18   within my team within the asset finance group at

19   Credit Suisse, who by the date of this period of

20   time -- this is -- I take it we're talking about

21   1999, 2000, 2001 -- was working for Joe Donovan's

22   direct superior at that time, which was

23   John Chrystal, and he was in a credit derivatives

24   team.

25   Q.   In, I'm sorry?

200

Fiachra O'Driscoll

2   A.   He was within a business unit that

3   dealt primarily with credit derivatives and other

4   structured -- structured credit activities.  I

5   think it was technically called structured credit

6   products at the time, I believe.

7   Q.   What was the relationship of him or his

8   outfit to Oakwood?

9   A.   None, that I know of.

10   Q.   Okay.  CSFB has produced a number of

11   e-mails to me that are showing him as getting

12   copies that related to Oakwood.  I have a bunch of

13   them available.

14        You cannot remember any role he played

15   on the Oakwood transactions?

16   A.   Yes, I can.

17   Q.   What role did he play on the Oakwood

18   transactions?

19   A.   The role that he took was he was -- he

20   was responsible to Joe Donovan's -- to Joe

21   Donovan's supervisor, John Chrystal, for a variety

22   of different credit positions, including

23   effectively taking onto his trading book as it was

24   at the time, the credit risk from this particular

25   Oakwood loan -- what turned into the loan purchase

201

Fiachra O'Driscoll

2   facility.

3   Q.   All right.  So -- and did Kareem have

4   any relationship with Oakwood other than the loan

5   purchase facility?

6   A.   Kareem had worked within my team in the

7   asset securitization group back in 1996, 1997,

8   part of 1998.  So he knew Doug Muir, he knew

9   several of the executives of Oakwood from that

10   period of time.

11   Q.   Do you know whether he had any contact

12   with any Oakwood people in the period after 1999,

13   let's say?

14   A.   I know that he met Doug Muir, again, on

15   one occasion in the preparation for putting

16   together the loan purchase facility, because we

17   had a flight down there to meet with those guys at

18   one point.

19   Q.   Was he located here in New York?

20   A.   He was located at different times

21   during that period in London and New York.

22   Q.   All right.  Have you now told me

23   everything you know about the role or roles that

24   Kareem played in all the Oakwood transactions

25   before the bankruptcy?

202

1         Fiachra O'Driscoll

2     A.    Everything -- I don't know.  You would

3  have to ask me specific questions.

4     Q.    All right.  Well, I'm just trying to

5  understand what his role was.  And I think you've

6  identified two things for me.

7         You're not aware, as you sit here

8  today, of anything more than that?

9     A.    That's what springs immediate to mind,

10  if I can put it that way.

11     Q.    Okay.  Do you know whether he was

12  involved in any way in the reverse repurchase

13  facility proposals?

14     A.    I don't recall.

15     Q.    Okay.  Let me see if this document will

16  refresh your recollection.  It's Credit Suisse

17  CSFB 173794.  For some reason it's two pages, the

18  second of which is blank.  And in the lower e-mail

19  you appear to be transmitting a quotation of the

20  terms from some document to him.  And if you need

21  to read that to answer the question I'm going to

22  ask you, that's fine.

23         But first I want to ask you if -- what

24  I'm really going to ask you about is his message

25  back to you, which consists of three lines.

1         Fiachra O'Driscoll

2         MR. CASTANARES:  So that will be

3  Exhibit 55, I believe.

4         And, counsel, I don't know whether this

5  was produced as one document or not.  But

6  just for the sake of clarity can we -- will

7  you and I -- can you and I agree that the

8  second page can be ripped off this document

9  and we'll just call it a one-page document?

10         MR. OSNATO:  That would be fine with

11  me, with the understanding that thereafter

12  there may be --

13         Are you proposing to take it out of the

14  Bates range altogether --

15         MR. CASTANARES:  No, I'm just

16  proposing --

17         MR. OSNATO:  -- or just for purposes of

18  the exhibit?

19         MR. CASTANARES:  This exhibit should

20  consist of one page.

21         MR. OSNATO:  That I am perfectly

22  amenable to.

23         MR. CASTANARES:  Okay.

24         (CSFB Exhibit 55, One-page e-mail,

25  bearing Bates stamp No. CSFB-50173794, marked

1         Fiachra O'Driscoll

2  for identification, as of this date.)

3         (Witness looks at document.)

4         THE WITNESS:  Yup.  Thank you.

5     Q.    What transaction is this all about?

6     A.    I don't know.

7     Q.    Okay.  This is clearly not about the

8  asset purchase facility of early 2001, though,

9  correct?

10     A.    I think it may be -- it may even be the

11  very beginning of those discussions.

12     Q.    Okay.  What --

13         Do you have any knowledge of what he's

14  referring to here as the "Oakwood MH deal

15  prospectus"?

16     A.    Yes.

17     Q.    What is that?

18     A.    What it would be, in other words, is

19  the prospectus from the latest, most recent

20  Oakwood Acceptance MH securitization.

21     Q.    Okay.  And had -- what does the --

22         Do you know what he's referring to here

23  as "the inventory"?

24     A.    I actually don't.

25     Q.    Okay.  Can you tell whether it's the

1         Fiachra O'Driscoll

2  inventory of manufactured homes as distinguished

3  from an inventory of paper?

4     A.    I can't tell.  That was the question in

5  my mind when I read this.

6     Q.    Okay.  And what about where he talks

7  about the "inventory has insurance," can you tell

8  whether that has to do with paper or houses?

9     A.    It only confuses me more.

10     Q.    Does this document help in any way

11  refresh your memory of what Kareem's role was at

12  this time?

13     A.    No, on the contrary.  If anything it

14  almost surprises me.

15     Q.    And why is that?

16     A.    I wasn't aware -- April 14th, 2000 is

17  earlier than I would have thought that we were

18  having discussions, but we clearly were.

19     Q.    Okay.  And you're talking about the

20  asset purchase, right?

21     A.    Yes.

22         MR. CASTANARES:  Okay.  Let me ask the

23  reporter to mark as Exhibit 56 CSFB 173796

24  and 7.

25

**Page 207 (left top)**

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
1              Fiachra O'Driscoll
2         (CSFB Exhibit 56, Two-page e-mail,
3    bearing Bates stamp Nos. CSFB-00173796 and
4    CSFB-00173797, marked for identification, as
5    of this date.)
6         MR. OSNATO:  Thank you.
7         MR. CASTANARES:  I'm sorry.
8         MR. OSNATO:  That's okay.
9         (Witness looks at document.)
10        THE WITNESS:  Uh-huh.
11   Q.   Did you respond to this?
12   A.   I don't recall.
13   Q.   Okay.  Does this refresh your memory as
14   to whether you assisted Oakwood in any way in
15   preparing valuations of its REMIC securities?
16   A.   It doesn't in the least.  Actually, I
17   think it's consistent with what I told you this
18   morning.
19   Q.   Okay.  And do you recall commenting in
20   any way on the nature of the model that should be
21   used for such valuations?
22   A.   I don't recall.
23        MR. CASTANARES:  Okay.  Thank you.
24   Q.   Do the initials VMF mean anything to
25   you?
```

**Page 209 (right top)**

```
1              Fiachra O'Driscoll
2    ideas during this period of time as ways of
3    providing -- of finding other ways to address the
4    B2 issue.  I don't recall the details or whether
5    we ever prepared a term sheet for an idea of this
6    sort.
7    Q.   Okay.  Well, this suggests there's some
8    term sheet here.  It's "I finally got the
9    opportunity to review the late is term sheet," he
10   says.
11   A.   Yup.
12   Q.   Can you recall what that term sheet
13   was?
14   A.   I can't actually, no.
15   Q.   And then you reply and talk about
16   essentially purchasing an interest in Oakwood
17   Acceptance.
18   A.   Uh-huh.
19   Q.   Was that something you had discussed
20   with anybody at Oakwood?
21   A.   I don't recall.
22   Q.   Okay.  Do you have any idea where this
23   idea came from?
24   A.   I think it came from one of my
25   supervisors who said, well, you know, one of
```

**Page 208 (left bottom)**

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
1              Fiachra O'Driscoll
2    A.   VMF, no.
3    Q.   CNC?
4    A.   Oh, I'm sorry.  Yes.
5         Vanderbilt Mortgage and Finance.
6    Q.   Okay.
7    A.   And CNC was Conseco's ticker, stock
8    ticker, so it means Vanderbilt and Conseco.
9         MR. CASTANARES:  Okay.  Let me ask the
10   reporter to mark as 56 --
11        MR. HOLT:  57.
12        MR. CASTANARES:  I'm sorry, 57 --
13   Thank you.
14        -- 492624.
15        (CSFB Exhibit 57, One-page e-mail,
16   bearing Bates stamp No. CSFB-00492624, marked
17   for identification, as of this date.)
18        (Witness looks at document.)
19        THE WITNESS:  Thank you.
20   Q.   Yes.
21        What is the transaction that
22   Mr. Chrystal is referring to in the lowest message
23   on this page?
24        (Witness looks at document.)
25   A.   I do recall that we contemplated other
```

**Page 210 (right bottom)**

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
1              Fiachra O'Driscoll
2    the -- one of the things that perhaps we should be
3    thinking about for Oakwood was to try to come up
4    with some alternative way for them to find
5    financing within the space.  And that perhaps
6    something that's more of a solution for Oakwood
7    Acceptance that gives it other roots and other
8    investors in the mortgage securitizations and in
9    the mortgage business might make sense.
10   Q.   So in other words, your infusion of
11   some equity for the purchase of a piece of it
12   would give it greater liquidity?
13   A.   That was the concept.
14   Q.   All right.  And what happened to that
15   proposal?
16   A.   I don't recall.
17   Q.   Was it ever formalized in any way, was
18   there ever a term sheet?
19   A.   I don't believe there was.
20   Q.   Was it ever discussed with anyone at
21   Oakwood?
22   A.   I don't remember that it was.
23   Q.   So as far as you know, it was just
24   something internal to CSFB as an idea?
25   A.   Yeah.  I have no recollection that it
```

Fiachra O'Driscoll

1  Fiachra O'Driscoll
2  not any further.
3      Q.  Okay.  And did you ever reply to his
4  comments in response to your question about
5  conflicts?
6      A.  I don't recall.
7      Q.  Okay.  Was he correct in the assumption
8  he made about the reference to conflicts that you
9  were making?
10     A.  Seeing as the situation never arose,
11  it's not something that I can answer at this
12  point.  Because we never did invest in Oakwood
13  Acceptance in that way.
14     Q.  No.  But my question to you is when you
15  wrote about "managing the conflicts" he then
16  replies that he assumes -- he is making
17  assumptions as to what conflicts you're talking
18  about, is he correct that those are the conflicts
19  that you were concerned with?
20     A.  You know, I don't recall.  Obviously
21  what I was relating to here specifically in this
22  e-mail was the conflicts of interest as it
23  pertained to this e-mail specifically.
24     Q.  Now, does looking at this e-mail in any
25  way help place in your mind the timing of the

211

1  Fiachra O'Driscoll
2  beginnings of discussion of the asset purchase
3  facility?
4      A.  It doesn't.  It doesn't.
5      Q   Okay.  Is it -- does it seem likely to
6  you that that was being discussed at the same time
7  as whatever proposal was embodied in these e-mails
8  on Exhibit 5?
9      A.  I don't know.
10     Q.  All right.  And you said that -- I
11  believe you said in answer to an earlier question
12  that you were thinking of various financing
13  methods; is that correct?
14     A.  We were -- we were continually trying
15  to come up with ways that was going to address
16  both the problem of Oakwood's need to find
17  liquidity for its loans on a more frequent basis
18  than simply the quarterly takeout securitization.
19  And we were also by this point thinking about how
20  to get liquidity for their B2s.  In other words,
21  how to get purchasers for their B2s.  And those
22  were the two recurring themes throughout that
23  period.
24     Q.  Okay.  And what was there about the
25  quarterly takeout securitizations that was

212

1  Fiachra O'Driscoll
2  unsatisfactory from a liquidity perspective?
3      A.  In essence you can kind of see what
4  happens to a finance company that uses
5  securitization as a takeout, as seeing its loan
6  inventory moved through what's really a sawtooth
7  pattern.  So loan inventory -- sorry, this doesn't
8  get in the camera -- loan inventory rises and
9  rises and rises and peaks out the day that the
10  company closes the securitization.  At which point
11  it falls abruptly and very dramatically by the
12  amount of the proceeds of that securitization.
13  Then it rises again steadily, falls again
14  steadily, rises again steadily, falls again
15  steadily in a recurring fashion spaced out by the
16  intervals at which the securitizations are done.
17     The problem with that, of course, is
18  that it means that the company's need for money --
19  the company's need for in essence money varies
20  enormously depending on whether you're just before
21  a securitization closes or just after a
22  securitization closes.
23     If you have something -- if you have a
24  flow purchase arrangement, as is common enough,
25  especially in the non-conforming mortgage markets

213

1  Fiachra O'Driscoll
2  today, it's not an unusual arrangement at all,
3  where you're selling loans to somebody on a flow
4  basis.  Then you either have got no zigzag up or
5  down or the zigzag is very, very, very small
6  indeed.  So the net result is that whatever
7  financing that you need is closer to the
8  consistent amount of financing that you need for
9  the rest of your business activities.
10     Q.  All right.  And what was unsatisfactory
11  about simply a traditional revolving line of
12  credit as a way of solving this problem, if
13  anything?
14     A.  The problem was that Oakwood's need for
15  a traditional revolving line of credit would have
16  been significantly greater than the amount that a
17  company of that size and with its rating would
18  have been able to get.
19     Q.  And did Oakwood have some sort of
20  warehouse or asset purchase facility in place with
21  some different institution than CSFB at this time?
22     A.  If I recall, it had facilities with two
23  institutions at around -- around that time.  But
24  the first was a straightforward revolving credit
25  facility, very much like the type that you've

214

Fiachra O'Driscoll

1  discussed and that was with a syndicate of banks
2  led by First Union and arranged by First Union.
3  The second was that they had a commercial paper
4  conduit facility which was provided by Bank of
5  America.
6  Q.   All right.  What is a commercial paper
7  conduit facility?
8  A.   A commercial paper conduit facility is
9  a very, very common approach to financing of
10 securities, loans, and a variety of other things.
11 And it's -- you know, at this stage it's probably
12 a trillion dollar market in total.  And what it
13 is, is it's a company -- a very small company,
14 relative to the scale of the financing I'll
15 describe in a moment -- that purchases securities,
16 purchases loans either on a permanent basis or in
17 the type of reverse repurchase arrangement that
18 I've described before.
19       And it finances those purchases not
20 from its own conventional resources, if you will,
21 but instead by issuing commercial paper to
22 commercial paper investors as a whole.  Usually
23 short term, less than 30-day, you know, short of
24 overnight to 30-day commercial paper to the CP

215

Fiachra O'Driscoll

1  Oakwood company, from either the reverse
2  repurchase or the asset purchase facilities?
3  A.   It differs in a couple of different
4  ways.  Usually the type of facilities that we're
5  talking about at something like B of A would be
6  relatively short term.  Not as short term as a
7  commercial -- sorry, as a reverse repo, which very
8  often would be as short as -- you know, either
9  more or less overnight or three months.  Usually
10 these things would be one-year facilities.
11       Other than that, other than that it
12 could be quite similar to either of the -- to
13 either of the other two in the sense that it would
14 purchase loans on a flow basis from the company
15 and hold those loans until such time as they were
16 to go into a securitization.  So it could be quite
17 similar to the loan purchase facility we
18 discussed.
19 Q.   So -- okay.
20       And when you're saying the purchase
21 loans you're talking about what we referred to
22 earlier as mortgages?
23 A.   Mortgages.
24 Q.   Just to keep our terminology straight

217

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1  markets.
2        The challenge, of course, it's usually
3  a very small company that's issuing perhaps a
4  billion dollars in total debt.  So the way in
5  which it actually does that is by having a
6  backstop, from usually you did this one lead bank
7  and there's usually a group of other banks, from
8  one to many also participating in the arrangement.
9  Whereby in the event that the company is unable to
10 roll its commercial paper, in other words, the
11 commercial paper matures, after a day or a week or
12 whatever and the company can't issue it again, the
13 banks promise to essentially take out that
14 commercial paper and to make a loan to the CP
15 vehicle sufficient to meet its cash needs at any
16 given point in time.
17 Q.   Now, is either the commercial paper or
18 the issuer's obligation to the bank collateralized
19 by the underlying assets?
20 A.   Yes.
21 Q.   Which, or both?
22 A.   I think typically both.
23 Q.   How does this differ economically from
24 the company -- from the perspective of say the

216

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1  here I want to make sure I've understood your
2  answer.
3        This entity that issues this commercial
4  paper would buy those mortgages from Oakwood, that
5  would be the idea?
6  A.   That would be -- correct.
7  Q.   Okay.  And it would then hold them
8  until they got securitized, right?
9  A.   Correct.
10 Q.   And would they be securitized in the
11 hands of Oakwood, would they somehow get back to
12 Oakwood or would they be securitized in the hands
13 of the buyer?
14 A.   It could be either of the above.
15 Q.   And what was contemplated here was
16 which?
17 A.   In --
18 MR. OSNATO:  I'm sorry to interrupt.
19 "Here," are you talking about the Bank
20 of America facility that preceded --
21 MR. CASTANARES:  Yes, thank you.
22 MR. OSNATO:  -- the Credit Suisse line?
23 MR. CASTANARES:  Good clarification,
24 thank you.

218

Fiachra O'Driscoll

1
2    A.    I don't recall.
3    Q.    And was that facility replaced by the
4    asset purchase facility of early 2001 with CSFB?
5    A.    Yes.
6    Q.    And was the revolver also replaced by
7    that facility?
8    A.    No.
9    Q.    It continued to exist?
10   A.    No.  It was replaced by the later
11   Foothill facility, if I recall.
12         MR. CASTANARES:  All right.  Let's take
13   five.
14         MR. OSNATO:  Sounds good.
15         THE VIDEOGRAPHER:  Okay.  We'll go off
16   the record.  The time is 2:20.  This is the
17   end of tape No. 2.  Thank you.
18         (Recess taken.)
19         (CSFB Exhibit 58, One-page e-mail,
20   bearing Bates stamp No. CSFB-00170548,
21   premarked for identification, as of this
22   date.)
23         (CSFB Exhibit 59, One-page e-mail,
24   bearing Bates stamp No. CSFB-00485278,
25   premarked for identification, as of this

219

Fiachra O'Driscoll

1
2    addressed your inquiry to him?
3    A.    I don't know.
4    Q.    All right.  Did you ever hear back from
5    either Miller, or Xanthos, or Irwin on this
6    proposal?
7    A.    Again, I think this would have been
8    part of what was an ongoing dialogue with Tom and
9    with James.
10        Or to be clear about it, specifically
11   with Tom.  James worked for Tom.  I would
12   occasionally have dialogue with James directly,
13   but my -- the person who I was going to get
14   credit approvals to make proposals, and so on, was
15   Tom.
16   Q.    All right.  What was this proposal in
17   Exhibit 58?
18   A.    This appears to be identical to what I
19   recall the terms of the Bank America loan, CP
20   conduit facility was.
21   Q.    So essentially CSFB would step into
22   B of A's shoes on this?
23   A.    That's what it would appear to be.  I
24   don't have a specific recollection of the details,
25   but that's consistent with what my recollection of

221

Fiachra O'Driscoll

1
2    date.)
3         THE VIDEOGRAPHER:  Okay.  We're back on
4    the record.  It's 2:28.  This is tape 3.
5         THE WITNESS:  Thank you.
6         MR. OSNATO:  Thank you.
7    BY MR. CASTANARES:
8    Q.    As exhibit --
9         What do I have in front you, 58?
10   A.    Uh-huh.
11   Q.    I fooled myself here.
12        The reporter has marked CSFB 170548.
13        (Witness looks at document.)
14   Q.    First, who is Bruce Miller?
15   A.    Bruce Miller was one of the employees
16   of the New York branch, Credit Suisse New York
17   branch at that time.
18   Q.    Okay.  Was he in the CRM department?
19   A.    Nope.  He was one of the branch bank
20   officials.
21   Q.    And did he have any contact with
22   Oakwood, to your knowledge, other than what's
23   reflected in Exhibit 58?
24   A.    Not to my knowledge, no.
25   Q.    Okay.  How did it happen that you

220

Fiachra O'Driscoll

1
2    the Bank America terms was.
3    Q.    All right.  Do you recognize the
4    handwriting hear saying "whole loans"?
5    A.    No.
6    Q.    Is that a correct characterization of
7    this transaction?
8    A.    That is a correct characterization of
9    the Bank of America transaction.  Whole loans was
10   another term that was used to describe the -- what
11   we're calling mortgage loans for these purposes.
12   Q.    All right.  And now I'd like to ask you
13   the same question that Mr. Miller did, "What does
14   'less risky' mean?"
15   A.    In other words, it would seem at this
16   point in time that I was -- I was proposing to CRM
17   that a facility that excluded the B2 securities
18   and only focused on the whole loans instead was
19   less risky.
20   Q.    Less risky than that?
21   A.    To Credit Suisse.
22        Than something that was a financing of
23   the B2s.
24   Q.    Okay.  So -- and would the --
25        Would the reverse repo proposal in late

222

Fiachra O'Driscoll

1  '99 and early 2000 have been -- have included a
2  financing of the B2s?
3      A.   It did include a financing of the B2s.
4      Q.   All right.  So were you telling
5  Mr. Miller and the CRM people that this was a less
6  risky proposal than the one that you had put to
7  them a few months before?
8      A.   That is what I seem to be suggesting
9  here.
10     Q.   Do you recall whether you responded to
11 Mr. Miller's request?
12     A.   I don't.
13     Q.   And whatever happened to this proposal?
14     A.   This -- this I don't.
15          Again, you're characterizing each of
16 these things as being a proposal, which wasn't
17 really the case.  It wasn't how things actually
18 worked.
19     Q.   Suggestion, idea?
20          What shall we call it?
21     A.   You kind of characterized it as first
22 the -- the first reverse repo proposal, the second
23 reverse repo proposal, the third reverse repo
24 proposal.

Fiachra O'Driscoll

1  correspondence saying approved or rejected.  That
2  wasn't the way things worked within Credit Suisse.
3          There was -- it was more common in
4  truth -- it was relatively unusual to have a
5  situation where -- in fact, very unusual to have a
6  situation where a proposal was simply yes or no at
7  the outset.  Almost always it was a dialogue with
8  CRM, as to what kind of counterparty credit
9  exposure they were content to take.
10     Q.   Were they content to take any?
11     A.   I think you would have to ask them
12 that.
13     Q.   Did they communicate to you that they
14 were content to take any?
15     A.   They communicated to me that they were
16 content to continue a dialogue as to what might
17 work.
18     Q.   And as long as it didn't involve any
19 additional request -- exposure to CSFB, correct?
20          MR. OSNATO:  I object to the form.
21     A.   I'm not sure I understand your
22 question.
23     Q.   Okay.  And did you give to Mr. Miller
24 or to either of the other addressees of this

Fiachra O'Driscoll

1          Typically I would be having a dialogue
2  every week with Tom Irwin on a variety of
3  different -- different credit exposures with
4  different customers along the way, almost every
5  week.
6          And there would be an ongoing dialogue
7  that we would have about what terms on which we
8  would provide financing to a given customer.
9      Q.   In the course of these weekly
10 discussions you never asked him what happened to
11 the 75 million proposal?
12     A.   I don't remember.
13     Q.   Or the 50 million proposal?
14     A.   Typically the kind of answer I would
15 get from Tom would be, well, have you thought
16 about the following?
17          You know, would you think about this,
18 what if we excluded the B2s?
19          You know, so the dialogue with Tom,
20 rather than being -- and some institutions have
21 perhaps a CRM process where you make a formal
22 written submission to credit risk management, risk
23 management then takes that proposal and sends you
24 back an e-mail or some other written

Fiachra O'Driscoll

1  e-mail Oakwood's recent results and the deal
2  documentation?
3      A.   I don't recall.
4          (Elizabeth Sorenson entered the room.)
5          MR. CASTANARES:  And as Exhibit 59 the
6  reporter has marked CSFB 485278.
7          (Witness looks at document.)
8      Q.   So as of 14 September 2000 what is it
9  that you were telling Kareem?
10         (Witness looks at document.)
11         MR. OSNATO:  Do you want him to read
12 the e-mail to you?
13         MR. CASTANARES:  No.  I want him to
14 tell me what this transaction was.
15     A.   I actually don't remember this
16 dialogue.
17     Q.   Who is John Herbert?
18     A.   John Herbert was one of my colleagues
19 within the MH and non-conforming mortgage
20 securitization team.
21     Q.   And is that part of ABS?
22     A.   Yeah.
23     Q.   Okay.  And Beth May?
24     A.   Beth May was the woman in investment

Fiachra O'Driscoll

1  banking who was responsible for -- who had been
2  made responsible for around that time not just the
3  building, the house builders, but I think she was
4  also given responsibility for developing or trying
5  to develop an investment banking advisory
6  relationship with people in the manufactured
7  housing sector. "People" meaning companies.
8      Q.   Was she part of Felt's group?
9      A.   No.
10     Q.   What was the relationship between her
11 activities and what Felt's group did?
12     A.   Jared wasn't an employee of
13 Credit Suisse at that time. Jared joined
14 Credit Suisse with his team, with that entire team
15 as part of the merger with DLJ.
16     Q.   Okay.
17     A.   Which was within about a month of the
18 date of this if my memory serves.
19     Q.   Okay. So would it be correct for me to
20 infer from that the function that Felt's group was
21 performing, at least in so far as this type of
22 transaction was concerned, was taken over by
23 Felt's group when it came on?
24         MR. OSNATO: Objection to the form.

227

Fiachra O'Driscoll

1      A.   No, that wouldn't be correct.
2      Q.   What would be correct?
3      A.   After the DLJ merger one of the things
4  that DLJ brought on board was a good many people
5  who were professional investment bankers who
6  focused on M&A, on advisory assignments, and on
7  things of that sort, particularly in sectors like
8  the house building sector. And they had close
9  relationships with some people within the
10 manufactured housing sector in general, Champion
11 Enterprises being notable among those.
12         So sometime after this Beth was --
13 while Beth was still involved a good many of the
14 people in the investment banking advisory side
15 were really put with her and with her team on the
16 investment banking advisory side. But Jared's
17 team was kept as an entirely separate team whose
18 role was restructuring.
19     Q.   I see. All right.
20         Who is Susan Menkhaus, M-e-n-k-h-a-u-s?
21     A.   Susan was a second or third year
22 associate.
23     Q.   All right. And is she still employed
24 by CSFB?

228

Fiachra O'Driscoll

1      A.   She is not.
2      Q.   When did she leave?
3      A.   About two years ago.
4      Q.   All right. After Oakwood's bankruptcy?
5      A.   I -- I guess that was -- well, yeah it
6  was.
7      Q.   Two years ago?
8      A.   Yeah.
9      Q.   Okay. And you have no recollection of
10 the transaction that is discussed in Exhibit 59;
11 is that right?
12     A.   It never turned into a transaction.
13     Q.   Of the proposed transaction or the
14 suggested or idealized transaction that's in 59?
15     A.   I think this is one of many ideas that
16 we discussed at that time as to what might work
17 for both Credit Suisse and the company.
18     Q.   And do you -- okay.
19         What did --
20         When you said "Bob told me in the
21 strictest confidence that the board is likely to
22 replace the CEO," is that Bob Smith?
23     A.   Yes.
24     Q.   And what did he tell you regarding the

229

Fiachra O'Driscoll

1  confidential nature of that information, what did
2  he say to you?
3      A.   I don't recall.
4      Q.   Your best recollection is on this page,
5  that's it?
6      A.   Uh-huh.
7      Q.   And would you please answer audibly?
8      A.   Yes.
9          I beg your pardon.
10     Q.   No problem. Thank you.
11         MR. CASTANARES:  Exhibit 60 is
12 CSFB 170905.
13         (CSFB Exhibit 60, One-page e-mail,
14 bearing Bates stamp No. CSFB-90170905, marked
15 for identification, as of this date.)
16         (Witness looks at document.)
17         THE WITNESS:  All right.
18     Q.   Can you tell me what this is all about?
19     A.   Absolutely. This was the period of
20 time when -- we all remember the Internet madness
21 along the way. And one of the particular
22 enthusiasms that actually made a fair amount of
23 sense within the mortgage securitizations space
24 was a lot of investors pushed companies to move

230

Fiachra O'Driscoll

1    their monthly reporting on their mortgage
2    securitizations online.  So that investors, rather
3    than phoning up the company and having to be sent
4    the monthly reporting that would be prepared in
5    every one of these mortgage securitizations by the
6    trustee or the servicer, or some combination of
7    the two, that instead people would be able to
8    access it on line.
9        And that's something that, frankly, is
10   standard by now.  Pretty much any of these
11   mortgage companies you go to, if you know the Web
12   page -- and it's one that will be usually a little
13   bit difficult to find, because they don't want
14   necessarily ordinary borrowers looking for the
15   phone number for -- you know, where they're
16   supposed to phone, to necessarily be digging into
17   this information.  Not that there's anything very
18   sinister about it, but it's intended as investor
19   information.
20       Q.   And the kind of information that's
21   available on this is information regarding the
22   performance of the underlying mortgages in the
23   pool?
24       A.   Some of it will be the performance of

231

Fiachra O'Driscoll

1    of this date.)
2        (Witness looks at document.)
3        THE WITNESS:  Thank you.
4        Q.   Okay.  I have a series of questions
5    about this, I think.
6        A.   Uh-huh.
7        Q.   Who is Alberta Zonca?
8        A.   Alberto Zonca was another one of the
9    Credit Suisse New York branch officials and he was
10   one of the people specifically involved in
11   managing Alpine.
12       Q.   What was Alpine?
13       A.   Alpine was a commercial paper conduit,
14   as I described, with Bank of America's commercial
15   paper conduit.
16       Q.   What do you mean by "commercial paper
17   conduit"?
18       A.   In other words, a company that
19   purchases loans, and purchases securities, and
20   finances the purchase of those securities by
21   commercial paper that's rated highly enough to be
22   sold to commercial paper issuers in general, by
23   virtue of the fact that it has a backstop behind
24   it from, usually a number of -- one or more

233

Fiachra O'Driscoll

1    the underlying mortgages in the pool, some of it
2    will be on the performance of the securities, but
3    most typically the underlying mortgages.
4        Q.   Okay.  And when you say "the
5    performance of the securities," what are you
6    talking about there --
7        A.   In other words --
8        Q.   -- the cash flow?
9        A.   Cash flows, but more usually simply --
10   in a slightly simpler form, which is the
11   reductions in principal amount, for instance, on
12   specific securities, from one month to the next.
13       Q.   As the principal is paid down?
14       A.   Exactly.
15       Q.   Okay.  Do you recall -- while we're
16   still on this document, Exhibit 60 -- whether, in
17   fact, David Hunt -- David Rich responded to this
18   e-mail, to your knowledge?
19       A.   I don't.
20       MR. CASTANARES:  Exhibit 61 will be
21   CSFB 173581 and 2.
22       (CSFB Exhibit 61, Two-page document,
23   bearing Bates stamp Nos. CSFB-00173581 and
24   CSFB-00173582, marked for identification, as

232

Fiachra O'Driscoll

1    financial institutions.
2        Q.   So was the transaction contemplated by
3    this series of e-mails a commercial paper
4    facility?
5        A.   No.  In this -- what was actually
6    contemplated was -- I think that this is one of
7    the early term sheets for the loan purchase
8    facility, in fact.  So that what we were actually
9    doing here was a little bit different from the
10   usual, in the sense that typically a commercial
11   paper conduit entity wouldn't provide commitments
12   for -- actually technically wouldn't provide
13   commitments at all.  And the bank backstops -- the
14   bank takeouts to the commercial paper would be
15   364-day evergreen commitments to it.
16       And you may recall that I mentioned
17   that CP conduit financings generally were kind of
18   intermediate.  In term they were typically one
19   year, to be precise, 364-day facilities, that was
20   kind of the norm.
21       With this it had to be done a little
22   bit differently, because the concept in essence
23   was that the loan purchase facility would be a
24   three-year commitment, rather than a shorter term

234

Fiachra O'Driscoll

1  364-day commitment.

3  Q.    So why would there be -- what function
4  would the conduit serve in such a transaction?

5  A.    The conduit would provide the financing
6  for the entity in question and they would also do
7  all of the management of the flow purchasing of
8  the loans.

9  Q.    When you say "the entity in question,"
10  for whom would the conduit provide the financing?

11  A.    In other words, the securitization
12  trust that was set up to which the loan purchase
13  facility was extended, the way in which -- perhaps
14  the easiest thing is if I just explain how it
15  works --

16  Q.    Please do.

17  A.    -- in summary.

18        The way it worked in essence was that a
19  securitization trust was set up, one that could
20  purchase loans on a periodic basis, sell them on
21  to permanent securitization takeout trusts on the
22  other side.

23        How it would finance itself is it would
24  issue a note -- and these notes are most usually
25  called variable funding notes.

---

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2        The reason they called them variable
3  funding notes is because the amount that's drawn
4  on that note, unlike with a regular securitization
5  where it kind of kicks off being a finite amount
6  and only decreases over time, with a variable
7  funding note it could decrease and increase over
8  time.

9        Then that variable funding note would
10  be an asset that would be purchased by Alpine
11  Securities Corporation and it would finance that
12  purchase by issuing commercial paper to the market
13  as a whole.

14        Now, the only way it could issue that
15  commercial paper is if it had a dollar per dollar
16  takeout of the commercial paper in the event that
17  Alpine couldn't -- couldn't issue CP to pay for
18  the CP that it had matured.

19  Q.    Okay. I may need to break this down a
20  little bit to understand it.

21  A.    Very good.

22  Q.    You'll forgive me if I lack the
23  financial sophistication.

24        Somebody set up a trust that issued a
25  note?

---

Fiachra O'Driscoll

2  A.    Correct.

3  Q.    Who set up the trust?

4  A.    I think it was one of Oakwood's
5  lawyers.

6  Q.    So it was an Oakwood entity?

7  A.    I couldn't answer that.

8  Q.    Okay. Well, do you know whether it was
9  a CSFB entity?

10  A.    I recall that it was consolidated by
11  Oakwood.

12  Q.    Incorporated or formed, you mean?

13  A.    No. It was consolidated in the sense
14  that it was consolidated onto Oakwood's books and
15  records.

16  Q.    Okay.

17  A.    It was regarded from an accounting
18  standpoint as being a subsidiary of Oakwood.

19  Q.    Okay. And it issued a note, correct?

20  A.    Yes.

21  Q.    It was the maker of the note?

22  A.    Issuer of the note, yes.

23  Q.    Okay. And was the note payable to
24  someone?

25  A.    The note would be payable to its

---

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2  bearer.

3  Q.    All right. And was it secured?

4  A.    Secured by the underlying loan
5  inventory.

6  Q.    All right. And those are the end user
7  paper that we've called mortgages or --

8  A.    Mortgage loans, exactly.

9  Q.    Now, did --

10        How did the trust get hold of those
11  mortgages?

12  A.    As a kind of a practical matter?

13  Q.    Or how did it obtain -- either that or
14  legally, how did it obtain title to them so that
15  it could --

16  A.    What would happen as a practical
17  matter, which is probably the easiest way to
18  actually describe it in the first instance. And
19  this is where Alpine came in, actually. Because
20  what Alpine was -- what Alpine really did for a
21  living was it provided financing on an every day
22  basis. In the sense that it would be purchasing
23  securities, it would be taking payments, it would
24  be -- deliberately it would be selling securities
25  on a day-to-day basis.

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
 1                  Fiachra O'Driscoll
 2          So what would actually happen in
 3   reality was that Oakwood would submit a sale
 4   request.  I don't remember the exact form of the
 5   document, but essentially a piece of paper saying
 6   we would like financing in two days time, to be
 7   increased by X amount.  And we propose selling X
 8   plus the appropriate overcollateralization amount
 9   of loans to the trust.
10          And once that process had been
11   processed effectively two days later the loans,
12   which by that point would be -- and the physical
13   loan documents themselves would usually have been
14   delivered to -- I think it was First Union.  And
15   once you had notice that those loans had been
16   physically delivered then the -- then Oakwood
17   would be paid for those loans by Alpine from the
18   commercial paper that Alpine had issued.
19      Q.   Oakwood would be paid or the trust
20   would be paid by Alpine?
21      A.   Oakwood would be paid for those
22   loans -- or to -- from a legal point of view the
23   way it would have worked was that, that Alpine
24   would issue commercial paper.  It would use the
25   proceeds from that commercial paper to purchase an
```

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
 1                  Fiachra O'Driscoll
 2   increased amount of the variable funding note.
 3   The increased amount of that variable funding note
 4   would then provide the wherewithal for the
 5   securitization trust to purchase the loans from
 6   Oakwood.
 7      Q.   Okay.  And then -- and so the
 8   securitization trust would pay Oakwood for the
 9   loans?
10      A.   Precisely.
11      Q.   Okay.  From the proceeds that it got
12   from Alpine's purchase of a portion of the
13   variable funding note?
14      A.   Yes.
15      Q.   And was Alpine an existing corporation
16   at that time?
17      A.   Yes.
18      Q.   Was it a CSFB entity?
19      A.   It was an entity sponsored by
20   Credit Suisse.
21      Q.   What do you mean by that?
22      A.   I think from a legal point of view it
23   was actually managed by a special outside board of
24   directors.  But Credit Suisse companies probably
25   provided 90 percent of the backstop that I
```

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
 1                  Fiachra O'Driscoll
 2   described, that -- the agreement to take out
 3   commercial paper if you couldn't roll it.
 4      Q.   Was Credit Suisse a beneficial owner of
 5   Alpine?
 6      A.   I don't -- from a legal point of view,
 7   I don't know.
 8      Q.   You don't know who held its stock?
 9      A.   I don't.
10      Q.   Were you ever an officer, director, or
11   employee of Alpine?
12      A.   No.
13      Q.   Do you know anybody who was?
14      A.   Nope.
15      Q.   Did you ever speak to anybody who
16   purported to speak on behalf of Alpine?
17      A.   I don't recall doing so, no.
18      Q.   If you wanted to find that information
19   out as to -- that is to say, who were Alpine's
20   directors, officers, employees, how would you go
21   about doing that?
22      A.   It would be probably easier for you to
23   do so than I.  I imagine it's a matter of a fairly
24   simple request.
25      Q.   I'm sorry?
```

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
 1                  Fiachra O'Driscoll
 2      A.   I would imagine it's a matter of a
 3   fairly simple request.
 4      Q.   Made to whom?
 5      A.   I don't know.
 6      Q.   Well, is there anybody at CSFB that you
 7   think you could ask that question to that you
 8   might get some answer for it?
 9      A.   Possibly.
10      Q.   Who is that?
11      A.   I -- that I don't know.  I don't doubt
12   that one could find out the information quite
13   quickly.
14      Q.   Okay.  Who is Graham Hunt?
15      A.   Graham Hunt was a CRM officer.
16      Q.   Okay.  Where did he stand in the
17   hierarchy there relative to Mr. Irwin?
18      A.   I don't know.  It's -- he didn't, which
19   is why I'm a little surprised that there was an
20   e-mail that connected Graham to it.
21      Q.   When you say "he didn't" --
22      A.   Correct.
23      Q.   -- he wasn't in the hierarchy --
24      A.   I -- my recollection was that he was
25   transferred to the Tokyo office at about this time
```

**Page 243**

```
1              Fiachra O'Driscoll
2    and he was never actually part of the CRM
3    hierarchy that dealt with any of these mortgage
4    transactions that I can recall.
5       Q.   Okay.  And what's a TRS?
6       A.   Total return swap.
7       Q.   "Total return swap"?
8       A.   Yes.
9       Q.   And what is that?
10      A.   That was the term of art that was used
11   to describe the takeout of the commercial paper
12   for Alpine that I described before in this
13   particular instance.
14      Q.   What did the swap accomplish?
15      A.   What the swap essentially did was it
16   promised Alpine that in the event that Alpine
17   couldn't roll its commercial paper that CSFBi
18   would pay it for the commercial paper.  And it
19   also promised that in the event that there was any
20   losses on the variable funding note that were
21   described that CSFBi would make a payment equal to
22   the amount of those loss.
23      Q.   So did this effectively make this a
24   risk free transaction from Alpine's perspective?
25      A.   Yes.
```

**Page 244**

```
1              Fiachra O'Driscoll
2       Q.   And that's because CSFBi was taking
3    upon itself that risk?
4       A.   Yes.
5       Q.   What's CSFBi?
6       A.   Credit Suisse First Boston
7    International.
8       Q.   Okay.  And what is its relationship
9    with the entity you worked for?
10      A.   It was a sister company.  It's
11   actually -- it's the main derivatives entity and
12   it's where a great deal of the -- how would I put
13   it -- the counterparty risk within Credit Suisse
14   would actually be held.
15      Q.   All right.  And would it then lay off
16   that risk elsewhere?
17      A.   It might or it might not.
18      Q.   Depending on how its book happened to
19   stand at that time?
20      A.   I was not -- yeah.  I was not part of
21   the team, but, yes.
22      Q.   And did you understand what Mr. Graham
23   Hunt meant by "obtaining credit approval on the
24   other side of this trade," what was the other
25   side?
```

**Page 245**

```
1              Fiachra O'Driscoll
2       A.   At this time CSFBi had its own credit
3    risk management apparatus, so any exposure that --
4    any significant exposure to a counterparty that
5    CSFBi to took on had to be handled by this team
6    within CSFBi.  They were merged together around
7    about this time, so that there was only one credit
8    risk management function for really the entire
9    bank.  But at that time CSFBi would have had its
10   own credit officers to review this.
11      Q.   All right.  And what was the answer to
12   the question that Mr. Graham asked, "Why are we
13   issuing term sheets to clients on behalf of
14   CSFBi?"
15      A.   Frankly, I'm puzzled that Alberto ever
16   sent this to Graham in the first place, so I'm not
17   sure I have an answer for you.
18      Q.   Okay.  And did you understand
19   Mr. Zonca's response when he talked about "CSFB NY
20   standing between Alpine and CSFBi"?
21           MR. OSNATO:  You're asking for his
22      understanding of the words?
23           MR. CASTANARES:  I'm asking if he
24      understood it at the time.
25           MR. OSNATO:  Do you understand the
```

**Page 246**

```
1              Fiachra O'Driscoll
2    question?
3           THE WITNESS:  I do.
4           MR. OSNATO:  Okay.
5           (Witness looks at document.)
6       A.   That certainly was not how the
7    transaction was put together, so I'm not sure what
8    Alberto's getting at.
9       Q.   Okay.  And then Mr. Hunt replies at the
10   top of the page.  And he says, among other things,
11   that "CRM has declined the provision of facilities
12   to this name twice for credit reasons."
13           Did you understand the "name" to be
14   Oakwood?
15      A.   That seems like a reasonable inference,
16   yes.
17      Q.   Okay.  So did you get this e-mail?
18      A.   I did, but I have no recollection of it
19   at all.
20      Q.   Does it now refresh your memory that
21   CRM had turned Oakwood down at least once?
22      A.   It wasn't my recollection that there
23   was ever a formal turndown of Oakwood on any
24   occasion, much less twice.  And I'm a little
25   puzzled that Graham would ever have been part of
```

Fiachra O'Driscoll

the dialogue.

   Q.   So when you got this e-mail did that sentence come as news to you?

   A.   I don't remember this e-mail at all.

   Q.   Did you have the impression that Mr. Hunt was concerned with the credit exposure that CSFB would take on if it entered into this transaction?

   A.   Well, Graham was not connected to this business line, the non-conforming mortgage business line, apart from with respect to one counterparty, which was Bombardier, the Canadian company. So I'm not quite sure how or why Alberto would ever have sent this to Graham in the first place.

   Q.   Do you know if anybody ever responded to Mr. Hunt's e-mail in any way, that's at the top of the page there?

   A.   I don't.

   Q.   Who is Sanjeev, S-a-n-j-e-e-v, Gupta?

   A.   He was the person at that time who was Kareem's supervisor and who in turn reported to John Chrystal.

   Q.   Okay. And if you've told me this

---

Fiachra O'Driscoll

   Q.   And that was part of -- was that part of the organization you just described to me?

   A.   Yes.

   MR. CASTANARES:  Okay. I'll ask the reporter -- or I'll mark as Exhibit 62 CSFB 156363 and 4.

   MR. OSNATO:  Thanks.

   (CSFB Exhibit 62, Two-page e-mail, bearing Bates stamp Nos. CSFB-00156363 and CSFB-00156364, marked for identification, as of this date.)

   (Witness looks at document.)

   THE WITNESS:  Great.

   Q.   Okay. What is Mr. Okuyama -- what transaction is Mr. Okuyama referring to?

   A.   He was an employee in the financial engineering group at the time. This was referring to a structure in which on one or more occasions we actually included a preexisting B2 security from another transaction in as part of a new securitization.

   Q.   So that would form part of the collateral pool for one of the tranches of a new securitization?

---

Fiachra O'Driscoll

before, forgive me.

   What was Mr. Chrystal's title?

   A.   I don't remember his title at the time.

   Q.   But his function then?

   A.   His function was -- he was -- he was the supervisor of a number of different businesses, including Joe Donovan's business at the time, which included my business, the asset securitization business. It also included Sanjeev Gupta's business, which was a credit derivatives business, and a number of other businesses in the -- in this structured credit space.

   Q.   And could you just give me a definition of what you mean by "structured credit space."

   A.   In other words, transactions where -- transactions such as mortgage securitizations, such as asset securitizations, such as credit default swaps, such as credit -- CDOs, such as the business I'm working on at the moment.

   Q.   And you work within that branch as well?

   A.   I worked in the asset securitization group at that time.

---

Fiachra O'Driscoll

   A.   It would form part of the collateral pool for the new securitization in general.

   Q.   Okay. All right. And that was the transaction being contemplated by Mr. Okuyama's --

   A.   E-mail, yup.

   Q.   -- e-mail?

   Okay. So this would have referred to a securitization contemplated for sometime late in 2000 or early 2001?

   A.   I don't remember the date, but we actually did -- we did the securitization.

   Q.   Okay. And did that include the B2s?

   A.   It included the B2s.

   Q.   And did it wind up only getting 18 million?

   A.   I don't remember the numbers.

   Q.   Okay.

   A.   These certainly weren't the final numbers.

   Q.   And how do you know that?

   A.   Because I do remember the numbers were different from this. I've forgotten what they were.

   Q.   Who is Jack MacDowell?

**Page 251**

Fiachra O'Driscoll

1
2    A.    Jack was an analyst in the ABS group at
3    that time.
4        Q.    Worked for you?
5        A.    Worked for -- really for John and for
6    Susan, but worked as part of my team, yes.
7        Q.    All right.  And who is Philip Li, L-i?
8        A.    Phil Li was another financial engineer.
9        Q.    And who is Janie Lee, L-e-e?
10       A.    Well, she's actually now my wife.
11       Q.    All right.  Who was she then?
12       A.    Her role at that time was --
13       Q.    Congratulations.
14             Who was she then?
15       A.    She was a manager in the financial
16   engineering group.
17       Q.    And what was she referring to, if you
18   know, "if we are shy of their bogey," what is she
19   talking about there, do you know?
20       A.    I think what she was saying was there
21   might have been some -- some number that Oakwood
22   had in mind -- and I don't recall what the number
23   was -- by way of proceeds that Oakwood was hoping
24   to get out of putting the B2s into a new
25   securitization with loans.

251

**Page 252**

1            Fiachra O'Driscoll
2            MR. CASTANARES:  I'm sorry, could you
3    read that back to me, please?
4            It's all right.  Never mind.  I'll just
5    re --
6        A.    Would it be helpful if I can expand it
7    a little bit?
8        Q.    Yes.
9        A.    And how the whole thing works, because
10   I know it's a little confusing.
11           MR. OSNATO:  That's fine.  But let's
12   just -- I need to hear what the question is.
13           So can you read back the question,
14   please?
15           MR. CASTANARES:  Yes.
16           (Record read.)
17       A.    The way that the transaction worked was
18   that we put together a securitization that was a
19   REMIC trust as before.  But whereas up until this
20   point all of the -- all of the assets of the
21   REMIC, the securitization entity, were individual
22   mortgage loans.  In this situation, as well as
23   individual mortgage loans.  We also put in a B2
24   security, one or more B2 securities.  I don't
25   remember if it was one or if it was more than one

252

**Page 253**

1            Fiachra O'Driscoll
2    into the transaction itself from a preceding
3    transaction.
4            And therefore the total -- the total
5    collateral that was in the deal, meaning the total
6    assets within the deal, consisted of both the new
7    mortgage loans, newly originated mortgage loans.
8    And in addition to that it also included these B2
9    securities as well.  So the total face amount of
10   the assets of the REMIC were the face amount of
11   the loans plus the face amount of the B2s.
12           We then took that to the rating
13   agencies and got the rating agencies to rate the
14   entire transaction with both the loans and the B2s
15   chopped into different securities, mortgage
16   securities issued by the REMIC and rated as usual,
17   AAA, AA, A, BBB, BB, and so on, all the way down.
18       Q.    All right.  As of this time the B2s
19   that we're talking about, were those guaranteed by
20   Oakwood?
21       A.    I don't remember if these ones were
22   guaranteed or not.
23       Q.    But would it be correct that the
24   financial effect of this upon Oakwood would be
25   that it would get a certain number of cents on the

253

**Page 254**

1            Fiachra O'Driscoll
2    dollar compared to the face value of the B2, but
3    it would issue a new guarantee of some new tranche
4    of the new securitization that included those old
5    B2s?
6        A.    My recollection was that of this
7    particular deal, that the B2 wasn't guaranteed up
8    until the time of the Berkshire Hathaway, Lotus
9    transaction series.
10       Q.    Okay.  And so that was an unguaranteed
11   B2 that went into the Lotus transaction series?
12       A.    Yup.
13       Q.    When did the Lotus transaction series
14   occur?
15       A.    It was -- it was the summer of 2002.
16       Q.    Okay.  Did it occur over a period of
17   time?
18       A.    There was one initial one and then
19   there were a number of subsequent additions to
20   that first transaction.
21       Q.    They were all then either in the summer
22   of 2002 or afterward?
23       A.    Correct.
24       Q.    Okay.
25       A.    I'm sorry.  I beg your pardon, summer

254

Fiachra O'Driscoll

2 of 2001.

3    Q.   "2001"?

4        Okay. Who is Eric Rosenfeld?

5    A.   I remember that name, but I don't

6 remember.

7    Q.   How about Hans Bald?

8    A.   Hans Bald was another one of the senior

9 managers of the Alpine entity, so Alberto Zonca's

10 supervisor.

11    Q.   Did those people hold any positions at

12 CSFB as distinguished from positions they held at

13 Alpine?

14    A.   They were officers of the Credit Suisse

15 New York branch.

16    Q.   And were they also officers of Alpine,

17 or do you know?

18    A.   I don't know.

19    Q.   But they did purport to speak for

20 Alpine?

21    A.   I don't know.

22    MR. CASTANARES: All right. As

23 Exhibit 63 we'll mark 492629 through 31.

24    (CSFB Exhibit 63, Three-page e-mail,

25    bearing Bates stamp Nos. CSFB-00492629

255

---

Fiachra O'Driscoll

2    A.   He was a lawyer with CSFBi in London.

3    Q.   Okay. Simon Page?

4    A.   I don't remember who Simon was.

5    Q.   Stuart Firth?

6    A.   He was another CSFBi person in London.

7    Q.   I notice all the CSFBi people seem to

8 have a CSFB e-mail address, except Mr. -- except

9 Kareem, can you tell me why that is?

10    A.   Kareem appears to have been sending

11 this from his home e-mail account at 11 o'clock at

12 night.

13    Q.   Okay. Just so you're not misled. By

14 the way, we've seen a number of e-mails that have

15 been adjusted to Greenwich Mean Time, so we don't

16 really know whether this is -- we don't know where

17 it's 11 o'clock at night.

18    A.   He could have been sending it at

19 4 o'clock in the morning for all I know.

20    MR. CASTANARES: For all we know,

21 that's true. Okay.

22    Exhibit 64 will be CSFB 485340.

23    (CSFB Exhibit 64, One-page e-mail,

24    bearing Bates stamp No. CSFB-00485340, marked

25    for identification, as of this date.)

257

---

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2 through CSFB-00492631, marked for

3 identification, as of this date.)

4    (Witness looks at document.)

5    THE WITNESS: Thank you.

6    Q.   Is this the transaction that later

7 became the purchase facility that included the

8 warrant in early 2001?

9    A.   It appears to be a term sheet

10 summarizing what turned into that.

11    Q.   All right. And was this document

12 shared with Oakwood, to your knowledge?

13    A.   I don't recall.

14    Q.   Was Kareem then working for CSFB?

15    A.   He was working for CSFBi.

16    Q.   All right. And I have a bunch of names

17 here I wanted to ask you if you --

18    Roger Machlis, M-a-c-h-l-i-s?

19    A.   He was a officer in the legal and

20 compliance department.

21    Q.   And Simon Davidson?

22    A.   He was -- he was a member of the CSFBi

23 team in London, which was where Kareem was by this

24 point.

25    Q.   Edmond Curtin, C-u-r-t-i-n?

256

---

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

2    A.   Uh-huh.

3    Q.   Do you recall receiving this?

4    A.   I don't recall receiving this.

5    Q.   Okay. Do you recall responding to it?

6    A.   I don't.

7    Q.   Or -- I guess I should ask a better

8 question.

9    Do you recall supplying the information

10 that's requested here to Mr. Xanthos?

11    A.   I recall responding to a fairly wide

12 list of items that Tom had requested and I think

13 that this request from James probably formed part

14 of that, which would have been along these kind of

15 lines.

16    Q.   Okay. Now, what was the 15 million in

17 fees payable to CSFB?

18    A.   I think that that was the sum total of

19 the spread payable to CSFB over the three years.

20    Q.   Was that the total compensation that

21 CSFB would receive for providing this line?

22    A.   If it -- this together with the

23 warrants if the transaction had lasted for the

24 full three years, which it didn't.

25    Q.   Okay. So some of that 15 million was

258

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1          Fiachra O'Driscoll
2    earned as the facility was provided; is that
3    correct?
4          A.    Some of it was.
5          Q.    All right.  And the reason it did not
6    pay --
7                I gather it paid less than the full
8    15 million?
9          A.    Much less.
10         Q.    Was there an up front portion of the
11   fee?
12         A.    Yes.
13         Q.    And what was that?
14         A.    I don't remember, but it was a lot less
15   than 15.
16         Q.    Okay.  And was there a covenant
17   established, to your recollection, that Oakwood
18   maintain a $75 million line of credit?
19         A.    Not to my recollection, no.
20         Q.    What about gaining control about
21   "Oakwood's underwriting process," what was your
22   understanding of that?
23         A.    James -- again, James was relatively --
24   he was an associate who reported to Tom Irwin.
25   What he meant by that I don't know, because

259

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1          Fiachra O'Driscoll
2    obviously we never did have control of Oakwood's
3    underwriting process.
4          Q.    And by "underwriting process" did you
5    understand -- or as you use the term right now, do
6    you mean credits criteria by which they would
7    either grant or deny credit to a proposed
8    purchaser of their product?
9          A.    Yes.  And I think in essence what he
10   actually means is, if we can look back to
11   Exhibit --
12               MR. OSNATO:  No, no.
13               THE WITNESS:  Oh, sorry.
14               MR. OSNATO:  Is that the Kareem e-mail?
15         A.    If we can go back to Exhibit 63, if I
16   have the terminology right.
17               MR. OSNATO:  Which is the e-mail from
18         Kareem's Hotmail account?
19         A.    Yeah, the Kareem e-mail.
20               And you can see that one of the key
21   things -- one of the key aspects of the structure
22   of any transaction like this is what are the
23   receivables that -- what are the mortgage loans
24   that are eligible for such a transaction.  Because
25   one of the things that's important, of course, is

260

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1          Fiachra O'Driscoll
2    that ultimately this loan purchase facility is
3    going to fill up to its maximum amount, which I
4    think is 200 million.  And literally fill up
5    unless you can -- unless you can accomplish to
6    take out securitizations on the other side.
7                So one of the things that's key in any
8    of these situations is to ensure that the nature
9    of the loan -- the nature of the mortgage loans
10   that are going into the loan purchase facility are
11   ones that you'll be able to distribute out to
12   investors in the form of a securitization or in
13   some other form on the other end.
14               So one of the things that you'd see
15   within any of these kind of things, whether it be
16   a loan purchase facility like this, a CP conduit
17   or warehouse financing, any of these kind of
18   things, was a list of the criteria within
19   Oakwood's -- within Oakwood's underwriting, within
20   Oakwood's loan originations, effectively that the
21   portfolio was -- as a whole or individual loans
22   within the transaction would have to be consistent
23   with.
24         Q.    Okay.  Mr. Xanthos here isn't saying we
25   need to understood Oakwood's underwriting process.

261

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

1          Fiachra O'Driscoll
2    We need to get control of it, he says, did that
3    mean anything to you.
4          A.    I don't think James at this point in
5    his career -- and I don't mean to disparage James,
6    because he's a very highly accomplished
7    professional, was before and is now, I don't think
8    that James at this point actually understood the
9    way that these things worked.
10         Q.    I see.
11               And on what do you base that?
12         A.    My experience of working with James.
13         Q.    I see.
14               So how does that relate to his
15   statement that you need to gain control of the
16   underwriting process?
17         A.    I don't know, because that was never a
18   feasible thing, nor would it even have been
19   advisable from Credit Suisse's point of view or
20   any other bank to put in -- to do what would be
21   necessary to do that, which is to essentially put
22   in loan officers, which is an expertise that we
23   don't -- we don't have loan officers who could
24   actually underwrite the individual loans.
25         Q.    Where is James now?

262

Page 263:

```
1              Fiachra O'Driscoll
2    A.    I don't know, actually.
3    Q.    Well, I think you said he's an
4    accomplished professional now.  I took it from
5    that that you have some idea --
6    A.    Well, I take it he's not dead.  I've
7    forgotten where he went to, but...
8    Q.    How long ago did he leave CSFB?
9    A.    I don't remember.  I'm not even sure if
10   he has left CSFB.
11   Q.    All right.  Well, there we go.
12         But wherever he is you've surmised that
13   he's an accomplished professional, correct?
14   A.    Well, he may have quit the business
15   entirely.  The last time I saw him he was very
16   good.
17         MR. OSNATO:  I can confirm he is alive
18   and he is no longer with CSFB.
19         MR. CASTANARES:  You know, I think I
20   got that message from you earlier.  But I
21   thank you, counsel.  Good.
22         MR. OSNATO:  Certainly.
23         MR. CASTANARES:  As Exhibit 65 we'll
24   mark CSFB 512061.
25
```

263

Page 264:

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
1              Fiachra O'Driscoll
2         (CSFB Exhibit 65, One-page e-mail,
3    bearing Bates stamp No. CSFB-00512061, marked
4    for identification, as of this date.)
5         (Witness looks at document.)
6         THE WITNESS:  Thank you.
7    Q.    Now, when Mr. Irwin tells you that he
8    has "represented to Dick that" you "can control
9    and manage underwriting standards," does that
10   indicate to you that Mr. Irwin also didn't
11   understand this transaction?
12   A.    I think here Tom is -- what Tom is
13   talking about is exactly what I described before,
14   which is the loans -- to ensure that the loans
15   that are getting purchased into the transaction
16   are ones that are going to be consistent with
17   the -- with what we believe we can sell out in a
18   securitization on the other side.
19         Because as you can see here, this
20   reference to a list of 35 points, I think it was
21   somewhat less than that, but there was a very,
22   very long list of points, an extended list of the
23   list that you saw in Kareem's e-mail that went
24   through a relatively long list of points that we
25   felt were important that the loan pool consist of
```

264

Page 265:

```
1    to ensure that the loans were ones that we could
2    subsequently market out on the other side.
3    Q.    All right.  Well, after receiving this
4    e-mail did you come to believe that you could
5    control Oakwood's underwriting standards any more
6    than you felt earlier when Mr. Xanthos had
7    commented upon that subject?
8    A.    No.
9    Q.    Okay.  And did you read the Moody's
10   report that was attached to this?
11   A.    I don't recall.
12   Q.    Okay.  Can you recall whether, in fact,
13   Moody's was showing that the quality of
14   underwriting had declined?
15   A.    I can't recall.
16   Q.    If we assume that the Moody's report
17   attached to this document -- and I can tell you I
18   believe this is the document -- this document is
19   in the form produced to us by CSFB.  I don't
20   believe the attachment was with it.  I could be
21   proved horribly wrong in that regard, but I
22   believe that's correct.
23         MR. OSNATO:  I don't think that you're
24   wrong.  I think this document was produced in
25
```

265

Page 266:

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

```
1              Fiachra O'Driscoll
2    hard copy format.  Whose ever files it
3    resided in had only the e-mail.
4         MR. CASTANARES:  Okay.  So we don't
5    have the attachment.
6    Q.    But let's assume for the purposes of
7    discussion that Moody's report shows what
8    Mr. Irwin says it showed.
9         Would that be consistent with your
10   earlier testimony today that you thought that the
11   underwriting standards were improving consistently
12   up to the date of bankruptcy?
13   A.    I'd rather not make the first
14   assumption.  Because I think that -- I remember
15   this e-mail, one of the ones I do remember.  And
16   there was two things about it.  The first was the
17   bit here about "as you know, Dick Thornburgh."
18   I wasn't actually at this meeting with
19   Dick Thornburgh and hadn't been invited to it.
20         That the CRM guys had essentially gone
21   off and had their own meeting internally to
22   discuss it internally within CRM and hadn't
23   involved any of the people from the asset
24   securitization group in that dialogue.
25         And my recollection was that I
```

266

Fiachra O'Driscoll

1  Fiachra O'Driscoll
2  disagreed with the points that Tom was making.
3  Tom was also somebody who would on occasion fly a
4  trial balloon, if you will, would try to be a
5  little inflammatory to see whether you disagreed
6  with something or whether you could make
7  counterpoints to shoot down his points.
8      Q.   So did you reply to this e-mail?
9      A.   I don't recall if I replied in writing,
10  but I know that the ultimate outcome from this
11  e-mail was this list of 35 points.  I don't think
12  it was 35 in the end, but it was actually a very
13  long list that we planned to use to address the
14  concern.
15      Q.   Okay.  And the 35 points or whatever
16  number it actually was dealt with Oakwood's
17  underwriting standards; is that right?
18      A.   To be precise, he's using the language
19  here again a little bit loosely.  But what those
20  35 points were there for, and this was something
21  he was well aware of, was what those would do is
22  to ensure that the loan -- the average loan
23  production that went into the loan purchase
24  facility, the average mortgage loan production
25  that went in the loan purchase facility were ones

267

1  Fiachra O'Driscoll
2  that were consistent with these points, that we
3  believed that there was going to be no issue with
4  the takeout securitization of.
5      Q.   Okay.  So they were points that related
6  to Oakwood's underwriting standards; is that
7  right?
8      A.   They would have related to -- they --
9  we never attempted at any point to tell Oakwood
10  you can't underwrite this loan or you can't
11  underwrite that loan.  What we did do was we
12  constructed the facility in such a way that we
13  were reasonably confident that the aggregate
14  production as a whole that was going into the loan
15  purchase facility was -- was loans that we were
16  confident we would be able to get through the
17  rating agencies, get rated, and get distributed to
18  the market.
19      Q.   And what did you contemplate that
20  Oakwood would do with mortgages that it had that
21  were outside the cap in the line?
22      A.   By and large -- by and large, with the
23  exception of fairly short intervals of time, I
24  think they stayed within the cap.  There would be
25  loans that would fall from time to time outside

268

1  Fiachra O'Driscoll
2  the cap.  And Oakwood funded those primarily
3  through I think the Foothill line eventually or
4  through other financial resources broadly.
5      I certainly do recall that when the
6  Foothill line was put in place those ones that
7  weren't eligible for the loan purchase facility
8  were pledged to the Foothill line.
9      Q.   All right.  Now, I see that there's a
10  reference here to the DPAP program --
11      A.   Uh-huh.
12      Q.   -- is that down payment assistance
13  program?
14      A.   Yup.
15      Q.   And that was viewed as a negative from
16  an underwriting perspective; is that correct?
17      A.   Yes.
18      Q.   And as of this time had you had any
19  awareness of Oakwood's LAP program?
20      A.   Yes.
21      Q.   When did you first become aware of it?
22      A.   It was a technique that Oakwood had
23  used for a very, very long time.  I'm not sure
24  that I could say a date.  But certainly very early
25  in my career I became aware that loan assumptions

269

1  Fiachra O'Driscoll
2  were a technique that was being used, not just by
3  Oakwood, but really fairly generally throughout
4  the industry.
5      Each one of them, the major -- not all
6  of the major finance companies, but nearly all of
7  the major finance companies did something like it.
8  Conseco's one was called DTOE, default transfer of
9  equity.  There were different kind of acronyms and
10  names for the same kind of program, but it was a
11  technique that was used very broadly in the
12  industry for many, many, many years.
13      Q.   Was Oakwood using that technique when
14  you came on board in 1996?
15      A.   I believe it was.  I believe it was.
16      Q.   And as far as you know, was it still
17  using that technique as of January of '01?
18      A.   I believe it was.
19      Q.   Had Oakwood ever discussed that program
20  with you in any way?
21      A.   Yes, I'm sure they had.
22      Q.   Had Oakwood ever discussed with you the
23  effect that the LAP program had on Oakwood's
24  liquidity?
25      MR. OSNATO:  Object to the form of the

270

Fiachra O'Driscoll

1 question.
2 A.    The only point at which the impact on
3 Oakwood's liquidity was discussed was very close
4 to the date of the termination of the loan
5 assumption program.
6 Q.    And when was that?
7 A.    I believe that was in the summer of
8 2002, spring or summer of 2002.
9 Q.    Right around the time you made a
10 presentation to Berkshire?
11 A.    I would need to go back and refresh my
12 recollection as to the dates.
13 Q.    Okay.  And what brought about, if you
14 know, the termination of the LAP program?
15 A.    From what I knew of it, I was told by
16 Doug Muir that Oakwood Acceptance had increased
17 dramatically in the months up to that point its
18 use of the loan assumption program, very
19 dramatically.
20         And as I understand it -- understood
21 it, essentially what happened was, that I was
22 phoned by Doug Muir a day or so before the press
23 release went out announcing that they were
24 terminating the loan assumption program.  And was

Fiachra O'Driscoll

1 essentially given a heads up so that we wouldn't
2 be surprised that this announcement was made
3 public.
4         And at that point they -- Doug told me
5 that OAC had dramatically increased the use of the
6 loan assumption program in the three months prior
7 to that.  It had chewed up far more of the
8 company's available cash assets than were
9 expected.  And that the senior executives, I don't
10 recall specifically who, but the senior executives
11 had taken a decision to terminate it.
12 Q.    And is this the first you knew of this?
13 A.    The first I knew of?
14 Q.    The increased use of it.
15 A.    I was aware that they had increased the
16 loan assumption program somewhat.  They increased
17 it very dramatically in those months and that
18 wasn't something I was aware of.
19 Q.    How did you become aware that they had
20 increased it at all?
21 A.    I don't know.  I don't know.
22 Q.    When did you become aware that they had
23 increased it?
24 A.    Sometime in the course of 2002.

1 Q.    Now, did the loan assumption program in
2 your view have any effect on the performance of
3 the mortgages in the portfolio that would have any
4 influence on any aspect of the underwriting
5 process?
6         THE WITNESS:  We're just coming up on
7 an hour.  Do you mind if I just take a little
8 pit stop?
9         MR. CASTANARES:  Not at all.
10         MR. OSNATO:  Okay.  Thank you.
11         THE VIDEOGRAPHER:  Going off the
12 record, 3:31, tape 3.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  We're back on the
15 record.  It's 3:39.  This is tape 3.
16         MR. CASTANARES:  I withdraw the pending
17 question.
18 BY MR. CASTANARES:
19 Q.    When you were told by Mr. Muir of the
20 dramatic increase in the LAP did he tell you why
21 the company had done that?
22 A.    On the contrary.  He expressed his
23 dismay that it had happened.
24         And the -- he indicated that OAC,

Fiachra O'Driscoll

1 Oakwood Acceptance, had, if not legally exceeded
2 their authority certainly exceeded -- had
3 proceeded to do much more of this, with much more
4 cash flow consequences than the senior management
5 was aware of or had any authorization to do.
6 Q.    So he suggested to you that this came
7 as a surprise to him, too?
8 A.    He suggested it came as a surprise to
9 him, too.
10 Q.    And did he say that it came as a
11 surprise to other Oakwood senior management?
12 A.    Yes.
13 Q.    Specifically, Mr. Standish?
14 A.    Yes.
15 Q.    Anybody else?
16 A.    That's what I recall.
17 Q.    Okay.  And did he tell you who had
18 taken the decision to create this dramatic
19 increase in the LAP?
20 A.    He actually did, yes.
21 Q.    And who did he say?
22 A.    Bob Smith.
23 Q.    Did you discuss this with Mr. Smith at
24 about that time?

Fiachra O'Driscoll

1  
2   A.   I did not.  
3   Q.   And did he, did Mr. Muir convey to you  
4   any understanding or any statements on what had  
5   motivated Mr. Smith to do this?  
6   A.   I don't recall precisely.  I don't  
7   recall.  
8   Q.   I take it -- and I take it Mr. Muir  
9   suggested to you that this had had some sort of  
10  disadvantageous consequences for Oakwood?  
11  A.   He didn't tell me exactly how much.  It  
12  was fairly -- we would sometimes -- because we  
13  didn't have access to information, other than the  
14  normal, you know, publicly available filings.  We  
15  didn't normally get information ahead of the  
16  company's announcement with respect to its general  
17  financial condition when it would make its  
18  quarterly disclosures or annual disclosures.  
19       So -- but every so often you would get  
20  a phone call like this from them saying I just  
21  want to give you a heads up that, you know, you're  
22  going to see the following in the paper tomorrow  
23  morning.  Well, not in the paper, on the Bloomberg  
24  screen or whatever form it would come in.  
25       Typically there wouldn't be numbers  

Fiachra O'Driscoll

1  
2   attached to it, sometimes there would be.  But  
3   what he did make clear at that point was that it  
4   had had a -- that a significant amount of money  
5   had gone into this substantial increase in the  
6   LAPs.  
7   Q.   Now, did you understand that the effect  
8   of the LAP was that you take a default or a repo  
9   and treat it in such a way that it was no longer  
10  classified as a default or a repo for various  
11  purposes?  
12  A.   I don't think that's an accurate  
13  understanding.  
14  Q.   Okay.  How is it -- how am I wrong?  
15  A.   What any of these loan assumptions  
16  actually was in their original formulation, if  
17  a borrower became seriously delinquent one of the  
18  standard things that the servicers would do, as I  
19  related earlier on, was they tried to endeavor to  
20  try to find if there were ways to fix the problem.  
21       And if there weren't ways -- if it  
22  wasn't a short-term problem, if it was a  
23  persistent problem, one of the things that they  
24  would ask for within most of the mortgage lenders  
25  in the space was, well, do you have somebody else  

1  
2   who can take over the loan from you?  
3        Is there a parent, is there a brother  
4   or sister who wants to take on the home?  
5        Is there someone in your neighborhood  
6   that you know who would take on -- who would move  
7   into the home and to take over the obligations of  
8   the loan itself?  
9        And essentially what a loan assumption  
10  was, was in essence that.  So what it did was it  
11  took a loan which wasn't necessarily defaulted at  
12  that point in time, but almost certainly was  
13  delinquent at that point in time, and caused a new  
14  obligor to take over that loan who would not be  
15  delinquent.  
16       And that's it in a nutshell.  
17  Q.   In that situation, if there were no LAP  
18  that loan would become classified as a default or  
19  a repo, correct?  
20  A.   Not necessarily, because it wouldn't  
21  necessarily have been the only servicing technique  
22  that Oakwood would have used.  It's reasonable to  
23  assume that there's a significant percentage of  
24  them that would have eventually become repos.  And  
25  without a doubt, one of the key reasons that  

Fiachra O'Driscoll

1  
2   Oakwood, and Conseco, and Clayton, and everybody  
3   else -- not everybody, but many other mortgage  
4   finance companies had this program was to avoid  
5   repos.  Because it was easier and cheaper to get  
6   somebody else to take over the loan than it was to  
7   repossess the house, take it away from its site,  
8   take it back to a dealership and remarket it.  
9   Q.   Well, you say it was easier and  
10  cheaper, but you did understand that it had  
11  negative financial consequences for Oakwood  
12  Acceptance as well, correct?  
13  A.   The negative financial consequences,  
14  though, were generally less than the cost of  
15  repossessing the home and remarketing it.  
16  Q.   Okay.  And what were those negative  
17  financial consequences that it had?  
18  A.   The negative financial consequences  
19  came from the fact that the payments that were  
20  delinquent on the loan would not be made up  
21  immediately by the borrower who took over the  
22  loan, but instead would typically be added to the  
23  back end of the loan.  Meaning to the -- the  
24  payments to be made on the loan at its final  
25  maturity.  So instead of having immediate cash in

Fiachra O'Driscoll

1  hand for those delinquent payments, instead this
2  was going to be cash you were going to get in
3  either 30 years time or whenever the loan was
4  going to be prepaid.
5
6      Q.    Okay.  Now, by using the LAP as to a
7  particular loan Oakwood was able to avoid having
8  it classified as a repo, correct?
9      A.    Correct.
10     Q.    And it was therefore possible to use
11 that particular mortgage as collateral in certain
12 lending facilities and in securitizations,
13 correct?
14     A.    Correct.
15     Q.    Where it would not have been possible
16 to use it if it had been classified as a repo,
17 correct?
18     A.    Well, generally speaking the loans --
19 the original loans as they were would in almost
20 all cases be already in an existing
21 securitization.
22     Q.    Okay.  And what would be the effect --
23 if all of those loans that had been used, that had
24 been treated under the LAP had not been treated
25 under the LAP and had become repos or a

279

Fiachra O'Driscoll

1  always had the excess interest strip within the
2  transaction structure.  In other words, the
3  difference between the coupon rate on the loans
4  and the coupon rate on the REMIC securities that
5  were issued out.
6
7      So any losses that occurred, first of
8  all, were applied to that excess interest amount.
9  So Oakwood would get out of the securitization,
10 the excess interest net of the amount of these
11 losses.
12     The second was that if the losses had
13 become so large that the excess interest strip was
14 in fact zero -- and that was without a doubt the
15 case with some of these situations at that point
16 in time -- then there could potentially be a
17 guarantee payment on a B2 security, for instance.
18     Q.    Would it affect the marketability of
19 the B2 securities?
20     A.    Well, by that point those B2 securities
21 would have been sold, with the exception of some
22 of the more recent B2 securities, which were
23 obviously of more recent vintage and where that
24 generally wasn't occurring.
25     Q.    And would the classification of these

281

Fiachra O'Driscoll

1  substantial portion of them had, what effect would
2  that have had upon the securities in the REMIC
3  securitizations that had occurred where those
4  loans form part of the collateral pool?
5      A.    In the event that the loans -- in the
6  event that the loans had simply proceeded directly
7  to repo?
8      Q.    Yes.
9      A.    Yeah, in that situation that repo would
10 have been remarketed, presumably at a loss.
11 Because usually these things, taking account of
12 the costs of the repossession process and selling
13 the home, almost invariably there was going to be
14 a -- the proceeds of that were significantly less
15 than the principal balance of the loans, plus the
16 cost of doing it.  So you would have a loss within
17 the securitizations equal to whatever that amount
18 was.
19     Q.    And what effect would that then have on
20 Oakwood?
21     A.    That would have a negative effect.
22     Q.    How so?
23     A.    In several different ways.  The first
24 way was that Oakwood, as I mentioned, almost

280

Fiachra O'Driscoll

1  loans as repos, but for the LAP program, had had
2  any effect on future securitizations?
3      A.    Potentially it would.
4      Q.    And how so?
5      A.    It might have affected investors
6  understanding of the losses that they were exposed
7  to within the securitizations themselves.
8      Q.    Investors would better understand the
9  level of defaults that was occurring as
10 distinguished from the appearance of fewer of them
11 that was created by the use of the LAP program?
12     A.    I think I probably misstated myself.
13 There was another more fundamental driver going
14 on, which was that one of the reasons for using
15 the LAP was by that point in time Oakwood was
16 reducing the number of sales centers that it had.
17 But the retail sale centers had two roles.  The
18 first role was to sell new homes.  The second role
19 was to sell the repossessed homes that Oakwood had
20 taken in.
21     One of the challenges was that every
22 one of these repossessions that was done
23 essentially crowded out, from Oakwood's point of
24 view, the ability to sell a new home.  Because

282

Fiachra O'Driscoll

1  more often than not all these homes ended up in a
2  sale center. Every customer who walked away with
3  a home ended up with either a new home or with a
4  preowned repossessed home. And the net result of
5  that was that inevitably the number of new homes
6  that were sold was less.
7
8      It also meant there was more pressure
9  on the retail sales centers to sell these
10 repossessed homes that they had cluttering up the
11 site more cheaply. So the net result was that the
12 loss severities on these repo repossessions -- the
13 loss severities on the repossessed homes was
14 increasing largely because the sales centers were
15 finding it harder to remarket these things.
16     So the question of whether a loan
17 assumption or whether to repossess a home was more
18 economically efficient was -- was not a clear one.
19 But by and large, for a lot of the time period a
20 loan assumption was actually cheaper from
21 Oakwood's point of view than repossessing a home
22 and working it through the process.
23     Q.   Would the classification of some of
24 these loans as either repos or on the other hand
25 not doing so because of the LAP program have any

283

Fiachra O'Driscoll

1
2  effect upon availability or eligibility for draws
3  under the warehouse or asset purchase program?
4      A.   No, I don't think so.
5      Q.   Was there a cap on the amount of repos
6  that could be in the pool and the --
7      A.   There was a cap on the number of
8  repo refis that could be in the pool.
9      Q.   And wouldn't it be the case then that
10 to the extent that Oakwood had used the LAP and
11 avoided classifying a given loan as a repo or refi
12 it could avoid that eligibility problem?
13     A.   That would be true.
14     Q.   So the effect of the LAP really was to
15 give Oakwood some short-term liquidity at the
16 expense of long-term liquidity; is that correct?
17     A.   I don't know. I would want to think
18 about that.
19     Q.   All right. Did -- when Mr. Muir told
20 you that Oakwood was cutting out the LAP program
21 did he ask you for any opinion on the subject or
22 ask you to express yourself in any way, or did
23 you?
24     A.   No.
25     Q.   You didn't?

284

Fiachra O'Driscoll

1
2      A.   I don't recall expressing myself. I do
3  recall that he didn't ask me my opinion.
4      Q.   Okay.
5      A.   It was a fait accompli.
6      Q.   All right. And had Mr. Smith ever
7  discussed the LAP program with you?
8      A.   I don't recall.
9      Q.   Did he say or did you have any
10 knowledge, that is to say Mr. Muir, did Mr. Muir
11 say or did you have any knowledge as to how
12 Mr. Smith had managed to pull this off without the
13 knowledge of you or senior executives at Oakwood?
14     A.   Well, I wouldn't have typically been
15 privy to that kind of information. In any
16 case, he didn't say how this had been done.
17     Essentially that was the conversation.
18 And then from there the next thing -- the next
19 awareness that I had of it was the public
20 disclosures then that came within a few days.
21     Q.   Is it possible, Mr. O'Driscoll, that
22 implementation or in the dramatic increase in the
23 LAP program accounted for what appeared to be
24 improvement in the default and repo rate in
25 Oakwood in recent months prior to its termination?

285

Fiachra O'Driscoll

1
2      A.   The substantial increase may well have
3  done that.
4      Q.   And once the -- let me just -- I'm
5  going to call this the warehouse, because it's
6  just a --
7      MR. CASTANARES:  I'm going to call it
8  the warehouse line or whatever. I won't call
9  it a loan. But if I refer to it as the
10 warehouse, I'll refer to it the same way that
11 the witness refers to it in various --
12     MR. OSNATO:  We need to be clear.
13 We've spent a couple of hours today calling
14 it the asset purchase facility.
15     MR. CASTANARES:  Fine. I think that --
16     MR. OSNATO:  So I think for the sake of
17 clarity we should --
18     THE WITNESS:  Well, we can call it what
19 it is, because the asset purchase facility is
20 the term you've generally been using.
21     And actually I find it a little
22 confusing, because asset purchase agreements
23 are actually one of the building blocks in
24 commercial paper conduit facilities. You're
25 not to know that, but for me at least it's a

286

Fiachra O'Driscoll

little confusing, so...

Q.   What would you like me to call it?

A.   Can we just maybe call it the loan
purchase facility, which is what its legal name
was.

Q.   Okay. That's fine.

A.   So it's easier if we all stick to that.
Because there are things called GAPIS and LAPIS,
which I'm sure you don't want to know about.

Q.   I don't.  I know too much of these
things already, and not enough.

     That is the same facility that is
referred to in e-mails as the warehouse and that's
referred to in the e-mails late in 2002 -- just
before the bankruptcy as the warehouse, when
you're talking about getting a waiver from the
warehouse.

     That's the same facility we're talking
about, right?

A.   Some people -- plenty of people refer
to it fairly casually as the warehouse.

Q.   Okay.

A.   But its legal construct and its legal
form was a loan purchase facility.

287

Fiachra O'Driscoll

Q.   All right.  In connection with the
negotiation and agreement upon the loan purchase
facility, did Oakwood agree to implement the
35 points or any of them that were referred to in
Exhibit 65?

A.   Yes.  We negotiated down to a smaller
number of points.  I don't remember the exact
number of points, but it was still a pretty long
list.

Q.   And what effect did that have on
Oakwood's sales?

A.   I'm not aware of any effect.

Q.   Did these 35 points, or whatever the
number was, constrict Oakwood's underwriting
standards?

     MR. OSNATO:  Objection to the form.

     You can answer.

A.   In my opinion they didn't.

     Because, again, there was a period of
time in which their credit was, in my view at
least, improving.  And from what we saw of the
loans that they were actually purchasing into the
facility, in some places they -- they did run into
constraints and we had to change some of those

288

Fiachra O'Driscoll

35 points on -- I think on two occasions, if my
memory serves me.

     But by and large they were fitting, on
the vast majority of those points, well within the
parameters.  So if anything, there was a degree of
leeway that Oakwood had.  And on the two occasions
on which they found the 35 points, or whatever the
number was, didn't work for them they came to us
and sought waivers.

Q.   All right.  And did the default repo
rate improve after the implementation of these
35 points?

     MR. OSNATO:  Objection.

     We've clarified that there have been a
number of points.  We haven't established
that all 35 --

     MR. CASTANARES:  Whatever they were.

     MR. OSNATO:  -- were embedded in the
agreement.

A.   I would need to go back and take a
look.

Q.   You just don't remember?

A.   I don't know.

Q.   Okay.

289

Fiachra O'Driscoll

A.   But what I do know is that the average
quality of their new loans had been improving
throughout that period.

Q.   All right.  And you just can't recall
off the top of your head whether it improved after
the implementation of these points?

A.   That would be correct.  At any specific
point in time I'm not sure I remember.

     MR. CASTANARES:  All right.  I'll
ask -- or I will actually mark as Exhibit 66
CSFB 292514 through 2516.

     (CSFB Exhibit 66, Three-page e-mail,
bearing Bates stamp Nos. CSFB-00293514
through CSFB-00293516, marked for
identification, as of this date.)

     (Witness looks at document.)

     THE WITNESS:  Thank you.

Q.   Do you remember receiving this
document?

A.   I do.

Q.   And do you know who Stella Young is?

A.   No, I don't.

Q.   Okay.  What transaction is referred to
in this?

290

29/06/2006 O'DRISCOLL, Fiachra (vol 1)

Fiachra O'Driscoll

A.    This was the transaction I described a
few minutes ago, which was the mortgage
securitization in which we put a B2 in as part of
the collateral within the deal.  The one where --
the e-mail from Janie referring to the 60 to
65 cents on the dollar.

Q.    Okay.  So this is -- you used an old B2
in a new securitization?

A.    Correct.

Q.    Okay.  And did that actually then
happen?

A.    It did.

Q.    Okay.  And did you -- when you received
this e-mail did you understand Mr. Rich to be
communicating legal advice to Oakwood?

(Witness looks at document.)

A.    Well, specifically what he -- what this
whole thing related to, was when we were going to
do this originally the presumption was that we
would be able to do it from Oakwood's mortgage
shelf, meaning the registration statement at the
SEC that Oakwood habitually used for the
securitization of these transactions either before
or after the loan service facility was put into

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

place.

        And we ran into this concern that one
of the lawyers -- I think it was Chris Lewis at
Simpson Thacher that pointed it out, which was --
which was that you couldn't, in fact, do that
where one of the securities in question wasn't
itself, in fact, a registered security.  And
therefore we were going to have to do that next
upcoming securitization as a 144-A securitization,
rather than as a bottom transaction.

Q.    And who did Simpson Thacher represent?

A.    Credit Suisse.

Q.    And was this a full securitization,
that this was done with all of the various
tranches to it, or was it just a placement of the
B2s?

A.    This was a full securitization.

MR. CASTANARES:  Exhibit 67 will be --
482173 through 77.

(CSFB Exhibit 67, Five-page document,
bearing Bates stamp Nos. CSFB-00482173
through CSFB-00482177, marked for
identification, as of this date.)

(Witness looks at document.)

Fiachra O'Driscoll

THE WITNESS:  Thank you.

Q.    Is Jesse Sable somebody that worked in
your department?

A.    He worked in the financial engineering
group.

Q.    Okay.  Why had he requested this
particular data at this particular time?

A.    I don't remember.

Q.    Do you recall what use you made of this
data when you got it?

A.    No, but this is very typical.  I think
I described to you what the collateral analysts
who were a subgroup within the financial engineers
did, which was that they produced summaries of the
information from the loan tapes that they would
get from Oakwood that would summarize the
characteristics of particular loan pools.  So this
was very, very typical of what they would
routinely do in a transaction.

Q.    Did this have to do with a
securitization or with a loan purchase facility?

A.    I don't know.

MR. CASTANARES:  Exhibit 68 will be --
I guess it will be 178954 and 5.

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

THE WITNESS:  Thank you.

(CSFB Exhibit 68, Two-page e-mail,
bearing Bates stamp Nos. CSFB-00178954
through CSFB-00178955, marked for
identification, as of this date.)

MR. CASTANARES:  I'm going to ask you
only about the top message here.  You may
read whatever you wish.  I don't intend to
ask you any questions about the bottom one.

THE WITNESS:  Uh-huh.

(Witness looks at document.)

THE WITNESS:  Ready.

Q.    Do you recall receiving this?

A.    I do.

Q.    And is he asking -- is he thanking you
for helping with the loan purchase facility or a
the securitization?

A.    The loan purchase facility.

Q.    Did you respond to this in any way?

A.    I don't recall.

Q.    Did you discuss with anybody what the
options were for the company with regard to the
repos that kept coming?

MR. OSNATO:  Objection to the form.

Fiachra O'Driscoll

1       You can answer.
2
3       A.    Can you -- the -- it's probably fair to
4   say that the repos were -- and the question of how
5   to deal with the repos that Bob quite succinctly
6   summarizes here was an ongoing topic of
7   conversation with the company.
8       Q.    And did you discuss with him what the
9   options were?
10      A.    Not that I can recall a specific
11  instance.
12      Q.    Did you discuss it with somebody else?
13      Or how did you --
14      A.    I am sure I did, because, again, it was
15  one of these things.  It was an ongoing topic of
16  conversation for really -- for all of the
17  securitizations right throughout these years, but
18  I'm not sure I have any specific instances.
19      Q.    All right.  Do you know what "OMI SSA"
20  stands for?
21      A.    Yup.  It's the Oakwood Mortgage
22  Investors Sale and Servicing Agreement.
23      Q.    And that refers to the loan purchase
24  facility?
25      A.    I'm not certain that it does.

295

---

Fiachra O'Driscoll

1
2       Oakwood Mortgage Investors was one of
3   the entities that I think I described that was in
4   the chain of transfer of mortgage loans into the
5   securitizations.
6       Q.    Okay.
7       A.    So it may be the case that actually -- .
8   I don't know.
9       Q.    Based upon what Mr. Muir told you about
10  the LAP program, do you believe that it was at
11  about the time of this e-mail that we've just
12  discussing that Mr. Smith ramped up the LAP
13  program?
14      A.    I don't know when it started to ramp
15  up.  I don't think that there was a sudden
16  ramp-up.  I think it was from -- from my
17  recollection, it seemed -- from my subsequent --
18  from the subsequent things I heard, but I'm not
19  sure it was ever any one conversation, I got the
20  impression that it was a gradual ramp up.  But
21  that it increased very rapidly in about a
22  three-month time period.
23      Q.    The e-mail Mr. Smith suggests that they
24  need new paper to mix in.
25      Did you understand that reference?

296

---

Fiachra O'Driscoll

1
2       A.    Yes.
3       Q.    What was it?
4       A.    He's summarizing very succinctly,
5   actually, the point that I made earlier on, which
6   was that the -- it ties into the "sales still
7   stink" point.
8       THE REPORTER:  I'm sorry?  "The"...
9       THE WITNESS:  The "sales still stink"
10  point.
11      MR. CASTANARES:  "Sales still"...
12      THE WITNESS:  "Sales still stink."
13  It's a bit of a tongue twister, isn't it?
14      MR. CASTANARES:  The reporter has it.
15  I can see his computer there.
16      THE WITNESS:  Very good.  You're doing
17  better than me.
18      A.    Because the issue is the "new paper"
19  he's referring to, in other words, is the sales of
20  new homes.  The repos, of course, are the sales
21  through all the retail sales centers of
22  repossessed, refurbished homes that are crowding
23  out the new sales.
24      So their problem was that the total mix
25  of sales that they were making was -- they were

297

---

Fiachra O'Driscoll

1
2   spending too much of the energy and the resources
3   of the entire system, Oakwood Retail, Oakwood
4   Acceptance on remarketing repossessed homes.  And
5   because in part, because of the shrinkage of the
6   number of retail sales centers, they were finding
7   it more and more difficult to sell the new homes
8   to keep the factory busy.
9       Q.    Now, did the company ever solve this
10  repo problem that Mr. Smith succinctly set forth
11  in the e-mail?
12      A.    No.
13      Q.    Okay.  And other than simply the
14  addition of more money what would the mixing in of
15  new paper accomplish?
16      A.    I think the point that he is trying to
17  make here -- and forgive me for doing something I
18  perhaps shouldn't, which is putting words into his
19  mouth here -- but in essence the challenge is
20  Oakwood made money from selling new homes.
21  Oakwood did not make money from selling
22  repossessed homes.  So to continue to generate
23  profits, to continue to generate revenues for the
24  company it had to sell new homes.  And every repo
25  that it sold, crowding out the sale of a new home,

298

Fiachra O'Driscoll

2 was effectively a revenue opportunity that was
3 lost to the company.
4 Q.    Did it also affect the company's
5 ability to obtain short-term liquidity, either
6 through the loan purchase facility or through
7 securitizations?
8 A.    At one point one of the waivers that
9 they asked us -- they asked us for was an
10 amendment to the percentage of repo refis provided
11 for in the LPF, the loan purchase facility.
12 Q.    All right.  And, in fact, you
13 recommended that waiver, didn't you?
14 A.    I did.
15 Q.    And what happened to it?
16 A.    I think it was approved.
17 Q.    Okay.  When did that occur?
18 A.    I don't recall the date exactly.
19 Q.    Do you know who Palm Harbor was?
20 A.    Yes.
21 Q.    Who was it?
22 A.    It was a manufacturer, home
23 manufacturer based in Dallas.
24 Q.    And were you aware of any talks going
25 on between Palm Harbor and Oakwood?

Fiachra O'Driscoll

2 A.    I was aware that there were talks going
3 on between Palm Harbor and Oakwood.
4 Q.    And what was the nature of the talks
5 that you were aware of?
6 A.    I think that they were trying to figure
7 out whether or not there was some business that
8 the company could do together that was going to be
9 mutually beneficial for the two corporations.
10 Q.    Would this involve some sort of
11 combination, or merger, or sale of one of the
12 companies?
13 A.    I don't think it ever got as far as
14 that.
15 Q.    Did you have any knowledge of the
16 transaction that they were contemplating?
17 A.    One aspect of it I did have knowledge
18 of, which was one of the things that they were
19 looking to do, is Palm Harbor was looking to get
20 into the mortgage securitization business, didn't
21 have a mortgage securitization arm of its own and
22 was hurting quite badly in their view, because
23 they didn't have the ability to have a mortgage
24 arm that could finance their own loan production.
25 Q.    They wanted what Oakwood had?

Fiachra O'Driscoll

2 A.    Believe it or not, they wanted what
3 Oakwood had.
4 So the gist of it was how could they
5 work together to use the Oakwood mortgage engine.
6 Q.    And what was your understanding of why
7 you were being made aware of these discussions?
8 A.    What I do know is that I was asked to
9 come down.  And I think I was present at a
10 meeting with Lee Posey, who was the chairman of
11 Palm Harbor at that time, and Myles Standish.
12 Q.    All right.  And what occurred at that
13 meeting?
14 A.    And they discussed the topics that I
15 have described.
16 Q.    And what did you say at that meeting?
17 A.    I don't recall that I said anything.
18 Q.    Okay.  What was your understanding of
19 why you had been invited to that meeting?
20 A.    Because I knew some of the finance
21 executives at Palm Harbor.  Palm Harbor had
22 basically hired a number of ex-Conseco executives
23 to try to set up -- to start-up a finance
24 operation.
25 And what Lee was -- I knew these

Fiachra O'Driscoll

2 gentlemen -- what Lee was trying to do was to
3 really shortcut the business of growing their own
4 version of Oakwood Acceptance by finding some way
5 to work with Oakwood to use both.
6 Because, you know, Lee I think was
7 particularly concerned about whether or not in
8 that period of time -- and I forgot the exact
9 period of time, but it was a time when -- it
10 wasn't 1996, if I can put it that way.
11 Lee was concerned that if he simply
12 went out and started originating mortgages through
13 this new entity that they would accumulate loans
14 and they wouldn't be able to get a securitization
15 off on their own, given that they were kind of a
16 first time start-up entity with no track record.
17 Q.    Did anything come of this?
18 A.    I do not believe so.
19 MR. CASTANARES:  Exhibit 69 will be
20 CSFB 181850 through 51.
21 (CSFB Exhibit 69, Two-page e-mail,
22 bearing Bates stamp Nos. CSFB-00181850 and
23 CSFB-00181851, marked for identification, as
24 of this date.)
25 THE WITNESS:  Thank you.

Fiachra O'Driscoll

1             Fiachra O'Driscoll

2      (Witness looks at document.)

3      THE WITNESS:  Right, yeah.

4    Q.   What's this all about?

5    A.   This was the e-mail -- sorry, the

6 securitization we talked about a little while ago.

7 The one in which we put one or more B2 bonds in

8 with the rest of the whole loan collateral.  This,

9 as you may recall from one at least of the e-mails

10 we discussed, had to get done as a Rule 144-A

11 transaction, which was one of the relatively few

12 Rule 144-A transactions.

13      MR. CASTANARES:  Exhibit 70 will be

14 CSFB 181713 through 18.

15      (CSFB Exhibit 70, Six-page document,

16 bearing Bates stamp Nos. CSFB-0018713 through

17 CSFB-0018718, marked for identification, as

18 of this date.)

19      (Witness looks at document.)

20      MR. CASTANARES:  And just so you know,

21 Mr. O'Driscoll, I may not have any detailed

22 questions for you beyond asking you what this

23 transaction was.  So if you can familiarize

24 yourself enough to answer that question, I

25 may or may not have any others.

303

1             Fiachra O'Driscoll

2      MR. OSNATO:  Why don't you just look

3 through it, rather than read it carefully.

4 And if you need to go back, you can do that.

5      (Witness looks at document.)

6      THE WITNESS:  Great.

7    Q.   So what was this all about?

8    A.   Do you have a specific question or...

9    Q.   I'm trying to understand what this

10 servicer facility was.

11    A.   Trying to understand the nature of the

12 transaction here?

13    Q.   Yes.

14    A.   Yes.  What this was, this was a

15 somewhat unusual securitization, but one that we

16 had made something of a little specialty of within

17 Credit Suisse at the time and we did for a number

18 of other people as well.  And the way it worked in

19 essence was the servicer advances that Oakwood had

20 to make to the securitizations, we essentially

21 resecuritized all of those by selling the

22 receivables from those advanced amounts into a new

23 trust.  And then selling a -- selling a note that

24 was issued from that trust to an end investor.

25    Q.   Okay.  So the new investor was getting

304

1             Fiachra O'Driscoll

2 a note issued by a trust and it was secured by

3 receivables?

4    A.   Correct.

5    Q.   And the trust was an Oakwood entity?

6    A.   I believe so.

7    Q.   Did this transaction happen?

8    A.   Yes.

9    Q.   And the collateral for that note was

10 money that the servicing entity at Oakwood was to

11 receive from servicing the mortgages in the

12 collateral pool?

13    A.   Yes.

14    Q.   And these were advances that the

15 Oakwood entity had made for what purpose?

16    A.   These were what are known in the

17 industry as servicer advances.  And these are

18 relatively universal features of mortgage

19 securitizations, not just manufactured housing,

20 but even -- you know, even Fannie Mae and

21 Freddie Mac mortgages.

22      What they are is, if a borrower fails

23 to make its payment on the due date, then the

24 servicer advances to the securitization trust the

25 amount of that delayed payment.  And when the

305

1             Fiachra O'Driscoll

2 borrower makes the payment it gets that money back

3 more or less immediately.

4      In the event that the loan goes all the

5 way to default within the transaction, then the

6 borrower -- sorry, the servicer has a first lien

7 on the proceeds from that repossession to repay

8 itself for those servicer advances.

9      But one of the challenges for Oakwood

10 was that the amount of the servicer advances,

11 which if I recall it, approached something in the

12 region of $50 million by the point in this

13 transaction, what was becoming a constraint on

14 their liquidity.

15      So what they asked us to do was to do a

16 transaction similar to one that we had done for

17 Conseco Finance.  I think it was a little bit

18 before that, which was essentially to put together

19 a transaction whereby Oakwood could sell those

20 receivables to a securitization trust, have a note

21 issued from that, sell that note to an end

22 investor, and to get the proceeds of that note as

23 essentially an advance -- a return -- an early

24 return of its servicer advances.

25    Q.   Okay.  So if the -- in the situation

306

**Page 307**

Fiachra O'Driscoll

where the end purchaser or the mortgagor made up a
missed payment, this is an extremely short-term
receivable that Oakwood had, correct?

A.    This was a month-to-month receivable.

Q.    Okay.  And in the situations where the
mortgagor didn't make up the lost payment and the
loan went into a full default Oakwood was
guaranteed it was getting its money back, but it
just was a little bit longer in getting it?

A.    Exactly.

Q.    So this is a relatively short-term
financing that this facility provided?

A.    Well, actually what it did was it
provided this on a revolving basis.  So every
month as Oakwood would have to make advances it
could essentially sell those advances into the
securitization trust, get money back for those
advances immediately.

Q.    Okay.  So what was CSFB's role in all
of this?

A.    We were the arranger of the
transaction.

Q.    And what does that mean?

A.    What that means was that we put

**Page 308**

Fiachra O'Driscoll

together -- developed the structure for the
transaction, took the transaction to rating
agencies to have the note in question rated.
We -- worked with the rating agencies to do a
financial analysis and, indeed, legal analysis of
the nature of these servicer advances.  Got a
rating on the notes, which, of course, only came
after we put the legal documents together for the
securitization trust that would actually buy these
receivables and issue the notes.  We found an end
investor for the note who bought and held them.

Q.    Who was that?

A.    I believe it was Prudential Financial.

Q.    Okay.  And what fee did CSFB earn for
this transaction?

A.    I don't remember, but I do remember we
got a fee.

Q.    And what was the amount of this
facility?

A.    I think it was $50 million, the number
mentioned here.

Q.    So did Oakwood get $50 million right
away for this?

A.    I don't remember what the advance rate

**Page 309**

Fiachra O'Driscoll

was.  Actually, I think Oakwood got -- I beg your
pardon, I think Oakwood got 50 million.

Q.    And what was the cost of this money to
Oakwood?

A.    I don't remember the rate.

Q.    Okay.  And for how long a period did
this facility remain in place?

A.    This expired at the date of bankruptcy
or rather it went into what they call amortization
at the date of the bankruptcy, so over the
succeeding months after the bankruptcy the note
paid down.

Q.    I see.
So in other words, the -- no more
advances were made under it --

A.    Exactly.

Q.    -- after the date of bankruptcy?

A.    Yes.

Q.    And what occurred then was simply a pay
down of the note proceeds of the collateral?

A.    Exactly.  And actually Oakwood stopped
making those servicer advances at approximately
the date of the bankruptcy filing in any case.

Q.    All right.  And was there only one note

**Page 310**

Fiachra O'Driscoll

issued in this transaction or was there a series
of them?

A.    I believe there was only one note
issued here.

Q.    And was there only one such transaction
or did this happen more than once with Oakwood?

A.    I think there was only one with
Oakwood.

MR. CASTANARES:  Okay.  Exhibit 71 will
be CSFB 182753 and 4.

(CSFB Exhibit 71, Two-page e-mail,
bearing Bates stamp Nos. CSFB-00182753 and
CSFB-00182754, marked for identification, as
of this date.)

THE WITNESS:  Thank you.

(Witness looks at document.)

THE WITNESS:  Thank you.

Q.    Who did you understand "Duane" now to
be?

A.    CEO.

Q.    And Mr. Smith at this point occupied
what position?

A.    He was either the CFO or he was -- his
title changed to, I think, EVP corporate finance.

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

1  Q.   All right.

A.   And Suzanne, who had been his
subordinate, took over the CFO title.

Q.   All right.  Now, what road show were
you and he talking about?

A.   We wanted to take a number of the
Oakwood executives, particularly Bob -- who was
also responsible for OAC, if I remember at the
time -- out to meet with mortgage investors.  This
was something that we would do from time to time.
When -- not always, but probably once every year
or two we would take them out to meet mortgage
investors and to talk to them about the
forthcoming securitization, talk to them about
industry conditions, talk to them about things
like that.

Q.   All right.  And so these were potential
purchasers of REMIC securities?

A.   Yes.

Q.   Okay.  Now, in the third paragraph of
his e-mail Mr. Smith says that, "We are making the
operational changes now at retail that I wish we
had made when I came here.  It also allows us to
make the needed changes at OAC."

Fiachra O'Driscoll

again, forgive me.  I'm verging into matters which
you probably want a securities lawyer to get into.

But with securitization transactions in
general there's always been a concern as to -- on
the part of the consumer finance and mortgage
finance bar that the -- that if you have a -- if
you don't have a transferor of a security
intermediate between a trust, a REMIC trust most
typically and the original holder of the loans,
that there is some possibility that the transfer
to the securitization won't be seen as being a
true sale.

Q.   I see.

So it's an entity that's interposed to
ensure that legally the transaction will be viewed
as a sale instead of a loan?

MR. OSNATO:  Objection as to the form.

You can answer the question.

A.   And I've kind of given you a layman's
answer to it, but a more exact answer should
probably come from a lawyer.

Q.   Okay.  And so did you ever speak to
anybody who purported to speak on behalf of
Gingko?

29/06/2006 O'DRISCOLL, Fiachra (vol. 1)

Fiachra O'Driscoll

Did you have any knowledge of what he
was talking about?

A.   I don't specifically recall what he was
addressing now.

Q.   Okay.  Specifically with regard to OAC,
were you aware of any changes that he had in mind
making at that time?

A.   I don't recall.

Q.   Now, are you aware of a corporation
with the name Gingko, G-i-n-g-k-o, in it?

A.   That was one of the transfer entities
for the loan purchase facility, similar to OMI.

Q.   All right.  And whose company was it?

A.   It consolidated in as a subsidiary of
Oakwood.

Q.   Okay.  Did you ever deal with anybody
who spoke on behalf of Gingko?

A.   Gingko, similarly to OMI, was a
transfer SPV.

Q.   And I'm not sure how that answers my
question --

A.   I beg your pardon.

Q.   -- so you better explain it to me.

A.   There would have been -- it was --

Fiachra O'Driscoll

A.   No.

Q.   Do you know who its officers,
directors, or employees were?

A.   I don't recall.

Q.   Do you know that it had any officers,
directors, or employees?

A.   I -- it did not have any employees.  I
do not recall if it had directors or officers.

Q.   Did it have bank accounts?

A.   I don't recall.

Q.   Did it have any access to money?

A.   Can you explain what that means?

Q.   Well, did it get any income of any
kind?

Did it have any revenue of any kind?

A.   It, again, as with OMI, it existed
purely to transfer loans in and transfer loans
out, usually simultaneously with each other.

Q.   Okay.  And what was Oak Leaf Holdings
LLC?

A.   That was another one of the entities in
the same chain.

Q.   Okay.  Would your answers be the same
if I asked the same questions about --

1          Fiachra O'Driscoll
2     A.    Yes.
3     Q.    -- who its officers were, whether it
4  had bank accounts, whether it held meetings,
5  et cetera?
6     A.    We can shortcut all those questions,
7  yes.
8          MR. CASTANARES:  Okay.  Thank you.
9          We've got five minutes on the
10 videotape, so why don't we take five.
11         MR. OSNATO:  Okay.
12         THE VIDEOGRAPHER:  We're off the record
13 at 4:35.  This is the end of tape No. 3.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  Okay.  We're back on
16 the record.  It's 4:42.  This is tape No. 4.
17 BY MR. CASTANARES:
18    Q.    Do you think that the loan purchase
19 program that was instituted in early 2001 for
20 Oakwood represented an improvement for Oakwood
21 over its prior facility?
22    A.    Can you expand on "improvement,"
23 please.
24    Q.    Was it cheaper money?
25    A.    It was slightly more expensive money.

1          Fiachra O'Driscoll
2  were pushing hard to -- in exchange for its - for
3  taking on credit risk, pushing hard to get
4  mandates for investment banking advisory services,
5  securities underwriting and so on.
6          And B of A had actually kind of gone
7  through a transition, not just with Oakwood, but
8  with quite a lot of other people as we got into
9  that period of time where they actually started
10 retrenching and they withdrew credit from a lot of
11 customers.
12         So one of the things that was -- that
13 almost certainly the case was that the Bank of
14 America facility was one that Oakwood was being
15 put under at -- Bank of America was making it
16 clear that they were looking to get out.
17         Furthermore, the Bank of America
18 facility was fairly short dated.  I don't know
19 what the term of it was, but the term was
20 364 days, perhaps, that would have been fairly
21 typical.  Whereas what this facility was, was a
22 three-year committed facility.
23    Q.    Anything else?
24    A.    So having the three-year term as
25 opposed to a 364-day term gave Oakwood a great

1          Fiachra O'Driscoll
2     Q.    Okay.  Was it more money?
3     A.    It -- I don't recall.  I think -- I
4  think it was about the same amount.
5     Q.    Okay.  Did it give more leeway to the
6  company in terms of collateral quality?
7     A.    I don't know, because I actually don't
8  know the full terms of the predecessor facility.
9     Q.    Can you think of any particular
10 advantage that this facility gave -- strike that.
11         Did the earlier facility require
12 Oakwood to give the provider of the facility
13 20 percent of its stock?
14    A.    Nope.
15    Q.    Can you think of any term of this
16 transaction which represented an improvement from
17 Oakwood's perspective from what it had before?
18    A.    Absolutely.
19    Q.    Please do.
20    A.    There was two key things.  The first
21 was that the Bank of America facility was a
22 short-term facility.  And Bank of America -- it
23 was a time period when B of A had kind of reversed
24 what we talked about earlier on.  Because you may
25 recall that I mentioned that B of A in particular

1          Fiachra O'Driscoll
2  deal more certainty that its problem of how to
3  deal with its inventory of newly originated loans
4  had gone away.
5     Q.    All right.  Any other advantages you
6  can think of over --
7     A.    That was an enormous advantage, in my
8  opinion.
9     Q.    Can you think of any others, however
10 slight?
11    A.    That was the salient advantage.
12    Q.    Okay.  Were you involved in the
13 negotiation of the various ceilings in the
14 facility in loan-to-value ratio, FICO scores,
15 et cetera?
16    A.    Yes.
17    Q.    Were you the primary person who
18 negotiated those ratios and terms on behalf of
19 CSFB?
20    A.    There were several people involved in
21 it at different points of time.  I would have been
22 the main point of contact with Oakwood.
23    Q.    Okay.  Was anybody else in direct
24 contact with Oakwood on those points?
25    A.    I don't recall.

Fiachra O'Driscoll

1              Fiachra O'Driscoll
2    Q.    Okay. Who did you talk to at Oakwood
3  on those points?
4    A.    Primarily Doug Muir.
5    Q.    Anybody else?
6    A.    He's the only one I definitely recall.
7    Q.    Were the negotiations entirely oral or
8  did they proceed in writing to any extent?
9    A.    I don't remember.
10    Q.    Do you know whether Oakwood ever
11  requested CSFB to permit it to use any proceeds of
12  the loan purchase facility for funding its LAP
13  program?
14    A.    I'm confused by your point.
15    Q.    I'll try to state it again.
16    Do you know whether Oakwood ever asked
17  CSFB if it would be okay if it used some of the
18  money that it got out of the loan purchase
19  facility to fund the payments it had to make to
20  operate the LAP program?
21    A.    No.
22    Q.    You don't know?
23    A.    I know that they didn't.
24    Q.    Okay. And you know that because you
25  would have been the person that they would have

1              Fiachra O'Driscoll
2  convert idea, which, frankly, I don't remember the
3  details of, that idea in some shape or form had
4  been knocking around for a long time. And also
5  other mortgage lenders had done similar kinds of
6  things at different points of time, so it wasn't a
7  kind of a new, creative CSFB idea.
8    Q.    All right. Were you the first person
9  who raised it with Oakwood?
10    A.    I don't know for a fact, but I probably
11  was.
12    Q.    And was there a negotiation over the
13  quantity of or the size of this position?
14    A.    Yes.
15    Q.    Okay. Tell me how that went.
16    A.    I do recall that we asked for
17  25 percent. My recollection is that we were
18  negotiated down to 20 and that that was then, if I
19  remember, for some regulatory reason that escapes
20  me now that was changed to 19.9.
21    Q.    It was changed to one share less than
22  20, correct?
23    A.    Something along those lines, yeah.
24    Q.    Okay. CSFB shut that facility down at
25  the time of bankruptcy, didn't it?

1              Fiachra O'Driscoll
2  asked?
3    A.    Well, more specifically the facility
4  didn't work that way. Unlike a commercial banking
5  facility, you know, a regular -- a regular, you
6  know, bank credit facility or something of that
7  sort where there were covenants and stipulations
8  that would determine how Oakwood could use the
9  funds, as was the case, for instance, in the
10  Foothill facility. Here Oakwood was selling the
11  loans into the loan purchase facility entity and
12  getting cash, end of story. They could have spent
13  it on anything that they pleased.
14    Q.    Okay. So there were no restrictions on
15  its use of the funds that it received from this
16  facility?
17    A.    I don't recall that there were any.
18    Q.    Now, were you the person who first on
19  behalf of CSFB raised the subject of the
20  20 percent warrant?
21    A.    I don't remember.
22    Q.    Okay. Did that -- was that -- did that
23  idea originate in your own head or did it come
24  from somebody else at CSFB?
25    A.    I don't remember. As you saw with the

1              Fiachra O'Driscoll
2    MR. OSNATO:  Object to the form.
3    You can answer that.
4    A.    No.
5    Q.    It suspended it, correct?
6    A.    No.
7    Q.    What did it do?
8    A.    The transaction itself, if Oakwood
9  filed for bankruptcy the facility by its terms
10  forbade -- I think the way it worked was that it
11  forbade Alpine from purchasing further loans from
12  Oakwood.
13    Q.    Okay. And Alpine then stopped
14  purchasing at the time of bankruptcy?
15    A.    Yup.
16    Q.    Was there any discussion within CSFB
17  over whether or not that should happen?
18    A.    Yes.
19    Q.    Tell me about that discussion.
20    A.    As I recall -- and I don't have all the
21  paperwork in front of me -- CRM put a -- made --
22  put in place a number of conditions that they
23  needed to see put in place at the bankruptcy date
24  for them to provide for that waiver.
25    Q.    When did you first become aware of

Fiachra O'Driscoll

those conditions?

    A.    I don't recall a date.

          MR. CASTANARES:  How am I doing on 12

    minutes?

          MR. OSNATO:  I think you're probably

    about halfway through.

          MR. CASTANARES:  Oh, okay.

    Q.    Approximately how long before

bankruptcy did you first hear of these conditions?

    A.    I think that's exactly the same as the

question you posed to me a moment ago, no?

    Q.    You don't recall?

    A.    Yeah, I don't recall the exact date.

It was in the weeks running up to it, possibly the

days.

    Q.    Can you remember what the conditions

were?

    A.    In general terms, yes.  In very general

terms there was a requirement that the Foothill

DIP facility be in place.  Secondly, that there be

a commitment from Berkshire Hathaway.  I've

forgotten the exact nature of the commitment, but

there be a commitment from Berkshire Hathaway with

respect to its support of the company.

Fiachra O'Driscoll

          Those were two.  I think there was a

third, but it escapes me now.

    Q.    Okay.  Now, Foothill also made it a

condition of their deal that a loan purchase

facility what they called a warehouse be in place,

correct?

    A.    Correct.

    Q.    And Berkshire Hathaway also made that a

condition of their deal, correct?

    A.    Yes.

    Q.    How did you propose to solve this

chicken and egg problem?

    A.    We solved that in the week following

the bankruptcy, in the business week following the

bankruptcy, which happened on a Friday.  We solved

that by making it clear to the various parties, if

my memory -- if my memory serves, that we were

prepared to do it if everybody else was prepared

to do it.  And we hammered out everybody's

commitments essentially around the table.

    Q.    So did it actually start funding again

in the week following bankruptcy?

    A.    I think it got put back in place on the

Friday following the bankruptcy.

Fiachra O'Driscoll

    Q.    So November 22nd?

    A.    I'm not sure I remember the date

precisely, but the Friday following the date of

the bankruptcy filing date.

    Q.    All right.  So are you fairly convinced

that money started flowing again under that

facility within a week following bankruptcy?

    A.    It did not flow on that date.

    Q.    When did it flow?

    A.    It was sometime in the week or two

following that date.

    Q.    So are we saying that within

three weeks of Oakwood's bankruptcy money was

flowing out of the facility once again?

    A.    I don't remember the exact date.  I

remember -- I do recall that on the date in which

all of the parties came together and all of the

paperwork was done, that was not the date on which

the money -- on which the first loan sale was

placed.

          In part, indeed, because Oakwood by the

mere fact of its bankruptcy filing, its liquidity

situation had improved quite a bit.  So I don't

think it actually needed to sell loans then for a

Fiachra O'Driscoll

period of time after that.

    Q.    But it needed to have that facility in

place before the DIP would go forward or before

Berkshire Hathaway would, correct?

    A.    Well, my recollection is all of those

came together on the same day.

          MR. CASTANARES:  This is a good place

    to break.

          MR. OSNATO:  Perfect.  Thank you.

          THE VIDEOGRAPHER:  Going off the

    record.  It's 4:53.  This is the end of

    tape 4.

          (Time noted:  4:53 p.m.)

    _____

          FIACHRA O'DRISCOLL

Subscribed and sworn to before me

this _____ day of _____, 2006.

_____        _____

(Notary Public)                My Commission Expires:

**Page 327**

```
 1
 2                    * * *
 3        ACKNOWLEDGEMENT OF DEPONENT
 4        I, _____, do hereby
 5  acknowledge that I have read and examined the
 6  foregoing testimony, and the same is a true,
 7  correct and complete transcription of the
 8  testimony given by me, and any corrections appear
 9  on the attached Errata sheet signed by me.
10
11
12
13
14  _____    _____
15  (DATE)             (SIGNATURE)
16
17
18
19
20
21
22
23
24
25
```

**Page 329**

```
 1
 2        C E R T I F I C A T E
 3  STATE OF NEW YORK  )
 4                     : ss.
 5  COUNTY OF NEW YORK )
 6
 7        I, DONALD R. DePEW, a Registered
 8  Professional Reporter, Certified Realtime Reporter
 9  and Notary Public within and for the State of
10  New York, do hereby certify:
11        That FIACHRA O'DRISCOLL, the witness
12  whose deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition is a
14  true record of the testimony given by the witness.
15        I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage, and that I am in no way interested in
18  the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set
20  my hand this 12th day of June, 2006.
21        _____
22        DONALD R. DePEW, RPR, CRR
23
24
25
```

**Page 328**

```
 1
 2  WITNESS: _____
    DATE(S): _____
 3  CASE:    _____
    I wish to make the following changes, for the
 4  following reasons:
 5  PAGE LINE ____ ____
              CHANGE FROM:_____
 6            CHANGE TO: _____
 7  REASON:_____
    ____ ____ CHANGE FROM:_____
 8            CHANGE TO: _____
 9  REASON:_____
              CHANGE FROM:_____
10            CHANGE TO: _____
11  REASON:_____
    ____ ____ CHANGE FROM:_____
12            CHANGE TO: _____
13  REASON:_____
              CHANGE FROM:_____
14            CHANGE TO: _____
15  REASON:_____
              CHANGE FROM:_____
16            CHANGE TO: _____
17  REASON:_____
    ____ ____ CHANGE FROM:_____
18            CHANGE TO: _____
19  REASON:_____
              CHANGE FROM:_____
20            CHANGE TO: _____
21  REASON:_____
              CHANGE FROM:_____
22            CHANGE TO: _____
23
    Subscribed and sworn to before me this _____ day
24  of _____, 2006.
25  _____
```

**Page 330**

```
 1
 2              INDEX OF WITNESS
 3  FIACHRA O'DRISCOLL
 4  BY MR. CASTANARES . . . . . . . . . . . . .    4
 5
 6        CSFB EXHIBITS
 7  NO      DESCRIPTION                    ID
 8  50                                     138
          Three-page document,
 9        bearing Bates stamp Nos.
          CSFB-00174305 through
10        CSFB-00174307
11  51                                     142
          Two-page document, bearing
12        Bates stamp Nos.
          CSFB-00174907 and
13        CSFB-00174908
14  52                                     157
          One-page document, bearing
15        Bates stamp No.
          CSFB-00174238
16
    53                                     190
17        One-page Memorandum,
          bearing Bates stamp No.
18        CSFB-00512903
19  54                                     198
          Multipage Memorandum,
20        bearing Bates stamp Nos.
          CSFB-00250116 through
21        CSFB-00250129
22  55                                     203
          One-page e-mail, bearing
23        Bates stamp No.
          CSFB-00173794
24
25
```

| | NO | DESCRIPTION | ID |
|---|---|---|---|
| | | CSFB EXHIBITS | |
| | 56 | | 206 |
| | | Two-page e-mail, bearing Bates stamp Nos. CSFB-00173796 and CSFB-00173797 | |
| | 57 | | 207 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00492624 | |
| | 58 | | 218 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00170548 | |
| | 59 | | 218 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00485278 | |
| | 60 | | 229 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00170905 | |
| | 61 | | 231 |
| | | Two-page document, bearing Bates stamp Nos. CSFB-00173581 and CSFB-00173582 | |
| | 62 | | 248 |
| | | Two-page e-mail, bearing Bates stamp Nos. CSFB-00156363 and CSFB-00156364 | |
| | 63 | | 254 |
| | | Three-page e-mail, bearing Bates stamp Nos. CSFB-00492629 through CSFB-00492631 | |

| | NO | DESCRIPTION | ID |
|---|---|---|---|
| | | CSFB EXHIBITS | |
| | 64 | | 256 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00485340 | |
| | 65 | | 263 |
| | | One-page e-mail, bearing Bates stamp No. CSFB-00512061 | |
| | 66 | | 289 |
| | | Three-page e-mail, bearing Bates stamp Nos. CSFB-00292514 through CSFB-00292516 | |
| | 67 | | 291 |
| | | Five-page document, bearing Bates stamp Nos. CSFB-00482173 through CSFB-00482177 | |
| | 68 | | 293 |
| | | Two-page e-mail, bearing Bates stamp Nos. CSFB-00178954 through CSFB-00178955 | |
| | 69 | | 301 |
| | | Two-page e-mail, bearing Bates stamp Nos. CSFB-00181850 and CSFB-00181851 | |
| | 70 | | 302 |
| | | Six-page document, bearing Bates stamp Nos. CSFB-0018713 through CSFB-0018718 | |

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

**$**

$2 [97:21] [156:5,6]
$3 [97:8,16,23]
$450 [94:7,8] [95:4]
$5 [96:13]
$50 [94:10] [95:5,13] [190:
  22] [191:10] [306:12]
  [308:21,23]
$500 [94:6,9] [95:3,10]
  [96:3]
$600 [145:21]
$75 [120:25] [160:19]
  [163:15] [170:15] [171:13
  [172:20] [185:24] [191:18]
  [194:5] [195:20] [259:18]

**0**

00 [171:14,16]
01 [171:15] [270:17]

**1**

1 [4:3] [72:16,19] [116:16]
  [136:3,6] [137:21,22]
  [150:7] [191:13]
1:28 [171:3,9]
10 [98:11,12] [136:4] [147:
  18] [148:12] [151:20]
  [152:10]
10:28 [72:16]
10:37 [72:19]
100 [64:15] [112:7]
10010 [12:12]
10105 [3:14]
10th [197:9,10]
11 [12:12] [151:21] [257:11
  ,17]
11:24 [116:16]
11:32 [116:19]
12 [323:4]
12:30 [167:23]
12:35 [170:24,25]
12th [329:20]
13 [151:19]
133 [121:3]
1345 [3:13] [4:10]
138 [330:8]
14 [151:19] [226:9]
142 [330:11]
144 [292:10] [303:10,12]
144a [292:10] [303:10,12]
144-a [292:10] [303:10,12]
14th [206:16]
15 [258:16,25] [259:8,15]
156363 [249:7]
157 [330:14]
15th [52:23]
170 [121:3]
170548 [220:12]
170905 [230:13]
173581 [232:22]

173794 [203:17]
173796 [206:23]
174238 [158:16]
174305 [139:3] [141:11]
174307 [140:9]
174907 [143:10]
178954 [293:25]
18 [250:16] [303:14]
181713 [303:14]
181850 [302:20]
182753 [310:11]
19.9 [321:20]
190 [330:]
1901 [3:6]
198 [330:19]
1990 [151:18]
1990s [150:3]
1992 [13:24]
1994 [147:8,11]
1995 [8:18] [151:20]
1996 [5:24] [6:3] [14:7]
  [57:15] [59:19] [65:5]
  [66:6] [75:18] [146:24]
  [148:18] [202:7] [270:14]
  [302:10]
1996a [6:3] [146:24]
1996-a [6:3] [146:24]
1997 [66:17] [74:21] [202:7]
1998 [29:14] [85:15] [105:12]
  [114:5] [172:7] [202:8]
1999 [8:7] [27:22] [81:7,10
  ,12] [100:2,11] [142:8]
  [171:18] [172:7] [184:13]
  [200:21] [202:12]

**2**

2 [116:19] [150:8] [170:24]
  [171:9] [219:17] [232:22]
2:20 [219:16]
2:28 [220:4]
20 [43:7] [316:13] [320:20]
  [321:18,22]
200 [261:4]
2000 [8:7] [74:22] [91:23]
  [115:25] [124:22] [137:7]
  [151:22] [173:5] [184:14,25]
  [189:5] [191:11] [192:2]
  [193:11,15] [197:11,12,15]
  [200:21] [206:16] [223:2]
  [226:9] [250:10]
2001 [8:7] [12:17] [43:6]
  [54:19] [55:16] [72:24]
  [74:22] [81:19] [82:6]
  [99:7,8] [100:6] [124:22]
  [157:23,25] [158:4] [173:6]
  [200:21] [205:8] [219:4]
  [250:10] [255:2,3] [256:8]
  [315:19]
2002 [8:7] [52:23] [73:3]
  [99:5,6,8] [119:21] [124:22]
  [138:10] [148:21] [158:7,11]
  [173:5] [192:16] [254:15,22]
  [271:9] [272:25] [287:15]

2006 [4:6] [326:18] [328:24]
  [329:20]
203 [330:22]
206 [331:4]
207 [331:7]
20th [78:21]
21 [192:2]
218 [331:12]
229 [331:]
22nd [325:2]
231 [331:17]
248 [331:20]
25 [321:17]
250116 [196:22]
2516 [290:12]
254 [331:23]
256 [332:4]
263 [332:]
289 [332:9]
291 [332:12]
292514 [290:12]
293 [332:15]
29th [4:6]

**3**

3 [96:13] [150:10] [220:4]
  [273:13,16] [315:13]
3:31 [273:13]
3:39 [273:16]
30 [215:24,25] [279:4]
301 [332:18]
302 [332:21]
305 [141:12]
307 [139:3]
30day [215:24,25]
30-day [215:24,25]
31 [255:23]
35 [154:21] [264:20] [267:11
  ,12,15,20] [288:5,14]
  [289:2,8,13,17]
364 [234:16,20] [235:2]
  [317:20,25]
364day [234:16,20] [235:2]
  [317:25]
364-day [234:16,20] [235:2]
  [317:25]

**4**

4 [90:24,25] [91:2] [96:13,16]
  [249:7] [257:19] [310:11]
  [315:16] [326:13] [330:4]
4:35 [315:13]
4:42 [315:16]
4:53 [326:12,14]
450 [95:10] [96:4]
482173 [292:20]
485278 [226:7]
485340 [257:22]
49 [139:11]
492624 [208:14]
492629 [255:23]
4th [28:13]

**5**

5 [147:14,17,20,21] [148:5
  ,13,19,24] [149:14,15]
  [151:24] [293:25]
50 [78:20] [139:2,4,8,11]
  [142:14] [147:24] [224:14]
  [309:3] [330:8]
51 [143:9,11] [302:20]
  [330:11]
512061 [263:24]
512903 [191:3]
52 [158:15,17] [330:14]
53 [191:3,4] [330:]
54 [199:10,11] [330:19]
55 [64:4,5,8,15] [204:3,24]
  [330:22]
56 [206:23] [207:2] [208:10]
  [331:4]
57 [208:11,12,15] [212:8]
  [331:7]
58 [219:19] [220:9,23]
  [221:17] [331:]
59 [219:23] [226:6] [229:11
  ,15] [331:12]

**6**

60 [230:12,14] [232:17]
  [291:6] [331:]
61 [232:21,23] [331:17]
62 [249:6,9] [331:20]
63 [255:23,24] [260:15]
  [331:23]
64 [257:22,23] [332:4]
65 [263:23] [264:2] [288:6]
  [291:7] [332:]
66 [290:11,13] [332:9]
67 [292:19,21] [332:12]
68 [293:24] [294:3] [332:15]
69 [302:19,21] [332:18]

**7**

7 [206:24]
70 [303:13,15] [332:21]
71 [310:10,12]
75 [164:8] [224:12]
77 [292:20]

**8**

8 [143:10] [152:10]

**9**

9 [152:10]
9,000 [97:22]
9:22 [4:7]
90 [98:11,13] [240:25]
90067 [3:7]
900676013 [3:7]
90067-6013 [3:7]

A.1

95 [112:19] [147:23]
96 [11:20] [151:20]
96a [11:20]
96-a [11:20]
98 [60:19] [74:22] [81:24]
   [85.8,9] [112:8]
99 [60:19] [74:22] [81:24]
   [85:9] [112:8,17] [115:25]
   [171:16] [172:14,20]
   [184:14] [223:2]

_____

A

_____

a/greenpoint [76:2]
aa [18:18] [136:8] [253:17]
aaa [18:18] [89:18,22]
   [136:8] [253:17]
ability [16:2] [30:21] [46:20]
   [111:16] [113:22] [137:3]
   [282:25] [299:5] [300:23]
able [5:18,19] [16:8] [60:8]
   [91:20] [92:9] [98:4] [111:
   10] [113:8,25] [114:8] .
   [137:8] [147:16] [157:7]
   [162:7] [214:18] [231:8]
   [261:11] [268:16] [279:7]
   [291:21] [302:14]
above [114:2] [218:15]
abruptly [213:11]
abs [13:3.11,20] [36:8]
   [57:18] [58:23] [59:21]
   [68:21] [69:7] [110:7,20]
   [111:4] [123:14,15] [124:9]
   [226:22] [251:2]
absolutely [68:6] [70:12]
   [121:22] [181:10] [190:12]
   [193:24] [230:20] [316:18]
absorb [111:21]
absorbed [89:14]
acceptance [6:5] [66:16]
   [159:19] [160:7] [205:20]
   [209:17] [210:7] [211:13]
   [271:17] [274:2] [278:12]
   [298:4] [302:4]
access [31:5,15] [33:4,10]
   [122:9] [153:14,15,16]
   [231:9] [275:13] [314:12]
accommodation [109:21]
accompli [285:5]
accomplish [243:14] [261:
   5] [298:15]
accomplished [262:6]
   [263:4,13]
accordingly [47:18]
account [111:16] [118:11]
   [257:11] [260:18] [280:12]
accounted [174:25] [285:23]
accounting [117:21] [174:
   24] [175:4,6] [237:17]
accounts [314:10] [315:4]
accumulate [302:13]
accumulating [75:11]
accurate [145:13] [171:19]
   [276:12]

accurately [169:20]
achieve [152:20]
acknowledge [327:5]
acknowledgement [327:3]
acquired [75:6] [76:6]
   [77:18]
acronyms [270:9]
across [47:19] [82:10]
act [106:18]
acted [108:18] [125:17]
   [129:9]
acting [52:23] [65:8] [106:20]
   [108:17] [129:5,21]
action [329:16]
activities [35:8] [135:24]
   [165:20] [201:4] [214:9]
   [227:12]
actual [16:15,25] [98:17]
   [118:17]
actually [12:9,18] [14:5]
   [18:5] [23:22] [28:24]
   [35:23] [49:22] [61:6]
   [63:12,24] [71:17] [77:10]
   [84:19] [109:14] [110:15]
   [111:25] [113:3] [115:12]
   [118:2] [119:24] [126:9,25]
   [129:15] [130:22] [132:17
   ,25] [134:20] [135:2] [138:
   4,11] [151:10] [159:2]
   [160:16] [161:3] [163:12,25]
   [172:22] [174:25] [181:7]
   [183:17] [188:7,25] [189:17]
   [190:7] [191:12,20] [205:24]
   [207:16] [209:14] [216:6]
   [223:18] [226:16] [230:23]
   [234:6,9,13] [238:18,19]
   [239:2] [240:23] [243:2]
   [244:11,14] [249:20]
   [250:12] [251:10] [260:10]
   [262:8,24] [263:2] [266:18]
   [267:12,16] [274:21]
   [276:16] [283:20] [286:21
   ,23] [288:23] [290:11]
   [291:11] [296:7] [297:5]
   [307:14] [308:10] [309:2,22]
   [316:7] [317:6,9] [324:22]
   [325:25]
add [36:2] [159:22]
added [278:22]
addition [68:25] [69:3]
   [253:8] [298:14]
additional [107:20] [129:9]
   [155:5] [225:20]
additions [254:19]
address [12:11] [83:20]
   [209:3] [212:15] [257:8]
   [267:13]
addressed [141:8,17]
   [221:2]
addressees [225:25]
addressing [312:5]
adjusted [174:10] [257:15]
adopted [187:11]
advance [66:23] [80:25]

[306:23] [308:25]
advanced [304:22]
advances [304:19] [305:14
   ,17,24] [306:8,10,24]
   [307:16,17,19] [308:7]
   [309:16,23]
advantage [96:2] [112:16]
   [152:15] [316:10] [318:7,11]
advantages [318:5]
advice [11:10] [26:4,21]
   [27:2,25] [28:19] [41:21,23]
   [140:11,24] [141:19]
   [142:2] [143:4] [154:15]
   [291:16]
advisable [25:24] [262:19]
advised [196:14]
adviser [52:24]
advisers [41:17]
advisory [73:3] [119:18]
   [158:10] [163:3] [165:20]
   [166:15] [169:10] [170:3]
   [227:6] [228:7,15,17]
   [317:4]
affect [90:6,7] [281:18]
   [299:4]
affected [282:6]
affiliate [78:20]
afraid [159:7]
afterward [254:22]
again [33:22] [46:11,18]
   [99:4,13,23] [151:6] [155:
   14] [156:10] [161:10]
   [173:2] [175:18] [178:25]
   [182:3] [183:8] [188:21]
   [190:14] [202:14] [213:13
   ,14] [216:13] [221:7] [223:
   16] [259:23] [267:19]
   [288:20] [295:14] [313:2]
   [314:17] [319:15] [324:22]
   [325:7,15]
against [118:10] [196:9]
agencies [17:25] [18:3,7,10
   ,25] [19:2] [21:7,10] [22:10
   ,16,25] [23:6,14,18,23]
   [67:14] [69:4,18] [88:12]
   [89:8] [100:14] [101:6,25]
   [102:20] [103:3] [104:4]
   [111:15] [151:6] [253:13]
   [268:17] [308:4,5]
agency [101:4]
agent [106:20] [119:25]
aggregate [90:2] [268:13]
aggregated [175:21]
aggressive [165:25]
aggressively [154:24]
ago [7:4] [11:14] [24:16]
   [31:13] [81:3] [99:24]
   [144:8] [145:4] [229:4,8]
   [263:8] [291:3] [303:6]
   [323:12]
agree [107:18] [204:7]
   [288:4]
agreed [104:15] [174:15]
agreement [48:9] [155:25]

[241:2] [288:3] [289:20]
   [295:22]
agreements [74:14] [286:22]
agrees [174:6]
ahead [25:17] [27:7] [182:10]
   [275:15]
ahold [133:18]
akin [74:12]
alberta [233:8]
alberto [233:9] [245:15]
   [247:14] [255:9]
albertos [246:8]
alive [263:17]
allow [156:6]
allowed [31:8] [33:10]
   [48:16]
allows [311:24]
almost [17:25] [32:6] [58:10]
   [71:21] [79:6] [103:11]
   [145:24] [181:10] [183:3]
   [206:14] [224:5] [225:8]
   [277:12] [279:19] [280:14
   ,25] [317:13]
along [59:8] [94:24] [95:17]
   [162:14] [224:5] [230:22]
   [258:14] [321:23]
alpine [233:12,13,14]
   [236:10,17] [238:19,20]
   [239:17,18,20,23] [240:15]
   [241:5,11,16] [243:12,16]
   [245:20] [255:9,13,16,20]
   [322:11,13]
alpines [240:12] [241:19]
   [243:24]
already [33:16] [69:11]
   [279:20] [287:12]
alternative [96:24] [97:3,11]
   [210:4]
alternatively [94:14] [126:
   18] [167:8]
altogether [204:14]
always [20:10] [38:14]
   [42:23] [44:8] [71:21]
   [136:3,15] [175:4] [194:2,3]
   [225:8] [281:2] [311:12]
   [313:5]
am [5:14] [12:18] [57:15]
   [73:14] [100:12] [101:23]
   [142:8] [163:12,20] [190:14]
   [197:20] [204:21] [276:14]
   [295:14] [323:4] [329:15,17]
amenable [204:22]
amendment [299:10]
america [34:24] [142:23]
   [153:13] [159:17] [164:21]
   [165:16] [167:14] [170:9,11]
   [215:6] [218:21] [221:19]
   [222:2,9] [316:21,22]
   [317:14,15,17]
americas [3:13] [4:10]
   [168:25] [233:15]
ameriquest [150:24]
among [17:2] [148:14]
   [228:12] [246:10]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

amortization [309:10]
amount [15:14] [38:2]
  [63:18,22] [89:18,20]
  [90:7,15,18] [110:24]
  [111:2,3] [118:19] [144:14]
  [190:22] [191:17] [213:12]
  [214:8,16] [230:23] [232:12]
  [236:3,5] [239:7,8] [240:2
  ,3] [243:22] [253:9,10,11]
  [261:3] [276:4] [280:18]
  [281:8,10] [284:5] [305:25]
  [306:10] [308:19] [316:4]
amounts [37:9] [60:10]
  [63:8] [304:22]
analysis [15:10] [17:8,10]
  [116:22,25] [118:9] [308:6]
analyst [14:22] [251:2]
analysts [293:13]
andrew [120:15,20,25]
  [121:2,6,10,18,24] [122:7]
  [124:2,7]
angeles [3:7] [4:9]
announcement [155:25]
  [272:3] [275:16]
announcing [271:24]
annual [275:18]
answer [8:13] [9:3] [11:4,7
  ,8,12] [19:20] [24:17,24]
  [25:17,18] [26:24] [27:7,13
  ,16] [29:4,11] [38:9] [41:15
  ,18] [44:14] [47:20,21]
  [50:22] [52:14] [53:2,22]
  [54:11] [55:2] [60:5] [64:10]
  [65:10,18] [69:9] [87:22,23]
  [106:24] [115:3,6] [126:10]
  [146:18] [159:23] [176:8]
  [178:13] [189:9,15,22,24]
  [190:2,11,12,16] [193:3]
  [195:10,11] [203:21]
  [211:11] [212:11] [218:3]
  [224:15] [230:8] [237:7]
  [242:8] [245:11,17] [288:18]
  [295:2] [303:24] [313:19,21]
  [322:3]
answered [19:11,12] [176:
  7]
answering [168:21]
answers [8:20] [67:17]
  [114:25] [167:6] [312:21]
  [314:24]
anybody [14:9] [24:2]
  [25:23] [27:3] [29:22]
  [44:5] [56:3,21] [57:9]
  [81:6] [86:20] [87:14]
  [100:10] [117:15] [123:24]
  [130:11] [138:20] [175:25]
  [178:18] [194:6] [196:11]
  [209:20] [241:13,15]
  [242:6] [247:17] [274:16]
  [294:22] [312:17] [313:24]
  [318:23] [319:5]
anyone [24:8] [210:20]
anything [48:25] [53:13]
  [61:18] [66:10] [70:10]

[87:11] [113:13] [130:25]
  [161:5] [181:3,10,11]
  [191:15] [193:23] [203:8]
  [206:13] [207:24] [214:13]
  [231:18] [262:3] [289:6]
  [301:17] [302:17] [317:23]
  [320:13]
anyway [9:16] [59:24]
  [81:2] [162:20] [200:2]
apart [66:12] [247:12]
apologies [19:19] [115:6]
apparatus [245:3]
appear [183:16] [203:19]
  [221:23] [327:8]
appearance [282:11]
appeared [82:20] [285:23]
appears [140:8] [141:8]
  [221:18] [256:9] [257:10]
applicable [83:8]
application [179:4,6]
  [196:2]
applied [115:16] [167:11]
  [281:8]
apply [111:20]
approach [18:7] [28:10]
  [48:20] [61:18] [168:25]
  [193:5] [215:10]
approached [138:2,4]
  [306:11]
approaches [20:22]
appropriate [71:2] [156:19]
  [239:8]
approval [47:17] [50:3]
  [55:18] [179:25] [180:10]
  [182:12,17] [183:10,11,15
  ,18] [184:10] [192:25]
  [244:23]
approvals [47:15] [221:14]
approve [49:24] [180:12]
  [181:23] [182:22] [190:6]
  [195:6]
approved [188:2,15,25]
  [189:2] [195:13] [225:2]
  [299:16]
approximately [187:11]
  [191:11] [192:2] [309:23]
  [323:9]
approximating [60:12]
april [206:16]
area [36:21] [73:11] [96:14]
  [111:7] [112:9] [134:21]
  [153:9]
areas [111:8]
arent [122:22]
argue [170:10]
argument [96:17]
arise [137:22]
arm [300:21,24]
arose [211:10]
around [29:14] [62:17]
  [64:6] [81:9,16] [85:10]
  [99:3,16] [100:4] [101:17]
  [124:21] [144:15] [146:12]
  [165:22] [214:23] [227:3]

[245:6] [271:10] [321:4]
  [324:21]
arrange [25:2] [135:3]
arranged [215:3]
arrangement [36:17] [37:7]
  [38:3] [80:19] [133:2]
  [173:24] [174:5] [177:6,7]
  [213:24] [214:2] [215:18]
  [216:9]
arrangements [174:22]
arranger [307:22]
array [151:11]
arrived [120:18]
art [17:17] [243:10]
aside [106:7] [108:5] [185:
  19]
ask [5:18] [18:10,11] [24:18]
  [27:18,25] [28:6] [29:4,7]
  [31:10] [41:22] [59:17]
  [67:16] [73:12,17] [92:13]
  [95:8] [105:20] [143:17]
  [158:16] [159:6] [162:15]
  [191:2] [194:6] [199:9]
  [203:3,22,23,24] [206:22]
  [208:9] [222:12] [225:12]
  [242:7] [249:5] [256:17]
  [258:7] [276:24] [284:21,22]
  [285:3] [290:11] [294:7,10]
asked [6:3,7] [46:15] [53:25]
  [54:5,10,13] [55:9,11]
  [56:20,24] [117:18,22]
  [156:17] [183:6,21] [190:9]
  [224:11] [245:12] [299:9]
  [301:8] [306:15] [314:25]
  [319:16] [320:2] [321:16]
asking [10:11] [47:16]
  [126:9] [187:15] [245:21,23]
  [294:16] [303:22]
aspect [134:19,22] [187:13]
  [273:5] [300:17]
aspects [15:5] [260:21]
aspersions [188:19]
assembly [152:22]
assess [30:21]
assessment [84:2] [187:24]
asset [19:22] [32:2] [35:14]
  [39:14] [40:14] [42:16]
  [72:24] [128:3] [163:20]
  [185:13,25] [187:5,10]
  [188:10] [200:18] [202:7]
  [205:8] [206:20] [212:2]
  [214:20] [217:3] [219:4]
  [236:10] [248:9,19,24]
  [266:23] [284:3] [286:14,19
  ,22]
assetbacked [32:2] [35:14]
asset-backed [32:2] [35:14]
assets [58:23] [64:24]
  [186:22] [216:20] [252:20]
  [253:6,10] [272:9]
assign [18:15]
assigned [8:23] [14:2]
assignment [119:19]
assignments [123:9]

[166:12] [169:10,11] [170:
  8,9] [228:7]
assistance [269:12]
assisted [207:14]
assisting [121:18]
associate [3:20] [7:7]
  [14:19] [50:19] [228:23]
  [259:24]
associated [73:6]
associates [113:8] [122:7]
assume [96:13] [160:22]
  [265:17] [266:6] [277:23]
assumes [211:16]
assuming [182:6]
assumption [170:18]
  [211:7] [266:14] [271:6,19
  ,25] [272:7,17] [273:2]
  [277:9] [283:17,20]
assumptions [21:16]
  [211:17] [269:25] [276:15]
astonishingly [148:2]
attached [265:11,18] [266:
  2] [327:9]
attachment [265:21] [266:
  5]
attempt [30:21] [55:7]
  [92:12] [117:5] [133:16]
attempted [268:9]
attempting [53:5,15] [56:13]
attention [28:15]
attorneys [3:4,11] [4:12]
  [125:14,15,18,21]
atypical [154:9]
audibly [230:8]
auditors [118:24]
august [28:17] [73:3] [119:
  19,21] [158:11]
authorities [49:15]
authority [43:3,17] [44:12,18]
  [45:4,18] [46:2,6,13,17]
  [47:4] [48:12] [49:6,11,19]
  [182:8] [190:5] [274:3]
authorization [274:6]
auto [13:13]
availability [284:2]
available [23:15] [151:12]
  [201:13] [231:22] [272:9]
  [275:14]
avenue [3:6,13] [4:10]
  [12:12]
average [22:5,6] [67:12]
  [89:4,9] [93:22] [267:22,24]
  [290:2]
avoid [157:12] [278:4]
  [279:7] [284:12]
avoided [284:11]
aware [5:11] [27:20] [52:21]
  [55:3] [86:20] [100:9]
  [118:23] [119:5] [129:8]
  [142:17] [190:6] [193:19]
  [196:11] [203:7] [206:16]
  [267:21] [269:21,25]
  [272:16,19,20,23] [274:6]
  [288:13] [299:24] [300:2,5]

A.3

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

[301:7] [312:7,10] [322:25]
awareness [269:19] [285:19]
away [278:7] [283:3] [308:
24] [318:4]

___

B

___

b2 [29:15] [30:13] [59:22]
[61:14] [62:10] [64:19]
[90:10,23] [91:5,12,21]
[92:12,16,19,25] [93:8]
[94:16,21,22] [95:21]
[100:21] [101:16] [110:19]
[113:13,17,23] [117:2]
[120:2] [137:14] [145:15]
[146:5] [209:4] [222:17]
[249:20] [252:23,24]
[253:8] [254:2,7,11] [281:
17,19,20,22] [291:4,8]
[303:7]
b2s [62:15,19,22] [63:6]
[91:15] [92:8] [94:17]
[98:3] [117:6] [212:20,21]
[222:23] [223:3,4] [224:19]
[250:13,14] [251:24]
[253:11,14,18] [254:5]
[292:17]
back [41:5] [61:8] [66:6]
[69:10] [72:18] [116:18]
[123:4] [134:24] [150:2]
[168:20] [169:3] [171:8]
[172:6,16] [175:8] [176:24]
[177:12] [187:22] [189:16
,19] [202:7] [203:25] [218:
12] [220:3] [221:4] [224:25]
[252:3,13] [260:10,15]
[271:12] [273:15] [278:8,23]
[289:21] [304:4] [306:22]
[307:9,18] [315:15] [324:24]
backstop [216:7] [233:24]
[240:25]
backstops [234:14]
bad [144:6,25] [145:6]
[153:13]
badly [300:22]
balance [22:3,5] [93:2]
[97:4] [280:16]
bald [255:7,8]
balloon [267:4]
ballpark [96:14] [112:9]
bank [34:24] [74:10] [85:5]
[142:23] [159:17] [164:21]
[165:16] [167:13] [168:25]
[169:4] [170:9,11] [177:14]
[184:25] [215:5] [216:7,19]
[218:20] [220:19] [221:19]
[222:2,9] [233:15] [234:14
,15] [245:9] [262:20] [314:
10] [315:4] [316:21,22]
[317:13,15,17] [320:6]
banker [84:17]
bankers [133:4] [228:6]
banking [162:4,10,12]
[164:20] [165:18,20]

[166:6,15] [167:5] [169:17
,25] [170:3] [227:2,6]
[228:15,17] [317:4] [320:4]
bankrupt [35:3] [77:8]
[172:8,10]
bankruptcy [32:16] [33:6,13]
[34:21] [39:13] [41:2]
[52:12,22] [53:18] [54:8,25]
[91:18] [116:2] [136:19,24]
[137:4,11] [138:2,4] [146:
14] [150:19] [157:13,19,20
,24] [158:5] [173:10,17,18]
[174:20] [184:21] [185:2]
[192:16] [202:25] [229:5]
[266:12] [287:16] [309:9,11
,12,18,24] [321:25] [322:9
,14,23] [323:10] [324:15,16
,23,25] [325:5,8,14,23]
banks [97:5,6,15] [104:13]
[215:2] [216:8,14]
bar [313:7]
barely [97:14]
base [262:11]
based [165:6] [296:9]
[299:23]
basically [92:6] [93:9]
[127:20] [128:6] [133:21]
[157:6] [301:22]
basis [26:10] [40:8] [60:10]
[96:19] [105:15] [108:24]
[110:9,10] [160:5] [170:13]
[179:17] [212:17] [214:4]
[215:17] [217:15] [235:20]
[238:22,25] [307:15]
bates [139:5] [143:12]
[158:18] [191:5] [196:21]
[199:12] [204:14,25]
[207:3] [208:16] [219:20,24]
[230:15] [232:24] [249:10]
[255:25] [257:24] [264:3]
[290:14] [292:22] [294:4]
[302:22] [303:16] [310:13]
[330:9,12,15,,20,23]
[331:5,8,,13,,18,21,24]
[332:5,,10,13,16,19,22]
bb [18:19] [89:20] [253:17]
bbb [18:18] [89:20] [253:17]
bear [126:12]
bearer [238:2]
bearing [139:5] [143:12]
[158:18] [191:5] [199:12]
[204:25] [207:3] [208:16]
[219:20,24] [230:15]
[232:24] [249:10] [255:25]
[257:24] [264:3] [290:14]
[292:22] [294:4] [302:22]
[303:16] [310:13] [330:9,,
,,20,] [331:10,,15,,,] [332:7
,,,,]
became [8:15] [34:23]
[63:9] [76:20] [91:23]
[151:15] [152:11] [154:18]
[159:8] [160:11] [256:7]
[269:25] [276:17]

become [8:2] [85:4] [90:12]
[92:5] [134:2] [145:22]
[269:21] [272:20,23]
[277:18,24] [279:25]
[281:13] [322:25]
becoming [150:20] [306:13]
beforehand [179:15]
beg [173:19] [230:10]
[254:25] [309:2] [312:23]
began [27:21] [119:19]
beginning [27:19] [58:9]
[115:11] [205:11]
beginnings [212:2]
begins [4:2] [140:20]
begun [81:24]
behalf [4:20,22,24] [42:20]
[43:18] [44:18] [55:8]
[79:2] [121:14] [130:12]
[135:17] [241:16] [245:13]
[312:18] [313:24] [318:18]
[320:19]
behave [16:9]
behind [233:24]
belief [81:7,20] [98:25]
[99:14,18] [137:15]
believe [6:4] [9:22] [21:5]
[37:16] [51:15] [53:3]
[57:15] [62:2] [63:10,16]
[64:6,22] [76:18] [99:7]
[100:5] [105:2] [109:8]
[117:12] [120:9] [142:25]
[143:3] [156:11] [157:16,22
,23] [158:4,7] [163:17]
[172:24] [187:12] [199:20
,21] [200:5] [201:6] [204:3]
[210:19] [212:11] [264:17]
[265:5,19,21,23] [270:15,18]
[271:8] [296:10] [301:2]
[302:18] [305:6] [308:14]
[310:4]
believed [100:2,10] [119:7]
[268:3]
believing [100:7]
belonged [123:18]
below [7:8,11,13] [18:19]
[94:4] [135:18]
beneficial [241:4] [300:9]
benefit [112:5] [153:20]
[177:3]
berkshire [59:22] [62:3,7,16
,20] [63:13] [65:2] [91:8]
[155:10,12,23] [156:4]
[254:8] [271:11] [323:22,24]
[324:9] [326:5]
beside [125:20]
best [27:4] [28:2] [70:25]
[105:15] [191:15] [195:12]
[230:5]
beth [226:24,25] [227:21]
[228:13,14]
better [11:12] [92:13] [96:6
,8] [131:25] [151:15] [153:
8] [258:7] [282:9] [297:17]
[312:24]

beyond [15:21,25] [16:14]
[61:15] [137:15] [142:5]
[143:6] [182:12] [303:22]
big [97:22] [106:2] [150:14
,21] [165:17]
bigger [167:14] [169:10]
billion [96:13,16] [97:8,16,21
,23] [145:20] [156:5,6]
[216:5]
bit [26:2] [34:10] [60:13]
[89:7] [95:7] [109:10]
[124:20] [199:16] [231:14]
[234:10,23] [236:20]
[252:7] [266:17] [267:19]
[297:13] [306:17] [307:10]
[325:24]
bitter [116:3]
blank [203:18]
blocks [286:23]
blood [329:16]
bloomberg [275:23]
board [47:19] [58:25]
[59:13,19] [158:4] [228:5]
[229:22] [240:23] [270:14]
bob [56:5] [161:13] [229:21
,23] [274:23] [295:5] [311:
8]
body [68:8] [174:23]
bogey [251:18]
bolt [134:18]
bombardier [35:4,6] [60:18]
[61:24] [78:6] [247:13]
bond [102:23,24] [165:21]
bonds [303:7]
book [71:6,7] [201:23]
[244:18]
books [94:21] [117:20]
[237:14]
borrow [151:23]
borrower [15:19] [58:13]
[133:17,21,24] [134:3,6,23
,24] [153:7] [276:17] [278:
21] [305:22] [306:2,6]
borrowers [15:20] [88:20,21]
[89:5,6] [132:22] [133:14]
[134:25] [147:16] [148:10]
[231:15]
boston [4:6] [7:19,22]
[8:4,16] [51:7] [166:21]
[170:12] [184:5] [244:6]
bottom [18:20] [62:12]
[93:17] [112:3] [143:17]
[144:2] [292:11] [294:10]
bottomed [81:9,15] [99:2,16]
[100:3,8,11]
bottoming [82:2]
bought [308:12]
bowels [155:10]
box [133:2,7]
branch [39:14] [41:2]
[42:22] [43:18,23] [44:6,11]
[51:3,6,11,16,18,19,22]
[52:4] [54:6] [178:5] [180:
8] [183:22,24,25] [220:16,17

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

,19] [233:10] [248:22]
[255:15]
break [65:20] [72:11,13]
[88:2] [91:9] [124:14,16,20]
[167:24] [168:4,13] [170:20]
[180:16] [182:14] [236:19]
[326:9]
brief [33:19] [70:3] [109:25]
briefing [26:12]
briefly [13:10] [72:23]
[73:2]
bring [134:23]
broad [40:22] [61:8]
broader [59:17] [151:11]
[164:22] [166:25]
broadly [269:4] [270:11]
broken [15:8]
broker [51:8,14,17] [103:22]
[184:4]
brokerdealer [51:8,14,17]
[184:4]
broker-dealer [51:8,14,17]
[184:4]
brokerdealers [103:22]
broker-dealers [103:22]
brother [277:3]
brothers [80:20]
brought [73:15] [148:8]
[154:4] [157:19] [158:3]
[164:15] [228:5] [271:14]
bruce [220:14,15]
buffett [154:23] [155:6]
builder [141:22]
builders [78:17] [227:4]
building [152:21] [227:4]
[228:9] [286:23]
built [135:6]
bulk [37:9] [61:3] [133:6]
bunch [201:12] [256:16]
bundled [63:25]
business [34:4] [35:5]
[57:25] [73:7,25] [75:2,4,7
,9] [82:22] [84:22] [95:24]
[129:5,10,20] [165:23]
[167:5] [169:12] [172:9]
[173:11,13,15] [178:24]
[183:19] [184:9] [196:12]
[201:2] [210:9] [214:9]
[247:11,12] [248:8,9,10,11
,12,21] [263:14] [300:7,20]
[302:3] [324:15]
businesses [77:10] [166:14
,15] [173:13] [248:8,13]
bust [144:18]
busy [298:8]
buy [37:7] [107:13,24]
[108:4] [148:12] [150:10]
[176:24] [218:5] [308:10]
buyer [93:6] [106:23] [218:
14]
buyers [92:9] [104:16,21]
[127:23]
buying [16:17,19]
buyout [144:20] [145:17]

———————————
C
———————————

calculated [177:13]
california [3:7]
call [37:2,24] [39:2] [58:2,13
,16] [96:16] [105:22] [136:
4] [152:18] [176:13] [179:10]
[204:9] [223:21] [275:20]
[286:5,7,8,18] [287:3,4]
[309:10]
called [5:3] [8:3] [30:22]
[35:9] [62:9] [88:14] [94:2
,18] [105:14] [122:9,12]
[123:19,20] [147:12]
[185:3] [201:5] [235:25]
[236:2] [238:7] [270:8]
[287:9] [324:6]
calling [58:5] [94:16] [114:
25] [222:11] [286:13]
camera [213:8]
canadian [247:13]
cannot [102:18] [195:11]
[201:14]
cant [32:19] [87:11] [95:22]
[98:10,22,23] [106:10]
[118:2,5] [144:12] [166:10]
[172:23] [195:9] [198:20]
[206:4] [209:14] [216:13]
[265:16] [268:10] [290:5]
cap [97:21] [145:21] [268:21
,24] [269:2] [284:5,7]
capabilities [188:22]
capability [49:23]
capacity [129:6,9,21]
capital [35:4] [78:6] [105:23]
[155:5] [156:8] [157:8]
car [13:14]
care [46:23] [168:9] [174:18]
career [15:4] [20:17] [123:
11] [262:5] [269:25]
carefully [304:3]
carried [120:19] [177:21,23]
carry [39:3] [62:20]
case [11:12] [16:16] [25:12
[39:12] [40:12] [74:9]
[80:3] [82:10,11] [95:9]
[103:16] [114:10] [129:22]
[137:25] [138:5] [153:8]
[181:9] [193:3] [223:18]
[281:15] [284:9] [285:16]
[296:7] [309:24] [317:13]
[320:9] [328:3]
cases [279:20]
cash [16:21] [131:7,21,24]
[132:7] [177:5] [216:16]
[232:9,10] [272:9] [274:5]
[278:25] [279:3] [320:12]
cast [52:6,8] [188:18]
castanares [3:8] [4:15]
[5:8] [10:11,25] [34:7,13]
[40:21] [47:20] [54:11]
[72:12,20] [83:17] [87:25]
[99:11] [116:4,10,14,20]

[138:25] [139:10,13,17]
[143:9,15] [158:15] [168:8
,12,18,24] [170:19] [171:11]
[190:24] [196:25] [197:7,13
,16,19] [198:2,8,11,15,23]
[199:9] [204:2,15,19,23]
[206:22] [207:7,23] [208:9
,12] [218:22,24] [219:12]
[220:7] [226:6,14] [230:12]
[232:21] [245:23] [249:5]
[252:2,15] [255:22] [257:20]
[263:19,23] [266:4] [273:10
,17,19] [286:7,15] [289:18]
[290:10] [292:19] [293:24]
[294:7] [297:11,14] [302:19]
[303:13,20] [310:10]
[315:8,17] [323:4,8] [326:
8] [330:4]
casually [287:22]
catch [122:21]
category [23:2]
cause [65:13] [90:10]
caused [146:15] [277:13]
cdo [31:17,23,24] [32:12,17]
cdos [248:20]
ceilings [318:13]
center [283:3]
centered [29:14]
centers [60:22] [159:25]
[160:2] [282:17,18] [283:9
,14] [297:21] [298:6]
cents [112:17] [253:25]
[291:7]
century [78:21]
ceo [144:16] [229:23]
[310:21]
certain [21:5] [22:14] [48:13]
[49:9] [50:4] [68:8] [108:4]
[156:11] [174:9] [176:9]
[182:25] [183:25] [253:25]
[279:11] [295:25]
certainly [55:21] [82:6]
[86:18] [87:13] [97:24]
[109:17,22] [110:21]
[131:20] [139:21] [142:23]
[145:24] [173:23] [191:23]
[246:6] [250:19] [263:22]
[269:5,24] [274:3] [277:12]
[317:13]
certainty [318:2]
certified [329:8]
certify [329:10,15]
cetera [66:14] [114:6]
[118:14] [165:7] [315:5]
[318:15]
cfo [310:24] [311:4]
chain [127:2] [296:4] [314:
23]
chairman [301:10]
challenge [137:12] [216:3]
[298:19]
challenges [282:22] [306:
9]
champion [36:5,9,12]

[228:11]
chance [196:17]
change [17:3] [52:8] [84:16]
[90:17,23] [116:4] [136:18
,24] [137:3] [150:14,21]
[172:13] [184:20] [192:23]
[288:25] [328:6,,8,,10,,12
,,14,,16,,18,20,,22]
changed [12:19] [20:19]
[52:7] [55:20] [63:23]
[71:20] [310:25] [321:20,21]
changes [17:4] [22:22]
[65:5,13,19,23,25] [67:10
,12,13] [149:25] [311:23,25]
[312:7] [328:]
changing [146:8]
character [77:23]
characteristic [78:4]
characteristics [15:14,22]
[17:9] [22:8,23] [25:10]
[67:6,7] [110:19] [185:19,23]
[187:2] [293:18]
characterization [156:24]
[222:6,8]
characterize [17:5] [26:21]
[39:7] [144:17]
characterized [21:12]
[223:22]
characterizes [37:20]
[169:21]
characterizing [223:16]
characters [52:7,8]
charged [56:13]
cheaper [88:19] [278:5,10]
[283:20] [315:24]
cheaply [283:11]
check [32:13] [76:24]
[133:23]
chewed [272:8]
chicken [324:13]
chinese [31:14,19] [33:3]
[196:3]
choices [96:18] [150:3,6]
chooses [85:5]
choosing [197:20]
chopped [253:15]
chose [49:21]
chris [292:4]
chrystal [200:23] [201:21]
[208:22] [247:24]
chrystals [248:3]
chuck [161:11]
circulars [19:4]
circumstances [22:14]
[84:16] [163:22] [179:12]
[185:17]
city [4:11]
clarification [123:3] [218:24]
clarified [289:15]
clarify [40:18] [67:16]
[95:8] [122:8] [166:17]
[168:14] [179:24]
clarity [169:23] [204:6]
[286:17]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

class [153:15]
classification [281:25]
[283:23]
classified [276:10] [277:18]
[279:8,16]
classifying [284:11]
clayton [35:7,25] [36:9,11]
[78:13,18,23,25] [79:2]
[113:7] [154:12,19,20,22]
[155:6,11] [156:2] [157:2]
[166:10] [278:2]
clayton/vanderbilt [78:12]
claytons [154:17] [155:8]
clean [99:12] [168:16]
clear [11:3] [100:6] [115:3]
[134:2] [141:10] [146:24]
[149:24] [150:18,20]
[158:9] [164:19] [166:7]
[168:20,22] [169:7] [170:6]
[221:10] [276:3] [283:18]
[286:12] [317:16] [324:17]
clearing [70:17] [118:14,16]
clearly [167:11] [205:7]
[206:18]
client [24:20] [73:20,22]
[161:14]
clients [79:9] [245:13]
clock [172:24]
close [154:12] [162:13]
[166:4] [173:13] [228:9]
[271:4]
closed [19:16] [156:2]
closely [42:3]
closer [98:12] [214:7]
closes [213:10,21,22]
cluttering [283:10]
cnc [208:3,7]
co [142:13]
code [174:20]
cognizant [154:14]
collateral [100:18] [249:24]
[250:2] [253:5] [279:11]
[280:5] [291:5] [293:13]
[303:8] [305:9,12] [309:21]
[316:6]
collateralized [31:18]
[62:15] [216:19]
colleagues [6:7] [188:19]
[226:19]
collection [62:10] [132:18
,19]
collegial [183:2]
combination [231:7] [300:
11]
coming [85:14] [128:4]
[149:22] [273:7] [294:24]
commence [173:4]
commencement [27:24]
commentary [40:20]
commented [265:8]
commenting [207:19]
comments [188:21] [211:4]
commercial [133:4] [169:4]
[215:4,7,9,22,23,25]

[216:11,12,15,18] [217:8]
[218:4] [233:14,15,17,22,23]
[234:4,11,15] [236:12,15,16]
[239:18,24,25] [241:3]
[243:11,17,18] [286:24]
[320:4]
commission [326:20]
commit [48:12]
commitment [104:19,24]
[105:5,11] [106:10,15,21]
[107:11] [186:20] [234:25]
[235:2] [323:22,23,24]
commitments [234:12,14,16]
[324:21]
committed [186:16] [317:22]
committee [49:25] [182:11
,24]
committing [170:12]
common [49:22] [66:16]
[111:6] [174:16] [213:24]
[215:10] [225:4]
commonly [17:12] [68:4]
communicate [102:19]
[103:2] [194:24] [225:14]
communicated [193:25]
[194:3] [225:16]
communicating [100:15]
[140:24] [142:3] [291:16]
communication [46:10]
[133:20] [143:4] [185:6]
communications [41:19]
[142:13,18]
community [93:24]
companies [10:10,21]
[25:21] [33:14,24] [34:3]
[35:3,6,21,23] [37:22]
[44:19] [49:9] [64:20]
[73:11] [77:5] [79:14,18,21]
[102:17] [112:24] [130:9,12
,14] [149:18] [166:11]
[227:8] [230:25] [231:12]
[240:24] [270:6,7] [278:4]
[300:12]
company [5:23] [9:7,15]
[10:12] [11:11] [21:22]
[23:7,9,19] [24:7,20,25]
[25:14,19] [26:10] [27:2,5
,25] [28:9] [29:6] [35:9]
[36:23] [37:4,8] [40:7,12]
[48:6] [56:23,25] [70:3]
[73:8] [77:19] [78:14,15]
[83:4] [84:18] [85:5] [93:18]
[96:2] [97:13] [109:7]
[110:10] [122:12] [131:22]
[138:2,3] [142:14,19]
[143:5] [144:20,22,25]
[145:19,20] [146:8] [149:7]
[154:19] [155:2] [156:6,8]
[169:12] [177:21] [179:15
,16,23] [181:22] [213:4,10]
[214:17] [215:14] [216:4,10
,13,25] [217:2,15] [229:18]
[231:4] [233:19] [244:10]
[247:14] [273:22] [294:23]

[295:7] [298:9,24] [299:3]
[300:8] [312:14] [316:6]
[323:25]
companybycompany
[110:10]
company-by-company
[110:10]
companys [28:2] [30:16,21]
[40:7] [118:24] [133:3]
[140:12,17,25] [143:5]
[150:19] [213:18,19]
[272:9] [275:16] [299:4]
comparable [170:13]
compared [254:2]
comparison [118:16]
[154:13] [187:21]
comparisons [82:25]
compensated [41:3] [74:23]
[79:8] [177:8]
compensation [40:13]
[79:20,25] [80:7] [108:12,17]
[135:5,10] [258:20]
competing [112:13]
competitive [151:16]
[152:12]
competitor [159:18,23]
[160:7,8]
compile [21:24]
complete [193:16,17]
[327:7]
completed [50:21]
compliance [256:20]
complied [166:3]
comply [118:6]
component [92:21] [93:17]
[194:21]
components [87:22]
compound [88:2]
compulsory [175:3]
computational [17:13,16]
[66:4,15]
computer [297:15]
concept [210:13] [234:23]
concern [267:14] [292:3]
[313:5]
concerned [145:16] [211:19]
[227:23] [247:7] [302:7,11]
conclusion [81:15]
conclusions [118:20]
condition [275:17] [324:5,10]
conditions [28:22] [311:16]
[322:22] [323:2,10,17]
conduct [18:9]
conducted [61:10]
conduit [215:5,8,9] [221:20]
[233:14,16,18] [234:12,18]
[235:4,5,10] [261:16]
[286:24]
confidence [229:22]
confident [268:13,16]
confidential [11:10,15]
[34:4,18] [73:13] [230:2]
confine [110:3]
confirm [263:17]

conflicts [211:5,8,15,17,18
,22]
confused [95:7] [159:14]
[167:6,18] [183:22] [319:14]
confuses [206:9]
confusing [252:10] [286:22]
[287:2]
congratulations [251:13]
connected [242:20] [247:10]
connection [65:8] [288:2]
conseco [34:24] [73:20]
[74:8] [75:2,9,15,21,22]
[76:4] [77:15] [80:18,21]
[109:10] [113:7] [147:11]
[159:9] [166:9] [208:8]
[278:2] [306:17]
consecos [208:7] [270:8]
consequence [85:3] [89:8]
[146:4] [152:10]
consequences [274:5]
[275:10] [278:11,13,17,18]
consider [61:5] [92:16]
consideration [192:15]
considering [132:3]
consist [26:11] [204:20]
[264:25]
consisted [253:6]
consistent [267:17] [214:8]
[221:25] [261:22] [264:16]
[266:9] [268:2]
consistently [266:11]
consisting [12:21]
consists [203:25]
consolidated [237:10,13,14]
[312:15]
constraint [306:13]
constraints [288:25]
constrict [288:15]
construct [287:24]
constructed [95:2] [268:12]
consult [25:19,22] [183:4]
consultation [183:2]
consumer [313:6]
consumption [19:5]
contact [5:23] [13:4] [44:6]
[45:25] [46:3] [51:2,4]
[57:14] [67:21] [69:3]
[73:7] [133:16] [202:11]
[220:21] [318:22,24]
contacted [75:18]
contacts [69:4]
contemplate [268:19]
contemplated [175:17]
[208:25] [218:16] [234:3,7]
[250:5,9]
contemplating [300:16]
contemporaneous [187:20]
content [67:3] [225:10,11,15
,17]
contents [197:22]
contested [154:24]
context [60:15] [71:17]
[143:21] [145:5] [199:16]
contingent [169:9]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

continual [149:11,12]
continually [212:14]
continue [92:11] [93:9]
  [150:8] [167:21] [225:17]
  [298:22,23]
continued [114:10] [115:25]
  [133:24] [169:7] [219:9]
continuing [83:21,24]
  [87:19] [134:4]
contract [73:3] [137:9]
  [158:8,9,11]
contracts [57:21] [58:8]
  [137:5]
contractually [136:25]
contrary [121:19,20] [206:
  13] [273:23]
contrast [187:8]
control [259:20] [260:2]
  [262:2,15] [264:8] [265:6]
controlled [154:20]
conventional [61:5] [215:21]
conversation [87:3,14]
  [109:18] [165:5] [285:17]
  [295:7,16] [296:19]
conversations [41:19]
convert [321:2]
convey [275:3]
convinced [84:17] [325:6]
copies [201:12]
copy [139:9,15,16] [189:3,4]
  [266:2]
core [175:10]
corporate [101:11,15]
  [165:21] [310:25]
corporation [8:17] [51:7]
  [63:9] [97:21,23] [184:5]
  [236:11] [240:15] [312:10]
corporations [101:11]
  [128:25] [129:2] [300:9]
correct [9:13] [10:3,4]
  [20:6,11] [21:7] [26:8,20]
  [32:17,18] [33:11] [38:4]
  [40:16] [41:4] [53:3,7,9]
  [57:15,16] [62:24] [64:12,16
  ,17,21,22] [65:3] [76:8]
  [79:11] [93:10] [95:10]
  [98:24] [99:3,17] [101:23]
  [105:2] [106:16] [118:22]
  [119:22] [120:8,9] [123:16]
  [130:8] [134:20] [136:14,15
  ,16] [140:18] [142:8] [156:
  22] [157:6] [159:9] [160:19]
  [163:20] [171:17] [172:24]
  [180:4] [193:12] [195:21]
  [196:15] [205:9] [211:7,18]
  [212:13] [218:7,10] [222:6
  ,8] [225:20] [227:20] [228:
  2,3] [237:2,19] [242:22]
  [253:23] [254:23] [259:3]
  [263:13] [265:23] [269:16]
  [277:19] [278:12] [279:8,9
  ,13,14,17] [284:16] [290:8]
  [291:10] [305:4] [307:4]
  [321:22] [322:5] [324:7,8,10]

[326:5] [327:7]
corrections [327:8]
correctly [37:18] [39:25]
  [52:5] [64:9]
correspondence [225:2]
  [309:4]
cost [278:14] [280:17]
costs [90:2] [280:13]
couldnt [104:16,20,21]
  [106:22] [133:18] [134:18]
  [156:17] [236:17] [237:7]
  [241:3] [243:17] [292:6]
counderwriters [142:13]
co-underwriters [142:13]
counsel [33:9] [41:17]
  [104:5,6] [190:18] [197:17]
  [204:4] [263:21]
counsels [154:15]
counter [167:12] [170:10]
counterparties [181:16]
counterparty [49:2] [181:14
  ,22] [225:9] [244:13] [245:
  4] [247:13]
counterpoints [267:7]
countrywide [150:25]
county [329:5]
couple [67:17] [145:20]
  [164:18] [180:17] [182:14]
  [217:4] [286:13]
coupon [15:14] [22:5,22]
  [63:7] [64:11] [66:12]
  [72:2] [93:21,23] [111:17,18]
  [118:17] [281:4,5]
course [15:24] [18:6] [23:4]
  [42:8,17] [58:15] [69:24]
  [84:21,24] [88:18] [100:23]
  [114:15] [124:9] [145:17]
  [170:4] [176:8] [194:4]
  [195:18,23] [213:17]
  [216:3] [224:10] [260:25]
  [272:25] [297:20] [308:8]
court [5:13] [10:16] [34:8]
covenant [259:16]
covenants [320:7]
cover [30:15]
covered [51:5,6]
covering [162:11]
cp [215:25] [216:15] [221:19]
  [234:18] [236:17,18]
  [261:16]
crack [50:10]
create [92:24] [95:21]
  [125:4,7,10,20] [126:4]
  [274:19]
created [54:7] [124:12]
  [282:12]
creative [321:7]
credit [4:5] [6:16] [7:18,21]
  [8:3,16] [10:4,18] [12:10]
  [15:17,20] [34:3] [41:20,23]
  [44:19] [47:17] [48:2,5,11
  ,23,25] [49:2,10,13,17,25]
  [51:7] [56:21] [57:5,7]
  [74:9,11] [80:2,4,5,25]

[81:3] [86:16,21] [88:13]
  [89:4,15] [90:7] [97:7,16,25]
  [103:15] [115:10,15]
  [137:16] [141:14,21]
  [147:2,5,7,9] [148:17]
  [149:10,11,13,16,17]
  [150:4] [151:4,12,13,23]
  [153:11] [156:22,23]
  [157:2] [164:23,25] [166:5
  ,12,20] [167:12,15] [169:4
  ,8] [170:11,12] [178:15]
  [179:18] [182:4,8,13,22]
  [183:4,10] [184:5] [185:12]
  [188:14,15,16] [190:6]
  [196:2] [200:19,23] [201:3
  ,4,5,22,24] [203:16] [214:12
  ,15,24] [218:23] [220:16]
  [221:14] [222:21] [224:4,23]
  [225:3,9] [227:14,15]
  [229:18] [233:10] [240:20
  ,24] [241:4] [244:6,13,23]
  [245:2,7,10] [246:12]
  [247:7] [248:11,13,16,19,20]
  [255:14] [259:18] [260:7]
  [262:19] [288:21] [292:13]
  [304:17] [317:3,10] [320:6]
credits [88:17] [147:6]
  [260:6]
creditworthiness [23:19]
  [78:3] [97:17,18] [100:16]
  [102:2,16]
crisis [105:13,16,17,18,22
  ,24] [114:5,6]
criteria [260:6] [261:18]
crm [44:10,21] [48:20]
  [49:7] [51:4,5,23] [56:3,8]
  [160:18] [163:14] [178:3,5
  ,19,23] [179:8,10] [180:4,11]
  [181:8] [182:16,24] [188:2
  ,6] [194:6,11,13,16,19,24]
  [195:5,13,19] [220:18]
  [222:16] [223:6] [224:22]
  [225:9] [242:15] [243:2]
  [246:11,21] [266:20,22]
  [322:21]
crms [180:9]
crowded [282:24]
crowding [297:22] [298:25]
crr [329:22]
csfb [11:2,16] [12:2,5,8,14]
  [13:18,21,23] [14:9] [20:7
  ,10] [24:2] [25:23] [27:3]
  [29:22] [39:13,16] [41:3]
  [43:2,6,16] [51:2] [52:23]
  [53:4,18] [54:6] [55:7]
  [57:4] [59:3] [61:22] [65:8]
  [69:6,24] [70:10] [73:7,8,21]
  [74:23] [76:16] [79:7,13,16]
  [81:7] [86:14] [91:11]
  [98:4] [100:10] [106:11,12]
  [107:2,13,15,17,24] [108:
  6,12] [109:20] [116:21]
  [117:5,8] [119:9] [120:14]
  [121:8,14,16,23] [124:10]

[125:7] [130:6] [131:7]
  [132:6] [138:23] [139:2,4,5
  ,6] [142:9] [143:10,11,12,13]
  [158:17,18] [161:15,24]
  [167:20] [169:15] [176:23]
  [177:8,20] [187:3,9,17]
  [191:3,4,5] [193:19] [199:
  11,12,13] [201:10] [203:17]
  [204:24,25] [206:23]
  [207:2,3,4] [208:15,16]
  [210:24] [214:21] [219:4,19
  ,20,23,24] [220:12] [221:21]
  [225:20] [226:7] [228:25]
  [230:13,14,15] [232:22,23
  ,24,25] [237:9] [240:18]
  [242:6] [245:19] [247:8]
  [249:7,9,10,11] [255:12,24
  ,25] [256:2,14] [257:8,22,23
  ,24] [258:17,19,21] [263:8
  ,10,18,24] [264:2,3] [265:20]
  [290:12,13,14,15] [292:21
  ,22,23] [294:3,4,5] [302:20
  ,21,22,23] [303:14,15,16,17]
  [308:15] [310:11,12,13,14]
  [318:19] [319:11,17]
  [320:19,24] [321:7,24]
  [322:16] [330:6,,10,,13,,18
  ,,21,] [331:2,,6,,11,,16,,19
  ,,22,,25] [332:2,,8,,11,,14
  ,,17,,20,,23]
csfb-00156363 [249:10]
  [331:]
csfb-00156363 [249:10]
  [331:]
csfb-00156364 [249:11]
  [331:22]
csfb-00156364 [249:11]
  [331:22]
csfb-00170548 [219:20]
  [331:11]
csfb-00170548 [219:20]
  [331:11]
csfb-00170905 [230:15]
  [331:16]
csfb-00170905 [230:15]
  [331:16]
csfb00173581 [232:24]
  [331:]
csfb-00173581 [232:24]
  [331:]
csfb00173582 [232:25]
  [331:19]
csfb-00173582 [232:25]
  [331:19]
csfb00173794 [204:25]
  [330:]
csfb-00173794 [204:25]
  [330:]
csfb00173796 [207:3]
  [331:]
csfb-00173796 [207:3]
  [331:]
csfb00173797 [207:4]
  [331:6]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

csfb-00173797 [207:4] [331:6]
csfb-00174238 [158:18] [330:]
csfb-00174238 [158:18] [330:]
csfb-00174305 [139:5] [330:]
csfb-00174305 [139:5] [330:]
csfb-00174307 [139:6] [330:10]
csfb-00174307 [139:6] [330:10]
csfb-00174907 [143:12] [330:]
csfb-00174907 [143:12] [330:]
csfb-00174908 [143:13] [330:13]
csfb-00174908 [143:13] [330:13]
csfb00178954 [294:4] [332:]
csfb-00178954 [294:4] [332:]
csfb00178955 [294:5] [332:17]
csfb-00178955 [294:5] [332:17]
csfb00181850 [302:22] [332:]
csfb-00181850 [302:22] [332:]
csfb00181851 [302:23] [332:20]
csfb-00181851 [302:23] [332:20]
csfb00182753 [310:13]
csfb-00182753 [310:13]
csfb00182754 [310:14]
csfb-00182754 [310:14]
csfb0018713 [303:16] [332:]
csfb-0018713 [303:16] [332:]
csfb0018718 [303:17] [332:23]
csfb-0018718 [303:17] [332:23]
csfb00250116 [199:12] [330:]
csfb-00250116 [199:12] [330:]
csfb00250129 [199:13] [330:21]
csfb-00250129 [199:13] [330:21]
csfb00292514 [290:14] [332:]
csfb-00292514 [290:14] [332:]
csfb00292516 [290:15] [332:11]

csfb-00292516 [290:15] [332:11]
csfb00482173 [292:22] [332:]
csfb-00482173 [292:22] [332:]
csfb00482177 [292:23] [332:14]
csfb-00482177 [292:23] [332:14]
csfb00485278 [219:24] [331:]
csfb-00485278 [219:24] [331:]
csfb00485340 [257:24] [332:]
csfb-00485340 [257:24] [332:]
csfb00492624 [208:16] [331:]
csfb-00492624 [208:16] [331:]
csfb00492629 [255:25] [331:]
csfb-00492629 [255:25] [331:]
csfb00492631 [256:2] [331:25]
csfb-00492631 [256:2] [331:25]
csfb00512061 [264:3] [332:8]
csfb-00512061 [264:3] [332:8]
csfb00512903 [191:5] [330:18]
csfb-00512903 [191:5] [330:18]
csfbi [243:17,21] [244:2,5] [245:2,5,6,9,14,20] [256:15 ,22] [257:2,6,7]
csfbs [10:6,11] [65:14] [72:22] [75:13] [108:17] [131:23] [185:23] [307:20]
current [12:11]
currently [12:13]
curtin [256:25]
c-u-r-t-i-n [256:25]
cushion [111:24]
customer [89:2] [224:9] [283:3]
customers [169:2,7] [224: 5] [317:11]
cut [34:9] [49:3]
cutting [284:20]

D

daisy [127:2]
dallas [299:23]
damned [81:4]
dane [14:15,18,22]
darn [145:3]
data [293:8,11]

database [122:12]
date [4:6] [15:16] [91:22] [94:24] [119:20] [139:7] [143:14] [158:19] [174:7] [176:25] [184:12] [185:2] [191:6] [196:20,23] [199:14] [200:19] [205:2] [207:5] [208:17] [219:22] [220:2] [227:19] [230:16] [233:2] [249:12] [250:11] [256:3] [257:25] [264:4] [266:12] [269:24] [271:5] [290:16] [292:24] [294:6] [299:18] [302:24] [303:18] [305:23] [309:9,11,18,24] [310:15] [322:23] [323:3,14] [325:3 ,4,5,9,12,16,17,19] [327:15] [328:]
dated [317:18]
dates [109:16] [271:13]
david [3:22] [4:8] [50:6,8] [56:6] [140:14,16] [232:18]
davidson [120:15,20,25] [121:2,10,18,24] [124:2,7] [256:21]
davidsons [121:6] [122:7]
day [22:3] [28:18] [155:9] [184:10] [213:9] [216:12] [238:21,25] [271:23] [326:7,18] [328:] [329:20]
days [37:25] [95:24] [169:3] [176:3] [194:22] [239:6,11] [285:20] [317:20] [323:16]
daytoday [238:25]
day-to-day [238:25]
dead [263:6]
deal [24:4] [68:12] [101:14] [108:25] [109:2] [111:13] [135:19] [149:10] [164:24] [166:11] [182:18] [187:23] [205:14] [226:2] [244:12] [253:5,6] [254:7] [291:5] [295:5] [312:17] [318:2,3] [324:5,10]
dealers [78:25]
dealership [278:8]
dealerships [83:3]
dealing [132:16]
deals [32:17,20] [100:13] [109:9] [122:15] [138:10,13]
dealt [19:17] [68:9] [69:17,21] [101:10] [201:3] [243:3] [267:16]
debt [31:18] [80:22] [216:5]
decade [20:20] [24:16] [27:10] [36:20] [57:25] [148:9] [174:3] [175:13]
decades [174:18]
decide [180:12]
decided [173:11]
deciding [55:15]
decision [45:5] [49:6,12,15] [180:8,14] [182:22] [183:5] [192:6] [272:12] [274:19]

decisionmaking [49:6,15]
decision-making [49:6,15]
declined [188:16] [246:11] [265:15]
declining [106:18]
decrease [85:18] [186:25] [187:4,6] [236:7]
decreases [236:6]
default [88:23] [248:20] [270:8] [276:8,10] [277:18] [285:24] [289:11] [306:5] [307:8]
defaulted [277:11]
defaults [84:6] [88:4] [282: 10]
defendants [3:11] [4:20,22 ,24]
defer [16:4]
definitely [176:18] [178:10] [319:6]
definition [248:15]
degree [66:2] [84:5] [89:12 ,13] [174:10,21] [182:25] [289:6]
delayed [48:24] [305:25]
delays [114:7]
deliberately [238:24]
delinquencies [84:6,20] [134:4]
delinquency [22:21]
delinquent [85:4] [133:25] [134:6] [276:17] [277:13,15] [278:20] [279:2]
deliver [37:23,25] [66:7] [179:20]
delivered [239:14,16]
demanding [72:6] [167:14]
demise [146:16]
dent [14:14] [123:5]
deny [260:7]
departed [144:21]
department [44:10] [49:7] [51:4] [160:18] [162:22,24] [220:18] [256:20] [293:4]
departures [173:8]
depend [185:17]
dependent [114:8]
depending [17:3] [48:18] [81:25] [108:13] [163:22] [179:12] [181:20] [183:16] [213:20] [244:18]
depew [329:7,22]
deponent [327:3]
deposition [4:3] [58:16] [329:12,13]
derivatives [200:23] [201: 3] [244:11] [248:12]
derive [96:3] [177:3]
describe [9:5] [13:10] [45:22] [68:7] [74:4] [114: 22] [129:12] [132:14] [135:14] [162:6,8] [215:16] [222:10] [238:18] [243:11]
described [13:6] [55:16]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

[62:2] [69:3,5] [70:2] [74:15]
[79:5] [86:3] [104:8] [123:
4] [129:6] [156:16] [157:19]
[176:22] [215:19] [233:15]
[241:2] [243:12,21] [249:3]
[264:13] [291:2] [293:13]
[296:3] [301:15]
describing [11:18]
description [34:2] [38:5]
[109:25] [145:10] [330:7]
[331:3] [332:3]
designated [103:20,22]
designed [73:17]
detail [48:6] [187:23]
detailed [303:21]
details [81:2,5] [156:20]
[209:4] [221:24] [321:3]
determine [101:16] [320:8]
deutsche [184:25]
develop [227:6]
developed [308:2]
developing [227:5]
diagnosis [150:17,18]
dialogue [26:9] [68:23]
[221:8,12] [224:2,7,20]
[225:8,17] [226:17] [247:2]
[266:24]
dick [50:16] [264:8] [266:17
,19]
didnt [42:11] [53:14] [62:25]
[80:19] [89:2,24] [92:19,24]
[93:8] [98:6] [99:6] [103:2]
[105:10] [106:14] [107:24]
[113:4,20,22] [134:12]
[135:22] [136:24] [137:3]
[147:19] [153:16] [169:6]
[187:20] [190:5,7,10]
[196:7] [225:19] [242:18,21]
[258:24] [264:10] [275:11
,13,15] [284:25] [285:3,16]
[288:19] [289:9] [299:13]
[300:20,23] [307:7] [319:23]
[320:4] [321:25]
differ [86:5] [216:24]
difference [36:14] [63:11]
[93:21] [94:20] [108:11]
[111:17] [112:19] [177:10
,16] [185:11] [187:13,15]
[281:4]
differences [64:8]
different [7:24] [20:15,22]
[36:18] [60:7,16] [63:24]
[74:21] [79:22] [102:12]
[132:21] [137:6] [142:25]
[165:19] [180:17] [182:15]
[185:18,22] [186:10,22,23]
[198:9] [201:22] [202:20]
[214:21] [217:4] [224:4,5]
[234:10] [248:7] [250:23]
[253:15] [270:9] [280:24]
[318:21] [321:6]
differently [106:8] [193:5]
[234:23]
differs [217:4]

difficult [28:14] [90:21]
[95:14] [152:11] [231:14]
[298:7]
difficulty [91:22,24] [114:4]
[152:23]
digging [231:17]
digressing [46:15]
dip [323:21] [326:4]
direct [44:6] [74:9] [88:25]
[146:4] [164:23] [200:22]
[318:23]
directed [10:9] [180:22]
directly [15:6] [66:22]
[106:6] [178:15] [180:4]
[185:6] [221:12] [280:7]
director [7:9,12] [241:10]
directors [128:22] [240:24]
[241:20] [314:4,7,9]
disadvantage [97:10,12]
disadvantageous [275:10]
disagreed [267:2,5]
disapproval [180:2]
disapproved [195:14]
disclose [41:18]
disclosures [275:18]
[285:20]
discount [61:11] [96:23]
discovery [10:17]
discretion [130:24]
discuss [28:20] [86:8]
[87:8] [179:22] [266:22]
[274:24] [294:22] [295:8,12]
discussed [48:3] [72:23]
[97:2] [161:16] [171:14]
[172:21] [188:1,1,12]
[209:19] [210:20] [212:6]
[215:2] [217:19] [229:11,17]
[270:19,22] [271:4] [285:7]
[301:14] [303:10]
discussing [296:12]
discussion [29:12,20,25]
[61:24] [100:24] [101:25]
[119:6] [182:7] [212:2]
[266:7] [322:16,19]
discussions [87:4,9] [102:
3,4] [158:23] [160:12]
[192:18,19,20,23] [205:11]
[206:18] [224:11] [301:7]
dislocation [106:4]
dismay [273:24]
disparage [262:5]
dispense [67:3]
disprove [190:6]
dispute [10:16]
dissimilar [164:2,3,4,5]
distant [30:17]
distinct [19:7] [20:16]
distinction [95:11] [106:17]
distinguish [49:8]
distinguished [19:21]
[54:20] [100:17] [157:4]
[159:4] [173:18] [206:2]
[255:12] [282:11]
distress [154:7]

distressed [155:2]
distribute [127:9] [261:11]
distributed [17:2] [268:17]
divides [16:20]
divulge [11:9]
divulging [34:4]
dlj [227:16] [228:4,5]
document [31:3,10,13]
[66:12] [107:5] [139:4,19,21]
[140:6] [141:2] [143:11,24]
[144:3] [158:17,20] [191:8]
[193:14] [197:24] [199:5,7
,19,24] [203:15,20] [204:5
,8,9] [205:3] [206:10]
[207:9] [208:18,24] [220:13]
[226:8,11] [230:17] [232:17
,23] [233:3] [239:5] [246:5]
[249:13] [256:4,11] [264:5]
[265:18,19,25] [290:17,20]
[291:17] [292:21,25]
[294:12] [303:2,15,19]
[304:5] [310:17] [330:]
[331:] [332:]
documentary [179:6]
documentation [149:19]
[226:3]
documents [41:6] [62:8]
[66:24] [104:7] [121:11]
[129:18] [164:10] [186:6,9]
[197:5] [198:7] [239:13]
[308:9]
doesnt [207:16] [212:4]
[213:7]
doing [9:8] [26:14,22]
[28:11,25] [31:21] [35:14]
[36:8] [37:4] [81:13] [92:23]
[106:18] [119:16] [121:25]
[125:18] [132:20] [137:24]
[152:22] [159:5] [181:11]
[195:16] [234:10] [241:17
,21] [280:17] [283:25]
[297:16] [298:17] [323:4]
dollar [64:5] [90:15] [112:17]
[191:17] [215:13] [236:15]
[254:2] [291:7]
dollars [145:20] [216:5]
donald [329:7,22]
done [10:9,17] [13:17]
[28:8] [40:2] [42:9] [49:24]
[61:10] [78:24] [79:4]
[86:6] [110:2,8,9] [125:24]
[131:3,4] [138:21] [144:6,25]
[147:20] [149:10,14]
[150:13] [153:22] [172:15]
[179:3,11] [182:17] [184:4]
[185:14] [195:8,24] [213:16]
[234:22] [273:22] [282:23]
[285:16] [286:3] [292:15]
[303:10] [306:16] [321:5]
[325:19]
donovan [185:3,5]
donovans [200:21] [201:20
,21] [248:8]
dont [6:20,25] [7:3] [11:14]

[12:9] [14:5] [20:24] [23:16]
[24:3,16] [25:18] [29:23]
[30:18] [31:12] [32:24]
[33:2] [36:13] [39:25]
[43:21] [44:4,9,23] [45:6,16]
[46:11,23] [53:9,12] [54:15]
[55:21] [56:2] [59:10]
[60:17] [64:6] [76:18]
[79:15,19,23] [81:2] [82:5
,9] [84:15] [85:9,23] [86:7]
[87:2] [98:16] [99:10]
[101:24] [102:3,6] [103:25]
[105:8] [108:15] [109:15]
[117:7,16] [121:15] [122:5]
[124:8] [126:13] [128:25]
[130:13] [131:5,6] [132:8]
[138:21,24] [139:21]
[141:23] [142:16,22]
[143:7] [148:20] [158:14]
[159:2,7] [160:21,24,25]
[161:2,3,18] [162:7] [163:
7] [165:4] [166:2] [167:25]
[168:9] [172:2,18] [176:20]
[178:25] [185:8] [186:6,7,19]
[188:18,21] [190:23]
[191:14,17,22] [194:8]
[195:7,22] [196:16] [197:2
,21,22] [200:2] [203:2,14]
[204:4] [205:6,24] [207:12
,22] [209:4,21] [210:16,19
,22] [211:6,20] [212:9]
[219:2] [221:3,24] [223:13
,15] [224:13] [226:4,16]
[230:4] [231:14] [232:20]
[239:4] [241:6,7,8,9,17]
[242:5,11,18] [247:5,20]
[248:4] [250:11,17] [251:22]
[252:24] [253:21] [255:5,18
,21] [256:13] [257:4,15,16]
[258:4,6] [259:14,25]
[262:4,5,7,17,23] [263:2,9]
[265:12,20,24] [266:4]
[267:9,11] [272:10,22]
[275:6] [276:12] [284:4,17]
[285:2,8] [287:10,11]
[288:8] [289:23,24] [290:23]
[293:9,23] [294:9,21]
[296:8,14,15] [299:18]
[300:13] [301:17] [304:2]
[308:17,25] [309:6] [312:4
,9] [313:8] [314:5,11]
[315:10] [316:3,7] [317:18]
[318:25] [319:9,22] [320:17
,21,25] [321:2,10] [322:20]
[323:3,13,14] [325:16,24]
door [94:10]
doubt [153:19] [242:11]
[277:25] [281:14]
doug [24:6] [29:21] [86:24]
[141:4,5] [164:19] [170:6]
[202:8,14] [271:17,23]
[272:5] [319:4]
dougs [167:10]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

down [15:18] [18:19] [27:8]
  [65:21] [124:14,16,20]
  [147:14,17,20,21] [148:5,12
  ,13,19,22,24] [149:6,14,15
  ,21] [150:7] [173:13,14]
  [180:16] [182:14] [188:2,6
  ,8] [189:6] [190:4] [192:3]
  [193:20] [196:15] [202:17]
  [214:5] [232:14] [236:19]
  [246:21] [253:17] [267:7]
  [269:12] [288:7] [301:9]
  [309:13,21] [321:18,24]
downstream [146:7]
downturn [27:20,25] [81:24]
downwards [144:21]
dozen [76:25] [77:2]
dpap [269:10]
dramatic [273:21] [274:19]
  [285:22]
dramatically [213:11]
  [271:18,20] [272:6,18]
draw [188:21]
drawing [148:25]
drawn [61:16] [236:3]
draws [284:2]
drew [170:18]
driver [282:14]
dtoe [270:8]
dual [160:10]
duane [310:19]
due [63:9,12] [140:20]
  [305:23]
duly [5:4] [329:13]
during [17:6] [51:10] [53:17
  23] [66:18] [67:2] [79:20]
  [90:12] [96:11] [97:24]
  [113:2] [136:10] [171:25]
  [175:25] [181:12] [191:21]
  [202:21] [209:2]

E
─────────────────
earlier [33:23] [87:17]
  [99:20] [123:10] [137:19]
  [138:13] [151:8] [156:16]
  [163:17] [172:3,6] [183:21]
  [206:17] [212:11] [217:23]
  [263:20] [265:7] [266:10]
  [276:19] [297:5] [316:11,24]
early [29:14] [43:6] [54:19]
  [66:3] [71:20] [72:24]
  [150:2] [171:15,16] [172:7]
  [184:14] [205:8] [219:4]
  [223:2] [234:8] [250:10]
  [256:8] [269:24] [306:23]
  [315:19]
earn [166:13] [177:10]
  [308:15]
earned [259:2]
earning [177:16,17]
easier [47:23] [109:9]
  [124:19] [241:22] [278:5,9]
  [287:8]
easiest [235:14] [238:17]

easily [167:8]
easy [150:16] [159:14]
economic [26:22] [64:13]
  [107:9,12,14,19,20,25]
  [108:5,8,14] [126:15]
  [146:4] [185:9,18,22]
economically [216:24]
  [283:18]
economies [152:20]
edmond [256:25]
effect [40:6] [63:17] [64:13]
  [88:5,9] [90:14] [92:23]
  [113:10,19,22] [116:22]
  [117:2] [119:7] [145:8]
  [146:7] [156:25] [190:18]
  [253:24] [270:23] [273:3]
  [276:7] [279:22] [280:2,20
  ,22] [282:3] [284:2,14]
  [288:11,13]
effectively [64:11] [92:20]
  [112:12] [174:12] [201:23]
  [239:11] [243:23] [261:20]
  [299:2]
effects [30:16] [137:13]
  [146:2]
efficient [61:3,8] [283:18]
effort [53:19] [54:22] [55:5]
  [91:11] [117:8]
efforts [54:16] [91:14,16]
  [105:15]
egg [324:13]
eight [31:13] [35:19] [65:22]
eightyear [35:19]
eight-year [35:19]
either [5:15] [7:3] [11:3]
  [24:25] [37:8,10,22,23]
  [40:5,12,13] [55:13] [74:6]
  [78:5] [79:4] [87:11] [94:12]
  [95:9] [114:17,19] [123:22]
  [127:12] [134:23] [150:7]
  [159:4] [161:9,10] [166:13]
  [172:8,14] [178:15] [179:23]
  [188:14] [195:13] [214:4]
  [215:17] [216:18] [217:2,9
  ,13,14] [218:15] [221:5]
  [225:25] [238:13] [254:21]
  [260:7] [279:4] [283:4,24]
  [291:24] [299:5] [310:24]
element [94:3] [186:12]
eligibility [284:2,12]
eligible [260:24] [269:7]
eliminated [148:21]
elizabeth [3:20] [226:5]
else [14:3,9,11] [24:8]
  [25:23] [27:3] [29:22]
  [37:5] [56:3,22] [57:9]
  [66:10] [78:4] [81:6] [86:14
  ,20] [100:10] [117:15]
  [121:8] [125:13] [175:25]
  [178:5] [179:19] [182:20]
  [193:23] [274:16] [276:25]
  [278:3,6] [295:12] [317:23]
  [318:23] [319:5] [320:24]
  [324:19]

elsewhere [244:16]
email [40:4] [141:24] [144:
  13] [145:5] [148:23] [203:18]
  [204:24] [207:2] [208:15]
  [211:22,23,24] [219:19,23]
  [224:25] [226:2,13] [230:14]
  [232:19] [242:20] [246:17]
  [247:3,5,18] [249:9] [250:
  6,7] [255:24] [257:8,11,23]
  [260:14,17,19] [264:2,23]
  [265:5] [266:3,15] [267:8,11]
  [290:13] [291:6,15] [294:3]
  [296:11,23] [298:11]
  [302:21] [303:5] [310:12]
  [311:22] [330:] [331:10,,15
  ,,] [332:7,,,]
e-mail [40:4] [141:24]
  [144:13] [145:5] [148:23]
  [203:18] [204:24] [207:2]
  [208:15] [211:22,23,24]
  [219:19,23] [224:25]
  [226:2,13] [230:14] [232:19]
  [242:20] [246:17] [247:3,5
  ,18] [249:9] [250:6,7]
  [255:24] [257:8,11,23]
  [260:14,17,19] [264:2,23]
  [265:5] [266:3,15] [267:8,11]
  [290:13] [291:6,15] [294:3]
  [296:11,23] [298:11]
  [302:21] [303:5] [310:12]
  [311:22] [330:] [331:10,,15
  ,,] [332:7,,,]
emails [39:11] [142:8]
  [201:11] [212:7] [234:4]
  [257:14] [287:14,15]
  [303:9]
e-mails [39:11] [142:8]
  [201:11] [212:7] [234:4]
  [257:14] [287:14,15]
  [303:9]
embedded [289:19]
embodied [212:7]
emergence [150:22]
employed [12:13,16,17,18]
  [51:14,15] [228:24]
employee [8:16] [13:18,21]
  [227:13] [241:11] [249:17]
employees [6:16] [97:22]
  [220:15] [241:20] [314:4,7
  ,8]
employer [56:16,20]
employment [42:8,18]
enabled [148:12] [155:6]
  [157:2,12]
end [9:19] [10:4] [34:10]
  [58:3,15] [103:12,13]
  [105:10] [115:11] [116:3,16]
  [154:19,22] [160:13]
  [219:17] [238:6] [261:13]
  [267:12] [278:23] [304:24]
  [306:21] [307:2] [308:11]
  [315:13] [320:12] [326:12]
endeavor [276:19]
ended [173:9] [283:2,4]

energy [298:2]
engage [25:24] [27:5]
  [28:3] [121:16]
engaged [33:5] [35:23]
  [59:19] [61:21] [75:17]
engaging [57:17]
engine [301:5]
engineer [122:17] [251:8]
engineering [14:21,25]
  [19:21] [20:18,23,25]
  [69:2,13] [122:5] [123:7,8
  ,20] [124:6] [249:18] [251:
  16] [293:5]
engineers [17:7,23] [18:23]
  [19:8] [20:5] [293:14]
enhancement [90:8]
enlighten [110:11]
enormous [97:25] [318:7]
enormously [213:20]
enough [162:7] [165:4]
  [171:25] [199:5] [213:24]
  [233:22] [287:12] [303:24]
ensure [19:8] [261:8] [264:
  14] [265:2] [267:22] [313:16]
ensuring [52:3]
enter [48:16] [174:5]
entered [226:5] [247:8]
entering [48:7]
enterprises [36:5] [228:12]
enthusiasms [230:23]
entire [62:17] [87:15] [90:13
  ,24,25] [139:20] [152:21]
  [197:23] [199:7] [227:15]
  [245:8] [253:14] [298:3]
entirely [24:21] [161:8]
  [179:11] [228:18] [263:15]
  [319:7]
entities [10:18] [35:15]
  [124:11] [126:7,16,17]
  [127:16,25] [128:9] [129:5
  ,8] [143:3] [296:3] [312:12]
  [314:22]
entitled [136:6]
entity [7:18,25] [8:6,8,10,18]
  [12:5,8,10,16,19] [16:20]
  [100:17] [125:4,17] [126:20]
  [126:4,19,20] [127:2,8,13]
  [129:14] [132:11] [145:23]
  [159:18] [183:17] [218:4]
  [234:12] [235:6,9] [237:6,9]
  [240:18,19] [244:9,11]
  [252:21] [255:9] [302:13,16]
  [305:5,10,15] [313:15]
  [320:11]
environment [153:23]
equal [63:11] [243:21]
  [280:18]
equals [14:17]
equities [66:9] [70:20]
  [71:7]
equity [79:13,17] [145:21,24]
  [154:22] [210:11] [270:9]
equivalent [179:5]
eric [163:9] [255:4]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

errata [327:9]
escapes [321:19] [324:3]
escrow [128:7]
especially [213:25]
esperon [6:10,14] [7:2]
e-s-p-e-r-o-n [6:14]
esperons [6:21]
esq [3:8,9,15,16,17]
essence [70:8,15] [71:25]
[84:4] [127:11] [132:20]
[177:16] [213:3,19] [234:23]
[235:18] [260:9] [277:10]
[298:19] [304:19]
essential [132:15]
essentially [26:15] [36:17]
[37:3] [62:11] [64:25]
[71:6] [80:7,24] [106:17]
[135:25] [147:15] [159:19]
[209:16] [216:14] [221:21]
[239:5] [243:15] [262:21]
[266:20] [271:22] [272:2]
[277:9] [282:24] [285:17]
[304:20] [306:18,23]
[307:17] [324:21]
established [43:5] [259:17]
[289:16]
et [66:14] [114:6] [118:14]
[165:7] [315:5] [318:15]
euphemism [57:24] [71:12]
[170:2]
euphemistically [105:22]
evaluate [117:9] [120:2]
evaluated [182:12]
evaluation [119:8,11,12]
[120:10]
even [15:24] [18:19] [49:23]
[71:23] [89:24] [95:22]
[97:23] [141:5] [148:16]
[150:18] [153:5] [167:17]
[205:10] [262:18] [263:9]
[305:20]
event [63:5] [106:22] [109:
13] [172:19] [216:10]
[236:16] [243:16,19]
[280:6,7] [306:4]
events [5:18]
eventually [157:13] [269:3]
[277:24]
ever [5:22] [20:24] [23:17]
[24:2] [25:22] [26:4] [27:2
,15,25] [28:24] [29:6]
[30:22] [32:11] [46:4,9]
[73:20] [79:14,16] [92:13,15]
[99:25] [100:7] [116:21,25]
[117:5,8] [118:23] [119:5]
[128:15] [130:11] [131:7]
[138:16,22] [142:17]
[185:5] [189:3,4] [190:19]
[191:14,16,23] [193:19,20]
[194:10,24] [195:3] [196:12]
[200:7,8] [209:5] [210:17,18
,20] [211:3] [221:4] [241:10
,15] [245:15] [246:23,25]
[247:15,17] [266:2] [270:19

,22] [285:6] [296:19] [298:9]
[300:13] [312:17] [313:23]
[319:10,16]
evergreen [234:16]
every [22:19] [35:21] [37:24
,25] [67:9] [84:23] [95:5]
[101:18] [131:10] [153:25]
[194:22] [224:3,5] [231:6]
[238:21] [275:19] [282:22]
[283:3] [298:24] [307:15]
[311:12]
everybody [109:6] [179:19]
[278:2,3] [324:19]
everybodys [324:19]
everything [66:11] [202:23]
[203:2]
evidence [193:17]
evidenced [193:16]
evp [310:25]
ex [301:22]
exact [149:19] [191:17]
[239:4] [288:8] [302:8]
[313:21] [323:14,23]
[325:16]
exactly [43:4] [57:5] [68:19]
[78:8] [128:8] [134:6]
[155:20] [164:11] [174:18]
[232:15] [238:8] [264:13]
[275:11] [299:18] [307:11]
[309:17,22] [323:11]
examination [5:7] [171:10]
examine [16:8]
examined [5:5] [171:6]
[327:5]
example [34:14] [80:18]
[105:5] [140:19]
examples [80:14]
exceeded [181:24] [274:2,3]
except [257:8]
exception [73:4] [147:3]
[268:23] [281:21]
excess [76:25] [93:19]
[111:16,20] [281:2,8,10,13]
exchange [24:11] [122:14]
[166:12] [317:2]
exclude [59:21]
excluded [222:17] [224:19]
exclusive [68:14]
exclusively [78:25]
exconseco [301:22]
ex-conseco [301:22]
executive [49:11]
executives [162:14] [202:9]
[272:10,11] [285:13]
[301:21,22] [311:8]
exercise [94:17]
exhibit [139:2,4,12] [142:14]
[143:9,11] [158:17] [191:4]
[199:10,11] [204:3,18,19,24]
[206:23] [207:2] [208:15]
[212:8] [219:19,23] [220:8
,23] [221:17] [226:6] [229:
11] [230:12,14] [232:17,21
,23] [249:6,9] [255:23,24]

[257:22,23] [260:11,15]
[263:23] [264:2] [288:6]
[290:11,13] [292:19,21]
[293:24] [294:3] [302:19,21]
[303:13,15] [310:10,12]
exhibits [330:6] [331:2]
[332:2]
exist [219:9]
existed [142:9] [314:17]
existence [9:16] [129:14]
existing [240:15] [279:20]
expand [252:6] [315:22]
expansive [60:5]
expect [16:10,11,12]
expected [104:13] [195:19]
[272:10]
expeditiously [47:12]
expense [284:16]
expenses [138:8]
expensive [315:25]
experience [8:24] [12:23]
[13:8,20] [33:14] [34:20]
[73:15] [86:2] [89:15]
[262:12]
experienced [137:19]
expertise [262:22]
expired [309:9]
expires [326:20]
explain [18:7] [47:24]
[73:23] [77:20] [173:21]
[235:14] [312:24] [314:13]
explains [113:10]
exposed [282:7]
exposure [48:15,17,25]
[90:15] [117:6] [120:7,19]
[181:21] [182:4,7] [186:23
,25] [187:6] [225:10,20]
[245:3,4] [247:7]
exposures [48:13] [224:4]
express [284:22]
expressed [273:23]
expressing [285:2]
extended [88:20] [153:4]
[169:4] [235:13] [264:22]
extension [80:5]
extensive [174:23]
extent [51:2] [61:21] [91:16]
[141:17] [284:10] [319:8]
extremely [307:3]

F

face [60:15] [96:23] [253:9
,10,11] [254:2]
facilities [37:21] [55:7]
[104:19] [157:7] [167:16]
[175:14] [214:22] [217:3,5
,11] [234:20] [246:11]
[279:12] [286:24]
facility [9:11,18,22] [12:3,21]
[36:12,15] [37:6,17] [38:11
,15,22,23] [39:6,8,12,14,15
,22] [40:6,14,15,24] [41:12]
[42:2,4,6,16,21] [43:2,4,5

,18] [44:8,20] [47:4] [48:8]
[49:7,16,18] [51:3,21]
[52:10,18,19] [53:6,11,20
,24] [54:3,4,7,19,22,23]
[55:17] [72:24] [74:11,12]
[80:23] [97:7] [127:4]
[128:3] [156:5,12,16,22]
[160:19] [163:15,18,20,25]
[164:15] [170:16] [171:13]
[172:20] [173:22,24]
[176:5,15] [180:24] [185:13]
[188:11] [190:4,21] [191:10]
[192:15,20] [195:5,20]
[196:14] [202:2,5,16]
[203:13] [205:8] [212:3]
[214:20,25] [215:5,8,9]
[217:18] [218:21] [219:3,4
,7,11] [221:20] [222:17]
[234:5,9,24] [235:13]
[256:7] [259:2] [261:2,10,16]
[267:24,25] [268:12,15]
[269:7] [286:14,19] [287:5
,13,19,25] [293:22] [294:17
,19] [295:24] [299:6,11]
[304:10] [307:13] [308:20]
[309:8] [312:13] [315:21]
[316:8,10,11,12,21,22]
[317:14,18,21,22] [318:14]
[319:12,19] [320:3,5,6,10
,11,16] [321:24] [322:9]
[323:21] [324:6] [325:8,15]
[326:3]
fact [14:6] [46:19] [64:7]
[67:4] [136:16] [153:3]
[155:22,24] [160:3,23]
[161:4] [170:11] [183:7]
[196:7] [225:6] [232:18]
[233:24] [234:9] [265:13]
[278:19] [281:14] [292:6,8]
[299:12] [321:10] [325:23]
factor [149:9,23] [153:12,20]
factors [146:21] [149:22]
[153:11] [154:3]
factory [152:22] [298:8]
fail [84:10]
failed [63:6,8] [85:2] [153:25]
[154:2,8]
failing [135:2] [155:13]
fails [305:22]
failure [105:25] [154:4]
fair [230:23] [295:3]
fairly [49:22] [61:10,16]
[84:21] [91:21] [96:23]
[97:22] [115:5] [137:17]
[146:10] [147:21] [150:20]
[170:6] [186:11] [241:23]
[242:3] [258:11] [268:23]
[270:3] [275:12] [287:22]
[317:18,20] [325:6]
fait [285:5]
fall [15:6] [91:25] [105:21]
[114:4] [268:25]
falls [213:11,13,14]

familiar [43:8]
familiarize [303:23]
familiarized [43:12]
families [150:5,9,10,13]
   [151:13]
family [23:8,10,20] [25:22]
   [44:19] [56:21] [64:21]
   [102:17] [130:3,5] [150:3,4]
   [154:20,25]
fannie [77:24] [305:20]
far [23:13] [46:14] [100:7]
   [149:13,16] [188:9] [192:14]
   [196:13] [210:23] [227:22]
   [270:16] [272:8] [300:13]
farther [73:18]
fashion [19:10,18] [36:22]
   [74:15] [75:14] [85:2]
   [133:13,15] [175:22]
   [213:15]
fashions [36:19]
feasibility [26:22] [29:14,17]
   [87:18] [88:5]
feasible [262:18]
feature [104:17] [174:17]
features [305:18]
fed [166:4]
federal [151:6]
lee [109:23] [135:16,17]
   [136:11] [138:12] [259:11]
   [308:15,18]
feel [143:21]
fees [109:11] [135:10,18,20]
   [138:7] [166:13] [258:17]
fell [151:17]
felt [139:12] [154:25] [162:
   22] [165:3,8,11] [264:25]
   [265:7]
felts [123:21,25] [158:3]
   [227:9,12,24]
few [15:8] [60:19] [84:10]
   [99:24] [106:6] [112:23]
   [154:6] [190:21] [194:5]
   [223:8] [285:20] [291:3]
   [303:11]
fewer [282:11]
fha [77:25]
fiachra [5:1] [6:1] [7:1]
   [8:1] [9:1] [10:1] [11:1]
   [12:1] [13:1] [14:1] [15:1]
   [16:1] [17:1] [18:1] [19:1]
   [20:1] [21:1] [22:1] [23:1]
   [24:1] [25:1] [26:1] [27:1]
   [28:1] [29:1] [30:1] [31:1]
   [32:1] [33:1] [34:1] [35:1]
   [36:1] [37:1] [38:1] [39:1]
   [40:1] [41:1] [42:1] [43:1]
   [44:1] [45:1] [46:1] [47:1]
   [48:1] [49:1] [50:1] [51:1]
   [52:1] [53:1] [54:1] [55:1]
   [56:1] [57:1] [58:1] [59:1]
   [60:1] [61:1] [62:1] [63:1]
   [64:1] [65:1] [66:1] [67:1]
   [68:1] [69:1] [70:1] [71:1]
   [72:1] [73:1] [74:1] [75:1]

[76:1] [77:1] [78:1] [79:1]
[80:1] [81:1] [82:1] [83:1]
[84:1] [85:1] [86:1] [87:1]
[88:1] [89:1] [90:1] [91:1]
[92:1] [93:1] [94:1] [95:1]
[96:1] [97:1] [98:1] [99:1]
[100:1] [101:1] [102:1]
[103:1] [104:1] [105:1]
[106:1] [107:1] [108:1]
[109:1] [110:1] [111:1]
[112:1] [113:1] [114:1]
[115:1] [116:1] [117:1]
[118:1] [119:1] [120:1]
[121:1] [122:1] [123:1]
[124:1] [125:1] [126:1]
[127:1] [128:1] [129:1]
[130:1] [131:1] [132:1]
[133:1] [134:1] [135:1]
[136:1] [137:1] [138:1]
[139:1] [140:1] [141:1]
[142:1] [143:1] [144:1]
[145:1] [146:1] [147:1]
[148:1] [149:1] [150:1]
[151:1] [152:1] [153:1]
[154:1] [155:1] [156:1]
[157:1] [158:1] [159:1]
[160:1] [161:1] [162:1]
[163:1] [164:1] [165:1]
[166:1] [167:1] [168:1]
[169:1] [170:1] [171:1]
[172:1] [173:1] [174:1]
[175:1] [176:1] [177:1]
[178:1] [179:1] [180:1]
[181:1] [182:1] [183:1]
[184:1] [185:1] [186:1]
[187:1] [188:1] [189:1]
[190:1] [191:1] [192:1]
[193:1] [194:1] [195:1]
[196:1] [197:1] [198:1]
[199:1] [200:1] [201:1]
[202:1] [203:1] [204:1]
[205:1] [206:1] [207:1]
[208:1] [209:1] [210:1]
[211:1] [212:1] [213:1]
[214:1] [215:1] [216:1]
[217:1] [218:1] [219:1]
[220:1] [221:1] [222:1]
[223:1] [224:1] [225:1]
[226:1] [227:1] [228:1]
[229:1] [230:1] [231:1]
[232:1] [233:1] [234:1]
[235:1] [236:1] [237:1]
[238:1] [239:1] [240:1]
[241:1] [242:1] [243:1]
[244:1] [245:1] [246:1]
[247:1] [248:1] [249:1]
[250:1] [251:1] [252:1]
[253:1] [254:1] [255:1]
[256:1] [257:1] [258:1]
[259:1] [260:1] [261:1]
[262:1] [263:1] [264:1]
[265:1] [266:1] [267:1]
[268:1] [269:1] [270:1]
[271:1] [272:1] [273:1]

[274:1] [275:1] [276:1]
[277:1] [278:1] [279:1]
[280:1] [281:1] [282:1]
[283:1] [284:1] [285:1]
[286:1] [287:1] [288:1]
[289:1] [290:1] [291:1]
[292:1] [293:1] [294:1]
[295:1] [296:1] [297:1]
[298:1] [299:1] [300:1]
[301:1] [302:1] [303:1]
[304:1] [305:1] [306:1]
[307:1] [308:1] [309:1]
[310:1] [311:1] [312:1]
[313:1] [314:1] [315:1]
[316:1] [317:1] [318:1]
[319:1] [320:1] [321:1]
[322:1] [323:1] [324:1]
[325:1] [326:1,16] [329:11]
[330:3]
fico [318:14]
figure [63:21] [120:24]
[300:6]
figures [120:19]
filed [146:14] [322:9]
files [266:2]
filing [157:12] [309:24]
[325:5,23]
filings [275:14]
fill [261:3,4]
final [66:22] [182:12] [250:
19] [278:24]
finally [148:20] [209:8]
finance [34:24] [35:9]
[75:9] [77:15,19] [78:14,15]
[79:21] [80:21] [84:17]
[85:5] [96:10] [97:8] [147:
11] [157:7,8,9] [183:18]
[200:18] [208:5] [213:4]
[235:23] [236:11] [270:6,7]
[278:4] [300:24] [301:20,23]
[306:17] [310:25] [313:6,7]
finances [215:20] [233:21]
financial [14:20,25] [17:6,22]
[18:9,11,22] [19:8,21]
[20:4,18,22,25] [21:6,12]
[23:6] [25:15] [34:23]
[35:2,10] [52:23] [69:2,13]
[73:2] [84:16] [97:5] [113:
8] [119:18] [120:20] [121:12]
[122:5,10,17] [123:7,8,20]
[124:6] [147:13] [149:20]
[154:7] [155:9] [158:10]
[163:2] [234:2] [236:23]
[249:17] [251:8,15] [253:24]
[269:4] [275:17] [278:11,13
,17,18] [293:5,14] [308:6,14]
financiers [114:18]
financing [13:14] [97:15]
[112:15] [152:8] [164:12,13
,25] [175:5,20] [186:14]
[210:5] [212:12] [214:7,8]
[215:10,15] [222:22]
[223:3,4] [224:9] [235:5,10]
[238:21] [239:6] [261:17]

[307:13]
financings [184:2] [234:18]
find [31:7] [49:14] [69:23]
[70:16] [71:5] [92:9] [93:6]
[104:16,20,21] [106:22]
[122:23] [210:4] [212:16]
[231:14] [241:18] [242:12]
[276:20] [286:21]
finding [209:3] [283:15]
[298:6] [302:4]
fine [58:18,21] [60:6] [126:
11] [168:13,18] [198:4,8]
[203:22] [204:10] [252:11]
[286:15] [287:7]
finish [34:15] [47:9] [72:10]
[167:25]
finite [38:25] [39:2] [236:5]
firms [20:21]
first [4:5,14] [5:22] [7:18,22
,25] [8:3,16,22] [13:4,23]
[14:2,6] [15:10] [22:3,8]
[24:4,9,13] [25:5] [42:9]
[51:7] [55:18] [57:13]
[58:24] [65:4] [66:21]
[75:18] [76:12] [84:10]
[95:12] [115:9] [117:25]
[132:21] [133:3,6,7,21]
[141:7] [142:25] [144:19]
[146:3,22] [148:4] [153:11]
[164:21] [166:21] [170:12]
[178:13] [179:21] [180:11]
[184:5] [188:6] [190:3,19]
[192:12] [193:10] [203:23]
[214:24] [215:3] [220:14]
[223:22,23] [238:18]
[239:14] [244:6] [245:16]
[247:15] [254:20] [266:13
,16] [269:21] [272:13,14]
[280:24] [281:7] [282:19]
[302:16] [306:6] [316:20]
[320:18] [321:8] [322:25]
[323:10] [325:20]
firth [257:5]
fit [50:18]
fitch [18:4] [101:13]
fitting [289:4]
five [116:7,11] [149:6]
[219:13] [292:21] [315:9,10]
[332:]
fivepage [292:21] [332:]
five-page [292:21] [332:]
fix [276:20]
fixed [39:9] [145:9,14]
[174:7]
flat [146:25]
fleet [13:14]
flight [202:17]
floor [3:6]
flow [37:7,17,19] [96:19]
[213:24] [214:3] [217:15]
[232:9] [235:7] [274:5]
[325:9,10]
flowed [127:25]
flowing [325:7,15]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

flows [16:21] [131:7,22,24]
[132:7] [232:10]
fly [267:3]
focus [104:11] [143:16]
focused [101:8] [222:18]
[228:7]
follow [36:18] [108:7]
[113:15] [181:2]
following [28:17] [49:13]
[52:11] [134:20] [148:9]
[224:17] [275:22] [324:14
,15,23,25] [325:4,8,12]
[328:4]
follows [5:6] [47:22] [171:7]
fooled [220:11]
foot [152:16,18]
foothill [219:11] [269:3,6,8]
[320:10] [323:20] [324:4]
forbade [322:10,11]
forbearance [80:8,9]
force [19:11] [70:21] [71:5]
forces [157:18]
foreclose [85:6]
foreclosure [134:14]
foreclosures [84:7]
foregoing [327:6]
forget [9:7]
forgive [21:13] [60:4] [126:
8] [154:14] [183:20] [186:8]
[236:22] [248:2] [298:17]
[313:2]
forgot [302:8]
forgotten [96:12] [162:17]
[250:23] [263:7] [323:23]
form [8:12] [9:2] [16:3]
[21:24] [24:23] [26:23]
[28:5,20] [29:10] [36:20]
[38:7,8] [39:20] [40:17]
[43:11] [44:13] [45:20]
[48:9] [52:13,25] [54:9,24]
[56:14] [58:12] [63:15]
[65:9] [67:5,11] [69:8]
[79:20] [80:6,25] [82:14]
[87:21] [93:5,15] [94:12]
[95:19] [104:4] [124:13]
[128:14,20] [133:20]
[134:21] [142:4] [146:17]
[151:15] [165:2] [169:8,19]
[175:7] [177:14] [183:9]
[185:16] [188:3] [189:8,13]
[192:23] [193:21] [195:15
,19] [225:21] [227:25]
[232:11] [239:4] [249:23]
[250:2] [261:12,13] [265:20]
[270:25] [275:24] [280:5]
[287:25] [288:17] [294:25]
[313:18] [321:3] [322:2]
formal [78:4] [179:5] [194:
18] [224:22] [246:23]
formalized [210:17]
formally [48:12]
format [266:2]
formed [237:12] [258:13]
forms [21:11] [36:18] [40:6]

[74:13]
formulation [276:16]
forth [298:10] [329:12]
forthcoming [311:15]
forward [45:9] [47:12]
[148:8] [149:2] [180:8]
[183:13] [326:4]
forwarded [133:10]
found [119:24] [289:8]
[308:11]
foundation [190:15]
four [40:10] [85:13] [149:5]
[180:18]
fraction [60:14]
frame [124:24] [126:4]
frankly [20:19] [61:25]
[112:23] [134:5] [150:17]
[152:24] [153:13] [231:10]
[245:15] [321:2]
fred [6:10,13]
f-r-e-d [6:13]
freddie [77:25] [305:21]
free [143:21] [243:24]
frequent [40:9] [212:17]
frequently [37:24] [42:19]
[109:2] [111:10] [112:2]
[188:13,16]
friday [324:16,25] [325:4]
front [136:7,9] [197:8,20]
[198:3] [220:9] [259:10]
[322:21]
fulfilled [20:8]
fulfilling [14:4]
full [136:10] [137:20,22]
[138:12] [258:24] [259:7]
[292:14,18] [307:8] [316:8]
function [14:4] [20:8,23]
[23:5,22] [24:21] [69:2]
[72:3] [100:14] [126:2,6,15]
[127:6] [135:6] [227:21]
[235:3] [245:8] [248:5,6]
functions [126:6]
fund [106:2] [319:19]
fundamental [134:8] [282:
14]
funded [269:2]
funding [40:8] [127:5]
[235:25] [236:3,7,9] [240:
2,3,13] [243:20] [319:12]
[324:22]
funds [320:9,15]
furnishing [178:22]
further [149:3] [166:12,13]
[211:2] [322:11] [329:15]
furthermore [88:24] [317:17]
future [30:17] [88:6] [113:11
,23] [131:7,24] [137:9,18,23]
[149:4] [174:7,14] [282:3]

G

gain [262:15]
gaining [259:20]
gapis [287:9]

gather [122:7] [182:2]
[259:7]
gathered [133:9] [149:19]
gave [21:17] [170:14]
[182:9,17] [316:10] [317:25]
general [17:23] [20:16]
[22:17] [59:9] [68:22]
[77:11] [86:2] [101:6,19]
[106:5] [115:6] [158:24]
[181:3] [228:11] [233:23]
[250:3] [275:16] [313:5]
[323:19]
generally [18:16] [22:12]
[61:15] [64:22] [67:4,25]
[68:16] [84:12] [91:20]
[95:16] [96:21] [110:8,15,17]
[114:20] [115:10] [123:19]
[125:22] [132:24] [146:25]
[149:18] [162:9] [163:4]
[169:2] [180:22] [234:18]
[270:3] [278:14] [279:18]
[281:24] [286:20]
generate [298:22,23]
generated [9:18,25] [58:3,15]
[156:18] [157:3,4]
generating [92:8]
gentleman [14:13,14]
[50:5] [123:5] [162:24]
[184:15] [200:17]
gentlemen [163:9] [302:2]
george [144:16]
gets [17:21] [306:2]
getting [64:14] [94:8] [109:
9] [137:20,21] [138:6,7,11
,13] [169:9] [196:4] [201:11]
[246:8] [250:15] [264:15]
[287:17] [304:25] [307:9,10]
[320:12]
gingko [312:11,18,19]
[313:25]
g-i-n-g-k-o [312:11]
ginnie [77:25]
giordano [51:9,13]
gist [179:16] [301:4]
give [24:17] [27:12] [33:18]
[48:25] [50:12] [60:5]
[106:15] [112:17] [126:10]
[131:25] [146:6] [147:24]
[158:12] [166:12] [170:7]
[197:2] [210:12] [225:24]
[248:15] [275:21] [284:15]
[316:5,12]
given [11:10] [21:23] [25:4]
[26:13,17] [28:23] [43:6]
[49:2] [67:17,18] [70:6]
[96:15] [104:24] [105:5]
[106:10] [109:24] [110:24]
[111:3] [113:12] [131:8]
[136:21] [153:14] [176:9]
[216:17] [224:9] [227:5]
[272:2] [284:11] [302:15]
[313:20] [327:8] [329:14]
gives [210:7]
giving [41:17]

glatt [3:5] [4:16,18]
go [8:10] [18:7] [25:17]
[27:7] [36:21] [41:5] [44:21]
[55:5] [56:24] [69:10]
[70:16] [71:4] [73:18]
[80:13] [90:24] [91:2]
[96:24] [97:4] [99:13]
[112:6] [118:8] [134:18]
[139:14] [150:2] [170:23]
[172:8] [175:8] [180:8]
[182:9,10,11] [184:7,25]
[187:22] [217:17] [219:15]
[231:12] [241:20] [260:15]
[263:11] [271:12] [289:21]
[304:4] [326:4]
goes [45:9] [71:12] [306:4]
going [24:22] [28:13,14]
[36:10] [43:10] [47:5]
[50:9] [71:25] [72:2,3,15]
[84:15,16] [85:12,18]
[95:8,16,17] [96:10,13]
[101:17] [116:8] [126:10]
[137:22] [142:5] [143:6,17]
[146:12] [156:9] [159:6]
[162:15] [167:23,24]
[169:9] [170:7] [172:15]
[179:18] [180:16] [183:17]
[185:15] [189:11] [190:14]
[194:7] [195:5] [203:21,24]
[212:15] [221:13] [261:3,10]
[264:16] [268:3,14] [273:12]
[275:22] [279:3,5] [280:14]
[282:14] [286:5,7] [291:19]
[292:9] [294:7] [299:24]
[300:2,8] [326:11]
gone [109:18] [123:5]
[266:20] [276:5] [317:6]
[318:4]
good [5:9,10] [6:24] [26:18]
[28:12] [29:3,7] [34:13,16]
[35:13] [36:20] [58:21]
[60:11] [119:8] [164:24]
[166:11] [170:20,21]
[187:23] [200:9] [218:24]
[219:14] [228:5,14] [236:21]
[263:16,21] [297:16]
[326:8]
gord [184:18,19]
g-o-r-d [184:18]
gotten [84:13]
grade [91:20] [92:4] [97:13
,14] [98:3] [112:5] [113:2,6
,11,18,21] [114:13] [135:19]
[143:6] [145:20,22,25]
gradual [296:20]
graham [242:14,15,20]
[244:22] [245:12,16]
[246:25] [247:10,15]
granetz [163:10]
grant [49:7] [260:7]
great [111:13] [144:4]
[149:10,25] [170:19]
[244:12] [249:14] [304:6]
[317:25]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

greater [152:6] [187:16,17]
    [210:12] [214:16]
green [34:22] [73:20] [147:
    13] [159:11,12]
greenpoint [35:2,6] [77:2]
    [151:2] [158:23] [159:5,8,16]
    [160:6] [161:14,24] [162:14]
    [163:6]
greenwich [257:15]
group [31:17,18,20,23,24]
    [32:12,17] [122:5,19,23]
    [123:14,15,17,22,25]
    [158:3] [163:3,5,8] [200:18]
    [202:7] [216:8] [227:9,12,24]
    [248:25] [249:18] [251:2,16]
    [266:24] [293:6]
grow [144:18]
growing [302:3]
growth [148:6]
guarantee [29:8,15,18]
    [30:14] [62:17,20] [63:3,5
    ,18,25] [64:10] [90:15]
    [100:24] [101:17,18]
    [107:24] [108:4] [110:24]
    [111:3] [112:6] [113:5,6]
    [114:3,9] [120:3,6] [254:3]
    [281:17]
guaranteed [90:11] [101:14]
    [114:2] [117:6] [145:15]
    [253:19,22] [254:7] [307:9]
guaranteeing [64:15]
    [107:13] [113:13,17]
guarantees [30:16,22]
    [90:8] [117:2] [120:7]
guess [30:8] [119:13]
    [122:12] [141:24] [147:22]
    [229:6] [258:7] [293:25]
gupta [247:21]
guptas [248:11]
guy [185:3]
guys [79:24] [112:14]
    [202:17] [266:20]

H

habitually [291:23]
hadnt [133:14] [153:23]
    [188:12] [192:17] [194:11
    ,13,16,18] [266:19,22]
half [7:20] [91:2] [112:8]
    [151:24]
halfway [323:7]
hammered [324:20]
hand [180:11] [279:2]
    [283:24] [329:20]
handled [128:6] [132:25]
    [133:3,5] [184:9] [245:5]
handling [65:6,12]
hands [33:7,8] [218:12,13]
handwriting [222:4]
hans [255:7,8]
happen [94:25] [108:23]
    [125:23] [181:25] [182:20]
    [196:8] [220:25] [238:16]

[239:2] [291:12] [305:7]
    [310:7] [322:17]
happened [27:15] [127:20]
    [147:10] [148:4] [149:25]
    [150:14,21] [151:14]
    [160:17] [172:13] [184:23]
    [188:13] [210:14] [223:14]
    [224:11] [244:18] [271:22]
    [273:24] [299:15] [324:16]
happening [83:11]
happens [213:4]
happy [10:20] [11:6] [152:3]
    [197:8,19]
harbor [299:19,25] [300:3,19]
    [301:11,21]
hard [27:12] [82:21] [85:22]
    [144:9] [266:2] [317:2,3]
harder [167:13] [283:15]
hate [167:22]
hathaway [62:16] [155:10,12
    ,23] [254:8] [323:22,24]
    [324:9] [326:5]
havent [133:22] [198:22]
    [200:3] [289:16]
having [5:4] [78:14] [82:25]
    [92:25] [101:24] [109:18]
    [111:24] [134:9] [152:8]
    [157:19] [171:5] [197:23]
    [206:18] [216:6] [224:2]
    [231:4] [278:25] [279:7]
    [317:24]
hazy [61:25]
head [183:19] [290:6]
    [320:23]
heads [272:2] [275:21]
hear [37:17] [138:16] [221:
    4] [222:4] [252:12] [323:10]
heard [57:22,24] [138:22]
    [150:23] [190:19] [192:12]
    [194:11,13,16] [296:18]
hedge [106:2]
held [37:9] [64:25] [99:14]
    [117:9] [126:21] [130:6]
    [137:5] [176:17,19] [241:8]
    [244:14] [255:12] [308:12]
    [315:4]
help [190:25] [191:8] [198:
    4] [206:10] [211:25]
helpful [252:6]
helping [294:17]
herbert [226:18,19]
hereby [327:4] [329:10]
hereinbefore [329:12]
hereunto [329:19]
herring [19:4] [66:8,11,23]
    [67:4]
hes [49:12] [162:16] [205:13
    ,22] [262:6] [263:3,6,13]
    [267:18] [297:4,19] [319:6]
hierarchy [20:17] [48:14]
    [50:18] [123:12] [242:17,23]
    [243:3]
high [148:2]
higher [88:22] [89:9,16]

[90:4] [111:13] [113:13,17
    ,23] [115:15] [136:22]
    [149:16] [152:7,9] [153:6]
highly [93:4] [175:11]
    [233:22] [262:6]
hindsight [150:15] [153:20]
hired [301:22]
historically [175:9]
histories [149:17] [151:13
    ,23]
history [77:8] [144:19]
hold [59:14] [92:21] [93:10]
    [97:3] [126:17,18,20]
    [127:8,13,14] [128:24]
    [129:24] [156:7,17] [157:2]
    [217:16] [218:8] [238:10]
    [255:11]
holder [63:14] [64:19]
    [313:10]
holders [136:13]
holding [91:12] [96:7,8]
holdings [314:20]
holdon [59:14]
hold-on [59:14]
holds [173:25] [174:3]
hollday [28:13]
holt [3:9] [4:17] [197:9,11]
    [208:11]
home [76:6] [78:16] [89:3]
    [134:18] [147:16] [148:12]
    [150:11] [153:3,6,15]
    [257:11] [277:4,7] [278:15]
    [280:14] [282:25] [283:4,5
    ,17,21] [298:25] [299:22]
homeowner [152:17]
homes [9:19] [35:7,24,25]
    [58:3] [62:18] [63:9] [75:3
    ,5,8,11] [77:12] [82:23]
    [88:16,17,18,19] [89:5,6]
    [101:21] [112:14,15]
    [144:19] [154:12,13]
    [157:4] [159:24] [160:9]
    [166:10] [206:2] [282:19,20]
    [283:2,6,10,13] [297:20,22]
    [298:4,7,20,22,24]
honest [86:6] [158:14]
    [187:22,24]
hope [166:17] [199:6]
hopefully [126:12]
hoping [251:23]
horning [169:16]
horribly [265:22]
hotmail [260:18]
hour [168:6] [273:8]
hours [286:13]
house [152:19] [227:4]
    [228:9] [278:7]
household [150:23]
houses [206:8]
housing [6:6] [8:25] [9:7]
    [10:2] [11:21] [12:23]
    [27:21] [33:15] [34:20,25]
    [35:5] [68:20] [70:5] [73:11]
    [75:20] [77:13] [78:17]

[81:8,12] [82:18,19] [87:15]
    [99:15] [100:3] [105:19]
    [110:14,22] [111:5,7,14]
    [112:20,21,25] [114:18]
    [150:2] [152:5,6,9,12,15]
    [153:9,21] [154:2] [159:17]
    [171:22] [172:5] [173:11,12]
    [181:13] [227:8] [228:11]
    [305:19]
howard [14:14,18,19]
    [17:20] [123:5]
however [38:14] [143:21]
    [318:9]
huge [60:10] [90:16]
human [134:22]
hunt [232:18] [242:14,15]
    [244:23] [246:9] [247:7]
hunton [140:15]
hunts [247:18]
hurting [300:22]

I

id [4:12] [41:9] [129:18]
    [138:25] [164:9] [175:22]
    [187:22] [190:19] [222:12]
    [266:13] [330:7] [331:3]
    [332:3]
idea [29:7] [119:8] [164:14]
    [209:5,22,23] [210:24]
    [218:6] [223:20] [263:5]
    [320:23] [321:2,3,7]
idealized [229:15]
ideas [209:2] [229:16]
identical [221:18]
identification [139:7]
    [143:13] [158:19] [191:6]
    [199:14] [205:2] [207:4]
    [208:17] [219:21,25]
    [230:16] [232:25] [249:11]
    [256:3] [257:25] [264:4]
    [290:16] [292:24] [294:6]
    [302:23] [303:17] [310:14]
identified [10:13] [12:22]
    [69:12] [174:15] [203:6]
identify [33:24] [45:14]
    [142:23] [144:11]
identities [10:21]
identity [184:21]
ill [5:18] [27:15] [34:15]
    [88:2] [158:15] [191:2]
    [197:7,13,19] [199:9]
    [215:15] [249:5,6] [252:4]
    [286:10] [290:10] [319:15]
illiquid [93:4]
im [4:8] [10:11,20] [11:6,13
    ,24] [13:4] [17:15] [24:22]
    [27:14] [31:13] [33:20]
    [34:12,17,19] [35:11]
    [37:13] [39:23] [40:3]
    [43:10] [47:5] [49:14]
    [50:8,9] [52:20] [53:14]
    [55:3] [58:17] [59:18]
    [64:7] [69:23] [73:12,13]

[80:16] [83:23] [86:10,12,22]
[90:6] [93:12] [95:7,8]
[96:13] [98:7,19] [100:7]
[102:6] [104:20] [107:21]
[113:15] [119:3] [122:23]
[125:24] [126:8,9] [131:19]
[141:5] [143:17] [145:4]
[154:14] [156:11] [159:7,11]
[161:9,18] [167:6,7,17]
[168:22] [169:5,20] [171:16]
[176:9] [180:19] [183:8]
[185:10,15] [187:8,15]
[189:11] [190:6] [194:8]
[195:7] [197:21] [200:12,25]
[203:4,21,24] [204:15]
[207:7] [208:4,12] [218:19]
[225:22] [241:25] [242:19]
[245:15,16,23] [246:7,24]
[247:14] [248:21] [252:2]
[254:25] [263:9] [269:23]
[270:21] [286:4,7] [287:10]
[288:13] [290:9] [294:7]
[295:18,25] [296:18]
[297:8] [304:9] [312:21]
[313:2] [319:14] [325:3]
imagine [241:23] [242:2]
immediate [174:13] [203:9]
    [278:25]
immediately [7:11] [95:22]
    [278:21] [306:3] [307:19]
impact [88:11] [89:25]
    [149:24] [271:3]
impaired [5:17]
implement [288:4]
implementation [285:22]
    [289:12] [290:7]
implications [134:3]
implicitly [92:21]
important [15:15] [16:5]
    [260:25] [264:25]
impossible [92:6]
impression [247:6] [296:20]
improve [147:5] [289:12]
improved [81:22] [290:6]
    [325:24]
improvement [285:24]
    [315:20,22] [316:16]
improving [82:7,13] [100:6]
    [115:10,13] [137:23]
    [146:25] [147:2,7] [148:17]
    [266:11] [288:22] [290:3]
inappropriate [10:24]
inartfully [183:7]
include [135:9] [223:4]
    [250:13]
included [223:2] [248:9,10]
    [249:20] [250:14] [253:8]
    [254:4] [256:7]
including [54:25] [72:24]
    [140:10] [201:22] [248:8]
income [145:9,14,15]
    [150:3,4,5,13] [151:12]
    [314:14]
incomes [88:21] [149:20]

[153:15]
incorporated [237:12]
incorrect [192:7,8]
increase [85:18] [87:16]
    [89:19] [90:14,18] [137:14]
    [186:25] [187:6] [236:7]
    [273:21] [274:20] [276:5]
    [285:22] [286:2]
increased [63:22] [239:7]
    [240:2,3] [271:17] [272:6,15
    ,16,17,21,24] [296:21]
increasing [63:18] [90:5]
    [283:14]
indeed [16:3] [37:21] [88:12]
    [94:24] [141:21,23] [152:3]
    [160:6] [214:6] [308:6]
    [325:22]
independent [41:7] [118:24]
    [119:8,10,17] [123:11]
independently [120:3]
index [330:2]
indicate [264:10]
indicated [273:25]
indirect [88:11]
indistinguishable [79:6]
individual [48:11] [66:13]
    [67:7] [89:25] [108:24]
    [160:4] [252:21,23] [261:21]
    [262:24]
industry [8:25] [12:23]
    [17:13] [27:21] [33:15,25]
    [34:21] [40:20] [58:10]
    [61:17] [71:12] [81:8,15]
    [82:11,12] [83:6,15,20]
    [86:2] [87:15] [88:25]
    [91:25] [92:3] [99:2,15]
    [100:3,10] [105:15] [110:9]
    [111:5] [112:25] [114:19]
    [115:3,23] [122:9,13]
    [147:9,19] [148:2] [149:9]
    [152:12,16] [154:5,7]
    [165:7,18] [169:24] [171:21]
    [172:5,16] [173:2] [174:17]
    [270:4,12] [305:17] [311:16]
industrybyindustry [110:9]
industry-by-industry
    [110:9]
indymac [141:20]
ineligible [77:24]
inevitable [87:13] [157:24]
    [158:5]
inevitably [283:6]
infer [9:13] [38:5] [101:23]
    [227:21]
inference [246:15]
inflammatory [267:5]
influence [87:17] [273:5]
influenced [128:12,19]
    [131:16]
information [11:9] [18:15]
    [21:6,9,17,19,20,24,25]
    [22:10,16,24] [23:6,14,18]
    [24:15,20] [25:9,14] [31:6]
    [34:5,19] [66:2] [67:18]

[73:13] [100:15,17] [102:9
    ,11,16] [121:9,12] [122:8,14]
    [131:13] [132:5,7] [133:9]
    [149:18] [178:23] [182:2]
    [230:2] [231:18,20,21,22]
    [241:18] [242:12] [258:9]
    [275:13,15] [285:15]
    [293:16]
informed [188:7] [192:2,6]
infusion [210:10]
inherit [150:9]
initial [98:5] [155:25] [254:
    18]
initials [207:24]
initiated [161:10,12]
initiation [66:8]
initiative [60:24]
inquire [195:3]
inquired [178:19]
inquiries [23:24] [24:2]
inquiry [221:2]
installment [57:21] [58:8]
instance [22:2] [28:8,9]
    [39:7] [48:23] [49:21]
    [55:18] [61:4] [65:25]
    [66:5,21] [80:20] [83:2]
    [93:14] [101:18] [111:11,15]
    [112:19] [133:22] [144:12]
    [148:23] [159:24] [163:24]
    [178:21] [179:2,21] [232:12]
    [238:18] [243:13] [281:17]
    [295:11] [320:9]
instances [77:3] [102:7]
    [131:20] [142:22] [295:18]
instead [16:19] [89:3]
    [92:25] [93:2] [95:2,21]
    [135:25] [152:21] [215:22]
    [222:18] [231:8] [278:22,25]
    [279:2] [313:17]
instituted [315:19]
institution [107:9] [214:21]
institutional [68:9,11,15]
    [93:6] [94:23] [95:17]
    [154:25]
institutions [68:17] [97:6]
    [163:2] [214:23] [224:21]
    [234:2]
instruct [11:3]
instruction [33:23] [178:16]
instrument [58:12] [70:7]
    [95:19,25]
instruments [16:7,22]
    [98:18] [118:12] [187:23]
insurance [206:7]
insured [68:22]
integrated [21:2]
intend [294:9]
intended [25:3] [29:4]
    [38:6] [41:22] [186:5]
    [231:19]
intentionally [91:12]
interacted [185:5]
interchangeably [39:19,24]
    [119:14,15]

interest [26:15] [40:16]
    [41:3] [48:23] [63:6] [64:16]
    [93:3,4,19] [95:18] [111:13]
    [112:20] [130:7] [135:25]
    [136:2,5,7,9,13] [151:16,24]
    [177:17] [209:16] [211:22]
    [281:2,8,10,13]
interested [27:14] [34:17,19]
    [59:18] [329:17]
interests [27:4] [28:2]
interface [17:22] [18:22]
    [45:18,22,24] [56:8,10]
    [123:25]
interject [10:8] [83:14]
intermediate [7:14] [234:19]
    [313:9]
internal [19:5] [20:10]
    [210:24]
internally [101:7,14] [195:
    25] [266:21,22]
international [244:7]
internet [230:21]
interposed [313:15]
interrupt [72:8] [114:23]
    [167:22] [218:19]
interrupted [168:9]
interval [27:9] [81:22]
    [86:7] [155:24] [172:2]
    [174:9,10]
intervals [65:21] [213:16]
    [268:23]
intervening [127:8]
intext [122:10,13]
introduce [4:12]
introduced [24:5] [147:13]
invariably [183:3] [280:14]
inventory [157:8] [205:23]
    [206:2,3,7] [213:6,7,8]
    [238:5] [318:3]
invest [32:4] [68:18] [71:11
    ,14] [211:12]
investment [91:19] [92:4]
    [97:13,14] [98:3] [112:5,25]
    [113:6,11,18,21] [114:11,13]
    [135:18] [145:19,22,25]
    [162:4,10,12] [165:18,20]
    [166:15] [167:5] [169:17,25]
    [170:3] [226:25] [227:6]
    [228:6,15,17] [317:4]
investor [66:7] [68:12]
    [93:24] [94:23] [95:17,24]
    [156:4] [231:19] [304:24,25]
    [306:22] [308:12]
investors [16:6,23] [17:3]
    [19:12] [26:14] [28:15]
    [32:4] [66:3] [67:3] [68:9,11]
    [70:4,16] [71:5,8] [72:6]
    [88:13] [94:5] [111:19]
    [127:10] [131:25] [132:22]
    [135:19] [136:8,9] [145:9,14
    ,15] [146:10] [154:25]
    [210:8] [215:23] [230:25]
    [231:3] [261:12] [282:6,9]
    [295:22] [296:2] [311:10,14]

invited [266:19] [301:19]
involve [38:11] [225:19]
  [300:10]
involved [29:19] [31:10]
  [32:8,9,20] [41:11] [42:4]
  [50:14] [55:14,17,23,25]
  [56:4,5,6] [59:3,5] [61:22]
  [74:17] [75:23] [76:19,20]
  [88:7] [98:17] [103:6,7]
  [115:8] [117:13] [120:15]
  [142:13,18] [146:23]
  [185:11] [203:12] [228:14]
  [233:11] [266:23] [318:12
  .20]
involvement [61:24] [76:13]
  [114:15]
irrespective [49:12] [61:13]
irwin [49:17] [50:20] [55:23]
  [56:11] [181:9] [188:20]
  [192:5] [194:21] [221:5]
  [224:3] [242:17] [259:24]
  [264:7,10] [266:8]
irwins [182:8]
isnt [95:19] [136:15] [149:24]
  [261:24] [297:13]
isolation [190:5]
issuance [127:18]
issuances [102:21,23,24]
issue [126:22] [127:13,14]
  [133:13] [209:4] [216:13]
  [235:24] [236:14,17]
  [239:24] [254:3] [268:3]
  [297:18] [308:11]
issued [16:19] [18:2] [32:14]
  [62:14] [63:3] [66:14]
  [67:23] [72:25] [127:9]
  [128:10] [236:24] [237:19]
  [239:18] [253:16] [281:6]
  [304:24] [305:2] [306:21]
  [310:2,5]
issuer [237:22]
issuers [216:19] [233:23]
issues [51:23] [182:13]
  [218:4]
issuing [215:22] [216:4]
  [236:12] [245:13]
items [258:12]
itself [19:14] [21:25] [23:7,19]
  [42:5] [60:16] [71:15]
  [78:3] [92:22] [93:3] [100:
  17] [113:16] [118:17]
  [135:19] [137:2] [235:23]
  [244:3] [253:2] [277:8]
  [292:8] [306:8] [322:8]
ive [13:6] [46:15] [55:16]
  [70:2] [96:11] [162:16]
  [169:14] [183:6] [215:19]
  [218:2] [250:23] [263:6]
  [313:20] [323:22]

J

jack [250:25] [251:2]
james [50:17] [190:4]

[221:9,11,12] [258:13]
  [259:23] [262:4,5,8,12,25]
janie [251:9] [291:6]
january [8:18] [189:5]
  [193:11,15] [197:9,10]
  [270:17]
jared [227:13,14]
jareds [228:17]
jesse [293:3]
job [68:18] [84:13,14]
  [134:10] [144:6,25]
joe [185:3] [200:21] [201:20]
  [248:8]
john [200:23] [201:21]
  [226:18,19] [247:24]
  [251:5]
joined [227:14]
jointly [104:14]
jr [3:15]
judgment [118:15]
july [28:13]
june [4:6] [13:24] [142:8]
  [329:20]
jurisdiction [142:5]
justin [3:16] [4:21]

K

kareem [200:10,11] [202:3
  ,6,24] [226:10] [256:14,23]
  [257:9,10] [260:14,19]
k-a-r-e-e-m [200:11]
kareems [206:11] [247:23]
  [260:18] [264:23]
keep [169:16] [217:25]
  [298:8]
kept [228:18] [294:24]
key [153:20] [260:20,21]
  [261:7] [277:25] [316:20]
kicks [236:5]
kind [16:22] [18:25] [20:17]
  [21:9] [24:14,19] [26:16,21]
  [37:20] [45:14] [48:14]
  [56:10] [60:9] [66:16,20]
  [68:19] [74:2] [84:7] [91:3]
  [92:24] [94:16] [98:14]
  [102:9] [105:10] [112:11]
  [122:13,15] [123:11]
  [124:2] [125:5,8,11] [127:
  2] [134:5] [149:22] [150:11
  ,12] [151:17,25] [153:16]
  [157:11] [160:9] [163:5]
  [174:22] [175:10,14,16,21]
  [176:4] [183:25] [213:3]
  [223:22] [224:15] [225:9]
  [231:21] [234:18,21]
  [236:5] [238:12] [258:14]
  [261:15,17] [270:9,10]
  [285:15] [302:15] [313:20]
  [314:15,16] [316:23]
  [317:6] [321:7]
kinds [18:2] [22:7] [32:2,14
  ,16] [321:5]
knew [159:6] [202:8] [271:

16] [272:13,14] [301:20,25]
knocking [321:4]
know [5:21] [10:15] [11:14]
  [16:16] [23:13,16] [24:3,16]
  [28:10] [44:5,17] [45:4,10
  ,15,16] [46:22] [47:7]
  [50:4] [73:22] [79:15,16,19
  ,23] [82:9] [84:12] [85:17]
  [94:9] [97:21] [98:16]
  [105:12] [108:15] [109:8]
  [114:5,7] [117:7] [119:13]
  [120:18] [123:24] [125:17]
  [128:9,13,15,19,25] [129:
  4] [130:9,14] [131:5,6]
  [133:19] [136:4] [141:20]
  [142:16] [143:7] [144:17,18]
  [145:19] [146:10] [148:18]
  [150:12,15] [151:24,25]
  [152:14] [153:12] [155:8,17]
  [160:6,25] [161:2] [162:7,15]
  [163:7] [164:11] [172:18]
  [173:7] [174:19] [175:8]
  [178:5,6] [179:21] [185:4]
  [186:7] [188:9,21] [190:7,10]
  [192:14] [193:4] [195:22]
  [196:13,16] [198:19]
  [199:5] [201:9] [202:11,14
  ,23] [203:2,11] [204:4]
  [205:6,22] [209:25] [210:23]
  [211:20] [212:9] [215:12,24]
  [217:9] [221:3] [224:18,20]
  [231:12,16] [237:8] [241:7
  ,8,13] [242:5,11,18] [247:17]
  [250:21] [251:18,19]
  [252:10] [255:17,18,21]
  [257:16,19,20] [259:25]
  [262:17] [263:2,19] [266:17]
  [267:10] [270:16] [271:15]
  [272:22] [275:14,21]
  [277:6] [284:17] [286:25]
  [287:10,11] [289:24]
  [290:2,22] [293:23] [295:19]
  [296:8,14] [299:19] [301:8]
  [302:6] [303:20] [305:20]
  [314:3,6] [316:7,8] [317:18]
  [319:10,16,22,23,24]
  [320:5,6] [321:10]
knowing [27:14] [59:18]
knowledge [23:25] [25:22]
  [27:3] [73:9] [92:15] [116:
  24] [117:4] [120:23] [121:16]
  [142:15] [165:6] [187:25]
  [188:5] [191:15] [195:12]
  [205:13] [220:22,24]
  [232:19] [256:12] [285:10
  ,11,13] [300:15,17] [312:2]
known [17:13] [34:23,25]
  [159:16] [305:16]
kreem [200:10]
k-r-e-e-m [200:10]

L

labor [28:18]

lack [190:15] [236:22]
language [267:18]
lap [269:19] [270:23] [271:
  15] [273:21] [274:20]
  [276:8] [277:17] [279:6,24
  ,25] [282:2,12,16] [283:25]
  [284:10,14,20] [285:7,23]
  [296:10,12] [319:12,20]
lapis [287:9]
laps [276:6]
large [61:2] [84:22] [94:13]
  [97:7] [101:9] [114:7]
  [115:7] [138:9] [147:7]
  [148:18] [268:22] [281:13]
  [283:19] [289:4]
largely [26:11] [146:11]
  [148:5] [152:19] [283:14]
larger [90:12] [170:7]
last [11:19] [36:20] [82:4]
  [108:25] [109:3,4,5] [139:
  12] [174:3] [175:12] [263:15]
lasted [258:23]
late [91:23] [147:23] [171:14
  ,16,18] [172:7,20] [184:14]
  [209:9] [222:25] [250:9]
  [287:15]
later [34:25] [71:22] [121:2]
  [172:14,25] [176:25]
  [185:14,25] [187:12]
  [188:10] [190:22] [192:20
  ,21] [219:10] [239:11]
  [256:6]
latest [120:24] [205:19]
latter [20:2]
law [5:13] [166:3] [169:6]
lawyer [257:2] [313:3,22]
lawyers [31:11] [41:20,24]
  [140:12,17,25] [142:15,19]
  [143:5] [175:24] [237:5]
  [292:4]
lay [244:15]
laymans [126:10] [313:20]
lcd [179:19,20]
lead [103:21,23,24] [104:2
  ,3] [170:8] [216:7]
leading [52:11] [53:18]
leads [104:10]
leaf [314:20]
least [29:21] [51:10] [58:21]
  [74:8] [103:14] [122:4]
  [129:13] [147:11] [198:16]
  [207:16] [227:22] [246:21]
  [286:25] [288:22] [303:9]
leave [168:16] [172:15]
  [188:23] [229:3] [263:8]
leaving [35:11] [171:20]
  [172:4,22]
led [81:20] [144:17] [215:3]
lee [251:9] [301:10,25]
  [302:2,6,11]
l-e-e [251:9]
leeway [289:7] [316:5]
left [173:2] [184:25] [188:17]
  [263:10]

legal [15:15] [16:20] [19:13]
[33:8] [36:19] [41:21]
[58:12] [73:23] [107:5]
[126:9] [128:14,20] [134:19
,20] [140:11] [141:19]
[142:2] [143:4] [175:7]
[185:11] [239:22] [240:22]
[241:6] [256:19] [287:5,24]
[291:16] [308:6,9]
legally [15:25] [238:14]
[274:2] [313:16]
lehman [80:20]
lend [166:21] [169:17]
lender [40:13] [77:9] [78:7]
[84:17]
lenders [79:5] [112:12]
[113:3] [160:5] [171:20,22]
[172:4,10,12,21] [173:2,17
,20] [276:24] [321:5]
lending [77:11,13] [80:24]
[137:24] [147:2] [148:5,25]
[150:11,12] [151:15]
[152:13] [156:15,22]
[279:12]
lent [88:19] [94:9]
less [60:14] [61:11] [77:2]
[109:10] [137:21] [138:14]
[151:5] [152:17] [215:24]
[217:10] [222:14,19,20]
[223:6] [246:24] [259:7,9,14]
[264:21] [278:14] [280:15]
[283:7] [306:3] [321:21]
lesser [187:18]
let [10:8] [24:18] [27:18]
[34:14,15] [42:13] [47:9,21]
[49:8] [59:17,21] [67:16]
[73:12] [92:13] [99:11,23]
[106:7] [126:14] [137:6]
[139:24] [155:21] [159:22]
[166:24] [169:14] [171:24]
[179:24] [183:6,8] [189:9,10
,17,21,25] [190:24] [197:16]
[203:15] [206:22] [208:9]
[286:4]
lets [24:11] [27:11] [65:24]
[96:16] [137:7] [141:7]
[157:23] [168:16] [176:13]
[198:24] [202:13] [219:12]
[252:11] [266:6]
letter [133:17]
level [7:8,12] [64:7] [70:17]
[72:4] [282:10]
leveraged [145:23]
lewis [292:4]
li [251:7,8]
l-i [251:7]
liability [63:19] [64:2]
[120:12]
liable [104:14]
libor [71:22] [118:13] [177:
15]
lien [306:6]
likely [70:5] [212:5] [229:22]
limit [182:4,8]

limits [48:13,15]
line [72:10] [82:13,15]
[97:16,25] [152:22] [156:22
,23,25] [167:25] [185:20]
[186:2,5,11] [187:2] [214:
11,15] [218:23] [231:9]
[247:11,12] [258:21]
[259:18] [268:21] [269:3,6
,8] [286:8] [328:5]
lines [186:16] [203:25]
[258:15] [321:23]
linking [166:4]
linklaters [3:12,21] [4:10,20
,22,23]
liquid [175:12]
liquidation [4:5,18] [111:22]
liquidity [30:17] [116:23]
[117:3] [210:12] [212:17,20]
[213:2] [270:24] [271:4]
[284:15,16] [299:5] [306:14]
[325:23]
list [35:12] [36:3] [69:10]
[121:10] [258:12] [261:18]
[264:20,22,23,24] [267:11
,13] [288:10]
listen [189:23]
literally [37:23] [38:19]
[39:6] [109:5] [198:16]
[261:4]
literature [174:24]
little [26:2] [27:12] [30:2]
[34:10] [45:2] [60:13]
[89:7] [95:7] [109:10]
[144:9] [166:24] [172:6]
[183:22] [199:16] [231:13]
[234:10,22] [236:20]
[242:19] [246:24] [252:7,10]
[267:5,19] [273:8] [286:21]
[287:2] [303:6] [304:16]
[306:17] [307:10]
live [150:6,8]
lives [67:12]
living [238:21]
llc [314:21]
load [149:6]
loan [9:10,17,21] [12:2,21]
[15:16,18,23] [16:3] [21:21
,25] [22:6,16,23] [36:12,14
,17,22] [37:6,20,23] [38:11]
[48:8,21] [52:18] [53:11,20
,24] [54:3,4] [55:6,16]
[61:9] [78:3] [85:6] [96:10
,12] [97:9] [114:16] [127:4]
[135:23] [141:22] [148:6]
[151:25] [174:3] [176:5]
[177:7] [179:4] [192:20]
[201:25] [202:4,16] [213:5
,7,8] [216:15] [217:18]
[221:19] [234:8,24] [235:12]
[238:4] [239:13] [261:2,9,10
,16,20] [262:22,23] [264:25]
[267:22,23,24,25] [268:10
,11,14] [269:7,25] [271:5,19
,25] [272:7,17] [273:2]

[276:15] [277:2,8,9,11,14,18]
[278:6,20,22,23,24] [279:
4,7] [283:16,20] [284:11]
[286:9] [287:4,25] [288:3]
[291:25] [293:16,18,22]
[294:17,19] [295:23]
[299:6,11] [300:24] [303:8]
[306:4] [307:8] [312:13]
[313:17] [315:18] [318:14]
[319:12,18] [320:11]
[324:5] [325:20]
loanbyloan [135:23]
loan-by-loan [135:23]
loans [9:18,24,25] [15:11,13
,17,23] [16:4,9,17,18]
[17:2,4,8,9,10] [21:20,22]
[22:3,5,6,7,11,12] [25:3]
[36:23] [37:4,7,15,23]
[38:2,12] [40:8] [59:2]
[60:9] [67:6] [75:10,14]
[85:14] [94:6] [95:3] [96:19
,22] [97:4] [111:18] [115:17]
[127:3,14] [130:21] [132:19]
[133:12] [147:14,20]
[148:14,19] [149:2,5,14,15]
[151:4,17] [153:4] [156:7]
[157:9] [160:4] [164:13]
[175:14,15,20] [176:14]
[186:12,14] [187:7] [212:17]
[214:3] [215:11,17] [217:15
,16,22] [222:4,9,11,18]
[233:20] [235:8,20] [238:8]
[239:9,11,15,17,22] [240:
5,9] [251:25] [252:22,23]
[253:7,11,14] [260:23]
[261:9,21] [262:24] [264:14]
[265:2] [268:15,25] [279:18
,19,23] [280:5,6,7,16]
[281:4] [282:2] [283:24]
[288:23] [290:3] [296:4]
[302:13] [313:10] [314:18]
[318:3] [320:11] [322:11]
[325:25]
loantovalue [15:18] [22:6]
[318:14]
loan-to-value [15:18]
[22:6] [318:14]
local [60:10,22]
located [202:19,20]
lock [133:2,7]
london [202:21] [256:23]
[257:2,6]
long [7:4,17] [11:14] [19:20]
[39:2] [58:19] [61:16,18]
[82:4] [105:23] [115:5]
[116:23] [117:2] [123:5]
[124:18] [199:5] [225:19]
[263:8] [264:22,24] [267:13]
[269:23] [284:16] [288:9]
[309:7] [321:4] [323:9]
longer [9:15] [31:14] [263:
18] [276:9] [307:10]
longterm [61:18] [105:23]
[116:23] [117:2] [284:16]

long-term [61:18] [105:23]
[116:23] [117:2] [284:16]
look [31:2,4] [129:18]
[134:5] [146:12] [147:25]
[151:18,19] [175:10]
[187:22] [199:4] [260:10]
[289:22] [304:2]
looked [110:5]
looking [67:4] [73:13,14]
[179:16] [211:24] [231:15]
[300:19] [317:16]
looks [139:19] [140:6]
[141:2] [143:24] [144:3]
[158:20] [199:19] [205:3]
[207:9] [208:18,24] [220:13]
[226:8,11] [230:17] [233:3]
[246:5] [249:13] [256:4]
[264:5] [290:17] [291:17]
[292:25] [294:12] [303:2,19]
[304:5] [310:17]
loosely [267:19]
los [3:7] [4:9]
loss [22:21] [113:11,18,21]
[114:11] [149:7] [243:22]
[280:11,17] [283:12,13]
losses [89:14,15] [111:21]
[243:20] [281:7,11,12]
[282:7]
lost [91:19] [92:4] [98:2]
[134:10] [299:3] [307:7]
lot [47:12] [49:24] [148:8]
[153:14] [186:13] [230:25]
[259:14] [283:19] [317:8,10]
lotus [62:9,23] [254:8,11,13]
low [150:3,4,5,13]
lower [88:20,21] [89:7]
[90:9] [138:17] [151:12]
[153:5] [203:18]
lowest [94:4] [208:22]
lpf [299:11]
ltcm [105:25] [114:5]
ltd [8:4]
lunch [167:25] [168:10,17]
[170:20]
luncheon [170:25]

M

m&a [165:20] [228:7]
ma [50:8]
m-a [50:8]
mac [77:25] [305:21]
macdowell [250:25]
machlis [256:18]
m-a-c-h-l-i-s [256:18]
madison [12:12]
madness [230:21]
mae [77:24,25] [305:20]
mail [133:23]
main [56:8,10] [244:11]
[318:22]
maintain [68:23] [148:6]
[259:18]
major [112:24] [270:5,6,7]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

majority [136:16,17] [289:5]
maker [237:21]
making [21:16] [46:18] [53:19] [91:11,14] [147:16] [148:10] [165:17] [169:6] [183:4] [211:9,16] [267:2] [297:25] [309:23] [311:22] [312:8] [317:15] [324:17]
malletta [50:6,8,10] [56:6]
m-a-l-l-e-t-t-a [50:10]
manage [264:9]
managed [137:10] [155:12] [240:23] [285:12]
management [48:2,6,12] [50:2] [105:23] [144:20] [145:17] [183:10] [224:23 ,24] [235:7] [245:3,8] [274:5,12]
manager [49:10] [179:18] [251:15]
managers [49:13] [68:18] [255:9]
managing [144:6,25] [145:6] [211:15] [233:12]
mandates [317:4]
manner [76:7]
manufacture [35:23]
manufactured [6:6] [8:24] [9.6] [10:2] [11:21] [12:23] [27:21] [33:15] [34:20] [35:5,24] [68:20] [70:5] [73:11] [75:3,11,20] [77:12 ,13] [78:17] [81:8,12] [82:18,19] [87:14] [99:15] [100:2] [105:19] [110:14,22] [111:5,7,14] [112:14,25] [114:18] [150:11] [152:4,6 ,9,11,15] [153:8,21] [154:2] [171:22] [172:4] [173:11,12] [181:13] [206:2] [227:7] [228:11] [305:19]
manufacturer [36:6] [78:13] [154:2] [299:22,23]
manufacturers [76:5] [77:17] [154:6,8] [173:18]
manufacturing [75:5,7] [81:8]
march [191:11] [192:2]
mark [138:25] [139:2] [158:16] [163:10] [168:6] [191:2] [199:10] [206:23] [208:10] [249:6] [255:23] [263:24] [290:11]
marked [139:6,16] [143:13] [158:18] [191:5] [199:13] [204:25] [207:4] [208:16] [220:12] [226:7] [230:15] [232:25] [249:11] [256:2] [257:24] [264:3] [290:15] [292:23] [294:5] [302:23] [303:17] [310:14]
market [19:17] [26:12,16] [28:22] [29:16] [30:13]

[61:3,8] [68:15] [70:3,4] [81:12] [97:21] [112:21,22] [117:21] [118:11,14,16,20] [145:21] [150:2,22] [151:9] [153:21,23] [157:18] [175:10] [215:13] [236:12] [265:3] [268:18]
marketability [281:18]
markets [106:5] [213:25] [216:2]
marriage [329:17]
match [109:11]
material [180:3]
materials [17:14,16] [19:3 ,5] [66:4,15,20]
matter [4:4] [10:23] [24:11] [30:11] [33:25] [48:3] [134:5] [182:21,23] [183:3 ,7] [238:12,17] [241:23] [242:2] [329:18]
matters [153:2] [313:2]
matthews [14:15,22]
mature [16:12]
matured [236:18]
matures [15:16] [216:12]
maturity [15:15] [186:22,24] [187:13] [278:25]
maximum [261:3]
may [4:25] [5:16] [11:10] [27:16] [34:6] [41:19] [47:17,20] [54:11] [62:8] [105:20] [123:4] [131:3,4] [138:10,21] [139:21] [166:16,23] [168:14] [176:7] [178:4] [186:9] [190:2] [191:19] [196:23] [204:12] [205:10] [226:24 ,25] [227:21] [234:17] [236:19] [263:14] [286:2] [294:8] [296:7] [303:9,21,25] [316:24]
maybe [37:25] [49:3] [60:13] [68:20] [112:6,7] [144:13] [147:23] [183:6] [186:13] [287:4]
mbs [68:21,22]
mean [6:22] [14:24] [15:23] [26:3] [45:23] [46:3] [52:15] [62:6] [65:12] [71:17,25] [73:24] [80:5] [82:15] [115:13] [119:10,11] [121:21] [122:25] [124:15] [147:19] [149:12,13] [168:20] [172:10] [177:23 ,24] [185:19] [196:9] [207:24] [222:14] [233:17] [237:12] [240:21] [248:16] [257:15] [260:6] [262:3,5] [307:24]
meaning [73:23] [227:8] [253:5] [278:23] [291:22]
means [15:12] [132:18,20] [208:8] [213:18] [260:10] [307:25] [314:13]

meant [112:2] [144:24] [145:18] [147:15] [151:11] [153:5] [244:23] [259:25] [283:8]
meantime [152:4]
measure [82:21] [148:17] [182:25]
measured [26:16] [40:15] [48:17] [71:19] [81:25] [149:17]
measures [157:17]
mechanisms [176:4]
medication [5:16]
meet [151:5] [202:17] [216:16] [311:10,13]
meeting [193:8] [266:18,21] [301:10,13,16,19]
meetings [128:24] [315:4]
member [256:22]
members [39:16] [70:22] [122:4]
memorandum [191:4] [195:15] [199:11] [330:17 ,]
memory [5:19] [27:17] [41:7] [119:23] [136:2] [146:24] [156:10] [190:25] [191:9] [198:4] [206:11] [207:13] [227:19] [246:20] [289:3] [324:18]
menkhaus [228:21]
m-e-n-k-h-a-u-s [228:21]
mentioned [76:2] [96:21] [123:10] [160:2] [234:17] [280:25] [308:22] [316:25]
mere [325:23]
merely [48:20]
merged [245:6]
merger [7:21] [227:16] [228:4] [300:11]
mergers [7:23]
message [140:8] [141:8] [142:2] [143:16] [203:24] [208:22] [263:20] [294:8]
met [202:14]
method [57:18] [58:22]
methods [212:13]
mh [205:14,20] [226:20]
michael [3:15] [4:19]
mickey [122:6]
mid [99:2,15]
mid2001 [99:2,15]
mid-2001 [99:2,15]
middle [153:15]
miller [220:14,15] [221:5] [222:13] [223:6] [225:24]
millers [223:12]
million [94:6,7,8,9,10] [95:4,5,10,13] [96:3,4] [120:25] [121:3] [145:21] [160:19] [163:15] [164:8] [170:15] [171:13] [172:20] [185:24] [190:22] [191:10 ,18] [194:5] [195:20] [224:

12,14] [250:16] [258:16,25] [259:8,18] [261:4] [306:12] [308:21,23] [309:3]
millions [95:3]
mind [43:14] [60:2] [63:21] [116:13] [140:2] [203:9] [206:5] [211:25] [251:22] [252:4] [273:8] [312:7]
minds [193:9]
minimum [134:17]
minor [13:15]
minutes [99:24] [116:7] [291:3] [315:9] [323:5]
misled [257:13]
missed [307:3]
misspoke [167:7]
misstated [282:13]
mistake [46:19]
misunderstand [166:21]
misunderstood [99:19] [166:16] [167:9]
mitigate [134:25]
mix [187:5] [296:24] [297:24]
mixing [298:14]
mode [66:20]
model [131:7] [207:20]
modeling [121:24] [122:15] [124:3] [131:23] [132:7]
models [18:9,11] [121:12,18] [122:10]
moment [40:21] [190:9] [215:16] [248:21] [323:12]
monetize [58:23] [59:20] [95:14]
monetized [113:5]
monetizing [57:18] [75:14] [76:9] [157:5]
money [80:8,9,10,11,24] [127:16,24] [130:17,20,25] [166:21] [169:18] [213:18 ,19] [276:4] [298:14,20,21] [305:10] [306:2] [307:9,18] [309:4] [314:12] [315:24,25] [316:2] [319:18] [325:7,14 ,20]
monitoring [121:17]
month [22:4] [26:17,18] [28:8] [84:23] [186:17] [227:18] [232:13] [307:5,16]
monthly [132:23] [153:2,6] [231:2,5]
months [40:9,10] [106:6] [121:2] [190:21] [194:5] [217:10] [223:8] [271:18] [272:7,18] [285:25] [309:12]
monthtomonth [307:5]
month-to-month [307:5]
moodys [18:4] [101:13] [265:10,14,17] [266:7]
morning [5:9,10] [200:7,8] [207:18] [257:19] [275:23]
mortgage [6:6] [13:13] [15:2,16,25] [18:6] [19:13] [21:2] [25:4] [31:25] [35:8]

[60:15,23] [62:12] [74:7]
[77:11,22] [78:21] [84:8,9
,10,13] [85:6] [94:6] [101:8
,12] [110:17] [111:11]
[112:3,12] [113:3] [122:13]
[150:22] [151:8] [152:5,25]
[153:4] [161:20] [175:15]
[181:15,17] [208:5] [210:8
,9] [213:25] [222:11] [226:
20] [230:24] [231:2,6,12]
[238:8] [243:3] [247:11]
[248:18] [252:22,23]
[253:7,15] [260:23] [261:9]
[267:24] [276:24] [278:3]
[279:11] [291:3,21] [295:21]
[296:2,4] [300:20,21,23]
[301:5] [305:18] [311:10,13]
[313:6] [321:5]
mortgaged [165:22]
mortgages [58:5,11,16]
[59:20] [61:3,6,7,19]
[84:20] [93:10] [126:18,19
,20,21] [132:16,18] [152:2]
[157:3] [176:16] [217:23,24]
[218:5] [231:23] [232:2,4]
[238:7,11] [268:20] [273:4]
[302:12] [305:11,21]
mortgagor [307:2,7]
mostly [175:11]
motivated [144:5] [173:7]
[275:5]
mouth [99:21] [298:19]
move [47:12] [183:13]
[230:25] [277:6]
moved [213:6]
moving [26:16]
mr [4:4,15,17,19,21,23]
[5:8,9] [6:19] [8:12] [9:2]
[10:8,11,15,20,25] [11:6]
[24:15,22] [25:16] [26:23]
[27:6] [28:5] [29:10] [33:22]
[34:7,13,18] [38:8] [39:20]
[40:17,21] [41:15] [43:10]
[44:13] [45:20] [47:5,8,11
,14,20] [51:13] [52:13,25]
[53:8,21] [54:9,11,24]
[55:2] [56:14] [63:15]
[65:9,17] [69:8] [72:8,12,14
,20,21] [82:14] [83:14,17,18]
[87:21,25] [99:10,11]
[114:23] [116:4,7,10,12,14
,20,21] [119:22] [123:2,21
,25] [124:13] [138:25]
[139:8,10,11,13,14,17,18]
[140:9,11] [141:8,10,18]
[142:2,4] [143:9,15,19]
[146:17] [154:23] [155:6,16
,19] [158:3,9,15] [160:21,25]
[162:22] [167:20,24]
[168:5,8,11,12,16,18,19,24]
[169:19] [170:19,21]
[171:11,12] [180:21]
[182:8] [185:5,15] [188:3]
[189:8,13,19,23] [190:12,24]

[193:21] [196:18,19,23,25]
[197:4,7,9,10,11,12,13,14
,16,18,19,25] [198:2,5,8,9
,11,13,15,23,25] [199:9,15]
[204:2,10,15,17,19,21,23]
[206:22] [207:6,7,8,23]
[208:9,11,12,22] [218:19,22
,23,24] [219:12,14] [220:6
,7] [222:13] [223:6,12]
[225:21,24] [226:6,12,14]
[227:25] [230:12] [232:21]
[242:17] [244:22] [245:12
,19,21,23,25] [246:4,9]
[247:7,18] [248:3] [249:5,8
,15,16] [250:5] [252:2,11,15]
[255:22] [257:8,20] [258:10]
[260:12,14,17] [261:24]
[263:17,19,22,23] [264:7,10]
[265:7,24] [266:4,8] [270:
25] [273:10,11,17,19,20]
[274:14,24] [275:3,5,8]
[284:19] [285:6,10,12,21]
[286:7,12,15,16] [288:17]
[289:14,18,19] [290:10]
[291:15] [292:19] [293:24]
[294:7,25] [296:9,12,23]
[297:11,14] [298:10]
[302:19] [303:13,20,21]
[304:2] [310:10,22] [311:22]
[313:18] [315:8,11,17]
[322:2] [323:4,6,8] [326:8
,10] [330:4]
ms [6:21] [7:2]
muir [24:6,15] [29:21]
[86:24] [140:9,11] [141:18]
[142:2] [164:19] [167:20]
[202:8,14] [271:17,23]
[273:20] [275:3,8] [284:19]
[285:10] [296:9] [319:4]
muirs [169:15]
multipage [199:11] [330:]
multiple [47:15] [191:23]
[197:5] [198:6] [199:3]
mutually [300:9]
myles [301:11]
myself [166:23] [220:11]
[282:13] [285:2]

N

name [9:7] [12:19] [14:13,14]
[31:10,12] [50:6] [78:20,21]
[94:18] [123:17] [124:5]
[162:15,17] [184:15]
[246:12,13] [255:5] [287:5]
[312:11]
named [14:13] [73:10]
names [6:9,11] [45:10]
[46:16,22,25] [150:24]
[176:21] [256:16] [270:10]
narrow [27:8]
narrowed [150:6]
narrower [27:8]
nature [15:19] [16:7] [18:8]

[28:19] [36:10] [48:6,18]
[51:25] [63:2] [66:2,19]
[67:10] [84:9] [85:8,12]
[88:16,18] [89:22] [94:6]
[108:8] [110:12] [118:12]
[145:18] [146:8] [187:22]
[193:8] [207:20] [230:2]
[261:8,9] [300:4] [304:11]
[308:7] [323:23]
nay [43:3,17] [44:12,20]
[45:19] [46:7,13,20] [47:4
,13] [49:19]
near [30:17] [71:16] [145:3]
nearly [270:6]
necessarily [38:10,16]
[42:23] [51:5] [100:8]
[113:4] [136:15] [150:5]
[159:23] [160:8] [178:17]
[231:15,17] [277:11,20,21]
necessary [262:21]
necessity [82:25]
need [32:13] [36:2] [41:5]
[65:20] [76:24] [90:8]
[93:5] [96:10] [116:4]
[123:3] [129:18] [131:19]
[132:17,22] [141:15]
[143:19,25] [156:9] [164:9]
[165:8] [168:19] [183:9,14
,18] [187:22] [199:15]
[203:20] [212:16] [213:18
,19] [214:7,8,14] [236:19]
[252:12] [261:25] [262:2,15]
[271:12] [286:12] [289:21]
[296:24] [304:4]
needed [89:15] [117:21]
[311:25] [322:23] [325:25]
[326:3]
needing [67:3]
needs [15:21] [157:9]
[216:16]
negative [269:15] [278:11
,13,16,18] [280:22]
negotiate [97:5]
negotiated [109:22] [288:7]
[318:18] [321:18]
negotiating [44:7]
negotiation [41:12] [42:2,15
,25] [43:24] [288:3] [318:13]
[321:12]
negotiations [41:16] [108:
17,23] [319:7]
neighborhood [27:22]
[277:5]
neither [152:25]
net [94:10] [112:10] [148:23]
[153:6,10,18] [214:6]
[281:10] [283:5,11]
network [78:23]
nevada [129:14,16]
new [3:14] [4:11] [12:12]
[39:14] [41:2] [42:21]
[43:18,23] [44:6,11] [51:3
,6,11] [54:6,23] [62:13,14]
[83:8,10,12] [86:3] [87:19]

[89:2] [124:11] [125:4,7,10
,20] [126:4,7] [134:10]
[151:2] [163:11] [172:16]
[178:5] [180:7] [183:22,24
,25] [202:19,21] [220:16]
[233:10] [249:21,24]
[250:3] [251:24] [253:6]
[254:3,4] [255:15] [277:13]
[282:19,25] [283:4,6]
[290:3] [291:9] [296:24]
[297:18,20,23] [298:7,15,20
,24,25] [302:13] [304:22,25]
[321:7] [329:3,5,10]
newly [253:7] [318:3]
news [144:7] [145:2,6]
[247:4]
newspapers [106:3]
next [26:18] [28:8,11,12]
[194:4] [232:13] [285:18]
[292:9]
nick [144:16]
night [257:12,17]
no [4:3] [9:15] [11:21,23,25]
[12:7] [13:3,6,22] [20:13]
[21:8] [23:12] [24:9] [26:25]
[28:24] [31:14] [32:10]
[41:7] [42:10,13,14] [43:19]
[46:12,19] [51:18] [56:17]
[58:17] [59:9] [75:25]
[84:14] [88:8] [91:14]
[93:11] [99:21] [104:24]
[106:9,25] [108:10] [119:2
,4] [120:17] [122:20,23]
[123:23] [125:9] [126:5]
[127:6] [130:10] [132:8]
[133:13] [141:25] [144:10]
[150:7,8,10] [157:21]
[158:2,18] [159:10] [160:21]
[161:7] [162:23] [165:10]
[167:7] [172:2] [179:7]
[181:4] [182:19] [187:19]
[188:4] [189:7] [191:5,12,13]
[192:4] [194:15] [195:2,11]
[199:25] [200:3,4] [204:15
,25] [206:13] [208:2,16]
[209:14] [210:25] [211:14]
[214:4] [219:8,10,17,20,24]
[220:24] [222:5] [225:7]
[226:14] [227:10] [228:2]
[229:10] [230:11,15]
[234:6] [237:13] [241:12,17]
[246:18] [257:24] [259:19]
[260:12] [263:18] [264:3]
[265:9] [268:3] [276:9]
[277:17] [284:4,24] [290:23]
[293:12] [298:12] [302:16]
[309:15] [314:2] [315:13,16]
[319:21] [320:14] [322:4,6]
[323:12] [329:17] [330:7,15
,,23] [331:3,8,,13,] [332:3,5
,]
nobody [56:19]
non [68:12,14,21] [77:11,21]
[110:16] [112:3,11] [113:3

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

,19] [151:8] [181:15,17]
[213:25] [226:20] [247:11]
**nonagency** [68:21]
**non-agency** [68:21]
**nonconforming** [77:11,21]
[110:16] [112:11] [113:3]
[151:8] [181:15,17] [213:25]
[226:20] [247:11]
**non-conforming** [77:11,21]
[110:16] [112:11] [113:3]
[151:8] [181:15,17] [213:25]
[226:20] [247:11]
**none** [15:24] [21:12] [107:16]
[201:9]
**nonetheless** [92:11]
**nonguaranteed** [113:19]
**non-guaranteed** [113:19]
**noninstitutional** [68:12,14]
**non-institutional** [68:12,14]
**nonperforming** [112:3]
**non-performing** [112:3]
**nonpublic** [11:9] [34:5]
**nope** [42:10] [103:4] [143:8]
[192:10] [220:19] [241:14]
[316:14]
**nor** [152:25] [262:18]
**norm** [66:6] [234:21]
**normal** [275:14]
**normally** [42:7,11,17]
[183.3] [275:15]
**nos** [139:5] [143:12] [199:12]
[207:3] [232:24] [249:10]
[255:25] [290:14] [292:22]
[294:4] [302:22] [303:16]
[310:13] [330:9,12,20]
[331:5,18,21,24] [332:10,13
,16,19,22]
**notable** [228:12]
**notary** [5:5] [171:6] [326:20]
[329:9]
**note** [62:14,16,18] [102:23]
[235:24] [236:4,7,9,25]
[237:19,21,22,23,25]
[240:2,3,13] [243:20]
[304:23] [305:2,9] [306:20
,21,22] [308:4,12] [309:12
,21,25] [310:4]
**noted** [171:3] [326:14]
**notes** [102:21] [235:24,25]
[236:3] [308:8,11]
**nothing** [96:6] [155:8]
[160:13,15]
**notice** [39:11] [114:16]
[134:14,15,17] [239:15]
[257:7]
**november** [52:23] [325:2]
**number** [7:23] [13:11,15]
[15:5] [39:11] [45:8] [60:9
,16] [63:24] [65:23] [73:10]
[76:24] [79:21,22] [83:2]
[85:3] [92:2] [94:25] [109:
19] [132:20] [137:21]
[146:21] [149:5] [172:7]
[173:9] [201:10] [231:16]

[233:25] [248:7,12] [251:21
,22] [253:25] [254:19]
[257:14] [267:16] [282:17]
[283:6] [284:7] [288:8,9,15]
[289:9,16] [298:6] [301:22]
[304:17] [308:21] [311:7]
[322:22]
**numbers** [250:17,20,22]
[275:25]
**numerous** [20:19]
**nutshell** [277:16]
**ny** [12:12] [245:19]

**O**

**oac** [272:6] [273:25] [311:9
,25] [312:6]
**oak** [314:20]
**oakwood** [5:23] [6:4] [8:23]
[10:10,19,22] [11:20]
[13:5] [14:3,7] [19:25]
[22:15,18] [23:7,9,10,19,20]
[24:5,14] [25:21] [32:8,15
,20] [33:5,24] [36:10]
[39:13,22] [40:19,24,25]
[41:16] [42:9] [43:2,7]
[44:6] [49:18] [52:22,24]
[53:20] [54:14] [56:25]
[57:14,17] [58:4,22] [59:15
,19] [60:8,19] [61:21]
[62:18,20] [63:3,9] [64:14
,20,25] [65:5,6,15] [69:6,25]
[72:23] [73:6,8,16] [74:5]
[75:19] [76:13,21] [78:22]
[79:4] [82:11] [83:18]
[86:9] [88:6] [90:7,8]
[91:12,19] [92:3,8,11,15]
[94:19] [96:3,9,12,18]
[97:20] [98:2] [100:15,16]
[101:21] [102:2,17] [103:8]
[104:25] [106:12] [110:6,13]
[112:12,18] [113:7,12,16]
[114:16,19] [115:2,9,20,21]
[117:6,9] [119:6] [120:15,18]
[124:11] [125:4,15,16,17,20]
[126:4] [127:3] [128:2]
[130:2,3,4] [131:14] [132:
6,10,11] [135:15,22,24]
[136:6,25] [137:8,16,24]
[138:11,18] [142:10]
[144:6,19] [146:12,14,23,25]
[153:25] [154:13] [156:17]
[157:12,17] [159:4,19,24]
[160:7,9] [161:22] [162:9,11]
[164:16,18,22,23] [166:8,20]
[176:5,17,19,22] [177:3]
[178:6,23] [185:6] [193:22]
[194:6,20,25] [196:14]
[201:8,12,15,17,25] [202:
4,9,12,24] [205:14,20]
[207:14] [209:16,20]
[210:3,6,21] [211:12]
[214:19] [217:2] [218:5,12
,13] [220:22] [237:6,11,18]

[239:3,16,19,21] [240:6,8]
[246:14,21,23] [251:21,23]
[253:20,24] [256:12]
[259:17] [268:9,20] [269:2
,22] [270:3,13,19,22]
[271:17] [274:2,12] [275:10]
[277:22] [278:2,11] [279:7]
[280:21,25] [281:9] [282:16
,20] [284:10,15,20] [285:13
,25] [288:4] [289:7] [291:16
,23] [293:17] [295:21]
[296:2] [298:3,20,21]
[299:25] [300:3,25] [301:3
,5] [302:4,5] [304:19]
[305:5,10,15] [306:9,19]
[307:4,8,16] [308:23]
[309:2,3,5,22] [310:7,9]
[311:8] [312:16] [315:20]
[316:12] [317:7,14,25]
[318:22,24] [319:2,10,16]
[320:8,10] [321:9] [322:8,12]
[325:22]
**oakwoods** [22:13] [33:13]
[34:21] [52:12] [53:18]
[54:8,25] [55:8] [63:18]
[64:10] [85:25] [90:15]
[91:18] [96:5,18] [102:20,22]
[104:6] [113:10] [114:11]
[116:2,23] [117:2,20]
[120:7] [135:6] [136:11,21]
[154:4,9] [157:24] [158:5]
[184:20] [192:16] [212:16]
[214:14] [226:2] [229:5]
[237:4,14] [259:21] [260:2]
[261:19,20,25] [265:6]
[267:16] [268:6] [269:19]
[270:23] [271:4] [282:24]
[283:21] [288:12,15]
[291:21] [316:17] [325:14]
**oath** [5:11,12]
**object** [24:22] [43:10]
[47:5] [56:14] [58:17]
[185:15] [189:13] [190:14]
[225:21] [270:25] [322:2]
**objection** [8:12] [9:2] [25:16]
[26:23] [27:6] [28:5] [29:10]
[38:8] [39:20] [40:17]
[44:13] [45:20] [52:13,25]
[53:8,21] [54:9,24] [63:15]
[65:9,17] [69:8] [82:14]
[87:21] [124:13] [142:4]
[146:17] [169:19] [188:3]
[189:8,10] [193:21] [227:25]
[288:17] [289:14] [294:25]
[313:18]
**obligation** [216:19]
**obligations** [18:18] [277:7]
**obligor** [277:14]
**obrien** [50:14] [56:5]
**obtain** [54:5] [118:24]
[238:13,14] [299:5]
**obtained** [79:16]
**obtaining** [54:21] [244:23]
**obviously** [15:15] [107:10]

[211:20] [260:2] [281:23]
**occasion** [18:24] [39:24]
[68:11] [92:7] [102:6]
[103:20,21] [109:4] [117:11
,25] [129:23] [131:15]
[187:20] [202:15] [246:24]
[267:3]
**occasional** [147:3]
**occasionally** [16:4] [160:3]
[192:25] [221:12]
**occasions** [80:22] [94:25]
[109:7,19] [114:4] [117:19]
[118:4] [125:23] [131:21]
[142:21] [164:18] [249:19]
[289:2,7]
**occupied** [310:22]
**occur** [65:13] [74:20] [84:7]
[109:15] [111:21] [194:10]
[254:14,16] [299:17]
**occurred** [62:21] [64:18]
[76:12] [109:14] [117:25]
[118:4] [280:4] [281:7]
[301:12] [309:20]
**occurring** [87:20] [281:24]
[282:10]
**oclock** [257:11,17,19]
**oddly** [171:25]
**odriscoll** [4:4] [5:1,9] [6:1]
[7:1] [8:1] [9:1] [10:1,20]
[11:1] [12:1] [13:1] [14:1]
[15:1] [16:1] [17:1] [18:1]
[19:1] [20:1] [21:1] [22:1]
[23:1] [24:1] [25:1] [26:1]
[27:1] [28:1] [29:1] [30:1]
[31:1] [32:1] [33:1] [34:1,7
,18] [35:1] [36:1] [37:1]
[38:1] [39:1] [40:1] [41:1]
[42:1] [43:1] [44:1] [45:1]
[46:1] [47:1,14] [48:1]
[49:1] [50:1] [51:1] [52:1]
[53:1] [54:1] [55:1] [56:1]
[57:1] [58:1] [59:1] [60:1]
[61:1] [62:1] [63:1] [64:1]
[65:1] [66:1] [67:1] [68:1]
[69:1] [70:1] [71:1] [72:1,21]
[73:1] [74:1] [75:1] [76:1]
[77:1] [78:1] [79:1] [80:1]
[81:1] [82:1] [83:1] [84:1]
[85:1] [86:1] [87:1] [88:1]
[89:1] [90:1] [91:1] [92:1]
[93:1] [94:1] [95:1] [96:1]
[97:1] [98:1] [99:1] [100:1]
[101:1] [102:1] [103:1]
[104:1] [105:1] [106:1]
[107:1] [108:1] [109:1]
[110:1] [111:1] [112:1]
[113:1] [114:1] [115:1]
[116:1,21] [117:1] [118:1]
[119:1] [120:1] [121:1]
[122:1] [123:1] [124:1]
[125:1] [126:1] [127:1]
[128:1] [129:1] [130:1]
[131:1] [132:1] [133:1]
[134:1] [135:1] [136:1]

[137:1] [138:1] [139:1]
[140:1] [141:1] [142:1]
[143:1] [144:1] [145:1]
[146:1] [147:1] [148:1]
[149:1] [150:1] [151:1]
[152:1] [153:1] [154:1]
[155:1] [156:1] [157:1]
[158:1] [159:1] [160:1]
[161:1] [162:1] [163:1]
[164:1] [165:1] [166:1]
[167:1] [168:1] [169:1]
[170:1] [171:1,12] [172:1]
[173:1] [174:1] [175:1]
[176:1] [177:1] [178:1]
[179:1] [180:1] [181:1]
[182:1] [183:1] [184:1]
[185:1] [186:1] [187:1]
[188:1] [189:1] [190:1]
[191:1] [192:1] [193:1]
[194:1] [195:1] [196:1]
[197:1] [198:1] [199:1]
[200:1] [201:1] [202:1]
[203:1] [204:1] [205:1]
[206:1] [207:1] [208:1]
[209:1] [210:1] [211:1]
[212:1] [213:1] [214:1]
[215:1] [216:1] [217:1]
[218:1] [219:1] [220:1]
[221:1] [222:1] [223:1]
[224:1] [225:1] [226:1]
[227:1] [228:1] [229:1]
[230:1] [231:1] [232:1]
[233:1] [234:1] [235:1]
[236:1] [237:1] [238:1]
[239:1] [240:1] [241:1]
[242:1] [243:1] [244:1]
[245:1] [246:1] [247:1]
[248:1] [249:1] [250:1]
[251:1] [252:1] [253:1]
[254:1] [255:1] [256:1]
[257:1] [258:1] [259:1]
[260:1] [261:1] [262:1]
[263:1] [264:1] [265:1]
[266:1] [267:1] [268:1]
[269:1] [270:1] [271:1]
[272:1] [273:1] [274:1]
[275:1] [276:1] [277:1]
[278:1] [279:1] [280:1]
[281:1] [282:1] [283:1]
[284:1] [285:1,21] [286:1]
[287:1] [288:1] [289:1]
[290:1] [291:1] [292:1]
[293:1] [294:1] [295:1]
[296:1] [297:1] [298:1]
[299:1] [300:1] [301:1]
[302:1] [303:1,21] [304:1]
[305:1] [306:1] [307:1]
[308:1] [309:1] [310:1]
[311:1] [312:1] [313:1]
[314:1] [315:1] [316:1]
[317:1] [318:1] [319:1]
[320:1] [321:1] [322:1]
[323:1] [324:1] [325:1]
[326:1,16] [329:11] [330:3]

off [28:16] [34:10] [35:11]
[45:8,16] [72:15] [85:14]
[116:8,15] [170:23] [204:8]
[219:15] [236:5] [244:15]
[266:21] [273:12] [285:12]
[290:6] [302:15] [315:12]
[326:11]
offer [71:3] [92:19,24]
[93:8] [169:12]
offered [28:21] [67:12]
[70:11] [110:14,16]
offering [19:3] [66:8,9,19]
[70:20] [71:7] [92:16]
[110:13]
offerings [98:5] [165:21]
offers [70:5]
office [12:11] [141:21]
[242:25]
officer [49:18] [54:14]
[162:10,12] [181:8] [241:10]
[242:15] [256:19]
officers [51:9] [128:21]
[241:20] [245:10] [255:14
,16] [262:22,23] [314:3,6,9]
[315:3]
offices [128:16,17,18]
officials [220:20] [233:10]
often [18:19] [25:8] [126:25]
[132:25] [174:8] [179:13]
[188:23] [193:2] [217:9]
[275:19] [283:2]
oh [34:12] [57:22] [93:12]
[140:3] [159:11] [184:19]
[208:4] [260:13] [323:8]
ohc [4:4]
okay [5:15,22] [7:5,25]
[23:17] [24:10] [29:19,22]
[33:12] [34:17] [35:13]
[36:4,6,8] [42:13,20,25]
[46:14,17] [47:2] [51:19,25]
[57:22,23] [59:25] [63:13,17]
[65:4] [72:14] [74:19]
[77:4] [78:9,11] [79:7]
[86:17] [93:12] [98:10,14]
[100:13] [101:22] [102:19]
[103:12,17,24] [104:23]
[105:9,16] [107:2,23]
[108:3] [109:20] [110:23]
[113:16] [119:5] [120:10]
[123:21] [125:17] [128:6,12
,15,21] [129:8] [130:23]
[137:6] [138:13] [139:14]
[140:7] [143:9] [145:8]
[154:10] [155:21] [156:13
,21] [160:14] [161:14,23]
[163:8,13,23] [164:14]
[166:16] [167:17] [168:5,24]
[169:13] [170:19,23]
[171:8,20] [172:13] [173:7
,16] [176:7,21] [177:19]
[178:18] [181:5] [182:6,20]
[184:6,19] [188:5] [190:20]
[192:11] [193:10,19,25]

[194:4,10] [196:13] [198:8]
[199:4] [200:3,7,9,16]
[201:10] [203:11,15]
[204:23] [205:7,12,21,25]
[206:6,19,22] [207:8,13,19
,23] [208:6,9] [209:7,22]
[211:3,7] [212:5,24] [217:
20] [218:8] [219:15] [220:3
,18,25] [222:24] [225:24]
[226:24] [227:17,20]
[229:10,19] [232:5,16]
[233:5] [236:19] [237:8,16
,19,23] [240:7,11] [242:14
,16] [243:5] [244:8] [245:18]
[246:4,9,17] [247:25]
[249:5,15] [250:4,8,13,18]
[254:10,16,24] [255:4]
[257:3,13,21] [258:5,16,25]
[259:16] [261:24] [265:10
,13] [266:4] [267:15] [268:
5] [271:14] [273:11] [274:18]
[276:14] [278:16] [279:6,22]
[285:4] [287:7,23] [289:25]
[290:24] [291:8,11,14]
[293:7] [296:6] [298:13]
[299:17] [301:18] [304:25]
[306:25] [307:6,20] [308:15]
[309:7] [310:10] [311:21]
[312:6,17] [313:23] [314:20
,24] [315:8,11,15] [316:2,5]
[318:12,23] [319:2,17,24]
[320:14,22] [321:15,24]
[322:13] [323:8] [324:4]
okuyama [249:15,16]
okuyamas [250:5]
old [254:4] [291:8]
omi [295:19] [312:13,19]
[314:17]
once [98:2] [173:2] [239:10
,15] [246:21] [286:4] [310:
7] [311:12] [325:15]
one [7:15] [12:20] [13:6]
[15:21] [16:5,24] [17:24]
[18:3,5] [29:4] [32:24]
[35:18,21] [36:2,13] [37:8
,23] [38:7,24] [39:8,9]
[41:2,7] [42:3] [43:21]
[44:23] [45:7,16] [46:11,12
,19] [51:9] [53:4] [55:7]
[58:17] [59:5] [61:5,12,19]
[64:2,20] [65:23] [68:17]
[72:4] [73:22] [74:13]
[75:13] [77:10] [80:18,23]
[85:10] [101:9] [103:5,16,18
,21] [105:20] [112:20]
[117:11] [118:5] [119:23]
[120:11] [122:4,6,7] [126:
4] [129:13,23] [131:10]
[137:13] [140:16] [142:2,24]
[143:7] [144:11,17] [148:7]
[149:25] [151:7,10,14]
[152:14,20] [153:13]
[155:21,23] [158:17]
[160:4,5] [161:5,13,25]

[164:7,11] [165:21] [173:25]
[175:19] [178:9,11,14]
[179:17] [181:2] [183:20]
[187:12,17] [188:2,6,14,20
,25] [191:4,16,25] [194:14]
[197:6] [200:5] [202:15,18]
[204:5,9,20,24] [208:15]
[209:24,25] [210:2] [216:7
,9] [217:11] [219:19,23]
[220:15,19] [223:7] [226:19]
[228:4] [229:16] [230:14,22]
[231:6,13] [232:13] [233:9
,11,25] [234:7,19] [235:19]
[237:4] [242:12] [245:7]
[247:12] [249:19,24]
[252:24,25] [254:18]
[255:8] [257:23] [260:20,21
,25] [261:7,14] [264:2]
[266:15] [270:5,8] [276:17
,23] [277:25] [282:15,22,23]
[283:18] [286:23] [291:5]
[292:3,7] [294:10] [295:15]
[296:2,19] [299:8] [300:11
,17,18] [303:7,9,11] [304:15]
[306:9,16] [309:25] [310:4
,6,8] [312:12] [314:22]
[317:12,14] [319:6] [321:21]
[330:17,] [331:10,,15]
[332:7]
oneoff [61:19]
one-off [61:19]
onepage [158:17] [191:4]
[204:9,24] [208:15] [219:19
,23] [230:14] [257:23]
[264:2] [330:17,] [331:10,
,15] [332:7]
one-page [158:17] [191:4]
[204:9,24] [208:15] [219:19
,23] [230:14] [257:23]
[264:2] [330:17,] [331:10,
,15] [332:7]
ones [13:16] [25:8] [32:20]
[36:10] [48:20] [104:9,11]
[105:9] [139:22] [172:14]
[175:24] [187:18] [199:3]
[253:21] [261:11] [264:16]
[265:2] [266:15] [267:25]
[269:6]
oneyear [217:11]
one-year [217:11]
ongoing [26:10] [129:14]
[162:20] [221:8] [224:7]
[295:6,15]
online [231:3]
onto [91:13] [96:7,8] [157:
2] [201:23] [237:14]
onwards [91:22]
open [118:19] [188:10,17,23]
opened [83:4] [153:24]
operate [38:22] [319:20]
operation [77:14] [301:24]
operational [311:23]
operations [141:14]
opinion [71:13] [85:20,22,23]

[284:21] [285:3] [288:19]
[318:8]
opportunities [166:13]
opportunity [209:9] [299:2]
opposed [187:7,8] [317:25]
option [92:19]
optional [175:3]
options [294:23] [295:9]
oral [319:7]
orally [46:4] [194:2,3]
order [97:8] [167:20] [183:
11]
ordinary [153:15] [195:18,23]
[231:15]
organization [7:19] [249:3]
organized [20:20,23]
oriented [196:24]
original [22:4] [189:24]
[276:16] [279:19] [313:10]
originally [291:20]
originate [78:22] [158:25]
[320:23]
originated [36:24] [78:24]
[85:15] [159:3] [253:7]
[318:3]
originating [75:10] [302:12]
origination [148:6]
originations [96:12] [261:20]
osnato [3:15] [4:19] [8:12]
[9:2] [10:8,15] [11:6]
[24:22] [25:16] [26:23]
[27:6] [28:5] [29:10] [33:22]
[38:8] [39:20] [40:17]
[41:15] [43:10] [44:13]
[45:20] [47:5,8,11] [52:13
,25] [53:8,21] [54:9,24]
[55:2] [56:14] [63:15]
[65:9,17] [69:8] [72:8,14]
[82:14] [83:14,18] [87:21]
[99:10] [114:23] [116:7,12]
[119:22] [123:2] [124:13]
[139:8,11,14,18] [141:10]
[142:4] [143:19] [146:17]
[155:16,19] [158:9] [160:21
,19] [169:19] [170:21]
[180:21] [185:15] [188:3]
[189:8,13,19,23] [190:12]
[193:21] [196:19,23]
[197:4,10,12,14,18,25]
[198:5,9,13,25] [199:15]
[204:10,17,21] [207:6,8]
[218:19,23] [219:14]
[220:6] [225:21] [226:12]
[227:25] [245:21,25]
[246:4] [249:8] [252:11]
[260:12,14,17] [263:17,22]
[265:24] [270:25] [273:11]
[286:12,16] [288:17]
[289:14,19] [294:25]
[304:2] [313:18] [315:11]
[322:2] [323:6] [326:10]
otherwise [149:3] [182:23]
ourselves [137:7]

outcome [267:10] [329:18]
outfit [201:8]
outlet [37:11,14]
outright [187:7] [192:25]
[193:2]
outset [225:8]
outside [31:19] [55:7]
[78:22,23] [111:4] [119:9,25]
[240:23] [268:21,25]
outstandings [96:15]
overall [92:8] [147:4]
overcollateralization
[94:2,14,15] [95:13] [239:
8]
overnight [215:25] [217:10]
owe [89:12]
own [18:12] [23:23] [33:4]
[49:20] [60:24] [71:13]
[73:14] [101:15] [123:12]
[182:23] [215:21] [245:2,10]
[266:21] [300:21,24]
[302:3,15] [320:23]
owned [78:20]
owner [241:4]
ownership [153:16] [154:21]

P

p.m [3:21] [170:25] [171:3]
[326:14]
pace [148:18]
package [93:5] [108:12]
packaged [64:19]
packaging [91:5]
page [58:20] [140:9] [198:14
,17] [204:8,20] [208:23]
[230:5] [231:13] [246:10]
[247:19] [257:3] [328:5]
pages [203:17]
paid [63:12] [135:15,16,18]
[136:5] [137:20,21] [232:14]
[239:17,19,20,21] [259:7]
[309:13]
paired [174:13]
palm [299:19,25] [300:3,19]
[301:11,21]
paper [57:18,20] [58:2,14]
[75:6] [76:6] [77:18] [78:22
,24] [156:17] [157:3] [190:
17] [206:3,8] [215:4,7,9,22
,23,25] [216:11,12,15,18]
[218:5] [233:14,16,17,22,23]
[234:4,12,15] [236:12,15,16]
[238:7] [239:5,18,24,25]
[241:3] [243:11,17,18]
[275:22,23] [286:24]
[296:24] [297:18] [298:15]
paperwork [322:21] [325:19]
par [60:13,14] [61:11]
[64:11] [71:15,16] [72:2]
[146:6]
paragraph [140:20,24]
[311:21]
parameters [15:17] [289:6]

pardon [173:19] [230:10]
[254:25] [309:3] [312:23]
parent [277:3]
part [25:4] [66:3,24] [71:20]
[91:24] [92:3,17] [94:15]
[97:18] [102:25] [104:17]
[119:18] [123:13,15,21]
[132:15] [137:12] [152:5]
[178:11,13,17] [202:8]
[221:8] [226:22] [227:9,16]
[243:2] [244:20] [246:25]
[249:2,21,23] [250:2]
[251:6] [258:13] [280:5]
[291:4] [298:5] [313:6]
[325:22]
participant [74:10]
participants [103:19]
participate [6:8] [43:24]
[104:13] [108:16] [121:5]
participated [24:14] [76:16]
participating [216:9]
particular [25:24] [26:6]
[27:5] [28:3,7] [49:16,20]
[70:6] [83:3,4] [89:13]
[94:24] [127:5] [147:6]
[151:14] [163:24] [164:20]
[165:17] [174:2] [176:15]
[196:6] [201:24] [230:22]
[243:13] [254:7] [279:7,11]
[293:8,18] [316:9,25]
particularly [58:8] [81:23]
[175:14,19] [188:18]
[228:8] [302:7] [311:8]
parties [60:24] [102:9,12]
[124:19] [140:9] [143:4]
[173:25] [324:17] [325:18]
[329:16]
parts [15:9] [173:14]
party [124:12,17] [125:10,19]
[164:17] [173:25] [174:4,6]
pass [126:18] [127:6,12]
passed [24:15] [65:22]
passes [24:20]
past [22:11]
pattern [84:5] [85:17]
[181:3] [213:7]
paul [3:17] [4:23]
pay [30:21] [63:6,8] [143:6]
[152:8] [236:17] [240:8]
[243:18] [259:6] [309:20]
payable [237:23,25] [258:17
,19]
paying [40:13] [109:10]
[111:19]
payment [15:25] [63:10]
[132:17] [133:22] [136:10]
[147:14,17] [148:5,19,24]
[149:15] [153:2,7] [243:21]
[269:12] [281:17] [305:23
,25] [306:2] [307:3,7]
payments [15:18] [16:4,11
,25] [84:11,23] [85:2]
[132:23,24] [133:8,10,11,12
,15] [135:11,18] [136:13]

[147:20,22] [149:21] [238:
23] [278:19,24] [279:2]
[319:19]
peak [85:9,11,13] [97:22]
[147:23]
peaks [213:9]
peloza [3:22] [4:8]
pending [10:16] [273:17]
people [14:16] [16:2,17]
[20:7,12,15,18] [33:8]
[42:3] [44:24] [45:8,11,18
,25] [48:11] [49:5,23]
[51:11] [52:16] [55:14,17]
[56:24] [60:16] [68:8]
[70:23] [81:4] [84:23,24,25]
[85:4] [89:12] [101:15]
[105:21] [115:22] [126:24]
[149:16] [150:22,25]
[151:3,4,22] [152:8,24]
[153:14] [172:8,16] [173:9
,10,16] [181:15] [185:7]
[188:20] [202:12] [223:6]
[227:7,8] [228:5,10,15]
[231:8] [233:11] [255:11]
[257:7] [266:23] [287:21]
[304:18] [317:8] [318:20]
peoples [149:20]
per [152:16,18] [236:15]
perceived [160:8]
percent [43:7] [78:20]
[90:24,25] [91:2] [98:11]
[112:7,8] [136:3,4] [137:21
,22] [147:14,17,18,20,21,24]
[148:5,12,13,19,24] [149:
14,15] [151:19,21,24]
[152:10] [154:21] [240:25]
[316:13] [320:20] [321:17]
percentage [84:25] [89:10]
[90:13] [98:3,7] [136:6]
[148:3,22] [149:14] [277:23]
[299:10]
perfect [326:10]
perfectly [204:21]
perform [69:6] [163:6]
performance [15:22] [17:10]
[22:11,13,17,21,22] [25:10]
[231:23,25] [232:3,6]
[273:3]
performed [69:24]
performing [120:14] [227:
22]
perhaps [18:20] [28:17,18]
[39:9] [71:23] [89:2] [119:
16] [148:9] [169:13] [170:8
,9] [173:6,10] [174:3]
[210:2,5] [216:4] [224:22]
[235:13] [298:18] [317:20]
period [17:6] [38:25] [39:2]
[51:10] [53:13,18,23]
[58:9] [66:4,16,18] [67:2]
[79:21] [81:21] [82:2,3,6]
[84:19] [86:19] [90:12]
[96:11] [97:24] [100:6]
[105:14] [106:5] [113:2]

[115:5] [124:17,18,21]
[133:4] [136:10] [147:8]
[156:3,9] [162:11] [165:15
,16] [172:3] [176:2] [181:12]
[186:18,19] [191:22]
[200:19] [202:10,12,21]
[209:2] [212:23] [230:20]
[254:16] [283:19] [288:20]
[290:4] [296:22] [302:8,9]
[309:7] [316:23] [317:9]
[326:2]
periodic [235:20]
periods [111:12,25]
permanent [38:12,20,21,23]
[39:8] [134:9] [215:17]
[235:21]
permit [11:4] [319:11]
permitted [33:4,21,23]
persistent [276:23]
person [24:21] [43:3,16,22]
[44:18,23] [45:7] [46:6,10
,12,20,23] [56:12] [57:6,11]
[119:6] [122:17] [124:6]
[161:11] [177:20] [178:7]
[221:13] [247:22] [257:6]
[318:17] [319:25] [320:18]
[321:8]
personal [33:13] [34:19]
[67:21] [73:15] [133:17]
personally [39:23] [45:17]
[67:21] [74:16] [75:23]
[76:19] [86:11] [108:16]
[146:15]
personnel [44:7] [121:23]
persons [46:16,23] [47:3]
perspective [92:18] [96:5]
[185:23] [187:3] [191:24]
[192:19] [213:2] [216:25]
[243:24] [269:16] [316:17]
pertained [211:23]
phase [144:18]
phenomenon [153:12]
phil [184:16,17] [251:8]
philip [251:7]
phone [231:16,17] [275:20]
phoned [271:23]
phonetically [200:12]
phoning [231:4]
phrase [47:18] [145:11]
[166:24]
phrased [46:21] [73:18]
physical [129:15] [135:3]
[239:12]
physically [239:16]
pick [168:17]
piece [17:21] [18:20] [94:14
,15] [95:13,15] [112:4]
[165:23] [190:17] [210:11]
[239:5]
pieces [15:6] [18:25] [90:3]
[104:7] [114:8,24]
pilar [6:10,14]
p-i-l-a-r [6:14]
pit [167:23] [273:9]

place [37:3] [38:24,25]
[39:9] [53:5,24] [54:19]
[55:8] [64:4] [106:20]
[117:5] [150:8] [170:20]
[176:4] [190:3,4,7] [211:25]
[214:20] [245:16] [247:16]
[269:6] [292:2] [309:8]
[322:22,23] [323:21]
[324:6,24] [326:4,8]
placed [325:21]
placement [292:16]
places [288:24]
plaintiff [3:4] [4:16]
plaintiffs [4:13]
planned [267:13]
play [201:17]
played [11:2] [201:14]
[202:24]
players [154:5]
please [6:2,9,12] [7:15]
[9:5] [11:5,8] [13:10]
[21:4] [30:3] [33:18] [39:4]
[45:13,22] [46:25] [47:9]
[50:7] [68:25] [70:13]
[74:4] [88:3] [93:12] [114:
22] [129:12] [132:14]
[135:14] [139:9] [162:6]
[189:9,20] [230:8] [235:16]
[252:3,14] [315:23] [316:19]
pleased [320:13]
pledged [269:8]
plenty [148:19] [287:21]
plus [64:16] [239:8] [253:11]
[280:16]
pocket [94:11] [95:5]
point [8:9] [16:6] [20:24]
[21:23] [25:5] [26:13,17]
[28:23,24] [35:18,20]
[40:7] [46:15] [52:3] [58:12]
[61:9] [66:10] [67:17]
[81:5,14] [83:4] [85:5]
[86:19] [90:22] [92:5]
[96:15] [107:10] [127:5]
[136:6,22] [144:9] [145:7]
[146:6] [152:24] [158:12]
[163:13] [166:2] [167:13]
[168:15] [169:2,23] [172:17]
[175:6,18] [188:12] [198:5
,6] [202:18] [211:12] [212:
19] [213:10] [216:17]
[222:16] [239:12,22]
[240:22] [241:6] [252:20]
[256:24] [262:4,8,19]
[268:9] [271:3,18] [277:5]
[276:3] [277:12,13] [281:15
,20] [282:16,24] [283:21]
[290:9] [297:5,7,10] [298:
16] [299:8] [306:12] [310:22]
[318:22] [319:14]
pointed [292:5]
points [7:24] [19:4] [20:15]
[60:7] [74:21] [102:12]
[142:25] [198:10] [264:20
,22,24] [267:2,7,11,15,20]

[268:2,5] [288:5,8,9,14]
[289:2,5,8,13,16] [290:7]
[318:21,24] [319:3] [321:6]
politely [133:21]
pool [15:11] [21:25] [61:19]
[89:9] [100:18] [132:16]
[231:24] [232:2] [249:24]
[250:3] [264:25] [280:5]
[284:6,8] [305:12]
pools [22:23] [32:3] [293:18]
poor [150:4]
portfolio [61:6] [68:18]
[261:21] [273:4]
portion [58:7] [240:12]
[259:10] [280:2]
posed [323:12]
posey [301:10]
position [6:19,22] [7:5,11]
[79:13,17] [136:21] [310:23]
[321:13]
positions [7:13] [201:22]
[255:11,12]
positive [83:5,7,12]
possibility [313:11]
possible [96:22] [97:15]
[170:10] [279:10,15]
[285:21]
possibly [146:7] [242:9]
[323:15]
potential [30:15] [55:6]
[67:22] [102:5,13] [164:15]
[181:21] [311:18]
potentially [184:7] [281:16]
[282:4]
powers [180:7]
practical [96:20] [182:21,23]
[183:2] [238:12,16]
practicality [87:18]
practically [67:9]
practice [88:25]
prebankruptcy [43:2]
preceded [218:21]
preceding [22:4] [52:22]
[253:2]
precipitated [106:4]
precise [26:2] [56:23]
[58:11] [67:13] [78:19]
[81:2] [89:7] [234:20]
[267:18]
precisely [51:24] [54:14]
[76:11] [90:22] [128:5]
[138:15] [240:10] [275:6]
[325:4]
precursor [147:12]
predecessor [316:8]
preexisting [249:20]
preface [73:12]
prefer [41:9]
premarked [219:21,25]
preowned [88:18] [283:5]
prepaid [279:5]
preparation [202:15]
prepare [19:2,3] [25:9]
[179:13] [195:14]

prepared [95:24] [179:4]
[195:19,25] [209:5] [231:5]
[324:19]
preparing [66:23] [104:6]
[207:15]
prepay [16:3]
prepayment [22:20]
presence [129:16]
present [3:19] [120:6]
[301:9]
presentation [30:4,7,12,25]
[31:3] [271:11]
presented [187:16]
president [7:16]
press [271:23]
pressure [164:24] [166:11]
[167:10] [283:8]
pressuring [166:20]
presumably [177:25]
[280:11]
presume [180:3] [195:9]
presumption [291:20]
pretty [61:25] [64:7] [108:25]
[110:15] [115:12] [145:13]
[151:17] [161:9] [163:25]
[164:3,4] [231:11] [288:9]
prevent [155:12] [196:4]
prevented [157:20]
previous [89:10]
previously [171:5]
price [60:12] [61:8] [64:5,14]
[71:2,11,14,15,16,17,24]
[89:23] [144:21] [152:16,17]
[153:6] [154:23] [155:2]
[174:8,9] [176:24] [177:11
,12,14]
priced [72:2]
prices [60:11] [177:17]
pricing [70:11] [87:18]
[88:10,12] [89:25] [100:25]
primarily [117:22] [131:25]
[177:22] [201:3] [269:2]
[319:4]
primary [13:16] [318:17]
prime [61:5]
principal [16:10] [22:2,4]
[63:8] [64:11] [136:13]
[232:12,14] [280:16]
principally [56:12] [57:7]
principle [94:22] [96:19]
prior [8:24] [11:21] [12:25]
[13:4,12] [22:13] [25:9]
[32:15] [33:6] [39:13]
[40:25] [64:10] [76:12,17]
[91:17] [272:7] [285:25]
[315:21]
priority [135:10] [136:22]
privilege [174:21]
privy [285:15]
probability [16:13] [88:23]
probably [13:15] [19:14]
[29:21] [30:8] [33:8] [47:23]
[51:11] [58:5] [66:17]
[80:13] [81:19] [97:5]

[108:22] [124:19] [141:3,24]
[147:22,23] [148:7,21]
[150:24] [151:19,20]
[155:14] [156:23] [157:14]
[167:17] [171:18] [175:12]
[176:5] [178:7] [194:21]
[215:12] [238:17] [240:24]
[241:22] [258:13] [282:13]
[295:3] [311:12] [313:3,22]
[321:10] [323:6]
problem [134:7,25] [135:2]
[148:16] [212:16] [213:17]
[214:12,14] [230:11]
[276:20,22,23] [284:12]
[297:24] [298:10] [318:2]
[324:13]
problems [137:18] [147:25]
[149:11] [154:18] [156:4]
proceed [26:6] [173:14]
[319:8]
proceeded [66:21] [274:4]
[280:7]
proceedings [123:6]
proceeds [61:12] [213:12]
[239:25] [240:11] [251:23]
[280:15] [306:7,22] [309:21]
[319:11]
process [19:3] [44:22]
[61:16] [69:17] [100:25]
[118:8] [132:15] [134:17]
[179:25] [180:15,20,21]
[181:2] [182:24] [224:22]
[239:10] [259:21] [260:3,4]
[261:25] [262:16] [273:6]
[280:13] [283:22]
processed [19:16] [239:11]
produced [201:10] [204:5]
[265:20,25] [293:15]
product [10:2] [60:23]
[83:8,9] [84:8] [86:3]
[260:8]
production [6:6] [96:10]
[97:9] [147:24] [267:23,24]
[268:14] [300:24]
products [101:9] [201:6]
profession [175:4]
professional [188:22]
[228:6] [262:7] [263:4,13]
[329:8]
profits [298:23]
program [94:19] [141:22]
[269:10,13,19] [270:10,19
,23] [271:6,15,19,25]
[272:7,17] [273:2] [278:4]
[282:2,12] [283:25] [284:3
,20] [285:7,23] [296:10,13]
[315:19] [319:13,20]
programs [147:6]
progression [20:17]
projects [123:9]
prominent [150:24]
promise [176:24] [216:14]
promised [243:16,19]
pronounce [200:13]

pronouncing [200:12]
properly [19:15]
property [134:15] [135:4]
[150:9]
proposal [177:21] [178:3]
[180:2] [181:8,18] [185:24
,25] [187:10,11] [188:10]
[191:9,14,16,19,25] [193:
16,18] [194:5,17,25] [210:
15] [212:7] [221:6,16]
[222:25] [223:7,14,17,23,24
,25] [224:12,14,24] [225:7]
proposals [191:23] [193:20]
[203:13] [221:14]
propose [239:7] [324:12]
proposed [52:9] [144:19]
[160:18] [178:20] [180:23]
[187:9] [190:21] [195:14]
[229:14] [260:7]
proposing [204:13,16]
[222:16]
proposition [163:14]
proprietary [10:17] [42:5]
prospect [145:16]
prospectus [66:22] [205:15
,19]
prove [99:3,16]
proved [265:22]
provide [33:25] [90:9]
[109:20] [117:22] [123:2]
[156:8] [164:25] [183:17]
[189:24] [224:9] [234:12,13]
[235:5,10] [240:4] [322:24]
provided [34:3] [66:3,5]
[74:8,11] [102:8,11,15]
[122:11] [156:4] [164:12]
[169:9] [215:5] [238:21]
[240:25] [259:2] [299:10]
[307:13,15]
provider [42:21,23] [55:6]
[316:12]
providing [80:22] [106:21]
[164:23] [167:16] [169:24]
[170:4] [209:3] [258:21]
proving [137:25] [138:4]
provision [54:6,21] [55:15]
[80:2,11] [137:9] [166:5]
[169:8] [246:11]
provisions [174:20]
prudential [142:24] [308:14]
public [5:5] [154:16] [155:18
,19,22] [156:14] [171:6]
[272:4] [285:19] [326:20]
[329:9]
publicly [23:15] [275:14]
pull [285:12]
purchase [9:11,17,18,21]
[12:3,21] [16:15] [32:4]
[36:12,15] [37:6,7,17,20]
[38:2,11,12] [39:14] [40:15]
[42:16] [48:8] [52:18]
[53:11,20,24] [54:3,4]
[55:6,16] [58:3] [72:24]
[77:24] [95:18,25] [104:14

,15,19,20] [106:10,22]
[107:18] [127:4,11,17] [19:9]
[128:2,3] [130:21] [141:21]
[153:5] [156:2] [163:20]
[176:5] [185:13] [186:2]
[187:10] [188:10] [192:20]
[201:25] [202:5,16] [205:8]
[206:20] [210:11] [212:2]
[213:24] [214:20] [217:3,15
,18,21] [219:4] [233:21]
[234:8,24] [235:12,20]
[236:12] [239:25] [240:5,12]
[256:7] [261:2,10,16]
[267:23,25] [268:15]
[269:7] [284:3] [286:14,19
,22] [287:5,25] [288:3]
[293:22] [294:17,19]
[295:23] [299:6,11] [312:13]
[315:18] [319:12,18]
[320:11] [324:5]
purchased [9:24] [60:18]
[127:2] [177:11] [236:10]
[264:15]
purchaser [12:2] [40:14]
[260:8] [307:2]
purchasers [67:19,22]
[69:5,21] [101:5] [102:5,13]
[212:21] [311:19]
purchases [78:16] [215:16
,17,20] [233:20]
purchasing [70:23] [89:6]
[132:3] [209:16] [235:7]
[238:22] [288:23] [322:11
,14]
pure [169:3]
purely [19:5] [314:18]
purport [255:19]
purported [130:12] [241:16]
[313:24]
purpose [94:17] [131:23]
[305:15]
purposes [117:22] [182:6]
[204:17] [222:11] [266:6]
[276:11]
pursue [15:7]
pursued [17:20]
push [165:17]
pushed [230:25]
pushing [317:2,3]
put [15:2] [17:11] [19:9]
[28:16] [30:4] [36:12]
[37:4] [52:4] [53:5,19,25]
[54:22] [55:7] [62:13]
[71:6] [99:21] [101:17]
[113:8] [127:24] [137:6,7,9]
[139:24] [148:11] [163:14]
[176:4,21] [186:9] [197:8,19]
[203:10] [223:7] [228:16]
[244:12] [246:7] [252:18,23]
[262:20,21] [269:6] [291:4
,25] [302:10] [303:7] [306:
18] [307:25] [308:9] [317:15]
[322:21,22,23] [324:24]
putting [9:10] [42:4] [53:12]

[54:18] [104:3] [164:23]
[166:10] [202:15] [251:24]
[298:18]
puzzled [245:15] [246:25]

Q
qualification [161:19]
qualify [89:2]
quality [147:4] [151:5]
[265:14] [290:3] [316:6]
quantification [181:21]
quantify [90:19] [98:8]
quantity [321:13]
quarter [82:8] [90:25]
[112:8]
quarterly [212:18,25]
[275:18]
question [8:14,20] [9:15,20]
[10:9,25] [11:4,19] [14:12]
[15:13] [16:23] [22:24]
[25:3] [29:2,3,4] [31:22]
[34:18] [40:22] [41:22,25]
[43:11,13] [44:16] [45:2]
[47:2,18,22] [48:7,19]
[53:14] [59:17] [60:2]
[70:7,18] [71:18] [75:5]
[76:15] [85:16] [92:14]
[95:25] [99:4,12] [105:6]
[106:8,23,24] [107:9,22]
[110:3] [113:14] [114:24]
[115:17,18] [126:9,14,22]
[133:11] [134:3,16,21]
[135:4] [137:7] [139:24]
[168:8,19,23] [176:8]
[180:21] [183:7] [185:16]
[189:14,16,20,24] [190:10
,13,15,16] [194:23] [199:6
,17] [203:21] [206:4] [211:
4,14] [212:11] [222:13]
[225:23] [235:6,9] [242:7]
[245:12] [246:2] [252:12,13]
[258:8] [271:2] [273:18]
[283:16] [292:7] [295:4]
[303:24] [304:8] [308:4]
[312:22] [313:19] [323:12]
questioning [168:2] [197:21]
questions [19:10,12]
[73:17] [139:22] [141:15]
[180:17,18] [182:15]
[183:21] [185:11] [203:3]
[233:5] [294:10] [303:22]
[314:25] [315:6]
quick [72:11,12]
quickly [144:22] [147:21]
[153:22] [242:13]
quit [263:14]
quite [65:22] [93:11] [101:9]
[111:10] [112:23] [126:13]
[154:20] [188:24] [217:13
,17] [242:12] [247:14]
[295:5] [300:22] [317:8]
[325:24]
quotation [203:19]

quote [165:17]
quoted [71:22]

R

raised [141:15] [320:19]
   [321:9]
ramp [296:14,16,20]
ramped [296:12]
rampup [296:16]
ramp-up [296:16]
ran [130:9] [292:3]
range [71:2] [196:21] [204:
   14]
rapidly [296:21]
rarely [84:10] [182:21]
rate [22:22] [40:15] [41:3]
   [48:23] [67:15] [93:21,23]
   [111:18] [151:25] [152:25]
   [153:5] [177:18] [253:13]
   [281:4,5] [285:24] [289:12]
   [308:25] [309:6]
rated [18:3,18] [97:13]
   [100:21] [101:20] [112:4]
   [135:19] [145:22] [233:22]
   [253:16] [268:17] [308:4]
rates [26:15] [66:12] [72:5]
   [90:6] [111:13] [112:20]
   [118:13] [151:16] [152:5,9]
rather [38:24] [47:18]
   [73:17] [120:5] [144:22]
   [156:18] [175:24] [192:24]
   [224:21] [231:3] [234:25]
   [266:13] [292:11] [304:3]
   [309:10]
rating [17:25] [18:3,7,10,25]
   [19:2] [21:7,10] [22:9,16,25]
   [23:6,13,18,22] [67:13]
   [69:4,17] [88:12] [89:8]
   [91:20] [92:4] [98:3] [100:
   14,23,24] [101:4,6,8,10,16
   ,20,25] [102:20] [103:3]
   [104:4] [111:15] [145:25]
   [146:4] [214:17] [253:12,13]
   [268:17] [308:3,5,8]
ratings [18:15,16] [67:13]
   [118:12]
ratio [22:6] [318:14]
ratios [15:18] [318:18]
raw [16:17] [61:7] [175:14]
re [252:5]
reach [85:20,22] [118:20]
reaching [85:23]
reaction [169:15]
read [41:5] [106:3] [139:20]
   [140:4] [168:20] [189:16,19]
   [196:17] [197:3,23] [198:18
   ,20] [199:5,7,15,20,22,23]
   [200:3,5] [203:21] [206:5]
   [226:12] [252:3,13,16]
   [265:10] [294:9] [304:3]
   [327:5]
readily [91:21] [113:5]
ready [294:13]

real [94:20]
reality [105:24] [239:3]
really [15:4,8,23] [17:19,21]
   [19:19,20] [27:14] [48:24]
   [59:23] [61:17] [66:8,11]
   [68:14] [70:18,20] [71:17]
   [81:24] [84:7] [92:18]
   [96:20] [112:18] [114:25]
   [132:19] [148:3] [150:3,6,15]
   [153:11] [159:7] [173:5]
   [174:16] [179:11] [181:10
   ,14] [203:24] [213:6] [223:
   18] [228:16] [238:20]
   [245:8] [251:5] [257:16]
   [270:3] [284:14] [295:16]
   [302:3]
realtime [329:8]
reason [5:17] [37:2] [84:4,14]
   [148:4] [183:21] [196:6]
   [203:17] [236:2] [259:5]
   [321:19] [328:7,9,11,13,15
   ,17,19,21]
reasonable [156:24] [246:
   15] [277:22]
reasonably [268:13]
reasons [84:3] [96:20]
   [97:17] [195:15] [246:12]
   [277:25] [282:15] [328:4]
recall [6:20] [12:9] [14:5]
   [29:23] [30:11,18] [32:2]
   [36:13] [44:4,9] [53:12,16]
   [54:2,15] [55:21] [56:2]
   [79:23] [82:5,9] [85:23]
   [86:7,15] [87:2,4,7,11]
   [90:21] [98:7] [101:24]
   [102:3,7,8,15,18] [105:25]
   [108:15] [109:13,15,16,18]
   [117:16,24] [118:3] [121:15]
   [122:5] [123:4] [130:13]
   [131:20,21] [138:21,22,24]
   [141:20,21,23] [144:24]
   [158:14] [159:2,3,7] [160:
   13,14,23] [161:3] [163:13]
   [165:4] [176:20] [178:14,18
   ,21,22,25] [179:2] [181:7,17]
   [185:8] [186:6,19] [190:23]
   [191:17] [195:7] [199:17]
   [203:14] [207:12,19,22]
   [208:25] [209:4,12,21]
   [210:16] [211:6,20] [214:22]
   [219:2,11] [221:19] [223:11]
   [226:4] [230:4] [232:16]
   [234:17] [237:10] [241:17]
   [243:4] [251:22] [256:13]
   [258:3,4,5,9,11] [265:12,13
   ,16] [267:9] [269:5] [272:11]
   [274:17] [275:6,7] [285:2,3
   ,8] [290:5] [293:10] [294:14
   ,21] [295:10] [299:18]
   [301:17] [303:9] [306:11]
   [312:4,9] [314:5,9,11]
   [316:3,25] [318:25] [319:6]
   [320:17] [321:16] [322:20]
   [323:3,13,14] [325:17]

receivable [307:4,5]
receivables [260:23] [304:
   22] [305:3] [306:20] [308:11]
receive [23:17] [25:14]
   [80:20] [189:3] [258:21]
   [305:11]
received [108:12] [130:25]
   [132:5] [133:22] [136:9]
   [140:12,25] [291:14]
   [320:15]
receiving [258:3,4] [265:4]
   [290:19] [294:14]
recent [174:2] [205:19]
   [226:2] [281:22,23] [285:25]
reception [29:16] [70:4]
recess [72:17] [116:17]
   [170:25] [219:18] [273:14]
   [315:14]
recognize [87:25] [222:3]
recognized [88:13]
recollection [23:21] [29:13]
   [41:10] [59:11] [60:8]
   [61:25] [80:23] [124:20]
   [129:19] [138:3,11] [144:10]
   [158:22] [164:10] [186:8]
   [194:9] [203:16] [210:25]
   [221:24,25] [229:10]
   [230:5] [242:24] [246:18,22]
   [254:6] [259:17,19] [266:25]
   [271:13] [296:17] [321:17]
   [326:6]
recollections [60:17]
recommendation [49:10,13]
   [182:2] [193:12]
recommended [299:13]
record [11:3] [72:16,18]
   [116:9,15,18] [154:16]
   [155:18,19,22] [156:14]
   [168:16] [170:24] [171:9]
   [219:16] [220:4] [252:16]
   [273:13,16] [302:16]
   [315:12,16] [326:12]
   [329:14]
records [33:4] [98:14,20,21]
   [237:15]
recourse [66:22]
recovering [153:21]
recurring [212:22] [213:15]
red [19:4] [66:8,11,23]
   [67:4]
reduce [89:18] [109:11]
   [146:3] [149:10]
reducing [282:17]
reductions [232:12]
refer [39:12,16] [52:17]
   [286:9,10] [287:21]
reference [158:12] [211:8]
   [264:20] [269:10] [296:25]
referred [17:12] [52:10]
   [53:6,10] [151:7] [161:11]
   [176:16] [217:22] [250:8]
   [287:14,15] [288:5] [290:24]
referring [52:18] [57:3]
   [115:4] [158:10] [196:20]

[205:14,22] [208:22] [249:
   16,18] [251:17] [291:6]
   [297:19]
refers [286:11] [295:23]
refi [284:11]
refinance [152:2]
refinances [89:10]
refinancing [88:15]
refis [88:14] [284:8] [299:10]
reflect [41:21]
reflected [220:23]
refresh [27:17] [41:9]
   [124:20] [129:19] [164:10]
   [186:8] [190:25] [191:8]
   [198:4] [203:16] [206:11]
   [207:13] [246:20] [271:12]
refurbished [297:22]
regard [16:14] [57:10]
   [58:11] [83:12] [157:10]
   [175:6,20] [184:24] [265:22]
   [294:23] [312:6]
regarded [169:25] [237:17]
regarding [51:3] [65:15]
   [100:16] [178:19] [195:20]
   [229:25] [231:22]
region [306:12]
registered [292:8] [329:7]
registration [291:22]
regular [152:13,18] [153:14]
   [236:4] [320:5]
regulations [140:21]
regulatory [321:19]
reimbursement [135:23]
rejected [137:4] [225:2]
relate [5:19] [109:17] [262:
   14]
related [78:2] [193:22]
   [201:12] [268:5,8] [276:19]
   [291:19] [329:15]
relating [140:11] [194:25]
   [211:21]
relation [138:17]
relationship [65:15] [73:8,25]
   [74:9] [142:9] [160:10]
   [161:24] [162:5,13,20]
   [164:22] [201:7] [202:4]
   [227:7,11] [244:8]
relationships [73:5] [164:20]
   [228:10]
relative [97:19] [215:15]
   [242:17]
relatively [39:18] [60:11]
   [81:13] [95:14] [217:7]
   [225:5] [259:23] [264:24]
   [303:11] [305:18] [307:12]
release [271:24]
relying [23:14]
remain [309:8]
remains [11:14]
remarket [278:8] [283:15]
remarketed [280:11]
remarketing [278:15]
   [298:4]
remember [5:18] [6:25]

[7.3] [29:24] [30:3,4,24]
[31:12] [32:19,24] [81:2,5]
[85:9] [122:20] [124:5]
[145:4] [195:10,11] [198:20]
[201:14] [210:22] [224:13]
[226:16] [230:21] [239:4]
[247:5] [248:4] [250:11,17
,22] [252:25] [253:21]
[255:5,6] [257:4] [259:14]
[263:9] [266:14,15] [288:8]
[289:23] [290:9,19] [293:9]
[308:17,25] [309:6] [311:9]
[319:9] [320:21,25] [321:2
,19] [323:17] [325:3,16,17]

remic [66:13] [67:24] [72:22]
[93:14,15] [95:3,4] [96:15]
[103:6] [116:22] [117:9]
[125:3] [126:23] [127:14,15
,23] [135:17] [136:14]
[140:20] [142:10] [176:17
,18] [207:15] [252:19,21]
[253:10,16] [280:3] [281:5]
[311:19] [313:9]

remics [122:11] [137:5]
remuneration [138:6]
rent [150:8]
rental [13:14]
repay [306:7]
repeat [99:4]
repeating [33:22]
rephrase [9:20] [31:22]
[44:15] [47:2] [76:15]
[113:14] [126:14] [166:23]
[189:21,25] [190:2]
replace [229:23]
replaced [219:3,6,10]
replacing [14:3]
replied [267:9]
replies [211:16] [246:9]
reply [143:18,20] [209:15]
[211:3] [267:8]
repo [48:9] [88:14] [89:3,10]
[90:5] [154:18] [183:23]
[184:3] [186:5,11,20]
[187:9] [191:17] [192:15]
[195:20] [217:8] [222:25]
[223:23,24] [276:8,10]
[277:19] [279:8,16] [280:8
,10] [283:12] [284:8,11]
[285:24] [289:11] [298:10
,24] [299:10]
reporefi [90:5]
repo-refi [90:5]
report [20:12,14] [189:4]
[190:8] [195:15,19] [196:4
,5,12,18,20] [265:11,17]
[266:7]
reported [247:23] [259:24]
reporter [34:9] [139:2]
[158:16] [191:2] [199:10]
[206:23] [208:10] [220:12]
[226:7] [249:6] [297:8,14]
[329:8]
reporting [231:2,5]

repos [277:24] [278:5]
[279:25] [282:2] [283:24]
[284:5] [294:24] [295:4,5]
[297:20]
reposessions [83:24]
repossess [278:7] [283:17]
repossessed [83:9] [88:16]
[89:5,6] [148:15] [282:20]
[283:5,10,13] [297:22]
[298:4,22]
repossessing [278:15]
[283:21]
repossession [134:15]
[135:3] [280:13] [306:7]
repossessions [83:13,21]
[84:6] [85:14,18] [86:4]
[87:16] [88:5] [92:2] [111:
22] [148:3] [149:7] [282:23]
[283:12]
represent [51:22] [292:12]
represented [264:8] [315:20]
[316:16]
reps [107:6]
repurchase [74:12] [160:19]
[163:15,18,25] [170:15]
[171:13] [173:22,23]
[174:14] [175:2,3,4] [180:
24] [185:13,24] [190:21]
[191:10] [195:4] [203:12]
[215:18] [217:3]
request [118:23] [131:19]
[223:12] [225:20] [239:4]
[241:24] [242:3] [258:13]
requested [170:15] [258:10
,12] [293:7] [319:11]
requests [23:17]
require [45:8] [89:11]
[139:23] [316:11]
required [16:2] [151:5]
requirement [323:20]
resecuritization [32:6]
[62:9]
resecuritized [304:21]
resell [174:6]
resided [266:3]
residing [21:22]
resources [149:20] [215:21]
[269:4] [298:2]
respect [10:13] [52:9]
[61:20] [78:16] [83:10]
[103:8] [110:23] [111:3]
[124:2] [131:8,10] [163:19]
[180:18] [181:14] [183:23]
[247:12] [275:16] [323:25]
respectfully [99:22]
respective [103:18]
respects [164:5]
respond [207:11] [294:20]
responded [223:11] [232:18]
[247:17]
responding [258:5,11]
response [70:4,6] [157:18]
[167:4,10] [211:4] [245:19]
responsibilities [132:11]

responsibility [52:2] [57:7]
[227:5]
responsible [44:25] [57:12]
[134:13] [178:14] [181:13]
[201:20] [227:2,3] [311:9]
rest [214:9] [303:8]
restrictions [320:14]
restructuring [228:19]
result [94:10] [112:10]
[148:24] [153:10,18]
[154:9] [214:6] [283:5,11]
resulted [185:25]
results [154:17] [155:9]
[226:2]
resumed [171:4]
retail [57:21] [58:7] [60:10]
[159:25] [160:2] [282:18]
[283:9] [297:21] [298:3,6]
[311:23]
retailer [78:23]
retailers [75:10]
retained [118:21,25]
retains [93:18]
retired [162:16]
retrench [173:12]
retrenching [317:10]
return [243:6,7] [306:23,24]
revenue [299:2] [314:16]
revenues [82:16,17] [130:
15] [298:23]
reverse [48:9] [74:12]
[160:19] [163:15,18,25]
[170:15] [171:13] [173:22'
,23] [180:23] [183:23]
[184:3] [185:12,24] [186:5
,11,20] [187:9] [190:20]
[191:10,16] [192:14]
[195:4,20] [203:12] [215:18]
[217:2,8] [222:25] [223:23
,24]
reversed [316:23]
review [143:19] [181:25]
[209:9] [245:10]
reviewing [199:17]
revised [191:19] [193:6]
revisions [191:21]
revolver [219:6]
revolving [74:11] [214:11,15
,24] [307:15]
ric [57:18,20]
rich [140:14,16] [141:8,18]
[232:18] [291:15]
richard [50:16]
richardson [161:11,12]
right [7:14] [8:5,9,19] [9:8,12
,17] [12:20] [13:7,17]
[17:18] [19:24] [21:4]
[23:4,11,25] [24:18] [25:13]
[27:11,18,19] [29:3] [30:6
,10,20] [32:21] [35:22]
[36:25] [37:16] [38:4]
[42:11] [43:16] [49:3]
[50:9,11,21,25] [51:13,20]
[52:6] [54:7] [55:10] [57:13]

[59:7,12] [61:20] [62:2,19]
[64:3] [65:24] [67:16]
[68:25] [70:10] [71:14]
[72:13] [74:16,23] [75:13]
[76:25] [77:16,20] [79:2]
[81:6,14] [85:25] [86:8,13]
[91:4] [98:25] [99:23]
[100:9] [103:12,13] [104:17]
[105:13] [107:12] [108:9]
[109:24] [110:18] [112:6]
[116:3] [117:24] [120:5,12]
[122:16] [123:13] [125:25]
[126:13] [129:4,17] [133:19]
[135:5] [137:3] [141:3,6]
[142:7] [144:15] [152:2]
[155:11,20] [156:25]
[157:14] [158:15] [159:8]
[160:11] [162:18] [163:4]
[165:22] [169:22] [170:14]
[171:15,23] [172:19,22]
[177:19] [183:6] [185:4]
[192:3] [194:17,23] [195:24]
[197:6,7] [198:23] [199:3,24]
[200:4,7,9] [202:3,22]
[203:4] [206:20] [210:14]
[212:10] [214:10] [215:7]
[218:9] [219:12] [221:4,16]
[222:3,12] [223:5] [228:20
,24] [229:5,12] [230:18]
[238:3,6] [244:15] [245:11]
[250:4] [251:7,11] [252:4]
[253:18] [255:22] [256:11
,16] [259:5] [260:5,16]
[263:11] [265:4] [267:17]
[268:7] [269:9] [271:10]
[284:19] [285:6] [287:20]
[288:2] [289:11] [290:5,10]
[295:17,19] [299:12]
[301:12] [303:3] [308:23]
[309:25] [311:2,5,18]
[312:14] [318:5] [321:8]
[325:6]
ripped [204:8]
rise [48:25] [84:20] [85:7]
[170:14]
rises [85:3] [213:8,9,13,14]
rising [91:25] [92:2] [137:17]
risk [48:2,5,11] [49:25]
[106:12] [107:2,12,19,20,25]
[108:5,8,14] [179:18]
[181:14] [182:13] [183:10]
[185:18,22] [187:2,9,10]
[201:24] [224:23] [243:24]
[244:3,13,16] [245:3,8]
[317:3]
risks [107:14,19] [108:5]
[185:9] [187:17]
risky [222:14,19,20] [223:7]
road [311:5]
robert [50:14]
roger [256:18]
role [10:6,12] [11:2,7]
[14:20] [17:5,7,20,22,23]
[18:23] [19:7,8,22,23,25]

[20:5,25] [21:3,5] [41:25]
[51:20,22] [72:22] [74:24]
[75:13] [77:8] [79:8] [100:
20] [103:18] [108:18]
[119:25] [120:14] [121:17
,23] [123:6] [133:25] [178:
12] [201:14,17,19] [202:23]
[203:5] [206:11] [228:19]
[251:12] [282:19] [307:20]
roles [202:23] [282:18]
roll [216:11] [241:3] [243:17]
room [226:5]
roots [210:7]
rose [147:22]
rosenfeld [255:4]
roughly [64:15]
route [96:25]
routes [179:23]
routinely [150:12] [293:20]
rpr [329:22]
rule [20:16] [59:9] [101:6]
[196:9] [303:10,12]
rules [166:4]
run [18:12] [146:9] [163:9]
[288:24]
running [70:24] [121:18]
[323:15]
runs [163:8]
russia [105:13,17,18,22]
[114:5]

S

s&p [18:4] [101:13]
sable [293:3]
sake [34:8] [96:16] [204:6]
[286:16]
sale [9:25] [112:15] [155:11]
[174:13] [175:2] [239:3]
[282:18] [283:3] [295:22]
[298:25] [300:11] [313:13
,17] [325:20]
sales [19:4,11] [58:8]
[59:4,15] [60:22] [61:3,9]
[70:21] [71:5] [81:22,23]
[82:7] [83:6,7,8,10,12]
[86:3] [91:25] [98:18]
[100:6] [148:8] [149:2]
[159:25] [160:2] [282:17]
[283:9,14] [288:12] [297:6
,9,11,12,19,20,21,23,25]
[298:6]
salient [318:11]
sanjeev [247:21] [248:11]
s-a-n-j-e-e-v [247:21]
satisfactory [109:23]
saw [89:8] [166:8,9] [172:7]
[193:11,17] [196:5,18]
[199:21] [263:15] [264:23]
[288:22] [320:25]
sawtooth [213:6]
say [17:5,6] [23:9] [28:10,25]
[37:17] [42:13] [43:3,17]
[44:12,19] [45:18] [46:7,13

,20] [47:4] [48:21] [49:19]
[57:3] [62:22] [71:10]
[80:4] [84:8] [86:13] [90:23]
[99:5] [104:19] [109:8]
[114:3] [115:13] [119:3]
[121:20] [135:20,23]
[151:18] [157:23] [160:20
,25] [162:8] [165:3,5]
[167:4,11] [172:23] [174:18]
[175:22] [202:13] [216:25]
[230:3] [232:5] [235:9]
[241:19] [242:21] [269:24]
[274:11,22] [278:9] [285:9
,10,11,16] [295:4] [301:16]
saying [73:12] [144:24]
[155:7] [159:23] [164:24]
[179:21] [217:21] [222:4]
[225:2] [239:5] [251:20]
[261:24] [275:20] [325:13]
says [40:4] [140:14] [141:14]
[209:10] [246:10] [262:2]
[266:8] [311:22]
scale [215:15]
scenarios [16:8] [17:11]
scene [65:5]
scope [15:7]
scores [15:20] [89:4] [149:
17] [318:14]
screen [275:24]
seasonal [82:22]
sec [291:23]
second [8:10] [22:9] [25:7]
[72:5,9] [96:24] [142:24]
[149:8] [178:16] [190:7]
[191:13] [197:17] [203:18]
[204:8] [215:4] [223:23]
[228:22] [281:12] [282:19]
secondarily [149:4]
secondly [148:13] [323:21]
sector [112:20,21] [227:8]
[228:9,11]
sectors [228:8]
secured [36:17,22,23]
[238:3,4] [305:2]
securities [16:15,19] [17:11
,12] [18:2,16,17] [28:21,22]
[29:15,18] [30:13] [31:24,25]
[32:2,7,8,14,16,23] [59:23]
[62:3,11,12] [64:19] [66:13]
[67:7,11,22,24,25] [68:19
,21,22] [70:11,18,23]
[71:3,6,18] [89:18,20,22,24
,25] [90:2] [91:5,12,21]
[92:12,16,20,25] [93:9,22
,23] [94:7] [95:5] [100:18]
[101:16] [104:12,15,20]
[106:5,10,21,23] [107:14,18
,25] [108:4] [110:12,19]
[111:20] [115:17] [117:9,19]
[118:10,11,19,21,25]
[119:9] [120:4] [121:10,11]
[126:22,23] [127:8,12,13,15
,17,18,24] [129:24] [132:2]
[136:12,14] [142:24]

[145:15] [146:5] [164:12]
[166:14] [169:11] [170:4]
[174:17] [175:12] [176:11
,13,14,17,18] [186:13]
[187:14,16] [207:15]
[215:11,16] [222:17]
[232:3,6,13] [233:20,21]
[236:11] [238:23,24]
[252:24] [253:9,15,16]
[280:3] [281:5,19,20,22]
[292:7] [311:19] [313:3]
[317:5]
securitization [6:4,5]
[8:23] [9:9] [10:14] [14:7]
[15:3] [18:6,17] [19:14,22]
[21:2] [22:20] [24:13]
[25:4,25] [26:7,12,19,22]
[27:5] [28:3,7,11] [31:19]
[40:10] [61:13] [63:11,14]
[64:24] [65:2,7,16] [67:9,20]
[92:22] [93:3] [95:6] [96:25]
[101:8,12] [108:24] [115:9]
[125:3,4] [131:8] [146:24]
[161:21] [175:21] [202:7]
[205:20] [212:18] [213:5,10
,12,21,22] [217:17] [226:21]
[235:11,19,21] [236:4]
[240:5,8] [248:10,24]
[249:22,25] [250:3,9,12]
[251:25] [252:18,21]
[254:4] [261:12] [264:18]
[266:24] [268:4] [279:21]
[281:9] [291:4,9,24] [292:
10,14,18] [293:22] [294:18]
[300:20,21] [302:14]
[303:6] [304:15] [305:24]
[306:20] [307:18] [308:10]
[311:15] [313:4,12]
securitizations [13:13,14]
[22:14] [25:10] [26:11]
[28:25] [29:9] [32:15]
[35:15,20] [57:19] [58:24]
[59:21] [62:13] [72:22]
[74:7] [75:20] [87:17,19]
[88:6] [91:17] [92:9,17]
[98:4] [103:7] [105:19]
[108:19] [109:16] [110:2,6]
[113:12,24] [116:23]
[124:10] [126:7] [129:21]
[130:18,21] [131:24]
[132:10] [135:7] [137:2,10]
[138:18] [142:10] [165:23]
[210:8] [212:25] [213:16]
[230:24] [231:3,6] [248:18
,19] [261:6] [279:12] [280:
4,18] [282:3,8] [295:17]
[296:5] [299:7] [304:20]
[305:19]
securitize [37:10]
securitized [15:12] [93:16]
[218:9,11,13]
securitizers [110:15,17]
securitizing [75:12] [156:18]
security [29:17] [61:14]

[63:7] [71:25] [72:7] [93:2]
[94:4,16,22] [95:20,21]
[101:14] [118:17] [120:11]
[174:2,6,13,14] [176:23]
[177:11,12] [249:20]
[252:24] [281:17] [292:8]
[313:8]
seeing [196:12] [211:10]
[213:5]
seek [26:4] [27:2] [181:23]
seeking [40:8,20] [106:20]
[141:19] [142:2] [166:5]
seem [82:7,10] [212:5]
[222:15] [223:9] [257:7]
seemed [81:25] [82:12]
[83:5] [296:17]
seems [246:15]
seen [61:17] [167:15]
[170:2] [190:19] [194:18]
[257:14] [313:12]
segment [151:7]
selected [175:24]
sell [60:9,23] [61:7] [82:23]
[91:11,15,21,24] [92:6,12]
[94:7,23] [95:22,24] [96:19
,22] [98:5,6,9] [106:11]
[113:22,25] [114:8] [160:4]
[176:23] [235:20] [264:17]
[282:19,20,25] [283:9]
[298:7,24] [306:19,21]
[307:17] [325:25]
sellers [114:17]
selling [29:15,17] [61:18]
[95:9] [96:3,6] [104:12]
[112:14] [155:2] [157:4]
[214:3] [238:24] [239:7]
[280:13] [298:20,21]
[304:21,23] [320:10]
sells [174:3]
send [18:9] [24:25] [25:6,7
,11] [132:23]
sending [134:14] [257:10,18]
sends [224:24]
senior [6:7] [101:19,20]
[162:13] [255:8] [272:10,11]
[274:5,12] [285:13]
sense [37:19] [71:7] [112:13]
[132:19] [134:9] [210:9]
[217:14] [230:24] [234:11]
[237:13] [238:22]
sent [25:2] [231:4] [245:16]
[247:15]
sentence [140:13,19]
[247:4]
separate [23:22] [101:10]
[161:8] [178:8] [185:10]
[228:18]
september [147:8,11]
[226:9]
serageldin [200:11,14,15,16]
s-e-r-a-g-e-l-d-i-n [200:14]
series [233:5] [234:4]
[254:9,11,13] [310:2]
seriously [85:4] [276:17]

serve [235:4]
serves [119:23] [136:2] [156:10] [227:19] [289:3] [324:18]
service [80:4] [132:17] [169:17] [291:25]
servicer [132:12] [133:10,16,25] [134:13] [231:7] [304:10,19] [305:17,24] [306:6,8,10,24] [308:7] [309:23]
servicers [276:18]
services [34:2,25] [69:6,25] [73:2] [80:3] [109:11] [159:17] [163:5] [166:6] [167:15] [169:25] [170:3,5] [317:4]
servicing [135:6,16,24] [136:11] [137:5] [138:7,12] [277:21] [295:22] [305:10,11]
set [39:12] [40:25] [72:3] [235:12,19] [236:24] [237:3] [298:10] [301:23] [329:12,19]
settlement [48:24]
seven [35:19] [65:22] [144:8] [145:4]
several [202:9] [280:24] [318:20]
severities [283:12,13]
shaky [151:23]
shall [39:3] [58:2] [99:13] [223:21]
shape [16:3] [80:6] [93:5] [165:2] [169:8] [321:3]
share [22:15] [131:13,17,21] [167:14] [169:10] [321:21]
shared [179:15] [256:12]
shareholders [145:21,24]
shares [43:7]
sharp [61:10] [106:4]
sharply [151:17]
sheer [97:19]
sheet [42:5] [93:2] [97:4] [179:13,14,17] [209:5,8,9,12] [210:18] [256:9] [327:9]
sheets [191:20,21] [193:6,7] [234:8] [245:13]
shelf [291:22]
shes [251:10]
shift [66:18]
shoes [221:22]
shoot [267:7]
short [38:25] [49:4] [186:21] [215:24] [217:7,9] [268:23] [276:22] [284:15] [299:5] [307:3,12] [316:22] [317:18]
shortcut [302:3] [315:6]
shorter [67:5] [124:14] [186:15,18,24] [234:25]
shortly [52:11]
shortterm [276:22] [284:15] [299:5] [307:3,12] [316:22]

short-term [276:22] [284:15] [299:5] [307:3,12] [316:22]
shot [70:25]
shouldnt [141:24] [298:18]
show [30:6,18] [98:15] [179:22] [198:24] [311:5]
showed [120:25] [198:22] [266:8]
showing [201:11] [265:14]
shown [66:20] [190:17]
shows [266:7]
shrinkage [298:5]
shut [173:13] [321:24]
shy [251:18]
side [29:22] [31:14] [101:15] [185:12] [228:15,17] [235:22] [244:24,25] [261:6] [264:18] [265:3]
sign [45:8]
signature [327:15]
signed [45:15] [158:8,11] [327:9]
significant [147:10] [148:25] [149:5,8,24] [186:12] [192:17] [245:4] [276:4] [277:23]
significantly [48:18] [61:11] [145:16] [146:11] [152:17] [214:16] [280:15]
similar [22:7,11,12] [32:2] [36:9,11] [70:23] [74:5] [76:4] [78:9,10] [79:3] [81:4] [110:13,16,19,21,23] [111:2,4] [118:11] [163:19] [217:13,18] [306:16] [312:13] [321:5]
similarly [77:14] [105:13] [312:19]
simon [256:21] [257:3,4]
simple [179:10] [241:24] [242:3]
simpler [232:11]
simplest [132:21]
simply [46:13] [58:11] [66:21] [71:11] [78:17] [92:16] [93:19] [94:22] [95:18] [96:6] [106:19] [107:19] [129:22] [134:18,22] [143:16] [169:4] [172:8] [212:18] [214:11] [225:7] [232:10] [280:7] [298:13] [302:11] [309:20]
simpson [292:5,12]
simultaneous [128:7]
simultaneously [127:21] [160:17] [174:4] [314:19]
single [43:21] [62:14] [87:2]
sinister [231:19]
sir [50:25] [52:21] [55:4] [107:22] [140:10] [196:14]
sister [8:8] [130:3] [244:10] [277:4]
sit [199:23] [203:7]

site [77:12] [112:15] [152:13,19,21] [278:7] [283:11]
sitebuilt [77:12] [112:15] [152:13,19]
site-built [77:12] [112:15] [152:13,19]
situation [24:19] [39:5] [40:24] [76:5] [95:12] [136:18] [147:4] [188:15,17] [194:12] [211:10] [225:6,7] [252:22] [277:17] [280:10] [306:25] [325:24]
situations [37:22] [38:17] [79:22] [95:12] [103:17] [108:3] [261:8] [281:15] [307:6]
six [149:6] [186:17] [303:15] [332:]
sixpage [303:15] [332:]
six-page [303:15] [332:]
size [97:19,20] [137:14] [185:20] [214:17] [321:13]
skirted [166:3]
slide [30:6]
slight [318:10]
slightly [60:5] [137:6,19] [232:11] [315:25]
small [37:8] [38:2] [60:9,20] [64:8] [65:23] [67:10] [90:17] [144:14] [148:22] [214:5] [215:14] [216:4]
smaller [65:21] [124:17] [149:13] [288:7]
smith [161:13] [229:23] [274:23,24] [275:5] [285:6,12] [296:12,23] [298:10] [310:22] [311:22]
socalled [126:23]
so-called [126:23]
sold [59:2] [61:13] [62:16] [65:2] [68:13] [89:18,20] [90:3] [93:23] [94:5] [95:4] [98:6] [126:23] [154:23] [174:11] [177:12] [233:23] [281:21] [283:7] [298:25]
sole [63:13] [170:9] [173:10]
solely [103:14]
solution [157:11] [210:6]
solve [298:9] [324:12]
solved [324:14,16]
solving [214:12]
somebody [14:3] [35:11] [43:23] [44:11] [48:15] [51:4] [56:22] [75:7] [84:9] [86:14] [121:8] [122:19] [134:9] [162:18,21] [177:24] [178:4] [184:8] [214:3] [236:24] [267:3] [276:25] [278:6] [293:3] [295:12] [320:24]
somebodys [134:18] [188:22]
somehow [77:17] [155:11] [157:5] [218:12]

someone [178:7,16] [237:24] [277:5]
someplace [197:2]
something [7:8] [33:20] [37:4] [42:7,16] [48:22] [68:4] [70:20] [77:23] [78:4] [85:6] [95:23] [96:4] [99:19] [130:3,4,6] [134:8,24] [160:9] [174:16] [176:3] [177:15] [179:5,9,14,20] [182:12] [184:3] [188:23] [209:19] [210:6,24] [211:11] [213:23] [217:6] [222:22] [231:10] [267:6,20] [270:7] [272:19] [298:17] [304:16] [306:11] [311:11] [320:6] [321:23]
sometime [27:22] [66:17] [81:3] [228:13] [250:9] [272:25] [325:11]
sometimes [60:13,14,22] [126:5] [127:7] [133:5,18] [160:4] [188:24] [192:24] [275:12] [276:2]
somewhat [83:22,25] [88:17,21,22] [89:16] [109:9] [115:6] [134:2] [147:5] [175:23,25] [186:10] [264:21] [272:17] [304:15]
somewhere [40:3,4] [96:14] [112:9] [132:22] [147:23]
soon [81:9,16] [99:3,16] [100:3]
sophistication [236:23]
sorenson [3:20] [226:5]
sorry [11:24] [13:4] [17:15] [34:12] [36:2] [37:13] [42:13] [78:22] [80:16] [83:23] [104:20] [119:3] [127:14] [132:22] [159:11,22] [161:18] [171:16] [186:12] [189:12] [200:25] [207:7] [208:4,12] [213:7] [217:8] [218:19] [241:25] [252:2] [254:25] [260:13] [297:8] [303:5] [306:6]
sort [15:20] [36:18] [47:23] [48:22] [53:19] [60:21] [67:15] [70:21] [101:9] [106:15] [121:13] [123:9] [129:10,15] [134:11] [167:16] [175:15] [177:15] [178:3] [179:4] [182:4,11] [191:21] [196:2,3] [209:6] [214:19] [228:8] [275:9] [300:10] [320:7]
sought [289:10]
sound [196:22]
sounds [219:14]
source [127:5] [132:6] [149:21]
space [95:10] [111:14] [151:4] [181:11,16,17] [210:5] [230:24] [248:14,16]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

[276:25]
spaced [213:15]
span [32:22] [35:20]
speak [46:4] [124:21]
[130:11,12] [155:16,18]
[173:16] [197:16] [241:15
,16] [255:19] [313:23,24]
speaking [22:12] [39:25]
[68:16] [84:12] [90:6]
[91:20] [95:16] [96:22]
[106:11] [140:8] [162:2]
[163:5] [169:2] [193:14]
[279:18]
special [240:23]
specialized [15:4]
specialty [304:16]
specific [59:10] [60:17]
[65:11] [68:17] [73:23]
[77:3] [80:14] [82:17]
[87:2] [102:7] [109:13,16]
[130:16] [131:18,19,20]
[135:23] [141:23] [142:22]
[174:19,20] [178:21]
[179:2] [181:7] [183:16]
[194:9] [196:19] [203:3]
[221:24] [232:13] [290:8]
[295:10,18] [304:8]
specifically [14:21] [35:8]
[39:21] [40:19] [45:15]
[47:16] [79:23] [82:5]
[83:6,19] [86:7] [102:2]
[117:18] [120:2] [140:13]
[144:13] [145:5,14] [156:6]
[164:19] [174:21] [180:23]
[181:19] [211:21,23]
[221:10] [233:11] [272:11]
[274:14] [291:18] [312:4,6]
[320:3]
specificity [87:6]
specified [174:8] [176:24]
speculate [141:4] [144:9]
[157:15]
spell [6:11] [50:7]
spelling [50:9]
spend [130:24] [197:23]
spending [298:2]
spent [286:13] [320:12]
spoke [312:18]
sponsored [240:19]
spooked [145:11]
spread [71:18,19,21,22,23]
[72:5] [89:23] [111:16,20]
[148:9] [177:14] [258:19]
spreads [26:14] [118:15,16]
[152:7]
spring [271:9]
springs [203:9]
spv [312:20]
square [152:16,18]
ss [329:4]
ssa [295:19]
st [144:16]
stable [66:25]
stage [123:6] [137:12]

[152:7] [215:12]
stamp [139:5] [143:12]
[158:18] [180:9] [191:5]
[199:12] [204:25] [207:3]
[208:16] [219:20,24]
[230:15] [232:24] [249:10]
[255:25] [257:24] [264:3]
[290:14] [292:22] [294:4]
[302:22] [303:16] [310:13]
[330:9,12,15,,20,23]
[331:5,8,,13,,18,21,24]
[332:5,,10,13,16,19,22]
stand [242:16] [244:19]
standard [122:14] [137:23]
[147:13] [181:6] [231:11]
[276:18]
standards [88:13] [114:17]
[115:10,16] [137:16]
[147:9] [151:6] [264:9]
[265:6] [266:11] [267:17]
[268:6] [288:16]
standing [245:20]
standish [274:14] [301:11]
standpoint [237:18]
stands [168:9] [295:20]
stars [3:6]
start [35:13] [84:20] [99:11
,23] [106:8] [115:2] [143:25]
[301:23] [302:16] [324:22]
started [296:14] [302:12]
[317:9] [325:7]
starting [4:13]
startup [301:23] [302:16]
start-up [301:23] [302:16]
state [134:16] [144:5]
[319:15] [329:3,9]
stated [63:6]
statement [25:15] [119:6]
[192:5] [262:15] [291:22]
statements [34:11] [120:20]
[275:4]
statistical [84:22]
statistically [88:22]
status [113:11,18,21]
[114:11,13] [195:4]
stay [85:19] [169:6]
stayed [268:24]
steadily [137:17] [213:13,14
,15]
steady [148:18]
steep [96:23]
stella [290:22]
step [167:13] [221:21]
stick [152:19] [154:15]
[287:8]
stickbuilt [152:19]
stick-built [152:19]
stink [297:7,9,12]
stipulations [320:7]
stock [128:10] [144:20]
[208:7] [241:8] [316:13]
stop [167:23] [273:9]
stopped [309:22] [322:13]
stores [83:3]

storms [122:6]
story [320:12]
straight [165:19] [217:25]
straightforward [177:7]
[214:24]
street [20:21]
stress [152:6]
stresses [18:12,13]
strictest [229:22]
strike [8:5] [24:11] [25:19]
[52:7] [92:13] [126:2]
[176:12] [316:10]
strip [135:25] [136:2] [281:
2,13]
strong [71:13]
structure [19:13] [94:4]
[109:25] [110:5] [135:6,9]
[173:22] [175:18] [176:22]
[249:19] [260:21] [281:3]
[308:2]
structured [201:4,5] [248:
13,16]
structures [110:7]
structuring [14:20,24]
stuart [257:5]
stuck [155:10]
stuff [49:24] [69:15] [175:11]
stutman [3:5] [4:16,17]
style [175:23]
subgroup [293:14]
subject [10:23] [11:19]
[30:5,11] [33:25] [62:23]
[85:21,23,24] [100:24]
[176:12,15] [265:8] [284:21]
[320:19]
submission [47:24] [48:2,5]
[160:18] [194:19] [224:23]
submit [179:18] [182:3]
[239:3]
submitted [177:24] [179:8
,9] [180:3,13] [181:8,18]
submitting [178:15]
subordinate [80:22] [89:24]
[136:12] [311:4]
subordinated [137:2]
subordination [89:12]
subprime [111:11] [150:22]
[153:3,23]
subscribe [71:8]
subscribed [326:17] [328:
]
subsequent [254:19]
[296:17,18]
subsequently [16:9] [148:
14] [154:24] [265:3]
subsidiary [130:2] [237:18]
[312:15]
substance [10:24]
substantial [97:20] [111:12
,25] [276:5] [280:2] [286:2]
succeeding [309:12]
successful [91:17] [92:7]
[134:13]
succinctly [295:5] [297:4]

[298:10]
sudden [296:15]
suddenly [145:22]
suffice [162:8]
sufficient [118:18] [216:16]
sufficiently [43:12] [66:25]
suggest [28:16] [166:2]
suggested [229:15] [274:7
,9] [275:9]
suggesting [169:5] [223:9]
suggestion [223:20]
suggests [209:7] [296:23]
suisse [4:5] [6:16] [7:18,21]
[8:3,16] [10:18] [12:10]
[34:3] [41:23] [44:19]
[49:2] [51:7] [56:21] [57:5
,7] [81:3] [86:16,21] [103:15]
[164:25] [166:20] [167:12
,15] [170:11] [184:5] [185:
12] [200:19] [203:16]
[218:23] [220:16] [222:21]
[225:3] [227:14,15] [229:18]
[233:10] [240:20,24]
[241:4] [244:6,13] [255:14]
[292:13] [304:17]
suisses [41:20] [262:19]
sum [258:18]
summaries [293:15]
summarize [293:17]
summarizes [23:3] [295:6]
summarizing [256:10]
[297:4]
summary [20:3] [21:24]
[22:20] [33:19] [67:5]
[235:17]
summer [3:20] [81:19]
[254:15,21,25] [271:8,9]
summertime [82:24]
superior [182:3] [200:22]
superiors [6:17] [14:16]
[183:4]
superseded [192:19]
supervising [121:17]
supervisor [50:5,13,15]
[184:8,11,21] [185:3]
[201:21] [247:23] [248:7]
[255:10]
supervisors [14:12] [48:4]
[183:15] [209:25]
supplied [21:6,9] [121:9]
supply [22:9,19,25] [23:5]
supplying [258:9]
support [323:25]
suppose [28:9]
supposed [231:17]
sure [11:13] [19:10,11,12,15]
[35:11] [40:3] [50:8] [53:14]
[56:6] [58:17] [64:7] [86:10
,12] [97:20] [98:7] [100:7]
[102:6] [107:21] [113:15]
[115:3] [125:2,24] [131:19]
[139:10] [141:5] [143:23]
[145:4,19] [161:9] [163:12]
[167:7] [168:11] [169:20]

[176:19] [183:8] [194:8]
[195:7] [197:6,18] [198:13]
[218:2] [225:22] [245:17]
[246:7] [247:14] [263:9]
[269:23] [270:21] [287:10]
[290:9] [295:14,18] [296:19]
[312:21] [325:3]
surmised [263:12]
surprise [274:8,9,12]
surprised [242:19] [272:3]
surprises [206:14]
surprisingly [82:23] [151:23]
survive [154:11] [155:6]
survived [154:7]
susan [228:21,22] [251:6]
suspend [54:7]
suspended [322:5]
suzanne [311:3]
swap [72:5] [118:13] [243:
6,7,14,15]
swaps [48:24] [71:23]
[248:20]
swear [4:25]
sweeping [27:13] [45:3]
sworn [5:4] [171:5] [326:17]
[328:] [329:13]
syndicate [215:2]
system [298:3]

T

table [73:16] [324:21]
tailor [28:21]
tailored [16:22] [73:17]
taken [5:12] [62:13] [72:17]
[116:17] [133:8] [157:17]
[175:7] [219:18] [227:23]
[272:12] [273:14] [274:19]
[282:21] [315:14]
takeout [212:18,25] [213:5]
[235:21] [236:16] [243:11]
[268:4]
takeouts [234:15]
taking [5:16] [107:16]
[118:11] [201:23] [238:23]
[244:2] [280:12] [317:3]
talk [58:14] [71:2,11,24]
[141:7] [209:15] [311:14,15
,16] [319:2]
talked [51:8] [67:18] [72:21]
[86:25] [91:4,9] [140:14]
[149:12] [163:18] [194:21]
[245:19] [303:6] [316:24]
talking [27:9] [32:22] [39:21
,23] [40:18] [52:20] [54:20]
[58:19] [83:15] [135:21]
[141:11] [156:21] [164:6]
[173:17] [180:22] [197:6,14]
[200:20] [206:19] [211:17]
[217:6,22] [218:20] [232:7]
[251:19] [253:19] [264:13]
[287:17,19] [311:6] [312:3]
talks [206:6] [299:24]
[300:2,4]

tangential [61:23]
tape [21:21] [25:2] [72:16,19]
[116:16,19] [170:24]
[171:9] [219:17] [220:4]
[273:13,16] [315:13,16]
[326:13]
tapes [293:16]
tasks [132:21]
team [39:16] [68:17,23]
[70:22] [101:7,9,10,12]
[123:7,8] [200:18,24]
[202:6] [226:21] [227:15]
[228:16,18] [244:21]
[245:5] [251:6] [256:23]
teams [101:7]
technically [49:18] [68:13]
[71:15] [183:23] [201:5]
[234:13]
technique [269:22] [270:2
,11,13,17] [277:21]
telephone [133:17,19]
[179:10]
tell [5:25] [14:24] [21:4,15,17]
[24:10] [28:12] [29:24]
[30:2,3,10] [31:3,9,16]
[33:18] [38:17] [44:24]
[45:13] [68:25] [70:13]
[86:24] [93:12] [98:10]
[121:15] [133:21] [141:5]
[144:12,13] [165:8] [169:22]
[178:12] [184:23] [188:25]
[192:9] [195:22] [199:2]
[200:13] [205:25] [206:4,7]
[226:15] [229:25] [230:19]
[257:9] [265:18] [268:9]
[273:21] [274:18] [275:11]
[321:15] [322:19]
telling [167:19] [223:5]
[226:10]
tells [264:7]
temporary [38:7,15,20]
ten [156:12]
tend [82:23] [88:16] [90:3]
tended [66:18] [88:22,24,25]
[89:7,11,23] [186:25]
[187:5]
tendency [34:9] [175:13]
tenyear [156:12]
ten-year [156:12]
term [17:16] [39:9] [42:5]
[47:13] [58:10] [71:16]
[73:22] [77:21] [108:24]
[119:13] [138:16] [179:13
,14,17] [186:15] [191:19,21]
[193:6,7] [209:5,8,9,12]
[210:18] [215:24] [217:7]
[222:10] [234:8,19,25]
[243:10] [245:13] [256:9]
[260:5] [286:20] [316:15]
[317:19,24,25]
terminate [84:15] [272:12]
terminated [35:4]
terminating [271:25]
termination [271:5,15]

[285:25]
terminology [217:25]
[260:16]
terms [39:18,24] [42:15]
[43:24] [44:7] [66:19]
[158:24] [161:16] [185:9]
[195:5] [203:20] [221:19]
[222:2] [224:8] [316:6,8]
[318:18] [322:9] [323:19,20]
terrell [6:10,13]
t-e-r-r-e-l-l [6:13]
terrells [6:19]
testified [5:5] [47:14] [171:
6]
testify [10:21] [41:16]
testifying [5:13]
testimony [53:17] [163:17]
[169:21] [266:10] [327:6,8]
[329:14]
thacher [292:5,12]
thank [50:24] [72:14] [91:7]
[140:5,7] [144:4] [158:21]
[170:22] [177:19] [205:4]
[207:6,23] [208:13,19]
[218:22,25] [219:17]
[220:5,6] [230:11] [233:4]
[256:5] [263:21] [264:6]
[273:11] [290:18] [293:2]
[294:2] [302:25] [310:16,18]
[315:8] [326:10]
thanking [294:16]
thanks [249:8]
thats [17:17] [19:19,20]
[27:9] [29:2,3,4] [35:13]
[36:23] [39:8] [40:8] [53:3
,9] [58:2,18] [71:25] [72:2]
[75:5] [84:13,21] [105:2]
[110:2] [118:22] [120:9]
[144:23] [145:5] [156:14]
[168:5,13] [169:22] [170:14]
[174:9,15,16] [198:4,5]
[199:6] [203:9,22] [207:8]
[210:6] [216:4] [221:23,25]
[229:15] [230:6] [231:10,21]
[233:22] [236:3] [244:2]
[247:18] [252:11] [257:21]
[258:10] [260:25] [261:7]
[265:23] [274:17] [276:12]
[277:16] [287:7,14,19]
[313:15] [323:11]
themes [212:22]
themselves [4:13] [15:12]
[16:17] [17:2,9] [21:20]
[65:14] [67:8,11] [93:22]
[104:12] [120:4] [121:11]
[127:19] [187:14,16]
[239:13] [282:8]
theoretical [49:23]
thereafter [98:4] [137:10]
[204:11]
thered [131:18] [134:19]
therefore [253:4] [279:10]
[292:9]
theres [15:4,5] [25:18]

[34:13] [36:2,19] [37:11,14]
[40:3] [44:23] [149:8]
[151:3] [174:19,23] [175:13]
[180:17] [209:7] [216:8]
[231:18] [269:9] [277:23]
[313:5]
theyd [148:22] [178:6]
theyll [16:24] [36:18]
theyre [16:19] [33:7] [37:9,17]
[73:18] [161:8] [163:11]
[174:25] [231:16]
theyve [84:12,17]
thicker [111:24]
thing [22:8,9] [25:5,7]
[45:9] [49:22] [72:5] [91:3]
[144:11,23] [150:16]
[151:25] [152:21] [153:2]
[154:22] [161:5] [164:7]
[166:8,9] [174:11] [175:6]
[178:15] [179:11] [188:25]
[193:5] [235:14] [252:9]
[262:18] [285:18] [291:19]
things [15:20] [16:6,24]
[17:17] [18:2] [19:20]
[32:2] [36:21] [45:8] [48:21
,22,24] [49:24] [53:4]
[67:15] [68:13] [71:23]
[72:3] [81:4] [82:21] [93:15]
[94:18] [119:24] [134:11]
[148:4] [150:7] [151:10,14]
[155:23] [164:12] [165:19]
[174:24] [175:5,7,9,15,19]
[178:8] [184:9] [186:15,17]
[188:14] [194:20] [203:6]
[210:2] [215:11] [217:11]
[223:17,18] [225:3] [228:4
,8] [246:10] [260:21,25]
[261:7,14,15,18] [262:9]
[266:16] [276:18,23]
[280:12] [283:15] [287:9,12]
[295:15] [296:18] [300:18]
[311:16] [316:20] [317:12]
[321:6]
think [8:15] [11:2] [20:21,24]
[21:13] [23:3] [24:17]
[25:18] [33:7] [43:21]
[44:23] [45:2,6] [46:11,18]
[47:11,23] [53:9,10] [56:6]
[58:9] [60:18,19] [61:23]
[62:8,18] [63:23] [65:20]
[69:12,16,20] [70:2] [77:7]
[78:21] [80:13,21] [84:15]
[85:8] [91:23] [96:25]
[98:20,22,23] [99:6] [100:
19] [101:18] [103:13]
[105:8,12] [107:23] [108:7]
[109:9,24] [114:6] [121:12]
[122:8,16] [123:10] [129:15]
[132:8] [133:5,6] [139:22,25]
[141:15] [145:10] [147:21]
[148:20] [149:10] [153:22]
[154:3,21] [156:5,10]
[159:25] [161:10] [164:9]
[166:9] [167:3] [169:13]

[170:17] [171:18,24] [172:
2] [191:14,22] [193:4]
[199:21] [200:2] [201:5]
[203:5] [205:10] [207:17]
[209:24] [216:23] [221:7]
[224:18] [225:12] [227:4]
[229:16] [233:6] [234:7]
[237:4] [239:14] [240:22]
[242:7] [251:20] [258:12,18]
[260:9] [261:4] [262:4,7]
[263:3,19] [264:12,20]
[265:24,25] [266:14]
[267:11] [268:24] [269:3]
[276:12] [282:13] [284:4,17]
[286:15,16] [289:2] [292:4]
[293:12] [296:3,15,16]
[298:16] [299:16] [300:6,13]
[301:9] [302:6] [306:17]
[308:21] [309:2,3] [310:8,25]
[315:18] [316:3,4,9,15]
[318:6,9] [322:10] [323:6,11]
[324:2,24] [325:25]
**thinking** [28:10] [210:3]
[212:12,19]
**thinks** [152:14]
**thinner** [145:23]
**third** [23:2] [97:3,10,12]
[140:19,20] [164:17]
[223:24] [228:22] [311:21]
[324:3]
**thornburgh** [50:16] [266:17
,19]
**though** [15:24] [45:7]
[49:23] [148:16] [153:5]
[188:20] [205:8] [278:14]
**thought** [99:8,24] [118:15]
[191:18] [200:13] [206:17]
[224:16] [266:10]
**thoughts** [141:16] [144:14]
**thousand** [46:24]
**thousands** [32:23]
**three** [7:20] [18:3] [21:11]
[37:25] [39:6,10] [40:9]
[73:4] [85:13] [87:23]
[95:23] [101:13] [139:4]
[149:5] [150:7] [168:6]
[186:16,17] [188:14]
[194:22] [203:25] [217:10]
[234:25] [255:24] [258:19
,24] [272:7] [290:13] [296:
22] [317:22,24] [325:14]
[330:] [331:] [332:]
**threemonth** [39:6] [296:22]
**three-month** [39:6] [296:22]
**threepage** [139:4] [255:24]
[290:13] [330:] [331:]
[332:]
**three-page** [139:4] [255:24]
[290:13] [330:] [331:]
[332:]
**threeyear** [186:16] [234:25]
[317:22,24]
**three-year** [186:16] [234:25]
[317:22,24]

**threshold** [181:23,24]
**throughout** [15:4] [19:25]
[87:15] [115:23] [212:22]
[270:3] [290:4] [295:17]
**ticker** [208:7,8]
**ties** [297:6]
**tightening** [115:14] [149:11
,13]
**tighter** [89:23]
**till** [115:11] [116:3] [185:2]
**time** [4:7] [5:22] [7:4,6,24]
[8:17,22] [11:14] [12:24]
[13:18] [17:6] [19:25] [20:16]
[21:23] [25:5] [26:13,17,19]
[27:9,24] [28:23] [33:12]
[35:19] [37:8,10,24] [42:8
,9] [51:10] [53:6,11,13,23]
[54:18] [57:13] [58:9,24]
[59:2] [60:7] [61:9] [63:3,23]
[65:21] [66:6,10,18] [67:2]
[71:20] [73:5,6] [74:21]
[79:21] [81:21,22] [82:2,3
,6] [83:4,11] [84:19] [85:3,7
,11] [86:4,7,19] [87:24]
[88:6] [90:12,22] [95:6]
[96:11,16] [97:24] [99:25]
[100:11] [102:10,12,20]
[105:4,14] [108:25] [109:3
,4,5] [111:12,25] [113:2]
[115:5,7] [124:17,18,24]
[126:3] [127:6] [129:24,25]
[133:2,5,6] [136:10,17]
[142:7] [143:2] [144:15]
[145:7] [146:14,22] [147:12]
[148:23] [150:19] [155:24]
[156:2,3,9] [157:22] [158:
8] [160:4] [162:11] [165:15
,16,22] [166:2] [169:3,23]
[170:18] [171:3,12,21,25]
[172:21,25] [174:7,9,10,15]
[176:2,23] [181:9,12]
[184:11] [186:18,19]
[187:20,21] [191:18,22]
[192:16] [193:11,15]
[195:13] [197:23] [198:10]
[200:20,22] [201:6,24]
[202:10] [206:12] [209:2]
[212:6] [214:21,23] [216:17]
[217:16] [219:16] [220:17]
[222:16] [227:3,14] [229:17]
[230:21] [236:6,8] [239:6]
[240:16] [242:25] [244:19]
[245:2,7,9,24] [247:22]
[248:4,9,25] [249:18]
[251:3,12] [253:18] [254:8
,17] [257:15] [263:15]
[268:23,25] [269:18,23]
[271:10] [274:25] [277:12
,13] [279:4] [281:16] [282:
16] [283:19] [288:21]
[290:9] [293:8] [296:11,22]
[301:11] [302:8,9,16]
[304:17] [311:10,11]
[312:8] [316:23] [317:9]

[318:21] [321:4,6,25]
[322:14] [326:2,14]
**timely** [19:9,17] [85:2]
[133:13,15]
**times** [20:19] [90:11] [174:
2] [202:20]
**timing** [211:25]
**title** [6:23,24,25] [7:3]
[238:14] [248:3,4] [310:25]
[311:4]
**today** [5:13,17] [31:3,6]
[61:4] [97:23] [203:8]
[214:2] [266:10] [286:13]
**todays** [4:6]
**together** [9:10] [15:2]
[17:11] [19:9] [30:5] [32:3]
[36:12] [42:4] [52:4] [53:12
,19,25] [54:22] [64:2]
[71:6] [91:5] [104:3] [166:
4,5] [202:16] [245:6] [246:
7] [252:18] [258:22] [300:8]
[301:5] [306:18] [308:2,9]
[325:18] [326:7]
**tokyo** [242:25]
**told** [33:16] [69:16,20]
[101:24] [107:23] [166:19]
[187:12] [202:22] [207:17]
[229:21] [247:25] [271:16]
[272:5] [273:20] [284:19]
[296:9]
**tom** [49:17] [50:20] [56:11]
[181:9] [182:21] [188:20]
[194:21] [221:8,11,15]
[224:3,16,20] [258:12]
[259:24] [264:12] [267:2,3]
**tomorrow** [275:22]
**tongue** [297:13]
**tony** [3:8] [4:15] [51:9]
**took** [57:6] [107:25] [108:13]
[147:9] [201:19] [245:5]
[253:12] [263:4] [277:11]
[278:21] [308:3] [311:4]
**top** [82:13,15] [95:15]
[143:18,20] [246:10]
[247:18] [290:6] [294:8]
**topic** [87:13] [295:6,15]
**topics** [301:14]
**toss** [155:21]
**total** [22:2] [63:18] [96:12,14]
[136:5,7] [147:24] [154:22]
[215:13] [216:5] [243:6,7]
[253:4,5,9] [258:18,20]
[297:24]
**touched** [73:2]
**tougher** [154:18,19]
**towards** [188:19]
**toxic** [138:16]
**toxicity** [138:17]
**track** [134:24] [302:16]
**trade** [40:10] [244:24]
**trading** [118:19] [146:6]
[201:23]
**tradition** [147:18]
**traditional** [156:15] [214:11

,15]
**tranche** [89:13,14] [90:11,13
,23] [111:4] [113:13] [254:
3]
**tranches** [29:8] [90:9]
[100:21] [110:2,6] [113:17
,19,23,25] [114:2] [138:18]
[249:24] [292:16]
**transaction** [10:7,12]
[11:16,17,18,22] [12:21]
[14:23] [15:3] [17:7] [18:8
,21] [19:9,16] [22:19]
[28:4] [43:8,13,25] [45:19]
[46:7,21] [47:22] [48:19]
[49:20] [50:15] [52:4,9]
[56:9] [59:22,24] [62:3,4,7
,10,23] [63:4] [64:14,18]
[67:15] [71:9] [78:9] [89:19
,21] [90:13,24,25] [91:3]
[93:17,20] [94:4] [95:15]
[104:3,6] [106:9,11] [110:
20] [111:12] [112:3,4,18]
[125:19] [126:3] [128:7]
[136:5,8] [177:4,9] [178:4
,20] [180:9] [182:10,17]
[183:9,15] [187:17] [195:14]
[205:5] [208:21] [222:7,9]
[226:15] [227:23] [229:11
,13,14,15] [234:3] [235:4]
[243:24] [246:7] [247:9]
[249:16,21] [250:5] [252:17]
[253:2,3,14] [254:9,11,13
,20] [256:6] [258:23] [260:
22,24] [261:22] [264:11,15]
[281:3] [290:24] [291:2]
[292:11] [293:20] [300:16]
[303:11,23] [304:12]
[305:7] [306:5,13,16,19]
[307:23] [308:3,16] [310:2
,6] [313:16] [316:16] [322:
8]
**transactions** [13:8,12,21]
[14:21] [15:8] [32:3,9]
[33:5] [36:9] [38:6] [48:13
,20] [56:11] [59:13,20]
[60:21] [61:22] [62:21]
[63:25] [64:4] [65:7,14,16]
[67:14,20] [69:7] [73:14]
[74:17,19,24] [75:18]
[76:17,20,23] [78:16]
[79:3,8] [91:8] [93:19,25]
[102:25] [106:14] [107:3,17]
[108:6,13] [110:7,22]
[111:4] [113:9] [114:19]
[137:17] [178:24] [201:15
,18] [202:24] [243:4] [248:
17,18] [291:24] [303:12]
[313:4]
**transcription** [327:7]
**transfer** [270:8] [296:4]
[312:12,20] [313:11]
[314:18]
**transferor** [313:8]
**transferred** [242:25]

,15]

29/06/2006  O'DRISCOLL, Fiachra (vol. 1)

transformed [193:7]
transient [134:7] [135:2]
transition [317:7]
transmitting [203:19]
treasure [24:6]
treasuries [71:21] [72:4,6]
  [175:11]
treasury [118:13]
treat [174:21] [276:9]
treated [279:24]
tree [34:22] [73:20] [147:13]
  [159:11,12]
treister [3:5] [4:16,18]
trend [90:5] [105:3] [147:2]
trends [26:13] [83:5,6,7,8,12]
  [86:2,9] [88:4] [114:16]
  [165:7]
trial [267:4]
tried [276:19]
trillion [215:13]
trs [243:5]
true [20:21] [103:10] [115:
  19,20,21,23] [257:21]
  [284:13] [313:13] [327:6]
  [329:14]
trust [4:5,18] [16:20] [62:9
  ,13,14] [63:11,14] [65:2]
  [93:15] [127:7,9] [135:12]
  [235:12,19] [236:24]
  [237:3] [238:10] [239:9,19]
  [240:5,8] [252:19] [304:23
  ,24] [305:2,5,24] [306:20]
  [307:18] [308:10] [313:9]
trustee [231:7]
trusts [129:3] [235:21]
truth [30:2] [36:19] [67:10]
  [105:23] [121:15] [145:3]
  [164:9] [195:22] [225:5]
try [34:14,15] [47:21] [49:8]
  [71:4] [87:23] [91:14]
  [126:10] [133:20] [183:8]
  [210:3] [267:4] [276:20]
  [301:23] [319:15]
trying [49:14] [69:23] [98:20]
  [122:21,23] [134:23]
  [152:2] [167:5] [180:19]
  [185:10] [187:8] [203:4]
  [212:14] [227:5] [298:16]
  [300:6] [302:2] [304:9,11]
tuesday [28:14]
turn [50:13] [81:9,16] [94:15]
  [99:3,16] [100:4] [147:10]
  [178:7] [190:4] [247:23]
turndown [193:2,16,18]
  [194:24] [246:23]
turned [149:6] [188:2,6,8]
  [192:3] [193:20] [196:15]
  [201:25] [229:13] [246:21]
  [256:10]
turning [189:5]
twelfth [3:6]
twice [246:12,24]
twister [297:13]
twopage [143:11] [207:2]

[232:23] [249:9] [294:3]
  [302:21] [310:12] [330:]
  [331:] [332:]
two-page [143:11] [207:2]
  [232:23] [249:9] [294:3]
  [302:21] [310:12] [330:]
  [331:] [332:]
type [15:3] [30:7] [53:25]
  [54:23] [74:13] [128:7]
  [152:12] [193:14] [214:25]
  [215:18] [217:5] [227:22]
typical [18:17] [24:10,19]
  [25:18] [30:9] [86:2] [110:
  7] [125:3] [126:3] [154:9]
  [176:6] [293:12,19] [317:21]
typically [16:2,16,18]
  [17:25] [18:10] [22:18]
  [23:23] [24:25] [25:12,13]
  [31:25] [36:16,23] [68:21]
  [78:2] [80:3] [84:24] [90:16]
  [93:16] [94:19] [97:6]
  [98:19] [103:15] [104:2]
  [125:14] [130:19] [134:16]
  [135:15] [136:3] [170:2]
  [175:9] [181:25] [183:14]
  [186:15,16] [192:24]
  [195:25] [216:23] [224:2,15]
  [232:4] [234:11,19] [275:25]
  [278:22] [285:14] [313:10]

U

u.s [8:17] [149:25] [174:17]
uh [73:19] [76:3] [77:6]
  [108:2] [178:10] [185:21]
  [191:7] [207:10] [209:18]
  [220:10] [230:7] [233:7]
  [258:2] [269:11] [294:11]
uhhuh [73:19] [76:3] [77:6]
  [108:2] [178:10] [185:21]
  [191:7] [207:10] [209:18]
  [220:10] [230:7] [233:7]
  [258:2] [269:11] [294:11]
uh-huh [73:19] [76:3]
  [77:6] [108:2] [178:10]
  [185:21] [191:7] [207:10]
  [209:18] [220:10] [230:7]
  [233:7] [258:2] [269:11]
  [294:11]
ultimate [49:5,14] [50:3]
  [126:20] [267:10]
ultimately [40:5] [261:2]
unable [134:10] [216:10]
uncertainly [146:12]
underlying [16:21] [17:4]
  [32:7] [97:9] [111:18]
  [216:20] [231:23] [232:2,4]
  [238:4]
understand [8:13] [15:22]
  [16:25] [21:13] [44:21]
  [64:9] [105:6] [107:21]
  [140:10,16,23] [141:18]
  [143:20] [161:18] [165:11]
  [169:14] [180:6,20] [197:4]

[198:11,15] [203:5] [225:22]
  [236:20] [244:22] [245:18
  ,25] [246:13] [260:5] [264:
  11] [271:21] [276:7] [278:10]
  [282:9] [291:15] [296:25]
  [304:9,11] [310:19]
understanding [13:25]
  [15:11,12] [16:7] [130:23]
  [132:2,9] [182:9,16] [204:
  11] [245:22] [259:22]
  [275:4] [276:13] [282:7]
  [301:6,18]
understood [67:2] [113:6]
  [132:14] [151:16] [158:13]
  [166:19] [167:4,19] [179:25]
  [197:25] [218:2] [245:24]
  [261:25] [262:8] [271:21]
undertake [107:2]
undertaking [107:15]
undertook [74:7]
underwrite [11:16] [262:24]
  [268:10,11]
underwriter [69:7] [103:6,21
  ,23,25] [104:2] [106:13,19]
  [107:7,8]
underwriters [104:5] [142:
  12,18]
underwriting [19:22] [21:3
  ,5] [23:5] [24:19,21] [69:17
  ,24] [100:14] [103:19]
  [114:17] [115:16] [166:14]
  [169:11] [170:5] [259:21]
  [260:3,4] [261:19,25]
  [262:16] [264:9] [265:6,15]
  [266:11] [267:17] [268:6]
  [269:16] [273:5] [288:15]
  [317:5]
underwritings [104:18,23]
  [161:21]
underwrote [124:11]
unfortunately [153:19]
  [162:16]
unguaranteed [254:10]
uniformly [68:10]
union [133:3,6,7] [142:25]
  [164:21] [215:3] [239:14]
unit [183:19] [184:9] [196:12]
  [201:2]
united [35:3,6] [77:5]
universal [305:18]
universally [58:10]
unless [261:5]
unlike [162:9] [236:4]
  [320:4]
unquote [165:17]
unrated [18:20]
unsatisfactory [213:2]
  [214:10]
unsecured [101:19,20]
unsecuritized [16:18]
unsold [107:14,18,24]
  [108:4]
until [28:16,17,18] [37:10]
  [91:19] [116:2] [137:4]

[148:21] [194:17] [217:16]
  [218:9] [252:19] [254:8]
unusual [49:21] [191:20]
  [192:22] [214:2] [225:5,6]
  [304:15]
upcoming [292:10]
upon [23:14] [30:22] [48:18]
  [54:7] [65:4] [73:2] [88:5,9]
  [165:6] [174:15] [179:12]
  [244:3] [253:24] [265:8]
  [280:3] [284:2] [288:3]
  [296:9]
upset [146:10]
us [14:23] [15:24] [25:2,6,8
  ,11] [26:12] [28:25] [34:9]
  [53:12] [56:24] [57:3]
  [109:8] [149:9] [152:2]
  [164:19] [169:22] [265:20]
  [289:9] [299:9] [306:15]
  [311:24]
use [21:23] [39:23] [71:16]
  [80:10] [157:7] [175:13]
  [239:24] [260:5] [267:13]
  [271:19] [272:6,15] [279:10
  ,16] [282:12] [293:10]
  [301:5] [302:5] [319:11]
  [320:8,15]
used [17:17] [39:18] [47:13]
  [58:10] [67:14] [77:21]
  [79:20] [94:19] [127:25]
  [129:22] [138:17] [200:17]
  [207:21] [222:10] [243:10]
  [269:23] [270:2,11] [277:22]
  [279:23] [284:10] [291:8,23]
  [319:17]
useful [47:17] [80:13]
user [238:6]
users [9:19] [10:4] [58:3,15]
uses [213:4]
using [18:14] [58:22] [119:
  13] [130:19,20] [267:18]
  [270:13,17] [279:6] [282:15]
  [286:20]
usual [234:11] [253:16]
usually [18:4] [22:3] [37:6,23]
  [48:2] [61:10] [71:15]
  [80:2] [84:5,18] [88:19]
  [93:16] [129:17] [131:18]
  [174:8] [177:13,15] [179:9]
  [215:23] [216:3,7,8] [217:
  5,10] [231:13] [232:10]
  [233:25] [235:24] [239:13]
  [280:12] [314:19]

V

va [77:25]
valuation [118:25] [119:11
  ,17,25]
valuations [117:21,23]
  [207:15,21]
value [60:15] [117:5] [120:
  2,4,6,7] [254:2]
valued [118:10]

A.32

vanderbilt [35:9,10] [78:24]
 [79:3] [208:5,8]
variable [235:25] [236:2,6,9]
 [240:2,3,13] [243:20]
varied [48:17] [134:16]
varies [213:19]
variety [126:24] [165:19]
 [201:21] [215:11] [224:3]
various [36:19] [94:18]
 [140:9] [194:19] [212:12]
 [276:10] [286:11] [292:15]
 [318:13] [324:17]
varvel [163:9]
vary [83:5]
vast [136:17] [289:5]
vehicle [216:16]
verbal [47:25]
verbally [179:11]
verging [313:2]
vernacular [88:15]
version [302:4]
versus [4:5] [17:6] [112:21]
vexed [156:3]
viable [61:18]
vice [7:16]
videographer [3:22] [4:2,8
 ,25] [72:15,18] [116:8,15,18]
 [170:23] [171:8] [219:15]
 [220:3] [273:12,15] [315:12
 ,15] [326:11]
videolink [4:9]
videotape [4:3] [116:5]
 [315:10]
view [10:24] [16:6] [40:7]
 [52:3] [58:13] [107:10]
 [141:25] [146:15] [152:24]
 [175:6,19] [239:22] [240:22]
 [241:6] [262:19] [273:3]
 [282:25] [283:21] [288:21]
 [300:22]
viewed [175:5] [269:15]
 [313:16]
vintage [281:23]
virtue [112:19] [233:24]
vis [135:11]
visavis [135:11]
vis-a-vis [135:11]
visit [133:18]
vmf [207:24] [208:2]
vogue [175:23,25]
vogues [175:23]
volume [4:2] [148:6]

W

wait [139:18] [150:9]
waiting [40:9]
waive [55:15]
waiver [54:5,21] [56:13,24]
 [287:17] [299:13] [322:24]
waivers [289:10] [299:8]
walked [283:3]
wall [31:14,19] [33:3] [196:
 3]

want [16:24] [44:15,17]
 [45:4,14] [46:24] [58:14]
 [73:17] [110:3] [116:10]
 [133:23] [166:2] [168:12]
 [176:9] [179:21] [188:18,21]
 [189:16] [197:2,5,22]
 [198:13] [203:23] [218:2]
 [226:12,14] [231:14]
 [275:21] [284:17] [287:10]
 [313:3]
wanted [18:8] [31:2,7]
 [178:5] [241:18] [256:17]
 [300:25] [301:2] [311:7]
wants [169:16] [277:4]
warehouse [36:13,15,16]
 [37:2] [38:3,14,21,23]
 [39:5,15] [40:4,14] [42:16]
 [48:8,21] [52:10,17] [53:6
 ,20,25] [55:6] [74:13,14]
 [127:3] [128:3] [163:19]
 [214:20] [261:17] [284:3]
 [286:5,8,10] [287:14,16,18
 ,22] [324:6]
warehouses [37:21]
warrant [43:6] [72:25]
 [79:17] [256:8] [320:20]
warranties [107:6]
warrants [80:21] [258:23]
wasnt [61:2,17] [90:16]
 [92:18] [99:18] [100:19]
 [105:9] [107:13] [113:16]
 [123:21] [133:5] [134:12]
 [137:20] [150:15,17]
 [162:10] [173:11] [182:24]
 [190:22] [191:20] [192:22]
 [194:14] [196:11] [206:16]
 [223:17,18] [225:3] [227:13]
 [242:23] [246:22] [254:7]
 [266:18] [272:19] [276:22]
 [277:11] [281:24] [292:7]
 [302:10] [321:6]
watching [172:23]
ways [16:22] [39:17] [70:15]
 [209:2,3] [212:15] [217:5]
 [276:20,21] [280:24]
weak [107:10]
weaker [88:17] [147:6]
 [151:13]
web [231:12]
wed [22:9] [28:21] [151:25]
week [28:11,12,13,15,17]
 [37:25] [216:12] [224:3,6]
 [324:14,15,23] [325:8,11]
weekend [28:13]
weekly [224:10]
weeks [52:11,21] [70:24]
 [323:15] [325:14]
weighted [22:5] [93:22]
weingart [184:17]
weingord [184:16] [185:5]
well [9:9] [24:11] [27:14,18]
 [30:10] [33:9] [45:4,14]
 [46:14] [50:15] [51:12]
 [56:7,23] [58:20] [59:25]

[60:4,20,25] [66:25] [69:12]
 [77:14] [78:13] [81:13]
 [84:14] [85:7] [93:8,25]
 [105:12,20] [106:7,17]
 [107:4,23] [112:23] [113:6]
 [115:22] [117:18] [122:12
 ,20] [124:16] [129:16]
 [141:7] [142:25] [144:8,12]
 [155:21] [160:21] [162:5]
 [164:13] [165:2] [166:10]
 [167:11] [168:3] [170:23]
 [173:6,15] [175:15] [176:13]
 [177:24] [178:8] [184:10]
 [186:8] [189:17,23] [193:3]
 [194:14,23] [198:23]
 [203:4] [204:9] [209:7,25]
 [219:15] [224:16] [229:6]
 [237:8] [242:6] [247:10]
 [248:23] [251:10] [252:22]
 [253:9] [255:23] [263:3,6,11
 ,14,23] [265:4] [267:21]
 [275:23] [276:25] [278:9,12]
 [279:18] [281:20] [285:14]
 [286:2,18] [289:5] [291:18]
 [304:18] [307:14] [314:14]
 [320:3] [326:6]
wellcompensated [84:14]
well-compensated [84:14]
went [8:2] [69:11] [74:14]
 [100:7] [123:9] [130:22]
 [172:10] [254:11] [263:7]
 [264:23] [267:23,25]
 [271:24] [302:12] [307:8]
 [309:10] [321:15]
werent [114:8] [123:13]
 [137:22] [167:23] [169:24]
 [187:19] [250:19] [269:7]
 [276:21]
weve [91:4,8] [96:25] [161:
 16] [238:7] [257:14] [286:13]
 [289:15] [296:11] [315:9]
whatever [48:9] [71:11]
 [109:5] [123:2] [127:4]
 [169:8] [178:6] [212:7]
 [214:6] [216:13] [223:14]
 [267:15] [275:24] [280:18]
 [286:8] [288:14] [289:8,18]
 [294:9]
whats [7:14] [17:13] [36:14]
 [105:14] [154:15] [176:6]
 [213:6] [220:22] [243:5]
 [244:5] [303:4]
whenever [279:4]
whereas [147:17] [184:2]
 [252:19] [317:21]
whereby [37:7] [173:24]
 [174:5] [216:10] [306:19]
whereof [329:19]
wherever [21:22] [128:3]
 [263:12]
wherewithal [148:11]
 [240:4]
whether [11:13,14] [25:23]
 [26:5,6,17] [27:4,15]

[28:2,7] [29:7] [32:19]
 [44:5] [46:23] [49:6,12]
 [53:15] [55:15] [59:18]
 [61:13] [69:23] [79:16,23]
 [85:16,17] [86:20] [98:10]
 [100:9] [102:8,15] [105:4]
 [108:13] [123:24] [128:9,15
 ,16] [130:24] [131:16]
 [138:22] [141:25] [159:3]
 [167:8] [168:10] [178:18]
 [180:12] [185:4] [188:25]
 [191:9] [193:4,22] [195:5]
 [198:20] [199:5,17] [202:11]
 [203:11] [204:4] [205:25]
 [206:8] [207:14] [209:4]
 [213:20] [223:11] [232:17]
 [237:8] [257:16] [261:15]
 [265:13] [267:5,6] [283:16
 ,17] [290:6] [300:7] [302:7]
 [315:3,4] [319:10,16]
 [322:17]
whitman [3:9] [4:17]
whole [61:9] [83:16] [186:13]
 [215:23] [222:4,9,18]
 [236:13] [252:9] [261:21]
 [268:14] [291:19] [303:8]
whom [20:14] [24:4] [48:7]
 [54:10,14] [56:15] [101:3]
 [138:19] [181:8] [235:10]
 [242:4]
whos [95:17]
whose [9:7] [68:18] [78:20]
 [119:25] [151:4] [164:14]
 [173:10] [228:18] [266:2]
 [312:14] [329:12]
why [84:14] [96:8] [99:10]
 [111:9] [113:17] [120:23]
 [134:6] [136:24] [137:8]
 [154:3,10] [156:17] [160:14]
 [165:3,8,11] [167:25]
 [187:25] [188:6] [194:11]
 [206:15] [235:3] [242:19]
 [245:12] [247:14] [257:9]
 [273:21] [293:7] [301:6,19]
 [304:2] [315:10]
wickes [3:17] [4:23]
wide [82:12] [258:11]
wife [251:10]
will [16:9,11,12] [32:7]
 [48:15] [49:10,25] [58:17,21]
 [60:24] [71:11] [84:25]
 [85:7] [95:14] [109:11]
 [114:3] [139:22] [143:9]
 [165:24] [203:15] [204:2,6]
 [215:21] [231:13,25]
 [232:3,21] [257:22] [267:4]
 [290:11] [292:19] [293:24
 ,25] [302:19] [303:13]
 [310:10] [313:16]
williams [140:15]
williamson [3:16] [4:21]
wind [250:15]
window [174:15]
wintertime [82:24]

wish [139:20] [294:9]
[311:23] [328:]
wished [71:8]
withdraw [273:17]
withdrew [317:10]
within [15:6] [23:22] [31:17]
[36:21] [47:21] [48:11]
[49:25] [51:10] [62:12]
[66:12] [68:16] [89:19]
[90:2] [92:22] [93:3,20]
[95:15,23] [101:12] [123:6]
[135:19] [138:23] [151:3]
[169:6] [174:9,14] [177:21]
[181:11,15,16,22] [182:7,24]
[184:9] [186:13] [196:11]
[200:18] [201:2] [202:6]
[210:5] [225:3] [226:20]
[227:18] [228:10] [230:24]
[244:13] [245:6] [248:22]
[253:6] [261:15,18,19,22]
[266:22] [268:24] [276:24]
[280:17] [281:2] [282:8]
[285:20] [289:5] [291:5]
[293:14] [304:16] [306:5]
[322:16] [325:8,13] [329:9]
without [29:18] [30:14]
[33:19] [34:4] [58:11]
[66:22] [91:22] [112:5]
[114:3] [153:19] [154:7]
[175:6] [277:25] [281:14]
[285:12]
witness [3:11] [5:2,4]
[11:3,7] [33:20] [34:12,16]
[47:10] [88:3] [91:7] [99:13]
[116:6] [139:19] [140:6]
[141:2] [143:16,23,24,25]
[144:3] [158:13,20,21]
[167:22] [168:3,14,22]
[171:5] [189:12,17,21,25]
[190:11] [191:7] [196:24]
[197:3] [199:19] [205:3,4]
[207:9,10] [208:18,19,24]
[220:5,13] [226:8,11]
[230:17,18] [233:3,4]
[246:3,5] [249:13,14]
[256:4,5] [260:13] [264:5,6]
[273:7] [286:11,18] [290:17
,18] [291:17] [292:25]
[293:2] [294:2,11,12,13]
[297:9,12,16] [302:25]
[303:2,3,19] [304:5,6]
[310:16,17,18] [328:2]
[329:11,14,19] [330:2]
woman [226:25]
wonder [194:11]
wonderful [150:16]
wont [114:3] [199:7] [286:8]
[313:12]
word [45:23]
words [16:10,18] [35:19]
[59:14] [60:12] [68:19]
[74:10] [77:22] [86:16]
[88:15] [89:13] [93:20]
[99:21] [106:19] [111:17]

[115:15] [122:10] [135:22]
[136:4] [161:20] [205:18]
[210:10] [212:20] [216:11]
[222:15] [232:8] [233:19]
[235:11] [245:22] [248:17]
[281:3] [297:19] [298:18]
[309:15]
work [6:3] [8:2,10,23]
[10:9,17,23] [13:23] [14:2
,6] [15:7] [17:24] [18:24]
[31:17] [57:9] [70:19,21]
[71:4] [109:6] [120:21,25]
[121:6] [134:12,23] [162:24]
[200:17] [225:18] [229:17]
[248:22] [289:9] [301:5]
[302:5] [320:4]
worked [9:6] [10:22] [12:6]
[13:11] [14:22] [19:14]
[34:22,24] [35:2,3,5,7]
[50:19] [77:14] [115:9]
[122:6,19,24] [157:11]
[162:19,21] [194:20]
[195:13] [202:6] [221:11]
[223:19] [225:3] [235:18]
[239:23] [244:9] [248:24]
[251:4,5,6] [252:17] [262:
9] [293:3,5] [304:18] [308:
5] [322:10]
working [7:17] [8:7] [32:12]
[104:4] [121:24] [156:8]
[157:8] [173:15] [200:21]
[248:21] [256:14,15]
[262:12] [283:22]
works [124:24] [235:15]
[252:9]
worse [83:22,25] [147:10]
[154:17,18]
worth [96:4]
wouldnt [31:5,8] [97:14]
[116:12] [128:11,18,23]
[129:7] [137:8] [148:10,11]
[156:19] [174:18] [178:17]
[183:24] [190:3] [228:2]
[234:12,13] [272:2] [275:25]
[277:20] [284:9] [285:14]
[302:14]
wrapped [62:17]
writing [47:25] [267:9]
[319:8]
written [46:9] [102:9,11]
[194:18] [198:9] [224:23,25]
wrong [93:13] [119:16]
[138:10] [265:22,25]
[276:14]
wrote [189:5] [211:15]

X

xanthos [50:17] [55:25]
[189:5] [192:6] [197:5]
[198:6] [221:5] [258:10]
[261:24] [265:7]
x-a-n-t-h-o-s [50:17]
xanthoss [193:11] [196:18]

Y

yea [43:3,17] [44:12,19]
[45:19] [46:7,13,20] [47:4
,13] [49:19]
yeah [6:25] [9:21] [44:17]
[47:10] [60:4] [69:12]
[77:19] [80:10] [87:25]
[91:10] [99:8] [105:7]
[115:12] [116:12] [140:22]
[166:24] [167:2] [168:22]
[172:23] [178:2] [183:12]
[189:17] [192:22] [210:25]
[226:23] [229:6,9] [244:20]
[260:19] [280:10] [303:3]
[321:23] [323:14]
year [81:23] [85:9,11]
[137:7] [151:22] [156:12]
[185:14,25] [187:11]
[188:10] [192:21] [228:22]
[234:20] [311:12]
years [7:20] [13:12] [31:13]
[39:9,10] [65:22] [85:12,13]
[87:15] [137:19] [144:8]
[145:4] [147:18] [149:6]
[229:4,8] [258:19,24]
[270:12] [279:4] [295:17]
yes [6:18] [7:10] [9:4] [12:4
,15,18] [13:2,9,19] [14:8,10]
[20:3,4,9] [27:23] [33:17,22]
[35:16] [36:7] [38:13]
[41:13] [42:13] [43:9,15]
[44:2] [45:12,21] [46:5,8]
[50:23] [54:12,17] [55:24]
[57:2,5,8,21] [59:16]
[62:5] [63:20] [64:23]
[65:18] [68:2,3,10] [74:3,18
,25] [75:16,22] [76:22]
[78:8] [79:10] [80:12]
[81:11,17] [83:17] [88:3]
[90:16] [100:22] [102:14]
[103:9] [108:20] [110:25]
[114:12,21] [115:15,24]
[117:10,14] [118:7] [122:2
,18] [125:6,12] [126:5]
[129:11] [131:9,12,15]
[132:13] [135:8,13] [136:17
,20,23] [139:9,10,17]
[141:13] [142:11,20]
[145:12] [146:19] [156:24]
[158:24] [159:20] [161:17]
[162:2] [163:16] [165:13]
[172:6] [173:3,20] [177:2]
[178:13] [180:5] [184:22]
[186:3] [193:13,24] [195:17]
[201:16] [205:16] [206:21]
[208:4,20] [216:21] [218:22]
[219:5] [225:7] [229:24]
[230:9] [237:20,22] [240:14
,17] [243:8,25] [244:4,21]
[246:16] [249:4] [251:6]
[252:8,15] [259:12] [260:9]
[269:17,20] [270:21]

[274:13,15,21] [280:9]
[288:7] [297:2] [299:20]
[304:13,14] [305:8,13]
[309:19] [311:20] [315:2,7]
[318:16] [321:14] [322:18]
[323:19] [324:11]
yesterday [190:18] [192:13]
[193:10] [194:17] [196:18]
[198:18] [199:6,20,21]
[200:6]
yet [10:13] [133:22]
york [3:14] [4:11] [12:12]
[39:14] [41:2] [42:21]
[43:18,23] [44:6,11] [51:3
,6,11] [54:6] [151:2] [163:11]
[178:5] [180:7] [183:22,24
,25] [202:19,21] [220:16]
[233:10] [255:15] [329:3,5
,10]
youd [22:19,24] [30:18]
[71:3,4,6] [95:4] [115:2]
[192:25] [193:2] [195:18]
[261:14]
youll [21:13] [34:14] [126:8
,12] [150:23] [166:17]
[183:20] [186:7] [236:22]
[261:11]
young [290:22]
youre [12:13] [27:9] [32:9,22]
[33:3,10,23] [46:18] [82:25]
[94:7,10] [95:5,9,16]
[111:19] [115:4] [122:21]
[126:9] [135:20] [142:5]
[143:6] [155:7] [156:21]
[158:10] [162:15] [168:20]
[173:17] [177:16,17]
[180:16] [196:20] [203:7]
[206:19] [211:17] [213:20]
[214:3] [217:21,22] [223:16]
[245:21] [257:13] [265:24]
[275:21] [286:24] [287:17]
[297:16] [323:6]
yourself [37:11] [140:10]
[141:9] [284:22] [303:24]
youve [5:11] [11:18] [12:22]
[32:11] [33:16] [46:21]
[67:17,18] [69:2,12,16,20]
[77:21] [79:5] [86:3] [94:8
,9,13] [95:12,22] [99:21]
[101:23] [107:23] [109:24]
[129:6] [139:13] [157:18]
[174:12,13] [176:8,22]
[199:23] [203:5] [214:25]
[247:25] [263:12] [286:20]
yup [9:23] [10:5] [69:14,19
,22] [79:12] [114:14] [124:
23] [204:5] [209:11] [250:6]
[254:12] [269:14] [295:21]
[322:15]

Z

zero [106:24] [107:25]
[281:14]

**zigzag** [214:4,5]
**zonca** [233:8,9]
**zoncas** [245:19] [255:9]