**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------x

| | |
|---|---|
| In re | |
| Oakwood Homes Corporation, | Chapter 11 |
| et al., | Case No. 02-13396 (PJW) |
| Debtors. | |

OHC Liquidation Trust,

    Plaintiff,

v.

Credit Suisse (f/k/a Credit Suisse First Boston, a
Swiss banking corporation), Credit Suisse Securities
(USA), LLC (f/k/a Credit Suisse First Boston LLC),
Credit Suisse Holdings (USA), Inc. (f/k/a Credit
Suisse First Boston, Inc.), and Credit Suisse (USA),
Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.),
the subsidiaries and affiliates of each, and Does 1
through 100,

    Defendants.

Adversary Proceeding
No. 04-57060 (PJW)

Civil Action No. 07-799 (JJF)

---------------------------------------------------

**DOCUMENTS**
**IN SUPPORT OF DEFENDANTS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

**VOLUME III**

*EXHIBIT AA*

# In The Matter Of:

*OHC LIQUIDATION TRUST v.*
*CREDIT SUISSE FIRST BOSTON*

---

## ALAN C. SHAPIRO
*September 5, 2007*

---

# MERRILL LEGAL SOLUTIONS

*25 West 45th Street - Suite 900*
*New York, NY 10036*
PH: 212-557-7400 / FAX: 212-692-9171

**SHAPIRO, ALAN C. - Vol. 1**

**Page 2**

```
 1
 2    A P P E A R A N C E S:
 3
 4    Attorneys for Plaintiff
 5        STUTMAN TREISTER & GLATT
 6        1901 Avenue of the Stars, Twelfth Floor
 7        Los Angeles, California 90067-6013
 8    BY:  TONY CASTANARES, ESQ.
 9
10    Attorneys for Defendants
11        LINKLATERS LLP
12        1345 Avenue of the Americas
13        New York, New York 10105
14    BY:  R. PAUL WICKES, ESQ.
15        J. JUSTIN WILLIAMSON, ESQ.
16            -AND-
17        LINKLATERS LLP
18        One Silk Street
19        London EC2Y 8HQ
20    BY:  RICHARD A. DOBLE, ESQ.
21
22    ALSO PRESENT:
23        PETER KOZLOWSKI, Director, Counsel, (a.m.
24        only) Credit Suisse Securities (USA) LLC
25        DOUGLAS HUEBNER, Videographer
```

**Page 3**

```
            ALAN SHAPIRO
 1
 2        (Exhibit 501, multipage document
 3    entitled Report of Alan C. Shapiro, Ph.D.,
 4    dated 4/30/07, premarked for identification,
 5    as of this date.)
 6        THE VIDEOGRAPHER:  Here begins
 7    videotape No. 1 in the deposition of
 8    Alan Shapiro. In re: Oakwood Homes
 9    Corporation, et al., OHC Liquidation Trust
10    versus Credit Suisse First Boston, et al.,
11    Case No. 02-13396 (PJW).  Today's date is
12    September 5th, 2007.  The time is 10:15.
13        The video operator today is
14    Douglas Huebner of Merrill Legal Solutions,
15    25 West 45th Street, New York, New York.
16    The video deposition is taking place at
17    Linklaters, 1345 Avenue of the Americas,
18    New York, New York.
19        Will counsel please introduce
20    themselves for the record.
21        MR. WICKES:  Paul Wickes from
22    Linklaters for the defendant.  And with me
23    are Justin Williamson and Richard Doble,
24    also from our firm, and Peter Kozlowski of
25    Credit Suisse.
```

**Page 4**

```
            ALAN SHAPIRO
 1
 2        MR. CASTANARES:  Tony Castanares,
 3    Stutman Treister & Glatt, for the plaintiff.
 4        THE VIDEOGRAPHER:  Will the court
 5    reporter please swear in the witness.
 6    A L A N   C .   S H A P I R O,    called as a
 7        witness, having been duly sworn by the
 8        Notary Public, was examined and testified as
 9        follows:
10    EXAMINATION BY
11    MR. WICKES:
12        Q.    Professor Shapiro, I see from your
13    expert report and your qualifications that you are
14    experienced at this business of depositions, so I
15    assume I don't need to explain the process to you;
16    is that right?
17        A.    Yes.
18        Q.    All right.  Is there any reason today
19    why you're not able to give us your best
20    testimony?
21        A.    No.
22        Q.    All right.  Professor, in your expert
23    report, dated April 30th, 2007, which we've marked
24    as Exhibit 501 in this case, you tell us on page 4
25    that you've been *asked by counsel to assume that
```

**Page 5**

```
 1
 2    CSFB owed Oakwood and its creditors a fiduciary
 3    responsibility"; is that correct?
 4        A.    Yes.
 5        Q.    Tell me, if you would, Professor, how
 6    would the conclusions in your report have been
 7    different had you not made that assumption.
 8        A.    Well, I can't --
 9        MR. CASTANARES:  Objection to form.
10        A.    I can't give you -- well, a legal
11    opinion, but I guess I would say even if there
12    were no fiduciary obligation that Credit Suisse's
13    behavior was inconsistent with its -- with the
14    guidelines in its compliance manual.  So from that
15    standpoint I think my conclusions would still
16    stand, in that as my specific opinions, which are
17    expressed on pages 3 and 4, that CSFB did not
18    behave in a reasonable or a reasonably prudent
19    manner with respect to the services it provided to
20    Oakwood doesn't rely specifically on the existence
21    of a fiduciary obligation.
22        And second, that my opinion that CSFB
23    had financial incentives to keep Oakwood operating
24    and to delay recommending that Oakwood file for
25    bankruptcy doesn't -- does not specifically rely
```

ALAN SHAPIRO

1  on the assumption of a fiduciary obligation, but I
2  think that it does -- it's inconsistent with the
3  guidelines in the compliance manual.
4      Q.   So do I understand from that answer
5  that your conclusions would not be any different
6  if you had not made the assumption identified at
7  Roman numeral V.A on page 4 of your report?
8      A.   Yes, I believe that the fiduciary
9  obligation certainly strengthens my conclusions,
10  but I think those conclusions would still stand.
11      Q.   In what way does the fiduciary
12  obligation strengthen your conclusions?
13      A.   Well, it would strengthen the -- it
14  wouldn't affect the second conclusion regarding
15  financial incentives, those exist independent of
16  any fiduciary obligation.  But the reasonable or
17  reasonably prudent, I think you do want to take in
18  figuring whether something -- whether somebody
19  behaved in a reasonable manner.  I think if they
20  had a fiduciary obligation to behave in a certain
21  way that that strengthens that obligation or makes
22  behavior less reasonable than it otherwise would.
23      Q.   Who was it who asked you to make that
24  assumption?

6

---

ALAN SHAPIRO

1      A.   I don't recall the specific person, but
2  it was somebody from the law firm of Stutman.
3      Q.   Do you remember when it was you were
4  asked to make that assumption?
5      A.   It was sometime before I began writing
6  my report.
7      Q.   Was it before you began work on your
8  report?
9      A.   I believe so.
10      Q.   And you can't remember who it was who
11  asked you to make the assumption?
12      A.   No, I don't.  I can't.
13      Q.   Can you remember the occasion when you
14  were asked to make that assumption?
15      A.   Not specifically.  We had various
16  meetings, both telephonic conversations as well as
17  in-person meetings.
18      Q.   Before you began to write?
19      A.   That's correct, and then while I was
20  working on the report.
21      Q.   Do you remember whether it was in a
22  group meeting that someone asked you to make this
23  assumption or one on one?
24      A.   I believe that all my meetings were

7

---

ALAN SHAPIRO

1  group meetings, both telephonically as well as in
2  person.
3      Q.   And who were the participants in those
4  group meetings?
5      A.   They varied.  I couldn't tell you how
6  many there were or which people.  I can tell you
7  the general cast of people.
8      Q.   Would you?
9      A.   Sure.
10          Mr. Castanares.  And again, I have to
11  say that I'll mention names, but I don't think
12  that they were -- that they all participated in
13  each meeting.  I think there were different people
14  participating in different meetings.
15      Q.   Okay.
16      A.   Stephan Ray, Whitman, I can't recall
17  his last name.  Scott Yun and -- you know, I --
18  I'm trying to think.  I think there may have been
19  one or -- possibly another lawyer or two.  And
20  then there were my associates, people who helped
21  me on this matter.  Dr. Atulya Sarin --
22      Q.   Hang on a second.
23      A.   Sure.
24      Q.   Just on the question of the lawyers

8

---

ALAN SHAPIRO

1  from the Stutman firm, was Pamela King a
2  participant in any of those meetings? ' --
3      A.   I don't recall.
4      Q.   Do you know her?
5      A.   I don't have a recollection of her.
6      Q.   Okay.  Now, you started to tell us
7  about associates and I was going to ask you later,
8  but we'll do it now, were there other people,
9  other than the lawyers at Stutman with whom you
10  worked in preparing this report?
11      A.   Yes.
12      Q.   Can you tell me who they were.
13      A.   Dr. Atulya Sarin, and his name --
14      Q.   You better spell that for us.
15      A.   Yes, his name is spelled A-t-u-l-y-a,
16  Sarin, S-a-r-i-n.
17          Paul Sandhu, that's S-a-n-d-h-u.  Those
18  were the principal people.  And then I had a
19  couple of other people who did various data
20  analyses for me.
21      Q.   And who were the other people?
22      A.   Reza Ilkhani, that's R-e-z-a,
23  I-l-k-h-a-n-i, I believe.
24      Q.   Okay.

9

ALAN SHAPIRO

1    ALAN SHAPIRO
2    A.    And Allen Shen, A-l-l-e-n, S-h-e-n.
3    And Paul Hanouna, H-a-n-o-u-n-a.
4    Q.    Okay. And if you would, just briefly
5    identify those people for me, that is, are they
6    work colleagues, are they employees?
7    A.    Sure, yeah.
8    Atulya Sarin is a professor of finance
9    at Santa Clara University. Paul Sandhu is an
10    independent contractor. The same with Allen Shen
11    and Reza Ilkhani. And Paul Hanouna is an
12    assistant professor of finance at Villanova
13    University.
14    Q.    Okay. And can you just tell me
15    generally what role each of those five people
16    played in your work.
17    A.    Sure. Atulya Sarin is a colleague who
18    works very closely with me. We, you know, pretty
19    much discuss everything related to a case. We
20    work on other cases together.
21    Q.    Okay.
22    A.    Paul Sandhu works with us on various
23    cases. His background is economics and law. He
24    has a law degree from Canada, although he doesn't
25    work as a lawyer. He goes -- he spends a fair

10

ALAN SHAPIRO

1    ALAN SHAPIRO
2    amount of time going through documents, you know,
3    very carefully helping me identify various
4    documents that would be of relevance.
5    And the others, Reza, Allen, and
6    Paul Hanouna, they mostly provide data analysis
7    services. They help me, particularly with regard
8    to the supplemental report that I wrote in this
9    matter.
10    Q.    Did they -- did those three, that is,
11    Ilkhani, Shen, and Hanouna, did they assist in the
12    principal report?
13    A.    You know, they may have done some
14    things, but I just don't recall. What I do recall
15    is that they -- is their assistance in the
16    supplemental report.
17    Q.    So the principal people who worked with
18    you on Exhibit 501 are Dr. Sarin and Paul Sandhu?
19    A.    That's correct.
20    Q.    All right. And have you worked with
21    all those people on other matters in the past?
22    A.    Yes, I have.
23    Q.    Your principal occupation is as a
24    professor at the University of Southern
25    California; is that right?

11

1    ALAN SHAPIRO
2    A.    That's correct.
3    Q.    Is the work you do as an expert
4    witness, do you do that through some entity or
5    organization?
6    A.    Well, I have -- well, Atulya Sarin and
7    I own a company called Trident Consulting Group
8    through which we operate.
9    Q.    I see.
10    And is it Trident Consulting Group that
11    was actually retained by the plaintiffs in this
12    action to provide expert services?
13    A.    No, I was.
14    Q.    You were.
15    So is it --
16    A.    And I, in turn, used Trident Consulting
17    Group to -- you know, to provide services to me.
18    Q.    And what kind of entity is Trident
19    Consulting Group?
20    A.    It's an LLC.
21    Q.    It's an LLC. Okay.
22    You get paid for your services in this
23    matter; is that right?
24    A.    That's correct.
25    Q.    When you send a bill to the plaintiff

12

1    ALAN SHAPIRO
2    does that bill come from you or from Trident?
3    A.    From me.
4    Q.    And the payment is made to you?
5    A.    That's correct.
6    Q.    And then do you pay Trident?
7    A.    Yes.
8    Q.    And who pays Ms. Ilkhani, Mr. Shen, and
9    Mr. Hanouna?
10    A.    Well, Atulya Sarin actually handles
11    that. Those -- every -- Atulya and I are the only
12    principals, really partners in the LLC.
13    Q.    Right.
14    A.    And then Atulya, in turn, contracts
15    with these other people. They're all independent
16    contractors.
17    Q.    Okay. So do you make a payment then to
18    Trident?
19    A.    No. Actually, it's -- even though we
20    have an LLC, actually I have an S corporation and
21    Dr. Sarin has an S corporation. I make the
22    payment to Dr. Sarin's S corporation.
23    Q.    When you say I make the payment, do you
24    mean your S corporation?
25    A.    My S corporation, yes. I have a --

13

ALAN SHAPIRO

1

2     Q.    Let me go back to the question I asked

3   you before.

4           Bills and payments with respect to your

5   services, are they made to you personally or to

6   your S corporation?

7     A.    Actually to my S corporation.

8     Q.    What's the name of that corporation?

9     A.    Alan C. Shapiro, Inc.

10    Q.    And what's the name of Dr. Sarin's

11  corporation?

12    A.    Saagar Enterprises, that's S-a-a-g-a-r

13  Enterprises.

14    Q.    And are those two entities, are they

15  the owners of Trident or are you --

16    A.    That's correct.

17    Q.    Okay.  Is there some reason why there's

18  no mention of any of those entities in your

19  report?

20    A.    No.  There just was no reason to, to

21  mention them.

22    Q.    Okay.  Is there some reason why there's

23  no mention in your report of the fact that other

24  people worked on it with you?

25    A.    Yes, because I wrote the report.  I

14

---

ALAN SHAPIRO

1

2     A.    Yes.

3     Q.    And --

4     A.    I only hesitated because it's connected

5   to the Internet, but...

6     Q.    I understand.

7           Your report is dated April 30th, 2007.

8   Can you tell us approximately when you began the

9   actual drafting of the report.

10    A.    I would say sometime in March, probably

11  early March, but I don't remember specifically.

12    Q.    Presumably the hard drive on your

13  computer would have a record of when drafting

14  began.

15    A.    I -- most likely.

16    Q.    Okay.  Did you maintain and keep drafts

17  of your report?

18    A.    No, there's just one draft that I just

19  would type over.

20    Q.    Okay.  Did you share with lawyers at

21  the Stutman firm drafts of your report prior to

22  the April 30th report?

23    A.    No.

24    Q.    So they never saw it until it was in

25  its final form; is that right?

16

---

ALAN SHAPIRO

1

2   ...nd I did have help from other people.

3     Q.    Okay.  And when you say you wrote the

4   report, tell me as a purely mechanical matter how

5   was Exhibit 501 created.

6     A.    Well, I sat at the keyboard and wrote

7   it.

8     Q.    Okay.  Did you write all of it or did

9   some of these other people write some parts of it?

10    A.    I wrote all of it.

11    Q.    Okay.  And so everything that is in

12  this report represents your conclusions?

13    A.    That's correct.

14    Q.    Do your S corporation or Trident have

15  offices?

16    A.    Well, we both have home offices.

17    Q.    Okay.  So was the work on this report

18  done at your home office?

19    A.    Yes, it was.

20    Q.    So you were working on a computer at

21  your home office?

22    A.    That's correct.

23    Q.    Is that computer networked?

24    A.    No.

25    Q.    It's just a standalone computer?

15

---

ALAN SHAPIRO

1

2     A.    I believe that's true.

3     Q.    Did Dr. Sarin see drafts of the report?

4     A.    Yes.

5     Q.    And did he make comments or edits to

6   the report?

7     A.    Yes.

8     Q.    And as a mechanical matter how would

9   Dr. Sarin do his editing of the report?

10    A.    Well, most of the time he would -- we

11  would talk about it in conference calls.  Several

12  times he came to my home and actually worked on it

13  together.

14    Q.    Okay.

15    A.    The same with Paul Sandhu.

16    Q.    And did you --

17          Now, you say the same with Paul Sandhu,

18  did Paul Sandhu -- sorry.

19          Did you e-mail drafts back and forth

20  amongst yourself and Mr. Sandhu and Dr. Sarin?

21    A.    Yes.

22    Q.    And would those e-mails be preserved on

23  your computer system?

24    A.    No.

25    Q.    Why not?

17

ALAN SHAPIRO

2    A.    I just make a habit of deleting
3  e-mails.
4    Q.    You delete all e-mails?
5    A.    After a certain -- after a week or so.
6    Q.    After a week or so you delete all of
7  the e-mails?
8    A.    Yes.
9    Q.    Okay.  So there would be no record of
10  the successive drafts of the report, other than
11  whatever Word maintains; is that right?
12    A.    I think so.
13    Q.    Did you talk with anybody at Stutman,
14  at the Stutman firm, about whether or not you
15  should maintain drafts of your report?
16    A.    Not that I can recall.
17    Q.    Who was your principal contact at
18  Stutman?
19    A.    I think it varied.  I'd say generally
20  Stephan Ray.
21    Q.    Okay.  Is this the first matter on
22  which you've served as an expert witness, working
23  with the Stutman firm?
24    A.    That's correct.
25    Q.    This is the first time working with

18

---

ALAN SHAPIRO

2  them?
3    A.    Yes.
4    Q.    Have you -- you have quite a
5  substantial list here of matters that you've
6  worked on in the past.
7          Have you ever been engaged in a matter
8  in which Credit Suisse or Credit Suisse First
9  Boston or any of its related entities were
10  involved?
11    A.    Yes.
12    Q.    Tell me when, what matters those were.
13    A.    Well, as best as I recall it was one
14  matter.
15    Q.    Okay.
16    A.    And that's in the Orange County
17  bankruptcy case.
18    Q.    Right.
19    A.    I worked for the SEC as their
20  expert economist and one of the defendants was
21  Credit Suisse.  And I believe I wrote a report
22  on behalf of the SEC with regard to CSFB.
23    Q.    Do you remember generally what the
24  conclusions of that report were?
25    A.    Yes, that CSFB didn't adequately

19

---

ALAN SHAPIRO

2  disclose in offering documents the riskiness of
3  the Orange County investment pool.
4    Q.    Okay.  Do you still have a copy of that
5  report?
6    A.    I don't think so.  The SEC probably
7  does, but...
8    Q.    As a matter of course in your expert
9  witness work do you keep copies of your work
10  product?
11    A.    Generally.  It's just been, what, maybe
12  ten or 15 years ago.  I just can't recall if I
13  have it or not.
14          MR. WICKES:  Can we ask you to make
15  a -- have a search made for that and provide
16  it if you have it.
17          MR. CASTANARES:  You can ask.
18          We'll take it under advisement.
19    A.    I shouldn't say that I don't have it, I
20  may.  It's just been so long.  I have a garage
21  stuffed with boxes of materials.
22    Q.    Did you look at that report as you were
23  working on Exhibit 501?
24    A.    No.
25    Q.    Did work that you did in that regard

20

---

ALAN SHAPIRO

2  with respect to CSFB in any respect impact on the
3  work you did in connection with this matter?
4    A.    No.
5    Q.    How did you come to be retained in this
6  matter?
7    A.    I really don't recall.  All I know is I
8  got a phone call one day.  I think it was from
9  Mr. Ray.  And I don't -- I cannot recall how he
10  got hold of my name.
11    Q.    Okay.  Were you -- was there an
12  interview or --
13          Do you know what a beauty contest is?
14    A.    Yes.
15    Q.    Was there a beauty contest for this
16  engagement?
17    A.    I don't know, in that I don't know if
18  there were any other contestants.
19    Q.    Right.
20    A.    I know that several people came to my
21  home to talk to me about the case.
22    Q.    Okay.  Who were those people?
23    A.    You know, I can't, I think it may have
24  been Mr. Ray.  I think there may have been
25  somebody from the Alvarez company.

21

ALAN SHAPIRO

1  Q.  Uh-huh.

3  A.  I'm trying -- possibly Whitman, but

4  this was, what, maybe a year and a half ago or so.

5  I just can't -- I don't have a good recollection

6  of that.  What I do recollect is that I believe

7  there were three, maybe four people who came to my

8  home to talk to me.

9  Q.  Was there a representative of the

10 bondholders in that group?

11 A.  I just don't recall.

12 Q.  Okay.  And sometime after that you were

13 retained to be an expert in this case; is that

14 right?

15 A.  That's correct.

16 Q.  And in that first meeting what did they

17 tell you about the case?

18 A.  I really don't -- don't recall.  I

19 think they were talking to me about my background

20 and experiences.  I really don't have any

21 recollection of what they told me.

22 Q.  Would you have any notes, or records,

23 or computer entries that would indicate who was at

24 that first meeting?

25 A.  No.

22

---

ALAN SHAPIRO

1

2  Q.  Do you keep a calendar on your home

3  computer?

4  A.  I have a calendar, but I wouldn't have

5  kept something like that because I didn't -- I

6  didn't know who would show up.  If I know I'm

7  going to have a meeting with somebody I'll include

8  their name, but I think in this -- I don't know

9  what the entry would have been, probably meeting

10 with Stutman or something like that.

11 Q.  Is it fair to say that by the end of

12 that meeting you understood that what this group

13 wanted was an expert who would express a negative

14 opinion about the work that Credit Suisse First

15 Boston had done in connection with Oakwood Homes?

16 A.  Well, I really don't recall what we --

17 just what we talked about.  Just as if I'm sitting

18 here now I -- and just being reasonable.  They

19 wouldn't want somebody who had a positive opinion,

20 but I had no idea -- I've turned down a number of

21 cases where I disagreed with the -- with what

22 attorneys asked me or would have liked me to say.

23 So I had to wait and look at the documents before

24 I could express any opinion.

25 Q.  But you understood that for the

23

---

ALAN SHAPIRO

1

2  purposes of the litigation they were involved in

3  they needed somebody to express negative opinions

4  about Credit Suisse's work, that was clear, wasn't

5  it?

6  A.  Well, as I said, I don't recollect what

7  we talked about.  I'm just saying, sitting here

8  now, it's pretty clear to me that if you're

9  bringing an action against a defendant that you

10 would want somebody who had a negative opinion of

11 the behavior of the defendant.  But I have no

12 independent recollection of just what they asked

13 me about.

14 Q.  At that first meeting did you talk

15 about the basis on which you would be compensated

16 for your services?

17 A.  I just don't -- don't recall whether it

18 was then or at a later time that I was called to

19 find out what my rates were.

20 Q.  Okay.  How are you paid for your work

21 on this matter?

22 A.  Well, I'm paid for my time and the

23 other people are paid for their time.

24 Q.  Okay.  What's your hourly rate?

25 A.  My hourly rate is $800.

24

---

ALAN SHAPIRO

1

2  Q.  And Dr. Sarin's?

3  A.  Dr. Sarin's is $600.

4  Q.  Okay.  And Mr. Sandhu?

5  A.  His rate, I believe, is $490 an hour.

6  Q.  Okay.  How much in total have you

7  billed or been paid so far on this matter?

8  A.  $984,000.

9  Q.  And that's the total billings for your

10 work and the work of the others you've described?

11 A.  That's correct.

12 Q.  Do you know approximately what portion

13 of that represents -- or specifically, if you

14 know -- represents your own time?

15 A.  My best approximation, sitting here --

16 and I have not gone back to look at it -- but I

17 would estimate that about one-third of those

18 billings would be for my time and the other

19 two-thirds for my associates.

20 Q.  Do you know approximately how many

21 hours you've spent on this matter?

22 A.  No.  I could estimate, as I said, based

23 on my rate and my estimated billings.

24 Q.  I just tried to do that here quickly.

25 Is 400 hours, does that seem about

25

ALAN SHAPIRO

1 right?

2    A.    That sounds about right.

3    Q.    Okay.  I won't hold you to that math

4 or --

5    A.    It's just an arithmetic issue.

6    Q.    And have you been billed -- have you

7 billed and been paid currently up through today?

8    A.    No.  I sent in my last invoice as

9 the -- for August and haven't been paid on that

10 yet.

11    Q.    But is that amount included in the

12 $984,000?

13    A.    Yes.

14    Q.    So that's the total amount billed, some

15 portion is yet unpaid?

16    A.    That's correct.

17    Q.    But you have confidence in the Stutman

18 firm that it will be paid?

19    A.    Well, I hope so.  I guess more in the

20 Oakwood Liquidation Trust or...

21         MR. CASTANARES:  We're solvent.

22         THE WITNESS:  Good.

23    Q.    Let me go back to your report.  And I

24 want to focus again on page 4 on Roman numeral

26

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1 V.A.  "I have been asked by counsel to assume that

2 CSFB owed Oakwood and its creditors a fiduciary

3 responsibility."

4         When you were asked to make that

5 assumption did -- were you told what it meant to

6 have a fiduciary responsibility?

7    A.    Well, I was told -- I'm not -- I'm not

8 a lawyer.  I tried to translate that into -- put

9 some economic substance to that.  I mean,

10 generally as a financial economist you hear the

11 term fiduciary obligation on a regular basis.

12    Q.    Well, this term is fiduciary

13 responsibility.

14    A.    Or responsibility, yeah.

15    Q.    What do you understand that to mean?

16    A.    Well, the same as a fiduciary

17 obligation.  I treat those terms to be synonymous.

18    Q.    Okay.  And what do those synonymous

19 terms mean?

20    A.    Well, I understand from a legal

21 standpoint that there are, generally speaking, two

22 aspects to it, a duty of care and a duty of

23 loyalty.

24         The care I translate into looking after

27

ALAN SHAPIRO

1 the economic interests of the other party or

2 parties.  And the duty of loyalty, basically no

3 self-dealing or no enriching yourself at the

4 expense of the other party.

5    Q.    When you were asked to make the

6 assumption about fiduciary responsibility that is

7 described here in your report, did whoever it was

8 who asked you that give you either a definition or

9 explain to you what was meant by that term?

10    A.    No.

11         Well, as best I recall, we did talk

12 about that.

13    Q.    Okay.

14    A.    And, you know, I tried to -- as I said,

15 I tried to translate that into something that I'm

16 familiar with.  In other words, into something of

17 economic consequence.  And, you know, although I

18 don't have a real specific recollection, I believe

19 that whoever I talked to agreed that that -- the

20 economic terminology that I used was consistent

21 with the notion of a fiduciary obligation.

22    Q.    And you said that the assumption that

23 you made was that CSFB owed that fiduciary

24 obligation to Oakwood and its creditors.  So let's

28

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1 break that apart a bit

2    A.    Sure.

3    Q.    When you talk about owing a fiduciary

4 responsibility to Oakwood, what do we mean by

5 Oakwood in that context?

6    A.    Oakwood the enterprise.

7    Q.    So can we sort of use the term Oakwood

8 and the company interchangeably there?

9    A.    Yes.

10    Q.    All right.

11    A.    And I translate that, when I think

12 about the duty to a company I translate that into

13 the economic interests of its owners.

14    Q.    So does that --

15         Do I understand from that, that when

16 you say that you assumed that CSFB owed Oakwood

17 separate from its creditors, that it owed Oakwood

18 a fiduciary responsibility, that in that sense

19 you're really referring to a duty owing to the

20 shareholders?

21    A.    No.  When I -- I think I wasn't precise

22 enough.  When I talk about owners I mean the

23 owners of all its securities.  Generally that

24 means a responsibility to the shareholders.

29

ALAN SHAPIRO

1
2  Q.   Right.
3  A.   But in this particular case, given that
4  I assume that the company was insolvent in effect,
5  I believe that the company was owned by its
6  creditors.
7  Q.   So when you say -- well, let me ask a
8  different --
9       If I read that sentence to say simply I
10  was asked to assume that CSFB owed Oakwood's
11  creditors a fiduciary responsibility, is that
12  saying anything different than what the sentence
13  says as its written?
14       MR. CASTANARES:  Objection to form.
15  A.   Not really in this particular case.
16  Q.   CSFB -- you have a chart I was just
17  trying to find in your report that indicates that
18  CSFB was underwriting asset-backed securities for
19  this company for a number of years.
20       Do you remember that?
21  A.   Yes.
22  Q.   And is your opinion that --
23  A.   Page 17.
24  Q.   Page 17.  Good.
25       Page 17 doesn't tell us when they

30

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2  started underwriting asset-backed securities, does
3  it?
4  A.   Oh, I think that was 1994 or so.
5  Q.   So were you asked to assume that CSFB
6  owed Oakwood and its creditors a fiduciary duty
7  throughout the time that Credit Suisse worked with
8  Oakwood?
9  A.   We didn't talk about that.  It was just
10  in the relevant time period, from about 2000 on.
11  Q.   And that --
12       When you conflate the interest of the
13  company and the creditors is there some event or
14  some condition that causes that to happen?
15       MR. CASTANARES:  Objection to form.
16  A.   Yes, and that is when a company is
17  economically insolvent.
18  Q.   When a company is not economically
19  insolvent, if someone owes a fiduciary duty to
20  that company to whom do they owe it?
21  A.   Well, I think that --
22       MR. CASTANARES:  Objection, the
23  question is calling for a legal conclusion.
24       You may answer it.
25       MR. WICKES:  I'm asking him  -

31

ALAN SHAPIRO

1
2  A.   That does call for a legal conclusion.
3  But speaking as an economist, I think that it's
4  generally accepted among financial economists that
5  for a solvent company the fiduciary obligation is
6  to the shareholders of the company, the residual
7  claimants.
8  Q.   Okay.  And in your understanding as a
9  financial economist, when we talk about that
10  fiduciary duty to an entity absent insolvency does
11  the duty run to stakeholders other than the equity
12  owners?
13  A.   Well, again, that would call for a
14  legal conclusion.  I can tell you what is
15  generally accepted among financial economists.
16  Q.   Well, instead of that why don't you
17  tell me what your understanding is.
18       MR. CASTANARES:  Object to the question
19  as calling for a legal conclusion.
20  A.   Well, I don't have -- if you're just
21  looking for a legal conclusion I can't --
22  Q.   I'm not looking for a legal conclusion.
23  I'm asking your -- you --
24       At the very outset of your report you
25  tell us that you made an assumption, is that an

32

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2  important assumption?
3  A.   Well, as I explained before, I think it
4  strengthens the notion of -- or the issue of
5  whether CSFB behaved in a reasonable manner.  I
6  don't think that it's absolutely necessary to
7  reach the conclusion that I did.
8       Whether there's any legal consequence
9  to the conclusion depends on the existence of a
10  fiduciary obligation, I believe.
11  Q.   Okay.  According to your understanding,
12  in a pre-insolvency situation does the fiduciary
13  duty that someone owes to a corporation encompass
14  only the interests of its equity holders?
15  A.   As I've explained, that calls for a
16  legal conclusion.  But as a financial economist I
17  can tell you I accept what the general view is
18  among financial economists, which is that the
19  fiduciary obligation to an entity ultimately
20  becomes a fiduciary obligation to the shareholders
21  and not to other stakeholders of the organization,
22  except insofar as there's a specific obligation to
23  those other stakeholders.
24  Q.   Okay.  So in general in a
25  pre-insolvency situation your understanding from

33

2  an economic point of view is that the obligation

3  of someone who has a fiduciary duty to a

4  corporation, is that that duty encompasses the

5  interests of the equity holders and not other

6  stakeholders, such as creditors, or employees, or

7  the communities where the company works or others?

8         MR. CASTANARES:  Objection to form.

9     A.    That's correct.

10    Q.    But that --

11          Do I further understand you to be

12  saying that when the entity is insolvent that that

13  fiduciary obligation of the outsider now switches

14  and runs to the interest of the creditors?

15         MR. CASTANARES:  Objection to form.

16    A.    That is --

17         MR. CASTANARES:  You may answer.

18    A.    That is correct.

19    Q.    Okay.  Any particular creditors or all

20  creditors?

21    A.    The creditors of an entity, and then --

22    Q.    Okay.  But an entity such as Oakwood

23  had lots of different kinds of creditors, right?

24    A.    Well, you'd have to -- well, they did

25  have various creditors.  Some actually were

34

---

2          There were some private notes; is that

3  right?

4     A.    I believe that's the case, industrial

5  revenue bonds or something like that.

6     Q.    And is the fiduciary duty that you're

7  describing, does it run to all of those creditors

8  or does it run to some particular subsets of them?

9         MR. CASTANARES:  Objection to the

10  question as calling for a legal conclusion.

11    A.    Again, that does require a legal

12  opinion.  I can tell you that my understanding was

13  specifically with regard to the bondholders.

14  There may have been some fiduciary obligation to

15  other creditors that I -- we did not talk about

16  that.  I can think of economic reasons why that

17  would make sense, but I don't have an opinion

18  about that.

19    Q.    So would it be fair to say on the basis

20  of the discussion we've had that what you were

21  actually asked to assume -- the assumption that

22  you actually made here in your report is that --

23  and I'm looking here again at Roman numeral V.A,

24  and I've just edited it a bit based on our

25  discussion -- that you were asked by counsel to

36

---

1          ALAN SHAPIRO

2  creditors of Oakwood.  Others were creditors of

3  its SPE.  I think that's a very different --

4  special purpose entity, the one through which

5  securitizations were done.

6     Q.    Right.  But when we're talking about --

7  I just want to understand your understanding.  The

8  obligation that's owed to the company when the

9  company is insolvent, you tell us your

10  understanding is that's now an obligation to the

11  creditors.

12          Oakwood had in 2000, 2001 many

13  different kinds of creditors; isn't that right?

14         MR. CASTANARES:  Objection to form.

15    A.    I'm not -- they had various creditors,

16  yes.

17    Q.    They had owners of publicly traded

18  bonds, right?

19    A.    Yes.

20    Q.    They had trade creditors, right?

21    A.    Yes.

22    Q.    They had employees, right?

23    A.    Yes.

24    Q.    They had as I remember some other kinds

25  of instruments other than publicly traded bonds.

35

---

1          ALAN SHAPIRO

2  assume that from 2000 onward CSFB owed Oakwood's

3  bondholders a fiduciary responsibility?

4         MR. CASTANARES:  Objection to form.

5     A.    Well, those were the only creditors

6  that we talked about.  It may well be that they

7  had other creditors in mind as well, I can't speak

8  to -- I never raised that question.

9     Q.    Okay.  But --

10    A.    So my understanding was that the

11  specific -- that the assumption talked

12  specifically about the bondholders.  It may by

13  inference have extended to other creditors, but

14  that I don't know.

15    Q.    Okay.  But in any event where the

16  assumption on page 4 of your report, Oakwood and

17  its creditors, do I correctly understand that what

18  the assumption you were asked to make was there

19  was no difference there, that is, the duty was

20  owed to Oakwood's creditors?

21         MR. CASTANARES:  Objection to form.

22    A.    Well, we had a number of discussions.

23  I can't recall exactly what the evolution of those

24  discussions were, but I do recall -- I do recall

25  my comments, which was that it would make economic

37

ALAN SHAPIRO

1    sense for -- to the extent there's a fiduciary
2    obligation to security holders, that that
3    obligation would shift depending on the solvency
4    of the company.  That for a solvent company the
5    obligation would be to the shareholders and when
6    the company became insolvent that the
7    obligation -- it would make economic sense for
8    that obligation to shift to the creditors.
9         And I pointed to a large academic
10   literature explaining the different -- the ways in
11   which incentives change, depending on whether
12   you're dealing with a solvent or insolvent
13   company.  And why it would make economic sense
14   given the shift in incentives for a company that
15   is insolvent, why it would make sense to shift any
16   fiduciary obligation to creditors and away from
17   shareholders.
18        Q.   And that shift would be to creditors of
19   any sort, not just security holders; is that
20   right?
21             MR. CASTANARES:  Objection to form.  It
22   calls for a legal conclusion.
23        A.   That's correct.  From the standpoint of
24   the academic literature we don't distinguish

<center>38</center>

ALAN SHAPIRO

1         Q.   Managers?
2         A.   -- as well as directors.  I believe if
3    you look at the literature it primarily talks
4    about managers.
5         Q.   To whom do managers of a corporation
6    report and from whom do they take instruction?
7         A.   Well, the CEO reports to the board of
8    directors and takes instructions -- often as not
9    gives instructions to the board of directors.  The
10   CEO typically sits on the board of directors, many
11   times as chairman of the board.  Other managers
12   would report to the CEO and only report to the
13   board, insofar as the board specifically requests
14   them to report to it.
15        Q.   All right.  If you think about the
16   academic literature that you've been describing
17   with respect to the shift of fiduciary
18   responsibility, can you point me to any of that
19   literature which addresses -- which suggests that
20   third parties, that is, not managers or directors
21   of the corporation, have fiduciary duties that
22   shift in this way to create fiduciary duties to
23   creditors.
24        A.   No, I cannot.

<center>40</center>

ALAN SHAPIRO

1    between different types of debt holders.  We talk
2    about debt holders in general.
3         I can't speak to other liabilities --
4    holders of other liabilities, such as employees
5    and the like, let's say unpaid taxes, and so on.
6    I think that really does require some legal
7    opinion.  The academic literature itself deals
8    only with debt in a generic sense.
9         Q.   But again, to look at your sentence in
10   Section V.A where you wrote Oakwood and its
11   creditors, that's as we now look at it redundant,
12   isn't it, you're really meaning to refer to
13   Oakwood's creditors?
14             MR. CASTANARES:  Objection to form.
15        A.   Given the assumption of insolvency,
16   that's correct.
17        Q.   Okay.  Now, you've made reference to
18   the academic literature around this subject of the
19   movement of fiduciary responsibility.
20        It's fair to say, isn't it, that that
21   academic literature in the main addresses the
22   fiduciary obligations of directors?
23        A.   I believe that the real emphasis is on
24   managers and --

<center>39</center>

ALAN SHAPIRO

1         Q.   The other assumption you were asked to
2    make was that Oakwood was insolvent in September
3    of 2001.
4         And you indicate at V.B that that
5    assumption is based on Dr. Tennenbaum's report; is
6    that correct?
7         A.   That's correct.
8         Q.   So is my understanding correct that up
9    until at least April 30th of 2007, the date of
10   Exhibit 501, you have made no independent effort
11   to come to a conclusion about solvency or
12   insolvency of Oakwood?
13        A.   Well, I wouldn't say that I made no
14   effort.  I -- I reviewed Mr. Tennenbaum's report.
15   I actually met with him and talked with him prior
16   to my report just to learn the bases for his
17   conclusions or his conclusion.  And also actually
18   looked at data, including analyses done by CSFB,
19   to assure myself that Mr. Tennenbaum's conclusion
20   was reasonable given the various facts.
21        Q.   So you saw --
22        Dr. Tennenbaum's report, if my memory
23   serves me correctly, is dated the same as
24   Exhibit 501, April 30th.

<center>41</center>

ALAN SHAPIRO

2  A.  Yes.
3  Q.  Did you see drafts of Dr. Tennenbaum's
4  report before that date?
5  A.  You know, I believe that I saw a draft
6  or maybe I reviewed it in the meeting.  I can't
7  recall.
8  Q.  Okay.
9  A.  As I said, we did meet at Stutman's
10  office in Century City prior to my report being
11  due.  So I don't think I ever had a physical copy
12  of the report, so -- although I don't have a
13  recollection, that would have been -- I can't
14  imagine any other time that I would have seen that
15  report.
16  Q.  Now, Dr. Shapiro, is it fair to say
17  that a substantial amount of your work as an
18  expert witness deals with issues valuation?
19  A.  Yes.
20  Q.  Why was it that in this matter
21  Dr. Tennenbaum was brought in to opine on
22  valuation as opposed to your doing that yourself?
23  MR. CASTANARES:  It calls for
24  speculation.
25  MR. WICKES:  Well, maybe.

42

ALAN SHAPIRO

2  Q.  Do you know?
3  A.  I have no idea, actually.
4  Q.  When you were talking with whoever you
5  were talking with about being retained in this
6  matter, did you discuss with them whether part of
7  what you would do would be to provide valuation
8  testimony?
9  A.  No, never.  I believe I was told that
10  Dr. Tennenbaum was working on a solvency analysis
11  and that was -- that was that.  I never asked why.
12  I just assumed that the law firm had its own
13  reasons for splitting the work.
14  Q.  Was it your understanding that
15  Dr. Tennenbaum was retained and at work before you
16  were?
17  A.  I -- boy, I just don't recall.
18  Q.  Okay.
19  A.  I just don't know.  But at some point I
20  learned that Dr. Tennenbaum was working on a
21  solvency analysis, but I don't recall if it was at
22  that first meeting when I was interviewed or at a
23  later date.  But I was never asked about the
24  solvency analysis.  I was just told that he was
25  doing a solvency analysis.

43

ALAN SHAPIRO

2  Q.  And you were asked to assume when you
3  started work that the company was insolvent and
4  that Dr. Tennenbaum would so conclude?
5  A.  Yes.  But as I mentioned, I wouldn't
6  just rely on his word or the words of the lawyers.
7  I wanted to assure myself that that was a
8  reasonable conclusion without engaging in a full
9  blown analysis of my own.
10  Q.  Okay.  After you were retained how did
11  you begin your work?
12  A.  Just reviewing documents.
13  Q.  Okay.
14  A.  I spent a lot of time going through
15  documents.
16  Q.  Okay.  And what documents were you
17  given to review?
18  A.  Well, I've tried to list all the
19  documents at the back of my report and I --
20  Q.  Let me ask the question a different
21  way.
22  As a mechanical matter how did you get
23  documents to review?
24  A.  Oh.  They were shipped to my house.  I
25  just received boxes of documents.

44

ALAN SHAPIRO

2  Q.  Who shipped them to you?
3  A.  Stutman.
4  Q.  Okay.  Did they give to you all of the
5  documents that were produced in discovery in this
6  case?
7  MR. CASTANARES:  It calls for
8  speculation.
9  A.  I have no way of knowing that.  I did
10  receive additional documents over time, of course,
11  as depositions were taken.
12  Q.  Right.
13  A.  But I don't -- my best guess is that I
14  haven't seen every document in this case.  I mean,
15  my experience with cases like this is that there
16  are loads of documents.  So maybe I received them
17  all, but I have no way of knowing.
18  Q.  So what you know then is that what you
19  saw is some documents that were given to you by
20  someone at Stutman?
21  A.  Yes.
22  Q.  Okay.  And where you list -- I think
23  it's at the end of your report you list the things
24  that you -- it says "List of Documents Relied
25  On" --

45

ALAN SHAPIRO

1
2  A.  Yes.
3  Q.  -- at Appendix B. Is that -- there's a
4  combination there of some, if you will, public
5  documents and then there are the documents that
6  are labeled "CSFB" with numbers. Those are the
7  discovery documents.
8       Is this a list of everything you were
9  given or is it a list of something else?
10  A.  Well, it's mostly documents that I was
11  given. I came up with some additional ones. For
12  example, any academic articles.
13  Q.  Right.
14      But with respect -- in particular with
15  respect to -- I guess it's numbers 9 through 45,
16  the ones that have Bates numbers.
17  A.  Yeah, I...
18  Q.  Is that everything that Stutman gave
19  you or is that some subset of that?
20  A.  I think it's a subset. I believe I
21  received the various equity research reports from
22  CSFB as well.
23  Q.  Okay.
24  A.  They don't have Bates numbers on them.
25  Q.  Right. Okay.

46

ALAN SHAPIRO

1
2  on?
3  A.  Oh, I just told him to include every
4  document that we had received.
5  Q.  All right.
6  A.  So relied on I'd say loosely means that
7  I at least reviewed the document.
8  Q.  So do I --
9  A.  Not that it necessarily affected my
10  opinion.
11  Q.  Right.
12      But so do I understand then that
13  Exhibit B contains a full list of all the
14  documents that you had available to you in
15  preparing your analysis?
16  A.  To my best recollection the answer is,
17  yes.
18  Q.  Okay. And Mr. Sandhu prepared
19  Exhibit B.
20      Did Mr. Sandhu prepare any of the other
21  parts of this report?
22  A.  No.
23  Q.  Did you prepare Exhibit A yourself?
24  A.  That's my resume, I believe, yes.
25  Q.  Well, sorry.

48

ALAN SHAPIRO

1
2  A.  And, of course, the depositions without
3  Bates numbers, I received from them.
4  Q.  Right.
5  A.  But I think if it -- you know, sitting
6  here now I can't tell you if every document
7  dealing with Oakwood came directly from Stutman or
8  if Paul Sandhu or somebody else might have found
9  some of those.
10      I think -- my best recollection is that
11  all the documents dealing with Oakwood came from
12  Stutman, but I can't guarantee that that's the
13  case, that some of those documents might not have
14  been found by Paul Sandhu, for example.
15  Q.  Did the documents that you got from
16  Stutman come directly to you or did they go to
17  Mr. Sandhu first?
18  A.  Oh, they -- I asked to have two
19  shipments, one to me and one to Dr. Sarin.
20  Q.  Okay. Now, Exhibit B itself, again
21  mechanically, did you at your keyboard prepare
22  Exhibit B?
23  A.  No, I had Paul Sandhu prepare that.
24  Q.  And how did Mr. Sandhu know, for
25  example, which of the CSFB documents you relied

47

ALAN SHAPIRO

1
2  All right. You're right. Okay.
3      So you just said to Mr. Sandhu make a
4  list for Exhibit B of everything that we've had
5  about Oakwood?
6  A.  Yes, and other documents that I've used
7  in the report.
8  Q.  Right.
9  A.  Yeah, including the academic articles
10  and the like.
11  Q.  All right. So if there's some document
12  that's not on Exhibit B we can assume that you
13  never had it?
14  A.  To the first approximation -- there's
15  always a possibility of error, but to the best of
16  my understanding that Exhibit B includes all -- or
17  Appendix B includes all of the documents that I
18  received and reviewed.
19  Q.  Okay. At the beginning of your report
20  on pages 3 and 4 you summarize your opinions that
21  you reached based on your work in this case,
22  right?
23  A.  Yes.
24  Q.  Okay. Let's just talk about those
25  summaries for a bit.

49

ALAN SHAPIRO

First of all, you talk throughout about

something that you refer to as CSFB.  Tell me

what -- to your understanding what is CSFB.

    A.    Credit Suisse First Boston.

    Q.    Okay.  What is that?

    A.    I believe it's a combination commercial

and investment bank.

    Q.    Just tell me what you know about CSFB

that you had in your mind as you're preparing this

report.

    A.    Well, my -- I believe Credit Suisse was

one of the major Swiss commercial banks that

some -- a couple of decades ago, I guess, decided

to get more heavily into investment banking

activities.  It acquired First Boston and at some

point changed its name to Credit Suisse First

Boston, so it's now a combination commercial bank.

In other words, deposit taking institution as well

as investment bank.  And in this particular

instance it provided basically three types of

services to Oakwood Home Corporation.

    Q.    We'll get to that.

    Did you in the process of your analysis

or preparing this report do any research or

50

    A.    Well, it's a major -- one of the major

investment banks.  You might call it a bulge

bracket bank, one that is very well known.  It

does a lot of work in mergers and acquisitions,

initial public offerings, helping companies raise

capital.

    It specifically -- I believe it helped

originate the mortgage-backed securities market

back in the early 1980s.  It has a very good

reputation.  It's one of the premiere investment

banks in the world.

    Q.    All right.  And with respect to the

services that CSFB provided to Oakwood that are

the subject of your report, who were the principal

actors for CSFB?

    A.    Well, the one that immediately comes to

mind is Mr. O'Driscoll.  I'm not sure I can

pronounce his first name without butchering it.

    Q.    Fiachra.

    A.    Fiachra, Fiachra O'Driscoll, that's a

name that stands out in my mind.  I know I saw

various others, but I can't think of them right

now.

    Q.    My understanding, Doctor, that as we

52

ALAN SHAPIRO

analysis to just give you general background into

CSFB?

    A.    No.

    Q.    Okay.  Do you know, for example, how at

the time of -- from 2000 to 2002 CSFB was

organized?

    A.    No, I don't.  I did not.

    Q.    Okay.  You talked, for example, about

commercial banking and investment banking.

    Did you have as you prepared this

report any understanding of the relationships

between those different parts of the institution?

    MR. CASTANARES:  Object to the form.

    A.    Not specifically, no.

    Q.    Did you do anything as you conducted

your work on this report to inform yourself about

CSFB's reputation in the industry?

    A.    Well, as a general matter I'm aware of

its reputation.

    Q.    Okay.

    A.    But I did nothing specifically to

enhance that understanding in this case.

    Q.    What's your general understanding of

CSFB's reputation?

51

ALAN SHAPIRO

sit here today the only name of an individual at

CSFB who provided services to Oakwood that you can

recall is the name of Mr. Fiachra  - that's

F-i-c-h-r-a, I think --

    MR. CASTANARES:  F-i-a-c-h-r-a.

    Q.    -- O'Driscoll; is that correct?

    MR. CASTANARES:  That misstates the

prior testimony.

    A.    That's correct.

    MR. WICKES:  I guess it doesn't.

    Q.    Okay.  Do you know what part of CSFB

Mr. O'Driscoll worked in?

    A.    Oh, I'm sorry.  Of course,

Mr. James Xanthos is another -- another name.  He

didn't provide services, he was part of the credit

risk management group, I believe.

    Q.    So, again, the only name you can

remember of anybody who provided services to

Oakwood was Mr. O'Driscoll?

    A.    Yes.

    Q.    Okay.  And Mr. Xanthos, that's --

    MR. CASTANARES:  X a-n-t-h-o-s.

    Q.    What did you understand his role was?

    A.    Well, he did several credit analyses --

53

ALAN SHAPIRO

```
 1                  ALAN SHAPIRO
 2        Q.    Okay.
 3        A.    -- of Oakwood in conjunction with their
 4   request for -- I think a reverse repo line of
 5   credit.
 6        Q.    Okay.  Do you know what part of CSFB
 7   Mr. O'Driscoll worked in?
 8        A.    I believe the ABS group, asset-backed
 9   securities.
10        Q.    Do you know what part of CSFB
11   Mr. Xanthos worked in?
12        A.    I think that was CRM, the credit risk
13   management, but I'm --
14        Q.    Do you have any understanding --
15        A.    -- I'm not sure.  I think that's it.
16        Q.    From an organizational point of view,
17   do you have any idea of what the relationship, if
18   any, is between the ABS group and CRM?
19        A.    No.
20        Q.    All right.  In the "Summary of
21   Opinions" on page 3, Exhibit 501, you say -- you
22   begin by saying "CSFB's various relationships with
23   Oakwood," let's talk about that.
24              "CSFB's various relationships with
25   Oakwood," what do you mean there by the various
```

54

ALAN SHAPIRO

```
 1   relationships?
 2        A.    That it had multiple relationships with
 3   Oakwood.
 4        Q.    Okay.  And what were those multiple
 5   relationships?
 6        A.    Well, it acted as the securitization
 7   agent.  It acted as a lender in the case of the
 8   warehouse facility.  And it acted as a financial
 9   adviser, both paid and unpaid.
10        Q.    Okay.  Are those all?
11        A.    That I can think of, yes.
12        Q.    Okay.  And can you roughly put times on
13   those relationships.
14              When was it -- when you say
15   securitization agent you're not using that in a
16   technical term; is that right?
17        A.    That's correct.
18        Q.    They played a role with respect to the
19   securitization of Oakwood's consumer paper?
20        A.    Yes, they helped Oakwood to securitize
21   its paper.
22        Q.    Right.
23              Can you put dates around that, roughly.
24        A.    I think that started in 1994 and ran
```

55

ALAN SHAPIRO

```
 1   through probably mid-2002.
 2        Q.    Okay.  And you said they were a lender
 3   to Oakwood in connection with the warehouse
 4   facility.
 5        A.    Yes.
 6        Q.    Can you put a time around that.
 7        A.    I think that went from '01 at least to
 8   the end or close to the end of '02.
 9        Q.    Okay.  And what about -- you said they
10   were financial adviser, both paid and unpaid.
11              First paid, do you know when the timing
12   was of that?
13        A.    I -- that was 2002, I think it started
14   in August of '02.
15        Q.    And I'm interested in the unpaid part.
16              Is it your understanding on the basis
17   of your background and experience that major
18   investment banks are in the business of providing
19   unpaid financial advice to their customers?
20        A.    Yes.
21        Q.    How do they make their money?
22        A.    Through fees.  In other words, they
23   form a relationship with their customers and hope
24   that their customers turn to them for financial
```

56

ALAN SHAPIRO

```
 1   advice and develop a relationship of trust.  And
 2   that, in turn, helps keep the customer coming back
 3   for fee based services such as securitizations.
 4        Q.    And what dates would you put on that
 5   unpaid advisory relationship?
 6        A.    I couldn't tell you when that began,
 7   but it was in full swing certainly when I began
 8   analyzing this matter as of 2000.
 9        Q.    Okay.  So you say again back on page 3
10   of Exhibit 501, "CSFB's various relationships with
11   Oakwood afforded it access to information, both
12   public and inside, about Oakwood's financial
13   condition." right?
14        A.    Yes.
15        Q.    What non-public information about
16   Oakwood's financial condition did CSFB have?
17        A.    Well, for example, in putting together
18   the securitizations it would have to understand
19   the -- you know, the defaults on mortgages,
20   problems with mortgages, and so on.  And it would
21   likely have first access to that information.  In
22   other words, information before it became publicly
23   known.
24        Q.    Now, let me be careful here for a
```

57

ALAN SHAPIRO

1
2  minute. I don't want you to tell me what CSFB
3  would have had or would have been likely to have
4  had. I want you to tell me based on your review
5  of the documents that were provided to you what
6  non-public financial information about Oakwood's
7  condition CSFB had.
8      A.    I can't point to anything specifically.
9      Q.    Okay.
10     A.    It's just inherent in the nature of an
11 investment bank that it would have access to
12 non-public information.
13     Q.    So in all of the materials that you
14 were given and that you saw and that you reviewed,
15 you're not aware of any non-public financial --
16 any non-public information about Oakwood's
17 financial condition that was in the possession of
18 CSFB; is that right?
19     A.    Not that I can think of right now. I
20 point out the type of information that I think it
21 would have, but I can't point to a specific
22 document that said, yes, they had this specific
23 information.
24     Q.    Right.
25     A.    At least I can't think of it right now.

58

ALAN SHAPIRO

1
2      Q.    Okay. And then you say in that same
3  paragraph, "CSFB should have advised Oakwood to
4  reduce its operations or file for bankruptcy prior
5  to its engagement as a financial adviser...in
6  August 2002."
7          Just focusing on the first part of
8  that, can you point me to anything that you've
9  seen in the materials that you have reviewed that
10 suggests that at any time anybody at Oakwood asked
11 anybody at Credit Suisse for advice with respect
12 to Oakwood's operations.
13     A.    Well, I think as a general matter
14 Oakwood was looking to CSFB for advice about what
15 to do with its precarious financial situation.
16 And CSFB did come back with a variety of
17 recommendations, different plans, but those plans
18 always seemed to be based on attempting to
19 maintain the operational status quo as opposed to
20 changing the operations. In other words, it was
21 looking to provide financing to keep the company
22 going on an as-is basis.
23     Q.    Can we make a distinction, just so
24 we're clear here, between financial advice and
25 operational advice.

59

ALAN SHAPIRO

1
2      A.    Sure.
3      Q.    Okay. And by operational advice -- I
4  just want to make sure we're communicating here.
5          By operational advice I would mean
6  things like how many plants to operate, how many
7  stores to operate, how many units to build, and so
8  forth and so on, right?
9          Do you agree with that?
10     A.    Yes.
11     Q.    Okay. So when you say "CSFB should
12 have advised Oakwood to reduce its operations,"
13 can you point me to anything in the record that
14 you have reviewed that shows that anybody at
15 Oakwood ever asked anybody at CSFB for that kind
16 of advice about its operations.
17     A.    Well, I don't think that you can give
18 financial advice without understanding the
19 operational situation of a company. And I've
20 written quite extensively about the relationship
21 between the real side of the business, the
22 operations and the financial side of the business.
23 And I think good financial advice always -- it's
24 based on that know your customer knowledge and
25 information. So I fail to see how one could give

60

ALAN SHAPIRO

1
2  financial advice without taking into account the
3  operating realities facing a company.
4      Q.    Okay. I understand how --
5      A.    I'd just want to know what - for
6  example, at the very least what's the money going
7  to be used for.
8      Q.    I understand that opinion. I want to
9  go back to my question.
10         I want to know whether anything you saw
11 in the materials you reviewed gives any indication
12 that anyone from Oakwood ever asked anyone from
13 CSFB for its advice about operational matters.
14     A.    I can't -- sitting here now I cannot
15 point specifically to any such request.
16         MR. WICKES: Okay. How about a
17 ten-minute break, is that all right?
18         MR. CASTANARES: Sure.
19         THE VIDEOGRAPHER: Going off the record
20 at 11:39.
21         (Recess taken.)
22         THE VIDEOGRAPHER: Back on the record,
23 at 11:55. This marks the beginning of
24 tape 2.
25 BY MR. WICKES:

61

ALAN SHAPIRO

1    Q.    Doctor, back in your summary of
2    opinions on page 3 of Exhibit 501 you conclude
3    that "CSFB should have advised Oakwood to reduce
4    its operations or file for bankruptcy prior to its
5    engagement as a financial adviser for
6    restructuring purposes in August 2002."
7         And you preface that by saying, "Given
8    Oakwood's financial condition and in line with
9    its" -- I take it you mean CSFB's -- "fiduciary
10   responsibility to Oakwood and its creditors and
11   its own guidelines and principles of conduct."
12        Can you point me to anything in
13   particular in CSFB's guidelines and principles of
14   contact that you reviewed in which those
15   principles and guidelines suggest that CSFB should
16   be advising its clients to file for bankruptcy.
17   A.    Well, not necessarily file for
18   bankruptcy.  I can turn to page 27 of my report
19   where I talk about the relevant guidelines, which
20   says, "'be completely open and truthful with
21   customers' and 'make no recommendation unless you
22   have a reasonable basis to do so and can
23   substantiate it through publicly available
24   information.'"

---

ALAN SHAPIRO

1    A.    -- to explain.
2    Q.    -- is, no?
3         MR. CASTANARES:  And I object to the
4    form of the question as to be so delimited as
5    to calling for speculation as to what is in
6    the mind of CSFB.
7         MR. WICKES:  Well, you know what, if
8    you're going to object, object.  Don't tell
9    him what he's supposed to say, all right?
10   Q.    The question is, in the materials that
11   you have reviewed did you or did you not see any
12   documentation that indicates that any individual
13   at CSFB told anyone at Oakwood something which
14   that individual from CSFB did not actually
15   believe?
16   A.    Not specifically, no.
17   Q.    Okay.  In the second piece of your
18   summary of opinion you indicate that "CSFB had
19   financial incentives to keep Oakwood operating and
20   to delay recommending that Oakwood file for
21   bankruptcy"; is that right?
22   A.    Yes.
23   Q.    In all of the documents that you have
24   reviewed have you seen anything that indicates

---

ALAN SHAPIRO

1    No recommendation -- well, let's see.
2    "Never act in a manner adverse to the best
3    interests of its customer."  And then the know
4    your customer rule.
5         I would say in all of that, giving
6    advice and acting in a way that is geared towards
7    maintaining operations in a money losing business
8    is -- you know, is not appropriate advice and is
9    not appropriate behavior under those
10   circumstances.
11   Q.    In the materials that you have reviewed
12   can you point me to anything in the record that
13   you've seen that indicates that any individual at
14   CSFB in dealing with Oakwood ever gave Oakwood
15   information or advice contrary to what that person
16   actually believed.
17   A.    Well, I -- I can't tell you what the
18   people believed.  I can point to the fact that --
19   Q.    So the answer to my question is, no?
20        MR. CASTANARES:  I object to the
21   interruption of the witness's answer.
22   A.    I was trying to --
23   Q.    I'll let you explain, but the answer to
24   my question --

---

ALAN SHAPIRO

1    that anyone at CSFB who was dealing with Oakwood
2    actually believed that Oakwood should file for
3    bankruptcy prior to the time it did?
4    A.    No, I've seen no such evidence as to
5    what they did or did not believe.
6    Q.    Okay.  And with respect to your
7    conclusion that "CSFB had financial incentives to
8    keep Oakwood operating," how, if at all, is that
9    financial incentive different, for example, from
10   the incentive of a supplier to Oakwood who is
11   selling it materials to be used in making
12   manufactured housing, who presumably also would
13   have had a financial incentive to keep Oakwood
14   operating?
15   A.    Well, for one thing, CSFB would have
16   much more financial knowledge or much more
17   knowledge as to the financial condition of the
18   company.
19        For another thing, the supplier would
20   not automatically have an incentive to keep
21   selling, because typically they sell on trade
22   credit and they're unsecured creditors.  So if
23   they believed that the company was going bankrupt
24   they probably would cut back on supply or would

ALAN SHAPIRO

2  change the nature -- you know, the terms and
3  conditions of their supply.  It might ask for cash
4  on the barrelhead, for example.
5     Q.   And as a general matter would you agree
6  with me that an ordinary trade supplier would have
7  an interest in its customer continuing to operate
8  so long as it was operating in a way that the
9  supplier was getting paid for what it sold?
10    A.   I think it would be the same incentive
11 in that case.
12    Q.   Similarly would you agree that
13 employees of Oakwood had financial incentives for
14 the company to keep operating?
15    A.   Yes.  Again, with the proviso that they
16 were reasonably certain of being paid for their
17 work.
18    Q.   Right.
19         And what is it that you want the reader
20 to conclude from your conclusion about CSFB's
21 financial incentives?
22         MR. CASTANARES:  Objection to form.
23    A.   Well, I point to behavior that CSFB
24 engaged in, which was to help -- to help an
25 insolvent enterprise keep behaving in a way that

ALAN SHAPIRO

2  is that they -- there are errors of omission that
3  I see in the record, which is that they don't
4  point out to Oakwood that it is insolvent and
5  things are not getting better.  And in order to
6  protect the company and its creditors, who by now
7  have become the residual claimants, that it should
8  change its behavior or at least accelerate its
9  drive to downsize and look into a variety of other
10 alternatives geared towards preserving and
11 creating value as opposed to destroying value.
12    Q.   Are you suggesting by putting this
13 conclusion in your report that we should
14 immediately be suspicious of CSFB's dealings with
15 Oakwood because of the existence of these
16 financial incentives?
17         MR. CASTANARES:  Objection to form.
18    A.   Well, I think the fact that they had
19 economic incentives to behave in this way doesn't
20 prove that that's why they behaved in that way,
21 but I think it's consistent with that.
22    Q.   Okay.
23    A.   If they had finance -- I think the
24 contrary, that if they had financial incentives to
25 behave otherwise and they still behaved in this

ALAN SHAPIRO

2  was geared towards making it even more insolvent.
3  And I point to the economic incentives that
4  they -- that CSFB had to continue in that
5  behavior, and that's what I'd like the reader to
6  understand.
7     Q.   So do you want the reader to understand
8  that in the absence of these financial incentives
9  CSFB would have somehow behaved differently
10 vis-a-vis Oakwood?
11    A.   They may well have.  I can't say with
12 perfect certainty that that's the case, but I
13 believe that the financial incentives that they
14 had were a motivating factor.
15    Q.   And is there anything that you've seen
16 in the record that suggests that any individual at
17 CSFB was not being truthful in what they told
18 Oakwood as a result of these financial incentives?
19    A.   Well, I think there are errors of
20 omission as well as errors of commission.
21         In other words, did they commit any
22 deliberate untruth?
23         I can't point to anything.
24    Q.   Okay.
25    A.   But the point that I'm trying to make

ALAN SHAPIRO

2  way, I would certainly not say they did it because
3  of their incentives to behave in that way.  It may
4  be that they just made mistakes.  They certainly
5  didn't have an economic incentive to behave in
6  that way.
7     Q.   I'm sorry.  I'll --
8     A.   But in this particular -- in other
9  words, if the financial incentives ran in the
10 other direction and yet they still behaved the way
11 in which they did, I would not say that, well,
12 they deliberately didn't tell the company to
13 behave otherwise because they had a financial
14 incentive.
15         In this particular case what I can
16 point out is that they -- they engaged in a
17 pattern of behavior that was consistent with the
18 financial incentives that they had.
19    Q.   Isn't it true, Doctor, that your report
20 in this matter is consistent with the financial
21 incentives that you have as a person who is being
22 paid by the hour as this litigation continues?
23    A.   No.  I can tell you I thought this
24 litigation had ended probably almost a year ago,
25 and sincerely wish that it had ended back then.  I

ALAN SHAPIRO

1    have more than enough other things to occupy
2    myself.
3        Q.    Well, do you know whether or not CSFB
4    had other things to occupy itself with at the
5    time, in 2001?
6            Was Oakwood its only customer?
7        A.    No, it had other customers.
8        Q.    You get paid by the hour in this case,
9    right?
10       A.    I do.
11       Q.    The more hours that the case drags on
12   the more you get paid?
13       A.    And the less leisure time I have.  And
14   I value my leisure time even more than the hours
15   that I bill on this case.  So my incentives run in
16   the opposite direction.
17       Q.    It's true, isn't it, Doctor, that your
18   financial incentives in terms of your retention in
19   this case are consistent with the conclusions that
20   you've reached?
21           MR. CASTANARES:  Objection,
22   argumentative.
23       A.    No, they're not.  As I pointed to -- it
24   certainly is true that the more hours I spend the

ALAN SHAPIRO

1    more money I earn on this case.  So from that
2    standpoint you can point to an alignment of
3    financial incentives.
4            I'm pointing to my -- to the fact I
5    have other things to do, and if I -- and if I
6    didn't I would value my leisure -- I would put a
7    higher price on my leisure time than I do on the
8    income that I earn from the case.
9        Q.    But you have no way of knowing, do you,
10   whether CSFB or any of the individuals who were
11   working on the Oakwood matters similarly had other
12   kinds of -- either uses they could put their money
13   to or uses they could put their time to?
14           You simply say because they were
15   getting fees it was in their interest to keep
16   getting fees, isn't that all that says?
17           MR. CASTANARES:  Objection to form.
18       A.    Yes, basically.
19       Q.    Okay.  And, in fact, is the conclusion
20   that you express there, "CSFB had financial
21   incentives to keep Oakwood operating and to delay
22   recommending that Oakwood file for bankruptcy," is
23   that any different from ordinary financial
24   incentives that pertain when a financial

ALAN SHAPIRO

1    institution is working with a customer?
2        A.    No, it's not, although there are --
3    through its guidelines and the assumption of
4    fiduciary obligation there are limits on what one
5    should be prepared to do.
6        Q.    Right.
7            All right.  Now, let's look in the more
8    detailed section of your report, in Section VII
9    that begins on page 12.  You start your detailed
10   discussion of your conclusion that "CSFB did not
11   behave in a prudent manner."
12           In Section VII.A.1 headed "Investment
13   Banks have unique access to information" you give
14   us a general description of the role of an
15   investment banker in its underwriting capacity.
16           And you cite in footnote 36 and
17   footnote 38 information from something called
18   "Investopedia" and something called "findlaw.com"
19   that have to do with the description of the roles
20   of an investment bank; is that right?
21       A.    Yes.
22       Q.    And are those two articles the
23   principal source of the information you have here
24   in Section VII.A.1 about the role of an investment

ALAN SHAPIRO

1    bank?
2        A.    No.  I've written extensively on this,
3    but these are external sources.
4        Q.    And what's the --
5        A.    I've worked with investment banks, and
6    I've written about them, read a lot of literature
7    about them, so...
8        Q.    Have you ever worked for an investment
9    bank?
10       A.    No.
11       Q.    So what's the point of those two
12   citations here to Investopedia and FindLaw?
13       A.    Oh, it's just a citation or just
14   citations to external sources.
15       Q.    Did you find those citations or did one
16   of your colleagues find them?
17       A.    No.  It was either Dr. Sarin or
18   Mr. Sandhu who found these.
19       Q.    Did you ask one or the other of them to
20   find you some general description about the role
21   of investment banks?
22       A.    Yes, I did.
23       Q.    Who did you ask?
24       A.    Dr. Sarin, and he may have asked

ALAN SHAPIRO

1
2   Mr. Sandhu to come up with that. I don't know.
3       Q.    And one of the two of them found these
4   two articles on the Web and then you cite them
5   here?
6       A.    Yes.
7       Q.    Now, is it your understanding that
8   prior to the time of the warehouse loan CSFB's
9   role was primarily with respect to the
10  securitization activities of Oakwood?
11      A.    Yes.
12      Q.    All right. And if you would so we're
13  clear -- and these are with respect to what is
14  sometimes referred to in your report as the
15  asset-backed securities or ABSs?
16      A.    Yes. I believe that it provided
17  financial advice during this time as well. But
18  the sole fee generating activity I believe was the
19  securitizations.
20      Q.    So let's focus on the securitizations
21  for a moment.
22          Tell me, if you will, about these ABS
23  transactions, what were those transactions about?
24      A.    Well, those -- what Oakwood would do
25  would be to sell manufactured housing and

74

ALAN SHAPIRO

1
2   generally provide financing to its customers. It
3   would take the mortgages that the customers
4   entered into and sell it to a finance subsidiary
5   of Oakwood. And the finance subsidiary, in turn,
6   would just basically -- a loose description, would
7   basically bundle these mortgages in a bankruptcy
8   remote entity and then securitize them.
9          In other words, issue claims against
10  the cash flows generated by those mortgages. And
11  CSFB would help them in the packaging of those
12  mortgages. There are different types of
13  mortgage-backed securities where you can have
14  just a single tranche, that is just a pass through
15  of all the cash flows to every owner of the
16  mortgage-backed securities, or more typically you
17  have tranches, with the first tranche being paid
18  before the second tranche being paid, and so on.
19  And then the residuals, in this particular case
20  the B2 securities.
21          So CSFB would help in the packaging and
22  pricing and marketing of those mortgages, that's
23  my understanding of the role that it played in the
24  securitization.
25      Q.    As a technical matter do you understand

75

ALAN SHAPIRO

1
2   that the obligations of the manufactured home
3   customer is to repay the money it's borrowed, is
4   that a mortgage or is that some other kind of
5   paper?
6       A.    I call it a mortgage, but I can't tell
7   you technically if that's -- if that's what it's
8   called as opposed to some other type of loan,
9   secured loan or...
10      Q.    In the course of your preparation of
11  this report, what is the source of your
12  understanding about how these asset-backed
13  securities worked?
14      A.    I can't tell you which specific
15  document or documents I relied on.
16      Q.    Did you review - in preparing your
17  report did you review the actual transaction
18  documents with respect to any of these
19  asset-backed securities?
20      A.    I believe I looked at one or two
21  prospectuses, but I -- if I did it would have been
22  quite a while ago.
23      Q.    Was it --
24      A.    I've looked at --
25      Q.    Is it fair to say, Doctor, that your

76

ALAN SHAPIRO

1
2   description that is in your report that you've
3   just given me about asset-backed securities is...
4   based generally on your knowledge of the industry
5   and about how those transactions work?
6       A.    That's correct.
7       Q.    These were not unfamiliar to you when
8   you began this assignment?
9       A.    That's correct.
10      Q.    Okay. So at the end of the chain
11  you've described someone purchases an interest in
12  this pool of obligations; is that right?
13      A.    Yes.
14      Q.    And what is it that that person is
15  looking to, that is, the purchaser, for the
16  repayment of their investment?
17      A.    The monthly payments by the purchases
18  of the manufactured housing on the loans that they
19  took out from Oakwood.
20      Q.    Right.
21          The purchaser of that securitization
22  paper is not looking to Oakwood itself to repay
23  its investment, is it?
24      A.    Only to the extent that Oakwood has
25  provided guarantees.

77

ALAN SHAPIRO

Q.    To what extent between 1994 and 2001,
if you know, did Oakwood provide such guarantees?

A.    As best as I know, Oakwood did not
provide any guarantees except in mid-1980 -- I'm
sorry, mid-2001 on the -- where it provided the
B2 guarantees.

Q.    So in general with respect to these
asset-backed securities that were being issued
according to what you've told us starting in 1994,
the purchaser of the interest in the
securitization is looking not to Oakwood, but to
the pool of individual retail customers for the
source of their repayment; is that correct?

A.    That's correct.

Q.    All right.  On page 14 under
Section VII.A.2.a you began by -- you begin by
saying, "CSFB began to serve as Oakwood's
securities underwriter in 1994.  Over the next
eight years, CSFB wrote more than $7.5 billion
in Oakwood securities over approximately 25
securitizations," right?

A.    Yes.

Q.    And you have a footnote there, right?

A.    Yes.

---

ALAN SHAPIRO

Q.    And what do you cite there is the
source of that information?

A.    A legal document in this case called
"Objections and Counterclaims," dated
November 11th, 2004.

Q.    Okay.  And do you understand that that
document is serving the function of    is in
effect the complaint in the litigation between the
trust and Credit Suisse?

A.    Yes.

Q.    Is it your understanding that a
complaint is a part of the factual record of a
case?

A.    I don't have a good legal
understanding, except that it is a complaint with
one party setting out what it believes to be the
facts and then draws various conclusions.

Q.    Right.

In -- on page 3, Roman numeral III,
"Basis for Opinions," you say that the documents
and materials that you relied on "are of the type
typically relied on by experts or financial
economists in their research."

Would you say that the complaint in a

---

ALAN SHAPIRO

lawsuit in which one party sets out their position
in a case is the type of material on which experts
and financial economists typically rely in their
research?

A.    Yes, to the extent that it contains
facts.

Q.    Do you have any independent way of
knowing whether or not that fact is accurate?

A.    Well, no, not sitting here.  I mean,
clearly I could have gotten hold of all the
prospectuses or attempted to get hold of all the
prospectuses, but that seemed to be needless,
particularly since the specific number, even
though I cite the dollar amount and number of
securitizations, really doesn't affect my opinion.
So there was no reason in this case, you know, to
try to independently verify those numbers.

Q.    Okay.  So you made -- you just took
those numbers from the complaint and made no
effort to check on them?

A.    That's correct.

Q.    Okay.  On page 12, Section VII.A, "CSFB
had access to public and private information
concerning Oakwood's financial condition."

---

ALAN SHAPIRO

In connection with the role it played
in the securitization transactions, is it correct
to say that the information that CSFB would have
had access to would have been information about
the underlying obligations?

A.    Yes, if you include the payment history
of -- on those obligations.

Q.    Of the payment history of the mobile
home customers --

A.    Yes.

Q.    -- in paying their notes, right?

A.    Yes.

Q.    And you describe -- and I don't have my
finger on it right now, but you describe a number
of kinds of information that CSFB would have had
access to, including valuations of the assets and
the credit history of the customers, and so forth
and so on, right?

A.    Yes.

Q.    And that information is information,
again, with respect to the underlying obligations?

A.    Yes.

Q.    And that information is used for the
purpose of preparing the prospectus that's used to

ALAN SHAPIRO

1  sell the aggregated securities?

2

3  A.    That's correct.

4  Q.    Because the person who is buying those

5  securities is interested in how that pool is going

6  to perform in terms of repayment.

7  A.    That's correct.

8  Q.    And the person who is buying the

9  securities doesn't actually have an interest in

10  whether or not -- how Oakwood is going to perform,

11  because Oakwood's not obligated to pay on the

12  securities, right?

13  A.    Well, that's not entirely the case,

14  because to the extent that -- I mean, the owners

15  of those interests would have at least some

16  interest in how Oakwood would perform because

17  of -- let's suppose, for example, you have a

18  foreclosure on one of those mobile homes.

19  Q.    All right.

20  A.    Then it certainly helps if Oakwood is

21  in existence in order to refurbish and resell that

22  mobile home.  If Oakwood just disappeared, then I

23  would say that that mobile home is likely to lose

24  value, and hence there would be less value

25  accruing to the owner of an interest.  So that

82

ALAN SHAPIRO

1

2  would be, you know, the only point I would make

3  with regard to that, that they do have some

4  interest in Oakwood's survival.

5  And, of course, the higher the default

6  rate the greater the interest in Oakwood's

7  survival would be from that standpoint.

8  Q.    Okay.  Now, the way Section VII works

9  is you say in Section VII.A, "CSFB had access to

10  public and private information."  And in VII.A.1

11  we have your general description of what

12  investment banks do.

13  In VII.A.2 you tell us that "CSFB

14  served as" the "investment banker and thus enjoyed

15  the type of access to information described

16  previously."

17  Aside from your general understanding

18  of how these relationships worked, in your

19  activities in preparing your report have you been

20  able to identify any financial information about

21  Oakwood that was in CSFB's possession that was not

22  also public?

23  A.    Well, I can't point to specific

24  financial information.  What I can point to, for

25  example, is the fact that Mr. Xanthos can go and

83

ALAN SHAPIRO

1

2  visit Oakwood, talk to various people, find out

3  what their plans are, how they're doing.  I'm sure

4  that he had access to private information in that

5  respect.

6  In addition Oakwood management would

7  bounce ideas off CSFB personnel.  I remembered

8  another name, Mr. Felt, as well as Mr. O'Driscoll,

9  to get their advice and their thinking.  So from

10  that standpoint they had private information that

11  did have a bearing on the financial performance of

12  the company.

13  Q.    Well, do you actually have any way of

14  knowing with respect to this specific

15  relationship, whether in the discussions between

16  individuals at CSFB and individuals at Oakwood any

17  information that was not public was given to CSFB?

18  A.    I can't point to any specific piece of

19  information.

20  Q.    And, in fact, for most of the time of

21  the relationship the principal information that

22  CSFB would have been concerned with was the

23  information about the paper that was being

24  securitized; is that incorrect?

25  MR. CASTANARES:  Objection, calls for

84

ALAN SHAPIRO

1

2  speculation, and form.

3  A.    Well, as far as I know and -- but that

4  was the period of time that I -- that is not part

5  of my report because CSFB was -- I'm sorry,

6  Oakwood was a solvent corporation during that time

7  period.

8  Q.    And what --

9  When did Oakwood stop being a solvent

10  corporation?

11  A.    Well, my analysis, which in my

12  supplemental report indicates --

13  Q.    Let me -- I just want to stop you

14  there.  I'm sorry to interrupt.  I want to ask my

15  question more carefully.

16  A.    Sure.

17  Q.    At the time you prepared Exhibit 501

18  what was your understanding about when Oakwood

19  became insolvent?

20  A.    Well, I was just asked to assume that

21  Mr. -- Mr. Tennenbaum's date, which is September

22  2001.

23  Q.    Okay.  Is there any reason to think

24  that at any period of time CSFB had access to

25  information about Oakwood that was not also

85

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

available to its management and board of

directors?

   A.   No.

   Q.   Okay. Now, in 2001, according to your

report at page 16, CSFB took on a new role; is

that right?

   A.   Yes.

   Q.   And what was that new role?

   A.   That was to step into the shoes of

Bank of America as the provider of a warehouse

loan facility.

   Q.   Now, does the warehouse loan facility

have some relationship -- excuse me -- to the

asset-backed securities we've been discussing?

   A.   Yes, it does.

   Q.   What is that relationship?

   A.   Well, that's to provide basically the

bridge financing between the time that Oakwood

lends money to its customers to buy their

manufactured housing and the time that Oakwood can

securitize that paper, that intervening period is

in effect bridged by the warehouse facility.

   Q.   Why is it referred to -- is warehouse a

common term in these --

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

   A.   It is.

   Q.   Where does that term come from?

   A.   Basically you're warehousing paper,

you're buying up paper and keeping it in inventory

until you sell it off.

   Q.   Until you're ready to do the next

securitization?

   A.   Securitization, yes.

   Q.   You said that they stepped into the

shoes of Bank of America, what do you mean by

that?

   A.   Well, Bank of America was the provider

of the warehouse facility and Bank of America

wanted out, and so --

   Q.   And how do you know that?

   A.   I can't -- I read it in some document

or other.

   Q.   Okay.

   A.   I think the depositions talked about

that as well.

   Q.   Okay.

   A.   And so CSFB took over that as provider

of the warehouse facility. In other words,

basically it's a revolving line of credit.

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

   Q.   And is it structured in such a way that

according to your understanding that CSFB was

actually a secured lender to Oakwood Corporation?

   A.   I don't -- it was -- no, it was a

lender to a bankruptcy remote entity. The whole

idea was to try to avoid to the extent possible

any credit risk associated with Oakwood.

   Q.   Right.

      It was intended, again, to be a way in

which an investor or a lender looked to the

underlying paper as the source of its repayment,

right?

   A.   Yes.

      MR. CASTANARES: Objection to form.

   A.   Well, it would look to whatever assets

secured the line of credit.

   Q.   And what were those assets?

   A.   Basically they were the mortgages or

loans made to Oakwood's customers.

   Q.   Have you in the course of preparing

your analysis looked at the warehouse documents?

   A.   I don't believe so.

   Q.   Okay. Again, is a warehouse

arrangement of this sort commonly used in

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

association with a securitization structure of the

type we've been describing?

   A.   Yes, it is.

   Q.   It's of no surprise to you here to see

it in this transaction?

   A.   No.

   Q.   Okay. Now, you say on page 16, "In

February, Bank of America decided not to renew the

Warehouse Facility, and CSFB assumed the role as

lender to Oakwood by purchasing the notes from the

Warehouse Trust."

   A.   Yes.

   Q.   I think as we've just seen that it's

actually not technically right that CSFB assumed

the role of lender to Oakwood, right?

   A.   Ah, you are correct. I was using that

in a more generic sense, but...

   Q.   They stepped in and provided this

warehouse facility?

   A.   That's correct. And it was not a

lender to Oakwood, but they lent specifically to

this bankruptcy remote entity.

   Q.   Right.

      And that's the standard way these

ALAN SHAPIRO

2  warehouse arrangements are done, isn't it?

3      A.    Very much so.

4      Q.    Okay. What would have happened to

5  your understanding in February of 2001 had

6  Credit Suisse not stepped into the shoes of Bank

7  of America?

8      A.    My best understanding was that there

9  was nobody else looking to replace Bank of America

10  as the lender. I believe I read that somewhere,

11  in which case this whole structure would have

12  collapsed. That's my understanding.

13      Q.    And what would have been the

14  consequence of that?

15      A.    Well, there would have had to have been

16  some serious restructuring taking place at

17  Oakwood. I don't know exactly what would have

18  happened. Maybe Oakwood would have been sold,

19  maybe it would have gotten into bankruptcy.

20  Possibly it might have gotten some type of secured

21  loan to restructure its operations, to buy it time

22  to shut down various facilities, and so on.

23      I'm not sure what would have happened,

24  but the one thing I'm pretty certain is that they

25  couldn't have kept doing business as usual.

90

ALAN SHAPIRO

2      Q.    The only thing -- at the time you

3  prepared your report the only thing you know about

4  solvency or insolvency is that you were asked to

5  assume that Oakwood was insolvent in September of

6  2001, right?

7      A.    Yes.

8      Q.    Okay. So now we're in February of

9  2001.

10      A.    Ah.

11      Q.    Oakwood, a company with which --

12  according to your report -- Credit Suisse had had

13  a relationship since 1994 finds itself in

14  life-threatening circumstances because Bank of

15  America wants to discontinue the warehouse role.

16      And my question to you is, do you have

17  an opinion as to whether CSFB was unreasonable or

18  not reasonably prudent when it stepped in in

19  February of 2001 and made possible the

20  continuation of that warehouse facility?

21      MR. CASTANARES: Asked and answered.

22      A.    Okay. As of February 1st and given the

23  assumption of insolvency as of September '01,

24  then, no, there was nothing imprudent or

25  unreasonable about that.

92

ALAN SHAPIRO

2      Q.    Okay. In your opinion, Professor, did

3  CSFB breach any duty it owed to anyone by stepping

4  into the shoes of Bank of America and taking over

5  that warehouse facility role in February of 2001?

6      A.    Well, that becomes -- that's a legal

7  issue, I believe. What I can tell you is that the

8  economic consequences of doing that, again, is

9  that it enabled Oakwood to maintain business as

10  usual, which was not beneficial to its creditors.

11      Q.    Do you believe it was unreasonable or

12  not reasonably prudent of CSFB to step into that

13  role in February of 2001?

14      A.    Well, in general there's nothing wrong

15  and a lot of things right about being a lender to

16  a warehouse facility.

17      What I would say in this particular

18  instance, given the circumstances that --

19  financial circumstances that Oakwood was in,

20  anything that enabled it to maintain a

21  business-as-usual stance was going to harm the

22  economic interests of the company and its

23  creditors. Whether -- you know, if it owed a

24  fiduciary obligation, then that's -- I would say

25  it's even less reasonable to do that.

91

ALAN SHAPIRO

2      Relative to my supplemental report,

3  which looked more carefully at this issue and

4  looked at data that -- the same data that CSFB had

5  access to and analyzed, I would say it was

6  unreasonable even as far back as February.

7      But at the time that I wrote this

8  report I would say that there was nothing

9  unreasonable about providing that warehouse

10  facility as of February '01. But by September

11  '01, given insolvency, I believe that CSFB should

12  have backed away and forced some type of

13  restructuring on Oakwood.

14      Q.    Is it, Doctor, in your opinion always

15  unreasonable and unreasonably prudent for a

16  financial institution to provide financial

17  accommodations to a customer when that customer is

18  insolvent?

19      A.    No, not at all. There's a whole class

20  of lenders called debtor in possession, which

21  specialize in making loans to insolvent

22  enterprises.

23      Q.    Is it in your opinion, Professor,

24  always unreasonable or unreasonably -- or

25  reasonably imprudent for a financial institution

93

**ALAN SHAPIRO** (page 94)

1    ALAN SHAPIRO
2    to make financial accommodations to a borrower
3    when the borrower is insolvent, but not in a
4    bankruptcy proceeding?
5        A.    No.
6        MR. WICKES:  Okay.  Tony, I think this
7    would be a good time for us to take a break
8    for lunch, if that's all right with you.
9        MR. CASTANARES:  That's good.  Sure.
10       THE VIDEOGRAPHER:  Going off the record
11   at 12:44.
12       (Luncheon recess:  12:44 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

94

---

1    ALAN SHAPIRO
2        And now that means not that -- I take
3    it, not that CSFB's securitization business would
4    have collapsed, but that Oakwood's securitization
5    would have collapsed?
6        A.    Yes, that's correct.
7        Q.    And the consequence of that would have
8    been that Oakwood at that time would not have been
9    able to continue conducting its business as it had
10   been, it would have needed a bankruptcy or some
11   other major reorganization.
12       A.    Yes.
13       Q.    Okay.  And I think just before we broke
14   you told us that it's now your opinion that CSFB
15   should have refused to step into that role and
16   should have forced some type of restructuring on
17   Oakwood; is that right?
18       A.    Under the circumstances of insolvency,
19   yes.
20       Q.    Okay.  Tell me about the board of
21   directors of Oakwood.
22       What do you know about the Oakwood
23   board?
24       MR. CASTANARES:  Objection, vague.
25       A.    I don't recall anything about the

96

---

1    ALAN SHAPIRO
2        A F T E R N O O N   S E S S I O N
3        (Time noted:  1:34 p.m.)
4    A L A N   C .   S H A P I R O,    resumed as a
5    witness, having been previously sworn by the
6    Notary Public, was examined and testified as
7    follows:
8        THE VIDEOGRAPHER:  Back on the record
9    at 1:34.
10   EXAMINATION BY
11   MR. WICKES:
12       Q.    Dr. Shapiro, if we can, go back to
13   Section VII.A.2.b of your report on page 17 --
14   strike that, 16 and 17.
15       I think we agreed before lunch that
16   where in that paragraph you refer to Oakwood, in
17   terms of CSFB becoming a lender to Oakwood, and so
18   forth, we really mean CSFB becoming a lender to
19   the special purpose vehicle that was set up to be
20   the warehouse; is that right?
21       A.    Yes.
22       Q.    And at the end of that section you say,
23   "if CSFB did not take over the role as lender, its
24   securitization business would have immediately
25   collapsed."

95

---

1    ALAN SHAPIRO
2    directors, except -- well, I can't even recall the
3    name of -- I read one or two depositions of
4    directors, but...
5        Q.    Do you know --
6        A.    Aside from a director pointing to
7    advice that the board and particularly the audit
8    committee got from CSFB, I don't recall.
9        Q.    In your work in connection with
10   preparing this report did you review minutes of
11   Oakwood director meetings?
12       A.    I don't recall reviewing such minutes.
13       Q.    Do you know or did you know at the time
14   you prepared this report what the professional
15   background of any of the directors were?
16       A.    I just don't recall.  I just don't
17   remember.
18       Q.    Okay.  Do you have an opinion as to
19   whether or not the board of directors of Oakwood
20   was competent to perform its roles?
21       A.    No, I don't.
22       Q.    Okay.  Do you know -- is there anything
23   you saw in your work in preparing this report that
24   would suggest to you that the Oakwood board was
25   not capable of fulfilling its duties?

97

ALAN SHAPIRO

A.    Not that I remember.

Q.    Okay.  Do you -- in the course of the work you did in preparing this report did you form any opinion about the professional abilities or skills of Oakwood's management?

A.    Well, I think they were overly optimistic about their business and they didn't -- I don't think they fully understood the trouble that they were in, which I guess says something about their competency.

Q.    And do you say that on any basis other than hindsight?

A.    Yes.  I think the fact is that it was well known through -- and well known I mean it's written about in equity reports and newspaper articles that the industry was suffering from substantial excess capacity and defaults were rising.  And so I think under those circumstances management should have been, you know, looking at other courses of action besides just trying to maintain the business as usual with some modest downsizing.

Q.    Leave aside what we know about what courses of management -- what courses of action

98

ALAN SHAPIRO

management took.

Did you review any materials in the course of preparing your report from which you would have formed an understanding of the extent to which management and/or the board were considering alternative courses of action?

A.    Well, I saw various presentations by CSFB to management of various financial courses of action to undertake.  And so I have to -- they probably were asked about that.

Q.    Well, we're going to talk about CSFB's role as financial adviser as you describe it here later on.

Aside from what you saw about their discussions with CSFB, do you have any basis on which to have an understanding of the extent to which the management and the board of Oakwood during 2001 was considering alternatives?

A.    Not that I can recall sitting here.

Q.    So you don't know, for example, the extent to which, if at all, the management and the board of Oakwood in 2001 were giving consideration to a bankruptcy filing and the consequences of that; is that correct?

99

ALAN SHAPIRO

A.    That's correct.

Q.    Okay.  Now, in Section VII.A.2.c of your report starting at page 17 you talk about CSFB's role as a financial adviser prior to the time in August of 2002 when they were actually formally retained in that capacity; is that right?

A.    Yes.

Q.    Okay.  And you cite some deposition testimony in which various people talk generally about CSFB's role as a financial adviser.

Can I ask you this, aside from the three presentations by Mr. Felt that you describe in some detail that we'll talk about separately, aside from those presentations from Mr. Felt do you see in the materials that you have reviewed any indication that the Oakwood management or directors were looking to CSFB for advice unrelated to the securitization financing that we've talked about earlier today?

A.    Well, as I point in my report there that -- you know, Mr. Muir testified that any substantive business decision that Oakwood was considering that might have an impact on loan originations, the ABS program, loan servicing,

100

ALAN SHAPIRO

that they inform CSFB.  And that could cover a fairly wide range, including defaults and what they were doing about defaults, and so on and so forth, but...

And the people from CSFB came on a regular basis to talk about various ideas, but I don't have -- I can't point to any specific ideas.

Q.    So on page 18 of your report you have a quote from Mr. Muir's deposition testimony and you say near the bottom of that page, "Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action regularly taken by the Company," right?

A.    Yes.

Q.    And then you have a quote from Mr. Muir's deposition in which he says, "it was practice for me anytime Oakwood made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback."

101

ALAN SHAPIRO

2    Now, there in that part you've quoted
3  wouldn't you agree that what Mr. Muir is
4  describing, loan originations, the ABS program,
5  loan servicing, those are matters that had
6  directly to do with the ongoing securitization
7  program?
8    A.    Yes.
9    Q.    Okay.  And would you agree with me that
10  it overstates the import of that quote for you to
11  say that Mr. Muir testified that Oakwood regularly
12  solicited feedback from CSFB with respect to any
13  significant action taken by the company?
14    A.    Well, possibly, but not necessarily, in
15  that most of the significant actions that the
16  company might take would likely have an impact on
17  loan originations.  In other words, how many
18  offices you keep open, how much production -- to
19  what extent you maintain production, and so on,
20  all will ultimately have an impact on loan
21  originations and default rates, and so on, which
22  certainly have an impact on securitization.
23    Q.    All right.  Other than that quote on
24  page 18 and you have another quote from Mr. Muir
25  at the top of page 19, and again, leaving aside

ALAN SHAPIRO

2    the presentations by Mr. Pelt that we'll talk
3  about separately, have you seen in the record
4  examples of Oakwood consulting with CSFB about its
5  business unrelated to the securitization?
6    A.    Well, as -- oh, aside from
7  Mr. Pelt's --
8    Q.    Yes.
9    A.    -- presentation, work on restructuring
10  the balance sheet, and so on?
11    Q.    Right.
12    A.    None that I can point to.
13    Q.    And, in fact, we know, don't we, that
14  Mr. O'Driscoll was an ABS specialist?
15    A.    Yes.
16    Q.    So that if Mr. Muir were considering an
17  M&A transaction, for example, you wouldn't have
18  expected him necessarily to talk to Mr. Pelt
19  about -- to Mr. O'Driscoll about that?
20    A.    That's correct.
21    Q.    Okay.  Do you see in the records you
22  have reviewed, again, leaving aside Mr. Pelt, any
23  indication that Oakwood was seeking advice from
24  anybody at CSFB other than Mr. O'Driscoll?
25    A.    I don't believe I've seen such

ALAN SHAPIRO

2    evidence.
3    Q.    Okay.  And, in fact, at least up until
4  February of 2001 Oakwood's board and management
5  dealt with other banks other than CSFB; isn't that
6  right?
7    A.    Yes.
8    Q.    So, for example, we talked about
9  Bank of America had provided the warehouse
10  facility, right?
11    A.    Yes.
12    Q.    And there were, if I remember
13  correctly, a couple of issues of publicly traded
14  debt that were direct obligations of Oakwood as
15  opposed to securitizations that you've talked
16  about.
17    A.    That's correct.
18    Q.    Do you know who was the underwriter on
19  those?
20    A.    No, I don't.
21    Q.    Was it CSFB?
22    A.    I don't know.
23    Q.    And then finally the fourth role that
24  CSFB had with respect to Oakwood you describe in
25  Section VII.A.2.d, which is the role they took on

ALAN SHAPIRO

2    when they were retained in August of 19 --
3  August 19th of 2002 to become their restructuring
4  and financial adviser pursuant to a written
5  agreement, right?
6    A.    Yes.
7    Q.    And that's when Oakwood actually
8  retained Mr. Pelt to provide them with assistance
9  in getting ready for a bankruptcy filing?
10    A.    Yes.
11    Q.    Okay.  And I don't understand from your
12  opinion, and I want you to tell me if I'm wrong, I
13  don't understand you to have expressed any opinion
14  about CSFB's performance of its role as financial
15  adviser for restructuring purposes pursuant to
16  that August 19th, 2002 engagement agreement; is
17  that correct?
18    A.    That's correct.
19    Q.    Okay.  So when you talk about CSFB's
20  poor performance in their role as financial
21  adviser you're talking about that role in the
22  period prior to August of 2002 when I think you
23  said they were serving -- they were serving as
24  kind of an informal financial adviser without a
25  written agreement; is that right?

ALAN SHAPIRO

2   A.   Yes.

3   Q.   Okay.  And do I understand correctly

4 that your focus with respect to CSFB's advice in

5 that regard is particularly with reference to

6 presentations made by CSFB to Oakwood in June of

7 2001, August of 2001, and March of 2002?

8   A.   Well, those are specific references,

9 but I believe that they provided advice or could

10 have provided advice at other points as well,

11 particularly with regard to the securitizations

12 and right along with the warehouse facility,

13 pointing out that these actions were just

14 perpetuating money losing businesses.

15   Q.   Let's break that down.

16      You said that -- in your answer that

17 they were providing advice or could have been

18 providing advice that these were just perpetuating

19 money losing businesses.

20      Aside from the presentations, June,

21 August, and March, 2001 and 2002, do you see in

22 the record, can you point me to anything in the

23 record that shows CSFB giving the company advice

24 other than with respect to the structuring and

25 execution of the ABS and warehouse transactions.

106

---

ALAN SHAPIRO

2   A.   Well, that -- it depends on how you

3 interpret Mr. Muir's comment, as I -- or his

4 testimony.  His testimony could cover a pretty

5 wide range of matters and still be relevant to the

6 securitization.  So I'm not sure exact -- just

7 what the specifics of that advice were.

8   Q.   Okay.  But aside from Mr. Muir's

9 testimony you haven't seen, have you, any other

10 examples of -- again, leaving aside Mr. Pelt's

11 three presentations -- of somebody from CSFB

12 giving -- affirmatively giving advice to the

13 company unrelated to the securitization warehouse

14 business?

15   A.   That's correct.

16   Q.   Okay.  In Section VII.A.3 of your

17 report beginning on page 22 that's headed "CSFB

18 obtained both public and inside information about

19 Oakwood's financial condition," is there any

20 information that you discuss in that section of

21 your report that would not have been known to

22 Oakwood's management and board?

23   A.   I don't believe so.

24   Q.   Okay.  And, in fact, you point -- I

25 can't put my finger on it right now, but you point

107

---

ALAN SHAPIRO

2 to some equity research notes by CSFB's research

3 side in which they talked about the possibility of

4 a bankruptcy, right?

5   A.   That's correct.

6   Q.   Okay.  And those are by definition

7 public documents, right, they're produced by the

8 bank as advice to their customers?

9   A.   Yes.

10   Q.   In your experience do the management

11 and directors of publicly traded corporations pay

12 careful attention to what equity analysts are

13 saying about their company?

14   A.   Yes.

15   Q.   So there's no reason to think, is

16 there, that the directors and management of

17 Oakwood would not have known what CSFB's equity

18 research folks were saying about Oakwood?

19   A.   Well, they should have and I have no

20 reason to believe that they did not.

21   Q.   And, in fact, for the reasons we've

22 just said you would expect they probably did know

23 that?

24   A.   Yes.

25   Q.   In fact, isn't it true in the world of

108

---

ALAN SHAPIRO

2 financial economists that people tend to believe

3 boards and management pay too much attention to

4 that information?

5   A.   No, they believe they pay too much

6 attention to quarterly results.

7   Q.   All right.  On page 23 at the bottom,

8 this is still in Section VII.A.3, "In addition to

9 obtaining publicly available information about

10 Oakwood, CSFB also had access to private, inside

11 information."  Then you go on and say, "as part of

12 preparing the securitization prospectuses, Oakwood

13 provided CSFB with inside information, including

14 the historical loss experience of a securitized

15 pool of assets, repossession and foreclosure

16 rates, and the credit quality of each home buyer."

17      So again, that's all information

18 directly related to preparing the prospectus for

19 the securitization, right?

20   A.   That's correct.

21   Q.   At Section VII.B.2 on page 26 you say,

22 "Throughout its relationship with Oakwood, CSFB

23 continued to monitor and insulate itself from the

24 bankruptcy risks surrounding Oakwood."

25      Would you agree with me that it is in

109

ALAN SHAPIRO

the very nature of the kind of asset-backed

securities that we've been talking about here with

Oakwood, that those structures are created to

isolate the entities involved with the

securitization from bankruptcy risk at the

operating company?

        Isn't that what ABSs are about?

    A.   That's exactly right and there's

nothing sinister about that.

    Q.   Okay.  Now, in Section VII.B starting

on page 24 you talk about a couple of reports

written in early 2000 by Mr. Xanthos at CSFB.

        What's your understanding of what

Mr. Xanthos's role was at CSFB?

    A.   Well, that he was part of the credit

risk management team that gave independent

opinions as to the credit risk of potential

borrowers.  And so there was -- I guess there was

a $75 million reverse repo facility for the ABS

manufactured housing securities that CSFB was

asked to provide.  And so he went out and -- to

access the creditworthiness of Oakwood because

that would influence the creditworthiness of this

facility.

ALAN SHAPIRO

    Q.   Okay.  And Mr. Xanthos had a pretty

negative view of Oakwood, didn't he?

    A.   He did.

    Q.   Is it --

        Now, in your experience it's pretty

standard, isn't it, in a bank that there's a

group, it may have a different name, but like this

CRM team at CSFB, to evaluate proposed credit

exposure by the banks?

    A.   Yes, that's correct.  It's quite

standard.

    Q.   And in your experience wouldn't you

expect that that's where you tend to find the

people who have skeptical views of their customers

and the proposed transactions?

    A.   Well, I expect to see a greater degree

of skepticism among members of the credit risk

management team than I would among those who would

get credit for making the loan.  There's a

constant tension within banks, both commercial and

investment banks, between the lending officers and

the risk -- the credit risk people.

    Q.   Indeed, that's the purpose of setting

up a separate unit in a bank for that function,

ALAN SHAPIRO

isn't it?

    A.   Yes.

    Q.   It's a kind of check and balance?

    A.   That's right.

    Q.   Can you show me -- do you see in

Mr. Xanthos's two memoranda that you discuss, are

there facts -- as opposed to his conclusions, are

there facts which were not -- which, A, would not

have been known to the management and board of

Oakwood and, B, were not consistent with what was

being said publicly by -- about Oakwood at the

time?

    A.   I don't believe so.

    Q.   Okay.  On page 28 near the bottom of

the page you say, "No evidence exists that CSFB

performed any assessment of the costs and benefits

of the securitizations it was leading or conducted

any type of analysis regarding the likelihood that

Oakwood would be able to turn itself around and

pull itself out of its financial predicament.

Also, no evidence exists that CSFB considered and

assessed the harmful impact on Oakwood's existing

creditors when engaging in transactions and

providing advice to the Company."

ALAN SHAPIRO

        Would you agree with me that it would

be more accurate there to say that you had not

seen such evidence, rather than that no evidence

exists?

    A.   Yes.

    Q.   Okay.  Similarly at the top of page 29

you say, "no evidence exists that CSFB suggested

filing for bankruptcy as an option," et cetera,

et cetera.

        You'd agree with me, wouldn't you, that

what that really should say is that you have seen

no such evidence, not that no such evidence

exists?

    A.   That's correct.

    Q.   All right.  Now, let's talk about

Mr. Felt.

        What's your understanding of what part

of CSFB Mr. Felt worked in?

    A.   I don't recall exactly.  I think it was

investment banking and particularly advisory

services, but I don't know specifically.  Maybe

restructuring, but I'm not sure.

    Q.   What is cross selling?

    A.   I'm sorry?

ALAN SHAPIRO

2  Q.  What is cross selling, what does that
3  mean, cross selling?
4  A.  Cross selling?
5  Q.  Right.
6  A.  Oh, that's where you have a customer
7  for one of your products and you attempt to sell
8  another product to that customer as well.
9  Q.  Right.  And --
10  A.  In other words, the same company tries
11  to sell different products to the same customer.
12  Q.  So you'd agree with me, wouldn't you,
13  that it's typical in the world of major financial
14  institutions that one of the things they try to do
15  with their customers when they have a relationship
16  providing one kind of service, is they try to
17  introduce their customer to other folks in their
18  organization who provide other kinds of services
19  for fees?
20  A.  Cross selling is certainly the holy
21  grail of financial institutions.
22  Q.  Okay.  And again, there's nothing
23  particularly sinister or evil about that, is
24  there?
25  A.  Not at all.

114

ALAN SHAPIRO

2  A.  Right.
3  I just don't recall when that started,
4  if Mr. Felt had come in and talked to them prior
5  to making these pitches.
6  Q.  All right.  Well, what we know is,
7  according to your report, that on June 26th, 2001
8  there's a presentation.  Actually you say, "On
9  June 26th, 2001, in a presentation made by CSFB to
10  Oakwood," and so forth and so on.
11  Actually we don't know, do we, whether
12  a presentation actually was made, what we know is
13  there is a document --
14  A.  Document.
15  Q.  -- with that date on it?
16  A.  That's correct.
17  MR. WICKES:  And that's -- let me just
18  see if I can...
19  Can you find for me that one,
20  June 26th, 2001.  It's probably one of these
21  in here.
22  THE WITNESS:  Can we take a quick
23  break --
24  MR. WICKES:  Absolutely.
25  THE WITNESS:  -- right now?

116

ALAN SHAPIRO

2  Q.  Okay.  And isn't it clear that when
3  Mr. O'Driscoll introduces Mr. Felt to the company
4  in June of 2001 that's exactly what's going on,
5  he's trying to cross sell Oakwood to use CSFB's
6  restructuring advice?
7  A.  I just don't -- don't recall that
8  sequence of events.  It's been quite a while since
9  I've read these depositions, if that's where it
10  showed up.  I just don't recall.
11  Q.  Well, you've seen Mr. Felt's -- the
12  documents that he presented on these dates.
13  A.  I'm sorry?
14  Q.  You've seen the documents that Mr. Felt
15  presented to Oakwood on the dates you've referred
16  to here, right?
17  A.  Yes.
18  Q.  Those were pitch documents, weren't
19  they?
20  A.  Yes.
21  Q.  By pitch document we mean that's a
22  document that somebody at the bank has prepared to
23  try to convince the company, Oakwood, to hire
24  Mr. Felt's part of CSFB, to provide them a certain
25  kind of services?

115

ALAN SHAPIRO

2  MR. WICKES:  Should we take
3  five minutes?
4  MR. CASTANARES.  Sure.
5  THE VIDEOGRAPHER:  Going off the
6  record, end of tape 2 at 2:10.
7  (Recess taken.)
8  THE VIDEOGRAPHER:  Back on the record
9  at 2:18.  This is the beginning of tape 3.
10  (Exhibit 502, Multipage document
11  entitled Presentation to Oakwood Homes
12  Corporation, dated 6/26/01, marked for
13  identification, as of this date.)
14  BY MR. WICKES:
15  Q.  Doctor, I've given you what's been
16  marked for identification as Exhibit 502.
17  Is that the presentation to Oakwood
18  that you refer to in your report as of June 26th,
19  2001?
20  A.  Yes.
21  Q.  Do you know who -- to whom at Oakwood
22  this was given?
23  A.  I don't recall.  I assume it would have
24  been the CEO and probably the CFO, but I just
25  don't recall.

117

ALAN SHAPIRO

2    Q.   Do you, in fact, know -- not what you

3    assume, do you, in fact, know whether or not there

4    was actually a meeting or whether this written

5    material was just delivered?

6    A.   No, I don't know.

7    Q.   Okay.  Would you agree that this is a

8   pitch document?

9    A.   Yes, I do.

10   Q.   Okay.  So this is -- and if you look on

11  the page that's marked page 1 of the document.

12    I guess it's actually Bates No. 52956

13  headed "CSFB Restructuring Expertise," that's

14  actually showing different parts of CSFB that

15  might be involved in some engagement, right?

16   A.   Yes.

17   Q.   And it identifies at the top the

18  "Restructuring Group," with Phil Jacob as managing

19  director, Jared Felt as a director, and a couple

20  of other folks, right?

21   A.   Yes.

22   Q.   Okay.  "CSFB," it says, "is uniquely

23  suited to advise Oakwood.  The firm's

24  restructuring expertise is complemented by its

25  No. 1 position in the High Yield market,"

---

ALAN SHAPIRO

2  et cetera, et cetera.

3    So this is Mr. Felt coming to the

4  company, to Oakwood, and saying look at all the

5  expertise we have in these kinds of difficult

6  situations, we'd sure like you to retain us to

7  become your financial adviser, and here are some

8  ideas about what we might do, right?

9   A.   Yes.

10   Q.   Okay.  Do you know whether as a result

11  of this presentation Oakwood actually retained the

12  restructuring group of CSFB?

13   A.   Not at this point, eventually.

14   Q.   Eventually?

15   A.   Yes.

16   Q.   But not at this time?

17   A.   That's right.  Not for a little over a

18  year later.

19   Q.   Right.

20    And they -- and Oakwood did not act

21  upon any of the alternatives that are laid out in

22  the report as possible restructuring ideas?

23   A.   That's right.

24   Q.   Okay.  On page 36 of your report, at

25  the end of your description of this document you

---

ALAN SHAPIRO

2  say, "Rather than advise Oakwood to cut its losses

3  and file for bankruptcy, CSFB encouraged Oakwood

4  to continue to engage in financing activities

5  based on uncertain assumptions that industry-wide

6  and company-specific conditions would improve.

7  This advice only accelerated the Company's

8  insolvent financial position."

9   A.   Yes.

10   Q.   Now, the advice didn't accelerate

11  anything, did it?

12    What accelerated -- what we know is

13  that actually this advice that CSFB describes in

14  this pitch document was not taken.

15   A.   That's right.

16   Q.   Okay.  Do you have any reason to

17  believe based on the information you've reviewed

18  in preparing your report that if CSFB had

19  recommended an immediate bankruptcy filing the

20  company would have acted on that recommendation?

21   A.   No, I don't know how the company would

22  have responded.

23   Q.   Indeed, we know, don't we, that by this

24  time the company certainly knew -- by the company

25  I mean its management and directors -- the company

---

ALAN SHAPIRO

2  certainly knew that bankruptcy was a possibility?

3   A.   Yes --

4   Q.   Okay.

5   A.   -- it did.

6   Q.   So to the best we know the consequence

7  of this June 26th presentation is nothing.  The

8  company neither proceeded with any of the ideas

9  discussed here, nor did they retain Mr. Felt's

10  group to be their financial adviser.

11   A.   Well, I would say that what this

12  document really indicated was kind of stay the

13  course.  In other words, keep doing what you're

14  doing, rearrange some of your financial claims --

15   Q.   All right.

16   A.   -- but basically keep on doing business

17  as usual and we'll help you in that.

18   Q.   Where in this document does it say

19  we'll help you in that.  I mean --

20   A.   Well, the we'll help you was that by

21  rearranging your claims.

22   Q.   In these financial restructuring ideas

23  that are discussed?

24   A.   Yes, that's correct.

25    And outside of this they're saying

ALAN SHAPIRO

1
2 we'll help you implicitly through the ongoing
3 securitizations and providing the warehouse
4 facility, that was at least tacit agreement with
5 the course that Oakwood was on.
6     Q.   I think what you've just said is that
7 in effect it's an assumption that underlies the
8 June 26th presentation that the warehouse and
9 securitization facilities would continue as they
10 had been.
11     A.   Yes.
12     Q.   Okay.
13     A.   Well, in fact, they did.  There was no
14 indication that anything would change.
15     Q.   And is it your opinion, Professor, that
16 as of June 26th, 2001 CSFB had a duty to Oakwood
17 to cut off the securitization and warehouse
18 facilities?
19     A.   Not necessarily to cut it off, but to
20 engage in a discussion with Oakwood as to what its
21 situation was, that it was economically insolvent.
22 In fact, this presentation itself demonstrates
23 that Oakwood was deeply insolvent at the time and
24 that it was time for some more radical measures.
25        Now, as part of that you may do some

122

ALAN SHAPIRO

1
2 law is.  My best understanding is that the law is
3 in some flux as to whether an obligation is owed
4 directly to creditors or just an obligation to the
5 company.  I just want to make it clear that I
6 believe that from an economic standpoint, that
7 when a company is insolvent that the duty to the
8 company passes through to a duty to creditors.
9     Q.   All right.  And that's the duty of the
10 directors you're describing, right?
11     A.   Directors and management.
12     Q.   And management.  Okay.
13     A.   Yes, and to the extent that anybody
14 else has a fiduciary obligation to the company.
15 Again, I'm not -- I'm just making an assumption
16 here.  I'm not giving a legal opinion as to who
17 else might owe such a fiduciary duty.
18     Q.   And had -- had CSFB come to Oakwood on
19 June 26th, 2001 and said you need to file for
20 bankruptcy and we need to significantly change the
21 ways in which we're handling the securitization
22 and warehouse facilities, in what ways would the
23 ultimate outcome with respect to Oakwood have been
24 different?
25     A.   Well, to begin with I didn't say

124

ALAN SHAPIRO

1
2 securitizations, but you would change your credit
3 standards quite substantially.  You may -- you
4 would still need a warehouse facility, possibly a
5 smaller warehouse facility, and so on.
6        So I'm not saying that the company
7 should have followed a liquidation strategy.
8 There may well have been valuable aspects of the
9 business to preserve, but the -- the effect of
10 facilitation, of doing business as usual, I think
11 was not in the economic best interests of the
12 company or its creditors.
13     Q.   Well, let's break that apart, the
14 company or its creditors.
15     A.   Yes.
16     Q.   I think what you told me before, and I
17 want you to correct me if I'm wrong on this, is
18 that in your opinion by this time the only
19 constituency at the company that should have been
20 considered was the creditors; is that right?
21     A.   That's correct.
22     Q.   Okay.  So when you say the company and
23 its creditors you're just being redundant?
24     A.   Well, in this particular instance.  But
25 just to make sure in case -- I don't know what the

123

ALAN SHAPIRO

1
2 necessarily that bankruptcy was the only option.
3 There are other -- there may well have been other
4 alternatives, such as the sale of the company or
5 providing additional financing to restructure the
6 company outside of bankruptcy.  You can rearrange
7 claims outside of bankruptcy, do equity for debt
8 swaps, and so on and so forth.  You don't have to
9 go into bankruptcy.  But let's just call it some
10 type of dramatic restructuring that should have
11 taken place.
12     Q.   All right.  The bankruptcy proceeding
13 of Oakwood is but for this litigation nearly
14 complete, is that your understanding?
15        MR. CASTANARES:  I just didn't hear the
16 question, could you repeat it, please.
17     Q.   I said the bankruptcy proceedings with
18 respect to Oakwood, aside from this litigation, is
19 nearly complete.
20     A.   I really don't have any understanding
21 of what else might transpire.  This is the only
22 thing that I'm aware of.
23     Q.   Do you know what the outcome in
24 Oakwood's bankruptcy has been with respect to
25 payment of claims of creditors and others?

125

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1    A.    No, I don't.

2    Q.    Okay.

3    A.    That would -- I'm sorry. With regard

4    to your prior question, that would really require

5    a damages analysis, which I have not done. In

6    other words, what an alternative outcome would

7    have been.

8    Q.    Well, how is it that we know -- because

9    it seems to be your view -- how is it that we know

10   that the outcome for interested parties in Oakwood

11   would have been better if something slightly had

12   been done in June of 2001 than what was done?

13   A.    I can't say that it would have. I

14   think it would have, because they persisted in a

15   business that was losing substantial amounts of

16   money. I think in that following year from June

17   till -- from '01 to '02 they lost, I think, a

18   couple of hundred million dollars in their

19   business. What they would have lost with some

20   other type of restructuring, I don't know.

21   Q.    Isn't it right, Doctor, that to attempt

22   to say today how things would have turned out if

23   some other course of action -- some unspecified

24   other course of action had been followed in June

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1    of 2001 would just be speculating?

2    MR. CASTANARES: Objection to the form.

3    A.    Well, it wouldn't be speculative if you

4    did an analysis -- you know, a serious analysis.

5    I'm not opining as to what the consequences of

6    undertaking alternative actions would have been or

7    might have been.

8    Q.    Right.

9    But if we were going to try to see what

10   an alternative outcome would have been, to begin

11   with we would have -- we'd have to be specific

12   about what that alternative was, wouldn't we?

13   A.    Yes, or you could look at a range of

14   alternatives.

15   Q.    Or you could look at a range.

16   So are you able, given the materials

17   that you have reviewed and the work that you have

18   done, to tell us with any degree of confidence

19   what different outcome there would have been had

20   Mr. Felt's June 26th report done the things you

21   say it should have done?

22   A.    No, I have not done such analysis --

23   Q.    Okay.

24   A.    -- so I cannot say.

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1    Q.    All right.

2    MR. WICKES: Then let's take a look

3    next at the August presentation, which we'll

4    mark as 503.

5    (Exhibit 503, Multipage document

6    entitled Presentation to Oakwood Homes

7    Corporation, dated 8/9/01, marked for

8    identification, as of this date.)

9    Q.    In June this presentation is prepared

10   and either is or is not presented to somebody, and

11   what the company says is, thanks, we're not

12   interested in buying that advice, right?

13   MR. CASTANARES: Objection to form.

14   A.    Yes, I believe that's the case.

15   Q.    So now a little over a month later

16   Mr. Felt makes another presentation, right?

17   A.    Yes.

18   Q.    That's Exhibit 503 that's discussed in

19   your report at VII.D.1.b, right?

20   A.    Okay. What page -- I don't -- I

21   didn't --

22   Q.    It's page 31.

23   A.    I did not memorize all the --

24   Q.    That's all right.

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1    A.    -- headings.

2    Yeah. Yes.

3    Q.    And this section -- this document,

4    No. 503, this is another pitch document, isn't it?

5    A.    Yes.

6    Q.    Again, offering up Mr. Felt's group's

7    restructuring expertise, talking about the

8    experience of CSFB in distressed finance

9    assignments, and offering up some more ideas

10   for -- what shall we call it, financial

11   engineering?

12   A.    Yes.

13   Q.    Fair enough?

14   A.    That's fine.

15   Q.    Okay. And then, again, do we know

16   whether there's actually a meeting or a

17   presentation, do we know anything about what

18   happened with this document?

19   A.    No, but they weren't -- to the best of

20   my knowledge, they were not hired by Oakwood to

21   engage in any of this financial engineering.

22   Q.    Right.

23   So we have another failed pitch?

24   A.    Yes.

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2   Q.   Right?
3        Cross selling attempt No. 2 fails?
4   A.   Yes.
5   Q.   Okay.  And again, none of the
6   suggestions that are made here about -- what do
7   they say, exchange offers, and smaller facilities
8   with a flip up, and so on, none of those things
9   were done?
10  A.   That's correct.
11  Q.   Okay.  So there's no harm to anyone
12  from this presentation, other than in your view,
13  again, the absence of the recommendation of some
14  more drastic action.  This is just talk.
15  A.   I'm sorry, I -- could you repeat that.
16  Q.   All they did is they come down and say
17  we'd like to talk to you again about what we can
18  do, here are some more ideas.  The company says,
19  no thanks, we're still not interested.
20       There's no harm from that, except in
21  your view from the failure to recommend something
22  more serious, right?
23  A.   Yes, with regard to the pitch.
24       The other aspect, as I mentioned, is
25  the -- are the ongoing securitizations and

130

---

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2   warehouse facility, which enabled the company to
3   keep on engaging in value destroying activities.
4   Q.   Right.
5   A.   But no other harm from the pitch
6   itself.
7   Q.   Okay.
8        MR. WICKES:  And then we'll mark this
9   as 504.
10       (Exhibit 504, Multipage document
11       entitled Oakwood Homes Discussion Materials,
12       March 2002, marked for identification, as of
13       this date.)
14       (Witness looks at document.)
15  Q.   What I've given you here is what we've
16  now marked as Exhibit 504.
17       Is this the presentation that you
18  discuss in Section VII.D.1.c of your report
19  beginning at page 32?
20  A.   Yes.
21       I do want to clarify, I don't recall --
22  you know, sitting here I don't recall.  At some
23  point there was a pitch regarding the B2 sale
24  and -- with guarantees, and I don't -- I don't
25  recall if it was in one of these pitches or not.

131

---

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2   Q.   All right.
3   A.   It may have been in the first pitch.
4   There was a B2 sale and that may have ultimately
5   led to the Lotus transaction.
6   Q.   But this document, Exhibit 504, this is
7   another pitch, right?
8   A.   Yes, it is.
9   Q.   And this is -- as you describe it, this
10  is in particular addressed to the fact that the
11  company has some notes coming due in 2004.  And it
12  suggests that there's a way to refinance those
13  notes, stretch them out to 2009 as a kind of
14  refinancing to take off the pressure of that
15  upcoming deadline.
16  A.   That's correct.
17  Q.   And again, so far as we know what the
18  company says in response to this proposal is no
19  thanks.
20  A.   Yes.
21  Q.   Right.
22       So nothing happens as a result of 504?
23  A.   That's correct.
24  Q.   Okay.  And, in fact, then in August of
25  2002 for the first time CSFB actually does engage

132

---

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1
2   Mr. Felt's group.  Let me show you --
3        MR. CASTANARES:  Oakwood, I think you
4   meant to say.
5        MR. WICKES:  Oakwood, I'm sorry.
6        What did I say?
7        MR. CASTANARES:  You said CSFB.
8        MR. WICKES:  I'm trying to do too many
9   things.
10       This would be 505, I think.
11       Would you mark this as 505.
12       (Exhibit 505, Multipage document
13       entitled Oakwood Homes Corporation,
14       Presentation to the Board of Directors, dated
15       8/19/02, marked for identification, as of
16       this date.)
17  Q.   I've given you what we've marked as
18  505.  This is called a "Presentation to the Board
19  of Directors, August 19th, 2002."
20       This is pitch document No. 4, right?
21  A.   Yes.
22  Q.   As a result of this pitch Mr. Felt's
23  group actually is retained to help the company get
24  ready for Chapter 11.
25  A.   Yes.

133

ALAN SHAPIRO

1  Q.   And there's some discussion here of

2  what kinds of things might happen in a Chapter 11

3  of the company.

4  A.   Yes.

5  Q.   And, in fact, we know that in November

6  of 2002 Oakwood actually files for a Chapter 11

7  bankruptcy.

8  A.   Yes, that's right.

9  Q.   And I think you've told us that you're

10 not critical of the advice and work that's done by

11 CSFB pursuant to the August 2002 retention and the

12 preparation for what was the ultimate bankruptcy

13 filing.

14 A.   Yes. I've not analyzed that, but from

15 what I've seen I have no criticisms of it.

16 Q.   All right. So is it fair to say,

17 Professor, that the sum of your opinion here is

18 that CSFB should have at least a year earlier than

19 it did advised Oakwood to make a bankruptcy filing

20 and should have refused to continue the

21 securitization and warehouse facilities so as to

22 force that decision on the company?

23 MR. CASTANARES: Objection to form.

24 A.   Well, again, I didn't -- I did not say

134

ALAN SHAPIRO

1  period, you know, always hoping for, you know,

2  things would be better tomorrow, I guess.

3  Q.   So Oakwood through its management and

4  directors has decided during this period of

5  time -- to adopt your characterization of a wait

6  and see attitude -- has decided to hope things get

7  better, whatever it's decided.

8  Is it your opinion, Professor, that it

9  was the duty of CSFB to substitute its judgment

10 about those matters for the judgment of the board

11 of directors and the management of Oakwood?

12 A.   It's not my opinion. As I said, I'm --

13 what I'm assuming is that CSFB owed a fiduciary

14 obligation to the company, and under the

15 circumstances that means the creditors of Oakwood.

16 It did not owe a duty to the directors and

17 management.

18 Unless the directors and management

19 gave additional information, facts, analysis to

20 CSFB that would lead it to change its opinion as

21 to the existence of economic insolvency, or the

22 trade-offs associated with a stay the course, or a

23 wait and see type policy versus some type of

24 dramatic restructuring, such as a sale or a

25

136

ALAN SHAPIRO

1  specifically that CSFB should have advised filing

2  for bankruptcy. What CSFB should have done is

3  done an extensive analysis of Oakwood's situation

4  to study the various alternatives. First of all,

5  in each one of these presentations, if you look at

6  it, CSFB's own analysis shows that Oakwood is

7  deeply economically insolvent. And so from that

8  standpoint should have assessed what alternatives

9  were available to Oakwood, look at the pluses and

10 minuses and make some recommendations.

11 If -- I think there should have been

12 some type of dialogue with Oakwood. You know,

13 what the appropriate alternatives should have

14 been, I don't know and I don't think we'll ever

15 know because no such analysis was ever done at the

16 time with the facts then available. They might

17 have gone out and gathered additional facts in the

18 process of doing their analysis.

19 I mentioned several alternatives

20 already. There's no need to repeat myself on

21 that. But the one thing I don't think that they

22 should have done was maintain business as usual.

23 In effect implicitly ratify the wait and see

24 policy that, in fact, Oakwood followed during this

25

135

ALAN SHAPIRO

1  bankruptcy. Those are not mutually exclusive,

2  necessarily. I think that CSFB knowing what it

3  knew should have cut off the company, even if

4  management, you know, wanted to follow such a stay

5  the course policy. Again, because it's -- if it

6  has a fiduciary obligation it's to the company,

7  not to management or the directors. You know, the

8  management and directors may well have failed

9  their fiduciary obligation as well. I was not

10 asked to render an opinion in that regard. But

11 even if they did, that's no reason for CSFB to

12 violate any fiduciary obligation that it may have

13 owed to the company and its creditors.

14 Q.   Well, we know, don't we, that the board

15 of Oakwood owed a fiduciary duty to the company?

16 A.   Yes.

17 Q.   And as you said, in the academic

18 literature and maybe or maybe not even in the law

19 there's some discussion about whether that

20 fiduciary duty moves from being owed primarily to

21 shareholders and onto creditors by the directors,

22 right?

23 A.   Yes.

24 Q.   But it's the job --

25

137

ALAN SHAPIRO

1  Would you agree with me from an
2  economic point of view that it's the job of the
3  directors to be making that judgment as time goes
4  along about where their duties lie and how they
5  should best carry out those duties?
6  A.   Yes --
7  Q.   Okay.
8  A.   -- I agree with that.
9  Q.   Here we know what the directors were
10  deciding.
11  My question to you is, is it your
12  opinion that the reasonable and reasonably prudent
13  course for CSFB to have followed was to substitute
14  its judgment on these matters for the judgment of
15  the directors?
16  A.   I believe so.  Given that CSFB is the
17  financial expert here it has a particular
18  financial expertise.  And as I said, there may
19  well have been a failure on the part of the board
20  of directors and management to exercise their
21  fiduciary obligation to the company, but that's no
22  reason for CSFB not to exercise its fiduciary
23  obligation.
24  And to the extent that CSFB sees that

138

ALAN SHAPIRO

1  this is an economically insolvent company engaged
2  in value destroying activities, regardless of what
3  management wanted to keep doing I think that CSFB
4  should have exercised its independent judgment.
5  It may not make it very popular with
6  the company, but if you have a fiduciary
7  obligation your job is not to be popular, but to
8  follow that obligation wherever it may take you.
9  Q.   I think we've agreed, have we, that so
10  far as you've been able to determine there was no
11  factual information about Oakwood, its business,
12  or its prospects that CSFB had that was not also
13  available to the company?
14  A.   As far as I know, that's correct.
15  Q.   And I think we've -- I think we've
16  agreed that you simply don't know anything at all
17  about what financial or other expertise there was
18  amongst the members of the board of directors?
19  A.   That's correct.
20  Q.   Okay.  Do you know whether the board of
21  directors was getting advice from anyone other
22  than CSFB during 2001 and 2002?
23  A.   I don't know.  I think -- who was it --
24  FTI that was brought in later in 2002, so...

139

ALAN SHAPIRO

1  But prior to that I don't -- I'm not
2  aware of anybody else providing financial advice
3  to Oakwood or its board of directors or
4  management.
5  Q.   Okay.  And we don't really know -- I
6  think we've agreed -- how the world would have
7  turned out differently if some different course of
8  action had been followed starting in 2001.
9  A.   That's correct.
10  Q.   Okay.  Did you make any attempt in your
11  research, in your preparation of this report, to
12  see, to research, to determine what other
13  investment banking companies faced with similar
14  situations did or didn't do?
15  MR. CASTANARES:  Objection to form.
16  A.   No, I have not.
17  Q.   There were a number of companies in the
18  manufactured housing industry that during this
19  period of time were experiencing many of the same
20  difficulties that Oakwood was; is that correct?
21  A.   That's correct.
22  Q.   Do you know whether those companies had
23  financial advisers?
24  A.   I don't know anything specifically.  I

140

ALAN SHAPIRO

1  assume they probably did, but I don't know.
2  Q.   Those other companies in the
3  manufactured housing industry all would have been
4  running securitization programs, weren't they?
5  A.   I believe they would have.
6  Q.   Okay.
7  A.   Again, I don't know that for a fact,
8  but it would make economic sense.
9  Q.   Did you make any determination -- any
10  effort to determine whether the securitization
11  advisers for any of those other companies shut off
12  the securitization in the way you're suggesting
13  CSFB should have done here?
14  A.   No.  And that wouldn't necessarily be
15  determinative or affect my opinion in any case,
16  because the facts and circumstances of each
17  company I presume would be unique.
18  MR. WICKES:  Okay.  Get me this one,
19  tab 19.
20  506, please.
21  (Exhibit 506, Multipage document
22  entitled Credit Suisse First Boston
23  Compliance Manual, marked for identification,
24  as of this date.)

141

ALAN SHAPIRO

1   Q.    Professor, I've handed you what we've
2   marked as Exhibit 506.
3       I want you to tell me whether that is
4   the CSFB compliance manual that is referred to in
5   your report on pages 27 and 28.
6       (Witness looks at document.)
7   A.    It looks like it.
8   Q.    Okay. And you make reference in
9   your -- on page 28 to the so called know your
10  customer rule that's described in this account --
11  in this document in Section 5 starting on the page
12  that's Bates numbered 53089.
13  A.    Yes.
14  Q.    Okay. What kind of customers are the
15  subject of those rules?
16      MR. CASTANARES:  Objection to form.
17  A.    In this case it would refer to retail
18  customers, customers for stocks and bonds that the
19  company might sell.  I guess investment accounts.
20  Q.    The know your customer rules apply to
21  retail accounts at a broker-dealer, right?
22  A.    Yes.
23  Q.    Does this manual apply in any respect
24  to the relationship with a company like Oakwood

142

ALAN SHAPIRO

1   and the services Mr. Felt was providing?
2   A.    Well, it doesn't -- I think the know
3   your customer rule from a legal standpoint, my
4   best understanding is that it only applies to
5   accounts at broker-dealers.  What I'm doing is
6   using the notion of know your customer and saying
7   that's a good rule for all transactions.
8   Q.    Ah.  So you're taking the retail
9   account know your customer rule and suggesting
10  that it should be applied here to the relationship
11  between CSFB and Oakwood that Mr. O'Driscoll was
12  managing because it's a good rule?
13  A.    It's a good guideline to follow.
14  Q.    In your -- in the materials that you
15  have reviewed do you see any indication that CSFB
16  did not understand the financial situation at
17  Oakwood?
18  A.    I would say quite the contrary.  I
19  believe that CSFB did understand the financial
20  situation, and that's why I think it was
21  inappropriate for it to continue with the
22  securitization program and the warehouse lending
23  facility on an as-is basis.
24  Q.    You just think --

143

ALAN SHAPIRO

1   A.    Now that being said, I think one of --
2   I think either Mr. Muir or Mr. Standish, I make a
3   reference to this, who say that -- who argue that
4   CSFB did not understand their situation.  But my
5   assessment is that CSFB did understand its
6   customer.
7   Q.    Okay. And they came to --
8       And you think they should have come to
9   and shared with Oakwood a different conclusion
10  about what actions Oakwood should have been taking
11  starting sometime in 2001?
12  A.    Yes.  The know your customer rule,
13  which I think is in general a good idea, the
14  purpose is not to get to know your customer,
15  per se, but that's a means to an end, which is to
16  provide reasonable advice given their economic
17  circumstances.  You first have to know your
18  customer in order to be able to give reasonable
19  advice.
20  Q.    Right.
21      And your opinion here is that CSFB did
22  know its customer and failed to give it the advice
23  you think they should have given it?
24  A.    Yes.  And helped facilitate behavior

144

ALAN SHAPIRO

1   that I think was destructive of economic value.
2   Q.    To an extent that is today impossible
3   to measure?
4   A.    I wouldn't say it's impossible to
5   measure.  I have not done that.  Financial
6   economists have a variety of techniques where you
7   can get an estimate.  You're never going to be --
8   get a perfect answer, but you can get -- come up
9   with realistic approximations.
10      I've not -- I was not asked to do that
11  and have not done that, and I've seen no other
12  work that anybody has attempted to do in that
13  regard.
14      MR. WICKES:  Okay.  Let's take a short
15  break.
16      MR. CASTANARES:  Sure.
17      THE VIDEOGRAPHER:  Going off the record
18  at 3:04.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  Back on the record
21  at 3:13.
22      MR. WICKES:  Before I continue I just
23  want to briefly say on the record we received
24  sometime last week Dr. Shapiro's supplemental

145

ALAN SHAPIRO

report. And we've indicated in
correspondence with counsel that we expect to
have some proceedings before the court about
that. And we've indicated that because of
the timing when we received it we didn't
think we would be prepared to examine
Dr. Shapiro about it today.

However, since we have covered most of
what we want to cover with respect to the
principal report, and since it's only about
3 o'clock in the afternoon, I'm going to ask
Dr. Shapiro a few questions about this
report. I will reserve in full our rights to
proceed in front of the court, as we've
suggested.

I don't ask, Tony, that you agree to
any of that. I just want to say that by
asking the doctor a few questions about this
supplemental report I don't intend thereby to
waive any positions we may have with respect
to his report.

MR. CASTANARES: I'll just say that I
recognize there has been correspondence
regarding this matter and I have not been

146

---

ALAN SHAPIRO

supplemental report; is that right?

A. That's correct.

MR. WICKES: Let's just mark for
identification Exhibit 507.

(Exhibit 507, Eight-page document
entitled Supplemental Report of Alan C.
Shapiro, Ph.D., dated 8/28/07, marked for
identification, as of this date.)

Q. Is that your supplemental report of
August 28th, 2007?

A. It is.

Q. All right. When were you first asked
to prepare a supplemental report in this matter?

A. Well, it wasn't quite like that. I
wasn't asked outright to prepare a supplemental
report.

The way it took place is I was told
that a case had recently come down which pointed
to the importance of looking at market data. And
I was sent a copy of the judge's decision in the
case, Campbell, and I reviewed the case and said I
agree with the judge. I was asked how difficult
would it be to do a market value analysis on the
company to determine whether it was economically

148

---

ALAN SHAPIRO

party to the correspondence. I believe a
letter came to you from my office yesterday,
which I have been unable to open up on my
BlackBerry and I therefore don't know what it
says. However, I can imagine, but --

MR. WICKES: Well, we have it. I can
tell you -- I can I think fairly paraphrase
the letter as saying we will huff and we will
puff and we will blow your house down.

MR. CASTANARES: Yeah, similar to your
letter in response.

However, I will say this, I don't
believe you have any rights to reserve. But
let us just agree that neither anything you
say now or anything I say either creates or
waives any rights that we might have and have
at it.

MR. WICKES: Fine.

MR. CASTANARES: Good.

MR. WICKES: All right.

BY MR. WICKES:

Q. Dr. Shapiro, sometime after the
completion of your report that we've been talking
about as Exhibit 501 you were asked to prepare a

147

---

ALAN SHAPIRO

insolvent. And I pointed out that's pretty much
bread and butter for a financial economist.

And so I asked would you like me to
write such a report?

Because obviously it was going to cost
the client money. And I don't recall who it was,
whether it was -- I really don't recall who gave
the go ahead, but somebody gave me the go ahead.
And so I went ahead and wrote the report.

Now, when was I -- as I said, it
started with my receipt of the Campbell case. And
that was maybe two months ago, or so, or
thereabouts. Maybe three months, I'm not -- I'm
not sure. I've been very busy the last few
months. I don't have a good picture.

Q. Who first called the Campbell case to
your attention?

A. Again, somebody from Stutman. I don't
recall, it may have been Scott, it may have been
Steve, Steve Ray. Maybe Mr. Castanares, I just
don't remember.

Q. Two or three months ago and you don't
remember who you had the conversation with?

A. I tell you one of the unfortunate

149

ALAN SHAPIRO

1  aspects of getting older is I have a lousy memory,
2  a truly lousy memory.
3
4     Q.   Now, originally your assignment was to
5  simply take as an assumption Mr. --
6  Dr. Tennenbaum's conclusion that the company was
7  insolvent whenever it was, by
8     A.   September --
9     Q.   -- by September of 2001.
10    A.   -- of '01.
11        Is there a question or can I comment?
12    Q.   I'm just -- I'm working on a question.
13    A.   Okay.
14    Q.   Memory is not the only thing that goes
15  when you get older.
16        Why was it that if the judgment was
17  made that there was a different kind of solvency
18  analysis needed that it wasn't Dr. Tennenbaum's
19  job to do that?
20    A.   Oh.  First of all, I want to say that I
21  didn't just accept Dr. Tennenbaum's conclusion on
22  faith.  I did look -- I did review his report --
23  well, I went through this before.
24    Q.   Right.
25    A.   I looked at some other information.  I

---

ALAN SHAPIRO

1  also saw that effectively, you know, CSFB, as I
2  mentioned, did several solvency analyses in its --
3  in the various pitches that Mr. Felt made.
4        But with regard to your question, I
5  have no idea why -- well, I guess I do have an
6  idea.  I guess the idea is that rather than me
7  rely on -- just on Mr. Tennenbaum's conclusion,
8  that I guess it would strengthen my opinion if I
9  actually looked at market data to come to that
10  conclusion, that's my supposition.  But other than
11  that, I don't know.
12    Q.   Well, when --
13    A.   They didn't explain it to me.
14    Q.   When you got called by whoever it was
15  you can't remember who called you and they said
16  we'd like you to take a look at valuation from
17  this other perspective, did you not say, well,
18  isn't that Dr. Tennenbaum's job?
19    A.   No.  I mean, this is something I was
20  interested in.  And as I said, market value
21  analyses are bread and butter for financial
22  economists.
23    Q.   I guess we could conclude, couldn't we,
24  that your financial incentives would have been

---

ALAN SHAPIRO

1  consistent with your preparing a supplemental
2  report in the ways we talked about financial
3  incentives before?
4     A.   That's correct.
5     Q.   Okay.  And one of the things you tell
6  us in this supplemental report is that during 2001
7  and 2002 the company's ten-year publicly traded
8  bond was trading at about 40 percent of its face
9  value, right?
10    A.   Yes.
11    Q.   And that means, if I understand it,
12  that that reflects what the market thought the
13  value of those bonds was, taking into account the
14  likelihood of eventual repayment and interest
15  rates and the other things that affect value; is
16  that right?
17    A.   Yes.
18    Q.   Okay.  Now, assume with me -- I think
19  you said you don't know what the ultimate recovery
20  of the bondholders has been in the bankruptcy
21  case; is that right?
22    A.   That's correct.
23    Q.   Okay.  Then assume with me, if you
24  will, that the ultimate recovery of the

---

ALAN SHAPIRO

1  bondholders in the Oakwood bankruptcy case was
2  between 45 and 50 cents on the dollar, okay?
3     A.   Okay.
4     Q.   Okay?
5        As opposed to the 40 cents on the
6  dollar that it was trading at in 2001, okay?
7     A.   Okay.
8     Q.   All right.
9     A.   You say you recovered between 40 --
10    Q.   45 and 50.  Just assume --
11    A.   -- 45 and 50 cents?
12    Q.   Okay.
13    A.   Okay.
14    Q.   Doesn't that tell us that the value of
15  the enterprise increased rather than decreased
16  between 2001 and 2007?
17    A.   Well, not necessarily.  First of all,
18  I'd like to know what happened to -- there's a
19  time value of money.  What happened to all the
20  accrued interest between 2001 and 2007.  In other
21  words, it makes a real difference whether you get,
22  say, 45 cents today or get it two years down the
23  road.
24    Q.   Right.

ALAN SHAPIRO

A. Now that's one thing.

For another thing it may well be -- well, market expectations play a critical role in asset pricing, bonds, stocks, and so on. And it may well be that the market was heavily -- more heavily discounting the bonds because it anticipated that the company would persist in its value destroying activities. And once the company was put into bankruptcy and started to be run on behalf of creditors as opposed to on behalf of shareholders, it could well be in the process of -- you know, since the market had anticipated the continuance of value destroying activities and now that was ended the value would go up.

Q. Do you know whether that's the case?

A. No. I'm just saying that it's not automatically the case that the enterprise just happened to increase in value. It could well be that value destroying activities were ended and that would have the same effect on the value of the enterprise, namely it would increase the market's estimate of the enterprise's valuation.

Q. There wasn't anything to the best of your knowledge secret, was there, about what

154

ALAN SHAPIRO

the second quarter of 2000, it became insolvent. I can't give you a better estimate because I only have quarter end data on the debt on the balance sheet.

Q. So sometime between March 30th and June 30th of 2000 the company went from being solvent to insolvent in your opinion?

A. Yes.

Q. You've used repeatedly today the expression economically insolvent, do you mean by that something different from what Mr. Castanares and I would mean by just saying insolvent?

MR. CASTANARES: Why don't you tell him what you mean.

A. Well, when I say economically insolvent I mean that the market value of the enterprise is less than the face value of its debt, that's what I mean by economically insolvent. You may -- I've heard terms such as cash flow insolvent, and so on. This is the definition that I'm using.

Q. I'm sorry, tell me that definition again.

A. Market -- that when the market value of the enterprise is less than the face value of the

156

ALAN SHAPIRO

Oakwood was doing with its business in 2001 and 2002?

A. Not as far as I know.

Q. Okay. And there wasn't anything secret about the role that CSFB was playing with respect to the securitizations and the warehouse?

A. No.

Q. Those facts were known to the market. In fact, as I think you've just said, you characterized them as value destroying activities, but you said you think the market probably reflected that it knew those activities were going on and was taking them into account.

A. That's correct.

Q. Okay. Do you now have an opinion about when Oakwood became insolvent or do you now back up to June 30th, 2000 your opinion as to when the company was insolvent?

A. Sure.

The company was economically insolvent no later than 6/30/2000. I don't know just when it became economically insolvent. You know, the data indicate that it was solvent as of the end of March 2000. Sometime during that quarter, during

155

ALAN SHAPIRO

enterprise's debt that enterprise is economically insolvent.

Q. So whenever --

Is it correct to say from that, that in your view whenever a corporation's debt is trading at a more marginal discount to its face value that the corporation is economically insolvent?

A. No.

Q. I'm sorry, I thought that's what you just said.

A. No, I said the market value of the enterprise. And the market value of the enterprise is equal to the market value of the claims against that enterprise. And those claims come in the form of debt and equity. So as long as the market value of the equity is greater than the discount on the -- in the market value of the debt, I would say that enterprise still is economically solvent.

Q. If debt has the first claim on the assets why would equity ever have a value greater than the discount on the debt?

A. Well, because there's some probability of bankruptcy. And meanwhile -- and the prospect

157

ALAN SHAPIRO

of bankruptcy means that equity starts acting much
more like a call option on the assets of the
business. And so part --

Q.    I'm sorry. Go ahead.

A.    Part of the value of the debt is the
value of that call option on the assets of the
company, so...

Well, maybe I ought to let you ask
another question, if there is.

Q.    I understand that there -- I think I
understand. And I know this is a lawyer trying to
understand economics, which is always difficult.

But as I understand it in economic
theory, the reason that the value of the equity
never goes below zero is that it's always got some
option value.

A.    Yes.

Well, it doesn't go below -- the
reason -- no, the real reason it never goes below
zero is because of limited liability. If there
were unlimited liability it could well go below
zero.

Q.    The reason it doesn't -- the reason a
company's equity retains some value, no matter how

158

ALAN SHAPIRO

insolvent the company is, is there is some option
value there?

A.    Well, it could be zero. It could be
deep enough that there's absolutely --

Q.    Correct.

A.    -- no value. But the reason that it --
ordinarily it maintains some value, even if a
penny or two, is because of the option value, the
possibility that something may turn around.

Q.    When the market value of the company,
which is the sum of the market value of its debt
and the market value of its equity, is below the
face amount of the debt that's when the company is
economically insolvent?

A.    Yes.

Q.    Okay. And is it your opinion that
whenever that point is reached it is the
responsibility of people who are dealing with the
company -- third parties who are dealing with the
company to stop allowing the company to continue
on the course it's been?

A.    No. It depends whether they have a
fiduciary obligation to that company or not. If
they have no fiduciary obligation, then they can

159

ALAN SHAPIRO

act in their own self interest.

Q.    Well. I thought you told me that the
assumption that you made that CSFB had a fiduciary
duty actually didn't change your conclusion about
CSFB's performance.

A.    Right. What I said is that if CSFB did
not have a fiduciary obligation, the fact that it
continued to facilitate value destroying
activities means that it did not behave in a
reasonable or a reasonably prudent manner.
Whether that has any legal significance is a
totally different issue.

MR. WICKES: All right. Could you read
that answer back to me.

(Record read.)

Q.    Now, there were other parties who would
have also been in 2001 in a position to cause
Oakwood to stop operating the way it was
operating; isn't that right?

A.    There may have been. I really
didn't -- didn't look at that.

Q.    Well, they're in the business of
manufacturing mobile homes, right?

A.    Yes.

160

ALAN SHAPIRO

Q.    So they need to buy raw materials to do
that with.

A.    That's correct.

Q.    And their raw material suppliers are
presumably supplying those materials on some kind
of trade credit terms.

A.    Yes.

Q.    And if a major supplier of -- I don't
know what they used -- aluminum refused to
continue to sell aluminum to the company that
would have had the same effect as stopping the
securitizations, wouldn't it?

A.    That could well be the case provided
that there were no other suppliers willing to step
in.

Q.    Okay. So was it -- would it have been
the duties of the raw material suppliers to stop
extending trade credit to the company?

A.    I'm not saying that anybody had a
fiduciary obligation. I'm just -- I'm making that
assumption that CSFB had a fiduciary obligation.
And to the extent that it did, then I think it did
not carry it out - carry that fiduciary
obligation out. If it had no fiduciary

161

ALAN SHAPIRO

1  obligation, then whatever it did is quite
2  irrelevant, I think.
3
4      Q.    Okay. How do we know that had CSFB
5  stopped providing the warehouse and securitization
6  facilities that some other financial institution
7  wouldn't have stepped in to do it?
8      A.    Well, I don't know that for sure. I
9  did see in one or two of the depositions some
10 statement to the effect that it was difficult to
11 replace B of A or they were having some
12 difficulty, I think. Whether somebody else would
13 have stepped in if they had gotten the
14 securitization business along with the requirement
15 to provide a warehouse facility, in other words,
16 some type of tie in, that may be the case. I
17 don't know. I don't know if somebody would have
18 stepped in or not.
19     Q.    Did you make any attempt to determine
20 whether there would have been alternative
21 financing available?
22     A.    No.
23           MR. WICKES:  That's all I have. Thank
24     you, Doctor.
25           THE WITNESS:  Thank you.

162

ALAN SHAPIRO

1           MR. CASTANARES:  I have a couple of
2      questions for Dr. Shapiro.
3  EXAMINATION BY
4  MR. CASTANARES:
5      Q.    Dr. Shapiro, in preparing -- in doing
6  the work preparatory to the creation of your
7  supplemental report did you attempt to follow the
8  methodology set forth in the Campbell Soup case?
9      A.    I did.
10     Q.    And did that methodology involve as a
11 first step determining the market value of a share
12 of the company multiplied by the number of the
13 shares outstanding?
14     A.    It did.
15     Q.    And did you have a source of data
16 available to you to determine the market value of
17 a share of the company?
18     A.    Yes.
19     Q.    What was that source?
20     A.    The CRISP database, that's the Center
21 for Research in Securities Prices at the
22 University of Chicago.
23     Q.    Is that a source that is generally
24 relied upon by professionals in your business?

163

ALAN SHAPIRO

1      A.    Yes, it is.
2      Q.    Is it a source generally available to
3  members of the public who might wish to obtain
4  that information?
5      A.    Yes.
6      Q.    And did you consider it reliable at the
7  time.
8      A.    I did.
9      Q.    And once you had that data from the
10 CRISP database, in order to perform that step of
11 the analysis was it necessary to do anything more
12 than multiply that number times the number of
13 shares outstanding?
14     A.    To come -- not to come up with a market
15 value of equity at each point in time.
16     Q.    And then was the next step then to
17 determine the market value of debt?
18     A.    Yes.
19     Q.    And was that determined by reference to
20 some data indicating the market value of the
21 company's debt?
22     A.    Yes.
23     Q.    What was the source of that data?
24     A.    I had data on the 2009 bond, which came

164

ALAN SHAPIRO

1  from a Web site run by J.P. Morgan.
2      Q.    And is that -- the data from that Web
3  site generally available to members of the public?
4      A.    Yes.
5      Q.    And is the data from that Web site
6  generally relied upon by people in your business?
7      A.    As far as I know.
8      Q.    And was the next step in the analysis
9  then to multiply that figure times the face value
10 of the company's debt outstanding?
11     A.    Yes, with the assumption that since I
12 didn't have market prices for the 2004 maturing
13 debt I assumed that it was the same. And that
14 assumption was supported by the data provided by
15 CSFB on three particular dates in 2001 and 2002,
16 which showed that both bonds were trading at
17 virtually identical discounts.
18     Q.    All right. And was the next step in
19 the analysis then to add together the two numbers
20 which were the figure you had found for the market
21 value of the equity plus the market value of the
22 debt?
23     A.    Yes.
24     Q.    And was the final step in the analysis

165

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1  then to compare that figure with the face value of
2  the company's debt outstanding?
3      A.    That's correct.
4      Q.    And did you determine the face value of
5  the company's debt outstanding from publicly
6  available documents?
7      A.    Yes, its various quarterly findings.
8      Q.    All right. And did that then lead you
9  to a conclusion as to whether or not this method
10 of valuation corroborated your reliance upon
11 Dr. Tennenbaum's opinion of the company's
12 insolvency in September of 2001?
13     A.    It did.
14     Q.    And in examining this data further did
15 it occur to you to test it further to see whether
16 or not the data would support conclusions as to
17 company -- the company's solvency or insolvency at
18 times other than 2001?
19     A.    Yes. I wanted -- Dr. Tennenbaum did
20 his analysis as of September 2001 just to make
21 sure that it wasn't, you know, some happenstance
22 or some -- or a result of the particular cash flow
23 forecast that he had at that time. I wanted to --
24 in other words, that it wasn't just a fluke of the

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1  data, I went ahead and looked at prior data as
2  well.
3          And based on that determined that as
4  far back as June 30th, 2001 Oakwood would have
5  been economically insolvent. And that supported
6  my use -- or corroborated my use of
7  Dr. Tennenbaum's conclusion.
8      Q.    Right.
9          In examining Dr. Tennenbaum's report --
10 now aside from the market data approach suggested
11 by the Campbell Soup case, but just in examining
12 Dr. Tennenbaum's report at an earlier time, in
13 terms of making your opinion based upon the
14 assumption of his conclusion of insolvency in
15 September of 2001, did you examine the studies
16 that he undertook to reach that conclusion?
17     A.    I did.
18     Q.    And did you have any difficulty
19 following the steps that Dr. Tennenbaum had taken
20 in that analysis?
21     A.    No.
22     Q.    Did you -- were you able to determine
23 from his report whether or not the analysis that
24 he undertook was of the type commonly used by

ALAN SHAPIRO

1  professionals in your business?
2      A.    Yes.
3      Q.    Was it?
4      A.    It was.
5      Q.    Did you see anything in
6  Dr. Tennenbaum's report that you were unable to
7  understand?
8      A.    No.
9          MR. CASTANARES:  I have no further
10     questions.
11         MR. WICKES:  Nothing further.
12         MR. CASTANARES:  Thank you.
13         THE WITNESS:  Thank you.
14         MR. CASTANARES:  Let's go off the TV
15     record anyway. And on the audio record at
16     least --
17         THE VIDEOGRAPHER:  Going off the
18     record, end of tape 3 at 3:42.
19         MR. CASTANARES:  Whatever our usual
20     stipulation is as to signing time, and so
21     forth. I forget what we agreed upon,
22     whatever it is.
23         MR. WILLIAMSON:  The court reporter
24     will send it to you for him to sign and then

05/09/2007 SHAPIRO, ALAN C. (Proofed)

ALAN SHAPIRO

1  we hold onto the original signature.
2          MR. CASTANARES:  Oh, good.
3          Off the record.
4          (Time noted:  3:43 p.m.)
5
6          ALAN C. SHAPIRO
7  Subscribed and sworn to before me
8  this _____ day of _____, 2007.
9
10 _____
11 (Notary Public)          My Commission Expires:

**Page 170**

```
 1
 2                · · ·
 3        ACKNOWLEDGEMENT OF DEPONENT
 4      I, _____, do hereby
 5   acknowledge that I have read and examined the
 6   foregoing testimony, and the same is a true,
 7   correct and complete transcription of the
 8   testimony given by me, and any corrections appear
 9   on the attached Errata sheet signed by me.
10
11
12
13
14   _____      _____
15   (DATE)                  (SIGNATURE)
16
17
18
19
20
21
22
23
24
25
```

**Page 172**

```
 1
 2           C E R T I F I C A T E
 3   STATE OF NEW YORK  )
 4                      : ss.
 5   COUNTY OF NEW YORK )
 6
 7        I, DONALD R. DePEW, a Registered
 8   Professional Reporter, Certified Realtime Reporter
 9   and Notary Public within and for the State of
10   New York, do hereby certify:
11        That ALAN C. SHAPIRO, the witness whose
12   deposition is hereinbefore set forth, was duly
13   sworn by me and that such deposition is a true
14   record of the testimony given by the witness.
15        I further certify that I am not related
16   to any of the parties to this action by blood or
17   marriage, and that I am in no way interested in
18   the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set
20   my hand this 17th day of September, 2007.
21
22                DONALD R. DePEW, RPR, CRR
23
24
25
```

**Page 171**

```
 1
 2   WITNESS: _____
     DATE(S): _____
 3   CASE: _____
     I wish to make the following changes, for the
 4   following reasons:
 5   PAGE LINE ___ ___
           CHANGE FROM:_____
 6         CHANGE TO: _____
 7   REASON:_____
           CHANGE FROM:_____
 8         CHANGE TO: _____
 9   REASON:_____
           CHANGE FROM:_____
10        CHANGE TO: _____
11   REASON:_____
           CHANGE FROM:_____
12        CHANGE TO: _____
13   REASON:_____
           CHANGE FROM:_____
14        CHANGE TO: _____
15   REASON:_____
           CHANGE FROM:_____
16        CHANGE TO: _____
17   REASON:_____
           CHANGE FROM:_____
18        CHANGE TO: _____
19   REASON:_____
           CHANGE FROM:_____
20        CHANGE TO: _____
21   REASON:_____
           CHANGE FROM:_____
22        CHANGE TO: _____
23   _____
     Subscribed and sworn to before me this ____ day
24   of _____, 2007.
25   _____
```

**Page 173**

```
 1
 2              EXHIBITS
 3   NO    DESCRIPTION                        ID
 4   501                                      9
 5         Multipage document entitled
           Report of Alan C. Shapiro,
           Ph.D., dated 4/30/07
 6
 7   502                                      117
           Multipage document entitled
 8         Presentation to Oakwood
           Homes Corporation, dated
 9         6/26/01
10   503                                      128
           Multipage document entitled
11         Presentation to Oakwood
           Homes Corporation, dated
12         8/9/01
13   504                                      131
           Multipage document entitled
14         Oakwood Homes Discussion
           Materials, March 2002
15   505                                      133
           Multipage document entitled
16         Oakwood Homes Corporation,
           Presentation to the Board
17         of Directors, dated 8/19/02
18   506                                      142
           Multipage document entitled
19         Credit Suisse First Boston
           Compliance Manual
20
21   507                                      148
           Eight-page document
22         entitled Supplemental
           Report of Alan C. Shapiro,
23         Ph.D., dated 8/28/07
24
25
```

05/09/2007, SHAPIRO, ALAN C. (Proofed)

1
2                    INDEX OF WITNESS
3   ALAN C. SHAPIRO
4   BY MR. WICKES . . . . . . . . . . . . . .    4
5   BY MR. CASTANARES . . . . . . . . . . . .  163
6   REQUESTS:
7   Mr. Wickes  . . . . . . . . . . . . . . .   20
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

174

$

$400 [25:5]
$600 [25:3]
$7.5 [78:20]
$75 [110:20]
$800 [24:25]
$984,000 [25:8] [26:13]

0

01 [56:8] [92:23] [93:10,11]
  [126:18] [150:10]
02 [3:11] [56:9,15] [126:18]
0213396 [3:11]
02-13396 [3:11]

1

1 [3:7] [118:11,25]
1:34 [95:3,9]
10:15 [3:12]
10105 [2:13]
11 [133:24] [134:3,7]
11:39 [61:20]
11:55 [61:23]
117 [173:]
12 [72:10] [80:23]
12:44 [94:11,12]
128 [173:]
131 [173:]
133 [173:15]
1345 [2:12] [3:17]
13th [79:6]
14 [78:16]
142 [173:18]
148 [173:]
15 [20:12]
16 [86:6] [89:8] [95:14]
163 [174:5]
17 [30:23,24,25] [95:13,14]
  [100:4]
17th [172:20]
18 [101:9] [102:24]
19 [102:25] [105:2] [141:20]
1901 [2:6]
1980s [52:10]
1994 [31:4] [55:25] [78:2,10
  ,19] [92:13]
19th [105:3,16] [133:19]
1st [92:22]

2

2 [61:24] [117:6] [130:3]
2:10 [117:6]
2:18 [117:9]
20 [174:7]
2000 [31:10] [35:12] [37:2]
  [51:6] [57:9] [110:13]
  [155:18,25] [156:2,7]
2001 [35:12] [41:4] [70:6]
  [78:2] [85:22] [86:5] [90:5]

[91:5,13] [92:6,9,19] [99:19
  ,23] [104:4] [106:7,21]
  [115:4] [116:7,9,20] [117:
  19] [122:16] [124:19]
  [126:13] [127:2] [139:23]
  [140:9] [144:12] [150:9]
  [152:7] [153:7,17,21]
  [155:2] [160:18] [165:16]
  [166:13,19,21] [167:5,16]
2002 [51:6] [56:14] [59:6]
  [62:7] [100:6] [105:3,16,22]
  [106:7,21] [131:12] [132:25]
  [133:19] [134:7,12] [139:23
  ,25] [152:8] [155:3] [165:16]
  [173:14]
2004 [79:6] [132:11] [165:13]
2007 [3:12] [4:23] [16:7]
  [41:10] [148:11] [153:17,21]
  [169:9] [171:24] [172:20]
2009 [132:13] [164:25]
22 [107:17]
23 [109:7]
24 [110:12]
25 [3:15] [78:21]
26 [109:21]
26th [116:7,9,20] [117:18]
  [121:7] [122:8,16] [124:19]
  [127:21]
27 [62:19] [142:6]
28 [112:15] [142:6,10]
28th [148:11]
29 [113:7]

3

3 [5:17] [49:20] [54:21]
  [57:10] [62:3] [79:20]
  [117:9] [146:12] [168:19]
  [173:4]
3:04 [145:19]
3:13 [145:22]
3:42 [168:19]
3:43 [169:5]
30 [119:24]
30th [4:23] [16:7,22] [41:10
  ,25] [155:18] [156:6,7]
  [167:5]
31 [128:23]
32 [131:19]
36 [72:17]
38 [72:18]

4

4 [4:24] [5:17] [6:8] [26:25]
  [37:16] [49:20] [133:20]
  [174:4]
4/30/07 [3:4] [173:]
40 [152:9] [153:6,10]
400 [25:25]
45 [46:15] [153:3,11,12,23]
45th [3:15]

5

5 [142:12]
50 [153:3,11,12]
501 [3:2] [42:4] [11:18]
  [15:5] [20:23] [41:11,25]
  [54:21] [57:11] [62:3]
  [85:17] [147:25] [173:4]
502 [117:10,16] [173:]
503 [128:5,6,19] [129:5]
  [173:]
504 [131:9,10,16] [132:6,22]
  [173:]
505 [133:10,11,12,18]
  [173:15]
506 [141:21,22] [142:3]
  [173:18]
507 [148:5,6] [173:]
52956 [118:12]
53089 [142:13]
5th [3:12]

6

6/26/01 [117:12] [173:]
6/30/2000 [155:22]

8

8/19/02 [133:15] [173:17]
8/28/07 [148:8] [173:]
8/9/01 [128:8] [173:]
8hq [2:19]

9

9 [46:15]
90067 [2:7]
900676013 [2:7]
90067-6013 [2:7]

A

a.m [2:23]
abilities [98:5]
able [4:19] [83:20] [96:9]
  [112:20] [127:17] [139:11]
  [144:19] [167:23]
abs [54:8,18] [74:22] [100:
  25] [101:22] [102:4] [103:14]
  [106:25] [110:20]
absence [67:8] [130:13]
absent [32:10]
absolutely [33:6] [116:24]
  [159:5]
abss [74:15] [110:8]
academic [38:10,25] [39:8
  ,19,22] [40:17] [46:12]
  [49:9] [137:18]
accelerate [68:8] [120:10]
accelerated [120:7,12]
accept [33:17] [150:21]
accepted [32:4,15]

access [57:12,22] [58:11]
  [72:14] [80:24] [81:5,17]
  [83:9,15] [84:4] [85:24]
  [93:5] [109:10] [110:23]
accommodations [93:17]
  [94:2]
according [33:11] [78:10]
  [86:5] [88:3] [92:12] [116:
  7]
account [61:2] [142:11]
  [143:10] [152:14] [155:14]
accounts [142:20,22]
  [143:6]
accrued [153:21]
accruing [82:25]
accurate [80:9] [113:3]
acknowledge [170:5]
acknowledgement [170:3]
acquired [50:16]
acquisitions [52:5]
act [63:3] [119:20] [160:2]
acted [55:7,8,9] [120:20]
acting [63:7] [158:2]
action [12:12] [24:9] [98:21
  ,25] [99:7,10] [101:14]
  [102:13] [126:24,25]
  [130:14] [140:9] [172:16]
actions [102:15] [106:13]
  [127:7] [144:11]
activities [50:16] [74:10]
  [83:19] [120:4] [131:3]
  [139:3] [154:9,14,20]
  [155:12,13] [160:10]
activity [74:18]
actors [52:16]
actual [16:9] [76:17]
actually [12:11] [13:10,19,20]
  [14:7] [17:12] [34:25]
  [36:21,22] [41:16,18]
  [43:3] [63:17] [64:15]
  [65:3] [82:9] [84:13] [88:4]
  [89:15] [100:6] [105:7]
  [116:8,11,12] [118:4,12,14]
  [119:11] [120:13] [129:17]
  [132:25] [133:23] [134:7]
  [151:10] [160:5]
add [165:20]
addition [84:6] [109:8]
additional [45:10] [46:11]
  [125:5] [135:18] [136:20]
addressed [132:10]
addresses [39:22] [40:20]
adequately [19:25]
adopt [136:6]
adverse [63:3]
advice [56:20] [57:2] [59:11
  ,14,24,25] [60:3,5,16,18,23]
  [61:2,13] [63:7,9,16]
  [74:17] [84:9] [97:7] [100:
  18] [103:23] [106:4,9,10,17
  ,18,23] [107:7,12] [108:8]
  [112:25] [115:6] [127:7,10
  ,13] [128:13] [134:11]
  [139:22] [140:3] [144:17,20

,23]

advise [118:23] [120:2]

advised [59:3] [60:12]
[62:4] [134:20] [135:2]

advisement [20:18]

adviser [55:10] [56:11]
[62:6] [99:13] [100:5,11]
[105:4,15,21,24] [119:7]
[121:10]

adviser...in [59:5]

advisers [140:24] [141:12]

advising [62:17]

advisory [57:6] [113:21]

affect [6:15] [80:16] [141:16]
[152:16]

affected [48:9]

affirmatively [107:12]

afforded [57:12]

afternoon [146:12]

again [8:11] [26:25] [32:13]
[36:11,23] [39:10] [47:20]
[53:18] [57:10] [66:15]
[81:22] [88:10,24] [91:8]
[102:25] [103:22] [107:10]
[109:17] [114:22] [124:15]
[129:7,16] [130:5,13,17]
[132:17] [134:25] [137:6]
[141:8] [149:19] [156:23]

against [24:9] [75:9] [157:15]

agent [55:8,16]

aggregated [82:2]

ago [20:12] [22:4] [50:14]
[69:24] [76:22] [149:13,23]

agree [60:9] [66:5,12]
[102:3,9] [109:25] [113:2,11]
[114:12] [118:7] [138:2,9]
[146:17] [147:15] [148:23]

agreed [28:20] [95:15]
[139:10,17] [140:7] [168:22]

agreement [105:5,16,25]
[122:4]

ah [89:17] [92:10] [143:9]

ahead [149:9,10] [158:5]
[167:2]

al [3:9,10]

alan [3:1,3,8] [4:1] [6:1]
[7:1] [8:1] [9:1] [10:1]
[11:1] [12:1] [13:1] [14:1,9]
[15:1] [16:1] [17:1] [18:1]
[19:1] [20:1] [21:1] [22:1]
[23:1] [24:1] [25:1] [26:1]
[27:1] [28:1] [29:1] [30:1]
[31:1] [32:1] [33:1] [34:1]
[35:1] [36:1] [37:1] [38:1]
[39:1] [40:1] [41:1] [42:1]
[43:1] [44:1] [45:1] [46:1]
[47:1] [48:1] [49:1] [50:1]
[51:1] [52:1] [53:1] [54:1]
[55:1] [56:1] [57:1] [58:1]
[59:1] [60:1] [61:1] [62:1]
[63:1] [64:1] [65:1] [66:1]
[67:1] [68:1] [69:1] [70:1]
[71:1] [72:1] [73:1] [74:1]
[75:1] [76:1] [77:1] [78:1]

[79:1] [80:1] [81:1] [82:1]
[83:1] [84:1] [85:1] [86:1]
[87:1] [88:1] [89:1] [90:1]
[91:1] [92:1] [93:1] [94:1]
[95:1] [96:1] [97:1] [98:1]
[99:1] [100:1] [101:1]
[102:1] [103:1] [104:1]
[105:1] [106:1] [107:1]
[108:1] [109:1] [110:1]
[111:1] [112:1] [113:1]
[114:1] [115:1] [116:1]
[117:1] [118:1] [119:1]
[120:1] [121:1] [122:1]
[123:1] [124:1] [125:1]
[126:1] [127:1] [128:1]
[129:1] [130:1] [131:1]
[132:1] [133:1] [134:1]
[135:1] [136:1] [137:1]
[138:1] [139:1] [140:1]
[141:1] [142:1] [143:1]
[144:1] [145:1] [146:1]
[147:1] [148:1,7] [149:1]
[150:1] [151:1] [152:1]
[153:1] [154:1] [155:1]
[156:1] [157:1] [158:1]
[159:1] [160:1] [161:1]
[162:1] [163:1] [164:1]
[165:1] [166:1] [167:1]
[168:1] [169:1,7] [172:11]
[173:5,22] [174:3]

alignment [71:3]

allen [10:2,10] [11:5]

a-l-l-e-n [10:2]

allowing [159:21]

almost [69:24]

along [106:12] [138:5]
[162:14]

already [135:21]

alternative [99:7] [126:7]
[127:7,11,13] [162:20]

alternatives [68:10] [99:19]
[119:21] [125:4] [127:15]
[135:5,9,14,20]

although [10:24] [28:18]
[42:12] [72:3]

aluminum [161:10,11]

alvarez [21:25]

always [49:15] [59:18]
[60:23] [93:14,24] [101:23]
[136:2] [158:13,16]

am [172:15,17]

america [86:11] [87:11,13,14]
[89:9] [90:7,9] [91:4]
[92:15] [104:9]

americas [2:12] [3:17]

among [32:4,15] [33:18]
[111:18,19]

amongst [17:20] [139:19]

amount [11:2] [26:12,15]
[42:17] [80:15] [159:14]

amounts [126:16]

analyses [9:21] [41:19]
[53:25] [151:3,22]

analysis [11:6] [43:10,21,24

,25] [44:9] [48:15] [50:24]
[51:2] [85:11] [88:22]
[112:19] [126:6] [127:5,23]
[135:4,7,16,19] [136:20]
[148:24] [150:18] [164:12]
[165:9,20,25] [166:21]
[167:21,24]

analysts [108:12]

analyzed [93:5] [134:15]

analyzing [57:9]

and/or [99:6]

angeles [2:7]

answer [6:5] [31:24] [34:17]
[48:16] [63:20,22,24]
[106:16] [145:9] [160:15]

answered [92:21]

anticipated [154:8,13]

anybody [18:13] [53:19]
[59:10,11] [60:14,15]
[103:24] [124:13] [140:3]
[145:13] [161:20]

anyone [61:12] [64:14]
[65:2] [91:3] [130:11]
[139:22]

anything [42:10] [51:16]
[58:8] [59:8] [60:13] [61:10]
[62:13] [63:13] [64:25]
[67:15,23] [91:20] [96:25]
[97:22] [101:21] [106:22]
[120:11] [122:14] [129:18]
[139:17] [140:25] [147:15
,16] [154:24] [155:5] [164:
12] [168:6]

anytime [101:18]

anyway [168:16]

apart [29:2] [123:13]

appear [170:8]

appendix [46:3] [49:17]

applied [143:11]

applies [143:5]

apply [142:21,24]

approach [167:11]

appropriate [63:9,10]
[135:14]

approximately [16:8]
[25:12,20] [78:21]

approximation [25:15]
[49:14]

approximations [145:10]

april [4:23] [16:7,22] [41:10
,25]

argue [144:4]

argumentative [70:23]

arithmetic [26:6]

around [39:19] [55:24]
[56:7] [112:20] [159:10]

arrangement [88:25]

arrangements [90:2]

articles [46:12] [49:9]
[72:23] [74:4] [98:17]

aside [83:17] [97:6] [98:24]
[99:15] [100:12,15] [102:25]
[103:6,22] [106:20] [107:8
,10] [125:18] [167:11]

asis [59:22] [143:24]

as-is [59:22] [143:24]

ask [9:8] [20:14,17] [30:7]
[44:20] [66:3] [73:20,24]
[85:14] [100:12] [146:12,17]
[158:9]

asked [4:25] [6:24] [7:5,12
,15,23] [14:2] [23:22]
[24:12] [27:2,5] [28:6,9]
[30:10] [31:5] [36:21,25]
[37:18] [41:2] [43:11,23]
[44:2] [47:18] [59:10]
[60:15] [61:12] [73:25]
[85:20] [92:4,21] [99:11]
[110:22] [137:11] [145:11]
[147:25] [148:13,16,23]
[149:4]

asking [31:25] [32:23]
[146:19]

aspect [130:24]

aspects [27:23] [123:8]
[150:2]

assessed [112:23] [135:9]

assessment [112:17]
[144:6]

asset [30:18] [31:2] [54:8]
[74:15] [76:12,19] [77:3]
[78:9] [86:15] [110:2]
[154:5]

assetbacked [30:18] [31:2]
[54:8] [74:15] [76:12,19]
[77:3] [78:9] [86:15] [110:
2]

asset-backed [30:18]
[31:2] [54:8] [74:15] [76:12
,19] [77:3] [78:9] [86:15]
[110:2]

assets [81:17] [88:16,18]
[109:15] [157:22] [158:3,7]

assignment [77:8] [150:4]

assignments [129:10]

assist [11:11]

assistance [11:15] [105:8]

assistant [10:12]

associated [88:8] [136:23]

associates [8:21] [9:8]
[25:19]

association [89:2]

assume [4:15,25] [27:2]
[30:4,10] [31:5] [36:21]
[37:2] [44:2] [49:12] [85:20]
[92:5] [117:23] [118:3]
[141:2] [152:19,24] [153:11]

assumed [29:17] [43:12]
[89:10,15] [165:14]

assuming [136:14]

assumption [5:7] [6:2,7,25]
[7:5,12,15,24] [27:6]
[28:7,23] [32:25] [33:2]
[36:21] [37:11,16,18]
[39:16] [41:2,6] [72:4]
[92:23] [122:7] [124:15]
[150:5] [160:4] [161:22]
[165:12,15] [167:15]

assumptions [120:5]
assure [41:20] [44:7]
attached [170:9]
attempt [114:7] [126:22]
[130:3] [140:11] [162:19]
[163:8]
attempted [80:12] [145:13]
attempting [59:18]
attention [108:12] [109:3,6]
[149:18]
attitude [136:7]
attorneys [2:4,10] [23:22]
atulya [8:22] [9:14,16]
[10:8,17] [12:6] [13:10,11
,14]
a-t-u-l-y-a [9:16]
audio [168:16]
audit [97:7]
august [26:10] [56:15]
[59:6] [62:7] [100:6] [105:
2,3,16,22] [106:7,21]
[128:4] [132:24] [133:19]
[134:12] [148:11]
automatically [65:21]
[154:18]
available [48:14] [62:24]
[86:2] [109:9] [135:10,17]
[139:14] [162:21] [163:17]
[164:3] [165:4] [166:7]
avenue [2:6,12] [3:17]
avoid [88:7]
aware [51:19] [58:15]
[125:22] [140:3]
away [38:17] [93:12]

B

b2 [75:20] [78:7] [131:23]
[132:4]
back [14:2] [17:19] [25:16]
[26:24] [44:19] [52:10]
[57:3,10] [59:16] [61:9,22]
[62:2] [65:25] [69:25]
[93:6] [95:8,12] [117:8]
[145:21] [155:17] [160:15]
[167:5]
backed [93:12]
background [10:23] [22:19]
[51:2] [56:18] [97:15]
balance [103:10] [112:4]
[156:4]
bank [50:8,18,20] [52:4]
[58:11] [72:21] [73:2,10]
[86:11] [87:11,13,14]
[89:9] [90:6,9] [91:4]
[92:14] [104:9] [108:8]
[111:7,25] [115:22]
banker [72:16] [83:14]
banking [50:15] [51:10]
[113:21] [140:14]
bankrupt [65:24]
bankruptcy [5:25] [19:17]
[59:4] [62:5,17,19] [64:22]
[65:4] [71:23] [75:7] [88:6]

[89:23] [90:19] [94:4] [96:10]
[99:24] [105:9] [108:4]
[109:24] [110:6] [113:9]
[120:3,19] [121:2] [124:20]
[125:2,6,7,9,12,17,24]
[134:8,13,20] [135:3]
[137:2] [152:21] [153:2]
[154:10] [157:25] [158:2]
banks [50:13] [52:3,12]
[56:19] [72:14] [73:6,22]
[83:12] [104:5] [111:10,21
,22]
barrelhead [66:4]
based [25:22] [36:24]
[41:6] [49:21] [57:4] [58:4]
[59:18] [60:24] [77:4]
[120:5,17] [167:4,14]
bases [41:17]
basically [28:3] [50:21]
[71:19] [75:6,7] [86:18]
[87:4,25] [88:19] [121:16]
basis [24:15] [27:12] [36:19]
[56:17] [59:22] [62:23]
[79:21] [98:12] [99:16]
[101:7] [143:24]
bates [46:16,24] [47:3]
[118:12] [142:13]
bearing [84:11]
beauty [21:13,15]
became [38:7] [57:23]
[85:19] [155:17,23] [156:2]
become [68:7] [105:3]
[119:7]
becomes [33:20] [91:6]
becoming [95:17,18]
began [7:6,8,19] [16:8,14]
[57:7,8] [77:8] [78:17,18]
begin [44:11] [54:22] [78:17]
[124:25] [127:11]
beginning [49:19] [61:23]
[107:17] [117:9] [131:19]
begins [3:6] [72:10]
behalf [19:22] [154:11]
behave [5:18] [6:21] [68:19
,25] [69:3,5,13] [72:12]
[160:10]
behaved [6:20] [33:5]
[67:9] [68:20,25] [69:10]
behaving [66:25]
behavior [5:13] [6:23]
[24:11] [63:10] [66:23]
[67:5] [68:8] [69:17] [144:
25]
believe [6:9] [7:10,25]
[9:24] [17:2] [19:21] [22:6]
[25:5] [28:19] [30:5] [33:10]
[36:4] [39:24] [40:3] [42:5]
[43:9] [46:20] [48:24]
[50:7,12] [52:8] [53:17]
[54:8] [64:16] [65:6] [67:13]
[74:16,18] [76:20] [88:23]
[90:10] [91:7,11] [93:11]
[103:25] [106:9] [107:23]
[108:20] [109:2,5] [112:14]

[120:17] [124:6] [128:15]
[138:17] [141:6] [143:20]
[147:2,14]
believed [63:17,19] [65:3,24]
believes [79:17]
below [158:16,19,20,22]
[159:13]
beneficial [91:10]
benefits [112:17]
besides [98:21]
best [4:19] [19:13] [25:15]
[28:12] [45:13] [47:10]
[48:16] [49:15] [63:3]
[78:4] [90:8] [121:6] [123:
11] [124:2] [129:20] [138:6]
[143:5] [154:24]
better [9:15] [68:5] [126:12]
[136:3,8] [156:3]
bill [12:25] [13:2] [70:16]
billed [25:7] [26:7,8,15]
billings [25:9,18,23]
billion [78:20]
bills [14:4]
bit [29:2] [36:24] [49:25]
blackberry [147:5]
blood [172:16]
blow [147:10]
blown [44:9]
board [40:8,10,11,12,14]
[86:2] [96:20,23] [97:7,19
,24] [99:6,18,23] [104:4]
[107:22] [112:10] [133:14
,18] [136:11] [137:15]
[138:20] [139:19,21]
[140:4] [173:]
boards [109:3]
bond [152:9] [164:25]
bondholders [22:10] [36:13]
[37:3,12] [152:21] [153:2]
bonds [35:18,25] [36:5]
[142:19] [152:14] [154:5,7]
[165:17]
borrowed [76:3]
borrower [94:2,3]
borrowers [110:19]
boston [3:10] [19:9] [23:15]
[50:5,16,18] [141:23]
[173:19]
bottom [101:11] [109:7]
[112:15]
bounce [84:7]
boxes [20:21] [44:25]
boy [43:17]
bracket [52:4]
breach [91:3]
bread [149:3] [151:22]
break [29:2] [61:17] [94:7]
[106:15] [116:23] [123:13]
[145:16]
bridge [86:19]
bridged [86:23]
briefly [10:4] [145:24]
bringing [24:9]
broke [96:13]

broker [142:22] [143:6]
brokerdealer [142:22]
broker-dealer [142:22]
brokerdealers [143:6]
broker-dealers [143:6]
brought [42:21] [139:25]
build [60:7]
bulge [52:3]
bundle [75:7]
business [4:14] [56:19]
[60:21,22] [63:8] [90:25]
[91:9,21] [95:24] [96:3,9]
[98:8,22] [100:23] [101:19]
[103:5] [107:14] [121:16]
[123:9,10] [126:16,20]
[135:23] [139:12] [155:2]
[158:4] [160:23] [162:14]
[163:25] [165:7] [168:2]
businessasusual [91:21]
business-as-usual [91:21]
businesses [106:14,19]
busy [149:15]
butchering [52:19]
butter [149:3] [151:22]
buy [86:20] [90:21] [161:2]
buyer [109:16]
buying [82:4,8] [87:5]
[128:13]

C

calendar [23:2,4]
california [2:7] [11:25]
call [21:8] [32:2,13] [52:3]
[76:6] [125:9] [129:11]
[158:3,7]
called [4:6] [12:7] [24:18]
[72:18,19] [76:8] [79:4]
[93:20] [133:18] [142:10]
[149:17] [151:15,16]
calling [31:23] [32:19]
[36:10] [64:6]
calls [17:11] [33:15] [38:23]
[42:23] [45:7] [84:25]
campbell [148:22] [149:12
,17] [163:9] [167:12]
canada [10:24]
cannot [21:9] [40:25] [61:14]
[127:25]
cant [5:8,10] [7:11,13]
[8:17] [20:12] [21:23]
[22:5] [32:21] [37:7,23]
[39:4] [42:6,13] [47:6,12]
[52:23] [58:8,21,25] [61:14]
[63:18] [67:11,23] [76:6,14]
[83:23] [84:18] [81:17]
[97:2] [101:8] [107:25]
[126:14] [151:16] [156:3]
capable [97:25]
capacity [72:16] [98:18]
[100:7]
capital [52:7]
care [27:23,25]
careful [57:25] [108:12]

carefully [11:3] [85:15] [93:3]
carry [138:6] [161:24]
case [3:11] [4:24] [10:19] [19:17] [21:21] [22:13,17] [30:3,15] [36:4] [45:6,14] [47:13] [49:21] [51:23] [55:8] [66:11] [67:12] [69:15] [70:9,12,16,20] [71:2,9] [75:19] [79:4,14] [80:3,17] [82:13] [90:11] [123:25] [128:15] [141:16] [142:18] [148:19,22] [149:12,17] [152:22] [153:2] [154:16,18] [161:14] [162:16] [163:9] [167:12] [171:3]
cases [10:20,23] [23:21] [45:15]
cash [66:3] [75:10,15] [156:20] [166:23]
cast [8:8]
castanares [2:8] [4:2] [5:9] [8:11] [20:17] [26:22] [30:14] [31:15,22] [32:18] [34:8,15,17] [35:14] [36:9] [37:4,21] [38:22] [39:15] [42:23] [45:7] [51:14] [53:6,8,23] [61:18] [63:21] [64:4] [66:22] [68:17] [70:22] [71:18] [84:25] [88:15] [92:21] [94:9] [96:24] [117:4] [125:15] [127:3] [128:14] [133:3,7] [134:24] [140:16] [142:17] [145:17] [146:23] [147:11 ,20] [149:21] [156:12,14] [163:2,5] [168:10,13,15,20] [169:3] [174:5]
cause [160:18]
causes [31:14]
center [163:21]
cents [153:3,6,12,23]
century [42:10]
ceo [40:8,11,13] [117:24]
certain [6:21] [18:5] [66:16] [90:24] [115:24]
certainly [6:10] [57:8] [69:2,4] [70:25] [82:20] [102:22] [114:20] [120:24] [121:2]
certainty [67:12]
certified [172:8]
certify [172:10,15]
cetera [113:9,10] [119:2]
cfo [117:24]
chain [77:10]
chairman [40:12]
change [38:12] [66:2] [68:8] [122:14] [123:2] [124:20] [136:21] [160:5] [171:6,,8,,10,,12,,14,,16,,18 ,,20,,22]
changed [50:17]

changes [171:]
changing [59:20]
chapter [133:24] [134:3,7]
characterization [136:6]
characterized [155:11]
chart [30:16]
check [80:21] [112:4]
chicago [163:23]
circumstances [63:11] [91:18,19] [92:14] [96:18] [98:19] [136:16] [141:17] [144:18]
citation [73:14]
citations [73:13,15,16]
cite [72:17] [74:4] [79:2] [80:15] [100:9]
city [42:10]
claim [157:21]
claimants [32:7] [68:7]
claims [75:9] [121:14,21] [125:7,25] [157:15]
clara [10:9]
clarify [131:21]
class [93:19]
clear [24:4,8] [59:24] [74:13] [115:2] [124:5]
clearly [80:11]
client [149:7]
clients [62:17]
close [56:9]
closely [10:18]
collapsed [90:12] [95:25] [96:4,5]
colleague [10:17]
colleagues [10:6] [73:17]
combination [46:4] [50:7,18] [132:11]
coming [57:3] [119:3]
comment [107:3] [150:11]
comments [17:5] [37:25]
commercial [50:7,13,18] [51:10] [111:21]
commission [67:20] [169: 11]
commit [67:21]
committee [97:8]
common [86:25]
commonly [88:25] [167:25]
communicating [60:4]
communities [34:7]
companies [52:6] [140:14 ,18,23] [141:3,12]
company [12:7] [21:25] [29:9,13] [30:4,5,19] [31:13,16,18,20] [32:5,6] [34:7] [35:8,9] [38:5,7,14,15] [44:3] [59:21] [60:19] [61:3] [65:19,24] [66:14] [68:6] [69:12] [84:12] [91:22] [92:11] [101:14] [102:13,16] [106:23] [107:13] [108:13] [110:7] [112:25] [114:10] [115:3,23] [119:4] [120:6,20,21,24,25]

[121:8] [123:6,12,14,19,22] [124:5,7,8,14] [125:4,6] [128:12] [130:18] [131:2] [132:11,18] [133:23] [134:4,23] [136:15] [137:4 ,7,14,16] [138:22] [139:2,7 ,14] [141:18] [142:20,25] [148:25] [150:6] [154:8,9] [155:19,21] [156:7] [158:8] [159:2,11,14,20,21,24] [161:11,19] [163:13,18] [166:18]
companys [120:7] [152:8] [158:25] [164:22] [165:11] [166:3,6,12,18]
companyspecific [120:6]
company-specific [120:6]
compare [166:2]
compensated [24:15]
competency [98:11]
competent [97:20]
complaint [79:9,13,16,25] [80:20]
complemented [118:24]
complete [125:14,19] [170:7]
completely [62:21]
completion [147:24]
compliance [5:14] [6:4] [141:24] [142:5] [173:]
computer [15:20,23,25] [16:13] [17:23] [22:23] [23:3]
concerned [84:22]
concerning [80:25]
conclude [44:4] [62:3] [66:20] [151:24]
conclusion [6:15] [31:23] [32:2,14,19,21,22] [33:7,9 ,16] [36:10] [38:23] [41:12 ,18,20] [44:8] [65:8] [66:20] [68:13] [71:20] [72:11] [144:10] [150:6,21] [151:8 ,11] [160:5] [166:10] [167: 8,15,17]
conclusions [5:6,15] [6:6,10,11,13] [15:12] [19:24] [41:18] [70:20] [79:18] [12:8] [166:17]
condition [31:14] [57:14,17] [58:7,17] [62:9] [65:18] [80:25] [107:19]
conditions [66:3] [120:6]
conduct [62:12]
conducted [51:16] [112:18]
conducting [96:9]
conference [17:11]
confidence [26:18] [127:19]
conflate [31:12]
conjunction [54:3]
connected [16:4]
connection [21:3] [23:15] [56:4] [81:2] [97:9]
consequence [28:18]

[33:8] [90:14] [96:7] [121:6]
consequences [91:8] [99:24] [127:6]
consider [164:7]
consideration [99:23]
considered [112:22] [123: 20]
considering [99:7,19] [100:24] [103:16]
consistent [28:21] [68:21] [69:17,20] [70:20] [112:11] [152:2]
constant [111:21]
constituency [123:19]
consulting [12:7,10,16,19] [103:4]
consumer [55:20]
contact [18:17] [62:15]
contains [48:13] [80:6]
contest [21:13,15]
contestants [21:18]
context [29:6]
continuance [154:14]
continuation [92:20]
continue [67:4] [96:9] [120:4] [122:9] [134:21] [143:22] [145:23] [159:21] [161:11]
continued [109:23] [160:9]
continues [69:22]
continuing [66:7]
contractor [10:10]
contractors [13:16]
contracts [13:14]
contrary [63:16] [68:24] [143:19]
conversation [149:24]
conversations [7:17]
convince [115:23]
copies [20:9]
copy [20:4] [42:11] [148:21]
corporation [3:9] [13:20,21 ,22,24,25] [14:6,7,8,11] [15:14] [33:13] [34:4] [40:6,22] [50:22] [85:6,10] [88:4] [117:12] [128:8] [133:13] [157:8] [173:8,11 ,16]
corporations [108:11] [157:6]
correct [5:3] [7:20] [11:19] [12:2,24] [13:5] [14:16] [15:13,22] [18:24] [22:15] [25:11] [26:17] [34:9,18] [38:24] [39:17] [41:7,8,9] [53:7,10] [55:18] [77:6,9] [78:14,15] [80:22] [81:3] [82:3,7] [89:17,21] [96:6] [99:25] [100:2] [103:20] [104:17] [105:17,18] [107:15] [108:5] [109:20] [111:11] [113:15] [116:16] [121:24] [123:17,21] [130:10] [132:16,23]

[139:15,20] [140:10,21,22]
[148:3] [152:5,23] [155:15]
[157:5] [159:6] [161:4]
[166:4] [170:7]
corrections [170:8]
correctly [37:17] [41:24]
[104:13] [106:3]
correspondence [146:3,24]
[147:2]
corroborated [166:11]
[167:7]
cost [149:6]
costs [112:17]
couldnt [8:6] [57:7] [90:25]
[151:24]
counsel [2:23] [3:19] [4:25]
[27:2] [36:25] [146:3]
counterclaims [79:5]
county [19:16] [20:3] [172:
5]
couple [9:20] [50:14] [104:
13] [110:12] [118:19]
[126:19] [163:2]
course [20:8] [45:10] [47:2]
[53:14] [76:10] [83:5]
[88:21] [98:3] [99:4] [121:
13] [122:5] [126:24,25]
[136:23] [137:6] [138:14]
[140:8] [159:22]
courses [98:21,25] [99:7,9]
court [4:4] [146:4,15] [168:
24]
cover [101:2] [107:4] [146:
10]
covered [146:9]
create [40:23]
created [15:5] [110:4]
creates [147:16]
creating [68:11]
creation [163:7]
credit [2:24] [3:10,25]
[5:12] [19:8,21] [23:14]
[24:4] [31:7] [50:5,12,17]
[53:16,25] [54:5,12] [59:11]
[65:23] [79:10] [81:18]
[87:25] [88:8,17] [90:6]
[92:12] [109:16] [110:16,18]
[111:9,18,20,23] [123:2]
[141:23] [161:7,19] [173:19]
creditors [5:2] [27:3] [28:25]
[29:18] [30:6,11] [31:6,13]
[34:6,14,19,20,21,23,25]
[35:2,11,13,15,20] [36:7,15]
[37:5,7,13,17,20] [38:9,17
,19] [39:12,14] [40:24]
[62:11] [65:23] [68:6]
[91:10,23] [112:24] [123:12
,14,20,23] [124:4,8] [125:25]
[136:16] [137:14,22]
[154:11]
creditworthiness [110:23
,24]
crisp [163:21] [164:11]
critical [134:11] [154:4]

criticisms [134:16]
crm [54:12,18] [111:9]
cross [113:24] [114:2,3,4,20]
[115:5] [130:3]
crr [172:22]
csfb [5:2,17,22] [19:22,25]
[21:2] [27:3] [28:24] [29:17]
[30:10,16,18] [31:5] [33:5]
[37:2] [41:19] [46:6,22]
[47:25] [50:3,4,9] [51:3,6]
[52:14,16] [53:3,12] [54:6
,10] [57:17] [58:2,7,18]
[59:3,14,16] [60:11,15]
[61:13] [62:4,16] [63:15]
[64:7,14,15,19] [65:2,8,16]
[66:23] [67:4,9,17] [70:4]
[71:11,21] [72:11] [75:11,21]
[78:18,20] [80:23] [81:4,16]
[83:9,13] [84:7,16,17,22]
[85:5,24] [86:6] [87:23]
[88:3] [89:10,15] [91:3,12]
[92:17] [93:4,11] [95:17,18
,23] [96:14] [97:8] [99:9,16]
[100:18] [101:2,6,13,24]
[102:12] [103:4,24] [104:5
,21,24] [106:6,23] [107:11
,17] [109:10,13,22] [110:13
,15,21] [111:9] [112:16,22]
[113:8,19] [115:24] [116:9]
[118:13,14,22] [119:12]
[120:3,13,18] [122:16]
[124:18] [129:9] [132:25]
[133:7] [134:12,19] [135:2
,3] [136:10,14,21] [137:3,12]
[138:14,17,23,25] [139:4,13
,23] [141:14] [142:5] [143:
12,16,20] [144:5,6,22]
[151:2] [155:6] [160:4,7]
[161:22] [162:4] [165:16]
csfbs [51:18,25] [54:22,24]
[57:11] [62:10,14] [66:20]
[68:14] [74:8] [83:21]
[96:3] [99:12] [100:5,11]
[105:14,19] [106:4] [108:2
,17] [115:5] [135:7] [160:6]
currently [26:8]
customer [57:3] [60:24]
[63:4,5] [66:7] [70:7]
[72:2] [76:3] [93:17] [114:
6,8,11,17] [142:11,21]
[143:4,7,10] [144:7,13,15
,19,23]
customers [56:20,24,25]
[62:22] [70:8] [75:2,3]
[78:13] [81:10,18] [86:20]
[88:20] [108:8] [111:15]
[114:15] [142:15,19]
cut [65:25] [120:2] [122:17
,19] [137:4]

D

damages [126:6]
data [9:20] [11:6] [41:19]

[93:4] [148:20] [151:10]
[155:24] [156:4] [163:16]
[164:10,21,24,25] [165:3,6
,15] [166:15,17] [167:2,11]
database [163:21] [164:11]
date [3:5,11] [41:10] [42:4]
[43:23] [85:21] [116:15]
[117:13] [128:9] [131:13]
[133:16] [141:25] [148:9]
[170:15] [171:]
dated [3:4] [4:23] [16:7]
[41:24] [79:5] [117:12]
[128:8] [133:14] [148:8]
[173:8,11,17,]
dates [55:24] [57:5] [115:12
,15] [165:16]
day [21:8] [169:9] [171:]
[172:20]
deadline [132:15]
dealing [38:13] [47:7,11]
[63:15] [65:2] [159:19,20]
dealings [68:14]
deals [39:8] [42:18]
dealt [104:5]
debt [39:2,3,9] [104:14]
[125:7] [156:4,18] [157:2,6
,16,19,21,23] [158:6]
[159:12,14] [164:18,22]
[165:11,14,23] [166:3,6]
debtor [93:20]
decades [50:14]
decided [54:14] [89:9]
[136:5,7,8]
deciding [138:11]
decision [100:23] [101:19]
[134:23] [148:21]
decreased [153:16]
deep [159:5]
deeply [122:23] [135:8]
default [83:5] [102:21]
defaults [57:20] [98:18]
[101:3,4]
defendant [3:22] [24:9,11]
defendants [2:10] [19:20]
definition [28:9] [108:6]
[156:21,22]
degree [10:24] [111:17]
[127:19]
delay [5:24] [64:21] [71:22]
delete [18:4,6]
deleting [18:2]
deliberate [67:22]
deliberately [69:12]
delimited [64:5]
delivered [118:5]
demonstrates [122:22]
depending [38:4,12]
depends [33:9] [107:2]
[159:23]
depew [172:7,22]
deponent [170:3]
deposit [50:19]
deposition [3:7,16] [100:9]
[101:10,17] [172:12,13]

depositions [4:14] [45:11]
[47:2] [87:20] [97:3] [115:
9] [162:9]
describe [81:14,15] [99:13]
[100:13] [104:24] [132:9]
described [25:10] [28:8]
[77:11] [83:15] [142:11]
describes [120:13]
describing [36:7] [40:17]
[89:3] [102:4] [124:10]
description [72:15,20]
[73:21] [75:6] [77:2] [83:11]
[119:25] [173:3]
destroying [68:11] [131:3]
[139:3] [154:9,14,20]
[155:11] [160:9]
destructive [145:2]
detail [100:14]
detailed [72:9,10]
determination [141:10]
determinative [141:16]
determine [139:11] [140:13]
[141:11] [148:25] [162:19]
[163:17] [164:18] [166:5]
[167:23]
determined [164:20] [167:
4]
determining [163:12]
develop [57:2]
dialogue [135:13]
didnt [19:25] [23:5,6] [31:9]
[53:16] [69:5,12] [71:7]
[98:8] [111:3] [120:10]
[124:25] [125:15] [128:22]
[134:25] [140:15] [146:6]
[150:21] [151:14] [160:5,22]
[165:13]
difference [37:19] [153:22]
different [5:7] [6:6] [8:14,15]
[30:8,12] [34:23] [35:3,13]
[38:11] [39:2] [44:20]
[51:13] [59:17] [65:10]
[71:24] [75:12] [111:8]
[114:11] [118:14] [124:24]
[126:12] [127:20] [140:8]
[144:10] [150:17] [156:12]
[160:13]
differently [67:9] [140:8]
difficult [119:5] [148:23]
[158:13] [162:10]
difficulties [140:21]
difficulty [162:12] [167:19]
direct [104:14]
direction [69:10] [70:17]
directly [47:7,16] [102:6]
[109:18] [124:4]
director [2:23] [97:6,11]
[118:19]
directors [39:23] [40:3,9,10
,11,21] [86:3] [96:21]
[97:2,4,15,19] [100:18]
[108:11,16] [120:25]
[124:10,11] [133:14,19]
[136:5,12,17,19] [137:8,9

,22] [138:4,10,16,21] [139:
19,22] [140:4] [173:17]
disagreed [23:21]
disappeared [82:22]
disclose [20:2]
discontinue [92:15]
discount [157:7,18,23]
discounting [154:7]
discounts [165:18]
discovery [45:5] [46:7]
discuss [10:19] [43:6]
[107:20] [112:7] [131:18]
discussed [121:9,23]
[128:19]
discussing [86:15]
discussion [36:20,25]
[72:11] [122:20] [131:11]
[134:2] [137:20] [173:]
discussions [37:22,24]
[84:15] [99:16]
distinction [59:23]
distinguish [38:25]
distressed [129:9]
doble [2:20] [3:23]
doctor [52:25] [62:2] [69:19]
[70:18] [76:25] [93:14]
[117:15] [126:22] [146:19]
[162:24]
document [3:2] [45:14]
[47:6] [48:4,7] [49:11]
[58:22] [76:15] [79:4,8]
[87:17] [115:21,22] [116:13
,14] [117:10] [118:8,11]
[119:25] [120:14] [121:12
,18] [128:6] [129:4,5,19]
[131:10,14] [132:6] [133:12
,20] [141:22] [142:7,12]
[148:6] [173:7,10,13,,,21]
documentation [64:13]
documents [11:2,4] [20:2]
[23:23] [44:12,15,16,19,23
,25] [45:5,10,16,19,24]
[46:5,7,10] [47:11,13,15,25]
[48:14] [49:6,17] [58:5]
[64:24] [76:15,18] [79:21]
[88:22] [108:7] [115:12,14
,18] [166:7]
doesnt [5:20,25] [10:24]
[30:25] [53:11] [68:19]
[80:16] [82:9] [143:3]
[153:15] [158:19,24]
doing [42:22] [43:25] [84:3]
[90:25] [91:8] [101:4,24]
[121:13,14,16] [123:10]
[135:19] [139:4] [143:6]
[155:2] [163:6]
dollar [80:15] [153:3,7]
dollars [126:19]
donald [172:7,22]
done [11:13] [15:18] [23:15]
[35:5] [41:19] [90:2] [126:
6,13] [127:19,21,22,23]
[130:9] [134:11] [135:3,4,16
,23] [141:14] [145:6,12]

dont [4:15] [7:2,13] [8:12]
[9:4,6] [11:14] [16:11]
[20:6,19] [21:7,9,17]
[22:5,11,18,20] [23:8,16]
[24:6,17] [28:19] [32:16,20]
[33:6] [36:17] [37:14]
[38:25] [42:11,12] [43:17,19
,21] [45:13] [46:24] [51:8]
[58:2] [60:17] [64:9] [68:3]
[74:2] [79:15] [81:14]
[88:5,23] [90:17] [96:25]
[97:8,12,16,21] [98:9]
[99:21] [101:8] [103:13,25]
[104:20,22] [105:11,13]
[107:23] [112:14] [113:20
,22] [115:7,10] [116:3,11]
[117:23,25] [118:6] [120:21
,23] [123:25] [125:8,20]
[126:2,21] [128:21] [131:21
,22,24] [135:15,22] [137:15]
[139:17,24] [140:2,6,25]
[141:2,8] [146:17,20]
[147:5,13] [149:7,8,16,19
,22,23] [151:12] [152:20]
[155:22] [156:14] [161:9]
[162:8,17]
douglas [2:25] [3:14]
down [23:20] [90:22] [106:
15] [130:16] [147:10]
[148:19] [153:23]
downsize [68:9]
downsizing [98:23]
dr [8:22] [9:14] [11:18]
[13:21,22] [14:10] [17:3,9
,20] [25:2,3] [41:6,23]
[42:3,16,21] [43:10,15,20]
[44:4] [47:19] [73:18,25]
[95:12] [145:25] [146:8,13]
[147:23] [150:6,18,21]
[151:19] [163:3,6] [166:12
,20] [167:8,10,13,20]
[168:7]
draft [16:18] [42:5]
drafting [16:9,13]
drafts [16:16,21] [17:3,19]
[18:10,15] [42:3]
drags [70:12]
dramatic [125:10] [136:25]
drastic [130:14]
draws [79:18]
drive [16:12] [68:9]
due [42:11] [132:11]
duly [4:7] [172:12]
during [74:17] [85:6] [99:19]
[135:25] [136:5] [139:23]
[140:19] [152:7] [155:25]
duties [40:22,23] [97:25]
[138:5,6] [161:18]
duty [27:23] [28:3] [29:13,20]
[31:6,19] [32:10,11] [33:13]
[34:3,4] [36:6] [37:19]
[91:3] [122:16] [124:7,8,9
,17] [136:10,17] [137:16,21]
[160:5]

E
———————————————

earlier [100:20] [134:19]
[167:13]
early [16:11] [52:10] [110:13]
earn [71:2,9]
ec2y [2:19]
economic [27:10] [28:2,18
,21] [29:14] [34:2] [36:16]
[37:25] [38:8,14] [67:3]
[68:19] [69:5] [91:8,22]
[123:11] [124:6] [136:22]
[138:3] [141:9] [144:17]
[145:2] [158:14]
economically [31:17,18]
[122:21] [135:8] [139:2]
[148:25] [155:21,23]
[156:11,16,19] [157:2,8,20]
[159:15] [167:6]
economics [10:23] [158:13]
economist [19:20] [27:11]
[32:3,9] [33:16] [149:3]
economists [32:4,15]
[33:18] [79:24] [80:4]
[109:2] [145:7] [151:23]
edited [36:24]
editing [17:9]
edits [17:5]
effect [30:4] [79:9] [86:23]
[122:7] [123:9] [135:24]
[154:21] [161:12] [162:10]
effectively [151:2]
effort [41:11,15] [80:21]
[141:11]
eight [78:20] [148:6] [173:21]
eightpage [148:6] [173:21]
eight-page [148:6] [173:21]
either [28:9] [71:13] [73:18]
[128:11] [144:3] [147:16]
else [46:9] [47:8] [90:9]
[124:14,17] [125:21]
[140:3] [162:12]
email [17:19]
e-mail [17:19]
emails [17:22] [18:3,4,7]
e-mails [17:22] [18:3,4,7]
emphasis [39:24]
employees [10:6] [34:6]
[35:22] [39:5] [66:13]
enabled [91:9,20] [131:2]
encompass [33:13]
encompasses [34:4]
encouraged [120:3]
end [23:11] [45:23] [56:9]
[77:10] [95:22] [117:6]
[119:25] [144:16] [155:24]
[156:4] [168:19]
ended [69:24,25] [154:15,20]
engage [120:4] [122:20]
[129:22] [132:25]
engaged [19:7] [66:24]
[69:16] [139:2]
engagement [21:16] [59:5]

[62:6] [105:16] [118:15]
engaging [44:8] [112:24]
[131:3]
engineering [129:12,22]
enhance [51:23]
enjoyed [83:14]
enough [29:23] [70:2]
[129:14] [159:5]
enriching [28:4]
entered [75:4]
enterprise [29:7] [66:25]
[153:16] [154:18,22]
[156:17,25] [157:2,13,14,15
,19]
enterprises [14:12,13]
[93:22] [154:23] [157:2]
entirely [82:13]
entities [14:14,18] [19:9]
[110:5]
entitled [3:3] [117:11]
[128:7] [131:11] [133:13]
[141:23] [148:7] [173:7,10
,13,,,]
entity [12:4,18] [32:10]
[33:19] [34:12,21,22]
[35:4] [75:8] [88:6] [89:23]
entries [22:23]
entry [23:9]
equal [157:14]
equity [32:11] [33:14]
[34:5] [46:21] [98:16]
[108:2,12,17] [125:7]
[157:16,17,22] [158:2,15,25]
[159:13] [164:16] [165:22]
errata [170:9]
error [49:15]
errors [67:19,20] [68:2]
esq [2:8,14,15,20]
estimate [25:17,22] [145:8]
[154:23] [156:3]
estimated [25:23]
et [3:9,10] [113:9,10] [119:
2]
evaluate [111:9]
even [5:11] [13:19] [67:2]
[70:15] [80:14] [91:25]
[93:6] [97:2] [101:20]
[137:4,12,19] [159:8]
event [31:13] [37:15]
events [115:8]
eventual [152:15]
eventually [119:13,14]
ever [19:7] [42:11] [60:15]
[61:12] [63:15] [73:9]
[135:15,16] [157:22]
every [13:11] [45:14] [47:6]
[48:3] [75:15]
everything [10:19] [15:11]
[46:8,18] [49:4]
evidence [65:5] [104:2]
[112:16,22] [113:4,8,13]
evil [114:23]
evolution [37:23]
exact [107:6]

exactly [37:23] [90:17] [110:9] [113:20] [115:4]
examination [4:10] [95:10] [163:4]
examine [146:7] [167:16]
examined [4:8] [95:6] [170:5]
examining [166:15] [167:10,12]
example [46:12] [47:14,25] [51:5,9] [57:18] [61:6] [65:10] [66:4] [82:17] [83:25] [99:21] [103:17] [104:8]
examples [103:4] [107:10]
except [33:22] [78:5] [79:16] [97:2] [130:20]
excess [98:18]
exchange [130:7]
exclusive [137:2]
excuse [86:14]
execution [106:25]
exercise [138:21,23]
exercised [139:5]
exhibit [3:2] [4:24] [11:18] [15:5] [20:23] [41:11,25] [47:20,22] [48:13,19,23] [49:4,12,16] [54:21] [57:11] [62:3] [85:17] [117:10,16] [128:6,19] [131:10,16] [132:6] [133:12] [141:22] [142:3] [147:25] [148:5,6]
exhibits [173:2]
exist [6:16]
existence [5:20] [33:9] [68:15] [82:21] [136:22]
existing [112:23]
exists [112:16,22] [113:5,8,14]
expect [108:22] [111:14,17] [146:3]
expectations [154:4]
expected [103:18]
expense [28:5]
experience [45:15] [56:18] [108:10] [109:14] [111:6,13] [129:9]
experienced [4:14]
experiences [22:20]
experiencing [140:20]
expert [4:13,22] [12:3,12] [18:22] [19:20] [20:8] [22:13] [23:13] [42:18] [138:18]
expertise [118:13,24] [119:5] [129:8] [138:19] [139:18]
experts [79:23] [80:3]
expires [169:11]
explain [4:15] [28:10] [63:24] [64:2] [151:14]
explained [33:3,15]
explaining [38:11]
exposure [111:10]

express [23:13,24] [24:3] [71:21]
expressed [5:17] [105:13]
expression [156:11]
extended [37:13]
extending [161:19]
extensive [135:4]
extensively [60:20] [73:3]
extent [38:2] [77:24] [78:2] [80:6] [82:14] [88:7] [99:5,17,22] [102:19] [124:13] [138:25] [145:3] [161:23]
external [73:4,15]

F

face [152:9] [156:18,25] [157:7] [159:14] [165:10] [166:2,5]
faced [140:14]
facilitate [144:25] [160:9]
facilitation [123:10]
facilities [90:22] [122:9,18] [124:22] [130:7] [134:22] [162:6]
facility [55:9] [56:5] [86:12,13,23] [87:14,24] [89:10,20] [91:5,16] [92:20] [93:10] [104:10] [106:12] [110:20,25] [122:4] [123:4,5] [131:2] [143:24] [162:15]
facing [61:3]
fact [14:23] [63:19] [68:18] [71:5,20] [80:9] [83:25] [84:20] [98:14] [103:13] [104:3] [107:24] [108:21,25] [118:2,3] [122:13,22] [132:10,24] [134:6] [135:25] [141:8] [155:10] [160:8]
factor [67:14]
facts [41:21] [79:18] [80:7] [112:8,9] [135:17,18] [136:20] [141:17] [155:9]
factual [79:13] [139:12]
fail [60:25]
failed [129:24] [137:9] [144:23]
fails [130:3]
failure [130:21] [138:20]
fair [10:25] [23:11] [36:19] [39:21] [42:16] [76:25] [129:14] [134:17]
fairly [101:3] [147:8]
faith [150:22]
familiar [28:17]
far [25:7] [85:3] [93:6] [132:17] [139:11,15] [155:4] [165:8] [167:5]
february [89:9] [90:5] [91:5,13] [92:8,19,22] [93:6,10] [104:4]
fee [57:4] [74:18]
feedback [101:13,25] [102:12]

fees [56:23] [71:16,17] [114:19]
felt [84:8] [100:13,15] [103:2,18,22] [105:8] [113:17,19] [115:3,14] [116:4] [118:19] [119:3] [128:17] [143:2] [151:4]
felts [103:7] [107:10] [115:11,24] [121:9] [127:21] [129:7] [133:2,22]
few [146:13,19] [149:15]
fiachra [52:20,21] [53:4,6]
f-i-a-c-h-r-a [53:6]
fichre [53:5]
f-i-c-h-r-e [53:5]
fiduciary [5:2,12,21] [6:2,9,12,17,21] [27:3,7,12,13,17] [28:7,22,24] [29:4,19] [30:11] [31:6,19] [32:5,10] [33:10,12,19,20] [34:3,13] [36:6,14] [37:3] [38:2,17] [39:20,23] [40:18,22,23] [62:10] [72:5] [91:24] [124:14,17] [136:14] [137:7,10,13,16,21] [138:22,23] [139:7] [159:24,25] [160:4,8] [161:21,22,24,25]
figure [165:10,21] [166:2]
figuring [6:19]
file [5:24] [59:4] [62:5,17,18] [64:21] [65:3] [71:23] [120:3] [124:19]
files [134:7]
filing [99:24] [105:9] [113:9] [120:19] [134:14,20] [135:2]
final [16:25] [165:25]
finally [104:23]
finance [10:8,12] [68:23] [75:4,5] [129:9]
financial [5:23] [6:16] [27:11] [32:4,9,15] [33:16,18] [55:9] [56:11,20,25] [57:13,17] [58:6,15,17] [59:5,15,24] [60:18,22,23] [61:2] [62:6,9] [64:20] [65:8,10,14,17,18] [66:13,21] [67:8,13,18] [68:16,24] [69:9,13,18,20] [70:19] [71:4,21,24,25] [74:17] [79:23] [80:4,25] [83:20,24] [84:11] [91:19] [93:16,25] [94:2] [99:9,13] [100:5,11] [105:4,14,20,24] [107:19] [109:2] [112:21] [114:13,21] [119:7] [120:8] [121:10,14,22] [129:11,22] [138:18,19] [139:18] [140:3,24] [143:17,20] [145:6] [149:3] [151:22,25] [152:3] [162:6]
financing [59:21] [75:2] [86:19] [100:19] [120:4] [125:5] [162:21]
find [24:19] [30:17] [73:16,17

,21] [84:2] [111:14] [116:19]
findings [166:8]
findlaw [73:13]
findlaw.com [72:19]
finds [92:13]
fine [129:15] [147:19]
finger [81:15] [107:25]
firm [3:24] [7:3] [9:2] [16:21] [18:14,23] [26:19] [43:12]
firms [118:23]
first [3:10] [18:21,25] [19:8] [22:16,24] [23:14] [24:14] [43:22] [47:17] [49:14] [50:2,5,16,17] [52:19] [56:12] [57:22] [59:7] [75:17] [132:3,25] [135:5] [141:23] [144:18] [148:13] [149:17] [150:20] [153:18] [157:21] [163:12] [173:19]
five [10:15] [117:3]
flip [130:8]
floor [2:6]
flow [156:20] [166:23]
flows [75:10,15]
fluke [166:25]
flux [124:3]
focus [26:25] [74:20] [106:4]
focusing [59:7]
folks [108:18] [114:17] [118:20]
follow [137:5] [139:9] [143:14] [163:8]
followed [123:7] [126:25] [135:25] [138:14] [140:9]
following [126:17] [167:20] [171:4]
follows [4:9] [95:7]
footnote [72:17,18] [78:24]
force [134:23]
forced [93:12] [96:16]
forecast [166:24]
foreclosure [82:18] [109:15]
foregoing [170:6]
forget [168:22]
form [5:9] [16:25] [30:14] [31:15] [34:8,15] [35:14] [37:4,21] [38:22] [39:15] [51:14] [56:24] [64:5] [66:22] [68:17] [71:18] [85:2] [88:15] [98:4] [127:3] [128:14] [134:24] [140:16] [142:17] [157:16]
formally [100:7]
formed [99:5]
forth [17:19] [60:8] [81:18] [95:18] [101:5] [116:10] [125:8] [163:9] [168:22] [172:12]
found [47:8,14] [73:19] [74:3] [165:21]
four [22:7]
fourth [104:23]
front [146:15]

fti [139:25]
fulfilling [97:25]
full [44:8] [48:13] [57:8]
  [146:14]
fully [98:9]
function [79:8] [111:25]
further [34:11] [166:15,16]
  [168:10,12] [172:15]

G

garage [20:20]
gathered [135:18]
gave [46:18] [63:15] [110:17]
  [136:20] [149:8,9]
geared [63:7] [67:2] [68:10]
general [8:8] [33:17,24]
  [39:3] [51:2,19,24] [59:13]
  [66:5] [72:15] [73:21]
  [78:8] [83:11,17] [91:14]
  [144:14]
generally [10:15] [18:19]
  [19:23] [20:11] [27:11,22]
  [29:24] [32:4,15] [75:2]
  [77:4] [100:10] [163:24]
  [164:3] [165:4,7]
generated [75:10]
generating [74:18]
generic [39:9] [89:18]
getting [66:9] [68:5] [71:16
  ,17] [105:9] [139:22] [150:
  2]
give [4:19] [5:10] [28:9]
  [45:4] [51:2] [60:17,25]
  [72:14] [144:19,23] [156:3]
given [30:3] [38:15] [39:16]
  [41:21] [44:17] [45:19]
  [46:9,11] [58:14] [62:8]
  [77:3] [84:17] [91:18]
  [92:22] [93:11] [117:15,22]
  [127:17] [131:15] [133:17]
  [138:17] [144:17,24]
  [170:8] [172:14]
gives [40:10] [61:11]
giving [63:6] [99:23] [106:23]
  [107:12] [124:16]
glatt [2:5] [4:3]
go [14:2] [26:24] [47:16]
  [61:9] [83:25] [95:12]
  [109:11] [125:9] [149:9]
  [154:15] [158:5,19,22]
  [168:15]
goes [10:25] [138:4] [150:14]
  [158:16,20]
going [9:8] [11:2] [23:7]
  [44:14] [59:22] [61:6,19]
  [64:9] [65:24] [82:5,10]
  [91:21] [94:10] [99:12]
  [115:4] [117:5] [127:10]
  [145:8,18] [146:12] [149:6]
  [155:14] [168:18]
gone [25:16] [135:18]
good [22:5] [26:23] [30:24]
  [52:10] [60:23] [79:15]

[94:7,9] [143:8,13,14]
  [144:14] [147:20] [149:16]
  [169:3]
gotten [80:11] [90:19,20]
  [162:13]
grail [114:21]
greater [83:6] [111:17]
  [157:17,22]
group [7:23] [8:2,5] [12:7,10
  ,17,19] [22:10] [23:12]
  [53:17] [54:8,18] [111:8]
  [118:18] [119:12] [121:10]
  [133:2,23]
groups [129:7]
guarantee [47:12]
guarantees [77:25] [78:3,5
  ,7] [131:24]
guess [5:11] [26:20] [45:13]
  [46:15] [50:14] [53:11]
  [98:10] [110:19] [118:12]
  [136:3] [142:20] [151:6,7,9
  ,24]
guideline [143:14]
guidelines [5:14] [6:4]
  [62:12,14,16,20] [72:4]

H

habit [18:2]
half [22:4]
hand [172:20]
handed [142:2]
handles [13:10]
handling [124:21]
hang [8:23]
hanouna [10:3,11] [11:6,11]
  [13:9]
h-a-n-o-u-n-a [10:3]
happen [31:14] [134:3]
happened [90:4,18,23]
  [129:19] [153:19,20]
  [154:19]
happens [132:22]
happenstance [166:22]
hard [16:12]
harm [91:21] [130:11,20]
  [131:5]
harmful [112:23]
havent [26:10] [45:14]
  [107:9]
having [4:7] [95:5] [101:21]
  [162:11]
headed [72:13] [107:17]
  [118:13]
headings [129:2]
hear [27:11] [125:15]
heard [156:20]
heavily [50:15] [154:6,7]
help [11:7] [15:2] [66:24]
  [75:11,21] [121:17,19,20]
  [122:2] [133:23]
helped [8:21] [52:8] [55:21]
  [144:25]
helping [11:3] [52:6]

helps [57:3] [82:20]
hence [82:24]
hereby [170:4] [172:10]
hereinbefore [172:12]
hereunto [172:19]
hes [64:10] [115:5]
hesitated [16:4]
high [118:25]
higher [71:8] [83:5]
hindsight [98:13]
hire [115:23]
hired [129:21]
historical [109:14]
history [81:7,9,18]
hold [21:10] [26:4] [80:11,12]
  [169:2]
holders [33:14] [34:5]
  [38:3,20] [39:2,3,5]
holy [114:20]
home [15:16,18,21] [17:12]
  [21:21] [22:8] [23:2] [50:22]
  [76:2] [81:10] [82:22,23]
  [109:16]
homes [3:8] [23:15] [82:18]
  [117:11] [128:7] [131:11]
  [133:13] [160:24] [173:8,11
  ,,16]
hope [26:20] [56:24] [136:7]
hoping [136:2]
hour [25:5] [69:22] [70:9]
hourly [24:24,25]
hours [25:21,25] [70:12,15
  ,25]
house [44:24] [147:10]
housing [65:13] [74:25]
  [77:18] [86:21] [110:21]
  [140:19] [141:4]
however [146:9] [147:6,13]
huebner [2:25] [3:14]
huff [147:9]
hundred [126:19]

I

id [18:19] [48:6] [61:5]
  [67:5] [153:19] [173:3]
idea [23:20] [43:3] [54:17]
  [88:7] [144:14] [151:6,7]
ideas [84:7] [101:7,8]
  [119:8,22] [121:8,22]
  [129:10] [130:18]
identical [165:18]
identification [3:4] [117:13
  ,16] [128:9] [131:12] [133:
  15] [141:24] [148:5,9]
identified [6:7]
identifies [118:17]
identify [10:5] [11:3] [83:20]
iii [79:20]
ilkhani [9:23,24] [10:11]
  [11:11] [13:8]
i-l-k-h-a-n-i [9:24]
ill [8:12] [23:7] [63:24]
  [69:7] [146:23]

im [8:19] [22:3] [23:6,17]
  [24:7,22] [27:8] [28:16]
  [31:25] [32:22,23] [35:15]
  [36:23] [51:19] [52:18]
  [53:14] [54:13,15] [56:16]
  [67:25] [69:7] [71:5] [78:5]
  [84:3] [85:5,14] [90:23,24]
  [105:12] [107:6] [113:23,25]
  [115:13] [123:6,17] [124:15
  ,16] [125:22] [126:4] [127:
  6] [130:15] [133:5,8] [136:
  13,14] [140:2] [143:6]
  [146:12] [149:14] [150:12]
  [154:17] [156:21,22]
  [157:10] [158:5] [161:20,21]
imagine [42:14] [147:6]
immediate [120:19]
immediately [52:17] [68:14]
  [95:24]
impact [21:2] [100:24]
  [101:20,21] [102:16,20,22]
  [112:23]
implicitly [122:2] [135:24]
import [102:10]
importance [148:20]
important [33:2]
impossible [145:3,5]
improve [120:6]
imprudent [92:24] [93:25]
inappropriate [143:22]
inc [14:9]
incentive [65:10,11,14,21]
  [66:10] [69:5,14]
incentives [5:23] [6:16]
  [38:12,15] [64:20] [65:8]
  [66:13,21] [67:3,8,13,18]
  [68:16,19,24] [69:3,9,18,21]
  [70:16,19] [71:4,22,25]
  [151:25] [152:4]
include [23:7] [48:3] [81:7]
included [26:12]
includes [49:16,17]
including [41:19] [49:9]
  [81:17] [101:3] [109:13]
income [71:9]
inconsistent [5:13] [6:3]
incorrect [84:24]
increase [154:19,22]
increased [153:16]
indeed [111:24] [120:23]
independent [6:16] [10:10]
  [13:15] [24:12] [41:11]
  [80:8] [110:17] [139:5]
independently [80:18]
index [174:2]
indicate [22:23] [41:5]
  [64:19] [155:24]
indicated [121:12] [146:2,5]
indicates [30:17] [63:14]
  [64:13,25] [85:12]
indicating [164:21]
indication [61:11] [100:17]
  [103:23] [122:14] [143:16]
individual [53:2] [63:14]

individuals [71:11] [84:16]
industrial [36:4]
industry [51:18] [77:4]
 [98:17] [120:5] [140:19]
 [141:4]
industrywide [120:5]
industry-wide [120:5]
inference [37:13]
influence [110:24]
inform [51:17] [101:2,23]
informal [105:24]
information [57:12,16,22,23]
 [58:6,12,16,20,23] [60:25]
 [62:25] [63:16] [72:14,18,24]
 [79:3] [80:24] [81:4,5,16,21
 ,24] [83:10,15,20,24]
 [84:4,10,17,19,21,23]
 [85:25] [107:18,20] [109:4
 ,9,11,13,17] [120:17]
 [136:20] [139:12] [150:25]
 [164:5]
inherent [58:10]
initial [52:6]
inperson [7:18]
in-person [7:18]
inside [57:13] [107:18]
 [109:10,13]
insofar [33:22] [40:14]
insolvency [32:10] [39:16]
 [41:13] [92:4,23] [93:11]
 [96:18] [136:22] [166:13,18]
 [167:15]
insolvent [30:4] [31:17,19]
 [34:12] [35:9] [38:7,13,16]
 [41:3] [44:3] [66:25] [67:2]
 [68:4] [85:19] [92:5] [93:18
 ,21] [94:3] [120:8] [122:21
 ,23] [124:7] [135:8] [139:2]
 [149:2] [150:7] [155:17,19
 ,21,23] [156:2,8,11,13,16,19
 ,20] [157:3,8] [159:2,15]
 [167:6]
instance [50:21] [91:18]
 [123:24]
instead [32:16]
institution [50:19] [51:13]
 [72:2] [93:16,25] [162:6]
institutions [114:14,21]
instruction [40:7]
instructions [40:9,10]
instruments [35:25]
insulate [109:23]
intend [146:20]
intended [88:10]
interchangeably [29:9]
interest [31:12] [34:14]
 [66:7] [71:16] [77:11]
 [78:11] [82:9,16,25] [83:4
 ,6] [152:15] [153:21] [160:
 2]
interested [56:16] [82:5]
 [126:11] [128:13] [130:19]
 [151:21] [172:17]

interests [28:2] [29:14]
 [33:14] [34:5] [63:4] [82:15]
 [91:22] [123:11]
internet [16:5]
interpret [107:3]
interrupt [85:14]
interruption [63:22]
intervening [86:22]
interview [21:12]
interviewed [43:22]
introduce [3:19] [114:17]
introduces [115:3]
inventory [87:5]
investment [20:3] [50:8,15
 ,20] [51:10] [52:3,11]
 [56:19] [58:11] [72:13,16,21
 ,25] [73:6,9,22] [77:16,23]
 [83:12,14] [111:22] [113:21]
 [140:14] [142:20]
investopedia [72:19]
 [73:13]
investor [88:11]
invoice [26:9]
involve [163:11]
involved [19:10] [24:2]
 [110:5] [118:15]
irrelevant [162:3]
isnt [35:13] [39:13,21]
 [69:19] [70:18] [71:17]
 [90:2] [104:5] [108:25]
 [110:8] [111:7] [112:2]
 [115:2] [126:22] [129:5]
 [151:19] [160:20]
isolate [110:5]
issue [26:6] [33:4] [75:9]
 [91:7] [93:3] [160:13]
issued [78:9]
issues [42:18] [104:13]
itself [39:8] [47:20] [70:5]
 [77:22] [92:13] [109:23]
 [112:20,21] [122:22]
 [131:6]
ive [23:20] [33:15] [36:24]
 [44:18] [49:6] [60:19]
 [65:5] [73:3,6,7] [76:24]
 [103:25] [115:9] [117:15]
 [131:15] [133:17] [134:15
 ,16] [142:2] [145:11,12]
 [149:15] [156:19]

**J**

j.p [165:2]
jacob [118:18]
james [53:15]
jared [118:19]
job [137:25] [138:3] [139:8]
 [150:19] [151:19]
judge [148:23]
judges [148:21]
judgment [136:10,11]
 [138:4,15] [139:5] [150:16]
june [106:6,20] [115:4]
 [116:7,9,20] [117:18]

 [121:7] [122:8,16] [124:19]
 [126:13,17,25] [127:21]
 [128:10] [155:18] [156:7]
 [167:5]
justin [2:15] [3:23]

**K**

keep [5:23] [16:16] [20:9]
 [23:2] [57:3] [59:21] [64:20]
 [65:9,14,21] [66:14,25]
 [71:16,22] [102:18] [121:13
 ,16] [131:3] [139:4]
keeping [87:5]
kept [23:5] [90:25]
keyboard [15:6] [47:21]
kind [12:18] [60:15] [76:4]
 [105:24] [110:2] [112:4]
 [114:16] [115:25] [121:12]
 [132:13] [142:15] [150:17]
 [161:6]
kinds [34:23] [35:13,24]
 [71:13] [81:16] [114:18]
 [119:5] [134:3]
king [9:2]
knew [120:24] [121:2]
 [137:4] [155:13]
know [8:18] [9:5] [10:18]
 [11:2,13] [12:17] [21:7,14
 ,17,20,23] [23:6,8] [25:12,14
 ,20] [28:15,18] [37:14]
 [42:5] [43:2,19] [45:18]
 [47:5,24] [50:9] [51:5]
 [52:22] [53:12] [54:6,10]
 [56:12] [57:20] [60:24]
 [61:5,10] [63:4,9] [64:8]
 [66:2] [70:4] [74:2] [78:3,4]
 [80:17] [83:2] [85:3] [87:16]
 [90:17] [91:23] [92:3]
 [96:22] [97:5,13,22] [98:20
 ,24] [99:21] [100:22] [103:
 13] [104:18,22] [108:22]
 [113:22] [116:6,11,12]
 [117:21] [118:2,3,6] [119:
 10] [120:12,21,23] [121:6]
 [123:25] [125:23] [126:9,10
 ,21] [127:5] [129:16,18]
 [131:22] [132:17] [134:6]
 [135:13,15,16] [136:2]
 [137:5,8,15] [138:10]
 [139:15,17,21,24] [140:6,23
 ,25] [141:2,8] [142:10,21]
 [143:3,7,10] [144:13,15,18
 ,23] [147:5] [151:2,12]
 [152:20] [153:19] [154:13
 ,16] [155:4,22,23] [158:12]
 [161:10] [162:4,8,17]
 [165:8] [166:22]
knowing [45:9,17] [71:10]
 [80:9] [84:14] [137:3]
knowledge [60:24] [65:17
 ,18] [77:4] [129:21] [154:25]
known [52:4] [57:24] [98:15]
 [107:21] [108:17] [112:10]

 [155:9]
kozlowski [2:23] [3:24]

**L**

labeled [46:6]
laid [119:21]
large [38:10]
last [8:18] [26:9] [145:25]
 [149:15]
later [9:8] [24:18] [43:23]
 [99:14] [119:18] [128:16]
 [139:25] [155:22]
law [7:3] [10:23,24] [43:12]
 [124:2] [137:19]
lawsuit [80:2]
lawyer [8:20] [10:25] [27:9]
 [158:12]
lawyers [8:25] [9:10] [16:20]
 [44:6]
lead [136:21] [166:9]
leading [112:18]
learn [41:17]
learned [43:20]
least [41:10] [48:7] [56:8]
 [58:25] [61:6] [68:8] [82:15]
 [104:3] [122:4] [134:19]
 [168:17]
leave [98:24]
leaving [102:25] [103:22]
 [107:10]
led [132:5]
legal [3:14] [5:10] [27:21]
 [31:23] [32:2,14,19,21,22]
 [33:8,16] [36:10,11] [38:23]
 [39:7] [79:4,15] [91:6]
 [124:16] [143:4] [160:12]
leisure [70:14,15] [71:7,8]
lender [55:8] [56:3] [88:4,6
 ,11] [89:11,16,22] [90:10]
 [91:15] [95:17,18,23]
lenders [93:20]
lending [111:22] [143:23]
lends [86:20]
lent [89:22]
less [6:23] [70:14] [82:24]
 [91:25] [101:20] [156:18,25]
let [14:2] [26:24] [30:7]
 [44:20] [57:25] [63:24]
 [85:13] [116:17] [133:2]
 [147:15] [158:9]
lets [28:25] [39:6] [49:24]
 [54:23] [63:2] [72:8] [74:20]
 [82:17] [106:15] [113:16]
 [123:13] [125:9] [128:3]
 [145:15] [148:4] [168:15]
letter [147:3,9,12]
liabilities [39:4,5]
liability [158:21,22]
lie [138:5]
life [92:14]
lifethreatening [92:14]
life-threatening [92:14]
liked [23:22]

likelihood [112:19] [152:15]
likely [16:15] [57:22] [58:3]
 [82:23] [102:16]
limited [158:21]
limits [72:5]
line [54:4] [62:9] [87:25]
 [88:17] [171:5]
linklaters [2:11,17] [3:17,22]
liquidation [3:9] [26:21]
 [123:7]
list [19:5] [44:18] [45:22,23
 ,24] [46:8,9] [48:13] [49:4]
literature [38:11,25] [39:8,19
 ,22] [40:4,17,20] [73:7]
 [137:19]
litigation [24:2] [69:22,24]
 [79:9] [125:13,18]
little [119:17] [128:16]
llc [2:24] [12:20,21] [13:12
 ,20]
llp [2:11,17]
loads [45:16]
loan [74:8] [76:8,9] [86:12,13]
 [90:21] [100:24,25] [101:22]
 [102:4,5,17,20] [111:20]
loans [77:18] [88:20] [93:21]
london [2:19]
long [20:20] [66:8] [157:16]
look [20:22] [23:23] [25:16]
 [39:10,12] [40:4] [68:9]
 [72:8] [88:16] [118:10]
 [119:4] [127:14,16] [128:3]
 [135:6,10] [150:22] [151:17]
 [160:22]
looked [41:19] [76:20,24]
 [88:11,22] [93:3,4] [150:25]
 [151:10] [167:2]
looking [27:25] [32:21,22]
 [36:23] [59:14,21] [77:15,22]
 [78:12] [90:9] [98:20]
 [100:18] [148:20]
looks [131:14] [142:7,8]
loose [75:6]
loosely [48:6]
los [2:7]
lose [82:23]
losing [63:8] [106:14,19]
 [126:16]
loss [109:14]
losses [120:2]
lost [126:18,20]
lot [44:14] [52:5] [73:7]
 [91:15]
lots [34:23]
lotus [132:5]
lousy [150:2,3]
loyalty [27:24] [28:3]
lunch [94:8] [95:15]
luncheon [94:12]

M

m&a [103:17]
main [39:22]

maintain [16:16] [18:15]
 [59:19] [91:9,20] [98:22]
 [102:19] [135:23]
maintaining [63:8]
maintains [18:11] [159:8]
major [50:13] [52:2] [56:18]
 [96:11] [114:13] [161:9]
making [65:12] [67:2]
 [93:21] [111:20] [116:5]
 [124:15] [138:4] [161:21]
 [167:14]
management [53:17]
 [54:13] [84:6] [86:2] [98:6
 ,20,25] [99:2,6,9,18,22]
 [100:17] [104:4] [107:22]
 [108:10,16] [109:3] [110:17]
 [111:19] [112:10] [120:25]
 [124:11,12] [136:4,12,18,19]
 [137:5,8,9] [138:21] [139:
 4] [140:5]
managers [39:25] [40:2,5,6
 ,12,21]
managing [118:18] [143:13]
manner [5:19] [6:20] [33:5]
 [63:3] [72:12] [160:11]
manual [5:14] [6:4] [141:24]
 [142:5,24] [173:]
manufactured [65:13]
 [74:25] [76:2] [77:18]
 [86:21] [110:21] [140:19]
 [141:4]
manufacturing [160:24]
march [16:10,11] [106:7,21]
 [131:12] [155:25] [156:6]
 [173:14]
marginal [157:7]
mark [128:5] [131:8] [133:11]
 [148:4]
marked [4:23] [117:12,16]
 [118:11] [128:8] [131:12,16]
 [133:15,17] [141:24]
 [142:3] [148:8]
market [52:9] [118:25]
 [148:20,24] [151:10,21]
 [152:13] [154:4,6,13]
 [155:9,12] [156:17,24]
 [157:12,13,14,17,18]
 [159:11,12,13] [163:12,17]
 [164:15,18,21] [165:13,21
 ,22] [167:11]
marketing [75:22]
markets [154:23]
marks [61:23]
marriage [172:17]
material [80:3] [101:20]
 [118:5] [161:5,18]
materials [20:21] [58:13]
 [59:9] [61:11] [63:12]
 [64:11] [65:12] [79:22]
 [99:3] [100:16] [127:17]
 [131:11] [143:15] [161:2,6]
 [173:14]
math [26:4]
matter [8:22] [11:9] [12:23]

[15:4] [17:8] [18:21] [19:7,14]
 [20:8] [21:3,6] [24:21]
 [25:7,21] [42:20] [43:6]
 [44:22] [51:19] [57:9]
 [59:13] [66:5] [69:20]
 [75:25] [146:25] [148:14]
 [158:25] [172:18]
matters [11:21] [19:5,12]
 [61:13] [71:12] [102:5]
 [107:5] [136:11] [138:15]
maturing [165:13]
may [8:19] [11:13] [20:20]
 [21:23,24] [31:24] [34:17]
 [36:14] [37:6,12] [67:11]
 [69:3] [73:25] [111:8]
 [122:25] [123:3,8] [125:3]
 [132:3,4] [137:9,13] [138:
 19] [139:6,9] [146:21]
 [149:20] [154:3,6] [156:19]
 [159:10] [160:21] [162:16]
maybe [20:11] [22:4,7]
 [42:6,25] [45:16] [90:18,19]
 [113:22] [137:19] [149:13
 ,14,21] [158:9]
mean [13:24] [27:10,16,20]
 [29:5,23] [45:14] [54:25]
 [60:5] [62:10] [80:10]
 [82:14] [87:11] [95:18]
 [98:15] [114:3] [115:21]
 [120:25] [121:19] [151:20]
 [156:11,13,15,17,19]
meaning [39:13]
means [29:25] [48:6] [96:2]
 [136:16] [144:16] [152:12]
 [158:2] [160:10]
meant [27:6] [28:10] [133:4]
meanwhile [157:25]
measure [145:4,6]
measures [122:24]
mechanical [15:4] [17:8]
 [44:22]
mechanically [47:21]
meet [42:9]
meeting [7:23] [8:14] [22:16
 ,24] [23:7,9,12] [24:14]
 [42:6] [43:22] [118:4]
 [129:17]
meetings [7:17,18,25]
 [8:2,5,15] [9:3] [97:11]
members [111:18] [139:19]
 [164:4] [165:4]
memoranda [112:7]
memorize [128:24]
memory [41:23] [150:2,3,14]
mention [8:12] [14:18,21,23]
mentioned [44:5] [130:24]
 [135:20] [151:3]
mergers [52:5]
merrill [3:14]
met [41:16]
method [166:10]
methodology [163:9,11]
mid [56:2] [78:5,6]
mid1980 [78:5]

mid-1980 [78:5]
mid2001 [78:6]
mid-2001 [78:6]
mid2002 [56:2]
mid-2002 [56:2]
million [110:20] [126:19]
mind [37:7] [50:10] [52:18,22]
 [64:7]
minuses [135:11]
minute [58:2]
minutes [97:10,12] [117:3]
misstates [53:8]
mistakes [69:4]
mobile [81:9] [82:18,22,23]
 [160:24]
modest [98:22]
moment [74:21]
money [56:22] [61:6] [63:8]
 [71:2,13] [76:3] [86:20]
 [106:14,19] [126:17]
 [149:7] [153:20]
monitor [109:23]
month [128:16]
monthly [77:17]
months [149:13,14,16,23]
morgan [165:2]
mortgage [52:9] [75:13,16]
 [76:4,6]
mortgagebacked [52:9]
 [75:13,16]
mortgage-backed [52:9]
 [75:13,16]
mortgages [57:20,21]
 [75:3,7,10,12,22] [88:19]
mostly [11:6] [46:10]
motivating [67:14]
movement [39:20]
moves [137:21]
mr [3:21] [4:2,11] [5:9]
 [8:11] [13:8,9] [17:20]
 [20:14,17] [21:9,24] [25:4]
 [26:22] [30:14] [31:15,22,25]
 [32:18] [34:8,15,17] [35:14]
 [36:9] [37:4,21] [38:22]
 [39:15] [41:15,20] [42:23,25]
 [45:7] [47:17,24] [48:18,20]
 [49:3] [51:14] [52:18]
 [53:4,6,8,11,13,15,20,22,23]
 [54:7,11] [61:16,18,25]
 [63:21] [64:4,8] [66:22]
 [68:17] [70:22] [71:18]
 [73:19] [74:2] [83:25]
 [84:8,25] [85:21] [88:15]
 [92:21] [94:6,9] [95:11]
 [96:24] [100:13,15,22]
 [101:10,11,17] [102:3,11,24]
 [103:2,7,14,16,18,19,22,24]
 [105:8] [107:3,8,10] [110:
 13,15] [111:2] [112:7]
 [113:17,19] [115:3,11,14,24]
 [116:4,17,24] [117:2,4,14]
 [119:3] [121:9] [125:15]
 [127:3,21] [128:3,14,17]
 [129:7] [131:8] [133:2,3,5

,7,8,22] [134:24] [140:16]
[141:19] [142:17] [143:2,12]
[144:3] [145:15,17,23]
[146:23] [147:7,11,19,20,21
,22] [148:4] [149:21] [150:
5] [151:4,8] [156:12,14]
[160:14] [162:23] [163:2,5]
[168:10,12,13,15,20,24]
[169:3] [174:4,5,7]
ms [13:8]
muir [100:22] [101:11]
[102:3,11,24] [103:16]
[144:3]
muirs [101:10,17] [107:3,8]
multipage [3:2] [117:10]
[128:6] [131:10] [133:12]
[141:22] [173:7,10,13,,]
multiple [55:3,5]
multiplied [163:13]
multiply [164:13] [165:10]
mutually [137:2]
myself [41:20] [44:7] [70:3]
[135:21]

N

name [8:18] [9:14,16]
[14:8,10] [21:10] [23:8]
[50:17] [52:19,22] [53:2,4
,15,18] [84:8] [97:3] [111:8]
namely [154:22]
names [8:12]
nature [58:10] [66:2] [110:
2]
near [101:11] [112:15]
nearly [125:13,19]
necessarily [48:9] [62:18]
[102:14] [103:18] [122:19]
[125:2] [137:3] [141:15]
[153:18]
necessary [33:6] [164:12]
need [4:15] [123:4] [124:19
,20] [135:21] [161:2]
needed [24:3] [96:10]
[150:18]
needless [80:13]
negative [23:13] [24:3,10]
[111:3]
neither [121:8] [147:15]
networked [15:23]
new [2:13] [3:15,18] [86:6,9]
[172:3,5,10]
newspaper [98:16]
next [78:19] [87:7] [128:4]
[164:17] [165:9,19]
no [3:7,11] [4:21] [5:12]
[7:13] [12:13] [13:19]
[14:18,20,23] [15:24]
[16:18,23] [17:24] [18:9]
[20:24] [21:4] [22:25]
[23:20] [24:11] [25:22]
[26:9] [28:3,4,11] [29:22]
[37:19] [40:25] [41:11,14]
[43:3,9] [45:9,17] [47:23]

[48:22] [51:4,8,15] [54:19]
[62:22] [63:2,20] [64:3,17]
[65:5] [69:23] [70:8,24]
[71:10] [72:3] [73:3,11,18]
[80:10,17,20] [86:4] [88:5]
[89:5,7] [92:24] [93:19]
[94:5] [97:21] [104:20]
[108:15,19] [109:5] [112:16
,22] [113:4,8,13] [118:6,12
,25] [120:21] [122:13]
[126:2] [127:23] [129:5,20]
[130:3,11,19,20] [131:5]
[132:18] [133:20] [134:16]
[135:16,21] [137:12]
[138:22] [139:11] [140:17]
[141:15] [145:12] [151:6,20]
[154:17] [155:8,22] [157:9
,12] [158:20,25] [159:7,23
,25] [161:15,25] [162:22]
[167:22] [168:9,10] [172:17]
[173:3]
nobody [90:9]
non [57:16] [58:6,12,15,16]
none [103:12] [130:5,8]
nonpublic [57:16] [58:6,12
,15,16]
non-public [57:16] [58:6,12
,15,16]
nor [121:9]
notary [4:8] [95:6] [169:11]
[172:9]
noted [95:3] [169:5]
notes [22:22] [36:2] [81:12]
[89:11] [108:2] [132:11,13]
nothing [51:22] [91:14]
[92:24] [93:8] [110:10]
[114:22] [121:7] [132:22]
[168:12]
notion [28:22] [33:4] [143:
7]
november [79:6] [134:6]
number [23:20] [30:19]
[37:22] [80:14,15] [81:15]
[140:18] [163:13] [164:13]
numbered [142:13]
numbers [46:6,15,16,24]
[47:3] [80:18,20] [165:20]
numeral [6:8] [26:25] [36:23]
[79:20]

O

oakwood [3:8] [5:2,20,23,24]
[23:15] [26:21] [27:3]
[28:25] [29:5,6,7,8,17,18]
[31:6,8] [34:22] [35:2,12]
[37:16] [39:11] [41:3,13]
[47:7,11] [49:5] [50:22]
[52:14] [53:3,20] [54:3,23
,25] [55:4,21] [56:4] [57:12]
[59:3,10,14] [60:12,15]
[61:12] [62:4,11] [63:15]
[64:14,20,21] [65:2,3,9,11
,14] [66:13] [67:10,18]

[68:4,15] [70:7] [71:12,22,23]
[74:10,24] [75:5] [77:19,22
,24] [78:3,4,12,21] [82:10,16
,20,22] [83:21] [84:2,6,16]
[85:6,9,18,25] [86:19,21]
[88:4,8] [89:11,16,22]
[90:17,18] [91:9,19] [92:5
,11] [93:13] [95:16,17]
[96:8,17,21,22] [97:11,19
,24] [99:18,23] [100:17,23]
[101:12,18] [102:11]
[103:4,23] [104:14,24]
[105:7] [106:6] [108:17,18]
[109:10,12,22,24] [110:4,23]
[111:3] [112:11,12,20]
[115:5,15,23] [116:10]
[117:11,17,21] [118:23]
[119:4,11,20] [120:2,3]
[122:5,16,20,23] [124:18,23]
[125:13,18] [126:11]
[128:7] [129:21] [131:11]
[133:3,5,13] [134:7,20]
[135:7,10,13,25] [136:4,12
,16] [137:16] [139:12]
[140:4,21] [142:25] [143:12
,18] [144:10,11] [153:2]
[155:2,17] [160:19] [167:5]
[173:16]
oakwoods [30:10] [37:2,20]
[39:14] [55:20] [57:13,17]
[58:6,16] [59:12] [62:9]
[78:18] [80:25] [82:11]
[83:4,6] [88:20] [96:4]
[98:6] [104:4] [107:19,22]
[112:23] [125:24] [135:4]
object [32:18] [51:14]
[63:21] [64:4,9]
objection [5:9] [30:14]
[31:15,22] [34:8,15] [35:14]
[36:9] [37:4,21] [38:22]
[39:15] [66:22] [68:17]
[70:22] [71:18] [84:25]
[88:15] [96:24] [127:3]
[128:14] [134:24] [140:16]
[142:17]
objections [79:5]
obligated [82:11]
obligation [5:12,21] [6:2,10
,13,17,21,22] [27:12,18]
[28:22,25] [32:5] [33:10,19
,20,22] [34:2,13] [35:8,10]
[36:14] [38:3,4,6,8,9,17]
[72:5] [91:24] [124:3,4,14]
[136:15] [137:7,10,13]
[138:22,24] [139:8,9]
[159:24,25] [160:8] [161:21
,22,25] [162:2]
obligations [39:23] [76:2]
[77:12] [81:6,8,22] [104:14]
obtain [164:4]
obtained [107:18]
obtaining [109:9]
obviously [149:6]
occasion [7:14]

occupation [11:23]
occupy [70:2,5]
occur [166:16]
oclock [146:12]
odriscoll [52:18,21] [53:7,13
,20] [54:7] [84:8] [103:14,19
,24] [115:3] [143:12]
off [61:19] [84:7] [87:6]
[94:10] [117:5] [122:17,19]
[132:14] [137:4] [141:12]
[145:18] [168:15,18]
[169:4]
offering [20:2] [129:7,10]
offerings [52:6]
offers [130:7]
office [15:18,21] [42:10]
[147:3]
officers [111:22]
offices [15:15,16] [102:18]
often [40:9]
oh [31:4] [44:24] [47:18]
[48:3] [53:14] [73:14]
[103:6] [114:6] [150:20]
[169:3]
ohc [3:9]
okay [8:16] [9:7,25] [10:4,14
,21] [12:21] [13:17] [14:17
,22] [15:3,8,11,17] [16:16,20]
[17:14] [18:9,21] [19:15]
[20:4] [21:11,22] [22:12]
[24:20,24] [25:4,6] [26:4]
[27:19] [28:14] [32:8]
[33:11,24] [34:19,22]
[37:9,15] [39:18] [42:8]
[43:18] [44:10,13,16]
[45:4,22] [46:23,25] [47:20]
[48:18] [49:2,19,24] [50:6]
[51:5,9,21] [53:12,22]
[54:2,6] [55:5,11,13]
[56:3,10] [57:10] [58:9]
[59:2] [60:3,11] [61:4,16]
[64:18] [65:7] [67:24]
[68:22] [71:20] [77:10]
[79:7] [80:19,23] [83:8]
[85:23] [86:5] [87:19,22]
[88:24] [89:8] [90:4] [91:2]
[92:8,22] [94:6] [96:13,20]
[97:18,22] [98:3] [100:3,9]
[102:9] [103:21] [104:3]
[105:11,19] [106:3] [107:8
,16,24] [108:6] [110:11]
[111:2] [112:15] [113:7]
[114:22] [115:2] [118:7,10
,22] [119:10,24] [120:16]
[121:4] [122:12] [123:22]
[124:12] [126:3] [127:24]
[128:21] [129:16] [130:5,11]
[131:7] [132:24] [138:8]
[139:21] [140:6,11] [141:7
,19] [142:9,15] [144:8]
[145:15] [150:13] [152:6,19
,24] [153:3,4,5,7,8,13,14]
[155:5,16] [159:17] [161:17]
[162:4]

older [150:2,15]
omission [67:20] [68:2]
once [154:9] [164:10]
one [2:18] [7:24] [8:20]
  [16:18] [19:13,20] [21:8]
  [25:17] [35:4] [47:19]
  [50:13] [52:2,4,11,17]
  [60:25] [65:16] [72:5]
  [73:16,20] [74:3] [76:20]
  [79:17] [80:2] [82:18]
  [90:24] [97:3] [114:7,14,16]
  [116:19,20] [131:25]
  [135:6,22] [141:19] [144:2]
  [149:25] [152:6] [154:2]
  [162:9]
ones [46:11,16]
onethird [25:17]
one-third [25:17]
ongoing [102:6] [122:2]
  [130:25]
onto [137:22] [169:2]
onward [37:2]
open [62:21] [102:18]
  [147:4]
operate [12:8] [60:6,7]
  [66:7]
operating [5:23] [61:3]
  [64:20] [65:9,15] [66:8,14]
  [71:22] [110:7] [160:19,20]
operational [59:19,25]
  [60:3,5,19] [61:13]
operations [59:4,12,20]
  [60:12,16,22] [62:5] [63:8]
  [90:21]
operator [3:13]
opine [42:21]
opining [127:6]
opinion [5:11,22] [23:14,19
  ,24] [24:10] [30:22] [36:12
  ,17] [39:8] [48:10] [61:8]
  [64:19] [80:16] [91:2]
  [92:17] [93:14,23] [96:14]
  [97:18] [98:5] [105:12,13]
  [122:15] [123:18] [124:16]
  [134:18] [136:9,13,21]
  [137:11] [138:13] [141:16]
  [144:22] [151:9] [155:16,18]
  [156:8] [159:17] [166:12]
  [167:14]
opinions [5:16] [24:3]
  [49:20] [54:21] [62:3]
  [79:21] [110:18]
opposed [42:22] [59:19]
  [68:11] [76:8] [104:15]
  [112:8] [153:6] [154:11]
opposite [70:17]
optimistic [98:8]
option [113:9] [125:2]
  [158:3,7,17] [159:2,9]
orange [19:16] [20:3]
order [68:5] [82:21] [144:19]
  [164:11]
ordinarily [159:8]
ordinary [66:6] [71:24]

organization [12:5] [33:21]
  [114:18]
organizational [54:16]
organized [51:7]
original [169:2]
originally [150:4]
originate [52:9]
originations [100:25]
  [101:22] [102:4,17,21]
otherwise [6:23] [68:25]
  [69:13]
ought [158:9]
outcome [124:23] [125:23]
  [126:7,11] [127:11,20]
  [172:18]
outright [148:16]
outset [32:24]
outside [121:25] [125:6,7]
outsider [34:13]
outstanding [163:14]
  [164:14] [165:11] [166:3,6]
overly [98:7]
overstates [102:10]
owe [31:20] [124:17] [136:
  17]
owed [5:2] [27:3] [28:24]
  [29:17,18] [30:10] [31:6]
  [35:8] [37:2,20] [91:3,23]
  [124:3] [136:14] [137:14,16
  ,21]
owes [31:19] [33:13]
owing [29:4,20]
own [12:7] [25:14] [43:12]
  [44:9] [62:12] [135:7]
  [160:2]
owned [30:5]
owner [75:15] [82:25]
owners [14:15] [29:14,23,24]
  [32:12] [35:17] [82:14]

———————————————
P
———————————————

p.m [94:12] [95:3] [169:5]
packaging [75:11,21]
page [4:24] [6:8] [26:25]
  [30:23,24,25] [37:16]
  [54:21] [57:10] [62:3,19]
  [72:10] [78:16] [79:20]
  [80:23] [86:6] [89:8] [95:13]
  [100:4] [101:9,11] [102:24
  ,25] [107:17] [109:7,21]
  [110:12] [112:15,16]
  [113:7] [118:11] [119:24]
  [128:21,23] [131:19]
  [142:10,12] [171:5]
pages [5:17] [49:20] [142:6]
paid [12:22] [24:20,22,23]
  [25:7] [26:8,10,19] [55:10]
  [56:11,12] [66:9,16] [69:22]
  [70:9,13] [75:17,18]
pamela [9:2]
paper [55:20,22] [76:5]
  [77:22] [84:23] [86:22]
  [87:4,5] [88:12]

paragraph [59:3] [95:16]
paraphrase [147:8]
part [43:6] [53:12,16] [54:6
  ,10] [56:16] [59:7] [79:13]
  [85:4] [102:2] [109:11]
  [110:16] [113:18] [115:24]
  [122:25] [138:20] [158:4,6]
participant [9:3]
participants [8:4]
participated [8:13]
participating [8:15]
particular [30:3,15] [34:19]
  [36:8] [46:14] [50:20]
  [62:14] [69:8,15] [75:19]
  [91:17] [123:24] [132:10]
  [138:18] [165:16] [166:23]
particularly [11:7] [80:14]
  [97:7] [106:5,11] [113:21]
  [114:23]
parties [28:3] [40:21] [126:
  11] [159:20] [160:17]
  [172:16]
partners [13:12]
parts [15:9] [48:21] [51:13]
  [118:14]
party [28:2,5] [79:17] [80:2]
  [147:2]
pass [75:14]
passes [124:8]
past [11:21] [19:6]
pattern [69:17]
paul [2:14] [3:21] [9:18]
  [10:3,9,11,22] [11:6,18]
  [17:15,17,18] [47:8,14,23]
pay [13:6] [82:11] [108:11]
  [109:3,5]
paying [81:12]
payment [13:4,17,22,23]
  [81:7,9] [125:25]
payments [14:4] [77:17]
pays [13:8]
penny [159:9]
people [8:7,8,14,21] [9:9,19
  ,20,22] [10:5,15] [11:17,21]
  [13:15] [14:24] [15:2,9]
  [21:20,22] [22:7] [24:23]
  [63:19] [84:2] [100:10]
  [101:6] [109:2] [111:15,23]
  [159:19] [165:7]
per [144:16]
percent [152:9]
perfect [67:12] [145:9]
perform [82:6,10,16] [97:20]
  [164:11]
performance [84:11] [105:
  14,20] [160:6]
performed [112:17]
period [31:10] [85:4,7,24]
  [86:22] [105:22] [136:2,5]
  [140:20]
perpetuating [106:14,18]
persist [154:8]
persisted [126:15]
person [7:2] [8:3] [63:16]

  [69:21] [77:14] [82:4,8]
personally [14:5]
personnel [84:7]
perspective [151:18]
pertain [71:25]
peter [2:23] [3:24]
ph.d [3:3] [148:8] [173:]
phil [118:18]
phone [21:8]
physical [42:11]
picture [149:16]
piece [64:18] [84:18]
pitch [115:18,21] [118:8]
  [120:14] [129:5,24] [130:23]
  [131:5,23] [132:3,7] [133:
  20,22]
pitches [116:5] [131:25]
  [151:4]
pjw [3:11]
place [3:16] [90:16] [125:11]
  [148:18]
plaintiff [2:4] [4:3] [12:25]
plaintiffs [12:11]
plans [59:17] [84:3]
plants [60:6]
play [154:4]
played [10:16] [55:19]
  [75:23] [81:2]
playing [155:6]
please [3:19] [4:5] [125:16]
  [141:21]
plus [165:22]
pluses [135:10]
point [34:2] [40:19] [43:19]
  [50:17] [54:16] [58:8,20,21]
  [59:8] [60:13] [61:15]
  [62:13] [63:13,19] [66:23]
  [67:3,23,25] [68:4] [69:16]
  [71:3] [73:12] [83:2,23,24]
  [84:18] [100:21] [101:8]
  [103:12] [106:22] [107:24
  ,25] [119:13] [131:23]
  [138:3] [159:18] [164:16]
pointed [38:10] [70:24]
  [148:19] [149:2]
pointing [71:5] [97:6]
  [106:13]
points [106:10]
policy [135:25] [136:24]
  [137:6]
pool [20:3] [77:12] [78:13]
  [82:5] [109:15]
poor [105:20]
popular [139:6,8]
portion [25:12] [26:16]
position [80:2] [118:25]
  [120:8] [160:18]
positions [146:21]
positive [23:19]
possession [58:17] [83:21]
  [93:20]
possibility [49:15] [108:3]
  [121:2] [159:10]
possible [88:7] [92:19]

[119:22]
possibly [8:20] [22:3]
  [90:20] [102:14] [123:4]
potential [110:18]
practice [101:18,23]
pre [33:12,25]
precarious [59:15]
precise [29:22]
predicament [112:21]
preface [62:8]
preinsolvency [33:12,25]
pre-insolvency [33:12,25]
premarked [3:4]
premiere [52:11]
preparation [76:10] [134:13]
  [140:12]
preparatory [163:7]
prepare [47:21,23] [48:20,23]
  [147:25] [148:14,16]
prepared [48:18] [51:11]
  [72:6] [85:17] [92:3] [97:14]
  [115:22] [128:10] [146:7]
preparing [9:11] [48:15]
  [50:10,25] [76:16] [81:25]
  [83:19] [88:21] [97:10,23]
  [98:4] [99:4] [109:12,18]
  [120:18] [152:2] [163:6]
present [2:22]
presentation [103:9] [116:
  8,9,12] [117:11,17] [119:11]
  [121:7] [122:8,22] [128:4,7
  ,10,17] [129:18] [130:12]
  [131:17] [133:14,18]
  [173:]
presentations [99:8] [100:
  13,15] [103:2] [106:6,20]
  [107:11] [135:6]
presented [115:12,15]
  [128:11]
preserve [123:9]
preserved [17:22]
preserving [68:10]
pressure [132:14]
presumably [16:12] [65:13]
  [161:6]
presume [141:18]
pretty [10:18] [24:8] [90:24]
  [107:4] [111:2,6] [149:2]
previously [83:16] [95:5]
price [71:8]
prices [163:22] [165:13]
pricing [75:22] [154:5]
primarily [40:4] [74:9]
  [137:21]
principal [9:19] [11:12,17,23]
  [18:17] [52:15] [72:24]
  [84:21] [146:11]
principals [13:12]
principles [62:12,14,16]
prior [16:21] [41:16] [42:10]
  [53:9] [59:4] [62:5] [65:4]
  [74:8] [100:5] [105:22]
  [116:4] [126:5] [140:2]
  [167:2]

private [36:2] [80:24] [83:10]
  [84:4,10] [109:10]
probability [157:24]
probably [16:10] [20:6]
  [23:9] [56:2] [65:25] [69:24]
  [99:11] [108:22] [116:20]
  [117:24] [141:2] [155:13]
problems [57:21]
proceed [146:15]
proceeded [121:8]
proceeding [94:4] [125:12]
proceedings [125:17]
  [146:4]
process [4:15] [50:24]
  [135:19] [154:12]
produced [45:5] [108:7]
product [20:10] [114:8]
production [102:18,19]
products [114:7,11]
professional [97:14] [98:5]
  [172:8]
professionals [163:25]
  [168:2]
professor [4:12,22] [5:5]
  [10:8,12] [11:24] [91:2]
  [93:23] [122:15] [134:18]
  [136:9] [142:2]
program [100:25] [101:22]
  [102:4,7] [143:23]
programs [141:5]
pronounce [52:19]
proposal [132:18]
proposed [111:9,16]
prospect [157:25]
prospects [139:13]
prospectus [81:25] [109:18]
prospectuses [76:21]
  [80:12,13] [109:12]
protect [68:6]
prove [68:20]
provide [11:6] [12:12,17]
  [20:15] [43:7] [53:16]
  [59:21] [75:2] [78:3,5]
  [86:18] [93:16] [105:8]
  [110:22] [114:18] [115:24]
  [144:17] [162:15]
provided [5:19] [50:21]
  [52:14] [53:3,19] [58:5]
  [74:16] [77:25] [78:6]
  [89:19] [104:9] [106:9,10]
  [109:13] [161:14] [165:15]
provider [86:11] [87:13,23]
providing [56:19] [93:9]
  [106:17,18] [112:25]
  [114:16] [122:3] [125:5]
  [140:3] [143:2] [162:5]
proviso [66:15]
prudent [5:18] [6:18] [72:12]
  [91:12] [92:18] [93:15]
  [138:13] [160:11]
public [4:8] [46:4] [52:6]
  [57:13] [80:24] [83:10,22]
  [84:17] [95:6] [107:18]
  [108:7] [164:4] [165:4]

[169:11] [172:9]
publicly [35:17,25] [57:23]
  [62:24] [104:13] [108:11]
  [109:9] [112:12] [152:8]
  [166:6]
puff [147:10]
pull [112:21]
purchaser [77:15,21]
  [78:11]
purchases [77:11,17]
purchasing [89:11]
purely [15:4]
purpose [35:4] [81:25]
  [95:19] [111:24] [144:15]
purposes [24:2] [62:7]
  [105:15]
pursuant [105:4,15] [134:12]
put [27:9] [55:13,24] [56:7]
  [57:5] [71:7,13,14] [107:25]
  [154:10]
putting [57:18] [68:12]

Q

qualifications [4:13]
quality [109:16]
quarter [155:25] [156:2,4]
quarterly [109:6] [166:8]
question [8:25] [14:2]
  [31:23] [32:18] [36:10]
  [37:8] [44:20] [61:9] [63:20
  ,25] [64:5,11] [85:15]
  [92:16] [125:16] [126:5]
  [138:12] [150:11,12]
  [151:5] [158:10]
questions [146:13,19]
  [163:3] [168:11]
quick [116:22]
quickly [25:24]
quite [19:4] [60:20] [76:22]
  [111:11] [115:8] [123:3]
  [143:19] [148:15] [162:2]
quo [59:19]
quote [101:10,16] [102:10
  ,23,24]
quoted [102:2]

R

radical [122:24]
raise [52:6]
raised [37:8]
ran [55:25] [69:9]
range [101:3] [107:5] [127:
  14,16]
rate [24:24,25] [25:5,23]
  [83:6]
rates [24:19] [102:21]
  [109:16] [152:16]
rather [113:4] [120:2]
  [151:7] [153:16]
ratify [135:24]
raw [161:2,5,18]
ray [8:17] [18:20] [21:9,24]

[149:21]
re [3:8]
reach [33:7] [167:17]
reached [49:21] [70:21]
  [159:18]
read [30:9] [73:7] [87:17]
  [90:10] [97:3] [115:9]
  [160:14,16] [170:5]
reader [66:19] [67:5,7]
ready [87:7] [105:9] [133:24]
real [28:19] [39:24] [60:21]
  [153:22] [158:20]
realistic [145:10]
realities [61:3]
really [13:12] [21:7] [22:18
  ,20] [23:16] [29:20] [30:15]
  [39:7,13] [80:16] [95:18]
  [113:12] [121:12] [125:20]
  [126:5] [140:6] [149:8]
  [160:21]
realtime [172:8]
rearrange [121:14] [125:6]
rearranging [121:21]
reason [4:18] [14:17,20,22]
  [80:17] [85:23] [108:15,20]
  [120:16] [137:12] [138:23]
  [158:15,20,24] [159:7]
  [171:7,9,11,13,15,17,19,21]
reasonable [5:18] [6:17,20
  ,23] [23:18] [33:5] [41:21]
  [44:8] [62:23] [91:25]
  [138:13] [144:17,19]
  [160:11]
reasonably [5:18] [6:18]
  [66:16] [91:12] [92:18]
  [93:25] [138:13] [160:11]
reasons [36:16] [43:13]
  [108:21] [171:4]
recall [7:2] [8:17] [9:4]
  [11:14] [18:16] [19:13]
  [20:12] [21:7,9] [22:11,18]
  [23:16] [24:17] [32:12]
  [37:23,24] [42:7] [43:17,21]
  [53:4] [96:25] [97:2,8,12,16]
  [99:20] [113:20] [115:7,10]
  [116:3] [117:23,25] [131:21
  ,22,25] [149:7,8,20]
receipt [149:12]
receive [45:10]
received [44:25] [45:16]
  [46:21] [47:3] [48:4] [49:18]
  [145:24] [146:6]
recently [148:19]
recess [61:21] [94:12]
  [117:7] [145:20]
recognize [146:24]
recollect [22:6] [24:6]
recollection [9:6] [22:5,21]
  [24:12] [28:19] [42:13]
  [47:10] [48:16]
recommend [130:21]
recommendation [62:22]
  [63:2] [120:20] [130:13]
recommendations [59:17]

[135:11]
recommended [120:19]
recommending [5:24]
  [64:21] [71:23]
record [3:20] [16:13] [18:9]
  [60:13] [61:19,22] [63:13]
  [67:16] [68:3] [79:13]
  [94:10] [95:8] [103:3]
  [106:22,23] [117:6,8]
  [145:18,21,24] [160:16]
  [168:16,19] [169:4] [172:14]
records [22:22] [103:21]
recovered [153:10]
recovery [152:20,25]
reduce [59:4] [60:12] [62:4]
redundant [39:12] [123:23]
refer [39:13] [50:3] [95:16]
  [117:18] [142:18]
reference [39:18] [106:5]
  [142:9] [144:4] [164:20]
references [106:8]
referred [74:14] [86:24]
  [115:15] [142:5]
referring [29:20]
refinance [132:12]
refinancing [132:14]
reflected [155:13]
reflects [152:13]
refurbish [82:21]
refused [96:15] [134:21]
  [161:10]
regard [11:7] [19:22] [20:25]
  [36:13] [83:3] [106:5,11]
  [126:4] [130:23] [137:11]
  [145:14] [151:5]
regarding [6:15] [112:19]
  [131:23] [146:25]
regardless [139:3]
registered [172:7]
regular [27:12] [101:7]
regularly [101:12,14]
  [102:11]
related [10:19] [19:9] [109:
  18] [172:15]
relationship [54:17] [56:24]
  [57:2,6] [60:20] [84:15,21]
  [86:14,17] [92:13] [109:22]
  [114:15] [142:25] [143:11]
relationships [51:12]
  [54:22,24] [55:2,3,6,14]
  [57:11] [83:18]
relative [93:2]
relevance [11:4]
relevant [31:10] [62:20]
  [107:5]
reliable [164:7]
reliance [166:11]
relied [45:24] [47:25] [48:6]
  [76:15] [79:22,23] [163:25]
  [165:7]
rely [5:20,25] [44:6] [80:4]
  [151:8]
remember [7:4,11,14,22]
  [16:11] [19:23] [30:20]

[35:24] [53:19] [97:17]
  [98:2] [104:12] [149:22,24]
  [151:16]
remembered [84:7]
remote [75:8] [88:6] [89:23]
render [137:11]
renew [89:9]
reorganization [96:11]
repay [76:3] [77:22]
repayment [77:16] [78:14]
  [82:6] [88:12] [152:15]
repeat [125:16] [130:15]
  [135:21]
repeatedly [156:10]
replace [90:9] [162:11]
repo [54:4] [110:20]
report [3:3] [4:13,23] [5:6]
  [6:8] [7:7,9,21] [9:11]
  [11:8,12,16] [14:19,23,25]
  [15:4,12,17] [16:7,9,17,21
  ,22] [17:3,6,9] [18:10,15]
  [19:21,24] [20:5,22] [26:24]
  [28:8] [30:17] [32:24]
  [36:22] [37:16] [40:7,13,15]
  [41:6,15,17,23] [42:4,10,12
  ,15] [44:19] [45:23] [48:21]
  [49:7,19] [50:11,25] [51:12
  ,17] [52:15] [62:19] [68:13]
  [69:19] [72:9] [74:14]
  [76:11,17] [77:2] [83:19]
  [85:5,12] [86:6] [92:3,12]
  [93:2,8] [95:13] [97:10,14
  ,23] [98:4] [99:4] [100:4,21]
  [101:9] [107:17,21] [116:7]
  [117:18] [119:22,24]
  [120:18] [127:21] [128:20]
  [131:18] [140:12] [142:6]
  [146:2,11,14,20,22] [147:
  24] [148:2,7,10,14,17]
  [149:5,10] [150:22] [152:3
  ,7] [163:8] [167:10,13,24]
  [168:7] [173:5,22]
reporter [4:5] [168:24]
  [172:8]
reports [40:8] [46:21]
  [98:16] [110:12]
repossession [109:15]
representative [22:9]
represents [15:12] [25:13,14]
reputation [51:18,20,25]
  [52:11]
request [54:4] [61:15]
requests [40:14] [174:6]
require [36:11] [39:7]
  [126:5]
requirement [162:14]
research [46:21] [50:25]
  [79:24] [80:5] [108:2,18]
  [140:12,13] [163:22]
resell [82:21]
reserve [146:14] [147:14]
residual [32:6] [68:7]
residuals [75:19]
respect [5:19] [14:4] [21:2]

[40:18] [46:14,15] [52:13]
  [55:19] [59:11] [65:7]
  [74:9,13] [76:18] [78:8]
  [81:22] [84:5,14] [101:13]
  [102:12] [104:24] [106:4,24]
  [124:23] [125:18,24]
  [142:24] [146:10,21]
  [155:6]
responded [120:22]
response [132:18] [147:12]
responsibility [5:3] [27:4,7
  ,14,15] [28:7] [29:5,19,25]
  [30:11] [37:3] [39:20]
  [40:19] [62:11] [159:19]
restructure [90:21] [125:5]
restructuring [62:7] [90:16]
  [93:13] [96:16] [103:9]
  [105:3,15] [113:23] [115:6]
  [118:13,18,24] [119:12,22]
  [121:22] [125:10] [126:21]
  [129:8] [136:25]
result [67:18] [119:10]
  [132:22] [133:22] [166:23]
results [109:6]
resume [48:24]
resumed [95:4]
retail [78:13] [142:18,22]
  [143:9]
retain [119:6] [121:9]
retained [12:11] [21:5]
  [22:13] [43:5,15] [44:10]
  [100:7] [105:2,8] [119:11]
  [133:23]
retains [158:25]
retention [70:19] [134:12]
revenue [36:5]
reverse [54:4] [110:20]
review [44:17,23] [58:4]
  [76:16,17] [97:10] [99:3]
  [150:22]
reviewed [41:15] [42:6]
  [48:7] [49:18] [58:14]
  [59:9] [60:14] [61:11]
  [62:15] [63:12] [64:12,25]
  [100:16] [103:22] [120:17]
  [127:18] [143:16] [148:22]
reviewing [44:12] [97:12]
revolving [87:25]
revolving [32:2] [10:11] [11:5]
r-e-z-a [9:23]
reza [9:23] [10:11] [11:5]
r-e-z-a [9:23]
richard [2:20] [3:23]
right [4:16,18,22] [11:20,25]
  [12:23] [13:13] [16:25]
  [18:11] [19:18] [21:19]
  [22:14] [26:2,3] [29:11]
  [30:2] [34:23] [35:6,13,18
  ,20,22] [36:3] [38:21]
  [40:16] [45:12] [46:13,25]
  [47:4] [48:5,11] [49:2,8,11
  ,22] [52:13,23] [54:20]
  [55:17,23] [57:14] [58:18,19
  ,24,25] [60:8] [61:17]
  [64:10,22] [66:18] [70:10]
  [72:7,8,21] [74:12] [77:12

,20] [78:16,22,24] [79:19]
  [81:12,15,19] [82:12,19]
  [86:7] [88:9,13] [89:15,16
  ,24] [91:15] [92:6] [94:8]
  [95:20] [96:17] [100:7]
  [101:14] [102:23] [103:11]
  [104:6,10] [105:5,25]
  [106:12] [107:25] [108:4,7]
  [109:7,19] [110:9] [112:5]
  [113:16] [114:5,9] [115:16]
  [116:2,6,25] [118:15,20]
  [119:8,17,19,23] [120:15]
  [121:15] [123:20] [124:9,10]
  [125:12] [126:22] [127:9]
  [128:2,13,17,20,25] [129:
  23] [130:2,22] [131:4]
  [132:2,7,21] [133:20]
  [134:9,17] [137:23] [142:22]
  [144:21] [147:21] [148:2,13]
  [150:24] [152:10,17,22]
  [153:9,25] [160:7,14,20,24]
  [165:19] [166:9] [167:9]
rights [146:14] [147:14,17]
rising [98:19]
risk [53:17] [54:12] [88:8]
  [110:6,17,18] [111:18,23]
riskiness [20:2]
risks [109:24]
road [153:24]
role [10:15] [53:24] [55:19]
  [72:15,25] [73:21] [74:9]
  [75:23] [81:2] [86:6,9]
  [89:10,16] [91:5,13] [92:15]
  [95:23] [96:15] [99:13]
  [100:5,11] [104:23,25]
  [105:14,20,21] [110:15]
  [154:4] [155:6]
roles [72:20] [97:20]
roman [6:8] [26:25] [36:23]
  [79:20]
roughly [55:13,24]
rpr [172:22]
rule [63:5] [142:11] [143:4,8
  ,10,13] [144:13]
rules [142:16,21]
run [32:11] [36:7,8] [70:16]
  [154:10] [165:12]
running [141:5]
runs [34:14]

S

saagar [14:12]
s-a-a-g-a-r [14:12]
sale [125:4] [131:23] [132:
  4] [136:25]
sandhu [9:18] [10:9,22]
  [11:18] [17:15,17,18,20]
  [25:4] [47:8,14,17,23,24]
  [48:18,20] [49:3] [73:19]
  [74:2]
s-a-n-d-h-u [9:18]
santa [10:9]
sarin [8:22] [9:14,17] [10:8

,17] [11:18] [12:6] [13:10,21]
[17:3,9,20] [47:19] [73:18
,25]
s-a-r-i-n [9:17]
sarins [13:22] [14:10]
[25:2,3]
sat [15:6]
saw [16:24] [41:22] [42:5]
[45:19] [52:22] [58:14]
[61:10] [97:23] [99:8,15]
[151:2]
say [5:11] [8:12] [13:23]
[15:3] [16:10] [17:17]
[18:19] [20:19] [23:11,22]
[29:17] [30:7,9] [36:19]
[39:6,21] [41:14] [42:16]
[48:6] [54:21] [55:15]
[57:10] [59:2] [60:11]
[63:6] [64:10] [67:11]
[69:2,11] [71:15] [76:25]
[79:21,25] [81:4] [82:23]
[83:9] [89:8] [91:17,24]
[93:5,8] [95:22] [98:12]
[101:11] [102:11] [109:11
,21] [112:16] [113:3,8,12]
[116:8] [120:2] [121:11,18]
[123:22] [124:25] [126:14
,23] [127:22,25] [130:7,16]
[133:4,6] [134:17,25]
[143:19] [144:4] [145:5,24]
[146:18,23] [147:13,16]
[150:20] [151:18] [153:10
,23] [156:16] [157:5,19]
saying [24:7] [30:12] [34:12]
[54:22] [62:8] [78:18]
[108:13,18] [119:4] [121:25]
[123:6] [143:7] [147:9]
[154:17] [156:13] [161:20]
says [30:13] [45:24] [62:21]
[71:17] [98:10] [101:17]
[118:22] [128:12] [130:18]
[132:18] [147:6]
scott [8:18] [149:20]
se [144:16]
search [20:15]
sec [19:19,22] [20:6]
second [5:22] [6:15] [8:23]
[64:18] [75:18] [156:2]
secret [154:25] [155:5]
section [39:11] [72:9,13,25]
[78:17] [80:23] [83:8,9]
[95:13,22] [100:3] [104:25]
[107:16,20] [109:8,21]
[110:11] [129:4] [131:18]
[142:12]
secured [76:9] [88:4,17]
[90:20]
securities [2:24] [29:24]
[30:18] [31:2] [52:9] [54:9]
[74:15] [75:13,16,20]
[76:13,19] [77:3] [78:9,19
,21] [82:2,5,9,12] [86:15]
[110:3,21] [163:22]
securitization [55:7,16,20]

[74:10] [75:24] [77:21]
[78:12] [81:3] [87:8,9]
[89:2] [95:24] [96:3,4]
[100:19] [102:6,22] [103:5]
[107:6,13] [109:12,19]
[110:6] [122:9,17] [124:21]
[134:22] [141:5,11,13]
[143:23] [162:5,14]
securitizations [35:5]
[57:4,19] [74:19,20] [78:22]
[80:16] [104:15] [106:11]
[112:18] [122:3] [123:2]
[130:25] [155:7] [161:13]
securitize [55:21] [75:8]
[86:22]
securitized [84:24] [109:14]
security [38:3,20]
seeking [103:23]
seem [25:25]
seemed [59:18] [80:13]
seems [126:10]
seen [42:14] [45:14] [59:9]
[63:14] [64:25] [65:5]
[67:15] [89:14] [103:3,25]
[107:9] [113:4,12] [115:11
,14] [134:16] [145:12]
self [28:4] [160:2]
selfdealing [28:4]
self-dealing [28:4]
sell [65:22] [74:25] [75:4]
[82:2] [87:6] [114:7,11]
[115:5] [142:20] [161:11]
selling [65:12,22] [113:24]
[114:2,3,4,20] [130:3]
send [12:25] [168:25]
sense [29:19] [36:17]
[38:2,8,14,16] [39:9]
[89:18] [141:9]
sent [26:9] [148:21]
sentence [30:9,12] [39:10]
separate [29:18] [111:25]
separately [100:14] [103:3]
september [3:12] [41:3]
[85:21] [92:5,23] [93:10]
[150:8,9] [166:13,21]
[167:16] [172:20]
sequence [115:8]
serious [90:16] [127:5]
[130:22]
serve [78:18]
served [18:22] [83:14]
serves [41:24]
service [114:16]
services [5:19] [11:7]
[12:12,17,22] [14:5] [24:16]
[50:22] [52:14] [53:3,16,19]
[57:4] [113:22] [114:18]
[115:25] [143:2]
servicing [100:25] [101:23]
[102:5]
serving [79:8] [105:23]
set [95:19] [163:9] [172:12
,19]
sets [80:2]

setting [79:17] [111:24]
several [17:11] [21:20]
[53:25] [135:20] [151:3]
shall [129:11]
shapiro [3:1,3,8] [4:1,12]
[6:1] [7:1] [8:1] [9:1] [10:1]
[11:1] [12:1] [13:1] [14:1,9]
[15:1] [16:1] [17:1] [18:1]
[19:1] [20:1] [21:1] [22:1]
[23:1] [24:1] [25:1] [26:1]
[27:1] [28:1] [29:1] [30:1]
[31:1] [32:1] [33:1] [34:1]
[35:1] [36:1] [37:1] [38:1]
[39:1] [40:1] [41:1] [42:1,16]
[43:1] [44:1] [45:1] [46:1]
[47:1] [48:1] [49:1] [50:1]
[51:1] [52:1] [53:1] [54:1]
[55:1] [56:1] [57:1] [58:1]
[59:1] [60:1] [61:1] [62:1]
[63:1] [64:1] [65:1] [66:1]
[67:1] [68:1] [69:1] [70:1]
[71:1] [72:1] [73:1] [74:1]
[75:1] [76:1] [77:1] [78:1]
[79:1] [80:1] [81:1] [82:1]
[83:1] [84:1] [85:1] [86:1]
[87:1] [88:1] [89:1] [90:1]
[91:1] [92:1] [93:1] [94:1]
[95:1,12] [96:1] [97:1]
[98:1] [99:1] [100:1] [101:
1] [102:1] [103:1] [104:1]
[105:1] [106:1] [107:1]
[108:1] [109:1] [110:1]
[111:1] [112:1] [113:1]
[114:1] [115:1] [116:1]
[117:1] [118:1] [119:1]
[120:1] [121:1] [122:1]
[123:1] [124:1] [125:1]
[126:1] [127:1] [128:1]
[129:1] [130:1] [131:1]
[132:1] [133:1] [134:1]
[135:1] [136:1] [137:1]
[138:1] [139:1] [140:1]
[141:1] [142:1] [143:1]
[144:1] [145:1] [146:1,8,13]
[147:1,23] [148:1,8] [149:
1] [150:1] [151:1] [152:1]
[153:1] [154:1] [155:1]
[156:1] [157:1] [158:1]
[159:1] [160:1] [161:1]
[162:1] [163:1,3,6] [164:1]
[165:1] [166:1] [167:1]
[168:1] [169:1,7] [172:11]
[173:5,22] [174:3]
shapiros [145:25]
share [16:20] [163:12,18]
shared [144:10]
shareholders [29:21,25]
[32:6] [33:20] [38:6,18]
[137:22] [154:12]
shares [163:14] [164:14]
sheet [103:10] [156:5]
[170:9]
shen [10:2,10] [11:11]
[13:8]

s-h-e-n [10:2]
shift [38:4,9,15,16,19]
[40:18,23]
shipments [47:19]
shipped [44:24] [45:2]
shoes [86:10] [87:11]
[90:6] [91:4]
short [145:15]
shouldnt [20:19]
show [23:6] [112:6] [133:2]
showed [115:10] [165:17]
showing [118:14]
shows [60:14] [106:23]
[135:7]
shut [90:22] [141:12]
side [60:21,22] [108:3]
sign [168:25]
signature [169:2] [170:15]
signed [170:9]
significance [160:12]
significant [101:13,21]
[102:13,15]
significantly [124:20]
signing [168:21]
silk [2:18]
similar [140:14] [147:11]
similarly [66:12] [71:12]
[113:7]
simply [30:9] [71:15] [139:
17] [150:5]
sincerely [69:25]
single [75:14]
sinister [110:10] [114:23]
sit [53:2]
site [165:2,4,6]
sits [40:11]
sitting [23:17] [24:7] [25:15]
[47:5] [61:14] [80:10]
[99:20] [131:22]
situation [33:12,25] [59:15]
[60:19] [122:21] [135:4]
[143:17,21] [144:5]
situations [119:6] [140:15]
skeptical [111:15]
skepticism [111:18]
skills [98:6]
smaller [123:5] [130:7]
sold [66:9] [90:18]
sole [74:18]
solicit [101:25]
solicited [101:12] [102:12]
solutions [3:14]
solvency [38:4] [41:12]
[43:10,21,24,25] [92:4]
[150:17] [151:3] [166:18]
solvent [26:22] [32:5]
[38:5,13] [85:6,9] [155:24]
[156:8] [157:20]
somebody [6:19] [7:3]
[21:25] [23:7,19] [24:3,10]
[47:8] [107:11] [115:22]
[128:11] [149:9,19] [162:12
,17]
somehow [67:9]

someone [7:23] [31:19] [33:13] [34:3] [45:20] [77:11]
something [6:19] [23:5,10] [28:16,17] [36:5] [46:9] [50:3] [64:14] [72:18,19] [98:10] [126:12] [130:21] [151:20] [156:12] [159:10]
sometime [7:6] [16:10] [22:12] [144:12] [145:25] [147:23] [155:25] [156:6]
sometimes [74:14]
somewhere [90:10]
sorry [17:18] [48:25] [53:14] [69:7] [78:6] [85:5,14] [113:25] [115:13] [126:4] [130:15] [133:5] [156:22] [157:10] [158:5]
sort [29:8] [38:20] [88:25]
sounds [26:3]
soup [163:9] [167:12]
source [72:24] [76:11] [78:14] [79:3] [88:12] [163:16,20,24] [164:3,24]
sources [73:4,15]
southern [11:24]
spe [35:3]
speak [37:7] [39:4]
speaking [27:22] [32:3]
special [35:4] [95:19]
specialist [103:14]
specialize [93:21]
specific [5:16] [7:2] [28:19] [33:22] [37:1f] [58:21,22] [76:14] [80:14] [83:23] [84:14,18] [101:8] [106:8] [127:12]
specifically [5:20,25] [7:16] [16:11] [25:13] [36:13] [37:12] [40:14] [51:15,22] [52:8] [58:8] [61:15] [64:17] [89:22] [113:22] [135:2] [140:25]
specifics [107:7]
speculating [127:2]
speculation [42:24] [45:8] [64:6] [85:2]
speculative [127:4]
spell [9:15]
spelled [9:16]
spend [70:25]
spends [10:25]
spent [25:21] [44:14]
splitting [43:13]
ss [172:4]
stakeholders [32:11] [33:21,23] [34:6]
stance [91:21]
stand [5:16] [6:11]
standalone [15:25]
standard [89:25] [111:7,12]
standards [123:3]
standish [144:3]
standpoint [5:15] [27:22]

[38:24] [71:3] [83:7] [84:10] [124:6] [135:9] [143:4]
stands [52:22]
stars [2:6]
start [72:10]
started [9:7] [31:2] [44:3] [55:25] [56:14] [116:3] [149:12] [154:10]
starting [78:10] [100:4] [110:11] [140:9] [142:12] [144:12]
starts [158:2]
state [172:3,9]
statement [162:10]
status [59:19]
stay [121:12] [136:23] [137:5]
step [86:10] [91:12] [96:15] [161:15] [163:12] [164:11 ,17] [165:9,19,25]
stephan [8:17] [18:20]
stepped [87:10] [89:19] [90:6] [92:18] [162:7,13,18]
stepping [91:3]
steps [167:20]
steve [149:21]
stipulation [168:21]
stocks [142:19] [154:5]
stop [85:9,13] [159:21] [160:19] [161:18]
stopped [162:5]
stopping [161:12]
stores [60:7]
strategy [123:7]
street [2:18] [3:15]
strengthen [6:13,14] [151: 9]
strengthens [6:10,22] [33:4]
stretch [132:13]
strike [95:14]
structure [89:2] [90:11]
structured [88:2]
structures [110:4]
structuring [106:24]
studies [167:16]
study [135:5]
stuffed [20:21]
stutman [2:5] [4:3] [7:3] [9:2,10] [16:21] [18:13,14 ,18,23] [23:10] [26:18] [45:3,20] [46:18] [47:7,12 ,16] [149:19]
stutmans [42:9]
subject [39:19] [52:15] [142:16]
subscribed [169:8] [171:]
subset [46:19,20]
subsets [36:8]
subsidiary [75:4,5]
substance [27:10]
substantial [19:5] [42:17] [98:18] [126:16]
substantially [123:3]

substantiate [62:24]
substantive [100:23] [101:19]
substitute [136:10] [138:14]
successive [18:10]
suffering [98:17]
suggest [62:16] [97:24]
suggested [113:8] [146:16] [167:11]
suggesting [68:12] [141:13] [143:10]
suggestions [130:6]
suggests [40:20] [59:10] [67:16] [132:12]
suisse [2:24] [3:10,25] [19:8,21] [23:14] [31:7] [50:5,12,17] [59:11] [79:10] [90:6] [92:12] [141:23] [173:19]
suisses [5:12] [24:4]
suited [118:23]
sum [134:18] [159:12]
summaries [49:25]
summarize [49:20]
summary [54:20] [62:2] [64:19]
supplemental [11:8,16] [85:12] [93:2] [145:25] [146:20] [148:2,7,10,14,16] [152:2,7] [163:8] [173:]
supplier [65:11,20] [66:6,9] [161:9]
suppliers [161:5,15,18]
supply [65:25] [66:3]
supplying [161:6]
support [166:17]
supported [165:15] [167:6]
suppose [82:17]
supposed [64:10]
supposition [151:11]
sure [8:10,24] [10:7,17] [29:3] [52:18] [54:15] [60:2,4] [61:18] [84:3] [85:16] [90:23] [94:9] [107:6] [113:23] [117:4] [119:6] [123:25] [145:17] [149:15] [155:20] [162:8] [166:22]
surprise [89:5]
surrounding [109:24]
survival [83:4,7]
suspicious [68:14]
swaps [125:8]
swear [4:5]
swing [57:8]
swiss [50:13]
switches [34:13]
sworn [4:7] [95:5] [169:8] [171:] [172:13]
synonymous [27:18,19]
system [17:23]

T
_____

tab [141:20]
tacit [122:4]
taken [45:11] [61:21] [101: 14] [102:13] [117:7] [120:14] [125:11] [145:20] [167:20]
taking [3:16] [50:19] [61:2] [90:16] [91:4] [143:9] [144:11] [152:14] [155:14]
talk [17:11] [18:13] [21:21] [22:8] [24:14] [28:12] [29:4,23] [31:9] [32:9] [36:15] [39:2] [49:24] [50:2] [54:23] [62:20] [84:2] [99:12] [100:4,10,14] [101:7] [103:2,18] [105:19] [110:12] [113:16] [130:14 ,17]
talked [23:17] [24:7] [28:20] [37:6,11] [41:16] [51:9] [87:20] [100:20] [104:8,15] [108:3] [116:4] [152:3]
talking [22:19] [35:6] [43:4 ,5] [105:21] [110:3] [129:8] [147:24]
talks [40:4]
tape [61:24] [117:6,9] [168:19]
taxes [39:6]
team [110:17] [111:9,19]
technical [55:17] [75:25]
technically [76:7] [89:15]
techniques [145:7]
telephonic [7:17]
telephonically [8:2]
tell [4:24] [5:5] [8:6,7] [9:7,13] [10:14] [15:4] [16:8] [19:12] [22:17] [30:25] [32:14,17,25] [33:17] [35:9] [36:12] [47:6] [50:3,9] [57:7] [58:2,4] [63:18] [64:9] [69:12,23] [74:22] [76:6,14] [83:13] [91:7] [96:20] [105:12] [127:19] [142:4] [147:8] [149:25] [152:6] [153:15] [156:14,22]
ten [20:12] [61:17] [152:8]
tend [109:2] [111:14]
tenminute [61:17]
ten-minute [61:17]
tennenbaum [42:21] [43:10 ,15,20] [44:4] [166:20] [167:20]
tennenbaums [41:6,15,20 ,23] [42:3] [85:21] [150:6,18 ,21] [151:8,19] [166:12] [167:8,10,13] [168:7]
tension [111:21]
tenyear [152:8]
ten-year [152:8]
term [27:12,13] [28:10] [29:8] [55:17] [86:25] [87:3]
terminology [28:21]
terms [27:18,20] [66:2]

[70:19] [82:6] [95:17] [156:
  20] [161:7] [167:14]
test [166:16]
testified [4:8] [95:6] [100:22]
  [101:12] [102:11]
testimony [4:20] [43:8]
  [53:9] [100:10] [101:10]
  [107:4,9] [170:6,8] [172:14]
thank [162:23,25] [168:13
  ,14]
thanks [128:12] [130:19]
  [132:19]
thats [7:20] [9:18,23] [11:19]
  [12:2,24] [13:5] [14:12,16]
  [15:13,22] [17:2] [18:24]
  [19:16] [22:15] [25:9,11]
  [26:15,17] [34:9] [35:3,8,10]
  [36:4] [38:24] [39:12,17]
  [41:8] [47:12] [48:24]
  [49:12] [52:21] [53:4,10,22]
  [54:15] [55:18] [67:5,12]
  [68:20] [75:22] [76:7]
  [77:6,9] [78:15] [80:22]
  [81:25] [82:3,7,13] [86:18]
  [89:21,25] [90:12] [91:6,24]
  [94:8,9] [96:6] [100:2]
  [103:20] [104:17] [105:7,18]
  [107:15,17] [108:5] [109:17
  ,20] [110:9] [111:11,14,24]
  [112:5] [113:15] [114:6]
  [115:4,9,21] [116:16,17]
  [118:11,13] [119:17,23]
  [120:15] [121:24] [123:21]
  [124:9] [128:15,19,25]
  [129:15] [130:10] [132:16
  ,23] [134:9,11] [137:12]
  [138:22] [139:15,20]
  [140:10,22] [142:11,13]
  [143:8,21] [144:16] [148:3]
  [149:2] [151:11] [152:5,23]
  [154:2,16] [155:15] [156:18]
  [157:10] [159:14] [161:4]
  [162:23] [163:21] [166:4]
themselves [3:20]
theory [158:15]
thereabouts [149:14]
thereby [146:20]
therefore [147:5]
theres [14:17,22] [16:18]
  [33:8,22] [38:2] [46:3]
  [49:11,14] [91:14] [93:19]
  [108:15] [110:9] [111:7,20]
  [114:22] [116:8] [129:17]
  [130:11,20] [132:12]
  [134:2] [135:21] [137:20]
  [153:19] [157:24] [159:5]
theyre [13:15] [65:23]
  [70:24] [84:3] [108:7]
  [121:25] [160:23]
thing [65:16,20] [90:24]
  [92:2,3] [125:22] [135:22]
  [150:14] [154:2,3]
things [11:14] [45:23]
  [60:6] [68:5] [70:2,5]

[71:6] [91:15] [114:14]
  [126:23] [127:21] [130:8]
  [133:9] [134:3] [136:3,7]
  [152:6,16]
think [5:15] [6:3,11,18,20]
  [8:12,14,19] [18:12,19]
  [20:6] [21:8,23,24] [22:19]
  [23:8] [29:12,22] [31:4,21]
  [32:3] [33:3,6] [35:3]
  [36:16] [39:7] [40:16]
  [42:11] [45:22] [46:20]
  [47:5,10] [52:23] [53:5]
  [54:4,12,15] [55:12,25]
  [56:8,14] [58:19,20,25]
  [59:13] [60:17,23] [66:10]
  [67:19] [68:18,21,23]
  [85:23] [87:20] [89:14]
  [94:6] [95:15] [96:13]
  [98:7,9,14,19] [105:22]
  [108:15] [113:20] [122:6]
  [123:10,16] [126:15,17,18]
  [133:3,10] [134:10] [135:12
  ,15,22] [137:3] [139:4,10,16
  ,24] [140:7] [143:3,21,25]
  [144:2,3,9,14,24] [145:22]
  [146:7] [147:8] [152:19]
  [155:10,12] [158:11]
  [161:23] [162:3,12]
thinking [84:9]
third [40:21] [159:20]
though [13:19] [80:15]
thought [69:23] [152:13]
  [157:10] [160:3]
three [11:10] [22:7] [50:21] ·
  [100:13] [107:11] [149:14
  ,23] [165:16]
throughout [31:7] [50:2]
  · [109:22]
thus [83:14]
tie [162:16]
till [126:18]
time [3:12] [11:2] [17:10]
  [18:25] [24:18,22,23]
  [25:14,18] [31:7,10] [42:14]
  [44:14] [45:10] [51:6]
  [56:7] [59:10] [65:4] [70:6
  ,14,15] [71:8,14] [74:8,17]
  [84:20] [85:4,6,17,24]
  [86:19,21] [90:21] [92:2]
  [93:7] [94:7] [95:3] [96:8]
  [97:13] [100:6] [112:13]
  [119:16] [120:24] [122:23
  ,24] [123:18] [132:25]
  [135:17] [136:6] [138:4]
  [140:20] [153:20] [164:8,16]
  [166:24] [167:13] [168:21]
  [169:5]
times [17:12] [40:12] [55:13]
  [164:13] [165:10] [166:19]
timing [56:12] [146:6]
today [3:13] [4:18] [26:8]
  [53:2] [100:20] [126:23]
  [145:3] [146:8] [153:23]
  [156:10]

todays [3:11]
together [10:20] [17:13]
  [57:18] [165:20]
told [22:21] [27:6,8] [43:9,24]
  [48:3] [64:14] [67:17]
  [78:10] [96:14] [123:16]
  [134:10] [148:18] [160:3]
tomorrow [136:3]
tony [2:8] [4:2] [94:6] [146:
  17]
took [77:19] [80:19] [86:6]
  [87:23] [99:2] [104:25]
  [148:18]
top [102:25] [113:7] [118:17]
total [25:6,9] [26:15]
totally [160:13]
towards [63:7] [67:2] [68:10]
trade [35:20] [65:22] [66:6]
  [136:23] [161:7,19]
traded [35:17,25] [104:13]
  [108:11] [152:8]
tradeoffs [136:23]
trade-offs [136:23]
trading [152:9] [153:7]
  [157:6] [165:17]
tranche [75:14,17,18]
tranches [75:17]
transaction [76:17] [89:6]
  [103:17] [132:5]
transactions [74:23] [77:5]
  [81:3] [106:25] [111:16]
  [112:24] [143:8]
transcription [170:7]
translate [27:9,25] [28:16]
  [29:12,13]
transpire [125:21]
treat [27:18]
treister [2:5] [4:3]
trident [12:7,10,16,18]
  [13:2,6,18] [14:15] [15:14]
tried [25:24] [27:9] [28:15,16]
  [44:18]
tries [114:10]
trouble [98:9]
true [17:2] [69:19] [70:18,25]
  [108:25] [170:6] [172:13]
truly [150:3]
trust [3:9] [26:21] [57:2]
  [79:10] [89:12]
truthful [62:21] [67:17]
try [80:18] [88:7] [114:14,16]
  [115:23] [127:10]
trying [8:19] [22:3] [30:17]
  [63:23] [67:25] [98:21]
  [115:5] [133:8] [158:12]
turn [12:16] [13:14] [56:25]
  [57:3] [62:19] [75:5] [112:
  20] [159:10]
turned [23:20] [126:23]
  [140:8]
tv [168:15]
twelfth [2:6]
twothirds [25:19]
two-thirds [25:19]

type [16:19] [58:20] [76:8]
  [79:22] [80:3] [83:15]
  [89:3] [90:20] [93:12]
  [96:16] [112:19] [125:10]
  [126:21] [135:13] [136:24]
  [162:16] [167:25]
types [39:2] [50:21] [75:12]
typical [114:13]
typically [40:11] [65:22]
  [75:16] [79:23] [80:4]

_____

U

uh [22:2]
uhhuh [22:2]
uh-huh [22:2]
ultimate [124:23] [134:13]
  [152:20,25]
ultimately [33:19] [102:20]
  [132:4]
unable [147:4] [168:7]
uncertain [120:5]
underlies [122:7]
underlying [81:6,22] [88:12]
understand [6:5] [16:6]
  [27:16,21] [29:16] [34:11]
  [35:7] [37:17] [48:12]
  [53:24] [57:19] [61:4,8]
  [67:6,7] [75:25] [79:7]
  [105:11,13] [106:3] [143:17
  ,20] [144:5,6] [152:12]
  [158:11,12,13,14] [168:8]
understanding [32:8,17]
  [33:11,25] [35:7,10] [36:12]
  [37:10] [41:9] [43:14]
  [49:16] [50:4] [51:12,23,24]
  [52:25] [54:14] [56:17]
  [60:18] [74:7] [75:23]
  [76:12] [79:12,16] [83:17]
  [85:18] [88:3] [90:5,8,12]
  [99:5,17] [110:14] [113:18]
  [124:2] [125:14,20] [143:5]
understood [23:12,25]
  [98:9]
undertake [99:10]
undertaking [127:7]
undertook [167:17,25]
underwriter [78:19] [104:18]
underwriting [30:18] [31:2]
  [72:16]
unfamiliar [77:7]
unfortunate [149:25]
unique [72:14] [141:18]
uniquely [118:22]
unit [111:25]
units [60:7]
university [10:9,13] [11:24]
  [163:23]
unless [62:22] [136:19]
unlimited [158:22]
unpaid [26:16] [39:6] [55:10]
  [56:11,16,20] [57:6]
unreasonable [91:11]
  [92:17,25] [93:6,9,15,24]

unreasonably [93:15,24]
unrelated [100:19] [103:5]
  [107:13]
unsecured [65:23]
unspecified [126:24]
until [16:24] [41:10] [87:6,7]
  [104:3]
untruth [67:22]
upcoming [132:15]
upon [119:21] [163:25]
  [165:7] [166:11] [167:14]
  [168:22]
us [4:19,24] [9:7,15] [10:22]
  [16:8] [30:25] [32:25]
  [35:9] [72:15] [78:10]
  [83:13] [94:7] [96:14]
  [119:6] [127:19] [134:10]
  [147:15] [152:7] [153:15]
usa [2:24]
use [29:8] [115:5] [167:7]
used [12:16] [28:21] [49:6]
  [61:7] [65:12] [81:24,25]
  [88:25] [156:10] [161:10]
  [167:25]
uses [71:13,14]
using [55:16] [89:17] [143:
  7] [156:21]
usual [90:25] [91:10] [98:22]
  [121:17] [123:10] [135:23]
  [168:20]

V

v.a [6:8] [27:2] [36:23]
  [39:11]
v.b [41:5]
vague [96:24]
valuable [123:8]
valuation [42:18,22] [43:7]
  [151:17] [154:23] [166:11]
valuations [81:17]
value [68:11] [70:15] [71:7]
  [82:24] [131:3] [139:3]
  [145:2] [148:24] [151:21]
  [152:10,14,16] [153:15,20]
  [154:9,14,15,19,20,21]
  [155:11] [156:17,18,24,25]
  [157:7,12,13,14,17,18,22]
  [158:6,7,15,17,25] [159:3
  ,7,8,9,11,12,13] [160:9]
  [163:12,17] [164:16,18,21]
  [165:10,22] [166:2,5]
varied [8:6] [18:19]
variety [59:16] [68:9] [145:
  7]
various [7:16] [9:20] [10:22]
  [11:3] [34:25] [35:15]
  [41:21] [46:21] [52:23]
  [54:22,24,25] [57:11]
  [79:18] [84:2] [90:22]
  [99:8,9] [100:10] [101:7]
  [135:5] [151:4] [166:8]
vehicle [95:19]
verify [80:18]

versus [3:10] [136:24]
video [3:13,16]
videographer [2:25] [3:6]
  [4:4] [61:19,22] [94:10]
  [95:8] [117:5,8] [145:18,21]
  [168:18]
videotape [3:7]
view [33:17] [34:2] [54:16]
  [111:3] [126:10] [130:12,21]
  [138:3] [157:6]
views [111:15]
vii [72:9] [83:8]
vii.a [80:23] [83:9]
vii.a.1 [72:13,25] [83:10]
vii.a.2 [83:13]
vii.a.2.a [78:17]
vii.a.2.b [95:13]
vii.a.2.c [100:3]
vii.a.2.d [104:25]
vii.a.3 [107:16] [109:8]
vii.b [110:11]
vii.b.2 [109:21]
vii.d.1.b [128:20]
vii.d.1.c [131:18]
villanova [10:12]
violate [137:13]
virtually [165:18]
vis [67:10]
visavis [67:10]
vis-a-vis [67:10]
visit [84:2]

W

wait [23:23] [135:24] [136:
  6,24]
waive [146:21]
waives [147:17]
want [6:18] [23:19] [24:10]
  [26:25] [35:7] [58:2,4]
  [60:4] [61:5,8,10] [66:19]
  [67:7] [85:13,14] [105:12]
  [123:17] [124:5] [131:21]
  [142:4] [145:24] [146:10,18]
  [150:20]
wanted [23:13] [44:7]
  [87:15] [137:5] [139:4]
  [166:20,24]
wants [92:15]
warehouse [55:9] [56:4]
  [74:8] [86:11,13,23,24]
  [87:14,24] [88:22,24]
  [89:10,12,20] [90:2] [91:5
  ,16] [92:15,20] [93:9]
  [95:20] [104:9] [106:12,25]
  [107:13] [122:3,8,17]
  [123:4,5] [124:22] [131:2]
  [134:22] [143:23] [155:7]
  [162:5,15]
warehousing [87:4]
wasnt [24:4] [29:22] [148:15
  ,16] [150:18] [154:24]
  [155:5] [166:22,25]
ways [38:11] [124:21,22]

[152:3]
web [74:4] [165:2,3,6]
wed [119:6] [127:2,12]
  [130:17] [151:17]
week [18:5,6] [145:25]
well [5:8,10] [6:14] [7:17]
  [8:2] [9:9] [12:6] [13:10]
  [15:6,16] [17:10] [19:13]
  [20:18] [23:16] [24:6,22]
  [26:20] [27:8,13,17,21]
  [28:12] [30:7] [31:21]
  [32:13,16,20] [33:3] [34:24]
  [37:5,6,7,22] [40:3,8]
  [41:14] [42:25] [44:18]
  [46:10,22] [48:25] [50:12,19
  ,23] [51:19] [52:2,4,17]
  [53:25] [55:7] [57:18]
  [59:13] [60:17] [62:18]
  [63:2,18] [64:8] [65:16]
  [66:23] [67:11,19,20]
  [68:18] [69:11] [70:4]
  [74:17,24] [80:10] [82:13]
  [83:23] [84:8,13] [85:3,11
  ,20] [86:18] [87:13,21]
  [88:16] [90:15] [91:6,14]
  [97:2] [98:7,15] [99:8,12]
  [100:14,21] [102:14]
  [103:2,6] [106:8,10] [107:
  2] [108:19] [110:16] [111:17]
  [114:8] [115:11] [116:6]
  [121:11,17,19,20] [122:2,13]
  [123:8,13,24] [124:25]
  [125:3] [126:9] [127:4]
  [128:4] [131:8] [134:25]
  [135:15] [137:9,10,15]
  [138:20] [143:3] [147:7]
  [148:15] [150:23] [151:6,13
  ,18] [153:18] [154:3,4,6,12
  ,19] [156:16] [157:24]
  [158:9,19,22] [159:4]
  [160:3,23] [161:14] [162:8]
  [167:3]
went [56:8] [110:22] [149:10]
  [150:23] [156:7] [167:2]
werent [115:18] [129:20]
  [141:5]
west [3:15]
weve [4:23] [36:20] [49:4]
  [86:15] [89:3,14] [100:20]
  [108:21] [110:3] [131:15]
  [133:17] [139:10,16]
  [140:7] [142:2] [146:2,5,15]
  [147:24]
whatever [18:11] [88:16]
  [136:8] [162:2] [168:20,23]
whats [14:8,10] [24:24]
  [51:24] [61:6] [73:5,12]
  [110:14] [113:18] [115:4]
  [117:15]
whenever [150:7] [157:4,6]
  [159:18]
whereof [172:19]
wherever [139:9]
whether [6:19] [7:22] [18:14]

[24:17] [33:5,8] [38:12]
  [43:6] [61:10] [70:4] [71:11]
  [80:9] [82:10] [84:15]
  [91:23] [92:17] [97:19]
  [116:11] [118:3,4] [119:10]
  [124:3] [129:17] [137:20]
  [139:21] [140:23] [141:11]
  [142:4] [148:25] [149:8]
  [153:22] [154:16] [159:23]
  [160:12] [162:12,20]
  [166:10,16] [167:24]
whitman [8:17] [22:3]
whoever [28:8,20] [43:4]
  [151:15]
whole [88:6] [90:11] [93:19]
whom [9:10] [31:20] [40:6,7]
  [117:21]
whose [172:11]
why [4:19] [14:17,22] [17:25]
  [32:16] [36:16] [38:14,16]
  [42:20] [43:11] [68:20]
  [86:24] [101:24] [143:21]
  [150:16] [151:6] [156:14]
  [157:22]
wickes [2:14] [3:21] [4:11]
  [20:14] [31:25] [42:25]
  [53:11] [61:16,25] [64:8]
  [94:6] [95:11] [116:17,24]
  [117:2,14] [128:3] [131:8]
  [133:5,8] [141:19] [145:15
  ,23] [147:7,19,21,22]
  [148:4] [160:14] [162:23]
  [168:12] [174:4,7]
wide [101:3] [107:5]
will [3:19] [4:4] [26:19]
  [46:4] [74:22] [102:20]
  [146:14] [147:9,10,13]
  [152:25] [168:25]
williamson [2:15] [3:23]
  [168:24]
willing [161:15]
wish [69:25] [164:4] [171:]
within [111:21] [172:9]
without [44:8] [47:2] [52:19]
  [60:18] [61:2] [105:24]
witness [4:5,7] [12:4]
  [18:22] [20:9] [26:23]
  [42:18] [95:5] [116:22,25]
  [131:14] [142:7] [162:25]
  [168:14] [171:2] [172:11,14
  ,19] [174:2]
witnesss [63:22]
wont [26:4]
word [18:11] [44:6]
words [28:17] [44:6] [50:19]
  [56:23] [57:23] [59:20]
  [67:21] [69:9] [75:9] [87:24]
  [102:17] [114:10] [121:13]
  [126:7] [153:22] [162:15]
  [166:25]
work [7:8] [10:6,16,20,25]
  [12:3] [15:17] [20:9,25]
  [21:3] [23:14] [24:4,20]
  [25:10] [42:17] [43:13,15]

[44:3,11] [49:21] [51:17]
[52:5] [66:17] [77:5] [97:9
,23] [98:4] [103:9] [127:18]
[134:11] [145:13] [163:7]
**worked** [9:11] [11:17,20]
[14:24] [17:12] [19:6,19]
[31:7] [53:13] [54:7,11]
[73:6,9] [76:13] [83:18]
[113:19]
**working** [7:21] [15:20]
[18:22,25] [20:23] [43:10,20]
[71:12] [72:2] [150:12]
**works** [10:18,22] [34:7]
[83:8]
**world** [52:12] [108:25]
[114:13] [140:7]
**wouldnt** [6:15] [23:4,19]
[41:14] [44:5] [102:3]
[103:17] [111:13] [113:11]
[114:12] [127:4,13] [141:15]
[145:5] [161:13] [162:7]
**write** [7:19] [15:8,9] [149:5]
**writing** [7:6]
**written** [30:13] [60:20]
[73:3,7] [98:16] [105:4,25]
[110:13] [118:4]
**wrong** [91:14] [105:12]
[123:17]
**wrote** [11:8] [14:25] [15:3,6
,10] [19:21] [39:11] [78:20]
[93:7] [149:10]

---

X

---

**xanthos** [53:15,22,23]
[54:11] [83:25] [110:13]
[111:2]
**x-a-n-t-h-o-s** [53:23]
**xanthoss** [110:15] [112:7]

---

Y

---

**yeah** [10:7] [27:15] [46:17]
[49:9] [129:3] [147:11]
**year** [22:4] [69:24] [119:18]
[126:17] [134:19]
**years** [20:12] [30:19] [78:20]
[153:23]
**yes** [4:17] [5:4] [6:9] [9:12,16]
[11:22] [13:7,25] [14:25]
[15:19] [16:2] [17:4,7,21]
[18:8] [19:3,11,25] [21:14]
[26:14] [29:10] [30:21]
[31:16] [35:16,19,21,23]
[42:2,19] [44:5] [45:21]
[46:2] [48:17,24] [49:6,23]
[53:21] [55:12,21] [56:6,21]
[57:15] [58:22] [60:10]
[64:23] [66:15] [71:19]
[72:22] [73:23] [74:6,11,16]
[77:13] [78:23,25] [79:11]
[80:6] [81:7,11,13,20,23]
[86:8,16] [87:9] [88:14]
[89:4,13] [92:7] [95:21]

[96:6,12,19] [98:14] [100:8]
[101:15] [102:8] [103:8,15]
[104:7,11] [105:6,10]
[106:2] [108:9,14,24]
[111:11] [112:3] [113:6]
[115:17,20] [117:20]
[118:9,16,21] [119:9,15]
[120:9] [121:3,24] [122:11]
[123:15] [124:13] [127:14]
[128:15,18] [129:3,6,13,25]
[130:4,23] [131:20] [132:8
,20] [133:21,25] [134:5,9,15]
[137:17,24] [138:7] [142:14
,23] [144:13,25] [152:11,18]
[156:9] [158:18] [159:16]
[160:25] [161:8] [163:19]
[164:2,6,19,23] [165:5,12
,24] [166:8,20] [168:3]
**yesterday** [147:3]
**yet** [26:11,16] [69:10]
**yield** [118:25]
**york** [2:13] [3:15,18] [172:3
,5,10]
**youd** [34:24] [113:11]
[114:12]
**youre** [4:19] [24:8] [29:20]
[32:20] [36:6] [38:13]
[39:13] [49:2] [50:10]
[55:16] [58:15] [64:9]
[87:4,5,7] [105:21] [121:13]
[123:23] [124:10] [134:10]
[141:13] [143:9] [145:8]
**yourself** [17:20] [28:4]
[42:22] [48:23] [51:17]
**youve** [4:25] [18:22] [19:5]
[25:10,21] [39:18] [40:17]
[59:8] [63:14] [67:15]
[70:21] [77:2,11] [78:10]
[102:2] [104:15] [115:11,14
,15] [120:17] [122:6] [134:
10] [139:11] [155:10]
[156:10]
**yun** [8:18]

---

Z

---

**zero** [158:16,21,23] [159:4]

A.19

*EXHIBIT BB*

# In The Matter Of:

*OHC LIQUIDATION TRUST, v.*
*CREDIT SUISSE FIRST BOSTON, ET AL.,*

---

## *MYLES STANDISH*
### *September 21, 2006*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**STANDISH, MYLES - Vol. I**



APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.

Stutman, Treister & Glatt

1901 Avenue of the Stars

Twelfth Floor

Los Angeles, California  90067-6013

(310) 228-5755

(310) 228-5788 FAX

TCastanres@stutman.com

For the Defendants:

MICHAEL J. OSNATO, JR., Esq.

BRENDAN MURPHY, Esq.

Linklaters

1345 Avenue of the Americas

New York, New York  10105

(212) 903-9000

(212) 903-9041 FAX

Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

. . . . .

INDEX OF EXHIBITS

For the Defendants:     Page

| | | Page |
|---|---|---|
| 201 | Employment agreement - 4-13-04 | 57 |
| 202 | Declaration of Douglas Muir - | |
| | 11-18-02 | 79 |
| 203 | Memorandum - 4-13-00 | 89 |
| 204 | Oakwood minutes of board of | |
| | directors meeting - 7-24-01 | 116 |
| 205 | E mail printout and attachment | |
| | - 7-31-02 | 148 |
| 206 | Oakwood minutes of board of | |
| | directors meeting - 6-25-02 | 153 |
| 207 | Oakwood minutes of board of | |
| | directors meeting - 7-29-02 | 158 |
| 208 | Presentation to board of | |
| | directors - 8-19-02 | 170 |
| 209 | Oakwood minutes of board of | |
| | directors meeting - 8-19-02 | 179 |
| 210 | Presentation to Lotus - | |
| | 10-15-02 | 188 |
| 211 | E mail printout - 10-18-02 | 193 |

21/09/2006 STANDISH, Myles

Videotape Deposition of MYLES STANDISH, taken

by the Plaintiff, at the Marriott Hotel, 425 North

Cherry Street, Winston-Salem, North Carolina, on the

21st day of September, 2006 at 8:24 a.m., before K.

Denise Neal, Registered Professional Reporter and

Notary Public.

. . . . .

CONTENTS

| THE WITNESS:  MYLES STANDISH | EXAMINATION |
|---|---|
| BY MR. OSNATO | 6 |

. . . . .

21/09/2006 STANDISH, Myles

1       THE VIDEOGRAPHER:  We're on the record at

2   8:24.  Today's date is September 21st, 2006.

3   This is the deposition of Myles Standish taken

4   in the matter of In Re: Oakwood Homes

5   Corporation, et al., Debtors, OHC Liquidation

6   Trust, Plaintiff, versus Credit Suisse First

7   Boston, et al., Defendants, in the United States

8   Bankruptcy Court, District of Delaware.

9       This deposition is being held at 425 North

10   Cherry Street, Winston-Salem, North Carolina.

11   Will counsel introduce themselves for the

12   record, please?

13       MR. OSNATO:   Certainly.  You have Michael

14   Osnato and Brendan Murphy of Linklaters on

15   behalf of the Credit Suisse Defendants.

16       MR. CASTANARES:  And Tony Castanares of

17   Stutman, Triester & Glatt on behalf of the

18   Oakwood Liquidation Trust.

19       THE VIDEOGRAPHER:  Will the court reporter

20   please place the witness under oath?

21       MYLES STANDISH,

22   having been first duly sworn, was examined and

23   testified as follows:

24   ///

25   ///

EXAMINATION

BY MR. OSNATO:

Q.   Again, good morning, Mr. Standish.

A.   Good morning.

Q.   As I said earlier, we do appreciate you taking the time to testify.  I know that Oakwood is in the past, so we're grateful that you set some time out of your schedule for us.  As I just indicated, we are the attorneys for Credit Suisse in this matter and I take it that you have been deposed before?

A.   I have.

Q.   And are you, therefore, familiar with the ground rules that govern today's deposition?

A.   In general, yes.

Q.   Let me just go over a few of the more notable ones so we're all on the same page; okay?

A.   Okay.

Q.   The first and most important one is that you are testifying under oath and, therefore, subject to the laws of perjury and must, therefore, give me honest and truthful answers.  Is that clear?

A.   Yes.

Q.   One of the things that will be quite helpful for the court reporter is if we have a clean record.  So I will, therefore, ask you to wait until

6

I finish my question.  I'll observe the same courtesy to you and we'll have a clean record.  Is that fair?

A   Yes.

Q.   Okay.  If you need to take a break at any point, I'm happy to do that.  I ask only that if we are in the midst of a question or a line of questioning you let me finish, and then I'm happy to give you an opportunity to take a break; okay?

A.   Okay.

Q.   From time to time Mr. Castanares may object to my questions.  So long as he does not instruct you not to answer my question, I will ask you to answer it to the extent you understand it.  Is that clear?

A.   Yes.

Q.   Okay.  Is there any reason why you're not capable of giving me your honest and truthful recollection today?

A.   Not that I can think of.

Q.   Okay.  You're not taking any kind of medication or drugs that would impair your memory?

A.   I am not.

Q.   Okay.  Thank you.  Mr. Standish, were you deposed previously as part of the administration of

7

the bankruptcy of Oakwood?

A.   Yes.  I was I believe on December 26th, 2002.

Q.   And do you recall who took that deposition?

A.   Robert Stark.

Q.   And do you recall who Mr. Stark was representing?

A.   He was representing the creditors' committee.

Q.   And in that deposition did Mr. Stark ask you for your views on why Oakwood had filed for bankruptcy?

MR. CASTANARES:  Objection to form.

MR. OSNATO:  You can answer.

THE WITNESS:  I believe that he did.

Q.   (By Mr. Osnato)  And do you recall the answer that you gave?

A.   I don't recall exactly what answer I gave.

Q.   Well, as we sit here today do you have views on why Oakwood filed for chapter 11 bankruptcy in November of 2002?

A.   I do.

Q.   And can you share those with us today?

A.   Well, the immediate reason that we filed

8

for bankruptcy was we were out of money.

Q.   And were there any other reasons beyond the liquidity crisis you're alluding to?

A.   Well, I think even before we were out of money we realized that there were structural problems particularly with our loan portfolio.  So we had been planning to file for bankruptcy for some period of time in order to correct those structural problems.

However, on the week beginning I think November 11th we really had no choice other than to file at that time because we were essentially out of cash.

Q.   In your answer you have referred to we, and I take it you're referring to the board of directors and senior management of the company; is that correct?

A.   Yes.

Q.   And am I also correct that the decision to file for bankruptcy was made by the board of directors assisted by senior management?

A.   Yes.  I think it would take a board decision.  I used to be a lawyer.  I'm not a lawyer anymore, but I would think that it would take a board decision to go ahead and file for bankruptcy.

Q.   Okay.  Thank you.  There's a lot of ground

9

**[Page 10]**

1   to cover today, and so I think it would be useful for
2   us first to have a general discussion about what this
3   case is about and your general recollection of the
4   underlying facts.  So what I'd like to do is ask you
5   a series of questions that go more to background and
6   from that we'll segue into some of the more specific
7   events and documents.  Does that sound fair?
8       A.   Okay.
9       Q.   Okay.  Do you have a general understanding
10   of what this particular lawsuit is about?
11      A.   I have a general understanding.  I read
12   the complaint I think shortly after it was filed.  I
13   have not seen the complaint since.
14      Q.   Can I take from your answer that you did
15   not review the counterclaims before they were filed?
16      A.   I did not, not the specific written form,
17   no.
18      Q.   And did anyone from the liquidation trust
19   seek out your guidance as to the allegations in the
20   suit before the suit was filed?
21      A.   I was interviewed by attorneys
22   representing the trust on a number of occasions.
23      Q.   And do you know if the purpose of any of
24   those interviews was to gather information to be used
25   in this lawsuit?

**[Page 11]**

1       A.   I don't know that specifically.  I would
2   I would suspect that was the case.
3       Q.   Can you tell me your general understanding
4   of what you understand this lawsuit to be about?
5           MR. CASTANARES:  I'm going to caution the
6   witness in the course of answering the question
7   not to reveal attorney-client communications,
8   but you can -- you can testify as to any
9   knowledge you have other than what you've
10   learned from counsel.
11          THE WITNESS:  The -- I think that the
12   genesis of the -- of the lawsuit was a claim
13   filed by First Boston for some $3 million that
14   First Boston claimed was due on their financial
15   advisory contract.  I know that there were some
16   counterclaims that have since been made by the
17   liquidation trust relating to fees that had been
18   paid by Oakwood to First Boston.
19          And I know that -- I recall that there was
20   a claim made as well, I don't know if this was
21   with respect to the fees or an independent
22   claim, about First Boston and their role in the
23   assumption program that Oakwood Acceptance
24   Corporation had for a period of time.
25      Q.   (By Mr. Osnato)  Are you referring to the

**[Page 12]**

1   loan assumption program?
2       A.   Yes.
3       Q.   Okay.  And do you have an understanding of
4   the allegations that are being directed specifically
5   at Credit Suisse's conduct in this lawsuit?
6       A.   As I said, I read the complaint shortly
7   after it was filed, so my -- but my recollection of
8   that is rather sketchy.
9       Q.   Fair enough.  Do you recall agreeing with
10   the allegations in the counterclaims when you
11   reviewed them some time ago?
12      A.   I recall both agreeing with some as well
13   as disagreeing with some.
14      Q.   Okay.  Well, we'll go through the
15   counterclaims at some point later and if you can
16   refer me to those that you disagree with, I would be
17   grateful.  Broadly speaking, Mr. Standish, do you
18   have any views on the adequacy of the services that
19   Credit Suisse provided to Oakwood?
20      A.   That's a rather general question.  I have
21   some views on some services that I think were
22   adequate and some services that were not.
23      Q.   That's a fair observation, so let me do it
24   this way.  What services did Credit Suisse provide to
25   Oakwood during your tenure with the company?

**[Page 13]**

1       A.   Well, when you say my tenure, are you
2   talking about all the time I was employed by the
3   company?
4       Q.   Let's focus on the period 1999 through the
5   filing.
6       A.   Okay.  Credit Suisse served as our primary
7   underwriter in our securitization program.  Credit
8   Suisse also served in a more general capacity as a --
9   as an advisor with respect to our overall financial
10   condition, liquidity condition with respect to
11   options that might be available.  Credit Suisse was
12   also provided a loan purchase facility where we
13   liquified our loans prior to securitization.
14          First Boston also served as the financial
15   advisor as we were looking to restructure the company
16   pursuant to a contract entered into in August of
17   2002.  First Boston I believe during that period of
18   time had a research analyst that followed the company
19   for at least a period of time.  They may have had
20   other roles, but those are the ones I recall at the
21   moment.
22      Q.   Okay.  Now, let's focus specifically on
23   the underwriting services that Credit Suisse
24   provided.  It's my understanding that those services
25   included performing some measure of diligence,

1 interacting with rating agencies on behalf of Oakwood
2 and generating potential investor interest in
3 securitizations; is that correct?
4      MR. CASTANARES:  Objection to form.
5      THE WITNESS:  Among other things, yes,
6 they did those things.
7      Q.   (By Mr. Osnato)  What did I leave out?
8      A.   Well, they certainly were the primary
9 people involved in structuring the transaction
10 itself.  That's the only thing I can -- additional
11 thing that I can recall at the moment.
12      Q.   Am I correct that the securitizations
13 tended to use the same structure?
14      A.   The same general structure in the sense
15 that it was a securitization.  You would have
16 different tranches.  You would have sometimes
17 interest-only strips.  You would have sometimes bonds
18 that were guaranteed, sometimes bonds that were not
19 guaranteed.  So there was -- there was a good bit of
20 variability in the structure of each of the
21 securitizations.
22      Q.   Again focusing only on the underwriting
23 services that Credit Suisse provided, do you think
24 that it provided those services adequately and
25 competently?

14

---

21/09/2006 STANDISH, Myles

1      A.   In general, yes.
2      Q.   Focusing on the financial advisory
3 services that you described a moment ago, I'm going
4 to ask you the same question.  Do you think that
5 Credit Suisse provided those services adequately and
6 competently?
7      A.   When you say financial advisory services,
8 does that include the financial advisory contract in
9 August of 2002?
10      Q.   Well, again, that's a fair observation, so
11 let's break that question down into two pieces; okay?
12 Separate out for the moment the services provided
13 under the August contract, and please give me your
14 views on whether Credit Suisse provided its services
15 adequately and competently?
16      A.   Under the August 2002 contract?
17      Q.   No.  Anything other than --
18      A.   Anything other than that contract?
19      Q.   -- under that contract.
20      A.   Okay.  The -- I know that -- I know that
21 Credit Suisse came to us with a number of
22 alternatives during the years --
23      Q.   Uh-huh.
24      A.   -- as far as ways that we could provide
25 better liquidity or that they could help us provide

15

---

1 better liquidity for Oakwood.  None of the things
2 that they brought to the table ever came to pass
3 other than when we entered into the loan purchase
4 agreement with them.
5      So they brought ideas to the table which
6 either didn't come to pass because First Boston
7 ultimately wouldn't approve them or they didn't come
8 to pass because management didn't think that the
9 ideas were worth pursuing to finality.
10      So in general I can't -- I don't know if
11 there were other things that they could have brought
12 to the table that would have provided us with better
13 options than we ended up taking, but -- but they did
14 not come to the table with things that management
15 viewed to be workable.
16      So, you know, were they trying to bring
17 ideas to the table that might work?  I think so.
18 Ultimately they didn't work.  Does that mean that
19 they were unsatisfactory?  I don't know.  I can just
20 tell you what the results were.
21      Q.   Credit Suisse's role as an advisor was to
22 bring options to the board and senior management and
23 it was senior management and the directors' role to
24 select options they thought were in the best
25 interests of the company; isn't that right?

16

---

21/09/2006 STANDISH, Myles

1      A.   With the advice of First Boston, yes.
2      Q.   But ultimately it was the prerogative and
3 responsibility of the board to make the decisions as
4 to which options to pursue; isn't that correct?
5      A.   Certainly the board -- to actually pursue
6 an option, the board or management would have to be
7 the ones to say that we were going ahead with that
8 option, yes.
9      Q.   At any point in your tenure with Oakwood
10 did Credit Suisse control Oakwood?
11      A.   Not in the colloquial sense of the word.
12 I think that they did have a 19.9 percent option,
13 which under some securities definitions might make
14 them a controlling party.
15      Q.   Well, let me try and focus the question a
16 bit then.  Can you recall an instance where Credit
17 Suisse demanded the hiring or firing of any employees
18 of Oakwood?
19      A.   I do not.
20      Q.   Can you recall an instance where Credit
21 Suisse demanded that a certain director be removed
22 from the board?
23      A.   I do not.
24      Q.   Did --
25      A.   If you'd give me a moment  I left my cell

17

```
 1    phone on.  Let me turn it off.
 2         Q.    No problem.  Did Credit Suisse have any of
 3    its representatives seated on the Oakwood board?
 4         A.    They did not have a representative seated
 5    on the board.  I hesitate only because Sabin Streeter
 6    was a board member of Oakwood for some period of
 7    time.  He was affiliated -- he was a managing
 8    director I believe of DLJ, Donaldson, Lufkin &
 9    Jenrette, which was merged into First Boston.  And I
10    don't know whether Sabin had an affiliation with
11    First Boston after that merger or not.
12         Q.    Do you recall the date that Mr. Streeter
13    first was appointed to the board?
14         A.    I believe it would be 1986.
15         Q.    And am I right that that date predates by
16    some time the first services provided to Oakwood by
17    Credit Suisse?
18         A.    As far as I know, yes.
19         Q.    Thank you.  Did Credit Suisse have the
20    ability to dictate corporate policy to Oakwood's
21    board of directors or senior management?
22         MR. CASTANARES:  Could you break that down
23    as to time, please, counsel?
24         Q.    (By Mr. Osnato)  At any time during your
25    tenure at Oakwood?
```

18

```
 1    was in more and more financial difficulty, the
 2    ability to do that would be lessened because
 3    typically an underwriter doesn't want to deal
 4    with a company in financial distress,
 5    particularly if it's the first time they're
 6    dealing with that company.
 7         Certainly if First Boston said that they
 8    were not going to serve as underwriter, then the
 9    marketplace would wonder why First Boston wasn't
10    going to underwrite.  So even had we
11    successfully found another underwriter, I think
12    that there would have been significant damage
13    done to the securitization program.
14         Q.    (By Mr. Osnato)  Can you think of a
15    specific corporate transaction that Oakwood entered
16    into at the direction of Credit Suisse?
17         A.    Certainly any underwriting we would have
18    entered into, it would have been at the -- with the
19    advice -- or any securitization -- excuse me -- that
20    we would have entered into would have been with the
21    advice of First Boston.
22         We often sought First Boston's advice on
23    anything pertaining to our -- to our loan
24    underwriting.  If you're asking do I remember First
25    Boston essentially ordering us to do something and we
```

20

```
 1         A.    I hesitate only because First Boston as
 2    both our underwriter and the provider of our loan
 3    purchase facility certainly had some power over the
 4    board if it would withhold those underwriting
 5    services or the -- withdraw the loan purchase
 6    facility.  So there was certainly some power there.
 7         I don't recall First Boston actually
 8    dictating policy to the board.  Certainly -- well,
 9    with -- certainly they advised the board on certain
10    things.  Certainly they used the loan purchase
11    facility to in essence dictate certain policies to
12    the company, whether to the board or management, from
13    the standpoint that it contained some rather detailed
14    underwriting criteria that had to be followed in
15    order for the loans to go into the loan purchase
16    facility.
17         Q.    If Credit Suisse had stated to the board
18    that it was going to withhold its underwriting
19    services, am I correct that Oakwood could simply have
20    looked to another financial institution to underwrite
21    those securitizations?
22         MR. CASTANARES:  Objection to form.
23         THE WITNESS:  Oakwood could certainly have
24    gone to other financial institutions and tried
25    to have them serve as underwriter.  As Oakwood
```

19

```
 1    complied with that, I don't recall that.  It was more
 2    of a mutual situation.
 3         Q.    Did Credit Suisse have the ability to
 4    force Oakwood to engage in a securitization
 5    transaction if the board determined that wasn't in
 6    the company's interest?
 7         A.    Well, I don't remember those circumstances
 8    happening.  As I said, if Credit Suisse would have
 9    come to the board and said you do this or we will no
10    longer serve as underwriter and we'll withdraw the
11    loan purchase facility, it would have put the board
12    in a difficult position.
13         Q.    But that never happened; right?
14         A.    That's correct.  I do not recall that
15    happening.
16         Q.    Did Credit Suisse have the ability to
17    force Oakwood to file for chapter 11 bankruptcy?
18         A.    Well, in essence they did.  On the -- on
19    the week of November 11th the Credit Suisse for a
20    period of several days stopped funding loans under
21    the warehouse or the loan purchase facility.  They
22    gave us no reason as to why they had done so.
23    Ultimately I believe on the Friday that we filed for
24    bankruptcy Credit Suisse did fund those loans that
25    had been -- that should have been funded several days
```

21

1  before but notified Oakwood that they were no longer
2  going to fund loans under the loan purchase facility
3  until some other agreement was worked out.  So as I
4  said earlier, the week of November 11th we
5  essentially had no choice other than to file for
6  bankruptcy because we were out of money --
7      Q.   Uh-huh.
8      A.   -- and the actions of First Boston were
9  one of the precipitating events to that.
10     Q.   Uh-huh.  Your earlier testimony I believe
11 was that the immediate precipitating factor was that
12 Oakwood ran out of money; is that right?
13     A.   Yes.
14     Q.   At some point in time after the chapter 11
15 filing did Oakwood terminate Credit Suisse?
16          MR. CASTANARES:  Would you care to break
17     down which relationship you're talking about or
18     do you mean under any relationship at all?
19          MR. OSNATO:  Under any relationship.
20          THE WITNESS:  We never terminated Credit
21     Suisse as far as a general matter.  We continued
22     to work with Fiachra O'Driscoll.  He continued
23     to provide us with advisory services on our
24     securitizations as well as working with us to
25     put back in place the loan purchase facility.

22

21/09/2006 STANDISH, Myles

1  We did terminate First Boston's role under the
2  August 2002 contract.
3      Q.   (By Mr. Osnato)  Let's talk for a moment
4  about Mr. O'Driscoll.  I take it you know who he is?
5      A.   I do.
6      Q.   And I take it that you have some views on
7  his abilities, competence; is that right?
8      A.   I do.
9      Q.   Can you tell us what those are?
10     A.   I think Fiachra has provided us -- I think
11 Fiachra in general is very competent.  I think he
12 served us well in general with the securitizations
13 work that he did prior to bankruptcy.  I was
14 disappointed in his work immediately leading up to
15 bankruptcy as far as getting a waiver so that the
16 loan purchase facility could remain in place.
17          I was somewhat disappointed after the
18 bankruptcy filing when we attempted to securitize our
19 loans for the first time in a transaction that would
20 have involved an entity called C-Bass.  Being the
21 servicer, Fiachra had indicated to me that he thought
22 -- what he thought our proceeds would be under that
23 transaction and the transaction never took place, but
24 it never took place because the proceeds were going
25 to be significantly in a very material sense less

23

1  than what he had indicated he expected it to be.
2      Q.   Mr. Standish, if you were the CEO of
3  Oakwood at the time this lawsuit was brought, would
4  you have authorized its filing?
5          MR. CASTANARES:  Objection to form.
6          THE WITNESS:  Again, it's been some time
7     since I read the counterclaim itself, so I can't
8     say for sure.  I do not think I would have
9     authorized a filing with respect to the loan
10    assumption program.
11         I can't -- I don't remember enough about
12    the counterclaims, the remaining counterclaims
13    themselves, to say that -- to say one way or the
14    other on the remaining counterclaims.  I
15    certainly as CEO of Oakwood would have defended
16    the lawsuit that was filed by First Boston as
17    far as payments under the August 2002 contract.
18     Q.   (By Mr. Osnato)  I do appreciate your
19 reservations about the services provided under the
20 August contract.  Would you have authorized a suit
21 brought on behalf of Oakwood that asserted the
22 underwriting services provided by Credit Suisse were
23 deficient or negligent?
24         MR. CASTANARES:  Same objection.
25         THE WITNESS:  I don't think I could really

24

21/09/2006 STANDISH, Myles

1  answer that without reviewing the complaint
2  itself.
3      Q.   (By Mr. Osnato)  Fair enough.  Now, in one
4  of your previous answers you alluded to the
5  assumption program and specifically the allegations
6  and the counterclaims relating to it; is that right?
7      A.   Yes.  I did.
8      Q.   Is there some aspect of those allegations
9  you believe to be incorrect?
10     A.   My general recollection of the allegations
11 with respect to the assumption program were that
12 First Boston caused management to enter into the
13 assumption program and that they did so in order to
14 kind of let's say keep the ball rolling to enable the
15 securitization program to continue in place for a
16 period of time longer than perhaps it otherwise would
17 have.
18         While First Boston was certainly aware of
19 the loan assumption program and what Oakwood was
20 doing with respect to the loan assumption program, I
21 disagreed with the idea that First Boston was the
22 driving force behind the loan assumption program if I
23 recall the allegations correctly.
24     Q.   Uh-huh.
25     A.   So I did -- I recall when I read the

25

1    complaint disagreeing with that aspect of it.

2         Q.   Do you continue to disagree with that

3    aspect of the complaint?

4         A.   To the extent I recall it correctly, yes.

5              MR. OSNATO:   I have here two copies of the

6         counterclaims.  I see no need to mark these as

7         exhibits.

8              MR. CASTANARES:  Okay.

9         Q.   (By Mr. Osnato)  Mr. Standish, I've just

10   handed you a copy of the counterclaims that were

11   filed in this lawsuit, and I believe you testified

12   earlier that at some point after they were filed you

13   first reviewed them; is that correct?

14        A.   That's correct.

15        Q.   Okay.  I'm going to draw your attention to

16   page 11 of the counterclaims.

17        A.   I'm there.

18        Q.   And in particular heading number two,

19   which reads CSFB encouraged debtors to aggressively

20   use the loan assumption program.  Do you agree with

21   that statement?

22        A.   I do not.

23        Q.   Was the decision to institute the loan

24   assumption program made exclusively by Oakwood?

25        A.   Well, as I said, I think CSFB knew what we

26

1    were doing and I believe that Fiachra -- it would

2    have been discussed with Fiachra prior to doing it to

3    make sure there would be no adverse effect on our

4    securitization program; but as far as the decision to

5    -- well, let me -- let me back up.

6              Your -- the question really is based on an

7    incorrect factual assumption and that is that in -- I

8    believe in 2000 or 2001, whatever time period we're

9    talking about that we instituted a loan assumption

10   program, there had always been a loan assumption

11   program at Oakwood Acceptance Corporation.  The --

12   and it's fairly typical in the industry.

13             What we did was there was a decision to

14   expand to be somewhat more aggressive in the loan

15   assumption program sometime in the 2000, 2001 time

16   frame.  And that's what I'm really talking about.

17   And I'm sure before expanding that program it was

18   discussed with Fiachra, but as far as the decision to

19   go ahead and expand that program, that decision was

20   made by Oakwood management.

21        Q.   And to your knowledge was the Oakwood

22   board of directors apprised of Oakwood's use of the

23   assumption program?

24        A.   Yes.  And the world was apprised of the

25   assumption program  I think that it was in all of

27

1    our public documents, how many repossessed homes had

2    we had, how many -- versus how many homes awaiting

3    assumption there were.  If you looked at our 10-Qs

4    and 10-Ks and press releases, it was out there for

5    the world to see.

6         Q.   What is the or was the purpose of the loan

7    assumption program as it was used by Oakwood?

8         A.   There were two purposes.  One was a loss

9    mitigation purpose that if you can find a borrower to

10   go ahead and take over a loan that would otherwise

11   result in a repossessed home, then you, number one,

12   avoid the repossession.  You avoid a lot of the

13   expenses typically associated with a repossession,

14   and so it's a -- it's a loss mitigation technique.

15             The other factor which caused Oakwood to

16   more aggressively utilize the loan assumption program

17   in the 2000, 2001 time frame was it increased our

18   liquidity.  It increased the liquidity from the

19   standpoint that that loan had already been financed

20   in a securitization.

21        Q.   Uh-huh.

22        A.   If I can find somebody to assume that

23   loan, then it can stay financed in that

24   securitization so I don't have to look for financing

25   for that home.

28

1         Q.   And did there come a point in time when

2    Oakwood decided to terminate the assumption program?

3         A.   I don't know that the assumption program

4    was ever completely terminated.  It was certainly --

5    as far as the use of an assumption as a loss

6    mitigation technique as I talked about earlier, it

7    may have been completely terminated.  I'm not -- I

8    don't completely recall.

9         Q.   Uh-huh.

10        A.   But certainly in the June, July 2002 time

11   frame it was -- it was significantly cut back if not

12   terminated.

13        Q.   And why was that?

14        A.   Because even though it allowed us to keep

15   the home financed in the existing securitization,

16   there were expenses being associated with the loan

17   assumption program that were expenses that Oakwood

18   could not recover for in the near term.  Those

19   expenses would be refurbishment of the home, moving

20   the home if that was the case, bringing the balance

21   current if we did that.

22             So as cash became even more of an issue,

23   which it did in the June and July 2002 time frame,

24   even though the assumption program from a cash

25   standpoint was favorable as opposed to a refinancing

29

1 of a repossession, we made the decision to take a
2 more drastic step and that was to simply wholesale
3 the homes, which would cause the securitizations to
4 take significant losses but it preserved cash for
5 Oakwood.
6 Q. Uh-huh. Now, do you recall being
7 surprised by the magnitude of expenses associated
8 with the program in the summer of 2002?
9 A. Not in the summer of 2002.
10 Q. Was there a point in time where you were
11 surprised by the magnitude of the expenses associated
12 with the program?
13 A. There were two times I was surprised by
14 the expenses of the program. The -- in the winter of
15 2002 when -- in connection with the preparation of
16 our quarterly financial statement, we recorded a
17 significant amount of expenses that I was not aware
18 of before that time. And the same thing happened in
19 the late spring, May time frame of 2002 when we were
20 preparing our financial statements for our second
21 fiscal quarter.
22 Q. Did you -- strike that. At the time the
23 LAP program was either terminated or curtailed in the
24 summer of 2002, you were the CEO; correct?
25 A. I was.

30

1 Q. Did you make the decision to either
2 terminate or curtail the program?
3 A. Ultimately I guess I did. It certainly
4 would have been discussed at a board meeting prior to
5 actually terminating or curtailing it, but yes. It
6 was my decision that that was the best thing for
7 Oakwood.
8 Q. And after you made that decision in
9 conjunction with the board, did anyone from Credit
10 Suisse seek to lobby you to keep the program alive?
11 A. Not that I recall.
12 Q. Am I right that the loan assumption
13 program was fundamentally a good program that was
14 overused by Oakwood?
15 A. There were elements of the assumption
16 program that were -- that were good.
17 Q. Uh-huh.
18 A. It is a recognized loss mitigation
19 technique that I think has been used by most
20 servicers. It can mitigate losses.
21 Q. Did Oakwood have in place measures to
22 track the performance of a loan assumption program?
23 A. That information was very difficult to
24 get.
25 Q. And why was it difficult to get?

31

1 A. Because -- and I'm not an IT person, so
2 let me -- I can only talk at a higher level, but the
3 -- as I understood it the -- our system did not have
4 the ability to track the assumptions themselves
5 because it was as though that assumption was the
6 initial loan itself.
7 Q. Uh-huh.
8 A. So there was -- I did not have an ability
9 other than manual, which was a time-consuming process
10 and we didn't have people with a whole lot of excess
11 time, to really get any good data on the performance
12 of those assumptions.
13 Q. Was there an employee at Oakwood who had
14 responsibility for overseeing the loan assumption
15 program?
16 A. I don't think there was an employee --
17 well, there would have been employees at Oakwood that
18 were dedicated to the loan assumption program. I'm
19 not sure how that part of Oakwood Acceptance
20 Corporation was structured at the time.
21 I don't remember -- at this point in time
22 I don't remember whether there was a managerial
23 person overseeing that group specifically or whether
24 it was a managerial person who would have been
25 overseeing that group along with certain other

32

1 groups.
2 Q. My review of the documents suggests that
3 Robert Smith had a key role in overseeing the
4 assumption program. Is that right?
5 A. Well, Oakwood Acceptance Corporation at
6 this point in time, the 2001, 2002 time period,
7 reported to Robert Smith. So he would have been
8 involved in the decision making of the loan
9 assumption program.
10 Q. Do you recall any conversations with Doug
11 Muir to the effect that Mr. Smith had done a poor job
12 of running the assumption program?
13 A. I don't have any specific recollections.
14 Q. Do you personally have the view that Mr.
15 Smith did a poor job of running the program?
16 A. I think that the -- I think that the
17 program itself was not structured sufficiently so
18 that we could get data from it as far as costs, as
19 far as performance, as far as general underwriting
20 guidelines or what was actually being underwritten.
21 Whether that was due to Bob Smith's failure or
22 someone below him, I don't know.
23 Q. Your earlier testimony was that you were
24 surprised in the summer of 2002 to learn of the
25 magnitude of expenses associated with the program.

33

1  Am I paraphrasing correctly?

2      A.    I don't recall.

3      Q.    Do you remember learning in the summer of

4  2002 the dollar amount of expenses associated with

5  the program?

6      A.    Well, as I said, if I testified previously

7  that I learned in the summer of 2002, as I said, I

8  don't recall that, but I do recall being surprised as

9  I said in May of 2002.  If I was talking about the

10 summer of 2002, I probably was not as accurate as I

11 should have been.

12     Q.    Uh-huh.  That's fine.

13     A.    But it would have been in May of 2002 in

14 connection with the preparation of our financial

15 statements.

16     Q.    In the summer of 2002 was the assumption

17 program diverting liquidity that Oakwood otherwise

18 could have used for its operations?

19     A.    Yes.

20     Q.    And was it in your view -- strike that.

21 Was that diversion of liquidity a factor that led

22 Oakwood to file for bankruptcy in November?

23     A.    It's -- it's a difficult -- it's a

24 difficult area to quantify, and I say that because

25 there are numerous impacts on the cash flows that

34

---

1  assumption program even absorbing those expenses that

2  we then still don't get paid a servicing fee because

3  of how poorly that securitization is performing, then

4  that's a loss of liquidity to us, but only in that

5  circumstance is it a loss of liquidity to us.

6      So overall it's difficult sitting here to

7  say without knowing -- and I don't recall now whether

8  we were in the circumstance where the securitizations

9  even with the assumption expenses, whether we were so

10 far upside down in some or many of them that we

11 weren't getting an offset on the other side in the

12 servicing fee; but, you know, all that being said, in

13 general the assumption program I believe cost us some

14 liquidity.

15     It's not a dollar for dollar liquidity

16 when you look in our financial statements and you see

17 what those expenses were.  It's not a dollar for

18 dollar, but to the extent anything cost Oakwood

19 liquidity, it would have acted to precipitate the

20 bankruptcy at an earlier event rather than a later

21 event.

22     Q.    But your testimony is that Credit Suisse

23 -- Credit Suisse neither controlled nor directed

24 Oakwood's use of the LAP; is that right?

25     A.    The LAP being the loan assumption program?

36

---

1  result from the assumption program.

2      Q.    Uh-huh.

3      A.    As I said before, the assumption program

4  creates expenses that we don't recover for a

5  significant period of time down the road.  However,

6  there's a counterimpact on our cash flows that could

7  be roughly equivalent.  The way our securitizations

8  worked was that in every securitization we had

9  anywhere -- well, in every securitization we had a

10 hundred basis points of servicing fee.

11     Because of the losses that were running

12 through these securitizations, the servicing fee was

13 paid after everybody else got paid.  So, in fact, we

14 weren't getting paid our full servicing fee and in

15 some securitizations we weren't getting paid hardly

16 any servicing fee.  There may have been some that we

17 weren't paid at all.

18     To the extent that the loan assumption

19 program is stopping losses from hitting the

20 securitizations, we're paying out of this pocket but

21 it's causing the securitizations not to lose money,

22 which means we get a servicing fee of the

23 roughly equivalent amount out of the other side.

24 That's if all things are equal.  Now, if the

25 securitization is so far under water that the

35

---

1      Q.    Correct.

2      A.    Yes.  That's correct.

3      Q.    Can you please turn to page 12 of the

4  counterclaims which remain in front of you?

5      A.    Yes.

6      Q.    And in particular paragraph 21.  Can you

7  please read to yourself the final sentence?

8      A.    Well, let me read the whole paragraph.

9      Q.    Certainly, sir.

10     A.    Okay.

11     Q.    I want to focus in particular on the final

12 sentence, in particular the portion of the sentence

13 that reads, quote:  The LAP morphed into a grossly

14 overused program that became not only unsustainable

15 but also resulted in the expenditure of a significant

16 amount of cash that could otherwise have been used in

17 the debtor's operations.

18     A.    Okay.

19     Q.    Do you agree with that statement?

20     A.    Well, there's a lot in that statement, so

21 I don't know that I can say that I agree with the

22 statement or I disagree with the statement.  There's

23 parts of it I agree with and there's parts of it that

24 I don't.

25     Q.    Well, let's talk about the parts that you

37

1    don't agree with.  What are those?

2        A.    The parts that I don't agree with?

3        Q.    Correct.

4        A.    Well, to say that the LAP morphed into a

5    grossly overused program, I mean, as I said before,

6    the  - I'm not sure about the use of the word

7    morphed.  Assumptions have been around for a long

8    period of time.

9        Q.    Uh-huh.

10       A.    Was it a grossly overused program?  It was

11   certainly in my mind overused.  As I indicated

12   before, the cash that was used in the assumption

13   program was not a dollar for dollar loss of cash that

14   could have otherwise gone into our operations.  It

15   was only a dollar for dollar loss of cash if we were

16   not getting cash back in the -- through the servicing

17   fee.

18       Q.    Uh-huh.

19       A.    And I think in some cases we probably

20   were.  In some cases we probably weren't.

21       Q.    Now, had you reviewed these counterclaims

22   before they were filed, would you have objected to

23   the use of the language you just cited in paragraph

24   21?

25            MR. CASTANARES:  Objection to form.

                                                    38

---

21/09/2006 STANDISH, Myles

1            THE WITNESS:  I may have.  I don't -- it

2    would be according to how detailed I would have

3    reviewed them and the extent I would have been

4    involved.

5        Q.    (By Mr. Osnato)  But you didn't review

6    this paragraph before the counterclaims were filed;

7    right?

8        A.    I did not.

9        Q.    Can you please turn to paragraph 49 of the

10   counterclaims?

11           MR. CASTANARES:  Page 27.

12           MR. OSNATO:  Page 27.  Thank you.

13           THE WITNESS:  Forty-nine, okay.

14       Q.    (By Mr. Osnato)  You can go ahead and read

15   that, please.

16       A.    Okay.

17       Q.    I'm going to ask you some questions about

18   paragraph 49, but before I do that I just want to

19   take a step back and talk about the assumption

20   program a little more.  And the reason why I've asked

21   you all these questions is because Defendants believe

22   they were allowed to have influenced or coerced

23   Oakwood into using the LAP to artificially prolong

24   its life to generate fees.  Do you agree with that

25   assertion?

                                                    39

---

1            MR. CASTANARES:  Objection to form.

2            THE WITNESS:  Well, I think as I testified

3    before, it was management's decision to move

4    ahead with the loan assumption program.  It was

5    not CSFB.  I know that management sought CSFB's

6    advice concerning the loan assumption program.

7    I think that the more aggressive use of it was

8    management's idea, not CSFB's.

9        Q.    (By Mr. Osnato)  Okay.  Now, if we return

10   to paragraph 49, please, and in particular the final

11   sentence, which reads:  The net effect of CSFB's

12   knowing activity was to cause the debtors to remain

13   in business solely for the purpose of generating

14   lender investment banking and restructuring financial

15   advisory fees for the benefit of CSFB.  Do you agree

16   with that statement?

17           MR. CASTANARES:  Objection to form.

18           THE WITNESS:  Again, there's parts of the

19   statement I agree with and parts that I don't.

20   The use of the loan assumption program kept our

21   securitizations from -- from deteriorating.  So

22   the use of the assumption program did allow

23   Oakwood to continue originating loans and to

24   securitize loans for a longer period of time

25   probably than it otherwise would have.

                                                    40

---

21/09/2006 STANDISH, Myles

1            Otherwise, it would have had to wholesale

2    loans and -- or wholesale repossessed homes,

3    which would have had losses, significant --

4    would have caused significant losses on the

5    securitizations and probably would have resulted

6    in negative action by the rating agencies

7    sooner.

8            So it allowed Oakwood to continue for a

9    longer period of time to originate and

10   securitize, which had the effect of generating

11   more revenue to CSFB, but the generation of

12   revenue for CSFB was not the sole reason or the

13   motivating reason behind moving forward with the

14   loan assumption program.

15       Q.    (By Mr. Osnato)  And that's because as

16   you've testified previously, the assumption program

17   was controlled by Oakwood; is that right?

18           MR. CASTANARES:  Objection to form.

19           THE WITNESS:  Well, I was -- I guess

20   that's part of it, but I was focused more on the

21   part of the sentence that --

22           MR. OSNATO:  Uh-huh.

23           THE WITNESS:  -- that the net effect was to

24   allow the debtors to remain in business solely

25   to generate fees for CSFB.  The loan assumption

                                                    41

```
1    program allowed Oakwood to continue in the
2    course of its normal business activity for a
3    longer period of time.  So it wasn't for the
4    sole purpose of generating fees for CSFB.
5         Q.   (By Mr. Osnato)  Uh-huh.  Focusing on that
     portion of the sentence that says the net effect of
6    CSFB's knowing activity was to cause the debtors to
7    remain in business solely for the purpose of, period,
8    generating fees, do you agree with that statement?
9    Do you believe that Credit Suisse intentionally
10   advised Oakwood in a way that kept it in business
11   solely so that Credit Suisse could profit at the
12   expense of the company?
13        MR. CASTANARES:  Objection to form.
14        THE WITNESS:  I do not.
15        MR. OSNATO:  Why don't we take if you
16   don't mind a quick break, an hour and ten
17   minutes in?
18        MR. CASTANARES:  Sure.
19        MR. OSNATO:  Thank you.
20        THE VIDEOGRAPHER:  We're off the record at
21   9:31.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  This is tape number
24   two.  We're on the record at 9:38.
```

42

```
1    Q.   (By Mr. Osnato)  Okay.  Mr. Standish, I'm
2    going to do something now which typically happens at
3    the beginning of a deposition but since we launched
4    into the LAP discussion we skipped over, and that is
5    to do some background.  Could you just please tell me
6    your home address?
7    A.   It's 6 Gwynedd, G-w-y-n-e-d-d, Lane --
8    Q.   Okay.
9    A.   -- Summerfield, North Carolina.
10   Q.   And are you presently employed?
11   A.   I am not.
12   Q.   When was the last time that you were
13   employed?
14   A.   Well, let me clarify that I'm not employed
15   from the standpoint that I'm an employee that pays
16   Social Security, but --
17   Q.   Sure.
18   A.   -- I own or I'm the majority owner of a
19   business in Idaho that I spend a good bit of time at.
20   Q.   Okay.  And what's the name of that
21   business?
22   A.   It's -- the name of the business is Kit,
23   K-i-t, Home Builders West.
24   Q.   And what kind of services does your
25   company provide?
```

43

```
1    A.   It produces manufactured homes.
2    Q.   And this is a privately owned company, I
3    take it?
4    A.   It is.
5    Q.   Are you the principal owner?
6    A.   Yes.
7    Q.   Can you briefly, sir, tell me your
8    educational background?
9    A.   Beginning at what point?
10   Q.   Why don't we start with college, please.
11   A.   I graduated from Harvard College in 1977.
12   Q.   And I take it at some point you received a
13   JD degree; is that right?
14   A.   I received a JD degree from the University
15   of North Carolina in 1981.
16   Q.   Okay.  And after receiving that degree,
17   did you pass a bar exam in any state?
18   A.   Well, immediately following that,
19   immediately following graduation from law school I
20   clerked for a federal circuit court judge for a
21   year --
22   Q.   Uh-huh.
23   A.   -- and then following that took the North
24   Carolina Bar and passed the North Carolina Bar.
25   Q.   And upon passing the North Carolina Bar
```

44

```
1    did you practice with a firm?
2    A.   I did.
3    Q.   And what was the name of that firm?
4    A.   Kennedy, Covington, Lobdell & Hickman.
5    Q.   For how many years were you employed by
6    that firm?
7    A.   Well, I was employed by the firm for five
8    years.
9    Q.   And then you made partner?
10   A.   Yes.
11   Q.   In what year did you become a partner of
12   the firm?
13   A.   It would have been 1987, I believe.
14   Q.   And as of the time you made partner, did
15   you have any field that you specialized in?
16   A.   Well, I was on the -- what we called the
17   corporate securities team.  We had four different
18   groups that covered a broad range of practice.  So I
19   guess I specialized in corporate and securities, but
20   I did a number of other things as well.
21   Q.   And at some point in time did Oakwood
22   Homes become a client of yours?
23   A.   Well, Oakwood Homes had been a client of
24   the firm prior to my joining the firm.
25   Q.   At some point in time did you start to
```

45

1   provide legal advice to Oakwood?

2       A.   Yes.  The -- I think that my first or

3   second assignment in the firm I believe was with

4   respect to Oakwood.

5       Q.   Okay.  In the course of your private

6   practice did you ever advise companies on their

7   fiduciary duties?

8       A.   I can't recall specifically advising

9   companies on their fiduciary duties, but it wouldn't

10  surprise me if I did.

11      Q.   By virtue of your legal training and

12  private practice as well as service as general

13  counsel of Oakwood, do you have an understanding of

14  what a fiduciary duty encompasses?

15      A.   In general, yes.

16      Q.   And what is that understanding?

17      A.   Well, a fiduciary owes a duty of trust, a

18  duty of loyalty to the entity that it's -- that the

19  fiduciary is serving.

20      Q.   And at any point in time did you believe

21  that Credit Suisse had a fiduciary relationship to

22  Oakwood Homes?

23      A.   I never thought of it in those terms.  As

24  far as -- well, when I say I never thought of it in

25  those terms, I never thought, you know, does Oak --

46

1   does Credit Suisse owe us a fiduciary duty.

2   Certainly, certainly there was a lot of trust, a lot

3   of loyalty between the two entities.

4        I think that certainly under the -- the --

5   the connection between an underwriter and an issuer

6   of securities, I would think there would be a

7   fiduciary relationship between those two as well as

8   under the financial advisory agreement that First

9   Boston entered into.  I would think there would be a

10  fiduciary relationship owed under that.

11      Q.   Uh-huh, okay.  At some point in time did

12  you leave private practice?

13      A.   I did.

14      Q.   And in what year was that?

15      A.   I believe it was 1995.

16      Q.   And did you leave to take a new job?

17      A.   I did.

18      Q.   And where was that job?

19      A.   It was with Oakwood Homes.

20      Q.   And you said this was 1995?

21      A.   I believe it was.

22      Q.   Okay.  And what position did you assume at

23  Oakwood?

24      A.   My title was senior vice president and

25  general counsel.

47

1       Q.   Okay.  And first focusing on your role as

2   senior vice president, can you please tell me what

3   your job responsibilities were?

4       A.   It was really simply general counsel.

5       Q.   Okay.

6       A.   The senior vice president was a title, but

7   it didn't add anything other than the general counsel

8   role itself.

9       Q.   And at this point in time was Oakwood a

10  publicly listed company?

11      A.   It was.

12      Q.   Do you know in what year Oakwood listed on

13  the New York Stock Exchange?

14      A.   I don't recall specifically, but I would

15  believe it would have been around 1987 or '88.

16      Q.   And in your role as general counsel of the

17  company, did you rely on outside counsel to advise

18  Oakwood?

19      A.   I did.

20      Q.   Do you recall approximately how many firms

21  Oakwood used?

22      A.   Well, if you're talking about firms in any

23  kind of role, there would have been upwards of a

24  hundred firms that were used.

25      Q.   Was there a firm that advised Oakwood in

48

1   connection with its listing on the New York Stock

2   Exchange?

3       A.   Yes.

4       Q.   And what firm was that?

5       A.   Kennedy Covington.

6       Q.   And that's your former firm?

7       A.   Yes.

8       Q.   And was there a firm that advised Oakwood

9   in connection with its securitizations?

10      A.   Yes.

11      Q.   And what firm was that?

12      A.   Hunton & Williams.

13      Q.   And as to those two firms, do you believe

14  they consistently provided Oakwood with sound

15  independent advice?

16      A.   Generally speaking, yes.

17      Q.   Is that true in the period all the way

18  through and including the filing for bankruptcy in

19  November 2002?

20      A.   In a general matter I think -- well,

21  you're just focusing on those two firms?

22      Q.   Uh-huh.

23      A.   In a general matter, yes.  I could talk

24  about specific things that I thought were not done

25  correctly, but --

49

```
 1     Q.    Sure.  Did Oakwood also retain the
 2  services of any Delaware counsel?
 3     A.    Yes.  We did.
 4     Q.    And what firm was that?
 5     A.    Morris Nichols.
 6     Q.    Was that true during the entire period you
 7  were general counsel of the firm -- excuse me -- of
 8  the company?
 9     A.    No.
10     Q.    At what point in time did you begin using
11  Morris Nichols?
12     A.    October 2002.
13     Q.    And was the purpose of retaining that firm
14  to help prepare for the bankruptcy filing?
15     A.    Yes.
16     Q.    If you could please just run me through
17  your titles at Oakwood from the period when you
18  joined in '95 through the filing in November of 2002,
19  I would appreciate it.
20     A.    Okay.  I'll try.  In I believe 1998 my
21  title changed -- well, let me back up.  I was general
22  counsel of the company the entire time I was there,
23  so that title never changed.  In 1998 I also had the
24  title of executive vice president, chief
25  administrative officer.
```

50

```
 1     Q.    Uh-huh.
 2     A.    In 2000 I believe that title changed
 3  simply to executive vice president.  It may have been
 4  executive vice president, operations, I don't know,
 5  but the chief administrative officer was no longer
 6  part of my title.  In 2001 I became the president of
 7  the company and the chief executive officer and the
 8  chairman of the board, and those titles remained
 9  until the company was sold.
10     Q.    Uh-huh.  I'm sorry.  Did you say it was
11  2001 that you became president and chief executive
12  officer?
13     A.    Yes.
14     Q.    What were your job duties as president and
15  chief executive officer of Oakwood?
16     A.    Well, I was ultimately responsible for the
17  operations of the company.
18     Q.    And I take it you were also serving as the
19  general counsel?
20     A.    I was.
21     Q.    And as of 2000 you also had a seat on the
22  board; is that correct?
23     A.    Yes.
24     Q.    Focusing on the board of directors of
25  Oakwood, am I correct that during your time there the
```

51

```
 1  board met on a regular basis?
 2     A.    Well, there were regular board meetings
 3  from the standpoint that I think under our bylaws we
 4  had an annual meeting and quarterly meetings.  So
 5  there were regular meetings in that regard.
 6     Q.    Focusing on 2002, do you recall the names
 7  of the board directors in that period?
 8     A.    I can give it a shot.
 9     Q.    Please.
10     A.    There was myself.  There was Robert Smith.
11  There was Dennis Meyer, Clarence Walker, Sabin
12  Streeter, Mike Weaver and Faye Vincent.  I'm not -- I
13  may be missing somebody, but I don't think so.
14     Q.    Can you recall any instance in 2002 that
15  Credit Suisse dictated to the board that a certain
16  decision had to be made?
17     A.    I recall Credit Suisse attending a number
18  of board meetings.  I don't remember them dictating
19  or making an ultimatum that a certain decision needed
20  to be made.
21     Q.    Now, would you agree with me that each of
22  the directors you just identified owed fiduciary
23  duties to Oakwood and its shareholders?
24     A.    They did.
25     Q.    And in your view, and again focusing on
```

52

```
 1  2002, did the directors discharge their fiduciary
 2  duties in adequate fashion?
 3     A.    I believe they did.
 4     Q.    And I believe you testified earlier that
 5  ultimately it was the decision of the board when and
 6  whether to file for bankruptcy; is that correct?
 7     A.    I believe that's a fair summary of my
 8  testimony.
 9     Q.    And do you believe that in reaching that
10  decision the board acted in an informed and
11  professional manner?
12     A.    Yes.
13     Q.    In your view in 2002 did Oakwood have a
14  sophisticated and competent board of directors?
15     A.    Yes.
16     Q.    And am I right that among those directors
17  were certain individuals with an accounting
18  background?
19     A.    I don't believe so.
20     Q.    Do you recall that in the months preceding
21  the bankruptcy filing that Credit Suisse presented a
22  number of options to the company, one of which was
23  bankruptcy?
24     A.    Yes.
25     Q.    And did the board in your view carefully
```

53

1    assess and study those various options?

2       A.    To the extent they needed to be carefully

3    studied and assessed.  Many of the options that were

4    presented by Credit Suisse were -- were not options

5    that would have helped our situation at all.

6       Q    But ultimately you would agree that it was

7    the prerogative of the board to select an option if

8    it thought it was in the best interests of the

9    company?

10      A.    Yes.

11      Q.    And I take it you remained in your

12    position as CEO and president after the bankruptcy

13    filing?

14      A.    I did.

15      Q.    And at what point in time did you leave

16    that position?

17      A.    On the date that the company was sold.

18      Q.    Are you referring to the sale to Clayton

19    Homes?

20      A.    Yes.

21      Q.    Were you involved in the negotiation of

22    the terms of that sale?

23      A.    I was.

24      Q.    And as part of that transaction do you

25    know if -- strike that.  Did Oakwood have a financial

54

1      Q.    (By Mr. Osnato)  Uh-huh.  And did you, in

2    fact, provide services to the trust along the lines

3    of what you just described?

4      A.    I did.

5      Q.    For how long were you employed by the

6    trust?

7      A.    I was never employed by the trust.

8      Q.    Who were you employed by?

9      A.    I wasn't employed.  I was acting as a

10    consultant.

11      Q.    Did you sign any kind of contract as part

12    of this employment?

13      A.    I believe I did.

14      Q.    And were you compensated for the work that

15    you did?

16      A.    Yes.

17      Q.    Do you recall the total amount of

18    compensation you received?

19      A.    I do not.

20      Q.    Were part of the services you provided

21    advising on this lawsuit or the allegations in the

22    counterclaims?

23      A.    I was interviewed about matters relating

24    to this lawsuit.  I did not act as -- in an advisory

25    capacity.

56

1    advisor for purposes of the Clayton acquisition?

2      A.    Yes.

3      Q.    And who was that?

4      A.    Miller Buckfyre.

5      Q.    And do you know if that firm provided --

6    excuse me -- performed any valuations of Oakwood?

7      A.    I believe they did.

8      Q.    At the time that Clayton acquired Oakwood,

9    was Clayton part of the Berkshire Hathaway family of

10    companies?

11      A.    It was.

12      Q.    At some point in time were you retained by

13    the liquidation trust that's overseeing the

14    administration of Oakwood's bankruptcy?

15      A.    I was.

16      Q.    Do you remember when that was?

17      A.    I think the agreement was entered into

18    shortly before the company was sold.

19      Q.    And why were you retained by the trust?

20            MR. CASTANARES:  Objection to form.

21            THE WITNESS:  I assume that the trust

22    wanted to make sure that they had access to

23    knowledge on an ongoing basis at least -- at

24    least for a period of time after the sale took

25    place and the trust was put in its capacity.

55

1      Q.    And today you have no employment

2    relationship with the trust; is that right?

3      A.    I believe that the agreement that I signed

4    called for -- it called for payments over a period of

5    time, maybe for three months, and then it -- it

6    stated that any other services that may be needed, I

7    would be compensated at an hourly rate.  I'm assuming

8    that that -- I'm not aware of a termination date I

9    guess is what I'm saying.

10           MR. OSNATO:  Okay.  Please have the

11    reporter mark as -- do you know where we left

12    off?

13           MR. CASTANARES:  Do you want to now use a

14    consecutive system?  Why don't you just start

15    with an arbitrary number like 201 or something?

16           MR. OSNATO:  Well, let's do this.  Let's

17    do -- that's fine.  Let's mark this as 201.

18           (Exhibit 201 was marked for

19    identification.)

20      Q.    (By Mr. Osnato)  Mr. Standish, I'm going

21    to hand you what's been marked as Exhibit 201, and

22    it's an employment agreement bearing a Bates range of

23    OHCLT-456810 through 818.  Is this the employment

24    agreement that you referred to a moment ago?

25      A.    This is what I was referring to.  It's the

57

1    -- I guess my only hesitation is as I said, I wasn't
2    really acting as an employee. I wasn't paid as an
3    employee. There weren't deductions taken out but
4    that's a legal matter, but this is -- this is -- this
5    looks like the agreement that I was referring to.
6        Q.    Okay. So if I refer you to page -- Bates
7    page ending 813, is that your signature on the page?
8        A.    Looks like it.
9        Q.    Okay. Thank you. Are you being
10   compensated in any way for your testimony today by
11   the trust?
12       A.    My recollection is that under this
13   agreement I'm paid $500 an hour for anything done
14   afterwards. So I would assume that that would apply.
15   I don't see the provision, but that's my --
16       Q.    Uh-huh.
17       A.    -- my general recollection that --
18       Q.    But to date you've received no
19   compensation for your testimony today?
20       A.    I have not.
21       Q.    And do you intend to seek that
22   compensation?
23       A.    I don't know. I haven't -- I haven't
24   thought about that.
25       Q.    Okay. There's a reference in this

58

1    document on page three to something called a KERP?
2        A.    Yes.
3        Q.    Key employee retention program. What is
4    that program?
5        A.    There was a program that was set up in
6    June of 2002, I believe. The -  that applied --
7    there was a program that was agreed to by the
8    creditors' committee in June of 2002 which I believe
9    established certain targets for how management was
10   going to get paid bonuses or what thresholds were
11   necessary for management to get paid bonuses during
12   the bankruptcy period.
13           That provision had in it a statement that
14   the creditors' committee would also recommend a
15   retention plan for senior management. In around
16   October of 2002 one of the members of senior
17   management resigned, Suzanne Wood.
18           And at that time I think representatives
19   of FTI, which was a consultant that Oakwood used
20   during the bankruptcy process, talked to Deloitte
21   Touche, who was representing the creditors'
22   committee, and said that there may be a chance to
23   save Suzanne; but in any event, the -- if the
24   creditors' committee was going to do anything with
25   that phrase back in June of 2002, that they better go

59

1    the rd and Jo something because otherwise they might
2    face management attrition.
3        Q.    Uh-huh.
4        A.    As a result of that the creditors'
5    committee approved a key employee retention plan for
6    management that was also at the time that we were
7    exploring a sale of the company. So there was a key
8    employee retention plan that was approved for I
9    believe Suzanne was still with us at the time, so I
10   believe it was approved for the four -- yeah. I'm
11   certain it was approved for the four members of
12   senior management.
13       Q.    Uh-huh.
14       A.    At that time ultimately Suzanne did leave,
15   so she did not participate under the terms of the key
16   employee retention plan.
17       Q.    Uh-huh, okay. And did you, in fact,
18   receive any compensation under that plan?
19       A.    I did.
20       Q.    Over separate and apart from the KERP, do
21   you have any kind of agreement whereby you'll receive
22   any compensation as a result of this lawsuit?
23       A.    As I said, I think that under -- my
24   recollection although I don't see it here is that
25   after the July 16, 2004 termination date here that

60

1    for any services that I provided the trust that I
2    would get $500 an hour for those services.
3        Q.    Apart from hourly compensation, do you
4    have any right to recovery of any percentage of
5    damages that might be paid or settlement might be
6    paid by Credit Suisse in this lawsuit?
7        A.    Under the terms of the key employee
8    retention plan the -- it entitled me to a payment at
9    the time the company was sold.
10       Q.    Uh-huh.
11       A.    There are two contingent payments as part
12   of that plan. One is a payment of $162,500 if the --
13   if the unsecured creditors which would include First
14   Boston under their claim receive distributions of
15   $350 million. There is another payment that would be
16   made if the unsecured creditors -- and this is an
17   additional $162,500 payment, if the unsecured
18   creditors receive distributions of up to
19   $275 million.
20
21
22
23
24
25

61

4    Q.    Uh-huh, okay.  And to be clear, is your

5   right to these payments derived from the KERP?

6    A.    Yes.

7    Q.    Okay.  And what other executives do you

8   know also have rights to recovery under that plan?

9    A.    Bob Smith would and Doug Muir would.

10    Q.    And do you know the respective amounts

11  that Mr. Smith or Mr. Muir would be entitled to if

12  either 250 million or 275 million are reached?

13    A.    I believe that with Doug whereas each

14  payment to me was 162,500, with Doug it would be

15  $100,000.  I can't recall exactly what Bob's would

16  be, but it would be somewhere in between the two.

17    Q.    Okay.  Have you had any discussions with

18  either Mr. Smith or Mr. Muir about this lawsuit?

19    A.    I have had no discussions with Bob Smith

20  about the lawsuit.  I believe that I had a discussion

21  with Doug Muir at the time the suit was filed after I

22  had seen a copy of the lawsuit.  I also had a

23  discussion and I can't recall -- well, I had a

24  discussion with Doug after we got the subpoenas for

25  the deposition.

1  The discussion was a brief one and there
2  was something that triggered it and I don't -- I
3  don't know what, but I recall asking Doug about the
4  relevance of the assumptions to the lawsuit and he
5  reminded me of the counterclaim with respect to the
6  assumptions.
7      Q.  Uh-huh.
8      A.  And then I recalled that counterclaim,
9  which I had previously forgotten, but that was the
10  extent of the conversation.
11     Q.  And again, to be clear, is the
12  conversation you're referring to one that was
13  precipitated by receiving the subpoenas?
14     A.  Yes.
15     Q.  How did the topic of the assumption
16  program come up in that conversation?
17     A.  There was something that triggered it in
18  my mind. It seemed to me that it might be a document
19  or something. I truly can't recall, but I recall
20  asking Doug about the relevance of assumptions to the
21  lawsuit. And then as I said, he reminded me of the
22  counterclaim and then I recalled the counterclaim.
23     Q.  Okay. Now, focusing on the first
24  discussion that you recall with Mr. Muir about this
25  lawsuit, which I believe you testified happened

66

1  shortly after you reviewed the counterclaims; is that
2  right?
3      A.  Yes.
4      Q.  Tell me what you remember about that
5  conversation?
6         MR. CASTANARES:  I'd like to caution the
7      witness that if in the course of answering the
8      question -- I have no problem with answering the
9      question, but if in the course of answering the
10     question there was discussion between him and
11     Mr. Muir about discussions that either of them
12     had with counsel in this lawsuit, I'd like him
13     to at least alert me to that fact so we can
14     consider whether or not it's privileged.
15        MR. OSNATO:  Uh-huh.
16        THE WITNESS:  I can just recall a brief
17     discussion with Mr. Muir about the -- about the
18     lawsuit, but the specifics, I don't have any
19     recall.
20     Q.  (By Mr. Osnato) Do you recall in that
21  conversation expressing to Mr. Muir any misgivings
22  about the allegations in the suit?
23     A.  I don't have a specific recall of that
24  now.
25     Q.  As you sit here today do you think that

67

might have happened?
2      A.  I think I may have mentioned to him that I
3  was surprised at the allegations about the assumption
4  program.
5      Q.  And do you remember what his response was?
6      A.  I do not.
7      Q.  Do you know if he -- strike that. Did Mr.
8  Muir ever indicate to you that he, too, was surprised
9  about the assumption allegations?
10     A.  I don't have any specific recall of that.
11     Q.  Do you recall ever having a discussion
12  with Mr. O'Driscoll in which you expressed regret
13  about this lawsuit?
14     A.  I do not.
15     Q.  Did you ever have that kind of
16  conversation with anyone else at Credit Suisse?
17     A.  Not that I recall. I don't recall any
18  conversations at this time, although this is contrary
19  to what -- well, I don't recall any discussions or
20  meetings with First Boston since April of 2004.
21     Q.  Uh-huh.
22     A.  I had dinner with Fiachra in New York
23  shortly before the company was sold to Clayton, but I
24  don't recall any discussions after that.
25     Q.  At that dinner do you remember discussing

68

1  your views on how Credit Suisse had advised Oakwood?
2      A.  I do not.
3      Q.  What was the purpose of the dinner?
4      A.  It was just a social dinner. I was in New
5  York --
6      Q.  Uh-huh.
7      A.  -- and I called Fiachra and he asked me to
8  meet him for dinner.
9      Q.  Sure, okay. In your view is the
10  liquidation trust's pursuit of this lawsuit a
11  worthwhile use of the State's funds?
12        MR. CASTANARES:  Objection to form.
13        THE WITNESS:  I don't know. I'm not in a
14     position to answer that question. I don't know
15     how much money they're spending on this lawsuit
16     and I don't know -- I don't have an adequate
17     basis at this point in time to assess the
18     probabilities of success.
19     Q.  (By Mr. Osnato) Based on your review of
20  the counterclaims, do you think this lawsuit is
21  meritorious?
22        MR. CASTANARES:  Objection to form.
23        THE WITNESS:  As I said, the only
24     counterclaim that I really have a recall of at
25     this point in time is the counterclaim with

69

1    respect to the assumptions.  And as I said, I
2    disagree with some of the characterizations in
3    the counterclaim with respect to that program.
4    Q.    (By Mr. Osnato)  Now, Mr. Standish, if
5    this case does, in fact, proceed to trial, do you
6    intend to testify in person at trial?
7    A.    If I'm asked to.
8    Q.    If served with a subpoena, do you intend
9    to appear?
10   A.    I will if -- if I'm asked to.
11   Q.    Okay.  And for purposes of today's
12   deposition am I correct that you are being
13   represented by Mr. Castanares?
14   A.    You are correct.
15   Q.    And is the -- strike that.  Is that
16   representation confined solely to your deposition
17   today?
18   A.    As far as I know.
19   Q.    And did you meet with Mr. Castanares
20   yesterday to prepare for this deposition?
21   A.    I did.
22   Q.    About how long did you meet?
23   A.    I believe it was about three hours.
24   Q.    And was it just the two of you that met?
25   A.    That's correct.

1    Q.    Apart from Mr. Muir, Mr. Castanares and
2    perhaps your family members, have you discussed this
3    lawsuit with anyone else?
4    A.    Only in the most general sense to let
5    people know that I'm having my deposition taken.
6    Q.    Fair enough.  All right.  Let's if we can
7    move to a new topic, and I just very briefly want you
8    to explain to me Oakwood's business in the period
9    1999 through 2002, what it did, the industry that it
10   operated in.  And if you can give me a general
11   description, then I think we can probably move pretty
12   quickly through this.  Does that make sense?
13   A.    I'll give it a shot.
14   Q.    Okay, please.
15   A.    Oakwood was involved in several different
16   businesses.  It had a number of plants that
17   manufactured both manufactured homes and modular
18   homes.  It had a number of sales centers which sold
19   those homes along with it was associated with a
20   number of independent dealers who also sold those
21   homes.
22         Oakwood had a finance company that
23   originated loans with respect to the sale of the
24   homes both from Oakwood retail dealers as well as
25   independent dealers.  And Oakwood had a - Oakwood

1    through its retail arm acted as an agent in the sale
2    of insurance products associated with the home, both
3    extended warranty homeowner's insurance and credit
4    life insurance.  And it reinsured -- it acted as an
5    agent for American Bankers Insurance Group in Miami,
6    Florida and it reinsured all of the risk on those, on
7    that insurance through a Bermuda reinsurance company.
8    Q.    Okay.
9    A.    Oakwood also through its finance arm
10   serviced the loans that it had originated as well as
11   a small percentage of loans that it had purchased
12   from outside sources.
13   Q.    And did the description that you just gave
14   me remain true all the way up until the period that
15   Oakwood filed for bankruptcy?
16   A.    Generally speaking, it remained true.
17   Over time Oakwood eliminated certain of its
18   reinsurance activities because the reinsurance
19   business was tieing up capital.
20   Q.    Uh-huh.  Who in your view were the major
21   competitors of Oakwood?
22   A.    Well, Oakwood was in different industries,
23   so --
24   Q.    Well, let's focus, please, on the
25   manufacturing piece of the business.

1    A.    On the manufacturing piece your major
2    competitors would be Champion Homes, Fleetwood Homes,
3    Clayton Homes, Palm Harbor Homes.  And then you'd
4    have other competitors that were in more localized
5    markets.
6    Q.    Uh-huh.  Of the four companies you just
7    mentioned, did any of them also file for bankruptcy?
8    A.    No.  One of the major competitors that I
9    did not mention, American Homestar, filed for
10   bankruptcy I believe in 2000.  And that's the reason
11   that I didn't mention --
12   Q.    Sure.
13   A.    -- them, but they were certainly a major
14   competitor prior to that time.
15   Q.    Who is your predecessor as chief executive
16   officer of the company?
17   A.    Duane Daggett.
18   Q.    And do you have any views on the
19   competence of Mr. Daggett's leadership of the
20   company?
21   A.    I don't think Mr. Daggett understood the
22   industry well enough to have been in the position
23   that he was in.
24   Q.    Did Mr. Daggett have any kind of
25   background in the manufactured housing industry prior

1   to becoming CEO?

2      A.   Yes.  He had -- prior to being CEO he had

3   been an employee of Oakwood for maybe some three or

4   four months.  He had also done consulting work for

5   Oakwood for a period of time prior to that.  He also

6   it's my understanding had -- prior to coming to

7   Oakwood he had been a business professor at

8   Appalachian State University.

9      And it's my understanding that he had had

10   meetings with Oakwood executives and had used Oakwood

11   as a -- as a business model from which his business

12   class did case studies on.

13      Q.   Uh-huh.

14      A.   But that's the only -- those are the only

15   experiences that I know that Mr. Daggett had in the

16   manufactured housing industry.

17      Q.   Uh-huh.  Do you know if Mr. Muir shared

18   your views about Mr. Daggett's suitability to be CEO

19   of the company?

20      A.   I think he did.

21      Q.   And do you think that decisions that were

22   made by Mr. Daggett later had a negative impact on

23   the company?

24      A.   Certain decisions, yes.

25      Q.   Can you identify those decisions?

74

1      A.   He was reluctant to close stores and

2   plants in a period of time when the industry was

3   shrinking.  I think that was a poor decision.  There

4   were other things that I thought were poor decisions,

5   but that's the -- that's the most significant one.

6      Q.   And did Mr. Daggett's reluctance to

7   downsize complicate matters for you when you assumed

8   your role as CEO?

9      A.   I think had we downsized, we would have

10   been in better shape financially than we, in fact,

11   were when I became CEO.

12      Q.   Am I right that when you became CEO you

13   put in place a rationalization plan to shrink the

14   company; is that right?

15      A.   Well, there was a rationalization plan

16   that was put in place which happened concurrent with

17   the filing for bankruptcy.

18      Q.   Uh-huh.

19      A.   Prior to that, though, I had taken a

20   number of actions to shut down plants as well as

21   sales centers.

22      Q.   Uh-huh.

23      A.   So it was an ongoing process.

24      Q.   Do you think the actions that you took

25   should have been instituted earlier in time?

75

1      A.   Well, as I said, certainly I thought that

2   we should have taken action to shrink the company

3   when Duane was CEO.  So to that extent, yes.  Now, if

4   your question is should I have taken quicker action

5   to shrink the company, the -- I took the action that

6   I thought was appropriate at the time.  Perhaps with

7   20/20 hindsight I should have acted faster as well.

8      Q.   Am I right that Mr. St. George was the

9   predecessor to Mr. Daggett as CEO?

10      A.   That's not correct.

11      Q.   Who is in between?

12      A.   Bill Edwards.

13      Q.   Okay.  Well, let's talk about Mr. St.

14   George for a moment.  When was he CEO?  Do you

15   recall?

16      A.   I believe he became CEO in 1978.

17      Q.   Okay.

18      A.   And I believe he left in 1998.

19      Q.   Do you think that some of the downsizing

20   measures we've been discussed should have begun as

21   early as 1998?

22      A.   I've never thought about that.  The -- in

23   1998 you started to see a downturn in the market.

24   Nick left in September of '98.  Could we or should we

25   have reacted faster in downsizing?  I'm not -- I

76

1   haven't thought about that, that the downturn was --

2   had just begun and we weren't sure whether it was a

3   blip or whether it was a true - the true beginning

4   of a cyclical downturn.

5      One thing that should have been done at

6   that time which Nick was still around was we were

7   operating our plants essentially until June of 1998

8   at full capacity and we were building inventory, and

9   in retrospect that was a poor decision.

10      Q.   Do you know if that decision was made in

11   response to expectations from Wall Street?

12      A.   I don't think so.  I think the decision at

13   that time as I recall we had what was called a

14   sourcing model, which would say how our sales centers

15   are going to get product.  The operation of those

16   plants at capacity was in part dictated by the

17   sourcing model, which showed that we wouldn't have

18   enough capacity to meet the demands of our sales

19   centers in the late summer and fall of that year.

20      The -- I think that the sourcing model

21   probably unreasonably -- well, the sourcing model was

22   incorrect because there was an unreasonable level of

23   demand in the sourcing model, but running the plants

24   full out really -- I don't see that as being a

25   response to Wall Street because you don't recognize

77

the revenue --

Q. Uh-huh.

A. -- on those until -- and the build-up in inventory was inventory going to Oakwood retail sales centers. There is no recognition of revenue in our consolidated income statements until that home is ultimately sold by the retail sales center. So building them did not add to our profitability.

Q. Uh-huh. Now, what I want to do is talk about the reasons why Oakwood filed for bankruptcy, and there's two ways to do it. One is to have a very long discussion about it. The other is to show you a document that I think purports to summarize some of the reasons why the company found itself filing for bankruptcy in November 2002.

That's what I'm going to do. We'll discuss it and if you agree with me and you agree with the statements in the document, that will be great. And if not, then we'll have a little longer discussion.

I'm not going to mark this document because it is already part of the court filing in this case or I should say is part of the administration of Oakwood. This is, Mr. Standish, the affidavit that was submitted by Mr. Muir.

A. Uh-huh.

MR. OSNATO: It's part of the first day filings by Oakwood.

MR. CASTANARES: Counsel, if you're going to question the witness about the document, I'd appreciate it if you'd mark it as an exhibit.

MR. OSNATO: Okay. That's fine.

(Exhibit Number 202 was marked for identification.)

MR. OSNATO: We're marking as Exhibit 202 an affidavit submitted by Douglas Muir titled declaration of Douglas R. Muir in support of first day relief dated November 18th, 2002.

MR. CASTANARES: Thank you, counsel.

Q. (By Mr. Osnato) Certainly. Mr. Standish, do you recall seeing this document before today?

A. I do.

Q. Do you recall seeing it at some point before it was filed?

A. I think I saw drafts of this document before it was filed.

Q. And do you remember why you were shown those drafts?

MR. CASTANARES: Objection to form.

THE WITNESS: I was given it by our

attorneys and asked to review it.

Q. (By Mr. Osnato) Uh-huh. If you'd turn, please, to page 16, paragraph 37 in particular. Do you see the section entitled events leading to chapter 11 filing?

A. I do.

Q. Okay. Do you recall reviewing paragraphs 37 through 46?

A. I do not recall it, no.

Q. Okay. Well, if I could ask you, please, to take a moment and read those paragraphs and tell me if you agree that they accurately set forth the events and reasons why Oakwood filed for bankruptcy, I would appreciate it.

A. Okay. Thirty-seven through forty-six?

MR. OSNATO: Correct.

MR. CASTANARES: I'll object to the form of the question before the witness goes to the trouble of reading it.

THE WITNESS: Can I just make comments as I go through rather than marking them?

MR. OSNATO: Absolutely.

THE WITNESS: The second sentence of paragraph 37 says --

MR. OSNATO: Uh-huh.

THE WITNESS: - over the last several years the debtors expanded into a contracting market. I'm not -- I don't agree with that statement. There may have been some expansion into a contracting market in the '98 time frame, but generally during this period we were contracting, maybe not fast enough --

MR. OSNATO: Uh-huh.

THE WITNESS: -- but we were contracting.

MR. OSNATO: Okay.

THE WITNESS: In paragraph 38 --

MR. OSNATO: Uh-huh.

THE WITNESS: -- as I think back on it, I would have added to that paragraph the stress, both current as well as future stress --

MR. OSNATO: Uh-huh.

THE WITNESS: - of making payments under the guaranteed B2 bonds.

Q. (By Mr. Osnato) Uh-huh. And apart from that caveat, do you agree that -- do you agree with the statements set forth in paragraph 38?

A. In general I do, yes.

Q. Okay. Thank you.

A. Paragraph 40, I'm not - I have a couple of issues.

```
 1      Q.    Okay.  Before we get to those issues, can
 2   you tell me if you agree with the statements set
 3   forth in paragraph 39?
 4      A.    Yes.  In general I do.
 5      Q.    Okay.  Tell me about the issues you have
 6   with paragraph 40.
 7      A.    Okay.  It says that gross profit margin
 8   contraction due to increased --
 9      Q.    Uh-huh.
10      A.    -- competition.  I don't think there was
11   increased competition, but you had gross margin
12   because during this time retailers were getting out
13   of the industry rather than in the industry.
14      Q.    Uh-huh.
15      A.    But I think that you had too many stores
16   chasing a limited number of buyers.
17      Q.    Uh-huh.
18      A.    Wasn't -- this reads as though that
19   there's more people coming into the industry, but I
20   think it's just competition --
21      Q.    Uh-huh.
22      A.    -- for that -- for those fewer retail
23   customers.
24      Q.    Okay.
25      A.    It also talks about lower operating rates
```

```
 1   at manufacturing plants.  I believe at this point in
 2   time when this was filed our operating rates were
 3   actually higher on a year over year basis, 2002
 4   compared to 2001.  Now, they would not have been as
 5   high as they were in let's say 1998.
 6      Q.    Uh-huh.
 7      A.    Paragraph 41 I generally agree with.
 8      Q.    Uh-huh.
 9      A.    I would have added in looking back at it
10   that not only was what was hurting the industry was
11   the lower rates for site built homes, but in addition
12   the fact that site built lending was significantly
13   changing its nature.
14           Whereas traditionally site built lending
15   had required 20 percent downpayment and a reasonable
16   credit score, the site built lending market was going
17   to -- increasingly to lower down payments or zero
18   down payments and was chasing a buyer with a credit
19   profile that traditionally had only been able to get
20   a loan through a manufactured housing lender.
21      Q.    Uh-huh, okay.
22      A.    Paragraph 42 I agree with.
23      Q.    Uh-huh.  I'm going to ask you to please
24   stop after you read paragraph 43.
25      A.    Okay.  Okay.
```

```
 1      Q.    Okay.  Do you agree with what is set forth
 2   in paragraph 43?
 3      A.    In general, yes.
 4      Q.    Okay.  And so am I correct that what is
 5   set forth in paragraph 37 through 43 together with
 6   some of the caveats that you have mentioned set forth
 7   the reasons why Oakwood filed for bankruptcy?
 8      A.    Well, it certainly sets forth some of the
 9   background --
10      Q.    Uh-huh.
11      A.    -- for why we filed for bankruptcy, but
12   the -- the bottom line as mentioned here in paragraph
13   43, in November of 2004 we were unable to meet our
14   current obligations when due.
15      Q.    Uh-huh.
16      A.    I could go through here and perhaps add
17   additional reasons that caused that to come about,
18   but --
19      Q.    Please do.
20      A.    During this time period, particularly in
21   2002, with the upturn in site built housing you began
22   to see inflation in building material costs, which in
23   a downward market is very difficult to pass on to
24   your customers.  That certainly squeezed some
25   margins.
```

```
 1           As I mentioned before, the site built
 2   industry not only had lower rates but they were
 3   becoming much more aggressive in their lending
 4   practices at a time period -- and I don't recall this
 5   being discussed here, but at a time period when the
 6   manufactured housing industry was -- including
 7   Oakwood was increasingly tightening their credit
 8   standards.
 9           So for the first time I think since the
10   manufactured housing industry had come about it was
11   much easier to get an approval for a site built home
12   that ultimately ended up being financed by Fannie or
13   Freddie than it was through a traditional
14   manufactured housing lender.  It had always been the
15   reverse.
16           I think that one of the other issues that
17   faced Oakwood was there was an increasing volume of
18   litigation, particularly in certain areas of the
19   country, which were areas of the country as indicated
20   here that we were planning to exit in our
21   rationalization plan.  I don't see any mention of
22   that, but that was an ongoing cost as well as a
23   contingent liability that was out there.
24      Q.    Uh-huh, okay.
25      A.    That's all I can think of at the moment.
```

1    Q.    Okay.  And if you return to paragraph 43,
2    please --
3        A.    Yes.
4        Q.    -- there's a reference in the first
5    sentence to the company incurring substantial debt
6    during the mid to late 1990s.  Am I correct in
7    understanding that to mean public bond offerings?
8        A.    Well, in part.  There were some public
9    bond offerings that were there.  There was a small
10   one I believe in the early '90s, but in the -- there
11   was a public debt offering I believe in 1999.
12   However, before that public debt offering in 1999
13   there had been increasing use from '97 forward, maybe
14   even in '96, I'm not sure, but there had been
15   increasing use of short-term credit facilities --
16       Q.    Uh-huh.
17       A.    -- which essentially were replaced by that
18   public bond offering in 1999.
19       Q.    And am I correct that Credit Suisse was
20   not among the underwriters on the 1999 offering?
21       A.    They were not.
22       Q.    Do you recall who the underwriters were?
23       A.    I think Bank of America was involved in
24   it.  It would have been NationsBank at the time.  I
25   can't recall whether J.C. Bradford or Legg Mason was

86

1    involved in it.  They may have been.  First Union,
2    now Wachovia, may have been, but I'm -- I don't
3    recall the specifics of that very well.
4        Q.    Do you recall if Merrill Lynch played a
5    role in that underwriting?
6        A.    They may have.  They played roles in other
7    underwritings for the company.
8        Q.    Other public bond offerings?
9        A.    Public equity offerings.  I think they may
10   have been -- well, they were also involved in
11   Oakwood's initial securitizations.
12       Q.    Uh-huh.  Apart from securitization
13   underwriting and perhaps some equity underwritings,
14   do you recall if Merrill Lynch provided the company
15   with any other kinds of services?
16       A.    No.  The company had a relationship with
17   Merrill Lynch in the early 1990s.
18       Q.    Uh-huh.
19       A.    And I think Merrill Lynch did either the
20   first or the first two securitization deals for
21   Oakwood.  The major finance company at that time in
22   the industry was a company called Greentree that
23   filed for bankruptcy in 2002, but they were the major
24   player in the industry at that time.  And they told
25   Merrill Lynch that if Merrill Lynch did any more

87

1    underwriting for Oakwood, that they would no longer
2    use Merrill Lynch.  So Merrill Lynch chose to partner
3    up with Greentree and cast us aside, so I don't think
4    that there was too much relationship between Oakwood
5    and Merrill Lynch after that period of time.
6        Q.    And do you recall the approximate date
7    that Merrill left the scene as to Oakwood?
8        A.    Well, that would have been -- and I'm not
9    saying there wasn't any relationship after that
10   time -
11       Q.    Uh-huh.
12       A.    -- but that would have been around 1994.
13       Q.    Uh-huh.  I see.  Okay.  Are you familiar
14   with something that was known as the nine point plan,
15   sometimes called the performance enhancement plan?
16       A.    Sounds like a Bill Edwards plan.
17       Q.    What do you remember about that plan, if
18   anything?
19       A.    I remember some -- it was not in my mind
20   what I would call a plan.  It was certain bullets,
21   but what they were, I couldn't tell you.
22       Q.    In your initial answer you characterized
23   it as a Bill Edwards plan.  My interpretation at
24   least was that that had a negative connotation in
25   your mind.  Am I right?

88

1        A.    Well, not necessarily a negative.
2        Q.    Okay.  Well, tell me what you meant.
3        A.    It's just that Bill was one to come up
4    with slogans.  So hearing the nine point plan, it
5    rings a vague bell in my head, but it just sounds
6    like the kind of thing that Bill would come up and
7    name something.
8        Q.    Uh-huh.  Do you recall the general time
9    frame when the nine point plan was unveiled?
10       A.    Well, if I'm right that it was a Bill
11   Edwards plan, it would have been around 1998, 1999.
12       MR. OSNATO:  Okay.  I'm going to mark,
13   please, as Defendant's Exhibit 203 a document
14   bearing the Bates range OHC-025774 through 776.
15   This is an April 13th, 2000 memo from Bob Smith
16   to the board of directors.
17       (Exhibit Number 203 was marked for
18   identification.)
19       THE WITNESS:  You want me to review the
20   whole thing?
21       Q.    (By Mr. Osnato)  Have you seen this
22   document before?
23       A.    I probably have, but it doesn't ring a
24   bell.
25       Q.    Okay.  Does this refresh your recollection

89

1    that in the March or April time frame of 2000 the

2    nine point plan was something that was under

3    consideration by the company?

4    A.    Well, I'm going to have to look through it

5    a little more.

6    MR. CASTANARES:  Again, you haven't given

7    him a chance to read it, so --

8    MR. OSNATO:  Understood.  If you need to

9    read it to refresh your memory, that's fine.

10    THE WITNESS:  Okay.  What's the question?

11    Q.    (By Mr. Osnato)  Did you have any role in

12    developing the nine point plan that's outlined in

13    this document?

14    A.    I don't believe I did.

15    Q.    Do you know who did?

16    A.    I think it was Bill Edwards.

17    Q.    Uh-huh.  Mr. Edwards was the chief

18    executive at the time?

19    A.    I think he was the chief executive until

20    September of 2000.

21    Q.    And I take it that Credit Suisse had no

22    involvement in developing this plan; is that right?

23    A.    Not that I'm aware of.

24    Q.    What was the purpose of this plan as you

25    understood it?

90

---

1    A.    Well, again, as I say, I wouldn't call

2    this a plan.

3    Q.    What would you call it?

4    A.    I would call it bullets.

5    Q.    And were the objectives outlined in the

6    plan achieved by the company?

7    A.    I think certain of them were and certain

8    of them weren't.

9    Q.    Okay.  And which were not in your view?

10    A.    Okay.  Let's go through them.  Increased

11    sales, that was not achieved.

12    Q.    Uh-huh.

13    A.    Number two, grow independent business, I

14    think that that was achieved.  Increase cash flow and

15    liquidity, obviously, the fact that we ended up

16    filing for bankruptcy because we didn't have

17    sufficient liquidity, we did not achieve that.

18    Reduce inventory, we achieved that.

19    Reduce costs, I think to a certain extent we achieved

20    that.  Limit expansion, we achieved that at the time.

21    The goal should have been to eliminate facilities

22    rather than limit expansion, so we did limit

23    expansion.  Reorganize finance company, we did do

24    that and then we later reorganized it again.  Reduce

25    repos and delinquency, ultimately we did not achieve

91

---

1    that.  Focus on core business.  I think we achieved

2    that.

3    Q.    Okay.  Do you have any understanding of

4    why this plan was put in place in the 2000 time

5    period?

6    A.    Well, we had deteriorating performance

7    during that time period from -- really from 1998

8    forward.  The -- I think that in my mind, and that's

9    why I'm -- I said this is a Bill Edwards thing, that

10    in why I say it's not a plan, this was really

11    intended to I believe -- I never had a discussion

12    with Bill I don't believe as far as how he came up

13    with this or what its purpose was, but I think it was

14    intended to keep the important objectives there and

15    be clear what they are so you don't get involved with

16    the minutiae but you keep in your mind what the

17    important goals are.

18    Q.    And when you became chief executive

19    officer did the nine point plan remain in effect?

20    A.    I don't think I ever referred to it.  Now,

21    you know, did I want to do all these things?  Sure,

22    but, you know, to say that nine bullets are a plan,

23    this is -- to me, and I don't mean any offense to

24    Bill Edwards, but it's a difference in style.  I view

25    this as slogans and not a -- not a plan.  A plan

92

---

1    tells you how you're going to do something.

2    Q.    When you became chief executive officer,

3    was it your view that you'd been placed in a hole by

4    some of the decisions by your predecessors?

5    A.    Yes.

6    Q.    Can you identify what you thought were the

7    key mistakes that had been made by your predecessors?

8    A.    The overriding mistake that had been made

9    by my predecessors were -- was the credit quality of

10    our portfolio.

11    Q.    Uh-huh.

12    A.    That was something that it's almost

13    impossible to have much of an impact on because those

14    loans are written for 25, 30-year periods.  As I

15    mentioned to you before, I think that we also had --

16    we hadn't reacted quickly enough to the market

17    downturn to downsize upward to be a profitable entity

18    from a manufacturing and a retail standpoint.  The

19    other thing that was troublesome was that we had a

20    retail network that was still not sufficiently

21    controlled.

22    Q.    Uh-huh.

23    A.    Finally, we still had a large overhang of

24    old inventory that still had to get rid of -- that

25    still had -- that we still had to get rid of.  I may

93

1  have misspoke earlier talking about the overhang of
2  inventory.  I think I said we operated our plants
3  full out until June of '98 and I think I meant to say
4  June of '99.
5      Q.   Uh-huh.  Fair enough.  Of the factors you
6  just identified, am I right that the poor credit
7  quality of the loan portfolio was the most serious in
8  your view?
9      A.   Yes.
10     Q.   And is that -- strike that.  Was the poor
11 quality of the portfolio a result of aggressive
12 underwriting standards by Oakwood in the mid to late
13 '90s?
14     A.   Yes.
15     Q.   And who -- strike that.  Am I right that
16 Oakwood was responsible for setting its own
17 underwriting standards during that period?
18     A.   Oakwood had responsibility for setting its
19 underwriting standards during that time and, of
20 course, there were constraints in our warehouse
21 agreement at that time as to what the warehouse would
22 take.  And I think at that point in time in the '90s
23 it was a warehouse agreement, not a loan purchase
24 agreement.  The -- Oakwood had made strides between
25 '96 and '98 in improving the quality of its

94

1  securitizations but put these in the same
2  securitization as we put our other loans.  That
3  program was around for a period of time, which made
4  those '98, '99 loans very difficult.  We had a high
5  level of repossessions off of that select program.
6      Q.   Uh-huh.  Am I right that the poor quality
7  of the company's loan portfolio ultimately was a
8  factor in causing it to file for bankruptcy?
9      A.   It was.
10     MR. CASTANARES:  Mike, at some convenient
11 point if you would be so kind?
12     MR. OSNATO:  I'm happy to do that now,
13 Tony.
14     MR. CASTANARES:  That's fine.  I don't
15 want to interrupt you.
16     THE VIDEOGRAPHER:  We're off the record at
17 11:14.
18     (A recess was taken.)
19     THE VIDEOGRAPHER:  Tape number three.
20 We're on the record at 11:22.
21     Q.   (By Mr. Osnato)  Mr. Standish, can you
22 refresh my memory as to the exact approximate date
23 that you became CEO of the company?
24     A.   I believe it was late July of 2001.
25     Q.   And at that time did you have any views as

96

1  underwriting.  In '98 the CFO of Oakwood at that
2  time, a man named Mike Kilbourne, thought that
3  perhaps we could go back to the same underwriting
4  standards that we were using in '96 --
5      Q.   Uh-huh.
6      A.   -- and capture a lot more sales, and he
7  drew up a plan.  I don't know if it was a detailed
8  plan but whereby we would risk adjust our pricing and
9  have what was ultimately named the select lending
10 program.
11     And if you were selected into the select
12 lending program, you got an interest rate of three or
13 four percent higher than what our standard rate was,
14 but that was to risk adjust the -- the interest rate,
15 which in doing that Mike's view was that we would
16 separately securitize and service these select loans.
17     And he consulted with First Boston with
18 respect to that, and First Boston got back to Mike
19 and said that that was a securitization vehicle that
20 would work and that the market because of the excess
21 spread would accept those bonds.
22     The -- ultimately what happened in '98 was
23 that we, Oakwood, did move forward with this select,
24 more risky underwriting program but, in fact, did not
25 use these as -- did not pool these in separate

95

1  to the financial condition of the company?
2      A.   Yes.
3      Q.   What were they?
4      A.   It was poor.
5      Q.   Okay.  And at that time did you take any
6  steps to improve the financial condition of the
7  company?
8      A.   Yes.  Either at -- I'm not -- not
9  immediately, but over a period of time we took a
10 number of actions.  I don't think I can remember all
11 of them, but we lowered our inventory.
12     Q.   Uh-huh.
13     A.   We closed stores.  We closed plants.  We
14 improved our underwriting standards.  Those would be
15 some of the significant ones.
16     Q.   Uh-huh.  And in taking those steps am I
17 correct that you did not rely upon Credit Suisse to
18 assist you?
19     A.   I think I probably would have talked with
20 Fiachra with respect to our underwriting standards,
21 what actions we should take, what actions would help
22 our bonds sell.  I may have talked to him about other
23 things, but that would be the primary thing.
24     Q.   Uh-huh.  And as you sit here today is it
25 your view that the measures you've described were too

97

1  little, too late?

2  A.  I don't know that they were too little.

3  They were too late.

4  Q.  And they were too late I take it because

5  of some of the decisions taken by your predecessors;

6  is that right?

7  A.  Well, some of the decisions taken by my

8  predecessors as well as the overall poor condition of

9  the industry.  The industry had gone through a

10  contraction so that at least on what we in the

11  industry talk about as shipments, that shipments in

12  2002 were about a third of what they were in 1998.

13  Also, you had general economic conditions

14  that were exacerbating our repossession problems

15  while I believe the economy looking backwards might

16  have started on an upswing in 2002.  I'm not positive

17  of that.  Our customer base, which tends to be blue

18  collar and manufacturing oriented, had seen

19  significant deterioration, particularly in the

20  Southeast, which was our biggest concentration in

21  retail.

22  The furniture industry was decimated.  The

23  textile industry was decimated, and those are our

24  core customers.  So not only did you have the problem

25  that you had probably been too aggressive in

98

1  underwriting credit.  You had those same customers

2  taking abnormal economic hits.

3  Q.  Uh-huh.  What's the first point in time

4  that you can remember dealing with anyone from Credit

5  Suisse?

6  A.  Probably 1996.

7  Q.  And would that have been Mr. O'Driscoll,

8  if you recall?

9  A.  No.  I think it was a -- I think my first

10  dealings with somebody from Credit Suisse would have

11  been with Kareem.

12  Q.  Kareem Serageldin?

13  A.  I believe that's his last name.

14  Q.  We'll spell that later.  Apart from Mr.

15  O'Driscoll and Mr. Serageldin, who else at Credit

16  Suisse do you remember dealing with at any point in

17  time during your time at Oakwood?

18  A.  Well, I dealt with a number of people

19  there, but in Fiachra's group the primary people that

20  I would have dealt with would have been John Herbert

21  and Susan -- I forget her last name.  It starts with

22  an M.

23  Q.  Menkhaus?

24  A.  Yes.  I think that's right.  I had brief

25  dealings with Tom Irwin, I believe, from Credit.

99

1  Q.  Uh-huh.

2  A.  I had dealings with Jared Felt and there

3  were a number of individuals in his department, Peter

4  Landon and I think Phil -- Jared's boss.  I can't

5  remember his name, but he attended one of our board

6  meetings.  I had a couple of meetings with Beth May,

7  who was in the M&A group.  That's all that come to

8  mind right now.

9  Q.  Okay.  Thank you.  Focusing only on Mr.

10  O'Driscoll's group, what's your assessment of the

11  competence of the people working under him?  And that

12  would be to clarify, Ms. Menkhaus and Mr. Herbert.

13  A.  I thought John was competent.  I had some

14  questions about Susan.

15  Q.  Uh-huh.  And why did you have questions

16  about Susan?

17  A.  I didn't have that many dealings with

18  Susan.  I think maybe some of my questions with Susan

19  had to do with what other people might have said

20  about her, but I don't think that -- she didn't seem

21  to -- she didn't sometimes seem to get it.

22  Q.  Uh-huh, okay.  And I take it your

23  discussions with her would have centered around

24  securitizations broadly speaking; is that right?

25  A.  Yes.

100

1  Q.  Now, am I right that securitizations were

2  the principal way that Oakwood generated liquidity?

3  A.  It was the most significant way, yes.

4  Q.  Okay.  Now, can you briefly describe for

5  me your understanding of how the securitization

6  process works?

7  A.  Generally speaking, loans are transferred

8  into a bankruptcy remote entity.

9  Q.  Uh-huh.

10  A.  The underwriters, in this case First

11  Boston, do cash flow analysis based on those loans,

12  the maturity of those loans, the payment terms of

13  those loans, assumptions with respect to

14  repossessions and delinquencies of those loans.

15  The loans are then sold to a trust that

16  issues bonds with different maturities that are

17  approximate maturities based upon the cash flow

18  assumptions that have been generated and based upon

19  what type of investor demand that there is, that

20  being done after the rating agencies rate the bonds

21  and put the percentage of triple A, double A, single

22  A, et cetera.

23  Q.  Uh-huh.

24  A.  That's generally the way the process

25  works.

101

1    Q.    Uh-huh.  And am I right that other

2  competitors of Oakwood also use securitizations in

3  the same manner that Oakwood did?

4    A.    Well, again, when you use the term

5  competitors, we're in a number of different

6  industries.  The Clayton Homes, which is also another

7  manufacturer as well as originator, generated funds

8  through the same sources.  They're the only other

9  manufacturer --

10    Q.    Uh-huh.

11    A.    -- that did that.  There were a number of

12  other finance companies that generated funds through

13  the same method.

14    Q.    Uh-huh.  Would those include Greentree,

15  for example?

16    A.    They would include Greentree, Greenpoint,

17  the United companies, Bombardier, a number of others.

18    Q.    Okay.

19    A.    Associates.

20    Q.    I'm going to ask you, please, to return to

21  the Muir affidavit --

22    A.    Yes.

23    Q.    -- which has been marked previously as

24  Exhibit 202, please.

25    A.    Uh-huh.

1    Q.    And turn, please, to page nine.

2    A.    Yes.

3    Q.    And if I could ask you to review paragraph

4  18 and tell me if you agree with the assertions that

5  are set forth in that paragraph?

6    A.    I basically agree with it.  The lead-in is

7  somewhat confusing because it doesn't relate to a

8  time period.  If you look at when OAC was formed back

9  in the I think probably 1988 time frame, there were

10  not sufficient sources of finance for this industry.

11  That was true probably until about '93, '94.

12    And then you had a flood of lenders come

13  in at that time and so there was -- even if OAC

14  hadn't been around, there was sufficient financing in

15  the industry.  Now, again, because of the exit of a

16  number of the companies that we just mentioned

17  probably around 2000, once again the industry was

18  somewhat constrained from the financing side.

19    Q.    Uh-huh.  In 2002 rather than engage in

20  securitizations, could Oakwood have simply obtained a

21  bank loan to finance its manufacturing and sales

22  operations?

23    A.    No.

24    Q.    Why not?

25    A.    Because nobody would extend that loan to

1  us.

2    Q.    Because of the magnitude of the proposed

3  loan, the size?

4    A.    Well, if you go back, you have a few

5  different issues.  First, facts simply don't -- if

6  you're asking could we go with a $200 million

7  portfolio of loans --

8    Q.    Uh-huh.  I am.

9    A.    -- and ask a bank to finance that

10  $200 million, banks -- it used to be that you could

11  find banks who would have done that.  In fact, back

12  in the late '80s, early '90s Oakwood did a number of

13  those transactions where we would put just to use

14  round numbers let's say $10,500,000 of loans in a

15  pool and get $10 million of proceeds from the bank,

16  so they would be overcollateralized by five percent.

17    We did a number of those transactions with

18  Sovereign Bank, which I think now is part of Bank of

19  America.  The problem, of course, with that type of

20  facility is the long-term nature of that facility to

21  amortize with loans.  So you had a couple of things.

22    First of all, banks generally speaking

23  moved out of that type of business.  And the loan

24  maturities as the homes became larger and as

25  underwriting standards became more aggressive, the

1  terms of the loans whereas in the late '80s when

2  Oakwood was doing this, the average term of the loans

3  might be 10 to 12 years.  The weighted average term

4  of the loans that we were doing in the 2000, 2002

5  time period was probably 25 years, and you could not

6  find a bank who would -- who would do that.

7    Q.    Uh-huh.  If you'd turn, please, to

8  paragraph 19 of the Muir affidavit and please tell me

9  when you've read that paragraph?

10    A.    Paragraph 19?

11    Q.    Paragraph 19, please.

12    A.    Oh, I was going to page 19.  Okay.

13    Q.    Do you agree with the assertion that

14  securitizations were historically the most effective

15  and least expensive financing option for Oakwood?

16    A.    Well, actually, the transactions that I

17  described that Oakwood did with Sovereign Bank were

18  less expensive and more effective; but as I said, I

19  don't think we could have found somebody to do that

20  transaction in the time period of 2002.

21    Q.    Uh-huh.  Well, then focusing on 2002, do

22  you agree that securitizations were the most

23  effective and least expensive option available to the

24  company?

25    A.    As far as I know, yes.

1    Q.   And why is that?

2    A.   Well, you had really just two different

3    possibilities.  One was a securitization.  One was a

4    whole loan sale.  And the market for whole loan sales

5    of this magnitude and this type of buyer simply --

6    simply wasn't there or to the extent it was

7    available, it was available at an overly expensive

8    price.

9    Q.   And am I correct that Oakwood continued to

10   engage in securitizations post filing; is that right?

11   A.   I don't think we did a securitization post

12   filing.

13   Q.   Post bankruptcy filing?

14   A.   Right.

15   Q.   Okay.  How at that point did Oakwood

16   generate liquidity?

17   A.   We sold the loans to Greenwich.  Greenwich

18   did securitize and we had essentially a residual --

19   part of a residual interest in that.

20   Q.   I take it that Credit Suisse was

21   compensated for its role as an underwriter in the

22   various securitizations; is that right?

23   A.   I'm sure they were.

24   Q.   And do you know how those fees were

25   calculated?

106

1    A.   That was really Doug's job.  I think

2    that --

3    Q.   Uh-huh.

4    A.   -- Doug kept abreast of what the market

5    was and tried to see what he could get out of First

6    Boston.

7    Q.   As far as you know were the fees in line

8    with what the rest of the market was receiving?

9    A.   I don't really know.  Generally speaking,

10   they were higher than what First Boston was charging

11   Vanderbilt.  At least that's my impression.

12   Q.   And how did you learn that fact?

13   A.   It probably would have been from Doug.

14   Q.   Am I right that Mr. Muir was the

15   individual at the company responsible for the

16   securitization program?

17   A.   He was.

18   Q.   Anyone else at Oakwood have some kind of

19   responsibility over the securitization program?

20   A.   Well, there certainly would have been a

21   lot of people --

22   Q.   Uh-huh.

23   A.   -- who were -- had responsibility for the

24   securitization program.  You had tremendous reporting

25   requirements, cash flow distribution requirements.

107

1    So there would have been a number of people that

2    would have been involved in that, but the primary

3    responsibility was with Doug.

4    Q.   Uh-huh.  If you turn to, please, the last

5    sentence in paragraph 19 that begins continuing to

6    participate.  Do you see that sentence?

7    A.   Uh-huh.

8    Q.   Do you agree with it?

9    A.   I probably did when this was filed.  In

10   retrospect, I don't.

11   Q.   And why not today?

12   A.   Well, if we had come out of bankruptcy

13   stand alone, ultimately we would have sold off the

14   finance portfolio and gotten out of the

15   securitization business -- the loan origination

16   business and, therefore, the securitization business

17   altogether.

18   Q.   Did Oakwood rely on any other financial

19   institutions other than Credit Suisse to underwrite

20   its securitizations?

21   A.   We had from time to time comanagers or,

22   you know, maybe from time to time maybe once or twice

23   there was even somebody who was the lead other than

24   First Boston, but my understanding is that after we

25   stopped doing business with Merrill Lynch that First

108

1    Boston was always essentially the lead underwriter,

2    that to the extent we used other people along with

3    First Boston, it was to throw a bone to Bank of

4    America or First Union or other people whose services

5    we were using in other areas at the time.

6    Q.   And am I right that it would be Mr. Muir

7    who would be the principal interface on behalf of the

8    company with Credit Suisse?

9    A.   Yes.

10   Q.   Did you get involved at any point in time

11   negotiating the structure of any of these deals?

12   A.   I probably was involved to a certain

13   extent, but not -- I can't -- I can't recall

14   specifics.  I know Doug would come to me from time to

15   time and tell me that there was an issue about this

16   or an issue about that and ask for my input on it,

17   but the specifics I can't remember.

18   Q.   And describe for me, please, what the

19   proceeds of the securitizations were used to do?

20   A.   They were used to do anything.  Cash is

21   fungible.  Once cash comes into the general account,

22   it goes out to pay any bills.

23   Q.   Was the cash used to fund the company's

24   manufacturing?

25   A.   It -- once cash comes into a general

109

1    account. it's used for anything that you have a need

2    for cash.

3    Q.    Now, my understanding is that you

4    testified earlier that you were generally satisfied

5    with the securitization services that Credit Suisse

6    provided; is that right?

7    A.    I believe that's an accurate summary.

8    Q.    Okay. Are you familiar with an entity

9    known as Foothill?

10   A.    I am.

11   Q.    Did Foothill provide any kinds of services

12   to the company?

13   A.    They provided us with a line of credit.

14   Q.    And was that true if you know during the

15   entire period you were with the company?

16   A.    No.

17   Q.    When did they first begin providing credit

18   to Oakwood?

19   A.    Maybe sometime in the late 2001 time

20   period.

21   Q.    Okay. Focusing on 2001, apart from

22   Foothill were there any other financial institutions

23   that were providing credit to the company?

24   A.    Well, at some point in time CSFB started

25   providing us with a warehouse facility. Before that

110

1    it had been provided through Bank of America. Before

2    Foothill came in we had a line with First Union. We

3    at some point in time in 2001 entered into a servicer

4    advance agreement with Prudential. Those would be

5    the major facilities that I could think of.

6    Q.    And it was important for the company to

7    maintain relationships with a number of lenders;

8    right?

9    A.    Well, it certainly doesn't hurt to have

10   relationships with a number of lenders.

11   Q.    Because it's important to diversify your

12   potential sources of liquidity; right?

13   A.    You could argue that one way or the other.

14   Q.    Why do you think it's important?

15   A.    Well, I think that having -- well, it's

16   important in one respect that certain lenders

17   understand certain types of assets.

18   Q.    Uh-huh.

19   A.    For example, Foothill lends primarily

20   based on hard assets, inventory, for example. There

21   aren't many people around who would understand a

22   warehouse agreement or a loan purchase agreement like

23   we had with First Boston because there's very few

24   people who would understand the collateral that was

25   there.

111

1    Similar to the servicing line that we had

2    with Prudential. I think Prudential had been the

3    first ones to do a similar type of servicing line

4    like that. They understood what the asset was and

5    was comfortable with the asset. Generally speaking,

6    it would have been hard to finance these varying

7    types of assets with only one lender.

8    Q.    Okay. Do you recall the circumstances

9    under which Berkshire Hathaway came to participate in

10   securitization transactions with the company?

11   A.    Generally, yes.

12   Q.    Please tell me what you remember.

13   A.    I remember that we had an inventory of B2

14   pieces that was difficult to liquidate. We had sold

15   B2s in the past but at some point in time, maybe

16   around '99, 2000, that market had become a very

17   difficult market. I know that First Boston presented

18   to Berkshire Hathaway the idea of Berkshire Hathaway

19   buying these B2s.

20   Now the Lotus structure came about,

21   whether that was an idea that Fiachra had or

22   Fiachra's group or whether that was an idea that

23   Berkshire Hathaway had, I'm not sure, but I suspect

24   it was generated from First Boston.

25   Q.    And did you participate in the

112

1    negotiations of the terms of the transaction with

2    Berkshire Hathaway?

3    A.    I did not.

4    Q.    Did someone at Oakwood negotiate on behalf

5    of the company?

6    A.    I think it was negotiated between Fiachra

7    and Berkshire Hathaway.

8    Q.    So is it your understanding that no one

9    from Oakwood participated in those discussions?

10   A.    I think there was some discussion about

11   the structure of the deal.

12   Q.    Uh-huh.

13   A.    Whether that was negotiation or just

14   discussion to understand, I don't know, but those

15   discussions would have been with Doug as far as Doug

16   may have had some input into the pricing, but I

17   remember it more as a take it or leave it kind of

18   deal.

19   Q.    And who -- strike that. Did you testify

20   earlier that before the Berkshire Hathaway deal the

21   company had, in fact, liquidated B2s off its balance

22   sheet; is that right?

23   A.    We had for a period of time -- the market

24   essentially dried up. We did make one sale to an

25   insurance company I believe based in Cincinnati. I

113

1 can't remember the name of it. At some point in time
2 during this period but essentially we had a few
3 different -- you need to look at it in different
4 periods of time. Back in the mid-'90s there were B2
5 buyers.
6 Now, at some point in time, probably
7 around '96, Oakwood itself became an investment grade
8 rated company. So we were a triple B minus I believe
9 at that time probably between '96 and '98 or '99.
10 That meant that we could guarantee the B2 piece,
11 which brought the B2 piece up to a triple B piece or
12 a triple B minus.
13 So during that period of time that we were
14 investment grade we could sell the B2 piece, but it
15 was an investment grade piece because of the Oakwood
16 guarantee. Now, after Oakwood lost its investment
17 grade rating, whether immediate or after a period of
18 time, I don't know, but it became very difficult to
19 liquidate the B2 pieces.
20 Q. Do you recall times when Oakwood disagreed
21 with the rating decisions, the rating agencies?
22 A. I'm sure there were lots of times we
23 disagreed with the rating agency decisions.
24 Q. Do you personally recall any instances
25 where you did?

114

1 standpoint, yes.
2 Q. It also gave you credibility in the
3 marketplaces by virtue of Berkshire's reputation;
4 isn't that right?
5 A. It did not.
6 Q. It did not. Why not?
7 A. We were not allowed to use the Berkshire
8 name.
9 Q. At some point do you recall preparing a
10 press release announcing the Lotus, which is now
11 known as the Lotus transaction?
12 A. I don't recall a press release, preparing
13 a press release.
14 Q. But from the perspective of generating
15 liquidity, your view is that it was a good deal for
16 the company?
17 A. It was the best deal that we had at the
18 time.
19 MR. OSNATO: I'm going to mark, please, as
20 Exhibit 204 a document bearing Bates range
21 KCLH-1176 through 1181, which are the minutes of
22 the meeting of the board of directors held
23 Tuesday, July 24th, 2001.
24 (Exhibit Number 204 was marked for
25 identification.)

116

1 A. I can recall one.
2 Q. Okay. And what do you remember?
3 A. I can recall when we were trying to
4 securitize after we filed for bankruptcy. We had
5 been working with Fiachra on a securitization. It
6 was going to be a different type of structure where
7 we were going to essentially sell the B two-piece
8 along with the residual along with the servicing
9 rights to an entity called C-Bass.
10 And because of the improvements in our
11 underwriting standards we essentially had the -- we
12 essentially had the best pool of loans that we had
13 ever gone to securitize. In early December we got
14 the ratings from -- I think it was from Moody's that
15 we got first and they were -- we had the best pool of
16 loans we ever had and we had by far the worst ratings
17 that we ever had. And I can remember being rather
18 upset at that point in time, but that's the only
19 specific time I can remember.
20 Q. Uh-huh. And returning to the Berkshire
21 Hathaway transaction, Oakwood was pleased that
22 Berkshire Hathaway was going to buy these B2s; isn't
23 that right?
24 A. It appeared to give us the -- more
25 liquidity than any other option. So from that

115

1 Q. [By Mr. Osnato] And I'm not going to ask
2 you about the entire contents of this document.
3 Rather, I'm going to ask you about the section that
4 deals with the Lotus transaction, and that is the
5 paragraph on the first page that begins the first
6 item of business.
7 A. Uh-huh.
8 Q. If you could briefly read that paragraph
9 and let me know when you're done?
10 A. Yes.
11 Q. Okay. Does this paragraph describe the
12 Lotus transaction that we've just been discussing?
13 A. I believe it does.
14 Q. And you testified you were not personally
15 involved in any negotiations over the terms of the
16 deal; is that right?
17 A. I was not.
18 Q. Okay. Am I right that the Lotus
19 transaction was a form - excuse me -- approved by
20 the board because it believed it was in the best
21 interests of the company?
22 A. I think that would be correct.
23 Q. Okay. And isn't it true that Credit
24 Suisse did a service to Oakwood by bringing Berkshire
25 Hathaway to the table?

117

A.    They brought Berkshire Hathaway to the
table, yes.

Q.    And isn't it a fact that Oakwood had
instructed Credit Suisse to canvass the market for
potential buyers of the B2 securities; is that right?

A.    Yes.  We needed to liquidate the B2
securities at the best price that we could get.

Q.    And the net result of that process was the
Berkshire Lotus transaction; right?

A.    It was.

Q.    Okay.  Do you recall personally being
pleased that Berkshire Hathaway was now a substantial
investor in the company?

A.    I recall it being somewhat of a mixed bag.

Q.    Okay.  In what sense?

A.    Certainly you're pleased that, you know,
you've got -- that you're doing business with someone
like Warren Buffett.  At the same time you've invited
the 800-pound gorilla into the -- into the tent.  So
that's why I say somewhat of a mixed bag.

Q.    I take it from your answer that you knew
as of the time of the Lotus transaction that
Berkshire was not going to be a passive investor?

A.    Oh, I didn't know that at all one way or
the other.  I mean, typically Berkshire is a passive

118

investor, but certainly with anyone with the
financial resources of Berkshire, they could do
something else as well.

Q.    Did if you know Berkshire engage in any
diligence of Oakwood before the Lotus deal was
consummated?

A.    I would assume they did some diligence,
but what it was, I don't know.  They didn't    before
the deal was consummated they didn't -- they didn't
come down to Oakwood.

Q.    So you don't recall any on sites by any
Berkshire representatives?

A.    Mark Millard came probably in the fall of
2001 --

Q.    Uh-huh.

A.    -- and came down to the corporate
headquarters, and then we took him down to our
Richfield and Rockwell plants in North Carolina and
then -- to show him what we were doing.  And then he
returned the same day, I think, but that was after
the Lotus transaction took place.

Q.    Did Mr. Millard become your principal
point of contact at Berkshire?

A.    After a certain point in time, yes.

Q.    Did you deal with anyone else there?

119

A.    I dealt with Warren Buffett.

Q.    And did those interactions occur in the
period roughly preceding the bankruptcy filing?

A.    Yes, with Mr. Buffett.

Q.    Correct.  And what are your views on Mr.
Millard?

MR. CASTANARES:  Could you -- may I ask a
more -- well, I'll just object to the form of
the question.

Q.    (By Mr. Osnato)  Do you think Mr. Millard
is a capable businessman?

A.    Yes.

Q.    Do you know how Credit Suisse was
compensated for its work on the Lotus transaction?

A.    I believe that they received approximately
two percent of the principal amount of the bond,
111,000,000.  I'm not -- I'm not sure of that.

Q.    Do you know how that two percent figure
was arrived at?

A.    I do not.

Q.    Do you know if the two percent is below
industry standard for fees in this kind of
transaction?

A.    I do not.

Q.    Do you know if Berkshire suggested to

120

anyone at Oakwood that two percent was the right
number?

A.    I do not.

Q.    Do you think Credit Suisse had a conflict
of interest in the Lotus transaction?

A.    In a legal sense?

Q.    Any sense.

A.    The -- certainly there's some inherent
conflict of interest that's, you know, somewhat
insurmountable when they're dealing with a company
like us that they've represented for a period of time
as well as a company like Berkshire Hathaway that
they often sell products to and who certainly could
have a big appetite for products that they want to
make sure that they're happy as well.

So there's somewhat of a -- of an inherent
conflict there.  That was at the time something that
we would have been aware of.  Since this time I
understand that Berkshire Hathaway also owned a
significant amount of our debt, which I understand
First Boston knew about at that time but they did not
inform us about that at that time.

And I'm not sure why we were not informed
of that because again, as I said, you know, there's
some trepidation anytime you do something like this

121

1    that you have the 800-pound gorilla in your tent, but
2    I would have liked to have known.  I don't know if it
3    would have made any difference, but I would have
4    liked to have known that he was already in our tent.
5         Q.   Uh-huh.  But the board would have approved
6    the deal even if it had been disclosed that Berkshire
7    Hathaway owned some public bonds; isn't that right?
8              MR. CASTANARES:  Objection to form.
9              THE WITNESS:  I don't know.  I think that
10        there may have been certainly some inquiry as to
11        what the level of interest and what the -- what
12        the potential plan of Berkshire Hathaway was had
13        we known that.
14        Q.   (By Mr. Osnato)  Do the terms that are set
15   out in the paragraph in Exhibit 204 that we've been
16   looking at represent the final terms of the deal as
17   you understood it?
18        A.   I do not know.
19        Q.   Do you believe those terms as reflected in
20   204 to be fair?
21        A.   Well, I believe that they were the best
22   price that we -- that we thought that we could get at
23   the time.
24        Q.   After the Lotus securitization transaction
25   closed, did you have any dealings with Berkshire

122

1    Hathaway thereafter apart from any discussions as
2    part of the bankruptcy?
3         A.   As I said, Mr. Millard came down to visit
4    us sometime in I believe the fall of 2001.  Really,
5    the next -- the next time that I can remember having
6    any dealings with Berkshire Hathaway was when we
7    decided to eliminate or curtail the loan assumption
8    program, and we had a meeting with Mr. Buffett and
9    Mr. Millard in Omaha at the Berkshire offices to give
10   them an update on that.
11        Q.   And do you recall who requested that
12   meeting?
13        A.   Well, the request to Berkshire Hathaway
14   went through First Boston.  I would think that
15   Piachra would have talked to Tom Connor at First
16   Boston and have Tom arrange a meeting.
17             Now, I'm not sure where the -- I'm not
18   sure whose idea that we needed a meeting with
19   Berkshire Hathaway was, whether it was something
20   after we talked with Piachra and talked about the
21   changes to the loan assumption program that he said,
22   you know, we don't want to surprise the guys in Omaha
23   or whether it's something that we suggested to him.
24   I don't recall that.
25        Q.   But your recollection is that the purpose

123

1    of the meeting was to discuss the consequences of the
2    loan assumption program with Berkshire Hathaway?
3         A.   That was the -- that was the general
4    purpose of the meeting, yes.
5         Q.   Okay.  And were you at the meeting?
6         A.   I was.
7         Q.   And did you speak at the meeting?
8         A.   I did.
9         Q.   Did you make a presentation?
10        A.   I walked through a brief presentation,
11   yes.
12        Q.   Okay.  And what was the subject matter of
13   your presentation?
14        A.   It was -- as I recall, it was mostly about
15   the loan assumption program and the impact that this
16   was going to have on the Lotus transaction.  There
17   was probably also material in there that gave them a
18   general update on the -- on the business.
19        Q.   How did the assumption program impact the
20   Lotus transaction?
21        A.   It devastated it.
22        Q.   In what sense?
23        A.   Well, rather than Oakwood assuming the
24   losses or mitigating the losses, we now had half of
25   our foreclosures being sold into the wholesale

124

1    market.  Whereas traditionally how we had disposed of
2    our repos had been either through assumptions or
3    through repo refinances where with assumptions the
4    securitization didn't take any hit, with repo
5    refinances over the broader period of time we were
6    having a recovery rate of about 80 percent, although
7    that had deteriorated some by July of 2002 or June of
8    2002.
9              When we started wholesaling repos at that
10   point in time the repo market, the wholesale market
11   for repos, was the worst it had ever been.  So the
12   losses that we were incurring, our recovery rate was
13   only about 20 percent, give or take a few, on those
14   wholesale units and the -- and the -- that loss gets
15   passed on to the securitizations.
16             So Oakwood as I discussed before would
17   take the first loss from the standpoint that it
18   wouldn't get paid a servicing fee, but the next loss,
19   it's the residuals and the B2s, which is what
20   Berkshire owned.  So there was little immediate
21   impact because the Lotus transaction called for a
22   reserve fund to be built up.  And there was a reserve
23   fund built up, but after a few months I think that
24   the Berkshire cash flows decreased dramatically.
25        Q.   And do you recall the reaction of

125

1   Berkshire to this news at the meeting?

2        A.   I think they understood what we had to say

3   and understood why we were doing what we were doing.

4        Q.   Uh-huh.

5        A.   They asked some general questions about

6   the business, where we were headed, but it was

7   overall a fairly pleasant meeting.

8        Q.   And do you recall how you or anyone else

9   from Oakwood responded when asked where you were

10  headed?

11       A.   I think we explained what our business

12  strategy was going forward, what the obstacles were,

13  where the industry was.

14       Q.   Uh-huh.

15       A.   As far as specifically saying where we

16  were headed, I think we just talked about what the --

17  what the issues were.

18       Q.   Was there any discussion at the meeting of

19  a bankruptcy filing at that point in time?

20       A.   Warren Buffett made a comment as he looked

21  at the numbers. He said, well, you know, it's pretty

22  simple. Either you start making money or you're

23  going to have to file for bankruptcy at some point in

24  time, and we agreed with that comment.

25       Q.   Did you tell him that you intended to

126

---

1        Q.   Uh-huh.  You testified earlier about a

2   warehouse facility that had been provided by Bank of

3   America?

4        A.   Yes.

5        Q.   At some point in time did that facility

6   terminate?

7        A.   That facility, Bank of America applied

8   increasing pressure to us to get out of that

9   facility.

10       Q.   Uh-huh.

11       A.   It did not ever terminate, although I

12  think it would have terminated in -- by its terms in

13  September of 2002 --

14       Q.   Uh-huh.

15       A.   -- I believe.  But when we went to the

16  Credit Suisse facility, that Bank of America facility

17  had not terminated.

18       Q.   And why if you know did Bank of America

19  place pressure on Oakwood with respect to the B of A

20  facility?

21       A.   I'm not really sure what their motivation

22  was.  I think at the time Bank of America had been

23  going through some financial issues and was cutting

24  back on some of their exposures, but I -- I can't

25  tell you any more than that.

128

---

1   start making money?

2        A.   No.

3        Q.   Was that your view at the time?

4        A.   My view at the time was that we would

5   probably have to file for bankruptcy.

6        Q.   As of the summer of 2002?

7        A.   Yes.

8        Q.   And do you know if the board shared that

9   sentiment?

10       A.   I don't know that the board necessarily

11  agreed with that sentiment or disagreed with that

12  sentiment.  I know that at some point in time, I

13  believe it was probably June of 2002, in that time

14  frame I advised the board that I thought it was

15  prudent to obtain -- to retain bankruptcy counsel,

16  and they agreed with that.

17       Q.   Apart from -- strike that.  In addition to

18  Mr. Millard and Mr. Buffett and yourself, who else

19  attended the meeting in Omaha in the summer of 2002?

20       A.   Fiachra, Tom Connor, Bob Smith and Doug

21  Muir.

22       Q.   Did Credit Suisse have a speaking role at

23  this meeting?

24       A.   I think they spoke, yes.  They didn't have

25  a main speaking role, I don't think.

127

---

1        Q.   Do you recall the dollar amount associated

2   with the B of A facility?

3        A.   I do not, no.

4        Q.   Was that facility structured as a loan?

5        A.   I believe it was.

6        Q.   And --

7        A.   At least initially it was.  It may have

8   changed over time, but I believe it was a loan.

9        Q.   At any point in time did Oakwood in turn

10  pressure Credit Suisse to step up and provide some

11  kind of financing options to Oakwood?

12       A.   I'm not sure that pressure is the right

13  word.  I know that we asked CSFB to see what they

14  could do.  Bank of America, as I said, had made it

15  clear to us that they wanted to decrease their

16  exposure and I think Bank of America saw that Credit

17  Suisse was getting large underwriting fees but at the

18  same time was not providing any credit to the

19  company.

20            And they thought that Credit Suisse ought

21  to -- while they were wanting to lower their

22  exposures, they thought it was appropriate for Credit

23  Suisse to step to the plate and take part of those

24  exposures.

25       Q.   Uh-huh.  You described the Credit Suisse

129

1   facility earlier as a loan purchase facility; is that
2   right?
3        A.   I believe that was the name of it, yes.
4        Q.   Did you understand -- do you understand
5   how that facility operated?
6        A.   I know that it was a bankruptcy remote
7   entity and that because of the way the facility was
8   structured, it allowed us to remove that debt off of
9   our books.
10       Q.   Uh-huh.  Were you involved in any of the
11  negotiations over the terms of structure of the
12  Credit Suisse loan purchase facility?
13       A.   I'm sure I was involved somewhat, but Doug
14  and Bob would have been primarily involved.
15       Q.   Would they have kept you informed of key
16  events?
17       A.   Yes.  They would have.
18       Q.   Do you know if a true sale opinion was
19  rendered as part of the creation of a loan purchase
20  facility?
21       A.   I would assume that there was a true sale
22  opinion.  Typically in any type of facility like that
23  there would be, but I can't tell you that there was
24  one on this one.
25       Q.   Okay.  So you have no independent

130

1   recollection of seeing such opinion?
2        A.   I've seen hundreds of true sale opinions
3   and I don't have a recollection of that specific one.
4        Q.   You mentioned a moment ago that there was
5   a bankruptcy remote entity associated with this
6   facility; is that right?
7        A.   I believe so, yes.
8        Q.   Do you recall the name of that entity?
9        A.   OMI Trust maybe?
10       Q.   Sounds about right.  Do you know why the
11  trust was made to be bankruptcy remote?
12       A.   Typically it's made to be bankruptcy
13  remote to protect the creditor in the event of a
14  bankruptcy.
15       Q.   In this case the creditor being Credit
16  Suisse?
17       A.   Yes.
18       Q.   And at the time did you see anything
19  unusual or alarming about the fact that this
20  structure was put in place?
21       A.   To be honest with you, I probably never
22  looked at the structural documents themselves, so I
23  don't really have -- I wouldn't have any basis to
24  have an opinion one way or the other.
25       Q.   Do you know if the loan purchase facility

131

1   was approved by the board of directors of the
2   company?
3        A.   I believe it probably was.
4        Q.   And do you have any reason to -- strike
5   that.
6        A.   I know the board would have had to be
7   involved in approving the warrant that was associated
8   with the loan purchase facility.
9        Q.   Are you familiar with the fees that were
10  payable to Credit Suisse under the facility?
11       A.   I believe there was annual fees of
12  two-and-a-half percent.
13       Q.   Anything else?
14       A.   That's all that I can recall.
15       Q.   You didn't participate in negotiating
16  those fees?
17       A.   If I did, I can't recall.
18       Q.   Do you know if Oakwood had counsel of its
19  own involved in the negotiation of the structure of
20  the facility?
21       A.   Hunton & Williams would have been involved
22  in that.
23       Q.   Okay.  Are you familiar with the way that
24  funds flowed under the loan purchase facility?
25       A.   I am not.

132

1        Q.   Do you have any reason to think they
2   didn't flow the way they were supposed to as set out
3   in the documents?
4        A.   I don't have any reason to believe that.
5   Nobody raised that as an issue.
6        Q.   Okay.  And after the facility was put in
7   place, was Oakwood generally satisfied with the way
8   it operated?
9        A.   Generally speaking, yes.
10       Q.   Okay.  Earlier this morning you testified
11  about a warrant that was awarded to Credit Suisse.
12  Do you recall that testimony?
13       A.   You're talking about my reference a couple
14  of minutes ago?
15       Q.   No.  I think it was earlier this morning.
16       A.   I don't -- I don't recall.  Well, yes, I
17  do.  Yes, I do.
18       Q.   Okay.
19       A.   Uh-huh.
20       Q.   Tell me what you remember about that
21  warrant?
22       A.   I remember that there was a warrant.  I
23  don't remember the price.  I remember that at one
24  point in time the warrant had been for a larger
25  amount and/or at least the discussions about the

133

1    warrant had been for a larger amount. And I remember
2    that it was finally ratcheted down to 19.9 percent
3    because that was as much as CSFB could have for
4    regulatory purposes.
5        Q.    Uh-huh. Were you personally involved in
6    negotiating the terms of the warrant?
7        A.    I don't -- I don't recall being personally
8    involved. I'm sure I was updated by Bob and Doug,
9    but I don't recall the -- any phone calls or anything
10   else where I would have been personally involved. I
11   may have been.
12       Q.    And as you understand it, did the warrant
13   give Credit Suisse the right to convert into common
14   shares of the company?
15       A.    Yes.
16       Q.    Were there any criteria that had to be met
17   before the warrant could be converted?
18       A.    Not that I'm aware of.
19       Q.    Did Credit Suisse ever use the existence
20   of the warrant to dictate conduct or influence the
21   company?
22       A.    I'm not aware of any specific incident.
23       Q.    We spoke a little while ago about
24   underwriting standards that Oakwood would use as part
25   of its lending. Do you recall that?

134

1        A.    Yes.
2        Q.    Did you have any role in setting those
3    standards?
4        A.    At certain points of time, yes.
5        Q.    As a general matter before Oakwood would
6    loan to an individual customer, would that customer
7    have to satisfy the standards that were in place at
8    the time?
9        A.    Generally speaking, yes, although like
10   with any standards, things aren't always a hundred
11   percent black and white.
12       Q.    Uh-huh. At the retail level did managers
13   have the discretion to waive compliance with
14   standards?
15       A.    They did not.
16       Q.    Did it happen nonetheless?
17       A.    From time to time it certainly did happen.
18       Q.    Did you view that as a serious problem at
19   the company?
20       A.    It was a problem. The magnitude of it I
21   don't think was -- was terribly high.
22       Q.    When you became the chief executive
23   officer did you take any steps to tighten the
24   underwriting standards in place at the company?
25       A.    I did.

135

1        Q.    And why did you do that?
2        A.    Because I thought our underwriting
3    standards were too loose.
4        Q.    And what steps did you take?
5        A.    We increased our credit cut-off scores.
6    We decreased our maturities. We increased some of
7    our downpayment requirements. There were -- there
8    were a number of different times after I became CEO
9    that the standards changed, but they were always to
10   tighten the underwriting standards.
11       Q.    And was this a matter of priority to you
12   when you became -- when you became the CEO?
13       A.    It was a matter of importance. The bigger
14   problem was what to do with all of the repos coming
15   in from the old underwriting standards, which you
16   really couldn't get away from, but it was a matter of
17   priority to over time tighten the underwriting
18   standards.
19       Q.    Am I correct that the high level of repo
20   and refis that Oakwood was experiencing in 2001 and
21   2002 were a result of lax underwriting standards that
22   had been put in place in the '90s?
23       A.    Generally speaking, that's correct.
24       Q.    Did Credit --
25       A.    There were periods of time in the '90s

136

1    that we had appropriate understanding -- underwriting
2    standards, though.
3        Q.    But as a general matter the correlation I
4    laid out is true?
5        A.    The majority of repos that we were getting
6    in the 2001, 2002 time period related to the 1990s,
7    yes.
8        Q.    Okay. Did there ever come a point in time
9    where Credit Suisse controlled Oakwood's underwriting
10   standards?
11       A.    Well, in a manner of speaking, yes,
12   because under the loan purchase facility it set forth
13   rather detailed standards that had to be met in order
14   to place a loan in the loan purchase facility. And
15   because of our lack of liquidity, we essentially had
16   to meet those criteria because we couldn't finance
17   those loans until it got securitized on our own.
18       Q.    But am I right that the standards that
19   were reflected in the facility were of benefit to
20   Oakwood because they reflected a tightening of
21   standards?
22       A.    I'd have to go through each one of them
23   to -- to really answer the question. I haven't
24   looked at those standards in a while. Certainly it
25   reflected -- certainly it reflected overall a

137

1    tightening of underwriting standards and it was in
2    the direction that we were going. There were some
3    standards in there that caused us problems as well.
4        I know that there was a requirement in the
5    agreement that we could only have 17-and-a-half
6    percent of the paper be repossession/refis, which
7    drove us to have more assumptions rather than
8    repossession/refis because if we did
9    repossession/refis over that 17-and-a-half percent,
10   we had no -- no funding source for it.
11       So that was problematic. There may have
12   been some other standards in there that were
13   problematic. I'd have to --
14       Q.   Uh-huh.
15       A.   I'd have to go through each one and
16   refresh my recollection, but generally speaking it
17   tightened underwriting standards. It was in line
18   with the direction that we would have gone anyway.
19       Q.   Uh-huh. So the -- any requirements
20   reflected in the facility documents were consistent
21   with what you as CEO believed needed to be done as a
22   general matter in any event?
23       MR. CASTANARES:   I object to the form of
24   that question.
25       THE WITNESS:   Well, you say -- as I said

138

1    before, I'd have to go through -- your question
2    said any requirements in there and I'd have to
3    go through each one of them and refresh my
4    recollection as to what they were. All I'm
5    saying is as a general --
6        MR. OSNATO:   Uh-huh.
7        THE WITNESS:   -- matter, it was in accord
8    with the direction that we were moving.
9        Q.   (By Mr. Osnato)  Uh-huh, thank you. And
10   did you think it was unreasonable for Credit Suisse
11   to take steps to protect its position under the
12   facility by inserting these underwriting
13   requirements?
14       A.   I'm not sure that I thought about it as
15   far as the reasonableness or not. The level of
16   detail that was in those standards was something that
17   we really had not seen in prior agreements before.
18       MR. OSNATO:   Okay. I'm about at the end
19   of the line, so why don't we break for lunch.
20       THE WITNESS:   Okay.
21       THE VIDEOGRAPHER:   We're off the record at
22   12:36.
23       (A luncheon recess was taken.)
24       THE VIDEOGRAPHER:   This is tape number
25   four. We're on the record at 1:32.

139

1        MR. OSNATO:   Welcome back.
2        THE WITNESS:   Thank you.
3        Q.   (By Mr. Osnato)  Mr. Standish, I take it
4    that the Oakwood board was aware of the fact that the
5    company was using securitizations to generate
6    liquidity; is that right?
7        A.   They were.
8        Q.   And did the board approve of that practice
9    to your knowledge?
10       A.   They did.
11       Q.   Did anyone at any point who sat on the
12   board ever express misgivings about securitizations
13   as a strategy for generating liquidity?
14       A.   There may have been some discussions from
15   time to time whether other alternatives were better
16   such as a whole loan sale or bank-type financings
17   that we talked about this morning. I don't have any
18   specific recollection, but I do believe at some time
19   or another alternatives were discussed.
20       Q.   And do you recall if those alternatives
21   were discussed at some point in 2002?
22       A.   Well, I'm not sure that they were
23   discussed at the board level. Certainly one of the
24   options that Fiachra was pursuing in 2002 was a whole
25   loan sale to C-Bass. Whether that was discussed at

140

1    the board or not, I do not know.
2        Q.   I'm going to ask you the same question
3    directed to you in your capacity as chief executive
4    officer, and the question is did you approve of the
5    use of securitizations to generate liquidity for the
6    company?
7        A.   I did.
8        Q.   Okay. Did there come a point in time in
9    2002 when senior management began to explore
10   restructuring alternatives for the company?
11       A.   Yes. There did.
12       Q.   Do you remember the approximate date those
13   discussions began?
14       A.   As I mentioned earlier today, I believe
15   sometime around June, it may have been a little
16   earlier, I sought and received approval from the
17   board to hire bankruptcy counsel to prepare -- to
18   advise us as well as to prepare for a filing in the
19   event that we needed to. And then there were
20   discussions off and on from that point in time
21   forward until the filing in November.
22       Q.   And what led you to seek permission to
23   retain bankruptcy counsel at that point in time?
24       A.   Well, our financial situation continued to
25   deteriorate. The fact that -- and again, I don't

141

1   recall exactly the time it was. It should be in the
2   board minutes I would think.
3        Q.   Uh-huh.
4        A.   But that was about the time where the
5   assumption program was either being called into
6   question or curtailed or terminated. I was aware
7   that -- around that time I became fully aware of what
8   the costs of the assumption program were, which were
9   higher than what I had previously believed that they
10  were. I knew that something had to be done.
11       I knew that the alternative would be
12  selling our repos in the wholesale market, which
13  would put a lot of stress on these securitizations.
14  And I was worried once that stress came on the
15  securitizations and they started performing
16  significantly worse what our access to the
17  securitization market would be.
18       I also at that point in time realized that
19  once we started wholesaling those repos, that we
20  would essentially be receiving no servicing income
21  despite the fact that we had a run rate of about
22  $30 million a year in servicing costs. So all of
23  those things combined made me feel that a bankruptcy
24  filing would be a significant possibility.
25       Q.   And again, to be clear, this is at some

142

1   point in the summer of 2002?
2        A.   The summer or the spring.
3        Q.   And did you at that point in time view
4   your responsibility as developing a range of options
5   to present to the board for its consideration and
6   ultimate approval?
7        A.   No. I considered it my responsibility to
8   bring the best option to the board.
9        Q.   And as part of that process would you as
10  chief executive officer consider a range of options
11  yourself perhaps with other officers to determine
12  what the best option was?
13       A.   Yes.
14       Q.   Okay. And did you ultimately reach a
15  conclusion as to the best option for Oakwood as of
16  the summer of 2002?
17       A.   I was convinced at some point in time in
18  the summer of 2002 that the only feasible option that
19  we had was a bankruptcy filing.
20       Q.   Did you believe that a bankruptcy filing
21  could help Oakwood shed some of its liabilities and
22  emerge a stronger company?
23       A.   I did.
24       Q.   At any point in 2001 did you believe that
25  Oakwood should file for chapter 11 bankruptcy?

143

1        A.   I didn't in 2001 believe that Oakwood
2   should file for bankruptcy at that time. I certainly
3   saw at that time the possibility that we would need
4   to file for bankruptcy.
5        Q.   And if I ask you the same question as to
6   2000, your answer would be?
7        A.   Again, there was no event in 2000 that
8   caused me to think that we would need to file for
9   bankruptcy at that time, but there was certainly
10  consideration of a possibility that we might have to
11  file for bankruptcy at some point in time in the
12  future.
13       Q.   In 2001 were you of the view that
14  disciplined restructuring of Oakwood would allow it
15  to avert bankruptcy?
16       A.   Are you asking did I think that that was a
17  probability?
18       Q.   I'm asking whether you thought in 2001 if
19  Oakwood aggressively downsized whether it could avoid
20  bankruptcy?
21       A.   In 2001 I believed that downsizing Oakwood
22  was in the best interest of the company and gave the
23  company a better chance of avoiding bankruptcy, but I
24  believe in 2001 had I been asked, which I don't think
25  I was, I think I would have said that a bankruptcy

144

1   filing was more probable than not despite whatever
2   action we could take at the time.
3        Q.   Uh-huh. Do you recall consideration over
4   being given to a bond buy-back program by Oakwood?
5        A.   I recall First Boston making certain
6   proposals with respect to the bond - to a bond
7   buy-back. I thought that those proposals were
8   misguided.
9        Q.   Why did you think that?
10       A.   Because they would consume liquidity.
11       Q.   Did you express that view to Oakwood --
12  excuse me -- to Credit Suisse?
13       A.   I believe I did.
14       Q.   What was the response?
15       A.   I don't -- I don't recall a response.
16       Q.   And so I take it -- strike that. Did
17  Oakwood ever engage in a bond buy-back program?
18       A.   There were certain bonds that I believe
19  matured in 2002. There was a small issuance of
20  bonds. I can't recall when it was, but we did buy
21  back some of those bonds in the open market back in
22  2001, I believe.
23       Q.   Am I correct that that buy-back was
24  separate and distinct from the proposal that was
25  being put forward by Credit Suisse in 2002?

145

1      A.    It dealt with a totally different tranche
2  of bonds.
3      Q.    And am I correct that Oakwood rejected the
4  proposal put forward by Credit Suisse for a bond
5  buy-back program?
6      A.    Yes.  Our biggest issue was not the 2004
7  bonds.  Our biggest issue was we didn't have cash.  I
8  always thought if we could make it until 2004, we
9  would find a way to deal with those bonds; but I
10 didn't see any point in buying back bonds when -- I
11 didn't think we'd be able to make it to 2004 without
12 a bankruptcy filing.  All that would do would
13 precipitate a bankruptcy filing sooner rather than
14 later.
15     Q.    Did Oakwood also have a series of public
16 bonds that were to come due in 2009?
17     A.    We did.
18     Q.    Do you know if that series of bonds was
19 also the subject of a Credit Suisse proposal?
20     A.    I believe it probably was, but I'm not a
21 hundred percent sure.
22     Q.    Do you recall if Credit Suisse made a
23 presentation to the board on the topic of a bond
24 buy-back program?
25     A.    I think that -- well, there was a

146

---

1  presentation of a bond buy-back program to the board
2  as an alternative to filing chapter 11.  I do not
3  recall specifically a separate presentation outside
4  of the time period that we had engaged First Boston
5  as a financial advisor.  I do recall a presentation
6  to management prior to that time which dealt with a
7  bond buy-back.  There may have been a presentation to
8  the board, but I do not recall it.
9      Q.    Okay.  Are you familiar with the
10 consulting firm known as McKenzie & Company?
11     A.    I am.
12     Q.    Did McKenzie ever provide any services to
13 Oakwood?
14     A.    They did.
15     Q.    What were the nature of those services?
16     A.    I do not recall.
17     Q.    Do you recall the time period in which
18 McKenzie provided services?
19     A.    Probably in the late 2001, early 2002 time
20 period.  I can recall that Fiachra wanted us to use
21 McKenzie to look at some of our business issues and
22 he had a friend who worked at McKenzie.  And he --
23 Fiachra said that the way that McKenzie worked was
24 they would come in on a consulting basis and
25 essentially do a free consulting job in order to show

147

---

1  their worth and get their foot in the door.  And on
2  that basis we decided to get McKenzie down.  It
3  didn't turn out to be quite what Fiachra had said.
4       It was -- I think that they did agree to
5  do a small project for us without compensation, but
6  again, I can't remember what it was.  I think that
7  all of this came about as a result of Fiachra's
8  employment by McKenzie prior to going to work at
9  First Boston.
10     MR. OGNATO:  I'm going to mark as
11 Exhibit 205, please, a document bearing Bates
12 range CSFB-00055756 through 760.
13     (Exhibit Number 205 was marked for
14 identification.)
15     Q.    (By Mr. Ognato)  I'm not going to ask you
16 about the entirety of the document, but you are
17 welcome to take a look and let me know when you're
18 ready.
19     A.    Do you know why the E mail is dated
20 July 31st, 2002 and the document is dated July 5,
21 2001?
22     Q.    I don't.  And I can only surmise that it's
23 a typo, but that's only a surmise.  I suspect that
24 the author of the letter mistyped the date, but I
25 don't know that to be a fact.  Do you recall meeting

148

---

1  with McKenzie any time other than in 2002?
2      A.    Give me -- well, as I said, I thought it
3  could be in 2001 or 2002
4      Q.    Uh huh, okay.
5      A.    Okay.
6      Q.    Okay.  Does this letter which purports to
7  be from representatives of McKenzie refresh your
8  memory about a meeting with them to discuss strategic
9  options for Oakwood?
10     A.    It does a little bit.  I do recall having
11 dinner with these two individuals.  I do recall a
12 meeting with them.  I do recall that there was -- I
13 recall that, as I said earlier, that what Fiachra had
14 said McKenzie's approach would be was different than
15 what I'm seeing here where Fiachra had essentially
16 said that they would come in and we'd try to identify
17 a project for them to do and they'd come in as a
18 freebie.
19     And we got this and it's more of a broad
20 kind of proposal, we're here to work for you and
21 everything.  And I think that I had a discussion with
22 Jack Welch after getting this letter and saying this
23 wasn't what I had expected.  And I think that there
24 was something   he said, well, they would come in
25 and do a little something for us, something like a

149

**Page 150**

1  two-day window. And I think that they did that, but
2  I can't recall what it was.
3      Q.  Uh-huh. If you'd turn to the first page,
4  please, of the letter under the section captioned
5  background?
6      A.  Uh-huh.
7      Q.  Can you please read the first paragraph
8  and tell me if you agree with what is set forth
9  there?
10     A.  Well, the last part of the second sentence
11  is incorrect.
12     Q.  What are you referring to in particular?
13     A.  That high levels of repossessions have
14  adversely affected cash flow due to refurbishing
15  expenses. They may be talking about assumptions, but
16  he refers to repossessions. Repossession expenses
17  are paid out of the REMIC trust back to Oakwood at
18  the time the repossession is ultimately sold.
19         Before that time we received the
20  refurbishment expenses out of the servicer advance
21  facility. So really refurbishing expenses did not
22  have any impact -- refurbishing expenses for repos
23  had a minimal, if any, impact on our cash flow.
24     Q.  Okay. We're done with that document.
25  Have you ever heard of a firm called Soles, Brower,

---

**Page 151**

1  Smith & Company?
2      A.  I have.
3      Q.  And what kind of institution is Soles
4  Brower?
5      A.  It's a small investment banking firm in
6  Greensboro.
7      Q.  And did Soles Brower provide investment
8  banking services to Oakwood?
9      A.  Yes.
10     Q.  Do you recall something known as Project
11  Coconut?
12     A.  I do not.
13     Q.  Okay. Are you familiar with a firm known
14  as Andrew Davidson & Company?
15     A.  I am.
16     Q.  And did Andrew Davidson to your knowledge
17  provide any services to Oakwood?
18     A.  They did.
19     Q.  And do you know when those services were
20  provided?
21     A.  I believe it was in October of 2002.
22     Q.  And do you know why they were provided?
23     A.  Yes.
24     Q.  What's the reason?
25     A.  My recollection is that as we moved

---

**Page 152**

1  forward in filing for bankruptcy that either -- well,
2  we know that we wanted to have a meeting with
3  Berkshire Hathaway in order to let them know what we
4  were doing as well as to get their support for the
5  filing because we felt their support would be a
6  critical element in the success of a reorganization.
7         Either -- in that process either Jared or
8  Fiachra felt that it would be helpful to have the
9  guarantee obligation to Berkshire Hathaway as well as
10  our other guarantee obligations quantified so that
11  there can be some estimate of the percentage
12  ownership of Berkshire after reorganization. Fiachra
13  suggested that Andrew Davidson was the best party to
14  perform that work, so we engaged Andrew Davidson to
15  value the guarantee liabilities prior to going to
16  meet with Berkshire Hathaway.
17     Q.  And did Andrew Davidson, in fact, perform
18  the work you've just described?
19     A.  They did.
20     Q.  Do you recall if they arrived at a dollar
21  amount as to the guarantee?
22     A.  Well, any dollar amount is simply an
23  estimate since nobody can predict what the future
24  will bring, but they did -- they did come up with a
25  dollar amount. I forget what -- they used a

---

**Page 153**

1  technique that I was not familiar with, we did not
2  use in our own guarantee. It's -- they called it a
3  Monte Carlo method but they did, in fact, come up
4  with a number that they thought was the most
5  probable.
6      Q.  Do you remember the number?
7      A.  I remember there were several numbers and
8  what it finally ended up with, I do not know. I
9  would say it was somewhere between 133 and 250
10  million.
11     Q.  Okay. Thank you.
12     A.  There were different variations.
13         MR. OSNATO:  I'm going to mark as
14  Exhibit 206 a document bearing Bates range
15  MNAT-006726 through 728.
16         (Exhibit Number 206 was marked for
17  identification.)
18     Q.  (By Mr. Osnato)  This document is the
19  minutes of the meeting of the board of directors of
20  Oakwood held Tuesday, June 25th, 2002. And, sir, you
21  can take a moment to familiarize yourself with it. I
22  am not going to ask you about every paragraph but
23  rather specific ones. So let me know when you're
24  ready.
25         MR. CASTANARES:  Do you want him to read

1    the whole document then?
2            MR. OSNATO:  No.  He does not need to read
3    the whole document.
4            MR. CASTANARES:  How does he know which
5    ones you're going to ask him about?
6    Q.      (By Mr. Osnato)  Take your time and
7    familiarize yourself with the document, please.  I'm
8    first going to ask you about the final paragraph on
9    page one.
10   A.      Okay.
11   Q.      Does this document refresh your
12   recollection that it was about June 2002 that the
13   board was informed that the assumption program would
14   be substantially eliminated?
15   A.      Well, it doesn't refresh my recollection,
16   but that's certainly what the document shows.
17   Q.      This document indicates or suggests that
18   you led this particular meeting.  Was it your
19   practice in this time period to lead discussions at
20   board meetings?
21   A.      As far as discussions of operational
22   items, yes.  At this time as these minutes reflect,
23   Dennis Meyer was the chairman of the board.  As I
24   recall, I didn't take that role until November of
25   2002.

154

1    Q.      Uh-huh.
2    A.      But yes.  As far as discussion of
3    operational items, at this time I would have been
4    leading those discussions.
5    Q.      If you could please turn to the next page
6    which bears Bates range 6727?
7    A.      Uh-huh.
8    Q.      And directing you to the paragraph
9    beginning Mr. Standish reported that management had
10   updated --
11   A.      Uh-huh.
12   Q.      -- if you could please read that sentence?
13   A.      Yes.
14   Q.      If you could actually continue reading
15   through the phrase key uncertainties?
16   A.      Uh-huh.
17   Q.      Am I correct that at this point in time
18   you were advising the board that the discontinuance
19   of the loan assumption program would have a
20   beneficial impact on the company's liquidity
21   situation?
22   A.      Yes.  Somewhat of a beneficial impact.
23   Q.      Uh-huh.  And do you see the reference
24   there to adequate liquidity being in place to fund
25   operations until the March 1, 2004 maturity of 125

155

1    million senior notes?
2    A.      I see the words, yes.
3    Q.      Are those senior notes the ones that were
4    the subject of the Credit Suisse bond buy-back
5    proposal?
6    A.      As I said before, I don't remember whether
7    the 2009 notes were part of that proposal or not, but
8    the 2004 notes were.
9    Q.      Was there any consideration given to using
10   the liquidity captured by the discontinuance of the
11   assumption program to fund a buy-back program?
12   A.      Well, there was certainly some
13   consideration of it, but there wasn't much
14   consideration of it because we needed the liquidity
15   to continue operations.  As this paragraph I think
16   fairly clearly says, in order to get to March 1st,
17   2004 we have to basically be operating in a perfect
18   situation.  And that's without using any money to buy
19   back bonds.
20   Q.      I'll direct your attention, please, to the
21   following paragraph, which reads:  Mr. Standish
22   commented that in light of the inherent uncertainties
23   facing the corporation and a difficult and extended
24   industry downturn and the particular difficulties
25   that could arise from a liquidity crisis if one were

156

1    to develop, management believed that it would be
2    prudent to begin developing an action plan that could
3    be implemented in the event that a financial
4    reorganization of the corporation became necessary.
5    Do you see that?
6    A.      Yes.
7    Q.      To your recollection is this the first
8    point in time that you began to consider a possible
9    bankruptcy filing in 2002?
10   A.      No.
11   Q.      Okay.  Did you discuss with Mr. Muir the
12   wisdom of putting in place an action plan for
13   possible restructuring alternatives?
14   A.      I did.
15   Q.      And did he share your views?
16   A.      I believe he did.
17   Q.      And did you, in fact, put in place a plan?
18   A.      Not as far as a plan being a written
19   document.  We did -- Mr. Muir met with counsel, with
20   bankruptcy counsel on or about this time in order to
21   begin providing counsel with the information
22   necessary to make a filing.
23   Q.      There's a reference in the paragraph we're
24   talking about to a liquidity crisis.  In particular,
25   the document says a liquidity crisis if one were to

157

1  develop.

2      A.  Uh-huh.

3      Q.  At this point in time, which is to say

4  June 25th, 2002, was Oakwood in the midst of a

5  liquidity crisis in your view?

6      A.  Well, not at that moment.  Now, we had a

7  liquidity crisis from the standpoint that it was very

8  difficult to project how far out in the future if

9  nothing changed that we would be able to continue to

10  pay our bills on a timely basis, but that was not an

11  issue at the date of this meeting.  We had adequate

12  liquidity to pay our bills at this time.

13      MR. OSNATO:  I'm done with that document.

14  I'm going to mark as Exhibit 207 a document

15  bearing Bates range MNAT 006776 through 77 and

16  it is the minutes of the meeting of the board of

17  directors held Monday, July 29th, 2002.

18      (Exhibit Number 207 was marked for

19  identification.)

20      Q.  (By Mr. Osnato)  I'm going to first direct

21  your attention, sir, to the final paragraph on page

22  -- the first page of this document.

23      A.  Yes.

24      Q.  Okay.  There's a reference in this

25  paragraph to discussions being had with Credit Suisse

158

1  First Boston about retaining that firm as a financial

2  advisor.  Do you recall having those discussions with

3  Credit Suisse?

4      A.  I recall talking to Piachra and Piachra

5  came down and we had dinner one night somewhere

6  around this time frame, probably before this meeting,

7  and talking with him about potentially retaining

8  First Boston as our financial advisor.

9      Q.  There's a reference in this paragraph to

10  consideration being given to other potential

11  advisors.  Do you know if, in fact, other financial

12  institutions were considered for this role?

13      A.  Other financial -- other institutions were

14  discussed internally among management as well as the

15  board as well as with one other former outside

16  director, but I don't think any discussions were

17  actually had with any of the other potential

18  financial institutions directly.

19      Q.  Do you remember the names of the other

20  institutions under at least preliminary

21  consideration?

22      A.  I do not at this time.

23      Q.  Were you of the view as of July 2002 that

24  Oakwood should immediately file for chapter 11

25  protection?

159

1      A.  I wasn't of the view that we should

2  immediately file for chapter 11 protection because we

3  weren't prepared to file for chapter 11 protection.

4  I was of the view that we should get prepared as

5  quickly as we could so that we could file.

6      Q.  Am I correct that part of the preparation

7  you're referring to would be the retention of counsel

8  in Delaware?

9      A.  That would be part of it, yes.

10      Q.  And what else am I leaving out?

11      A.  Well, I think you're leaving a lot of it

12  out.  First of all, you'd have to prepare all the

13  documentation.  You'd have to prepare all the

14  schedules.  You'd have to do what you could do to

15  make sure that you had financing in place.

16      You need to have a PR strategy to deal

17  with the filing.  You need to make certain

18  institutions who you would need on an ongoing basis

19  aware of what you were doing.  There were a number of

20  steps that needed to be taken prior to a filing.

21      Q.  Okay.  If I could please direct your

22  attention to the first paragraph on the second page

23  of this document?

24      A.  Okay.

25      Q.  Who at this point in time sat on the

160

1  executive committee at the board?

2      A.  I don't recall.

3      Q.  Do you see the reference to the executive

4  committee being assigned a task of developing a list

5  of alternative strategies to deal with the financial

6  issues facing the company?

7      A.  I see the words.

8      Q.  Did that, in fact, happen?

9      A.  I'm sure it happened in some form, but I

10  can't say for sure what actually was the result of

11  it.

12      Q.  Okay.  The final sentence indicates that a

13  preliminary action plan was to be delivered by

14  August 19th.  Do you recall if such a plan was

15  prepared?

16      A.  I don't recall a preliminary action plan.

17      Q.  You don't recall having any role in

18  preparing such a plan?

19      A.  A lot of things were happening at that

20  time, but I don't recall preparing anything other

21  than -- I can recall First Boston preparing some

22  alternative plans, but I cannot personally recall

23  preparing any plan other than a chapter 11 filing.

24      Q.  I take it at some point in time Credit

25  Suisse was formally retained to be a financial

161

| | |
|---|---|
| 1   advisor to Oakwood in 2002; is that right? | 1   have allowed us to exchange equity for some of these |
| 2       A.    I believe that's correct. | 2   bonds.  I think that the amount was $75,000 a month |
| 3       Q.    Did you make that decision? | 3   that we could do based upon the securities law |
| 4       A.    I made that decision along with the board. | 4   exemption. |
| 5       Q.    So the board ultimately had responsibility | 5        I didn't understand why we got those |
| 6   for approving that retention? | 6   materials because to me they were more of a nuisance, |
| 7       A.    I believe that's correct. | 7   and they were an embarrassment to sit in front of the |
| 8       Q.    Okay.  Were you responsible for | 8   board and have Jared discuss these items that really |
| 9   negotiating the terms of that engagement? | 9   had no relevance to our current condition. |
| 10      A.    Ultimately, yes. | 10       I do recall at one point in time calling |
| 11      Q.    Were you responsible for negotiating the | 11   Fiachra and asking Fiachra whether Jared was the |
| 12   fees to be paid to Credit Suisse under that | 12   right person to be involved in this because it seemed |
| 13   agreement? | 13   that what we were getting from CSFB from their |
| 14      A.    Ultimately, yes. | 14   restructuring group was academic presentations that |
| 15      Q.    Okay.  Who did you negotiate with at | 15   really had no relevance to what our existing |
| 16   Credit Suisse? | 16   condition was. |
| 17      A.    I think most of the negotiations actually | 17      Q.    Did you express that view to Mr. Felt |
| 18   went through our lawyers rather than management | 18   directly? |
| 19   getting into an adversarial relationship with Credit | 19      A.    I may have, but I don't recall. |
| 20   Suisse. | 20      Q.    And do you recall what, if anything, Mr. |
| 21      Q.    And what law firm would have represented | 21   O'Driscoll said in response to your concerns? |
| 22   Oakwood in those negotiations, if you know? | 22      A.    Fiachra assured me that he had worked with |
| 23      A.    I believe it would have been Rick Rayburn. | 23   Jared before.  He said that Jared was very tenacious. |
| 24   I can't recall the name of his firm right now. | 24   I don't think that he disagreed with what I said as |
| 25      Q.    What did you as CEO understand Credit | 25   far as the academic nature of the materials that |

| | |
|---|---|
| 1   Suisse's role to be as financial advisor to the | 1   Jared was preparing, but he said that Jared was very |
| 2   company in August 2002? | 2   tenacious, he was very competitive, and he said that |
| 3       A.    Well, I understood their role to be | 3   he thought that Jared was the appropriate person. |
| 4   primarily to prepare us for a bankruptcy filing to | 4       Q.    Based on your own observations of Mr. |
| 5   avoid -- to do whatever they could to avoid a free | 5   Felt, did you share a view that he was tenacious and |
| 6   fall bankruptcy, to move it as close as possible to a | 6   competitive? |
| 7   prepackaged bankruptcy versus a free fall bankruptcy. | 7       A.    I never saw that.  Well, I take that back. |
| 8        I know that they took it as their role to | 8   After the filing he certainly hung in there and tried |
| 9   provide alternate avenues as well, but my view of | 9   to do some things in connection with the DIP, but I |
| 10   their role was to prepare us for the filing, to do | 10   certainly never saw anything before then. |
| 11   what they could as far as providing investor consent | 11      Q.    Do you recall -- strike that.  I believe |
| 12   or approval prior to the filing as well as to do what | 12   you testified earlier that Mr. Felt was assisted by |
| 13   they could to put our financing sources in place. | 13   Peter Landon? |
| 14      Q.    So I take it that at least as of | 14      A.    Yes. |
| 15   August 2002 in your mind it was a foregone conclusion | 15      Q.    And Beth May? |
| 16   that Oakwood was going to file for chapter 11? | 16      A.    Beth May was in a separate department of |
| 17      A.    Yes. | 17   CSFB.  She was in the mergers and acquisition group. |
| 18      Q.    And is it your testimony that Credit | 18      Q.    And why if you know did she become |
| 19   Suisse was nonetheless retained to look at options | 19   involved in working with Oakwood? |
| 20   other than bankruptcy? | 20      A.    We had a -- she may have been tangentially |
| 21      A.    We continued to receive reports from | 21   involved before.  She had a background in housing, |
| 22   Credit Suisse, which were given to the board, were | 22   although not in manufactured housing.  I think I may |
| 23   given to management, showing other alternatives such | 23   have met her one time when I was at CSFB, but she |
| 24   as the bond buy-back program, such as the · there | 24   became involved more specifically after we had a |
| 25   was some exchange idea in their materials which would | 25   meeting in October with Berkshire Hathaway. |

1    And Berkshire Hathaway said that they
2  wanted to shop the company before they made a
3  decision as to whether to support the company's
4  reorganization plan, and she was involved in that
5  process of shopping the company.
6    Q.    Uh-huh.  I may have asked this already, so
7  if I have, forgive me.  Were you involved in
8  negotiating the terms of the letter agreement that
9  memorialized the financial services agreement between
10  Credit Suisse and Oakwood?
11    A.    I certainly reviewed it.  I certainly made
12  some comments on it, but as I said before, I think
13  the bulk of those discussions between Oakwood and
14  CSFB went through Rick Rayburn.
15    Q.    Uh-huh.  Did you express to Mr. Rayburn
16  your view that Credit Suisse should be retained for
17  the purposes of preparing Oakwood for filing?
18    MR. CASTANARES:  Counsel, I don't know how
19  far you intend to go with this.
20    MR. OSNATO:  Not very.  It's a yes or no.
21    MR. CASTANARES:  Because you're really
22  just asking him what he told counsel in terms of
23  seeking advice as far as I can see.
24    MR. OSNATO:  That's not my intent at all.
25    MR. CASTANARES:  Why don't you clarify

166

1  prepare Oakwood for chapter 11 filing?
2    A.    I do not recall one way or the other.
3    MR. OSNATO:  Okay.  Proof of claim.
4    MR. MORGAN:  Fifty-one A.
5    MR. OSNATO:  Thank you.  I'm not going to
6  mark this.
7    MR. CASTANARES:  Yeah.  I think we can
8  agree that this has already been marked in the
9  Felt deposition.  I don't remember the exhibit
10  number, but --
11    MR. OSNATO:  That's fine.
12    MR. CASTANARES:  -- but if we'll just put
13  on the record that this is the proof of claim
14  filed in the Oakwood Homes Corporation, then we
15  can cross-reference it to the number already
16  marked.
17    MR. OSNATO:  Uh-huh.
18    MR. CASTANARES:  Great.
19    Q.    (By Mr. Osnato)  Mr. Standish, if you flip
20  through to approximately the sixth page in, and I see
21  you have it already --
22    A.    Uh-huh.
23    Q.    -- is this as far as you know the contract
24  that was signed as between Oakwood and Credit Suisse
25  for financial advisory services?

168

1  your question then if you'd be so kind?  I've
2  got a problem with it as far as attorney-client
3  privilege is concerned.  I don't want to
4  interpose an objection unnecessarily, but I
5  think as it's phrased it asks for privileged
6  communications.
7    MR. OSNATO:  That's not my intent.
8    Q.    (By Mr. Osnato)  Mr. Standish, I believe,
9  and tell me if I'm wrong, that you testified that you
10  believe Credit Suisse was retained to help prepare
11  the company for bankruptcy filing; is that correct?
12    A.    Yes.
13    Q.    And did you convey that sentiment to Mr.
14  Rayburn?
15    MR. CASTANARES:  I'll let him answer that
16  question if you'll agree that I'm not waiving a
17  privilege or any greater privilege than just
18  simply this question.
19    MR. OSNATO:  Fair enough.
20    MR. CASTANARES:  Fair enough.
21    THE WITNESS:  Yes.
22    Q.    (By Mr. Osnato)  And do you know if the
23  letter agreement that was ultimately put in place
24  between Credit Suisse and Oakwood limited Credit
25  Suisse's role to being one -- confined it to helping

167

1    A.    It certainly looks like it.
2    Q.    Okay.  If I could direct your attention to
3  part two --
4    A.    Uh-huh.
5    Q.    -- titled retention?
6    A.    Uh-huh.
7    Q.    Do you see that section?
8    A.    I do.
9    Q.    Okay.  Do you see in part A where it says
10  assist the company in its evaluation of certain
11  strategic alternatives, their feasibility and
12  possible means of execution?
13    A.    I do.
14    Q.    Do you see that?  Did you view that --
15  strike that.  In your view did Credit Suisse do the
16  acts outlined in 2(a)?
17    A.    They did not.
18    Q.    And what -- tell me why you conclude they
19  do not -- they did not?
20    A.    Well, they put forward a menu of strategic
21  alternatives.  They failed to grasp as best I could
22  tell that all of the alternatives other than one that
23  they were putting forward in their menu were not
24  feasible.  This says that they're supposed to
25  evaluate their feasibility and to me suggesting that

169

1  we're going to go out and we're going to buy in $125
2  million of bonds at a time when we don't have any
3  liquidity is -- does not comply with what this says.
4     Q.   Do you remember at what point in time you
5  expressed your concerns about Mr. Felt's performance
6  to Mr. O'Driscoll?
7     A.   I do not recall, but it would have been in
8  the August, September time frame.
9     MR. CASTANARES:  Are we done with this
10    one?
11    MR. OSNATO:  I am, yes.  Thank you.  Okay.
12    I'm going to mark as 208 a document bearing the
13    Bates range MNAT-006731 through 6775.  It's a
14    document entitled Oakwood Homes Corporation,
15    presentation to the board of directors,
16    August 19th, 2002.
17       (Exhibit Number 208 was marked for
18       identification.)
19    Q.   (By Mr. Osnato)  Okay.  This is clearly a
20  lengthy document and I am not going to ask you about
21  every slide.
22    A.   Good.
23    Q.   Do you recall attending a presentation by
24  Credit Suisse to the Oakwood board of directors on or
25  about August 19th?

170

1     A.   Well, there were several presentations.  I
2  don't recall specifically which one this was.
3     Q.   If we could go to page three, please,
4  which bears a Bates range of 6734?
5     A.   Uh-huh.
6     Q.   If you look towards the bottom of the
7  page, there's a sentence that begins despite these
8  conditions?
9     A.   Uh-huh.
10    Q.   Do you see that sentence?
11    A.   I do.
12    Q.   It indicates that a spectrum of
13  alternatives are available to Oakwood including
14  potential sale of the company.  Did you agree with
15  that statement at the time it was made?
16    A.   I didn't make this statement.
17    Q.   I'm asking if you agreed with it?
18    A.   No.
19    Q.   Okay.  And why not?
20    A.   Because I think that at this point in time
21  it was very clear to me that we had the alternative
22  of a chapter 11 filing or a sale of the company.  And
23  even a sale of the company would have required a
24  chapter 11 filing because no one would have bought
25  the company without minimizing the liabilities

171

1  through the credit arm of the company.
2     Q.   Uh-huh.
3     A.   So in my -- in my mind there was no
4  spectrum of restructuring alternatives.  There was
5  either a reorganization inside bankruptcy or a sale
6  inside bankruptcy.
7     Q.   Would I be -- would I be correct in
8  assuming that -- strike that.  You testified that you
9  don't specifically recall receiving this presentation
10  from Credit Suisse?
11    A.   Oh, I recall receiving this presentation.
12  What I said was there were a number of presentations
13  and you said this presentation on August 19 --
14    Q.   Uh-huh.
15    A.   -- and I wasn't aware of which
16  presentation this was.
17    Q.   If you'd turn to page Bates range 6739,
18  please --
19    A.   Yes.
20    Q.   -- captioned decision factors?
21    A.   Yes.
22    Q.   Do you see at the top where it says the
23  restructuring timing and path Oakwood chooses should
24  be influenced by its degree of optimism or pessimism,
25  the ability of the company to grow into its capital

172

1  structure before running out of liquidity?
2     A.   I see the words.
3     Q.   Where on that spectrum did you fall?  Were
4  you optimistic or pessimistic?
5     A.   Well, they're the ones that came up with
6  this spectrum.
7     Q.   Uh-huh.
8     A.   Optimistic at this point in time to me was
9  a dream world.  Pessimistic, what they have here as
10  pessimistic was reality.
11    Q.   Did you tell anyone from Credit Suisse
12  that you disagreed that there was the remote chance
13  of an optimistic outcome?
14    A.   I believe I did.
15    Q.   Did you tell them in August 2002?
16    A.   I believe I did.
17    Q.   Did you tell them to stop pursuing any
18  lines of work other than preparing for a chapter 11
19  filing?
20    A.   I don't recall saying that in those words,
21  no.
22    Q.   Who do you remember having these
23  discussions with apart from Mr. O'Driscoll?
24    A.   I think I had discussions with Jared that
25  this -- this didn't really reflect our reality, that

173

1  where we were headed was a chapter 11 filing.

2      Q.    Do you recall his response?

3      A.    I do not.

4      Q.    At some point in time did Berkshire

5  Hathaway inform Oakwood that it wanted the

6  possibility of a sale explored?

7      A.    Yes.  I think I stated that earlier.

8      Q.    Do you recall the time frame when that

9  information was conveyed?

10     A.    It was the middle of October 2002.

11     Q.    And what was your reaction to hearing

12 that?

13     A.    I thought that I disagreed with that, but

14 when your largest stakeholder tells you to explore

15 the possibility, I felt it was prudent to go ahead

16 and explore the possibility and authorize First

17 Boston to do that.

18     Q.    And so did you, in fact, authorize First

19 Boston to pursue a possible sale?

20     A.    I did.

21     Q.    And did they, in fact, conduct work in

22 that regard?

23     A.    They did.

24     Q.    Do you recall what they did?

25     A.    I recall that there was a booklet prepared

174

---

1  with information about the company.

2      Q.    Uh-huh.

3      A.    There were -- it was sent out in two

4  different forms, I believe, one form to venture

5  capital firms and one form to competitors.  The form

6  going to our competitors had less information in it

7  than the other did.

8          And I can recall that they asked for

9  indications of interest and a range of potential

10 values for a sale, the premise being that the sale

11 would take place inside of bankruptcy after a series

12 of enumerated actions had taken place inside the

13 bankruptcy.

14     Q.    If you could please turn to page 674?

15     A.    Yes.

16     Q.    And would you agree with me that this

17 slide discusses various factors relevant to a

18 possible sale or business combination of Oakwood?

19     A.    That's what it appears to discuss.

20     Q.    If you go down to the middle of the page

21 there's a bullet that begins however, sophisticated

22 financial buyers may be able to recognize the

23 inherent value in Oakwood and be attracted to a

24 discounted valuation?  Do you see that?

25     A.    I see that.

175

---

1      Q.    Do you agree with that statement?

2      A.    Not outside of bankruptcy, I don't.

3      Q.    Okay.  So in your view the only way to

4  achieve a sale would be to put Oakwood through the

5  bankruptcy process?

6      A.    Yes.

7      Q.    Did you communicate that view to Berkshire

8  Hathaway?

9      A.    I think all of the discussions of sale as

10 I mentioned that involved Berkshire Hathaway and all

11 of the work that First Boston ultimately did with

12 respect to a sale transaction assumed that the sale

13 would take place inside of bankruptcy after taking

14 certain actions such as flipping the servicer fee to

15 a senior basis and other contemplated actions had

16 already taken place.

17     Q.    There's a reference in the bullet point I

18 just read to discounted valuation of Oakwood.  Do you

19 see that?

20     A.    Yes.

21     Q.    Do you have an understanding of what that

22 means?

23     A.    The way I would read this is the fact that

24 the stock was selling at such a low price, but it

25 could relate to the bonds being at a low price.  I do

176

---

1  not know.

2      Q.    Okay.  Did you think that Berkshire's

3  request that a possible sale be explored was a

4  distraction to the company in its preparation for

5  filing?

6      A.    Yes.

7      Q.    And was that because resources were

8  diverted to explore that possibility at the expense

9  of preparing for the filing?

10     A.    There were certainly resources diverted.

11 The -- it was -- but the resources diverted putting

12 the book together were really fairly minimal.  As I

13 recall it was -- I guess what caused me to look at it

14 as a distraction was that whatever we were going to

15 get prior to our filing was -- was going to be just

16 some indications of interest and ranges of values

17 that had no binding impact.

18          So all of that to me to the extent

19 Berkshire wanted it done could have been done after

20 we filed for bankruptcy rather than before, but I

21 don't think that the time that it took to put the

22 book together, most of that was done I believe by

23 First Boston with input from the company.  I don't

24 think that that significantly interfered in our

25 preparation.

177

Q.   As of this time period, which is to say
August of 2002, what was your view as to the best way
forward for Oakwood?

MR. CASTANARES:  I'm sorry.  I didn't hear
the question.  As to the best --

MR. OSNATO:  The best way forward for
Oakwood.

MR. CASTANARES:  Okay.

THE WITNESS:  My view of the best way
forward for Oakwood was to move forward with the
bankruptcy filing, to go through as quick a
reorganization process as we could in
bankruptcy, to emerge out of bankruptcy and then
having emerged from bankruptcy, the stakeholders
could decide whether or not it made sense for
the company to continue as a stand alone company
or to sell the company.

I thought the -- I thought that maximizing
value would occur -- that the maximum value in a
sale would have occurred after we emerged from
bankruptcy rather than inside of bankruptcy.

Q.   (By Mr. Osnato)  And do you think that the
board shared those views as of August 2002?

A.   I think the board realized that we were
most probably heading toward a bankruptcy filing.  I

178

think that the board in their -- in the exercise of
their fiduciary duty was not really focused on that
issue but was focused on what their fiduciary duty in
North Carolina was, and that was to preserve as much
value as they could for the Oakwood common equity
holders.

MR. OSNATO:  Let's take a ten-minute break
if we could.

THE VIDEOGRAPHER:  We're off the record at
2:41.

(A recess was taken.)

THE VIDEOGRAPHER:  This is tape number
five.  We're on the record at 2:48.

MR. OSNATO:  I'd like to mark as
Exhibit 209, please, a document with the Bates
range MNAT-006729 through 6730, minutes of the
board of directors dated August 19th, 2002.
There you go.

THE WITNESS:  Uh-huh.

(Exhibit Number 209 was marked for
identification.)

Q.   (By Mr. Osnato)  Sir, I'm going to ask you
in particular about some items on the second page of
this document.

A.   Okay.

179

Q.   Okay.  First of all, there's a reference
on the first page to you being in attendance.  Do you
recall attending a meeting on August 19th, 2002?

A.   Not specifically, but I'm sure I did.

Q.   Okay.  Fair enough.  If you look at the
second page, please, the paragraph that begins Mr.
Felt and Ms. May --

A.   Uh-huh.

Q.   -- do you see that paragraph?  There's a
reference to Credit Suisse providing the board with a
presentation?

A.   Uh-huh.

Q.   Do you understand that presentation to
have been the exhibit we just looked at, i.e.,
Exhibit 208?

A.   I believe it was.

Q.   Okay.  The following paragraph indicates
that there was an extension of -- excuse me --
extensive discussion following the presentation.  Do
you recall that discussion?

A.   Not specifically, no.

Q.   I believe you testified earlier that your
view was that the various options and ranges of
options put forward by Credit Suisse in Exhibit 208
were in essence wishful thinking; is that right?

180

A.   A number of them, yes.

Q.   Okay.  Were some of them in your view
viable?

A.   I told you what I felt in my view was
viable.

Q.   Well, could you please read the paragraph
that begins further discussion ensued among the
directors and management?

A.   Yes.

Q.   Okay.  There's a reference in that
paragraph to the board directing management to study
and explore each of the alternative courses of action
set forth in the CSFB presentation including a
comprehensive restructuring of the corporation's
financial obligations with a view towards bringing to
the board a recommended course of action at the
earliest possible date.  Do you see that?

A.   I see that.

Q.   Did you disagree with the board's
instruction that all of the options set forth in the
Credit Suisse presentation be studied?

A.   Well, it doesn't -- this just says to
study the options.  I did a quick study of some of
the options.  They weren't feasible.

Q.   Did you report that back to the board?

181

1    A.    Well, yes.  I did.  I mean, let's look at
2  the report if I can.
3    Q.    Uh-huh.
4    A.    And let's -- you know, one of the options
5  that we're presented with on page ten, section
6  3(a)(9) exchanges, privately negotiate run off debt
7  for equity exchanges under section 3(a)(9).  Next
8  bullet, you know, I could do that for less than
9  $100,000 a month.  It doesn't take me long to study
10  that option to tell me this does nothing for the
11  company.  So yes, I studied it as much as it needed
12  to be studied.
13    Q.    Do you recall at some point in time
14  bringing to the board a recommended course of action?
15    A.    I believe I did.
16    Q.    And do you remember when that was?
17    A.    I do not.
18    Q.    And what was the course of action?
19    A.    To file for a chapter 11 reorganization.
20    Q.    And do you recall if any of the board
21  members disagreed with that recommendation?
22    A.    I do not think there was any disagreement.
23    Q.    And were you assisted by Credit Suisse in
24  formulating that recommendation?
25    A.    Credit Suisse helped to move forward with

182

1  a filing in the best way possible, in particular in
2  discussions with Mr. Buffett, but I don't think they
3  disagreed with my conclusion that a filing was the
4  right way to go forward.
5        They did at several times disagree with a
6  filing as early as we filed.  I think one time in
7  October and one time a week before we filed they
8  expressed disagreement and suggested that we extend
9  the filing to a later time, but I don't -- I don't
10  recall them disagreeing with filing.
11    Q.    As far as you know was the August 19th
12  presentation we've been looking at the first formal
13  presentation made by Credit Suisse after it was
14  retained as financial advisor?
15        MR. CASTANARES:  Object to the form of the
16  question.
17        THE WITNESS:  I believe it was.  I think
18  they were retained on August 19th and this was
19  made on August 19th.
20    Q.    (By Mr. Osnato)  And do you think that it
21  was sensible for the board of Oakwood to be presented
22  with the full range of options available to it under
23  the circumstances?
24    A.    To the extent they were options.
25    Q    Do you know if Credit Suisse actually

183

1  undertook any work on the section 3(a)(19) proposal
2  you identified a moment ago?
3    A.    I think I said 3(a)(9).
4    Q.    3(a)(9).  Excuse me.  Did Credit Suisse
5  devote any resources to pursuing that proposal apart
6  from what's reflected on these slides?
7    A.    I do not know.
8    Q.    But you don't recall any further
9  discussions on that topic; do you?
10    A.    It was a topic that they had presented to
11  us a year before and I told them that it was of no
12  value to us.
13    Q.    Okay.
14    A.    I don't know that they did anything else.
15  They certainly re-presented it.
16    Q.    Let's talk about Berkshire Hathaway again.
17  Do you recall meeting in Omaha in the period roughly
18  preceding the bankruptcy filing?
19    A.    Sometime in the middle of October, yes.
20    Q.    And did you attend that meeting?
21    A.    I did.
22    Q.    Who else from Oakwood attended?
23    A.    Doug Muir and Suzanne Wood.
24    Q.    And did anyone from Credit Suisse attend?
25    A.    Yes.

184

1    Q.    Who attended?
2    A.    Fiachra, Jared and I believe Tom Connor
3  was there.
4    Q.    Okay.  What was the purpose of the
5  meeting?
6    A    To discuss the potential filing.
7    Q.    Did Berkshire Hathaway request the
8  meeting?
9    A.    I believe we requested the meeting.
10    Q.    And why did you request the meeting?
11    A.    To try to elicit their support.
12    Q.    Support for what?
13    A.    For our plan of reorganization.
14    Q.    At that point in time am I right that
15  Berkshire held a substantial position in REMIC
16  securities as well as public bonds?
17    A.    They did.
18    Q.    Tell me what you remember about that
19  meeting?
20    A.    I remember that we presented the plan to
21  them, what we sought to accomplish.  There was a lot
22  of discussion about moving the entire servicing fee
23  senior, and I believe they requested different
24  iterations with different levels of senior servicing
25  fees.  We discussed whether the underlying business

185

1  was a viable business, and those are generally the
2  topics that I can recall.
3      Q.    I take it Mr. Millard and Mr. Buffett --
4      A.    Excuse me.  We -- that was also the
5  meeting where they requested that we pursue a sale of
6  the company as well.
7      Q.    When you say they, are you referring in
8  particular to Mr. Millard and Mr. Buffett?
9      A.    Mr. Buffett.
10     Q.    So it was Mr. Buffett who specifically
11 directed -- strike that.  Was it Mr. Buffett who
12 indicated his view that the company should pursue a
13 sale?
14     A.    He indicated that he would like to have a
15 sale pursued to see what type of range of values
16 could be achieved from a sale as opposed to a stand
17 alone so that he would have -- he would have the
18 information of the value of the company on a stand
19 alone basis versus a sale.  Again, when we were
20 talking about pursuing a sale he was looking for
21 indications of interest, but the sale would take
22 place in bankruptcy.
23     Q.    Uh-huh.  And I take it that Oakwood did,
24 in fact, carry out those analyses at the request of
25 Mr. Buffett?

186

21/09/2006 STANDISH, Myles

1      A.    As I mentioned before, Oakwood provided
2  information to First Boston for First Boston to put a
3  book together to send out to potential purchasers.
4  First Boston then contacted potential purchasers,
5  sent a book out to the interested purchasers and
6  received several indications of interest and ranges
7  of values.
8      Q.    Do you recall if any of those indications
9  of interest were substantial enough for Oakwood to
10 pursue them in any way?
11     A.    They were not.
12     Q.    Okay.  What was the mood like at this
13 meeting in Omaha?
14     A.    Overall it was a pretty good -- pretty
15 good mood.  I think that in that meeting, unlike the
16 earlier meeting, that Buffett had what I would call
17 his game face on and he was clearly rather than in a
18 listening mode and an understanding mode, he was more
19 in a negotiating mode.
20     Q.    At that point in time did you have the
21 view that Oakwood needed the support of Berkshire
22 Hathaway before it was to file for bankruptcy?
23     A.    I thought it would be helpful to the  - to
24 the filing.  I didn't think that it was necessary to
25 the filing.

187

1      Q.    Earlier you mentioned that one of the
2  purposes of the meeting was for Oakwood to present
3  its plan to Berkshire?
4      A.    Yes.
5      Q.    What did you mean by the reference to
6  plan?
7      A.    I think the presentation materials
8  contained a number of items.  The plan would be an
9  outline of our plan of reorganization, which included
10 what we called our rationalization plan of closing
11 five manufacturing plants and a hundred or so sales
12 centers.
13          It also included flipping the servicing
14 fee to a hundred basis points senior rather than
15 subordinate.  It called for essentially converting
16 all debt to equity and there were probably a number
17 of other items in there as well.
18          MR. OSNATO:  Okay.  We're going to mark as
19 Exhibit 210, please, a document bearing Bates
20 range CSFB-00063112 through 63135.  This is a
21 presentation dated October 15th, 2002 titled
22 presentation to Lotus.
23          (Exhibit Number 210 was marked for
24 identification.)
25     Q.    (By Mr. Osnato)  Is this the presentation

188

21/09/2006 STANDISH, Myles

1  that was made at the meeting we've been discussing?
2      A.    This appears to be.
3      Q.    Do you know who prepared these materials?
4      A.    CSFB.
5      Q.    Do you remember reviewing them before they
6  were presented to Berkshire Hathaway?
7      A.    I do not recall reviewing them, but I'm
8  sure that I did.
9      Q.    Okay.  If you could please turn to Bates
10 range 63123, which is page nine of the presentation?
11     A.    Yes.
12     Q.    There's a reference to a rationalization
13 plan?
14     A.    Yes.
15     Q.    Is this what you've described as Oakwood's
16 plan to restructure the company following bankruptcy?
17     A.    From an operational -- following a filing
18 of bankruptcy from an operational standpoint, yes.
19     Q.    Was this plan, in fact, put in place?
20     A.    Yes.  It was.
21     Q.    Was it successful?
22     A.    I believe it was.
23     Q.    Did this plan in your view -- strike that.
24 Was the success of this plan a factor in the
25 company's ultimate acquisition by Clayton?

189

1    A.    I believe that it was.  The acquisition by
2    Clayton took place at a much higher number than what
3    they had previously indicated.
4        Q.    At this point in time, which is to say
5    October 2002, do you know if Clayton was yet part of
6    the Berkshire Hathaway family of companies?
7        A.    They were not.
8        Q.    If you could, please, turn to page 63132,
9    which is page 17 of the presentation?
10       A.    Yes.
11       Q.    Okay.  In particular, the sentence that
12   reads we would like to work with Lotus to accomplish
13   the following.
14       A.    Yes.
15       Q.    What was Lotus's reaction to these
16   proposals?
17       A.    They did not like moving the servicing fee
18   up to a hundred basis points, which is what this
19   first bullet is referring to, because it would
20   decrease the cash that they would get from the Lotus
21   transaction.
22       Q.    Do you remember whose idea it was to
23   change the priority of the servicing fees?  Did
24   Credit Suisse develop that idea?
25       A.    I don't recall who first brought up the

---

190

---

1    servicing fees.  The servicing fees were one of the
2    structural problems that Oakwood had.  It could have
3    been anybody who brought it up, but the problem was
4    an obvious one.
5        Q.    As of the date of this presentation, which
6    is October 2002, do you think that Credit Suisse was
7    appropriately focused on its task as financial
8    advisor to Oakwood?
9        A.    I think that they were appropriately
10   focused on trying to obtain Berkshire Hathaway's
11   consent.  I don't think that they were appropriately
12   focused on making sure that we had the necessary
13   credit facilities in place as we moved forward with a
14   bankruptcy filing.
15       Q.    Are you referring in particular to DIP
16   financing?
17       A.    DIP financing as well as warehouse
18   financing.
19       Q.    Okay.  But focusing only now on the
20   Berkshire Hathaway piece, are you satisfied that
21   Credit Suisse did a good job of representing
22   Oakwood's interests?
23       A.    Well, you asked me before whether they
24   were appropriately focused and I said I thought they
25   were appropriately focused on this part of their

---

191

---

1    task.  Whether they did a good job or not, I
2    disagreed with some of the things that had been done
3    to this document, particularly with respect to the
4    projections that were included in this document.
5        The initial projections that we had in
6    this document showed significantly more profitability
7    under this plan.  I was strongly advised by First
8    Boston to cut back those estimates, which we
9    ultimately did.
10       I think the advice from First Boston was
11   to -- that it wasn't in so many words, but it was
12   basically to say that you better be a hundred percent
13   sure that you can meet these projections because you
14   don't want to be in the position of coming out of
15   bankruptcy and disappointing Berkshire Hathaway.
16       So the projections were cut back
17   significantly and I think that they were cut back to
18   the extent that it made Berkshire Hathaway feel as
19   though this was a company that was doomed to failure
20   even under a reorganization.
21       Q.    So your view is that the Credit Suisse
22   projections were too conservative?
23       A.    Well, ultimately they were Oakwood's
24   projections.  I wouldn't say that they were Credit
25   Suisse's projections, but I was uncertain to their

---

192

---

1    advice -- as to the wisdom of their advice at the
2    time to cut back the projections as dramatically as
3    we did.  However, I thought they had more expertise
4    in this matter than I did, so we did as they
5    suggested and I think that    that that was a
6    mistake.
7        Q.    A mistake because it led Berkshire
8    Hathaway to conclude that there was little upside in
9    Oakwood post reorganization?
10       A.    Yes.
11       MR. OSNATO:  I'm going to mark as
12   Exhibit 211 a document bearing Bates range
13   CSFB-00035137 through 142.  It's an E mail dated
14   October 17th, 2002.
15       (Exhibit Number 211 was marked for
16   identification.)
17       Q.    (By Mr. Osnato)  I'm going to ask you a
18   series of questions about this document, so I
19   encourage you to read it.
20       A.    Are these both the same document?
21       Q.    They appear to me to be the same.  One
22   appears to be a word version of the E mail, but I
23   can't say that every word is the same.  I don't know
24   that to be a fact.
25       A.    Do you want me to read both of them?

---

193

1   MR. OSNATO:  I'd like you to read the E

2   mail, please.

3       THE WITNESS:  Okay.

4       MR. CASTANARES:  I think it should be

5   pointed out to the witness that the Bates range

6   indicates these are produced by CSFB.

7       MR. OSNATO:  Uh-huh.

8       THE WITNESS:  Okay.

9   Q.   (By Mr. Osnato)  Okay.  Do you recall

10  preparing this E mail?

11  A.   I do.

12  Q.   Do you know if this E mail was eventually

13  sent in some form to Berkshire Hathaway?

14  A.   I believe it was not.

15  Q.   Do you know why it was not?

16  A.   I was advised by First Boston that this

17  would simply appear to be arguing with Buffett and

18  not being receptive to his desire to seek a sale of

19  the company.

20  Q.   Did you come to agree with that assessment

21  by Credit Suisse?

22  A.   I took their advice as the company's

23  financial advisor, but I did not agree with the

24  advice.

25  Q.   There's a reference in the first paragraph

---

1   A.   I think that that's a paraphrase of what

2   Buffett said, yes.

3   Q.   Did he explain the reasoning behind that

4   sentiment in the meeting?

5   A.   No.  I think that what he did was he

6   looked at the back page which had the projections and

7   saw that we were projecting losing money the first

8   two quarters and then making what was a rather

9   nominal amount of money in his mind and came to that

10  conclusion.

11  Q.   If you'd turn, please, to the next page,

12  Bates range 35138, the first full paragraph --

13  A.   Yes.

14  Q.   -- begins I think I did Oakwood a

15  disservice in the projections I provided you.

16  A.   Yes.

17  Q.   Are you here referring to the conservative

18  assumptions that were ultimately included in the

19  presentation?

20  A.   I was.

21  Q.   Did Oakwood ultimately furnish Berkshire

22  Hathaway with a revised set of assumptions and

23  projections?

24  A.   Not that I can recall.  I think I was

25  advised not to by CSFB.

---

21/09/2006 STANDISH, Myles

1   to Berkshire Hathaway's desire to have Oakwood pursue

2   a sale of the company.  And again to be clear, were

3   the discussions of the sale focused on a sale after

4   the bankruptcy filing?

5   A.   Yes.

6   Q.   There was no discussion of a sale before

7   any filing could take place?

8   A.   I don't believe so, no.

9   Q.   And so do you know if the indications of

10  interest that Credit Suisse received from potential

11  buyers factored in a chapter 11 filing?

12  A.   I think in the presentation materials that

13  Credit Suisse sent out there they specifically said

14  that they were seeking valuations based on certain

15  actions that would take place in the bankruptcy

16  context including flipping the servicer fee senior.

17  Q.   If you turn, please, to the second

18  paragraph, there's a reference in the second sentence

19  to Berkshire Hathaway's opinion that this is, quote,

20  simply a bad business losing value daily.  Was that

21  if you recall an exact quote of something that was

22  said at the meeting?

23  A.   You're looking at the third paragraph?

24  Q.   I'm sorry.  You're right.  The third

25  paragraph.

---

21/09/2006 STANDISH, Myles

1   Q.   If you'd turn, please, to the next

2   paragraph?  In particular I'm referring to --

3   A.   Now, let me -- before you go on, let me --

4   Q.   Uh-huh.

5   A.   -- expand on my answer.

6   Q.   Please.

7   A.   Buffett would have gotten and Berkshire

8   Hathaway would have gotten different projections in

9   connection with their ultimate financing of part of

10  the DIP as well as through projections given to the

11  creditor's committee; but as far as giving -- I do

12  not recall giving specifically to Berkshire Hathaway

13  different projections, but they would have gotten

14  those projections through the case.

15  Q.   Uh-huh, okay.  If you could please go to

16  the paragraph that begins although my viewpoint is

17  undoubtedly biased?

18  A.   Yes.

19  Q.   Do you see that?  Please tell me when

20  you're finished reading it.

21  A.   Yes.

22  Q.   You write that we, Oakwood, have, quote,

23  corrected a number of internal problems, end quote.

24  What were the problems you were referring to?

25  A.   Well, we had corrected our underwriting

1  issues. We now had a retail sales operation that was
2  capable of operating profitably in a world that
3  wasn't based on loose credit. We had solidified our
4  independent dealers. We had improved significantly
5  our profitability of both manufacturing and at
6  retail. In general that's what I was referring to.
7       Q.   Uh-huh. So if you'd please go to the next
8  paragraph?
9       A.   Yes.
10      Q.   I'm going to ask you a number of questions
11 about it, so you can please go ahead and read the
12 whole paragraph.
13      A.   Well, I read it before, so --
14      Q.   Okay. Good. There's a reference in the
15 fourth paragraph to --
16      A.   Fourth?
17      Q.   Excuse me. Fourth sentence that begins
18 poor decisions --
19      A.   Yes.
20      Q.   -- caused us to go one way while good,
21 conservative decisions caused Clayton to go in the
22 opposite direction?
23      A.   Yes.
24      Q.   Are the poor decisions you're referring
25 to, do those decisions include, for example, lax

198

1  did you have any more interactions with either Mr.
2  Buffett or Mr. Millard before the bankruptcy filing
3  in November?
4       A.   I think on the day of the bankruptcy
5  filing I had several E mails from Mark Millard, but
6  other than that, no.
7       Q.   Okay. And do you know if Berkshire
8  Hathaway ultimately came to support the filing by
9  Oakwood?
10      A.   I was told -- I can't recall exactly when
11 we filed, but I was told on the morning of
12 November 15th I believe by Jared Felt that Berkshire
13 had supported our filing and we issued a press
14 release sometime during that morning, which
15 essentially said that without Berkshire's name being
16 on the press release.
17      I later I believe got an E mail from Mark
18 Millard probably around 3:00 o'clock that afternoon
19 asking me what was going on, that he didn't think
20 that we were going to file until Monday and that
21 Berkshire had not yet supported our plan, although he
22 thought that they would. So when we filed I thought
23 we had Berkshire's support, but according to Mark's
24 communication to me we did not have their support at
25 that time.

200

---

1  underwriting standards that were put in place in the
2  1990s?
3       A.   That would have been one of them, yes
4       Q.   What are some of the other ones?
5       A.   We overexpanded. We didn't have good
6  control -- controls over our retail operation. We
7  had not tied into our retail compensation as Clayton
8  had the performance of the loan portfolio. Those
9  would be the major items.
10      Q.   If you skip down a few sentences there's a
11 sentence that reads unfortunately the one thing that
12 we cannot do is outrun a bad loan portfolio. The
13 only thing that will allow us to do that is a filing.
14 Do you agree with that statement today?
15      A.   Yes.
16      Q.   Do you believe that the precipitating
17 factor -- strike that. Do you believe that the
18 principal reason that Oakwood filed for bankruptcy
19 was the negative quality of its loan portfolio?
20      A.   Yes.
21      Q.   And am I correct that the negative quality
22 of the loan portfolio was in large part a function of
23 underwriting standards put in place in the 1990s?
24      A.   That was certainly a major element of it.
25      Q.   Okay. After the October meeting in Omaha

199

---

1       Q.   I want to talk about the services that
2  Credit Suisse provided to Oakwood under the August
3  2002 financial advisory contract.
4       A.   Yes.
5       Q.   And I take it from some of your previous
6  answers that you were less than satisfied with some
7  of the things that Credit Suisse did; is that right?
8       A.   That's correct.
9       Q.   Can you tell me what it is that you were
10 dissatisfied with in the work by Credit Suisse?
11      A.   I don't believe that Credit Swiss ever
12 understood the financial difficulty that we were in.
13 As I mentioned to you earlier, there were a couple of
14 times when Credit Suisse advised us to delay a
15 bankruptcy filing. One time was on the flight back
16 after visiting Berkshire Hathaway in the middle of
17 October and one was the Friday before we filed.
18      Both times Credit Suisse indicated that we
19 should consider putting off the filing for a period
20 of time. Both of those times both Doug and I told
21 them that we didn't have an option to put off the
22 filing past -- that we were going to be lucky to get
23 to November 15 when we were planning the filing. We
24 didn't have the option to go any longer. I think at
25 the time by November 8th, the Friday before we filed,

201

1  Credit Suisse had done virtually nothing in
2  connection with obtaining a DIP other than Jared went
3  down to a meeting at Foothill which he arrived at
4  about a half an hour or 45 minutes late and he popped
5  in and he popped out. All of the work that was done
6  with Foothill to the extent I know of it was done by
7  FTI as well as the company.
8       I think that -- I don't think that Jared
9  even contacted any other potential DIP lender until
10 the Monday of our filing, if he did it that soon. I
11 was repeatedly advised that there would not be a
12 problem in getting a waiver for the warehouse. That
13 did, in fact, turn out to be a significantly
14 problematic manner -- matter and, in fact, we had to
15 basically shut down our lending for a period of time
16 after the filing.
17      There was no contact of any other
18 warehouse lender, potential warehouse lender by First
19 Boston prior to the filing because presumably they
20 felt that we would get a waiver, which we did not on
21 a timely basis. The first time anyone from First
22 Boston showed up to do any due diligence with respect
23 to a waiver of the warehouse was when Fiachra, Jared
24 and Tom Irwin showed up in our offices on the night
25 of November 14th, the day before we filed.

1       I did not know nor did anyone else at
2  Oakwood know that anyone from First Boston was even
3  coming down until Fiachra informed me that they were
4  coming down just a couple of hours or he may have
5  actually been on the way to catch the plane at that
6  time. Having basically starting diligence on the
7  renewal of the warehouse the day before -- the night
8  before we filed and the next day was significantly
9  disruptive at a time when we were trying to negotiate
10 a DIP with a new lender that FTI had brought to the
11 scene.
12      Having your financial advisor with no
13 notice suspend fundings under the warehouse for a
14 reason that I've never been able to know the week of
15 filing was disruptive. And being told that there
16 would be no filings -- no further fundings
17 essentially until further notice on the day that
18 you're filing was certainly disruptive. Those are
19 the major concerns that come to mind right now.
20      Q.  Okay. Is there anything else that comes
21 to mind?
22      A.  Not at the moment.
23      Q.  Okay. So to be clear, you were
24 dissatisfied with --
25      A.  There is -- there is one other thing that

1  comes to mind. The week -- I believe it was the week
2  before we filed or it may have been the Monday of the
3  week that we were -- that we filed, I received a call
4  from Fiachra as I was driving into work, so about at
5  7:30 or 8:00 o'clock in the morning, that advised me
6  that CSPB's legal department was working on matters
7  but they thought that they would have a problem being
8  retained as our financial advisor after we filed for
9  bankruptcy because of potential conflicts with the
10 fact that they had served as underwriters for us.
11      Fiachra said that there was a technical
12 argument that because they had served as underwriter
13 for a bankruptcy remote entity, that perhaps they
14 could be retained as a financial advisor, but he
15 couldn't give me any assurance as to that. That was
16 the first time that had ever been mentioned to me.
17      Q.  Focusing only on the DIP issue, at some
18 point after the filing on November 15th Oakwood did,
19 in fact, obtain sufficient DIP financing; isn't that
20 right?
21      A.  We obtained DIP financing, yes.
22      Q.  And who provided that financing?
23      A.  Greenwich Capital, Ranch Capital and
24 Berkshire Hathaway.
25      Q.  And do you recall the date upon which that

1  financing became available?
2       A.  I can't recall a date. I know that there
3  were some interim financings that became available.
4  First we had some interim financing through the
5  Foothills facility. We then had some interim
6  financing through the Greenwich facility, but the --
7  when the facility was actually put in place, I don't
8  know. That would have been late December or early
9  January.
10      Q.  Was FTI also responsible for helping
11 procure DIP financing prior to the filing?
12      A.  They did not serve as our financial
13 advisor. They were -- their role was -- their role had
14 been Foothills requested that we have FTI come in to
15 work on projections, to work on capital needs.
16      FTI did, in fact, once Foothill told us
17 that they would only provide an additional I think it
18 was either 15 or $25 million into a liquidating
19 chapter 11 facility. Foothill did or FTI -- excuse
20 me. FTI did seek other DIP lenders, which led to the
21 Greenwich DIP.
22      Q.  Am I right that Foothill and Oakwood had a
23 preexisting lending relationship?
24      A.  We did
25      Q.  How far back in time did that go if you

1 know?

2   A.   It was less than a year.

3   Q.   Were you --

4   A.   It may have been more than a year, but it

5 was -- it was around a year.

6   Q.   Were you surprised to learn that Foothill

7 was balking at providing DIP financing?

8   A.   I was surprised that they balked to the

9 extent that they did.

10   Q.   And do you know why they were reluctant to

11 commit financing?

12   A.   I think that in my opinion as I mentioned

13 earlier, the different lenders like to lend against

14 different assets.  And I don't think that Foothill

15 made an adequate assessment of the value of the

16 collateral of our financing assets -- of our

17 financial assets.

18        As a result of that, I don't think that

19 they could come up with a sufficient borrowing base

20 to get to the number that we thought we needed.

21   Q.   And when did this issue become apparent to

22 you?

23   A.   Well, I knew that there was going to be --

24 I suspected there was going to be somewhat of an

25 issue before Foothill notified us.  We asked for a

1 facility of $140 million, I believe.  I didn't think

2 Foothill would come through with the full 140

3 million, but I thought that they would come through

4 with something that we could live with; but I know

5 that I had a conversation with Piachra and with Jared

6 I believe on November 8th when Jared said he had had

7 a conversation with Foothill and that it didn't

8 appear that Foothill was going to go along with our

9 proposal.

10        So I certainly was aware of something at

11 that time, but we had a meeting with them and I

12 believe Wednesday, November 6th.  And at that point

13 in time I doubted that they would provide the full

14 $140 million facility, but at the same time I thought

15 that we could get by with something less than that.

16   Q.   Would I be -- would I be correct in

17 asserting that at least up until November 6th your

18 own view was that Foothill would provide the required

19 DIP financing?

20   A.   With adequate DIP financing, yes.

21   Q.   And it was at or around November 6th that

22 you began to question whether, in fact, that

23 financing would be provided?

24   A.   That's not what I said.

25   Q.   Please correct me.

1   A.   What I said was on November 6th I felt it

2 unlikely that Foothill would provide us with

3 everything that we had asked for, but I still thought

4 that we would get something back that would be a

5 workable proposal.

6   Q.   And at some point in time did you come to

7 the view that Foothill would not provide any

8 financing whatsoever?

9   A.   No.

10   Q.   Do you think that Credit Suisse's

11 performance under the financial services agreement

12 negatively impacted Foothill's decision to provide

13 DIP financing to Oakwood?

14   A.   It's hard for me to say because other than

15 Jared appearing at that meeting on what I believe was

16 November 6th, which wasn't a very good presentation

17 since he came in about a half an hour, 45 minutes

18 late, I can't recall any significant involvement that

19 First Boston had.

20        All the heavy lifting with Foothills was

21 done through -- by either FTI or the company, and as

22 best I can tell First Boston simply had a passive

23 role in that.  So if First Boston had played a more

24 active role, I have no idea what the result would

25 have been.

1   Q.   I take it -- strike that.  Were you at the

2 November 6th meeting you've described?

3   A.   I was.

4   Q.   And was it your sense that Foothill was

5 likely to provide the DIP financing the company

6 wanted it to?

7   A.   I'll try it a third time.  At the

8 November 6th meeting I felt that Foothill would not

9 provide the financing that we asked for, but I

10 thought they would provide us with adequate financing

11 because I felt that we were asking for somewhat more

12 than we needed.

13   Q.   Did you lead the presentation on behalf of

14 the company at that meeting?

15   A.   I believe I did.

16   Q.   I take it there were representatives of

17 FTI also there?

18   A.   There were.

19   Q.   I believe you testified a moment ago that

20 the following week Credit Suisse initiated contact

21 with other potential DIP providers; is that right?

22   A.   I believe that Credit Suisse made some

23 contacts beginning Monday, November 11th.

24   Q.   Did they do that at the request of the

25 company?

A.    I can't recall. I can recall as I
testified a few moments ago that Jared and Fiachra
called us, certain individuals in the company on
November 8th, and Jared said that he had had a call
with FTI -- or excuse me -- with Foothill and
Foothill indicated that they would not provide us
with a full proposal that we had asked for.

Now, at that point in time I didn't have
any indication that what they were going to provide
would be inadequate, but I'm sure at that point in
time we discussed other potential DIP lenders. And
whether we asked CSFB or CSFB said we'll go ahead and
make some other contacts, I don't know.

Q.    Do you recall if Credit Suisse reported
that it had made contact with Bank of America?

A.    I don't recall that specifically.

Q.    CIT Group?

A.    Again, I don't recall specifically who
they contacted, but I recall that they said that they
had made some contacts I believe beginning Monday,
November 11th.

Q.    And let's talk about the loan purchase
facility.

A.    Yes.

Q.    You indicated that you were dissatisfied

210

with Credit Suisse's timing with respect to obtaining
a waiver under that agreement; is that right?

A.    Yes.

Q.    So I take it you were aware that a
bankruptcy filing constituted an event of default
under the loan purchase facility; is that right?

A.    I don't know if it was an event of default
or if it was an event that would allow them
termination rights, but I knew that the facility
could terminate in the event of bankruptcy.

Q.    Uh-huh. And do you recall when you first
became aware of that fact?

A.    No.

Q.    Did you have any discussions with Mr.
O'Driscoll about obtaining a waiver?

A.    I had numerous discussions with Mr.
O'Driscoll.

Q.    When is the first time you remember having
those discussions?

A.    Probably September or October.

Q.    What did he say to you?

A.    Fiachra always indicated that getting a
waiver should not be a problem, that he didn't think
it would even require an amendment to the facility.
He thought he could get a simple agreement and he

211

thought there would be no fees associated with it.
That was generally the context of that -- of the
discussions. That was also relayed to Foothill by
Jared at our meeting on November 6th.

Q.    That Credit Suisse anticipated a waiver
would be obtained?

A.    That it would be obtained.

Q.    Was a waiver, in fact, obtained at some
date?

A.    I don't know if a waiver was obtained or
if we -- well, certainly it wasn't just a simple
waiver agreement. I don't know if we ended up having
a whole new facility or an amended facility, but
there was a new facility or an amended facility that
was put in place probably in late December or
January.

There would also have been something put
in place prior to that time which would have allowed
us to do some interim borrowings, but that wouldn't
have been put into place until probably a couple of
weeks after our filing.

Q.    Do you recall who provided the interim
facility you've just described?

A.    Credit Suisse and Berkshire Hathaway.

Q.    And then when either a new or amended

212

facility was put in place, was Credit Suisse also the
provider under that facility?

A.    Yes, as well as Berkshire Hathaway.

Q.    And do you know if Credit Suisse obtained
a fee as a result of providing the new or amended
facility?

A.    It's according to what you mean by a fee.
I know that -- that I believe I testified earlier and
my recollection is the original facility contained
essentially a two-and-a-half point annual fee. The
renewed facility I believe knocked that up to
$3 million or three percent. I'm sorry. Three
percent, not $3 million.

I think it had been two-and-a-half percent
and this knocked it up to three percent. So to the
extent that's a fee, then they did obtain that. The
letter agreement that we received from CSFB on
November 22nd, I believe, did not have any other fee
mentioned in that letter agreement; but we were
provided documents, draft documents I believe on
Wednesday, November 27th, I believe.

Q.    Uh-huh.

A.    And those draft documents contained an
additional $3 million fee that was then negotiated
away.

213

| | |
|---|---|
| 1   Q.   Did Mr. O'Driscoll keep you apprised of | 1   record at 3:54. |
| 2   developments in his attempts to obtain a waiver | 2   (A recess was taken.) |
| 3   within Credit Swiss? | 3   THE VIDEOGRAPHER: We're on the record at |
| 4   A.   He generally did, but the indications | 4   4:07. |
| 5   generally were positive that we would be getting a | 5   Q.   (By Mr Osnato) Mr. Standish, you've |
| 6   waiver until I was informed on the morning of | 6   testified about your dissatisfaction with the |
| 7   November 15th that the facility was -- was shut down, | 7   financial advisory work done by Credit Suisse and I |
| 8   that we -- and I believe it was we as opposed to | 8   believe you've also indicated as to Berkshire |
| 9   First Boston -- needed to find First Boston a partner | 9   Hathaway that Credit Suisse was appropriately focused |
| 10   in the facility and that we may be able to get the | 10   on the task at hand; is that correct? |
| 11   facility reopened, but it wasn't going to happen in | 11   MR. CASTANARES: Asked and answered. |
| 12   the short-term. | 12   THE WITNESS: Well, I think I said that |
| 13   Q.   What was your reaction? I think I know | 13   they were -- they appeared to be focused on that |
| 14   the answer, but -- | 14   part of their task. |
| 15   A.   I was a little ticked off. | 15   Q.   (By Mr. Osnato) Okay. Are there any |
| 16   Q.   And what did you say? | 16   other areas in which you think Credit Suisse added |
| 17   A.   I think I simply absorbed that information | 17   value to Oakwood as part of its financial advisory |
| 18   at the time and walked away. | 18   engagement? |
| 19   Q.   Uh-huh. Did Mr. O'Driscoll explain any | 19   MR. CASTANARES: Object to the form. |
| 20   issues he was experiencing in attempting to obtain | 20   THE WITNESS: I think Jared improved our |
| 21   the waiver internally of Credit Suisse? | 21   press release that we issued in connection with |
| 22   A.   I don't think he did at the time. We had | 22   the bankruptcy. |
| 23   a number of discussions the following week as the | 23   Q.   (By Mr. Osnato) Okay. Anything else? |
| 24   week went on and he -- I recall then some of the | 24   A.   Not that I can think of. |
| 25   issues that he brought up. | 25   Q.   Is it fair to say that your -- |

| | |
|---|---|
| 1   Q.   And what do you recall those issues as | 1   A.   Let me back up. |
| 2   having been? | 2   Q.   Okay. |
| 3   A.   I recall that there had been an issue with | 3   A.   I think that in thinking about it, I think |
| 4   another securitization issuer. I do not believe | 4   that Fiachra did a lot of work internally at First |
| 5   First Boston was involved in it, but there was an | 5   Boston to obtain a waiver. The dissatisfaction that |
| 6   issue out in the market where an issuer had somehow | 6   I have in that regard is only in respect of the fact |
| 7   talked the trustee into inappropriately releasing | 7   that I was advised that a waiver -- that a waiver |
| 8   funds back to the issuer when the funds should have | 8   would be coming and that, in fact, it did not; but I |
| 9   continued to be held by the trustee and ultimately | 9   do think that Fiachra put in a good amount of work |
| 10   disbursed to the investors. | 10   internally in First Boston to attempt to get that |
| 11   That was something that had First Boston | 11   done. |
| 12   concerned. I'm not sure why. The -- I think at some | 12   Q.   Am I right that your -- strike that. Am I |
| 13   point in time Fiachra also indicated that First | 13   right that any dissatisfaction you had as to Credit |
| 14   Boston was looking to decrease their credit exposures | 14   Suisse is confined to the work it did under the |
| 15   throughout the company and when they looked at us as | 15   financial services agreement? |
| 16   a company in bankruptcy or on the verge of filing | 16   A.   Not entirely. I think I mentioned earlier |
| 17   bankruptcy, that it seemed to them that that was an | 17   that Fiachra was working on a securitization and/or |
| 18   easy one for them to eliminate. | 18   whole loan sale with C-Bass right before we filed for |
| 19   MR. OSNATO: Why don't we take a few | 19   bankruptcy as well as after we filed for bankruptcy. |
| 20   minutes and I don't think that we have a | 20   And Fiachra had indicated to me that he anticipated |
| 21   substantial amount of ground to cover. | 21   Oakwood receiving proceeds of some 95 point something |
| 22   THE WITNESS: Okay. | 22   cents on the dollar. |
| 23   MR. OSNATO: So give me a few minutes and | 23   And, in fact, when we went to the rating |
| 24   I'll see what remains; okay? | 24   agencies to get levels on that, the possibilities of |
| 25   THE VIDEOGRAPHER: We're going off the | 25   getting -- well, there was no possibility of getting |

1  anywhere close to where Fiachra thought we would be.
2  So I was -- it was somewhat of a dynamic market and
3  it was changing, but I was disappointed having
4  thought that we would start out the bankruptcy with
5  what would be viewed as a very successful
6  securitization when, in fact, what we had was a real
7  mess on our hands and a big loss in disposing of our
8  loans.
9      Q.   At the time of the Clayton acquisition was
10  Credit Suisse providing any services to Oakwood?
11     A.   The Clayton acquisition of Oakwood?
12     Q.   Correct.
13     A.   None that I can think of.
14     Q.   And do you remember the approximate last
15  point in time you had any dealings with Mr.
16  O'Driscoll?
17     A.   I believe the last point in time that I
18  had any dealings with him, as I mentioned before, I
19  had dinner with him in April, early April of 2004.
20     Q.   Do you recall the last services that
21  Credit Suisse provided to Oakwood after the
22  bankruptcy?
23     A.   I know that after the bankruptcy we were
24  in touch with Fiachra as far as securitization
25  alternatives, structuring alternatives, but I don't

218

21/09/2006 STANDISH, Myles

1  believe there was any transaction that actually took
2  place involving us and First Boston.
3          MR. OSNATO:  Those are all the questions
4      that I have today, so thank you very much for
5      your time.  I do appreciate it.
6          THE WITNESS:  Okay.
7          MR. OSNATO:  We are done.
8          THE WITNESS:  Okay.
9          MR. CASTANARES:  Shall we have the same
10     stipulation as to signatures?  The court
11     reporter will send the original transcript to
12     Mr. Standish.  After that he can sign it and
13     advise us of changes and return an original --
14     do you want to keep the original?  Do you want
15     me to keep it?
16         MR. OSNATO:  I think that you should
17     because you're representing him.
18         MR. CASTANARES:  I'll keep it, okay.  So
19     you'll send the original transcript to me after
20     you've signed it.  And they have been
21     generous -- we have been actually mutually
22     generous in extending the time to sign by a few
23     days.  So if you can't get it done in 30, 45
24     will be fine..  Okay, great.
25         THE WITNESS:  It will be good airplane

219

1  reading sometime.
2          MR. CASTANARES:  And the witness can sign
3      under penalty of perjury as distinguished from a
4      notary public.
5          MR. OSNATO:  I believe that's correct.
6      That's fine.
7          MR. CASTANARES:  Thank you.
8          THE VIDEOGRAPHER:  We're off the record at
9      4:14.
10         (Deposition concluded at 4:14 p.m.)
11          . . . . .

220

21/09/2006 STANDISH, Myles

1  STATE OF NORTH CAROLINA        C E R T I F I C A T E
2  COUNTY OF GUILFORD
3          I, K. Denise Neal, RPR, Registered
4  Professional Reporter and Notary Public, do hereby
5  certify that MYLES STANDISH was duly sworn by me
6  prior to the taking of the Deposition; that said
7  Deposition was taken and transcribed under my
8  supervision; and that the foregoing 220 pages are a
9  true and accurate transcription of the testimony of
10  the said deponent.
11         I further certify that review and signing
12  of the transcript by the witness was reserved.
13         I further certify that the persons were
14  present as stated.
15         I further certify that I am not related
16  to, of counsel for or in the employment of any of the
17  parties to this action.
18         IN WITNESS WHEREOF, I have hereunto
19  subscribed my name, this the 28th day of September,
20  2006.
21              K. Denise Neal, RPR
22              Registered Professional Reporter
23              and Notary Public
24  My Commission Expires
25  June 23, 2010.

221

1           DEPOSITION OF MYLES STANDISH/KDN

2           I do hereby certify that I have read all

3       questions propounded to me and all answers given by

4       me on the 21st day of September, 2006, taken before

5       K  Denise Neal, and that:

6               1)  There are no changes noted.

7               2)  The following changes are noted:

8           Pursuant to Rule 30(e) of the Federal Rules of

9       Civil Procedure, which reads in part:  Any changes in

10      form or substance which you desire to make shall be

11      entered upon the deposition...with a statement of the

12      reasons given...for making them.  Accordingly, to

13      assist you in effecting corrections, please use the

14      form below:

15      Page No.        Line No.        should read:

16      Page No.        Line No.        should read:

17      Page No.        Line No.        should read:

18      Page No.        Line No.        should read:

19      Page No.        Line No.        should read:

20      Page No.        Line No.        should read:

21      Page No.        Line No.        should read:

22      Page No.        Line No.        should read:

23      Page No.        Line No.        should read:

24      Page No.        Line No.        should read:

**21/09/2006 STANDISH, Myles**

1           DEPOSITION OF MYLES STANDISH/KDN

2       Page No         Line No.        should read:

3       Page No.        Line No.        should read:

4       Page No.        Line No.        should read:

5       Page No.        Line No.        should read:

6       Page No.        Line No.        should read:

7       Page No.        Line No.        should read:

8       Page No.        Line No.        should read:

9       Page No.        Line No.        should read:

10      If supplemental or additional pages are necessary,

11      please furnish same in typewriting annexed to this

12      deposition.

13              MYLES STANDISH

$

$10 [104:15]
$10,500,000 [104:14]
$100,000 [65:15] [182:9]
$125 [170:1]
$140 [207:1,14]
$162,500 [61:12,17] [62:2,10]
  [63:11]
$200 [104:6,10]
$243 [61:24] [62:14] [63:14
  ,16]
$25 [205:18]
$250 [61:15] [62:5] [64:22]
$275 [61:19] [62:21] [64:24]
$3 [11:13] [63:6] [213:12,13
  ,24]
$30 [142:22]
$50 [63:10,12]
$500 [58:13] [61:2]
$7 [62:1]
$75,000 [164:2]

0

006776 [158:15]

1

1 [155:25] [222:6]
1:32 [139:25]
10 [4:] [28:3,4] [105:3]
10105 [2:]
10-15-02 [4:]
101502 [4:]
101802 [4:]
10-18-02 [4:]
10ks [28:4]
10-ks [28:4]
10qs [28:3]
10-qs [28:3]
11 [4:] [8:21] [21:17] [22:14
  [26:16] [80:5] [143:25]
  [147:2] [159:24] [160:2,3]
  [161:23] [163:16] [168:1]
  [171:22,24] [173:18]
  [174:1] [182:19] [195:11]
  [205:19]
11:14 [96:17]
11:22 [96:20]
111,000,000 [120:17]
111802 [4:]
11-18-02 [4:]
116 [4:]
1181 [116:21]
11th [9:10] [21:19] [22:4]
  [209:23] [210:21]
12 [37:3] [105:3]
12:36 [139:22]
125 [155:25]
13 [4:]
133 [153:9]
1345 [2:]

13th [89:15]
140 [207:2]
142 [193:13]
148 [4:]
14th [202:25]
15 [4:] [201:23] [205:18]
153 [4:]
158 [4:]
15th [188:21] [200:12]
  [204:18] [214:7]
16 [60:25] [80:3]
162,500 [65:3,14]
17 [138:5,9] [190:9]
170 [4:]
179 [4:]
17andahalf [138:5,9]
17-and-a-half [138:5,9]
17th [193:14]
18 [4:] [103:4]
188 [4:]
18th [79:13]
19 [4:] [105:8,10,11,12]
  [108:5] [172:13] [184:1]
19.9 [17:12] [134:2]
1901 [2:]
193 [4:]
1977 [44:11]
1978 [76:16]
1981 [44:15]
1986 [18:14]
1987 [45:13] [48:15]
1988 [103:9]
1990s [86:6] [87:17] [137:6]
  [199:2,23]
1994 [88:12]
1995 [47:15,20]
1996 [99:6]
1998 [50:20,23] [76:18,21,23]
  [77:7] [83:5] [89:11] [92:7]
  [98:12]
1999 [13:4] [71:9] [86:11,12
  ,18,20] [89:11]
19th [161:14] [170:16,25]
  [179:17] [180:3] [183:11,18
  ,19]
1st [156:16]

2

2 [169:16] [222:7]
2:41 [179:10]
2:48 [179:13]
20 [83:15] [125:13]
20/20 [76:7]
2000 [27:8,15] [28:17]
  [51:2,21] [73:10] [89:15]
  [90:1,20] [92:4] [103:17]
  [105:4] [112:16] [144:6,7]
2001 [27:8,15] [28:17]
  [33:6] [51:6,11] [83:4]
  [96:24] [110:19,21] [111:3]
  [116:23] [119:14] [123:4]
  [136:20] [137:6] [143:24]
  [144:1,13,18,21,24] [145:

22] [147:19] [148:21] [149:
  3]
2002 [8:3,22] [13:17] [15:9
  ,16] [23:2] [24:17] [29:10,23]
  [30:8,9,15,19,24] [33:6,24]
  [34:4,7,9,10,13,16] [49:19]
  [50:12,18] [52:6,14] [53:1
  ,13] [59:6,8,16,25] [71:9]
  [78:15] [79:13] [83:3]
  [84:21] [87:23] [98:12,16]
  [103:19] [105:4,20,21]
  [125:7,8] [127:6,13,19]
  [128:13] [136:21] [137:6]
  [140:21,24] [141:9] [143:1
  ,16,18] [145:19,25] [147:19]
  [148:20] [149:1,3] [151:21]
  [153:20] [154:12,25]
  [157:9] [158:4,17] [159:23]
  [162:1] [163:2,15] [170:16]
  [173:15] [174:10] [178:2,23]
  [179:17] [180:3] [188:21]
  [190:5] [191:6] [193:14]
  [201:3]
2004 [60:25] [68:20] [84:13]
  [146:6,8,11] [155:25]
  [156:8,17] [218:19]
2006 [3:] [5:2] [221:20]
  [222:4]
2009 [146:16] [156:7]
201 [4:] [57:15,17,18,21]
2010 [221:25]
202 [4:] [79:8,10] [102:24]
203 [4:] [89:13,17]
204 [4:] [116:20,24] [122:15
  ,20]
205 [4:] [148:11,13]
206 [4:] [153:14,16]
207 [4:] [158:14,18]
208 [4:] [170:12,17] [180:15
  ,24]
209 [4:] [179:15,20]
21 [37:6] [38:24]
210 [4:] [188:19,23]
211 [4:] [193:12,15]
212 [2:]
21st [3:] [5:2] [222:4]
220 [221:8]
228 [2:]
2285755 [2:]
228-5755 [2:]
2285788 [2:]
228-5788 [2:]
22nd [213:18]
23 [221:25]
24 [4:]
243 [64:11]
24th [116:23]
25 [4:] [93:14] [105:5]
250 [62:20] [65:12] [153:9]
25th [153:20] [158:4]
26th [8:2]
27 [39:11,12]
275 [65:12]
27th [213:21]

28th [221:19]
29 [4:]
293 [63:20]
29th [158:17]

3

3 [182:6,7] [184:1,3,4]
3:00 [200:18]
3:54 [216:1]
30 [93:14] [219:23] [222:8]
30year [93:14]
30-year [93:14]
31 [4:]
310 [2:]
31st [148:20]
35138 [196:12]
37 [80:3,8,24] [84:5]
38 [81:11,21]
39 [82:3]

4

4 [4:]
4:07 [216:4]
4:14 [220:9,10]
40 [81:24] [82:6]
41 [83:7]
41300 [4:]
4-13-00 [4:]
41304 [4:]
4-13-04 [4:]
42 [83:22]
425 [3:] [5:9]
43 [83:24] [84:2,5,13]
  [86:1]
45 [202:4] [208:17] [219:23]
46 [80:8]
49 [39:9,18] [40:10]

5

5 [148:20]
50 [63:18]
57 [4:]

6

6 [3:] [4:] [43:7]
62502 [4:]
6-25-02 [4:]
63123 [189:10]
63132 [190:8]
63135 [188:20]
6727 [155:6]
6730 [179:16]
6734 [171:4]
6739 [172:17]
6743 [175:14]
6775 [170:13]
6th [207:12,17,21] [208:1,16]
  [209:2,8] [212:4]

------------------------------
7
------------------------------

7 [4:]
7:30 [204:5]
72401 [4:]
7-24-01 [4:]
728 [153:15]
72902 [4:]
7-29-02 [4:]
73102 [4:]
7-31-02 [4:]
760 [148:12]
77 [158:15]
776 [89:14]
79 [4:]

------------------------------
8
------------------------------

8 [4:]
8:00 [204:5]
8:24 [3:] [5:2]
80 [125:6]
800 [118:19] [122:1]
800pound [118:19] [122:1]
800-pound [118:19] [122:1]
80s [104:12] [105:1]
813 [58:7]
818 [57:23]
81902 [4:]
8-19-02 [4:]
88 [48:15]
89 [4:]
8th [201:25] [207:6] [210:4]

------------------------------
9
------------------------------

9 [182:6,7] [184:3,4]
9:31 [42:22]
9:38 [42:25]
90067 [2:]
900676013 [2:]
90067-6013 [2:]
903 [2:]
9039000 [2:]
903-9000 [2:]
9039041 [2:]
903-9041 [2:]
90s [86:10] [94:13,22]
[104:12] [136:22,25]
93 [103:11]
94 [103:11]
95 [50:18] [217:21]
96 [86:14] [94:25] [95:4]
[114:7,9]
97 [86:13]
98 [76:24] [81:5] [94:3,25]
[95:1,22] [96:4] [114:9]
99 [94:4] [96:4] [112:16]
[114:9]

------------------------------
A
------------------------------

a.m [3:]

abilities [23:7]
ability [18:20] [20:2] [21:3,16]
[32:4,8] [172:25]
able [83:19] [146:11] [158:
9] [175:22] [203:14] [214:10]
abnormal [99:2]
abreast [107:4]
absolutely [80:22]
absorbed [214:17]
absorbing [36:1]
academic [164:14,25]
accept [95:21]
acceptance [11:23] [27:11]
[32:19] [33:5]
access [55:22] [142:16]
accomplish [185:21] [190:
12]
accord [139:7]
according [39:2] [200:23]
[213:7]
accordingly [222:12]
account [109:21] [110:1]
accounting [53:17]
accurate [34:10] [110:7]
[221:9]
accurately [80:12]
achieve [91:17,25] [176:4]
achieved [91:6,11,14,18,19
,20] [92:1] [186:16]
acquired [55:8]
acquisition [55:1] [165:17]
[189:25] [190:1] [218:9,11]
act [56:24]
acted [36:19] [53:10] [72:1
,4] [76:7]
acting [56:9] [58:2]
action [41:6] [76:2,4,5]
[145:2] [157:2,12] [161:13
,16] [181:12,16] [182:14,18]
[221:17]
actions [22:8] [75:20,24]
[97:10,21] [175:12] [176:14
,15] [195:15]
active [208:24]
activities [72:18]
activity [40:12] [42:2,7]
acts [169:16]
actually [17:5] [19:7] [31:5]
[33:20] [83:3] [105:16]
[155:14] [159:17] [161:10]
[162:17] [183:25] [203:5]
[205:7] [219:1,21]
add [48:7] [78:8] [84:16]
added [62:14] [81:14]
[83:9] [216:16]
addition [83:11] [127:17]
additional [14:10] [61:17,25]
[84:17] [205:17] [213:24]
[223:10]
additive [62:19] [63:7]
address [43:6]
adequacy [12:18]
adequate [12:22] [53:2]
[69:16] [155:24] [158:11]

[206:15] [207:20] [209:10]
adequately [14:24] [15:5,15]
adjust [95:8,14]
administration [7:25]
[55:14] [78:24]
administrative [50:25]
[51:5]
advance [111:4] [150:20]
adversarial [162:19]
adverse [27:3]
adversely [150:14]
advice [17:1] [20:19,21,22]
[40:6] [46:1] [49:15] [166:
23] [192:10] [193:1] [194:22
,24]
advise [46:6] [48:17] [141:
18] [219:13]
advised [19:9] [42:11]
[48:25] [49:8] [69:1] [127:
14] [192:7] [194:16] [196:25]
[201:14] [202:11] [204:5]
[217:7]
advising [46:8] [56:21]
[155:18]
advisor [13:9,15] [16:21]
[55:1] [147:5] [159:2,8]
[162:1] [163:1] [183:14]
[191:8] [194:23] [203:12]
[204:8,14] [205:13]
advisors [159:11]
advisory [11:15] [15:2,7,8]
[22:23] [40:15] [47:8]
[56:24] [168:25] [201:3]
[216:7,17]
affected [150:14]
affidavit [78:25] [79:11]
[102:21] [105:8]
affiliated [18:7]
affiliation [18:10]
affirmative [63:24]
afternoon [200:18]
afterwards [58:14]
again [6:3] [14:22] [15:10]
[24:6] [40:18] [52:25]
[62:9] [66:11] [90:6] [91:1
,24] [102:4] [103:15,17]
[121:24] [141:25] [142:25]
[144:7] [148:6] [184:16]
[186:19] [195:2] [210:18]
against [206:13]
agencies [14:1] [41:6]
[101:20] [114:21] [217:24]
agency [114:23]
agent [72:1,5]
aggressive [27:14] [40:7]
[85:3] [94:11] [98:25]
[104:25]
aggressively [26:19] [28:16]
[144:19]
ago [12:11] [15:3] [57:24]
[131:4] [133:14] [134:23]
[184:2] [209:19] [210:2]
agree [26:20] [37:19,21,23]
[38:1,2] [39:24] [40:15,19]

[42:9] [52:21] [54:6] [78:17]
[80:12] [81:3,20] [82:2]
[83:7,22] [84:1] [103:4,6]
[105:13,22] [108:8] [148:4]
[150:8] [167:16] [168:8]
[171:14] [175:16] [176:1]
[194:20,23] [199:14]
agreed [59:7] [126:24]
[127:11,16] [171:17]
agreeing [12:9,12]
agreement [4:] [16:4]
[22:3] [47:8] [55:17] [57:3
,22,24] [58:5,13] [60:21]
[94:21,23,24] [111:4,22]
[138:5] [162:13] [166:8,9]
[167:23] [208:11] [211:2,25]
[212:12] [213:17,19]
[217:15]
agreements [139:17]
ahead [9:24] [17:7] [27:19]
[28:10] [39:14] [40:4]
[60:1] [174:15] [198:11]
[210:12]
airplane [219:25]
al [5:5,7]
alarming [131:19]
alert [67:13]
alive [31:10]
allegations [10:19] [12:4,10]
[25:5,8,10,23] [56:21]
[67:22] [68:3,9]
alleged [39:22]
allow [40:22] [41:24] [144:
14] [199:13] [211:8]
allowed [29:14] [41:8]
[42:1] [116:7] [130:8]
[164:1] [212:18]
alluded [25:4]
alluding [9:3]
almost [62:5] [93:12]
alone [108:13] [178:16]
[186:17,19]
along [32:25] [56:2] [71:19]
[109:2] [115:8] [162:4]
[207:8]
already [28:19] [64:12]
[78:22] [122:4] [166:6]
[168:8,15,21] [176:16]
alternate [163:9]
alternative [142:11] [147:2]
[161:5,22] [171:21] [181:12]
alternatives [15:22] [140:15
,19,20] [141:10] [157:13]
[163:23] [169:11,21,22]
[171:13] [172:4] [218:25]
although [60:24] [68:18]
[125:6] [128:11] [135:9]
[165:22] [197:16] [200:21]
altogether [108:17]
always [27:10] [85:14]
[109:1] [135:10] [136:9]
[146:8] [211:22]
am [7:23] [9:18] [14:12]
[18:15] [19:19] [31:12]

[34:1] [43:11] [51:25] [53:16]
[61:25] [70:12] [75:12]
[76:8] [84:4] [86:6,19]
[88:25] [94:6,15] [96:6]
[97:16] [101:1] [102:1]
[104:8] [106:9] [107:14]
[109:6] [110:10] [117:18]
[132:25] [136:19] [137:18]
[145:23] [146:3] [147:11]
[151:15] [153:22] [155:17]
[160:6,10] [170:11,20]
[185:14] [199:21] [205:22]
[217:12] [221:15]
amended [212:13,14,25]
[213:5]
amendment [211:24]
america [86:23] [104:19]
[109:4] [111:1] [128:3,7,16
,18,22] [129:14,16] [210:15]
american [72:5] [73:9]
americas [2:]
among [14:5] [53:16] [86:20]
[159:14] [181:7]
amortize [104:21]
amount [30:17] [34:4]
[35:23] [37:16] [56:17]
[120:16] [121:20] [129:1]
[133:25] [134:1] [152:21,22
,25] [164:2] [196:9] [215:21]
[217:9]
amounts [65:10]
analyses [186:24]
analysis [101:11]
analyst [13:18]
and/or [133:25] [217:17]
andrew [151:14,16] [152:13
,14,17]
angeles [2:]
annexed [223:11]
announcing [116:10]
annual [52:4] [132:11]
[213:10]
answer [7:13,14] [8:15,18,19]
[9:13] [10:14] [25:1] [69:14]
[88:22] [118:21] [137:23]
[144:6] [167:15] [197:5]
[214:14]
answered [216:11]
answering [11:6] [67:7,8,9]
answers [6:21] [25:4]
[201:6] [222:3]
anticipated [212:5] [217:20]
anybody [191:3]
anymore [9:23]
anyone [10:18] [31:9]
[64:7] [68:16] [71:3] [99:4]
[107:18] [119:1,25] [121:1]
[126:8] [140:11] [173:11]
[184:24] [202:21] [203:1,2]
anything [15:17,18] [20:23]
[36:18] [48:7] [58:13]
[59:24] [88:18] [109:20]
[110:1] [131:18] [132:13]
[134:9] [161:20] [164:20]

[165:10] [184:14] [203:20]
[216:23]
anytime [121:25] [149:1]
anyway [138:18]
anywhere [35:9] [218:1]
apart [60:20] [61:3] [71:1]
[81:19] [87:12] [99:14]
[110:21] [123:1] [127:17]
[173:23] [184:5]
appalachian [74:8]
apparent [206:21]
appear [70:9] [193:21]
[194:17] [207:8]
appearance [2:]
appeared [115:24] [216:13]
appearing [208:15]
appears [175:19] [189:2]
[193:22]
appetite [121:14]
applied [59:6] [128:7]
apply [58:14]
appointed [18:13]
appreciate [6:5] [24:18]
[50:19] [79:6] [80:14]
[219:5]
apprised [27:22,24] [214:1]
approach [149:14]
appropriate [76:6] [129:22]
[137:1] [165:3]
appropriately [191:7,9,11
,24,25] [216:9]
approval [85:11] [141:16]
[143:6] [163:12]
approve [16:7] [140:8]
[141:4]
approved [60:5,8,10,11]
[117:19] [122:5] [132:1]
approving [132:7] [162:6]
approximate [88:6] [96:22]
[101:17] [141:12] [218:14]
approximately [48:20]
[120:15] [168:20]
april [68:20] [89:15] [90:1]
[218:19]
arbitrary [57:15]
area [34:24]
areas [85:18,19] [109:5]
[216:16]
arent [111:21] [135:10]
argue [111:13]
arguing [194:17]
argument [204:12]
arise [156:25]
arm [72:1,9] [172:1]
around [38:7] [48:15]
[59:15] [63:17] [77:6]
[88:12] [89:11] [96:3]
[100:23] [103:14,17]
[111:21] [112:16] [114:7]
[141:15] [142:7] [159:6]
[200:18] [206:5] [207:21]
arrange [123:16]
arrived [120:19] [152:20]
[202:3]

artificially [39:23]
aside [88:3]
ask [6:25] [7:6,13] [8:11]
[10:4] [15:4] [39:17] [80:10]
[83:23] [102:20] [103:3]
[104:9] [109:16] [117:1,3]
[120:7] [141:2] [144:5]
[148:15] [153:22] [154:5,8]
[170:20] [179:22] [193:17]
[198:10]
asked [39:20] [69:7] [70:7,10]
[80:1] [126:5,9] [129:13]
[144:24] [166:6] [175:8]
[191:23] [206:25] [208:3]
[209:9] [210:7,12] [216:11]
asking [20:24] [66:3,20]
[104:6] [144:16,18] [164:11]
[166:22] [171:17] [200:19]
[209:11]
asks [167:5]
aspect [25:8] [26:1,3]
asserted [24:21]
asserting [207:17]
assertion [39:25] [105:13]
assertions [103:4]
assess [54:1] [69:17]
assessed [54:3]
assessment [100:10]
[194:20] [206:15]
asset [112:4,5]
assets [111:17,20] [112:7]
[206:14,16,17]
assigned [161:4]
assignment [46:3]
assist [97:18] [169:10]
[222:13]
assisted [9:20] [165:12]
[182:23]
associated [28:13] [29:16]
[30:7,11] [33:25] [34:4]
[71:19] [72:2] [129:1]
[131:5] [132:7] [212:1]
associates [102:19]
assume [28:22] [47:22]
[55:21] [58:14] [62:16]
[64:4] [119:7] [130:21]
assumed [75:7] [176:12]
assuming [57:7] [63:23]
[124:23] [172:8]
assumption [11:23] [12:1]
[24:10] [25:5,11,13,19,20
,22] [26:20,24] [27:7,9,10,15
,23,25] [28:3,7,16] [29:2,3
,5,17,24] [31:12,15,22]
[32:5,14,18] [33:4,9,12]
[34:16] [35:1,3,18] [36:1,9
,13,25] [38:12] [39:19]
[40:4,6,20,22] [41:14,16,25]
[66:15] [68:3,9] [123:7,21]
[124:2,15,19] [142:5,8]
[154:13] [155:19] [156:11]
assumptions [32:4,12]
[38:7] [66:4,6,20] [70:1]
[101:13,18] [125:2,3]

[138:7] [150:15] [196:18,22]
assurance [204:15]
assured [164:22]
attachment [4:]
attempt [217:10]
attempted [23:18]
attempting [214:20]
attempts [214:2]
attend [184:20,24]
attendance [180:2]
attended [100:5] [127:19]
[184:22] [185:1]
attending [52:17] [170:23]
[180:3]
attention [26:15] [156:20]
[158:21] [160:22] [169:2]
attorney [11:7] [167:2]
attorneyclient [11:7] [167:
2]
attorney-client [11:7]
[167:2]
attorneys [6:9] [10:21]
[62:18] [80:1]
attracted [175:23]
attrition [60:2]
august [13:16] [15:9,13,16]
[23:2] [24:17,20] [161:14]
[163:2,15] [170:8,16,25]
[172:13] [173:15] [178:2,23]
[179:17] [180:3] [183:11,18
,19] [201:2]
author [148:24]
authorize [174:16,18]
authorized [24:4,9,20]
available [13:11] [105:23]
[106:7] [171:13] [183:22]
[205:1,3]
avenue [2:]
avenues [163:9]
average [105:2,3]
avert [144:15]
avoid [28:12] [144:19]
[163:5]
avoiding [144:23]
awaiting [28:2]
awarded [133:11]
aware [25:18] [30:17]
[57:8] [90:23] [121:18]
[134:18,22] [140:4] [142:6
,7] [160:19] [172:15] [207:
10] [211:4,12]
away [136:16] [213:25]
[214:18]
awry [64:23]

B

b2 [81:18] [112:13] [114:4,10
,11,14,19] [118:5,6]
b2s [112:15,19] [113:21]
[115:22] [125:19]
back [22:25] [27:5] [29:11]
[38:16] [39:19] [50:21]
[59:25] [81:13] [83:9]

[95:3,18] [103:8] [104:4,11]
[114:4] [128:24] [140:1]
[145:21] [146:10] [150:17]
[156:19] [165:7] [181:25]
[192:8,16,17] [193:2]
[196:6] [201:15] [205:25]
[208:4] [215:8] [217:1]
**background** [10:5] [43:5]
[44:8] [53:18] [73:25]
[84:9] [150:5] [165:21]
**backwards** [98:15]
**bad** [195:20] [199:12]
**bag** [118:14,20]
**balance** [29:20] [113:21]
**balked** [206:8]
**balking** [206:7]
**ball** [25:14]
**bank** [86:23] [103:21]
[104:9,15,18] [105:6,17]
[109:3] [111:1] [128:2,7,16
,18,22] [129:14,16] [140:16]
[210:15]
**bankers** [72:5]
**banking** [40:14] [151:5,8]
**bankruptcy** [5:8] [8:1,13,21]
[9:1,7,19,24] [21:17,24]
[22:6] [23:13,15,18] [34:22]
[36:20] [49:18] [50:14]
[53:6,21,23] [54:12] [55:14]
[59:12,20] [72:15] [73:7,10]
[75:17] [78:10,15] [80:13]
[84:7,11] [87:23] [91:16]
[96:8] [101:8] [106:13]
[108:12] [115:4] [120:3]
[123:2] [126:19,23] [127:5
,15] [130:6] [131:5,11,12,14]
[141:17,23] [142:23]
[143:19,20,25] [144:2,4,9
,11,15,20,23,25] [146:12,13]
[152:1] [157:9,20] [163:4,6
,7,20] [167:11] [172:5,6]
[175:11,13] [176:2,5,13]
[177:20] [178:11,13,14,21
,25] [184:18] [186:22]
[187:22] [189:16,18]
[191:14] [192:15] [195:4,15]
[199:18] [200:2,4] [201:15]
[204:9,13] [211:5,10]
[215:16,17] [216:22]
[217:19] [218:4,22,23]
**banks** [104:10,11,22]
**banktype** [140:16]
**bank-type** [140:16]
**bar** [44:17,24,25]
**base** [98:17] [206:19]
**based** [27:6] [62:21] [69:19]
[101:11,17,18] [111:20]
[113:25] [164:3] [165:4]
[195:14] [198:3]
**basically** [103:6] [156:17]
[192:12] [202:15] [203:6]
**basis** [35:10] [52:1] [55:23]
[64:10,20] [69:17] [83:3]
[131:23] [147:24] [148:2]

[158:10] [160:18] [176:15]
[186:19] [188:14] [190:18]
[202:21]
**bates** [57:22] [58:6] [89:14]
[116:20] [148:11] [153:14]
[155:6] [158:15] [170:13]
[171:4] [172:17] [179:15]
[188:19] [189:9] [193:12]
[194:5] [196:12]
**bearing** [57:22] [89:14]
[116:20] [148:11] [153:14]
[158:15] [170:12] [188:19]
[193:12]
**bears** [155:6] [171:4]
**became** [29:22] [37:14]
[51:6,11] [75:11,12] [76:16]
[92:18] [93:2] [96:23]
[104:24,25] [114:7,18]
[135:22] [136:8,12] [154:27]
[157:4] [165:24] [205:1,3]
[211:12]
**become** [45:11,22] [112:16]
[119:22] [165:18] [206:21]
**becoming** [74:1] [85:3]
**began** [84:21] [141:9,13]
[157:8] [207:22]
**begin** [50:10] [110:17]
[157:2,21]
**beginning** [9:9] [43:3]
[44:9] [77:3] [155:9] [209:
23] [210:20]
**begins** [108:5] [117:5]
[171:7] [175:21] [180:6]
[181:7] [196:14] [197:16]
[198:17]
**begun** [76:20] [77:2]
**behalf** [5:15,17] [14:1]
[24:21] [109:7] [113:4]
[209:13]
**behind** [25:22] [41:13]
[196:3]
**believe** [8:2,16] [13:17]
[18:8,14] [21:23] [22:10]
[25:9] [26:11] [27:1,8]
[36:13] [39:21] [42:10]
[45:13] [46:3,20] [47:15,21]
[48:15] [49:13] [50:20]
[51:2] [53:3,4,7,9,19]
[55:7] [56:13] [57:3] [59:6
,8] [60:9,10] [61:23] [63:17]
[64:1,9,11,18,19] [65:1,13
,20] [66:25] [70:23] [73:10]
[76:16,18] [83:1] [86:10,11]
[90:14] [92:11,12] [96:24]
[98:15] [99:13,25] [110:7]
[113:25] [114:8] [117:13]
[120:15] [122:19,21]
[123:4] [127:13] [128:15]
[129:5,8] [130:3] [131:7]
[132:3,11] [133:4] [140:18]
[141:14] [143:20,24]
[144:1,24] [145:13,18,22]
[146:20] [151:21] [157:16]
[162:2,7,23] [165:11]

[167:8,10] [173:14,16]
[175:4] [177:22] [180:16,22]
[182:15] [183:17] [185:2,9
,23] [189:22] [190:1] [194:
14] [195:8] [199:16,17]
[200:12,17] [201:11]
[204:1] [207:1,6,12] [208:
15] [209:15,19,22] [210:20]
[213:8,11,18,20,21] [214:
8] [215:4] [216:8] [218:17]
[219:1] [220:5]
**believed** [117:20] [138:21]
[142:9] [144:21] [157:1]
**bell** [89:5,24]
**below** [33:22] [120:21]
[222:14]
**beneficial** [155:20,22]
**benefit** [40:15] [137:19]
**berkshire** [55:9] [112:9,18
,23] [113:2,7,20] [115:20,22]
[116:7] [117:24] [118:1,9,12
,23,25] [119:2,4,12,23]
[120:25] [121:12,19]
[122:6,12,25] [123:6,9,13
,19] [124:2] [125:20,24]
[126:1] [152:3,9,12,16]
[165:25] [166:1] [174:4]
[176:7,10] [177:19] [184:16]
[185:7,15] [187:21] [188:3]
[189:6] [190:6] [191:10,20]
[192:15,18] [193:7] [194:13]
[195:1,19] [196:21] [197:7
,12] [200:7,12,21] [201:16]
[204:24] [212:24] [213:3]
[216:8]
**berkshires** [116:3] [177:2]
[200:15,23]
**bermuda** [72:7]
**best** [16:24] [31:6] [54:8]
[115:12,15] [116:17]
[117:20] [118:7] [122:21]
[143:8,12,15] [144:22]
[152:13] [169:21] [178:2,5
,6,9] [183:1] [208:22]
**beth** [100:6] [165:15,16]
**better** [15:25] [16:1,12]
[59:25] [75:10] [140:15]
[144:23] [192:12]
**beyond** [9:2]
**biased** [197:17]
**big** [121:14] [218:7]
**bigger** [136:13]
**biggest** [98:20] [146:6,7]
**bill** [76:12] [88:16,23]
[89:3,6,10] [90:16] [92:9,12
,24]
**bills** [109:22] [158:10,12]
**binding** [177:17]
**bit** [14:19] [17:16] [43:19]
[149:10]
**black** [135:11]
**blip** [77:3]
**blue** [98:17]
**board** [4:] [9:14,19,21,23]

[16:22] [17:3,5,6,22] [18:3
,5,6,13,21] [19:4,8,9,12,17]
[21:5,9,11] [27:22] [31:4,9]
[51:8,22,24] [52:1,2,7,15,18]
[53:5,10,14,25] [54:7]
[89:16] [100:5] [116:22]
[117:20] [122:15] [127:8,10
,14] [132:1,6] [140:4,8,12,23]
[141:1,17] [142:2] [143:5,8]
[146:23] [147:1,8] [153:19]
[154:13,20,23] [155:18]
[158:16] [159:15] [161:1]
[162:4,5] [163:22] [164:8]
[170:15,24] [178:23,24]
[179:1,17] [180:10] [181:11
,16,25] [182:14,20] [183:21]
**boards** [181:19]
**bob** [33:21] [65:9,19] [89:15]
[127:20] [130:14] [134:8]
**bobs** [65:15]
**bombardier** [102:17]
**bond** [86:7,9,18] [87:8]
[120:16] [145:4,6,17]
[146:4,23] [147:1,7] [156:
4] [163:24]
**bonds** [14:17,18] [81:18]
[95:21] [97:22] [101:16,20]
[122:7] [145:18,20,21]
[146:2,7,9,10,16,18]
[156:19] [164:2] [170:2]
[176:25] [185:16]
**bone** [109:3]
**bonuses** [59:10,11]
**book** [177:12,22] [187:3,5]
**booklet** [174:25]
**books** [130:9]
**borrower** [28:9]
**borrowing** [206:19]
**borrowings** [212:19]
**boss** [100:4]
**boston** [5:7] [11:13,14,18,22]
[13:14,17] [16:6] [17:1]
[18:9,11] [19:1,7] [20:7,9,21
,25] [22:8] [24:16] [25:12,18
,21] [47:9] [61:14] [62:17,24]
[63:5] [68:20] [95:17,18]
[101:11] [107:6,10] [108:24]
[109:1,3] [111:23] [112:17
,24] [121:21] [123:14,16]
[145:5] [147:4] [148:9]
[159:1,8] [161:21] [174:17
,19] [176:11] [177:23]
[187:2,4] [192:8,10] [194:
16] [202:19,22] [203:2]
[208:19,22,23] [214:9]
[215:5,11,14] [217:5,10]
[219:2]
**bostons** [20:22] [23:1]
**bottom** [84:12] [171:6]
**bought** [171:24]
**bradford** [86:25]
**break** [7:5,9] [15:11] [18:22]
[22:16] [42:17] [139:19]
[179:7]

brendan [2:] [5:14]
brief [66:1] [67:16] [99:24]
 [124:10]
briefly [44:7] [71:7] [101:4]
 [117:8]
bring [16:16,22] [143:8]
 [152:24]
bringing [29:20] [117:24]
 [181:15] [182:14]
broad [45:18] [149:19]
broader [125:5]
broadly [12:17] [100:24]
brought [16:2,5,11] [24:3,21]
 [114:11] [118:1] [190:25]
 [191:3] [203:10] [214:25]
brower [150:25] [151:4,7]
buckfyre [55:4]
buffett [118:18] [120:1,4]
 [123:8] [126:20] [127:18]
 [183:2] [186:3,8,9,10,11,25]
 [187:16] [194:17] [196:2]
 [197:7] [200:2]
build [78:3]
builders [43:23]
building [77:8] [78:8] [84:22]
buildup [78:3]
build-up [78:3]
built [83:11,12,14,16]
 [84:21] [85:1,11] [125:22,23]
bulk [166:13]
bullet [175:21] [176:17]
 [182:8] [190:19]
bullets [88:20] [91:4] [92:22]
business [40:13] [41:24]
 [42:2,8,11] [43:19,21,22]
 [71:8] [72:19,25] [74:7,11]
 [91:13] [92:1] [104:23]
 [108:15,16,25] [117:6]
 [118:17] [124:18] [126:6,11]
 [147:21] [175:18] [185:25]
 [186:1] [195:20]
businesses [71:16]
businessman [120:11]
buy [115:22] [145:4,7,17,20
 ,23] [146:5,24] [147:1,7]
 [156:4,11,18] [163:24]
 [170:1]
buyback [145:4,7,17,23]
 [146:5,24] [147:1,7] [156:
 4,11] [163:24]
buy-back [145:4,7,17,23]
 [146:5,24] [147:1,7] [156:
 4,11] [163:24]
buyer [83:18] [106:5]
buyers [82:16] [114:5]
 [118:5] [175:22] [195:11]
buying [112:19] [146:10]
bylaws [52:3]

C

calculated [106:25]
california [2:]
call [88:20] [91:1,3,4] [187:

16] [204:3] [210:4]
called [23:20] [45:16]
 [57:4] [59:1] [64:19] [69:7]
 [77:13] [87:22] [88:15]
 [115:9] [125:21] [142:5]
 [150:25] [153:2] [188:10,15]
 [210:3]
calling [164:10]
calls [134:9]
cannot [161:22] [199:12]
cant [16:10] [24:7,11]
 [46:8] [65:15,23] [66:19]
 [86:25] [100:4] [109:13,17]
 [114:1] [128:24] [130:23]
 [132:17] [145:20] [148:6]
 [150:2] [161:10] [162:24]
 [193:23] [200:10] [205:2]
 [208:18] [210:1] [219:23]
canvass [118:4]
capable [7:18] [120:11]
 [198:2]
capacity [13:8] [55:25]
 [56:25] [77:8,16,18] [141:
 3]
capital [72:19] [172:25]
 [175:5] [204:23] [205:15]
captioned [150:4] [172:20]
capture [95:6]
captured [156:10]
cards [64:25]
care [22:16]
carefully [53:25] [54:2]
carlo [153:3]
carolina [3:] [5:10] [43:9]
 [44:15,24,25] [119:18]
 [179:4] [221:1]
carry [186:24]
case [10:3] [11:2] [29:20]
 [63:9] [70:5] [74:12] [78:23]
 [101:10] [131:15] [197:14]
cases [38:19,20]
cash [9:12] [29:22,24]
 [30:4] [34:25] [35:6] [37:16]
 [38:12,13,15,16] [91:14]
 [101:11,17] [107:25]
 [109:20,21,23,25] [110:2]
 [125:24] [146:7] [150:14,23]
 [190:20]
cast [88:3]
castanares [2:] [5:16]
 [7:11] [8:14] [11:5] [14:4]
 [18:22] [19:22] [22:16]
 [24:5,24] [26:8] [38:25]
 [39:11] [40:1,17] [41:18]
 [42:14,19] [55:20] [57:13]
 [67:6] [69:12,22] [70:13,19]
 [71:1] [79:4,14,24] [80:17]
 [90:6] [96:10,14] [120:7]
 [122:8] [138:23] [153:25]
 [154:4] [166:18,21,25]
 [167:15,20] [168:7,12,18]
 [170:9] [178:4,8] [183:15]
 [194:4] [216:11,19] [219:9
 ,18] [220:2,7]

catch [203:5]
cause [30:3] [40:12] [42:7]
caused [25:12] [28:15]
 [41:4] [84:17] [138:3]
 [144:8] [177:13] [198:20,21]
causing [35:21] [96:8]
caution [11:5] [67:6]
caveat [81:20]
caveats [84:6]
cbass [23:20] [115:9]
 [140:25] [217:18]
c-bass [23:20] [115:9]
 [140:25] [217:18]
cell [17:25]
center [78:7]
centered [100:23]
centers [71:18] [75:21]
 [77:14,19] [78:5] [188:12]
cents [17:22]
ceo [24:2,15] [30:24] [54:12]
 [74:1,2,18] [75:8,11,12]
 [76:3,9,14,16] [96:23]
 [136:8,12] [138:21] [162:25]
certain [17:21] [19:9,11]
 [32:25] [52:15,19] [53:17]
 [59:9] [60:11] [63:16]
 [72:17] [74:24] [85:18]
 [88:20] [91:7,19] [109:12]
 [111:16,17] [119:24]
 [135:4] [145:5,18] [160:17]
 [169:10] [176:14] [195:14]
 [210:3]
certainly [5:13] [14:8]
 [17:5] [19:3,6,8,9,10,23]
 [20:7,17] [24:15] [25:18]
 [29:4,10] [31:3] [37:9]
 [38:11] [47:2,4] [73:13]
 [76:1] [79:15] [84:8,24]
 [107:20] [111:9] [118:16]
 [119:1] [121:8,13] [122:10]
 [135:17] [137:24,25]
 [140:23] [144:2,9] [154:16]
 [156:12] [165:8,10] [166:11]
 [169:1] [177:10] [184:15]
 [199:24] [203:18] [207:10]
 [212:11]
certify [221:5,11,13,15]
 [222:2]
cetera [101:22]
cfo [95:1]
chairman [51:8] [154:23]
champion [73:2]
chance [59:22] [90:7]
 [144:23] [173:12]
change [63:14] [190:23]
changed [50:21,23] [51:2]
 [129:8] [136:9] [158:9]
changes [123:21] [219:13]
 [222:6,7,9]
changing [83:13] [218:3]
chapter [8:21] [21:17]
 [22:14] [80:5] [143:25]
 [147:2] [159:24] [160:2,3]
 [161:23] [163:16] [168:1]

[171:22,24] [173:18] [174:
 1] [182:19] [195:11] [205:19]
characterizations [70:2]
characterized [88:22]
charging [107:10]
chasing [82:16] [83:18]
cherry [3:] [5:10]
chief [50:24] [51:5,7,11,15]
 [73:15] [90:17,19] [92:18]
 [93:2] [135:22] [141:3]
 [143:10]
choice [9:10] [22:5]
chooses [172:23]
chose [88:2]
cincinnati [113:25]
circuit [44:20]
circumstance [36:5,8]
circumstances [21:7]
 [112:8] [183:23]
cit [210:17]
cited [38:23]
civil [222:9]
claim [11:12,20,22] [61:14]
 [62:23,24,25] [63:25]
 [168:3,13]
claimed [11:14]
clarence [52:11]
clarify [43:14] [100:12]
 [166:25]
class [74:12]
clayton [54:18] [55:1,8,9]
 [68:23] [73:3] [102:6]
 [189:25] [190:2,5] [198:21]
 [199:7] [218:9,11]
clean [6:24] [7:2]
clear [6:21] [7:15] [65:4]
 [66:11] [92:15] [129:15]
 [142:25] [171:21] [195:2]
 [203:23]
clearly [156:16] [170:19]
 [187:17]
clerked [44:20]
client [45:22,23]
close [75:1] [163:6] [218:1]
closed [97:13] [122:25]
closing [188:10]
coconut [151:11]
coerced [39:22]
collar [98:18]
collateral [111:24] [206:16]
college [44:10,11]
colloquial [17:11]
comanagers [108:21]
combination [175:18]
combined [142:23]
comfortable [112:5]
coming [74:6] [82:19]
 [136:14] [192:14] [203:3,4]
 [217:8]
comment [126:20,24]
commented [156:22]
comments [80:20] [166:12]
commission [221:24]
commit [206:11]

committee [8:10] [59:8,14
,22,24] [60:5] [161:1,4]
[197:11]
common [134:13] [179:5]
communicate [176:7]
communication [200:24]
communications [11:7]
[167:6]
companies [46:6,9] [55:10]
[73:6] [102:12,17] [103:16]
[190:6]
company [9:15] [12:25]
[13:3,15,18] [16:25] [19:12]
[20:4,6] [42:13] [43:25]
[44:2] [48:10,17] [50:8,22]
[51:7,9,17] [53:22] [54:9,17]
[55:18] [60:7] [61:9] [68:23]
[71:22] [72:7] [73:16,20]
[74:19,23] [75:14] [76:2,5]
[78:14] [86:5] [87:7,14,16
,21,22] [90:3] [91:6,23]
[96:23] [97:1,7] [105:24]
[107:15] [109:8] [110:12,15
,23] [111:6] [112:10] [113:
5,21,25] [114:8] [116:16]
[117:21] [118:13] [121:10
,12] [129:19] [132:2] [134:
14,21] [135:19,24] [140:5]
[141:6,10] [143:22] [144:22
,23] [147:10] [151:1,14]
[161:6] [163:2] [166:2,5]
[167:11] [169:10] [171:14
,22,23,25] [172:1,25]
[175:1] [177:4,23] [178:16
,17] [182:11] [186:6,12,18]
[189:16] [192:19] [194:19]
[195:2] [202:7] [208:21]
[209:5,14,25] [210:3] . . .
[215:15,16]
companys [21:6] [96:7]
[109:23] [155:20] [166:3]
[189:25] [194:22]
compared [83:4]
compensated [56:14]
[57:7] [58:10] [106:21]
[120:14]
compensation [56:18]
[58:19,22] [60:18,22]
[61:3] [148:5] [199:7]
competence [23:7] [73:19]
[100:11]
competent [23:11] [53:14]
[100:13]
competently [14:25] [15:6
,15]
competition [82:10,11,20]
competitive [165:2,6]
competitor [73:14]
competitors [72:21] [73:2,4
,8] [102:2,5] [175:5,6]
complaint [10:12,13]
[12:6] [25:1] [26:1,3]
completely [29:4,7,8]
compliance [135:13]

complicate [75:7]
complied [21:1]
comply [170:3]
comprehensive [181:14]
concentration [98:20]
concerned [167:3] [215:12]
concerning [40:6]
concerns [164:21] [170:5]
[203:19]
conclude [169:18] [193:8]
concluded [220:10]
conclusion [143:15] [163:
15] [183:3] [196:10]
concurrent [75:16]
condition [13:10] [97:1,6]
[98:8] [164:9,16]
conditions [98:13] [171:8]
conduct [12:5] [134:20]
[174:21]
confined [70:16] [167:25]
[217:14]
conflict [121:4,9,17]
conflicts [204:9]
confusing [103:7]
conjunction [31:9]
connection [30:15] [34:14]
[47:5] [49:1,9] [165:9]
[197:9] [202:2] [216:21]
connor [123:15] [127:20]
[185:2]
connotation [88:24]
consecutive [57:14]
consent [163:11] [191:11]
consequences [124:1]
conservative [192:22]
[196:17] [198:21]
consider [67:14] [143:10]
[157:8] [201:19]
consideration [90:3] [143:
5] [144:10] [145:3] [156:9,13
,14] [159:10,21]
considered [143:7] [159:12]
consistent [138:20]
consistently [49:14]
consolidated [78:6]
constituted [211:5]
constrained [103:18]
constraints [94:20]
consultant [56:10] [59:19]
consulted [95:17]
consulting [74:4] [147:10,24
,25]
consume [145:10]
consummated [119:6,9]
contact [119:23] [202:17]
[209:20] [210:15]
contacted [187:4] [202:9]
[210:19]
contacts [209:23] [210:13
,20]
contained [19:13] [188:8]
[213:9,23]
contemplated [176:15]
contents [3:] [117:2]

context [195:16] [212:2]
contingent [61:11] [85:23]
continue [25:15] [26:2]
[40:23] [41:8] [42:1] [155:
14] [156:15] [158:9] [178:16]
continued [22:21,22]
[106:9] [141:24] [163:21]
[215:9]
continuing [108:5]
contract [11:15] [13:16]
[15:8,13,16,18,19] [23:2]
[24:17,20] [56:11] [168:23]
[201:3]
contracting [81:2,5,7,9]
contraction [82:8] [98:10]
contrary [68:18]
control [17:10] [199:6]
controlled [36:23] [41:17]
[93:21] [137:9]
controlling [17:14]
controls [199:6]
convenient [96:10]
conversation [66:10,12,16]
[67:5,21] [68:16] [207:5,7]
conversations [33:10]
[68:18]
convert [134:13]
converted [134:17]
converting [188:15]
convey [167:13]
conveyed [174:9]
convinced [143:17]
copies [26:5]
copy [26:10] [65:22]
core [92:1] [98:24]
corporate [18:20] [20:15]
[45:17,19] [119:16]
corporation [5:5] [11:24]
[27:11] [32:20] [33:5]
[156:23] [157:4] [168:14]
[170:14]
corporations [181:14]
correct [9:8,16,18] [14:3,12]
[17:4] [19:19] [21:14]
[26:13,14] [30:24] [37:1,2]
[38:3] [51:22,25] [53:6]
[61:25] [62:3] [70:12,14,25]
[76:10] [80:16] [84:4]
[86:6,19] [97:17] [106:9]
[117:22] [120:5] [136:19,23]
[145:23] [146:3] [155:17]
[160:6] [162:2,7] [167:11]
[172:7] [199:21] [201:8]
[207:16,25] [216:10]
[218:12] [220:5]
corrected [197:23,25]
corrections [222:13]
correctly [25:23] [26:4]
[34:1] [49:25]
correlation [137:3]
cost [36:13,18] [85:22]
costs [33:18] [84:22] [91:19]
[142:8,22]
couldnt [88:21] [136:16]

[137:16] [204:15]
counsel [2:] [5:11] [11:10]
[18:23] [46:13] [47:25]
[48:4,7,16,17] [50:2,7,22]
[51:19] [67:12] [79:4,14]
[127:15] [132:18] [141:17
,23] [157:19,20,21] [160:7]
[166:18,22] [221:16]
counterclaim [24:7] [66:5,8
,22] [69:24,25] [70:3]
counterclaims [10:15]
[11:16] [12:10,15] [24:12,14]
[25:6] [26:6,10,16] [37:4]
[38:21] [39:6,10] [56:22]
[67:1] [69:20]
counterimpact [35:6]
country [85:19]
county [221:2]
couple [81:24] [100:6]
[104:21] [133:13] [201:13]
[203:4] [212:20]
course [11:6] [42:2] [46:5]
[67:7,9] [94:20] [104:19]
[181:16] [182:14,18]
courses [181:12]
court [5:8,19] [6:24] [44:20]
[78:22] [219:10]
courtesy [7:1]
cover [10:1] [215:21]
covered [45:18]
covington [45:4] [49:5]
creates [35:4]
creation [130:19]
credibility [116:2]
credit [5:6,15] [6:9] [12:5,19
,24] [13:6,7,11,23] [14:23]
[15:5,14,21] [16:21] [17:10
,16,20] [18:2,17,19] [19:17]
[20:16] [21:3,8,16,19,24]
[22:15,20] [24:22] [31:9]
[36:22,23] [42:10,12]
[46:21] [47:1] [52:15,17]
[53:21] [54:4] [61:6] [62:13]
[63:9] [68:16] [69:1] [72:3]
[83:16,18] [85:7] [86:15,19]
[90:21] [93:9] [94:6] [97:17]
[99:1,4,10,15,25] [106:20]
[108:19] [109:8] [110:5,13
,17,23] [117:23] [118:4]
[120:13] [121:4] [127:22]
[128:16] [129:10,16,18,20
,22,25] [130:12] [131:15]
[132:10] [133:11] [134:13
,19] [136:5,24] [137:9]
[139:10] [145:12,25]
[146:4,19,22] [156:4]
[158:25] [159:3] [161:24]
[162:12,16,19,25] [163:18
,22] [166:10,16] [167:10,24]
[168:24] [169:15] [170:24]
[172:1,10] [173:11] [180:10
,24] [181:21] [182:23,25]
[183:13,25] [184:4,24]
[190:24] [191:6,13,21]

[192:21,24] [194:21] [195:
10,13] [198:3] [201:2,7,10
,11,14,18] [202:1] [208:10]
[209:20,22] [210:14]
[211:1] [212:5,24] [213:1,4]
[214:3,21] [215:14] [216:7
,9,16] [217:13] [218:10,21]
creditor [63:5] [131:13,15]
creditors [8:9] [59:8,14,21
,24] [60:4] [61:13,16,18,21
,22] [62:20] [63:13] [197:11]
crisis [9:3] [156:25] [157:24
,25] [158:5,7]
criteria [19:14] [134:16]
[137:16]
critical [152:6]
cross [168:15]
crossreference [168:15]
cross-reference [168:15]
csfb [26:19,25] [40:5,15]
[41:11,12,25] [42:4] [110:
24] [129:13] [134:3] [148:12]
[164:13] [165:17,23]
[166:14] [181:13] [188:20]
[189:4] [193:13] [194:6]
[196:25] [210:12] [213:17]
csfb00035137 [193:13]
csfb-00035137 [193:13]
csfb-00055756 [148:12]
csfb-00055756 [148:12]
csfb-00063112 [188:20]
csfb-00063112 [188:20]
csfbs [40:5,8,11] [42:7]
[204:6]
current [29:21] [81:15]
[84:14] [164:9]
curtail [31:2] [123:7]
curtailed [30:23] [142:6]
curtailing [31:5]
customer [98:17] [135:6]
customers [82:23] [84:24]
[98:24] [99:1]
cut [29:11] [136:5] [192:8,16
,17] [193:2]
cutoff [136:5]
cut-off [136:5]
cutting [128:23]
cyclical [77:4]

D

daggett [73:17,21,24]
[74:15,22] [76:9]
daggetts [73:19] [74:18]
[75:6]
daily [195:20]
damage [20:12]
damages [61:5] [62:13]
data [32:11] [33:18]
date [5:2] [18:12,15] [54:17]
[57:8] [58:18] [60:25]
[61:22] [64:13] [88:6]
[96:22] [141:12] [148:24]
[158:11] [181:17] [191:5]

[204:25] [205:2] [212:9]
dated [79:13] [148:19,20]
[179:17] [188:21] [193:13]
davidson [151:14,16]
[152:13,14,17]
day [3:] [79:2,13] [119:20]
[200:4] [202:25] [203:7,8,17]
[221:19] [222:4]
days [21:20,25] [219:23]
deal [20:3] [113:11,18,20]
[116:15,17] [117:16]
[119:5,9,25] [122:6,16]
[146:9] [160:16] [161:5]
dealers [71:20,24,25]
[198:4]
dealing [20:6] [99:4,16]
[121:10]
dealings [99:10,25] [100:2
,17] [122:25] [123:6] [218:
15,18]
deals [87:20] [109:11]
[117:4]
dealt [99:18,20] [120:1]
[146:1] [147:6]
debt [86:5,11,12] [121:20]
[130:8] [182:6] [188:16]
debtors [5:5] [26:19] [37:17]
[40:12] [41:24] [42:7]
[81:2]
december [8:2] [115:13]
[205:8] [212:15]
decide [178:15]
decided [29:2] [123:7]
[148:2]
decimated [98:22,23]
decision [9:18,22,24]
[26:23] [27:4,13,18,19]
[30:1] [31:1,6,8] [33:8]
[40:3] [52:16,19] [53:5,10]
[75:3] [77:9,10,12] [162:3
,4] [166:3] [172:20] [208:12]
decisions [17:3] [74:21,24
,25] [75:4] [93:4] [98:5,7]
[114:21,23] [198:18,21,24
,25]
declaration [4:] [79:12]
decrease [129:15] [190:20]
[215:14]
decreased [125:24] [136:6]
dedicated [32:18]
deductions [58:3]
default [211:5,7]
defendants [2:] [4:] [5:7,15]
[39:21] [89:13]
defended [24:15]
deficient [24:23]
definitions [17:13]
degree [44:13,14,16] [172:
24]
delaware [5:8] [50:2] [160:
8]
delay [201:14]
delinquencies [101:14]
delinquency [91:25]

delivered [161:13]
deloitte [59:20]
demand [77:23] [101:19]
demanded [17:17,21]
demands [77:18]
denise [3:] [221:3,21]
[222:5]
dennis [52:11] [154:23]
department [100:3] [165:16]
[204:6]
deponent [221:10]
deposed [6:10] [7:25]
deposition [3:] [5:3,9]
[6:13] [8:5,11] [43:3]
[65:25] [70:12,16,20]
[71:5] [168:9] [220:10]
[221:6,7] [222:1] [223:1,12]
deposition...with [222:11]
derived [65:5]
describe [101:4] [109:18]
[117:11]
described [15:3] [56:3]
[97:25] [105:17] [129:25]
[152:18] [189:15] [209:2]
[212:23]
description [71:11] [72:13]
desire [194:18] [195:1]
[222:10]
despite [142:21] [145:1]
[171:7]
detail [139:16]
detailed [19:13] [39:2]
[95:7] [137:13]
deteriorate [141:25]
deteriorated [125:7]
deteriorating [40:21] [92:6]
deterioration [98:19]
determine [143:11]
determined [21:5]
devastated [124:21]
develop [157:1] [158:1]
[190:24]
developing [90:12,22]
[143:4] [157:2] [161:4]
developments [214:2]
devote [184:5]
dictate [18:20] [19:11]
[134:20]
dictated [52:15] [77:16]
dictating [19:8] [52:18]
didnt [16:6,7,8,18] [32:10]
[39:5] [48:7] [73:11] [91:16]
[100:17,20,21] [118:24]
[119:8,9] [125:4] [127:24]
[132:15] [133:2] [144:1]
[146:7,10,11] [148:3]
[154:24] [164:5] [171:16]
[173:25] [178:4] [187:24]
[199:5] [200:19] [201:21,24]
[207:1,7] [210:8] [211:23]
difference [92:24] [122:3]
different [14:16] [45:17]
[71:15] [72:22] [101:16]
[102:5] [104:5] [106:2]

[114:3] [115:6] [136:8]
[146:1] [149:14] [153:12]
[175:4] [185:23,24] [197:8
,13] [206:13,14]
difficult [21:12] [31:23,25]
[34:23,24] [36:6] [84:23]
[96:4] [112:14,17] [114:18]
[156:23] [158:8]
difficulties [156:24]
difficulty [20:1] [201:12]
diligence [13:25] [119:5,7]
[202:22] [203:6]
dinner [68:22,25] [69:3,4,8]
[149:11] [159:5] [218:19]
dip [165:9] [191:15,17]
[197:10] [202:2,9] [203:10]
[204:17,19,21] [205:11,20
,21] [206:7] [207:19,20]
[208:13] [209:5,21] [210:11]
direct [156:20] [158:20]
[160:21] [169:2]
directed [12:4] [36:23]
[141:3] [186:11]
directing [155:8] [181:11]
direction [20:16] [138:2,18]
[139:8] [198:22]
directly [159:18] [164:18]
director [17:21] [18:8]
[159:16]
directors [4:] [9:15,20]
[16:23] [18:21] [27:22]
[51:24] [52:7,22] [53:1,14
,16] [89:16] [116:22] [132:
1] [153:19] [158:17] [170:15
,24] [179:17] [181:8]
disagree [12:16] [26:2]
[37:22] [70:2] [181:19]
[183:5]
disagreed [25:21] [114:20
,23] [127:11] [164:24]
[173:12] [174:13] [182:21]
[183:3] [192:2]
disagreeing [12:13] [26:1]
[183:10]
disagreement [182:22]
[183:8]
disappointed [23:14,17]
[218:3]
disappointing [192:15]
disbursed [215:10]
discharge [53:1]
disciplined [144:14]
disclosed [122:6]
discontinuance [155:18]
[156:10]
discounted [175:24] [176:
18]
discretion [135:13]
discuss [78:17] [124:1]
[149:8] [157:11] [164:8]
[175:19] [185:6]
discussed [27:2,18] [31:4]
[71:2] [76:20] [85:5] [125:
16] [140:19,21,23,25]

A.7

[159:14] [185:25] [210:11]
discusses [175:17]
discussing [68:25] [117:12]
[189:1]
discussion [10:2] [43:4]
[64:16,21,25] [65:1,20,23
,24] [66:1,24] [67:10,17]
[68:11] [78:12,20] [92:11]
[113:10,14] [126:18]
[149:21] [155:2] [180:19,20]
[181:7] [185:22] [195:6]
discussions [64:5,8] [65:17
,19] [67:11] [68:19,24]
[100:23] [113:9,15] [123:1]
[133:25] [140:14] [141:13
,20] [154:19,21] [155:4]
[158:25] [159:2,16] [166:13]
[173:23,24] [176:9] [183:2]
[184:9] [195:3] [211:14,16
,19] [212:3] [214:23]
disposed [125:1]
disposing [218:7]
disruptive [203:9,15,18]
dissatisfaction [216:6]
[217:5,13]
dissatisfied [201:10] [203:
24] [210:25]
disservice [196:15]
distinct [145:24]
distinguished [220:3]
distraction [177:4,14]
distress [20:4]
distributed [62:20] [63:13,18]
[64:12]
distribution [63:20,22]
[107:25]
distributions [61:14,18,21
,24] [63:7] [64:10]
district [5:8]
diversify [111:11]
diversion [34:21]
diverted [177:8,10,11]
diverting [34:17]
dlj [18:8]
document [59:1] [66:18]
[78:13,18,21] [79:5,16,20]
[89:13,22] [90:13] [116:20]
[117:2] [148:11,16,20]
[150:24] [153:14,18]
[154:1,3,7,11,16,17]
[157:19,25] [158:13,14,22]
[160:23] [170:12,14,20]
[179:15,24] [188:19]
[192:3,4,6] [193:12,18,20]
documentation [160:13]
documents [10:7] [28:1]
[33:2] [131:22] [133:3]
[138:20] [213:20,23]
doesnt [20:3] [89:23] [103:
7] [111:9] [154:15] [181:22]
[182:9]
doing [25:20] [27:1,2]
[95:15] [105:2,4] [108:25]
[118:17] [119:19] [126:3]

[152:4] [160:19]
dollar [34:4] [36:15,17,18]
[38:13,15] [61:21] [129:1]
[152:20,22,25] [217:22]
dollars [63:3]
donald [2:]
donaldson [18:8]
done [20:13] [21:22] [33:11]
[49:24] [58:13] [74:4]
[77:5] [101:20] [104:11]
[117:9] [138:21] [142:10]
[150:24] [158:13] [170:9]
[177:19,22] [192:2] [202:1
,5,6] [208:21] [216:7]
[217:11] [219:7,23]
dont [8:19] [11:1,20] [16:10
,19] [18:10] [19:7] [21:1,7]
[24:11,25] [28:24] [29:3,8]
[32:16,21,22] [33:13,22]
[34:2,8] [35:4] [36:2,7]
[37:21,24] [38:1,2] [39:1]
[40:19] [42:16,17] [44:10]
[48:14] [51:4] [52:13,18]
[53:19] [57:14] [58:15,23]
[60:24] [64:1] [66:2,3]
[67:18,23] [68:10,17,19,24]
[69:13,14,16] [73:21]
[77:12,24,25] [81:3] [82:10]
[85:4,21] [87:2] [88:3]
[90:14] [92:12,15,20,23]
[95:7] [96:14] [97:10]
[98:2] [100:20] [104:5]
[105:19] [106:11] [107:9]
[108:10] [113:14] [114:18]
[116:12] [119:8,11] [122:2
,9] [123:22,24] [127:10,25]
[131:3,23] [133:4,16,23]
[134:7,9] [135:21] [139:13]
[140:17] [141:25] [144:24]
[145:15] [148:22,25]
[156:6] [159:16] [161:2,16
,17,20] [164:19,24] [166:18
,25] [167:3] [168:9] [170:2]
[171:2] [172:9] [173:20]
[176:2] [177:21,23] [183:2
,9] [184:8,14] [190:25]
[191:11] [192:14] [193:23]
[195:8] [201:11] [202:8]
[205:7] [206:14,18] [210:13
,16,18] [211:7] [212:10,12]
[214:22] [215:19,20]
[218:25]
doomed [192:19]
door [148:1]
double [101:21]
doubted [207:13]
doug [33:10] [65:9,13,14,21
,24] [66:3,20] [107:4,13]
[108:3] [109:14] [113:15]
[127:20] [130:13] [134:8]
[184:23] [201:20]
douglas [4:] [79:11,12]
dougs [107:1]
down [15:11] [18:22] [22:17]

[35:5] [36:10] [75:20] [83:17
,18] [119:10,16,17] [123:3]
[134:2] [148:2] [159:5]
[175:20] [199:10] [202:3,15]
[203:3,4] [214:7]
downpayment [83:15]
[136:7]
downsize [75:7] [93:17]
downsized [75:9] [144:19]
downsizing [76:19,25]
[144:21]
downturn [76:23] [77:1,4]
[93:17] [156:24]
downward [84:23]
draft [213:20,23]
drafts [79:20,23]
dramatically [125:24]
[193:2]
drastic [30:2]
draw [26:15]
dream [173:9]
drew [95:7]
dried [113:24]
driving [25:22] [204:4]
drove [138:7]
drugs [7:22]
duane [73:17] [76:3]
due [11:14] [33:21] [82:8]
[84:14] [146:16] [150:14]
[202:22]
duly [5:22] [221:5]
during [12:25] [13:17]
[15:22] [18:24] [50:6]
[51:25] [59:11,20] [81:6]
[82:12] [84:20] [86:6]
[92:7] [94:17,19] [99:17]
[110:14] [114:2,13] [200:14]
duties [46:7,9] [51:14]
[52:23] [53:2]
duty [46:14,17,18] [47:1]
[179:2,3]
dynamic [218:2]

E

earlier [6:5] [22:4,10] [26:12]
[29:6] [33:23] [36:20]
[53:4] [75:25] [94:1] [110:
4] [113:20] [128:1] [130:1]
[133:10,15] [141:14,16]
[149:13] [165:12] [174:7]
[180:22] [187:16] [188:1]
[201:13] [206:13] [213:8]
[217:16]
earliest [181:17]
early [76:21] [86:10] [87:17]
[104:12] [115:13] [147:19]
[183:6] [205:8] [218:19]
easier [85:11]
easy [215:18]
economic [98:13] [99:2]
economy [98:15]
educational [44:8]
edwards [76:12] [88:16,23]

[89:11] [90:16,17] [92:9,24]
effect [27:3] [33:11] [40:11]
[41:10,23] [42:6] [92:19]
effecting [222:13]
effective [105:14,18,23]
either [16:6] [30:23] [31:1]
[64:17] [65:12,18] [67:11]
[87:19] [97:8] [125:2]
[126:22] [142:5] [152:1,7]
[172:5] [200:1] [205:18]
[208:21] [212:25]
element [152:6] [199:24]
elements [31:15]
elicit [185:11]
eliminate [91:21] [123:7]
[215:18]
eliminated [72:17] [154:14]
[193:2]
else [35:13] [68:16] [71:3]
[99:15] [107:18] [119:3,25]
[126:8] [127:18] [132:13]
[134:10] [160:10] [184:14
,22] [203:1,20] [216:23]
embarrassment [164:7]
emerge [143:22] [178:13]
emerged [178:14,20]
employed [13:2] [43:10,13
,14] [45:5,7] [56:5,7,8,9]
[58:2,3] [59:3] [60:5,8,16]
[61:7] [74:3]
employees [17:17] [32:17]
employment [4:] [56:12]
[57:1,22,23] [148:8] [221:
16]
enable [25:14]
encompasses [46:14]
encourage [193:19]
encouraged [26:19]
end [139:18] [197:23]
[91:15] [153:8] [212:12]
ending [58:7]
engage [21:4] [103:19]
[106:10] [119:4] [145:17]
engaged [147:4] [152:14]
engagement [162:9] [216:
18]
enhancement [88:15]
enough [12:9] [24:11]
[25:3] [71:6] [73:22] [77:18]
[81:7] [93:16] [94:5] [167:
19,20] [180:5] [187:9]
ensued [181:7]
enter [25:12]
entered [13:16] [16:3]
[20:15,18,20] [47:9] [55:17]
[111:3] [222:11]
entire [50:6,22] [110:15]
[117:2] [185:22]
entirely [217:16]
entirety [148:16]
entities [47:3]
entitled [61:8] [63:21]
[65:11] [80:4] [170:14]

entitlement [64:6]
entity [23:20] [46:18] [93:17]
  [101:8] [110:8] [115:9]
  [130:7] [131:5,8] [204:13]
enumerated [175:12]
equal [35:24]
equity [87:9,13] [164:1]
  [179:5] [182:7] [188:16]
equivalent [35:7,23]
esq [2:]
essence [19:11] [21:18]
  [180:25]
essentially [9:11] [20:25]
  [22:5] [64:21] [65:1] [77:7]
  [86:17] [106:18] [109:1]
  [113:24] [114:2] [115:7,11
  ,12] [137:15] [142:20]
  [147:25] [149:15] [188:15]
  [200:15] [203:17] [213:10]
established [59:9]
estimate [152:11,23]
estimates [192:8]
et [5:5,7] [101:22]
evaluate [169:25]
evaluation [169:10]
even [9:4] [20:10] [29:14,22
  ,24] [36:1,9] [86:14] [103:13]
  [108:23] [122:6] [171:23]
  [192:20] [202:9] [203:2]
  [211:24]
event [36:20,21] [59:23]
  [131:13] [138:22] [141:19]
  [144:7] [157:3] [211:5,7,8
  ,10]
events [10:7] [22:9] [80:4,13]
  [130:16]
eventually [194:12]
ever [16:2] [29:4] [46:6]
  [68:8,11,15] [92:20] [115:
  13,16,17] [125:11] [128:11]
  [134:19] [137:8] [140:12]
  [145:3,17] [147:12] [150:25]
  [201:11] [204:16]
every [35:8,9] [153:22]
  [170:21] [193:23]
everybody [35:13]
everything [149:21] [208:3]
exacerbating [98:14]
exact [96:22] [195:21]
exactly [8:19] [65:15]
  [142:1] [200:10]
exam [44:17]
examination [3:] [6:1]
examined [5:22]
example [102:15] [111:19,20]
  [198:25]
exceed [62:18]
excess [32:10] [95:20]
exchange [48:13] [49:2]
  [64:14,17] [163:25] [164:1]
exchanges [182:6,7]
exclusively [26:24]
excuse [20:19] [50:7]
  [55:6] [61:20] [117:19]

[145:12] [180:18] [184:4]
  [186:4] [198:17] [205:19]
  [210:5]
execution [169:12]
executive [50:24] [51:3,4,7
  ,11,15] [73:15] [90:18,19]
  [92:18] [93:2] [135:22]
  [141:3] [143:10] [161:1,3]
executives [65:7] [74:10]
exemption [164:4]
exercise [179:1]
exhibit [57:18,21] [79:6,8,10]
  [89:13,17] [102:24] [116:20
  ,24] [122:15] [148:11,13]
  [153:14,16] [158:14,18]
  [168:9] [170:17] [179:15,20]
  [180:14,15,24] [188:19,23]
  [193:12,15]
exhibits [4:] [26:7]
existence [134:19]
existing [29:15] [164:15]
exists [62:15]
exit [85:20] [103:15]
expand [27:14,19] [197:5]
expanded [81:2]
expanding [27:17]
expansion [81:4] [91:20,22
  ,23]
expectations [77:11]
expected [24:1] [149:23]
expenditure [37:15]
expense [42:13] [177:8]
expenses [28:13] [29:16,17
  ,19] [30:7,11,14,17] [33:25]
  [34:4] [35:4] [36:1,9,17]
  [150:15,16,20,21,22]
expensive [105:15,18,23]
  [106:7]
experiences [74:15]
experiencing [136:20]
  [214:20]
expertise [193:3]
expires [221:24]
explain [71:8] [196:3]
  [214:19]
explained [126:11]
explore [141:9] [174:14,16]
  [177:8] [181:12]
explored [174:6] [177:3]
exploring [60:7]
exposure [129:16]
exposures [128:24] [129:22
  ,24] [215:14]
express [140:12] [145:11]
  [164:17] [166:15]
expressed [68:12] [170:5]
  [183:8]
expressing [67:21]
extend [103:25] [183:8]
extended [72:3] [156:23]
extending [219:22]
extension [180:18]
extensive [180:19]
extent [7:14] [26:4] [35:18]

[36:18] [39:3] [54:2] [62:16
  ,18,22,24] [63:5,12,18]
  [66:10] [76:3] [91:19]
  [106:6] [109:2,13] [177:18]
  [183:24] [192:18] [202:6]
  [206:9] [213:16]

F

face [60:2] [187:17]
faced [85:17]
facilities [86:15] [91:21]
  [111:5] [191:13]
facility [13:12] [19:3,6,11,16]
  [21:11,21] [22:2,25] [23:16]
  [104:20] [110:25] [128:2,5
  ,7,9,16,20] [129:2,4] [130:
  1,5,7,12,20,22] [131:6,25]
  [132:8,10,20,24] [133:6]
  [137:12,14,19] [138:20]
  [139:12] [150:21] [205:5,6
  ,7,19] [207:1,14] [210:23]
  [211:6,9,24] [212:13,14,23]
  [213:1,2,6,9,11] [214:7,10
  ,11]
facing [156:23] [161:6]
fact [35:13] [56:2] [60:17]
  [67:13] [70:5] [75:10]
  [104:11] [107:12] [113:21]
  [118:3] [131:19] [140:4]
  [141:25] [142:21] [148:25]
  [152:17] [153:3] [157:17]
  [159:11] [161:8] [174:18,21]
  [176:23] [186:24] [189:19]
  [193:24] [202:13,14]
  [204:10,19] [205:16]
  [207:22] [211:12] [212:8]
  [217:6,8,23] [218:6]
factor [22:11] [28:15] [34:21]
  [96:8] [189:24] [199:17]
factored [195:11]
factors [94:5] [172:20]
  [175:17]
facts [10:4] [104:5]
factual [27:7]
failed [169:21]
failure [33:21] [192:19]
fair [7:3] [10:7] [12:9,23]
  [15:10] [25:3] [53:7] [71:6]
  [94:5] [122:20] [167:19,20]
  [180:5] [216:25]
fairly [27:12] [126:7] [156:16]
  [177:12]
fall [77:19] [119:13] [123:4]
  [163:6,7] [173:3]
familiar [6:12] [88:13]
  [110:8] [132:9,23] [147:9]
  [151:13] [153:1]
familiarize [153:21] [154:7]
family [55:9] [71:2] [190:6]
fannie [85:12]
far [15:24] [18:18] [22:21]
  [23:15] [24:17] [27:4,18]

[29:5] [33:18,19] [35:25]
  [36:10] [46:24] [70:18]
  [92:12] [105:25] [107:7]
  [113:15] [115:16] [126:15]
  [139:15] [154:21] [155:2]
  [157:18] [158:8] [163:11]
  [164:25] [166:19,23]
  [167:2] [168:23] [183:11]
  [197:11] [205:25] [218:24]
fashion [53:2]
fast [81:7]
faster [76:7,25]
favorable [29:25]
fax [2:]
faye [52:12]
feasibility [169:11,25]
feasible [143:18] [169:24]
  [181:24]
federal [44:20] [222:8]
fee [35:10,12,14,16,22]
  [36:2,12] [38:17] [125:18]
  [176:14] [185:22] [188:14]
  [190:17] [195:16] [213:5,7
  ,10,16,18,24]
feel [142:23] [192:18]
fees [11:17,21] [39:24]
  [40:15] [41:25] [42:4,9]
  [62:19] [106:24] [107:7]
  [120:22] [129:17] [132:9,11
  ,16] [162:12] [185:25]
  [190:23] [191:1] [212:1]
felt [100:2] [152:5,8] [164:17]
  [165:5,12] [168:9] [174:15]
  [180:7] [181:4] [200:12]
  [202:20] [208:1] [209:8,11]
felts [170:5]
few [6:15] [104:4] [111:23]
  [114:2] [125:13,23] [199:10]
  [210:2] [215:19,23] [219:22]
fewer [82:22]
fiachra [22:22] [23:10,11,21]
  [27:1,2,18] [68:22] [69:7]
  [97:20] [112:21] [113:6]
  [115:12] [123:15,20] [127:20]
  [140:24] [147:20,23]
  [148:3] [149:13,15] [152:8
  ,12] [159:4] [164:11,22]
  [185:2] [202:23] [203:3]
  [204:4,11] [207:5] [210:2]
  [211:22] [215:13] [217:4,9
  ,17,20] [218:1,24]
fiachras [99:19] [112:22]
  [148:7]
fiduciary [46:7,9,14,17,19
  ,21] [47:1,7,10] [52:22]
  [53:1] [179:2,3]
field [45:15]
fifty [168:4]
fiftyone [168:4]
fifty-one [168:4]
figure [62:9,14] [120:18]
figures [62:21]
file [9:7,11,19,24] [21:17]
  [22:5] [34:22] [53:6] [73:7]

[96:8] [126:23] [127:5]
[143:25] [144:2,4,8,11]
[159:24] [160:2,3,5] [163:
16] [182:19] [187:22]
[200:20]
filed [8:12,21,25] [10:12,15
,20] [11:13] [12:7] [21:23]
[24:16] [26:11,12] [38:22]
[39:6] [65:21] [72:15]
[73:9] [78:10] [79:19,21]
[80:13] [83:2] [84:7,11]
[87:23] [108:9] [115:4]
[168:14] [177:20] [183:6,7]
[199:18] [200:11,22]
[201:17,25] [202:25]
[203:8] [204:2,3,8] [217:18
,19]
filing [13:5] [22:15] [23:18]
[24:4,9] [49:18] [50:14,18]
[53:21] [54:13] [75:17]
[78:14,22] [80:5] [91:16]
[106:10,12,13] [120:3]
[126:19] [141:18,21]
[142:24] [143:19,20]
[145:1] [146:12,13] [147:2]
[152:1,5] [157:9,22] [160:
17,20] [161:23] [163:4,10,12]
[165:8] [166:17] [167:11]
[168:1] [171:22,24] [173:19]
[174:1] [177:5,9,15] [178:
11,25] [183:1,3,6,9,10]
[184:18] [185:6] [187:24,25]
[189:17] [191:14] [195:4,7
,11] [199:13] [200:2,5,8,13]
[201:15,19,22,23] [202:10
,16,19] [203:15,18] [204:18]
[205:11] [211:5] [212:21]
[215:16]
filings [79:3] [203:16]
final [37:7,11] [40:10]
[122:16] [154:8] [158:21]
[161:12]
finality [16:9]
finally [93:23] [134:2]
[153:8]
finance [71:22] [72:9]
[87:21] [91:23] [102:12]
[103:10,21] [104:9] [108:14]
[112:6] [137:16]
financed [28:19,23] [29:15]
[85:12]
financial [11:14] [13:9,14]
[15:2,7,8] [19:20,24]
[20:1,4] [30:16,20] [34:14]
[36:16] [40:14] [47:8]
[54:25] [97:1,6] [108:18]
[110:22] [119:2] [128:23]
[141:24] [147:5] [157:3]
[159:1,8,11,13,18] [161:5
,25] [163:1] [166:9] [168:25]
[175:22] [181:15] [183:14]
[191:7] [194:23] [201:3,12]
[203:12] [204:8,14] [205:12]
[206:17] [208:11] [216:7,17]

[217:15]
financially [75:10]
financing [28:24] [103:14,18]
[105:15] [129:11] [160:15]
[163:13] [191:16,17,18]
[197:9] [204:19,21,22]
[205:1,4,6,11] [206:7,11,16]
[207:19,20,23] [208:8,13]
[209:5,9,10]
financings [140:16] [205:3]
find [28:9,22] [104:11]
[105:6] [146:9] [214:9]
fine [34:12] [57:17] [79:7]
[90:9] [96:14] [168:11]
[219:24] [220:6]
finish [7:1,8]
finished [197:20]
firing [17:17]
firm [45:1,3,6,7,12,24]
[46:3] [48:25] [49:4,6,8,11]
[50:4,7,13] [55:5] [147:10]
[150:25] [151:5,13] [159:1]
[162:21,24]
firms [48:20,22,24] [49:13
,21] [175:5]
first [5:6,22] [6:18] [10:2]
[11:13,14,18,22] [13:14,17]
[16:6] [17:1] [18:9,11,13,16]
[19:1,7] [20:5,7,9,21,22,24]
[22:8] [23:1,19] [24:16]
[25:12,18,21] [26:13]
[46:2] [47:8] [48:1] [61:13]
[62:17,24] [63:5] [66:23]
[68:20] [79:2,3] [85:9]
[86:4] [87:1,20] [95:17,18]
[99:3,9] [101:10] [104:5,22]
[107:5,10] [108:24,25]
[109:3,4] [110:17] [111:2,23]
[112:3,17,24] [115:15]
[117:5] [121:21] [123:14,15]
[125:17] [145:5] [147:4]
[148:9] [150:3,7] [154:8]
[157:7] [158:20,22] [159:1
,8] [160:12,22] [161:21]
[174:16,18] [176:11]
[177:23] [180:1,2] [183:12]
[187:2,4] [190:19,25]
[192:7,10] [194:16,25]
[196:7,12] [202:18,21]
[203:2] [204:16] [205:4]
[208:19,22,23] [211:11,18]
[214:9] [215:5,11,13]
[217:4,10] [219:2]
fiscal [30:21]
five [45:7] [104:16] [179:13]
[188:11]
fleetwood [73:2]
flight [201:15]
flip [168:19]
flipping [176:14] [188:13]
[195:16]
flood [103:12]
floor [2:]
florida [72:6]

flow [91:14] [101:11,17]
[107:25] [133:2] [150:14,23]
flowed [132:24]
flows [34:25] [35:6] [125:24]
focus [13:4,22] [17:15]
[37:11] [72:24] [92:1]
focused [41:20] [179:2,3]
[191:7,10,12,24,25] [195:
3] [216:9,13]
focusing [14:22] [15:2]
[42:5] [48:1] [49:21] [51:24]
[52:6,25] [66:23] [100:9]
[105:21] [110:21] [191:19]
[204:17]
followed [13:18] [19:14]
following [44:18,19,23]
[156:21] [180:17,19]
[189:16,17] [190:13]
[209:20] [214:23] [222:7]
follows [5:23]
foot [148:1]
foothill [110:9,11,22] [111:
2,19] [202:3,6] [205:16,19
,22] [206:6,14,25] [207:2,7
,8,18] [208:2,7] [209:4,8]
[210:5,6] [212:3]
foothills [205:5,14] [208:12
,20]
force [21:4,17] [25:22]
foreclosures [124:25]
foregoing [221:8]
foregone [163:15]
forget [99:21] [152:25]
forgive [166:7]
forgotten [66:9]
form [8:14] [10:16] [14:4]
[19:22] [24:5] [38:25]
[40:1,17] [41:18] [42:14]
[55:20] [69:12,22] [79:24]
[80:17] [117:19] [120:8]
[122:8] [138:23] [161:9]
[175:4,5] [183:15] [194:13]
[216:19] [222:10,14]
formal [183:12]
formally [161:25]
formed [103:8]
former [49:6] [159:15]
forms [175:4]
formulating [182:24]
forth [80:12] [81:21] [82:3]
[84:1,5,6,8] [103:5] [137:12]
[150:8] [181:13,20]
forty [39:13] [80:15]
fortynine [39:13]
forty-nine [39:13]
fortysix [80:15]
forty-six [80:15]
forward [41:13] [86:13]
[92:8] [95:23] [126:12]
[141:21] [145:25] [146:4]
[152:1] [169:20,23] [178:3
,6,10] [180:24] [182:25]
[183:4] [191:13]
found [20:11] [78:14]

[105:19]
four [45:17] [60:10,11]
[73:6] [74:4] [95:13] [139:
25]
fourth [198:15,16,17]
frame [27:16] [28:17] [29:11
,23] [30:19] [81:5] [89:9]
[90:1] [103:9] [127:14]
[159:6] [170:8] [174:8]
freddie [85:13]
free [147:25] [163:5,7]
freebie [149:18]
friday [21:23] [201:17,25]
friend [147:22]
front [37:4] [164:7]
fti [59:19] [202:7] [203:10]
[205:10,14,16,19,20]
[208:21] [209:17] [210:5]
full [35:14] [77:8,24] [94:3]
[183:22] [196:12] [207:2,13]
[210:7]
fully [142:7]
function [199:22]
fund [21:24] [22:2] [109:23]
[125:22,23] [155:24]
[156:11]
fundamentally [31:13]
funded [21:25]
funding [21:20] [138:10]
fundings [203:13,16]
funds [69:11] [102:7,12]
[132:24] [215:8]
fungible [109:21]
furnish [196:21] [223:11]
furniture [98:22]
further [181:7] [184:8]
[203:16,17] [221:11,13,15]
future [81:15] [144:12]
[152:23] [158:8]

G
                                    
game [187:17]
gather [10:24]
gave [8:18,19] [21:22]
[72:13] [116:2] [124:17]
[144:22]
general [6:14] [10:2,3,9,11]
[11:3] [12:20] [13:8] [14:14]
[15:1] [16:10] [22:21]
[23:11,12] [25:10] [33:19]
[36:13] [46:12,15] [47:25]
[48:4,7,16] [49:20,23]
[50:7,21] [51:19] [58:17]
[71:4,10] [81:22] [82:4]
[84:3] [89:8] [98:13] [109:
21,25] [124:3,18] [126:5]
[135:5] [137:3] [138:22]
[139:5] [198:6]
generally [49:16] [72:16]
[81:6] [83:7] [101:7,24]
[104:22] [107:9] [110:4]
[112:5,11] [133:7,9] [135:
9] [136:23] [138:16] [186:1]

A.10

[212:2] [214:4,5]
generate [39:24] [41:25]
  [106:16] [140:5] [141:5]
generated [101:2,18]
  [102:7,12] [112:24]
generating [14:2] [40:13]
  [41:10] [42:4,9] [116:14]
  [140:13]
generation [41:11]
generous [219:21,22]
genesis [11:12]
george [76:8,14]
gets [62:25] [125:14]
getting [23:15] [35:14,15]
  [36:11] [38:16] [82:12]
  [129:17] [137:5] [149:22]
  [162:19] [164:13] [202:12]
  [211:22] [214:5] [217:25]
give [6:20] [7:9] [15:13]
  [17:25] [52:8] [71:10,13]
  [115:24] [123:9] [125:13]
  [134:13] [149:2] [204:15]
  [215:23]
given [79:25] [90:6] [145:4]
  [156:9] [159:10] [163:22,23]
  [197:10] [222:3]
given...for [222:12]
giving [7:18] [197:11,12]
glatt [2:] [5:17]
go [6:15] [9:24] [10:5]
  [12:14] [19:15] [27:19]
  [28:10] [39:14] [59:25]
  [80:21] [84:16] [91:10]
  [95:3] [104:4,6] [137:22]
  [138:15] [139:1,3] [166:19]
  [170:1] [171:3] [174:15]
  [175:20] [178:11] [179:18]
  [183:4] [197:3,15] [198:7,11]
  ,20,21] [201:24] [205:25]
  [207:8] [210:12]
goal [91:21]
goals [92:17]
goes [80:18] [109:22]
going [11:5] [15:3] [17:7]
  [19:18] [20:8,10] [22:2]
  [23:24] [26:15] [39:17]
  [43:2] [57:20] [59:10,24]
  [63:4] [77:15] [78:4,16,21]
  [79:4] [83:16,23] [89:12]
  [90:4] [93:1] [102:20]
  [105:12] [115:6,7,22]
  [116:19] [117:1,3] [118:23]
  [124:16] [126:12,23]
  [128:23] [138:2] [141:2]
  [148:8,10,15] [152:15]
  [153:13,22] [154:5,8]
  [158:14,20] [163:16]
  [168:5] [170:1,12,20]
  [175:6] [177:14,15] [179:22]
  [188:18] [193:11,17]
  [198:10] [200:19,20]
  [201:22] [206:23,24]
  [207:8] [210:9] [214:11]
  [215:25]

gone [19:24] [38:14] [98:9]
  [115:13] [138:18]
good [6:3,4] [14:19] [31:13
  ,16] [32:11] [43:19] [116:15]
  [170:22] [187:14,15]
  [191:21] [192:1] [198:14,20]
  [199:5] [208:16] [217:9]
  [219:25]
gorilla [118:19] [122:1]
gotten [108:14] [197:7,8,13]
govern [6:13]
grade [114:7,14,15,17]
graduated [44:11]
graduation [44:19]
grasp [169:21]
grateful [6:7] [12:17]
graves [2:]
great [78:19] [168:18]
  [219:24]
greater [167:17]
greenpoint [102:16]
greensboro [151:6]
greentree [87:22] [88:3]
  [102:14,16]
greenwich [106:17] [204:23]
  [205:6,21]
gross [82:7,11]
grossly [37:13] [38:5,10]
ground [6:13] [9:25] [215:21]
group [32:23,25] [72:5]
  [99:19] [100:7,10] [112:22]
  [164:14] [165:17] [210:17]
groups [33:1] [45:18]
grow [91:13] [172:25]
guarantee [114:10,16]
  [152:9,10,15,21] [153:2]
guaranteed [14:18,19]
  [81:18]
guess [31:3] [41:19] [45:19]
  [57:9] [58:1] [177:13]
guidance [10:19]
guidelines [33:20]
guilford [221:2]
guys [123:22]
g-w-y-n-e-d-d [43:7]

H

hadnt [93:16] [103:14]
half [124:24] [202:4] [208:17]
hand [57:21] [216:10]
handed [26:10]
hands [218:7]
happen [135:16,17] [161:8]
  [214:11]
happened [21:13] [30:18]
  [66:25] [68:1] [75:16]
  [95:22] [161:9]
happening [21:8,15] [161:
  19]
happens [43:2]
happy [7:6,8] [96:12] [121:
  15]

harbor [73:3]
hard [111:20] [112:6] [208:
  14]
hardly [35:15]
harvard [44:11]
hathaway [55:9] [112:9,18
  ,23] [113:2,7,20] [115:21,22]
  [117:25] [118:1,12] [121:12
  ,19] [122:7,12] [123:1,6,13
  ,19] [124:2] [152:3,9,16]
  [165:25] [166:1] [174:5]
  [176:8,10] [184:16] [185:7]
  [187:22] [189:6] [190:6]
  [191:20] [192:15,18]
  [193:8] [194:13] [196:22]
  [197:8,12] [200:8] [201:16]
  [204:24] [212:24] [213:3]
  [216:9]
hathaways [191:10] [195:1
  ,19]
havent [58:23] [64:8] [77:1]
  [90:6] [137:23]
having [5:22] [68:11] [71:5]
  [111:15] [123:5] [125:6]
  [149:10] [159:2] [161:17]
  [173:22] [178:14] [203:6,12]
  [211:18] [212:12] [215:2]
  [218:3]
head [89:5]
headed [126:6,10,16]
  [174:1]
heading [26:18] [178:25]
headquarters [119:17]
hear [178:4]
heard [150:25]
hearing [89:4] [174:11]
heavy [208:20]
held [5:9] [116:22] [153:20]
  [158:17] [185:15] [215:9]
help [15:25] [50:14] [97:21]
  [143:21] [167:10]
helped [54:5] [182:25]
helpful [6:24] [152:8] [187:
  23]
helping [167:25] [205:10]
herbert [99:20] [100:12]
hereby [221:4] [222:2]
hereunto [221:18]
hesitate [18:5] [19:1]
hesitation [58:1]
hickman [45:4]
high [83:5] [96:4] [135:21]
  [136:19] [150:13]
higher [32:2] [83:3] [95:13]
  [107:10] [142:9] [190:2]
hindsight [76:7]
hire [141:17]
hiring [17:17]
historically [105:14]
hit [125:4]
hits [99:2]
hitting [35:19]
holders [179:6]
hole [93:3]

home [28:11,25] [29:15,19
  ,20] [43:6,23] [72:2] [78:6]
  [85:11]
homeowners [72:3]
homes [5:4] [28:1,2] [30:3]
  [41:2] [44:1] [45:22,23]
  [46:22] [47:19] [54:19]
  [71:17,18,19,21,24] [73:2
  ,3] [83:11] [102:6] [104:24]
  [168:14] [170:14]
homestar [73:9]
honest [6:21] [7:18] [131:21]
hotel [3:]
hour [42:17] [58:13] [61:2]
  [202:4] [208:17]
hourly [57:7] [61:3]
hours [70:23] [203:4]
housing [73:25] [74:16]
  [83:20] [84:21] [85:6,10,14]
  [165:21,22]
however [9:9] [35:5] [86:12]
  [175:21] [193:3]
hundred [35:10] [48:24]
  [135:10] [146:21] [188:11
  ,14] [190:18] [192:12]
hundreds [131:2]
hung [165:8]
hunton.[49:12] [132:21]
hurt [111:9]
hurting [83:10]
hypothetical [63:8]

I

i.e [180:14]
id [10:4] [67:6,12] [79:5]
  [137:22] [138:13,15]
  [139:1,2] [179:14] [194:1]
idaho [43:19]
idea [25:21] [40:8] [112:18
  ,21,22] [123:18] [163:25]
  [190:22,24] [208:24]
ideas [16:5,9,17]
identification [57:19]
  [79:9] [89:18] [116:25]
  [148:14] [153:17] [158:19]
  [170:18] [179:21] [188:24]
  [193:16]
identified [52:22] [94:6]
  [184:2]
identify [74:25] [93:6]
  [149:16]
ill [7:1] [50:20] [71:13]
  [80:17] [120:8] [156:20]
  [167:15] [209:7] [215:24]
  [219:18]
im [7:6,8] [9:22] [11:5]
  [15:3] [26:15,17] [27:16,17]
  [29:7] [32:1,18] [38:6]
  [39:17] [43:1,14,15,18]
  [51:10] [52:12] [57:7,8,9,20]
  [58:13] [60:10] [63:16]
  [69:13] [70:7,10] [71:5]
  [76:25] [78:16,21] [81:3,24]

[83:23] [86:14] [87:2] [88:8]
[89:10,12] [90:4,23] [92:9]
[96:12] [97:8] [98:16]
[102:20] [106:23] [112:23]
[114:22] [116:19] [117:1,3]
[120:17] [121:23] [123:17]
[128:21] [129:12] [130:13]
[134:8,18,22] [139:4,14,18]
[140:22] [141:2] [144:18]
[146:20] [148:10,15]
[149:15] [153:13] [154:7]
[158:13,14,20] [161:9]
[167:9,16] [168:5] [170:12]
[171:17] [178:4] [179:22]
[180:4] [189:7] [193:11,17]
[195:24] [197:2] [198:10]
[210:10] [213:12] [215:12]
**immediate** [8:25] [22:11]
[114:17] [125:20]
**immediately** [23:14] [44:18
,19] [97:9] [159:24] [160:2]
**impact** [74:22] [93:13]
[124:15,19] [125:21]
[150:22,23] [155:20,22]
[177:17]
**impacted** [208:12]
**impacts** [34:25]
**impair** [7:22]
**implemented** [157:3]
**importance** [136:13]
**important** [6:18] [92:14,17]
[111:6,11,14,16]
**impossible** [93:13]
**impression** [107:11]
**improve** [97:6]
**improved** [97:14] [198:4]
[216:20]
**improvements** [115:10]
**improving** [94:25]
**inadequate** [210:10]
**inappropriately** [215:7]
**incident** [134:22]
**include** [15:8] [61:13]
[102:14,16] [198:25]
**included** [13:25] [188:9,13]
[192:4] [196:18]
**including** [49:18] [85:6]
[171:13] [181:13] [195:16]
**income** [78:6] [142:20]
**incorrect** [25:9] [27:7]
[77:22] [150:11]
**increase** [91:14]
**increased** [28:17,18] [82:8
,11] [91:10] [136:5,6]
**increasing** [85:17] [86:13,15]
[128:8]
**increasingly** [83:17] [85:7]
**incurring** [86:5] [125:12]
**independent** [11:21] [49:15]
[71:20,25] [91:13] [130:25]
[198:4]
**index** [4:]
**indicate** [68:8]
**indicated** [6:8] [23:21]

[24:1] [38:11] [85:19] [186:
12,14] [190:3] [201:18]
[210:6,25] [211:22] [215:13]
[216:8] [217:20]
**indicates** [154:17] [161:12]
[171:12] [180:17] [194:6]
**indication** [210:9]
**indications** [175:9] [177:16]
[186:21] [187:6,8] [195:9]
[214:4]
**individual** [107:15] [135:6]
**individuals** [53:17] [100:3]
[149:11] [210:3]
**industries** [72:22] [102:6]
**industry** [27:12] [71:9]
[73:22,25] [74:16] [75:9]
[82:13,19] [83:10] [85:2,6
,10] [87:22,24] [98:9,11,22
,23] [103:10,15,17] [120:22]
[126:13] [156:24]
**inflation** [84:22]
**influence** [134:20]
**influenced** [39:22] [172:24]
**inform** [121:22] [174:5]
**information** [10:24] [31:23]
[64:20] [157:21] [174:9]
[175:1,6] [186:18] [187:2]
[214:17]
**informed** [53:10] [121:23]
[130:15] [154:13] [203:3]
[214:6]
**inherent** [121:8,16] [156:22]
[175:23]
**initial** [32:6] [87:11] [88:22]
[192:5]
**initially** [129:7]
**initiated** [209:20]
**input** [109:16] [113:16]
[177:23]
**inquiry** [122:10]
**inserting** [139:12]
**inside** [172:5,6] [175:11,12]
[176:13] [178:21]
**instance** [17:16,20] [52:14]
**instances** [114:24]
**institute** [26:23]
**instituted** [27:9] [75:25]
**institution** [19:20] [151:3]
**institutions** [19:24] [108:19]
[110:22] [159:13,18,20]
[160:18]
**instruct** [7:13]
**instructed** [118:4]
**instruction** [181:20]
**insurance** [72:2,3,4,5,7]
[113:25]
**insurmountable** [121:10]
**intend** [58:21] [70:6,8]
[166:19]
**intended** [92:11,14] [126:25]
**intent** [166:24] [167:7]
**intentionally** [42:10]
**interacting** [14:1]
**interactions** [120:2] [200:1]

**interest** [14:2,17] [21:6]
[95:12,14] [106:19] [121:5
,9] [122:11] [144:22] [175:
9] [177:16] [186:21] [187:6
,9] [195:10]
**interested** [187:5]
**interestonly** [14:17]
**interest-only** [14:17]
**interests** [16:25] [54:8]
[117:21] [191:22]
**interface** [109:7]
**interfered** [177:24]
**interim** [205:3,4,5] [212:19
,22]
**internal** [197:23]
**internally** [159:14] [214:21]
[217:4,10]
**interpose** [167:4]
**interpretation** [88:23]
**interrupt** [96:15]
**interviewed** [10:21] [56:23]
**interviews** [10:24]
**introduce** [5:11]
**inventory** [77:8] [78:4]
[91:18] [93:24] [94:2]
[97:11] [111:20] [112:13]
**investment** [40:14] [114:7
,14,15,16] [151:5,7]
**investor** [14:2] [101:19]
[118:13,23] [119:1] [163:11]
**investors** [215:10]
**invited** [118:18]
**involved** [14:9] [23:20]
[33:8] [39:4] [54:21] [71:15]
[86:23] [87:1,10] [92:15]
[108:2] [109:10,12] [117:15]
[130:10,13,14] [132:7,19,21]
[134:5,8,10] [164:12]
[165:19,21,24] [166:4,7]
[176:10] [215:5]
**involvement** [90:22] [208:
18]
**involving** [219:2]
**irwin** [99:25] [202:24]
**isnt** [16:25] [17:4] [115:22]
[116:4] [117:23] [118:3]
[122:7] [204:19]
**issuance** [145:19]
**issue** [29:22] [109:15,16]
[133:5] [146:6,7] [158:11]
[179:3] [204:17] [206:21,25]
[215:3,6]
**issued** [200:13] [216:21]
**issuer** [47:5] [215:4,6,8]
**issues** [81:25] [82:1,5]
[85:16] [101:16] [104:5]
[126:17] [128:23] [147:21]
[161:6] [198:1] [214:20,25]
[215:1]
**item** [117:6]
**items** [154:22] [155:3]
[164:8] [179:23] [188:8,17]
[199:9]
**iterations** [185:24]

**itself** [14:10] [24:7] [25:2]
[32:6] [33:17] [48:8] [78:14]
[114:7]
**ive** [26:9] [39:20] [76:22]
[131:2] [167:1] [203:14]

**J**

**j.c** [86:25]
**jack** [149:22]
**january** [205:9] [212:16]
**jared** [100:2] [152:7] [164:8
,11,23] [165:1,3] [173:24]
[185:2] [200:12] [202:2,8,23]
[207:5,6] [208:15] [210:2,4]
[212:4] [216:20]
**jareds** [100:4]
**jd** [44:13,14]
**jenrette** [18:9]
**job** [33:11,15] [47:16,18]
[48:3] [51:14] [107:1]
[147:25] [191:21] [192:1]
**john** [99:20] [100:13]
**joined** [50:18]
**joining** [45:24]
**jr** [2:]
**judge** [44:20]
**july** [29:10,23] [60:25]
[96:24] [116:23] [125:7]
[148:20] [158:17] [159:23]
[77:7] [94:3,4] [125:7]
[127:13] [141:15] [153:20]
[154:12] [158:4] [221:25]

**K**

**kareem** [99:11,12]
**kclh** [116:21]
**kclh1176** [116:21]
**kclh-1176** [116:21]
**keep** [25:14] [29:14] [31:10]
[92:14,16] [214:1] [219:14
,15,18]
**kennedy** [45:4] [49:5]
**kept** [40:20] [42:11] [107:4]
[130:15]
**kerp** [59:1] [60:20] [65:5]
**key** [33:3] [59:3] [60:5,7,15]
[61:7] [93:7] [130:15]
[155:15]
**kilbourne** [95:2]
**kind** [7:21] [25:14] [43:24]
[48:23] [56:11] [60:21]
[68:15] [73:24] [89:6]
[96:11] [107:18] [113:17]
[120:22] [129:11] [149:20]
[151:3] [167:1]
**kinds** [87:15] [110:11]
**kit** [43:22,23]
**k-i-t** [43:23]
**knew** [26:25] [105:25]
[118:21] [121:21] [142:10
,11] [152:2] [206:23] [211:

9]
knocked [213:11,15]
know [6:6] [10:23] [11:1,15
,19,20] [15:20] [16:10,16,19]
[18:10,18] [23:4] [29:3]
[33:22] [36:12] [37:21]
[40:5] [46:25] [48:12]
[51:4] [54:25] [55:5] [57:11]
[58:23] [61:20] [62:12]
[64:2,17,22,23] [65:2,8,10]
[66:3] [68:7] [69:13,14,16]
[70:18] [71:5] [74:15,17]
[77:10] [90:15] [92:21,22]
[95:7] [98:2] [106:24]
[107:7,9] [108:22] [109:14]
[110:14] [112:17] [113:14]
[114:18] [117:9] [118:16,24]
[119:4,8] [120:13,18,21,25]
[121:9,24] [122:2,9,18]
[123:22] [126:21] [127:8,10
,12] [128:18] [129:13]
[130:6,18] [131:10,25]
[132:6,18] [138:4] [141:1]
[146:18] [148:17,19,25]
[151:19,22] [152:3] [153:8
,23] [154:4] [159:11] [162:
22] [163:8] [165:18] [166:18]
[167:22] [168:23] [177:1]
[182:4,8] [183:11,25]
[184:7,14] [189:3] [190:5]
[193:23] [194:12,15]
[195:9] [200:7] [202:6]
[203:1,2,14] [205:2,8]
[206:1,10] [207:4] [210:13]
[211:7] [212:10,12] [213:4
,8] [214:13] [218:23]
knowing [36:7] [40:12]
[42:7]
knowledge [11:9] [27:21]
[55:23] [140:9] [151:16]
known [88:14] [110:9]
[116:11] [122:2,4,13]
[147:10] [151:10,13]
kvarda [64:9]

L

lack [137:15]
laid [137:4]
landon [100:4] [165:13]
lane [43:7]
language [38:23]
lap [30:23] [36:24,25]
[37:13] [38:4] [39:23]
[43:4]
large [93:23] [129:17]
[199:22]
larger [104:24] [133:24]
[134:1]
largest [174:14]
last [43:12] [81:1] [99:13,21]
[108:4] [150:10] [218:14,17
,20]
late [30:19] [77:19] [86:6]

[94:12] [96:24] [98:1,3,4]
[104:12] [105:1] [110:19]
[147:19] [202:4] [205:8]
[208:18] [212:15]
later [12:15] [36:20] [74:22]
[91:24] [99:14] [146:14]
[183:9] [200:17]
launched [43:3]
law [44:19] [162:21] [164:3]
laws [6:20]
lawsuit [10:10,25] [11:4,12]
[12:5] [24:3,16] [26:11]
[56:21,24] [60:22] [61:6]
[62:14] [65:18,20,22]
[66:4,21,25] [67:12,18]
[68:13] [69:10,15,20]
[71:3]
lawyer [9:22]
lawyers [162:18]
lax [136:21] [198:25]
lead [103:6] [108:23] [109:
1] [154:19] [209:13]
leadership [73:19]
leadin [103:6]
lead-in [103:6]
leading [23:14] [80:4]
[155:4]
learn [33:24] [107:12]
[206:6]
learned [11:10] [34:7]
learning [34:3]
least [13:19] [55:23,24]
[67:13] [88:24] [98:10]
[105:15,23] [107:11]
[129:7] [133:25] [159:20]
[163:14] [207:17]
leave [14:7] [47:12,16]
[54:15] [60:14] [113:17]
leaving [160:10,11]
led [34:21] [141:22] [154:18]
[193:7] [205:20]
left [17:25] [57:11] [76:18,24]
[88:7]
legal [46:1,11] [58:4] [121:
6] [204:6]
legg [86:25]
lend [206:13]
lender [40:14] [83:20]
[85:14] [112:7] [202:9,18]
[203:10]
lenders [103:12] [111:7,10
,16] [205:20] [206:13]
[210:11]
lending [83:12,14,16]
[85:3] [95:9,12] [134:25]
[202:15] [205:23]
lends [111:19]
lengthy [170:20]
less [23:25] [105:18] [175:
6] [182:8] [201:6] [206:2]
[207:15]
lessened [20:2]
let [6:15] [7:8] [12:23]
[17:15] [18:1] [27:5] [32:2]

[37:8] [43:14] [50:21] [71:4]
[117:9] [148:17] [152:3]
[153:23] [167:15] [197:3]
[217:1]
lets [13:4,22] [15:11] [23:3]
[25:14] [37:25] [57:16,17]
[71:6] [72:24] [76:13]
[83:5] [91:10] [104:14]
[179:7] [182:1,4] [184:16]
[210:22]
letter [148:24] [149:6,22]
[150:4] [166:8] [167:23]
[213:17,19]
level [32:2] [77:22] [96:5]
[122:11] [135:12] [136:19]
[139:15] [140:23]
levels [150:13] [185:24]
[217:24]
liabilities [143:21] [152:15]
[171:25]
liability [85:23]
life [39:24] [72:4]
lifting [208:20]
light [156:22]
liked [122:2,4]
likely [209:5]
limit [91:20,22]
limited [82:16] [167:24]
line [7:7] [84:12] [107:7]
[110:13] [111:2] [117:1,3]
[138:17] [139:19] [222:15
,16,17,18,19,20,21,22,23
,24] [223:2,3,4,5,6,7,8,9]
lines [56:2] [173:18]
linklaters [2:] [5:14]
liquidate [112:14] [114:19]
[118:6]
liquidated [113:21]
liquidating [205:18]
liquidation [5:5,18] [10:18]
[11:17] [55:13] [64:4]
[69:10]
liquidity [9:3] [13:10] [15:25]
[16:1] [28:18] [34:17,21]
[36:4,5,14,15,19] [91:15,17]
[101:2] [106:16] [111:12]
[115:25] [116:15] [137:15]
[140:6,13] [141:5] [145:10]
[155:20,24] [156:10,14,25]
[157:24,25] [158:5,7,12]
[170:3] [173:1]
liquified [13:13]
list [161:4]
listed [48:10,12]
listening [187:18]
listing [49:1]
litigation [85:18]
little [39:20] [78:19] [90:5]
[98:1,2] [125:20] [134:23]
[141:15] [149:10,25]
[193:8] [214:15]
live [207:4]
loan [9:6] [12:1] [13:12]
[16:3] [19:2,5,10,15]

[20:23] [21:11,21] [22:2,25]
[23:16] [24:9] [25:19,20,22]
[26:20,23] [27:9,10,14]
[28:6,10,16,19,23] [29:16]
[31:12,22] [32:6,14,18]
[33:8] [35:18] [36:25]
[40:4,6,20] [41:14,25]
[83:20] [94:7,23] [96:7]
[103:21,25] [104:3,23]
[106:4] [108:15] [111:22]
[123:7,21] [124:2,15]
[129:4,8] [130:1,12,19]
[131:25] [132:8,24] [135:6]
[137:12,14] [140:16,25]
[155:19] [199:8,12,19,22]
[210:22] [211:6] [217:18]
loans [13:13] [19:15] [21:20
,24] [22:2] [23:19] [40:23,24]
[41:2] [71:23] [72:10,11]
[93:14] [95:16] [96:2,4]
[101:7,11,12,13,14,15]
[104:7,14,21] [105:1,2,4]
[106:17] [115:12,16]
[137:17] [218:8]
lobby [31:10]
lobdell [45:4]
localized [73:4]
long [7:12] [38:7] [56:5]
[70:22] [78:12] [104:20]
[182:9]
longer [21:10] [22:1] [25:16]
[40:24] [41:9] [42:3] [51:5]
[78:19] [88:1] [201:24]
longterm [104:20]
long-term [104:20]
look [28:24] [36:16] [64:24]
[90:4] [103:8] [114:3]
[147:21] [148:17] [163:19]
[171:6] [177:13] [180:5]
[182:1]
looked [19:20] [28:3] [126:
20] [131:22] [137:24]
[180:14] [196:6] [215:15]
looking [13:15] [83:9]
[98:15] [122:16] [183:12]
[186:20] [195:23] [215:14]
looks [58:5,8] [65:2] [169:1]
loose [136:3] [198:3]
los [2:]
lose [35:21]
losing [195:20] [196:7]
loss [28:8,14] [29:5] [31:18]
[36:4,5] [38:13,15] [125:14
,17,18] [218:7]
losses [30:4] [31:20] [35:11
,19] [41:3,4] [124:24]
[125:12]
lost [114:16]
lot [9:25] [28:12] [32:10]
[37:20] [47:2] [95:6] [107:
21] [142:13] [160:1,1]
[161:19] [185:21] [217:4]
lots [114:22]
lotus [4:] [112:20] [116:10,11]

[117:4,12,18] [118:9,22]
[119:5,21] [120:14] [121:5]
[122:24] [124:16,20]
[125:21] [188:22] [190:12
,20]
**lotuss** [190:15]
**low** [176:24,25]
**lower** [82:25] [83:11,17]
[85:2] [129:21]
**lowered** [97:11]
**loyalty** [46:18] [47:3]
**lucky** [201:22]
**lufkin** [18:8]
**lunch** [139:19]
**luncheon** [139:23]
**lynch** [87:4,14,17,19,25]
[88:2,5] [108:25]

———————

M

**m&a** [100:7]
**magnitude** [30:7,11] [33:25]
[104:2] [106:5] [135:20]
**mail** [4:] [64:9,13,17,25]
[148:19] [193:13,22]
[194:2,10,12] [200:17]
**mailed** [64:18]
**mails** [200:5]
**main** [127:25]
**maintain** [111:7]
**major** [72:20] [73:1,8,13]
[87:21,23] [111:5] [199:9,24]
[203:19]
**majority** [43:18] [137:5]
**making** [33:8] [52:19]
[81:17] [126:22] [127:1]
[145:5] [191:12] [196:8]
[222:12]
**man** [95:2]
**management** [9:15,20]
[16:8,14,22,23] [17:6]
[18:21] [19:12] [25:12]
[27:20] [40:5] [59:9,11,15
,17] [60:2,6,12] [141:9]
[147:6] [155:9] [157:1]
[159:14] [162:18] [163:23]
[181:8,11]
**managements** [40:3,8]
**managerial** [32:22,24]
**managers** [135:12]
**managing** [18:7]
**manner** [53:11] [102:3]
[137:11] [202:14]
**manual** [32:9]
**manufactured** [44:1] [71:17]
[73:25] [74:16] [83:20]
[85:6,10,14] [165:22]
**manufacturer** [102:7,9]
**manufacturing** [72:25]
[73:1] [83:1] [93:18] [98:18]
[103:21] [109:24] [188:11]
[198:5]
**march** [90:1] [155:25]
[156:16]

**margin** [82:7,11]
**margins** [84:25]
**mark** [26:6] [57:11,17]
[64:22,24] [78:21] [79:6]
[89:12] [116:19] [119:13]
[148:10] [153:13] [158:14]
[168:6] [170:12] [179:14]
[188:18] [191:1] [205:19]
**marked** [57:18,21] [79:8]
[89:17] [102:23] [116:24]
[148:13] [153:16] [158:18]
[168:8,16] [170:17] [179:20]
[188:23] [193:15]
**market** [76:23] [81:3,5]
[83:16] [84:23] [93:16]
[95:20] [106:4] [107:4,8]
[112:16,17] [113:23]
[118:4] [125:1,10] [142:12
,17] [145:21] [215:6] [218:
2]
**marketplace** [20:9]
**marketplaces** [116:3]
**markets** [73:5]
**marking** [79:10] [80:21]
**marks** [200:23]
**marriott** [3:]
**mason** [86:25]
**material** [23:25] [84:22]
[124:17]
**materials** [163:25] [164:6,25]
[188:7] [189:3] [195:12]
**matt** [64:9,16,18,21]
**matter** [5:4] [6:9] [22:21]
[49:20,23] [58:4] [124:12]
[135:5] [136:11,13,16]
[137:3] [138:22] [139:7]
[193:4] [202:14]
**matters** [56:23] [75:7]
[204:6]
**matured** [145:19]
**maturities** [101:16,17]
[104:24] [136:6]
**maturity** [101:12] [155:25]
**maximizing** [178:18]
**maximum** [178:19]
**may** [7:11] [13:19] [29:7]
[30:19] [34:9,13] [35:16]
[39:1] [51:3] [52:13] [57:6]
[59:22] [64:15] [68:2]
[81:4] [87:1,2,6,9] [93:25]
[97:22] [100:6] [113:16]
[120:7] [122:10] [129:7]
[134:11] [138:11] [140:14]
[141:15] [147:7] [150:15]
[164:19] [165:15,16,20,22]
[166:6] [175:22] [180:7]
[203:4] [204:2] [206:4]
[214:10]
**maybe** [57:5] [74:3] [81:7]
[86:13] [100:18] [108:22]
[110:19] [112:15] [131:9]
**mckenzie** [147:10,12,18,21
,22,23] [148:2,8] [149:1,7]
**mckenzies** [149:14]

**mean** [16:18] [22:18] [38:5]
[86:7] [92:23] [118:25]
[182:1] [188:5] [213:7]
**means** [35:22] [169:12]
[176:22]
**meant** [89:2] [94:3] [114:10]
**measure** [13:25]
**measures** [31:21] [76:20]
[97:25]
**medication** [7:22]
**meet** [69:8] [70:19,22]
[77:18] [84:13] [137:16]
[152:16] [192:13]
**meeting** [4:] [31:4] [52:4]
[116:22] [123:8,12,16,18]
[124:1,4,5,7] [126:1,7,18]
[127:19,23] [148:25]
[149:8,12] [152:2] [153:19]
[154:18] [158:11,16]
[159:6] [165:25] [180:3]
[184:17,20] [185:5,8,9,10
,19] [186:5] [187:13,15,16]
[188:2] [189:1] [195:22]
[196:4] [199:25] [202:3]
[207:11] [208:15] [209:2,8
,14] [212:4]
**meetings** [52:2,4,5,18]
[68:20] [74:10] [100:6]
[154:20]
**member** [18:6]
**members** [59:16] [60:11]
[71:2] [182:21]
**memo** [89:15]
**memorandum** [4:]
**memorialized** [166:9]
**memory** [7:22] [90:9] [96:22]
[149:8]
**menkhaus** [99:23] [100:12]
**mention** [73:9,11] [85:21]
**mentioned** [68:2] [73:7]
[84:6,12] [85:1] [93:15]
[103:16] [131:4] [141:14]
[176:10] [187:1] [188:1]
[201:13] [204:16] [206:12]
[213:19] [217:16] [218:18]
**menu** [169:20,23]
**merged** [18:9]
**merger** [18:11]
**mergers** [165:17]
**meritorious** [69:21]
**merrill** [87:4,14,17,19,25]
[88:2,5,7] [108:25]
**mess** [218:7]
**met** [52:1] [63:24] [64:24]
[70:24] [134:16] [137:13]
[157:19] [165:23]
**method** [102:13] [153:3]
**meyer** [52:11] [154:23]
**miami** [72:5]
**michael** [2:] [5:13]
michael.osnato@linklaters.com
[2:]
**mid** [86:6] [94:12] [114:4]
**mid90s** [114:4]

**mid-90s** [114:4]
**middle** [174:10] [175:20]
[184:19] [201:16]
**midst** [7:7] [158:4]
**mike** [52:12] [95:2,18]
[96:10]
**mikes** [95:15]
**millard** [119:13,22] [120:6
,10] [123:3,9] [127:18]
[186:3,8] [200:2,5,18]
**miller** [55:4]
**million** [11:13] [61:15,19,24]
[62:1,5,14,21] [63:1,6,10,12
,14,16,18,20] [64:12,22,24]
[65:12] [104:6,10,15]
[142:22] [153:10] [156:1]
[170:2] [205:18] [207:1,3,14]
[213:12,13,24]
**mind** [38:11] [42:17] [66:18]
[88:19,25] [92:8,16] [100:
8] [163:15] [172:3] [196:9]
[203:19,21] [204:1]
**minimal** [150:23] [177:12]
**minimizing** [171:25]
**minus** [114:8,12]
**minutes** [4:] [42:18] [116:21]
[133:14] [142:2] [153:19]
[154:22] [158:16] [179:16]
[202:4] [208:17] [215:20,23]
**minutiae** [92:16]
**misgivings** [67:21] [140:12]
**misguided** [145:8]
**missing** [52:13]
**misspoke** [94:1]
**mistake** [93:8] [193:6,7]
**mistakes** [93:7]
**mistyped** [148:24]
**mitigate** [31:20]
**mitigating** [124:24]
**mitigation** [28:9,14] [29:6]
[31:18]
**mixed** [118:14,20]
**mnat** [153:15] [158:15]
[170:13] [179:16]
**mnat006726** [153:15]
**mnat-006726** [153:15]
**mnat006729** [179:16]
**mnat-006729** [179:16]
**mnat006731** [170:13]
**mnat-006731** [170:13]
**mode** [187:18,19]
**model** [74:11] [77:14,17,20
,21,23]
**modular** [71:17]
**moment** [13:21] [14:11]
[15:3,12] [17:25] [23:3]
[57:24] [76:14] [80:11]
[85:25] [131:4] [153:21]
[158:6] [184:2] [203:22]
[209:19]
**monday** [158:17] [200:20]
[202:10] [204:2] [209:23]
[210:20]

**21/09/2006  STANDISH, Myles**

money [9:1,5] [22:6,12]
[35:21] [63:4] [69:15]
[126:22] [127:1] [156:18]
[196:7,9]
monte [153:3]
month [164:2] [182:9]
months [53:20] [57:5]
[74:4] [125:23]
mood [187:12,15]
moodys [115:14]
morgan [168:4]
morning [6:3,4] [133:10,15]
[140:17] [200:11,14]
[204:5] [214:6]
morphed [37:13] [38:4,7]
morris [50:5,11]
mostly [124:14]
motivating [41:13]
motivation [128:21]
move [40:3] [71:7,11]
[95:23] [163:6] [178:10]
[182:25]
moved [104:23] [151:25]
[191:13]
moving [29:19] [41:13]
[139:8] [185:22] [190:17]
mr [2:] [3:] [5:13,16] [6:2,3]
[7:11,24] [8:7,11,14,15,17]
[11:5,25] [12:17] [14:4,7]
[18:12,22,24] [19:22]
[20:14] [22:16,19] [23:3,4]
[24:2,5,18,24] [25:3]
[26:5,8,9] [33:11,14]
[38:25] [39:5,11,12,14]
[40:1,9,17] [41:15,18,22]
[42:5,14,16,19,20] [43:1]
[55:20] [56:1] [57:10,13,16
,20] [65:11,18] [66:24]
[67:6,11,15,17,20,21]
[68:7,12] [69:12,19,22]
[70:4,13,19] [71:1] [73:19
,21,24] [74:15,17,18,22]
[75:6] [76:8,9,13] [78:24,25]
[79:2,4,7,10,14,15,24]
[80:2,16,17,22,25] [81:8,10
,12,16,19] [89:12,21]
[90:6,8,11,17] [96:10,12,14
,21] [99:7,14,15] [100:9,12]
[107:14] [109:6] [116:19]
[117:1] [119:22] [120:4,5,7
,10] [122:8,14] [123:3,8,9]
[127:18] [138:23] [139:6,9
,18] [140:1,3] [148:10,15]
[153:13,18,25] [154:2,4,6]
[155:9] [156:21] [157:11,19]
[158:13,20] [164:17,20]
[165:4,12] [166:15,18,20,21
,24,25] [167:7,8,13,15,19,20
,22] [168:3,4,5,7,11,12,17
,18,19] [170:5,6,9,11,19]
[173:23] [178:4,6,8,22]
[179:7,14,22] [180:6]
[183:2,15,20] [186:3,8,9,10
,11,25] [188:18,25] [193:11

,17] [194:1,4,7,9] [200:1,2]
[211:14,16] [214:1,19]
[215:19,23] [216:5,11,15,19
,23] [218:15] [219:3,7,9,12
,16,18] [220:2,5,7]
ms [100:12] [180:7]
muir [4:] [33:11] [65:9,11,18
,21] [66:24] [67:11,17,21]
[68:8] [71:1] [74:17] [78:25]
[79:11,12] [102:21] [105:8]
[107:14] [109:6] [127:21]
[157:11,19] [184:23]
murphy [2:] [5:14]
mutual [21:2]
mutually [219:21]
myles [3:] [5:3,21] [221:5]
[222:1] [223:1,13]
myself [52:10]

N

name [43:20,22] [45:3]
[89:7] [99:13,21] [100:5]
[114:1] [116:8] [130:3]
[131:8] [162:24] [200:15]
[221:19]
named [95:2,9]
names [52:6] [159:19]
nationsbank [86:24]
nature [83:13] [104:20]
[147:15] [164:25]
neal [3:] [221:3,21] [222:5]
near [29:18]
necessarily [89:1] [127:10]
necessary [59:11] [157:4,22]
[187:24] [191:12] [223:10]
need [7:5] [26:6] [90:8]
[110:1] [114:3] [144:3,8]
[154:2] [160:16,17,18]
needed [52:19] [54:2]
[57:6] [118:6] [123:18]
[138:21] [141:19] [156:14]
[160:20] [182:11] [187:21]
[206:20] [209:12] [214:9]
needs [205:15]
negative [41:6] [74:22]
[88:24] [89:1] [199:19,21]
negatively [208:12]
negligent [24:23]
negotiate [113:4] [162:15]
[182:6] [203:9]
negotiated [113:6] [213:24]
negotiating [109:11] [132:
15] [134:6] [162:9,11]
[166:8] [187:19]
negotiation [54:21] [113:13]
[132:19]
negotiations [113:1] [117:
15] [130:11] [162:17,22]
neither [36:23]
net [40:11] [41:23] [42:6]
[118:8]
network [93:20]
new [2:] [47:16] [48:13]

[49:1] [68:22] [69:4] [71:7]
[203:10] [212:13,14,25]
[213:5]
news [126:1]
next [123:5] [125:18] [155:
5] [182:7] [196:11] [197:1]
[198:7] [203:8]
nichols [50:5,11]
nick [76:24] [77:6]
night [159:5] [202:24]
[203:7]
nine [88:14] [89:4,9] [90:2,12]
[92:19,22] [103:1] [189:10]
no [9:10] [10:17] [15:17]
[18:2] [21:9,22] [22:1,5]
[26:6] [27:3] [50:9] [51:5]
[57:1] [58:18] [65:19]
[67:8] [73:8] [78:5] [80:9]
[87:16] [88:1] [90:21]
[99:9] [103:23] [110:16]
[113:8] [127:2] [129:3]
[130:25] [133:15] [138:10]
[142:20] [143:7] [144:7]
[154:2] [157:10] [164:9,15]
[166:20] [171:18,24]
[172:3] [173:21] [177:17]
[180:21] [184:11] [195:6,8]
[196:5] [200:6] [202:17]
[203:12,16] [208:9,24]
[211:13] [212:1] [217:25]
[222:6,15,16,17,18,19,20]
,21,22,23,24] [223:2,3,4,5
,6,7,8,9]
nobody [103:25] [133:5]
[152:23]
nominal [196:9]
none [16:1] [218:13]
nonetheless [135:16]
[163:19]
nor [36:23] [203:1]
normal [42:2]
north [3:] [5:9,10] [43:9]
[44:15,23,24,25] [119:18]
[179:4] [221:1]
notable [6:16]
notary [3:] [220:4] [221:4,23]
noted [222:6,7]
notes [156:1,3,7,8]
nothing [158:9] [182:10]
[202:1]
notice [203:13,17]
notified [22:1] [206:25]
november [8:22] [9:10]
[21:19] [22:4] [34:22]
[49:19] [50:18] [78:15]
[79:13] [84:13] [141:21]
[154:24] [200:3,12] [201:23
,25] [202:25] [204:18]
[207:6,12,17,21] [208:1,16]
[209:2,8,23] [210:4,21]
[212:4] [213:18,21] [214:7]
nuisance [164:6]
number [10:22] [15:21]
[26:18] [28:11] [42:24]

[45:20] [52:17] [53:22]
[57:15] [71:16,18,20]
[75:20] [79:8] [82:16]
[89:17] [91:13] [96:19]
[97:10] [99:18] [100:3]
[102:5,11,17] [103:16]
[104:12,17] [108:11] [111:7
,10] [116:24] [121:2] [136:
8] [139:24] [148:13] [153:4
,6,16] [158:18] [160:19]
[168:10,15] [170:17]
[172:12] [179:12,20]
[181:1] [188:8,16,23]
[190:2] [193:15] [197:23]
[198:10] [206:20] [214:23]
numbers [104:14] [126:21]
[153:7]
numerous [34:25] [211:16]

O

oac [103:8,13]
oak [46:25]
oakwood [4:] [5:4,18]
[6:6] [8:1,12,21] [11:18,23]
[12:19,25] [14:1] [16:1]
[17:9,10,18] [18:3,6,16,25]
[19:19,23,25] [20:15]
[21:4,17] [22:1,12,15]
[24:3,15,21] [25:19] [26:24]
[27:11,20,21] [28:7,15]
[29:2,17] [30:5] [31:7,14,21]
[32:13,17,19] [33:5] [34:17
,22] [36:18] [39:23] [40:23]
[41:8,17] [42:1,11] [45:21
,23] [46:1,4,13,22] [47:19,23]
[48:9,12,18,21,25] [49:8,14]
[50:1,17] [51:15,25] [52:23]
[53:13] [54:25] [55:6,8]
[59:19] [69:1] [71:15,22,24
,25] [72:9,15,17,21,22]
[74:3,5,7,10] [78:4,10,24]
[79:3] [80:13] [84:7] [85:7
,17] [87:21] [88:1,4,7]
[94:12,16,18,24] [95:1,23]
[99:17] [101:2] [102:2,3]
[103:20] [104:12] [105:2,15
,17] [106:9,15] [107:18]
[108:18] [110:18] [113:4,9]
[114:7,15,16,20] [115:21]
[117:24] [118:3] [119:5,10]
[121:1] [124:23] [125:16]
[126:9] [128:19] [129:9,11]
[132:18] [133:7] [134:24]
[135:5] [136:20] [137:20]
[140:4] [143:15,21,25]
[144:1,14,19,21] [145:4,11
,17] [146:3,15] [147:13]
[149:9] [150:17] [151:8,17]
[153:20] [158:4] [159:24]
[162:1,22] [163:16] [165:19]
[166:10,13,17] [167:24]
[168:1,14,24] [170:14,24]
[171:13] [172:23] [174:5]

[175:18,23] [176:4,18]
[178:3,7,10] [179:5] [183:
21] [184:22] [186:23]
[187:1,9,21] [188:2] [191:
2,8] [193:9] [195:1] [196:14
,21] [197:22] [199:18]
[200:9] [201:2] [203:2]
[204:18] [205:22] [208:13]
[216:17] [217:21] [218:10
,11,21]
oakwoods [18:20] [27:22]
[36:24] [55:14] [71:8]
[87:11] [137:9] [189:15]
[191:22] [192:23]
oath [5:20] [6:19]
object [7:12] [80:17] [120:8]
[138:23] [183:15] [216:19]
objected [38:22]
objection [8:14] [14:4]
[19:22] [24:5,24] [38:25]
[40:1,17] [41:18] [42:14]
[55:20] [69:12,22] [79:24]
[122:8] [167:4]
objectives [91:5] [92:14]
obligation [152:9]
obligations [84:14] [152:10]
[181:15]
observation [12:23] [15:10]
observations [165:4]
observe [7:1]
obstacles [126:12]
obtain [127:15] [191:10]
[204:19] [213:16] [214:2,20]
[217:5]
obtained [103:20] [204:21]
[212:6,7,8,10] [213:4]
obtaining [202:2] [211:1,15]
obvious [191:4]
obviously [91:15]
occasions [10:22]
occur [120:2] [178:19]
occurred [178:20]
oclock [200:18] [204:5]
october [50:12] [59:16]
[151:21] [165:25] [174:10]
[183:7] [184:19] [188:21]
[190:5] [191:6] [193:14]
[199:25] [201:17] [211:20]
odriscoll [22:22] [23:4]
[68:12] [99:7,15] [164:21]
[170:6] [173:23] [211:15,17]
[214:1,19] [218:16]
odriscolls [100:10]
off [18:1] [42:21] [57:12]
[96:5,16] [108:13] [113:21]
[130:8] [139:21] [141:20]
[179:9] [182:6] [201:19,21]
[214:15] [215:25] [220:8]
offense [92:23]
offering [86:11,12,18,20]
offerings [86:7,9] [87:8,9]
officer [50:25] [51:5,7,12,15]
[73:16] [92:19] [93:2]
[135:23] [141:4] [143:10]

officers [143:11]
offices [123:9] [202:24]
offset [36:11]
often [20:22] [121:13]
oh [105:12] [118:24] [172:11]
ohc [5:5] [89:14]
ohc025774 [89:14]
ohc-025774 [89:14]
ohclt [57:23]
ohclt456810 [57:23]
ohclt-456810 [57:23]
okay [6:16,17] [7:5,9,10,17
,21,24] [9:25] [10:8,9]
[12:3,14] [13:6,22] [15:11
,20] [26:8,15] [37:10,18]
[39:13,16] [40:9] [43:1,8,20]
[44:16] [46:5] [47:11,22]
[48:1,5] [50:20] [57:10]
[58:6,9,25] [60:17] [63:8]
[65:4,7,17] [66:23] [69:9]
[70:11] [71:14] [72:8]
[76:13,17] [79:7] [80:7,10
,15] [81:10,23] [82:1,5,7,24]
[83:21,25] [84:1,4] [85:24]
[86:1] [88:13] [89:2,12,25]
[90:10] [91:9,10] [92:3]
[97:5] [100:9,22] [101:4]
[102:18] [105:12] [106:15]
[110:8,21] [112:8] [115:2]
[117:11,18,23] [118:11,15]
[124:5,12] [130:25] [132:23]
[133:6,10,18] [137:8]
[139:18,20] [141:8] [143:14]
[147:9] [149:4,5,6] [150:24]
[151:13] [153:11] [154:10]
[157:11] [158:24] [160:21
,24] [161:12] [162:8,15]
[168:3] [169:2,9] [170:11,19]
[171:19] [176:3] [177:2]
[178:8] [179:25] [180:1,5,17]
[181:2,10] [184:13] [185:4]
[187:12] [188:18] [189:9]
[190:11] [191:19] [194:3,8
,9] [197:15] [198:14] [199:
25] [200:7] [203:20,23]
[215:22,24] [216:15,23]
[217:2] [219:6,8,18,24]
old [93:24] [136:15]
omaha [123:9,22] [127:19]
[184:17] [187:13] [199:25]
omi [131:9]
once [103:17] [108:22]
[109:21,25] [142:14,19]
[205:16]
one [6:18,23] [22:9] [24:13]
[25:3] [28:8,11] [53:22]
[59:16] [61:12] [64:18]
[66:1,12] [73:8] [75:5]
[77:5] [78:11] [85:16]
[86:10] [89:3] [100:5]
[106:3] [111:13,16] [112:7]
[113:8,24] [115:1] [118:24]
[130:24] [131:3,24] [133:23]
[137:22] [138:15] [139:3]

[140:23] [154:9] [156:25]
[157:25] [159:5,15] [164:10]
[165:23] [167:25] [168:2]
[169:22] [170:10] [171:2,24]
[175:4,5] [182:4] [183:6,7]
[188:1] [191:1,4] [193:21]
[198:20] [199:3,11] [201:15
,17] [203:25] [215:18]
ones [6:16] [13:20] [17:7]
[97:15] [112:3] [153:23]
[154:5] [156:3] [173:5]
[199:4]
ongoing [55:23] [75:23]
[85:22] [160:18]
open [145:21]
operated [71:10] [94:2]
[130:5] [133:8]
operating [77:7] [82:25]
[83:2] [156:17] [198:2]
operation [77:15] [198:1]
[199:6]
operational [154:21] [155:
3] [189:17,18]
operations [34:18] [37:17]
[38:14] [51:4,17] [103:22]
[155:25] [156:15]
opinion [130:18,22] [131:1
,24] [195:19] [206:12]
opinions [131:2]
opportunity [7:9]
opposed [29:25] [186:16]
[214:8]
opposite [198:22]
optimism [172:24]
optimistic [173:4,8,13]
option [17:6,8,12] [54:7]
[105:15,23] [115:25]
[143:8,12,15,18] [182:10]
[201:21,24]
options [13:11] [16:13,22,24]
[17:4] [53:22] [54:1,3,4]
[129:11] [140:24] [143:4,10]
[149:9] [163:19] [180:23,24]
[181:20,23,24] [182:4]
[183:22,24]
order [9:8] [19:15] [25:13]
[137:13] [147:25] [152:3]
[156:16] [157:20]
ordering [20:25]
oriented [98:18]
original [213:9] [219:11,13
,14,19]
originate [41:9]
originated [71:23] [72:10]
originating [40:23]
origination [108:15]
originator [102:7]
osnato [2:] [3:] [5:13,14]
[6:2] [8:15,17] [11:25]
[14:7] [18:24] [20:14]
[22:19] [23:3] [24:18]
[25:3] [26:5,9] [39:5,12,14]
[40:9] [41:15,22] [42:5,16
,20] [43:1] [56:1] [57:10,16

,20] [67:15,20] [69:19]
[70:4] [79:2,7,10,15]
[80:2,16,22,25] [81:8,10,12
,16,19] [89:12,21] [90:8,11]
[96:12,21] [116:19] [117:1]
[120:10] [122:14] [139:6,9
,18] [140:1,3] [148:10,15]
[153:13,18] [154:2,6]
[158:13,20] [166:20,24]
[167:7,8,19,22] [168:3,5,11
,17,19] [170:11,19] [178:6
,22] [179:7,14,22] [183:20]
[188:18,25] [193:11,17]
[194:1,7,9] [215:19,23]
[216:5,15,23] [219:3,7,16]
[220:5]
otherwise [25:16] [28:10]
[34:17] [37:16] [38:14]
[40:25] [41:1] [60:1]
ought [129:20]
outcome [173:13]
outline [188:9]
outlined [90:12] [91:5]
[169:16]
outrun [199:12]
outside [48:17] [72:12]
[147:3] [159:15] [176:2]
outstanding [62:4]
overall [13:9] [36:6] [98:8]
[126:7] [137:25] [187:14]
overcollateralized [104:16]
overexpanded [199:5]
overhang [93:23] [94:1]
overly [106:7]
overriding [93:8]
overseeing [32:14,23,25]
[33:3] [55:13]
overused [31:14] [37:14]
[38:5,10,11]
owe [47:1]
owed [47:10] [52:22]
owes [46:17]
own [43:18] [94:16] [132:19]
[137:17] [153:2] [165:4]
[207:18]
owned [44:2] [121:19]
[122:7] [125:20]
owner [43:18] [44:5]
ownership [152:12]

P

p.m [220:10]
page [4:] [6:16] [26:16]
[37:3] [39:11,12] [58:6,7]
[59:1] [80:3] [103:1] [105:
12] [117:5] [150:3] [154:9]
[155:5] [158:21,22] [160:22]
[168:20] [171:3,7] [172:17]
[175:14,20] [179:23]
[180:2,6] [182:5] [189:10]
[190:8,9] [196:6,11] [222:
15,16,17,18,19,20,21,22,23
,24] [223:2,3,4,5,6,7,8,9]

pages [221:8] [223:10]
paid [11:18] [35:13,14,15,17]
  [36:2] [58:2,13] [59:10,11]
  [61:5,6] [62:13] [63:6]
  [125:18] [150:17] [162:12]
palm [73:3]
paper [138:6]
paragraph [37:6,8] [38:23]
  [39:6,9,18] [40:10] [80:3,24]
  [81:11,14,21,24] [82:3,6]
  [83:7,22,24] [84:2,5,12]
  [86:1] [103:3,5] [105:8,9,10
  ,11] [108:5] [117:5,8,11]
  [122:15] [150:7] [153:22]
  [154:8] [155:8] [156:15,21]
  [157:23] [158:21,25]
  [159:9] [160:22] [180:6,9,17]
  [181:6,11] [194:25] [195:18
  ,23,25] [196:12] [197:2,16]
  [198:8,12,15]
paragraphs [80:7,11]
paraphrase [196:1]
paraphrasing [34:1]
part [7:25] [32:19] [41:20,21]
  [51:6] [54:24] [55:9] [56:11
  ,20] [61:11] [62:13,25]
  [77:16] [78:22,23] [79:2]
  [86:8] [104:18] [106:19]
  [123:2] [129:23] [130:19]
  [134:24] [143:9] [150:10]
  [156:7] [160:6,9] [169:3,9]
  [190:5] [191:25] [197:9]
  [199:22] [216:14,17]
  [222:9]
participate [60:15] [108:6]
  [112:9,25] [132:15]
participated [113:9]
particular [10:10] [26:18]
  [37:6,11,12] [40:10] [80:3]
  [150:12] [154:18] [156:24]
  [157:24] [179:23] [183:1]
  [186:8] [190:11] [191:15]
  [197:2]
particularly [9:6] [20:5]
  [84:20] [85:18] [98:19]
  [192:3]
parties [221:17]
partner [45:9,11,14] [88:2]
  [214:9]
parts [37:23,25] [38:2]
  [40:18,19]
party [17:14] [152:13]
pass [16:2,6,8] [44:17]
  [84:23]
passed [44:24] [125:15]
passing [44:25]
passive [118:23,25] [208:22]
past [6:7] [64:5] [112:15]
  [201:22]
path [172:23]
pay [109:22] [158:10,12]
payable [132:10]
paying [35:20]
payment [61:8,12,15,17]

[63:25] [65:3,14] [101:12]
payments [24:17] [57:4]
  [61:11] [62:17] [63:11,21]
  [64:6] [65:5] [81:17] [83:17
  ,18]
pays [43:15]
penalty [220:3]
people [14:9] [32:10] [71:5]
  [82:19] [99:18,19] [100:11
  ,19] [107:21] [108:1] [109:
  2,4] [111:21,24]
percent [17:12] [83:15]
  [95:13] [104:16] [120:16,18
  ,21] [121:1] [125:6,13]
  [132:12] [134:2] [135:11]
  [138:6,9] [146:21] [192:12]
  [213:12,13,14,15]
percentage [61:4] [72:11]
  [101:21] [152:11]
perfect [156:17]
perform [152:14,17]
performance [31:22] [32:11]
  [33:19] [88:15] [92:6]
  [170:5] [199:8] [208:11]
performed [55:6]
performing [13:25] [36:3]
  [142:15]
perhaps [25:16] [71:2]
  [76:6] [84:16] [87:13]
  [95:3] [143:11] [204:13]
period [9:7] [11:24] [13:4,17
  ,19] [18:6] [21:20] [25:16]
  [27:8] [33:6] [35:5] [38:8]
  [40:24] [41:9] [42:3,8]
  [49:17] [50:6,17] [52:7]
  [55:24] [57:4] [59:12]
  [71:8] [72:14] [74:5] [75:2]
  [81:6] [84:20] [85:4,5]
  [88:5] [92:5,7] [94:17]
  [96:3] [97:9] [103:8] [105:
  5,20] [110:15,20] [113:23]
  [114:2,13,17] [120:3]
  [121:11] [125:5] [137:6]
  [147:4,17,20] [154:19]
  [178:1] [184:17] [201:19]
  [202:15]
periods [93:14] [114:4]
  [136:25]
perjury [6:20] [220:3]
permission [141:22]
person [32:1,23,24] [70:6]
  [164:12] [165:3]
personally [33:14] [114:24]
  [117:14] [118:11] [134:5,7
  ,10] [161:22]
persons [221:13]
perspective [116:14]
pertaining [20:23]
pessimism [172:24]
pessimistic [173:4,9,10]
peter [100:3] [165:13]
phil [100:4]
phone [18:1] [134:9]
phrase [59:25] [155:15]

phrased [167:5]
pick [63:8]
piece [72:25] [73:1] [114:10
  ,11,14,15] [191:20]
pieces [15:11] [112:14]
  [114:19]
place [5:20] [22:25] [23:16
  ,23,24] [25:15] [31:21]
  [55:25] [75:13,16] [92:4]
  [119:21] [128:19] [131:20]
  [133:7] [135:7,24] [136:22]
  [137:14] [155:24] [157:12
  ,17] [160:15] [163:13]
  [167:23] [175:11,12]
  [176:13,16] [186:22]
  [189:19] [190:2] [191:13]
  [195:7,15] [199:1,23]
  [205:7] [212:15,18,20]
  [213:1] [219:2]
placed [93:3]
plaintiff [2:] [3:] [5:6]
plan [59:15] [60:5,8,16,18]
  [61:8,12] [65:8] [75:13,15]
  [85:21] [88:14,15,16,17,20
  ,23] [89:4,9,11] [90:2,12,22
  ,24] [91:2,6] [92:4,10,19,22
  ,25] [95:7,8] [122:12]
  [157:2,12,17,18] [161:13,14
  ,16,18,23] [166:4] [185:13
  ,20] [188:3,6,8,9,10] [189:
  13,16,19,23,24] [192:7]
  [200:21]
plane [203:5]
planning [9:7] [85:20]
  [201:23]
plans [161:22]
plants [71:16] [75:2,20]
  [77:7,16,23] [83:1] [94:2]
  [97:13] [119:18] [188:11]
plate [129:23]
played [87:4,6] [208:23]
player [87:24]
pleasant [126:7]
please [5:12,20] [15:13]
  [18:23] [37:3,7] [39:9,15]
  [40:10] [43:5] [44:10]
  [48:2] [50:16] [52:9] [57:10]
  [71:14] [72:24] [80:3,10]
  [83:23] [84:19] [86:2]
  [89:13] [102:20,24] [103:1]
  [105:7,8,11] [108:4] [109:
  18] [112:12] [116:19]
  [148:11] [150:4,7] [154:7]
  [155:5,12] [156:20] [160:21]
  [171:3] [172:18] [175:14]
  [179:15] [180:6] [181:6]
  [188:19] [189:9] [190:8]
  [194:2] [195:17] [196:11]
  [197:1,6,15,19] [198:7,11]
  [207:25] [222:13] [223:11]
pleased [115:21] [118:12,16]
pocket [35:20]
point [7:6] [12:15] [17:9]
  [22:14] [26:12] [29:1]

[30:10] [32:21] [33:6] [44:9
  ,12] [45:21,25] [46:20]
  [47:11] [48:9] [50:10]
  [54:15] [55:12] [69:17,25]
  [79:18] [83:1] [88:14]
  [89:4,9] [90:2,12] [92:19]
  [94:22] [96:11] [99:3,16]
  [106:15] [109:10] [110:24]
  [111:3] [112:15] [114:1,6]
  [115:18] [116:9] [119:23,24]
  [125:10] [126:19,23]
  [127:12] [128:5] [129:9]
  [133:24] [137:8] [140:11,21]
  [141:8,20,23] [142:18]
  [143:1,3,17,24] [144:11]
  [146:10] [155:17] [157:8]
  [158:3] [160:25] [161:24]
  [164:10] [170:4] [171:20]
  [173:8] [174:4] [176:17]
  [182:13] [185:14] [187:20]
  [190:4] [204:18] [207:12]
  [208:6] [210:8,10] [213:10]
  [215:13] [217:21] [218:15
  ,17]
pointed [194:5]
points [35:10] [135:4]
  [188:14] [190:18]
policies [19:11]
policy [18:20] [19:8]
pool [95:25] [104:15] [115:
  12,15]
poor [33:11,15] [75:3,4]
  [77:9] [94:6,10] [96:6]
  [97:4] [98:8] [198:18,24]
poorly [36:3]
popped [202:4,5]
portfolio [9:6] [93:10]
  [94:7,11] [96:7] [104:7]
  [108:14] [199:8,12,19,22]
portion [37:12] [42:6]
position [21:12] [47:22]
  [54:12,16] [69:14] [73:22]
  [139:11] [185:15] [192:14]
positive [98:16] [214:5]
possibilities [106:3] [217:
  24]
possibility [142:24] [144:3
  ,10] [174:6,15,16] [177:8]
  [217:25]
possible [157:8,13] [163:6]
  [169:12] [174:19] [175:18]
  [177:3] [181:17] [183:1]
post [106:10,11,13] [193:9]
potential [14:2] [111:12]
  [118:5] [122:12] [159:10,17]
  [171:14] [175:9] [185:6]
  [187:3,4] [195:10] [202:9,18]
  [204:9] [209:21] [210:11]
potentially [159:7]
power [19:3,6]
pr [160:16]
practice [45:1,18] [46:6,12]
  [47:12] [140:8] [154:19]
practices [85:4]

preceding [53:20] [120:3] [184:18]
precipitate [36:19] [146:13]
precipitated [66:13]
precipitating [22:9,11] [199:16]
predates [18:15]
predecessor [73:15] [76:9]
predecessors [93:4,7,9] [98:5,8]
predict [152:23]
preexisting [205:23]
preference [62:23]
preliminary [159:20] [161: 13,16]
premise [175:10]
prepackaged [163:7]
preparation [30:15] [34:14] [160:6] [177:4,25]
prepare [50:14] [70:20] [141:17,18] [160:12,13] [163:4,10] [167:10] [168:1]
prepared [160:3,4] [161:15] [174:25] [189:3]
preparing [30:20] [116:9,12] [161:18,20,21,23] [165:1] [166:17] [173:18] [177:9] [194:10]
prerogative [17:2] [54:7]
present [143:5] [188:2] [221:14]
presentation [4:] [124:9,10 ,13] [146:23] [147:1,3,5,7] [170:15,23] [172:9,11,13,16] [180:11,13,19] [181:13,21] [183:12,13] [188:7,21,22,25] [189:10] [190:9] [191:5] [195:12] [196:19] [208:16] [209:13]
presentations [164:14] [171:1] [172:12]
presented [53:21] [54:4] [112:17] [182:5] [183:21] [184:10] [185:20] [189:6]
presently [43:10]
preserve [179:4]
preserved [30:4]
president [47:24] [48:2,6] [50:24] [51:3,4,6,11,14] [54:12]
press [28:4] [116:10,12,13] [200:13,16] [216:21]
pressure [128:8,19] [129:10 ,12]
presumably [202:19]
pretty [71:11] [126:21] [187:14]
previous [25:4] [201:5]
previously [7:25] [34:6] [41:16] [66:9] [102:23] [142:9] [190:3]
price [106:8] [118:7] [122:22] [133:23] [176:24,25]
pricing [95:8] [113:16]

primarily [111:19] [130:14] [163:4]
primary [13:6] [14:8] [97:23] [99:19] [108:2]
principal [44:5] [101:2] [109:7] [119:22] [120:16] [199:18]
printout [4:]
prior [13:13] [23:13] [27:2] [31:4] [45:24] [73:14,25] [74:2,5,6] [75:19] [139:17] [147:6] [148:8] [152:15] [160:20] [163:12] [177:15] [202:19] [205:11] [212:18] [221:6]
priority [136:11,17] [190:23]
private [46:5,12] [47:12]
privately [44:2] [182:6]
privilege [167:3,17]
privileged [67:14] [167:5]
probabilities [69:18]
probability [144:17]
probable [145:1] [153:5]
probably [34:10] [38:19,20] [40:25] [41:5] [71:11] [77:21] [89:23] [97:19] [98:25] [99:6] [103:9,11,17] [105:5] [107:13] [108:9] [109:12] [114:6,9] [119:13] [124:17] [127:5,13] [131:21] [132:3] [146:20] [147:19] [159:6] [178:25] [188:16] [200:18] [211:20] [212:15 ,20]
problem [18:2] [67:8] [98:24] [104:19] [135:18,20] [136:14] [167:2] [191:3] [202:12] [204:7] [211:23]
problematic [138:11,13] [202:14]
problems [9:5,8] [98:14] [138:3] [191:2] [197:23,24]
procedure [222:9]
proceed [70:5]
proceeds [23:22,24] [64:2] [104:15] [109:19] [217:21]
process [32:9] [59:20] [75:23] [101:6,24] [118:8] [143:9] [152:7] [166:5] [176:5] [178:12]
procure [205:11]
produced [194:6]
produces [44:1]
product [77:15]
products [72:2] [121:13,14]
professional [3:] [53:11] [221:4,22]
professor [74:7]
profile [83:19]
profit [42:12] [82:7]
profitability [78:8] [192:6] [198:5]
profitable [93:17]
profitably [198:2]

program [11:23] [12:1] [13:7] [20:13] [24:10] [25:5,11,13,15,19,20,22] [26:20,24] [27:4,10,11,15 ,17,19,23,25] [28:7,16] [29:2,3,17,24] [30:8,12,14 ,23] [31:2,10,13,16,22] [32:15,18] [33:4,9,12,15,17 ,25] [34:5,17] [35:1,3,19] [36:1,13,25] [37:14] [38:5 ,10,13] [39:20] [40:4,6,20,22] [41:14,16] [42:1] [59:3,4,5 ,7] [66:16] [68:4] [70:3] [95:10,12,24] [96:3,5] [107:16,19,24] [123:8,21] [124:2,15,19] [142:5,8] [145:4,17] [146:5,24] [147:1] [154:13] [155:19] [156:11] [163:24]
project [148:5] [149:17] [151:10] [158:8]
projecting [196:7]
projections [192:4,5,13,16 ,22,24,25] [193:2] [196:6,15 ,23] [197:8,10,13,14] [205:15]
prolong [39:23]
proof [168:3,13]
proposal [145:24] [146:4,19] [149:20] [156:5,7] [184:1,5] [207:9] [208:5] [210:7]
proposals [145:6,7] [190:16]
proposed [104:2]
propounded [222:3]
protect [131:13] [139:11]
protection [159:25] [160:2 ,3]
provide [12:24] [15:24,25] [22:23] [43:25] [46:1] [56:2] [110:11] [129:10] [147:12] [151:7,17] [163:9] [205:17] [207:13,18] [208:2,7,12] [209:5,9,10] [210:6,9]
provided [12:19] [13:12,24] [14:23,24] [15:5,12,14] [16:12] [18:16] [23:10] [24:19,22] [49:14] [55:5] [56:20] [61:1] [87:14] [110:6,13] [111:1] [128:2] [147:18] [151:20,22] [187:1] [196:15] [201:2] [204:22] [207:23] [212:22] [213:20] [218:21]
provider [19:2] [213:2]
providers [209:21]
providing [110:17,23,25] [129:18] [157:21] [163:11] [180:10] [206:7] [213:5] [218:10]
provision [58:15] [59:13]
prudent [127:15] [157:2] [174:15]
prudential [111:4] [112:2]

public [3:] [28:1] [86:7,8,11 ,12,18] [87:8,9] [122:7] [146:15] [185:16] [220:4] [221:4,23]
publicly [48:10]
purchase [13:12] [16:3] [19:3,5,10,15] [21:11,21] [22:2,25] [23:16] [94:23] [111:22] [130:1,12,19] [131:25] [132:8,24] [137:12 ,14] [210:22] [211:6]
purchased [72:11]
purchasers [187:3,4,5]
purports [78:13] [149:6]
purpose [10:23] [28:6,9] [40:13] [42:4,8] [50:13] [69:3] [90:24] [92:13] [123:25] [124:4] [185:4]
purposes [28:8] [55:1] [70:11] [134:4] [166:17] [188:2]
pursuant [13:16] [222:8]
pursue [17:4,5] [174:19] [186:5,12] [187:10] [195:1]
pursued [186:15]
pursuing [16:9] [140:24] [173:17] [184:5] [186:20]
pursuit [69:10]
put [21:11] [22:25] [55:25] [75:13,16] [92:4] [96:1,2] [101:21] [104:13] [131:20] [133:6] [136:22] [142:13] [145:25] [146:4] [157:17] [163:13] [167:23] [168:12] [169:20] [176:4] [177:21] [180:24] [187:2] [189:19] [199:1,23] [201:21] [205:7] [212:15,17,20] [213:1] [217:9]
putting [157:12] [169:23] [177:11] [201:19]

Q

quality [93:9] [94:7,11,25] [96:6] [199:19,21]
quantified [152:10]
quantify [34:24]
quarter [30:21]
quarterly [30:16] [52:4]
quarters [196:8]
question [7:1,7,13] [11:6] [12:20] [15:4,11] [17:15] [27:6] [67:8,9,10] [69:14] [76:4] [79:5] [80:18] [90:10] [120:9] [137:23] [138:24] [139:1] [141:2,4] [142:6] [144:5] [167:1,16,18] [178:5] [183:16] [207:22]
questioning [7:8]
questions [7:12] [10:5] [39:17,21] [100:14,15,18] [126:5] [193:18] [198:10] [219:3] [222:3]

A.18

quick [42:17] [178:11]
[181:23]
quicker [76:4]
quickly [71:12] [93:16]
[160:5]
quite [6:23] [148:3]
quote [37:13] [195:19,21]
[197:22,23]

----

R

raised [133:5]
ran [22:12]
ranch [204:23]
range [45:18] [57:22] [89:14]
[116:20] [143:4,10] [148:12]
[153:14] [155:6] [158:15]
[170:13] [171:4] [172:17]
[175:9] [179:16] [183:22]
[186:15] [188:20] [189:10]
[193:12] [194:5] [196:12]
ranges [177:16] [180:23]
[187:6]
ratcheted [134:2]
rate [57:7] [95:12,13,14]
[101:20] [125:6,12] [142:21]
rated [114:8]
rates [82:25] [83:2,11]
[85:2]
rather [12:8,20] [19:13]
[36:20] [80:21] [82:13]
[91:22] [103:19] [115:17]
[117:3] [124:23] [137:13]
[138:7] [146:13] [153:23]
[162:18] [177:20] [178:21]
[187:17] [188:14] [196:8]
rating [14:1] [41:6] [101:20]
[114:17,21,23] [217:23]
ratings [115:14,16]
rationalization [75:13,15]
[85:21] [188:10] [189:12]
rayburn [162:23] [166:14,15]
[167:14]
re [5:4] [184:15]
reach [143:14]
reached [62:6,7,9] [65:12]
reaching [53:9]
reacted [76:25] [93:16]
reaction [125:25] [174:11]
[190:15] [214:13]
read [10:11] [12:6] [24:7]
[25:25] [37:7,8] [39:14]
[80:11] [83:24] [90:7,9]
[105:9] [117:8] [150:7]
[153:25] [154:2] [155:12]
[176:18,23] [181:6] [193:19]
,25] [194:1] [198:11,13]
[222:2,15,16,17,18,19,20]
,21,22,23,24] [223:2,3,4,5]
,6,7,8,9]
reading [80:19] [155:14]
[197:20] [220:1]
reads [26:19] [37:13] [40:11]
[82:18] [156:21] [190:12]

[199:11] [222:9]
ready [148:18] [153:24]
real [218:6]
reality [173:10,25]
realized [9:5] [142:18]
[178:24]
really [9:10] [24:25] [27:6,16]
[32:11] [48:4] [58:2] [69:24]
[77:24] [92:7,10] [106:2]
[107:1,9] [123:4] [128:21]
[131:23] [136:16] [137:23]
[139:17] [150:21] [164:8,15]
[166:21] [173:25] [177:12]
[179:2]
reason [7:17] [8:25] [21:22]
[39:20] [41:12,13] [73:10]
[132:4] [133:1,4] [151:24]
[199:18] [203:14]
reasonable [83:15]
reasonableness [139:15]
reasoning [196:3]
reasons [9:2] [78:10,14]
[80:13] [84:7,17] [222:12]
recall [8:4,7,17,19] [11:19]
[12:9,12] [13:20] [14:11]
[17:16,20] [18:12] [19:7]
[21:1,14] [25:23,25] [26:4]
[29:8] [30:6] [31:11] [33:10]
[34:2,8] [36:7] [46:8]
[48:14,20] [52:6,14,17]
[53:20] [56:17] [65:15,23]
[66:3,19,24] [67:16,19,20]
,23] [68:10,11,17,19,24]
[69:24] [76:15] [77:13]
[79:16,18] [80:7,9] [85:4]
[86:22,25] [87:3,4,14]
[88:6] [89:8] [99:8] [109:13]
[112:8] [114:20,24] [115:1]
,3] [116:9,12] [118:11,14]
[119:11] [123:11,24]
[124:14] [125:25] [126:8]
[129:1] [131:8] [132:14,17]
[133:12,16] [134:7,9,25]
[140:20] [142:1] [145:3,5,15]
,20] [146:22] [147:3,5,8,16]
,17,20] [148:25] [149:10,11]
,12,13] [150:2] [151:10]
[152:20] [154:24] [159:2,4]
[161:2,14,16,17,20,21,22]
[162:24] [164:10,19,20]
[165:11] [168:2] [170:7,23]
[171:2] [172:9,11] [173:20]
[174:2,8,24,25] [175:8]
[177:13] [180:3,20] [182:13]
,20] [183:10] [184:8,17]
[186:2] [187:8] [189:7]
[190:25] [194:9] [195:21]
[196:24] [197:12] [200:10]
[204:25] [205:2] [208:18]
[210:1,14,16,18,19] [211:
11] [212:22] [214:24]
[215:1,3] [218:20]
recalled [66:8,22]
receive [60:18,21] [61:14,18]

[62:1,10] [63:11] [163:21]
received [44:12,14] [56:18]
[58:18] [61:21] [62:1]
[120:15] [141:16] [150:19]
[187:6] [195:10] [204:3]
[213:17]
receiving [44:16] [66:13]
[107:8] [142:20] [172:9,11]
[217:21]
receptive [194:18]
recess [42:23] [96:18]
[139:23] [179:11] [216:2]
recognition [78:5]
recognize [77:25] [175:22]
recognized [31:18]
recollection [7:19] [10:3]
[12:7] [25:10] [58:12,17]
[60:24] [89:25] [123:25]
[131:1,3] [138:16] [139:4]
[140:18] [151:25] [154:12]
,15] [157:7] [213:9]
recollections [33:13]
recommend [59:14]
recommendation [182:21]
,24]
recommended [181:16]
[182:14]
record [5:1,12] [6:25]
[7:2] [42:21,25] [96:16,20]
[139:21,25] [168:13]
[179:9,13] [216:1,3] [220:
8]
recorded [30:16]
recover [29:18] [35:4]
recovery [61:4] [65:8]
[125:6,12]
reduce [91:18,19,24]
refer [12:16] [58:6]
reference [58:25] [86:4]
[133:13] [155:23] [157:23]
[158:24] [159:9] [161:3]
[176:17] [180:1,10] [181:10]
[188:5] [189:12] [194:25]
[195:18] [198:14]
referred [9:13] [57:24]
[92:20]
referring [9:14] [11:25]
[54:18] [57:25] [58:5]
[66:12] [150:12] [160:7]
[186:7] [190:19] [191:15]
[196:17] [197:2,24] [198:6]
,24]
refers [150:16]
refinances [125:3,5]
refinancing [29:25]
refis [136:20]
reflect [154:22] [173:25]
reflected [122:19] [137:19]
,20,25] [138:20] [184:6]
refresh [89:25] [90:9]
[96:22] [138:16] [139:3]
[149:7] [154:11,15]
refurbishing [150:14,21,22]
refurbishment [29:19]

[150:20]
regard [52:5] [174:22]
[217:6]
registered [3:] [221:3,22]
regret [68:12]
regular [52:1,2,5]
regulatory [134:4]
reinsurance [72:7,18]
reinsured [72:4,6]
rejected [146:3]
relate [103:7] [176:25]
related [137:6] [221:15]
relating [11:17] [25:6]
[56:23]
relationship [22:17,18,19]
[46:21] [47:7,10] [57:2]
[87:16] [88:4,9] [162:19]
[205:23]
relationships [111:7,10]
relayed [212:3]
release [116:10,12,13]
[200:14,16] [216:21]
releases [28:4]
releasing [215:7]
relevance [66:4,20] [164:9]
,15]
relevant [175:17]
relief [79:13]
reluctance [75:6]
reluctant [75:1] [206:10]
rely [48:17] [97:17] [108:18]
remain [23:16] [37:4] [40:12]
[41:24] [42:8] [72:14]
[92:19]
remained [51:8] [54:11]
[72:16]
remaining [24:12,14]
remains [215:24]
remember [20:24] [21:7]
[24:11] [32:21,22] [34:3]
[52:18] [55:16] [64:13]
[67:4] [68:5,25] [79:22]
[88:17,19] [97:10] [99:4,16]
[100:5] [109:17] [112:12,13]
[113:17] [114:1] [115:2,17]
,19] [123:5] [133:20,22,23]
[134:1] [141:12] [148:6]
[153:6,7] [156:6] [159:19]
[168:9] [170:4] [173:22]
[182:16] [185:18,20]
[189:5] [190:22] [211:18]
[218:14]
remic [150:17] [185:15]
reminded [66:5,21]
remote [101:8] [130:6]
[131:5,11,13] [173:12]
[204:13]
remove [130:8]
removed [17:21]
rendered [130:19]
renewal [203:7]
renewed [31:15]
reopened [214:11]
reorganization [152:6,12]

[157:4] [166:4] [172:5]
[178:12] [182:19] [185:13]
[188:9] [192:20] [193:9]
reorganize [91:23]
reorganized [91:24]
repeatedly [202:11]
replaced [86:17]
repo [125:3,4,10] [136:19]
report [181:25] [182:2]
reported [33:7] [155:9]
[210:14]
reporter [3:] [5:19] [6:24]
[57:11] [219:11] [221:4,22]
reporting [107:24]
reports [163:21]
repos [91:25] [125:2,9,11]
[136:14] [137:5] [142:12,19]
[150:22]
repossessed [28:1,11]
[41:2]
repossession [28:12,13]
[30:1] [98:14] [150:16,18]
repossession/refis [138:6
,8,9]
repossessions [96:5]
[101:14] [150:13,16]
represent [122:16]
representation [70:16]
representative [18:4]
representatives [18:3]
[59:18] [119:12] [149:7]
[209:16]
represented [70:13] [121:11]
[162:21] [184:15]
re-presented [184:15]
representing [8:8,9] [10:22]
[59:21] [191:21] [219:17]
reputation [116:3]
request [123:13] [177:3]
[185:7,10] [186:24] [209:24]
requested [123:11] [185:9
,23] [186:5] [205:14]
require [211:24]
required [83:15] [171:23]
[207:18]
requirement [138:4]
requirements [107:25]
[136:7] [138:19] [139:2,13]
research [13:18]
reservations [24:19]
reserve [125:22]
reserved [221:12]
reserves [62:4]
residual [106:18,19] [115:
8]
residuals [125:19]
resigned [59:17]
resources [119:2] [177:7,10
,11] [184:5]
respect [11:21] [13:9,10]
[24:9] [25:11,20] [46:4]
[66:5] [70:1,3] [71:23]
[95:18] [97:20] [101:13]
[111:16] [128:19] [145:6]

[176:12] [192:3] [202:22]
[211:1] [217:6]
respective [65:10]
responded [126:9]
response [68:5] [77:11,25]
[145:14,15] [164:21]
[174:2]
responsibilities [48:3]
responsibility [17:3] [32:14]
[94:18] [107:19,23] [108:3]
[143:4,7] [162:5]
responsible [51:16] [94:16]
[107:15] [162:8,11] [205:10]
rest [107:8]
restructure [13:15] [189:16]
restructuring [40:14]
[141:10] [144:14] [157:13]
[164:14] [172:4,23] [181:14]
result [28:11] [35:1] [60:4,22]
[63:11] [94:11] [118:8]
[136:21] [148:7] [161:10]
[206:18] [208:24] [213:5]
resulted [37:15] [41:5]
results [16:20]
retail [71:24] [72:1] [78:4,7]
[82:22] [93:18,20] [98:21]
[135:12] [198:1,6] [199:6,7]
retailers [82:12]
retain [50:1] [127:15] [141:
23]
retained [55:12,19] [161:25]
[163:19] [166:16] [167:10]
[183:14,18] [204:8,14]
retaining [50:13] [159:1,7]
retention [59:3,15] [60:5,8
,16] [61:8] [160:7] [162:6]
[169:5]
retrospect [77:9] [108:10]
return [40:9] [86:1] [102:20]
[219:13]
returned [119:20]
returning [115:20]
reveal [11:7]
revenue [41:11,12] [78:1,5]
reverse [85:15]
review [10:15] [33:2] [39:5]
[69:19] [80:1] [89:19]
[103:3] [221:11]
reviewed [12:11] [26:13]
[38:21] [39:3] [67:1] [166:
11]
reviewing [25:1] [80:7]
[189:5,7]
revised [196:22]
richfield [119:18]
rick [162:23] [166:14]
rid [93:24,25]
right [16:25] [18:15] [21:13]
[22:12] [23:7] [25:6] [31:12]
[33:4] [36:24] [39:7] [41:17]
[44:13] [53:16] [57:2]
[61:4] [65:5] [67:2] [71:6]
[75:12,14] [76:8] [88:25]
[89:10] [90:22] [94:6,15]

[96:6] [98:6] [99:24] [100:8
,24] [101:1] [102:1] [106:10
,14,22] [107:14] [109:6]
[110:6] [111:8,12] [113:22]
[115:23] [116:4] [117:16,18]
[118:5,9] [121:1] [122:7]
[129:12] [130:2] [131:6,10]
[134:13] [137:18] [140:6]
[162:1,24] [164:12] [180:25]
[183:4] [185:14] [195:24]
[201:7] [203:19] [204:20]
[205:22] [209:21] [211:2,6]
[217:12,13,18]
rights [65:8] [115:9] [211:9]
ring [89:23]
rings [89:5]
risk [72:6] [95:8,14]
risky [95:24]
road [35:5]
robert [8:6] [33:3,7] [52:10]
rockwell [119:18]
role [11:22] [16:21,23]
[23:1] [33:3] [48:1,8,16,23]
[75:8] [87:5] [90:11] [106:
21] [127:22,25] [135:2]
[154:24] [159:12] [161:17]
[163:1,3,8,10] [167:25]
[205:13] [208:23,24]
roles [13:20] [87:6]
rolling [25:14]
roughly [35:7,23] [120:3]
[184:17]
round [104:14]
rpr [221:3,21]
rule [222:8]
rules [6:13] [222:8]
run [50:16] [142:21] [182:6]
running [33:12,15] [35:11]
[77:23] [173:1]

S

sabin [18:5,10] [52:11]
sale [54:18,22] [55:24]
[60:7] [71:23] [72:1] [106:
4] [113:24] [130:18,21]
[131:2] [140:16,25] [171:14
,22,23] [172:5] [174:6,19]
[175:10,18] [176:4,9,12]
[177:3] [178:20] [186:5,13
,15,16,19,20,21] [194:18]
[195:2,3,6] [217:18]
sales [71:18] [75:21] [77:14
,18] [78:4,7] [91:11] [95:6]
[103:21] [106:4] [188:11]
[198:1]
sat [140:11] [160:25]
satisfied [110:4] [133:7]
[191:20] [201:6]
satisfy [135:7]
save [59:23]
saw [79:20] [129:16] [144:
3] [165:7,10] [196:7]
say [13:1] [15:7] [17:7]

[24:8,13] [25:14] [34:24]
[36:7] [37:21] [38:4] [46:24]
[51:10] [64:15] [77:14]
[78:23] [83:5] [91:1] [92:10
,22] [94:3] [104:14] [118:20]
[126:2] [138:25] [153:9]
[158:3] [161:10] [178:1]
[186:7] [190:4] [192:12,24]
[193:23] [208:14] [211:21]
[214:16] [216:25]
saying [57:9] [88:9] [126:15]
[139:5] [149:22] [173:20]
says [42:6] [80:24] [82:7]
[156:16] [157:25] [169:9,24]
[170:3] [172:22] [181:22]
scene [88:7] [203:11]
schedule [6:8]
schedules [160:14]
school [44:19]
score [83:16]
scores [136:5]
seat [51:21]
seated [18:3,4]
second [30:20] [46:3]
[80:23] [150:10] [160:22]
[179:23] [180:6] [195:17,18]
section [80:4] [117:3]
[150:4] [169:7] [182:5,7]
[184:1]
securities [17:13] [45:17,19]
[47:6] [118:5,7] [164:3]
[185:16]
securitization [13:7,13]
[14:15] [20:13,19] [21:4]
[25:15] [27:4] [28:20,24]
[29:15] [35:8,9,25] [36:3]
[87:12,20] [95:19] [96:2]
[101:5] [106:3,11] [107:16
,19,24] [108:15,16] [110:5]
[112:10] [115:5] [122:24]
[125:4] [142:17] [215:4]
[217:17] [218:6,24]
securitizations [14:3,12,21]
[19:21] [22:24] [23:12]
[30:3] [35:7,12,15,20,21]
[36:8] [40:21] [41:5] [49:9]
[87:11] [96:1] [100:24]
[101:1] [102:2] [103:20]
[105:14,22] [106:10,22]
[108:20] [109:19] [125:15]
[140:5,12] [141:5] [142:13
,15]
securitize [23:18] [40:24]
[41:10] [95:16] [106:18]
[115:4,13]
securitized [137:17]
security [43:16]
seeing [79:16,18] [131:1]
[149:15]
seek [10:19] [31:10] [58:21]
[141:22] [194:18] [205:20]
seeking [63:3] [166:23]
[195:14]
seem [100:20,21]

seemed [66:18] [164:12] [215:17]
seen [10:13] [65:22] [89:21] [98:18] [131:2] [139:17]
segue [10:6]
select [16:24] [54:7] [95:9,11,16,23] [96:5]
selected [95:11]
sell [97:22] [114:14] [115:7] [121:13] [178:17]
selling [142:12] [176:24]
send [64:2] [187:3] [219:11,19]
senior [9:15,20] [16:22,23] [18:21] [47:24] [48:2,6] [59:15,16] [60:12] [141:9] [156:1,3] [176:15] [185:23,24] [188:14] [195:16]
sense [14:14] [17:11] [23:25] [71:4,12] [118:15] [121:6,7] [124:22] [178:15] [209:4]
sensible [183:21]
sent [175:3] [187:5] [194:13] [195:13]
sentence [37:7,12] [40:11] [41:21] [42:6] [80:23] [86:5] [108:5,6] [150:10] [155:12] [161:12] [171:7,10] [190:11] [195:18] [198:17] [199:11]
sentences [199:10]
sentiment [127:9,11,12] [167:13] [196:4]
separate [15:12] [60:20] [95:25] [145:24] [147:3] [165:16]
separately [95:16]
september [3:] [5:2] [76:24] [90:20] [128:13] [170:8] [211:20] [221:19] [222:4]
serageldin [99:12,15]
series [10:5] [146:15,18] [175:11] [193:18]
serious [94:7] [135:18]
serve [19:25] [20:8] [21:10] [205:12]
served [13:6,8,14] [23:12] [70:8] [204:10,12] [205:13]
service [46:12] [95:16] [117:24]
serviced [72:10]
servicer [23:21] [111:3] [150:20] [176:14] [195:16]
servicers [31:20]
services [12:18,21,22,24] [13:23,24] [14:23,24] [15:3,5,7,12,14] [18:16] [19:5,19] [22:23] [24:19,22] [43:24] [50:2] [56:2,20] [57:6] [61:1,2] [87:15] [109:4] [110:5,11] [147:12,15,18] [151:8,17,19] [166:9] [168:25] [201:1]

servicing [35:10,12,14,16,22] [36:2,12] [38:16] [112:1,3] [115:8] [125:18] [142:20,22] [185:22,24] [188:13] [190:17,23] [191:1]
serving [46:19] [51:18]
set [6:7] [59:5] [80:12] [81:21] [82:2] [84:1,5,6] [103:5] [122:14] [133:2] [137:12] [150:8] [181:13,20] [196:22]
sets [84:8]
setting [94:16,18] [135:2]
settle [63:9]
settlement [61:5] [62:12]
several [21:20,25] [71:15] [81:1] [153:7] [171:1] [183:5] [187:6] [200:5]
shall [219:9] [222:10]
shape [75:10]
share [8:24] [157:15] [165:5]
shared [74:17] [127:8] [178:23]
shareholders [52:23]
shares [134:14]
shed [143:21]
sheet [113:22]
shipments [98:11]
shop [166:2]
shopping [166:5]
short [86:15] [214:12]
shortly [10:12] [12:6] [55:18] [67:1] [68:23]
shortterm [86:15] [214:12]
short-term [86:15] [214:12]
shot [52:8] [71:13]
show [78:12] [119:19] [147:25]
showed [77:17] [192:6] [202:22,24]
showing [163:23]
shown [79:22]
shows [154:16]
shrink [75:13] [76:2,5]
shrinking [75:3]
shut [75:20] [202:15] [214:7]
side [35:23] [36:11] [103:18]
sign [56:11] [219:12,22] [220:2]
signature [58:7]
signatures [219:10]
signed [57:3] [168:24] [219:20]
significant [20:12] [30:4,17] [35:5] [37:15] [41:3,4] [75:5] [97:15] [98:19] [101:3] [121:20] [142:24] [208:18]
significantly [23:25] [29:11] [83:12] [142:16] [177:24]

[192:6,17] [198:4] [202:13] [203:8]
signing [221:11]
similar [112:1,3]
simple [63:8] [126:22] [211:25] [212:11]
simply [19:19] [30:2] [48:4] [51:3] [103:20] [104:5] [106:5,6] [152:22] [167:18] [194:17] [195:20] [208:22] [214:17]
single [101:21]
sir [37:9] [44:7] [153:20] [158:21] [179:22]
sit [8:20] [67:25] [97:24] [164:7]
site [83:11,12,14,16] [84:21] [85:1,11]
sites [119:11]
sitting [36:6]
situation [21:2] [54:5] [141:24] [155:21] [156:18]
sixth [168:20]
size [104:3]
sketchy [12:8]
skip [199:10]
skipped [43:4]
slide [170:21] [175:17]
slides [184:6]
slogans [89:4] [92:25]
small [72:11] [86:9] [145:19] [148:5] [151:5]
smith [33:3,7,11,15] [52:10] [65:9,11,18;19] [89:15] [127:20] [151:1]
smiths [33:21]
social [43:16] [69:4]
sold [51:9] [54:17] [55:18] [61:9] [68:23] [71:18,20] [78:7] [101:15] [106:17] [108:13] [112:14] [124:25] [150:18]
sole [41:12] [42:4]
solely [40:13] [41:24] [42:8,12] [70:16]
soles [150:25] [151:3,7]
solidified [198:3]
somebody [28:22] [52:13] [99:10] [105:19] [108:23]
somehow [215:6]
someone [33:22] [113:4] [118:17]
something [20:25] [43:2] [57:15] [59:11] [60:1] [64:23] [66:2,17,19] [88:14] [89:7] [90:2] [93:1,12] [119:3] [121:17,25] [123:19,23] [139:16] [142:10] [149:24,25] [151:10] [195:21] [207:4,10,15] [208:4] [212:17] [215:11] [217:21]
sometime [27:15] [110:19] [123:4] [141:15] [184:19] [200:14] [220:1]

sometimes [14:16,17,18] [88:15] [100:21]
somewhat [23:17] [27:14] [103:7,18] [118:14,20] [121:9,16] [130:13] [155:22] [206:24] [209:11] [218:2]
somewhere [63:17] [65:16] [153:9] [159:5]
soon [202:10]
sooner [41:7] [146:13]
sophisticated [53:14] [175:21]
sorry [51:10] [178:4] [195:24] [213:12]
sought [20:22] [40:5] [141:16] [185:21]
sound [10:7] [49:14]
sounds [88:16] [89:5] [131:10]
source [138:10]
sources [72:12] [102:8] [103:10] [111:12] [163:13]
sourcing [77:14,17,20,21,23]
southeast [98:20]
sovereign [104:18] [105:17]
speak [124:7]
speaking [12:17] [49:16] [72:16] [100:24] [101:7] [104:22] [107:9] [112:5] [127:22,25] [133:9] [135:9] [136:23] [137:11] [138:16]
specialized [45:15,19]
specific [10:6,16] [20:15] [33:13] [49:24] [67:23] [68:10] [115:19] [131:3] [134:22] [140:18] [153:23]
specifically [11:1] [12:4] [13:22] [25:5] [32:23] [46:8] [48:14] [126:15] [147:3] [165:24] [171:2] [172:9] [180:4,21] [186:10] [195:13] [197:12] [210:16,18]
specifics [67:18] [87:3] [109:14,17]
spectrum [171:12] [172:4] [173:3,6]
spell [99:14]
spend [43:19]
spending [69:15]
spoke [127:24] [134:23]
spread [95:21]
spring [30:19] [143:2]
squeezed [84:24]
st [76:8,13]
stakeholder [174:14]
stakeholders [178:14]
stand [62:1,10] [108:13] [178:16] [186:16,18]
standard [95:13] [120:22]
standards [85:8] [94:12,17,19] [95:4] [97:14,20] [104:25] [115:11] [134:24] [135:3,7,10,14,24] [136:3

,9,10,15,18,21] [137:2,10,13
,18,21,24] [138:1,3,12,17]
[139:16] [199:1,23]
standish [3:] [5:3,21] [6:3]
[7:24] [12:17] [24:2] [26:9]
[43:1] [57:20] [70:4] [78:24]
[79:15] [96:21] [140:3]
[155:9] [156:21] [167:8]
[168:19] [216:5] [219:12]
[221:5] [223:13]
standish/kdn [222:1]
[223:1]
standpoint [19:13] [28:19]
[29:25] [43:15] [52:3]
[93:18] [116:1] [125:17]
[158:7] [189:18]
stark [8:6,7,11]
stars [2:]
start [44:10] [45:25] [57:14]
[126:22] [127:1] [218:4]
started [76:23] [98:16]
[110:24] [125:9] [142:15,19]
starting [203:6]
starts [99:21]
state [44:17] [74:8] [221:1]
stated [19:17] [57:6] [174:7]
[221:14]
statement [26:21] [30:16]
[37:19,20,22] [40:16,19]
[42:9] [59:13] [64:11]
[81:4] [171:15,16] [176:1]
[199:14] [222:11]
statements [30:20] [34:15]
[36:16] [78:6,18] [81:21]
[82:2]
states [5:7] [69:11]
stay [28:23]
step [30:2] [39:19] [129:10
,23]
steps [63:24] [97:6,16]
[135:23] [136:4] [139:11]
[160:20]
stipulation [219:10]
stock [48:13] [49:1] [176:24]
stood [64:10]
stop [83:24] [173:17]
stopped [21:20] [108:25]
stopping [35:19]
stores [75:1] [82:15] [97:13]
strategic [149:8] [169:11,20]
strategies [161:5]
strategy [126:12] [140:13]
[160:16]
street [3:] [5:10] [77:11,25]
streeter [18:5,12] [52:12]
stress [81:14,15] [142:13,14]
strides [94:24]
strike [30:22] [34:20] [54:25]
[68:7] [70:15] [94:10,15]
[113:19] [127:17] [132:4]
[145:16] [165:11] [169:15]
[172:8] [186:11] [189:23]
[199:17] [209:1] [217:12]
strips [14:17]

stronger [143:22]
strongly [192:7]
structural [9:5,8] [131:22]
[191:2]
structure [14:13,14,20]
[109:11] [112:20] [113:11]
[115:6] [130:11] [131:20]
[132:19] [173:1]
structured [32:20] [33:17]
[129:4] [130:8]
structuring [14:9] [218:25]
studied [54:3] [181:21]
[182:11,12]
studies [74:12]
study [54:1] [181:11,23]
[182:9]
stutman [2:] [5:17]
style [92:24]
subject [6:19] [124:12]
[146:19] [156:4]
submitted [78:25] [79:11]
subordinate [188:15]
subpoena [70:8]
subpoenas [65:24] [66:13]
subscribed [221:19]
substance [222:10]
substantial [86:5] [118:12]
[185:15] [187:9] [215:21]
substantially [154:14]
succeed [63:6]
success [69:18] [152:6]
[189:24]
successful [62:25] [189:21
` [218:5]
successfully [20:11]
sufficient [91:17] [103:10,14]
[204:19] [206:19]
sufficiently [33:17] [93:20]
suggested [120:25] [123:23]
[152:13] [183:8] [193:5]
suggesting [169:25]
suggests [33:2] [154:17]
suisse [5:6,15] [6:9] [12:19
,24] [13:6,8,11,23] [14:23]
[15:5,14,21] [17:10,17,21]
[18:2,17,19] [19:17] [20:16]
[21:3,8,16,19,24] [22:15,21]
[24:22] [31:10] [36:22,23]
[42:10,12] [46:21] [47:1]
[52:15,17] [53:21] [54:4]
[61:6] [62:13] [63:9] [68:16]
[69:1] [86:19] [90:21]
[97:17] [99:5,10,16] [106:
20] [108:19] [109:8] [110:5]
[117:24] [118:4] [120:13]
[121:4] [127:22] [128:16]
[129:10,17,20,23,25]
[130:12] [131:16] [132:10]
[133:11] [134:13,19]
[137:9] [139:10] [145:12,25]
[146:4,19,22] [156:4]
[158:25] [159:3] [161:25]
[162:12,16,20] [163:19,22]
[166:10,16] [167:10,24]

[168:24] [169:15] [170:24]
[172:10] [173:11] [180:10
,24] [181:21] [182:23,25]
[183:13,25] [184:4,24]
[190:24] [191:6,21] [192:21]
[194:21] [195:10,13]
[201:2,7,10,14,18] [202:1]
[209:20,22] [210:14]
[212:5,24] [213:1,4] [214:
21] [216:7,9,16] [217:14]
[218:10,21]
suisses [12:5] [16:21]
[163:1] [167:25] [192:25]
[208:10] [211:1]
suit [10:20] [24:20] [63:6]
[65:21] [67:22]
suitability [74:18]
summarize [78:13]
summary [53:7] [110:7]
summer [30:8,9,24] [33:24]
[34:3,7,10,16] [77:19]
[127:6,19] [143:1,2,16,18]
summerfield [43:9]
supervision [221:8]
supplemental [223:10]
support [79:12] [152:4,5]
[166:3] [185:11,12] [187:21]
[200:8,23,24]
supported [200:13,21]
supposed [133:2] [169:24]
sure [24:8] [27:3,17] [32:19]
[38:6] [42:19] [43:17]
[50:1] [55:22] [62:5] [69:9]
[73:12] [77:2] [86:14]
[92:21] [106:23] [112:23]
[114:22] [120:17] [121:15
,23] [123:17,18] [128:21]
[129:12] [130:13] [134:8]
[139:14] [140:22] [146:21]
[160:15] [161:9,10] [180:4]
[189:8] [191:12] [192:13]
[210:10] [215:12]
surmise [148:22,23]
surprise [46:10] [123:22]
surprised [30:7,11,13]
[33:24] [34:8] [68:3,8]
[206:6,8]
susan [99:21] [100:14,16,18]
suspect [11:2] [112:23]
[148:23]
suspected [206:24]
suspend [203:13]
suzanne [59:17,23] [60:9,14]
[184:23]
swiss [201:11] [214:3]
sworn [5:22] [221:5]
system [32:3] [57:14]

————————————
T
————————————

table [16:2,5,12,14,17]
[117:25] [118:2]
taken [3:] [5:3] [42:23]
[58:3] [71:5] [75:19] [76:2

,4] [96:18] [98:5,7] [139:23]
[160:20] [175:12] [176:16]
[179:11] [216:2] [221:7]
[222:4]
taking [6:6] [7:21] [16:13]
[97:16] [99:2] [176:13]
[221:6]
talk [23:3] [32:2] [37:25]
[39:19] [49:23] [76:13]
[78:9] [98:11] [184:16]
[201:1] [210:22]
talked [29:6] [59:20] [97:19
,22] [123:15,20] [126:16]
[140:17] [215:7]
talking [13:2] [22:17] [27:9
,16] [34:9] [48:22] [94:1]
[133:13] [150:15] [157:24]
[159:4,7] [186:20]
talks [82:25]
tangentially [165:20]
tape [42:24] [96:19] [139:24]
[179:12]
targets [59:9]
task [161:4] [191:7] [192:1]
[216:10,14]
tcastanres@stutman.com
[2:]
team [45:17]
technical [204:11]
technique [28:14] [29:6]
[31:19] [153:1]
tell [11:3] [16:20] [23:9]
[43:5] [44:7] [48:2] [67:4]
[80:11] [82:2,5] [88:21]
[89:2] [103:4] [105:8]
[109:15] [112:12] [126:25]
[128:25] [130:23] [133:20]
[150:8] [167:9] [169:18,22]
[173:11,15,17] [182:10]
[185:18] [197:19] [201:9]
[208:22]
telling [64:9]
tells [93:1] [174:14]
ten [42:17] [179:7] [182:5]
tenacious [164:23] [165:2
,5]
tended [14:13]
tends [98:17]
tenminute [179:7]
ten-minute [179:7]
tent [118:19] [122:1,4]
tenure [12:25] [13:1] [17:9]
[18:25]
term [29:18] [102:4] [105:2
,3]
terminate [22:15] [23:1]
[29:2] [31:2] [128:6,11]
[211:10]
terminated [22:20] [29:4,7
,12] [30:23] [128:12,17]
[142:6]
terminating [31:5]
termination [57:8] [60:25]
[211:9]

terms [46:23,25] [54:22]
[60:15] [61:7] [101:12]
[105:1] [113:1] [117:15]
[122:14,16,19] [128:12]
[130:11] [134:6] [162:9]
[166:8,22]
terribly [64:23] [135:21]
testified [5:23] [26:11]
[34:6] [40:2] [41:16] [53:4]
[66:25] [110:4] [117:14]
[128:1] [133:10] [165:12]
[167:9] [172:8] [180:22]
[209:19] [210:2] [213:8]
[216:6]
testify [6:6] [11:8] [70:6]
[113:19]
testifying [6:19]
testimony [22:10] [33:23]
[36:22] [53:8] [58:10,19]
[133:12] [163:18] [221:9]
textile [98:23]
thank [7:24] [9:25] [18:19]
[39:12] [42:20] [58:9]
[79:14] [81:23] [100:9]
[139:9] [140:2] [153:11]
[168:5] [170:11] [219:4]
[220:7]
thats [12:20,23] [14:10]
[15:10] [21:14] [26:14]
[27:16] [34:12] [35:24]
[36:4] [37:2] [41:15,20]
[49:6] [53:7] [55:13] [57:17]
[58:4,15] [62:3] [63:3]
[64:10,19] [70:25] [73:10]
[74:14] [75:5] [76:10]
[78:16] [79:7] [85:25]
[90:9,12] [92:8] [96:14]
[99:13,24] [100:7] [101:24]
[107:11] [110:7] [115:18]
[118:20] [121:9] [132:14]
[136:23] [148:23] [154:16]
[156:18] [162:2,7] [166:24]
[167:7] [168:11] [175:19]
[196:1] [198:6] [201:8]
[207:24] [213:16] [220:5,6]
themselves [5:11] [24:13]
[32:4] [131:22]
thereafter [123:1]
therefore [6:12,19,20,25]
[108:16]
theres [9:25] [35:6] [37:20
,22,23] [40:18] [58:25]
[64:17] [78:11] [82:19]
[86:4] [111:23] [121:8,16,24]
[157:23] [158:24] [159:9]
[171:7] [175:21] [176:17]
[180:1,9] [181:10] [189:12]
[194:25] [195:18] [198:14]
[199:10]
theyd [149:17]
theyre [20:5] [69:15] [102:8]
[121:10,15] [169:24]
[173:5]
theyve [121:11]

thing [14:10,11] [30:18]
[31:6] [62:5] [77:5] [89:6,20]
[92:9] [93:19] [97:23]
[199:11,13] [203:25]
things [6:23] [14:5,6] [16:1
,11,14] [19:10] [35:24]
[45:20] [49:24] [75:4]
[92:21] [97:23] [104:21]
[135:10] [142:23] [161:19]
[165:9] [192:2] [201:7]
think [7:20] [9:4,9,21,23]
[10:1,12] [11:11] [12:21]
[14:23] [15:4] [16:8,17]
[17:12] [20:11,14] [23:10,11]
[24:8,25] [26:25] [27:25]
[31:19] [32:16] [33:16]
[38:19] [40:2,7] [46:2]
[47:4,6,9] [49:20] [52:3,13]
[55:17] [59:18] [60:23]
[67:25] [68:2] [69:20]
[71:11] [73:21] [74:20,21]
[75:3,9,24] [76:19] [77:12
,20] [78:13] [79:20] [81:13]
[82:10,15,20] [85:9,16,25]
[86:23] [87:9,19] [88:3]
[90:16,19] [91:7,14,19]
[92:1,8,13,20] [93:15]
[94:2,3,22] [97:10,19]
[99:9,24] [100:4,18,20]
[103:9] [104:18] [105:19]
[106:11] [107:1] [111:5,14
,15] [112:2] [113:6,10]
[115:14] [117:22] [119:20]
[120:10] [121:4] [122:9]
[123:14] [125:23] [126:2,11
,16] [127:24,25] [128:12,22]
[129:16] [133:1,15] [135:21]
[139:10] [142:2] [144:8,16
,24,25] [145:9] [146:11,25]
[148:4,6] [149:21,23]
[150:1] [156:15] [159:16]
[160:11] [162:17] [164:2,24]
[165:22] [166:12] [167:5]
[168:7] [171:20] [173:24]
[174:7] [176:9] [177:2,21,24]
[178:22,24] [179:1] [182:22]
[183:2,6,17,20] [184:3]
[187:15,24] [188:7] [191:6
,9,11] [192:10,17] [193:5]
[194:4] [195:12] [196:1,5,14
,24] [200:4,19] [201:24]
[202:8] [205:17] [206:12,14
,18] [207:1] [208:10] [211:
23] [213:14] [214:13,17,22]
[215:12,20] [216:12,16,20
,24] [217:3,9,16] [218:13]
[219:16]
thinking [180:25] [217:3]
third [98:12] [195:23,24]
[209:7]
thirty [80:15]
thirtyseven [80:15]
thirty-seven [80:15]
though [29:14,24] [32:5]

[75:19] [82:18] [137:2]
[192:19]
thought [16:24] [23:21,22]
[46:23,24,25] [49:24]
[54:8] [58:24] [75:4] [76:1
,6,22] [77:1] [93:6] [95:2]
[100:13] [122:22] [127:14]
[129:20,22] [136:2] [139:14]
[144:18] [145:7] [146:8]
[149:2] [153:4] [165:3]
[174:13] [178:18] [187:23]
[191:24] [193:3] [200:22]
[204:7] [206:20] [207:3,14]
[208:3] [209:10] [211:25]
[212:1] [218:1,4]
three [57:5] [59:1] [62:25]
[70:23] [74:3] [95:12]
[96:19] [171:3] [213:12,15]
thresholds [59:10] [63:23]
throughout [215:15]
throw [109:3]
ticked [214:15]
tied [199:7]
tieing [72:19]
tighten [135:23] [136:10,17]
tightened [138:17]
tightening [85:7] [137:20]
[138:1]
time [6:6,7] [7:11] [9:8,11]
[11:24] [12:11] [13:2,18,19]
[18:7,16,23,24] [20:5]
[22:14] [23:19] [24:3,6]
[25:16] [27:8,15] [28:17]
[29:1,10,23] [30:10,18,19
,22] [32:9,11,20,21] [33:6]
[35:5] [38:8] [40:24] [41:9]
[42:3] [43:12,19] [45:14,21
,25] [46:20] [47:11] [48:9]
[50:10,22] [51:25] [54:15]
[55:8,12,24] [57:5] [59:18]
[60:6,9,14] [61:9] [64:18]
[65:21] [68:18] [69:17,25]
[72:17] [73:14] [74:5]
[75:2,25] [76:6] [77:6,13]
[81:5] [82:12] [83:2] [84:20]
[85:4,5,9] [86:24] [87:21,24]
[88:5,10] [89:8] [90:1,18]
[91:20] [92:4,7] [94:19,21
,22] [95:2] [96:3,25] [97:5,9]
[99:3,17] [103:8,9,13]
[105:5,20] [108:21,22]
[109:5,10,14,15] [110:19,24]
[111:3] [112:15] [113:23]
[114:1,4,6,9,13,18] [115:18
,19] [116:18] [118:18,22]
[119:24] [121:11,17,18,21
,22] [122:23] [123:5] [125:
5,10] [126:19,24] [127:3,4
,12,13] [128:5,22] [129:8,9
,18] [131:18] [133:24]
[135:4,8,17] [136:17,25]
[137:6,8] [140:15,18]
[141:8,20,23] [142:1,4,7,18]
[143:3,17] [144:2,3,9,11]

[145:2] [147:4,6,17,19]
[150:18,19] [154:6,19,22]
[155:3,17] [157:8,20]
[158:3,12] [159:6,22]
[160:25] [161:20,24]
[164:10] [165:23] [170:2,4
,8] [171:15,20] [173:8]
[174:4,8] [177:21] [178:1]
[182:13] [183:6,7,9] [185:
14] [187:20] [190:4] [193:2]
[200:25] [201:15,20,25]
[202:15,21] [203:6,9]
[204:16] [205:25] [207:11
,13,14] [208:6] [209:7]
[210:8,11] [211:18] [212:18]
[214:18,22] [215:13]
[218:9,15,17] [219:5,22]
timeconsuming [32:9]
time-consuming [32:9]
timely [158:10] [202:21]
times [30:13] [114:20,22]
[136:8] [183:5] [201:14,18
,20]
timing [172:23] [211:1]
title [47:24] [48:6] [50:21,23
,24] [51:2,6]
titled [79:11] [169:5] [188:21]
titles [50:17] [51:8]
today [7:19] [8:20,24]
[10:1] [57:1] [58:10,19]
[62:15] [67:25] [70:17]
[79:16] [97:24] [108:11]
[141:14] [199:14] [219:4]
todays [5:2] [6:13] [70:11]
together [84:5] [177:12,22]
[187:3]
told [64:19] [87:24] [166:22]
[181:4] [184:11] [200:10,11]
[201:20] [203:15] [205:16]
tom [99:25] [123:15,16]
[127:20] [185:2] [202:24]
tomorrow [63:9]
tony [2:] [5:16] [96:13]
took [8:4] [23:23,24] [44:23]
[55:24] [75:24] [76:5]
[97:9] [119:17,21] [163:8]
[177:21] [190:2] [194:22]
[219:1]
top [172:22]
topic [66:15] [71:7] [146:23]
[184:9,10]
topics [186:2]
total [56:17] [61:20]
totally [146:1]
touch [218:24]
touche [59:21]
toward [178:25]
towards [171:6] [181:15]
track [31:22] [32:4]
traditional [85:13]
traditionally [83:14,19]
[125:1]
training [46:11]
tranche [146:1]

tranches [14:16]
transaction [14:9] [20:15]
[21:5] [23:19,23] [54:24]
[105:20] [113:1] [115:21]
[116:11] [117:4,12,19]
[118:9,22] [119:21] [120:14
,23] [121:5] [122:24] [124:
16,20] [125:21] [176:12]
[190:21] [219:1]
transactions [104:13,17]
[105:16] [112:10]
transcribed [221:7]
transcript [219:11,19]
[221:12]
transcription [221:9]
transferred [101:7]
treated [63:4]
treister [2:]
tremendous [107:24]
trepidation [121:25]
trial [70:5,6]
tried [19:24] [107:5] [165:8]
triester [5:17]
triggered [66:2,17]
triple [101:21] [114:8,11,12]
trouble [80:19]
troublesome [93:19]
true [49:17] [50:6] [72:14,16]
[77:3] [103:11] [110:14]
[117:23] [130:18,21]
[131:2] [137:4] [221:9]
truly [66:19]
trust [5:6,18] [10:18,22]
[11:17] [46:17] [47:2]
[55:13,19,21,25] [56:2,6,7]
[57:2] [58:11] [61:1] [62:18]
[64:4,7] [101:15] [131:9,11]
[150:17]
trustee [215:7,9]
trusts [69:10]
truthful [6:21] [7:18]
try [17:15] [50:20] [149:16]
[185:11] [209:7]
trying [16:16] [115:3] [191:
10] [203:9]
tuesday [116:23] [153:20]
turn [18:1] [37:3] [39:9]
[80:2] [103:1] [105:7]
[108:4] [129:9] [148:3]
[150:3] [155:5] [172:17]
[175:14] [189:9] [190:8]
[195:17] [196:11] [197:1]
[202:13]
twelfth [2:]
twice [108:22]
twoandahalf [132:12]
[213:10,14]
two-and-a-half [132:12]
[213:10,14]
twoday [150:1]
two-day [150:1]
twopiece [115:7]
two-piece [115:7]
type [101:19] [104:19,23]

[106:5] [112:3] [115:6]
[130:22] [186:15]
types [111:17] [112:7]
typewriting [223:11]
typical [27:12]
typically [20:3] [28:13]
[43:2] [118:25] [130:22]
[131:12]
typo [148:23]

U

uh [15:23] [22:7,10] [25:24]
[28:21] [29:9] [30:6] [31:17]
[32:7] [34:12] [35:2] [38:9
,18] [41:22] [42:5] [44:22]
[47:11] [49:22] [51:1,10]
[56:1] [58:16] [60:3,13,17]
[61:10] [63:2,15] [65:4]
[66:7] [67:15] [68:21]
[69:6] [72:20] [73:6] [74:13
,17] [75:18,22] [78:2,9]
[79:1] [80:2,25] [81:8,12,16
,19] [82:9,14,17,21] [83:6,8
,21,23] [84:10,15] [85:24]
[86:16] [87:12,18] [88:11,13]
[89:8] [90:17] [91:12]
[93:11,22] [94:5] [95:5]
[96:6] [97:12,16,24] [99:3]
[100:1,15,22] [101:9,23]
[102:1,10,14,25] [103:19]
[104:8] [105:7,21] [107:3,22]
[108:4,7] [111:18] [113:12]
[115:20] [117:7] [119:15]
[122:5] [126:4,14] [128:1,10
,14] [129:25] [130:10]
[133:19] [134:5] [135:12]
[138:14,19] [139:6,9]
[142:3] [145:3] [149:4]
[150:3,6] [155:1,7,11,16,23]
[158:2] [166:6,15] [168:17
,22] [169:4,6] [171:5,9]
[172:2,14] [173:7] [175:2]
[179:19] [180:8,12] [182:3]
[186:23] [194:7] [197:4,15]
[198:7] [211:11] [213:22]
[214:19]
uhhuh [15:23] [22:7,10]
[25:24] [28:21] [29:9]
[30:6] [31:17] [32:7] [34:12]
[35:2] [38:9,18] [41:22]
[42:5] [44:22] [47:11]
[49:22] [51:1,10] [56:1]
[58:16] [60:3,13,17] [61:10]
[63:2,15] [65:4] [66:7]
[67:15] [68:21] [69:6]
[72:20] [73:6] [74:13,17]
[75:18,22] [78:2,9] [79:1]
[80:2,25] [81:8,12,16,19]
[82:9,14,17,21] [83:6,8,21
,23] [84:10,15] [85:24]
[86:16] [87:12,18] [88:11,13]
[89:8] [90:17] [91:12]
[93:11,22] [94:5] [95:5]

[96:6] [97:12,16,24] [99:3]
[100:1,15,22] [101:9,23]
[102:1,10,14,25] [103:19]
[104:8] [105:7,21] [107:3,22]
[108:4,7] [111:18] [113:12]
[115:20] [117:7] [119:15]
[122:5] [126:4,14] [128:1,10
,14] [129:25] [130:10]
[133:19] [134:5] [135:12]
[138:14,19] [139:6,9]
[142:3] [145:3] [149:4]
[150:3,6] [155:1,7,11,16,23]
[158:2] [166:6,15] [168:17
,22] [169:4,6] [171:5,9]
[172:2,14] [173:7] [175:2]
[179:19] [180:8,12] [182:3]
[186:23] [194:7] [197:4,15]
[198:7] [211:11] [213:22]
[214:19]
uh-huh [15:23] [22:7,10]
[25:24] [28:21] [29:9]
[30:6] [31:17] [32:7] [34:12]
[35:2] [38:9,18] [41:22]
[42:5] [44:22] [47:11]
[49:22] [51:1,10] [56:1]
[58:16] [60:3,13,17] [61:10]
[63:2,15] [65:4] [66:7]
[67:15] [68:21] [69:6]
[72:20] [73:6] [74:13,17]
[75:18,22] [78:2,9] [79:1]
[80:2,25] [81:8,12,16,19]
[82:9,14,17,21] [83:6,8,21
,23] [84:10,15] [85:24]
[86:16] [87:12,18] [88:11,13]
[89:8] [90:17] [91:12]
[93:11,22] [94:5] [95:5]
[96:6] [97:12,16,24] [99:3]
[100:1,15,22] [101:9,23]
[102:1,10,14,25] [103:19]
[104:8] [105:7,21] [107:3,22]
[108:4,7] [111:18] [113:12]
[115:20] [117:7] [119:15]
[122:5] [126:4,14] [128:1,10
,14] [129:25] [130:10]
[133:19] [134:5] [135:12]
[138:14,19] [139:6,9]
[142:3] [145:3] [149:4]
[150:3,6] [155:1,7,11,16,23]
[158:2] [166:6,15] [168:17
,22] [169:4,6] [171:5,9]
[172:2,14] [173:7] [175:2]
[179:19] [180:8,12] [182:3]
[186:23] [194:7] [197:4,15]
[198:7] [211:11] [213:22]
[214:19]
ultimate [143:6] [189:25]
[197:9]
ultimately [16:7,18] [17:2]
[21:23] [31:3] [51:16]
[53:5] [54:6] [60:14] [62:19]
[64:22] [65:2] [78:7] [85:12]
[91:25] [95:9,22] [96:7]
[108:13] [143:14] [150:18]
[162:5,10,14] [167:23]

[176:11] [192:9,23] [196:18
,21] [200:8] [215:9]
ultimatum [52:19]
unable [84:13]
uncertain [192:25]
uncertainties [155:15]
[156:22]
underlying [10:4] [185:25]
understand [7:14] [11:4]
[62:3] [111:17,21,24]
[113:14] [121:19,20]
[130:4] [134:12] [162:25]
[164:5] [180:13]
understanding [10:9,11]
[11:3] [12:3] [13:24] [46:13
,16] [63:10] [74:6,9] [86:7]
[92:3] [101:5] [108:24]
[110:3] [113:8] [137:1]
[176:21] [187:18]
understood [32:3] [73:21]
[90:8,25] [112:4] [122:17]
[126:2,3] [163:3] [201:12]
undertook [184:1]
underwrite [19:20] [20:10]
[108:19]
underwriter [13:7] [19:2,25]
[20:3,8,11] [21:10] [47:5]
[106:21] [109:1] [204:12]
underwriters [86:20,22]
[101:10] [204:10]
underwriting [13:23] [14:22]
[19:4,14,18] [20:17,24]
[24:22] [33:19] [87:5,13]
[88:1] [94:12,17,19] [95:1
,3,24] [97:14,20] [99:1]
[104:25] [115:11] [129:17]
[134:24] [135:24] [136:2,10
,15,17,21] [137:1,9] [138:1
,17] [139:12] [197:25]
[199:1,23]
underwritings [87:7,13]
underwritten [33:20]
undoubtedly [197:17]
unfortunately [199:11]
union [87:1] [109:4] [111:2]
united [5:7] [102:17]
units [125:14]
university [44:14] [74:8]
unless [64:23]
unlike [187:15]
unlikely [208:2]
unnecessarily [167:4]
unreasonable [77:22]
[139:10]
unreasonably [77:21]
unsatisfactory [16:19]
unsecured [61:13,16,17,22]
[63:4,13]
unsecureds [63:19,20]
unsustainable [37:14]
until [6:25] [22:3] [51:9]
[72:14] [77:7] [78:3,6]
[90:19] [94:3] [103:11]
[137:17] [141:21] [146:8]

[154:24] [155:25] [200:20] [202:9] [203:3,17] [207:17] [212:20] [214:6]
unusual [131:19]
unveiled [89:9]
update [123:10] [124:18]
updated [134:8] [155:10]
upon [44:25] [97:17] [101:17,18] [164:3] [204:25] [222:11]
upset [115:18]
upside [36:10] [193:8]
upswing [98:16]
upturn [84:21]
upward [93:17]
upwards [48:23]
us [6:8] [8:24] [10:2] [15:21,25] [16:12] [20:25] [21:22] [22:23,24] [23:9,10,12] [29:14] [36:4,5,13] [47:1] [60:9] [88:3] [104:1] [110:13,25] [115:24] [121:11,22] [123:4] [128:8] [129:15] [130:8] [138:3,7] [141:18] [147:20] [148:5] [149:25] [163:4,10] [164:1] [184:11,12] [198:20] [199:13] [201:14] [204:10] [205:16] [206:25] [208:2] [209:10] [210:3,6] [212:19] [215:15] [219:2,13]
use [14:13] [26:20] [27:22] [29:5] [36:24] [38:6,23] [40:7,20,22] [57:13] [69:11] [86:13,15] [88:2] [95:25] [102:2,4] [104:13] [116:7] [134:19,24] [141:5] [147:20] [153:22] [222:13]
used [9:22] [10:24] [19:10] [28:7] [31:19] [34:18] [37:16] [38:12] [48:21,24] [59:19] [74:10] [104:10] [109:2,19,20,23] [110:1] [152:25]
useful [10:1]
using [39:23] [50:10] [95:4] [109:5] [140:5] [156:9,18]
utilize [28:16]

**V**

vague [89:5]
valuation [175:24] [176:18]
valuations [55:6] [195:14]
value [61:21] [152:15] [175:23] [178:19] [179:5] [184:12] [186:18] [195:20] [206:15] [216:17]
values [175:10] [177:16] [186:15] [187:7]
vanderbilt [107:11]
variability [14:20]
variations [153:12]
various [54:1] [106:22]

[15:17] [180:23]
varying [112:6]
vehicle [95:19]
venture [175:4]
verge [215:16]
version [193:22]
versus [5:6] [28:2] [163:7] [186:19]
viable [181:3,5] [186:1]
vice [47:24] [48:2,6] [50:24] [51:3,4]
videographer [2:] [5:1,19] [42:21,24] [96:16,19] [139:21,24] [179:9,12] [215:25] [216:3] [220:8]
videotape [3:]
view [33:14] [34:20] [52:25] [53:13,25] [69:9] [72:20] [91:9] [92:24] [93:3] [94:8] [95:15] [97:25] [116:15] [127:3,4] [135:18] [143:3] [144:13] [145:11] [158:5] [159:23] [160:1,4] [163:9] [164:17] [165:5] [166:16] [169:14,15] [176:3,7] [178:2,9] [180:23] [181:2,4,15] [186:12] [187:21] [189:23] [192:21] [207:18] [208:7]
viewed [16:15] [218:5]
viewpoint [197:16]
views [8:12,21] [12:18,21] [15:14] [23:6] [69:1] [73:18] [74:18] [96:25] [120:5] [157:15] [178:23]
vincent [52:12]
virtually [202:1]
virtue [46:11] [116:3]
visit [123:3]
visiting [201:16]
volume [85:17]

**W**

wachovia [87:2]
wait [6:25]
waive [135:13]
waiver [23:15] [202:12,20,23] [211:2,15,23] [212:5,8,10,12] [214:2,6,21] [217:5,7]
waiving [167:16]
walked [124:10] [214:18]
walker [52:11]
wall [77:11,25]
want [20:3] [37:11] [39:18] [57:13] [71:7] [78:9] [89:19] [92:21] [96:15] [121:14] [123:22] [153:25] [167:3] [192:14] [193:25] [201:1] [219:14]
wanted [55:22] [129:15] [147:20] [152:2] [166:2] [174:5] [177:19] [209:6]
wanting [129:21]

warehouse [21:21] [94:20,21,23] [110:25] [111:22] [128:2] [191:17] [202:12,18,23] [203:7,13]
warrant [132:7] [133:11,21,22,24] [134:1,6,12,17,20] [202:1]
warranty [72:3]
warren [118:18] [120:1] [126:20]
wasnt [20:9] [21:5] [42:3] [56:9] [58:1,2] [82:18] [88:9] [106:6] [149:23] [156:13] [160:1] [172:15] [192:11] [198:3] [208:16] [212:11] [214:11]
water [35:25]
ways [15:24] [78:11]
weaver [52:12]
wed [146:11] [149:16]
wednesday [207:12] [213:21]
week [9:9] [21:19] [22:4] [183:7] [203:14] [204:1,3] [209:20] [214:23,24]
weeks [212:21]
weighted [105:3]
welch [149:22]
welcome [140:1] [148:17]
well [7:2] [8:20,25] [9:4] [10:6] [11:20] [12:12,14] [13:1] [14:8] [15:10] [17:15] [19:8] [21:7,10,18] [22:24] [23:12] [26:25] [27:5] [32:17] [33:5] [34:6] [35:9] [37:8,20,25] [38:4] [40:2] [41:19] [43:14] [44:18] [45:7,16,20,23] [46:12,17,24] [47:7] [48:22] [49:20] [50:21] [51:16] [52:2] [57:16] [62:16] [63:7] [64:16] [65:23] [68:19] [71:24] [72:10,22,24] [73:22] [75:15,20] [76:1,7,13] [77:21] [78:16,19] [80:10] [81:15] [84:8] [85:22] [86:8] [87:3,10] [88:8] [89:1,2,10] [90:4] [91:1] [92:6] [98:7,8] [99:14,18] [102:4,7] [104:4] [105:16,21] [106:2] [107:20] [108:12] [110:24] [111:9,15] [119:3] [120:8] [121:12,15] [122:21] [123:13] [124:23] [126:21] [133:16] [137:11] [138:3,25] [140:22] [141:18,24] [146:25] [149:2,24] [150:10] [152:1,4,9,22] [154:15] [156:12] [158:6] [159:14,15] [160:11] [163:3,9,12] [165:7] [168:12] [169:20] [171:1] [173:5] [181:6,22] [182:1] [185:16] [186:6] [188:17] [191:17,23]

[192:23] [197:10,25] [198:13] [202:7] [206:23] [210:12] [212:11] [213:3] [216:12] [217:19,25]
went [64:23] [123:14] [128:15] [162:18] [166:14] [202:2] [214:24] [217:23]
werent [35:14,15,17] [36:11] [38:20] [58:3] [77:2] [91:8] [160:3] [181:24]
west [43:23]
weve [76:20] [117:12] [122:15] [183:12] [189:1]
whatever [27:8] [63:1] [145:1] [163:5] [177:14]
whats [43:20] [57:21] [62:19] [90:10] [99:3] [100:10] [151:24] [184:6]
whatsoever [208:8]
whereas [65:13] [83:14] [105:1] [125:1]
whereby [60:21] [95:8]
whereof [221:18]
whether [15:14] [18:10] [19:12] [32:22,23] [33:21] [36:7,9] [53:6] [62:12] [67:14] [77:2,3] [86:25] [112:21,22] [113:13] [114:17] [123:19,23] [140:15,25] [144:18,19] [156:6] [164:11] [166:3] [178:15] [185:25] [191:23] [192:1] [207:22] [210:12]
white [135:11]
whole [32:10] [37:8] [63:18] [89:20] [106:4] [140:16,24] [154:1,3] [198:12] [212:13] [217:18]
wholesale [30:2] [41:1,2] [124:25] [125:10,14] [142:12]
wholesaling [125:9] [142:19]
whose [109:4] [123:18] [190:22]
why [7:17] [8:12,21] [20:9] [21:22] [29:13] [31:25] [39:20] [42:16] [44:10] [55:19] [57:14] [78:10,14] [79:22] [80:13] [84:7,11] [92:4,9,10] [100:15] [103:24] [106:1] [108:11] [111:14] [116:6] [118:20] [121:23] [126:3] [128:18] [131:10] [136:1] [139:19] [145:9] [148:19] [151:22] [164:5] [165:18] [166:25] [169:18] [171:19] [185:10] [194:15] [206:10] [215:12,19]
will [5:11,19] [6:23,25] [7:13] [21:9] [62:7,14] [70:10] [78:18] [152:24] [199:13] [219:11,24,25]
williams [49:12] [132:21]
window [150:1]

winston [3:] [5:10]
winstonsalem [3:] [5:10]
winston-salem [3:] [5:10]
winter [30:14]
wisdom [157:12] [193:1]
wishful [180:25]
withdraw [19:5] [21:10]
withhold [19:4,18]
within [214:3]
without [25:1] [36:7] [146:11]
[148:5] [156:18] [171:25]
[200:15]
witness [3:] [5:20] [8:16]
[11:6,11] [14:5] [19:23]
[22:20] [24:6,25] [39:1,13]
[40:2,18] [41:19,23] [42:15]
[55:21] [67:7,16] [69:13,23]
[79:5,25] [80:18,20,23]
[81:1,9,11,13,17] [89:19]
[90:10] [122:9] [138:25]
[139:7,20] [140:2] [167:21]
[178:9] [179:19] [183:17]
[194:3,5,8] [215:22] [216:
12,20] [219:6,8,25] [220:2]
[221:12,18]
wonder [20:9]
wont [65:3]
wood [59:17] [184:23]
word [17:11] [38:6] [129:13]
[193:22,23]
words [156:2] [161:7]
[173:2,20] [192:11]
work [16:17,18] [22:22]
[23:13,14] [56:14] [74:4]
[95:20] [120:14] [148:8]
[149:20] [152:14,18]
[173:18] [174:21] [176:11]
[184:1] [190:12] [201:10]
[202:5] [204:4] [205:15]
[216:7] [217:4,9,14]
workable [16:15] [208:5]
worked [22:3] [35:8] [147:22
,23] [164:22]
working [22:24] [100:11]
[115:5] [165:19] [204:6]
[217:17]
works [101:6,25]
world [27:24] [28:5] [173:9]
[198:2]
worried [142:14]
worse [142:16]
worst [115:16] [125:11]
worth [16:9] [148:1]
worthwhile [69:11]
wouldnt [16:7] [46:9] [77:17]
[91:1] [125:18] [131:23]
[192:24] [212:19]
write [197:22]
written [10:16] [93:14]
[157:18]
wrong [167:9]

Y

yeah [60:10] [168:7]
year [44:21] [45:11] [47:14]
[48:12] [64:6] [77:19]
[83:3] [142:22] [184:11]
[206:2,4,5]
years [15:22] [45:5,8]
[81:2] [105:3,5]
yes [6:14,22] [7:4,16] [8:2,23]
[9:17,21] [12:2] [14:5]
[15:1] [17:1,8] [18:18]
[22:13] [25:7] [26:4] [27:24]
[31:5] [34:19] [37:2,5]
[44:6] [45:10] [46:2,15]
[49:3,7,10,16,23] [50:3,15]
[51:13,23] [53:12,15,24]
[54:10,20] [55:2] [56:16]
[59:2] [62:8,11] [63:21]
[65:6] [66:14] [67:3] [74:2
,24] [76:3] [81:22] [82:4]
[84:3] [86:3] [93:5] [94:9,14]
[97:2,8] [99:24] [100:25]
[101:3] [102:22] [103:2]
[105:25] [109:9] [112:11]
[116:1] [117:10] [118:2,6]
[119:24] [120:4,12] [124:4
,11] [127:7,24] [128:4]
[130:3,17] [131:7,17]
[133:9,16,17] [134:15]
[135:1,4,9] [137:7,11]
[141:11] [143:13] [146:6]
[151:9,23] [154:22] [155:2
,13,22] [156:2] [157:6]
[158:23] [160:9] [162:10,14]
[163:17] [165:14] [166:20]
[167:12,21] [170:11]
[172:19,21] [174:7] [175:15]
[176:6,20] [177:6] [181:1,9]
[182:1,11] [184:19,25]
[188:4] [189:11,14,18,20]
[190:10,14] [193:10]
[195:5] [196:2,13,16]
[197:18,21] [198:9,19,23]
[199:3,15,20] [201:4]
[204:21] [207:20] [210:24]
[211:3] [213:3]
yesterday [70:20]
yet [190:5] [200:21]
york [2:] [48:13] [49:1]
[68:22] [69:5]
youd [17:25] [73:3] [79:6]
[80:2] [93:3] [105:7] [150:
3] [160:12,13,14] [167:1]
[172:17] [196:11] [197:1]
[198:7]
youll [60:21] [65:2] [167:16]
[219:19]
youre [7:17,21] [9:3,14]
[20:24] [22:17] [48:22]
[49:21] [66:12] [79:4]
[93:1] [104:6] [117:9]
[118:16,17] [126:22]
[133:13] [148:17] [153:23]
[154:5] [160:7,11] [166:21]
[195:23,24] [197:20]

[198:24] [203:18] [219:17]
yourself [37:7] [127:18]
[143:11] [153:21] [154:7]
youve [11:9] [41:16] [58:18]
[97:25] [105:9] [118:17,18]
[152:18] [189:15] [209:2]
[212:23] [216:5,8] [219:20]

Z

zero [83:17]

*EXHIBIT CC*

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    In re:                          )  Chapter 11

     Oakwood Homes Corporation, et al.,)  No. 02-13396 (PJW)

5              Debtors,              )

     OHC Liquidation Trust,           )

6              Plaintiff,            )

     vs.                             )

7    Credit Suisse (f/k/a Credit Suisse)  Adversary

     First Boston, a Swiss banking    )  Proceedings

8    corporation), Credit Suisse      )

     Securities (USA), LLC (f/k/a     )  No. 04-57060 (PJW)

9    Credit Suisse First Boston LLC), )

     Credit Suisse Holdings (USA),    )  Volume I

10   Inc. (f/k/a Credit Suisse First  )  Pages 1-80

     Boston, Inc.), and Credit Suisse )

11   (U.S.A.), Inc.,), the subsidiaries)

     and affiliates of each, and DOES )

12   1 through 100,                   )

                   Defendants.        )

13   _____  )

14

15

16   DEPOSITION OF:

17              MICHAEL TENNENBAUM, Ph.D.

18              MONDAY, OCTOBER 22, 2007

19              LOS ANGELES, CALIFORNIA

20

21

22

23   Reported by:

24              Felipe F. Carrillo

25              RPR, CSR No. 9555

1    DEPOSITION OF MICHAEL TENNENBAUM, Ph.D., THE
2    WITNESS, TAKEN ON BEHALF OF THE DEFENDANT, AT 1901
3    AVENUE OF THE STARS, SUITE 1200, LOS ANGELES,
4    CALIFORNIA, ON MONDAY, OCTOBER 22, 2007, AT 9:44 A.M.,
5    BEFORE FELIPE CARRILLO, CSR #9555, RPR.
6
7    APPEARANCES:
8    FOR PLAINTIFF:
9        LAW OFFICES OF STUTMAN, TREISTER & GLATT
10       BY:  TONY CASTANARES, ATTORNEY AT LAW
11       1901 Avenue of the Stars
12       Suite 1200
13       Los Angeles, California  90067-6013
14       (310) 228-5755
15
16   FOR DEFENDANT:
17       LINKLATERS LLP
18       BY:  R. PAUL WICKES, ATTORNEY AT LAW
19       1345 Avenue of the Americas
20       New York, New York 10105
21       (212) 903-9000
22
23   ALSO PRESENT:
24       Whitman Holt
25       Inga Kornev, Videographer

2

---

1                    I N D E X
2
3    WITNESS              EXAMINATION           PAGE
4    MICHAEL TENNENBAUM, Ph.D.                    4
5                        (BY MR. WICKES)     5
6
7    EXHIBITS MARKED FOR IDENTIFICATION:
8    NO.        PAGE     DESCRIPTION
9    EXHIBIT 601    5        STACK OF DOCUMENTS
10
11   EXHIBITS REFERRED TO PREVIOUSLY MARKED:
12                        (NONE)
13
14   INFORMATION REQUESTED:
15                        (NONE)
16
17   QUESTIONS INSTRUCTED NOT TO ANSWER:
18                        (NONE)
19
20
21
22
23
24
25

3

---

LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 22, 2007
9:44 A.M.
-oOo-

1
2
3
4        THE VIDEOGRAPHER:  Here begins Volume I,
5    videotape No. 1 in the deposition of Dr. Michael
6    Tennenbaum, in the matter of OHC Liquidation Trust
7    versus Credit Suisse, et al., in the United States
8    Bankruptcy Court in the District of Delaware.  The case
9    number is 02-13396.
10       Today's date is October 22, 2007.  The time
11   on the video monitor is 9:45.  The video operator today
12   is Inga Kornev, contracted by Merrill Legal Solutions,
13   at 25 West 45th Street, New York, New York.
14       This video deposition is taking place at
15   Stutman, Treister & Glatt, located at 1901 Avenue of the
16   Stars, Los Angeles, California, and was noticed by
17   R. Paul Wickes of Linklaters.
18       Counsel, please voice identify yourselves
19   and state whom you represent.
20       MR. WICKES:  Paul Wickes of Linklaters for
21   Credit Suisse.
22       MR. CASTANARES:  Tony Castanares, Stutman,
23   Treister & Glatt for plaintiff.
24       THE VIDEOGRAPHER:  Thank you.  The court
25

4

---

1    reporter today is Felipe Carrillo of Merrill Legal
2    Solutions.
3        Will the reporter please swear in the
4    witness.
5
6        MICHAEL TENNENBAUM, Ph.D.,
7        having been first duly sworn,
8        was examined and testified as follows:
9
10       THE VIDEOGRAPHER:  Please begin.
11       MR. WICKES:  Thank you.
12
13                    EXAMINATION
14   BY MR. WICKES:
15   Q.  All right.  Good morning, Doctor.  I take it from
16   materials included with your report that you are
17   experienced at the deposition process; is that right?
18   A.  I think so.
19   Q.  So you know the rules, and we don't need to go
20   through them this morning?
21   A.  I think that's correct.
22           (THE STACK OF DOCUMENTS WERE
23           COLLECTIVELY MARKED DEFENDANT'S
24           EXHIBIT 601 FOR IDENTIFICATION.)
25   BY MR. WICKES:

5

1    Q.  All right.  I have put in front of you what's

2   marked as Exhibit 601, which is your report.

3           Well, let me ask you, is that a copy of your

4   report in this matter?

5    A.  Yes.

6    Q.  And that Exhibit 601 has as its first page a

7   cover letter from you to Stutman Treister; is that

8   right?

9    A.  Yes.

10   Q.  And what's the date on the cover letter?

11   A.  April 27, 2007.

12   Q.  I don't see in the body of the report anywhere a

13  date.  Would I conclude properly that this report was

14  concluded at or about April 27th, 2007?

15   A.  Yes.

16   Q.  All right.  At the end of that report is -- the

17  last few pages starting at page 54, is a document that

18  lays forth your professional qualifications.

19           Did you prepare that and attach it to your

20  report?

21   A.  I did.  I can't remember exactly when this

22  particular document statement of professional

23  qualifications was prepared, but it was before the

24  report was prepared.

25   Q.  All right.

6

---

1    A.  It's in the files in the office.

2    Q.  So this is just a standard form of your CV that

3   was attached to the report when it was prepared?

4    A.  That's correct.

5    Q.  It indicates that you've been -- you were a

6   professor of economics at Cal State Long Beach from 1969

7   to 1986, and that from 1971 to date, you've been a

8   consulting economist; is that right?

9    A.  Yes.

10   Q.  And in 1971 to date, have you been with the firm

11  of Flavell, Tennenbaum & Edwards?

12   A.  I've been with Flavell, Tennenbaum & Edwards

13  since 1975 or -6.

14   Q.  Okay.

15   A.  Preceding that -- preceding the partnership with

16  Mr. Flavell, I had an independent consulting practice.

17   Q.  Okay.  Have you ever had full-time employment

18  other than as a professor at Cal State Long Beach or --

19  as a consulting economist?

20   A.  No.

21   Q.  Okay.  The document begins on page 54, includes

22  some examples of previous engagements that you've worked

23  on, and so on.

24           Have you ever, prior to your engagement on

25  the Oakwood matter, served as a consulting economist

7

---

1   with respect to a company involved in the manufactured

2   housing business?

3    A.  Not that I recall.

4    Q.  Okay.  So you don't bring to the work you've done

5   here any particular knowledge or expertise in that

6   business; is that correct?

7    A.  That's correct.

8    Q.  Okay.  When were you first contacted about the

9   possibility that you might serve as an expert witness in

10  this matter?

11   A.  It would have been early 2005.

12   Q.  And by whom were you first contacted?

13   A.  My recollection is that I got a phone call from

14  Pam King (phonetic).

15   Q.  Okay.  Who was that?

16   A.  She's an attorney working with the Stutman firm.

17   Q.  Okay.  And did you -- did you work with Ms. King

18  before?

19   A.  Yes.

20   Q.  Okay.  On how many occasions?

21   A.  One.

22   Q.  Okay.  What was that matter?

23   A.  That was the Heckinger matter, also bankruptcy

24  matter.

25   Q.  Also a bankruptcy matter in the District of

8

---

1   Delaware; is that right?

2    A.  Yes.

3    Q.  Aside from Ms. King, had you, other than the

4   Heckinger matter, ever worked with the Stutman Treister

5   firm before?

6    A.  Yes.

7    Q.  On how many occasions?

8    A.  Going back over 30 some odd years, probably eight

9   to ten.

10   Q.  And are you presently working on any engagements

11  with the Stutman firm other than the Oakwood matter?

12   A.  No.

13   Q.  Have you worked before on a matter with

14  Mr. Castanares?

15   A.  Yes.

16   Q.  What was that?

17   A.  Well, Heckinger --

18   Q.  Right.

19   A.  -- being the most recent one, I've worked with

20  Mr. Castanares on a matter involving a development

21  project here in Los Angeles on Wilshire Boulevard, going

22  back to the early to mid 1980s, and worked on a matter

23  involving a project in Calgary.  I guess that was late

24  '80s.

25   Q.  Okay.  What did Ms. King tell you about the

9

1   Oakwood matter when she first contacted you?

2      A.   She said that they were -- she was involved in

3   a -- in some litigation involving Oakwood Homes, and

4   that there -- there would likely be issues involving

5   valuation of Oakwood Homes and determination of the

6   solvency of Oakwood Homes, and that they had an enormous

7   raft of documents that they already had and were in the

8   process of getting additional documents, so there will

9   be a lot of documents to review.

10     Q.   Okay.  Did she -- have you -- have you been

11  involved in any matters concerning Oakwood Homes other

12  than the litigation against Credit Suisse?

13     A.   Well, I'm not sure what the answer to that is.  I

14  did provide consultation with a firm in New York on --

15  with respect to some matters involving Oakwood which did

16  not lead to any expert testimony, and I can't remember

17  the name of the firm.  The lawyer I spoke with was a

18  fellow named Halpren.

19     Q.   What was it you did for or with Mr. Halpren?

20     A.   Provided him with some consultation with respect

21  to methodology, valuation methodology, and analyses of

22  what would go into looking at present values of

23  anticipated future cash flows under various assumptions.

24  It was largely hypothetical, and that was the only

25  meeting that I had with him.

10

1      Q.   Was that meeting in the nature of an exploration

2   about the possibility of employing you to work on

3   Oakwood?

4      A.   No.  It was -- I was already -- I was already

5   working on Oakwood for the firm here.  And I was asked

6   to attend a meeting in New York with respect to some

7   other issues that involved Oakwood, which I did not get

8   involved in.  But they wanted to have some idea as to

9   valuation methodologies and how I was going about

10  things.  So I attended that meeting at Ms. King's

11  request.

12     Q.   When was that meeting?

13     A.   I think it was mid to late 2005.

14     Q.   Did Ms. King attend the meeting?

15     A.   By telephone.

16     Q.   And who else attended the meeting?

17     A.   There were a couple of lawyers from Mr. Halpren's

18  firm, whose names I do not recall, but it was at

19  Mr. Halpren's offices.

20     Q.   And when you say they were interested in matters

21  involving discounted cash flows, were those discounted

22  cash flows of Oakwood?

23     A.   Yes.

24     Q.   And were they also interested in the question of

25  solvency involving Oakwood?

11

1      A.   I believe so, although, we didn't speak about

2   that in any detail, to the best of my recollection.  It

3   was primarily focused on methodological aspects of doing

4   a discounted cash flow analysis.

5      Q.   Were there anyone -- any nonlawyers in that

6   conversation?

7      A.   Just me.

8      Q.   Okay.  Did they give you any information at that

9   meeting?

10     A.   Not that I recall.  I received no documents that

11  I recall either.

12     Q.   Did you share with them any of the documents that

13  you had received in connection with your Oakwood

14  engagement?

15     A.   No.

16     Q.   Did you share with them any information that you

17  had received in connection with your Oakwood engagement?

18     A.   No.

19     Q.   All right.  Back to when you first spoke to

20  Ms. King.

21          What did she tell you about the nature of

22  the disputes between the Liquidation Trust and Credit

23  Suisse?

24     A.   I don't recall specifically her telling me

25  anything about the nature of the disputes, other than

12

1   that one of the issues that would likely come up in the

2   litigation would be one that I -- they would want me to

3   provide consultation with respect to and prospectively

4   expert testimony with respect to, and that would be the

5   issue of solvency of Oakwood and, correspondingly, the

6   issue of the present value of the cash flows in prospect

7   for Oakwood.

8      Q.   And you understood, didn't you, from that first

9   conversation with Ms. King that her client would want

10  you to conclude that, at whatever time was turned out to

11  be relevant, that Oakwood was insolvent?

12     A.   Absolutely not.  I did not have any understanding

13  from Ms. King in that regard at all and would have

14  rejected any insinuation like that.

15     Q.   So in your first conversation with Ms. King, you

16  had no idea whether it would be her -- in her client's

17  interest for Oakwood to be determined solvent or

18  insolvent.  Is that your testimony?

19     A.   That's correct.

20     Q.   When did you first come to have an understanding

21  about that?

22     A.   As my analysis proceeded, and I generated

23  calculations internally leading to a determination of

24  what the cash flows and discounted cash flow valuation

25  looked like, the framework of the litigation was --

13

1  became evident to me, both from documents and from
2  conversations with counsel.
3          And, you know, I still don't claim to have
4  any lawyer's expertise as to what might benefit or what
5  might not benefit the Stutman firm's clients, but I do
6  have an analysis of solvency.
7      Q.  All right.  Your resume indicates, Doctor, that
8  you have a lot of experience in bankruptcy matters; is
9  that correct?
10     A.  I think so.
11     Q.  Okay.  When Ms. King first talked to you, did she
12 tell you her client was the OHC Liquidation Trust?
13     A.  I don't recall.
14     Q.  When did you first learn that the client was the
15 OHC Liquidation Trust?
16     A.  I'm not sure when I first learned it.  It may
17 have been in that first conversation, but certainly
18 after looking at the -- at the complaint that was
19 forwarded to me shortly after my conversation with
20 Ms. King, I learned who the client was.
21     Q.  Okay.  And when you say that saw that complaint
22 shortly after your first conversation with Ms. King, you
23 recognized that, among other things, the complaint
24 sought to recover what are alleged to be preferences and
25 fraudulent conveyances; is that right?

14

1  Liquidation Trust for your conclusion to be that the
2  company was insolvent?
3      A.  Probably.
4      Q.  It's not a subtle point, is it?
5      A.  Well, I think it is a subtle point.  I want to
6  make sure that nobody gets the impression that my
7  analysis was influenced by the desire of the client,
8  because it wasn't.
9      Q.  What I meant by not a subtle point was that it's
10 not a subtle point that the plaintiff in an action
11 seeking to recover preferences in fraudulent conveyances
12 needs to have evidence that at the relevant times that
13 the company was insolvent?
14     A.  I don't believe that's a subtle point, no.
15     Q.  Okay.  Are you the sole author of this report?
16     A.  Yes.
17     Q.  Did you receive assistance --
18     A.  Yes.
19     Q.  -- in preparing the report?
20          From whom?
21     A.  I didn't receive assistance in preparing the
22 report.  I did receive assistance in the work.
23     Q.  And who did you receive assistance from and tell
24 me what they did?
25     A.  Staff members at my firm.  Tom Yoshioka worked on

16

1      A.  That's my recollection, yes.
2      Q.  For somebody with your experience in bankruptcy,
3  is it difficult to put those two things together and
4  conclude what the OHC Liquidation Trust needed was an
5  opinion that the company was insolvent?
6      A.  I don't know what the OHC needed.  I knew what I
7  could provide.  What I could provide was an analysis.
8  Whether that analysis turns out to be useful or not to
9  the client is not something that I get involved in.
10     Q.  Okay.  Is it your testimony this morning that you
11 performed your valuation exercise without any
12 understanding of whether OHC Liquidation Trust wanted a
13 conclusion to be that the company was solvent or
14 insolvent?
15     A.  It's my testimony that I perform my analysis
16 without taking it into account at all whether the
17 Liquidation Trust wanted an opinion as to the company
18 being solvent or insolvent.  It had no affect on my
19 analysis whatsoever.
20     Q.  But you understand, Doctor, that's the answer to
21 a different question than the one I asked.
22          The question I asked was not whether it had
23 an affect on your work or your opinion.  The question I
24 asked was whether you understood at the time you were
25 doing your work that it was in the interest of the OHC

15

1  organizing documents, summarizing documents, determining
2  dates of various cash flows.  Jason Tennenbaum, who is
3  my son, worked on cash flows and obtaining documents
4  with respect to determination of appropriate discount
5  rates, calculations.  But primarily the time spent and
6  the work product is mine.
7      Q.  Who was it you said assisted by summarizing
8  documents?
9      A.  Tom Yoshioka.
10     Q.  Okay.  You know, Doctor, there's been some
11 dispute in this matter about what of your files and work
12 papers has bee turned over to the other side in this
13 litigation.  You are familiar with that?
14     A.  I just saw some documents from your firm with
15 respect to that, yes.
16     Q.  Do you know whether the summaries prepared by
17 Mr. Yoshokowa (sic) were included in the materials stack
18 that have been provided to us?
19     A.  Yoshioka.
20     Q.  Yoshioka.  Sorry.
21     A.  Yes, to the best of my knowledge, they have been.
22 Well, they were sent here.  So I imagine they were
23 turned over to you.
24     Q.  All right.  How are you paid for your work on
25 this engagement?

17

1   A.   Hourly.

2   Q.   What are your total billings so far?

3   A.   Total billings of fees plus expenses add up to

4   almost $405,000, of which about 390 some odd thousand

5   are fees, and I think it's about $12,000 that are

6   expenses.

7   Q.   Have you been paid to date?

8   A.   Yes.

9   Q.   Okay.  What's your hourly rate?

10   A.   $395.  Actually, currently it's 425, but it was

11   395 on this assignment.

12   Q.   How many of your hours are involved in the

13   billings that have been made so far?

14   A.   Almost all of the billings represent my hours,

15   the vast majority.  I would -- I would say probably no

16   more than $20,000 of the fees are -- represent hours of

17   people in the firm other than me.

18   Q.   Do you know roughly how many of your hours are

19   involved in those bills?

20   A.   If you take roughly 370,000 and divide by 395,

21   you get a ballpark estimate.  Whatever that is.

22   Q.   What would that be about, 1,000 hours?

23   A.   Well, something less than 1,000.

24   Q.   Okay.  So, for example, did you yourself look at

25   most of the documents that you were provided with

18

1   respect to this matter?

2   A.   I myself looked at all the documents that I was

3   provided with.

4   Q.   Okay.  And how were you provided documents?

5   A.   I was provided -- the documents came from the

6   Stutman firm.

7   Q.   Okay.  So in terms of sorting out from the entire

8   universe of Oakwood documents to do what you looked at,

9   that sort was done by lawyers at the Stutman firm and

10   not by you; is that right?

11   A.   I'm not sure I understand the question.

12   Q.   Did you ever come here to Stutman's office to

13   look at the Oakwood documents?

14   A.   Yes.

15   Q.   And were you given access to all of the documents

16   that Stutman had or some subset?

17   A.   I would have no way of knowing what the answer to

18   that question is.

19   Q.   So then the answer to my question is, what you

20   know of the documents you received is you received

21   documents that Stutman decided to give you?

22   A.   That's correct.

23   Q.   Okay.

24   A.   There were some additional documents that I got

25   from Mr. Muir, but those turned out to be the same or

19

1   included amongst the documents that subsequently also

2   came from the Stutman firm.

3   Q.   Okay.  And how did Mr. Muir come to be giving you

4   documents?

5   A.   I had a meeting with him in North Carolina in --

6   over several days in 2006.

7   Q.   Who besides Stutman lawyers and Mr. Muir have you

8   met with in connection with your work in this matter?

9   A.   Well, Mr. Halpern.

10   Q.   Well, I thought that was with respect to some

11   different matter?

12   A.   It was the same issues, so I -- I don't know

13   whether ...

14   Q.   Okay.

15   A.   I don't know whether they were separate, a

16   separate matter or something related to this matter.  I

17   never got a determination as to what the relationship

18   was.

19   Q.   All right.

20   A.   So other than the Stutman firm lawyers and

21   Mr. Muir, that's it.

22   Q.   You never met Mr. Standish?

23   A.   No.

24   Q.   What about Mr. Shapiro, Dr. Shapiro?

25   A.   Yes, I did speak with Dr. Shapiro.  I apologize

20

1   for forgetting that.

2   Q.   And you said you spent several days in North

3   Carolina with Mr. Muir?

4   A.   Yes.

5   Q.   And who else was there when you met with

6   Mr. Muir?

7   A.   Mr. Kvarda was there for much of the time.

8   Q.   Okay.

9   A.   And another -- there were two other people from

10   Mr. Kvarda's office whose names allude me.  They were

11   there for part of that series of meetings.  That's it.

12   Q.   What was the purpose of your meeting with

13   Mr. Muir?

14   A.   Get some background on the company, go over some

15   of the issues and the calculations with respect to the

16   internal valuation process for the securities that were

17   on the books of Oakwood.  I went over their valuation

18   methodology and discussed projections that they were --

19   that they had done at various points in time.

20   Q.   You said several days.  How many days were you

21   with Mr. Muir?

22   A.   I think it was three that I recall.

23   Q.   For the better part of three days?

24   A.   Yes.

25   Q.   At that time was Mr. Muir, to your understanding,

21

1    still under some sort of consulting arrangement with the

2    Liquidation Trust?

3        A.   I believe so.

4        Q.   Okay.  And did you find Mr. Muir helpful?

5        A.   Yes.

6        Q.   Did you find him knowledgeable?

7        A.   Yes.

8        Q.   Did you find him to be open and forthcoming?

9        A.   Seemed to be.

10       Q.   Okay.  Did you talk with Mr. Muir about what led

11   to the bankruptcy of Oakwood?

12       A.   Yes.

13       Q.   What did he tell you?

14       A.   He indicated that he believed there were a number

15   of things that led to the bankruptcy of Oakwood,

16   including overly aggressive financing of sales of mobile

17   homes by the company and, indeed, by its competitors

18   in -- during the mid to late 1990s, which led to a -- an

19   over expansion of capacity in the industry both from a

20   manufacturing and a retail perspective;

21            The fact that there were a lot of loans that

22   were made to mobile home purchasers on terms that were

23   overly generous in terms of very high loan-to-value

24   ratios;

25            And they -- the resulting downturn in the

                                                              22

1    industry leading to a very large increase in

2    repossessions, which had the effect of impacting on

3    future sales as the repos became competitive with a new

4    product;

5            And that the repose also had negative

6    affects on securitizations;

7            And, finally, the recession of late 2000,

8    early 2001, which had relatively severe impact on areas

9    of the country where Oakwood did a substantial amount of

10   business.

11       Q.   Okay.  Did you find your conversation with

12   Mr. Muir helpful?

13       A.   Yes.

14       Q.   Was there a reason why in your report where you

15   cite the source of information available to you, you

16   didn't mention that you had spent three days with

17   Mr. Muir?

18       A.   Well, I understood the purpose of the -- those

19   citations to be citations of documents that I relied on

20   rather than conversations.

21       Q.   Okay.  On page four of your report, carrying over

22   onto page five, there's a list of financial texts and

23   economic and financial journals that you reviewed in

24   connection with your report.  Is that list complete?

25                    (Brief pause)

                                                              23

1            THE WITNESS:  I think so.

2    BY MR. WICKES:

3        Q.   Okay.  And are these, the materials listed on

4    page four and at the top of page five, are they all

5    materials which you actively looked at in the course of

6    preparing this report?

7        A.   To varying degrees, yes.

8        Q.   Okay.  This just isn't a list of things on your

9    bookshelf; this is stuff that you used in doing your

10   work; is that right?

11       A.   No, there's lots more on my bookshelf.

12       Q.   I would have thought so.

13            And on page six of your report at the end of

14   page six, there's a list of five reported court cases

15   that you say you looked at.  How did you to look at

16   those cases?

17       A.   They were sent to me by the Stutman firm.

18       Q.   For what purpose?

19       A.   As background material that might provide kind of

20   a framework for what the status of the law might --

21   would be that might affect my analyses.

22       Q.   And tell me exactly what was the scope of the

23   analysis that you were asked to prepare?

24       A.   I was asked to prepare an analysis of the

25   solvency of Oakwood Homes going back as far from the

                                                              24

1    date of bank. -- of the filing of its bankruptcy in

2    November of 2002 as I could, given the available

3    documents.

4        Q.   Okay.  So is it fair -- I don't want to put words

5    in your mouth.  But is it fair to say that you were

6    asked to determine whether or not Oakwood was solvent at

7    some particular point in time, and then to carry that

8    analysis back as far in time as you could?

9        A.   Yes.

10       Q.   All right.  Did you read the court cases that are

11   listed there on page six?

12       A.   I didn't read all of them.  I didn't read all of

13   each case.  I did review them all.

14       Q.   Okay.  Tell me, for example, what did the case of

15   E-Toys Inc. versus Goldman Sachs have to do with the

16   question of whether or not Oakwood was solvent or

17   insolvent at any particular point in time?

18            MR. CASTANARES:  Objection to form.

19            THE WITNESS:  I don't recall what that case

20   dealt with.  If I review it quickly, I might be able to

21   answer the question better.

22            As I indicated, I just scanned each of these

23   cases without going through it in any detail.

24   BY MR. WICKES:

25       Q.   Did the cases that are listed there have an

                                                              25

1 impact on the conclusions you reached?

2    A.  No.

3    Q.  None?

4    A.  No.

5    Q.  So it was just a waste of time to look at them?

6    A.  In retrospect, probably.

7    Q.  Did you discuss those cases with Ms. King or with

8 somebody else from Stutman Treister?

9    A.  I discussed, I think it was, the Trenwick case.

10 I had a conversation about Trenwick with Mr. Yun on the

11 telephone.

12    Q.  What do you remember about that conversation?

13    A.  My recollection is that case dealt with the issue

14 of deepening insolvency, and that the Court didn't look

15 favorably on the deepening insolvency.

16    Q.  Why would that information have been useful to

17 you in doing the work you were doing?

18      MR. CASTANARES:  Objection to form.

19      THE WITNESS:  Well, I don't know that it

20 did -- that it would have.  But within the framework of

21 my analyses, you know, one of the things that could be

22 utilized, one of the approaches that could be utilized

23 as a result of my analyses, is to look at insolvency of

24 the company as of one date point in time, look at the

25 insolvency at another date and time, and then it's just

26

1 arithmetic to determine whether the company's insolvency

2 had deepened.

3      Whether that's an issue or whether that's

4 a -- an issue for the Court or not, I have nothing to

5 say.  But the implications can be drawn from the

6 analyses that I performed.

7 BY MR. WICKES:

8    Q.  Who initiated the conversation between you and

9 Mr. Yun about the Trenwick case?

10    A.  I think it was Mr. Yun.  Although, I think I had

11 seen the Trenwick case before he sent it to me.  I think

12 my son pointed it out to me.

13    Q.  Okay.  And Mr. Yun called you, didn't he, and he

14 said, "Well, it looks like we have a problem because

15 Delaware doesn't recognize deepening insolvency

16 anymore"?

17      MR. CASTANARES:  Objection to form.

18      THE WITNESS:  I don't -- I don't recall him

19 using that terminology, nor do I recall him -- you know,

20 his conversation being characterized that way.  He

21 indicated that there was a ruling that had come down,

22 dealing with deepening insolvency, and did I want to

23 look at it.  And I said yes.  Because I -- I also

24 indicated to him that I become aware of that case from

25 another source.

27

1 BY MR. WICKES:

2    Q.  And what did he tell you that the Trenwick case

3 had done with respect to deepening insolvency?

4      MR. CASTANARES:  Objection to form.

5      THE WITNESS:  He indicated that the Trenwick

6 case appeared to have ruled against deepening insolvency

7 as being some sort of a measure of damages.

8 BY MR. WICKES:

9    Q.  Look to page 14 of your report, would you?

10    A.  (Complies).

11    Q.  From page 14 to 18 there's some information about

12 the company, about Oakwood.  What's the source of that

13 information?

14    A.  Various documents that were CSFB documents, in

15 terms of their presentations to the board of directors

16 of Oakwood over various time periods in 2001, 2002.

17    Q.  Is it your testimony that all of the information

18 on pages 14 to 18 comes from CSFB documents?

19    A.  And, also, I think one of them -- there was a

20 report that was done by another brokerage firm that came

21 from the Stutman firm.  I think it also had a CSFB Bates

22 stamp on it.

23      And there were -- there were other documents

24 that -- there's a memorandum, a couple of internal memos

25 that were CSFB internal memos that had some of this

28

1 information as well.

2      And, finally, there was also a -- an

3 internal Oakwood Homes document that was a set of

4 projections for fiscal years '01 and '02 that OHC did.

5 My recollection is that was September 25th, 2001.

6    Q.  And was that one of the sources for the

7 information on pages 14 to 18?

8    A.  Yes.

9    Q.  Which information comes from that?

10    A.  I don't recall specifically.  I think it was the

11 securitization information on page 15 and the

12 delinquency repossession and assumption information on

13 page 16.  At least some of the information on page 15

14 and 16 came from that document.

15    Q.  So all of the basic information describing

16 Oakwood comes from CSFB information plus one set of

17 financial projections about Oakwood; is that right?

18    A.  Plus the name of the firm, brokerage -- outside

19 brokerage firm will come to me.  But it was a report on

20 Oakwood that was not done by CS First Boston, but I

21 think it had a CS First Boston Bates stamp on it when I

22 got it.

23    Q.  Was it done by Miller Buckfire?

24    A.  No.

25    Q.  Was it done by FTI?

29

1 A. No. It will come to me.

2 Q. So the fact, for example, that manufactured homes

3 were manufactured in single sections 14 or 16 feet wide

4 and 40 to 80 feet long, that comes from the CSFB

5 documents?

6 A. Yes, basically.

7 Q. Do you remember which document?

8 A. It would have been one of the presentations that

9 CSFB did to the -- to the board of directors of -- of

10 Oakwood.

11 Q. Now, look if you will at page 20.

12 A. (Complies).

13 Q. You have some discussion there of something

14 called five-year plan projections, which are then laid

15 out through page 28; right?

16 A. (No response).

17 Q. Is that right?

18 A. Yes.

19 Q. So it was page 20 and the top of 21, describes

20 the five-year plan projections, and the next pages 22

21 through 28 are those projections that are discussed?

22 A. Yes.

23 Q. Where did you get those projections?

24 A. Again, from the Stutman firm.

25 Q. Who was the author of those projections?

---

1 A. I'm not 100 percent sure. I believe it was

2 Miller Buckfire.

3 Q. Who is Miller Buckfire?

4 A. They are a firm that specializes in re-

5 organizations, financial analyses with respect to

6 reorganization.

7 Q. Did they play some role in the Oakwood matter, to

8 your knowledge?

9 A. It's my understanding that they were consultants

10 to Oakwood in the Chapter 11 case.

11 Q. Okay. Is it correct to say that your basic

12 analysis about solvency of Oakwood takes as its starting

13 point this set of five-year projections?

14 A. Yes.

15 Q. This is the basic data on which you worked?

16 A. That's correct.

17 Q. Okay.

18 A. As far as the cash flows are concerned.

19 Q. As far as the cash flows are concerned.

20 Do you know when this five-year plan was

21 prepared?

22 A. It was prepared subsequent to the filing.

23 Q. Do you know how much subsequent?

24 A. It was completed, I think, several months after

25 the filing. It was based on some internal analyses that

---

1 Oakwood had been working on prior to the filing, but it

2 went into a lot more detail.

3 Q. How do you know what it's based on?

4 A. From Mr. Muir.

5 Q. All right. So did you -- you discussed these

6 projections with Mr. Muir?

7 A. Yes.

8 Q. Right. Your report says on page 20 that "The

9 projections entitled 'Oakwood Homes five-year plan' are

10 based on projections developed in connection with the

11 proposed plan of reorganization for OHC"; right?

12 A. Yes.

13 Q. Do you know when the plan of reorganization was

14 confirmed?

15 A. Sometime in 2003, I believe.

16 Q. Are you sure?

17 A. I don't know for sure.

18 Q. All right. Wouldn't you then understand that, if

19 these were projections developed in connection with the

20 proposed plan of reorganization, they were developed

21 sometime around the time that plan of reorganization was

22 filed?

23 A. There were a number of projections that led up to

24 the proposed plan and, as indicated from Mr. Muir, these

25 things had been ongoing for some period of time prior to

---

1 filing. So my view of these projections is that these

2 are the kinds of projections that would have been

3 available to a knowledgeable investor around the time of

4 the filing, prior to the filing.

5 MR. WICKES: I'm sorry. Could I have that

6 read back.

7 THE REPORTER: Yes.

8 (Record read)

9 BY MR. WICKES:

10 Q. How would these projections have been available

11 to a knowledgeable investor?

12 A. Given that the projections were in process prior

13 to the filing for Chapter 11, somebody who wanted to

14 analyze the prospects of the company going forward from

15 fall of 2002 could have generated these kinds of --

16 these kinds of projections, if not precisely these

17 projections, pretty close to it. So that these

18 projections are the analyses that would underlie

19 valuation of the assets as of late 2001 -- I'm sorry --

20 late 2002.

21 Q. In fact, in doing your work you've seen lots and

22 lots and lots and lots of projections about Oakwood,

23 haven't you?

24 A. Yes.

25 Q. What led you to choose this particular set as the

1    basis of your analysis?

2    A.  This set of projections deals with Oakwood on a

3    scale-down basis where it has essentially reduced the

4    financial services income flow in prospect dramatically

5    from what was the case while it was heavily engaged in

6    securitizations.  So these are the kinds of projections

7    that would underlie the going-forward operations of

8    Oakwood in prospect, as of fall 2002.

9        Knowing that you are going to have to cut

10   back on securitizations, you are going to cut back on

11   loan-to-value ratios, you are going to be much more

12   careful with respect to your customers, and you are

13   going to cut back on manufacturing plants, consistent

14   with the rationalization plan that had been under

15   consideration for quite sometime.

16   Q.  So these are projections with respect to an

17   Oakwood group of companies, rather different in shape

18   and business from Oakwood as it actually existed in the

19   summer of 2002; is that correct?

20   A.  It is -- no.  It is a set of projections for an

21   Oakwood that on a going-forward basis whose revenue

22   stream would be below what it had been during the late

23   1990s, when it was actively involved in a lot of

24   securitizations and would reflect a cutback in the

25   securitization aspect of its business.

1    Q.  And it would reflect a number of other

2    differences from the company as it actually existed in

3    the summer of 2002.  For example, it assumes, doesn't

4    it, a significant reduction in the number of retail

5    sales centers?

6    A.  It does.

7    Q.  And it assumes, for example, a significant

8    reduction in manufacturing capacity?

9    A.  Yes.  It's all part of the rationalizations

10   process that I referred to.

11   Q.  What do you mean by "the rationalization

12   process"?

13   A.  That's what the company was calling it in

14   internally.  It was a series of steps which the company

15   was considering and was looking at going forward with,

16   which would reduce the number of manufacturing plants,

17   reduce the number of retail sales operations, exit

18   states where there had been a lot of foreclosure

19   problems, and cut back on securitizations.

20   Q.  And the way in which they were going to be able

21   to cut down on securitizations, essentially, was that

22   they were going to go out of the business of providing

23   retail financing for the customers and let other third

24   parties do that; isn't that right?

25   A.  Largely, yes.

1    Q.  So instead of saying: We'll make you the loan,

2    they'd say:  Here's our friend at XYZ Company that you

3    can talk to about a loan?

4    A.  Yes.

5    Q.  Okay.  Did you compare the numbers in the

6    five-year plan forecast that's included in your report

7    with contemporaneous projections that were done in the

8    summer of 2002 or thereabouts?

9    A.  I did, yes.

10   Q.  So could you tell me, for example, how the net

11   sales figure on page 22, the top line, how that number

12   would have compared to other internal cash flow

13   forecasts at the company at the time, that is, in the

14   summer of 2002?

15   A.  They would be lower because the company would not

16   be making sales on as high loan-to-value ratio basis as

17   it had been in the past.  So there will be fewer

18   qualified buyers, less in the way of manufacturing.  So

19   net sales would be rather consistently lower than other

20   projections which preceded this.

21   Q.  Okay.  Are you familiar with the provisions of

22   the plan of reorganization of Oakwood Homes that was

23   actually confirmed in this case?

24   A.  Only very vaguely.

25   Q.  Do you know whether in connection with a plan of

1    reorganization the company was sold?

2    A.  That's my understanding.

3    Q.  It was sold to Clayton Homes; is that right?

4    A.  That's my understanding.

5    Q.  And are you familiar with the fact that prior to

6    the agreement to sell the company to Clayton Homes there

7    was a so-called stand-alone plan of reorganization

8    proposed?

9    A.  I don't recall.

10   Q.  These forecasts that we're looking at here

11   starting at page 22, these are forecasts that assume

12   that Oakwood continues as an independent entity, but on

13   the reduced scale that you've described; is that right?

14   A.  Yes.

15   Q.  Okay.

16        THE REPORTER:  Excuse me, Counsel.  When you

17   have a moment, I could use a short break.

18        MR. WICKES:  I'd be happy to take a break

19   right now.

20        THE REPORTER:  Thank you.

21        THE VIDEOGRAPHER:  Okay.  One second,

22   please.  Going off the record, the time is 10:39.

23            (Recess)

24        THE VIDEOGRAPHER:  We're back on the record.

25   The time is 10:52.

1    BY MR. WICKES:

2        Q.  Doctor, before we took our break, we were talking

3    about the five-year plan projections that start on page

4    20 of your report, just to summarize where we are.

5             These projections were prepared by someone

6    at the Miller Buckfire firm; right?

7        A.  I believe so.

8        Q.  Do you know who?

9        A.  No.

10       Q.  Did you ever talk to anyone at Miller Buckfire

11   about them?

12       A.  No.

13       Q.  Okay.  Do you know what sources they used to

14   prepare them?

15       A.  I know part of the source was backup work that --

16   prior work that had been done by the company.

17       Q.  And you know that from your discussions with

18   Mr. Muir?

19       A.  Yes.

20       Q.  Okay.  And you are not sure when they were

21   prepared?

22       A.  That's correct.

23       Q.  Okay.  And they were prepared in connection with

24   a plan of reorganization different from the one that was

25   actually confirmed; is that right?

38

---

1        A.  I don't know that to be a fact.

2        Q.  Well, you know that the plan of reorganization

3    that was confirmed involved a sale of the company to

4    Clayton Homes; right?

5        A.  That's my understanding.

6        Q.  And these projections are for a stand-alone

7    company?

8        A.  Which may have been information that Clayton used

9    to formulate its offer price.  I don't know.

10       Q.  But these are not -- these numbers don't assume a

11   combination with Clayton homes?

12       A.  Oh, no, they don't, that's correct.

13       Q.  And your conclusion about the value of the

14   company as of September of 2002 is based on using the

15   methodology you disclosed, you describe, later in your

16   report to this set of numbers in this so-called

17   five-year plan?

18       A.  Yes.

19       Q.  Okay.  And if you go to page 29, there's

20   something called "late 2001 projections."  Where do

21   these projections come from?

22       A.  These are also projections that were contained in

23   various presentations from or done by CS First Boston.

24       Q.  Let me stop you.  What do you mean when you say

25   "also" in that answer?

39

---

1        A.  Did I say "also"?

2        Q.  Yes.

3        A.  I apologize.

4        Q.  It's all right.

5        A.  These are presentations -- these are projections

6    that came from presentations to the board of directors

7    of Oakwood by CS First Boston, which had at least as

8    part of their basis prior work done by Oakwood Homes

9    internally.

10       Q.  Now, with respect to the late 2001 projections,

11   the text of your report doesn't tell us where those

12   projections come from.  How is it that you are able to

13   tell me now where they came from?

14       A.  I recall where they came from as a result of

15   doing the work.  I recall the documents that I reviewed.

16       Q.  Okay.  And do you know -- you say the projections

17   were in a report prepared by CSFB.  Do you know the date

18   of that report?

19       A.  There were several that contained this.  My

20   recollection is that they were contained in

21   presentations to the board in late 2002.

22       Q.  And do you know who the author is of these

23   projections?

24       A.  I don't.

25       Q.  Do you know whether they represent independent

40

---

1    work of CSFB as opposed to just taking information from

2    the company and including it in the report?

3        A.  I don't know.

4        Q.  Okay.  Did you talk about that question with

5    Mr. Muir?

6        A.  I did.

7        Q.  And what did he tell you?

8        A.  He indicated that these were projections that

9    were presented to the board by CS First Boston, and that

10   they were at least in part derived from prior work done

11   in Mr. Muir's shop at the firm, at the company.

12       Q.  Do you know whether these materials are just

13   copies of work that Mr. Muir's shop had done as opposed

14   to based on some work Mr. Muir had done with some

15   independent input from CSFB?

16       A.  I don't know.

17       Q.  So you have no idea with respect to the

18   projections shown on page 30 how much of those

19   projections represent work done by CSFB and how much

20   represents work done by the company?

21       A.  Correct.

22       Q.  And with respect to the mid-2001 projections,

23   same question.  Do you know who the author of those

24   projections is?

25       A.  These were also contained in a document that was

41

1   a -- I can't recall whether it was a presentation to the
2   board or was a -- some other CS First Boston document
3   that I reviewed and obtained from the Stutman firm.
4       Q.  Okay.  And is it similarly true with respect to
5   the projection shown on page 32 that you don't know
6   whether that represents work product of the company or
7   CSFB?
8       A.  I don't know precisely.  I do know that the
9   document that -- of which these projections are a part
10  is self-described as a CSFB DCF.
11      Q.  That's what's described in the document?
12      A.  Yes.
13      Q.  That's the CSFB document dated March 2002?
14      A.  Yes.
15      Q.  "Containing aggressive projections and analyses
16  as of July 2001."
17          What do you mean by the word "aggressive" in
18  that sentence?
19      A.  Aggressive in that the projections are what are
20  known in the valuation trade as "hockey stick
21  projections," showing initial -- after an initial
22  decrease in revenues, a strong and continuous rapid
23  increase thereafter, so that by 2005 the projected
24  revenues are greater than the company had ever done
25  before.

42

1           And similarly, its EBITDA numbers by 2005
2   are at or above the most successful year that the
3   company had ever had.  So they could be viewed given the
4   context of the circumstances of the company and the
5   industry in the early part of the this Century as being
6   quite aggressive.
7           (Mr. Holt entered the room.)
8   BY MR. WICKES:
9       Q.  You say in that same sentence on Page 31, "The
10  projections, the analyses appear to presume a
11  substantial industry recovery in growing revenues which
12  include financial service revenues."
13          Is that what you mean by "aggressive"?
14      A.  Yes.
15      Q.  Now, you arrived at your valuation for
16  September 2002 by applying the techniques described
17  later in your report to the five-year plan cash flows;
18  is that right?
19      A.  Yes.
20      Q.  And you reach your conclusion about the value in
21  September 2001 by using those same techniques and
22  applying them to which set of projections?
23      A.  Both the mid and late 2001 projections.  They
24  don't differ all that much in terms of implications for
25  value.  But I applied a DCF analysis to both sets of

43

1   projections for 2001.
2       Q.  Okay.  And each of those analyses came to a
3   conclusion that the value in September of 2001 was
4   around $350 million?
5       A.  Yes.
6       Q.  And your conclusion about the value in September
7   2002 was that the value was about $300 million?
8       A.  Or less, yes.
9       Q.  On page nine of your report, item No. 2, you say,
10  "The enterprise value of OHC as of September 2002 was
11  300 million in rounded terms"; right?
12      A.  Yes.
13      Q.  Is that your opinion?
14      A.  It is, but I want to indicate that it is at most
15  300 million, yeah.
16      Q.  Why didn't you say that in your report?
17      A.  I think the report does indicate that part of the
18  300 million is attribution of approximately 50 million
19  or so to excess assets, and I was quite generous in
20  valuing the excess assets.
21      Q.  The first item in your report on page nine says,
22  "The enterprise value of the corporation fiscal year
23  2001 was 350 million in rounded terms."  Is that your
24  opinion?
25      A.  Yes, given the projections that I utilized,

44

1   correct.
2       Q.  I don't understand that qualification.
3           Is it your opinion or not that the
4   enterprise value of the company was $350 million in
5   September of 2001?
6       A.  It is.
7       Q.  It is your opinion?
8       A.  Yes.
9       Q.  Okay.  What would the enterprise value of the
10  company have been at September of 2002 if the company
11  had gone into bankruptcy in September of 2001?
12      A.  If the company had gone into bankruptcy in 2001,
13  I don't know that there would be a valuation issue as of
14  September 2002.
15          If my analyses, if my valuation conclusions
16  are correct, then the company would have been able to
17  realize $350 million from sale of its assets as of late
18  2001 and could have distributed that to creditors.
19      Q.  So am I correct to understand that your analysis
20  tells us that had the company gone into bankruptcy
21  proceedings in September of 2001, immediately
22  proceeded to liquidate the business, that there should
23  have been at the end of the day $350 million available
24  for distribution to creditors?
25      A.  They're -- yes.  They're exclusive of fees and

45

1  bankruptcy charges and the like, but the value of the
2  assets, the gross value of the assets that could have
3  been realized would have been $350 million.
4      Q.  Well, do I understand correctly that in both your
5  valuations as of 2001 and 2002, that you have valued the
6  company on a going-concern basis?
7      A.  Yes.
8      Q.  So you've assumed in both cases that the company
9  would continue to operate along the lines reflected in
10  the various projections?
11      A.  That it could have.  It could have sold or it
12  could have sold itself to a buyer on the basis of the
13  cash flows in prospect as of late 2001 and have realized
14  from that sale $350 million in gross value.
15      Q.  And in expressing that opinion, did you make any
16  attempt to determine whether -- whether in September of
17  2001 there were any likely buyers for Oakwood at that
18  price?
19      A.  That's what a valuation exercise does, is it
20  attempts to look at if you offer this -- these assets to
21  the marketplace and walk in the foot steps of a
22  knowledgeable buyer, what kind of rate of return would
23  that knowledgeable buyer have demanded; and given that
24  rate of return, what does that imply for the present
25  value of the cash flows that are in prospect for

46

1  ownership of the assets.  That's exactly what valuation
2  does.  It assumes this hypothetical sale.
3      Q.  And it assumes a hypothetical purchaser; right?
4      A.  Yes.
5      Q.  And my question is, did you make any attempt in
6  connection with your work to determine whether as of
7  September of 2001, there were any likely purchasers for
8  Oakwood?
9          MR. CASTANARES:  Asked and answered.
10          MR. WICKES:  Asked and not answered.
11          THE WITNESS:  Well, did I answer it.  The
12  answer is that the valuation exercise does that.  It
13  does not go out and attempt to walk in the footsteps of
14  an investment banker and ascertain whether company A, B,
15  C, or D would be a buyer.  But what it does do is it
16  looks at the marketplace to see what's going on with
17  respect to transactions and required rates of return,
18  and applies those required rates of return to the cash
19  flows resulting in the expectation of $350 million in
20  value being realized from a hypothetical sale.
21  BY MR. WICKES:
22      Q.  Does the valuation exercise simply assume that at
23  the price arrived at by this methodology there must be a
24  purchaser?
25      A.  Any transaction assumes a purchaser.

47

1      Q.  No.  Any transaction that's actually a
2  transaction has a purchaser.
3          My question is with respect to the
4  valuation.  Do we just assume if we've done the
5  valuation correctly someone will buy it at that price?
6          MR. CASTANARES:  I object to strike the --
7  move to strike from the question the declarative
8  sentence that began it.
9  BY MR. WICKES:
10      Q.  All right.  You can go ahead.
11          MR. CASTANARES:  Objection to form.
12          THE WITNESS:  Valuation is an exercise which
13  attempts to simulate the results of a hypothetical
14  transaction involving the asset being valued.  If the
15  asset were offered on the market, what would be the
16  likely result of that offer to sell.
17          And the results of my analysis are that,
18  among other things, that in September of 2001 the likely
19  results of that offer to sell would have been
20  approximately $350 million in realized proceeds.
21          I can't specify who the buyer would have
22  been, but given transactions in the marketplace from
23  which my discount rates are derived, that's the
24  forecast.
25  BY MR. WICKES:

48

1      Q.  Okay.  What if in September of 2001 the company
2  had gone into bankruptcy and not either liquidated or
3  sold itself, as you've hypothesized, but went through a
4  process that lasted several years as, in fact, happened
5  when they did go bankrupt?
6          MR. CASTANARES:  Objection to form.
7          MR. WICKES:  I don't think there's a
8  question yet.
9          MR. CASTANARES:  Excuse me.
10          MR. WICKES:  It's all right.  You can warn
11  him that's coming.
12      Q.  If the company went into bankruptcy, and it
13  lasted for several years, as this company's bankruptcy
14  did, can you tell me what the value would have been in
15  September of 2001 under that scenario?
16          MR. CASTANARES:  Objection to form.
17          THE WITNESS:  Are you asking me to change
18  the date of value?
19  BY MR. WICKES:
20      Q.  No.  I'm asking you to keep the date of value and
21  change the assumption that I'm asking about, which is
22  the assumption of:  Assume the company went bankrupt in
23  September of 2001, and that bankruptcy lasted for
24  several years?
25      A.  If the cash flows, which are one of the drivers

49

1    of value, if the cash flows remain as I hypothesized,
2    then that driver of value tells you that the value ought
3    to remain the same.  If the discount rates don't change,
4    then that driver of value tells you that the value will
5    remain the same.
6            So that in present value terms, bringing the
7    value back to September 2001, if those value drivers
8    remain unaffected by the change in your circumstances,
9    the value ought to remain $350 million.
10   Q.  Okay.  Do you know how much Clayton Homes paid
11   for the company?
12   A.  I don't know exactly.  According to Mr. Muir, it
13   was somewhere in the 200 million to less than
14   $300 million range.
15   Q.  Now, after you present them, your sets of
16   projections in the report, you've next turned to the
17   techniques that you used to turn those projections into
18   valuations; is that right?
19   A.  Yes.
20   Q.  Okay.  And you have sections that describe the
21   calculation of the rate of average cost of capital and
22   then something -- how do we say, the Fama French model?
23   A.  Yes, named after Gene Fama and Ken French.
24   Q.  Okay.  And with respect to your description of
25   the process of calculating -- well, let me strike that.

50

---

1            Why in this exercise do we need to calculate
2    a weighted average cost of capital?
3    A.  That's the discount rate.
4    Q.  Tell me a little more about that.
5    A.  Well, the weighted average cost of capital
6    comprise, is comprised of, a weighted average of the
7    required rate of return to equity and the required rate
8    of return to debt capital.
9            And what that formulates is the market's
10   weighted required return to the cash flows from
11   ownership of the assets of the company, weighted by how
12   much of the capitalization is debt versus how much is
13   equity.
14   Q.  And the discount rate you used as part of the
15   process of determining the present value of the, in
16   effect, permanent cash flows of the company; is that
17   right?
18   A.  That's correct.
19   Q.  Okay.  And are -- is the Fama French model
20   something different from the weighted average cost of
21   capital?  Is it in addition to it?  How does it relate
22   to the basic weighted average calculation?
23   A.  The Fama French model is a one of the techniques
24   that is utilized alongside the capital asset pricing
25   model for purposes of determining what the required rate

51

---

1    of return to equity is.
2            Whereas the capital asset pricing model
3    looks at determining the required rate of return to
4    equity by focusing on the sensitivity of a company's
5    rate of return to variability in the stock market.
6            The Fama French model expands that by also
7    looking at the sensitivity of the rate of return to
8    variability in size of company and book-to-market
9    ratios.
10           So it's an expansion of the capital asset
11   pricing model that is -- it's another approach to
12   getting to the same result which utilizes more data.
13   Q.  Now, on pages 33 and 34, if I understand
14   correctly, you described for us the mathematical formula
15   that's used in the capital asset pricing model and the
16   interest that go into it; right?
17   A.  Yes.
18   Q.  And then on page 36, you say in the second bullet
19   point on 36, "Our analyses resulted in the following
20   valuation parameters for use in the capital asset
21   pricing model as applied to Oakwood."
22           And you have two terms there that I don't
23   see in the earlier description of the formula.  And I
24   just want you to tell me whether I've missed them
25   somewhere.  One is the size premium.  Is that somewhere

52

---

1    in your description of the formula?
2    A.  It is -- it's an addition to the capital asset
3    pricing model formula, the capital asset pricing model
4    formula as a general proposition doesn't -- doesn't take
5    into account the impact of the size of -- I'm sorry.
6            (Coughing)
7            THE WITNESS:  -- the impact on the size of
8    the company on required rates of return, nor does it
9    take into account the specific risk that some companies
10   would have in addition to the CAPM.
11   BY MR. WICKES:
12   Q.  And in this case what accounts for your assigning
13   a three to five percent specific risk premium?
14   A.  Well, if you take a look at data with respect to
15   this industry, you find a number of things.  One of
16   which is that what is known as Jensen's alpha is
17   negative for the company going back five years -- for
18   the industry going back five years.
19           What that means is that the capital asset
20   price model has overstated rates -- realized rates of
21   return for this industry going back five years from
22   2002.  Which is another way of saying that in order to
23   get the correct required rate of return to equity, you
24   need to compensate for that.  So you need to add a
25   required rate of return because capital asset pricing

53

1    model does not capture everything that goes on in the
2    determination of required rate of return.  So this
3    Jensen's alpha is one aspect.
4        The second element that goes into
5    determination of the specific risk premium is obtained
6    from looking at the Fama French -- the implications of
7    Fama French model.  The Fama French model implies for
8    this industry the additional rate of return that would
9    be necessary for taking account of the riskiness of --
10   the specific riskiness of this industry, and even more
11   so Oakwood being riskier than most of the firms in the
12   industry because of the fact that it was in very deep
13   trouble at the time.  And that the projections assumed a
14   quick turnaround, which, of course, adds to the risk of
15   the buyer.
16       You need to account for the -- what Fama
17   French called the HML variable, and that is the
18   relationship between high book value relative to market.
19   The industry -- the marketplace doesn't pay much for
20   going concern value for firms in this industry as of the
21   early part of this century.  So that the HML variable
22   from the Fama French model implies an additional
23   specific risk premium of about three to five percent --
24   of about 3.5 percent.  So there's another indicator.
25       And then a further indicator of a specific

54

22/10/2007 TENNENBAUM, Michael (Proofed)

1    risk premium is obtained by looking at the data from
2    Ibbotson, which is one of the foremost data providers in
3    this industry with respect to required rates of return,
4    capital asset pricing model calculations, and weighted
5    average cost of capital by industry and by firm.  And
6    the Ibbotson valuation model utilizes a specific risk
7    for this industry of 5.07 percent as an additional
8    factor.
9        All of those taken together led me to
10   believe that a reasonable estimate of a premium for
11   specific risk for this firm would be in the three to
12   five percent range.
13       Q.  And are the -- based on what you just said, is it
14   fair of me to understand that both the size premium and
15   the specific risk premium, and determination of those
16   values, involved your making a judgment informed by the
17   kind of data you've just described?
18       A.  An informed judgment, yes, based on the available
19   data.
20       Q.  Right, that's what I said.
21       A.  Yes.
22       Q.  Yes.  There isn't someplace you go look up and
23   say what's the size premium.  You have to look at a lot
24   of data and make a judgment?
25       A.  Yes, you have to look at a lot of data and look

55

1    at places that say whatever the size premium -- whatever
2    the specific risk premium ought to be, it's somewhere in
3    this range.
4        Q.  All right.  So we started with our projections,
5    and we now have the description of the weighted average
6    cost of capital and the Fama French model.  And did
7    you, as a mechanical matter, do the capital asset
8    pricing model and the Fama French model inputs that
9    you've described between pages 33 and 37, get applied to
10   both of those different valuations in the same way?  I
11   mean to the different cash flows?
12       A.  They do.
13       Q.  So you have two different sets of cash flows, and
14   then you have --
15       A.  Three, actually.
16       Q.  Three.
17       A.  Yes.
18       Q.  Although two of them you say worked out to about
19   the same?
20       A.  Yes.
21       Q.  Right.  So we have a 2001 set and a 2002 set?
22       A.  Yes.
23       Q.  And you apply these inputs to them in the same
24   way?
25       A.  Yes.

56

22/10/2007 TENNENBAUM, Michael (Proofed)

1        Q.  Okay.  Is it your judgment that it's correct as a
2    matter of valuation to apply those same inputs for the
3    Fama French model and the capital asset pricing model,
4    even though the cash flows that underlie them reflect
5    very different companies?
6            MR. CASTANARES:  Objection to form.
7            THE WITNESS:  Yes.  Yes, because those --
8    the derivation of those premiums are industry wide, so
9    that for circumstances like the one in which Oakwood
10   finds itself in the troubled industry with a hoped-for
11   turnaround to various degrees, it should be applied
12   regardless of whether you are talking about September
13   '01 or September '02.
14   BY MR. WICKES:
15       Q.  And that's true, for example, regardless of
16   whether the company remains in or goes out of the
17   financing part of the business?
18       A.  Yes.
19       Q.  Okay.  Can we talk a bit about the notion that's
20   described starting on page 45 in your report?
21       A.  I'm sorry.  Both Mr. Castanares and I were
22   coughing, and I didn't catch the page.
23       Q.  I'm sorry, although I wasn't coughing.
24           If we look at page 45, we start to talk
25   about equity as a call option.  Can you just tell me in

57

1    kind of in layman's terms what does that mean to say

2    that equity is a call option?

3        A.   What it means is that as an equity owner, what

4    you have is an option on future value after you pay off

5    the debt obligations.

6             So if you have a situation in which equity

7    as of this particular point in time is valued on the

8    marketplace at a dollar a share, but there is some

9    high -- some reasonably high probability that the value

10   of the assets of the company will fluctuate dramatically

11   over time, so that before the debt obligations come due

12   there's some likelihood that asset value will exceed the

13   debt obligations by substantial amount, buyers are

14   willing to pay for that.

15            On the other hand, as the time period

16   between the date of your value inspection and the due

17   date of the obligations, as that shrinks, buyer are

18   going to be willing to pay less, because you have less

19   of an opportunity for the -- for the home run to be hit.

20       Q.   Okay.  Let me see if I understand it, and you

21   correct me.  As an ordinary matter, we think that all

22   debt gets paid before equity gets paid.  Fair enough?

23       A.   Yes.

24       Q.   And in a situation where it seems unlikely that

25   all the debts will be paid, we might given the first

1    assumption assume that the equity was worth zero; right?

2        A.   Yes.

3        Q.   But, I think, if I understand what you are saying

4    here about the call option, it reflects, if you will, an

5    opinion by some buyers that actually there's a chance

6    that the debt will get paid and there will be something

7    left for equity?

8        A.   Yes.

9        Q.   Okay.  And this, in the case of Oakwood, its

10   stock was publicly traded; right?

11       A.   Correct.

12       Q.   On the New York Stock Exchange, was it?

13       A.   Yes.

14       Q.   And what do we think as economists about the

15   price of the equity in this situation?  Does it reflect

16   the market's judgment about the likelihood that there

17   will be some value for equity?

18       A.   It reflects the willingness of speculative

19   purchasers to take a gamble on the prospect of a turn-

20   around in this industry sufficient -- and a turnaround

21   for the company, sufficient to allow it to pay off the

22   debt obligations, and to have, therefore, a value left

23   over for equity.

24            And the parameters for considering whether

25   that's a reasonable bet or not include how variable are

1    our asset values in this industry and for Oakwood,

2    therefore, include how long of a timeframe do you have.

3    If you have to turnaround within the next six months,

4    that equity is worthless.  If you have five or

5    six years, you may have a value depending on how

6    variable the assets are likely to be, and it depends on

7    interest rates because there's a time value of money

8    issue.

9             So given those -- given those parameters,

10   you can determine, utilizing a variety of models, the

11   most -- by far the most popular of which is the black

12   scholes model, you can utilize a variety of models like

13   black scholes to determine, well, what's a reasonable

14   bet.

15       Q.   As a general matter in your valuation work, are

16   you a believer in efficient markets?

17       A.   I'm a believer in relatively efficient markets,

18   yes.

19       Q.   Relative to what?

20       A.   Relative to full information models.  In other

21   words, I'm a believer that in markets in which there are

22   a lot of transactions and, therefore, a lot of

23   transparency, a lot of information available, that the

24   market is an excellent meter for accumulation of that

25   data in determining the value implications.  .

1             It isn't always true that that information

2    is transparent.  It isn't always true that both sides of

3    the market have similar information.  You know, a

4    classic example being the current mess in the mortgage

5    markets, in mortgage securities and SIVs, things along

6    those lines where there is some lack of transparency

7    and, therefore, widespread differences of opinion as to

8    values.

9             So where there is a lot of information,

10   markets utilize that information efficiently.

11       Q.   Okay.  So in this situation, for example, where

12   the equity shares of the company are being traded on the

13   New York Stock Exchange, would we assume that buyers and

14   sellers of those shares have the same information

15   available to them?

16       A.   Pretty much.

17       Q.   So would we assume that the price of the equity

18   then would represent the workings of a relatively

19   efficient market?

20       A.   Assuming that there are a lot of transactions

21   involved, yes.

22       Q.   Okay.  How do you measure a lot of transactions?

23       A.   Frequency of transactions, volume of transactions

24   relative to the outstanding number of shares available.

25       Q.   And does the -- do I understand from the

1   discussions starting at page 48 in your report that it's
2   possible to take the information about the value of
3   equity in this circumstance and deduce from that some
4   information about the likelihoods of default?
5       A.   Yes.   So that -- so that -- on the top of page
6   50, for example, in the first bullet point, you say,
7   "For OHC the foregoing inputs imply an increase in
8   default probability from September '01 to September
9   '02."   And you say that "The default probability of
10  September '01 was 62.3 percent, and then a year later it
11  was 96.9 percent."
12      Q.   Can you just walk me through, remembering having
13  a little mercy on somebody who is a history major and
14  not a math major, how it is from this data we conclude
15  something about the default probability?
16      A.   Well, the default probability is indicated at the
17  bottom of page 49.
18      Q.   Okay.
19      A.   As being one minus ND2.   ND2 is a probability
20  distribution.   It's a likelihood of a -- for a normal
21  distribution, it's the likelihood of values being equal
22  to or less than certain amounts here.   Where D1 and D2
23  are functions of the relative size of the asset price
24  and the -- on the one hand, and the debt on the other,
25  and the times of to maturity.

62

1       So given those calculations ND2 is the
2   probability of the assets eventually becoming worth more
3   than the debt on or before the due date of the debt.
4   And so one minus ND2 is, therefore, by definition, of
5   the -- the probability that the assets don't reach the
6   size of debt and, therefore, you default.
7       Q.   So --
8       A.   But I do want to condition that whole series of
9   statements on the presumption that you are willing to
10  accept -- as of September '01 you are willing to accept
11  the projections as being -- the cash flow projections as
12  being the most likely set of projections.
13      If those projections are considered
14  aggressive, as I considered them in the report, then the
15  probability of default will go up from what is stated
16  here.   So that these probabilities of default
17  are -- are as high as they are even with aggressive
18  projections.
19      If you make projections that are somewhat
20  less aggressive as the company did, you are going to get
21  a default probability that is substantially in excess of
22  62 percent and is well in excess of 80 percent for --
23  I'm sorry -- for September '01.   So that the
24  62.3 percent default probability is a default
25  probability given the acceptance of aggressive cash

63

1   flows.
2       Q.   Do you want to take a break?
3       A.   Could I have one minute to get a cup of coffee
4   while it's hot?
5       Q.   The rule is, if we take a break, it has to be at
6   least five minutes so I can go down and take a
7   cigarette.
8       A.   I'll wait.
9       Q.   I'm happy to have a break.
10      THE VIDEOGRAPHER:   Going off the record, the
11  time is 11:38.
12      (Brief pause)
13      THE VIDEOGRAPHER:   We're back on the record.
14  The time is 11:43.   This marks the end of videotape
15  No. 1 in the deposition of Dr. Michael Tennenbaum.
16      Going off the record, the time is 11:43.
17      (Recess)
18      THE VIDEOGRAPHER:   We're back on the record.
19  Here begins videotape No. 2 in the deposition of
20  Dr. Michael Tennenbaum.   The time is 11:53.
21  BY MR. WICKES:
22      Q.   Doctor, on page 48 and 49 you do the calculations
23  for valuation of OHC equity as of September 2001 and
24  2002, utilizing the black scholes model.
25      On page 49 at the top, you have a number for

64

1   . . equity value.   What is the source of that equity value?
2       A.   Well, it's -- it's the resulting -- it's a result
3   of the calculation of the call value.   It -- what it is
4   is, when you utilize the inputs described on page 48
5   with respect to the enterprise value, the face value of
6   the debt, the weighted average debt duration, standard
7   deviation in enterprises value and the risk-free
8   interest rate, and you plug those numbers into the basic
9   black scholes equation identified at the middle of page
10  46 and the additional values below that, you wind up
11  with the calculation of equity value of $25.8 million as
12  of September '01.
13      Q.   Do you know how that number compares to the
14  number we would find if we multiplied the number of
15  outstanding equity shares of the company by its price as
16  of September 30, 2001?
17      A.   Well, the -- there are about nine and a half
18  million shares outstanding, so if we divide this by nine
19  and a half, you are going to -- by 9.5 million, you are
20  going to get a couple dollars a share, two and a half
21  dollars a share, something like that.
22      Q.   Do you know what the share place was at
23  September 30th, 2001?
24      A.   It fluctuated over time.   I think it was down
25  around a dollar and a half or two dollars, something

65

1    like that.
2        Q.    And -- sorry.  I've lost my train of thought.
3             Did you make any attempt in your work to
4    compare the -- any of the cash flow projections that you
5    used in doing your work with projections about the
6    company that were in the public domain at the time?
7        A.    I never saw any projections in the public domain
8    that went out a few years, so I did not.
9        Q.    Okay.  Did you, for example, compare any of the
10   projections that you used with whatever projections for
11   whatever period of time were being published by various
12   equity analysts who covered the Oakwood stock?
13       A.    Again, all of the equity analyst reports that I
14   saw either had no specific projections or there were
15   projections for a very short period of time.  I never
16   saw any endless projections that ran out a couple of
17   years or certainly not five, six years.
18       Q.    Okay.  Maybe you can help me.  Somewhere in this
19   report you say that you think the value of the B2
20   guaranties increased from 100 million in 2001 to 144
21   million in 2002.  Do you know where that appears?
22       A.    Yes.  It would be a comparison of -- I'll find
23   the pages in a moment.  It would be a comparison of page
24   41 and 39.
25       Q.    Okay.  On page 39 you say the value of the B2

1    guaranties is $144 million.  What's the source of that
2    number?
3        A.    Preliminary calculations of the Davidson firm.
4        Q.    Okay.
5        A.    And -- which I saw, and those calculations were
6    contained in CSFB presentations to the board of
7    directors at Oakwood and, I believe, to Brookshire
8    (phonetic).
9        Q.    And what's the source of the $100 million number
10   on page 41?
11       A.    The source of the $100 million number on page 41
12   is to take the Davidson numbers and delete the
13   securitizations which occurred after 2001, and reduce
14   the resulting figures to present value by application of
15   a 10 percent discount rate which Mr. Davidson's firm
16   utilized.
17       Q.    That's the calculation you did?
18       A.    Yes.  It actually gets you a number slightly in
19   excess of 100 million, but I rounded it down.
20       Q.    And did you make any attempt to compare that
21   number to what Oakwood's financial statement said the
22   value of those guaranties was?
23       A.    Yes.
24       Q.    What -- in 2001 what did Oakwood's financial
25   statements say the value of the guaranties were?

1        A.    Thirty some odd million dollars, 36 million, I
2    believe.
3        Q.    And those were there are audited financial
4    statements audited by Price Waterhouse Coopers?
5        A.    Yes, on bases that are different from what is --
6    what results from the projections that I utilized.
7             Because what you have to take account of is
8    the fact that in order to get to these aggressive
9    projections, you have to assume that the servicing fee
10   that OAC had, the fee that it was going to be able to
11   charge for servicing the outstanding mortgages, instead
12   of being at the bottom of the waterfall was going to go
13   to the top of the waterfall.  And they were going to get
14   a -- they were going to get a market rate of about
15   one percent.
16             Which means -- which would have the further
17   implication that since they're getting paid earlier, the
18   B2s are going to be paid later, and some of them are not
19   going to be paid at all.  And, therefore, the guaranties
20   would kick in to a greater extent than is contained in
21   this assumptions leading up to the financial statements.
22             So, you know, they're different states of
23   the world, as it were.  So a direct comparison is it
24   needs to take account of the fact that the assumed
25   status of the servicing fee is different.

1        Q.    So your $100 million for September 2001, that
2    assumes that the securitizations were amended in such a
3    way that the servicing fees would have been paid at a
4    high enough priority to always be paid; is that right?
5        A.    Yes.  That's what Mr. Davidson's numbers assume.
6        Q.    And so you just took that assumption back to
7    2001?
8        A.    Correct.
9        Q.    All right.  On page 51 of your report in your
10   conclusions, in your fourth bullet point, you say that
11   "Continued operation of OHC business model involving
12   securitization of loans and guarantying certain
13   tranches of the securities had the following impacts on
14   OHC's values."
15            Can we just talk for a moment first in
16   general.  Let's go back before 2001, if you'd like.
17   What was the relationship between the securitization
18   process and Oakwood's underlying business model?
19       A.    Well, the securitization process provided the
20   funding for Oakwood to enable it to finance the
21   mortgages that it was financing for its customers.
22       Q.    Let me just try an example to see if I understand
23   it.  Let's suppose Oakwood has gone through the process
24   of manufacturing a mobile home, and they sell it to a
25   customer at their lot for -- pick a number -- $100,000.

1   I have no idea what a mobile home costs nowadays. It
2   will make the math easier.
3           And let's assume that Oakwood finances that
4   purchase by the purchaser at a 90 percent loan-to-value
5   ratio. Now, all that's happened insofar as Oakwood is
6   concerned up to that point in the transaction is they
7   sold a mobile home and realized $10,000 in cash and a
8   receivable for $90,000; right?
9       A.  Yes.
10      Q.  Okay. And if you assume that the cost of the
11  mobile home is more than -- the cost to manufacture the
12  mobile home is more than $10,000, on a cash basis
13  they've lost money at that point; right?
14      A.  So far so good.
15      Q.  Okay. So now this is where the securitization
16  comes in; right?
17      A.  Yes.
18      Q.  Which is a way to take that $90,000 and convert
19  some part of it into cash?
20      A.  Yes.
21      Q.  Okay. And that's the process of the quarterly
22  securitizations that have been going on for a long time?
23      A.  Yes.
24      Q.  Is it the fact of the securit- -- strike that.
25          Up to that point in my hypothetical has the

70

1   securitization process itself done anything to affect
2   the value of Oakwood's business?
3       A.  It depends. If it allows Oakwood to finance
4   transactions with its customers which would otherwise
5   not be viable, which would not be financeable, then what
6   it -- what that accomplishes is that it buys Oakwood
7   trouble in the future when those mortgages get defaulted
8   on.
9       Q.  Okay. When you talked to Mr. Muir, did he talk
10  to you about the problems that arose in the business
11  when, as a general matter, the industry moved from a
12  standard 90 percent loan-to-value ratio to a 95 percent
13  loan-to-value ratio?
14      A.  Yes.
15      Q.  Did he tell you that in hindsight that people
16  recognized that in that five percent difference, they
17  brought into their customer base a group of people who
18  had turned out to have rather different performance in
19  default results than the customers at the 90 percent
20  level?
21      A.  Yes.
22      Q.  Okay. Did he tell you why they went from
23  9 percent to 95 percent?
24      A.  They were trying to match the competition. There
25  was kind of an industry-wide approach, the higher

71

1   loan-to-value ratios.
2       Q.  Okay. In the last bullet point on page 51 you
3   say, "Oakwood homes suffered damages as a result of
4   continued operation of its business model in an amount
5   of at least $50 million."
6           Do I understand from that that you mean to
7   say that it would have been $50 million better for the
8   company if in September of 2001 CSFB had simply refused
9   to do further securitizations and forced the end of the
10  company's business model at that point?
11      A.  Probably, yes.
12      Q.  Okay. I understand that correctly?
13      A.  Yes.
14      Q.  Okay. In addition, you go on to say, "OHC paid
15  fees relating to the continuation of a business model
16  which was destroying value. Such fees added to the
17  damage suffered by OHC, and we were informed that the
18  fees in question are in excess of 20 million."
19          Who informed you of that?
20      A.  Mr. Yun.
21      Q.  Mr. Yun.
22          And what fees are those?
23      A.  I'm -- fees paid to CS First Boston. I don't
24  know what the breakdown of the fees is.
25      Q.  Do you know whether the fees were actually paid

72

1   by the company or were simply reductions in the proceeds
2   of financing transactions?
3       A.  I don't know.
4       Q.  What do you think would have happened at Oakwood
5   if on September the 30th of 2001, CSFB had simply said
6   no more securitizations period, full stop?
7       A.  I think the company would have filed Chapter 11.
8       Q.  Immediately?
9       A.  I think so.
10      Q.  And then what would have happened?
11      A.  Hopefully, they would have sought to engage in an
12  orderly sale of the company on a going -- of the assets
13  on a going concern basis, and would have been able
14  to generate in September '01 dollars $350 million for
15  potential distribution to the creditors.
16      Q.  Was it important in what you just told me that
17  the company be able to realize that value by arranging
18  for sale of the assets on a going-concern basis?
19      A.  Sure.
20      Q.  Okay. How would the company have continue on a
21  going concern basis if it had no further ability to
22  securitize or finance the proceeds of its installment
23  sales contracts from its customers?
24      A.  There was an alternative possibility of whole --
25  whole loan sales. They may have been able to securitize

73

1  to some extent to, you know, a less -- in a lesser
2  volume.  And when you go out to sell the assets, you
3  sell them on the basis of, look, here's what's
4  available, that we have cash flows in prospect; if you
5  are able to obtain financing and sell the company, sell
6  the company's cash flow prospects that way.
7    Q.  Okay.
8    A.  Rather than, you know, liquidate assets.
9    Q.  But to sell the company's cash flow prospects,
10  the company would have had to have continued in the
11  business of manufacturing and selling mobile homes?
12    A.  Yes.
13    Q.  Okay.  And up until that time, isn't it a fact
14  that the principal source of liquidity in order to keep
15  doing that business was the securitizations?
16    A.  Yes.
17    Q.  Okay.  And to what extent have you investigated,
18  and can you tell us, what other sources of liquidity
19  would have actually been available to the company at
20  that time?
21    A.  I haven't done an analysis of that.
22    Q.  Okay.  So is it possible that if, in our
23  hypothesis on September 30th of 2001, Credit Suisse had
24  simply said: We're done, we're going home, that the
25  result would not only have been a Chapter 11 filing, but

74

1  would have been a very rapid cessation of the business
2  activities of the company?
3    A.  Is it possible?
4    Q.  Yes.
5    A.  Anything is possible.
6    Q.  Given that you have not investigated alternative
7  sources of financing to replace the liquidity
8  prepared -- provided by the securitizations, it's a
9  fact, isn't it, that you are not able to tell us how
10  likely it is that the results of the end of the
11  securitization process would have been the rapid
12  liquidation of the company?
13    A.  If you shut off the financing completely, yeah,
14  of course.  I did not investigate what would happen
15  under those circumstances.
16    Q.  You didn't?
17    A.  Correct.
18    Q.  Other than to say that -- well, strike that.
19      Is it your opinion that -- in September of
20  2001 is it your opinion that the creditors of the
21  company would have been better off had Credit Suisse in
22  September of 2001 simply stopped the securitizations?
23    A.  I don't know.  What my analysis indicates is that
24  the creditors would have been better off had it received
25  advice to file in September of '01 and seek a purchaser

75

1  for the going-concern value of the company as of that
2  point in time because of the fact that that going
3  concern value was dissipating and was going to dissipate
4  over the next -- over the foreseeable future.
5      And that does not imply anything at all
6  about what would happen if somebody forced them to
7  liquidate.  That, I don't know.
8    Q.  Well, let's just test the assumptions that are
9  built into that.  First of all, you said you think the
10  creditors would have been better off had the company
11  been given advice in September of 2001 that they should
12  go into bankruptcy.  Actually, what advice the company
13  got wouldn't have had any effect, would it?  What would
14  have made a difference is if they had gotten that advice
15  and acted on it?
16    A.  Yes, sure, assuming they acted on it.
17    Q.  All right.  So and isn't it further accurate to
18  say that your assumption that the creditors would have
19  been better off in that circumstance, assumes that in
20  that scenario, in a Chapter 11 commencing around the
21  First of October 2001, there would have been some
22  alternative source of liquidity to allow the company to
23  continue to remain a going concern?
24    A.  Yes.
25    Q.  And it's a fact, if I further understand your

76

1  testimony, that you made no attempt to determine whether
2  any such alternative sources of liquidity would have
3  been available?
4    A.  That's correct, I did no analysis of the
5  liquidity available to the company.
6    Q.  Okay.  And is it correct that you made no attempt
7  to estimate what values might have been recovered by the
8  company if, in fact, it had not been able to be sold as
9  a going concern, but had gone into an immediate shut
10  down and liquidation model?
11    A.  That's correct.
12    Q.  Okay.  If the company had been able to find some
13  alternative source of liquidity in our October 1st,
14  2001, bankruptcy scenario -- strike that.  That's going
15  nowhere.
16      Do you know what the recovery of unsecured
17  creditors in the case ultimately was?
18    A.  I don't have any specific knowledge of that.
19    Q.  Well, what have you heard?
20    A.  40 to 50 percent range.
21    Q.  Okay.  What was the debt trading at in September
22  of 2001?
23    A.  The debt was in the -- it fluctuated between 30
24  cents on the dollar and 60 cents on the dollar.
25      MR. WICKES:  That's all I have.

77

1    MR. CASTANARES:  I have no cross.

2    THE VIDEOGRAPHER:  Conclude the depo?

3    MR. WICKES:  (Nods his head up and down).

4    THE VIDEOGRAPHER:  This concludes the

5    deposition of Michael Tennenbaum, Volume I.  The number

6    of tapes used today was two.  The original videotapes

7    will be retained by Merrill Legal Solutions at 25 West

8    45th Street, Suite 900, New York, New York 10039.

9    Going off the record, the time is 12:20.

10

11    (Whereupon, at the hour of 12:20 p.m.,

12    proceedings were adjourned.)

13    -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

78

---

1    State of California      .)

2    )

3    County of Los Angeles    )

4

5

6    I, MICHAEL TENNENBAUM, Ph.D., do hereby declare

7    under penalty of perjury that I have read the foregoing

8    transcript of my deposition; that I have made such

9    corrections as noted herein, in ink, initialed by me, or

10    attached hereto; that my testimony as contained herein,

11    as corrected, is true and correct.

12    Executed this _____day of_____, 2007,

13    at_____,_____.

14

15

16

17    _____

18    MICHAEL TENNENBAUM, Ph.D.

19

20

21

22

23

24

25

79

---

1    State of California         )

2    )

3    County of Los Angeles       )

4

5    I, Felipe F. Carrillo, Certified Shorthand Reporter

6    No. 9555 for the State of California, do hereby certify:

7    That prior to being examined, the witness named in

8    the foregoing deposition was duly sworn to testify the

9    truth, the whole truth, and nothing but the truth;

10    That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced by me to typewritten form, and that

13    the same is a true, correct and complete transcript of

14    said proceedings.

15    Before completion of the deposition, review of the

16    transcript ( ) was ( ) was not requested.  If requested,

17    and changes made by the deponent (and provided to the

18    reporter) during the period allowed are appended hereto.

19    I further certify that I am not interested in the

20    outcome of the action nor a relative or employee of any

21    attorney of any of the interested parties.

22    Witness my hand this _____ day of _____, _____.

23

24    _____

25    FELIPE F. CARRILLO, RPR, CSR #9555

80

22/10/2007  TENNENBAUM, Michael (Proofed)

**#**

#9555 [2:5] [80:25]

**$**

$10,000 [70:7,12]
$100 [67:9,11] [69:1]
$100,000 [69:25]
$12,000 [18:5]
$144 [67:1]
$20,000 [18:16]
$25.8 [65:11]
$300 [44:7] [50:14]
$350 [44:4] [45:4,17,23]
    [46:3,14] [47:19] [48:20]
    [50:9] [73:14]
$395 [18:10]
$405,000 [18:4]
$50 [72:5,7]
$90,000 [70:8,18]

**0**

01 [29:4] [57:13] [62:8,10]
    [63:10,23] [65:12] [73:14]
    [75:25]
02 [4:10] [29:4] [57:13]
    [62:9]
0213396 [4:10]
02-13396 [4:10]

**1**

1 [4:6] [64:15]
1,000 [18:22,23]
10 [67:15]
10:39 [37:22]
10:52 [37:25]
100 [31:1] [66:20] [67:19]
10039 [78:8]
10105 [2:20]
11 [31:10] [33:13] [73:7]
    [74:25] [76:20]
11:38 [64:11]
11:43 [64:14,16]
11:53 [64:20]
12:20 [78:9,11]
1200 [2:3,12]
1345 [2:19]
14 [28:9,11,18] [29:7]
    [30:3]
144 [66:20]
15 [29:11,13]
16 [29:13,14] [30:3]
18 [28:11,18] [29:7]
1901 [2:2,11] [4:16]
1969 [7:6]
1971 [7:7,10]
1975 [7:13]
1980s [9:22]
1986 [7:7]
1990s [22:18] [34:23]

1st [77:13]

**2**

2 [44:9] [64:19]
20 [30:11,19] [32:8] [38:4]
    [72:18]
200 [50:13]
2000 [23:7]
2001 [23:8] [28:16] [29:5]
    [33:19] [39:20] [40:10]
    [42:16] [43:21,23] [44:1,3
    ,23] [45:5,11,12,18,21]
    [46:5,13,17] [47:7] [48:18]
    [49:1,15,23] [50:7] [56:21]
    [64:23] [65:16,23] [66:20]
    [67:13,24] [69:1,7,16]
    [72:8] [73:5] [74:23] [75:20
    ,22] [76:11,21] [77:14,22]
2002 [25:2] [28:16] [33:15,20]
    [34:8,19] [35:3] [36:8,14]
    [39:14] [40:21] [42:13]
    [43:16] [44:7,10] [45:10,14]
    [46:5] [53:22] [56:21]
    [64:24] [66:21]
2003 [32:15]
2005 [8:11] [11:13] [42:23]
    [43:1]
2006 [20:6]
2007 [2:4] [4:1,11] [6:11,14]
    [79:12]
21 [30:19]
212 [2:21]
22 [2:4] [4:1,11] [30:20]
    [36:11] [37:11]
228 [2:14]
2285755 [2:14]
228-5755 [2:14]
25 [4:14] [78:7]
25th [29:5]
27 [6:11]
27th [6:14]
28 [30:15,21]
29 [39:19]

**3**

3.5 [54:24]
30 [9:8] [41:18] [65:16]
    [77:23]
300 [44:11,15,18]
30th [65:23] [73:5] [74:23]
31 [43:9]
310 [2:14]
32 [42:5]
33 [52:13] [56:9]
34 [52:13]
350 [44:23]
36 [52:18,19] [68:1]
37 [56:9]
370,000 [18:20]
39 [66:24,25]
390 [18:4]
395 [18:11,20]

**4**

40 [30:4] [77:20]
41 [66:24] [67:10,11]
425 [18:10]
45 [57:20,24]
45th [4:14] [78:8]
46 [65:10]
48 [62:1] [64:22] [65:4]
49 [62:17] [64:22,25]

**5**

5 [3:5,9]
5.07 [55:7]
50 [44:18] [62:6] [77:20]
51 [69:9] [72:2]
54 [6:17] [7:21]

**6**

6 [7:13]
60 [77:24]
601 [3:9] [5:24] [6:2,6]
62 [63:22]
62.3 [62:10] [63:24]

**8**

80 [30:4] [63:22]
80s [9:24]

**9**

9 [71:23]
9.5 [65:19]
9:44 [2:4] [4:2]
9:45 [4:12]
90 [70:4] [71:12,19]
900 [78:4]
90067 [2:13]
900676013 [2:13]
90067-6013 [2:13]
903 [2:21]
9039000 [2:21]
903-9000 [2:21]
95 [71:12,23]
9555 [80:6]
96.9 [62:11]

**A**

a.m [2:4] [4:2]
ability [73:21]
able [25:20] [35:20] [40:12]
    [45:16] [68:10] [73:13,17,25]
    [74:5] [75:9] [77:8,12]
above [43:2]
absolutely [13:12]
accept [63:10]
acceptance [63:25]
access [19:15]
accomplishes [71:6]

according [50:12]
account [15:16] [53:5,9]
    [54:9,16] [68:7,24]
accounts [53:12]
accumulation [60:24]
accurate [76:17]
acted [76:15,16]
action [16:10] [80:20]
actively [24:5] [34:23]
activities [75:2]
actually [18:10] [34:18]
    [35:2] [36:23] [38:25]
    [48:1] [56:15] [59:5] [67:18]
    [72:25] [74:19] [76:12]
add [18:3] [53:24]
added [72:16]
addition [51:21] [53:2,10]
    [72:14]
additional [10:8] [19:24]
    [54:8,22] [55:7] [65:10]
adds [54:14]
adjourned [78:12]
advice [75:25] [76:11,12,14]
affect [15:18,23] [24:21]
    [71:1]
affects [23:6]
again [30:24] [66:13]
against [10:12] [28:6]
aggressive [22:16] [42:15
    ,17,19] [43:6,13] [63:14,17
    ,20,25] [68:8]
agreement [37:6]
ahead [48:10]
al [4:8]
alleged [14:24]
allow [59:21] [76:22]
allowed [80:18]
allows [71:3]
allude [21:10]
almost [18:4,14]
along [46:9] [61:5]
alongside [51:24]
alpha [53:16] [54:3]
already [10:7] [11:4]
alternative [73:24] [75:6]
    [76:22] [77:2,13]
although [12:1] [27:10]
    [56:18] [57:23]
always [61:1,2] [69:4]
am [45:19] [80:19]
amended [69:2]
americas [2:19]
among [14:23] [48:18]
amongst [20:1]
amount [23:9] [58:13]
    [72:4]
amounts [62:22]
analyses [10:21] [24:21]
    [26:21,23] [27:6] [31:5,25]
    [33:18] [42:15] [43:10]
    [44:2] [45:15] [52:19]
analysis [12:4] [13:22]
    [14:6] [15:7,8,15,19]
    [16:7] [24:23,24] [25:8]

A.1

[31:12] [34:1] [43:25] [45:19]
[48:17] [74:21] [75:23]
[77:4]
analyst [66:13]
analysts [66:12]
analyze [33:14]
angeles [2:3,13] [4:1,17]
[9:21] [79:3] [80:3]
answer [3:17] [10:13]
[15:20] [19:17,19] [25:21]
[39:25] [47:11,12]
answered [47:9,10]
anticipated [10:23]
anymore [27:16]
anyone [12:5] [38:10]
anything [12:25] [71:1]
[75:5] [76:5]
anywhere [6:12]
apologize [20:25] [40:3]
appear [43:10]
appearances [2:7]
appeared [28:6]
appears [66:21]
appended [80:18]
application [67:14]
applied [43:25] [52:21]
[56:9] [57:11]
applies [47:18]
apply [56:23] [57:2]
applying [43:16,22]
approach [52:11] [71:25]
approaches [26:22]
appropriate [17:4]
approximately [44:18]
[48:20]
april [6:11,14]
areas [23:8]
arithmetic [27:1]
arose [71:10]
around [32:21] [33:3]
[44:4] [59:20] [65:25]
[76:20]
arrangement [22:1]
arranging [73:17]
arrived [43:15] [47:23]
ascertain [47:14]
aside [9:3]
ask [6:3]
asked [11:5] [15:21,22,24]
[24:23,24] [25:6] [47:9,10]
asking [49:17,20,21]
aspect [34:25] [54:3]
aspects [12:3]
asset [48:14,15] [51:24]
[52:2,10,15,20] [53:2,3,19
,25] [55:4] [56:7] [57:3]
[58:12] [60:1] [62:23]
assets [33:19] [44:19,20]
[45:17] [46:2,20] [47:1]
[51:11] [58:10] [60:6]
[63:2,5] [73:12,18] [74:2,8]
assigning [53:12]
assignment [18:11]
assistance [16:17,21,22,23]

assisted [17:7]
assume [37:11] [39:10]
[47:22] [48:4] [49:22]
[59:1] [61:13,17] [68:9]
[69:5] [70:3,10]
assumed [46:8] [54:13]
[68:24]
assumes [35:3,7] [47:2,3,25]
[69:2] [76:19]
assuming [61:20] [76:16]
assumption [29:12] [49:21
,22] [59:1] [69:6] [76:18]
assumptions [10:23]
[68:21] [76:8]
attach [6:19]
attached [7:3] [79:10]
attempt [46:16] [47:5,13]
[66:3] [67:20] [77:1,6]
attempts [46:20] [48:13]
attend [11:6,14]
attended [11:10,16]
attorney [2:10,18] [8:16]
[80:21]
attribution [44:18]
audited [68:3,4]
author [16:15] [30:25]
[40:22] [41:23]
available [23:15] [25:2]
[33:3,10] [45:23] [55:18]
[60:23] [61:15,24] [74:4,19]
[77:3,5]
avenue [2:3,11,19] [4:16]
average [50:21] [51:2,5,6,20
,22] [55:5] [56:5] [65:6]
aware [27:24]

——————————————
B
——————————————

b2 [66:19,25]
b2s [68:18]
back [9:8,22] [12:19] [24:25]
[25:8] [33:6] [34:10,13]
[35:19] [37:24] [50:7]
[53:17,18,21] [64:13,18]
[69:6,16]
background [21:14] [24:19]
backup [38:15]
ballpark [18:21]
bank [25:1]
banker [47:14]
bankrupt [49:5,22]
bankruptcy [4:9] [8:23,25]
[14:8] [15:2] [22:11,15]
[25:1] [45:11,12,20] [46:1]
[49:2,12,13,23] [76:12]
[77:14]
base [71:17]
based [31:25] [32:3,10]
[39:14] [41:14] [55:13,18]
bases [68:5]
basic [29:15] [31:11,15]
[51:22] [65:8]
basically [30:6]
basis [34:1,3,21] [36:16]

[40:8] [46:6,12] [70:12]
[73:13,18,21] [74:3]
bates [28:21] [29:21]
beach [7:6,18]
became [14:1] [23:3]
become [27:24]
becoming [63:2]
bee [17:12]
began [48:8]
begin [5:10]
begins [4:5] [7:21] [64:19]
behalf [2:2]
believe [12:1] [16:14]
[22:3] [31:1] [32:15] [38:7]
[55:10] [67:7] [68:2]
believed [22:14]
believer [60:16,17,21]
below [34:22] [65:10]
benefit [14:4,5]
besides [20:7]
best [12:2] [17:21]
bet [59:25] [60:14]
better [21:23] [25:21] [72:7]
[75:21,24] [76:10,19]
billings [18:2,3,13,14]
bills [18:19]
bit [57:19]
black [60:11,13] [64:24]
[65:9]
board [28:15] [30:9] [40:6,21]
[41:9] [42:2] [67:6]
body [6:12]
book [52:8] [54:18]
books [21:17]
bookshelf [24:9,11]
booktomarket [52:8]
book-to-market [52:8]
boston [29:20,21] [39:23]
[40:7] [41:9] [42:2] [72:23]
bottom [62:17] [68:12]
boulevard [9:21]
break [37:17,18] [38:2]
[64:2,5,9]
breakdown [72:24]
brief [23:25] [64:12]
bring [8:4]
bringing [50:6]
brokerage [28:20] [29:18,19]
brookshire [67:7]
brought [71:17]
buckfire [29:23] [31:2,3]
[38:6,10]
built [76:9]
bullet [52:18] [62:6] [69:10]
[72:2]
business [8:2,6] [23:10]
[34:18,25] [35:22] [45:22]
[57:17] [69:11,18] [71:2,10]
[72:4,10,15] [74:11,15]
[75:1]
buy [48:5]
buyer [46:12,22,23] [47:15]
[48:21] [54:15] [58:17]
buyers [36:18] [46:17]

[58:13] [59:5] [61:13]
buys [71:6]

——————————————
C
——————————————

cal [7:6,18]
calculate [51:1]
calculating [50:25]
calculation [50:21] [51:22]
[65:3,11] [67:17]
calculations [13:23] [17:5]
[21:15] [55:4] [63:1] [64:22]
[67:3,5]
calgary [9:23]
california [2:4,13] [4:1,17]
[79:1] [80:1,6]
call [8:13] [57:25] [58:2]
[59:4] [65:3]
called [27:13] [30:14]
[39:20] [54:17]
calling [35:13]
cant [6:21] [10:16] [42:1]
[48:21]
capacity [22:19] [35:8]
capital [50:21] [51:2,5,8,21
,24] [52:2,10,15,20] [53:2,3
,19,25] [55:4,5] [56:6,7]
[57:3]
capitalization [51:12]
capm [53:10]
capture [54:1]
careful [34:12]
carolina [20:5] [21:3]
carrillo [2:5] [5:1] [80:5,25]
carry [25:7]
carrying [23:21]
case [4:9] [25:13,14,19]
[26:9,13] [27:9,11,24]
[28:2,6] [31:10] [34:5]
[36:23] [53:12] [59:9]
[77:17]
cases [24:14,16] [25:10,23
,25] [26:7] [46:8]
cash [10:23] [11:21,22]
[12:4] [13:6,24] [17:2,3]
[31:18,19] [36:12] [43:17]
[46:13,25] [47:18] [49:25]
[50:1] [51:10,16] [56:11,13]
[57:4] [63:11,25] [66:4]
[70:7,12,19] [74:4,6,9]
castanares [2:10] [4:23]
[9:14,20] [25:18] [26:18]
[27:17] [28:4] [47:9] [48:6
,11] [49:6,9,16] [57:6,21]
[78:1]
catch [57:22]
centers [35:5]
cents [77:24]
century [43:5] [54:21]
certain [62:22] [69:12]
certainly [14:17] [66:17]
certified [80:5]
certify [80:6,19]
cessation [75:1]

chance [59:5]
change [49:17,21] [50:3,8]
changes [80:17]
chapter [31:10] [33:13]
  [73:7] [74:25] [76:20]
characterized [27:20]
charge [68:11]
charges [46:1]
choose [33:25]
cigarette [64:7]
circumstance [62:3] [76:19]
circumstances [43:4]
  [50:8] [57:9] [75:15]
citations [23:19]
cite [23:15]
claim [14:3]
classic [61:4]
clayton [37:3,6] [39:4,8,11]
  [50:10]
client [13:9] [14:12,14,20]
  [15:9] [16:7]
clients [13:16] [14:5]
close [33:17]
coffee [64:3]
collectively [5:23]
combination [39:11]
coming [49:11]
commencing [76:20]
companies [34:17] [53:9]
  [57:5]
company [8:1] [15:5,13,17]
  [16:2,13] [21:14] [22:17]
  [26:24] [28:12] [33:14]
  [35:2,13,14] [36:2,13,15]
  [37:1,6] [38:16] [39:3,7,14]
  [41:2,11,20] [42:6,24]
  [43:3,4] [45:4,10,12,16,20]
  [46:6,8] [47:14] [49:1,12,22]
  [50:11] [51:11,16] [52:8]
  [53:8,17] [57:16] [58:10]
  [59:21] [61:12] [63:20]
  [65:15] [66:6] [72:8] [73:1]
  ,7,12,17,20] [74:5,10,19]
  [75:2,12,21,24] [76:1,10,12]
  ,22] [77:5,8,12]
companys [27:1] [49:13]
  [52:4] [72:10] [74:6,9]
compare [36:5] [66:4,9]
  [67:20]
compared [36:12]
compares [65:13]
comparison [66:22,23]
  [68:23]
compensate [53:24]
competition [71:24]
competitive [23:3]
competitors [22:17]
complaint [14:18,21,23]
complete [23:24] [80:13]
completed [31:24]
completely [75:13]
completion [80:15]
complies [28:10] [30:12]
comprise [51:6]

comprised [51:6]
concern [54:20] [73:13,21]
  [76:3,23] [77:9]
concerned [31:18,19]
  [70:6]
concerning [10:11]
conclude [6:13] [13:10]
  [15:4] [62:14] [78:2]
concluded [6:14]
concludes [78:4]
conclusion [15:13] [16:1]
  [39:13] [43:20] [44:3,6]
conclusions [26:1] [45:15]
  [69:10]
condition [63:8]
confirmed [32:14] [36:23]
  [38:25] [39:3]
connection [12:13,17]
  [20:8] [23:24] [32:10,19]
  [36:25] [38:23] [47:6]
consideration [34:13]
considered [63:13,14]
considering [35:15] [59:24]
consistent [34:13]
consistently [36:19]
consultants [31:9]
consultation [10:14,20]
  [13:3]
consulting [7:8,16,19,25]
  [22:1]
contacted [8:8,12] [10:1]
contained [39:22] [40:19,20]
  [41:25] [67:6] [68:20]
  [79:10]
containing [42:15]
contemporaneous [36:7]
context [43:4]
continuation [72:15]
continue [46:9] [73:20]
  [76:23]
continued [69:11] [72:4]
  [74:10]
continues [37:12]
continuous [42:22]
contracted [4:13]
contracts [73:23]
conversation [12:6] [13:9,15]
  [14:17,19,22] [23:11]
  [26:10,12] [27:8,20]
conversations [14:2]
  [23:20]
convert [70:18]
conveyances [14:25]
  [16:11]
coopers [68:4]
copies [41:13]
copy [6:3]
corporation [44:22]
correct [5:21] [7:4] [8:6,7]
  [13:19] [14:9] [19:22]
  [31:11,16] [34:19] [38:22]
  [39:12] [41:21] [45:1,16,19]
  [51:18] [53:23] [57:1]
  [58:21] [59:11] [69:8]

[75:17] [77:4,6,11] [79:11]
  [80:13]
corrected [79:11]
corrections [79:9]
correctly [46:4] [48:5]
  [52:14] [72:12]
correspondingly [13:5]
cost [50:21] [51:2,5,20]
  [55:5] [56:6] [70:10,11]
costs [70:1]
coughing [53:6] [57:22,23]
counsel [4:19] [14:2] [37:16]
country [23:9]
county [79:3] [80:3]
couple [11:17] [28:24]
  [65:20] [66:16]
course [24:5] [54:14] [75:14]
court [4:9,25] [24:14] [25:10]
  [26:14] [27:4]
cover [6:7,10]
covered [66:12]
credit [4:8,22] [10:12]
  [12:22] [74:23] [75:21]
creditors [45:18,24] [73:15]
  [75:20] [76:10,18] [77:17]
cross [78:1]
cs [29:20,21] [39:23] [40:7]
  [41:9] [42:2] [72:23]
csfb [28:14,18,21,25]
  [29:16] [30:4,9] [40:17]
  [41:1,15,19] [42:7,10,13]
  [67:6] [72:8] [73:5]
csr [2:5] [80:25]
cup [64:3]
current [61:4]
currently [18:10]
customer [69:25] [71:17]
customers [34:12] [35:23]
  [69:21] [71:4,19] [73:23]
cut [34:9,10,13] [35:19,21]
cutback [34:24]
cv [7:2]

_____

D

d1 [62:22]
d2 [62:22]
damage [72:17]
damages [28:7] [72:3]
data [31:15] [52:12] [53:14]
  [55:1,2,17,19,24,25]
  [60:25] [62:14]
date [4:11] [6:10,13] [7:7,10]
  [18:7] [25:1] [26:24,25]
  [40:17] [49:18,20] [58:16,17]
  [63:3]
dated [42:13]
dates [17:2]
davidson [67:3,12]
davidsons [67:15] [69:5]
day [45:23] [79:12] [80:22]
days [20:6] [21:2,20,23]
  [23:16]
dcf [42:10] [43:25]

dealing [27:22]
deals [34:2]
dealt [25:20] [26:13]
debt [51:8,12] [58:5,11,13,22]
  [59:6,22] [62:24] [63:3,6]
  [65:6] [77:21,23]
debts [58:25]
decided [19:21]
declarative [48:7]
declare [79:6]
decrease [42:22]
deduce [62:3]
deep [54:12]
deepened [27:2]
deepening [26:14,15]
  [27:15,22] [28:3,6]
default [62:4,8,9,15,16]
  [63:6,15,16,21,24] [71:19]
defaulted [71:7]
defendant [2:2,16]
defendants [5:23]
definition [63:4]
degrees [24:7] [57:11]
delaware [4:9] [9:1] [27:15]
delete [67:12]
delinquency [29:12]
demanded [46:23]
depending [60:5]
depends [60:6] [71:3]
depo [78:2]
deponent [80:17]
deposition [2:1] [4:6,15]
  [5:17] [64:15,19] [78:5]
  [79:8] [80:8,10,15]
derivation [57:8]
derived [41:10] [48:23]
describe [39:15] [50:20]
described [37:13] [42:11]
  [43:16] [52:14] [55:17]
  [56:9] [57:20] [65:4]
describes [30:19]
describing [29:15]
description [3:8] [50:24]
  [52:23] [53:1] [56:5]
desire [16:7]
destroying [72:16]
detail [12:2] [15:23] [32:2]
determination [10:5] [13:23]
  [17:4] [20:17] [54:2,5]
  [55:15]
determine [25:6] [27:1]
  [46:16] [47:6] [60:10,13]
  [77:1]
determined [13:17]
determining [17:1] [51:15,25]
  [52:3] [60:25]
developed [32:10,19,20]
development [9:20]
deviation [65:7]
didnt [12:1] [13:8] [16:21]
  [23:16] [25:12] [26:14]
  [27:13] [44:16] [57:22]
  [75:16]
differ [43:24]

difference [71:16] [76:14]
differences [35:2] [61:7]
different [15:21] [20:11]
    [34:17] [38:24] [51:20]
    [56:10,11,13] [57:5] [68:5
    ,22,25] [71:18]
difficult [15:3]
direct [68:23]
directors [28:15] [30:9]
    [40:6] [67:7]
disclosed [39:15]
discount [17:4] [48:23]
    [50:3] [51:3,14] [67:15]
discounted [11:21] [12:4]
    [13:24]
discuss [26:7]
discussed [21:18] [26:9]
    [30:21] [32:5]
discussion [30:13]
discussions [38:17] [62:1]
dispute [17:11]
disputes [12:22,25]
dissipate [76:3]
dissipating [76:3]
distributed [45:18]
distribution [45:24] [62:20
    ,21] [73:15]
district [4:9] [8:25]
divide [18:20] [65:18]
doctor [5:15] [14:7] [15:20]
    [17:10] [38:2] [64:22]
document [6:17,22] [7:21]
    [29:3,14] [30:7] [41:25]
    [42:2,9,11,13]
documents [3:9] [5:22]
    [10:7,8,9] [12:10,12]
    [14:1] [17:1,3,8,14] [18:25]
    [19:2,4,5,8,13,15,20,21,24]
    [20:1,4] [23:19] [25:3]
    [28:14,18,23] [30:5] [40:15]
doesnt [27:15] [35:3] [40:11]
    [53:4] [54:19]
doing [12:3] [15:25] [24:9]
    [26:17] [33:21] [40:15]
    [66:5] [74:15]
dollar [58:8] [65:25] [77:24]
dollars [65:20,21,25] [68:1]
    [73:14]
domain [66:6,7]
done [8:4] [19:9] [21:19]
    [28:3,20] [29:20,23,25]
    [36:7] [38:16] [39:23]
    [40:8] [41:10,13,14,19,20]
    [42:24] [48:4] [71:1] [74:21
    ,24]
dont [5:19] [6:12] [8:4]
    [12:24] [14:3,13] [15:6]
    [16:14] [20:12,15] [25:4,19]
    [26:19] [27:18] [29:10]
    [32:17] [37:9] [39:1,9,10,12]
    [40:24] [41:3,16] [42:5,8]
    [43:24] [45:2,13] [49:7]
    [50:3,12] [52:22] [63:5]
    [72:23] [73:3] [75:23]

[76:7] [77:18]
down [27:21] [35:21] [64:6]
    [65:24] [67:19] [77:10]
    [78:3] [80:10]
downturn [22:25]
dr [4:6] [20:24,25] [64:15,20]
dramatically [34:4] [58:10]
drawn [27:5]
driver [50:2,4]
drivers [49:25] [50:7]
due [58:11,16] [63:3]
duly [5:7] [80:8]
duration [65:6]
during [22:18] [34:22]
    [80:18]

E

earlier [52:23] [68:17]
early [8:11] [9:22] [23:8]
    [43:5] [54:21]
easier [70:2]
ebitda [43:1]
economic [23:23]
economics [7:6]
economist [7:8,19,25]
economists [59:14]
edwards [7:11,12]
effect [23:2] [51:16] [76:13]
efficient [60:16,17] [61:19]
efficiently [61:10]
eight [9:8]
either [12:11] [49:2] [66:14]
element [54:4]
else [11:16] [21:5] [26:8]
employee [80:20]
employing [11:2]
employment [7:17]
enable [69:20]
end [6:16] [24:13] [45:23]
    [64:14] [72:9] [75:10]
endless [66:16]
engage [73:11]
engaged [34:5]
engagement [7:24] [12:14
    ,17] [17:25]
engagements [7:22] [9:10]
enormous [10:6]
enough [58:22] [69:4]
entered [43:7]
enterprise [44:10,22]
    [45:4,9] [65:5]
enterprises [65:7]
entire [19:7]
entitled [32:9]
entity [37:12]
equal [62:21]
equation [65:9]
equity [51:7,13] [52:1,4]
    [53:23] [57:25] [58:2,3,6,22]
    [59:1,7,15,17,23] [60:4]
    [61:12,17] [62:3] [64:23]
    [65:1,11,15] [66:12,13]
essentially [34:3] [35:21]

estimate [18:21] [55:10]
    [77:7]
et [4:8]
etoys [25:15]
e-toys [25:15]
even [54:10] [57:4] [63:17]
eventually [63:2]
ever [7:17,24] [9:4] [19:12]
    [38:10] [42:24] [43:3]
everything [54:1]
evidence [16:12]
evident [14:1]
exactly [6:21] [24:22]
    [47:1] [50:12]
examination [3:3] [5:13]
examined [5:8] [80:7]
example [18:24] [25:14]
    [30:2] [35:3,7] [36:10]
    [57:15] [61:4,11] [62:6]
    [66:9] [69:22]
examples [7:22]
exceed [58:12]
excellent [60:24]
excess [44:19,20] [63:21,22]
    [67:19] [72:18]
exchange [59:12] [61:13]
exclusive [45:25]
excuse [37:16] [49:9]
executed [79:12]
exercise [15:11] [46:19]
    [47:12,22] [48:12] [51:1]
exhibit [3:9] [5:24] [6:2,6]
exhibits [3:7,11]
existed [34:18] [35:2]
exit [35:17]
expands [52:6]
expansion [22:19] [52:10]
expectation [47:19]
expenses [18:3,6]
experience [14:8] [15:2]
experienced [5:17]
expert [8:9] [10:16] [13:4]
expertise [8:5] [14:4]
exploration [11:1]
expressing [46:15]
extent [68:20] [74:1,17]

F

face [65:5]
fact [22:21] [30:2] [33:21]
    [37:5] [39:1] [49:4] [54:12]
    [68:8,24] [70:24] [74:13]
    [75:9] [76:2,25] [77:8]
factor [55:8]
fair [25:4,5] [55:14] [58:22]
fall [33:15] [34:8]
fama [50:22,23] [51:19,23]
    [52:6] [54:6,7,16,22]
    [56:6,8] [57:3]
familiar [17:13] [36:21]
    [37:5]
far [18:2,13] [24:25] [25:8]
    [31:18,19] [60:11] [70:14]

favorably [26:15]
fee [68:9,10,25]
fees [18:3,5,16] [45:25]
    [69:3] [72:15,16,18,22,23
    ,24,25]
feet [30:3,4]
felipe [2:5] [5:1] [80:5,25]
fellow [10:18]
few [6:17] [66:8]
fewer [36:17]
figure [36:11]
figures [67:14]
file [75:25]
filed [32:22] [73:7]
files [7:1] [17:11]
filing [25:1] [31:22,25]
    [32:1] [33:1,4,13] [74:25]
finally [23:7] [29:2]
finance [69:20] [71:3]
    [73:22]
financeable [71:5]
finances [70:3]
financial [23:22,23] [29:17]
    [31:5] [34:4] [43:12] [67:21
    ,24] [68:3,21]
financing [22:16] [35:23]
    [57:17] [69:21] [73:2]
    [74:5] [75:7,13]
find [22:4,6,8] [23:11]
    [53:15] [65:14] [66:22]
    [77:12]
finds [57:10]
firm [7:10] [8:16] [9:5,11]
    [10:14,17] [11:5,18] [16:25]
    [17:14] [18:17] [19:6,9]
    [20:2,20] [24:17] [28:20,21]
    [29:18,19] [30:24] [31:4]
    [38:6] [41:11] [42:3] [55:5
    ,11] [67:3,15]
firms [14:5] [54:11,20]
first [5:7] [6:6] [8:8,12]
    [10:1] [12:19] [13:8,15,20]
    [14:11,14,16,17,22] [29:20
    ,21] [39:23] [40:7] [41:9]
    [42:2] [44:21] [58:25]
    [62:6] [69:15] [72:23]
    [76:9,21]
fiscal [29:4] [44:22]
five [23:22] [24:4,14] [30:14
    ,20] [31:13,20] [32:9]
    [36:6] [38:3] [39:17] [43:17]
    [53:13,17,18,21] [54:23]
    [55:12] [60:4] [64:6] [66:17]
    [71:16]
fiveyear [30:14,20] [31:13,20]
    [32:9] [36:6] [38:3] [39:17]
    [43:17]
five-year [30:14,20] [31:13
    ,20] [32:9] [36:6] [38:3]
    [39:17] [43:17]
flavell [7:11,12,16]
flow [12:4] [13:24] [34:4]
    [36:12] [63:11] [66:4]
    [74:6,9]

flows [10:23] [11:21,22] [13:6,24] [17:2,3] [31:18,19] [43:17] [46:13,25] [47:19] [49:25] [50:1] [51:10,16] [56:11,13] [57:4] [64:1] [74:4]
fluctuate [58:10]
fluctuated [65:24] [77:23]
focused [12:3]
focusing [52:4]
following [52:19] [69:13]
follows [5:8]
foot [46:21]
footsteps [47:13]
forced [72:9] [76:6]
forecast [36:6] [48:24]
forecasts [36:13] [37:10,11]
foreclosure [35:18]
foregoing [62:7] [79:7] [80:8]
foremost [55:2]
foreseeable [76:4]
forgetting [21:1]
form [7:2] [25:18] [26:18] [27:17] [28:4] [48:11] [49:6,16] [57:6] [80:12]
formula [52:14,23] [53:1,3 ,4]
formulate [39:9]
formulates [51:9]
forth [6:18]
forthcoming [22:8]
forward [33:14] [35:15]
forwarded [14:19]
four [23:21] [24:4]
fourth [69:10]
framework [13:25] [24:20] [26:20]
fraudulent [14:25] [16:11]
french [50:22,23] [51:19,23] [52:6] [54:6,7,17,22] [56:6,8] [57:3]
frequency [61:23]
friend [36:2]
front [6:1]
fti [29:25]
full [7:17] [60:20] [73:6]
fulltime [7:17]
full-time [7:17]
functions [62:23]
funding [69:20]
further [54:25] [68:16] [72:9] [73:21] [76:17,25] [80:19]
future [10:23] [23:3] [58:4] [71:7] [76:4]

G

gamble [59:19]
gene [50:23]
general [53:4] [60:15] [69:16] [71:11]
generate [73:14]

generated [13:22] [33:15]
generous [22:23] [44:19]
gets [16:6] [58:22] [67:18]
getting [10:8] [52:12] [68:17]
give [12:8] [19:21]
given [19:15] [25:2] [33:12] [43:3] [44:25] [46:23] [48:22] [58:25] [60:9] [63:1,25] [75:6] [76:11]
giving [20:3]
glatt [2:9] [4:16,24]
go [5:19] [10:22] [21:14] [35:22] [39:19] [47:13] [48:10] [49:5] [52:16] [55:22] [63:15] [64:6] [68:12] [69:16] [72:14] [74:2] [76:12]
goes [54:1,4] [57:16]
going [9:8,21] [11:9] [24:25] [25:23] [33:14] [34:7,9,10 ,11,13,21] [35:15,20,22] [37:22] [46:6] [47:16] [53:17,18,21] [54:20] [58:18] [63:20] [64:10,16] [65:19,20] [68:10,12,13,14 ,18,19] [70:22] [73:12,13,18 ,21] [74:24] [76:1,2,3,23] [77:9,14] [78:9]
goingconcern [46:6] [73:18] [76:1]
going-concern [46:6] [73:18] [76:1]
goingforward [34:7,21]
going-forward [34:7,21]
goldman [25:15]
gone [45:11,12,20] [49:2] [69:23] [77:9]
good [5:15] [70:14]
gotten [76:14]
greater [42:24] [68:20]
gross [46:2,14]
group [34:17] [71:17]
growing [43:11]
guaranties [66:20] [67:1,22 ,25] [68:19]
guarantying [69:12]
guess [9:23]

H

half [65:17,19,20,25]
halpren [10:18,19] [20:9]
halprens [11:17,19]
hand [58:15] [62:24] [80:22]
happen [75:14] [76:6]
happened [49:4] [70:5] [73:4,10]
happy [37:18] [64:9]
havent [33:23] [74:21]
having [5:7] [62:12]
head [78:3]
heard [77:19]
heavily [34:5]
heckinger [8:23] [9:4,17]

help [66:18]
helpful [22:4] [23:12]
hereby [79:6] [80:6]
herein [79:9,10]
heres [36:2] [74:3]
hereto [79:10] [80:18]
high [22:23] [36:16] [54:18] [58:9] [63:17] [69:4]
higher [71:25]
hindsight [71:15]
history [62:13]
hit [58:19]
hml [54:17,21]
hockey [42:20]
holt [2:24] [43:7]
home [22:22] [58:19] [69:24] [70:1,7,11,12] [74:24]
homes [10:3,5,6,11] [22:17] [24:25] [29:3] [30:2] [32:9] [36:22] [37:3,6] [39:4,11] [40:8] [50:10] [72:3] [74:11]
hoped [57:10]
hopedfor [57:10]
hoped-for [57:10]
hopefully [73:11]
hot [64:4]
hour [78:11]
hourly [18:1,9]
hours [18:12,14,16,18,22]
housing [8:2]
hypothesis [74:23]
hypothesized [49:3] [50:1]
hypothetical [10:24] [47:2 ,3,20] [48:13] [70:25]

I

ibbotson [55:2,6]
id [37:18]
idea [11:8] [13:16] [41:17] [70:1]
identification [3:7] [5:24]
identified [65:9]
identify [4:19]
ill [64:8] [66:22]
im [10:13] [14:16] [19:11] [31:1] [33:5,19] [49:20,21] [53:5] [57:21,23] [60:17,21] [63:23] [64:9] [72:23]
imagine [17:22]
immediate [77:9]
immediately [45:21] [73:8]
impact [23:8] [26:1] [53:5,7]
impacting [23:2]
impacts [69:13]
implication [68:17]
implications [27:5] [43:24] [54:6] [60:25]
implies [54:7,22]
imply [46:24] [62:7] [76:5]
important [73:16]
impression [16:6]
inc [25:15]
include [43:12] [59:25]

[60:2]
included [5:16] [17:17] [20:1] [36:6]
includes [7:21]
including [22:16] [41:2]
income [34:4]
increase [23:1] [42:23] [62:7]
increased [66:20]
indeed [22:17]
independent [7:16] [37:12] [40:25] [41:15]
indicate [44:14,17]
indicated [22:14] [25:22] [27:21,24] [28:5] [32:24] [41:8] [62:16]
indicates [7:5] [14:7] [75:23]
indicator [54:24,25]
industry [22:19] [23:1] [43:5,11] [53:15,18,21] [54:8,10,12,19,20] [55:3,5 ,7] [57:8,10] [59:20] [60:1] [71:11,25]
industrywide [71:25]
industry-wide [71:25]
influenced [16:7]
information [3:14] [12:8,16] [23:15] [26:16] [28:11,13,17] [29:1,7,9,11,12,13,15,16] [39:8] [41:1] [60:20,23] [61:1,3,9,10,14] [62:2,4] [61:1,3,9,10,14] [62:2,4] informed [55:16,18] [72:17 ,19]
inga [2:25] [4:13]
initial [42:21]
initialed [79:9]
initiated [27:8]
ink [79:9]
input [41:15]
inputs [56:8,23] [57:2] [62:7] [65:4]
insinuation [13:14]
insofar [70:5]
insolvency [26:14,15,23,25] [27:1,15,22] [28:3,6]
insolvent [13:11,18] [15:5 ,14,18] [16:2,13] [25:17]
inspection [58:16]
installment [73:22]
instead [36:1] [68:11]
instructed [3:17]
interest [13:17] [15:25] [52:16] [60:7] [65:8]
interested [11:20,24] [80:19,21]
internal [21:16] [28:24,25] [29:3] [31:25] [36:12]
internally [13:23] [35:14] [40:9]
investigate [75:14]
investigated [74:17] [75:6]
investment [47:14]
investor [33:3,11]
involved [8:1] [10:2,11]

22/10/2007  TENNENBAUM, Michael (Proofed)

[11:7,8] [15:9] [18:12,19]
[34:23] [39:3] [55:16]
[61:21]
involving [9:20,23] [10:3,4
,15] [11:21,25] [48:14]
[69:11]
isnt [24:8] [35:24] [55:22]
[61:1,2] [74:13] [75:9]
[76:17]
issue [13:5,6] [26:13]
[27:3,4] [45:13] [60:8]
issues [10:4] [11:7] [13:1]
[20:12] [21:15]
item [44:9,21]
itself [46:12] [49:3] [57:10]
[71:1]
ive [7:12] [9:19] [52:24]
[66:2]

J

jason [17:2]
jensens [53:16] [54:3]
journals [23:23]
judgment [55:16,18,24]
[57:1] [59:16]
july [42:16]

K

keep [49:20] [74:14]
ken [50:23]
kick [68:20]
kind [24:19] [46:22] [55:17]
[58:1] [71:25]
kinds [33:2,15,16] [34:6]
king [8:14,17] [9:3,25]
[11:14] [12:20] [13:9,13,15]
[14:11,20,22] [26:7]
kings [11:10]
knew [15:6]
know [5:19] [14:3] [15:6]
[17:10,16] [18:18] [19:20]
[20:12,15] [26:19,21]
[27:19] [31:20,23] [32:3,13
,17] [36:25] [38:8,13,15,17]
[39:1,2,9] [40:16,17,22,25]
[41:3,12,16,23] [42:5,8]
[45:13] [50:10,12] [61:3]
[65:13,22] [66:21] [68:22]
[72:24,25] [73:3] [74:1,8]
[75:23] [76:7] [77:16]
knowing [19:17] [34:9]
knowledge [8:5] [17:21]
[31:8] [77:18]
knowledgeable [22:6]
[33:3,11] [46:22,23]
known [42:20] [53:16]
kornev [2:25] [4:13]
kvarda [21:7]
kvardas [21:10]

L

lack [61:6]
laid [30:14]
large [23:1]
largely [10:24] [35:25]
last [6:17] [72:2]
lasted [49:4,13,23]
late [9:23] [11:13] [22:18]
[23:7] [33:19,20] [34:22]
[39:20] [40:10,21] [43:23]
[45:17] [46:13]
later [39:15] [43:17] [62:10]
[68:18]
law [2:9,10,18] [24:20]
lawyer [10:17]
lawyers [11:17] [14:4]
[19:9] [20:7,20]
laymans [58:1]
lays [6:18]
lead [10:16]
leading [13:23] [23:1]
[68:21]
learn [14:14]
learned [14:16,20]
least [29:13] [40:7] [41:10]
[64:6] [72:5]
led [22:10,15,18] [32:23]
[33:25] [55:9]
left [59:7,22]
legal [4:13] [5:1] [78:7]
less [18:23] [36:18] [44:8]
[50:13] [58:18] [62:22]
[63:20] [74:1]
lesser [74:1]
let [6:3] [35:23] [39:24]
[50:25] [58:20] [69:22]
lets [69:16,23] [70:3] [76:8]
letter [6:7,10]
level [71:20]
likelihood [58:12] [59:16]
[62:20,21]
likelihoods [62:4]
likely [10:4] [13:1] [46:17]
[47:7] [48:16,18] [60:6]
[63:12] [75:10]
line [36:11]
lines [46:9] [61:6]
linklaters [2:17] [4:18,21]
liquidate [45:22] [74:8]
[76:7]
liquidated [49:2]
liquidation [4:7] [12:22]
[14:12,15] [15:4,12,17]
[16:1] [22:2] [75:12] [77:10]
liquidity [74:14,18] [75:7]
[76:22] [77:2,5,13]
list [23:22,24] [24:8,14]
listed [24:3] [25:11,25]
litigation [10:3,12] [13:2,25]
[17:13]
little [51:4] [62:13]
llp [2:17]
loan [22:23] [34:11] [36:1,3
,16] [70:4] [71:12,13]
[72:1] [73:25]

loans [22:21] [69:12]
loantovalue [22:23] [34:11]
[36:16] [70:4] [71:12,13]
[72:1]
loan-to-value [22:23]
[34:11] [36:16] [70:4]
[71:12,13] [72:1]
located [4:16]
long [7:6,18] [30:4] [60:2]
[70:22]
look [18:24] [19:13] [24:15]
[26:5,14,23,24] [27:23]
[28:9] [30:11] [46:20]
[53:14] [55:22,23,25]
[57:24] [74:3]
looked [13:25] [19:2,8]
[24:5,15]
looking [10:22] [14:18]
[35:15] [37:10] [52:7]
[54:6] [55:1]
looks [27:14] [47:16] [52:3]
[79:3] [80:3]
los [2:3,13] [4:1,17] [9:21]
[79:3] [80:3]
lost [66:2] [70:13]
lot [10:9] [14:8] [22:21]
[32:2] [34:23] [35:18]
[55:23,25] [60:22,23]
[61:9,20,22] [69:25]
lots [24:11] [33:21,22]
lower [36:15,19]

M

major [62:13,14]
majority [18:15]
making [36:16] [55:16]
manufacture [70:11]
manufactured [8:1] [30:2,3]
manufacturing [22:20]
[34:13] [35:8,16] [36:18]
[69:24] [74:11]
march [42:13]
marked [3:7,11] [5:23]
[6:2]
market [48:15] [52:5] [54:18]
[60:24] [61:3,19] [64:12]
marketplace [46:21] [47:16]
[48:22] [54:19] [58:8]
markets [51:9] [59:16]
[60:16,17,21] [61:5,10]
marks [64:14]
match [71:24]
material [24:19]
materials [5:16] [17:17]
[24:3,5] [41:12]
math [62:14] [70:2]
mathematical [52:14]
matter [4:7] [6:4] [7:25]
[8:10,22,23,24,25] [9:4,11
,13,20,22] [10:1] [17:11]
[19:1] [20:8,11,16] [31:7]
[56:7] [57:2] [58:21] [60:15]
[71:11]
matters [10:11,15] [11:20]

[14:8]
maturity [62:25]
may [14:16] [39:8] [60:5]
[73:25]
maybe [66:18]
mean [35:11] [39:24] [42:17]
[43:13] [56:11] [58:1]
[72:6]
means [53:19] [58:3] [68:16]
meant [16:9]
measure [28:7] [61:22]
mechanical [56:7]
meeting [10:25] [11:1,6,10
,12,14,16] [12:9] [20:5]
[21:12]
meetings [21:11]
members [16:25]
memorandum [28:24]
memos [28:24,25]
mention [23:16]
mercy [62:13]
merrill [4:13] [5:1] [78:7]
mess [61:4]
met [20:8,22] [21:5]
meter [60:24]
methodological [12:3]
methodologies [11:9]
methodology [10:21]
[21:18] [39:15] [47:23]
michael [2:1] [3:4] [4:6]
[5:6] [64:15,20] [78:5]
[79:6,18]
mid [9:22] [11:13] [22:18]
[41:22] [43:23]
mid2001 [41:22]
mid-2001 [41:22]
middle [65:9]
miller [29:23] [31:2,3]
[38:6,10]
million [44:4,7,11,15,18,23]
[45:4,17,23] [46:3,14]
[47:19] [48:20] [50:9,13,14]
[65:11,18,19] [66:20,21]
[67:1,9,11,19] [68:1]
[69:1] [72:5,7,18] [73:14]
mine [17:6]
minus [62:19] [63:4]
minute [64:3]
minutes [64:6]
missed [52:24]
mobile [22:16,22] [69:24]
[70:1,7,11,12] [74:11]
model [50:22] [51:19,23,25]
[52:2,6,11,15,21] [53:3,20]
[54:1,7,22] [55:4,6] [56:6,8]
[57:3] [60:12] [64:24]
[69:11,18] [72:4,10,15]
[77:10]
models [60:10,12,20]
moment [37:17] [66:23]
[69:15]
monday [2:4] [4:1]
money [60:7] [70:13]
monitor [4:12]

months [31:24] [60:3]
morning [5:15,20] [15:10]
mortgage [61:4,5]
mortgages [68:11] [69:21]
[71:7]
mouth [25:5]
move [48:7]
moved [71:11]
mr [3:5] [4:21,23] [5:11,14,25]
[7:16] [9:14,20] [10:19]
[11:17,19] [17:17] [19:25]
[20:3,7,9,21,22,24] [21:3,6
,7,10,13,21,25] [22:4,10]
[23:12,17] [24:2] [25:18,24]
[26:10,18] [27:7,9,10,13,17]
[28:1,4,8] [32:4,6,24]
[33:5,9] [37:18] [38:1,18]
[41:5,11,13,14] [43:7,8]
[47:9,10,21] [48:6,9,11,25]
[49:6,7,9,10,16,19] [50:12]
[53:11] [57:6,14,21] [64:21]
[67:15] [69:5] [71:9] [72:20
,21] [77:25] [78:1,3]
ms [8:17] [9:3,25] [11:10,14]
[12:20] [13:9,13,15] [14:11
,20,22] [26:7]
muir [19:25] [20:3,7,21]
[21:3,6,13,21,25] [22:4,10]
[23:12,17] [32:4,6,24]
[38:18] [41:5,14] [50:12]
[71:9]
muirs [41:11,13]
multiplied [65:14]
myself [19:2]

N

name [10:17] [29:18]
named [10:18] [50:23]
[80:7,11]
names [11:18] [21:10]
nature [11:1] [12:21,25]
nd2 [62:19] [63:1,4]
necessary [54:9]
need [5:19] [51:1] [53:24]
[54:16]
needed [15:4,6]
needs [16:12] [68:24]
negative [23:5] [53:17]
net [36:10,19]
new [2:20] [4:14] [10:14]
[11:6] [23:3] [59:12] [61:13]
[78:8]
next [30:20] [50:16] [60:3]
[76:4]
nine [44:9,21] [65:17,18]
no [3:8] [4:6] [7:20] [9:12]
[11:4] [12:10,15,18] [13:16]
[15:18] [16:14] [18:15]
[19:17] [20:23] [24:11]
[26:2,4] [29:24] [30:1,16]
[34:20] [38:9,12] [39:12]
[41:17] [44:9] [48:1] [49:20]
[64:15,19] [66:14] [70:1]

[73:6,21] [77:1,4,6] [78:1
[80:6]
nobody [16:6]
nods [78:3]
none [3:12,15,18] [26:3]
nonlawyers [12:5]
nor [27:19] [53:8] [80:20]
normal [62:20]
north [20:5] [21:2]
noted [79:9]
nothing [27:4] [80:9]
noticed [4:17]
notion [57:19]
november [25:2]
nowadays [70:1]
nowhere [77:15]
number [4:10] [22:14]
[32:23] [35:1,4,16,17]
[36:11] [53:15] [61:24]
[64:25] [65:13,14] [67:2,9
,11,18,21] [69:25] [78:5]
numbers [36:5] [39:10,16]
[43:1] [65:8] [67:12] [69:5]

O

oac [68:10]
oakwood [7:25] [9:11]
[10:1,3,5,6,11,15] [11:3,5
,7,22,25] [12:13,17] [13:5,7
,11,17] [19:8,13] [21:17]
[22:11,15] [23:9] [24:25]
[25:6,16] [28:12,16] [29:3
,16,17,20] [30:10] [31:7,10
,12] [32:1,9] [33:22] [34:2,8
,17,18,21] [36:22] [37:12]
[40:7,8] [46:17] [47:8]
[52:21] [54:11] [57:9]
[59:9] [60:1] [66:12] [67:7]
[69:20,23] [70:3,5] [71:3,6]
[72:3] [73:4]
oakwoods [67:21,24]
[69:18] [71:2]
object [48:6]
objection [25:18] [26:18]
[27:17] [28:4] [48:11]
[49:6,16] [57:6]
obligations [58:5,11,13,17]
[59:22]
obtain [74:5]
obtained [42:3] [54:5]
[55:1]
obtaining [17:3]
occasions [8:20] [9:7]
occurred [67:13]
october [2:4] [4:1,11]
[76:21] [77:13]
odd [9:8] [18:4] [68:1]
off [37:22] [58:4] [59:21]
[64:10,16] [75:13,21,24]
[76:10,19] [78:9]
offer [39:9] [46:20] [48:16,19]
offered [48:15]
office [7:1] [19:12] [21:10]

offices [2:9] [11:19]
oh [39:12]
ohc [4:7] [14:12,15] [15:4,6
,12,25] [29:4] [32:11]
[44:10] [62:7] [64:23]
[69:11] [72:14,17]
ohcs [69:14]
okay [7:14,17,21] [8:4,8,15
,17,20,22] [9:25] [10:10]
[12:8] [14:11,21] [15:10]
[16:15] [17:10] [18:9,24]
[19:4,7,23] [20:3,14]
[21:8] [22:4,10] [23:11,21]
[24:3,8] [25:4,14] [27:13]
[31:11,17] [36:5,21] [37:15
,21] [38:13,20,23] [39:19]
[40:16] [41:4] [42:4] [44:2]
[45:9] [49:1] [50:10,20,24]
[51:19] [57:1,19] [58:20]
[59:9] [61:11,22] [62:18]
[66:9,18,25] [67:4] [70:10
,15,21] [71:9,22] [72:2,12,14]
[73:20] [74:7,13,17,22]
[77:6,12,21]
one [8:21] [9:19] [13:1,2]
[15:21] [26:21,22,24]
[28:19] [29:6,16] [30:8]
[37:21] [38:24] [49:25]
[51:23] [52:25] [53:15]
[54:3] [55:2] [57:9] [62:19
,24] [63:4] [64:3] [68:15]
ongoing [32:25]
onto [23:22]
ooo [4:3] [78:13]
open [22:8]
operate [46:9]
operation [69:11] [72:4]
operations [34:7] [35:17]
operator [4:12]
opinion [15:5,17,23] [44:13
,24] [45:3,7] [46:15] [59:5]
[61:7] [75:19,20]
opportunity [58:19]
opposed [41:1,13]
option [57:25] [58:2,4]
[59:4]
order [53:22] [68:8] [74:14]
orderly [73:12]
ordinary [58:21]
organizations [31:5]
organizing [17:1]
original [78:6]
otherwise [71:4]
ought [50:2,9] [56:2]
outcome [80:20]
outside [29:18]
outstanding [61:24] [65:15
,18] [68:11]
overly [22:16,23]
overstated [53:20]
owner [58:3]
ownership [47:1] [51:11]

P

p.m [78:11]
page [3:3,8] [6:6,17] [7:21]
[23:21,22] [24:4,13,14]
[25:11] [28:9,11] [29:11,13]
[30:1,15,19] [32:8] [36:11]
[37:11] [38:3] [39:19]
[41:18] [42:5] [43:9] [44:9
,21] [52:18] [57:20,22,24]
[62:1,5,17] [64:22,25]
[65:4,9] [66:23,25] [67:10
,11] [69:9] [72:2]
pages [6:17] [28:18] [29:7]
[30:20] [52:13] [56:9]
[66:23]
paid [17:24] [18:7] [50:10]
[58:22,25] [59:6] [68:17,18
,19] [69:3,4] [72:14,23,25]
pam [8:14]
papers [17:12]
parameters [52:20] [59:24]
[60:9]
part [21:11,23] [35:9] [38:15]
[40:8] [41:10] [42:9] [43:5]
[44:17] [51:14] [54:21]
[57:17] [70:19]
particular [6:22] [8:5]
[25:7,17] [33:25] [58:7]
parties [35:24] [80:21]
partnership [7:15]
past [36:17]
paul [2:18] [4:18,21]
pause [23:25] [64:12]
pay [54:19] [58:4,14,18]
[59:21]
penalty [79:7]
people [18:17] [21:9] [71:15
,17]
percent [31:1] [53:13]
[54:23,24] [55:7,12] [62:10
,11] [63:22,24] [67:15]
[68:15] [70:4] [71:12,16,19
,23] [77:20]
perform [15:15]
performance [71:18]
performed [15:11] [27:6]
period [32:25] [58:15]
[66:11,15] [73:6] [80:18]
periods [28:16]
perjury [79:7]
permanent [51:16]
perspective [22:20]
ph.d [2:1] [3:4] [5:6] [79:6,18]
phone [8:13]
phonetic [8:14] [67:8]
pick [69:25]
place [4:15] [65:22] [80:11]
places [56:1]
plaintiff [2:8] [4:24] [16:10]
plan [30:14,20] [31:20]
[32:9,11,13,20,21,24]
[34:14] [36:6,22,25] [37:7]

[38:3,24] [39:2,17] [43:17]
plants [34:13] [35:16]
play [31:7]
please [4:19] [5:3,10]
[37:22]
plug [65:8]
plus [18:3] [29:16,18]
point [16:4,5,9,10,14]
[25:7,17] [26:24] [31:13]
[52:19] [58:7] [62:6] [69:10]
[70:6,13,25] [72:2,10]
[76:2]
pointed [27:12]
points [21:19]
popular [60:11]
possibility [8:9] [11:2]
[73:24]
possible [62:2] [74:22]
[75:3,5]
potential [73:15]
practice [7:16]
preceded [36:20]
preceding [7:15]
precisely [33:16] [42:8]
preferences [14:24] [16:11]
preliminary [67:3]
premium [52:25] [53:13]
[54:5,23] [55:1,10,14,15,23]
[56:1,2]
premiums [57:8]
prepare [6:19] [24:23,24]
[38:14]
prepared [6:23,24] [7:3]
[17:16] [31:21,22] [38:5,21
,23] [40:17] [75:8]
preparing [16:19,21] [24:6]
present [2:23] [10:22]
[13:6] [46:24] [50:6,15]
[51:15] [67:14]
presentation [42:1]
presentations [28:15]
[30:8] [39:23] [40:5,6,21]
[67:6]
presented [41:9]
presently [9:10]
presume [43:10]
presumption [63:9]
pretty [33:17] [61:16]
previous [7:22]
previously [3:11]
price [39:9] [46:18] [47:23]
[48:5] [53:20] [59:15]
[61:17] [62:23] [65:15]
[68:4]
pricing [51:24] [52:2,11,15
,21] [53:3,25] [55:4] [56:8]
[57:3]
primarily [12:3] [17:5]
principal [74:14]
prior [7:24] [32:1,25] [33:4
,12] [37:5] [38:16] [40:8]
[41:10] [80:7]
priority [69:4]
probabilities [63:16]

probability [58:9] [62:8,9,15
,16,19] [63:2,5,15,21,24,25]
probably [9:8] [16:3] [18:15]
[26:6] [72:11]
problem [27:14]
problems [35:19] [71:10]
proceeded [13:22] [45:22]
proceedings [45:21] [78:12]
[80:14]
proceeds [48:20] [73:1,22]
process [5:17] [10:8] [21:16]
[33:12] [35:10,12] [49:4]
[50:25] [51:15] [69:18,19,23]
[70:21] [71:1] [75:11]
product [17:6] [23:4] [42:6]
professional [6:18,22]
professor [7:6,18]
project [9:21,23]
projected [42:23]
projection [42:5]
projections [21:18] [29:4,17]
[30:14,20,21,23,25] [31:13]
[32:6,9,10,19,23] [33:1,2,10
,12,16,17,18,22] [34:2,6,16
,20] [36:7,20] [38:3,5]
[39:6,20,21,22] [40:5,10,12
,16,23] [41:8,18,19,22,24]
[42:9,15,19,21] [43:10,22
,23] [44:1,25] [46:10]
[50:16,17] [54:13] [56:4]
[63:11,12,13,18,19] [66:4
,5,7,10,14,15,16] [68:6,9]
properly [6:13]
proposed [32:11,20,24]
[37:8]
proposition [53:4]
prospect [13:6] [34:4,8]
[46:13,25] [59:19] [74:4]
prospectively [13:3]
prospects [33:14] [74:6,9]
provide [10:14] [13:3]
[15:7] [24:19]
provided [10:20] [17:18]
[18:25] [19:3,4,5] [69:19]
[75:8] [80:17]
providers [55:2]
providing [35:22]
provisions [36:21]
public [66:6,7]
publicly [59:10]
published [66:11]
purchase [70:4]
purchaser [47:3,24,25]
[48:2] [70:4] [75:25]
purchasers [22:22] [47:7
[59:19]
purpose [21:12] [23:18]
[24:18]
purposes [51:25]
put [6:1] [15:3] [25:4]

Q
───────
qualification [45:2]

qualifications [6:18,23]
qualified [36:18]
quarterly [70:21]
question [11:24] [15:21,22
,23] [19:11,18,19] [25:16,21]
[41:4,23] [47:5] [48:3,7]
[49:8] [72:18]
questions [3:17]
quick [54:14]
quickly [25:20]
quite [34:15] [43:6] [44:19]

R
───────
raft [10:7]
ran [66:16]
range [50:14] [55:12] [56:3]
[77:20]
rapid [42:22] [75:1,11]
rate [18:9] [46:22,24] [50:21]
[51:3,7,14,25] [52:3,5,7]
[53:23,25] [54:2,8] [65:8]
[67:15] [68:14]
rates [17:5] [47:17,18]
[48:23] [50:3] [53:8,20]
[55:3] [60:7]
rather [23:20] [34:17]
[36:19] [71:18] [74:8]
ratio [36:16] [70:5] [71:12,13]
rationalization [34:14]
[35:11]
rationalizations [35:9]
ratios [22:24] [34:11] [52:9]
[72:1]
re [31:4]
reach [43:20] [63:5]
reached [26:1]
read [25:10,12] [33:6,8]
[79:7]
realize [45:17] [73:17]
realized [46:3,13] [47:20]
[48:20] [53:20] [70:7]
reason [23:14]
reasonable [55:10] [59:25]
[60:13]
reasonably [58:9]
recall [8:3] [11:18] [12:10,11
,24] [14:13] [21:22] [25:19]
[27:18,19] [29:10] [37:9]
[40:14,15] [42:1]
receivable [70:8]
receive [16:17,21,22,23]
received [12:10,13,17]
[19:20] [75:24]
recent [9:19]
recess [37:23] [64:17]
recession [23:7]
recognize [27:15]
recognized [14:23] [71:16]
recollection [8:13] [12:2]
[15:1] [26:13] [29:5] [40:20]
record [33:8] [37:22,24]
[64:10,13,16,18] [78:9]
recover [14:24] [16:11]

recovered [77:7]
recovery [43:11] [77:16]
reduce [35:16,17] [67:13]
reduced [34:3] [37:13]
[80:12]
reduction [35:4,8]
reductions [73:1]
referred [3:11] [35:10]
reflect [34:24] [35:1] [57:4]
[59:15]
reflected [46:9]
reflects [59:4,18]
refused [72:8]
regard [13:13]
regardless [57:12,15]
relate [51:21]
related [20:16]
relating [72:15]
relationship [20:17] [54:18]
[69:17]
relative [54:18] [60:19,20]
[61:24] [62:23] [80:20]
relatively [23:8] [60:17]
[61:18]
relevant [13:11] [16:12]
relied [23:19]
remain [50:1,3,5,8,9] [76:23]
remains [57:16]
remember [6:21] [10:16]
[26:12] [30:7]
remembering [62:12]
reorganization [31:6]
[32:11,13,20,21] [36:22]
[37:1,7] [38:24] [39:2]
replace [75:7]
report [5:16] [6:2,4,12,13,16
,20,24] [7:3] [16:15,19,22]
[23:14,21,24] [24:6,13]
[28:9,20] [29:19] [32:8]
[36:6] [38:4] [39:16] [40:11
,17,18] [41:2] [43:17]
[44:9,16,17,21] [50:16]
[57:20] [62:1] [63:14]
[66:19] [69:9]
reported [24:14]
reporter [5:1,3] [33:7]
[37:16,20] [80:5,18]
reports [66:13]
repos [23:3]
repose [23:5]
repossession [29:12]
repossessions [23:2]
represent [4:20] [18:14,16]
[40:25] [41:19] [61:18]
represents [41:20] [42:6]
request [11:11]
requested [3:14] [80:16]
required [47:17,18] [51:7,10
,25] [52:3] [53:8,23,25]
[54:2] [55:3]
respect [8:1] [10:15,20]
[11:6] [13:3,4] [17:4,15]
[19:1] [20:10] [21:15]

[28:3] [31:5] [34:12,16]
[40:10] [41:17,22] [42:4]
[47:17] [48:3] [50:24]
[53:14] [55:3] [65:5]
response [30:16]
result [26:23] [40:14] [48:16]
[52:12] [65:2] [72:3] [74:25]
resulted [52:19]
resulting [22:25] [47:19]
[65:2] [67:14]
results [48:13,17,19] [68:6]
[71:19] [75:10]
resume [14:7]
retail [22:20] [35:4,17,23]
retained [78:7]
retrospect [26:6]
return [46:22,24] [47:17,18]
[51:7,8,10] [52:1,3,5,7]
[53:8,21,23,25] [54:2,8]
[55:3]
revenue [34:21]
revenues [42:22,24] [43:11
,12]
review [10:9] [25:13,20]
[80:15]
reviewed [23:23] [40:15]
[42:3]
right [5:15,17] [6:1,8,16,25]
[7:8] [9:1,18] [12:19]
[14:7,25] [17:24] [19:10]
[20:19] [24:10] [25:10]
[29:17] [30:15,17] [32:5,8
,11,18] [35:24] [37:3,13,19]
[38:6,25] [39:4] [40:4]
[43:18] [44:11] [47:3]
[48:10] [49:10] [50:18]
[51:17] [52:16] [55:20]
[56:4,21] [59:1,10] [69:4,9]
[70:8,13,16] [76:17]
risk [53:9,13] [54:5,14,23]
[55:1,6,11,15] [56:2]
[65:7]
riskfree [65:7]
risk-free [65:7]
riskier [54:11]
riskiness [54:9,10]
role [31:7]
room [43:7]
roughly [18:18,20]
rounded [44:11,23] [67:19]
rpr [2:5] [80:25]
rule [64:5]
ruled [28:6]
rules [5:19]
ruling [27:21]
run [58:19]

S

sachs [25:15]
sale [39:3] [45:17] [46:14]
[47:2,20] [73:12,18]
sales [22:16] [23:3] [35:5,17]
[36:11,16,19] [73:23,25]

saw [14:21] [17:14] [66:7,14
,16] [67:5]
say [11:20] [14:21] [18:15]
[24:15] [25:5] [27:5] [31:11]
[36:2] [39:24] [40:1,16]
[43:9] [44:9,16] [50:22]
[52:18] [55:23] [56:1,18]
[58:1] [62:6,9] [66:19,25]
[67:25] [69:10] [72:3,7,14]
[75:18] [76:18]
saying [36:1] [53:22] [59:3]
says [32:8] [44:21]
scale [34:3] [37:13]
scaledown [34:3]
scale-down [34:3]
scanned [25:22]
scenario [49:15] [76:20]
[77:14]
scholes [60:12,13] [64:24]
[65:9]
scope [24:22]
second [37:21] [52:18]
[54:4]
sections [30:3] [50:20]
securit [70:24]
securities [21:16] [61:5]
[69:13]
securitization [29:11]
[34:25] [69:12,17,19]
[70:15] [71:1] [75:11]
securitizations [23:6]
[34:6,10,24] [35:19,21]
[67:13] [69:2] [70:22]
[72:9] [73:6] [74:15] [75:8
,22]
securitize [73:22,25]
seek [75:25]
seeking [16:11]
seemed [22:9]
seems [58:24]
seen [27:11] [33:21]
self [42:10]
selfdescribed [42:10]
self-described [42:10]
sell [37:6] [48:16,19] [69:24]
[74:2,3,5,9]
sellers [61:14]
selling [74:11]
sensitivity [52:4,7]
sent [17:22] [24:17] [27:11]
sentence [42:18] [43:9]
[48:8]
separate [20:15,16]
september [29:5] [39:14]
[43:16,21] [44:3,6,10]
[45:5,10,11,14,21] [46:16]
[47:7] [48:18] [49:1,15,23]
[50:7] [57:12,13] [62:8,10]
[63:10,23] [64:23] [65:12,16
,23] [69:1] [72:8] [73:5,14]
[74:23] [75:19,22,25]
[76:11] [77:21]
series [21:11] [35:14]
[63:8]

serve [8:9]
served [7:25]
service [43:12]
services [34:4]
servicing [68:9,11,25]
[69:3]
set [29:3,16] [31:13] [33:25]
[34:2,20] [39:16] [43:22]
[56:21] [63:12]
sets [43:25] [50:15] [56:13]
several [20:6] [21:2,20]
[31:24] [40:19] [49:4,13,24]
severe [23:8]
shape [34:17]
shapiro [20:24,25]
share [12:12,16] [58:8]
[65:20,21,22]
shares [61:12,14,24] [65:15
,18]
shes [8:16]
shop [41:11,13]
short [37:17] [66:15]
shorthand [80:5,11]
shortly [14:19,22]
showing [42:21]
shown [41:18] [42:5]
shrinks [58:17]
shut [75:13] [77:9]
sic [17:17]
side [17:12]
sides [61:2]
significant [35:4,7]
similar [61:3]
similarly [42:4] [43:1]
simply [47:22] [72:8] [73:1
,5] [74:24] [75:22]
simulate [48:13]
single [30:3]
situation [58:6,24] [59:15]
[61:11]
sivs [61:5]
six [24:13,14] [25:11]
[60:3,5] [66:17]
size [52:8,25] [53:5,7]
[55:14,23] [56:1] [62:23]
[63:6]
slightly [67:18]
socalled [37:7] [39:16]
so-called [37:7] [39:16]
sold [37:1,3] [46:11,12]
[49:3] [70:7] [77:8]
sole [16:15]
solutions [4:13] [5:2] [78:7]
solvency [10:6] [11:25]
[13:5] [14:6] [24:25] [31:12]
solvent [13:17] [15:13,18]
[25:6,16]
somebody [15:2] [26:8]
[33:13] [62:13] [76:6]
someone [38:5] [48:5]
someplace [55:22]
something [15:9] [18:23]
[20:16] [30:13] [39:20]
[50:22] [51:20] [59:6]

[62:15] [65:21,25]
sometime [32:15,21] [34:15]
somewhat [63:19]
somewhere [50:13] [52:25]
[56:2] [66:18]
son [17:3] [27:12]
sorry [17:20] [33:5,19]
[53:5] [57:21,23] [63:23]
[66:2]
sort [19:9] [22:1] [28:7]
sorting [19:7]
sought [14:24] [73:11]
source [23:15] [27:25]
[28:12] [38:15] [65:1]
[67:1,9,11] [74:14] [76:22]
[77:13]
sources [29:6] [38:13]
[74:18] [75:7] [77:2]
speak [12:1] [20:25]
specializes [31:4]
specific [53:9,13] [54:5,10
,23,25] [55:6,11,15] [56:2]
[66:14] [77:18]
specifically [12:24] [29:10]
specify [48:21]
speculative [59:18]
spent [17:5] [21:2] [23:16]
spoke [10:17] [12:19]
stack [3:9] [5:22] [17:17]
staff [16:25]
stamp [28:22] [29:21]
stand [37:7] [39:6]
standalone [37:7] [39:6]
stand-alone [37:7] [39:6]
standard [7:2] [65:6] [71:12]
standish [20:22]
stars [2:3,11] [4:17]
start [38:3] [57:24]
started [56:4]
starting [6:17] [31:12]
[37:11] [57:20] [62:1]
state [4:20] [7:6,18] [79:1]
[80:1,6]
stated [63:15]
statement [6:22] [67:21]
statements [63:9] [67:25]
[68:4,21]
states [4:8] [35:18] [68:22]
status [24:20] [68:25]
steps [35:14] [46:21]
stick [42:20]
stock [52:5] [59:10,12]
[61:13] [66:12]
stop [39:24] [73:6]
stopped [75:22]
stream [34:22]
street [4:14] [78:8]
strike [48:6,7] [50:25]
[70:24] [75:18] [77:14]
strong [42:22]
stuff [24:9]
stutman [2:9] [4:16,23]
[6:7] [8:16] [9:4,11] [14:5]
[19:6,9,16,21] [20:2,7,20]

[24:17] [26:8] [28:21] [30:24]
[42:3]
stutmans [19:12]
subsequent [31:22,23]
subsequently [20:1]
subset [19:16]
substantial [23:9] [43:11]
[58:13]
substantially [63:21]
subtle [16:4,5,9,10,14]
successful [43:2]
suffered [72:3,17]
sufficient [59:20,21]
suisse [4:8,22] [10:12]
[12:23] [74:23] [75:21]
suite [2:3,12] [78:8]
summaries [17:16]
summarize [38:4]
summarizing [17:1,7]
summer [34:19] [35:3]
[36:8,14]
suppose [69:23]
sure [10:13] [14:16] [16:6]
[19:11] [31:1] [32:16,17]
[38:20] [73:19] [76:16]
swear [5:3]
sworn [5:7] [80:8]

T

taken [2:2] [55:9] [80:10]
taking [4:15] [15:16] [41:1]
[54:9]
talk [22:10] [36:3] [38:10]
[41:4] [57:19,24] [69:15]
[71:9]
talked [14:11] [71:9]
talking [38:2] [57:12]
tapes [78:6]
techniques [43:16,21]
[50:17] [51:23]
telephone [11:15] [26:11]
tell [9:25] [12:21] [14:12]
[16:23] [22:13] [24:22]
[25:14] [28:2] [36:10]
[40:11,13] [41:7] [49:14]
[51:4] [52:24] [57:25]
[71:15,22] [74:18] [75:9]
telling [12:24]
tells [45:20] [50:2,4]
ten [9:9]
tennenbaum [2:1] [3:4]
[4:7] [5:6] [7:11,12] [12:7]
[64:15,20] [78:5] [79:6,18]
terminology [27:19]
terms [19:7] [22:22,23]
[28:15] [43:24] [44:11,23]
[50:6] [52:22] [58:1]
test [76:8]
testified [5:8]
testify [80:8]
testimony [10:16] [13:4,18]
[15:10,15] [28:17] [77:1]
[79:10]

text [40:11]
texts [23:22]
thank [4:25] [5:11] [37:20]
thats [5:21] [7:4] [8:7]
[13:19] [15:1,20] [16:14]
[19:22] [20:21] [21:11]
[27:3] [31:16] [35:13]
[36:6] [37:2,4] [38:22]
[39:5,12] [42:11,13] [46:19]
[47:1] [48:1,23] [49:11]
[51:3,18] [52:15] [55:20]
[57:15,19] [59:25] [67:17]
[69:5] [70:5,21] [77:4,11,14
,25]
thereabouts [36:8]
thereafter [42:23] [80:12]
therefore [59:22] [60:2,22]
[61:7] [63:4,6] [68:19]
therein [80:11]
theres [17:10] [23:22]
[24:11,14] [28:11,24]
[39:19] [49:7] [54:24]
[58:12] [59:5] [60:7]
theyd [36:2]
theyre [45:25] [68:17,22]
theyve [70:13]
things [11:10] [14:23]
[15:3] [22:15] [24:8] [26:21]
[32:25] [48:18] [53:15]
[61:5]
think [5:18,21] [11:13]
[14:10] [16:5] [18:5] [21:22]
[24:1] [26:9] [27:10,11]
[28:19,21] [29:10,21]
[31:24] [44:17] [49:7]
[58:21] [59:3,14] [65:24]
[66:19] [73:4,7,9] [76:9]
third [35:23]
thirty [68:1]
though [57:4]
thought [20:10] [24:12]
[66:2]
thousand [18:4]
three [21:22,23] [23:16]
[53:13] [54:23] [55:11]
[56:15,16]
time [4:11] [13:10] [15:24]
[17:5] [21:7,19,25] [25:7,8
,17] [26:5,24,25] [28:16]
[32:21,25] [33:3] [36:13]
[37:22,25] [54:13] [58:7,11
,15] [60:7] [64:11,14,16,20]
[65:24] [66:6,11,15] [70:22]
[74:13,20] [76:2] [78:9]
[80:11]
timeframe [60:2]
times [16:12] [62:25]
today [4:12] [5:1] [78:6]
todays [4:11]
together [15:3] [55:9]
told [73:16]
tom [16:25] [17:9]
tony [2:10] [4:23]
took [38:2] [69:6]

top [24:4] [30:19] [36:11]
[62:5] [64:25] [68:13]
total [18:2,3]
trade [42:20]
traded [59:10] [61:12]
trading [77:21]
train [66:2]
transaction [47:25] [48:1,2
,14] [70:6]
transactions [47:17] [48:22]
[60:22] [61:20,22,23]
[71:4] [73:2]
transcript [79:8] [80:13,16]
transparency [60:23]
[61:6]
transparent [61:2]
traunches [69:13]
treister [2:9] [4:16,24]
[6:7] [9:4] [26:8]
trenwick [26:9,10] [27:9,11]
[28:2,5]
trouble [54:13] [71:7]
troubled [57:10]
true [42:4] [57:15] [61:1,2]
[79:11] [80:13]
trust [4:7] [12:22] [14:12,15]
[15:4,12,17] [16:1] [22:2]
truth [80:9]
try [69:22]
trying [71:24]
turn [50:17] [59:19]
turnaround [54:14] [57:11]
[59:20] [60:3]
turned [13:10] [17:12,23]
[19:25] [50:16] [71:18]
turns [15:8]
typewritten [80:12]

U

ultimately [77:17]
unaffected [50:8]
underlie [33:18] [34:7]
[57:4]
underlying [69:18]
understand [15:20] [19:11]
[32:18] [45:2,19] [46:4]
[52:13] [55:14] [58:20]
[59:3] [61:25] [69:22]
[72:6,12] [76:25]
understanding [13:12,20]
[15:12] [21:25] [31:9]
[37:2,4] [39:5]
understood [13:8] [15:24]
[23:18]
united [4:8]
universe [19:8]
unlikely [58:24]
unsecured [77:16]
until [74:13]
us [17:18] [40:11] [45:20]
[52:14] [74:18] [75:9]
use [37:17] [52:20]
used [24:9] [38:13] [39:8]

[50:17] [51:14] [52:15]
[66:5,10] [78:6]
useful [15:8] [26:16]
using [27:19] [39:14] [43:21]
utilize [60:12] [61:10]
[65:4]
utilized [26:22] [44:25]
[51:24] [67:16] [68:6]
utilizes [52:12] [55:6]
utilizing [60:10] [64:24]

V

vaguely [36:24]
valuation [10:5,21] [11:9]
[13:24] [15:11] [21:16,17]
[33:19] [42:20] [43:15]
[45:13,15] [46:19] [47:1,12
,22] [48:4,5,12] [52:20]
[55:6] [57:2] [60:15] [64:23]
valuations [46:5] [50:18]
[56:10]
value [13:6] [39:13] [43:20
,25] [44:3,6,7,10,22] [45:4
,9] [46:1,2,14,25] [47:20]
[49:14,18,20] [50:1,2,4,6,7
,9] [51:15] [54:18,20]
[58:4,9,12,16] [59:17,22]
[60:5,7,25] [62:2] [65:1,3,5
,7,11] [66:19,25] [67:14,22
,25] [71:2] [72:16] [73:13,17]
[76:1,3]
valued [46:5] [48:14] [58:7]
values [10:22] [55:16]
[60:1] [61:8] [62:21] [65:10]
[69:14] [77:7]
valuing [44:20]
variability [52:5,8]
variable [54:17,21] [59:25]
[60:6]
variety [60:10,12]
various [10:23] [17:2]
[21:19] [28:14,16] [39:23]
[46:10] [57:11] [66:11]
varying [24:7]
vast [18:15]
versus [4:8] [25:15] [51:12]
viable [71:5]
video [4:12,15]
videographer [2:25] [4:5,25]
[5:10] [37:21,24] [64:10,13
,18] [78:2,4]
videotape [4:14,19]
videotapes [78:6]
view [33:1]
viewed [43:3]
voice [4:19]
volume [4:5] [61:23] [74:2]
[78:5]

W

wait [64:8]
walk [46:21] [47:13] [62:12]

want [13:2,9] [16:5] [25:4]
  [27:22] [44:14] [52:24]
  [63:8] [64:2]
wanted [11:8] [15:12,17]
  [33:13]
warn [49:10]
wasnt [16:8] [57:23]
waste [26:5]
waterfall [68:12,13]
waterhouse [68:4]
weighted [51:2,5,6,10,11,20
  ,22] [55:4] [56:5] [65:6]
well [6:3] [9:17] [10:13]
  [16:5] [17:22] [18:23]
  [20:9,10] [23:18] [26:19]
  [27:14] [29:1] [36:1] [39:2]
  [46:4] [47:11] [50:25]
  [51:5] [53:14] [60:13]
  [62:16] [63:22] [65:2,17]
  [69:19] [75:18] [76:8]
  [77:19]
went [21:17] [32:2] [49:3,12
  ,22] [66:8] [71:22]
west [4:14] [78:7]
weve [48:4]
whatever [13:10] [18:21]
  [56:1] [66:10,11]
whats [6:1,10] [18:9] [28:12]
  [42:11] [47:16] [55:23]
  [60:13] [67:1,9] [74:3]
whatsoever [15:19]
whereas [52:2]
whereupon [78:11]
whether [13:16] [15:8,12,16
  ,22,24] [17:16] [20:13,15]
  [25:6,16] [27:1,3] [36:25]
  [40:25] [41:12] [42:1,6]
  [46:16] [47:6,14] [52:24]
  [57:12,16] [59:24] [72:25]
  [77:1]
whitman [2:24]
whole [63:8] [73:24,25]
  [80:9]
whom [4:20] [8:12] [16:20]
whose [11:18] [21:10]
  [34:21]
why [23:14] [26:16] [44:16]
  [51:1] [71:22]
wickes [2:18] [3:5] [4:18,21]
  [5:11,14,25] [24:2] [25:24]
  [27:7] [28:1,8] [33:5,9]
  [37:18] [38:1] [43:8] [47:10
  ,21] [48:9,25] [49:7,10,19]
  [53:11] [57:14] [64:21]
  [77:25] [78:3]
wide [30:3] [57:8]
widespread [61:7]
will [5:3] [10:8] [29:19]
  [30:1,11] [36:17] [48:5]
  [50:4] [58:10,12,25] [59:4
  ,6,17] [63:15] [70:2] [78:7]
willing [58:14,18] [63:9,10]
willingness [59:18]
wilshire [9:21]

wind [65:10]
within [26:20] [60:3]
without [15:11,16] [25:23]
witness [2:2] [3:3] [5:4]
  [8:9] [24:1] [25:19] [26:19]
  [27:18] [28:5] [47:11]
  [48:12] [49:17] [53:7]
  [57:7] [80:7,22]
word [42:17]
words [25:4] [60:21]
work [8:4,17] [11:2] [15:23
  ,25] [16:22] [17:6,11,24]
  [20:8] [24:10] [26:17]
  [33:21] [38:15,16] [40:8,15]
  [41:1,10,13,14,19,20]
  [42:6] [47:6] [60:15] [66:3
  ,5]
worked [7:22] [9:4,13,19,22]
  [16:25] [17:3] [31:15]
  [56:18]
working [8:16] [9:10] [11:5]
  [32:1]
workings [61:18]
world [68:23]
worth [59:1] [63:2]
worthless [60:4]
wouldnt [32:18] [76:13]
_____
X
_____
xyz [36:2]
_____
Y
_____
yeah [44:15] [75:13]
year [43:2] [44:22] [62:10]
years [9:8] [29:4] [49:4,13,24]
  [53:17,18,21] [60:5] [66:8
  ,17]
yes [6:5,9,15] [7:9] [8:19]
  [9:2,6,15] [11:23] [15:1]
  [16:16,18] [17:15,21]
  [18:8] [19:14] [20:25]
  [21:4,24] [22:5,7,12]
  [23:13] [24:7] [25:9] [27:23]
  [29:8] [30:6,18,22] [31:14]
  [32:7,12] [33:7,24] [35:9,25]
  [36:4,9] [37:14] [38:19]
  [39:18] [40:2] [42:12,14]
  [43:14,19] [44:5,8,12,25]
  [45:8,25] [46:7] [47:4]
  [50:19,23] [52:17] [55:18,21
  ,22,25] [56:17,20,22,25]
  [57:7,18] [58:23] [59:2,8,13]
  [60:18] [61:21] [62:5]
  [66:22] [67:18,23] [68:5]
  [69:5] [70:9,17,20,23]
  [71:14,21] [72:11,13]
  [74:12,16] [75:4] [76:16,24]
yet [49:8]
york [2:20] [4:14] [10:14]
  [11:6] [59:12] [61:13]
  [78:8]
yoshioka [16:25] [17:9,19,20]

yoshokowa [17:17]
youd [69:16]
yourself [18:24]
yourselves [4:19]
youve [7:5,7,22] [8:4]
  [33:21] [37:13] [46:8]
  [49:3] [50:16] [55:17]
  [56:9]
yun [26:10] [27:9,10,13]
  [72:20,21]
_____
Z
_____
zero [59:1]

*EXHIBIT DD*

```
     0001
 1                    CLARENCE WALKER
 2            UNITED STATES BANKRUPTCY COURT
 3                 DISTRICT OF DELAWARE
 4       ----------------------------x
 5       In Re:
 6       OAKWOOD HOMES CORPORATION,
         et al.,
 7
                        Debtors.
 8
 9       Chapter 11
         Case No. 02-13396 (PJW)
10       ----------------------------x
11       OHC LIQUIDATION TRUST,
12                      Plaintiff,
13                 v.           ADV. Proc.No. 04-57060 (PJW)
14       CREDIT SUISSE FIRST BOSTON, a
         Swiss banking corporation,
15       CREDIT SUISSE FIRST BOSTON
         LLC, a Delaware limited
16       liability corporation, CREDIT
         SUISSE FIRST BOSTON, INC.,
17       CREDIT SUISSE FIRST BOSTON
         (U.S.A.), INC., a Delaware
18       corporation and a wholly owned
         subsidiary of CREDIT SUISSE
19       FIRST BOSTON, INC., the
         subsidiaries and affiliates of
20       each, and DOES 1 through 100,
21                      Defendants.
22       ----------------------------x
23
24                         December 12, 2006
25                              1:04 p.m.
```

```
     0001
 1                        CLARENCE WALKER
 2                UNITED STATES BANKRUPTCY COURT
 3                     DISTRICT OF DELAWARE
 4        --------------------------------x
 5        In Re:
 6        OAKWOOD HOMES CORPORATION,
          et al.,
 7
                         Debtors.
 8
 9        Chapter 11
          Case No. 02-13396 (PJW)
10        --------------------------------x
11        OHC LIQUIDATION TRUST,
12                     Plaintiff,
13               v.              ADV. Proc.No. 04-57060 (PJW)
14        CREDIT SUISSE FIRST BOSTON, a
          Swiss banking corporation,
15        CREDIT SUISSE FIRST BOSTON
          LLC, a Delaware limited
16        liability corporation, CREDIT
          SUISSE FIRST BOSTON, INC.,
17        CREDIT SUISSE FIRST BOSTON
          (U.S.A.), INC., a Delaware
18        corporation and a wholly owned
          subsidiary of CREDIT SUISSE
19        FIRST BOSTON, INC., the
          subsidiaries and affiliates of
20        each, and DOES 1 through 100,
21                     Defendants.
22        --------------------------------x
23
24                                December 12, 2006
25                                     1:04 p.m.
```

03/08/2007 11:50 AM                                                    2

CLARENCE WALKER

1
2
3
4
5
6         Telephonic deposition of Clarence W.
7    Walker, taken by Defendants, at the offices of
8    Linklaters, 1345 Avenue of the Americas, New
9    York, New York, before Brandon Rainoff, a
10   Federal Certified Realtime Reporter and Notary
11   Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

---

CLARENCE WALKER

1    CLARENCE WESLEY WALKER,
2         having been duly sworn, was examined and
3         testified as follows:
4
5    EXAMINATION
6    BY MR. OSNATO:
7         Q.    Thank you, Mr. Walker. This is Mr.
8    Osnato on behalf of the defendants.
9         First of all, I want to say thank you
10   very much for making yourself available for this
11   deposition. We realize you are not a party and
12   that Oakwood is, for you, at some point in the
13   past, and we are grateful that you made some
14   time in your schedule for us.
15        A.    You're welcome.
16        Q.    With that said, let me briefly ask you
17   if you have been deposed before?
18        A.    Yes.
19        Q.    So therefore I take it you are
20   generally familiar with the ground rules in a
21   deposition?
22        A.    Yes.
23        Q.    Let me very, very briefly, then,
24   remind you of some of the more important ones.
25   The first and most obvious one is that you are

5

---

CLARENCE WALKER

1
2    A P P E A R A N C E S:
3
4    LINKLATERS
5    Attorneys for Defendants
6         1345 Avenue of the Americas
7         New York, New York 10105
8    BY:  MICHAEL J. OSNATO, JR., ESQ.
9         JUSTIN WILLIAMSON, ESQ.
10
11
12   Appearing Telephonically:
13   STUTMAN TREISTER & GLATT
14   Attorneys for Plaintiff
15        1901 Avenue of the Stars
16        Twelfth Floor
17        Los Angeles, California 90067-6013
18   BY:  CAROL CHOW, ESQ.
19        WHITMAN L. HOLT, ESQ.
20
21
22
23
24
25

4

---

CLARENCE WALKER

1    under oath and therefore obligated to give us
2    your honest and truthful recollection, is that
3    clear?
4
5         A.    Yes.
6         Q.    As you know, we have a court reporter
7    with us today, and therefore everything that is
8    said while we are on the record will be recorded
9    in writing, and it is therefore quite important
10   for us to speak very clearly, and to give the
11   court reporter an opportunity to record what is
12   said, I will ask you to wait until I have
13   finished my question to provide your response,
14   and I in turn will give you the same courtesy by
15   letting you complete your answer.
16        Does that make sense?
17        A.    It does.
18        Q.    From time to time counsel for the
19   plaintiff may intercede with an objection and we
20   should both give either Ms. Chow or Mr. Holt the
21   opportunity to do so. If, however, you
22   understand the question that I am putting to
23   you, I will ask you to answer it, but if for
24   some reason you are not clear as to what I am
25   asking you, by all means please let me know and

6

**CLARENCE WALKER**

1  I will be happy to rephrase the question so that
2  we are both on the same page.
3       A.   I will do that.
4       Q.   And finally, I will try and be as
5  efficient as possible, and I anticipate this
6  should not take more than a few hours, but while
7  we are on the record, if at any point you want
8  to take a break to stretch your legs or for any
9  other reason, do please let me know.  I am happy
10 to take five, ten minutes or whatever you may
11 need.
12      A.   Thank you.
13      Q.   Okay.  With the background concluded,
14 let me first, sir, ask you to please tell us
15 your educational background beginning with
16 college.
17      A.   I received an AB degree at Duke
18 University and an LL.B degree from Duke Law
19 School.
20      Q.   As part of the LL.B degree, did you
21 receive a J.D.?
22      A.   No.
23      Q.   In what year did you receive your
24 LL.B, Mr. Walker?

7

---

**CLARENCE WALKER**

1       A.   1953
2       Q.   Following your receipt of that degree,
3  did you obtain a job?
4       A    Were you referring to the LL.B?
5       Q.   Yes.  Is the LL.B the extent of your
6  educational experience?
7       A.   Well, I will take it that the BA
8  degree was also a part of it.  My answer of 1953
9  related to the BA degree.
10      Q.   I see.
11      A.   I received the LL.B in 1955.
12      Q.   Thank you for that clarification.
13           Did you at any point attend a law
14 school?
15      A.   Did I attend what?
16      Q.   A law school?
17      A.   I attended Duke Law School.
18      Q.   Is it in 1955 that you obtained a
19 degree from Duke Law School?
20      A.   That's correct.
21      Q.   Upon receiving your degree from Duke
22 Law School, did you take any bar exam?
23      A.   Yes, I took the North Carolina bar
24 exam and later took the New York bar exam.

8

---

**CLARENCE WALKER**

1       Q.   Were you admitted to the bar in the
2  State of North Carolina?
3       A.   Yes.
4       Q.   And following your admission to the
5  bar, did you practice with any firm?
6       A.   Not in the state of North Carolina.
7  Immediately after taking the North Carolina Bar
8  Association, I began work with a Wall Street law
9  firm named Mudge, Rose, Baldwin & Todd.
10      Q.   Was that here in New York City?
11      A.   Yes.
12      Q.   Could you briefly recount for us your
13 legal career beginning with your position at
14 Mudge Rose through the present?
15      A.   Yes.  I was at Mudge Rose from August
16 of 1955 through March of 1959.  In March of 1959
17 I returned to North Carolina and joined the law
18 firm of Kennedy, Covington, Lobdell & Hickman as
19 an associate.  I became a partner of that firm
20 in 1961.  I have been a partner of that firm
21 until recently when I became of counsel.
22      Q.   During your time with Kennedy
23 Covington, did you develop a particular
24 specialty or area of law in which you practiced?

9

---

**CLARENCE WALKER**

1       A.   Yes.
2       Q.   What is that?
3       A.   Corporate and utilities, public
4  utilities.
5       Q.   As part of your employment by Kennedy
6  Covington, did you or your firm provide legal
7  advice to the Oakwood companies?
8       A.   Yes, we did.
9       Q.   Did you personally provide that
10 advice?
11      A.   Well, beginning about 1971 I provided
12 that advice, but at some point after that I
13 ceased providing any legal advice personally.
14      Q.   Did that coincide with your service on
15 the board of directors of Oakwood Homes?
16      A.   It did not.
17      Q.   Was there a reason why you ceased
18 personally to provide advice to Oakwood?
19      A.   I was able to get other people up to
20 speed and to a level of proficiency that they
21 could do it.
22      Q.   Was Kennedy Covington Oakwood's
23 primary outside corporate counsel?
24      A.   Yes.

10

CLARENCE WALKER

1 
2    Q.    Did that remain true all the way
3    through and including the date of Oakwood's
4    bankruptcy in 2002?
5    A.    Yes.
6    Q.    If I could, Mr. Walker, now turn to
7    your service on the board of directors of the
8    Oakwood companies, could you please give us the
9    dates upon which you served on the board of
10   directors?
11   A.    I served on the board of directors of
12   Oakwood from the time it became a public
13   corporation in 1971 as I recall until its
14   demise.
15   Q.    In 2002?  So approximately thirty
16   years of service on the board of directors, is
17   that right?
18   A.    That's correct.
19   Q.    During your time of service on the
20   board of directors, were you responsible for
21   service on any subcommittees of the board?
22   A.    Yes, audit committee, and at a point
23   in time the compensation committee.
24   Q.    Focusing now on the audit committee,
25   do you remember the date ranges of your service

11

CLARENCE WALKER

1 
2    company -- the executive office rarely gave us
3    updates.  It was financial management.  The
4    chief financial officer and the principal
5    accounting officer.  And, of course, at the
6    time, during the time that we had it, the
7    director of internal audit.
8    Q.    Did your approximately thirty years of
9    service on Oakwood's board make you the longest
10   tenured director of the company, do you know?
11   A.    Well, I'm not able to answer that
12   because there were directors of the company
13   prior to my going on the board and prior to it
14   being a public corporation.  From the time that
15   the company made its initial public offering, I
16   don't -- there was no director on the board at
17   the time of the bankruptcy who had been there as
18   long as I had.
19   Q.    Now, we talked about the fact that
20   Oakwood filed for bankruptcy November of 2002.
21        Do you, on the basis of your nearly
22   thirty years of service on the Oakwood board of
23   directors, have an understanding of the reasons
24   why Oakwood filed for bankruptcy?
25   A.    I have a general appreciation of the

13

CLARENCE WALKER

1 
2    on that particular committee?
3    A.    I'm sorry, I don't remember when I
4    began to serve on the audit committee.
5    Q.    Do you remember if you were serving on
6    the audit committee at or around the time
7    Oakwood filed for bankruptcy in 2002?
8    A.    Yes.
9    Q.    Very briefly --
10   A.    Yes, I remember, and yes, I did.
11   Q.    Thank you.  Could you please describe
12   for us the purpose of the audit committee?
13   A.    Well, the purpose of the audit
14   committee was to -- there were several purposes.
15   One was to interface with financial management
16   of the company to stay abreast of financial
17   developments, accounting practices.  Another was
18   to approve and recommend to the board the
19   approval of the outside auditors of the company.
20   Another was to oversee the process of internal
21   controls.
22   Q.    In the discharge of the duties that
23   you just described, would you receive frequent
24   updates from company management?
25   A.    From financial management, not

12

CLARENCE WALKER

1 
2    events that led to our    the necessity of
3    filing for reorganization    ...
4    Q    Could you briefly share with us that
5    general understanding?
6    A.    Yes.  Probably the principal one was
7    an - almost a meltdown in the manufactured
8    housing industry that began some time at the
9    turn of the millennium.
10       The nineties had been a very strong
11   decade for manufactured housing.  That changed
12   some time after the decade of the nineties,
13   early in the 2000 range, and sales began to
14   flatten and drop.  There had been many entries
15   as I recall into the manufacturing business
16   during the nineties by operators large and small
17   and there developed an excess of inventory.
18       All of the -- as I recall, practically
19   all of the manufacturers of manufactured housing
20   during that time, and by that time I mean the
21   2000 to 2002 era, were experiencing increasing
22   levels of repossessions.
23       Oakwood experienced that perhaps more
24   than others, and that coupled with the drop in
25   sales and the heavy costs that we had built --

14

CLARENCE WALKER

1  
2  cost structure that we had built up with  
3  manufacturing around the country and  
4  acquisitions on the west coast during the  
5  nineties began to make it clear that we had to  
6  change our business plan, but we simply didn't  
7  make the    weren't able -- things evolved so  
8  quickly that we weren't able to make the changes  
9  quick enough to stave off the necessity of  
10  bankruptcy.  
11    Q.    Thank you for that summary.  
12    Would you agree with me, Mr. Walker,  
13  that it was the fiduciary obligation of the  
14  board of directors with the assistance of  
15  management to decide the appropriate time for  
16  Oakwood to file for bankruptcy?  
17    A.    Yes.  
18    MS. CHOW:  Objection as form.  
19  BY MR. OSNATO:  
20    Q.    I'm sorry. I didn't get your answer,  
21  Mr. Walker. Was that a yes?  
22    A.    Yes.  
23    Q.    Thank you.  
24    Focusing for the moment on the year  
25  2002 which, again, is the year in which Oakwood

CLARENCE WALKER

1  
2    MS. CHOW:  Same objection.  
3    Q.    Is your --  
4    A.    In the year 2000 the issue of  
5  bankruptcy was not on the horizon at all.  
6    Q.    Thank you. Am I correct, Mr. Walker,  
7  that the Oakwood board of directors would meet  
8  on a regular basis?  
9    A.    That's correct.  
10    Q.    And again focusing on the period from  
11  2000 through 2002, approximately how many times  
12  per year did the board meet?  
13    A.    In that period the board met more  
14  regularly than it normally had in the past.  The  
15  board prior to that time had met approximately  
16  four times a year.  During that period the board  
17  met it not on a monthly basis, even on a more  
18  frequent basis than monthly because of the  
19  necessity of monitoring the situation that was  
20  developing fairly fast.  
21    Q.    Focusing on the year 2002 for the  
22  moment, in addition to yourself as an outside  
23  director, do you recall the names of the other  
24  outside directors who sat on the board?  
25    A.    Yes.

CLARENCE WALKER

1  
2  filed for bankruptcy, is it your view, Mr.  
3  Walker, that the board of directors of Oakwood  
4  was comprised of competent and qualified  
5  directors who acted in the company's best  
6  interest?  
7    A.    Yes.  
8    MS. CHOW:  Objection as to form.  I'm  
9  sorry, Mr. Walker, if you could perhaps give me  
10  an opportunity to raise the objection,  
11  especially with the doing this by telephone.  
12  Hopefully the court reporter can hear the  
13  objection before the testimony.  
14    I apologize. I didn't mean to  
15  interrupt.  
16    THE WITNESS:  I will undertake to  
17  pause after the question.  
18    MS. CHOW:  Thank you.  
19  BY MR. OSNATO:  
20    Q    And, Mr. Walker, if I was to ask you  
21  the same question for the year 2001, would your  
22  answer also be yes?  
23    MS. CHOW:  Same objection.  
24    A.    Yes.  
25    Q.    And for the year 2000?

CLARENCE WALKER

1  
2    Q.    Who were they?  
3    A.    Dennis Meyer of Washington, D.C.  
4  Kermit Phillips of Greensboro, North Carolina.  
5  Michael Weaver, also of Greensboro, North  
6  Carolina.  Fay Vincent of New York, the State of  
7  New York.  I'm not certain just where his  
8  principal residence was.  His name is Francis T.  
9  Vincent.  
10    Roger Schipke who at the time was in  
11  Florida.  Sabin C. Streeter, S-T-R-E-E-T-E-R, of  
12  New York.  I think his home is in Chappaqua.  
13  His work was in New York City.  
14    I'm trying to think if there were  
15  others.  I think there certainly were others  
16  during that period but right now they don't  
17  occur to me.  Those were the outside directors,  
18  that is, the nonemployee directors.  
19    Q.    Thank you. And do you believe that  
20  the individuals that you have just identified  
21  provided Oakwood with disinterested and  
22  impartial advice during their tenure on the  
23  Oakwood board?  
24    MS. CHOW:  Objection as to form.  
25    A.    Yes.

CLARENCE WALKER

Q.   Am I correct, Mr. Walker, that the
board had available to it outside counsel if it
believed it was necessary to receive legal
advice as part of its fiduciary duties?

A.   Yes.

Q.   Would that consist of calling upon
your firm?

A.   Yes.

Q.   Focusing again on the period 2001 now
and 2002, am I correct that prior to approving
any material transaction, the board would first
act to inform itself of all material facts?

MS. CHOW:  Objection as to form.

A.   Well, first, I don't - I don't want
to imply that the board approved every material
transaction.  That's not the case.  But on those
matters that came before the board for its
approval, of course the board undertook and saw
as its duty to undertake to inform itself fully
as to the matter involved.

Q.   As part of the process that you just
described, was it the board's practice to
regularly consult with Oakwood's senior
management?

19

CLARENCE WALKER

A.   Yes.

MS. CHOW:  Objection as to form.

Q.   Was it the practice of senior
management to attend some or all portions of
Oakwood board meetings?

MS. CHOW:  I'm going to object to the
form of the question.  This line of questioning
is very broad.

A.   During this period, this period being
the 2000 to 2002 period, senior management
attended all of the board meetings.  Two or
three of the members, I think two of the members
of senior management were directors, that is,
the chief executive officer and the chief
financial officer, and also the secretary of the
corporation who also was heavily involved in the
securitization process, Douglas Muir, attended
all board meetings and participated in informing
the board about matters that came before it.

Also at that time the chief accounting
officer whose name somehow escapes me right now,
she attended board meetings for the purpose only
of providing advice concerning accounting
matters.

20

CLARENCE WALKER

Q.   You mentioned a moment ago that Mr.
Muir would sometimes attend board meetings and
that Mr. Muir was principally responsible for
Oakwood's securitization process, is that right?

A.   No, it is not right.  He always
attended board meetings because he was the
secretary.

Q.   I see.

A.   He did sometimes provide advice with
respect to securitizations if those matters came
before the board, and he was in charge of that
area.

Q.   Focusing again on the years 2000
through 2002, am I correct that if the board of
directors believed it needed information about
Oakwood's financial or -- operations, it would
seek out members of management to provide that
information?

MS. CHOW:  I'm going to object to the
form of the question.

A.   Yes.

Q.   Mr. Walker, are you familiar with the
services that were provided by Credit Suisse to
the Oakwood companies?

21

CLARENCE WALKER

A.   I was familiar with those services to
the extent that Credit Suisse interfaced with
the board.  And to the extent that management
reported to the board on its own consultations
with Credit Suisse First Boston, but I'm not
sure that I'm fully familiar with all of the
services that Credit Suisse provided or the
timeframe in which they provided it.

Q.   Well, that certainly is fair.

Do you have at least a partial
recollection of the types of services that were
provided to Oakwood by Credit Suisse?

A.   Yes.  Credit Suisse was involved in
the securitizations.  My recollection is that it
at one time, at least, was involved in the
warehouse facility, that is, the advances made
during the accumulation of paper prior to the
inclusion of that paper in a securitization.

During the final days, Credit Suisse
provided advice to the board with respect to
efforts to deal with several issues that the
board was concerned about, one of those being
the oncoming maturity date of some senior notes
that were outstanding.  I think that maturity

22

**Page 23 (top left):**

```
 1            CLARENCE WALKER
 2  date was probably sometime in '04 or '05, 2004
 3  or 2005, somewhere in that timeframe.
 4         The board, of course, was concerned to
 5  have some plan in place to deal with those
 6  notes.  And from time to time Credit Suisse
 7  would give us advice with respect to possible
 8  reorganizations of the company outside of any
 9  bankruptcy during the 2001 and 2002 period.  I
10  think it was mostly in 2002, by way of bringing
11  in perhaps an equity investor and a possible
12  merger or acquisition.
13         Those are the types of things that
14  Credit Suisse interfaced with the board on.
15     Q.    So I take it that in your capacity as
16  a director you would have had the opportunity to
17  directly interact with personnel from Credit
18  Suisse, is that right?
19     A.    That's right.
20     Q.    Now, focusing if we could for the
21  moment only on the securitization services that
22  were provided by Credit Suisse, do you have a
23  view on whether Credit Suisse provided those
24  services adequately?
25         MS. CHOW:  I'm going to object to the
```

**Page 25 (top right):**

```
 1            CLARENCE WALKER
 2         To the extent that Credit Suisse
 3  reported to the board and we were able to -- we
 4  the board were able to assess its services, I
 5  don't recall having any complaint about the
 6  adequacy of them.
 7     Q.    I'd like to make sure that I
 8  understand your answer fully.
 9         When you indicate that the board had
10  no reason to be dissatisfied with Credit
11  Suisse's services, are you now speaking to the
12  full range of services that were provided to the
13  company by Credit Suisse?
14         MS. CHOW:  Objection to the form of
15  the question.
16     A.    I was thinking only of securitization
17  services which was what you asked me about.
18     Q.    That's absolutely fair.  And if I was
19  to ask you whether as a director you had a view
20  on whether Credit Suisse provided financial
21  advisory services in an adequate manner to
22  Oakwood in the period before its bankruptcy,
23  what would your answer be?
24         MS. CHOW:  Objection to the form of
25  the question.
```

**Page 24 (bottom left):**

```
 1            CLARENCE WALKER
 2  form of the question.  I think it is vague and
 3  ambiguous as to what services we are talking
 4  about precisely.  I don't think that's ever been
 5  defined.
 6         MR. OSNATO:  I think embedded in my
 7  question explicitly was a focus upon the
 8  securitization services provided to Oakwood by
 9  Credit Suisse.
10     Q.    Mr. Walker, I will restate the
11  question.
12         I am asking again to focus only on the
13  securitization services that were provided to
14  Oakwood by Credit Suisse, and my question is,
15  based on your service as a director, did you
16  come to a view on whether Credit Suisse provided
17  those services adequately?
18         MS. CHOW:  Objection to the form of
19  the question.
20     A.    The answer to the question is yes.  I
21  did come to the view that it provided the
22  services to our satisfaction.  I don't recall
23  management's ever making a complaint to the
24  board or indicating to the board that it was
25  dissatisfied with Credit Suisse services.
```

**Page 26 (bottom right):**

```
 1            CLARENCE WALKER
 2     A.    I'm sorry, I wasn't paying close
 3  attention.  Would you repeat that question?
 4     Q.    That's probably better for everybody
 5         I would like to now focus your
 6  attention on the financial advisory services
 7  that Credit Suisse provided to Oakwood in the
 8  period preceding its bankruptcy, and I would
 9  like to ask you whether based on your service on
10  the board of directors, you had a view on
11  whether Credit Suisse provided those services in
12  an adequate and professional manner?
13         MS. CHOW:  Objection to the form of
14  the question.
15     A.    Yes, I had a view as to whether they
16  provided the services adequately and
17  professionally and my view was that they did so.
18     Q.    Thank you.  And I would like now to
19  focus on the final piece of service that you
20  identified as having been provided by Credit
21  Suisse which was the warehouse facility as you
22  described it, is that right?
23     A.    That's correct.
24     Q.    Did you have a view on whether Credit
25  Suisse provided services relating to the
```

---

**Page 27**

CLARENCE WALKER

warehouse facility in a professional and

adequate manner?

       MS. CHOW:  Objection as to the form of

the question.

    A.   No.

    Q.   Is there a reason why you did not have

a view?

    A.   Because the warehouse facility was not

a matter that the board had occasion to hear

from Credit Suisse on.  The operation of the

warehouse facility was between management and,

to the extent Credit Suisse was involved, Credit

Suisse.

    Q.   In your capacity as a director, did

you ever have reason to think that Credit Suisse

was acting dishonestly?

    A.   No.

       MS. CHOW:  Objection to the form of

the question.

    Q.   In your service as director, do you

recall any member of Oakwood's senior management

informing you or the board that it believed that

Credit Suisse was acting in a dishonest or

improper manner?

---

**Page 28**

12/12/2006 WALKER, Clarence

CLARENCE WALKER

       MS. CHOW:  Objection to the form of

the question.

    A.   No.

    Q.   Did Mr. Muir ever report to you his

views on the service provided by Credit Suisse

to Oakwood?

    A.   Mr. Muir's reporting to me was in my

capacity as a member of the audit committee.  He

discussed more with the audit committee than

with the board as a whole the operation of the

securitization program.  And from time to time

Credit Suisse was asked to evaluate that program

and to provide sensitivities related to it.

       And while I don't recall Doug Muir's

ever making a statement one way or the other, I

never had any reason to believe that he was

dissatisfied with the services of Credit Suisse.

    Q.   Did you, Mr. Walker, ever come to the

conclusion that Credit Suisse was advising

Oakwood in a way that would artificially prolong

its life so that Credit Suisse would enrich

itself?

       MS. CHOW:  I'm going to object to the

form of the question.

---

**Page 29**

12/12/2006 WALKER, Clarence

CLARENCE WALKER

    A.   No, I do not believe that.

    Q.   Thank you.  Focusing now if we could,

Mr. Walker, on the year 2002, do you believe

that in 2002 Oakwood was experiencing some level

of financial distress?

    A.   Yes.

    Q.   Now, again in 2002, did the board

believe that Oakwood could weather the storm and

emerge as a more profitable company?

    A.   Well, there was a time -- I mean, you

have to divide the 2002 into periods.  Early in

2002 as I recall the board was getting reports

from management that the past position was

sufficient, that the programs that the company

had put in place for downsizing, that is, for

closing sales centers, for closing manufacturing

plants, and for continuing the securitization

program, were sufficient that we could weather

the severe conditions that the industry was

facing, and Oakwood maybe more than some others.

       Later in 2002 it became -- it began to

look as if the situation was not improving and

if anything was deteriorating, and toward the --

as we neared the fall and winter of 2002, it

---

**Page 30**

12/12/2006 WALKER, Clarence

CLARENCE WALKER

became obvious that we were not going to be able

to survive on a cash basis and that's what led

to the consideration of filing for bankruptcy

reorganization.

    Q.   Focusing now on the portion of 2002

when it became clear to the board that Oakwood

would need to contemplate bankruptcy, am I

correct that during that period the decisions

taken by the board were intended to benefit the

company and its shareholders?

       MS. CHOW:  Objection to the form of

the question.

    A.   Absolutely correct.

    Q.   Am I also correct that the board of

directors always sought to maximize the value to

shareholders in the company?

       MS. CHOW:  Objection to the form of

the question.

    A.   You are correct.  The board was very

concerned about assuring that the shareholders

benefited to the maximum from the moves and

actions that the board was taking.  The board

pursued a lot of avenues with the participation

of management, of course, to that end, including

CLARENCE WALKER

1    attempting to bring in a knowledgeable

2    manufactured housing operator who had been

3    successful, relatively so, during this period of

4    stress in the industry, that was Lee Posey of

5    Palm Harbor Homes, and also pursuing a possible

6    merger or some sort of arrangement with another

7    successful operator in that time, Clayton Homes.

8        The board was looking to every

9    possible way of assuring that shareholders --

10    the corporation and the shareholders, and

11    principally the shareholders, benefited from the

12    actions that we were able to take.

13      Q.    Do you know, Mr. Walker, if in the

14    year 2002 Oakwood continued to incur debt?

15        MS. CHOW: Object to the form of the

16    question.

17      A.    Well, yes, the company continued to

18    incur a debt and it continued to discharge debt.

19    I'm not certain what the meaning -- I'm not

20    clear as to the question.

21      Q.    That's fair. And let me clarify,

22    then.

23        In 2002, did Oakwood, do you know,

24    have available to it credit facilities?

31

CLARENCE WALKER

1      A.    Yes. I think that the securitization

2    program is a credit facility of a sort. It is a

3    way of using the collateral that we had in the

4    form of the contracts on the mobile homes

5    that - to obtain cash from those contracts; and

6    the warehouse facility was a credit facility

7    that enabled us to anticipate that cash during

8    the build-up of the paper to the point that it

9    was of a sufficient critical mass to have a

10    securitization.

11      Q.    To the extent that Oakwood utilized

12    securitizations in the warehouse facility in

13    2002, did it in your view do so in an attempt to

14    return the company to profitability?

15        MS. CHOW: Object to the form of the

16    question.

17      A.    Yes, in the sense that everything that

18    the board did was focused on returning the

19    company to profitability.

20      Q.    Thank you. Now, we talked a little

21    bit about securitizations. Am I correct that

22    Oakwood's reliance on securitizations was one of

23    the principal ways in which it generated

24    liquidity?

32

CLARENCE WALKER

1        MS. CHOW: Objection to the form of

2    the question.

3      A.    Yes, you are correct.

4      Q.    Was the board of directors --

5      A.    I'm sorry, I have lost you.

6      Q.    I'm sorry, can you hear me now?

7      A.    No, I can hear you very faintly.

8      Q.    Is this better?

9      A.    Suddenly your voice has become

10    distant.

11      Q.    Is this any better?

12      A.    Much better.

13      Q.    Okay. Good. I will not move.

14        Am I correct, Mr. Walker, that the

15    board of directors was kept apprised by senior

16    management of developments in the securitization

17    market?

18        MS. CHOW: Object to the form of the

19    question.

20      A.    You are correct. The board was kept

21    advised in a general way by both senior

22    management and the audit committee, and the

23    audit committee was kept advised in a more -- in

24    more depth by Doug Muir.

33

CLARENCE WALKER

1      Q.    Am I correct that the board of

2    directors approved the use of securitizations by

3    the company to generate liquidity?

4        MS. CHOW: Object to the form of the

5    question.

6      A.    You are correct in this sense. The

7    securitization program had been an integral part

8    of the company's operation for a long time. I

9    don't recall when it was first initiated, but it

10    certainly was not in this 2001-2002 period, it

11    was earlier than that. And the board got

12    continual reports about the status of the

13    securitization and acquiesced in it.

14        Now, I don't think particular

15    securitizations ever were presented to the board

16    for its approval, but the board was fully aware

17    of how the program operated, how it was doing,

18    and at no time undertook to mandate the

19    discontinuance of it.

20      Q.    Thank you. I take it that your answer

21    remains true for all of the year 2002?

22      A.    That's correct.

23      Q.    In your capacity as a director, do you

24    have any reason to believe that the

34

CLARENCE WALKER

2 securities engaged in by Oakwood were a
3 harmful financing technique?
4     A.   No.
5          MS. CHOW:  Object to the form of the
6 question.
7     Q.   I'm sorry, your answer was, sir?
8     A.   The answer to the question was no.
9     Q.   Thank you.
10          You also mentioned, Mr. Walker, the
11 warehouse facility.  You have provided us with a
12 brief description of that facility.
13          Am I correct that the board was kept
14 apprised of Oakwood's use of the warehouse
15 facility?
16     A.   Yes, you are correct.  The warehouse
17 facility became an integral part of the whole
18 securitization process and the board was kept
19 aware of that as a part of the whole
20 securitization process.
21     Q.   To your knowledge did the board
22 approve of Oakwood's use of the warehouse
23 facility?
24          MS. CHOW:  Objection to the form of
25 the question.

35

CLARENCE WALKER

2     A.   There was never any specific action by
3 the board in which it approved the use of the
4 warehouse facility.  But if you use "approved"
5 in the generalized sense of acquiescing after
6 having been informed of this operation, the
7 answer is yes.
8     Q.   Thank you.  Did Credit Suisse have the
9 ability in your view to dictate corporate policy
10 to the board of directors?
11          MS. CHOW:  Objection to the form of
12 the question.
13     A.   Absolutely not.
14     Q.   Did Credit Suisse have the ability to
15 dictate to senior management policy?
16          MS. CHOW:  Object to the form of the
17 question.
18     A.   I'm not able to answer that.
19     Q.   Fair enough.  Did Credit Suisse have
20 any representatives on the board of directors of
21 Oakwood at any time during your tenure?
22     A.   No.
23     Q.   In your service on the board of
24 directors, can you recall any instance in which
25 Credit Suisse demanded that the board terminate

36

CLARENCE WALKER

2 an employee of the company?
3     A.   No, I don't recall any such incident.
4     Q.   Do you know if Oakwood had the ability
5 to terminate the services of Credit Suisse at
6 any time it wished?
7          MS. CHOW:  Object to the form of the
8 question.
9     A.   Yes, I know that the board could have
10 terminated Credit Suisse at any time.  I don't
11 know whether that termination would have
12 triggered penalties in any agreements that we
13 had with Credit Suisse.
14     Q.   Did Credit Suisse direct or instruct
15 the board of directors that Oakwood should file
16 for bankruptcy?
17          MS. CHOW:  Object to the form of the
18 question.
19     A.   No.
20     Q.   Did Credit Suisse, based on your
21 observation, have day-to-day control of
22 Oakwood's decision making process?
23          MS. CHOW:  Object to the form of the
24 question.
25     A.   It certainly did not.

37

CLARENCE WALKER

2     Q.   Do you recall any instance where
3 senior management of Oakwood informed the board
4 that it was concerned about the degree of
5 influence that Credit Suisse had over Oakwood?
6          MS. CHOW:  Object to the form of the
7 question.
8     A.   I don't recall any such instance.
9     Q.   Mr. Walker, as you know the plaintiff
10 in this lawsuit is an entity called the OHC
11 Liquidation Trust.
12          Am I correct, sir, that you have been
13 sued in your capacity as a director by that
14 entity?
15     A.   That's correct.
16     Q.   Do you remember the approximate
17 timeframe of that lawsuit?
18     A.   It was my general -- my general
19 recollection is it began a couple of years ago
20 and was concluded within a year or so after it
21 began.
22     Q.   What was the general subject matter of
23 that lawsuit?
24     A.   The subject matter was -- well, the
25 lawsuit had a number of counts, some of which

38

**CLARENCE WALKER**

1  
2  were constructive fraud and overreaching, but  
3  the principal counts of it were preferential  
4  payments to the directors related to directors'  
5  fees and the termination of a director's phantom  
6  stock plan.  
7  Q. Do you remember if that lawsuit  
8  included a claim for breach of fiduciary duties?  
9  A. It did.  
10  Q. Am I correct that that lawsuit was  
11  settled?  
12  A. That's correct.  
13  Q. Mr. Walker, I have previously as you  
14  know provided you with a copy of the complaint  
15  in this lawsuit, is that right?  
16  A. That's correct.  
17  Q. Have you had the opportunity to review  
18  those counterclaims prior to today's testimony?  
19  A. In a general way, yes.  
20  Q. Before this lawsuit was filed, were  
21  you approached to review the complaint in draft  
22  form?  
23  A. No.  
24  Q. Did any representative of the  
25  liquidation trust at any point in time seek your  

---

**CLARENCE WALKER**

1  
2  (Exhibit 300, Document captioned in  
3  re: Oakwood Homes Corporation, et al., and  
4  bearing 18 tabs, marked for identification)  
5  BY MR. OSNATO:  
6  Q. I would like to place before you, Mr.  
7  Walker, Exhibit 300, tab one.  
8  A. All right.  
9  Q. This is a document dated December 20,  
10  2000 entitled Minutes of the Meeting of the  
11  Board of Directors. They are in Bates range  
12  MNAT006712 through 6716.  
13  I'm not going to ask you questions in  
14  any detail about this or any of the other  
15  documents, but I would like to ask you first, is  
16  this a representative example of the minutes  
17  that were prepared summarizing what was  
18  discussed at Oakwood board meetings?  
19  MS. CHOW: Object to the form of the  
20  question.  
21  Q. Let me do this, Mr. Walker. Was it  
22  the practice of the board of directors to  
23  memorialize discussions at meetings in the form  
24  of written minutes?  
25  A. Yes  

---

**CLARENCE WALKER**

1  
2  those on the services provided to the company by  
3  Credit Suisse?  
4  A. No  
5  Q. If they had done so would you have  
6  provided some information to them?  
7  A. Yes  
8  Q. Now, Mr. Walker, as you know, I have  
9  also sent you, together with counsel for the  
10  plaintiff, a small collection of documents I  
11  would like to ask you about today.  
12  A. All right.  
13  Q. Do you have those in front of you,  
14  sir?  
15  A. I do  
16  Q. Okay. Thank you. What I would like  
17  to do, and I think makes most sense is to call  
18  the entire booklet Exhibit 300, then when I  
19  refer you to specific documents, simply say  
20  Exhibit 300 tab one, two, three, so forth, does  
21  that make sense?  
22  A. Yes, it does.  
23  Q. Okay. For the record, the court  
24  reporter is now placing upon the document  
25  Exhibit 300.  

---

**CLARENCE WALKER**

1  
2  Q. Does tab one represent one such  
3  example of those minutes?  
4  A. Yes.  
5  Q. Now, if I could direct you to the  
6  third paragraph, do you see where you are listed  
7  as having been an attendee?  
8  A. Yes.  
9  Q. If I could, please, on the first page  
10  of this document take you to the second  
11  paragraph from the bottom which begins: "The  
12  next item of business"?  
13  A. Yes.  
14  Q. Do you see where it refers to  
15  negotiations with Credit Suisse First Boston  
16  with respect to a new warehouse facility?  
17  A. Yes.  
18  Q. Then there is a notation that there  
19  was a discussion of that transaction, do you see  
20  that?  
21  A. Yes.  
22  Q. Do you have any reason to doubt that  
23  the board did not discuss the proposed Credit  
24  Suisse warehouse facility on December 20, 2000?  
25  MS. CHOW: I'll object to the form of

CLARENCE WALKER

1  the question.
2      A     That's a double negative. Let me say
3  this. That sentence is a distillation of what
4  undoubtedly was a fairly lengthy discussion of
5  it, of the matter.
6          This was a board that was -- had a
7  high level of curiosity and involvement at this
8  point in time and earlier, for that matter. But
9  the board discussed matters, and it was typical
10  to encapsulate those discussions in a sentence
11  that simply referred to them rather than trying
12  to recount them.
13     Q.    Thank you.
14          If I could please ask you to turn to
15  the second page of this document bearing Bates
16  No. 6713?
17     A.    Yes.
18     Q.    If I could direct you, please, to the
19  second paragraph from the bottom, do you see the
20  header that reads:  Approval of CSFB Facility?
21     A.    Yes.
22     Q.    Am I correct that the board would not
23  have approved the CSFB facility if it did not
24  believe the facility was in the best interests

43

CLARENCE WALKER

1  of Oakwood?
2          MS. CHOW:  Objection to the form of
3  the question.
4      A.    You are correct.
5      Q.    Am I also correct that, in the course
6  of approving the facility, the board received
7  all the information it believed necessary to
8  render that approval?
9          MS. CHOW:  Objection to the form of
10  the question.
11     A.    You are correct.
12     Q.    If I could please, Mr. Walker, take
13  you to tab two now?
14     A.    All right.
15     Q.    Tab two bears Bates range KCLH 1124
16  through 1128, and again, Mr. Walker, you'll see
17  in the third paragraph that you are listed as a
18  participant in the board of directors meeting.
19          Do you see that?
20     A.    Yes.
21     Q.    If I could refer you, please, to the
22  paragraph on page one beginning:  The next item
23  of business?
24     A.    All right.

44

CLARENCE WALKER

1      Q.    If you look, sir, in the fifth line
2  down in that paragraph?
3      A.    Yes.
4      Q.    There is a reference to an
5  ill-informed rating action by Moody's, do you
6  see that?
7      A.    Yes, I see that.
8      Q.    Do you recall occasions where the
9  board or management disagreed with the rating
10  decisions taken by Moody's or other credit
11  agencies?
12     A.    Well, this refreshes my recollection
13  that management disagreed with the action taken
14  by Moody's.  I'm not sure that the board formed
15  an independent judgment of that at the time, but
16  that's what management reported.
17     Q.    Did management ever communicate to the
18  board that it believed that credit agencies were
19  assigning unnecessarily negative ratings to
20  Oakwood?
21     A.    Yes.
22     Q.    Did that happen on more than one
23  occasion?
24     A.    Well, now I'm not able to tell you

45

CLARENCE WALKER

1  whether I received those reports as a member of
2  the board or as a member of the audit committee.
3  I heard it a lot at audit committee meetings
4  during this time and it may be that the board as
5  a whole heard it a lot.  I don't recall that.
6      Q.    Okay.  Thank you.
7          If I could please direct your
8  attention to the final paragraph on the first
9  page which begins "the next item of business was
10  a report by Mr. Muir"?
11     A.    Yes.
12     Q.    There is a reference there to Mr.
13  Muir's effort to monetize some or all of the
14  corporation's inventory of subordinated
15  asset-backed securities?
16     A.    Yes.
17     Q.    Do you know if Mr. Muir did that at
18  the direction of the board of directors?
19     A.    I don't know.  He did it with the
20  knowledge of the board of directors.  Whether
21  the board ever issued a specific mandate that he
22  do that I doubt.
23     Q.    Do you have an understanding of why
24  Mr. Muir was focused upon attempting to monetize

46

2   certain subordinated asset-backed securities?

3   A.   Yes.  The company -- throughout this

4   period the company was cognizant of the need to

5   turn debt into cash.  The subordinated pieces

6   were the pieces that were not included in the

7   primary securitizations.  They were so-called

8   retained pieces, and it -- more and more

9   necessary as we moved along in this difficult

10  time to cash those out.

11       Q.   If I could please direct you, Mr.

12  Walker, now to tab four?

13       A.   All right.

14       Q.   Tab four bears Bates range KCLH 1172

15  through 1174 and is a copy of the minutes of the

16  board through June 8, 2001.  And you will see,

17  Mr. Walker, you are listed again as a

18  participant in the second paragraph of this

19  document, do you see that?

20       A.   Yes.

21       Q.   I would like, please, to direct you to

22  the final page bearing Bates range 1174?

23       A.   Yes.

24       Q.   And the paragraph beginning "The next

25  item of business was a report from Mr. Smith on

47

2   repossessed and resold homes was higher than the

3   rate -- than the level of defaults and

4   repossessions on initially sold homes.  And the

5   loan assumption program helped in that respect.

6        Q.   So am I correct, Mr. Walker, that as

7   of June 2001, the board of directors supported

8   Oakwood's usage of the loan assumption program?

9             MS. CHOW:  Object to the form of the

10  question.

11       A.   You are correct that the board

12  supported in the sense of having heard reports

13  that it was going on, the board made no

14  objection to it.

15       Q.   Was there, do you know, a member of

16  management who had principal responsibility for

17  overseeing the program?

18       A.   I'm sorry, I didn't understand the

19  question.

20       Q.   Do you know who at the company if

21  anyone was responsible for overseeing Oakwood's

22  use of the LAP?

23       A.   Well, the person who reported to the

24  board as this document reflects is Bob Smith who

25  at this time was the chief financial officer.

49

1   activities being undertaken," do you see that?

2        A.   Yes.

3        Q.   There is a reference in this paragraph

4   to something called the loan assumption program.

5             Do you have an understanding of what

6   that program was intended to achieve?

7             MS. CHOW:  Objection to the form of

8   the question.

9        A.   Yes.

10       Q.   What is that understanding?

11       A.   Well, my understanding is that the

12  program was intended to avoid our going into the

13  process of selling repossessed inventory to

14  retail buyers.  The costs of refurbishing a home

15  after it was repossessed, the transaction fees

16  involved in repossession and the resale all were

17  heavy drains on the earnings of the company.

18            The thought was that if you could

19  obtain a person, if there was a person willing

20  to assume the loan, then you would shortcut a

21  lot of those expenses.

22            Also we had recognized on the board

23  and the audit committee that the level of

24  repossessions, of defaults that occurred on

48

1        Q.   Do you know upon what date Oakwood

2   first began using the assumption program?

3        A.   In order to answer that question I

4   have to point out that there had -- we had

5   been -- the company had been experiencing loan

6   assumptions and using loan assumptions, so far

7   as I'm aware forever.

8             Whenever a person in default was able

9   to find another person who would assume the

10  loan, the company would accept it, the

11  assumption.  It was along about this time

12  that -- this time being in the 2001 era -- that

13  management indicated that the loan assumption

14  program could be emphasized as a means of

15  accomplishing the results I have already told

16  you about.

17       Q.   Did you ever see any evidence that

18  Credit Suisse controlled Oakwood's use of the

19  loan assumption program?

20            MS. CHOW:  Object to the form of the

21  question.

22       A.   I never saw any such evidence.

23       Q.   Did you ever see any evidence that

24  Credit Suisse directed that Oakwood use the loan

50

CLARENCE WALKER

1
2   assumption program in an increased and
3   aggressive manner?
4          MS. CHOW:  Object to the form of the
5   question.
6      A.   No, I did not.
7      Q.   Am I correct that the board of
8   directors would receive periodic updates from
9   management on the company's use of the loan
10  assumption program?
11     A.   You are correct in the sense that from
12  time to time either the board of directors or
13  the audit committee would hear reports from
14  management on the loan assumption program.
15  There was as far as I can recall no regular
16  reporting process for that program to the board.
17     Q.   If we could please turn now to tab
18  five --
19     A.   I don't hear you.
20     Q.   If we could turn now please to tab
21  five?
22     A.   All right.
23     Q.   Which bears Bates range OHC 045530
24  through 32, and this document is a copy of
25  minutes of the audit committee July 23rd, 2001,

---

1          CLARENCE WALKER
2   and you will see, Mr. Walker, that you are
3   listed as a participant in the second paragraph,
4   do you see that?
5      A.   Yes.
6      Q.   If could you turn, please, to the
7   second page of this document and the paragraph
8   beginning "the next topic of discussion was a
9   review of"?
10     A.   Yes.
11     Q.   Do you see that paragraph?
12     A.   Yes.
13     Q.   There is a reference in the third
14  sentence to "the committee then reviewed an
15  analysis of the loan assumptions program"?
16     A.   Yes.
17     Q.   Is this consistent with your
18  recollection that the audit committee was
19  occasionally kept apprised of the use of the
20  loan assumption program?
21     A.   Yes.
22     Q.   If I could please direct you to the
23  next paragraph beginning "Ms. Wood then
24  presented"?
25     A.   Yes.

---

1
2      Q.   If you go five sentences down from the
3   top to the sentence beginning "it is anticipated
4   that another securitization may take place in
5   August"?
6      A.   Yes.
7      Q.   Am I correct that the audit committee
8   was also kept apprised of Oakwood's intended use
9   of securitizations?
10         MS. CHOW:  Object to the form of the
11  question.
12     A.   You are absolutely correct.
13     Q.   If I could, please, direct your
14  attention to the following tab, tab six, which
15  is a copy of the minutes of the meeting of the
16  board of directors for July 24th, 2001, bearing
17  Bates range KCLH 1176 through 1181.
18         Mr. Walker, do you see yourself listed
19  as a participant in the second paragraph?
20     A.   Yes.
21     Q.   If I could please direct your
22  attention to the paragraph beginning "The first
23  item of business was a briefing from Mr. Muir"?
24     A.   Yes.
25     Q.   Does this paragraph, do you know,

---

1
2   represent Mr. Muir's successful attempt to
3   monetize what you have described as retained
4   REMIC securities?
5      A.   Yes.
6      Q.   Do you know who the buyer of those
7   securities was as described in this paragraph?
8      A.   No.
9      Q.   Am I correct that you have previously
10  testified that the benefit to the company of
11  proceeding with a transaction like this was that
12  it permitted the company to generate needed
13  liquidity?
14         MS. CHOW:  Object to the form of the
15  question and asked and answered.
16     A.   Yes.
17     Q.   If you go, please, to the second to
18  last sentence in this paragraph that reads, "it
19  was the unanimous consensus of the board that
20  the transaction be completed," am I correct that
21  the board would not have approved this
22  transaction if it did not believe it was in the
23  best interest of the company?
24         MS. CHOW:  Object to the form of the
25  question.

CLARENCE WALKER

1  
2    A.    You are correct.  
3    Q.    Now, if we could please now turn to  
4  tab seven?  
5    A.    All right.  
6    Q.    Which are minutes of the meeting of  
7  the board of directors for November 15, 2001  
8  bearing Bates range KCLH 1201 through 1207.  
9         Do you see, sir, your name listed as a  
10 participant in the third paragraph?  
11   A.    Yes.  
12   Q.    If I could please ask you to turn to  
13 the second page?  
14   A.    All right.  
15   Q.    And the fifth paragraph from the top,  
16 please, that reads:  "The next item of business  
17 was a report by Mr. Smith on the status of the  
18 pending Foothill loan transaction, the  
19 resecuritization of subordinated ABS securities  
20 closed in August, and the upcoming regular loan  
21 securitization."  
22   A.    Yes.  
23   Q.    Is that notation consistent with your  
24 testimony that the board was kept regularly kept  
25 apprised of securitizations by the company?  

CLARENCE WALKER

1    top beginning:  "Ms. Oakwood led the group in a  
2    review of the results."  
3  
4    A.    Yes.  
5    Q.    Do you see that paragraph?  
6    A.    Yes.  
7    Q.    There is a reference in the third line  
8  from the bottom of that paragraph to "higher  
9  expenses related to the loan assumption program  
10 beginning to erode the positive difference," do  
11 you see that reference?  
12   A.    Yes.  
13   Q.    Do you know if in May 6, 2002, this  
14 was the first time the audit committee was being  
15 made aware of higher expenses associated with  
16 the loan assumption program?  
17        MS. CHOW:  Object to the form of the  
18 question.  
19   A.    I don't have any independent  
20 recollection of our having, that is, the audit  
21 committee's having been advised of that at any  
22 earlier time.  
23   Q.    Do you know if Oakwood itself  
24 internally had systems in place that would allow  
25 it to track the costs associated with the loan  

CLARENCE WALKER

1  
2         MS. CHOW:  Object to the form of the  
3  question.  
4    A.    That's correct.  I want to say that  
5  that had not been the case in the decade of the  
6  nineties.  That was the case in this decade -- I  
7  mean, in this period of 2000 and 2002 because  
8  the securitizations were becoming more costly  
9  because of the rates, that is, the interest  
10 rates and because of the downgradings of the  
11 securities in those securitizations.  
12        And the board was very concerned about  
13 being certain that we were continuing to be able  
14 to do so on a basis that wasn't ultimately  
15 punitive.  
16   Q.    Did the board satisfy itself that in  
17 2002 it was still appropriate for Oakwood to  
18 engage in securitizations?  
19   A.    It did.  
20   Q.    If I could please ask you now to turn  
21 to tab nine which is a document bearing Bates  
22 range KCLH 1229 through 1230 and is a copy of  
23 the minutes of meeting of the audit committee on  
24 May 6, 2002, and if I could, Mr. Walker, direct  
25 your attention to the sixth paragraph from the  

CLARENCE WALKER

1  
2    assumption program?  
3    A.    Yes, I know that the company did have . . .  
4    such systems in place  
5    Q.    Do you know if those systems were  
6  adequate to accurately capture the costs  
7  associated with the program?  
8         MS. CHOW:  Object to the form of the  
9  question.  
10   A.    No, I do not.  
11   Q.    I'm sorry, the answer was?  
12   A.    No, I do not.  
13   Q.    If I could please direct your  
14 attention to the final paragraph on the first  
15 page?  
16   A.    All right.  
17   Q.    There is a reference in the fifth line  
18 from the top of that paragraph to the committee  
19 asking that a report on the progress of PwC's  
20 recommendation to strengthen internal and  
21 monitoring controls surrounding the extensions  
22 and loan assumption program, do you see that  
23 reference?  
24   A.    Yes.  
25   Q.    Do you have any recollection of the

CLARENCE WALKER

2  recommendations made by PwC on that subject?

3  A.    No, at this point I really don't.  I

4  see what's said there but I have no recollection

5  of specifically what weaknesses PwC,

6  PricewaterhouseCoopers, had identified.

7  Q.    So you have no recollection of

8  Pricewaterhouse raising concerns about the

9  company's ability to track expenses associated

10  with the program?

11  A.    No independent recollection.

12  Q.    Okay.  Thank you.

13  If we could, please, proceed to tab 11

14  which is a document bearing Bates range

15  MNAT006776, through 77?

16  A.    Yes.

17  Q.    This is a copy of the minutes of the

18  board of directors for July 29th, 2002, and

19  you'll see, Mr. Walker, you are again listed as

20  a participant in the third paragraph?

21  A.    Yes.

22  Q.    If I could please direct your

23  attention to the paragraph that is the sixth

24  from the top reading:  "The next item of

25  business was a discussion of the corporation's

59

CLARENCE WALKER

1  liquidity position."

3  A.    Yes.

4  Q.    Do you see that?

5  A.    Yes.

6  Q.    There is a reference in this paragraph

7  to "potential solutions to the ongoing

8  performance and financial issues facing the

9  corporation."

10  Do you see that?

11  A.    Yes.

12  Q.    At this point in time, which is to say

13  July 2002, did the board believe there were

14  solutions to the financial issues facing the

15  company?

16  MS. CHOW:  Object to the form of the

17  question.

18  A.    I'm not able to pinpoint the timing

19  with -- exactly on that as you asked the

20  question, but I will say that there were -- the

21  board was continually questioning management

22  during this period about the liquidity position,

23  about whether there were potential programs that

24  would enable us to deal with the senior notes

25  that were coming due in 2004 or '05, that the

60

CLARENCE WALKER

2  ability to continue to do securitizations on a

3  basis that made sense, those were issues that we

4  continually questioned management about during

5  this period.

6  And the responses that we were getting

7  from management during this period was that the

8  programs that management was putting in place,

9  we were downsizing, we were -- had begun -- at

10  some point we began to wholesale rather than to

11  re-- rather than to continue the loan assumption

12  program, we wholesaled the repossessions or a

13  lot of them.  And while that was costly at the

14  bottom line, it was -- preserved cash and was --

15  and improved -- had a tendency to improve the

16  liquidity position.

17  We were, as I say, closing sales

18  centers.  The company was closing manufacturing

19  plants and cutting expenses, and there was every

20  expectation until very late in the game that we

21  would be able to come through this.  Everybody

22  were seeing during this period signs of

23  improvement in the industry as a whole, and the

24  thought was that we could weather this storm.

25  Now, I can't pin that to a month or a

61

CLARENCE WALKER

1  week or a particular meeting.  I just say that

2  that was the case until fairly late in the game.

3  Q.    Perhaps if we could focus on the date

4  that Oakwood filed for bankruptcy which was

5  November 15, 2002, using that as a reference

6  point, do you recall at what point in time it

7  became clear to the board of directors that

8  Oakwood would be required to file for

9  bankruptcy?

10  MS. CHOW:  Object to the form of the

11  question.

12  A.    I would say yes, I do recall that it

13  was not too much ahead of that time.  Maybe a

14  month or two ahead of that it became obvious

15  that we were going to have to go through some

16  kind of reorganization.  How it happened,

17  whether it was in bankruptcy or outside of

18  bankruptcy, was something that the board

19  considered.  And I would think that maybe thirty

20  to sixty days prior to the filing of the

21  bankruptcy the board began to contemplate some

22  type of complete reorganization.

23  Q.    If I could, what I would suggest is

24  that we take a five-minute break because I don't

62

CLARENCE WALKER

1  hire that much additional ground to cover, and
2  if I take a break I can perhaps streamline
3  things.
4       MS. CHOW:  Sure.
5       MR. OSNATO:  So my watch reads 2:24,
6  so I would suggest we reconvene if it is all
7  right with everyone in ten minutes.
8       MS. CHOW:  Sure.
9       MR. OSNATO:  Is that okay with you,
10 Mr. Walker.
11      THE WITNESS:  That suits me fine.
12      MR. OSNATO:  So
13      THE WITNESS:  Now, by reconvene, do
14 you mean hang up and calling into this number
15 again?
16      MR. OSNATO:  I plan to stay on the
17 line.  I think it is probably easiest if
18 everyone does that.
19      THE WITNESS:  All right.  I will do
20 that.
21      MR. OSNATO:  Thank you very much.
22      (Recess)
23 BY MR. OSNATO:
24      Q.  Mr. Walker, you remain under oath --

63

CLARENCE WALKER

1       A.  Yes.
2       Q.  As you know.
3           Am I correct, Mr. Walker, that you
4  have previously testified that in 2002 the
5  company had in place a downsizing and
6  rationalization plan, is that right?
7       A.  Yes.
8       Q.  Was it the company's hope that the
9  downsizing plan would allow it to weather the
10 storm and avert bankruptcy?
11      MS. CHOW:  Objection to the form of
12 the question.
13      Q.  Did you understand the question, Mr.
14 Walker?
15      A.  Yes.  You are right, the downsizing
16 and rationalization plan was only one of the
17 things that we were doing in the effort to get
18 through this period without bankruptcy.
19          One of the other areas was that we
20 changed -- management changed the whole system
21 of accountability at the sales center manager
22 level of the credit quality -- for the credit
23 quality for the purchasers of our homes.
24          That had been one of the things that

64

CLARENCE WALKER

1  management and the board believed differentiated
2  our situation from that of companies like
3  Clayton.  And the difference was that the
4  managers under the new system began to be
5  accountable for credit losses on sales that were
6  made at their credit center, at their sales
7  center in computing the incentive compensation
8  of the sales center's manager.
9           That was an important -- that was a
10 change that the board considered to be important
11 in improving credit quality, therefore
12 diminishing or reducing the number of defaults
13 and repossessions because repossessions are
14 expensive, however you get rid of them.
15          I think that completes my answer.
16      Q.  Thank you.  Am I correct that while
17 all of the things you have just described were
18 ongoing in 2002, that the board continued to
19 believe that securitizations were an appropriate
20 way to finance the company?
21      MS. CHOW:  Objection to the form of
22 the question.
23      A.  The answer is yes.
24      Q.  Thank you.  If I could, Mr. Walker,

65

CLARENCE WALKER

1  please direct you to tab 15 which bears Bates
2  range MNAT 006827 through 6828, and this is a
3  copy of the minutes of the meeting of the board
4  for October 28, 2002.
5           You will see, sir, that you are listed
6  as a participant in the third paragraph, do you
7  see that?
8           If I could, please, Mr. Walker, direct
9  you to the second page of this document, and the
10 first full paragraph beginning:  "Mr. Standish
11 next reported that FTI."
12      A.  Yes.
13      Q.  Do you have a recollection of the role
14 that was played by FTI in the period prior to
15 Oakwood's bankruptcy?
16      A.  I really don't.  I am sitting here
17 trying to remember what the FTI even stands for
18 and I don't.
19      Q.  Well, I think I can tell you.  I don't
20 know what FTI stands for, but FTI is a
21 consulting firm that -- well, it is a consulting
22 firm.
23          But I take it you have no recollection
24 of the services provided by FTI?

66

**Page 67**

CLARENCE WALKER

A.   No specific recollection at this time.

Q.   There is a reference in this paragraph to DIP financing.

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   Do you understand that it was the responsibility of management working with FTI to obtain such financing?

MS. CHOW:  Object to the form of the question.

A.   I understood that -- I understand now and I understood then that it was management's effort and responsibility to seek and obtain debtor in possession financing.  I still don't have a complete recollection or clear recollection of the role of FTI.

Q.   If I could correct your attention to tab 16 which bears Bates range OHC 020348 through 350 and which is a copy of the minutes of the board meeting for November 4th, 2002?

A.   Yes.

Q.   If you could please refer to the final paragraph on the first page?

**Page 68**

CLARENCE WALKER

A.   Yes.

Q.   Do you see the quotation beginning, "Mr. Standish further briefed the board on discussions with Foothill Capital regarding DIP financing noting that Foothill appeared receptive to providing same and that discussions would be continuing this week"?

A.   Yes.

Q.   Do you know if Foothill ultimately provided the company with DIP financing as part of the bankruptcy filing?

MS. CHOW:  Objection, asked and answered.

Q.   You can answer, sir.

A.   It is my general recollection that Foothill did indeed provide the DIP financing.

Q.   Is it also your recollection that in early November it was the expectation of the board and the company that Foothill would in fact provide the required financing?

MS. CHOW:  Objection, asked and answered as misleading.

Q.   You can answer.

A.   Well, the board accepted management's

**Page 69**

CLARENCE WALKER

reports that it was moving in the direction of obtaining this DIP financing from Foothill.  I think the board did expect the financing to materialize.

Q.   Thank you.  Mr. Walker, those are all the questions I have on behalf of the defendants, and as I began, I want to conclude by saying we are grateful that you took the time to testify here.  This probably wasn't high on your list of priorities, but it was very helpful, and on behalf of the defendants, thank you very much.

A.   You are welcome.

EXAMINATION
BY MS. CHOW:

Q.   Mr. Walker, this is Carol Chow again.  I introduced myself earlier, but just for the record, I am with Stutman Treister & Glatt, and I am counsel for the plaintiff OHC Liquidation Trust.

Thank you very much for appearing for your deposition today.  Again, it is not something that people choose to do, but in any event we are here.  And I do have some follow-up

**Page 70**

CLARENCE WALKER

questions and hopefully it will not take too long.

Mr. Walker, can you tell me when you were first contacted about appearing for a deposition in this case?

A.   I believe it was -- we came here to my -- to our house in Arizona on November 19, and my recollection is that the first contact -- was after that.  That could be wrong.  It was fairly recently, though.  I could probably go into my e-mail -- I was contacted by telephone originally but then -- after that it was just an e-mail exchange.

Q.   Who called you?

A.   Who called me?

Q.   Yes.

A.   Mr. Osnato -- Osnato -- how do you pronounce that?

MR. OSNATO:  The second time was the charm.

A.   Osnato -

MR. OSNATO:  Yes.

A.   - called me.  He's the only person that I talked with or had e-mail exchange with.

CLARENCE WALKER

1
2  Q.   So you had a conversation with Mr.
3  Osnato and an e-mail exchange.
4       Did you have any conversations or
5  communications with anyone else about your
6  deposition or this case in general?  And let me
7  limit that to the past few months?
8  A.   No conversations.  I think that I told
9  a golfing buddy that I was going to have to have
10  my deposition taken, and I obviously told my
11  wife that.  I don't remember discussing it with
12  anybody else.  I know I didn't discuss it with
13  anybody else.  I have been here in Arizona since
14  November 19 and have had no conversations with
15  any of my colleagues in the law firm and very
16  few with anybody else.
17  Q.   Fair enough.
18       Can you just briefly tell me the
19  content of your conversation with Mr. Osnato?
20  A.   Yes.  The first contact he made, he
21  asked me if I would -- he told me about the fact
22  of the lawsuit and whom he was representing and
23  told me -- he asked me if I would be willing to
24  have my deposition taken with respect to my role
25  on the board of directors during the period

CLARENCE WALKER

1  was just wondering if he provided any other
2  materials aside from what was sent to you on
3  December 6?
4  A.   No.
5  Q.   Aside from the -- well, we covered the
6  telephone conversation.  You also mentioned an
7  e-mail.
8       Can you tell me what the e-mail was
9  about?
10  A.   The e-mail exchange had to do with
11  settling on a date for the deposition and he
12  advised me by e-mail that he -- I think I had
13  told him in the telephone conversation that I'm
14  in a fairly remote place out here in Arizona,
15  that it would be a long drive for me to go
16  either to Phoenix or Tucson, and I think that in
17  the e-mail exchange he explained to me that he
18  could conduct the deposition by telephone and
19  that was pleasing to me.  And the rest of the
20  e-mail exchange had to do simply with settling
21  on a time and date.  There is no substance in
22  the e-mail exchange.
23  Q.   Have you spoken to any -- strike that.
24       Earlier in this deposition you had
25

71

CLARENCE WALKER

1  involved.  I told him that I would be willing to
2  do that.  I wouldn't be eager to do it but I
3  would be willing to do it.
4  Q.   How long was the conversation roughly?
5  A.   Oh, not more than five minutes,
6  probably not more than three minutes.
7  Q.   How did he describe the lawsuit to you
8  if you recall?
9  A.   He described the lawsuit as a suit by
10  the trust, and, of course, at this point I was
11  aware of the existence of the trust, against
12  Credit Suisse, claiming that Credit Suisse used
13  its inside information and its leverage with the
14  company to exact fees that it was not entitled
15  to.
16  Q.   Did he provide any materials to you
17  aside from the package that was forwarded to you
18  on December 5?
19  A.   Yes.  He provided a covering letter
20  for that package and that -- I don't know
21  whether the covering letter is in that package,
22  but that covering letter is dated December 6
23  and -- you want me to read it to you?
24  Q.   No, I actually have a copy of it.  I
25

CLARENCE WALKER

1  testified to the effect that you were satisfied
2  with the financial advisory services provided by
3  CSFB, is that a fair statement?
4  A.   Yes.
5  Q.   Can you tell me over what period of
6  time those services were being provided to
7  Oakwood?
8  A.   I really can't.  CSFB had been an
9  underwriter in some of the securities that
10  Oakwood had sold publicly, but in terms of its
11  service as a financial advisor, those services
12  were probably provided to management at a time
13  prior to the time the board became aware of
14  that.  I don't know that.  But I know that there
15  was a point in time when the board approved a
16  specific contractual arrangement with CSFB, but
17  that was fairly late in the game and I have the
18  sense that CSFB was providing advice both to the
19  audit committee and the board prior to that.
20       The audit committee looked to CSFB for
21  some advice relating to the model that we were
22  using to evaluate the repossessions and the
23  securitizations, and so I really can't tell you
24  what period of time all of that took place.
25

73

72
74

CLARENCE WALKER

2    Q.    Maybe if I can help narrow that down a

3    bit, would it -- obviously the bankruptcy was in

4    December of 2002.  Would you say that the

5    services were being provided throughout 2002 up

6    until the bankruptcy?

7    A.    I don't know the answer to that.  If

8    you say throughout -- going back to January of

9    2002, I doubt it.  I doubt that any services

10   were being provided to the board of Oakwood in

11   the early part of 2002 by CSFB.  But I don't

12   really know.  It just is not in my recollection.

13   Q.    Fair enough.  It was quite a while

14   ago.

15         With respect to the securitizations,

16   you again testified that you were satisfied with

17   the securitizations that were provided by CSFB;

18   again, is that a fair statement?

19   A.    I was satisfied with the services that

20   CSFB provided in reference to the

21   securitizations, yes.

22   Q.    I believe that you had mentioned that

23   you relied on the input of management in terms

24   of arriving at that conclusion.  Was my

25   understanding correct?

---

CLARENCE WALKER

1    A.    Yes, the -- it's correct in -- but I

3    need to elaborate on that because there were

4    times when CSFB spoke directly to the board and

5    those times it undoubtedly, though I don't

6    recall specific instances, spoke with reference

7    to the securitizations.

8         But the services that CSFB provided

9    with reference to the securitizations were

10   reported on not to the audit committee and the

11   board most of the time, not by CSFB itself, but

12   by management.  Management would say we have --

13   we've discussed this with CSFB and they say thus

14   and such and thus and such and thus and such and

15   thus and such.  And we were relying on

16   management's assessment of that as we went

17   along.

18   Q.    Are you familiar with the proof of

19   claim that CSFB filed against the estate?

20   A.    I am not.  Let me say this.  I am

21   aware of it because I did generally look at the

22   complaint.

23   Q.    Let me clarify.  The pleading that you

24   are referring to, is that the pleading that was

25   included in the December 5 package?

---

CLARENCE WALKER

1    A.    Yes, it is in the front --

3    Q.    Okay.

4    A.    Front of that package.

5    Q.    Okay.  That pleading actually is a --

6    is called an objection to proof of claim?

7    A.    All right.  I'm sorry.

8    Q.    Yes, I'm sorry.  It is a little bit

9    confusing.  And this pleading is actually filed

10   in objection to proof of claim filed by Credit

11   Suisse First Boston.  I was actually asking you

12   whether you were aware of the proof of claims

13   that were filed by Credit Suisse?

14   A.    Only through my reading of this

15   objection.

16   Q.    So you have never seen the proof of

17   claim that was actually filed by CSFB?

18   A.    I have not.

19   Q.    Okay.  That was never provided to you?

20   A.    No, I have not.

21   Q.    As the company was approaching

22   bankruptcy, you had some testimony regarding the

23   DIP financing.

24         Do you recall who was responsible for

25   reporting to the board on the status of the DIP

---

CLARENCE WALKER

2    financing?

3    A.    My general recollection is that that

4    was Bob Smith, Robert Smith, who at the time I

5    think -- I think he had -- I think Susan Wood

6    had succeeded him as chief financial officer and

7    he was at that time executive vice president.

8    But he functioned mainly in the financial end of

9    the business.

10   Q.    Do you know what CSFB's involvement

11   was with respect to the DIP financing?

12        MR. OSNATO:  Objection as to the form.

13   You can answer.

14   A.    I don't have an independent

15   recollection of that.

16   Q.    Do you recall anything with regard to

17   the warehouse facility as the company approached

18   bankruptcy?

19   A.    By anything, I am aware that it

20   continues to exist.  I don't recall the details

21   of it, the parameters of it, the fees and

22   interest rates that we were being charged.

23   Those were things that if I knew them

24   specifically I have forgotten them.

25   Q.    Okay.  Do you recall there being any

CLARENCE WALKER

1  CLARENCE WALKER
2  discussion regarding the waiver of any default
3  provision?
4      A.    Yes, I do recall that.  As a member of
5  the audit committee as well as of the board, we
6  were always concerned with default provisions
7  not only in the warehouse facility but in the
8  senior notes and other evidences of indebtedness
9  that we had.
10     Q.    Do you recall what was discussed with
11 regard to the waiver of the warehouse facility,
12 of the default position with respect to the
13 warehouse facility?
14     A.    I don't recall specifically anything
15 with respect to the warehouse facility.
16         MS. CHOW:  If it is all right with
17 everyone can we take a quick five-minute break,
18 then we will reconvene in five minutes?  I just
19 want to gather up my notes.
20         THE WITNESS:  I'll go get my wife and
21 make sure she doesn't hang up the phone.
22         MR. OSNATO:  Okay.  Thank you very
23 much.
24         (Recess)
25         MS. CHOW:  Well, thank you, Mr.

CLARENCE WALKER

1          MR. OSNATO:  I believe that the
2  stipulation we have with Mr. Castanares is that
3  we agreed mutually to waive the 30-day
4  requirement and endeavor to get it in as quickly
5  as possible.
6          MS. CHOW:  Right, okay.  Perfect.
7          THE WITNESS:  Excuse me, let me make
8  this clear to everybody.  I'll be going back to
9  Charlotte on December the 17th, and anything
10 that is sent to me by mail should be sent to my
11 Charlotte office.
12         MR. OSNATO:  Very good.
13         THE WITNESS:  Very good, thank you.
14         MS. CHOW:  Thank you so much, Mr.
15 Walker.
16         (Time noted:  2:59 p.m.)
17
18
19
20  _____
21         CLARENCE WALKER
22 Subscribed and sworn to before me
23 this ____ day of _____, 2006.
24
25 _____

CLARENCE WALKER

1  CLARENCE WALKER
2  Walker.  I'm actually done, and so, mike, do you
3  want to just go back on the record and finish
4  off?
5          MR. OSNATO:  I do, yes, thank you,
6  Carol.  Before I do that I just have one piece
7  of housekeeping, and that is what I had marked
8  as Exhibit 200 I now realize would be
9  duplicative of a preexisting Exhibit 200, so I
10 have therefore asked the court reporter to
11 change the designation to Exhibit 300 and to
12 correct any references in the transcript.
13         That's all that I have for
14 housekeeping and I believe the deposition is
15 concluded.  So once again, thank you, Mr.
16 Walker, and have a wonderful Christmas.
17         THE WITNESS:  Thank you, and the same
18 to all of you.
19         MR. OSNATO:  Okay.  Thank you very
20 much.
21         MS. CHOW:  Thank you.  Before we hang
22 up, because I'm sort of new to the case in terms
23 of these depositions, is there a stipulation in
24 terms of the turn-around time for the review of
25 the deposition transcript?

CLARENCE WALKER

1  STATE OF NEW YORK
2  COUNTY OF NEW YORK
3      I wish to make the following changes, for the
4  following reasons:
5  PAGE LINE
6      CHANGE: _____
7      REASON: _____
8      CHANGE: _____
9      REASON: _____
10     CHANGE: _____
11     REASON: _____
12     CHANGE: _____
13     REASON: _____
14     CHANGE: _____
15     REASON: _____
16     CHANGE: _____
17     REASON: _____
18     CHANGE: _____
19     REASON: _____
20     CHANGE: _____
21     REASON: _____
22     CHANGE: _____
23     REASON: _____
24
25

CLARENCE WALKER

C E R T I F I C A T E

STATE OF NEW YORK

COUNTY OF NEW YORK

    I, BRANDON RAINOFF, a Federal
Certified Realtime Reporter and Notary Public
within and for the State of New York, do hereby
certify:

    That CLARENCE WALKER, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is a
true record of the testimony given by the
witness.

    I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.

    IN WITNESS WHEREOF, I have hereunto
set my hand this____day of_____, 2006.


        _____

        BRANDON RAINOFF, FCRR, CM

83

**0**

006827 [66:3]
020348 [67:20]
04 [23:2]
045530 [51:23]
05 [23:2] [60:25]

**1**

10105 [4:7]
11 [59:13]
1124 [44:16]
1128 [44:17]
1172 [47:14]
1174 [47:15,22]
1176 [53:17]
1181 [53:17]
1201 [55:8]
1207 [55:8]
1229 [56:22]
1230 [56:22]
1345 [3:8] [4:6]
15 [55:7] [62:6] [66:2]
16 [67:20]
17th [81:10]
18 [41:4]
19 [70:8] [71:14]
1901 [4:15]
1953 [8:2,9]
1955 [8:12,19] [9:17]
1959 [9:17]
1961 [9:21]
1971 [10:12] [11:13]

**2**

2:24 [63:6]
2:59 [81:17]
20 [41:9] [42:24]
200 [41:7] [80:8,9]
2000 [14:13,21] [16:25]
  [17:4,11] [20:11] [21:14]
  [41:10] [42:24] [56:7]
2001 [16:21] [19:10] [23:9]
  [34:11] [47:16] [49:7]
  [50:13] [51:25] [53:16]
  [55:7]
20012002 [34:11]
2001-2002 [34:11]
2002 [11:4,15] [12:7] [13:20]
  [14:21] [15:25] [17:11,21]
  [19:11] [20:11] [21:15]
  [23:9,10] [29:4,5,8,12,13,22
  ,25] [30:6] [31:15,24]
  [32:14] [34:22] [56:7,17,24]
  [57:13] [59:18] [60:13]
  [62:6] [64:5] [65:19] [66:5]
  [67:22] [75:4,5,9,11]
2004 [23:2] [60:25]
2005 [23:3]
2006 [81:23] [83:21]
23rd [51:25]

**24th** [53:16]
**28** [66:5]
**29th** [59:18]

**3**

30 [81:4]
300 [40:18,20,25] [41:2]
  [80:11]
30day [81:4]
30-day [81:4]
32 [51:24]
350 [67:21]

**4**

4th [67:22]

**5**

5 [72:19]

**6**

6 [56:24] [57:13] [72:23]
  [73:4] [76:25]
6713 [43:17]
6716 [41:12]
6828 [66:3]

**7**

77 [59:15]

**8**

8 [47:16]

**9**

90067 [4:17]
900676013 [4:17]
90067-6013 [4:17]

**A**

ab [7:18]
ability [36:9,14] [37:4]
  [59:9] [61:2]
able [10:20] [13:11] [15:7,8]
  [25:3,4] [30:2] [31:13]
  [36:18] [45:25] [50:9]
  [56:13] [60:18] [61:21]
abreast [12:16]
abs [55:19]
absolutely [25:18] [30:14]
  [36:13] [53:12]
accept [50:11]
accepted [68:25]
accomplishing [50:16]
accountability [64:22]
accountable [65:6]
accounting [12:17] [13:5]
  [20:21,24]

accumulation [22:18]
accurately [58:6]
achieve [48:7]
acquiesced [34:14]
acquiescing [36:5]
acquisition [23:12]
acquisitions [15:4]
act [19:13]
acted [16:5]
acting [27:17,24]
action [36:2] [45:6,14]
  [83:17]
actions [30:23] [31:13]
activities [48:2]
actually [72:25] [77:5,9,11
  ,17] [80:2]
addition [17:22]
additional [63:2]
adequacy [25:6]
adequate [25:21] [26:12]
  [27:3] [58:6]
adequately [23:24] [24:17]
  [26:12]
admission [9:5]
admitted [9:2]
advances [22:17]
advice [9:8,11,13,14,19]
  [18:22] [19:5] [20:24]
  [21:10] [22:21] [23:7]
  [74:19,22]
advised [33:22,24] [57:21]
  [73:13]
advising [28:20]
advisor [74:12]
advisory [25:21] [26:6]
  [74:3]
again [15:25] [17:10] [19:10]
  [21:14] [24:12] [29:8]
  [44:17] [47:17] [59:19]
  [63:16] [69:17,23] [75:16,18]
  [80:15]
against [72:12] [76:19]
agencies [45:12,19]
aggressive [51:3]
ago [21:2] [38:19] [75:14]
agree [15:12]
agreed [81:4]
agreements [37:12]
ahead [62:14,15]
al [41:3]
allow [57:24] [64:10]
almost [14:7]
along [47:9] [50:12] [76:17]
already [50:16]
always [21:6] [30:16] [79:6]
  [19:2,11] [21:15] [24:12]
  [30:8,15] [32:22] [33:15]
  [34:2] [35:13] [38:12]
  [39:10] [43:23] [44:6]
  [49:6] [51:7] [53:7] [54:9,20]
  [64:4] [65:17] [66:17]
  [69:19,20] [76:20] [78:19]
  [83:16,18]

ambiguous [24:3]
americas [3:8] [4:6]
analysis [52:15]
angeles [4:17]
answer [6:15,23] [8:9]
  [13:11] [15:20] [16:22]
  [24:20] [25:8,23] [34:21]
  [35:7,8] [36:7,18] [50:4]
  [58:11] [65:16,24] [68:15,24]
  [75:7] [78:13]
answered [54:15] [68:14,23]
anticipate [7:6] [32:8]
anticipated [53:3]
anybody [71:12,13,16]
anyone [49:21] [71:5]
anything [29:24] [78:16,19]
  [79:14] [81:10]
apologize [16:14]
appeared [68:6]
appearing [4:12] [69:22]
  [70:5]
appreciation [13:25]
apprised [33:16] [35:14]
  [52:19] [53:8] [55:25]
approached [39:21] [78:17]
approaching [77:21]
appropriate [15:15] [56:17]
  [65:20]
approval [12:19] [19:19]
  [34:17] [43:21] [44:9]
approve [12:18] [35:22]
approved [19:16] [34:3]
  [36:3,4] [43:24] [54:21]
  [74:16]
approving [19:11] [44:7]
approximate [38:16]
approximately [11:15]
  [13:8] [17:11,15]
area [9:25] [21:13]
areas [64:20]
arizona [70:8] [71:13]
  [73:15]
around [12:6] [15:3]
arrangement [31:7] [74:17]
arriving [75:24]
artificially [28:21]
aside [72:18] [73:3,6]
ask [5:16] [6:12,23] [7:15]
  [16:20] [25:19] [26:9]
  [40:11] [41:13,15] [43:15]
  [55:12] [56:20]
asked [25:17] [28:13]
  [54:15] [60:19] [68:13,22]
  [71:21,23] [80:10]
asking [6:25] [24:12] [58:19]
  [77:11]
assess [25:4]
assessment [76:16]
asset [46:16] [47:2]
assetbacked [46:16] [47:2]
asset-backed [46:16]
  [47:2]
assigning [45:20]
assistance [15:14]

associate [9:20]
associated [57:15,25]
  [58:7] [59:9]
association [9:9]
assume [48:21] [50:10]
assumption [48:5] [49:5,8]
  [50:3,12,14,20] [51:2,10,14]
  [52:20] [57:9,16] [58:2,22]
  [61:11]
assumptions [50:7] [52:15]
assuring [30:21] [31:10]
attempt [32:14] [54:2]
attempting [31:2] [46:25]
attend [8:14,16] [20:5]
  [21:3]
attended [8:18] [20:12,18,23]
  [21:7]
attendee [42:7]
attention [26:3,6] [46:9]
  [53:14,22] [56:25] [58:14]
  [59:23] [67:19]
attorneys [4:5,14]
audit [11:22,24] [12:4,6,12
  ,13] [13:7] [28:9,10] [33:23
  ,24] [46:3,4] [48:24] [51:13
  ,25] [52:18] [53:7] [56:23]
  [57:14,20] [74:20,21]
  [76:10] [79:5]
auditors [12:19]
august [9:16] [53:5] [55:20]
available [5:10] [19:3]
  [31:25]
avenue [3:8] [4:6,15]
avenues [30:24]
avert [64:11]
avoid [48:13]
aware [34:17] [35:19]
  [50:8] [57:15] [72:12]
  [74:14] [76:21] [77:12]
  [78:19]


B

ba [8:8,10]
back [75:8] [80:3] [81:9]
background [7:14,16]
baldwin [9:10]
bankruptcy [11:4] [12:7]
  [13:17,20,24] [15:10,16]
  [16:2] [17:5] [23:9] [25:22]
  [26:8] [30:4,8] [37:16]
  [62:5,10,18,19,22] [64:11
  ,19] [66:16] [68:12] [75:3,6]
  [77:22] [78:18]
bar [8:23,24,25] [9:2,6,8]
based [24:15] [26:9] [37:20]
  [30:3] [56:14] [61:3]
basis [13:21] [17:8,17,18]
bates [41:11] [43:16] [44:16]
  [47:14,22] [51:23] [53:17]
  [55:8] [56:21] [59:14]
  [66:2] [67:20]
bearing [41:4] [43:16]
  [47:22] [53:16] [55:8]

  [56:21] [59:14]
bears [44:16] [47:14] [51:23]
  [66:2] [67:20]
became [9:20,22] [11:12]
  [29:22] [30:2,7] [35:17]
  [62:8,15] [74:14]
become [33:10]
becoming [56:8]
began [9:9] [12:4] [14:8,13]
  [15:5] [29:22] [38:19,21]
  [50:3] [61:10] [62:22]
  [65:5] [69:8]
beginning [7:16] [9:14]
  [10:12] [44:23] [47:24]
  [52:8,23] [53:3,22] [57:2,10]
  [66:11] [68:3]
begins [42:11] [46:10]
begun [61:9]
behalf [5:8] [69:7,12]
believe [18:19] [28:17]
  [29:2,4,9] [34:25] [43:25]
  [54:22] [60:13] [65:20]
  [70:7] [75:22] [80:14]
  [81:2]
believed [19:4] [21:16]
  [27:23] [44:8] [45:19]
  [65:2]
benefit [30:10] [54:10]
benefited [30:22] [31:12]
best [16:5] [43:25] [54:23]
better [26:4] [33:9,12,13]
bit [32:22] [75:3] [77:8]
blood [83:18]
board [10:16] [11:7,9,11,16
  ,20,21] [12:18] [13:9,13,16
  ,22] [15:14] [16:3] [17:7,12
  ,13,15,16,24] [18:23]
  [19:3,12,16,18,19] [20:6,12
  ,19,20,23] [21:3,7,12,15]
  [22:4,5,21,23] [23:4,14]
  [24:24] [25:3,4,9] [26:10]
  [27:10,23] [28:11] [29:8,13]
  [30:7,10,15,20,23] [31:9]
  [32:19] [33:5,16,21] [34:2
  ,12,16,17] [35:13,18,21]
  [36:3,10,20,23,25] [37:9,15]
  [38:3] [41:11,18,22] [42:23]
  [43:7,10,23] [44:7,19]
  [45:10,15,19] [46:3,5,19,21
  ,22] [47:16] [48:23] [49:7,11
  ,13,24] [51:7,12,16] [53:16]
  [54:19,21] [55:7,24] [56:12
  ,16] [59:18] [60:13,21]
  [62:8,19,22] [65:2,11,19]
  [66:4] [67:22] [68:4,20,25]
  [69:4] [71:25] [74:14,16,20]
  [75:10] [76:4,11] [77:25]
  [79:5]
boards [19:23]
bob [49:24] [78:4]
booklet [40:18]
boston [22:6] [42:15]
  [77:11]
bottom [42:11] [43:20]

  [57:8] [61:14]
brandon [3:9] [83:7,24]
breach [39:8]
break [7:9] [62:25] [63:3]
  [79:17]
brief [35:12]
briefed [68:4]
briefing [53:23]
briefly [5:16,23] [9:13]
  [12:9] [14:4] [71:18]
bring [31:2]
bringing [23:10]
broad [20:9]
buddy [71:9]
build [32:9]
buildup [32:9]
build-up [32:9]
built [14:25] [15:2]
business [14:15] [15:6]
  [42:12] [44:24] [46:10]
  [47:25] [53:23] [55:16]
  [59:25] [78:9]
buyer [54:6]
buyers [48:15]


C

california [4:17]
call [40:17]
called [38:10] [48:5] [70:15
  ,16,24] [77:6]
calling [19:7] [63:15]
cant [61:25] [74:9,24]
capacity [23:15] [27:15]
  [28:9] [34:24] [38:13]
capital [68:5]
captioned [41:2]
capture [58:6]
career [9:14]
carol [4:18] [69:17] [80:6]
carolina [8:24] [9:3,7,8,18]
  [18:4,6]
case [19:17] [56:5,6] [62:3]
  [70:6] [71:6] [80:22]
cash [30:3] [32:6,8] [47:5,10]
  [61:14]
castanares [81:3]
ceased [10:14,18]
center [64:22] [65:7,8]
centers [29:17] [61:18]
  [65:9]
certain [18:7] [31:20] [47:2]
  [56:13]
certainly [18:15] [22:10]
  [34:11] [37:25]
certified [3:10] [83:8]
certify [83:10,16]
change [15:6] [65:11]
  [80:11] [82:7,9,11,13,15,17
  ,19,21,23]
changed [14:11] [64:21]
changes [15:8] [82:4]
chappaqua [18:12]
charge [21:12]

charged [78:22]
charlotte [81:10,12]
charm [70:21]
chief [13:4] [20:15,21]
  [49:25] [78:6]
choose [69:24]
chow [4:18] [6:20] [15:18]
  [16:8,18,23] [17:2] [18:24]
  [19:14] [20:3,7] [21:20]
  [23:25] [24:18] [25:14,24]
  [26:13] [27:4,19] [28:2,24]
  [30:12,18] [31:16] [32:16]
  [33:2,19] [34:5] [35:5,24]
  [36:11,16] [37:7,17,23]
  [38:6] [41:19] [42:25]
  [44:3,10] [48:8] [49:9]
  [50:21] [51:4] [53:10]
  [54:14,24] [56:2] [57:17]
  [58:8] [60:16] [62:11]
  [63:5,9] [64:12] [65:22]
  [67:11] [68:13,22] [69:16,17]
  [79:16,25] [80:21] [81:7,15]
christmas [80:16]
city [9:11] [18:13]
claim [39:8] [76:19] [77:6,10
  ,17]
claiming [72:13]
claims [77:12]
clarence [3:1,6] [4:1] [5:1,2]
  [6:1] [7:1] [8:1] [9:1] [10:1]
  [11:1] [12:1] [13:1] [14:1]
  [15:1] [16:1] [17:1] [18:1]
  [19:1] [20:1] [21:1] [22:1]
  [23:1] [24:1] [25:1] [26:1]
  [27:1] [28:1] [29:1] [30:1]
  [31:1] [32:1] [33:1] [34:1]
  [35:1] [36:1] [37:1] [38:1]
  [39:1] [40:1] [41:1] [42:1]
  [43:1] [44:1] [45:1] [46:1]
  [47:1] [48:1] [49:1] [50:1]
  [51:1] [52:1] [53:1] [54:1]
  [55:1] [56:1] [57:1] [58:1]
  [59:1] [60:1] [61:1] [62:1]
  [63:1] [64:1] [65:1] [66:1]
  [67:1] [68:1] [69:1] [70:1]
  [71:1] [72:1] [73:1] [74:1]
  [75:1] [76:1] [77:1] [78:1]
  [79:1] [80:1] [81:1,21]
  [82:1] [83:1,11]
clarification [8:13]
clarify [31:22] [76:23]
clayton [31:8] [65:4]
clear [6:4,24] [15:5] [30:7]
  [31:21] [62:8] [67:17]
  [81:9]
clearly [6:10]
close [26:2]
closed [55:20]
closing [29:17] [61:17,18]
cm [83:24]
coast [15:4]
cognizant [47:4]
coincide [10:15]
collateral [32:4]

A.2

colleagues [71:15]
collection [40:10]
college [7:17]
coming [60:25]
committee [11:22,23,24]
  [12:2,4,6,12,14] [28:9,10]
  [33:23,24] [46:3,4] [48:24]
  [51:13,25] [52:14,18]
  [53:7] [56:23] [57:14]
  [58:18] [74:20,21] [76:10]
  [79:5]
committees [57:21]
communicate [45:18]
communications [71:5]
companies [10:8] [11:8]
  [21:25] [65:3]
company [12:16,19,24]
  [13:2,10,12,15] [23:8]
  [25:13] [29:10,15] [30:11,17]
  [31:18] [32:15,20] [34:4]
  [37:2] [40:2] [47:3,4]
  [48:18] [49:20] [50:6,11]
  [54:10,12,23] [55:25]
  [58:3] [60:15] [61:18]
  [64:6] [65:21] [68:11,20]
  [72:15] [77:21] [78:17]
companys [16:5] [34:9]
  [51:9] [59:9] [64:9]
compensation [11:23]
  [65:8]
competent [16:4]
complaint [24:23] [25:5]
  [39:14,21] [76:22]
complete [6:15] [62:23]
  [67:17]
completed [54:20]
completes [65:16]
comprised [16:4]
computing [65:8]
concerned [22:23] [23:4]
  [30:21] [38:4] [56:12]
  [79:6]
concerning [20:24]
concerns [59:8]
conclude [69:8]
concluded [7:14] [38:20]
  [80:15]
conclusion [28:20] [75:24]
conditions [29:20]
conduct [73:19]
confusing [77:9]
consensus [54:19]
consideration [30:4]
considered [62:20] [65:11]
consist [19:7]
consistent [52:17] [55:23]
constructive [39:2]
consult [19:24]
consultations [22:5]
consulting [66:22]
contact [70:9] [71:20]
contacted [70:5,12]
contemplate [30:8] [62:22]
content [71:19]

continual [34:13]
continually [60:21] [61:4]
continue [61:2,11]
continued [31:15,18,19]
  [65:19]
continues [78:20]
continuing [29:18] [56:13]
  [68:8]
contracts [32:5,6]
contractual [74:17]
control [37:21]
controlled [50:19]
controls [12:21] [58:21]
conversation [71:2,19]
  [72:5] [73:7,14]
conversations [71:4,8,14]
copy [39:14] [47:15] [51:24]
  [53:15] [56:22] [59:17]
  [66:4] [67:21] [72:25]
corporate [10:4,24] [36:9]
corporation [11:13] [13:14]
  [20:17] [31:11] [41:3]
  [60:9]
corporations [46:15]
  [59:25]
correct [8:21] [11:18]
  [17:6,9] [19:2,11] [21:15]
  [26:23] [30:9,14,15,20]
  [32:22] [33:4,15,21] [34:2
  ,7,23] [35:13,16] [38:12,15]
  [39:10,12,16] [43:23]
  [44:5,6,12] [49:6,11]
  [51:7,11] [53:7,12] [54:9,20]
  [55:2] [56:4] [64:4] [65:17]
  [67:19] [75:25] [76:2]
  [80:12]
cost [15:2]
costly [65:8] [61:13]
costs [14:25] [48:15] [57:25]
  [58:6]
counsel [6:18] [9:22] [10:24]
  [19:3] [40:9] [69:20]
counterclaims [39:18]
country [15:3]
counts [38:25] [39:3]
county [82:3] [83:5]
couple [38:19]
coupled [14:24]
course [13:5] [19:19] [23:4]
  [30:25] [44:6] [72:11]
court [6:6,11] [16:12] [40:23]
  [80:10]
courtesy [6:14]
cover [63:2]
covered [73:6]
covering [72:20,22,23]
covington [9:19,24] [10:7,23]
credit [21:24] [22:3,6,8,13
  ,14,20] [23:6,14,17,22,23]
  [24:9,14,16,25] [25:2,10,13
  ,20] [26:7,11,20,24] [27:11
  ,13,16,24] [28:6,13,18,20,22]
  [31:25] [32:3,7] [36:8,14,19
  ,25] [37:5,10,13,14,20]

[38:5] [40:3] [42:15,23]
  [45:11,19] [50:19,25]
  [64:23] [65:6,7,12] [72:13]
  [77:10,13]
critical [32:10]
csfb [43:21,24] [74:4,9,17,19
  ,21] [75:11,17,20] [76:4,8,11
  ,13,19] [77:17]
csfbs [78:10]
curiosity [43:8]
cutting [61:19]

D
_____

d.c [18:3]
date [11:3,25] [22:24]
  [23:2] [50:2] [62:4] [73:12
  ,22]
dated [41:9] [72:23]
dates [11:9]
day [37:21]
days [22:20] [62:21]
daytoday [37:21]
day-to-day [37:21]
deal [22:22] [23:5] [60:24]
debt [31:15,19] [47:5]
debtor [67:16]
decade [14:11,12] [56:5,6]
december [41:9] [42:24]
  [72:19,23] [73:4] [76:25]
  [81:10]
decide [15:15]
decision [37:22]
decisions [30:9] [45:11]
default [50:9] [79:2,6,12]
defaults [48:25] [49:3]
  [65:13]
defendants [3:7] [4:5]
  [5:8] [69:8,12]
defined [24:5]
degree [7:18,19,21] [8:3,9
  ,10,20,22] [38:4]
demanded [36:25]
demise [11:14]
dennis [18:3]
deposed [5:17]
deposition [3:6] [5:11,21]
  [69:23] [70:6] [71:6,10,24]
  [73:12,19,25] [80:14,25]
  [83:12,13]
depositions [80:23]
depth [33:25]
describe [12:11] [72:8]
described [12:23] [19:23]
  [26:22] [54:3,7] [65:18]
  [72:10]
description [35:12]
designation [80:11]
detail [41:14]
details [78:20]
deteriorating [29:24]
develop [9:24]
developed [14:17]
developing [17:20]

developments [12:17]
  [33:17]
dictate [36:9,15]
didnt [15:6,20] [16:14]
  [49:18] [71:12]
difference [57:10] [65:4]
differentiated [65:2]
difficult [47:9]
diminishing [65:13]
dip [67:4] [68:5,11,17]
  [69:3] [77:23,25] [78:11]
direct [37:14] [42:5] [43:19]
  [46:8] [47:11,21] [52:22]
  [53:13,21] [56:24] [58:13]
  [59:22] [66:2,9]
directed [50:25]
direction [46:19] [69:2]
directly [23:17] [76:4]
director [13:7,10,16] [17:23]
  [23:16] [24:15] [25:19]
  [27:15,21] [34:24] [38:13]
directors [10:16] [11:7,10,11
  ,16,20] [13:12,23] [15:14]
  [16:3,5] [17:7,24] [18:17,18]
  [20:14] [21:16] [26:10]
  [30:16] [33:5,16] [34:3]
  [36:10,20,24] [37:11]
  [39:4,5] [41:11,22] [44:19]
  [46:19,21] [49:7] [51:8,12]
  [53:16] [55:7] [59:18]
  [62:8] [71:25]
disagreed [45:10,14]
discharge [12:22] [31:19]
discontinuance [34:20]
discuss [42:23] [71:12]
discussed [28:10] [41:18]
  [43:10] [76:13] [79:10]
discussing [71:11]
discussion [42:19] [43:5]
  [52:8] [59:25] [79:2]
discussions [41:23] [43:11]
  [68:5,7]
dishonest [27:24]
dishonestly [27:17]
disinterested [18:21]
dissatisfied [24:25] [25:10]
  [28:18]
distant [33:11]
distillation [43:4]
distress [29:6]
divide [29:12]
document [40:24] [41:2,9]
  [42:10] [43:16] [47:19]
  [49:24] [51:24] [52:7]
  [56:21] [59:14] [66:10]
documents [40:10,19]
  [41:15]
doesnt [79:21]
doing [16:11] [34:18] [64:18]
done [40:5] [80:2]
dont [12:3] [13:16] [18:16]
  [19:15] [24:4,22] [25:5]
  [28:15] [34:10,15] [37:3,10]
  [38:8] [46:6,20] [51:19]

[57:19] [59:3] [62:25] [66:17
,19,20] [67:16] [71:11]
[72:21] [74:15] [75:7,11]
[76:5] [78:14,20] [79:14]
double [43:3]
doubt [42:22] [46:23]
[75:9]
doug [28:15] [33:25]
douglas [20:18]
down [45:3] [53:2] [75:2]
downgradings [56:10]
downsizing [29:16] [61:9]
[64:6,10,16]
draft [39:21]
drains [48:18]
drive [73:16]
drop [14:14,24]
due [60:25]
duke [7:18,19] [8:18,20,22]
duly [5:3] [83:13]
duplicative [80:9]
during [9:23] [11:19] [13:6]
[14:16,20] [15:4] [17:16]
[18:16,22] [20:10] [22:18,20]
[23:9] [30:9] [31:4] [32:8]
[36:21] [46:5] [60:22]
[61:4,7,22] [71:25]
duties [12:22] [19:5] [39:8]
duty [19:20]

E

eager [72:3]
earlier [34:12] [43:9] [57:22]
[69:18] [73:25]
early [14:13] [29:12] [68:19]
[75:11]
earnings [48:18]
easiest [63:18]
educational [7:16] [8:7]
effect [74:2]
efficient [7:6]
effort [46:14] [64:18] [67:15]
efforts [22:22]
either [6:20] [51:12] [73:17]
elaborate [76:3]
else [71:5,12,13,16]
email [70:12,14,25] [71:3]
[73:8,9,11,13,18,21,23]
e-mail [70:12,14,25] [71:3]
[73:8,9,11,13,18,21,23]
embedded [24:6]
emerge [29:10]
emphasized [50:15]
employee [37:2]
employment [10:6]
enable [60:24]
enabled [32:8]
encapsulate [43:11]
end [30:25] [78:8]
endeavor [81:5]
engage [56:18]
engaged [35:2]
enough [15:9] [36:19]

[71:17] [75:13]
enrich [28:22]
entire [40:18]
entitled [41:10] [72:15]
entity [38:10,14]
entries [14:14]
equity [23:11]
era [14:21] [50:13]
erode [57:10]
escapes [20:22]
especially [16:11]
esq [4:8,9,18,19]
estate [76:19]
et [41:3]
evaluate [28:13] [74:23]
even [17:17] [66:18]
event [69:25]
events [14:2]
ever [24:4,23] [27:16]
[28:5,16,19] [34:16] [45:18]
[46:22] [50:18,24]
every [19:16] [31:9] [61:19]
everybody [26:4] [61:21]
[81:9]
everyone [63:8,19] [79:17]
everything [6:7] [32:18]
evidence [50:18,23,24]
evidences [79:8]
evolved [15:7]
exact [72:15]
exactly [60:19]
exam [8:23,25]
examination [5:5] [69:15]
examined [5:3]
example [41:16] [42:3]
excess [14:17]
exchange [70:14,25] [71:3]
[73:11,18,21,23]
excuse [81:8]
executive [13:2] [20:15]
[78:7]
exhibit [40:18,20,25] [41:2
,7] [80:8,9,11]
exist [78:20]
existence [72:12]
expect [69:4]
expectation [61:20] [68:19]
expenses [48:22] [57:9,15]
[59:9] [61:19]
expensive [65:15]
experience [8:7]
experienced [14:23]
experiencing [14:21]
[29:5] [50:6]
explained [73:18]
explicitly [24:7]
extensions [58:21]
extent [8:6] [22:3,4] [25:2]
[27:13] [32:12]

F

facilities [31:25]
facility [22:17] [26:21]

[27:2,9,12] [32:3,7,13]
[35:11,12,15,17,23] [36:4]
[42:16,24] [43:21,24,25]
[44:7] [78:17] [79:7,11,13
,15]
facing [29:21] [60:8,14]
fact [13:19] [68:21] [71:21]
facts [19:13]
faintly [33:8]
fair [22:10] [25:18] [31:22]
[36:19] [71:17] [74:4]
[75:13,18]
fairly [17:20] [43:5] [62:3]
[70:11] [73:15] [74:18]
fall [29:25]
familiar [5:20] [21:23]
[22:2,7] [76:18]
far [50:7] [51:15]
fast [17:20]
fay [18:6]
fcrr [83:24]
federal [3:10] [83:7]
fees [39:5] [48:16] [72:15]
[78:21]
few [7:7] [7:7,16]
fiduciary [15:13] [19:5]
[39:8]
fifth [45:2] [55:15] [58:17]
file [15:16] [37:15] [62:9]
filed [12:7] [13:20,24]
[16:2] [39:20] [62:5] [76:19]
[77:9,10,13,17]
filing [14:3] [30:4] [62:21]
[68:12]
final [22:20] [26:19] [46:9]
[47:22] [58:14] [67:24]
finally [7:5]
finance [65:21]
financial [12:15,16,25]
[13:3,4] [20:16] [21:17]
[25:20] [26:6] [29:6] [49:25]
[60:8,14] [74:3,12] [78:6,8]
financing [35:3] [67:4,10,16]
[68:6,11,17,21] [69:3,4]
[77:23] [78:2,11]
find [50:10]
fine [63:12]
finish [80:3]
finished [6:13]
firm [9:6,10,19,20,21]
[10:7] [19:8] [66:22,23]
[71:15]
first [5:9,25] [7:15] [19:12,15]
[22:6] [34:10] [41:15]
[42:9,15] [46:9] [50:3]
[53:22] [57:14] [58:14]
[66:11] [67:25] [70:5,9]
[71:20] [77:11]
five [7:11] [51:18,21] [53:2]
[62:25] [72:6] [79:17,18]
fiveminute [62:25] [79:17]
five-minute [62:25] [79:17]
flatten [14:14]
floor [4:16]

florida [18:11]
focus [24:7,12] [26:5,19]
[62:4]
focused [32:19] [46:25]
focusing [11:24] [15:24]
[17:10,21] [19:10] [21:14]
[23:20] [29:3] [30:6]
follow [69:25]
following [8:3] [9:5] [53:14]
[82:4,5]
follows [5:4]
followup [69:25]
follow-up [69:25]
foothill [55:18] [68:5,6,10,17
,20] [69:3]
forever [50:8]
forgotten [78:24]
form [15:18] [16:8] [18:24]
[19:14] [20:3,8] [21:21]
[24:2,18] [25:14,24] [26:13]
[27:4,19] [28:2,25] [30:12
,18] [31:16] [32:5,16]
[33:2,19] [34:5] [35:5,24]
[36:11,16] [37:7,17,23]
[38:6] [39:22] [41:19,23]
[42:25] [44:3,10] [48:8]
[49:9] [50:21] [51:4] [53:10]
[54:14,24] [56:2] [57:17]
[58:8] [60:16] [62:11]
[64:12] [65:22] [67:11]
[78:12]
formed [45:15]
forth [40:20] [83:12]
forwarded [72:18]
four [17:16] [47:12,14]
francis [18:8]
fraud [39:2]
frequent [21:22] [17:18]
front [40:13] [77:2,4]
ftl [66:12,15,18,21,25]
[67:9,18]
full [25:12] [66:11]
fully [19:20] [22:7] [25:8]
[34:17]
functioned [78:8]
further [68:4] [83:16]

G

game [61:20] [62:3] [74:18]
gather [79:19]
gave [13:2]
general [13:25] [14:5]
[33:22] [38:18,22] [39:19]
[68:16] [71:6] [78:3]
generalized [36:5]
generally [5:20] [76:21]
generate [34:4] [54:12]
generated [32:24]
getting [29:13] [61:6]
give [6:2,10,14,20] [11:8]
[16:9] [23:7]
given [83:14]
glatt [4:13] [69:19]

go [53:2] [54:17] [62:16]
[70:11] [73:16] [79:20]
[80:3]
going [13:13] [20:7] [21:20]
[23:25] [28:24] [30:2]
[41:13] [48:13] [49:13]
[62:16] [71:9] [75:8] [81:9]
golfing [71:9]
good [33:14] [81:13,14]
grateful [5:13] [69:9]
greensboro [18:4,5]
ground [5:20] [63:2]
group [57:2]

H

hand [83:21]
hang [63:15] [79:21] [80:21]
happen [45:23]
happened [62:17]
happy [7:2,10]
harbor [31:6]
harmful [35:3]
having [5:3] [25:5] [26:20]
[36:6] [42:7] [49:12] [57:20
,21]
header [43:21]
hear [16:12] [27:10] [33:7,8]
[51:13,19]
heard [46:4,6] [49:12]
heavily [20:17]
heavy [14:25] [48:18]
help [75:2]
helped [49:5]
helpful [69:12]
hereby [83:9]
hereinbefore [83:12]
hereunto [83:20]
hes [70:24]
hickman [9:19]
high [43:8] [69:10]
higher [49:2] [57:8,15]
holt [4:19] [6:20]
home [18:12] [48:15]
homes [10:16] [31:6,8]
[32:5] [41:3] [49:2,4]
[64:24]
honest [6:3]
hope [64:9]
hopefully [16:12] [70:2]
horizon [17:5]
hours [7:7]
house [70:8]
housekeeping [80:7,14]
housing [14:8,11,19]
[31:3]
however [6:21] [65:15]

I

id [25:7]
identification [41:4]
identified [18:20] [26:20]
[59:6]

ill [42:25] [45:6] [79:20]
[81:9]
illinformed [45:6]
ill-informed [45:6]
im [12:3] [13:11] [15:20]
[16:8] [18:7,14] [20:7]
[21:20] [22:6,7] [23:25]
[26:2] [28:24] [31:20]
[33:6,7] [35:7] [36:18]
[41:13] [45:15,25] [49:18]
[50:8] [58:11] [60:18]
[73:14] [77:7,8] [80:2,22]
immediately [9:8]
impartial [18:22]
imply [19:16]
important [5:24] [6:9]
[65:10,11]
improper [27:25]
improve [61:15]
improved [61:15]
improvement [61:23]
improving [29:23] [65:12]
incentive [65:8]
incident [37:3]
included [39:8] [47:6]
[76:25]
including [11:3] [30:25]
inclusion [22:19]
increased [51:2]
increasing [14:21]
incur [31:15,19]
indebtedness [79:8]
indeed [68:17]
independent [45:16] [57:19]
[59:11] [78:14]
indicate [25:9]
indicated [50:14]
indicating [24:24]
individuals [18:20]
industry [14:8] [29:20]
[31:5] [61:23]
influence [38:5]
inform [19:13,20]
information [21:16,19]
[40:6] [44:8] [72:14]
informed [36:6] [38:3]
informing [20:19] [27:23]
initial [13:15]
initially [49:4]
initiated [34:10]
input [75:23]
inside [72:14]
instance [36:24] [38:2,8]
instances [76:6]
instruct [37:14]
integral [34:8] [35:17]
intended [30:10] [48:7,13]
[53:8]
interact [23:17]
intercede [6:19]
interest [16:6] [54:23]
[56:9] [78:22]
interested [83:19]
interests [43:25]

interface [12:15]
interfaced [22:3] [23:14]
internal [12:20] [13:7]
[58:20]
internally [57:24]
interrupt [16:15]
introduced [69:18]
inventory [14:17] [46:15]
[48:14]
investor [23:11]
involved [19:21] [20:17]
[22:14,16] [27:13] [48:17]
[72:2]
involvement [43:8] [78:10]
issue [17:4]
issued [46:22]
issues [22:22] [60:8,14]
[61:3]
item [42:12] [44:23] [46:10]
[47:25] [53:23] [55:16]
[59:24]
itself [19:13,20] [28:23]
[56:16] [57:23] [76:11]

J

j.d [7:22]
january [75:8]
job [8:4]
joined [9:18]
jr [4:8]
judgment [45:16]
july [51:25] [53:16] [59:18]
[60:13]
june [47:16] [49:7]
justin [4:9]

K

kclh [44:16] [47:14] [53:17]
[55:8] [56:22]
kennedy [9:19,23] [10:6,23]
kept [33:16,21,24] [35:13,18]
[52:19] [53:8] [55:24]
kermit [18:4]
kind [62:17]
knew [78:23]
know [6:6,25] [7:10] [13:10]
[31:14,24] [37:4,9,11]
[38:9] [39:14] [40:8] [46:18
,20] [49:15,20] [50:2]
[53:25] [54:6] [57:13,23]
[58:3,5] [64:3] [66:21]
[68:10] [71:12] [72:21]
[74:15] [75:7,12] [78:10]
knowledge [35:21] [46:21]
knowledgeable [31:2]

L

lap [49:22]
large [14:16]
last [54:18]
late [61:20] [62:3] [74:18]

later [8:25] [29:22]
law [7:19] [8:14,17,18,20,23]
[9:9,18,25] [71:15]
lawsuit [38:10,17,23,25]
[39:7,10,15,20] [71:22]
[72:8,10]
least [22:11,16]
led [14:2] [30:3] [57:2]
lee [31:5]
legal [9:14] [10:7,14] [19:4]
legs [7:9]
lengthy [43:5]
let [5:16,23] [6:25] [7:10,15]
[31:22] [41:21] [43:3]
[71:6] [76:20,23] [81:8]
letter [72:20,22,23]
letting [6:15]
level [10:21] [29:5] [43:8]
[48:24] [49:3] [64:23]
levels [14:22]
leverage [72:14]
life [28:22]
limit [71:7]
line [20:8] [45:2] [57:7]
[58:17] [61:14] [63:18]
[82:6]
linklaters [3:8] [4:4]
liquidation [38:11] [39:25]
[69:20]
liquidity [32:25] [34:4]
[54:13] [60:2,22] [61:16]
list [69:11]
listed [42:6] [44:18] [47:17]
[52:3] [53:18] [55:9] [59:19]
[66:6]
little [32:21] [77:8]
ll.b [7:19,21,25] [8:5,6,12]
[50:6,7,11,14,20,25]
[51:9,14] [52:15,20] [55:18
,20] [57:9,16,25] [58:22]
[61:11]
lobdell [9:19]
long [13:18] [34:9] [70:3]
[72:5] [73:16]
longest [13:9]
look [29:23] [45:2] [76:21]
looked [74:21]
looking [31:9]
los [4:17]
losses [65:6]
lost [33:6]
lot [30:24] [46:4,6] [48:22]
[61:13]

M

mail [81:11]
mainly [78:8]
making [5:10] [24:23]
[28:16] [37:22]
management [12:15,24,25]
[13:3] [15:15] [19:25]
[20:5,11,14] [21:18] [22:4]

[27:12,22] [29:14] [30:25]
[33:17,23] [36:15] [38:3]
[45:10,14,17,18] [49:16]
[50:14] [51:9,14] [60:21]
[61:4,7,8] [64:21] [65:2]
[67:9] [74:13] [75:23]
[76:12]
managements [24:23]
[67:14] [68:25] [76:16]
manager [64:22] [65:9]
managers [65:5]
mandate [34:19] [46:22]
manner [25:21] [26:12]
[27:3,25] [51:3]
manufactured [14:7,11,19]
[31:3]
manufacturers [14:19]
manufacturing [14:15]
[15:3] [29:17] [61:18]
march [9:17]
marked [41:4] [80:7]
market [33:18]
marriage [83:18]
mass [32:10]
material [19:12,13,16]
materialize [69:5]
materials [72:17] [73:3]
matter [19:21] [27:10]
[38:22,24] [43:6,9] [83:19]
matters [19:18] [20:20,25]
[21:11] [43:10]
maturity [22:24,25]
maximize [30:16]
maximum [30:22]
may [6:19] [7:11] [46:5]
[53:4] [56:24] [57:13]
maybe [29:21] [62:14,20]
[75:2]
mean [14:20] [16:14] [29:11]
[56:7] [63:15]
meaning [31:20]
means [6:25] [50:15]
meet [17:7,12]
meeting [41:10] [44:19]
[53:15] [55:6] [56:23]
[62:2] [66:4] [67:22]
meetings [20:6,12,19,23]
[21:3,7] [41:18,23] [46:4]
meltdown [14:7]
member [27:22] [28:9]
[46:2,3] [49:15] [79:4]
members [20:13] [21:18]
memorialize [41:23]
mentioned [21:2] [35:10]
[73:7] [75:22]
merger [23:12] [31:7]
met [17:13,15,17]
meyer [18:3]
michael [4:8] [18:5]
mike [80:2]
millennium [14:9]
minutes [7:11] [41:10,16,24]
[42:3] [47:15] [51:25]
[53:15] [55:6] [56:23]

[59:17] [63:8] [66:4] [67:21]
[72:6,7] [79:18]
misleading [68:23]
mnat [66:3]
mnat006712 [41:12]
mnat006776 [59:15]
mobile [32:5]
model [74:22]
moment [15:24] [17:22]
[21:2] [23:21]
monetize [46:14,25] [54:3]
monitoring [17:19] [58:21]
month [61:25] [62:15]
monthly [17:17,18]
months [71:7]
moodys [45:6,11,15]
mostly [23:10]
move [33:14]
moved [47:9]
moves [30:22]
moving [69:2]
mr [5:6,7] [6:20] [7:25]
[11:6] [15:12,19,21] [16:2
,9,19,20] [17:6] [19:2]
[21:2,4,23] [24:6,10]
[28:5,8,19] [29:4] [31:14]
[33:15] [35:10] [38:9]
[39:13] [40:8] [41:5,6,21]
[44:13,17] [46:11,13,18,25]
[47:11,17,25] [49:6] [52:2]
[53:18,23] [54:2] [55:17]
[56:24] [59:19] [63:6,10,11
,13,17,22,24,25] [64:4,14]
[65:25] [66:9,11] [68:4]
[69:6,17] [70:4,18,20,23]
[71:2,19] [78:12] [79:22,25]
[80:5,15,19] [81:2,3,13,15]
ms [6:20] [15:18] [16:8,18,23]
[17:2] [18:24] [19:14]
[20:3,7] [21:20] [23:25]
[24:18] [25:14,24] [26:13]
[27:4,19] [28:2,24] [30:12
,18] [31:16] [32:16] [33:2,19]
[34:5] [35:5,24] [36:11,16]
[37:7,17,23] [38:6] [41:19]
[42:25] [44:3,10] [48:8]
[49:9] [50:21] [51:4] [52:23]
[53:10] [54:14,24] [56:2]
[57:2,17] [58:8] [60:16]
[62:11] [63:5,9] [64:12]
[65:22] [67:11] [68:13,22]
[69:16] [79:16,25] [80:21]
[81:7,15]
mudge [9:10,15,16]
muir [20:18] [21:3,4] [28:5]
[33:25] [46:11,18,25]
[53:23]
muirs [28:8,15] [46:14]
[54:2]
mutually [81:4]
myself [69:18]

N

name [18:8] [20:22] [55:9]
named [9:10]
names [17:23]
narrow [75:2]
neared [29:25]
nearly [13:21]
necessary [19:4] [44:8]
[47:9]
necessity [14:2] [15:9]
[17:19]
need [7:12] [30:8] [47:4]
[76:3]
needed [21:16] [54:12]
negative [43:3] [45:20]
negotiations [42:15]
new [3:8,9,11] [4:7] [8:25]
[9:11] [18:6,7,12,13]
[42:16] [65:5] [80:22]
[82:2,3] [83:4,5,9]
next [42:12] [44:23] [46:10]
[47:24] [52:8,23] [55:16]
[59:24] [66:12]
nine [56:21]
nineties [14:10,12,16]
[15:5] [56:6]
no [7:23] [13:16] [21:6]
[25:10] [27:6,18] [28:4]
[29:2] [33:8] [34:19] [35:4
,8] [36:22] [37:3,19] [39:23]
[40:4] [43:17] [49:13]
[51:6,15] [54:8] [58:10,12]
[59:3,4,7,11] [66:24]
[67:2] [71:8,14] [72:25]
[73:5,22] [77:20] [83:18]
nonemployee [18:18]
normally [17:14]
north [8:24] [9:3,7,8,18]
[18:4,5]
notary [3:10] [83:8]
notation [42:18] [55:23]
noted [81:17]
notes [22:24] [23:6] [60:24]
[79:8,19]
noting [68:6]
november [13:20] [55:7]
[62:6] [67:22] [68:19]
[70:8] [71:14] [75:4]
number [38:25] [63:15]
[65:13]

O

oakwood [5:12] [10:8,16,19]
[11:8,12] [12:7] [13:20,22
,24] [14:23] [15:16,25]
[16:3] [17:7] [18:21,23]
[20:6] [21:25] [22:13]
[24:8,14] [25:22] [26:7]
[28:7,21] [29:5,9,21]
[30:7] [31:15,24] [32:12]
[35:2] [36:21] [37:4,15]
[38:3,5] [41:3,18] [44:2]
[45:21] [50:2,25] [56:17]
[57:2,23] [62:5,9] [74:8,11]

[75:10]
oakwoods [10:23] [11:3]
[13:9] [19:24] [21:5,17]
[27:22] [32:23] [35:14,22]
[37:22] [49:8,21] [50:19]
[53:8] [66:16]
oath [6:2] [63:25]
object [20:7] [21:20] [23:25]
[28:24] [31:16] [32:16]
[33:19] [34:5] [35:5] [36:16]
[37:7,17,23] [38:6] [41:19]
[42:25] [49:9] [50:21]
[51:4] [53:10] [54:14,24]
[56:2] [57:17] [58:8] [60:16]
[62:11] [67:11]
objection [6:19] [15:18]
[16:8,10,13,23] [17:2]
[18:24] [19:14] [20:3]
[24:18] [25:14,24] [26:13]
[27:4,19] [28:2] [30:12,18]
[33:2] [35:24] [36:11]
[44:3,10] [48:8] [49:14]
[64:12] [65:22] [68:13,22]
[77:6,10,15] [78:12]
obligated [6:2]
obligation [15:13]
observation [37:21]
obtain [8:4] [32:6] [48:20]
[67:10,15]
obtained [8:19]
obtaining [69:3]
obvious [5:25] [30:2] [62:15]
obviously [71:10] [75:3]
occasion [27:10] [45:24]
occasionally [52:19]
occasions [45:9]
occur [18:17]
occurred [48:25]
october [66:5]
off [15:9] [80:4]
offering [13:15]
office [13:2] [81:12]
officer [13:4,5] [20:15,16,22]
[49:25] [78:6]
offices [3:7]
oh [72:6]
ohc [38:10] [51:23] [67:20]
[69:20]
okay [7:14] [33:14] [40:16,23]
[46:7] [59:12] [63:10]
[77:3,5,19] [78:25] [79:22]
[80:19] [81:7]
once [80:15]
oncoming [22:24]
one [5:25] [12:15] [14:6]
[22:16,23] [28:16] [32:23]
[40:20] [41:7] [42:2] [44:23]
[45:23] [64:17,20,25]
[80:6]
ones [5:24]
ongoing [60:7] [65:19]
operated [34:18]
operation [27:11] [28:11]
[34:9] [36:6]

operations [21:17]
operator [31:3,8]
operators [14:16]
opportunity [6:11,21]
  [16:10] [23:16] [39:17]
order [50:4]
originally [70:13]
osnato [4:8] [5:6,8] [15:19]
  [16:19] [24:6] [41:5] [63:6
  ,10,13,17,22,24] [70:18,20
  ,22,23] [71:3,19] [78:12]
  [79:22] [80:5,19] [81:2,13]
outcome [83:19]
outside [10:24] [12:19]
  [17:22,24] [18:17] [19:3]
  [23:8] [62:18]
outstanding [22:25]
overreaching [39:2]
oversee [12:20]
overseeing [49:17,21]
own [22:5]

P

p.m [81:17]
package [72:18,21,22]
  [76:25] [77:4]
page [7:3] [42:9] [43:16]
  [44:23] [46:10] [47:22]
  [52:7] [55:13] [58:15]
  [66:10] [67:25] [82:6]
palm [31:6]
paper [22:18,19] [32:9]
paragraph [42:6,11] [43:20]
  [44:18,23] [45:3] [46:9]
  [47:18,24] [48:4] [52:3,7,11
  ,23] [53:19,22,25] [54:7,18]
  [55:10,15] [56:25] [57:5,8]
  [58:14,18] [59:20,23]
  [60:6] [66:7,11] [67:3,25]
parameters [78:21]
part [7:21] [8:9] [10:6]
  [19:5,22] [34:8] [35:17,19]
  [68:11] [75:11]
partial [22:11]
participant [44:19] [47:18]
  [52:3] [53:19] [55:10]
  [59:20] [66:7]
participated [20:19]
participation [30:24]
particular [9:24] [12:2]
  [34:15] [62:2]
parties [83:17]
partner [9:20,21]
party [5:11]
past [5:13] [17:14] [29:14]
  [71:7]
pause [16:17]
paying [26:2]
payments [39:4]
penalties [37:12]
pending [55:18]
people [10:20] [69:24]
per [17:12]

perfect [81:7]
performance [60:8]
perhaps [14:23] [16:9]
  [23:11] [62:4] [63:3]
period [17:10,13,16] [18:16]
  [19:10] [20:10,11] [23:9]
  [25:22] [26:8] [30:9] [31:4]
  [34:11] [47:4] [56:7] [60:22]
  [61:5,7,22] [64:19] [66:15]
  [71:25] [74:6,25]
periodic [51:8]
periods [29:12]
permitted [54:12]
person [48:20] [49:23]
  [50:9,10] [70:24]
personally [10:10,14,19]
personnel [23:17]
phantom [39:5]
phillips [18:4]
phoenix [73:17]
phone [79:21]
piece [26:19] [80:6]
pieces [47:5,6,8]
pin [61:25]
pinpoint [60:18]
place [23:5] [29:16] [41:6]
  [53:4] [57:24] [58:4] [61:8]
  [64:6] [73:15] [74:25]
placing [40:24]
plaintiff [4:14] [6:19] [38:9]
  [40:10] [69:20]
plan [15:6] [23:5] [39:6]
  [63:17] [64:7,10,17]
plants [29:18] [61:19]
played [66:15]
pleading [76:23,24] [77:5,9]
please [6:25] [7:10,15]
  [11:8] [12:11] [42:9] [43:15
  ,19] [44:13,22] [46:8]
  [47:11,21] [51:17,20]
  [52:6,22] [53:13,21] [54:17]
  [55:3,12,16] [56:20] [58:13]
  [59:13,22] [66:2,9] [67:24]
pleasing [73:20]
point [5:12] [7:8] [8:14]
  [10:13] [11:22] [32:9]
  [39:25] [43:9] [50:5] [59:3]
  [60:12] [61:10] [62:7]
  [72:11] [74:16]
policy [36:9,15]
portion [30:6]
portions [20:5]
posey [31:5]
position [9:14] [29:14]
  [60:2,22] [61:16] [79:12]
positive [57:10]
possession [67:16]
possible [7:6] [23:7,11]
  [31:6,10] [81:6]
potential [60:7,23]
practically [14:18]
practice [9:6] [19:23] [20:4]
  [41:22]
practiced [9:25]

practices [12:17]
preceding [26:8]
precisely [24:4]
preexisting [80:9]
preferential [39:3]
prepared [41:17]
present [9:15]
presented [34:16] [52:24]
preserved [61:14]
previously [39:13] [54:9]
  [64:5]
pricewaterhouse [59:8]
pricewaterhousecoopers
  [59:6]
primary [10:24] [47:7]
principal [13:4] [14:6]
  [18:8] [32:24] [39:3] [49:16]
principally [21:4] [31:12]
prior [13:13] [17:15] [19:11]
  [22:18] [39:18] [62:21]
  [66:15] [74:14,20]
priorities [69:11]
probably [14:6] [23:2]
  [26:4] [63:18] [69:10]
  [70:11] [72:7] [74:13]
proceed [59:13]
proceeding [54:11]
process [12:20] [19:22]
  [20:18] [21:5] [35:18,20]
  [37:22] [48:14] [51:16]
professional [26:12] [27:2]
professionally [26:17]
proficiency [10:21]
profitability [32:15,20]
profitable [29:10]
program [28:12,13] [29:19]
  [32:3] [34:8,18] [48:5,7,13]
  [49:5,8,17] [50:3,15,20]
  [51:2,10,14,16] [52:15,20]
  [57:9,16] [58:2,7,22]
  [59:10] [61:12]
programs [29:15] [60:23]
  [61:8]
progress [58:19]
prolong [28:21]
pronounce [70:19]
proof [76:18] [77:6,10,12,16]
proposed [42:23]
provide [6:13] [10:7,10,19]
  [21:10,18] [28:14] [68:17,21]
  [72:17]
provided [10:12] [18:21]
  [21:24] [22:8,9,13,21]
  [23:22,23] [24:8,13,16,21]
  [25:12,20] [26:7,11,16,20
  ,25] [28:6] [35:11] [39:14]
  [40:2,6] [66:25] [68:11]
  [72:20] [73:2] [74:3,7,13]
  [75:5,10,17,20] [76:8]
  [77:19]
providing [10:14] [20:24]
  [68:7] [74:19]
provision [79:3]
provisions [79:6]

public [3:11] [10:4] [11:12]
  [13:14,15] [83:8]
publicly [74:11]
punitive [56:15]
purchasers [64:24]
purpose [12:12,13] [20:23]
purposes [12:14]
pursued [30:24]
pursuing [31:6]
put [29:16]
putting [6:22] [61:8]
pwc [59:2,5]
pwcs [58:19]

Q

qualified [16:4]
quality [64:23,24] [65:12]
question [6:13,22] [7:2]
  [16:17,21] [20:8] [21:21]
  [24:2,7,11,14,19,20]
  [25:15,25] [26:3,14] [27:5
  ,20] [28:3,25] [30:13,19]
  [31:17,21] [32:17] [33:3,20]
  [34:6] [35:6,8,25] [36:12,17]
  [37:8,18,24] [38:7] [41:20]
  [43:2] [44:4,11] [48:9]
  [49:10,19] [50:4,22] [51:5]
  [53:11] [54:15,25] [56:3]
  [57:18] [58:9] [60:17,20]
  [62:12] [64:13,14] [65:23]
  [67:12]
questioned [61:4]
questioning [20:8] [60:21]
questions [41:13] [69:7]
  [70:2]
quick [15:9] [79:17]
quickly [15:8] [81:5]
quite [6:9] [75:13]
quotation [68:3]

R

rainoff [3:9] [83:7,24]
raise [16:10]
raising [59:8]
range [14:13] [25:12] [41:11]
  [44:16] [47:14,22] [51:23]
  [53:17] [55:8] [56:22]
  [59:14] [66:3] [67:20]
ranges [11:25]
rarely [13:2]
rate [49:3]
rates [56:9,10] [78:22]
rather [43:12] [61:10,11]
rating [45:6,10]
ratings [45:20]
rationalization [64:7,17]
re [41:3] [61:11]
read [72:24]
reading [59:24] [77:14]
reads [43:21] [54:18] [55:16]
  [63:6]
realize [5:11] [80:8]

A.7

**really** [59:3] [66:17] [74:9,24] [75:12]
**realtime** [3:10] [83:8]
**reason** [6:24] [7:10] [10:18] [25:10] [27:7,16] [28:17] [34:25] [42:22] [82:8,10,12 ,14,16,18,20,22,24]
**reasons** [13:23] [82:5]
**recall** [11:13] [14:15,18] [17:23] [24:22] [25:5] [27:22] [28:15] [29:13] [34:10] [36:24] [37:3] [38:2,8] [45:9] [46:6] [51:15] [62:7,13] [72:9] [76:6] [77:24] [78:16,20,25] [79:4,10,14]
**receipt** [8:3]
**receive** [7:22,24] [12:23] [19:4] [51:8]
**received** [7:18] [8:12] [44:7] [46:2]
**receiving** [8:22]
**recently** [9:22] [70:11]
**receptive** [68:7]
**recess** [63:23] [79:24]
**recognized** [48:23]
**recollection** [6:3] [22:12,15] [38:19] [45:13] [52:18] [57:20] [58:25] [59:4,7,11] [66:14,24] [67:2,17,18] [68:16,18] [70:9] [75:12] [78:3,15]
**recommend** [12:18]
**recommendation** [58:20]
**recommendations** [59:2]
**reconvene** [63:7,14] [79:18]
**record** [6:8,11] [7:8] [40:23] [69:19] [80:3] [83:14]
**recorded** [6:8]
**recount** [9:13] [43:13]
**reducing** [65:13]
**refer** [40:19] [44:22] [67:24]
**reference** [45:5] [46:13] [48:4] [52:13] [57:7,11] [58:17,23] [60:6] [62:6] [67:3] [75:20] [76:6,9]
**references** [80:12]
**referred** [43:12]
**referring** [8:5] [76:24]
**refers** [42:14]
**reflects** [49:24]
**refreshes** [45:13]
**refurbishing** [48:15]
**regard** [78:16] [79:11]
**regarding** [68:5] [77:22] [79:2]
**regular** [17:8] [51:15] [55:20]
**regularly** [17:14] [19:24] [55:24]
**related** [8:10] [28:14] [39:4] [57:9] [83:17]
**relating** [26:25] [74:22]
**relatively** [31:4]

**reliance** [32:23]
**relied** [75:23]
**relying** [76:15]
**remain** [11:2] [63:25]
**remains** [34:22]
**remember** [11:25] [12:3,5,10] [38:16] [39:7] [66:18] [71:11]
**remic** [54:4]
**remind** [5:24]
**remote** [73:15]
**render** [44:9]
**reorganization** [14:3] [30:5] [62:17,23]
**reorganizations** [23:8]
**repeat** [26:3]
**rephrase** [7:2]
**report** [28:5] [46:11] [47:25] [55:17] [58:19]
**reported** [22:5] [25:3] [45:17] [49:23] [66:12] [76:10]
**reporter** [3:10] [6:6,11] [16:12] [40:24] [80:10] [83:8]
**reporting** [28:8] [51:16] [77:25]
**reports** [29:13] [34:13] [46:2] [49:12] [51:13] [69:2]
**repossessed** [48:14,16] [49:2]
**repossession** [48:17]
**repossessions** [14:22] [48:25] [49:4] [61:12] [65:14] [74:23]
**represent** [42:2] [54:2]
**representative** [39:24] [41:16]
**representatives** [36:20]
**representing** [71:22]
**required** [62:9] [68:21]
**requirement** [81:5]
**resale** [48:17]
**resecuritization** [55:19]
**residence** [18:8]
**resold** [49:2]
**respect** [21:11] [22:21] [23:7] [42:16] [49:5] [71:24] [75:15] [78:11] [79:12,15]
**response** [6:13]
**responses** [61:6]
**responsibility** [49:16] [67:9,15]
**responsible** [11:20] [21:4] [49:21] [77:24]
**rest** [73:20]
**restate** [24:10]
**results** [50:16] [57:3]
**retail** [48:15]
**retained** [47:8] [54:3]
**return** [32:15]
**returned** [9:18]
**returning** [32:19]

**review** [39:17,21] [52:9] [57:3] [80:24]
**reviewed** [52:14]
**rid** [65:15]
**right** [11:17] [18:16] [20:22] [21:5,6] [23:18,19] [26:22] [39:15] [40:12] [41:8] [44:15,25] [47:13] [51:22] [55:5,14] [58:16] [63:8,20] [64:7,16] [77:7] [79:16] [81:7]
**robert** [78:4]
**roger** [18:10]
**role** [66:14] [67:18] [71:24]
**rose** [9:10,15,16]
**roughly** [72:5]
**rules** [5:20]

---

**S**

---

**sabin** [18:11]
**sales** [14:13,25] [29:17] [61:17] [64:22] [65:6,7,9]
**sat** [17:24]
**satisfaction** [24:22]
**satisfied** [74:2] [75:16,19]
**satisfy** [56:16]
**saw** [19:19] [50:23]
**say** [5:9] [40:19] [43:3] [56:4] [60:12,20] [61:17] [62:2,13] [75:4,8] [76:12,13 ,20]
**saying** [69:9]
**schedule** [5:14]
**schipke** [18:10]
**school** [7:20] [8:15,17,18,20 ,23]
**second** [42:10] [43:16,20] [47:18] [52:3,7] [53:19] [54:17] [55:13] [66:10] [70:20]
**secretary** [20:16] [21:8]
**securities** [46:16] [47:2] [54:4,7] [55:19] [56:11] [74:10]
**securitization** [20:18] [21:5] [22:19] [23:21] [24:8,13] [25:16] [28:12] [29:18] [32:2,11] [33:17] [34:8,14] [35:18,20] [53:4] [55:21]
**securitizations** [21:11] [22:15] [32:13,22,23] [34:3,16] [35:2] [47:7] [53:9] [55:25] [56:8,11,18] [61:2] [65:20] [74:24] [75:15,17,21] [76:7,9]
**seeing** [61:22]
**seek** [21:18] [39:25] [67:15]
**seen** [77:16]
**selling** [48:14]
**senior** [19:24] [20:4,11,14] [22:24] [27:22] [33:16,22] [36:15] [38:3] [60:24]

[79:8]
**sense** [6:16] [32:18] [34:7] [36:5] [40:17,21] [49:12] [51:11] [61:3] [74:19]
**sensitivities** [28:14]
**sent** [40:9] [73:3] [81:11]
**sentence** [43:4,11] [52:14] [53:3] [54:18]
**sentences** [53:2]
**serve** [12:4]
**served** [11:9,11]
**service** [10:15] [11:7,16,19 ,21,25] [13:9,22] [24:15] [26:9,19] [27:21] [28:6] [36:23] [74:12]
**services** [21:24] [22:2,8,12] [23:21,24] [24:3,8,13,17,22 ,25] [25:4,11,12,17,21] [26:6,11,16,25] [28:18] [37:5] [40:2] [66:25] [74:3 ,7,12] [75:5,9,19] [76:8]
**serving** [12:5]
**set** [83:12,21]
**settled** [39:11]
**settling** [73:12,21]
**seven** [55:4]
**several** [12:14] [22:22]
**severe** [29:20]
**share** [14:4]
**shareholders** [30:11,17,21] [31:10,11,12]
**shortcut** [48:21]
**signs** [61:22]
**simply** [15:6] [40:19] [43:12] [73:21]
**sir** [7:15] [35:7] [38:12] [40:14] [45:2] [55:9] [66:6] [68:15]
**sitting** [66:17]
**situation** [17:19] [29:23] [65:3]
**six** [53:14]
**sixth** [56:25] [59:23]
**sixty** [62:21]
**small** [14:16] [40:10]
**smith** [47:25] [49:24] [55:17] [78:4]
**socalled** [47:7]
**so-called** [47:7]
**sold** [49:4] [74:11]
**solutions** [60:7,14]
**somehow** [20:22]
**something** [48:5] [62:19] [69:24]
**sometime** [23:2]
**sometimes** [21:3,10]
**somewhere** [23:3]
**sorry** [12:3] [15:20] [16:9] [26:2] [33:6,7] [35:7] [49:18] [58:11] [77:7,8]
**sort** [31:7] [32:3] [80:22]
**sought** [30:16]
**speak** [6:10]
**speaking** [25:11]

A.8

specialty [9:25]
specific [36:2] [40:19] [46:22] [67:2] [74:17] [76:6]
specifically [59:5] [78:24] [79:14]
speed [10:21]
spoke [76:4,6]
spoken [73:24]
standish [66:11] [68:4]
stands [66:18,21]
stars [4:15]
state [3:11] [9:3,7] [18:6] [82:2] [83:4,9]
statement [28:16] [74:4] [75:18]
status [34:13] [55:17] [77:25]
stave [15:9]
stay [12:16] [63:17]
stipulation [80:23] [81:3]
stock [39:6]
storm [29:9] [61:24] [64:11]
streamline [63:3]
street [9:9]
streeter [18:11]
s-t-r-e-e-t-e-r [18:11]
strengthen [58:20]
stress [31:5]
stretch [7:9]
strike [73:24]
strong [14:10]
structure [15:2]
stutman [4:13] [69:19]
subcommittees [11:21]
subject [38:22,24] [59:2]
subordinated [46:15] [47:2,5] [55:19]
subscribed [81:22]
substance [73:22]
succeeded [78:6]
successful [31:4,8] [54:2]
suddenly [33:10]
sued [38:13]
sufficient [29:15,19] [32:10]
suggest [62:24] [63:7]
suisse [21:24] [22:3,6,8,13 ,14,20] [23:6,14,18,22,23] [24:9,14,16,25] [25:2,13,20] [26:7,11,21,25] [27:11,13 ,14,16,24] [28:6,13,18,20,22] [36:8,14,19,25] [37:5,10,13 ,14,20] [38:5] [40:3] [42:15 ,24] [50:19,25] [72:13] [77:11,13]
suisses [25:11]
suit [72:10]
suits [63:12]
summarizing [41:17]
summary [15:11]
supported [49:7,12]
sure [22:7] [25:7] [45:15] [63:5,9] [79:21]
surrounding [58:21]

survive [30:3]
susan [78:5]
sworn [5:3] [81:22] [83:13]
system [64:21] [65:5]
systems [57:24] [58:4,5]

T

tab [40:20] [41:7] [42:2] [44:14,16] [47:12,14] [51:17,20] [53:14] [55:4] [56:21] [59:13] [66:2] [67:20]
tabs [41:4]
taken [3:7] [30:10] [45:11,14] [71:10,24]
taking [9:8] [30:23]
talked [13:19] [32:21] [70:25]
talking [24:3]
technique [35:3]
telephone [16:11] [70:12] [73:7,14,19]
telephonic [3:6]
telephonically [4:12]
tell [7:15] [45:25] [66:20] [70:4] [71:18] [73:9] [74:6 ,24]
ten [7:11] [63:8]
tendency [61:15]
tenure [18:22] [36:21]
tenured [13:10]
terminate [36:25] [37:5]
terminated [37:10]
termination [37:11] [39:5]
terms [74:11] [75:23] [80:22 ,24]
testified [5:4] [54:10] [64:5] [74:2] [75:16]
testify [69:10]
testimony [16:13] [39:18] [55:24] [77:22] [83:14]
thank [5:7,9] [7:13] [8:13] [12:11] [15:11,23] [16:18] [17:6] [18:19] [26:18] [29:3] [32:21] [34:21] [35:9] [36:8] [40:16] [43:14] [46:7] [59:12] [63:22] [65:17,25] [69:6,12,22] [79:22,25] [80:5,15,17,19 ,21] [81:14,15]
thats [8:21] [11:18] [17:9] [19:17] [23:19] [24:4] [25:18] [26:4,23] [30:3] [31:22] [34:23] [38:15] [39:12,16] [43:3] [45:17] [56:4] [80:13]
therefore [5:19] [6:2,7,9] [65:12] [80:10]
things [15:7] [23:13] [63:4] [64:18,25] [65:18] [78:23]
think [18:12,14,15] [20:13] [22:25] [23:10] [24:2,4,6] [27:16] [32:2] [34:15]

[40:17] [62:20] [63:18] [65:16] [66:20] [69:4] [71:8] [73:13,17] [78:5]
thinking [25:16]
third [42:6] [44:18] [52:13] [55:10] [57:7] [59:20] [66:7]
thirty [11:15] [13:8,22] [62:20]
this_day [81:23] [83:21]
thisday [81:23] [83:21]
though [70:11] [76:5]
thought [48:19] [61:24]
three [20:13] [40:20] [72:7]
throughout [47:3] [75:5,8]
thus [76:13,14,15]
time [5:14] [6:18] [9:23] [11:12,19,23] [12:6] [13:6 ,14,17] [14:8,12,20] [15:15] [17:15] [18:10] [20:21] [22:16] [23:6] [28:12] [29:11] [31:8] [34:9,19] [36:21] [37:6,10] [39:25] [43:9] [45:16] [46:5] [47:10] [49:25] [50:12,13] [51:12] [57:14,22] [60:12] [62:7,14] [67:2] [69:9] [70:20] [73:22] [74:7,13,14,16,25] [76:11] [78:4,7] [80:24] [81:17]
timeframe [22:9] [23:3] [38:17]
times [17:11,16] [76:4,5]
timing [60:18]
today [6:7] [40:11] [69:23]
todays [39:18]
todd [9:10]
together [40:9]
told [50:16] [71:8,10,21,23] [72:2] [73:14]
took [8:24,25] [69:9] [74:25]
top [53:3] [55:15] [57:2] [58:18] [59:24]
topic [52:8]
toward [29:24]
track [57:25] [59:9]
transaction [19:12,17] [42:19] [48:16] [54:11,20,22] [55:18]
transcript [80:12,25]
treister [4:13] [69:19]
triggered [37:12]
true [11:2] [34:22] [83:14]
trust [38:11] [39:25] [69:21] [72:11,12]
truthful [6:3]
try [7:5]
trying [18:14] [43:12] [66:18]
tucson [73:17]
turn [6:14] [11:6] [14:9] [43:15] [47:5] [51:17,20] [52:6] [55:3,12] [56:20] [80:24]
turnaround [80:24]
turn-around [80:24]

twelfth [4:16]
type [62:23]
types [22:12] [23:13]
typical [43:10]

U

ultimately [56:14] [68:10]
unanimous [54:19]
understand [6:22] [25:8] [49:18] [64:14] [67:8,13]
understanding [13:23] [14:5] [46:24] [48:6,11,12] [75:25]
understood [67:13,14]
undertake [16:16] [19:20]
undertaken [48:2]
undertook [19:19] [34:19]
underwriter [74:10]
undoubtedly [43:5] [76:5]
university [7:19]
unnecessarily [45:20]
until [6:12] [9:22] [11:13] [61:20] [62:3] [75:6]
upcoming [55:20]
updates [12:24] [13:3] [51:8]
upon [8:22] [11:9] [19:7] [24:7] [40:24] [46:25] [50:2]
us [5:14] [6:2,7,10] [7:15] [9:13] [11:8] [12:12] [13:2] [14:4] [23:7] [32:8] [35:11] [60:24]
usage [49:8]
use [34:3] [35:14,22] [36:3 ,4] [49:22] [50:19,25] [51:9] [52:19] [53:8]
used [72:13]
using [32:4] [50:3,7] [62:6] [74:23]
utilities [10:4,5]
utilized [32:12]

V

vague [24:2]
value [30:16]
vice [78:7]
vicepresident [78:7]
vice-president [78:7]
view [16:2] [23:23] [24:16,21] [25:19] [26:10,15,17,24] [27:8] [32:14] [36:9]
views [28:6] [40:2]
vincent [18:6,9]
voice [33:10]

W

wait [6:12]
waive [81:4]
waiver [79:2,11]
walker [3:1,7] [4:1] [5:1,2,7]

[6:1] [7:1,25] [8:1] [9:1]
[10:1] [11:1,6] [12:1]
[13:1] [14:1] [15:1,12,21]
[16:1,3,9,20] [17:1,6]
[18:1] [19:1,2] [20:1]
[21:1,23] [22:1] [23:1]
[24:1,10] [25:1] [26:1]
[27:1] [28:1,19] [29:1,4]
[30:1] [31:1,14] [32:1]
[33:1,15] [34:1] [35:1,10]
[36:1] [37:1] [38:1,9]
[39:1,13] [40:1,8] [41:1,7,21]
[42:1] [43:1] [44:1,13,17]
[45:1] [46:1] [47:1,12,17]
[48:1] [49:1,6] [50:1]
[51:1] [52:1,2] [53:1,18]
[54:1] [55:1] [56:1,24]
[57:1] [58:1] [59:1,19]
[60:1] [61:1] [62:1] [63:1,11
,25] [64:1,4,15] [65:1,25]
[66:1,9] [67:1] [68:1]
[69:1,6,17] [70:1,4] [71:1]
[72:1] [73:1] [74:1] [75:1]
[76:1] [77:1] [78:1] [79:1]
[80:1,2,16] [81:1,16,21]
[82:1] [83:1,11]
wall [9:9]
want [5:9] [7:8] [19:15]
[56:4] [69:8] [72:24] [79:19]
[80:3]
warehouse [22:17] [26:21]
[27:2,9,12] [32:7,13]
[35:11,14,16,22] [36:4]
[42:16,24] [78:17] [79:7,11
,13,15]
washington [18:3]
wasnt [26:2] [56:14] [69:10]
watch [63:6]
ways [32:24]
weaknesses [59:5]
weather [29:9,19] [61:24]
[64:10]
weaver [18:5]
week [62:2] [68:8]
welcome [5:15] [69:14]
well [8:8] [10:12] [12:13]
[13:11] [19:15] [22:10]
[29:11] [31:18] [38:24]
[45:13,25] [48:12] [49:23]
[66:20,22] [68:25] [73:6]
[79:5,25]
went [76:16]
werent [15:7,8]
wesley [5:2]
west [15:4]
weve [76:13]
whatever [7:11]
whats [59:4]
whenever [50:9]
whereof [83:20]
whether [23:23] [24:16]
[25:19,20] [26:9,11,15,24]
[37:11] [46:2,21] [60:23]
[62:18] [72:22] [77:12]

whitman [4:19]
whole [28:11] [35:17,19]
[46:6] [61:23] [64:21]
wholesale [61:10]
wholesaled [61:12]
whom [71:22]
whose [20:22] [83:12]
why [10:18] [13:24] [27:7]
[46:24]
wife [71:11] [79:20]
will [6:8,12,14,23] [7:2,4,5]
[8:8] [16:16] [24:10] [33:14]
[47:16] [52:2] [60:20]
[63:20] [66:6] [70:2] [79:18]
williamson [4:9]
willing [48:20] [71:23]
[72:2,4]
winter [29:25]
wish [82:4]
wished [37:6]
within [38:20] [83:9]
without [64:19]
witness [16:16] [63:12,14,20]
[79:20] [80:17] [81:8,14]
[83:11,15,20]
wonderful [80:16]
wondering [73:2]
wood [52:23] [78:5]
work [9:9] [18:13]
working [67:9]
wouldnt [72:3]
writing [6:9]
written [41:24]
wrong [70:10]

Y

year [7:24] [15:24,25]
[16:21,25] [17:4,12,16,21]
[29:4] [31:15] [34:22]
[38:20]
years [11:16] [13:8,22]
[21:14] [38:19]
yes [5:18,22] [6:5] [8:6,24]
[9:4,12,16] [10:2,9,25]
[11:5,22] [12:8,10] [14:6]
[15:17,21,22] [16:7,22,24]
[17:25] [18:25] [19:6,9]
[20:2] [21:22] [22:14]
[24:20] [26:15] [29:7]
[31:18] [32:2,18] [33:4]
[35:16] [36:7] [37:9] [39:19]
[40:7,22] [41:25] [42:4,8,13
,17,21] [43:18,22] [44:21]
[45:4,8,22] [46:12,17]
[47:3,20,23] [48:3,10]
[52:5,10,12,16,21,25]
[53:6,20,24] [54:5,16]
[55:11,22] [57:4,6,12]
[58:3,24] [59:16,21] [60:3
,5,11] [62:13] [64:2,8,16]
[65:24] [66:13] [67:5,7,23]
[68:2,9] [70:17,23] [71:20]
[72:20] [74:5] [75:21]

[76:2] [77:2,8] [79:4] [80:5]
york [3:9,11] [4:7] [8:25]
[9:11] [18:6,7,12,13]
[82:2,3] [83:4,5,9]
youll [44:17] [59:19]
youre [5:15]
yourself [5:10] [17:22]
[53:18]