IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re:  Civil Docket Nos. 39 & 40** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S COUNTER-STATEMENT CERTIFYING THAT GENUINE ISSUES
OF MATERIAL FACT EXIST**

| | | |
|---|---|---|
| Tony Castañares (CA SBN 47564) | -&- | Marla Rosoff Eskin (No. 2989) |
| Stephan M. Ray (CA SBN 89853) | | Kathleen Campbell Davis (No. 4229) |
| Scott H. Yun (CA SBN 185190) | | Kathryn S. Keller (No. 4660) |
| Whitman L. Holt (CA SBN 238198) | | CAMPBELL & LEVINE, LLC |
| STUTMAN, TREISTER & GLATT, P.C. | | 800 N. King Street, Suite 300 |
| 1901 Avenue of the Stars, 12th Floor | | Wilmington, DE 19801 |
| Los Angeles, CA 90067 | | (302) 426-1900 |
| (310) 228-5600 | | |

*Special Counsel for the OHC Liquidation Trust*

Dated:  March 13, 2008

Pursuant to this Court's standing Summary Judgment Procedure Order,[1] Plaintiff submits this Counter-Statement certifying that genuine issues of material fact exist with regard to the motion for partial summary judgment (the "**MSJ**" [D.I. #39]) filed on February 29, 2008 by the defendants in the above-captioned proceeding (collectively, "**Defendants**" or "**Credit Suisse**").  Since the existence of these genuine issues of material fact prohibits summary disposition, Plaintiff requests that the Court deny the MSJ without requiring further briefing.

## OVERVIEW

Defendants did not file the certified Statement the Summary Judgment Procedure Order requires.  Plaintiff will show below that Defendants simply *could not* do so, because there are a multitude of disputed issues of material fact.  In any event, Defendants' failure to file the required certified Statement presents sufficient grounds for the Court to deny the MSJ outright.

Defendants instead opted to provide a cursory "statement of undisputed facts" in their opening brief in support of the MSJ (the "**Defendants' Brief**" [D.I. #40]; cited herein as "Def. Br. at __"), while also referencing various other factual propositions throughout the Defendants' Brief.  If the Court is willing to consider the MSJ despite Defendants' omission of a certified Statement, Plaintiff has arranged the discussion in this Counter-Statement in three areas:

1.  Counter-statements with respect to Defendants' list of "undisputed facts";

2.  Counter-statements with respect to factual propositions asserted elsewhere in the Defendants' Brief; and

3.  Counter-statements with respect to other, omitted factual propositions that bear directly on the issues raised by the Defendants' Brief.

---

[1] A copy of the Court's standing Summary Judgment Procedure Order is available at http://www.ded.uscourts.gov/JJFmain.htm (click on the "Case Mgmt." tab, and then on the "Summary Judgment Procedure Order" link) (last accessed March 12, 2008).

1

The material facts that are disputed[2] in each of these three areas prohibit summary disposition.[3]

## CREDIT SUISSE'S 7-POINT LIST

On pages 2-3 of the Defendants' Brief, Defendants provide a list of seven numbered points they claim "may be taken as undisputed and are sufficient to support summary judgment." Plaintiff disagrees, and submits that each of these seven points is subject to dispute.

1. While Defendants state that "[a]ll financing services provided by Credit Suisse to Oakwood were approved by Oakwood's Management and Board of Directors," they omit any reference to the fact that all such approvals were done against the backdrop of Credit Suisse's negligent and self-interested advice and omissions. To the extent that any such approval may have been effective, there remains a factual dispute – for the jury to decide at trial – about whether such transactions would have been approved had Credit Suisse fully satisfied its duties.

2. Plaintiff disputes Defendants' suggestion that any "strategy" adopted by Oakwood in 1999 was in effect or relevant to events that occurred in 2002. Further, Plaintiff

---

[2] To assist the Court's review of certain disputed factual issues, Plaintiff's Counter-Statement includes reference to some record evidence. Copies of all deposition excerpts, expert reports, and other documents referenced herein are attached as exhibits to the accompanying declaration of Whitman L. Holt and are cited as "Holt Decl. Ex. '__'." All such evidentiary references are simply examples, not an exhaustive catalog, of the evidence that Plaintiff will marshal at trial to support its position before the jury regarding the numerous disputed issues of material fact set forth herein. Likewise, Plaintiff has, at certain points in this Counter-Statement, included limited references to legal authority to highlight particular points. Such references should not be taken as an exhaustive account of Plaintiff's position on, or authority regarding, those issues (or any other issue).

