# Exhibit "A"

**CERTIFIED COPY**

1        IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE DISTRICT OF DELAWARE

3

4    IN RE:

5    OAKWOOD HOMES CORPORATION, ET AL.,)
                                        )
6            DEBTORS,                   )
                                        )
7    _____)
                                        )
     OHC LIQUIDATION TRUST,             )    No. 02-13396(PJW)
8                                       )
             PLAINTIFF,                 )    VOLUME 1
9                                       )    PAGES 1 THROUGH 292
     VS.                                )
10                                      )
     CREDIT SUISSE FIRST BOSTON, A      )
11   SWISS BANKING CORPORATION, CREDIT )
     SUISSE FIRST BOSTON LLC, A         )
12   DELAWARE LIMITED LIABILITY         )
     CORPORATION, CREDIT SUISSE FIRST   )
13   BOSTON, INC., CREDIT SUISSE FIRST )
     BOSTON (USA), INC., A DELAWARE     )
14   CORPORATION AND A WHOLLY OWNED     )
     SUBSIDIARY OF CREDIT SUISSE FIRST )
15   BOSTON, INC., THE SUBSIDIARIES AND)
     AFFILIATES OF EACH, AND DOES 1     )
16   THROUGH 100,                       )
                                        )
17           DEFENDANTS.                )
     _____)
18

19

20   VIDEOTAPED
     DEPOSITION OF:
21                   JARED FELT
                     THURSDAY, JUNE 15, 2006
22                   LOS ANGELES, CALIFORNIA

23

24
     REPORTED BY:
25   FELIPE F. CARRILLO, CSR 9555



**LEGALINK**
A MERRILL COMPANY

20750 Ventura Blvd          tel (818) 593-2300      www.merrillcorp.com
Suite 205                   tel (800) 826-0277
Woodland Hills, CA 91364    fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1

1             DEPOSITION OF JARED FELT, TAKEN ON

2    BEHALF OF PLAINTIFF, AT 1901 AVENUE OF THE STARS,

3    12TH FLOOR, LOS ANGELES, CALIFORNIA, 90067-6013,

4    ON THURSDAY, JUNE 15, 2006, AT 9:20 A.M., BEFORE

5    FELIPE CARRILLO, CSR #9555.

6
     APPEARANCES:
7

8    FOR PLAINTIFF:

9      LAW OFFICES OF STUTMAN, TREISTER & GLATT

10     BY:   TONY CASTANARES, ATTORNEY AT LAW

11     1901 AVENUE OF THE STARS

12     12TH FLOOR

13     LOS ANGELES, CALIFORNIA   90067-6013

14     (310) 228-5755

15

16     LAW OFFICES OF STUTMAN, TREISTER & GLATT

17     BY:   STEPHAN M. RAY, ATTORNEY AT LAW

18     1901 AVENUE OF THE STARS

19     12TH FLOOR

20     LOS ANGELES, CALIFORNIA   90067-6013

21     (310) 228-5695

22

23

24

25

                                                          2

```
1    APPEARANCES, CONTINUED:

2

3    FOR PLAINTIFF:

4        LAW OFFICES OF STUTMAN, TREISTER & GLATT

5        BY:  WHITMAN L. HOLT, ATTORNEY AT LAW

6        1901 AVENUE OF THE STARS

7        12TH FLOOR

8        LOS ANGELES, CALIFORNIA  90067-6013

9        (310) 228-5690

10   FOR DEFENDANT:

11       LINKLATERS

12       BY:  MARY K. WARREN, ATTORNEY AT LAW

13       1345 AVENUE OF THE AMERICAS

14       NEW YORK, NEW YORK  10105

15       (212) 903-9000

16

17       LINKLATERS

18       BY:  J. JUSTIN WILLIAMSON, ATTORNEY AT LAW

19       1345 AVENUE OF THE AMERICAS

20       19TH FLOOR

21       NEW YORK, NEW YORK  10105

22       (212) 424-9000

23

24   ALSO PRESENT:

25       LORRAINE GRAY, CCV
```

3

1          THE WITNESS:   Thank you.

2          MS. WARREN:   About ten minutes.

3          THE VIDEOGRAPHER:   We're going off the

4    record.   The time is 10:30.

5                    (Brief recess)

6          THE VIDEOGRAPHER:   We're back on the record,

7    and the time is 10:44.

8    BY MR. CASTANARES:

9    Q.   The document which is Exhibit 6 resulted from or

10   followed, let's put it that way, a presentation that you

11   had made to the company in late June of 2001; is that

12   correct?

13   A.   That sounds reasonable.   I was surprised at the

14   GAP.

15   Q.   All right.   I'll show you the document later, but

16   a few weeks before, is that fair enough to say from your

17   memory?

18   A.   It must have been a request by Bob of what would

19   we charge that would have triggered this letter.

20   Q.   All right.   When did you personally first have

21   any contact whatever with Oakwood Homes in your capacity

22   as an employee of CSFB?

23   A.   I believe it was mid 2001.

24   Q.   And what was the context in which you first had

25   contact with Oakwood Homes?

62

1       A.   I was -- Fihchra O'Driscall, who is the primary

2    contact for Oakwood Homes, asked Phil Jacob, the head of

3    our group, about our becoming involved with the client.

4       Q.   And how do you know that?

5       A.   Just because I remember an e-mail exchange where

6    Fihchra sent an e-mail to Phil, and Phil asked me to

7    work on the project.

8       Q.   Do you know whether Mr. Jacob worked on the

9    project at all before you started doing so?

10      A.   I don't know.   I don't believe he did.

11      Q.   All right.   Do you know whether Mr. Jacob had had

12   any contact whatever with Oakwood before you started

13   working on this matter?

14      A.   Not that I'm aware of.

15      Q.   At the time you started working on this matter,

16   was anybody else from restructuring also working on it?

17      A.   Yes, the team that I mentioned.   Let's see, I

18   think initially it was a slightly different team.   If I

19   recall, Joe Benevides was involved, Ben Barnett and Phil

20   Jacob.

21      Q.   Okay.   And were you the point person at that

22   time?

23      A.   I was the senior point person, yes.

24      Q.   What was the nature of the work you were doing

25   when you first had contact with Oakwood?

63

1       A.    We were initially trying to solicit their

2    business, and in the process of doing that, trying to

3    help them understand creative ways to address their

4    balance sheet issues that we saw.

5       Q.    All right.  Do you know what it was that

6    Mr. O'Driscall had said to Mr. Jacob about the reason

7    for getting your group involved?

8       A.    I don't know specifically what conversation he

9    had.

10       Q.    Do you know whether he had presented Mr. Jacob

11    essentially with a proposition that his unit or his

12    group might develop some business here or was he asking

13    for specific help for the company that your group might

14    offer?

15                    MS. WARREN:    Objection.  Asked and answered.

16                    THE WITNESS:    I'm not sure.

17    BY MR. CASTANARES:

18       Q.    Okay.  And do you know whether -- I believe you

19    mentioned the e-mail.  Was there anything more than an

20    e-mail that you are aware of that describes the nature

21    of the assignment as Mr. O'Driscall envisioned it?

22       A.    I can talk to you about the conversations he and

23    I had, not about conversations he had with others.

24       Q.    Okay.  Was one of the first things that happened,

25    from your perspective, that you talked to him?

64

1      A.   Yes.

2      Q.   And what did he tell you at that time about

3   Oakwood?

4      A.   My recollection is just that the company had a

5   lot of debt that was trading below par, and is there

6   anything we could do to help them.

7      Q.   To help them do what?

8      A.   To help his client, to help his client address

9   his -- are there any opportunities here for the company,

10  the company being Oakwood Homes.

11     Q.   Did he talk to you about anything more than

12  simply the company's bonds trading below a certain

13  level, that is to say, did he talk to you about

14  potentially a restructuring transaction?

15          MS. WARREN:   Objection to the form.

16          Are you talking about ever did they discuss these

17  topics or are you limiting it to a time period?

18          MR. CASTANARES:   I'm talking about when

19  Mr. Felt first spoke to Mr. O'Driscall sometime in the

20  spring of 2001.

21     Q.   Do I have the time period correctly?

22     A.   I guess.

23     Q.   All right.

24     A.   About then.

25     Q.   Okay.

65

1        A.    It was a long process doing business.

2        Q.    At the beginning of your contact with the Oakwood

3    relationship?

4        A.    He asked me to take a look at the company, which

5    I did, and went back to him with ideas of things they

6    might be able to do.

7        Q.    Okay.    Now, did he tell you that whether or not

8    the company knew that he has -- he was making this

9    request of you?

10       A.    I don't remember.

11       Q.    Did you contact anybody at the company fairly

12   soon thereafter?

13       A.    You have a better sense of the time line because

14   you have all the documents in front of you.    When is the

15   first presentation dated?

16       Q.    I believe it's June 26, 2001.

17       A.    Okay.

18       Q.    Did you have any contact with anyone at the

19   company before making that presentation?

20       A.    I may have, but it would have always been in

21   conjunction with Fihchra because he was the primary

22   contact for the company.

23       Q.    Did you go to the company to gather any

24   information for the purposes of helping you make that

25   presentation before you made the presentation?

66

1    important -- with important questions and kept him

2    appraised as we went.

3        Q.   He didn't actually work on this project then,

4    other than to simply responding to inquiries that you

5    might have made of him?

6             MS. WARREN:   Objection to the form.

7             THE WITNESS:   He was extremely helpful in

8    the process.

9    BY MR. CASTANARES:

10       Q.   Okay.   What did he do besides respond to your

11   questions?

12       A.   He provided advice and a sounding board.

13       Q.   To you?

14       A.   To me and to the rest of the team, yes.

15       Q.   All right.

16       A.   As well as to Fihchra, but mainly to me, Peter

17   and Dodd.

18       Q.   And typically when he did that -- did he do that

19   orally or in writing?

20       A.   Orally.

21       Q.   Okay.   Do you know whether he had any contact

22   with anybody at Oakwood directly?

23       A.   On September 30th, this is a date I remember, he

24   attended a board meeting.   He may have had other direct

25   contact, but that was the day that my daughter was born

84

1    and so he covered -- he covered the meeting for me

2    because I simply was not able to attend.

3        Q.   Was that a -- did he attend that meeting

4    personally or by telephone?

5        A.   I don't recall.

6        Q.   Did he tell you what occurred at that meeting?

7        A.   Yes.

8        Q.   Did anybody else from CSFB attend that meeting,

9    to your knowledge?

10       A.   Yes, they did.  I don't recall who.

11       Q.   All right.  And other than attending the

12   September 30th -- and I think we're talking about 2002;

13   correct?

14       A.   Yes.

15       Q.   Other than attending that meeting, do you know

16   whether Mr. Jacob had any direct contact with anybody at

17   Oakwood at any time?

18       A.   I don't recall.

19       Q.   All right.  Now, let me ask you to focus on the

20   period immediately after the signing of the August 19th

21   contract.  Did you start work right away?

22       A.   Yes, and we had been working before that, even

23   though we were not formally engaged.

24       Q.   What -- how long had you been working before

25   that, before you were formally engaged?

85

1      A.   The first presentation we made to the company was

2    in June.  We made many other presentations to the

3    company about ideas and different things that they could

4    do.

5      Q.   Just to clarify your question.

6      A.   Yes.

7      Q.   I believe there have been a couple presentations

8    in June.  There was one in June 2001.  I believe there

9    was another in 2002.  Did your last answer refer to the

10   one approximately a year earlier in June 2001?

11     A.   Yes.  Thank you.

12     Q.   Okay.  All right.  And during that period of

13   time, even though you weren't formally engaged, was the

14   nature of the work that you were doing for Oakwood

15   similar to the kind of work you would have done if you

16   were formally engaged?

17            MS. WARREN:  Objection to the form.

18            THE WITNESS:  We were trying to provide them

19   with good ideas and -- with good ideas primarily and,

20   also, hoping to gain their trust so that they would work

21   with us as opposed to someone else.

22   BY MR. CASTANERAS:

23     Q.   Okay.  And I gather you were trying to give them

24   good ideas before, before and after --

25     A.   Yes.

86

```
 1     Q.  -- the August 19th contract was signed; correct?

 2     A.  Yes.

 3     Q.  And I assume you were trying to gain their trust

 4     both before and after August 19th as well; correct?

 5     A.  Yes.

 6     Q.  And you did gain their trust; correct?

 7     A.  I believe we did.

 8     Q.  And, actually, CSFB through Mr. O'Driscall had

 9     gained their trust at an earlier time, didn't they?

10              MS. WARREN:  Objection to the form.

11              THE WITNESS:  The company worked with

12     Fihchra and with the rest of the ABS team on a number of

13     occasions, so they must have trusted his work and

14     respected his work.

15     BY MR. CASTANARES:

16     Q.  Do you think that that assisted you in gaining

17     the trust of Oakwood Homes and the assignment you had

18     for it?

19     A.  In a number of ways, yes.

20     Q.  How so?

21     A.  First of all, they trusted him, therefore, they

22     were more inclined to talk to me.  Second, it was very

23     important to management to find a restructuring advisor

24     or a firm that could help them with both the very

25     difficult REMIC questions as well as the more typical
```

87

1    restructuring debt-related questions.

2        If you look at the transaction, it was both the

3    bond pieces that's typical of companies and then the

4    REMIC related questions, which are far less common and

5    far fewer firms can provide advice.

6    Q.   And how did that fact help you gain the company's

7    trust?

8    A.   It didn't help me gain the company's trust.

9    Instead it helped -- I think it was instrumental in

10   their deciding to work with us as opposed to someone

11   else.

12   Q.   All right.  You had already gained their trust,

13   and this was just a business factor that helped them

14   decide?

15   A.   Of course not.

16       MS. WARREN:  Objection to the form.

17       THE WITNESS:  Of course I hadn't gained

18   their trust yet.

19   BY MR. CASTANARES:

20   Q.   When did you gain their trust?

21   A.   You'd have to ask them.

22   Q.   But you know that you did?

23       MS. WARREN:  Objection to the form.

24       THE WITNESS:  All I know is they hired us.

25   BY MR. CASTANARES:

88

1       Q.   Okay.  Did you visit the company at any time

2    before August 19th, 2002, for the purpose of gaining

3    information about the company at any time other than

4    times you were making presentations?

5       A.   I don't recall.

6       Q.   Can you recall visiting the company at any time

7    prior to August 19th, 2002, other than those times that

8    you made presentations?

9       A.   I don't recall.

10      Q.   Can you recall whether anyone on your staff did

11   so for any purpose other than making presentations?

12      A.   I don't recall, but we did spend time with the

13   company to try to understand its business and start the

14   due diligence process.

15      Q.   Okay.  But you don't recall whether anybody from

16   your group actually went there as a part of that before

17   August 19th?

18      A.   We went there, but you asked a slightly different

19   question of, did you ever do it when you weren't making

20   a presentation.

21      Q.   Right.

22      A.   I don't recall.

23      Q.   Okay.

24      A.   If there were ever a separate flight to North

25   Carolina.

100

1          Q.   Okay.  What was this due diligence process that

2     you mentioned?

3          A.   Trying to understand the company's situation.

4          Q.   And when did that begin?

5          A.   From the first day we met them.

6          Q.   From the first day -- I just didn't hear you.

7     I'm sorry?

8          A.   From the first day I started learning about the

9     company.

10         Q.   Spring of '01?

11         A.   Sure.

12         Q.   Okay.

13         A.   Yes.

14         Q.   And you -- did that due diligence continue after

15    August 19, '02?

16         A.   Yes.

17         Q.   Okay.  Did it continue right up through the date

18    of bankruptcy?

19         A.   It continued -- yes.

20         Q.   Okay.  Did the due diligence process change

21    either in intensity or the nature of the things you were

22    doing after August 19th from where it had been before

23    August 19th?

24         A.   I don't recall, but I would -- but I would assume

25    that it became more intense.

                                                             101

1     Q.   Okay.  You don't recall anything specific that

2     you personally did by way of due diligence that was

3     different after August 19th from before?

4              MS. WARREN:  Objection to the form.

5              THE WITNESS:  I don't recall.

6     BY MR. CASTANARES:

7     Q.   Okay.  Now, looking again at the contract, and I

8     have before me page 134636.  Are we on the same page

9     literally at least?

10    A.   Yeah, we are.

11    Q.   And looking at paragraph 2B, the last line with

12    respect to a sale transaction, had the -- had CSFB done

13    anything to assist the company with respect to a sales

14    transaction before August 19th of 2002?

15    A.   We helped them consider one, but we did not

16    actively begin a process to potentially sell the

17    company, which would be inappropriate if you are not

18    retained.

19    Q.   All right.  During what period of time did you

20    help them consider one?

21    A.   I don't recall.

22    Q.   Was it shortly before August 19th of 2002, or was

23    it maybe perhaps as early as 2001 sometime?

24    A.   I don't recall, but it would have been part of

25    the overall conversations of what are the company's

102

1

2                              * * *

3                  ACKNOWLEDGEMENT OF DEPONENT

4        I, Jared Felt, do hereby acknowledge

5        that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14    _Nov 15, 2006_____        _~~~~~~~~~~~~~_____

15       (DATE)                        (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

1                           ERRATA SHEET

2       PAGE    LINE    CHANGE CORRECTION

3       16      20      "was" to "of" (incorrect)

4       19      12      "spending" to "pending" (typo)

5       20      21      "asset" to "asset in" (omitted word)

6       29      14      "Fihchra" to "Fiachra" (typo)

7       30      7       "F-I-H-C-H-R-A" to "F-I-A-C-H-R-A" (typo)

8       32      19      "Felt" to "felt" (incorrect)

9       47      21      "Felt" to "felt" (incorrect)

10      48      25      "Falt" to "felt" (incorrect)

11      59      2       "approaches the company or" to "approaches or" (incorrect)

12      65      9       "his" to "its" (incorrect)

13      91      13      "accept" to "except" (incorrect)

14      91      21      "at" to "that" (typo)

15      96      4       "hope" to "hoped" (typo)

16      97      10      "FCC" to "SEC" (incorrect)

17      103     16      "Felt" to "felt" (incorrect)

18      113     8       "Felt" to "felt" (incorrect)

19      129     9       "theses" to "these" (typo)

20      132     1       "suspected" to "suspect" (typo)

21      140     20      "sign" to "signed" (typo)

22      143     21      "15.th" to "15th" (typo)

23      156     2       "Not in" to "Not" (incorrect)

24      161     12      "GM2" to "GMT" (typo)

25      171     9       "want" to "went" (typo)

| | | ERRATA SHEET |
|---|---|---|
| 1 | | |
| 2 | PAGE | LINE | CHANGE CORRECTION |

| 1 | | | ERRATA SHEET |
|---|---|---|---|
| 2 | PAGE | LINE | CHANGE CORRECTION |
| 3 | 190 | 21 | "GAP" to "GAAP" (incorrect) |
| 4 | 191 | 7 | "GAP" to "GAAP" (incorrect) |
| 5 | 203 | 7 | "sister" to "sisters" (typo) |
| 6 | 213 | 15 | "loan" to "loans" (incorrect) |
| 7 | 217 | 19 | "secularization" to "securitization" (incorrect) |
| 8 | 238 | 23 | "graft" to "graph" (incorrect) |
| 9 | 238 | 24 | "graft" to "graph" (incorrect) |
| 10 | 240 | 8 | "decline" to "declined" (typo) |
| 11 | 259 | 18 | "range capital" to "Ranch Capital" (upper case) |
| 12 | 259 | 24 | "last" to "least" (typo) |
| 13 | 260 | 6 | "advise" to "advisor" (incorrect) |
| 14 | 269 | 7 | "non0critical" to "non-critical" (typo) |
| 15 | ___ | ___ | _____ |
| 16 | ___ | ___ | _____ |
| 17 | ___ | ___ | _____ |
| 18 | ___ | ___ | _____ |
| 19 | ___ | ___ | _____ |
| 20 | ___ | ___ | _____ |
| 21 | ___ | ___ | _____ |
| 22 | ___ | ___ | _____ |
| 23 | ___ | ___ | _____ |
| 24 | ___ | ___ | _____ |
| 25 | ___ | ___ | _____ |

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE    **CERTIFIED**

3                                             **COPY**

4       IN RE:

5       OAKWOOD HOMES CORPORATION, ET AL.,)
                                          )
6                   DEBTORS,              )
        _____)
7                                         )
        OHC LIQUIDATION TRUST,            )No. 02-13396(PJW)
8                                         )
                    PLAINTIFF,            )VOLUME 2
9                                         )PAGES 292 THROUGH 497
        vs.                               )
10                                        )
        CREDIT SUISSE FIRST BOSTON, A     )
11      SWISS BANKING CORPORATION, CREDIT )
        SUISSE FIRST BOSTON LLC, A        )
12      DELAWARE LIMITED LIABILITY        )
        CORPORATION, CREDIT SUISSE FIRST  )
13      BOSTON, INC., CREDIT SUISSE FIRST )
        BOSTON (USA), INC., A DELAWARE    )
14      CORPORATION AND A WHOLLY OWNED    )
        SUBSIDIARY OF CREDIT SUISSE FIRST )
15      BOSTON, INC., THE SUBSIDIARIES AND)
        AFFILIATES OF EACH, AND DOES 1    )
16      THROUGH 100,                      )
                                          )
17                  DEFENDANTS.           )
        _____)
18

19

20      VIDEOTAPED
        DEPOSITION OF:
21                  JARED FELT
                    FRIDAY, JUNE 16, 2006
22                  LOS ANGELES, CALIFORNIA

23

24
        REPORTED BY:
25      FELIPE F. CARRILLO, CSR 9555


                                                        292


**LEGALINK**®        20750 Ventura Blvd        tel (818) 593-2300        www.merrillcorp.com
A MERRILL COMPANY    Suite 205                 tel (800) 826-0277
                     Woodland Hills, CA 91364  fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1          DEPOSITION OF JARED FELT, TAKEN ON

2     BEHALF OF PLAINTIFF, AT 1901 AVENUE OF THE STARS,

3     12TH FLOOR, LOS ANGELES, CALIFORNIA, 90067-6013,

4     ON FRIDAY, JUNE 16, 2006, AT 9:12 A.M., BEFORE

5     FELIPE CARRILLO, CSR #9555.

6

      APPEARANCES:

7

8     FOR PLAINTIFF:

9          LAW OFFICES OF STUTMAN, TREISTER & GLATT

10         BY:  TONY CASTANARES, ATTORNEY AT LAW

11         1901 AVENUE OF THE STARS

12         12TH FLOOR

13         LOS ANGELES, CALIFORNIA  90067-6013

14         (310) 228-5755

15

16         LAW OFFICES OF STUTMAN, TREISTER & GLATT

17         BY:  WHITMAN L. HOLT, ATTORNEY AT LAW

18         1901 AVENUE OF THE STARS

19         12TH FLOOR

20         LOS ANGELES, CALIFORNIA  90067-6013

21         (310) 228-5690

22

23

24

25

293

1    APPEARANCES, CONTINUED:

2

3       LAW OFFICES OF STUTMAN, TREISTER & GLATT

4       BY:   CAROL CHOW, ATTORNEY AT LAW

5       1901 AVENUE OF THE STARS

6       12TH FLOOR

7       LOS ANGELES, CALIFORNIA   90067-6013

8       (310) 228-5725

9

10   FOR DEFENDANT:

11      LINKLATERS

12      BY:   MARY K. WARREN, ATTORNEY AT LAW

13      1345 AVENUE OF THE AMERICAS

14      NEW YORK, NEW YORK   10105

15      (212) 903-9000

16

17   ALSO PRESENT:

18      LORRAINE GRAY, CCV

19

20

21

22

23

24

25

294

11:31:11   1      Q.   That fits the definition you just gave me of

11:31:11   2    positive noncommittal response?

11:31:15   3      A.   The way I would --

11:31:15   4              MS. WARREN:   Objection to the form.  Let him

11:31:19   5    finish the question.  And, Tony, please don't cut him

11:31:22   6    off.

11:31:22   7              MR. CASTANARES:   I don't think I have.   I

11:31:22   8    think what actually happened was your objection got cut

11:31:24   9    off.

11:31:26   10             Did the reporter get the answer?

11:31:27   11             THE REPORTER:   No, I didn't, sir.

11:31:27   12             MR. CASTANARES:   I didn't either, so I'll

11:31:29   13   rephrase the question.  Allow me to state the question.

11:31:32   14   Allow your counsel to state her formal objection, and

11:31:35   15   then you can answer it.

11:31:36   16   BY MR. CASTANARES:

11:31:37   17     Q.   The response that you have just described that

11:31:39   18   Mr. O'Driscall gave to Oakwood as to why -- as to what

11:31:45   19   progress was being made on getting New York branch to

11:31:48   20   commit to a post-bankruptcy warehouse line, fit within

11:31:55   21   the definition you just gave of quote "positive non-

11:32:04   22   committal response," close quote, when you define that

11:32:10   23   term for me a few questions ago; correct?

11:32:12   24             MS. WARREN:   Objection to the form.

11:32:15   25   BY MR. CASTANARES:

LegaLink,   a Merrill Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

11:32:16  1      Q.  Please answer.

11:32:16  2      A.  Foothill was a third party to whom we had no

11:32:21  3  fiduciary duty.  We were trying to sell to them -- we

11:32:27  4  were trying to help the company sell to them a DIP

11:32:30  5  facility.  We had a fiduciary duty to Oakwood.  We were

11:32:38  6  very honest in our assessment of progress made in all

11:32:42  7  situations, including with respect to the loan purchase

11:32:47  8  facility.

11:32:48  9      Q.  Tell me, sir, in capsule form your formal

11:32:54  10  education since high school.

11:32:55  11      A.  Sure.  I graduated summa cum laude from Weaver

11:33:04  12  State College.  I graduated with an MBA from Stanford

11:33:09  13  University.

11:33:09  14      Q.  Okay.  What years did you get those two degrees,

11:33:11  15  please?

11:33:12  16      A.  I officially received my degree from Weaver State

11:33:16  17  College in 1990, I believe.

11:33:19  18      Q.  And the master's?

11:33:21  19      A.  In 1994.

11:33:22  20      Q.  Thank you.  Do you know whether Mr. O'Driscall

11:33:32  21  communicated the progress with New York branch on the

11:33:36  22  post-bankruptcy warehouse line to the company in writing

11:33:39  23  at any time?

11:33:40  24      A.  I don't know.

11:33:43  25      Q.  Okay.  Were you ever in contact with any of the

376

11:33:55     1     New York branch people regarding the post-bankruptcy

11:33:58     2     warehouse line?

11:33:58     3         A.   Yes.

11:33:59     4         Q.   Whom did you contact there?

11:34:02     5         A.   After the company filed, I was asked to

11:34:06     6     participate in at least one credit meeting where it was

11:34:14     7     discussed.

11:34:14     8         Q.   When you say a "credit meeting," that's a meeting

11:34:17     9     of the credit managers or credit risk managers of New

11:34:21    10     York branch?

11:34:21    11         A.   Yes.

11:34:22    12         Q.   And about how long after the filing was that?

11:34:24    13         A.   Soon after.  I don't recall specific dates.

11:34:28    14         Q.   Okay.  What occurred at that meeting?

11:34:31    15         A.   There was discussion about whether or not the

11:34:37    16     company -- that New York branch should provide a loan

11:34:40    17     purchase facility.  There was discussion about the

11:34:44    18     credit -- the credit worthiness of that facility, and

11:34:51    19     the loans underlying the facility at the time.

11:34:54    20              There was a lot of discussion of needs for

11:34:58    21     capital elsewhere within the bank, and there was also a

11:35:05    22     strong focus on ascertaining or making sure that the --

11:35:13    23     that OAC was considered by the court a bankruptcy-remote

11:35:17    24     entity and that there was a true sale opinion associated

11:35:20    25     with those loans.

377

15:04:42    1              THE WITNESS:    I'm sorry.    I know that this

15:04:45    2    is something that we formatted and made.

15:04:47    3    BY MR. CASTANARES:

15:04:48    4        Q.    All right.    And were you the person who did that

15:04:50    5    at CSFB?

15:04:50    6        A.    No.

15:04:51    7        Q.    Do you have any knowledge of the differentiation

15:04:54    8    that appears to be here between the 20 percent of the

15:05:01    9    stock that CSFB holds in the category of insider

15:05:05    10   holdings and the 0.2 percent of the stock that CSFB

15:05:14    11   holds in the category of institutional holdings?

15:05:19    12             MS. WARREN:    I'll just object to the form to

15:05:22    13   the extent that you are asking the witness for a legal

15:05:23    14   conclusion.

15:05:23    15             Otherwise, you can go ahead and answer.

15:05:27    16             MR. CASTANARES:    I'll rephrase the question.

15:05:29    17       Q.    When you prepared this page or when your unit

15:05:34    18   prepared this page, why did it put 20 percent of the

15:05:36    19   stock that CSFB held in the insider category and 0.2

15:05:41    20   percent that CSFB held in the institutional category?

15:05:46    21             MS. WARREN:    Same objection.

15:05:48    22             THE WITNESS:    I could only make an educated

15:05:56    23   guess.

15:05:56    24             MS. WARREN:    Don't guess.

15:05:57    25   BY MR. CASTANARES:

447

15:05:57    1      Q.  You don't remember?

15:05:58    2      A.  I didn't prepare this.

15:05:59    3      Q.  Somebody in your group did; correct?

15:06:01    4      A.  Yes.

15:06:05    5      Q.  Okay.  Was the term "insider holding" something

15:06:08    6   that was in the Spectrum data you received?

15:06:08    7      A.  I didn't prepare this.  Based on the footnotes

15:06:24    8   that is the from the company's filings.

15:06:28    9      Q.  Did you review this page before the presentation

15:06:30    10   was made?

15:06:31    11      A.  Yes.

15:06:31    12      Q.  You were the person at CSFB who was principally

15:06:37    13   responsible for the making of this presentation and the

15:06:40    14   submission of this document to Oakwood; correct?

15:06:44    15      A.  Yes.

15:06:45    16      Q.  Okay.  Did anybody -- strike that.

15:06:57    17          Did you attend a presentation at Oakwood on or

15:07:02    18   about June 26th of 2001?

15:07:03    19      A.  I believe I participated in the presentation.  I

15:07:09    20   don't recall where it occurred.

15:07:11    21      Q.  Okay.  Did anybody at Oakwood comment on this --

15:07:15    22   either the placement of some of CSFB's stock in the

15:07:19    23   insider category or the placement of other parts of

15:07:22    24   CSFB's stock in the institutional category?

15:07:25    25      A.  I don't believe they did.

448

15:07:26    1    Q.  Okay.

15:07:31    2              MS. WARREN:  Is now a good time for a break?

15:07:33    3              MR. CASTANARES:  Sure.

15:07:34    4              THE VIDEOGRAPHER:  We're going off the

15:07:36    5    record.  The time is 15:07.

15:14:37    6                    (Brief recess)

15:14:39    7              THE VIDEOGRAPHER:  We're back on the record,

15:15:03    8    and the time is 15:14.

15:15:06    9    BY MR. CASTANARES:

15:15:06    10    Q.  Do you recall whether the Oakwood people had

15:15:09    11    anything to say about your presentation of June 26th,

15:15:12    12    2001?

15:15:13    13    A.  I don't recall.

15:15:13    14    Q.  Do you recall whether -- how was it left after

15:15:22    15    the June 26th, 2001, presentation?  Were you to do

15:15:26    16    something?  Were they to do something?  What was

15:15:28    17    supposed to happen next?

15:15:30    18    A.  I don't remember specifically.

15:15:34    19              MR. CASTANERAS:  Okay.  Exhibit 44 will be

15:15:58    20    265232.

15:15:58    21              (THE DOCUMENT WAS MARKED PLAINTIFF'S

15:16:14    22              EXHIBIT 44 FOR IDENTIFICATION.)

15:16:14    23              THE WITNESS:  Thank you.

15:16:32    24                    (Brief pause)

15:16:36    25              THE WITNESS:  I'm ready.

LegaLink,  a Merrill Company
800-826-0277  818-593-2300  Fax 818-593-2301  www.legalink.com

1

2                                    * * *

3                        ACKNOWLEDGEMENT OF DEPONENT

4          I, Jared Felt, do hereby acknowledge

5          that I have read and examined the

6          foregoing testimony, and the same is a true,

7          correct and complete transcription of the

8          testimony given by me, and any corrections appear

9          on the attached Errata sheet signed by me.

10

11

12

13

14      ___Nov 15, 2006___                    _____

15      (DATE)                              (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

1                    ERRATA SHEET

2    PAGE    LINE    CHANGE CORRECTION (REASON)

3    298     17      "16th department" to "Fixed Income Department" (incorrect)

4    323     10      "It may have been a" to "It may have been" (incorrect)

5    327     16      "Bane" to "Bain" (incorrect)

6    327     19      "leverage to buy out" to " leveraged buyout" (incorrect)

7    327     24      "Bane" to "Bain" (incorrect)

8    327     25      "Bane" to "Bain" (incorrect)

9    328     10      "Bane" to "Bain" (incorrect)

10   344     23      "The color" to "Color" (incorrect)

11   345     11      "our" to "any" (incorrect)

12   363     21      "Felt" to "felt" (lower case)

13   364     22      "Felt" to "felt" (lower case)

14   376     11      "Weaver" to "Weber" (incorrect)

15   376     16      "Weaver" to "Weber" (incorrect)

16   395     8       "in" to "and" (incorrect)

17   405     11      "Felt" to "felt" (lower case)

18   408     11      "believe" to "believed" (incorrect)

19   412     4       "understand" to "understand," (omitted coma)

20   423     13      "Felt" to "felt" (lower case)

21   427     25      "didn't to be" to "didn't want to be" (omitted word)

22   446     21      "spectrum" to "Spectrum" (capitalize)

23   453     18      "GAP" to "GAAP"

24   482     7       "talk" to "talked" (incorrect)

25   489     3       "economic basis" to "economics based" (incorrect)

1              ERRATA SHEET

2    PAGE    LINE    CHANGE CORRECTION

3    490     11      "concepts" to "consents" (incorrect)

4    491     5       "Tyco" to "Taiko" (incorrect)

5    491     7       "Donaldson" to "Donaldson," (omitted coma)

6    491     8       "Lefton and Generat" to "Lufkin and Jenrette" (incorrect)

7    ____   ____    _____

8    ____   ____    _____

9    ____   ____    _____

10   ____   ____    _____

11   ____   ____    _____

12   ____   ____    _____

13   ____   ____    _____

14   ____   ____    _____

15   ____   ____    _____

16   ____   ____    _____

17   ____   ____    _____

18   ____   ____    _____

19   ____   ____    _____

20   ____   ____    _____

21   ____   ____    _____

22   ____   ____    _____

23   ____   ____    _____

24   ____   ____    _____

25   ____   ____    _____

# Exhibit "B"

 1                UNITED STATES BANKRUPTCY COURT

 2                     DISTRICT OF DELAWARE

 3                          — — —

 4

 5      In re:                        )
                                      )
 6      OAKWOOD HOMES CORPORATION,     )   Chapter 11
        et al.,                       )
 7                                    )
                    Debtors.          )
 8      --------------------------------)   Case No.
        OHC LIQUIDATION TRUST,         )
 9                                    )   02-13396 (PJW)
                    Plaintiff,        )
10                                    )
             vs.                      )
11                                    )   Pages 1 - 82
        CREDIT SUISSE FIRST BOSTON,    )
12      et al.,                       )
                                      )
13                  Defendants.       )
        --------------------------------)
14      AND RELATED CROSS-ACTION.     )
                                      )
15

16

17      TELEPHONIC DEPOSITION OF:

18                    MARK D. MILLARD

19                    MONDAY, SEPTEMBER 24, 2007

20                    1:03 P.M.

21

22

23      Reported by:

24            ALFRED J. LONG

25            CSR No. 2024

1                    TELEPHONIC DEPOSITION OF MARK D.

2       MILLARD, the witness, taken on behalf of the

3       Plaintiff at 1901 Avenue of the Stars, Twelfth Floor,

4       Los Angeles, California, commencing at 1:03 p.m.,

5       Monday, September 24, 2007, before Alfred J. Long,

6       CSR No. 2024.

7

8       APPEARANCES OF COUNSEL:

9

10      FOR THE PLAINTIFF:

11                  STUTMAN TREISTER & GLATT, PC

12                  BY:   SCOTT H. YUN, ESQ.

13                  1901 Avenue of the Stars

14                  Twelfth Floor

15                  Los Angeles, California 90067-6013

16                  (310) 228-5750

17

18      FOR THE WITNESS (TELEPHONICALLY):

19                  MUNGER TOLLES & OLSEN LLP

20                  BY:   KELLY M. KLAUS, ESQ.

21                  355 South Grand Avenue

22                  35th Floor

23                  Los Angeles, California 90071-1560

24                  (213) 683-9100

25

2

```
 1    APPEARANCES OF COUNSEL (Continued)

 2

 3    FOR DEFENDANT CREDIT SUISSE FIRST BOSTON

 4    (TELEPHONICALLY):

 5            LINKLATERS LLP

 6            BY:   MICHAEL OSNATO, ESQ.

 7                  JUSTIN WILLIAMSON, ESQ.

 8            1345 Avenue of the Americas

 9            New York, New York 10105

10            (212) 903-9000

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    question that you believe need clarification, you can

2    point that out, too.

3          THE WITNESS:  Okay.  My recollection is that

4    this proposed transaction was brought to us by Credit

5    Suisse.

6    BY MR. YUN:

7          Q.  At the time Credit Suisse brought this

8    opportunity to Berkshire Hathaway, were you looking

9    to invest more in Oakwood Homes independently?

10         A.  We had the willingness to continue

11   purchasing public debt of Oakwood Homes, but at that

12   time had not considered, you know, this Lotus-type

13   purchase.

14         Q.  What was Berkshire Hathaway's objective in

15   investing in the Oakwood Homes B-2 securities?

16         MR. KLAUS:  I'm sorry, Mr. Yun, I missed the

17   tail end of that question.  Could you repeat it.

18         MR. YUN:  Sure.

19         Q.  What was Berkshire Hathaway's objective in

20   investing in Oakwood Homes B-2 securities?

21         A.  The response would be very similar to the

22   one I gave regarding our purchase of the public debt.

23   It was to purchase them at such a price that we

24   thought we would make a fair return on our

25   investment.

16

1      Q.   Were you the person at Berkshire Hathaway

2   who negotiated the Lotus transactions?

3      A.   I was certainly heavily involved, yes.  My

4   boss would be included in that, and I would have

5   relayed, you know, whatever information to Credit

6   Suisse.

7      Q.   Who did you negotiate the terms of the Lotus

8   transactions with?

9      A.   The question is, who did I negotiate the

10   terms with?

11      Q.   Yes.

12      A.   With various personnel at Credit Suisse,

13   including Tom Connors.

14      Q.   Did you talk to anyone from Oakwood Homes

15   directly while negotiating the Lotus transactions?

16      A.   To the best of my recollection, I did not.

17      Q.   Did Fiachra O'Driscoll make any

18   representations to you that he had the authority to

19   negotiate the terms of the Lotus transactions on

20   behalf of Oakwood Homes?

21           MR. WILLIAMSON:   Objection to form.

22           THE WITNESS:   Well, I'll just answer as best

23   I can.  Fiachra was certainly one of the point

24   persons I dealt with in this transaction.

25           But to answer the question, did he, you

17

1    know, indicate that he had authority, I had known by

2    that time that he -- you know, he was working with

3    the company, but I don't have a specific recollection

4    of, you know, what authority he was under.

5    BY MR. YUN:

6        Q.  Did Mr. Tom Connors make any representations

7    to you regarding his authority to negotiate on behalf

8    of Oakwood Homes?

9            MR. WILLIAMSON:  Objection to form.

10            THE WITNESS:  The way I viewed Tom Connors'

11    responsibility was, he was a go-between between us

12    and/or other personnel at his firm and/or the

13    company, so I did not take Tom's relationship as

14    meaning that he had the authority to get a deal done.

15    BY MR. YUN:

16        Q.  Did you believe Fiachra O'Driscoll had the

17    authority to negotiate the terms of the Lotus

18    transactions on behalf of Oakwood Homes?

19            MR. WILLIAMSON:  Objection.

20            MR. KLAUS:  I'm sorry, I didn't -- is the

21    question, Mr. Yun, did he believe that at the time?

22            MR. YUN:  Yes, did he believe that at the

23    time?

24            THE WITNESS:  I believed at the time Fiachra

25    was working with the company in structuring a deal

18

1    owned them -- and there was little liquidity in this

2    marketplace.  Nobody would buy them, so this was a

3    way to monetize, if you will, these securities.

4           So I don't believe that there were many fair

5    market value estimates around at the time.  So, to my

6    knowledge, I guess the answer is, I don't believe so.

7    Q.   We previously discussed that there were

8    multiple Lotus transactions.  My recollection is that

9    there were four.  You weren't sure whether there were

10   four, but you thought that was about right.

11          Why were all the Lotus transactions priced

12   the same?  And by "price," I mean 55 percent of par

13   value.

14          MR. KLAUS:  And again, if you have an

15   understanding, Mr. Millard.

16          THE WITNESS:  My general recollection is

17   that we would earn a certain return if losses were

18   less than a certain number, and that, generally

19   speaking, these transactions were very similar.

20   BY MR. YUN:

21   Q.   You may have answered this question, but

22   this will be a little more specific.

23          Between the first Lotus transaction and the

24   last Lotus transaction, did Credit Suisse provide you

25   with updated cash flow models or financial models?

27

1          MR. WILLIAMSON:  Objection to form.

2          THE WITNESS:  I'm sure they did, as we would

3     have wanted to stay on top of not only what we had

4     already purchased, but also to help us gauge whether

5     or not an additional investment would be warranted.

6     BY MR. YUN:

7          Q.  Were the financial data and models provided

8     by Credit Suisse good?  Did you think they were good

9     or poor?

10         MR. WILLIAMSON:  Objection to form.

11         MR. KLAUS:  I'd say it's a little vague and

12    ambiguous.

13         Mr. Millard, if you understand the question,

14    you can answer it.  If you'd like more clarification,

15    you can ask for it.

16         THE WITNESS:  My response would be:  There

17    were certainly errors in the figures over time, as we

18    found out and discovered, you know, unfortunately, a

19    little later.

20    BY MR. YUN:

21         Q.  If you can, can you describe for me the

22    errors that you alluded to in your response.

23         A.  One area of concern became some documents

24    that were provided as to how the Lotus transactions

25    would work.  In fact, I don't believe they were

28

1    accurately modeled, in that there were some triggers

2    on certain classes that were not ultimately met, and

3    we certainly didn't realize that, and weren't told,

4    to my knowledge, up front about that.

5         And then, you know, there were many figures

6    involved, and they were various corrections that

7    would -- you know, we would find, you know,

8    throughout the course of the review and try to get

9    those corrected.

10    Q.    Mr. Millard, do you recall a meeting on

11    July 24, 2002, between Oakwood Homes, Berkshire

12    Hathaway and Credit Suisse in Nebraska?

13    A.    I believe there were a couple of meetings

14    that were, you know, met -- that we had with those

15    parties.  But yes, that sounds correct.

16    Q.    Who contacted Berkshire Hathaway about

17    setting up this particular meeting in July 2002?

18         MR. WILLIAMSON:  Objection to form.

19         THE WITNESS:  As with most of the meetings

20    and calls, I believe that was set up through -- Tom

21    Connors would have tried to at least help schedule

22    that.

23    BY MR. YUN:

24    Q.    What did you think the purpose of the

25    meeting was?

29

1          MR. KLAUS:  And by that do you mean, does

2     Mr. Millard have a recollection of what he thought

3     the meeting was going to be prior to the meeting?

4          MR. YUN:  Yes.

5          MR. KLAUS:  Okay.

6          THE WITNESS:  Again, it's been a while, but

7     my recollection is that the management team wanted to

8     meet with, quite frankly, my boss and myself, but

9     probably more my boss, and to perhaps give us a

10    summary or recap of what was happening in the

11    manufactured housing industry, you know, and with

12    Oakwood in particular.

13         It was my recollection that by this time,

14    they had already known that we had, you know, made a

15    significant investment in their public debt, and I

16    believe we had made several or numerous -- well, I

17    don't know how many of the four of the Lotus

18    transactions we had already done, but we had probably

19    done a majority of them by then, certainly.

20    BY MR. YUN:

21         Q.  During the July 2002 meeting, was there any

22    discussion of the Loan Assumption Program?

23         A.  I don't recall that specifically.  I don't

24    remember the exact details of the meeting itself.

25         Q.  Mr. Millard, I'd like to refer you, if you

30

1          D E C L A R A T I O N

2

3          I hereby declare I am the deponent in

4    the within matter; that I have read the foregoing

5    deposition and know the contents thereof, and I

6    declare that the same is true of my knowledge

7    except as to the matters which are therein stated

8    upon my information or belief, and as to those

9    matters, I believe it to be true.

10         I declare under the penalties of

11   perjury of the State of California that the foregoing

12   is true and correct.

13         Executed this 8th day of *October*

14   2007, at    *Omaha*    , *Nebraska.*

15

16                         *Mark D. Millard*

17

18

19

20            W I T N E S S

21                 *Jackie Wilson*

22

23

24

25

                                                    81

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

| | ERRATA SHEET | | |
|---|---|---|---|
| 1 | | | |
| 2 | **PAGE** | **LINE** | **CHANGE CORRECTION** |
| 3 | 14 | 21 | "point" should be "price" |
| 4 | 26 | 11 | "weekly" should be "monthly" |
| 5 | 52 | 2 | "Hanberg" should be "Hamburg" |
| 6 | 52 | 5 | "infrastructure" should be "a restructuring" |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

# Exhibit "C"

DOUGLAS R. MUIR

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - -X
                                   : Chapter 11
In Re:                             Case No. 02-13396
OAKWOOD HOMES CORPORATION,         : (PJW)
et al.,                            Jointly Administered
                                   :
          Debtors.
_____  :          ORIGINAL
OHC LIQUIDATION TRUST,
                                   :
          Plaintiff,
                                   :
     v.                            Adv. Proc. No.
                                   : 04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation,       :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited            :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,         :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware         :
corporation and a wholly
owned subsidiary of CREDIT         :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and              :
affiliates of each, and
DOES 1 through 100,                :

          Defendants.              :

- - - - - - - - - - - - - - -X

     Videotape Deposition of DOUGLAS R. MUIR, VOLUME I
               (Taken by Defendants)
            Winston-Salem, North Carolina
                 September 26, 2006


Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public



**LEGALINK**
A MERRILL
COMMUNICATIONS
COMPANY

420 Lexington Ave          tel (212) 557-7400      www.merrillcorp.com
Suite 2108                 tel (800) 325-3376
New York, NY 10170         fax (212) 692-9171

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
 1              APPEARANCE OF COUNSEL
 2
      For the Plaintiff:
 3
      TONY CASTANARES, Esq.
 4    Stutman, Treister & Glatt
      1901 Avenue of the Stars
 5    Twelfth Floor
      Los Angeles, California  90067-6013
 6    (310) 228-5755
      (310) 228-5788 FAX
 7    TCastanres@stutman.com
 8
      For the Defendants:
 9
      MARY K. WARREN, Esq.
10    J. JUSTIN WILLIAMSON, Esq.
      Linklaters
11    1345 Avenue of the Americas
      New York, New York  10105
12    (212) 903-9000
      (212) 903-9041 FAX
13    Michael.osnato@linklaters.com
14
      Videographer:
15
      Mr. Donald Graves
16
17              *  *  *  *  *
18
19
20
21
22
23
24
25
```

DOUGLAS R. MUIR

3

1          Videotape Deposition of DOUGLAS MUIR, VOLUME I,

2     taken by the Plaintiff, at the Marriott Hotel, 425

3     North Cherry Street, Winston-Salem, North Carolina,

4     on the 26th day of September, 2006 at 8:40 a.m.,

5     before K. Denise Neal, Registered Professional

6     Reporter and Notary Public.

7

8                    *  *  *  *  *

9

10                      CONTENTS

11   THE WITNESS:  DOUGLAS R. MUIR          EXAMINATION

12            BY MS. WARREN                          6

13

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1      Q.    How was that decision taken?  Who made the

2    decision?

3      A.    I don't know that any one individual did,

4    but certainly Mike and I discussed it.  Bob and I

5    would have discussed it, Myles and I.  We talked to

6    the people in our retail organization.

7          The reason they were important is they

8    were part of the process of helping sell repossessed

9    properties and they had a significant role in the

10   loan assumption program.  So we all discussed it and

11   discussed the merits and thought that -- that it was

12   possible to run a program that made sense.

13     Q.    Do you remember approximately when

14   Oakwood, in fact, implemented the expansion of the

15   loan assumption program?

16     A.    I don't remember exactly, but my best

17   recollection is it's sometime in the summer or

18   perhaps the fall of 2000.  I could be off.

19     Q.    Who was in charge, if anyone, of

20   monitoring the expansion -- the expanded assumptions

21   program to see if it was doing what it was supposed

22   to do?

23     A.    I don't know.

24     Q.    Was there anyone monitoring the loan

25   assumptions program at Oakwood?

DOUGLAS R. MUIR

62

1    A.    I don't know of anyone who was tasked

2    specifically with monitoring it.  There was

3    information available including some available to me

4    that enabled me to get an understanding of how many

5    loans were being put through the program.  What

6    information others had, I don't know.

7    Q.    Am I correct that at some point it came to

8    your attention that the assumptions program was not

9    having the desired effect?

10    A.    I would -- I would characterize it as

11    having come to my attention that it had some side

12    effects.

13    Q.    Explain that to me.

14    A.    The information came to my attention that

15    caused me to believe that we were doing too many loan

16    assumptions, that the loan assumption process was

17    being applied to delinquent loans that were not good

18    candidates for it, and that as a consequence that

19    running the program was having some significant

20    adverse liquidity effects.  It was eating up cash.

21    Q.    When did that come to your attention?

22    A.    As best I can recall would be sometime in

23    the spring, late winter, early spring, early summer

24    of 2001, certainly by July of that year.

25    Q.    And do you remember when you informed

1    Credit Suisse that the expanded loan assumption

2    program was having difficulties or side effects?

3        A.    I don't.

4        Q.    To your knowledge was Credit Suisse

5    involved in the decision to expand the loan

6    assumptions program?

7        A.    I don't think they -- to my knowledge they

8    were not involved in the decision.  They were

9    certainly informed of it.

10        Q.    Was the loan assumption program eventually

11    terminated?

12        A.    Yes.

13        Q.    And around when was that?

14        A.    Around July of 2001 I believe is the

15    correct date.

16        Q.    Who made the decision to terminate the

17    loan assumption program?

18        A.    As best I recall, Bob and Myles and I

19    collectively discussed it.  Myles was very much in

20    favor of terminating it and so was I.  So I guess

21    ultimately Myles, who was CEO of the company, made

22    the decision.

23        Q.    Do you remember when or if Credit Suisse

24    was informed of the decision to terminate the loan

25    assumption program?

DOUGLAS R. MUIR

64

1      A.    No.   I'm sorry.   Did you say -- was the

2  question when or if?

3      Q.    Yes.

4      A.    I know we told them.   When we told them, I

5  don't know.

6      Q.    Do you remember any reaction from the

7  Credit Suisse people about being informed that the

8  loan assumption program had terminated?

9      A.    I don't because, again, I don't have a

10 specific recollection of calling and telling anyone.

11     Q.    We've touched on this a bit in passing,

12 but what services did Credit Suisse provide for

13 Oakwood during the period 1999 to the petition date?

14     A.    Two or three depending on how you count.

15 The ones that I remember are they were the ongoing

16 lead underwriter for the ABS transactions, which was

17 a -- generally a quarterly type event.   They were the

18 arranger of the servicing advance facility in the

19 fall of 2001 as I recall, around October.

20           There were a number of occasions when

21 people from CSFB outside the investment banking side,

22 for example, perhaps from the investment banking side

23 or the financial advisory side came and talked to us

24 about ideas.   These were not engagements where there

25 was an engagement letter and they were getting a fee.

DOUGLAS R. MUIR

65

1    They'd just come down and say hey, we've been

2    thinking about you. Here's an idea. Why don't you

3    consider this.

4        Q.    Did you consider they were pitching for

5    more business from you with those ideas?

6        A.    Yes. If they were hoping to get an

7    engagement, yeah. I thought that's what they were

8    doing, sure. And then ultimately we signed an

9    engagement letter with them in August of 2002 to

10   provide financial advisory services.

11       Q.    So have I understood you correctly to say

12   that the services that Credit Suisse provided to

13   Oakwood during the period 1999 to the petition date

14   were serving as lead underwriter for the asset backed

15   securities, being the arranger of the servicing

16   advance facility and eventually beginning in 2002

17   serving as financial advisor?

18       A.    All of those and I forgot the loan

19   purchase facility, the warehouse facility. That was

20   pretty important.

21       Q.    And when Credit Suisse came and pitched

22   for your business by giving you ideas, you didn't

23   compensate them for that; right?

24       A.    No.

25       Q.    I mean, they were hoping that they could

DOUGLAS R. MUIR

66

1    get more business from you to the best of your

2    knowledge; right?

3        A.    That was --

4        Q.    You weren't paying them to come and just

5    give you ideas?

6        A.    We were not paying them for ideas.  I

7    assume they hoped to land an engagement.

8        Q.    In your view did Credit Suisse perform its

9    services as lead underwriter for the securitizations

10    competently?

11        A.    Yes.

12        Q.    Did Credit Suisse perform its services in

13    providing the loan purchase facility competently?

14        A.    Yes.  I believe so.

15        Q.    Did Credit Suisse perform the financial

16    advisory services beginning in August of 2002

17    competently?

18        A.    Of that I'm a little less certain.

19        Q.    And why do you say that?

20        A.    There are a couple of reasons.  And by

21    saying I'm not certain they were competent, I'm not

22    saying they were incompetent.

23        Q.    I understand.  Is it fair to say that

24    you're saying that there were some problems?

25        A.    There were what I perceived to be some

DOUGLAS R. MUIR

1       A.      And often did.

2       Q.      Is it your understanding that this

3   provision allows the OMI Note Trust to use proceeds

4   to pay note holders?

5       A.      Proceeds of sale of assets?

6       Q.      Yes.

7       A.      Yes.

8       Q.      Do you know of any claim that Oakwood

9   could assert over funds that were to be paid to note

10  holders pursuant to this agreement, Exhibit 213?

11      A.      I'm not sure I understand the question.

12  I'm sorry.

13      Q.      Do you know of any reason why Oakwood

14  would have any right to proceeds that were paid to

15  note holders out of the OMI Note Trust account

16  pursuant to this agreement, Exhibit 213?

17      A.      Let me say it another way to make sure I

18  understand the question.  If you're asking me if the

19  class A note holders received money pursuant to this

20  agreement and there wasn't some error made, does

21  Oakwood have any claim to that money.  I think the

22  answer -- so far as I know the answer is no, but I'm

23  not a lawyer.

24      Q.      Understood.  I'm just asking for your

25  understanding as the business person who dealt with

DOUGLAS R. MUIR

86

1    these agreements and operated some of the facilities.

2    Take a look back at section 3.2 of Exhibit 213 and in

3    particular Bates page 92191, and you'll see the ninth

4    priority payment in this waterfall is to the servicer

5    if OAC the servicing fee.  That's Romanette nine.  Do

6    you see that?

7        A.    I do.

8        Q.    What is your understanding of why the

9    servicing fee was ninth in priority?

10            MR. CASTANARES:  I'll object to the form

11       of the question.

12            THE WITNESS:  Well, it's the -- it's in

13       the priority it is because that's where we

14       negotiated it.  I'd have to speculate as to

15       CSFB's motives in why they negotiated it for it

16       to be where it is.

17       Q.    (By Ms. Warren)  Would you have preferred

18    it to be higher up in the waterfall?

19       A.    Well, to the extent that I was

20    representing OAC and I have a right to money, I'd

21    always rather have my priority higher than others,

22    yes.

23       Q.    Sure.  I'm showing you now, Mr. Muir,

24    Defendant's Exhibit 214, which is on letterhead of

25    Hunton & Williams and it's Bates numbered CSFB-225678

DOUGLAS R. MUIR

87

1   to 225702 dated February 26th, 2001.  Take a look at

2   that and let me know if you've seen it before.

3        A.    I don't specifically recall this, but I

4   think it's highly likely that I have seen it before.

5        Q.    Do you remember what Hunton & Williams'

6   role was?

7        A.    In what?  I'm sorry.

8        Q.    In setting up the OMI Note Trust?

9        A.    They were counsel to Oakwood.

10       Q.    Do you remember whether Hunton & Williams

11  produced this document, Defendant's Exhibit 214, at

12  Oakwood's direction?

13       A.    I'm certain that they did.

14       Q.    Would you review legal opinions like this

15  in the course of your duties at Oakwood?

16       A.    Occasionally.

17       Q.    But you don't really have a memory of this

18  one?

19       A.    I do not.

20       Q.    I'm showing you a document that's been

21  marked Defendant's Exhibit 215.  It appears -- the

22  first page appears to be an account statement issued

23  by J.P. Morgan and this is Bates numbered

24  OHCLT-428297 through 428307.  Take a look at that and

25  let me know if you recognize it?

DOUGLAS R. MUIR

142

1   advisor, it was going to need to be somebody that was

2   capable of understanding and coordinating the

3   constituencies associated with three rather different

4   businesses.  And we had trade credit, traditional

5   commercial industrial-type business in the

6   manufacturing side of the house.

7           We had a multi-unit retail operation that

8   had its own set of issues.  We had a seven or eight

9   hundred million dollar a year production finance

10  company with a $5 billion servicing portfolio and a

11  whole set of constituents associated with that

12  business, ABS security holders, investment bankers,

13  rating agencies, then three businesses that operated

14  together but that had very different liquidity needs

15  and a fairly long cycle between buying 2 x 4s up here

16  at the front end of the process and securitizing a

17  loan on the back end.

18          And it was going to take a fairly

19  sophisticated and talented firm to be able to

20  understand all those constituencies that were

21  involved, B2 guarantee holders, corporate debt

22  holders, liquidity providers.  And that was a big

23  consideration at the time when we talked about the

24  relative merits of the people that were on the list.

25      Q.    Did you have pitches from any of these

DOUGLAS R. MUIR

143

1    other potential financial advisors?

2        A.    I don't remember if we did or not.  I

3    don't recall any, but that's not to say that we

4    didn't get a pitch book, have a sit down.  I just --

5    I can't say that there weren't any, but I don't

6    remember any.

7        Q.    And why ultimately did you and Mr.

8    Standish decide on Credit Suisse to be the financial

9    advisor?

10       A.    I think there were probably others

11   involved in the decision, but I was in favor of CSFB

12   and I think Myles shared this view for a couple of

13   reasons, maybe three.  First, they had a very, very

14   long history with the company going back to 1994, so

15   we had had a chance to see a lot of them.  We knew

16   the caliber of the people they typically brought to

17   the table.

18            We liked them.  We trusted them.  So that

19   was important to us.  Number two, they had a good

20   reputation from what we had been able to glean in

21   some tough, complex bankruptcy or financial

22   restructuring situations.  So it had a good

23   reputation.  Third, we thought they had the skill

24   sets to bring together and understand the different

25   facets of the business because if you're going to

1    bankrupt Oakwood and run it through that process, if

2    that were the decision, what you were going to do

3    about warehousing credit, what you were going to do

4    about your ABS bondholders, guarantees in place for

5    those, were you going to be able to successfully

6    securitize and finance your business in bankruptcy,

7    CSFB was in a unique position to advise us on that

8    because they were just -- that's what they did for

9    us.

10           They had done that to the virtual

11    exclusion of all others, you know, for eight years.

12    So we thought, you know, they had the horsepower to

13    do the job and were uniquely suited to do it.  At

14    least that was my view.

15        Q.    And was the hiring of Credit Suisse to be

16    the financial advisor approved by the board?

17        A.    I don't specifically remember it.  The

18    minutes would show, but we would never have signed

19    onto a letter like that without getting the blessing

20    of the board formally or informally.

21        Q.    And when you say you wouldn't have signed

22    onto a letter like that, what do you mean?

23        A.    The August contract.

24        Q.    Right.  But what do you mean a letter like

25    that?

DOUGLAS R. MUIR

145

1    A.    It was a significant contract for very

2    important services in a very difficult time of the

3    business.   And we would not have engaged someone to

4    render services that were that important without

5    getting at least the implicit approval of the board.

6        Q.    Who is Andrew Davidson?

7        A.    Andy is I think the owner or the principal

8    owner of a company called Andrew Davidson and Co.   He

9    is a former Merrill Lynch research person.   I think

10   he's a Ph.D. in economics and in the Andrew Davidson

11   business runs quantitative analysis typically on

12   asset backed securities.

13       Q.    Was the -- was Andrew Davidson's company

14   retained by Oakwood?

15       A.    Yes.

16       Q.    How did that come about?

17       A.    We -- my recollection is in consultation

18   with CSFB we concluded that because the potential

19   claims in the bankruptcy by the holders of corporate

20   guarantees on certain B2 securities, because those

21   claims were apt to be very large but were contingent

22   I think the word the lawyers use is ~~liquidated~~ unliquidated and,

23   therefore, you know, determining exactly what the

24   size of their claims were going to be in any

25   bankruptcy was going to be important and potentially

1    having a whole lot to do with it.  At that point it

2    was the company and Greenwich and Ranch.

3         Q.    Right, but before that?

4         A.    Again, I had -- had limited visibility to

5    what was going on in the preparation for the DIP.  I

6    know again that FTI worked on helping Suzanne and Bob

7    and principally Bob I think do some financial

8    projections trying to size the DIP; but in terms of

9    who they may have contacted, the extent of any

10   contact they may have had with potential lenders, I

11   did not recall that FTI had been involved in that at

12   all other that in terms of contacting lenders, but I

13   knew they had been involved in preparatory work.

14            And they were not involved at all that I

15   can remember, at least not in any material way, in

16   the negotiation with Greenwich and Ranch.  They did

17   bring them to the table, however.

18            MS. WARREN:  Excuse me.

19            (Discussion off the record.)

20        Q.    (By Ms. Warren)  Did anyone from Credit

21   Suisse tell you in words or substance before the

22   bankruptcy filing that Credit Suisse would waive any

23   event of default in the credit facility?

24        A.    I don't recall anybody saying that.

25        Q.    Did you expect that there would need to be

1    some negotiation over a waiver?

2        A.    I knew that we were going to have to

3    document something with the warehouse lender because

4    the transaction by its terms terminated with the

5    bankruptcy filing.  So I knew there was going to be

6    an amendment, a redo or something, but I expected it

7    to be in essence ministerial in nature.

8        Q.    Mr. Muir, did Credit Suisse ever try to

9    tell management what to do in terms of operating the

10   company?

11       A.    Not that I can remember.  That's not to

12   say they wouldn't weigh in with an opinion when asked

13   and on a number of matters they were asked fairly

14   frequently; but did they ever attempt to direct us,

15   no.

16       Q.    Did Credit Suisse ever dictate or try to

17   dictate changes in key officers or directors?

18       A.    Not that I know of.

19       Q.    Did Credit Suisse try to weigh in on your

20   day-to-day management decisions?

21       A.    Let me answer that this way.  It was not

22   unusual and, in fact, it was practice for me anytime

23   we made any substantive business decision that might

24   have a material impact or even a less than material

25   but significant impact on anything having to do with

DOUGLAS R. MUIR

195

1    loan originations, the ABS program, loan servicing,

2    it was my practice always to inform CSFB of what we

3    were doing and why we were doing it and solicit

4    feedback.  So to the extent that's weighing in, yeah,

5    they sure did.  They were asked to weigh in.

6        Q.    But you were asking Credit Suisse to weigh

7    in on matters that might affect the fate of

8    securitizations on the market; right?

9        A.    That might -- things that might affect the

10   performance of securitizations that had already been

11   done, things that might have the ability -- an effect

12   on our ability to do securitizations in the future.

13             Things that might have had an effect on if

14   not whether or not a future transaction would get

15   done but the terms on which it would get done,

16   marketplace reception to securities that had certain

17   loans in them, rating agency views on underwriting

18   decisions, all of those kinds of things were

19   routinely discussed.

20       Q.    And did you always do whatever Credit

21   Suisse told you to do when you consulted with them?

22       A.    I don't ever recall being told to do

23   anything by CSFB.  There were decisions that were

24   made that CSFB and I think thought were good

25   decisions and said so.  And I think there are things

1    we did that CSFB, meaning Fiachra, thought were not

2    so good.  And I thought highly of Fiachra's opinion

3    and if Fiachra thought we were making a mistake in

4    something, I certainly conveyed that back.  And we

5    valued and trusted him and valued his judgment.

6        Q.    So is it fair to say that sometimes Credit

7    Suisse agreed with what you were doing and sometimes

8    Credit Suisse didn't, but management did what it

9    thought was best?

10       A.    I think in retrospect and even at the time

11   CSFB would tell you we did some things that we told

12   them we were doing that they didn't think were very

13   smart and some things that conversely they thought

14   probably were smart.

15       Q.    Do you think Credit Suisse tried to serve

16   Oakwood to the best of its professional ability?

17       A.    I don't know quite how to -- how to answer

18   that other than to answer it this way.  I had a

19   tremendous amount of experience over the years

20   dealing with Fiachra O'Driscoll and his team.  They

21   worked extremely hard on our behalf, did a lot of

22   wonderful things.

23            From time to time with their assistance we

24   avoided making some business mistakes.  And so did

25   they -- did they try?  Based on observations I saw a

DOUGLAS R. MUIR

197

1   lot of trying over a lot of years, and more

2   particularly I saw a lot of results.  And I'm much

3   more interested in results than how hard somebody

4   tries.  I had a much more limited opportunity to

5   observe that in the financial advisory role, but I

6   saw a lot less in terms of results than I expected to

7   see.

8        Q.    Did you think that the folks providing

9   financial advisory services were doing what they

10  thought was their best even if you weren't getting

11  the results that you might have liked?

12       A.    You know, it's hard for me to assess what

13  they thought.  I think maybe you'd have to ask them.

14       Q.    Well, but I'm asking you what you

15  perceived.  Did you think that the financial advisory

16  folks were working hard?

17       A.    Often, no.  I didn't.

18       Q.    And was this because you weren't getting

19  -- some things weren't accomplished that you thought

20  should have been accomplished?

21       A.    In part, but more particularly I never

22  felt Jared Felt had a sense of urgency.  We had I

23  don't know how many discussions and it was a source

24  of frustration for me that I think I earlier

25  testified there was not an unlimited amount of time

DOUGLAS R. MUIR

202

```
 1          DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN
 2          I do hereby certify that I have read all
       questions propounded to me and all answers given by
 3     me on the 26th day of September, 2006, taken before
       K. Denise Neal, and that:
 4
          1)   There are no changes noted.
 5          2)   The following changes are noted:
 6          Pursuant to Rule 30(e) of the Federal Rules of
       Civil Procedure, which reads in part:  Any changes in
 7     form or substance which you desire to make shall be
       entered upon the deposition...with a statement of the
 8     reasons given...for making them.  Accordingly, to
       assist you in effecting corrections, please use the
 9     form below:
10
       Page No. 44      Line No. 5      should read: "An advance
11                                                   Company" should
12     Page No.          Line No.        should read: not read "in
13                                                   a finance
                                                     Company"
14
15     Page No. 145     Line No. 22     should read: "liquidated"
16                                                   should be
                                                     "unliquidated"
17
18     Page No. 150     Line No. 44     should read: "in Durham"
19                                                   should be
                                                     "& Durham"
20
21     Page No. 159     Line No. 3      should read: "nonbonding"
22                                                   should be
                                                     "nonbinding"
23
24     Page No.          Line No.        should read:
25
```

DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.

_____
DOUGLAS R. MUIR

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

ORIGINAL

```
- - - - - - - - - - - - - - - -X
                                :  Chapter 11
In Re:                             Case No. 02-13396
OAKWOOD HOMES CORPORATION,      :  (PJW)
et al.,                            Jointly Administered
                                :
        Debtors.
_____ :
OHC LIQUIDATION TRUST,
                                :
        Plaintiff,
                                :
        v.                         Adv. Proc. No.
                                :  04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation,    :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited         :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,      :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware      :
corporation and a wholly
owned subsidiary of CREDIT      :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and            :
affiliates of each, and
DOES 1 through 100,             :

        Defendants.             :

- - - - - - - - - - - - - - - -X
```

Continuation of the Videotape Deposition of
DOUGLAS R. MUIR, VOLUME II
(Taken by Defendants)
Winston-Salem, North Carolina
September 27, 2006


Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public

**LEGALINK**

A MERRILL
COMMUNICATIONS
COMPANY

420 Lexington Ave
Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

DOUGLAS R. MUIR

Page 205

1                    APPEARANCE OF COUNSEL

2

      For the Plaintiff:
3
      TONY CASTANARES, Esq.
4     Stutman, Treister & Glatt
      1901 Avenue of the Stars
5     Twelfth Floor
      Los Angeles, California  90067-6013
6     (310) 228-5755
      (310) 228-5788 FAX
7     TCastanres@stutman.com

8

      For the Defendants:
9
      MARY K. WARREN, Esq.
10    J. JUSTIN WILLIAMSON, Esq.
      Linklaters
11    1345 Avenue of the Americas
      New York, New York  10105
12    (212) 903-9000
      (212) 903-9041 FAX
13    Michael.osnato@linklaters.com

14

      Videographer:
15
      Mr. Donald Graves
16

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

DOUGLAS R. MUIR

Page 206

1          Continuation of the Videotape Deposition of

2     DOUGLAS R. MUIR, Volume II, taken by the Defendants,

3     at the Marriott Hotel, 425 North Cherry Street,

4     Winston-Salem, North Carolina, on the 27th day of

5     September, 2006 at 9:00 a.m., before K. Denise Neal,

6     Registered Professional Reporter and Notary Public.

7

8                          *  *  *  *  *

9

10                         CONTENTS

11    THE WITNESS:  DOUGLAS MUIR              EXAMINATION

12              BY MS. WARREN                     208

13              BY MR. CASTANARES                 264

14

15                     *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

DOUGLAS R. MUIR

Page 262

1        A.    I did not.  And I'm not entirely certain I

2    saw the final version after it was filed, but it was

3    my understanding that what I was looking at was the

4    final version.

5        Q.    When you received the objection and

6    counterclaims, did you read it?

7        A.    I did.

8        Q.    Take a look at paragraph 19 of the

9    complaint, which is on page 11, and just take a

10    minute and read that to yourself.

11        A.    I've read it.

12        Q.    Do you believe that Credit Suisse sought

13    to enrich itself through fees by negligently

14    prolonging the life of Oakwood's securitization

15    program?

16            MR. CASTANARES:  Objection to form.

17            THE WITNESS:  You know, I'm not sure I'm

18        qualified to, you know, have an opinion as to

19        whether or not CSFB was negligent.  I mean, that

20        has legal meanings.  I'm not trained in the law.

21        I'm not something -- sure that that's something

22        I ought to have an opinion on.

23        Q.    (By Ms. Warren)  Well, do you think that

24    Credit Suisse intentionally advised Oakwood to

25    artificially prolong the life of its securitization

DOUGLAS R. MUIR

Page 263

1    program just for the sake of getting fees?

2        A.    I have no reason to believe that.

3            MR. CASTANARES:  I didn't get to make a

4        form objection before the answer came, but --

5        Q.    (By Ms. Warren)  Do you believe that

6    Credit Suisse intentionally advised Oakwood so as to

7    artificially prolong its life outside of bankruptcy

8    for the sake of fees?

9            MR. CASTANARES:  Objection to form.

10           THE WITNESS:  Well, again, I don't know

11       what their intentions were.  I don't -- I'm not

12       sure I know what artificial means, but I

13       don't -- I don't recall ever having a sense that

14       CSFB took or failed to take any action or gave

15       us any advice with the principal objective of

16       earning them a fee.

17       Q.    (By Ms. Warren)  Do you believe in the end

18   that Fiachra O'Driscoll and the folks working in his

19   group at Credit Suisse merited your trust?

20       A.    We're talking about the people in the ABS

21   group?

22       Q.    Yes.

23       A.    I trusted them, yes.

24       Q.    And do you think they did their best for

25   Oakwood?

DOUGLAS R. MUIR

Page 264

1          A.    I think as I testified yesterday, they

2     worked very hard.  I thought they had our interests

3     at heart and they achieved very, very good results in

4     my opinion.

5               MS. WARREN:  Thank you.  I think we're

6          through here.

7               MR. CASTANARES:  Thank you.  I'd just like

8          the witness to clarify one thing that occurred

9          to me.

10                         EXAMINATION

11    BY MR. CASTANARES:

12         Q.    Mr. Muir, yesterday you testified I

13    believe you went to work for the trust in August of

14    2004.  Did you mean to say April?

15         A.    I did mean to say April.  Thank you.

16              MR. CASTANARES:  Thank you, sir.  No

17         further questions.

18              MS. WARREN:  Thank you, Mr. Muir.

19              THE WITNESS:  Thank you.

20              THE VIDEOGRAPHER:  We're off the record

21         at --

22              MR. CASTANARES:  Before we go off the

23         record -- we can go off videotape.  Before we go

24         off the reported record, I presume we'll

25         stipulate to the same thing we've stipulated to

Page 267

1          DEPOSITION OF DOUGLAS R. MUIR, VOLUME II/KDN

2          I do hereby certify that I have read all
questions propounded to me and all answers given by
3   me on the 27th day of September, 2006, taken before
K. Denise Neal, and that:

4
          1)   There are no changes noted.
5          2)   The following changes are noted:

6          Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure, which reads in part:  Any changes in
7   form or substance which you desire to make shall be
entered upon the deposition...with a statement of the
8   reasons given...for making them.  Accordingly, to
assist you in effecting corrections, please use the
9   form below:

10
     Page No.         Line No.         should read:
11

12   Page No.         Line No.         should read:

13
     Page No.         Line No.         should read:
14

15   Page No.         Line No.         should read:   *None*

16
     Page No.         Line No.         should read:
17

18   Page No.         Line No.         should read:

19
     Page No.         Line No.         should read:
20

21   Page No.         Line No.         should read:

22
     Page No.         Line No.         should read:
23

24   Page No.         Line No.         should read:

25

DOUGLAS R. MUIR

Page 268

1          DEPOSITION OF DOUGLAS R. MUIR, VOLUME II/KDN

2      Page No.        Line No.        should read:

3

4      Page No.        Line No.        should read:

5     .Page No.        Line No.        should read:

6

7      Page No.        Line No.        should read:

8      Page No.        Line No.        should read:

9

10     Page No.        Line No.        should read:

11     Page No.        Line No.        should read:

12

13     Page No.        Line No.        should read:

14

15     If supplemental or additional pages are necessary,
       please furnish same in typewriting annexed to this
16     deposition.

17

                    DOUGLAS R. MUIR
18

19

20

21

22

23

24

25

# Exhibit "D"

**CERTIFIED
COPY**

1

2        UNITED STATES BANKRUPTCY COURT
             DISTRICT OF DELAWARE
3        ------------------------------x
         In Re:                        )Chapter 11
4        OAKWOOD HOMES CORPORATION,     )Case No. 02-13396
         et al.,                       )(PJW)
5                          Debtors.    )Jointly Administered
         ------------------------------x
6        OHC LIQUIDATION TRUST,         )
                          Plaintiff,   )
7                    vs.              )Adv. Proc. No.
         CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
8        Swiss banking corporation,    )
         CREDIT SUISSE FIRST BOSTON     )
9        LLC, a Delaware limited       )
         liability corporation, CREDIT)
10       SUISSE FIRST BOSTON, INC.,    )
         CREDIT SUISSE FIRST BOSTON     )
11       (U.S.A.), INC., a Delaware    )
         corporation and a wholly      )
12       owned subsidiary of CREDIT    )
         SUISSE FIRST BOSTON, INC.,the)
13       subsidiaries and affiliates  )
         of each, and DOES 1 through   )
14       100,                          )
                          Defendants.)
15       ------------------------------x

16                      June 29, 2006

17                      9:22 a.m.

18

19              Deposition of FIACHRA O'DRISCOLL, held

20       at the law offices of Linklaters, 1345 Avenue of

21       the Americas, New York, New York, pursuant to

22       notice, before Donald R. DePew, an RPR, CRR and

23       Notary Public within and for the State of

24       New York.

25


**LEGALINK**®
**A MERRILL COMPANY**

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1

```
 1

 2   A P P E A R A N C E S:

 3

 4   Attorneys for Plaintiff

 5        STUTMAN TREISTER & GLATT

 6        1901 Avenue of the Stars, Twelfth Floor

 7        Los Angeles, California 90067-6013

 8   BY:  TONY CASTANARES, ESQ.

 9        WHITMAN L. HOLT, ESQ.

10

11   Attorneys for Defendants and the Witness

12        LINKLATERS

13        1345 Avenue of the Americas

14        New York, New York 10105

15   BY:  MICHAEL J. OSNATO, JR., ESQ.

16        J. JUSTIN WILLIAMSON, ESQ.

17        R. PAUL WICKES, ESQ.

18

19   ALSO PRESENT:

20        ELIZABETH SORENSON, Summer Associate,

21        Linklaters (p.m. only)

22        DAVID PELOZA, Videographer

23

24

25
```

2

|   | 1 | Fiachra O'Driscoll |
|---|---|---|
| 10:16:54 | 2 | By and large there wasn't a very |
| 10:16:57 | 3 | efficient market for bulk sales of mortgages in |
| 10:17:03 | 4 | the way that -- for instance, today there is in |
| 10:17:06 | 5 | what one would consider conventional prime |
| 10:17:08 | 6 | mortgages, where you can actually take a portfolio |
| 10:17:11 | 7 | of raw mortgages and sell that for a very |
| 10:17:14 | 8 | efficient price to a very broad market.  Back at |
| 10:17:17 | 9 | that point in time whole loan sales when they were |
| 10:17:21 | 10 | conducted were, A, usually done at a fairly sharp |
| 10:17:24 | 11 | discount to par, significantly less than the |
| 10:17:26 | 12 | proceeds that one could get out of a |
| 10:17:28 | 13 | securitization, irrespective of whether you sold |
| 10:17:31 | 14 | the B2 security or not. |
| 10:17:32 | 15 | And beyond that it was generally a |
| 10:17:34 | 16 | fairly long -- a fairly long, drawn out process. |
| 10:17:37 | 17 | So it wasn't really seen in the industry as being |
| 10:17:40 | 18 | a viable, long-term approach to selling anything |
| 10:17:44 | 19 | other than a one-off pool of mortgages. |
| 10:17:47 | 20 | Q.    All right.  And with respect to -- to |
| 10:17:50 | 21 | the extent that Oakwood engaged in any such |
| 10:17:53 | 22 | transactions was CSFB involved in any way in them? |
| 10:17:57 | 23 | A.    I think we might have had a tangential |
| 10:18:00 | 24 | involvement with a Bombardier discussion, but |
| 10:18:03 | 25 | frankly my -- my recollection is pretty hazy. |

60

|          | 1  | Fiachra O'Driscoll |
|----------|----|---|
| 10:18:06 | 2  | Q.    All right.  And I believe you described |
| 10:18:09 | 3  | the Berkshire transaction as a securities |
| 10:18:11 | 4  | transaction. |
| 10:18:13 | 5  | A.    Yes. |
| 10:18:13 | 6  | Q.    What did you mean by that? |
| 10:18:18 | 7  | A.    The Berkshire transaction was a -- you |
| 10:18:23 | 8  | may see it in the documents as -- I think it was |
| 10:18:25 | 9  | called the Lotus Resecuritization Trust.  And it |
| 10:18:29 | 10 | was a transaction in which a collection of the B2 |
| 10:18:33 | 11 | securities, which were at the -- essentially the |
| 10:18:38 | 12 | bottom securities within each of the mortgage |
| 10:18:42 | 13 | securitizations were taken, put into a new trust, |
| 10:18:45 | 14 | a single new trust.  And a single note was issued |
| 10:18:49 | 15 | that was collateralized by all of those B2s.  And |
| 10:18:51 | 16 | that note was then sold to Berkshire Hathaway |
| 10:18:55 | 17 | after a guarantee was wrapped around the entire |
| 10:18:58 | 18 | note by -- by I think Oakwood Homes. |
| 10:19:02 | 19 | Q.    All right.  Now, these B2s, did they |
| 10:19:04 | 20 | carry an Oakwood guarantee before these Berkshire |
| 10:19:08 | 21 | transactions occurred? |
| 10:19:11 | 22 | A.    When you say "these B2s," the B2s that |
| 10:19:14 | 23 | were the subject of the Lotus transaction? |
| 10:19:17 | 24 | Q.    Correct. |
| 10:19:18 | 25 | A.    Some of them did, some of them didn't. |

61

|            |    |                                                      |
|------------|----|------------------------------------------------------|
|            | 1  | Fiachra O'Driscoll                                   |
| 10:19:20   | 2  | Q.    And what was the nature of the                 |
| 10:19:21   | 3  | guarantee that Oakwood issued at the time of this    |
| 10:19:27   | 4  | transaction?                                         |
| 10:19:27   | 5  | A.    It was a guarantee that in the event           |
| 10:19:31   | 6  | that the B2s failed to pay the stated interest       |
| 10:19:35   | 7  | coupon on the security, on their security, or        |
| 10:19:38   | 8  | failed to pay the principal amounts when they        |
| 10:19:41   | 9  | became due, that Oakwood Homes Corporation would     |
| 10:19:44   | 10 | make a payment to the -- I believe to the            |
| 10:19:47   | 11 | securitization trust equal to the difference         |
| 10:19:50   | 12 | between what was due and what was actually paid.     |
| 10:19:52   | 13 | Q.    Okay.   And was Berkshire the sole             |
| 10:19:55   | 14 | holder of that securitization trust?                 |
| 10:19:58   | 15 | MR. OSNATO:   Objection as to the form.              |
| 10:20:01   | 16 | A.    I believe so.                                   |
| 10:20:02   | 17 | Q.    Okay.   So did this have the effect of         |
| 10:20:04   | 18 | increasing the total amount of Oakwood's guarantee   |
| 10:20:10   | 19 | liability?                                            |
| 10:20:10   | 20 | A.    Yes.                                            |
| 10:20:11   | 21 | Q.    Do you have any figure in mind as to           |
| 10:20:12   | 22 | the amount by which that increased?                  |
| 10:20:16   | 23 | A.    I think it -- it changed over time,            |
| 10:20:23   | 24 | because there were actually a number of different    |
| 10:20:25   | 25 | transactions that bundled -- bundled the guarantee   |

LegaLink,   a Merrill Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

1          Fiachra O'Driscoll

10:20:28    2    liability together into one.

10:20:29    3        Q.    All right.  And did all these

10:20:31    4    transactions take place at 55?

10:20:32    5        A.    At dollar price of 55?

10:20:35    6            I don't believe so, but it was around

10:20:37    7    that level.  I'm pretty sure, in fact, that there

10:20:40    8    were small differences from 55.

10:20:42    9        Q.    And do I correctly understand your

10:20:45   10    prior answer as being that Oakwood's guarantee was

10:20:47   11    effectively at par on both principal and coupon?

10:20:49   12        A.    Correct.

10:20:50   13        Q.    So the economic effect of this

10:20:52   14    transaction was that Oakwood was getting a price

10:20:54   15    which was roughly 55 and guaranteeing 100; is that

10:20:57   16    correct, plus interest?

10:20:58   17        A.    That is correct.

10:21:03   18        Q.    And before that transaction occurred

10:21:05   19    the holder of the B2 securities that were packaged

10:21:11   20    into it was Oakwood or one of the companies in its

10:21:15   21    family; is that correct?

10:21:17   22        A.    I believe that it's generally correct,

10:21:19   23    yes.

10:21:20   24        Q.    This was a securitization of assets

10:21:22   25    that were held by Oakwood and then essentially

LegaLink,    a Merrill Company
800-826-0277    818-593-2300    Fax 818-593-2301    www.legalink.com

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | Fiachra O'Driscoll                                     |
| 10:21:25 | 2  | sold into the securitization trust to Berkshire?       |
| 10:21:28 | 3  | A.    Correct.                                          |
| 10:21:28 | 4  | Q.    Okay.  When you first came upon the               |
| 10:21:33 | 5  | scene at Oakwood in 1996 did you make any changes       |
| 10:21:36 | 6  | in the way that Oakwood was handling these              |
| 10:21:40 | 7  | securitization transactions or in the way that          |
| 10:21:42 | 8  | CSFB was acting in connection with them?                |
| 10:21:45 | 9  | MR. OSNATO:  Objection as to the form.                  |
| 10:21:46 | 10 | You can answer that.                                    |
| 10:21:50 | 11 | A.    Can you be more specific about what you           |
| 10:21:53 | 12 | mean by "handling."                                     |
| 10:21:55 | 13 | Q.    Did you cause any changes to occur in             |
| 10:21:57 | 14 | the transactions themselves or in CSFB's                |
| 10:21:59 | 15 | relationship with Oakwood regarding the                 |
| 10:22:01 | 16 | securitization transactions?                            |
| 10:22:03 | 17 | MR. OSNATO:  The same objection.                        |
| 10:22:06 | 18 | A.    The answer is, yes.                               |
| 10:22:07 | 19 | Q.    What changes?                                     |
| 10:22:09 | 20 | A.    You -- I think we would need to break             |
| 10:22:11 | 21 | it down into smaller time intervals.  Because over      |
| 10:22:13 | 22 | seven or eight years that passed there were quite       |
| 10:22:16 | 23 | a number of small changes in one way or another.        |
| 10:22:20 | 24 | Q.    All right.  Let's --                              |
| 10:22:21 | 25 | A.    There were changes, for instance, to a            |

64

1          Fiachra O'Driscoll

10:22:24    2    degree in the nature of the information that we

10:22:25    3    provided to investors.  In the early part of that

10:22:30    4    period it was before computational materials were

10:22:35    5    provided, for instance.

10:22:36    6          At that time, back in 1996, the norm

10:22:38    7    was that you would deliver to an investor at the

10:22:43    8    initiation really of the offering a red herring,

10:22:47    9    much as you would with an equities offering or

10:22:50   10    with anything else at that point in time.  And

10:22:52   11    that red herring would have really everything

10:22:55   12    within the document, apart from the coupon rates

10:22:59   13    on the individual REMIC securities that were being

10:23:03   14    issued out of, et cetera, et cetera.

10:23:06   15          Then computational materials came into

10:23:10   16    common acceptance in the period kind of after

10:23:12   17    that, probably sometime in 1997.  And it was

10:23:15   18    during that period of time that we tended to shift

10:23:18   19    over in terms of the nature of the offering

10:23:20   20    materials that were shown out to that kind of mode

10:23:22   21    in the first instance and simply proceeded

10:23:24   22    directly to a final prospectus without recourse to

10:23:29   23    preparing a red herring in advance.

10:23:30   24          Part of it was that the documents were

10:23:32   25    sufficiently stable and sufficiently well

65

1           Fiachra O'Driscoll

11:23:25    2    start if you'd like with Oakwood or the

11:23:27    3    industry, but make sure your answer is clear

11:23:29    4    as to which you're referring to.

11:23:36    5         A.    It's a fairly long period of time, so

11:23:39    6    my apologies if my answer is somewhat general.

11:23:42    7    But by and large from the -- from the time at

11:23:47    8    which I would have got involved in the very -- in

11:23:51    9    the first securitization for Oakwood that I worked

11:23:55    10   on, credit standards were generally improving.

11:24:02    11        Q.    From the beginning till the end?

11:24:05    12        A.    Pretty much actually, yeah.

11:24:06    13        Q.    And when you say "improving" you mean

11:24:09    14   they were tightening?

11:24:10    15        A.    In other words, yes.  Higher credit

11:24:11    16   standards were applied to the underwriting of the

11:24:14    17   securities in question -- of the loans in

11:24:16    18   question.

11:24:16    19        Q.    And this was true --

11:24:17    20              Was this true of Oakwood?

11:24:19    21        A.    And this was true of Oakwood and of

11:24:21    22   other people as well.

11:24:23    23        Q.    True throughout the industry?

11:24:24    24        A.    Yes.

11:24:25    25        Q.    And this continued through '99, 2000,

114

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Fiachra O'Driscoll                                   |
| 11:24:28 | 2  | and up until Oakwood's bankruptcy?                   |
| 11:24:30 | 3  | A.    Right till the bitter end.                     |
| 11:24:32 | 4  | MR. CASTANARES:  We need to change the               |
| 11:24:32 | 5  | videotape, so...                                     |
| 11:24:35 | 6  | THE WITNESS:  So I see.                              |
| 11:24:36 | 7  | MR. OSNATO:  Five minutes?                           |
| 11:24:37 | 8  | THE VIDEOGRAPHER:  Going off the                     |
| 11:24:37 | 9  | record --                                            |
| 11:24:38 | 10 | MR. CASTANARES:  Do you want to take                 |
| 11:24:38 | 11 | five?                                                |
| 11:24:38 | 12 | MR. OSNATO:  Yeah, if you wouldn't                   |
| 11:24:38 | 13 | mind.                                                |
| 11:24:38 | 14 | MR. CASTANARES:  Not at all.                         |
| 11:24:39 | 15 | THE VIDEOGRAPHER:  Off the record,                   |
| 11:24:40 | 16 | 11:24.  This is the end of tape 1.                   |
| 11:32:00 | 17 | (Recess taken.)                                      |
| 11:32:07 | 18 | THE VIDEOGRAPHER:  Back on the record,               |
| 11:32:08 | 19 | it's 11:32.  This is tape 2.                         |
| 11:32:11 | 20 | BY MR. CASTANARES:                                   |
| 11:32:16 | 21 | Q.    Mr. O'Driscoll, did CSFB ever make any         |
| 11:32:19 | 22 | analysis of the effect of the REMIC                  |
| 11:32:22 | 23 | securitizations on Oakwood's long-term liquidity?    |
| 11:32:29 | 24 | A.    Not to my knowledge.                           |
| 11:32:32 | 25 | Q.    Did it ever make any analysis of the           |

115

1                        Fiachra O'Driscoll

11:32:34    2    effect of the B2 guarantees on Oakwood's long-term

11:32:38    3    liquidity?

11:32:38    4        A.    Not to my knowledge.

11:32:41    5        Q.    Did CSFB ever attempt to place a value

11:32:46    6    on the Oakwood exposure to the guaranteed B2s?

11:32:58    7        A.    I don't know.

11:33:01    8        Q.    Did CSFB ever make any effort to

11:33:05    9    evaluate the REMIC securities that Oakwood held?

11:33:14    10       A.    Yes.

11:33:17    11       Q.    Did it do so on more than one occasion?

11:33:19    12       A.    I believe so.

11:33:20    13       Q.    Were you involved in it in any way?

11:33:23    14       A.    Yes.

11:33:25    15       Q.    Was anybody else?

11:33:29    16       A.    I don't recall.

11:33:30    17       Q.    What did you do?

11:33:31    18       A.    Well, what we were specifically asked

11:33:33    19   for on occasions was for some of the securities

11:33:36    20   that were on Oakwood's books, to -- which they

11:33:39    21   needed to have market valuations on for accounting

11:33:43    22   purposes primarily.  We were asked to provide

11:33:46    23   valuations for those.

11:33:51    24       Q.    All right.  Can you recall when that

11:33:54    25   first such occasion occurred?

116

1          Fiachra O'Driscoll

11:33:55    2      A.    I can't, actually.

11:33:56    3      Q.    And can you recall how many such

11:33:58    4    occasions it occurred?

11:33:59    5      A.    I can't, but more than one.

11:34:01    6      Q.    And did you comply?

11:34:02    7      A.    Yes.

11:34:04    8      Q.    What process did you go through to make

11:34:06    9    that analysis?

11:34:07   10      A.    We valued the securities against

11:34:10   11    similar securities in the market, taking account

11:34:13   12    of the ratings, the nature of the instruments,

11:34:18   13    treasury rates, swap rates, LIBOR rates,

11:34:20   14    et cetera, et cetera. And the market clearing

11:34:24   15    spreads or what we thought in our judgment was the

11:34:28   16    market clearing spreads by comparison with the

11:34:31   17    actual coupon on the security itself.

11:34:34   18      Q.    Do I take it there was not a sufficient

11:34:35   19    amount of trading of these securities in the open

11:34:38   20    market to reach conclusions that way?

11:34:42   21      A.    These -- for the retained securities,

11:34:43   22    that's correct.

11:34:46   23      Q.    Were you ever aware of a request by the

11:34:48   24    company's auditors that it obtain an independent

11:34:53   25    valuation of the retained securities?

117

|          | 1  | Fiachra O'Driscoll |
|----------|----|--------------------|
| 14:11:15 | 2  | got any further. |
| 14:11:16 | 3  | Q.    Okay.  And did you ever reply to his |
| 14:11:19 | 4  | comments in response to your question about |
| 14:11:20 | 5  | conflicts? |
| 14:11:25 | 6  | A.    I don't recall. |
| 14:11:25 | 7  | Q.    Okay.  Was he correct in the assumption |
| 14:11:27 | 8  | he made about the reference to conflicts that you |
| 14:11:29 | 9  | were making? |
| 14:11:39 | 10 | A.    Seeing as the situation never arose, |
| 14:11:41 | 11 | it's not something that I can answer at this |
| 14:11:44 | 12 | point.  Because we never did invest in Oakwood |
| 14:11:46 | 13 | Acceptance in that way. |
| 14:11:48 | 14 | Q.    No.  But my question to you is when you |
| 14:11:50 | 15 | wrote about "managing the conflicts" he then |
| 14:11:53 | 16 | replies that he assumes -- he is making |
| 14:11:55 | 17 | assumptions as to what conflicts you're talking |
| 14:11:58 | 18 | about, is he correct that those are the conflicts |
| 14:12:00 | 19 | that you were concerned with? |
| 14:12:03 | 20 | A.    You know, I don't recall.  Obviously |
| 14:12:05 | 21 | what I was relating to here specifically in this |
| 14:12:07 | 22 | e-mail was the conflicts of interest as it |
| 14:12:10 | 23 | pertained to this e-mail specifically. |
| 14:12:13 | 24 | Q.    Now, does looking at this e-mail in any |
| 14:12:15 | 25 | way help place in your mind the timing of the |

210

|           | 1  | Fiachra O'Driscoll |
|-----------|----|---------------------|
| 14:12:19  | 2  | beginnings of discussion of the asset purchase |
| 14:12:24  | 3  | facility? |
| 14:12:26  | 4  | A.    It doesn't.   It doesn't. |
| 14:12:27  | 5  | Q.    Okay.   Is it -- does it seem likely to |
| 14:12:31  | 6  | you that that was being discussed at the same time |
| 14:12:33  | 7  | as whatever proposal was embodied in these e-mails |
| 14:12:38  | 8  | on Exhibit 57? |
| 14:12:39  | 9  | A.    I don't know. |
| 14:12:41  | 10 | Q.    All right.   And you said that -- I |
| 14:12:43  | 11 | believe you said in answer to an earlier question |
| 14:12:46  | 12 | that you were thinking of various financing |
| 14:12:48  | 13 | methods; is that correct? |
| 14:12:49  | 14 | A.    We were -- we were continually trying |
| 14:12:55  | 15 | to come up with ways that was going to address |
| 14:12:57  | 16 | both the problem of Oakwood's need to find |
| 14:13:03  | 17 | liquidity for its loans on a more frequent basis |
| 14:13:06  | 18 | than simply the quarterly takeout securitization. |
| 14:13:09  | 19 | And we were also by this point thinking about how |
| 14:13:11  | 20 | to get liquidity for their B2s.   In other words, |
| 14:13:16  | 21 | how to get purchasers for their B2s.   And those |
| 14:13:18  | 22 | were the two recurring themes throughout that |
| 14:13:21  | 23 | period. |
| 14:13:22  | 24 | Q.    Okay.   And what was there about the |
| 14:13:25  | 25 | quarterly takeout securitizations that was |

211

1         Fiachra O'Driscoll

14:13:28    2    unsatisfactory from a liquidity perspective?

14:13:34    3         A.      In essence you can kind of see what

14:13:36    4    happens to a finance company that uses

14:13:41    5    securitization as a takeout, as seeing its loan

14:13:43    6    inventory moved through what's really a sawtooth

14:13:47    7    pattern.  So loan inventory -- sorry, this doesn't

14:13:50    8    get in the camera -- loan inventory rises and

14:13:53    9    rises and rises and peaks out the day that the

14:13:56    10   company closes the securitization.  At which point

14:13:59    11   it falls abruptly and very dramatically by the

14:14:03    12   amount of the proceeds of that securitization.

14:14:04    13   Then it rises again steadily, falls again

14:14:07    14   steadily, rises again steadily, falls again

14:14:10    15   steadily in a recurring fashion spaced out by the

14:14:13    16   intervals at which the securitizations are done.

14:14:15    17        The problem with that, of course, is

14:14:17    18   that it means that the company's need for money --

14:14:20    19   the company's need for in essence money varies

14:14:24    20   enormously depending on whether you're just before

14:14:26    21   a securitization closes or just after a

14:14:29    22   securitization closes.

14:14:30    23        If you have something -- if you have a

14:14:32    24   flow purchase arrangement, as is common enough,

14:14:34    25   especially in the non-conforming mortgage markets

212

|  | 1 | Fiachra O'Driscoll |
|---|---|---|
| 15:42:10 | 2 | attached to it, sometimes there would be.  But |
| 15:42:13 | 3 | what he did make clear at that point was that it |
| 15:42:15 | 4 | had had a -- that a significant amount of money |
| 15:42:18 | 5 | had gone into this substantial increase in the |
| 15:42:22 | 6 | LAPs. |
| 15:42:25 | 7 | Q.    Now, did you understand that the effect |
| 15:42:26 | 8 | of the LAP was that you take a default or a repo |
| 15:42:31 | 9 | and treat it in such a way that it was no longer |
| 15:42:34 | 10 | classified as a default or a repo for various |
| 15:42:37 | 11 | purposes? |
| 15:42:38 | 12 | A.    I don't think that's an accurate |
| 15:42:39 | 13 | understanding. |
| 15:42:40 | 14 | Q.    Okay.  How is it -- how am I wrong? |
| 15:42:44 | 15 | A.    What any of these loan assumptions |
| 15:42:45 | 16 | actually did was in their original formulation, if |
| 15:42:49 | 17 | a borrower became seriously delinquent one of the |
| 15:42:53 | 18 | standard things that the servicers would do, as I |
| 15:42:56 | 19 | related earlier on, was they tried to endeavor to |
| 15:42:59 | 20 | try to find if there were ways to fix the problem. |
| 15:43:01 | 21 | And if there weren't ways -- if it |
| 15:43:03 | 22 | wasn't a short-term problem, if it was a |
| 15:43:05 | 23 | persistent problem, one of the things that they |
| 15:43:07 | 24 | would ask for within most of the mortgage lenders |
| 15:43:09 | 25 | in the space was, well, do you have somebody else |

275

|          |    | Fiachra O'Driscoll |
|----------|----|--------------------|
| 15:43:12 | 2  | who can take over the loan from you? |
| 15:43:14 | 3  | Is there a parent, is there a brother |
| 15:43:16 | 4  | or sister who wants to take on the home? |
| 15:43:18 | 5  | Is there someone in your neighborhood |
| 15:43:20 | 6  | that you know who would take on -- who would move |
| 15:43:22 | 7  | into the home and to take over the obligations of |
| 15:43:25 | 8  | the loan itself? |
| 15:43:26 | 9  | And essentially what a loan assumption |
| 15:43:28 | 10 | was, was in essence that. So what it did was it |
| 15:43:32 | 11 | took a loan which wasn't necessarily defaulted at |
| 15:43:35 | 12 | that point in time, but almost certainly was |
| 15:43:37 | 13 | delinquent at that point in time, and caused a new |
| 15:43:40 | 14 | obligor to take over that loan who would not be |
| 15:43:44 | 15 | delinquent. |
| 15:43:46 | 16 | And that's it in a nutshell. |
| 15:43:48 | 17 | Q.    In that situation, if there were no LAP |
| 15:43:51 | 18 | that loan would become classified as a default or |
| 15:43:54 | 19 | a repo, correct? |
| 15:43:57 | 20 | A.    Not necessarily, because it wouldn't |
| 15:43:59 | 21 | necessarily have been the only servicing technique |
| 15:44:01 | 22 | that Oakwood would have used. It's reasonable to |
| 15:44:03 | 23 | assume that there's a significant percentage of |
| 15:44:06 | 24 | them that would have eventually become repos. And |
| 15:44:08 | 25 | without a doubt, one of the key reasons that |

276

1                    Fiachra O'Driscoll

15:44:11   2    Oakwood, and Conseco, and Clayton, and everybody

15:44:13   3    else -- not everybody, but many other mortgage

15:44:16   4    finance companies had this program was to avoid

15:44:19   5    repos.  Because it was easier and cheaper to get

15:44:22   6    somebody else to take over the loan than it was to

15:44:24   7    repossess the house, take it away from its site,

15:44:27   8    take it back to a dealership and remarket it.

15:44:29   9        Q.    Well, you say it was easier and

15:44:32  10    cheaper, but you did understand that it had

15:44:35  11    negative financial consequences for Oakwood

15:44:37  12    Acceptance as well, correct?

15:44:41  13        A.    The negative financial consequences,

15:44:44  14    though, were generally less than the cost of

15:44:47  15    repossessing the home and remarketing it.

15:44:50  16        Q.    Okay.  And what were those negative

15:44:52  17    financial consequences that it had?

15:44:54  18        A.    The negative financial consequences

15:44:55  19    came from the fact that the payments that were

15:44:58  20    delinquent on the loan would not be made up

15:45:03  21    immediately by the borrower who took over the

15:45:06  22    loan, but instead would typically be added to the

15:45:08  23    back end of the loan.  Meaning to the -- the

15:45:12  24    payments to be made on the loan at its final

15:45:15  25    maturity.  So instead of having immediate cash in

277

1       Fiachra O'Driscoll

15:45:18 2 hand for those delinquent payments, instead this

15:45:20 3 was going to be cash you were going to get in

15:45:22 4 either 30 years time or whenever the loan was

15:45:26 5 going to be prepaid.

15:45:27 6   Q. Okay.  Now, by using the LAP as to a

15:45:32 7 particular loan Oakwood was able to avoid having

15:45:35 8 it classified as a repo, correct?

15:45:37 9   A. Correct.

15:45:39 10   Q. And it was therefore possible to use

15:45:41 11 that particular mortgage as collateral in certain

15:45:46 12 lending facilities and in securitizations,

15:45:48 13 correct?

15:45:49 14   A. Correct.

15:45:49 15   Q. Where it would not have been possible

15:45:51 16 to use it if it had been classified as a repo,

15:45:53 17 correct?

15:45:54 18   A. Well, generally speaking the loans --

15:45:55 19 the original loans as they were would in almost

15:45:59 20 all cases be already in an existing

15:46:02 21 securitization.

15:46:05 22   Q. Okay.  And what would be the effect --

15:46:07 23 if all of those loans that had been used, that had

15:46:10 24 been treated under the LAP had not been treated

15:46:14 25 under the LAP and had become repos or a

278

1                    Fiachra O'Driscoll

15:46:18   2    substantial portion of them had, what effect would

15:46:21   3    that have had upon the securities in the REMIC

15:46:24   4    securitizations that had occurred where those

15:46:26   5    loans form part of the collateral pool?

15:46:33   6         A.    In the event that the loans -- in the

15:46:35   7    event that the loans had simply proceeded directly

15:46:39   8    to repo?

15:46:40   9         Q.    Yes.

15:46:40   10        A.    Yeah, in that situation that repo would

15:46:43   11   have been remarketed, presumably at a loss.

15:46:47   12   Because usually these things, taking account of

15:46:50   13   the costs of the repossession process and selling

15:46:53   14   the home, almost invariably there was going to be

15:46:56   15   a -- the proceeds of that were significantly less

15:47:00   16   than the principal balance of the loans, plus the

15:47:03   17   cost of doing it.  So you would have a loss within

15:47:05   18   the securitizations equal to whatever that amount

15:47:08   19   was.

15:47:08   20        Q.    And what effect would that then have on

15:47:10   21   Oakwood?

15:47:10   22        A.    That would have a negative effect.

15:47:13   23        Q.    How so?

15:47:13   24        A.    In several different ways.  The first

15:47:15   25   way was that Oakwood, as I mentioned, almost

LegaLink,   a Merrill Company
800-826-0277  818-593-2300   Fax 818-593-2301  www.legalink.com

1     Fiachra O'Driscoll

15:47:18 2 always had the excess interest strip within the

15:47:20 3 transaction structure.  In other words, the

15:47:22 4 difference between the coupon rate on the loans

15:47:26 5 and the coupon rate on the REMIC securities that

15:47:28 6 were issued out.

15:47:30 7    So any losses that occurred, first of

15:47:33 8 all, were applied to that excess interest amount.

15:47:36 9 So Oakwood would get out of the securitization,

15:47:40 10 the excess interest net of the amount of these

15:47:42 11 losses.

15:47:43 12    The second was that if the losses had

15:47:46 13 become so large that the excess interest strip was

15:47:51 14 in fact zero -- and that was without a doubt the

15:47:54 15 case with some of these situations at that point

15:47:57 16 in time -- then there could potentially be a

15:48:00 17 guarantee payment on a B2 security, for instance.

15:48:03 18   Q. Would it affect the marketability of

15:48:04 19 the B2 securities?

15:48:05 20   A. Well, by that point those B2 securities

15:48:07 21 would have been sold, with the exception of some

15:48:10 22 of the more recent B2 securities, which were

15:48:12 23 obviously of more recent vintage and where that

15:48:15 24 generally wasn't occurring.

15:48:17 25   Q. And would the classification of these

280

|          | 1  | Fiachra O'Driscoll |
|----------|----|---------------------|
| 15:48:19 | 2  | loans as repos, but for the LAP program, had had |
| 15:48:23 | 3  | any effect on future securitizations? |
| 15:48:30 | 4  | A.    Potentially it would. |
| 15:48:31 | 5  | Q.    And how so? |
| 15:48:32 | 6  | A.    It might have affected investors |
| 15:48:36 | 7  | understanding of the losses that they were exposed |
| 15:48:37 | 8  | to within the securitizations themselves. |
| 15:48:41 | 9  | Q.    Investors would better understand the |
| 15:48:44 | 10 | level of defaults that was occurring as |
| 15:48:47 | 11 | distinguished from the appearance of fewer of them |
| 15:48:50 | 12 | that was created by the use of the LAP program? |
| 15:48:52 | 13 | A.    I think I probably misstated myself. |
| 15:48:55 | 14 | There was another more fundamental driver going |
| 15:48:57 | 15 | on, which was that one of the reasons for using |
| 15:49:00 | 16 | the LAP was by that point in time Oakwood was |
| 15:49:06 | 17 | reducing the number of sales centers that it had. |
| 15:49:12 | 18 | But the retail sale centers had two roles.  The |
| 15:49:15 | 19 | first role was to sell new homes.  The second role |
| 15:49:19 | 20 | was to sell the repossessed homes that Oakwood had |
| 15:49:22 | 21 | taken in. |
| 15:49:23 | 22 | One of the challenges was that every |
| 15:49:24 | 23 | one of these repossessions that was done |
| 15:49:27 | 24 | essentially crowded out, from Oakwood's point of |
| 15:49:30 | 25 | view, the ability to sell a new home.  Because |

281

1               Fiachra O'Driscoll

15:49:33    2    more often than not all these homes ended up in a

15:49:36    3    sale center.  Every customer who walked away with

15:49:39    4    a home ended up with either a new home or with a

15:49:42    5    preowned repossessed home.  And the net result of

15:49:46    6    that was that inevitably the number of new homes

15:49:50    7    that were sold was less.

15:49:52    8               It also meant there was more pressure

15:49:54    9    on the retail sales centers to sell these

15:49:56    10   repossessed homes that they had cluttering up the

15:49:59    11   site more cheaply.  So the net result was that the

15:50:02    12   loss severities on these repo repossessions -- the

15:50:08    13   loss severities on the repossessed homes was

15:50:12    14   increasing largely because the sales centers were

15:50:14    15   finding it harder to remarket these things.

15:50:17    16              So the question of whether a loan

15:50:20    17   assumption or whether to repossess a home was more

15:50:24    18   economically efficient was -- was not a clear one.

15:50:30    19   But by and large, for a lot of the time period a

15:50:33    20   loan assumption was actually cheaper from

15:50:35    21   Oakwood's point of view than repossessing a home

15:50:39    22   and working it through the process.

15:50:44    23       Q.    Would the classification of some of

15:50:46    24   these loans as either repos or on the other hand

15:50:51    25   not doing so because of the LAP program have any

282

1                    Fiachra O'Driscoll

15:50:54    2    effect upon availability or eligibility for draws

15:50:58    3    under the warehouse or asset purchase program?

15:51:03    4         A.    No, I don't think so.

15:51:04    5         Q.    Was there a cap on the amount of repos

15:51:07    6    that could be in the pool and the --

15:51:09    7         A.    There was a cap on the number of

15:51:11    8    repo refis that could be in the pool.

15:51:14    9         Q.    And wouldn't it be the case then that

15:51:15    10   to the extent that Oakwood had used the LAP and

15:51:18    11   avoided classifying a given loan as a repo or refi

15:51:22    12   it could avoid that eligibility problem?

15:51:28    13        A.    That would be true.

15:51:30    14        Q.    So the effect of the LAP really was to

15:51:33    15   give Oakwood some short-term liquidity at the

15:51:36    16   expense of long-term liquidity; is that correct?

15:51:42    17        A.    I don't know.  I would want to think

15:51:43    18   about that.

15:51:44    19        Q.    All right.  Did -- when Mr. Muir told

15:51:49    20   you that Oakwood was cutting out the LAP program

15:51:52    21   did he ask you for any opinion on the subject or

15:51:55    22   ask you to express yourself in any way, or did

15:51:57    23   you?

15:51:58    24        A.    No.

15:51:58    25        Q.    You didn't?

283

|  | 1 | Fiachra O'Driscoll |
| 15:51:59 | 2 | A.    I don't recall expressing myself.  I do |
| 15:52:01 | 3 | recall that he didn't ask me my opinion. |
| 15:52:03 | 4 | Q.    Okay. |
| 15:52:04 | 5 | A.    It was a fait accompli. |
| 15:52:08 | 6 | Q.    All right.  And had Mr. Smith ever |
| 15:52:10 | 7 | discussed the LAP program with you? |
| 15:52:16 | 8 | A.    I don't recall. |
| 15:52:18 | 9 | Q.    Did he say or did you have any |
| 15:52:20 | 10 | knowledge, that is to say Mr. Muir, did Mr. Muir |
| 15:52:24 | 11 | say or did you have any knowledge as to how |
| 15:52:27 | 12 | Mr. Smith had managed to pull this off without the |
| 15:52:29 | 13 | knowledge of you or senior executives at Oakwood? |
| 15:52:34 | 14 | A.    Well, I wouldn't have typically been |
| 15:52:36 | 15 | privy to that kind of information.  But in any |
| 15:52:40 | 16 | case, he didn't say how this had been done. |
| 15:52:44 | 17 | Essentially that was the conversation. |
| 15:52:47 | 18 | And then from there the next thing -- the next |
| 15:52:50 | 19 | awareness that I had of it was the public |
| 15:52:53 | 20 | disclosures then that came within a few days. |
| 15:52:57 | 21 | Q.    Is it possible, Mr. O'Driscoll, that |
| 15:52:59 | 22 | implementation or in the dramatic increase in the |
| 15:53:02 | 23 | LAP program accounted for what appeared to be |
| 15:53:06 | 24 | improvement in the default and repo rate in |
| 15:53:08 | 25 | Oakwood in recent months prior to its termination? |

284

1          Fiachra O'Driscoll

15:53:13    2        A.    The substantial increase may well have

15:53:17    3    done that.

15:53:32    4        Q.    And once the -- let me just -- I'm

15:53:35    5    going to call this the warehouse, because it's

15:53:38    6    just a --

15:53:38    7            MR. CASTANARES:  I'm going to call it

15:53:39    8        the warehouse line or whatever.  I won't call

15:53:41    9        it a loan.  But if I refer to it as the

15:53:43    10        warehouse, I'll refer to it the same way that

15:53:46    11        the witness refers to it in various --

15:53:48    12            MR. OSNATO:  We need to be clear.

15:53:49    13        We've spent a couple of hours today calling

15:53:52    14        it the asset purchase facility.

15:53:53    15            MR. CASTANARES:  Fine.  I think that --

15:53:54    16            MR. OSNATO:  So I think for the sake of

15:53:55    17        clarity we should --

15:53:55    18            THE WITNESS:  Well, we can call it what

15:53:56    19        it is, because the asset purchase facility is

15:53:58    20        the term you've generally been using.

15:54:00    21            And actually I find it a little

15:54:03    22        confusing, because asset purchase agreements

15:54:05    23        are actually one of the building blocks in

15:54:07    24        commercial paper conduit facilities.  You're

15:54:09    25        not to know that, but for me at least it's a

285

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Fiachra O'Driscoll                                   |
| 15:54:11 | 2  | little confusing, so...                              |
| 15:54:12 | 3  | Q.    What would you like me to call it?             |
| 15:54:12 | 4  | A.    Can we just maybe call it the loan             |
| 15:54:14 | 5  | purchase facility, which is what its legal name      |
| 15:54:16 | 6  | was.                                                 |
| 15:54:17 | 7  | Q.    Okay.  That's fine.                            |
| 15:54:18 | 8  | A.    So it's easier if we all stick to that.        |
| 15:54:18 | 9  | Because there are things called GAPIS and LAPIS,     |
| 15:54:20 | 10 | which I'm sure you don't want to know about.         |
| 15:54:23 | 11 | Q.    I don't.  I know too much of these             |
| 15:54:25 | 12 | things already, and not enough.                      |
| 15:54:31 | 13 | That is the same facility that is                    |
| 15:54:32 | 14 | referred to in e-mails as the warehouse and that's   |
| 15:54:35 | 15 | referred to in the e-mails late in 2002 -- just      |
| 15:54:38 | 16 | before the bankruptcy as the warehouse, when         |
| 15:54:40 | 17 | you're talking about getting a waiver from the       |
| 15:54:42 | 18 | warehouse.                                           |
| 15:54:43 | 19 | That's the same facility we're talking               |
| 15:54:44 | 20 | about, right?                                         |
| 15:54:44 | 21 | A.    Some people -- plenty of people refer          |
| 15:54:46 | 22 | to it fairly casually as the warehouse.              |
| 15:54:48 | 23 | Q.    Okay.                                          |
| 15:54:48 | 24 | A.    But its legal construct and its legal          |
| 15:54:50 | 25 | form was a loan purchase facility.                   |

286

1

2                              * * *

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, Fiachra O'Driscoll, do hereby

5     acknowledge that I have read and examined the

6     foregoing testimony, and the same is a true,

7     correct and complete transcription of the

8     testimony given by me, and any corrections appear

9     on the attached Errata sheet signed by me.

10

11

12

13

14      _Oct 23, 2006_                    _____

15      (DATE)                            (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

```
1                    ERRATA SHEET

2     PAGE   LINE   CHANGE CORRECTION (REASON)

3     23     6      "treasure" to "treasurer" (incorrect)

4     56     22     "them" to "the term" (incorrect)

5     58     14     "hold on" to "whole loan" (incorrect)

6     80     23     "into" to "on" (typo)

7     82     24     "reposession" to "repossession" (typo)

8     96     20     "size" to "size of" (omitted word)

9     104    23     "long term capital management" to "Long Term Capital Management"

10                  (capitalized)

11    165    3      "complied" to "didn't comply" (incorrect)

12    208    9      "late is" to "latest" (incorrect)

13    221    4      "hear" to "here" (typo)

14    286    9      "GAPIS and LAPIS" to "GAPAs and LAPAs" (incorrect)

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    Dated: October 23 2006

24                                         _____

25                                            Fiachra O'Driscoll
```

LegaLink, a Merrill Company
800-826-0277 818-593-2300 Fax 818-593-2301 www.legalink.com

CERTIFIED
COPY

```
 1

 2        UNITED STATES BANKRUPTCY COURT
               DISTRICT OF DELAWARE
 3        ----------------------------x
          In Re:                    )Chapter 11
 4        OAKWOOD HOMES CORPORATION, )Case No. 02-13396
          et al.,                   )(PJW)
 5                      Debtors. )Jointly Administered
          ----------------------------x
 6        OHC LIQUIDATION TRUST,     )
                            Plaintiff, )
 7                 vs.              )Adv. Proc. No.
          CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
 8        Swiss banking corporation, )
          CREDIT SUISSE FIRST BOSTON )
 9        LLC, a Delaware limited    )
          liability corporation, CREDIT)
10        SUISSE FIRST BOSTON, INC., )
          CREDIT SUISSE FIRST BOSTON )
11        (U.S.A.), INC., a Delaware )
          corporation and a wholly   )
12        owned subsidiary of CREDIT )
          SUISSE FIRST BOSTON, INC.,the)
13        subsidiaries and affiliates )
          of each, and DOES 1 through )
14        100,                      )
                            Defendants.)
15        ----------------------------x

16                     June 30, 2006

17                     9:07 a.m.

18

19             Continued Deposition of

20        FIACHRA O'DRISCOLL, held at the law offices of

21        Linklaters, 1345 Avenue of the Americas, New York,

22        New York, pursuant to notice, before Donald R.

23        DePew, an RPR, CRR and Notary Public within and

24        for the State of New York.

25
```

333


LEGALINK®
A MERRILL COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
 1
 2    A P P E A R A N C E S:
 3
 4    Attorneys for Plaintiff
 5        STUTMAN TREISTER & GLATT
 6        1901 Avenue of the Stars, Twelfth Floor
 7        Los Angeles, California 90067-6013
 8    BY:  TONY CASTANARES, ESQ.
 9        WHITMAN L. HOLT, ESQ.
10.
11    Attorneys for Defendants and the Witness
12        LINKLATERS
13        1345 Avenue of the Americas
14        New York, New York 10105
15    BY:  MICHAEL J. OSNATO, JR., ESQ.
16        J. JUSTIN WILLIAMSON, ESQ.
17
18    ALSO PRESENT:
19        MARY WARREN, Esq., Linklaters
20        R. PAUL WICKES, Esq., Linklaters
21        ELIZABETH SORENSON, Summer Associate,
22        Linklaters
23        DAVID PELOZA, Videographer
24
25
```

334

|        |    | Fiachra O'Driscoll |
|--------|----|---|
| 13:09:25 | 2 | which we're taking your request under |
| 13:09:29 | 3 | advisement. |
| 13:09:30 | 4 | Q.    The question is, what side of this |
| 13:09:31 | 5 | transaction was CSFB on, Berkshire's, Conseco's, |
| 13:09:37 | 6 | or both? |
| 13:09:39 | 7 | THE WITNESS:  I think the same rule |
| 13:09:40 | 8 | applies. |
| 13:09:42 | 9 | MR. OSNATO:  I would agree. |
| 13:09:43 | 10 | And to the extent that there is, in |
| 13:09:45 | 11 | fact, some kind of agreement in place, |
| 13:09:47 | 12 | without knowing the scope of that I'm not |
| 13:09:49 | 13 | comfortable having this witness answer that |
| 13:09:52 | 14 | question.  So perhaps when we revisit the |
| 13:09:55 | 15 | issue we can address that question as well. |
| 13:09:58 | 16 | MR. CASTANARES:  I've made the record I |
| 13:10:00 | 17 | need to make to say that the witness has |
| 13:10:01 | 18 | refused to answer the question based upon |
| 13:10:03 | 19 | your instruction, correct? |
| 13:10:04 | 20 | MR. OSNATO:  That is correct. |
| 13:10:05 | 21 | MR. CASTANARES:  Thank you, counsel. |
| 13:10:06 | 22 | MR. OSNATO:  And I will note -- and I |
| 13:10:07 | 23 | appreciate, counsel, that you're not as |
| 13:10:10 | 24 | familiar with the prior discovery record in |
| 13:10:12 | 25 | this case -- part of plaintiff's motion to |

464

|          |    | Fiachra O'Driscoll |
|----------|----|---|
| 13:10:14 | 2  | compel filed, I believe, in December |
| 13:10:16 | 3  | addresses discovery directed to clients of |
| 13:10:20 | 4  | Credit Suisse other than Oakwood. |
| 13:10:22 | 5  | MR. CASTANARES:  Okay.  I don't think |
| 13:10:26 | 6  | we serve any purpose prolonging this |
| 13:10:29 | 7  | colloquy.  So things are what they are and |
| 13:10:31 | 8  | we'll sort it out in due course. |
| 13:10:33 | 9  | MR. OSNATO:  Thank you. |
| 13:10:34 | 10 | (CSFB Exhibit 98, Two-page e-mail, |
| 13:10:34 | 11 | bearing Bates stamp Nos. CSFB-00191475 and |
| 13:10:34 | 12 | CSFB-00191476, marked for identification, as |
| 13:10:34 | 13 | of this date.) |
| 13:10:58 | 14 | MR. CASTANARES:  Exhibit 98 is 191475 |
| 13:11:03 | 15 | and 6. |
| 13:11:07 | 16 | (Witness looks at document.) |
| 13:12:42 | 17 | THE WITNESS:  Thank you. |
| 13:12:44 | 18 | Q.    In the message from you to Mr. McCarthy |
| 13:12:48 | 19 | that appears in the center of this page -- |
| 13:12:49 | 20 | You understood Mr. McCarthy to be an |
| 13:12:52 | 21 | attorney for Oakwood, correct? |
| 13:12:54 | 22 | A.    Ms. McCarthy, actually, was -- not that |
| 13:12:58 | 23 | I think it matters, but Ms. McCarthy was a tax |
| 13:13:03 | 24 | lawyer at Hunton~& Williams who specialized in the |
| 13:13:08 | 25 | tax aspects of REMICs. |

465

```
                1              Fiachra O'Driscoll
13:13:10        2       Q.     So she represented Oakwood, correct?
13:13:13        3       A.     Correct.
13:13:13        4       Q.     Not CSFB?
13:13:15        5       A.     Not CSFB.
13:13:16        6       Q.     The same is true of Mr. Molenkamp,
13:13:18        7    correct?
13:13:18        8       A.     Correct.
13:13:22        9       Q.     Was it your practice to -- strike that.
13:13:27       10              In the text that you addressed to
13:13:29       11    Ms. McCarthy you were seeking her opinion on a
13:13:33       12    legal subject, correct?
13:13:34       13              MR. OSNATO:  Object to the form of the
13:13:35       14         question.
13:13:36       15              You can answer.
13:13:39       16       A.     What we were seeking was to have her or
13:13:48       17    her team, who were the best tax people that we
13:13:50       18    knew in the area, address the question of whether
13:13:53       19    the loan assumptions, which we'd been -- we'd been
13:14:01       20    developing a clear idea of in particular some of
13:14:03       21    the expenses that Oakwood was incurring on these
13:14:08       22    loans, in terms of the nature of what those
13:14:10       23    expenses were.
13:14:12       24              Because something that hadn't been
13:14:15       25    apparent to me before that stage was that along
```

466

|          | 1  | Fiachra O'Driscoll |
|----------|----|--------------------|
| 13:14:19 | 2  | the way Oakwood was doing things, such as |
| 13:14:22 | 3  | replacing carpets, replacing refrigerators, and |
| 13:14:26 | 4  | doing some refurbishment, work when these loans |
| 13:14:30 | 5  | were being assumed as an incentive for whoever was |
| 13:14:34 | 6  | assuming the loans to actually take these loans |
| 13:14:37 | 7  | on.  And the concern was that these additional |
| 13:14:39 | 8  | expense amounts were being -- were basically |
| 13:14:42 | 9  | becoming part of the -- were becoming part of the |
| 13:14:46 | 10 | loan amount within the REMIC itself. |
| 13:14:50 | 11 | Now, a REMIC, which is a real estate |
| 13:14:54 | 12 | mortgage investment conduit, is an instrument |
| 13:14:57 | 13 | which by its nature can only have real estate -- |
| 13:14:59 | 14 | real estate mortgages and the fruits of real |
| 13:15:03 | 15 | estate mortgages within it, but within certain |
| 13:15:05 | 16 | fairly narrow exceptions provided by the tax code. |
| 13:15:09 | 17 | And the concern here was that for some of these |
| 13:15:12 | 18 | transactions would these types of expenses be ones |
| 13:15:15 | 19 | that were legitimately good -- considered to be |
| 13:15:21 | 20 | what they call in the vernacular good REMIC assets |
| 13:15:24 | 21 | or was it going to cause a problem with the use of |
| 13:15:27 | 22 | REMICs for these kind of transactions going |
| 13:15:29 | 23 | forward. |
| 13:15:29 | 24 | Q.    You were seeking her advice on a legal |
| 13:15:31 | 25 | subject, correct? |

467

|          |    | Fiachra O'Driscoll                              |
|----------|----|------------------------------------------------|
| 13:15:32 | 2  | A.    Correct.                                 |
| 13:15:34 | 3  | Q.    Had Oakwood authorized you to seek        |
| 13:15:38 | 4  | advice from its counsel without even so much as |
| 13:15:40 | 5  | copying anybody at Oakwood on your request?     |
| 13:15:43 | 6  | MR. OSNATO:  Objection to the form of          |
| 13:15:43 | 7  | the question.                                  |
| 13:15:44 | 8  | You can answer.                                |
| 13:15:46 | 9  | A.    I don't recall.                          |
| 13:15:49 | 10 | Q.    Had you done this on other occasions?    |
| 13:15:51 | 11 | A.    I would need to check.                   |
| 13:15:55 | 12 | Q.    Did you regularly seek legal advice      |
| 13:15:57 | 13 | from Oakwood's counsel, whether or not you copied |
| 13:15:59 | 14 | Oakwood's people?                              |
| 13:16:05 | 15 | A.    Not regularly.                           |
| 13:16:06 | 16 | Q.    But sometimes?                           |
| 13:16:07 | 17 | A.    It would happen on occasion.             |
| 13:16:09 | 18 | Q.    And did you do that on each occasion     |
| 13:16:11 | 19 | with specific authorization from Oakwood or -- |
| 13:16:15 | 20 | A.    I --                                     |
| 13:16:15 | 21 | MR. OSNATO:  Object to the form of the         |
| 13:16:16 | 22 | question.                                      |
| 13:16:17 | 23 | You can answer.                                |
| 13:16:18 | 24 | A.    I don't know.                            |
| 13:16:19 | 25 | Q.    You don't know?                          |

468

|          | 1  | Fiachra O'Driscoll |
|----------|----|----|
| 13:16:19 | 2  | A.    I don't know. |
| 13:16:20 | 3  | Q.    Because you don't remember or because |
| 13:16:20 | 4  | you don't know whether Oakwood authorized it or |
| 13:16:23 | 5  | not? |
| 13:16:24 | 6  | A.    Because I don't remember. |
| 13:16:27 | 7  | Q.    If you had received some sort of |
| 13:16:30 | 8  | authorization to seek legal advice from Oakwood's |
| 13:16:32 | 9  | lawyers would that advice -- that authorization |
| 13:16:37 | 10 | have been in writing? |
| 13:16:38 | 11 | A.    Highly unlikely. |
| 13:16:44 | 12 | Q.    And if you wanted to seek such |
| 13:16:47 | 13 | authorization from whom would you have sought it? |
| 13:16:49 | 14 | A.    Doug Muir. |
| 13:16:54 | 15 | Q.    Do you recall whether you ever |
| 13:16:55 | 16 | discussed with Doug Muir whether you were |
| 13:16:57 | 17 | authorized to seek legal advice from Oakwood's |
| 13:17:00 | 18 | counsel? |
| 13:17:02 | 19 | MR. OSNATO:    Objection to the form. |
| 13:17:04 | 20 | You can answer. |
| 13:17:05 | 21 | A.    What I would have discussed on occasion |
| 13:17:07 | 22 | is whether I could go to talk to his counsel or |
| 13:17:09 | 23 | not on a particular point. |
| 13:17:11 | 24 | Q.    Okay.  And do you recall his ever |
| 13:17:13 | 25 | telling you yea or nay on that? |

469

1                    Fiachra O'Driscoll

13:17:15    2        A.    I do recall him telling me on occasion

13:17:17    3    either that I could or alternatively suggesting

13:17:20    4    that I do so without my asking.

13:17:23    5        Q.    All right.  Now here in this first

13:17:27    6    sentence of the -- of your communication to

13:17:31    7    Ms. McCarthy you say that "Oakwood is extensively

13:17:35    8    using its 'loan assumption program.'"

13:17:38    9            Did that reflect any change in your

13:17:39   10    understanding of the extent to which Oakwood was

13:17:40   11    using that program from your prior understanding?

13:17:41   12        A.    I don't recall.

13:17:46   13        Q.    Thank you, sir.

13:18:07   14            By the way, did Oakwood -- was Oakwood

13:18:09   15    aware of the Yugo transaction?

13:18:15   16            MR. OSNATO:   What's the relevance of

13:18:16   17        that question?

13:18:17   18            MR. CASTANARES:   You may answer it.

13:18:18   19        A.    I do not know.

13:18:19   20        Q.    Did you do anything to disclose to

13:18:22   21    Oakwood whatever CSFB's role might have been in

13:18:25   22    the Yugo transaction?

13:18:25   23            MR. OSNATO:   Let me --

13:18:26   24        A.    No.

13:18:26   25            MR. OSNATO:   -- just for the record

470

|          |    | Fiachra O'Driscoll |
|----------|----|---|
| 13:18:28 | 2  | object to this entire line of questioning. |
| 13:18:30 | 3  | You can answer that question. |
| 13:18:32 | 4  | A.    No. |
| 13:18:33 | 5  | Q.    To your knowledge, did anybody at CSFB |
| 13:18:35 | 6  | make any effort to disclose that relationship to |
| 13:18:37 | 7  | Oakwood? |
| 13:18:38 | 8  | A.    I don't know. |
| 13:18:51 | 9  | Q.    Did any of the transactions in the |
| 13:18:56 | 10 | series of transactions which we have discussed as |
| 13:18:59 | 11 | the Lotus resecuritizations occur either during or |
| 13:19:07 | 12 | after the time that the Yugo transaction was under |
| 13:19:13 | 13 | discussion? |
| 13:19:15 | 14 | A.    I would need to check and I don't |
| 13:19:17 | 15 | recall. |
| 13:19:53 | 16 | MR. CASTANARES:   Let me ask -- let me |
| 13:19:56 | 17 | mark as Exhibit 99 CSFB 191543. |
| 13:20:02 | 18 | (CSFB Exhibit 99, One-page e-mail, |
| 13:20:02 | 19 | bearing Bates stamp No. CSFB-00191543, marked |
| 13:20:02 | 20 | for identification, as of this date.) |
| 13:20:05 | 21 | (Witness looks at document.) |
| 13:21:53 | 22 | THE WITNESS:   Thank you. |
| 13:21:56 | 23 | Q.    What were the circumstances under |
| 13:21:58 | 24 | which -- if you know, under which Mr. Smith |
| 13:22:01 | 25 | decided to send you this e-mail? |

471

|  |  | Fiachra O'Driscoll |
|---|---|---|
| 13:54:32 | 2 | THE WITNESS:   Thank you. |
| 13:54:35 | 3 | Q.   Do you know anything about this? |
| 13:54:36 | 4 | A.   Yes. |
| 13:54:36 | 5 | Q.   What happened here? |
| 13:54:38 | 6 | A.   We usually -- not always there was a |
| 13:54:42 | 7 | co-manager on the transaction and we -- we |
| 13:54:53 | 8 | approached Merrill Lynch after some discussion |
| 13:54:57 | 9 | with Oakwood as to who the co-manager might be, to |
| 13:55:01 | 10 | act as co-manager on the transaction.   As the |
| 13:55:05 | 11 | other underwriter, usually there was two, |
| 13:55:08 | 12 | sometimes there were three, to act as co-manager |
| 13:55:10 | 13 | on the deal.   As you can see here, Merrill at that |
| 13:55:13 | 14 | time -- its asset securitization group had become |
| 13:55:18 | 15 | somewhat diminished, but quite frankly, I |
| 13:55:21 | 16 | didn't -- the fact that Ken Mulford and |
| 13:55:23 | 17 | Laura Schwartz had left in the previous couple of |
| 13:55:26 | 18 | weeks I personally didn't think was the reason why |
| 13:55:29 | 19 | Merrill declined to act as underwriter. |
| 13:55:32 | 20 | Q.   What did you think it was? |
| 13:55:33 | 21 | A.   I think at this point after some of the |
| 13:55:35 | 22 | announcements about Oakwood, Merrill had decided |
| 13:55:38 | 23 | not to. |
| 13:55:39 | 24 | Q.   Which announcements were those? |
| 13:55:41 | 25 | A.   The announcement about the termination |

497

|  | 1 | Fiachra O'Driscoll |
| 13:55:43 | 2 | of the loan assumption program and its |
| 13:55:45 | 3 | implications. |
| 13:55:46 | 4 | Q.    What about that or about its |
| 13:55:47 | 5 | implications did you believe caused Merrill to shy |
| 13:55:51 | 6 | away from acting as an underwriter? |
| 13:56:02 | 7 | A.    The fact that what had been announced |
| 13:56:04 | 8 | was something that was clearly detrimental to |
| 13:56:08 | 9 | Oakwood in the eyes of the securitization market. |
| 13:56:10 | 10 | Q.    How so? |
| 13:56:13 | 11 | A.    Because the result of that termination |
| 13:56:14 | 12 | was clearly going to mean that Oakwood was going |
| 13:56:17 | 13 | to do a good deal more repo refis going forward. |
| 13:56:22 | 14 | And therefore almost as a necessity it was going |
| 13:56:25 | 15 | to put further pressure on the securitizations, |
| 13:56:28 | 16 | when repo refis were seen as being a bad fact |
| 13:56:32 | 17 | in general, particularly increasing numbers of |
| 13:56:35 | 18 | repo refis. |
| 13:56:36 | 19 | Q.    This didn't deter CSFB from being |
| 13:56:40 | 20 | interested in doing underwriting for Oakwood? |
| 13:56:43 | 21 | MR. OSNATO:   Object to the form. |
| 13:56:43 | 22 | "This" being the announcement of the |
| 13:56:47 | 23 | LAP? |
| 13:56:50 | 24 | MR. CASTANARES:   This and its |
| 13:56:51 | 25 | implications, correct. |

498

|   |   |   |
|---|---|---|
|   | 1 | Fiachra O'Driscoll |
| 13:56:54 | 2 | A.    I don't recall.  I don't recall the |
| 13:57:00 | 3 | nature of the discussions.  One of the mitigating |
| 13:57:05 | 4 | factors within it, though, was that the rating |
| 13:57:08 | 5 | agencies were significantly increasing the |
| 13:57:10 | 6 | enhancement levels within the deal structures. |
| 13:57:12 | 7 | And that this was going to a degree mitigate, at |
| 13:57:16 | 8 | least in our eyes, for some of the negative |
| 13:57:18 | 9 | consequences, potential negative downstream |
| 13:57:21 | 10 | consequences from the end of the loan assumption |
| 13:57:23 | 11 | program. |
| 13:57:24 | 12 | Q.    What was it the rating agencies were |
| 13:57:27 | 13 | asking? |
| 13:57:28 | 14 | A.    What they were going to do was they |
| 13:57:29 | 15 | were going to require a good deal more |
| 13:57:31 | 16 | subordination below any particular tranche in the |
| 13:57:36 | 17 | capital structure, which would necessarily make |
| 13:57:38 | 18 | those tranches safer than they otherwise would be |
| 13:57:41 | 19 | because they could absorb a greater quantity of |
| 13:57:44 | 20 | losses. |
| 13:57:45 | 21 | Q.    And that would be beneficial to |
| 13:57:47 | 22 | Oakwood? |
| 13:57:47 | 23 | A.    That would have a negative impact on |
| 13:57:50 | 24 | Oakwood, but it would make for stronger |
| 13:57:52 | 25 | securitizations. |

499

|  | 1 | Fiachra O'Driscoll |
|---|---|---|
| 13:57:52 | 2 | Q.    So it would have a positive impact on |
| 13:57:55 | 3 | CSFB? |
| 13:57:56 | 4 | MR. OSNATO:   Object to the form. |
| 13:57:57 | 5 | Q.    Correct? |
| 13:57:58 | 6 | A.    That's not correct. |
| 13:57:59 | 7 | I'm not sure whether it's incorrect or |
| 13:58:01 | 8 | correct, but it's... |
| 13:58:04 | 9 | Q.    Well, CSFB would be able to earn fees |
| 13:58:07 | 10 | from doing securitizations as a result, which they |
| 13:58:09 | 11 | might not otherwise be able to do if the rating |
| 13:58:11 | 12 | agencies demands were not met, correct? |
| 13:58:14 | 13 | A.    What would be the case would be that if |
| 13:58:17 | 14 | Oakwood wasn't able to get securitizations off at |
| 13:58:21 | 15 | all, by that point the whole loan sale route, |
| 13:58:24 | 16 | which I think we described yesterday was something |
| 13:58:26 | 17 | that was potentially there, but always a long, |
| 13:58:30 | 18 | painful process, really by the summer of 2002 |
| 13:58:33 | 19 | wasn't there at all.  So Oakwood had no real |
| 13:58:37 | 20 | expectation that it was able to -- going to be |
| 13:58:40 | 21 | able to sell these loans at a whole loan basis. |
| 13:58:44 | 22 | So it was very important for Oakwood -- |
| 13:58:46 | 23 | if Oakwood was going to be able to sell homes, for |
| 13:58:49 | 24 | Oakwood to be able to sell homes at all it was |
| 13:58:51 | 25 | going to have to originate loans.  If it was going |

500

|          |    |                                                   |
|----------|----|---------------------------------------------------|
|          | 1  | Fiachra O'Driscoll                                |
| 13:58:54 | 2  | to originate loans then it was very important that |
| 13:58:57 | 3  | Oakwood be able to securitize those loans.  So    |
| 13:58:59 | 4  | even if the present enhancement levels meant that |
| 13:59:03 | 5  | Oakwood was getting 93 cents, rather than         |
| 13:59:05 | 6  | 94 cents, or 92 cents, rather than 95 cents, then |
| 13:59:09 | 7  | from Oakwood's point of view that was still a     |
| 13:59:12 | 8  | great deal more positive than not being able to   |
| 13:59:14 | 9  | originate and sell loans at all.                  |
| 13:59:16 | 10 | Q.    But it was an ever declining picture        |
| 13:59:19 | 11 | for Oakwood at that point, wasn't it?             |
| 13:59:22 | 12 | A.    By that state it was an ever declining      |
| 13:59:25 | 13 | picture.                                          |
| 13:59:26 | 14 | Q.    And was there a way out of that that        |
| 13:59:28 | 15 | you saw at the time?                              |
| 13:59:29 | 16 | MR. OSNATO:  Object to the form.                  |
| 13:59:30 | 17 | You can answer.                                    |
| 13:59:35 | 18 | A.    I thought at the time that there were a     |
| 13:59:37 | 19 | number of ways out, yes.                          |
| 13:59:39 | 20 | Q.    And what did you think was a way out        |
| 13:59:40 | 21 | for Oakwood at the time, other than bankruptcy?   |
| 13:59:43 | 22 | A.    I -- it was going beyond my area of         |
| 13:59:45 | 23 | expertise, but I did think that there were a      |
| 13:59:48 | 24 | number of ways out.                               |
| 13:59:49 | 25 | Q.    And what were they?                         |

501

|            |    |                                             |
|------------|----|---------------------------------------------|
|            | 1  | Fiachra O'Driscoll                          |
| 13:59:50   | 2  | A.    Including the nature of the plan that |
| 13:59:55   | 3  | subsequently got put together.              |
| 13:59:56   | 4  | Q.    Okay.  Well, excluding bankruptcy did |
| 13:59:59   | 5  | you think Oakwood really had any options at that |
| 14:00:01   | 6  | point to get out of this ever declining picture |
| 14:00:04   | 7  | that it was in?                             |
| 14:00:06   | 8  | MR. OSNATO:  Objection to the form of       |
| 14:00:07   | 9  | the question.                               |
| 14:00:08   | 10 | You can answer.                             |
| 14:00:09   | 11 | A.    Yes, I did.                           |
| 14:00:10   | 12 | Q.    What were they?                       |
| 14:00:10   | 13 | A.    I thought that it was possible that the |
| 14:00:12   | 14 | company could get sold.                     |
| 14:00:13   | 15 | Q.    Anything else?                        |
| 14:00:14   | 16 | A.    I think that was the clearest one.    |
| 14:00:16   | 17 | Q.    Did Oakwood have any real option to   |
| 14:00:18   | 18 | make it on its own anymore after it got itself |
| 14:00:22   | 19 | into this ever declining picture?           |
| 14:00:24   | 20 | A.    I don't know.                         |
| 14:00:25   | 21 | Q.    You didn't have an opinion on that at |
| 14:00:26   | 22 | the time?                                   |
| 14:00:29   | 23 | A.    I think my opinion was they probably  |
| 14:00:31   | 24 | didn't.                                     |
| 14:00:40   | 25 | THE WITNESS:  Can we take a quick           |

502

|          |    | Fiachra O'Driscoll |
|----------|----|--------------------|
| 14:00:41 | 2  | five minutes? |
| 14:00:42 | 3  | MR. OSNATO:  Can we take our one hour |
| 14:00:45 | 4  | break? |
| 14:00:45 | 5  | MR. CASTANARES:  Sure. |
| 14:00:50 | 6  | THE VIDEOGRAPHER:  Going off the |
| 14:00:50 | 7  | record.  The time is 2:00.  This is the end |
| 14:00:54 | 8  | of tape 6. |
| 14:00:59 | 9  | (Recess taken.) |
| 14:08:15 | 10 | THE VIDEOGRAPHER:  Okay.  We're back on |
| 14:08:16 | 11 | the record.  It's 2:08 and this is tape 7. |
| 14:08:26 | 12 | MR. CASTANARES:  Are we on? |
| 14:08:27 | 13 | MR. OSNATO:  Yes. |
| 14:08:28 | 14 | MR. CASTANARES:  I'm sorry.  Thank you. |
| 14:08:29 | 15 | (CSFB Exhibit 103, Multipage e-mail, |
| 14:08:29 | 16 | bearing Bates stamp Nos. CSFB-00192964 |
| 14:08:29 | 17 | through CSFB-00192976, marked for |
| 14:08:29 | 18 | identification, as of this date.) |
| 14:08:31 | 19 | MR. CASTANARES:  Exhibit 103 is 192964 |
| 14:08:36 | 20 | through 976. |
| 14:08:39 | 21 | BY MR. CASTANARES: |
| 14:08:39 | 22 | Q.  And, sir, I don't intend to ask you, I |
| 14:08:42 | 23 | don't believe at least, any detail about this.  If |
| 14:08:44 | 24 | I do, I will do so.  But I'm just going to ask if |
| 14:08:48 | 25 | you had any hand in preparing this document. |

503

|          | 1  | Fiachra O'Driscoll |
| 16:10:16 | 2  | contract? |
| 16:10:17 | 3  | A.    I do not. |
| 16:10:27 | 4  | Q.    Does CSFB at this time, to your |
| 16:10:30 | 5  | knowledge, have any expectation of receiving any |
| 16:10:34 | 6  | revenue from any source that's related in any way |
| 16:10:39 | 7  | to Oakwood, other than through the proof of claim |
| 16:10:43 | 8  | filed in bankruptcy court? |
| 16:10:45 | 9  | A.    I do not. |
| 16:10:49 | 10 | Q.    Have you been in contact in any |
| 16:10:51 | 11 | shape -- in any way or form with any member of the |
| 16:10:56 | 12 | Oakwood management team that you dealt with |
| 16:10:58 | 13 | earlier since this litigation began? |
| 16:11:01 | 14 | MR. OSNATO:    Can you give him a frame |
| 16:11:02 | 15 | of reference. |
| 16:11:03 | 16 | A.    Can you give me a reference? |
| 16:11:05 | 17 | MR. OSNATO:    He may not be familiar |
| 16:11:06 | 18 | with when the proof of claim was filed. |
| 16:11:08 | 19 | Q.    Okay.  Have you been in contact with |
| 16:11:11 | 20 | anybody associated with Oakwood management in the |
| 16:11:14 | 21 | last 12 months? |
| 16:11:18 | 22 | A.    I believe I spoke with -- on -- spoke |
| 16:11:22 | 23 | separately with both Doug Muir since he -- since |
| 16:11:27 | 24 | he took up his new position at Krispy Kreme, and |
| 16:11:31 | 25 | separately with Myles Standish since he went to do |

573

                    1                    Fiachra O'Driscoll

16:11:35    2    what he's doing around 12 months ago.

16:11:38    3         Q.    All right.  And in that discussion did

16:11:40    4    you discuss this litigation or any aspects of it

16:11:43    5    at all?

16:11:45    6         A.    No.

16:11:47    7         Q.    Was anybody else present in any of

16:11:49    8    those discussions?

16:11:50    9         A.    They were telephone conversations.

16:12:08    10        Q.    Do you recall whether you've ever

16:12:10    11   discussed this litigation with anybody on the

16:12:14    12   Oakwood management team?

16:12:15    13        A.    I have not.

16:12:27    14        Q.    Are you aware of whether or not any

16:12:29    15   valuation of either any REMIC securities or of the

16:12:35    16   present value of Oakwood's guarantees of them was

16:12:38    17   ever performed by PaineWebber?

16:12:40    18        A.    By PaineWebber?

16:12:42    19              No.

16:12:51    20        Q.    When the Lotus transactions were

16:12:53    21   initiated was a separate analysis done of the

16:12:56    22   expected performance of the assets in the pool,

16:13:01    23   the B2s, beyond that which had been done when they

16:13:04    24   were originally securitized?

16:13:08    25        A.    I don't know.

                                                                    574

1                    Fiachra O'Driscoll

16:13:10    2        Q.    Was a separate analysis done of

16:13:15    3    Oakwood's exposure on the guarantees of the B2s as

16:13:20    4    they existed before the securitization?

16:13:24    5        A.    Not to my knowledge.

16:13:26    6        Q.    Did you discuss with anybody whether or

16:13:27    7    not that should be done?

16:13:29    8        A.    I did not.

16:13:48    9            MR. CASTANARES:    Let me show you

16:13:49    10    Exhibit 114, CSFB 250135 through 212.

16:13:59    11            (CSFB Exhibit 114, Multipage

16:13:59    12        presentation, bearing Bates stamp Nos.

16:13:59    13        CSFB-00250135 through CSFB-00250212, marked

16:13:59    14        for identification, as of this date.)

16:14:00    15            THE WITNESS:    Thank you.

16:14:01    16            (Witness looks at document.)

16:14:59    17        Q.    Have you seen this document before?

16:15:00    18        A.    Yes.

16:15:01    19        Q.    Did you have a hand in its preparation?

16:15:03    20        A.    Yup.

16:15:04    21        Q.    What was the purpose of this

16:15:05    22    presentation to CRM?

16:15:07    23        A.    The purpose of this presentation was

16:15:12    24    essentially a formal presentation to CRM in the

16:15:17    25    weeks leading up to the bankruptcy, of Oakwood's

575

|         |    |                                                      |
|---------|----|------------------------------------------------------|
|         | 1  | Fiachra O'Driscoll                                   |
| 16:15:21 | 2  | situation as we saw it, to -- with a view to        |
| 16:15:28 | 3  | preparing them for the waiver discussions.          |
| 16:15:33 | 4  | Q.    Are you fairly certain, sir, that this        |
| 16:15:35 | 5  | document was presented to CRM before Oakwood's      |
| 16:15:38 | 6  | bankruptcy as distinguished from afterwards?        |
| 16:15:41 | 7  | A.    I'm not certain, but I would have             |
| 16:15:43 | 8  | believed it was.                                     |
| 16:15:53 | 9  | Q.    Let me ask you to refer to page 8 of          |
| 16:15:55 | 10 | the document, which is Bates 143.                   |
| 16:16:01 | 11 | A.    I've just done that.                           |
| 16:16:03 | 12 | I was wrong then.  It was clearly                   |
| 16:16:05 | 13 | afterwards.                                           |
| 16:16:06 | 14 | Q.    And while we're there, what was the           |
| 16:16:11 | 15 | term sheet from Foothill, CIT, and Textron?         |
| 16:16:21 | 16 | A.    I've some recollection now that               |
| 16:16:25 | 17 | Foothill had syndicated its DIP facility up to      |
| 16:16:31 | 18 | CIT, or Textron, or at least it considered doing    |
| 16:16:36 | 19 | so.  I'm not certain which.                          |
| 16:16:38 | 20 | Q.    Was this the same term sheet which            |
| 16:16:40 | 21 | Mr. Felt's e-mail that we saw earlier had           |
| 16:16:47 | 22 | mentioned receiving from Foothill on                |
| 16:16:51 | 23 | November 14th?                                        |
| 16:16:52 | 24 | A.    I can't be certain that it was the one        |
| 16:16:55 | 25 | that he referred to specifically in that e-mail.    |

576

1

2                              * * *

3                  ACKNOWLEDGEMENT OF DEPONENT

4        I, Fiachra O'Driscoll, do hereby

5        acknowledge that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14        Oct 23, 2006

15        (DATE)                    (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

1           ERRATA SHEET

2      PAGE    LINE    CHANGE CORRECTION (REASON)

3      512     9       "product" to "products" (incorrect)

4      522     18      "Reagan" to "Regan" (incorrect)

5      528     1<del>2</del>3   "I'd" to "I've" (incorrect)

6      ___     ___     _____

7      ___     ___     _____

8      ___     ___     _____

9      ___     ___     _____

10     ___     ___     _____

11     ___     ___     _____

12     ___     ___     _____

13     ___     ___     _____

14     ___     ___     _____

15     ___     ___     _____

16     ___     ___     _____

17     ___     ___     _____

18     ___     ___     _____

19     ___     ___     _____

20     ___     ___     _____

21     ___     ___     _____

22     ___     ___     _____

23     Dated: October 23 2006

24

25                                    Fiachra O'Driscoll

# Exhibit "E"

Page 1

UNITED STATES BANKRUPTCY COURT
    DISTRICT OF DELAWARE

# COPY

----------------------------x

In Re:                    )Chapter 11

OAKWOOD HOMES CORPORATION,  )Case No. 02-13396

et al.,                )(PJW)

           Debtors. )Jointly Administered

----------------------------x

OHC LIQUIDATION TRUST,     )

           Plaintiff, )

       vs.          )Adv. Proc. No.

CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)

Swiss banking corporation,  )

CREDIT SUISSE FIRST BOSTON  )

LLC, a Delaware limited    )

liability corporation, CREDIT)

SUISSE FIRST BOSTON, INC.,  )

CREDIT SUISSE FIRST BOSTON  )

(U.S.A.), INC., a Delaware  )

corporation and a wholly   )

owned subsidiary of CREDIT  )

SUISSE FIRST BOSTON, INC.,the)

subsidiaries and affiliates  )

of each, and DOES 1 through  )

100,                  )

          Defendants.)

----------------------------x

        September 5, 2007
        10:15 a.m.


      Deposition of ALAN C. SHAPIRO, held at
the law offices of Linklaters LLP, 1345 Avenue of
the Americas, New York, New York, pursuant to
agreement, before Donald R. DePew, an RPR, CRR and
Notary Public within and for the State of
New York.

Page 2

```
 1

 2    A P P E A R A N C E S:

 3

 4    Attorneys for Plaintiff

 5         STUTMAN TREISTER & GLATT

 6         1901 Avenue of the Stars, Twelfth Floor

 7         Los Angeles, California 90067-6013

 8    BY:  TONY CASTANARES, ESQ.

 9

10    Attorneys for Defendants

11         LINKLATERS LLP

12         1345 Avenue of the Americas

13         New York, New York 10105

14    BY:  R. PAUL WICKES, ESQ.

15         J. JUSTIN WILLIAMSON, ESQ.

16              -AND-

17         LINKLATERS LLP

18         One Silk Street

19         London EC2Y 8HQ

20    BY:  RICHARD A. DOBLE, ESQ.

21

22    ALSO PRESENT:

23         PETER KOZLOWSKI, Director, Counsel, (a.m.

24         only) Credit Suisse Securities (USA) LLC

09:00:22 25    DOUGLAS HUEBNER, Videographer
```

Page 89

ALAN SHAPIRO

12:37:41  2    association with a securitization structure of the

12:37:46  3    type we've been describing?

12:37:48  4        A.    Yes, it is.

12:37:48  5        Q.    It's of no surprise to you here to see

12:37:51  6    it in this transaction?

12:37:53  7        A.    No.

12:37:54  8        Q.    Okay.  Now, you say on page 16, "In

12:37:57  9    February, Bank of America decided not to renew the

12:37:59 10    Warehouse Facility, and CSFB assumed the role as

12:38:03 11    lender to Oakwood by purchasing the notes from the

12:38:07 12    Warehouse Trust."

12:38:08 13        A.    Yes.

12:38:09 14        Q.    I think as we've just seen that it's

12:38:11 15    actually not technically right that CSFB assumed

12:38:14 16    the role of lender to Oakwood, right?

12:38:18 17        A.    Ah, you are correct.  I was using that

12:38:19 18    in a more generic sense, but...

12:38:22 19        Q.    They stepped in and provided this

12:38:24 20    warehouse facility?

12:38:25 21        A.    That's correct.  And it was not a

12:38:28 22    lender to Oakwood, but they lent specifically to

12:38:31 23    this bankruptcy remote entity.

12:38:34 24        Q.    Right.

12:38:34 25              And that's the standard way these

1                        ALAN SHAPIRO

12:38:36  2    warehouse arrangements are done, isn't it?

12:38:38  3        A.    Very much so.

12:38:39  4        Q.    Okay.  What would have happened to

12:38:41  5    your understanding in February of 2001 had

12:38:46  6    Credit Suisse not stepped into the shoes of Bank

12:38:49  7    of America?

12:38:49  8        A.    My best understanding was that there

12:38:53  9    was nobody else looking to replace Bank of America

12:38:58 10    as the lender.  I believe I read that somewhere,

12:39:08 11    in which case this whole structure would have

12:39:11 12    collapsed.  That's my understanding.

12:39:14 13        Q.    And what would have been the

12:39:15 14    consequence of that?

12:39:17 15        A.    Well, there would have had to have been

12:39:20 16    some serious restructuring taking place at

12:39:23 17    Oakwood.  I don't know exactly what would have

12:39:26 18    happened.  Maybe Oakwood would have been sold,

12:39:29 19    maybe it would have gotten into bankruptcy.

12:39:34 20    Possibly it might have gotten some type of secured

12:39:40 21    loan to restructure its operations, to buy it time

12:39:44 22    to shut down various facilities, and so on.

12:39:49 23            I'm not sure what would have happened,

12:39:52 24    but the one thing I'm pretty certain is that they

12:39:56 25    couldn't have kept doing business as usual.

ALAN SHAPIRO

12:39:58  Q.    Okay.  In your opinion, Professor, did

12:40:04  CSFB breach any duty it owed to anyone by stepping

12:40:08  into the shoes of Bank of America and taking over

12:40:10  that warehouse facility role in February of 2001?

12:40:18  A.    Well, that becomes -- that's a legal

12:40:25  issue, I believe.  What I can tell you is that the

12:40:28  economic consequences of doing that, again, is

12:40:32  that it enabled Oakwood to maintain business as

12:40:38  usual, which was not beneficial to its creditors.

12:40:46  Q.    Do you believe it was unreasonable or

12:40:48  not reasonably prudent of CSFB to step into that

12:40:53  role in February of 2001?

12:40:58  A.    Well, in general there's nothing wrong

12:41:05  and a lot of things right about being a lender to

12:41:10  a warehouse facility.

12:41:13  What I would say in this particular

12:41:15  instance, given the circumstances that --

12:41:20  financial circumstances that Oakwood was in,

12:41:23  anything that enabled it to maintain a

12:41:27  business-as-usual stance was going to harm the

12:41:35  economic interests of the company and its

12:41:40  creditors.  Whether -- you know, if it owed a

12:41:43  fiduciary obligation, then that's -- I would say

12:41:46  it's even less reasonable to do that.

Page 170

1

2                              * * *

3               ACKNOWLEDGEMENT OF DEPONENT

4         I,  *Alan C. Shapiro*   , do hereby

5    acknowledge that I have read and examined the

6    foregoing testimony, and the same is a true,

7    correct and complete transcription of the

8    testimony given by me, and any corrections appear

9    on the attached Errata sheet signed by me.

10

11

12

13

14    *10/7/07*

15    (DATE)                    (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

Page 171

1
2   WITNESS: _Alan C. Shapiro_____
    DATE(S): _10/4/07, 10/7/07_____
3   CASE: _OHC Liquidation Trust V. Credit Suisse, et al_
    I wish to make the following changes, for the
4   following reasons:
5   PAGE LINE _60_ _22_
                    CHANGE FROM: _Operations and_____
6               CHANGE TO: _operations, and_____
7   REASON: _Changes the intended meaning_____
    _158_ _6_ CHANGE FROM: _debt_____
8               CHANGE TO: _equity_____
9   REASON: _I misspoke, I was talking about equity, not debt_
    _163_ _21_ CHANGE FROM: _CRISP_____
10              CHANGE TO: _CRSP_____
11  REASON: _That's the correct abbreviation_____
    _164_ _11_ CHANGE FROM: _CRISP_____
12              CHANGE TO: _CRSP_____
13  REASON: _Correct abbreviation._____
    _166_ _8_ CHANGE FROM: _findings_____
14              CHANGE TO: _filings_____
15  REASON: _I believe the court stenographer misunderstood me._
    _166_ _21_ CHANGE FROM: _2001 just_____
16              CHANGE TO: _2001. Just_____
17  REASON: _Misunderstanding by stenographer_____
    ____ ____ CHANGE FROM: _____
18              CHANGE TO: _____
19  REASON: _____
    ____ ____ CHANGE FROM: _____
20              CHANGE TO: _____
21  REASON: _____
    ____ ____ CHANGE FROM: _____
22              CHANGE TO: _____
23
    Subscribed and sworn to before me this _____ day
24  of _____, 2007.
25

Page 171

WITNESS: _____

DATE(S): _____

CASE: _____

I wish to make the following changes, for the following reasons:

PAGE LINE ____ ____

CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

____ ____ CHANGE FROM:_____
CHANGE TO: _____
REASON:_____

Subscribed and sworn to before me this _7th_ day of _October_, 2007.

_____

# Exhibit "F"

MYLES STANDISH

COPY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -X
                                  : Chapter 11
In Re:                              Case No. 02-13396
OAKWOOD HOMES CORPORATION,        : (PJW)
et al.,                             Jointly Administered
                                  :
          Debtors.
_____   :
OHC LIQUIDATION TRUST,
                                  :
          Plaintiff,
                                  :
          v.                        Adv. Proc. No.
                                  : 04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation,      :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited           :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,        :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware        :
corporation and a wholly
owned subsidiary of CREDIT        :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and              :
affiliates of each, and
DOES 1 through 100,               :

          Defendants.             :

- - - - - - - - - - - - - - -X

          Videotape Deposition of MYLES STANDISH
                  (Taken by Defendants)
               Winston-Salem, North Carolina
                    September 21, 2006


Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public

MYLES STANDISH

Page 2

```
 1                    APPEARANCE OF COUNSEL
 2
     For the Plaintiff:
 3
     TONY CASTANARES, Esq.
 4   Stutman, Treister & Glatt
     1901 Avenue of the Stars
 5   Twelfth Floor
     Los Angeles, California   90067-6013
 6   (310) 228-5755
     (310) 228-5788 FAX
 7   TCastanres@stutman.com
 8
     For the Defendants:
 9
     MICHAEL J. OSNATO, JR., Esq.
10   BRENDAN MURPHY, Esq.
     Linklaters
11   1345 Avenue of the Americas
     New York, New York   10105
12   (212) 903-9000
     (212) 903-9041 FAX
13   Michael.osnato@linklaters.com
14
     Videographer:
15
     Mr. Donald Graves
16
17                    *  *  *  *  *
18
19
20
21
22
23
24
25
```

MYLES STANDISH

Page 3

1        Videotape Deposition of MYLES STANDISH, taken

2    by the Plaintiff, at the Marriott Hotel, 425 North

3    Cherry Street, Winston-Salem, North Carolina, on the

4    21st day of September, 2006 at 8:24 a.m., before K.

5    Denise Neal, Registered Professional Reporter and

6    Notary Public.

7

8                          * * * * *

9

10                         CONTENTS

11   THE WITNESS:  MYLES STANDISH              EXAMINATION

12            BY MR. OSNATO                         6

13

14                    * * * * *

15

16

17

18

19

20

21

22

23

24

25

MYLES STANDISH

1    loan assumption program?

2        A.    Yes.

3        Q.    Okay.  And do you have an understanding of

4    the allegations that are being directed specifically

5    at Credit Suisse's conduct in this lawsuit?

6        A.    As I said, I read the complaint shortly

7    after it was filed, so my -- but my recollection of

8    that is rather sketchy.

9        Q.    Fair enough.  Do you recall agreeing with

10   the allegations in the counterclaims when you

11   reviewed them some time ago?

12       A.    I recall both agreeing with some as well

13   as disagreeing with some.

14       Q.    Okay.  Well, we'll go through the

15   counterclaims at some point later and if you can

16   refer me to those that you disagree with, I would be

17   grateful.  Broadly speaking, Mr. Standish, do you

18   have any views on the adequacy of the services that

19   Credit Suisse provided to Oakwood?

20       A.    That's a rather general question.  I have

21   some views on some services that I think were

22   adequate and some services that were not.

23       Q.    That's a fair observation, so let me do it

24   this way.  What services did Credit Suisse provide to

25   Oakwood during your tenure with the company?

MYLES STANDISH

1       A.     Well, when you say my tenure, are you

2    talking about all the time I was employed by the

3    company?

4       Q.     Let's focus on the period 1999 through the

5    filing.

6       A.     Okay.  Credit Suisse served as our primary

7    underwriter in our securitization program.  Credit

8    Suisse also served in a more general capacity as a --

9    as an advisor with respect to our overall financial

10   condition, liquidity condition with respect to

11   options that might be available.  Credit Suisse was

12   also provided a loan purchase facility where we

13   liquified our loans prior to securitization.

14            First Boston also served as the financial

15   advisor as we were looking to restructure the company

16   pursuant to a contract entered into in August of

17   2002.  First Boston I believe during that period of

18   time had a research analyst that followed the company

19   for at least a period of time.  They may have had

20   other roles, but those are the ones I recall at the

21   moment.

22      Q.     Okay.  Now, let's focus specifically on

23   the underwriting services that Credit Suisse

24   provided.  It's my understanding that those services

25   included performing some measure of diligence,

MYLES STANDISH

1    interacting with rating agencies on behalf of Oakwood

2    and generating potential investor interest in

3    securitizations; is that correct?

4           MR. CASTANARES:  Objection to form.

5           THE WITNESS:  Among other things, yes,

6        they did those things.

7        Q.    (By Mr. Osnato)  What did I leave out?

8        A.    Well, they certainly were the primary

9    people involved in structuring the transaction

10   itself.  That's the only thing I can -- additional

11   thing that I can recall at the moment.

12       Q.    Am I correct that the securitizations

13   tended to use the same structure?

14       A.    The same general structure in the sense

15   that it was a securitization.  You would have

16   different tranches.  You would have sometimes

17   interest-only strips.  You would have sometimes bonds

18   that were guaranteed, sometimes bonds that were not

19   guaranteed.  So there was -- there was a good bit of

20   variability in the structure of each of the

21   securitizations.

22       Q.    Again focusing only on the underwriting

23   services that Credit Suisse provided, do you think

24   that it provided those services adequately and

25   competently?

MYLES STANDISH

Page 15

```
 1        A.      In general, yes.

 2        Q.      Focusing on the financial advisory

 3   services that you described a moment ago, I'm going

 4   to ask you the same question.  Do you think that

 5   Credit Suisse provided those services adequately and

 6   competently?

 7        A.      When you say financial advisory services,

 8   does that include the financial advisory contract in

 9   August of 2002?

10        Q.      Well, again, that's a fair observation, so

11   let's break that question down into two pieces; okay?

12   Separate out for the moment the services provided

13   under the August contract, and please give me your

14   views on whether Credit Suisse provided its services

15   adequately and competently?

16        A.      Under the August 2002 contract?

17        Q.      No.  Anything other than --

18        A.      Anything other than that contract?

19        Q.      -- under that contract.

20        A.      Okay.  The -- I know that -- I know that

21   Credit Suisse came to us with a number of

22   alternatives during the years --

23        Q.      Uh-huh.

24        A.      -- as far as ways that we could provide

25   better liquidity or that they could help us provide
```

MYLES STANDISH

1    better liquidity for Oakwood.  None of the things

2    that they brought to the table ever came to pass

3    other than when we entered into the loan purchase

4    agreement with them.

5           So they brought ideas to the table which

6    either didn't come to pass because First Boston

7    ultimately wouldn't approve them or they didn't come

8    to pass because management didn't think that the

9    ideas were worth pursuing to finality.

10          So in general I can't -- I don't know if

11   there were other things that they could have brought

12   to the table that would have provided us with better

13   options than we ended up taking, but -- but they did

14   not come to the table with things that management

15   viewed to be workable.

16          So, you know, were they trying to bring

17   ideas to the table that might work?  I think so.

18   Ultimately they didn't work.  Does that mean that

19   they were unsatisfactory?  I don't know.  I can just

20   tell you what the results were.

21       Q.    Credit Suisse's role as an advisor was to

22   bring options to the board and senior management and

23   it was senior management and the directors' role to

24   select options they thought were in the best

25   interests of the company; isn't that right?

MYLES STANDISH

1      A.    With the advice of First Boston, yes.

2      Q.    But ultimately it was the prerogative and

3  responsibility of the board to make the decisions as

4  to which options to pursue; isn't that correct?

5      A.    Certainly the board -- to actually pursue

6  an option, the board or management would have to be

7  the ones to say that we were going ahead with that

8  option, yes.

9      Q.    At any point in your tenure with Oakwood

10  did Credit Suisse control Oakwood?

11      A.    Not in the colloquial sense of the word.

12  I think that they did have a 19.9 percent option,

13  which under some securities definitions might make

14  them a controlling party.

15      Q.    Well, let me try and focus the question a

16  bit then.  Can you recall an instance where Credit

17  Suisse demanded the hiring or firing of any employees

18  of Oakwood?

19      A.    I do not.

20      Q.    Can you recall an instance where Credit

21  Suisse demanded that a certain director be removed

22  from the board?

23      A.    I do not.

24      Q.    Did --

25      A.    If you'd give me a moment.  I left my cell

MYLES STANDISH

Page 18

```
 1    phone on.  Let me turn it off.
 2        Q.    No problem.  Did Credit Suisse have any of
 3    its representatives seated on the Oakwood board?
 4        A.    They did not have a representative seated
 5    on the board.  I hesitate only because Sabin Streeter
 6    was a board member of Oakwood for some period of
 7    time.  He was affiliated -- he was a managing
 8    director I believe of DLJ, Donaldson, Lufkin &
 9    Jenrette, which was merged into First Boston.  And I
10    don't know whether Sabin had an affiliation with
11    First Boston after that merger or not.
12        Q.    Do you recall the date that Mr. Streeter
13    first was appointed to the board?
14        A.    I believe it would be 1986.
15        Q.    And am I right that that date predates by
16    some time the first services provided to Oakwood by
17    Credit Suisse?
18        A.    As far as I know, yes.
19        Q.    Thank you.  Did Credit Suisse have the
20    ability to dictate corporate policy to Oakwood's
21    board of directors or senior management?
22            MR. CASTANARES:  Could you break that down
23        as to time, please, counsel?
24        Q.    (By Mr. Osnato)  At any time during your
25    tenure at Oakwood?
```

MYLES STANDISH

1    A.    I hesitate only because First Boston as

2    both our underwriter and the provider of our loan

3    purchase facility certainly had some power over the

4    board if it would withhold those underwriting

5    services or the -- withdraw the loan purchase

6    facility.  So there was certainly some power there.

7         I don't recall First Boston actually

8    dictating policy to the board.  Certainly -- well,

9    with -- certainly they advised the board on certain

10   things.  Certainly they used the loan purchase

11   facility to in essence dictate certain policies to

12   the company, whether to the board or management, from

13   the standpoint that it contained some rather detailed

14   underwriting criteria that had to be followed in

15   order for the loans to go into the loan purchase

16   facility.

17   Q.    If Credit Suisse had stated to the board

18   that it was going to withhold its underwriting

19   services, am I correct that Oakwood could simply have

20   looked to another financial institution to underwrite

21   those securitizations?

22        MR. CASTANARES:  Objection to form.

23        THE WITNESS:  Oakwood could certainly have

24        gone to other financial institutions and tried

25        to have them serve as underwriter.  As Oakwood

1    was in more and more financial difficulty, the

2    ability to do that would be lessened because

3    typically an underwriter doesn't want to deal

4    with a company in financial distress,

5    particularly if it's the first time they're

6    dealing with that company.

7         Certainly if First Boston said that they

8    were not going to serve as underwriter, then the

9    marketplace would wonder why First Boston wasn't

10   going to underwrite.  So even had we

11   successfully found another underwriter, I think

12   that there would have been significant damage

13   done to the securitization program.

14        Q.    (By Mr. Osnato)  Can you think of a

15   specific corporate transaction that Oakwood entered

16   into at the direction of Credit Suisse?

17        A.    Certainly any underwriting we would have

18   entered into, it would have been at the -- with the

19   advice -- or any securitization -- excuse me -- that

20   we would have entered into would have been with the

21   advice of First Boston.

22        We often sought First Boston's advice on

23   anything pertaining to our -- to our loan

24   underwriting.  If you're asking do I remember First

25   Boston essentially ordering us to do something and we

MYLES STANDISH

1    complied with that, I don't recall that.  It was more

2    of a mutual situation.

3        Q.    Did Credit Suisse have the ability to

4    force Oakwood to engage in a securitization

5    transaction if the board determined that wasn't in

6    the company's interest?

7        A.    Well, I don't remember those circumstances

8    happening.  As I said, if Credit Suisse would have

9    come to the board and said you do this or we will no

10   longer serve as underwriter and we'll withdraw the

11   loan purchase facility, it would have put the board

12   in a difficult position.

13       Q.    But that never happened; right?

14       A.    That's correct.  I do not recall that

15   happening.

16       Q.    Did Credit Suisse have the ability to

17   force Oakwood to file for chapter 11 bankruptcy?

18       A.    Well, in essence they did.  On the -- on

19   the week of November 11th the Credit Suisse for a

20   period of several days stopped funding loans under

21   the warehouse or the loan purchase facility.  They

22   gave us no reason as to why they had done so.

23   Ultimately I believe on the Friday that we filed for

24   bankruptcy Credit Suisse did fund those loans that

25   had been -- that should have been funded several days

MYLES STANDISH

1    before but notified Oakwood that they were no longer

2    going to fund loans under the loan purchase facility

3    until some other agreement was worked out.  So as I

4    said earlier, the week of November 11th we

5    essentially had no choice other than to file for

6    bankruptcy because we were out of money --

7         Q.    Uh-huh.

8         A.    -- and the actions of First Boston were

9    one of the precipitating events to that.

10        Q.    Uh-huh.  Your earlier testimony I believe

11   was that the immediate precipitating factor was that

12   Oakwood ran out of money; is that right?

13        A.    Yes.

14        Q.    At some point in time after the chapter 11

15   filing did Oakwood terminate Credit Suisse?

16        MR. CASTANARES:  Would you care to break

17        down which relationship you're talking about or

18        do you mean under any relationship at all?

19        MR. OSNATO:  Under any relationship.

20        THE WITNESS:  We never terminated Credit

21        Suisse as far as a general matter.  We continued

22        to work with Fiachra O'Driscoll.  He continued

23        to provide us with advisory services on our

24        securitizations as well as working with us to

25        put back in place the loan purchase facility.

MYLES STANDISH

Page 23

1      We did terminate First Boston's role under the

2      August 2002 contract.

3           Q.    (By Mr. Osnato)   Let's talk for a moment

4      about Mr. O'Driscoll.   I take it you know who he is?

5           A.    I do.

6           Q.    And I take it that you have some views on

7      his abilities, competence; is that right?

8           A.    I do.

9           Q.    Can you tell us what those are?

10          A.    I think Fiachra has provided us -- I think

11     Fiachra in general is very competent.   I think he

12     served us well in general with the securitizations

13     work that he did prior to bankruptcy.   I was

14     disappointed in his work immediately leading up to

15     bankruptcy as far as getting a waiver so that the

16     loan purchase facility could remain in place.

17          I was somewhat disappointed after the

18     bankruptcy filing when we attempted to securitize our

19     loans for the first time in a transaction that would

20     have involved an entity called C-Bass.   Being the

21     servicer, Fiachra had indicated to me that he thought

22     -- what he thought our proceeds would be under that

23     transaction and the transaction never took place, but

24     it never took place because the proceeds were going

25     to be significantly in a very material sense less

MYLES STANDISH

Page 46

1    provide legal advice to Oakwood?

2        A.    Yes.    The -- I think that my first or

3    second assignment in the firm I believe was with

4    respect to Oakwood.

5        Q.    Okay.    In the course of your private

6    practice did you ever advise companies on their

7    fiduciary duties?

8        A.    I can't recall specifically advising

9    companies on their fiduciary duties, but it wouldn't

10   surprise me if I did.

11       Q.    By virtue of your legal training and

12   private practice as well as service as general

13   counsel of Oakwood, do you have an understanding of

14   what a fiduciary duty encompasses?

15       A.    In general, yes.

16       Q.    And what is that understanding?

17       A.    Well, a fiduciary owes a duty of trust, a

18   duty of loyalty to the entity that it's -- that the

19   fiduciary is serving.

20       Q.    And at any point in time did you believe

21   that Credit Suisse had a fiduciary relationship to

22   Oakwood Homes?

23       A.    I never thought of it in those terms.    As

24   far as -- well, when I say I never thought of it in

25   those terms, I never thought, you know, does Oak --

MYLES STANDISH

 1    does Credit Suisse owe us a fiduciary duty.

 2    Certainly, certainly there was a lot of trust, a lot

 3    of loyalty between the two entities.

 4              I think that certainly under the -- the --

 5    the connection between an underwriter and an issuer

 6    of securities, I would think there would be a

 7    fiduciary relationship between those two as well as

 8    under the financial advisory agreement that First

 9    Boston entered into.  I would think there would be a

10    fiduciary relationship owed under that.

11         Q.   Uh-huh, okay.  At some point in time did

12    you leave private practice?

13         A.   I did.

14         Q.   And in what year was that?

15         A.   I believe it was 1995.

16         Q.   And did you leave to take a new job?

17         A.   I did.

18         Q.   And where was that job?

19         A.   It was with Oakwood Homes.

20         Q.   And you said this was 1995?

21         A.   I believe it was.

22         Q.   Okay.  And what position did you assume at

23    Oakwood?

24         A.   My title was senior vice president and

25    general counsel.

MYLES STANDISH

Page 48

1      Q.    Okay.  And first focusing on your role as

2   senior vice president, can you please tell me what

3   your job responsibilities were?

4      A.    It was really simply general counsel.

5      Q.    Okay.

6      A.    The senior vice president was a title, but

7   it didn't add anything other than the general counsel

8   role itself.

9      Q.    And at this point in time was Oakwood a

10  publicly listed company?

11     A.    It was.

12     Q.    Do you know in what year Oakwood listed on

13  the New York Stock Exchange?

14     A.    I don't recall specifically, but I would

15  believe it would have been around 1987 or '88.

16     Q.    And in your role as general counsel of the

17  company, did you rely on outside counsel to advise

18  Oakwood?

19     A.    I did.

20     Q.    Do you recall approximately how many firms

21  Oakwood used?

22     A.    Well, if you're talking about firms in any

23  kind of role, there would have been upwards of a

24  hundred firms that were used.

25     Q.    Was there a firm that advised Oakwood in

MYLES STANDISH

Page 111

```
 1    it had been provided through Bank of America.   Before

 2    Foothill came in we had a line with First Union.   We

 3    at some point in time in 2001 entered into a servicer

 4    advance agreement with Prudential.   Those would be

 5    the major facilities that I could think of.

 6         Q.    And it was important for the company to

 7    maintain relationships with a number of lenders;

 8    right?

 9         A.    Well, it certainly doesn't hurt to have

10    relationships with a number of lenders.

11         Q.    Because it's important to diversify your

12    potential sources of liquidity; right?

13         A.    You could argue that one way or the other.

14         Q.    Why do you think it's important?

15         A.    Well, I think that having -- well, it's

16    important in one respect that certain lenders

17    understand certain types of assets.

18         Q.    Uh-huh.

19         A.    For example, Foothill lends primarily

20    based on hard assets, inventory, for example.   There

21    aren't many people around who would understand a

22    warehouse agreement or a loan purchase agreement like

23    we had with First Boston because there's very few

24    people who would understand the collateral that was

25    there.
```

MYLES STANDISH

1        Similar to the servicing line that we had

2   with Prudential, I think Prudential had been the

3   first ones to do a similar type of servicing line

4   like that.  They understood what the asset was and

5   was comfortable with the asset.  Generally speaking,

6   it would have been hard to finance these varying

7   types of assets with only one lender.

8        Q.    Okay.  Do you recall the circumstances

9   under which Berkshire Hathaway came to participate in

10  securitization transactions with the company?

11       A.    Generally, yes.

12       Q.    Please tell me what you remember.

13       A.    I remember that we had an inventory of B2

14  pieces that was difficult to liquidate.  We had sold

15  B2s in the past but at some point in time, maybe

16  around '99, 2000, that market had become a very

17  difficult market.  I know that First Boston presented

18  to Berkshire Hathaway the idea of Berkshire Hathaway

19  buying these B2s.

20       How the Lotus structure came about,

21  whether that was an idea that Fiachra had or

22  Fiachra's group or whether that was an idea that

23  Berkshire Hathaway had, I'm not sure, but I suspect

24  it was generated from First Boston.

25       Q.    And did you participate in the

MYLES STANDISH

Page 113

```
 1   negotiations of the terms of the transaction with

 2   Berkshire Hathaway?

 3        A.    I did not.

 4        Q.    Did someone at Oakwood negotiate on behalf

 5   of the company?

 6        A.    I think it was negotiated between Fiachra

 7   and Berkshire Hathaway.

 8        Q.    So is it your understanding that no one

 9   from Oakwood participated in those discussions?

10        A.    I think there was some discussion about

11   the structure of the deal.

12        Q.    Uh-huh.

13        A.    Whether that was negotiation or just

14   discussion to understand, I don't know, but those

15   discussions would have been with Doug as far as Doug

16   may have had some input into the pricing, but I

17   remember it more as a take it or leave it kind of

18   deal.

19        Q.    And who -- strike that.  Did you testify

20   earlier that before the Berkshire Hathaway deal the

21   company had, in fact, liquidated B2s off its balance

22   sheet; is that right?

23        A.    We had for a period of time -- the market

24   essentially dried up.  We did make one sale to an

25   insurance company I believe based in Cincinnati.  I
```

MYLES STANDISH

Page 114

1    can't remember the name of it.  At some point in time

2    during this period but essentially we had a few

3    different -- you need to look at it in different

4    periods of time.  Back in the mid-'90s there were B2

5    buyers.

6         Now, at some point in time, probably

7    around '96, Oakwood itself became an investment grade

8    rated company.  So we were a triple B minus I believe

9    at that time probably between '96 and '98 or '99.

10   That meant that we could guarantee the B2 piece,

11   which brought the B2 piece up to a triple B piece or

12   a triple B minus.

13        So during that period of time that we were

14   investment grade we could sell the B2 piece, but it

15   was an investment grade piece because of the Oakwood

16   guarantee.  Now, after Oakwood lost its investment

17   grade rating, whether immediate or after a period of

18   time, I don't know, but it became very difficult to

19   liquidate the B2 pieces.

20        Q.    Do you recall times when Oakwood disagreed

21   with the rating decisions, the rating agencies?

22        A.    I'm sure there were lots of times we

23   disagreed with the rating agency decisions.

24        Q.    Do you personally recall any instances

25   where you did?

MYLES STANDISH

Page 189

1    that was made at the meeting we've been discussing?

2         A.    This appears to be.

3         Q.    Do you know who prepared these materials?

4         A.    CSFB.

5         Q.    Do you remember reviewing them before they

6    were presented to Berkshire Hathaway?

7         A.    I do not recall reviewing them, but I'm

8    sure that I did.

9         Q.    Okay.  If you could please turn to Bates

10   range 63123, which is page nine of the presentation?

11        A.    Yes.

12        Q.    There's a reference to a rationalization

13   plan?

14        A.    Yes.

15        Q.    Is this what you've described as Oakwood's

16   plan to restructure the company following bankruptcy?

17        A.    From an operational -- following a filing

18   of bankruptcy from an operational standpoint, yes.

19        Q.    Was this plan, in fact, put in place?

20        A.    Yes.  It was.

21        Q.    Was it successful?

22        A.    I believe it was.

23        Q.    Did this plan in your view -- strike that.

24   Was the success of this plan a factor in the

25   company's ultimate acquisition by Clayton?

MYLES STANDISH

1      A.    I believe that it was.   The acquisition by

2  Clayton took place at a much higher number than what

3  they had previously indicated.

4      Q.    At this point in time, which is to say

5  October 2002, do you know if Clayton was yet part of

6  the Berkshire Hathaway family of companies?

7      A.    They were not.

8      Q.    If you could, please, turn to page 63132,

9  which is page 17 of the presentation?

10     A.    Yes.

11     Q.    Okay.   In particular, the sentence that

12 reads we would like to work with Lotus to accomplish

13 the following.

14     A.    Yes.

15     Q.    What was Lotus's reaction to these

16 proposals?

17     A.    They did not like moving the servicing fee

18 up to a hundred basis points, which is what this

19 first bullet is referring to, because it would

20 decrease the cash that they would get from the Lotus

21 transaction.

22     Q.    Do you remember whose idea it was to

23 change the priority of the servicing fees?  Did

24 Credit Suisse develop that idea?

25     A.    I don't recall who first brought up the

MYLES STANDISH

 1    servicing fees.  The servicing fees were one of the
 2    structural problems that Oakwood had.  It could have
 3    been anybody who brought it up, but the problem was
 4    an obvious one.
 5        Q.    As of the date of this presentation, which
 6    is October 2002, do you think that Credit Suisse was
 7    appropriately focused on its task as financial
 8    advisor to Oakwood?
 9        A.    I think that they were appropriately
10    focused on trying to obtain Berkshire Hathaway's
11    consent.  I don't think that they were appropriately
12    focused on making sure that we had the necessary
13    credit facilities in place as we moved forward with a
14    bankruptcy filing.
15        Q.    Are you referring in particular to DIP
16    financing?
17        A.    DIP financing as well as warehouse
18    financing.
19        Q.    Okay.  But focusing only now on the
20    Berkshire Hathaway piece, are you satisfied that
21    Credit Suisse did a good job of representing
22    Oakwood's interests?
23        A.    Well, you asked me before whether they
24    were appropriately focused and I said I thought they
25    were appropriately focused on this part of their

MYLES STANDISH

1    task.    Whether they did a good job or not, I

2    disagreed with some of the things that had been done

3    to this document, particularly with respect to the

4    projections that were included in this document.

5            The initial projections that we had in

6    this document showed significantly more profitability

7    under this plan.    I was strongly advised by First

8    Boston to cut back those estimates, which we

9    ultimately did.

10           I think the advice from First Boston was

11   to -- that it wasn't in so many words, but it was

12   basically to say that you better be a hundred percent

13   sure that you can meet these projections because you

14   don't want to be in the position of coming out of

15   bankruptcy and disappointing Berkshire Hathaway.

16           So the projections were cut back

17   significantly and I think that they were cut back to

18   the extent that it made Berkshire Hathaway feel as

19   though this was a company that was doomed to failure

20   even under a reorganization.

21      Q.    So your view is that the Credit Suisse

22   projections were too conservative?

23      A.    Well, ultimately they were Oakwood's

24   projections.    I wouldn't say that they were Credit

25   Suisse's projections, but I was uncertain to their

# Exhibit "G"

COPY

Page 1

CLARENCE WALKER

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - -x

In Re:

OAKWOOD HOMES CORPORATION,

et al.,


                    Debtors.


Chapter 11

Case No. 02-13396 (PJW)

- - - - - - - - - - - - - - - - - - - - - - - - - -x

OHC LIQUIDATION TRUST,

          Plaintiff,

          v.              ADV. Proc.No. 04-57060 (PJW)

CREDIT SUISSE FIRST BOSTON, a

Swiss banking corporation,

CREDIT SUISSE FIRST BOSTON

LLC, a Delaware limited

liability corporation, CREDIT

SUISSE FIRST BOSTON, INC.,

CREDIT SUISSE FIRST BOSTON

(U.S.A.), INC., a Delaware

corporation and a wholly owned

subsidiary of CREDIT SUISSE

FIRST BOSTON, INC., the

subsidiaries and affiliates of

each, and DOES 1 through 100,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -x



                         December 12, 2006

                         1:04 p.m.

Page 2

1                      CLARENCE WALKER

2

3

4

5

6              Telephonic deposition of Clarence W.

7    Walker, taken by Defendants, at the offices of

8    Linklaters, 1345 Avenue of the Americas, New

9    York, New York, before Brandon Rainoff, a

10   Federal Certified Realtime Reporter and Notary

11   Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                          CLARENCE WALKER

2       A P P E A R A N C E S:

3

4       LINKLATERS

5       Attorneys for Defendants

6                   1345 Avenue of the Americas

7                   New York, New York 10105

8       BY:    MICHAEL J. OSNATO, JR., ESQ.

9                   JUSTIN WILLIAMSON, ESQ.

10

11

12      Appearing Telephonically:

13      STUTMAN TREISTER & GLATT

14      Attorneys for Plaintiff

15                  1901 Avenue of the Stars

16                  Twelfth Floor

17                  Los Angeles, California 90067-6013

18      BY:    CAROL CHOW, ESQ.

19                  WHITMAN L. HOLT, ESQ.

20

21

22

23

24

25

1              CLARENCE WALKER

2        A.    I was familiar with those services to

3    the extent that Credit Suisse interfaced with

4    the board.  And to the extent that management

5    reported to the board on its own consultations

6    with Credit Suisse First Boston, but I'm not

7    sure that I'm fully familiar with all of the

8    services that Credit Suisse provided or the

9    timeframe in which they provided it.

10       Q.    Well, that certainly is fair.

11             Do you have at least a partial

12   recollection of the types of services that were

13   provided to Oakwood by Credit Suisse?

14       A.    Yes.  Credit Suisse was involved in

15   the securitizations.  My recollection is that it

16   at one time, at least, was involved in the

17   warehouse facility, that is, the advances made

18   during the accumulation of paper prior to the

19   inclusion of that paper in a securitization.

20             During the final days, Credit Suisse

21   provided advice to the board with respect to

22   efforts to deal with several issues that the

23   board was concerned about, one of those being

24   the oncoming maturity date of some senior notes

25   that were outstanding.  I think that maturity

Page 22

1                         CLARENCE WALKER

2      date was probably sometime in '04 or '05, 2004

3      or 2005, somewhere in that timeframe.

4             The board, of course, was concerned to

5      have some plan in place to deal with those

6      notes.  And from time to time Credit Suisse

7      would give us advice with respect to possible

8      reorganizations of the company outside of any

9      bankruptcy during the 2001 and 2002 period, I

10     think it was mostly in 2002, by way of bringing

11     in perhaps an equity investor and a possible

12     merger or acquisition.

13            Those are the types of things that

14     Credit Suisse interfaced with the board on.

15        Q.    So I take it that in your capacity as

16     a director you would have had the opportunity to

17     directly interact with personnel from Credit

18     Suisse, is that right?

19        A.    That's right.

20        Q.    Now, focusing if we could for the

21     moment only on the securitization services that

22     were provided by Credit Suisse, do you have a

23     view on whether Credit Suisse provided those

24     services adequately?

25            MS. CHOW:  I'm going to object to the

Page 23

1                    CLARENCE WALKER

2      form of the question.  I think it is vague and

3      ambiguous as to what services we are talking

4      about precisely.  I don't think that's ever been

5      defined.

6               MR. OSNATO:  I think embedded in my

7      question explicitly was a focus upon the

8      securitization services provided to Oakwood by

9      Credit Suisse.

10          Q.   Mr. Walker, I will restate the

11     question.

12               I am asking again to focus only on the

13     securitization services that were provided to

14     Oakwood by Credit Suisse, and my question is,

15     based on your service as a director, did you

16     come to a view on whether Credit Suisse provided

17     those services adequately?

18               MS. CHOW:  Objection to the form of

19     the question.

20          A.   The answer to the question is yes.  I

21     did come to the view that it provided the

22     services to our satisfaction.  I don't recall

23     management's ever making a complaint to the

24     board or indicating to the board that it was

25     dissatisfied with Credit Suisse services.

Page 72

1                    CLARENCE WALKER

2    was just wondering if he provided any other

3    materials aside from what was sent to you on

4    December 6?

5        A.    No.

6        Q.    Aside from the -- well, we covered the

7    telephone conversation.  You also mentioned an

8    e-mail.

9             Can you tell me what the e-mail was

10   about?

11       A.    The e-mail exchange had to do with

12   settling on a date for the deposition and he

13   advised me by e-mail that he -- I think I had

14   told him in the telephone conversation that I'm

15   in a fairly remote place out here in Arizona,

16   that it would be a long drive for me to go

17   either to Phoenix or Tucson, and I think that in

18   the e-mail exchange he explained to me that he

19   could conduct the deposition by telephone and

20   that was pleasing to me.  And the rest of the

21   e-mail exchange had to do simply with settling

22   on a time and date.  There is no substance in

23   the e-mail exchange.

24       Q.    Have you spoken to any -- strike that.

25            Earlier in this deposition you had

1                    CLARENCE WALKER

2      testified to the effect that you were satisfied

3      with the financial advisory services provided by

4      CSFB, is that a fair statement?

5           A.    Yes.

6           Q.    Can you tell me over what period of

7      time those services were being provided to

8      Oakwood?

9           A.    I really can't.  CSFB had been an

10     underwriter in some of the securities that

11     Oakwood had sold publicly, but in terms of its

12     service as a financial advisor, those services

13     were probably provided to management at a time

14     prior to the time the board became aware of

15     that.  I don't know that.  But I know that there

16     was a point in time when the board approved a

17     specific contractual arrangement with CSFB, but

18     that was fairly late in the game and I have the

19     sense that CSFB was providing advice both to the

20     audit committee and the board prior to that.

21              The audit committee looked to CSFB for

22     some advice relating to the model that we were

23     using to evaluate the repossessions and the

24     securitizations, and so I really can't tell you

25     what period of time all of that took place.

Page 74

1                    CLARENCE WALKER

2        Q.    Maybe if I can help narrow that down a

3    bit, would it -- obviously the bankruptcy was in

4    November of 2002.  Would you say that the

5    services were being provided throughout 2002 up

6    until the bankruptcy?

7        A.    I don't know the answer to that.  If

8    you say throughout -- going back to January of

9    2002, I doubt it.  I doubt that any services

10   were being provided to the board of Oakwood in

11   the early part of 2002 by CSFB.  But I don't

12   really know.  It just is not in my recollection.

13       Q.    Fair enough.  It was quite a while

14   ago.

15            With respect to the securitizations,

16   you again testified that you were satisfied with

17   the securitizations that were provided by CSFB;

18   again, is that a fair statement?

19       A.    I was satisfied with the services that

20   CSFB provided in reference to the

21   securitizations, yes.

22       Q.    I believe that you had mentioned that

23   you relied on the input of management in terms

24   of arriving at that conclusion.  Was my

25   understanding correct?

# Exhibit "H"

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In re:

OAKWOOD HOMES CORPORATION et al.

Debtors

vs.

CREDIT SUISSE FIRST BOSTON, et al.

Defendants

# EXPERT WITNESS REPORT OF THOMAS F. BOLAND

February 29. 2008

A.    Introduction and Qualifications

1.    I, Thomas F. Boland, am a former member of senior management of Citigroup, Inc., New
York, New York and a former Managing Director of Seneca Financial Group, Inc., New York,
New York. I consider myself to be an expert in corporate and investment banking, credit and
capital markets and corporate restructures.

2.    I graduated with a degree in Business Administration from the University of Notre Dame,
South Bend, Indiana in 1965. From 1970 through 2001, I held various executive positions with
Citicorp and Citigroup. From 1978 through 1980, I was assigned to the Restructuring
Department of Citibank, managing numerous complex problem credits and working with
borrowers both inside and outside of bankruptcy. From 1980 through 1985 I was the Corporate
Bank Head for Citibank Canada, responsible for corporate relationships throughout Canada and
their international subsidiaries. From 1999 through 2001, I was Head of Credit and Operating
Risk Management for Japan, North America and Europe. As such, I managed a 540 person
organization with financial accountability for Credit Risk, Portfolio Management, Remedial
Management and Operating Risk covering six divisions within Citigroup, including Corporate
Banking, Structured Finance, Worldwide Securities Services, Global Cash and Trade
Management at Citibank N.A. and Capital Markets Credit at Solomon Smith Barney. I had the
highest level of credit approval authority within the Citigroup Corporate and Investment Bank. I
had management responsibility for a $170 billion loan and unfunded commitment portfolio.
Under my direction, Citigroup's use of asset sales and credit derivatives in tandem with proactive
remedial management by my group's highly experienced workout department made the
credit quality of this portfolio among the best in the industry. From 2001 through 2005, as a
principal in the Seneca Financial Group, I worked on numerous financial advisory assignments on
behalf of troubled companies including a $1 billion out of court restructure of a major U.S.
airline which was impacted by the events of September 11, 2001. A copy of my curriculum vitae

2

and published articles are attached as Exhibit 1.

3.  In the course of my duties I have directly managed hundreds of corporate relationships and had management responsibility for thousands of corporate relationships.  I have worked in a large financial institution and fully understand the interrelationships among client managers, investment bankers, product specialists and risk assessment.  I have worked with hundreds of troubled companies and have first hand experience regarding the complexities and uncertainties of dealing with a company in financial distress.

4.  I have presented expert testimony as follows;

| October 8, 2002 | Federal Energy Regulatory Commission<br>PacifiCorp v. Reliant Energy, et al.<br>Docket EL 02-80-000 |
| --- | --- |
| January 3, 2003 | Federal Energy Regulatory Commission<br>Nevada Power/Sierra Pacific v. El Paso et al.<br>Docket EL 02-26-000 |

Both of these cases involved the abrogation of long-term energy contracts in California.  I testified as an expert in the capital markets.

| August 5, 2003 | Rebel Rents, Inc. 307 B. R. 171 |
| --- | --- |

This case involved the valuation of a business that was emerging from bankruptcy.

| March 22, 2005 | Federal Energy Regulatory Commission<br>Devon Power LLC, et al.<br>Docket ER03-563-030 |
| --- | --- |

In this case I testified on the adequacy of returns on debt and equity.

| March 13, 2006 | Duke Energy v. ExxonMobil Energy Canada<br>Under the Alberta Arbitration Act |
| --- | --- |

In this arbitration I testified as to the reasonableness of ExxonMobil's actions concerning a credit dispute.

### B.    Nature of Assignment

5.    I have been retained by Linklaters LLP counsel for Defendants Credit Suisse First Boston, et

al., to provide an expert opinion regarding the conclusions of Professor Alan C. Shapiro in his

report dated April 30, 2007.  Specifically, his conclusions are as follows;

> - CSFB did not behave in a reasonable or reasonably prudent manner with respect to
>   the services it provided to Oakwood.
>
> - CSFB had financial incentives to keep Oakwood operating and to delay
>   recommending that Oakwood file for bankruptcy.

6.    Based upon my over thirty years of experience working in a large financial institution and

understanding the dynamics of relationship management and my extensive experience dealing

with financially distressed companies, I believe I am qualified to offer expert testimony on

matters I address in this opinion.  I have agreed to be compensated at an hourly rate of $600 per

hour for my services plus any actual and reasonable expenses.

### C.    Records and Information

7.    In addition to general contextual background from counsel, I have considered certain

specific information listed in Exhibit 2.  This Exhibit contains a list of information provided to

me by counsel for CSFB and a list of additional materials, which I have retrieved from public

sources.

4

## D.    Analysis

8.    In his report Professor Shapiro discusses the role of an Investment Bank; he reviews the actions of CSFB personnel and concludes that since CSFB is an Investment Bank this automatically makes them a trusted advisor to Oakwood's management and Board of Directors. Accordingly, in the course of their dealings with the company, CSFB should have been providing strategic operational and financial advice including filing for bankruptcy a year sooner than they did. By not taking these actions, Professor Shapiro concludes that CSFB acted imprudently.

9.    To respond to Professor Shapiro's conclusion it is necessary to examine the complexities and structure of an Investment Bank and to understand what was the true nature of CSFB's relationship with Oakwood and to clarify what Investment Banks can do and what Investment Banks should not do.

## E.    Investment Banking

10.    Investment Banks provide a broad range of financial and investment related services, such as, advising clients on security issues, acquisitions and business disposals, arranging and underwriting new issues, distributing securities and running fund-management companies. Also, proprietary trading has become an increasingly important part of Investment Banking. Typically, Investment Banks are divided into three areas; Investment Banking, Capital Markets and, Sales and Trading. Targeted clients and prospects are managed in the Investment Banking Division. The role of the Investment Banker is to understand the client's needs and to coordinate with the appropriate product group a solution to the client's problem. The Boston Consulting Group recommends that "client relationship managers should be responsible for a customer's P&L

5

account across all investment and corporate banking products."[1]  Most large financial institutions

now take this approach.  For example;

- Deutsche Bank – We have integrated our coverage model and aligned our coverage intensity to our new client tiering system.  We aim to further integrate our various businesses within the Corporate and Investment Bank to capture cross-divisional opportunities.[2]

- NatCity Investment Banking -  We have unique access including 500 corporate bankers, private equity services, commercial lending groups, proprietary equity research, and leading economists.[3]

- BMO Financial Group – Successfully leveraging lending relationships by cross selling fee based products and fully integrated, advisory-oriented coverage.[4]

11.    The model recommended by the Boston Consulting Group calls for a client relationship

manager to be the primary interface with the client.  A successful Investment Banker works

closely with the client's management to understand what products and services can be sold to the

client.  This Investment Banker centered approach is now utilized by most major financial

institutions.  Once an opportunity is identified by an Investment Banker a sales presentation is

prepared by the appropriate product group.  The sales presentation takes the form of a

"pitchbook".  Most firms use a standard format pitchbook which includes sections on the client

based upon available public information, the idea or product being pitched, a market analysis,

relevant financial analysis and information about the bankers who will be involved with the

mandate.  A pitchbook presentation is the standard marketing document utilized by an Investment

Bank.

12.    The most lucrative transactions for an Investment Bank are Merger & Acquisition

transactions, equity offerings and bond issuance.  The in depth client due diligence described in

Professor Shapiro's report would be required for these products.  There are some Investment

Banking products, such as a derivative transaction, which could require little or no due diligence.

---

[1] Growing Profits Under Pressure, Boston Consulting Group, 2002.
[2] Deutsche Bank Annual Report 2006.
[3] www.nationalcity.com/investmentbanking/Aboutus.asp
[4] BMO Financial Group, U.S. Expansion Strategy

6

In other words, the level and type of due diligence on the part of the Investment Bank depends upon what service or product the Investment Bank is providing and to whom they would be providing the product or service.

13. Since Investment Bankers are expensive it is important to focus their efforts on clients and prospects that may use a wide array of products. Most Investment Banks have screening criteria which help identify top prospects and eliminate prospects where significant potential opportunities may be limited. Companies that do not make the Investment Banking cut may find a home in a product group in the Capital Markets Division. These are companies with a specific need which can be addressed with a specific product. A client in this category would be characterized as a Product Managed Relationship and not as an Investment Banking Relationship.

14. It is clear that from the inception of the CSFB/Oakwood relationship in 1994 until August 2002 Oakwood was a Product Managed Relationship focusing exclusively on securitization transactions and nothing more. Based upon this type of relationship, the broad, in depth coverage which would have existed if Oakwood was in the Investment Banking Division did not exist. As will be discussed, the securitization product revolves around the credit worthiness of Oakwood's customers and not on the credit quality of the Oakwood Homes Corporation. This being the case, there was no need for CSFB to access in depth non public information about the Oakwood Homes Corporation.

## F.   Oakwood Homes Corporation

15. It has been well documented that Oakwood, which was founded in 1946, was a fully integrated company in terms of manufacturing, selling and financing homes. In 1999 they were the nation's largest retailer of manufactured housing operating 371 company-owned retail sales centers in 29 states. They were also the third largest manufacturer of manufactured housing, with 26 manufacturing lines in 12 states. In addition to sales and manufacturing Oakwood had a large consumer finance operation, Oakwood Acceptance Corporation, which originated and purchased

7

loans originated by the company's retail operations as well as from third parties. At year end 1999, Oakwood had total revenues in excess of $1.5 billion.

16.    It is worth noting that since its founding in 1946, Oakwood and the manufactured housing industry have gone through numerous cycles, the worst being in 1972 when more than one-third of America's mobile home dealers went bankrupt and in the late 1980's when over half of the 200 mobile home companies operating in 1978 went bankrupt. Oakwood successfully made it through these downturns and subsequently prospered.[5] As Oakwood and other housing manufacturers were growing the challenge of financing their sales became an impediment to continued growth. This dilemma was addressed in the late 1970's when Salomon Brothers distributed the first mortgage-backed securities. This was the start of the asset securitization business.

17.    By reviewing the minutes of the Board of Director meetings from 1999 through 2002 it is very evident that management and the Board were well aware of Oakwood's financial situation and understood the cyclical nature of their business. It is typical for a public company such as Oakwood, to have quarterly Board meetings. Over a four year period that would amount to sixteen meetings. In the period 1999-2002 the Oakwood Board met thirty-six times. Instead of meeting every three months the Board was meeting every forty days. This unusually active involvement by the Board would indicate that they were concerned about the company and the industry and wanted to be sure that they were making informed decisions which were in the Corporation's best interest.

## G.    CSFB - Securitization

18.    The primary interface between CSFB and Oakwood Home's management was Fiachra O'Driscoll, a Managing Director in CSFB's Asset Finance Group. O'Driscoll is an asset securitization product specialist. He described his role as "to ensure that the transaction was put

8

together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investor questions were answered, to make sure that the legal structure of the mortgage securitization worked properly, and to make sure that the transaction got closed, processed, and that it was dealt with in the aftermarket in a timely fashion."[6] Since the inception of the CSFB/Oakwood relationship in 1994 until August 17, 2002 the entire relationship was based exclusively on the securitization business and O'Driscoll was Oakwood's primary CSFB interface since 1996.

19. Securitization is a financial technique that pools assets together by turning future cash flows into tradable, bond-like securities. The customer benefit is that they can immediately realize the value of a cash producing asset and can shed some of the risk that future expected revenues may not materialize. The customer's risk is shed because the pools of assets are generally sold on a non-recourse basis. If the expected cash flow from the pool of assets does not materialize the investors in the securitization have no additional recourse. This being the case, what is critical in structuring a successful securitization is packaging a pool of assets which are diverse and predicable based upon prior experience.

20. A review of a typical prospectus will show the scope of the business CSFB was doing with Oakwood, including, what was necessary to make a transaction work and what type of due diligence would be needed to put a successful transaction together. The Prospectus and the Prospectus Supplement dated May 20, 2002 is typical of the type of transaction CSFB was executing for Oakwood since 1994.[7] These documents contain 171 pages of detailed information. The key information contained in the documents is a description of the asset pool. On closing the trust would purchase 2,167 initial assets with a principal balance of approximately $119 million. The 2,167 loans are broken down in great detail by credit bureau scores, geographic distribution, breakdown of initial asset amounts, loan to value ratios, year of origination and remaining term to

---

[5] www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html
[6] Deposition of Fiachra O'Driscoll, June 29, 2006, page 18.

9

maturity. A description of investor protections through overcollaterization and subordination is also detailed. What is not in these documents is a description of Oakwood Home Corporation or any financial analysis of Oakwood This is because, as the document point out, "Neither Oakwood Mortgage nor any underwriter nor any of their affiliates will insure or guarantee the certificates of any series."[8]

21. In his deposition, Mr. O'Driscoll stated that CSFB had executed numerous securitizations for many firms involved in the manufactured housing business including Clayton Homes and Champion Enterprises.[9] To help follow the industry trends the Asset Finance Group could access the research reports of CSFB's public side equity analyst, Ivy Zelman, who closely followed, home builders, manufactured housing companies, building products and furniture companies. Ms. Zelman has been rated the number –one analyst in the housing industry by the Institutional Investors All American Research Team since 1999 and by the Greenwich Associates Institutional Research Services Poll since 2000. The May 2005 issue of Forbes magazine ranked her number one among 3,300 analysts in all of Wall Street.[10]

## H.    CSFB – Loan Purchase Facility

22. In 2000 Bank of America decided not to renew its financing arrangement with Oakwood. Since a warehouse facility is an important interim step between a loan origination and a public securitization, early in 2001 O'Driscoll was able to put together a facility utilizing securitization techniques.

23. In his report Professor Shapiro state that this is when CSFB became a secured lender to Oakwood.[11] This is in fact incorrect. This transaction was structured not as a loan but as an asset purchase, similar to securitization. The individual who negotiated and structured the transaction

---

[7] Prospectus Supplement to Prospectus dated May 20, 2002, CSFB-00220030 – CSFB-00220208.
[8] Ibid., p.54.
[9] Deposition of Fiachra O'Driscoll, June 29,2006, page 34.
[10] www.jwmag.org/site/c.fhLOK0PGLsF/b.2447241/k.2D69/Ivy_Zelman.htm

was Fiachra O'Driscoll.[12]  This facility was very similar to the type of business CSFB had been

doing with Oakwood since 1994.  As part of the compensation for this transaction CSFB received

warrants for 19.9% of Oakwood equity.  A warrant is a right to purchase equity of an issuer at a

specified price within a certain time frame.  A warrant is not equity nor does it receive any of the

rights of an equity holder.  Warrants can be used as a sweetener to increase the marketability of a

bond or security and could have been useful to CSFB if they subsequently decided to sell off all

or part of this facility.  To conclude that these out of the money options somehow made CSFB an

equity owner of Oakwood is incorrect.  It is also logical to assume that if CSFB believed that

Oakwood was insolvent at the time of this transaction they would not have been asking for

warrants.  Including warrants as a part of their compensation would indicate that there was a

belief by CSFB that there would be an upturn in the cycle in the not too distant future.

## I.    CSFB – Proposals

24.    Any attempt to expand the CSFB/Oakwood relationship beyond the Asset Finance Group

got nowhere.  A proposed $75 million Committed Reverse Repo Facility languished.  The

proposal was reviewed by an analyst, in Credit Risk Management, James Xanthos who had no

experience with the housing industry or with Oakwood.[13]  His analysis contained numerous

unsupported opinions and ignored the market analysis of the CSFB Equity Research Group.  One

reason that this transaction never went forward may be the fact that Oakwood did not have an

Investment Banker to oversee the relationship and champion the client.

25.    As will be discussed later in this report, the management and Board of Oakwood believed

that the company had sufficient liquidity in place until March, 2004.  On three occasions, in June

and August of 2001 and March of 2002 CSFB made presentations to Oakwood management

regarding the 2004 bonds.  These presentations contain the standard pitchbook format and were

---

[11] Report of Alan Shapiro, April 30, 2007, page 16

[12] Deposition of Fiachra O'Driscoll. June 29, 2006, page 41.

[13] Deposition of James Xanthos, August 24, 2006, page 45.

11

presented to management and not the Board of Directors. The presentations contain no non public information nor do they demonstrate any insiders' knowledge of Oakwood. The pitchbooks contain a number of alternatives which Oakwood could use to deal with the 2004 maturities. None of the proposals contained in the pitchbooks were pursued by Oakwood management. One of Oakwood's troubled competitors, Fleetwood Enterprises, in 2001 was able to use a variation of one of the ideas in the CSFB presentation and working with their investment bank they issued convertible trust preferred securities in exchange for other debt.[14] This type of financial restructuring plus other initiatives assisted Fleetwood in avoiding bankruptcy.

26.    Instead of offering ideas to deal with future liquidity needs, Professor Shapiro believes that CSFB should have been advising Oakwood on operational improvement strategies which focused upon downsizing Oakwood's operations.[15] He also thought that CSFB should have been advising Oakwood to file bankruptcy.[16]

27.    Before commenting on why it would have been inappropriate for CSFB to give anyone this type of advice it needs to be pointed out that no one at CSFB, as with most financial institutions, has the expertise to advise on "operational improvement strategies." There are firms that do this type of consulting but they are not banks. Advice for dealing with a bankruptcy has to be carefully managed within the scope of legally vetted restructuring assignment.

28.    Starting with the Farah case in 1984 creditors learned that if they exercised excessive power and control over the business activities of a debtor, especially when the debtor is in financial difficulty, the creditor can suffer serious adverse consequences.[17] Post the Farah case there was a rash of lender liability cases and bankers learned what "tortious interference" was all about and changed their behavior. Most financial professionals understand where to draw the line with their clients and do not get involved in telling them how to run their business.

---

[14] Fleetwood Enterprises Annual Report, 2005, page 49
[15] Deposition of Alan Shapiro, April 30, 2007, page 38.
[16] Ibid., page 39.
[17] Third Party Interference, Phillip Campanella, at 13.06.

29.    The primary oversight for the financial and legal well being of a corporation is its Board of Directors and not its bankers.  The Oakwood Board was meeting very frequently and they were briefed by management on the state of the company and the outlook for the industry.  The Board brought about management changes and authorized significant downsizing. The Board explored strategic alternatives with Merrill Lynch and pursued numerous capital raising initiatives without the assistance of CSFB.  It appears that the Directors acted on an informed basis and in good faith.

## J.    CSFB – Financial Advisor for Restructuring Purposes

30.    On August 24, 2002 Oakwood retained the restructuring group of CSFB in the role of a Financial Advisor for Restructuring Purposes.  Their mandate was to assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm and preparing the company for bankruptcy.  This was the first time in the eight year CSFB/Oakwood relationship that the Asset Finance Group was not the focal point of the relationship.

31.    The signing of this agreement singled an important change in the relationship between CSFB and Oakwood.  To understand what brought about this agreement it is worthwhile to examine the events which led Oakwood's management and Board to conclude that their company needed assistance in restructuring their balance sheet.

32.    In June 2001 Equity Research at CSFB was stating, "While we believe the industry may be nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of the downturn."[18]  In the same report they opinioned, "we believe the increased demand for OH

---

[18] Manufactured Housing Industry Outlook, CSFB Equity Research, June 11, 2001, page 1. (CSFB-00050117)

deals and the tightening spreads support a more positive long-term outlook for the company."[19]

In reviewing 2001 the Monthly Labor Review cited housing as one of the bright spots in the economy stating, "Declining mortgage rates benefited not only prospective home buyers, but also homeowners who either wanted to tap into their equity or refinance." [20]  In working through the cycle Oakwood management appeared to be doing the right things as pointed out in a CSFB Equity Research Report, "Although management should be praised for its proactive decisions at this point in the cycle, we believe that neither the industry or OH are out of the woods yet."[21]

33.    Although Oakwood had managed through prior down cycles and management and the Board were taking actions to manage through this one, there were a series of events which made this cycle longer and deeper than anyone expected nor could have predicted.  In late 2001 and early 2002 an unprecedented number of financing sources exited the market, including Bank of America, Bombardier Capital, Greenpoint Financial, CIT and Conseco.  Contributing to the lenders problems was the September 11 terrorist attacks.  According to the New York Times, "The attacks that destroyed the World Trade Center towers and the Pentagon brought the American economy to an unprecedented halt and made a recession far more likely than before."[22]  Commenting on the attacks, Standard & Poor's stated that, "Manufactured-housing producers could see further rating downgrades in the near term, as this segment's buyers may be disproportionately more vulnerable to expected layoff."[23]

34    The deepening recession and industry specific problems were reflected in Oakwood's June 25, 2002 Board of Directors meeting.  This meeting was the first time that the Board understood the severity of the Corporation's situation.  Given that the last Board meeting had been only six weeks prior it is probable that management did not reach the conclusions discussed at the meeting much before the meeting.  Several reasons were given for the change in outlook.  First, Mr

---

[19] Ibid., page 18.
[20] U.S. Labor Markets in 2001, Monthly Labor Review, February 2002, page 11.
[21] Oakwood Homes, CSFB Equity Research, July 27, 2001, page 3. (CSFB-00050085)
[22] A Body Blow to the Economy, David Leonhardt, New York Times, September 16, 2001, page 1.
[23] Housing Market is Suddenly Uncertain, Alan Heavens, The Philadelphia Inquirer, October 7, 2001.

Standish indicated that "it appears that conditions may be softer than had been the case at the last board meeting." He cited Champion Enterprises wider than expected losses and the impact of Conseco's withdrawal from the dealer floorplan lending business as contributing factors. In response to these conditions management decided to close a Texas plant, close some retail locations and revamp the retail pay plan. Mr. Standish also indicated that the loan assumption program would be eliminated in order to improve the Corporation's liquidity. Mr. Standish told the Board that management had updated the company's cash flow projections and "those cash flow projections indicated that adequate liquidity was in place to fund operations until the March 1, 2004 maturity of $125 million of senior notes." [24]

35.     By the end of July, Mr. Standish was telling the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well as considered other potential financial advisors." From this statement it can be concluded that at the end of July, Oakwood had not yet decided which firm to hire as a financial advisor.[25] It would appear that Oakwood management was starting to understand the impact that the loan assumption program had on their liquidity position. On August 6, 2002, Oakwood released their third quarter results which indicated that, "During the first nine months of 2002, the Company expended cash approximating $47.6 million related to the loan assumption program."[26]

36.     In his deposition Mr. Standish indicated that he was surprised by the expense of the loan assumption program. He indicated that, "the program itself was not structured sufficiently so that we could get data from it as far as costs, as far as performance, as far as general underwriting guidelines or what was actually being underwritten."[27] Making it through a difficult period is all about managing your liquidity. Although management had taken steps to bolster liquidity the

---

[24] Binder of Meeting Minutes, No. 04-57060 (Bankr. D De.), Tab 35.

[25] Ibid., Tab 36.

[26] Oakwood Homes Corporation Reports Third Quarter 2002 Results, August 6, 2002, Exhibit 99.1.

[27] Deposition of Myles Standish, September 21, 2006, page 33.

15

worse than expected economy coupled with a $48 million surprise would indicate that their belief

in late June 2002 that they had sufficient liquidity for the next twenty-one months was wrong.

37.    Oakwood's financial situation was not unique in the manufactured housing sector. Many

of their competitors were encountering similar difficulties but managed to make it through the

cycle without having to file for bankruptcy. In November 2002 BB&T Capital Markets raised

their ratings on Champion Enterprises, Clayton Homes, Fleetwood Enterprises and Palm Harbor

Homes from Hold to Buy based upon the likely entry of GMAC Residential Funding unit into

manufactured housing retail chattel lending. BB&T stated, "Because we believe that the health of

the industry is so closely tied to the availability of financing, an infusion of new financing dollars

into an already tight retail lending environment would be a major plus for the MH industry."[28]

This indication that there was some good news for the industry came just ten days after

Oakwood's bankruptcy filing. The success that these firms had in avoiding bankruptcy clearly

demonstrates that it was possible to avoid a filing. Those experienced in working with companies

in financial difficulty know that an out of court restructuring is much more preferable than going

into Chapter 11. When dealing with the troubled auto parts supply company, Delphi, Steve

Miller, the noted restructuring guru was quoted as saying, "Not going into Chapter 11 is much to

be preferred. It is simpler, cheaper, quicker to avoid it, whereas the Chapter 11 process takes

longer, costs more and has a lot of aggravation that goes with it."[29]


## K.    CSFB/OAKWOOD RELATIONSHIP

38.    Professor Shapiro claims that CSFB had financial incentives to keep Oakwood operating.

An Investment Bank has financial incentives for doing business with all of their clients. CSFB

was paid fairly for the work they performed. I can see no conflict of interest in the work CSFB

did for Oakwood and see no issue on how they performed that work.

---

[28] BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10.

39    The fees paid to CSFB by Oakwood were for services rendered. Pricing on a securitization
can vary depending upon the asset pool and the size of the transaction. Pricing is transparent
since fess on public transactions are disclosed in the prospectus. In his deposition Douglas Muir
stated that he was able to benchmark what he was paying against other issues. He said, "you can
benchmark and find out where the market is, not only what CSFB was charging but what other
banks were charging."[30] Pricing on the Loan Purchase Facility is difficult to assess since as
Douglas Muir stated, "CSFG was the only game in town."[31] At the time when the facility was put
in place Oakwood's bonds were rated CCC. According to Fitch Ratings the definition of a CCC
rating is Substantial Risk. As ratings decrease the probability of default increases, therefore,
transactions with lower investment grade companies need to build in the increased default risk
into their pricing. The Advisory Agreement pricing is well within industry norms. The monthly
fee is in the mid-range of transactions I am familiar with, normal M&A and restructuring fees
range from 1% to 2%. Fairness opinions can be a percentage of the M&A fee or a flat amount. It
is not uncommon in this type of engagement to have a success fee on top of the other fees.

## L.    Conclusions

40.    From the actions and services provided by CSFB for the Oakwood Homes Corporation it is
very evident that CSFB was not a financial advisor to Oakwood until August, 2002. In addition
to the analysis contained in my report this conclusion is supported by a review of the minutes of
the Board of Director meetings.[32] In June of 1999 the Board hired Merrill Lynch as an advisor.
A year latter it was reported to the Board that Merrill recommended holding off pursuing a
merger Merrill's input regarding financial alternatives was again discussed at the August, 2000
meeting. In meetings in April, June and July of 2001 the Board discussed various asset sale

---

[29] Delphi CEO Would Rather Fix Company's Woes out of Court, Wall Street Journal, Sep. 21, 2005, pg. A5
[30] Deposition of Douglas Muir, September 26, 2006, page 49.
[31] Ibid., page 52.
[32] Binder of Minute Meetings, No 04-57060.

possibilities and sources of new investment. It is clear that CSFB was not involved with these important initiatives. At the July 29, 2002 meeting Myles Standish told the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well considered other potential financial advisors."[33] From this statement it can be concluded that at the end of July, 2002, Oakwood had not yet decided which firm to hire as a financial advisor.

41.    Prior to August 2002 the involvement of CSFB in the Oakwood relationship was limited to securitization transactions and proposals dealing with the bonds maturing in 2004. The only CSFB professional closely involved with the company was the securitization product specialist, Fiachra O'Driscoll. For example, Jared Felt demonstrated his distance from Oakwood when on December 14, 2001 he emailed Fiachra O'Driscoll and asked, "Do you have any sense of what we can do for Oakwood given that they've already completed a refinancing with Foothill?"[34] The relationship between CSFB and Oakwood was a very typical banking/client product driven relationship and was conducted in an appropriate manner.

42.    In the period 2000 through 2002 the manufactured housing industry was experiencing significant problems. There were many factors causing the downturn and many opinions as to the depth and length of the downturn. Forcing companies into bankruptcy is not an optimum solution in times of duress. Yearly, federal bank examiners review the loan portfolios of all U.S. regulated banks. At the end of 2001 the regulators reported that there were $193 billion in problem loans including over $30 billion in loans where full repayment was doubtful.[35] Many of these exposures got restructured outside of a courtroom. Suggesting that lenders would be required to perform ongoing valuations of their clients and to liquidate them if their valuations came up short would lead to economic chaos. This type of behavior would be deemed inappropriate.

43.    On September 5, 2001 First Union Securities Equity Research issued a report on the state of the manufactured housing industry in which they stated that, "Things should look much better

---

[33] Ibid., Tab 35.
[34] Email, Jared Felt, December 13, 2001, CSFB-00148970.

in 2002. Profitability looks like it has bottomed."[36]  They were wrong, as were other analysts and as was Oakwood's Board of Directors.  It is very difficult in a middle of an economic downturn to accurately predict when the cycle will turn up.  The Oakwood Board was fully engaged in performing their fiduciary duties.  They nor anyone else should be held accountable for not being capable of predicting the future.

44.    The fees paid to CSFB by Oakwood were for services rendered.  Pricing for the products and services contracted for by Oakwood from CSFB were market driven and the compensation received by CSFB appears to be within market norms.

45.    Based upon my experience in working with companies in financial situations similar to Oakwood's I believe that most bankers would have not stopped funding the company as long as management and the Board understood the situation and were dealing with it.  By structuring transactions which would manage their risk and by understanding the cyclical nature of the industry most bankers would have acted similar to the actions of CSFB.


Thomas F. Boland

---

[35] Board of Governors of the Federal Reserve System, NR 2001-87, October 5, 2001.
[36] First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1.

19

**EXHIBIT 1**

**Thomas F. Boland**
**1209 Thomas Jefferson Parkway**
**Charlottesville, VA 22902**
**(434) 295-2733**
**tfboland162@aol.com**

Experience

**Seneca Financial Group, Inc.**                              2001 - 2005
**Managing Director**

Principal in specialty investment bank which focused primarily on financial restructuring
advisory services. Assignments ranged from successfully advising a major airline in their
Airline Transportation Safety Board loan guaranty application process to working with
equipment distributors in their validation of their business models and/or a quantification
of their strategic options. Expert witness involving valuations in bankruptcy cases as
well as matters before the Federal Energy Regulatory Commission.

**Citigroup Corporate and Investment Bank**                  1999 - 2001
**Head of Credit and Operating Risk Management - Japan, Europe and North America**

Managed a 540 person organization with functional accountability for Credit Risk,
Portfolio Management, Remedial Management and Operating Risk covering six divisions
within Citigroup including, Corporate Bank, Structured Finance, Worldwide Securities
Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets
Credit at Salomon Smith Barney. Accountable for $360 Million in revenues and a $140
Million expense base. This position has the highest level of credit approval authority in
the Citigroup Corporate and Investment Bank.

Managed a $170 billion loan and unfunded commitment portfolio. The use of asset sales
and credit derivatives in tandem with proactive remedial management by a highly
experienced workout department made the credit quality of this portfolio one of the best
in the industry.

**Citibank - Global Relationship Bank**                      1993 - 1999
**Senior Risk Manager**

Managed 80 risk professionals in 14 countries, providing risk management oversight for
over 2,000 multi-national corporations and financial institutions. As part of the Global
Relationship Bank senior management team worked to set strategic direction of global
corporate banking business which was based upon ability to make risk/return tradeoffs on
both a transactional and portfolio basis.

**Citibank – Credit Policy Committee**                       1990 - 1993
**Credit Policy Committee Member**

Coordinated credit risk management policies for the Global Corporate Bank. Provided
counsel to the Corporate Bank and Real Estate businesses evaluating the impact of
changes in business direction including associated remedial actions.

THOMAS F. BOLAND                                                                          2

In a difficult credit environment, assisted in refocusing the firm's approach to risk tolerance. Heavy involvement in the unwinding of a $26 billion real estate portfolio. High level of regulatory interface during this tumultuous corporate period.

**Citicorp - Citicorp Industry Credit**                                      1985 - 1990
**Risk Manager / Treasurer**

Provided risk oversight for business units involved in leveraged buyouts, securitization and leasing. Managed a Treasury function responsible for a $5 billion funding book.

**Citicorp - Citibank Canada**                                               1980 - 1985
**Corporate Bank Head**

Managed the Corporate Banking business in Canada, with offices in Toronto, Montreal, Calgary and Vancouver. Customers included Canadian corporates, multinationals, global financial institutions and government entities. Frequently interfaced and negotiated with senior government officials.

**Citibank - Institutional Recovery Management**                             1977 - 1980
**Team Head**

Managed the restructuring of problem loans in North America, Colombia and Libya. Extensive involvement with bankruptcy cases. As Co-Head of the Itel Creditors Committee helped to successfully resolve the largest Californian bankruptcy, at that time. Considerable time spent in Colombia negotiating, litigating and lobbying on a complex fraud case.

**Citibank, Agribusiness-Commodities Department**                            1970 - 1977
**Unit Head /Transactor**

Engaged in an array of lending activities for accounts ranging from global grain trading companies to cattle feedlots. Managed offices in four U.S. cities.

**Additional Information**

- Member Board of Directors and Audit Committee                             2001 - present
  The FINOVA Group, Inc.

- Chairman of the Board of Citicorp North America from 1999 – 2001.

- Chairman of the Board of Shuttle, Inc. from 1992 – 1997.
  Shuttle, Inc. was the successor to the Trump Shuttle.
  Significant debt recoveries were realized by initiating management changes, cost cutting and the negotiated sale of the airline to USAir.

- Completed an advanced management program at the Amos Tuck School of Business
  BBA, University of Notre Dame. Served as a Lieutenant, U.S. Navy.

THOMAS F. BOLAND                                                                    3

## ARTICLES

1.  Getting Through Rough Economic Times With Lessons Learned From Lending
    Law Journal's Equipment Leasing Newsletter
    February, 2002

2.  Airlines And the Internet
    Issues Facing the Airline Industry
    AFN White Paper 2004

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 1. | Objection to the Proof of Claim filled by Credit Suisse First Boston LLC; Plaintiff's Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (G) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency; and Demand for Jury Trial dated November 13, 2004 |
| 2. | Defendants' Opening Brief in Support of Motion to Dismiss Certain Claims of the Complaint dated May 6, 2005 |
| 3. | SEC form 10-Ks for Oakwood Homes Corp. from 1999 – 2002<br>    • 10-K Filed 12/29/1999<br>    • 10-K Filed 12/29/2000<br>    • 10-K Filed 12/28/2001<br>    • 10-K Filed 01/14/2003 |
| 4. | SEC Form 8-K for Oakwood Homes Corp. dated August 9, 2002 |
| 5. | Credit Suisse First Boston Equity Research Reports<br>    • CSFB–00050263 - CSFB–00050272<br>    • CSFB–00050239 - CSFB–00050262<br>    • CSFB–00050227 - CSFB–00050238<br>    • CSFB–00050219 - CSFB–00050222<br>    • CSFB–00050212 - CSFB–00050218<br>    • CSFB–00050198 - CSFB–00050211<br>    • CSFB–00050195 - CSFB–00050197<br>    • CSFB–00050192 - CSFB–00050194<br>    • CSFB–00050164 - CSFB–00050191<br>    • CSFB–00050152 - CSFB–00050163<br>    • CSFB–00049523 - CSFB–00049528<br>    • CSFB–00050117 - CSFB–00050145<br>    • CSFB–00050115 - CSFB–00050116<br>    • CSFB–00050094 - CSFB–00050114<br>    • CSFB–00050091 - CSFB–00050093 |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

|   |   |
|---|---|
|   | • CSFB–00050085 - CSFB–00050090<br>• CSFB–00266304 - CSFB–00266330<br>• CSFB–00052800 - CSFB–00052839<br>• CSFB–00052680 - CSFB–00052755<br>• CSFB–00050081 - CSFB–00050084<br>• CSFB–00052644 - CSFB–00052675<br>• CSFB–00052596 - CSFB–00052619<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00050072 - CSFB–00050075<br>• CSFB–00050069 - CSFB–00050071<br>• CSFB–00050066 - CSFB–00050068<br>• CSFB–00050039 - CSFB–00050065<br>• CSFB–00049908 - CSFB–00050038<br>• CSFB–00049905 - CSFB–00049907<br>• CSFB–00049298 - CSFB–00049309<br>• CSFB–00049862 - CSFB–00049892<br>• CSFB–00049732 - CSFB–00049861<br>• CSFB–00049004 - CSFB–00049136<br>• CSFB–00049674 - CSFB–00049704<br>• CSFB–00049533 - CSFB–00049673<br>• CSFB–00049529 - CSFB–00049532 |
| 6. | Credit Suisse First Boston Manufacts<br>• (CSFB–00052575 – CSFB–00052595)<br>• (CSFB–00052453 – CSFB–00052475)<br>• (CSFB–00052356 – CSFB–00052382)<br>• (CSFB–00052176 – CSFB–00052202)<br>• (CSFB–00052102 – CSFB–00052127)<br>• (CSFB–00051980 – CSFB–00052008)<br>• (CSFB–00051843 – CSFB–00051875)<br>• (CSFB–00051574 – CSFB–00051606)<br>• (CSFB–00051348 – CSFB–00051376)<br>• (CSFB–00051226 – CSFB–00051225) |
| 7. | Engagement Letter (MNAT 003849 – MNAT 003862) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 8. | Warrant (CSFB-00092357 – CSFB-00092369) |

| DEPOSITIONS & EXHIBITS | |
|---|---|
| 9. | Deposition of Jared Felt dated June 15-16, 2006 |
| 10. | Deposition of Thomas Irwin (with exhibits) dated November 8, 2006 |
| 11. | Deposition of Douglas Muir dated September 26-27, 2006 |
| 12. | Deposition of Fiachra O'Driscoll (with exhibits) dated June 29-30, 2006 |
| 13. | Deposition of Alan Shapiro dated September 5, 2007 |
| 14. | Deposition of Myles Standish dated September 21, 2006 |
| 15. | Deposition of Michael Tennenbaum dated October 22, 2007 |
| 16. | Deposition of James Xanthos (with exhibits) August 24, 2006 |
| 17. | Exhibit # 202 to Standish Deposition (Declaration of Douglas Muir in Support of First Day Relief (filed in In re Oakwood Homes Corp., No. 02-13396 (Bankr. De.)), dated November 18, 2002) |
| 18. | Exhibit # 203 to Standish Deposition (OHCLT-05175 – OHCLT-05177) |
| 19. | Exhibit # 205 to Standish Deposition (CSFB-00055756 – CSFB-00055760) |

| EXPERT REPORTS | |
|---|---|
| 20. | The Expert Report of Alan Shapiro dated April 30, 2007 |
| 21. | The Supplemental Expert Report of Alan Shapiro dated August 28, 2007 |
| 22. | The Expert Report of Michael Tennenbaum dated April 27, 2007 |

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 25. | Adrian Zawada. Winston-Salem Journal "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as |

## EXHIBIT 2

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO |
|---|---|
| | Tougher Lending Standards Cut Demand." November 29, 2000 |
| 26. | Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9 |
| 27. | Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001 |
| 28. | Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001 |
| 29. | Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001 |
| 30. | Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007 |
| 31. | George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996 |
| 32. | Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007 |
| 33. | Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004 |
| 34. | Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6 |
| 35. | Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem Under Credit Risk." Rutgers Business School, June 2005 |
| 36. | Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4 |
| 37. | *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004 |
| 38. | Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS |

4

## EXHIBIT 2

### Materials Considered in Preparation of Expert Report of Thomas Boland

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| | Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002 (MNAT003849 – MNAT003862) |
| 39. | Credit Suisse - Oakwood Discussion Materials - March 2002 CSFB-00033240 – CSFB-00033258 (at CSFB-00033246) |
| 40. | Credit Suisse – Presentation to Oakwood Homes Corp. - April 9, 2001 CSFB-00052849 – CSFB-00052905 (at CSFB-00052854, CSFB-00052855 and CSFB-00052873) |
| 41. | Credit Suisse – Presentation to Oakwood Homes Corp. – June 26, 2001 CSFB-00052953 – CSFB-00053034 (at CSFB-00052956, CSFB-00052958 and CSFB-00052978) |
| 42. | Credit Suisse – Compliance Manual CSFB-00053059 – CSFB-00053226 (at CSFB-00053080, CSFB-00053081and CSFB-00053089) |
| 43. | Materials Prepared for Discussion – Oakwood Homes Corp. December 18, 2000 CSFB-00141064 – CSFB-00141069 (at CSFB-00141065) |
| 44. | Email from Fiachra O'Driscoll to Susan Menkhaus Cc: John Herbert re: Moody's Rating dated February 15, 2002 (CSFB-00148791) |
| 45. | Email from Fiachra O'Driscoll to Phil Jacob Cc: John Herbert re: Oakwood Homes dated June 6, 2001 (CSFB-00154641) |
| 46. | Credit Suisse Equity Research Report – OH Reported a FY2Q01 Loss of $0.60 per Share CSFB-00155802 – CSFB-00155808 (at CSFB-00155802) |
| 47. | Email from Alberto Zonca to Joseph Spave, Josh Borg and Carl Iovine Cc: Mark Lengel re: Oakwood Datails (Alpine) dated June 6, 2001 (CSFB-00165521 – CSFB-00165522) |
| 48. | Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus re: S&P Cuts Oakwood Homes dated October 30, 2000 (CSFB-00170815 – CSFB-00170816) |
| 49. | Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000 (CSFB-00173794 – CSFB-00173795) |
| 50. | Email from David Caspar to Doug Muir Cc: Fiachra O'Driscoll dated November 2, 1999 (CSFB-00175025) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO |
|---|---|
| 51. | Memorandum from Joe Donovan, Scott Ulm and Fiachra O'Driscoll to Credit Risk Management re: Oakwood Homes $50 Million Repo dated March 15, 2000 (CSFB-00204186) |
| 52. | Prospectus Supplement to Prospectus dated May 20, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-B CSFB-00220030 – CSFB-00220208 (at CSFB-00220040) |
| 53. | Prospectus Supplement to Prospectus dated February 22, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-A  CSFB-00220209 – CSFB-00220387 (at CSFB-00220219) |
| 54. | Credit Suisse First Boston – New Customer Credit Review (CSFB-00250093 – CSFB-00250100) |
| 55. | Memorandum from James Xanthos to Credit File re: November 19, 1999 On Site Visit dated January 10, 2000 CSFB-00250116 – CSFB-00250129 (at CSFB-00250116, CSFB-00250117, CSFB-00250118 and CSFB-00250121) |
| 56. | Credit Issues/Concerns with Oakwood Homes Corp. (CSFB-00250130) |
| 57. | Memorandum from James Xanthos to File re: Update on Oakwood Homes Corp. dated March 13, 2000 (CSFB-00250131 – CSFB-00250132) |
| 58. | Memorandum from Fiachra O'Driscoll re: Oakwood Transaction dated December 11, 2000 CSFB-00205989.301 - CSFB-00205989.304 (at CSFB-00205989.301) |
| 59. | Credit Suisse First Boston – Equity Research – Manufactured Housing: Retail Inventory Update: Second Quarter 2001 dated September 20, 2001 CSFB-00266304 – CSFB-00266330 (at CSFB-00266317) |
| 60. | Credit Suisse First Boston – Equity Research – Manufactured Housing: Approaching Bottom of Cycle; Not Out of the Woods Yet dated June 11, 2001 CSFB-00266459 – CSFB-00266488 (at CSFB-00266476) |
| 61. | Memorandum from Fiachra O'Driscoll re: Oakwood Homes Transaction dated May 25, 2001 (CSFB-00485359 – CSFB-00485360) |
| 62. | Email from John Chrystal to Fiachra O'Driscoll re: Oakwood dated May 16, 2000 (CSFB-00492624) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 63. | Email from Fiachra O'Driscoll to Kareem Serageldin re: Judge Walsh's Order Protecting Warehouse Facility dated November 22, 2002 (CSFB-00512527) |
| 64. | CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002 (CSFB-00048801 – CSFB-00048804) |
| 65. | CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share " August 8, 2002 (CSFB-00049310 – CSFB-00049312) |
| 66. | CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002 (CSFB-00049449 – CSFB-00049452) |
| 67. | CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002 (CSFB-00050066 – CSFB-00050068) |
| 68. | CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999 (CSFB-00050386 – CSFB-00050397) |
| 69. | Credit Modification Request F-656 – F-667 (at F-657 and F-658) |
| 70. | Credit Suisse First Boston – Presentation to the Board of Directors dated August 19, 2002 MNAT006731 – MNAT006775 (at MNAT006734, MNAT006735 and MNAT006739) |
| 71. | Oakwood Homes Corp. – Creditors Committee Meeting dated December 9, 2002 MNAT024062 – MNAT0024101 (at MNAT024088 and MNAT024090) |
| 72. | Credit Suisse First Boston – Presentation to the Board of Directors dated August 19, 2002 (OHCLT-1706 – OHCLT-01750) |
| 73. | Prospectus Supplement to Prospectus dated August 27, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-C OHCLT-230789 - OHCLT-230961 (at OHCLT-230798) |

| SECURITIZATION DOCUMENTS | |
|---|---|
| 74. | Confidential Offering Circular - $111,117,295 Pass-Through Securities (Aug. 13, 2001) (CSFB 00244002 – 00244050) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| SECURITIZATION DOCUMENTS | |
|---|---|
| 75. | Trust Agreement - Oakwood Mortgage Resecuritization Trust 2001(Aug. 1, 2001) (CSFB 00243854 – 00243946) |
| 76. | Purchase Agreement - Oakwood Mortgage REMIC Trust 2001 Pass-Through Securities, Class A (Aug. 14, 2001) (CSFB 00122183 – 00122199) |
| 77. | Note Purchase Agreement - Oakwood Mortgage Resecuritization Trust 2001 Collateralized Notes, Class A $8,993,000 (March 12, 2002) (CSFB 00089648 – 00089666) |
| 78. | Note Purchase Agreement - Oakwood Mortgage Resecuritization Trust 2001 Collateralized Notes, Class A $17,292,000 (February 14, 2002)(CSFB 00089783 – 00089801) |
| 79. | Pooling & Servicing Agreement – Oakwood Mortgage REMIC Trust, Series 2001 (Aug. 1, 2001) (CSFB 00124135 – 00124213) |
| 80. | Confidential Offering Supplement to the Confidential Offering Circular dated August 14, 2001, as supplemented - $8,993,000 Collateralized Notes (March 11, 2001) (CSFB 00089591 – 00089645) |
| 81. | Confidential Offering Supplement to the Confidential Offering Circular dated August 13, 2001 - $17,292,000 Collateralized Notes (Feb. 13, 2001) (CSFB 00089727 – 00089780) |
| 82. | Confidential Offering Supplement to the Confidential Offering Circular dated Aug. 14, 2001, as supplemented - $8,993,000 14,315,000 Collateralized Notes (CSFB 00121884 – 00121937) |
| 83. | Amended and Restated Trust Agreement – Oakwood Mortgage Resecuritization Trust 2001 – Hunton & Williams Draft of February 1 13, 2002 (Feb. 1, 2002) (CSFB 00122013 – 00122117) |

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 84. | Board Minutes dated 29 April 1998  (MNAT020038 – MNAT020041) |
| 85. | Board Minutes dated 18 November 1998  (MNAT020025 – MNAT020037) |
| 86. | Board Minutes dated 3 February 1999  (KCLH0888 – KCLH0890) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 87. | Board Minutes dated 22 April 1999  (KCLH 0925 – KCLH 0927) |
| 88. | Board Minutes dated 17 June 1999  (KCLH 0931 – KCLH 0936) |
| 89. | Board Minutes dated 30 June 1999 (KCLH 0938 – KCLH 0943) |
| 90. | Board Minutes dated 21 July 1999  (KCLH 0948 – KCLH 0954) |
| 91. | Board Minutes dated 2 August 1999 (KCLH0956 – KCLH0959) |
| 92. | Board Minutes dated 10 August 1999  (KCLH 0961 – KCLH 0969) |
| 93. | Board Minutes dated 20 September 1999  (KCLH 0971 – KCLH 0972) |
| 94. | Board Minutes dated 27 September 1999  (KCLH 0974 – KCLH 0976) |
| 95. | Board Minutes dated 20 October 1999  (KCLH 0978 – KCLH 0981) |
| 96. | Board Minutes dated 3 November 1999  (KCLH 0983 – KCLH 0985) |
| 97. | Board Minutes dated 17 November 1999 KCLH 0987 – KCLH 0992 |
| 98. | Board Minutes dated 20 December 1999 (KCLH 0994 – KCLH 0996) |
| 99. | Board Minutes (Shareholders) dated 9 February 2000 (MNAT002742 - MNAT002744) |
| 100. | Board Minutes dated 9 February 2000  (MNAT002745 - MNAT002746) |
| 101. | Board Minutes (Audit Committee) dated 16 February 2000 (OHCLT-13763 - OHCLT-13765) |
| 102. | Board Minutes (Audit Committee) dated 18 April 2000 (OHCLT-13737 – OHCLT13739) |
| 103. | Board Minutes (Valuation Committee) dated 6 June 2000 (OHCLT-04860 – OHCLT-0486) |
| 104. | Board Minutes dated 30 June 2000 (KCLH 1034 – KCLH 1036) |
| 105. | Board Minutes dated 8 August 2000  (KCLH 1038 – KCLH 1042) |
| 106. | Board Minutes dated 20 September 2000 (RCDA 033115 – RCDA 033118) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | BOARD OF DIRECTORS MEETING MINUTES |
|---|---|
| 107. | Board Minutes dated 16 October 2000 (KCLH 1059 – KCLH 1061) |
| 108. | Board Minutes dated 15 November 2000 (MNAT006717 – MNAT006722) |
| 109. | Board Minutes dated 20 December 2000 (MNAT006712 – MNAT006716) |
| 110. | Board Minutes dated 30 and 31 January 2001 (KCLH 1124 – KCLH1128) |
| 111. | Board Minutes dated 19 April 2001 (KCLH 1151 – KCLH 1154) |
| 112. | Board Minutes dated 8 June 2001 (KCLH 1172 – KCLH 1174) |
| 113. | Board Minutes (Audit Committee) dated 23 July 2001 (OHCLT-13756 – OHCLT-13758) |
| 114. | Board Minutes dated 24 July 2001 (KCLH 1176 – KCLH 1181) |
| 115. | Board Minutes dated 20 August 2001 (MNAT002585 – MNAT002586) |
| 116. | Board Minutes dated 15 November 2001 (KCLH 1201 – KCLH 1207) |
| 117. | Board Minutes dated 6 May 2002 (OHCLT-02877 – OHCLT-02879) |
| 118. | Board Minutes (Audit Committee) dated 6 May 2002 (KCLH 1229 – KCLH 1230) |
| 119. | Board Minutes dated 25 June 2002 (MNAT006726 – MNAT006728) |
| 120. | Board Minutes dated 29 July 2002 (MNAT006776 – MNAT006777) |
| 121. | Board Minutes (Audit Committee) dated 29 July 2002 (OHCLT-037993 – OHCLT-037994) |
| 122. | Board Minutes dated 19 August 2002 (MNAT006729 – MNAT006730) |
| 123. | Board Minutes dated 30 September 2002 (MNAT006780 – MNAT006782) |
| 124. | Board Minutes dated 18 October 2002 (MNAT006825 – MNAT006826) |
| 125. | Board Minutes dated 28 October 2002 (MNAT006827 – MNAT006828) |
| 126. | Board Minutes dated 4 November 2002 (OHCLT-02761 – OHCLT-02763) |
| 127. | Board Minutes dated 12 November 2002 (MNAT006829 – MNAT006837) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 128. | Board Minutes dated 14 November 2002 (OHCLT-02655 – OHCLT-02660) |

| PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND | |
|---|---|
| 1. | Growing Profits Under Pressure: Integrating Corporate and Investment Banking, Ludger Kubel-Sorger, Jurgen E. Schwarz, The Boston Consulting Group, 2002. |
| 2. | Deutsche Bank Annual Report 2006 – Corporate and Investment Banking http://annualreport.deutsche bank.com/2006/ar/managementreport/outlook/corporateandinvestmentbank.html. |
| 3. | Investment Banking – National City Corporation https://www.nationalcity.com/investmentbanking/Aboutus.asp. |
| 4. | BMO Financial Group, U.S. Expansion Strategy, Successfully Leveraging Lending Relationships. |
| 5. | Oakwood Homes Corporation – Company Profile http://www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html. |
| 6. | Ivy Zelman – Excelling in Stock Analysis, Robin Heffler, JW Magazine, Fall, 2005. |
| 7. | Fleetwood Enterprises Annual Report, 2005, page 49. |
| 8. | Third Party Interference, Philip J. Campanella, Joseph A. Castrodale, Matthew Bender & Company, 2008 |
| 9. | U.S. Labor Markets in 2001: Economy Enters a Recession, David S. Langdon, Monthly Labor Review, February 2002. |
| 10. | A Body Blow to the Economy, David Leonhardt, Luis Uchitelle, New York Times September 16, 2001. |
| 11. | Housing Market is Duddenly Uncertain, Alan J. Heavens, The Philadelphia Inquirer October 7, 2001. |
| 12. | BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10. |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND | |
|---|---|
| 13. | Delphi CEO Would Rather Fix Company's Woes Out of Court, Wall Street Journal, September 21, 2005, Page A.5. |
| 14. | Joint Releas Board of Governors of the Federal Reserve, FDIC, Comptroller of the Currency, NR 2001-87, October 5, 2001 |
| 15. | First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1. |

# Exhibit "I"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, *et al.,* | ) | Case No. 02-13396 (PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ————————————— | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT OF ALAN C. SHAPIRO, PH.D.

### April 30, 2007

### CONFIDENTIAL

# Table of Contents

I.      Scope of Engagement ..................................................................................................... 1

II.     Credentials .................................................................................................................... 1

III.    Basis for Opinions ........................................................................................................ 3

IV.     Summary of Opinions ................................................................................................... 3

V.      Assumptions ................................................................................................................. 4

        V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty ................................. 4

        V.B    Oakwood Was Insolvent in September 2001 ...................................................... 4

VI.     Background ................................................................................................................... 4

        VI.A   Manufactured Housing Industry ....................................................................... 4

        VI.B   Business Overview of Oakwood ........................................................................ 5

        VI.C   Financial Performance of the Industry Prior to 1999 ........................................ 5

        VI.D   Industry Downturn Beginning in 1999 .............................................................. 6

        VI.E   Oakwood's Downturn and Bankruptcy .............................................................. 7

                VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

                VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ..................... 9

                VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported
                        Losses in 2002 ...................................................................................... 10

                VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ............................... 11

VII.    CSFB Did Not Behave In a Prudent Manner ............................................................... 12

        VII.A  CSFB Had Access to Public and Private Information Concerning
               Oakwood's Financial Condition ........................................................................ 12

                VII.A.1  Investment Banks Have Unique Access to Information ....................... 12

                VII.A.2  Relationship between Oakwood and CSFB ....................................... 14

                VII.A.3  CSFB Obtained Both Public and Inside Information about
                         Oakwood's Financial Condition ........................................................ 22

        VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy
               Risk ................................................................................................................. 24

                VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial
                         Condition ......................................................................................... 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood ................................................................................................ 26

VII.C  CSFB's Own Guidelines Require a High Standard of Care to its Clients ............ 27

VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors .......................................................................... 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy ............................................................................................ 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives .................................................................. 34

VII.E  The Advice CSFB Provided to Oakwood was Inappropriate ............................... 35

VII.F  The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition ................................ 36

VII.G  CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value ...................................................... 37

VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating ................................ 39

VIII.A CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood ............................................................................................................... 39

VIII.A.1 Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2 Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood .............................................................................................. 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor .................................................................................................. 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern ........................................................... 41

VIII.B CSFB's Equity Interest provided it with a Financial Interest in Oakwood Continuing Operations ......................................................................................... 42

VIII.B.1 Agency Conflict between Equity and Debt Holders ........................... 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C Even Though CSFB was a Lender, Its Interests Differed from Those of Other Debt Holders ............................................................................................. 45

VIII.D Conclusion Regarding CSFB's Incentives ............................................................. 47

# List of Tables

Table 7.1: CSFB's Roles and Fees Earned..................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB ......................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects .................................44

# List of Figures

Figure 7.1: Oakwood's Securitization Process ...........................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.    Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance*. In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis*, (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management*.

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

2

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.    Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.    Summary of Opinions

My opinions in this matter are as follow:

- *CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.* CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

3

- *CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.* These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V.    Assumptions

### V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B    Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI.    Background

### VI.A    Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

4

## VI.B   Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C   Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.
[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.
[3] *Ibid.*, p. 2.

5

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D   Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*
[5] *Ibid.*, p. 7.
[6] *Ibid.*, p. 3.
[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.
[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks … [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E    Oakwood's Downturn and Bankruptcy

### VI.E.1    Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.
[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000, p. 1.
[12] *Ibid.*
[13] Amilda Dymi, National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[14] *Ibid.*

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13, Issue 26.

[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2  Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] *Ibid.*

[21] *Ibid.*

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

### VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

[26] *Ibid.*

[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.

[28] *Ibid.*

[29] *Ibid.*, p. 2.

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4  Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.

[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A    CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

#### VII.A.1    Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 59.
[35] *Ibid.*, p.183.

12

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website,
http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

### VII.A.2  Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

### VII.A.2.a  Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than $7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;

- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;

- Testing the financial information contained in the prospectuses; and

- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

15

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

**VII.A.2.b    Role as Provider of Loan Purchase Facility**

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[T]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, December 12, 2006, p. 73.

[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 89.

[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. I, p. 64-5.

[53] *Ibid.*, p. 194-5.

18

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

19

**VII.A.2.d    Role as Financial Advisor for Restructuring Purposes**

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 … We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.
[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.
[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

## Table 7.1: CSFB's Roles and Fees Earned

| Role | Description | Fees Earned |
|------|-------------|-------------|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | • Warrants of 19.9% of Oakwood's Common Stock<br>• Upfront fee of $2.5 million<br>• Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006, p. 163.
[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006, p. 152.

21

This section and section VII.A.1 demonstrate that investment banks are in a unique position to access information concerning the financial conditions of their clients and that CSFB's professional responsibilities with respect to Oakwood went beyond its role of underwriter. In light of the numerous roles CSFB served for Oakwood, CSFB had access to both public and private information about the Company's financial condition. In the following section I show that CSFB did in fact obtain public and inside information about Oakwood's financial condition and outlook.

### VII.A.3    CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition

Given its roles as underwriter, lender, and financial advisor, CSFB obtained both public and private information from Oakwood, credit-rating agencies, and other market analysts. Oakwood provided CSFB personnel with substantial amounts of confidential information, including the historical loss experience of the securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. This information was relevant to an assessment of whether the manufactured housing industry in general was experiencing a significant downturn, and whether Oakwood in particular was suffering from an insolvent financial position from which it would not likely recover.

As early as June 1999, Moody's and S&P rated Oakwood's unsecured senior notes as Baa3 and BBB-, respectively – the lowest investment-grade ratings. Any downgrade would result in a junk bond status. Both Moody's and S&P placed the Company on a negative credit watch given that Oakwood's third-quarter results were anticipated to be as much as 50 percent lower than expectations.[64] By November 1999, Moody's and S&P had downgraded Oakwood's ratings on its corporate credit and long-term senior debt securities to below investment grade with a negative outlook.[65] In late 2000, the credit-rating agencies continued to downgrade Oakwood's credit rating. In lowering the credit rating of the Company's senior notes from BB- to CCC, S&P viewed Oakwood as having the highest-risk junk bond rating possible before entering default status. S&P maintained a negative outlook on Oakwood based on its belief that the Company's "current operating loss position will continue well into [2001], due to lower volumes at manufacturing, continued pricing pressures at retail, and higher costs within its captive finance

---

[64] CSFB New Customer Credit Review dated July 16, 1999. Document # CSFB-00250093.
[65] Email from David Caspar to Douglass Muir dated November 2, 1999. Document # CSFB-00175025.

unit."[66] By June 2001, Fiachra O'Driscoll noted that Oakwood "was rated Baa3/BBB- two years ago and is now Caa1/CCC."[67] In closely monitoring the actions taken by the credit-rating agencies, CSFB knew Oakwood had fallen below investment-grade status in 1999 and continued to be downgraded through 2002 to a level just above default junk bond status.

Through its own information processing, CSFB identified a number of credit issues and concerns with Oakwood in late 1999. In particular, CSFB noted that Oakwood was in a "poor financial condition."[68] Based on estimates provided by CSFB's Manufactured Housing analysts, CSFB projected in 2000 that Oakwood would realize a gross operating margin of 26.1 percent, resulting in a net loss of $1.8 million. CSFB further projected that Oakwood's EBIT would be about $15 million in 2000, significantly less than the level needed to cover its anticipated interest expense of $50 million in that year.[69] In estimating Oakwood's free cash flows in 2000, which included the repayment of interest expense and a $125 million revolver, CSFB's Credit Risk Management ("CRM") Team predicted negative cash flows ranging from losses of $75 million to $110 million.[70]

In addition to obtaining publicly available information about Oakwood, CSFB also had access to private, inside information. As discussed, as part of preparing the securitization prospectuses, Oakwood provided CSFB with inside information, including the historical loss experience of a securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectuses for securitizations. CSFB was given access to all deal files and closing binders on all retail installment sales contracts ("RICs") to be included in each securitized asset pool and had access to prior deal files and monthly tracking reports. Furthermore, Oakwood consulted with CSFB as to which customer would be approved to determine how those decisions would affect the market's perception of the collateral.[71]

---

[66] Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus dated October 30, 2000. Document # CSFB-00170815.
[67] Email from Fiachra O'Driscoll to Phil Jacob dated June 6, 2001. Document # CSFB-00154641.
[68] CSFB Credit Issues/Concerns with Oakwood Homes Corp. Document # CSFB-00250130.
[69] Ibid.
[70] Ibid.
[71] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 45.

23

## VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a  Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] *Ibid.*
[74] *Ibid.*, Document # CSFB-00250116.

24

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] *Ibid.*
[76] *Ibid.*, Document # CSFB-00250117.
[77] *Ibid.*, Document # CSFB-00250121.
[78] *Ibid.*, Document # CSFB-00250118.
[79] *Ibid.*, Document # CSFB-00250117.

25

### VII.B.1.b   March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2   Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.

[81] *Ibid.*, Document # CSFB-00250132.

[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventor levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C   CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] *Ibid.*, Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] *Ibid.*
[88] *Ibid.*

27

Furthermore, with respect to handling customer accounts, CSFB's compliance manual requires adherence to the New York Stock Exchange's ("NYSE") "Know your Customer" rule. This rule mandates "every member organization to learn the essential facts concerning every customer, every account and every order executed on behalf of a customer,"[89] and is intended to protect customers of NYSE members in cases where "investors who suffer losses in securities transactions often allege that their loss resulted from recommendations made by brokers which were unsuitable for them in light of their financial situation and investment objectives."[90] Given CSFB's access to both public and inside information about Oakwood, CSFB was in a position in which it could have known all the essential facts concerning the Company's insolvent financial condition. Yet its recommendations and advice to Oakwood to maintain its operations were inappropriate given that both public and inside information about Oakwood indicated that the Company was in an irreversible spiral to bankruptcy.

### VII.D    CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors

The previous sections demonstrate that, given its roles as financial advisor, lender, and underwriter, CSFB had access to public and private information about Oakwood's financial condition and outlook and was concerned about Oakwood's bankruptcy risk. Further, in addition to the fiduciary duty CSFB owed Oakwood and its creditors, its own internal guidelines required that it know its customers and avoid conducting transactions harmful to its clients. Nevertheless, CSFB's advice and conduct with respect to Oakwood were inconsistent with the Company's bleak financial condition and outlook, and thus in violation of the duties it owed.

Although Oakwood was insolvent by the fall of 2001, CSFB continued until August 2002 to provide advice and arrange transactions that did not properly consider the Company's financial condition and outlook and that served to exacerbate its insolvency. No evidence exists that CSFB performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that CSFB considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.

---

[89] CSFB Compliance Manual. Section 5- Customer Accounts. Document # CSFB-0053089.
[90] *Ibid.*

In the rest of Section VII.D, I assess the advice CSFB provided to Oakwood. As I discuss, no evidence exists that CSFB suggested filing for bankruptcy as an option for Oakwood until August 2002. In Section VII.E, I demonstrate that CSFB's advice to Oakwood did not duly consider the Company's financial situation. In Section VII.F, I show that the transactions CSFB engaged in with Oakwood were value-destroying and exacerbated the Company's financial problems. In Section VII.G, I explain that CSFB should have advised Oakwood to curtail its operations and should not have enabled the Company to continue to destroy value to its creditors.

### VII.D.1    CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy

As discussed, between 2001 and August 19, 2002, the date CSFB signed a formal advisory agreement with Oakwood, CSFB was acting as a financial advisor to Oakwood. Based on the documents I have examined, CSFB never advised Oakwood of its insolvency or to even consider bankruptcy. Rather, the financial advice CSFB offered Oakwood centered on refinancing its outstanding debt to prolong the business. The objective of the CSFB presentations was to pitch certain financing schemes as a way to continue earning fees. I will now highlight the financial advice CSFB offered Oakwood throughout this period.

### VII.D.1.a    CSFB Presentation to Oakwood on June 26, 2001

On June 26, 2001, in a presentation made by CSFB to Oakwood, CSFB claimed that its equity research analysts "believed that signals exist which may point to a bottom for the manufactured housing industry"[91] and that the industry "will rebound."[92] Whereas CSFB's CRM Team believed that there was great uncertainty as to whether the manufactured housing industry had reached a bottom yet, its Investment Banking Division provided Oakwood with information that expressed optimism that industry trends would soon begin to work in the Company's favor. This had the effect of prolonging Oakwood's financing activities rather than encouraging Oakwood to consider bankruptcy in light of its unrecoverable, insolvent financial condition.

Without discussing the option of bankruptcy, CSFB maintained that it was "uniquely suited to advise Oakwood [and that its] restructuring expertise [was] complemented by its #1 position in the High Yield market, strength in the asset-backed market and #1 ranked research."[93] CSFB also provided an update on its view of Oakwood's financial health. In particular, it forecasted the

---

[91] CSFB Presentation to Oakwood Homes Corporation dated June 26, 2001, Document # CSFB-00052958.
[92] *Ibid.*
[93] *Ibid.*, Document # CSFB-00052956.

29

Company's net income to increase from -$120.9 million in fiscal year 2000, to -$59.7 million in FY 2001, to -$23.3 million in FY 2002, and forecasted its EBITDA margin to increase from -0.3% in FY 2000, to 1.9% in FY 2001, to 4.6% in FY 2002. CSFB further claimed Oakwood had made great progress in addressing its capital structure and operating strategy issues and believed more could be accomplished to reduce the capital structure's drag on the business with the following key objectives: reducing the cash interest burden on Oakwood, shortening the time to a positive cash flow, reducing the book value of debt and increasing the common share price, and improving Oakwood's credit profile, thereby facilitating Oakwood's future access to the capital markets.[94]

When Oakwood's senior notes were trading at a combined discount of $150 million, CSFB recommended three strategies to Oakwood. The first strategy was called the "B-2 Sale and Bond Buyback." CSFB claimed Oakwood could capture a significant portion of the $150 million discount by monetizing its retained B-2 securities and using the proceeds to quietly buy back and retire some of its outstanding senior notes. CSFB's recommendation was based on the assumption that the industry had bottomed out and the Company's financial condition was going to improve, resulting in an increase in the prices of Oakwood's bonds in the near future. The second strategy was called the "Package Exchange Offer." Under this alternative, CSFB recommended that Oakwood offer its bondholders a package of new debt and common shares in exchange for old notes to capture more of the current bond discount. The third strategy was called "One-Off Equity for Debt Exchange." CSFB claimed that Oakwood could chip away at its debt by quietly offering individual bondholders common shares in exchange for senior notes. CSFB advised Oakwood that individual bondholders would be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time.

Rather than advise Oakwood to cut its losses and file for bankruptcy, CSFB encouraged Oakwood to continue to engage in financing activities based on uncertain assumptions that industry-wide and company-specific conditions would improve. This advice only accelerated the Company's insolvent financial position.

---

[94] *Ibid.*, Document # CSFB-00052978.

### VII.D.1.b   CSFB Presentation to Oakwood on August 9, 2001

On August 9, 2001, CSFB made another presentation to Oakwood to provide further restructuring alternatives to the Company. Although Oakwood's bankruptcy appeared to be imminent, CSFB stated that "Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current trading level of its outstanding Notes."[95] Again, CSFB stated that it believed signals existed indicating that the manufactured housing industry had reached its bottom and that Oakwood should aggressively pursue strategies to capitalize on the trading levels of its public bonds.[96]

In stating that recent liquidity transactions had successfully positioned Oakwood to pursue restructuring options, CSFB recommended that the Company proceed with a three-step process. First, CSFB believed Oakwood should proceed with the application of the B-2 and receivables purchase facility proceeds that it proposed in its June 26, 2001, presentation. The second step was for Oakwood to refinance its credit facility with a new facility of $50 million. The goal of this strategy was to replace the current senior lenders with non-traditional lenders to allow Oakwood greater latitude. Third, CSFB advised Oakwood, as it did in its previous presentation, to further reduce its debt by considering a "Package Exchange Offer" and a "One-off Equity for Debt Exchange."[97] At the end of the presentation, CSFB listed more than one hundred "distressed finance assignments" it had performed for companies in which CSFB acted as a financial advisor to companies suffering from precarious financial and operating conditions.

Interestingly, shortly before making these presentations to Oakwood in 2001, CSFB issued a negative equity research report about the Company on April 26, 2001. In that report, CSFB lowered its fiscal 2001 estimate to a loss of $2.00 per share "based on the company's latest results and the continued softness in the manufactured housing industry."[98] In addition, the report maintained a Hold rating "given [Oakwood's] recent losses and excessive leverage (51% debt to capital and negative interest coverage) as well as the continued soft industry conditions."[99] While CSFB's equity research analysts were pessimistic about the condition of both Oakwood and the entire manufactured housing industry, CSFB's investment banking division was optimistic about the future prospects of the Company and the industry as a whole as a way to solicit more business from Oakwood.

---

[95] CSFB Presentation to Oakwood Homes Corporation dated August 9, 2001. Document # CSFB-00052854.
[96] *Ibid.*, Document # CSFB-00052855.
[97] *Ibid.*, Document # CSFB-00052873.
[98] CSFB Equity Research. "Oakwood Homes Corporation." April 26, 2001. Document # CSFB 001555802.
[99] *Ibid.*

31

**VII.D.1.c  CSFB Presentation to Oakwood in March 2002**

In a March 2002 presentation to Oakwood, CSFB advised Oakwood that it could reduce its March 2004 refinancing risk by exchanging the notes coming due in 2004 for a package of new notes and cash. CSFB noted that at that time notes coming due in 2004 had a face value of $125 million. CSFB recommended that these notes be exchanged for notes with a face value of $125 million with the same coupon and maturity as its notes coming due in 2009, with the cash portion of the exchange being sized to provide a modest premium to the trading levels of the 2004 notes.[100]

Table 7.2 below provides a summary of the strategic options and alternatives provided by CSFB in its presentations to Oakwood prior to August 2002.

### Table 7.2: Summary of Strategic Options Provided by CSFB

| Presentation Date | Key Company Objectives Identified by CSFB in the Presentation | Strategic Alternatives Provided by CSFB |
|---|---|---|
| June 26, 2001 | • Reduce cash interest burden on Oakwood<br>• Shorten the time to positive cash flow levels<br>• Reduce book value of debt and increase common share price<br>• Improve Oakwood's credit profile<br>• Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty | • B-2 sale and open-market bond buyback<br>• Package exchange offer<br>• One-off equity for debt exchange<br>• Negotiate a flip-up transaction with a non-traditional senior lender |
| August 9, 2001 | • Avoid a going-concern issue<br>• Replace current bank group<br>• Better utilize assets to raise non-traditional capital<br>• Reduce cash interest burden on Company<br>• Reduce debt & increase common share price<br>• Improve Oakwood's credit profile, thereby facilitating future access to the capital markets | • Proceed with application of B-2 and Receivables Purchase Facility Proceeds<br>• Refinance credit facility with a new facility of $50 million or more<br>• Consider reducing debt through package exchange offer and one-off equity for debt exchange |
| March 2002 | Reduce Oakwood's March 2004 refinancing risk by exchanging the 2004 Notes for a package of new notes and cash | • 2004 notes exchanged for $125M face value of new notes structured with the same coupon and maturity as 2009 notes<br>• Package exchange offer<br>• Flip-up transaction |

---

[100] CSFB Presentation to Oakwood Homes Corporation dated March 2002. Document # CSFB-00033246.

In providing a number of strategic alternatives for Oakwood to pursue to address its capital structure, at no point prior to August 2002 did CSFB advise Oakwood to consider filing for bankruptcy or that industry fundamentals were unlikely to improve soon enough for Oakwood to maintain its operations through the industry downturn. While CSFB's investment banking division failed to discuss the probability of bankruptcy with Oakwood until August 2002, its equity research group concluded that Oakwood posed a significant chance of bankruptcy throughout that time. On June 11, 2001, CSFB released a manufactured housing industry report stating that "[Oakwood] is still operating well in the red and the industry is not reaccelerating at this time."[101] In light of the weakness in Oakwood and the manufactured housing industry, CSFB explicitly asserted in the June 2001 report:

> Our probability that Oakwood does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with Oakwood, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares.[102]

On September 20, 2001, CSFB released another analyst report that stated verbatim its beliefs about the likelihood of Oakwood having to file for bankruptcy. CSFB still maintained a Hold rating on Oakwood, based again on its opinion that the "probability that Oakwood does not file for bankruptcy is now 50%."[103] While CSFB's investment banking division continued to present strategic options to Oakwood in 2001 and 2002 without discussing the possibility of bankruptcy, CSFB's research analysts contemporaneously published reports reflecting its concern that Oakwood posed a significant probability of bankruptcy. Not only did CSFB's research analysts believe that Oakwood had a fifty percent chance of filing for bankruptcy in June 2001, it believed that the probability of this occurrence had been even higher six months prior. Thus, CSFB's investment banking division continued to engage in activities that exacerbated Oakwood's insolvent financial condition and never advised the Company about the option of filing for bankruptcy until August 2002, even though its research analysts explicitly opined that the Company posed at least a 50 percent chance of filing for bankruptcy throughout 2001.

---

[101] CSFB Equity Research. "Manufactured Housing Industry Outlook: Approaching Bottom of Cycle; Not Out of the Woods Yet." June 11, 2001. Document # CSFB-00266476.
[102] Ibid.
[103] CSFB Equity Research. "Manufactured Housing- Retail Inventory Update: Second Quarter 2001." September 20, 2001. Document # CSFB 00266317.

**VII.D.2    CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time
CSFB Discussed and Presented Potential Restructuring Alternatives**

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise
Oakwood that its best course of action might have been a restructuring. CSFB discussed
Oakwood's capital structure and the potential courses of action it felt Oakwood should have
considered pursuing to meet its liquidity and capital needs "in light of the sustained losses
suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which
stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB
stated that "while many thought that the industry had bottomed, there continues to be a
downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's
current state of operations and its short- and long-term prospects. Of particular concern was the
maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term
guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment
characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring
alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that
the factors threatening Oakwood's short-term liquidity position were $24 million in annual
interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes
maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving,
which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default
rates and a structural change in the industry would place additional stress on Oakwood and that
the guarantees on the principal and interest payments of $275 million of subordinated B-2
REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood
chose should be based on its degree of optimism or pessimism as to its ability to grow into its
capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views,
CSFB offered a number of strategic alternatives. An optimistic view was seen as having a
moderate-to-high probability of being able to service and refinance debt capitalization. If this
were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue
debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid.*
[106] *Ibid.*, Document # MNAT006735.

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

### VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid.*, Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006, p. 201.
[109] *Ibid.*, pp. 169-170.
[110] *Ibid.* p. 16.

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F   The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006, Vol. 2, p. 232.
[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006, p. 19.
[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 15, 2004.
[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

### VII.G    CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.
[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.
[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

Committee in December 2002, Oakwood provided details of a rationalization plan ("the Plan") that sought to address the difficulties surrounding the Company's operations. The strategy of the Plan was to downsize Oakwood's operations, reduce fixed operating expenses, and improve the Company's cash flow and profitability.[118] In particular, the Plan proposed that Oakwood eliminate poorly performing retail stores, increase its focus on wholesales sales, adjust manufacturing capacity to a level in line with expected future sales, and reduce corporate overhead in line with the downsized company.[119] The Plan proposed accomplishing these objectives by eliminating Oakwood's presence in high-default states as well as closing seventy-four retail centers, five manufacturing plants and its Austin, Texas loan origination office. These actions alone were predicted to increase Oakwood's 2002 manufacturing and retail operating income by $30 million.[120] In light of the fact that the downturn in the manufactured housing industry was due in large part to overcapacity and excessive growth by companies like Oakwood, the advice CSFB provided should have entailed operational improvement strategies which focused upon downsizing the Company's operations. Rather, CSFB proposed alternative financing options which resulted in losses on securitization transactions and further impairment charges on Oakwood's REMIC valuations.

In addition, similar to providing the optimistic and pessimistic scenarios set forth in its presentation to Oakwood's board of directors after it was formally retained as a financial advisor for restructuring purposes, CSFB should have provided the Company with certain alternative courses of action if Oakwood's management believed it could not turn around its insolvent financial condition prior to mid-2002. Throughout its relationship with Oakwood, CSFB should have emphasized that the Company was confronted with both immediate and future liquidity-draining issues. Over the long term, CSFB should have advised that additional stress was going to be placed on the Company if the trends in default rates and industry structural change continued.[121] On further pointing out that Oakwood's securities were trading at distressed levels, its annual interest expense was high, and the servicing fees it earned on its REMIC securities were insufficient to cover the associated servicing costs, CSFB should have informed Oakwood of its unlikely prospect of improving its capital structure and provided more comprehensive restructuring solutions prior to August 2002 based on the assumption that the downturn in the manufactured housing industry was going to continue.

---

[118] Oakwood Homes Corporation. Creditors Committee Meeting dated December 9, 2002. Document # MNAT024088.
[119] *Ibid.*
[120] *Ibid.*, Document # MNAT024090.
[121] CSFB Presentation to Oakwood Board of Directors dated August 19, 2002. Document # OHCLT-01706.

Further, CSFB should have advised Oakwood that if the Company was pessimistic about the future prospects of its financial and operating conditions, it should not continue to employ a wait-and-see approach or take advantage of the discounted trading levels of its debt. Assuming Oakwood was insolvent in the fall of 2001, CSFB should have recognized and considered early in its relationship with Oakwood that the Company's outstanding indebtedness exceeded its fundamental value and that a sale of the Company or a filing for bankruptcy were options Oakwood should have thoroughly evaluated. Prior to August 2002, CSFB should have been recommending that Oakwood scale back its operations or begin implementing a pre-arranged or pre-packaged bankruptcy strategy. Both of these options would have been in the best interests of the Company and its credit holders. Instead, CSFB's recommendations were centered on its financial incentive to keep Oakwood operational to earn exorbitant fees through its roles as an underwriter, lender, and advisor.

## VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating

In this section, I describe the financial incentives CSFB had to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy. I first describe the fees CSFB was earning, and stood to continue earning, from its relationship with Oakwood. I then explain how CSFB's equity interest in Oakwood allowed it to share in the upside of an Oakwood recovery. Finally, I describe how, despite being a lender to Oakwood, CSFB did not share in the costs of the turnaround attempt because its debt was bankruptcy protected. In short, because of its unique position as a bankruptcy-insulated lender and equity owner, CSFB would enjoy the upside of an Oakwood recovery without facing the consequences of the attempt (that continuing operations was further exacerbating Oakwood's insolvent financial condition), and because of its relationships with Oakwood, CSFB would earn more fees the longer the attempt continued.

### VIII.A   CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood

As I described in Section VII, CSFB provided several services and played varying roles over the course of its relationship with Oakwood from the early 1990s through 2002. During this period, CSFB acted as Oakwood's general financial advisor, primary underwriter of its securitization program, secured lender, and as of August 19, 2002, its financial advisor for restructuring purposes. As discussed below, CSFB earned significant fees for providing these services to Oakwood.

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility. [126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.
[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.
[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, Objections and Counterclaims. November 13, 2004.
[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.
[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.
[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

### VIII.A.3  Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:

  o  The face amount of the old securities;

  o  One third of the face amount of the securitization guarantees; and

  o  One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

### VIII.A.4  Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

## VIII.B  CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1  Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.
[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.
[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

**Table 8.1: Illustration of Payoffs and Probabilities of Projects**

| | Project A | | Project B | |
|---|---|---|---|---|
| | Unsuccessful | Successful | Unsuccessful | Successful |
| Cash Flow | Payoff (80% Prob.) | Payoff (20% Prob.) | Payoff (50% Prob.) | Payoff (50% Prob.) |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

### VIII.B.2  CSFB Had a Conflict of Interest with Oakwood's Debt Holders

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

### VIII.C  Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.

[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989_301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection to lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict – that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

## VIII.D   Conclusion Regarding CSFB's Incentives

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.


Dated:    April 30, 2007


Alan C. Shapiro, Ph.D.


47

**Appendix A: Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California 90089-1427

## EDUCATION
Ph. D.        Economics, Carnegie Mellon University, 1971
B.A.          Mathematics, Rice University, 1967

## CURRENT POSITION
1991-Present:    Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

## PAST POSITIONS
1993-1997:    Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:    Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:    Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:    Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:    Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:    Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:    Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:    Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

## VISITING APPOINTMENTS
Spring 2003:    U.S. Naval Academy

Spring 1990:    Yale School of Management, Yale University

1

1984-1985:        Anderson Graduate School of Management, UCLA

Spring 1981:      Faculty of Commerce, University of British Columbia

Spring 1977:      Stockholm School of Economics

## TEACHING EXPERIENCE

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

## EXECUTIVE PROGRAMS: UNIVERSITIES

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

2

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

**EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS**
CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

3

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy; O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

Editorial Positions

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

Boards of Directors

Academy of International Business
Western Finance Association
American Finance Association

Reviewer for

| | |
|---|---|
| *Journal of Financial Economics* | *Journal of Banking and Finance* |
| *Journal of Political Economy* | *Financial Review* |
| *Journal of Finance* | *International Trade Journal* |
| *Management Science* | *Financial Management* |
| *Journal of International Economics* | *Urban Economics* |
| *Journal of Money, Credit, and Banking* | *Journal of International Business Studies* |
| *Journal of Financial and Quantitative Analysis* | *Journal of Economics and Business* |
| *National Science Foundation* | *Journal of Financial Services Research* |
| *Journal of International Money and Finance* | |

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management Association, 1986.

5

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

> Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

> Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

6

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

10

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

## WORKING PAPERS

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

## CONSULTING AND PROFESSIONAL ACTIVITIES

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

11

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

13

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

## AWARDS AND SPECIAL RECOGNITION

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

## SPEECHES

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

## EXPERT WITNESSING

1. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2. Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3. Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4. New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

15

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6. O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7. IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8. IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9. Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

17

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

20

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Haiif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton: Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

21

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

22

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:**
**1994-2006**

1. Fleet Funding, Inc. and Fleet Funding II, Inc., Appellants v. Commissioner of Revenue, Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

2. K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc., Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the County of Santa Clara: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages. I was deposed on February 3, 2006 on behalf of the defendant.

3. Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior Court of the State of California for the County of Santa Clara: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the plaintiff.

4. Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C, United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004 (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5. Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6. TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7. Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8. Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9. Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

26

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

20. Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

29

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

## Appendix B:  List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.*

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

# Exhibit "J"

# EXPERT WITNESS REPORT
# OF
# DR. MICHAEL TENNENBAUM
# FLAVELL, TENNENBAUM & EDWARDS

---

# OHC LIQUIDATION TRUST
# V.
# CREDIT SUISSE FIRST BOSTON, ET AL.

---

# IN RE: OAKWOOD HOMES CORPORATION, ET AL.

## EXPERT WITNESS REPORT OF DR. MICHAEL TENNENBAUM

I have been requested by the OHC Liquidation Trust and its counsel, the firm of Stutman, Treister & Glatt, to analyze and opine on a number of issues regarding Oakwood Homes Corporation, as more fully set forth below.

I am a partner in the valuation and financial consulting firm known as Flavell, Tennenbaum & Edwards, and have been a practicing consulting economist for more than thirty (30) years. My educational background includes a B.A. in Economics and Mathematics, an M.A. in Economics and a Ph.D. in Economics, all earned at the University of California, Los Angeles. From 1969 to 1986 I was also a Professor of Economics at California State University, Long Beach. During my career, I have conducted valuation analyses on dozens of companies for transaction as well as litigation purposes, and have also valued large complex real property assets. I have prepared reorganization value studies, reorganization plan feasibility studies and solvency analyses in connection with many major bankruptcy reorganizations. I have rendered expert valuation testimony in many Federal Bankruptcy courts, Federal District Court, Federal Tax Court, Chancery Court in Delaware, and State courts throughout California, and in Michigan and Washington. During my teaching career I have taught courses in corporate valuation, finance, real property valuation and economics. A full and complete copy of my curriculum vitae is included herewith.

In addition to the analyses summarized in this report, I have been requested to provide the following information.

1.     Michael Tennenbaum, Ph.D. - - Publications and Testimony

    a.     Publications within the last fifteen years: "The Income Approach to Business Valuation," Trial News, Washington State Lawyers Assoc., July/August, 1994

    b.     Cases in which expert testimony was rendered at trial and/or by deposition within the last five years:

2002:

| In re. Edwards Theatres<br>    Chapter 11 – Orange County | deposition, court testimony |
|---|---|
| Fair v. Caruso<br>    Los Angeles County Superior Court | deposition, arbitration testimony |
| Resort at Summerlin v. Marsh, USA<br>    Federal District Court, Las Vegas | deposition |

2003:

| Furgatch v. San Diego Unified Port District<br>    (Case No. GIC 775242/784923) | deposition, court testimony |
|---|---|
| Sunrise Buena Park v. Old Navy<br>    Orange County, CA<br>    (Superior Court No. 02 CC05035) | deposition, court testimony |
| In re. Hechinger Investment Company of Delaware, Inc.<br>    Delaware Bankruptcy Court | deposition |

2004:

| In re. Olympic Pipeline Company, Chapter 11, Seattle Washington | deposition, court testimony |
|---|---|

2005:

| Brown v. Gill<br>    Federal Bankruptcy Court, Los Angeles | deposition |
|---|---|
| Los Angeles Export Terminal, Inc. v. Thyssenkrupp Robins Inc., et al.<br>    Los Angeles Superior Court Case No. BC 284285 | deposition |

2006:

| Los Angeles Export Terminal, Inc. v. Thyssenkrupp Robins Inc., et al.<br>    Los Angeles Superior Court Case No. BC 284285 | court testimony |
|---|---|

2.    Hourly Rate Schedule for Flavell, Tennenbaum & Edwards:

R.H. Flavell, MAI          $350

M. Tennenbaum, Ph.D.       $395

D. Edwards, MAI            $350

Professional Staff         ($100 - $200)

     Michael Daniels

     Thomas Yoshioka

     Jason Tennenbaum

Fees are computed based on the hourly rate schedule, and expenses consist of out of pocket expenditures.

My analyses in this matter included review of numerous documents, including filings with the court, deposition transcripts and exhibits, brokerage firm analyst reports, SEC filings, Oakwood Homes Corporation financial documents, and financial and economic texts and professional journal literature.

In particular, my review included deposition transcripts and exhibits of the depositions of:

     Myles Standish

     Doug Muir

     James Xanthos

     Fiachra O'Driscoll

     Jared Felt

     Thomas P. Irwin

     Clarence W. Walker

Securities and Exchange Commission filings, consisting of various 10-K and 10-Q reports for Oakwood and comparable competitive companies were reviewed, as were reports from Hoovers, Morningstar and Ibbotson Associates.

3

The economic and financial texts which I reviewed include, but are not limited to, the following:

Ibbotson Associates, Stocks, Bonds, Bills and Inflation

B. Cornell, The Equity Risk Premium

B. Cornell, Corporate Valuation

A. Damodaran, Investment Valuation

A. Damodaran, Corporate Finance

A. Davidson, A. Sanders, L. Wolff, A. Ching, Securitization

L. Hayre, Guide to Mortgage Backed & Asset Backed Securities

J. Stowe, T. Robinson, J. Pinto & d. McLeavey, Equity Asset Valuation

T. Copeland, J. F. Weston & K. Shastri, Financial Theory & Corporate Policy

W. Goetzmann & R. Ibbotson, The Equity Risk Premium

J. Siegel, Stocks for the Long Run

E. Dimson, P. Marsh & M. Staunton, Triumph of the Optimists

T. Koller, M. Goedhart & d. Wessels, Valuation

UCLA Andersen School, Proceedings of the UCLA Conference on the Equity Premium & Stock Market Valuation

Professional economic and finance journal articles which I reviewed include, but are not limited to, the following:

R. Ibbotson & P. Chen, "Long Run Stock Returns," Financial Analysts Journal, Jan./Feb. 2003

J. Graham, "Proxies for the Corporate Marginal Tax Rate," Journal of Financial Economics, 1996

J. Siegel, "The Equity Premium: Stock and Bond Returns Since 1802," Financial Analysts Journal, 1992

J. R. Woolridge, "Do Stock Prices Reflect Fundamental Values?" Journal of Applied Corporate Finance, 1995

J. Siegel & R. Thaler "The Equity Premium Puzzle," Journal of Economic Perspectives, 1997

J. Siegel, "The Shrinking Equity Premium," UCLA Conference on the Equity Premium, 1999

R. Grabowski & D. King, "New Evidence on Size Effects and Rates of Return," Business Valuation Review, 1996

S. Kothari & J. Shanken, "In Defense of Beta," Journal of Applied Corporate Finance, 1995

4

D. King, "Equity Risk Premium for Cost of Capital Studies," <u>Business Valuation Review</u>, 1994

F. Black, "Beta and Return," <u>Journal of Portfolio Management</u>, 1993

E. Fama & K. French, "The Cross Section of Expected Stock Returns," <u>Journal of Finance</u>, 199

P. Kaplan & J. Peterson, "Full Information Industry Betas," <u>Financial Management</u>, 1998

My analyses included review of internal Oakwood documents, Credit Suisse First Boston documents and Price Waterhouse Coopers documents comprising thousands of pages. In addition, reports by a variety of professionals were reviewed.

The categories of internal OHC documents include:

1. Financial data and Rationalization Plan documents
2. Restructuring Term Sheets
3. Presentation to Lotus
4. OHC Board of Director Meeting Minutes
5. Executive Reports to the Board of Directors
6. Cumulative Loss Data and Security Price Histories
7. Internal E-Mail Documents and Prospectus Documents
8. Internal REMIC Valuation Documents

The categories of Price Waterhouse Coopers documents reviewed include:

1. PWC financial reports
2. PWC audit work papers
3. Review documents re REMIC valuation

The categories of Credit Suisse First Boston Documents reviewed include:

1. Presentations to OHC Board of Directors
2. Financial OHC Discussion Materials
3. Securities Sales Points
4. Internal Discussion Materials
5. Restructuring Term Sheets
6. OAC Residual Analyses

7.   Presentations to Lotus

8.   Presentations to Risk Management

9.   Power Point Presentations

10.  Presentations to Berkshire Hathaway

11.  CSFB Credit Department Documents

12.  CSFB Equity Department Reports

I also reviewed various reports prepared by financial professionals, including reports by Bradford Cornell, Miller Buckfire and Andrew Davidson.

Additional documents reviewed include certain reported court cases:

1.   In re. Radnor Holdings Corp.

2.   E-Toys Inc. v. Goldman Sachs

3.   In re. Greater Southeast Community Hospital Corp.

4.   Trenwick America Litigation Trust v. Ernst & Young LLP

5.   In re Oakwood Homes Corporation, Debtor; JP Morgan Chase Bank, Appellant; U.S. Court of Appeals for the Third Circuit (449 F. 3d 588; 2006 U.S. App. Lexis 14183)

6

The purpose of this report is to provide my professional opinion as to the financial condition of Oakwood Homes Corporation as of various dates of value described below, and to consider the impact of certain financial activities of the company in view of its financial condition.

In particular, the issues on which opinions are rendered below include:

1.    The Enterprise Value (i.e., Asset Value) of Oakwood as of mid-2001, FYE September 2001 and FYE September 2002.

2.    The solvency of Oakwood Homes Corp. as of September 2001 and September 2002.

3.    The change in Asset Values and change in long term Liability Values for Oakwood between September 2001 and September 2002.

4.    The Equity Value in Oakwood Homes, valued as a call option on Enterprise Value, as of September 2001 and September 2002.

5.    The long term Debt and Guarantee values of Oakwood implied by the call option analysis as of September 2001 and September 2002.

6.    The change in Equity Value and Debt Value implied by the call option analysis between September 2001 and September 2002.

7.    The default probability and probability of a return to solvency for Oakwood implied by the call option analysis, as of September 2001 and September 2002.

8.    Changes in the probability of default by Oakwood and the probability of Oakwood's return to solvency between September 2001 and September 2002.

9.     The impact of continued securitization of loans, guarantee of loans and servicing of loans on Oakwood's solvency and default probability between September 2001 and September 2002.

10.     Damages suffered by Oakwood's Enterprise as a result of the foregoing issues.

My opinions in this matter include:

1.    The Enterprise Value of Oakwood Homes Corporation as of FYE 2001 (September 2001) was $350 Million, in rounded terms.

2.    The Enterprise Value of OHC as of September 2002 (FYE 2002) was $300 Million, in rounded terms.

3.    Oakwood Homes Corporation was insolvent as of September 2001 and remained insolvent as of September 2002. As of September 2001, the value of OHC's Assets was $120 Million less than the value of its Debt and Guarantees, and as of September 2002 the value of OHC's Assets was $210 Million less than the value of its Debt and Guarantees.

4.    OHC's Enterprise Value (Asset Value) fell by approximately $50 Million between September 2001 and September 2002, while its long term liabilities increased by approximately $40 Million.

5.    Not only was OHC insolvent as of September 2001 and September 2002, but the likelihood of a return to solvency within a reasonable time frame (e.g., the expected duration of OHC's debt) was remote.

6.    Economic theory predicts that in the presence of uncertainty as to future asset values, investors may be willing to pay for the equity of insolvent firms, since such equity represents a call option on future firm value. Despite its insolvency, analysis of OHC's Equity Value under such a Call option model yields an Equity Value as of September 2001 of $25.8 Million and an Equity Value of $1.2 Million as of September 2002.

7.    The implied long term Debt and Guarantee values resulting from the call option analysis are $324.2 Million as of September, 2001, and $298.8 Million as of September, 2002.

9

8. The analysis of distressed and/or insolvent firm equity as a call option on Enterprise Value implies a reduction in Equity Value of $24.6 Million and a reduction of Debt and Guarantee Values of $25.4 Million between September 2001 and September 2002. Thus, both debt and equity suffered as a result of continued operations of Oakwood.

9. Even utilizing the extremely aggressive cash flow projections of mid 2001 and late 2001, OHC was insolvent by September 2001 and faced a high and increasing probability of default. The likelihood of a return to solvency was remote by September 2001, and continued insolvency was virtually certain by September 2002.

10. Continued securitization and guaranteed B-2 issuance beyond the middle of 2001 resulted in dissipation of OHC's Enterprise Value, i.e., reduction in the value of corporate assets, as well as an increase in liabilities.

This report is a summary of my opinions and may not include every aspect of my opinions. Charts and graphic aids embodying the information and "bullet points" in this report may be prepared for illustrative purposes.

The data and analyses supporting my opinions are contained in the sections of the report which follows.

10

## SUBJECT INDUSTRY

o   Manufactured housing is a significant subsector of the housing industry.  During the late 1990's
     and the early years of this century, manufactured housing accounted for approximately one-third
     of all housing starts in the U.S.  Most manufactured homes are rarely moved once situated, and
     nearly two-thirds are placed on private property, as opposed to MH communities.

o   Manufactured Housing is a cyclical industry.  Manufactured homes are factory built, transported
     to a site and installed.  Economies of scale and efficient factory construction result in lower
     prices than for stick built homes.

o   The industry experienced rapid growth in the mid-1990's as financial lenders tapped the asset-
     backed securities market to monetize consumer loans.  Entry of dozens of sub-prime lenders,
     attracted by interest margins of 300 bps or more, resulted in weakened credit standards, high loan
     to value ratios (up to 95%), and underpriced loans.  This led eventually to the same kind of
     default issues and financial distress currently affecting the sub prime mortgage market.

o   By 1999, manufacturing capacity and shipments outpaced consumer demand, repossessions
     increased substantially, collateral performance began to deteriorate, and some lenders began to
     exit the industry.  Sales dropped from 372,000 homes in 1998 to 193,000 in 2001.  Industry
     problems persisted for a number of years.

o   MH Industry Shipment Cycles:
     o   Shipments increased from 221,000 in 1980 to 295,000 in 1984
     o   Then shipments fell to 171,000 by 1991
     o   Shipments rose from 171,000 in 1991 to 372,000 in 1998
     o   Shipments then fell to 193,000 in 2001

11

- Manufacturing Plants:
  - 1980-1991: number of plants fell to 25 from 300+
  - 1991-1999: plants increase to 175+
  - 1999-2001: plants fall to 100+

- MH Industry Retail Inventory:
  - 1980-1984: inventory increases from 56,000to 82,000±
  - 1984-1990: inventory falls to 48,000±
  - 1990-1997: inventory increases to 88,000±
  - 1997-2001: inventory falls to 58,000±

- Industry-wide Repos as % of Inventory:
  - 1999: 18.9%
  - 2000: 34.9%
  - 2001: 40.1%
  - 2002: 36.8%

- Industry Downsizing, 1998/99 to late 2002:
  - Champion:
    Shipments fall from 70,300 to 39,500
    Retail Centers decrease from 303 to 117
    Plants decrease from 68 to 39
  - Clayton:
    Shipments fall from 28,300 to 20,400
    Retail Centers decrease from 318 to 287
    Plants rise from 18 to 20
  - Fleetwood:
    Shipments fall from 66,200 to 30,400
    Retail Centers decrease from 243 to 137
    Plants fall from 38 to 27

° Oakwood:

Shipments fall from 33,800 to 22,300

Retail Centers decrease from 412 to 197

Plants decrease from 32 to 19

Unsold repossessed homes increase from 1,267 to 7,063

## SUBJECT COMPANY

o     Oakwood Homes was established in 1946 and headquartered in Greensboro, North Carolina. The Company was publicly held and one of the largest companies in the Mobile Home Industry, and one of the few fully integrated firms in the industry. OHC operated three inter-related business divisions:

           a.     Manufacturing

           b.     Retail

           c.     Consumer Finance

o     Manufacturing Division produced manufactured and modular homes:

     o     Manufactured Homes:

         o     Single section: 14' and 16' wide, 40' to 80' long

         o     Multi section: 24', 28' and 32' wide, 2 – 4 floor, 40' – 80' wide

         o     Permanent residences, but can be transported to homesites

     o     Modular Homes:

         o     950 sq. ft. – 3,365 sq. ft., similar to site built homes, single-story – 2 story

o     OHC formerly operated 32 manufacturing plants in 12 states, primarily in the South and Midwest. Subsequently reduced to 19.

     o     Average product costs were 70% materials, 15% direct labor and 15% overhead

     o     Homes built for company owned retail centers based on quantity and model assortment needs. Homes built for independent dealers based on dealer orders and funding availability.

o     Retail Division:

     o     OHC had peak of 412 company owned sales centers in 1998/1999, subsequently reduced to 197 by 2002

     o     More than half of 2002 sales revenues came from company owned sales centers

     o     Gross margins on retail sales were substantially higher than wholesale sales, as sales through OHC owned centers earn manufacturing margin plus retail markup. In 2002,

gross margins on retail sales reached 30%, while gross margins on wholesale sales were 17%, but wholesale sales were converted to cash 30-45 days faster than retail.

- o Consumer Finance Division:
  - o Oakwood Acceptance Corp (OAC) financed vast majority of retail sales, and in turn OAC securitized these loans in ABS market through Real Estate Mortgage Investment Conduits (REMICs). OAC generated income from servicing the manufactured home loans which it securitized
  - o Until 2002, OHC also operated an insurance subsidiary which generated revenues from sales to homebuyers of physical damage insurance, credit life insurance and homebuyer protection contracts

- o Securitization:
  - o OAC funded loan originations (for approximately 75% of retail sales and 38% of whole sale sales) by aggregating loans quarterly and placing them into REMIC sold to investors as asset backed security
  - o ABS sold in tranches, most of which were investment grade. Non-investment grade tranches ("B" pieces) were subordinate to investment grade tranches (mostly AAA rated). B pieces were generally retained by Oakwood and either included in future securitizations or sold whole. Retained REMIC interests were valued by OHC based on net credit loss, discount rate and prepayment assumptions.
  - o As a credit enhancement, the company guaranteed payment of principal and interest on some B pieces sold to investors, recording a liability equal to the fair value of the guarantee. By FY 2002, the face amount of such guarantees reached $274 Million, with an estimated fair value of approximately $144 Million.
  - o OAC retained the right to service all of its securitized loans in exchange for a servicing fee of approximately 1% of the principal balance of the serviced loans. The service fee was subordinate to all payments to REMIC bondholders.

○ Delinquency, Repossession & Assumption:

   ○ Lenders to mobile home purchasers are, in effect, sub-prime lenders. Mobile home buyers have tended to be lower income consumers who could not afford or qualify for mortgages to purchase "stick built" homes (at least until recently). MH loans had (since the mid 1990's) lower down payments (LTVs at 90% to 95%) and much higher interest rates (in the 9% to 18% range). As a result, MH loans had high and hard to predict default rates. These characteristics are similar to the recently imploding sub-prime mortgage/ABS market, with similar market results.

   ○ Repossession of homes from defaulting borrowers resulted in some payments of principal and interest made by OAC to the REMIC, refurbishing costs, sale of the home to a new buyer (often for less than the remaining loan balance, as mobile homes often depreciated in value), payoff of original loan balance to the REMIC trust, and inclusion of the new loan (often at 100% LTV) in a subsequent securitization.

   ○ Repos resulted in losses to the REMIC trust resulting from loss on resale, plus reimbursement to OAC of servicing advances and refurbishment. In addition:

      ○ Inclusion of repos in future securitizations affected credit ratings
      ○ Loan Purchase Facility contained limits on amount of repo loans
      ○ OHC may need to revalue its residual pieces
      ○ OHC guarantee payments may become more likely
      ○ Repos compete with new units in marketplace

   ○ OAC's Loan Assumption Program (LAP) tried to minimize effects of repos, but used substantial amounts of capital, as some expenses (e.g. refurbishment) couldn't be charged to REMICs and had to be charged to earnings.

   ○ Industry wide lax underwriting standards for loans in late 1990's, matched by OAC, resulted in high and rising net losses from repos. Oakwood's repos reached 13,400± by FY 2002, compared to 5,475 in FY 1998. Net losses from repos as a percentage of average principal loan amounts reach 4.6% by FY 2002, compared to 1.96% in FY 2000. Such figures are reminiscent of recent sub-prime mortgage data.

- ○ Competition:
  - ○ Retail market was competitive, with top five companies representing about 25% of the market by 2002.
  - ○ Manufacturing was relatively concentrated, with the top ten manufacturers capturing about 79% of the market by 2002. Of the top ten, seven were public:

    Champion Enterprises

    Fleetwood Enterprises

    Oakwood Homes

    Clayton Homes

    Palm Harbor Homes

    Skyline Corp.

    Cavalier Homes

    In addition, Cavco Industries, which operated in the southwestern and western U.S., was a subsidiary of Centex Corp.

- ○ Financial History
  - ○ The financial history of OHC between 1995 and 2002 is depicted on the accompanying schedule
  - ○ Manufacturing, Wholesale and Retail revenues more than doubled between 1995 and 1999, to $1.5 Billion. Between 1999 and 2002, Wholesale revenues fell 11%, while Retail revenue fell 50%. EBIT Margins for Manufacturing & Retail fell from 7% - 8% in 1995 -1998 to 1% in 1999, and became negative from 2000 – 2002.
  - ○ Consumer finance revenues peaked in 1997 at $91.7 Million, falling to $64.5 Million by 2002, a decrease of 30%. Financial Services EBIT peaked at $73.7 Million in 1997 and by 2002 fell to $21.4 Million. EBIT Margin fell from 78.5% in 1996 to 22.7% in 2002.
  - ○ Total OHC EBIT peaked at $168.4 Million in 1998, and became negative for 2000 - 2002.
  - ○ Total OHC EBITDA peaked at $192.5 Million in 1998, an 83% increase from 1995, and fell to $8.5 Million by 2002, a 95% drop from 1998. Total EBITDA Margin ranged between 12% and 16% for 1995 – 1998, falling to 0.8% by 2002.

17

o    The foregoing deterioration in revenues and earnings, together with impending increases in recognized B2 guarantee liabilities and loss of cash, resulted in severe financial distress and a late 2002 Chapter 11 filing.

**Oakwood Homes**
*Historical Financial Data*

| | 1995 | 1996 | 1997 | FYE September 30, 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| **Manufacturing & Retail Revenue** | | | | | | | | |
| Wholesale | $ 196,900,000 | $ 158,900,000 | $ 94,300,000 | $ 264,400,000 | $ 459,500,000 | $ 420,900,000 | $ 351,600,000 | $ 410,700,000 |
| Retail | $ 544,600,000 | $ 703,200,000 | $ 858,400,000 | $ 1,140,000,000 | $ 1,037,000,000 | $ 769,000,000 | $ 653,500,000 | $ 515,800,000 |
| Other | $ 17,900,000 | $ 19,500,000 | $ 14,600,000 | $ 10,800,000 | $ 13,400,000 | $ 9,900,000 | $ 9,300,000 | $ 7,500,000 |
| Total Manufacturing Revenue | $ 759,400,000 | $ 881,600,000 | $ 967,300,000 | $ 1,415,200,000 | $ 1,509,900,000 | $ 1,199,800,000 | $ 1,014,400,000 | $ 934,100,000 |
| % Growth | | 16.1% | 9.7% | 46.3% | 6.7% | -20.5% | -15.5% | -7.9% |
| | | | | | | | | |
| **Manufacturing & Retail Expenses** | | | | | | | | |
| Cost of Sales | $ 543,300,000 | $ 609,300,000 | $ 651,400,000 | $ 973,400,000 | $ 1,081,700,000 | $ 927,500,000 | $ 784,600,000 | $ 708,800,000 |
| SG&A | $ 165,300,000 | $ 211,800,000 | $ 236,600,000 | $ 341,400,000 | $ 411,300,000 | $ 335,100,000 | $ 310,800,000 | $ 281,500,000 |
| Total Manufacturing & Retail EBIT | $ 50,800,000 | $ 60,500,000 | $ 79,300,000 | $ 100,400,000 | $ 16,900,000 | $ (62,800,000) | $ (81,000,000) | $ (56,200,000) |
| Manufacturing & Retail EBIT Margin | 6.7% | 6.9% | 8.2% | 7.1% | 1.1% | NM | NM | NM |
| | | | | | | | | |
| **Financial Services Revenue** | | | | | | | | |
| Consumer Finance | $ 59,400,000 | $ 89,100,000 | $ 91,700,000 | $ 87,100,000 | $ 61,800,000 | $ 49,600,000 | $ 80,100,000 | $ 64,500,000 |
| Insurance | $ 2,600,000 | $ 3,200,000 | $ 11,100,000 | $ 34,000,000 | $ 49,600,000 | $ 56,400,000 | $ 38,900,000 | $ 29,900,000 |
| Total Financial Services Revenue | $ 62,000,000 | $ 92,300,000 | $ 102,800,000 | $ 121,100,000 | $ 111,400,000 | $ 106,000,000 | $ 119,000,000 | $ 94,400,000 |
| % Growth | | 48.9% | 11.4% | 17.8% | -8.0% | -4.8% | 12.3% | NM |
| | | | | | | | | |
| **Financial Services Expenses** | | | | | | | | |
| Consumer Finance | $ 11,800,000 | $ 16,800,000 | $ 20,400,000 | $ 24,200,000 | $ 37,500,000 | $ 43,200,000 | $ 40,500,000 | $ 51,300,000 |
| Insurance | $ 1,200,000 | $ 2,000,000 | $ 8,700,000 | $ 27,600,000 | $ 38,500,000 | $ 32,300,000 | $ 18,500,000 | $ 13,500,000 |
| Provision for Losses on Credit Sales | $ 2,100,000 | $ 1,000,000 | $ - | $ 1,300,000 | $ 3,300,000 | $ 3,000,000 | $ 5,400,000 | $ 8,200,000 |
| Total Financial Services EBIT | $ 47,100,000 | $ 72,500,000 | $ 73,700,000 | $ 68,000,000 | $ 32,100,000 | $ 27,500,000 | $ 54,600,000 | $ 21,400,000 |
| Financial Services EBIT Margin | 76.0% | 78.5% | 71.7% | 56.2% | 28.8% | 25.9% | 45.9% | 22.7% |
| | | | | | | | | |
| **Total EBIT** | $ 97,900,000 | $ 133,000,000 | $ 153,000,000 | $ 168,400,000 | $ 49,000,000 | $ (35,300,000) | $ (36,400,000) | $ (14,800,000) |
| Total EBIT Margin | 11.9% | 13.7% | 14.3% | 11.0% | 3.0% | -2.7% | -3.2% | -1.4% |
| Depreciation and Ammortization | $ 7,100,000 | $ 9,500,000 | $ 13,500,000 | $ 24,100,000 | $ 44,300,000 | $ 48,400,000 | $ 46,200,000 | $ 23,300,000 |
| **Total EBITDA** | $ 105,000,000 | $ 142,500,000 | $ 166,500,000 | $ 192,500,000 | $ 93,300,000 | $ 13,100,000 | $ 9,800,000 | $ 8,500,000 |
| Total EBITDA Margin | 12.8% | 14.6% | 15.6% | 12.5% | 5.8% | 1.0% | 0.9% | 0.8% |

## FIVE YEAR PLAN PROJECTIONS

○   The projections entitled "Oakwood Homes Five Year Plan" are based on projections developed in connection with the proposed Plan of Reorganization for OHC. The plan calls for volume and price growth consistent with difficult market conditions in the Manufactured Housing industry, and an effective exit from financial services.

○   Summary characteristics of the Five Year Plan include:
   ○   Revenues increase from $631 Million to $829 Million annually
   ○   Net income increases from $6.25 Million to $36.2 Million
   ○   EBITDA rises from $43.4 Million to $82.4 Million
   ○   The number of sales centers remains constant at 99
   ○   Retail gross margin slowly increases from 21.1% to 22.1%
   ○   Securitizations fall by varying amounts, falling to $49 Million and averaging less than $100 Million
   ○   Cash flow from operations vary between a negative $54.2 Million projected for FYE 2004 and $72 Million projected for FYE 2005, then declining thereafter
   ○   Total projected cash flows increase from negligible amounts to $25.5 Million per year
   ○   Annual capital expenditures increase from $8 Million to $16 Million

○   The annual cash flow whose present value generates asset value is Free Cash Flow. In this case, OHC's Free Cash Flow can be computed as follows:

   Free Cash Flow = EBITDA − Taxes − Capital Expenditures − Increases in Working Capital − Reserve for Uncollectible Receivables + Sale of Loans − Increase in Retained Interests − Loans Originated.

○   Projected annual Free Cash Flows increase to an interim amount of $69 Million and a stabilized amount (such that sale of loans offsets loans originated and increase in retained interests) in the amount of $58.8 Million per year by the end of the projection horizon.

20

o    The foregoing projections form the basis for analysis of the reasonably anticipated Enterprise
     Value of Oakwood Homes, and its solvency, as of September 2002.

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Income Statement | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Net Sales | | | | | | |
| Retail | $ 313,032 | $ 249,307 | $ 286,631 | $ 306,945 | $ 328,741 | $ 355,665 |
| Wholesale | 318,677 | 328,068 | 363,752 | 383,237 | 403,776 | 425,478 |
| Net Sales | 631,709 | 577,375 | 650,383 | 690,182 | 732,517 | 781,143 |
| | | | | | | |
| Financial Services Income | | | | | | |
| Consumer Finance | (79,029) | 44,518 | 42,826 | 39,814 | 37,057 | 37,163 |
| Insurance | 7,279 | 4,240 | 3,912 | 3,670 | 3,486 | 3,328 |
| Financial Services Income | (71,750) | 48,759 | 46,738 | 43,484 | 40,543 | 40,491 |
| | | | | | | |
| Other Income | 12,094 | 5,131 | 5,894 | 6,294 | 6,723 | 7,254 |
| | | | | | | |
| Total Revenues | $ 572,053 | $ 631,265 | $ 703,015 | $ 739,960 | $ 779,782 | $ 828,889 |
| | | | | | | |
| | | | | | | |
| **Operating Cost and Expesnes** | | | | | | |
| Cost of Sales | 513,691 | 436,299 | 486,128 | 514,144 | 542,285 | 574,526 |
| Gross Profit Percent | 18.7% | 24.4% | 25.3% | 25.5% | 26.0% | 26.5% |
| | | | | | | |
| General & Administrative Expenses | 50,925 | 36,381 | 37,630 | 38,804 | 40,126 | 42,554 |
| as % of total revenues | 8.9% | 5.8% | 5.4% | 5.2% | 5.1% | 5.1% |
| Service Expenses (including warranty) | 35,627 | 26,293 | 29,657 | 31,444 | 33,344 | 35,525 |
| as % of total revenues | 6.2% | 4.2% | 4.2% | 4.2% | 4.3% | 4.3% |
| Selling Expense | 88,976 | 66,166 | 70,531 | 73,028 | 75,684 | 78,819 |
| as % of total revenues | 15.6% | 10.5% | 10.0% | 9.9% | 9.7% | 9.5% |
| Consumer Finance Operating Expenses | 44,586 | 36,573 | 33,084 | 30,175 | 27,854 | 26,107 |
| Insurance Operating Expenses | 4,158 | 456 | 456 | 456 | 456 | 456 |
| Provisions for Losses on Credit Sales | 6,177 | 822 | 864 | 916 | 970 | 1,031 |
| Interest Expenses | 36,998 | 14,538 | 12,979 | 10,482 | 9,196 | 9,555 |
| Total Operating Cost and Expenses | $ 781,138 | $ 617,530 | $ 671,330 | $ 699,449 | $ 729,915 | $ 768,572 |

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Income Statement | | Forecast FY 2003 | | Forecast FY 2004 | | Forecast FY 2005 | | Forecast FY 2006 | | Forecast FY 2007 | | Forecast FY 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restructuring and Impairment Costs** | | | | | | | | | | | | |
| Restructuring Costs & Impairment Costs | | 38,538 | | 0 | | 0 | | 0 | | 0 | | 0 |
| Recapture of Servicing Liabilites | | (87,790) | | 0 | | 0 | | 0 | | 0 | | 0 |
| Impairment of REMIC Regular Interests | | 1,209 | | 0 | | 0 | | 0 | | 0 | | 0 |
| Impairment of Guarantee Liabilities | | 235,776 | | 0 | | 0 | | 0 | | 0 | | 0 |
| Professional Fees | | 20,148 | | 1,650 | | 0 | | 0 | | 0 | | 0 |
| **Total Restructuring and Impairment Costs** | $ | 207,881 | $ | 1,650 | $ | 0 | $ | 0 | $ | 0 | $ | 0 |
| | | | | | | | | | | | | |
| **Income Before Taxes** | $ | (416,966) | $ | 12,085 | $ | 31,685 | $ | 40,511 | $ | 49,868 | $ | 60,317 |
| | | | | | | | | | | | | |
| Provisions for Income Taxes | | 0 | | 5,826 | | 12,674 | | 16,204 | | 19,947 | | 24,127 |
| | | | | | | | | | | | | |
| **Net Income** | $ | (416,966) | $ | 6,258 | $ | 19,011 | $ | 24,307 | $ | 29,921 | $ | 36,190 |
| | | | | | | | | | | | | |
| **EBITDA** (2003 Reflects Normalized EBITDA) | | 43,457 | | 48,065 | | 59,669 | | 64,518 | | 71,959 | | 82,395 |

23

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Consolidated Cash Flow | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Operating Activities** | | | | | | |
| Operations | | | | | | |
| Net Income/(Loss) | $ (416,966) $ | 6,258 $ | 19,011 $ | 24,307 $ | 29,921 $ | 36,190 |
| Depreciation and Ammortization | 29,679 | 9,250 | 8,677 | 9,028 | 9,442 | 9,920 |
| Non Cash Asset Impairment | 262,198 | 0 | 0 | 0 | 0 | 0 |
| (Gains)/Losses On Sale of Securities | 53,637 | 0 | 0 | 0 | 0 | 0 |
| (Increase)/Decrease in Retained Interests | (1,208) | (2,878) | (8,997) | (6,032) | (8,502) | (3,574) |
| Reserve for Uncollectable Receivables | 6,567 | (6,765) | (600) | (600) | (600) | (600) |
| Trade Accounts Receivable | 568 | (4,777) | (3,983) | (2,356) | (2,310) | (2,588) |
| Escrow Advances Receivable | 610 | (949) | (1,007) | (1,069) | (1,134) | (1,204) |
| Extensions Receivable | 12,447 | 3,748 | 3,322 | 2,944 | 2,610 | 2,313 |
| Income Taxes Receivable | 20,422 | 0 | 0 | 0 | 0 | 0 |
| Loans Servicing Assets | 7,397 | 8,664 | 4,169 | 2,988 | 1,385 | 1,619 |
| Other Receivables | 10,749 | 565 | 532 | 501 | 471 | 444 |
| Change in Inventory | 60,811 | 8,158 | (470) | 5,743 | (642) | (1,407) |
| Accounts Payable and Accrued Liabilities | 5,080 | (45,087) | 15,116 | 7,765 | 7,547 | 8,453 |
| Insurance Reserves and Unearned Premiums | (16,208) | 0 | 0 | 0 | 0 | 0 |
| Deferred Income Taxes | (378) | 455 | 787 | 442 | 465 | 509 |
| Other Assets | (31,085) | 0 | 0 | 0 | 0 | 0 |
| Other Lon-Term Obligations | (14,546) | (341) | (344) | (348) | (351) | (355) |
| Cash Provided by Operations | (10,226) | (23,699) | 36,213 | 43,313 | 38,302 | 49,720 |
| | | | | | | |
| Loans Originated | (319,464) | (68,533) | (72,037) | (76,293) | (80,809) | (85,893) |
| Principal Receipts on Loans/Sale of Loans | 22,506 | 0 | 0 | 0 | 0 | 0 |
| Sale of Loans | 328,411 | 38,032 | 107,883 | 75,443 | 103,398 | 49,205 |
| | | | | | | |
| **Cash Provided/(Used) by Operating Activities** | $ 21,227 $ | (54,200) $ | 72,059 $ | 42,463 $ | 60,891 $ | 13,032 |
| | | | | | | |
| **Investing Activities** | | | | | | |
| Acquisition of Properties & Facilities | 16,490 | (8,000) | (10,000) | (12,000) | (14,000) | (16,000) |
| Other | 0 | 0 | 0 | 0 | 0 | 0 |
| **Cash Provided/(Used) by Investing Activities** | $ 16,490 $ | (8,000) $ | (10,000) $ | (12,000) $ | (14,000) $ | (16,000) |

Oakwood Homes
5-Year Plan
Consolidated

| Consolidated Cash Flow | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Financing Activities** | | | | | | |
| Net Borrowings/(Repayments) on Short-Term Credit Facilities | (34,060) | 32,332 | (28,137) | 548 | 17,718 | 28,502 |
| Net Borrowings/(Repayments) on DIP | 1,990 | (2,191) | 0 | 0 | 0 | 0 |
| Net Borrowings/(Repayments) on Fresh Start Revolver | 0 | 27,059 | (33,920) | (5,937) | 0 | 0 |
| Payments on Notes and Bonds | (753) | 0 | 0 | 0 | 0 | 0 |
| Cash Provided/(Used) by Financing Activities | $ (32,823) $ | 57,200 $ | (62,057) $ | (5,389) $ | 17,718 $ | 28,502 |
| | | | | | | |
| **Cash and Cash Equivalents** | | | | | | |
| Beginning of Period | 20,107 | 25,000 | 20,000 | 20,000 | 45,074 | 74,247 |
| Net Increase/(Decrease) in Cash and Cash Equivalents | 4,892 | (5,000) | 0 | 25,074 | 29,173 | 25,534 |
| Cash and Cash Equivalents at End of Period | $ 25,000 $ | 20,000 $ | 20,000 $ | 45,074 $ | 74,247 $ | 99,781 |

25

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Consolidated Balance Sheet | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and Cash Equivalents | $ 25,000 | $ 20,000 | $ 20,000 | $ 45,074 | $ 74,247 | $ 99,781 |
| | | | | | | |
| Loans and Investments | | | | | | |
| Loans Held for Sale | 49,051 | 79,552 | 43,706 | 44,555 | 21,966 | 58,654 |
| Retained Interests | 18,754 | 21,632 | 30,629 | 36,660 | 45,162 | 48,737 |
| Less: Reserve for Uncollectable Receivables | (11,956) | (5,191) | (4,591) | (3,991) | (3,391) | (2,791) |
| Loans and Investments | 55,849 | 95,993 | 69,744 | 77,224 | 63,737 | 104,600 |
| | | | | | | |
| Other Receivables | | | | | | |
| Trade Accounts Receivable | 27,279 | 32,056 | 36,040 | 38,395 | 40,705 | 43,293 |
| Escrow Advances Receivable | 15,510 | 16,459 | 17,466 | 18,535 | 19,669 | 20,873 |
| Extensions Receivable | 32,985 | 29,237 | 25,916 | 22,971 | 20,361 | 18,048 |
| Other | 33,215 | 32,651 | 32,119 | 31,618 | 31,147 | 30,703 |
| Other Receivables | 108,989 | 110,403 | 111,541 | 111,519 | 111,882 | 112,917 |
| | | | | | | |
| Inventories | | | | | | |
| Manufactured Homes - New & Used | 82,197 | 75,781 | 76,835 | 78,044 | 79,424 | 80,495 |
| Raw Materials and Supplies | 19,901 | 19,901 | 19,901 | 13,920 | 14,186 | 14,357 |
| Work-in-Process | 4,453 | 4,547 | 4,610 | 4,683 | 4,765 | 4,830 |
| Land/Homes Under Development | 10,577 | 8,741 | 8,094 | 7,051 | 5,984 | 6,065 |
| Inventories | 117,128 | 108,970 | 109,440 | 103,698 | 104,339 | 105,747 |
| | | | | | | |
| Properties and Facilities, Net | 110,718 | 109,468 | 110,792 | 113,764 | 118,322 | 124,402 |
| Loan Servicing Assets | 23,585 | 21,586 | 17,416 | 14,429 | 13,044 | 11,424 |
| Other Assets | 79,109 | 79,450 | 79,794 | 80,142 | 80,493 | 80,848 |
| | | | | | | |
| **Total Assets** | $ 520,378 | $ 545,871 | $ 518,727 | $ 545,850 | $ 566,065 | $ 639,719 |

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Consolidated Balance Sheet | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Liabilities and Shareholder's Equity** | | | | | | |
| *Liabilites Not Subject To Compromise* | | | | | | |
| Short-Term Borrowing | | | | | | |
| CS First Boston Loan Purchase Facility | 14,940 | 47,271 | 19,134 | 19,682 | 1,963 | 30,465 |
| Revolver | 11,989 | 0 | 0 | 0 | 0 | 0 |
| Fresh Start Revolver | 0 | 39,857 | 5,937 | 0 | 0 | 0 |
| Short-Term Borrowings | 26,929 | 87,128 | 25,071 | 19,682 | 1,963 | 30,465 |
| | | | | | | |
| Accounts Payable and Accrued Liabilities | | | | | | |
| Accounts Payable | 30,719 | 37,136 | 45,946 | 48,725 | 51,358 | 54,322 |
| Servicing Liability | 0 | 0 | 0 | 0 | 0 | 0 |
| Accrued Warranty | 6,949 | 6,351 | 7,154 | 7,592 | 8,058 | 8,593 |
| Accrued Compensation | 8,377 | 5,808 | 6,210 | 6,506 | 6,720 | 6,991 |
| Other | 79,206 | 49,869 | 54,969 | 59,222 | 63,455 | 68,138 |
| Accounts Payable and Accrued Liabilities | 125,251 | 99,164 | 114,280 | 122,044 | 129,591 | 138,044 |
| | | | | | | |
| Insurance Reserves and Unearned Premiums | 66 | 66 | 66 | 66 | 66 | 66 |
| Deferred Income Taxes | 5,791 | 6,245 | 7,032 | 7,474 | 7,939 | 8,448 |
| | | | | | | |
| *Liabilites Subject To Compromise* | | | | | | |
| Notes and Bonds Payable | 308,434 | 7,112 | 7,112 | 7,112 | 7,112 | 7,112 |
| Accounts Payable and Accrued Liabilities | 66,278 | 0 | 0 | 0 | 0 | 0 |
| Other Long-Term Obligations | 381,879 | 0 | 0 | 0 | 0 | 0 |
| Shareholder's Equity | (394,248) | 0 | 0 | 0 | 0 | 0 |
| Fresh Start Shareholder's Equity | 0 | 346,155 | 365,166 | 389,473 | 419,394 | 455,584 |
| | | | | | | |
| Total Liabilities and Shareholder's Equity | $ 520,378 | $ 545,871 | $ 518,727 | $ 545,850 | $ 566,065 | $ 639,719 |

27

**Oakwood Homes**
Projected Free Cash Flows
*Five Year Plan*

| | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| EBIT | $    43,457 | $    38,815 | $    50,992 | $    55,490 | $    62,517 | $    72,475 |
| Depreciation & Ammortization | 9,500 | 9,250 | 8,677 | 9,028 | 9,442 | 9,920 |
| Taxes | 13,582 | 15,526 | 20,397 | 22,196 | 25,007 | 28,990 |
| Capital Expenditures | 6,000 | 8,000 | 10,000 | 12,000 | 14,000 | 16,000 |
| Working Capital | 100,867 | 120,209 | 106,701 | 93,173 | 86,630 | 80,620 |
| Accounts Recievable | 108,989 | 110,403 | 111,541 | 111,519 | 111,882 | 112,917 |
| Inventory | 117,128 | 106,970 | 109,440 | 103,698 | 104,339 | 105,747 |
| Accounts Payable | 125,251 | 99,164 | 114,280 | 122,044 | 129,591 | 138,044 |
| Δ Working Capital | 15,032 | 19,343 | (13,508) | (13,528) | (6,543) | (6,010) |
| Reserve for Uncollectible Recievables | (6,567) | 6,765 | 600 | 600 | 600 | 600 |
| Sale of Loans | 328,411 | 38,032 | 107,883 | 76,443 | 103,398 | 49,205 |
| Increase in Retained Interests | 1,208 | 2,878 | 8,997 | 6,032 | 8,502 | 3,574 |
| Loans Originated | 319,464 | 68,533 | 72,037 | 76,293 | 80,809 | 85,893 |
| Free Cash Flows | $    32,650 | $    (34,948) | $    69,029 | $    36,368 | $    52,982 | $    2,553 |
| | | | | | | |
| Stabilized Free Cash Flows | | | | | $ | 58,815 |

## LATE 2001 PROJECTIONS

○    These late 2001 projections are among the most aggressive projections during the 2001 time period. The income and expense projections assume a recovery in the Manufactured Housing industry, substantial growth in OHC manufacturing and retail revenues, as well as financial servicing revenues which return to pre-crash levels.

○    Summary Characteristics of these projections include:

       ○  Revenues increase from $956 Million in FYE 2002 to $1.515 billion by FYE 2007, representing a stabilized growth rate of approximately 9% by the end of the projection horizon

       ○  Gross margins increase from 30.9% in FYE 2003 to 34.1% in FYE 2007

       ○  EBITDA rises from $61.9 Million in FYE 2002 to $134.3 Million by FYE 2007

       ○  EBITDA Margins gradually rise to a level of 8.9% by FYE 2007

       ○  Free Cash Flow Before Debt Service is projected to range between negative $23.8 Million in FYE 2004 and $66.5 Million in FYE 2006. Stabilized Free Cash Flow reaches a level of $82.7 Million by FYE 2007.

**Oakwood Homes**
*Late 2001 Financial Projections*

| Pro Forma Financial Projections - OAC | | FY 2002 | | FY 2003 | | FY 2004 | | FY 2005 | | FY 2006 | | FY 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | |
| Total Manufacturing Revenues | $ | 929,600,000 | $ | 983,600,000 | $ | 1,055,700,000 | $ | 1,152,300,000 | $ | 1,257,700,000 | $ | 1,372,900,000 |
| Total Servicing Revenue | | 65,200,000 | | 97,800,000 | | 106,900,000 | | 114,400,000 | | 123,100,000 | | 132,700,000 |
| Other Revenue | | 45,100,000 | | 7,400,000 | | 9,600,000 | | 9,600,000 | | 9,600,000 | | 9,600,000 |
| **Total Revenue** | $ | 1,039,900,000 | $ | 1,088,800,000 | $ | 1,172,200,000 | $ | 1,276,300,000 | $ | 1,390,400,000 | $ | 1,515,200,000 |
| % Growth | | | | 4.7% | | 7.7% | | 8.9% | | 8.9% | | 9.0% |
| | | | | | | | | | | | | |
| **Gross Profit** | $ | 309,400,000 | $ | 336,800,000 | $ | 369,000,000 | $ | 413,400,000 | $ | 462,800,000 | $ | 517,400,000 |
| Gross Margin (% of Total Sales) | | 30.0% | | 30.9% | | 31.5% | | 32.4% | | 33.3% | | 34.1% |
| | | | | | | | | | | | | |
| **EBITDA** | $ | 61,900,000 | $ | 19,300,000 | $ | 35,700,000 | $ | 64,600,000 | $ | 97,400,000 | $ | 134,300,000 |
| EBITDA Margin (%of Total Sales) | | 6.0% | | 1.8% | | 3.0% | | 5.1% | | 7.0% | | 8.9% |
| | | | | | | | | | | | | |
| **Cash Flow:** | | | | | | | | | | | | |
| EBITDA | $ | 61,900,000 | $ | 19,300,000 | $ | 35,700,000 | $ | 64,600,000 | $ | 97,400,000 | $ | 134,300,000 |
| Less: Change in Working Capital & Other | | (8,100,000) | | 600,000 | | (39,800,000) | | (32,700,000) | | (33,600,000) | | (34,600,000) |
| Less: Change in Loans/Investments | | (32,800,000) | | 5,400,000 | | (15,200,000) | | (15,500,000) | | 8,300,000 | | (43,700,000) |
| Less: Change in Warehouse Facility | | 46,900,000 | | 18,600,000 | | 9,500,000 | | 9,500,000 | | 10,400,000 | | 11,400,000 |
| Less: Cash Capex | | (16,600,000) | | (13,000,000) | | (14,000,000) | | (15,000,000) | | (16,000,000) | | (17,000,000) |
| **Free Cash Flow Before Debt Service** | $ | 51,300,000 | $ | 30,900,000 | $ | (23,800,000) | $ | 10,900,000 | $ | 66,500,000 | $ | 50,400,000 |
| | | | | | | | | | | | | |
| Stabilized Cash Flows | | | | | | | | | | | $ | 82,700,000 |

30

## MID 2001 PROJECTIONS

o    The mid 2001 projections summarize data and projections contained in an "Oakwood Homes Discussion Materials" CSFB document dated March 2002 and containing aggressive projections and analyses as of July, 2001. As was the case with the other 2001 projections described in this report, the analyses appear to assume a substantial industry recovery and growing revenues which include financial service revenues.

o    Summary Characteristics of these projections include:

   o    Revenues increase from $1.15 Billion in FYE 2001 to $1.64 Billion in FYE 2005

   o    EBITDA increases from $21.9 Million to $131.6 Million. The implied EBITDA Margin is projected to reach 8%.

   o    Annual EBIT was projected to increase consistently from a negative $34.7 Million for FY 2001 to $70.6 Million for FY 2005

   o    After tax income was projected to rise to an annual level of $43.1 Million by FYE 2005

   o    Cash Flow from Operations increases from $21.9 Million in FYE 2001 to $104.1 in FYE 2005

   o    Free Cash Flow (unlevered) is projected to increase from a negative $45.5 Million in FYE 2001 to $90.8 Million in FYE 2005

   o    Stabilized Free Cash Flow as of the end of the projection horizon was projected to be $90.8 Million per year.

31

**Oakwood Homes**
Pro Forma Financial Projections
*Mid 2001*

| | Projected FYE September 31, | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| Revenue | $ 1,146,100,000 | $ 1,482,400,000 | $ 1,543,000,000 | $ 1,588,000,000 | $ 1,644,000,000 |
| EBITDA | $ 21,900,000 | $ 68,700,000 | $ 85,300,000 | $ 106,000,000 | $ 131,600,000 |
| EBIT | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 47,100,000 | $ 70,600,000 |
| Goodwill and Intangible Asset Ammortization | $ - | $ - | $ - | $ - | $ - |
| Pre-Tax Income | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 47,100,000 | $ 70,600,000 |
| Less: Income Taxes @   39% | $ - | $ - | $ - | $ 8,500,000 | $ 27,500,000 |
| After Tax Operating Income | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 38,600,000 | $ 43,100,000 |
| Plus: Depreciation & Ammortization | $ 56,600,000 | $ 55,000,000 | $ 56,900,000 | $ 59,900,000 | $ 61,000,000 |
| Operating Cash Flow | $ 21,900,000 | $ 68,700,000 | $ 85,300,000 | $ 98,500,000 | $ 104,100,000 |
| Plus: (Increase)/Decrease in Working Capital and Loan Trading | $ (54,400,000) | $ (77,000,000) | $ - | $ - | $ - |
| Less: Capital Expenditures | $ 13,000,000 | $ 12,000,000 | $ 12,400,000 | $ 12,900,000 | $ 13,300,000 |
| Unlevered Free Cash Flow | $ (45,500,000) | $ (20,300,000) | $ 72,900,000 | $ 85,600,000 | $ 90,800,000 |

32

## WEIGHTED AVERAGE COST OF CAPITAL

○   The discount rate applicable to free cash flow to the firm is the Weighted Average Cost of Capital, which is the weighted average of the required return to equity and the cost of debt.

    ○   The formula for the Weighted Average Cost of Capital is as follows:

$$WACC = R_{Equity} [E/C] + (1-T)[D/C]R_{Debt}$$

where:

| | | |
|---|---|---|
| WACC | = | Weighted Average Cost of Capital |
| $R_E$ | = | Cost of Equity Capital |
| $R_{Equity}$ | = | $R_f + \beta_L[R_m - R_f]$, per Capital Asset Pricing Model |
| $R_f$ | = | Risk Free Return |
| $R_m$ | = | Overall Market Return |
| $R_m - R_f$ | = | Market Risk Premium |
| $\beta_L$ | = | Subject Company Leveraged Beta Value |
| | = | Covariance, Stock Price & Market Index / Variance of Market Returns |
| T | = | Average Tax Rate |
| E/C | = | Equity to Total Capitalization |
| D/C | = | Debt to Total Capitalization |
| $R_{Debt}$ | = | Cost of Debt Capital (interest rate) |

○   The required rate of return to equity is the discount rate attributable to free cash flows to equity (i.e., after debt service), and is estimated utilizing the Capital Asset Pricing Model.

○   The Capital Asset Pricing Model, stripped of most of its underlying mathematical and statistical framework, states that investors in organized markets tend to price capital assets and securities so

33

that the expected return on such assets or securities is equal to the return on a riskless security, plus a premium for the risk which is relevant to the subject asset or business.  In turn, this "risk premium" is proportional to the asset's price volatility relative to that of an "average" stock or security.

o    The basic mathematical framework of the CAPM is:

$R_i = R_F + B_i [E(R_m) - R_F]$

where:

$R_i$    =    expected rate of return on security i, which is equal to the capitalization rate relevant to income from security i;

$R_F$    =    rate of return (interest rate) on a risk-less security, usually U.S. Treasury securities;

$E(R_M)$   =    expected rate of return on a portfolio consisting of <u>all</u> stocks; it is also the rate of return on an "average" stock; thus

$E(R_M) - R_F$ =    the <u>market risk premium,</u> or the "price of risk," for an average stock; it is the additional return over the riskless rate required to compensate investors for assuming an "average" amount of risk;

$B_i$    =    the relative volatility of the shares of firm or industry i; known as the "<u>beta coefficient</u>," it measures the sensitivity of the return on security i relative to general market movements.   For the average security or asset, B = 1.  The greater the risk, or volatility of return, the greater is B.  Thus:

$B_i[E(R_M) - R_F]$ =   the <u>risk premium on the subject security</u>, which is less than, equal to, or greater than the premium on an average security, depending on whether its beta value is less than, equal to, or greater than one.

34

o    Leveraged beta values for Oakwood can be estimated by determining the "asset beta" (i.e., unleveraged beta) typical for the subject industry, and then releveraging to account for the specific debt to capital and equity to capital ratios applicable to the subject company, using the following formula:

$$\beta_L \quad = \quad \beta_U [\, 1 + (1\text{-}T)(D/E)]$$

Where:

$\beta_L$    =    levered beta

$\beta_U$    =    unlevered beta

o    In determining the appropriate beta values for calculating the required return to equity applicable to Oakwood Homes Corp., financial data with respect to the following competitor companies was reviewed:

> Clayton Homes
>
> Champion Enterprises
>
> Palm Harbor Homes
>
> Nobility Homes
>
> Skyline Corp.
>
> Cavalier Homes
>
> Coachmen Industries
>
> Southern Energy Homes
>
> Liberty Homes
>
> Fleetwood Enterprises

In addition, Ibbotson Associates data for companies in SIC Code 2451 was reviewed.

o    Analysis of the applicable Equity Risk Premium was based on published studies and Ibbotson Associates data. These studies imply an Equity Risk Premium as of the dates of value of this report in a range of 4% to 7%. Based on the economic conditions then applicable as well as most recent Ibbotson studies, the Equity Risk Premium was estimated to be 6%.

35

o    The required return to equity for OHC would also be subject to adjustments for size and specific risk. The market capitalization for OHC places it in the small firm, probably tenth decile, category. Similarly a low market to book value ratio and high industry risk imply a specific risk premium.

o    Our analyses resulted in the following valuation parameters for use in the CAPM as applied to Oakwood:

| | | |
|---|---|---|
| $\beta_U$ | = | 0.93 |
| $\beta_L$ | = | 1.07 |
| Debt/Capital | = | 10% |
| Equity/Capital | = | 90% |
| Size Premium | = | 2.9% - 3.5% |
| Specific Risk Premium | = | 3% - 5% |
| $R_F$ | = | 5.5% |

o    The resulting range of values for $R_E$ is 18% to 20%

o    Assuming a cost of debt in the range of 10% to 12% results in a range of applicable values for WACC between 16.8% and 18.6%, with most values approximately 18%.

36

# FAMA-FRENCH MODEL

o   The Fama-French Three Factor Model incorporates information with respect to a company's size and financial risk in addition to the market factor used in the CAPM.  Small companies and financially distressed companies (as measured by higher book-to-market ratios) demonstrate more risk, which implies a higher cost of equity.

o   The formula for the Fama-French Model is:

$$E(R_i)-R_f = \beta_m RP_m + \beta_s RP_s + \beta_v RP_v$$

Where:

| | | |
|---|---|---|
| $E(R_i)$ | = | expected return on security i; |
| $R_f$ | = | rate on risk-free asset; |
| $\beta_m$ | = | market coefficient in the Fama-French regression; |
| $RP_m$ | = | expected market risk premium; |
| $\beta_s$ | = | small-minus-big (SMB) coefficient in the Fama-French regression; |
| $RP_s$ | = | the expected SMB risk premium, estimated as the difference between the historical average annual returns on the small-capitalization and large-capitalization portfolios; |
| $B_v$ | = | high-minus-low (HML) coefficient in the Fama-French regressions; and |
| $RP_v$ | = | the expected HML risk premium, estimated as the difference between the historical average annual returns on the high book-to-market stocks and the low book-to-market stocks. |

o   Ibbotson Associates reports that the Fama-French analysis of the Cost of Equity Capital for SIC Code 2451, the Mobile Home Industry, with data inclusive of Oakwood Homes, is in a range of 20.58% to 21.55%

o   The Weighted Average Cost of Capital results derived from the Fama-French Model were in the range of 19.76% to 20.54%

## OHC SEPTEMBER 2002 DCF VALUATION

o     The Enterprise Value (i.e., Asset Value) of OHC as of September 2002 can be estimated by application of the discount rate analysis and terminal value analysis to the Free Cash Flows derived from the Five Year Plan projections.

o     The present value of the Free Cash Flows, utilizing a discount rate range of 16% to 20%, is in an overall range of $82.5 Million to $92.75 Million (rounded). The primary range is $82.5 Million to $87.5 Million.

o     The Continuing Value of the OHC Cash Flows (i.e., present value of OHC Terminal Value) can be obtained by application of a capitalization rate given by the Gordon Model:

Cap Rate = 1/(Discount Rate – Growth Rate)
Or by application of a multiple equal to 5 x Final Year EBITDA.

o     Application of the foregoing Terminal Value Analyses yields an overall value range for OHC's continuing value of between $133.1 Million and $242 Million, with a primary range of $133.1 Million to $168.3 Million.

o     The resulting Enterprise Value range is $215 Million to $270 Million. The estimated value is $245 Million.

o     In addition to the above, the Income & Expense projections for the Five Year Plan imply that there are some excess assets on the OHC balance sheet as of September 2002, primarily consisting of excess inventory. The maximum likely value of these excess assets was in a range of $50 Million to $60 Million.

o     The Enterprise Value derived for Oakwood as of September 2002 was $300 Million. Oakwood's debt plus guarantee obligations totaled approximately $510 Million:

| | | |
|---|---|---|
| Short Term Borrowings: | $59.0 | |
| Notes & Bonds Payable: | 309.2 | |
| B-2 Guarantees: | 144.0 | |
| Total: | $512.2 | Million |
| Rounded: | $510.0 | Million |

o     Oakwood was substantially insolvent as of September, 2002, as its Enterprise Value (Asset Value) was $210 Million less than the value of its Debt and B-2 Guarantees.

**Oakwood Homes**
Value Analysis Summary
*Five Year Plan*

**Free Cash Flows**

| | Discount Rate | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| | Present Value | $ 92,758 | $ | 87,447 | $ | 82,572 |

**Terminal Value #1**

| | | $ 411,975 | (5 x Yr. 2006 EBITDA) | | | |
|---|---|---|---|---|---|---|
| | Discount Rate | 16% | | 18% | | 20% |
| | Present Value | $ 169,092 | $ | 152,609 | $ | 137,970 |

**Terminal Value #2**

| | Discount Rate | 16% | | 16% | | 18% | | 18% | | 20% | | 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Growth Rate | 4% | | 5% | | 4% | | 5% | | 4% | | 5% |
| | Terminal Value | $ 530,119 | $ | 589,487 | $ | 454,388 | $ | 498,796 | $ | 397,589 | $ | 432,290 |
| | Present Value | $ 217,583 | $ | 241,950 | $ | 168,320 | $ | 184,770 | $ | 133,152 | $ | 144,773 |

**Enterprise Value Range**

| | Discount Rate | 16% | | 16% | | 16% | | 18% | | 18% | | 18% | | 20% | | 20% | | 20% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Growth Rate | TV #1 | | 4% | | 5% | | TV #1 | | 4% | | 5% | | TV #1 | | 4% | | 5% |
| | Range | $ 261,850 | $ | 310,341 | $ | 334,708 | $ | 240,055 | $ | 255,766 | $ | 272,216 | $ | 220,542 | $ | 215,724 | $ | 227,345 |

## OHC SEPTEMBER 2001 DCF VALUATION

o    The Enterprise Value of OHC as of September 2001 can be estimated by application of the discount rates derived above to the 2001 Free Cash Flows developed in the mid 2001 and late 2001 projections.

o    Application of the discount rates, stabilized growth rates and EBITDA multiples described above to the late 2001 projected Free Cash Flows results in a primary Enterprise Value range of $280 Million to $353 Million.

o    Application of the discount rates, stabilized growth rates and EBITDA multiples to mid-2001 Projected Free Cash Flows results in an Enterprise Value range between $305 Million and $373 Million.

o    Most of the Enterprise Value analyses cluster around $350 Million. Therefore, the implied Enterprise Value for Oakwood as of September 2001 was $350 Million.

o    Oakwood's debt plus guarantee obligations as of September 2001 totaled approximately $470 Million:

| | | |
|---|---|---|
| Short Term Borrowings: | $47.5 | |
| Notes & Bonds Payable: | 323.1 | |
| B-2 Guarantees: | 100.0 | |
| Total: | $470.6 | Million |
| Rounded: | $470.0 | Million |

o    Oakwood was substantially insolvent as of September, 2001, as its Enterprise Value (Asset Value) was $120 Million less than the value of its Debt and B-2 Guarantees.

41

## Oakwood Homes
### Value Analysis Summary
*Late 2001 Financial Projections*

**Free Cash Flows**

| | 16% | 18% | 20% |
|---|---|---|---|
| Discount Rate | 16% | 18% | 20% |
| Present Vlaue | $ 110,307,997 | $ 104,540,672 | $ 99,295,460 |

**Terminal Value #1**

| | 16% | 18% | 20% |
|---|---|---|---|
| EBITDA '07 Multiple | $ 671,500,000 | | |
| Discount Rate | 16% | 18% | 20% |
| Present Value | $ 275,611,974 | $ 248,744,779 | $ 224,883,991 |

**Terminal Value #2**

| | 16% | 18% | 20% |
|---|---|---|---|
| Assumed Growth Rate | 4% | | |
| 2008 Stabilized Free Cash Flow | $ 86,008,000 | | |
| Cap Rates | 12% | 14% | 16% |
| Capitalized Values | $ 716,733,333 | $ 614,342,857 | $ 537,550,000 |
| Discount Rate | 16% | 18% | 20% |
| Present Values | $ 294,177,645 | $ 227,571,970 | $ 180,024,407 |

**Terminal Value #3**

| | 16% | 18% | 20% |
|---|---|---|---|
| Assumed Growth Rate | 5% | | |
| 2008 Stabilized Free Cash Flow | $ 86,835,000 | | |
| Cap Rates | 11% | 13% | 15% |
| Capitalized Values | $ 789,409,091 | $ 667,961,538 | $ 578,900,000 |
| Discount Rate | 16% | 18% | 20% |
| Present Values | $ 324,006,847 | $ 247,434,021 | $ 193,872,439 |

**Enterprise Value Range**

| At Discount Rate | 16% | 18% | 20% |
|---|---|---|---|
| PV of FCF + PV of Terminal Value #1 | $385,919,971 | $353,285,450 | $324,179,452 |
| PV of FCF + PV of Terminal Value #2 | $404,485,642 | $332,112,642 | $279,319,868 |
| PV of FCF + PV of Terminal Value #3 | $434,314,844 | $351,974,692 | $293,167,899 |

42

**Oakwood Homes**
Value Analysis Summary
*Financial Projections*
*Mid 2001*

### Free Cash Flows

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| Discount Rate | | 16% | | 18% | | 20% |
| Present Vlaue | $ | 82,900,779 | $ | 75,071,769 | $ | 67,944,959 |

### Terminal Value #1

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| EBITDA '05 Multiple | $ | 658,000,000 | | | | |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Value | $ | 313,282,364 | $ | 287,617,864 | $ | 264,435,442 |

### Terminal Value #2

| | | 12% | | 14% | | 16% |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 4% | | | | |
| 2006 Stabilized Free Cash Flow | $ | 94,432,000 | | | | |
| Cap Rates | | 12% | | 14% | | 16% |
| Capitalized Values | $ | 786,933,333 | $ | 674,514,286 | $ | 590,200,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 374,669,202 | $ | 294,836,411 | $ | 237,188,143 |

### Terminal Value #3

| | | 12% | | 14% | | 16% |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 5% | | | | |
| 2006 Stabilized Free Cash Flow | $ | 95,340,000 | | | | |
| Cap Rates | | 12% | | 14% | | 16% |
| Capitalized Values | $ | 794,500,000 | $ | 681,000,000 | $ | 595,875,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 378,271,791 | $ | 297,671,376 | $ | 239,468,798 |

### Enterprise Value Range

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| At Discount Rate | | 16% | | 18% | | 20% |
| PV of FCF + PV of Terminal Value #1 | $ | 396,183,143 | $ | 362,689,633 | $ | 332,380,401 |
| PV of FCF + PV of Terminal Value #2 | $ | 457,569,982 | $ | 369,908,180 | $ | 305,133,102 |
| PV of FCF + PV of Terminal Value #3 | $ | 461,172,570 | $ | 372,743,145 | $ | 307,413,757 |

43

## DCF CONCLUSIONS

o    Oakwood Homes Corp was insolvent by September 2001, and more so by September 2002.

o    Oakwood's Enterprise Value fell between September 2001 and September 2002, while the amount of its Debt plus B-2 Guarantees increased.

o    By FYE 2001 it was clear that business conditions and Free Cash Flows were not likely to improve sufficiently to allow OHC's Enterprise Value to reach or exceed the value of its Debt plus Guarantees within a reasonable time frame.

o    By September 2001, the likelihood of OHC's insolvency being reversed was remote, and by September 2002 OHC's continued insolvency was a virtual certainty.

o    Continued securitization and guaranteed B-2 issuance resulted in dissipation of OHC's Enterprise Value, i.e. reduction in the value of corporate assets.

# EQUITY AS A CALL OPTION

o     Equity in a highly leveraged distressed firm, and a firm which is insolvent or operating in the zone of insolvency, can be viewed as an out-of-the-money call option on the Enterprise Value of the firm.

o     Equity in such firms may have value, even if the firm is insolvent, because of the time premium on the call option (i.e., the time to maturity of the firm's debt) and the possibility that asset values may increase to levels above the face value of the debt before the maturity date of the debt, in view of the variance of asset value.

o     The analysis of equity value in an insolvent or distressed firm as a call option on future firm value has meaning only for limited liability equity investors whose potential losses are limited to the acquisition price of the equity, and whose potential gains, if any, are a function of the extent to which future asset values may exceed debt values.  Such an equity investor can potentially benefit from large "upside" variance in value while avoiding most of the "downside" variance. Option theory is not directly applicable to decision makers for the firm as a whole, because they face not only upside variance but significant downside risk as well, far beyond the limited risk faced by the hypothetical equity investor.

o     Given the above description of equity value as a call option on firm value, the key variables in such an analysis are:

    1.     Underlying asset value
    2.     Variance of asset value
    3.     Strike price on the option
    4.     Time to expiration
    5.     Interest rates

45

**BLACK-SCHOLES MODEL**

o    The most frequently used valuation model for valuing call options is the Black-Scholes Model, which estimates the value of an option using a relatively small number of input variables.

o    In the Black Scholes Model the value of Equity in an insolvent firm, viewed as a call option on the firm value, is a function of the following variables:

| | | |
|---|---|---|
| S | = | Current value of the underlying asset |
| | = | Enterprise value of the firm |
| K | = | Strike price of the option |
| | = | Face value of the firm's debt |
| t | = | Life to expiration of the option |
| | = | Weighted average duration of the debt |
| r | = | Risk-free interest rate corresponding to life of the option |
| | = | U.S. Treasury Bond rates corresponding to duration of firm's debt |
| $\sigma^2$ | = | Variance in ln (value) of underlying asset |
| | = | Variance of Enterprise Value of firm |

o    The value of a call option (i.e., the value of equity in an insolvent firm) is given by:

Equity Value = $SN(d_1) - Ke^{-rt}N(d_2)$

Where:

| | | |
|---|---|---|
| $d_1$ | = | $\dfrac{\ln(S/K) + (r + (\sigma^2/2))t}{\sigma\sqrt{t}}$ |
| $d_2$ | = | $d_1 - \sigma\sqrt{t}$ |

and:

| | | |
|---|---|---|
| $e^{-rt}$ | = | present value factor reflecting the delay until the debt becomes due |

$N(d_1)$ and $N(d_2)$ are cumulative normal probabilities based on the values of $d_1$ and $d_2$

o    In the Black-Scholes Model, increases in Enterprise Value, the variability (i.e., variance) of Enterprise Value, duration of firm debt and interest rates will tend to increase Equity Values, while increases in the Face Value of firm debt will tend to decrease equity values.

46

o     The analyses developed above can be used to derive inputs in the Black-Scholes Model for valuation of the Equity Value of Oakwood Homes Corp. as a distressed firm.

## VALUATION OF OAKWOOD HOMES EQUITY AS CALL OPTION

○    The inputs for valuation of OHC Equity as of September 2001 and September 2002 utilizing the Black-Scholes Model are:

Enterprise Value:

9/01    :    $350 Million

9/02    :    $300 Million

Face Value of Debt & Guarantees:

9/01    :    $470 Million

9/02    :    $510 Million

Weighted Average Debt Duration:

9/01    :    5.42 years

9/02    :    4.42 years

Standard Deviation in Enterprise Value (per Damodaran data set):

9/01    :    40.85%

9/02    :    45.19%

Risk Free Interest Rate:

9/01    :    4.6%

9/02    :    3.6%

○    The resulting model output is:

    ○    September 2001:

| | | |
|---|---|---|
| $d_1$ | = | -0.077782711 |
| $N(d_1)$ | = | 0.46900045 |
| $d_2$ | = | -0.311463049 |

48

$N(d_2)$ = 0.377724315

| | | |
|---|---|---|
| Equity value | = | $25,795,270 |
| Value of Outstanding Debt + Guarantees | = | $324,204,730 |
| Rounded to: | | |
| Equity | = | $25.8 Million |
| Debt + Guarantees | = | $324.2 Million |

- September 2002:
  - $d_1$ = -1.654982583
  - $N(d_1)$ = 0.048964015
  - $d_2$ = -1.866007463
  - $N(d_2)$ = 0.031020161

| | | |
|---|---|---|
| Equity value | = | $1,196,180 |
| Value of Outstanding Debt + Guarantees | = | $298,803,820 |
| Rounded to: | | |
| Equity | = | $1.2 Million |
| Debt + Guarantees | = | $298.8 Million |

- Implication: Despite its insolvency as of September 2001, OHC's equity had some significant value as a call option on future firm value, but this value was almost completely dissipated by September 2002.

- In the Black-Scholes Model, $N(d_2)$ can be interpreted as the probability that $S > K$ before the firm's debt comes due, so that:

$$1 - N(d_2) = \text{default probability}$$

49

o    For OHC, the foregoing inputs imply an increase in default probability form 9/01 to 9/02:

Default Probability at 9/01:  62.3%
Default Probability as 9/02:  96.9%
Increase in Default Probability:  34.6%

Correspondingly:
Probability of Return to Solvency at 9/01:  37.7%
Probability of Return to Solvency at 9/02:  3.1%
Reduction in Likelihood of Return to Solvency:  34.6%

o    In addition, the Black-Scholes Model implies:

Reduction in Equity Valued as Call Option:  $24.6 Million
Reduction in Value of Debt & Guarantees:  $25.4 Million

o    This analysis indicates that by September 2001 OHC was insolvent and faced a high and increasing probability of default. Further, the likelihood of a return to solvency was remote by September 2001, and continued insolvency was virtually certain by September 2002. These conclusions follow from the analysis even using the extremely aggressive cash flow projections of mid 2001 and late 2001. It follows that more realistic cash flow projections as of mid to late 2001 would have resulted in the conclusion that OHC was even more insolvent, and that the likelihood of a return to solvency was even more remote, than depicted above.

o    Analysis of Equity Value, Debt Value and Default Probabilities for OHC supports conclusion that OHC was "a bad business getting worse."

## CONCLUSIONS

o    Oakwood Homes was quite insolvent by September, 2001, and given the extent of its insolvency, was certainly insolvent for a number of months before then.

o    By September, 2001, and for several months before, it was apparent that the likelihood of OHC recovering from its insolvency as a result of improving asset values was slim.

o    By September, 2002, the extent of OHC's insolvency had increased substantially and the prospects of a recovery to a solvent condition had become even more remote.

o    Continued operation of OHC's business model, involving securitization of loans and guaranteeing certain tranches of the securities, had the following impacts on OHC's asset values, debt and guarantee values and solvency between September 2001 and September 2002:
    o    Enterprise value fell from $350 Million to $300 Million
    o    Face value of debt plus present value of guarantee payments increased from $470 Million to $510 Million
    o    The extent of OHC's insolvency rose from a negative equity of $120 Million to a negative equity of $210 Million

o    In turn, from the perspective of valuing OHC's equity as a call option on firm value, continued operation of OHC's business model resulted in the following:
    o    Equity value decreased from $25.8 Million to $1.2 Million
    o    Debt value decreased from $324.2 Million to $298.8 Million
    o    OHC's probability of default increased from 62.3% to 96.9%

o    Oakwood Homes suffered damages as a result of continued operation of its business model in an amount of at least $50 Million. In addition, OHC paid fees related to the continuation of a business model which was destroying value. Such fees added to the damage suffered by OHC, and we are informed that the fees in question are in excess of $20 Million.

51

This Expert Report sets forth a summary of my opinions in this matter, and does not constitute every detail of my expected expert testimony, or every fact supporting my opinions. Moreover, I may form additional opinions based on additional information which may become available after the date of this report. I therefore reserve the right to supplement and/or amend this report in response to such new information

Respectfully,

FLAVELL, TENNENBAUM & EDWARDS

Michael Tennenbaum, Ph.D.

ADDENDUM

MICHAEL TENNENBAUM, PH.D.
PROFESSIONAL QUALIFICATIONS

## PROFESSIONAL EXPERIENCE

1971 To Date          Consulting Economist

Responsibilities: Economic and financial analyses and feasibility studies; going business, reorganization value, and real property valuations; market research studies; merger, acquisition, corporate reorganization and venture capital analyses; income loss studies; rendering of expert testimony.

## TEACHING EXPERIENCE

1969 To 1986          Professor, Department of Economics
                     California State University, Long Beach

Responsibilities: Taught courses in Managerial Economics, Urban Economics, Financial Analysis, Capital Theory and Investment Analysis, Monetary Theory, Antitrust Economics.

## RECENT REPRESENTATIVE ASSIGNMENTS

Valuation of department store assets of major publicly-held department store chain for bankruptcy reorganization

Valuation of large privately-held real estate company stock and assets in appraisal proceeding

Analyses of reorganization values, feasibility of plans of reorganization, and values of securities issued in connection with major bankruptcy reorganizations (e.g., DEP Corporation, House of Fabrics, Inc., Sun World, Inc., Carter Hawley Hale Stores, Inc., Ritter Ranch, Maguire Partners – Fifth & Grand Ltd., Wilshire Center Marketplace, Hechinger Company, Olympic Pipe Line Co.)

Statistical analysis of economic impacts of proximity to airport operations and toxic waste facilities on property values

Valuation of shareholders' equity in large, privately held theme restaurant company

Valuation and Financial Analysis of chain of home improvement stores

Valuation of going business concerns for merger, acquisition and divestiture

Major hotel, department store and office building feasibility studies and appraisals

Economic analysis of major network television program profitability

Economic feasibility analysis of developing luxury boxes at major sports stadium

Valuations of airport industrial properties, office buildings, hotels, condominium and apartment projects, shopping centers, marinas and cement plants

Valuation of losses in patent infringement cases

MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS
PAGE 2

## QUALIFIED EXPERT WITNESS

Superior Courts in the California Counties of Los Angeles, Orange, San Bernardino, San Diego, Riverside, Santa Barbara, Santa Clara and Ventura; in Wayne and Oakland Counties in Michigan; King County, Washington

Federal Bankruptcy Courts in Los Angeles, San Diego, Santa Ana and San Bernardino, California; Las Vegas, Nevada; Salt Lake City, Utah; and Seattle, Washington

Federal District Courts in Los Angeles and San Diego, California

Federal Tax Court in Los Angeles, California

Chancery Court in Wilmington, Delaware

## REPRESENTATIVE CLIENTS/REFERENCES

### Law Firms - Southern California Area

Andrews & Kurth
Bergman & Wedner, Inc.
Blecher & Collins
Breidenbach, Swainston & Way
Buchalter, Nemer, Fields & Younger
Cox, Castle & Nicholson
Fulbright & Jaworski
Gibson, Dunn & Crutcher
Greenberg, Glusker, Fields,
    Claman & Machtinger
Hennigan, Mercer & Bennett
Hughes, Hubbard & Reed
Irell & Manella
Jeffer, Mangels, Butler & Marmaro
Jones, Day, Reavis & Pogue
Katten, Muchin & Zavis
Kirkland & Ellis
Klee, Tuchin, Bogdanoff & Stern
Levene, Neale, Bender & Rankin
Lewis, D'Amato, Brisbois & Bisgaard

Loeb and Loeb
Manatt, Phelps & Phillips
McDermott, Will & Emery
Meserve, Mumper & Hughes
Morrison & Foerster
Munger, Tolles & Olson
Musick, Peeler & Garrett
O'Melveny & Myers
Pachulski, Stang, Ziehl & Young
Paul, Hastings, Janofsky & Walker
Pillsbury, Madison & Sutro
Richards, Watson & Gershon
Rosenfeld, Meyer & Susman
Schell & Delamer
Sheppard, Mullin, Richter & Hampton
Sidley, Austin, Brown & Wood
Skadden, Arps, Slate, Meagher & Flom
Stutman, Treister & Glatt
Weissmann, Wolff, Bergman, Coleman &
    Silverman

MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS
PAGE 3

### Law Firms - Other Locations

| | |
|---|---|
| Ackerman & Ackerman | Detroit, Michigan |
| Ashby & Geddes | Wilmington, Delaware |
| Bucknell, Stehlik, Sato & Stubner | Seattle, Washington |
| Culp, Guterson & Grader | Seattle, Washington |
| Danielson, Harrigan & Tollefson | Seattle, Washington |
| Dykema, Gossett, Spencer, Goodnow & Trigg | Detroit, Michigan |
| Foster, Pepper & Shefelman | Seattle, Washington |
| Greve, Clifford, Diepenbrock & Paras | Sacramento, California |
| Heller, Ehrman, White & McAuliffe | San Francisco, California |
| Hopkins, Sutter, Hamel & Park | Washington, DC |
| Murphy, Weir & Butler | San Francisco, California |
| Shulkin & Hutton | Seattle, Washington |
| Wilkie, Farr & Gallagher | New York, New York |
| Williams, Kastner & Gibbs | Seattle, Washington |

### Corporations

| | |
|---|---|
| Aetna Insurance | Equitable Insurance |
| Aldrich, Eastman & Waltch | Falcon Communications, Inc. |
| Alper Development Corporation | Federal Wholesale Toy Company |
| Ameron, Inc. | Forest City Properties, Inc. |
| The Arba Group | Goldman Sachs International |
| Arden Realty | Goldrich & Kest |
| Bank of America | Gordon Group Holdings |
| Beverly Hills Oil Company | Great Western Savings & Loan |
| Beverly Hills Transfer & Storage | Hilton Hotel Company |
| Blackstone Real Estate | House of Fabrics, Inc. |
| Bloomberg Financial | IML Trucking Company |
| British Petroleum/Shell Oil Company | The Irvine Company |
| Budget Rent a Car of | Johnson Controls, Inc. |
| Southern California | Knudsen Foremost Dairies |
| C & R Clothiers, Inc. | L'Ermitage Hotel Group |
| C.R. Bard, Inc. | LaSalle Paper Company |
| California Commerce Club | Leonard Green Partners |
| CalMat Corporation | Lerner Shops of California, Inc. |
| Carter Hawley Hale, Inc. | Lockheed Corporation |
| Century Laminators, Inc. | Maguire Partners |
| Chevys Inc. | MAXXAM, Inc. |
| Communicom Corporation | The May Department Stores Company |
| Community Bank | MCA/Universal |
| Computer Communications, Inc. | McDonald's Corporation |
| Continental Development Corp. | Mistele Oil & Gas Company |
| Davis Walker Corporation | Modernfold, Inc. |
| DEP Corporation | Monolith Portland Cement Company |
| Dolco Packaging Corporation | National Australia Bank |
| Dollar Rent a Car | National Drum & Barrel Company |
| Edison Brothers Stores, Inc. | NBI, Inc. |
| Emulex Corporation | Newfield Enterprises, Inc. |

MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS
PAGE 4

### Corporations - continued

Oaktree Capital Management
Olympic Pipe Line Co.
Orient Express Hotels Co.
Paramount Ranch Company
Perceptronics, Inc.
Preferred Financial Corp.
Pritzker Realty Group
Ritz-Carlton Hotel Company
Simon Property Group

Shapell Industries
Southwest Savings & Loan
Sun World, Inc.
Thrifty Oil Company
Toys-R-Us
Twentieth Century-Fox Film Corp.
Union Oil Company
W.R. Grace & Company
Watt Industries

### Government Agencies

U.S. Department of Justice
U.S. Department of Energy
California Attorney General's Office
California Department of Transportation
Los Angeles County Counsel's Office
Sacramento County Counsel
Port of Seattle
Los Angeles Unified School District

Santa Clara County Counsel
Southern California Rapid Transit District
City of Torrance
City of Long Beach
Burbank-Glendale-Pasadena Airport Authority
Los Angeles Coliseum Commission

## EDUCATION

1973    University of California, Los Angeles
        Ph.D., Economics
        Fields of Concentration included: Urban and Real Estate Economics; Monetary Analysis &
        Financial Markets; Microeconomic Theory; Capital Theory and Investment Analysis; Public
        Finance; Mathematical Economics
1967    M.A., Economics
1966    B.A., with honors, Economics and Mathematics

## PROFESSIONAL AFFILIATIONS

American Economic Association
American Finance Association
Western Economic Association

Omicron Delta Epsilon, National Honor Society
National Association of Business Economists

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————— | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on March 19, 2008,

I caused a copy of the ***Documents in Support of Plaintiff's Counter-Statement Certifying That***

***Genuine Issues Of Material Fact Exist (Volume II – Exhibits A-J)***, to be served upon the

individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: March 19, 2008           CAMPBELL & LEVINE, LLC

*/s/ Kathryn S. Keller*
Kathryn S. Keller (No. 4660)
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900