# Exhibit "K"

# [REDACTED]

# Exhibit "L"

| From: | DMuir@OakwoodHomes.com |
|---|---|
| Sent: | Monday, June 21, 1999 8:50 PM |
| To: | drich@hunton.com; fiachra.o'driscoll@csfb.com |
| Cc: | RFaulk@oakwoodhomes.com; MRutherford@OakwoodHomes.com; WTyser@OakwoodHomes.com |
| Subject: | Possible Deal Issues ("not" 99-C!) |

David and Fiachra:

Credit operations has raised two questions as to which I think we need your thoughts:

IndyMac office transition

As you may or may not know, OAC is "buying" two IndyMac offices, one in Indiana and one in Washington (state).  I think the gist of the transaction is that we are taking over the leases and hiring some employees.

Because of technology lead time issues, we will not be able to have OAC systems installed in these offices by July 1, the date on which we anticipate taking over these operations. In order to avoid having down time between July 1 and the date on which the technology will be ready (estimated to be approximately August 1), operations has proposed that loans be originated in these offices using IndyMac documents and in IndyMac's name. (We are unable to use OAC docs until the technology arrives and is ready.) Funding for the loans (all of which would be for unrelated, non-Oakwood
dealers) would be done with OAC cash and booked by OAC.  The employees doing the work would work for OAC.  The idea is to have IndyMac assign the loans to OAC simultaneously with funding.

Because OAC technology would not be in place, the loans would not be scored by OAC until after closing, but the underwriting would be under Oakwood supervision.

What we are trying to avoid is losing all the in-process and in the pipeline loans (and related dealer relationships) while the technology is being put in place.  I am informed that IndyMac has all necessary licenses in all states for which these offices do business, and I believe OAC has the required licenses as well.

What fatal issues do you see in this plan?  What logistical issues are we going to have to deal with (e.g. UCC-1 filings, etc.).

Proposed "credit builder" loan program

As you know, we charge relatively higher rates of interest to applicants which have relatively lower credit profiles.  These rates can obviously be an impediment to closing deals.

An idea that's being tossed around is a loan program which would provide that the interest rate on the loan be reduced at a point or points subsequent to origination.  Such reduction would be contingent on the customer's satisfactory performance under the loan contract (i.e. customer pays on time).  For purposes of discussion, assume that the amount (s) of any
reduction(s) are known at closing, so the only uncertainty is whether the reductions ultimately occur.

Presumably, in order to be effective from a marketing point of view, the provision for rate reduction would have to be included in the retail installment contract, thought I do not know this for certain.  Further, presumably, even if the rate reduction were written into the contract, the trigger would be "soft" in that it would provide for some level of discretion by OAC (unless introducing ambiguity into the contract causes other legal problems).  I assume that once reduced, there would be no provision for a rate increase in

1

CSFB-00174305



the event of subsequent unsatisfactory borrower performance.

What operations seems to be trying to do is "codify," if you will, an option that is always available to us, which is to do a loan modification in order to keep a good customer. However, one thing I think we are trying to avoid by use of the codification is the instant voluntary prepayment (from the REMIC standpoint) that now results when we modify a loan coupon downward.

I think my concerns with this from a securitization point of view are (1) explaining this to investors (i.e. too complicated at a time when we really need to keep things clear and simple); (2) rating agency reaction (i.e. do they assume in assigning levels that every eligible loan steps down, which may be a worse answer than what we have now); and (3) does the design or operation of this proposed contractual loan feature cause a REMIC tax problem? There probably are other issues I haven't yet thought of.

I would appreciate your thoughts on the foregoing. Obviously, the IndyMac origination question is the more pressing.

Many thanks!

Doug

P.S. to Rick and Mike: If I haven't explained these issues fully or correctly, please feel free to send a follow up email to Fiachra and David.

2

CSFB-00174306

# Exhibit "M"

| | |
|---|---|
| From: | O'Driscoll, Fiachra |
| Sent: | Monday, January 10, 2000 4:33 PM |
| To: | 'crichardson@greenpoint.com' |
| Cc: | 'bsmith@oakwoodhomes.com' |
| Subject: | Follow-up memo on OH |

This memo is a follow-up from our meeting with Oakwood's executives last month. It outlines possible alternatives that could form a basis for Greenpoint to work more closely with Oakwood:

1    Purchase land/home loans from Oakwood on a flow basis
- the retail sales "bang for the buck" to Oakwood from land/home loans is low because, for every home they sell, they must also finance the land
- this makes Oakwood particularly interested in selling the land/home loans
- this could be done, either with recourse to Oakwood, or at a discount price
- on the other hand, the land/home loans have high points attached

2    Purchase chattel paper loans
- Oakwood may also be interested in selling chattel paper loans because this would reduce their need to hold B-pieces

3    Do piggyback securizations for Oakwood
- Clayton/Vanderbilt routinely "piggybacks" for 21st Century, American Homestar's Finance Co.
- this means that Oakwood would sell a pool to GPT at par, and then take back the residual interest.
- GPT would then issue a securitzation combining both issuers
  - this would also help Oakwood with its subordinate piece liquidity

4    Use Oakwood's retail sales centers to remarket GPT repossessions
- Oakwood has sales centers in the same areas that have few repos in inventory
- they might also be prepared to retail some GPT repos

5    Purchase subordinate classes
- a key issue for Oakwood at this time is its liquidity situation

6    Equity injection into Oakwood Homes or Oakwood Acceptance
- the most pressing issue for Oakwood's executives at present is its stock price
- to cement relationship, GPT could buy a part of the finance company, Oakwood Acceptance
- alternatively, GPT could take a shareholding in the parent company Oakwood Homes

Each of these options has some potential benefits to you and to Oakwood. Some combination of these may be the package that helps you both. Let me know which of these you would like to explore in more detail.

1



CSFB-00174238

# Exhibit "N"

# [REDACTED]

# Exhibit "O"

From:           Serageldin, Kareem
Sent:           Thursday, September 14, 2000 4:05 PM
To:             O'Driscoll, Fiachra
Cc:             Donovan, Joseph; Chrystal, John; Herbert, John; May, Beth
Subject:        RE: Oakwood: I talked to the CFO again

(i) yes -- if finished goods then the same 2x coverage as the convertible bond.
(ii) yes -- we could increase to 25% but could we get a bit more spread on the covert in return?

-----Original Message-----
From:   O'Driscoll, Fiachra
Sent:   14 September 2000 16:53
To:     Serageldin, Kareem
Cc:     Donovan, Joseph; Chrystal, John; Herbert, John; May, Beth
Subject:        Oakwood: I talked to the CFO again

... about our latest proposal (warrants in the form of a convertible bond plus a CP loan warehouse). Bob told me, in the strictest confidence, that the board is likely to replace the CEO, who they feel is not moving quickly enough to change things. He believes that Oakwood needs to exit a number of markets, including the Northwest, and shut more plants. He is also clearly feeling a great deal of personal stress from the business situation, even though their existing financings have been extended for a year.

Bob likes our proposal a lot, and is looking at it alongside an asset-based revolver from Foothill that would also be secured by finished goods inventory. As you will recall, he also liked our last proposal, but the Board members felt it was giving away too much stock too cheaply.

Bob asked two things:  (i) if the revolver could be secured by either finished goods inventory or by loan inventory and (ii) if the conversion premium could be higher.

1



CSFB-00485278

# Exhibit "P"

# [REDACTED]

# Exhibit "Q"

# [REDACTED]

# Exhibit "R"

# [REDACTED]

# Exhibit "S"

# [Redacted]

# Exhibit "T"

| | |
|---|---|
| From: | BSmith@oakwoodhomes.com |
| Sent: | Saturday, February 17, 2001 2:24 PM |
| To: | fiachra.o'driscoll@csfb.com |
| Subject: | RE: OMI SSA etc |

Doug tells me we closed Friday evening. Thanks for your help in stewarding this thing through. I know it was problematic and took a huge effort on your part.

Now we need to work on making the warrants worth something.

Sales still stink and repos keep coming, so we may need to figure a strategy to deal with this. Wholesaling them is not an option because of the recovery rates, and we need more "new" paper in order to blend in the repos. Just like most companies, not many problems that more revenues won't fix.


-----Original Message-----
From: O'Driscoll, Fiachra [mailto:fiachra.o'driscoll@csfb.com]
Sent: Thursday, February 15, 2001 5:07 PM
To: Smith, Bob
Subject: FW: OMI SSA etc


-----Original Message-----
From: O'Driscoll, Fiachra
Sent: Thursday, February 15, 2001 4:37 PM
To: 'O'Brien, Duncan T.'; Douglas R. Muir (E-mail)
Cc: Serageldin, Kareem; Menkhaus, Susan; Xanthos, James
Subject: RE: OMI SSA etc


"Excluded Receivables Balance" means, with respect to any day, the sum, without duplication, of the following amounts: ....

.... plus (xii) the amount by which the aggregate Loan Balance of Eligible Receivables (a) secured by manufactured homes previously repossessed by the Seller or any of its Affiliates and (b) with a "beacon" or other Fair Isaacs score as shown on the credit bureau report relied upon in underwriting such Receivable of 100 or greater exceeds 67% of the remaining pool of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates plus (xiii) the aggregate amount of the Loan Balance of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates which must be disregarded in order to cause the remaining pool of Eligible Receivables secured by manufactured homes previously repossessed by the Seller or any of its Affiliates to have a weighted average borrower's Fair Isaacs score of 185 or greater as calculated using the customized score card in effect at the Seller at the date of this agreement.

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. CREDIT SUISSE GROUP and each of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this

1

CSFB-00178954



# Exhibit "U"

**From:**       BSmith@oakwoodhomes.com
**Sent:**       Thursday, April 12, 2001 12:07 PM
**To:**         fiachra.o'driscoll@csfb.com
**Subject:**    RE:

Who should go?  I was thinking of letting Duane handle this one by himself! I'll need to give you some more feedback on his visits to the competition. The one word that comes to mind is embarrassing.  They have to think we're totally incompetent since he is the only one they have met with one on one......and he really knows very little about our industry.

Myles and I have daily operational control and the Board looks to us for any decision, but we still have to work around Duane on a daily basis.  His focus lately is on expense reports, dress code and our employee gift policy. Myles and I tolerate that since it keeps him from getting into anything that matters.  Still a downer for mid level management.   The Board is aware of the situation and will need to take some sort of action before long.

We are making the operational changes now at retail that I wish we had made when I came here.  It also allows us to make the needed changes at OAC. We're not there yet, but at least our direction is clear and we're not going to back up.  I'm don't even wish for good luck, just for the bad luck to stay away.

Doug should be available anytime for a road show.  Suzanne and I will be up to our ears in Foothill, but will work it in even if we have to divide it up and split a week or something. I am working on some five year projections that we might want to include.  I get a little nervous about that, but only because we haven't released any of that kind of information to anyone except the banks.  AS part of the road show, we might also want to try and work in some of the ratings agencies.

As always, thanks for all of your hard work and support.

