## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Oakwood Homes Corporation, et al., | Case No. 02-13396 (PJW) |
| Debtors. | |

| | |
|---|---|
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 04-57060 (PJW) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Civil Action No. 07-799 (JJF) |
| Defendants. | |

---------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY
## OF MICHAEL TENNENBAUM PURSUANT TO FED. R. EVID. 702

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York  10105
Telephone:  (212) 903-9000
Facsimile:  (212) 903-9100


Dated:  April 16, 2008
        Wilmington, Delaware

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 4

      A.     Plaintiff's Claims ............................................................................... 4

      B.     Dr. Tennenbaum's Proposed Expert Testimony For Plaintiff.................... 6

      C.     Expert Rebuttal Report Of Allen M. Pfeiffer For Defendants ................. 10

ARGUMENT ................................................................................................................. 11

    I.     The Standard For Expert Testimony Pursuant To
         Fed. R. Evid. 702 ....................................................................................... 11

    II.    Dr. Tennenbaum's Proposed Testimony On Damages Will
         Not Assist The Trier Of Fact Because His Analysis Does
         Not Fit Plaintiff's Theory Of The Case And Is Entirely
         Speculative ................................................................................................. 12

    III.   Dr. Tennenbaum's Proposed Analysis Is So Rife With Methodological
         Errors, Sloppy Shortcuts, And Faulty Assumptions That It Cannot
         Be Considered Reliable .............................................................................. 18

CONCLUSION ............................................................................................................... 22

## TABLE OF AUTHORITIES

Page

### CASES

*Benjamin v. Peter's Farm Condo. Owners Ass'n,*
820 F.2d 640 (3d Cir. 1987).................................................................................................12

*Bi-Economy Market, Inc. v. Harleysville Ins. Co. of N. Y.,*
No. 4, 2008 WL 423451 (N.Y. Feb. 19, 2008) ............................................................13

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)...............................................................................................11, 18

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997)........................................................................................................11

*JMJ Enter. Inc. v. Via Veneto Italian Ice, Inc.,*
No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 15, 1998) ................17, 19

*Joy v. Bell Helicoter Textron, Inc.,*
999 F.2d 549 (D.C.Cir.1993), *modified on other grounds,* 40 F.3d 475 (D.C.Cir.1994)..............11

*Kenford Co. v. County of Erie,*
493 N.E.2d 234 (N.Y. 1986)............................................................................................13

*Kolbeck v. LIT Am., Inc.,*
939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd,* 152 F.3d 918 (2d Cir. 1998).........................15

*Kurtzman v. Bergstol,*
835 N.Y.S.2d 644 (App. Div. 2007) .................................................................................14

*Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group
(In re Hechinger Inv. Co. of Del.),* 327 B.R. 537 (D. Del. 2005) ....................................20

*In re Nellson Nutraceutical, Inc.,*
365 B.R. 364 (Bankr. D. Del. 2006) .................................................................................21

*Oddi v. Ford Motor Co.,*
234 F.3d 136 (3d Cir. 2000), *cert. denied,* 532 U.S. 921 (2001)....................................12

*Out-A-Sight Pet Containment, Inc. v. Radio Sys. Corp.,*
NO. CIV.A. 01-5775, 2004 WL 1562556 (E.D. Pa. July 9, 2004)...................................20

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir.1994)...................................................................................12, 17, 18

*Peltz v. Hatten*,
279 B.R. 710 (D. Del. 2002), *aff'd, In re USN Commc'ns, Inc.*,
60 F.App'x 401 (3d Cir. 2003) ............................................................................21

*R.M. Newell Co. v. Rice*,
653 N.Y.S.2d 1004 (App. Div. 1997) ..................................................................14

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
353 F. Supp. 2d 460 (S.D.N.Y. 2005), *aff'd*, 450 F.3d 121 (2d Cir. 2006) ............................13, 15

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
395 F.3d 921 (8th Cir. 2005) ..............................................................................17

*T. Frederick Jackson, Inc. v. Pepper Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.)*,
No. 98-140-SLR, 2000 WL 376398 (D. Del. Mar. 28, 2000) .................................13, 15

*Terwilliger v. Terwilliger*,
206 F.3d 240 (2d Cir. 2000)................................................................................13

*Total Containment, Inc. v. Dayco Prods., Inc.*,
No. CIV. A. 1997-CV-6013, 2001 WL 1167506 (E.D. Pa. Sept. 6, 2001) .............................12, 17

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del.Ch. 2006), *aff'd, Trenwick Am. Litig. Trust v. Billett* ,
931 A.2d 168 (Del. 2007) .....................................................................................2

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
29 F.3d 137 (4th Cir. 1994) ...............................................................................17

*United States v. Mathis*,
264 F.3d 321 (3d Cir. 2001)...............................................................................12

*VBC LLC v. Campbell Soup Co.*,
482 F.3d 624 (3d Cir. 2007)...............................................................................20

*Wai Ming Ng v. Tow*,
688 N.Y.S.2d 647 (App. Div. 1999) ....................................................................13

*Williams v. Rene*,
72 F.3d 1096 (3d Cir.1995).................................................................................12

## STATUTES & RULES

11 U.S.C. § 101......................................................................................................4

Fed. R. Evid. 702 ..................................................................................................11

## **OTHER AUTHORITIES**

Aswath Damodaran, *Investment Valuation* 16-17 (2000)............................................................20

W. Page Keeton et al., *Prosser and Keeton on Torts* § 41 (5th ed.1984).....................................15

*Weinstein's Federal Evidence* § 702.02[6][b] ...............................................................................4

Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants" or "Credit Suisse"), respectfully submit this Memorandum in Support of Their Motion to Exclude the Expert Testimony of Michael Tennenbaum pursuant to Federal Rule of Evidence 702.

