## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Oakwood Homes Corporation, et al., | Case No. 02-13396 (PJW) |
| Debtors. | |

| | |
|---|---|
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 04-57060 (PJW) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Civil Action No. 07-799 (JJF) |
| Defendants. | |

---------------------------------------------x

### DECLARATION OF J. JUSTIN WILLIAMSON
### IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT
### TESTIMONY OF MICHAEL TENNENBAUM

I, J. Justin Williamson, declare as follows:

      1.     I am an attorney associated with the law firm of Linklaters LLP, counsel to Defendants in this action.  I submit this Declaration in connection with Defendants' Motion to Exclude the Expert Testimony of Michael Tennenbaum Pursuant to Fed. R. Evid. 702.

      2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff's Supplement to Its Rule 26(a)(1) Initial Disclosures, dated May 1, 2006.

3.     Attached hereto as Exhibit B is a true and correct copy of Plaintiff's Motion for Determination of Plaintiff's Rights to a Jury Trial, dated October 5, 2007.

4.     Attached hereto as Exhibit C is a true and correct copy of Plaintiff's Reply Brief in Support of the Motion for Determination of Plaintiff's Rights to a Jury Trial, dated October 17, 2007.

5.     Attached hereto as Exhibit D is a true and correct copy of the Report of Michael Tennenbaum, served April 27, 2007.

6.     Attached hereto as Exhibit E is a true and correct copy of the Deposition of Michael Tennenbaum, dated October 22, 2007.

7.     Attached hereto as Exhibit F is a true and correct copy of the Expert Rebuttal Report of Allen M. Pfeiffer, dated February 29, 2008.

8.     Attached hereto as Exhibit G is a true and correct copy of the Deposition of Allen M. Pfeiffer, dated March 27, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 14, 2008
       New York, New York


_____
                    J. Justin Williamson, Esq.

# **Exhibit A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. 04- |
| v. | ) | 57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF OHC LIQUIDATION TRUST'S SUPPLEMENT TO**
**ITS RULE 26(a)(1) INITIAL DISCLOSURES**

Plaintiff OHC Liquidation Trust ("Trust" or "Plaintiff"), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby submits the following supplement to its Rule 26(a)(1) initial disclosures to Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.) (collectively, "CSFB" or "Defendants") as follows:

## I. INTRODUCTION

The Court, in its Memorandum Opinion entered on March 31, 2006, ordered the Trust to provide additional information regarding its preliminary damage calculations pursuant to Federal Rule of Civil Procedure 26(a)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7026. For convenience, the Trust has created the following categories for its computation of damages: (a) Preferential and Fraudulent Transfers (the Fifth, Sixth, Seventh, and Eighth Counterclaims); (b) Breach of Fiduciary Duty and Negligence (the First and Second Counterclaims); (c) Unjust Enrichment (the Third Counterclaim); (d) Breach of Implied and Express Contract (the Ninth Counterclaim); (e) Deepening Insolvency (the Tenth Counterclaim); and (f) Objection to CSFB's Claim and Equitable Subordination (the Fourth Counterclaim). Calculations of damages set forth herein are initial estimates based upon the best information currently available to the Trust

and are subject to modification. Fact discovery is still on-
going in this adversary proceeding, and no depositions have
taken place.  Expert discovery will follow the completion of
fact discovery.  The Trust, therefore, reserves the right to
amend, supplement, or modify its initial estimated damage
calculations from time to time as additional information becomes
available and additional analyses are performed.

The Trust either has already produced or will produce
all documents in its possession, which are not privileged or
protected from disclosure, on which its computation of damages
is based, including material bearing on the nature and extent of
damages suffered.  The Trust, however, will reproduce certain
principal documents bearing on its damage calculations shortly
after service of this supplement.[1]

## II.  CALCULATION OF DAMAGES

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| I. Preferential and Fraudulent Transfers | | |
| | Fifth Counterclaim (90 Day Transfers) | Subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within 90 days of the petition date (the "90 Day Transfers") as preferential transfers pursuant to section 547(b) of Title 11 of the United States Code (the |

---

[1]   There are other documents that may bear on the Trust's damage
calculations.  The Trust is merely grouping together and
reproducing certain material documents as a courtesy to CSFB.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | "Bankruptcy Code"), plus interest. The 90 Day Transfers, the sum of which is approximately $166,811,129.54, are described in paragraph 41 of the Trust's objection to claim and counterclaims (the "Objection/Counterclaims"). |
| | Sixth Counterclaim (One Year Transfers) | The Trust asserts that CSFB was an insider of the Debtors.  Accordingly, subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within one year of the petition date (the "One Year Transfers") as preferential transfers pursuant to Bankruptcy Code section 547(b), plus interest.  The One Year Transfers, the sum of which is approximately $595,845,154.45, are described in paragraph 42 of the Objection/Counterclaims.[2] |
| | Seventh Counterclaim (Fraudulent Transfers under Bankruptcy Code section 548) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB as fraudulent transfers under Bankruptcy Code section 548(a)(1)(B), plus interest. |
| | Eighth Counterclaim (Bankruptcy Code section 544(b) and Applicable State Law) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB under applicable state fraudulent transfer and/or conveyance laws, plus interest.  The Trust may also be entitled to recover transfers made to CSFB more than one year prior to the petition date |

---

[2]  In paragraph 42 of the Objection/Counterclaims, the Trust listed $595,845,398.42 in transfers, which contains a minor mathematical error.  The proper sum of the One Year Transfers is $595,845,154.45.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | pursuant to applicable state laws. |
| II.<br><br>Breach of Fiduciary Duty and Negligence | | |
| | First Counterclaim (Breach of Fiduciary Duty) | The Trust asserts that as a result of the multi-layered and multi-faceted relationship with the Debtors (as the lender, underwriter, powerful warrant holder, and financial/restructuring advisor), CSFB was an insider and owed the Debtors fiduciary duties. Moreover, because the Debtors were insolvent or within the zone or vicinity of insolvency up to two or more years prior to bankruptcy, CSFB owed the Debtors' creditors fiduciary duties.  CSFB had access to and knowledge of confidential and inside information.<br><br>Despite its knowledge of the Debtors' failing financial health, the Trust asserts that CSFB continued to underwrite asset-backed securitization offerings and facilitated those offerings through extensions of credit under the warehouse facility.  In addition, CSFB encouraged the Debtors' use of the Loan Assumption Program ("LAP").  CSFB acted for its own benefit, and at the detriment of the Debtors.  As a result of these and other breaches of fiduciary duties, CSFB unjustly enriched itself, and so the Trust is entitled to recover from CSFB all fees and other remuneration paid to CSFB and to recover consequential and actual damages, |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|----------|--------------|-------------------------------------|
| | | including, but not limited to: |
| | | 1.   Fees, costs, and expenses incurred by the Debtors for the LAP. The Trust estimates that the LAP cost the Debtors approximately $56.5 million. |
| | | 2.   In order to fund the LAP, the Debtors were forced to borrow more under their credit facilities. |
| | | a.   CSFB Warehouse Facility |
| | | i.   Fees for establishing the warehouse facility with CSFB – approximately $2.5 million. |
| | | ii.  Approximately twenty-one payments of $416,666.67 in monthly maintenance fees to CSFB for the warehouse facility, for a total of approximately $8,750,000. |
| | | iii. Interest payments for the warehouse facility for the period from February 2001 to the petition date – approximately $3,464,767.90. |
| | | iv.   Other professional fees and costs incurred in connection with this facility. |
| | | b.   Servicer Advance Facility: costs of approximately $2.4 million. |
| | | 3.   Fees and Costs of Securitizations |
| | | a.   Underwriting fees paid to CSFB (for the 1999-E; 2000- A, B, C, & D; 2001- B, C, D, & E; LOTUS II, III, & IV; and 2002- A, B, & C series of securitizations): approximately $11.93 million. |
| | | b.   Fees and costs paid to various |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | professionals related to securitizations and credit facilities, including, but not limited to, fees and costs paid to Hunton & Williams; Loeb & Loeb; Rayburn Cooper & Durham; Richards Layton & Finger; Simpson Thacher & Bartlett; Sullivan & Worcester; and Wachtell, Lipton, Rosen & Katz.<br><br>c.    Fees paid to Chase Manhattan Bank (later JP Morgan Chase) as indenture trustee for REMICs: to be determined.<br><br>d.    Cost of running the Loan Origination Department for the LAP: approximately $44.2 million.<br><br>4.    The Debtors' obligations, including guarantee payments made, on account of defaults on REMICs: to be determined.<br><br>5.    Prejudgment interest. |
| | Second Counterclaim (Negligence) | Damages for this Counterclaim are substantially similar to the damages sought for breach of fiduciary duty, which are discussed above.  The same facts that support the breach of fiduciary Counterclaim may support this Counterclaim.  Nevertheless, this Counterclaim is a separate Cause of Action on which the Trust may recover damages. |
| III.<br><br>Unjust Enrichment | | |
| | Third Counterclaim (Unjust Enrichment) | For this Counterclaim, the Trust seeks restitution and disgorgement of profits from CSFB.  With respect to the restitution component, the damages sought are substantially similar to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | the damages sought for the breach of fiduciary duty and negligence Counterclaims, which are discussed above.  With respect to the second component, the Trust seeks the disgorgement of profits CSFB earned by using the funds that it illicitly received from the Debtors.  As a result of CSFB's refusal to respond to interrogatories or produce documents related to its profits (including collateral profits, or so-called "profits on profits"), the Trust is unable to calculate this component of damages.  If the Trust prevails on its unjust enrichment claim, it may request that the Court order CSFB to disgorge its profits calculated based on the annual rate of return to CSFB's equity on a global/consolidated basis as reported in CSFB's SEC and other additional filings, compounded annually. |
| IV.<br><br>Breach of Implied and Express Contract | | |
| | Ninth Counterclaim (Breach of Implied and Express Contract) | The Trust asserts that CSFB breached both its implied and express contract with the Debtors to act as their restructuring and financial advisors. The Trust alleges that CSFB breached its contractual obligations to the Debtors by, among other things, improperly prolonging the prepetition operations of the Debtors, failing to find a suitable debtor-in-possession financing and/or warehouse line prior to the petition date, failing to adequately prepare the Debtors for the bankruptcy filing, and failing to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | adequately advise the Debtors that CSFB could not act as a restructuring and financial advisor to the Debtors once in bankruptcy as a result of CSFB's role as underwriters for the Debtors.  The Trust seeks to recover the following damages, plus interest, from CSFB:<br><br>1.    Express Contracts – approximately $1,811,129.54 paid by the Debtors to CSFB under the Financial Advisory Agreement.<br><br>2.    Excess cost of the debtor-in-possession financing ("DIP Financing"): approximately $7.8 million.<br><br>3.    Amounts paid to FTI Consulting to arrange the DIP Financing as a result of CSFB's failure: at least $323,290 pursuant to FTI Consulting's fee application.  The Debtors and/or bankruptcy estates also incurred additional fees and costs to Rayburn Cooper & Durham; Morris Nichols; Deloitte & Touche; Hunton & Williams; and Akin Gump.<br><br>4.    All other expenses of reorganization:  to be determined.<br><br>5.    Postpetition Warehouse Facility. It cost the Debtors approximately $2 million in fees to restart the warehouse facility post-petition.<br><br>6.    Implied contract damages.  The Trust asserts that well before the date of its written contract, CSFB acted as the financial advisor to the Debtors.  The damages for breaching this implied contract include consequential damages suffered by the Debtors as a result of CSFB's failure |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | to advise the Debtors to stop the asset-backed securitizations, which did not benefit the Debtors but only deepened their insolvency. The amount sought for CSFB's breach of the implied contract is substantially similar to the damage calculation for the Tenth Counterclaim (i.e., Deepening Insolvency), which is discussed below. |
| **V.**<br><br>**Deepening Insolvency** | | |
| | Tenth Counterclaim (Deepening Insolvency) | Existing case law provides the Trust with several different methods for calculating its damages for deepening insolvency, and the Trust's expert witness has not yet concluded his analysis. Although the Trust has not yet completed its calculation of damages for this Counterclaim, one way to measure the damages would be to calculate the amount needed to pay the Trust's constituents (i.e., the general unsecured creditors) in full, plus pre- and post-judgment interest and reimbursement of expenses. As of the date of this supplement, the shortfall to general unsecured creditors is approximately 59% of the value of the claims against the Debtors' estates.[3] |

---

[3]   Due to active trading of claims filed in these cases and instruments issued prior to bankruptcy, the Trust believes that it is unable to provide additional information regarding the shortfall without an agreement with CSFB that: (a) the information to be provided will be covered by the Agreed Protective Order entered by the Court on October 21, 2005; and (b) CSFB will not use the information provided to engage in buying, selling, or trading of any claims and/or instruments.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| VI.<br><br>Objection to Claim and Equitable Subordination | | |
| | Objection to Claim and Fourth Counterclaim (Equitable Subordination) | The Trust seeks to disallow CSFB's claim in the amount of $3,288,391.54 (including a contingent claim asserted by CSFB) on the grounds that such amount was not due or earned, pursuant to Bankruptcy Code section 502(d), and based on the facts supporting the Counterclaims.  Alternatively, the Trust seeks to subordinate CSFB's claim to the other general unsecured creditors as a result of CSFB's inequitable conduct and unfair advantage, and the damages caused to the Debtors, all as discussed above. |

Dated:    May 1, 2006
          Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

and

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
CAROL CHOW (CA SBN 169299)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the OHC
Liquidation Trust

# **Exhibit B**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit | ) | |
| Suisse First Boston, a Swiss | ) | |
| banking corporation), Credit | ) | |
| Suisse Securities (USA), LLC | ) | |
| (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse | ) | |
| Holdings (USA), Inc. (f/k/a | ) | |
| Credit Suisse First Boston, | ) | |
| Inc.), and Credit Suisse (USA), | ) | |
| Inc. (f/k/a Credit Suisse First | ) | |
| Boston (U.S.A.), Inc.), the | ) | |
| subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MOTION FOR DETERMINATION OF PLAINTIFF'S RIGHTS TO A JURY TRIAL**

Plaintiff OHC Liquidation Trust (the **"Trust"**), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby moves this Court for a determination of its Seventh Amendment rights to a jury trial with respect to certain counterclaims against the Defendants in the above-captioned adversary proceeding (collectively, **"Credit Suisse"** or the **"Defendants"**).

## I.    NATURE AND STAGE OF THE PROCEEDINGS

The instant litigation finds its genesis in four identical proofs of claim filed by Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC) (**"CSS"**) in the jointly-administered bankruptcy cases of Oakwood Homes Corporation and certain of its affiliates (collectively, the **"Debtors"** and together with the non-debtor affiliates, the **"Oakwood Entities"**).  In those proofs of claim, CSS asserted an entitlement to various liquidated and unliquidated amounts, *all* of which stemmed from a certain letter agreement dated August 19, 2002 (the **"August 19 Contract"**), which agreement was attached as an exhibit to the rider CSS filed with its proofs of claim.

The Trust commenced this adversary proceeding on November 13, 2004 via an objection to CSS's proofs of claim, which objection was coupled with ten counterclaims (the **"Objection/Counterclaims"** [Docket No. 1]).  The

objection/Counterclaims contained numerous allegations of fact that pre-dated the parties' execution of the August 19 Contract. (*See, e.g.*, Objection/Counterclaims at ¶¶ 11, 18-32.) The cover page of the Objection/Counterclaims explicitly stated **"JURY TRIAL DEMANDED,"** a point the Trust reiterated in the pleading's text. (*See id.* at ¶ 3 ("Plaintiff demands a jury trial of any issue triable by a jury.").) This constituted a timely jury demand.

Throughout the discovery process, the Trust uncovered various facts that allowed it to hone its theories against the Defendants. Virtually all of the discovery in this matter has concluded, however, and the Trust will soon be ready to take this adversary proceeding to trial. Critically, the case that is supported by the facts and that the Trust is prepared to try consists of two conceptually distinct parts.

First, the Trust wishes to try several causes of action that stem from Credit Suisse's actions or inactions unrelated to the August 19 Contract, most of which occurred prior to August 19, 2002. More specifically, the evidence will demonstrate that Credit Suisse enjoyed a close and intimate relationship with the Oakwood Entities. This trust and confidence between the parties gave rise to extra-contractual fiduciary duties for Credit Suisse, as well as an implied advisory contract. The evidence will further

2

demonstrate that Credit Suisse behaved in a fashion at odds
with its clear duties - indeed, a fashion that violated even
the traditional "reasonable" standard of care - and in so
doing caused substantial economic harm to the Oakwood
Entities.  Notwithstanding these on-going breaches of duty,
Credit Suisse consistently generated both massive fees for
itself and assorted damages to Oakwood in the process.
Accordingly, the Trust will seek to remedy Credit Suisse's
long-standing and habitual misconduct at trial via an award of
compensatory money damages.

       Second, the Trust wishes to try several other causes
of action that relate directly to the quality of performance
under the August 19 Contract.  The gravamen of this latter
group of counterclaims is that CSS failed to fulfill its
obligations under the August 19 Contract, which breaches now
prevent the allowance of CSS's claims, entitle the Trust to an
additional damages award, and trigger certain claims under 11
U.S.C. §§ 547 & 548.

       Although both sets of counterclaims stem from Credit
Suisse's malfeasance, a bright-line separates them:  The first
set is based upon conduct unrelated to the August 19 Contract,
and thus has no logical relationship to the allowance or
disallowance of CSS's claims; the second set is based upon
conduct occurring on and after August 19, 2002, and is

inextricably linked to the allowance of CSS's claims.
Accordingly, the Trust maintains that all its causes of action
invoking facts and conduct that pre-date the parties'
execution of the August 19 Contract should be tried by a jury.

The Trust has consented to a jury trial conducted by
this Court pursuant to 28 U.S.C. § 157(e) and Federal Rule of
Bankruptcy Procedure 9015(b), but the Defendants have informed
the Trust that they do not consent to a jury trial conducted
by this Court.  While they have not moved to strike, the
Defendants have denied that the Trust has any right to a jury
trial.  (*See* Answer and Affirmative Defenses [Docket No. 132]
at ¶ 3.)

## II.  BASIS FOR THE MOTION

Because the Defendants do not consent to a jury
trial conducted by this Court, it will be necessary for the
Trust to move to withdraw the reference if it has a right to a
jury trial.  *See, e.g., Growe v. Bilodard Inc.*, 325 B.R. 490,
492 (D. Me. 2005) ("A bankruptcy court may not conduct a jury
trial without the consent of the parties.  Therefore, a valid
jury demand can have the effect of mandating withdrawal to the
District Court for trial." (citation omitted)).  In this and
other districts, a motion for withdrawal of the reference on
such grounds would be timely and ripe only once an adversary
proceeding is actually "trial ready," which this adversary

proceeding will be soon after the close of expert discovery.

*See, e.g., Wakefern Food Corp. v. C&S Wholesale Grocers, Inc.*
*(In re Big V Holding Corp.)*, No. 01-233, 2002 U.S. Dist. LEXIS
12609, at *17 (D. Del. July 11, 2002) ("Withdrawal of the
reference based on the ground that a party is entitled to a
jury trial should be deferred until the case is 'trial
ready.'").  This established procedure is clear, but there are
some unanswered questions in the statute and rules, including
uncertainty about which court ultimately resolves the
predicate question of whether a party *does* have a right to a
jury trial.

Numerous courts have taken a similar path to resolve
this indeterminacy.  On the one hand, multiple district courts
have denied or deferred motions to withdraw the reference,
reasoning that the *bankruptcy court* is the proper arbiter of
the predicate question.  *See, e.g., Corzin v. Harvey (In re*
*Commercial Maint. & Repair, Inc.)*, No. 5:06-MC-46, 2007 U.S.
Dist. LEXIS 71408, at *6-11 (N.D. Ohio Sept. 25, 2007)
("[T]his Court finds that the bankruptcy court should
initially decide whether the Defendants have a right to a jury
trial."); *Official Comm. of Unsecured Creditors v. TSG Equity*
*Fund L.P. (In re EnvisioNet Computer Servs.)*, 276 B.R. 1, 6-7
(D. Me. 2002) ("The bankruptcy court is an appropriate
tribunal for determining whether there is a right to a trial

by jury of issues for which a jury trial is demanded.").
Likewise, several bankruptcy judges who have considered this
specific issue reached a similar conclusion: bankruptcy courts
should determine a party's right to a jury trial in the first
instance. *See, e.g.*, *Capital Assocs. Int'l, Inc. v. Banc One
Leasing Corp. (In re Capital Assocs. Int'l, Inc.)*, No. 03-
2017, 2003 Bankr. LEXIS 931, at *5 (Bankr. N.D. Tex. Aug. 6,
2003) ("The bankruptcy court determines, in the first
instance, whether the parties to an adversary are entitled to
a trial by jury."); *Quarles v. Wells Fargo Home Mortgage, Inc.
(In re Quarles)*, 294 B.R. 729, 729 (Bankr. E.D. Ark. 2003)
("This Court initially makes a determination of whether a
party is entitled to a jury trial."); *In re Wash. Mfg. Co.*,
128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991) ("The bankruptcy
court is an appropriate tribunal for determining whether there
is a right to a trial by jury of issues for which a jury trial
is demanded.  This is so even if the bankruptcy court, after
determining that a jury right exists, can not ultimately
preside over the trial of the jury issues." (citation and
quotations omitted)); *see also EXDS, Inc. v. RK Elec., Inc.
(In re EXDS, Inc.)*, 301 B.R. 436 (Bankr. D. Del. 2003) (Walsh,
J.) (deciding motion to strike jury demand).  Accordingly,
even though the Defendants have not moved to strike the
Trust's jury demand (which they could have done at any point),

6

basic concepts of logic and judicial efficiency suggest that
it is now an appropriate juncture for *this Court* to determine
the scope of the Trust's jury trial rights.[1]

## III. ARGUMENT

The Seventh Amendment's guarantee that, "[i]n Suits
at common law, where the value in controversy shall exceed
twenty dollars, the right of trial by jury shall be
preserved," is "preserved to the parties inviolate" by Federal
Rule of Civil Procedure 38(a), applicable here per Federal
Rule of Bankruptcy Procedure 9015(a).  As the Supreme Court
has repeatedly observed, "'[m]aintenance of the jury as a
fact-finding body is of such importance and occupies so firm a
place in our history and jurisprudence that any seeming
curtailment of the right to a jury trial should be scrutinized
with the utmost care.'"  *Chauffeurs, Teamsters & Helpers v.
Terry*, 494 U.S. 558, 565 (1990) (quoting *Beacon Theatres, Inc.
v. Westover*, 359 U.S. 500, 501 (1959) (quoting *Dimick v.
Schiedt*, 293 U.S. 474, 486 (1935))).

The seminal decision regarding parties' rights to a
jury trial in bankruptcy remains *Granfinanciera, S.A. v.*

---

[1] If the Court determines the Trust has a right to a jury trial,
then the Trust will promptly move to withdraw the reference on
such grounds.  If the Court determines the Trust has no right to
a jury trial, then the Trust will proceed to trial before this
Court.

*Nordberg*, 492 U.S. 33 (1989). *See, e.g., Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 543-46 (D. Del. 2005) (adopting and applying the *Granfinanciera* test). In *Granfinanciera*, Justice Brennan outlined the following analytic framework:

> The form of our analysis is familiar.
> First, we compare the statutory action to
> 18th-century actions brought in the courts
> of England prior to the merger of the
> courts of law and equity. Second, we
> examine the remedy sought and determine
> whether it is legal or equitable in
> nature. ***The second stage of this analysis
> is more important than the first.*** [Third,
> if], on balance, these two factors
> indicate that a party is entitled to a
> jury trial under the Seventh Amendment, we
> must decide whether Congress may assign
> and has assigned resolution of the
> relevant claim to a non-Article III
> adjudicative body that does not use a jury
> as factfinder.

*Id.*, 492 U.S. at 42 (emphasis added) (citations and quotations omitted). The third inquiry turns on whether a cause of action is part of "the restructuring of debtor-creditor relations in bankruptcy," such as in the claims-allowance process, or whether it is a "claim[] brought by a bankrupt corporation to augment the bankruptcy estate." *See id.* at 56.

Under the legal framework developed in *Granfinanciera* and subsequently applied by numerous courts, the Trust plainly is entitled to a jury trial on all its causes of action that stem from conduct unrelated to the

August 19 Contract.  As explained below, some of these
counterclaims are "legal" in nature, and they *all* seek a
classically "legal" remedy.  Furthermore, the success or
failure of these counterclaims is logically separate from the
allowance *vel non* of CSS's proofs of claim.  Thus, because the
Trust's causes of action based upon Credit Suisse's pattern of
malfeasance that began before August 19, 2002 will be tried in
order "to augment the bankruptcy estate," the Trust
respectfully requests that the Court affirm its Seventh
Amendment right to have a jury try all those counterclaims.

### A.    The Trust Has Asserted Legal Claims As To Which It Has A Seventh Amendment Right To A Jury Trial.

In order to determine whether the Trust has any
Seventh Amendment right in the first instance, *Granfinanciera*
requires this Court to examine the inherent nature of the
Trust's counterclaims, as well as its requested remedy.
Although some counterclaims arise from state law, the Trust's
right to a jury trial remains an issue of federal law.  *See,
e.g.*, *Simler v. Conner*, 372 U.S. 221, 222 (1963) ("[T]he
characterization of [a] state-created claim as legal or
equitable for purposes of whether a right to jury trial is
indicated must be made by recourse to federal law.");
*Hechinger Inv. Co.*, 327 B.R. at 543.

The first prong of the *Granfinanciera* test asks this
Court to explore the nature of the Trust's pre-August 19, 2002
counterclaims against Credit Suisse.  Those causes of action
are essentially three: negligence, breach of implied contract,
and breach of fiduciary duty.  As to the first two claims,
there can be no dispute that such actions would be "legal"
claims in 18th-century England.  *See, e.g., Ross v. Bernhard*,
396 U.S. 531, 542 (1970) (explaining how a corporation "would
have been entitled to a jury's determination, at a minimum, .
. . of its rights against its own directors because of their
negligence"); *Donovan v. Robbins*, 579 F. Supp. 817, 822 (N.D.
Ill. 1984) (claims seeking "money damages for breach of
express or implied contracts . . . . are clearly legal and []
the Seventh Amendment would require a jury trial as to them");
*Redmond v. Hassan (In re Hassan)*, No. 05-6215, 2007 Bankr.
LEXIS 139, at *40 (Bankr. D. Kan. Jan. 23, 2007) ("Claims for
damages to a person or property based on torts such as
negligence are legal claims."); *Hays v. Equitex, Inc. (In re
RDM Sports Group)*, 260 B.R. 915, 919 (Bankr. N.D. Ga. 2001)
("Negligence and malpractice are legal claims.").

        As to the third claim, the Trust acknowledges "that
as a 'general rule' breach of fiduciary duty claims were
historically within the jurisdiction of the equity courts."
*Pereira v. Farace*, 413 F.3d 330, 338 (2d Cir. 2005), *cert.*

                                    10

*denied*, 126 S. Ct. 2286 (2006).  Thus, under *Granfinanciera*'s
first prong, the Trust asserts a mix of "legal" and
"equitable" claims, and this fact alone gives rise to a jury
trial right.  *See, e.g., Ross*, 396 U.S. at 537-38 ("[W]here
equitable and legal claims are joined in the same action,
there is a right to jury trial on the legal claims which must
not be infringed either by trying the legal issues as
incidental to the equitable ones or by a court trial of a
common issue existing between the claims."); *RDM Sports Group*,
260 B.R. at 919 ("That an equitable claim has been joined with
three legal claims does not justify a denial of the Trustee's
right to a jury trial.").

     Furthermore, the analysis does not end with
*Granfinanciera*'s first prong.  Under the second prong – which
"is more important than the first," 492 U.S. at 42 – the Court
must examine the nature of the remedy sought by the Trust.
Pursuant to this prong, the outcome is clear:  The Trust seeks
compensatory money damages, which is "the classic form of
*legal* relief."  *Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*,
508 U.S. 248, 255 (1993)); *see also, e.g., Dairy Queen, Inc.
v. Wood*, 369 U.S. 469, 477 (1962) ("[W]e think it plain that
[a] claim for a money judgment is a claim wholly legal in its
nature however the complaint is construed.").  Indeed,

numerous courts have held that claims seeking such relief, *including for breach of fiduciary duty*, are "legal" claims that fall within the Seventh Amendment's scope. *See, e.g.,* *Mirant Corp. v. Southern Co.*, 337 B.R. 107, 120 (N.D. Tex. 2006) ("Generally, claims for breach of fiduciary duty are within the exclusive jurisdiction of courts of equity. However, when a legal remedy, such as monetary relief, is sought for breach of a fiduciary duty, the action assumes legal attributes." (citations omitted)); *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 641-43 (S.D.N.Y. 2005); *Hassan*, 2007 Bankr. LEXIS 139, at *41 ("Although claims for breaching fiduciary duties were traditionally, as a general rule, equitable ones tried in the equity courts, where the remedy sought is compensatory damages, the entire claim is a legal one carrying a jury trial right."); *RDM Sports Group*, 260 B.R. at 919-20; *Stalford v. Blue Mack Transp. (In re Lands End Leasing)*, 193 B.R. 426, 433-34 (Bankr. D.N.J. 1996). There is no reason why precisely the same conclusion ought not obtain here.

The Second Circuit's recent opinion in *Pereira v. Farace* is particularly instructive. In *Pereira*, the bankruptcy trustee of Trace International Holdings, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. The

trustee asserted various claims for money damages, including
for amounts improperly transferred by Trace under the
defendants' watch.  The defendants maintained "that they were
entitled to a jury trial on the Trustee's breach of fiduciary
duty claim because the nature of the underlying action was
legal and the remedy sought was compensatory damages, not
equitable restitution."  *Id.*, 413 F.3d at 337.  On appeal, the
Second Circuit applied the *Granfinanciera* test and agreed with
the defendants that they had a right to a jury trial.  Because
the fiduciary duty claim "would have been equitable in 18th
century England," the outcome-determinative issue was the
nature of the relief sought by the bankruptcy trustee.  *See*
*id.* at 339-41.  Since the trustee sought to recover fungible
money damages, rather than particular property in the
defendants' possession, the second prong of the *Granfinanciera*
test rendered his suit "legal" in nature and required a jury
trial.  *See id.* at 341.  So too here; the Trust seeks damages
for the harm stemming from Credit Suisse's negligence and
breaches of its contractual and fiduciary duties to the
Oakwood Entities, and a jury should properly determine its
right to that legal relief.

　　　　The *Hechinger Investment Co.* decision is not to the
contrary.  There, the remedy sought by a liquidation trust was
the return of funds misappropriated by director-defendants,

which the District Court held was an equitable attempt to restore the *status quo ante*. *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 544-45 (D. Del. 2005). Here, in contrast, the Trust seeks broader damages from Credit Suisse. While quantification of such damages may *include* Credit Suisse's ill-gotten fees, those fees are not the entirety of the Trust's damages claim; the Trust also seeks damages for harm caused by Credit Suisse's misconduct (such as the extent to which certain transactions - including the so-called "Lotus" transactions - increased the Oakwood Entities' indebtedness and caused significant losses). This fact only accents the "legal" nature of the Trust's requested remedy, thereby making *Hechinger*'s analysis inapposite. *See also, e.g., Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 577-78 (7th Cir. 2004) (Posner, J.) (explaining why "restitution" remains a "legal remedy" where the plaintiff seeks a damages award in the form of a generic sum of money and, as here, "is not seeking to impress a lien on particular property").

In summary, the Trust brings counterclaims against Credit Suisse that are plainly "legal" pursuant to the test set forth in *Granfinanciera*. Under the first prong, the Trust has asserted a blended mix of "legal" and "equitable" claims,

14

which alone is sufficient to merit a jury trial.  Under the

second - and more weighty - prong, however, the form of relief

sought by the Trust is "legal" in nature.  Accordingly, the

Trust has a fundamental constitutional right to have a jury

try all three of its counterclaims that are conceptually

unrelated to the August 19 Contract.  This inviolate right

would be enforceable outside of bankruptcy or if Credit Suisse

were a non-creditor defendant.  As explained below, the fact

that CSS has filed proofs of claim based on the August 19

Contract does not alter the analysis.

**B.    The Trust Has Not Implicitly Waived Its Jury Trial
Right Because Its Legal Claims Are Not Integral To
The "Claims-Allowance Process," But Rather Will
"Augment The Estate."**

The case law is clear that when a cause of action

"falls within the process of the allowance and disallowance of

claims," neither the debtor's estate nor the defendant has a

Seventh Amendment right to trial by jury "because [the] claim

has been converted from a legal one into an equitable dispute

over a share of the estate."  *See, e.g.*, *Billing v. Ravin,*

*Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1253 (3d Cir. 1994),

*cert. denied*, 513 U.S. 999 (1994).  In contrast, when a legal

cause of action is not integrally related to the claims-

allowance process, but instead seeks to garner additional

funds that will "augment" the bankruptcy estate, both the

15

debtor and the defendant retain their constitutional right to
have a jury try such an action.  *See, e.g., Germain v. Conn.
Nat'l Bank*, 988 F.2d 1323, 1327 (2d Cir. 1996) (explaining how
"suits . . . which would augment the estate but which have no
effect on the allowance of a creditor's claim simply cannot be
part of the claims-allowance process").[2]

---

[2]  *See also, e.g., Mirant Corp. v. Southern Co.*, 337 B.R. 107, 121
(N.D. Tex. 2006) (holding that right to jury trial existed when
claims were brought "to augment the bankruptcy estate" and
"simply will not directly implicate the bankruptcy claim
resolution process"); *R&F Intellectual Prop. Acquisition, Inc. v.
Hantover, Inc. (In re Dynamic Tooling Sys.)*, No. 06-5476, 2007
Bankr. LEXIS 2090, at *20-23 (Bankr. D. Kan. June 12, 2007)
(holding that creditor that filed proof of claim did not waive
its jury trial rights with respect to plaintiff's "legal claims
and tort counts," including claims for aiding and abetting breach
of fiduciary duty and "deepening insolvency," because those
claims were not based on "matters integrally tied up in the
allowance or disallowance of the [creditor's] claim"); *Rickel &
Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 320 B.R.
513, 517 (Bankr. S.D.N.Y. 2005) (creditor who filed proof of
claim against bankruptcy estate retained right to jury trial on
breach of fiduciary duty claim because plaintiffs "seek money
damages, and the determination of the breach of fiduciary duty
claim will not affect the allowability or priority of [the
creditor's] proof of claim in the bankruptcy case"); *WSC, Inc. v.
Home Depot, Inc. (In re WSC, Inc.)*, 286 B.R. 321, 329 (Bankr.
M.D. Tenn. 2002) (explaining how "a debtor forfeits its jury
trial right only with respect to causes of action 'integral to
the restructuring of the debtor-creditor relationship,'" and not
"when the cause of action involves augmenting the bankruptcy
estate rather than adjudicating claims" (quoting *Langenkamp v.
Culp*, 498 U.S. 42, 44 (1990))); *Hays v. Equitex, Inc. (In re RDM
Sports Group)*, 260 B.R. 915, 925 (Bankr. N.D. Ga. 2001) (stating
that defendant retained right to jury trial regarding claims
asserted "to generate funds for distribution to creditors"
because such claims "do not have anything to do with the claims
process and/or the restructuring of the debtor-creditor
relationship").

Accordingly, the critical task for any court faced
with this issue is to "ask whether the resolution of the
particular dispute at issue is **necessarily part of the process**
of the disallowance and allowance of claims" against the
bankruptcy estate. *Billing*, 22 F.3d at 1252 n.14 (emphasis
added).[3]

---

[3]  This precise analytic framework has been applied where, as here,
"counterclaims" are proffered by the representative of the
debtor's estate in response to a creditor's proof of claim.  As
one court explained:

> Unlike the act of filing a proof of claim, **the
> assertion of a counterclaim by the debtor does not
> automatically result in waiver of the right to
> trial by jury on those counterclaims.**  Moreover,
> counterclaims such as the ones in this case often
> go beyond the mere allowance or disallowance of the
> filed claim to seek affirmative recovery against
> the claimant.  The Court must consider whether the
> counterclaims are "integral to the restructuring of
> the debtor-creditor relationship through the
> bankruptcy court's equity jurisdiction," which
> would dispense with [the] right to a jury trial on
> those counterclaims.

*McClelland v. Braverman Kaskey & Caprara, P.C. (In re
McClelland)*, 332 B.R. 90, 95 (Bankr. S.D.N.Y. 2005) (emphasis
added) (quoting *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990)).
In *McClelland*, the estate's counterclaims were "integrally
related to the allowance or disallowance of the [creditor-
Claimants'] claims" because "[t]he very services for which
Claimants seek compensation in their proofs of claim are the same
services, for the same time periods during which the Debtor
counterclaims that the Claimants engaged in negligence and
malpractice."  *See id.* at 97-98; *see also, e.g., Dietert v.
Dietert (In re Dietert)*, 271 B.R. 499, 507 (Bankr. S.D. Tex.
2002) (explaining how a counterclaim to a proof of claim "can be
adjudicated by the bankruptcy judge without a jury and the
bankruptcy judge can award a judgment for affirmative relief
against the creditor if, **and only if**, __all__ elements necessary to
adjudication of the counterclaim are part of the adjudication of
the objection to claim" (emphasis added)).  As explained in the
text, that clearly is not the case here; CSS's proofs of claim

Here, the Trust's counterclaims which are based upon
a pattern of behavior starting long before August 19, 2002 are
not "necessarily part the process" of determining whether
CSS's claims should be allowed.  The Trust's claims for breach
of contractual and fiduciary duties, as well as negligence,
arise out of separate transactions and conduct, undertaken
during a much longer period of time, and by corporate entities
other than CSS.  Moreover, the Trust's causes of action
unrelated to the August 19 Contract are not products of the
Bankruptcy Code; they are state law claims that could have
been asserted by the Oakwood Entities against the Defendants
prior to August 19, 2002 (although the true magnitude of the
damages may not have been apparent until after the petition
date), and later became property of Oakwood's bankruptcy
estate pursuant to 11 U.S.C. § 541(a).  Thus, these
counterclaims are even further removed from the "claims-
allowance process" than was the fraudulent transfer action in
*Granfinanciera* or the preference action in *Langenkamp* since
the Trust's success on such causes of action could not even

---

are based solely upon "services" allegedly provided to the
Oakwood Entities between August 19, 2002 and November 15, 2002,
but the Trust's counterclaims on which it seeks a jury trial stem
from other "services" provided to the Oakwood Entities in a
different time period.  Accordingly, the Trust's counterclaims
are not "integrally related to the allowance or disallowance" of
CSS's claims against Oakwood's bankruptcy estate.

18

theoretically be grounds for disallowance of CSS's claims under 11 U.S.C. § 502(d).

Indeed, as a purely logical matter, the counterclaims that encompass pre-August 19, 2002 conduct are utterly separate from CSS's proof of claim; it is conceivable that the Trust could succeed on some or all of those counterclaims yet fail in its objection to CSS's claims, or vice versa. Although judicial economy likely requires that all the Trust's counterclaims be tried at one time - with a jury resolving issues of fact and law pertaining to the Trust's legal claims as to which it retains a Seventh Amendment right, and a court resolving the remaining issues - such a process is not strictly necessary; the pre-August 19, 2002 counterclaims could be tried as a completely separate action, which trial could occur either before or after CSS's proofs of claim are resolved. This reality demonstrates that such counterclaims are not part of the "restructuring of debtor-creditor relations in bankruptcy," but rather are "claims brought by a bankrupt corporation to augment the bankruptcy estate." *Granfinanciera*, 492 U.S. at 56. As such, the procedural posture of this adversary proceeding does not affect the Trust's Seventh Amendment rights, and because certain counterclaims are "legal" under the *Granfinanciera* test, the Trust retains the sacrosanct right to a jury trial.

This conclusion is further buttressed by a brief review of two cases involving similar facts.

First, in *Germain v. Connecticut National Bank*, 988 F.2d 1323 (2d Cir. 1993), the bankruptcy trustee asserted several "lender liability" claims against a large bank ("CNB" or the "Bank") that had filed a proof of claim against the estate. The trustee argued "that because his claims are legal in nature and because he seeks only legal relief in the form of money damages, he is entitled to a jury trial under the Seventh Amendment." *See id.* at 1325. CNB disagreed, insisting that the estate lost its right to a jury trial when CNB filed its proof of claim against the estate. The Second Circuit firmly rejected CNB's position:

> Resolution of the Trustee's action is not
> required in order to determine whether to
> allow CNB's claim as a creditor in the
> bankruptcy proceeding. The Trustee asks
> for money damages to compensate the estate
> for the destruction of the debtor's
> business. If he wins, the estate is
> enlarged, and this may affect the amount
> the Bank and its fellow creditors
> ultimately recover on their claims, but it
> has no effect whatever on the allowance of
> the Bank's claims. Thus, a court could
> allow the Bank's claim before hearing
> argument on the Trustee's complaint, and
> this chronology would be both logical and
> consistent with the Bankruptcy Code.

*Id.* at 1327; *see also id.* at 1330 ("[N]either precedent nor logic supports the proposition that either the creditor or the

debtor automatically waives all right to a jury trial whenever

a proof of claim is filed."). Since CNB's proof of claim and

the trustee's causes of action were based on different sets of

facts, the latter did "not involve any other creditor's rights

or the relationship among the creditors as a group or between

the debtor and another creditor," which meant they had

"nothing to do with the essence of the bankruptcy regulatory

scheme of allowing or reordering claims." *See id.* at 1331.

Consequently, the Second Circuit concluded the trustee's

"action involves private rights and should be tried before a

jury, if that is the Trustee's choice," because doing so would

not affect the bankruptcy court's power "to readjust debtor-

creditor relations and reorder creditor claims equitably and

completely." *See id.* at 1332.

The Second Circuit's analysis in *Germain* applies to

this adversary proceeding with incredible force and should be

outcome-determinative.[4]  Like CNB, CSS has filed proofs of

---

[4]  The U.S. Court of Appeals for the Third Circuit discussed *Germain*
at some length in the *Billing* case and ultimately distinguished
the Second Circuit's decision *on the facts*. *See* 22 F.3d at 1251-
52. Specifically, in *Billing*, the estate's malpractice action
had such a "close connection" to a law firm's proof of claim for
attorneys' fees - i.e., the proof of claim and the suit arose
from the same operative transactions and facts, and "the debtors'
malpractice suit mirror[ed] its objection to the allowance of
attorneys' fees" - "that 'the merits of the malpractice claims
**must be resolved before** there can be a resolution of the fee
dispute.'" *Id.* at 1252 (emphasis added) (quoting *Billing v.
Ravin Greenberg & Zackin, P.A. (In re Billing)*, 150 B.R. 563, 570

claim against the estate and is the target of litigation based upon facts unrelated to its proofs of claim. As a result, all of the Trust's counterclaims which are based on events beginning long before the August 19 Contract was executed are simply not part of the "process of allowance or disallowance of claims," and this means the Trust necessarily retains the full spectrum of its Seventh Amendment rights as to each of those causes of action.

Second and more recently, in *Mirant Corp. v. Southern Co.*, 337 B.R. 107 (N.D. Tex. 2006), Southern – a defendant in an adversary proceeding initiated by the debtors and the creditors' committee – moved to withdraw the reference on the grounds that, *inter alia*, it was entitled to a jury trial on certain causes of action. The underlying complaint asserted six counts against Southern, including (i) a count seeking compensatory damages for Southern's alleged assistance with various destructive transactions and (ii) a count

---

n.2 (D.N.J. 1993)). That "the interrelated nature of the actions" led the Third Circuit "to conclude that the debtors' allegations of malpractice are part of the process of allowance and disallowance of claims," *id.*, is consistent with the mode of analysis deployed in the *McClelland* case discussed *supra* note 3. Critically, both *Billing* and *McClelland* are inapposite here because several of the Trust's counterclaims are based on a different, and earlier, set of facts than those undergirding CSS's proofs of claim. The grounds on which the Third Circuit distinguished *Germain* are absent, and the Second Circuit's well-reasoned decision should be controlling, here – like Germain, the Trust may choose to try its claims before a jury.

objecting to various claims filed by Southern in the debtors'
bankruptcy cases. *See id.* at 110-11 (describing "Count IV"
and "Count V"). Southern asserted that "it has a right to a
jury trial with respect to the fraudulent transfer and
conveyance claims, the fiduciary duty claims, and the illegal
dividend claims." *Id.* at 112. The debtors argued in
response, and the bankruptcy court agreed below, that "any
right Southern might have had to a jury trial was lost upon
the filing of its claims against debtors in the chapter 11
cases." *See id.* at 113. The district court reversed this
holding.

    The district court first examined the plaintiffs'
requested relief – monetary damages – and concluded that such
a request gave Southern a right to a jury trial on the
underlying claims, including the claim for breach of fiduciary
duty. *See id.* at 120-21. The court then addressed the
contention that Southern's jury trial rights were eliminated
because it had filed proofs of claim to which the debtors
objected:

> Resolution of the legal claims raised in
> this action will not directly affect the
> liability or priority of Southern's proofs
> of claim in the bankruptcy cases, nor do
> the legal claims asserted in this action
> arise as part of the process of allowance
> or disallowance of claims in bankruptcy.
> Rather, they essentially are claims
> brought by the debtors and Committee to

23

> augment the bankruptcy estate.  The
> determinations of the legal claims in this
> action simply will not directly implicate
> the bankruptcy claim resolution process,
> nor will the power of the bankruptcy court
> to readjust the debtor-creditor relations
> and reorder creditor claims equitably and
> completely be diminished if the legal
> claims in this action are tried to a jury.

*Id.* at 121 (citations omitted).

Thus, notwithstanding the fact that "Count V" of the *very same pleading* was an express objection to Southern's proofs of claim, Southern retained its right to a jury trial with respect to the other counts because those causes of action did not go "directly to the process of allowance and disallowance of claims." *See id.* at 122; *see also id.* ("[T]he mere fact that the outcome of a dispute could have the effect of enlarging the estate does not mean that the dispute will have any effect on the allowance of a disputant's claims in bankruptcy."). The principal difference between the instant case and *Mirant* is the juxtaposition of the parties — here the plaintiff Trust seeks a jury trial, whereas in *Mirant* the defendant creditor sought a jury trial. Both cases involve an objection to proofs of claim that happened to be bundled in the same pleading with other, "legal" causes of action based upon different facts. This happenstance of pleading is not sufficient to make the "legal" claims part of the claims-allowance process, which means the Trust's right to a jury is

24

at least as robust as Southern's right in *Mirant*. *See also,
e.g.*, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962)
("[T]he constitutional right to trial by jury cannot be made
to depend upon the choice of words used in the pleadings.");
*Lee Way Holding Co. v. Liberty Mut. Ins. Co. (In re Lee Way
Holding Co.)*, 118 B.R. 544, 553 (Bankr. S.D. Ohio 1990) (court
noted that, even if it agreed that bankruptcy trustee "had
originally asserted an equitable claim, . . . the
constitutional right to a jury trial does not rest solely on
the words used in the pleadings," including in the plaintiff-
trustee's complaint).

The *Hechinger Investment Co.* decision is a useful
contrast to *Germain* and *Mirant*. There, a liquidation trust
had objected to the claims of the Chase Manhattan Bank
("Chase") and the Fleet Retail Financial Group ("Fleet") on
the grounds that the related liens were avoidable as
fraudulent transfers. *See Liquidation Trust of Hechinger Inv.
Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327
B.R. 537, 545-46 (D. Del. 2005). That trust subsequently
initiated litigation against Chase, Fleet, and others, whereby
the plaintiff-trust alleged that payments made in connection
with the secured debt were fraudulent conveyances. *See id.* at
546. The trust demanded a jury trial on its fraudulent
conveyance claims, but the District Court concluded "that

plaintiff's subsequently filed fraudulent conveyance suit
mirrors its objection to" Chase and Fleet's claims, which mean
those claims were "part of the process of allowance and
disallowance of claims and are not entitled to a jury trial."
*See id.* at 546 (citing *Billing*, 22 F.3d at 1252).   The
District Court's conclusion once again highlights how there
*must* be a tight factual overlap between the estate's claim
objections and its affirmative litigation if the estate's jury
trial rights are to be deemed implicitly waived.   That
necessary factual overlap is conspicuously absent here.

In the final analysis, the outcomes in *Germain*,
*Mirant*, and *Hechinger* only further cement the conclusion that
certain of the Trust's counterclaims are not "necessarily part
of the process of the disallowance and allowance of claims."
*Billing*, 22 F.3d at 1252 n.14.   To the contrary, those
counterclaims – based upon different facts occurring during a
different period of time – are clearly intended to augment the
Oakwood bankruptcy estate by redressing the lasting damage
caused by Credit Suisse's misconduct.   Hence, the Trust
continues to retain its Seventh Amendment right to have each
counterclaim unrelated to the August 19 Contract that is of a
"legal" nature – which, based upon the remedy sought by the
Trust, includes them *all* – tried by a jury.

26

## IV.    CONCLUSION

For the reasons and based on the authorities presented above, the Trust requests that this Court affirm the continuing validity of its demand for a jury trial of all its counterclaims that stem from the Defendants' pattern of malfeasance that began long before August 19, 2002 and are not related to CSS's claims.

Respectfully submitted,

Dated:   October 5, 2007
Wilmington, Delaware

/s/Marla Rosoff Eskin
MARLA ROSOFF ESKIN (No. 2989),
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

-and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the
OHC Liquidation Trust

**TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................1

II.   BASIS FOR THE MOTION .......................................4

III.  ARGUMENT ...................................................7

      A.    The Trust Has Asserted Legal Claims As To
            Which It Has A Seventh Amendment Right To A
            Jury Trial. ...........................................9

      B.    The Trust Has Not Implicitly Waived Its Jury
            Trial Right Because Its Legal Claims Are Not
            Integral To The "Claims-Allowance Process,"
            But Rather Will "Augment The Estate." ................15

IV.   CONCLUSION ................................................27

i

## **TABLE OF AUTHORITIES**

### **CASES**

*Beacon Theatres, Inc. v. Westover*,
   359 U.S. 500 (1959) ........................................ 7

*Billing v. Ravin, Greenberg & Zackin, P.A.*,
   22 F.3d 1242 (3d Cir. 1994), *cert. denied*, 513
   U.S. 999 (1994) ...................................... *passim*

*Capital Assocs. Int'l, Inc. v. Banc One Leasing
   Corp. (In re Capital Assocs. Int'l, Inc.)*,
   No. 03-2017, 2003 Bankr. LEXIS 931 (Bankr. N.D.
   Tex. Aug. 6, 2003) ........................................ 5

*Chauffeurs, Teamsters & Helpers v. Terry*,
   494 U.S. 558 (1990) ........................................ 7

*Corzin v. Harvey (In re Commercial Maint. & Repair,
   Inc.)*,
   No. 5:06-MC-46, 2007 U.S. Dist. LEXIS 71408
   (N.D. Ohio Sept. 25, 2007) ................................ 5

*Dairy Queen, Inc. v. Wood*,
   369 U.S. 469 (1962) ................................... 11, 23

*Design Strategies, Inc. v. Davis*,
   367 F. Supp. 2d 630 (S.D.N.Y. 2005) ...................... 11

*Dietert v. Dietert (In re Dietert)*,
   271 B.R. 499 (Bankr. S.D. Tex. 2002) ..................... 16

*Dimick v. Schiedt*,
   293 U.S. 474 (1935) ........................................ 7

*Donovan v. Robbins*,
   579 F. Supp. 817 (N.D. Ill. 1984) ......................... 9

*EXDS, Inc. v. RK Elec., Inc. (In re EXDS, Inc.)*,
   301 B.R. 436 (Bankr. D. Del. 2003) ........................ 6

*Germain v. Conn. Nat'l Bank*,
   988 F.2d 1323 (2d Cir. 1996) ........................ *passim*

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) .................................. *passim*

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ....................................... 11

*Growe v. Bilodard Inc.*,
    325 B.R. 490 (D. Me. 2005) ................................. 4

*Hays v. Equitex, Inc. (In re RDM Sports Group)*,
    260 B.R. 915 (Bankr. N.D. Ga. 2001) .............. 10, 11, 15

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ............................... 15, 16, 17

*Lee Way Holding Co. v. Liberty Mut. Ins. Co. (In re
    Lee Way Holding Co.)*,
    118 B.R. 544 (Bankr. S.D. Ohio 1990) ..................... 23

*Liquidation Trust of Hechinger Inv. Co. v. Fleet
    Retail Fin. Group (In re Hechinger Inv. Co.)*,
    327 B.R. 537 (D. Del. 2005) .......................... *passim*

*McClelland v. Braverman Kaskey & Caprara, P.C. (In
    re McClelland)*,
    332 B.R. 90 (Bankr. S.D.N.Y. 2005) ................... 16, 20

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ...................................... 11

*Mirant Corp. v. Southern Co.*,
    337 B.R. 107 (N.D. Tex. 2006) ....................... *passim*

*Official Comm. of Unsecured Creditors v. TSG Equity
    Fund L.P. (In re EnvisioNet Computer Servs.)*,
    276 B.R. 1 (D. Me. 2002) ................................. 5

*Pereira v. Farace*,
    413 F.3d 330 (2d Cir. 2005), *cert. denied*, 126
    S. Ct. 2286 (2006) ................................... 10, 12

*Quarles v. Wells Fargo Home Mortgage, Inc. (In re
    Quarles)*,
    294 B.R. 729 (Bankr. E.D. Ark. 2003) ..................... 5

*R&F Intellectual Prop. Acquisition, Inc. v.
    Hantover, Inc. (In re Dynamic Tooling Sys.)*,
    No. 06-5476, 2007 Bankr. LEXIS 2090 (Bankr. D.
    Kan. June 12, 2007) ..................................... 15

*Redmond v. Hassan (In re Hassan)*,
    No. 05-6215, 2007 Bankr. LEXIS 139 (Bankr. D.
    Kan. Jan. 23, 2007) ................................... 9, 11

*Rickel & Assocs., Inc. v. Smith (In re Rickel &*
    *Assocs., Inc.),*
    320 B.R. 513 (Bankr. S.D.N.Y. 2005) ...................... 15

*Ross v. Bernhard,*
    396 U.S. 531 (1970) ................................... 9, 10

*Simler v. Conner,*
    372 U.S. 221 (1963) ....................................... 9

*Stalford v. Blue Mack Transp. (In re Lands End*
    *Leasing),*
    193 B.R.  426 (Bankr. D.N.J. 1996) ....................... 11

*Wakefern Food Corp. v. C&S Wholesale Grocers, Inc.*
    *(In re Big V Holding Corp.),*
    No. 01-233, 2002 U.S. Dist. LEXIS 12609 (D.
    Del. July 11, 2002) ....................................... 4

*In re Wash. Mfg. Co.,*
    128 B.R. 198(Bankr. M.D. Tenn. 1991) ...................... 6

*Williams Elecs. Games, Inc. v. Garrity,*
    366 F.3d 569 (7th Cir. 2004) ............................. 13

*WSC, Inc. v. Home Depot, Inc. (In re WSC, Inc.),*
    286 B.R. 321 (Bankr. M.D. Tenn. 2002) .................... 15

## STATUTES AND RULES

11 U.S.C. § 502(d) ........................................... 17

11 U.S.C. § 541(a) ........................................... 17

11 U.S.C. § 547 ............................................... 3

11 U.S.C. § 548 ............................................... 3

28 U.S.C. § 157(e) ........................................... 3

Fed. R. Bankr. P. 9015 .................................... 4, 7

Fed. R. Civ. P. 38(a) ........................................ 7

## OTHER AUTHORITIES

U.S. Const. amend. VII .................................. *passim*

# **Exhibit C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit | ) | |
| Suisse First Boston, a Swiss | ) | |
| banking corporation), Credit | ) | |
| Suisse Securities (USA), LLC | ) | |
| (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse | ) | Re: Adv. Proc. D.I. 198 |
| Holdings (USA), Inc. (f/k/a | ) | |
| Credit Suisse First Boston, | ) | |
| Inc.), and Credit Suisse (USA), | ) | |
| Inc. (f/k/a Credit Suisse First | ) | |
| Boston (U.S.A.), Inc.), the | ) | |
| subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |

REPLY BRIEF IN SUPPORT OF THE
MOTION FOR DETERMINATION OF PLAINTIFF'S RIGHTS TO A JURY TRIAL

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................... 1

II.   ARGUMENT ................................................... 3

      A.    The Defendants' Forced Attempt To Recast This
            Adversary Proceeding As One That Is Purely
            "Equitable" Must Fail; Plaintiff Seeks "Legal"
            Relief Based Upon "Legal" Claims. ..................... 4

      B.    Because Several Claims And Issues Are
            Logically Distinct From The Allowance *Vel Non*
            Of CSS's Proofs Of Claim, The Defendants'
            Implied Waiver Theory Collapses Completely. .......... 8

      C.    A Pre-Petition Contract Waiving Certain
            Debtors' Jury Rights As Against One Defendant,
            And Only With Respect To That Specific
            Contract, Has No Effect On This Proceeding. ......... 14

      D.    To The Extent That The Court Considers This To
            Be A Close Question, It Should Err On The Side
            Of Preserving And Protecting Plaintiff's Core
            Constitutional Rights. ............................. 19

III.  CONCLUSION ................................................ 20

## TABLE OF AUTHORITIES

### CASES

*Aetna Ins. Co. v. Kennedy,*
    301 U.S. 389 (1937) ..................................... 14

*Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.),*
    203 B.R. 184 (Bankr. S.D.N.Y. 1996) ........................ 6

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 500 (1959) ..................................... 19

*Billing v. Ravin, Greenberg & Zackin, P.A.,*
    22 F.3d 1242 (3d Cir. 1994), *cert. denied*, 513
    U.S. 999 (1994) ................................. 10, 12, 13

*Cantor v. Perelman,*
    No. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb.
    10, 2006) ................................................ 7

*Capital Assocs. Int'l, Inc. v. Banc One Leasing Corp. (In re Capital Assocs. Int'l, Inc.),*
    No. 03-2017, 2003 Bankr. LEXIS 931 (Bankr. N.D.
    Tex. Aug. 6, 2003) ...................................... 14

*In re Crown Vantage, Inc.,*
    No. 02-03836, 2002 U.S. Dist. LEXIS 26109 (N.D.
    Cal. Dec. 16, 2002) ................................. 12, 13

*Dairy Queen, Inc. v. Wood,*
    369 U.S. 469 (1962) ................................. 1, 4, 8

*Dastgheib v. Genentech, Inc.,*
    457 F. Supp. 2d 536 (E.D. Pa. 2006) ....................... 6

*EEOC v. Blue Star Foods, Inc.,*
    No. 78-5-W, 1980 U.S. Dist. LEXIS 11131 (S.D.
    Iowa Mar. 7, 1980) ...................................... 19

*EEOC v. Waffle House, Inc.,*
    534 U.S. 279 (2002) ..................................... 16

*Educ. Testing Servs. v. Katzman,*
    670 F. Supp. 1237 (D.N.J. 1987) ......................... 19

*First Union Nat'l Bank v. United States,*
    164 F. Supp. 2d 660 (E.D. Pa. 2001) .................. 17, 18

*In re Franklin Towne Lodge Ltd. P'ship,*
    No. 91-2702, 1992 U.S. Dist. LEXIS 18817 (E.D.
    Pa. Nov. 25, 1992) ....................................... 8

*Germain v. Conn. Nat'l Bank,*
    988 F.2d 1323 (2d Cir. 1993) ...................... 10, 11, 13

*In re Globe Parcel Serv., Inc.,*
    75 B.R. 381 (E.D. Pa. 1987) ................................. 8

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989) ...................................... 4, 5

*Hays v. Equitex, Inc. (In re RDM Sports Group),*
    260 B.R. 915 (Bankr. N.D. Ga. 2001) ........................ 9

*Hulsey v. West,*
    966 F.2d 579 (10th Cir. 1992) ............................. 16

*Jennings v. McCormick,*
    154 F.3d 542 (5th Cir. 1998) ............................. 14

*Med. Air Tech. Corp. v. Marwan Inv., Inc.,*
    303 F.3d 11 (1st Cir. 2002) ........................... 14, 16

*Mirant Corp. v. Southern Co.,*
    337 B.R. 107 (N.D. Tex. 2006) ................. 10, 11, 12, 13

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),*
    203 B.R. 905 (D. Del. 1996) ...................... 8, 10, 13

*Nat'l Acceptance Co. v. Myca Prods., Inc.,*
    381 F. Supp. 269 (W.D. Pa. 1974) ...................... 14, 17

*Nat'l Union Elec. Corp. v. Wilson,*
    434 F.2d 986 (6th Cir. 1970) .............................. 3

*Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.,*
    913 F. Supp. 1088 (N.D. Ill. 1995) ....................... 17

*Nisselson v. Empyrean Inv. Fund, L.P. (In re
    MarketXT Holdings Corp.),*
    336 B.R. 39 (Bankr. S.D.N.Y. 2006) ....................... 15

*OHC Liquidation Trust v. Credit Suisse First Boston
    (In re Oakwood Homes Corp.),*
    340 B.R. 510 (Bankr. D. Del. 2006) ...................... 17

*Paracor Fin., Inc. v. GE Capital Corp.,*
    96 F.3d 1151 (9th Cir. 1996) ............................. 16

*Parsons v. Bedford,*
    3 Pet. 433 (1830) ......................................... 5

*Prudential Oil Corp. v. Phillips Petrol. Co.,*
    392 F. Supp. 1018 (S.D.N.Y. 1975) ........................ 19

*Reboy v. Cozzi Iron & Metal, Inc.,*
9 F.3d 1303 (7th Cir. 1993) ............................... 14

*Ross v. Bernhard,*
396 U.S. 531 (1970) .................................... 8, 13

*Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.,*
294 F.2d 486 (5th Cir. 1961) ............................. 4

*Tracinda Corp. v. DaimlerChrysler AG,*
No. 05-2363, 2007 U.S. App. LEXIS 22221 (3d
Cir. Sept. 18, 2007) .................................... 16

*Tray-Wrap, Inc. v. Six L's Packing Co.,*
984 F.2d 65 (2d Cir. 1993) ............................... 3

*Turner v. Johnson & Johnson,*
809 F.2d 90 (1st Cir. 1986) .............................. 19

*United States v. McAlister,*
630 F.2d 772 (10th Cir. 1980) ............................ 19

*Urban Outfitters, Inc. v. 166 Enter. Corp.,*
136 F. Supp. 2d 273 (S.D.N.Y. 2001) ...................... 14

*Williams Elecs. Games, Inc. v. Garrity*
366 F.3d 569 (7th Cir. 2004) ............................. 6

## STATUTES AND RULES

FED. R. CIV. P. 38(b) ........................................ 3

## OTHER AUTHORITIES

8 MOORE'S FEDERAL PRACTICE § 39.12[2] (Matthew Bender 3d
ed. rev. 2007) ........................................... 10

U.S. CONST. amend. VII ..................................... *passim*

Plaintiff[1] respectfully submits this Reply Brief to further support Plaintiff's motion for a determination of its Seventh Amendment rights to a jury trial and to address the Defendants' October 12, 2007 Response thereto [Docket No. 201] (the **"Defendants' Brief"**; cited herein as "Def. Br. at ___").

## I.    PRELIMINARY STATEMENT

Once one sifts through the rhetoric and insinuation that lard the Defendants' Brief, Credit Suisse's strategy is clear:  Rather than respond to Plaintiff's position on the merits, Credit Suisse muddies the waters with a barrage of irrelevant points.  But even brief analysis of each component of Credit Suisse's jury-rigged construct reveals glaring flaws, which collapse Credit Suisse's Response completely.

First, the Defendants' attempt to implode two of the Trust's claims, as support for their "mixed relief" theory, is inappropriate.  The Defendants cannot rewrite the borders of Plaintiff's claims and remedies or erase their inherently "legal" nature.  Further, even on its own terms, their "mixed relief" theory is akin to the "incidental" theory rejected long ago by *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).

Second, the Defendants' categorical "waiver" theory, under which there are *no* jury rights when debtors or trustees sue in bankruptcy court, is likewise contrary to Supreme Court precedent, as well as case law in this circuit.  The proper

---

[1]  All capitalized terms used but not otherwise defined in this Reply Brief have the meaning given such terms in Plaintiff's initial motion [Docket No. 198] (the **"Opening Brief"**).

1

inquiry is whether **every one** of Plaintiff's counterclaims is a part of the "claims-allowance process." Here, the Defendants try to have the August 19 Contract – which covers only the last 88 days of a multi-year relationship – be the tail that wags the constitutional rights dog. This strategy ignores the fact that three counterclaims are unrelated to CSS's claims.

Third, the Defendants also try to seek asylum in a contractual jury waiver. But they overlook the inconvenient truth that this waiver was limited in scope and was only signed by a handful of the parties to this action. Plus, even if that contractual waiver could somehow be read to apply here, the Defendants have still failed to meet their burden of proving that the waiver was enforceable in the first instance.

Fourth, the Defendants gloss over the fact that they are asking this Court to curtail the constitutional right to a jury as no court has done before. Such a result not only would be unprecedented, but also will do extreme violence to the long-standing principle that every close case should be resolved in favor of protecting parties' fundamental rights.

At bottom, the facts and the case law clearly ground four basic conclusions: (1) Plaintiff properly demanded a jury trial; (2) because Plaintiff is asserting "legal" claims and seeking "legal" relief, it has a Seventh Amendment right to a jury; (3) neither Plaintiff nor the Debtors ever waived that fundamental right; and (4) three of Plaintiff's counterclaims are unrelated to the "claims-allowance process." As such, this Court should affirm Plaintiff's rights to a jury trial.

## II.  **ARGUMENT**

The Defendants' Brief rests on three slim ledges:

(1) each and every aspect of this action is "equitable" or "mixed" in nature (*see* Def. Br. at 7-12);

(2) by filing the Objection/Counterclaims in this Court, Plaintiff somehow made **all** its counterclaims part of the "claims-allowance process" or otherwise destroyed the right to a jury[2] (*see* Def. Br. at 13-21); and

(3) because certain of the Debtors signed an agreement with "a Defendant" that purported to waive those entities' rights **as to actions relating to that contract,** Plaintiff somehow has no jury trial rights as to **any** of the Defendants (*see* Def. Br. at 21-24).

The fatal flaws pervading each premise are discussed in turn.

Before turning to substance, Plaintiff notes that the Defendants concede that *this Court* may properly determine this issue. (*See* Def. Br. at 5.) Plaintiff disagrees that the Defendants can collaterally attack a ruling by this Court before the District Court, but leaves that debate for another day. The Trust also disputes the unfounded theory that it has done anything to waive its ability now to request a jury trial or to include that issue in any appeal from a final order. (*See* Def. Br. at 1, 5-6, 6 n.4.) To be clear and to avoid any future misunderstanding, Plaintiff has waived nothing.[3]

---

[2]  In an attempt to tumesce their brief, the Defendants suggest this point supports two separate arguments. As explained on pages 8-10, *infra*, this framework is incorrect; the underlying issue is always whether "legal" claims were converted to "equitable" ones via the "claims-allowance process," regardless of the forum.

[3]  As the Second Circuit has explained, once a proper jury demand is made under Rule 38(b), "[t]he federal rules have cloaked the waiver process in a ritual that is almost sacramental." *Tray-Wrap, Inc. v. Six L's Packing Co.*, 984 F.2d 65, 68 (2d Cir.

**A.    The Defendants' Forced Attempt To Recast This Adversary Proceeding As One That Is Purely "Equitable" Must Fail; Plaintiff Seeks "Legal" Relief Based Upon "Legal" Claims.**

The Defendants' first argument attempts to respond to the analysis set forth on pages 9-15 of the Opening Brief, wherein Plaintiff applied the initial prongs of *Granfinanciera* to this action. Credit Suisse responds by attempting to cram Plaintiff's claims and remedies into some "mixed relief" box. (*See* Def. Br. at 8-11.) As explained below, this attempt fails because it presumes an unduly myopic view of Plaintiff's claims and remedies. Even were that not so, however, Credit Suisse's "mixed relief" theory founders on its face. As the Supreme Court explained in *Dairy Queen, Inc. v. Wood*, "[i]t would make no difference if the equitable cause clearly outweighed the legal cause so that the basic issue of the case taken as a whole is equitable. *As long as any legal cause is involved the jury rights it creates control*." 369 U.S. 469, 473 n.8 (1962) (emphasis added) (quoting *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.*, 294 F.2d 486, 491 (5th Cir. 1961)). While the Defendants may not like it, *Dairy Queen* is

---

1993). The "meticulous provision made in Rule 39 for jury waivers" has undisputedly *not* been followed here, and any alleged "informality" on Plaintiff's part is irrelevant. *See id.* Moreover, Plaintiff's decision to proceed to trial before this Court in the event of an adverse ruling – rather than to seek immediate appellate relief – does not bar Plaintiff from including the jury trial issue in a later appeal from a final order. *See, e.g.*, *Nat'l Union Elec. Corp. v. Wilson*, 434 F.2d 986, 988 (6th Cir. 1970) (party's decision to proceed to trial – rather than to seek an interlocutory appeal or writ of mandamus – did not preclude that party from seeking review of order denying jury trial as part of an appeal taken from post-trial judgment).

4

still good and controlling law, and a "mixed relief" thesis parallels the "incidental" construct forcefully rejected by the Court. *Granfinanciera* itself also underscores the key distinction between "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where **equitable rights alone** were recognized, and equitable remedies were administered." 492 U.S. 33, 41 (1989) (bolded emphasis added) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447 (1830)). Here, "legal" features not only are present but predominate the action, destroying any "mixed relief" theory.

First, Credit Suisse does not contest that claims for negligence and breach of implied contract are historically "legal" claims. Instead, Credit Suisse desperately tries to recast Plaintiff's whole case by asserting that these two claims "exactly track" or are "duplicative" of the breach of fiduciary duty claim. (*See* Def. Br. at 11-12.) This is a mistake; the three counterclaims are not coextensive.[4] For instance, the trier-of-fact could conclude that although Credit Suisse and the Oakwood Entities enjoyed an intimate relationship, it was not enough to create fiduciary duties. Such a finding would not preclude the existence of an implied advisory contract, however. Likewise, Credit Suisse always

---

[4] The Defendants' analysis is also question-begging in the extreme: Why should *everything* collapse *into* the fiduciary duty claim? Assuming *arguendo* that there is some "duplicative" aspect to the claims, why should they not collapse into the negligence claim? In fact, since that claim is unquestionably "legal" and because the law favors preservation of constitutional rights, the latter result is preferable, which undermines the Defendants' position.

owed the Oakwood Entities a duty of reasonable care vis-à-vis its "services," the breach of which duty gives rise to damages even in the absence of any fiduciary relationship. *See, e.g.,* *Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*, 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996). Mere factual overlap between the three claims is similarly not dispositive since a single act of malfeasance can often violate several distinct legal duties. As such, Credit Suisse's overt attempt to avoid the fact that two-thirds of Plaintiff's pre-August 19, 2002 counterclaims are "legal" in nature falls flat; the continuing existence of those separate claims creates a jury trial right.

Second, the Defendants simply misunderstand the remedy analysis. Plaintiff does not seek "equitable" relief — such as an accounting, constructive trust, or injunction – but rather an award of fungible money damages. Such an award is not contingent on the "tracing" or other identification of particular property in the Defendants' possession; the Trust does not care from where Credit Suisse gets the funds to pay an adverse judgment. Thus, as Judge Posner cogently explained in *Williams Electronics Games, Inc. v. Garrity* — a case the Defendants simply ignore – Plaintiff's requested relief is "a legal remedy for a legal wrong, not [] an equitable remedy for a legal or an equitable wrong." 366 F.3d 569, 578 (7th Cir. 2004); *see also, e.g., Dastgheib v. Genentech, Inc.*, 457 F. Supp. 2d 536, 543-46 (E.D. Pa. 2006) (detailing why a request for return of unjust profits in the form of fungible dollars is considered a "legal" remedy carrying a right to a jury).

Critically, this conclusion would obtain *even if* all Plaintiff sought was the return of Credit Suisse's fees, but that is not the extent of the damages here – Plaintiff also seeks damages for the direct harm to the Debtors caused by Credit Suisse's malfeasance. There can be no real dispute that such compensatory damages are wholly "legal" in nature.

Third, the principal case on which the Defendants rely, *Cantor v. Perelman*, No. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb. 10, 2006), should be distinguished from the case at bar. Just two claims were at issue in *Cantor* – breach of fiduciary duty and aiding and abetting the same – both of which are historically "equitable." Here, in contrast, there are additional causes of action that have always been "legal" in nature. Indeed, Judge Jordan expressly noted how the analysis in *Cantor* would have been different "if at least one of Plaintiffs' claims [had been] legal rather than equitable." *Id.* at *7 n.7. Additionally, the plaintiffs in *Cantor* clearly were focused on the recovery of specific sums received by three directors in connection with certain note transactions, *see id.* at *1, which gave their requested remedy a distinctly equitable flavor. *See id.* at *9. Here, in contrast, the thrust of Plaintiff's case is on remedying the harm done to the Debtors, rather than on merely recovering illicit gains. Thus, unlike *Cantor*, the core nature of this case is about getting "legal" relief on account of "legal" causes of action.

Because the Defendants cannot unilaterally transmute the nature of Plaintiff's case, their attempt to avoid the

"legal" aspects of Plaintiff's counterclaims and remedies must fail. As *Dairy Queen* makes clear, even "incidental" "legal" features control the outcome and require a jury trial here.

**B.    Because Several Claims And Issues Are Logically Distinct From The Allowance *Vel Non* Of CSS's Proofs Of Claim, The Defendants' Implied Waiver Theory Collapses Completely.**

Credit Suisse's second argument is that the Trust's choice to combine claim objections with affirmative litigation before this Court somehow made the entire adversary proceeding part of the claims-allowance process or otherwise triggered a categorical submission to "the equitable jurisdiction of this Court." (*See* Def. Br. at 14-21.)  This radical theory ignores the analytic framework prescribed by the Third Circuit and runs directly counter to the Supreme Court's jurisprudence.

The Defendants' core proposal – that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates **any and all** of the estate's jury trial rights forever – flies smack in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity."  *Ross v. Bernhard*, 396 U.S. 531, 538 (1970). Several courts in this circuit have rejected Credit Suisse's rigid forum-based rule, using *Ross*'s guidance as a foothold.[5]

---

[5]    *See NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 912-13 (D. Del. 1996) (rejecting notion that an action in bankruptcy court must waive jury rights because "courts should not be eager to embrace an implied waiver of constitutional rights where is an affirmative and timely assertion of those

The Defendants' extreme theory was also considered
and flatly rejected in *Hays v. Equitex, Inc. (In re RDM Sports
Group)*, 260 B.R. 915 (Bankr. N.D. Ga. 2001). There, the
trustee filed an adversary proceeding against the debtors'
former law firm. In response, the law firm argued "that the
Trustee, by filing this action in the bankruptcy court, as
opposed to the district court or the state court, waived his
right to a jury trial." *See id.* at 920-21. The firm's point
mirrored that now made by Credit Suisse: Since the trustee
brought "his complaint in a court that lacks the authority to
conduct a jury trial," he "submitted to equity" and waived any
jury right. *See id.* at 921-22. The court was not convinced;
it concluded that the relevant Supreme Court cases focus on
"the claims process and/or the restructuring of the debtor-
creditor relationship," and thus "the Trustee's commencement
of [an] action in bankruptcy court does not constitute an
automatic waiver of his right to a trial by jury," even if the
trustee's claims may be brought elsewhere. *See id.* at 924-25.

---

rights" and because "[t]he constitutional right to a trial by
jury is not so ephemeral" so as to turn on the forum); *In re
Franklin Towne Lodge Ltd. P'ship*, No. 91-2702, 1992 U.S. Dist.
LEXIS 18817, at *9 (E.D. Pa. Nov. 25, 1992) ("By asserting its
private rights, [the debtor] has not implicitly waived its jury
right by commencing an adversary proceeding in the bankruptcy
court, as legal claims cannot be magically converted into
equitable claims by their presentation to a court of equity."); *In re Globe Parcel Serv., Inc.*, 75 B.R. 381, 383 (E.D. Pa. 1987)
("The type of forum chosen as the arena for litigation is not
dispositive on the question of whether a right to a jury trial
exists. The mere fact that a plaintiff raises his legal claims
before a court of equity in the context of an equitable
proceeding does not somehow convert claims that are otherwise
legal — triable before a court of law — into equitable ones.").

The Second Circuit likewise held that a *per se* rule of waiver akin to that advanced by Credit Suisse is supported by "neither precedent nor logic" and "[f]or a waiver to occur, the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims." *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993). This rule coheres with the Third Circuit's belief that a waiver theory based solely on a bankruptcy forum "raises as many questions as it answers," and the mere "fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis. **A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims**." *See Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1251-52, n.14 (3d Cir. 1994) (emphasis added), *cert. denied*, 513 U.S. 999 (1994); *accord In re NDEP Corp.*, 203 B.R. at 912 (crystallizing the same question). Thus, since Credit Suisse's categorical rule creates exactly the "ephemeral" right against which *In re NDEP Corp.* cautions, *see* 203 B.R. at 913, the focus must return to where it began in the Opening Brief: Are the three claims for breach of fiduciary duty, negligence, and breach of implied contract **necessarily** part of the claims-allowance process?[6]

---

[6] Credit Suisse incorrectly asserts that "[t]he sole issue is thus whether **this action** implicates the claims allowance process." (Def. Br. at 14 (emphasis added).) "The right to jury trial attaches to specific issues, rather than to an entire action." 8 MOORE'S FEDERAL PRACTICE § 39.12[2] (Matthew Bender 3d ed. rev.

The Defendants blithely contend that "allowance or disallowance of CSS's Proof of Claim cannot be resolved without reference to the conduct and claims underlying the counterclaims" (Def. Br. at 15), but they fail ever to explain **why** this is so.  In fact, as Plaintiff detailed on pages 18-19 of the Opening Brief, this is decidedly **not** the case; the three counterclaims for which Plaintiff requests a jury trial are based on a completely different set of "services," over a different period of time, involving several Credit Suisse entities other than CSS.  A jury's resolution of the issues attendant to those counterclaims will not affect whether CSS has an allowable claim against the Debtors' estates.  Although considerations of efficiency justify a single trial – a truth the Defendants never contest – this adversary proceeding could theoretically be bifurcated around the August 19 Contract. Consequently, all the counterclaims unrelated to that contract are not **necessarily** connected to the claims-allowance process.

In the Opening Brief, Plaintiff explained at length why the *Germain* and *Mirant* decisions both support this mode of analysis.  The Defendants' Brief briefly discusses *Germain*[7]

---

2007).  Clearly "this action" bears on the claims-allowance process, as did the "action" in *Mirant Corp. v. Southern Co.*, 337 B.R. 107 (N.D. Tex. 2006).  But that is not the relevant issue; unless **every one** of Plaintiff's counterclaims **also** "implicates the claims allowance process," the posture of this adversary proceeding does not defeat Plaintiff's rights to a jury trial.

[7]  Beyond merely repeating *Germain*'s instructive holding, the Defendants suggest in their footnote 10 that the Second Circuit's equitable subordination analysis distinguishes the case.  That is incorrect; the court merely noted that the trustee could not use

but essentially ignores *Mirant*.[8]  This is unfortunate, because
*Mirant* provides useful guidance about the proper result here.

Similarly helpful is *In re Crown Vantage, Inc.*, No.
02-03836, 2002 U.S. Dist. LEXIS 26109 (N.D. Cal. Dec. 16,
2002).  There, the debtor filed an adversary proceeding
against a creditor ("Fort James") that had filed proofs of
claim.  The debtor's complaint included claims for breach of
fiduciary duty and negligence based on prepetition misconduct.
Fort James moved to strike the debtor's demand for a jury
trial, asserting – just like Credit Suisse in this case – that
the adversary proceeding was "inextricably intertwined" with
its proofs of claim and that the debtor waived its jury rights
via "the submission to the equitable jurisdiction of the
[bankruptcy] court."  *See id.* at *9-11.  The court rejected
both arguments.  As to the first, the court concluded that:

> Even if Fort James's proof of claim and Crown's
> claims against Fort James arose from the same
> agreement or are otherwise related, this does not
> deprive Crown of the right to a jury trial. When,
> as here, the resolution of a party's legal claims

---

the results of a jury trial as a basis for equitable
subordination.  *See* 988 F.2d at 1332.  A similar framework could
be used here; e.g., the Court might rule that if Plaintiff tries
certain counterclaims to a jury, it may not subsequently use that
jury's findings as a basis to equitably subordinate CSS's claim.

[8]  The only reference to *Mirant* is in a footnote on page 16, where
the Defendants attempt to distinguish the case on the grounds
that it involved a creditor's rights, instead of the estate's.
It is easy to understand why the Defendants hope to avoid *Mirant*
– it is nearly a mirror image of the instant case.  Yet Credit
Suisse's suggestion that a role juxtaposition alters the result
is undercut by the Third Circuit's decision in *Billing*, which
explains that the estate's rights to a jury essentially track a
creditor's, and turn on the same questions.  *See* 22 F.3d at 1253.

> arising from a bankruptcy proceeding will have
> but a negligible impact on the claims-allowance
> process, the right to a jury trial is preserved.

*Id.* at *10.  This conclusion only underscores how ***every one*** of

Plaintiff's counterclaims must be a fundamental part of the

claims-allowance process for a complete "waiver"; that some

may have an incidental or negligible impact is an insufficient

reason to obliterate Plaintiff's rights.  The *Crown Vantage*

court quickly dismissed Fort James's broad "waiver" argument,

concluding - as in *Germain*, *Billing*, *Mirant*, and *NDEP* - that

the focus is not on the bankruptcy forum itself, but rather on

the logical connection between specific causes of action and

inherent bankruptcy court functions.  *See id.* at *11-13.

In sum, this Court should reject the Defendants'

broad, categorical "waiver" theory as being deeply out of step

with the Supreme Court's *Ross* opinion and subsequent case law.

Any regime under which a party's choice of forum is conclusive

renders the Seventh Amendment a transient and ephemeral right.

The bulk of the case law - operating under basic common sense

and due respect for the Constitution - correctly holds that a

more substantive inquiry should be used.  In the context of

bankruptcy cases, that deeper inquiry looks to the claims-

allowance process and reviews each individual claim to see if

it necessarily affects that process.  Here, Plaintiff will try

several counterclaims that have no bearing on the allowance of

CSS's proofs of claim, and that logical disconnect preserves

Plaintiff's Seventh Amendment rights to have a jury try all

those claims.  Credit Suisse fails to persuade otherwise.

13

C.    **A Pre-Petition Contract Waiving Certain Debtors' Jury Rights As Against One Defendant, And Only With Respect To That Specific Contract, Has No Effect On This Proceeding.**

In a final gambit to avoid trying any part of this case before a jury, the Defendants point to a contractual jury waiver clause in the documentation for the "warehouse" credit facility used by the Oakwood Entities. There are three deep flaws with the Defendants' ploy, however, any one of which proves fatal. Before detailing those problems, it is useful to recall the Supreme Court's timeless recognition that, "as the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937).[9] Following the Court's maxim, courts strictly construe purported contractual jury waivers against the party seeking to enforce such a waiver.[10]

---

[9]   *See also, e.g., Jennings v. McCormick*, 154 F.3d 542, 545 (5th Cir. 1998) ("The right to jury trial is too important . . . for courts to find a knowing and voluntary relinquishment of the right in a doubtful situation."); *Reboy v. Cozzi Iron & Metal, Inc.*, 9 F.3d 1303, 1306 (7th Cir. 1993) ("The right to a jury trial is important and this Court will not find a waiver without clear, unequivocal evidence that the party intended to waive its right."); *Nat'l Acceptance Co. v. Myca Prods., Inc.*, 381 F. Supp. 269, 270 (W.D. Pa. 1974) ("Courts will narrowly construe any waiver of [the jury trial] right and will indulge in every reasonable presumption against waiver.").

[10]   *See, e.g., Med. Air Tech. Corp. v. Marwan Inv., Inc.*, 303 F.3d 11, 18 (1st Cir. 2002) ("There is a presumption against denying a jury trial based on waiver, and waivers must be strictly construed."); *Urban Outfitters, Inc. v. 166 Enter. Corp.*, 136 F. Supp. 2d 273, 275 (S.D.N.Y. 2001) ("Courts are to strictly construe jury waiver clauses, as the right to a jury trial is fundamental and protected by the Seventh Amendment."); *Capital Assocs. Int'l, Inc. v. Banc One Leasing Corp. (In re Capital Assocs. Int'l, Inc.)*, No. 03-2017, 2003 Bankr. LEXIS 931, at *6 (Bankr. N.D. Tex. Aug. 6, 2003) ("[C]ourts construe purported

Hence, any uncertainty about the true scope and effect of the purported jury waiver should be resolved in the Trust's favor.

The first problem with the Defendants' contractual waiver theory stems from the identity of the signatories. As the Defendants coyly admit, the purported waivers only involve two of the Debtors and "a Defendant" entity – specifically, "Credit Suisse First Boston, New York Branch, as Agent" for the warehouse facility (**"NY Branch"**). (*See* Def. Br. at 22-23; Murphy Decl. [Docket No. 202] Ex. "D" at signature page, Ex. "E" at signature page.) The Trust succeeded to the rights of nearly twenty "Debtor" entities, however, and NY Branch is not the sole, or even the primary, defendant in this proceeding. Indeed, the Defendants' own brief attempts to portray this dispute as one that only involves a ***totally different Credit Suisse entity***.[11] (*See* Def. Br. at 7 (arguing that all the "remaining claims – on which the Trust now seeks a jury trial – are ***claims arising out of the relationship between Oakwood and CSS prior to August [19], 2002*** (emphasis added)).)

---

contractual jury waiver provisions strictly against waiver, and will indulge every reasonable presumption against waiver.").

[11] The Defendants' efforts to apply NY Branch's waiver to CSS via osmosis directly conflict with their insistence in footnote 3 of the Defendants' Brief that the separateness of the Credit Suisse entities should be respected – a theme one of the key CSS actors stressed at his deposition. (*See* Declaration of Whitman L. Holt ("**Holt Decl.**"), Ex. "A" at 70:18-71:4, 172:1-19, 389:9-391:12.) Although Plaintiff believes the Credit Suisse entities functioned as one unit or were otherwise "alter egos," this issue need not be resolved today because that fact still would not justify including a nonsignatory within the scope of a contractual jury waiver. *See, e.g., Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 336 B.R. 39, 63 (Bankr. S.D.N.Y. 2006).

This is a weighty problem in both directions. After all, it is fundamental that, "[g]enerally, a jury waiver provision in a contract or lease affects only the rights of the parties to that contract or lease." *Hulsey v. West*, 966 F.2d 579, 581 (10th Cir. 1992) (guarantor of corporate loan was not bound by jury waiver in loan agreement that he did not execute in his personal capacity).[12] Thus, the Defendants, including CSS, cannot all claim shelter in a waiver signed only by NY Branch. Nor can that waiver diminish the rights of Debtors that did not sign it - rights that now belong to the Trust. Simply put, the waiver applies to the wrong parties.

The second major problem relates to the scope of the waiver itself. At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the "warehouse" facility. But this litigation is not about any breach of those contracts, or about whether NY Branch adequately performed thereunder. Rather, it is about

---

[12] *See also, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Med. Air Tech. Corp.*, 303 F.3d at 18 ("In general, a contractual waiver binds only the parties who sign the contract."); *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1166 n.21 (9th Cir. 1996) (explaining that because "courts generally construe jury waivers narrowly," the court is "even more hesitant to extend the protections of [a] jury waiver clause to a nonsignatory"). The Third Circuit's recent decision in *Tracinda Corp. v. DaimlerChrysler AG*, No. 05-2363, 2007 U.S. App. LEXIS 22221 (3d Cir. Sept. 18, 2007), is not to the contrary. In *Tracinda*, the court held that a contractual jury waiver signed by a corporation encompassed nonsignatory directors and officers of that corporation, in their capacity as corporate agents. *See id.* at *31. This rule is inapplicable here since there has not been (nor could there be) any allegation, or evidence, that CSS was somehow acting as a corporate agent on the behalf of NY Branch.

whether Credit Suisse breached far broader duties, not arising from *any* contract, by partaking in myriad illicit transactions with the Oakwood Entities.  Indeed, while NY Branch's provision of the "warehouse" is undoubtedly *a relevant fact*, it is hardly the lynchpin of Plaintiff's counterclaims; the claims for negligence, breach of fiduciary duty, and breach of implied contract would be equally viable even if an entirely different lender had provided Oakwood's "warehouse" facility.

Once again, the Defendants adopt a far too myopic view of this case in an effort to limit Plaintiff's rights. Because this action is about much more than the "warehouse" facility and related agreements, it falls outside the scope of the purported waiver.  Other courts have reached precisely the same conclusion in similar circumstances.[13]  Simply put, the purported contractual waiver is far too limited to apply here.

The final problem with the Defendants' contractual waiver theory is that the Defendants have failed to meet their burden of proving that the waiver is enforceable in the first instance.  *First Union National Bank v. United States*, 164 F.

---

[13]  *See, e.g.*, *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088, 1146-47 (N.D. Ill. 1995) (broad jury waiver in "Distributor Agreement" did not encompass any "claims that do not directly arise or have their basis in the Distributor Agreement"); *Nat'l Acceptance Co. v. Myca Prods., Inc.*, 381 F. Supp. 269, 269-70 (W.D. Pa. 1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); *see also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 519-20 (Bankr. D. Del. 2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties).

Supp. 2d 660 (E.D. Pa. 2001), highlights the issue.  There, a
bank that had loaned millions of dollars to a corporation
attempted to enforce a contractual jury waiver contained in
the loan agreement as against a nonsignatory party.  The court
began its analysis by noting how "Courts do not uphold jury
trial waivers lightly and the burden of proving that a waiver
was done both knowingly and intelligently falls upon the party
seeking enforcement of a waiver of a jury trial clause."  *Id.*
at 663.  Among the evidence the waiver proponent **must** proffer
is some "evidence that there was not a gross disparity in
bargaining power between" the parties.  *See id.* at 665.  This
is particularly important when the signatory corporation is in
poor "financial straits at the time the documents were
executed, [since] it is highly likely that there was a severe
disparity in bargaining power" in such circumstances.  *See id.*

        Here, the Defendants have not proffered a shred of
evidence to meet their burden of showing that there was no
gross disparity in power between Oakwood and NY Branch.  This
is critically important, because there **is** unrebutted evidence
in the record that the Oakwood Entities were insolvent at the
time and had no practical choice but to sign whatever form of
documents Credit Suisse presented.[14]  As such, any purported

---

[14]  *See, e.g.,* Holt Decl. Ex. "B" at 50:6-52:16 (key Oakwood officer
explaining that the "warehouse" deal was "the only game in town"
and "had to get done" no matter the terms).  Both of the Trust's
experts have concluded and will testify that the Debtors were
insolvent during this period.  While expert discovery does not
close until next week, Credit Suisse can offer no "rebuttal"
experts to counter the insolvency (or any other) conclusion.

contractual jury waiver is presumptively invalid, and the Defendants have not met their burden of proving otherwise.

The purported contractual waiver involves the wrong parties, is too narrow, and is not enforceable in any event. Given the skeptical eye with which courts read such waivers, this flimsy one cannot eviscerate Plaintiff's basic rights.

**D.    To The Extent That The Court Considers This To Be A Close Question, It Should Err On The Side Of Preserving And Protecting Plaintiff's Core Constitutional Rights.**

All three of Credit Suisse's strained arguments against a jury ultimately fail for the reasons outlined above. Nevertheless, if the Court still has any lingering doubt about whether the Trust retains its Seventh Amendment rights, this Court properly should err *in favor of* protecting Plaintiff's fundamental rights. As powerfully explained by one court:

> the right to a trial by jury is one of the most precious of the rights guaranteed by the Constitution, and should be one of the most jealously guarded. In view of this, if the Court is to err in its holding, it chooses to err in favor of granting a right to trial by jury, as opposed to denying such an important right.

*EEOC v. Blue Star Foods, Inc.*, No. 78-5-W, 1980 U.S. Dist. LEXIS 11131, at *11 (S.D. Iowa Mar. 7, 1980).[15]  Because Credit

---

[15]    *See also, e.g., Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) ("Since the right to jury trial is a constitutional one, however, while no similar requirement protects trials by the court, [judicial] discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." (footnote omitted)); *Turner v. Johnson & Johnson*, 809 F.2d 90, 99 (1st Cir. 1986) ("[I]f we must err, we choose to do so on the side of preserving plaintiffs' right to a jury trial."); *United States v. McAlister*, 630 F.2d 772, 774 (10th Cir. 1980) (noting how if a decision will "require too many jury trials, we properly

Suisse has not established its position beyond the shadow of a doubt, any residual uncertainty must favor Plaintiff's rights.

### III. CONCLUSION

For the reasons and based on the authorities presented above and in the Opening Brief, Plaintiff requests that this Court affirm Plaintiff's rights to a jury trial.

Respectfully submitted,

Dated:  October 17, 2007
Wilmington, Delaware

/s/Marla Rosoff Eskin
MARLA ROSOFF ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

-and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the
OHC Liquidation Trust

---

err on the side of protecting a constitutional right"); *Educ. Testing Servs. v. Katzman*, 670 F. Supp. 1237, 1243 (D.N.J. 1987) (Barry, J.) (concluding that if court erred by denying motion to strike, it "erred on the side of protecting an important constitutional right, fundamental to the fair administration of justice"); *Prudential Oil Corp. v. Phillips Petrol. Co.*, 392 F. Supp. 1018, 1022 (S.D.N.Y. 1975) ("[T]he inescapable teaching of recent Supreme Court decisions is that there is a clear federal policy in light of the Seventh Amendment favoring jury trials and that, in doubtful cases, that policy should be favored.").

# **Exhibit D**

# EXPERT WITNESS REPORT

## OF

## DR. MICHAEL TENNENBAUM

## FLAVELL, TENNENBAUM & EDWARDS

———————

## OHC LIQUIDATION TRUST

## V.

## CREDIT SUISSE FIRST BOSTON, ET AL.

———————

## IN RE: OAKWOOD HOMES CORPORATION, ET AL.

## EXPERT WITNESS REPORT OF DR. MICHAEL TENNENBAUM

I have been requested by the OHC Liquidation Trust and its counsel, the firm of Stutman, Treister & Glatt, to analyze and opine on a number of issues regarding Oakwood Homes Corporation, as more fully set forth below.

I am a partner in the valuation and financial consulting firm known as Flavell, Tennenbaum & Edwards, and have been a practicing consulting economist for more than thirty (30) years. My educational background includes a B.A. in Economics and Mathematics, an M.A. in Economics and a Ph.D. in Economics, all earned at the University of California, Los Angeles. From 1969 to 1986 I was also a Professor of Economics at California State University, Long Beach. During my career, I have conducted valuation analyses on dozens of companies for transaction as well as litigation purposes, and have also valued large complex real property assets. I have prepared reorganization value studies, reorganization plan feasibility studies and solvency analyses in connection with many major bankruptcy reorganizations. I have rendered expert valuation testimony in many Federal Bankruptcy courts, Federal District Court, Federal Tax Court, Chancery Court in Delaware, and State courts throughout California, and in Michigan and Washington. During my teaching career I have taught courses in corporate valuation, finance, real property valuation and economics. A full and complete copy of my curriculum vitae is included herewith.

In addition to the analyses summarized in this report, I have been requested to provide the following information.

1.   Michael Tennenbaum, Ph.D. - - Publications and Testimony

    a.   Publications within the last fifteen years: "The Income Approach to Business Valuation," Trial News, Washington State Lawyers Assoc., July/August, 1994

    b.   Cases in which expert testimony was rendered at trial and/or by deposition within the last five years:

2002:

| In re. Edwards Theatres<br>        Chapter 11 – Orange County | deposition, court testimony |
|---|---|
| Fair v. Caruso<br>        Los Angeles County Superior Court | deposition, arbitration testimony |
| Resort at Summerlin v. Marsh, USA<br>        Federal District Court, Las Vegas | deposition |

2003:

| Furgatch v. San Diego Unified Port District<br>        (Case No. GIC 775242/784923) | deposition, court testimony |
|---|---|
| Sunrise Buena Park v. Old Navy<br>        Orange County, CA<br>        (Superior Court No. 02 CC05035) | deposition, court testimony |
| In re. Hechinger Investment Company of Delaware, Inc.<br>        Delaware Bankruptcy Court | deposition |

2004:

| In re. Olympic Pipeline Company, Chapter 11, Seattle Washington | deposition, court testimony |
|---|---|

2005:

| Brown v. Gill<br>        Federal Bankruptcy Court, Los Angeles | deposition |
|---|---|
| Los Angeles Export Terminal, Inc. v. Thyssenkrupp Robins Inc., et al.<br>        Los Angeles Superior Court Case No. BC 284285 | deposition |

2006:

| Los Angeles Export Terminal, Inc. v. Thyssenkrupp Robins Inc., et al.<br>        Los Angeles Superior Court Case No. BC 284285 | court testimony |
|---|---|

2.      Hourly Rate Schedule for Flavell, Tennenbaum & Edwards:

R.H. Flavell, MAI            $350

M. Tennenbaum, Ph.D.         $395

D. Edwards, MAI              $350

Professional Staff           ($100 - $200)

    Michael Daniels

    Thomas Yoshioka

    Jason Tennenbaum

Fees are computed based on the hourly rate schedule, and expenses consist of out of pocket expenditures.

My analyses in this matter included review of numerous documents, including filings with the court, deposition transcripts and exhibits, brokerage firm analyst reports, SEC filings, Oakwood Homes Corporation financial documents, and financial and economic texts and professional journal literature.

In particular, my review included deposition transcripts and exhibits of the depositions of:

    Myles Standish

    Doug Muir

    James Xanthos

    Fiachra O'Driscoll

    Jared Felt

    Thomas P. Irwin

    Clarence W. Walker

Securities and Exchange Commission filings, consisting of various 10-K and 10-Q reports for Oakwood and comparable competitive companies were reviewed, as were reports from Hoovers, Morningstar and Ibbotson Associates.

The economic and financial texts which I reviewed include, but are not limited to, the following:

Ibbotson Associates, Stocks, Bonds, Bills and Inflation

B. Cornell, The Equity Risk Premium

B. Cornell, Corporate Valuation

A. Damodaran, Investment Valuation

A. Damodaran, Corporate Finance

A. Davidson, A. Sanders, L. Wolff, A. Ching, Securitization

L. Hayre, Guide to Mortgage Backed & Asset Backed Securities

J. Stowe, T. Robinson, J. Pinto & d. McLeavey, Equity Asset Valuation

T. Copeland, J. F. Weston & K. Shastri, Financial Theory & Corporate Policy

W. Goetzmann & R. Ibbotson, The Equity Risk Premium

J. Siegel, Stocks for the Long Run

E. Dimson, P. Marsh & M. Staunton, Triumph of the Optimists

T. Koller, M. Goedhart & d. Wessels, Valuation

UCLA Andersen School, Proceedings of the UCLA Conference on the Equity Premium & Stock Market Valuation

Professional economic and finance journal articles which I reviewed include, but are not limited to, the following:

R. Ibbotson & P. Chen, "Long Run Stock Returns," Financial Analysts Journal, Jan./Feb. 2003

J. Graham, "Proxies for the Corporate Marginal Tax Rate," Journal of Financial Economics, 1996

J. Siegel, "The Equity Premium: Stock and Bond Returns Since 1802," Financial Analysts Journal, 1992

J. R. Woolridge, "Do Stock Prices Reflect Fundamental Values?" Journal of Applied Corporate Finance, 1995

J. Siegel & R. Thaler "The Equity Premium Puzzle," Journal of Economic Perspectives, 1997

J. Siegel, "The Shrinking Equity Premium," UCLA Conference on the Equity Premium, 1999

R. Grabowski & D. King, "New Evidence on Size Effects and Rates of Return," Business Valuation Review, 1996

S. Kothari & J. Shanken, "In Defense of Beta," Journal of Applied Corporate Finance, 1995

4

D. King, "Equity Risk Premium for Cost of Capital Studies," <u>Business Valuation Review</u>, 1994

F. Black, "Beta and Return," <u>Journal of Portfolio Management</u>, 1993

E. Fama & K. French, "The Cross Section of Expected Stock Returns," <u>Journal of Finance</u>, 199

P. Kaplan & J. Peterson, "Full Information Industry Betas," <u>Financial Management</u>, 1998

My analyses included review of internal Oakwood documents, Credit Suisse First Boston documents and Price Waterhouse Coopers documents comprising thousands of pages. In addition, reports by a variety of professionals were reviewed.

The categories of internal OHC documents include:

1. Financial data and Rationalization Plan documents
2. Restructuring Term Sheets
3. Presentation to Lotus
4. OHC Board of Director Meeting Minutes
5. Executive Reports to the Board of Directors
6. Cumulative Loss Data and Security Price Histories
7. Internal E-Mail Documents and Prospectus Documents
8. Internal REMIC Valuation Documents

The categories of Price Waterhouse Coopers documents reviewed include:

1. PWC financial reports
2. PWC audit work papers
3. Review documents re REMIC valuation

The categories of Credit Suisse First Boston Documents reviewed include:

1. Presentations to OHC Board of Directors
2. Financial OHC Discussion Materials
3. Securities Sales Points
4. Internal Discussion Materials
5. Restructuring Term Sheets
6. OAC Residual Analyses

7.    Presentations to Lotus

8.    Presentations to Risk Management

9.    Power Point Presentations

10.   Presentations to Berkshire Hathaway

11.   CSFB Credit Department Documents

12.   CSFB Equity Department Reports

I also reviewed various reports prepared by financial professionals, including reports by Bradford Cornell, Miller Buckfire and Andrew Davidson.

Additional documents reviewed include certain reported court cases:

1.    In re. Radnor Holdings Corp.

2.    E-Toys Inc. v. Goldman Sachs

3.    In re. Greater Southeast Community Hospital Corp.

4.    Trenwick America Litigation Trust v. Ernst & Young LLP

5.    In re Oakwood Homes Corporation, Debtor; JP Morgan Chase Bank, Appellant; U.S. Court of Appeals for the Third Circuit (449 F. 3d 588; 2006 U.S. App. Lexis 14183)

The purpose of this report is to provide my professional opinion as to the financial condition of Oakwood Homes Corporation as of various dates of value described below, and to consider the impact of certain financial activities of the company in view of its financial condition.

In particular, the issues on which opinions are rendered below include:

1.    The Enterprise Value (i.e., Asset Value) of Oakwood as of mid-2001, FYE September 2001 and FYE September 2002.

2.    The solvency of Oakwood Homes Corp. as of September 2001 and September 2002.

3.    The change in Asset Values and change in long term Liability Values for Oakwood between September 2001 and September 2002.

4.    The Equity Value in Oakwood Homes, valued as a call option on Enterprise Value, as of September 2001 and September 2002.

5.    The long term Debt and Guarantee values of Oakwood implied by the call option analysis as of September 2001 and September 2002.

6.    The change in Equity Value and Debt Value implied by the call option analysis between September 2001 and September 2002.

7.    The default probability and probability of a return to solvency for Oakwood implied by the call option analysis, as of September 2001 and September 2002.

8.    Changes in the probability of default by Oakwood and the probability of Oakwood's return to solvency between September 2001 and September 2002.

9.    The impact of continued securitization of loans, guarantee of loans and servicing of loans on Oakwood's solvency and default probability between September 2001 and September 2002.

10.    Damages suffered by Oakwood's Enterprise as a result of the foregoing issues.

My opinions in this matter include:

1.  The Enterprise Value of Oakwood Homes Corporation as of FYE 2001 (September 2001) was $350 Million, in rounded terms.

2.  The Enterprise Value of OHC as of September 2002 (FYE 2002) was $300 Million, in rounded terms.

3.  Oakwood Homes Corporation was insolvent as of September 2001 and remained insolvent as of September 2002. As of September 2001, the value of OHC's Assets was $120 Million less than the value of its Debt and Guarantees, and as of September 2002 the value of OHC's Assets was $210 Million less than the value of its Debt and Guarantees.

4.  OHC's Enterprise Value (Asset Value) fell by approximately $50 Million between September 2001 and September 2002, while its long term liabilities increased by approximately $40 Million.

5.  Not only was OHC insolvent as of September 2001 and September 2002, but the likelihood of a return to solvency within a reasonable time frame (e.g., the expected duration of OHC's debt) was remote.

6.  Economic theory predicts that in the presence of uncertainty as to future asset values, investors may be willing to pay for the equity of insolvent firms, since such equity represents a call option on future firm value. Despite its insolvency, analysis of OHC's Equity Value under such a Call option model yields an Equity Value as of September 2001 of $25.8 Million and an Equity Value of $1.2 Million as of September 2002.

7.  The implied long term Debt and Guarantee values resulting from the call option analysis are $324.2 Million as of September, 2001, and $298.8 Million as of September, 2002.

9

8.    The analysis of distressed and/or insolvent firm equity as a call option on Enterprise Value implies a reduction in Equity Value of $24.6 Million and a reduction of Debt and Guarantee Values of $25.4 Million between September 2001 and September 2002. Thus, both debt and equity suffered as a result of continued operations of Oakwood.

9.    Even utilizing the extremely aggressive cash flow projections of mid 2001 and late 2001, OHC was insolvent by September 2001 and faced a high and increasing probability of default. The likelihood of a return to solvency was remote by September 2001, and continued insolvency was virtually certain by September 2002.

10.    Continued securitization and guaranteed B-2 issuance beyond the middle of 2001 resulted in dissipation of OHC's Enterprise Value, i.e., reduction in the value of corporate assets, as well as an increase in liabilities.

This report is a summary of my opinions and may not include every aspect of my opinions. Charts and graphic aids embodying the information and "bullet points" in this report may be prepared for illustrative purposes.

The data and analyses supporting my opinions are contained in the sections of the report which follows.

## SUBJECT INDUSTRY

o    Manufactured housing is a significant subsector of the housing industry.  During the late 1990's
     and the early years of this century, manufactured housing accounted for approximately one-third
     of all housing starts in the U.S.  Most manufactured homes are rarely moved once situated, and
     nearly two-thirds are placed on private property, as opposed to MH communities.

o    Manufactured Housing is a cyclical industry.  Manufactured homes are factory built, transported
     to a site and installed.  Economies of scale and efficient factory construction result in lower
     prices than for stick built homes.

o    The industry experienced rapid growth in the mid-1990's as financial lenders tapped the asset-
     backed securities market to monetize consumer loans.  Entry of dozens of sub-prime lenders,
     attracted by interest margins of 300 bps or more, resulted in weakened credit standards, high loan
     to value ratios (up to 95%), and underpriced loans.  This led eventually to the same kind of
     default issues and financial distress currently affecting the sub prime mortgage market.

o    By 1999, manufacturing capacity and shipments outpaced consumer demand, repossessions
     increased substantially, collateral performance began to deteriorate, and some lenders began to
     exit the industry.  Sales dropped from 372,000 homes in 1998 to 193,000 in 2001.  Industry
     problems persisted for a number of years.

o    MH Industry Shipment Cycles:
     o    Shipments increased from 221,000 in 1980 to 295,000 in 1984
     o    Then shipments fell to 171,000 by 1991
     o    Shipments rose from 171,000 in 1991 to 372,000 in 1998
     o    Shipments then fell to 193,000 in 2001

11

o    Manufacturing Plants:
  o    1980-1991: number of plants fell to 25 from 300+
  o    1991-1999: plants increase to 175+
  o    1999-2001: plants fall to 100+

o    MH Industry Retail Inventory:
  o    1980-1984: inventory increases from 56,000to 82,000±
  o    1984-1990: inventory falls to 48,000±
  o    1990-1997: inventory increases to 88,000±
  o    1997-2001: inventory falls to 58,000±

o    Industry-wide Repos as % of Inventory:
  o    1999: 18.9%
  o    2000: 34.9%
  o    2001: 40.1%
  o    2002: 36.8%

o    Industry Downsizing, 1998/99 to late 2002:
  o    Champion:
       Shipments fall from 70,300 to 39,500
       Retail Centers decrease from 303 to 117
       Plants decrease from 68 to 39
  o    Clayton:
       Shipments fall from 28,300 to 20,400
       Retail Centers decrease from 318 to 287
       Plants rise from 18 to 20
  o    Fleetwood:
       Shipments fall from 66,200 to 30,400
       Retail Centers decrease from 243 to 137
       Plants fall from 38 to 27

    °        Oakwood:

                Shipments fall from 33,800 to 22,300

                Retail Centers decrease from 412 to 197

                Plants decrease from 32 to 19

                Unsold repossessed homes increase from 1,267 to 7,063

## SUBJECT COMPANY

o    Oakwood Homes was established in 1946 and headquartered in Greensboro, North Carolina.
     The Company was publicly held and one of the largest companies in the Mobile Home Industry,
     and one of the few fully integrated firms in the industry.  OHC operated three inter-related
     business divisions:

        a.    Manufacturing

        b.    Retail

        c.    Consumer Finance

o    Manufacturing Division produced manufactured and modular homes:
     o    Manufactured Homes:
          o    Single section: 14' and 16' wide, 40' to 80' long
          o    Multi section: 24', 28' and 32' wide, 2 – 4 floor, 40' – 80' wide
          o    Permanent residences, but can be transported to homesites
     o    Modular Homes:
          o    950 sq. ft. – 3,365 sq. ft., similar to site built homes, single-story – 2 story

o    OHC formerly operated 32 manufacturing plants in 12 states, primarily in the South and
     Midwest.  Subsequently reduced to 19.
     o    Average product costs were 70% materials, 15% direct labor and 15% overhead
     o    Homes built for company owned retail centers based on quantity and model assortment
          needs.  Homes built for independent dealers based on dealer orders and funding
          availability.

o    Retail Division:
     o    OHC had peak of 412 company owned sales centers in 1998/1999, subsequently reduced
          to 197 by 2002
     o    More than half of 2002 sales revenues came from company owned sales centers
     o    Gross margins on retail sales were substantially higher than wholesale sales, as sales
          through OHC owned centers earn manufacturing margin plus retail markup.  In 2002,

14

gross margins on retail sales reached 30%, while gross margins on wholesale sales were 17%, but wholesale sales were converted to cash 30-45 days faster than retail.

- Consumer Finance Division:
  - Oakwood Acceptance Corp (OAC) financed vast majority of retail sales, and in turn OAC securitized these loans in ABS market through Real Estate Mortgage Investment Conduits (REMICs). OAC generated income from servicing the manufactured home loans which it securitized
  - Until 2002, OHC also operated an insurance subsidiary which generated revenues from sales to homebuyers of physical damage insurance, credit life insurance and homebuyer protection contracts

- Securitization:
  - OAC funded loan originations (for approximately 75% of retail sales and 38% of whole sale sales) by aggregating loans quarterly and placing them into REMIC sold to investors as asset backed security
  - ABS sold in tranches, most of which were investment grade. Non-investment grade tranches ("B" pieces) were subordinate to investment grade tranches (mostly AAA rated). B pieces were generally retained by Oakwood and either included in future securitizations or sold whole. Retained REMIC interests were valued by OHC based on net credit loss, discount rate and prepayment assumptions.
  - As a credit enhancement, the company guaranteed payment of principal and interest on some B pieces sold to investors, recording a liability equal to the fair value of the guarantee. By FY 2002, the face amount of such guarantees reached $274 Million, with an estimated fair value of approximately $144 Million.
  - OAC retained the right to service all of its securitized loans in exchange for a servicing fee of approximately 1% of the principal balance of the serviced loans. The service fee was subordinate to all payments to REMIC bondholders.

○     Delinquency, Repossession & Assumption:

- ○ Lenders to mobile home purchasers are, in effect, sub-prime lenders. Mobile home buyers have tended to be lower income consumers who could not afford or qualify for mortgages to purchase "stick built" homes (at least until recently). MH loans had (since the mid 1990's) lower down payments (LTVs at 90% to 95%) and much higher interest rates (in the 9% to 18% range). As a result, MH loans had high and hard to predict default rates. These characteristics are similar to the recently imploding sub-prime mortgage/ABS market, with similar market results.

- ○ Repossession of homes from defaulting borrowers resulted in some payments of principal and interest made by OAC to the REMIC, refurbishing costs, sale of the home to a new buyer (often for less than the remaining loan balance, as mobile homes often depreciated in value), payoff of original loan balance to the REMIC trust, and inclusion of the new loan (often at 100% LTV) in a subsequent securitization.

- ○ Repos resulted in losses to the REMIC trust resulting from loss on resale, plus reimbursement to OAC of servicing advances and refurbishment. In addition:

  - ○ Inclusion of repos in future securitizations affected credit ratings
  - ○ Loan Purchase Facility contained limits on amount of repo loans
  - ○ OHC may need to revalue its residual pieces
  - ○ OHC guarantee payments may become more likely
  - ○ Repos compete with new units in marketplace

- ○ OAC's Loan Assumption Program (LAP) tried to minimize effects of repos, but used substantial amounts of capital, as some expenses (e.g. refurbishment) couldn't be charged to REMICs and had to be charged to earnings.

- ○ Industry wide lax underwriting standards for loans in late 1990's, matched by OAC, resulted in high and rising net losses from repos. Oakwood's repos reached 13,400± by FY 2002, compared to 5,475 in FY 1998. Net losses from repos as a percentage of average principal loan amounts reach 4.6% by FY 2002, compared to 1.96% in FY 2000. Such figures are reminiscent of recent sub-prime mortgage data.

16

○   Competition:

    ○   Retail market was competitive, with top five companies representing about 25% of the market by 2002.

    ○   Manufacturing was relatively concentrated, with the top ten manufacturers capturing about 79% of the market by 2002. Of the top ten, seven were public:

        Champion Enterprises

        Fleetwood Enterprises

        Oakwood Homes

        Clayton Homes

        Palm Harbor Homes

        Skyline Corp.

        Cavalier Homes

    In addition, Cavco Industries, which operated in the southwestern and western U.S., was a subsidiary of Centex Corp.

○   Financial History

    ○   The financial history of OHC between 1995 and 2002 is depicted on the accompanying schedule

    ○   Manufacturing, Wholesale and Retail revenues more than doubled between 1995 and 1999, to $1.5 Billion. Between 1999 and 2002, Wholesale revenues fell 11%, while Retail revenue fell 50%. EBIT Margins for Manufacturing & Retail fell from 7% - 8% in 1995 -1998 to 1% in 1999, and became negative from 2000 – 2002.

    ○   Consumer finance revenues peaked in 1997 at $91.7 Million, falling to $64.5 Million by 2002, a decrease of 30%. Financial Services EBIT peaked at $73.7 Million in 1997 and by 2002 fell to $21.4 Million. EBIT Margin fell from 78.5% in 1996 to 22.7% in 2002.

    ○   Total OHC EBIT peaked at $168.4 Million in 1998, and became negative for 2000 - 2002.

    ○   Total OHC EBITDA peaked at $192.5 Million in 1998, an 83% increase from 1995, and fell to $8.5 Million by 2002, a 95% drop from 1998. Total EBITDA Margin ranged between 12% and 16% for 1995 – 1998, falling to 0.8% by 2002.

    °        The foregoing deterioration in revenues and earnings, together with impending increases in recognized B2 guarantee liabilities and loss of cash, resulted in severe financial distress and a late 2002 Chapter 11 filing.

**Oakwood Homes**
*Historical Financial Data*

| | | | | | FYE September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
| **Manufacturing & Retail Revenue** | | | | | | | | |
| Wholesale | $ 196,900,000 | $ 158,900,000 | $ 94,300,000 | $ 264,400,000 | $ 459,600,000 | $ 420,900,000 | $ 351,800,000 | $ 410,700,000 |
| Retail | $ 544,600,000 | $ 703,200,000 | $ 858,400,000 | $ 1,140,500,000 | $ 1,037,000,000 | $ 769,000,000 | $ 653,600,000 | $ 516,800,000 |
| Other | $ 17,900,000 | $ 18,900,000 | $ 14,600,000 | $ 10,800,000 | $ 13,400,000 | $ 9,900,000 | $ 9,300,000 | $ 7,600,000 |
| Total Manufacturing Revenue | $ 759,400,000 | $ 881,000,000 | $ 967,300,000 | $ 1,415,200,000 | $ 1,509,900,000 | $ 1,199,800,000 | $ 1,014,400,000 | $ 934,100,000 |
| % Growth | | 16.1% | 9.7% | 46.3% | 6.7% | -20.5% | -15.5% | -7.9% |
| | | | | | | | | |
| **Manufacturing & Retail Expenses** | | | | | | | | |
| Cost of Sales | $ 543,300,000 | $ 609,200,000 | $ 651,400,000 | $ 923,400,000 | $ 1,081,700,000 | $ 927,500,000 | $ 764,600,000 | $ 708,800,000 |
| SG&A | $ 165,300,000 | $ 211,400,000 | $ 236,600,000 | $ 381,400,000 | $ 411,300,000 | $ 335,100,000 | $ 310,800,000 | $ 261,500,000 |
| Total Manufacturing & Retail EBIT | $ 50,800,000 | $ 60,500,000 | $ 79,300,000 | $ 100,400,000 | $ 16,900,000 | $ (62,800,000) | $ (61,000,000) | $ (36,200,000) |
| Manufacturing & Retail EBIT Margin | 6.7% | 6.9% | 8.2% | 7.1% | 1.1% | NM | NM | NM |
| | | | | | | | | |
| **Financial Services Revenue** | | | | | | | | |
| Consumer Finance | $ 59,400,000 | $ 88,100,000 | $ 91,700,000 | $ 87,100,000 | $ 61,600,000 | $ 49,600,000 | $ 80,100,000 | $ 64,500,000 |
| Insurance | $ 2,600,000 | $ 3,200,000 | $ 11,100,000 | $ 34,000,000 | $ 49,800,000 | $ 56,400,000 | $ 38,900,000 | $ 29,900,000 |
| Total Financial Services Revenue | $ 62,000,000 | $ 92,300,000 | $ 102,800,000 | $ 121,100,000 | $ 111,400,000 | $ 106,000,000 | $ 119,000,000 | $ 94,400,000 |
| % Growth | | 48.9% | 11.3% | 17.8% | -8.0% | -4.8% | 12.3% | NM |
| | | | | | | | | |
| **Financial Services Expenses** | | | | | | | | |
| Consumer Finance | $ 11,600,000 | $ 16,800,000 | $ 20,400,000 | $ 24,200,000 | $ 37,500,000 | $ 43,200,000 | $ 40,500,000 | $ 51,300,000 |
| Insurance | $ 1,200,000 | $ 2,000,000 | $ 9,700,000 | $ 27,600,000 | $ 38,300,000 | $ 32,300,000 | $ 16,500,000 | $ 13,500,000 |
| Provision for Losses on Credit Sales | $ 2,100,000 | $ 1,000,000 | | $ 1,800,000 | $ 3,300,000 | $ 3,000,000 | $ 8,400,000 | $ 3,200,000 |
| Total Financial Services EBIT | $ 47,100,000 | $ 72,500,000 | $ 73,700,000 | $ 68,000,000 | $ 32,100,000 | $ 27,500,000 | $ 54,600,000 | $ 26,400,000 |
| Financial Services EBIT Margin | 76.0% | 78.5% | 71.7% | 56.2% | 28.8% | 25.9% | 45.9% | 27.7% |
| | | | | | | | | |
| **Total EBIT** | $ 97,900,000 | $ 133,000,000 | $ 153,000,000 | $ 168,400,000 | $ 49,000,000 | $ (35,300,000) | $ (36,400,000) | $ (14,800,000) |
| Total EBIT Margin | 11.9% | 13.7% | 14.3% | 11.0% | 3.0% | -2.7% | -3.2% | -1.4% |
| Depreciation and Amortization | $ 7,100,000 | $ 9,800,000 | $ 13,500,000 | $ 24,100,000 | $ 44,300,000 | $ 48,400,000 | $ 46,200,000 | $ 23,300,000 |
| | | | | | | | | |
| **Total EBITDA** | $ 105,000,000 | $ 142,800,000 | $ 166,500,000 | $ 192,600,000 | $ 93,300,000 | $ 13,100,000 | $ 9,800,000 | $ 8,000,000 |
| Total EBITDA Margin | 12.8% | 14.6% | 15.6% | 12.5% | 5.8% | 1.0% | 0.9% | 0.9% |

19

## FIVE YEAR PLAN PROJECTIONS

o       The projections entitled "Oakwood Homes Five Year Plan" are based on projections developed
        in connection with the proposed Plan of Reorganization for OHC. The plan calls for volume and
        price growth consistent with difficult market conditions in the Manufactured Housing industry,
        and an effective exit from financial services.

o       Summary characteristics of the Five Year Plan include:
        o       Revenues increase from $631 Million to $829 Million annually
        o       Net income increases from $6.25 Million to $36.2 Million
        o       EBITDA rises from $43.4 Million to $82.4 Million
        o       The number of sales centers remains constant at 99
        o       Retail gross margin slowly increases from 21.1% to 22.1%
        o       Securitizations fall by varying amounts, falling to $49 Million and averaging less than
                $100 Million
        o       Cash flow from operations vary between a negative $54.2 Million projected for FYE
                2004 and $72 Million projected for FYE 2005, then declining thereafter
        o       Total projected cash flows increase from negligible amounts to $25.5 Million per year
        o       Annual capital expenditures increase from $8 Million to $16 Million

o       The annual cash flow whose present value generates asset value is Free Cash Flow. In this case,
        OHC's Free Cash Flow can be computed as follows:

        Free Cash Flow = EBITDA – Taxes – Capital Expenditures – Increases in Working Capital –
        Reserve for Uncollectible Receivables + Sale of Loans – Increase in Retained Interests – Loans
        Originated.

o       Projected annual Free Cash Flows increase to an interim amount of $69 Million and a stabilized
        amount (such that sale of loans offsets loans originated and increase in retained interests) in the
        amount of $58.8 Million per year by the end of the projection horizon.

o       The foregoing projections form the basis for analysis of the reasonably anticipated Enterprise
        Value of Oakwood Homes, and its solvency, as of September 2002.

**Oakwood Homes**
**5-Year Plan**
**Consolidated**

| Income Statement | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| Revenues | | | | | | |
| Net Sales | | | | | | |
| Retail | $ 313,032 | $ 249,307 | $ 286,631 | $ 306,945 | $ 328,741 | $ 355,665 |
| Wholesale | 318,677 | 328,068 | 363,752 | 383,237 | 403,776 | 425,478 |
| Net Sales | 631,709 | 577,375 | 650,383 | 690,182 | 732,517 | 781,143 |
| | | | | | | |
| Financial Services Income | | | | | | |
| Consumer Finance | (79,029) | 44,518 | 42,826 | 39,814 | 37,057 | 37,163 |
| Insurance | 7,279 | 4,240 | 3,912 | 3,670 | 3,486 | 3,328 |
| Financial Services Income | (71,750) | 49,759 | 46,738 | 43,484 | 40,543 | 40,491 |
| | | | | | | |
| Other Income | 12,094 | 5,131 | 5,894 | 6,294 | 6,723 | 7,254 |
| | | | | | | |
| Total Revenues | $ 572,053 | $ 631,265 | $ 703,015 | $ 739,960 | $ 779,782 | $ 828,889 |
| | | | | | | |
| | | | | | | |
| Operating Cost and Expesnes | | | | | | |
| Cost of Sales | 513,891 | 436,299 | 486,128 | 514,144 | 542,285 | 574,526 |
| Gross Profit Percent | 18.7% | 24.4% | 25.3% | 25.5% | 26.0% | 26.5% |
| | | | | | | |
| General & Administrative Expenses | 50,925 | 36,361 | 37,630 | 38,804 | 40,128 | 42,564 |
| as % of total revenues | 8.9% | 5.8% | 5.4% | 5.2% | 5.1% | 5.1% |
| Service Expenses (including warranty) | 35,627 | 26,293 | 29,657 | 31,444 | 33,344 | 35,525 |
| as % of total revenues | 6.2% | 4.2% | 4.2% | 4.2% | 4.3% | 4.3% |
| Selling Expense | 88,976 | 66,166 | 70,531 | 73,028 | 75,684 | 78,819 |
| as % of total revenues. | 15.6% | 10.5% | 10.0% | 9.9% | 9.7% | 9.5% |
| Consumer Finance Operating Expenses | 44,586 | 36,573 | 33,084 | 30,175 | 27,854 | 26,107 |
| Insurance Operating Expenses | 4,168 | 456 | 456 | 456 | 456 | 456 |
| Provisions for Losses on Credit Sales | 6,177 | 822 | 864 | 916 | 970 | 1,031 |
| Interest Expenses | 36,998 | 14,538 | 12,979 | 10,482 | 9,196 | 9,555 |
| Total Operating Cost and Expenses | $ 781,138 | $ 617,530 | $ 671,330 | $ 699,449 | $ 729,915 | $ 768,572 |

22

**Oakwood Homes**
**5-Year Plan**
*Consolidated*

| Income Statement | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Restructuring and Impairment Costs** | | | | | | |
| Restructuring Costs & Impairment Costs | 38,538 | 0 | 0 | 0 | 0 | 0 |
| Recapture of Servicing Liabilities | (87,790) | 0 | 0 | 0 | 0 | 0 |
| Impairment of REMIC Regular Interests | 1,209 | 0 | 0 | 0 | 0 | 0 |
| Impairment of Guarantee Liabilities | 235,776 | 0 | 0 | 0 | 0 | 0 |
| Professional Fees | 20,148 | 1,650 | 0 | 0 | 0 | 0 |
| **Total Restructuring and Impairment Costs** | $ 207,881 | $ 1,650 | $ 0 | $ 0 | $ 0 | $ 0 |
| | | | | | | |
| **Income Before Taxes** | $ (416,966) | $ 12,085 | $ 31,685 | $ 40,511 | $ 49,868 | $ 60,317 |
| | | | | | | |
| Provisions for Income Taxes | 0 | 5,826 | 12,674 | 16,204 | 19,947 | 24,127 |
| | | | | | | |
| **Net Income** | $ (416,966) | $ 6,258 | $ 19,011 | $ 24,307 | $ 29,921 | $ 36,190 |
| | | | | | | |
| EBITDA (2003 Reflects Normalized EBITDA) | 43,457 | 48,065 | 59,669 | 64,518 | 71,959 | 32,395 |

**Oakwood Homes**
5-Year Plan
Consolidated

| Consolidated Cash Flow | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Operating Activities** | | | | | | |
| Operations | | | | | | |
| Net Income/(Loss) | $ (416,966) | $ 6,253 | $ 19,011 | $ 24,307 | $ 29,921 | $ 36,190 |
| Depreciation and Ammortization | 29,879 | 9,250 | 8,677 | 9,028 | 9,442 | 9,920 |
| Non Cash Asset Impairment | 262,198 | 0 | 0 | 0 | 0 | 0 |
| (Gains)/Losses On Sale of Securities | 53,637 | 0 | 0 | 0 | 0 | 0 |
| (Increase)/Decrease in Retained Interests | (1,208) | (2,878) | (8,997) | (8,032) | (8,502) | (3,574) |
| Reserve for Uncollectable Receivables | 8,567 | (6,765) | (600) | (600) | (600) | (600) |
| Trade Accounts Receivable | 585 | (4,777) | (3,983) | (2,356) | (2,310) | (2,589) |
| Escrow Advances Receivable | 610 | (949) | (1,007) | (1,069) | (1,134) | (1,204) |
| Extensions Receivable | 12,447 | 3,746 | 3,522 | 2,944 | 2,919 | 2,313 |
| Income Taxes Receivable | 20,422 | 0 | 0 | 0 | 0 | 0 |
| Loans Servicing Assets | 7,397 | 8,664 | 4,159 | 2,369 | 1,385 | 1,619 |
| Other Receivables | 10,749 | 565 | 532 | 501 | 471 | 444 |
| Change in Inventory | 80,811 | 8,158 | (470) | 5,743 | (642) | (1,407) |
| Accounts Payable and Accrued Liabilities | 5,069 | (45,067) | 15,116 | 7,766 | 7,547 | 8,453 |
| Insurance Reserves and Unearned Premiums | (16,208) | 0 | 0 | 0 | 0 | 0 |
| Deferred Income Taxes | (378) | 465 | 787 | 442 | 465 | 509 |
| Other Assets | (31,985) | 0 | 0 | 0 | 0 | 0 |
| Other Lon-Term Obligations | (14,546) | (341) | (344) | (348) | (361) | (355) |
| Cash Provided by Operations | (10,226) | (23,699) | 36,213 | 43,313 | 38,302 | 49,720 |
| | | | | | | |
| Loans Originated | (319,464) | (68,533) | (72,037) | (76,293) | (80,809) | (85,893) |
| Principal Receipts on Loans/Sale of Loans | 22,506 | 0 | 0 | 0 | 0 | 0 |
| Sale of Loans | 328,411 | 38,032 | 107,883 | 75,443 | 103,399 | 49,205 |
| | | | | | | |
| **Cash Provided/(Used) by Operating Activities** | $ 21,227 | $ (54,200) | $ 72,059 | $ 42,463 | $ 60,891 | $ 13,032 |
| | | | | | | |
| **Investing Activities** | | | | | | |
| Acquisition of Properties & Facilities | 16,490 | (8,000) | (10,000) | (12,000) | (14,000) | (16,000) |
| Other | 0 | 0 | 0 | 0 | 0 | 0 |
| **Cash Provided/(Used) by Investing Activities** | $ 16,490 | $ (8,000) | $ (10,000) | $ (12,000) | $ (14,000) | $ (16,000) |

Oakwood Homes
5-Year Plan
*Consolidated*

| Consolidated Cash Flow | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Financing Activities** | | | | | | |
| Net Borrowings/(Repayments) on Short-Term Credit Facilities | (34,060) | 32,332 | (28,137) | 548 | 17,718 | 28,502 |
| Net Borrowings/(Repayments) on DIP | 1,990 | (2,191) | 0 | 0 | 0 | 0 |
| Net Borrowings/(Repayments) on Fresh Start Revolver | 0 | 27,059 | (33,920) | (5,937) | 0 | 0 |
| Payments on Notes and Bonds | (753) | 0 | 0 | 0 | 0 | 0 |
| Cash Provided/(Used) by Financing Activities | $ (32,823) $ | 57,200 $ | (62,057) $ | (5,389) $ | 17,718 $ | 28,502 |
| | | | | | | |
| **Cash and Cash Equivalents:** | | | | | | |
| Beginning of Period | 20,107 | 25,000 | 20,000 | 20,000 | 45,074 | 74,247 |
| Net Increase/(Decrease) in Cash and Cash Equivalents | 4,892 | (5,000) | 0 | 25,074 | 29,173 | 25,534 |
| Cash and Cash Equivalents at End of Period | $ 25,000 $ | 20,000 $ | 20,000 $ | 45,074 $ | 74,247 $ | 99,781 |

25

**Oakwood Homes**
**5-Year Plan**
*Consolidated*

| Consolidated Balance Sheet | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and Cash Equivalents | $ 25,000 | $ 20,000 | $ 20,000 | $ 45,074 | $ 74,247 | $ 99,781 |
| **Loans and Investments** | | | | | | |
| Loans Held for Sale | 49,051 | 79,552 | 43,706 | 44,555 | 21,966 | 58,654 |
| Retained Interests | 18,754 | 21,632 | 30,629 | 36,660 | 45,162 | 48,737 |
| Less: Reserve for Uncollectable Receivables | (11,956) | (5,191) | (4,591) | (3,991) | (3,391) | (2,791) |
| Loans and Investments | 55,849 | 95,993 | 69,744 | 77,224 | 63,737 | 104,600 |
| **Other Receivables** | | | | | | |
| Trade Accounts Receivable | 27,279 | 32,056 | 36,040 | 38,395 | 40,705 | 43,293 |
| Escrow Advances Receivable | 15,510 | 16,459 | 17,466 | 18,535 | 19,869 | 20,873 |
| Extensions Receivable | 32,985 | 29,237 | 25,916 | 22,971 | 20,361 | 18,049 |
| Other | 33,215 | 32,651 | 32,119 | 31,618 | 31,147 | 30,703 |
| Other Receivables | 108,989 | 110,403 | 111,541 | 111,519 | 111,882 | 112,917 |
| **Inventories** | | | | | | |
| Manufactured Homes - New & Used | 82,197 | 75,781 | 76,835 | 78,044 | 79,424 | 80,495 |
| Raw Materials and Supplies | 19,901 | 19,901 | 19,901 | 13,920 | 14,166 | 14,357 |
| Work-in-Process | 4,453 | 4,547 | 4,610 | 4,683 | 4,765 | 4,830 |
| Land/Homes Under Development | 10,577 | 8,741 | 8,094 | 7,051 | 5,984 | 6,065 |
| Inventories | 117,128 | 108,970 | 109,440 | 103,698 | 104,339 | 105,747 |
| Properties and Facilities, Net | 110,718 | 109,468 | 110,792 | 113,784 | 118,322 | 124,402 |
| Loan Servicing Assets | 23,595 | 21,586 | 17,416 | 14,429 | 13,044 | 11,424 |
| Other Assets | 79,109 | 79,450 | 79,794 | 80,142 | 80,493 | 80,848 |
| **Total Assets** | $ 520,378 | $ 545,871 | $ 518,727 | $ 545,850 | $ 566,065 | $ 639,719 |

**Oakwood Homes**
5-Year Plan
*Consolidated*

| Consolidated Balance Sheet | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| **Liabilities and Shareholder's Equity** | | | | | | |
| *Liabilities Not Subject To Compromise* | | | | | | |
| Short-Term Borrowing | | | | | | |
| CS First Boston Loan Purchase Facility | 14,940 | 47,271 | 19,134 | 19,682 | 1,963 | 30,465 |
| Revolver | 11,989 | 0 | 0 | 0 | 0 | 0 |
| Fresh Start Revolver | 0 | 39,857 | 5,937 | 0 | 0 | 0 |
| Short-Term Borrowings | 26,929 | 87,128 | 25,071 | 19,682 | 1,963 | 30,465 |
| | | | | | | |
| Accounts Payable and Accrued Liabilities | | | | | | |
| Accounts Payable | 30,719 | 37,138 | 45,946 | 48,725 | 51,358 | 54,322 |
| Servicing Liability | 0 | 0 | 0 | 0 | 0 | 0 |
| Accrued Warranty | 6,949 | 6,351 | 7,154 | 7,592 | 8,058 | 8,593 |
| Accrued Compensation | 8,377 | 5,808 | 6,210 | 6,506 | 6,720 | 6,991 |
| Other | 79,206 | 49,869 | 54,969 | 59,222 | 63,455 | 68,138 |
| Accounts Payable and Accrued Liabilities | 125,251 | 99,164 | 114,280 | 122,044 | 129,591 | 138,044 |
| | | | | | | |
| Insurance Reserves and Unearned Premiums | 66 | 66 | 66 | 66 | 66 | 66 |
| Deferred Income Taxes | 5,791 | 6,245 | 7,032 | 7,474 | 7,939 | 8,448 |
| | | | | | | |
| *Liabilities Subject To Compromise* | | | | | | |
| Notes and Bonds Payable | 308,434 | 7,112 | 7,112 | 7,112 | 7,112 | 7,112 |
| Accounts Payable and Accrued Liabilities | 66,276 | 0 | 0 | 0 | 0 | 0 |
| Other Long-Term Obligations | 381,879 | 0 | 0 | 0 | 0 | 0 |
| Shareholder's Equity | (394,248) | 0 | 0 | 0 | 0 | 0 |
| Fresh Start Shareholder's Equity | 0 | 346,156 | 365,166 | 389,473 | 419,394 | 455,584 |
| | | | | | | |
| **Total Liabilities and Shareholder's Equity** | $ 520,378 | $ 545,871 | $ 518,727 | $ 545,850 | $ 566,065 | $ 639,719 |

27

## Oakwood Homes
### Projected Free Cash Flows
*Five Year Plan*

| | Forecast FY 2003 | Forecast FY 2004 | Forecast FY 2005 | Forecast FY 2006 | Forecast FY 2007 | Forecast FY 2008 |
|---|---|---|---|---|---|---|
| EBIT | $ 43,457 | $ 38,815 | $ 50,992 | $ 55,490 | $ 62,617 | $ 72,475 |
| Depreciation & Ammortization | 9,500 | 9,250 | 8,577 | 9,028 | 9,442 | 9,920 |
| Taxes | 13,582 | 15,526 | 20,397 | 22,196 | 25,097 | 28,990 |
| Capital Expenditures | 6,000 | 8,000 | 10,000 | 12,000 | 14,000 | 16,000 |
| Working Capital | 100,867 | 120,209 | 106,701 | 93,173 | 86,630 | 80,620 |
| Accounts Recievable | 108,989 | 110,403 | 111,541 | 111,519 | 111,882 | 112,817 |
| Inventory | 117,128 | 108,970 | 109,440 | 103,698 | 104,339 | 105,747 |
| Accounts Payable | 125,251 | 99,164 | 114,280 | 122,044 | 129,591 | 138,044 |
| Δ Working Capital | 15,032 | 19,343 | (13,508) | (13,528) | (6,543) | (6,010) |
| Reserve for Uncollectible Recievables | (5,567) | 6,765 | 600 | 600 | 600 | 600 |
| Sale of Loans | 328,411 | 38,032 | 107,883 | 79,443 | 103,398 | 49,205 |
| Increase in Retained Interests | 1,208 | 2,878 | 8,997 | 6,032 | 8,502 | 3,574 |
| Loans Originated | 319,464 | 68,533 | 72,037 | 76,293 | 80,809 | 85,893 |
| Free Cash Flows | $ 32,650 | $ (34,948) | $ 69,029 | $ 36,368 | $ 52,982 | $ 2,553 |
| | | | | | | |
| Stabilized Free Cash Flows | | | | | $ | 58,615 |

## LATE 2001 PROJECTIONS

○    These late 2001 projections are among the most aggressive projections during the 2001 time period. The income and expense projections assume a recovery in the Manufactured Housing industry, substantial growth in OHC manufacturing and retail revenues, as well as financial servicing revenues which return to pre-crash levels.

○    Summary Characteristics of these projections include:

    ○    Revenues increase from $956 Million in FYE 2002 to $1.515 billion by FYE 2007, representing a stabilized growth rate of approximately 9% by the end of the projection horizon

    ○    Gross margins increase from 30.9% in FYE 2003 to 34.1% in FYE 2007

    ○    EBITDA rises from $61.9 Million in FYE 2002 to $134.3 Million by FYE 2007

    ○    EBITDA Margins gradually rise to a level of 8.9% by FYE 2007

    ○    Free Cash Flow Before Debt Service is projected to range between negative $23.8 Million in FYE 2004 and $66.5 Million in FYE 2006. Stabilized Free Cash Flow reaches a level of $82.7 Million by FYE 2007.

**Oakwood Homes**
*Late 2001 Financial Projections*

| Pro Forma Financial Projections - OAC | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Total Manufacturing Revenues | $ 928,600,000 | $ 983,600,000 | $ 1,055,700,000 | $ 1,152,300,000 | $ 1,257,700,000 | $ 1,372,900,000 |
| Total Servicing Revenue | 65,200,000 | 97,800,000 | 106,900,000 | 114,400,000 | 123,100,000 | 132,700,000 |
| Other Revenue | 45,100,000 | 7,400,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 |
| **Total Revenue** | $ 1,038,900,000 | $ 1,088,800,000 | $ 1,172,200,000 | $ 1,276,300,000 | $ 1,390,400,000 | $ 1,515,200,000 |
| % Growth | | 4.7% | 7.7% | 8.9% | 8.9% | 9.0% |
| **Gross Profit** | $ 309,400,000 | $ 336,800,000 | $ 369,000,000 | $ 413,400,000 | $ 462,800,000 | $ 517,400,000 |
| Gross Margin (% of Total Sales) | 30.0% | 30.9% | 31.5% | 32.4% | 33.3% | 34.1% |
| **EBITDA** | $ 61,800,000 | $ 19,300,000 | $ 35,700,000 | $ 64,800,000 | $ 97,400,000 | $ 134,300,000 |
| EBITDA Margin (% of Total Sales) | 6.0% | 1.8% | 3.0% | 5.1% | 7.0% | 8.9% |
| **Cash Flow:** | | | | | | |
| EBITDA | $ 61,800,000 | $ 19,300,000 | $ 35,700,000 | $ 64,800,000 | $ 97,400,000 | $ 134,300,000 |
| Less: Change in Working Capital & Other | (8,100,000) | 600,000 | (39,800,000) | (32,700,000) | (33,600,000) | (34,600,000) |
| Less: Change in Loans/Investments | (32,800,000) | 5,400,000 | (15,200,000) | (15,500,000) | 8,500,000 | (43,700,000) |
| Less: Change in Warehouse Facility | 48,900,000 | 18,600,000 | 9,500,000 | 9,500,000 | 10,400,000 | 11,400,000 |
| Less: Cash Capex | (16,500,000) | (13,000,000) | (14,000,000) | (16,000,000) | (16,000,000) | (17,000,000) |
| **Free Cash Flow Before Debt Service** | $ 51,300,000 | $ 30,900,000 | $ (23,800,000) | $ 10,900,000 | $ 66,500,000 | $ 50,400,000 |
| Stabilized Cash Flows | | | | | | $ 42,700,000 |

30

## MID 2001 PROJECTIONS

○   The mid 2001 projections summarize data and projections contained in an "Oakwood Homes Discussion Materials" CSFB document dated March 2002 and containing aggressive projections and analyses as of July, 2001.  As was the case with the other 2001 projections described in this report, the analyses appear to assume a substantial industry recovery and growing revenues which include financial service revenues.

○   Summary Characteristics of these projections include:
   ○   Revenues increase from $1.15 Billion in FYE 2001 to $1.64 Billion in FYE 2005
   ○   EBITDA increases from $21.9 Million to $131.6 Million.  The implied EBITDA Margin is projected to reach 8%.
   ○   Annual EBIT was projected to increase consistently from a negative $34.7 Million for FY 2001 to $70.6 Million for FY 2005
   ○   After tax income was projected to rise to an annual level of $43.1 Million by FYE 2005
   ○   Cash Flow from Operations increases from $21.9 Million in FYE 2001 to $104.1 in FYE 2005
   ○   Free Cash Flow (unlevered) is projected to increase from a negative $45.5 Million in FYE 2001 to $90.8 Million in FYE 2005
   ○   Stabilized Free Cash Flow as of the end of the projection horizon was projected to be $90.8 Million per year.

31

Oakwood Homes
Pro Forma Financial Projections
Mid 2001

| | | Projected FYE September 31, | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| Revenue | $ 1,146,100,000 | $ 1,482,400,000 | $ 1,543,600,000 | $ 1,588,900,000 | $ 1,644,000,000 |
| EBITDA | $ 21,900,000 | $ 68,700,000 | $ 85,300,000 | $ 109,000,000 | $ 131,800,000 |
| EBIT | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 47,100,000 | $ 70,600,000 |
| Goodwill and Intangible Asset Ammortization | $ — | $ — | $ — | $ — | — |
| Pre-Tax Income | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 47,100,000 | $ 70,600,000 |
| Less: Income Taxes @    39% | $ — | $ — | $ — | $ 8,500,000 | $ 27,500,000 |
| After Tax Operating Income | $ (34,700,000) | $ 13,700,000 | $ 28,400,000 | $ 38,600,000 | $ 43,100,000 |
| Plus: Depreciation & Ammortization | $ 56,600,000 | $ 55,000,000 | $ 56,900,000 | $ 59,900,000 | $ 61,000,000 |
| Operating Cash Flow | $ 21,900,000 | $ 68,700,000 | $ 85,300,000 | $ 98,500,000 | $ 104,100,000 |
| Plus: (Increase)/Decrease in Working Capital and Loan Trading | $ (54,400,000) | $ (77,000,000) | $ — | $ — | — |
| Less: Capital Expenditures | $ 13,000,000 | $ 12,000,000 | $ 12,400,000 | $ 12,900,000 | $ 13,300,000 |
| Unlevered Free Cash Flow | $ (45,500,000) | $ (20,300,000) | $ 72,900,000 | $ 85,600,000 | $ 90,800,000 |

32

## WEIGHTED AVERAGE COST OF CAPITAL

o    The discount rate applicable to free cash flow to the firm is the Weighted Average Cost of Capital, which is the weighted average of the required return to equity and the cost of debt.

  o    The formula for the Weighted Average Cost of Capital is as follows:

   $$WACC = R_{Equity} [E/C] + (1-T)[D/C]R_{Debt}$$

   where:

   | | | |
   |---|---|---|
   | WACC | = | Weighted Average Cost of Capital |
   | $R_E$ | = | Cost of Equity Capital |
   | $R_{Equity}$ | = | $R_f + \beta_L[R_m - R_f]$, per Capital Asset Pricing Model |
   | $R_f$ | = | Risk Free Return |
   | $R_m$ | = | Overall Market Return |
   | $R_m - R_f$ | = | Market Risk Premium |
   | $\beta_L$ | = | Subject Company Leveraged Beta Value |
   | | = | <u>Covariance, Stock Price & Market Index</u><br>Variance of Market Returns |
   | T | = | Average Tax Rate |
   | E/C | = | Equity to Total Capitalization |
   | D/C | = | Debt to Total Capitalization |
   | $R_{Debt}$ | = | Cost of Debt Capital (interest rate) |

o    The required rate of return to equity is the discount rate attributable to free cash flows to equity (i.e., after debt service), and is estimated utilizing the Capital Asset Pricing Model.

o    The Capital Asset Pricing Model, stripped of most of its underlying mathematical and statistical framework, states that investors in organized markets tend to price capital assets and securities so

33

that the expected return on such assets or securities is equal to the return on a riskless security, plus a premium for the risk which is relevant to the subject asset or business. In turn, this "risk premium" is proportional to the asset's price volatility relative to that of an "average" stock or security.

o    The basic mathematical framework of the CAPM is:

$R_i = R_F + B_i [E(R_m) - R_F]$

where:

$R_i$    =    expected rate of return on security i, which is equal to the capitalization rate relevant to income from security i;

$R_F$    =    rate of return (interest rate) on a risk-less security, usually U.S. Treasury securities;

$E(R_M)$ =    expected rate of return on a portfolio consisting of <u>all</u> stocks; it is also the rate of return on an "average" stock; thus

$E(R_M)-R_F$ =    the <u>market risk premium</u>, or the "price of risk," for an average stock; it is the additional return over the riskless rate required to compensate investors for assuming an "average" amount of risk;

$B_i$    =    the relative volatility of the shares of firm or industry i; known as the "<u>beta coefficient</u>," it measures the sensitivity of the return on security i relative to general market movements. For the average security or asset, B = 1. The greater the risk, or volatility of return, the greater is B. Thus:

$Bi[E(R_M)- R_F]$ =    the <u>risk premium on the subject security</u>, which is less than, equal to, or greater than the premium on an average security, depending on whether its beta value is less than, equal to, or greater than one.

34

○　　Leveraged beta values for Oakwood can be estimated by determining the "asset beta" (i.e., unleveraged beta) typical for the subject industry, and then releveraging to account for the specific debt to capital and equity to capital ratios applicable to the subject company, using the following formula:

$$\beta_L \quad = \quad \beta_U [\ 1 + (1\text{-}T)(D/E)]$$

Where:

$\beta_L \quad = \quad$ levered beta

$\beta_U \quad = \quad$ unlevered beta

○　　In determining the appropriate beta values for calculating the required return to equity applicable to Oakwood Homes Corp., financial data with respect to the following competitor companies was reviewed:

>　Clayton Homes
>　Champion Enterprises
>　Palm Harbor Homes
>　Nobility Homes
>　Skyline Corp.
>　Cavalier Homes
>　Coachmen Industries
>　Southern Energy Homes
>　Liberty Homes
>　Fleetwood Enterprises

In addition, Ibbotson Associates data for companies in SIC Code 2451 was reviewed.

○　　Analysis of the applicable Equity Risk Premium was based on published studies and Ibbotson Associates data. These studies imply an Equity Risk Premium as of the dates of value of this report in a range of 4% to 7%. Based on the economic conditions then applicable as well as most recent Ibbotson studies, the Equity Risk Premium was estimated to be 6%.

○    The required return to equity for OHC would also be subject to adjustments for size and specific risk. The market capitalization for OHC places it in the small firm, probably tenth decile, category. Similarly a low market to book value ratio and high industry risk imply a specific risk premium.

○    Our analyses resulted in the following valuation parameters for use in the CAPM as applied to Oakwood:

| | | |
|---|---|---|
| $\beta_U$ | = | 0.93 |
| $\beta_L$ | = | 1.07 |
| Debt/Capital | = | 10% |
| Equity/Capital | = | 90% |
| Size Premium | = | 2.9% - 3.5% |
| Specific Risk Premium | = | 3% - 5% |
| $R_F$ | = | 5.5% |

○    The resulting range of values for $R_E$ is 18% to 20%

○    Assuming a cost of debt in the range of 10% to 12% results in a range of applicable values for WACC between 16.8% and 18.6%, with most values approximately 18%.

36

## FAMA-FRENCH MODEL

o     The Fama-French Three Factor Model incorporates information with respect to a company's size and financial risk in addition to the market factor used in the CAPM. Small companies and financially distressed companies (as measured by higher book-to-market ratios) demonstrate more risk, which implies a higher cost of equity.

o     The formula for the Fama-French Model is:

$$E(R_i)-R_f = \beta_m RP_m + \beta_s RP_s + \beta_v RP_v$$

Where:

| | | |
|---|---|---|
| $E(R_i)$ | = | expected return on security i; |
| $R_f$ | = | rate on risk-free asset; |
| $\beta_m$ | = | market coefficient in the Fama-French regression; |
| $RP_m$ | = | expected market risk premium; |
| $\beta_s$ | = | small-minus-big (SMB) coefficient in the Fama-French regression; |
| $RP_s$ | = | the expected SMB risk premium, estimated as the difference between the historical average annual returns on the small-capitalization and large-capitalization portfolios; |
| $B_v$ | = | high-minus-low (HML) coefficient in the Fama-French regressions; and |
| $RP_v$ | = | the expected HML risk premium, estimated as the difference between the historical average annual returns on the high book-to-market stocks and the low book-to-market stocks. |

o     Ibbotson Associates reports that the Fama-French analysis of the Cost of Equity Capital for SIC Code 2451, the Mobile Home Industry, with data inclusive of Oakwood Homes, is in a range of 20.58% to 21.55%

o     The Weighted Average Cost of Capital results derived from the Fama-French Model were in the range of 19.76% to 20.54%

## OHC SEPTEMBER 2002 DCF VALUATION

o    The Enterprise Value (i.e., Asset Value) of OHC as of September 2002 can be estimated by application of the discount rate analysis and terminal value analysis to the Free Cash Flows derived from the Five Year Plan projections.

o    The present value of the Free Cash Flows, utilizing a discount rate range of 16% to 20%, is in an overall range of $82.5 Million to $92.75 Million (rounded). The primary range is $82.5 Million to $87.5 Million.

o    The Continuing Value of the OHC Cash Flows (i.e., present value of OHC Terminal Value) can be obtained by application of a capitalization rate given by the Gordon Model:

     Cap Rate = 1/(Discount Rate – Growth Rate)
     Or by application of a multiple equal to 5 x Final Year EBITDA.

o    Application of the foregoing Terminal Value Analyses yields an overall value range for OHC's continuing value of between $133.1 Million and $242 Million, with a primary range of $133.1 Million to $168.3 Million.

o    The resulting Enterprise Value range is $215 Million to $270 Million. The estimated value is $245 Million.

o    In addition to the above, the Income & Expense projections for the Five Year Plan imply that there are some excess assets on the OHC balance sheet as of September 2002, primarily consisting of excess inventory. The maximum likely value of these excess assets was in a range of $50 Million to $60 Million.

o    The Enterprise Value derived for Oakwood as of September 2002 was $300 Million. Oakwood's debt plus guarantee obligations totaled approximately $510 Million:

38

| | | |
|---|---|---|
| Short Term Borrowings: | $59.0 | |
| Notes & Bonds Payable: | 309.2 | |
| B-2 Guarantees: | 144.0 | |
| Total: | $512.2 | Million |
| Rounded: | $510.0 | Million |

o    Oakwood was substantially insolvent as of September, 2002, as its Enterprise Value (Asset Value) was $210 Million less than the value of its Debt and B-2 Guarantees.

**Oakwood Homes**
*Value Analysis Summary*
*Five Year Plan*

**Free Cash Flows**

| Discount Rate | 16% | 18% | 20% |
|---|---|---|---|
| Present Value | $ 92,758 | $ 87,447 | $ 82,572 |

**Terminal Value #1**   $ 441,975   (5 x Yr. 2008 EBITDA)

| Discount Rate | 16% | 18% | 20% |
|---|---|---|---|
| Present Value | $ 169,092 | $ 152,509 | $ 137,970 |

**Terminal Value #2**

| Discount Rate | 16% | 16% | 18% | 18% | 20% | 20% |
|---|---|---|---|---|---|---|
| Growth Rate | 4% | 5% | 4% | 5% | 4% | 5% |
| Terminal Value | $ 530,119 | $ 589,487 | $ 464,388 | $ 498,796 | $ 397,569 | $ 432,290 |
| Present Value | $ 217,583 | $ 241,950 | $ 168,320 | $ 184,770 | $ 133,152 | $ 144,773 |

**Enterprise Value Range**

| Discount Rate | 16% | 16% | 18% | 18% | 18% | 18% | 20% | 20% | 20% |
|---|---|---|---|---|---|---|---|---|---|
| Growth Rate | TV #1 | 4% | 5% | TV #1 | 4% | 5% | TV #1 | 4% | 5% |
| Range | $ 261,850 | $ 310,341 | $ 334,708 | $ 240,055 | $ 255,766 | $ 272,216 | $ 220,542 | $ 215,724 | $ 227,345 |

40

## OHC SEPTEMBER 2001 DCF VALUATION

o     The Enterprise Value of OHC as of September 2001 can be estimated by application of the discount rates derived above to the 2001 Free Cash Flows developed in the mid 2001 and late 2001 projections.

o     Application of the discount rates, stabilized growth rates and EBITDA multiples described above to the <u>late 2001</u> projected Free Cash Flows results in a primary Enterprise Value range of $280 Million to $353 Million.

o     Application of the discount rates, stabilized growth rates and EBITDA multiples to <u>mid-2001</u> Projected Free Cash Flows results in an Enterprise Value range between $305 Million and $373 Million.

o     Most of the Enterprise Value analyses cluster around $350 Million.  Therefore, the implied Enterprise Value for Oakwood as of September 2001 was $350 Million.

o     Oakwood's debt plus guarantee obligations as of September 2001 totaled approximately $470 Million:

|  |  |  |
|---|---|---|
| Short Term Borrowings: | $47.5 | |
| Notes & Bonds Payable: | 323.1 | |
| B-2 Guarantees: | 100.0 | |
| Total: | $470.6 | Million |
| Rounded: | $470.0 | Million |

o     Oakwood was substantially insolvent as of September, 2001, as its Enterprise Value (Asset Value) was $120 Million less than the value of its Debt and B-2 Guarantees.

41

## Oakwood Homes
### Value Analysis Summary
*Late 2001 Financial Projections*

**Free Cash Flows**

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| Discount Rate | | 16% | | 18% | | 20% |
| Present Vlaue | $ | 110,307,997 | $ | 104,540,672 | $ | 99,295,460 |

**Terminal Value #1**

| | | | | | | |
|---|---|---|---|---|---|---|
| EBITDA '07 Multiple | $ | 671,500,000 | | | | |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Value | $ | 275,611,974 | $ | 248,744,779 | $ | 224,883,991 |

**Terminal Value #2**

| | | | | | | |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 4% | | | | |
| 2008 Stabilized Free Cash Flow | $ | 86,008,000 | | | | |
| Cap Rates | | 12% | | 14% | | 16% |
| Capitalized Values | $ | 716,733,333 | $ | 614,342,857 | $ | 537,550,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 294,177,646 | $ | 227,571,970 | $ | 180,024,407 |

**Terminal Value #3**

| | | | | | | |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 5% | | | | |
| 2008 Stabilized Free Cash Flow | $ | 86,835,000 | | | | |
| Cap Rates | | 11% | | 13% | | 15% |
| Capitalized Values | $ | 789,409,091 | $ | 667,961,538 | $ | 578,900,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 324,006,847 | $ | 247,434,021 | $ | 193,872,439 |

**Enterprise Value Range**

| At Discount Rate | 16% | 18% | 20% |
|---|---|---|---|
| PV of FCF + PV of Terminal Value #1 | $385,919,971 | $353,285,450 | $324,179,452 |
| PV of FCF + PV of Terminal Value #2 | $404,485,642 | $332,112,642 | $279,319,868 |
| PV of FCF + PV of Terminal Value #3 | $434,314,844 | $351,974,692 | $293,167,899 |

# Oakwood Homes
## Value Analysis Summary
### Financial Projections
### Mid 2001

**Free Cash Flows**

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| Discount Rate | | 16% | | 18% | | 20% |
| Present Value | $ | 82,900,779 | $ | 75,071,769 | $ | 67,944,959 |

**Terminal Value #1**

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| EBITDA '05 Multiple | $ | 656,000,000 | | | | |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Value | $ | 313,282,364 | $ | 287,617,864 | $ | 264,435,442 |

**Terminal Value #2**

| | | 12% | | 14% | | 16% |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 4% | | | | |
| 2006 Stabilized Free Cash Flow | $ | 94,432,000 | | | | |
| Cap Rates | | 12% | | 14% | | 16% |
| Capitalized Values | $ | 786,933,333 | $ | 674,514,286 | $ | 590,200,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 374,669,202 | $ | 294,836,411 | $ | 237,188,143 |

**Terminal Value #3**

| | | 12% | | 14% | | 16% |
|---|---|---|---|---|---|---|
| Assumed Growth Rate | | 5% | | | | |
| 2006 Stabilized Free Cash Flow | $ | 95,340,000 | | | | |
| Cap Rates | | 12% | | 14% | | 16% |
| Capitalized Values | $ | 794,500,000 | $ | 681,000,000 | $ | 595,875,000 |
| Discount Rate | | 16% | | 18% | | 20% |
| Present Values | $ | 378,271,791 | $ | 297,671,376 | $ | 239,488,798 |

**Enterprise Value Range**

| | | 16% | | 18% | | 20% |
|---|---|---|---|---|---|---|
| At Discount Rate | | 16% | | 18% | | 20% |
| PV of FCF + PV of Terminal Value #1 | $ | 396,183,143 | $ | 362,689,633 | $ | 332,380,401 |
| PV of FCF + PV of Terminal Value #2 | $ | 457,569,982 | $ | 369,908,180 | $ | 305,133,102 |
| PV of FCF + PV of Terminal Value #3 | $ | 461,172,570 | $ | 372,743,145 | $ | 307,413,757 |

43

## DCF CONCLUSIONS

o    Oakwood Homes Corp was insolvent by September 2001, and more so by September 2002.

o    Oakwood's Enterprise Value fell between September 2001 and September 2002, while the amount of its Debt plus B-2 Guarantees increased.

o    By FYE 2001 it was clear that business conditions and Free Cash Flows were not likely to improve sufficiently to allow OHC's Enterprise Value to reach or exceed the value of its Debt plus Guarantees within a reasonable time frame.

o    By September 2001, the likelihood of OHC's insolvency being reversed was remote, and by September 2002 OHC's continued insolvency was a virtual certainty.

o    Continued securitization and guaranteed B-2 issuance resulted in dissipation of OHC's Enterprise Value, i.e. reduction in the value of corporate assets.

## EQUITY AS A CALL OPTION

○    Equity in a highly leveraged distressed firm, and a firm which is insolvent or operating in the zone of insolvency, can be viewed as an out-of-the-money call option on the Enterprise Value of the firm.

○    Equity in such firms may have value, even if the firm is insolvent, because of the time premium on the call option (i.e., the time to maturity of the firm's debt) and the possibility that asset values may increase to levels above the face value of the debt before the maturity date of the debt, in view of the variance of asset value.

○    The analysis of equity value in an insolvent or distressed firm as a call option on future firm value has meaning only for limited liability equity investors whose potential losses are limited to the acquisition price of the equity, and whose potential gains, if any, are a function of the extent to which future asset values may exceed debt values. Such an equity investor can potentially benefit from large "upside" variance in value while avoiding most of the "downside" variance. Option theory is not directly applicable to decision makers for the firm as a whole, because they face not only upside variance but significant downside risk as well, far beyond the limited risk faced by the hypothetical equity investor.

○    Given the above description of equity value as a call option on firm value, the key variables in such an analysis are:
1.    Underlying asset value
2.    Variance of asset value
3.    Strike price on the option
4.    Time to expiration
5.    Interest rates

## BLACK-SCHOLES MODEL

○   The most frequently used valuation model for valuing call options is the Black-Scholes Model, which estimates the value of an option using a relatively small number of input variables.

○   In the Black Scholes Model the value of Equity in an insolvent firm, viewed as a call option on the firm value, is a function of the following variables:

| | | |
|---|---|---|
| S | = | Current value of the underlying asset |
| | = | Enterprise value of the firm |
| K | = | Strike price of the option |
| | = | Face value of the firm's debt |
| t | = | Life to expiration of the option |
| | = | Weighted average duration of the debt |
| r | = | Risk-free interest rate corresponding to life of the option |
| | = | U.S. Treasury Bond rates corresponding to duration of firm's debt |
| $\sigma^2$ | = | Variance in ln (value) of underlying asset |
| | = | Variance of Enterprise Value of firm |

○   The value of a call option (i.e., the value of equity in an insolvent firm) is given by:

Equity Value = $SN(d_1) - Ke^{-rt}N(d_2)$

Where:

$$d_1 = \frac{\ln(S/K) + (r + (\sigma^2/2))t}{\sigma\sqrt{t}}$$

$$d_2 = d_1 - \sigma\sqrt{t}$$

and:

$e^{-rt}$   =   present value factor reflecting the delay until the debt becomes due

$N(d_1)$ and $N(d_2)$ are cumulative normal probabilities based on the values of $d_1$ and $d_2$

○   In the Black-Scholes Model, increases in Enterprise Value, the variability (i.e., variance) of Enterprise Value, duration of firm debt and interest rates will tend to increase Equity Values, while increases in the Face Value of firm debt will tend to decrease equity values.

46

o      The analyses developed above can be used to derive inputs in the Black-Scholes Model for valuation of the Equity Value of Oakwood Homes Corp. as a distressed firm.

## VALUATION OF OAKWOOD HOMES EQUITY AS CALL OPTION

o       The inputs for valuation of OHC Equity as of September 2001 and September 2002 utilizing the Black-Scholes Model are:

Enterprise Value:

9/01 : $350 Million

9/02 : $300 Million

Face Value of Debt & Guarantees:

9/01 : $470 Million

9/02 : $510 Million

Weighted Average Debt Duration:

9/01 : 5.42 years

9/02 : 4.42 years

Standard Deviation in Enterprise Value (per Damodaran data set):

9/01 : 40.85%

9/02 : 45.19%

Risk Free Interest Rate:

9/01 : 4.6%

9/02 : 3.6%

o       The resulting model output is:

   o       September 2001:

$d_1$      =              -0.077782711

$N(d_1)$ =              0.46900045

$d_2$      =              -0.311463049

48

$$N(d_2) \quad = \quad 0.377724315$$

| | | |
|---|---|---|
| Equity value | = | $25,795,270 |
| Value of Outstanding Debt + Guarantees | = | $324,204,730 |
| Rounded to: | | |
| Equity | = | $25.8 Million |
| Debt + Guarantees | = | $324.2 Million |

- ○ September 2002:

$$d_1 \quad = \quad -1.654982583$$
$$N(d_1) \quad = \quad 0.048964015$$
$$d_2 \quad = \quad -1.866007463$$
$$N(d_2) \quad = \quad 0.031020161$$

| | | |
|---|---|---|
| Equity value | = | $1,196,180 |
| Value of Outstanding Debt + Guarantees | = | $298,803,820 |
| Rounded to: | | |
| Equity | = | $1.2 Million |
| Debt + Guarantees | = | $298.8 Million |

- ○ Implication: Despite its insolvency as of September 2001, OHC's equity had some significant value as a call option on future firm value, but this value was almost completely dissipated by September 2002.

- ○ In the Black-Scholes Model, $N(d_2)$ can be interpreted as the probability that S > K before the firm's debt comes due, so that:

$$1 - N(d_2) = \text{default probability}$$

49

○   For OHC, the foregoing inputs imply an increase in default probability form 9/01 to 9/02:

Default Probability at 9/01:  62.3%
Default Probability as 9/02:  96.9%
Increase in Default Probability:  34.6%

Correspondingly:
Probability of Return to Solvency at 9/01:  37.7%
Probability of Return to Solvency at 9/02:  3.1%
Reduction in Likelihood of Return to Solvency:  34.6%

○   In addition, the Black-Scholes Model implies:

Reduction in Equity Valued as Call Option:  $24.6 Million
Reduction in Value of Debt & Guarantees:  $25.4 Million

○   This analysis indicates that by September 2001 OHC was insolvent and faced a high and increasing probability of default.  Further, the likelihood of a return to solvency was remote by September 2001, and continued insolvency was virtually certain by September 2002.  These conclusions follow from the analysis even using the extremely aggressive cash flow projections of mid 2001 and late 2001.  It follows that more realistic cash flow projections as of mid to late 2001 would have resulted in the conclusion that OHC was even more insolvent, and that the likelihood of a return to solvency was even more remote, than depicted above.

○   Analysis of Equity Value, Debt Value and Default Probabilities for OHC supports conclusion that OHC was "a bad business getting worse."

## CONCLUSIONS

o     Oakwood Homes was quite insolvent by September, 2001, and given the extent of its insolvency, was certainly insolvent for a number of months before then.

o     By September, 2001, and for several months before, it was apparent that the likelihood of OHC recovering from its insolvency as a result of improving asset values was slim.

o     By September, 2002, the extent of OHC's insolvency had increased substantially and the prospects of a recovery to a solvent condition had become even more remote.

o     Continued operation of OHC's business model, involving securitization of loans and guaranteeing certain tranches of the securities, had the following impacts on OHC's asset values, debt and guarantee values and solvency between September 2001 and September 2002:
  - Enterprise value fell from $350 Million to $300 Million
  - Face value of debt plus present value of guarantee payments increased from $470 Million to $510 Million
  - The extent of OHC's insolvency rose from a negative equity of $120 Million to a negative equity of $210 Million

o     In turn, from the perspective of valuing OHC's equity as a call option on firm value, continued operation of OHC's business model resulted in the following:
  - Equity value decreased from $25.8 Million to $1.2 Million
  - Debt value decreased from $324.2 Million to $298.8 Million
  - OHC's probability of default increased from 62.3% to 96.9%

o     Oakwood Homes suffered damages as a result of continued operation of its business model in an amount of at least $50 Million. In addition, OHC paid fees related to the continuation of a business model which was destroying value. Such fees added to the damage suffered by OHC, and we are informed that the fees in question are in excess of $20 Million.

51

This Expert Report sets forth a summary of my opinions in this matter, and does not constitute every detail of my expected expert testimony, or every fact supporting my opinions. Moreover, I may form additional opinions based on additional information which may become available after the date of this report. I therefore reserve the right to supplement and/or amend this report in response to such new information

Respectfully,

FLAVELL, TENNENBAUM & EDWARDS

Michael Tennenbaum, Ph.D.

ADDENDUM

# MICHAEL TENNENBAUM, PH.D.
## PROFESSIONAL QUALIFICATIONS

## PROFESSIONAL EXPERIENCE

1971 To Date            Consulting Economist

Responsibilities: Economic and financial analyses and feasibility studies; going business, reorganization value, and real property valuations; market research studies; merger, acquisition, corporate reorganization and venture capital analyses; income loss studies; rendering of expert testimony.

## TEACHING EXPERIENCE

1969 To 1986            Professor, Department of Economics
                        California State University, Long Beach

Responsibilities: Taught courses in Managerial Economics, Urban Economics, Financial Analysis, Capital Theory and Investment Analysis, Monetary Theory, Antitrust Economics.

## RECENT REPRESENTATIVE ASSIGNMENTS

Valuation of department store assets of major publicly-held department store chain for bankruptcy reorganization

Valuation of large privately-held real estate company stock and assets in appraisal proceeding

Analyses of reorganization values, feasibility of plans of reorganization, and values of securities issued in connection with major bankruptcy reorganizations (e.g., DEP Corporation, House of Fabrics, Inc., Sun World, Inc., Carter Hawley Hale Stores, Inc., Ritter Ranch, Maguire Partners – Fifth & Grand Ltd., Wilshire Center Marketplace, Hechinger Company, Olympic Pipe Line Co.)

Statistical analysis of economic impacts of proximity to airport operations and toxic waste facilities on property values

Valuation of shareholders' equity in large, privately held theme restaurant company

Valuation and Financial Analysis of chain of home improvement stores

Valuation of going business concerns for merger, acquisition and divestiture

Major hotel, department store and office building feasibility studies and appraisals

Economic analysis of major network television program profitability

Economic feasibility analysis of developing luxury boxes at major sports stadium

Valuations of airport industrial properties, office buildings, hotels, condominium and apartment projects, shopping centers, marinas and cement plants

Valuation of losses in patent infringement cases

# MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS PAGE 2

## QUALIFIED EXPERT WITNESS

Superior Courts in the California Counties of Los Angeles, Orange, San Bernardino, San Diego, Riverside, Santa Barbara, Santa Clara and Ventura; in Wayne and Oakland Counties in Michigan; King County, Washington.

Federal Bankruptcy Courts in Los Angeles, San Diego, Santa Ana and San Bernardino, California; Las Vegas, Nevada; Salt Lake City, Utah; and Seattle, Washington

Federal District Courts in Los Angeles and San Diego, California.

Federal Tax Court in Los Angeles, California

Chancery Court in Wilmington, Delaware

## REPRESENTATIVE CLIENTS/REFERENCES

### Law Firms - Southern California Area

Andrews & Kurth
Bergman & Wedner, Inc.
Blecher & Collins
Breidenbach, Swainston & Way
Buchalter, Nemer, Fields & Younger
Cox, Castle & Nicholson
Fulbright & Jaworski
Gibson, Dunn & Crutcher
Greenberg, Glusker, Fields,
    Claman & Machtinger
Hennigan, Mercer & Bennett
Hughes, Hubbard & Reed
Irell & Manella
Jeffer, Mangels, Butler & Marmaro
Jones, Day, Reavis & Pogue
Katten, Muchin & Zavis
Kirkland & Ellis
Klee, Tuchin, Bogdanoff & Stern
Levene, Neale, Bender & Rankin
Lewis, D'Amato, Brisbois & Bisgaard

Loeb and Loeb
Manatt, Phelps & Phillips
McDermott, Will & Emery
Meserve, Mumper & Hughes
Morrison & Foerster
Munger, Tolles & Olson
Musick, Peeler & Garrett
O'Melveny & Myers
Pachulski, Stang, Ziehl & Young
Paul, Hastings, Janofsky & Walker
Pillsbury, Madison & Sutro
Richards, Watson & Gershon
Rosenfeld, Meyer & Susman
Schell & Delamer
Sheppard, Mullin, Richter & Hampton
Sidley, Austin, Brown & Wood
Skadden, Arps, Slate, Meagher & Flom
Stutman, Treister & Glatt
Weissmann, Wolff, Bergman, Coleman &
    Silverman

MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS
PAGE 3

### Law Firms - Other Locations

| | |
|---|---|
| Ackerman & Ackerman | Detroit, Michigan |
| Ashby & Geddes | Wilmington, Delaware |
| Bucknell, Stehlik, Sato & Stubner | Seattle, Washington |
| Culp, Guterson & Grader | Seattle, Washington |
| Danielson, Harrigan & Tollefson | Seattle, Washington |
| Dykema, Gossett, Spencer, Goodnow & Trigg | Detroit, Michigan |
| Foster, Pepper & Shefelman | Seattle, Washington |
| Greve, Clifford, Diepenbrock & Paras | Sacramento, California |
| Heller, Ehrman, White & McAuliffe | San Francisco, California |
| Hopkins, Sutter, Hamel & Park | Washington, DC |
| Murphy, Weir & Butler | San Francisco, California |
| Shulkin & Hutton | Seattle, Washington |
| Wilkie, Farr & Gallagher | New York, New York |
| Williams, Kastner & Gibbs | Seattle, Washington |

### Corporations

| | |
|---|---|
| Aetna Insurance | Equitable Insurance |
| Aldrich, Eastman & Waltch | Falcon Communications, Inc. |
| Alper Development Corporation | Federal Wholesale Toy Company |
| Ameron, Inc. | Forest City Properties, Inc. |
| The Arba Group | Goldman Sachs International |
| Arden Realty | Goldrich & Kest |
| Bank of America | Gordon Group Holdings |
| Beverly Hills Oil Company | Great Western Savings & Loan |
| Beverly Hills Transfer & Storage | Hilton Hotel Company |
| Blackstone Real Estate | House of Fabrics, Inc. |
| Bloomberg Financial | IML Trucking Company |
| British Petroleum/Shell Oil Company | The Irvine Company |
| Budget Rent a Car of | Johnson Controls, Inc. |
|  Southern California | Knudsen Foremost Dairies |
| C & R Clothiers, Inc. | L'Ermitage Hotel Group |
| C.R. Bard, Inc. | LaSalle Paper Company |
| California Commerce Club | Leonard Green Partners |
| CalMat Corporation | Lerner Shops of California, Inc. |
| Carter Hawley Hale, Inc. | Lockheed Corporation |
| Century Laminators, Inc. | Maguire Partners |
| Chevys Inc. | MAXXAM, Inc. |
| Communicom Corporation | The May Department Stores Company |
| Community Bank | MCA/Universal |
| Computer Communications, Inc. | McDonald's Corporation |
| Continental Development Corp. | Mistele Oil & Gas Company |
| Davis Walker Corporation | Modernfold, Inc. |
| DEP Corporation | Monolith Portland Cement Company |
| Dolco Packaging Corporation | National Australia Bank |
| Dollar Rent a Car | National Drum & Barrel Company |
| Edison Brothers Stores, Inc. | NBI, Inc. |
| Emulex Corporation | Newfield Enterprises, Inc. |

MICHAEL TENNENBAUM, PH.D., PROFESSIONAL QUALIFICATIONS
PAGE 4

**Corporations - continued**

Oaktree Capital Management
Olympic Pipe Line Co.
Orient Express Hotels Co.
Paramount Ranch Company
Perceptronics, Inc.
Preferred Financial Corp.
Pritzker Realty Group
Ritz-Carlton Hotel Company
Simon Property Group

Shapell Industries
Southwest Savings & Loan
Sun World, Inc.
Thrifty Oil Company
Toys-R-Us
Twentieth Century-Fox Film Corp.
Union Oil Company
W.R. Grace & Company
Watt Industries

**Government Agencies**

U.S. Department of Justice
U.S. Department of Energy
California Attorney General's Office
California Department of Transportation
Los Angeles County Counsel's Office
Sacramento County Counsel
Port of Seattle
Los Angeles Unified School District

Santa Clara County Counsel
Southern California Rapid Transit District
City of Torrance
City of Long Beach
Burbank-Glendale-Pasadena Airport Authority
Los Angeles Coliseum Commission

## EDUCATION

1973    University of California, Los Angeles
        Ph.D., Economics
        Fields of Concentration Included:  Urban and Real Estate Economics; Monetary Analysis &
        Financial Markets; Microeconomic Theory; Capital Theory and Investment Analysis; Public
        Finance; Mathematical Economics
1967    M.A., Economics
1966    B.A., with honors, Economics and Mathematics

## PROFESSIONAL AFFILIATIONS

American Economic Association
American Finance Association
Western Economic Association

Omicron Delta Epsilon, National Honor Society
National Association of Business Economists

# **Exhibit E**

# In The Matter Of:

*OAKWOOD HOMES CORPORATION, et al./OHC LIQUIDATION TRUST v.*
*CREDIT SUISSE, et al.*

---

## MICHAEL TENNENBAUM, Ph.D.
*October 22, 2007*

---

# MERRILL LEGAL SOLUTIONS
## 25 West 45th Street - Suite 900
## New York, NY 10036
PH: 212-557-7400 / FAX: 212-692-9171

**TENNENBAUM, MICHAEL - Vol. 1**

MICHAEL TENNENBAUM, Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Oakwood Homes Corporation, et al.,) | | No. 02-13396 (PJW) |
| Debtors, | ) | |
| OHC Liquidation Trust, | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| Credit Suisse (f/k/a Credit Suisse) | | Adversary |
| First Boston, a Swiss banking | ) | Proceedings |
| corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a | ) | No. 04-57060 (PJW) |
| Credit Suisse First Boston LLC), | ) | |
| Credit Suisse Holdings (USA), | ) | Volume I |
| Inc. (f/k/a Credit Suisse First | ) | Pages 1-80 |
| Boston, Inc.), and Credit Suisse | ) | |
| (U.S.A.), Inc.,), the subsidiaries) | | |
| and affiliates of each, and DOES | ) | |
| 1 through 100, | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF:

MICHAEL TENNENBAUM, Ph.D.

MONDAY, OCTOBER 22, 2007

LOS ANGELES, CALIFORNIA

Reported by:

Felipe F. Carrillo

RPR, CSR No. 9555

MICHAEL TENNENBAUM, Ph.D.

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | DEPOSITION OF MICHAEL TENNENBAUM, Ph.D., THE |
| 2 | WITNESS, TAKEN ON BEHALF OF THE DEFENDANT, AT 1901 |
| 3 | AVENUE OF THE STARS, SUITE 1200, LOS ANGELES, |
| 4 | CALIFORNIA, ON MONDAY, OCTOBER 22, 2007, AT 9:44 A.M., |
| 5 | BEFORE FELIPE CARRILLO, CSR #9555, RPR. |
| 6 | |
| 7 | APPEARANCES: |
| 8 | FOR PLAINTIFF: |
| 9 | LAW OFFICES OF STUTMAN, TREISTER & GLATT |
| 10 | BY: TONY CASTANARES, ATTORNEY AT LAW |
| 11 | 1901 Avenue of the Stars |
| 12 | Suite 1200 |
| 13 | Los Angeles, California 90067-6013 |
| 14 | (310) 228-5755 |
| 15 | |
| 16 | FOR DEFENDANT: |
| 17 | LINKLATERS LLP |
| 18 | BY: R. PAUL WICKES, ATTORNEY AT LAW |
| 19 | 1345 Avenue of the Americas |
| 20 | New York, New York 10105 |
| 21 | (212) 903-9000 |
| 22 | |
| 23 | ALSO PRESENT: |
| 24 | Whitman Holt |
| 25 | Inga Kornev, Videographer |

|  | Page 3 |
|---|---|
| 1 | INDEX |
| 2 | |
| 3 | WITNESS        EXAMINATION        PAGE |
| 4 | MICHAEL TENNENBAUM, Ph.D. |
| 5 | (BY MR. WICKES)        5 |
| 6 | |
| 7 | EXHIBITS MARKED FOR IDENTIFICATION: |
| 8 | NO.      PAGE      DESCRIPTION |
| 9 | EXHIBIT 601    5      STACK OF DOCUMENTS |
| 10 | |
| 11 | EXHIBITS REFERRED TO PREVIOUSLY MARKED: |
| 12 | (NONE) |
| 13 | |
| 14 | INFORMATION REQUESTED: |
| 15 | (NONE) |
| 16 | |
| 17 | QUESTIONS INSTRUCTED NOT TO ANSWER: |
| 18 | (NONE) |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 22, 2007 |
| 2 | 9:44 A.M. |
| 3 | -oOo- |
| 4 | |
| 5 | THE VIDEOGRAPHER: Here begins Volume I, |
| 6 | videotape No. 1 in the deposition of Dr. Michael |
| 7 | Tennenbaum, in the matter of OHC Liquidation Trust |
| 8 | versus Credit Suisse, et al., in the United States |
| 9 | Bankruptcy Court in the District of Delaware. The case |
| 10 | number is 02-13396. |
| 11 | Today's date is October 22, 2007. The time |
| 12 | on the video monitor is 9:45. The video operator today |
| 13 | is Inga Kornev, contracted by Merrill Legal Solutions, |
| 14 | at 25 West 45th Street, New York, New York. |
| 15 | This video deposition is taking place at |
| 16 | Stutman, Treister & Glatt, located at 1901 Avenue of the |
| 17 | Stars, Los Angeles, California, and was noticed by |
| 18 | R. Paul Wickes of Linklaters. |
| 19 | Counsel, please voice identify yourselves |
| 20 | and state whom you represent. |
| 21 | MR. WICKES: Paul Wickes of Linklaters for |
| 22 | Credit Suisse. |
| 23 | MR. CASTANARES: Tony Castanares, Stutman, |
| 24 | Treister & Glatt for plaintiff. |
| 25 | THE VIDEOGRAPHER: Thank you. The court |

|  | Page 5 |
|---|---|
| 1 | reporter today is Felipe Carrillo of Merrill Legal |
| 2 | Solutions. |
| 3 | Will the reporter please swear in the |
| 4 | witness. |
| 5 | |
| 6 | MICHAEL TENNENBAUM, Ph.D., |
| 7 | having been first duly sworn, |
| 8 | was examined and testified as follows: |
| 9 | |
| 10 | THE VIDEOGRAPHER: Please begin. |
| 11 | MR. WICKES: Thank you. |
| 12 | |
| 13 | EXAMINATION |
| 14 | BY MR. WICKES: |
| 15 | Q. All right. Good morning, Doctor. I take it from |
| 16 | materials included with your report that you are |
| 17 | experienced at the deposition process; is that right? |
| 18 | A. I think so. |
| 19 | Q. So you know the rules, and we don't need to go |
| 20 | through them this morning? |
| 21 | A. I think that's correct. |
| 22 | (THE STACK OF DOCUMENTS WERE |
| 23 | COLLECTIVELY MARKED DEFENDANT'S |
| 24 | EXHIBIT 601 FOR IDENTIFICATION.) |
| 25 | BY MR. WICKES: |

MICHAEL TENNENBAUM, Ph.D.

3 (Pages 6 to 9)

| Page 6 | Page 8 |
|---|---|
| 1    Q. All right. I have put in front of you what's<br>2  marked as Exhibit 601, which is your report.<br>3       Well, let me ask you, is that a copy of your<br>4  report in this matter?<br>5    A. Yes.<br>6    Q. And that Exhibit 601 has as its first page a<br>7  cover letter from you to Stutman Treister; is that<br>8  right?<br>9    A. Yes.<br>10   Q. And what's the date on the cover letter?<br>11   A. April 27, 2007.<br>12   Q. I don't see in the body of the report anywhere a<br>13  date. Would I conclude properly that this report was<br>14  concluded at or about April 27th, 2007?<br>15   A. Yes.<br>16   Q. All right. At the end of that report is -- the<br>17  last few pages starting at page 54, is a document that<br>18  lays forth your professional qualifications.<br>19      Did you prepare that and attach it to your<br>20  report?<br>21   A. I did. I can't remember exactly when this<br>22  particular document statement of professional<br>23  qualifications was prepared, but it was before the<br>24  report was prepared.<br>25   Q. All right. | 1  with respect to a company involved in the manufactured<br>2  housing business?<br>3    A. Not that I recall.<br>4    Q. Okay. So you don't bring to the work you've done<br>5  here any particular knowledge or expertise in that<br>6  business; is that correct?<br>7    A. That's correct.<br>8    Q. Okay. When were you first contacted about the<br>9  possibility that you might serve as an expert witness in<br>10  this matter?<br>11   A. It would have been early 2005.<br>12   Q. And by whom were you first contacted?<br>13   A. My recollection is that I got a phone call from<br>14  Pam King (phonetic).<br>15   Q. Okay. Who was that?<br>16   A. She's an attorney working with the Stutman firm.<br>17   Q. Okay. And did you -- did you work with Ms. King<br>18  before?<br>19   A. Yes.<br>20   Q. Okay. On how many occasions?<br>21   A. One.<br>22   Q. Okay. What was that matter?<br>23   A. That was the Heckinger matter, also bankruptcy<br>24  matter.<br>25   Q. Also a bankruptcy matter in the District of |

| Page 7 | Page 9 |
|---|---|
| 1    A. It's in the files in the office.<br>2    Q. So this is just a standard form of your CV that<br>3  was attached to the report when it was prepared?<br>4    A. That's correct.<br>5    Q. It indicates that you've been -- you were a<br>6  professor of economics at Cal State Long Beach from 1969<br>7  to 1986, and that from 1971 to date, you've been a<br>8  consulting economist; is that right?<br>9    A. Yes.<br>10   Q. And in 1971 to date, have you been with the firm<br>11  of Flavell, Tennenbaum & Edwards?<br>12   A. I've been with Flavell, Tennenbaum & Edwards<br>13  since 1975 or -6.<br>14   Q. Okay.<br>15   A. Preceding that -- preceding the partnership with<br>16  Mr. Flavell, I had an independent consulting practice.<br>17   Q. Okay. Have you ever had full-time employment<br>18  other than as a professor at Cal State Long Beach or --<br>19  as a consulting economist?<br>20   A. No.<br>21   Q. Okay. The document begins on page 54, includes<br>22  some examples of previous engagements that you've worked<br>23  on, and so on.<br>24      Have you ever, prior to your engagement on<br>25  the Oakwood matter, served as a consulting economist | 1  Delaware; is that right?<br>2    A. Yes.<br>3    Q. Aside from Ms. King, had you, other than the<br>4  Heckinger matter, ever worked with the Stutman Treister<br>5  firm before?<br>6    A. Yes.<br>7    Q. On how many occasions?<br>8    A. Going back over 30 some odd years, probably eight<br>9  to ten.<br>10   Q. And are you presently working on any engagements<br>11  with the Stutman firm other than the Oakwood matter?<br>12   A. No.<br>13   Q. Have you worked before on a matter with<br>14  Mr. Castanares?<br>15   A. Yes.<br>16   Q. What was that?<br>17   A. Well, Heckinger --<br>18   Q. Right.<br>19   A. -- being the most recent one, I've worked with<br>20  Mr. Castanares on a matter involving a development<br>21  project here in Los Angeles on Wilshire Boulevard, going<br>22  back to the early to mid 1980s, and worked on a matter<br>23  involving a project in Calgary. I guess that was late<br>24  '80s.<br>25   Q. Okay. What did Ms. King tell you about the |

MICHAEL TENNENBAUM, Ph.D.

4 (Pages 10 to 13)

Page 10

1  Oakwood matter when she first contacted you?
2    A. She said that they were -- she was involved in
3  a -- in some litigation involving Oakwood Homes, and
4  that these -- there would likely be issues involving
5  valuation of Oakwood Homes and determination of the
6  solvency of Oakwood Homes, and that they had an enormous
7  raft of documents that they already had and were in the
8  process of getting additional documents, so there will
9  be a lot of documents to review.
10   Q. Okay. Did she -- have you -- have you been
11  involved in any matters concerning Oakwood Homes other
12  than the litigation against Credit Suisse?
13   A. Well, I'm not sure what the answer to that is. I
14  did provide consultation with a firm in New York on --
15  with respect to some matters involving Oakwood which did
16  not lead to any expert testimony, and I can't remember
17  the name of the firm. The lawyer I spoke with was a
18  fellow named Halpren.
19   Q. What was it you did for or with Mr. Halpren?
20   A. Provided him with some consultation with respect
21  to methodology, valuation methodology, and analyses of
22  what would go into looking at present values of
23  anticipated future cash flows under various assumptions.
24  It was largely hypothetical, and that was the only
25  meeting that I had with him.

Page 11

1    Q. Was that meeting in the nature of an exploration
2  about the possibility of employing you to work on
3  Oakwood?
4    A. No. It was -- I was already -- I was already
5  working on Oakwood for the firm here. And I was asked
6  to attend a meeting in New York with respect to some
7  other issues that involved Oakwood, which I did not get
8  involved in. But they wanted to have some idea as to
9  valuation methodologies and how I was going about
10  things. So I attended that meeting at Ms. King's
11  request.
12   Q. When was that meeting?
13   A. I think it was mid to late 2005.
14   Q. Did Ms. King attend the meeting?
15   A. By telephone.
16   Q. And who else attended the meeting?
17   A. There were a couple of lawyers from Mr. Halpren's
18  firm, whose names I do not recall, but it was at
19  Mr. Halpren's offices.
20   Q. And when you say they were interested in matters
21  involving discounted cash flows, were those discounted
22  cash flows of Oakwood?
23   A. Yes.
24   Q. And were they also interested in the question of
25  solvency involving Oakwood?

Page 12

1    A. I believe so, although, we didn't speak about
2  that in any detail, to the best of my recollection. It
3  was primarily focused on methodological aspects of doing
4  a discounted cash flow analysis.
5    Q. Were there anyone -- any nonlawyers in that
6  conversation?
7    A. Just me.
8    Q. Okay. Did they give you any information at that
9  meeting?
10   A. Not that I recall. I received no documents that
11  I recall either.
12   Q. Did you share with them any of the documents that
13  you had received in connection with your Oakwood
14  engagement?
15   A. No.
16   Q. Did you share with them any information that you
17  had received in connection with your Oakwood engagement?
18   A. No.
19   Q. All right. Back to when you first spoke to
20  Ms. King.
21       What did she tell you about the nature of
22  the disputes between the Liquidation Trust and Credit
23  Suisse?
24   A. I don't recall specifically her telling me
25  anything about the nature of the disputes, other than

Page 13

1  that one of the issues that would likely come up in the
2  litigation would be one that I -- they would want me to
3  provide consultation with respect to and prospectively
4  expert testimony with respect to, and that would be the
5  issue of solvency of Oakwood and, correspondingly, the
6  issue of the present value of the cash flows in prospect
7  for Oakwood.
8    Q. And you understood, didn't you, from that first
9  conversation with Ms. King that her client would want
10  you to conclude that, at whatever time was turned out to
11  be relevant, that Oakwood was insolvent?
12   A. Absolutely not. I did not have any understanding
13  from Ms. King in that regard at all and would have
14  rejected any insinuation like that.
15   Q. So in your first conversation with Ms. King, you
16  had no idea whether it would be her -- in her client's
17  interest for Oakwood to be determined solvent or
18  insolvent. Is that your testimony?
19   A. That's correct.
20   Q. When did you first come to have an understanding
21  about that?
22   A. As my analysis proceeded, and I generated
23  calculations internally leading to a determination of
24  what the cash flows and discounted cash flow valuation
25  looked like, the framework of the litigation was --

MICHAEL TENNENBAUM, Ph.D.

5 (Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 became evident to me, both from documents and from
2 conversations with counsel.
3 And, you know, I still don't claim to have
4 any lawyer's expertise as to what might benefit or what
5 might not benefit the Stutman firm's clients, but I do
6 have an analysis of solvency.
7 Q. All right. Your resume indicates, Doctor, that
8 you have a lot of experience in bankruptcy matters; is
9 that correct?
10 A. I think so.
11 Q. Okay. When Ms. King first talked to you, did she
12 tell you her client was the OHC Liquidation Trust?
13 A. I don't recall.
14 Q. When did you first learn that the client was the
15 OHC Liquidation Trust?
16 A. I'm not sure when I first learned it. It may
17 have been in that first conversation, but certainly
18 after looking at the -- at the complaint that was
19 forwarded to me shortly after my conversation with
20 Ms. King, I learned who the client was.
21 Q. Okay. And when you say that saw that complaint
22 shortly after your first conversation with Ms. King, you
23 recognized that, among other things, the complaint
24 sought to recover what are alleged to be preferences and
25 fraudulent conveyances; is that right?

**Page 15**

1 A. That's my recollection, yes.
2 Q. For somebody with your experience in bankruptcy,
3 is it difficult to put those two things together and
4 conclude what the OHC Liquidation Trust needed was an
5 opinion that the company was insolvent?
6 A. I don't know what the OHC needed. I knew what I
7 could provide. What I could provide was an analysis.
8 Whether that analysis turns out to be useful or not to
9 the client is not something that I get involved in.
10 Q. Okay. Is it your testimony this morning that you
11 performed your valuation exercise without any
12 understanding of whether OHC Liquidation Trust wanted a
13 conclusion to be that the company was solvent or
14 insolvent?
15 A. It's my testimony that I perform my analysis
16 without taking it into account at all whether the
17 Liquidation Trust wanted an opinion as to the company
18 being solvent or insolvent. It had no affect on my
19 analysis whatsoever.
20 Q. But you understand, Doctor, that's the answer to
21 a different question than the one I asked.
22 The question I asked was not whether it had
23 an affect on your work or your opinion. The question I
24 asked was whether you understood at the time you were
25 doing your work that it was in the interest of the OHC

**Page 16**

1 Liquidation Trust for your conclusion to be that the
2 company was insolvent?
3 A. Probably.
4 Q. It's not a subtle point, is it?
5 A. Well, I think it is a subtle point. I want to
6 make sure that nobody gets the impression that my
7 analysis was influenced by the desire of the client,
8 because it wasn't.
9 Q. What I meant by not a subtle point was that it's
10 not a subtle point that the plaintiff in an action
11 seeking to recover preferences in fraudulent conveyances
12 needs to have evidence that at the relevant times that
13 the company was insolvent?
14 A. I don't believe that's a subtle point, no.
15 Q. Okay. Are you the sole author of this report?
16 A. Yes.
17 Q. Did you receive assistance --
18 A. Yes.
19 Q. -- in preparing the report?
20 From whom?
21 A. I didn't receive assistance in preparing the
22 report. I did receive assistance in the work.
23 Q. And who did you receive assistance from and tell
24 me what they did?
25 A. Staff members at my firm. Tom Yoshioka worked on

**Page 17**

1 organizing documents, summarizing documents, determining
2 dates of various cash flows. Jason Tennenbaum, who is
3 my son, worked on cash flows and obtaining documents
4 with respect to determination of appropriate discount
5 rates, calculations. But primarily the time spent and
6 the work product is mine.
7 Q. Who was it you said assisted by summarizing
8 documents?
9 A. Tom Yoshioka.
10 Q. Okay. You know, Doctor, there's been some
11 dispute in this matter about what of your files and work
12 papers has bee turned over to the other side in this
13 litigation. You are familiar with that?
14 A. I just saw some documents from your firm with
15 respect to that, yes.
16 Q. Do you know whether the summaries prepared by
17 Mr. Yoshokowa (sic) were included in the materials stack
18 that have been provided to us?
19 A. Yoshioka.
20 Q. Yoshioka. Sorry.
21 A. Yes, to the best of my knowledge, they have been.
22 Well, they were sent here. So I imagine they were
23 turned over to you.
24 Q. All right. How are you paid for your work on
25 this engagement?

MICHAEL TENNENBAUM, Ph.D.

6  (Pages 18 to 21)

Page 18

1    A. Hourly.
2    Q. What are your total billings so far?
3    A. Total billings of fees plus expenses add up to
4    almost $405,000, of which about 390 some odd thousand
5    are fees, and I think it's about $12,000 that are
6    expenses.
7    Q. Have you been paid to date?
8    A. Yes.
9    Q. Okay. What's your hourly rate?
10   A. $395. Actually, currently it's 425, but it was
11   395 on this assignment.
12   Q. How many of your hours are involved in the
13   billings that have been made so far?
14   A. Almost all of the billings represent my hours,
15   the vast majority. I would -- I would say probably no
16   more than $20,000 of the fees are -- represent hours of
17   people in the firm other than me.
18   Q. Do you know roughly how many of your hours are
19   involved in those bills?
20   A. If you take roughly 370,000 and divide by 395,
21   you get a ballpark estimate. Whatever that is.
22   Q. What would that be about, 1,000 hours?
23   A. Well, something less than 1,000.
24   Q. Okay. So, for example, did you yourself look at
25   most of the documents that you were provided with

Page 19

1    respect to this matter?
2    A. I myself looked at all the documents that I was
3    provided with.
4    Q. Okay. And how were you provided documents?
5    A. I was provided -- the documents came from the
6    Stutman firm.
7    Q. Okay. So in terms of sorting out from the entire
8    universe of Oakwood documents to do what you looked at,
9    that sort was done by lawyers at the Stutman firm and
10   not by you; is that right?
11   A. I'm not sure I understand the question.
12   Q. Did you ever come here to Stutman's office to
13   look at the Oakwood documents?
14   A. Yes.
15   Q. And were you given access to all of the documents
16   that Stutman had or some subset?
17   A. I would have no way of knowing what the answer to
18   that question is.
19   Q. So then the answer to my question is, what you
20   know of the documents you received is you received
21   documents that Stutman decided to give you?
22   A. That's correct.
23   Q. Okay.
24   A. There were some additional documents that I got
25   from Mr. Muir, but those turned out to be the same or

Page 20

1    included amongst the documents that subsequently also
2    came from the Stutman firm.
3    Q. Okay. And how did Mr. Muir come to be giving you
4    documents?
5    A. I had a meeting with him in North Carolina in --
6    over several days in 2006.
7    Q. Who besides Stutman lawyers and Mr. Muir have you
8    met with in connection with your work in this matter?
9    A. Well, Mr. Halpren.
10   Q. Well, I thought that was with respect to some
11   different matter?
12   A. It was the same issues, so I -- I don't know
13   whether ...
14   Q. Okay.
15   A. I don't know whether they were separate, a
16   separate matter or something related to this matter. I
17   never got a determination as to what the relationship
18   was.
19   Q. All right.
20   A. So other than the Stutman firm lawyers and
21   Mr. Muir, that's it.
22   Q. You never met Mr. Standish?
23   A. No.
24   Q. What about Mr. Shapiro, Dr. Shapiro?
25   A. Yes, I did speak with Dr. Shapiro. I apologize

Page 21

1    for forgetting that.
2    Q. And you said you spent several days in North
3    Carolina with Mr. Muir?
4    A. Yes.
5    Q. And who else was there when you met with
6    Mr. Muir?
7    A. Mr. Kvarda was there for much of the time.
8    Q. Okay.
9    A. And another -- there were two other people from
10   Mr. Kvarda's office whose names allude me. They were
11   there for part of that series of meetings. That's it.
12   Q. What was the purpose of your meeting with
13   Mr. Muir?
14   A. Get some background on the company, go over some
15   of the issues and the calculations with respect to the
16   internal valuation process for the securities that were
17   on the books of Oakwood. I went over their valuation
18   methodology and discussed projections that they were --
19   that they had done at various points in time.
20   Q. You said several days. How many days were you
21   with Mr. Muir?
22   A. I think it was three that I recall.
23   Q. For the better part of three days?
24   A. Yes.
25   Q. At that time was Mr. Muir, to your understanding,

MICHAEL TENNENBAUM, Ph.D.

7 (Pages 22 to 25)

Page 22

1  still under some sort of consulting arrangement with the
2  Liquidation Trust?
3      A. I believe so.
4      Q. Okay. And did you find Mr. Muir helpful?
5      A. Yes.
6      Q. Did you find him knowledgeable?
7      A. Yes.
8      Q. Did you find him to be open and forthcoming?
9      A. Seemed to be.
10     Q. Okay. Did you talk with Mr. Muir about what led
11 to the bankruptcy of Oakwood?
12     A. Yes.
13     Q. What did he tell you?
14     A. He indicated that he believed there were a number
15 of things that led to the bankruptcy of Oakwood,
16 including overly aggressive financing of sales of mobile
17 homes by the company and, indeed, by its competitors
18 in -- during the mid to late 1990s, which led to a -- an
19 over expansion of capacity in the industry both from a
20 manufacturing and a retail perspective;
21         The fact that there were a lot of loans that
22 were made to mobile home purchasers on terms that were
23 overly generous in terms of very high loan-to-value
24 ratios;
25         And they -- the resulting downturn in the

Page 23

1  industry leading to a very large increase in
2  repossessions, which had the effect of impacting on
3  future sales as the repos became competitive with a new
4  product;
5          And that the repose also had negative
6  affects on securitizations;
7          And, finally, the recession of late 2000,
8  early 2001, which had relatively severe impact on areas
9  of the country where Oakwood did a substantial amount of
10 business.
11     Q. Okay. Did you find your conversation with
12 Mr. Muir helpful?
13     A. Yes.
14     Q. Was there a reason why in your report where you
15 cite the source of information available to you, you
16 didn't mention that you had spent three days with
17 Mr. Muir?
18     A. Well, I understood the purpose of the -- those
19 citations to be citations of documents that I relied on
20 rather than conversations.
21     Q. Okay. On page four of your report, carrying over
22 onto page five, there's a list of financial texts and
23 economic and financial journals that you reviewed in
24 connection with your report. Is that list complete?
25         (Brief pause)

Page 24

1          THE WITNESS: I think so.
2  BY MR. WICKES:
3      Q. Okay. And are these, the materials listed on
4  page four and at the top of page five, are they all
5  materials which you actively looked at in the course of
6  preparing this report?
7      A. To varying degrees, yes.
8      Q. Okay. This just isn't a list of things on your
9  bookshelf; this is stuff that you used in doing your
10 work; is that right?
11     A. No, there's lots more on my bookshelf.
12     Q. I would have thought so.
13         And on page six of your report at the end of
14 page six, there's a list of five reported court cases
15 that you say you looked at. How did you to look at
16 those cases?
17     A. They were sent to me by the Stutman firm.
18     Q. For what purpose?
19     A. As background material that might provide kind of
20 a framework for what the status of the law might --
21 would be that might affect my analyses.
22     Q. And tell me exactly what was the scope of the
23 analysis that you were asked to prepare?
24     A. I was asked to prepare an analysis of the
25 solvency of Oakwood Homes going back as far from the

Page 25

1  date of bank, -- of the filing of its bankruptcy in
2  November of 2002 as I could, given the available
3  documents.
4      Q. Okay. So is it fair -- I don't want to put words
5  in your mouth. But is it fair to say that you were
6  asked to determine whether or not Oakwood was solvent at
7  some particular point in time, and then to carry that
8  analysis back as far in time as you could?
9      A. Yes.
10     Q. All right. Did you read the court cases that are
11 listed there on page six?
12     A. I didn't read all of them. I didn't read all of
13 each case. I did review them all.
14     Q. Okay. Tell me, for example, what did the case of
15 E-Toys Inc. versus Goldman Sachs have to do with the
16 question of whether or not Oakwood was solvent or
17 insolvent at any particular point in time?
18         MR. CASTANARES: Objection to form.
19         THE WITNESS: I don't recall what that case
20 dealt with. If I review it quickly, I might be able to
21 answer the question better.
22         As I indicated, I just scanned each of these
23 cases without going through it in any detail.
24 BY MR. WICKES:
25     Q. Did the cases that are listed there have an

MICHAEL TENNENBAUM, Ph.D.

8  (Pages 26 to 29)

Page 26

1   impact on the conclusions you reached?
2      A.  No.
3      Q.  None?
4      A.  No.
5      Q.  So it was just a waste of time to look at them?
6      A.  In retrospect, probably.
7      Q.  Did you discuss those cases with Ms. King or with
8   somebody else from Stutman Treister?
9      A.  I discussed, I think it was, the Trenwick case.
10  I had a conversation about Trenwick with Mr. Yun on the
11  telephone.
12     Q.  What do you remember about that conversation?
13     A.  My recollection is that case dealt with the issue
14  of deepening insolvency, and that the Court didn't look
15  favorably on the deepening insolvency.
16     Q.  Why would that information have been useful to
17  you in doing the work you were doing?
18        MR. CASTANARES: Objection to form.
19        THE WITNESS: Well, I don't know that it
20  did -- that it would have. But within the framework of
21  my analyses, you know, one of the things that could be
22  utilized, one of the approaches that could be utilized
23  as a result of my analyses, is to look at insolvency of
24  the company as of one date point in time, look at the
25  insolvency at another date and time, and then it's just

Page 27

1   arithmetic to determine whether the company's insolvency
2   had deepened.
3         Whether that's an issue or whether that's
4   a -- an issue for the Court or not, I have nothing to
5   say. But the implications can be drawn from the
6   analyses that I performed.
7   BY MR. WICKES:
8      Q.  Who initiated the conversation between you and
9   Mr. Yun about the Trenwick case?
10     A.  I think it was Mr. Yun. Although, I think I had
11  seen the Trenwick case before he sent it to me. I think
12  my son pointed it out to me.
13     Q.  Okay. And Mr. Yun called you, didn't he, and he
14  said, "Well, it looks like we have a problem because
15  Delaware doesn't recognize deepening insolvency
16  anymore"?
17        MR. CASTANARES: Objection to form.
18        THE WITNESS: I don't -- I don't recall him
19  using that terminology, nor do I recall him -- you know,
20  his conversation being characterized that way. He
21  indicated that there was a ruling that had come down,
22  dealing with deepening insolvency, and did I want to
23  look at it. And I said yes. Because I -- I also
24  indicated to him that I become aware of that case from
25  another source.

Page 28

1   BY MR. WICKES:
2      Q.  And what did he tell you that the Trenwick case
3   had done with respect to deepening insolvency?
4        MR. CASTANARES: Objection to form.
5        THE WITNESS: He indicated that the Trenwick
6   case appeared to have ruled against deepening insolvency
7   as being some sort of a measure of damages.
8   BY MR. WICKES:
9      Q.  Look to page 14 of your report, would you?
10     A.  (Complies).
11     Q.  From page 14 to 18 there's some information about
12  the company, about Oakwood. What's the source of that
13  information?
14     A.  Various documents that were CSFB documents, in
15  terms of their presentations to the board of directors
16  of Oakwood over various time periods in 2001, 2002.
17     Q.  Is it your testimony that all of the information
18  on pages 14 to 18 comes from CSFB documents?
19     A.  And, also, I think one of them -- there was a
20  report that was done by another brokerage firm that came
21  from the Stutman firm. I think it also had a CSFB Bates
22  stamp on it.
23        And there were -- there were other documents
24  that -- there's a memorandum, a couple of internal memos
25  that were CSFB internal memos that had some of this

Page 29

1   information as well.
2         And, finally, there was also a -- an
3   internal Oakwood Homes document that was a set of
4   projections for fiscal years '01 and '02 that OHC did.
5   My recollection is that was September 25th, 2001.
6      Q.  And was that one of the sources for the
7   information on pages 14 to 18?
8      A.  Yes.
9      Q.  Which information comes from that?
10     A.  I don't recall specifically. I think it was the
11  securitization information on page 15 and the
12  delinquency repossession and assumption information on
13  page 16. At least some of the information on page 15
14  and 16 came from that document.
15     Q.  So all of the basic information describing
16  Oakwood comes from CSFB information plus one set of
17  financial projections about Oakwood; is that right?
18     A.  Plus the name of the firm, brokerage -- outside
19  brokerage firm will come to me. But it was a report on
20  Oakwood that was not done by CS First Boston, but I
21  think it had a CS First Boston Bates stamp on it when I
22  got it.
23     Q.  Was it done by Miller Buckfire?
24     A.  No.
25     Q.  Was it done by FTI?

MICHAEL TENNENBAUM, Ph.D.

Page 30

1    A. No. It will come to me.
2    Q. So the fact, for example, that manufactured homes
3  were manufactured in single sections 14 or 16 feet wide
4  and 40 to 80 feet long, that comes from the CSFB
5  documents?
6    A. Yes, basically.
7    Q. Do you remember which document?
8    A. It would have been one of the presentations that
9  CSFB did to the -- to the board of directors of -- of
10 Oakwood.
11   Q. Now, look if you will at page 20.
12   A. (Complies).
13   Q. You have some discussion there of something
14 called five-year plan projections, which are then laid
15 out through page 28; right?
16   A. (No response).
17   Q. Is that right?
18   A. Yes.
19   Q. So it was page 20 and the top of 21, describes
20 the five-year plan projections, and the next pages 22
21 through 28 are those projections that are discussed?
22   A. Yes.
23   Q. Where did you get those projections?
24   A. Again, from the Stutman firm.
25   Q. Who was the author of those projections?

Page 31

1    A. I'm not 100 percent sure. I believe it was
2  Miller Buckfire.
3    Q. Who is Miller Buckfire?
4    A. They are a firm that specializes in re-
5  organizations, financial analyses with respect to
6  reorganization.
7    Q. Did they play some role in the Oakwood matter, to
8  your knowledge?
9    A. It's my understanding that they were consultants
10 to Oakwood in the Chapter 11 case.
11   Q. Okay. Is it correct to say that your basic
12 analysis about solvency of Oakwood takes as its starting
13 point this set of five-year projections?
14   A. Yes.
15   Q. This is the basic data on which you worked?
16   A. That's correct.
17   Q. Okay.
18   A. As far as the cash flows are concerned.
19   Q. As far as the cash flows are concerned.
20       Do you know when this five-year plan was
21 prepared?
22   A. It was prepared subsequent to the filing.
23   Q. Do you know how much subsequent?
24   A. It was completed, I think, several months after
25 the filing. It was based on some internal analyses that

Page 32

1  Oakwood had been working on prior to the filing, but it
2  went into a lot more detail.
3    Q. How do you know what it's based on?
4    A. From Mr. Muir.
5    Q. All right. So did you -- you discussed these
6  projections with Mr. Muir?
7    A. Yes.
8    Q. Right. Your report says on page 20 that "The
9  projections entitled 'Oakwood Homes five-year plan' are
10 based on projections developed in connection with the
11 proposed plan of reorganization for OHC"; right?
12   A. Yes.
13   Q. Do you know when the plan of reorganization was
14 confirmed?
15   A. Sometime in 2003, I believe.
16   Q. Are you sure?
17   A. I don't know for sure.
18   Q. All right. Wouldn't you then understand that, if
19 these were projections developed in connection with the
20 proposed plan of reorganization, they were developed
21 sometime around the time that plan of reorganization was
22 filed?
23   A. There were a number of projections that led up to
24 the proposed plan and, as indicated from Mr. Muir, these
25 things had been ongoing for some period of time prior to

Page 33

1  filing. So my view of these projections is that these
2  are the kinds of projections that would have been
3  available to a knowledgeable investor around the time of
4  the filing, prior to the filing.
5        MR. WICKES: I'm sorry. Could I have that
6  read back.
7        THE REPORTER: Yes.
8            (Record read)
9  BY MR. WICKES:
10   Q. How would these projections have been available
11 to a knowledgeable investor?
12   A. Given that the projections were in process prior
13 to the filing for Chapter 11, somebody who wanted to
14 analyze the prospects of the company going forward from
15 fall of 2002 could have generated these kinds of --
16 these kinds of projections, if not precisely these
17 projections, pretty close to it. So that these
18 projections are the analyses that would underlie
19 valuation of the assets as of late 2001 -- I'm sorry --
20 late 2002.
21   Q. In fact, in doing your work you've seen lots and
22 lots and lots and lots of projections about Oakwood,
23 haven't you?
24   A. Yes.
25   Q. What led you to choose this particular set as the

MICHAEL TENNENBAUM, Ph.D.

10 (Pages 34 to 37)

Page 34

1  basis of your analysis?
2      A. This set of projections deals with Oakwood on a
3  scale-down basis where it has essentially reduced the
4  financial services income flow in prospect dramatically
5  from what was the case while it was heavily engaged in
6  securitizations. So these are the kinds of projections
7  that would underlie the going-forward operations of
8  Oakwood in prospect, as of fall 2002.
9          Knowing that you are going to have to cut
10  back on securitizations, you are going to cut back on
11  loan-to-value ratios, you are going to be much more
12  careful with respect to your customers, and you are
13  going to cut back on manufacturing plants, consistent
14  with the rationalization plan that had been under
15  consideration for quite sometime.
16      Q. So these are projections with respect to an
17  Oakwood group of companies, rather different in shape
18  and business from Oakwood as it actually existed in the
19  summer of 2002; is that correct?
20      A. It is -- no. It is a set of projections for an
21  Oakwood that on a going-forward basis whose revenue
22  stream would be below what it had been during the late
23  1990s, when it was actively involved in a lot of
24  securitizations and would reflect a cutback in the
25  securitization aspect of its business.

Page 35

1      Q. And it would reflect a number of other
2  differences from the company as it actually existed in
3  the summer of 2002. For example, it assumes, doesn't
4  it, a significant reduction in the number of retail
5  sales centers?
6      A. It does.
7      Q. And it assumes, for example, a significant
8  reduction in manufacturing capacity?
9      A. Yes. It's all part of the rationalizations
10  process that I referred to.
11      Q. What do you mean by "the rationalization
12  process"?
13      A. That's what the company was calling it in
14  internally. It was a series of steps which the company
15  was considering and was looking at going forward with,
16  which would reduce the number of manufacturing plants,
17  reduce the number of retail sales operations, exit
18  states where there had been a lot of foreclosure
19  problems, and cut back on securitizations.
20      Q. And the way in which they were going to be able
21  to cut down on securitizations, essentially, was that
22  they were going to go out of the business of providing
23  retail financing for the customers and let other third
24  parties do that; isn't that right?
25      A. Largely, yes.

Page 36

1      Q. So instead of saying: We'll make you the loan,
2  they'd say: Here's our friend at XYZ Company that you
3  can talk to about a loan?
4      A. Yes.
5      Q. Okay. Did you compare the numbers in the
6  five-year plan forecast that's included in your report
7  with contemporaneous projections that were done in the
8  summer of 2002 or thereabouts?
9      A. I did, yes.
10      Q. So could you tell me, for example, how the net
11  sales figure on page 22, the top line, how that number
12  would have compared to other internal cash flow
13  forecasts at the company at the time, that is, in the
14  summer of 2002?
15      A. They would be lower because the company would not
16  be making sales on as high loan-to-value ratio basis as
17  it had been in the past. So there will be fewer
18  qualified buyers, less in the way of manufacturing. So
19  net sales would be rather consistently lower than other
20  projections which preceded this.
21      Q. Okay. Are you familiar with the provisions of
22  the plan of reorganization of Oakwood Homes that was
23  actually confirmed in this case?
24      A. Only very vaguely.
25      Q. Do you know whether in connection with a plan of

Page 37

1  reorganization the company was sold?
2      A. That's my understanding.
3      Q. It was sold to Clayton Homes; is that right?
4      A. That's my understanding.
5      Q. And are you familiar with the fact that prior to
6  the agreement to sell the company to Clayton Homes there
7  was a so-called stand-alone plan of reorganization
8  proposed?
9      A. I don't recall.
10      Q. These forecasts that we're looking at here
11  starting at page 22, these are forecasts that assume
12  that Oakwood continues as an independent entity, but on
13  the reduced scale that you've described; is that right?
14      A. Yes.
15      Q. Okay.
16          THE REPORTER: Excuse me, Counsel. When you
17  have a moment, I could use a short break.
18          MR. WICKES: I'd be happy to take a break
19  right now.
20          THE REPORTER: Thank you.
21          THE VIDEOGRAPHER: Okay. One second,
22  please. Going off the record, the time is 10:39.
23          (Recess)
24          THE VIDEOGRAPHER: We're back on the record.
25  The time is 10:52.

MICHAEL TENNENBAUM, Ph.D.

11 (Pages 38 to 41)

Page 38

1 BY MR. WICKES:
2   Q. Doctor, before we took our break, we were talking
3 about the five-year plan projections that start on page
4 20 of your report, just to summarize where we are.
5        These projections were prepared by someone
6 at the Miller Buckfire firm; right?
7   A. I believe so.
8   Q. Do you know who?
9   A. No.
10   Q. Did you ever talk to anyone at Miller Buckfire
11 about them?
12   A. No.
13   Q. Okay. Do you know what sources they used to
14 prepare them?
15   A. I know part of the source was backup work that --
16 prior work that had been done by the company.
17   Q. And you know that from your discussions with
18 Mr. Muir?
19   A. Yes.
20   Q. Okay. And you are not sure when they were
21 prepared?
22   A. That's correct.
23   Q. Okay. And they were prepared in connection with
24 a plan of reorganization different from the one that was
25 actually confirmed; is that right?

Page 39

1   A. I don't know that to be a fact.
2   Q. Well, you know that the plan of reorganization
3 that was confirmed involved a sale of the company to
4 Clayton Homes; right?
5   A. That's my understanding.
6   Q. And these projections are for a stand-alone
7 company?
8   A. Which may have been information that Clayton used
9 to formulate its offer price. I don't know.
10   Q. But these are not -- these numbers don't assume a
11 combination with Clayton homes?
12   A. Oh, no, they don't, that's correct.
13   Q. And your conclusion about the value of the
14 company as of September of 2002 is based on using the
15 methodology you disclosed, you describe, later in your
16 report to this set of numbers in this so-called
17 five-year plan?
18   A. Yes.
19   Q. Okay. And if you go to page 29, there's
20 something called "late 2001 projections." Where do
21 these projections come from?
22   A. These are also projections that were contained in
23 various presentations from or done by CS First Boston.
24   Q. Let me stop you. What do you mean when you say
25 "also" in that answer?

Page 40

1   A. Did I say "also"?
2   Q. Yes.
3   A. I apologize.
4   Q. It's all right.
5   A. These are presentations -- these are projections
6 that came from presentations to the board of directors
7 of Oakwood by CS First Boston, which had at least as
8 part of their basis prior work done by Oakwood Homes
9 internally.
10   Q. Now, with respect to the late 2001 projections,
11 the text of your report doesn't tell us where those
12 projections come from. How is it that you are able to
13 tell me now where they came from?
14   A. I recall where they came from as a result of
15 doing the work. I recall the documents that I reviewed.
16   Q. Okay. And do you know -- you say the projections
17 were in a report prepared by CSFB. Do you know the date
18 of that report?
19   A. There were several that contained this. My
20 recollection is that they were contained in
21 presentations to the board in late 2002.
22   Q. And do you know who the author is of these
23 projections?
24   A. I don't.
25   Q. Do you know whether they represent independent

Page 41

1 work of CSFB as opposed to just taking information from
2 the company and including it in the report?
3   A. I don't know.
4   Q. Okay. Did you talk about that question with
5 Mr. Muir?
6   A. I did.
7   Q. And what did he tell you?
8   A. He indicated that these were projections that
9 were presented to the board by CS First Boston, and that
10 they were at least in part derived from prior work done
11 in Mr. Muir's shop at the firm, at the company.
12   Q. Do you know whether these materials are just
13 copies of work that Mr. Muir's shop had done as opposed
14 to based on some work Mr. Muir had done with some
15 independent input from CSFB?
16   A. I don't know.
17   Q. So you have no idea with respect to the
18 projections shown on page 30 how much of those
19 projections represent work done by CSFB and how much
20 represents work done by the company?
21   A. Correct.
22   Q. And with respect to the mid-2001 projections,
23 same question. Do you know who the author of those
24 projections is?
25   A. These were also contained in a document that was

MICHAEL TENNENBAUM, Ph.D.

12 (Pages 42 to 45)

Page 42

1  a -- I can't recall whether it was a presentation to the
2  board or was a -- some other CS First Boston document
3  that I reviewed and obtained from the Stutman firm.
4    Q. Okay. And is it similarly true with respect to
5  the projection shown on page 32 that you don't know
6  whether that represents work product of the company or
7  CSFB?
8    A. I don't know precisely. I do know that the
9  document that -- of which these projections are a part
10  is self-described as a CSFB DCF.
11    Q. That's what's described in the document?
12    A. Yes.
13    Q. That's the CSFB document dated March 2002?
14    A. Yes.
15    Q. "Containing aggressive projections and analyses
16  as of July 2001."
17       What do you mean by the word "aggressive" in
18  that sentence?
19    A. Aggressive in that the projections are what are
20  known in the valuation trade as "hockey stick
21  projections," showing initial -- after an initial
22  decrease in revenues, a strong and continuous rapid
23  increase thereafter, so that by 2005 the projected
24  revenues are greater than the company had ever done
25  before.

Page 43

1       And similarly, its EBITDA numbers by 2005
2  are at or above the most successful year that the
3  company had ever had. So they could be viewed given the
4  context of the circumstances of the company and the
5  industry in the early part of the this Century as being
6  quite aggressive.
7       (Mr. Holt entered the room.)
8  BY MR. WICKES:
9    Q. You say in that same sentence on Page 31, "The
10  projections, the analyses appear to presume a
11  substantial industry recovery in growing revenues which
12  include financial service revenues."
13       Is that what you mean by "aggressive"?
14    A. Yes.
15    Q. Now, you arrived at your valuation for
16  September 2002 by applying the techniques described
17  later in your report to the five-year plan cash flows;
18  is that right?
19    A. Yes.
20    Q. And you reach your conclusion about the value in
21  September 2001 by using those same techniques and
22  applying them to which set of projections?
23    A. Both the mid and late 2001 projections. They
24  don't differ all that much in terms of implications for
25  value. But I applied a DCF analysis to both sets of

Page 44

1  projections for 2001.
2    Q. Okay. And each of those analyses came to a
3  conclusion that the value in September of 2001 was
4  around $350 million?
5    A. Yes.
6    Q. And your conclusion about the value in September
7  2002 was that the value was about $300 million?
8    A. Or less, yes.
9    Q. On page nine of your report, item No. 2, you say,
10  "The enterprise value of OHC as of September 2002 was
11  300 million in rounded terms"; right?
12    A. Yes.
13    Q. Is that your opinion?
14    A. It is, but I want to indicate that it is at most
15  300 million, yeah.
16    Q. Why didn't you say that in your report?
17    A. I think the report does indicate that part of the
18  300 million is attribution of approximately 50 million
19  or so to excess assets, and I was quite generous in
20  valuing the excess assets.
21    Q. The first item in your report on page nine says,
22  "The enterprise value of the corporation fiscal year
23  2001 was 350 million in rounded terms." Is that your
24  opinion?
25    A. Yes, given the projections that I utilized,

Page 45

1  correct.
2    Q. I don't understand that qualification.
3       Is it your opinion or not that the
4  enterprise value of the company was $350 million in
5  September of 2001?
6    A. It is.
7    Q. It is your opinion?
8    A. Yes.
9    Q. Okay. What would the enterprise value of the
10  company have been at September of 2002 if the company
11  had gone into bankruptcy in September of 2001?
12    A. If the company had gone into bankruptcy in 2001,
13  I don't know that there would be a valuation issue as of
14  September 2002.
15       If my analyses, if my valuation conclusions
16  are correct, then the company would have been able to
17  realize $350 million from sale of its assets as of late
18  2001 and could have distributed that to creditors.
19    Q. So am I correct to understand that your analysis
20  tells us that had the company gone into bankruptcy
21  proceedings in September of 2001, and immediately
22  proceeded to liquidate the business, that there should
23  have been at the end of the day $350 million available
24  for distribution to creditors?
25    A. They're -- yes. They're exclusive of fees and

MICHAEL TENNENBAUM, Ph.D.

13 (Pages 46 to 49)

Page 46

1  bankruptcy charges and the like, but the value of the
2  assets, the gross value of the assets that could have
3  been realized would have been $350 million.
4      Q. Well, do I understand correctly that in both your
5  valuations as of 2001 and 2002, that you have valued the
6  company on a going-concern basis?
7      A. Yes.
8      Q. So you've assumed in both cases that the company
9  would continue to operate along the lines reflected in
10  the various projections?
11      A. That it could have. It could have sold or it
12  could have sold itself to a buyer on the basis of the
13  cash flows in prospect as of late 2001 and have realized
14  from that sale $350 million in gross value.
15      Q. And in expressing that opinion, did you make any
16  attempt to determine whether -- whether in September of
17  2001 there were any likely buyers for Oakwood at that
18  price?
19      A. That's what a valuation exercise does, is it
20  attempts to look at if you offer this -- these assets to
21  the marketplace and walk in the foot steps of a
22  knowledgeable buyer, what kind of rate of return would
23  that knowledgeable buyer have demanded; and given that
24  rate of return, what does that imply for the present
25  value of the cash flows that are in prospect for

Page 47

1  ownership of the assets. That's exactly what valuation
2  does. It assumes this hypothetical sale.
3      Q. And it assumes a hypothetical purchaser; right?
4      A. Yes.
5      Q. And my question is, did you make any attempt in
6  connection with your work to determine whether as of
7  September of 2001, there were any likely purchasers for
8  Oakwood?
9          MR. CASTANARES: Asked and answered.
10          MR. WICKES: Asked and not answered.
11          THE WITNESS: Well, did I answer it. The
12  answer is that the valuation exercise does that. It
13  does not go out and attempt to walk in the footsteps of
14  an investment banker and ascertain whether company A, B,
15  C, or D would be a buyer. But what it does do is it
16  looks at the marketplace to see what's going on with
17  respect to transactions and required rates of return,
18  and applies those required rates of return to the cash
19  flows resulting in the expectation of $350 million in
20  value being realized from a hypothetical sale.
21  BY MR. WICKES:
22      Q. Does the valuation exercise simply assume that at
23  the price arrived at by this methodology there must be a
24  purchaser?
25      A. Any transaction assumes a purchaser.

Page 48

1      Q. No. Any transaction that's actually a
2  transaction has a purchaser.
3          My question is with respect to the
4  valuation. Do we just assume if we've done the
5  valuation correctly someone will buy it at that price?
6          MR. CASTANARES: I object to strike the --
7  move to strike from the question the declarative
8  sentence that began it.
9  BY MR. WICKES:
10      Q. All right. You can go ahead.
11          MR. CASTANARES: Objection to form.
12          THE WITNESS: Valuation is an exercise which
13  attempts to simulate the results of a hypothetical
14  transaction involving the asset being valued. If the
15  asset were offered on the market, what would be the
16  likely result of that offer to sell.
17          And the results of my analysis are that,
18  among other things, that in September of 2001 the likely
19  results of that offer to sell would have been
20  approximately $350 million in realized proceeds.
21          I can't specify who the buyer would have
22  been, but given transactions in the marketplace from
23  which my discount rates are derived, that's the
24  forecast.
25  BY MR. WICKES:

Page 49

1      Q. Okay. What if in September of 2001 the company
2  had gone into bankruptcy and not either liquidated or
3  sold itself, as you've hypothesized, but went through a
4  process that lasted several years as, in fact, happened
5  when they did go bankrupt?
6          MR. CASTANARES: Objection to form.
7          MR. WICKES: I don't think there's a
8  question yet.
9          MR. CASTANARES: Excuse me.
10          MR. WICKES: It's all right. You can warn
11  him that's coming.
12      Q. If the company went into bankruptcy, and it
13  lasted for several years, as this company's bankruptcy
14  did, can you tell me what the value would have been in
15  September of 2001 under that scenario?
16          MR. CASTANARES: Objection to form.
17          THE WITNESS: Are you asking me to change
18  the date of value?
19  BY MR. WICKES:
20      Q. No. I'm asking you to keep the date of value and
21  change the assumption that I'm asking about, which is
22  the assumption of: Assume the company went bankrupt in
23  September of 2001, and that bankruptcy lasted for
24  several years?
25      A. If the cash flows, which are one of the drivers

MICHAEL TENNENBAUM, Ph.D.

14 (Pages 50 to 53)

Page 50

1  of value, if the cash flows remain as I hypothesized,
2  then that driver of value tells you that the value ought
3  to remain the same. If the discount rates don't change,
4  then that driver of value tells you that the value will
5  remain the same.
6       So that in present value terms, bringing the
7  value back to September 2001, if those value drivers
8  remain unaffected by the change in your circumstances,
9  the value ought to remain $350 million.
10  Q. Okay. Do you know how much Clayton Homes paid
11  for the company?
12  A. I don't know exactly. According to Mr. Muir, it
13  was somewhere in the 200 million to less than
14  $300 million range.
15  Q. Now, after you present them, your sets of
16  projections in the report, you've next turned to the
17  techniques that you used to turn those projections into
18  valuations; is that right?
19  A. Yes.
20  Q. Okay. And you have sections that describe the
21  calculation of the rate of average cost of capital and
22  then something — how do we say, the Fama French model?
23  A. Yes, named after Gene Fama and Ken French.
24  Q. Okay. And with respect to your description of
25  the process of calculating — well, let me strike that.

Page 51

1       Why in this exercise do we need to calculate
2  a weighted average cost of capital?
3  A. That's the discount rate.
4  Q. Tell me a little more about that.
5  A. Well, the weighted average cost of capital
6  comprise, is comprised of, a weighted average of the
7  required rate of return to equity and the required rate
8  of return to debt capital.
9       And what that formulates is the market's
10  weighted required return to the cash flows from
11  ownership of the assets of the company, weighted by how
12  much of the capitalization is debt versus how much is
13  equity.
14  Q. And the discount rate you used as part of the
15  process of determining the present value of the, in
16  effect, permanent cash flows of the company; is that
17  right?
18  A. That's correct.
19  Q. Okay. And are — is the Fama French model
20  something different from the weighted average cost of
21  capital? Is it in addition to it? How does it relate
22  to the basic weighted average calculation?
23  A. The Fama French model is a one of the techniques
24  that is utilized alongside the capital asset pricing
25  model for purposes of determining what the required rate

Page 52

1  of return to equity is.
2       Whereas the capital asset pricing model
3  looks at determining the required rate of return to
4  equity by focusing on the sensitivity of a company's
5  rate of return to variability in the stock market.
6       The Fama French model expands that by also
7  looking at the sensitivity of the rate of return to
8  variability in size of company and book-to-market
9  ratios.
10       So it's an expansion of the capital asset
11  pricing model that is — it's another approach to
12  getting to the same result which utilizes more data.
13  Q. Now, on pages 33 and 34, if I understand
14  correctly, you described for us the mathematical formula
15  that's used in the capital asset pricing model and the
16  interest that go into it; right?
17  A. Yes.
18  Q. And then on page 36, you say in the second bullet
19  point on 36, "Our analyses resulted in the following
20  valuation parameters for use in the capital asset
21  pricing model as applied to Oakwood."
22       And you have two terms there that I don't
23  see in the earlier description of the formula. And I
24  just want you to tell me whether I've missed them
25  somewhere. One is the size premium. Is that somewhere

Page 53

1  in your description of the formula?
2  A. It is — it's an addition to the capital asset
3  pricing model formula, the capital asset pricing model
4  formula as a general proposition doesn't — doesn't take
5  into account the impact of the size of — I'm sorry.
6       (Coughing)
7       THE WITNESS: — the impact on the size of
8  the company on required rates of return, nor does it
9  take into account the specific risk that some companies
10  would have in addition to the CAPM.
11  BY MR. WICKES:
12  Q. And in this case what accounts for your assigning
13  a three to five percent specific risk premium?
14  A. Well, if you take a look at data with respect to
15  this industry, you find a number of things. One of
16  which is that what is known as Jensen's alpha is
17  negative for the company going back five years — for
18  the industry going back five years.
19       What that means is that the capital asset
20  price model has overstated rates — realized rates of
21  return for this industry going back five years from
22  2002. Which is another way of saying that in order to
23  get the correct required rate of return to equity, you
24  need to compensate for that. So you need to add a
25  required rate of return because capital asset pricing

MICHAEL TENNENBAUM, Ph.D.

15 (Pages 54 to 57)

Page 54

1  model does not capture everything that goes on in the
2  determination of required rate of return. So this
3  Jensen's alpha is one aspect.
4       The second element that goes into
5  determination of the specific risk premium is obtained
6  from looking at the Fama French -- the implications of
7  Fama French model. The Fama French model implies for
8  this industry the additional rate of return that would
9  be necessary for taking account of the riskiness of --
10  the specific riskiness of this industry, and even more
11  so Oakwood being riskier than most of the firms in the
12  industry because of the fact that it was in very deep
13  trouble at the time. And that the projections assumed a
14  quick turnaround, which, of course, adds to the risk of
15  the buyer.
16       You need to account for the -- what Fama
17  French called the HML variable, and that is the
18  relationship between high book value relative to market.
19  The industry -- the marketplace doesn't pay much for
20  going concern value for firms in this industry as of the
21  early part of this century. So that the HML variable
22  from the Fama French model implies an additional
23  specific risk premium of about three to five percent --
24  of about 3.5 percent. So there's another indicator.
25       And then a further indicator of a specific

Page 55

1  risk premium is obtained by looking at the data from
2  Ibbotson, which is one of the foremost data providers in
3  this industry with respect to required rates of return,
4  capital asset pricing model calculations, and weighted
5  average cost of capital by industry. And we find
6  the Ibbotson valuation model utilizes a specific risk
7  for this industry of 5.07 percent as an additional
8  factor.
9       All of those taken together led me to
10  believe that a reasonable estimate of a premium for
11  specific risk for this firm would be in the three to
12  five percent range.
13  Q. And are the -- based on what you just said, is it
14  fair of me to understand that both the size premium and
15  the specific risk premium, and determination of those
16  values, involved your making a judgment informed by the
17  kind of data you've just described?
18  A. An informed judgment, yes, based on the available
19  data.
20  Q. Right, that's what I said.
21  A. Yes.
22  Q. Yes. There isn't someplace you go look up and
23  say what's the size premium. You have to look at a lot
24  of data and make a judgment?
25  A. Yes, you have to look at a lot of data and look

Page 56

1  at places that say whatever the size premium -- whatever
2  the specific risk premium ought to be, it's somewhere in
3  this range.
4  Q. All right. So we started with our projections,
5  and we now have the description of the weighted average
6  cost of capital and the Fama French model. And did
7  you, as a mechanical matter, do the capital asset
8  pricing model and the Fama French model inputs that
9  you've described between pages 33 and 37, get applied to
10  both of those different valuations in the same way? I
11  mean to the different cash flows?
12  A. They do.
13  Q. So you have two different sets of cash flows, and
14  then you have --
15  A. Three, actually.
16  Q. Three.
17  A. Yes.
18  Q. Although two of them you say worked out to about
19  the same?
20  A. Yes.
21  Q. Right. So we have a 2001 set and a 2002 set?
22  A. Yes.
23  Q. And you apply these inputs to them in the same
24  way?
25  A. Yes.

Page 57

1  Q. Okay. Is it your judgment that it's correct as a
2  matter of valuation to apply those same inputs for the
3  Fama French model and the capital asset pricing model,
4  even though the cash flows that underlie them reflect
5  very different companies?
6       MR. CASTANARES: Objection to form.
7       THE WITNESS: Yes. Yes, because those --
8  the derivation of those premiums are industry wide, so
9  that for circumstances like the one in which Oakwood
10  finds itself in the troubled industry with a hoped-for
11  turnaround to various degrees, it should be applied
12  regardless of whether you are talking about September
13  '01 or September '02.
14  BY MR. WICKES:
15  Q. And that's true, for example, regardless of
16  whether the company remains in or goes out of the
17  financing part of the business?
18  A. Yes.
19  Q. Okay. Can we talk a bit about the notion that's
20  described starting on page 45 in your report?
21  A. I'm sorry. Both Mr. Castanares and I were
22  coughing, and I didn't catch the page.
23  Q. I'm sorry, although I wasn't coughing.
24       If we look at page 45, we start to talk
25  about equity as a call option. Can you just tell me in

MICHAEL TENNENBAUM, Ph.D.

16 (Pages 58 to 61)

Page 58

1  kind of in layman's terms what does that mean to say
2  that equity is a call option?
3     A. What it means is that as an equity owner, what
4  you have is an option on future value after you pay off
5  the debt obligations.
6        So if you have a situation in which equity
7  as of this particular point in time is valued on the
8  marketplace at a dollar a share, but there is some
9  high -- some reasonably high probability that the value
10  of the assets of the company will fluctuate dramatically
11  over time, so that before the debt obligations come due
12  there's some likelihood that asset value will exceed the
13  debt obligations by substantial amount, buyers are
14  willing to pay for that.
15        On the other hand, as the time period
16  between the date of your value inspection and the due
17  date of the obligations, as that shrinks, buyer are
18  going to be willing to pay less, because you have less
19  of an opportunity for the -- for the home run to be hit.
20     Q. Okay. Let me see if I understand it, and you
21  correct me. As an ordinary matter, we think that all
22  debt gets paid before equity gets paid. Fair enough?
23     A. Yes.
24     Q. And in a situation where it seems unlikely that
25  all the debts will be paid, we might given the first

Page 59

1  assumption assume that the equity was worth zero; right?
2     A. Yes.
3     Q. But, I think, if I understand what you are saying
4  here about the call option, it reflects, if you will, an
5  opinion by some buyers that actually there's a chance
6  that the debt will get paid and there will be something
7  left for equity?
8     A. Yes.
9     Q. Okay. And this, in the case of Oakwood, its
10  stock was publicly traded; right?
11     A. Correct.
12     Q. On the New York Stock Exchange, was it?
13     A. Yes.
14     Q. And what do we think as economists about the
15  price of the equity in this situation? Does it reflect
16  the market's judgment about the likelihood that there
17  will be some value for equity?
18     A. It reflects the willingness of speculative
19  purchasers to take a gamble on the prospect of a turn-
20  around in this industry sufficient -- and a turnaround
21  for the company, sufficient to allow it to pay off the
22  debt obligations, and to have, therefore, a value left
23  over for equity.
24        And the parameters for considering whether
25  that's a reasonable bet or not include how variable are

Page 60

1  our asset values in this industry and for Oakwood,
2  therefore, include how long of a timeframe do you have
3  If you have to turnaround within the next six months,
4  that equity is worthless. If you have five or
5  six years, you may have a value depending on how
6  variable the assets are likely to be, and it depends on
7  interest rates because there's a time value of money
8  issue.
9        So given those -- given those parameters,
10  you can determine, utilizing a variety of models, the
11  most -- by far the most popular of which is the black
12  scholes model, you can utilize a variety of models like
13  black scholes to determine, well, what's a reasonable
14  bet.
15     Q. As a general matter in your valuation work, are
16  you a believer in efficient markets?
17     A. I'm a believer in relatively efficient markets,
18  yes.
19     Q. Relative to what?
20     A. Relative to full information models. In other
21  words, I'm a believer that in markets in which there are
22  a lot of transactions and, therefore, a lot of
23  transparency, a lot of information available, that the
24  market is an excellent meter for accumulation of that
25  data in determining the value implications.

Page 61

1        It isn't always true that that information
2  is transparent. It isn't always true that both sides of
3  the market have similar information. You know, a
4  classic example being the current mess in the mortgage
5  markets, in mortgage securities and SIVs, things along
6  those lines where there is some lack of transparency
7  and, therefore, widespread differences of opinion as to
8  values.
9        So where there is a lot of information,
10  markets utilize that information efficiently.
11     Q. Okay. So in this situation, for example, where
12  the equity shares of the company are being traded on the
13  New York Stock Exchange, would we assume that buyers and
14  sellers of those shares have the same information
15  available to them?
16     A. Pretty much.
17     Q. So would we assume that the price of the equity
18  then would represent the workings of a relatively
19  efficient market?
20     A. Assuming that there are a lot of transactions
21  involved, yes.
22     Q. Okay. How do you measure a lot of transactions?
23     A. Frequency of transactions, volume of transactions
24  relative to the outstanding number of shares available.
25     Q. And does the -- do I understand from the

MICHAEL TENNENBAUM, Ph.D.

17 (Pages 62 to 65)

Page 62

1  discussions starting at page 48 in your report that it's
2  possible to take the information about the value of
3  equity in this circumstance and deduce from that some
4  information about the likelihoods of default?
5      A. Yes. So that -- so that -- on the top of page
6  50, for example, in the first bullet point, you say,
7  "For OHC the foregoing inputs imply an increase in
8  default probability from September '01 to September
9  '02." And you say that "The default probability of
10  September '01 was 62.3 percent, and then a year later it
11  was 96.9 percent."
12     Q. Can you just walk me through, remembering having
13  a little mercy on somebody who is a history major and
14  not a math major, how it is from this data we conclude
15  something about the default probability?
16     A. Well, the default probability is indicated at the
17  bottom of page 49.
18     Q. Okay.
19     A. As being one minus ND2. ND2 is a probability
20  distribution. It's a likelihood of a -- for a normal
21  distribution, it's the likelihood of values being equal
22  to or less than certain amounts here. Where D1 and D2
23  are functions of the relative size of the asset price
24  and the -- on the one hand, and the debt on the other,
25  and the times of to maturity.

Page 63

1          So given those calculations ND2 is the
2  probability of the assets eventually becoming worth more
3  than the debt on or before the due date of the debt.
4  And so one minus ND2 is, therefore, by definition, of
5  the -- the probability that the assets don't reach the
6  size of debt and, therefore, you default.
7      Q. So --
8      A. But I do want to condition that whole series of
9  statements on the presumption that you are willing to
10  accept -- as of September '01 you are willing to accept
11  the projections as being -- the cash flow projections as
12  being the most likely set of projections.
13         If those projections are considered
14  aggressive, as I considered them in the report, then the
15  probability of default will go up from what is stated
16  here. So that these probabilities of default
17  are -- are as high as they are even with aggressive
18  projections.
19         If you make projections that are somewhat
20  less aggressive as the company did, you are going to get
21  a default probability that is substantially in excess of
22  62 percent and is well in excess of 80 percent for --
23  I'm sorry -- for September '01. So that the
24  62.3 percent default probability is a default
25  probability given the acceptance of aggressive cash

Page 64

1  flows.
2      Q. Do you want to take a break?
3      A. Could I have one minute to get a cup of coffee
4  while it's hot?
5      Q. The rule is, if we take a break, it has to be at
6  least five minutes so I can go down and take a
7  cigarette.
8      A. I'll wait.
9      Q. I'm happy to have a break.
10        THE VIDEOGRAPHER: Going off the record, the
11  time is 11:38.
12            (Brief pause)
13        THE VIDEOGRAPHER: We're back on the record.
14  The time is 11:43. This marks the end of videotape
15  No. 1 in the deposition of Dr. Michael Tennenbaum.
16        Going off the record, the time is 11:43.
17            (Recess)
18        THE VIDEOGRAPHER: We're back on the record.
19  Here begins videotape No. 2 in the deposition of
20  Dr. Michael Tennenbaum. The time is 11:53.
21  BY MR. WICKES:
22      Q. Doctor, on page 48 and 49 you do the calculations
23  for valuation of OHC equity as of September 2001 and
24  2002, utilizing the black scholes model.
25        On page 49 at the top, you have a number for

Page 65

1  equity value. What is the source of that equity value?
2      A. Well, it's -- it's the resulting -- it's a result
3  of the calculation of the call value. It -- what it is
4  is, when you utilize the inputs described on page 48
5  with respect to the enterprise value, the face value of
6  the debt, the weighted average debt duration, standard
7  deviation in enterprises value and the risk-free
8  interest rate, and you plug those numbers into the basic
9  black scholes equation identified at the middle of page
10  46 and the additional values below that, you wind up
11  with the calculation of equity value of $25.8 million as
12  of September '01.
13     Q. Do you know how that number compares to the
14  number we would find if we multiplied the number of
15  outstanding equity shares of the company by its price as
16  of September 30, 2001?
17     A. Well, the -- there are about nine and a half
18  million shares outstanding, so if we divide this by nine
19  and a half, you are going to -- by 9.5 million, you are
20  going to get a couple dollars a share, two and a half
21  dollars a share, something like that.
22     Q. Do you know what the share place was at
23  September 30th, 2001?
24     A. It fluctuated over time. I think it was down
25  around a dollar and a half or two dollars, something

MICHAEL TENNENBAUM, Ph.D.

18 (Pages 66 to 69)

Page 66

1  like that.
2      Q.  And -- sorry.  I've lost my train of thought.
3          Did you make any attempt in your work to
4  compare the -- any of the cash flow projections that you
5  used in doing your work with projections about the
6  company that were in the public domain at the time?
7      A.  I never saw any projections in the public domain
8  that went out a few years, so I did not.
9      Q.  Okay.  Did you, for example, compare any of the
10  projections that you used with whatever projections for
11  whatever period of time were being published by various
12  equity analysts who covered the Oakwood stock?
13     A.  Again, all of the equity analyst reports that I
14  saw either had no specific projections or there were
15  projections for a very short period of time.  I never
16  saw any endless projections that ran out a couple of
17  years or certainly not five, six years.
18     Q.  Maybe you can help me.  Somewhere in this
19  report you say that you think the value of the B2
20  guaranties increased from 100 million in 2001 to 144
21  million in 2002.  Do you know where that appears?
22     A.  Yes.  It would be a comparison of -- I'll find
23  the pages in a moment.  It would be a comparison of page
24  41 and 39.
25     Q.  Okay.  On page 39 you say the value of the B2

Page 67

1  guaranties is $144 million.  What's the source of that
2  number?
3      A.  Preliminary calculations of the Davidson firm.
4      Q.  Okay.
5      A.  And -- which I saw, and those calculations were
6  contained in CSFB presentations to the board of
7  directors at Oakwood and, I believe, to Brookshire
8  (phonetic).
9      Q.  And what's the source of the $100 million number
10  on page 41?
11     A.  The source of the $100 million number on page 41
12  is to take the Davidson numbers and delete the
13  securitizations which occurred after 2001, and reduce
14  the resulting figures to present value by application of
15  a 10 percent discount rate which Mr. Davidson's firm
16  utilized.
17     Q.  That's the calculation you did?
18     A.  Yes.  It actually gets you a number slightly in
19  excess of 100 million, but I rounded it down.
20     Q.  And did you make any attempt to compare that
21  number to what Oakwood's financial statement said the
22  value of those guaranties was?
23     A.  Yes.
24     Q.  What -- in 2001 what did Oakwood's financial
25  statements say the value of the guaranties were?

Page 68

1      A.  Thirty some odd million dollars, 36 million, I
2  believe.
3      Q.  And those were there are audited financial
4  statements audited by Price Waterhouse Coopers?
5      A.  Yes, on bases that are different from what is --
6  what results from the projections that I utilized.
7          Because what you have to take account of is
8  the fact that in order to get to these aggressive
9  projections, you have to assume that the servicing fee
10  that OAC had, the fee that it was going to be able to
11  charge for servicing the outstanding mortgages, instead
12  of being at the bottom of the waterfall was going to go
13  to the top of the waterfall.  And they were going to get
14  a -- they were going to get a market rate of about
15  one percent.
16          Which means -- which would have the further
17  implication that since they're getting paid earlier, the
18  B2s are going to be paid later, and some of them are not
19  going to be paid at all.  And, therefore, the guaranties
20  would kick in to a greater extent than is contained in
21  this assumptions leading up to the financial statements.
22          So, you know, they're different states of
23  the world, as it were.  So a direct comparison is it
24  needs to take account of the fact that the assumed
25  status of the servicing fee is different.

Page 69

1      Q.  So your $100 million for September 2001, that
2  assumes that the securitizations were amended in such a
3  way that the servicing fees would have been paid at a
4  high enough priority to always be paid; is that right?
5      A.  Yes.  That's what Mr. Davidson's numbers assume
6      Q.  And so you just took that assumption back to
7  2001?
8      A.  Correct.
9      Q.  All right.  On page 51 of your report in your
10  conclusions, in your fourth bullet point, you say that
11  "Continued operation of OHC business model involving
12  securitization of loans and guarantying certain
13  tranches of the securities had the following impacts on
14  OHC's values."
15          Can we just talk for a moment first in
16  general.  Let's go back before 2001, if you'd like.
17  What was the relationship between the securitization
18  process and Oakwood's underlying business model?
19     A.  Well, the securitization process provided the
20  funding for Oakwood to enable it to finance the
21  mortgages that it was financing for its customers.
22     Q.  Let me just try an example to see if I understand
23  it.  Let's suppose Oakwood has gone through the process
24  of manufacturing a mobile home, and they sell it to a
25  customer at their lot for -- pick a number -- $100,000.

| Page 70 |
|---|
| 1 I have no idea what a mobile home costs nowadays. It |
| 2 will make the math easier. |
| 3 And let's assume that Oakwood finances that |
| 4 purchase by the purchaser at a 90 percent loan-to-value |
| 5 ratio. Now, all that's happened insofar as Oakwood is |
| 6 concerned up to that point in the transaction is they |
| 7 sold a mobile home and realized $10,000 in cash and a |
| 8 receivable for $90,000; right? |
| 9 A. Yes. |
| 10 Q. Okay. And if you assume that the cost of the |
| 11 mobile home is more than -- the cost to manufacture the |
| 12 mobile home is more than $10,000, on a cash basis |
| 13 they've lost money at that point; right? |
| 14 A. So far so good. |
| 15 Q. Okay. So now this is where the securitization |
| 16 comes in; right? |
| 17 A. Yes. |
| 18 Q. Which is a way to take that $90,000 and convert |
| 19 some part of it into cash? |
| 20 A. Yes. |
| 21 Q. Okay. And that's the process of the quarterly |
| 22 securitizations that have been going on for a long time? |
| 23 A. Yes. |
| 24 Q. Is it the fact of the securit-- strike that. |
| 25 Up to that point in my hypothetical has the |

| Page 71 |
|---|
| 1 securitization process itself done anything to affect |
| 2 the value of Oakwood's business? |
| 3 A. It depends. If it allows Oakwood to finance |
| 4 transactions with its customers which would otherwise |
| 5 not be viable, which would not be financeable, then what |
| 6 it -- what that accomplishes is that it buys Oakwood |
| 7 trouble in the future when those mortgages get defaulted |
| 8 on. |
| 9 Q. Okay. When you talked to Mr. Muir, did he talk |
| 10 to you about the problems that arose in finance |
| 11 when, as a general matter, the industry moved from a |
| 12 standard 90 percent loan-to-value ratio to a 95 percent |
| 13 loan-to-value ratio? |
| 14 A. Yes. |
| 15 Q. Did he tell you that in hindsight that people |
| 16 recognized that in that five percent difference, they |
| 17 brought into their customer base a group of people who |
| 18 had turned out to have rather different performance in |
| 19 default results than the customers at the 90 percent |
| 20 level? |
| 21 A. Yes. |
| 22 Q. Okay. Did he tell you why they went from |
| 23 9 percent to 95 percent? |
| 24 A. They were trying to match the competition. There |
| 25 was kind of an industry-wide approach, the higher |

| Page 72 |
|---|
| 1 loan-to-value ratios. |
| 2 Q. Okay. In the last bullet point on page 51 you |
| 3 say, "Oakwood homes suffered damages as a result of |
| 4 continued operation of its business model in an amount |
| 5 of at least $50 million." |
| 6 Do I understand from that that you mean to |
| 7 say that it would have been $50 million better for the |
| 8 company if in September of 2001 CSFB had simply refused |
| 9 to do further securitizations and forced the end of the |
| 10 company's business model at that point? |
| 11 A. Probably, yes. |
| 12 Q. Okay. I understand that correctly? |
| 13 A. Yes. |
| 14 Q. Okay. In addition, you go on to say, "OHC paid |
| 15 fees relating to the continuation of a business model |
| 16 which was destroying value. Such fees added to the |
| 17 damage suffered by OHC, and we were informed that the |
| 18 fees in question are in excess of 20 million." |
| 19 Who informed you of that? |
| 20 A. Mr. Yun. |
| 21 Q. Mr. Yun. |
| 22 And what fees are those? |
| 23 A. I'm -- fees paid to CS First Boston. I don't |
| 24 know what the breakdown of the fees is. |
| 25 Q. Do you know whether the fees were actually paid |

| Page 73 |
|---|
| 1 by the company or were simply reductions in the proceeds |
| 2 of financing transactions? |
| 3 A. I don't know. |
| 4 Q. What do you think would have happened at Oakwood |
| 5 if on September the 30th of 2001, CSFB had simply said |
| 6 no more securitizations period, full stop? |
| 7 A. I think the company would have filed Chapter 11. |
| 8 Q. Immediately? |
| 9 A. I think so. |
| 10 Q. And then what would have happened? |
| 11 A. Hopefully, they would have sought to engage in an |
| 12 orderly sale of the company on a going -- of the assets |
| 13 on a going concern value basis, and would have been able |
| 14 to generate in September '01 dollars $350 million for |
| 15 potential distribution to the creditors. |
| 16 Q. Was it important in what you just told me that |
| 17 the company be able to realize that value by arranging |
| 18 for sale of the assets on a going-concern basis? |
| 19 A. Sure. |
| 20 Q. Okay. How would the company have continue on a |
| 21 going concern basis if it had no further ability to |
| 22 securitize or finance the proceeds of its installment |
| 23 sales contracts from its customers? |
| 24 A. There was an alternative possibility of whole -- |
| 25 whole loan sales. They may have been able to securitize |

MICHAEL TENNENBAUM, Ph.D.

20 (Pages 74 to 77)

| Page 74 |
|---|
| 1   to some extent to, you know, a less -- in a lesser |
| 2   volume. And when you go out to sell the assets, you |
| 3   sell them on the basis of, look, here's what's |
| 4   available, that we have cash flows in prospect; if you |
| 5   are able to obtain financing and sell the company, sell |
| 6   the company's cash flow prospects that way. |
| 7     Q. Okay. |
| 8     A. Rather than, you know, liquidate assets. |
| 9     Q. But to sell the company's cash flow prospects, |
| 10   the company would have had to have continued in the |
| 11   business of manufacturing and selling mobile homes? |
| 12     A. Yes. |
| 13     Q. Okay. And up until that time, isn't it a fact |
| 14   that the principal source of liquidity in order to keep |
| 15   doing that business was the securitizations? |
| 16     A. Yes. |
| 17     Q. Okay. And to what extent have you investigated, |
| 18   and can you tell us, what other sources of liquidity |
| 19   would have actually been available to the company at |
| 20   that time? |
| 21     A. I haven't done an analysis of that. |
| 22     Q. Okay. So is it possible that if, in our |
| 23   hypothesis on September 30th of 2001, Credit Suisse had |
| 24   simply said: We're done, we're going home, that the |
| 25   result would not only have been a Chapter 11 filing, but |

| Page 75 |
|---|
| 1   would have been a very rapid cessation of the business |
| 2   activities of the company? |
| 3     A. Is it possible? |
| 4     Q. Yes. |
| 5     A. Anything is possible. |
| 6     Q. Given that you have not investigated alternative |
| 7   sources of financing to replace the liquidity |
| 8   prepared -- provided by the securitizations, it's a |
| 9   fact, isn't it, that you are not able to tell us how |
| 10   likely it is that the results of the end of the |
| 11   securitization process would have been the rapid |
| 12   liquidation of the company? |
| 13     A. If you shut off the financing completely, yeah, |
| 14   of course. I did not investigate what would happen |
| 15   under those circumstances. |
| 16     Q. You didn't? |
| 17     A. Correct. |
| 18     Q. Other than to say that -- well, strike that. |
| 19      Is it your opinion that in -- in September of |
| 20   2001 is it your opinion that the creditors of the |
| 21   company would have been better off had Credit Suisse in |
| 22   September of 2001 simply stopped the securitizations? |
| 23     A. I don't know. What my analysis indicates is that |
| 24   the company would have been better off had it received |
| 25   advice to file in September of '01 and seek a purchaser |

| Page 76 |
|---|
| 1   for the going-concern value of the company as of that |
| 2   point in time because of the fact that that going |
| 3   concern value was dissipating and was going to dissipate |
| 4   over the next -- over the foreseeable future. |
| 5     And that does not imply anything at all |
| 6   about what would happen if somebody forced them to |
| 7   liquidate. That, I don't know. |
| 8     Q. Well, let's just test the assumptions that are |
| 9   built into that. First of all, you said you think the |
| 10   creditors would have been better off had the company |
| 11   been given advice in September of 2001 that they should |
| 12   go into bankruptcy. Actually, what advice the company |
| 13   got wouldn't have had any effect, would it? What would |
| 14   have made a difference is if they had gotten that advice |
| 15   and acted on it? |
| 16     A. Yes, sure, assuming they acted on it. |
| 17     Q. All right. So and isn't it further accurate to |
| 18   say that your assumption that the creditors would have |
| 19   been better off in that circumstance, assumes that in |
| 20   that scenario, in a Chapter 11 commencing around the |
| 21   First of October 2001, there would have been some |
| 22   alternative source of liquidity to allow the company to |
| 23   continue to remain a going concern? |
| 24     A. Yes. |
| 25     Q. And it's a fact, if I further understand your |

| Page 77 |
|---|
| 1   testimony, that you made no attempt to determine whether |
| 2   any such alternative sources of liquidity would have |
| 3   been available? |
| 4     A. That's correct, I did no analysis of the |
| 5   liquidity available to the company. |
| 6     Q. Okay. And is it correct that you made no attempt |
| 7   to estimate what values might have been recovered by the |
| 8   company if, in fact, it had not been able to be sold as |
| 9   a going concern, but had gone into an immediate shut |
| 10   down and liquidation model? |
| 11     A. That's correct. |
| 12     Q. Okay. If the company had been able to find some |
| 13   alternative source of liquidity in our October 1st, |
| 14   2001, bankruptcy scenario -- strike that. That's going |
| 15   nowhere. |
| 16     Do you know what the recovery of unsecured |
| 17   creditors in the case ultimately was? |
| 18     A. I don't have any specific knowledge of that. |
| 19     Q. Well, what have you heard? |
| 20     A. 40 to 50 percent range. |
| 21     Q. Okay. What was the debt trading at in September |
| 22   of 2001? |
| 23     A. The debt was in the -- it fluctuated between 30 |
| 24   cents on the dollar and 60 cents on the dollar. |
| 25     MR. WICKES: That's all I have. |

MICHAEL TENNENBAUM, Ph.D.

21 (Pages 78 to 80)

Page 78

1      MR. CASTANARES: I have no cross.
2      THE VIDEOGRAPHER: Conclude the depo?
3      MR. WICKES: (Nods his head up and down).
4      THE VIDEOGRAPHER: This concludes the
5  deposition of Michael Tennenbaum, Volume I. The number
6  of tapes used today was two. The original videotapes
7  will be retained by Merrill Legal Solutions at 25 West
8  45th Street, Suite 900, New York, New York 10039.
9      Going off the record, the time is 12:20.
10
11      (Whereupon, at the hour of 12:20 p.m.,
12          proceedings were adjourned.)
13          -oOo-
14
15
16
17
18
19
20
21
22
23
24
25

Page 79

1  State of California      )
2                           )
3  County of Los Angeles   )
4
5
6      I, MICHAEL TENNENBAUM, Ph.D., do hereby declare
7  under penalty of perjury that I have read the foregoing
8  transcript of my deposition; that I have made such
9  corrections as noted herein, in ink, initialed by me, or
10  attached hereto; that my testimony as contained herein,
11  as corrected, is true and correct.
12      Executed this _____ day of _____, 2007,
13  at _____,
14
15
16
17      _____
18      MICHAEL TENNENBAUM, Ph.D.
19
20
21
22
23
24
25

Page 80

1  State of California      )
2                           )
3  County of Los Angeles   )
4
5      I, Felipe F. Carrillo, Certified Shorthand Reporter
6  No. 9555 for the State of California, do hereby certify:
7      That prior to being examined, the witness named in
8  the foregoing deposition was duly sworn to testify the
9  truth, the whole truth, and nothing but the truth;
10     That said deposition was taken down by me in
11  shorthand at the time and place therein named and
12  thereafter reduced by me to typewritten form, and that
13  the same is a true, correct and complete transcript of
14  said proceedings.
15     Before completion of the deposition, review of the
16  transcript { } was { } was not requested. If requested,
17  and changes made by the deponent (and provided to the
18  reporter) during the period allowed are appended hereto.
19     I further certify that I am not interested in the
20  outcome of the action nor a relative or employee of any
21  attorney of any of the interested parties.
22     Witness my hand this _____ day of _____, _____.
23
24
25     _____
         FELIPE F. CARRILLO, RPR, CSR #9555

MICHAEL TENNENBAUM, Ph.D.

**A**
ability 73:21
able 25:20 35:20
  40:12 45:16
  68:10 73:13,17
  73:25 74:5 75:9
  77:8,12
Absolutely 13:12
accept 63:10,10
acceptance 63:25
access 19:15
accomplishes
  71:6
account 15:16
  53:5,9 54:9,16
  68:7,24
accounts 53:12
accumulation
  60:24
accurate 76:17
acted 76:15,16
action 16:10
  80:20
actively 24:5
  34:23
activities 75:2
add 18:3 53:24
added 72:16
addition 51:21
  53:2,10 72:14
additional 10:8
  19:24 54:8,22
  55:7 65:10
adds 54:14
adjourned 78:12
Adversary 1:7
advice 75:25
  76:11,12,14
affect 15:18,23
  24:21 71:1
affiliates 1:11
aggressive 22:16
  42:15,17,19
  43:6,13 63:14
  63:17,20,25
  68:8

agreement 37:6
ahead 48:10
al 1:4 4:8
alleged 14:24
allow 59:21 76:22
allowed 80:18
allows 71:3
allude 21:10
alongside 51:24
alpha 53:16 54:3
alternative 73:24
  75:6 76:22 77:2
  77:13
amended 69:2
Americas 2:19
amount 23:9
  58:13 72:4
amounts 62:22
analyses 10:21
  24:21 26:21,23
  27:6 31:5,25
  33:18 42:15
  43:10 44:2
  45:15 52:19
analysis 12:4
  13:22 14:6 15:7
  15:8,15,19 16:7
  24:23,24 25:8
  31:12 34:1
  43:25 45:19
  48:17 74:21
  75:23 77:4
analyst 66:13
analysts 66:12
analyze 33:14
Angeles 1:19 2:3
  2:13 4:1,17 9:21
  79:3 80:3
answer 3:17
  10:13 15:20
  19:17,19 25:21
  39:25 47:11,12
answered 47:9,10
anticipated 10:23
anymore 27:16
apologize 20:25

40:3
appear 43:10
APPEARANCES
  2:7
appeared 28:6
appears 66:21
appended 80:18
application 67:14
applied 43:25
  52:21 56:9
  57:11
applies 47:18
apply 56:23 57:2
applying 43:16,22
approach 52:11
  71:25
approaches 26:22
appropriate 17:4
approximately
  44:18 48:20
April 6:11,14
areas 23:8
arithmetic 27:1
arose 71:10
arrangement
  22:1
arranging 73:17
arrived 43:15
  47:23
ascertain 47:14
Aside 9:3
asked 11:5 15:21
  15:22,24 24:23
  24:24 25:6 47:9
  47:10
asking 49:17,20
  49:21
aspect 34:25 54:3
aspects 12:3
asset 48:14,15
  51:24 52:2,10
  52:15,20 53:2,3
  53:19,25 55:4
  56:7 57:3 58:12
  60:1 62:23
assets 33:19 44:19

44:20 45:17
  46:2,2,20 47:1
  51:11 58:10
  60:6 63:2,5
  73:12,18 74:2,8
assigning 53:12
assignment 18:11
assistance 16:17
  16:21,22,23
assisted 17:7
assume 37:11
  39:10 47:22
  48:4 49:22 59:1
  61:13,17 68:9
  69:5 70:3,10
assumed 46:8
  54:13 68:24
assumes 35:3,7
  47:2,3,25 69:2
  76:19
assuming 61:20
  76:16
assumption 29:12
  49:21,22 59:1
  69:6 76:18
assumptions
  10:23 68:21
  76:8
attach 6:19
attached 7:3
  79:10
attempt 46:16
  47:5,13 66:3
  67:20 77:1,6
attempts 46:20
  48:13
attend 11:6,14
attended 11:10,16
attorney 2:10,18
  8:16 80:21
attribution 44:18
audited 68:3,4
author 16:15
  30:25 40:22
  41:23
available 23:15

25:2 33:3,10
  45:23 55:18
  60:23 61:15,24
  74:4,19 77:3,5
Avenue 2:3,11,19
  4:16
average 50:21
  51:2,5,6,20,22
  55:5 56:5 65:6
aware 27:24
A.M 2:4 4:2

**B**
B 47:14
back 9:8,22 12:19
  24:25 25:8 33:6
  34:10,10,13
  35:19 37:24
  50:7 53:17,18
  53:21 64:13,18
  69:6,16
background
  21:14 24:19
backup 38:15
ballpark 18:21
bank 25:1
banker 47:14
banking 1:7
bankrupt 49:5,22
bankruptcy 1:1
  4:9 8:23,25 14:8
  15:2 22:11,15
  25:1 45:11,12
  45:20 46:1 49:2
  49:12,13,23
  76:12 77:14
base 71:17
based 31:25 32:3
  32:10 39:14
  41:14 55:13,18
bases 68:5
basic 29:15 31:11
  31:15 51:22
  65:8
basically 30:6
basis 34:1,3,21

MICHAEL TENNENBAUM, Ph.D.

Page 2

36:16 40:8 46:6
46:12 70:12
73:13,18,21
74:3
**Bates** 28:21 29:21
**Beach** 7:6,18
**becoming** 63:2
**bee** 17:12
**began** 48:8
**begins** 4:5 7:21
64:19
**BEHALF** 2:2
**believe** 12:1 16:14
22:3 31:1 32:15
38:7 55:10 67:7
68:2
**believed** 22:14
**believer** 60:16,17
60:21
**benefit** 14:4,5
**best** 12:2 17:21
**bet** 59:25 60:14
**better** 21:23
25:21 72:7
75:21,24 76:10
76:19
**billings** 18:2,3,13
18:14
**bills** 18:19
**bit** 57:19
**black** 60:11,13
64:24 65:9
**board** 28:15 30:9
40:6,21 41:9
42:2 67:6
**body** 6:12
**book** 54:18
**books** 21:17
**bookshelf** 24:9,11
**book-to-market**
52:8
**Boston** 1:7,9,10
29:20,21 39:23
40:7 41:9 42:2
72:23
**bottom** 62:17

68:12
**Boulevard** 9:21
**break** 37:17,18
38:2 64:2,5,9
**breakdown** 72:24
**Brief** 23:25 64:12
**bring** 8:4
**bringing** 50:6
**brokerage** 28:20
29:18,19
**Brookshire** 67:7
**brought** 71:17
**Buckfire** 29:23
31:2,3 38:6,10
**built** 76:9
**bullet** 52:18 62:6
69:10 72:2
**business** 8:2,6
23:10 34:18,25
35:22 45:22
57:17 69:11,18
71:2,10 72:4,10
72:15 74:11,15
75:1
**buy** 48:5
**buyer** 46:12,22
46:23 47:15
48:21 54:15
58:17
**buyers** 36:18
46:17 58:13
59:5 61:13
**buys** 71:6
**B2** 66:19,25
**B2s** 68:18
—————————
**C**
**C** 47:15
**Cal** 7:6,18
**calculate** 51:1
**calculating** 50:25
**calculation** 50:21
51:22 65:3,11
67:17
**calculations**
13:23 17:5

21:15 55:4 63:1
64:22 67:3,5
**Calgary** 9:23
**California** 1:19
2:4,13 4:1,17
79:1 80:1,6
**call** 8:13 57:25
58:2 59:4 65:3
**called** 27:13
30:14 39:20
54:17
**calling** 35:13
**capacity** 22:19
35:8
**capital** 50:21 51:2
51:5,8,21,24
52:2,10,15,20
53:2,3,19,25
55:4,5 56:6,7
57:3
**capitalization**
51:12
**CAPM** 53:10
**capture** 54:1
**careful** 34:12
**Carolina** 20:5
21:3
**Carrillo** 1:24 2:5
5:1 80:5,25
**carry** 25:7
**carrying** 23:21
**case** 4:9 25:13,14
25:19 26:9,13
27:9,11,24 28:2
28:6 31:10 34:5
36:23 53:12
59:9 77:17
**cases** 24:14,16
25:10,23,25
26:7 46:8
**cash** 10:23 11:21
11:22 12:4 13:6
13:24,24 17:2,3
31:18,19 36:12
43:17 46:13,25
47:18 49:25

50:1 51:10,16
56:11,13 57:4
63:11,15 66:4
70:7,12,19 74:4
74:6,9
**Castanares** 2:10
4:23,23 9:14,20
25:18 26:18
27:17 28:4 47:9
48:6,11 49:6,9
49:16 57:6,21
78:1
**catch** 57:22
**centers** 35:5
**cents** 77:24,24
**century** 43:5
54:21
**certain** 62:22
69:12
**certainly** 14:17
66:17
**Certified** 80:5
**certify** 80:6,19
**cessation** 75:1
**chance** 59:5
**change** 49:17,21
50:3,8
**changes** 80:17
**Chapter** 1:4
31:10 33:13
73:7 74:25
76:20
**characterized**
27:20
**charge** 68:11
**charges** 46:1
**choose** 33:25
**cigarette** 64:7
**circumstance**
62:3 76:19
**circumstances**
43:4 50:8 57:9
75:15
**citations** 23:19,19
**cite** 23:15
**claim** 14:3

**classic** 61:4
**Clayton** 37:3,6
39:4,8,11 50:10
**client** 13:9 14:12
14:14,20 15:9
16:7
**clients** 14:5
**client's** 13:16
**close** 33:17
**coffee** 64:3
**COLLECTIVE...**
5:23
**combination**
39:11
**come** 13:1,20
19:12 20:3
27:21 29:19
30:1 39:21
40:12 58:11
**comes** 28:18 29:9
29:16 30:4
70:16
**coming** 49:11
**commencing**
76:20
**companies** 34:17
53:9 57:5
**company** 8:1 15:5
15:13,17 16:2
16:13 21:14
22:17 26:24
28:12 33:14
35:2,13,14 36:2
36:13,15 37:1,6
38:16 39:3,7,14
41:2,11,20 42:6
42:24 43:3,4
45:4,10,10,12
45:16,20 46:6,8
47:14 49:1,12
49:22 50:11
51:11,16 52:8
53:8,17 57:16
58:10 59:21
61:12 63:20
65:15 66:6 72:8

MICHAEL TENNENBAUM, Ph.D.

| | | | | |
|---|---|---|---|---|
| 73:1,7,12,17,20 74:5,10,19 75:2 75:12,21,24 76:1,10,12,22 77:5,8,12 | 45:15 69:10 **condition** 63:8 **confirmed** 32:14 36:23 38:25 39:3 | 14:19,22 23:11 26:10,12 27:8 27:20 **conversations** 14:2 23:20 | **court** 1:1 4:9,25 24:14 25:10 26:14 27:4 **cover** 6:7,10 **covered** 66:12 | 60:25 62:14 **date** 4:11 6:10,13 7:7,10 18:7 25:1 26:24,25 40:17 49:18,20 58:16 |
| **company's** 27:1 49:13 52:4 72:10 74:6,9 | **connection** 12:13 12:17 20:8 23:24 32:10,19 36:25 38:23 | **convert** 70:18 **conveyances** 14:25 16:11 **Coopers** 68:4 | **Credit** 1:7,7,8,9,9 1:10,10 4:8,22 10:12 12:22 74:23 75:21 | 58:17 63:3 **dated** 42:13 **dates** 17:2 **Davidson** 67:3,12 |
| **compare** 36:5 66:4,9 67:20 **compared** 36:12 | 47:6 **consideration** 34:15 **considered** 63:13 | **copies** 41:13 **copy** 6:3 **corporation** 1:4,8 44:22 | **creditors** 45:18 45:24 73:15 75:20 76:10,18 77:17 | **Davidson's** 67:15 69:5 **day** 45:23 79:12 80:22 |
| **compares** 65:13 **comparison** 66:22 66:23 68:23 | 63:14 **considering** 35:15 59:24 | **correct** 5:21 7:4 8:6,7 13:19 14:9 19:22 31:11,16 | **cross** 78:1 **CS** 29:20,21 39:23 40:7 41:9 | **days** 20:6 21:2,20 21:20,23 23:16 **DCF** 42:10 43:25 |
| **compensate** 53:24 **competition** 71:24 **competitive** 23:3 | **consistent** 34:13 **consistently** 36:19 **consultants** 31:9 | 34:19 38:22 39:12 41:21 45:1,16,19 51:18 53:23 | 42:2 72:23 **CSFB** 28:14,18 28:21,25 29:16 30:4,9 40:17 | **dealing** 27:22 **deals** 34:2 **dealt** 25:20 26:13 **debt** 51:8,12 58:5 |
| **competitors** 22:17 **complaint** 14:18 14:21,23 | **consultation** 10:14,20 13:3 **consulting** 7:8,16 | 57:1 58:21 59:11 69:8 75:17 77:4,6,11 | 41:1,15,19 42:7 42:10,13 67:6 72:8 73:5 | 58:11,13,22 59:6,22 62:24 63:3,3,6 65:6,6 |
| **complete** 23:24 80:13 | 7:19,25 22:1 **contacted** 8:8,12 10:1 | 79:11 80:13 **corrected** 79:11 **corrections** 79:9 | **CSR** 1:25 2:5 80:25 | 77:21,23 **Debtors** 1:5 |
| **completed** 31:24 **completely** 75:13 **completion** 80:15 | **contained** 39:22 40:19,20 41:25 67:6 68:20 | **correctly** 46:4 48:5 52:14 72:12 | **cup** 64:3 **current** 61:4 **currently** 18:10 | **debts** 58:25 **decided** 19:21 **declarative** 48:7 |
| **Complies** 28:10 30:12 | 79:10 **Containing** 42:15 | **correspondingly** 13:5 | **customer** 69:25 71:17 | **declare** 79:6 **decrease** 42:22 |
| **comprise** 51:6 **comprised** 51:6 | **contemporaneo...** 36:7 | **cost** 50:21 51:2,5 51:20 55:5 56:6 | **customers** 34:12 35:23 69:21 | **deduce** 62:3 **deep** 54:12 |
| **concern** 54:20 73:13,21 76:3 76:23 77:9 | **context** 43:4 **continuation** 72:15 | 70:10,11 **costs** 70:1 **coughing** 53:6 | 71:4,19 73:23 **cut** 34:9,10,13 35:19,21 | **deepened** 27:2 **deepening** 26:14 26:15 27:15,22 |
| **concerned** 31:18 31:19 70:6 | **continue** 46:9 73:20 76:23 | 57:22,23 **counsel** 4:19 14:2 | **cutback** 34:24 **CV** 7:2 | 28:3,6 **default** 62:4,8,9 |
| **concerning** 10:11 **conclude** 6:13 13:10 15:4 | **continued** 69:11 72:4 74:10 **continues** 37:12 | 37:16 **country** 23:9 **County** 79:3 80:3 | - - - - - - - - **D** - - - - - - - - | 62:15,16 63:6 63:15,16,21,24 63:24 71:19 |
| 62:14 78:2 **concluded** 6:14 | **continuous** 42:22 **contracted** 19:16 | **couple** 11:17 28:24 65:20 | **D** 3:1 47:15 **damage** 72:17 **damages** 28:7 | **defaulted** 71:7 **DEFENDANT** 2:2,16 |
| **concludes** 78:4 **conclusion** 15:13 16:1 39:13 | **contracts** 73:23 **conversation** 12:6 13:9,15 14:17 | 66:16 **course** 24:5 54:14 75:14 | 72:3 **data** 31:15 52:12 53:14 55:1,2,17 | **Defendants** 1:12 **DEFENDANT'S** 5:23 |
| 43:20 44:3,6 **conclusions** 26:1 | | | 55:19,24,25 | |

MICHAEL TENNENBAUM, Ph.D.

Page 4

definition 63:4
degrees 24:7
  57:11
Delaware 1:2 4:9
  9:1 27:15
delete 67:12
delinquency
  29:12
demanded 46:23
depending 60:5
depends 60:6
  71:3
depo 78:2
deponent 80:17
deposition 1:16
  2:1 4:6,15 5:17
  64:15,19 78:5
  79:8 80:8,10,15
derivation 57:8
derived 41:10
  48:23
describe 39:15
  50:20
described 37:13
  42:11 43:16
  52:14 55:17
  56:9 57:20 65:4
describes 30:19
describing 29:15
description 3:8
  50:24 52:23
  53:1 56:5
desire 16:7
destroying 72:16
detail 12:2 25:23
  32:2
determination
  10:5 13:23 17:4
  20:17 54:2,5
  55:15
determine 25:6
  27:1 46:16 47:6
  60:10,13 77:1
determined 13:17
determining 17:1
  51:15,25 52:3

60:25
developed 32:10
  32:19,20
development 9:20
deviation 65:7
differ 43:24
difference 71:16
  76:14
differences 35:2
  61:7
different 15:21
  20:11 34:17
  38:24 51:20
  56:10,11,13
  57:5 68:5,22,25
  71:18
difficult 15:3
direct 68:23
directors 28:15
  30:9 40:6 67:7
disclosed 39:15
discount 17:4
  48:23 50:3 51:3
  51:14 67:15
discounted 11:21
  11:21 12:4
  13:24
discuss 26:7
discussed 21:18
  26:9 30:21 32:5
discussion 30:13
discussions 38:17
  62:1
dispute 17:11
disputes 12:22,25
dissipate 76:3
dissipating 76:3
distributed 45:18
distribution
  45:24 62:20,21
  73:15
District 1:2 4:9
  8:25
divide 18:20
  65:18
Doctor 5:15 14:7

15:20 17:10
38:2 64:22
document 6:17,22
  7:21 29:3,14
  30:7 41:25 42:2
  42:9,11,13
documents 3:9
  5:22 10:7,8,9
  12:10,12 14:1
  17:1,1,3,8,14
  18:25 19:2,4,5,8
  19:13,15,20,21
  19:24 20:1,4
  23:19 25:3
  28:14,14,18,23
  30:5 40:15
doing 12:3 15:25
  24:9 26:17,17
  33:21 40:15
  66:5 74:15
dollar 58:8 65:25
  77:24,24
dollars 65:20,21
  65:25 68:1
  73:14
domain 66:6,7
downturn 22:25
Dr 4:6 20:24,25
  64:15,20
dramatically 34:4
  58:10
drawn 27:5
driver 50:2,4
drivers 49:25
  50:7
due 58:11,16 63:3
duly 5:7 80:8
duration 65:6
D1 62:22
D2 62:22
——————
        E
——————
E 3:1
earlier 52:23
  68:17
early 8:11 9:22

23:8 43:5 54:21
easier 70:2
EBITDA 43:1
economic 23:23
economics 7:6
economist 7:8,19
  7:25
economists 59:14
Edwards 7:11,12
effect 23:2 51:16
  76:13
efficient 60:16,17
  61:19
efficiently 61:10
eight 9:8
either 12:11 49:2
  66:14
element 54:4
employee 80:20
employing 11:2
employment 7:17
enable 69:20
endless 66:16
engage 73:11
engaged 34:5
engagement 7:24
  12:14,17 17:25
engagements 7:22
  9:10
enormous 10:6
entered 43:7
enterprise 44:10
  44:22 45:4,9
  65:5
enterprises 65:7
entire 19:7
entitled 32:9
entity 37:12
equal 62:21
equation 65:9
equity 51:7,13
  52:1,4 53:23
  57:25 58:2,3,6
  58:22 59:1,7,15
  59:17,23 60:4
  61:12,17 62:3

64:23 65:1,1,11
  65:15 66:12,13
essentially 34:3
  35:21
estimate 18:21
  55:10 77:7
et 1:4 4:8
eventually 63:2
evidence 16:12
evident 14:1
exactly 6:21
  24:22 47:1
  50:12
EXAMINATION
  3:3 5:13
examined 5:8
  80:7
example 18:24
  25:14 30:2 35:3
  35:7 36:10
  57:15 61:4,11
  62:6 66:9 69:22
examples 7:22
exceed 58:12
excellent 60:24
excess 44:19,20
  63:21,22 67:19
  72:18
Exchange 59:12
  61:13
exclusive 45:25
Excuse 37:16
  49:9
Executed 79:12
exercise 15:11
  46:19 47:12,22
  48:12 51:1
Exhibit 3:9 5:24
  6:2,6
EXHIBITS 3:7
  3:11
existed 34:18 35:2
exit 35:17
expands 52:6
expansion 22:19
  52:10

MICHAEL TENNENBAUM, Ph.D.

expectation 47:19
expenses 18:3,6
experience 14:8
  15:2
experienced 5:17
expert 8:9 10:16
  13:4
expertise 8:5 14:4
exploration 11:1
expressing 46:15
extent 68:20 74:1
  74:17
E-Toys 25:15

- - - - F - - - -
F 1:24 80:5,25
face 65:5
fact 22:21 30:2
  33:21 37:5 39:1
  49:4 54:12 68:8
  68:24 70:24
  74:13 75:9 76:2
  76:25 77:8
factor 55:8
fair 25:4,5 55:14
  58:22
fall 33:15 34:8
Fama 50:22,23
  51:19,23 52:6
  54:6,7,7,16,22
  56:6,8 57:3
familiar 17:13
  36:21 37:5
far 18:2,13 24:25
  25:8 31:18,19
  60:11 70:14
favorably 26:15
fee 68:9,10,25
fees 18:3,5,16
  45:25 69:3
  72:15,16,18,22
  72:23,24,25
feet 30:3,4
Felipe 1:24 2:5
  5:1 80:5,25
fellow 10:18

fewer 36:17
figure 36:11
figures 67:14
file 75:25
filed 32:22 73:7
files 7:1 17:11
filing 25:1 31:22
  31:25 32:1 33:1
  33:4,4,13 74:25
finally 23:7 29:2
finance 69:20
  71:3 73:22
financeable 71:5
finances 70:3
financial 23:22,23
  29:17 31:5 34:4
  43:12 67:21,24
  68:3,21
financing 22:16
  35:23 57:17
  69:21 73:2 74:5
  75:7,13
find 22:4,6,8
  23:11 53:15
  65:14 66:22
  77:12
finds 57:10
firm 7:10 8:16 9:5
  9:11 10:14,17
  11:5,18 16:25
  17:14 18:17
  19:6,9 20:2,20
  24:17 28:20,21
  29:18,19 30:24
  31:4 38:6 41:11
  42:3 55:5,11
  67:3,15
firms 54:11,20
firm's 14:5
first 1:7,9,10 5:7
  6:6 8:8,12 10:1
  12:19 13:8,15
  13:20 14:11,14
  14:16,17,22
  29:20,21 39:23
  40:7 41:9 42:2

44:21 58:25
  62:6 69:15
  72:23 76:9,21
fiscal 29:4 44:22
five 23:22 24:4,14
  53:13,17,18,21
  54:23 55:12
  60:4 64:6 66:17
  71:16
five-year 30:14
  30:20 31:13,20
  32:9 36:6 38:3
  39:17 43:17
Flavell 7:11,12,16
flow 12:4 13:24
  34:4 36:12
  63:11 66:4 74:6
  74:9
flows 10:23 11:21
  11:22 13:6,24
  17:2,3 31:18,19
  43:17 46:13,25
  47:19 49:25
  50:1 51:10,16
  56:11,13 57:4
  64:1 74:4
fluctuate 58:10
fluctuated 65:24
  77:23
focused 12:3
focusing 52:4
following 52:19
  69:13
follows 5:8
foot 46:21
footsteps 47:13
forced 72:9 76:6
forecast 36:6
  48:24
forecasts 36:13
  37:10,11
foreclosure 35:18
foregoing 62:7
  79:7 80:8
foremost 55:2
foreseeable 76:4

forgetting 21:1
form 7:2 25:18
  26:18 27:17
  28:4 48:11 49:6
  49:16 57:6
  80:12
formula 52:14,23
  53:1,3,4
formulate 39:9
formulates 51:9
forth 6:18
forthcoming 22:8
forward 33:14
  35:15
forwarded 14:19
four 23:21 24:4
fourth 69:10
framework 13:25
  24:20 26:20
fraudulent 14:25
  16:11
French 50:22,23
  51:19,23 52:6
  54:6,7,7,17,22
  56:6,8 57:3
Frequency 61:23
friend 36:2
front 6:1
FTI 29:25
full 60:20 73:6
full-time 7:17
functions 62:23
funding 69:20
further 54:25
  68:16 72:9
  73:21 76:17,25
  80:19
future 10:23 23:3
  58:4 71:7 76:4
f/k/a 1:7,8,10

- - - - G - - - -
gamble 59:19
Gene 50:23
general 53:4
  60:15 69:16

71:11
generate 73:14
generated 13:22
  33:15
generous 22:23
  44:19
getting 10:8 52:12
  68:17
give 12:8 19:21
given 19:15 25:2
  33:12 43:3
  44:25 46:23
  48:22 58:25
  60:9,9 63:1,25
  75:6 76:11
giving 20:3
Glatt 2:9 4:16,24
go 5:19 10:22
  21:14 35:22
  39:19 47:13
  48:10 49:5
  52:16 55:22
  63:15 64:6
  68:12 69:16
  72:14 74:2
  76:12
goes 54:1,4 57:16
going 9:8,21 11:9
  24:25 25:23
  33:14 34:9,10
  34:11,13 35:15
  35:20,22 37:22
  47:16 53:17,18
  53:21 54:20
  58:18 63:20
  64:10,16 65:19
  65:20 68:10,12
  68:13,14,18,19
  70:22 73:12,13
  73:21 74:24
  76:2,3,23 77:9
  77:14 78:9
going-concern
  46:6 73:18 76:1
going-forward
  34:7,21

MICHAEL TENNENBAUM, Ph.D.

Page 6

Goldman 25:15
good 5:15 70:14
gotten 76:14
greater 42:24
    68:20
gross 46:2,14
group 34:17
    71:17
growing 43:11
guaranties 66:20
    67:1,22,25
    68:19
guarantying
    69:12
guess 9:23

H

half 65:17,19,20
    65:25
Halpren 10:18,19
    20:9
Halpren's 11:17
    11:19
hand 58:15 62:24
    80:22
happen 75:14
    76:6
happened 49:4
    70:5 73:4,10
happy 37:18 64:9
head 78:3
heard 77:19
heavily 34:5
Heckinger 8:23
    9:4,17
help 66:18
helpful 22:4
    23:12
hereto 79:10
    80:18
high 22:23 36:16
    54:18 58:9,9
    63:17 69:4
higher 71:25
hindsight 71:15
history 62:13

hit 58:19
HML 54:17,21
hockey 42:20
Holdings 1:9
Holt 2:24 43:7
home 22:22 58:19
    69:24 70:1,7,11
    70:12 74:24
homes 1:4 10:3,5
    10:6,11 22:17
    24:25 29:3 30:2
    32:9 36:22 37:3
    37:6 39:4,11
    40:8 50:10 72:3
    74:11
hoped-for 57:10
Hopefully 73:11
hot 64:4
hour 78:11
hourly 18:1,9
hours 18:12,14,16
    18:18,22
housing 8:2
hypothesis 74:23
hypothesized
    49:3 50:1
hypothetical
    10:24 47:2,3,20
    48:13 70:25

I

Ibbotson 55:2,6
idea 11:8 13:16
    41:17 70:1
IDENTIFICAT...
    3:7 5:24
identified 65:9
identify 4:19
imagine 17:22
immediate 77:9
immediately
    45:21 73:8
impact 23:8 26:1
    53:5,7
impacting 23:2
impacts 69:13

implication 68:17
implications 27:5
    43:24 54:6
    60:25
implies 54:7,22
imply 46:24 62:7
    76:5
important 73:16
impression 16:6
include 43:12
    59:25 60:2
included 5:16
    17:17 20:1 36:6
includes 7:21
including 22:16
    41:2
income 34:4
increase 23:1
    42:23 62:7
increased 66:20
independent 7:16
    37:12 40:25
    41:15
indicate 44:14,17
indicated 22:14
    25:22 27:21,24
    28:5 32:24 41:8
    62:16
indicates 7:5 14:7
    75:23
indicator 54:24
    54:25
industry 22:19
    23:1 43:5,11
    53:15,18,21
    54:8,10,12,19
    54:20 55:3,5,7
    57:8,10 59:20
    60:1 71:11
industry-wide
    71:25
influenced 16:7
information 3:14
    12:8,16 23:15
    26:16 28:11,13
    28:17 29:1,7,9

29:11,12,13,15
    29:16 39:8 41:1
    60:20,23 61:1,3
    61:9,10,14 62:2
    62:4
informed 55:16
    55:18 72:17,19
Inga 2:25 4:13
initial 42:21,21
initialed 79:9
initiated 27:8
ink 79:9
input 41:15
inputs 56:8,23
    57:2 62:7 65:4
insinuation 13:14
insofar 70:5
insolvency 26:14
    26:15,23,25
    27:1,15,22 28:3
    28:6
insolvent 13:11
    13:18 15:5,14
    15:18 16:2,13
    25:17
inspection 58:16
installment 73:22
INSTRUCTED
    3:17
interest 13:17
    15:25 52:16
    60:7 65:8
interested 11:20
    11:24 80:19,21
internal 21:16
    28:24,25 29:3
    31:25 36:12
internally 13:23
    35:14 40:9
investigate 75:14
investigated
    74:17 75:6
investment 47:14
investor 33:3,11
involved 8:1 10:2
    10:11 11:7,8

15:9 18:12,19
    34:23 39:3
    55:16 61:21
involving 9:20,23
    10:3,4,15 11:21
    11:25 48:14
    69:11
issue 13:5,6 26:13
    27:3,4 45:13
    60:8
issues 10:4 11:7
    13:1 20:12
    21:15
item 44:9,21

J

Jason 17:2
Jensen's 53:16
    54:3
journals 23:23
judgment 55:16
    55:18,24 57:1
    59:16
July 42:16

K

keep 49:20 74:14
Ken 50:23
kick 68:20
kind 24:19 46:22
    55:17 58:1
    71:25
kinds 33:2,15,16
    34:6
King 8:14,17 9:3
    9:25 11:14
    12:20 13:9,13
    13:15 14:11,20
    14:22 26:7
King's 11:10
knew 15:6
know 5:19 14:3
    15:6 17:10,16
    18:18 19:20
    20:12,15 26:19
    26:21 27:19

MICHAEL TENNENBAUM, Ph.D.

31:20,23 32:3
32:13,17 36:25
38:8,13,15,17
39:1,2,9 40:16
40:17,22,25
41:3,12,16,23
42:5,8,8 45:13
50:10,12 61:3
65:13,22 66:21
68:22 72:24,25
73:3 74:1,8
75:23 76:7
77:16
knowing 19:17
34:9
knowledge 8:5
17:21 31:8
77:18
knowledgeable
22:6 33:3,11
46:22,23
known 42:20
53:16
Kornev 2:25 4:13
Kvarda 21:7
Kvarda's 21:10

———— L ————
lack 61:6
laid 30:14
large 23:1
largely 10:24
35:25
lasted 49:4,13,23
late 9:23 11:13
22:18 23:7
33:19,20 34:22
39:20 40:10,21
43:23 45:17
46:13
law 2:9,10,18
24:20
lawyer 10:17
lawyers 11:17
19:9 20:7,20
lawyer's 14:4

layman's 58:1
lays 6:18
lead 10:16
leading 13:23
23:1 68:21
learn 14:14
learned 14:16,20
led 22:10,15,18
32:23 33:25
55:9
left 59:7,22
Legal 4:13 5:1
78:7
lesser 74:1
letter 6:7,10
let's 69:16,23
70:3 76:8
level 71:20
likelihood 58:12
59:16 62:20,21
likelihoods 62:4
line 36:11
lines 46:9 61:6
Linklaters 2:17
4:18,21
liquidate 45:22
74:8 76:7
liquidated 49:2
liquidation 1:5
4:7 12:22 14:12
14:15 15:4,12
15:17 16:1 22:2
75:12 77:10
liquidity 74:14,18
75:7 76:22 77:2
77:5,13
list 23:22,24 24:8
24:14
listed 24:3 25:11
25:25
litigation 10:3,12
13:2,25 17:13
little 51:4 62:13
LLC 1:8,9
LLP 2:17
loan 36:1,3 73:25

loans 22:21 69:12
loan-to-value
22:23 34:11
36:16 70:4
71:12,13 72:1
located 4:16
long 7:6,18 30:4
60:2 70:22
look 18:24 19:13
24:15 26:5,14
26:23,24 27:23
28:9 30:11
46:20 53:14
55:22,23,25,25
57:24 74:3
looked 13:25 19:2
19:8 24:5,15
looking 10:22
14:18 35:15
37:10 52:7 54:6
55:1
looks 27:14 47:16
52:3
Los 1:19 2:3,13
4:1,17 9:21 79:3
80:3
lost 66:2 70:13
lot 10:9 14:8
22:21 32:2
34:23 35:18
55:23,25 60:22
60:22,23 61:9
61:20,22 69:25
lots 24:11 33:21
33:22,22,22
lower 36:15,19

———— M ————
major 62:13,14
majority 18:15
making 36:16
55:16
manufacture
70:11
manufactured
8:1 30:2,3

manufacturing
22:20 34:13
35:8,16 36:18
69:24 74:11
March 42:13
marked 3:7,11
5:23 6:2
market 48:15
52:5 54:18
60:24 61:3,19
68:14
marketplace
46:21 47:16
48:22 54:19
58:8
markets 60:16,17
60:21 61:5,10
market's 51:9
59:16
marks 64:14
match 71:24
material 24:19
materials 5:16
17:17 24:3,5
41:12
math 62:14 70:2
mathematical
52:14
matter 4:7 6:4
7:25 8:10,22,23
8:24,25 9:4,11
9:13,20,22 10:1
17:11 19:1 20:8
20:11,16,16
31:7 56:7 57:2
58:21 60:15
71:11
matters 10:11,15
11:20 14:8
maturity 62:25
mean 35:11 39:24
42:17 43:13
56:11 58:1 72:6
means 53:19 58:3
68:16
meant 16:9

measure 28:7
61:22
mechanical 56:7
meeting 10:25
11:1,6,10,12,14
11:16 12:9 20:5
21:12
meetings 21:11
members 16:25
memorandum
28:24
memos 28:24,25
mention 23:16
mercy 62:13
Merrill 4:13 5:1
78:7
mess 61:4
met 20:8,22 21:5
meter 60:24
methodological
12:3
methodologies
11:9
methodology
10:21,21 21:18
39:15 47:23
Michael 1:17 2:1
3:4 4:6 5:6
64:15,20 78:5
79:6,18
mid 9:22 11:13
22:18 43:23
middle 65:9
mid-2001 41:22
Miller 29:23 31:2
31:3 38:6,10
million 44:4,7,11
44:15,18,18,23
45:4,17,23 46:3
46:14 47:19
48:20 50:9,13
50:14 65:11,18
65:19 66:20,21
67:1,9,11,19
68:1,1 69:1 72:5
72:7,18 73:14

MICHAEL TENNENBAUM, Ph.D.

Page 8

mine 17:6
minus 62:19 63:4
minute 64:3
minutes 64:6
missed 52:24
mobile 22:16,22
69:24 70:1,7,11
70:12 74:11
model 50:22
51:19,23,25
52:2,6,11,15,21
53:3,3,20 54:1,7
54:7,22 55:4,6
56:6,8,8 57:3,3
60:12 64:24
69:11,18 72:4
72:10,15 77:10
models 60:10,12
60:20
moment 37:17
66:23 69:15
MONDAY 1:18
2:4 4:1
money 60:7 70:13
monitor 4:12
months 31:24
60:3
morning 5:15,20
15:10
mortgage 61:4,5
mortgages 68:11
69:21 71:7
mouth 25:5
move 48:7
moved 71:11
Muir 19:25 20:3
20:7,21 21:3,6
21:13,21,25
22:4,10 23:12
23:17 32:4,6,24
38:18 41:5,14
50:12 71:9
Muir's 41:11,13
multiplied 65:14

N

N 3:1
name 10:17 29:18
named 10:18
50:23 80:7,11
names 11:18
21:10
nature 11:1 12:21
12:25
ND2 62:19,19
63:1,4
necessary 54:9
need 5:19 51:1
53:24,24 54:16
needed 15:4,6
needs 16:12 68:24
negative 23:5
53:17
net 36:10,19
never 20:17,22
66:7,15
new 2:20,20 4:14
4:14 10:14 11:6
23:3 59:12
61:13 78:8,8
nine 44:9,21
65:17,18
Nods 78:3
nonlawyers 12:5
normal 62:20
North 20:5 21:2
noted 79:9
noticed 4:17
notion 57:19
November 25:2
nowadays 70:1
number 4:10
22:14 32:23
35:1,4,16,17
36:11 53:15
61:24 64:25
65:13,14,14
67:2,9,11,18,21
69:25 78:5
numbers 36:5
39:10,16 43:1
65:8 67:12 69:5

O

OAC 68:10
Oakwood 1:4
7:25 9:11 10:1,3
10:5,6,11,15
11:3,5,7,22,25
12:13,17 13:5,7
13:11,17 19:8
19:13 21:17
22:11,15 23:9
24:25 25:6,16
28:12,16 29:3
29:16,17,20
30:10 31:7,10
31:12 32:1,9
33:22 34:2,8,17
34:18,21 36:22
37:12 40:7,8
46:17 47:8
52:21 54:11
57:9 59:9 60:1
66:12 67:7
69:20,23 70:3,5
71:3,6 72:3 73:4
Oakwood's 67:21
67:24 69:18
71:2
object 48:6
Objection 25:18
26:18 27:17
28:4 48:11 49:6
49:16 57:6
obligations 58:5
58:11,13,17
59:22
obtain 74:5
obtained 42:3
54:5 55:1
obtaining 17:3
occasions 8:20
9:7
occurred 67:13
October 1:18 2:4
4:1,11 76:21
77:13
odd 9:8 18:4 68:1

offer 39:9 46:20
48:16,19
offered 48:15
office 7:1 19:12
21:10
offices 2:9 11:19
Oh 39:12
OHC 1:5 4:7
14:12,15 15:4,6
15:12,25 29:4
32:11 44:10
62:7 64:23
69:11 72:14,17
OHC's 69:14
Okay 7:14,17,21
8:4,8,15,17,20
8:22 9:25 10:10
12:8 14:11,21
15:10 16:15
17:10 18:9,24
19:4,7,23 20:3
20:14 21:8 22:4
22:10 23:11,21
24:3,8 25:4,14
27:13 31:11,17
36:5,21 37:15
37:21 38:13,20
38:23 39:19
40:16 41:4 42:4
44:2 45:9 49:1
50:10,20,24
51:19 57:1,19
58:20 59:9
61:11,22 62:18
66:9,18,25 67:4
70:10,15,21
71:9,22 72:2,12
72:14 73:20
74:7,13,17,22
77:6,12,21
ongoing 32:25
oOo 4:3 78:13
open 22:8
operate 46:9
operation 69:11
72:4

operations 34:7
35:17
operator 4:12
opinion 15:5,17
15:23 44:13,24
45:3,7 46:15
59:5 61:7 75:19
75:20
opportunity
58:19
opposed 41:1,13
option 57:25 58:2
58:4 59:4
order 53:22 68:8
74:14
orderly 73:12
ordinary 58:21
organizations
31:5
organizing 17:1
original 78:6
ought 50:2,9 56:2
outcome 80:20
outside 29:18
outstanding
61:24 65:15,18
68:11
overly 22:16,23
overstated 53:20
owner 58:3
ownership 47:1
51:11

P

page 3:3,8 6:6,17
7:21 23:21,22
24:4,4,13,14
25:11 28:9,11
29:11,13,13
30:11,15,19
32:8 36:11
37:11 38:3
39:19 41:18
42:5 43:9 44:9
44:21 52:18
57:20,22,24

MICHAEL TENNENBAUM, Ph.D.

62:1,5,17 64:22
64:25 65:4,9
66:23,25 67:10
67:11 69:9 72:2
**pages** 1:10 6:17
28:18 29:7
30:20 52:13
56:9 66:23
**paid** 17:24 18:7
50:10 58:22,22
58:25 59:6
68:17,18,19
69:3,4 72:14,23
72:25
**Pam** 8:14
**papers** 17:12
**parameters** 52:20
59:24 60:9
**part** 21:11,23
35:9 38:15 40:8
41:10 42:9 43:5
44:17 51:14
54:21 57:17
70:19
**particular** 6:22
8:5 25:7,17
33:25 58:7
**parties** 35:24
80:21
**partnership** 7:15
**Paul** 2:18 4:18,21
**pause** 23:25 64:12
**pay** 54:19 58:4,14
58:18 59:21
**penalty** 79:7
**people** 18:17 21:9
71:15,17
**percent** 31:1
53:13 54:23,24
55:7,12 62:10
62:11 63:22,22
63:24 67:15
68:15 70:4
71:12,12,16,19
71:23,23 77:20
**perform** 15:15

**performance**
71:18
**performed** 15:11
27:6
**period** 32:25
58:15 66:11,15
73:6 80:18
**periods** 28:16
**perjury** 79:7
**permanent** 51:16
**perspective** 22:20
**phone** 8:13
**phonetic** 8:14
67:8
**Ph.D** 1:17 2:1 3:4
5:6 79:6,18
**pick** 69:25
**PJW** 1:4,8
**place** 4:15 65:22
80:11
**places** 56:1
**plaintiff** 1:6 2:8
4:24 16:10
**plan** 30:14,20
31:20 32:9,11
32:13,20,21,24
34:14 36:6,22
36:25 37:7 38:3
38:24 39:2,17
43:17
**plants** 34:13
35:16
**play** 31:7
**please** 4:19 5:3,10
37:22
**plug** 65:8
**plus** 18:3 29:16
29:18
**point** 16:4,5,9,10
16:14 25:7,17
26:24 31:13
52:19 58:7 62:6
69:10 70:6,13
70:25 72:2,10
76:2
**pointed** 27:12

**points** 21:19
**popular** 60:11
**possibility** 8:9
11:2 73:24
**possible** 62:2
74:22 75:3,5
**potential** 73:15
**practice** 7:16
**preceded** 36:20
**preceding** 7:15,15
**precisely** 33:16
42:8
**preferences** 14:24
16:11
**Preliminary** 67:3
**premium** 52:25
53:13 54:5,23
55:1,10,14,15
55:23 56:1,2
**premiums** 57:8
**prepare** 6:19
24:23,24 38:14
**prepared** 6:23,24
7:3 17:16 31:21
31:22 38:5,21
38:23 40:17
75:8
**preparing** 16:19
16:21 24:6
**present** 2:23
10:22 13:6
46:24 50:6,15
51:15 67:14
**presentation** 42:1
**presentations**
28:15 30:8
39:23 40:5,6,21
67:6
**presented** 41:9
**presently** 9:10
**presume** 43:10
**presumption** 63:9
**pretty** 33:17
61:16
**previous** 7:22
**PREVIOUSLY**

3:11
**price** 39:9 46:18
47:23 48:5
53:20 59:15
61:17 62:23
65:15 68:4
**pricing** 51:24
52:2,11,15,21
53:3,3,25 55:4
56:8 57:3
**primarily** 12:3
17:5
**principal** 74:14
**prior** 7:24 32:1
32:25 33:4,12
37:5 38:16 40:8
41:10 80:7
**priority** 69:4
**probabilities**
63:16
**probability** 58:9
62:8,9,15,16,19
63:2,5,15,21,24
63:25
**probably** 9:8 16:3
18:15 26:6
72:11
**problem** 27:14
**problems** 35:19
71:10
**proceeded** 13:22
45:22
**proceedings** 1:7
45:21 78:12
80:14
**proceeds** 48:20
73:1,22
**process** 5:17 10:8
21:16 33:12
35:10,12 49:4
50:25 51:15
69:18,19,23
70:21 71:1
75:11
**product** 17:6 23:4
42:6

**professional** 6:18
6:22
**professor** 7:6,18
**project** 9:21,23
**projected** 42:23
**projection** 42:5
**projections** 21:18
29:4,17 30:14
30:20,21,23,25
31:13 32:6,9,10
32:19,23 33:1,2
33:10,12,16,17
33:18,22 34:2,6
34:16,20 36:7
36:20 38:3,5
39:6,20,21,22
40:5,10,12,16
40:23 41:8,18
41:19,22,24
42:9,15,19,21
43:10,22,23
44:1,25 46:10
50:16,17 54:13
56:4 63:11,11
63:12,13,18,19
66:4,5,7,10,16
66:14,15,16
68:6,9
**properly** 6:13
**proposed** 32:11
32:20,24 37:8
**proposition** 53:4
**prospect** 13:6
34:4,8 46:13,25
59:19 74:4
**prospectively**
13:3
**prospects** 33:14
74:6,9
**provide** 10:14
13:3 15:7,7
24:19
**provided** 10:20
17:18 18:25
19:3,4,5 69:19
75:8 80:17

MICHAEL TENNENBAUM, Ph.D.

Page 10

providers 55:2
providing 35:22
provisions 36:21
public 66:6,7
publicly 59:10
published 66:11
purchase 70:4
purchaser 47:3
  47:24,25 48:2
  70:4 75:25
purchasers 22:22
  47:7 59:19
purpose 21:12
  23:18 24:18
purposes 51:25
put 6:1 15:3 25:4
p.m 78:11

———— Q ————
qualification 45:2
qualifications
  6:18,23
qualified 36:18
quarterly 70:21
question 11:24
  15:21,22,23
  19:11,18,19
  25:16,21 41:4
  41:23 47:5 48:3
  48:7 49:8 72:18
QUESTIONS
  3:17
quick 54:14
quickly 25:20
quite 34:15 43:6
  44:19

———— R ————
R 2:18 4:18
raft 10:7
ran 66:16
range 50:14 55:12
  56:3 77:20
rapid 42:22 75:1
  75:11
rate 18:9 46:22,24

50:21 51:3,7,7
51:14,25 52:3,5
52:7 53:23,25
54:2,8 65:8
67:15 68:14
rates 17:5 47:17
  47:18 48:23
  50:3 53:8,20,20
  55:3 60:7
ratio 36:16 70:5
  71:12,13
rationalization
  34:14 35:11
rationalizations
  35:9
ratios 22:24 34:11
  52:9 72:1
reach 43:20 63:5
reached 26:1
read 25:10,12,12
  33:6,8 79:7
realize 45:17
  73:17
realized 46:3,13
  47:20 48:20
  53:20 70:7
reason 23:14
reasonable 55:10
  59:25 60:13
reasonably 58:9
recall 8:3 11:18
  12:10,11,24
  14:13 21:22
  25:19 27:18,19
  29:10 37:9
  40:14,15 42:1
receivable 70:8
receive 16:17,21
  16:22,23
received 12:10,13
  12:17 19:20,20
  75:24
Recess 37:23
  64:17
recession 23:7
recognize 27:15

recognized 14:23
  71:16
recollection 8:13
  12:2 15:1 26:13
  29:5 40:20
record 33:8 37:22
  37:24 64:10,13
  64:16,18 78:9
recover 14:24
  16:11
recovered 77:7
recovery 43:11
  77:16
reduce 35:16,17
  67:13
reduced 34:3
  37:13 80:12
reduction 35:4,8
reductions 73:1
referred 3:11
  35:10
reflect 34:24 35:1
  57:4 59:15
reflected 46:9
reflects 59:4,18
refused 72:8
regard 13:13
regardless 57:12
  57:15
rejected 13:14
relate 51:21
related 20:16
relating 72:15
relationship
  20:17 54:18
  69:17
relative 54:18
  60:19,20 61:24
  62:23 80:20
relatively 23:8
  60:17 61:18
relevant 13:11
  16:12
relied 23:19
remain 50:1,3,5,8
  50:9 76:23

remains 57:16
remember 6:21
  10:16 26:12
  30:7
remembering
  62:12
reorganization
  31:6 32:11,13
  32:20,21 36:22
  37:1,7 38:24
  39:2
replace 75:7
report 5:16 6:2,4
  6:12,13,16,20
  6:24 7:3 16:15
  16:19,22 23:14
  23:21,24 24:6
  24:13 28:9,20
  29:19 32:8 36:6
  38:4 39:16
  40:11,17,18
  41:2 43:17 44:9
  44:16,17,21
  50:16 57:20
  62:1 63:14
  66:19 69:9
reported 1:23
  24:14
reporter 5:1,3
  33:7 37:16,20
  80:5,18
reports 66:13
repos 23:3
repose 23:5
repossession
  29:12
repossessions
  23:2
represent 4:20
  18:14,16 40:25
  41:19 61:18
represents 41:20
  42:6
request 11:11
requested 3:14
  80:16,16

required 47:17,18
  51:7,7,10,25
  52:3 53:8,23,25
  54:2 55:3
respect 8:1 10:15
  10:20 11:6 13:3
  13:4 17:4,15
  19:1 20:10
  21:15 28:3 31:5
  34:12,16 40:10
  41:17,22 42:4
  47:17 48:3
  50:24 53:14
  55:3 65:5
response 30:16
result 26:23 40:14
  48:16 52:12
  65:2 72:3 74:25
resulted 52:19
resulting 22:25
  47:19 65:2
  67:14
results 48:13,17
  48:19 68:6
  71:19 75:10
resume 14:7
retail 22:20 35:4
  35:17,23
retained 78:7
retrospect 26:6
return 46:22,24
  47:17,18 51:7,8
  51:10 52:1,3,5,7
  53:8,21,23,25
  54:2,8 55:3
revenue 34:21
revenues 42:22
  42:24 43:11,12
review 10:9 25:13
  25:20 80:15
reviewed 23:23
  40:15 42:3
right 5:15,17 6:1
  6:8,16,25 7:8
  9:1,18 12:19
  14:7,25 17:24

MICHAEL TENNENBAUM, Ph.D.

19:10 20:19
24:10 25:10
29:17 30:15,17
32:5,8,11,18
35:24 37:3,13
37:19 38:6,25
39:4 40:4 43:18
44:11 47:3
48:10 49:10
50:18 51:17
52:16 55:20
56:4,21 59:1,10
69:4,9 70:8,13
70:16 76:17
**risk** 53:9,13 54:5
54:14,23 55:1,6
55:11,15 56:2
**riskier** 54:11
**riskiness** 54:9,10
**risk-free** 65:7
**role** 31:7
**room** 43:7
**roughly** 18:18,20
**rounded** 44:11,23
67:19
**RPR** 1:25 2:5
80:25
**rule** 64:5
**ruled** 28:6
**rules** 5:19
**ruling** 27:21
**run** 58:19
— — ———
—— — **S** _ — —
**Sachs** 25:15
**sale** 39:3 45:17
46:14 47:2,20
73:12,18
**sales** 22:16 23:3
35:5,17 36:11
36:16,19 73:23
73:25
**saw** 14:21 17:14
66:7,14,16 67:5
**saying** 36:1 53:22
59:3

**says** 32:8 44:21
**scale** 37:13
**scale-down** 34:3
**scanned** 25:22
**scenario** 49:15
76:20 77:14
**scholes** 60:12,13
64:24 65:9
**scope** 24:22
**second** 37:21
52:18 54:4
**sections** 30:3
50:20
**securit** 70:24
**securities** 1:8
21:16 61:5
69:13
**securitization**
29:11 34:25
69:12,17,19
70:15 71:1
75:11
**securitizations**
23:6 34:6,10,24
35:19,21 67:13
69:2 70:22 72:9
73:6 74:15 75:8
75:22
**securitize** 73:22
73:25
**see** 6:12 47:16
52:23 58:20
69:22
**seek** 75:25
**seeking** 16:11
**seen** 27:11 33:21
**self-described**
42:10
**sell** 37:6 48:16,19
69:24 74:2,3,5,5
74:9
**sellers** 61:14
**selling** 74:11
**sensitivity** 52:4,7
**sent** 17:22 24:17
27:11

**sentence** 42:18
43:9 48:8
**separate** 20:15,16
**September** 29:5
39:14 43:16,21
44:3,6,10 45:5
45:10,11,14,21
46:16 47:7
48:18 49:1,15
49:23 50:7
57:12,13 62:8,8
62:10 63:10,23
64:23 65:12,16
65:23 69:1 72:8
73:5,14 74:23
75:19,22,25
76:11 77:21
**series** 21:11 35:14
63:8
**serve** 8:9
**served** 7:25
**service** 43:12
**services** 34:4
**servicing** 68:9,11
68:25 69:3
**set** 29:3,16 31:13
33:25 34:2,20
39:16 43:22
56:21,21 63:12
**sets** 43:25 50:15
56:13
**severe** 23:8
**shape** 34:17
**Shapiro** 20:24,24
20:25
**share** 12:12,16
58:8 65:20,21
65:22
**shares** 61:12,14
61:24 65:15,18
**shop** 41:11,13
**short** 37:17 66:15
**shorthand** 80:5
80:11
**shortly** 14:19,22
**showing** 42:21

**shown** 41:18 42:5
**shrinks** 58:17
**shut** 75:13 77:9
**sic** 17:17
**side** 17:12
**sides** 61:2
**significant** 35:4,7
**similar** 61:3
**similarly** 42:4
43:1
**simply** 47:22 72:8
73:1,5 74:24
75:22
**simulate** 48:13
**single** 30:3
**situation** 58:6,24
59:15 61:11
**SIVs** 61:5
**six** 24:13,14 25:11
60:3,5 66:17
**size** 52:8,25 53:5
53:7 55:14,23
56:1 62:23 63:6
**slightly** 67:18
**sold** 37:1,3 46:11
46:12 49:3 70:7
77:8
**sole** 16:15
**Solutions** 4:13 5:2
78:7
**solvency** 10:6
11:25 13:5 14:6
24:25 31:12
**solvent** 13:17
15:13,18 25:6
25:16
**somebody** 15:2
26:8 33:13
**someplace** 55:22
**somewhat** 63:19
**son** 17:3 27:12
**sorry** 17:20 33:5
33:19 53:5
57:21,23 63:23
66:2

**sort** 19:9 22:1
28:7
**sorting** 19:7
**sought** 14:24
73:11
**source** 23:15
27:25 28:12
38:15 65:1 67:1
67:9,11 74:14
76:22 77:13
**sources** 29:6
38:13 74:18
75:7 77:2
**so-called** 37:7
39:16
**speak** 12:1 20:25
**specializes** 31:4
**specific** 53:9,13
54:5,10,23,25
55:6,11,15 56:2
66:14 77:18
**specifically** 12:24
29:10
**specify** 48:21
**speculative** 59:18
**spent** 17:5 21:2
23:16
**spoke** 10:17 12:19
**stack** 3:9 5:22
17:17
**Staff** 16:25
**stamp** 28:22
29:21
**standard** 7:2 65:6
71:12
**Standish** 20:22
**stand-alone** 37:7
39:6
**Stars** 2:3,11 4:17
**start** 38:3 57:24
**started** 56:4
**starting** 6:17
31:12 37:11
57:20 62:1
**state** 4:20 7:6,18
79:1 80:1,6

MICHAEL TENNENBAUM, Ph.D.

Page 12

stated 63:15
statement 6:22
  67:21
statements 63:9
  67:25 68:4,21
states 1:1 4:8
  35:18 68:22
status 24:20
  68:25
steps 35:14 46:21
stick 42:20
stock 52:5 59:10
  59:12 61:13
  66:12
stop 39:24 73:6
stopped 75:22
stream 34:22
Street 4:14 78:8
strike 48:6,7
  50:25 70:24
  75:18 77:14
strong 42:22
stuff 24:9
Stutman 2:9 4:16
  4:23 6:7 8:16
  9:4,11 14:5 19:6
  19:9,16,21 20:2
  20:7,20 24:17
  26:8 28:21
  30:24 42:3
Stutman's 19:12
subsequent 31:22
  31:23
subsequently
  20:1
subset 19:16
subsidiaries 1:11
substantial 23:9
  43:11 58:13
substantially
  63:21
subtle 16:4,5,9,10
  16:14
successful 43:2
suffered 72:3,17
sufficient 59:20

59:21
Suisse 1:7,7,8,9,9
  1:10,10 4:8,22
  10:12 12:23
  74:23 75:21
Suite 2:3,12 78:8
summaries 17:16
summarize 38:4
summarizing
  17:1,7
summer 34:19
  35:3 36:8,14
suppose 69:23
sure 10:13 14:16
  16:6 19:11 31:1
  32:16,17 38:20
  73:19 76:16
swear 5:3
Swiss 1:7
sworn 5:7 80:8

––––––– T –––––––
take 5:15 18:20
  37:18 53:4,9,14
  59:19 62:2 64:2
  64:5,6 67:12
  68:7,24 70:18
taken 2:2 55:9
  80:10
takes 31:12
talk 22:10 36:3
  38:10 41:4
  57:19,24 69:15
  71:9
talked 14:11 71:9
talking 38:2
  57:12
tapes 78:6
techniques 43:16
  43:21 50:17
  51:23
telephone 11:15
  26:11
tell 9:25 12:21
  14:12 16:23
  22:13 24:22

25:14 28:2
36:10 40:11,13
41:7 49:14 51:4
52:24 57:25
71:15,22 74:18
75:9
telling 12:24
tells 45:20 50:2,4
ten 9:9
Tennenbaum
  1:17 2:1 3:4 4:7
  5:6 7:11,12 17:2
  64:15,20 78:5
  79:6,18
terminology
  27:19
terms 19:7 22:22
  22:23 28:15
  43:24 44:11,23
  50:6 52:22 58:1
test 76:8
testified 5:8
testify 80:8
testimony 10:16
  13:4,18 15:10
  15:15 28:17
  77:1 79:10
text 40:11
texts 23:22
Thank 4:25 5:11
  37:20
thereabouts 36:8
they'd 36:2
things 11:10
  14:23 15:3
  22:15 24:8
  26:21 32:25
  48:18 53:15
  61:5
think 5:18,21
  11:13 14:10
  16:5 18:5 21:22
  24:1 26:9 27:10
  27:10,11 28:19
  28:21 29:10,21
  31:24 44:17

49:7 58:21 59:3
59:14 65:24
66:19 73:4,7,9
76:9
third 35:23
Thirty 68:1
thought 20:10
  24:12 66:2
thousand 18:4
three 21:22,23
  23:16 53:13
  54:23 55:11
  56:15,16
time 4:11 13:10
  15:24 17:5 21:7
  21:19,25 25:7,8
  25:17 26:5,24
  26:25 28:16
  32:21,25 33:3
  36:13 37:22,25
  54:13 58:7,11
  58:15 60:7
  64:11,14,16,20
  65:24 66:6,11
  66:15 70:22
  74:13,20 76:2
  78:9 80:11
timeframe 60:2
times 16:12 62:25
today 4:12 5:1
  78:6
Today's 4:11
told 73:16
Tom 16:25 17:9
Tony 2:10 4:23
top 24:4 30:19
  36:11 62:5
  64:25 68:13
total 18:2,3
trade 42:20
traded 59:10
  61:12
trading 77:21
train 66:2
transaction 47:25
  48:1,2,14 70:6

transactions
  47:17 48:22
  60:22 61:20,22
  61:23,23 71:4
  73:2
transcript 79:8
  80:13,16
transparency
  60:23 61:6
transparent 61:2
traunches 69:13
Treister 2:9 4:16
  4:24 6:7 9:4
  26:8
Trenwick 26:9,10
  27:9,11 28:2,5
trouble 54:13
  71:7
troubled 57:10
true 42:4 57:15
  61:1,2 79:11
  80:13
Trust 1:5 4:7
  12:22 14:12,15
  15:4,12,17 16:1
  22:2
truth 80:9,9,9
try 69:22
trying 71:24
turn 50:17 59:19
turnaround
  54:14 57:11
  59:20 60:3
turned 13:10
  17:12,23 19:25
  50:16 71:18
turns 15:8
two 15:3 21:9
  52:22 56:13,18
  65:20,25 78:6
typewritten 80:12

––––––– U –––––––
ultimately 77:17
unaffected 50:8
underlie 33:18

MICHAEL TENNENBAUM, Ph.D.

34:7 57:4
**underlying** 69:18
**understand** 15:20
  19:11 32:18
  45:2,19 46:4
  52:13 55:14
  58:20 59:3
  61:25 69:22
  72:6,12 76:25
**understanding**
  13:12,20 15:12
  21:25 31:9 37:2
  37:4 39:5
**understood** 13:8
  15:24 23:18
**United** 1:1 4:8
**universe** 19:8
**unsecured** 77:16
**USA** 1:8,9
**use** 37:17 52:20
**useful** 15:8 26:16
**utilize** 60:12
  61:10 65:4
**utilized** 26:22,22
  44:25 51:24
  67:16 68:6
**utilizes** 52:12
  55:6
**utilizing** 60:10
  64:24
**U.S.A** 1:11

**V**

**vaguely** 36:24
**valuation** 10:5,21
  11:9 13:24
  15:11 21:16,17
  33:19 42:20
  43:15 45:13,15
  46:19 47:1,12
  47:22 48:4,5,12
  52:20 55:6 57:2
  60:15 64:23
**valuations** 46:5
  50:18 56:10
**value** 13:6 39:13

43:20,25 44:3,6
  44:7,10,22 45:4
  45:9 46:1,2,14
  46:25 47:20
  49:14,18,20
  50:1,2,2,4,4,6,7
  50:7,9 51:15
  54:18,20 58:4,9
  58:12,16 59:17
  59:22 60:5,7,25
  62:2 65:1,1,3,5
  65:5,7,11 66:19
  66:25 67:14,22
  67:25 71:2
  72:16 73:13,17
  76:1,3
**valued** 46:5 48:14
  58:7
**values** 10:22
  55:16 60:1 61:8
  62:21 65:10
  69:14 77:7
**valuing** 44:20
**variability** 52:5,8
**variable** 54:17,21
  59:25 60:6
**variety** 60:10,12
**various** 10:23
  17:2 21:19
  28:14,16 39:23
  46:10 57:11
  66:11
**varying** 24:7
**vast** 18:15
**versus** 4:8 25:15
  51:12
**viable** 71:5
**video** 4:12,12,15
**Videographer**
  2:25 4:5,25 5:10
  37:21,24 64:10
  64:13,18 78:2,4
**videotape** 4:6
  64:14,19
**videotapes** 78:6
**view** 33:1

**viewed** 43:3
**voice** 4:19
**volume** 1:9 4:5
  61:23 74:2 78:5
**vs** 1:6

**W**

**wait** 64:8
**walk** 46:21 47:13
  62:12
**want** 13:2,9 16:5
  25:4 27:22
  44:14 52:24
  63:8 64:2
**wanted** 11:8
  15:12,17 33:13
**warn** 49:10
**wasn't** 16:8 57:23
**waste** 26:5
**waterfall** 68:12
  68:13
**Waterhouse** 68:4
**way** 19:17 27:20
  35:20 36:18
  53:22 56:10,24
  69:3 70:18 74:6
**weighted** 51:2,5,6
  51:10,11,20,22
  55:4 56:5 65:6
**went** 21:17 32:2
  49:3,12,22 66:8
  71:22
**West** 4:14 78:7
**We'll** 36:1
**we're** 37:10,24
  64:13,18 74:24
  74:24
**we've** 48:4
**whatsoever** 15:19
**Whitman** 2:24
**Wickes** 2:18 3:5
  4:18,21,21 5:11
  5:14,25 24:2
  25:24 27:7 28:1
  28:8 33:5,9
  37:18 38:1 43:8

47:10,21 48:9
  48:25 49:7,10
  49:19 53:11
  57:14 64:21
  77:25 78:3
**wide** 30:3 57:8
**widespread** 61:7
**willing** 58:14,18
  63:9,10
**willingness** 59:18
**Wilshire** 9:21
**wind** 65:10
**witness** 2:2 3:3
  5:4 8:9 24:1
  25:19 26:19
  27:18 28:5
  47:11 48:12
  49:17 53:7 57:7
  80:7,22
**word** 42:17
**words** 25:4 60:21
**work** 8:4,17 11:2
  15:23,25 16:22
  17:6,11,24 20:8
  24:10 26:17
  33:21 38:15,16
  40:8,15 41:1,10
  41:13,14,19,20
  42:6 47:6 60:15
  66:3,5
**worked** 7:22 9:4
  9:13,19,22
  16:25 17:3
  31:15 56:18
**working** 8:16
  9:10 11:5 32:1
**workings** 61:18
**world** 68:23
**worth** 59:1 63:2
**worthless** 60:4
**wouldn't** 32:18
  76:13

**X**

**X** 3:1
**XYZ** 36:2

**Y**

**yeah** 44:15 75:13
**year** 43:2 44:22
  62:10
**years** 9:8 29:4
  49:4,13,24
  53:17,18,21
  60:5 66:8,17,17
**York** 2:20,20
  4:14,14 10:14
  11:6 59:12
  61:13 78:8,8
**Yoshioka** 16:25
  17:9,19,20
**Yoshokawa** 17:17
**Yun** 26:10 27:9
  27:10,13 72:20
  72:21

**Z**

**zero** 59:1

**$**

**$10,000** 70:7,12
**$100** 67:9,11 69:1
**$100,000** 69:25
**$12,000** 18:5
**$144** 67:1
**$20,000** 18:16
**$25.8** 65:11
**$300** 44:7 50:14
**$350** 44:4 45:4,17
  45:23 46:3,14
  47:19 48:20
  50:9 73:14
**$395** 18:10
**$405,000** 18:4
**$50** 72:5,7
**$90,000** 70:8,18

**#**

**#9555** 2:5 80:25

**0**

**01** 29:4 57:13
  62:8,10 63:10

MICHAEL TENNENBAUM, Ph.D.

Page 14

63:23 65:12
73:14 75:25
**02** 29:4 57:13
62:9
**02-13396** 1:4 4:10
**04-57060** 1:8

**1**

**1** 1:12 4:6 64:15
**1st** 77:13
**1,000** 18:22,23
**1-80** 1:10
**10** 67:15
**10:39** 37:22
**10:52** 37:25
**100** 1:12 31:1
66:20 67:19
**10039** 78:8
**10105** 2:20
**11** 1:4 31:10
33:13 73:7
74:25 76:20
**11:38** 64:11
**11:43** 64:14,16
**11:53** 64:20
**12:20** 78:9,11
**1200** 2:3,12
**1345** 2:19
**14** 28:9,11,18
29:7 30:3
**144** 66:20
**15** 29:11,13
**16** 29:13,14 30:3
**18** 28:11,18 29:7
**1901** 2:2,11 4:16
**1969** 7:6
**1971** 7:7,10
**1975** 7:13
**1980s** 9:22
**1986** 7:7
**1990s** 22:18 34:23

**2**

**2** 44:9 64:19
**20** 30:11,19 32:8
38:4 72:18

**200** 50:13
**2000** 23:7
**2001** 23:8 28:16
29:5 33:19
39:20 40:10
42:16 43:21,23
44:1,3,23 45:5
45:11,12,18,21
46:5,13,17 47:7
48:18 49:1,15
49:23 50:7
56:21 64:23
65:16,23 66:20
67:13,24 69:1,7
69:16 72:8 73:5
74:23 75:20,22
76:11,21 77:14
77:22
**2002** 25:2 28:16
33:15,20 34:8
34:19 35:3 36:8
36:14 39:14
40:21 42:13
43:16 44:7,10
45:10,14 46:5
53:22 56:21
64:24 66:21
**2003** 32:15
**2005** 8:11 11:13
42:23 43:1
**2006** 20:6
**2007** 1:18 2:4 4:1
4:11 6:11,14
79:12
**21** 30:19
**212** 2:21
**22** 1:18 2:4 4:1,11
30:20 36:11
37:11
**228-5755** 2:14
**25** 4:14 78:7
**25th** 29:5
**27** 6:11
**27th** 6:14
**28** 30:15,21
**29** 39:19

**3**

**3.5** 54:24
**30** 9:8 41:18
65:16 77:23
**30th** 65:23 73:5
74:23
**300** 44:11,15,18
**31** 43:9
**310** 2:14
**32** 42:5
**33** 52:13 56:9
**34** 52:13
**350** 44:23
**36** 52:18,19 68:1
**37** 56:9
**370,000** 18:20
**39** 66:24,25
**390** 18:4
**395** 18:11,20

**4**

**40** 30:4 77:20
**41** 66:24 67:10,11
**425** 18:10
**45** 57:20,24
**45th** 4:14 78:8
**46** 65:10
**48** 62:1 64:22
65:4
**49** 62:17 64:22,25

**5**

**5** 3:5,9
**5.07** 55:7
**50** 44:18 62:6
77:20
**51** 69:9 72:2
**54** 6:17 7:21

**6**

**6** 7:13
**60** 77:24
**601** 3:9 5:24 6:2,6
**62** 63:22
**62.3** 62:10 63:24

**8**

**80** 30:4 63:22
**80s** 9:24

**9**

**9** 71:23
**9.5** 65:19
**9:44** 2:4 4:2
**9:45** 4:12
**90** 70:4 71:12,19
**900** 78:8
**90067-6013** 2:13
**903-9000** 2:21
**95** 71:12,23
**9555** 1:25 80:6
**96.9** 62:11

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| OAKWOOD HOMES CORPORATION | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | Civil Action |
| | ) | No. 07-799 (JJF) |
| v. | ) | |
| | ) | |
| CREDIT SUISSE , et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Expert Rebuttal Report of Allen M. Pfeiffer

# February 29, 2008

# Table of Contents

| | | |
|---|---|---|
| 1.0 | INTRODUCTION | 3 |
| 2.0 | VALUATION ANALYSIS | 3 |
| 3.0 | CONCLUSION | 11 |

Appendix A – Documents Relied Upon in Forming Expert Opinion................. 12

Appendix B – Allen M. Pfeiffer Resume................................................. 15

2

1.0    INTRODUCTION

I, Allen M. Pfeiffer, am a managing director at Duff & Phelps, LLC, and have advised hundreds of times on valuation, financial and solvency analyses. My full resume is attached to this report as Appendix B. At the request of counsel for Defendants, I have reviewed the Expert Report by Dr. Michael Tennenbaum dated April 27, 2007 ("The Tennenbaum Report"). The Tennenbaum Report describes various financial analyses of Oakwood Homes Corporation ("Oakwood"), performed by Dr. Tennenbaum, and his conclusions regarding the valuation of Oakwood as of September, 2001 and September, 2002. Based on commonly accepted valuation theory, commonly accepted financial analytical practices, the facts, and documents cited by Dr. Tennenbaum, I believe Dr. Tennenbaum's analyses and conclusions contain serious errors of methodology and reasoning. I set forth those errors in detail herein.

The documents I have considered in forming my opinions are referenced in Appendix A. Duff & Phelps is being compensated at their hourly rates ranging from $165 to $625 per hour. Our fees are not contingent upon either the outcome of the litigation or the conclusions expressed herein.

2.0    VALUATION ANALYSIS

I.    **Dr. Tennenbaum's damages analysis is speculative and provides no useful conclusion.** In my opinion, the damages calculation concerning a distressed company using financial analysis and valuation principles must be grounded in a damages model that is based on reasonably knowable facts that can be verified to a reasonable degree of certainty. Dr. Tennenbaum's analysis and conclusions are problematic in a number of specific areas, but perhaps most problematic is that his model used to calculate damage to Oakwood is not rationally based on any reliable facts. Dr. Tennenbaum's analysis is based on the decrease in "value" of Oakwood between two specific dates calculated by Dr. Tennenbaum using a simple Discounted Cash Flow ("DCF") analysis

3

applied to projections selected by Dr. Tennenbaum for each specific date. Such a model reflects no consideration of the actual result of Oakwood's bankruptcy nor does Dr. Tennenbaum's model attempt to calculate the result of a hypothetical bankruptcy filed a year prior to Oakwood's actual filing. In my opinion, given that Dr. Tennenbaum believes Oakwood should have filed for bankruptcy in September 2001,[1] and was damaged by the delay in filing for bankruptcy, a more plausible accurate and reliable damages analysis in this case would have compared (i) Oakwood's value upon the resolution of Oakwood's actual Chapter 11 proceeding with (ii) Oakwood's value upon the resolution of a hypothetical Chapter 11 proceeding filed in or around September 2001. While such an analysis would prove difficult to construct, in my opinion, a damages model and conclusion in this case would require a more detailed and sophisticated analysis than the simplistic DCF analysis utilized by Dr. Tennenbaum.

II.    **Contrary to accepted valuation practice, Dr. Tennenbaum ignores virtually all contemporaneous information.**

1. It is well established in IRS Revenue Rulings[2], accounting concepts[3] and standards[4], valuation standards[5] and academic literature[6] that market-based

---

[1] Expert Report of Michael Tennenbaum, p. 51

[2] IRS Revenue Ruling 59-60 states "A current appraisal by the investing public should be superior to the retrospective opinion of an individual."

[3] Statement of Financial Accounting Concepts No. 7, February 2000, pages 4-5 and 18 state "While the expectations of an entity's management are often useful and informative, the marketplace is the final arbiter of asset and liability values." Pages 8-9 state "Observable marketplace amounts are generally more reliable and are more efficiently determined than measurements that must employ estimates of future cash flows." Page 12 states "If a price for an asset or liability or an essentially similar asset or liability can be observed in the marketplace, there is no need to use present value measurements. The marketplace assessment of present value is already embodied in such prices."

[4] Statement of Financial Accounting Standards (SFAS) Number 157 page 9 states "a Fair Value Hierarchy" that "prioritizes the inputs to valuation techniques used to measure fair value into three broad levels. The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3)." Page 8 states "in some cases, a single valuation technique will be appropriate (for example, when valuing an asset or liability using quoted prices in an active market for identical assets or liabilities)."

[5] American Society of Appraisers Business Valuation Standards pages 5-6 state "The appraiser shall gather, analyze, and adjust the relevant information necessary to perform a valuation appropriate to the scope of work. Such information shall include...capital markets providing relevant information... prior transactions involving the subject business, an interest in the subject business, or the securities of the subject business."

4

information is the best indicator of a company's value. Value indicated by market data, when available, is preferred to valuation based on estimates of future cash flows. However, Dr. Tennenbaum ignores virtually all contemporaneous and market-based information in conducting his analyses and reaching his conclusions.

2. Dr. Tennenbaum agrees that the market for Oakwood stock is efficient yet he ignores the market price when valuing the equity of the company.[7] He fails to use actual market data even though Oakwood stock was traded on the NYSE[8]. Furthermore, Dr. Tennenbaum's analyses result in conclusions that are inconsistent with contemporaneous market-based information regarding Oakwood. For example, Dr. Tennenbaum's equity value calculation suggests prices of $2.71 and $0.13 for Oakwood stocks on September 30, 2001 and September 30, 2002, respectively.[9] Those values are substantially lower than the actual trading prices for Oakwood stock, which were $4.23 and $1.65 on September 30, 2001 and September 30, 2002, respectively. In my opinion, Dr. Tennenbaum's failure to consider market-based information and/or account for substantial differences between his conclusions and contemporaneous market-based information violates commonly accepted valuation principles.

3. Similarly, Dr. Tennenbaum also ignores Oakwood's bond trading prices during the relevant time period as well as information regarding the ultimate recovery of holders of Oakwood's bonds.[10] For example, post September 2001, Oakwood's bonds showed a significant improving trend. Furthermore, Oakwood's market-derived enterprise value, comprised of

---

[6] *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, Bradford Cornell, 1993, pp. 34-35. Dr. Bradford Cornell opines in his book, *Corporate Valuation*, that "*The Stock and Debt Approach*: When the securities of a company being appraised are publicly traded, there is a straightforward valuation procedure: Sum the market values of all outstanding securities....The efficient market hypothesis also implies that the stock and debt approach, where it can be applied, provides the most accurate estimate of a company's true value."

[7] Deposition of Michael Tennenbaum, October 22, 2007, pp. 64-67

[8] Ibid. p. 59

[9] Calculated by dividing the equity values on p. 49 of The Tennenbaum Report by Oakwood's shares outstanding as of 9/30/01 and 9/30/02, respectively.

[10] Oakwood 8 125% 10-year senior notes due 3/1/09 continue to trade with reportable prices on Bloomberg.

the combination of the market value of the company's stock and bonds, also showed an improving trend after September 2001. Additionally, the bondholders ultimately received at least 47 percent recovery.[11] Dr. Tennenbaum fails to consider or account for these facts and in my opinion that failure is a violation of commonly accepted valuation principles.

4.  Dr. Tennenbaum ignores other contemporary data. These include the fact that Oakwood's credit ratings remained stable between September 30, 2001 and September 30, 2002. S&P maintained its B- rating, Moody's maintained its Caa2 rating, and Fitch maintained its CCC rating.[12] Furthermore, as of March 14, 2002, the middle of Dr. Tennenbaum's damage period, S&P was predicting an industry turnaround in the coming year.[13] In fact, Oakwood's management believed at the time that there was a chance for a turnaround. Oakwood's CEO had confidence in the company and did not believe until June 2002 that it should file for bankruptcy.[14] These contemporaneous actions and views are inconsistent with a conclusion that value was being destroyed during the same time period. However, Dr. Tennenbaum fails to consider this contemporaneous market-based information that is contrary to his conclusions. In my opinion, such a failure violates commonly accepted valuation principles.

5.  In addition, Dr. Tennenbaum fails to consider the actual sale of Oakwood's assets in its bankruptcy proceeding. On November 25, 2003, Oakwood's assets were sold for $375 million to Clayton Homes, a competitor of Oakwood.[15] This actual sales price, in bankruptcy, is greater than the $350 million value Dr. Tennenbaum concludes that Oakwood would have received as of September 30, 2001. However,

---

[11] Post-confirmation Quarterly Summary Report, September 30, 2007 Summary Balance Sheet Information, footnote 3
[12] Bloomberg
[13] Standard & Poor's RatingsDirect®, "U.S. Homebuilders Demonstrate Remarkable Resilience", March 14, 2002.
[14] Deposition of Myles Standish, September 21, 2006, pp. 126, 142-143
[15] Total purchase price reflecting adjustments per the Proposed Supplemental Disclosure Statement dated February 6, 2004, Exhibit C.

6

Dr. Tennenbaum fails to consider this fact and its impact on his conclusion that value was destroyed between September 30, 2001 and September 30, 2002. The actual asset sale price also should have been considered as a test for reasonableness relative to Dr. Tennenbaum's concluded value as of September 30, 2002. Dr. Tennenbaum's DCF-based valuation of $300 million as of September 30, 2002 is considerably less than the actual November 2003 asset sales price, but Dr. Tennenbaum fails to consider or account for this difference. In my opinion, commonly accepted valuation principles require consideration of the ultimate sales price in the bankruptcy proceeding in reaching an opinion on damages.

6. Dr. Tennenbaum does not take into account market-wide factors that affected values during this period of time which in my opinion should have been considered based on commonly accepted valuation principles. For example, between September 30, 2001 and September 30, 2002, the S&P 500 Index declined 21.7 percent, which suggests the potential for market-wide forces affecting declines in value. Dr. Tennenbaum fails to take into account any decrease in value that was due to overall market performance, which must be separated from any potential change in value due to specific management decisions and company performance. Overall market performance should have been considered by Dr. Tennenbaum in reaching a conclusion that Oakwood suffered damages as a result of continued operation of its business model.

III. **Dr. Tennenbaum's valuations are based on financial projections that Dr. Tennenbaum considers unrealistic or that he does not attempt to validate.**

1. In my opinion, any DCF valuation analysis must begin with projections that are verifiable and reliable. However, Dr. Tennenbaum performs his DCF analyses for 2001 by simply adopting certain sets of projections which he considers to be "aggressive," "hockey stick projections".[16] First,

---

[16] Deposition of Michael Tennenbaum, October 22, 2007, pp 42

Dr. Tennenbaum's concern about the validity of the projections should have caused him to make downward adjustments to the projections to compensate for what he believed to be the projections' inaccuracies. However, he made no such adjustments. Utilizing projections that have not been adjusted to compensate for perceived inaccuracies is contrary to commonly accepted valuation principles. This is particularly true given Dr. Tennenbaum's belief that Oakwood was in financial distress in September 2001. When conducting a DCF analysis of a company in financial distress, more careful thought and attention is required. A valuation expert cannot treat a DCF analysis as a standard exercise comprising a simple adoption of any set of projections as the basis for the valuation in the context of a distressed company.[17]

2. Moreover, not only did Dr. Tennenbaum fail to make any adjustments to correct inaccuracies in the 2001 projections he has no knowledge of the underlying assumptions that informed the creation of the 2001 projections. The mid 2001 and late 2001 projections that Dr. Tennenbaum uses as the basis for his valuation of Oakwood as of September 30, 2001 came from Credit Suisse documents which he knows very little about. He did not investigate who created the projections. He did not attempt to verify what methodology or assumptions were used. In my opinion, his unquestioning

---

[17] *Investment Valuation*, Aswath Damodaran, 2000, pp. 16-17. Dr. Aswath Damodaran writes in a section entitled *Applicability and Limitations of Discounted Cash Flow Valuation* "Here are some scenarios where discounted cash flow valuation might run into trouble and need to be adapted. *Firms in Trouble* A distressed firm generally has negative earnings and cash flows and expects to lose money for some time in the future. For these firms, estimating future cash flows is difficult to do, since there is a strong probability of bankruptcy. For firms that are expected to fail, discounted cash flow valuation does not work very well, since the method values the firm as a going concern providing positive cash flows to its investors. Even for firms that are expected to survive, cash flows will have to be estimated until they turn positive, since obtaining a present value of negative cash flows will yield a negative value for equity[17] or for the firm....*Firms in the Process of Restructuring* Firms in the process of restructuring often sell some of their assets, acquire other assets, and change their capital structure and dividend policy. Some of them also change their ownership structure (going from publicly traded to private status and vice versa) and management compensation schemes. Each of these changes makes estimating future cash flows more difficult and affects the riskiness of the firm. Using historical data for such firms can give a misleading picture of the firm's value. However, these firms can be valued, even in light of the major changes in investment and financing policy, if future cash flows reflect the expected effects of these changes and the discount rate is adjusted to reflect the new business and financial risk in the firm."

adoption of projections that have no basis that he knows of is contrary to commonly accepted valuation principles.[18]

3.  In addition, the projections utilized to value Oakwood as of September 30, 2002 are inappropriate. Dr. Tennenbaum used projections developed by Miller Buckfire during the course of Oakwood's bankruptcy proceeding as the basis for his valuation of Oakwood as of September 30, 2002. However, the Miller Buckfire projections did not reflect, and were not intended to reflect, the actual condition of Oakwood in 2002. The Miller Buckfire projections were created in 2003 for a stand alone plan of reorganization, developed during the bankruptcy proceeding. The projections assume that Oakwood emerges from bankruptcy as a smaller company having discontinued certain aspects of its business. Consequently, those projections represent a very different company than Oakwood as it existed in September 2002. Further, as with the 2001 projections, Dr. Tennenbaum admits he knows nothing about the sources of data used by Miller Buckfire.[19] He further concedes that this set of projections was not available as of September 30, 2002. In my opinion, the use of projections developed in the year following the relevant valuation date, and based on assumptions inappropriate for the condition of Oakwood as of the valuation date, violates commonly accepted valuation principles.

IV.  **Dr. Tennenbaum does not estimate the costs of a hypothetical bankruptcy and subtract them from his September 30, 2001 valuation.** In my opinion, a proper valuation of Oakwood as of September 30, 2001 that assumes Oakwood should have filed for bankruptcy as of that date, must consider the potential costs associated with a bankruptcy filing. The bankruptcy process is known to be expensive. A recent study shows that professional fees alone

---

[18] Deposition of Michael Tennenbaum, October 22, 2007, pp 41-43
[19] Ibid. pp. 38-39

averaged $8.8 million for major bankruptcies.[20] Other factors such as loss of vendor support, loss of key management, adverse publicity and other factors exert additional pressure on corporate results. Dr. Tennenbaum should have considered and accounted for the adverse financial effects of bankruptcy. In my opinion, a valuation that does not account for such costs violates accepted valuation principles.

V.    **Dr. Tennenbaum does not adjust his valuation conclusion for concerns related to Oakwood's marketability in September 2001.** In my opinion, a DCF valuation of Oakwood as of September 30, 2001 must consider and adjust for concerns related to Oakwood's marketability in September 2001. However, Dr. Tennenbaum's DCF analysis relies on a financial projection of Oakwood as a going concern without consideration of any liquidity constraints and market distress. Dr. Tennenbaum provides no analysis of whether a sale of Oakwood was possible. Dr. Tennenbaum further fails to consider whether there would have been a buyer, at what price, sales costs, and the length of time to market and execute a sale. Furthermore, distressed companies often sell at distressed prices, especially when there are no strategic buyers. Dr. Tennenbaum identified no such buyer.[21] In my opinion, Dr. Tennenbaum's failure to consider and analyze these issues violates commonly accepted valuation principles.

VI.    **Dr. Tennenbaum's conclusion regarding fees earned by Credit Suisse is based on no independent analysis.** Dr. Tennenbaum claims that Oakwood paid more than $20 million in fees to Credit Suisse.[22] However, he has performed no independent expert analysis to support this conclusion. He

---

[20] "Chapter 11 Professional Fee Study", Table 14, Stephen J. Lubben, November 1, 2007, p. 37. This study was funded by American Bankruptcy Institute  The statistics cited here is for cases in the Big Case Dataset with confirmed plans.

[21] In 1999, Merrill Lynch, the board's advisor, explored strategic alternatives for the company, but reached the conclusion that "the best course of action available to the Board could be to stay independent", implying that it was unable to find a strategic buyer for the company at an attractive price. – Minutes of special meeting of the Board of Directors held August 2, 1999, Bates No. MCLH0958

[22] Expert Report of Michael Tennenbaum, p. 51

admits that he does not know whether these fees represent cash paid by Oakwood or reductions in proceeds from financing transactions.[23] He does not appear to know the source of any of the numbers or whether the calculations were performed correctly. Therefore, there is no analysis to examine on this issue.

3.0    CONCLUSION

I have reviewed The Tennenbaum Report in light of commonly accepted valuation theory and commonly accepted financial analytical practice. I conclude that his theory of damages and his methodologies are speculative, unreliable and inadequate in this context. Dr. Tennenbaum's analysis is inconsistent with generally accepted valuation practice in several important ways including faulty assumptions, inconsistent application of theory, omissions of key contemporaneous facts and market data, and use of admittedly doubtful projections. I, therefore, find Dr. Tennenbaum's conclusions regarding damages to be unpersuasive.

I reserve the right to update, supplement, or revise my opinion if and when additional information or data becomes available for my review.

Sincerely,

Allen M. Pfeiffer
Duff & Phelps LLC

February 29, 2008

---

[23] Deposition of Michael Tennenbaum, October 22, 2007, pp. 72-73

11

Appendix A – Documents Relied Upon in
Forming Expert Opinion

## Documents Relied Upon in Forming Expert Opinion

Produced:

- Expert Witness Report of Michael Tennenbaum, April 27, 2007 and documents produced by Dr. Tennenbaum in connection with the report
- Deposition of Michael Tennenbaum, October 22, 2007
- Deposition of Myles Standish, September 21, 2006
- Minutes of Special Meeting of the Board of Directors Held Monday, August 2, 1999, Bates No. MCLH 0958
- Supplemental Report of Alan C. Shapiro, August 28, 2007

Not Produced:

- Post-confirmation Quarterly Summary Report, September 30, 2007 Summary Balance Sheet Information
- Disclosure Statements In Re Oakwood Homes Corp., September 9, 2003, January 30, 2004, and February 6, 2004
- IRS Revenue Ruling 59-60
- American Society of Appraisers Business Valuation Standards
- Institute of Business Appraisers business appraisal standards
- Statement of Financial Accounting Concepts No. 7, February 2000
- Statement of Financial Accounting Standards Number 157
- *Investment Valuation,* Aswath Damodaran, 2000
- *Corporate Valuation· Tools for Effective Appraisal and Decision Making,* Bradford Cornell, 1993
- "Chapter 11 Professional Fee Study", Stephen J. Lubben, November 1, 2007
- Standard & Poor's RatingsDirect®, "U.S. Homebuilders Demonstrate Remarkable Resilience", March 14, 2002.

13

- Oakwood's credit rating history from Standard and Poors, Moody's and Fitch, acquired via Bloomberg
- Capital IQ: Oakwood number of shares outstanding as of 9/30/01 and 9/30/02
- Bloomberg: Oakwood Homes Corp., S&P 500 Index
- FactSet: Oakwood daily bond prices: CUSIPs 674098AF and 674098AE
- S&P Bond Guides: Oakwood month end bond prices

Appendix B – Allen M. Pfeiffer Resume

# DUFF&PHELPS

300 Headquarters Plaza East, 12th Floor
Morristown, New Jersey 07960
Tel:  973-775-8260
eFax: 443-601-2265
Cell:  201-390-2004
allen.pfeiffer@duffandphelps.com

## ALLEN M. PFEIFFER

| | |
|---|---|
| **Position** | Managing Director, Duff & Phelps, LLC<br>Global Service Leader – Dispute Consulting, Complex Valuation and Bankruptcy Litigation Practice |
| **Education** | M.B.A. – Finance, *with distinct honors*, Columbia Business School |
| | B.S. – Economics and Mathematics, *cum laude*, Yeshiva University |

**Professional Summary**

Mr. Pfeiffer has more than twelve years of experience with valuation, cash flow assessment and capital structure analysis. He has led hundreds of corporate finance engagements with advice related to an entire business, an interest in a business or an asset. Mr. Pfeiffer has advised both foreign and domestic buyers, sellers, joint venture partners, plaintiffs and defendants in mergers and acquisitions/corporate finance situations with regard to business valuation, raising financing, spin-offs, transaction support, bankruptcy, litigation, tax, financial reporting, valuing derivatives, fairness opinions, strategic planning, IP holding companies, restructurings and capital structure analysis.

The New York Supreme Court, the United States Bankruptcy Court, the American Arbitration Association and arbitrators operating under the rules of the International Chamber of Commerce have accepted Mr. Pfeiffer as a valuation and cash flow expert. In addition to his testifying experience, he has worked often as a lead consultant to attorneys in the context of retrospective solvency and many other valuation and corporate finance matters.

Mr. Pfeiffer was a Managing Director with Standard & Poor's Corporate Value Consulting at the time of its merger with Duff & Phelps in September 2005 and was a member of the CVC practice of PricewaterhouseCoopers LLP at the time of its sale to Standard & Poor's. Prior to joining Coopers & Lybrand in 1995, Mr. Pfeiffer worked for an affiliate of Alex Brown and worked as an actuarial analyst at Kwasha Lipton, a benefit consulting firm. Mr. Pfeiffer successfully completed four professional exams within his tenure as an actuary: multivariable calculus, probability theory, mathematical statistics and numerical equations.

**Selected Experience – Corporate Finance**

<u>Transaction Advisory</u>

- Advising a large private equity fund with respect to the value of their illiquid investments for a corporate reorganization

- Advising a private equity firm on the value of the intellectual property of a large electronics equipment manufacturer for purposes of refinancing

- Advising the board of directors of a leading international company with respect to potential responses to a potential hostile takeover bid

**Selected Experience –
Corporate Finance
(continued)**

- Advised shareholder and founder on the value of his company for purposes of put option rights

- Advised special committee of the board and largest minority shareholder with respect to the value of intellectual property of a technology company that received a buyout offer determined to be inadequate by the special committee

- Advised on the issuance of a solvency opinion for "RemainCo" relative to two of the largest spin-offs in history

- Advised a technology company in its negotiations with several international top-tier companies and several venture capital firms

- Advised an investment firm with respect to the price paid for an ownership interest in a telecommunications company, associated warrants and other deal terms

- Advised an international entertainment conglomerate with respect to pre-deal due diligence and valuation analysis

- Advised a technology company on valuation of the various levels of preferred stock prior to its successful initial public offering

- Advised on many buy-side valuation issues as part of due diligence efforts for a major telecommunications company

- Advised and presented to the board of directors and senior management of a leading technology company on the value of its total intellectual property portfolio for the application of the Delaware Law capital surplus test

- Provided independent valuation assessment of investments to board of directors of a major investment fund

- Sell-side advisory work for a major international IT services company

- Advised in the successful resolution of a joint venture in a buy/sell option discrepancy

- Advised technology company on the benefits of spin-off vs. divestiture

- Advised on terms of transaction and negotiated on behalf of a technology company

- For several companies, advised on the value of common shares for issuance of new warrants to management

- Advised government ministers in their consideration of the privatization of a telecommunications company, a bank and an airline

| | |
|---|---|
| **Selected Experience –**<br>**Corporate Finance**<br>**(continued)** | • Advised on valuation of subsidiary of a technology company for issuance of executive warrants |
| | • Advised on transactions and valuation matters related to more than ten major Israeli companies |
| | • Advised on the restructuring of five distinct businesses owned in a holding company |
| | • Advised on numerous fairness opinions as a member of review committees in Duff & Phelps and Standard & Poor's Corporate Value Consulting |

Strategic Planning

- Advised a subsidiary of an international entertainment conglomerate with respect to the value of its contingent liabilities

- Advised a private equity fund focused on technology and telecommunications with respect to the components of several transactions and assessing the value of its common stock

- Developed business case, strategy and valuations for many late stage start-ups

- Advised on new e-commerce business opportunities and capital investments within large multi-national corporations

- Corporate Finance liaison with the PwC Israel office

- Advised a telecommunications company relative to financial planning and funding for the launching of a CLEC business

- Valuation and advisory work associated with a dramatic operational turnaround of a multi-billion dollar company on behalf of an LBO fund over three years

- Utilized real option valuation metrics to solve complex and uncertain value propositions

- Advised on the strategic modeling and valuation regarding the combination of major professional sports teams in a joint venture

| | |
|---|---|
| **Selected Experience –**<br>**Bankruptcy Litigation** | • Testified as an expert witness in Philadelphia Bankruptcy Court (Oct. 2003) on behalf of secured lenders regarding the solvency of a manufacturer of technology |
| | • Testified in deposition as an expert witness on the reasonableness of a business case and budget for a large retailer in a bankruptcy/contract dispute |

ALLEN M. PFEIFFER
Page 4

**Selected Experience –**
**Bankruptcy Litigation**
**(continued)**

- Testified on behalf of a tractor company in a dispute regarding the value of recovered assets in bankruptcy

- Testified in deposition as an expert witness on behalf of a large cable company (MSO) against its joint venture partner with regard to cable systems in Puerto Rico

- Leading analysis of solvency at various dates for a fraudulent conveyance lawsuit filed against a leading global company by a former subsidiary claiming damages in excess of $2 billion

- Advising counsel for a multi-national bank in defense of their investment banking work performed for a multi-billion dollar planned joint venture

- Advising counsel and several hedge funds on the valuation of the derivative features attached to convertible bonds for purposes of arriving at OID (original issues discount) in bankruptcy litigation

- Advised on the valuation of a hedge fund relative to the reasonableness of a major transaction prior to the filing for bankruptcy

- Advised counsel with respect to solvency in large anticipated litigation against group of pre-petition lenders to an international financial services company that spiraled into bankruptcy after fraud was detected

- Led the retrospective solvency analysis of a supermarket business at various dates for a private equity fund and assisted counsel and insurance companies in effectuating a successful mediation

- Led the analysis of a preference case filed against a private equity firm and related to the bankruptcy filing of a large financial services company; analyzed convertible preferred stock, produced expert report and rebuttal report and assisted attorneys in deposition preparation

- Led analysis of solvency for a large fraudulent conveyance lawsuit filed against an international consumer products company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy, preparation for and participation in trial and post-trial submissions

- Led analysis of solvency for a preference lawsuit related to a multi-billion dollar pharmaceutical distribution company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy and preparation for trial

- Advised on a retrospective solvency analysis for a large retailer in a preference action

| Selected Experience – Other Litigation Support | • Testified as an expert witness in arbitration, International Chamber of Commerce (Sept. 2002) regarding the valuation of a minority interest in a European Internet service provider; also quantified damages |
|---|---|
| | • Testified as an expert witness in New York Supreme Court (Nov. 2002) regarding the value of the unregistered shares of a public Internet company; both sides in case unanimously accepted the testimony |
| | • Testified as an expert witness in arbitration (AAA) related to fair and reasonable terms and fair market value associated with a long-term agreement between a cable company and a content provider (Feb. 2004) |
| | • Testified in trial with respect to the value of the founder's ownership interest in a technology company in conjunction with a matrimonial action |
| | • Testified as an expert witness in deposition and produced an expert report on diminution of enterprise value, damages and lost profits to a cruise business |
| | • Leading the analysis of damages sustained by a leading communications company in connection with a malpractice claim related to a multi-billion dollar transaction |
| | • Advising counsel with respect to solvency and valuation issues related to the merger and refinancing of a corporate finance advisory firm |
| | • Advised counsel with respect to theories related to damages on a high profile insurance matter |
| | • Advised counsel on the appropriate financing terms for a telecommunications transaction in preparation for a potential litigation |
| | • Led the analysis of value provided by executives in managing large company-invested hedge funds |
| | • Led the analysis of a multitude of derivative transactions for a litigation |
| | • Led the assessment of damages for an early-stage cable television company |
| | • Advised counsel with respect to solvency and litigation issues in a large planned spin-off of a subsidiary |
| | • Led the analysis of the value of divisions of a large consumer products company in defense of an IRS probe related to a tax-free spin-off |
| | • Led the analysis of a merger between two market-leading companies and provided a retrospective fairness opinion; conversion ratio was challenged by a group of shareholders |

| | |
|---|---|
| **Selected Experience –<br>Other Litigation Support<br>(continued)** | • Led the analysis of whether a material adverse change clause applied to the circumstances associated with the decline in 2000 venture capital funding levels |
| | • Retained to advise on the relative value of two contracts and related clauses in the cable and entertainment industry |
| | • Advised a utilities company on the issuance of new securities – debt vs. equity considerations for cost of capital purposes in arbitration |
| | • Advised counsel on the appropriate care, transaction price and valuation methodologies in defense of a lead advisor investment bank in the technology and consumer product industry; produced expert report and rebuttal report and assisted attorneys in depositions |
| | • Led analysis of a shareholder oppression lawsuit filed in New Jersey regarding the valuation of a privately held trucking company |
| | • Assisted attorneys in the valuation of a manufacturing company in a purchase price dispute |
| | • Advised plaintiff on the value of complex options and warrants for purposes of assessing damages in litigation |
| **Selected Experience –<br>Valuation for Tax<br>Restructuring and<br>Reporting** | • Led numerous tax restructuring engagements for a multi-billion dollar telecommunications company |
| | • Valued dozens of subsidiaries worldwide in connection with the spin-off of major technology businesses for determining tax gain/loss |
| | • Valuation of the subsidiaries and assets of a chemical company as part of the consideration of the tax structure of a large contemplated transaction |
| | • Valuation of worldwide subsidiaries of a biotech company for the planning of intellectual property holding company restructuring |
| | • Determined the value of restricted stock discount and/or lack of marketability discount for dozens of companies |
| | • Valued several businesses for estate tax purposes |
| **Selected Experience –<br>Valuation for Financial<br>Reporting** | • Valued the Series C Preferred Stock of an independent marketer of natural gas and electricity |
| | • Valuation of the common equity and an embedded derivative for a privately held, telecommunications software company |

| | |
|---|---|
| **Selected Experience –**<br>**Valuation for Financial**<br>**Reporting (continued)** | • Led dozens of engagements related to purchase price allocations and intangible asset impairments - SFAS 141/SFAS 142, SFAS 121, SFAS 133 and APB 16 |
| | • Participated on PwC task force committee to communicate with the SEC on the valuation of In-Process Research and Development |
| | • Drafted numerous SEC response letters for several major companies on valuation issues, in all cases avoiding financial restatements |
| | • Numerous engagements related to valuation of options in connection with SFAS 123 and as components of purchase price |
| | • Assessed discounts for blockage, minority holdings, lack of marketability and restricted stock |
| **Continuing Learning**<br>**Programs** | • Led development and presented many Continuing Learning Education courses for attorneys regarding legal and financial analysis issues related to fairness opinions, valuation, expert witnesses and fraudulent conveyance |
| | • Led PwC's and S&P's internal training programs in corporate finance and valuation each year from 1997 through 2002 |
| | • For S&P in 2004-2005, designed curriculum for national training and analysis of complex client issues along with New York University professor Dr. Aswath Damodaran |
| | • Presented various topics at industry, accounting and valuation seminars and conferences; participant in ALI-ABA conferences, ABI conferences and other industry conferences |
| **Trial and Arbitration**<br>**Testimony** | *Lee v Chou*<br>Supreme Court of the State of New York, County of New York<br>Index No. 350601/03<br>October 2006 |
| | • Testimony in a matrimonial action on behalf of the Defendant with respect to the value of Plaintiff's ownership interest in a business that he founded |
| | *Suraleb, Inc  v  Production Association "Minsk Tractor Works",*<br>*Republic of Belarus*<br>Arbitration Institute of the Stockholm Chamber of Commerce<br>December 2005 |
| | • Testimony in arbitration on behalf of the Respondent, Minsk Tractor Works, as an expert witness related to the value of recovered assets in bankruptcy |

| | |
|---|---|
| **Trial and Arbitration Testimony (continued)** | *CSC Holdings, Inc. v. Yankees Entertainment and Sports Network, LLC*<br>American Arbitration Association, New York<br>Case No. 13 181 02839 03<br>February 2004 |

- Testimony on behalf of the Claimant as an expert witness related to fair and reasonable terms and fair market value associated with a long-term agreement between Cablevision and YES Network

*Official Committee of Unsecured Creditors (Exide Technologies) v Credit Suisse First Boston*
United States Bankruptcy Court, Eastern District of Pennsylvania
Case No. 02-11125
October 2003

- Testimony on behalf of the Defendant on the solvency of Exide Technologies in a fraudulent conveyance lawsuit

*Commonwealth Associates, LP v Smartserv Online, Inc*
Supreme Court of the State of New York, Southern District
Index No. 600869/00
November 2002

- Testimony on behalf of the Plaintiff of restricted shares in a publicly traded Internet company

*Banestyrelsen et al v. France Telecom*
International Chamber of Commerce
Case No. 11351
September 2002

- Testimony on behalf of the Plaintiff of a minority equity investment in an international Internet service provider

| | |
|---|---|
| **Deposition Testimony only** | *In re Adelphia Communications Corp., et al*<br>United States Bankruptcy Court, Southern District of New York<br>Case No. 02-41729<br>March 2006 |

- Deposition testimony on behalf of the Debtors as an expert witness related to the value of a cable company in conjunction with the failed buyout of a joint venture partner

| | |
|---|---|
| **Deposition Testimony**<br>**only (continued)** | *Celebrity Cruises, Inc , et al  v  Essef Corp , et al.*<br>United States District Court, Southern District of New York<br>Case No. 96-Civ-3135<br>July 2005 |

- Deposition testimony on behalf of the Plaintiff as an expert witness on diminution of enterprise value, damages and lost profits related to disease outbreak in the cruise industry

*In re  Footstar, Inc , et al*
United States Bankruptcy Court, Southern District of New York
Case No. 04-22350
June 2005

- Deposition testimony on behalf of Kmart Corporation, Respondent, as an expert witness related to reasonableness of income projections, in dispute against Footstar, Inc., et al. as Debtors

# Exhibit G

```
     0001
 1
 2
 3       UNITED STATES BANKRUPTCY COURT
 4       DISTRICT OF DELAWARE
         ------------------------------------x
 5
         In re:
 6                                   Chapter 11
         OAKWOOD HOMES CORPORATION,  Case No. 02-13396 (PJW)
 7       et al.,                     Jointly Administered
 8                         Debtors.
         ------------------------------------x
 9       OHC LIQUIDATION TRUST,
10                         Plaintiff,
11                              Adv. Proc. No.
                                04-57060 (PJW)
12              -against-
13       CREDIT SUISSE FIRST BOSTON, et al.,
14                         Defendants.
         ------------------------------------x
15
16            Videotaped DEPOSITION of ALLEN M. PFEIFFER,
17       held at the offices of Linklaters LLP, 1345 Avenue of
18       the Americas, New York, New York 10105, on the 27th
19       day of March 2008, commencing at 9:36 a.m., before
20       Colette Cantoni, a Registered Professional Reporter
21       and Notary Public of the State of New York, pursuant
22       to Notice.
23
24
25
```

```
 1
 2       A P P E A R A N C E S:
 3
 4           STUTMAN TREISTER & GLATT
                 Attorneys for Plaintiff
 5               1901 Avenue of the Stars
                 Los Angeles, California 90067-6013
 6
         BY:     TONY CASTANARES, ESQ.
 7
 8       LINKLATERS LLP
                 Attorneys for Defendants
 9               Credit Suisse First Boston
                 and the Witness
10               1345 Avenue of the Americas
                 New York, New York 10105
11
         BY:     J. JUSTIN WILLIAMSON, ESQ.
12
13
14
       ALSO PRESENT:
15
           SARAH ENGELMAN, Videographer
16
17
18
19
20
21
22
23
24
25
```

2

```
 1                          Pfeiffer
 2   A L L E N    M.    P F E I F F E R,
 3           having been previously duly sworn, was
 4           examined and testified further as follows:
 5   EXAMINATION
 6   BY MR. CASTANARES:
 7       Q     Good morning, Mr. Pfeiffer.
 8       A     Good morning.
 9       Q     You are a valuation professional?
10       A     Yes.
11       Q     What is valuation?
12       A     Valuation is -- is the exercise of opining
13   on what something is worth or what a company is worth
14   or the value assigned to a particular asset, company,
15   project, or investment.
16       Q     And when you say value, are you referring
17   to a concept of fair market value?
18       A     There are many different -- there are many
19   different distinctions within the, you know, in
20   terminologies within the valuation profession, and
21   fair market value is certainly one of them.
22       Q     When you attempt to opine on the value of
23   a company, is it fair market value that you seek?
24       A     Depending on the context, it may be.
25       Q     Okay.  What other kinds of values does a
```

4

```
 1
 2          (Whereupon, Exhibit 625 was premarked for
 3   identification.)
 4          THE VIDEOGRAPHER:  This is the video
 5   operator speaking, Sarah Engelman of LegalInk Los
 6   Angeles, 20750 Ventura Boulevard, suite 205, Woodland
 7   Hills, California.
 8          Today is March 27, 2008 and the time is
 9   9:36 a.m.
10          We're at the offices of Linklaters, 1345
11   Avenue of the Americas, New York, New York, to take
12   the videotaped deposition of Allen Pfeiffer, in the
13   Matter of Oakwood Homes Corporation, et al., OHC
14   Liquidation Trust versus Credit Suisse First Boston,
15   et al., in the United States Bankruptcy Court
16   District of Delaware.
17          Will counsel please introduce themselves
18   for the record.
19          MR. CASTANARES:  Tony Castanares, Stutman
20   Treister & Glatt, for plaintiff.
21          MR. WILLIAMSON:  Justin Williamson of
22   Linklaters, for Credit Suisse defendants.
23          THE VIDEOGRAPHER:  Will the court
24   reporter, Colette Cantoni of LegalInk Los Angeles,
25   please swear the witness.
```

3

```
 1                          Pfeiffer
 2   valuation expert render opinions on, such as they
 3   might be relevant to Oakwood Homes, as you've come to
 4   understand it, besides fair market value?
 5       A     It would be helpful if you could narrow
 6   the question down a little bit to --
 7       Q     Okay.  You have made a study of Oakwood
 8   Homes; is that correct?
 9       A     I've made a study of the report of
10   Dr. Tennenbaum as it related to Oakwood Homes.
11       Q     All right.  And so I gather you looked at
12   some information about Oakwood Homes; is that right?
13       A     That's correct.
14       Q     And did you attempt to determine any
15   values for Oakwood Homes?
16       A     I did not.
17       Q     At any time?
18       A     Only as it relates to Dr. Tennenbaum's
19   report.
20       Q     Did you attempt to find any values for
21   Oakwood Homes or any part of it, whether it related
22   to Dr. Tennenbaum's report or not?
23       A     Yes.
24       Q     Okay.  What kind of values did you attempt
25   to determine for Oakwood Homes?
```

5

Pfeiffer

1  A     I looked at the market value for the,
2  public market value, for the equity of Oakwood Homes.
3  I looked at the market value of the debt of
4  Oakwood Homes.  And various other indicators of value
5  as it relates to the rebuttal of Dr. Tennenbaum's
6  report.
7  Q     All right.  And when you say the market
8  value of the equity of Oakwood Homes, are you talking
9  about multiplying the number of shares outstanding by
10 the share price on a specific date?
11 A     For the common equity -- for the public
12 capitalization, the public equity value for
13 Oakwood Homes, I'm referring to the amount of shares
14 outstanding and the share price.
15 Q     All right.  Did you attempt to find any
16 other equity value for Oakwood Homes besides what you
17 are referring to as the public equity value?
18 A     I did not -- I did not provide an opinion
19 on equity value beyond that.
20       I looked at what Dr. Tennenbaum concluded
21 on equity values --
22 Q     All right.
23 A     -- but I did not separately opine on a
24 value.

6

Pfeiffer

1  Q     All right.  You said that you looked at
2  the value of debt; is that correct?
3  A     I said I looked at the public market value
4  of the debt.
5  Q     All right.  And you're not talking about
6  looking at the value of Oakwood's bonds on the
7  markets on specific dates multiplied by the total
8  value of bonds outstanding face, correct?
9        MR. WILLIAMSON:  Objection to form.
10 A     That's part of the exercise, yes.
11 Q     What other parts are there to it?
12 A     There's other debt.  There's some other
13 small portions of debt besides the public values
14 but --
15 Q     Did you attempt to find a value for that
16 other debt?
17 A     No.
18 Q     So as far as Oakwood is concerned, the
19 studies that you have made of value are of the value
20 of its public shares and the value of its public
21 debt; is that correct?
22       MR. WILLIAMSON:  Objection.
23 A     Again, I looked at all determinants of
24 value as it relates to what Dr. Tennenbaum did.

7

Pfeiffer

1  Q     You didn't do anything on your own?
2  A     And as relates to what I did on my own, I
3  did not determine the value of Oakwood as of various
4  dates, or as of the dates that are related to in
5  Dr. Tennenbaum's report.
6        However, if you asked me if I looked at
7  any specific values, I mentioned a few that I did
8  look at, which was the public equity and debt values.
9  Q     Do any others come to mind?
10 A     Certainly I looked at the determination of
11 value as of the Clayton acquisition of Oakwood in
12 2003.
13       Nothing else comes to mind right now.
14 Q     All right.  And you've done hundreds of
15 evaluations in your career; is that correct?
16 A     Correct.
17 Q     You served as an expert witness on more
18 than one occasion; is that right?
19 A     That's right.
20 Q     How many times?
21 A     I've served as an expert witness somewhere
22 between 10 and 15 times.
23 Q     Always on valuation issues?
24 A     Issues related to valuation, corporate

8

Pfeiffer

1  finance, cash flows.
2  Q     And is it your belief that the opinions of
3  professionals such as yourself on valuation subjects
4  are of assistance to judges and juries in making
5  determinations about evaluations?
6        MR. WILLIAMSON:  Objection.
7  A     I think at times that's correct.
8  Q     And are there recognized methodologies in
9  your profession for determining evaluations?
10 A     Yes, there are.
11 Q     And are those methodologies set forth in
12 any academic literature?
13 A     There certainly is an abundance of
14 literature on various methodologies.
15 Q     Did you understand Dr. Tennenbaum's report
16 as attempting to come to opinions on the fair market
17 value of Oakwood's assets as of any point in time?
18 A     I think to a certain extent Dr. Tennenbaum
19 was attempting to do that.
20 Q     Is fair market value a term that has a
21 meaning for you?
22 A     Yes.
23 Q     What is that meaning?
24 A     It is the price at which a willing buyer

9

Pfeiffer

1    Pfeiffer
2    and a willing seller would exchange property or
3    business, given a sufficient level of information
4    between the two.
5        Q    Does the definition assume that neither is
6    acting under any compulsion to sell or buy?
7        A    That's also true, yes.
8        Q    And does the definition also assume that
9    the property is exposed to the market for a
10   reasonable period of time?
11           MR. WILLIAMSON:  Objection.
12       A    There's -- depending on the context of the
13   valuation, that is an assumption that's made.
14       Q    Okay.  Have you given an opinion ever on
15   whether a company was solvent or not in -- not in the
16   sense of whether it could meet its obligations as
17   they came due, but whether the fair market value of
18   its assets did or did not exceed the amount of its
19   liabilities?
20       A    I've provided that opinion many times, but
21   I'm not sure in what context you're asking.
22       Q    I'm not really asking about any specific
23   context right now.
24           But in those situations in which you have
25   opined on whether in fact a company was solvent, was

10

Pfeiffer

1    Pfeiffer
2    the value of the assets that you're comparing to the
3    amount of the company's liabilities the fair market
4    value, as you have defined it, or was it some other
5    kind of value?
6            MR. WILLIAMSON:  Objection.
7            Are you asking in each of the instances,
8    in all of the instances was it the same?  Was it --
9        Q    Do you understand my question, sir?
10       A    I do.
11       Q    Okay.
12       A    Sitting here today, I can't recall every
13   instance of solvency where I've provided an opinion
14   to a board or a court or provided advice to a client
15   on that issue.
16           I've done it many times.  And many times
17   I've done it in the context of fair market value.
18   But it could be that I've done it as well in other --
19   with another definition of value as well.
20       Q    You have opined, though, on a question of
21   solvency previously; is that correct?
22           MR. WILLIAMSON:  Objection.
23       A    I have, yes.
24       Q    And what's your definition of solvency?
25       A    It's the -- there's three tests of

11

1    Pfeiffer
2    solvency as it relates to fraudulent conveyance and
3    there's one test of solvency as it relates to
4    preference.  And it depends -- it depends on the --
5    it depends on the case, definition may vary.
6            Solvency is not a -- not clearly defined
7    in every single case.
8        Q    Do you know of a definition of solvency
9    which is that the assets of a company or an
10   individual at fair value are more than the amount
11   required to pay his debts or less than the amount
12   required to pay his debts?  Is that a definition
13   familiar to you?
14       A    That is a broad, simplified definition
15   with respect to one of the -- one of the tests of
16   solvency.
17       Q    I'd like to refer to one of the tests of
18   solvency that compares value of assets to
19   liabilities.
20           Would you give me your definition of that
21   sense of the term "solvency" or "insolvency."
22       A    Again, I believe that certain courts have
23   different definitions but the -- the broad definition
24   I would use is the fair market value of the assets to
25   be greater than the face value of the debt of the

12

1    Pfeiffer
2    company.
3        Q    All right.  Now let's take a company that
4    is like Oakwood, to the extent that you know anything
5    about Oakwood -- strike that.
6            Have you ever been asked to render an
7    opinion on the value of a company as of some date in
8    the past?
9            MR. WILLIAMSON:  Objection.
10       A    Yes.
11       Q    And did you understand that that was what
12   Dr. Tennenbaum was attempting to do in his report?
13       A    That's one of the things he was attempting
14   to do, yes.
15       Q    All right.  And are there recognized
16   methodologies within your profession, that is to say
17   the profession of valuation experts, for determining
18   the value of a company as of some date in the past?
19       A    Yes.
20       Q    Describe those methods for me, please.
21           MR. WILLIAMSON:  Objection.
22       A    The -- it's important to not allow your
23   opinion to be infected by hindsight.  And when you
24   look back at a value as of a certain date in the
25   past, there are various methodologies, which include

13

Pfeiffer

1  a market approach, market transactions, market
2  comparables, discounted cash flow, contingent claim
3  analysis, liquidation analysis.
4         I believe it is incredibly important to
5  look at public market values, other contemporaneous
6  indications of solvency, including bids for the asset
7  of the company.  That also includes people's sense of
8  worth as it relates to advisors or other rating
9  analysts, equity analysts and the like.
10         It's a broad, a broad array of things that
11 one must look at in opining on the value of a company
12 as of a historical date.
13     Q    When you look at, say, the work of an
14 equity analyst, you just don't take the equity
15 analyst's opinion of value whole cloth and make it
16 your own opinion, do you?
17     A    No.
18     Q    You use that as a data point in the
19 various methodologies that prevail in your
20 profession; is that right?
21         MR. WILLIAMSON:  Objection.
22     A    I use it as one indication.
23     Q    Okay.  And would the same thing be true of
24 credit ratings by Standard & Poor's or Fitch's or

*14*

Pfeiffer

1  to their market cap relates to particular financial
2  indicators.  For example, revenue or EBITDA or
3  earnings or some other measures.
4         And you see that multiple and you
5  understand it, you analyze it, you look at the ranges
6  of multiples within the various comparable companies,
7  and then you consider assigning that similar multiple
8  to the company that you're valuing.
9      Q    And is that sometimes called a comparable
10 company analysis?
11     A    Yes.
12     Q    And so there's a discounted cash flow
13 analysis and a comparable company analysis.
14         Is there another analysis that consists of
15 looking at the value of the company's shares plus the
16 market value of its public debt?
17     A    Yes.
18     Q    Does that have a name?
19     A    I would say it's looking at market values.
20     Q    All right.  That's the one you contend
21 that Dr. Tennenbaum should have used in this case,
22 isn't it?
23         MR. WILLIAMSON:  Objection.
24     A    I contend he should have done a lot more

*16*

Pfeiffer

1  something like that?
2      A    I use it as one --
3      Q    Now --
4      A    -- information, one set of information.
5      Q    -- in the ordinary course in evaluating a
6  company as of a certain date in the past, one of the
7  methodologies that is used in your profession is the
8  discounted cash flow method; is that correct?
9      A    That's correct.
10     Q    Another is a market value approach; is
11 that correct?
12     A    That's correct.
13     Q    And that's the one where you add up the
14 market value of the company's stock as of a certain
15 date plus the market value of its bonds on a certain
16 date?
17     A    I wouldn't describe the approach that way,
18 no.
19     Q    Describe it for me then, please.
20     A    The market approach would be to look at
21 similar companies, comparable companies within that
22 industry, look at how their, if they're publicly
23 traded companies you look at how their publicly
24 traded -- publicly available information with respect

*16*

Pfeiffer

1  than that, but that's one of the things I contend,
2  yes.
3      Q    Okay.  Did you do a comparable company
4  analysis at any time that related to Oakwood?
5      A    I did not -- I did not conclude a market
6  comparable analysis.
7      Q    Did you gather any data toward doing a
8  market -- a comparable company analysis on Oakwood?
9      A    Not that I recall.
10     Q    Did you ever do a discounted cash flow
11 analysis for any purpose that related to Oakwood?
12     A    Again, I did not conclude on one.  And if
13 I did one, I don't recall it.
14     Q    Okay.  Now when I say you, sir, you
15 weren't selected as the expert witness in this case
16 until the night before your report was filed; isn't
17 that correct?
18         The report was filed on February 29th,
19 about two weeks ago, or three weeks ago, and you were
20 selected the night before; isn't that true?
21         MR. WILLIAMSON:  Objection.
22     A    I was told about a month before the report
23 was due that I may be the expert in this case.  I
24 wasn't officially told that they'd like me to sign

*17*

Pfeiffer

1   Pfeiffer
2   the report until the night before.
3      Q    Okay.  And so I want to make clear that
4   when I say -- when I'm asking you questions about
5   what you did in this case, I want to refer to your
6   entire team, not just you personally.
7           Is that clear to you?  So that when I ask
8   you if you ever did a cash flow analysis, I am
9   talking about anybody on your team with respect to
10  Oakwood.
11          MR. WILLIAMSON:  Objection.
12     Q    Is my question clear?
13     A    I understand your question.  I can't --
14          MR. WILLIAMSON:  To the extent that he
15  knows.
16     A    -- I can't know what everybody did, but I
17  understand your question.
18     Q    And so to the best of your knowledge, did
19  anybody on your team ever do a discounted cash flow
20  study as it related to Oakwood?
21     A    They might have looked at discounted cash
22  flows.
23     Q    And did you ever see such a thing?
24          MR. WILLIAMSON:  Let me -- let me
25  interject here, Tony, because we have a -- we have a

18

1           Pfeiffer
2   April 30th of 2007.
3           MR. WILLIAMSON:  Correct.
4           MR. CASTANARES:  So are you making a
5   temporal distinction as between April 30th of 2007
6   and times after that?
7           MR. WILLIAMSON:  The distinction that I'm
8   making is that prior to April 30th Duff & Phelps
9   served in a consulting capacity to Linklaters on this
10  case.
11          We view that consulting relationship as
12  privileged.  And to the extent that you ask questions
13  that delve into that, I will instruct the witness not
14  to answer.
15          MR. CASTANARES:  All right.
16          MR. WILLIAMSON:  To the extent you ask
17  questions that relate to anything having to do with
18  Mr. Pfeiffer's work in rebutting Dr. Tennenbaum's
19  analysis and in his expert report, you're free to ask
20  those questions.
21          MR. CASTANARES:  I'd just like to make it
22  clear that it is my position that anything this
23  witness ever did with relation to Oakwood is
24  discoverable, and I intend to have it one way or
25  another.  So I will ask the questions that make the

20

27/03/2008 PFEFFER, ALLEN M.

1           Pfeiffer
2   timing issue, and particularly with these broad
3   questions in terms of did anybody ever look at
4   comparable companies or do a discounted cash flow.
5           And prior to service of Dr. Tennenbaum's
6   report, Duff & Phelps served in a consulting capacity
7   to Linklaters in this case.
8           And we object to the disclosure of any
9   information with respect to that consulting capacity.
10          And I just want to make sure that to the
11  extent the witness is answering these questions, that
12  he's not disclosing any information that relates to
13  any of those prior consulting services.
14          MR. CASTANARES:  Well, let me respond to
15  this in a couple of ways.
16          Number one, once you designate him to
17  testify, ain't no privilege.  Okay.  I think that's
18  plainly the law.
19          So if you one time think you had a
20  privilege with him, once you designate him to testify
21  there is no privilege.
22          So you can feel free to instruct this
23  witness as you deem appropriate.  But let's make
24  clear the objection you're making.
25          Dr. Tennenbaum's report was served on

19

27/03/2008 PFEFFER, ALLEN M.

1           Pfeiffer
2   record, if need be.
3   BY MR. CASTANARES:
4      Q    So, sir, speaking as of any time after
5   April 30, 2007, are you aware of any discounted cash
6   flow work done by anybody in your office?
7      A    Only as it relates to potentially checking
8   some of the work of Dr. Tennenbaum, but no
9   independent, no independent discounted cash flow was
10  done.
11     Q    Okay.  And when you say as it relates to
12  checking the work of Dr. Tennenbaum, what did you do,
13  in terms of a discounted cash flow?
14     A    Our team may have looked at Tennenbaum's
15  analysis and found errors in the discounted cash
16  flow, as it relates to certain assumptions and so on.
17     Q    Did you at any time ever attempt to apply
18  a discount rate that you had derived to a set of
19  future cash flows with relation to Oakwood?
20          MR. WILLIAMSON:  Objection.
21     A    I don't recall.
22     Q    Did you do any discounted cash flow work
23  before April 30th of 2007?
24          MR. WILLIAMSON:  Objection.
25          I am going to instruct the witness not to

21

27/03/2008 PFEFFER, ALLEN M.
27/03/2008 PFEFFER, ALLEN M.

```
 1                    Pfeiffer
 2   answer based on privilege.
 3              MR. CASTANARES:  Okay.
 4        Q    Did you do any comparable company analysis
 5   related to Oakwood prior to April 30, 2007?
 6              MR. WILLIAMSON:  Objection.  Same
 7   instruction.
 8        Q    Did you do any market data work, that is
 9   to say the one that looks at the bond prices and
10   stock prices, related to Oakwood before April 30,
11   2007?
12              MR. WILLIAMSON:  Objection.  Same
13   instruction.
14        Q    Did you do any work related to Oakwood
15   prior to April 30, 2007?
16              MR. WILLIAMSON:  I'll let you answer in
17   broad, general terms as to the subject matter --
18              MR. CASTANARES:  The question calls for a
19   yes or no.
20        A    Yes.
21        Q    When did that work begin?
22        A    I don't recall the exact date.
23        Q    Can you give me any range of times
24   relative to April 30, 2007?  Was it about a month
25   before?  Was it about a year before?
```

```
 1                    Pfeiffer
 2   involvement with Oakwood to do work which you
 3   understood to be designed to yield an expression of
 4   an opinion of value on any basis by you?
 5        A    We were not asked to opine on the
 6   expression of value.
 7        Q    Okay.  Were you asked to opine on the
 8   question of the solvency of Oakwood at any time?
 9        A    No.
10        Q    Now, have you described to me the steps
11   that the valuation expert goes through in
12   gathering -- in the methodology which consists of
13   gathering stock and bond prices in public markets?
14   Have you told me about that fully?
15              THE WITNESS:  I am sorry --
16              MR. WILLIAMSON:  Objection.
17              THE WITNESS:  -- would you repeat the
18   question.
19        Q    Let me rephrase the question.
20        I forgot what you called it, Mr. Pfeiffer,
21   but you referred to one methodology for studying the
22   value of a public company which consisted of
23   gathering data about the market value of its stock
24   and its bonds; is that right?
25        A    That's right.
```

27/03/2008 PFEFFER, ALLEN M.

```
 1                    Pfeiffer
 2        A    Closer to a year.
 3        Q    Okay.  And who else -- describe for me
 4   what you did in that period.
 5              MR. WILLIAMSON:  Objection.
 6        I am going to caution the witness to
 7   answer that question, I'll allow you to answer it in
 8   terms of the broad, general nature and subject matter
 9   of the consulting work that Duff & Phelps did for
10   Linklaters, but beyond that I'll instruct you not to
11   answer.
12        A    We were asked to assist in reviewing
13   documents provided in discovery.  We were asked to
14   broadly analyze certain financial issues.  And to
15   consult on those broad financial issues.
16        Q    What were those financial issues?
17              MR. WILLIAMSON:  I'll allow you to answer
18   in broad subject matter terms.
19        A    Many issues related to the financing of
20   Oakwood, the business of Oakwood, the financial
21   statements of Oakwood, the analysis provided by third
22   parties to Oakwood, and the various issues as it
23   relates to the broader litigation in this case.
24        Q    All right.  Were you asked at any time in
25   the history of this case or in the history of your
```

27/03/2008 PFEFFER, ALLEN M.

```
 1                    Pfeiffer
 2        Q    Okay.  What's the professional term that
 3   you people use for that?
 4        A    Let's call it market data.
 5              MR. WILLIAMSON:  Objection.
 6        Q    Market data.
 7        Now, so in the market data approach you go
 8   back and find data regarding how much per share the
 9   stock was selling for; is that right?
10        A    That's part of it.
11        Q    Okay.  And then you multiply that per
12   share price by the total number of shares
13   outstanding, correct?
14        A    That's part of it, yes.
15        Q    And you come then to a value of the equity
16   or the stockholder's position in the company; is that
17   right?
18              MR. WILLIAMSON:  Objection.
19        A    In the case of Oakwood are you asking
20   or --
21        Q    I'm asking in general.  Does it differ --
22        A    In general, it depends on the different
23   classes of equity, but that, yeah.
24        Q    In Oakwood's case there was one?
25        A    That's right.
```

Pfeiffer

1    Q    So you would determine the value of equity
by looking at how much that one class of stock sold
for per share and multiplying it by the total number
of shares out there, right?

6    A    That's correct.

7    Q    Okay.  And then you would take a look at
the bonds.  And in Oakwood's case that was $3 million
worth, is that right, face?

10   A    Three million?  No.  That's not correct.

11   Q    What is correct?

12   A    Three million dollars worth you said?

13   Q    What was the face amount?  I'm sorry.
Strike that.

15        It was 300 million; is that right?

16   A    That's approximately right.  Correct.
Yes.

18   Q    And so the face value of the bonds is
$300 million, but you would gather data as to the
market value of those bonds on a specific date; is
that right?

22        MR. WILLIAMSON:  Objection.

23   A    Yes.

24   Q    And that would consist of finding out what
the bonds were trading for on that date?

---

Pfeiffer

2    A    Yes.

3    Q    And there are recognized methodologies
within your profession for finding that data out?

5    A    Yes.

6    Q    So if the bonds were trading at, let's
say, 40 and there were $300 million worth you would
assign a value of $120 million to the public debt
position; is that right?

10   A    For this approach that would be correct.

11   Q    Okay.  And then you would now add the
total value that you found for the stock outstanding
to the $120 million of bonds outstanding and you'd
come to an enterprise value for the company; is that
right?

16        MR. WILLIAMSON:  Objection.

17   A    Again, there may be some other nonpublic
debt, but that's part of the methodology.

19   Q    All right.  And if you wanted then to use
that methodology in determining whether the company
was solvent or not, you would take the sum of that
equity and debt position and compare it to the face
value of the company's debt; isn't that correct?

24   A    For that methodology, that would be
correct.

---

Pfeiffer

2    Q    All right.  So now have we now gone
through the steps of that methodology adequately, or
I'm missing something?

5    A    In terms of the actual science of the
methodology, I think you've got it.  I think you've
got it.

8    Q    Okay.  And I believe you told me in the
comparable company analysis, and I'm sure I am going
to do this shorthand but I want to see if I can
describe correctly, the basics steps that the
valuation professional goes through in the comparable
company analysis, it begins with attempting to find
companies that the valuation professional considers
to be comparable to the subject company in some way;
is that correct?

17   A    Correct.

18   Q    And then one gathers data about those
specific companies; is that correct?

20   A    Correct.

21   Q    And then if those companies have engaged
in transactions which are indicative of their own
values, such as being sold, one takes into account
that data; is that correct?

25        MR. WILLIAMSON:  Objection.

---

Pfeiffer

2    A    They could be sold in a transaction for
the whole company or sold in the course of market
participants selling and buying the stock every day.

5    Q    All right.  And then having the data about
what that company sold for, the valuation
professional then makes certain adjustments to that
data based upon whatever differences the valuation
professional perceives to exist between the
comparable company and the subject company; is that
correct?

12        MR. WILLIAMSON:  Objection.

13   A    I'm not sure who this valuation
professional is.

15        If you're asking what I do, I could answer
that.

17   Q    Go ahead.

18   A    I may make adjustments, but I typically
prefer not to make many adjustments.

20   Q    All right.  And then one can either --
what I'm really trying to ask about is the standard
methodology of your profession, which I assume you
follow; is that correct?

24   A    Yes.

25   Q    Okay.  So if you do it differently from

Pfeiffer

1  the standard methodology, tell me, but I'm just
2  trying to find out what the valuation professional
3  does in the ordinary course.
4        Am I clear?
5     A    Yes.
6     Q    Okay.  Having made whatever adjustments
7  the valuation professional then feels are
8  appropriate, the valuation professional then derives
9  some multiple of something, either cash flow or
10 EBITDA or profit or something, is that correct, and
11 applies it to the subject company?
12       MR. WILLIAMSON:  Objection.
13    A    That's correct.
14    Q    And thereby derives a value for the
15 subject company; is that right?
16    A    For the enterprise.
17    Q    All right.  And what is the difference
18 between the enterprise and the subject company?
19    A    I mean you could have -- I'm just trying
20 to make sure I keep the terms consistent.  I mean
21 there are other things you might do, for example I
22 mean you'd have to add debt, you'd have to take
23 out -- you'd have to -- you'd have to analyze the
24 company's cash position, marketable securities.

30

Pfeiffer

1  free of debt, or does the value that you find for the
2  assets depend upon the company's debt on its balance
3  sheet?
4        MR. WILLIAMSON:  Objection.
5     A    I'm not liking the way you characterize
6  the question.  I am sorry.
7     Q    Let me see if I can ask a better question.
8  Okay.
9        When you do a valuation using the market
10 data approach, you gather the total value of the
11 company's stock outstanding and the total market
12 value of its bonds outstanding, and that gives you
13 something called enterprise value; is that correct?
14       MR. WILLIAMSON:  Objection.
15    A    I mean that's broadly correct, but there
16 may be other adjustments that need to be made.
17    Q    Okay.  And when you get to that enterprise
18 value, which I've described broadly, correctly and
19 subject to the adjustments you're talking about, that
20 company has an enterprise value whether its total
21 debt is zero or a billion dollars; isn't that true?
22       MR. WILLIAMSON:  Objection.
23    Q    That is to say, you're valuing assets as
24 if they were free of debt; isn't that true?

32

Pfeiffer

1  There are things you have to do as well.
2     Q    Okay.  When you do a valuation using the
3  comparable company method, do you value the assets
4  standing alone as if the company had no debt and then
5  compare them to the debt or then add the debt back in
6  later or do you value the assets of the company on
7  the assumption that its existing debt on its balance
8  sheet will continue to exist?
9        MR. WILLIAMSON:  Objection.
10    A    It's a very -- you're asking a very broad
11 question.  I mean if you -- it depends what multiple
12 you're using.  You have to be consistent with the
13 methodology.  And therefore, if you're using an
14 EBITDA multiple, that is a multiple prior to
15 consideration of debt.  If you're using a, you know,
16 net income multiple, then your application of debt
17 would be different.
18       So your question is, is too broad to be
19 answered in the way it was asked.
20    Q    Okay.  Let me return for a moment if I
21 could to the market data method.
22       In doing the market data method to
23 evaluate assets, is it the practice in your
24 profession to evaluate the assets as if they stood

31

Pfeiffer

1        MR. WILLIAMSON:  Objection.
2     A    You asked two different questions.  If
3  I -- let's take one at a time.
4     Q    Yes, please do.
5     A    Okay.
6     Q    When you're doing the market data approach
7  are you valuating assets as if they were free of
8  debt?
9        MR. WILLIAMSON:  Objection.
10    A    You're considering the debt and the
11 equity.
12    Q    I'm considering the market value of the
13 debt in determining one component of the enterprise
14 value.
15    A    Correct.
16    Q    But that company that, let's say, had a
17 market value of its debt at $120 million could have
18 total debt of 120 million or could have total debt
19 of, let's say, the $300 million outstanding on its
20 bonds or it could have total debt of $3 billion
21 depending on what other debt it had; isn't that true?
22       MR. WILLIAMSON:  Objection.
23       Are we talking about a particular company?
24 You said that company, Tony.

33

Pfeiffer

A    I mean that company in theory could have market value of debt and the face value could be a very different number.

Q    Okay.  So is it fair then to say that the enterprise value you arrive at in this method speaks of the value of the assets as if they were free of debt?

MR. WILLIAMSON:  Objection.

A    Again, I don't -- I'm not comfortable the way you're characterizing the question.

Q    All right.

Now let's talk about the discounted cash flow approach to value.

Is that a recognized methodology within your profession?

A    Yes.

Q    It's one that you have used on various occasions, I take it?

A    Yes.

Q    Is it fair to say it's one you use on most occasions when you're evaluating --

MR. WILLIAMSON:  Objection.

Q    -- a company?

MR. WILLIAMSON:  Objection.

34

Pfeiffer

A    Yes.

Q    In fact, is it fair to say that it's very rare that you wouldn't do a discounted cash flow analysis in valuing a company?

MR. WILLIAMSON:  Objection.

A    I don't know how to characterize "very rare," but as I said before you typically do a discounted cash flow.

Q    Okay.  Take me through the steps that the valuation professional goes through in doing a discounted cash flow analysis.

MR. WILLIAMSON:  Objection.

A    Broadly speaking, irrespective -- we're not talking about Oakwood right now, we are talking about --

Q    I am just talking about methodology right now.

A    Because for Oakwood it may be very different.

Q    Okay.

A    And it certainly would be -- in general, you know, one has to consider the purpose of the analysis and the situation the company finds itself in.

35

Pfeiffer

But broadly speaking, a discounted cash flow starts with a projection of future cash flows.  Projection of expected cash flows, I should say.  And a present value determination of those future cash flows.

Q    All right.  So if the expert is valuing assets as of some date in the past, or valuing the company as of some date in the past, he finds what projected cash flows that company would experience, speaking as of that date in the past; is that correct?

MR. WILLIAMSON:  Objection.

A    I don't know what you mean by "would experience."

I mean there's a -- there's a -- you would look for the expected future cash flows as of that date in the past.

Q    Okay.  So if I asked you to do a discounted cash flow analysis of a company, say, starting as of three years ago, in order to find its expected cash flows would you just go look to see what's happened in the last three years?

MR. WILLIAMSON:  Objection.

Q    Or would you do something else?

36

Pfeiffer

MR. WILLIAMSON:  Objection.

A    I would do something else.

Q    What else would you do?  Strike that.

Why wouldn't you just look at what happened in the last three years?  You know for sure then, don't you?

A    Because as I explained, the exercise begins with looking at expected future cash flows as of that date.

Q    Okay.  So you have to look as of that date rather than simply with hindsight from now; is that correct to say?

A    That's correct.

Q    Okay.  And this set of projected cash flows would say that as of the date of valuation, let's say three years ago today, this company expected to have cash flows of X, Y and Z in the next several years; is that right?

MR. WILLIAMSON:  Objection.

A    I'm not sure what the question is.

Q    Okay.  The discounted cash flow analysis consists of determining as of the date of valuation what expected future cash flows would be; is that correct?

37

Pfeiffer

1    THE WITNESS:  Could you repeat the
2    question, please.
3    Q    I'll repeat the question.
4         The discounted cash flow analysis begins
5    with determining what predicted future cash flows
6    would be, speaking as of the date of valuation,
7    correct?
8         MR. WILLIAMSON:  Objection.
9    A    It doesn't -- the way the question's been
10   asked, the answer would be no.
11        You wouldn't just determine what was
12   predicted.  You determine the expected cash flows as
13   of that date.  Not predicted cash flows.
14   Q    So your difference with me is the use of
15   the word "expected" versus predicted?
16   A    Primarily, yeah.
17   Q    Okay.  So you would determine what cash
18   flows were expected to come in as of the date of
19   valuation as your principal step; is that correct?
20        MR. WILLIAMSON:  Objection.
21   A    That is one of your steps, yes.
22   Q    And the cash flow means money coming in
23   and out; is that right?
24   A    That's a very technical definition you

38

Pfeiffer

1    have there.  But -- that's not, that's not a very --
2    that's not a finance definition, but it's cash flow
3    means cash flowing --
4    Q    Okay.
5    A    -- so in and out, yes.
6    Q    What you're attempting to determine is
7    what, how much money is expected to come into this
8    company at certain times in the future versus how
9    much money is going to go out of this company at
10   certain times in the future; is that right?
11        MR. WILLIAMSON:  Objection.
12   A    That's right.
13   Q    And after you have made that study or that
14   determination, then the next step is to find the
15   present value of those expected cash flows; is that
16   correct?
17        MR. WILLIAMSON:  Objection.
18   A    Yes.
19   Q    And that is because a dollar a year from
20   now isn't the same, doesn't have the same value as a
21   dollar today; is that right?
22   A    Right.
23   Q    So if a company's predicted to or expected
24   to bring in positive cash flow of $100 a year from

39

Pfeiffer

1    now, a year from today, the valuation professional
2    would attempt to determine how much that money a year
3    from today is worth today; is that right?
4         MR. WILLIAMSON:  Objection.
5    A    I would say it differently.
6    Q    Sorry?
7    A    I would say it differently.
8    Q    Say it differently then, please.
9    A    I knew you'd ask that.
10   Q    I'm not a professional so I just do my
11   best muddling through here.
12   A    You're a professional, just not a
13   valuation professional.
14   Q    There you go.
15   A    I would say that the expected cash flow a
16   year from today has to be valued in today's present
17   value terms.
18   Q    And how does the valuation professional go
19   about determining what an expected cash flow a year
20   from today is worth in today's value terms?
21        MR. WILLIAMSON:  Objection.
22   A    Well, if it's a debt-free cash flow, one
23   would look at the weighted average costs of capital
24   of the company.

40

Pfeiffer

1    Q    And what would looking at the weighted
2    average cost of capital tell the valuation
3    professional?  Let me just ask a further question.
4         Looking at the weighted average cost of
5    capital, you as a valuation professional are trying
6    to derive a discount rate; isn't that correct?
7    A    Correct.
8    Q    And the discount rate is the method by
9    which you evaluate how much money $100 a year
10   interest today is worth in today's terms; isn't that
11   right?
12        MR. WILLIAMSON:  Objection.
13   A    In the context of that company's expected
14   cash flows.
15   Q    Okay.  So in the context of that company's
16   expected cash flows, if you had a discount rate of
17   10 percent you would say that $100 a year from today
18   is worth $90 today, correct?
19   A    Correct.
20   Q    And the cash flows that are being studied
21   in the discounted cash flow analysis consist of
22   essentially two things; am I correct?  First is the
23   cash flows that are expected from the company's
24   continued operations during the period under study;

41

Pfeiffer

1  and the second is the value of the company expressed
2  as sometimes called terminal value when the period
3  under study concludes --
4        MR. WILLIAMSON:  Objection.
5  Q    -- is that correct?
6        MR. WILLIAMSON:  Objection.
7        THE WITNESS:  If you could read back the
8  question, please.
9        (Question read.)
10       MR. WILLIAMSON:  Same objection.
11  A    There typically is a period of cash flows
12  that is explicitly projected as expected cash flows
13  and a terminal value.  There are certain situations
14  where there is no terminal value and you project out
15  the cash flows until you believe that they will not
16  exist anymore or don't need to be projected anymore.
17  But the expected cash flow period and then there's an
18  expected terminal value.
19  Q    All right.  And at the conclusion of that
20  then, you conclude that the present value, speaking
21  as of the valuation date, of all of the expected cash
22  flows of this company is a certain figure; is that
23  right?
24       MR. WILLIAMSON:  Objection.

Pfeiffer

1  A    Yes.
2  Q    Okay.  And that allows you to reach
3  conclusions about what an investor would pay for
4  those future cash flows; is that right?
5        MR. WILLIAMSON:  Objection.
6  Q    As a matter of fact, that's exactly
7  what -- when we talk about the value, the present
8  value of those future cash flows, what we're talking
9  about is how much an investor would pay for the right
10  to receive those future cash flows; is that right?
11  A    It's a -- it's a giant leap to that step.
12       You have to do a lot more work to
13  determine whether the discounted cash flow value
14  itself is the price that one would pay.
15  Q    What other work does one do to determine
16  that?
17  A    Well, first and foremost, you would do
18  other methodologies, not just discounted cash flow
19  methodology.
20  Q    So you would do the comparable company
21  analysis and --
22  A    The market data analysis, the asset
23  approach, which is to look asset by asset, what I
24  would call a balance sheet or net asset approach.

Pfeiffer

1        Again, like I mentioned before, there's
2  potentially, you know, real option analysis or
3  contingent claim analysis.  There's looking at
4  contemporaneous information.  So there's a lot of
5  things you would do, you know, in addition to looking
6  at the company's situation in terms of its liquidity
7  and its level of distress.  Whether there are other
8  companies in the industry that may or may not be
9  interested in buying this company.  Whether you'd
10  expect synergies.  Whether you'd expect a discount
11  for lack of marketability.  Whether you'd expect a
12  control premium.  There's many other factors that
13  have to be considered before you determine that a
14  particular analysis leads you to the price that
15  someone would pay.
16  Q    Does the valuation professional take into
17  account such things as control premium, expected
18  synergies, and the things you've just mentioned in
19  the course of doing a discounted cash flow analysis?
20       MR. WILLIAMSON:  Objection.
21  A    I'm not really sure how to answer that
22  question.  I mean I don't -- I don't know what -- I
23  mean those things are considered in your valuation
24  analysis.  I'm not sure what you're asking.

Pfeiffer

1  Q    Well, is it standard practice within your
2  profession, sir, to take those things into account in
3  determining a discount rate?
4  A    No.
5  Q    Now, you mentioned that in Oakwood's case
6  there may be some differences from the standard
7  practice in discounted cash flow.
8        Describe them, please.
9        MR. WILLIAMSON:  Objection.
10  A   Oakwood's cash flows, expected cash flows,
11  may be negative in the short term.  And they may or
12  may not be predicted or expected to be turning
13  positive in the long term.
14       And one would need to carefully analyze
15  the time horizon and the expectations with regard to
16  the company's change from a company losing cash to a
17  company potentially getting to a stable state.
18       There also may be various considerations
19  with respect to the company's level of distress, sale
20  of assets, change in business.
21       The company may or may not have a terminal
22  value, because it may decide to exit the business or
23  exit certain components of the business at various
24  points in time, or sell the business at points in

27/03/2008 PFEFFER, ALLEN M.

Pfeiffer

1 time.

3       There may be adjustments that need to be
4 made to the working capital model, to the company's
5 ability to spend on various marketing and other
6 capital expenditure programs.  And there may be some
7 scenario planning, meaning you might need to do
8 various cases projections, a downside, an upside,
9 reflecting the various different possible scenarios
10 the company has in front of them.

11   Q    These would lead you to study different
12 projections from the original ones studied in the
13 discounted cash flow study?

14       MR. WILLIAMSON:  Objection.

15   A    This would lead you to broaden the way
16 you'd look at the cash flows from the standard just
17 take prospective cash from methodology that we
18 described before.

19   Q    So you would, in just going through the
20 steps as methodology, you would adjust, you would
21 make adjustments to the projections of expected cash
22 flows?

23   A    No.

24       You'd have to do a lot more further
25 analysis.

46

27/03/2008 PFEFFER, ALLEN M.

Pfeiffer

2       Adjustment is a broad term that could mean
3 anything.

4       I'm saying you have to consider all the
5 various scenarios and all the various options, and
6 whether the company would be a going concern at
7 various points in time.  And as I described earlier,
8 you'd make, you'd have to consider a lot of different
9 factors, particularly if the company's in distress.
10 You'd have to consider that.  In addition to the fact
11 you'd have to be very careful to analyze the expected
12 projections relative to historical performance,
13 relative to other contemporaneous observers' belief
14 with respect to the future of the industry and some
15 of the competitors' outlook on the industry, analysts
16 and so on.  You'd have to take a much more careful
17 look at the projections before using them in any kind
18 of model.

19   Q    And did you do that in this case, you or
20 your associates?

21   A    I was not asked to.  No.

22   Q    So to the extent that your associates, you
23 or your associates ever ran any cash flow, discounted
24 cash flow studies, you didn't go through all the
25 steps you just described?

47

27/03/2008 PFEFFER, ALLEN M.

Pfeiffer

2       MR. WILLIAMSON:  Objection.

3   Q    Is that correct?

4   A    I don't recall if my team ever did such an
5 analysis.  But if they did do an analysis like that
6 and if they were asked to do a discounted cash flow
7 analysis, that's what I would have -- that's what I
8 expect they would have done.

9   Q    Okay.  And was Oakwood in distress at any
10 time that you examined it?

11       MR. WILLIAMSON:  Objection.

12   Q    As you use that term.

13   A    Yes.

14   Q    Was it in distress, as you use that term,
15 at all times that you examined it?

16   A    No.

17   Q    What -- when did it change?

18       MR. WILLIAMSON:  Objection.

19   A    I have not formed a -- I have not formed
20 an expert opinion as to when the company turned into
21 a distressed company.

22   Q    What is the basis of your statement that
23 at some time it was not in distress and at some other
24 time it was?

25   A    My basis is that it's my impression that

48

27/03/2008 PFEFFER, ALLEN M.

Pfeiffer

2 in the mid nineties the company was not in distress.

3   Q    Was it in distress in all of 2001, to the
4 extent that you looked at the company in 2001?

5   A    I have not reached a conclusion on that.

6   Q    How about 2002?

7   A    I would say yes.

8   Q    Okay.  How about 2000?

9   A    I have not reached a conclusion on that.

10   Q    Was it in distress for all of 2002?

11   A    I would say it was in various levels of
12 distress at various points in time 2002.

13   Q    Was it at any level of distress at any
14 point in time in 2001?

15       MR. WILLIAMSON:  Objection.

16   A    It likely was.

17   Q    What do you mean by distress?

18   A    I mean a company that has to consider its
19 liquidity, consider its cash flow situation, and must
20 consider those issues before conducting business in a
21 normal fashion.

22   Q    And when you say consider them, what do
23 you mean by that?

24   A    Meaning you've got a treasurer and a
25 finance, set of finance professionals who are

49

Pfeiffer

1              Pfeiffer
2 considering the company's actions relative to their
3 cash position.
4     Q    And what -- when you say relative to their
5 cash position, what do you mean?
6     A    I am sorry?
7     Q    When you say relative to their cash
8 position, tell me what you mean by that.
9     A    I mean the company has to maintain a
10 certain amount of liquidity, and it has to be able to
11 pay its debts, and it must consider those issues.
12     Q    And what kind of things do those people
13 that you described, the treasurer, et cetera, have to
14 consider in terms of conducting its business relative
15 to its cash position?
16           MR. WILLIAMSON:  Objection.
17     A    It must consider its financing programs.
18 It must consider its change in business operations.
19 It must consider its collection policies, its payment
20 policies, and many other factors.
21     Q    And these are factors that arise when the
22 company comes into distress?
23     A    Certainly those issues are considered
24 prior to a company going into distress, but in
25 particular when a company faces those issues on a

50

---

1              Pfeiffer
2 another point in time in the past?
3           MR. WILLIAMSON:  Objection.  And, Tony, I
4 am just going to say this just so that it's on the
5 record.  We've already had our discussion about the
6 temporal issue with respect to the consulting
7 relationship, and Mr. Pfeiffer's going to answer
8 questions with respect to the work that was done
9 post-April 30th.  And I realize you're asking those
10 broad questions but --
11           MR. CASTANARES:  Let's keep our record
12 clear then.  And I am just doing this as a favor to
13 you I think.
14     Q    At any time on or after April 30, 2007 did
15 you or your team compare the value of the assets of
16 Oakwood on one date in the past to the value of the
17 assets of Oakwood on another date in the past?
18     A    As it relates to Dr. Tennenbaum's report,
19 yes.
20     Q    Did you ever do so before April 30, 2007?
21           MR. WILLIAMSON:  Objection.
22           I am going to instruct the witness not to
23 answer.
24     Q    Tell me what you did in connection with
25 comparing Oakwood's asset value at one date in the

52

---

1              Pfeiffer
2 daily basis and with an increased level of attention,
3 it becomes more of a -- more of a focus, more of a
4 consideration.
5     Q    Did you ever attempt to, you or anybody on
6 your staff that is, ever attempt to create a set of
7 projections for Oakwood as of any date in the past
8 upon which to base a discounted cash flow study?
9           MR. WILLIAMSON:  Objection.
10     A    I don't recall.  I don't know.  Not I
11 don't recall.  I don't know.
12           MR. WILLIAMSON:  Tony, when you get to
13 a --
14           MR. CASTANARES:  This is convenient.
15           MR. WILLIAMSON:  -- we could take a break?
16           MR. CASTANARES:  Take a short break.
17           THE VIDEOGRAPHER:  The time is 10:37 a.m.,
18 we are off the record.
19           (A recess was taken.)
20           THE VIDEOGRAPHER:  The time is 10:51 a.m.,
21 you're on the record.
22 BY MR. CASTANARES:
23     Q    Mr. Pfeiffer, at any time did you or your
24 team study a comparison between the value of
25 Oakwood's assets at one point in time in the past and

51

---

1              Pfeiffer
2 past at and at another date in the past as it relates to
3 Dr. Tennenbaum's report.
4     A    Well, Dr. Tennenbaum, broadly speaking,
5 compares the value of the assets at different dates.
6           And so we looked at his conclusions and
7 found problems with his conclusion, and looked at
8 alternative approaches and, as you know, we looked at
9 the market value, public market value of the assets
10 at various dates.
11     Q    All right.  I may have asked perhaps too
12 broad a question.
13           I recognize that you performed some
14 criticism of what Dr. Tennenbaum did.  And my
15 question wasn't designed to ask you about that right
16 yet.  Rather, I'm asking you if you or your team
17 performed your own study of the value of Oakwood's
18 assets comparing any two points in time in the past.
19           MR. WILLIAMSON:  Post-April 30th.
20 Post-April 30th.
21     A    We looked at the market values, as written
22 in my report.  And did other analysis, as written in
23 my report.  But didn't arrive -- we did not arrive at
24 any final conclusion relative to the market values of
25 Oakwood and at various times in the past.

53

Pfeiffer

1   Q   Okay. Now, I believe you told me that you
2   were first engaged in this matter about a year or so
3   before April 30th of 2007; is that right?
4       MR. WILLIAMSON:  Objection.
5       A   I think what I said was it's closer to a
6   year than it is a month.
7   Q   Okay.
8       A   But it was not a year. It was potentially
9   more than that.
10  Q   It was more than a year?
11      A   It might have been more -- I don't recall,
12  but it might have been more than a year.
13  Q   Well, in the period that you have been
14  engaged in the matter has the nature of your
15  assignment changed in any way?
16      MR. WILLIAMSON:  Objection.
17      A   Yes.
18  Q   Describe.
19      A   I believe initially we were asked to
20  broadly look at many aspects of the case, of the
21  matter, and look at a broad set of documents that
22  were provided in discovery. And post-April 30th our
23  role was really focused on the expert report of
24  Dr. Tennenbaum and our views with respect to that

54

Pfeiffer

1   report.
2   Q   Did you ever understand at any time that
3   your assignment included opining on the value of
4   Oakwood at any point in the past?
5       MR. WILLIAMSON:  Objection.
6       Be careful with the difference between
7   consulting relationship and the post-April 30th
8   relationship.
9       MR. CASTANARES:  I'll make clear I'm
10  asking ever.
11      MR. WILLIAMSON:  I know, that's why I am
12  instructing the witness.
13      A   We -- we were never asked to opine on the
14  value of Oakwood at any point in time.
15  Q   All right. Were you ever asked to prepare
16  any studies that might be preliminary to your opining
17  on the value of Oakwood at any point in the past?
18      MR. WILLIAMSON:  Objection. Same
19  instruction.
20      THE WITNESS:  Could you repeat the
21  question, please.
22      MR. CASTANARES:  Would you read it back,
23  please.
24      (Question read.)

55

Pfeiffer

1       MR. WILLIAMSON:  You could answer the
2   question with respect to your post-April 30, 2007
3   engagement.
4       A   Certainly post-April 30, 2007 we were not
5   asked to do that.
6   Q   Before April 30th of 2007 were you asked
7   to perform any studies that would be preliminary
8   toward the rendition of an opinion of the value of
9   Oakwood at any time in the past?
10      MR. WILLIAMSON:  Objection.
11      I instruct the witness not to answer on
12  the grounds of privilege.
13  Q   I show you, sir, a document previously
14  marked as Exhibit 2624.
15      MR. CASTANARES:  I gave Mary a copy the
16  other day. I don't know -- it's not in that bundle
17  (indicating). Let me ask -- I didn't bring yet
18  another copy because I already gave Mary one copy a
19  couple of days ago.
20  Q   But do you recognize the handwriting here,
21  sir?
22      A   I do.
23  Q   Is it yours?
24      A   Unfortunately, it is.

56

Pfeiffer

1   Q   Are these notes that you took in the
2   course --
3       A   I say unfortunately because it is not very
4   good handwriting, not because of the content of it.
5   Q   Are these notes that you took in the
6   course of a telephone conversation?
7       A   I don't recall if it was a telephone
8   conversation or a meeting, but they're my notes.
9   Q   Whether it was a telephone conversation or
10  a meeting, describe all persons present, please, or
11  identify them.
12      MR. WILLIAMSON:  Objection.
13      A   My understanding is that this is a note
14  pad that has pages that were written on different
15  dates, and unfortunately the dates are not on the
16  notes. And for a variety of reasons therefore I
17  don't recall who was with me and who attended the
18  conversation or the meeting.
19  Q   All right. So is it your testimony that
20  not all of the notes that comprise Exhibit 624 were
21  taken at the same time?
22      A   Yes.
23  Q   All right. Let me ask you to refer to the
24  first page of this, and I am going to use page

57

Pfeiffer

1  numbers here using the Bates numbers in the lower
2  right-hand corner, 521703 being the first.
3
4          Do you see that?
5      A   Yes, I do.
6      Q   Okay.  Looking at that page, I see right
7  in the center of the page "2002 no longer in finance
8  business."
9
10         What did you mean by that?
11     A   I meant that in 2002 the company, Oakwood,
12 took steps to exit components of the finance
13 business.
14     Q   And is that something that someone told
15 you or is that something that you knew already when
16 you wrote these notes?
17     A   Something I knew already.
18     Q   All right.  And what did you know about
19 that?
20     A   I can't tell you exactly what I knew when
21 I wrote this note, but I knew that they were making
22 steps to rationalize their business and to exit
23 certain businesses as they prepared to file for
24 bankruptcy.
25     Q   And what particular steps did you know
   them to have taken in 2002 to exit the finance

Pfeiffer

1      A   I meant that there was a sufficient market
2  for these bonds.
3      Q   Sufficient for what purpose?
4      A   For purposes of determining that there was
5  an active market, that there were prices, the prices
6  available, there was volume on these bonds.
7      Q   Were you saying, sir, that the data was
8  sufficient in order for you to perform the public
9  debt portion of what you've called a market data
10 analysis?
11         MR. WILLIAMSON:  Objection.
12     A   Yes.
13     Q   Right.  And you knew that already as of
14 the time you made these notes, or was somebody
15 telling you this that you were writing down?
16     A   It was a discussion about making sure
17 there was a sufficient market.  And I wrote in my
18 notes that there was a sufficient market.
19     Q   My question to you is, is that something
20 somebody said to you in the course of this meeting
21 that you chose to write down or is it something you
22 knew already and you just memorialized here?
23         MR. WILLIAMSON:  Objection.
24     A   It's something that I knew already, but I

Pfeiffer

1  business?
2      A   Just what I told you.  That they would
3  change the way they did -- they conducted business as
4  relates to the financing portion of their business.
5      Q   All right.  Let me ask you to turn the
6  page to the page that's 704 in the lower right-hand
7  corner.
8          And you see here a reference on the third
9  line, it looks like it says "01/02 market is
10 sufficient for 8 1/8 and 7/7" something.
11         Do you see what I'm referring to?
12     A   Yes.
13     Q   Can you read it?
14     A   "01/02 market is sufficient for 8 1/8 and
15 7 7/8."
16     Q   And do those refer to Oakwood's two bond
17 issues?
18     A   Yes.
19     Q   And when you say sufficient, do you mean
20 that they were sufficient data available to find out
21 the bond prices on specific dates?
22         MR. WILLIAMSON:  Objection.
23     A   No, that's not what I meant.
24     Q   What did you mean?

Pfeiffer

1  confirmed after discussions with my team.  This was,
2  as I recall now sitting here, this was a discussion I
3  had with my team.
4      Q   All right.  And who was your team?
5      A   At this exact date or in general?
6      Q   As of the time you made these notes.
7      A   My team was Aijun Besio.
8      Q   Could you spell these names for the
9  reporter as you go by, too.
10     A   I could try but I'm not sure --
11     Q   Well, we have them elsewhere.  I'll get
12 them for her.  I have them.
13     A   All right.  A-I-J-U-N, I believe
14 B-E-S-I-O.
15         The other members of my team included --
16 sorry -- Adam Warren, Michael Vitti, and I had other
17 staff members who helped me at times, including
18 John Goldblatt, and my paralegal, Nicole Patterson.
19     Q   Okay.  And who was Aijun?  What was her
20 role?
21     A   Aijun is a vice president.  And her role
22 was to help me to prepare the various issues I needed
23 preparation for purposes of this expert report.
24     Q   All right.  And she's somebody senior in

## Page 62

```
 1                    Pfeiffer
 2    the organization to you or junior or equal?
 3        A    She's junior to me.
 4        Q    Is there anybody on your team in this
 5    matter that was senior to you?
 6        A    No.
 7        Q    All right.  Lower on this page 704 I see
 8    "Shapiro September 01/ 230 value."
 9             What is that reference, please?
10             MR. WILLIAMSON:  Objection.
11        A    That references the fact that in Shapiro's
12    report he ascribes a value of 230 million as of
13    September '01.
14        Q    And was that value based upon a market
15    data analysis?
16        A    It was intended -- it was intended by
17    Shapiro to do, broadly speaking, a market data
18    analysis, yes.
19        Q    He derived that figure by adding up the
20    market value of the company's stock on that date and
21    the market value of the company's bonds on that date
22    based upon the data he had; is that correct?
23             MR. WILLIAMSON:  Objection.
24        A    That's correct.
25        Q    Do your studies lead you to differ with
```

## Page 64

```
 1                    Pfeiffer
 2    that you know?
 3             MR. WILLIAMSON:  Objection.
 4        A    Again, you know, approximately
 5    300 million.
 6        Q    And did your studies differ from
 7    Dr. Shapiro, speaking as of September '01, on the
 8    market value of Oakwood's bonds?
 9             MR. WILLIAMSON:  Objection.
10        A    As I said a few minutes ago, you know, I
11    don't recall specifically as to whether our number
12    differed from Dr. Shapiro's as of September '01, but
13    we found various differences in the data that we had
14    versus the data that he had.
15        Q    Do you have any reason to doubt that
16    Dr. Shapiro had the data he had?
17             MR. WILLIAMSON:  Objection.
18        A    I have no reason to doubt that Dr. Shapiro
19    had the data he had.
20        Q    That data was derived from JPMorgan; is
21    that correct?
22             MR. WILLIAMSON:  Objection.
23        A    That's what Dr. Shapiro contends, yes.
24        Q    And you have no reason to doubt that
25    Dr. Shapiro fabricated this evidence and that it
```

## Page 63

```
 1                    Pfeiffer
 2    that figure?
 3        A    I can't specifically -- I can't speak
 4    specifically to that figure, and I'm not even sure if
 5    this exact figure is exact.  But our studies did, did
 6    differ a bit with Shapiro's.
 7        Q    And did they differ with him as to what
 8    the stock price was?
 9        A    I believe -- I don't believe so.
10        Q    Did they differ with him as to what the
11    total number of shares outstanding was?
12        A    I don't believe so.
13        Q    So as to the equity component of the
14    market data analysis, would it be fair to conclude
15    that your studies didn't differ?
16             MR. WILLIAMSON:  Objection.
17        A    As far as I remember, I don't think we --
18    I don't -- I'm not sure that we didn't find an error
19    in his numbers, but I don't recall finding an error.
20        Q    All right.  And did you differ from
21    Dr. Shapiro in your assessment of what the total face
22    value of all the bonds outstanding was?
23             MR. WILLIAMSON:  Objection.
24        A    I don't recall.
25        Q    Three hundred million, is that a number
```

## Page 65

```
 1                    Pfeiffer
 2    really wasn't JPMorgan's evidence, do you?
 3        A    No.
 4             MR. WILLIAMSON:  Objection.
 5        Q    You were unable to get the JPMorgan data,
 6    right?
 7        A    I believe that we did not obtain the
 8    JPMorgan data.
 9        Q    So you went out and looked for other data,
10    right?
11        A    We instead looked for actual trading data.
12        Q    Okay.  And did you find any?
13        A    Yes.
14        Q    Were you able to arrive at bond prices for
15    Oakwood's two issuances on specific dates in the
16    past?
17        A    Yes.
18        Q    Did that include September 30, 2001?
19        A    Yes.
20        Q    What price did you find for those bonds?
21        A    I don't recall off the top of my head.
22    I'd have to look at my work papers.
23        Q    At your work papers?
24        A    I'd have to look at the documents provided
25    to you in support of my report.
```

Pfeiffer

Q    All right.  We'll get to this point later,
but I am going to ask you to do that.  So maybe --
I've got a lot of documents here, I hope we'll be
able to short-circuit it, if you could help me decide
which ones to look at.  Okay.  So let's come back to
that issue.

At page 705 of this document, Exhibit 624,
there is a note that says "Assumes going concern,"
that looks like about the eighth or ninth line down
there, referring to apparently Dr. Tennenbaum's, it's
under "Compares apples to apples."

Do you see that?

A    Yes.

Q    And what does the "assumes going concern"
refer to?

A    That Dr. Tennenbaum assumes a going
concern.

Q    Is that a -- was that a correct assumption
to make as of September of '01?

MR. WILLIAMSON:  Objection.

A    I'm not sure -- if you can clarify your
question.

Q    Do you differ with Dr. Tennenbaum's
assumption of going concern as of September '01?

66

Pfeiffer

those a going concern?

A    No.

MR. WILLIAMSON:  Objection.  Sorry.

Q    So just so I have things clear, it is your
testimony that it is incorrect to assume a going
concern for Oakwood in September of 2001; is that
correct?

MR. WILLIAMSON:  Objection.

A    I didn't say that, no.

Q    Well, what is the correct assumption to
make about going concern in 2001 for Oakwood?

A    My opinion related to Dr. Tennenbaum's
report.  And the conclusion I reached with regard to
September 30, 2001 was that given the basis of his
opinion that the company should not have continued to
operate its business in the way it was operating it
as of September 2001, my opinion is that his going
concern premise therefore is faulted in that
analysis.

Q    Now are you saying that the company -- is
it your opinion the company should have continued to
operate in the way it was operating in September 2001
or should not have done so?

MR. WILLIAMSON:  Objection.

68

Pfeiffer

A    For the purposes of his analysis and his
contention and his theory of damages as I read it, I
differ with him, yes.

Q    Okay.  And so what is the alternative to
making a going concern assumption?  What is the other
assumption or what are the other assumptions that one
might make if one didn't assume a going concern?

A    You would assume a non-going concern.

Q    You would assume a liquidation, correct?

MR. WILLIAMSON:  Objection.

A    That's one of the alternatives is as a
non-going concern, yes.

Q    What are the other non-going concern
alternatives besides liquidation?

A    Well, you can liquidate part of your
business or sell part of your business and continue
to operate other parts.

Q    And the parts that you operated, would you
then consider to be a going concern?

MR. WILLIAMSON:  Objection.

A    Depending on the hypothetical scenario you
might consider it a going concern.

Q    What about the parts that you sold off on
other than liquidation basis, would you consider

67

Pfeiffer

A    I have not been asked to form an opinion
on that.

Q    And you don't have any based upon what
you've looked at?

A    No.

Q    Okay.  And are you therefore saying that
if it was incorrect for Dr. Tennenbaum to assume a
going concern in September 2001, let me ask you, sir,
what assumption he should have made in your opinion?

MR. WILLIAMSON:  Objection.

A    He should have been consistent, and if he
is saying that the company should have filed for
bankruptcy in September of 2001, he should have
valued the company as if it was going to file for
bankruptcy in September 2001.

Q    And is it your testimony that he did not?

A    My testimony is that the way, the method
in which he conducts his valuation is not consistent
with a liquidation scenario.

Q    Do you understand Dr. Tennenbaum's report
as saying that the company should have been
liquidated in 2001?

A    Not necessarily.

Q    Okay.  You understand his saying that if

69

27/03/2008 PFEFFER, ALLEN M.

Pfeiffer

1  Pfeiffer
2  the company had gone into bankruptcy in 2001 as
3  distinguished from 2002 it would have received better
4  value for its assets, don't you?
5        MR. WILLIAMSON:  Objection.
6     A    I understand his report and deposition to
7  be saying that, yes.
8     Q    And he was assuming for the purposes of
9  his study a going concern both in 2001 and 2002,
10  wasn't he?
11        MR. WILLIAMSON:  Objection.
12     A    The way his model is performed, there's an
13  inherent assumption of a going concern as of those
14  two dates.  What he had in his head I can't tell you.
15  But the model presumes a going concern as of those
16  two dates.
17     Q    Do you ever -- have you ever in your life
18  performed a valuation of a company in bankruptcy
19  other than on a liquidation basis?
20     A    Yes.
21     Q    Okay.  So is it therefore correct for me
22  to conclude that the fact that a company is going
23  into bankruptcy does not necessarily conflict with an
24  assumption that its assets should be valued as a
25  going concern?

70

1  Pfeiffer
2        MR. WILLIAMSON:  Objection.
3     A    If one assumes that the company was to
4  file for bankruptcy, one should consider the
5  possibility is the company is not a going concern.
6     Q    All right.  And is it your testimony that
7  Dr. Tennenbaum failed to consider that?
8     A    My testimony is that his model allows me
9  to make the assumption that he did not consider that.
10     Q    You actually as you're sitting here don't
11  know whether he considered and rejected that premise
12  or failed to consider it, do you?
13     A    I only know what he said in his deposition
14  about that subject.
15     Q    Okay.  If I asked you, sir, to evaluate
16  the assets of United Airlines today, would you value
17  them on a liquidation basis?
18        MR. WILLIAMSON:  Objection.
19     A    United Airlines is already in bankruptcy.
20     Q    Right.  That's why I chose that as an
21  example.
22     A    And the company has made certain
23  determinations as to what they plan to do going
24  forward.  And I'm not privy to all those
25  determinations.

71

1  Pfeiffer
2        But I would, I would value it as of today
3  based on the expectations for the company and its
4  cash flows and its predicament and its liquidity and
5  its scenario as of today.
6     Q    You would value it today as a going
7  concern, would you not, sir?
8     A    If it's intended that the company will
9  emerge as a going concern, then I would value it as a
10  going concern, allowing for all the various
11  bankruptcy costs and all the other issues that
12  result, you know, that resulted with a company in
13  bankruptcy.
14     Q    And did you have any knowledge of what the
15  intentions of Oakwood were as to whether it would
16  continue to operate as a going concern in September
17  of '01?
18     A    Yes.
19     Q    What were its intentions?
20     A    It was operating as a going concern, and
21  Myles Standish in his deposition stated that his
22  intention was to operate as a going concern.
23     Q    Was that also true in 2002?
24     A    At what date?
25     Q    September 30th.

72

1  Pfeiffer
2     A    No.
3     Q    Your testimony is that the company
4  intended to liquidate as of that time?
5        MR. WILLIAMSON:  Objection.
6     A    My testimony is as of September 30, 2002
7  the company was considering a number of
8  reorganization options that included a potential form
9  of liquidation.
10     Q    When the company was sold to Buffett in
11  late 2003 was it sold as a going concern, sir?
12        MR. WILLIAMSON:  Objection.
13     A    It was sold as a reorganized and somewhat
14  different going concern.
15     Q    Okay.  It wasn't sold as a liquidation; is
16  that right?
17        MR. WILLIAMSON:  Objection.
18     A    It wasn't sold as a liquidation, but I
19  recall that portions of the business and the assets
20  were sold in liquidation -- or in liquidation mode,
21  in distressed mode.
22     Q    All right.  But the basic operating assets
23  were sold to Buffett as a going concern?
24        MR. WILLIAMSON:  Objection.
25     A    Again, throughout 2001 and 2002 there were

73

Pfeiffer

1   times where the company was acting in distress mode,
2   and sold off businesses or assets or made deals with
3   respect to its securitization in a mode which was not
4   consistent with a complete going concern, it had
5   liquidated some forms of their business platform.
6
7        Q    What were those?
8        A    It cut certain deals with regard to
9   securitization that it might not have if it didn't
10  need the cash.
11       Q    Those were the sale of the B2 guarantees
12  to Buffett?
13       A    That's one example, yes.
14       Q    Anything else?
15       A    Their general business decisions seemed to
16  be made with an emphasis on cash.
17       Q    And that tells you that the company was
18  not intending to operate as a going concern?
19            MR. WILLIAMSON:  Objection.
20       A    No.
21            It tells me that the company was operating
22  in a form of distress.
23       Q    All right.  And how does that relate to
24  the question that I asked you, which is, which
25  related to a going concern?

74

Pfeiffer

1
2        A    It relates because when you provide a
3   valuation opinion there's clear going concern and
4   there's clear liquidation, but there are certainly
5   many avenues in between.  And this company was
6   conducting itself and, you know, conducting business
7   and continuing to operate, but was operating in a
8   different capacity than it had been in the prior --
9   in the years before that.
10       Q    All right.  Looking again at page 705 of
11  Exhibit 624, sir.  I see an asterisk down toward the
12  bottom, it says "Speak to Chanin," C-H-A-N-I-N, "re
13  restructuring assignments done for going concern."
14            Have I read that handwriting correctly?
15       A    Yes, you have.
16       Q    Who is Chanin?
17       A    Chanin is the -- is the restructuring
18  group that Duff & Phelps owns.
19       Q    I see.  And how is Chanin involved in this
20  case?
21       A    Chanin is a resource that I have at my
22  disposal because they're part of our firm.
23            And so if I have a question relating to
24  restructuring advice in particular, I can reach out
25  to them to ask them any questions I'd like.

75

Pfeiffer

1
2        Q    I notice in a number of the documents that
3   you have furnished to us the term "Daubert,"
4   D-A-U-B-E-R-T, appears.
5            Is that a term familiar to you?
6        A    Yes.
7        Q    What does it mean to you?
8        A    It means -- it's a motion to put in front
9   of the Court to challenge the qualifications or
10  methodologies of a particular expert.
11       Q    Part of your assignment in this case
12  involved the support of such a motion, isn't that
13  correct, with respect to Dr. Tennenbaum?
14       A    Correct.
15       Q    Now I recognize that you differ with his
16  methodologies and conclusions.
17            Do you have any quarrel with
18  Dr. Tennenbaum's qualifications as an expert --
19            MR. WILLIAMSON:  Objection.
20       Q    -- on the subjects that he purports to
21  opine on in his report?
22            MR. WILLIAMSON:  Objection.
23       A    I have not been asked to opine.  I haven't
24  studied that.
25       Q    Okay.  Did you talk to anybody in

76

Pfeiffer

1
2   connection with the information you gathered on your
3   assignment or assignments in this case other than
4   either lawyers or members of your own team?
5            Did you interview anybody?
6        A    The question is quite broad.  I --
7        Q    Fiachra O'Driscoll.
8        A    I am sorry?
9        Q    O'Driscoll, did you interview him?
10       A    I personally did not.
11       Q    Felt?
12       A    I personally did not, no.
13       Q    Did anybody on your team interview any of
14  those people?
15       A    I don't recall.
16       Q    Did anybody on your team interview
17  anybody?
18       A    I don't recall.
19       Q    Did anybody on your team talk to anybody
20  that had anything to do with this case other than
21  lawyers?
22       A    I don't recall.
23       Q    You know that you didn't, though, right?
24  Isn't that right?
25       A    Not that I remember sitting here today

77

Pfeiffer

1  but...

2

3     Q    Okay.  You didn't talk to anybody at

4  Oakwood?

5     A    Sitting here today, I don't -- I don't

6  recall talking to anybody at Oakwood.

7     Q    Okay.  You didn't talk to anybody at

8  Davidson?

9     A    Again, sitting here today, I don't recall

10  talking to anybody at Davidson.

11     Q    You did read some depositions or portions

12  thereof, sir?

13     A    Yes.

14     Q    When you read deposition testimony did you

15  read the full depositions or just certain pages of

16  them?

17     A    I reviewed the full deposition in certain

18  instances and I read pages of them in other

19  instances.

20     Q    In the instances -- how did you decide

21  which depositions to use, to read all of and which to

22  read only pages of?

23     A    If the topic was important for me to read,

24  I read it.  If it wasn't, I didn't read it.

25     Q    And as to those depositions that you

78

---

Pfeiffer

1

2  didn't read certain pages of, how do you know there

3  weren't topics in there that would be important for

4  you to read?

5     A    I only know that based on the members of

6  my team that may have read it and advised me as to

7  its importance.

8     Q    As to those depositions that you chose to

9  read only certain pages of, do you know for a fact,

10  sir, that it was your associates as distinguished

11  from lawyers who selected the pages that you were to

12  read?

13         MR. WILLIAMSON:  Objection.

14     A    In connection with this report that I'm

15  here to speak about today?

16     Q    Certainly that, yeah.

17     A    Well, in connection with Dr. Tennenbaum's

18  rebuttal, I'm pretty certain that my colleagues

19  pointed me to the important pages that I should read.

20     Q    And do you know where they got the

21  information as to what pages they should read?

22         Did they read the entire depositions?

23     A    They did, yes.

24     Q    Okay.  Now, as to some other aspect of

25  your assignment other than Dr. Tennenbaum's rebuttal,

79

---

Pfeiffer

1

2  do you know for a fact that the pages you chose to

3  read were chosen for you by your associates as

4  distinguished from lawyers?

5         MR. WILLIAMSON:  Objection.

6     A    I just do not recall.

7     Q    All right.  Do you base your opinions in

8  this matter upon the totality of the documents you

9  reviewed and the depositions you reviewed and the

10  studies you conducted or did you exclude certain

11  things from a basis for your opinions?

12         MR. WILLIAMSON:  Objection.

13     A    The basis of my opinion is limited to my

14  reading of Dr. Tennenbaum's report and the

15  consideration of the documents that are listed in

16  Exhibit A that I needed to -- that I needed to look

17  at or review or consider in connection with the

18  rebuttal report of Dr. Tennenbaum.

19     Q    Are there certain documents that you

20  received in connection with any aspect of any

21  assignment you've ever had in this matter that you

22  excluded from consideration with respect to your

23  effort to rebut the Tennenbaum report?

24         MR. WILLIAMSON:  Objection.

25         You can answer if you understand the

80

---

Pfeiffer

1

2  question.

3     A    No.

4     Q    Okay.  So would it be fair for me to

5  conclude that your opinions are based upon the

6  totality of what you've seen, not specifically

7  excluding any particular document or category of

8  documents?

9         MR. WILLIAMSON:  Objection.

10     A    No, it's not fair to conclude that either.

11     Q    So what is fair to conclude in this

12  regard?

13     A    That, as I said, I did not explicitly

14  exclude anything, but I only considered the documents

15  I needed to consider for purposes of rebutting

16  Dr. Tennenbaum's report.

17     Q    Did you write 100 percent of -- strike

18  that.

19         We've marked your report, sir, as Exhibit

20  625.

21         Is that in front of you?

22     A    Yes.

23     Q    Is it your report?

24     A    It looks like it is.  Yes.

25     Q    Okay.  You're looking at 624 at the

81

Pfeiffer

1  Pfeiffer
2  moment, or you're paging through it.  But I want to
3  move to 625 now.  All right.
4        Just to shorten things up, I'll let you
5  know that your counsel, Mr. Williamson, sitting next
6  to you, furnished this particular copy of it to us
7  this morning so I didn't monkey with it.
8        Is this your report?
9    A    I trust you didn't monkey with it anyway,
10  but it looks like it's my report.  Yes.
11    Q    Okay.  Did you write 100 percent of this
12  report, sir?
13        MR. WILLIAMSON:  Objection.
14    A    I certainly provided the 100 percent of
15  the opinions in this report but -- but I had some
16  assistance in writing some portions of the text.
17    Q    Now you had some assistance from some
18  members of your team within your company; isn't that
19  right?
20    A    That's correct.
21    Q    As you sit here today, sir, can you be
22  certain that no portions of your report, Exhibit 625,
23  were written or drafted by attorneys?
24    A    Yes.
25    Q    Okay.  Is that also true of all earlier

82

Pfeiffer

1  drafts of this report?
2    A    Yes.
3        MR. WILLIAMSON:  Objection.
4    Q    Okay.  And do you stand behind everything
5  contained in Exhibit 625, your report, as you sit
6  here today?
7    A    Yes.  With --
8        MR. WILLIAMSON:  Actually, you know
9  what --
10    A    I am sorry --
11        MR. WILLIAMSON:  -- let's go off the
12  record for just a second.
13        MR. CASTANARES:  Okay.
14        THE VIDEOGRAPHER:  The time is 11:30 a.m.,
15  this marks the end of tape 1, we're off the record.
16        (Off the record.)
17        THE VIDEOGRAPHER:  The time is 11:38 a.m.,
18  this marks the beginning of tape 2 in the deposition
19  of Allen Pfeiffer.  You're on the record.
20        MR. CASTANARES:  Thank you.
21  BY MR. CASTANARES:
22    Q    Mr. Pfeiffer, before the break I asked you
23  if you still stood by everything in Exhibit 625
24  today.  And your counsel has pointed out there's

83

Pfeiffer

1  apparently a discrepancy in stock prices as shown on
2  page 5.  And the figures that show there is $4.23 and
3  $1.65 respectively, are apparently both 10 cents high
4  because these are London prices rather than New York
5  prices, or words to that effect.  Is that correct?
6    A    It's approximately correct.  I mean I
7  think it's -- it's true that the $1.65 on the U.S.
8  exchange is $1.55.  The 4.23 on the -- in the U.S.
9  exchange, sitting here today I'm not exactly sure if
10  it was 4.11 or 4.13, but it's approximately a dime
11  lower.
12    Q    Okay.  Thank you.  With the exception of
13  that single correction, sir, do you now stand behind
14  everything that's contained in Exhibit 625?
15    A    Yes.
16    Q    All right.  Now, looking at pages 3 to 4
17  in paragraph 1, you are critical of Dr. Tennenbaum's
18  damages calculations, saying that he should have
19  compared Oakwood's value on the resolution of its
20  actual bankruptcy case with its value on a resolution
21  of a hypothetical Chapter 11 case filed in September
22  of '01.
23        Have I summarized that criticism
24  correctly?

84

Pfeiffer

1  Pfeiffer
2        (Witness reviewing document.)
3    A    You're -- you're summarizing half of the
4  sentence correctly but --
5    Q    Okay.  What's the other half?
6    A    -- it says "in my opinion, given that
7  Dr. Tennenbaum believes what he believes," right,
8  therefore it was his obligation to do a comparison
9  between the actual value upon the resolution of the
10  bankruptcy and the hypothetical bankruptcy as of
11  September 2001.
12    Q    All right.  So are you saying -- you're
13  not saying then that appropriate valuation technique
14  in and of itself would compare, in this particular
15  instance, would compare Oakwood's value resulting
16  from the actual bankruptcy to a hypothetical
17  bankruptcy in 2001, but only if one accepts
18  Dr. Tennenbaum's belief that the company should have
19  filed bankruptcy would that methodology be proper; is
20  that correct?
21        MR. WILLIAMSON:  Objection.
22    A    Only if you believe that there was damage
23  as a result of the fact that the company should have
24  filed for bankruptcy or should have taken a
25  drastically different course of action as of

85

Pfeiffer

1  September 2001, as Dr. Tennenbaum contends, then you
2  would, then in that circumstance it is my contention
3  that the proper way to do the comparison between one
4  date and the other is as reflected in this paragraph,
5  which is to compare the resolution value to the
6  hypothetical value.
7
8        Q    Okay.  Now have you ever seen that done
9  before, somebody comparing the outcome of an actual
10  Chapter 11 bankruptcy to a hypothetical Chapter 11
11  bankruptcy that would have occurred at an earlier
12  date?
13            MR. WILLIAMSON:  Objection.
14       A    Yes.
15       Q    Have you done it yourself?
16       A    In broad terms, yes.
17       Q    All right.  Did you do it in this case?
18       A    No.
19       Q    Why not?
20       A    I wasn't asked to.
21       Q    So as you sit here today you have no way
22  of knowing whether comparing the result of a
23  hypothetical bankruptcy in 2001 to the actual
24  bankruptcy in 2003 would yield a different result
25  from the one Dr. Tennenbaum got by comparing two

Pfeiffer

1
2  discounted cash flow analyses in 2001 and 2002, do
3  you?
4            MR. WILLIAMSON:  Objection.
5       A    I have basis to believe that the answer
6  would be different.
7       Q    Is your basis anything other than
8  guesswork?
9       A    Yes.
10       Q    And you say the answer would be different.
11  I don't doubt that it may be different.
12            Do you know whether it would be bigger or
13  smaller?
14            MR. WILLIAMSON:  Objection.
15       A    I do, yes.
16       Q    What do you know?
17       A    That the difference would be smaller.
18       Q    So there would be a smaller difference
19  between the amount achieved in the actual bankruptcy
20  and the amount achieved in a hypothetical 2001
21  bankruptcy compared with the difference between the
22  amount in Dr. Tennenbaum's two cash flows; is that
23  your testimony?
24       A    Yes.
25       Q    All right.  And what's the basis of that

Pfeiffer

1  belief?
2
3       A    As -- as written in my report, the
4  ultimate sales price was approximately $375 million.
5  And for various reasons it's my belief that if the
6  company would have filed in September of 2001 it
7  would not have obtained a value of 50 or so million
8  dollars more than that, which is what
9  Dr. Tennenbaum's analysis leads one to believe.
10       Q    Well, in fact, sir, Dr. Tennenbaum says
11  that the company would have gotten $350 million if it
12  had filed in September 2001; isn't that true?
13            MR. WILLIAMSON:  Objection.
14       A    Dr. Tennenbaum concludes on the fair
15  market value as of September 2001 are $350 million.
16            I don't know if that's what he thinks the
17  company would have gotten if they filed the
18  bankruptcy, but that's what he concludes.
19       Q    But he doesn't say that the company would
20  have gotten more dollars in 2001 in a bankruptcy than
21  what was ultimately the amount of the sale to
22  Buffett, does he?
23       A    He does not say that, no.
24       Q    Okay.  Well, what do you think the company
25  would have gotten for its assets in this hypothetical

Pfeiffer

1
2  bankruptcy in 2001?
3            MR. WILLIAMSON:  Objection.
4       A    I have not conducted that study.
5       Q    Well, if we're going to compare, sir, on
6  the one hand the difference between the actual
7  bankruptcy results and the hypothetical 2001
8  bankruptcy results to Dr. Tennenbaum's two discounted
9  cash flows studies on the other, what is the basis of
10  your saying that the difference would be greater or
11  lesser than Dr. Tennenbaum's result if you don't know
12  what you think the hypothetical bankruptcy would have
13  achieved?
14            MR. WILLIAMSON:  Objection.
15       A    My basis is looking at the market values
16  of the company as of 2001 and how they changed from
17  that point to the ultimate resolution of the
18  bankruptcy.  That's among my bases.
19            I didn't analyze the problem in its
20  totality, but that's my inclination.
21       Q    Well, when you say market values, you're
22  talking about performing what you called a market
23  value study before, where you take the total stock
24  and total debt values?
25       A    Market data.  I think we called it market

Pfeiffer

1  data, yes.
2      Q    Is that what you're talking about when you
3  are talking about finding market values now?
4      A    Yes.
5      Q    So you would start with a roughly $230
6  million or so, I think you said your number was
7  fairly close to Shapiro's for 2001, that would be
8  your starting point?
9          MR. WILLIAMSON: Objection.
10     A    I'd have to do more analysis to look at
11  whether there would be other liabilities, a
12  contingent liability's included in that number, but I
13  would start with the market data.
14     Q    Okay. And then you'd compare -- if you
15  found that the market data showed a $230 million
16  value you could compare that 230 to the 373 that
17  Buffett paid in 2003?
18         MR. WILLIAMSON: Objection.
19     A    Again, I'd have to do more analysis to
20  make sure that those two numbers are apples to
21  apples.
22     Q    What would you have to do?
23     A    Look at whether there are differences in
24  the liabilities assumed as of those two dates to

90

Pfeiffer

1      Q    Okay. So I take it, though, you didn't do
2  the hypothetical bankruptcy comparison that you say
3  Tennenbaum should have done, did you?
4      A    I did not.
5      Q    Tell me the steps you would go through in
6  order to determine how much a hypothetical bankruptcy
7  would have achieved in 2001 so as to be able to
8  compare it to the actual bankruptcy that occurred a
9  year later.
10     A    I would begin by obtaining a complete
11  understanding of what people thought at the time in
12  terms of what their options were, if they were to
13  file or if they were to go in a different direction
14  as of that date. What potential buyers and market
15  participants thought the company was worth. What the
16  company was worth to liquidate. What kind of values
17  would they get for each group of assets.
18         I would look at the various scenarios of
19  limiting the company's exposure to certain
20  businesses, because the company was vertically
21  integrated.
22         So if they limited their exposure to
23  certain levels of that integration process, what that
24  would mean from a cash flow perspective.

92

Pfeiffer

1  determine whether the 230 is complete or should I add
2  some portion of those liabilities and other debt
3  obligation.
4      Q    It is your testimony, though, sir, that
5  the comparison of a market data analysis in 2001 is
6  an apples to apples comparison with the bankruptcy
7  sale to Buffett in 2003?
8          MR. WILLIAMSON: Objection.
9      A    I'm not understanding your question.
10     Q    Does appropriate valuation methodology
11  allow one to arrive at a differential in value
12  between two dates, one of which consists of a market
13  data analysis on date one and the second of which
14  consists of a bankruptcy sale on date two? Is there
15  authority in the literature of your profession for
16  such a comparison?
17         MR. WILLIAMSON: Objection.
18     A    It's not that simple. You'd have to
19  understand all the circumstances and be able to
20  reconcile those numbers one to the other.
21         There are differences in the circumstances
22  between those two dates and those two scenarios, and
23  so you'd have to understand all the issues
24  surrounding those numbers.

91

Pfeiffer

1      I'd model out all the various scenarios.
2  I would look at what contemporaneous observers felt
3  with regard to the value of the debt and the
4  potential value to the equity.
5          Of course I would consider market data as
6  it relates to the value of the debt and the value of
7  the equity.
8          I would do a market comparables approach
9  also, obviously considering the fact that the company
10  may or may not be a going concern as of that date,
11  assuming a hypothetical bankruptcy. And in doing
12  that I might do a market approach, which was not
13  based on EBITDA or some measure of earnings but
14  rather a, you know, an asset-by-asset market
15  approach, what could you sell the inventory for,
16  looking at measures of how other companies may have
17  sold their inventory and so on and so forth.
18         So there are a number of things I would do
19  and a number of different approaches I would take
20  before arriving at a conclusion, which is
21  hypothetical in nature.
22         But again, I certainly would start with a
23  complete understanding of what everybody thought at
24  the time and what they thought their options were and

93

**Pfeiffer**

1  
2  what they considered, didn't consider at that point  
3  in time.  
4      Q    And those are not steps you have actually  
5  undertaken in this case; isn't that true?  
6      A    I have not.  
7      Q    But you would need to go through those to  
8  find out what this comparison would yield?  
9      A    Yes.  
10     Q    Now, what would you be comparing, by the  
11 way?  Would you be comparing the figure that could be  
12 achieved for a sale of the assets in a hypothetical  
13 2001 bankruptcy compared to the 373 million that  
14 Buffett paid or would you be comparing the amount of  
15 dividend to creditors in the hypothetical bankruptcy  
16 compared to the actual 2002 bankruptcy, or some  
17 combination of those or something different?  What  
18 would you be comparing?  
19     A    Your question presupposes some question  
20 that went before this, you know, for a few minutes  
21 ago.  I would only be -- you asked me what I would  
22 do.  
23          I'm only telling you what Dr. Tennenbaum  
24 should have done given his statement that the  
25 company -- that he believes the company was damaged  

94

**Pfeiffer**

1  
2  because of the continued operations at September  
3  2001.  
4      Q    All right.  Let me clarify my question.  
5      A    So asking what I am doing is not really --  
6      Q    I'll clarify my question.  
7      A    Okay.  
8      Q    If Dr. Tennenbaum had done what you say he  
9  should have done, would the comparison have involved  
10 simply comparing the raw sale price of the assets or  
11 would it have involved comparing the dividend payable  
12 to creditors or both of those things or neither of  
13 them or other things altogether?  
14          What was the comparison between?  
15          MR. WILLIAMSON:  Objection.  
16     A    Given Dr. Tennenbaum's contention that the  
17 company should have changed its course of operation  
18 in September 2001, and that indecision led to certain  
19 damages, if he were to have tried to prove that  
20 correctly he would have modeled not just the raw  
21 sales price but the entire picture, the entire  
22 equation as to what Oakwood would have been able to  
23 achieve in terms of value for its combined  
24 stakeholders as of that date.  And that would  
25 include, for example, if they were going to file for  

95

**Pfeiffer**

1  
2  bankruptcy, it would include the costs associated  
3  with filing for bankruptcy and the issues related to  
4  its reputation, would include potential, you know, a  
5  look at how marketable the assets were and so on and  
6  so forth.  
7      Q    Should he have compared the hypothetical  
8  dividend to creditors achievable in the hypothetical  
9  earlier bankruptcy to the actual dividend to  
10 creditors in the real bankruptcy?  
11          MR. WILLIAMSON:  Objection.  
12     A    You know, I'm not sure if that's a legal  
13 issue, a legal question.  
14     Q    It is not intended to be a legal issue.  
15          I am asking you what the appropriate  
16 methodology among people in your profession would  
17 have called for him to do that you say he didn't do.  
18     A    I'm saying he should have looked at the  
19 value to Oakwood, if they would have made this  
20 decision to change their business versus what they  
21 ultimately ended up obtaining in terms of value for  
22 Oakwood at the end of the day.  So that would -- if  
23 you're talking about, if that is described as payment  
24 to creditors or payment to stakeholders or total  
25 value of the Oakwood estate, Oakwood business at that  

96

**Pfeiffer**

1  
2  time given a different decision, that's what I would  
3  focus on.  
4      Q    Okay.  So are you saying he should have  
5  studied, if he had done what you believe the  
6  appropriate methodology in your profession would have  
7  required Dr. Tennenbaum to do, he should have studied  
8  both the raw sale price that would have been achieved  
9  in the earlier hypothetical bankruptcy and the  
10 difference between the dividend to creditors that  
11 would have been achieved in the hypothetical  
12 bankruptcy and what was actually paid to creditors?  
13          MR. WILLIAMSON:  Objection.  
14     A    I didn't say that.  
15          I said that -- no.  I said that he  
16 would -- you're referring to a raw sales price.  I'm  
17 not really sure what that means.  I'm not really sure  
18 what you mean by dividend to creditors and  
19 hypothetical -- again, I said the value of Oakwood,  
20 given a different set of decisions, what value would  
21 there be to the stakeholders at large after  
22 consideration of whatever action they would take,  
23 whether it's conduct the business in a different way  
24 or going into bankruptcy and then emerging from  
25 bankruptcy or liquidating the business or doing some  

97

Pfeiffer

1  combination thereof, and inclusive of bankruptcy
2  costs and whatever other reputational issues it may
3  be.
4        So it's inclusive of the entire picture,
5  in a hypothetical state versus the actual state.
6     Q    All right.  Let's take it perhaps one step
7  at a time.
8        The actual bankruptcy sold the assets of
9  Oakwood to Mr. Buffett in late 2003 for $373 million.
10       That's what your report says, doesn't it?
11    A    That's correct.  373, 375 or --
12    Q    373, 375, something like that, okay?
13       What figure should Dr. Tennenbaum have
14 derived if he had followed the appropriate
15 methodology, according to you, to compare to the 373
16 or $375 million sale to Buffett?
17       MR. WILLIAMSON:  Objection.
18    A    Well, in response to your question, let me
19 take a very large and important step back just to
20 make sure to clarify a very important issue.
21       Dr. Tennenbaum purports to be analyzing
22 damage.  And until now we've discussed a topic as if
23 the change in value between the actual sale and the
24 hypothetical sale is potential damage.  And that's

Pfeiffer

1     Q    Is it your practice as a valuation
2  professional to render opinions on issues of
3  causation in damages, sir?
4        MR. WILLIAMSON:  Objection.
5     A    I've looked at issues related to damages
6  in the past on behalf of my clients.
7     Q    Have you rendered as an expert -- have you
8  ever qualified as an expert on causation of damages?
9        MR. WILLIAMSON:  Objection.  You mean
10 causation in terms of what you and I mean by
11 causation or something else?
12       MR. CASTANARES:  I think I am using the
13 causation in the -- I think he's -- I think his
14 answer answers the question, sir.
15    Q    You may answer.
16       MR. WILLIAMSON:  If you understand.
17    Q    Have you ever qualified as an expert on
18 the field of causation of damages?
19    A    No, I don't believe so.
20    Q    Did you ever go to law school?
21    A    I've attended classes in law school when I
22 was in business school at Columbia, I did attend some
23 classes, but I did not -- I did not graduate with a
24 law degree.

Pfeiffer

1  not true.
2        Damages -- when you look at damages in
3  this context, one must consider many other factors
4  besides a change in value between two points in time.
5        And those factors include the fact that
6  the market changes irrespective of whether you make a
7  decision or not, you know, the view of the market
8  changes between two times -- two moments in time.
9  The broader market changes, the specific industry in
10 which Oakwood found itself changes.
11       There's also as it relates to damage
12 there's an issue of causation.  Did their decision
13 cause the damage or did some other factors cause the
14 damage?
15       Credit Suisse's role or lack of role in
16 that damage is also obviously an issue.  There's the
17 specificity of a damages calculation that has to be
18 considered.
19       So when you ask me about Dr. Tennenbaum's
20 analysis and what he should have done, it goes well
21 beyond the fact that he should have looked at the
22 value of the two companies as of two different dates.
23 In order to arrive at a damages calculation, he had
24 to do a lot more than that.

Pfeiffer

1     Q    Have you ever written on the field of
2  causation and damages?
3     A    Certainly have not, no.
4     Q    Have you taught that field?
5     A    No, I have not.
6     Q    So you've told me there are a number of
7  legal issues that are involved in damages that are
8  for the Judge and the jury to look at in this case.
9        I am strictly speaking, asking you to tell
10 me your criticisms of Dr. Tennenbaum's report as
11 fellow valuation experts.
12       It's correct, is it not, sir, that
13 Dr. Tennenbaum's damages calculation is based upon
14 comparing the value of the assets of the company on
15 September 30, 2001 to the value of the assets on
16 September 30, 2002; that is correct, isn't it?
17       MR. WILLIAMSON:  Objection.
18    A    You had a whole long speech before the
19 question.
20    Q    All right.
21    A    I don't agree -- if you're asking me if it
22 is -- your speech before the question I don't agree
23 with.
24       I don't think I gave any legal opinions.

Pfeiffer

1    I was simply telling you that what he did
2  was not a damages calculation because there's a lot
3  of issues in damages, separate from causation,
4  there's a lot of issues in damages that are not in
5  his report.
6    Q    Okay.
7    A    But now you're -- so you got to have to
8  rephrase your question and --
9    Q    I will restate the question.
10    A    -- and forget about that whole
11  introductory remark maybe.
12    Q    You understand Dr. Tennenbaum's opinion to
13  be based upon a comparison on the value of the assets
14  of the company at September 30th, '01 to the value of
15  the assets of the company at September 30th, '02,
16  correct?
17    A    That's part of his opinion, yes.
18    Q    And those two evaluations were based upon
19  discounted cash flow analyses in both cases, correct?
20    A    Correct.
21    Q    And you say that that's not what he should
22  have done; he should have been comparing the value of
23  what would have been achieved in a hypothetical 2001
24  bankruptcy to the value of what was achieved in a

Pfeiffer

1  2002 bankruptcy; is that correct?
2    A    No.
3    Q    What is correct?
4    A    I'm saying that as a first critique -- I'm
5  saying a lot of things, by the way.
6    If you read my report you will see a lot
7  of other things besides this.
8    Q    We will get to all of them, don't worry.
9  Stick to this one.
10    A    But as it relates to this exact point, I
11  didn't say anything about how he should have looked
12  at September '02's bankruptcy.
13    I said that he should have compared the
14  actual resolution, the actual bankruptcy proceeds,
15  with what he alleges to be what should have been a
16  company in September 2001 that should have acted a
17  very different way than it acted.
18    So he should have modeled what it would
19  have been worth if they should have done it the way
20  he said they should have done it, which is I
21  understand the should be filing for bankruptcy, should have
22  compared that to what actually happened, to arrive at
23  the beginnings of a damages analysis. But what I
24  said before is that would not be a damages analysis,

Pfeiffer

1  no.
2    Q    If you were doing the kind of analysis
3  that you suggest that Dr. Tennenbaum should have
4  done, would you somehow take into account the present
5  value in 2001 of the 373 that was achieved in early
6  2004, early 2003?
7    MR. WILLIAMSON:  Objection.
8    A    I would consider that issue, yes.
9    Q    Yes.  And you'd do that by utilizing a
10  discount rate, correct?
11    A    There could be various ways to do that.
12  It depends what I was trying to accomplish.  I mean
13  it would depend on whether the analysis was meant to
14  provide.  I mean I think, as I've mentioned before,
15  you'd have to adjust for a lot of other issues that
16  relate to market movements.  And I wouldn't want to
17  double-count adjusting for market movements and
18  adjusting for discount rates.  And so I'm not sure if
19  I would just apply a discount rate.
20    I'd have to look at whether other
21  adjustments have been made to arrive at a conclusion
22  that makes sense before just applying a discount
23  rate.
24    Q    What is the nature of the figure in the

Pfeiffer

1  hypothetical 2001 bankruptcy that you would compare
2  the 373 million in the actual bankruptcy to?
3    MR. WILLIAMSON:  Objection.
4    A    I don't understand the question.
5    Q    Well, you say that Dr. Tennenbaum should have
6  have compared the actual bankruptcy to a hypothetical
7  2001 bankruptcy, correct?
8    A    Given his contention, that's what I would
9  have expected him to do, yes.  As I wrote in my
10  report that would be a more plausible analysis.
11    Q    In making that point, sir, you make
12  reference on more than one occasion to the fact that
13  the result of the 2001 -- the actual bankruptcy,
14  rather, was a sale to Buffett for 373 or 375, right?
15    A    Right.
16    Q    Okay.  In making the comparison that you
17  say that Dr. Tennenbaum should have done, based upon
18  his assumptions, what figure compares to the $373
19  million?
20    MR. WILLIAMSON:  Objection.
21    A    The figure doesn't exist.  I'm not sure
22  what you're asking.
23    Q    Well, what should he have -- what steps
24  should he have gone through then, sir, to construct

Pfeiffer

1   this hypothetical 1970 -- rather -- 2001 bankruptcy?
2          MR. WILLIAMSON:  Objection, asked and
3   answered.
4   A      I thought I answered -- I thought I
5   answered that already.
6          MR. WILLIAMSON:  A while ago.
7   Q      I'm not sure you have.
8          What should he have been looking for to
9   compare to the $373 million?  That's what I am asking
10  you.
11         MR. WILLIAMSON:  Objection.
12  A      I'm just going to tell you the same answer
13  I told you before, if that's what you want to hear.
14  Q      Yes, let's hear it.
15  A      But he should have done a full analysis of
16  all the scenarios and everybody's view and all the
17  analysis and all the approaches and all the
18  methodologies that are appropriate to assess a
19  company that was considering the possibility of
20  bankruptcy and other similar scenarios as of that
21  date.
22  Q      Would that process have yielded a figure
23  that you think he should have compared to the
24  $373 million the assets were sold for in the real

106

Pfeiffer

1   two numbers, though, right?  There's got to be some
2   number that compares to the 373?  Am I right or am I
3   wrong?
4   A      As I said before, you may -- you may -- he
5   may have chosen instead to adjust the 373, not
6   compare it to exactly the 373, but rather adjust the
7   373 for issues that relate to market changes,
8   industry changes, the time that's elapsed in those
9   two years, and the like.
10  Q      Okay.  So let's suppose he did it that
11  way.  He took the 373 and he adjusted it for all the
12  things he should have adjusted it for.  Fair enough?
13  A      Okay.
14  Q      What does he compare that 373 as adjusted
15  to?
16         MR. WILLIAMSON:  Objection.
17  A      He'd either compare the adjusted 373 to a
18  hypothetical bankruptcy sale in 2001 or he would
19  compare the adjusted value of the hypothetical 2001
20  to the 373.
21  Q      How would he appropriately derive the
22  figure for the hypothetical bankruptcy sale in 2001?
23         MR. WILLIAMSON:  Objection.
24  A      I think I've answered that several times.

108

Pfeiffer

1   bankruptcy or wouldn't it have?
2   A      As I said a few minutes ago, it would be
3   unfair to compare those two numbers without
4   considering the many changes that have occurred over
5   a period of a few years.  I'd include market
6   movements, present value issues as you mentioned
7   before, issues related to the industry, and the like.
8   Q      Well, whether it was fair to compare the
9   numbers isn't the question I am asking.
10         I'm asking, should he have derived a
11  number to compare to the 373?
12  A      He should have derived a number to compare
13  to the 373 or some number -- or the 373 adjusted for
14  the issues related to the industry and the time that
15  has elapsed and the marginal market movements and all
16  kinds of issues like that.
17  Q      Okay.  You say one or the other, right?
18  A      Well, I just -- you know, it depends what
19  approach he's taking.
20         You got to adjust either the first number
21  or the second number to allow for the fact that
22  comparing those two numbers without adjusting them
23  doesn't, doesn't tell you anything about damages.
24  Q      Okay.  My question is, there has got to be

107

Pfeiffer

1   Q      Would he use a discounted cash flow
2   analysis?
3   A      As I said before --
4          MR. WILLIAMSON:  Objection.
5   A      -- he would use various methodologies and
6   various analyses, but you would not use a simple
7   discounted cash flow the way he's done it, no.
8   Q      Would you use, if it were you, would you
9   do any discounted cash flow analysis?
10  A      I might do a form of discounted cash flow
11  that allows for the various scenarios that one might
12  find in a bankruptcy in addition to the -- and I'd
13  compare it and do that in addition to the, you know,
14  liquidation analysis and looking at market
15  indications and so on and so forth, market data and
16  the like.
17  Q      All right.  And do you have any reason as
18  you sit here today to believe that if you attempted
19  to derive a figure for the hypothetical bankruptcy
20  sale in 2001 it would be a different figure from the
21  market data figure of around $230 million that
22  Dr. Shapiro's supplemental report shows for that
23  date?
24         THE WITNESS:  Could you repeat the

109

Pfeiffer

1   Pfeiffer
2   question, I am sorry.
3           (Question read.)
4       A   I have not conducted the analysis.
5       Q   In fact, sir, as you sit here today you
6   haven't any idea what a hypothetical bankruptcy sale
7   would have derived in 2001, do you?
8           MR. WILLIAMSON:  Objection.
9       A   I don't know how you define "any idea,"
10  but I don't have an answer.
11      Q   Okay.  That's good enough.
12          And you don't have any idea, sir, of what
13  a hypothetical bankruptcy would have paid in terms of
14  dividend to creditors to contrast with the 47 percent
15  dividend to creditors that you make reference to more
16  than once in your report as the result of the actual
17  bankruptcy; isn't that true?
18          MR. WILLIAMSON:  Objection.
19      A   I have not formed a conclusion relative to
20  that.
21      Q   In fact, you have no idea whatsoever, have
22  you?
23          MR. WILLIAMSON:  Objection.
24      A   Again, I would not agree with that
25  characterization of what it means.

110

1   Pfeiffer
2   the bankruptcy or anything to do with anything else,
3   then I would not consider anything that happened
4   beyond 2001 at all.
5       Q   All right.  And if I ask you to do a
6   valuation of the assets in 2002, would it also be
7   correct that you wouldn't consider anything that
8   happened afterwards at all either?
9           MR. WILLIAMSON:  Objection.
10      A   If I was told -- again, if the context of
11  my analysis was to only value as of 2002 and not
12  consider the relative changes in value and not
13  consider damages and not consider decisions and not
14  consider anything, you know, only consider as of that
15  date and not look beyond, then I think the question
16  defines the answer.
17          If I'm asked not to consider events that
18  were subsequent to that date, I wouldn't consider
19  events subsequent to that date.
20      Q   If I asked you to consider the value of
21  the assets of Oakwood in September of 2001 compared
22  to the value of the assets of Oakwood in 2002,
23  September 30 both years, to what extent would you
24  consider the subsequent sale to Buffett in 2003/2004?
25          MR. WILLIAMSON:  Objection.

112

Pfeiffer

1   Pfeiffer
2       Q   Well, if you have any idea whatsoever,
3   describe it for me, please.
4       A   I have an idea as to how I'd arrive at
5   that number, as I told you.  And I have an idea as to
6   what the market data's telling me.  And I have an
7   idea as to what, you know, what are magnitude
8   relative to what Dr. Tennenbaum has stated.  And so
9   all that has been discussed already.  But I don't
10  have -- I don't have conclusions with regard to the
11  exact figures.
12      Q   In attempting to derive a value for
13  Oakwood on any basis in 2001, how does the
14  professional valuation expert take into account the
15  sale to Buffett in 2003?
16          MR. WILLIAMSON:  Objection.
17      A   In arriving at the value as of 2001, that
18  was the assignment and the only assignment.
19          The manner in which or the appropriateness
20  of considering the sale to Buffett at all would
21  depend on the nature of the assignment as of 2001.
22          If I was asked only to value, I think as
23  your question asked, only to value the assets as of
24  2001, that's the only thing I was told, and I wasn't
25  told about a damages analysis or anything to do with

111

Pfeiffer

1   Pfeiffer
2       A   I think it would depend on the context of
3   the question.
4       Q   Well, if I just asked you for a
5   mathematical calculation, Mr. Pfeiffer, I would like
6   you to give me the fair market value of the assets of
7   Oakwood in 2001 by whatever methods you deem
8   appropriate, I would like you to do the same study in
9   2002 by whatever methods you deem appropriate, and if
10  you find a difference I'd like you to add or subtract
11  and tell me the answer.
12          To what extent on that basis would you
13  take into account the sale to Buffett in 2003?
14      A   If the assignment was meant to only
15  consider those two dates and nothing that happened
16  after those two dates, I would be inclined to not
17  include hindsight and not include anything that
18  happened after those dates.
19          However, to the extent that there was any
20  misinformation, you know, lack of disclosure, fraud
21  or that kind of issue and there were things that
22  allowed for more information subsequent to that date
23  that caused me to question the appropriateness of the
24  value based on the information as of the previous
25  date, depending on the assignment I might consider

113

Pfeiffer

1  that as well.
2
3     Q     Are you aware of any misinformation, lack
4  of disclosure or fraud as it relates to Oakwood at
5  any point, sir?
6            MR. WILLIAMSON:  Objection.
7     A     I think there was some -- there were some
8  times where investors and management understood
9  issues better than they understood them in the past.
10  And that understanding allowed them to have a better
11  basis for valuing the business, for understanding the
12  business.
13            MR. CASTANARES:  Would the reporter please
14  read back the pending question to the witness.
15            (Question read.)
16            MR. WILLIAMSON:  And the same objections.
17     A     I'm not aware specifically of any lack of
18  disclosure or fraud, but I don't believe that -- I
19  could be mistaken -- but I don't believe the company
20  had full disclosure or audited financial statements
21  at all dates in 2002, and September of 2002 in
22  particular may not have had a completed, I don't
23  believe it had a completed set of financials and full
24  disclosures that one might expect and require.
25            And so therefore, although I'm not aware

114

Pfeiffer

1  you called market data in earlier testimony today.
2     A     Yes.
3     Q     Okay.  Now, I notice you say "when
4  available" here.
5            Are there situations in which such data is
6  not available?
7     A     Yes.
8     Q     What does the valuation expert do when
9  such data is not available?
10            MR. WILLIAMSON:  Objection.
11     A     Look at other contemporaneous market
12  information.  You look at, obviously, all the other
13  methods that are appropriate for opining on a
14  valuation.
15     Q     All right.  And did you find the market
16  data to be sufficiently available in this particular
17  case to allow you to utilize that approach in
18  studying Oakwood at all dates that you deemed
19  appropriate?
20     A     Yes.
21     Q     All right.  And I take it from this
22  paragraph, sir, that you are contending that
23  Dr. Tennenbaum should have used a market data
24  approach in comparing the value of Oakwood's assets

116

Pfeiffer

1  of this information and the like, you know, I think
2  that it was a lack of the kind of information that
3  you'd typically expect.
4     Q     Okay.  Turning now to that section of your
5  report that's on pages 4 and 5, it talks about
6  market-based information.  Is that the kind of market
7  data that we have been talking about in the market
8  data approach, as we've described it so far today,
9  namely you add up the total value of the stock out
10  there and the bonds out there?
11     A     It's more than that.
12     Q     Okay.  What is it?
13     A     Well, if you look at the -- I am sorry.
14  Were you asking about just paragraph 1?
15     Q     I am talking about the paragraph -- there
16  are a number of paragraphs 1 in this document.  So I
17  am trying to use page numbers to clarify.
18            I am talking about the one that starts on
19  page 4 with the words "is well-established" and then
20  continuing on to paragraph -- page 5, rather.  You
21  talk about market data.
22            I am asking you if that's the same market
23  data, namely the value of stock and the value of
24  bonds, that we have talked about in the approach that

115

Pfeiffer

1  on the two dates he compared them rather than taking
2  a discounted cash flow approach?
3            MR. WILLIAMSON:  Objection.
4     A     That's an oversimplification of -- it's
5  just one critique of many is that he should have
6  considered market data.
7     Q     And are you certain that he didn't or is
8  it just -- I mean is it possible that he considered
9  it and rejected it, as distinguished from didn't
10  consider?
11            (Witness reviewing document.)
12     A     My reading of his deposition and my
13  reading of his report leads me to believe that he
14  didn't -- either he didn't consider it, or if he
15  considered it he certainly didn't tell anybody he
16  considered it.  So I can't tell you what he, you
17  know, what he did in his office --
18     Q     All right.
19     A     -- but as least what I know he didn't
20  consider it.
21     Q     Dr. Shapiro considered it, though, didn't
22  he?
23            MR. WILLIAMSON:  Objection.
24     A     Dr. Shapiro considered market data for his

117

Pfeiffer

1    report.

3    Q    For his supplemental report, right?

4    A    On a different topic, but yes.

5    Q    Okay.  On the topic being insolvency?

6    A    The topic of Dr. Shapiro's supplemental

7    report, I think that's a good, broadly solvency, yes.

8    Q    Now, did you personally do the analysis

9    that you contend that Dr. Tennenbaum should have paid

10   more attention to here, namely a comparison of the

11   market data approach in September of 2001 to the

12   market data approach in September 2002?

13   A    I don't think that I said anything about

14   how he should have done it as of September 30, 2002.

15   I don't think September 30, 2002 is a relevant date.

16         So you're mischaracterizing what I said he

17   should have done.

18         What I'm saying is that he ignored all

19   contemporaneous and market-based information in

20   conducting his analysis.

21   Q    Okay.  And what would that data have shown

22   if he had analyzed it for the two relevant dates?

23         MR. WILLIAMSON:  Objection.

24   A    How do you define "relevant dates"?

25   Q    September 30, 2001, September 30, 2002.

118

Pfeiffer

2    considering market data in providing an opinion of

3    damages as it relates to Oakwood.

4    Q    So did you do a comparison of what the

5    market data would show at September 30, 2001 to what

6    it would show on September 30, 2002?

7    A    No.

8    Q    Would it be difficult to do?

9    A    No.

10   Q    We could do it sitting right here,

11   couldn't we?

12         MR. WILLIAMSON:  Objection.

13   A    I'm not sure about that.

14   Q    All the data's in this room, isn't it?

15         MR. WILLIAMSON:  Objection.

16   A    You might need certain financial

17   statements that I'm not sure if it's in this room

18   but --

19   Q    It is.  Let's start with September 30,

20   2001.

21         Stock price roughly $4.15?

22         MR. WILLIAMSON:  Objection.

23   Q    According to your report, right?

24   A    Yes.

25   Q    As corrected?

120

Pfeiffer

2    A    I --

3         MR. WILLIAMSON:  Same objection to the

4    question.

5    A    I don't define those two dates as

6    relevant.

7    Q    I'll rephrase the question.

8    A    Okay.

9    Q    You criticized Dr. Tennenbaum for not

10   paying sufficient attention to market data in his

11   approach; is that correct?

12   A    Yes.

13   Q    Okay.  And his approach is to compare the

14   market of Oakwood's assets at September 30, 2001 to

15   the value of Oakwood's assets at September 30, 2002,

16   correct?

17   A    Among other things that he's done.

18   Q    Okay.  Well, the portion of it that you

19   criticize for not having paid sufficient attention to

20   market data is a comparison of the value of Oakwood's

21   assets at September 30, 2001 to the value of

22   Oakwood's assets at September 30, 2002, correct?

23   A    No.

24   Q    Why not?

25   A    I've criticized him for not -- not

119

Pfeiffer

2    A    Yes.

3    Q    About 9.3 million shares outstanding,

4    correct?

5    A

6         MR. WILLIAMSON:  Objection.

7    A    I'm not -- 9.-something, I don't

8    remember --

9    Q    All right.  Dr. Shapiro shows it in his

10   report -- I can show you the CSFB documents if you

11   want -- but if we take Dr. Shapiro's report, he's

12   showing market value of equity using $4.15 with

13   9,531,000 shares outstanding?

14         MR. WILLIAMSON:  I am sorry, are you going

15   to mark that or are we just going to --

16         MR. CASTANARES:  If you want --

17   A    9- --

18         MR. CASTANARES:  I don't see any

19   particular need to.

20   Q    He's showing $39,554,000 of market value

21   of equity as of September 30, 2001.

22         Do you have any reason to differ with

23   that?

24   A    I'd be more comfortable using my data, but

25   I don't have a particular reason to differ.

121

Pfeiffer

1
2      I just know that number of shares was not
3  9.3 million, though.
4      Q    I may have misspoken.  He's got 9.531
5  million.
6           MR. WILLIAMSON:  That's probably why we
7  should mark the document.
8           MR. CASTANARES:  That's fine.
9  Unfortunately, it is my only copy of it.
10          MR. WILLIAMSON:  I have a copy of it, I
11 think.
12          MR. CASTANARES:  As a matter of fact, why
13 don't we -- hang on a second, let's pull out a...
14          (Pause.)
15          MR. CASTANARES:  Sir, I am going to ask
16 that we mark as Exhibit 626 a document bearing CSFB
17 265172 through 265213 --
18          MR. WILLIAMSON:  Is that in this set
19 (indicating)?
20          MR. CASTANARES:  It is in the set that you
21 copied for me.
22          (Marked for identification.)
23     Q    And I am going to draw your attention to
24 the page that is Bates stamped 185.  And this, I know
25 that it has been marked before with a different

Pfeiffer

1
2  number, but I don't remember it so we'll mark it
3  again now if we can.
4           MR. WILLIAMSON:  I am sorry, this starts
5  on 265172?
6           MR. CASTANARES:  That's right.
7           MR. WILLIAMSON:  Is that right?  Okay.
8           MR. CASTANARES:  That's right.
9      Q    I am going to show you 265185.
10          This does not purport to speak as of 2001
11 but 2002.
12          MR. WILLIAMSON:  If you prefer to take a
13 look at the document --
14     Q    But is that a sufficient document for you
15 to get a rough idea, at least for working purposes
16 here today, as to the number of shares outstanding?
17          (Witness reviewing document.)
18     A    It's sufficient for me to get comfortable
19 with the fact that CSFB has them as document and I
20 have no reason to -- that I have no reason to believe
21 that it's incorrect, that the shares outstanding as
22 of September 2002 were 9.53 million shares.
23     Q    Okay.  And that's what Dr. Shapiro shows
24 for 2001 as well.  So are you comfortable enough or
25 do we need to get into further documents to look at

Pfeiffer

1
2  the 2001 date here?  Is 9.5 more or less about right?
3      I am not going to care about a million
4  dollars here.
5      A    What's a million dollars between friends?
6      Q    What's a million dollars between friends,
7  right?
8      So is it fair -- sir, do you have any
9  reason to differ with an equity data -- rather -- a
10 market data valuation which, as of September '01,
11 values equity at roughly 39 or $40 million?
12          MR. WILLIAMSON:  Objection.
13     A    No.
14     Q    Okay.  And you have -- I think you told me
15 you had bond price data for Oakwood's bonds at
16 September 30, 2001; is that right?
17     A    That's right.
18     Q    Okay.  Do you have it in hand?
19     A    The only thing I have in my hand is my
20 report.
21     Q    Okay.
22     A    And this document you gave me.
23     Q    Okay.  I will furnish you with a set of
24 copies of documents that was furnished to me
25 yesterday by Credit Suisse's counsel.  I am going to

Pfeiffer

1
2  give you the whole package.  It appears to contain
3  some bond data.  I don't know if it's there.  I also
4  got another exhibit that was produced by your office,
5  which is an e-mail with a lot of bond price data on
6  it.
7      Which of those would be more comfortable
8  for you to work with?
9      A    The e-mail.
10     Q    The e-mail.  Okay.  Let me get that out.
11          (Pause.)
12     Q    I am going to mark, sir, as Exhibit 627 a
13 document which bears CSFB 519279 through 519291,
14 appearing to begin with an e-mail or a string of
15 e-mails perhaps -- actually an e-mail from you, it
16 looks like, followed by what appear to be bond price
17 data.
18          (Marked for identification.)
19     Q    Is this the document that will help you
20 tell me what your data shows the bond price of
21 Oakwood's bonds to be at September 30th of 2001?
22     A    Yes.
23     Q    All right.  And do you find $51.50 and $47
24 for the two issues to be about right?
25     A    As of September 28, 2001, which is likely

Pfeiffer

2 the last trading date before September 30th, those

3 are the two prices, yes.

4     Q    So would it be reasonable then to use as a

5 working number here $50 for Oakwood's bonds as of

6 2001?

7     A    It would be a reasonable approximation but

8 not an exact number.

9     Q    Okay.  I think you told me a moment ago

10 that we could do this here in this room.

11        MR. WILLIAMSON:  Objection.

12     Q    If we were doing it right here right now

13 in this room based upon your data, would you use $50

14 as a reasonable approximation of Oakwood's bonds?

15     A    What I actually said was -- well, to

16 answer, we could use $50 as a reasonable

17 approximation, 50 cents on the dollar as a reasonable

18 approximation.

19        However, I did not say that we could

20 easily do it in this room, because as I said we might

21 need the financial statements to allow for various

22 adjustments to other forms of debt that are not --

23 they're not included in the public market price for

24 the bonds or for the stock.

25     Q    All right.  What forms of debt would that

Pfeiffer

2 be?

3     A    Letters of credit, guarantees, contingent

4 liabilities, things like that.

5     Q    Okay.  But if we used this, we would show

6 roughly $150 million as the market data indication of

7 the market's evaluation of Oakwood's public debt; is

8 that correct?

9        MR. WILLIAMSON:  Objection.

10     A    It's approximately correct.

11     Q    All right.  And subject to the possible

12 adjustments that you just described, you would then

13 take roughly $40 million of equity and add it to

14 roughly 150 million of debt, make the adjustments you

15 described, and come to a figure of roughly $190

16 million as an enterprise value subject to the

17 adjustments you described?

18        MR. WILLIAMSON:  Objection.

19     A    If you're asking me if 150 plus 40 is 190,

20 the answer is yes.

21     Q    And that is the enterprise value subject

22 to whatever adjustments you might wish to make based

23 upon the financial statement data that you talked

24 about, correct?

25        MR. WILLIAMSON:  Objection.

Pfeiffer

2     A    Well, yeah.  Yeah.  It would be subject.

3 As a matter of fact, as you saw we mentioned earlier,

4 even Shapiro's number was not 190.  So obviously the

5 subject is the --

6     Q    Well, I think Dr. Shapiro used a different

7 bond price number from yours.

8     A    Well, that could be --

9     Q    If you look at Dr. Shapiro's report, which

10 I think --

11        MR. WILLIAMSON:  We did not mark.

12     Q    -- it was not marked but you have in front

13 of you.

14     A    I do not have in front of me.

15     Q    No?  Where did it go?

16        Here it goes.

17     A    I could take my jacket off if that's okay

18 with you?

19     Q    Sure.

20        MR. WILLIAMSON:  Tony, it's 12:40, so if

21 it is okay with you --

22        MR. CASTANARES:  When we get to the end of

23 this line, let's -- we will quit.

24        (Pause.)

25

Pfeiffer

2 BY MR. CASTANARES:

3     Q    Rather than to try to go through all the

4 adjustments right now, sir, so I just want to compare

5 the stock price plus the bond price on the two dates

6 and see if we agree on what result we get from that.

7        If we now take the 190 million that

8 results from the sum of those two numbers in

9 September 30, 2001 -- and if you'll be so kind to

10 look again at page 265185 of Exhibit 627 in front of

11 you --

12        MR. WILLIAMSON:  That's the price list.

13     A    What page number?

14     Q    265185.  You're in the wrong document at

15 the moment.  It's Exhibit --

16        MR. WILLIAMSON:  626.

17     A    626?

18     Q    Excuse me.  626.  265185.

19        Here Credit Suisse in this document lists

20 the total bond value at 102.3 million; is that right?

21        MR. WILLIAMSON:  I am sorry, where are

22 you?  Tony?

23        MR. CASTANARES:  Am I on 265185?

24        MR. WILLIAMSON:  265185?

25     A    I don't see that number.

Pfeiffer

1    MR. WILLIAMSON:  I don't see that on this
2  one.
3    Q    Well, you don't see that number, but it is
4  the sum of the two figures that appear slightly
5  higher on the page; is that right, sir?
6    A    I don't see.
7    Q    I'll read the numbers.  49.8, do you see
8  that figure?
9    A    Yes.
10    Q    52.5?
11    A    Yes.
12    Q    Okay.  So we get 102.3 out of that; am I
13  right?
14    A    Okay.
15    Q    Okay.  102.3.  And then Credit Suisse
16  lists the value of the stock at $1.55 which conforms
17  to your number, right, at 14.8.
18        The sum of those two figures is $117.1
19  million, correct?
20    A    102.3 plus 14.8 is 117.1, correct?
21    Q    Right.
22        And so if we simply compare the value of
23  the market data respecting the stock and public
24  bond-traded price of Oakwood at September 30, 2001 to

Pfeiffer

1    MR. WILLIAMSON:  Objection.
2    Q    Right.
3    A    159 minus 117 is 42.
4    Q    Okay.  Now, did you believe that the value
5  of Oakwood's securities was set by an efficient
6  market in 2001?
7    MR. WILLIAMSON:  Objection.
8    A    The value of these securities were set by
9  an efficient market in 2001, yes.
10    Q    Did you believe the same thing in late
11  2002?
12    A    Yes.
13    Q    And what do you mean by the term
14  "efficient market"?
15    A    It was freely trading with a reasonable
16  set of information associated with that trading.
17    Q    Okay.  And what is the effect of assuming
18  the existence of an efficient market on the
19  conclusions that a valuation professional can arrive
20  at from the available market data?
21    MR. WILLIAMSON:  Objection.
22    THE WITNESS:  I am sorry, could you repeat
23  the question.
24    (Question read.)

Pfeiffer

1  the identical figures for September 30th of 2002, we
2  find that the combined value of those figures has
3  diminished by $42 million over that period of time,
4  correct?
5    MR. WILLIAMSON:  Objection.
6    A    The total -- the sum of the three numbers
7  is less than the sum of the two numbers that we went
8  through before, meaning --
9    Q    We went through before.
10        In 2001 the stock was 39 million 5 and the
11  bonds were 150 million, right?
12    A    Approximately, right.
13    Q    190 million roughly, right?
14    MR. WILLIAMSON:  Objection.
15    Q    Right?
16    A    Again, approximately.
17    Q    Okay.  And in 2002, the sum of those same
18  two calculations yields $117 million, right?
19    A    That's the math, correct.
20    Q    And 159 minus 117 as a matter of pure
21  value shows a diminution -- as a matter of pure
22  mathematics -- shows a diminution of 42 million 5 and
23  some change, right?
24    A    159 minus 117 you said?

Pfeiffer

1    MR. WILLIAMSON:  Same objection.
2        You can answer that if you --
3    A    It's a -- it's a -- it's an important
4  premise that there's an efficient market or somewhat
5  efficient market before assigning any relevance to
6  the prices ascertained.
7    Q    Is it fair to say that the efficiency of
8  the market, that gives the valuation expert comfort
9  in the reliability of market data as an indicator of
10  value?
11    A    It provides comfort, yes.
12    Q    Explain to me, sir, how you account for
13  the fact that between September 30, 2002, as shown on
14  Exhibit 626 in front of you, where Credit Suisse
15  shows Oakwood's stock to be worth $1.55 and
16  approximately three weeks later, on September --
17  rather -- October 20th of the same year the stock had
18  fallen from $1.55 to 57 cents.
19    MR. WILLIAMSON:  Objection.
20    A    You want me to explain why it dropped from
21  $1.55 to 57 cents?
22    Q    Yes.
23    MR. WILLIAMSON:  If you know.
24    A    The equity holders believe that the value

1                    Pfeiffer
2    is 50-something cents instead of $1.55 or they had
3    certain views relative to the -- relative to the kind
4    of payment they might get in a bankruptcy or things
5    change in terms of the capital structure of the
6    company.  I mean there are a lot of reasons why a
7    stock can trade at different numbers.
8         Q    New information came to the market?
9         A    Well, the market also changes.
10        Q    Okay.
11        A    But there's -- it's -- I can't possibly
12   describe to you why a price would change between -- I
13   haven't analyzed that.
14        Q    All right.
15             MR. CASTANARES:  I want to mark one more
16   exhibit and question on it and then we can break.  It
17   won't take long, but it is in the same line of
18   questioning.
19             628 is one of these documents that for
20   some reason has two different sets of Bates stamps.
21   I am going to use the one on the bottom.  It is OHCLT
22   02616 through 02635.
23             (Marked for identification.)
24        Q    And, sir, I am going to ask you to look at
25   the third page of this document, 02618.

134

1                    Pfeiffer
2             (Witness reviewing document.)
3         Q    This shows the market value of the Oakwood
4    bonds to have fallen from the 102.3 figure we saw on
5    Exhibit 626 to a total of $60 million three weeks
6    later; isn't that true?
7             MR. WILLIAMSON:  Objection.
8         A    Yes.
9         Q    And it shows the value of the stock, which
10   had shown at approximately 14 million and some change
11   on September 30, 2002 to have dropped to a total of
12   $8.1 million, correct?
13            MR. WILLIAMSON:  Objection.
14            (Witness reviewing document.)
15        A    Correct.
16        Q    So this indicates that the value of the
17   assets of this company as measured by the unadjusted
18   market data had dropped by an additional $49 million
19   in that three weeks, correct?
20            MR. WILLIAMSON:  Objection.
21        A    I haven't done the math, but it dropped.
22        Q    117 minus 68 is about 49 million by my
23   math.  Is that right?
24        A    Okay.
25            MR. CASTANARES:  All right.  This is a

135

1    good place to take our lunch break.  Can we make it
2    reasonably --
3             MR. WILLIAMSON:  Quick?
4             MR. CASTANARES:  -- quick?  I do want to
5    try to get home tonight to --
6             MR. WILLIAMSON:  Do you know, about what
7    time do you need to wrap up today?
8             MR. CASTANARES:  I think I probably can
9    get this done in a couple of hours, maybe a bit less.
10   I think we've done -- the hardest part of this has
11   been the numbers we have been going through.
12            MR. WILLIAMSON:  We can probably do lunch
13   over the next half hour or so.
14            THE VIDEOGRAPHER:  The time is 12:48 p.m.,
15   this marks the end of tape 2, you're off the record.
16            (Whereupon, at 12:48 p.m., a luncheon
17   recess was taken.)

136

1                    Pfeiffer
2    A F T E R N O O N   S E S S I O N.
3             (Time noted:  1:30 p.m.)
4             THE VIDEOGRAPHER:  The time is 1:30 p.m.,
5    this marks the beginning of tape 3 in the deposition
6    of Allen Pfeiffer.  We're on the record.
7             MR. CASTANARES:  Thank you.
8    A L L E N   M.   P F E I F F E R,
9             having been previously duly sworn, was
10            examined and testified further as follows:
11   EXAMINATION
12   BY MR. CASTANARES:  (Continued.)
13        Q    Mr. Pfeiffer, before lunch I asked you a
14   series of questions that contrasted the differential
15   between the added stock and bond market prices at
16   September 30, 2001 and the same figures for 2002.
17   And I think I may have misspoken in my questions in
18   that I had used Dr. Shapiro's bond valuation figures
19   of $40 in the 2001 figures rather than the ones that
20   you show in Exhibit 627 of $50.
21            And I just want to make sure that the
22   record is clear.  If we use the $50 valuation shown
23   in your Exhibit 627 for the bonds at September 30,
24   2001, the figure for the market value of the
25   company's bond debts would be 150 million, correct?

137

Pfeiffer

2    Q    Now let's talk about those various
3    adjustments.
4         By how much of a factor do you think those
5    might influence the conclusions that these two market
6    data studies show?
7              MR. WILLIAMSON:  Objection.
8    A    I haven't done the analysis, but it could
9    be significant.
10   Q    Could it be more than, say, 10 or
11   15 percent?
12   A    Ten or 15 percent of what?
13   Q    Of the, let's take the $190 million figure
14   we got for September 30, 2001.
15   A    Right.
16   Q    Do you think that there are various other
17   things that you might analyze in connection with
18   doing that market data study that would influence
19   that 190 million figure by more than 10 or
20   15 percent?
21   A    Could be.
22   Q    Could it be 50 percent?
23   A    Could be.
24   Q    And as you sit here today you don't have
25   any idea one way or the other?

140

---

Pfeiffer

1    Pfeiffer
2    MR. WILLIAMSON:  Objection.
3    A    If I used $50 or 50 cents you mean?
4    Q    Fifty cents, whatever you want to call it.
5    Fifty.
6    A    If I use 50 cents on roughly 300 million,
7    50 percent of 300 million is 150.
8    Q    Okay.  And I think we established that the
9    equity price as of that date was on the order of 39
10   to $40 million, correct?  4.15 a share times
11   9.3 million shares, roughly?
12   A    Approximately, yes.
13   Q    Okay.  And that yielded a total of
14   approximately $190 million roughly, 189-something,
15   right?
16   A    Yes.
17   Q    And then in September of 2002, using the
18   CSFB figures at page 265185, we concluded that the
19   added market value of the Oakwood's stock and Oakwood
20   bonds as of September 30, 2002 was $117.1 million; am
21   I right?
22   A    We concluded that if you add the 52.5 and
23   the 49.8 you get -- you don't get 117, no, you get --
24   Q    You get 102.3, right?
25   A    102.3, right.

138

---

Pfeiffer

2    Q    And you add to that the stock value of
3    14.8?
4    A    Okay.
5    Q    And get to 117.1, correct?
6    A    Correct.
7    Q    All right.  So the differential between
8    the added value of the market price of the stock and
9    the market price of the bonds at September 30, 2001,
10   and the same figures for September 30, 2002, is
11   actually 190 million minus 117.1 million, or roughly
12   73 million of diminution; is that correct?
13             MR. WILLIAMSON:  Objection.
14   A    I don't -- I don't agree with the
15   characterization that there's diminution.  I just
16   think that there's -- if you do the math and you add
17   the numbers for the trading value of the notes and
18   the trading value of the equity, and compare the
19   trading value of the notes in the equity to those --
20   on those two dates, without doing any other analysis
21   with regard to other liabilities or other changes in
22   the marketplace or circumstances or the other facets
23   of the market capitalization that one might analyze,
24   if you do that exact -- just that math, the
25   difference is automatically to $73 million.

139

---

Pfeiffer

2    A    That's correct.
3    Q    So as far as you know, sitting here today,
4    the $190 million adjusted for the various adjustments
5    you think should be made could just as easily bring
6    the figure up to Dr. Tennenbaum's 350 million by his
7    DCF study, true?
8              MR. WILLIAMSON:  Objection.
9    A    But you're comparing things that are not
10   possible to -- I mean I'm not comparing 190 to 350.
11   I'm comparing what you would use as market data as of
12   a particular date relative to the complete story for
13   market data.
14        I wasn't comparing it or answering any
15   question relative to Dr. Tennenbaum's conclusion.
16   Q    But if you take the $190 million that we
17   have for the figure for the market value of the
18   equity and bonds as of that date and made all the
19   adjustments to it that you claimed that you think
20   should be considered to be made to it, as far as you
21   know that number that results from adjusting the $190
22   million could be 50 million or 100 million or
23   200 million or 350 million or any other number; isn't
24   that true?
25             MR. WILLIAMSON:  Objection.

141

Pfeiffer

1     A    I think there's a realm of reasonableness

2  that it can't be any number, but I have not done the

3  analysis to ascertain what that number would be.

4     Q    Okay.  Now, is it your position, sir, that

5  the market data method is more indicative of the fair

6  market value of Oakwood's assets at September 30,

7  2001 than the discounted cash flow method?

8         MR. WILLIAMSON:  Objection.

9     A    It's my opinion that the market data

10  method is a better method than the discounted cash

11  flow as performed by Dr. Tennenbaum, yes.

12     Q    Well, when you say as performed by

13  Dr. Tennenbaum, let me just talk about methodology in

14  general.

15         Knowing what you know about Oakwood, if

16  you were looking for the value of its assets at

17  September 30, 1992, do you believe that the market

18  data method would be more indicative of value than

19  the discounted cash flow method?

20         MR. WILLIAMSON:  Objection.  You said

21  "1992."

22         MR. CASTANARES:  I am sorry, I meant to

23  say 2001.

24     A    I -- I think that -- well, I haven't done

Pfeiffer

1  the discounted cash flow analysis in the appropriate

2  way.

3         If done the appropriate way, with all the

4  relevant adjustments and scenarios and considering

5  the state of the company and so on and so forth, then

6  I think both the discounted cash flow and the market

7  data would be relevant indicators of value.

8     Q    And now if I asked you the same thing,

9  sir, if I hired you and asked you to give me an

10  analysis of the fair market value of Oakwood's assets

11  at September 30, 1992, would your answer be the same

12  that you think both of them would be appropriate

13  methods to utilize?

14     A    I don't -- I don't know as of 1992 what --

15     Q    I am sorry.

16         MR. WILLIAMSON:  I thought --

17     Q    I am just a decade off.  2002.

18     A    Can you repeat the question again.

19     Q    Yes, let me restate the question so it's

20  all in one place.

21         MR. WILLIAMSON:  I thought you might have

22  meant to say it that time.  Okay.

23     Q    If I asked you to evaluate Oakwood's

24  assets, the fair market value of Oakwood's assets as

Pfeiffer

1  of September 30, 2002, would your answer also be that

2  you believe that both the discounted cash flow and

3  market data approaches are appropriate indicators?

4         MR. WILLIAMSON:  Objection.

5     A    I would have to do my own further analysis

6  to determine what methods are appropriate, given the

7  fact that the company was headed towards bankruptcy.

8         And I would also say that relative to your

9  question, that you mischaracterized my answer with

10  regard to what's appropriate as of 2001.

11         I mean I didn't say discounted cash flows

12  was an appropriate method as of 2001 as a blanket

13  statement.  I said it has to be done with a lot of

14  careful attention to make sure that it actually

15  approximates the expected cash flows to the company

16  and the expected situation.

17         The discounted cash flow that's been done

18  here as a going concern, given the fact that

19  Dr. Tennenbaum believes it's, you know, it should

20  have changed the course of its business dramatically,

21  I think is entirely inappropriate.

22     Q    You're critical of Dr. Tennenbaum for

23  using projections in his discounted cash flow study

24  for 2001 that he believed to be extremely aggressive;

Pfeiffer

1  isn't that correct?

2     A    That's correct.

3     Q    Were they or weren't they extremely

4  aggressive?

5         MR. WILLIAMSON:  Objection.

6     A    I have not reached a final determination

7  as to whether they were or weren't.

8     Q    Have you ever expressed an opinion on that

9  subject?

10     A    I might have preliminarily looked at that,

11  but I haven't reached an opinion on that subject, no.

12     Q    But you did say in writing at least once

13  that they were not extremely aggressive, didn't you?

14         MR. WILLIAMSON:  Objection.

15     A    I don't recall exactly what I said, but I

16  might have said that there are ways to look at it as

17  more aggressive or less aggressive depending on an --

18  I don't recall what preliminarily I said.

19     Q    You don't recall ever writing the words to

20  the effect that the 2001 projections used by

21  Dr. Tennenbaum were not extremely aggressive?

22     A    I don't recall exactly what I wrote.

23         What I remember writing somewhere in an

24  e-mail that they might not have been as aggressive.

Pfeiffer

1  That's prior to -- that might have been prior to my
2  full analysis and prior, certainly prior to
3  Dr. Tennenbaum's deposition in which he thought they
4  were extremely aggressive.
5      Q    Well, so as you sit here today do you have
6  an opinion on whether or not the 2001 projections
7  were or were not extremely aggressive?
8      A    I do not have an opinion on that.
9      Q    So you don't really have an opinion, do
10 you, then on the appropriateness of a discounted cash
11 flow basis evaluation based upon those projections,
12 rather you simply criticize Dr. Tennenbaum for using
13 them despite the fact that he considered them to be
14 extremely aggressive; isn't that correct?
15     A    I think both statements are correct.
16          I criticize Dr. Tennenbaum for using what
17 he perceives to be aggressive hockey stick
18 projections, and using them in the manner which he
19 used them, without the appropriate adjustments.  And
20 I also have a problem with him using these
21 projections, irrespective of whether they're
22 aggressive or not, on many other grounds.
23          As stated in my report, that those grounds
24 include the fact that the basis of these projections,

146

Pfeiffer

1  how they came about, who authored them, at what
2  period of time, with what set of knowledge is
3  unknown.  And it's unknown to Dr. Tennenbaum.  And I
4  don't, sitting here today, have a much clearer
5  understanding of exactly how those projections came
6  about either.
7          So what I'm saying is that I have a
8  problem with him using those projections on that
9  ground.
10         And I also have a problem with the fact
11 that he -- whether they're aggressive or not
12 aggressive, I have a problem with the fact that
13 they're just put in a model as if this company was a
14 regular going concern company without any allowance
15 for the fact that the company was, first of all,
16 operating under, to a certain extent, under distress
17 and, second of all, certainly according to
18 Dr. Tennenbaum, was headed towards, or should have
19 been, according to Dr. Tennenbaum, should have been
20 making very drastically different decisions.
21         And so I guess on many, many grounds I
22 have problems with him using these projections, I
23 have problems with his methodology, I have problems
24 with his conclusion, I have problems with the way he

147

Pfeiffer

1  went about it, I have a problem with the things he
2  hasn't done to corroborate and to work with his
3  analysis and his conclusions.  And, you know, as
4  outlined in my report, those critiques have dramatic
5  implications.
6      Q    You saw those projections yourself, didn't
7  you?
8      A    I may have.  I don't recall.  I've seen
9  them since.
10     Q    You've seen them at some point or another,
11 right?
12     A    Actually, I'm having a hard time --
13 there's two different sets of projections that were
14 used in 2001.  And I believe I've seen one and I
15 don't believe I've seen the other.
16     Q    Okay.  The place you saw the one set of
17 projections that Dr. Tennenbaum used for 2001 was in
18 a document created by your client, Credit Suisse;
19 isn't that true?
20         MR. WILLIAMSON:  Objection.
21     A    I saw a document that was dated 2002, but
22 it was a CSFB document.
23     Q    Okay.  So was that the 2002 projections or
24 the 2001 projections?

148

Pfeiffer

1      A    The 2001 projections used by
2  Dr. Tennenbaum were in a document dated 2002.
3      Q    Which is a CSFB document, right?
4      A    Which is a CSFB document.
5      Q    Okay.  And do you have reason to believe
6  that CSFB prepares unrealistic projections?
7          MR. WILLIAMSON:  Objection.
8      A    I have no -- I have no reason to believe
9  that CSFB prepared the projections, and I have no
10 reason to believe that CSFB or anybody prepared them
11 at the time that this valuation date is meant to
12 reflect.
13         And I also don't believe that CSFB in that
14 document that I've seen purported these projections
15 to be the expected case set of cash flows which one
16 needs to use in using any discounted cash flow.
17     Q    Did the CSFB document that you saw
18 containing these projections contain some sort of
19 disclaimer to the effect that CSFB didn't believe
20 that they were accurate, shouldn't be relied upon?
21         MR. WILLIAMSON:  Objection.
22     A    I didn't -- I didn't analyze the document
23 well enough to even approach it, you know, an answer
24 to that kind of question.

149

Pfeiffer

Q    So as I understand it, though, as we sit
here today, you don't have a position one way or the
other on whether the projections that Dr. Tennenbaum
used in 2001 valuation work were or were not
reasonable projections; is that true?

MR. WILLIAMSON:  Objection.

A    Again, I know what I read Dr. Tennenbaum
to have said at his deposition.  Not only did he
refer to them as aggressive, but he referred to them
as hockey stick projections.

And so that's my basis, if I take a man at
his word who is taking a valuation, and he refers to
them as hockey stick projections, which is a
reference to the most aggressive, unrealistic
expectations -- projections you can find, and then
using those projections to arrive at a number, that's
the basis of my critique.

Basis of my critique is not my formulation
of my opinion with respect to his projection.

Q    Your critique isn't whether Dr. Tennenbaum
came to the right conclusion or not, it's whether he
went about it the right way; isn't that correct?
Because you can't really express an opinion on
whether his DCF analysis came to the right conclusion

150

Pfeiffer

or not, can you?

MR. WILLIAMSON:  Objection.

A    I think I've answered you before about
that.  I mean I have problems not only with his
methodology but also the things he hasn't done, his
inconsistencies, his formulation, his speculative
nature of his analysis.  And I think you've read it
in my report.

I haven't -- I haven't reached my own
conclusion on the subject as to what those were.

Q    Just so we're entirely clear here, I
believe you may have answered this earlier but I want
to be really clear, you are not expressing an
opinion on whether or not the 2001 projections were
or were not reasonable projections, are you?

MR. WILLIAMSON:  Objection.

A    I am not expressing an opinion on that,
no.

Q    And you are not expressing an opinion on
whether or not the 2001 projections were extremely
aggressive projections, are you?

MR. WILLIAMSON:  Objection.

A    I am not.

As you define 2001 projections, you're

151

Pfeiffer

defining the ones that he used as 2001 projections?

Q    Yes.

A    I am not here to express an opinion as to
whether they're extremely aggressive or not.

Q    And do you yourself know the origin of
those projections?

MR. WILLIAMSON:  Objection.

The 2001 projections?

MR. CASTANARES:  Right.

(Witness reviewing document.)

A    I don't know for sure, no.

Q    When you do a discounted cash flow
analysis does that typically lead you to be able to
express an opinion of the fair market value of a
company?

MR. WILLIAMSON:  Objection.

A    It's typically one of the approaches that
I might consider using in arriving at a fair market
value.

Q    And I think you said earlier that you
define fair market value to be the price that a buyer
would pay, a knowing and willing buyer, et cetera; is
that right?

MR. WILLIAMSON:  Objection.

152

Pfeiffer

A    That's how fair market value is defined,
yes.

Q    Okay.  And when you -- and you do arrive
at opinions in which you express an opinion as to the
fair market value of a company or the assets of that
company, don't you?

MR. WILLIAMSON:  Objection.

A    Generally speaking?

Q    Yes.

A    I do arrive at opinions of value, yes.

Q    All right.  Of fair market value, right?

A    I do arrive at opinions of fair market
value, yes.

Q    And when you do that, how do you go about
identifying who the buyer is going to be?

A    I -- depending on the circumstances, I
either -- I either have a particular buyer in mind or
I have a set of potential hypothetical buyers in
mind.

Q    And so is it necessary in order to achieve
an opinion of fair market value to know who the
buyer's going to be?

MR. WILLIAMSON:  Objection.

A    It's not necessary to determine exactly

153

Pfeiffer

1  who the buyer would be, no.
2
3       Q    In fact, sir, the definition of fair
4  market value assumes a hypothetical buyer, doesn't
5  it?
6            MR. WILLIAMSON:  Objection.
7       A    I think it depends on the circumstances.
8  Definitions of willing buyer, willing seller I
9  don't -- I don't think it has to be a hypothetical
10  buyer.  I mean I think you can determine fair market
11  value for a particular buyer as well.
12      Q    In any of the work that you have done in
13  connection with Oakwood did you ever attempt to
14  locate any particular buyer that might buy its assets
15  or any part of them?
16           MR. WILLIAMSON:  Objection.
17      A    Broadly speaking, we did.
18      Q    What did you do?
19      A    We looked at the -- in connection with
20  this report, we discussed the marketability of these
21  assets and what might happen in a potential
22  bankruptcy and execution of a sale, and looked at
23  some depositions where the topic was discussed and,
24  you know, generally became aware of the fact that
25  there's a certain group of buyers either who are

154

---

Pfeiffer

1  opinion, sir?
2
3       A    The significant -- the significance of
4  that sentence is that Dr. Tennenbaum believes that
5  the company should have shut it doors or discontinued
6  operations or file for bankruptcy in September of
7  2001.
8            And you would expect to see, if that were
9  the case, that things would, you know, absent other
10  market factors, you would have expected to see that
11  the market would have reacted the same way.  That the
12  market would have said, you know, these guys really
13  should cut it out already, and we're not very
14  confident in this management and its ability to
15  continue as a going concern.  And you might expect
16  the bonds to drop, in the same way that they actually
17  dropped, you know, with the numbers that you showed
18  me prior to lunch, in October of 2002.
19           And so because you did not see a decline
20  in the bonds, as a matter of fact you saw the
21  opposite, what you see is the market's contention,
22  the market's belief, that it was, if anything, more
23  comfortable with the company's situation than it was
24  prior to September 2001.
25      Q    Did you see something in Dr. Tennenbaum's

156

---

Pfeiffer

1
2  strategic or are financial buyers that may or may not
3  have been interested at various points in time in a
4  company like this.
5       Q    And can you identify any specific buyers
6  that you identified in the course of your work in
7  this matter, sir?
8       A    That was not -- our role was not to
9  identify a specific buyer.
10      Q    So you didn't do it, right?
11      A    It was not -- I was not asked to, and it
12  had nothing to do with what I was trying to do in my
13  report.
14      Q    Okay.
15      A    I only noted that there were points in
16  time, I think, specifically Merrill Lynch I believe
17  notes at a point in time that they had a hard time
18  finding a potential buyer.
19      Q    Let me ask you to refer now to page 5 of
20  your report, paragraph 3, beginning at the bottom of
21  the page there.  And the second sentence of that
22  paragraph reads, "For example, post-September 2001
23  Oakwood's bonds showed a significant improving
24  trend."
25           What is the significance of that for your

155

---

Pfeiffer

1
2  report or in his deposition where he said the company
3  should have shut its doors or suspended operations in
4  2001?
5       A    I saw him say that it should not have --
6  it should have not continued -- or, I should say, I
7  saw him say that there was damage as a result of the
8  fact that the company continued its business
9  operations.  And I also saw him in his deposition
10  state that he feels that the most likely course and
11  the only course that he really put his finger on was
12  that they should have filed for bankruptcy.
13      Q    I see.
14           Now you have testified in a number of
15  bankruptcy cases, haven't you?
16      A    Yes.
17      Q    As a matter of fact, I presume a large
18  part of your work as an expert witness has to do with
19  cases that arise in bankruptcy from in one context or
20  another; is that true?
21      A    I don't know about a large part, but a
22  meaningful part.
23      Q    Okay.  And you've seen companies sold as
24  going concerns out of bankruptcy cases, haven't you?
25      A    I've seen companies that have gone into

157

Pfeiffer

1  bankruptcy, restructured their debt, and emerged as
2  going concerns or have been sold as going concerns.
3  Q    Yes. Adelphia's a pretty good example,
4  isn't it?
5  A    Adelphia's an example.
6  Q    There was an operating business that
7  continued to operate during bankruptcy and was sold
8  as a going concern, correct?
9  A    Correct.
10  Q    The values that are achieved in sale were
11  values of a going concern, not an under-the-hammer
12  liquidation, correct?
13  A    The values reflected the buyer's intention
14  on operating as a going concern.
15  Q    So when you say that Dr. Tennenbaum
16  suggests the company went into bankruptcy, you don't
17  conclude from that that he thinks the company should
18  have closed its doors and stopped operations, do you?
19  You never heard him say that in any
20  context, did you?
21  A    Well, I conclude that he has a problem
22  with what the management did. And he believes that
23  there's damage associated with what management
24  continued to do.

Pfeiffer

1  And based on his deposition, the only
2  other alternative he provides is filing for
3  bankruptcy.
4  If they filed for bankruptcy in this
5  context, in September of 2001, you'd have a very
6  different business model, you'd have different cash
7  flows, you'd have a different situation, you'd have
8  bankruptcy costs, and you may or may not have a
9  liquidation scenario. And therefore, liquidation
10  should be one of the considerations in arriving at a
11  value as of that date.
12  Q    Of the differences that might have
13  occurred, some of them might have favored the
14  company's value and some of them might have
15  disfavored, correct?
16  MR. WILLIAMSON: Objection.
17  A    Relative to what?
18  Q    To what it was before bankruptcy. Let me
19  give you an example.
20  Did you see any documents in this case
21  that reflected a proposal that the servicer fees paid
22  to Oakwood under its contracts to service securitized
23  loans be rejected and that Oakwood should enjoy a
24  higher priority in the waterfall from those

Pfeiffer

1  securitizations for its servicing fees?
2  A    I may have seen that document.
3  Q    And if that had occurred, sir, that would
4  have improved the company's cash flows; isn't that
5  true?
6  A    Theoretically.
7  Q    Which would have been a favorable
8  post-bankruptcy event for Oakwood's value, correct?
9  MR. WILLIAMSON: Objection.
10  A    I'm not sure what time frame we're
11  analyzing here and in what context. It's hard to
12  answer the question.
13  It's hard to -- I mean certainly if the
14  company makes improvements they would, and the
15  improvements result in positive cash flow
16  adjustments, that would result in positive value.
17  But it depends on what date and it depends on -- your
18  question's very board.
19  Q    Is it your position in the sentence that I
20  have quoted to you about the bond prices here on page
21  5, paragraph 3, that the market -- that the improved
22  bond prices show that the market viewed Oakwood as a
23  healthier company after September 2001?
24  A    Not necessarily.

Pfeiffer

1  Q    In fact, sir, this rise in bond prices was
2  consistent with a rise in the bond market generally
3  during that period of time; isn't that true?
4  MR. WILLIAMSON: Objection.
5  A    It's my -- it's my belief that that --
6  that rise in bond prices that you have in 2001 was
7  largely a reflection on Oakwood and less of a
8  reflection of the bond market which is typically, you
9  know, more investment-grade or close to
10  investment-grade-type paper.
11  And furthermore, the statement here is not
12  necessarily focusing on the significance of the
13  improving trend, but rather that Dr. Tennenbaum
14  hasn't made any analysis to the extent -- ignores the
15  fact that although he thinks the company should have
16  gone in a very different direction, the bond market
17  does not seem to react negatively to the company
18  continuing in its same course.
19  Q    All right. So you're not saying that the
20  bond price movement actually meant anything, you're
21  just saying that you don't think Dr. Tennenbaum paid
22  sufficient attention to it?
23  MR. WILLIAMSON: Objection.
24  A    No.

Pfeiffer

1    I'm saying that it doesn't support his
2  contention, and therefore he should have -- he should
3  explain that.
4      Q    All right.
5          MR. CASTANARES:  I am going to mark 628, I
6  think --
7      A    629.
8          MR. CASTANARES:  -- 629, it will be CSFB
9  522133.  I only have one.
10         I don't have a copy for myself so if I
11  need to I'll look on with you, Justin, if I could.
12  Thanks.
13         (Marked for identification.)
14     Q    In fact, sir, three days before your final
15  report this document that I have just shown you as
16  Exhibit 629 shows that in fact the earlier drafts of
17  your report were attempting to claim that the rise in
18  the bond market indicated greater value for Oakwood
19  after September 2001; isn't that true?
20     A    The initial drafts of the report related
21  to the fact that the uptick reflects market
22  confidence.  Yes.
23     Q    Yes.  And the point that was -- you
24  concurred with the point that was made by Aijun in
25

---

Pfeiffer

1  the e-mail that is Exhibit 629, didn't you?
2      A    I concurred with part of it, and did not
3  agree with part of it.
4      Q    In any event, the decision was made to
5  rewrite the language to what now appears in your
6  report; is that right?
7          (Witness reviewing document.)
8      A    Yes.
9      Q    Now, sir, looking at paragraph 5 on page 6
10  of your report.  How do you contend that
11  Dr. Tennenbaum should have taken into account the
12  sale to Berkshire in performing his analysis?
13     A    I think he should have taken it into
14  consideration in several ways.
15         First of all, the relevant end date, in my
16  view, instead of being September 30, 2002, should
17  have been the ultimate resolution of the bankruptcy,
18  in this case the sale to Clayton Homes for
19  $375 million.
20         And secondly, the amount of the sale, the
21  $375 million itself, and as related to in point
22  number 3 on page 6, the extent to which the
23  bondholders received recovery, I think should have
24  been analyzed, considered and reconciled and
25

---

Pfeiffer

1  explained by Dr. Tennenbaum before opining on a
2  DCF-based valuation in a vacuum.
3      Q    What is the relevance of the extent of the
4  bondholder recovery to your opinion?
5          MR. WILLIAMSON:  Objection.
6      A    Well, if there's significant amount of
7  damage, one would have expected the bonds to have
8  traded down, potentially.
9      Q    You're not saying the bonds are selling
10  for 47 percent now, are you?
11         You're talking about the bankruptcy -- you
12  talk about the bondholders ultimately received at
13  least 47 percent -- at least 47 percent recovery in
14  the text accompanying note 11 on page 6?
15         You're talking about bankruptcy dividends
16  paid to the bondholders, aren't you?
17     A    Yes.
18     Q    So those are a function of -- that 47
19  percent is a function of both the numerator and the
20  denominator, isn't it?
21         You divide as the numerator the total
22  amount of assets that you have to distribute to
23  creditors and as the denominator the total amount of
24  claims, correct?
25

---

Pfeiffer

1          MR. WILLIAMSON:  Objection.
2      A    I don't know if I would agree with your
3  numerator and denominator.  I don't know if I could
4  agree with that equation.
5      Q    Well, what does the 47 cents show relative
6  to the amount of claims?
7      A    What it shows is, consistent with the
8  chart we looked at before on the bond prices, and as
9  exhibited in Exhibit 627, these bonds were traded,
10  you know, at 30 cents, at 40 cents, at 47, 50 cents
11  and so on in 2001.  And then went up a little bit and
12  then down substantially towards the fall of 2002,
13  ultimately continued to trade through the end of
14  2004.  And reflected a recovery of 47 cents on the
15  dollar.
16     Q    So are you talking about -- so just to
17  make things clear now, the 47 cents that you refer to
18  on page 6 of your report, are you referring to the
19  level of the bond prices at some particular point or
20  are you referring to the bankruptcy dividend payable
21  to general unsecured creditors in the case?
22     A    I'm referring to the ultimate bond
23  recovery at 47 percent.
24     Q    And when you say bond recovery, are you
25

Pfeiffer

1  distinguishing bondholders from any other kind of
2  creditors?
3     A    I can imagine there are some creditors who
4  did not get 47 percent; so, yes, I am distinguishing
5  them.
6     Q    Okay.  And do you have an idea of, say,
7  what general trade creditors got in the case?
8     A    Not offhand.
9     Q    So you don't have any knowledge of whether
10 the sale to Buffett was more beneficial to general
11 trade creditors than a hypothetical sale that
12 Dr. Tennenbaum advocates in 2001?
13           MR. WILLIAMSON:  Objection.
14    A    I didn't -- I did not do that analysis,
15 nor did Dr. Tennenbaum.
16    Q    Well, sir, did you do any analysis of the
17 recovery to bondholders in the hypothetical
18 bankruptcy on the assumption that the value of the
19 assets as shown by Dr. Tennenbaum's $350 million
20 conclusion was correct?
21           THE WITNESS:  Could you repeat that
22 question, please.
23           (Question read.)
24           MR. WILLIAMSON:  Objection.

168

Pfeiffer

1  or less in 2001 than they got ultimately.  That's my
2  point.
3     Q    But to answer the question that I asked
4  you --
5     A    Right.
6     Q    -- you don't have any idea as you sit here
7  today whether if bankruptcy had been filed in 2001
8  the creditors would have done better or worse than
9  they actually did in the actual bankruptcy, correct?
10    A    I was not asked to provide that opinion.
11    Q    So you don't know?
12    A    I -- I haven't studied that.
13    Q    Okay.
14           MR. WILLIAMSON:  Tony, when you get to a
15 point could we take five minutes or 10 minutes?
16           MR. CASTANARES:  Yes.  Give me just a
17 second.  Let me see where I am on this just to see
18 if...
19           (Pause.)
20           MR. CASTANARES:  Okay.  Now's a good time.
21           THE VIDEOGRAPHER:  The time is 2:12 p.m.,
22 we're off the record.
23           (A recess was taken.)
24           THE VIDEOGRAPHER:  The time is 2:18 p.m.,

168

Pfeiffer

1     A    I can't answer that question.
2     Q    I'll restate the question.
3           In the hypothetical bankruptcy in 2001
4  that you say should have occurred, or that
5  Dr. Tennenbaum should have considered in comparison
6  to the eventual bankruptcy, if you assume that he was
7  correct in concluding that the fair value of the
8  assets was $350 million at the end of 2001, did you
9  make any study of what dividend such a sale would
10 have paid to creditors?
11           MR. WILLIAMSON:  Objection.
12    A    Again, the way the question was worded --
13 there was a lot of introductory phrases to that
14 question that I don't agree with and I can't answer
15 the question as asked.
16    Q    So you don't have any way of knowing as
17 you sit here today, sir, do you, whether the
18 creditors would have gotten more if this company
19 filed bankruptcy in 2001 than they ultimately got in
20 the actual bankruptcy?
21    A    I was not asked to provide an opinion on
22 that.
23           My opinion is that Dr. Tennenbaum has no
24 idea in fact if the creditors would have gotten more

167

Pfeiffer

1  you're on the record.
2  BY MR. CASTANARES:
3     Q    Turning to page 7 of your report, sir.  We
4  once again refer to your criticism of
5  Dr. Tennenbaum's use of projections that he considers
6  aggressive.
7           Is it your position that he should have
8  used more pessimistic projections than those?
9           MR. WILLIAMSON:  Objection.
10    A    No.
11    Q    Okay.  If he had used more pessimistic
12 projections than those, it would have driven the
13 values down; is that right?
14    A    Generally speaking, yes.
15    Q    Okay.
16    A    Yes, everything else remaining the same.
17    Q    Yes.  If the discount rate remains the
18 same, the values would go down, right?
19    A    More than the discount rate.  All the
20 other assumptions in the model would have to remain
21 the same.
22    Q    Okay.
23    A    Then if that were the case, pessimistic
24 projections would make the value go down.

169

Pfeiffer

1     Q    All right.  Now, turning the page, you say
2  that he has no knowledge of the assumptions that went
3  behind the 2001 projections.  Do you?
4        (Witness reading.)
5     A    What are you referring to?  I am sorry.
6     Q    This is on page 8, paragraph 2.  "He has
7  no knowledge of the underlying assumptions that
8  informed the creation of the 2001 projections."
9        Do you have such knowledge?
10    A    I do not.
11    Q    Turning now to page 9, paragraph 3.  You
12  discuss the Miller Buckfire projections.
13    A    Yes.
14    Q    What do you know about where the
15  Miller Buckfire projections came from and the
16  assumption that they made?
17    A    I know what I have written in my report.
18  That "they were created in 2003 for a stand-alone
19  plan of reorganization developed during the
20  bankruptcy proceeding."
21    Q    All right.  Do you know anything about the
22  basis for preparation of the Miller Buckfire
23  projections?
24    A    Well, yes.  I know what I just said about

170

Pfeiffer

1  the basis.
2        And I also know the projections assume
3  that Oakwood emerging from bankruptcy as a smaller
4  company having discontinued certain aspects of its
5  business.
6     Q    All right.  Is that -- did you look at the
7  nine-point plan that Oakwood had in late 2002 as
8  embodied in certain Credit Suisse documents?
9     A    I believe I've seen it.
10    Q    And were the changes that you see here,
11  the smaller company, et cetera, essentially reflected
12  in the nine-point plan?
13        MR. WILLIAMSON:  Objection.
14    A    I have not analyzed that to the fullest
15  extent.
16    Q    To the best of your knowledge, sir, is it
17  to correct to say that the Miller Buckfire
18  projections were the company's 2002 projections as
19  adjusted for its nine-point plan?
20        MR. WILLIAMSON:  Objection.
21    A    I don't know.
22    Q    You don't know one way or the other?
23    A    I don't know for sure.
24    Q    As a matter of fact, other than what you

171

Pfeiffer

1  have written here, you have no idea whatever what
2  assumptions underlay the Miller Buckfire projections;
3  isn't that true?
4        MR. WILLIAMSON:  Objection.
5     A    I know what's written here in this
6  paragraph about the Miller Buckfire projection.
7     Q    And do you know whether the
8  Miller Buckfire projections had any points of
9  similarity or difference from the projections that
10  were being prepared by Oakwood and Credit Suisse
11  together in late 2002?
12        MR. WILLIAMSON:  Objection.
13    A    I don't know.
14    Q    Okay.  Now, once again referring to your
15  criticism of Dr. Tennenbaum's failure to compare the
16  results of the actual bankruptcy proceeding with a
17  hypothetical 2001 bankruptcy which you referred to on
18  page 9 again of your report, do you have any reason
19  to believe that the costs associated with the
20  hypothetical 2001 bankruptcy would have been any
21  greater or lesser than the costs of the actual
22  bankruptcy that occurred a year later?
23    A    No.
24    Q    So what is the basis of your criticism of

172

Pfeiffer

1  Dr. Tennenbaum for failing to adjust for those costs?
2     A    The basis is that if you're comparing the
3  value of a company as of particular dates to the
4  ultimate bankruptcy, the ultimate bankruptcy includes
5  those costs, and his -- his attempt to value the
6  company as of the earlier date does not include those
7  costs.
8     Q    All right.  And on page 10 in paragraph
9  Roman V you say that Dr. Tennenbaum should have
10  adjusted his discounted cash flow analyses for
11  concerns about Oakwood's marketability, liquidity
12  concerns and market distress in 2001.
13        Am I understanding you correctly?
14    A    Yes.
15    Q    How does the valuation professional take
16  those factors into account in doing a discounted cash
17  flow study?
18        MR. WILLIAMSON:  Objection.
19    A    If there is a feeling of distress around
20  the company, a professional will either provide for a
21  discount to the price to that distress or adjust the
22  cash flows due to that distress or adjust a discount
23  rate due to that distress or potentially provide
24  other methodologies to allow for the fact that

173

Pfeiffer

2  there's distress.

3      Q    Okay.  Is it fair to say that the discount
4  rate reflects two things; one being the time value of
5  money and the other being the risk factor in the
6  achievement of the expected cash flows?
7           MR. WILLIAMSON:  Objection.
8      A    That's broadly, broadly correct.
9      Q    Okay.  And so factors such as liquidity
10 problems and others such as that are typically
11 reflected in the valuation professional's calculation
12 of a discount rate; isn't that correct?
13          MR. WILLIAMSON:  Objection.
14     A    I don't think that's a good place to put
15 it, no.
16          I think that it should be considered at a
17 discount rate at times, but I think it's much more
18 appropriate to adjust the cash flows or adjust for a
19 lack of marketability discount.  Adjustments like
20 that are typically more appropriate than just
21 judgmentally adding a certain percentage to discount
22 rate.
23     Q    Well, part of the derivation of a discount
24 rate is weighted average cost of capital; isn't that
25 correct?

174

Pfeiffer

2      A    I would not agree with that, no.
3      Q    All right.
4      A    The weighted average cost of capital is a
5  form of a discount rate.
6      Q    All right.  When you do a discounted cash
7  flow analysis what factors go into deriving the
8  discount rate?
9      A    There is the cost of debt, its weighted
10 average between the cost of debt and the cost of
11 equity.  Cost of debt considers the cost of debt, the
12 interest, payments reflected in the debt, or the
13 company's debt that you would assume if it were on
14 par with comparable companies.  There's various ways
15 to obviously do it.  But from a simplistic point of
16 view, the company's costs of debt, and then you
17 adjust that for tax, for the fact that the -- the
18 interest payments are tax deductible.  And in
19 arriving at a cost of equity, one would look at the
20 rate of return expected in the marketplace and how my
21 company or the company that's being valued, how that
22 company's beta compares with the market at large.
23     Q    Beta being a measure of risk?
24     A    Broadly speaking.
25     Q    Okay.  Do you dispute the discount rates

175

Pfeiffer

2  derived by Dr. Tennenbaum in his report for the two
3  discounted cash flow studies that he did?
4      A    I haven't looked at that issue in many
5  months, and have not provided an opinion on that.
6      Q    You did consider at one point providing an
7  opinion on it, didn't you?
8      A    My firm considered providing an opinion on
9  a discount rate.
10     Q    And you determined that if you did quarrel
11 with Dr. Tennenbaum's discount rate it would be to
12 lower as distinguished from raising the amount of the
13 discount rate; isn't that true?
14          MR. WILLIAMSON:  Objection.
15     A    I don't recall.  I haven't reviewed those
16 draft reports.
17     Q    You did determine that if the discount
18 rates were lowered that would work in plaintiff's
19 favor as distinguished from defendant's; isn't that
20 true?
21          MR. WILLIAMSON:  Objection.
22     A    That would be -- a lower discount rate
23 would provide a higher value.
24          You'd have to show me the report.  I don't
25 know really what we wrote and I don't know what we

176

Pfeiffer

2  concluded.  And I don't know if I concluded -- I
3  don't think I reviewed those reports and concluded at
4  all, actually.
5      Q    Let me ask you to turn to page 10,
6  paragraph Roman IV of your report where you criticize
7  Dr. Tennenbaum for claiming that Oakwood paid more
8  than $20 million in fees to Credit Suisse.
9          Do you dispute that Credit Suisse got
10 $20 million for transactions related to Oakwood
11 during that period in time?
12          MR. WILLIAMSON:  Objection.
13     A    I have not opined on whether they did.  I
14 don't know.
15     Q    So you criticize him for saying this, but
16 you don't know one way or the other whether it's
17 true?
18     A    I criticize him for the fact that he
19 didn't provide an expert analysis.  He just -- he
20 just repeated what he was told.
21     Q    You don't -- do you know whether he saw
22 any documents?
23     A    I don't know whether he saw documents, no.
24     Q    And as you sit here today you don't know
25 whether it's true or isn't true that Credit Suisse

177

1                     Pfeiffer
2    received $1 or $20 million or hundred million dollars
3    in fees for transactions related to Oakwood during
4    any period of time at all, do you?
5              MR. WILLIAMSON:  Objection.
6              THE WITNESS:  Could you repeat the
7    question, please.  I am sorry.
8              (Question read.)
9         A    I have not analyzed how much Credit Suisse
10   received.
11        Q    Okay.  Does the term "Black-Scholes" mean
12   anything to you?
13        A    Yes.
14        Q    What does it mean?
15        A    It's a methodology used to value options.
16        Q    Okay.  And does it have any utility among
17   valuation professionals for valuing the stock of an
18   insolvent company?
19             MR. WILLIAMSON:  Objection.
20        A    Yes.
21        Q    Describe.
22        A    As a company has very low stock prices or
23   has a significant amount of debt, its equity could
24   trade as an option, and one might use a Black-Scholes
25   in determining the different variables, assumptions

178

1                     Pfeiffer
2    utilized in arriving at that option price.
3         Q    You understand the basic rule to be that
4    if a company's insolvent and its assets get
5    distributed to its stakeholders, the creditors get
6    paid first, right?
7         A    Right.
8         Q    And only if anything is left over does
9    anything go to the stockholders, right?
10        A    That's a broad characterization of what
11   typically happens, but there are many -- there are
12   bankruptcies where there's deal made for the equity
13   holders, they get a seat at the table, and sometimes
14   they get something, too.
15        Q    Okay.  But as a general rule, creditors
16   get paid first and then stockholders get paid; isn't
17   that the general way it works?
18        A    Generally, yes.
19        Q    Okay.  And I think we've decided that when
20   a company is insolvent, one definition of that is
21   that the fair saleable value of its assets is less
22   than the amount required to pay its debts; is that
23   correct?
24             MR. WILLIAMSON:  Objection.
25        A    That's one test, yes.

179

1                     Pfeiffer
2         Q    Okay.  And the Black-Scholes' analysis
3    helps the valuation expert explain the fact that even
4    though a company may be insolvent in that sense, the
5    stock still trades for some positive number; isn't
6    that right?
7         A    A Black-Scholes can be used in that way,
8    yes.
9         Q    Okay.  That's the way Dr. Tennenbaum used
10   it here, isn't it?
11        A    Purportedly, yes.
12        Q    Okay.  And you don't differ with the
13   validity of the methodology even though you may
14   differ with his conclusions, do you?
15        A    No.
16        Q    Okay.
17             (Pause.)
18             MR. CASTANARES:  Exhibit 630 is CSFB
19   523314 through 346.
20             (Marked for identification.)
21        Q    This consists of a two-page e-mail string
22   and then what appears to be one document following it
23   dated June 18, 2007.
24             Can you identify that document for me,
25   please, sir?

180

1                     Pfeiffer
2             (Reviewing document.)
3         A    It appears to be a draft of a report dated
4    June 18th, where I -- it was provided to me by my
5    staff and I revised or made comments on the report
6    through page 9.
7         Q    Are there comments those that are
8    reflected in these little windows showing deleted and
9    formatted, et cetera?
10        A    No.  I don't think so.
11        Q    Where are the comments that you made on
12   this draft?
13             (Witness reviewing document.)
14        A    I don't know.
15             The comments on the side here are just
16   comments that may have preceded my review.  I don't
17   know where my comments are.
18        Q    How do you know that you made comments on
19   it through page 9?
20        A    Because the e-mail said "Attached, please
21   find revised version with my comments through page
22   9."
23        Q    Oh, I see.  Okay.  So actually, Exhibit
24   630, as we see it, contains the draft of the report
25   reflecting the comments that you had already made

181

Pfeiffer

1  Pfeiffer
2  through page 9; is that right?
3      A    The way I understand it, this report
4  reflects John's comments on something that Robert had
5  done, and then also has some of my comments in it
6  through page 9.
7      Q    Okay.  And that's printed here?  So what
8  we have here is the document that already has your
9  comments in it; is that right?
10     A    Through page 9, yes.
11     Q    Okay.  Okay.  And just so the record is
12 clear, the page 9 you're referring to is the one
13 that's Bates stamped 52334 -- I am sorry -- 523324?
14            (Witness reviewing document.)
15     A    You want me to look at the front page?
16 Okay.
17     Q    I just want to make sure that the page 9
18 is -- strike that.  That's okay.  I think it's clear
19 enough.
20            Now, I would like to ask you to turn to
21 page 523321, and to turn to the paragraph that reads
22 as follows:  "While reasonable people can argue in
23 hindsight about the reliability of the projections
24 prepared contemporaneously over five years ago, my
25 analysis clearly shows that the projections prepared

182

1  Pfeiffer
2            Those were the projections that you say,
3  in the next paragraph, were not extremely aggressive,
4  aren't they?
5      MR. WILLIAMSON:  Objection.
6      A    I don't see the analysis here to be able
7  to -- I don't -- I just don't know.
8            Obviously, the sentence relates to the
9  sentence before, but I don't know if we knew for sure
10 which projections Tennenbaum was using and
11 characterizing as extremely aggressive.
12            This is a draft report.  I am not really
13 sure if we had all the information in order to be
14 able to conclude that we were referring to the same
15 set of projections.
16     Q    Well, what other possible set of
17 projections could it be that you are referring to
18 that are not extremely aggressive?
19            MR. WILLIAMSON:  Objection.
20     A    Again, the draft here refers to what we
21 believed to be Tennenbaum's projections in his
22 report, the same ones that he characterizes as
23 extremely aggressive.
24            However, sitting here today, knowing that
25 he actually was deposed and described in a little bit

184

1  Pfeiffer
2  contemporaneously were not 'extremely aggressive'
3  relative to past performance, and that there was
4  ample cushion for Oakwood's projections to be lowered
5  before the adjusted derived value of the assets would
6  become lower than the face value of the debt plus
7  fair value of the guarantees."
8            Now, sir, are the projections that you say
9  here your analysis shows were not extremely
10 aggressive the same ones that Dr. Tennenbaum used for
11 his 2001 discounted cash flow?
12            MR. WILLIAMSON:  Objection.
13            (Witness reviewing document.)
14     A    I don't know.
15     Q    Well, any reason you chose that particular
16 term, "extremely aggressive" to highlight here?
17     A    That term I think comes from Tennenbaum's
18 report.  But Tennenbaum was not deposed yet.  And we
19 clearly did not understand fully the source of all
20 his assumptions.
21     Q    Well, here we see the previous sentence,
22 "This clearly shows that Dr. Tennenbaum's conclusion
23 that Oakwood was insolvent by 2001, even using the
24 'extremely aggressive' cash flow projections of mid
25 2001 and late 2001 is flawed."

183

1  Pfeiffer
2  more detail what the actual source of those
3  projections were, I can't be sure sitting here today
4  that when we wrote this paragraph relative to those
5  projections that we were talking about the right set
6  of projections.
7      Q    Were you talking about the set of
8  projections that appeared in his report?
9      A    Again, what I'm saying is sitting here
10 today, looking at this draft report, I'm not
11 100 percent sure, I'm not sure what projections -- if
12 we were referring to the right projections.
13            The paragraph refers to the projections in
14 his report, but the paragraph also could have been
15 mistaken in our assumption as to what projections he
16 used.
17     Q    Well, weren't you making the assumption
18 that the projections that he used were the ones in
19 his report?
20     A    We're not understanding each other here.
21     Q    Well, sir, upon your oath as you sit here
22 today you know for a fact that the same set of
23 projections that you now criticize for
24 Dr. Tennenbaum -- Dr. Tennenbaum for having used
25 despite characterizing them as extremely aggressive

185

Pfeiffer

1  are the projections which you opine in this paragraph
2  were not extremely aggressive; isn't that true?
3     MR. WILLIAMSON: Objection.
4  A   What I'm trying to say is that this was a
5  report written in draft with one potential rebuttal
6  of Tennenbaum being that maybe those projections were
7  not extremely aggressive.
8     But I also remember sitting here today
9  that we were unclear as to exactly what Tennenbaum's
10 sources were for all his projections. And therefore,
11 it likely became more clear after his deposition in
12 which he clarified that, and then at that point, if I
13 saw the schedules and analyzed them, I could then
14 ascertain as to whether we indeed thought the
15 projections he used were the projections that he
16 indeed did use.
17 Q   You're testifying here today under your
18 oath right now that you don't know whether the
19 projections that you're referring to on page 523321
20 are the set of projections that Dr. Tennenbaum used
21 in his 2001 DCF?
22    MR. WILLIAMSON: Objection. I think he
23 just answered that.
24 A   Okay. What I'm saying is once again that

188

Pfeiffer

1  behind this. I haven't seen this report in six
2  months, and therefore I just don't know. I don't
3  want to make a statement that I'm not sure of.
4  Q   Okay. Well, you may not have seen this
5  report in six months; but you did pass upon it and
6  make corrections to it in June of 2007, which is
7  about nine months ago, correct?
8  A   Right. I probably haven't seen it since.
9  Right.
10 Q   Okay. And this purported to be a draft of
11 testimony that you were prepared to offer in Court
12 under oath as being your professional opinion, wasn't
13 it?
14 A   This was a draft of opinions that I might
15 have offered, yes.
16 Q   Okay.
17    MR. WILLIAMSON: Just out of curiosity.
18 Tony, you were not going to mark the Tennenbaum
19 report and ask him about the projections that are
20 referenced in here?
21    MR. CASTANARES: I have no particular
22 reason to mark it at the moment. Thank you.
23 Q   I notice that at the top of this page you
24 say, after correcting for the mistakes identified in

188

Pfeiffer

1  the paragraph refers to what we believe to be the
2  projections that he used in his report.
3     However, I also know that as of this time
4  we asked the attorneys to clarify certain things in
5  depositions that were unclear to us. And I just
6  don't know 100 percent for sure if after clarifying
7  that we understood the projections to be the same
8  projections we understood them to be as of this date.
9  Q   Well, tell me anything you ever found out
10 from the beginning of time to this moment that ever
11 would lead you to believe that the projections aren't
12 the same ones.
13    MR. WILLIAMSON: Objection. Same ones as
14 what?
15 Q   Name something.
16 A   What I'm saying is that they were mid
17 2001, they were described as mid 2001 and late 2001
18 projections.
19    We -- I remember being confused as to how
20 they were characterized as that, when you look at the
21 actual document and they're labeled 2002.
22    So I don't know, and what I'm saying is I
23 just don't know, I didn't draft this report, I don't
24 know what this -- I don't know what the analysis was

187

Pfeiffer

1  the bullet points above, "Oakwood's enterprise value
2  exceeded its debts and guarantees under any
3  reasonable discount rate for both the September 2001
4  and September 2002 valuation dates. See Schedules 3
5  A and 3 B."
6     First, what are Schedules 3 A and 3 B?
7  Have you produced those to me?
8     (Witness reviewing document.)
9  A   I don't know.
10 Q   Okay.
11 A   I probably never saw them.
12 Q   I haven't seen them.
13    MR. CASTANARES: And I would like to make
14 an official demand for production of those documents
15 at this time.
16 Q   Leaving that aside, however. It is
17 correct for me to read that sentence as indicating
18 that Oakwood's enterprise value was far in excess of
19 the $350 million that Dr. Tennenbaum finds by his DCF
20 study in September of 2001; isn't that true?
21    MR. WILLIAMSON: Objection.
22    (Witness reviewing document.)
23 A   It's true that it says that after
24 correcting for the mistakes identified in the pages

189

Pfeiffer

1  before, that the enterprise value would go up if you
2  corrected for those mistakes and it would exceed its
3  debt as of both of those dates.
4      Q    So your analysis in June of 2007, nine
5  months ago as we sit here today, on the previous page
6  shows the debt and guarantees to be $470 million in
7  September of 2001; am I right?
8      A    That's what it shows.
9      Q    And the study that you refer to in the
10  next sentence at the top of page 523321 tells us that
11  the enterprise value you found exceeded that number
12  of $470 million in 2001; isn't that true?
13     A    No.   You are mischaracterizing what the
14  report says and what I believe.  And you know that.
15  In --
16     Q    I don't know that.  I would like you to
17  explain it to me, please.
18     A    Okay.  I will.
19          This report does nothing to provide our
20  opinion relative to value.
21          This report simply says that if you
22  correct his errors with his methodology and his
23  projections, you arrive at a vast -- a very different
24  conclusion, and one that has the value exceeding its

190

Pfeiffer

1      Q    In fact, sir, the next sentence of the
2  report at 523321 says "The equity values contained in
3  Schedules 3 A and 3 B are upwards of 1.0 billion,
4  using a discount rate that is consistent with the
5  view of a highly respected valuation professor and
6  author cited as an authority by Dr. Tennenbaum."
7          Now, are you saying, sir, that if you took
8  Dr. Tennenbaum's 2001 projections and applied the
9  discount rate that's contained in Schedules 3 A and
10  3 B you'd get to a billion dollars in enterprise
11  value?
12         MR. WILLIAMSON:  Objection.
13     A    What I'm saying is, as described in the
14  pages that follow, is exactly that.  That it's poking
15  fun at the ridiculousness of his methodology and his
16  cash flow.
17         That he uses a set of projections and
18  slaps on a discount rate between 60 and 20 percent,
19  and the methodology is unreasonable, speculative, and
20  the conclusions are illogical, as if you apply that,
21  those projections to the appropriate discount rate
22  you would arrive at an equity value -- an enterprise
23  value over a billion dollars.
24     Q    What was the appropriate discount rate?

192

Pfeiffer

1  debt.
2          We did not, in this report or in my final
3  expert report, attempt to make our own opinion as to
4  what the enterprise value was as of that date.
5      Q    Well, what do you suppose Schedules 3 A
6  and 3 B are?
7      A    I suppose that they are what they say they
8  are, which is an explanation in more technical detail
9  as to what the errors are that are summarized in the
10  preceding page, and what the impact of those errors
11  are, and maybe a combination of those errors leading
12  to a particular value.
13     Q    So the effect of this isn't that you were
14  saying that the value, Oakwood's enterprise value
15  exceeds $470 million, you were saying that
16  Dr. Tennenbaum should have found Oakwood's enterprise
17  value to be larger than the $350 million number that
18  he found; is that right?
19         MR. WILLIAMSON:  Objection.
20     A    I'm saying that Dr. Tennenbaum's method
21  corrected for errors would conclude on a number
22  that's greater than $470 million.
23         I certainly don't believe that the method
24  nor the conclusion is accurate.

191

Pfeiffer

1          I thought you told me you didn't derive an
2  appropriate discount rate.
3          MR. WILLIAMSON:  Objection.
4      A    What I told you is I didn't opine on an
5  appropriate discount rate for purposes of my report.
6          I said probably I didn't recall if I
7  opined on a discount rate otherwise.
8          And I'm going to look at right now this
9  report to see if there's a discount rate.
10         However, even if there's a discount rate
11  in here, that's not my opinion on what a discount
12  rate is.  It's correcting for his errors in the way
13  he applies his discount rates based on the sources
14  that he quotes.  So --
15     Q    So you don't really have any idea what the
16  appropriate discount rate to apply to the September
17  2001 projections should be, do you?
18         MR. WILLIAMSON:  Objection.
19     A    I have not reached an opinion on what the
20  discount rate should be, yes.
21     Q    All right.  Let me ask you to look back to
22  page 523320, paragraph 6.
23         "Tennenbaum report provides no analysis to
24  support the assertion that the projections he used

193

Pfeiffer

1  for the discounted cash flow were 'extremely
2  aggressive'.  Furthermore, a review of Oakwood's
3  financial performance contained within the Tennenbaum
4  report does not support the assertion that the
5  projections were 'extremely aggressive'."
6       A    I am sorry, what page are you on?
7       Q    320.
8       A    Oh, 320.
9       Q    Paragraph 6.
10            And does that help you remember, sir,
11  whether the projections that you criticized
12  Dr. Tennenbaum as having used for because they were
13  extremely aggressive are the same ones that you on
14  page 523321 say were not extremely aggressive?
15            MR. WILLIAMSON:  Objection.
16       A    It helps me to remember that what we were
17  looking at here is the projections themselves
18  relative to the historical performance in the report.
19            And when you look at those two things in
20  the report, it does not seem to be extremely
21  aggressive.
22       Q    Okay.  So is it your conclusion now that
23  the projections were not extremely aggressive?
24            MR. WILLIAMSON:  Objection.

Pfeiffer

1  Dr. Tennenbaum refers to as a Black-Scholes analysis?
2            MR. WILLIAMSON:  Objection.
3       A    Yes.
4       Q    Okay.  And so what starts at page 523328
5  called revised call option analysis, could you tell
6  me more about what that is, please?
7            (Witness reviewing document.)
8       A    This seems to be a correction in the
9  application of Dr. Tennenbaum's Black-Scholes call
10  option analysis, and a revised analysis using some
11  corrected assumptions.
12       Q    I see.  All right.  Now, does that revised
13  call option analysis continue through page 523342?
14       A    It seems it does, yes.
15       Q    And is the expected default probability of
16  the subject company a portion of the call option
17  analysis?
18            MR. WILLIAMSON:  Objection.
19            (Witness reviewing documents.)
20       A    Is it an assumption?  Is that the --
21       Q    No.
22            Is it part of the call option analysis
23  study to look at the default probability?
24       A    I can't answer the question that you

Pfeiffer

1       A    I did not reach a conclusion on that.  I
2  don't really -- I haven't really analyzed the
3  projections recently to have any opinion on that.
4       Q    Okay.  Let me ask you to turn to the
5  section of this report that starts at page 523334,
6  titled "Call option analysis volatility assumption."
7       A    Okay.
8       Q    Do you see that?
9            How far into the report does that go?
10  Could you tell me where that section ends?
11       A    It ends at 337.
12       Q    337.  All right.  And is that essentially
13  a Black-Scholes analysis?
14       A    Is that essentially what?
15       Q    A Black-Scholes?
16       A    I haven't read it before.  I could read it
17  now and tell you.  I -- I don't know --
18       Q    Okay.  If you could identify for me what
19  this exercise consists of.
20            MR. WILLIAMSON:  Objection.
21            (Witness reading.)
22       Q    Let me ask you a simpler question perhaps.
23            When you use the term "call option
24  analysis" in this document are you referring to what

Pfeiffer

1  asked.
2       Q    What's all this default rate and default
3  probability information contained on 340, 341, 342,
4  what's that about?
5            MR. WILLIAMSON:  Objection.  Objection.
6       A    I believe that Dr. Tennenbaum concludes on
7  default probabilities in his report as it's one of
8  the results of his analysis.  And what you have here
9  is revised probabilities based on a revised analysis.
10       Q    And the difference consists, just in
11  broadbrush, of your finding a lower default
12  probability for Oakwood than Dr. Tennenbaum did,
13  correct?
14            MR. WILLIAMSON:  Objection.
15       A    I would have to read it.  I don't know.
16       Q    Okay.  Well, let's come to page 523341.
17            At the bottom of that page you say "The
18  key question is whether or not Oakwood's expected
19  default probability was significantly higher than the
20  overwhelming majority of companies.  As shown in
21  Tables 6-1 and 6-2, Oakwood's default probability,
22  using reasonable discount rates and guarantee figures
23  based on contemporaneous projections, was consistent
24  with a strong credit rating."

```
 1                      Pfeiffer
 2             Did I read that correctly, sir?
 3        A    You.
 4        Q    So what was Oakwood's credit rating in
 5   2001?  Fitch.
 6             MR. WILLIAMSON:  Objection.
 7        Q    Does CCC ring a bell?
 8        A    CCC.
 9        Q    What does CCC mean in Fitch language?
10        A    It's below investment-grade.
11        Q    Not what you would call a strong credit
12   rating, sir?
13        A    It's not what I would call a strong credit
14   rating, yes.
15        Q    What was Oakwood's credit rating in the
16   world of Credit Suisse at that time?
17             MR. WILLIAMSON:  Objection.
18        A    I'm not sure.  I'm not sure right now.
19        Q    Do you think Credit Suisse rated Oakwood
20   pretty high in 2001 as a credit risk?
21             MR. WILLIAMSON:  Objection.
22        Q    Strong credit rating?
23             MR. WILLIAMSON:  Objection.
24        A    What's the question?
25        Q    Yeah --
```

198

```
 1                      Pfeiffer
 2        A    Do I think --
 3        Q    Relative to your statement that Oakwood's
 4   default probability was consistent with a strong
 5   credit rating, how do you think that comports with
 6   what their actual credit rating at Credit Suisse was?
 7             MR. WILLIAMSON:  Objection.
 8        A    I think you're misunderstanding the
 9   statement in the report.
10             The statement in the report is not that we
11   believe the credit rating of Oakwood to be strong as
12   of that date.  It's that if you use his methodology
13   and you correct for certain assumptions it would spit
14   out an answer that would have you assigning a strong
15   credit rating to Oakwood.
16             It's not that we believe that it should
17   have a single A credit rating or anything like that.
18             We're inclined to believe that the credit
19   ratings assigned by the contemporaneous observers
20   were likely in line with what they belonged at.
21        Q    So in other words, this statement, "The
22   key question is whether or not Oakwood's expected
23   default probability was significantly higher than the
24   overwhelming majority of companies.  As shown in
25   Tables 6-1 and 6-2, Oakwood's default probability,
```

199

```
 1                      Pfeiffer
 2   using reasonable discount rates and guarantee figures
 3   based on contemporaneous projections, was consistent
 4   with a strong credit rating," that's not your
 5   statement?
 6             MR. WILLIAMSON:  Objection.
 7        A    If you read the -- this -- the paragraphs
 8   before, the pages before it, you would see that we
 9   we're intending -- what we're doing here is revising
10   the output of the model based on the revised inputs,
11   and that revised output results in this statement,
12   which is that you would have a default probability,
13   if you look at page 340, and you would assign a
14   discount rate of what's a 10 or 11 percent, look at
15   page 339, as of September 2001, if you assign a 10 or
16   11 percent discount rate and you ran that through the
17   model provided by Dr. Tennenbaum, what you end up is
18   with a call option value of somewhere between 5.47
19   and 6.98 and a resulting default probability of
20   somewhere between 23.6 and 29.7, which relates to an
21   implied S&P credit rating of anywhere between BB and
22   CCC.
23             And that's really the point here.
24        Q    So are you saying in this sentence that I
25   read to you that you ran reasonable discount rates
```

200

```
 1                      Pfeiffer
 2   through the model?
 3             MR. WILLIAMSON:  Objection.
 4        A    The sentence says that reasonable discount
 5   rates would give you a very different answer in that
 6   same model.  Yes.  I don't know where he ran the
 7   model.  I didn't run the model, and I honestly
 8   haven't reviewed this page before now.
 9        Q    Sir, at the time that you prepared Exhibit
10   630, it was your belief that your client wanted to
11   contest Dr. Tennenbaum's opinion about insolvency,
12   and therefore wanted you to criticize Dr. Tennenbaum
13   as having reached values that were too low; isn't
14   that true?
15             MR. WILLIAMSON:  Objection.
16        A    It -- could you repeat the question, just
17   to make sure I get it right.
18             (Question read.)
19             MR. WILLIAMSON:  Same objection.
20             THE WITNESS:  I am really sorry, could you
21   read the second half of that question again.
22             (Question read.)
23             MR. WILLIAMSON:  The same objection.
24        A    I now having heard the question, I don't
25   agree with the assertation that the attorneys wanted
```

201

Pfeiffer

1   Pfeiffer
2   us to do a certain thing.
3        We, in looking at Dr. Tennenbaum's report,
4   and initially viewing it as a report on solvency,
5   looked at some of the flaws in the assumptions and
6   explored in draft form the various ways those
7   assumptions can be revised.  And so -- so this is an
8   early attempt to look at those types of issues.
9        Q    This was an effort to lead the reader to
10  conclude, or the person who heard your testimony to
11  conclude, that the values reached by Dr. Tennenbaum
12  were unreasonably low as distinguished from being
13  unreasonably high; isn't that true?
14            MR. WILLIAMSON:  Objection.
15       A    It's true that it was meant to -- this
16  draft was meant to expand on the fact that
17  Dr. Tennenbaum's conclusions could have been higher.
18       Q    Okay.  In other words, the answer to my
19  question is yes?
20       A    Well --
21            MR. WILLIAMSON:  Objection.
22            THE WITNESS:  You have to ask the question
23  again to see if I could answer it yes or no.
24            (Question read.)
25            MR. WILLIAMSON:  I am sorry, and now your

1        Pfeiffer
2        Q    At the time you prepared Exhibit 630 you
3   believed that you would be called upon to testify in
4   this case that Dr. Tennenbaum's values were unduly
5   low; isn't that true?
6             MR. WILLIAMSON:  Objection.
7        A    Again, I was never asked to provide that
8   opinion, and I was never -- I never agreed to provide
9   that opinion.
10            This opinion is simply -- this opinion is
11  simply drafted in an attempt to show that his
12  methodology could arrive at a much higher conclusion.
13       Q    The work --
14       A    It's analyt- -- it's attacking the
15  appropriateness and the veracity of the actual model
16  and conclusion and methodology and inputs more than
17  it's providing -- and it's not providing my opinion
18  of value.
19       Q    All right.  The work that is reflected in
20  Exhibit 630 was intended by you to be foundational
21  for eventual testimony that Dr. Tennenbaum's values
22  were too low; isn't that true?
23            MR. WILLIAMSON:  Objection, asked and
24  answered for about three times now.
25       A    You know, all I can say is that I'm not

1        Pfeiffer
2   question is what?
3             MR. CASTANARES:  That was my question.
4             MR. WILLIAMSON:  No, you said -- you had a
5   secondary question that related to that question.
6   and --
7             MR. CASTANARES:  No, no --
8             MR. WILLIAMSON:  -- he answered the
9   previous question.
10            MR. CASTANARES:  -- no.  You're imagining
11  something.
12            The question stands.
13       Q    Is the answer to my question yes, sir?
14       A    No, the answer is not yes.
15            I was not intending on the reader to
16  conclude on my opinion being unreasonably low or
17  unreasonably high.  And we were careful not to
18  conclude on an opinion as to what we thought the
19  value was.
20            It was simply to explore Dr. Tennenbaum's
21  methodology with revised, more corrected assumptions.
22  His analysis was somewhat sloppy in certain regards.
23  And it was meant to expose that, and to point out
24  that with his methodology and revised assumptions the
25  number could be higher.

1        Pfeiffer
2   here providing testimony on this report (indicating),
3   and I never reached a formal opinion or a final
4   opinion on this report or any report similar to this.
5             And you can use your own best assumptions
6   as to why that is or why that isn't because I'm not
7   here to talk about that today.
8             I am here talking about this report
9   (indicating).  And I'm not here to talk about why I
10  was asked to do this or what I thought I wouldn't do
11  to this.  You know what, I honestly, I told you
12  before, I did not even write this report, I certainly
13  didn't produce it in final form.
14       Q    The report that you now wish to talk about
15  is one in which you criticize Dr. Tennenbaum for
16  having reached values that you consider unreasonably
17  high, isn't it?
18            MR. WILLIAMSON:  Objection.
19       A    Absolutely not.
20       Q    Well, do you dispute Dr. Tennenbaum's
21  finding of $350 million for the value of Oakwood's
22  assets as at September 30, 2001?
23       A    I have a problem with methodology and I
24  have a problem with the damages calculation, I have a
25  problem with the way he went about it, and I have a

**Page 206**

```
 1                    Pfeiffer
 2   problem with the dates he picked.  All those things.
 3           I never said that the value of 350 should
 4   be higher or lower.  I have absolutely no opinion on
 5   that sitting here today.
 6       Q    Do you dispute Dr. Tennenbaum's opinion
 7   that the value of Oakwood's assets at September 30,
 8   2002 was $300 million?
 9       A    Again, I have no opinion relative to
10   whether that value conclusion is correct or
11   incorrect.
12           My purpose sitting here today is to tell
13   you that the method in which he went about to arrive
14   at that conclusion -- on that conclusion is
15   inappropriate, speculative, based on the wrong date,
16   and so on and so forth.
17       Q    But your suggestion that Dr. Tennenbaum
18   should have paid more attention to market data than
19   to his DCF calculations is intended to lead to the
20   conclusion that his values should have been lower;
21   isn't that true?
22           MR. WILLIAMSON:  Objection.
23       A    Not at all, no.
24       Q    Sir, the only thing that's changed really
25   between today and nine months ago when you prepared
```

**Page 207**

```
 1
 2   Exhibit 30 that included these statements in it about
 3   Oakwood's strong credit rating and values of over a
 4   billion dollars is the fact that you perceive that
 5   your client wants you to testify to low numbers now
 6   and wanted you to testify to higher numbers then;
 7   isn't that true?
 8           MR. WILLIAMSON:  Objection.
 9       A    No.  I did not conclude on any values then
10   or now.
11           MR. CASTANARES:  I have no further
12   questions.
13           MR. WILLIAMSON:  I have nothing.
14           THE VIDEOGRAPHER:  Okay.  The time is 3:15
15   p.m., this marks the end of the deposition.  We're
16   off the record.
17           (Time noted:  3:15 p.m.)
```

**Page 208**

```
                    INDEX

WITNESS                     EXAMINED BY      PAGE
Allen M. Pfeiffer           Mr. Castanares   4

EXHIBITS
                                             PAGE
FOR IDENTIFICATION

625   Report of Allen M. Pfeiffer              3
626   Document, Bates stamped CSFB 265172
      through 265213                          122

627   E-mail string, Bates stamped CSFB 519279
      through 519291                          125
628   Document, Bates stamped OHCLT 02616
      through 02635                           134

629   Document, Bates stamped 522133          162

630   Document, Bates stamped CSFB 523314
      through 346                             180
                    ***
      DIRECTION NOT TO ANSWER
      PAGE   LINE   PAGE   LINE
      21     24     22     6
      22     12     52     21
      56     11
```

**Page 209**

```
                    ***
      REQUEST FOR INFORMATION AND DOCUMENTS
           PAGE   LINE
           189    14
```

```
1
2              A C K N O W L E D G M E N T
3
     STATE OF NEW YORK:
4    COUNTY OF NEW YORK:
5           I, ALLEN M. PFEIFFER, hereby certify that I
     have read the transcript of my testimony taken under
6    oath on the 27th day of March 2008, that the
     transcript is a true, complete and correct record of
7    what was asked, answered, and said during the
     deposition, and that the answers on the record as
8    given by me are true and correct.
9
10                       _____
                         ALLEN M. PFEIFFER
11
12
13   Signed and subscribed to before me
14   this    day of
15
16
17   Notary Public
18
19
20
21
22
23
24
25
```

210

```
1
2              C E R T I F I C A T E
3
     STATE OF NEW YORK    )
4                         : ss.:
     COUNTY OF NEW YORK   )
5               I, COLETTE CANTONI, a Registered
6    Professional Reporter and a Notary Public within and
7    for the State of New York, do hereby certify that the
8    foregoing deposition of ALLEN M. PFEIFFER, was taken
9    before me on the 27th day of March 2008.
10              That the said witness was duly sworn
11   before the commencement of his testimony; that the
12   said testimony was taken stenographically by me and
13   then transcribed.
14              I am not related by blood or marriage to
15   any of the said parties nor interested directly or
16   indirectly in the matter in controversy; nor am I in
17   the employ of any of the counsel.
18              IN WITNESS WHEREOF, I have hereunto set
19   my hand this 2nd day of April 2008.
20
21
22                       _____
23                       COLETTE CANTONI
24
25
```

211

### 27/03/2008 PFEFFER, ALLEN M.

**$**

**$1** [178:2]
**$1.55** [84:9] [130:17] [133:16 ,19,22] [134:2]
**$1.65** [84:4,8]
**$100** [39:25] [41:10,18]
**$117** [131:19]
**$117.1** [130:19] [138:20]
**$120** [27:8,13] [33:18]
**$150** [127:6]
**$190** [127:15] [138:14 [140:13] [141:4,16,21]
**$20** [177:8,10] [178:2]
**$230** [90:6,16] [109:22]
**$3** [26:8] [33:21]
**$300** [26:19] [27:7] [33:20] [206:8]
**$350** [88:11,15] [166:20] [167:9] [189:20] [191:18] [205:21]
**$373** [98:10] [105:19] [106:10 ,25]
**$375** [88:4] [98:17] [163:20,22]
**$39,554,000** [121:20]
**$4.15** [120:21] [121:12]
**$4.23** [84:3]
**$40** [124:11] [127:13] [137:19] [138:10]
**$42** [131:4]
**$47** [125:23]
**$470** [190:7,13] [191:16,23]
**$49** [135:18]
**$50** [126:5,13,16] [137:20,22] [138:3]
**$51.50** [125:23]
**$60** [135:5]
**$73** [139:25]
**$8.1** [135:12]
**$90** [41:19]

**0**

**01** [62:8,13] [64:7,12] [66:20 ,25] [72:17] [84:23] [102:15] [124:10]
**01/02** [59:10,15]
**02** [102:16]
**02616** [134:22] [208:13]
**02618** [134:25]
**02635** [134:22] [208:]
**02s** [103:13]

**1**

**1** [83:16] [84:18] [115:15,17]
**1.0** [192:4]
**1/8** [59:11,15]
**1:30** [137:3,4]
**10** [8:23] [41:18] [84:4 [140:10,19] [168:16] [173: 9] [177:5] [200:14,15]
**10:37** [51:17]
**10:51** [51:20]
**100** [81:17] [82:11,14] [141:

**22** [185:11] [187:7]
**10105** [2:]
**102.3** [129:20] [130:13,16,21] [135:4] [138:24,25]
**11** [84:22] [86:10] [164:15] [200:14,16] [208:22]
**11:30** [83:15]
**11:38** [83:18]
**117** [131:21,25] [132:4] [135:22] [138:23]
**117.1** [130:21] [139:5,11]
**12** [208:21]
**12:40** [128:20]
**12:48** [136:15,17]
**120** [33:19]
**122** [208:]
**125** [208:12]
**134** [208:]
**1345** [2:10] [3:10]
**14** [135:10] [209:5]
**14.8** [130:18,21] [139:3]
**15** [8:23] [140:11,12,20]
**150** [127:14,19] [131:12] [137:25] [138:7]
**159** [131:21,25] [132:4]
**162** [208:]
**18** [180:23]
**180** [208:16]
**185** [122:24]
**189** [138:14] [209:5]
**189something** [138:14]
**189-something** [138:14]
**18th** [181:4]
**190** [127:19] [128:4] [129:7] [131:14] [139:11] [140:19] [141:10]
**1901** [2:5]
**1970** [106:2]
**1992** [142:18,22] [143:12,15]

**2**

**2** [83:19] [136:16] [170:7]
**2:12** [168:22]
**2:18** [168:25]
**20** [192:19]
**200** [141:23]
**2000** [49:8]
**2001** [49:3,4,14] [65:18] [68:7,12,15,18,23] [69:9,14 ,16,23] [70:2,9] [73:25] [85:11,17] [86:2,23] [87:2,20] [88:6,12,15,20] [89:2,7,16] [90:8] [91:6] [92:8] [94:13] [95:3,18] [101:16] [102:24] [103:17] [104:6] [105:2,8,14] [106:2] [108:19,20,23] [109:21] [110:7] [111:13,17 ,21,24] [112:4,21] [113:7] [118:11,25] [119:14,21] [120:5,20] [121:21] [123:10 ,24] [124:2,16] [125:21,25] [126:6] [129:9] [130:25] [131:11] [132:7,10] [137:16 ,19,24] [139:9] [140:14] [142:8,24] [144:11,13,25]

**[145:21] [146:7] [148:15,18**
**,25] [149:2] [150:5] [151:15**
**,21,25] [152:2,9] [155:22]**
**[156:7,24] [157:4] [159:6]**
**[160:24] [161:7] [162:20]**
**[165:12] [166:13] [167:4,9**
**,20] [168:2,8] [170:4,9]**
**[172:18,21] [173:13] [183:**
**11,23,25] [186:22] [187:18]**
**[189:4,21] [190:8,13]**
**[192:9] [193:18] [198:5,20]**
**[200:15] [205:22]**
**2002** [49:6,10,12] [58:7,10,25] [70:3,9] [72:23] [73:6,25] [87:2] [94:16] [101:17] [103:2] [112:6,11,22] [113:9] [114:21] [118:12,14 ,15,25] [119:15,22] [120:6] [123:11,22] [131:2,18] [132:12] [133:14] [135:11] [137:16] [138:17,20] [139: 10] [143:18] [144:2] [148:22 ,24] [149:3] [156:18] [163:17] [165:13] [171:8,19] [172:12] [187:22] [189:5] [206:8]
**2003** [8:13] [73:11] [86:24] [90:18] [91:8] [98:10] [104:7] [111:15] [113:13] [170:19]
**2003/2004** [112:24]
**2004** [104:7] [165:15]
**2007** [20:2,5] [21:5,23] [22:5,11,15,24] [52:14,20] [54:4] [56:3,5,7] [180:23] [188:7] [190:5]
**2008** [3:8] [210:6] [211:9,19]
**205** [3:6]
**20750** [3:6]
**20th** [133:18]
**21** [208:20,21]
**22** [208:20,21]
**23.6** [200:20]
**230** [62:8,12] [90:17] [91:2]
**24** [208:20]
**2624** [56:15]
**265172** [122:17] [123:5] [208:10]
**265185** [123:9] [129:10,14,18 ,23,24] [138:18]
**265213** [122:17] [208:]
**27** [3:8]
**27th** [210:6] [211:9]
**28** [125:25]
**29.7** [200:20]
**29th** [17:19]
**2nd** [211:19]

**3**

**3** [84:17] [137:5] [155:20] [160:22] [163:23] [170:12] [189:5,6,7] [191:6,7] [192: 4,10,11] [208:9]
**3:15** [207:14,17]
**30** [21:5] [22:5,10,15,24] [52:14,20] [56:3,5] [65:18]

**[68:15] [73:6] [101:16,17]**
**[112:23] [118:14,15,25]**
**[119:14,15,21,22] [120:5,6**
**,19] [121:21] [124:16]**
**[129:9] [130:25] [133:14]**
**[135:11] [137:16,23] [138:**
**20] [139:9,10] [140:14]**
**[142:7,18] [143:12] [144:2]**
**[163:17] [165:11] [205:22]**
**[206:7] [207:2]**
**300** [26:15] [64:5] [138:6,7]
**30th** [20:2,5,8] [21:23] [52:9] [53:19,20] [54:4,23] [55:8] [56:7] [72:25] [102:15 ,16] [125:21] [126:2] [131:2]
**320** [194:8,9]
**337** [195:12,13]
**339** [200:15]
**340** [197:4] [200:13]
**341** [197:4]
**342** [197:4]
**346** [180:19] [208:16]
**350** [141:6,10,23] [206:3]
**373** [90:17] [94:13] [98:12,13 ,16] [104:6] [105:3,15] [107:12,14] [108:3,6,7,8,12 ,15,18,21]
**375** [98:12,13] [105:15]
**39** [124:11] [131:11] [138:9]

**4**

**4** [84:17] [115:6,20] [208:]
**4.11** [84:11]
**4.13** [84:11]
**4.15** [138:10]
**4.23** [84:9]
**40** [27:7] [127:19] [165:11]
**42** [131:23] [132:4]
**47** [110:14] [164:11,14,19] [165:6,11,15,18,24] [166:5]
**49** [135:22]
**49.8** [130:8] [138:23]

**5**

**5** [84:3] [115:6,21] [131:11,23] [155:19] [160:22] [163:10]
**5.47** [200:18]
**50** [88:7] [126:17] [134:2] [138:3,6,7] [140:22] [141:22] [165:11]
**50something** [134:2]
**50-something** [134:2]
**519279** [125:13] [208:]
**519291** [125:13] [208:12]
**52** [208:21]
**52.5** [130:11] [138:22]
**521703** [58:3]
**522133** [162:10] [208:]
**523314** [180:19] [208:]
**523320** [193:23]
**523321** [182:21] [186:20] [190:11] [192:3] [194:15]
**523324** [182:13]
**523328** [196:5]

**27/03/2008  PFEFFER, ALLEN M.**

**523334** [195:6]
**52334** [182:13]
**523341** [197:17]
**523342** [196:14]
**56** [208:22]
**57** [133:19,22]

---

**6**

**6** [163:10,23] [164:15] [165:
19] [193:23] [194:10] [197:
22] [199:25] [208:20]
**6.98** [200:19]
**60** [192:19]
**61** [197:22] [199:25]
**6-1** [197:22] [199:25]
**62** [197:22] [199:25]
**6-2** [197:22] [199:25]
**624** [57:21] [66:8] [75:11]
[81:25]
**625** [3:2] [81:20] [82:3,22]
[83:6,24] [84:15] [208:9]
**626** [122:16] [129:16,17,18]
[133:15] [135:5] [208:10]
**627** [125:12] [129:10] [137:20
,23] [165:10] [208:]
**628** [134:19] [162:6] [208:13]
**629** [162:8,9,17] [163:2]
[208:]
**630** [180:18] [181:24] [201:10]
[204:2,20] [208:]
**68** [135:22]

---

**7**

**7** [59:16] [169:4]
**7/7** [59:11]
**7/8** [59:16]
**704** [59:7] [62:7]
**705** [66:8] [75:10]
**73** [139:12]

---

**8**

**8** [59:11,15] [170:7]

---

**9**

**9** [121:7,17] [170:12] [172:19]
[181:6,19,22] [182:2,6,10,12
,17]
**9,531,000** [121:13]
**9.3** [121:3] [122:3] [138:11]
**9.5** [124:2]
**9.53** [123:22]
**9.531** [122:4]
**9.something** [121:7]
**9.-something** [121:7]
**9:36** [3:9]
**90067** [2:]
**900676013** [2:]
**90067-6013** [2:]

---

**A**

**a.m** [3:9] [51:17,20] [83:15,18]

**ability** [46:5] [156:14]
**able** [50:10] [65:14] [66:5]
[91:20] [92:8] [95:22]
[152:14] [184:6,14]
**above** [189:2]
**absent** [156:9]
**absolutely** [205:19] [206:4]
**abundance** [9:14]
**academic** [9:13]
**accepts** [85:17]
**accompanying** [164:15]
**accomplish** [104:13]
**according** [98:16] [120:23]
[147:18,20]
**account** [28:23] [44:18]
[45:3] [104:5] [111:14]
[113:13] [133:13] [163:12]
[173:17]
**accurate** [149:21] [191:25]
**achievable** [96:8]
**achieve** [95:23] [153:21]
**achieved** [87:19,20] [89:13]
[92:8] [94:12] [97:8,11]
[102:24,25] [104:6] [158:11]
**achievement** [174:6]
**acquisition** [8:12]
**acted** [103:17,18]
**acting** [10:6] [74:2]
**action** [85:25] [97:22]
**actions** [50:2]
**active** [60:6]
**actual** [28:5] [65:11] [84:21]
[85:9,16] [86:9,23] [87:19]
[89:6] [92:9] [94:16] [96:9]
[98:6,9,24] [103:15] [105:3
,7,14] [110:16] [167:21]
[168:10] [172:17,22] [185:
2] [187:22] [199:6] [204:15]
**actually** [71:10] [83:9]
[94:4] [97:12] [103:23]
[125:15] [126:15] [139:11]
[144:15] [148:13] [156:16]
[161:21] [168:10] [177:4]
[181:23] [184:25]
**adam** [61:17]
**add** [15:14] [27:11] [30:23]
[31:8] [91:2] [113:10]
[115:10] [127:13] [138:22]
[139:2,16]
**added** [137:15] [138:19]
[139:8]
**adding** [62:19] [174:21]
**addition** [44:6] [47:10]
[109:13,14]
**additional** [135:18]
**adelphias** [158:4,6]
**adequately** [28:3]
**adjust** [46:20] [104:16]
[107:21] [108:6,7] [173:2,22
,23] [174:18] [175:17]
**adjusted** [107:14] [108:12,13
,15,18,20] [141:4] [171:20]
[173:11] [183:5]
**adjusting** [104:18,19] [107:
23] [141:21]
**adjustment** [47:2]

**adjustments** [29:7,18,19]
[30:7] [32:17,20] [46:3,21]
[104:22] [126:22] [127:12,14
,17,22] [129:4] [140:3]
[141:4,19] [143:5] [146:20]
[160:17] [174:19]
**advice** [11:14] [75:24]
**advised** [79:6]
**advisors** [14:9]
**advocates** [166:13]
**afterwards** [112:8]
**again** [7:24] [12:22] [17:13]
[27:17] [34:10] [44:2]
[64:4] [73:25] [75:10]
[78:9] [90:20] [93:23]
[97:19] [110:24] [112:10]
[123:3] [129:10] [131:17]
[143:19] [150:8] [167:13]
[169:5] [172:15,19] [184:20]
[185:9] [186:25] [201:21]
[202:23] [204:7] [206:9]
**aggressive** [144:25] [145:5
,14,18,22,25] [146:5,8,15,18
,23] [147:12,13] [150:10,15]
[151:22] [152:5] [169:7]
[183:2,10,16,24] [184:3,11
,18,23] [185:25] [186:3,8]
[194:3,6,14,15,22,24]
**ago** [17:20] [36:21] [37:17]
[56:20] [64:10] [94:21]
[106:7] [107:3] [126:9]
[182:24] [188:8] [190:6]
[206:25]
**agree** [101:22,23] [110:24]
[129:6] [139:14] [163:4]
[165:3,5] [167:15] [175:2]
[201:25]
**agreed** [204:8]
**ahead** [29:17]
**aijun** [61:8,14,20,22] [162:25]
**a-i-j-u-n** [61:14]
**airlines** [71:16,19]
**aint** [19:17]
**al** [3:13,15]
**alleges** [103:16]
**allen** [3:12] [83:20] [137:6]
[208:9] [210:5,] [211:8]
**allow** [13:22] [23:7,17]
[91:12] [107:22] [116:18]
[126:21] [173:25]
**allowance** [147:15]
**allowed** [113:22] [114:10]
**allowing** [72:10]
**allows** [43:3] [71:8] [109:12]
**alone** [31:5]
**already** [52:5] [56:19] [58:14
,16] [60:14,23,25] [71:19]
[106:6] [111:9] [156:13]
[181:25] [182:8]
**alternative** [53:8] [67:5]
[159:3]
**alternatives** [67:12,15]
**although** [14:25] [161:16]
**altogether** [95:13]
**always** [8:24]
**am** [18:8] [21:25] [23:6]

**adjustments** ...

**advice** ...

[24:15] [28:9] [30:5] [32:7]
[35:17] [41:23] [50:6]
[52:4,12,22] [55:12] [57:25]
[66:3] [77:8] [83:11] [95:5]
[96:15] [100:13] [101:10]
[106:10] [107:10] [108:3]
[110:2] [115:14,16,18,19,23]
[121:14] [122:15,23] [123:
4,9] [124:3,25] [125:12]
[129:21,23] [130:13] [132:
23] [134:21,24] [138:20]
[142:23] [143:16,18] [151:
18,24] [152:4] [162:6]
[166:5] [168:18] [170:6]
[173:14] [178:7] [182:13]
[184:12] [190:8] [194:7]
[201:20] [202:25] [205:8]
[211:14,16]
**americas** [2:10] [3:11]
**among** [89:18] [96:16]
[119:17] [178:16]
**amount** [6:14] [10:18] [11:3]
[12:10,11] [26:13] [50:10]
[87:19,20,22] [88:21]
[94:14] [163:21] [164:7,23
,24] [165:7] [176:12] [178:23]
[179:22]
**ample** [183:4]
**analyses** [87:2] [102:20]
[109:7] [173:11]
**analysis** [14:4] [16:11,14,15]
[17:5,7,9,12] [18:8] [20:19]
[21:15] [22:4] [23:21]
[28:9,13] [35:5,12,24]
[36:20] [37:22] [38:5]
[41:22] [43:22,23] [44:3,4,15
,20,25] [46:25] [48:5,7]
[53:22] [60:11] [62:15,18]
[63:14] [67:2] [68:20]
[88:9] [90:11,20] [91:6,14]
[99:21] [103:24,25] [104:3
,14] [105:11] [106:16,18]
[109:3,10,15] [110:4]
[111:25] [112:11] [118:8,20]
[139:20] [140:8] [142:4]
[143:2,11] [144:6] [146:3]
[148:4] [150:25] [151:8]
[152:14] [161:15] [163:13]
[166:15,17] [175:7] [177:19]
[180:2] [182:25] [183:9]
[184:6] [187:25] [190:5]
[193:24] [195:7,14,25]
[196:2,6,11,14,18,23]
[197:9,10] [203:22]
**analyst** [14:15]
**analysts** [14:10,16] [47:15]
**analyt** [204:14]
**analyze** [16:6] [23:14] [30:24]
[45:15] [47:11] [89:19]
[139:23] [140:17] [149:23]
**analyzed** [118:22] [134:13]
[163:25] [171:15] [178:9]
[186:14] [195:3]
**analyzing** [98:22] [160:12]
**angeles** [2:] [3:6,24]
**answer** [20:14] [22:2,16]

A.2

## 27/03/2008  PFEFFER, ALLEN M.

[23:7,11,17] [29:15] [38:11]
[44:22] [52:7,23] [56:2,12]
[80:25] [87:5,10] [100:15,16]
[106:13] [110:10] [112:16]
[113:11] [126:16] [127:20]
[133:3] [143:12] [144:2,10]
[149:24] [160:13] [167:2,15]
[168:4] [196:25] [199:14]
[201:5] [202:18,23] [203:13
,14] [208:18]
**answered** [31:20] [106:4,5,6]
[108:25] [151:4,13] [186:24]
[203:8] [204:24] [210:7]
**answering** [19:11] [141:14]
**answers** [100:15] [210:]
**anybody** [18:9,19] [19:3]
[21:6] [51:5] [62:4] [76:25]
[77:5,13,16,17,19] [78:3,6
,7,10] [117:16] [149:11]
**anymore** [42:17]
**anything** [8:2] [13:4] [20:17
,22] [47:3] [74:14] [77:20]
[81:14] [87:7] [103:12]
[107:24] [111:25] [112:2,3
,7,14] [113:17] [118:13]
[156:22] [161:21] [170:22]
[178:12] [179:8,9] [187:10]
[199:17]
**anyway** [82:9]
**anywhere** [200:21]
**apparently** [66:11] [84:2,4]
**appear** [125:16] [130:5]
**appeared** [185:8]
**appearing** [125:14]
**appears** [76:4] [125:2]
[163:6] [180:22] [181:3]
**apples** [66:12] [90:21,22]
[91:7]
**application** [31:17] [196:10]
**applied** [192:9]
**applies** [30:12] [193:14]
**apply** [21:17] [104:20]
[192:21] [193:17]
**applying** [104:23]
**approach** [14:2] [15:11,18,21]
[25:7] [27:10] [32:11]
[33:7] [34:14] [43:24,25]
[93:9,13,16] [107:20]
[115:9,25] [116:18,25]
[117:3] [118:11,12] [119:11
,13] [149:24]
**approaches** [53:8] [93:20]
[106:18] [144:4] [152:18]
**appropriate** [19:23] [30:9]
[85:13] [91:11] [96:15]
[97:6] [98:15] [106:19]
[113:8,9] [116:14,20]
[143:2,4,13] [144:4,7,11,13]
[146:20] [174:18,20] [192:
22,25] [193:3,6,17]
**appropriately** [108:22]
**appropriateness** [111:19]
[113:23] [146:11] [204:15]
**approximately** [26:16]
[64:4] [84:7,11] [88:4]
[127:10] [131:13,17] [133:

17] [135:10] [138:12,14]
**approximates** [144:16]
**approximation** [126:7,14,17
,18]
**april** [20:2,5,8] [21:5,23]
[22:5,10,15,24] [52:14,20]
[54:4] [56:7] [211:19]
**arent** [164:17] [184:4] [187:
12]
**argue** [182:22]
**arise** [50:21] [157:19]
**around** [102:22] [173:20]
**array** [14:11]
**arrive** [34:6] [53:23] [65:14]
[91:12] [99:24] [103:23]
[104:22] [111:4] [132:20]
[150:17] [153:4,11,13]
[190:24] [192:23] [204:12]
[206:13]
**arriving** [93:21] [111:17]
[152:19] [159:11] [175:19]
[179:2]
**ascertain** [142:4] [186:15]
**ascertained** [133:7]
**ascribes** [62:12]
**aside** [189:17]
**ask** [18:7] [20:12,16,19,25]
[29:21] [32:8] [40:10]
[41:4] [53:15] [56:18]
[57:24] [59:6] [66:3] [69:9]
[75:25] [99:20] [112:5]
[122:15] [134:24] [155:19]
[177:5] [182:20] [188:20]
[193:22] [195:5,23] [202:22]
**asked** [8:7] [13:6] [23:12,13
,24] [24:5,7] [31:20] [33:3]
[36:19] [38:11] [47:21]
[48:6] [53:11] [54:20]
[55:14,16] [56:6,7] [69:2]
[71:15] [74:24] [76:23]
[83:23] [86:20] [94:21]
[106:3] [111:22,23] [112:17
,20] [113:4] [137:13] [143:9
,10,24] [155:11] [167:16,22]
[168:4,11] [187:5] [197:2]
[204:7,23] [205:10] [210:7]
**asking** [10:21,22] [11:7]
[18:4] [25:19,21] [29:15]
[31:11] [44:25] [52:9]
[53:16] [55:11] [95:5]
[96:15] [101:10,22] [105:23]
[106:10] [107:10,11] [115:
15,23] [127:19]
**aspect** [79:24] [80:20]
**aspects** [54:21] [171:5]
**assertation** [201:25]
**assertion** [193:25] [194:5]
**assess** [106:19]
**assessment** [63:21]
**asset** [4:14] [14:7] [43:23,24
,25] [52:25] [93:15]
**assetbyasset** [93:15]
**asset-by-asset** [93:15]
**assets** [9:18] [10:18] [11:2]
[12:9,18,24] [31:4,7,24,25]
[32:3,24] [33:8] [34:7]

[36:8] [45:21] [51:25] [52:15
,17] [53:5,9,18] [70:4,24]
[71:16] [73:19,22] [74:3]
[88:25] [92:18] [94:12]
[95:10] [96:5] [98:9] [101:15
,16] [102:14,16] [106:25]
[111:23] [112:6,21,22]
[113:6] [116:25] [119:14,15
,21,22] [135:17] [142:7,17]
[143:11,25] [153:6] [154:14
,21] [164:23] [166:20]
[167:9] [179:4,21] [183:5]
[205:22] [206:7]
**assign** [27:8] [200:13,15]
**assigned** [4:14] [199:19]
**assigning** [16:8] [133:6]
[199:14]
**assignment** [54:16] [55:4]
[76:11] [77:3] [79:25]
[80:21] [111:18,21] [113:14
,25]
**assignments** [75:13] [77:3]
**assist** [23:12]
**assistance** [9:5] [82:16,17]
**associated** [96:2] [132:17]
[158:24] [172:20]
**associates** [47:20,22,23]
[79:10] [80:3]
**assume** [10:5,8] [29:22]
[67:8,9,10] [68:6] [69:8]
[167:7] [171:3] [175:13]
**assumed** [90:25]
**assumes** [66:9,15,17]
[71:3] [154:4]
**assuming** [70:8] [93:12]
[132:18]
**assumption** [10:13] [31:8]
[66:19,25] [67:6,7] [68:11]
[69:10] [70:13,24] [71:9]
[166:19] [170:17] [185:15,17]
[195:7] [196:21]
**assumptions** [21:16] [67:7]
[105:19] [169:21] [170:3,8]
[172:3] [178:25] [183:20]
[196:12] [199:13] [202:5,7]
[203:21,24] [205:5]
**asterisk** [75:11]
**attached** [181:20]
**attacking** [204:14]
**attempt** [4:22] [5:14,20,24]
[6:16] [7:16] [21:17] [40:3]
[51:5,6] [154:13] [173:6]
[191:4] [202:8] [204:11]
**attempted** [109:19]
**attempting** [9:17,20] [13:12
,13] [28:13] [39:7] [111:12]
[162:18]
**attend** [100:23]
**attended** [57:18] [100:22]
**attention** [51:2] [118:10]
[119:10,19] [122:23] [144:
15] [161:23] [206:18]
**attorneys** [2:] [82:23] [187:5]
[201:25]
**audited** [114:20]
**author** [192:7]

**authored** [147:2]
**authority** [91:16] [192:7]
**automatically** [139:25]
**available** [15:25] [59:21]
[60:7] [116:5,7,10,17]
[132:21]
**avenue** [2:5,10] [3:11]
**avenues** [75:5]
**average** [40:24] [41:3,5]
[174:24] [175:4,10]
**aware** [21:5] [114:3,17,25]
[154:24]

―――――――――――――

### B

**b2** [74:11]
**back** [13:24] [25:8] [31:6]
[42:8] [55:23] [66:6] [98:20]
[114:14] [193:22]
**balance** [31:8] [32:3] [43:25]
**bankruptcies** [179:12]
**bankruptcy** [3:15] [58:23]
[69:14,16] [70:2,18,23]
[71:4,19] [72:11,13] [84:21]
[85:10,16,17,19,24] [86:10
,11,23,24] [87:19,21] [88:18
,20] [89:2,7,8,12,18] [91:7,15]
[92:3,7,9] [93:12] [94:13,15
,16] [96:2,3,9,10] [97:9,12,24
,25] [98:2,9] [102:25] [103:
2,13,15,22] [105:2,3,7,8,14]
[106:2,21] [107:2] [108:19
,23] [109:13,20] [110:6,13,17]
[112:2] [134:4] [144:8]
[154:22] [156:6] [157:12,15
,19,24] [158:2,8,17] [159:4
,5,9,19] [163:18] [164:12,16]
[165:21] [166:19] [167:4,7
,20,21] [168:8,10] [170:21]
[171:4] [172:17,18,21,23]
[173:5]
**base** [51:8] [80:7]
**based** [22:2] [29:8] [62:14,22]
[69:4] [72:3] [79:5] [81:5]
[93:14] [101:14] [102:14,19]
[105:18] [113:24] [126:13]
[127:22] [146:12] [159:2]
[193:14] [197:10,24] [200:
3,10] [206:15]
**bases** [89:18]
**basic** [73:22] [179:3]
**basics** [28:11]
**basis** [24:4] [48:22,25]
[51:2] [67:25] [68:15]
[70:19] [71:17] [80:11,13]
[87:5,7,25] [89:9,15] [111:
13] [113:12] [114:11] [146:
12,25] [150:12,18,19]
[170:23] [171:2] [172:25]
[173:3]
**bates** [58:2] [122:24] [134:20]
[182:13] [208:10,,13,,]
**bb** [200:21]
**bearing** [122:16]
**bears** [125:13]
**became** [154:24] [186:12]

become [183:6]
becomes [51:3]
begin [22:21] [92:11] [125:14]
beginning [83:19] [137:5]
[155:20] [187:11]
beginnings [103:24]
begins [28:13] [37:9] [38:5]
behalf [100:7]
behind [83:5] [84:14] [170:4]
[188:2]
belief [9:3] [47:13] [85:18]
[88:2,5] [156:22] [161:6]
[201:10]
believe [12:22] [14:5] [28:8]
[42:16] [54:2,20] [61:14]
[63:9,12] [65:7] [85:22]
[87:5] [88:9] [97:5] [100:20]
[109:19] [114:18,19,23]
[117:14] [123:20] [132:5,11]
[133:25] [142:18] [144:3]
[148:15,16] [149:6,9,11,14
,20] [151:13] [155:16]
[171:10] [172:20] [187:2,12]
[190:15] [191:24] [197:7]
[199:11,16,18]
believed [144:25] [184:21]
[204:3]
believes [85:7] [94:25]
[144:20] [156:4] [158:23]
bell [198:7]
belonged [199:20]
below [198:10]
berkshire [163:13]
beneficial [166:11]
besides [5:4] [6:17] [7:14]
[67:15] [99:5] [103:8]
besio [61:8,15]
b-e-s-i-o [61:15]
best [18:18] [40:12] [171:17]
[205:5]
beta [175:22,23]
better [32:8] [70:3] [114:9,10]
[142:11] [168:9]
beyond [6:20] [23:10] [99:22]
[112:4,15]
bids [14:7]
bigger [87:12]
billion [32:22] [33:21] [192:
4,11,24] [207:4]
bit [5:6] [63:6] [136:10]
[165:12] [184:25]
black [178:11,24] [180:2,7]
[195:14,16] [196:2,10]
blackscholes [178:11,24]
[180:2,7] [195:14,16]
[196:2,10]
black-scholes [178:11,24]
[180:2,7] [195:14,16]
[196:2,10]
blanket [144:13]
blood [211:14]
board [11:14] [160:19]
bond [22:9] [24:13] [59:17,22]
[65:14] [124:15] [125:3,5,16
,20] [128:7] [129:5,20]
[130:25] [137:15,18,25]

[160:21,23] [161:2,3,7,9,17
,21] [162:19] [165:9,20,23,25]
bondholder [164:5]
bondholders [163:24]
[164:13,17] [166:2,18]
bonds [7:7,9] [15:16] [24:24]
[26:8,18,20,25] [27:6,13]
[32:13] [33:21] [60:3,7]
[62:21] [63:22] [64:8]
[65:20] [115:11,25] [124:15]
[125:21] [126:5,14,24]
[131:12] [135:4] [137:23]
[138:20] [139:9] [141:18]
[155:23] [156:16,20] [164:
8,10] [165:10]
bondtraded [130:25]
bond-traded [130:25]
boston [2:9] [3:14]
bottom [75:12] [134:21]
[155:20] [197:18]
boulevard [3:6]
break [51:15,16] [83:23]
[134:16] [136:2]
bring [39:25] [56:18] [141:5]
broad [12:14,23] [14:11]
[19:2] [22:17] [23:8,15,18]
[31:11,19] [47:2] [52:10]
[53:12] [54:22] [77:6]
[86:16] [179:10]
broadbrush [197:12]
broaden [46:15]
broader [23:23] [99:10]
broadly [23:14] [32:16,19]
[35:14] [36:2] [53:4] [54:21]
[62:17] [118:7] [154:17]
[174:8] [175:24]
buckfire [170:13,16,23]
[171:18] [172:3,7,9]
buffett [73:10,23] [74:12]
[88:22] [90:18] [91:8]
[94:14] [98:10,17] [105:15]
[111:15,20] [112:24] [113:
13] [166:11]
bullet [189:2]
bundle [56:17]
business [10:3] [23:20]
[45:21,23,24,25] [49:20]
[50:14,18] [58:8,12,21]
[59:2,4,5] [67:17] [68:17]
[73:19] [74:6,15] [75:6]
[96:20,25] [97:23,25]
[100:23] [114:11,12] [144:
21] [157:8] [158:7] [159:7]
[171:6]
businesses [58:22] [74:3]
[92:21]
buy [10:6] [154:14]
buyer [9:25] [152:22,23]
[153:16,18] [154:2,4,8,10,11
,14] [155:9,18]
buyers [92:15] [153:19,23]
[154:25] [155:2,5] [158:14]
buying [29:4] [44:10]

———

C

———

calculation [99:18,24]
[101:14] [102:3] [113:5]
[174:11] [205:24]
calculations [84:19] [131:19]
[206:19]
california [2:] [3:7]
call [25:4] [43:25] [138:4]
[195:7,24] [196:6,10,14,17
,23] [198:11,13] [200:18]
called [16:10] [24:20] [32:14]
[42:3] [60:10] [89:22,25]
[96:17] [116:2] [196:6]
[204:3]
calls [22:18]
cant [11:12] [18:13,16]
[58:19] [63:3] [70:14]
[117:17] [134:11] [142:3]
[150:24] [167:2,15] [185:3]
[196:25]
cantoni [3:24] [211:5,23]
cap [16:2]
capacity [19:6,9] [20:9]
[75:8]
capital [40:24] [41:3,6]
[46:4,6] [134:5] [174:24]
[175:4]
capitalization [6:13] [139:23]
care [124:3]
career [8:16]
careful [47:11,16] [55:7]
[144:15] [203:17]
carefully [45:15]
case [12:5,7] [16:22] [17:16
,24] [18:5] [19:7] [20:10]
[23:23,25] [25:19,24]
[26:8] [45:6] [47:19] [54:21]
[75:20] [76:11] [77:3,20]
[84:21,22] [86:17] [94:5]
[101:9] [116:18] [149:16]
[156:9] [159:21] [163:19]
[165:22] [166:8] [169:24]
[204:4]
cases [46:8] [102:20] [157:15
,19,24]
cash [9:2] [14:3] [15:9]
[16:13] [17:11] [18:8,19,21]
[19:4] [21:5,9,13,15,19,22]
[30:10,25] [34:13] [35:4,9,12]
[36:2,3,4,5,10,17,20,22]
[37:9,15,18,22,24] [38:5,6
,13,14,18,23] [39:3,4,16,25]
[40:16,20,23] [41:15,17,21
,22,24] [42:12,13,16,18,22]
[43:5,9,11,14,19] [44:20]
[45:8,11,17] [46:13,16,17,21]
[47:23,24] [48:6] [49:19]
[50:3,5,7,15] [51:8] [72:4]
[74:10,16] [87:2,22] [89:9]
[92:25] [102:20] [109:2,8,10
,11] [117:3] [142:8,11,20]
[143:2,7] [144:3,12,16,18,24]
[146:11] [149:16,17] [152:
13] [159:7] [160:5,16]
[173:11,17,23] [174:6,18]
[175:6] [176:3] [183:11,24]
[192:17] [194:2]

castanares [2:] [3:19] [4:6]
[19:14] [20:4,15,21] [21:3]
[22:3,18] [51:14,16,22]
[52:11] [55:10,23] [56:16]
[83:14,21,22] [100:13]
[114:13] [121:16,18] [122:
8,12,15,20] [123:6,8] [128:
22] [129:2,23] [134:15]
[135:25] [136:5,9] [137:7,12]
[142:23] [152:10] [162:6,9]
[168:17,21] [169:3] [180:18]
[188:22] [189:14] [203:3,7
,10] [207:11] [208:]
category [81:7]
causation [99:13] [100:4,9,11
,12,14,19] [101:3] [102:4]
cause [99:14]
caused [113:23]
caution [23:6]
ccc [198:7,8,9] [200:22]
center [58:7]
cents [84:4] [126:17] [133:19
,22] [134:2] [138:3,4,6]
[165:6,11,15,18]
certain [9:19] [12:22] [13:24]
[15:7,15,16] [21:16] [23:14]
[29:7] [39:9,11] [42:14,23]
[45:24] [50:10] [58:22]
[71:22] [74:8] [78:15,17]
[79:2,9,18] [80:10,19]
[82:22] [92:20,24] [95:18]
[117:8] [120:16] [134:3]
[147:17] [154:25] [171:5,9]
[174:21] [187:5] [199:13]
[202:2] [203:22]
certainly [4:21] [8:11] [9:14]
[35:22] [50:23] [56:5]
[75:4] [79:16] [82:14]
[93:23] [101:4] [117:16]
[146:3] [147:18] [160:14]
[191:24] [205:12]
certify [210:5] [211:7]
cetera [50:13] [152:23]
[171:12] [181:9]
challenge [76:9]
change [45:17,21] [48:17]
[50:18] [59:4] [96:20]
[98:24] [99:5] [131:24]
[134:5,12] [135:10]
changed [54:16] [89:16]
[95:17] [144:21] [206:24]
changes [99:7,9,10,11]
[107:5] [108:8,9] [112:12]
[134:9] [139:21] [171:11]
chanin [75:12,16,17,19,21]
c-h-a-n-i-n [75:12]
chapter [84:22] [86:10]
characterization [110:25]
[139:15] [179:10]
characterize [32:6] [35:7]
characterized [187:21]
characterizes [184:22]
characterizing [34:11]
[184:11] [185:25]
chart [165:9]
checking [21:7,12]

**27/03/2008  PFEFFER, ALLEN M.**

chose [60:22] [71:20] [79:8] [80:2] [183:15]
chosen [80:3] [108:6]
circumstance [86:3]
circumstances [91:20,22] [139:22] [153:17] [154:7]
cited [192:7]
claim [14:3] [44:4] [162:18]
claimed [141:19]
claiming [177:7]
claims [164:25] [165:7]
clarified [186:13]
clarify [66:22] [95:4,6] [98:21] [115:18] [187:5]
clarifying [187:7]
class [26:3]
classes [25:23] [100:22,24]
clayton [8:12] [163:19]
clear [18:3,7,12] [19:24] [20:22] [30:5] [52:12] [55:10] [68:5] [75:3,4] [137:22] [151:12,14] [165:18] [182:12,18] [186:12]
clearer [147:5]
clearly [12:6] [182:25] [183:19,22]
client [14:11] [148:19] [201:10] [207:5]
clients [100:7]
close [90:8] [161:10]
closed [158:19]
closer [23:2] [54:6]
cloth [14:16]
colette [3:24] [211:5,23]
colleagues [79:18]
collection [50:19]
columbia [100:23]
combination [94:17] [98:2] [191:12]
combined [95:23] [131:3]
comfort [133:9,12]
comfortable [34:10] [121:24] [123:18,24] [125:7] [156:23]
coming [38:23]
commencement [211:11]
comments [181:5,7,11,15,16,17,18,21,25] [182:4,5,9]
common [6:12]
companies [15:22,24] [16:7] [19:4] [28:14,19,21] [44:9] [93:17] [99:23] [157:23,25] [175:14] [197:21] [199:24]
company [4:13,14,23] [10:15,25] [12:9] [13:2,3,7,18] [14:8,12] [15:7] [16:9,11,14] [17:4,9] [22:4] [24:22] [25:16] [27:14,20] [28:9,13,15] [29:3,6,10] [30:12,16,19] [31:4,5,7] [32:21] [33:17,24,25] [34:2,24] [35:5,24] [36:9,10,20] [37:17] [39:9,10] [40:25] [42:2,23] [43:21] [44:10] [45:17,18,22] [46:10] [47:6] [48:20,21] [49:2,4,18] [50:9,22,24,25]

companys [11:3] [15:15] [16:16] [27:23] [30:25] [32:3,12] [39:24] [41:14,16,24] [44:7] [45:17,20] [46:4] [47:9] [50:2] [62:20,21] [92:20] [137:25] [156:23] [159:15] [160:5] [171:19] [175:13,16,22] [179:4]
comparable [15:22] [16:7,10,14] [17:4,7,9] [19:4] [22:4] [28:9,12,15] [29:10] [31:4] [43:21] [175:14]
comparables [14:3] [93:9]
compare [27:22] [31:6] [52:15] [85:14,15] [86:6] [89:5] [90:15,17] [92:9] [98:16] [105:2] [106:10] [107:4,9,12,13] [108:7,15,18,20] [109:14] [119:13] [129:4] [130:23] [139:18] [172:16]
compared [84:20] [87:21] [94:13,16] [96:7] [103:14,23] [105:7] [106:24] [112:21] [117:2]
compares [12:18] [53:5] [66:12] [105:19] [108:3] [175:22]
comparing [11:2] [52:25] [53:18] [86:9,22,25] [94:10,11,14,18] [95:10,11] [101:15] [102:23] [107:23] [116:25] [141:9,10,11,14] [173:3]
comparison [51:24] [85:8] [86:4] [91:6,7,17] [92:3] [94:8] [95:9,14] [102:14] [105:17] [118:10] [119:20] [120:4] [167:6]
competitors [47:15]
complete [74:5] [91:2] [92:11] [93:24] [141:12] [210:1]
completed [114:22,23]
component [33:14] [63:13]
components [45:24] [58:11]
comports [199:5]
comprise [57:21]
compulsion [10:6]
concept [4:17]

concern [47:6] [66:9,15,18,25] [67:6,8,9,13,14,20,23] [68:2,7,12,19] [69:9] [70:9,13,15,25] [71:5] [72:7,9,10,16,20,22] [73:11,14,23] [74:5,18,25] [75:3,13] [93:11] [144:17,15] [156:15] [158:9,12,15]
concerned [7:19]
concerns [157:24] [158:3] [173:12,13]
conclude [17:6,13] [42:21] [63:14] [70:22] [81:5,10,11] [158:18,22] [184:14] [191:22] [202:10,11] [203:16,18] [207:9]
concluded [6:21] [138:18,22] [177:2,3]
concludes [42:4] [88:14,18] [197:7]
concluding [167:8]
conclusion [42:20] [49:5,9] [53:7,24] [68:14] [93:21] [104:22] [110:19] [141:15] [147:25] [150:22,25] [151:11] [166:21] [183:22] [190:25] [191:25] [194:23] [195:2] [204:12,16] [206:10,14,20]
conclusions [43:4] [53:6] [76:16] [111:10] [132:20] [140:5] [148:4] [180:14] [192:21] [202:17]
concurred [162:25] [163:3]
conduct [97:23]
conducted [59:4] [80:10] [89:4] [110:4]
conducting [49:20] [50:14] [75:6] [118:20]
conducts [69:19]
confidence [162:23]
confident [156:14]
confirmed [61:2]
conflict [70:23]
conforms [130:17]
confused [187:20]
connection [52:24] [77:2] [79:14,17] [80:17,20] [140:17] [154:13,19]
consider [16:8] [35:23] [47:4,8,10] [49:18,19,20,22] [50:11,14,17,18,19] [67:20,23,25] [71:4,7,9,12] [80:17] [81:15] [93:6] [94:2] [99:4] [104:9] [112:3,7,12,13,14,17,18,20,24] [113:15,25] [117:11,15,21] [152:19] [176:6] [205:16]
consideration [31:16] [51:4] [80:15,22] [97:22] [163:15]
considerations [45:19] [159:11]
considered [44:14,24] [50:23] [71:11] [81:14] [94:2] [99:19] [117:7,9,16,17,22,25] [141:20] [146:14]

[163:25] [167:6] [174:16] [176:8]
considering [33:11,13] [50:2] [73:7] [93:10] [106:20] [107:5] [111:20] [120:2] [143:5]
considers [28:14] [169:6] [175:11]
consist [26:24] [41:22]
consisted [24:22]
consistent [30:21] [31:13] [69:12,19] [74:5] [161:3] [165:8] [192:5] [197:24] [199:4] [200:3]
consists [16:15] [24:12] [37:23] [91:13,15] [180:21] [195:20] [197:11]
construct [105:25]
consult [23:15]
consulting [19:6,9,13] [20:9,11] [23:9] [52:6] [55:8]
contain [125:2] [149:19]
contained [83:6] [84:15] [192:3,10] [194:4] [197:4]
containing [149:19]
contains [181:24]
contemporaneous [14:6] [44:5] [47:13] [93:3] [116:12] [118:19] [197:24] [199:19] [200:3]
contemporaneously [182:24] [183:2]
contend [16:21,25] [17:2] [118:9] [163:11]
contending [116:23]
contends [64:23] [86:2]
content [57:5]
contention [67:3] [86:3] [95:16] [105:9] [156:21] [162:3]
contest [201:11]
context [4:24] [10:12,21,23] [11:17] [41:14,16] [99:4] [112:10] [113:2] [157:19] [158:21] [159:6] [160:12]
contingent [14:3] [44:4] [90:13] [127:3]
continue [31:9] [67:17] [72:16] [156:15] [196:14]
continued [41:25] [68:16,22] [95:2] [137:12] [157:6,8] [158:8,25] [165:14]
continuing [75:7] [115:21] [161:19]
contracts [159:23]
contrast [110:14]
contrasted [137:14]
control [44:13,18]
controversy [211:16]
convenient [51:14]
conversation [57:7,9,10,19]
conveyance [12:2]
copied [122:21]
copies [124:24]
copy [56:16,19] [82:6]

A.5

27/03/2008  PFEFFER, ALLEN M.

[122;9,10] [162:11]
corner [58:3] [59:8]
corporate [8:25]
corporation [3:13]
correct [5:8,13] [7:3,9,22]
 [8:16,17] [9:8] [11:21]
 [15:9,10,12,13] [17:18]
 [20:3] [25:13] [26:6,10,11,16]
 [27:10,23,25] [28:16,17,19
 ,20,24] [29:11,23] [30:11,14]
 [32:14,16] [33:16] [36:12]
 [37:13,14,25] [38:8,20]
 [39:17] [41:7,8,19,20,23]
 [42:6] [48:3] [62:22,24]
 [64:21] [66:19] [67:10]
 [68:8,11] [70:21] [76:13,14]
 [82:20] [84:6,7] [85:20]
 [98:12] [101:13,17] [102:17
 ,20,21] [103:2,4] [104:11]
 [105:8] [112:7] [119:11,16
 ,22] [121:4] [127:8,10,24]
 [130:20,21] [131:5,20]
 [135:12,15,19] [137:25]
 [138:10] [139:5,6,12]
 [141:2] [145:2,3] [146:15,16]
 [150:23] [158:9,10,13]
 [159:16] [160:9] [164:25]
 [166:21] [167:8] [168:10]
 [171:18] [174:8,12,25]
 [179:23] [188:8] [189:18]
 [190:23] [197:14] [199:13]
 [206:10] [210:8]
corrected [120:25] [190:3]
 [191:22] [196:12] [203:21]
correcting [188:25] [189:25]
 [193:13]
correction [84:14] [196:9]
corrections [188:7]
correctly [28:11] [32:19]
 [75:14] [84:25] [85:4]
 [95:20] [173:14] [198:2]
corroborate [148:3]
cost [41:3,5] [174:24] [175:
 4,9,10,11,19]
costs [40:24] [72:11] [96:2]
 [98:3] [159:9] [172:20,22]
 [173:2,6,8] [175:16]
couldnt [120:11]
counsel [3:17] [82:5] [83:25]
 [124:25] [211:17]
county [210:4] [211:]
couple [19:15] [56:20]
 [136:10]
course [15:6] [29:3] [30:4]
 [44:20] [57:3,7] [60:21]
 [85:25] [93:6] [95:17]
 [144:21] [155:6] [157:10,11]
 [161:19]
court [3:15,23] [11:14]
 [76:9] [188:12]
courts [12:22]
create [51:6]
created [148:19] [170:19]
creation [170:9]
credit [2:9] [3:14,22] [14:25]
 [99:16] [124:25] [127:3]

[129:19] [130:16] [133:15]
 [148:19] [171:9] [172:11]
 [177:8,9,25] [178:9] [197:25]
 [198:4,11,13,15,16,19,20,22]
 [199:5,6,11,15,17,18]
 [200:4,21] [207:3]
creditors [94:15] [95:12]
 [96:8,10,24] [97:10,12,18]
 [110:14,15] [164:24] [165:
 22] [166:3,4,8,12] [167:11,19
 ,25] [168:9] [179:5,15]
critical [84:18] [144:23]
criticism [53:14] [84:24]
 [169:5] [172:16,25]
criticisms [101:11]
criticize [119:19] [146:13,17]
 [177:6,15,18] [185:23]
 [201:12] [205:15]
criticized [119:9,25] [194:12]
critique [103:5] [117:6]
 [150:18,19,21]
critiques [148:5]
csfb [121:10] [122:16]
 [123:19] [125:13] [138:18]
 [148:23] [149:4,5,7,10,11,14
 ,18,20] [162:9] [180:18]
 [208:10,,]
curiosity [188:18]
cushion [183:4]
cut [74:8] [156:13]

___

D

daily [51:2]
damage [85:22] [98:23,25]
 [99:12,14,15,17] [157:7]
 [158:24] [164:8]
damaged [94:25]
damages [67:3] [84:19]
 [95:19] [99:3,18,24] [100:4
 ,6,9,19] [101:3,8,14] [102:3
 ,4,5] [103:24,25] [107:24]
 [111:25] [112:13] [120:3]
 [205:24]
data [14:19] [17:8] [22:8]
 [24:23] [25:4,6,7,8] [26:19]
 [27:4] [28:18,24] [29:5,8]
 [31:22,23] [32:11] [33:7]
 [43:23] [59:21] [60:8,10]
 [62:15,17,22] [63:14]
 [64:13,14,16,19,20] [65:5,8
 ,9,11] [89:25] [90:2,14,16]
 [91:6,14] [93:6] [109:16,22]
 [115:8,9,22,24] [116:2,6,10
 ,17,24] [117:7,25] [118:11,12
 ,21] [119:10,20] [120:2,5]
 [121:24] [124:9,10,15]
 [125:3,5,17,20] [126:13]
 [127:6,23] [130:24] [132:21]
 [133:10] [135:18] [140:6,18]
 [141:11,13] [142:6,10,19]
 [143:8] [144:4] [206:18]
datas [111:6] [120:14]
date [6:11] [13:7,18,24]
 [14:13] [15:7,16,17] [22:22]
 [26:20,25] [36:8,9,11,18]

[37:10,11,16,23] [38:7,14,19]
 [42:22] [51:7] [52:16,17,25]
 [53:2] [61:6] [62:20,21]
 [72:24] [86:5,12] [91:14,15]
 [92:15] [93:11] [95:24]
 [106:22] [109:24] [112:15,18
 ,19] [113:22,25] [118:15]
 [124:2] [126:2] [138:9]
 [141:12,18] [149:12] [159:
 12] [160:18] [163:16] [173:
 7] [187:9] [191:5] [199:12]
 [206:15]
dated [148:22] [149:3]
 [180:23] [181:3]
dates [7:8] [8:5] [53:5,10]
 [57:16] [59:22] [65:15]
 [70:14,16] [90:25] [91:13,23]
 [99:23] [113:15,16,18]
 [114:21] [116:19] [117:2]
 [118:22,24] [119:5] [129:5]
 [139:20] [173:4] [189:5]
 [190:4] [206:2]
daubert [76:3,4]
d-a-u-b-e-r-t [76:4]
davidson [78:8,10]
day [29:4] [56:17] [96:22]
 [210:6,14] [211:9,19]
days [56:20] [162:15]
dcf [141:7] [150:25] [164:3]
 [186:22] [189:20] [206:19]
dcfbased [164:3]
dcf-based [164:3]
deal [179:12]
deals [74:3,8]
debt [6:4] [7:3,5,13,14,17,22]
 [8:9] [12:25] [16:17] [27:8,18
 ,22,23] [30:23] [31:5,6,8,16
 ,17] [32:2,3,22,25] [33:9,11
 ,14,18,19,21,22] [34:3,8]
 [40:23] [60:10] [89:24]
 [91:3] [93:4,7] [126:22,25]
 [127:7,14] [158:2] [175:9,10
 ,11,12,13,16] [178:23]
 [183:6] [190:4,7] [191:2]
debtfree [40:23]
debt-free [40:23]
debts [12:11,12] [50:11]
 [137:25] [179:22] [189:3]
decade [143:18]
decide [45:23] [66:5] [78:20]
decided [179:19]
decision [96:20] [97:2]
 [99:8,13] [163:5]
decisions [74:15] [97:20]
 [112:13] [147:21]
decline [156:19]
deductible [175:18]
deem [19:23] [113:7,9]
deemed [116:19]
default [196:16,24] [197:3,8
 ,12,20,22] [199:4,23,25]
 [200:12,19]
defendants [2:] [3:22]
 [176:19]
define [110:9] [118:24]
 [119:5] [151:25] [152:22]

defined [11:4] [12:6] [153:2]
defines [112:16]
defining [152:2]
definition [10:5,8] [11:19,24]
 [12:5,8,12,14,20,23] [38:25]
 [39:3] [154:3] [179:20]
definitions [12:23] [154:8]
degree [100:25]
delaware [3:16]
deleted [181:8]
delve [20:13]
demand [189:15]
denominator [164:21,24]
 [165:4]
depend [32:3] [104:14]
 [111:21] [113:2]
depending [4:24] [10:12]
 [33:22] [67:22] [113:25]
 [145:18] [153:17]
depends [12:4,5] [25:22]
 [31:12] [104:13] [107:19]
 [154:7] [160:18]
deposed [183:18] [184:25]
deposition [3:12] [70:6]
 [71:13] [72:21] [78:14,17]
 [83:19] [117:13] [137:5]
 [146:4] [150:9] [157:2,9]
 [159:2] [186:12] [207:15]
 [210:] [211:8]
depositions [78:11,15,21,25]
 [79:8,22] [80:9] [154:23]
 [187:6]
derivation [174:23]
derive [41:7] [108:22] [109:
 20] [111:12] [193:2]
derived [21:18] [62:19]
 [64:20] [98:15] [107:11,13]
 [110:7] [176:2] [183:5]
derives [30:9,15]
deriving [175:7]
describe [13:20] [15:18,20]
 [23:3] [28:11] [45:9] [54:19]
 [57:11] [111:3] [134:12]
 [178:21]
described [24:10] [32:19]
 [46:18] [47:7,25] [50:13]
 [96:23] [115:9] [127:12,15
 ,17] [184:25] [187:18]
 [192:14]
designate [19:16,20]
designed [24:3] [53:15]
despite [146:14] [185:25]
detail [185:2] [191:9]
determinants [7:24]
determination [8:11] [36:5]
 [39:15] [145:7]
determinations [9:6] [71:23
 ,25]
determine [5:14,25] [8:4]
 [26:2] [38:12,13,18] [39:7]
 [40:3] [43:14,16] [44:14]
 [91:2] [92:7] [144:7] [153:25]
 [154:10] [176:17]
determined [176:10]
determining [9:10] [13:17]
 [27:20] [33:14] [37:23]

**27/03/2008  PFEFFER, ALLEN M.**

[38:6] [40:20] [45:4] [60:5]
[178:25]
**developed** [170:20]
**didnt** [8:2] [47:24] [53:23]
[56:18] [63:15,18] [67:8]
[68:10] [74:9] [77:23]
[78:3,7,24] [79:2] [82:7,9]
[89:19] [92:2] [94:2] [96:17]
[97:14] [103:12] [117:8,10
,15,16,20,22] [144:12]
[145:14] [148:7] [149:20,23]
[155:10] [163:2] [166:15]
[176:7] [177:19] [187:24]
[193:2,5,7] [201:7] [205:13]
**differ** [25:21] [62:25] [63:6,7
,10,15,20] [64:6] [66:24]
[67:4] [76:15] [121:22,25]
[124:9] [180:12,14]
**differed** [64:12]
**difference** [30:18] [38:15]
[55:7] [87:17,18,21] [89:6,10]
[97:10] [113:10] [139:25]
[172:10] [197:11]
**differences** [29:8] [45:7]
[64:13] [90:24] [91:22]
[159:13]
**different** [4:18,19] [12:23]
[25:22] [31:18] [33:3]
[34:4] [35:20] [46:9,11]
[47:8] [53:5] [57:15] [73:14]
[75:8] [85:25] [86:24]
[87:6,10,11] [92:14] [93:20]
[94:17] [97:2,20,23] [99:23]
[103:18] [109:21] [118:4]
[122:25] [128:6] [134:7,20]
[147:21] [148:14] [159:7,8]
[161:17] [178:25] [190:24]
[201:5]
**differential** [91:12] [137:14]
[139:7]
**differently** [29:25] [40:6,8,9]
**difficult** [120:8]
**dime** [84:11]
**diminished** [131:4]
**diminution** [131:22,23]
[139:12,15]
**direction** [92:14] [161:17]
[208:18]
**directly** [211:15]
**disclaimer** [149:20]
**disclosing** [19:12]
**disclosure** [19:8] [113:20]
[114:4,18,20]
**disclosures** [114:24]
**discontinued** [156:5] [171:
5]
**discount** [21:18] [41:7,9,17]
[44:11] [45:4] [104:11,19,20
,23] [169:18,20] [173:22,23]
[174:3,12,17,19,21,23]
[175:5,8,25] [176:9,11,13,17
,22] [189:4] [192:5,10,19,22
,25] [193:3,6,8,10,11,12,14
,17,21] [197:23] [200:2,14,16
,25] [201:4]
**discounted** [14:3] [15:9]

[16:13] [17:11] [18:19,21]
[19:4] [21:5,9,13,15,22]
[34:13] [35:4,9,12] [36:2,20]
[37:22] [38:5] [41:22]
[43:14,19] [44:20] [45:8]
[46:13] [47:23] [48:6]
[51:8] [87:2] [89:8] [102:20]
[109:2,8,10,11] [117:3]
[142:8,11,20] [143:2,7]
[144:3,12,18,24] [146:11]
[149:17] [152:13] [173:11,17]
[175:6] [176:3] [183:11]
[194:2]
**discoverable** [20:24]
**discovery** [23:13] [54:23]
**discrepancy** [84:2]
**discuss** [170:13]
**discussed** [98:23] [111:9]
[154:20,23]
**discussion** [52:5] [60:17]
[61:3]
**discussions** [61:2]
**disfavored** [159:16]
**disposal** [75:22]
**dispute** [175:25] [177:9]
[205:20] [206:6]
**distinction** [20:5,7]
**distinctions** [4:19]
**distinguished** [70:3] [79:10]
[80:4] [117:10] [176:12,19]
[202:12]
**distinguishing** [166:2,5]
**distress** [44:8] [45:20]
[47:9] [48:9,14,23] [49:2,3
,10,12,13,17] [50:22,24]
[74:2,22] [147:17] [173:13
,20,22,23,24] [174:2]
**distressed** [48:21] [73:21]
**distribute** [164:23]
**distributed** [179:5]
**district** [3:16]
**divide** [164:22]
**dividend** [94:15] [95:11]
[96:8,9] [97:10,18] [110:14
,15] [165:21] [167:10]
**dividends** [164:16]
**document** [56:14] [66:8]
[81:7] [85:2] [115:17]
[117:12] [122:7,16] [123:13
,14,17,19] [124:22] [125:13
,19] [129:14,19] [134:25]
[135:2,14] [148:19,22,23]
[149:3,4,5,15,18,23] [152:
11] [160:3] [162:16] [163:8]
[180:22,24] [181:2,13]
[182:8,14] [183:13] [187:22]
[189:9,23] [195:25] [196:8]
[208:10,13,,]
**documents** [23:13] [54:22]
[65:24] [66:4] [76:2] [80:8,15
,19] [81:8,14] [121:10]
[123:25] [124:24] [134:19]
[159:21] [171:9] [177:22,23]
[189:15] [196:20] [209:3]
**doesnt** [38:10] [39:21]
[88:19] [98:11] [105:22]

[107:24] [154:4] [162:2]
**doing** [17:8] [31:23] [33:7]
[35:11] [44:20] [52:12]
[93:12] [95:5] [97:25]
[104:3] [126:12] [139:20]
[140:18] [150:13] [173:17]
[200:9]
**dollar** [39:20,22] [126:17]
[165:16]
**dollars** [26:12] [32:22]
[88:8,20] [124:4,5,6] [178:
2] [192:11,24] [207:4]
**done** [8:15] [11:16,17,18]
[16:25] [21:6,10] [48:8]
[52:8] [68:24] [75:13]
[86:8,15] [92:4] [94:24]
[95:8,9] [97:5] [99:21]
[102:23] [103:20,21] [104:
5] [105:18] [106:16] [109:8]
[118:14,17] [119:17] [135:
21] [136:10,11] [140:8]
[142:3,25] [143:4] [144:14
,18] [148:3] [151:6] [154:12]
[168:9] [182:5]
**dont** [14:15] [17:14] [21:21]
[22:22] [34:10] [35:7]
[36:14] [37:7] [42:17]
[44:23] [48:4] [51:10,11]
[54:12] [56:17] [57:8,18]
[63:9,12,17,18,19,24]
[64:11] [65:21] [69:4]
[70:4] [71:10] [77:15,18,22]
[78:5,9] [87:11] [88:16]
[89:11] [100:20] [101:22,23
,25] [103:9] [105:5] [110:9,10
,12] [111:9,10] [114:18,19,22]
[118:13,15] [119:5] [121:7
,18,25] [122:13] [123:2]
[125:3] [129:25] [130:2,4,7]
[138:23] [139:14] [140:24]
[143:15] [145:16,19,20,23]
[146:10] [147:5] [148:9,16]
[149:14] [150:3] [152:12]
[153:7] [154:9] [157:21]
[158:17] [161:22] [162:11]
[165:3,4] [166:10] [167:15
,17] [168:7,12] [171:22,23,24]
[172:14] [174:14] [176:15,24
,25] [177:2,3,14,16,21,23,24]
[180:12] [181:10,14,16]
[183:14] [184:6,7,9] [186:19]
[187:7,23,24,25] [188:3]
[189:10] [190:17] [191:24]
[193:16] [195:3,18] [197:16]
[201:6,24]
**doors** [156:5] [157:3] [158:19]
**double** [104:18]
**doublecount** [104:18]
**double-count** [104:18]
**doubt** [64:15,18,24] [87:11]
**down** [5:6] [60:16,22] [66:10]
[75:11] [164:9] [165:13]
[169:14,19,25]
**downside** [46:8]
**dr** [5:10,18,22] [6:6,21]
[7:25] [8:6] [9:16,19] [13:12]

[16:22] [19:5,25] [20:18]
[21:8,12] [52:18] [53:3,4,14]
[54:25] [63:21] [64:7,12,16
,18,23,25] [66:11,17,24]
[68:13] [69:8,21] [71:7]
[76:13,18] [79:17,25]
[80:14,18] [81:16] [84:18]
[85:7,18] [86:2,25] [87:22]
[88:9,10,14] [89:8,11]
[94:23] [95:8,16] [97:7]
[98:14,22] [99:20] [101:11
,14] [102:13] [104:4] [105:6
,18] [109:23] [111:8] [116:24]
[117:22,25] [118:6,9]
[119:9] [121:9,11] [123:23]
[128:6,9] [137:18] [141:6,15]
[142:12,14] [144:20,23]
[145:22] [146:4,13,17]
[147:4,19,20] [148:18]
[149:3] [150:4,8,21] [156:4
,25] [158:16] [161:14,22]
[163:12] [164:2] [166:13,16
,20] [167:6,24] [169:6]
[172:16] [173:2,10] [176:2
,11] [177:7] [180:9] [183:10
,22] [185:24] [186:21]
[189:20] [191:17,21] [192:
7,9] [194:13] [196:2,10]
[197:7,13] [200:17] [201:11
,12] [202:3,11,17] [203:20]
[204:4,21] [205:15,20]
[206:6,17]
**draft** [176:16] [181:3,12,24]
[184:12,20] [185:10] [186:
6] [187:24] [188:11,15]
[202:6,16]
**drafted** [82:23] [204:11]
**drafts** [83:2] [162:17,21]
**dramatic** [148:5]
**dramatically** [144:21]
**drastically** [85:25] [147:21]
**draw** [122:23]
**driven** [169:13]
**drop** [156:16]
**dropped** [133:21] [135:11,18
,21] [156:17]
**due** [10:17] [17:24] [173:23
,24]
**duff** [19:6] [20:8] [23:9]
[75:18]
**duly** [4:3] [137:9] [211:10]
**during** [41:25] [158:8]
[161:4] [170:20] [177:11]
[178:3] [210:7]

_____

**E**

**earlier** [47:7] [82:25] [86:11]
[96:9] [97:9] [116:2] [128:3]
[151:13] [152:21] [162:17]
[173:7]
**early** [104:6,7] [202:8]
**earnings** [34:9] [93:14]
**easily** [126:20] [141:5]
**ebitda** [16:3] [30:11] [31:15]
[93:14]

A.7

**effect** [84:6] [132:18] [145:21]
[149:20] [191:14]
**efficiency** [133:8]
**efficient** [132:6,10,15,19]
[133:5,6]
**effort** [80:23] [202:9]
**eighth** [66:10]
**either** [29:20] [30:10] [77:4]
[81:10] [107:21] [108:18]
[112:8] [117:15] [147:7]
[153:18] [154:25] [173:21]
**elapsed** [107:16] [108:9]
**else** [8:14] [23:3] [36:25]
[37:3,4] [74:14] [100:12]
[112:2] [169:17]
**elsewhere** [61:12]
**email** [125:5,9,10,14,15]
[145:25] [163:2] [180:21]
[181:20] [208:]
**e-mail** [125:5,9,10,14,15]
[145:25] [163:2] [180:21]
[181:20] [208:]
**emails** [125:15]
**e-mails** [125:15]
**embodied** [171:9]
**emerge** [72:9]
**emerged** [158:2]
**emerging** [97:24] [171:4]
**emphasis** [74:16]
**employ** [211:17]
**end** [83:16] [96:22] [128:22]
[136:16] [163:16] [165:14]
[167:9] [200:17] [207:15]
**ended** [96:21]
**ends** [195:11,12]
**engaged** [28:21] [54:3,15]
**engagement** [56:4]
**engelman** [2:] [3:5]
**enjoy** [159:24]
**enough** [108:13] [110:11]
[123:24] [149:24] [182:19]
**enterprise** [27:14] [30:17,19]
[32:14,18,21] [33:14]
[34:6] [127:16,21] [189:2,19]
[190:2,12] [191:5,15,17]
[192:11,23]
**entire** [18:6] [79:22] [95:21]
[98:5]
**entirely** [144:22] [151:12]
**equal** [62:2]
**equation** [95:22] [165:5]
**equity** [6:3,9,12,13,17,18,20
,22] [8:9] [14:10,15] [25:15
,23] [26:2] [27:22] [33:12]
[63:13] [93:5,8] [121:12,21]
[124:9,11] [127:13] [133:25]
[138:9] [139:18,19] [141:18]
[175:11,19] [178:23] [179:
12] [192:3,23]
**error** [63:18,19]
**errors** [21:15] [190:23]
[191:10,11,12,22] [193:13]
**esq** [2:]
**essentially** [41:23] [171:12]
[195:13,15]
**established** [138:8]

**estate** [96:25]
**et** [3:13,15] [50:13] [152:23]
[171:12] [181:9]
**evaluate** [31:24,25] [41:10]
[71:15] [143:24]
**evaluating** [15:6] [34:22]
**evaluation** [127:7] [146:12]
**evaluations** [8:16] [9:6,10]
[102:19]
**even** [63:4] [128:4] [149:24]
[180:3,13] [183:23] [193:11]
[205:12]
**event** [160:9] [163:5]
**events** [112:17,19]
**eventual** [167:7] [204:21]
**ever** [10:14] [13:6] [17:11]
[18:8,19,23] [19:3] [20:23]
[21:17] [47:23] [48:4]
[51:5,6] [52:20] [55:3,11,16]
[70:17] [80:21] [86:8]
[100:9,18,21] [101:2]
[145:9,20] [154:13] [187:10
,11]
**every** [11:12] [12:7] [29:4]
**everybody** [18:16] [93:24]
**everybodys** [106:17]
**everything** [83:5,24] [84:15]
[169:17]
**evidence** [64:25] [65:2]
**exact** [22:22] [61:6] [63:5]
[103:11] [111:11] [126:8]
[139:24]
**exactly** [43:7] [58:19] [84:10]
[108:7] [145:16,23] [147:6]
[153:25] [186:10] [192:15]
**examination** [4:5] [137:11]
**examined** [4:4] [48:10,15]
[137:10] [208:4]
**example** [16:3] [30:22]
[71:21] [74:13] [95:25]
[155:22] [158:4,6] [159:20]
**exceed** [10:18] [190:3]
**exceeded** [189:3] [190:12]
**exceeding** [190:25]
**exceeds** [191:16]
**exception** [84:13]
**excess** [189:19]
**exchange** [10:2] [84:9,10]
**exclude** [80:10] [81:14]
**excluded** [80:22]
**excluding** [81:7]
**excuse** [129:18]
**execution** [154:22]
**exercise** [4:12] [7:11] [37:8]
[195:20]
**exhibit** [3:2] [56:15] [57:21]
[66:8] [75:11] [80:16]
[81:19] [82:22] [83:6,24]
[84:15] [122:16] [125:4,12]
[129:10,15] [133:15] [134:
16] [135:5] [137:20,23]
[162:17] [163:2] [165:10]
[180:18] [181:23] [201:9]
[204:2,20] [207:2]
**exhibited** [165:10]
**exhibits** [208:6]

**exist** [29:9] [31:9] [42:17]
[105:22]
**existence** [132:19]
**existing** [31:8]
**exit** [45:23,24] [58:11,21,25]
**expand** [202:16]
**expect** [44:11,12] [48:8]
[114:24] [115:4] [156:8,15]
**expectations** [45:16] [72:3]
[150:16]
**expected** [36:4,17,22]
[37:9,18,24] [38:13,16,19]
[39:8,16,24] [40:16,20]
[41:14,17,24] [42:13,18,19
,22] [44:18] [45:11,13]
[46:21] [47:11] [105:10]
[144:16,17] [149:16] [156:
10] [164:8] [174:6] [175:20]
[196:16] [197:19] [199:22]
**expenditure** [46:6]
**experience** [36:10,15]
**expert** [5:2] [8:18,22] [17:16
,24] [20:19] [24:11] [36:7]
[48:20] [54:24] [61:24]
[76:10,18] [100:8,9,18]
[111:14] [116:9] [133:9]
[157:18] [177:19] [180:3]
[191:4]
**experts** [13:17] [101:12]
**explain** [133:13,21] [162:4]
[180:3] [190:18]
**explained** [37:8] [164:2]
**explanation** [191:9]
**explicitly** [42:13] [81:13]
**explore** [203:20]
**explored** [202:6]
**expose** [203:23]
**exposed** [10:9]
**exposure** [92:20,23]
**express** [150:24] [152:4,15]
[153:5]
**expressed** [42:2] [145:9]
**expressing** [151:14,18,20]
**expression** [24:3,6]
**extent** [9:19] [13:4] [18:14]
[19:11] [20:12,16] [47:22]
[49:4] [112:23] [113:12,19]
[147:17] [161:15] [163:23]
[164:4] [171:16]
**extremely** [144:25] [145:4,14
,22] [146:5,8,15] [151:21]
[152:5] [183:2,9,16,24]
[184:3,11,18,23] [185:25]
[186:3,8] [194:2,6,14,15,21
,24]

F
──────────────────────
**fabricated** [64:25]
**face** [7:9] [12:25] [26:9,13,18]
[27:22] [34:3] [63:21]
[183:6]
**faces** [50:25]
**facets** [139:22]
**fact** [10:25] [35:3] [43:7]
[47:10] [62:11] [70:22]

[79:6] [80:2] [85:23] [88:10]
[93:10] [99:6,22] [105:13]
[107:22] [110:5,21] [122:12]
[123:19] [128:3] [133:14]
[144:8,19] [146:14,25]
[147:11,13,16] [154:3,24]
[156:20] [157:8,17] [161:2
,16] [162:15,17,22] [167:25]
[171:25] [173:25] [175:17]
[177:18] [180:3] [185:22]
[192:2] [202:16] [207:4]
**factor** [140:4] [174:5]
**factors** [44:13] [47:9] [50:20
,21] [99:4,6,14] [156:10]
[173:17] [174:9] [175:7]
**failed** [71:7,12]
**failing** [173:2]
**failure** [172:16]
**fair** [4:17,21,23] [5:4] [9:17,21]
[10:17] [11:3,17] [12:10,24]
[34:5,21] [35:3] [63:14]
[81:4,10,11] [88:14] [107:9]
[108:13] [113:6] [124:8]
[133:8] [142:6] [143:11,25]
[152:15,19,22] [153:2,6,12
,13,22] [154:3,10] [167:8]
[174:3] [179:21] [183:7]
**fairly** [90:8]
**fall** [165:13]
**fallen** [133:19] [135:4]
**familiar** [12:13] [76:5]
**far** [7:19] [63:17] [115:9]
[141:3,20] [189:19] [195:10]
**fashion** [49:21]
**faulted** [68:19]
**favor** [52:12] [176:19]
**favorable** [160:8]
**favored** [159:14]
**february** [17:19]
**feel** [19:22]
**feeling** [173:20]
**feels** [30:8] [157:10]
**fees** [159:22] [160:2] [177:8]
[178:3]
**fellow** [101:12]
**felt** [77:11] [93:3]
**few** [8:8] [64:10] [94:20]
[107:3,6]
**fiachra** [77:7]
**field** [100:19] [101:2,5]
**fifty** [138:4,5]
**figure** [42:23] [62:19] [63:2,4
,5] [94:11] [98:14] [104:25]
[105:19,22] [106:23] [108:
23] [109:20,21,22] [127:15]
[130:9] [135:4] [137:24]
[140:13,19] [141:6,17]
**figures** [84:3] [111:11]
[130:5,19] [131:2,3] [137:16
,18,19] [138:18] [139:10]
[197:23] [200:2]
**file** [58:22] [69:15] [71:4]
[92:14] [95:25] [156:6]
**filed** [17:17,19] [69:13]
[84:22] [85:19,24] [88:6,12
,17] [157:12] [159:5] [167:20]

## 27/03/2008  PFEFFER, ALLEN M.

[168:8]
**filing** [96:3] [103:22] [159:3]
**final** [53:24] [145:7] [162:15]
   [191:3] [205:3,13]
**finance** [9:2] [39:3] [49:25]
   [58:7,11,25]
**financial** [16:2] [23:14,15,16
   ,20] [114:20] [120:16]
   [126:21] [127:23] [155:2]
   [194:4]
**financials** [114:23]
**financing** [23:19] [50:17]
   [59:5]
**find** [5:20] [6:16] [7:16
   :25:8] [28:13] [30:3] [32:2]
   [36:21] [39:15] [59:21]
   [63:18] [65:12,20] [94:8]
   [109:13] [113:10] [116:16]
   [125:23] [131:3] [150:16]
   [181:21]
**finding** [26:24] [27:4] [63:19]
   [90:4] [155:18] [197:12]
   [205:21]
**finds** [35:24] [36:9] [189:20]
**fine** [122:8]
**finger** [157:11]
**firm** [75:22] [176:8]
**first** [2:9] [3:14] [41:23]
   [43:18] [54:3] [57:25]
   [58:3] [103:5] [107:21]
   [147:16] [163:16] [179:6,16]
   [189:7]
**fitch** [198:5,9]
**fitchs** [14:25]
**five** [168:16] [182:24]
**flawed** [183:25]
**flaws** [202:5]
**flow** [14:3] [15:9] [16:13]
   [17:11] [18:8,19] [19:4]
   [21:6,9,13,16,22] [30:10]
   [34:14] [35:4,9,12] [36:3,20]
   [37:22] [38:5,23] [39:3,25]
   [40:16,20,23] [41:22]
   [42:18] [43:14,19] [44:20]
   [45:8] [46:13] [47:23,24]
   [48:6] [49:19] [51:8] [87:2]
   [92:25] [102:20] [109:2,8,10
   ,11] [117:3] [142:8,12,20]
   [143:2,7] [144:3,18,24]
   [146:12] [149:17] [152:13]
   [160:16] [173:11,18] [175:
   7] [176:3] [183:11,24]
   [192:17] [194:2]
**flowing** [39:4]
**flows** [9:2] [18:22] [21:19]
   [36:3,4,6,10,17,22] [37:9,16
   ,18,24] [38:6,13,14,19]
   [39:16] [41:15,17,21,24]
   [42:12,13,16,23] [43:5,9,11]
   [45:11] [46:16,22] [72:4]
   [87:22] [89:9] [144:12,16]
   [149:16] [159:8] [160:5]
   [173:23] [174:6,18]
**focus** [51:3] [97:3]
**focused** [54:24]
**focusing** [161:13]

**follow** [29:23] [192:15]
**followed** [98:15] [125:16]
**following** [180:22]
**follows** [4:4] [137:10] [182:
   22]
**foregoing** [211:8]
**foremost** [43:18]
**forget** [102:11]
**forgot** [24:20]
**form** [7:10] [69:2] [73:8]
   [74:22] [109:11] [175:5]
   [202:6] [205:13]
**formal** [205:3]
**formatted** [48:19] [110:19]
**formed** [48:19] [110:19]
**forms** [74:6] [126:22,25]
**formulation** [150:19] [151:7]
**forth** [9:12] [93:18] [96:6]
   [109:16] [143:6] [206:16]
**forward** [71:24]
**found** [21:15] [27:12] [53:7]
   [64:13] [90:16] [99:11]
   [187:10] [190:12] [191:17,19]
**foundational** [204:20]
**frame** [160:11]
**fraud** [113:20] [114:4,18]
**fraudulent** [12:2]
**free** [19:22] [20:19] [32:2,25]
   [33:8] [34:7]
**freely** [132:16]
**friends** [124:5,6]
**front** [46:10] [76:8] [81:21]
   [128:12,14] [129:10] [133:
   15] [182:15]
**full** [78:15,17] [106:16]
   [114:20,23] [146:3]
**fullest** [171:15]
**fully** [24:14] [183:19]
**fun** [192:16]
**function** [164:19,20]
**furnish** [124:23]
**furnished** [76:3] [82:6]
   [124:24]
**further** [4:4] [41:4] [46:24]
   [123:25] [137:10] [144:6]
   [207:11]
**furthermore** [161:12] [194:
   3]
**future** [21:19] [36:3,5,17]
   [37:9,24] [38:6] [39:9,11]
   [43:5,9,11] [47:14]

___

G

**gather** [5:11] [17:8] [26:19]
   [32:11]
**gathered** [77:2]
**gathering** [24:12,13,23]
**gathers** [28:18]
**gave** [56:16,19] [101:25]
   [124:22]
**general** [22:17] [23:8] [25:21
   ,22] [35:22] [61:6] [74:15]
   [142:15] [165:22] [166:8,11]
   [179:15,17]
**generally** [153:9] [154:24]

[161:3] [169:15] [179:18]
**getting** [45:18]
**giant** [43:12]
**give** [12:20] [22:23] [113:6]
   [125:2] [143:10] [159:20]
   [168:17] [201:5]
**given** [10:3,14] [68:15]
   [85:6] [94:24] [95:16]
   [97:2,20] [105:9] [144:7,19]
   [210:8]
**gives** [32:13] [133:9]
**glatt** [2:4] [3:20]
**go** [25:7] [29:17] [36:22]
   [39:10] [40:15,19] [47:24]
   [61:10] [83:12] [92:6,14]
   [94:7] [100:21] [128:15]
   [129:3] [153:15] [169:19,25]
   [175:7] [179:9] [190:2]
   [195:10]
**goes** [24:11] [28:12] [35:11]
   [99:21] [128:16]
**going** [21:25] [23:6] [28:9]
   [39:10] [46:19] [47:6]
   [50:24] [52:4,7,22] [57:25]
   [66:3,9,15,17] [67:6,8,20
   ,23] [68:2,6,12,18] [69:9,15]
   [70:9,13,15,22,25] [71:5,23]
   [72:6,9,10,16,20,22] [73:11
   ,14,23] [74:5,18,25] [75:3,13]
   [89:5] [93:11] [95:25]
   [97:24] [106:13] [121:14,15]
   [122:15,23] [123:9] [124:3
   ,25] [125:12] [134:21,24]
   [136:12] [144:19] [147:15]
   [153:16,23] [156:15] [157:
   24] [158:3,9,12,15] [162:6]
   [188:19] [193:9]
**goldblatt** [61:19]
**gone** [28:2] [70:2] [105:25]
   [157:25] [161:17]
**good** [4:7,8] [57:5] [110:11]
   [118:7] [136:2] [158:4]
   [168:21] [174:14]
**gotten** [88:11,17,20,25]
   [167:19,25]
**grade** [161:11]
**graduate** [100:24]
**greater** [12:25] [89:10]
   [162:19] [172:22] [191:23]
**ground** [147:10]
**grounds** [56:13] [146:23,24]
   [147:22]
**group** [75:18] [92:18] [154:
   25]
**guarantee** [197:23] [200:2]
**guarantees** [74:11] [127:3]
   [183:7] [189:3] [190:7]
**guess** [147:22]
**guesswork** [87:8]
**guys** [156:12]

___

H

**half** [85:3,5] [136:14] [201:21]
**hand** [89:6] [124:18,19]
   [211:19]

**handwriting** [56:21] [57:5]
   [75:14]
**hang** [122:13]
**happen** [154:21]
**happened** [36:23] [37:6]
   [103:23] [112:3,8] [113:15
   ,18]
**happens** [179:11]
**hard** [148:13] [155:17]
   [160:12,14]
**hardest** [136:11]
**hasnt** [148:3] [151:6] [161:15]
**havent** [76:23] [110:6]
   [134:13] [135:21] [140:8]
   [142:25] [145:12] [151:10]
   [157:15,24] [168:13] [176:
   4,15] [188:2,9] [189:13]
   [195:3,17] [201:8]
**having** [4:3] [20:17] [29:5]
   [30:7] [119:19] [137:9]
   [148:13] [171:5] [185:24]
   [194:13] [201:13,24] [205:
   16]
**head** [65:21] [70:14]
**headed** [144:8] [147:19]
**healthier** [160:24]
**hear** [106:14,15]
**heard** [158:20] [201:24]
   [202:10]
**hed** [108:18]
**help** [61:23] [66:5] [125:19]
   [194:11]
**helped** [61:18]
**helpful** [5:5]
**helps** [180:3] [194:17]
**hereby** [210:5] [211:7]
**hereunto** [211:18]
**hes** [19:12] [100:14] [107:20]
   [109:8] [119:17] [121:11,20]
   [122:4]
**high** [84:4] [198:20] [202:13]
   [203:17] [205:17]
**higher** [130:6] [159:25]
   [176:23] [197:20] [199:23]
   [202:17] [203:25] [204:12]
   [206:4] [207:6]
**highlight** [183:16]
**highly** [192:6]
**hills** [3:7]
**hindsight** [13:23] [37:12]
   [113:17] [182:23]
**hired** [143:10]
**historical** [14:13] [47:12]
   [194:19]
**history** [23:25]
**hockey** [146:18] [150:11,14]
**holders** [133:25] [179:13]
**home** [136:6]
**homes** [3:13] [5:3,8,10,12,15
   ,21,25] [6:3,5,9,14,17]
   [163:19]
**honestly** [201:7] [205:11]
**hope** [66:4]
**horizon** [45:16]
**hour** [136:14]
**hours** [136:10]

___

**27/03/2008 PFEFFER, ALLEN M.**

however [8:7] [113:19]
[126:19] [184:24] [187:4]
[189:17] [193:11]
hundred [63:25] [178:2]
hundreds [8:15]
hypothetical [67:22] [84:22]
[85:10,16] [86:7,10,23]
[87:20] [88:25] [89:7,12]
[92:3,7] [93:12,22] [94:12,15]
[96:7,8] [97:9,11,19] [98:6
,25] [102:24] [105:2,7]
[106:2] [108:19,20,23]
[109:20] [110:6,13] [153:19]
[154:4,9] [166:12,18]
[167:4] [172:18,21]

I

id [12:17] [20:21] [65:22,24]
[75:25] [90:11,20] [93:2]
[104:21] [107:6] [109:13]
[111:4] [113:10] [121:24]
idea [110:6,9,12,21] [111:2
,4,5,7] [123:15] [140:25]
[166:7] [167:25] [168:7]
[172:2] [193:16]
identical [131:2]
identification [3:3] [122:22]
[125:18] [134:23] [162:14]
[180:20] [208:]
identified [155:6] [188:25]
[189:25]
identify [57:12] [155:5,9]
[180:24] [195:19]
identifying [153:16]
ignored [118:18]
ignores [161:15]
ill [22:16] [23:7,10,17] [38:4]
[55:10] [61:12] [82:4]
[95:6] [119:7] [130:8]
[162:12] [167:3]
illogical [192:21]
im [6:14] [10:21,22] [18:4]
[20:7] [25:21] [26:13]
[28:4,9] [29:13,21] [30:2,20]
[32:6] [33:13] [34:10]
[37:21] [40:11] [44:22,25]
[47:4] [53:16] [55:10]
[59:12] [61:11] [63:4,18]
[66:22] [71:24] [79:14,18]
[84:10] [91:10] [94:23]
[96:12,18] [97:16,17]
[103:5] [104:19] [105:22]
[106:8,13] [107:11] [112:17]
[114:17,25] [118:18] [120:
13,17] [121:7] [141:10,11]
[147:8] [148:13] [160:11]
[162:2] [165:23] [185:9,10
,11] [186:5,25] [187:17,23]
[188:4] [191:21] [192:14]
[193:9] [198:18] [204:25]
[205:6,9]
imagine [166:4]
imagining [203:10]
impact [191:11]
implications [148:6]

implied [200:21]
importance [79:7]
important [13:22] [14:5]
[78:23] [79:3,19] [98:20,21]
[133:4]
impression [48:25]
improved [160:5,22]
improvements [115,15,16]
improving [155:23] [161:14]
inappropriate [144:22]
[206:15]
inclination [89:20]
inclined [113:16] [199:18]
include [13:25] [65:18]
[95:25] [96:2,4] [99:6]
[107:6] [113:17] [146:25]
[173:7]
included [55:4] [61:16]
[73:8] [90:13] [126:23]
[207:2]
includes [14:8] [173:5]
including [14:7] [61:18]
inclusive [98:2,5]
income [31:17]
inconsistencies [151:7]
incorrect [68:6] [69:8]
[123:21] [206:11]
increased [51:2]
incredibly [14:5]
indecision [95:18]
indeed [186:15,17]
independent [21:9]
index [208:2]
indicated [162:19]
indicates [135:16]
indicating [56:18] [122:19]
[189:18] [205:2,9]
indication [14:23] [127:6]
indications [14:7] [109:16]
indicative [28:22] [142:6,19]
indicator [133:10]
indicators [6:5] [16:3]
[143:8] [144:4]
indirectly [211:16]
individual [12:10]
industry [15:23] [44:9]
[47:14,15] [99:10] [107:8,15]
[108:9]
infected [13:23]
influence [140:5,18]
information [5:12] [10:3]
[15:5,25] [19:9,12] [44:5]
[77:2] [79:21] [113:22,24]
[115:2,3,7] [116:13] [118:19]
[132:17] [134:8] [184:13]
[197:4] [209:3]
informed [170:9]
inherent [70:13]
initial [162:21]
initially [54:20] [202:4]
inputs [200:10] [204:16]
insolvency [12:21] [118:5]
[201:11]
insolvent [178:18] [179:4,20]
[180:4] [183:23]
instance [11:13] [85:15]

instances [11:7,8] [78:18,19
,20]
instead [65:11] [108:6]
[134:2] [163:17]
instruct [19:22] [20:13]
[21:25] [23:10] [52:22]
[56:12]
instructing [55:13]
instruction [22:7,13] [55:20]
integrated [92:22]
integration [92:24]
intend [20:24]
intended [62:16] [72:8]
[73:4] [96:14] [204:20]
[206:19]
intending [74:18] [200:9]
[203:15]
intention [72:22] [158:14]
intentions [72:15,19]
interest [41:11] [175:12,18]
interested [44:10] [155:3]
[211:15]
interject [18:25]
interview [77:5,9,13,16]
introduce [3:17]
introductory [102:12] [167:
14]
inventory [93:16,18]
investment [4:15] [161:10,11]
[198:10]
investmentgrade [161:10]
[198:10]
investment-grade [161:10]
[198:10]
investmentgradetype
[161:11]
investment-grade-type
[161:11]
investor [43:4,10]
investors [114:8]
involved [75:19] [76:12]
[95:9,11] [101:8]
involvement [24:2]
irrespective [35:14] [99:7]
[146:22]
isnt [16:23] [17:17,21]
[27:23] [32:22,25] [33:22]
[39:21] [41:7,11] [76:12]
[77:24] [82:18] [88:12]
[94:5] [101:17] [107:10]
[110:17] [120:14] [135:6]
[141:23] [145:2] [146:15]
[148:20] [150:21,23] [158:
5] [160:5] [161:4] [162:20]
[164:21] [172:4] [174:12,24]
[176:13,19] [177:25] [179:
16] [180:5,10] [186:3]
[189:21] [190:13] [191:14]
[201:13] [202:13] [204:5,22]
[205:6,17] [206:21] [207:7]
issuances [65:15]
issue [11:15] [19:2] [52:6]
[66:7] [96:13,14] [98:21]
[99:13,17] [104:9] [113:21]
[176:4]
issues [8:24,25] [23:14,15,16

,19,22] [49:20] [50:11,23,25]
[59:18] [61:23] [72:11]
[91:24] [96:3] [98:3] [100:3
,6] [101:8] [102:4,5] [104:16]
[107:7,8,15,17] [108:8]
[114:9] [125:24] [202:8]
itself [35:24] [43:15] [75:6]
[85:14] [99:11] [163:22]
iv [177:6]
ive [5:9] [8:22] [10:20] [11:13
,16,17,18] [32:19] [66:4]
[100:6,22] [104:15] [108:25]
[119:25] [148:9,15,16]
[149:15] [151:4] [157:25]
[171:10]

J

jacket [128:17]
john [61:19]
johns [182:4]
jpmorgan [64:20] [65:5,8]
jpmorgans [65:2]
judge [101:9]
judges [9:5]
judgmentally [174:21]
june [180:23] [181:4] [188:7]
[190:5]
junior [62:2,3]
juries [9:5]
jury [101:9]
justin [2:] [3:21] [162:12]

K

keep [30:21] [52:11]
key [197:19] [199:22]
kind [5:24] [11:5] [47:17]
[50:12] [92:17] [104:3]
[113:21] [115:3,7] [129:9]
[134:3] [149:25] [166:2]
kinds [4:25] [107:17]
knew [40:10] [58:14,16,19,20]
[60:14,23,25] [184:9]
know [4:19] [12:8] [13:4]
[18:16] [31:16] [35:7,23]
[36:14] [37:6] [44:3,6,23]
[51:10,11] [53:8] [55:12]
[56:17] [58:17,24] [64:2,4,10]
[71:11,13] [72:12] [75:6]
[77:23] [79:2,5,9,20] [80:2]
[82:5] [83:9] [87:12,16]
[88:16] [89:11] [93:15]
[94:20] [96:4,12] [99:8]
[107:19] [109:14] [110:9]
[111:7] [112:14] [113:20]
[115:2] [117:18,20] [122:2
,24] [125:3] [133:24] [136:7]
[141:3,21] [142:16] [143:15]
[144:20] [148:4] [149:24]
[150:8] [152:6,12] [153:22]
[154:24] [156:9,12,17]
[157:21] [161:10] [165:3,4
,11] [168:12] [170:15,18,22
,25] [171:3,22,23,24] [172:
6,8,14] [176:25] [177:2,14,16

,21,23,24] [181:14,17,18]
[183:14] [184:7,9] [185:22]
[186:19] [187:4,7,23,24,25]
[188:3] [189:10] [190:15,17]
[195:18] [197:16] [201:6]
[204:25] [205:11]
knowing [86:22] [142:16]
[152:23] [167:17] [184:24]
knowledge [18:18] [72:14]
[147:3] [166:10] [170:3,8,10]
[171:17]
knows [18:15]

---

L

labeled [187:22]
lack [44:12] [99:16] [113:20]
[114:3,17] [115:3] [174:19]
language [163:6] [198:9]
large [97:21] [98:20] [157:17
,21] [175:22]
largely [161:8]
larger [191:18]
last [36:23] [37:6] [126:2]
late [73:11] [98:10] [132:11]
[171:8] [172:12] [183:25]
[187:18]
later [31:7] [66:2] [92:10]
[133:17] [135:6] [172:23]
law [19:18] [100:21,22,25]
lawyers [77:4,21] [79:11]
[80:4]
lead [46:11,15] [62:25]
[152:14] [187:12] [202:9]
[206:19]
leading [191:12]
leads [44:15] [88:9] [117:14]
leap [43:12]
least [117:20] [123:15]
[145:13] [164:14]
leaving [189:17]
led [95:18]
left [179:8]
legal [96:12,13,14] [101:8,25]
legalink [3:5,24]
less [12:11] [124:2] [131:8]
[136:10] [145:18] [161:8]
[168:2] [179:21]
lesser [89:11] [172:22]
let [18:24] [19:14] [22:16]
[24:19] [31:21] [32:8]
[41:4] [56:18] [57:24]
[59:6] [69:9] [82:4] [95:4]
[98:19] [125:10] [142:14]
[143:20] [155:19] [159:19]
[168:18] [177:5] [193:22]
[195:5,23]
lets [13:3] [19:23] [25:4]
[27:6] [33:4,17,20] [34:13]
[37:17] [52:11] [66:6]
[83:12] [98:7] [106:15]
[108:11] [120:19] [122:13]
[128:23] [140:2,13] [197:17]
letters [127:3]
level [10:3] [44:8] [45:20]
[49:13] [51:2] [165:20]

levels [49:11] [92:24]
liabilities [10:19] [11:3]
[12:19] [90:12,25] [91:3]
[127:4] [139:21]
liabilitys [90:13]
life [70:17]
likely [49:16] [125:25] [157:
10] [186:12] [199:20]
liking [32:6]
limited [80:13] [92:23]
limiting [92:20]
line [59:10] [66:10] [128:23]
[134:17] [199:20] [208:19]
[209:4]
linklaters [2:8] [3:10,22]
[19:7] [20:9] [23:10]
liquidate [67:16] [73:4]
[92:17]
liquidated [69:23] [74:6]
liquidating [97:25]
liquidation [3:14] [14:4]
[67:10,15,25] [69:20]
[70:19] [71:17] [73:9,15,18
,20] [75:4] [109:15] [158:13]
[159:10]
liquidity [44:7] [49:19]
[50:10] [72:4] [173:12]
[174:9]
list [129:12]
listed [80:15]
lists [129:19] [130:17]
literature [9:13,15] [91:16]
litigation [23:23]
little [5:6] [165:12] [181:8]
[184:25]
llp [2:8]
loans [159:24]
locate [154:14]
london [84:5]
long [45:14] [101:19] [134:17]
longer [58:7]
look [8:9] [13:24] [14:6,12,14]
[15:21,23,24] [16:6] [19:3]
[26:7] [36:17,22] [37:5,11]
[40:24] [43:24] [46:16]
[47:17] [54:21,22] [65:22,24]
[66:6] [80:16] [90:11,24]
[92:19] [93:3] [96:5] [99:3]
[101:9] [104:21] [112:15]
[115:14] [116:12,13] [123:
13,25] [128:9] [129:10]
[134:24] [145:17] [162:12]
[171:7] [175:19] [182:15]
[187:21] [193:9,22] [194:20]
[196:24] [200:13,14] [202:
8]
looked [5:11] [6:2,4,21]
[7:2,4,24] [8:7,11] [18:21]
[21:14] [49:4] [53:6,7,8,21]
[65:9,11] [69:5] [96:18]
[99:22] [100:6] [103:12]
[145:11] [154:19,22] [165:
9] [176:4] [202:5]
looking [7:7] [16:16,20]
[26:3] [37:9] [41:2,5] [44:4
,6] [58:6] [75:10] [81:25]

[84:17] [89:15] [93:17]
[106:9] [109:15] [142:17]
[163:10] [185:10] [194:18]
[202:3]
looks [22:9] [59:10] [66:10]
[81:24] [82:10] [125:16]
los [2:] [3:5,24]
losing [45:17]
lot [16:25] [43:13] [44:5]
[46:24] [47:8] [66:4] [99:25]
[102:3,5] [103:6,7] [104:16]
[125:5] [134:6] [144:14]
[167:14]
low [178:22] [201:13] [202:12]
[203:16] [204:5,22] [207:5]
lower [58:2] [59:7] [62:7]
[84:12] [176:12,22] [183:6]
[197:12] [206:4,20]
lowered [176:18] [183:4]
lunch [136:2,13] [137:13]
[156:18]
luncheon [136:17]
lynch [155:16]

---

M

magnitude [111:7]
maintain [50:9]
majority [197:21] [199:24]
making [9:5] [19:24] [20:4,8]
[58:20] [60:17] [67:6]
[105:12,17] [147:21] [185:
17]
man [150:12]
management [114:8] [156:14]
[158:23,24]
manner [111:19] [146:19]
march [3:8] [210:6] [211:9]
marginal [107:16]
mark [121:15] [122:7,16]
[123:2] [125:12] [128:11]
[134:15] [162:6] [188:19,23]
marked [56:15] [81:19]
[122:22,25] [125:18] [128:
12] [134:23] [162:14] [180:
20]
market [4:17,21,23] [5:4]
[6:2,3,4,8] [7:4] [9:17,21]
[10:9,17] [11:3,17] [12:24]
[14:2,6] [15:11,15,16,21]
[16:2,17,20] [17:6,9] [22:8]
[24:23] [25:4,6,7] [26:20]
[29:3] [31:22,23] [32:10,12]
[33:7,13,18] [34:3] [43:23]
[53:9,21,24] [59:10,15]
[60:2,6,10,18,19] [62:14,17
,20,21] [63:14] [64:8] [88:15]
[89:15,21,22,25] [90:4,14,16]
[91:6,13] [92:15] [93:6,9,13
,15] [99:7,8,10] [104:17,18]
[107:6,16] [108:8] [109:15
,16,22] [111:6] [113:6]
[115:7,8,22,23] [116:2,12,16
,24] [117:7,25] [118:11,12,19]
[119:10,14,20] [120:2,5]
[121:12,20] [124:10] [126:

23] [127:6] [130:24] [132:7,10
,15,19,21] [133:5,6,9,10]
[134:8,9] [135:3,18] [137:15
,24] [138:19] [139:8,9,23]
[140:5,18] [141:11,13,17]
[142:6,7,10,18] [143:7,11,25]
[144:4] [152:15,19,22]
[153:2,6,12,13,22] [154:4,10]
[156:10,11,12] [160:22,23]
[161:3,9,17] [162:19,22]
[173:13] [175:22] [206:18]
marketability [44:12] [154:20]
[173:12] [174:19]
marketable [30:25] [96:5]
marketbased [115:7] [118:19]
market-based [115:7]
[118:19]
marketing [46:5]
marketplace [139:22] [175:
20]
markets [7:8] [24:13] [127:7]
[156:21,22]
marks [83:16,19] [136:16]
[137:5] [207:15]
marriage [211:14]
mary [56:16,19]
math [131:20] [135:21,23]
[139:16,24]
mathematical [113:5]
mathematics [131:23]
matter [3:13] [22:17] [23:8,18]
[43:7] [54:3,15,22] [62:5]
[80:8,21] [122:12] [128:3]
[131:21,22] [155:7] [156:20]
[157:17] [171:25] [211:16]
may [4:24] [12:5] [17:24]
[21:14] [27:17] [29:18]
[32:17] [35:19] [44:9]
[45:7,12,13,19,22,23]
[46:3,6] [53:11] [79:6]
[87:11] [93:11,17] [98:3]
[100:16] [108:5,6] [114:22]
[122:4] [137:17] [148:9]
[151:13] [155:2] [159:9]
[160:3] [180:4,13] [181:16]
[188:5]
maybe [66:3] [102:12]
[136:10] [186:7] [191:12]
mean [30:20,21,23] [31:12]
[32:16] [34:2] [36:14,16]
[44:23,24] [47:2] [49:17,18
,23] [50:5,8,9] [58:9] [59:20
,25] [76:7] [84:7] [92:25]
[97:18] [100:10,11] [104:13
,15] [117:9] [132:14] [134:6]
[138:3] [141:10] [144:12]
[151:5] [154:10] [160:14]
[178:11,14] [198:9]
meaning [9:22,24] [46:7]
[49:24] [131:9]
meaningful [157:22]
means [38:23] [39:4] [76:8]
[97:17] [110:25]
meant [58:10] [59:24] [60:2]
[104:14] [113:14] [142:23]
[143:23] [149:12] [161:21]

**27/03/2008  PFEFFER, ALLEN M.**

[202:15,16] [203:23]
**measure** [93:14] [175:23]
**measured** [135:17]
**measures** [16:4] [93:17]
**meet** [10:16]
**meeting** [57:9,11,19] [60:21]
**members** [61:16,18] [77:4]
[79:5] [82:18]
**memorialized** [60:23]
**mentioned** [8:8] [44:2,19]
[45:6] [104:15] [107:7]
[128:3]
**merrill** [155:16]
**method** [15:9] [31:4,22,23]
[34:6] [41:9] [69:18] [142:6
,8,11,19,20] [144:13] [191:
21,24] [206:13]
**methodologies** [9:9,12,15]
[13:16,25] [14:20] [15:8]
[27:3] [43:19] [76:10,16]
[106:19] [109:6] [173:25]
**methodology** [24:12,21]
[27:18,20,24] [28:3,6]
[29:22] [30:2] [31:14]
[34:15] [35:17] [43:20]
[46:17,20] [85:19] [91:11]
[96:16] [97:6] [98:16]
[142:14] [147:24] [151:6]
[178:15] [180:13] [190:23]
[192:16,20] [199:12] [203:
21,24] [204:12,16] [205:23]
**methods** [13:20] [113:7,9]
[116:14] [143:14] [144:7]
**michael** [61:17]
**mid** [49:2] [183:24] [187:17
,18]
**miller** [170:13,16,23] [171:18]
[172:3,7,9]
**million** [26:8,10,12,15,19]
[27:7,8,13] [33:18,19,20]
[62:12] [63:25] [64:5]
[88:4,7,11,15] [90:7,16]
[94:13] [98:10,17] [105:3,20]
[106:10,25] [109:22] [121:
3] [122:3,5] [123:22] [124:3
,5,6,11] [127:6,13,14,16]
[129:7,20] [130:20] [131:4
,11,12,14,19,23] [135:5,10
,12,18,22] [137:25] [138:6,7
,10,11,14,20] [139:11,12,25]
[140:13,19] [141:4,6,16,22
,23] [163:20,22] [166:20]
[167:9] [177:8,10] [178:2]
[189:20] [190:7,13] [191:16
,18,23] [205:21] [206:8]
**mind** [8:10,14] [153:18,20]
**minus** [131:21,25] [132:4]
[135:22] [139:11]
**minutes** [64:10] [94:20]
[107:3] [168:16]
**mischaracterized** [144:10]
**mischaracterizing** [118:16]
[190:14]
**misinformation** [113:20]
[114:3]
**missing** [28:4]

**misspoken** [122:4] [137:17]
**mistaken** [114:19] [185:15]
**mistakes** [188:25] [189:25]
[190:3]
**misunderstanding** [199:8]
**mode** [73:20,21] [74:2,4]
**model** [46:4] [47:18] [70:12
,15] [71:8] [93:2] [147:14]
[159:7] [169:21] [200:10,17]
[201:2,6,7] [204:15]
**modeled** [95:20] [103:19]
**moment** [31:21] [82:2]
[126:9] [129:15] [187:11]
[188:23]
**moments** [99:9]
**money** [38:23] [39:8,10]
[40:3] [41:10] [174:5]
**monkey** [82:7,9]
**month** [17:23] [22:24] [54:7]
**months** [176:5] [188:3,6,8]
[190:6] [206:25]
**morning** [4:7,8] [82:7]
**motion** [76:8,12]
**move** [82:3]
**movement** [161:21]
**movements** [104:17,18]
[107:7,16]
**mr** [3:19,21] [4:6,7] [7:10,23]
[9:7] [10:11] [11:6,22]
[13:9,21] [14:22] [16:24]
[17:22] [18:11,14,24]
[19:14] [20:3,4,7,15,16,18
,21] [21:3,20,24] [22:3,6,12
,16,18] [23:5,17] [24:16,20]
[25:5,18] [26:22] [27:16]
[28:25] [29:12] [30:13]
[31:10] [32:5,15,23] [33:2,10
,23] [34:9,23,25] [35:6,13]
[36:13,24] [37:2,20] [38:9,21]
[39:12,18] [40:5,22] [41:13]
[42:5,7,11,25] [43:6] [44:21]
[45:10] [46:14] [48:2,11,18]
[49:15] [50:16] [51:9,12,14
,15,16,22,23] [52:3,7,11,21]
[53:19] [54:5,17] [55:6,10,12
,19,23] [56:2,11,16] [57:13]
[59:23] [60:12,24] [62:10,23]
[63:16,23] [64:3,9,17,22]
[65:4] [66:21] [67:11,21]
[68:4,9,25] [69:11] [70:5,11]
[71:2,18] [73:5,12,17,24]
[74:19] [76:19,22] [79:13]
[80:5,12,24] [81:9] [82:5,13]
[83:4,9,12,14,21,22,23]
[85:21] [86:13] [87:4,14]
[88:13] [89:3,14] [90:10,19]
[91:9,18] [95:15] [96:11]
[97:13] [98:10,18] [100:5,10
,13,17] [101:18] [104:8]
[105:4,21] [106:3,7,12]
[108:17,24] [109:5] [110:8
,18,23] [111:16] [112:9,25]
[113:5] [114:6,13,16]
[116:11] [117:4,24] [118:23]
[119:3] [120:12,15,22]
[121:6,14,16,18] [122:6,8,10

,12,15,18,20] [123:4,6,7,8,12]
[124:12] [126:11] [127:9,18
,25] [128:11,20,22] [129:2,12
,16,21,23,24] [130:2] [131:
6,15] [132:2,8,22] [133:2,20
,24] [134:15] [135:7,13,20,25]
[136:4,5,7,9,13] [137:7,12
,13] [138:2] [139:13] [140:7]
[141:8,25] [142:9,21,23]
[143:17,22] [144:5] [145:6
,15] [148:21] [149:8,22]
[150:7] [151:3,17,23]
[152:8,10,17,25] [153:8,24]
[154:6,16] [159:17] [160:10]
[161:5,24] [162:6,9] [164:6]
[165:2] [166:14,25] [167:12]
[168:15,17,21] [169:3,10]
[171:14,21] [172:5,13]
[173:19] [174:7,13] [176:14
,21] [177:12] [178:5,19]
[179:24] [180:18] [183:12]
[184:5,19] [186:4,23]
[187:14] [188:18,22] [189:
14,22] [191:20] [192:13]
[193:4,19] [194:16,25]
[195:21] [196:3,19] [197:6
,15] [198:6,17,21,23] [199:
7] [200:6] [201:3,15,19,23]
[202:14,21,25] [203:3,4,7,8
,10] [204:6,23] [205:18]
[206:22] [207:8,11,13]
[208:]
**muddling** [40:12]
**multiple** [16:5,8] [30:10]
[31:12,15,17]
**multiples** [16:7]
**multiplied** [7:8]
**multiply** [25:11]
**multiplying** [6:10] [26:4]
**myles** [72:21]
**myself** [162:11]

---

**N**

**name** [16:19] [187:16]
**namely** [115:10,24] [118:10]
**names** [61:9]
**narrow** [5:5]
**nature** [23:8] [54:15] [93:22]
[104:25] [111:21] [151:8]
**necessarily** [69:24] [70:23]
[160:25] [161:13]
**necessary** [153:21,25]
**need** [21:2] [32:17] [42:17]
[45:15] [46:3,7] [74:10]
[94:7] [120:16] [121:19]
[123:25] [126:21] [136:8]
[162:12]
**needed** [61:23] [80:16]
[81:15]
**needs** [149:17]
**negative** [45:12]
**negatively** [161:14]
**neither** [10:5] [95:12]
**net** [31:17] [43:25]
**new** [2:] [3:11] [84:5] [134:8]

[210:4] [211:7]
**next** [37:18] [39:15] [82:5]
[136:14] [184:3] [190:11]
[192:2]
**nicole** [61:19]
**night** [17:17,21] [18:2]
**nine** [171:8,13,20] [188:8]
[190:5] [206:25]
**ninepoint** [171:8,13,20]
**nine-point** [171:8,13,20]
**nineties** [49:2]
**ninth** [66:10]
**no** [7:18] [14:18] [15:19]
[19:17,21] [21:8,9] [22:19]
[24:9] [26:10] [31:5] [38:11]
[42:15] [45:5] [46:23]
[47:21] [48:16] [58:7]
[59:24] [62:6] [64:18,24]
[65:3] [68:3,10] [69:6]
[73:2] [74:20] [77:12]
[81:3,10] [82:22] [86:18,21]
[88:23] [97:15] [100:20]
[101:4,6] [103:3] [104:2]
[109:8] [110:21] [119:23]
[120:7,9] [123:20] [124:13]
[128:15] [138:23] [145:12]
[149:9,10] [151:19] [152:12]
[154:2] [161:25] [167:24]
[169:11] [170:3,8] [172:2,24]
[174:15] [175:2] [177:23]
[180:15] [181:10] [188:22]
[190:14] [193:24] [196:22]
[202:23] [203:4,7,10,14]
[206:4,9,23] [207:9,11]
**non** [67:9,13,14]
**nongoing** [67:9,13,14]
**non-going** [67:9,13,14]
**nonpublic** [27:17]
**nor** [166:16] [191:25] [211:15
,16]
**normal** [49:21]
**notary** [210:17] [211:6]
**note** [57:14] [58:20] [66:9]
[164:15]
**noted** [137:3] [155:15]
[207:17]
**notes** [57:2,6,9,17,21]
[58:15] [60:15,19] [61:7]
[139:17,19] [155:17]
**nothing** [8:14] [113:15]
[155:12] [190:20] [207:13]
**notice** [76:2] [116:4] [188:24]
**nows** [168:21]
**number** [6:10] [19:16]
[25:12] [26:4] [34:4] [63:11
,25] [64:11] [73:7] [76:2]
[90:7,13] [93:19,20] [101:7]
[107:12,13,14,21,22]
[108:3] [111:5] [115:17]
[122:2] [123:2,16] [126:5,8]
[128:4,7] [129:13,25]
[130:4,18] [141:21,23]
[142:3,4] [150:17] [157:14]
[163:23] [180:5] [190:12]
[191:18,22] [203:25]
**numbers** [58:2] [63:19]

[90:21] [91:21,25] [107:4,10
,23] [108:2] [115:18] [129:8]
[130:8] [131:7,8] [134:7]
[136:12] [139:17] [156:17]
[207:5,6]
**numerator** [164:20,22]
[165:4]

─────────────

O

─────────────

**oakwood** [3:13] [5:3,7,10,12
,15,21,25] [6:3,5,9,14,17]
[7:19] [8:4,12] [13:4,5]
[17:5,9,12] [18:10,20]
[20:23] [21:19] [22:5,10,14]
[23:20,21,22] [24:2,8]
[25:19] [35:15,19] [48:9]
[51:7] [52:16,17] [53:25]
[55:5,15,18] [56:10] [58:10]
[68:7,12] [72:15] [78:4,6]
[95:22] [96:19,22,25]
[97:19] [98:10] [99:11]
[111:13] [112:21,22] [113:
7] [114:4] [116:19] [120:3]
[130:25] [135:3] [138:19]
[142:16] [154:13] [159:23,24]
[160:23] [161:8] [162:19]
[171:4,8] [172:11] [177:7,10]
[178:3] [183:23] [197:13]
[198:19] [199:11,15]
**oakwoods** [7:7] [9:18]
[25:24] [26:8] [45:6,11]
[51:25] [52:25] [53:17]
[59:17] [64:8] [65:15]
[84:20] [85:15] [116:25]
[119:14,15,20,22] [124:15]
[125:21] [126:5,14] [127:7]
[132:6] [133:16] [138:19]
[142:7] [143:11,24,25]
[155:23] [160:9] [173:12]
[183:4] [189:2,19] [191:15
,17] [194:3] [197:19,22]
[198:4,15] [199:3,22,25]
[205:21] [206:7] [207:3]
**oath** [185:21] [186:19]
[188:13] [210:6]
**object** [19:8]
**objection** [7:10,23] [9:7]
[10:11] [11:6,22] [13:9,21]
[14:22] [16:24] [17:22]
[18:11] [19:24] [21:20,24]
[22:6,12] [23:5] [24:16]
[25:5,18] [26:22] [27:16]
[28:25] [29:12] [30:13]
[31:10] [32:5,15,23] [33:2,10
,23] [34:9,23,25] [35:6,13]
[36:13,24] [37:2,20] [38:9,21]
[39:12,18] [40:5,22] [41:13]
[42:5,7,11,25] [43:6] [44:21]
[45:10] [46:14] [48:2,11,18]
[49:15] [50:16] [51:9]
[52:3,21] [54:5,17] [55:6,19]
[56:11] [57:13] [59:23]
[60:12,24] [62:10,23]
[63:16,23] [64:3,9,17,22]
[65:4] [66:21] [67:11,21]

[68:4,9,25] [69:11] [70:5,11]
[71:2,18] [73:5,12,17,24]
[74:19] [76:19,22] [79:13]
[80:5,12,24] [81:9] [82:13]
[83:4] [85:21] [86:13]
[87:4,14] [88:13] [89:3,14]
[90:10,19] [91:9,18] [95:15]
[96:11] [97:13] [98:18]
[100:5,10] [101:18] [104:8]
[105:4,21] [106:3,12]
[108:17,24] [109:5] [110:8
,18,23] [111:16] [112:9,25]
[114:6] [116:11] [117:4,24]
[118:23] [119:3] [120:12,15
,22] [121:6] [124:12] [126:11]
[127:9,18,25] [131:6,15]
[132:2,8,22] [133:2,20]
[135:7,13,20] [138:2]
[139:13] [140:7] [141:8,25]
[142:9,21] [144:5] [145:6,15]
[148:21] [149:8,22] [150:7]
[151:3,17,23] [152:8,17,25]
[153:8,24] [154:6,16]
[159:17] [160:10] [161:5,24]
[164:6] [165:2] [166:14,25]
[167:12] [169:10] [171:14,21]
[172:5,13] [173:19] [174:7
,13] [176:14,21] [177:12]
[178:5,19] [179:24] [183:12]
[184:5,19] [186:4,23]
[187:14] [189:22] [191:20]
[192:13] [193:4,19] [194:16
,25] [195:21] [196:3,19]
[197:6,15] [198:6,17,21,23
,23] [200:6] [201:3,15,19
,23] [202:14,21] [204:6,23]
[205:18] [206:22] [207:8]
**objections** [114:16]
**obligation** [85:8] [91:4]
**obligations** [10:16]
**observers** [47:13] [93:3]
[199:19]
**obtain** [65:7]
**obtained** [88:7]
**obtaining** [92:11] [96:21]
**obviously** [93:10] [99:17]
[116:13] [128:4] [175:15]
[184:8]
**occasion** [8:19] [105:13]
**occasions** [34:19,22]
**occurred** [86:11] [92:9]
[107:5] [159:14] [160:4]
[167:5] [172:23]
**october** [133:18] [156:18]
**odriscoll** [77:7,9]
**off** [51:18] [65:21] [67:24]
[74:3] [83:12,16,17] [128:17]
[136:16] [143:18] [168:23]
[207:16]
**offer** [188:12]
**offered** [188:16]
**offhand** [166:9]
**office** [21:6] [117:18] [125:4]
**offices** [3:10]
**official** [189:15]
**officially** [17:25]

**oh** [181:23] [194:9]
**ohc** [3:13]
**ohclt** [134:21] [208:13]
**okay** [4:25] [5:7,24] [10:14]
[11:11] [14:24] [17:4,15]
[18:3] [19:17] [21:11]
[22:3] [23:3] [24:7] [25:2,11]
[26:7] [27:11] [28:8] [29:25]
[30:7] [31:3,21] [32:9,18]
[33:6] [34:5] [35:10,21]
[36:19] [37:11,15,22]
[38:18] [39:5] [41:16]
[43:3] [48:9] [49:8] [54:2,8]
[58:6] [61:20] [65:12]
[66:6] [67:5] [69:7,25]
[70:21] [71:15] [73:15]
[76:25] [78:3,7] [79:24]
[81:4,25] [82:11,25] [83:5,14]
[84:13] [85:5] [86:8] [88:24]
[90:15] [92:2] [95:7] [97:4]
[98:13] [102:7] [105:17]
[107:18,25] [108:11,14]
[110:11] [115:5,13] [116:4]
[118:5,21] [119:8,13,18]
[123:7,23] [124:14,18,21,23]
[125:10] [126:9] [127:5]
[128:17,21] [130:13,15,16]
[131:18] [132:5,18] [134:10]
[135:24] [138:8,13] [139:4]
[142:5] [143:23] [148:17,24]
[149:6] [153:4] [155:14]
[157:23] [166:7] [168:14,21]
[169:12,16,23] [172:15]
[174:3,9] [175:25] [178:11
,16] [179:15,19] [180:2,9,12
,16] [181:23] [182:7,11,16,18]
[186:25] [188:5,11,17]
[189:11] [190:19] [194:23]
[195:5,8,19] [196:5] [197:17]
[202:18] [207:14]
**once** [19:16,20] [110:16]
[145:13] [169:5] [172:15]
[186:25]
**one** [4:21] [8:19] [12:3,15,17]
[13:13] [14:12,23] [15:3,5,7
,14] [16:21] [17:2,13,14]
[19:16,19] [20:24] [22:9]
[24:21] [25:24] [26:3]
[28:18,23] [29:20] [33:4,14]
[34:18,21] [35:23] [38:22]
[40:23] [43:15,16] [45:15]
[51:25] [52:16,25] [56:19]
[67:7,8,12] [71:3,4] [74:13]
[85:17] [86:4,25] [88:9]
[89:6] [91:12,13,14,21]
[98:7] [99:4] [103:10]
[105:13] [107:18] [109:12]
[114:24] [115:19] [117:6]
[130:3] [134:15,19,21]
[139:23] [140:25] [143:21]
[148:15,17] [149:16] [150:
3] [152:18] [157:19] [159:11]
[162:10] [164:8] [171:23]
[174:4] [175:19] [176:6]
[177:16] [178:24] [179:20,25]
[180:22] [182:12] [186:6]

[190:25] [197:8] [205:15]
**ones** [46:12] [66:6] [137:19]
[152:2] [183:10] [184:22]
[185:18] [187:13,14] [194:
14]
**operate** [67:18] [68:17,23]
[72:16,22] [74:18] [75:7]
[158:8]
**operated** [67:19]
**operating** [68:17,23] [72:20]
[73:22] [74:21] [75:7]
[147:17] [158:7,15]
**operation** [95:17]
**operations** [41:25] [50:18]
[95:2] [156:6] [157:3,9]
[158:19]
**operator** [3:5]
**opine** [4:22] [6:24] [24:5,7]
[55:14] [76:21,23] [186:2]
[193:5]
**opined** [10:25] [11:20]
[177:13] [193:8]
**opining** [4:12] [14:12] [55:4
,17] [116:14] [164:2]
**opinion** [6:19] [10:14,20]
[11:13] [13:7,23] [14:16,17]
[24:4] [48:20] [56:9] [68:13
,16,18,22] [69:2,10] [75:3]
[80:13] [85:6] [102:13,18]
[120:2] [142:10] [145:9,12]
[146:7,9,10] [150:20,24]
[151:15,18,20] [152:4,15]
[153:5,22] [156:2] [164:5]
[167:22,24] [168:11] [176:
5,7,8] [188:13] [190:21]
[191:4] [193:12,20] [195:4]
[201:11] [203:16,18] [204:
8,9,10,17] [205:3,4] [206:4
,6,9]
**opinions** [5:2] [9:3,17]
[80:7,11] [81:5] [82:15]
[100:3] [101:25] [153:5,11
,13] [188:15]
**opposite** [156:21]
**option** [44:3] [178:24] [179:
2] [195:7,24] [196:6,11,14,17
,23] [200:18]
**options** [47:5] [73:8] [92:13]
[93:25] [178:15]
**order** [36:21] [60:9] [92:7]
[99:24] [138:9] [153:21]
[184:13]
**ordinary** [15:6] [30:4]
**organization** [62:2]
**origin** [152:6]
**original** [46:12]
**otherwise** [193:8]
**outcome** [86:9]
**outlined** [148:5]
**outlook** [47:15]
**output** [200:10,11]
**outstanding** [6:10,15]
[7:9] [25:13] [27:12,13]
[32:12,13] [33:20] [63:11,22]
[121:3,13] [123:16,21]
**oversimplification** [117:5]

**27/03/2008  PFEFFER, ALLEN M.**

**overwhelming** [197:21] [199:24]
**own** [8:2,3] [14:17] [28:22] [53:17] [77:4] [144:6] [151:10] [191:4] [205:5]
**owns** [75:18]

---

**P**

**p.m** [136:15,17] [137:3,4] [168:22,25] [207:15,17]
**package** [125:2]
**pad** [57:15]
**page** [57:25] [58:6,7] [59:7] [62:7] [66:8] [75:10] [84:3] [115:18,20,21] [122:24] [129:10,13] [130:6] [134:25] [138:18] [155:19,21] [160: 21] [163:10,23] [164:15] [165:19] [169:4] [170:2,7,12] [172:19] [173:9] [177:5] [181:6,19,21] [182:2,6,10,12 ,15,17,21] [186:20] [188:24] [190:6,11] [191:11] [193:23] [194:7,15] [195:6] [196:5,14] [197:17,18] [200:13,15] [201:8] [208:4,7,19] [209:4]
**pages** [57:15] [78:15,18,22] [79:2,9,11,19,21] [80:2] [84:17] [115:6] [189:25] [192:15] [200:8]
**paging** [82:2]
**paid** [90:18] [94:14] [97:12] [110:13] [118:9] [119:19] [159:22] [161:22] [164:17] [167:11] [177:7] [179:6,16] [206:18]
**paper** [161:11]
**papers** [65:22,23]
**par** [175:14]
**paragraph** [84:18] [86:5] [115:15,16,21] [116:23] [155:20,22] [160:22] [163: 10] [170:7,12] [172:7] [173:9] [177:6] [182:21] [184:3] [185:4,13,14] [186:2] [187:2] [193:23] [194:10]
**paragraphs** [115:17] [200:7]
**paralegal** [61:19]
**part** [5:21] [7:11] [25:10,14] [27:18] [67:16,17] [75:22] [76:11] [102:18] [136:11] [154:15] [157:18,21,22] [163:3,4] [174:23] [196:23]
**participants** [29:4] [92:16]
**particular** [4:14] [16:2] [33:24] [44:15] [50:25] [58:24] [75:24] [76:10] [81:7] [82:6] [85:14] [114:22] [116:17] [121:19,25] [141: 12] [153:18] [154:11,14] [165:20] [173:4] [183:15] [188:22] [191:13]
**particularly** [19:2] [47:9]
**parties** [23:22] [211:15]

**parts** [7:12] [67:18,19,24]
**pass** [188:6]
**past** [13:8,18,25] [15:7] [36:8,9,11,18] [51:7,25] [52:2,16,17] [53:2,18,25] [55:5,18] [56:10] [65:16] [100:7] [114:9] [183:3]
**patterson** [61:19]
**pause** [122:14] [125:11] [128:24] [168:20] [180:17]
**pay** [12:11,12] [43:4,10,15] [44:16] [50:11] [152:23] [179:22]
**payable** [95:11] [165:21]
**paying** [119:10]
**payment** [50:19] [96:23,24] [134:4]
**payments** [175:12,18]
**pending** [114:14]
**people** [25:3] [50:12] [77:14] [92:12] [96:16] [182:22]
**peoples** [14:8]
**per** [25:8,11] [26:4]
**perceive** [207:4]
**perceives** [29:9] [146:18]
**percent** [41:18] [81:17] [82:11,14] [110:14] [138:7] [140:11,12,20,22] [164:11 ,14,20] [165:24] [166:5] [185:11] [187:7] [192:19] [200:14,16]
**percentage** [174:21]
**perform** [56:8] [60:9]
**performance** [47:12] [183:3] [194:4,19]
**performed** [53:13,17] [70:12 ,18] [142:12,13]
**performing** [89:22] [163:13]
**perhaps** [53:11] [98:7] [125:15] [195:23]
**period** [10:10] [23:4] [41:25] [42:3,12,18] [54:14] [107:6] [131:4] [147:3] [161:4] [177:11] [178:4]
**person** [202:10]
**personally** [18:6] [77:10,12] [118:8]
**persons** [57:11]
**perspective** [92:25]
**pessimistic** [169:9,12,24]
**pfeiffer** [3:12] [4:1,7] [5:1] [6:1] [7:1] [8:1] [9:1] [10:1] [11:1] [12:1] [13:1] [14:1] [15:1] [16:1] [17:1] [18:1] [19:1] [20:1] [21:1] [22:1] [23:1] [24:1,20] [25:1] [26:1] [27:1] [28:1] [29:1] [30:1] [31:1] [32:1] [33:1] [34:1] [35:1] [36:1] [37:1] [38:1] [39:1] [40:1] [41:1] [42:1] [43:1] [44:1] [45:1] [46:1] [47:1] [48:1] [49:1] [50:1] [51:1,23] [52:1] [53:1] [54:1] [55:1] [56:1] [57:1] [58:1] [59:1] [60:1] [61:1] [62:1] [63:1] [64:1]

[65:1] [66:1] [67:1] [68:1] [69:1] [70:1] [71:1] [72:1] [73:1] [74:1] [75:1] [76:1] [77:1] [78:1] [79:1] [80:1] [81:1] [82:1] [83:1,20,23] [84:1] [85:1] [86:1] [87:1] [88:1] [89:1] [90:1] [91:1] [92:1] [93:1] [94:1] [95:1] [96:1] [97:1] [98:1] [99:1] [100:1] [101:1] [102:1] [103:1] [104:1] [105:1] [106:1] [107:1] [108:1] [109:1] [110:1] [111:1] [112:1] [113:1,5] [114:1] [115:1] [116:1] [117:1] [118:1] [119:1] [120:1] [121:1] [122:1] [123:1] [124:1] [125:1] [126:1] [127:1] [128:1] [129:1] [130:1] [131:1] [132:1] [133:1] [134:1] [135:1] [137:1,6,13] [138:1] [139:1] [140:1] [141:1] [142:1] [143:1] [144:1] [145:1] [146:1] [147:1] [148:1] [149:1] [150:1] [151:1] [152:1] [153:1] [154:1] [155:1] [156:1] [157:1] [158:1] [159:1] [160:1] [161:1] [162:1] [163:1] [164:1] [165:1] [166:1] [167:1] [168:1] [169:1] [170:1] [171:1] [172:1] [173:1] [174:1] [175:1] [176:1] [177:1] [178:1] [179:1] [180:1] [181:1] [182:1] [183:1] [184:1] [185:1] [186:1] [187:1] [188:1] [189:1] [190:1] [191:1] [192:1] [193:1] [194:1] [195:1] [196:1] [197:1] [198:1] [199:1] [200:1] [201:1] [202:1] [203:1] [204:1] [205:1] [206:1] [208:9] [210:5,] [211:8]
**pfeiffers** [20:18] [52:7]
**phelps** [19:6] [20:8] [23:9] [75:18]
**phrases** [167:14]
**picked** [206:2]
**picture** [95:21] [98:5]
**place** [136:2] [143:21] [148:17] [174:14]
**plainly** [19:18]
**plaintiff** [2:] [3:20]
**plaintiffs** [176:18]
**plan** [71:23] [170:20] [171:8 ,13,20]
**planning** [46:7]
**platform** [74:6]
**plausible** [105:11]
**please** [3:17,25] [13:20] [15:20] [33:5] [38:3] [40:9] [42:9] [45:9] [55:22,24] [57:11] [62:9] [111:3]

[114:13] [166:23] [178:7] [180:25] [181:20] [190:18] [196:7]
**plus** [15:16] [16:16] [127:19] [129:5] [130:21] [183:6]
**point** [9:18] [14:19] [49:14] [51:25] [52:2] [55:5,15,18] [66:2] [89:17] [90:9] [94:2] [103:11] [105:12] [114:5] [148:11] [155:17] [162:24,25] [163:22] [165:20] [168:3,16] [175:15] [176:6] [186:13] [200:23] [203:23]
**pointed** [79:19] [83:25]
**points** [45:25] [47:7] [49:12] [53:18] [99:5] [155:3,15] [172:9] [189:2]
**poking** [192:15]
**policies** [50:19,20]
**poors** [14:25]
**portion** [59:5] [60:10] [91:3] [119:18] [196:17]
**portions** [7:14] [73:19] [78:11] [82:16,22]
**position** [20:22] [25:16] [27:9,22] [30:25] [50:3,5,8 ,15] [142:5] [150:3] [160:20] [169:8]
**positive** [39:25] [45:14] [160:16,17] [180:5]
**possibility** [71:5] [106:20]
**possible** [46:9] [117:9] [127:11] [141:10] [184:16]
**possibly** [134:11]
**post** [52:9] [53:19,20] [54:23] [55:8] [56:3,5] [155:22] [160:9]
**postapril** [52:9] [53:19,20] [54:23] [55:8] [56:3,5]
**post-april** [52:9] [53:19,20] [54:23] [55:8] [56:3,5]
**postbankruptcy** [160:9]
**post-bankruptcy** [160:9]
**postseptember** [155:22]
**post-september** [155:22]
**potential** [73:8] [92:15] [93:5] [96:4] [98:25] [153:19] [154:21] [155:18] [186:6]
**potentially** [21:7] [44:3] [45:18] [54:9] [164:9] [173:24]
**practice** [31:24] [45:2,8] [100:2]
**preceded** [181:16]
**preceding** [191:11]
**predicament** [72:4]
**predicted** [38:6,13,14,16] [39:24] [45:13]
**prefer** [29:19] [123:12]
**preference** [12:4]
**preliminarily** [145:11,19]
**preliminary** [55:17] [56:8]
**premarked** [3:2]
**premise** [68:19] [71:11] [133:5]
**premium** [44:13,18]

preparation [61:24] [170:23]
prepare [55:16] [61:23]
prepared [58:22] [149:10,11] [172:11] [182:24,25] [188:12] [201:9] [204:2] [206:25]
prepares [149:7]
present [2:] [36:5] [39:16] [40:17] [42:21] [43:8] [57:11] [104:5] [107:7]
president [61:22]
presume [157:17]
presumes [70:15]
presupposes [94:19]
pretty [79:18] [158:4] [198:20]
prevail [14:20]
previous [113:24] [183:21] [190:6] [203:9]
previously [4:3] [11:21] [56:14] [137:9]
price [6:11,15] [9:25] [25:12] [43:15] [44:15] [63:8] [65:20] [88:4] [95:10,21] [97:8,16] [120:21] [124:15] [125:5,16,20] [126:23] [128:7] [129:5,12] [130:25] [134:12] [138:9] [139:8,9] [152:22] [161:21] [173:22] [179:2]
prices [22:9,10] [24:13] [59:22] [60:6] [65:14] [84:2,5,6] [126:3] [133:7] [137:15] [160:21,23] [161:2,7] [165:9,20] [178:22]
primarily [38:17]
principal [38:20]
printed [182:7]
prior [19:5,13] [20:8] [22:5,15] [31:15] [50:24] [75:8] [146:2,3] [156:18,24]
priority [159:25]
privilege [19:17,20,21] [22:2] [56:13]
privileged [20:12]
privy [71:24]
probabilities [197:8,10]
probability [196:16,24] [197:4,13,20,22] [199:4,23 ,25] [200:12,19]
probably [122:6] [136:9,13] [188:9] [189:12] [193:7]
problem [89:19] [146:21] [147:9,11,13] [148:2] [158:22] [205:23,24,25] [206:2]
problems [53:7] [147:23,24 ,25] [151:5] [174:10]
proceeding [170:21] [172:17]
proceeds [103:15]
process [92:24] [106:23]
produce [205:13]
produced [125:4] [189:8]
production [189:15]
profession [4:20] [9:10] [13:16,17] [14:21] [15:8] [27:4] [29:22] [31:25] [34:16] [45:3] [91:16]

[96:16] [97:6]
professional [4:9] [25:2] [28:12,14] [29:7,9,14] [30:3,8,9] [35:11] [40:2,11 ,13,14,19] [41:4,6] [44:17] [100:3] [111:14] [132:20] [173:16,21] [188:13] [211:6]
professionals [9:4] [49:25] [174:11] [178:17]
professor [192:6]
profit [30:11]
programs [46:6] [50:17]
project [4:15] [42:15]
projected [36:10] [37:15] [42:13,17]
projection [36:3,4] [150:20] [172:7]
projections [46:8,12,21] [47:12,17] [51:7] [144:24] [145:21] [146:7,12,19,22,25] [147:6,9,23] [148:7,14,18,24 ,25] [149:2,7,10,15,19] [150:4,6,11,14,16,17] [151:15,16,21,22,25] [152:2,7,9] [169:6,9,13,25] [170:4,9,13,16,24] [171:3,19] [172:3,9,10] [182:23,25] [183:4,8,24] [184:2,10,15,17 ,21] [185:3,5,6,8,11,12,13,15 ,18,23] [186:2,7,11,16,20,21] [187:3,8,9,12,19] [188:20] [190:24] [192:9,18,22] [193:18,25] [194:6,12,18,24] [195:4] [197:24] [200:3]
proper [85:19] [86:4]
property [10:2,9]
proposal [159:22]
prospective [46:17]
prove [95:19]
provide [6:19] [75:2] [104:15] [167:22] [168:11] [173:21,24] [176:23] [177:19] [190:20] [204:7,8]
provided [10:20] [11:13,14] [23:13,21] [54:23] [65:24] [82:14] [176:5] [181:4] [200:17]
provides [133:12] [159:3] [193:24]
providing [120:2] [176:6,8] [204:17] [205:2]
public [6:3,12,13,18] [7:4,14 ,21] [8:9] [14:6] [16:17] [24:13,22] [27:8] [53:9] [60:9] [126:23] [127:7] [130:24] [210:17] [211:6]
publicly [15:23,24,25]
pull [122:13]
pure [131:21,22]
purport [123:10]
purported [149:15] [188:11]
purportedly [180:11]
purports [76:20] [98:22]
purpose [17:12] [35:23] [60:4] [206:12]

purposes [60:5] [61:24] [67:2] [70:8] [81:15] [123:15] [193:6]
put [76:8] [147:14] [157:11] [174:14]

Q

qualifications [76:9,18]
qualified [100:9,18]
quarrel [76:17] [176:10]
question [5:6] [11:9,20] [18:12,13,17] [22:18] [23:7] [24:8,18,19] [31:12,19] [32:7,8] [34:11] [37:21] [38:3,4] [41:4] [42:9,10] [44:23] [53:12,15] [55:22,25] [56:3] [60:20] [66:23] [74:24] [75:23] [77:6] [81:2] [91:10] [94:19] [95:4,6] [96:13] [98:19] [100:15] [101:20,23] [102:9,10] [105:5] [107:10,25] [110:2,3] [111:23] [112:15] [113:3,23] [114:14,15] [119:4,7] [132:24,25] [134:16] [141:15] [143:19,20] [144:10] [149:25] [160:13] [166:23,24] [167:2,3,13,15 ,16] [168:4] [178:7,8] [195:23] [196:25] [197:19] [198:24] [199:22] [201:16,18,21 ,22,24] [202:19,22,24] [203:2,3,5,9,12,13]
questioning [134:18]
questions [18:4] [19:3,11] [20:12,17,20,25] [33:3] [38:10] [52:8,10] [75:25] [137:14,17] [160:19] [207:12]
quick [136:4,5]
quit [128:23]
quite [77:6]
quoted [160:21]
quotes [193:15]

R

raising [176:12]
ran [47:23] [200:16,25] [201:6]
range [22:23]
ranges [16:6]
rare [35:4,8]
rate [21:18] [41:7,9,17] [45:4] [104:11,20,24] [169:18,20] [173:24] [174:4,12,17,22,24] [175:5,8,20] [176:9,11,13,22] [189:4] [192:5,10,19,22,25] [193:3 ,6,8,10,11,13,17,21] [197:3] [200:14,16]
rated [198:19]
rates [104:19] [175:25] [176:18] [193:14] [197:23] [200:2,25] [201:5]

rather [37:12] [53:16] [84:5] [93:15] [105:15] [106:2] [108:7] [115:21] [117:2] [124:9] [129:3] [133:18] [137:19] [146:13] [161:14]
rating [14:9] [197:25] [198:4 ,12,14,15,22] [199:5,6,11,15 ,17] [200:4,21] [207:3]
ratings [14:25] [199:19]
rationalize [58:21]
raw [95:10,20] [97:8,16]
re [75:12]
reach [43:3] [75:24] [195:2]
reached [49:5,9] [68:14] [145:7,12] [151:10] [193:20] [201:13] [202:11] [205:3,16]
react [161:18]
reacted [156:11]
read [42:8,10] [55:23,25] [59:14] [67:3] [75:14] [78:11,14,15,18,21,22,23,24] [79:2,4,6,9,12,19,21,22] [80:3] [103:7] [110:3] [114:14,15] [130:8] [132:25] [150:8] [151:8] [166:24] [178:8] [189:18] [195:17] [197:16] [198:2] [200:7,25] [201:18,21,22] [202:24] [210:]
reader [202:9] [203:15]
reading [80:14] [117:13,14] [170:5] [195:22]
reads [155:22] [182:21]
real [44:3] [96:10] [106:25]
realize [52:9]
really [10:22] [29:21] [44:22] [54:24] [65:2] [95:5] [97:17] [146:10] [150:24] [151:14] [156:12] [157:11] [176:25] [184:12] [193:16] [195:3] [200:23] [201:20] [206:24]
realm [142:2]
reason [64:15,18,24] [109:18] [121:22,25] [123:20] [124:9] [134:20] [149:6,9,11] [172:19] [183:15] [188:23]
reasonable [10:10] [126:4,7 ,14,16,17] [132:16] [150:6] [151:16] [182:22] [189:4] [197:23] [200:2,25] [201:4]
reasonableness [142:2]
reasonably [136:3]
reasons [57:17] [88:5] [134:6]
rebut [80:23]
rebuttal [6:6] [79:18,25] [80:18] [186:6]
rebutting [20:18] [81:15]
recall [11:12] [17:10,14] [21:21] [22:22] [48:4] [51:10,11] [54:12] [57:8,18] [61:3] [63:19,24] [64:11] [65:21] [73:19] [77:15,18,22] [78:6,9] [80:6] [145:16,19,20 ,23] [148:9] [176:15] [193:7]
receive [43:11]

**27/03/2008  PFEFFER, ALLEN M.**

received [70:3] [80:20]
[163:24] [164:13] [178:2,10]
recently [195:4]
recess [51:19] [136:18]
[168:24]
recognize [53:13] [56:21]
[76:15]
recognized [9:9] [13:15]
[27:3] [34:15]
reconcile [91:21]
reconciled [163:25]
record [3:18] [21:2] [51:18,21]
[52:5,11] [83:13,16,17,20]
[136:16] [137:6,22] [168:23]
[169:2] [182:11] [207:16]
[210:]
recovery [163:24] [164:5,14]
[165:15,24,25] [166:18]
refer [12:17] [18:5] [57:24]
[59:17] [66:16] [150:10]
[155:19] [165:18] [169:5]
[190:10]
reference [59:9] [62:9]
[105:13] [110:15] [150:15]
referenced [188:21]
references [62:11]
referred [24:21] [150:10]
[172:18]
referring [4:16] [6:14,18]
[59:12] [66:11] [97:16]
[165:19,21,23] [170:6]
[172:15] [182:12] [184:14,17]
[185:12] [186:20] [195:25]
refers [150:13] [184:20]
[185:13] [187:2] [196:2]
reflect [149:13]
reflected [86:5] [158:14]
[159:22] [165:15] [171:12]
[174:11] [175:12] [181:8]
[204:19]
reflecting [46:9] [181:25]
reflection [161:8,9]
reflects [162:22] [174:4]
[182:4]
regard [45:16] [68:14]
[74:8] [81:12] [93:4] [111:10]
[139:21] [144:11]
regarding [25:8]
regards [203:22]
registered [211:5]
regular [147:15]
rejected [71:11] [117:10]
[159:24]
relate [20:17] [74:23] [104:17]
[108:8]
related [5:10,21] [8:5,25]
[17:5,12] [18:20] [22:5,10,14]
[23:19] [68:13] [74:25]
[96:3] [100:6] [107:8,15]
[162:21] [163:22] [177:10]
[178:3] [203:5] [211:14]
relates [5:18] [6:6] [7:25]
[8:3] [12:2,3] [14:9] [16:2]
[19:12] [21:7,11,16] [23:23]
[52:18] [53:2] [59:5] [75:2]
[93:7] [99:12] [103:11]

relating [75:23]
relation [20:23] [21:19]
relationship [20:11] [52:7]
[55:8,9]
relative [22:24] [47:12,13]
[50:2,4,7,14] [53:24] [110:
19] [111:8] [112:12] [134:3]
[141:12,15] [144:9] [159:18]
[165:6] [183:3] [185:4]
[190:21] [194:19] [199:3]
[206:9]
relevance [133:6] [164:4]
relevant [5:3] [118:15,22,24]
[119:6] [143:5,8] [163:16]
reliability [133:10] [182:23]
relied [149:21]
remain [169:21]
remaining [169:17]
remains [169:18]
remark [102:12]
remember [63:17] [77:25]
[121:8] [123:2] [145:24]
[186:9] [187:20] [194:11,17]
render [5:2] [13:6] [100:3]
rendered [100:8]
rendition [56:9]
reorganization [73:8] [170:
20]
reorganized [73:13]
repeat [24:17] [38:2,4]
[55:21] [109:25] [132:23]
[143:19] [166:22] [178:6]
[201:16]
repeated [177:20]
rephrase [24:19] [102:9]
[119:7]
report [5:9,19,22] [6:7]
[8:6] [9:16] [13:12] [17:17,19
,23] [18:2] [19:6,25] [20:19]
[52:18] [53:3,22,23] [54:24]
[55:2] [61:24] [62:12]
[65:25] [68:14] [69:21]
[70:6] [76:21] [79:14]
[80:14,18,23] [81:16,19,23]
[82:8,10,12,15,22] [83:2,6]
[88:3] [98:11] [101:11]
[102:6] [103:7] [105:11]
[109:23] [110:16] [115:6]
[117:14] [118:2,3,7] [120:23]
[121:10,11] [124:20] [128:
9] [146:24] [148:5] [151:9]
[154:20] [155:13,20] [157:
2] [162:16,18,21] [163:7,11]
[165:19] [169:4] [170:18]
[172:19] [176:2,24] [177:6]
[181:3,5,24] [182:3] [183:18]
[184:12,22] [185:8,10,14,19]
[186:6] [187:3,24] [188:2,6
,20] [190:15,20,22] [191:3,4]
[192:3] [193:6,10,24]
[194:5,19,21] [195:6,10]
[197:8] [199:9,10] [202:3,4]
[205:2,4,8,12,14] [208:9]
reporter [3:24] [61:10]

[114:13] [211:6]
reports [176:16] [177:3]
reputation [96:4]
reputational [98:3]
request [209:3]
require [114:24]
required [12:11,12] [97:7]
[179:22]
resolution [84:20,21] [85:9]
[86:6] [89:17] [103:15]
[163:18]
resource [75:21]
respect [12:15] [15:25]
[18:9] [19:9] [45:20] [47:14]
[52:6,8] [54:25] [56:3]
[74:4] [76:13] [80:22]
[150:20]
respected [192:6]
respecting [130:24]
respectively [84:4]
respond [19:14]
response [98:19]
restate [102:10] [143:20]
[167:3]
restructured [158:2]
restructuring [75:13,17,24]
result [72:12] [85:23] [86:22
,24] [89:11] [105:14] [110:16]
[129:6] [157:7] [160:16,17]
resulted [72:12]
resulting [85:15] [200:19]
results [89:7,8] [129:8]
[141:21] [172:17] [197:9]
[200:11]
return [31:21] [175:20]
revenue [16:3]
review [80:17] [181:16]
[194:3]
reviewed [78:17] [80:9]
[176:15] [177:3] [201:8]
reviewing [23:12] [85:2]
[117:12] [123:17] [135:2,14]
[152:11] [163:8] [181:2,13]
[182:14] [183:13] [189:9,23]
[196:8,20]
revised [181:5,21] [196:6,11
,13] [197:10] [200:10,11]
[202:7] [203:21,24]
revising [200:9]
rewrite [163:6]
ridiculousness [192:16]
right [5:11,12] [6:8,16,23]
[7:2,6] [8:14,15,19,20]
[10:23] [13:3,15] [14:21]
[16:21] [20:15] [23:24]
[24:24,25] [25:9,17,25]
[26:5,9,15,16,21] [27:9,15
,19] [28:2] [29:5,20] [30:16
,18] [34:12] [35:15,17]
[36:7] [37:19] [38:24]
[39:11,13,22,23] [40:4]
[41:12] [42:20,24] [43:5,10
,11] [53:11,15] [54:4] [55:16]
[57:20,24] [58:3,6,17]
[59:6,7] [60:14] [61:5,14,25]
[62:7] [63:20] [65:6,10]

[66:2] [71:6,20] [73:16,22]
[74:23] [75:10] [77:23,24]
[80:7] [82:3,19] [84:17]
[85:7,12] [86:17] [87:25]
[95:4] [98:7] [101:21]
[105:15,16] [107:18] [108:
2,3] [109:18] [112:5] [116:16
,22] [117:19] [118:3] [120:10
,23] [121:9] [123:6,7,8]
[124:2,7,16,17] [125:23,24]
[126:12,25] [127:11] [129:
4,20] [130:6,14,18,22]
[131:12,13,14,16,19,24]
[132:3] [134:14] [135:23,25]
[138:15,21,24,25] [139:7]
[140:15] [148:12] [149:4]
[150:22,23,25] [152:10,24]
[153:12] [155:10] [161:20]
[162:5] [163:7] [168:6]
[169:14,19] [170:2,22]
[171:7] [173:9] [175:3,6]
[179:6,7,9] [180:6] [182:2,9]
[185:5,12] [186:19] [188:9
,10] [190:8] [191:19] [193:9
,22] [195:13] [196:13]
[198:18] [201:17] [204:19]
righthand [58:3] [59:7]
right-hand [58:3] [59:7]
ring [198:7]
rise [161:2,3,7] [162:18]
risk [174:5] [175:23] [198:20]
robert [182:4]
role [54:24] [61:21,22]
[99:16] [155:8]
roman [173:10] [177:6]
room [120:14,17] [126:10,13
,20]
rough [123:15]
roughly [90:6] [120:21]
[124:11] [127:6,13,14,15]
[131:14] [138:6,11,14]
[139:11]
rule [179:3,15]
run [201:7]

S

s&p [200:21]

sale [45:20] [74:11] [88:21]
[91:8,15] [94:12] [95:10]
[97:8] [98:17,24,25] [105:15]
[108:19,23] [109:21] [110:
6] [111:15,20] [112:24]
[113:13] [154:22] [158:11]
[163:13,19,21] [166:11,12]
[167:10]
saleable [179:21]
sales [88:4] [95:21] [97:16]
sarah [2:] [3:5]
saw [128:3] [135:4] [148:7,17
,22] [149:18] [156:20]
[157:5,7,9] [177:21,23]
[186:14] [189:12]
say [4:16] [6:8] [13:16]
[14:14] [16:20] [17:15]
[18:4] [21:11] [22:9] [27:7]

[32:24] [33:17,20] [34:5,21]
[35:3] [36:4,20] [37:13,16,17]
[40:6,8,9,16] [41:18] [49:7
,11,22] [50:4,7] [52:4]
[57:4] [59:20] [68:10]
[87:10] [88:19,23] [89:21]
[92:3] [95:8] [96:17] [97:14]
[102:22] [103:12] [105:6,18]
[107:18] [116:4] [126:19]
[133:8] [140:10] [142:13,24]
[143:23] [144:9,12] [145:13]
[157:5,6,7] [158:16,20]
[165:25] [166:7] [167:5]
[170:2] [171:18] [173:10]
[174:3] [183:8] [184:2]
[186:5] [188:25] [191:8]
[194:15] [197:18] [204:25]
saying [47:4] [60:8] [68:21]
[69:7,13,22,25] [70:7]
[84:19] [85:12,13] [89:10]
[96:18] [97:4] [103:5,6]
[118:18] [147:8] [161:20,22]
[162:2] [164:10] [177:15]
[185:9] [186:25] [187:17,23]
[191:15,16,21] [192:8,14]
[200:24]
says [59:10] [66:9] [75:12]
[85:6] [88:10] [98:11]
[189:24] [190:15,22] [192:
3] [201:4]
scenario [46:7] [67:22]
[69:20] [72:5] [159:10]
scenarios [46:9] [47:5]
[91:23] [92:19] [93:2]
[106:17,21] [109:12] [143:
5]
schedules [186:14] [189:5,7]
[191:6] [192:4,10]
school [100:21,22,23]
science [28:5]
seat [179:13]
second [42:2] [83:13] [91:14]
[107:22] [122:13] [147:18]
[155:21] [168:18] [201:21]
secondary [203:5]
secondly [163:21]
section [115:5] [195:6,11]
securities [30:25] [132:6,9]
securitization [74:4,9]
securitizations [160:2]
securitized [159:23]
seek [4:23]
seem [161:18] [194:21]
seemed [74:15]
seems [196:9,15]
seen [81:6] [86:8] [148:9,11
,15,16] [149:15] [157:23,25]
[160:3] [171:10] [188:2,5,9]
[189:13]
selected [17:16,21] [79:11]
sell [10:6] [45:25] [67:17]
[93:16]
seller [10:2] [154:8]
selling [25:9] [29:4] [164:10]
senior [61:25] [62:5]
sense [10:16] [12:21] [14:8]

[104:23] [180:4]
sentence [85:4] [155:21]
[156:4] [160:20] [183:21]
[184:8,9] [189:18] [190:11]
[192:2] [200:24] [201:4]
separate [102:4]
separately [6:24]
september [62:8,13] [64:7,12]
[65:18] [66:20,25] [68:7,15
,18,23] [69:9,14,16] [72:16
,25] [73:6] [84:22] [85:11]
[86:2] [88:6,12,15] [95:2,18]
[101:16,17] [102:15,16]
[103:13,17] [112:21,23]
[114:21] [118:11,12,14,15
,25] [119:14,15,21,22]
[120:5,6,19] [121:21]
[123:22] [124:10,16] [125:
21,25] [126:2] [129:9]
[130:25] [131:2] [133:14,17]
[135:11] [137:16,23] [138:
17,20] [139:9,10] [140:14]
[142:7,18] [143:12] [144:2]
[156:6,24] [159:6] [160:24]
[162:20] [163:17] [189:4,5
,21] [190:8] [193:17] [200:15]
[205:22] [206:7]
series [137:14]
served [8:18,22] [19:6,25]
[20:9]
service [19:5] [159:23]
servicer [159:22]
services [19:13]
servicing [160:2]
set [9:12] [15:5] [21:18]
[37:15] [49:25] [51:6]
[54:22] [97:20] [114:23]
[122:18,20] [124:23] [132:
6,9,17] [147:3] [148:17]
[149:16] [153:19] [184:15,16]
[185:5,7,22] [186:21]
[192:18] [211:18]
sets [134:20] [148:14]
several [37:19] [108:25]
[163:15]
shapiro [62:8,17] [63:21]
[64:7,16,18,23,25] [117:22
,25] [121:9] [123:23] [128:6]
shapiros [62:11] [63:6]
[64:12] [90:8] [109:23]
[118:6] [121:11] [128:4,9]
[137:18]
share [6:11,15] [25:8,12]
[26:4] [138:16]
shares [6:10,14] [7:21]
[16:16] [25:12] [26:5]
[63:11] [121:3,13] [122:2]
[123:16,21,22] [138:11]
sheet [31:9] [32:4] [43:25]
shes [61:25] [62:3]
short [45:12] [51:16] [66:5]
shortcircuit [66:5]
short-circuit [66:5]
shorten [82:4]
shorthand [28:10]
shouldnt [149:21]

show [56:14] [84:3] [120:5,6]
[121:10] [123:9] [127:5]
[137:20] [140:6] [160:23]
[165:6] [176:24] [204:11]
showed [90:16] [155:23]
[156:17]
showing [121:12,20] [181:8]
shown [84:2] [118:21]
[133:14] [135:10] [137:22]
[162:16] [166:20] [197:21]
[199:24]
shows [109:23] [121:9]
[123:23] [125:20] [131:22,23]
[133:16] [135:3,9] [162:17]
[165:8] [182:25] [183:9,22]
[190:7,9]
shut [156:5] [157:3]
side [181:15]
sign [17:25]
signed [210:13]
significance [155:25] [156:
3] [161:13]
significant [140:9] [155:23]
[156:3] [164:7] [178:23]
significantly [197:20] [199:
23]
similar [15:22] [16:8] [106:21]
[205:4]
similarity [172:10]
simple [91:19] [109:7]
simpler [195:23]
simplified [12:14]
simplistic [175:15]
simply [37:12] [95:10]
[102:2] [130:23] [146:13]
[190:22] [203:20] [204:10,11]
single [12:7] [84:14] [199:17]
sir [11:9] [17:15] [21:4]
[45:3] [56:14,22] [60:8]
[69:9] [71:15] [72:7] [73:11]
[75:11] [78:12] [79:10]
[81:19] [82:12,21] [84:14]
[88:10] [89:5] [91:5] [100:4
,15] [101:13] [105:12,25]
[110:5,12] [114:5] [116:23]
[122:15] [124:8] [125:12]
[129:4] [130:6] [133:13]
[134:24] [142:5] [143:10]
[154:3] [155:7] [156:2]
[160:4] [161:2] [162:15]
[163:10] [166:17] [167:18]
[169:4] [171:17] [180:25]
[183:8] [185:21] [192:2,8]
[194:11] [198:2,12] [201:9]
[203:13] [206:24]
sit [82:21] [83:6] [86:21]
[109:19] [110:5] [140:24]
[146:6] [150:2] [167:18]
[168:7] [177:24] [185:21]
[190:6]
sitting [11:12] [61:3] [71:10]
[77:25] [78:5,9] [82:5]
[84:10] [120:10] [141:3]
[147:5] [184:24] [185:3,9]
[186:9] [206:5,12]
situation [35:24] [44:7]

[49:19] [144:17] [156:23]
[159:8]
situations [10:24] [42:14]
[116:6]
six [188:2,6]
slaps [192:19]
slightly [130:5]
sloppy [203:22]
small [7:14]
smaller [87:13,17,18] [171:
4,12]
sold [26:3] [28:23] [29:2,3,6]
[67:24] [73:10,11,13,15,18
,20,23] [74:3] [93:18] [98:9]
[106:25] [157:23] [158:3,8]
solvency [11:13,21,24]
[12:2,3,6,8,16,18,21]
[14:7] [24:8] [118:7] [202:4]
solvent [10:15,25] [27:21]
somebody [60:15,21] [61:25]
[86:9]
somehow [104:5]
someone [44:16] [58:13]
something [4:13] [15:2]
[28:4] [30:10,11] [32:14]
[36:25] [37:3] [58:13,14,16]
[59:11] [60:20,22,25]
[94:17] [98:13] [100:12]
[156:25] [179:14] [182:4]
[187:16] [203:11]
sometimes [16:10] [42:3]
[179:13]
somewhat [73:13] [133:5]
[203:22]
somewhere [8:22] [145:24]
[200:18,20]
sorry [24:15] [26:13] [32:7]
[40:7] [50:6] [61:17] [68:4]
[77:8] [83:11] [110:2]
[115:14] [121:14] [123:4]
[129:21] [132:23] [142:23]
[143:16] [170:6] [178:7]
[182:13] [194:7] [201:20]
[202:25]
sort [149:19]
source [183:19] [185:2]
sources [186:11] [193:14]
speak [63:3] [75:12] [79:15]
[123:10]
speaking [3:5] [21:4] [35:14]
[36:2,11] [38:7] [42:21]
[53:4] [62:17] [64:7] [101:10]
[153:9] [154:17] [169:15]
[175:24]
speaks [34:6]
specific [6:11] [7:8] [8:8]
[10:22] [26:20] [28:19]
[59:22] [65:15] [99:10]
[155:5,9]
specifically [63:3,4] [64:11]
[81:6] [114:17] [155:16]
specificity [99:18]
speculative [151:7] [192:20]
[206:15]
speech [101:19,23]
spell [61:9]

## 27/03/2008  PFEFFER, ALLEN M.

spend [46:5]
spit [199:13]
ss [211:4]
stable [45:18]
staff [51:6] [61:18] [181:5]
stakeholders [95:24] [96:24]
[97:21] [179:5]
stamped [122:24] [182:13]
[208:10,,13,,]
stamps [134:20]
stand [83:5] [84:14] [170:19]
standalone [170:19]
stand-alone [170:19]
standard [14:25] [29:21]
[30:2] [45:2,7] [46:16]
standing [31:5]
standish [72:21]
stands [203:12]
stars [2:5]
start [90:6,14] [93:23] [120:
19]
starting [36:21] [90:9]
starts [36:3] [115:19] [123:4]
[195:6] [196:5]
state [45:18] [98:6] [143:6]
[157:10] [210:] [211:7]
stated [72:21] [111:8] [146:
24]
statement [48:22] [94:24]
[127:23] [144:14] [161:12]
[188:4] [199:3,9,10,21]
[200:5,11]
statements [23:21] [114:20]
[120:17] [126:21] [146:16]
[207:2]
states [3:15]
stenographically [211:12]
step [38:20] [39:15] [43:12]
[98:7,20]
steps [24:10] [28:3,11]
[35:10] [38:22] [46:20]
[47:25] [58:11,21,24]
[92:6] [94:4] [105:24]
stick [103:10] [146:18]
[150:11,14]
stock [15:15] [22:10] [24:13
,23] [25:9] [26:3] [27:12]
[29:4] [32:12] [62:20]
[63:8] [84:2] [89:23] [115:10
,24] [120:21] [126:24]
[129:5] [130:17,24] [131:11]
[133:16,18] [134:7] [135:9]
[137:15] [138:19] [139:2,8]
[178:17,22] [180:5]
stockholders [25:16] [179:
9,16]
stood [31:25] [83:24]
stopped [158:19]
story [141:12]
strategic [155:2]
strictly [101:10]
strike [13:5] [26:14] [37:4]
[81:17] [182:18]
string [125:14] [180:21]
[208:]
strong [197:25] [198:11,13,22]

[199:4,11,14] [200:4] [207:3]
structure [134:5]
studied [41:21] [46:12]
[76:24] [97:5,7] [168:13]
studies [7:20] [47:24] [55:17]
[56:8] [62:25] [63:5,15]
[64:6] [80:10] [89:9] [140:6]
[176:3]
study [5:7,9] [18:20] [39:14]
[41:25] [42:4] [46:11,13]
[51:8,24] [53:17] [70:9]
[89:4,23] [113:8] [140:18]
[141:7] [144:24] [167:10]
[173:18] [189:21] [190:10]
[196:24]
studying [24:21] [116:19]
stutman [2:4] [3:19]
subject [22:17] [23:8,18]
[28:15] [29:10] [30:12,16,19]
[32:20] [71:14] [127:11,16
,21] [128:2,5] [145:10,12]
[151:11] [196:17]
subjects [9:4] [76:20]
subscribed [210:13]
subsequent [112:18,19,24]
[113:22]
substantially [165:13]
subtract [113:10]
sufficient [10:3] [59:11,15,20
,21] [60:2,4,9,18,19] [119:10
,19] [123:14,18] [161:23]
sufficiently [116:17]
suggest [104:4]
suggestion [206:17]
suggests [158:17]
suisse [2:9] [3:14,22] [129:
19] [130:16] [133:15] [148:
19] [171:9] [172:11] [177:8
,9,25] [178:9] [198:16,19]
[199:6]
suisses [99:16] [124:25]
suite [3:6]
sum [27:21] [129:8] [130:5,19]
[131:7,8,18]
summarized [84:24] [191:10]
summarizing [85:3]
supplemental [109:23]
[118:3,6]
support [65:25] [76:12]
[162:2] [193:25] [194:5]
suppose [108:11] [191:6,8]
sure [10:21] [19:10] [28:9]
[29:13] [30:21] [37:6,21]
[44:22,25] [60:17] [61:11]
[63:4,18] [66:22] [84:10]
[90:21] [96:12] [97:17]
[98:21] [104:19] [105:22]
[106:8] [120:13,17] [128:19]
[137:21] [144:15] [152:12]
[160:11] [171:24] [182:17]
[184:9,13] [185:3,11]
[187:7] [188:4] [198:18]
[201:17]
surrounding [91:25]
suspended [157:3]
swear [3:25]

sworn [4:3] [137:9] [211:10]
synergies [44:11,19]
_____

T
_____

table [179:13]
tables [197:22] [199:25]
taken [51:19] [57:22] [58:25]
[85:24] [136:18] [163:12,14]
[168:24] [210:] [211:8,12]
taking [107:20] [117:2]
talk [34:13] [43:8] [76:25]
[77:19] [78:3,7] [115:22]
[140:2] [142:14] [164:13]
[205:7,9,14]
talked [115:25] [127:23]
talking [6:9] [7:6] [18:9]
[32:20] [33:24] [35:15,17]
[43:9] [78:6,10] [89:22]
[90:3,4] [96:23] [115:8,16,19]
[164:12,16] [165:17] [185:
5,7] [205:8]
talks [115:6]
tape [83:16,19] [136:16]
[137:5]
taught [101:5]
tax [175:17,18]
team [18:6,9,19] [21:14]
[48:4] [51:24] [52:15]
[53:16] [61:2,4,5,8,16]
[62:4] [77:4,13,16,19]
[79:6] [82:18]
technical [38:25] [191:9]
technique [85:13]
telephone [57:7,8,10]
tell [30:2] [41:3] [50:8]
[52:24] [58:19] [70:14]
[92:6] [101:10] [106:13]
[107:24] [113:11] [117:16,17]
[125:20] [187:10] [195:11,18]
[196:6] [206:12]
telling [60:16] [94:23] [102:
2] [111:6]
tells [74:17,21] [190:11]
temporal [20:5] [52:6]
ten [140:12]
tennenbaum [5:10] [6:21]
[7:25] [9:19] [13:12] [16:22]
[21:8,12] [53:4,14] [54:25]
[66:17] [69:8] [71:7] [76:13]
[80:18,23] [85:7] [86:2,25]
[88:10,14] [92:4] [94:23]
[95:8] [97:7] [98:14,22]
[104:4] [105:6,18] [111:8]
[116:24] [118:9] [119:9]
[142:12,14] [144:20,23]
[145:22] [146:13,17] [147:
4,19,20] [148:18] [149:3]
[150:4,8,21] [156:4] [158:16]
[161:14,22] [163:12] [164:
2] [166:13,16] [167:6,24]
[173:2,10] [176:2] [177:7]
[180:9] [183:10,18] [184:10]
[185:24] [186:7,21] [188:19]
[189:20] [191:17] [192:7]
[193:24] [194:4,13] [196:2]

[197:7,13] [200:17] [201:12]
[202:11] [205:15] [206:17]
tennenbaums [5:18,22]
[6:6] [8:6] [9:16] [19:5,25]
[20:18] [21:14] [52:18]
[53:3] [66:11,24] [68:13]
[69:21] [76:18] [79:17,25]
[80:14] [81:16] [84:18]
[85:18] [87:22] [88:9]
[89:8,11] [95:16] [99:20]
[101:11,14] [102:13] [141:
6,15] [146:4] [156:25]
[166:20] [169:6] [172:16]
[176:11] [183:17,22] [184:
21] [186:10] [191:21] [192:
9] [196:10] [201:11] [202:3
,17] [203:20] [204:4,21]
[205:20] [206:6]
term [9:21] [12:21] [25:2]
[45:12,14] [47:2] [48:12,14]
[76:3,5] [132:14] [178:11]
[183:16,17] [195:24]
terminal [42:3,14,15,19]
[45:22]
terminologies [4:20]
terms [19:3] [21:13] [22:17]
[23:8,18] [28:5] [30:21]
[40:18,21] [41:11] [44:7]
[50:14] [86:16] [92:13]
[95:23] [96:21] [100:11]
[110:13] [134:5]
test [12:3] [179:25]
testified [4:4] [137:10]
[157:14]
testify [19:17,20] [204:3]
[207:5,6]
testifying [186:18]
testimony [57:20] [68:6]
[69:17,18] [71:6,8] [73:3,6]
[78:14] [87:23] [91:5]
[116:2] [188:12] [202:10]
[204:21] [205:2] [210:]
[211:11,12]
tests [11:25] [12:15,17]
text [82:16] [164:15]
thank [83:21] [84:13] [137:7]
[188:23]
thanks [162:13]
thats [5:13] [7:11] [8:20]
[9:8] [10:7,13] [13:13]
[15:10,13,14] [16:21]
[17:2] [19:17] [24:25]
[25:10,14,25] [26:6,10,16]
[27:18] [30:14] [32:16]
[37:14] [38:25] [39:2,3,13]
[43:7] [48:7] [55:12] [59:7,24]
[62:24] [64:23] [67:12]
[71:20] [74:13] [82:20]
[84:15] [88:16,18] [89:18,20]
[96:12] [97:2] [98:11,12,25]
[102:18,22] [105:9] [106:10
,14] [108:9] [110:11] [111:24]
[115:6,23] [117:5] [118:7]
[122:6,8] [123:6,8,23]
[124:17] [128:17] [129:12]
[131:20] [141:2] [144:18]

**27/03/2008 PFEFFER, ALLEN M.**

[145:3] [146:2] [150:12,17] [153:2] [168:2] [174:8,14] [175:21] [179:10,25] [180:9] [182:7,13,18] [190:9] [191:23] [192:10] [193:12] [200:4,23] [206:24]
**themselves** [3:17] [194:18]
**theoretically** [160:7]
**theory** [34:2] [67:3]
**thereby** [30:15]
**therefore** [31:14] [57:17] [68:19] [69:7] [70:21] [85:8] [114:25] [159:10] [162:3] [186:11] [188:3] [201:12]
**thereof** [78:12] [98:2]
**theres** [7:13] [10:12] [11:25] [12:3] [16:13] [36:16] [42:18] [44:2,4,5,13] [70:12] [75:3,4] [83:25] [99:12,13,17] [102:3,5] [108:2] [133:5] [134:11] [139:15,16] [142:2] [148:14] [154:25] [158:24] [164:7] [174:2] [175:14] [179:12] [193:10,11]
**theyd** [17:25]
**theyre** [15:23] [57:9] [75:22] [126:23] [146:22] [147:12,14] [152:5] [187:22]
**thing** [14:24] [18:23] [111:24] [124:19] [132:11] [143:9] [202:2] [206:24]
**things** [13:13] [14:11] [17:2] [30:22] [31:2] [41:23] [44:6,18,19,24] [45:3] [50:12] [68:5] [80:11] [82:4] [93:19] [95:12,13] [103:6,8] [108:13] [113:21] [119:17] [127:4] [134:4] [140:17] [141:9] [148:2] [151:6] [156:9] [165:18] [174:4] [187:5] [194:20] [206:2]
**think** [9:8,19] [19:17,19] [28:6] [52:13] [54:6] [63:17] [84:8] [88:24] [89:12,25] [90:7] [100:13,14] [101:25] [104:15] [106:24] [108:25] [111:22] [112:15] [113:2] [114:7] [115:2] [118:7,13,15] [122:11] [124:14] [126:9] [128:6,10] [136:9,11] [137:17] [138:8] [139:16] [140:4,16] [141:5,19] [142:2,25] [143:7,13] [144:22] [146:16] [151:4,8] [152:21] [154:7,9,10] [155:16] [161:22] [162:7] [163:14,24] [174:14,16,17] [177:3] [179:19] [181:10] [182:18] [183:17] [186:23] [198:19] [199:2,5,8]
**thinks** [88:16] [158:18] [161:16]
**third** [23:21] [59:9] [134:25]
**though** [11:20] [77:23]

[91:5] [92:2] [108:2] [117:22] [122:3] [150:2] [180:4,13]
**thought** [92:12,16] [93:24,25] [106:5] [143:17,22] [146:4] [186:15] [193:2] [203:18] [205:10]
**three** [11:25] [17:20] [26:10 ,12] [36:21,23] [37:6,17] [63:25] [131:7] [133:17] [135:5,19] [162:15] [204:24]
**throughout** [73:25]
**time** [3:8] [5:17] [9:18] [10:10] [17:5] [19:19] [21:4,17] [23:24] [24:8] [33:4] [45:16,25] [46:2] [47:7] [48:10,23,24] [49:12 ,14] [51:17,20,23,25] [52:2 ,14] [53:18] [55:3,15] [56:10] [57:22] [60:15] [61:7] [73:4] [83:15,18] [92:12] [93:25] [94:3] [97:2] [98:8] [99:5,9] [107:15] [108:9] [131:4] [136:8,15] [137:3,4] [143:23] [147:3] [148:13] [149:12] [155:3,16,17] [160:11] [161:4] [168:21,22 ,25] [174:4] [177:11] [178:4] [187:4,11] [189:16] [198:16] [201:9] [204:2] [207:14,17]
**times** [8:21,23] [9:8] [10:20] [11:16] [20:6] [22:23] [39:9,11] [48:15] [53:25] [61:18] [74:2] [99:9] [108:25] [114:8] [138:10] [174:17] [204:24]
**timing** [19:2]
**titled** [195:7]
**today** [3:8] [11:12] [37:17] [39:22] [40:2,4,17,21] [41:11,18,19] [71:16] [72:2,5,6] [77:25] [78:5,9] [79:15] [82:21] [83:7,25] [84:10] [86:21] [109:19] [110:5] [115:9] [116:2] [123:16] [136:8] [140:24] [141:3] [146:6] [147:5] [150:3] [167:18] [168:8] [177:24] [184:24] [185:3,10 ,22] [186:9,18] [190:6] [205:7] [206:5,12,25]
**todays** [40:17,21] [41:11]
**together** [172:12]
**told** [17:23,25] [24:14] [28:8] [54:2] [58:13] [59:3] [101:7] [106:14] [111:5,24 ,25] [112:10] [124:14] [126:9] [177:20] [193:2,5] [205:11]
**tonight** [136:6]
**tony** [2] [3:19] [18:25] [33:25] [51:12] [52:3] [128:20] [129:22] [168:15] [188:19]
**took** [57:2,6] [58:11] [108:12] [192:8]
**top** [65:21] [188:24] [190:11]

**topic** [78:23] [98:23] [118:4 ,5,6] [154:23]
**topics** [79:3]
**total** [7:8] [25:12] [26:4] [27:12] [32:11,12,21] [33:19,21] [63:11,21] [89:23,24] [96:24] [115:10] [129:20] [131:7] [135:5,11] [138:13] [164:22,24]
**totality** [80:8] [81:6] [89:20]
**toward** [17:8] [56:9] [75:11]
**towards** [144:8] [147:19] [165:13]
**trade** [134:7] [165:14] [166:8,12] [178:24]
**traded** [15:24,25] [164:9] [165:10]
**trades** [180:5]
**trading** [26:25] [27:6] [65:11] [126:2] [132:16,17] [139:17 ,18,19]
**transaction** [29:2]
**transactions** [14:2] [28:22] [177:10] [178:3]
**transcribed** [211:13]
**transcript** [210:]
**treasurer** [49:24] [50:13]
**treister** [2:4] [3:20]
**trend** [155:24] [161:14]
**tried** [95:19]
**true** [10:7] [14:24] [17:21] [32:22,25] [33:22] [72:23] [82:25] [84:8] [88:12] [94:5] [99:2] [110:17] [135:6] [141:7,24] [148:20] [150:6] [157:20] [160:6] [161:4] [162:20] [172:4] [176:13,20] [177:17,25] [186:3] [189:21,24] [190:13] [201:14] [202:13,15] [204:5,22] [206:21] [207:7] [210:8]
**trust** [3:14] [82:9]
**try** [61:11] [129:3] [136:6]
**trying** [29:21] [30:3,20] [41:6] [104:13] [115:18] [155:12] [186:5]
**turn** [59:6] [177:5] [182:20,21] [195:5]
**turned** [48:20]
**turning** [45:13] [115:5] [169:4] [170:2,12]
**twopage** [180:21]
**two-page** [180:21]
**types** [202:8]
**typically** [29:18] [35:8] [42:12] [115:4] [152:14,18] [161:9] [174:10,20] [179:11]

———————

U

———————

**u.s** [84:8,9]
**ultimate** [88:4] [89:17] [163:18] [165:23] [173:5]
**ultimately** [88:21] [96:21] [164:13] [165:14] [167:20]

[168:2]
**unable** [65:5]
**unadjusted** [135:17]
**unclear** [186:10] [187:6]
**underlay** [172:3]
**underlying** [170:8]
**understand** [5:4] [9:16] [11:9] [13:11] [16:6] [18:13 ,17] [55:3] [69:21,25] [70:6] [80:25] [91:20,24] [100:17] [102:13] [103:22] [105:5] [150:2] [179:3] [182:3] [183:19]
**understanding** [57:14] [91:10] [92:12] [93:24] [114:10,11] [147:6] [173:14] [185:20]
**understood** [24:3] [114:8,9] [187:8,9]
**undertaken** [94:5]
**underthehammer** [158:12]
**under-the-hammer** [158:12]
**unduly** [204:4]
**unfair** [107:4]
**unfortunately** [56:25] [57:4 ,16] [122:9]
**united** [3:15] [71:16,19]
**unknown** [147:4]
**unrealistic** [149:7] [150:15]
**unreasonable** [192:20]
**unreasonably** [202:12,13] [203:16,17] [205:16]
**unsecured** [165:22]
**until** [17:17] [18:2] [42:16] [98:23]
**upon** [29:8] [32:3] [51:8] [62:14,22] [69:4] [80:8] [81:5] [85:9] [101:14] [102:14,19] [105:18] [126:13] [127:23] [146:12] [149:21] [185:21] [188:6] [204:3]
**upside** [46:8]
**uptick** [162:22]
**upwards** [192:4]
**us** [76:3] [82:6] [187:6] [190:11] [202:2]
**use** [12:24] [14:19,23] [15:3] [25:3] [27:19] [34:21] [38:15] [48:12,14] [57:25] [78:21] [109:2,6,7,9] [115:18] [126:4,13,16] [134:21] [137:22] [138:6] [141:11] [149:17] [169:6] [178:24] [186:17] [195:24] [199:12] [205:5]
**used** [15:8] [16:22] [34:18] [116:24] [127:5] [128:6] [137:18] [138:3] [145:21] [146:20] [148:15,18] [149:2] [150:5] [152:2] [169:9,12] [178:15] [180:7,9] [183:10] [185:16,18,24] [186:16,21] [187:3] [193:25] [194:13]
**uses** [192:18]
**using** [31:3,13,14,16] [32:10] [47:17] [58:2] [100:13]

**27/03/2008  PFEFFER, ALLEN M.**

[121:12,24] [138:17] [144:24]
[146:13,17,19,21] [147:9,23]
[149:17] [150:17] [152:19]
[183:23] [184:10] [192:5]
[196:11] [197:23] [200:2]
**utility** [178:16]
**utilize** [116:18] [143:14]
**utilized** [179:2]
**utilizing** [104:10]

---

V

---

**vacuum** [164:3]
**validity** [180:13]
**valuating** [33:8]
**valuation** [4:9,11,12,20]
[5:2] [8:24,25] [9:4] [10:13]
[13:17] [24:11] [28:12,14]
[29:6,8,13] [30:3,8,9]
[31:3] [32:10] [35:11]
[37:16,23] [38:7,20] [40:2,14
,19] [41:3,6] [42:22] [44:17
,24] [69:19] [70:18] [75:3]
[85:13] [91:11] [100:2]
[101:12] [111:14] [112:6]
[116:9,15] [124:10] [132:20]
[133:9] [137:18,22] [149:12]
[150:5,13] [164:3] [173:16]
[174:11] [178:17] [180:3]
[189:5] [192:6]
**value** [4:14,16,17,21,22,23]
[5:4] [6:2,3,4,5,9,13,17,18
,20,25] [7:3,4,7,9,16,20,21
,25] [8:4,12] [9:18,21]
[10:17] [11:2,4,5,17,19]
[12:10,18,24,25] [13:7,18,24
[14:12,16] [15:11,15,16]
[16:16,17] [24:4,6,22,23]
[25:15] [26:2,18,20] [27:8,12
,14,23] [30:15] [31:4,7]
[32:2,11,13,14,19,21]
[33:13,15,18] [34:3,6,7,14]
[36:5] [39:16,21] [40:18,21]
[42:2,3,14,15,19,21] [43:8
,9,14] [45:23] [51:24] [52:15
,16,25] [53:5,9,17] [55:4,15
,18] [56:9] [62:8,12,14,20,21]
[63:22] [64:8] [70:4] [71:16]
[72:2,6,9] [84:20,21] [85:9
,15] [86:6,7] [88:7,15]
[89:23] [90:17] [91:12]
[93:4,5,7] [95:23] [96:19,21
,25] [97:19,20] [98:24]
[99:5,23] [101:15,16]
[102:14,15,23,25] [104:6]
[107:7] [108:20] [111:12,17
,22,23] [112:11,12,20,22]
[113:6,24] [115:10,24]
[121:12,20] [127:16,21]
[129:20] [130:17,23] [131:
3,22] [132:5,9] [133:11,25]
[135:3,9,16] [137:24]
[138:19] [139:2,8,17,18,19]
[141:17] [142:7,17,19]
[143:8,11,25] [152:15,20,22]
[153:2,6,11,12,14,22] [154:
4,11] [159:12,15] [160:9,17]
[162:19] [166:19] [167:8]
[169:25] [173:4,6] [174:4]
[176:23] [178:15] [179:21]
[183:5,6,7] [189:2,19]
[190:2,12,21,25] [191:5,13
,15,18] [192:12,23,24]
[200:18] [203:19] [204:18]
[205:21] [206:3,7,10]
**valued** [40:17] [69:15]
[70:24] [175:21]
**values** [4:25] [5:15,20,24]
[6:22] [7:14] [8:8,9] [14:6]
[16:20] [28:23] [53:21,24]
[89:15,21,24] [90:4] [92:17]
[124:11] [158:11,12,14]
[169:14,19] [192:3] [201:13]
[202:11] [204:4,21] [205:16]
[206:20] [207:3,9]
**valuing** [16:9] [32:24] [35:5]
[36:7,8] [114:11] [178:17]
**variables** [178:25]
**variety** [57:17]
**various** [6:5] [8:4] [9:15]
[13:25] [14:20] [16:7]
[23:22] [34:18] [45:19,24]
[46:5,8,9] [47:5,7] [49:11,12]
[53:10,25] [61:23] [64:13]
[72:10] [88:5] [92:19]
[93:2] [104:12] [109:6,7,12]
[126:21] [140:2,16] [141:4]
[155:3] [175:14] [202:6]
**vary** [12:5]
**vast** [190:24]
**ventura** [3:6]
**veracity** [204:15]
**version** [181:21]
**versus** [3:14] [38:16] [39:9]
[64:14] [96:20] [98:6]
**vertically** [92:21]
**vice** [61:22]
**video** [3:4]
**videographer** [2:] [3:4,23]
[51:17,20] [83:15,18]
[136:15] [137:4] [168:22,25]
[207:14]
**videotaped** [3:12]
**view** [20:11] [99:8] [106:17]
[163:17] [175:16] [192:6]
**viewed** [160:23]
**viewing** [202:4]
**views** [54:25] [134:3]
**vitti** [61:17]
**volatility** [195:7]
**volume** [60:7]

---

W

---

**want** [18:3,5] [19:10] [28:10]
[82:2] [104:17] [106:14]
[121:11,16] [129:4] [133:21]
[134:15] [136:5] [137:21]
[138:4] [151:13] [182:15,17]
[188:4]
**wanted** [27:19] [201:10,12,25]
[207:6]
**wants** [207:5]
**warren** [61:17]
**wasnt** [17:25] [53:15] [65:2]
[70:10] [73:15,18] [78:24]
[86:20] [111:24] [141:14]
[188:13]
**waterfall** [159:25]
**ways** [19:15] [104:12] [145:
17] [163:15] [175:14] [202:
6]
**weeks** [17:20] [133:17]
[135:5,19]
**weighted** [40:24] [41:2,5]
[174:24] [175:4,9]
**well** [11:18,19] [19:14]
[31:2] [40:23] [43:18]
[45:2] [53:4] [54:14] [61:12]
[66:2,4] [67:16] [68:11]
[79:17] [88:10,24] [89:5,21]
[98:19] [99:21] [105:6,24]
[107:9,19] [111:2] [113:4]
[114:2] [115:14,20] [119:18]
[123:2,24] [126:15] [128:2
,6,8] [130:4] [134:9] [142:13
,25] [146:6] [149:24] [154:11]
[158:22] [164:7] [165:6]
[166:17] [170:25] [174:23]
[183:15,21] [184:16] [185:
17,21] [187:10] [188:5]
[191:6] [197:17] [202:20]
[205:20]
**wellestablished** [115:20]
**well-established** [115:20]
**went** [65:9] [94:20] [131:8,10]
[148:2] [150:23] [158:17]
[165:12] [170:3] [205:25]
[206:13]
**werent** [17:16] [79:3] [145:4
,8] [185:17]
**weve** [52:5] [81:19] [98:23]
[115:9] [136:11] [179:19]
**whatever** [29:8] [30:7]
[97:22] [98:3] [113:7,9]
[127:22] [138:4] [172:2]
**whats** [11:24] [25:2] [36:23]
[85:5] [87:25] [124:5,6]
[144:11] [172:6] [197:3,5]
[198:24] [200:14]
**whatsoever** [110:21] [111:2]
**whereof** [211:18]
**whereupon** [3:2] [136:17]
**whether** [5:21] [10:15,16,17
,25] [27:20] [32:21] [43:14]
[44:8,10,11,12] [47:6]
[57:10] [64:11] [71:11]
[72:15] [86:22] [87:12]
[90:12,24] [91:2] [97:23]
[99:7] [104:14,21] [107:9]
[145:8] [146:7,22] [147:12]
[150:4,21,22,25] [151:15,21]
[152:5] [166:10] [167:18]
[168:8] [172:8] [177:13,16
,21,23,25] [186:15,19]
[194:12] [197:19] [199:22]
[206:10]
**whole** [14:16] [29:3] [101:19]
[102:11] [125:2]
**why** [37:5] [55:12] [71:20]
[86:19] [119:24] [122:6,12]
[133:21] [134:6,12] [205:6
,9]
**will** [3:17,23] [20:13,25]
[31:9] [42:16] [72:8] [102:10]
[103:7,9] [124:23] [125:19]
[128:23] [162:9] [173:21]
[190:19]
**williamson** [2:] [3:21] [7:10
,23] [9:7] [10:11] [11:6,22]
[13:9,21] [14:22] [16:24]
[17:22] [18:11,14,24]
[20:3,7,16] [21:20,24]
[22:6,12,16] [23:5,17]
[24:16] [25:5,18] [26:22]
[27:16] [28:25] [29:12]
[30:13] [31:10] [32:5,15,23]
[33:2,10,23] [34:9,23,25]
[35:6,13] [36:13,24] [37:2,20]
[38:9,21] [39:12,18] [40:5,22]
[41:13] [42:5,7,11,25]
[43:6] [44:21] [45:10]
[46:14] [48:2,11,18] [49:15]
[50:16] [51:9,12,15] [52:3,21]
[53:19] [54:5,17] [55:6,12,19]
[56:2,11] [57:13] [59:23]
[60:12,24] [62:10,23]
[63:16,23] [64:3,9,17,22]
[65:4] [66:21] [67:11,21]
[68:4,9,25] [69:11] [70:5,11]
[71:2,18] [73:5,12,17,24]
[74:19] [76:19,22] [79:13]
[80:5,12,24] [81:9] [82:5,13]
[83:4,9,12] [85:21] [86:13]
[87:4,14] [88:13] [89:3,14]
[90:10,19] [91:9,18] [95:15]
[96:11] [97:13] [98:18]
[100:5,10,17] [101:18]
[104:8] [105:4,21] [106:3,7
,12] [108:17,24] [109:5]
[110:8,18,23] [111:16]
[112:9,25] [114:6,16]
[116:11] [117:4,24] [118:23]
[119:3] [120:12,15,22]
[121:6,14] [122:6,10,18]
[123:4,7,12] [124:12]
[126:11] [127:9,18,25]
[128:11,20] [129:12,16,21
,24] [130:2] [131:6,15]
[132:2,8,22] [133:2,20,24]
[135:7,13,20] [136:4,7,13]
[138:2] [139:13] [140:7]
[141:8,25] [142:9,21]
[143:17,22] [144:5] [145:6
,15] [148:21] [149:8,22]
[150:7] [151:3,17,23]
[152:8,17,25] [153:8,24]
[154:6,16] [159:17] [160:10]
[161:5,24] [164:6] [165:2]
[166:14,25] [167:12] [168:
15] [169:10] [171:14,21]
[172:5,13] [173:19] [174:7
,13] [176:14,21] [177:12]

A.20

**27/03/2008  PFEFFER, ALLEN M.**

[178:5,19] [179:24] [183:12]
[184:5,19] [186:4,23]
[187:14] [188:18] [189:22]
[191:20] [192:13] [193:4,19]
[194:16,25] [195:21] [196:
3,19] [197:6,15] [198:6,17,21
,23] [199:7] [200:6] [201:3,15
,19,23] [202:14,21,25]
[203:4,8] [204:6,23] [205:18]
[206:22] [207:8,13]
**willing** [9:25] [10:2] [152:23]
[154:8]
**windows** [181:8]
**wish** [127:22] [205:14]
**within** [4:19,20] [13:16]
[15:22] [16:7] [27:4] [34:15]
[45:2] [82:18] [194:4]
[211:6]
**without** [107:4,23] [139:20]
[146:20] [147:15]
**witness** [2:] [3:25] [8:18,22]
[17:16] [19:11,23] [20:13,23]
[21:25] [23:6] [24:15,17]
[38:2] [42:8] [52:22] [55:13
,21] [56:12] [85:2] [109:25]
[114:14] [117:12] [123:17]
[132:23] [135:2,14] [152:11]
[157:18] [163:8] [166:22]
[170:5] [178:6] [181:13]
[182:14] [183:13] [189:9,23]
[195:22] [196:8,20] [201:20]
[202:22] [208:4] [211:10,18]
**wont** [134:17]
**woodland** [3:6]
**word** [38:16] [150:13]
**worded** [167:13]
**words** [84:6] [115:20] [145:
20] [199:21] [202:18]
**work** [14:14] [20:18] [21:6,8
,12,22] [22:8,14,21] [23:9]
[24:2] [43:13,16] [52:8]
[65:22,23] [125:8] [148:3]
[150:5] [154:12] [155:6]
[157:18] [176:18] [204:13,19]
**working** [46:4] [123:15]
[126:5]
**works** [179:17]
**world** [198:16]
**worry** [103:9]
**worse** [168:9]
**worth** [4:13] [14:9] [26:9,12]
[27:7] [40:4,21] [41:11,19]
[92:16,17] [103:20] [133:16]
**wouldnt** [15:18] [35:4]
[37:5] [38:12] [104:17]
[107:2] [112:7,18] [205:10]
**wrap** [136:8]
**write** [60:22] [81:17] [82:11]
[205:12]
**writing** [60:16] [82:16]
[145:13,20,24]
**written** [53:21,22] [57:15]
[82:23] [88:3] [101:2]
[170:18] [172:2,6] [186:6]
**wrong** [108:4] [129:14]
[206:15]

**wrote** [58:15,20] [60:18]
[105:10] [145:23] [176:25]
[185:4]

---

Y

---

**yeah** [25:23] [38:17] [79:16]
[128:2] [198:25]
**year** [22:25] [23:2] [39:20,25]
[40:2,3,17,20] [41:10,18]
[54:3,7,9,11,13] [92:10]
[133:18] [172:23]
**years** [36:21,23] [37:6,17,19]
[75:9] [107:6] [108:10]
[112:23] [182:24]
**yes** [4:10] [5:23] [7:11]
[9:11,23] [10:7] [11:23]
[13:10,14,19] [16:12,18]
[17:3] [22:19,20] [25:14]
[26:17,23] [27:2,5] [29:24]
[30:6] [33:5] [34:17,20]
[35:2] [38:22] [39:6,19]
[43:2] [48:13] [49:7] [52:19]
[54:18] [57:23] [58:5]
[59:13,19] [60:13] [62:18]
[64:23] [65:13,17,19]
[66:14] [67:4,13] [70:7,20]
[72:18] [74:13] [75:15]
[76:6] [78:13] [79:23]
[81:22,24] [82:10,24]
[83:3,8] [84:16] [86:14,16]
[87:9,15,24] [90:2,5] [94:9]
[102:18] [104:9,10] [105:10]
[106:15] [116:3,8,21]
[118:4,7] [119:12] [120:24]
[121:2] [125:22] [126:3]
[127:20] [130:10,12] [132:
10,13] [133:12,23] [135:8]
[138:12,16] [142:12] [143:
20] [152:3] [153:3,10,11,14]
[157:16] [158:4] [162:23,24]
[163:9] [164:18] [166:5]
[168:17] [169:15,17,18]
[170:14,25] [173:15] [178:
13,20] [179:18,25] [180:8,11]
[182:10] [188:16] [193:21]
[196:4,15] [198:14] [201:6]
[202:19,23] [203:13,14]
**yesterday** [124:25]
**yet** [53:16] [56:18] [183:18]
**yield** [24:3] [86:24] [94:8]
**yielded** [106:23] [138:13]
**yields** [131:19]
**york** [2:] [3:11] [84:5] [210:4]
[211:7]
**youd** [27:13] [30:23,24]
[40:10] [44:10,11,12]
[46:16,24] [47:8,10,11,16]
[90:15] [91:19,24] [104:10
,16] [115:4] [159:6,7,8]
[176:24] [192:11]
**youll** [129:9]
**youre** [7:6] [10:21] [11:2]
[16:9] [19:24] [20:19]
[29:15] [31:11,13,14,16]
[32:20,24] [33:7,11] [34:11

,22] [39:7] [40:13] [44:25]
[51:21] [52:9] [71:10]
[81:25] [82:2] [83:20]
[85:3,12] [89:21] [90:3]
[96:23] [97:16] [101:22]
[102:8] [105:23] [118:16]
[127:19] [129:14] [136:16]
[141:9] [144:23] [151:25]
[161:20,21] [164:10,12,16]
[169:2] [173:3] [182:12]
[186:18,20] [199:8] [203:10]
**yourself** [9:4] [86:15] [148:7]
[152:6]
**youve** [5:3] [8:15] [28:6]
[44:19] [49:24] [60:10]
[69:5] [80:21] [81:6] [101:7]
[148:11] [151:8] [157:23]

---

Z

---

**zero** [32:22]