## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------×

| | |
|---|---|
| In re: | Chapter 11 |
| Oakwood Homes Corporation, <u>et al.</u>, | Case No. 02-13396 (PJW) |
| Debtors. | |

| | |
|---|---|
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 04-57060 (PJW) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Civil Action No. 07-799 (JJF) |
| Defendants. | |

---------------------------------------------×

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ALAN C. SHAPIRO PURSUANT TO FED. R. EVID. 702

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 903-9000
Facsimile: (212) 903-9100


Dated: April 16, 2008
        Wilmington, Delaware

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ..................................................1

SUMMARY OF ARGUMENT .................................................................................1

STATEMENT OF FACTS .......................................................................................3

    A.    Plaintiff's Claims ....................................................................................3

    B.    Professor Shapiro's Background ..............................................................4

    C.    Dr. Shapiro's Proposed Expert Testimony For Plaintiff............................5

ARGUMENT...........................................................................................................6

    I.    The Standard For Admissibility Of Expert Testimony
        Pursuant To Fed. R. Evid. 702................................................................6

    II.    Professor Shapiro Is Not Qualified To Render An Opinion On The
         Adequacy Of The Credit Suisse Defendants' Services To Oakwood.....................7

        A.    Professor Shapiro Is Not Qualified To Serve As
            An Expert ....................................................................................7

            1.    Professor Shapiro Has No Relevant
                Professional Experience..................................................8

            2.    Professor Shapiro's Academic Credentials Do Not
                Provide Him With The Specific Expertise
                Relevant To This Case.....................................................9

        B.    Permitting Plaintiff To Present Professor Shapiro's
            Testimony Will Confuse The Jury And Prejudice The
            Credit Suisse Defendants .........................................................12

    III.    Professor Shapiro's Opinion Is Not The Product Of Reliable Principles
         And Methods.........................................................................................13

        A.    Professor Shapiro's Testimony Is Not Supported By Reliable
            Principles Or Methods .............................................................14

i

IV.     Professor Shapiro's Opinion Is Based On A Plainly Incorrect Legal
Theory About Defendants' Duties, Which He Is Not Competent
To Testify About Anyway ....................................................................................18

CONCLUSION.............................................................................................................................21

ii

## TABLE OF AUTHORITIES

**Page**

### CASES

*Aloe Coal Co. v. Clark Equip. Co.*,
816 F.2d 110 (3d Cir. 1987)................................................................9

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996)............................................................13

*Bethea v. Bristol Lodge Corp.*,
No. 01-612, 2002 WL 31859434 (E.D. Pa. Dec. 18, 2002)................................14, 15, 17

*Bitler v. A.O. Smith Corp.*,
400 F.3d 1227 (10th Cir. 2004) ..........................................................18

*Carroll v. Otis Elevator Co.*,
896 F.2d 210 (7th Cir. 1990) ...........................................................7, 10

*Classic Coffee Concepts, Inc. v. Anderson*,
No. 06 CVS 2941, 2006 WL 3476598 (N.C. Super. Ct. Dec. 1, 2006)........................19

*D&D Assocs, Inc.. v. Bd. of Educ. of N. Plainfield*,
Civ. A. 03-1026, 2006 U.S. Dist. LEXIS 16721 (D. N.J. Mar. 20, 2006)......................7

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)......................................................................6

*De Angelis v. Lutheran Med. Ctr.*,
449 N.E.2d 406 (N.Y. 1983)..............................................................20

*Di Ponzio v. Riordan*,
645 N.Y.S.2d 368 (App. Div. 1996), *aff'd*, 679 N.E.2d 616 (N.Y. 1997)....................20

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)..............................................................7

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)......................................................................18

*Hart v. Gen. Motors Corp.*,
517 N.Y.S.2d 490 (App. Div. 1987)......................................................19

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).................................................................2, 7, 14, 15

*Lang v. Kohl's Food Stores, Inc.*,
217 F.3d 919 (7th Cir. 2000) .................................................................................17

*Murray v. Marina Dist. Dev. Co.*,
No 06-583, 2006 WL 3791336 (E.D. Pa. Dec. 22, 2006).......................................14, 15

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000), *cert. denied*, 532 U.S. 921 (2001).........................7, 14, 15

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir.1994).........................................................................................7, 13

*Primavera Familienstifung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001)...............................................................14, 15, 18

*Reed v. Chicago*,
No. 01 C 7865, 2006 WL 1543928 (N.D. Ill.   June 1, 2006) ......................................17

*Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*,
No. 1:05-CV-207, 2007 WL 1850858 (N.D. Ind. June 25, 2007) .................................12

*Surace v. Caterpillar Inc.*,
111 F.3d 1039 (3d Cir. 1997)........................................................................................9

*Terrell v. Childers*,
No. 93 C 2460, 1996 WL 385310 (N.D. Ill. July 3, 1996) ...........................................11

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) .......................................................................................11

*Trenwick Am. Litig, Trust v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006), *aff'd, Trenwick Am. Litig. Trust v. Billett*,
931 A.2d 438 (Del. Super. Ct. 2007) ............................................................................19

*Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*,
Nos. CIV.A. 01-2197, 03-2075,  2005 WL 3675999 (D.D.C. Mar. 31, 2005)...............12