[3] Although the contents of this Counter-Statement and the associated evidence should preclude the MSJ, the Court may determine that the matter should proceed to the second stage under the Summary Judgment Procedure Order – the filing of merits briefs and affidavits. In that event, Plaintiff will file a full and complete Answering Brief, which will more fully develop the applicable law, the importance of the facts in this Counter-Statement under that law, and the many other defects in Defendants' arguments (especially Credit Suisse's greatly distorted, "strawman" presentation of Plaintiff's theory of this case).

disputes that any "liquidity shortage" occurring "in mid-2002" was "unanticipated." To the contrary, it is very clear that employees of Credit Suisse understood the problems Oakwood faced regarding so-called "repo" loans as early as January 2001, and that the adverse effects of the Loan Assumption Program, resulting liquidity shortage, and ultimate Oakwood bankruptcy filing were the reasonably foreseeable results of those problems.[4]

        3.      Plaintiff disputes that the continuation of any "securitization program" was "necessary" to any value-preserving or -creating "strategy" supposedly set by Oakwood's board and management. Plaintiff also disputes the proposition that the particular securitization structures crafted by Credit Suisse – including guaranteed "B-2" tranches and the so-called "LOTUS" transactions – were in any way "necessary" to Oakwood's survival. No evidence supports these characterizations, and Plaintiff's experts will testify to the contrary at trial.[5]

---

[4] *See, e.g.*, Muir Dep. Tr. at 62:7-63:9 (discussing problems that led to, and were caused by, the Loan Assumption Program, and stating that Credit Suisse "was certainly informed of" Oakwood's decision to expand that program) [Holt Decl. Ex. "C"]; O'Driscoll Dep. Tr. at 276:20-285:3, 498:4-502:24 [Holt Decl. Ex. "D"]; January 9, 2001 e-mail from Thomas Irwin, CSFB-00512061 [Holt Decl. Ex. "P"]; January 9, 2001 "Memorandum," CSFB-00483869 [Holt Decl. Ex. "Q"]; February 14, 2001 e-mail from Thomas Irwin, CSFB-00515234 (Credit Suisse employee expressing concern that "Repo'd assets are going to be the major issue we face going forward, clearly the ability of [Oakwood] to survive hinges on this asset class remaining in 'control'") [Holt Decl. Ex. "S"]; August 19, 2001 e-mail from Fiachra O'Driscoll, CSFB-00186169 (Credit Suisse employee discussing increase in "repos" numbers and suggesting that Oakwood's "warehouse" be modified to finance the higher "repo" level) [Holt Decl. Ex. "AA"]; December 3, 2001 e-mail from Susan Menkhaus, CSFB-00188026 (Credit Suisse employee explaining how continual rise in the "repo" level led Oakwood to "switch[] over many of their loans to" the Loan Assumption Program) [Holt Decl. Ex. "CC"].

[5] *See, e.g.*, Report of Alan C. Shapiro, Ph.D. ("**Shapiro Report**") at p. 36 ("The transactions [Credit Suisse] engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value.") [Holt Decl. Ex. "I"]; Expert Witness Report of Dr. Michael Tennenbaum ("**Tennenbaum Report**") at p. 10 ("Continued securitization and guaranteed B-2 issuance beyond the middle of 2001 resulted in dissipation of [Oakwood's] Enterprise Value, i.e., reduction in the value of corporate assets, as well as an increase in liabilities.") [Holt Decl. Ex. "J"].

4.  Plaintiff disputes that Credit Suisse's "work" on "the securitization transactions . . . was done properly and well." As an example, there is substantial evidence in the record that Credit Suisse's "work" with respect to the so-called "LOTUS" transactions was done poorly and improperly.[6] Indeed, Credit Suisse's own employees have testified about the adverse effects of the "LOTUS" transactions they structured on Oakwood, while also conceding that they made no attempt to investigate any of those effects when they were structuring the transactions.[7] Based upon these and other problems, the jury could easily conclude that Credit Suisse did not comply with its basic duty of using reasonable care as to all the securitization transactions it structured and executed for Oakwood. In any event, a core negligence claim also lies in Credit Suisse's abject failure properly to investigate and advise Oakwood regarding the effects of the securitization and "LOTUS" transactions, not merely in the execution of those transactions.