Bob


-----Original Message-----
From: O'Driscoll, Fiachra [mailto:fiachra.o'driscoll@csfb.com]
Sent: Wednesday, April 11, 2001 5:39 PM
To: Muir, Doug; Smith, Bob
Cc: Herbert, John
Subject:


Before we do the next deal, we need to take you guys on an extensive roadshow - something similar to the roadshow we did by plane last year. I will call you to talk about it

Fiachra O'Driscoll
CREDIT | FIRST
SUISSE | BOSTON
Managing Director
Asset Finance Group
Tel : (212) 325-4940
Fax : (212) 743-1090
Cell : (917) 680-6645
Email : fiachra.o'driscoll@csfb.com

1

CSFB-00182753



# Exhibit "V"

From:       Heyse, Mike
Sent:       Tuesday, May 08, 2001 9:49 PM
To:         O'Driscoll, Fiachra
Subject:    RE: Follow-up

Fiachra-

Our information regarding Oakwood is the following:

They own:
*   3 well located buildings in Greensboro, NC (size not yet determined)
*   1 warehouse in Elkhart, IN (112,000 square feet)
*   multiple single story metal prefab manufacturing facilities

These should hold substantial value, and they are only slightly leveraged.  That is the good news.

The bad news, I am sure you are aware of , -is that their credit is CCC and their earnings have been disappointing.

The net of it all is that we are going to make some calls to determine interest in the product.  We have completed transactions with lesser credit than this, but the cap rate will be fairly high (12-14%).  We would probably have to sell the buildings for book value (which would not allow them to use any NLO) because of the credit issue.  Our turnaround story for the company would need to be compelling.

Off the cuff, we may be able to raise $20 mil (if that is book value) by selling the HQ buildings, and $2.5-3.5 million by selling the Elkhart warehouse (if it is well constructed, and not in disrepair).  I will call you tomorrow or Thursday to discuss this further.

Thanks

-----Original Message-----
From:   O'Driscoll, Fiachra
Sent:   Tuesday, May 08, 2001 2:56 PM
To:     Heyse, Mike
Cc:     Herbert, John
Subject:    RE: Follow-up

My buddies Oakwood Homes have a five-floor office building in Greensboro, NC right next to the interstate.  They build the building greenfield in 1996/97 and I believe their cost basis is around $20mm.  They have been cashflow constrained because of their industry's downturn (manufactured housing) over the last year and are in an NOL position.  I think OH would consider seriously a sale and leaseback.  They also have 33 factories that they typically own freehold, but I would guess that these are tougher assets to finance and appraise.

I expect that they will have environmentals and other documentation in pretty good order.  What do you think?

-----Original Message-----
From:   Heyse, Mike
Sent:   Tuesday, May 08, 2001 2:37 PM
To:     O'Driscoll, Fiachra
Subject:    Follow-up

Fiachra -

It was a pleasure for us to meet you yesterday - your group seems to have quite a successful franchise.

I wanted to follow up on our post meeting conversation regarding some of your clients real estate.  Real estate is clearly an afterthought to most insurance companies - yet oftentimes it is an untapped financial resource.  If there is any leg work we can do for you (to determine what a certain company has in their portfolio) please let us know.

1

CSFB-00182807

EXHIBIT
CSFB
73   17.
6/30/06

# Exhibit "W"

| From: | O'Driscoll, Fiachra |
|---|---|
| Sent: | Thursday, May 17, 2001 10:18 PM |
| To: | Herbert, John |
| Cc: | Menkhaus, Susan |
| Subject: | RE: summary of call with Pru |

Sounds perfectly reasonable. Clearly the investor solicitation will be key. If the Trustees let us send consents directly to investors, this will be easier. However, if they make us do everything thru DTC, it will be painful

----Original Message----
From: Herbert, John
Sent: Thursday, May 17, 2001 4:02 PM
To: O'Driscoll, Fiachra
Subject: FW: summary of call with Pru

FYI

----Original Message----
From: Menkhaus, Susan
Sent: Thursday, May 17, 2001 3:48 PM
To: Herbert, John
Subject: summary of call with Pru

Here is what they said:

They went to committee today and this was what was decided:

$50 million size is fine.

T+250 is fine.

Need to get a rating of single A or better

Maturity of end of September 2003

Prepayment...would like it locked out for one year and then otherwise can prepay with a make whole provision.

Advance rate...they still need to discuss with you. They expect it would be high.

They would like a liquidity reserve and are flexible for how we would like to structure that. Something to cover interest payments for several months.

They still have some concern about the Section 2.06(a) 2 b, c and d relating to the offsets issue. I explained what we learned from Doug and he said that he would still like some kind of record of the non-servicer related repurchases. I told him I would follow up on that (which I will).

Last issue is one that is out of our hands. He said that given Oakwood's credit rating, he has to send this up the flag pole to get a "delegation of authority". He doesn't think it should be an issue, but just so we know.

He said that if you wanted to discuss this further, you can contact Eric.

susan

1

CSFB-00154902



EXHIBIT
CSFB
96 IO.
6/30/06

# Exhibit "X"

| | |
|---|---|
| From: | BSmith@oakwoodhomes.com |
| Sent: | Tuesday, June 05, 2001 3:55 PM |
| To: | Fiachra.O'Driscoll@csfb.com |
| Subject: | Various |

Some things I wanted to bounce off of you.

First, thanks for your help on the last REMIC. It helped provide some temporary respite from the ongoing repo issues.

We have a couple of REMIC's that we need to support to protect form a downgrade. Hunton & Williams apparently has concern about us doing that ( helping some deals and not others) and have made comments that we could endanger true sale treatment. Your thoughts?

Our Foothill deal is on hold until we can get the P & I advance loan completed. We are beginning to look for alternate sources of liquidity. Possibly a sale and lease back of some assets and a much smaller asset based deal.

Conseco had a recent article defending their DTOE program. (Same as our assumption program). Looks like our losses from assumptions will average 60% less than repos now that we have the missed payment issues worked out. Front end accounting is a little painful, but this should be offset by better REMIC performance which will come to income over time. All in all, the assumption play has much better economics.

Banks were a little perturbed that we didn't include some B pieces in the last deal. They were intending to take part of the cash proceeds as additional collateral. They make take some of the cash from the "excess" repos instead. They just continue to improve their position ( i.e.. tighten the screws).

June business is looking a little better than earlier months.........but I don't count anything before its over. Industry shipments were still down 30% in April and 38% YTD, and that was against a 31% decline in April last year. Our wholesale business is only down 20% year to date so we have to be taking market share from somebody.........most likely Champion.

Cheers

1

EXHIBIT
CSFB
77 -10.
6/30/06

CSFB-00184166

# Exhibit "Y"

**[Redacted]**

# Exhibit "Z"

Confidential

*Presentation to*

# OAKWOOD HOMES CORPORATION

AUGUST 9, 2001

CREDIT SUISSE | FIRST BOSTON



EXHIBIT
4/14/06

OAKWOOD HOMES

# TABLE OF CONTENTS

1    EXECUTIVE SUMMARY

2    INDUSTRY UPDATE

3    OAKWOOD UPDATE

4    ANALYSIS OF ALTERNATIVES

5    SUPPLEMENTAL DATA

6    CSFB DISTRESSED FINANCE ASSIGNMENTS

CREDIT | FIRST
SUISSE | BOSTON

CSFB- 00052850

OAKWOOD HOMES

# CSFB RESTRUCTURING EXPERTISE

An integrated team drawn from specialized groups will work with Oakwood

CSFB is uniquely suited to advise Oakwood. The firm's restructuring expertise is complemented by its #1 position in the High Yield market, strength in the asset backed market and #1 ranked research.

RESTRUCTURING GROUP

Phil Jacob
Managing Director

Jared Felt
Director

Joe Benavides
Associate

Ben Barnett
Analyst

ASSET BACKED SECURITIES

Fiachra O'Driscoll
Managing Director

John Herbert
Vice President

HIGH YIELD DISTRESSED DEBT SALES & TRADING

Don Pollard
Managing Director

Evan Ratner
Managing Director

EQUITY AND HIGH YIELD RESEARCH

Ivy Zelman
Managing Director
Equity Research

Larry Taylor
Director
High Yield Research

OAKWOOD HOMES CORPORATION

CREDIT | FIRST
SUISSE | BOSTON

CSFB- 00052851

CSFB- 00052852



OAKWOOD HOMES

2

# EXECUTIVE SUMMARY

CREDIT FIRST
SUISSE BOSTON

CSFB- 00052853

OAKWOOD HOMES

# EXECUTIVE SUMMARY

We believe that Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current liquidity levels to restructure the Notes.

**CSFB's Recommendation:**

➤ The recent liquidity transactions have successfully positioned the Company to pursue restructuring options

➤ CSFB believes the Company should proceed as follows:

**Step 1:** Proceed with Application of B-2 and Receivables Purchase Facility Proceeds

– Utilize B-2 proceeds to repay amounts outstanding under the revolver and maintain liquidity

**Step 2:** Replace the current credit facility with one from non-traditional lenders to further enhance liquidity and buy back bonds

– If possible, obtain a larger facility which can be used to buy back bonds. May require negotiating a "flip up" transaction to increase the attractiveness of the transaction

**Step 3:** Consider pursuing additional steps to further reduce debt at a discount

– Section 3(a)(9) package exchange offer

– One-off equity for debt exchange

**CREDIT | FIRST**
**SUISSE | BOSTON**

3

OAKWOOD HOMES

# EXECUTIVE SUMMARY (CONT'D)

The manufactured housing market may have reached a bottom and is expected to rebound

Industry Overview

▶ CSFB's #1 ranked equity research analyst believes that signals exist which may point to a bottom for the manufactured housing industry

   – Wholesale shipments are down 39% since peaking in 1997 and now below 1991 levels

   – Industry fundamentals remain compelling with strong demand and large cost advantages over traditional stick-builders

▶ The public securities of all industry participants are trading at distressed levels.

   – The aggregate market cap of Oakwood's, Cavalier's, Champion's, Clayton's, Fleetwood's, Palm Harbor's and Skyline's outstanding stock has declined from approximately $9 billion to approximately $4 billion since April 1998

   – Both Oakwood's and Champion's bonds, the only publicly traded bonds in the sector, have lost their investment grade ratings and trade at distressed levels

▶ We believe that industry fundamentals may have bottomed and there is some potential for a rebound.

   – In aggregate, industry stocks have rebounded approximately 83% since bottoming in October 2000

   – Both Oakwood's and Champion's bonds have recovered significantly

▶ We believe that Oakwood should aggressively pursue strategies to capitalize on the current depressed trading levels of its public bonds

   – Oakwood's bonds currently are quoted in the 40's and low-50's, up sharply from the low-30's levels set in December 2000

   – The combined discount on the Company's 2004 and 2009 Notes still totals more than $150 million

CREDIT | FIRST
SUISSE | BOSTON

4

CSFB- 00052855

2

CSFB-  00052856

OAKWOOD HOMES

5

# INDUSTRY UPDATE

CREDIT FIRST
SUISSE BOSTON

CSFB- 00052857

OAKWOOD HOMES

# ANNUAL HOME SHIPMENTS

*New home shipments remain pace to fall below the 10-year low reached in 1991.*



ANNUAL HOME AND FLOOR SHIPMENTS

—— Home Shipments    —— Floor Shipments

1980 HOME SHIPMENT MIX
Singles 72.0%
Multis 28.0%

1990 HOME SHIPMENT MIX
Singles 52.0%
Multis 48.0%

2000 HOME SHIPMENT MIX
Singles 30.0%
Multis 70.0%

CREDIT | FIRST
SUISSE | BOSTON

9

CSFB− 00052858

OAKWOOD HOMES

7

# 10 YEAR INDUSTRY STOCK PRICE PERFORMANCE

Manufactured housing stocks are trading near their 10 year lows and appear oversold.