## NATURE AND STAGE OF THE PROCEEDINGS

This Adversary Proceeding was commenced in November 2004 by the filing of the Objection and Counterclaims with the Bankruptcy Court. (Adv. Proc. D.I. No. 1.) Motion practice and discovery proceeded before the Bankruptcy Court over the course of the following three years. On December 7, 2007, Plaintiff filed a Motion to Withdraw the Reference (Civ. D.I. No. 1.) Following briefing on the Motion to Withdraw the Reference and a status conference before this Court on January 22, 2008, the Court issued an order withdrawing the reference of this Adversary Proceeding to the Bankruptcy Court on the basis of judicial economy. (Civ. D.I. No. 23.) The present motion by Defendants respectfully requests that the Court exclude from evidence in its entirety the testimony of Plaintiff's expert Dr. Michael Tennenbaum.

## SUMMARY OF ARGUMENT

This Court should exclude the proposed testimony of Plaintiff's damages expert, Dr. Michael Tennenbaum, on the grounds of lack of fit and unreliability. His analysis is so speculative and lacking in probative value that it will not assist the trier of fact. Indeed, if that trier of fact is a jury (which as of this filing has not yet been determined by the Court), Dr. Tennenbaum's testimony would only incite jury confusion and speculation, inaccurate results, and prejudice to Defendants. Dr. Tennenbaum's opinions are not grounded in any logical connection to the Plaintiff's claims or in any sound methodology.

Plaintiff's contention is that the Credit Suisse Defendants, by virtue of Defendant Credit Suisse Securities LLC's assistance to Oakwood with the company's securitization program, somehow assumed an obligation to give Oakwood general strategic and financial advice. By sometime in 2001, Plaintiff's theory goes, Oakwood was sufficiently insolvent that Credit Suisse was obligated to (a) advise Oakwood to go into bankruptcy and, if Oakwood chose not to follow that advice, (b) cease doing the securitizations and force the company into bankruptcy. Oakwood's board of directors continued to attempt to avoid filing for bankruptcy until its sudden deterioration in liquidity required the company to file in November 2002.

Dr. Tennenbaum's approach to damages is simply the now widely-discredited theory of "deepening insolvency", although he mostly avoids using that terminology, no doubt because of the decision of the Delaware Court of Chancery in *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006) (rejecting deepening insolvency as a cause of action), *aff'd, Trenwick Am. Litig. Trust v. Billet*, 931 A.2d 168 (Del. Supr. Ct. 2007), which was decided while Dr. Tennenbaum was at work on his report (and affirmed by the Delaware Supreme Court some five months after his report was submitted).[1] In considering this motion, the Court need not decide whether deepening insolvency as a cause of action or theory of damages is now completely dead or just terminal, because Dr. Tennenbaum's analysis is so riddled with errors of approach and execution that he should be barred from giving his opinions under the familiar analysis required by Federal Rule of Evidence 702.

Dr. Tennenbaum's core conclusion is that the value of Oakwood declined by $50 million between September 2001 and September 2002. Dr. Tennenbaum gives no

---

[1] Dr. Tennenbaum discussed the Chancery Court's opinion with Plaintiff's counsel when it was decided. (Deposition of Dr. Michael Tennenbaum Ph.D, dated Oct. 22, 2007, at 26-28 (hereinafter cited "Tenn. Dep. at __") (attached as Ex. E to Declaration of J. Justin Williamson dated April 14, 2008) (hereinafter cited "Williamson Decl. Ex. __, at __") (contemporaneously filed herewith).)

2

rationale for the selection of those dates (Oakwood actually filed for bankruptcy on November 15, 2002); perhaps it is simply the convenience that Oakwood's fiscal year ended on September 30th. That difference in the company's value between the two dates, he says, is the measure of the harm caused by the fact that Defendants did not force the company into bankruptcy a year before it actually filed. According to Dr. Tennenbaum, over the course of that year, the value of Oakwood's assets declined from $350 million to $300 million.[2]

Dr. Tennenbaum's analysis suffers from at least the following defects:

- Dr. Tennenbaum's proposed testimony does not fit Plaintiff's theory of the case and, rather than assisting the trier of fact, will invite the trier of fact to speculate. Plaintiff contends that Defendants are liable because they "allowed" Oakwood to continue to operate its business until it went bankrupt in 2002 rather than advising or forcing the company to file in or around September 2001. Under this theory, the trier of fact would need to assess damages by asking whether the results of a bankruptcy in 2001 would have been better than the outcome of the actual bankruptcy, and, if so, by how much. Dr. Tennenbaum does not do this. Instead, he simply chooses an essentially random date in 2001, without assuming a bankruptcy filing, for his baseline valuation.

- As to reliability, even assuming that somehow Dr. Tennenbaum's damages fit the theory of Plaintiff's case, Dr. Tennenbaum values Oakwood (or its assets) solely on the basis of discounted cash flow (DCF) analyses, and starts those analyses with cash flows whose source he does not know and which he admits he does not believe to be realistic.