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ...................................................................................13

*United States v. Masferrer*,
367 F. Supp. 2d 1365 (S.D. Fla. 2005) ........................................................................12

*United States v. Mathis*,
264 F.3d 321 (3d Cir. 2001)...........................................................................................6

*Walbridge Aldinger Co. v. Aon Risk Servs., Inc. of Penn.*,
No. 06-CV-11161-DT, 2007 WL 1219036 (E.D. Mich. Apr. 25, 2007)...............................15, 18

*Westbrook v. WR Activities-Cabrera Markets*,
773 N.Y.S.2d 38 (App. Div. 2004)...................................................................................20

*Wheeling Pittsburg Steel Corp. v. Beelman River Terminals, Inc.*,
254 F.3d 706 (8th Cir. 2001) .........................................................................................11

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) .........................................................................................17

## STATUTES & RULES

11 U.S.C. § 101.................................................................................................................3

Fed. R. Evid. 403 ......................................................................................................12, 13

Fed. R. Evid. 702 ..................................................................................................*Passim*

## OTHER AUTHORITIES

American College of Trial Lawyers, *Standards and Procedures for Determining the
Admissibility of Expert Testimony after Daubert*, 157 F.R.D. 571 (1994)....................14

University of Southern California, USC Public Relations, Experts Directory
http://www.usc.edu/uscnews/experts/967.html (last visited Apr. 14, 2008) .................10

*Weinstein's Federal Evidence* § 702.02[6][b] ...............................................................3

*Weinstein's Federal Evidence* § 702.04[1][b] ...............................................................8

Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A), Inc.) (collectively, "Credit Suisse" or the "Credit Suisse Defendants" or "Defendants") respectfully submit this Memorandum of Law in Support of Defendants' Motion to Exclude the Expert Testimony of Alan C. Shapiro Pursuant to Fed. R. Evid. 702.

## NATURE AND STAGE OF THE PROCEEDINGS

This adversary Proceeding was commenced in November 2004 by the filing of the Objection and Counterclaims with the Bankruptcy Court. (Adv. Proc. D.I. No. 1.) Motion practice and discovery proceeded before the bankruptcy Court over the course of the following three years. On December 7, 2007, Plaintiff filed a Motion to Withdraw the Reference (Civ. D.I. No. 1.) Following briefing on the Motion to Withdraw the Reference and a status conference before this Court on January 22, 2008, the Court issued an order withdrawing the reference of this Adversary Proceeding to the Bankruptcy Court on the basis of judicial economy. (Civ. D.I. No. 23.) The present motion by Defendants respectfully requests that the Court exclude from evidence in its entirety the testimony of Plaintiff's expert Alan C. Shapiro.

## SUMMARY OF ARGUMENT

Plaintiff's theory of liability is supplied entirely by one of its experts, Professor Alan Shapiro, whose opinions include that the Credit Suisse Defendants should have forced Oakwood to file for bankruptcy a year earlier than it did. Professor Shapiro opines that by not doing so, and instead continuing to provide the securitization-related services that the company asked it to provide, Credit Suisse failed to act in a "reasonable or reasonably prudent" manner.

Professor Shapiro's opinions fall remarkably short of the standards for expert testimony under Federal Rule of Evidence 702. The first flaw is Professor Shapiro's complete lack of qualification to testify about how a "reasonable" investment bank should have acted. An expert witness must have "specialized expertise" in the area upon which his opinion is rendered. Professor Shapiro, however, has no training, background or professional experience in the area that matters here – the provision of securitization-related services by an investment bank, or the role of a bank providing such services to a company in financial distress. He is a professor of finance who, in his extensive business of providing expert testimony, typically does so in matters involving valuation. This case, however, turns on the very different and very specific question of how securitization-related services were provided to Oakwood, and Professor Shapiro simply lacks the qualifications to express an expert opinion on this matter.

The next ground for exclusion is that Professor Shapiro's opinion consists entirely of what the Supreme Court has called "*ipse dixit*" – or "because I said so" – expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 137 (1999). Embedded in the text of Fed. R. Evid. 702 is the explicit requirement that an expert's opinion be based upon the application of reliable "principles and methods." But Professor Shapiro's report is devoid of any methodology, principles, scholarship or comparative analysis that could conceivably support his conclusion that Credit Suisse acted unreasonably. The report is a recitation of facts, unblemished by any analysis of those facts, followed by the Professor's subjective opinion. That is plainly insufficient under Fed. R. Evid. 702 and Third Circuit precedent.

Finally, Professor Shapiro's opinion that Credit Suisse acted unreasonably is based on a novel legal theory that appears to have been invented for this case and that is entirely unsupported in the law or even, as Professor Shapiro admits, in any academic literature. His opinion depends on the theory that when a company is insolvent, an outside third-party provider

RLF1-3273993-1

2

of financial services has a duty to substitute its own judgment for that of its client's board of directors about the competing interests of the company's stakeholders and how to navigate among those interests. That is not the law and Professor Shapiro should not be allowed to testify as though it is.