5.  Plaintiff disputes Defendants' assertion that all "financial services" provided to Oakwood prior to August 2002 were "only in connection with securitizations of assets arising from Oakwood's consumer finance business." Evidence based upon which the jury could reasonably find in Plaintiff's favor on this issue of fact includes:

• Testimony that "from time to time Credit Suisse would give [Oakwood] advice with respect to possible reorganizations of the company outside of any bankruptcy during the

---

[6] *See, e.g.*, Millard Dep. Tr. at 28:7-29:9 (Berkshire Hathaway employee discussing how "[t]here were certainly errors in the figures [provided by Credit Suisse] over time," and how the LOTUS securities were not "accurately modeled" by Credit Suisse) [Holt Decl. Ex. "B"].

[7] *See, e.g.*, O'Driscoll Dep. Tr. at 61:2-64:2, 115:21-116:4, 574:20-575:8 [Holt Decl. Ex. "D"]; *see also, e.g.*, Shapiro Report at p. 28 ("No evidence exists that [Credit Suisse] performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that [Credit Suisse] considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.") [Holt Decl. Ex. "I"].

2001 and 2002 period."[8]

- Documents demonstrating that Oakwood's employees would regularly contact Credit Suisse's employees about, and affirmatively request their advice regarding, business issues beyond mere securitization transactions.[9]

- Credit Suisse's repeated decision to give extra-contractual advice to Oakwood and to engage in various other extra-contractual activities, ostensibly for Oakwood's benefit.[10]

- Testimony that Credit Suisse was "continually trying to come up with ways that was [sic] going to address both the problem of Oakwood's need to find liquidity for its loans on a more frequent basis than simply the quarterly takeout securitization. And [Credit Suisse was]

---

[8] Walker Dep. Tr. at 22:6-9; *see also id.* at 73:15-20 ("I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that.") [Holt Decl. Ex. "G"].

[9] *See, e.g.*, June 21, 1999 e-mail from Doug Muir, CSFB-00174305 – CSFB-00174306 [Holt Decl. Ex. "L"]; June 5, 2001 e-mail from Bob Smith, CSFB-00184166 (Oakwood employee writing to "bounce" various operational and financial issues unrelated to any securitization "off" of Credit Suisse) [Holt Decl. Ex. "X"]; January 24, 2002 e-mail from Bob Smith, CSFB-00188944 (Oakwood employee explaining how Oakwood had attempted to fix "ever more problematic" number of "repos" using the Loan Assumption Program, and requesting "some of your normal bright ideas" from Credit Suisse employee) [Holt Decl. Ex. "DD"]; June 24, 2002 e-mail from Bob Smith, CSFB-00192307 [Holt Decl. Ex. "HH"].

[10] *See, e.g.*, Felt Dep. Tr. at 63:24-65:10, 85:22-86:21, 101:3-11 [Holt Decl. Ex. "A"]; Standish Dep. Tr. at 15:20-16:20 [Holt Decl. Ex. "F"]; January 10, 2000 e-mail from Fiachra O'Driscoll, CSFB-00174238 (contacting third party lender to propose six ways that the lender "could work more closely with Oakwood," five of which were unrelated to any securitization transaction) [Holt Decl. Ex. "M"]; May 8, 2001 e-mail from Fiachra O'Driscoll, CSFB-00182807 (exploring potential sale-leaseback on Oakwood's behalf) [Holt Decl. Ex. "V"]; September 27, 2001 e-mail from Fiachra O'Driscoll, CSFB-00187153 (affirmatively seeking, apparently on Oakwood's behalf, to pursue possible reinsurance transaction) [Holt Decl. Ex. "BB"]; May 10, 2002 e-mail from Fiachra O'Driscoll, CSFB-00147111 [Holt Decl. Ex. "FF"]; July 2002 Berkshire Hathaway Presentation, CSFB-00146183 – CSFB-00146191 (pre-August 19, 2002 presentation made by Credit Suisse on Oakwood's behalf to explain Oakwood's financial problems to Berkshire Hathaway) [Holt Decl. Ex. "II"].