WEEKLY FROM AUGUST 2, 1991 - AUGUST 3, 2001



Indexed Prices

— Oakwood Homes Corp.        —— Composite

Note: Comparable Company Index Includes Skyline Corp., Fleetwood Enterprises Inc., Cavalier Homes Inc., Clayton Homes Inc., Oakwood Homes Corp., Palm Harbor Homes Inc., Champion Enterprises Inc.

CREDIT | FIRST
SUISSE | BOSTON

OAKWOOD HOMES

# LTM STOCK PRICE PERFORMANCE

The industry stocks have begun to fall as industry expectations have improved

WEEKLY FROM AUGUST 11, 2000 - AUGUST 3, 2001



— Oakwood Homes Corp.

— Composite

Note: Comparable Company Index includes Cavalier Homes Inc., Champion Enterprises Inc., Clayton Homes Inc., Fleetwood Enterprises Inc., Oakwood Homes Corp., Palm Harbor Homes Inc., Skyline Corp.

CREDIT FIRST
SUISSE BOSTON

CSFB- 00052860

8

OAKWOOD HOMES

# BOND PRICING

Sector bonds have yet to rally from recent lows.

MANUFACTURED HOUSING DEBT



Source: FactSet

CREDIT | FIRST
SUISSE | BOSTON

ς

CSFB- 00052862

OAKWOOD HOMES

10

# OAKWOOD UPDATE

CREDIT SUISSE | FIRST BOSTON

CSFB- 00052863

OAKWOOD HOMES

# CHRONOLOGY OF SIGNIFICANT RECENT EVENTS

The Company has recently taken significant steps to bolster its capital structure and financial performance

| Date | Event |
|---|---|
| July 26, 2001 | The Company announced that it securitized its B-2 loans for approximately $72 million and will enter into a $50 million receivables purchase facility in conjunction with the release of its Q3 financial results. |
| June 18, 2001 | The announced June 8, 2001 reverse stock split was effected at the end of trading. |
| June 8, 2001 | The Board of Directors and Company Shareholders approved a 1-for-5 reverse stock split, effective after the close of business on June 18, 2001. |
| March 28, 2001 | The Company completed the sale of approximately $226 million of asset-backed securities. |
| February 26, 2001 | The Company entered into a three-year, $200 million-loan purchase facility with CSFB. CSFB received a warrant to acquire approximately 9.5 million shares of the Company's pre-split common stock at a price of approximately $1.97 per share. |
| November 28, 2000 | The Company stopped production at its Buckeye, Arizona manufacturing plant and fired approximately 250 employees. |
| September 30, 2000 | Dennis I. Meyer assumed the position of Chairman of the Board following the resignation of former Chairman and Chief Executive Officer William G. Edwards. Duane D. Daggett, formerly President and Chief Operating Officer, was named Chief Executive Officer. |
| August 23, 2000 | The Company received an extension of waivers pertaining to covenant violations of the Company's revolving credit facility and revolving warehouse facility. |
| July 7, 2000 | The Board of Directors named Duane D. Daggett President and Chief Operating Officer. |

CREDIT | FIRST
SUISSE | BOSTON

11

CSFB- 00052864

OAKWOOD HOMES.

# HISTORICAL AND PROJECTED FINANCIAL ANALYSIS (1)

Adverse market conditions have impaired the Company's financial performance and reduced free cash flows.

## HISTORICAL AND PROJECTED FINANCIAL ANALYSIS (1)

($ in millions)

| | FYE September 30, | | | | Nine Months Ended June 30, | | LTM |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2000 | 2001 | |
| **Income Statement Items** | | | | | | | |
| Sales | $1,070.1 | $1,482.6 | $1,589.2 | $1,284.1 | $962.6 | $766.3 | $1,087.8 |
| *% Growth* | ..... | *38.5%* | *7.2%* | *(19.2%)* | ..... | *(20.4%)* | ..... |
| EBITDA | 167.1 | 140.3 | 65.1 | (4.2) | 10.2 | (23.2) | (37.6) |
| *% Margin* | *15.6%* | *9.5%* | *4.1%* | *(0.3%)* | *1.1%* | *(3.0%)* | *(3.5%)* |
| Interest Expense | 19.8 | 24.5 | 40.7 | 50.3 | 37.9 | 44.7 | 57.1 |
| Taxes | 51.3 | 34.7 | (18.4) | 16.1 | (23.3) | 0.0 | (7.1) |
| Net Income | $81.9 | $55.4 | ($31.3) | ($120.9) | ($38.0) | ($120.8) | ($203.7) |
| **Cash Flow Statement Items** | | | | | | | |
| Depr. and Amort. | $14.3 | $25.0 | $64.6 | $50.3 | $36.9 | $46.3 | $59.7 |
| Deferred Income Taxes | (3.3) | (4.4) | (22.0) | 36.9 | (10.6) | 0.0 | 47.5 |
| Other Expenses/Charges (2) | (15.8) | 52.8 | 78.9 | 46.4 | 40.4 | 25.4 | 31.4 |
| Change in WC | (66.5) | 13.8 | (163.5) | 54.3 | 40.3 | 14.6 | 38.6 |
| *% of Sales* | *(6.2%)* | *0.9%* | *(10.3%)* | *5.0%* | *4.2%* | *1.9%* | *3.5%* |
| Gain/(Loss) on Loan Purchases & Sales | 60.8 | (122.8) | 30.0 | 68.6 | 101.9 | 58.2 | 24.9 |
| Dividends | (1.8) | (1.9) | (1.9) | (1.4) | (1.4) | 0.0 | 0.0 |
| CapEx | (38.4) | (51.4) | (46.9) | (21.0) | (16.7) | (9.4) | (13.7) |
| *% of Sales* | *(3.6%)* | *(3.5%)* | *(3.0%)* | *(1.6%)* | *(1.7%)* | *(1.2%)* | *(1.3%)* |
| Net Free Cash Flow (3) | $31.1 | ($33.6) | ($111.2) | $123.2 | $152.8 | $14.2 | ($15.4) |

(1) Source: Company SEC filings.
(2) Non-cash and non-operating charges include provisions for losses on credit sales, gains/(losses) on loans sold or held for sale, loss on sale of securities, impairment and valuation provisions, excess cash over REMIC income recognized, and restructuring charges and reversals.
(3) Net Free Cash Flow available to repay principal amount of indebtedness.

CREDIT FIRST
SUISSE BOSTON

12

OAKWOOD HOMES

# CAPITALIZATION AND RATIO SUMMARY ANALYSIS(1)

Despite the distressed trading levels of the senior notes the company's equity has retained value.

## CAPITALIZATION AND RATIO SUMMARY ANALYSIS (1)

($ in millions)

| | At FYE September 30, | | | | At June 30, | | 8/3/2001 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1997 | 1998 | 1999 | 2000 | 2000 | 2001 | LTM |
| **Capitalization** | | | | | | | |
| Cash | $28.7 | $29.0 | $26.9 | $22.5 | ----- | $20.7 | $20.7 |
| *Debt* | | | | | | | |
| Bank Debt (2) | $175.8 | $375.0 | $199.8 | $65.5 | ----- | $54.9 | $54.9 |
| Notes & Bonds | 78.8 | 61.9 | 352.2 | 329.9 | ----- | 323.7 | 323.7 |
| Letters of Credit | 13.3 | 14.5 | 27.0 | 35.4 | ----- | 33.4 | 33.4 |
| Total Debt | 267.9 | 451.4 | 578.9 | 430.8 | ----- | 412.0 | 412.0 |
| Shares Outstanding (3) | 46.3 | 46.7 | 47.1 | 47.1 | ----- | 9.5 | 9.5 |
| Share Price (4) | $28.375 | $13.125 | $4.500 | $1.500 | ----- | $5.000 | $8.500 |
| Equity Value | 1,313.7 | 612.4 | 212.0 | 70.7 | ----- | 47.6 | 81.0 |
| Total Enterprise Value (TEV) | $1,552.9 | $1,034.9 | $764.0 | $479.0 | ----- | $439.0 | $472.4 |
| **Leverage, Coverage & Valuation Ratios** | | | | | | | |
| Total Debt / EBITDA | 1.6 x | 3.2 x | 8.9 x | NM | ----- | ----- | NM |
| EBITDA / Interest Exp. | 8.4 x | 5.7 x | 1.6 x | NM | ----- | ----- | NM |
| (EBITDA - CapEx) / Interest Exp. | 6.5 x | 3.6 x | 0.4 x | NM | ----- | ----- | NM |
| TEV / EBITDA | 9.3 x | 7.4 x | 11.7 x | NM | ----- | ----- | NM |

(1)  Source: Company SEC filings.
(2)  Bank debt as of June 30 includes $1.9 million First Union loan, $16.0 million revolver, $37.0 million CSFB loan purchase facility.
(3)  Reflects the one-for-five reverse stock split announced on June 8, 2001 which was effective on June 18, 2001.
(4)  Share Price as of 09/03/01 is $8.50.

CREDIT SUISSE | FIRST BOSTON

13

CSFB- 00052866

OAKWOOD HOMES

# CURRENT SUMMARY CAPITALIZATION

Oakwood's senior notes are trading at a combined discount of more than $150 million

## CAPITALIZATION (1)
*($ in millions)*

| | Maturity | Amount Outstanding June 30, 2001 | Market Capitalization as of August 03, 2001 | | |
| --- | --- | --- | --- | --- | --- |
| | | | Price | Yield | Amount |
| Revolving Credit Facility | Various | $16 | | | $16 |
| CSFB Loan Purchase Facility | Various | 37 | | | 37 |
| IRBs and Other | Various | 10 | | | 10 |
| Letters of Credit | Various | 33 | | | 33 |
| 7.875% Senior Notes | 3/1/2004 | 174 | 52.0 | 39.3% | 91 |
| 8.125% Senior Notes | 3/1/2009 | 125 | 40.0 | 26.0% | 50 |
| 8.000% Reset Debentures | Various | 17 | 50.0 | | 8 |
| Total Debt | | $412 | | | $245 |
| Shareholders' Equity(2) | | 306 | | | 81 |
| Total Capitalization | | $718 | | | $326 |

(1) Source: CSFB HY trading desk, Company executive report and other information for the period ended June 30, 2001.
(2) Share Price as of 08/03/01 is $8.50.