- The unreliability of Dr. Tennenbaum's analysis is increased by the fact that he ignores market-based information that contradicts his pulled-from-thin-air DCF valuation, despite the fact that Oakwood's common stock and its bonds were publicly traded. Most notably, Dr. Tennenbaum ignores the result of Oakwood's actual bankruptcy: most of the assets of Oakwood were sold to a subsidiary of Berkshire-Hathaway, Oakwood's largest creditor, for $373 million – more than either of Dr. Tennenbaum's valuations.

- Dr. Tennenbaum assumes that *all* of the reduction in Oakwood's value between 2001 and 2002 was Credit Suisse's fault – ignoring extrinsic factors such as the severe

---

[2] In addition, his report states that the Credit Suisse Defendants earned fees which Plaintiff's counsel told him were $20 million. Inexplicably, given Plaintiff's theory that September 2001 was the time when Defendants breached duties by failing to advise or force the company to file for bankruptcy, the $20 million counts fees received by Defendants starting in February of 2001. Dr. Tennenbaum does not discuss or analyze the fees in any way.

dislocations in markets following September 11, 2001, and contradictory contemporaneous information.

This Court should exclude Dr. Tennenbaum's testimony for lack of fit and unreliability. Allowing Dr. Tennenbaum's entirely speculative damages theory to be heard by the trier of fact – especially if that trier of fact is a jury – will only result in inaccurate results and prejudice to Defendants.[3]

## STATEMENT OF FACTS

### A.    Plaintiff's Claims

On November 15, 2002, Oakwood Homes Corp. and certain of its subsidiaries and affiliates ("Oakwood") filed petitions for bankruptcy protection under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. Oakwood was one of the largest manufacturers and retailers of manufactured housing in the country. Many of the manufactured housing units sold through Oakwood's retail centers were financed by Oakwood, and Oakwood generally retained a security interest in all the homes it financed, with the related loans documented as installment sales contracts or traditional mortgages (collectively, "RICs"). Oakwood originated these RICs itself and purchased other RICs originated by various independent entities. Oakwood funded its originations and purchases of the RICs through various public and private asset securitizations. From 1996 until Oakwood filed for bankruptcy, Credit Suisse Securities LLC ("CSS") provided services to Oakwood in connection with these securitizations, including the underwriting of securitization transactions and assisting with securing a receivables purchase or "warehouse" facility through an affiliate of CSS. In August 2002, Oakwood retained Defendant CSS as its financial advisor, pursuant to an engagement letter, to assist it with its bankruptcy filing.

---

[3] Because Plaintiff's only articulated theory of consequential damages is based on Dr. Tennenbaum's proposed testimony, the Court should hold a *Daubert* hearing to determine Professor Tennenbaum's ability to testify as an expert in this case. "The Third Circuit has been somewhat more adamant than other Circuits in its insistence on the need for a pretrial hearing to assess proposed expert testimony." *Weinstein's Federal Evidence* § 702.02[6][b].

4

Subsequent to the bankruptcy filing, Defendant CSS filed proofs of claim seeking payment of fees and expenses stemming from its August 2002 letter agreement with Oakwood. On November 13, 2004, Plaintiff commenced this adversary proceeding by filing Objections and Counterclaims to the Proof of Claim.

Plaintiff alleges that beginning sometime in 2001 the Credit Suisse Defendants harmed Oakwood by providing the securitization services (and getting paid for them), by continuing to provide them when the company was in financial distress, and by failing to advise or to force the company to file for bankruptcy earlier than it did. More specifically, Plaintiff's common law causes of action are: (1) for breach of an implied contract, asserting that the Credit Suisse Defendants breached an unwritten agreement to provide general financial and strategic advice which somehow arose out of the securitization services; (2) for negligence, asserting that Defendants failed to exercise due care; and (3) for breach of fiduciary duty, apparently based on the prior assertions and the fact that Defendants earned fees for the securitization services provided.

Plaintiff seeks consequential and actual damages of at least $50 million and all fees collected by Defendants as a result of their relationship with Oakwood between the closing of the Loan Purchase Facility (February 2001) and the Petition Date (November 2002). (Plaintiff's Supplement to Its Rule 26(a)(1) Initial Disclosures, dated May 1, 2006, at 4-6; Williamson Decl. Ex. A at 4-6.) Plaintiff states that: "the Trust will seek to remedy Credit Suisse's . . . misconduct at trial via an award of compensatory money damages." (Motion for Determination of Plaintiff's Rights to a Jury Trial, dated Oct. 5, 2007, at 3; Williamson Decl. Ex. B at 3.) Plaintiff further states that it seeks "damages for <u>the direct harm to the Debtors caused by Credit Suisse's malfeasance</u> . . . such compensatory damages are wholly 'legal' in nature." (Plaintiff's Reply Brief in Support of Motion for Determination

5

of Right to Jury Trial, dated Oct. 17, 2007, at 7; Williamson Decl. Ex. C at 7) (emphasis added).)

## B.    Dr. Tennenbaum's Proposed Expert Testimony For Plaintiff

Plaintiff served Dr. Tennenbaum's report on Defendants on or about April 27, 2007. Dr. Tennenbaum has been a consulting economist at the firm of Flavell, Tennenbaum & Edwards since the mid-1970s. (Tenn. Dep. at 7). He was a professor of economics at California State University from 1969 to 1986. (*Id.*) He has no expertise in the manufactured housing industry. (*Id.* at 7-8.) He has worked with Plaintiff's counsel on eight to ten previous engagements. (*Id.* at 9.)