Because Plaintiff's entire theory of liability is based on Professor Shapiro's proposed testimony, the Court should hold a *Daubert* hearing to determine Professor Shapiro's ability to testify as an expert in this case. The Third Circuit in particular has been "more adamant than other Circuits in its insistence on the need for a pretrial hearing to assess proposed expert testimony." *Weinstein's Federal Evidence* § 702.02[6][b].

## STATEMENT OF FACTS

### A.    Plaintiff's Claims

On November 15, 2002, Oakwood Homes Corp. and certain of its subsidiaries and affiliates ("Oakwood") filed petitions for bankruptcy protection under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.  Oakwood was one of the largest manufacturers and retailers of manufactured housing in the country.  Many of the manufactured housing units sold through Oakwood's retail centers were financed by installment sale contracts or loans arranged by Oakwood, and Oakwood generally retained a security interest in all the homes it financed, with the related loans documented as installment sales contracts or traditional mortgages (collectively, "RICs").  Oakwood originated these RICs itself and purchased other RICs originated by various independent entities.  Oakwood funded its originations and purchases of the RICs through various public and private asset securitizations.  From 1996 until Oakwood filed for bankruptcy, Credit Suisse Securities LLC ("CSS") provided services to Oakwood in connection with these securitizations, including the underwriting of securitization transactions and the maintenance of a loan purchase or "warehouse" facility.  In August 2002, Oakwood

retained Defendant CSS as its financial advisor, pursuant to an engagement letter, to assist it with its bankruptcy filing.

Subsequent to the bankruptcy filing, Defendant CSS filed proofs of claim seeking payment of fees and expenses stemming from its August 2002 letter agreement with Oakwood. On November 13, 2004, Plaintiff commenced this adversary proceeding by filing Objections and Counterclaims to the Proof of Claim.

Plaintiff alleges that beginning sometime in 2001 the Credit Suisse Defendants harmed Oakwood by providing the securitization services (and getting paid for them), by continuing to provide them when the company was in financial distress, and by failing to advise or to force the company to file for bankruptcy earlier than it did. More specifically, Plaintiff's common law causes of action are: (1) for breach of an implied contract, asserting that the Credit Suisse Defendants breached an implied agreement to provide general financial and strategic advice which somehow arose out of the securitization services; (2) for negligence, asserting that Defendants failed to exercise due care; and (3) for breach of fiduciary duty, apparently based on the prior assertions and the fact that Defendants earned fees for the securitization services provided.

Plaintiff seeks consequential and actual damages of at least $50 million and all fees collected by Defendants as a result of their relationship with Oakwood between the closing of the Loan Purchase Facility (February 2001) and the Petition Date (November 2002).

**B.    Professor Shapiro's Background**

Plaintiff's proposed expert Alan Shapiro is a Banking and Finance Professor at the Marshall School of Business, University of Southern California. He has held permanent or visiting professorships at the Wharton School at the University of Pennsylvania, Yale University, UCLA, the Naval Academy, the Stockholm School of Economics and the University of British

Columbia. (*See Declaration* of Kate Z. Machan dated April 16, 2008 ("Machan Decl.") (contemporaneously filed herewith), Ex. A at 1; *see also* Ex. A, Appendix A (*Curriculum Vita*).) He maintains an extensive practice of offering expert opinions in litigation, through a company created for that purpose. (*See* Machan Decl. Ex. A, Appendix A (*Curriculum Vita*)); Machan Decl. Ex. B at 12:3-24)

Professor Shapiro has never worked in an investment bank or any other financial institution. (*See* Appendix A to Shapiro Report (*Curriculum Vita*)); Machan Decl. Ex. B at 73:6-11.)

## C.    Dr. Shapiro's Proposed Expert Testimony For Plaintiff

Plaintiff served Dr. Shapiro's report on Defendants on or about April 30, 2007.[1] Defendants took Dr. Shapiro's deposition on September 7, 2007. Professor Shapiro's report summarizes his opinions as follows:

- ***CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.*** CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

(Machan Decl. Ex. A. at 3).

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its

---

[1]    Professor Shapiro submitted a supplemental report dated August 28, 2007. The supplemental report purports to opine upon Oakwood's solvency, a topic that is no longer germane to Plaintiff's claims and is not addressed by this Motion.

exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

*Id.* at 4.[2]

## ARGUMENT

**I.     The Standard For Admissibility Of Expert Testimony Pursuant To Fed. R. Evid. 702**

Federal Rule of Evidence 702 provides that a witness may offer expert testimony only if :

> "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In *Daubert v. Merrell Dow Pharmaceuticals., Inc.,* 509 U.S. 579 (1993), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers under Rule 702 to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function "applies to *all* expert testimony," including non-scientific testimony such as that proposed by Professor Shapiro. Fed. R. Evid. 702 advisory committee's note.