5

also by this point thinking about how to get liquidity for [Oakwood's] B2s."[11]

• Testimony that, with respect to Oakwood's general operational issues, Credit Suisse would "weigh in with an opinion when asked and on a number of matters they were asked fairly frequently."[12]

• Testimony regarding how:

> It was not unusual and, in fact, it was practice . . . anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing . . . always to inform [Credit Suisse] of what [Oakwood was] doing and why [Oakwood was] doing it and solicit feedback. So to the extent that's weighing in, yeah, [Credit Suisse] sure did. They were asked to weigh in [on Oakwood's day-to-day business decisions].

*See* Muir Dep. Tr. at 194:19-195:5 [Holt Decl. Ex. "C"].

Taken together, all of this evidence gives rise to very substantial factual questions about whether Credit Suisse was providing Oakwood with advice and services "only in connection with securitizations," and thus this dispute should properly be put before the jury at trial.[13]

6. Plaintiff disputes Defendants' statement regarding Oakwood's "continuing

---

[11] O'Driscoll Dep. Tr. at 211:14-20 [Holt Decl. Ex. "D"]; *see also, e.g.*, Muir Dep. Tr. at 64:20-65:3 ("There were a number of occasions when people from [Credit Suisse] outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. They'd just come down and say hey, we've been thinking about you. Here's an idea.") [Holt Decl. Ex. "C"].

[12] Muir Dep. Tr. at 194:11-14 [Holt Decl. Ex. "C"]; *see also, e.g.*, Standish Dep. Tr. at 13:6-21 (discussing how "Credit Suisse also served in a more general capacity . . . as an advisor with respect to [Oakwood's] overall financial condition, liquidity condition with respect to options that might be available"; contrasting that broader role with the discrete restructuring advice provided "pursuant to a contract entered into in August of 2002") [Holt Decl. Ex. "F"].

[13] In addition to all the direct evidence, it also appears that the parties will proffer competing expert testimony about the nature of the work performed by Credit Suisse prior to August 2002. These "dueling experts" also create a dispute that must be resolved by the jury at trial.

6

relationships with a number of financial institutions and financial advisors" on the grounds that no other institutions had the long, complex, and multifaceted "insider" relationship that Credit Suisse had, and any intimation to the contrary is totally inconsistent with the evidence. In any event, the presence of these other "relationships" does not resolve any issue in this case; at most, it creates competing interferences on both sides, which should properly be put before the jury.

7. Plaintiff disputes Defendants' contention that the 2004 sale of Oakwood is relevant. Plaintiff further disputes that the sale was in "an amount greater than" Dr. Tennenbaum's 2001 valuation on the grounds that Defendants have not properly discounted the sale proceeds to 2001 dollars, have not offset the substantial costs associated with Oakwood's bankruptcy and sale process against the sale proceeds, and have not taken into account intervening events. Additionally, Plaintiff further submits that the evidence shows Defendants' misconduct resulted in damages exceeding $50 million, including fees paid to Credit Suisse comprising a substantial percentage of that amount, in a fashion divorced from the discrete valuation analysis.

### **OTHER FACTUAL PROPOSITIONS IN THE DEFENDANTS' BRIEF**

Although not included in Defendants' list of supposedly undisputed facts, the Defendants' Brief contains other propositions of fact argued in support of the MSJ that Plaintiff believes are disputed, including:

1. Defendants state that "the discovery record . . . establishes that Credit Suisse was not an 'insider' of Oakwood" (Def. Br. at 15).[14] Plaintiff submits that Credit Suisse's

---

[14] As Defendants effectively concede, Credit Suisse's status as an "insider" is an important issue here because it would, *inter alia*, preclude any use of the *in pari delicto* defense. *See, e.g.*, *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005) (Farnan, *J.*) ("*In pari delicto* will not operate to bar claims against insiders of the

"insider" status is a heavily disputed issue of fact in this litigation, and thus it is an issue that must be put before the jury.[15] Evidence based upon which the jury could reasonably find in Plaintiff's favor on this issue of fact includes:

- Credit Suisse knowingly labeled itself an Oakwood "insider" in multiple presentations that it prepared for Oakwood.[16]

- Credit Suisse's assumption of numerous roles vis-à-vis Oakwood – including as underwriter, trusted advisor, de facto lender, and powerful warrant holder – which collectively made the parties' relationship advance beyond a traditional, arms-length business relationship.[17]

- Employees of Oakwood regularly provided Credit Suisse with material, non-public information, including information wholly unrelated to any securitization transaction.[18]

---

debtor corporation."); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 536 (Bankr. D. Del. 2006) (same; citing numerous cases).