CREDIT | FIRST
SUISSE | BOSTON

14

CSFB- 00052867

OAKWOOD HOMES

15

# HISTORICAL STOCK PRICES



Oakwood's stock has doubled since year end

DAILY FROM AUGUST 3, 2000 – AUGUST 6, 2001



—— Oakwood Homes Corp.

High: $13.00  Low: $2.50  Avg. Price: $6.37

(1) 8/3/00 - Suspended a regular cash dividend of $0.01 per share of common stock.
(2) 11/28/00 - Shutdown Arizona plant and fired 250 employees.
(3) 4/26/01 - Reported Q3 revenues of $243.3 million and losses of $28.0 million.
(4) 6/8/01 - Announced a one-for-five reverse stock split.
(5) 6/18/01 - Reverse stock split effected
(6) 7/26/01 - Announced liquidity transactions and Q3 results.

CREDIT | FIRST
SUISSE | BOSTON

CSFB–  00052868

OAKWOOD HOMES

# HISTORICAL BOND PRICES

Oakwood's bonds have rebounded significantly from the low 20's levels but still trade more than $30 million of discount.

HISTORICAL BOND PRICES



(Percentage of Par)

— 8.125% Senior Notes due 2009
— 7.875% Senior Notes due 2004

CREDIT SUISSE | FIRST BOSTON

16

none
none

CSFB- 00052869

CSFB- 00052870

OAKWOOD HOMES

17

# ANALYSIS OF STRATEGIC ALTERNATIVES

CREDIT | FIRST
SUISSE | BOSTON

CSFB- 00052871

OAKWOOD HOMES

18.

# COMPANY OBJECTIVES

Although the Company has recently made great progress in addressing capital structure and operating/strategy issues, CSFB believes more can be accomplished to reduce the capital structure's drag on the business.

## Key Objectives

▶ Avoid a "going concern issue"

▶ Replace current bank group

▶ Better utilize assets to raise non-traditional capital

▶ Reduce cash interest burden on Company

▶ Reduce debt and increase the common share price

▶ Improve the Company's credit profile thereby facilitating future access to the capital markets

▶ Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty

**CREDIT | FIRST**
**SUISSE | BOSTON**

OAKWOOD HOMES

# OVERVIEW OF STRATEGIC ALTERNATIVES

We believe that Oakwood can further reduce debt at a discount and build shareholder value

► CSFB believes the Company should proceed as follows:

**Step 1: Proceed with Application of B-2 and Receivables Purchase Facility Proceeds**
 – Utilize B-2 proceeds to repay amounts outstanding under the revolver and maintain liquidity
 – The sources and suggested immediate uses of cash are the following:

| Sources | | Uses | |
|---|---|---|---|
| Receivables Facility | $50 | Revolver | $16 |
| B-2 | | Available Liquidity | 106 |
| Amount Sold | $131 | | |
| Price | $0.55 | | |
| Total Proceeds | $72 | | |
| Sources | $122 | Uses | $122 |

**Step 2: Refinance the credit facility with a new facility of $50 million or more**
 – Replace the current senior lenders with non-traditional lenders who will allow Oakwood greater latitude
 – If possible, obtain a larger facility which can be used to buy back bonds. May require negotiating a "flip-up transaction" to increase the attractiveness of the transaction

**Step 3: Consider the following additional steps to further reduce debt**
 – §3(a)(9) package exchange offer
 – One-off equity for debt exchange

**CREDIT** | **FIRST**
**SUISSE** | **BOSTON**

19

OAKWOOD HOMES

# PRO FORMA CAPITALIZATION

Proceeds from the recent B-2 sale and the proposed receivables facility will provide needed liquidity and approximately $20 million of cash to purchase bonds

► The capitalization reflects:

– The application of the $72 million of B-2 proceeds to repay the revolver

– Placement of the receivables facility to enhance liquidity

($ in millions, except per security data)

| | Actual June 30, 2001 $ | % | B-2 Securitization and Receivables Facility Adjustment $ | Adjusted Balance $ | % |
|---|---|---|---|---|---|
| Cash(1) | $21 | 2.9% | $56 | $77 | 0.0% |
| Revolver | 16 | 2.2% | (16) | - | 0.0% |
| CSFB Loan Purchase Facility | 37 | 5.2% | - | 37 | 4.8% |
| LCs | 33 | 4.6% | - | 33 | 4.3% |
| Receivables Facility(2) | 0 | 0.0% | - | 0 | 0.0% |
| Reset Notes and Other | 26 | 3.6% | - | 26 | 3.3% |
| Senior Notes | 300 | 41.8% | - | 300 | 38.6% |
| Total Debt | $412 | 57.4% | ($16) | $396 | 51.0% |
| Equity(3) | 306 | 42.6% | 75 | 381 | 49.0% |
| Total Capitalization | $718 | 100.0% | | $776 | 100.0% |
| Receivables Capacity | | | $50 | | |

Source: Company executive report and other information for the period ended June 30, 2001.

(1) Cash at June 30, 2001 includes approximately $13.7 million of proceeds from B-2 securitization.

(2) Receivables purchase facility appears on balance sheet for illustrative purposes only. Total availability is expected to be approximately $50 million related to the receivables facility and B-2 securitization.

(3) Reflects book value adjustments which include changes in assets and liabilities related to the receivables facility and B-1 securitization.

► Approximately $20 million of the Company's cash can be used to buy back bonds

– Approximately $33 million should be set aside to cover letters of credit

CREDIT FIRST
SUISSE BOSTON

20

OAKWOOD HOMES

# REFINANCE THE CREDIT FACILITY

> Oakwood can further improve liquidity and buy back more bonds if it replaces its current credit facility. Oakwood may be better off liquidating our existing facility when we have a larger facility to loan against in a flip up transaction.

▶ We believe that we can find a non-traditional lender willing to provide a new credit facility based on Oakwood's improving business prospects, inventories and PP&E

($ in millions)

| | Balances at the Period Ended | | | |
|---|---|---|---|---|
| | 09/30/00 | 12/31/00 | 03/31/01 | 06/30/01 |
| Inventory | $323.0 | $283.7 | $269.0 | $249.6 |
| PP&E, net | 241.1 | 234.6 | 230.7 | 225.3 |
| Total | $564.1 | $518.3 | $499.7 | $474.8 |

▶ A non-traditional senior lender may be willing to provide a larger credit line if a portion of the proceeds are used to buy his or her notes at a premium. This is sometimes called a "flip up"

  – Effectively reduces the overall risk of his or her position by converting it into a secured loan ahead of all the remaining debt

  – Allows the lender to immediately book a substantial profit on his or her existing position in Oakwood's Notes

  – Allows Oakwood to capture bond discount

▶ The facility should be large enough to cover Oakwood's LC requirements and provide some liquidity

  – For simplicity, we examine a $50 million and $100 million facility

  – Either a smaller or larger facility will signal to the markets that Oakwood is financially stable and will emerge from the current industry slump with ample liquidity

**CREDIT   FIRST**
**SUISSE | BOSTON**

21

OAKWOOD HOMES

# SMALLER FACILITY WITHOUT FLIP UP

A $50 million facility will substantially improve liquidity and allow Oakwood not to purchase some debt

($ in millions, except per security data)

**Sources**

| | |
|---|---|
| New Credit Line | $50 |
| Excess Cash | 23 |
| **Sources** | **$73** |

**Uses**

| | |
|---|---|
| LCs | $33 |
| Liquidity Reserve | 17 |
| Notes Repurchase | |
| Amount Purchased | $46 |
| Price | 50¢ |
| Total Cost | $23 |
| **Uses** | **$73** |

**Discount Captured**

| | Size of Facility | | | |
|---|---|---|---|---|
| | $40 | $50 | $60 | $70 |
| **Price of Open Market Purchases** | | | | |
| 45¢ | $16 | $28 | $40 | $53 |
| 50¢ | 13 | 23 | 33 | 43 |
| 55¢ | 11 | 19 | 27 | 35 |
| 60¢ | 9 | 15 | 22 | 29 |
| 65¢ | 7 | 12 | 18 | 23 |

**Discount Captured / Share**

| | Size of Facility | | | |
|---|---|---|---|---|
| | $40 | $50 | $60 | $70 |
| **Price of Open Market Purchase** | | | | |
| 45¢ | $1.67 | $2.95 | $4.23 | $5.52 |
| 50¢ | 1.36 | 2.41 | 3.46 | 4.51 |
| 55¢ | 1.12 | 1.97 | 2.83 | 3.69 |
| 60¢ | 0.91 | 1.61 | 2.31 | 3.01 |
| 65¢ | 0.73 | 1.30 | 1.86 | 2.43 |

22

CREDIT SUISSE | FIRST BOSTON

OAKWOOD HOMES

# LARGER FACILITY WITH FLIP UP

A Flip Up in total $100 million facility followed by open market purchases of bonds will substantially decrease debt levels.

($ in millions, except per security data)

## Sources

| | |
|---|---|
| New Credit Line | $100 |
| Excess Cash | 23 |
| **Sources** | **$123** |

## Uses

| | | |
|---|---|---|
| LCs | | $33 |
| Liquidity Reserve | | 17 |
| Notes Repurchase | Face | Price | Use |
| Lender's Notes | 30 | 70¢ | 21 |
| Other Notes | 104 | 50¢ | 52 |
| Total | $134 | 54¢ | $73 |
| **Uses** | | | **$123** |

## Combined Discount Captured

| | Negotiated Flip Up Price on $30 million | | | |
|---|---|---|---|---|
| | 60¢ | 70¢ | 80¢ | 90¢ |
| | 45¢ | $69 | $66 | $63 | $60 |
| Price of | 50¢ | 64 | 61 | 58 | 55 |
| Open | 55¢ | 59 | 56 | 53 | 50 |
| Market | 60¢ | 54 | 51 | 48 | 45 |
| Purchases | 65¢ | 48 | 45 | 42 | 39 |

## Combined Discount Captured / Share

| | Negotiated Flip Up Price on $30 million | | | |
|---|---|---|---|---|
| | 60¢ | 70¢ | 80¢ | 90¢ |
| | 45¢ | $7.26 | $6.95 | $6.63 | $6.32 |
| Price of | 50¢ | 6.72 | 6.40 | 6.09 | 5.77 |
| Open | 55¢ | 6.17 | 5.86 | 5.54 | 5.23 |
| Market | 60¢ | 5.63 | 5.31 | 5.00 | 4.68 |
| Purchases | 65¢ | 5.08 | 4.76 | 4.45 | 4.13 |

## Summary

| Notes Repurchased | Face | Price | Cost | Discount Captured |
|---|---|---|---|---|
| Lender's Notes | $30 | 70¢ | $21 | $9 |
| Other Notes | 104 | 50¢ | 52 | 52 |
| Total | $134 | | $73 | $61 |
| | | | | |
| Per Share | | | | $6.40 |