Dr. Tennenbaum's proposed testimony addresses the change in Oakwood's financial condition as between two dates: September 2001 and September 2002. (Expert Witness Report of Dr. Michael Tennenbaum Ph.D.; Williamson Decl. Ex. D at 7 (hereinafter cited "Tenn. Report at __").) His analysis includes comparisons of Oakwood's enterprise value, asset and liability values, equity and debt values, and "[c]hanges in the probability of default by Oakwood and the probability of Oakwood's return to solvency" as between those two dates. (*Id.*) Tennenbaum states that his report also renders an opinion on "[d]amages suffered by Oakwood's Enterprise as a result of the foregoing issues." (*Id.* at 8.)

Dr. Tennenbaum's report includes the following conclusions:

1.    Oakwood's enterprise value was approximately $350 million as of September 2001 and approximately $300 million as of September 2002. (Tenn. Report at 9, 51.)

2.    Oakwood's asset value fell by approximately $50 million between the two dates, while its long term liabilities (face value of debt plus present value of guarantee payments) increased by approximately $40 million. (*Id.*)

3.    Oakwood was insolvent at both dates, and "[t]he extent of [its] insolvency rose from a negative equity of $120 Million to a negative equity of $210 Million." (Id. at 51.) By September 2002, the prospects of Oakwood's returning to a solvent condition had gone from "slim" to "even more remote." (*Id.*)

6

4.      Oakwood "suffered damages as a result of continued operation of its business model [between September 2001 and September 2002] of at least $50 million." (*Id.*)

5.      In addition, Oakwood "paid fees related to the continuation of a business model which was destroying value. Such fees added to the damage suffered by OHC, and we are informed that the fees in question are in excess of $20 Million." (*Id.*)

Dr. Tennenbaum conducted his valuations of Oakwood's enterprise value as of September 2001 and September 2002 by performing discounted cash flow analyses. He based his DCFs on three sets of projections: (1) "Five Year Plan" projections developed in connection with a proposed stand-alone plan of reorganization for Oakwood that was never confirmed (Tenn. Dep. at 34-39); (2) "Late 2001" projections; and (3) "Mid 2001" projections. He does not know the author of either of the 2001 projections. (*Id.* at 39-42).

Dr. Tennenbaum did not perform a market method or balance sheet valuation of Oakwood, at least insofar as his report and his deposition testimony indicate. Dr. Tennenbaum did not cite, in his report or his deposition, to contemporaneous market data about Oakwood.

During his deposition, Dr. Tennenbaum was asked to explain in more detail his damages conclusion:

Q.      In the last bullet point on page 51 you say, "Oakwood Homes suffered damages as a result of continued operation of its business model of at least $50 million."
Do I understand from that that you mean to say it would have been $50 million better for the company if in September 2001 CSFB had simply refused to do further securitizations and forced the end of the company's business model at that point?

A.      Probably, yes.

Q.      I understand that correctly?

A.      Yes.

. . . .

7

Q.    What do you think would have happened at Oakwood if on September the 30th of 2001, CSFB had simply said no more securitizations period, full stop?

A.    I think the company would have filed Chapter 11.

Q.    Immediately?

A.    I think so.

Q.    And then what would have happened?

A.    Hopefully, they would have sought to engage in an orderly sale of the company on a . . . going-concern value basis, and would have been able to generate in September '01 dollars $350 million for potential distribution to the creditors.

(Tenn. Dep. at 72-73.)

But when pressed to explain what would have happened specifically, rather than "hopefully", had Credit Suisse refused to provide securitizations, as Plaintiff claims it should have, Dr. Tennenbaum could not do so:

Q.    But to sell the company's cash flow prospects, the company would have had to have continued in the business of manufacturing and selling mobile homes?

A.    Yes.

Q.    Okay.  And up until that time, isn't it a fact that the principal source of liquidity in order to keep doing that business was the securitizations?

A.    Yes.

Q.    Okay.  And to what extent have you investigated, and can you tell us, what other sources of liquidity would have actually been available to the company at that time?

A.    I haven't done an analysis of that.

. . . .

Q.    Given that you have not investigated alternative sources of financing to replace the liquidity . . . provided by the securitizations, it's a fact, isn't it, that you are not able to tell us how likely it is that the results

8

of the end of the securitization process would have been the rapid liquidation of the company?

A.      If you shut off the financing completely, yeah, of course. I did not investigate what would happen under those circumstances.

(Tenn. Dep. at 74-75.)

When questioned about Oakwood's marketability and ability to find a buyer, Dr. Tennenbaum's answers demonstrated that he does not know and did not investigate whether there were any likely buyers for Oakwood in or around September 2001. (*Id.* at 46-48.)