The Third Circuit has interpreted Fed .R. Evid. 702 to embody "three distinct substantive restrictions on the admission of expert testimony:  qualifications, reliability, and fit.'' *United States v. Mathis*, 264 F.3d. 321, 335 (3d Cir. 2001) (quotation omitted). As to each element, Plaintiff bears the burden of establishing the admissibility of the expert opinion by a

---

[2]  The focal point of this Motion is Professor Shapiro's lack of qualifications and failure to supply a reliable methodology for concluding that Credit Suisse acted unreasonably. Professor Shapiro's other opinion – that investment banks have financial incentives to provide customers with services – is not squarely addressed herein. It is, however, clear that the notion that a financial institution wants to be paid for its work is well within the jury's understanding and superfluous "expert" testimony on this point would be unnecessary and unfairly prejudicial.

preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994); *see Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000), *cert. denied*, 532 U.S. 921 (2001).    In this instance, Dr. Shapiro's testimony fails to meet the Third Circuit's requirements of qualifications and reliability and should be excluded on these grounds:

- Professor Shapiro, a career academic who lacks any professional or academic experience involving the types of investment banking services he purports to opine on, is not qualified to render an opinion.

- Professor Shapiro's conclusion that Credit Suisse acted unreasonably is nothing more than his own wholly subjective opinion and therefore not the product of reliable principles and methods.

- Professor Shapiro's opinion that Credit Suisse acted unreasonably is based on the proposition that Credit Suisse, which worked for Oakwood, had a direct duty to Oakwood's bondholders, as opposed to the Company itself, which is simply incorrect.

## II.    Professor Shapiro Is Not Qualified To Render An Opinion On The Adequacy Of The Credit Suisse Defendants' Services To Oakwood

### A.    Professor Shapiro Is Not Qualified To Serve As An Expert

The Third Circuit has ruled that "[b]efore an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of <u>specialized expertise</u>." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (emphasis added).    In other words, the "expert must have specialized knowledge and be qualified to speak with authority on [the] particular matter" that is the subject of the expert's opinion. *D&D Assocs, Inc. v. Bd. of Educ. of N. Plainfield*, Civ. A. 03-1026, 2006 U.S. Dist. LEXIS 116721, at *8 (D.N.J. Mar. 20, 2006); *see also Kumho Tire*, 526 U.S. at 156.    The Court must thus "compare[e] the area in which [Professor Shapiro] has superior knowledge, skill, experience, or education with the subject matter of [his] testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).    If the Court concludes that Professor Shapiro's "training or experience, and resultant specialized

knowledge," is not "sufficiently related to the issues and evidence before the trier of fact," exclusion is required. *Weinstein's Federal Evidence* § 702.04[1][b].

The "subject matter" of Professor Shapiro's testimony is as follows: the Credit Suisse Defendants, because Defendant CSS was Oakwood's securitization underwriter, should have "advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002." Professor Shapiro opines that, because Defendants did not do so, they did not act in a "reasonable or reasonably prudent manner." (Machan Decl. Ex. A at 3). Professor Shapiro is thus being proffered as an expert on the topic of how an investment bank providing securitization-related services to a financially distressed company should behave.

Having established the subject matter of Professor Shapiro's testimony, the Court must next compare it to his background and experience. As shown below, there is a complete disconnect between the subject matter of Professor's Shapiro's opinion and his qualifications, which pertain to fields and topics far removed from the relevant facts.

### 1. Professor Shapiro Has No Relevant Professional Experience

Professor Shapiro claims to be qualified to opine on how Credit Suisse should have behaved in its dealings with Oakwood by virtue of his "experience." (Machan Decl. Ex. A at 3). That statement is pure boilerplate. As Professor Shapiro conceded in his deposition, he has never worked at an investment bank, let alone as an investment banker providing the type of securitization-related services upon which he purports to serve as an expert. (*See* Machan Decl. Ex. A at Appendix A, 1-2; Machan Decl. Ex. B at 73:6-11). Nor do any of the many consulting engagements referenced in Professor Shapiro's report relate to the type of services and conduct at issue in this litigation. (Machan Decl. Ex. A at 3) (characterizing consulting work as

involving "pricing stocks and bonds, corporate valuation, mergers & acquisitions, value-based management, and derivatives.").

Professor Shapiro therefore cannot be qualified as an expert witness by virtue of professional experience because he has none that is relevant. *See, e.g.*, *Surace v. Caterpillar Inc.*, 111 F.3d 1039, 1056 (3d Cir. 1997) (finding electrical engineer was not qualified to provide expert opinion on a topic where he had no training or experience in the area); *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) (holding that tractor salesperson was not qualified to give expert testimony on the cause of a tractor fire).[3]

### 2.    Professor Shapiro's Academic Credentials Do Not Provide Him With The Specific Expertise Relevant To This Case

Given Professor Shapiro's lack of <u>any</u> relevant professional experience, Plaintiff will presumably argue that Professor Shapiro is qualified to tell the jury how Defendants should have behaved because of his academic pedigree. Professor Shapiro's academic background and specialties are, however, wholly unrelated to the subject matter of his opinion. While Professor Shapiro does have academic training in a wide variety of areas – "corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics" to name a few – they are not a substitute for <u>specialized</u> expertise as to the conduct and standards applicable to an investment bank providing

---

[3] By contrast, Defendants' liability expert, Thomas Boland, is a retired senior executive and 31-year veteran of Citigroup and a former Managing Director of Seneca Financial Group, where his work focused on financial advisory engagements on behalf of distressed companies. The contrast between Mr. Boland's "real-life" training and experience in the kind of work done by Credit Suisse and Professor Shapiro's subjective and speculative conclusions speaks for itself. That Professor Shapiro is operating outside of his area of expertise is also underscored by the description of his prior expert engagements as principally relating to the "valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing." (Machan Decl. Ex. A at 3). None of those topics are at issue here.

the kind of services at issue here. (Machan Decl. Ex. A at 1-3); *see also Carroll*, 896 F.2d at 212 (to determine if a witness qualifies as an expert a court should compare "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness'[] testimony.").