[15] In addition to being a disputed factual issue, Plaintiff further believes that the Defendants' Brief adopts a legally inappropriate test for "insider" status. As this Court has stated: "Any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny may qualify as an 'insider.' Thus, the inquiry into insider status is fact-intensive and can be made only on a case-by-case basis." *Student Finance Corp.*, 335 B.R. at 547 (citations and quotation marks omitted). In the event that Plaintiff must file an Answering Brief, Plaintiff will further detail the doctrinal problems with Defendants' anemic "insider" analysis, which is fatally undermined by their own cited cases. *See Lucent Techs., Inc. v. Shubert (In re Winstar Commc'ns, Inc.)*, No. 06-147, 2007 WL 1232185, at *2-3 (D. Del. Apr. 26, 2007) (Farnan, *J.*); *In re South Beach Sec., Inc.*, 376 B.R. 881, 890-91 (Bankr. N.D. Ill. 2007).

[16] *See, e.g.*, Felt Dep. Tr. at 448:5-25 [Holt Decl. Ex. "A"]; August 9, 2001 "Presentation to Oakwood Homes," CSFB-00052849 – CSFB-00052905, at CSFB-00052890 [Holt Decl. Ex. "Z"].

[17] Judge Walsh previously made clear at the motion to dismiss stage of this litigation that a party wearing so many different hats could easily be considered a corporate fiduciary and an "insider." *See Oakwood Homes Corp.*, 340 B.R. at 518-19, 523-24.

[18] *See, e.g.*, September 14, 2000 e-mail from Fiachra O'Driscoll, CSFB-00485278 (Credit

- Testimony and other evidence that there was a long-time relationship of trust and confidence between the parties.[19]

- Credit Suisse's repeated decision to give extra-contractual advice to Oakwood and to engage in various other extra-contractual activities, ostensibly for Oakwood's benefit.[20]

- Credit Suisse's ability unilaterally to negotiate key transaction terms on Oakwood's behalf, often without including any Oakwood employees in the discussion.[21]

- Employees of Credit Suisse often contacted Oakwood's attorneys, sometimes without even copying any of Oakwood's employees, for the purposes of requesting or obtaining

---

Suisse employee bragging to his superiors and other Credit Suisse employees about how an Oakwood employee told him "in the strictest confidence, that the board is likely to replace the CEO," that Oakwood would soon be exiting numerous markets, and that Oakwood was considering certain non-securitization-related financing transactions) [Holt Decl. Ex. "O"]; February 17, 2001 e-mail from Bob Smith, CSFB-00178954 [Holt Decl. Ex. "T"]; April 12, 2001 e-mail from Bob Smith, CSFB-00182753 [Holt Decl. Ex. "U"]; June 5, 2001 e-mail from Bob Smith, CSFB-00184166 (detailing various intimate information about Oakwood's finances and third-party credit facilities, as well as recent sales results) [Holt Decl. Ex. "X"]; January 24, 2002 e-mail from Bob Smith, CSFB-00188944 [Holt Decl. Ex. "DD"]; May 22, 2002 e-mail from Bob Smith, CSFB-00191543 [Holt Decl. Ex. "GG"]; June 24, 2002 e-mail from Bob Smith, CSFB-00192307 [Holt Decl. Ex. "HH"].

[19] *See, e.g.*, Felt Dep. Tr. at 87:3-22 [Holt Decl. Ex. "A"]; Muir Dep. Tr. at 143:11-18, 195:23-196:5, 263:17-23 [Holt Decl. Ex. "C"]; Standish Dep. Tr. at 47:2-3 ("[C]ertainly there was a lot of trust, a lot of loyalty between the two entities.") [Holt Decl. Ex. "F"]; September 14, 2000 e-mail from Fiachra O'Driscoll, CSFB-00485278 (transmitting information received from Oakwood "in the strictest confidence") [Holt Decl. Ex. "O"]; January 24, 2002 e-mail from Bob Smith, CSFB-00188944 [Holt Decl. Ex. "DD"]; May 10, 2002 e-mail from Fiachra O'Driscoll, CSFB-00147111 [Holt Decl. Ex. "FF"].