CREDIT SUISSE | FIRST BOSTON

23

CSFB– 00052877

OAKWOOD HOMES

# REPLACE FACILITY

## Smaller Facility Without Flip Up

### Pros

▲ Provides needed liquidity

▲ Covers LC requirements

▲ Introduces more patient lenders than current bank group

    • Allow the repurchase of bonds

### Cons

▶ Higher cost debt

▶ Less convenient for day-to-day management

## Larger Facility With Flip Up

### Additional Pros

▲ Provides additional incentive to potential lenders to provide a new credit line

    Cost of additional incentive not borne by Oakwood

▲ Allows Oakwood to retire more debt at a discount to par

▲ Results in substantial decrease in debt

### Additional Cons

▶ Limited trading may preclude a candidate from building a new position to take advantage of an offer to participate in a flip up transaction

▶ Transaction may limit future senior borrowing capacity

CREDIT | FIRST
SUISSE | BOSTON

24

CSFB- 00052878

OAKWOOD HOMES

25

# ADDITIONAL STEPS

CREDIT | FIRST
SUISSE | BOSTON

OAKWOOD HOMES

26

# PACKAGE EXCHANGE OFFER

- Oakwood should be able to capture a significant amount of discount by offering bondholders a package of new debt and common shares in exchange for the old notes

### Concept

► Offer a package of new notes and common shares in exchange for the old notes

- The package would be worth more than the current market value of the old notes, but less than par
- The new notes would be senior to the old notes

► This structure would provide both a "carrot" and "stick" to motivate bondholders to participate

- Carrot: Bondholders could gain partial liquidity by immediately monetizing the common shares
- Stick: Old notes still held by those who forego the exchange will be subordinate to the new notes issued to those who participate

CREDIT | FIRST
SUISSE | BOSTON

CSFB- 00052880

OAKWOOD HOMES

27

# PACKAGE EXCHANGE OFFER (CONT'D)

**Significant Parameters**

▶ The exchange should be structured so that shareholder and/or bondholder approvals are not required

  – The new notes should be secured or structurally senior to the old notes

  – The new notes should fit within the old notes' limitations on subsidiary debt / secured debt to avoid the need to amend the indentures

  – The common shares issued should total less than 19.9% of the shares outstanding to avoid the NYSE's requiring a shareholder vote

▶ The market value of the package of new notes and common shares should exceed the current market value of the old notes

  – We will conservatively assume that the exchange does not change the market value of Oakwood's debt or equity

    • However, we believe the aggregate value of Oakwood's equity should increase as debt is extinguished and risk is reduced

OAKWOOD HOMES

# PACKAGE EXCHANGE OFFER (CONT'D)

For example, Oakwood could tender bonds under a package of $100 million of new Notes and 13 million shares in exchange for 50% of the old Notes.

| ($ and shares in millions) | Amount | Pro Forma Assumed Price | Assumed Value |
|---|---|---|---|
| **Exchange Package** | | | |
| New Notes | $100 | 80¢ | $80 |
| Common Shares(1) | 13 | $7.50 | 10 |
| Total | | | $90 |
| | | | |
| **Old Notes Exchanged** | | | |
| Old Notes | $150 | 50¢ | $75.0 |
| | | | |
| **Premium** | | | |
| Premium Offered | | | $15 |
| % Premium | | | 20.0% |
| | | | |
| **Net Debt Reduction /** | | | $50 |
| Shares Issued | | | $37.50 |
| Pro Forma Shares Outstanding | | | 4.60¢ |

**CREDIT FIRST**
**SUISSE BOSTON**

CSFB- 00052882

28

# PACKAGE EXCHANGE OFFER (CONT'D)

**EXAMPLE CONTINUED: (1)**
*($ in millions, except per security data)*

| | | Book Capitalization | | | Actual Book Cap. | | Pro Forma Market Cap. | |
|---|---|---|---|---|---|---|---|---|
| | Actual | Post-B-2 | E.O. Adj. | PF Adj. | Assumed Price | Market Cap | Assumed Price | Market Cap |
| Cash | $21 | | | $77 | | $77 | | $77 |
| First Priority Sr. Secured Debt (3) | $96 | $79 | | $79 | | $79 | | $79 |
| New Senior Notes | | | 100 | 100 | 50¢ | 0 | 80¢ | 80 |
| Old Public Notes | 300 | 300 | (150) | 150 | 50¢ | 150 | 47¢ | 70 |
| Reset Notes | 17 | 17 | | 17 | 50¢ | 8 | 47¢ | 8 |
| Total Debt | $413 | $396 | | $346 | | $237 | | $237 |
| Equity | 306 | 381 | 50 | 431 | $8.50 | 81 | $7.46 | 81 |
| Total Capitalization | $719 | $776 | | $776 | | $318 | | $318 |

(1) As in Alternative 1, prices assume that the market value of the debt and equity are unchanged by the transaction.

(2) Adjusted to reflect the application of proceeds from the receivables facility and the securitization of B-2s.

(3) Revolver credit line commitment of $100 million, unused commitment of $26 million.

CREDIT FIRST
SUISSE BOSTON

OAKWOOD HOMES

29

CSFB- 00052883

OAKWOOD HOMES

# PACKAGE EXCHANGE OFFER (CONT'D)

**PACKAGES AT VARIOUS VALUES (ASSUMING $8.50 PRE-TRANSACTION STOCK PRICE)**

*($ in millions, except per security data)*

| Package Value / Bond | 50.0¢ | 60.0¢ | 70.0¢ |
|---|---|---|---|
| Current Value | $75 | $90 | $105 |
| Premium | 20.0% | 20.0% | 20.0% |
| Total Value | 90 | 108 | 126 |
| **Components** | | | |
| Stock: | | | |
| Common Shares | 1.3 | 1.3 | 1.3 |
| Current Share Price | $8.50 | $8.50 | $8.50 |
| F.D. Price / Share | $7.46 | $7.46 | $7.46 |
| Value | $10 | $10 | $10 |
| Bonds: | | | |
| Par Value | $100 | $123 | $145 |
| Assumed Price / Bond | 80¢ | 80¢ | 80¢ |
| Value | $80 | $98 | $116 |
| **Impact** | | | |
| Debt Reduction | $50 | $27 | $5 |
| Debt Reduction / Share Issued | $37.50 | $20.57 | $3.70 |
| Premium to Current Price | 4.4x | 2.4x | 0.4x |
| Debt Reduction / Pro Forma Shares Outstanding | $4.60 | $2.53 | $0.45 |

CREDIT SUISSE | FIRST BOSTON

30

CSFB- 00052884

OAKWOOD HOMES

# PACKAGE EXCHANGE OFFER (CONT'D)

## Pros

▲ Captures significant amount of bond discount

▲ Reduces debt and fixed charges

Eases liquidity

Reduces capital structure risk

▲ Can be launched to "clean up" bonds remaining after B-2 Bond Buyback

## Cons

▼ Format requires that most if not all holders be approached

May encourage holders to organize

▼ A low stock price reduces the attractiveness of the offer to bondholders

Reduces the value which can be readily monetized

▼ May encourage short selling

**CREDIT FIRST**
**SUISSE BOSTON**

31

CSFB-   00052885

OAKWOOD HOMES

32

# ONE-OFF EQUITY FOR DEBT EXCHANGE

Oakwood can improve value its debt by quietly offering individual bondholders common shares in exchange for Senior Notes

▶ Individual bondholders should be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time

- The bondholder will gradually short the number of shares he or she expects to receive over the period

- The bondholder will use the shares received from Oakwood in exchange for the notes to settle his or her short positions

- Thereby, the bondholder effectively locks in the pre-negotiated cash selling price even though he or she accepts shares instead of cash

**EXAMPLE:**

*($ in millions, except per security data)*

| | |
|---|---|
| **Negotiated Price** | |
| Current value of bonds | 50¢ |
| Price at which holder will sell to OH | 60¢ |
| Premium | 20.0% |
| | |
| **Deal Mechanics** | |
| Face Amount to be Exchanged | $5 |
| Agreed upon Price | 60¢ |
| Value of Equity to be Delivered | $3 |
| | |
| **Bondholder Market Activity** | |
| Value to be settled in stock | $3 |
| Projected Average Closing Price over Period | $8.00 |
| Expected Shares | 0.375 |
| Approximate Daily Short Activity | 40,000 |

**CREDIT | FIRST**
**SUISSE | BOSTON**

CSFB-  00052886

OAKWOOD HOMES

33

# ONE-OFF EQUITY FOR DEBT EXCHANGE (CONT'D)

## Pros

▲ Allows Oakwood to quietly "chip away" at debt

▲ Buying debt at about half of face value allows Oakwood to effectively issue equity at roughly twice the current price

▲ Each exchange can be secretly negotiated on a one-off basis

Only the net reduction in debt and the increase in shares outstanding need to be disclosed

## Cons

▼ Potential volume of exchanges would be limited by stock trading volume

Otherwise, shorting activity could materially impact stock price

CREDIT FIRST
SUISSE BOSTON

CSFB- 00052887

5

CSFB- 00052888

OAKWOOD HOMES

34

# SUPPLEMENTAL DATA

CREDIT | FIRST
SUISSE | BOSTON

CSFB- 00052889

OAKWOOD HOMES

36

# SIGNIFICANT HOLDERS OF COMMON STOCK

The largest retail shareholder base should lend some buoyancy to Oakwood's stock.

($ and shares in millions)

| | Shares | Market Value[1] | % of Total |
|---|---|---|---|
| Total Shares Outstanding | 9.53 | $81.00 | 100.0% |
| *Insider Holdings[1]:* | | | |
| Credit Suisse First Boston International[3] | 1.91 | $16.21 | 20.0% |
| Other Management, Directors and Executive Officers | 0.80 | 6.84 | 8.4% |
| Daniel I. Meyer, Chairman | 0.08 | 0.69 | 0.9% |
| Diane D. Brazeen, Vice Chairman | 0.05 | 0.48 | 0.6% |
| Total Insider Holdings | 2.85 | $24.21 | 29.9% |
| Total Public Float | 6.68 | $56.78 | 70.1% |
| *Institutional Holdings[4]:* | | | |
| Dimensional Fund Advisors Inc. | 0.85 | $7.25 | 9.0% |
| Barclays Global Investors | 0.52 | 4.45 | 5.5% |
| Bessemer Trust Company N.A. | 0.32 | 2.72 | 3.4% |
| Goldman Sachs Asset Management | 0.26 | 2.24 | 2.8% |
| Venture Securities Corp | 0.21 | 1.79 | 2.2% |
| Northern Trust Company | 0.12 | 1.05 | 1.3% |
| Credit Suisse First Boston, Inc. | 0.11 | 0.95 | 1.2% |
| Other Institutional Holdings | 0.15 | 1.29 | 1.6% |
| Total Institutional Holdings | 2.56 | $21.73 | 26.8% |
| Total Retail Float | 4.12 | $35.05 | 43.3% |

(1) Stock price as of August 3, 2001 was $8.50.
(2) Source: Company filings. Includes shares subject to options presently exercisable.
(3) Represents shares subject to a warrant held.
(4) Source: Spectrum Run as of 6/30/01.