Finally, Dr. Tennenbaum admitted that he was unsure about his own conclusions:

> Q.    Is it your opinion that – in September of 2001 is it your opinion that the creditors of the company would have been better off had Credit Suisse in September of 2001 simply stopped the securitizations?
>
> A.    I don't know. What my analysis indicates is that the company would have been better off had it received advice to file in September of '01 and seek a purchaser for the going-concern value of the company as of that point in time because of the fact that that going concern value was dissipating and was going to dissipate over the next – over the foreseeable future. And that does not imply anything at all about what would happen if somebody forced them to liquidate. That, I don't know.
>
> Q.    Well, let's just test the assumptions that are built into that. First of all, you said you think the creditors would have been better off had the company been given advice in September of 2001 that they should go into bankruptcy. Actually, what advice the company got wouldn't have had any effect, would it? What would have made a difference is if they had gotten that advice and acted on it?
>
> A.    Yes, sure, assuming they acted on it.
>
> Q.    All right. So and isn't it further accurate to say that your assumption that the creditors would have been better off in that circumstance, assumes that in that scenario, in a Chapter 11 commencing around the first of October 2001, there would have been some alternative source of liquidity to allow the company to continue to remain a going concern?
>
> A.    Yes.

9

Q.    And it's a fact, if I further understand your testimony, that you made no attempt to determine whether any such alternative sources of liquidity would have been available?

A.    That's correct, I did no analysis of the liquidity available to the company.

Q.    Okay. And is it correct that you made no attempt to estimate what values might have been recovered by the company if, in fact, it had not been able to be sold as a going concern, but had gone into an immediate shut down and liquidation model?

A.    That's correct.

(Tenn. Dep. at 75-77.)

## C.    Expert Rebuttal Report Of Allen M. Pfeiffer For Defendants

On February 29, 2008, Defendants served the Expert Rebuttal Report of Allen M. Pfeiffer, addressing Dr. Tennenbaum's proposed testimony. Mr. Pfeiffer is a managing director at Duff & Phelps LLC, where he specializes in complex valuation and bankruptcy matters. (Expert Rebuttal Report of Allen M. Pfeiffer, dated Feb. 29, 2008; Williamson Decl. Ex. F, at App. B (hereinafter cited "Pfeiffer Report at ___").) Mr. Pfeiffer has more than 12 years of experience with valuation, cash flow assessment, and capital structure analysis, including litigation consulting on damages and enterprise valuation. (*Id.*) Mr. Pfeiffer analyzed Dr. Tennenbaum's expert report and deposition testimony and concluded the following:

1.    That Dr. Tennenbaum's "theory of damages and his methodologies are speculative, unreliable, and inadequate."

2.    That Dr. Tennenbaum's "analysis is inconsistent with generally accepted valuation practice in several important ways."

3.    That Dr. Tennenbaum's methodology and conclusions include "faulty assumptions, inconsistent application of theory, omissions of key contemporaneous facts and market date, and use of admittedly doubtful projections."

10

(*Id.* at 11.) Mr. Pfeiffer's specific analysis of Dr. Tennenbaum's testimony will be discussed in further detail below. Plaintiff took the deposition of Mr. Pfeiffer on March 27, 2008.

## ARGUMENT

### I.    The Standard for Expert Testimony Pursuant To Fed. R. Evid. 702

Federal Rule of Evidence 702 provides that a witness may offer expert testimony only if :

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmacueticals, Inc.,* 509 U.S. 579 (1993), "the Supreme Court charged trial judges with the responsibility to act as gatekeepers under Rule 702 to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony." Fed. R. Evid. 702 advisory committee's note.

The Supreme Court has emphasized that district courts must evaluate proffered expert evidence in the first instance rather than leaving the task for the jury to sort through.    *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (reaffirming "the 'gatekeeper' role of the trial judge in screening such evidence"); *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993) (finding that it was error to admit expert damages testimony which was premised upon one non-speculative earnings estimate and three speculative estimates where "the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy" because "we must resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves") (internal citations and quotations omitted), *modified on other grounds*, 40 F.3d 475 (D.C. Cir. 1994).

11

The Third Circuit has interpreted FRE 702 to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *United States v. Mathis*, 264 F.3d. 321, 335 (3d Cir. 2001) (internal citation and quotations omitted). As to each element, Plaintiff bears the burden of establishing the admissibility of the expert opinion by a preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994); *see Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000), *cert. denied*, 532 U.S. 921 (2001). The role of the judge with regard to expert testimony is to serve as a gatekeeper, and it is the judge who must decide if an expert's testimony reliably "fits" the case. *See Paoli*, 35 F.3d at 748.

The Third Circuit has not shied away from excluding expert economic testimony on reliability grounds. *See, e.g., Williams v. Rene*, 72 F.3d 1096, 1101-03 (3d Cir. 1995) (reversing admission of expert damages testimony where, despite significant detail, underlying assumption was "unsupported and speculative"); *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 642 (3d Cir. 1987) ("This Court has required more than speculative opinion when determining damages for prospective earnings loss."); *Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ.A.1997-CV-6013, 2001 WL 1167506, at *3-4 (E.D. Pa. Sept. 6, 2001) (collecting cases). In this instance, Dr. Tennenbaum's testimony fails to meet the Third Circuit's requirements of fit and reliability and should be excluded on those grounds.

## II.    Dr. Tennenbaum's Proposed Testimony On Damages Will Not Assist The Trier Of Fact Because His Analysis Does Not Fit Plaintiff's Theory Of The Case And Is Entirely Speculative

The heart of Plaintiff's case is its allegation that Credit Suisse should have advised, or even forced, Oakwood to file Chapter 11 proceedings approximately one year earlier than it did file. Had Credit Suisse advised or forced Oakwood to file for bankruptcy in or around September 2001, according to Plaintiff, Oakwood would not have experienced a

12

diminution of its enterprise value, and its creditors would have recovered more than they did in the actual bankruptcy. (Tenn. Dep. at 72-73.) This is where Dr. Tennenbaum comes in. He opines that Oakwood suffered a $50 million diminution in its enterprise value between September 2001 and September 2002. He opines that, had Credit Suisse advised or forced Oakwood to file earlier, that that loss would not have occurred. But Dr. Tennenbaum does not provide the trier of fact with the necessary information to determine what Oakwood's actual damages were: that is, Dr. Tennenbaum has no idea, and made no attempt to investigate, what would have happened to Oakwood had it filed for bankruptcy in September 2001.