Nothing in Professor Shapiro's academic background or training equips him with the type of "specialized expertise" necessary to opine on the very particularized question of how an investment bank should provide securitization-related services to a financially distressed company. He has not published a single article focused on the role or function of a securitization underwriter. He has not even published on the more general topic of what a reasonable investment bank should do when a client faces financial distress. (Machan Decl. Ex A at Appendix A, 5-11).

To the contrary, as reflected in Professor Shapiro's academic positions and publications, his specialties lie in the fields of capital structure, international financial and risk management, and financial analysis and valuation, none of which have anything to do with the issues on which he purports to opine in this case.[4] (Machan Decl. Ex. A. at 1-3). Nor can it even be said that Professor Shapiro, using his generalized academic skills in the fields listed

---

[4] Because Professor Shapiro's career in academics dates back to the early 1970's and his numerous publications since that time cover an array of topics relating to economics and finance, it is difficult to determine precisely what he specializes in, although the burden of doing so belongs to Plaintiff and not Credit Suisse. And while he claims in his report to have over a dozen areas of expertise, it is notable that "investment banking" is not one of them. (*See* Machan Decl. Ex. A at 3 (stating that he has served as an expert witness on "valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting and transfer pricing")); *see also* University of Southern California, USC Public Relations, Experts Directory, ttp://www.usc.edu/uscnews/experts/967.html (last visited Apr. 14, 2008) (listing Professor Shapiro as an expert in "international financial management, corporate finance, sub-investment grade securities (junk bonds), risks in international banking, links between finance and strategy, and financial analysis and valuation").

above, has interpreted a body of scholarship by other experts that speaks to the proper role of an underwriter in Credit Suisse's circumstances. Indeed, the Shapiro Report is strikingly devoid of any third party research, scholarship or other empirical data that might make Dr. Shapiro's opinion something other than a subjective conclusion.[5]

The rationale for excluding Professor Shapiro's testimony on qualification grounds is therefore simple: He opines that Defendants did not discharge CSS' responsibilities as a securitization underwriter and financial adviser in a reasonably prudent manner, yet nothing in his opinion or testimony indicates that he has the specialized expertise necessary to evaluate how a reasonably prudent investment bank should have acted. In these circumstances, exclusion under Fed. R. Evid. 702 is necessary. *See, e.g., Wheeling Pittsburg Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001) (overruling lower court's decision to allow testimony outside scope of witness' expertise); *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (overruling decision to allow expert testimony from witness who lacked professional experience in the field at issue and who had not published scholarship on matters of purported expertise); *Terrell v. Childers*, No. 93 C2460, 1996 WL 385310 (N.D. Ill. July 3, 1996) (excluding testimony of expert witness with "strong" academic credentials and

---

[5] To the extent it can be said that Professor Shapiro cites any "third party" research on the role of an investment bank, he cites the definition of an investment bank at the web site *www.investopedia.com* and a 1999 article about securities underwriters on the website *www.findlaw.com*. As to the *www.findlaw.com* article, the author discusses the elements of the statutory "due diligence" defense under the Securities Act of 1933 (the "1933 Act"), and notes that in order to be able to invoke the due diligence defense, an underwriter must perform the type of diligence described by Professor Shapiro. Credit Suisse, however, was not an underwriter of securities issued by Oakwood under the 1933 Act and therefore was not required to conduct the kind of due diligence cited by Professor Shapiro. Professor Shapiro in fact conceded in his deposition that the only information that Credit Suisse would be expected to review concerned the "underlying obligations" in the mortgage pools that would be securitized by Oakwood. (Machan Decl. Ex. B at 80:23-81:23).[5]

experience when proponent of evidence failed to show overlap between witness' actual expertise

and purported subject of expert testimony).[6]

**B.    Permitting Plaintiff To Present Professor Shapiro's Testimony Will Confuse The Jury And Prejudice The Credit Suisse Defendants**

Even assuming that Professor Shapiro is deemed qualified under Fed. R. Evid.

702, the Court must separately consider whether the factors embodied in Fed. R. Evid. 403

provide a separate ground for exclusion.

> Because of the powerful and potentially misleading effect of expert evidence . . . sometimes expert opinions that otherwise met the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury.