[20] *See, e.g.*, the evidence cited in footnote 10, *supra*.

[21] *See, e.g.*, Millard Dep. Tr. at 17:7-16 (describing how terms of the "LOTUS" transactions were negotiated exclusively between Berkshire Hathaway and Credit Suisse) [Holt Decl. Ex. "B"]; Standish Dep. Tr. at 112:8-113:18 (same; transaction was presented by Credit Suisse as "a take it or leave it kind of deal") [Holt Decl. Ex. "F"]; May 17, 2001 e-mails from Fiachra O'Driscoll and Susan Menkhaus, CSFB-00154902 [Holt Decl. Ex. "W"]; July 25, 2001 e-mail from Mark Millard, CSFB-00514136 – CSFB-00514137 [Holt Decl. Ex. "Y"].

9

legal advice regarding Oakwood's operations.[22] Such behavior could be appropriate only if Credit Suisse was in the "inner circle" of trusted Oakwood advisors – a fiduciary and "insider."

- Employees of both Credit Suisse and Oakwood conceptualized their relationship as one that was sufficiently close so as to give rise to fiduciary duties.[23]

- Credit Suisse had the power to exercise significant control over the financial and operational aspects of Oakwood, and Credit Suisse ultimately exercised that latent power by prompting Oakwood to file for bankruptcy.[24]

- The detailed description of when one becomes an "insider" that is contained in Credit Suisse's own internal policy manuals.[25]

Individually, any one of these ten sets of evidence would be grounds upon which the jury could reasonably find that Credit Suisse was an "insider"; in the aggregate, they certainly create a genuine dispute about a material fact that precludes summary adjudication of this issue.

   2.  Defendants assert that "Credit Suisse had no information that [Oakwood]

---

[22] *See, e.g.*, O'Driscoll Dep. Tr. at 465:18-470:4 [Holt Decl. Ex. "D"]; April 25, 2002 e-mail from Fiachra O'Driscoll, CSFB-00191475 – CSFB-00191476 (Credit Suisse employee asking for legal advice from Oakwood's outside counsel about the legal effects of the Loan Assumption Program; outside counsel had to specifically add an Oakwood manager to the "cc" line of his reply to ensure that Oakwood was involved in the discussion) [Holt Decl. Ex. "EE"]; October 19, 2002 e-mail from Jared Felt, CSFB-00035156 [Holt Decl. Ex. "JJ"].

[23] *See, e.g.*, Felt Dep. Tr. at 376:5 ("We had a fiduciary duty to Oakwood.") [Holt Decl. Ex. "A"]; Standish Dep. Tr. at 47:4-10 (ex-Oakwood CEO and attorney expressing his belief that there was a fiduciary relationship) [Holt Decl. Ex. "F"]. Importantly, Credit Suisse recognizes that a genuine issue of fact exists about whether it was a "fiduciary." (*See* Def. Br. at 20 n.9.) As such, it is very odd that Defendants contend that no dispute exists with respect to the "insider" issue given the substantial overlap between the two types of analysis.

[24] *See, e.g.*, Standish Dep. Tr. at 19:1-22:9 [Holt Decl. Ex. "F"].

[25] *See* Credit Suisse First Boston "Compliance Manual," CSFB-00053059 – CSFB-00053226, at CSFB-00053127 – CSFB-00053129 [Holt Decl. Ex. "K"].

did not have" (Def. Br. at 14). Plaintiff disputes this proposition. First, Credit Suisse had substantial internal information and analysis about Oakwood and the substantial problems it was (or soon would be) facing, much of which was never shared with Oakwood, including several very damning credit reports.[26] Moreover, Credit Suisse certainly had information about the broader financial markets, securitization processes and techniques, the manufactured housing industry, and Berkshire Hathaway that Oakwood did not have. Indeed, the great trust and confidence that Oakwood reposed in Credit Suisse stemmed from Credit Suisse's unique and supposedly sophisticated knowledge, experience, and expertise.[27] This superior knowledge and ability, combined with a misplaced belief in Credit Suisse's integrity, led Oakwood to expect that Credit Suisse would always engage in honest dealings with Oakwood's best interests in mind.[28]