**CREDIT** | **FIRST**
**SUISSE** | **BOSTON**

CSFB-  00052890




OAKWOOD HOMES

# SHAREHOLDER TURNOVER

PRICE VOLUME HISTOGRAM: 1/1/01 - 8/2/01

Note:  Split adjusted, percentage based on 8.7 million shares traded over the time frame shown.
Source:  FactSet.

CREDIT SUISSE | FIRST BOSTON

38

CSFB- 00052892

OAKWOOD HOMES

39

# CSFB DISTRESSED FINANCE ASSIGNMENTS

CREDIT | FIRST
SUISSE | BOSTON

CSFB-  00052893

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS

MultiCare.1
*Where your...*

**The MultiCare Companies**

Financial advisor to the
Company in Chapter 11

$780,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

e·spire™

**e.spire Communications**

Financial advisor to the
Company in Chapter 11

$1,300,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

**Auto Parts**

Undisclosed

Financial advisor to the
Company

$1,400,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

GT RADIAL
*World Class High Performance Tires*

**Gajah Tunggal**

Financial advisor to the
Company

$1,700,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

APP
ASIA PULP & PAPER CO. LTD.

**Asia Pulp & Paper**

Financial advisor to the
Company

$12,000,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

SPECIAL METALS

**Special Metals**

Financial advisor to the
Parent Company

$420,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

**Telecom**

Undisclosed

Financial advisor to the
Company

$600,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

internet capital group

**Internet Capital Group**

Financial advisor to the
Company

$566,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---



Classic

**Classic Cable**

Financial advisor to the
Company

$575,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

Lernout & Hauspie®

**Lernout & Hauspie**

Financial advisor to the
Company in Chapter 11

$700,000,000

*Pending*

**CREDIT SUISSE | FIRST BOSTON**

---

**CREDIT SUISSE | FIRST BOSTON**

40

CSFB- 00052894

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)



**Verado**
Financial advisor to the Company
$405,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Anacomp**
Financial advisor to the Company
$380,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Avado Brands**
Financial advisor to the Company in sale of division and overall restructuring
$330,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Auto Parts**
Undisclosed
Financial advisor to the Company in sale/recapitalization
$320,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Stellex Technologies**
Financial advisor in sale assignments in Chapter 11
$315,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**MCMS**
Financial advisor to the Company
$300,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**London Sumatra/Pan London**
Financial advisor to the Company
$300,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Financial Services**
Undisclosed
Financial advisor to the Company
$260,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Schwinn**
Financial advisor to the Company in sale/recapitalization
$250,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

**Bimantara**
Financial advisor to the Company
$250,000,000
*Pending*
CREDIT SUISSE | FIRST BOSTON

OAKWOOD HOMES

41

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

OAKWOOD HOMES

**FEDERAL MOGUL**

Federal Mogul

Financial advisor to the Company in its bank restructuring

$4,200,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**STERLING CHEMICALS**

Sterling Chemicals

Financial advisor to the Company prior to Chapter 11

$960,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**RITE AID**

Rite Aid

Co-Financial advisor to the Company in its multi-faceted recapitalization

$6,000,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**GST TELECOMMUNICATIONS**

GST Telecom

Financial advisor to the acquiror — Time Warner Telecom

$1,200,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**PT. SINAR MAS MULTIARTHA**

Sinar Mas Multi-Arta

Financial advisor to the Company

$120,000,000

Pending

CREDIT SUISSE | FIRST BOSTON

---

**RSL.COM**

RSL Communications

Financial advisor to the ad hoc bondholders' committee prior to Chapter 11

$1,500,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**Galaxy Telecom**

Galaxy Telecom

Financial advisor to the Company in its standalone recapitalization

$150,000,000

Pending

CREDIT SUISSE | FIRST BOSTON

---

**Teligent**

Teligent

Financial advisor to the Company prior to Chapter 11

$1,500,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---



**ENTERPRISES SHIPHOLDING**

Enterprises Shipping

Financial advisor to the Company

$210,000,000

Pending

CREDIT SUISSE | FIRST BOSTON

---

**VIATEL**

Viatel

Joint financial advisor to the Company prior to Chapter 11

$2,000,000,000

2001

CREDIT SUISSE | FIRST BOSTON

42

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)



**Loews Cineplex**

Financial advisor to the special committee of the board

$800,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**TWA**

Financial advisor to the acquiror — American Airlines

$740,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**Reliance Insurance**

Financial advisor to the Company

$700,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**MEDIQ**

Financial advisor to the Company in its pre-arranged standalone recapitalization

$600,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**GS Technologies**

Financial advisor to the Company prior to Chapter 11

$500,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**Panda Global Energy**

Financial advisor to the Company — Exchange Offer

$370,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**FRD Acquisition Co.**

Financial advisor to the Company in possible sale/distressed recapitalization prior to Chapter 11

$210,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**PT Trї Polyta**

Financial advisor to the Company

$185,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**Harborside Healthcare**

Financial advisor to the Company in its out-of-court standalone recapitalization

$175,000,000

2001

CREDIT SUISSE | FIRST BOSTON

---

**Compass Aerospace**

Financial advisor to the Company in its sale/recapitalization

$150,000,000

2001

CREDIT SUISSE | FIRST BOSTON

CREDIT SUISSE | FIRST BOSTON

OAKWOOD HOMES

43

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

44

**Colorado Prime Foods**
Financial advisor to the Company in its out-of-court standalone recapitalization
$120,000,000
2001
CREDIT SUISSE | FIRST BOSTON



**Nextwave**
Financial advisor to the Company in Chapter 11
$5,000,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**Sunbeam.**
Financial advisor to the Company prior to Chapter 11
$2,300,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**IRIDIUM**
Financial advisor to the Company
$2,100,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**Indecement**
Financial advisor to the Company
$1,100,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**Repap New Brunswick**
Financial advisor to the Company – in its sale
$1,000,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**METROCALL — AMERICA'S WIRELESS NETWORK**
Financial advisor to the Company regarding PageNet/Arch merger
$950,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**DecisionOne** — technology support for the digital world
Financial advisor to the Company in its standalone recapitalization
$750,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**Satelindo**
Financial advisor to the Company
$600,000,000
2000
CREDIT SUISSE | FIRST BOSTON

**celotex** — Build On Our Knowledge
Financial advisor to Asbestos Trust – Sale of the Company
$500,000,000
2000
CREDIT SUISSE | FIRST BOSTON

CREDIT SUISSE | FIRST BOSTON



OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

45

## Specialty Foods

Financial advisor to the Company in its sale in Chapter 11

$500,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## Belden and Blake

**Belden & Blake**

Financial advisor to the Company – Senior Secured Financing

$375,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## cambridge industries inc

**Cambridge Industries**

Financial advisor to the acquiror – Meridian Automotive Systems

$390,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## MORRIS MATERIAL HANDLING

**Morris Material**

Financial advisor to the Company pre-Chapter 11

$300,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## FPL

**FPL/Okeelanta**

Financial advisor to the Company

$288,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## Planet Hollywood

**Planet Hollywood**

Financial advisor to the Company

$260,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## ORBCOMM GLOBAL DATA & MESSAGING

**Orbcomm**

Financial advisor to the Company pre-Chapter 11

$170,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## PHASE METRICS

**Phase Metrics**

Financial advisor to the Company

$110,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## TBS

**TBS Shipping**

Financial advisor to the Company in its standalone recapitalization

$110,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

## ICSL

**Innovative Clinical Solutions Ltd.**

Financial advisor to the Company in its pre-arranged standalone recapitalization

$100,000,000

2000

**CREDIT SUISSE | FIRST BOSTON**

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)



**Jitney Jungle**

Financial advisor to the Company – Senior Secured Financing

$50,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

**Repap New Brunswick**

Financial advisor to the Company – Senior Secured Financing

$100,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

STERLING CHEMICALS

**Sterling Chemicals**

Financial advisor to the Company – Senior Secured Financing

$450,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---



SUN HEALTHCARE GROUP, INC.

**Sun Healthcare**

Financial advisor to the Company pre-Chapter 11

$2,000,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

🌀 SGL CARBON AG

**SGL Carbon**

Financial advisor to the Creditors' Committee in Chapter 11

NA

2000

**CREDIT SUISSE | FIRST BOSTON**

---

MECHALA JAMAICA
MECHALA GROUP JAMAICA LIMITED

**Mechala Group Jamaica**

Financial advisor to the Company – Debt Tender

$180,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

**Weatherford**

**Weatherford International**

Financial advisor to the Company in connection with acquisition of Dailey in Chapter 11

$275,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

P E T R O

**Petroleum Heat & Power**

Financial advisor in distressed recapitalization

$306,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---



**American Skiing Company**

Financial advisor to the Company in connection with equity private placement

$340,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---



**Long John Silver's**

Financial advisor to the Company in Chapter 11 sale to A&W restaurants

$515,000,000

1999

**CREDIT SUISSE | FIRST BOSTON**

---

**CREDIT SUISSE | FIRST BOSTON**

46

CSFB- 00052900

OAKWOOD HOMES

# CSFB Distressed Finance Assignments (Cont'd)

**Hollywood Theaters**

Financial advisor to the Company – Sale/Debt Tender

$175,000,000
1999

CREDIT SUISSE | FIRST BOSTON

---

**Livent**

Financial advisor to the Company pre-Chapter 11

$175,000,000
1999

CREDIT SUISSE | FIRST BOSTON

---

**SILVER CINEMAS**

Silver Cinemas

Financial advisor to the Company – Senior Secured Financing

$50,000,000
1999

CREDIT SUISSE | FIRST BOSTON

---

**MCI WORLDCOM**

MCI WorldCom

Financial advisor to MCI in acquiring wireless cable securities

NA
1999

CREDIT SUISSE | FIRST BOSTON

---

**Niagara Mohawk**

Niagara Mohawk Power

High yield offering in support of restructuring plan and financial advisor to the Company

$7,100,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Flagstar Companies/ Advantica**

Financial advisor to the Company in prepackaged bankruptcy

$2,100,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Hechinger Stores**

Financial advisor to the Company in restructuring/sale

$550,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Gothic Energy**

High yield offering in support of restructuring plan and financial advisor to the Company

$347,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Farm Fresh**

Farm Fresh

Financial advisor to the Company in its sale in Chapter 11

$270,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**AFR** American Fiber Resources

American Fiber Resources

Financial advisor to the Company

$210,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

CREDIT SUISSE | FIRST BOSTON

47

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

**Tri Polyta Indonesia**

Financial advisor to the Company in consent solicitation

$185,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Gorges/Quick-to-Fix**

Financial advisor to the Company in tender offer

$150,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Ponderosa Northampton**

Financial advisor to the Company pre-Chapter 11

$150,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Premier Cruise Lines**

Premier Cruises

Financial advisor to the Company

$160,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Carson Products**

Financial advisor in distressed recapitalization

$150,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**E-Z Serve**

Financial advisor in its sales

$100,000,000
1998

CREDIT SUISSE | FIRST BOSTON

---

**Foxmeyer Drug**

Financial advisor to acquirer in Chapter 11 sale

$1,000,000,000
1997

CREDIT SUISSE | FIRST BOSTON

---

**Anchor Glass**

Financial advisor to Company in its restructuring/sale

$950,000,000
1997

CREDIT SUISSE | FIRST BOSTON

---

**Grand Union**

Financial advisor to Company in raising second secured bank debt

$77,000,000
1997

CREDIT SUISSE | FIRST BOSTON

---

**Harrah's Jazz**

Financial advisor to Harrah's Entertainment

$600,000,000
1997

CREDIT SUISSE | FIRST BOSTON

---

CREDIT SUISSE | FIRST BOSTON

48

CSFB- 00052902

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

**ANACOMP**

Anacomp

Financial advisor to the Company

$400,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

**EVERGREEN**

Evergreen International Aviation

Financial advisor to the Company in standalone restructuring

$415,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

Mid-American Waste

Financial advisor to Company in Section 363 asset sale

$345,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

CAI Wireless Systems ...