A plaintiff must prove its damages with reasonable certainty; a speculative damages theory fails to satisfy the damages element of a plaintiff's case. *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, No. 4, 2008 WL 423451 (N.Y. Feb. 19, 2008) (proof of consequential damages cannot be speculative or conjectural); *Kenford Co., Inc. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986) (the alleged loss must be capable of proof with reasonable certainty); *Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000) ("To prevail on a breach of contract claim under New York law, a plaintiff must prove ... damages.") (internal citation and quotations); *Wai Ming Ng v. Tow*, 688 N.Y.S.2d 647, 649 (App. Div. 1999) (award of damages should place the plaintiff in the same position as he or she would have been in if the contract had not been breached; damages may not be "merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach") (internal citation and quotations omitted); *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 486 (S.D.N.Y. 2005) (granting summary judgment for the defendant on ground that not a "shred of evidence" supported plaintiff's speculative theory of proximate cause), *aff'd*, 450 F.3d 121 (2d Cir. 2006); *T. Frederick Jackson, Inc. v. Pepper Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.)*, No. 98-140-SLR, 2000 WL 376398 (D. Del. Mar. 28, 2000)

13

(granting summary judgment to defendant on plaintiff's claim for compensatory damages because plaintiff failed to prove that alleged breaches proximately caused it any loss).

In order for Dr. Tennenbaum's analysis to fit Plaintiff's theory of the case, Dr. Tennenbaum could and should have done an analysis that compares what would have happened had Defendants done what the Trust says they should have done – *i.e.*, somehow caused Oakwood's bankruptcy one year earlier than it occurred – with what resulted when Oakwood actually did go through a bankruptcy proceeding. But as matters stand now, the trier of fact will know half of the necessary equation – what happened after Oakwood's 2002 bankruptcy filing. It will have no information about the other half, and will have to guess whether Plaintiff is right that Oakwood would have been better off to have filed sooner. That scenario would have been hypothetical, certainly, but experts use facts in the record to create hypothetical scenarios all the time. The reasonableness and methodology of the experts' use of the record to create a hypothetical is something that the Court (upon a *Daubert* challenge) or trier of fact (at trial) can consider and weigh. If an expert is unable to provide any satisfactory answer to the question of what would have happened in a 2001 bankruptcy, perhaps that itself tells us something about the speculative nature of damages and causation in Plaintiff's case.

Moreover, Dr. Tennenbaum's damages analysis is totally unmoored from any notion of causation. With respect to each of its causes of action, Plaintiff bears the burden of proving not just damages, but causation. *Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (App. Div. 2007) (plaintiff must prove that its damages were directly caused by the defendant's misconduct); *R.M. Newell Co., Inc. v. Rice*, 653 N.Y.S.2d 1004 (App. Div. 1997) (affirming grant of summary judgment dismissing plaintiff's breach of fiduciary duty claim because, "as a matter of law, any damages sustained by plaintiff were not proximately caused by wrongful conduct on the part of defendants, an essential element of plaintiff's causes of action against

14

defendants"); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996) (dismissing claim on causation grounds when plaintiff's theory was based on speculative notion that if defendant had adequately investigated third party, plaintiff would have not engaged in conduct that caused losses), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 486 (S.D.N.Y. 2005) (granting summary judgment for the defendant on ground that not a "shred of evidence" supported plaintiff's speculative theory of proximate cause), *aff'd*, 450 F.3d 121 (2d Cir. 2006); *T. Frederick Jackson, Inc. v. Pepper Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.)*, No. 98-140-SLR, 2000 WL 376398 (D. Del. Mar. 28, 2000) (granting summary judgment to defendant on plaintiff's claim for compensatory damages because plaintiff failed to prove that alleged breaches proximately caused it any loss); W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 263 (5th ed.1984) ("An essential element" of any claim sounding in tort "is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.").

Plaintiff therefore must prove how each item of the "actual and consequential damages" it claims was proximately caused by the Credit Suisse Defendants. But Dr. Tennenbaum's proposed testimony offers no guidance about causation. Instead, he does nothing more than offer up calculated valuations as of two points in time, and assumes that the difference is all Defendants' fault.

Defendants' expert Mr. Pfeiffer commented on this deficiency during his deposition:

> Q      . . . What figure should Dr. Tennenbaum have derived if he had followed the appropriate methodology, according to you, to compare to the 373 or $375 million sale to Buffett?
> Mr. Williamson: Objection.
>
> A      Well, in response to your question, let me take a very large and important step back just to make sure to clarify a very important issue.

Dr. Tennenbaum purports to be analyzing damage. And until now we've discussed a topic as if the change in value between the actual sale and the hypothetical sale is potential damage. And that's not true.

Damages – when you look at damages in this context, one must consider many other factors besides a change in value between two points in time.

And those factors include the fact that the market changes irrespective of whether you make a decision or not, you know, the view of the market changes between two times – two moments in time. The broader market changes, the specific industry in which Oakwood found itself changes.