*United States v. Masferrer*, 367 F. Supp. 2d 1365, 1373-74 (S.D. Fla. 2005) (internal citations

omitted).  In this case, even assuming the Court finds Professor Shapiro is qualified, there is a

strong likelihood that his academic accomplishments and awards in unrelated fields will lead the

jury to attach undue weight to his conclusions on how the Credit Suisse Defendants should have

behaved.  This concern is immediate, as "expert testimony may be assigned talismanic

---

[6] Even assuming that Professor Shapiro has some "experience" that makes him qualified to opine on Defendants' actions, he still must explain how that experience "leads to the conclusion reached . . ." *See* Fed .R. Evid. 702 advisory committee's notes (2000 Amendments) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").  As detailed further in Section III *infra*, Professor Shapiro's report contains no trace of how his "experience" has led to the specific conclusions reached.  The best that can be said is that an academic with some knowledge of a wide smattering of areas, but none in the specific area in dispute in this case, has made a subjective determination that Credit Suisse should have acted differently.  Such sloppy and unsupported analysis is impermissible under Fed. R. Evid. 702.  *Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, Nos. Civ. A. 01-2197, 03-2075, 2005 WL 3675999, at *4-5 (D.D.C. Mar. 31, 2005) (excluding experts who, on the basis of experience, failed to demonstrate reliability of methods): *see also Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*,No. 1:05-CV-207, 2007 WL 1850858, at *6-7 (N.D. Ind. June 25, 2007) (same).

significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier,* 387 F.3d 1244, 1260, 1263 (11th Cir. 2004).

In connection with Plaintiff's claim that the Credit Suisse Defendants acted improperly, the jury will be told about complicated financial transactions and terms, *e.g.,* the securitization and "re-securitization" of mortgage receivables, the use of bankruptcy-remote special purpose vehicles, and other arcane financial topics. No jury can be fairly charged with fully grasping such concepts, let alone correctly applying them to the ultimate question of Defendants' conduct, without the benefit of properly grounded expert assistance. Plaintiff will no doubt seek to put Professor Shapiro forward, replete with his distinguished professorships and academic accolades, to guide the jury through this uncertain terrain. There is a very immediate risk that the jury will attach "talismanic" significance to Professor Shapiro's <u>general</u> qualifications and background and credit his testimony in an undue and prejudicial manner. Fed. R. Evid. 403 therefore provides a separate basis to exclude his testimony. *Frazier,* 387 F.3d 1244 at 1263.

## III.    Professor Shapiro's Opinion Is Not The Product Of Reliable Principles And Methods

Should the Court determine that Professor Shapiro is qualified to provide an opinion, it must separately assess whether his opinion is the product of reliable "principles and methods" or is simply "subjective belief or unsupported speculation." Fed. R. Evid. 702; *Ambrosini v. Labarraque,* 101 F.3d 129, 133 (D.C. Cir. 1996) (citation omitted). The Third Circuit has similarly interpreted Rule 702 to require that data underlying an expert's opinion be reliable. *See Paoli,* 35 F.3d at 748 ("If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests

entirely upon them must be excluded."); see *also* Fed. R. Evid. 702, advisory committee's note (2000 Amendments) (an important factor in assessing the reliability of an expert's methodology is "whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability."). As the Supreme Court ruled in *Kumho Tire*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co,* 526 U.S. at 157 (internal quotation marks omitted).

The Third Circuit requires expert testimony to be derived from the expert's application of a reliable "methodology," which it defined as a "body of methods, rules, and postulates employed by a discipline [which constitute] a particular procedure [or] set of procedures." *Oddi,* 234 F.3d at 156, n.20; *see also* American College of Trial Lawyers, *Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert,* 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field."); *see also Bethea v. Bristol Lodge Corp.,* No. 01-612, 2002 WL 31859434, at *5 (E.D. Pa. Dec. 18, 2002); *Murray v. Marina Dist. Dev. Co.,* No 06-583, 2006 WL 3791336, at *3 (E.D. Pa. Dec. 22, 2006) (same).

## A.      Professor Shapiro's Testimony Is Not Supported By Reliable Principles Or Methods

Professor Shapiro's opinion – that Credit Suisse did not act in a "reasonable or reasonably prudent manner with respect to the services it provided to Oakwood" – should have been the result of his application of "research, studies, or other generally accepted support for expert testimony." *Primavera Familienstifung v. Askin,* 130 F. Supp. 2d 450, 529 (S.D.N.Y.

2001); *Bethea*, 2002 WL 31859434, at *5; *Murray*, 2006 WL 3791336, at *3. But Professor

Shapiro has not (either in his opinion or at deposition) "detail[ed] any principles, methods or

comparative cases that he utilized in forming his opinion" that Defendants acted unreasonably.

*Walbridge Aldinger Co. v. Aon Risk Servs., Inc. of Penn.*, No. 06-CV-11161-DT, 2007 WL

1219036, at *3 (E.D. Mich. Apr. 25, 2007); *Oddi*, 234 F.3d at 156 n. 20;. His opinion is instead

precisely the type of "*ipse dixit*" expert testimony precluded by the Supreme Court. *Kumho Tire*,

526 U.S. at 156.

On page 1 of his report, Professor Shapiro states that his report contains the

"methodologies" that he employed in reaching his opinion that Defendants acted unreasonably.

The next 23 pages of the report recite the "facts" on which he purports to base his opinion. On

page 28, Professor Shapiro shifts into "conclusion" mode and, for the next several pages,

expands upon his opinion that Defendants acted unreasonably by "not properly consider[ing] the

Company's financial condition and outlook . . ." when providing Oakwood with services.

(Machan Decl. Ex. A at 28). Where, however, is the "methodology" promised on the first page

of the report? No industry customs or standards are discussed. No relevant professional

experience is applied to the facts. No comparative industry practice is reviewed or discussed.