        3.      Defendants suggest that only beneficiaries of the OHC Liquidation Trust are "former bondholders" of Oakwood. (*See* Def. Br. at 1, 20.) Plaintiff disputes this factual proposition because the Trust's beneficiaries include *all* types of unsecured Oakwood creditors, including (i) trade vendors; (ii) ex-employees; (iii) tax claimants; and (iv) holders of the massive

---

[26] *See generally, e.g.*, January 10, 2000 "Memorandum," CSFB-00250116 – 00250129 (internal analysis by Credit Suisse rejecting proposed Oakwood credit facility on grounds that, *inter alia*, "Oakwood is the weakest company in its industry's [sic] with very real/immediate bankruptcy risk issues/concerns," Oakwood's "management does not have a strong understanding of its marketplace," Oakwood would incur large losses with every quarterly securitization, and there was a real danger "that if the market proves softer than management has estimated that their inventory will be sold at unfavorable prices to uncreditworthy borrowers") [Holt Decl. Ex. "N"]; January 31, 2001 "Annual Review," CSFB-00513799 – CSFB-00513819 (detailed internal memo discussing numerous Credit Suisse "issues and concerns" regarding Oakwood and its future prospects, as well as details of transaction that would provide "protection" to isolate Credit Suisse from any risk) [Holt Decl. Ex. "R"].

[27] *See, e.g.*, Muir Dep. Tr. at 143:10-144:13 (detailing history between Oakwood and Credit Suisse that led Oakwood to trust and rely on them and put Credit Suisse "in a unique position to advise [Oakwood] because . . . that's what they did for [Oakwood]") [Holt Decl. Ex. "C"].

[28] *See, e.g.*, Muir Dep. Tr. at 195:20-196:24 [Holt Decl. Ex. "C"].

11

B-2 guarantee claims that resulted from the complicated transactions Credit Suisse designed.

    4.  Defendants aver that Credit Suisse was "one of Oakwood's banks." (*See* Def. Br. at 1.)  Plaintiff disputes this characterization.  Oakwood did not "bank" with Credit Suisse; rather, Credit Suisse occupied a number of roles vis-à-vis Oakwood, including as underwriter, trusted advisor, de facto lender, and powerful warrant holder.  A "bank" does not typically perform many of these tasks, particularly simultaneously.  Moreover, Credit Suisse apparently contends, through its proposed expert, that it did not even play a "lender" role with respect to Oakwood.[29]  Simply because Credit Suisse now wants to confine its participation to that of a "bank" does not make that proposition undisputed, particularly in light of the overwhelming evidence supporting the conclusion that Credit Suisse was far more than a mere "bank" for Oakwood.  (*See* the "insider" discussion in ¶ 1, *supra*.)

    5.  Defendants state that "everyone agrees that without the liquidity provided by the securitizations and the Warehouse Facility, Oakwood would have gone out of business" (Def. Br. at 26).  Plaintiff disputes this factual contention on the grounds that it is unclear what "gone out of business" means.  While a decision not to engage in securitizations or participate in the Warehouse Facility would have been a substantial one and not allowed Oakwood simply to continue "business as usual," it is not at all clear that the ultimate result would have been for Oakwood to "go[] out of business."[30]  Once again, this is a factual issue for the jury to decide.

    6.  Defendants repeatedly assert that Credit Suisse's pre-August 19, 2002

---

[29] *See, e.g.*, Expert Witness Report of Thomas F. Boland at p. 10 ¶ 23 (disputing conclusion that the "warehouse" facility operated as a "loan" to Oakwood) [Holt Decl. Ex. "H"].

[30] Contrary to Defendants' suggestion, this conclusion is wholly consistent with Dr. Shapiro's anticipated testimony.  *See, e.g.*, Shapiro Dep. Tr. at 90:15-25 (explaining how there could be several possible results if Oakwood had stopped the securitization process, but the one certainty "is that they couldn't have kept doing business as usual") [Holt Decl. Ex. "E"].

presentations, materials, and advice were mere "pitching." (*See, e.g.*, Def. Br. at 10, 24.) While this is how Defendants would like to spin the facts, Plaintiff disputes this characterization and believes that the jury should be the ultimate arbiter of what Credit Suisse was actually doing.