CAI Wireless

Financial advisor to the Company prior to restructuring

$335,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

**MERISEL**

Merisel

Financial advisor to Company in the restructuring resulting in a significant equity investment

$325,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

Alliance Entertainment

Financial advisor to Company in the divestiture of its Red Ant subsidiary

$320,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

Reeves

Financial advisor to Company in raising second secured bank debt

$160,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

RDM Sports

Financial advisor to the Company

$100,000,000

1997

CREDIT SUISSE | FIRST BOSTON

---

Marvel Entertainment

Financial advisor to McAndrews & Forbes pre-Chapter 11

$1,550,000,000

1996

CREDIT SUISSE | FIRST BOSTON

---

MobileMedia

Financial advisor to the Company pre-Chapter 11

$1,100,000,000

1996

CREDIT SUISSE | FIRST BOSTON

---

CREDIT SUISSE | FIRST BOSTON

49

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)



MORRISON KNUDSEN CORPORATION

**Morrison Knudsen**

Financial advisor to the Company in pre-arranged sale implemented in Chapter 11

$350,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**ANACOMP**

Anacomp

Financial advisor to the Company in rights offering

$380,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**Hechinger Stores**

Financial advisor to the Company in raising senior secured financing

$400,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**UDC Homes**

Financial advisor to the Company

$500,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**Southwestern Life (ICH)**

Financial advisor to the Company

$570,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**NEXTEL**

Nextel

Solicited bondholder consents to merger of Nextel with OneComm and Dial Call

$1,900,000,000

*1995*

CREDIT SUISSE | FIRST BOSTON

---

CADILLAC FAIRVIEW

Cadillac Fairview

Financial advisor to bondholders. Negotiated terms of equity investment in the Company

$4,400,000,000

*1995*

CREDIT SUISSE | FIRST BOSTON

---

**HOMELAND**

Homeland Stores

Financial advisor to the Company in a pre-negotiated Chapter 11

$120,000,000

*1995*

CREDIT SUISSE | FIRST BOSTON

---

**Scott Cable**

Financial advisor to the Company in Chapter 11

$150,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

---

**Lomas Financial**

Financial advisor to First Nationwide in purchase of substantially all the assets in bankruptcy

$250,000,000

*1996*

CREDIT SUISSE | FIRST BOSTON

CREDIT SUISSE | FIRST BOSTON

OAKWOOD HOMES

50

CSFB- 00052904

OAKWOOD HOMES

# CSFB DISTRESSED FINANCE ASSIGNMENTS (CONT'D)

**Home Insurance**

Seeking consent to acquisition by Zurich Insurance

$430,000,000
1995

CREDIT SUISSE | FIRST BOSTON

**Spectravision**

Financial advisor to the Company

$560,000,000
1995

CREDIT SUISSE | FIRST BOSTON



Dr Pepper-Seven Up Companies

Financial advisor to the Company in a comprehensive restructuring including soliciting consents enabling in order to modify indentures

$860,000,000
1995

CREDIT SUISSE | FIRST BOSTON



acme holdings, inc.

Acme Holdings
Financial advisor to the Company

$78,000,000
1995

CREDIT SUISSE | FIRST BOSTON



Phar-Mor

Financial advisor to Company in Chapter 11

$1,400,000,000
1995

CREDIT SUISSE | FIRST BOSTON

**Carolina Freight**

Financial advisor to the Company

$125,000,000
1995

CREDIT SUISSE | FIRST BOSTON

**Grand Union**

Financial advisor to holders of the Company's senior subordinated debt

$1,740,000,000
1995

CREDIT SUISSE | FIRST BOSTON

**Busse Broadcasting**

Financial advisor to the Company in a comprehensive prepackaged plan

$200,000,000
1995

CREDIT SUISSE | FIRST BOSTON

CREDIT SUISSE | FIRST BOSTON

51

# Exhibit "AA"

| | |
|---|---|
| **From:** | Serageldin, Kareem |
| **Sent:** | Tuesday, August 21, 2001 4:09 PM |
| **To:** | O'Driscoll, Fiachra |
| **Subject:** | RE: Oakwood loan purchase facility |

Not crazy about this but if they really need this I could live with the following:

* New cap of 25% till 31-Mar-02 and then reverts to 17.5%.
* New advance rates are ok but cap maximum blended advance rate at current advance rate.

-----Original Message-----
**From:** O'Driscoll, Fiachra
**Sent:** Sunday, August 19, 2001 2:09 PM
**To:** Serageldin, Kareem
**Subject:** Oakwood loan purchase facility

The previous Oakwood deal cleaned out all of Oakwood's repo refis ~ 37% – and we sold the securities without difficulty. Previously we had been holding back some loans to keep the pools to 20% max repo refi.

This week's deal will have 25%; we have the BBBs sold and probably the BBs also.

Oakwood looks like having about 25% repo refis all thru FY 2002. Our facility is limited to 17.5%. I suggest we modify the
facility to require different advance rates: 84% on new, 80% on used and 70% on repo refis. This gives us about the same advance rate if the collateral mix is 72.5% new / 10% used / 17.5% repo refi (actual number: 81.15%). It gives us a more conservative advance rate if we allow them to go to 65% new / 10% used / 25% repo refi (actual number: 80.10%)

What do you think?  If you're OK I will talk to the credit boys.

Fiachra O'Driscoll
CREDIT | FIRST
SUISSE | BOSTON
Managing Director
Asset Finance Group
Tel : (212) 325-4940
Fax : (212) 743-1090
Cell : (917) 680-6645
Email : fiachra.o'driscoll@csfb.com

1

CSFB-00186169



EXHIBIT
CSFB
85  TD.
DAO   8/30/06

# Exhibit "BB"

From:    jolivo@chubb.com
Sent:    Thursday, September 27, 2001 3:37 PM
To:      O'Driscoll, Fiachra
Subject: Re: Idea to run by you

Our phones are down – its extremely annoying.

Let me ask around here and see if anyone has any thoughts.

jim


"O'Driscoll, Fiachra" <fiachra.o'driscoll@csfb.com>

09/27/01 11:30 AM

     To:      "'jolivo@chubb.com'" <jolivo@chubb.com>
     cc:
     Subject:     Idea to run by you


I tried calling your offices, but I guess your phones are down. A client of
mine, Oakwood Homes, has a Bermuda captive that insures the mobile homes
they sell. They reinsure thru the Bermuda market. They have to maintain bank
LOCs of about $35mm against these, which really eats into their borrowing
capacity. I have been trying to find ways to do this in a more capital
efficient way for them. I don't know if this is up your street, but I
thought some of your team might have thoughts. I have a couple of other
clients in the same position also.

Phone: (212) 325-4940

Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

This message is for the named person's use only. It may contain
confidential, proprietary or legally privileged information. No
confidentiality or privilege is waived or lost by any mistransmission.
If you receive this message in error, please immediately delete it and all
copies of it from your system, destroy any hard copies of it and notify the
sender. You must not, directly or indirectly, use, disclose, distribute,
print, or copy any part of this message if you are not the intended
recipient. CREDIT SUISSE GROUP and each of its subsidiaries each reserve
the right to monitor all e-mail communications through its networks. Any
views expressed in this message are those of the individual sender, except
where the message states otherwise and the sender is authorised to state
them to be the views of any such entity.
Unless otherwise stated, any pricing information given in this message is
indicative only, is subject to change and does not constitute an offer to
deal at any price quoted.
Any reference to the terms of executed transactions should be treated as
preliminary only and subject to our formal written confirmation.

11/22/2005

EXHIBIT
CSFB
87 10
6/30/06

CSFB-00187153

# Exhibit "CC"

| | |
|---|---|
| From: | Menkhaus, Susan |
| Sent: | Monday, December 03, 2001 2:25 PM |
| To: | O'Driscoll, Fiachra |
| Subject: | RE: October 2001 Portfolio Performance |

One other reason, Fiachra, is that they have switched over many of their loans to this "assumption" program. The program allows borrowers to put their home up for sale to try and find someone to assume their loan. The net effect of this program is that it is causing a drop in the repos (good), but it is increasing the 60+ day delinquencies because loans that are in the assumption program are still considered delinquent. This is why 60+ day delinquencies have been going up in the last 6 months.

Let me know if I should talk to Mark about this.

-----Original Message-----
From: O'Driscoll, Fiachra
Sent: Monday, December 03, 2001 9:22 AM
To: 'mdmillard@brka.com'
Cc: Menkhaus, Susan; Connors, Tom
Subject: RE: October 2001 Portfolio Performance

Not exactly. the "1 mo" column is the percent of loans that are between 30 and 59 days delinquent. .The "2+ mo" is the percent of loans that are more than 60 days delinquent - generally up to 180 days, though most loans will be repoed at between 120 and 150 days. Therefore, as the issue's life progresses, you will normally expect "2+ mo" to be greater than "1 mo".

We are fixing the other bugs.

-----Original Message-----
From: Mark Millard [mailto:mdmillard@brka.com]
Sent: Monday, December 03, 2001 9:04 AM
To: O'Driscoll, Fiachra
Cc: Tom Connors
Subject: RE: October 2001 Portfolio Performance

Also, you might check out (or explain if correct) why the >60 day % is higher than the >30 day % in the Delinq. Columns. One would think-or at least I would-that the >60 day column would be a subset of the >30 day column and therefore a smaller figure/percentage. Please advise.

-----Original Message-----
From: O'Driscoll, Fiachra [mailto:fiachra.o'driscoll@csfb.com]
Sent: Friday, November 30, 2001 6:34 PM
To: 'mdmillard@brka.com'; Menkhaus, Susan; Culang, Brian
Cc: Connors, Tom
Subject: RE: October 2001 Portfolio Performance

I figured out the bug in the static pool spreadsheets as soon as I looked at the hard copies. The pool factor drops to 75% on the second month in each recent deal because, I think, a cell was hardwired to deal with prefunding. Susan is going to check on the bug with the monthly reporting guy at OH.

Susan: can you also check to make sure the reserve fund balance is built into the servicer report for the LOTUS deal? I think this may actually be being sent to Mark already.

-----Original Message-----

1

CSFB-00188026



# Exhibit "DD"

| From: | Smith, Bob [BSmith@oakwoodhomes.com] |
|---|---|
| Sent: | Thursday, January 24, 2002 1:51 PM |
| To: | 'Fiachra.o'driscoll@csfb.com' |
| Subject: | Repos vs used |

Got your message.  How true.