There's also as it relates to damage there's an issue of causation. Did their decision cause the damage or did some other factors cause the damage?

Credit Suisse's role or lack of role in that damage is also obviously an issue. There's the specificity of a damages calculation that has to be considered.

So when you ask me about Dr. Tennenbaum's analysis and what he should have done, it goes well beyond the fact that he should have looked at the value of the two companies as of two different dates. In order to arrive at a damages calculation, he had to do a lot more than that.

(Deposition of Allen Pfeiffer, dated March 27, 2008, at 98-99; Williamson Decl. Ex. G at 98-99 (hereinafter cited "Pfeiffer Dep. at __").)

Plaintiff's expert should have identified the components of damages that were proximately caused by Defendants, as compared to diminution in value or lost profits or other economic harm that was caused by factors other than Defendants' action or inaction. But here, Dr. Tennenbaum's testimony compels the trier of fact to assume that every single dollar of the alleged $50 million diminution in Oakwood's enterprise value is attributable to the Defendants. Dr. Tennenbaum gives no consideration to other very plausible factors for the company's decline, such as the decisions and actions of Oakwood's board of directors and management and the general decline in the securities markets following the events of September 11th.

This is not an issue of the weight of the Plaintiff's evidence about damages; it is an issue of Plaintiff's having no evidence about damages. What Dr. Tennenbaum has done is to conduct two valuations of Oakwood at two virtually random times, without any controls for differences in the valuations that may have resulted from the "failure" to file for bankruptcy in 2001, and without any consideration of other causes for any decline in value. That is not a damages analysis. In fact, it is not an analysis at all. It offers two numbers and

16

invites the trier of fact to speculate about how much and why Credit Suisse is allegedly responsible for the difference between the two numbers. Particularly if a jury is to be the trier of fact in this case, this kind of guesswork damages analysis presented by a purported expert will only prejudice Defendants, without providing the trier of fact with any useful framework of analysis. *Tyger Constr. Co., Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994) ("Scrutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it.") (internal citations and quotations omitted).

As Dr. Tennenbaum has no guidance to offer about damages, only speculation, his testimony will not assist in any trial in this matter. The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so it will aid the jury in reaching accurate results." *Paoli*, 35 F.3d at 744 (internal citations and quotations omitted); *See Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 928-29 (8th Cir. 2005) (affirming summary judgment on ground that plaintiff failed to prove damages element of its claim and finding "[t]he district court was well within its discretion in deciding that [plaintiff's expert's] testimony was so uninformed and baseless that it could not assist the jury in the task of fixing damages"); *Total Containment*, 2001 WL 1167506 at *4-5 (excluding expert testimony because expert ignored facts in record about company's performance and relied on improper sources for market share data); *JMJ Enters. Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098, at *26 (E.D.Pa. Apr. 15, 1998) (rejecting expert damages testimony as its "probative value . . . is substantially outweighed by its unfair prejudicial effect and the likelihood that it will confuse the jury").

17

The Court should rule that Dr. Tennenbaum's testimony is inadmissible as it will not assist the trier of fact and, moreover, will affirmatively prejudice Defendants by leaving the trier of fact to guess and speculate.

### III. Dr. Tennenbaum's Proposed Analysis Is So Rife With Methodological Errors, Sloppy Shortcuts, And Faulty Assumptions That It Cannot Be Considered Reliable

Although Defendants believe strongly that the flaws of fit and logic in Dr. Tennenbaum's analysis should mandate its exclusion on that ground alone, the Court would also be justified in excluding Dr. Tennenbaum's testimony on the ground of unreliability. The Supreme Court has instructed that, before expert testimony is admitted, a court must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. This is a "flexible" inquiry. *See id.* at 594. The Third Circuit has similarly interpreted Rule 702 to require that data underlying an expert's opinion be reliable. *See Paoli*, 35 F.3d at 748 ("If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.") (internal citation and quotations omitted).

In addition to the deficiencies of logic and causation in Dr. Tennenbaum's proposed testimony, (which the Defendants believe the Court should also consider as part of the reliability analysis as well as the helpfulness analysis under this Circuit's three-part test for admissibility), Dr. Tennenbaum's valuations of Oakwood are rife with significant methodological errors. First and most importantly, Dr. Tennenbaum's DCF analyses rest entirely on projections that Dr. Tennenbaum does not know the source of and/or considers unreliable, while at the same time Dr. Tennenbaum failed to consider contemporaneous

18

market information that would have shed light on, or even contradicted, the assumptions contained in his DCF analyses. (*See* Pfeiffer Report at 4-9.)