No academic, industry or other scholarly sources or authorities are cited. Professor Shapiro does

not even cite any of <u>his</u> <u>own</u> publications to justify his conclusions. The report contains nothing

more than baldly subjective opinions.

Indeed, the Shapiro report is littered with examples of Professor's Shapiro

subjective and unsupported judgments about what Defendants "should have" done when dealing

with Oakwood, including:

- "Advising Oakwood to make operational changes"

- Advising the company not to take a "wait and see" approach.

- Informing "Oakwood of its unlikely prospect of improving its capital structure"

- Recommending that "Oakwood scale back its operations"[7]

(Machan Decl. Ex. A at 34 – 39). How do we know that Defendants "should have" done these things? Because Professor Shapiro tell us so. In his deposition, Professor Shapiro admitted that he had done nothing to review the relevant industry to determine the standard of care applicable to a financial institution in the position of Credit Suisse:

> Q:    Did you make any attempt in your research, in your preparation of this report to see, to research, to determine what other investment banking companies faced with similar situations did or didn't do?
>
> A:    No I have not.
>
> Q:    There were a number of other companies in the manufactured housing industry that during this period of time were experiencing many of the same difficulties that Oakwood was; is that correct?
>
> A:    That's correct.
>
> Q:    Do you know whether those companies had financial advisers?
>
> A:    I don't know anything specifically.  I assume they probably did but I don't know.
>
> Q:    Those other companies in the manufactured housing industry all would have been running securitization programs, weren't they?
>
> A:    I believe they would have . . .  Again, I don't know that for a fact, but it would make economic sense.
>
> Q:    Did you make any determination -- any effort to determine whether the securitization advisers for any of those other companies shut off the securitization in the way you're suggesting Credit Suisse should have done here?

---

[7]   As is self evident, these assertions deliberately conflate the role of an outside advisor providing financial services to a company with that of the board of directors and senior management, who are charged with setting financial and operational strategy for the company. *See* Section IV *infra*.

A:    No.  And that wouldn't necessarily be determinative or affect my opinion in any case because the facts and circumstances of each company I presume would be unique.

(Machan Decl. Ex. B at 140:11-141:18).  This testimony only underscores the subjective nature of Professor Shapiro's conclusions.  His failure to provide any methodology to support this opinion mandates exclusion as a matter of law: an "expert must explain the means by which he reached his conclusions, and such means must satisfy at least one of the *Daubert* factors of reliability." *Bethea*, 2002 WL 3185934, at *5; *see also* Fed. R. Evid. 702 advisory committee's note ( "the trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") (citation omitted); *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (holding that "experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff-deploying neither data nor analysis-is not an acceptable methodology."); *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("[a] witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); *Reed v. Chicago*, No. 01 C 785, 2006 WL 1543928, at *2-3 (N.D. Ill. June 1, 2006) (striking expert testimony under Fed. R. Evid. 702 for failure to "cite to any authority" or describe how opinions were "formulated."). [8]

---

[8]    Professor Shapiro's opinion that Defendants acted "unreasonably" and "imprudently" is based on the assumption that there is a verifiable "reasonable and prudent" standard of care that *should have* been followed. But Professor Shapiro never sets out how a "reasonable" or "prudent" investment bank should have operated.  In his deposition, Professor Shapiro conceded that he had done nothing to review the financing and strategic activities of companies like Oakwood and  the financial institutions that worked with them such that he could construct a standard of "reasonableness." (Machan Decl. Ex. B at 140:11-141:18). He also admitted that the unreasonableness of Defendants' conduct was not dependent on the existence of a fiduciary obligation. (*Id.* at 6:12-6:23).

At best, Professor Shapiro seeks to define a "standard of care" – and thus provide a yardstick for measuring Credit Suisse's "reasonableness" – by citing in his report to a

Professor Shapiro's highly subjective and unreliable conclusions should be excluded from trial. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (observing that testimony may be excluded if there "simply too great an analytical gap between the data and the opinion proffered"); *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir. 2004) (holding that the court must examine not just the conclusions, but "the methodology employed in reaching those conclusions").

## IV.    Professor Shapiro's Opinion Is Based On A Plainly Incorrect Legal Theory About Defendants' Duties, Which He Is Not Competent To Testify About Anyway

In Professor Shapiro's report, he says that the Credit Suisse Defendants acted unreasonably toward "Oakwood and its creditors." (Machan Decl. Ex. A at 3). In his deposition, however, he made it clear that, in his view, because Oakwood was insolvent, Defendants owed duties <u>only</u> to Oakwood's creditors.[9] He agreed in his deposition that it would be correct to read