### **ADDITIONAL DISPUTED FACTS**

Plaintiff believes that the following factual propositions – which are not discussed in the Defendants' Brief – bear directly on issues raised by the MSJ, are disputed, and should be put to the jury at trial:

1. Was Oakwood sufficiently insolvent as of September 2001, and at all relevant times thereafter, such that the prospects of a return to solvency were remote?

2. Did Credit Suisse have a fiduciary relationship with Oakwood?[31]

3. Did Oakwood's management reasonably rely on Credit Suisse to fully investigate and advise Oakwood about, and to act in Oakwood's best interests regarding, the many complex financial transactions that permeated the parties' relationship?

4. Were substantial losses to Oakwood resulting from Oakwood's continuing use of securitization transactions, use of the Credit Suisse "warehouse" facility, and/or participation in the "LOTUS" transactions a reasonably foreseeable outcome for a party in the same position as Credit Suisse?

5. Did Credit Suisse ever separately consider or analyze (i) the net effect of Oakwood's securitization program, the "LOTUS" transactions, and/or the Loan Assumption Program on Oakwood's ability to pay its just debts; or (ii) Oakwood's ability to satisfy the

---

[31] Defendants pointedly decline to aver that Credit Suisse's status as an Oakwood fiduciary is not in dispute, asserting instead that "this motion does not require a determination of that question." (*See* Def. Br. at 20 n.9.) Thus, for purposes of the MSJ, the Court must presume that fiduciary duty is a live and disputed issue of material fact to be put before the jury.

additional B-2 guarantees that were created in conjunction with certain securitizations and the "LOTUS" transactions?

      6.    Did Credit Suisse ever advise Oakwood's management or board that Oakwood's continued use of the securitization program, continued guarantees of additional B-2 securities, continued use of the Loan Assumption Program, and/or continued participation in the "LOTUS" transactions was not in the best interests of Oakwood or its existing creditors?

      7.    Did Credit Suisse behave in a manner consistent with its own compliance manuals with respect to the various "services" it provided to Oakwood in 2001-2002?

      8.    Did Credit Suisse have financial incentives to keep Oakwood operating and to delay recommending that Oakwood stop operating on a "business as usual" basis?

      9.    Did Credit Suisse behave in a self-dealing manner by elevating its own interests above Oakwood's interests?

      10.    Did Credit Suisse's breaches of a fiduciary duty, breaches of an implied advisory contract, and/or negligence constitute a substantial factor contributing to Credit Suisse's receipt of nearly $21 million of fees between 2001-2002, including the following:

      A.    $2,500,000.00 in "start-up" warehouse fees;

      B.    $8,750,000.07 in cumulative monthly warehouse fees;

      C.    $4,602,245.65 in cumulative securitization underwriting fees;

      D.    $3,034,346.00 in cumulative LOTUS "placement" fees;

      E.    $250,000.00 in fees relating to the "servicer advance facility"; and

      F.    $1,811,129.54 in fees relating to the August 19, 2002 contract?

      11.    To the extent that Oakwood could be said to have "participated" in any of the malfeasance in which Credit Suisse engaged for purposes of the *in pari delicto* doctrine, and

to the extent that Credit Suisse is not precluded from taking advantage of that doctrine because it was an "insider" or otherwise, what is the relative allocation of responsibility and culpability as between the parties?

## **CERTIFICATION**

Plaintiff, by and through its undersigned counsel, hereby certifies that genuine issues of material fact exist that should prohibit summary disposition. Plaintiff, therefore, respectfully requests that the Court deny Defendants' MSJ without requiring further briefing.

Respectfully submitted,

Dated: March 13, 2008
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*
MARLA ROSOFF ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
KATHRYN S. KELLER (No. 4660)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

 -and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the
OHC Liquidation Trust

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on March 13, 2008, I caused a copy of the *Plaintiff's Counter-Statement Certifying That Genuine Issues Of Material Fact Exist*, to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

{D0107664.1 }

| | |
|---|---|
| Dated: March 13, 2008 | CAMPBELL & LEVINE, LLC |
| | |
| | */s/ Kathryn S. Keller* |
| | Kathryn S. Keller (No. 4660) |
| | 800 N. King Street, Suite 300 |
| | Wilmington, DE 19801 |
| | (302) 426-1900 |

{D0107664.1}