We still have challenges in financing repos via the warehouse facility. We can put more repo loans in a REMIC, say 30%, than we can the warehouse facility which caps at 17.5%.    The bucket for used homes is also 17.5% but goes substantially unutilized.   Will there ever be a way to combine these two activity into a "non new" bucket, even if it is smaller than the current two combined?

We continue to expand our independent financing, but in a controlled manner as we can't afford another Deutche debacle.   Last month we did $15 million. This allowed me to finance another $2.6 million in repos, or about 80-90 more homes.

Our repo inventory levels have become ever more problematic.   Our current level of new home financing allows us to keep up with the financing needs for current repo activity, but doesn't provide the room for us to eat into the backlog.  The LAP program is a big help for current defaults, but again doesn't provide a solution for the repos already on hand, which number close to 4,000.

We are finally, as a company, putting a full court press on the whole issue, with total support from retail management.   Our hands are tied as to financing which will greatly inhibit our ability to make any near term improvements.

I need some of your normal bright ideas.

Thanks,   Bob

1

EXHIBIT
CSF B
91  TD.
6/30/06

CSFB-00188944

# Exhibit "EE"

From:    Molenkamp, Jack [jmolenkamp@hunton.com]
Sent:    Friday, April 26, 2002 12:55 PM
To:      'O'Driscoll, Fiachra'; McCarthy, Milby
Cc:      Menkhaus, Susan; Molenkamp, Jack; 'Muir, Doug'
Subject: RE: Oakwood

We have been discussing these issues extensively the last several months. I think that Oakwood has capped the amount of expenses that a person assuming a loan has to pay, and simply eats the rest. I think the current documentation is unclear as to whether that is a new loan or something added on the back-end of the existing loan, but I think the latter is the better analysis. My understanding is that the existing loans can be modified if in default or there is a substantial likelihood of them falling into default, which would cover the loans in the LAP.

I apologize for jumping in on this, but I wanted to let you know that we have been thinking about this. I also shouldn't offer up tax advice, but fools rush in where wise men fear to tread.... and Milby can (and no doubt will) correct me if I am wrong!

-----Original Message-----
From: O'Driscoll, Fiachra [mailto:fiachra.o'driscoll@csfb.com]
Sent: Thursday, April 25, 2002 7:29 PM
To: McCarthy, Milby
Cc: Menkhaus, Susan; 'Molenkamp, Jack'
Subject: RE: Oakwood


Milby:

As you may be aware, Oakwood is extensively using its "loan assumption program" to avoid defaults by having new borrowers step into the shoes of deliquent borrowers. Many such "LAPs" involve expenses (refurbishment, other) that the new borrower promises to repay. At present these are documented as a separate loan note.

If these expenses were instead added to the existing balance of the assumed loan, would this breach REMIC tax regulations? Would it breach the terms of the existing PSA standard terms?

Thanks. Think it over and give me a call

Fiachra O'Driscoll
CREDIT | FIRST
SUISSE | BOSTON
Managing Director
Asset Finance Group
Tel : (212) 325-4940
Fax : (212) 743-1090
Cell : (917) 680-6645
Email : fiachra.o'driscoll@csfb.com

This message is for the named person's use only. It may contain sensitive and private proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you are not the intended recipient, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. CREDIT SUISSE GROUP and each legal entity in the CREDIT SUISSE FIRST BOSTON or CREDIT SUISSE ASSET MANAGEMENT business units of CREDIT SUISSE FIRST BOSTON reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

Unless otherwise stated, any pricing information given in this message is indicative only, is subject to change and does not

11/22/2005

CSFB-00191475



EXHIBIT
CSFB
98    10
DAO    6/30/06

constitute an offer to deal at any price quoted. Any reference to the terms of executed transactions should be treated as preliminary only and subject to our formal written confirmation.

11/22/2005

CSFB-00191476

# Exhibit "FF"

# [Redacted]

# Exhibit "GG"

**From:**       Smith, Bob [BSmith@oakwoodhomes.com]
**Sent:**       Wednesday, May 22, 2002 2:20 PM
**To:**         'fiachra.o'driscoll@csfb.com'
**Subject:**    Long e mail

We have a policy that under certain conditions we will make the customers payment and extend the due date. The missed payment is then added on the back of the loan and does not accrue interest. We are going to change that policy in that the extension payments will be set up as a second principle balance and amortized by changing the customers future payments for some period. (we're not going to increase their payment by more than 10% per month so amortization periods may vary.) The second principle balance will bear interest at the underlying loan rate. The goal here is to make the extensions a little harder to use for the collector and to impress on the customer there is no free ride. (We will make them a temporary loan for a missed payment in the event of temporary economic hardship. What we have been doing is a "permanent non-interest bearing loan")

A question comes in as to what to do with the second principle balance in the event of a subsequent default. It would not have been reported to the REMIC as a P & I advance, though in essence it is. We have asked Hunton and Williams to look at this issue as to whether or not we can charge this to the REMIC. I think we're splitting hairs a little to fine on this one. It should be recoverable as it is just a servicer advance with a different label, although it is a little different in that we would be passing along the unpaid balance rather than full payments.

There are other items that also end up in a second principle balance where we have incurred expenses as servicer to enhance a loan performance , for instance we occasionally move a house to keep the customer from defaulting and set up a second principal balance. We have not in the past charged these type expenses to the REMIC's, but again I think we are being super conservative.

We are considering making some similar changes to our Assumption program, whereby the new customer would make a higher payment than the old customer to amortize the missed payments which happened prior to the assumption as well as any refurb expenses we incur. If a LAP subsequently defaults and becomes a repo, we are not passing these type expenses through to the REMIC under the logic that we would be doubling up.

Robert A. Smith
Executive Vice President
Oakwood Homes Corporation
7800 McCloud Road
Greensboro, NC 27409-9634
(336) 664-3690    direct
(336) 664-3224    fax
bsmith@oakwoodhomes.com

1

CSFB-00191543


EXHIBIT
CSFB
99
6/30/06

# Exhibit "HH"

| From: | Smith, Bob [BSmith@oakwoodhomes.com] |
|---|---|
| Sent: | Monday, June 24, 2002 5:58 PM |
| To: | 'Fiachra.o'driscoll@csfb.com' |
| Subject: | Assumption/repo conversion |

If we intend to sell most all of our defaulted loans as repossessions, regardless of whether they go the retail or wholesale route, we will need to convert our existing LAP (Assumption) inventory to repos status at some point in time. We can convert is as we sell it, since that is when it has a cash impact, or we can convert it all at once which will have a large impact on earnings. As we mentioned before, the conversion moves the LAP from the 90 column to the repo inventory column in the static pool analysis.

We are agonizing a little bit over whether this is a June or July transaction, as we don't want to have it hit servicer reports before the news hits the street via our third quarter press release. If we do the conversion the first week of July, it shouldn't hit servicer reports until the ones distributed on August 15. I need to confirm these dates, but it sounds right.

Here are some of the questions I would like your view on:

1. Does it matter whether we do the conversion all at once or should we wait until the units are sold. This timing has limited cash impact but has broad accounting impact.

2. You mentioned earlier our need to do road shows with investors. As we will be in a blackout period until July 25 or so, shouldn't we wait until just after the news gets out but before they see it in their investor reports. Same questions for the rating agencies. Maybe we give them an advance visit or somehow communicate it to them.

3. How will this change affect the next securitization as to disclosures,etc. I know it creates pricing and marketing challenges, but should we have the conversion done for purposes of the various statistical analyses in the prospectus supp.?

I'm sure we will have many other things to consider. Promises to be a busy week around here.

Robert A. Smith
Executive Vice President
Oakwood Homes Corporation
7800 McCloud Road
Greensboro, NC 27409-9634
(336) 664-3690    direct
(336) 664-3224    fax
bsmith@oakwoodhomes.com

1

CSFB-00192307


EXHIBIT
CSFB
101    ID.
6/30/06

# Exhibit "II"

# [Redacted]

# Exhibit "JJ"

**From:**        C. Richard Rayburn, Jr. [CRR@rcdlaw.net]
**Sent:**        Saturday, October 19, 2002 3:22 PM
**To:**          Felt, Jared
**Subject:**     RE: RE: OH Draft Term Sheet

Good question.I am at office now.ARe you at home?Rick

-----Original Message-----
From: Felt, Jared [mailto:jared.felt@csfb.com]
Sent: Saturday, October 19, 2002 9:35 AM
To: C. Richard Rayburn, Jr.
Subject: Fw: RE: OH Draft Term Sheet

Rick

Could the Company selectively reinstate floor plan repurchase obligations made to certain
lenders, while attempting to push the remainder into an impaired senior unsecured class?
(See below.) How much do you think it would cost the Company in the end to effect,
recognizing that the Company would have to some how size the claim by assessing (a) the
likelihood that the underlying retailers would default and then (b) the likely recoveries
selling off the resuling distressed inventory in bulk sales?

Jared

------------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Standish, Myles <MES@OakwoodHomes.com>
To: Wales, Dod <dod.wales@csfb.com>; martin.flics@lw.com <martin.flics@lw.com>;
crr@rcdlaw.net <crr@rcdlaw.net>; Smith, Bob <RAS@OakwoodHomes.com>; Muir, Doug
<DRM@OakwoodHomes.com>; Wood, Suzanne <SWood@OakwoodHomes.com>; Antill, Egan
<egan.antill@csfb.com>; Felt, Jared <jared.felt@csfb.com>; Kurganska, Alysa
<alysa.kurganska@csfb.com>; Landon, Peter <peter.landon@csfb.com>; May, Beth
<beth.may@csfb.com>; O'Driscoll, Fiachra <fiachra.o'driscoll@csfb.com>; Schachter, Mark
<mark.schachter@csfb.com>
Sent: Sat Oct 19 09:24:07 2002
Subject: RE: OH Draft Term Sheet

Attached are my comments on the draft.  With respect to the treatment of floor plan, I
agree in general.  However, given that the majority of our floor plan is still with
Deutsche and Conseco, who we really could care less about, shouldn't we reject those
obligations if we can and keep the obligations to the remaining floor plan lenders.  Also,
when do we hear from Andrew Davidson?  We need to get that part wrapped up asap.

-----Original Message-----
From: Wales, Dod [mailto:dod.wales@csfb.com]
Sent: Friday, October 18, 2002 7:41 PM
To: 'martin.flics@lw.com'; 'crr@rcdlaw.net'; Smith, Bob; Muir, Doug; Standish, Myles;
Wood, Suzanne; Antill, Egan; Felt, Jared; Kurganska, Alysa; Landon, Peter; May, Beth;
O'Driscoll, Fiachra; Schachter, Mark; Wales, Dod
Subject: OH Draft Term Sheet

Please find attached a draft of the OH restructuring term sheet prepared by CSFB for
Lotus.  Please fax any comments to the number below, or email them to myself or Peter
Landon (peter.landon@csfb.com)

1

CSFB-00035156