Dr. Tennenbaum based his DCFs on three sets of projections: (1) "Five Year Plan" projections developed in connection with a proposed stand-alone plan of reorganization for Oakwood that was never confirmed (Tenn. Dep. at 34-39); (2) "Late 2001" projections contained in a Credit Suisse presentation to Oakwood's management; Dr. Tennenbaum does not know if these projections were created by Credit Suisse or Oakwood (*Id.* at 39-41); and (3) "Mid 2001" projections that he similarly does not know who prepard (*Id.* at 41-42). Dr. Tennenbaum made no effort to ascertain the author or assumptions of the two projections he knows nothing about. (*Id.* at 39-42). As to the Five Year Plan projections, he found out that they were prepared by the firm of Miller Buckfire, which was a consultant to Oakwood during its bankruptcy, but did not make further inquiries, of Miller Buckfire or anyone else, about the bases and assumptions for those projections. (*Id.* at 34-39.) Dr. Tennenbaum also admitted that the Miller Buckfire projections envisioned a different, smaller (restructured) company than Oakwood actually was, and that the kind of restructuring contemplated in these projections never actually occurred. (*Id.*) As to the earlier projections from 2001, Dr. Tennenbaum described them as "aggressive", "hockey stick" projections (*Id.* at 42), but relied on them anyway without making any adjustments for what he himself perceived to be their unreliability. Dr. Tennenbaum should have made adjustments to the projections to render them more realistic in his view, or used different projections, or conducted additional or substitute valuation methodologies like a comparable companies analysis or other form of analysis that takes into account market conditions. (Pfeiffer Dep. at 146-48.) *See JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098, at *23 (E.D.Pa. Apr. 15, 1998) (rejecting expert damages testimony on basis of "significant errors" and use of unrealistic sales projection).

19

This sloppy analysis is particularly likely to lead to unreliable results in the case of a company in distress, which is how Dr. Tennenbaum views Oakwood as of both 2001 and 2002. (*See* Tennenbaum Report at 51.) In his rebuttal report, Mr. Pfeiffer points out this significant flaw and cites to a respected valuation treatise highlighting the importance of extra care in conducting cash flow valuations of distressed companies. (Pfeiffer Report at 7-9, n.17, citing Aswath Damodaran, *Investment Valuation* 16-17 (2000)) Dr. Tennenbaum's lack of care in using and adjusting the projections, and lack of even basic investigation into the validity and source of the projections, contravenes proper valuation methodology. *See, e.g. Out-A-Sight Pet Containment, Inc. v. Radio Sys. Corp.*, No. Civ.A. 01-5775, 2004 WL 1562556, at *3 (E.D.Pa. July 9, 2004) (expert testimony about lost profits damages rejected because expert's wholesale adoption of sales projections prepared by a consultant to the subject company was unsupported by good grounds).

Dr. Tennenbaum's errors are magnified by his complete failure to consider contemporaneous market data bearing on the valuation and prospects of Oakwood that might have shed light on his DCF analysis. Accounting concepts and standards and valuation standards and treatises are in agreement that "market-based information is the best indicator of a company's value". (Pfeiffer Report at 4-5 & n. 2-6, *citing*, inter alia, Statement of Financial Accounting Standards No. 7 and No. 157, and American Society of Appraisers Business Valuation Standards.) Moreover, courts in this Circuit have explicitly affirmed the importance of using market data in valuations. *VBC LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) (affirming bankruptcy court's rejection of expert's valuation by means of discounted cash flow analyses in favor of valuation based on market data); *Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 548 (D. Del. 2005)("because valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give

20

deference to 'prevailing marketplace values' . . . rather than to values created with the benefit

of hindsight for the purpose of litigation") (quoting *Peltz v. Hatten*, 279 B.R. 710, 738 (D.

Del.2002), *aff'd, In re USN Commc'ns, Inc.*, 60 F.App'x 401 (3d Cir. 2003)).

      Yet Dr. Tennenbaum fails to account in his analysis for, among other things:

the market price for Oakwood's stock as traded on the NYSE, market prices for Oakwood's

bonds, the stability of Oakwood's credit ratings, and, unaccountably, <u>the actual sale price of

Oakwood's assets to Clayton Homes in 2003,</u> all of which data points contradict Dr.

Tennenbaum's concluded valuations. (Pfeiffer Report at 4-9; Pfeiffer Dep. at 116-17.)  For

instance, in Oakwood's actual bankruptcy, most of the assets of Oakwood were sold to a

subsidiary of Berkshire-Hathaway, Oakwood's largest creditor, for \$373 million – a higher

figure than either of Dr. Tennenbaum's valuations. *See In re Nellson Nutraceutical, Inc.,* 365

B.R. 364, 367 (Bankr. D. Del. 2006) ("Where an expert relies on altered facts, speculation,

and volatile projections or fails to consider relevant facts in reaching a conclusion, the

expert's opinion can offer no assistance to the trier of fact").[4]

      There was nothing preventing Dr. Tennenbaum from conducting a thorough

and careful valuation of Oakwood, and from attempting to link damages to Oakwood to

particular acts or omissions of the Credit Suisse Defendants as separated from market

conditions or other factors not under Defendants' control.  That he did not do so, whether on

his own or due to instructions from Plaintiff's counsel, means that his testimony should be

rejected as unreliable in its entirety.  This combination of fundamental logical errors and

---

[4] After Dr. Tennenbaum's report was submitted, Plaintiff clearly became concerned about his complete failure to use market data.  Several months later Plaintiff served a "supplemental report" of its <u>other</u> expert (who was not proffered as a damages expert) that contains a discussion of Oakwood's "insolvency" by reference to market data.  (*See* Supplemental Report of Alan C. Shapiro Ph.D., dated Aug. 28, 2007 (*See* Adv. Proc. D.I. No. 192).)

21

careless, incomplete methodology should not reach the trier of fact, especially if that trier of fact is a jury.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court exclude from evidence in its entirety the testimony of Plaintiff's expert Dr. Michael Tennenbaum.

Dated: April 16, 2008
Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 903-9000
Facsimile: (212) 903-9100

*Attorneys for Defendants*

22