---

"compliance manual [that] requires Credit Suisse to fulfill a high standard of care to its clients" and a New York Stock Exchange "Know Your Customer Rule." (Machan Decl. Ex. A at 27-28). But Professor Shapiro does not even attempt to apply these purported "standards,"and in his deposition he conceded that the "Know Your Customer Rule", which requires brokers to make suitable stock recommendations to retail customers, did not apply to the *corporate* Credit Suisse – Oakwood relationship. (Machan Decl. Ex B at 142:1-143:8). Courts routinely exclude expert testimony where, as here, the expert purports to find conduct "unreasonable" but neglects to articulate the relevant standard of care. For example, in *Walbridge*, the plaintiff sought to prove that the defendant had not "perform[ed] skillfully, carefully, diligently, and in a workmanlike manner." 2007 WL 1219036, at *2. In excluding the expert's testimony, the Court stated that "Plaintiff provides no basis for [the expert's] 'opinion regarding generally accepted surety industry standards' [and the expert] does not reveal what the relevant 'surety industry standards' consist of, nor does he detail any principles, methods or comparative cases that he utilized in forming his opinion." *Id., at *3. Primavera*, 130 F. Supp.2d at 529-30 (holding that while it is "proper for an expert to opine as to how a party's conduct measured up against [industry] standards," it was impermissible for an expert to offer his "thoughts" on the subject rather than providing a clear explanation of such standards).; *see also Murray*, 2006 WL 3791336, at *4 (excluding testimony when the expert failed to "demonstrate that he has a reliable methodology for evaluating" the defendant's conduct because he failed to "cite to any established industry standard for his opinions" that the defendant's conduct was unreasonable).

[9] Indeed, Professor Shapiro seems to believe that Credit Suisse's duties ran only to one subset of the Company's creditors, the holders of its public bonds. (Machan Decl. Ex. B at 36:6-37:8).

the phrase "Oakwood and its creditors" as meaning "the creditors," because he believed that once the Company was insolvent, there were no duties owed *except* to the Creditors. (*See* Machan Decl. Ex. B at 29:4-30:15.)  But that is a nonsensical conflation of issues about the duties of <u>directors</u> and the entirely different context of the duties of outsiders.

Of course, it is now commonly understood that the duties of directors, ordinarily conceived as fiduciary duties to shareholders, may shift when a company becomes insolvent or enters the "zone of insolvency."  We need not be concerned here with the exact state of the developing law of directors' duties, except perhaps to note that the analysis of directors' duties is not mechanical and does not clearly dictate what directors must do when a company faces financial difficulty.  For example, the Delaware Court of Chancery in its recent *Trenwick* decision made it clear that the fact of insolvency does not require directors to immediately liquidate the business, and that they remain free to exercise their business judgment in managing the company and even in taking on additional debt. *See Trenwick Am. Litig, Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd*, *Trenwick Am. Litig Trust v. Billet*, 931 A.2d 438 (Del. Super. Ct. 2007). [10]

But here, Professor Shapiro's opinion about the reasonableness of the Credit Suisse Defendants' actions depends upon the notion that, regardless of what Oakwood's board of directors decided to do to manage the business through difficult times, Credit Suisse had an obligation to Oakwood's *bondholders*, to the exclusion of all of the company's other stakeholders, to cut off Oakwood's financial lifeline and precipitate its reorganization. That is not the law, and more important for present purposes, Dr. Shapiro is in no position to tell the trier

---

[10]  The duties of Oakwood's board of directors were governed by North Carolina law. *See Hart v.Gen. Motors Corp.*, 517 N.Y.S. 2d 490, 492 (App.Div. 1987); *Classic Coffee Concepts, Inc. v. Anderson*, No. 06CVS2941, 2006 WL 3476598, at *11-12 (N.C. Super. Ct. Dec. 1, 2006).

of fact that it is the law. The Court will decide the existence and scope of any duty that the Credit Suisse Defendants may have had. *E.g., Westbrook v. WR Activities-Cabrera Markets*, 773 N.Y.S.2d 38, 45 (App. Div. 2004) ("The 'existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration,' and depends on a balancing of such factors as 'the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability.'") (citation omitted); *De Angelis v. Lutheran Med. Ctr.*, 449 N.E. 2d 406, 408 (N.Y. 1983) (existence of legal duty is for court to decide); *Di Ponzio v. Riordan*, 645 N.Y.S.2d 368, 370 (App. Div. 1996) ("'Unlike foreseeability and causation, which are issues generally and more suitably entrusted to fact finder adjudication, the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration.'") (citation omitted) *aff'd* 679 N.E.2d 616 (N.Y. 1997).

But it is not enough to prohibit Dr. Shapiro from telling the jury what Credit Suisse's duty was or to whom it was owed. Since his conclusion that Credit Suisse "acted unreasonably" <u>depends upon</u> his misunderstanding of its duties, that opinion may not be presented to the jury. Dr. Shapiro's notion that Defendants' actions were "unreasonable" can only be premised on his assumption that Defendants owed some kind of duty to someone. But whatever duties Credit Suisse owed, whether under the underwriting agreements, under some theory of negligence, or even if it could be said to have had a fiduciary duty, it owed those duties to Oakwood, the company. It was for Oakwood's board of directors to sort out the competing interests of its stakeholders. No jury should be permitted to hear, in the guise of "expert"

opinion, a conclusion that Defendants acted unreasonably that is based on a nonsensical theory

of what their duties were, advanced by a witness who is not even competent to offer that theory.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court

exclude from evidence in its entirety the testimony of Plaintiff's expert Alan Shapiro.

Dated:  April 16, 2008
        Wilmington, Delaware

Respectfully submitted,

_____
Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, NY  10105
Telephone:  (212) 903-9000
Facsimile:  (212) 903-9100

*Attorneys for Defendants*