**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Oakwood Homes Corporation, <u>et al.</u>, | Case No. 02-13396 (PJW) |
| Debtors. | |

| | |
|---|---|
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 04-57060 (PJW) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Civil Action No. 07-799 (JJF) |
| Defendants. | |

---------------------------------------------------------

**DECLARATION OF KATE Z. MACHAN IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE THE EXPERT TESTIMONY OF**
**ALAN C. SHAPIRO PURSUANT TO FED. R. EVID. 702**

I, Kate Z. Machan, declare as follows:

1.    I am an attorney associated with the law firm of Linklaters LLP, counsel to

Defendants in this action.  I submit this Declaration in connection with Defendants' Motion to

Exclude the Expert Testimony of Alan C. Shapiro Pursuant to Fed. R. Evid. 702.

2.    Attached hereto as Exhibit A is a true and correct copy of the Report of

Alan C. Shapiro, Ph.D. dated April 30, 2007.

3.    Attached hereto as Exhibit B is a true and correct copy of testimony from

the deposition of Alan C. Shapiro dated September 5, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 16, 2008
       New York, New York

Kate Z. Machan, Esq.

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT OF ALAN C. SHAPIRO, PH.D.

**April 30, 2007**

**CONFIDENTIAL**

# Table of Contents

I.      Scope of Engagement ................................................................................ 1

II.     Credentials ............................................................................................... 1

III.    Basis for Opinions .................................................................................. 3

IV.     Summary of Opinions ............................................................................. 3

V.      Assumptions ............................................................................................ 4

     V.A     CSFB Owed Oakwood and its Creditors a Fiduciary Duty .................... 4

     V.B     Oakwood Was Insolvent in September 2001 ......................................... 4

VI.     Background ............................................................................................. 4

     VI.A    Manufactured Housing Industry ........................................................... 4

     VI.B    Business Overview of Oakwood ........................................................... 5

     VI.C    Financial Performance of the Industry Prior to 1999 ............................ 5

     VI.D    Industry Downturn Beginning in 1999 .................................................. 6

     VI.E    Oakwood's Downturn and Bankruptcy .................................................. 7

          VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

          VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ...................... 9

          VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported
                Losses in 2002 ............................................................................. 10

          VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ................................ 11

VII.    CSFB Did Not Behave In a Prudent Manner ...................................... 12

     VII.A   CSFB Had Access to Public and Private Information Concerning
         Oakwood's Financial Condition ........................................................ 12

          VII.A.1 Investment Banks Have Unique Access to Information ........................ 12

          VII.A.2 Relationship between Oakwood and CSFB .......................................... 14

          VII.A.3 CSFB Obtained Both Public and Inside Information about
                Oakwood's Financial Condition ......................................................... 22

     VII.B   In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy
         Risk ................................................................................................ 24

          VII.B.1 Credit Memoranda Suggest Recognition of Oakwood's Financial
                Condition ..................................................................................... 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to
Monitor and Insulate Itself from the Bankruptcy Risks Surrounding
Oakwood ............................................................................................. 26

VII.C CSFB's Own Guidelines Require a High Standard of Care to its Clients ............ 27

VII.D CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation,
the Information It Had, Its Own Concerns, and the Duties It Owed
Oakwood and its Creditors ................................................................................. 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No
Mention of the Fact that Oakwood Should Have Considered
Bankruptcy ...................................................................................... 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the
First Time CSFB Discussed and Presented Potential Restructuring
Alternatives ..................................................................................... 34

VII.E The Advice CSFB Provided to Oakwood was Inappropriate .............................. 35

VII.F The Actions CSFB Engaged in with Oakwood Destroyed Value and
Exacerbated the Company's Insolvent Financial Condition ................................. 36

VII.G CSFB Should Have Advised Oakwood to Curtail Operations and Should Not
Have Enabled it to Continue to Destroy Value ................................................... 37

VIII.  **CSFB Had a Financial Incentive to Keep Oakwood Operating** ................................ 39

VIII.A CSFB Stood to Continue Earning Fees for the Services It Provided to
Oakwood ........................................................................................................... 39

VIII.A.1 Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2 Fees Earned by CSFB for Providing Loan Purchase Facility to
Oakwood .......................................................................................... 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial
Advisor ............................................................................................ 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood
Continuing as a Going Concern ........................................................ 41

VIII.B CSFB's Equity Interest provided it with a Financial Interest in Oakwood
Continuing Operations ...................................................................................... 42

VIII.B.1 Agency Conflict between Equity and Debt Holders ........................... 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C Even Though CSFB was a Lender, Its Interests Differed from Those of
Other Debt Holders ........................................................................................... 45

VIII.D Conclusion Regarding CSFB's Incentives ......................................................... 47

# List of Tables

Table 7.1: CSFB's Roles and Fees Earned....................................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB ...................................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects ...................................................44

# List of Figures

Figure 7.1: Oakwood's Securitization Process ...........................................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.    Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance*. In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis*, (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management.*

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

2

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.    Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.    Summary of Opinions

My opinions in this matter are as follow:

- ***CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.*** CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V.    Assumptions

### V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B    Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI.    Background

### VI.A    Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

4

## VI.B   Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C   Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.
[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.
[3] *Ibid.*, p. 2.

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D   Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*
[5] *Ibid.*, p. 7.
[6] *Ibid.*, p. 3.
[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.
[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks ... [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E   Oakwood's Downturn and Bankruptcy

### VI.E.1   Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.
[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000. p. 1.
[12] *Ibid.*
[13] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[14] *Ibid.*

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13. Issue 26.
[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.
[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2  Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] *Ibid.*

[21] *Ibid.*

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

### VI.E.3 Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.
[26] *Ibid.*
[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.
[28] *Ibid.*
[29] *Ibid.*, p. 2.

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4 Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.

[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A    CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

#### VII.A.1    Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006, p. 59.
[35] *Ibid.*, p.183.

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*

13

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

### VII.A.2    Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

### VII.A.2.a    Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than $7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;

- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;

- Testing the financial information contained in the prospectuses; and

- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

### VII.A.2.b   Role as Provider of Loan Purchase Facility

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[t]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, December 12, 2006, p. 73.
[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 89.
[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 64-5.
[53] *Ibid.*, p. 194-5.

18

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

**VII.A.2.d   Role as Financial Advisor for Restructuring Purposes**

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 … We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.

[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

### Table 7.1: CSFB's Roles and Fees Earned

| Role | Description | Fees Earned |
|---|---|---|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | ▪ Warrants of 19.9% of Oakwood's Common Stock ▪ Upfront fee of $2.5 million ▪ Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 163.
[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 152.

21

This section and section VII.A.1 demonstrate that investment banks are in a unique position to access information concerning the financial conditions of their clients and that CSFB's professional responsibilities with respect to Oakwood went beyond its role of underwriter. In light of the numerous roles CSFB served for Oakwood, CSFB had access to both public and private information about the Company's financial condition. In the following section I show that CSFB did in fact obtain public and inside information about Oakwood's financial condition and outlook.

### VII.A.3    CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition

Given its roles as underwriter, lender, and financial advisor, CSFB obtained both public and private information from Oakwood, credit-rating agencies, and other market analysts. Oakwood provided CSFB personnel with substantial amounts of confidential information, including the historical loss experience of the securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. This information was relevant to an assessment of whether the manufactured housing industry in general was experiencing a significant downturn, and whether Oakwood in particular was suffering from an insolvent financial position from which it would not likely recover.

As early as June 1999, Moody's and S&P rated Oakwood's unsecured senior notes as Baa3 and BBB-, respectively – the lowest investment-grade ratings. Any downgrade would result in a junk bond status. Both Moody's and S&P placed the Company on a negative credit watch given that Oakwood's third-quarter results were anticipated to be as much as 50 percent lower than expectations.[64] By November 1999, Moody's and S&P had downgraded Oakwood's ratings on its corporate credit and long-term senior debt securities to below investment grade with a negative outlook.[65] In late 2000, the credit-rating agencies continued to downgrade Oakwood's credit rating. In lowering the credit rating of the Company's senior notes from BB- to CCC, S&P viewed Oakwood as having the highest-risk junk bond rating possible before entering default status. S&P maintained a negative outlook on Oakwood based on its belief that the Company's "current operating loss position will continue well into [2001], due to lower volumes at manufacturing, continued pricing pressures at retail, and higher costs within its captive finance

---

[64] CSFB New Customer Credit Review dated July 16, 1999. Document # CSFB-00250093.
[65] Email from David Caspar to Douglass Muir dated November 2, 1999. Document # CSFB-00175025.

unit."[66] By June 2001, Fiachra O'Driscoll noted that Oakwood "was rated Baa3/BBB- two years ago and is now Caa1/CCC."[67] In closely monitoring the actions taken by the credit-rating agencies, CSFB knew Oakwood had fallen below investment-grade status in 1999 and continued to be downgraded through 2002 to a level just above default junk bond status.

Through its own information processing, CSFB identified a number of credit issues and concerns with Oakwood in late 1999. In particular, CSFB noted that Oakwood was in a "poor financial condition."[68] Based on estimates provided by CSFB's Manufactured Housing analysts, CSFB projected in 2000 that Oakwood would realize a gross operating margin of 26.1 percent, resulting in a net loss of $1.8 million. CSFB further projected that Oakwood's EBIT would be about $15 million in 2000, significantly less than the level needed to cover its anticipated interest expense of $50 million in that year.[69] In estimating Oakwood's free cash flows in 2000, which included the repayment of interest expense and a $125 million revolver, CSFB's Credit Risk Management ("CRM") Team predicted negative cash flows ranging from losses of $75 million to $110 million.[70]

In addition to obtaining publicly available information about Oakwood, CSFB also had access to private, inside information. As discussed, as part of preparing the securitization prospectuses, Oakwood provided CSFB with inside information, including the historical loss experience of a securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectuses for securitizations. CSFB was given access to all deal files and closing binders on all retail installment sales contracts ("RICs") to be included in each securitized asset pool and had access to prior deal files and monthly tracking reports. Furthermore, Oakwood consulted with CSFB as to which customer would be approved to determine how those decisions would affect the market's perception of the collateral.[71]

---

[66] Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus dated October 30. 2000. Document # CSFB-00170815.

[67] Email from Fiachra O'Driscoll to Phil Jacob dated June 6, 2001. Document # CSFB-00154641.

[68] CSFB Credit Issues/Concerns with Oakwood Homes Corp. Document # CSFB-00250130.

[69] *Ibid.*

[70] *Ibid.*

[71] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 45.

## VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a  Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] *Ibid.*
[74] *Ibid.*, Document # CSFB-00250116.

24

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] Ibid.
[76] Ibid., Document # CSFB-00250117.
[77] Ibid., Document # CSFB-00250121.
[78] Ibid., Document # CSFB-00250118.
[79] Ibid., Document # CSFB-00250117.

25

### VII.B.1.b    March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2    Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.
[81] *Ibid.*, Document # CSFB-00250132.
[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventor levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C  CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] *Ibid.*, Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] *Ibid.*
[88] *Ibid.*

27

Furthermore, with respect to handling customer accounts, CSFB's compliance manual requires adherence to the New York Stock Exchange's ("NYSE") "Know your Customer" rule. This rule mandates "every member organization to learn the essential facts concerning every customer, every account and every order executed on behalf of a customer,"[89] and is intended to protect customers of NYSE members in cases where "investors who suffer losses in securities transactions often allege that their loss resulted from recommendations made by brokers which were unsuitable for them in light of their financial situation and investment objectives."[90] Given CSFB's access to both public and inside information about Oakwood, CSFB was in a position in which it could have known all the essential facts concerning the Company's insolvent financial condition. Yet its recommendations and advice to Oakwood to maintain its operations were inappropriate given that both public and inside information about Oakwood indicated that the Company was in an irreversible spiral to bankruptcy.

## VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors

The previous sections demonstrate that, given its roles as financial advisor, lender, and underwriter, CSFB had access to public and private information about Oakwood's financial condition and outlook and was concerned about Oakwood's bankruptcy risk. Further, in addition to the fiduciary duty CSFB owed Oakwood and its creditors, its own internal guidelines required that it know its customers and avoid conducting transactions harmful to its clients. Nevertheless, CSFB's advice and conduct with respect to Oakwood were inconsistent with the Company's bleak financial condition and outlook, and thus in violation of the duties it owed.

Although Oakwood was insolvent by the fall of 2001, CSFB continued until August 2002 to provide advice and arrange transactions that did not properly consider the Company's financial condition and outlook and that served to exacerbate its insolvency. No evidence exists that CSFB performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that CSFB considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.

---

[89] CSFB Compliance Manual. Section 5- Customer Accounts. Document # CSFB-0053089.
[90] Ibid.

28

In the rest of Section VII.D, I assess the advice CSFB provided to Oakwood. As I discuss, no evidence exists that CSFB suggested filing for bankruptcy as an option for Oakwood until August 2002. In Section VII.E, I demonstrate that CSFB's advice to Oakwood did not duly consider the Company's financial situation. In Section VII.F, I show that the transactions CSFB engaged in with Oakwood were value-destroying and exacerbated the Company's financial problems. In Section VII.G, I explain that CSFB should have advised Oakwood to curtail its operations and should not have enabled the Company to continue to destroy value to its creditors.

### VII.D.1    CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy

As discussed, between 2001 and August 19, 2002, the date CSFB signed a formal advisory agreement with Oakwood, CSFB was acting as a financial advisor to Oakwood. Based on the documents I have examined, CSFB never advised Oakwood of its insolvency or to even consider bankruptcy. Rather, the financial advice CSFB offered Oakwood centered on refinancing its outstanding debt to prolong the business. The objective of the CSFB presentations was to pitch certain financing schemes as a way to continue earning fees. I will now highlight the financial advice CSFB offered Oakwood throughout this period.

### VII.D.1.a    CSFB Presentation to Oakwood on June 26, 2001

On June 26, 2001, in a presentation made by CSFB to Oakwood, CSFB claimed that its equity research analysts "believed that signals exist which may point to a bottom for the manufactured housing industry"[91] and that the industry "will rebound."[92] Whereas CSFB's CRM Team believed that there was great uncertainty as to whether the manufactured housing industry had reached a bottom yet, its Investment Banking Division provided Oakwood with information that expressed optimism that industry trends would soon begin to work in the Company's favor. This had the effect of prolonging Oakwood's financing activities rather than encouraging Oakwood to consider bankruptcy in light of its unrecoverable, insolvent financial condition.

Without discussing the option of bankruptcy, CSFB maintained that it was "uniquely suited to advise Oakwood [and that its] restructuring expertise [was] complemented by its #1 position in the High Yield market, strength in the asset-backed market and #1 ranked research."[93] CSFB also provided an update on its view of Oakwood's financial health. In particular, it forecasted the

---

[91] CSFB Presentation to Oakwood Homes Corporation dated June 26, 2001. Document # CSFB-00052958.
[92] *Ibid.*
[93] *Ibid.*, Document # CSFB-00052956.

Company's net income to increase from -$120.9 million in fiscal year 2000, to -$59.7 million in FY 2001, to -$23.3 million in FY 2002, and forecasted its EBITDA margin to increase from -0.3% in FY 2000, to 1.9% in FY 2001, to 4.6% in FY 2002. CSFB further claimed Oakwood had made great progress in addressing its capital structure and operating strategy issues and believed more could be accomplished to reduce the capital structure's drag on the business with the following key objectives: reducing the cash interest burden on Oakwood, shortening the time to a positive cash flow, reducing the book value of debt and increasing the common share price, and improving Oakwood's credit profile, thereby facilitating Oakwood's future access to the capital markets.[94]

When Oakwood's senior notes were trading at a combined discount of $150 million, CSFB recommended three strategies to Oakwood. The first strategy was called the "B-2 Sale and Bond Buyback." CSFB claimed Oakwood could capture a significant portion of the $150 million discount by monetizing its retained B-2 securities and using the proceeds to quietly buy back and retire some of its outstanding senior notes. CSFB's recommendation was based on the assumption that the industry had bottomed out and the Company's financial condition was going to improve, resulting in an increase in the prices of Oakwood's bonds in the near future. The second strategy was called the "Package Exchange Offer." Under this alternative, CSFB recommended that Oakwood offer its bondholders a package of new debt and common shares in exchange for old notes to capture more of the current bond discount. The third strategy was called "One-Off Equity for Debt Exchange." CSFB claimed that Oakwood could chip away at its debt by quietly offering individual bondholders common shares in exchange for senior notes. CSFB advised Oakwood that individual bondholders would be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time.

Rather than advise Oakwood to cut its losses and file for bankruptcy, CSFB encouraged Oakwood to continue to engage in financing activities based on uncertain assumptions that industry-wide and company-specific conditions would improve. This advice only accelerated the Company's insolvent financial position.

---

[94] *Ibid.*, Document # CSFB-00052978.

**VII.D.1.b   CSFB Presentation to Oakwood on August 9, 2001**

On August 9, 2001, CSFB made another presentation to Oakwood to provide further restructuring alternatives to the Company. Although Oakwood's bankruptcy appeared to be imminent, CSFB stated that "Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current trading level of its outstanding Notes."[95] Again, CSFB stated that it believed signals existed indicating that the manufactured housing industry had reached its bottom and that Oakwood should aggressively pursue strategies to capitalize on the trading levels of its public bonds.[96]

In stating that recent liquidity transactions had successfully positioned Oakwood to pursue restructuring options, CSFB recommended that the Company proceed with a three-step process. First, CSFB believed Oakwood should proceed with the application of the B-2 and receivables purchase facility proceeds that it proposed in its June 26, 2001, presentation. The second step was for Oakwood to refinance its credit facility with a new facility of $50 million. The goal of this strategy was to replace the current senior lenders with non-traditional lenders to allow Oakwood greater latitude. Third, CSFB advised Oakwood, as it did in its previous presentation, to further reduce its debt by considering a "Package Exchange Offer" and a "One-off Equity for Debt Exchange."[97] At the end of the presentation, CSFB listed more than one hundred "distressed finance assignments" it had performed for companies in which CSFB acted as a financial advisor to companies suffering from precarious financial and operating conditions.

Interestingly, shortly before making these presentations to Oakwood in 2001, CSFB issued a negative equity research report about the Company on April 26, 2001. In that report, CSFB lowered its fiscal 2001 estimate to a loss of $2.00 per share "based on the company's latest results and the continued softness in the manufactured housing industry."[98] In addition, the report maintained a Hold rating "given [Oakwood's] recent losses and excessive leverage (51% debt to capital and negative interest coverage) as well as the continued soft industry conditions."[99] While CSFB's equity research analysts were pessimistic about the condition of both Oakwood and the entire manufactured housing industry, CSFB's investment banking division was optimistic about the future prospects of the Company and the industry as a whole as a way to solicit more business from Oakwood.

---

[95] CSFB Presentation to Oakwood Homes Corporation dated August 9, 2001. Document # CSFB-00052854.
[96] *Ibid.*, Document # CSFB-00052855.
[97] *Ibid.*, Document # CSFB-00052873.
[98] CSFB Equity Research. "Oakwood Homes Corporation." April 26, 2001. Document # CSFB 001555802.
[99] *Ibid.*

**VII.D.1.c  CSFB Presentation to Oakwood in March 2002**

In a March 2002 presentation to Oakwood, CSFB advised Oakwood that it could reduce its March 2004 refinancing risk by exchanging the notes coming due in 2004 for a package of new notes and cash. CSFB noted that at that time notes coming due in 2004 had a face value of $125 million. CSFB recommended that these notes be exchanged for notes with a face value of $125 million with the same coupon and maturity as its notes coming due in 2009, with the cash portion of the exchange being sized to provide a modest premium to the trading levels of the 2004 notes.[100]

Table 7.2 below provides a summary of the strategic options and alternatives provided by CSFB in its presentations to Oakwood prior to August 2002.

**Table 7.2: Summary of Strategic Options Provided by CSFB**

| Presentation Date | Key Company Objectives Identified by CSFB in the Presentation | Strategic Alternatives Provided by CSFB |
|---|---|---|
| June 26, 2001 | ▪ Reduce cash interest burden on Oakwood<br>▪ Shorten the time to positive cash flow levels<br>▪ Reduce book value of debt and increase common share price<br>▪ Improve Oakwood's credit profile<br>▪ Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty | ▪ B-2 sale and open-market bond buyback<br>▪ Package exchange offer<br>▪ One-off equity for debt exchange<br>▪ Negotiate a flip-up transaction with a non-traditional senior lender |
| August 9, 2001 | ▪ Avoid a going-concern issue<br>▪ Replace current bank group<br>▪ Better utilize assets to raise non-traditional capital<br>▪ Reduce cash interest burden on Company<br>▪ Reduce debt & increase common share price<br>▪ Improve Oakwood's credit profile, thereby facilitating future access to the capital markets | ▪ Proceed with application of B-2 and Receivables Purchase Facility Proceeds<br>▪ Refinance credit facility with a new facility of $50 million or more<br>▪ Consider reducing debt through package exchange offer and one-off equity for debt exchange |
| March 2002 | Reduce Oakwood's March 2004 refinancing risk by exchanging the 2004 Notes for a package of new notes and cash | ▪ 2004 notes exchanged for $125M face value of new notes structured with the same coupon and maturity as 2009 notes<br>▪ Package exchange offer<br>▪ Flip-up transaction |

---

[100] CSFB Presentation to Oakwood Homes Corporation dated March 2002. Document # CSFB-00033246.

In providing a number of strategic alternatives for Oakwood to pursue to address its capital structure, at no point prior to August 2002 did CSFB advise Oakwood to consider filing for bankruptcy or that industry fundamentals were unlikely to improve soon enough for Oakwood to maintain its operations through the industry downturn. While CSFB's investment banking division failed to discuss the probability of bankruptcy with Oakwood until August 2002, its equity research group concluded that Oakwood posed a significant chance of bankruptcy throughout that time. On June 11, 2001, CSFB released a manufactured housing industry report stating that "[Oakwood] is still operating well in the red and the industry is not reaccelerating at this time."[101] In light of the weakness in Oakwood and the manufactured housing industry, CSFB explicitly asserted in the June 2001 report:

> Our probability that Oakwood does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with Oakwood, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares.[102]

On September 20, 2001, CSFB released another analyst report that stated verbatim its beliefs about the likelihood of Oakwood having to file for bankruptcy. CSFB still maintained a Hold rating on Oakwood, based again on its opinion that the "probability that Oakwood does not file for bankruptcy is now 50%."[103] While CSFB's investment banking division continued to present strategic options to Oakwood in 2001 and 2002 without discussing the possibility of bankruptcy, CSFB's research analysts contemporaneously published reports reflecting its concern that Oakwood posed a significant probability of bankruptcy. Not only did CSFB's research analysts believe that Oakwood had a fifty percent chance of filing for bankruptcy in June 2001, it believed that the probability of this occurrence had been even higher six months prior. Thus, CSFB's investment banking division continued to engage in activities that exacerbated Oakwood's insolvent financial condition and never advised the Company about the option of filing for bankruptcy until August 2002, even though its research analysts explicitly opined that the Company posed at least a 50 percent chance of filing for bankruptcy throughout 2001.

---

[101] CSFB Equity Research. "Manufactured Housing Industry Outlook: Approaching Bottom of Cycle; Not Out of the Woods Yet." June 11, 2001. Document # CSFB-00266476.
[102] *Ibid.*
[103] CSFB Equity Research. "Manufactured Housing- Retail Inventory Update: Second Quarter 2001." September 20, 2001. Document # CSFB 00266317.

### VII.D.2    CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise Oakwood that its best course of action might have been a restructuring. CSFB discussed Oakwood's capital structure and the potential courses of action it felt Oakwood should have considered pursuing to meet its liquidity and capital needs "in light of the sustained losses suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB stated that "while many thought that the industry had bottomed, there continues to be a downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's current state of operations and its short- and long-term prospects. Of particular concern was the maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that the factors threatening Oakwood's short-term liquidity position were $24 million in annual interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving, which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default rates and a structural change in the industry would place additional stress on Oakwood and that the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood chose should be based on its degree of optimism or pessimism as to its ability to grow into its capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views, CSFB offered a number of strategic alternatives. An optimistic view was seen as having a moderate-to-high probability of being able to service and refinance debt capitalization. If this were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid.*
[106] *Ibid.*, Document # MNAT006735.

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

## VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid.*, Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 201.
[109] *Ibid.*, pp. 169-170.
[110] *Ibid.* p. 16.

35

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F    The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006, Vol. 2, p. 232.
[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 19.
[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.
[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

## VII.G    CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.

[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.

[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

Committee in December 2002, Oakwood provided details of a rationalization plan ("the Plan") that sought to address the difficulties surrounding the Company's operations. The strategy of the Plan was to downsize Oakwood's operations, reduce fixed operating expenses, and improve the Company's cash flow and profitability.[118] In particular, the Plan proposed that Oakwood eliminate poorly performing retail stores, increase its focus on wholesales sales, adjust manufacturing capacity to a level in line with expected future sales, and reduce corporate overhead in line with the downsized company.[119] The Plan proposed accomplishing these objectives by eliminating Oakwood's presence in high-default states as well as closing seventy-four retail centers, five manufacturing plants and its Austin, Texas loan origination office. These actions alone were predicted to increase Oakwood's 2002 manufacturing and retail operating income by $30 million.[120] In light of the fact that the downturn in the manufactured housing industry was due in large part to overcapacity and excessive growth by companies like Oakwood, the advice CSFB provided should have entailed operational improvement strategies which focused upon downsizing the Company's operations. Rather, CSFB proposed alternative financing options which resulted in losses on securitization transactions and further impairment charges on Oakwood's REMIC valuations.

In addition, similar to providing the optimistic and pessimistic scenarios set forth in its presentation to Oakwood's board of directors after it was formally retained as a financial advisor for restructuring purposes, CSFB should have provided the Company with certain alternative courses of action if Oakwood's management believed it could not turn around its insolvent financial condition prior to mid-2002. Throughout its relationship with Oakwood, CSFB should have emphasized that the Company was confronted with both immediate and future liquidity-draining issues. Over the long term, CSFB should have advised that additional stress was going to be placed on the Company if the trends in default rates and industry structural change continued.[121] On further pointing out that Oakwood's securities were trading at distressed levels, its annual interest expense was high, and the servicing fees it earned on its REMIC securities were insufficient to cover the associated servicing costs, CSFB should have informed Oakwood of its unlikely prospect of improving its capital structure and provided more comprehensive restructuring solutions prior to August 2002 based on the assumption that the downturn in the manufactured housing industry was going to continue.

---

[118] Oakwood Homes Corporation. Creditors Committee Meeting dated December 9, 2002. Document # MNAT024088.
[119] *Ibid.*
[120] *Ibid.*, Document # MNAT024090.
[121] CSFB Presentation to Oakwood Board of Directors dated August 19, 2002. Document # OHCLT-01706.

Further, CSFB should have advised Oakwood that if the Company was pessimistic about the future prospects of its financial and operating conditions, it should not continue to employ a wait-and-see approach or take advantage of the discounted trading levels of its debt. Assuming Oakwood was insolvent in the fall of 2001, CSFB should have recognized and considered early in its relationship with Oakwood that the Company's outstanding indebtedness exceeded its fundamental value and that a sale of the Company or a filing for bankruptcy were options Oakwood should have thoroughly evaluated. Prior to August 2002, CSFB should have been recommending that Oakwood scale back its operations or begin implementing a pre-arranged or pre-packaged bankruptcy strategy. Both of these options would have been in the best interests of the Company and its credit holders. Instead, CSFB's recommendations were centered on its financial incentive to keep Oakwood operational to earn exorbitant fees through its roles as an underwriter, lender, and advisor.

## VIII.  CSFB Had a Financial Incentive to Keep Oakwood Operating

In this section, I describe the financial incentives CSFB had to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy. I first describe the fees CSFB was earning, and stood to continue earning, from its relationship with Oakwood. I then explain how CSFB's equity interest in Oakwood allowed it to share in the upside of an Oakwood recovery. Finally, I describe how, despite being a lender to Oakwood, CSFB did not share in the costs of the turnaround attempt because its debt was bankruptcy protected. In short, because of its unique position as a bankruptcy-insulated lender and equity owner, CSFB would enjoy the upside of an Oakwood recovery without facing the consequences of the attempt (that continuing operations was further exacerbating Oakwood's insolvent financial condition), and because of its relationships with Oakwood, CSFB would earn more fees the longer the attempt continued.

### VIII.A  CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood

As I described in Section VII, CSFB provided several services and played varying roles over the course of its relationship with Oakwood from the early 1990s through 2002. During this period, CSFB acted as Oakwood's general financial advisor, primary underwriter of its securitization program, secured lender, and as of August 19, 2002, its financial advisor for restructuring purposes. As discussed below, CSFB earned significant fees for providing these services to Oakwood.

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility. [126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.

[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.

[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.

[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.

[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

### VIII.A.3  Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:
    o  The face amount of the old securities;
    o  One third of the face amount of the securitization guarantees; and
    o  One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

### VIII.A.4  Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

## VIII.B   CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1   Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.

[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.
[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

**Table 8.1: Illustration of Payoffs and Probabilities of Projects**

| Cash Flow | Project A | | Project B | |
|---|---|---|---|---|
| | Unsuccessful | Successful | Unsuccessful | Successful |
| | Payoff (80% Prob.) | Payoff (20% Prob.) | Payoff (50% Prob.) | Payoff (50% Prob.) |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

## VIII.B.2  CSFB Had a Conflict of Interest with Oakwood's Debt Holders

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

## VIII.C  Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.
[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989.301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection to lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict – that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

## VIII.D    Conclusion Regarding CSFB's Incentives

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.

Dated:    April 30, 2007

Alan C. Shapiro, Ph.D.

**Appendix A:  Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California  90089-1427

### EDUCATION
Ph. D.       Economics, Carnegie Mellon University, 1971
B.A.          Mathematics, Rice University, 1967

### CURRENT POSITION
1991-Present:    Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

### PAST POSITIONS
1993-1997:    Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:    Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:    Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:    Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:    Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:    Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:    Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:    Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

### VISITING APPOINTMENTS
Spring 2003:    U.S. Naval Academy

Spring 1990:    Yale School of Management, Yale University

1

1984-1985:     Anderson Graduate School of Management, UCLA

Spring 1981:   Faculty of Commerce, University of British Columbia

Spring 1977:   Stockholm School of Economics

## TEACHING EXPERIENCE

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

## EXECUTIVE PROGRAMS: UNIVERSITIES

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

2

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

## EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS
CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

3

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy; O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

Editorial Positions

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

Boards of Directors

Academy of International Business
Western Finance Association
American Finance Association

Reviewer for

*Journal of Financial Economics*
*Journal of Political Economy*
*Journal of Finance*
*Management Science*
*Journal of International Economics*
*Journal of Money, Credit, and Banking*
*Journal of Financial and Quantitative Analysis*
*National Science Foundation*
*Journal of International Money and Finance*

*Journal of Banking and Finance*
*Financial Review*
*International Trade Journal*
*Financial Management*
*Urban Economics*
*Journal of International Business Studies*
*Journal of Economics and Business*
*Journal of Financial Services Research*

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management
    Association, 1986.

5

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

> Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

> Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

6

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

9

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

10

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

## WORKING PAPERS

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

## CONSULTING AND PROFESSIONAL ACTIVITIES

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

11

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

12

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

13

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

## AWARDS AND SPECIAL RECOGNITION

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

## SPEECHES

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

14

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

## EXPERT WITNESSING

1. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2. Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3. Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4. New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6. O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7. IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8. IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9. Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

17

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

19

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

20

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Hafif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton: Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:
1994-2006**

1.  Fleet Funding, Inc. and Fleet Funding 11, Inc., Appellants v. Commissioner of Revenue, Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

2.  K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc., Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the County of Santa Clara: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages. I was deposed on February 3, 2006 on behalf of the defendant.

3.  Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior Court of the State of California for the County of Santa Clara: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the plaintiff.

4.  Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C, United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004 (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5.  Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6.  TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7.  Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8.  Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9.  Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

26

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

**20.** Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

30

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

# Appendix B: List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.*

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

# EXHIBIT B

# In The Matter Of:

## OHC LIQUIDATION TRUST v.
## CREDIT SUISSE FIRST BOSTON

---

## ALAN C. SHAPIRO
### September 5, 2007

---

# MERRILL LEGAL SOLUTIONS
## 25 West 45th Street - Suite 900
## New York, NY 10036
PH: 212-557-7400 / FAX: 212-692-9171

SHAPIRO, ALAN C. - Vol. 1

Page 1

UNITED STATES BANKRUPTCY COURT
    DISTRICT OF DELAWARE
-------------------------------x
In Re:                        )Chapter 11
OAKWOOD HOMES CORPORATION,    )Case No. 02-13396
et al.,                       )(PJW)
                Debtors.      )Jointly Administered
-------------------------------x
OHC LIQUIDATION TRUST,        )
                Plaintiff,    )
        vs.                   )Adv. Proc. No.
CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
Swiss banking corporation,    )
CREDIT SUISSE FIRST BOSTON    )
LLC, a Delaware limited       )
liability corporation, CREDIT)
SUISSE FIRST BOSTON, INC.,    )
CREDIT SUISSE FIRST BOSTON    )
(U.S.A.), INC., a Delaware    )
corporation and a wholly      )
owned subsidiary of CREDIT    )
SUISSE FIRST BOSTON, INC.,(the)
subsidiaries and affiliates   )
of each, and DOES 1 through   )
100,                          )
                Defendants.)  )
-------------------------------x
            September 5, 2007
            10:15 a.m.

        Deposition of ALAN C. SHAPIRO, held at
the law offices of Linklaters LLP, 1345 Avenue of
the Americas, New York, New York, pursuant to
agreement, before Donald R. DePew, an RPR, CRR and
Notary Public within and for the State of
New York.

Page 2

1
2   A P P E A R A N C E S :
3
4   Attorneys for Plaintiff
5       STUTMAN TREISTER & GLATT
6       1901 Avenue of the Stars, Twelfth Floor
7       Los Angeles, California 90067-6013
8   BY: TONY CASTANARES, ESQ.
9
10  Attorneys for Defendants
11      LINKLATERS LLP
12      1345 Avenue of the Americas
13      New York, New York 10105
14  BY: R. PAUL WICKES, ESQ.
15      J. JUSTIN WILLIAMSON, ESQ.
16      -AND-
17      LINKLATERS LLP
18      One Silk Street
19      London EC2Y 8HQ
20  BY: RICHARD A. DOBLE, ESQ.
21
22  ALSO PRESENT:
23      PETER KOZLOWSKI, Director, Counsel, (a.m.
24      only) Credit Suisse Securities (USA) LLC
25      DOUGLAS HUEBNER, Videographer

Page 3

1               ALAN SHAPIRO
2       (Exhibit 501, Multipage document
3   entitled Report of Alan C. Shapiro, Ph.D.,
4   dated 4/30/07, premarked for identification,
5   as of this date.)
6       THE VIDEOGRAPHER:  Here begins
7   videotape No. 1 in the deposition of
8   Alan Shapiro, In re: Oakwood Homes
9   Corporation, et al., OHC Liquidation Trust
10  versus Credit Suisse First Boston, et al.,
11  Case No. 02-13396 (PJW).  Today's date is
12  September 5th, 2007.  The time is 10:15.
13      The video operator today is
14  Douglas Huebner of Merrill Legal Solutions,
15  25 West 45th Street, New York, New York.
16  The video deposition is taking place at
17  Linklaters, 1345 Avenue of the Americas,
18  New York, New York.
19      Will counsel please introduce
20  themselves for the record.
21      MR. WICKES:  Paul Wickes from
22  Linklaters for the defendant.  And with me
23  are Justin Williamson and Richard Doble,
24  also from our firm, and Peter Kozlowski of
25  Credit Suisse.

Page 4

1               ALAN SHAPIRO
2       MR. CASTANARES:  Tony Castanares,
3   Stutman Treister & Glatt, for the plaintiff.
4       THE VIDEOGRAPHER:  Will the court
5   reporter please swear in the witness.
6   A L A N   C.   S H A P I R O ,    called as a
7       witness, having been duly sworn by the
8       Notary Public, was examined and testified as
9       follows:
10  EXAMINATION BY
11  MR. WICKES:
12      Q.   Professor Shapiro, I see from your
13  expert report and your qualifications that you are
14  experienced at this business of depositions, so I
15  assume I don't need to explain the process to you;
16  is that right?
17      A.   Yes.
18      Q.   All right.  Is there any reason today
19  why you're not able to give us your best
20  testimony?
21      A.   No.
22      Q.   All right.  Professor, in your expert
23  report, dated April 30th, 2007, which we've marked
24  as Exhibit 501 in this case, you tell us on page 4
25  that you've been "asked by counsel to assume that

1 (Pages 1 to 4)

Page 5

1
2  CSFB owed Oakwood and its creditors a fiduciary
3  responsibility"; is that correct?
4     A.  Yes.
5     Q.  Tell me, if you would, Professor, how
6  would the conclusions in your report have been
7  different had you not made that assumption.
8     A.  Well, I can't --
9        MR. CASTANARES:  Objection to form.
10    A.  I can't give you -- well, a legal
11 opinion, but I guess I would say even if there
12 were no fiduciary obligation that Credit Suisse's
13 behavior was inconsistent with its -- with the
14 guidelines in its compliance manual.  So from that
15 standpoint I think my conclusions would still
16 stand, in that as my specific opinions, which are
17 expressed on pages 3 and 4, that CSFB did not
18 behave in a reasonable or a reasonably prudent
19 manner with respect to the services it provided to
20 Oakwood doesn't rely specifically on the existence
21 of a fiduciary obligation.
22       And second, that my opinion that CSFB
23 had financial incentives to keep Oakwood operating
24 and to delay recommending that Oakwood file for
25 bankruptcy doesn't -- does not specifically rely

Page 6

ALAN SHAPIRO
1
2  on the assumption of a fiduciary obligation, but I
3  think that it does -- it's inconsistent with the
4  guidelines in the compliance manual.
5     Q.  So do I understand from that answer
6  that your conclusions would not be any different
7  if you had not made the assumption identified at
8  Roman numeral V.A on page 4 of your report?
9     A.  Yes, I believe that the fiduciary
10 obligation certainly strengthens my conclusions,
11 but I think those conclusions would still stand.
12    Q.  In what way does the fiduciary
13 obligation strengthen your conclusions?
14    A.  Well, it would strengthen the -- it
15 wouldn't affect the second conclusion regarding
16 financial incentives, those exist independent of
17 any fiduciary obligation.  But the reasonable or
18 reasonably prudent, I think you do want to take in
19 figuring whether something -- whether somebody
20 behaved in a reasonable manner.  I think if they
21 had a fiduciary obligation to behave in a certain
22 way that that strengthens that obligation or makes
23 behavior less reasonable than it otherwise would.
24    Q.  Who was it who asked you to make that
25 assumption?

Page 7

ALAN SHAPIRO
1
2     A.  I don't recall the specific person, but
3  it was somebody from the law firm of Stutman.
4     Q.  Do you remember when it was you were
5  asked to make that assumption?
6     A.  It was sometime before I began writing
7  my report.
8     Q.  Was it before you began work on your
9  report?
10    A.  I believe so.
11    Q.  And you can't remember who it was who
12 asked you to make the assumption?
13    A.  No, I don't.  I can't.
14    Q.  Can you remember the occasion when you
15 were asked to make that assumption?
16    A.  Not specifically.  We had various
17 meetings, both telephonic conversations as well as
18 in-person meetings.
19    Q.  Before you began to write?
20    A.  That's correct, and then while I was
21 working on the report.
22    Q.  Do you remember whether it was in a
23 group meeting that someone asked you to make this
24 assumption or one on one?
25    A.  I believe that all my meetings were

Page 8

ALAN SHAPIRO
1
2  group meetings, both telephonically as well as in
3  person.
4     Q.  And who were the participants in those
5  group meetings?
6     A.  They varied.  I couldn't tell you how
7  many there were or which people.  I can tell you
8  the general cast of people.
9     Q.  Would you?
10    A.  Sure.
11       Mr. Castanares.  And again, I have to
12 say that I'll mention names, but I don't think
13 that they were -- that they all participated in
14 each meeting.  I think there were different people
15 participating in different meetings.
16    Q.  Okay.
17    A.  Stephan Ray, Whitman, I can't recall
18 his last name.  Scott Yun and -- you know, I --
19 I'm trying to think.  I think there may have been
20 one or -- possibly another lawyer or two.  And
21 then there were my associates, people who helped
22 me on this matter.  Dr. Atulya Sarin --
23    Q.  Hang on a second.
24    A.  Sure.
25    Q.  Just on the question of the lawyers

2 (Pages 5 to 8)

Page 9

ALAN SHAPIRO

1
2 from the Stutman firm, was Pamela King a
3 participant in any of those meetings?
4    A.   I don't recall.
5    Q.   Do you know her?
6    A.   I don't have a recollection of her.
7    Q.   Okay.  Now, you started to tell us
8 about associates and I was going to ask you later,
9 but we'll do it now, were there other people,
10 other than the lawyers at Stutman with whom you
11 worked in preparing this report?
12    A.   Yes.
13    Q.   Can you tell me who they were.
14    A.   Dr. Atulya Sarin, and his name --
15    Q.   You better spell that for us.
16    A.   Yes, his name is spelled A-t-u-l-y-a,
17 Sarin, S-a-r-i-n.
18         Paul Sandhu, that's S-a-n-d-h-u.  Those
19 were the principal people.  And then I had a
20 couple of other people who did various data
21 analyses for me.
22    Q.   And who were the other people?
23    A.   Reza Ilkhani, that's R-e-z-a,
24 I-l-k-h-a-n-i, I believe.
25    Q.   Okay.

Page 10

ALAN SHAPIRO

1
2    A.   And Allen Shen, A-l-l-e-n, S-h-e-n.
3 And Paul Hanouna, H-a-n-o-u-n-a.
4    Q.   Okay.  And if you would, just briefly
5 identify those people for me, that is, are they
6 work colleagues, are they employees?
7    A.   Sure, yeah.
8         Atulya Sarin is a professor of finance
9 at Santa Clara University.  Paul Sandhu is an
10 independent contractor.  The same with Allen Shen
11 and Reza Ilkhani.  And Paul Hanouna is an
12 assistant professor of finance at Villanova
13 University.
14    Q.   Okay.  And can you just tell me
15 generally what role each of those five people
16 played in your work.
17    A.   Sure.  Atulya Sarin is a colleague who
18 works very closely with me.  We, you know, pretty
19 much discuss everything related to a case.  We
20 work on other cases together.
21    Q.   Okay.
22    A.   Paul Sandhu works with us on various
23 cases.  His background is economics and law.  He
24 has a law degree from Canada, although he doesn't
25 work as a lawyer.  He goes -- he spends a fair

Page 11

ALAN SHAPIRO

1
2 amount of time going through documents, you know,
3 very carefully helping me identify various
4 documents that would be of relevance.
5         And the others, Reza, Allen, and
6 Paul Hanouna, they mostly provide data analysis
7 services.  They help me, particularly with regard
8 to the supplemental report that I wrote in this
9 matter.
10    Q.   Did they -- did those three, that is,
11 Ilkhani, Shen, and Hanouna, did they assist in the
12 principal report?
13    A.   You know, they may have done some
14 things, but I just don't recall.  What I do recall
15 is that they -- is their assistance in the
16 supplemental report.
17    Q.   So the principal people who worked with
18 you on Exhibit 501 are Dr. Sarin and Paul Sandhu?
19    A.   That's correct.
20    Q.   All right.  And have you worked with
21 all those people on other matters in the past?
22    A.   Yes, I have.
23    Q.   Your principal occupation is as a
24 professor at the University of Southern
25 California; is that right?

Page 12

ALAN SHAPIRO

1
2    A.   That's correct.
3    Q.   Is the work you do as an expert
4 witness, do you do that through some entity or
5 organization?
6    A.   Well, I have -- well, Atulya Sarin and
7 I own a company called Trident Consulting Group
8 through which we operate.
9    Q.   I see.
10         And is it Trident Consulting Group that
11 was actually retained by the plaintiffs in this
12 action to provide expert services?
13    A.   No, I was.
14    Q.   You were.
15         So is it --
16    A.   And I, in turn, used Trident Consulting
17 Group to -- you know, to provide services to me.
18    Q.   And what kind of entity is Trident
19 Consulting Group?
20    A.   It's an LLC.
21    Q.   It's an LLC.  Okay.
22         You get paid for your services in this
23 matter; is that right?
24    A.   That's correct.
25    Q.   When you send a bill to the plaintiff

3 (Pages 9 to 12)

Page 13

ALAN SHAPIRO

1    does that bill come from you or from Trident?
2
3    A.   From me.
4    Q.   And the payment is made to you?
5    A.   That's correct.
6    Q.   And then do you pay Trident?
7    A.   Yes.
8    Q.   And who pays Ms. Ilkhani, Mr. Shen, and
9    Mr. Hanouna?
10   A.   Well, Atulya Sarin actually handles
11   that.  Those -- every -- Atulya and I are the only
12   principals, really partners in the LLC.
13   Q.   Right.
14   A.   And then Atulya, in turn, contracts
15   with these other people.  They're all independent
16   contractors.
17   Q.   Okay.  So do you make a payment then to
18   Trident?
19   A.   No.  Actually, it's -- even though we
20   have an LLC, actually I have an S corporation and
21   Dr. Sarin has an S corporation.  I make the
22   payment to Dr. Sarin's S corporation.
23   Q.   When you say I make the payment, do you
24   mean your S corporation?
25   A.   My S corporation, yes.  I have a --

Page 14

ALAN SHAPIRO

1
2    Q.   Let me go back to the question I asked
3    you before.
4         Bills and payments with respect to your
5    services, are they made to you personally or to
6    your S corporation?
7    A.   Actually to my S corporation.
8    Q.   What's the name of that corporation?
9    A.   Alan C. Shapiro, Inc.
10   Q.   And what's the name of Dr. Sarin's
11   corporation?
12   A.   Saagar Enterprises, that's S-a-a-g-a-r
13   Enterprises.
14   Q.   And are those two entities, are they
15   the owners of Trident or are you --
16   A.   That's correct.
17   Q.   Okay.  Is there some reason why there's
18   no mention of any of those entities in your
19   report?
20   A.   No.  There just was no reason to, to
21   mention them.
22   Q.   Okay.  Is there some reason why there's
23   no mention in your report of the fact that other
24   people worked on it with you?
25   A.   Yes, because I wrote the report.  I

Page 15

ALAN SHAPIRO

1
2    said I did have help from other people.
3    Q.   Okay.  And when you say you wrote the
4    report, tell me as a purely mechanical matter how
5    was Exhibit 501 created.
6    A.   Well, I sat at the keyboard and wrote
7    it.
8    Q.   Okay.  Did you write all of it or did
9    some of these other people write some parts of it?
10   A.   I wrote all of it.
11   Q.   Okay.  And so everything that is in
12   this report represents your conclusions?
13   A.   That's correct.
14   Q.   Do your S corporation or Trident have
15   offices?
16   A.   Well, we both have home offices.
17   Q.   Okay.  So was the work on this report
18   done at your home office?
19   A.   Yes, it was.
20   Q.   So you were working on a computer at
21   your home office?
22   A.   That's correct.
23   Q.   Is that computer networked?
24   A.   No.
25   Q.   It's just a standalone computer?

Page 16

ALAN SHAPIRO

1
2    A.   Yes.
3    Q.   And --
4    A.   I only hesitated because it's connected
5    to the Internet, but...
6    Q.   I understand.
7         Your report is dated April 30th, 2007.
8    Can you tell us approximately when you began the
9    actual drafting of the report.
10   A.   I would say sometime in March, probably
11   early March, but I don't remember specifically.
12   Q.   Presumably the hard drive on your
13   computer would have a record of when drafting
14   began.
15   A.   I -- most likely.
16   Q.   Okay.  Did you maintain and keep drafts
17   of your report?
18   A.   No, there's just one draft that I just
19   would type over.
20   Q.   Okay.  Did you share with lawyers at
21   the Stutman firm drafts of your report prior to
22   the April 30th report?
23   A.   No.
24   Q.   So they never saw it until it was in
25   its final form; is that right?

4  (Pages 13 to 16)

Page 17

```
1              ALAN SHAPIRO
2      A.   I believe that's true.
3      Q.   Did Dr. Sarin see drafts of the report?
4      A.   Yes.
5      Q.   And did he make comments or edits to
6   the report?
7      A.   Yes.
8      Q.   And as a mechanical matter how would
9   Dr. Sarin do his editing of the report?
10     A.   Well, most of the time he would -- we
11  would talk about it in conference calls. Several
12  times he came to my home and actually worked on it
13  together.
14     Q.   Okay.
15     A.   The same with Paul Sandhu.
16     Q.   And did you --
17         Now, you say the same with Paul Sandhu,
18  did Paul Sandhu -- sorry.
19         Did you e-mail drafts back and forth
20  amongst yourself and Mr. Sandhu and Dr. Sarin?
21     A.   Yes.
22     Q.   And would those e-mails be preserved on
23  your computer system?
24     A.   No.
25     Q.   Why not?
```

Page 18

```
1              ALAN SHAPIRO
2      A.   I just make a habit of deleting
3   e-mails.
4      Q.   You delete all e-mails?
5      A.   After a certain -- after a week or so.
6      Q.   After a week or so you delete all of
7   the e-mails?
8      A.   Yes.
9      Q.   Okay. So there would be no record of
10  the successive drafts of the report, other than
11  whatever Word maintains; is that right?
12     A.   I think so.
13     Q.   Did you talk with anybody at Stutman,
14  at the Stutman firm, about whether or not you
15  should maintain drafts of your report?
16     A.   Not that I can recall.
17     Q.   Who was your principal contact at
18  Stutman?
19     A.   I think it varied. I'd say generally
20  Stephan Ray.
21     Q.   Okay. Is this the first matter on
22  which you've served as an expert witness, working
23  with the Stutman firm?
24     A.   That's correct.
25     Q.   This is the first time working with
```

Page 19

```
1              ALAN SHAPIRO
2   them?
3      A.   Yes.
4      Q.   Have you -- you have quite a
5   substantial list here of matters that you've
6   worked on in the past.
7          Have you ever been engaged in a matter
8   in which Credit Suisse or Credit Suisse First
9   Boston or any of its related entities were
10  involved?
11     A.   Yes.
12     Q.   Tell me when, what matters those were.
13     A.   Well, as best as I recall it was one
14  matter.
15     Q.   Okay.
16     A.   And that's in the Orange County
17  bankruptcy case.
18     Q.   Right.
19     A.   I worked for the SEC as their
20  expert economist and one of the defendants was
21  Credit Suisse. And I believe I wrote a report
22  on behalf of the SEC with regard to CSFB.
23     Q.   Do you remember generally what the
24  conclusions of that report were?
25     A.   Yes, that CSFB didn't adequately
```

Page 20

```
1              ALAN SHAPIRO
2   disclose in offering documents the riskiness of
3   the Orange County investment pool.
4      Q.   Okay. Do you still have a copy of that
5   report?
6      A.   I don't think so. The SEC probably
7   does, but...
8      Q.   As a matter of course in your expert
9   witness work do you keep copies of your work
10  product?
11     A.   Generally. It's just been, what, maybe
12  ten or 15 years ago. I just can't recall if I
13  have it or not.
14         MR. WICKES: Can we ask you to make
15  a -- have a search made for that and provide
16  it if you have it.
17         MR. CASTANARES: You can ask.
18         We'll take it under advisement.
19     A.   I shouldn't say that I don't have it, I
20  may. It's just been so long. I have a garage
21  stuffed with boxes of materials.
22     Q.   Did you look at that report as you were
23  working on Exhibit 501?
24     A.   No.
25     Q.   Did work that you did in that regard
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 21

ALAN SHAPIRO

1    with respect to CSFB in any respect impact on the
2    work you did in connection with this matter?
3       A.   No.
4       Q.   How did you come to be retained in this
5    matter?
6       A.   I really don't recall.  All I know is I
7    got a phone call one day.  I think it was from
8    Mr. Ray.  And I don't -- I cannot recall how he
9    got hold of my name.
10      Q.   Okay.  Were you -- was there an
11   interview or --
12           Do you know what a beauty contest is?
13      A.   Yes.
14      Q.   Was there a beauty contest for this
15   engagement?
16      A.   I don't know, in that I don't know if
17   there were any other contestants.
18      Q.   Right.
19      A.   I know that several people came to my
20   home to talk to me about the case.
21      Q.   Okay.  Who were those people?
22      A.   You know, I can't, I think it may have
23   been Mr. Ray.  I think there may have been
24   somebody from the Alvarez company.

Page 22

ALAN SHAPIRO

1       Q.   Uh-huh.
2       A.   I'm trying -- possibly Whitman, but
3    this was, what, maybe a year and a half ago or so.
4    I just can't -- I don't have a good recollection
5    of that.  What I do recollect is that I believe
6    there were three, maybe four people who came to my
7    home to talk to me.
8       Q.   Was there a representative of the
9    bondholders in that group?
10      A.   I just don't recall.
11      Q.   Okay.  And sometime after that you were
12   retained to be an expert in this case; is that
13   right?
14      A.   That's correct.
15      Q.   And in that first meeting what did they
16   tell you about the case?
17      A.   I really don't -- don't recall.  I
18   think they were talking to me about my background
19   and experiences.  I really don't have any
20   recollection of what they told me.
21      Q.   Would you have any notes, or records,
22   or computer entries that would indicate who was at
23   that first meeting?
24      A.   No.

Page 23

ALAN SHAPIRO

1       Q.   Do you keep a calendar on your home
2    computer?
3       A.   I have a calendar, but I wouldn't have
4    kept something like that because I didn't -- I
5    didn't know who would show up.  If I know I'm
6    going to have a meeting with somebody I'll include
7    their name, but I think in this -- I don't know
8    what the entry would have been, probably meeting
9    with Stutman or something like that.
10      Q.   Is it fair to say that by the end of
11   that meeting you understood that what this group
12   wanted was an expert who would express a negative
13   opinion about the work that Credit Suisse First
14   Boston had done in connection with Oakwood Homes?
15      A.   Well, I really don't recall what we --
16   just what we talked about.  Just as if I'm sitting
17   here now I -- and just being reasonable.  They
18   wouldn't want somebody who had a positive opinion,
19   but I had no idea -- I've turned down a number of
20   cases where I disagreed with the -- with what
21   attorneys asked me or would have liked me to say.
22   So I had to wait and look at the documents before
23   I could express any opinion.
24      Q.   But you understood that for the

Page 24

ALAN SHAPIRO

1    purposes of the litigation they were involved in
2    they needed somebody to express negative opinions
3    about Credit Suisse's work, that was clear, wasn't
4    it?
5       A.   Well, as I said, I don't recollect what
6    we talked about.  I'm just saying, sitting here
7    now, it's pretty clear to me that if you're
8    bringing an action against a defendant that you
9    would want somebody who had a negative opinion of
10   the behavior of the defendant.  But I have no
11   independent recollection of just what they asked
12   me about.
13      Q.   At that first meeting did you talk
14   about the basis on which you would be compensated
15   for your services?
16      A.   I just don't -- don't recall whether it
17   was then or at a later time that I was called to
18   find out what my rates were.
19      Q.   Okay.  How are you paid for your work
20   on this matter?
21      A.   Well, I'm paid for my time and the
22   other people are paid for their time.
23      Q.   Okay.  What's your hourly rate?
24      A.   My hourly rate is $800.

6 (Pages 21 to 24)

Page 25

ALAN SHAPIRO

1
2    Q.   And Dr. Sarin's?
3    A.   Dr. Sarin's is $600.
4    Q.   Okay.  And Mr. Sandhu?
5    A.   His rate, I believe, is $400 an hour.
6    Q.   Okay.  How much in total have you
7    billed or been paid so far on this matter?
8    A.   $984,000.
9    Q.   And that's the total billings for your
10   work and the work of the others you've described?
11   A.   That's correct.
12   Q.   Do you know approximately what portion
13   of that represents -- or specifically, if you
14   know -- represents your own time?
15   A.   My best approximation, sitting here --
16   and I have not gone back to look at it -- but I
17   would estimate that about one-third of those
18   billings would be for my time and the other
19   two-thirds for my associates.
20   Q.   Do you know approximately how many
21   hours you've spent on this matter?
22   A.   No.  I could estimate, as I said, based
23   on my rate and my estimated billings.
24   Q.   I just tried to do that here quickly.
25       Is 400 hours, does that seem about

Page 26

ALAN SHAPIRO

1
2    right?
3    A.   That sounds about right.
4    Q.   Okay.  I won't hold you to that math
5    or --
6    A.   It's just an arithmetic issue.
7    Q.   And have you been billed -- have you
8    billed and been paid currently up through today?
9    A.   No.  I sent in my last invoice as
10   the -- for August and haven't been paid on that
11   yet.
12   Q.   But is that amount included in the
13   $984,000?
14   A.   Yes.
15   Q.   So that's the total amount billed, some
16   portion is yet unpaid?
17   A.   That's correct.
18   Q.   But you have confidence in the Stutman
19   firm that it will be paid?
20   A.   Well, I hope so.  I guess more in the
21   Oakwood Liquidation Trust or...
22       MR. CASTANARES:  We're solvent.
23       THE WITNESS:  Good.
24   Q.   Let me go back to your report.  And I
25   want to focus again on page 4 on Roman numeral

Page 27

ALAN SHAPIRO

1
2    V.A.  "I have been asked by counsel to assume that
3    CSFB owed Oakwood and its creditors a fiduciary
4    responsibility."
5        When you were asked to make that
6    assumption did -- were you told what it meant to
7    have a fiduciary responsibility?
8    A.   Well, I was told -- I'm not -- I'm not
9    a lawyer.  I tried to translate that into -- put
10   some economic substance to that.  I mean,
11   generally as a financial economist you hear the
12   term fiduciary obligation on a regular basis.
13   Q.   Well, this term is fiduciary
14   responsibility."
15   A.   Or responsibility, yeah.
16   Q.   What do you understand that to mean?
17   A.   Well, the same as a fiduciary
18   obligation.  I treat those terms to be synonymous.
19   Q.   Okay.  And what do those synonymous
20   terms mean?
21   A.   Well, I understand from a legal
22   standpoint that there are, generally speaking, two
23   aspects to it, a duty of care and a duty of
24   loyalty.
25       The care I translate into looking after

Page 28

ALAN SHAPIRO

1
2    the economic interests of the other party or
3    parties.  And the duty of loyalty, basically no
4    self-dealing or no enriching yourself at the
5    expense of the other party.
6    Q.   When you were asked to make the
7    assumption about fiduciary responsibility that is
8    described here in your report, did whoever it was
9    who asked you that give you either a definition or
10   explain to you what was meant by that term?
11   A.   No.
12       Well, as best I recall, we did talk
13   about that.
14   Q.   Okay.
15   A.   And, you know, I tried to -- as I said,
16   I tried to translate that into something that I'm
17   familiar with.  In other words, into something of
18   economic consequence.  And, you know, although I
19   don't have a real specific recollection, I believe
20   that whoever I talked to agreed that that -- the
21   economic terminology that I used was consistent
22   with the notion of a fiduciary obligation.
23   Q.   And you said that the assumption that
24   you made was that CSFB owed that fiduciary
25   obligation to Oakwood and its creditors.  So let's

MERRILL LEGAL SOLUTIONS
(800) 325-3376              www.MerrillCorp.com

Page 29

ALAN SHAPIRO

1 break that apart a bit.
2
3    A.   Sure.
4    Q.   When you talk about owing a fiduciary
5 responsibility to Oakwood, what do we mean by
6 Oakwood in that context?
7    A.   Oakwood the enterprise.
8    Q.   So can we sort of use the term Oakwood
9 and the company interchangeably there?
10   A.   Yes.
11   Q.   All right.
12   A.   And I translate that, when I think
13 about the duty to a company I translate that into
14 the economic interests of its owners.
15   Q.   So does that --
16        Do I understand from that, that when
17 you say that you assumed that CSFB owed Oakwood
18 separate from its creditors, that it owed Oakwood
19 a fiduciary responsibility, that in that sense
20 you're really referring to a duty owing to the
21 shareholders?
22   A.   No.  When I -- I think I wasn't precise
23 enough.  When I talk about owners I mean the
24 owners of all its securities.  Generally that
25 means a responsibility to the shareholders.

Page 30

ALAN SHAPIRO

1
2    Q.   Right.
3    A.   But in this particular case, given that
4 I assume that the company was insolvent in effect,
5 I believe that the company was owned by its
6 creditors.
7    Q.   So when you say -- well, let me ask a
8 different --
9        If I read that sentence to say simply I
10 was asked to assume that CSFB owed Oakwood's
11 creditors a fiduciary responsibility, is that
12 saying anything different than what the sentence
13 says as its written?
14        MR. CASTANARES:  Objection to form.
15   A.   Not really in this particular case.
16   Q.   CSFB -- you have a chart I was just
17 trying to find in your report that indicates that
18 CSFB was underwriting asset-backed securities for
19 this company for a number of years.
20        Do you remember that?
21   A.   Yes.
22   Q.   And is your opinion that --
23   A.   Page 17.
24   Q.   Page 17.  Good.
25        Page 17 doesn't tell us when they

Page 31

ALAN SHAPIRO

1
2 started underwriting asset-backed securities, does
3 it?
4    A.   Oh, I think that was 1994 or so.
5    Q.   So were you asked to assume that CSFB
6 owed Oakwood and its creditors a fiduciary duty
7 throughout the time that Credit Suisse worked with
8 Oakwood?
9    A.   We didn't talk about that.  It was just
10 in the relevant time period, from about 2000 on.
11   Q.   And that --
12        When you conflate the interest of the
13 company and the creditors is there some event or
14 some condition that causes that to happen?
15        MR. CASTANARES:  Objection to form.
16   A.   Yes, and that is when a company is
17 economically insolvent.
18   Q.   When a company is not economically
19 insolvent, if someone owes a fiduciary duty to
20 that company to whom do they owe it?
21   A.   Well, I think that --
22        MR. CASTANARES:  Objection, the
23 question is calling for a legal conclusion.
24        You may answer it.
25        MR. WICKES:  I'm asking him --

Page 32

ALAN SHAPIRO

1
2    A.   That does call for a legal conclusion.
3 But speaking as an economist, I think that it's
4 generally accepted among financial economists that
5 for a solvent company the fiduciary obligation is
6 to the shareholders of the company, the residual
7 claimants.
8    Q.   Okay.  And in your understanding as a
9 financial economist, when we talk about that
10 fiduciary duty to an entity absent insolvency does
11 the duty run to stakeholders other than the equity
12 owners?
13   A.   Well, again, that would call for a
14 legal conclusion.  I can tell you what is
15 generally accepted among financial economists.
16   Q.   Well, instead of that why don't you
17 tell me what your understanding is.
18        MR. CASTANARES:  Object to the question
19 as calling for a legal conclusion.
20   A.   Well, I don't have -- if you're just
21 looking for a legal conclusion I can't --
22   Q.   I'm not looking for a legal conclusion.
23 I'm asking your -- you --
24        At the very outset of your report you
25 tell us that you made an assumption, is that an

ALAN SHAPIRO

1  important assumption?
2
3      A.   Well, as I explained before, I think it
4  strengthens the notion of -- or the issue of
5  whether CSFB behaved in a reasonable manner. I
6  don't think that it's absolutely necessary to
7  reach the conclusion that I did.
8          Whether there's any legal consequence
9  to the conclusion depends on the existence of a
10 fiduciary obligation, I believe.
11     Q.   Okay. According to your understanding,
12 in a pre-insolvency situation does the fiduciary
13 duty that someone owes to a corporation encompass
14 only the interests of its equity holders?
15     A.   As I've explained, that calls for a
16 legal conclusion. But as a financial economist I
17 can tell you I accept what the general view is
18 among financial economists, which is that the
19 fiduciary obligation to an entity ultimately
20 becomes a fiduciary obligation to the shareholders
21 and not to other stakeholders of the organization,
22 except insofar as there's a specific obligation to
23 those other stakeholders.
24     Q.   Okay. So in general in a
25 pre-insolvency situation your understanding from

ALAN SHAPIRO

1
2  an economic point of view is that the obligation
3  of someone who has a fiduciary duty to a
4  corporation, is that that duty encompasses the
5  interests of the equity holders and not other
6  stakeholders, such as creditors, or employees, or
7  the communities where the company works or others?
8          MR. CASTANARES: Objection to form.
9      A.   That's correct.
10     Q.   But that --
11         Do I further understand you to be
12 saying that when the entity is insolvent that that
13 fiduciary obligation of the outsider now switches
14 and runs to the interest of the creditors?
15         MR. CASTANARES: Objection to form.
16     A.   That is --
17         MR. CASTANARES: You may answer.
18     A.   That is correct.
19     Q.   Okay. Any particular creditors or all
20 creditors?
21     A.   The creditors of an entity, and then --
22     Q.   Okay. But an entity such as Oakwood
23 had lots of different kinds of creditors, right?
24     A.   Well, you'd have to -- well, they did
25 have various creditors. Some actually were

ALAN SHAPIRO

1
2  creditors of Oakwood. Others were creditors of
3  its SPE. I think that's a very different --
4  special purpose entity, the one through which
5  securitizations were done.
6      Q.   Right. But when we're talking about --
7  I just want to understand your understanding. The
8  obligation that's owed to the company when the
9  company is insolvent, you tell us your
10 understanding is that's now an obligation to the
11 creditors.
12         Oakwood had in 2000, 2001 many
13 different kinds of creditors; isn't that right?
14         MR. CASTANARES: Objection to form.
15     A.   I'm not -- they had various creditors,
16 yes.
17     Q.   They had owners of publicly traded
18 bonds, right?
19     A.   Yes.
20     Q.   They had trade creditors, right?
21     A.   Yes.
22     Q.   They had employees, right?
23     A.   Yes.
24     Q.   They had as I remember some other kinds
25 of instruments other than publicly traded bonds.

ALAN SHAPIRO

1
2          There were some private notes; is that
3  right?
4      A.   I believe that's the case, industrial
5  revenue bonds or something like that.
6      Q.   And is the fiduciary duty that you're
7  describing, does it run to all of those creditors
8  or does it run to some particular subsets of them?
9          MR. CASTANARES: Objection to the
10 question as calling for a legal conclusion.
11     A.   Again, that does require a legal
12 opinion. I can tell you that my understanding was
13 specifically with regard to the bondholders.
14 There may have been some fiduciary obligation to
15 other creditors that I -- we did not talk about
16 that. I can think of economic reasons why that
17 would make sense, but I don't have an opinion
18 about that.
19     Q.   So would it be fair to say on the basis
20 of the discussion we've had that what you were
21 actually asked to assume -- the assumption that
22 you actually made here in your report is that --
23 and I'm looking here again at Roman numeral V.A,
24 and I've just edited it a bit based on our
25 discussion -- that you were asked by counsel to

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 37

ALAN SHAPIRO
1  
2 assume that from 2000 onward CSFB owed Oakwood's
3 bondholders a fiduciary responsibility?
4     MR. CASTANARES: Objection to form.
5     A.  Well, those were the only creditors
6 that we talked about. It may well be that they
7 had other creditors in mind as well, I can't speak
8 to -- I never raised that question.
9     Q.  Okay. But --
10     A.  So my understanding was that the
11 specific -- that the assumption talked
12 specifically about the bondholders. It may by
13 inference have extended to other creditors, but
14 that I don't know.
15     Q.  Okay. But in any event where the
16 assumption on page 4 of your report, Oakwood and
17 its creditors, do I correctly understand that what
18 the assumption you were asked to make was there
19 was no difference there, that is, the duty was
20 owed to Oakwood's creditors?
21     MR. CASTANARES: Objection to form.
22     A.  Well, we had a number of discussions.
23 I can't recall exactly what the discussions were, but I do recall -- I do recall
24 discussions were, but I do recall -- I do recall
25 my comments, which was that it would make economic

Page 38

ALAN SHAPIRO
1  
2 sense for -- to the extent there's a fiduciary
3 obligation to security holders, that that
4 obligation would shift depending on the solvency
5 of the company. That for a solvent company the
6 obligation would be to the shareholders and when
7 the company became insolvent that the
8 obligation -- it would make economic sense for
9 that obligation to shift to the creditors.
10     And I pointed to a large academic
11 literature explaining the different -- the ways in
12 which incentives change, depending on whether
13 you're dealing with a solvent or insolvent
14 company. And why it would make economic sense
15 given the shift in incentives for a company that
16 is insolvent, why it would make sense to shift any
17 fiduciary obligation to creditors and away from
18 shareholders.
19     Q.  And that shift would be to creditors of
20 any sort, not just security holders; is that
21 right?
22     MR. CASTANARES: Objection to form. It
23     calls for a legal conclusion.
24     A.  That's correct. From the standpoint of
25 the academic literature we don't distinguish

Page 39

ALAN SHAPIRO
1  
2 between different types of debt holders. We talk
3 about debt holders in general.
4     I can't speak to other liabilities --
5 holders of other liabilities, such as employees
6 and the like, let's say unpaid taxes, and so on.
7 I think that really does require some legal
8 opinion. The academic literature itself deals
9 only with debt in a generic sense.
10     Q.  But again, to look at your sentence in
11 Section V.A where you wrote Oakwood and its
12 creditors, that's as we now look at it redundant,
13 isn't it, you're really meaning to refer to
14 Oakwood's creditors?
15     MR. CASTANARES: Objection to form.
16     A.  Given the assumption of insolvency,
17 that's correct.
18     Q.  Okay. Now, you've made reference to
19 the academic literature around this subject of the
20 movement of fiduciary responsibility.
21     It's fair to say, isn't it, that that
22 academic literature in the main addresses the
23 fiduciary obligations of directors?
24     A.  I believe that the real emphasis is on
25 managers and --

Page 40

ALAN SHAPIRO
1  
2     Q.  Managers?
3     A.  -- as well as directors. I believe if
4 you look at the literature it primarily talks
5 about managers.
6     Q.  To whom do managers of a corporation
7 report and from whom do they take instruction?
8     A.  Well, the CEO reports to the board of
9 directors and takes instructions -- often as not
10 gives instructions to the board of directors. The
11 CEO typically sits on the board of directors, many
12 times as chairman of the board. Other managers
13 would report to the CEO and only report to the
14 board, insofar as the board specifically requests
15 them to report to it.
16     Q.  All right. If you think about the
17 academic literature that you've been describing
18 with respect to the shift of fiduciary
19 responsibility, can you point me to any of that
20 literature which addresses -- which suggests that
21 third parties, that is, not managers or directors
22 of the corporation, have fiduciary duties that
23 shift in this way to create fiduciary duties to
24 creditors.
25     A.  No, I cannot.

10 (Pages 37 to 40)

MERRILL LEGAL SOLUTIONS
(800) 325-3376      www.MerrillCorp.com

Page 41

ALAN SHAPIRO

1
2    Q.   The other assumption you were asked to
3    make was that Oakwood was insolvent in September
4    of 2001.
5          And you indicate at V.B that that
6    assumption is based on Dr. Tennenbaum's report; is
7    that correct?
8    A.   That's correct.
9    Q.   So is my understanding correct that up
10   until at least April 30th of 2007, the date of
11   Exhibit 501, you have made no independent effort
12   to come to a conclusion about solvency or
13   insolvency of Oakwood?
14   A.   Well, I wouldn't say that I made no
15   effort. I -- I reviewed Mr. Tennenbaum's report.
16   I actually met with him and talked with him prior
17   to my report just to learn the bases for his
18   conclusions or his conclusion. And also actually
19   looked at data, including analyses done by CSFB,
20   to assure myself that Mr. Tennenbaum's conclusion
21   was reasonable given the various facts.
22   Q.   So you saw --
23        Dr. Tennenbaum's report, if my memory
24   serves me correctly, is dated the same as
25   Exhibit 501, April 30th.

Page 42

ALAN SHAPIRO

1
2    A.   Yes.
3    Q.   Did you see drafts of Dr. Tennenbaum's
4    report before that date?
5    A.   You know, I believe that I saw a draft
6    or maybe I reviewed it in the meeting. I can't
7    recall.
8    Q.   Okay.
9    A.   As I said, we did meet at Stutman's
10   office in Century City prior to my report being
11   due. So I don't think I ever had a physical copy
12   of the report, so -- although I don't have a
13   recollection, that would have been -- I can't
14   imagine any other time that I would have seen that
15   report.
16   Q.   Now, Dr. Shapiro, is it fair to say
17   that a substantial amount of your work as an
18   expert witness deals with issues valuation?
19   A.   Yes.
20   Q.   Why was it that in this matter
21   Dr. Tennenbaum was brought in to opine on
22   valuation as opposed to your doing that yourself?
23        MR. CASTANARES: It calls for
24   speculation.
25        MR. WICKES: Well, maybe.

Page 43

ALAN SHAPIRO

1
2    Q.   Do you know?
3    A.   I have no idea, actually.
4    Q.   When you were talking with whoever you
5    were talking with about being retained in this
6    matter, did you discuss with them whether part of
7    what you would do would be to provide valuation
8    testimony?
9    A.   No, never. I believe I was told that
10   Dr. Tennenbaum was working on a solvency analysis
11   and that was -- that was that. I never asked why,
12   I just assumed that the law firm had its own
13   reasons for splitting the work.
14   Q.   Was it your understanding that
15   Dr. Tennenbaum was retained and at work before you
16   were?
17   A.   I -- boy, I just don't recall.
18   Q.   Okay.
19   A.   I just don't know. But at some point I
20   learned that Dr. Tennenbaum was working on a
21   solvency analysis, but I don't recall if it was at
22   that first meeting when I was interviewed or at a
23   later date. But I was never asked about the
24   solvency analysis. I was just told that he was
25   doing a solvency analysis.

Page 44

ALAN SHAPIRO

1
2    Q.   And you were asked to assume when you
3    started work that the company was insolvent and
4    that Dr. Tennenbaum would so conclude?
5    A.   Yes. But as I mentioned, I wouldn't
6    just rely on his word or the words of the lawyers.
7    I wanted to assure myself that that was a
8    reasonable conclusion without engaging in a full
9    blown analysis of my own.
10   Q.   Okay. After you were retained how did
11   you begin your work?
12   A.   Just reviewing documents.
13   Q.   Okay.
14   A.   I spent a lot of time going through
15   documents.
16   Q.   Okay. And what documents were you
17   given to review?
18   A.   Well, I've tried to list all the
19   documents at the back of my report and I --
20   Q.   Let me ask the question a different
21   way.
22        As a mechanical matter how did you get
23   documents to review?
24   A.   Oh. They were shipped to my house. I
25   just received boxes of documents.

11 (Pages 41 to 44)

Page 45

ALAN SHAPIRO

1
2    Q.   Who shipped them to you?
3    A.   Stutman.
4    Q.   Okay. Did they give to you all of the
5 documents that were produced in discovery in this
6 case?
7        MR. CASTANARES: It calls for
8    speculation.
9    A.   I have no way of knowing that. I did
10 receive additional documents over time, of course,
11 as depositions were taken.
12   Q.   Right.
13   A.   But I don't -- my best guess is that I
14 haven't seen every document in this case. I mean,
15 my experience with cases like this is that there
16 are loads of documents. So maybe I received them
17 all, but I have no way of knowing.
18   Q.   So what you know then is that what you
19 saw is some documents that were given to you by
20 someone at Stutman?
21   A.   Yes.
22   Q.   Okay. And where you list -- I think
23 it's at the end of your report you list the things
24 that you -- it says "List of Documents Relied
25 On" --

Page 46

ALAN SHAPIRO

1
2    A.   Yes.
3    Q.   -- at Appendix B. Is that -- there's a
4 combination there of some, if you will, public
5 documents and then there are the documents that
6 are labeled "CSFB" with numbers. Those are the
7 discovery documents.
8        Is this a list of everything you were
9 given or is it a list of something else?
10   A.   Well, it's mostly documents that I was
11 given. I came up with some additional ones. For
12 example, any academic articles.
13   Q.   Right.
14       But with respect -- in particular with
15 respect to -- I guess it's numbers 9 through 45,
16 the ones that have Bates numbers.
17   A.   Yeah, I...
18   Q.   Is that everything that Stutman gave
19 you or is that some subset of that?
20   A.   I think it's a subset. I believe I
21 received the various equity research reports from
22 CSFB as well.
23   Q.   Okay.
24   A.   They don't have Bates numbers on them.
25   Q.   Right. Okay.

Page 47

ALAN SHAPIRO

1
2    A.   And, of course, the depositions without
3 Bates numbers, I received from them.
4    Q.   Right.
5    A.   But I think if it -- you know, sitting
6 here now I can't tell you if every document
7 dealing with Oakwood came directly from Stutman or
8 if Paul Sandhu or somebody else might have found
9 some of those.
10       I think -- my best recollection is that
11 all the documents dealing with Oakwood came from
12 Stutman, but I can't guarantee that that's the
13 case, that some of those documents might not have
14 been found by Paul Sandhu, for example.
15   Q.   Did the documents that you got from
16 Stutman come directly to you or did they go to
17 Mr. Sandhu first?
18   A.   Oh, they -- I asked to have two
19 shipments, one to me and one to Dr. Sarin.
20   Q.   Okay. Now, Exhibit B itself, again
21 mechanically, did you at your keyboard prepare
22 Exhibit B?
23   A.   No, I had Paul Sandhu prepare that.
24   Q.   And how did Mr. Sandhu know, for
25 example, which of the CSFB documents you relied

Page 48

ALAN SHAPIRO

1
2 on?
3    A.   Oh, I just told him to include every
4 document that we had received.
5    Q.   All right.
6    A.   So relied on I'd say loosely means that
7 I at least reviewed the document.
8    Q.   So do I --
9    A.   Not that it necessarily affected my
10 opinion.
11   Q.   Right.
12       But so do I understand then that
13 Exhibit B contains a full list of all the
14 documents that you had available to you in
15 preparing your analysis?
16   A.   To my best recollection the answer is,
17 yes.
18   Q.   Okay. And Mr. Sandhu prepared
19 Exhibit B.
20       Did Mr. Sandhu prepare any of the other
21 parts of this report?
22   A.   No.
23   Q.   Did you prepare Exhibit A yourself?
24   A.   That's my resume, I believe, yes.
25   Q.   Well, sorry.

12 (Pages 45 to 48)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 49

ALAN SHAPIRO

1
2    All right. You're right. Okay.
3    So you just said to Mr. Sandhu make a
4    list for Exhibit B of everything that we've had
5    about Oakwood?
6    A.    Yes, and other documents that I've used
7    in the report.
8    Q.    Right.
9    A.    Yeah, including the academic articles
10   and the like.
11   Q.    All right. So if there's some document
12   that's not on Exhibit B we can assume that you
13   never had it?
14   A.    To the first approximation -- there's
15   always a possibility of error, but to the best of
16   my understanding that Exhibit B includes all -- or
17   Appendix B includes all of the documents that I
18   received and reviewed.
19   Q.    Okay. At the beginning of your report
20   on pages 3 and 4 you summarize your opinions that
21   you reached based on your work in this case,
22   right?
23   A.    Yes.
24   Q.    Okay. Let's just talk about those
25   summaries for a bit.

Page 50

ALAN SHAPIRO

1
2    First of all, you talk throughout about
3    something that you refer to as CSFB. Tell me
4    what -- to your understanding what is CSFB.
5    A.    Credit Suisse First Boston.
6    Q.    Okay. What is that?
7    A.    I believe it's a combination commercial
8    and investment bank.
9    Q.    Just tell me what you know about CSFB
10   that you had in your mind as you're preparing this
11   report.
12   A.    Well, my -- I believe Credit Suisse was
13   one of the major Swiss commercial banks that
14   some -- a couple of decades ago, I guess, decided
15   to get more heavily into investment banking
16   activities. It acquired First Boston and at some
17   point changed its name to Credit Suisse First
18   Boston, so it's now a combination commercial bank.
19   In other words, deposit taking institution as well
20   as investment bank. And in this particular
21   instance it provided basically three types of
22   services to Oakwood Home Corporation.
23   Q.    We'll get to that.
24   Did you in the process of your analysis
25   or preparing this report do any research or

Page 51

ALAN SHAPIRO

1
2    analysis to just give you general background into
3    CSFB?
4    A.    No.
5    Q.    Okay. Do you know, for example, how at
6    the time of -- from 2000 to 2002 CSFB was
7    organized?
8    A.    No, I don't. I did not.
9    Q.    Okay. You talked, for example, about
10   commercial banking and investment banking.
11   Did you have as you prepared this
12   report any understanding of the relationships
13   between those different parts of the institution?
14       MR. CASTANARES: Object to the form.
15   A.    Not specifically, no.
16   Q.    Did you do anything as you conducted
17   your work on this report to inform yourself about
18   CSFB's reputation in the industry?
19   A.    Well, as a general matter I'm aware of
20   its reputation.
21   Q.    Okay.
22   A.    But I did nothing specifically to
23   enhance that understanding in this case.
24   Q.    What's your general understanding of
25   CSFB's reputation?

Page 52

ALAN SHAPIRO

1
2    A.    Well, it's a major -- one of the major
3    investment banks. You might call it a bulge
4    bracket bank, one that is very well known. It
5    does a lot of work in mergers and acquisitions,
6    initial public offerings, helping companies raise
7    capital.
8    It specifically -- I believe it helped
9    originate the mortgage-backed securities market
10   back in the early 1980s. It has a very good
11   reputation. It's one of the premiere investment
12   banks in the world.
13   Q.    All right. And with respect to the
14   services that CSFB provided to Oakwood that are
15   the subject of your report, who were the principal
16   actors for CSFB?
17   A.    Well, the one that immediately comes to
18   mind is Mr. O'Driscoll. I'm not sure I can
19   pronounce his first name without butchering it.
20   Q.    Fiachra.
21   A.    Fiachra, Fiachra O'Driscoll, that's a
22   name that stands out in my mind. I know I saw
23   various others, but I can't think of them right
24   now.
25   Q.    My understanding, Doctor, that as we

Page 53

1          ALAN SHAPIRO
2   sit here today the only name of an individual at
3   CSFB who provided services to Oakwood that you can
4   recall is the name of Mr. Fiachra -- that's
5   F-i-c-h-r-e, I think --
6          MR. CASTANARES: F-i-a-c-h-r-a.
7   Q.   -- O'Driscoll; is that correct?
8          MR. CASTANARES: That misstates the
9   prior testimony.
10  A.   That's correct.
11         MR. WICKES: I guess it doesn't.
12  Q.   Okay. Do you know what part of CSFB
13  Mr. O'Driscoll worked in?
14  A.   Oh, I'm sorry. Of course,
15  Mr. James Xanthos is another -- another name. He
16  didn't provide services, he was part of the credit
17  risk management group, I believe.
18  Q.   So, again, the only name you can
19  remember of anybody who provided services to
20  Oakwood was Mr. O'Driscoll?
21  A.   Yes.
22  Q.   Okay. And Mr. Xanthos, that's --
23         MR. CASTANARES: X-a-n-t-h-o-s.
24  Q.   What did you understand his role was?
25  A.   Well, he did several credit analyses --

Page 54

1          ALAN SHAPIRO
2   Q.   Okay.
3   A.   -- of Oakwood in conjunction with their
4   request for -- I think a reverse repo line of
5   credit.
6   Q.   Okay. Do you know what part of CSFB
7   Mr. O'Driscoll worked in?
8   A.   I believe the ABS group, asset-backed
9   securities.
10  Q.   Do you know what part of CSFB
11  Mr. Xanthos worked in?
12  A.   I think that was CRM, the credit risk
13  management, but I'm --
14  Q.   Do you have any understanding --
15  A.   -- I'm not sure. I think that's it.
16  Q.   From an organizational point of view,
17  do you have any idea of what the relationship, if
18  any, is between the ABS group and CRM?
19  A.   No.
20  Q.   All right. In the "Summary of
21  Opinions" on page 3, Exhibit 501, you say -- you
22  begin by saying "CSFB's various relationships with
23  Oakwood," let's talk about that.
24         "CSFB's various relationships with
25  Oakwood," what do you mean there by the various

Page 55

1          ALAN SHAPIRO
2   relationships?
3   A.   That it had multiple relationships with
4   Oakwood.
5   Q.   Okay. And what were those multiple
6   relationships?
7   A.   Well, it acted as the securitization
8   agent. It acted as a lender in the case of the
9   warehouse facility. And it acted as a financial
10  adviser, both paid and unpaid.
11  Q.   Okay. Are those all?
12  A.   That I can think of, yes.
13  Q.   Okay. And can you roughly put times on
14  those relationships.
15         When was it -- when you say
16  securitization agent you're not using that in a
17  technical term; is that right?
18  A.   That's correct.
19  Q.   They played a role with respect to the
20  securitization of Oakwood's consumer paper?
21  A.   Yes, they helped Oakwood to securitize
22  its paper.
23  Q.   Right.
24         Can you put dates around that, roughly.
25  A.   I think that started in 1994 and ran

Page 56

1          ALAN SHAPIRO
2   through probably mid-2002.
3   Q.   Okay. And you said they were a lender
4   to Oakwood in connection with the warehouse
5   facility.
6   A.   Yes.
7   Q.   Can you put a time around that.
8   A.   I think that went from '01 at least to
9   the end or close to the end of '02.
10  Q.   Okay. And what about -- you said they
11  were financial adviser, both paid and unpaid.
12         First paid, do you know when the timing
13  was of that?
14  A.   I -- that was 2002, I think it started
15  in August of '02.
16  Q.   And I'm interested in the unpaid part.
17         Is it your understanding on the basis
18  of your background and experience that major
19  investment banks are in the business of providing
20  unpaid financial advice to their customers?
21  A.   Yes.
22  Q.   How do they make their money?
23  A.   Through fees. In other words, they
24  form a relationship with their customers and hope
25  that their customers turn to them for financial

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 57

ALAN SHAPIRO

1    advice and develop a relationship of trust. And
2    that, in turn, helps keep the customer coming back
3    for fee based services such as securitizations.
4        Q.    And what dates would you put on that
5    unpaid advisory relationship?
6        A.    I couldn't tell you when that began,
7    but it was in full swing certainly when I began
8    analyzing this matter as of 2000.
9        Q.    Okay. So you say again back on page 3
10   of Exhibit 501, "CSFB's various relationships with
11   Oakwood afforded it access to information, both
12   public and inside, about Oakwood's financial
13   condition," right?
14       A.    Yes.
15       Q.    What non-public information about
16   Oakwood's financial condition did CSFB have?
17       A.    Well, for example, in putting together
18   the securitizations it would have to understand
19   the -- you know, the defaults on mortgages,
20   problems with mortgages, and so on. And it would
21   likely have first access to that information. In
22   other words, information before it became publicly
23   known.
24       Q.    Now, let me be careful here for a

Page 58

ALAN SHAPIRO

1    minute. I don't want you to tell me what CSFB
2    would have had or would have been likely to have
3    had. I want you to tell me based on your review
4    of the documents that were provided to you what
5    non-public financial information about Oakwood's
6    condition CSFB had.
7        A.    I can't point to anything specifically.
8        Q.    Okay.
9        A.    It's just inherent in the nature of an
10   investment bank that it would have access to
11   non-public information.
12       Q.    So in all of the materials that you
13   were given and that you saw and that you reviewed,
14   you're not aware of any non-public financial --
15   any non-public information about Oakwood's
16   financial condition that was in the possession of
17   CSFB; is that right?
18       A.    Not that I can think of right now. I
19   point out the type of information that I think it
20   would have, but I can't point to a specific
21   document that said, yes, they had this specific
22   information.
23       Q.    Right.
24       A.    At least I can't think of it right now.

Page 59

ALAN SHAPIRO

1        Q.    Okay. And then you say in that same
2    paragraph, "CSFB should have advised Oakwood to
3    reduce its operations or file for bankruptcy prior
4    to its engagement as a financial adviser...in
5    August 2002."
6            Just focusing on the first part of
7    that, can you point me to anything that you've
8    seen in the materials that you have reviewed that
9    suggests that at any time anybody at Oakwood asked
10   anybody at Credit Suisse for advice with respect
11   to Oakwood's operations.
12       A.    Well, I think as a general matter
13   Oakwood was looking to CSFB for advice about what
14   to do with its precarious financial situation.
15   And CSFB did come back with a variety of
16   recommendations, different plans, but those plans
17   always seemed to be based on attempting to
18   maintain the operational status quo as opposed to
19   changing the operations. In other words, it was
20   looking to provide financing to keep the company
21   going on an as-is basis.
22       Q.    Can we make a distinction, just so
23   we're clear here, between financial advice and
24   operational advice.

Page 60

ALAN SHAPIRO

1        A.    Sure.
2        Q.    Okay. And by operational advice -- I
3    just want to make sure we're communicating here.
4            By operational advice I would mean
5    things like how many plants to operate, how many
6    stores to operate, how many units to build, and so
7    forth and so on, right?
8            Do you agree with that?
9        A.    Yes.
10       Q.    Okay. So when you say "CSFB should
11   have advised Oakwood to reduce its operations,"
12   can you point me to anything in the record that
13   you have reviewed that shows that anybody at
14   Oakwood ever asked anybody at CSFB for that kind
15   of advice about its operations.
16       A.    Well, I don't think that you can give
17   financial advice without understanding the
18   operational situation of a company. And I've
19   written quite extensively about the relationship
20   between the real side of the business, the
21   operations and the financial side of the business.
22   And I think good financial advice always -- it's
23   based on that know your customer knowledge and
24   information. So I fail to see how one could give

15 (Pages 57 to 60)

Page 61

ALAN SHAPIRO

1
2 financial advice without taking into account the
3 operating realities facing a company.
4    Q.   Okay.  I understand how --
5    A.   I'd just want to know what -- for
6 example, at the very least what's the money going
7 to be used for.
8    Q.   I understand that opinion.  I want to
9 go back to my question.
10       I want to know whether anything you saw
11 in the materials you reviewed gives any indication
12 that anyone from Oakwood ever asked anyone from
13 CSFB for its advice about operational matters.
14    A.   I can't -- sitting here now I cannot
15 point specifically to any such request.
16       MR. WICKES:  Okay.  How about a
17 ten-minute break, is that all right?
18       MR. CASTANARES:  Sure.
19       THE VIDEOGRAPHER:  Going off the record
20 at 11:39.
21       (Recess taken.)
22       THE VIDEOGRAPHER:  Back on the record,
23 at 11:55.  This marks the beginning of
24 tape 2.
25 BY MR. WICKES:

Page 62

ALAN SHAPIRO

1
2    Q.   Doctor, back in your summary of
3 opinions on page 3 of Exhibit 501 you conclude
4 that "CSFB should have advised Oakwood to reduce
5 its operations or file for bankruptcy prior to its
6 engagement as a financial adviser for
7 restructuring purposes in August 2002."
8       And you preface that by saying, "Given
9 Oakwood's financial condition and in line with
10 its" -- I take it you mean CSFB's -- "fiduciary
11 responsibility to Oakwood and its creditors and
12 its own guidelines and principles of conduct."
13       Can you point me to anything in
14 particular in CSFB's guidelines and principles of
15 contact that you reviewed in which those
16 principles and guidelines suggest that CSFB should
17 be advising its clients to file for bankruptcy.
18    A.   Well, not necessarily file for
19 bankruptcy.  I can turn to page 27 of my report
20 where I talk about the relevant guidelines, which
21 says, "'be completely open and truthful with
22 customers' and 'make no recommendation unless you
23 have a reasonable basis to do so and can
24 substantiate it through publicly available
25 information.'"

Page 63

ALAN SHAPIRO

1
2       No recommendation -- well, let's see.
3 "Never act in a manner adverse to the best
4 interests of its customer."  And then the know
5 your customer rule.
6       I would say in all of that, giving
7 advice and acting in a way that is geared towards
8 maintaining operations in a money losing business
9 is -- you know, is not appropriate advice and is
10 not appropriate behavior under those
11 circumstances.
12    Q.   In the materials that you have reviewed
13 can you point me to anything in the record that
14 you've seen that indicates that any individual at
15 CSFB in dealing with Oakwood ever gave Oakwood
16 information or advice contrary to what that person
17 actually believed.
18    A.   Well, I -- I can't tell you what the
19 people believed.  I can point to the fact that --
20    Q.   So the answer to my question is, no?
21       MR. CASTANARES:  I object to the
22 interruption of the witness's answer.
23    A.   I was trying to --
24    Q.   I'll let you explain, but the answer to
25 my question --

Page 64

ALAN SHAPIRO

1
2    A.   -- to explain.
3    Q.   -- is, no?
4       MR. CASTANARES:  And I object to the
5 form of the question as to be so delimited as
6 to calling for speculation as to what is in
7 the mind of CSFB.
8       MR. WICKES:  Well, you know what, if
9 you're going to object, object.  Don't tell
10 him what he's supposed to say, all right?
11    Q.   The question is, in the materials that
12 you have reviewed did you or did you not see any
13 documentation that indicates that any individual
14 at CSFB told anyone at Oakwood something which
15 that individual from CSFB did not actually
16 believe?
17    A.   Not specifically, no.
18    Q.   Okay.  In the second piece of your
19 summary of opinion you indicate that "CSFB had
20 financial incentives to keep Oakwood operating and
21 to delay recommending that Oakwood file for
22 bankruptcy"; is that right?
23    A.   Yes.
24    Q.   In all of the documents that you have
25 reviewed have you seen anything that indicates

16 (Pages 61 to 64)

MERRILL LEGAL SOLUTIONS
(800) 325-3376      www.MerrillCorp.com

Page 65

ALAN SHAPIRO

1  that anyone at CSFB who was dealing with Oakwood
2  actually believed that Oakwood should file for
3  bankruptcy prior to the time it did?
4      A.  No, I've seen no such evidence as to
5  what they did or did not believe.
6      Q.  Okay.  And with respect to your
7  conclusion that "CSFB had financial incentives to
8  keep Oakwood operating," how, if at all, is that
9  financial incentive different, for example, from
10 the incentive of a supplier to Oakwood who is
11 selling it materials to be used in making
12 manufactured housing, who presumably also would
13 have had a financial incentive to keep Oakwood
14 operating?
15     A.  Well, for one thing, CSFB would have
16 much more financial knowledge or much more
17 knowledge as to the financial condition of the
18 company.
19         For another thing, the supplier would
20 not automatically have an incentive to keep
21 selling, because typically they sell on trade
22 credit and they're unsecured creditors.  So if
23 they believed that the company was going bankrupt
24 they probably would cut back on supply or would

Page 66

ALAN SHAPIRO

1  change the nature -- you know, the terms and
2  conditions of their supply.  It might ask for cash
3  on the barrelhead, for example.
4      Q.  And as a general matter would you agree
5  with me that an ordinary trade supplier would have
6  an interest in its customer continuing to operate
7  so long as it was operating in a way that the
8  supplier was getting paid for what it sold?
9      A.  I think it would be the same incentive
10 in that case.
11     Q.  Similarly would you agree that
12 employees of Oakwood had financial incentives for
13 the company to keep operating?
14     A.  Yes.  Again, with the proviso that they
15 were reasonably certain of being paid for their
16 work.
17     Q.  Right.
18         And what is it that you want the reader
19 to conclude from your conclusion about CSFB's
20 financial incentives?
21         MR. CASTANARES:  Objection to form.
22     A.  Well, I point to behavior that CSFB
23 engaged in, which was to help -- to help an
24 insolvent enterprise keep behaving in a way that

Page 67

ALAN SHAPIRO

1  was geared towards making it even more insolvent.
2  And I point to the economic incentives that
3  they -- that CSFB had to continue in that
4  behavior, and that's what I'd like the reader to
5  understand.
6      Q.  So do you want the reader to understand
7  that in the absence of these financial incentives
8  CSFB would have somehow behaved differently
9  vis-a-vis Oakwood?
10     A.  They may well have.  I can't say with
11 perfect certainty that that's the case, but I
12 believe that the financial incentives that they
13 had were a motivating factor.
14     Q.  And is there anything that you've seen
15 in the record that suggests that any individual at
16 CSFB was not being truthful in what they told
17 Oakwood as a result of these financial incentives?
18     A.  Well, I think there are errors of
19 omission as well as errors of commission.
20         In other words, did they commit any
21 deliberate untruth?
22         I can't point to anything.
23     Q.  Okay.
24     A.  But the point that I'm trying to make

Page 68

ALAN SHAPIRO

1  is that they -- there are errors of omission that
2  I see in the record, which is that they don't
3  point out to Oakwood that it is insolvent and
4  things are not getting better.  And in order to
5  protect the company and its creditors, who by now
6  have become the residual claimants, that it should
7  change its behavior or at least accelerate its
8  drive to downsize and look into a variety of other
9  alternatives geared towards preserving and
10 creating value as opposed to destroying value.
11     Q.  Are you suggesting by putting this
12 conclusion in your report that we should
13 immediately be suspicious of CSFB's dealings with
14 Oakwood because of the existence of these
15 financial incentives?
16         MR. CASTANARES:  Objection to form.
17     A.  Well, I think the fact that they had
18 economic incentives to behave in this way doesn't
19 prove that that's why they behaved in that way,
20 but I think it's consistent with that.
21     Q.  Okay.
22     A.  If they had finance -- I think the
23 contrary, that if they had financial incentives to
24 behave otherwise and they still behaved in this

17 (Pages 65 to 68)

Page 69

ALAN SHAPIRO

1    way, I would certainly not say they did it because
2    of their incentives to behave in that way. It may
3    be that they just made mistakes. They certainly
4    didn't have an economic incentive to behave in
5    that way.
6        Q.   I'm sorry, I'll --
7        A.   But in this particular -- in other
8    words, if the financial incentives ran in the
9    other direction and yet they still behaved the way
10   in which they did, I would not say that, well,
11   they deliberately didn't tell the company to
12   behave otherwise because they had a financial
13   incentive.
14       In this particular case what I can
15   point out is that they -- they engaged in a
16   pattern of behavior that was consistent with the
17   financial incentives that they had.
18       Q.   Isn't it true, Doctor, that your report
19   in this matter is consistent with the financial
20   incentives that you have as a person who is being
21   paid by the hour as this litigation continues?
22       A.   No. I can tell you I thought this
23   litigation had ended probably almost a year ago,
24   and sincerely wish that it had ended back then. I

Page 70

ALAN SHAPIRO

1    have more than enough other things to occupy
2    myself.
3        Q.   Well, do you know whether or not CSFB
4    had other things to occupy itself with at the
5    time, in 2001?
6        Was Oakwood its only customer?
7        A.   No, it had other customers.
8        Q.   You get paid by the hour in this case,
9    right?
10       A.   I do.
11       Q.   The more hours that the case drags on
12   the more you get paid?
13       A.   And the less leisure time I have. And
14   I value my leisure time even more than the hours
15   that I bill on this case. So my incentives run in
16   the opposite direction.
17       Q.   It's true, isn't it, Doctor, that your
18   financial incentives in terms of your retention in
19   this case are consistent with the conclusions that
20   you've reached?
21       MR. CASTANARES: Objection,
22   argumentative.
23       A.   No, they're not. As I pointed to -- it
24   certainly is true that the more hours I spend the

Page 71

ALAN SHAPIRO

1    more money I earn on this case. So from that
2    standpoint you can point to an alignment of
3    financial incentives.
4        I'm pointing to my -- to the fact I
5    have other things to do, and if I -- and if I
6    didn't I would value my leisure -- I would put a
7    higher price on my leisure time than I do on the
8    income that I earn from the case.
9        Q.   But you have no way of knowing, do you,
10   whether CSFB or any of the individuals who were
11   working on the Oakwood matters similarly had other
12   kinds of -- either uses they could put their money
13   to or uses they could put their time to?
14       You simply say because they were
15   getting fees it was in their interest to keep
16   getting fees, isn't that all that says?
17       MR. CASTANARES: Objection to form.
18       A.   Yes, basically.
19       Q.   Okay. And, in fact, is the conclusion
20   that you express there, "CSFB had financial
21   incentives to keep Oakwood operating and to delay
22   recommending that Oakwood file for bankruptcy," is
23   that any different from ordinary financial
24   incentives that pertain when a financial

Page 72

ALAN SHAPIRO

1    institution is working with a customer?
2        A.   No, it's not, although there are --
3    through its guidelines and the assumption of
4    fiduciary obligation there are limits on what one
5    should be prepared to do.
6        Q.   Right.
7        All right. Now, let's look in the more
8    detailed section of your report, in Section VII
9    that begins on page 12. You start your detailed
10   discussion of your conclusion that "CSFB did not
11   behave in a prudent manner."
12       In Section VII.A.1 headed "Investment
13   Banks have unique access to information" you give
14   us a general description of the role of an
15   investment banker in its underwriting capacity.
16       And you cite in footnote 36 and
17   footnote 38 information from something called
18   "Investopedia" and something called "findlaw.com"
19   that have to do with the description of the roles
20   of an investment bank; is that right?
21       A.   Yes.
22       Q.   And are those two articles the
23   principal source of the information you have here
24   in Section VII.A.1 about the role of an investment

18  (Pages 69 to 72)

ALAN SHAPIRO

1
2 bank?
3    A.   No.  I've written extensively on this,
4 but these are external sources.
5    Q.   And what's the --
6    A.   I've worked with investment banks, and
7 I've written about them, read a lot of literature
8 about them, so...
9    Q.   Have you ever worked for an investment
10 bank?
11    A.   No.
12    Q.   So what's the point of those two
13 citations here to Investopedia and FindLaw?
14    A.   Oh, it's just a citation or just
15 citations to external sources.
16    Q.   Did you find those citations or did one
17 of your colleagues find them?
18    A.   No.  It was either Dr. Sarin or
19 Mr. Sandhu who found these.
20    Q.   Did you ask one or the other of them to
21 find you some general description about the role
22 of investment banks?
23    A.   Yes, I did.
24    Q.   Who did you ask?
25    A.   Dr. Sarin, and he may have asked

ALAN SHAPIRO

1
2 Mr. Sandhu to come up with that, I don't know.
3    Q.   And one of the two of them found these
4 two articles on the Web and then you cite them
5 here?
6    A.   Yes.
7    Q.   Now, is it your understanding that
8 prior to the time of the warehouse loan CSFB's
9 role was primarily with respect to the
10 securitization activities of Oakwood?
11    A.   Yes.
12    Q.   All right.  And if you would so we're
13 clear -- and these are with respect to what is
14 sometimes referred to in your report as the
15 asset-backed securities or ABSs?
16    A.   Yes.  I believe that it provided
17 financial advice during this time as well.  But
18 the sole fee generating activity I believe was the
19 securitizations.
20    Q.   So let's focus on the securitizations
21 for a moment.
22         Tell me, if you will, about these ABS
23 transactions, what were those transactions about?
24    A.   Well, those -- what Oakwood would do
25 would be to sell manufactured housing and

ALAN SHAPIRO

1
2 generally provide financing to its customers.  It
3 would take the mortgages that the customers
4 entered into and sell it to a finance subsidiary
5 of Oakwood.  And the finance subsidiary, in turn,
6 would just basically -- a loose description, would
7 basically bundle these mortgages in a bankruptcy
8 remote entity and then securitize them.
9         In other words, issue claims against
10 the cash flows generated by those mortgages.  And
11 CSFB would help them in the packaging of those
12 mortgages.  There are different types of
13 mortgage-backed securities where you can have
14 just a single tranche, that is just a pass through
15 of all the cash flows to every owner of the
16 mortgage-backed securities, or more typically you
17 have tranches, with the first tranche being paid
18 before the second tranche being paid, and so on.
19 And then the residuals, in this particular case
20 the B2 securities.
21         So CSFB would help in the packaging and
22 pricing and marketing of those mortgages, that's
23 my understanding of the role that it played in the
24 securitization.
25    Q.   As a technical matter do you understand

ALAN SHAPIRO

1
2 that the obligations of the manufactured home
3 customer is to repay the money it's borrowed, is
4 that a mortgage or is that some other kind of
5 paper?
6    A.   I call it a mortgage, but I can't tell
7 you technically if that's -- if that's what it's
8 called as opposed to some other type of loan,
9 secured loan or...
10    Q.   In the course of your preparation of
11 this report, what is the source of your
12 understanding about how these asset-backed
13 securities worked?
14    A.   I can't tell you which specific
15 document or documents I relied on.
16    Q.   Did you review -- in preparing your
17 report did you review the actual transaction
18 documents with respect to any of these
19 asset-backed securities?
20    A.   I believe I looked at one or two
21 prospectuses, but I -- if I did it would have been
22 quite a while ago.
23    Q.   Was it --
24    A.   I've looked at --
25    Q.   Is it fair to say, Doctor, that your

Page 77

ALAN SHAPIRO

1   ALAN SHAPIRO
2   description that is in your report that you've
3   just given me about asset-backed securities is
4   based generally on your knowledge of the industry
5   and about how those transactions work?
6       A.   That's correct.
7       Q.   These were not unfamiliar to you when
8   you began this assignment?
9       A.   That's correct.
10      Q.   Okay. So at the end of the chain
11  you've described someone purchases an interest in
12  this pool of obligations; is that right?
13      A.   Yes.
14      Q.   And what is it that that person is
15  looking to, that is, the purchaser, for the
16  repayment of their investment?
17      A.   The monthly payments by the purchases
18  of the manufactured housing on the loans that they
19  took out from Oakwood.
20      Q.   Right.
21           The purchaser of that securitization
22  paper is not looking to Oakwood itself to repay
23  its investment, is it?
24      A.   Only to the extent that Oakwood has
25  provided guarantees.

Page 78

1   ALAN SHAPIRO
2       Q.   To what extent between 1994 and 2001,
3   if you know, did Oakwood provide such guarantees?
4       A.   As best as I know, Oakwood did not
5   provide any guarantees except in mid-1980 -- I'm
6   sorry, mid-2001 on the -- where it provided the
7   B2 guarantees.
8       Q.   So in general with respect to these
9   asset-backed securities that were being issued
10  according to what you've told us starting in 1994,
11  the purchaser of the interest in the
12  securitization is looking not to Oakwood, but to
13  the pool of individual retail customers for the
14  source of their repayment; is that correct?
15      A.   That's correct.
16      Q.   All right. On page 14 under
17  Section VII.A.2.a you began by -- you begin by
18  saying, "CSFB began to serve as Oakwood's
19  securities underwriter in 1994. Over the next
20  eight years, CSFB wrote more than $7.5 billion
21  in Oakwood securities over approximately 25
22  securitizations," right?
23      A.   Yes.
24      Q.   And you have a footnote there, right?
25      A.   Yes.

Page 79

1   ALAN SHAPIRO
2       Q.   And what do you cite there as the
3   source of that information?
4       A.   A legal document in this case called
5   "Objections and Counterclaims," dated
6   November 13th, 2004.
7       Q.   Okay. And do you understand that that
8   document is serving the function of -- is in
9   effect the complaint in the litigation between the
10  trust and Credit Suisse?
11      A.   Yes.
12      Q.   Is it your understanding that a
13  complaint is a part of the factual record of a
14  case?
15      A.   I don't have a good legal
16  understanding, except that it is a complaint with
17  one party setting out what it believes to be the
18  facts and then draws various conclusions.
19      Q.   Right.
20           In -- on page 3, Roman numeral III,
21  "Basis for Opinions," you say that the documents
22  and materials that you relied on "are of the type
23  typically relied on by experts or financial
24  economists in their research."
25           Would you say that the complaint in a

Page 80

1   ALAN SHAPIRO
2   lawsuit in which one party sets out their position
3   in a case is the type of material on which experts
4   and financial economists typically rely in their
5   research?
6       A.   Yes, to the extent that it contains
7   facts.
8       Q.   Do you have any independent way of
9   knowing whether or not that fact is accurate?
10      A.   Well, no, not sitting here. I mean,
11  clearly I could have gotten hold of all the
12  prospectuses or attempted to get hold of all the
13  prospectuses, but that seemed to be needless,
14  particularly since the specific number, even
15  though I cite the dollar amount and number of
16  securitizations, really doesn't affect my opinion.
17  So there was no reason in this case, you know, to
18  try to independently verify those numbers.
19      Q.   Okay. So you made -- you just took
20  those numbers from the complaint and made no
21  effort to check on them?
22      A.   That's correct.
23      Q.   Okay. On page 12, Section VII.A, "CSFB
24  had access to public and private information
25  concerning Oakwood's financial condition."

20 (Pages 77 to 80)

ALAN SHAPIRO

1
2       In connection with the role it played
3  in the securitization transactions, is it correct
4  to say that the information that CSFB would have
5  had access to would have been information about
6  the underlying obligations?
7       A.   Yes, if you include the payment history
8  of -- on those obligations.
9       Q.   Of the payment history of the mobile
10  home customers --
11      A.   Yes.
12      Q.   -- in paying their notes, right?
13      A.   Yes.
14      Q.   And you describe -- and I don't have my
15  finger on it right now, but you describe a number
16  of kinds of information that CSFB would have had
17  access to, including valuations of the assets and
18  the credit history of the customers, and so forth
19  and so on, right?
20      A.   Yes.
21      Q.   And that information is information,
22  again, with respect to the underlying obligations?
23      A.   Yes.
24      Q.   And that information is used for the
25  purpose of preparing the prospectus that's used to

ALAN SHAPIRO

1
2  sell the aggregated securities?
3       A.   That's correct.
4       Q.   Because the person who is buying those
5  securities is interested in how that pool is going
6  to perform in terms of repayment.
7       A.   That's correct.
8       Q.   And the person who is buying the
9  securities doesn't actually care about Oakwood --
10  whether or not -- how Oakwood is going to perform,
11  because Oakwood's not obligated to pay on the
12  securities, right?
13      A.   Well, that's not entirely the case,
14  because to the extent that -- I mean, the owners
15  of those interests would have at least some
16  interest in how Oakwood would perform because
17  of -- let's suppose, for example, you have a
18  foreclosure on one of those mobile homes.
19      Q.   All right.
20      A.   Then it certainly helps if Oakwood is
21  in existence in order to refurbish and resell that
22  mobile home. If Oakwood just disappeared, then I
23  would say that that mobile home is likely to lose
24  value, and hence there would be less value
25  accruing to the owner of an interest. So that

ALAN SHAPIRO

1
2  would be, you know, the only point I would make
3  with regard to that, that they do have some
4  interest in Oakwood's survival.
5       And, of course, the higher the default
6  rate the greater the interest in Oakwood's
7  survival would be from that standpoint.
8       Q.   Okay. Now, the way Section VII works
9  is you say in Section VII.A, "CSFB had access to
10  public and private information." And in VII.A.1
11  we have your general description of what
12  investment banks do.
13      In VII.A.2 you tell us that "CSFB
14  served as" the "investment banker and thus enjoyed
15  the type of access to information described
16  previously."
17      Aside from your general understanding
18  of how these relationships worked, in your
19  activities in preparing your report have you been
20  able to identify any financial information about
21  Oakwood that was in CSFB's possession that was not
22  also public?
23      A.   Well, I can't point to specific
24  financial information. What I can point to, for
25  example, is the fact that Mr. Xanthos can go and

ALAN SHAPIRO

1
2  visit Oakwood, talk to various people, find out
3  what their plans are, how they're doing. I'm sure
4  that he had access to private information in that
5  respect.
6       In addition Oakwood management would
7  bounce ideas off CSFB personnel. I remembered
8  another name, Mr. Felt, as well as Mr. O'Driscoll,
9  to get their advice and their thinking. So from
10  that standpoint they had private information that
11  did have a bearing on the financial performance of
12  the company.
13      Q.   Well, do you actually have any way of
14  knowing with respect to this specific
15  relationship, whether in the discussions between
16  individuals at CSFB and individuals at Oakwood any
17  information that was not public was given to CSFB?
18      A.   I can't point to any specific piece of
19  information.
20      Q.   And, in fact, for most of the time of
21  the relationship the principal information that
22  CSFB would have been concerned with was the
23  information about the paper that was being
24  securitized; is that incorrect?
25      MR. CASTANARES: Objection, calls for

21 (Pages 81 to 84)

Page 85

ALAN SHAPIRO
1  ALAN SHAPIRO
2  speculation, and form.
3  A.   Well, as far as I know and -- but that
4  was the period of time that I -- that is not part
5  of my report because CSFB was -- I'm sorry,
6  Oakwood was a solvent corporation during that time
7  period.
8  Q.   And what --
9      When did Oakwood stop being a solvent
10 corporation?
11 A.   Well, my analysis, which in my
12 supplemental report indicates --
13 Q.   Let me -- I just want to stop you
14 there. I'm sorry to interrupt. I want to ask my
15 question more carefully.
16 A.   Sure.
17 Q.   At the time you prepared Exhibit 501
18 what was your understanding about when Oakwood
19 became insolvent?
20 A.   Well, I was just asked to assume that
21 Mr. -- Mr. Tennenbaum's date, which is September
22 2001.
23 Q.   Okay. Is there any reason to think
24 that at any period of time CSFB had access to
25 information about Oakwood that was not also

Page 86

1  ALAN SHAPIRO
2  available to its management and board of
3  directors?
4  A.   No.
5  Q.   Okay. Now, in 2001, according to your
6  report at page 16, CSFB took on a new role; is
7  that right?
8  A.   Yes.
9  Q.   And what was that new role?
10 A.   That was to step into the shoes of
11 Bank of America as the provider of a warehouse
12 loan facility.
13 Q.   Now, does the warehouse loan facility
14 have some relationship -- excuse me -- to the
15 asset-backed securities we've been discussing?
16 A.   Yes, it does.
17 Q.   What is that relationship?
18 A.   Well, that's to provide basically the
19 bridge financing between the time that Oakwood
20 lends money to its customers to buy their
21 manufactured housing and the time that Oakwood can
22 securitize that paper, that intervening period is
23 in effect bridged by the warehouse facility.
24 Q.   Why is it referred to -- is warehouse a
25 common term in these --

Page 87

1  ALAN SHAPIRO
2  A.   It is.
3  Q.   Where does that term come from?
4  A.   Basically you're warehousing paper,
5  you're buying up paper and keeping it in inventory
6  until you sell it off.
7  Q.   Until you're ready to do the next
8  securitization?
9  A.   Securitization, yes.
10 Q.   You said that they stepped into the
11 shoes of Bank of America, what do you mean by
12 that?
13 A.   Well, Bank of America was the provider
14 of the warehouse facility and Bank of America
15 wanted out, and so --
16 Q.   And how do you know that?
17 A.   I can't -- I read it in some document
18 or other.
19 Q.   Okay.
20 A.   I think the depositions talked about
21 that as well.
22 Q.   Okay.
23 A.   And so CSFB took over that as provider
24 of the warehouse facility. In other words,
25 basically it's a revolving line of credit.

Page 88

1  ALAN SHAPIRO
2  Q.   And is it structured in such a way that
3  according to your understanding that CSFB was
4  actually a secured lender to Oakwood Corporation?
5  A.   I don't -- it was -- no, it was a
6  lender to a bankruptcy remote entity. The whole
7  idea was to try to avoid to the extent possible
8  any credit risk associated with Oakwood.
9  Q.   Right.
10    It was intended, again, to be a way in
11 which an investor or a lender looked to the
12 underlying paper as the source of its repayment,
13 right?
14 A.   Yes.
15    MR. CASTANARES: Objection to form.
16 A.   Well, it would look to whatever assets
17 secured the line of credit.
18 Q.   And what were those assets?
19 A.   Basically they were the mortgages or
20 loans made to Oakwood's customers.
21 Q.   Have you in the course of preparing
22 your analysis looked at the warehouse documents?
23 A.   I don't believe so.
24 Q.   Okay. Now, is a warehouse
25 arrangement of this sort commonly used in

Page 89

ALAN SHAPIRO

1
2 association with a securitization structure of the
3 type we've been describing?
4    A.  Yes, it is.
5    Q.  It's of no surprise to you here to see
6 it in this transaction?
7    A.  No.
8    Q.  Okay.  Now, you say on page 16, "In
9 February, Bank of America decided not to renew the
10 Warehouse Facility, and CSFB assumed the role as
11 lender to Oakwood by purchasing the notes from the
12 Warehouse Trust."
13    A.  Yes.
14    Q.  I think as we've just seen that it's
15 actually not technically right that CSFB assumed
16 the role of lender to Oakwood, right?
17    A.  Ah, you are correct.  I was using that
18 in a more generic sense, but...
19    Q.  They stepped in and provided this
20 warehouse facility?
21    A.  That's correct.  And it was not a
22 lender to Oakwood, but they lent specifically to
23 this bankruptcy remote entity.
24    Q.  Right.
25       And that's the standard way these

Page 90

ALAN SHAPIRO

1
2 warehouse arrangements are done, isn't it?
3    A.  Very much so.
4    Q.  Okay.  What would have happened to
5 your understanding in February of 2001 had
6 Credit Suisse not stepped into the shoes of Bank
7 of America?
8    A.  My best understanding was that there
9 was nobody else looking to replace Bank of America
10 as the lender.  I believe I read that somewhere,
11 in which case this whole structure would have
12 collapsed.  That's my understanding.
13    Q.  And what would have been the
14 consequence of that?
15    A.  Well, there would have had to have been
16 some serious restructuring taking place at
17 Oakwood.  I don't know exactly what would have
18 happened.  Maybe Oakwood would have been sold,
19 maybe it would have gotten into bankruptcy.
20 Possibly it might have gotten some type of secured
21 loan to restructure its operations, to buy it time
22 to shut down various facilities, and so on.
23       I'm not sure what would have happened,
24 but the one thing I'm pretty certain is that they
25 couldn't have kept doing business as usual.

Page 91

ALAN SHAPIRO

1
2    Q.  Okay.  In your opinion, Professor, did
3 CSFB breach any duty it owed to anyone by stepping
4 into the shoes of Bank of America and taking over
5 that warehouse facility role in February of 2001?
6    A.  Well, that becomes -- that's a legal
7 issue, I believe.  What I can tell you is that the
8 economic consequences of doing that, again, is
9 that it enabled Oakwood to maintain business as
10 usual, which was not beneficial to its creditors.
11    Q.  Do you believe it was unreasonable or
12 not reasonably prudent of CSFB to step into that
13 role in February of 2001?
14    A.  Well, in general there's nothing wrong
15 and a lot of things right about being a lender to
16 a warehouse facility.
17       What I would say in this particular
18 instance, given the circumstances that --
19 financial circumstances that Oakwood was in,
20 anything that enabled it to maintain a
21 business-as-usual stance was going to harm the
22 economic interests of the company and its
23 creditors.  Whether -- you know, if it owed a
24 fiduciary obligation, then that's -- I would say
25 it's even less reasonable to do that.

Page 92

ALAN SHAPIRO

1
2    Q.  The only thing -- at the time you
3 prepared your report the only thing you know about
4 solvency or insolvency is that you were asked to
5 assume that Oakwood was insolvent in September of
6 2001, right?
7    A.  Yes.
8    Q.  Okay.  So now we're in February of
9 2001.
10    A.  Ah.
11    Q.  Oakwood, a company with which --
12 according to your report -- Credit Suisse had had
13 a relationship since 1994 finds itself in
14 life-threatening circumstances because Bank of
15 America wants to discontinue the warehouse role.
16       And my question to you is, do you have
17 an opinion as to whether CSFB was unreasonable or
18 not reasonably prudent when it stepped in in
19 February of 2001 and made possible the
20 continuation of that warehouse facility?
21       MR. CASTANARES:  Asked and answered.
22    A.  Okay.  As of February 1st and given the
23 assumption of insolvency as of September '01,
24 then, no, there was nothing imprudent or
25 unreasonable about that.

23 (Pages 89 to 92)

Page 93

ALAN SHAPIRO

1
2    Relative to my supplemental report,
3    which looked more carefully at this issue and
4    looked at data that -- the same data that CSFB had
5    access to and analyzed, I would say it was
6    unreasonable even as far back as February.
7        But at the time that I wrote this
8    report I would say that there was nothing
9    unreasonable about providing that warehouse
10   facility as of February '01. But by September
11   '01, given insolvency, I believe that CSFB should
12   have backed away and forced some type of
13   restructuring on Oakwood.
14       Q.   Is it, Doctor, in your opinion always
15   unreasonable and unreasonably prudent for a
16   financial institution to provide financial
17   accommodations to a customer when that customer is
18   insolvent?
19       A.   No, not at all. There's a whole class
20   of lenders called debtor in possession, which
21   specialize in making loans to insolvent
22   enterprises.
23       Q.   Is it in your opinion, Professor,
24   always unreasonable or unreasonably -- or
25   reasonably imprudent for a financial institution

Page 94

ALAN SHAPIRO

1
2    to make financial accommodations to a borrower
3    when the borrower is insolvent, but not in a
4    bankruptcy proceeding?
5        A.   No.
6        MR. WICKES: Okay. Tony, I think this
7    would be a good time for us to take a break
8    for lunch, if that's all right with you.
9        MR. CASTANARES: That's good. Sure.
10       THE VIDEOGRAPHER: Going off the record
11   at 12:44.
12       (Luncheon recess: 12:44 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 95

ALAN SHAPIRO

1
2    A F T E R N O O N   S E S S I O N
3    (Time noted:  1:34 p.m.)
4    A L A N   C.   S H A P I R O,    resumed as a
5        witness, having been previously sworn by the
6        Notary Public, was examined and testified as
7        follows:
8        THE VIDEOGRAPHER:  Back on the record
9    at 1:34.
10   EXAMINATION BY
11   MR. WICKES:
12       Q.   Dr. Shapiro, if we can, go back to
13   Section VII.A.2.b of your report on page 17 --
14   strike that, 16 and 17.
15       I think we agreed before lunch that
16   where in that paragraph you refer to Oakwood, in
17   terms of CSFB becoming a lender to Oakwood, and so
18   forth, we really mean CSFB becoming a lender to
19   the special purpose vehicle that was set up to be
20   the warehouse; is that right?
21       A.   Yes.
22       Q.   And at the end of that section you say,
23   "if CSFB did not take over the role as lender, its
24   securitization business would have immediately
25   collapsed."

Page 96

ALAN SHAPIRO

1
2        And now that means not that -- I take
3    it, not that CSFB's securitization business would
4    have collapsed, but that Oakwood's securitization
5    would have collapsed?
6        A.   Yes, that's correct.
7        Q.   And the consequence of that would have
8    been that Oakwood at that time would not have been
9    able to continue conducting its business as it had
10   been, it would have needed a bankruptcy or some
11   other major reorganization.
12       A.   Yes.
13       Q.   Okay. And I think just before we broke
14   you told us that it's now your opinion that CSFB
15   should have refused to step into that role and
16   should have forced some type of restructuring on
17   Oakwood; is that right?
18       A.   Under the circumstances of insolvency,
19   yes.
20       Q.   Okay. Tell me about the board of
21   directors of Oakwood.
22       What do you know about the Oakwood
23   board?
24       MR. CASTANARES: Objection, vague.
25       A.   I don't recall anything about the

24 (Pages 93 to 96)

Page 97

```
1              ALAN SHAPIRO
2  directors, except -- well, I can't even recall the
3  name of -- I read one or two depositions of
4  directors, but...
5      Q.   Do you know --
6      A.   Aside from a director pointing to
7  advice that the board and particularly the audit
8  committee got from CSFB, I don't recall.
9      Q.   In your work in connection with
10 preparing this report did you review minutes of
11 Oakwood director meetings?
12     A.   I don't recall reviewing such minutes.
13     Q.   Do you know or did you know at the time
14 you prepared this report what the professional
15 background of any of the directors were?
16     A.   I just don't recall.  I just don't
17 remember.
18     Q.   Okay.  Do you have an opinion as to
19 whether or not the board of directors of Oakwood
20 was competent to perform its roles?
21     A.   No, I don't.
22     Q.   Okay.  Do you know -- is there anything
23 you saw in your work in preparing this report that
24 would suggest to you that the Oakwood board was
25 not capable of fulfilling its duties?
```

Page 98

```
1              ALAN SHAPIRO
2      A.   Not that I remember.
3      Q.   Okay.  Do you -- in the course of the
4  work you did in preparing this report did you form
5  any opinion about the professional abilities or
6  skills of Oakwood's management?
7      A.   Well, I think they were overly
8  optimistic about their business and they didn't --
9  I don't think they fully understood the trouble
10 that they were in, which I guess says something
11 about their competency.
12     Q.   And do you say that on any basis other
13 than hindsight?
14     A.   Yes.  I think the fact is that it was
15 well known through -- and well known I mean it's
16 written about in equity reports and newspaper
17 articles that the industry was suffering from
18 substantial excess capacity and defaults were
19 rising.  And so I think under those circumstances
20 management should have been, you know, looking at
21 other courses of action besides just trying to
22 maintain the business as usual with some modest
23 downsizing.
24     Q.   Leave aside what we know about what
25 courses of management -- what courses of action
```

Page 99

```
1              ALAN SHAPIRO
2  management took.
3          Did you review any materials in the
4  course of preparing your report from which you
5  would have formed an understanding of the extent
6  to which management and/or the board were
7  considering alternative courses of action?
8      A.   Well, I saw various presentations by
9  CSFB to management of various financial courses of
10 action to undertake.  And so I have to -- they
11 probably were asked about that.
12     Q.   Well, we're going to talk about CSFB's
13 role as financial adviser as you describe it here
14 later on.
15         Aside from what you saw about their
16 discussions with CSFB, do you have any basis on
17 which to have an understanding of the extent to
18 which the management and the board of Oakwood
19 during 2001 was considering alternatives?
20     A.   Not that I can recall sitting here.
21     Q.   So you don't know, for example, the
22 extent to which, if at all, the management and the
23 board of Oakwood in 2001 were giving consideration
24 to a bankruptcy filing and the consequences of
25 that; is that correct?
```

Page 100

```
1              ALAN SHAPIRO
2      A.   That's correct.
3      Q.   Okay.  Now, in Section VII.A.2.c of
4  your report starting at page 17 you talk about
5  CSFB's role as a financial adviser prior to the
6  time in August of 2002 when they were actually
7  formally retained in that capacity; is that right?
8      A.   Yes.
9      Q.   Okay.  And you cite some deposition
10 testimony in which various people talk generally
11 about CSFB's role as a financial adviser.
12         Can I ask you this, aside from the
13 three presentations by Mr. Felt that you describe
14 in some detail that we'll talk about separately,
15 aside from those presentations from Mr. Felt do
16 you see in the materials that you have reviewed
17 any indication that the Oakwood management or
18 directors were looking to CSFB for advice
19 unrelated to the securitization financing that
20 we've talked about earlier today?
21     A.   Well, as I point in my report there
22 that -- you know, Mr. Muir testified that any
23 substantive business decision that Oakwood was
24 considering that might have an impact on loan
25 originations, the ABS program, loan servicing,
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 101

ALAN SHAPIRO

that they inform CSFB. And that could cover a fairly wide range, including defaults and what they were doing about defaults, and so on and so forth, but...

And the people from CSFB came on a regular basis to talk about various ideas, but I don't have -- I can't point to any specific ideas.

Q. So on page 18 of your report you have a quote from Mr. Muir's deposition testimony and you say near the bottom of that page, "Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action regularly taken by the Company," right?

A. Yes.

Q. And then you have a quote from Mr. Muir's deposition in which he says, "it was practice for me anytime Oakwood made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback."

Page 102

ALAN SHAPIRO

Now, there in that part you've quoted wouldn't you agree that what Mr. Muir is describing, loan originations, the ABS program, loan servicing, those are matters that had directly to do with the ongoing securitization program?

A. Yes.

Q. Okay. And would you agree with me that it overstates the import of that quote for you to say that Mr. Muir testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the company?

A. Well, possibly, but not necessarily, in that most of the significant actions that the company might take would likely have an impact on loan originations. In other words, how many offices you keep open, how much production -- to what extent you maintain production, and so on, all will ultimately have an impact on loan originations and default rates, and so on, which certainly have an impact on securitization.

Q. All right. Other than that quote on page 18 and you have another quote from Mr. Muir at the top of page 19, and again, leaving aside

Page 103

ALAN SHAPIRO

the presentations by Mr. Felt that we'll talk about separately, have you seen in the record examples of Oakwood consulting with CSFB about its business unrelated to the securitization?

A. Well, as -- oh, aside from Mr. Felt's --

Q. Yes.

A. -- presentation, work on restructuring the balance sheet, and so on?

Q. Right.

A. None that I can point to.

Q. And, in fact, we know, don't we, that Mr. O'Driscoll was an ABS specialist?

A. Yes.

Q. So that if Mr. Muir were considering an M&A transaction, for example, you wouldn't have expected him necessarily to talk to Mr. Felt about -- to Mr. O'Driscoll about that?

A. That's correct.

Q. Okay. Do you see in the records you have reviewed, again, leaving aside Mr. Felt, any indication that Oakwood was seeking advice from anybody at CSFB other than Mr. O'Driscoll?

A. I don't believe I've seen such

Page 104

ALAN SHAPIRO

evidence.

Q. Okay. And, in fact, at least up until February of 2001 Oakwood's board and management dealt with other banks other than CSFB; isn't that right?

A. Yes.

Q. So, for example, we talked about Bank of America had provided the warehouse facility, right?

A. Yes.

Q. And there were, if I remember correctly, a couple of issues of publicly traded debt that were direct obligations of Oakwood as opposed to securitizations that you've talked about.

A. That's correct.

Q. Do you know who was the underwriter on those?

A. No, I don't.

Q. Was it CSFB?

A. I don't know.

Q. And then finally the fourth role that CSFB had with respect to Oakwood you describe in Section VII.A.2.d, which is the role they took on

Page 105

ALAN SHAPIRO

1
2  when they were retained in August of 19 --
3  August 19th of 2002 to become their restructuring
4  and financial adviser pursuant to a written
5  agreement, right?
6      A.  Yes.
7      Q.  And that's when Oakwood actually
8  retained Mr. Felt to provide them with assistance
9  in getting ready for a bankruptcy filing?
10     A.  Yes.
11     Q.  Okay.  And I don't understand from your
12 opinion, and I want you to tell me if I'm wrong, I
13 don't understand you to have expressed any opinion
14 about CSFB's performance of its role as financial
15 adviser for restructuring purposes pursuant to
16 that August 19th, 2002 engagement agreement; is
17 that correct?
18     A.  That's correct.
19     Q.  Okay.  So when you talk about CSFB's
20 poor performance in their role as financial
21 adviser you're talking about that role in the
22 period prior to August of 2002 when I think you
23 said they were serving -- they were serving as
24 kind of an informal financial adviser without a
25 written agreement; is that right?

Page 106

ALAN SHAPIRO

1
2      A.  Yes.
3      Q.  Okay.  And do I understand correctly
4  that your focus with respect to CSFB's advice in
5  that regard is particularly with reference to
6  presentations made by CSFB to Oakwood in June of
7  2001, August of 2001, and March of 2002?
8      A.  Well, those are specific references,
9  but I believe that they provided advice or could
10 have provided advice at other points as well,
11 particularly with regard to the securitizations
12 and right along with the warehouse facility,
13 pointing out that these actions were just
14 perpetuating money losing businesses.
15     Q.  Let's break that down.
16         You said that -- in your answer that
17 they were providing advice or could have been
18 providing advice that these were just perpetuating
19 money losing businesses.
20         Aside from the presentations, June,
21 August, and March, 2001 and 2002, do you see in
22 the record, can you point me to anything in the
23 record that shows CSFB giving the company advice
24 other than with respect to the structuring and
25 execution of the ABS and warehouse transactions.

Page 107

ALAN SHAPIRO

1
2      A.  Well, that -- it depends on how you
3  interpret Mr. Muir's comment, as I -- or his
4  testimony.  His testimony could cover a pretty
5  wide range of matters and still be relevant to the
6  securitization.  So I'm not sure exact -- just
7  what the specifics of that advice were.
8      Q.  Okay.  But aside from Mr. Muir's
9  testimony you haven't seen, have you, any other
10 examples of -- again, leaving aside Mr. Felt's
11 three presentations -- of somebody from CSFB
12 giving -- affirmatively giving advice to the
13 company unrelated to the securitization warehouse
14 business?
15     A.  That's correct.
16     Q.  Okay.  In Section VII.A.3 of your
17 report beginning on page 22 that's headed "CSFB
18 obtained both public and inside information about
19 Oakwood's financial condition," is there any
20 information that you discuss in that section of
21 your report that would not have been known to
22 Oakwood's management and board?
23     A.  I don't believe so.
24     Q.  Okay.  And, in fact, you point -- I
25 can't put my finger on it right now, but you point

Page 108

ALAN SHAPIRO

1
2  to some equity research notes by CSFB's research
3  side in which they talked about the possibility of
4  a bankruptcy, right?
5      A.  That's correct.
6      Q.  Okay.  And those are by definition
7  public documents, right, they're produced by the
8  bank as advice to their customers?
9      A.  Yes.
10     Q.  In your experience do the management
11 and directors of publicly traded corporations pay
12 careful attention to what equity analysts are
13 saying about their company?
14     A.  Yes.
15     Q.  So there's no reason to think, is
16 there, that the directors and management of
17 Oakwood would not have known what CSFB's equity
18 research folks were saying about Oakwood?
19     A.  Well, they should have and I have no
20 reason to believe that they did not.
21     Q.  And, in fact, for the reasons we've
22 just said you would expect they probably did know
23 that?
24     A.  Yes.
25     Q.  In fact, isn't it true in the world of

27 (Pages 105 to 108)

Page 109

ALAN SHAPIRO

1
2  financial economists that people tend to believe
3  boards and management pay too much attention to
4  that information?
5      A.  No, they believe they pay too much
6  attention to quarterly results.
7      Q.  All right.  On page 23 at the bottom,
8  this is still in Section VII.A.3, "In addition to
9  obtaining publicly available information about
10 Oakwood, CSFB also had access to private, inside
11 information."  Then you go on and say, "as part of
12 preparing the securitization prospectuses, Oakwood
13 provided CSFB with inside information, including
14 the historical loss experience of a securitized
15 pool of assets, repossession and foreclosure
16 rates, and the credit quality of each home buyer."
17     So again, that's all information
18 directly related to preparing the prospectus for
19 the securitization, right?
20     A.  That's correct.
21     Q.  At Section VII.B.2 on page 26 you say,
22 "Throughout its relationship with Oakwood, CSFB
23 continued to monitor and insulate itself from the
24 bankruptcy risks surrounding Oakwood."
25     Would you agree with me that it is in

Page 110

ALAN SHAPIRO

1
2  the very nature of the kind of asset-backed
3  securities that we've been talking about here with
4  Oakwood, that those structures are created to
5  isolate the entities involved with the
6  securitization from bankruptcy risk at the
7  operating company?
8      Isn't that what ABSs are about?
9      A.  That's exactly right and there's
10 nothing sinister about that.
11     Q.  Okay.  Now, in Section VII.B starting
12 on page 24 you talk about a couple of reports
13 written in early 2000 by Mr. Xanthos at CSFB.
14     What's your understanding of what
15 Mr. Xanthos's role was at CSFB?
16     A.  Well, that he was part of the credit
17 risk management team that gave independent
18 opinions as to the credit risk of potential
19 borrowers.  And so there was -- I guess there was
20 a $75 million reverse repo facility for the ABS
21 manufactured housing securities that CSFB was
22 asked to provide.  And so he went out and -- to
23 access the creditworthiness of Oakwood because
24 that would influence the creditworthiness of this
25 facility.

Page 111

ALAN SHAPIRO

1
2      Q.  Okay.  And Mr. Xanthos had a pretty
3  negative view of Oakwood, didn't he?
4      A.  He did.
5      Q.  Is it --
6      Now, in your experience it's pretty
7  standard, isn't it, in a bank that there's a
8  group, it may have a different name, but like this
9  CRM team at CSFB, to evaluate proposed credit
10 exposure by the banks?
11     A.  Yes, that's correct.  It's quite
12 standard.
13     Q.  And in your experience wouldn't you
14 expect that that's where you tend to find the
15 people who have skeptical views of their customers
16 and the proposed transactions?
17     A.  Well, I expect to see a greater degree
18 of skepticism among members of the credit risk
19 management team than I would among those who would
20 get credit for making the loan.  There's a
21 constant tension within banks, both commercial and
22 investment banks, between the lending officers and
23 the risk -- the credit risk people.
24     Q.  Indeed, that's the purpose of setting
25 up a separate unit in a bank for that function,

Page 112

ALAN SHAPIRO

1
2  isn't it?
3      A.  Yes.
4      Q.  It's a kind of check and balance?
5      A.  That's right.
6      Q.  Can you show me -- do you see in
7  Mr. Xanthos's two memoranda that you discuss, are
8  there facts -- as opposed to his conclusions, are
9  there facts which were not -- which, A, would not
10 have been known to the management and board of
11 Oakwood and, B, were not consistent with what was
12 being said publicly by -- about Oakwood at the
13 time?
14     A.  I don't believe so.
15     Q.  Okay.  On page 28 near the bottom of
16 the page you say, "No evidence exists that CSFB
17 performed any assessment of the costs and benefits
18 of the securitizations it was leading or conducted
19 any type of analysis regarding the likelihood that
20 Oakwood would be able to turn itself around and
21 pull itself out of its financial predicament.
22 Also, no evidence exists that CSFB considered and
23 assessed the harmful impact on Oakwood's existing
24 creditors when engaging in transactions and
25 providing advice to the Company."

28  (Pages 109 to 112)

Page 113

ALAN SHAPIRO

1      Would you agree with me that it would
2  be more accurate there to say that you had not
3  seen such evidence, rather than that no evidence
4  exists?
5      A.  Yes.
6      Q.  Okay.  Similarly at the top of page 29
7  you say, "no evidence exists that CSFB suggested
8  filing for bankruptcy as an option," et cetera,
9  et cetera.
10     You'd agree with me, wouldn't you, that
11  what that really should say is that you have seen
12  no such evidence, not that no such evidence
13  exists?
14     A.  That's correct.
15     Q.  All right.  Now, let's talk about
16  Mr. Felt.
17     What's your understanding of what part
18  of CSFB Mr. Felt worked in?
19     A.  I don't recall exactly.  I think it was
20  investment banking and particularly advisory
21  services, but I don't know specifically.  Maybe
22  restructuring, but I'm not sure.
23     Q.  What is cross selling?
24     A.  I'm sorry?

Page 114

ALAN SHAPIRO

1      Q.  What is cross selling, what does that
2  mean, cross selling?
3      A.  Cross selling?
4      Q.  Right.
5      A.  Oh, that's where you have a customer
6  for one of your products and you attempt to sell
7  another product to that customer as well.
8      Q.  Right.  And --
9      A.  In other words, the same company tries
10  to sell different products to the same customer.
11     Q.  So you'd agree with me, wouldn't you,
12  that it's typical in the world of major financial
13  institutions that one of the things they try to do
14  with their customers when they have a relationship
15  providing one kind of service, is they try to
16  introduce their customer to other folks in their
17  organization who provide other kinds of services
18  for fees?
19     A.  Cross selling is certainly the holy
20  grail of financial institutions.
21     Q.  Okay.  And again, there's nothing
22  particularly sinister or evil about that, is
23  there?
24     A.  Not at all.

Page 115

ALAN SHAPIRO

1      Q.  Okay.  And isn't it clear that when
2  Mr. O'Driscoll introduces Mr. Felt to the company
3  in June of 2001 that's exactly what's going on,
4  he's trying to cross sell Oakwood to use CSFB's
5  restructuring advice?
6      A.  I just don't -- don't recall that
7  sequence of events.  It's been quite a while since
8  I've read these depositions, if that's where it
9  showed up.  I just don't recall.
10     Q.  Well, you've seen Mr. Felt's -- the
11  documents that he presented on these dates.
12     A.  I'm sorry?
13     Q.  You've seen the documents that Mr. Felt
14  presented to Oakwood on the dates you've referred
15  to here, right?
16     A.  Yes.
17     Q.  Those were pitch documents, weren't
18  they?
19     A.  Yes.
20     Q.  By pitch document we mean that's a
21  document that somebody at the bank has prepared to
22  try to convince the company, Oakwood, to hire
23  Mr. Felt's part of CSFB, to provide them a certain
24  kind of services?

Page 116

ALAN SHAPIRO

1      A.  Right.
2      I just don't recall when that started,
3  if Mr. Felt had come in and talked to them prior
4  to making these pitches.
5      Q.  All right.  Well, what we know is,
6  according to your report, that on June 26th, 2001
7  there's a presentation.  Actually you say, "On
8  June 26th, 2001, in a presentation made by CSFB to
9  Oakwood," and so forth and so on.
10     Actually we don't know, do we, whether
11  a presentation actually was made, what we know is
12  there is a document --
13     A.  Document.
14     Q.  -- with that date on it?
15     A.  That's correct.
16     MR. WICKES:  And that's -- let me just
17  see if I can...
18     Can you find for me that one,
19  June 26th, 2001.  It's probably one of these
20  in here.
21     THE WITNESS:  Can we take a quick
22  break --
23     MR. WICKES:  Absolutely.
24     THE WITNESS:  -- right now?

29 (Pages 113 to 116)

Page 117

1          ALAN SHAPIRO
2      MR. WICKES:  Should we take
3  five minutes?
4      MR. CASTANARES:  Sure.
5      THE VIDEOGRAPHER:  Going off the
6  record, end of tape 2 at 2:10.
7      (Recess taken.)
8      THE VIDEOGRAPHER:  Back on the record
9  at 2:18.  This is the beginning of tape 3.
10     (Exhibit 502, Multipage document
11  entitled Presentation to Oakwood Homes
12  Corporation, dated 6/26/01, marked for
13  identification, as of this date.)
14 BY MR. WICKES:
15     Q.  Doctor, I've given you what's been
16 marked for identification as Exhibit 502.
17     Is that the presentation to Oakwood
18 that you refer to in your report as of June 26th,
19 2001?
20     A.  Yes.
21     Q.  Do you know who -- to whom at Oakwood
22 this was given?
23     A.  I don't recall.  I assume it would have
24 been the CEO and probably the CFO, but I just
25 don't recall.

Page 118

1          ALAN SHAPIRO
2      Q.  Do you, in fact, know -- not what you
3  assume, do you, in fact, know whether or not there
4  was actually a meeting or whether this written
5  material was just delivered?
6      A.  No, I don't know.
7      Q.  Okay.  Would you agree that this is a
8  pitch document?
9      A.  Yes, I do.
10     Q.  Okay.  So this is -- and if you look on
11 the page that's marked page 1 of the document.
12     I guess it's actually Bates No. 52956
13 headed "CSFB Restructuring Expertise," that's
14 actually showing different parts of CSFB that
15 might be involved in some engagement, right?
16     A.  Yes.
17     Q.  And it identifies at the top the
18 "Restructuring Group," with Phil Jacob as managing
19 director, Jared Felt as a director, and a couple
20 of other folks, right?
21     A.  Yes.
22     Q.  Okay.  "CSFB," it says, "is uniquely
23 suited to advise Oakwood.  The firm's
24 restructuring expertise is complemented by its
25 No. 1 position in the High Yield market,"

Page 119

1          ALAN SHAPIRO
2  et cetera, et cetera.
3      So this is Mr. Felt coming to the
4  company, to Oakwood, and saying look at all the
5  expertise we have in these kinds of difficult
6  situations, we'd sure like you to retain us to
7  become your financial adviser, and here are some
8  ideas about what we might do, right?
9      A.  Yes.
10     Q.  Okay.  Do you know whether as a result
11 of this presentation Oakwood actually retained the
12 restructuring group of CSFB?
13     A.  Not at this point, eventually.
14     Q.  Eventually?
15     A.  Yes.
16     Q.  But not at this time?
17     A.  That's right.  Not for a little over a
18 year later.
19     Q.  Right.
20     And they -- and Oakwood did not act
21 upon any of the alternatives that are laid out in
22 the report as possible restructuring ideas?
23     A.  That's right.
24     Q.  Okay.  On page 30 of your report, at
25 the end of your description of this document you

Page 120

1          ALAN SHAPIRO
2  say, "Rather than advise Oakwood to cut its losses
3  and file for bankruptcy, CSFB encouraged Oakwood
4  to continue to engage in financing activities
5  based on uncertain assumptions that industry-wide
6  and company-specific conditions would improve.
7  This advice only accelerated the Company's
8  insolvent financial position."
9      A.  Yes.
10     Q.  Now, the advice didn't accelerate
11 anything, did it?
12     What accelerated -- what we know is
13 that actually this advice that CSFB describes in
14 this pitch document was not taken.
15     A.  That's right.
16     Q.  Okay.  Do you have any reason to
17 believe based on the information you've reviewed
18 in preparing your report that if CSFB had
19 recommended an immediate bankruptcy filing the
20 company would have acted on that recommendation?
21     A.  No, I don't know how the company would
22 have responded.
23     Q.  Indeed, we know, don't we, that by this
24 time the company certainly knew -- by the company
25 I mean its management and directors -- the company

30  (Pages 117 to 120)

Page 121

ALAN SHAPIRO
1
2  certainly knew that bankruptcy was a possibility?
3      A.  Yes --
4      Q.  Okay.
5      A.  -- it did.
6      Q.  So to the best we know the consequence
7  of this June 26th presentation is nothing.  The
8  company neither proceeded with any of the ideas
9  discussed here, nor did they retain Mr. Felt's
10 group to be their financial adviser.
11     A.  Well, I would say that what this
12 document really indicated was kind of stay the
13 course.  In other words, keep doing what you're
14 doing, rearrange some of your financial claims --
15     Q.  All right.
16     A.  -- but basically keep on doing business
17 as usual and we'll help you in that.
18     Q.  Where in this document does it say
19 we'll help you in that.  I mean --
20     A.  Well, the we'll help you was that by
21 rearranging your claims.
22     Q.  In these financial restructuring ideas
23 that are discussed?
24     A.  Yes, that's correct.
25        And outside of this they're saying

Page 122

ALAN SHAPIRO
1
2  we'll help you implicitly through the ongoing
3  securitizations and providing the warehouse
4  facility, that was at least tacit agreement with
5  the course that Oakwood was on.
6      Q.  I think what you've just said is that
7  in effect it's an assumption that underlies the
8  June 26th presentation that the warehouse and
9  securitization facilities would continue as they
10 had been.
11     A.  Yes.
12     Q.  Okay.
13     A.  Well, in fact, they did.  There was no
14 indication that anything would change.
15     Q.  And is it your opinion, Professor, that
16 as of June 26th, 2001 CSFB had a duty to Oakwood
17 to cut off the securitization and warehouse
18 facilities?
19     A.  Not necessarily to cut it off, but to
20 engage in a discussion with Oakwood as to what its
21 situation was, that it was economically insolvent.
22 In fact, this presentation itself demonstrates
23 that Oakwood was deeply insolvent at the time and
24 that it was time for some more radical measures.
25        Now, as part of that you may do some

Page 123

ALAN SHAPIRO
1
2  securitizations, but you would change your credit
3  standards quite substantially.  You may -- you
4  would still need a warehouse facility, possibly a
5  smaller warehouse facility, and so on.
6        So I'm not saying that the company
7  should have followed a liquidation strategy.
8  There may well have been valuable aspects of the
9  business to preserve, but the -- the effect of
10 facilitation, of doing business as usual, I think
11 was not in the economic best interests of the
12 company or its creditors.
13     Q.  Well, let's break that apart, the
14 company or its creditors.
15     A.  Yes.
16     Q.  I think what you told me before, and I
17 want you to correct me if I'm wrong on this, is
18 that in your opinion by this time the only
19 constituency at the company that should have been
20 considered was the creditors; is that right?
21     A.  That's correct.
22     Q.  Okay.  So when you say the company and
23 its creditors you're just being redundant?
24     A.  Well, in this particular instance.  But
25 just to make sure in case -- I don't know what the

Page 124

ALAN SHAPIRO
1
2  law is.  My best understanding is that the law is
3  in some flux as to whether an obligation is owed
4  directly to creditors or just an obligation to the
5  company.  I just want to make it clear that I
6  believe that from an economic standpoint, that
7  when a company is insolvent that the duty to the
8  company passes through to a duty to creditors.
9      Q.  All right.  And that's the duty of the
10 directors you're describing, right?
11     A.  Directors and management.
12     Q.  And management.  Okay.
13     A.  Yes, and to the extent that anybody
14 else has a fiduciary obligation to the company.
15 Again, I'm not -- I'm just making an assumption
16 here.  I'm not giving a legal opinion as to who
17 else might owe such a fiduciary duty.
18     Q.  And had -- had CSFB come to Oakwood on
19 June 26th, 2001 and said you need to file for
20 bankruptcy and we need to significantly change the
21 ways in which we're handling the securitization
22 and warehouse facilities, in what ways would the
23 ultimate outcome with respect to Oakwood have been
24 different?
25     A.  Well, to begin with I didn't say

31 (Pages 121 to 124)

Page 125

ALAN SHAPIRO
1
2   necessarily that bankruptcy was the only option.
3   There are other -- there may well have been other
4   alternatives, such as the sale of the company or
5   providing additional financing to restructure the
6   company outside of bankruptcy. You can rearrange
7   claims outside of bankruptcy, do equity for debt
8   swaps, and so on and so forth. You don't have to
9   go into bankruptcy. But let's just call it some
10  type of dramatic restructuring that should have
11  taken place.
12      Q.   All right. The bankruptcy proceeding
13  of Oakwood is but for this litigation nearly
14  complete, is that your understanding?
15          MR. CASTANARES: I just didn't hear the
16  question, could you repeat it, please.
17      Q.   I said the bankruptcy proceedings with
18  respect to Oakwood, aside from this litigation, is
19  nearly complete.
20      A.   I really don't have any understanding
21  of what else might transpire. This is the only
22  thing that I'm aware of.
23      Q.   Do you know what the outcome in
24  Oakwood's bankruptcy has been with respect to
25  payment of claims of creditors and others?

Page 126

ALAN SHAPIRO
1
2   A.   No, I don't.
3   Q.   Okay.
4   A.   That would -- I'm sorry. With regard
5   to your prior question, that would really require
6   a damages analysis, which I have not done. In
7   other words, what an alternative outcome would
8   have been.
9   Q.   Well, how is it that we know -- because
10  it seems to be your view -- how is it that we know
11  that the outcome for interested parties in Oakwood
12  would have been better if something different had
13  been done in June of 2001 than what was done?
14      A.   I can't say that it would have. I
15  think it would have, because they persisted in a
16  business that was losing substantial amounts of
17  money. I think in that following year from June
18  till -- from '01 to '02 they lost, I think, a
19  couple of hundred million dollars in their
20  business. What they would have lost with some
21  other type of restructuring, I don't know.
22      Q.   Isn't it right, Doctor, that to attempt
23  to say today how things would have turned out if
24  some other course of action -- some unspecified
25  other course of action had been followed in June

Page 127

ALAN SHAPIRO
1
2   of 2001 we'd just be speculating?
3          MR. CASTANARES: Objection to the form.
4   A.   Well, it wouldn't be speculative if you
5   did an analysis -- you know, a serious analysis.
6   I'm not opining as to what the consequences of
7   undertaking alternative actions would have been or
8   might have been.
9   Q.   Right.
10          But if we were going to try to see what
11  an alternative outcome would have been, to begin
12  with we would have -- we'd have to be specific
13  about what that alternative was, wouldn't we?
14      A.   Yes, or you could look at a range of
15  alternatives.
16      Q.   Or you could look at a range.
17          So are you able, given the materials
18  that you have reviewed and the work that you have
19  done, to tell us with any degree of confidence
20  what different outcome there would have been had
21  Mr. Felt's June 26th report done the things you
22  say it should have done?
23      A.   No, I have not done such analysis --
24      Q.   Okay.
25      A.   -- so I cannot say.

Page 128

ALAN SHAPIRO
1
2   Q.   All right.
3          MR. WICKES: Then let's take a look
4   next at the August presentation, which we'll
5   mark as 503.
6          (Exhibit 503, Multipage document
7   entitled Presentation to Oakwood Homes
8   Corporation, dated 8/9/01, marked for
9   identification, as of this date.)
10      Q.   In June this presentation is prepared
11  and either is or is not presented to somebody, and
12  what the company says is, thanks, we're not
13  interested in buying that advice, right?
14          MR. CASTANARES: Objection to form.
15      A.   Yes, I believe that's the case.
16      Q.   So now a little over a month later
17  Mr. Felt makes another presentation, right?
18      A.   Yes.
19      Q.   That's Exhibit 503 that's discussed in
20  your report at VII.D.1.b, right?
21      A.   Okay. What page -- I don't -- I
22  didn't --
23      Q.   It's page 31.
24      A.   I did not memorize all the --
25      Q.   That's all right.

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 129

ALAN SHAPIRO

1
2    A.  -- headings.
3       Yeah.  Yes.
4    Q.  And this section -- this document,
5  No. 503, this is another pitch document, isn't it?
6    A.  Yes.
7    Q.  Again, offering up Mr. Felt's group's
8  restructuring expertise, talking about the
9  experience of CSFB in distressed finance
10  assignments, and offering up some more ideas
11  for -- what shall we call it, financial
12  engineering?
13    A.  Yes.
14    Q.  Fair enough?
15    A.  That's fine.
16    Q.  Okay.  And then, again, do we know
17  whether there's actually a meeting or a
18  presentation, do we know anything about what
19  happened with this document?
20    A.  No, but they weren't -- to the best of
21  my knowledge, they were not hired by Oakwood to
22  engage in any of this financial engineering.
23    Q.  Right.
24       So we have another failed pitch?
25    A.  Yes.

Page 130

ALAN SHAPIRO

1
2    Q.  Right?
3       Cross selling attempt No. 2 fails?
4    A.  Yes.
5    Q.  Okay.  And again, none of the
6  suggestions that are made here about -- what do
7  they say, exchange offers, and smaller facilities
8  with a flip up, and so on, none of those things
9  were done?
10    A.  That's correct.
11    Q.  Okay.  So there's no harm to anyone
12  from this presentation, other than in your view,
13  again, the absence of the recommendation of some
14  more drastic action.  This is just talk.
15    A.  I'm sorry, I -- could you repeat that.
16    Q.  All they did is they come down and say
17  we'd like to talk to you again about what we can
18  do, here are some more ideas.  The company says,
19  no thanks, we're still not interested.
20       There's no harm from that, except in
21  your view from the failure to recommend something
22  more serious, right?
23    A.  Yes, with regard to the pitch.
24       The other aspect, as I mentioned, is
25  the -- are the ongoing securitizations and

Page 131

ALAN SHAPIRO

1
2  warehouse facility, which enabled the company to
3  keep on engaging in value destroying activities.
4    Q.  Right.
5    A.  But no other harm from the pitch
6  itself.
7    Q.  Okay.
8       MR. WICKES:  And then we'll mark this
9  as 504.
10       (Exhibit 504, Multipage document
11  entitled Oakwood Homes Discussion Materials,
12  March 2002, marked for identification, as of
13  this date.)
14       (Witness looks at document.)
15    Q.  What I've given you here is what we've
16  now marked as Exhibit 504.
17       Is this the presentation that you
18  discuss in Section VII.D.1.c of your report
19  beginning at page 32?
20    A.  Yes.
21       I do want to clarify, I don't recall --
22  you know, sitting here I don't recall.  At some
23  point there was a pitch regarding the B2 sale
24  and -- with guarantees, and I don't -- I don't
25  recall if it was in one of these pitches or not.

Page 132

ALAN SHAPIRO

1
2    Q.  All right.
3    A.  It may have been in the first pitch.
4  There was a B2 sale and that may have ultimately
5  led to the Lotus transaction.
6    Q.  But this document, Exhibit 504, this is
7  another pitch, right?
8    A.  Yes, it is.
9    Q.  And this is -- as you describe it, this
10  is in particular addressed to the fact that the
11  company has some notes coming due in 2004.  And it
12  suggests that there's a way to refinance those
13  notes, stretch them out to 2009 as a kind of
14  refinancing to take off the pressure of that
15  upcoming deadline.
16    A.  That's correct.
17    Q.  And again, so far as we know what the
18  company says in response to this proposal is no
19  thanks.
20    A.  Yes.
21    Q.  Right.
22       So nothing happens as a result of 504?
23    A.  That's correct.
24    Q.  Okay.  And, in fact, then in August of
25  2002 for the first time CSFB actually does engage

33 (Pages 129 to 132)

Page 133

```
1            ALAN SHAPIRO
2  Mr. Felt's group. Let me show you --
3            MR. CASTANARES:  Oakwood, I think you
4  meant to say.
5            MR. WICKES:  Oakwood, I'm sorry.
6            What did I say?
7            MR. CASTANARES:  You said CSFB.
8            MR. WICKES:  I'm trying to do too many
9  things.
10           This would be 505, I think.
11           Would you mark this as 505.
12           (Exhibit 505, Multipage document
13  entitled Oakwood Homes Corporation,
14  Presentation to the Board of Directors, dated
15  8/19/02, marked for identification, as of
16  this date.)
17  Q.   I've given you what we've marked as
18  505. This is called a "Presentation to the Board
19  of Directors, August 19th, 2002."
20           This is pitch document No. 4, right?
21  A.   Yes.
22  Q.   As a result of this pitch Mr. Felt's
23  group actually is retained to help the company get
24  ready for Chapter 11.
25  A.   Yes.
```

Page 134

```
1            ALAN SHAPIRO
2  Q.    And there's some discussion here of
3  what kinds of things might happen in a Chapter 11
4  of the company.
5  A.   Yes.
6  Q.   And, in fact, we know that in November
7  of 2002 Oakwood actually files for a Chapter 11
8  bankruptcy.
9  A.   Yes, that's right.
10 Q.   And I think you've told us that you're
11 not critical of the advice and work that's done by
12 CSFB pursuant to the August 2002 retention and the
13 preparation for what was the ultimate bankruptcy
14 filing.
15 A.   Yes. I've not analyzed that, but from
16 what I've seen I have no criticisms of it.
17 Q.   All right. So is it fair to say,
18 Professor, that the sum of your opinion here is
19 that CSFB should have at least a year earlier than
20 it did advised Oakwood to make a bankruptcy filing
21 and should have refused to continue the
22 securitization and warehouse facilities so as to
23 force that decision on the company?
24           MR. CASTANARES:  Objection to form.
25 A.   Well, again, I didn't -- I did not say
```

Page 135

```
1            ALAN SHAPIRO
2  specifically that CSFB should have advised filing
3  for bankruptcy. What CSFB should have done is
4  done an extensive analysis of Oakwood's situation
5  to study the various alternatives. First of all,
6  in each one of these presentations, if you look at
7  it, CSFB's own analysis shows that Oakwood is
8  deeply economically insolvent. And so from that
9  standpoint should have assessed what alternatives
10 were available to Oakwood, look at the pluses and
11 minuses and make some recommendations.
12           If -- I think there should have been
13 some type of dialogue with Oakwood. You know,
14 what the appropriate alternatives should have
15 been, I don't know and I don't think we'll ever
16 know because no such analysis was ever done at the
17 time with the facts then available. They might
18 have gone out and gathered additional facts in the
19 process of doing their analysis.
20           I mentioned several alternatives
21 already. There's no need to repeat myself on
22 that. But the one thing I don't think that they
23 should have done was maintain business as usual.
24 In effect implicitly ratify the wait and see
25 policy that, in fact, Oakwood followed during this
```

Page 136

```
1            ALAN SHAPIRO
2  period, you know, always hoping for, you know,
3  things would be better tomorrow, I guess.
4  Q.   So Oakwood through its management and
5  directors has decided during this period of
6  time -- to adopt your characterization of a wait
7  and see attitude -- has decided to hope things get
8  better, whatever it's decided.
9            Is it your opinion, Professor, that it
10 was the duty of CSFB to substitute its judgment
11 about those matters for the judgment of the board
12 of directors and the management of Oakwood?
13 A.   It's not my opinion. As I said, I'm --
14 what I'm assuming is that CSFB owed a fiduciary
15 obligation to the company, and under the
16 circumstances that means the creditors of Oakwood.
17 It did not owe a duty to the directors and
18 management.
19           Unless the directors and management
20 gave additional information, facts, analysis to
21 CSFB that would lead it to change its opinion as
22 to the existence of economic insolvency, or the
23 trade-offs associated with a stay the course, or a
24 wait and see type policy versus some type of
25 dramatic restructuring, such as a sale or a
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 137

ALAN SHAPIRO

1    bankruptcy. Those are not mutually exclusive,
2    necessarily. I think that CSFB knowing what it
3    knew should have cut off the company, even if
4    management, you know, wanted to follow such a stay
5    the course policy. Again, because it's -- if it
6    has a fiduciary obligation it's to the company,
7    not to management or the directors. You know, the
8    management and directors may well have failed
9    their fiduciary obligation as well. I was not
10   asked to render an opinion in that regard. But
11   even if they did, that's no reason for CSFB to
12   violate any fiduciary obligation that it may have
13   owed to the company and its creditors.
14       Q.   Well, we know, don't we, that the board
15   of Oakwood owed a fiduciary duty to the company?
16       A.   Yes.
17       Q.   And as you said, in the academic
18   literature and maybe or maybe not even in the law
19   there's some discussion about whether that
20   fiduciary duty moves from being owed primarily to
21   shareholders and onto creditors by the directors,
22   right?
23       A.   Yes.
24       Q.   But it's the job --

Page 138

ALAN SHAPIRO

1        Would you agree with me from an
2    economic point of view that it's the job of the
3    directors to be making that judgment as time goes
4    along about where their duties lie and how they
5    should best carry out those duties?
6        A.   Yes --
7        Q.   Okay.
8        A.   -- I agree with that.
9        Q.   Here we know what the directors were
10   deciding.
11       My question to you is, is it your
12   opinion that the reasonable and reasonably prudent
13   course for CSFB to have followed was to substitute
14   its judgment on these matters for the judgment of
15   the directors?
16       A.   I believe so. Given that CSFB is the
17   financial expert here it has a particular
18   financial expertise. And as I said, there may
19   well have been a failure on the part of the board
20   of directors and management to exercise their
21   fiduciary obligation to the company, but that's no
22   reason for CSFB not to exercise its fiduciary
23   obligation.
24       And to the extent that CSFB sees that

Page 139

ALAN SHAPIRO

1    this is an economically insolvent company engaged
2    in value destroying activities, regardless of what
3    management wanted to keep doing I think that CSFB
4    should have exercised its independent judgment.
5        It may not make it very popular with
6    the company, but if you have a fiduciary
7    obligation your job is not to be popular, but to
8    follow that obligation wherever it may take you.
9        Q.   I think we've agreed, have we, that so
10   far as you've been able to determine there was no
11   factual information about Oakwood, its business,
12   or its prospects that CSFB had that was not also
13   available to the company?
14       A.   As far as I know, that's correct.
15       Q.   And I think we've -- I think we've
16   agreed that you simply don't know anything at all
17   about what financial or other expertise there was
18   amongst the members of the board of directors?
19       A.   That's correct.
20       Q.   Okay. Do you know whether the board of
21   directors was getting advice from anyone other
22   than CSFB during 2001 and 2002?
23       A.   I don't know. I think -- who was it --
24   FTI that was brought in later in 2002, so...

Page 140

ALAN SHAPIRO

1        But prior to that I don't -- I'm not
2    aware of anybody else providing financial advice
3    to Oakwood or its board of directors or
4    management.
5        Q.   Okay. And we don't really know -- I
6    think we've agreed -- how the world would have
7    turned out differently if some different course of
8    action had been followed starting in 2001.
9        A.   That's correct.
10       Q.   Okay. Did you make any attempt in your
11   research, in your preparation of this report, to
12   see, to research, to determine what other
13   investment banking companies faced with similar
14   situations did or didn't do?
15       MR. CASTANARES: Objection to form.
16       A.   No, I have not.
17       Q.   There were a number of companies in the
18   manufactured housing industry that during this
19   period of time were experiencing many of the same
20   difficulties that Oakwood was; is that correct?
21       A.   That's correct.
22       Q.   Do you know whether those companies had
23   financial advisers?
24       A.   I don't know anything specifically. I

35 (Pages 137 to 140)

Page 141

ALAN SHAPIRO

1  ALAN SHAPIRO
2  assume they probably did, but I don't know.
3    Q.  Those other companies in the
4  manufactured housing industry all would have been
5  running securitization programs, weren't they?
6    A.  I believe they would have.
7    Q.  Okay.
8    A.  Again, I don't know that for a fact,
9  but it would make economic sense.
10    Q.  Did you make any determination -- any
11  effort to determine whether the securitization
12  advisers for any of those other companies shut off
13  the securitization in the way you're suggesting
14  CSFB should have done here?
15    A.  No.  And that wouldn't necessarily be
16  determinative or affect my opinion in any case,
17  because the facts and circumstances of each
18  company I presume would be unique.
19      MR. WICKES:  Okay.  Get me this one,
20  tab 19.
21      506, please.
22      (Exhibit 506, Multipage document
23  entitled Credit Suisse First Boston
24  Compliance Manual, marked for identification,
25  as of this date.)

Page 142

1  ALAN SHAPIRO
2    Q.  Professor, I've handed you what we've
3  marked as Exhibit 506.
4      I want you to tell me whether that is
5  the CSFB compliance manual that is referred to in
6  your report on pages 27 and 28.
7      (Witness looks at document.)
8    A.  It looks like it.
9    Q.  Okay.  And you make reference in
10  your -- on page 28 to the so called know your
11  customer rule that's described in this account --
12  in this document in Section 5 starting on the page
13  that's Bates numbered 53089.
14    A.  Yes.
15    Q.  Okay.  What kind of customers are the
16  subject of those rules?
17      MR. CASTANARES:  Objection to form.
18    A.  In this case it would refer to retail
19  customers, customers for stocks and bonds that the
20  company might sell.  I guess investment accounts.
21    Q.  The know your customer rules apply to
22  retail accounts at a broker-dealer, right?
23    A.  Yes.
24    Q.  Does this manual apply in any respect
25  to the relationship with a company like Oakwood

Page 143

1  ALAN SHAPIRO
2  and the services Mr. Felt was providing?
3    A.  Well, it doesn't -- I think the know
4  your customer rule from a legal standpoint, my
5  best understanding is that it only applies to
6  accounts at broker-dealers.  What I'm doing is
7  using the notion of know your customer and saying
8  that's a good rule for all transactions.
9    Q.  Ah.  So you're taking the retail
10  account know your customer rule and suggesting
11  that it should be applied here to the relationship
12  between CSFB and Oakwood that Mr. O'Driscoll was
13  managing because it's a good rule?
14    A.  It's a good guideline to follow.
15    Q.  In your -- in the materials that you
16  have reviewed do you see any indication that CSFB
17  did not understand the financial situation at
18  Oakwood?
19    A.  I would say quite the contrary.  I
20  believe that CSFB did understand the financial
21  situation, and that's why I think it was
22  inappropriate for it to continue with the
23  securitization program and the warehouse lending
24  facility on an as-is basis.
25    Q.  You just think --

Page 144

1  ALAN SHAPIRO
2    A.  Now that being said, I think one of --
3  I think either Mr. Muir or Mr. Standish, I make a
4  reference to this, who say that -- who argue that
5  CSFB did not understand their situation.  But my
6  assessment is that CSFB did understand its
7  customer.
8    Q.  Okay.  And they came to --
9      And you think they should have come to
10  and shared with Oakwood a different conclusion
11  about what actions Oakwood should have been taking
12  starting sometime in 2001?
13    A.  Yes.  The know your customer rule,
14  which I think is in general a good idea, the
15  purpose is not to get to know your customer,
16  per se, but that's a means to an end, which is to
17  provide reasonable advice given their economic
18  circumstances.  You first have to know your
19  customer in order to be able to give reasonable
20  advice.
21    Q.  Right.
22      And your opinion here is that CSFB did
23  know its customer and failed to give it the advice
24  you think they should have given it?
25    A.  Yes.  And helped facilitate behavior

MERRILL LEGAL SOLUTIONS
(800) 325-3376    www.MerrillCorp.com

Page 145

ALAN SHAPIRO

1  ALAN SHAPIRO
2  that I think was destructive of economic value.
3      Q.   To an extent that is today impossible
4  to measure?
5      A.   I wouldn't say it's impossible to
6  measure. I have not done that. Financial
7  economists have a variety of techniques where you
8  can get an estimate. You're never going to be --
9  get a perfect answer, but you can get -- come up
10 with realistic approximations.
11          I've not -- I was not asked to do that
12 and have not done that, and I've seen no other
13 work that anybody has attempted to do in that
14 regard.
15         MR. WICKES:  Okay. Let's take a short
16 break.
17         MR. CASTANARES:  Sure.
18         THE VIDEOGRAPHER:  Going off the record
19 at 3:04.
20         (Recess taken.)
21         THE VIDEOGRAPHER:  Back on the record
22 at 3:13.
23         MR. WICKES:  Before I continue I just
24 want to briefly say on the record we received
25 sometime last week Dr. Shapiro's supplemental

Page 146

1  ALAN SHAPIRO
2  report. And we've indicated in
3  correspondence with counsel that we expect to
4  have some proceedings before the court about
5  that. And we've indicated that because of
6  the timing when we received it we didn't
7  think we would be prepared to examine
8  Dr. Shapiro about it today.
9          However, since we have covered most of
10 what we want to cover with respect to the
11 principal report, and since it's only about
12 3 o'clock in the afternoon, I'm going to ask
13 Dr. Shapiro a few questions about this
14 report. I will reserve in full our rights to
15 proceed in front of the court, as we've
16 suggested.
17         I don't ask, Tony, that you agree to
18 any of that. I just want to say that by
19 asking the doctor a few questions about this
20 supplemental report I don't intend thereby to
21 waive any positions we may have with respect
22 to his report.
23         MR. CASTANARES:  I'll just say that I
24 recognize there has been correspondence
25 regarding this matter and I have not been

Page 147

ALAN SHAPIRO

1  ALAN SHAPIRO
2  party to the correspondence. I believe a
3  letter came to you from my office yesterday,
4  which I have been unable to open up on my
5  BlackBerry and I therefore don't know what it
6  says. However, I can imagine, but --
7          MR. WICKES:  Well, we have it. I can
8  tell you -- I can I think fairly paraphrase
9  the letter as saying we will huff and we will
10 puff and we will blow your house down.
11         MR. CASTANARES:  Yeah, similar to your
12 letter in response.
13         However, I will say this, I don't
14 believe you have any rights to reserve. But
15 let us just agree that neither anything you
16 say now or anything I say either creates or
17 waives any rights that we might have and have
18 at it.
19         MR. WICKES:  Fine.
20         MR. CASTANARES:  Good.
21         MR. WICKES:  All right.
22 BY MR. WICKES:
23      Q.   Dr. Shapiro, sometime after the
24 completion of your report that we've been talking
25 about as Exhibit 501 you were asked to prepare a

Page 148

1  ALAN SHAPIRO
2  supplemental report; is that right?
3      A.   That's correct.
4          MR. WICKES:  Let's just mark for
5  identification Exhibit 507.
6          (Exhibit 507, Eight-page document
7  entitled Supplemental Report of Alan C.
8  Shapiro, Ph.D., dated 8/28/07, marked for
9  identification, as of this date.)
10     Q.   Is that your supplemental report of
11 August 28th, 2007?
12     A.   It is.
13     Q.   All right. When were you first asked
14 to prepare a supplemental report in this matter?
15     A.   Well, it wasn't quite like that. I
16 wasn't asked outright to prepare a supplemental
17 report.
18         The way it took place is I was told
19 that a case had recently come down which pointed
20 to the importance of looking at market data. And
21 I was sent a copy of the judge's decision in the
22 case, Campbell, and I reviewed the case and said I
23 agree with the judge. I was asked how difficult
24 would it be to do a market value analysis on the
25 company to determine whether it was economically

37 (Pages 145 to 148)

Page 149

ALAN SHAPIRO
1
2 insolvent. And I pointed out that's pretty much
3 bread and butter for a financial economist.
4        And so I asked would you like me to
5 write such a report?
6        Because obviously it was going to cost
7 the client money. And I don't recall who it was,
8 whether it was -- I really don't recall who gave
9 the go ahead, but somebody gave me the go ahead.
10 And so I went ahead and wrote the report.
11        Now, when was I -- as I said, it
12 started with my receipt of the Campbell case. And
13 that was maybe two months ago, or so, or
14 thereabouts. Maybe three months, I'm not -- I'm
15 not sure. I've been very busy the last few
16 months. I don't have a good picture.
17    Q.   Who first called the Campbell case to
18 your attention?
19    A.   Again, somebody from Stutman. I don't
20 recall, it may have been Scott, it may have been
21 Steve, Steve Ray. Maybe Mr. Castanares, I just
22 don't remember.
23    Q.   Two or three months ago and you don't
24 remember who you had the conversation with?
25    A.   I tell you one of the unfortunate

Page 150

ALAN SHAPIRO
1
2 aspects of getting older is I have a lousy memory,
3 a truly lousy memory.
4    Q.   Now, originally your assignment was to
5 simply take as an assumption Mr. --
6 Dr. Tennenbaum's conclusion that the company was
7 insolvent whenever it was, by --
8    A.   September --
9    Q.   -- by September of 2001.
10    A.   -- of '01.
11        Is there a question or can I comment?
12    Q.   I'm just -- I'm working on a question.
13    A.   Okay.
14    Q.   Memory is not the only thing that goes
15 when you get older.
16        Why was it that if the judgment was
17 made that there was a different kind of solvency
18 analysis needed that it wasn't Dr. Tennenbaum's
19 job to do that?
20    A.   Oh. First of all, I want to say that I
21 didn't just accept Dr. Tennenbaum's conclusion on
22 faith. I did look -- I did review his report --
23 well, I went through this before.
24    Q.   Right.
25    A.   I looked at some other information. I

Page 151

ALAN SHAPIRO
1
2 also saw that effectively, you know, CSFB, as I
3 mentioned, did several solvency analyses in its --
4 in the various pitches that Mr. Felt made.
5        But with regard to your question, I
6 have no idea why -- well, I guess I do have an
7 idea. I guess the idea is that rather than me
8 rely on -- just on Mr. Tennenbaum's conclusion,
9 that I guess it would strengthen my opinion if I
10 actually looked at market data to come to that
11 conclusion, that's my supposition. But other than
12 that, I don't know.
13    Q.   Well, when --
14    A.   They didn't explain it to me.
15    Q.   When you got called by whoever it was
16 you can't remember who called you and they said
17 we'd like you to take a look at valuation from
18 this other perspective, did you not say, well,
19 isn't that Dr. Tennenbaum's job?
20    A.   No. I mean, this is something I was
21 interested in. And as I said, market value
22 analyses are bread and butter for financial
23 economists.
24    Q.   I guess we could conclude, couldn't we,
25 that your financial incentives would have been

Page 152

ALAN SHAPIRO
1
2 consistent with your preparing a supplemental
3 report in the ways we talked about financial
4 incentives before?
5    A.   That's correct.
6    Q.   Okay. And one of the things you tell
7 us in this supplemental report is that during 2001
8 and 2002 the company's ten-year publicly traded
9 bond was trading at about 40 percent of its face
10 value, right?
11    A.   Yes.
12    Q.   And that means, if I understand it,
13 that that reflects what the market thought the
14 value of those bonds was, taking into account the
15 likelihood of eventual repayment and interest
16 rates and the other things that affect value; is
17 that right?
18    A.   Yes.
19    Q.   Okay. Now, assume with me -- I think
20 you said you don't know what the ultimate recovery
21 of the bondholders has been in the bankruptcy
22 case; is that right?
23    A.   That's correct.
24    Q.   Okay. Then assume with me, if you
25 will, that the ultimate recovery of the

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

Page 153

ALAN SHAPIRO

1
2  bondholders in the Oakwood bankruptcy case was
3  between 45 and 50 cents on the dollar, okay?
4      A.  Okay.
5      Q.  Okay?
6          As opposed to the 40 cents on the
7  dollar that it was trading at in 2001, okay?
8      A.  Okay.
9      Q.  All right.
10     A.  You say you recovered between 40 --
11     Q.  45 and 50.  Just assume --
12     A.  -- 45 and 50 cents?
13     Q.  Okay.
14     A.  Okay.
15     Q.  Doesn't that tell us that the value of
16 the enterprise increased rather than decreased
17 between 2001 and 2007?
18     A.  Well, not necessarily.  First of all,
19 I'd like to know what happened to -- there's a
20 time value of money.  What happened to all the
21 accrued interest between 2001 and 2007.  In other
22 words, it makes a real difference whether you get,
23 say, 45 cents today or get it two years down the
24 road.
25     Q.  Right.

Page 154

ALAN SHAPIRO

1
2      A.  Now that's one thing.
3          For another thing it may well be --
4  well, market expectations play a critical role in
5  asset pricing, bonds, stocks, and so on.  And it
6  may well be that the market was heavily -- more
7  heavily discounting the bonds because it
8  anticipated that the company would persist in its
9  value destroying activities.  And once the company
10 was put into bankruptcy and started to be run on
11 behalf of creditors as opposed to on behalf of
12 shareholders, it could well be in the process
13 of -- you know, since the market had anticipated
14 the continuance of value destroying activities and
15 now that was ended the value would go up.
16     Q.  Do you know whether that's the case?
17     A.  No.  I'm just saying that it's not
18 automatically the case that the enterprise just
19 happened to increase in value.  It could well be
20 that value destroying activities were ended and
21 that would have the same effect on the value of
22 the enterprise, namely it would increase the
23 market's estimate of the enterprise's valuation.
24     Q.  There wasn't anything to the best of
25 your knowledge secret, was there, about what

Page 155

ALAN SHAPIRO

1
2  Oakwood was doing with its business in 2001 and
3  2002?
4      A.  Not as far as I know.
5      Q.  Okay.  And there wasn't anything secret
6  about the role that CSFB was playing with respect
7  to the securitizations and the warehouse?
8      A.  No.
9      Q.  Those facts were known to the market.
10         In fact, as I think you've just said,
11 you characterized them as value destroying
12 activities, but you said you think the market
13 probably reflected that it knew those activities
14 were going on and was taking them into account.
15     A.  That's correct.
16     Q.  Okay.  Do you now have an opinion about
17 when Oakwood became insolvent or do you now back
18 up to June 30th, 2000 your opinion as to when the
19 company was insolvent?
20     A.  Sure.
21         The company was economically insolvent
22 no later than 6/30/2000.  I don't know just when
23 it became economically insolvent.  You know, the
24 data indicate that it was solvent as of the end of
25 March 2000.  Sometime during that quarter, during

Page 156

ALAN SHAPIRO

1
2  the second quarter of 2000, it became insolvent.
3  I can't give you a better estimate because I only
4  have quarter end data on the debt on the balance
5  sheet.
6      Q.  So sometime between March 30th and
7  June 30th of 2000 the company went from being
8  solvent to insolvent in your opinion?
9      A.  Yes.
10     Q.  You've used repeatedly today the
11 expression economically insolvent, do you mean by
12 that something different from what Mr. Castanares
13 and I would mean by just saying insolvent?
14         MR. CASTANARES:  Why don't you tell him
15 what you mean.
16     A.  Well, when I say economically insolvent
17 I mean that the market value of the enterprise is
18 less than the face value of its debt, that's what
19 I mean by economically insolvent.  You may -- I've
20 heard terms such as cash flow insolvent, and so
21 on.  This is the definition that I'm using.
22     Q.  I'm sorry, tell me that definition
23 again.
24     A.  Market -- that when the market value of
25 the enterprise is less than the face value of the

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 157

ALAN SHAPIRO
1
2  enterprise's debt that enterprise is economically
3  insolvent.
4     Q.   So whenever --
5        Is it correct to say from that, that in
6  your view whenever a corporation's debt is trading
7  at a more than marginal discount to its face value
8  that the corporation is economically insolvent?
9     A.   No.
10    Q.   I'm sorry, I thought that's what you
11 just said.
12    A.   No, I said the market value of the
13 enterprise.  And the market value of the
14 enterprise is equal to the market value of the
15 claims against that enterprise.  And those claims
16 come in the form of debt and equity.  So as long
17 as the market value of the equity is greater than
18 the discount on the -- in the market value of the
19 debt, I would say that enterprise still is
20 economically solvent.
21    Q.   If debt has the first claim on the
22 assets why would equity ever have a value greater
23 than the discount on the debt?
24    A.   Well, because there's some probability
25 of bankruptcy.  And meanwhile -- and the prospect

Page 158

ALAN SHAPIRO
1
2  of bankruptcy means that equity starts acting much
3  more like a call option on the assets of the
4  business.  And so part --
5     Q.   I'm sorry.  Go ahead.
6     A.   Part of the value of the debt is the
7  value of what call option on the assets of the
8  company, so...
9        Well, maybe I ought to let you ask
10 another question, if there is.
11    Q.   I understand that there -- I think I
12 understand.  And I know this is a lawyer trying to
13 understand economics, which is always difficult.
14       But as I understand it in economic
15 theory, the reason that the value of the equity
16 never goes below zero is that it's always got some
17 option value.
18    A.   Yes.
19       Well, it doesn't go below -- the
20 reason -- no, the real reason it never goes below
21 zero is because of limited liability.  If there
22 were unlimited liability it could well go below
23 zero.
24    Q.   The reason it doesn't -- the reason a
25 company's equity retains some value, no matter how

Page 159

ALAN SHAPIRO
1
2  insolvent the company is, is there is some option
3  value there?
4     A.   Well, it could be zero.  It could be
5  deep enough that there's absolutely --
6     Q.   Correct.
7     A.   -- no value.  But the reason that it --
8  ordinarily it maintains some value, even if a
9  penny or two, is because of the option value, the
10 possibility that something may turn around.
11    Q.   When the market value of the company,
12 which is the sum of the market value of its debt
13 and the market value of its equity, is below the
14 face amount of the debt that's when the company is
15 economically insolvent?
16    A.   Yes.
17    Q.   Okay.  And is it your opinion that
18 whenever that point is reached it is the
19 responsibility of people who are dealing with the
20 company -- third parties who are dealing with the
21 company to stop allowing the company to continue
22 on the course it's been?
23    A.   No.  It depends whether they have a
24 fiduciary obligation to that company or not.  If
25 they have no fiduciary obligation, then they can

Page 160

ALAN SHAPIRO
1
2  act in their own self interest.
3     Q.   Well, I thought you told me that the
4  assumption that you made that CSFB had a fiduciary
5  duty actually didn't change your conclusion about
6  CSFB's performance.
7     A.   Right.  What I said is that if CSFB did
8  not have a fiduciary obligation, the fact that it
9  continued to facilitate value destroying
10 activities means that it did not behave in a
11 reasonable or a reasonably prudent manner.
12 Whether that has any legal significance is a
13 totally different issue.
14       MR. WICKES:  All right.  Could you read
15    that answer back to me.
16       (Record read.)
17    Q.   Now, there were other parties who would
18 have also been in 2001 in a position to cause
19 Oakwood to stop operating the way it was
20 operating; isn't that right?
21    A.   There may have been.  I really
22 didn't -- didn't look at that.
23    Q.   Well, they're in the business of
24 manufacturing mobile homes, right?
25    A.   Yes.

40 (Pages 157 to 160)

Page 161

ALAN SHAPIRO
1
2    Q.   So they need to buy raw materials to do
3  that with.
4    A.   That's correct.
5    Q.   And their raw material suppliers are
6  presumably supplying those materials on some kind
7  of trade credit terms.
8    A.   Yes.
9    Q.   And if a major supplier of -- I don't
10  know what they used -- aluminum refused to
11  continue to sell aluminum to the company that
12  would have had the same effect as stopping the
13  securitizations, wouldn't it?
14    A.   That could well be the case provided
15  that there were no other suppliers willing to step
16  in.
17    Q.   Okay.  So was it -- would it have been
18  the duties of the raw material suppliers to stop
19  extending trade credit to the company?
20    A.   I'm not saying that anybody had a
21  fiduciary obligation.  I'm just -- I'm making that
22  assumption that CSFB had a fiduciary obligation.
23  And to the extent that it did, then I think it did
24  not carry it out -- carry that fiduciary
25  obligation out.  If it had no fiduciary

Page 162

ALAN SHAPIRO
1
2  obligation, then whatever it did is quite
3  irrelevant, I think.
4    Q.   Okay.  How do we know that had CSFB
5  stopped providing the warehouse and securitization
6  facilities that some other financial institution
7  wouldn't have stepped in to do it?
8    A.   Well, I don't know that for sure.  I
9  did see in one or two of the depositions some
10  statement to the effect that it was difficult to
11  replace B of A or they were having some
12  difficulty, I think.  Whether somebody else would
13  have stepped in if they had gotten the
14  securitization business along with the requirement
15  to provide a warehouse facility, in other words,
16  some type of tie in, that may be the case.  I
17  don't know.  I don't know if somebody would have
18  stepped in or not.
19    Q.   Did you make any attempt to determine
20  whether there would have been alternative
21  financing available?
22    A.   No.
23      MR. WICKES:  That's all I have.  Thank
24  you, Doctor.
25      THE WITNESS:  Thank you.

Page 163

ALAN SHAPIRO
1
2      MR. CASTANARES:  I have a couple of
3  questions for Dr. Shapiro.
4  EXAMINATION BY
5  MR. CASTANARES:
6    Q.   Dr. Shapiro, in preparing -- in doing
7  the work preparatory to the creation of your
8  supplemental report did you attempt to follow the
9  methodology set forth in the Campbell Soup case?
10    A.   I did.
11    Q.   And did that methodology involve as a
12  first step determining the market value of a share
13  of the company multiplied by the number of the
14  shares outstanding?
15    A.   It did.
16    Q.   And did you have a source of data
17  available to you to determine the market value of
18  a share of the company?
19    A.   Yes.
20    Q.   What was that source?
21    A.   The CRISP database, that's the Center
22  for Research in Securities Prices at the
23  University of Chicago.
24    Q.   Is that a source that is generally
25  relied upon by professionals in your business?

Page 164

ALAN SHAPIRO
1
2    A.   Yes, it is.
3    Q.   Is it a source generally available to
4  members of the public who might wish to obtain
5  that information?
6    A.   Yes.
7    Q.   And did you consider it reliable at the
8  time.
9    A.   I did.
10    Q.   And once you had that data from the
11  CRISP database, in order to perform that step of
12  the analysis was it necessary to do anything more
13  than multiply that number times the number of
14  shares outstanding?
15    A.   To come -- not to come up with a market
16  value of equity at each point in time.
17    Q.   And then was the next step then to
18  determine the market value of debt?
19    A.   Yes.
20    Q.   And was that determined by reference to
21  some data indicating the market value of the
22  company's debt?
23    A.   Yes.
24    Q.   What was the source of that data?
25    A.   I had data on the 2009 bond, which came

41 (Pages 161 to 164)

Page 165

ALAN SHAPIRO

1  from a Web site run by J.P. Morgan.
2
3      Q.  And is that -- the data from that Web
4  site generally available to members of the public?
5      A.  Yes.
6      Q.  And is the data from that Web site
7  generally relied upon by people in your business?
8      A.  As far as I know.
9      Q.  And was the next step in the analysis
10  then to multiply that figure times the face value
11  of the company's debt outstanding?
12      A.  Yes, with the assumption that since I
13  didn't have market prices for the 2004 maturing
14  debt I assumed that it was the same.  And that
15  assumption was supported by the data provided by
16  CSFB on three particular dates in 2001 and 2002,
17  which showed that both bonds were trading at
18  virtually identical discounts.
19      Q.  All right.  And was the next step in
20  the analysis then to add together the two numbers
21  which were the figure you had found for the market
22  value of the equity plus the market value of the
23  debt?
24      A.  Yes.
25      Q.  And was the final step in the analysis

Page 166

ALAN SHAPIRO

1  then to compare that figure with the face value of
2  the company's debt outstanding?
3      A.  That's correct.
4      Q.  And did you determine the face value of
5  the company's debt outstanding from publicly
6  available documents?
7      A.  Yes, its various quarterly findings.
8      Q.  All right.  And did that then lead you
9  to a conclusion as to whether or not this method
10  of valuation corroborated your reliance upon
11  Dr. Tennenbaum's opinion of the company's
12  insolvency in September of 2001?
13      A.  It did.
14      Q.  And in examining this data further did
15  it occur to you to test it further to see whether
16  or not the data would support conclusions as to
17  company -- the company's solvency or insolvency at
18  times other than 2001?
19      A.  Yes.  I wanted -- Dr. Tennenbaum did
20  his analysis as of September 2001 just to make
21  sure that it wasn't, you know, some happenstance
22  or some -- or a result of the particular cash flow
23  forecast that he had at that time.  I wanted to --
24  in other words, that it wasn't just a fluke of the

Page 167

ALAN SHAPIRO

1  data, I went ahead and looked at prior data as
2  well.
3      And based on that determined that as
4  far back as June 30th, 2001 Oakwood would have
5  been economically insolvent.  And that supported
6  my use -- or corroborated my use of
7  Dr. Tennenbaum's conclusion.
8      Q.  Right.
9      In examining Dr. Tennenbaum's report --
10  now aside from the market data approach suggested
11  by the Campbell Soup case, but just in examining
12  Dr. Tennenbaum's report at an earlier time, in
13  terms of making your opinion based upon the
14  assumption of his conclusion of insolvency in
15  September of 2001, did you examine the studies
16  that he undertook to reach that conclusion?
17      A.  I did.
18      Q.  And did you have any difficulty
19  following the steps that Dr. Tennenbaum had taken
20  in that analysis?
21      A.  No.
22      Q.  Did you -- were you able to determine
23  from his report whether or not the analysis that
24  he undertook was of the type commonly used by

Page 168

ALAN SHAPIRO

1  professionals in your business?
2      A.  Yes.
3      Q.  Was it?
4      A.  It was.
5      Q.  Did you see anything in
6  Dr. Tennenbaum's report that you were unable to
7  understand?
8      A.  No.
9      MR. CASTANARES:  I have no further
10  questions.
11      MR. WICKES:  Nothing further.
12      MR. CASTANARES:  Thank you.
13      THE WITNESS:  Thank you.
14      MR. CASTANARES:  Let's go off the TV
15  record anyway.  And on the audio record at
16  least --
17      THE VIDEOGRAPHER:  Going off the
18  record, end of tape 3 at 3:42.
19      MR. CASTANARES:  Whatever our usual
20  stipulation is as to signing time, and so
21  forth.  I forget what we agreed upon,
22  whatever it is.
23      MR. WILLIAMSON:  The court reporter
24  will send it to you for him to sign and then

Page 169

```
1         ALAN SHAPIRO
2    we hold onto the original signature.
3       MR. CASTANARES:  Oh, good.
4       Off the record.
5       (Time noted:  3:43 p.m.)
6    _____
7         ALAN C. SHAPIRO
8    Subscribed and sworn to before me
9    this _____ day of _____, 2007.
10   _____
11   (Notary Public)      My Commission Expires:
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 171

```
1
2    WITNESS: _____
     DATE(S): _____
3    CASE:
     I wish to make the following changes, for the
4    following reasons:
5    PAGE LINE
         CHANGE FROM:_____
6        CHANGE TO: _____
7    REASON:
         CHANGE FROM:_____
8        CHANGE TO: _____
9    REASON:
         CHANGE FROM:_____
10       CHANGE TO: _____
11   REASON:
         CHANGE FROM:_____
12       CHANGE TO: _____
13   REASON:
         CHANGE FROM:_____
14   REASON:
         CHANGE FROM:_____
15   REASON:
         CHANGE FROM:_____
16       CHANGE TO: _____
17   REASON:
         CHANGE FROM:_____
18       CHANGE TO: _____
19   REASON:
         CHANGE FROM:_____
20       CHANGE TO: _____
21   REASON:
         CHANGE FROM:_____
22       CHANGE TO: _____
23
     Subscribed and sworn to before me this _____ day
24   of _____, 2007.
25
```

Page 170

```
1
2            * * *
3    ACKNOWLEDGEMENT OF DEPONENT
4    I, _____, do hereby
5    acknowledge that I have read and examined the
6    foregoing testimony, and the same is a true,
7    correct and complete transcription of the
8    testimony given by me, and any corrections appear
9    on the attached Errata sheet signed by me.
10
11
12
13
14   _____
15   (DATE)        (SIGNATURE)
16
17
18
19
20
21
22
23
24
25
```

Page 172

```
1
2            C E R T I F I C A T E
3    STATE OF NEW YORK )
4                     : ss.
5    COUNTY OF NEW YORK )
6
7        I, DONALD R. DePEW, a Registered
8    Professional Reporter, Certified Realtime Reporter
9    and Notary Public within and for the State of
10   New York, do hereby certify:
11       That ALAN C. SHAPIRO, the witness whose
12   deposition is hereinbefore set forth, was duly
13   sworn by me and that such deposition is a true
14   record of the testimony given by the witness.
15       I further certify that I am not related
16   to any of the parties to this action by blood or
17   marriage, and that I am in no way interested in
18   the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set
20   my hand this 17th day of September, 2007.
21   _____
22   DONALD R. DePEW, RPR, CRR
23
24
25
```

43 (Pages 169 to 172)

Page 173

```
1
2          EXHIBITS
3    NO      DESCRIPTION         ID
4    501                  3
         Multipage document entitled
5        Report of Alan C. Shapiro,
         Ph.D., dated 4/30/07
6
7    502                  117
         Multipage document entitled
         Presentation to Oakwood
8        Homes Corporation, dated
         6/26/01
9
10   503                  128
         Multipage document entitled
11       Presentation to Oakwood
         Homes Corporation, dated
         8/9/01
12
13   504                  131
         Multipage document entitled
         Oakwood Homes Discussion
14       Materials, March 2002
15   505                  133
         Multipage document entitled
16       Oakwood Homes Corporation,
         Presentation to the Board
17       of Directors, dated 8/19/02
18   506                  142
         Multipage document entitled
19       Credit Suisse First Boston
         Compliance Manual
20
21   507                  148
         Eight-page document
         entitled Supplemental
22       Report of Alan C. Shapiro,
         Ph.D., dated 8/28/07
23
24
25
```

Page 174

```
1
2              INDEX OF WITNESS
3    ALAN C. SHAPIRO
4    BY MR. WICKES . . . . . . . . . . . . . .   4
5    BY MR. CASTANARES . . . . . . . . . . .  163
6    REQUESTS:
7    Mr. Wickes  . . . . . . . . . . . . . .  20
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

44 (Pages 173 to 174)

| A | | | | |
|---|---|---|---|---|
| **abilities** 98:5 | **acquisitions** 52:5 | 144:17,20,23 | 12:1 13:1 14:1,9 | 152:1 153:1 154:1 |
| **able** 4:19 83:20 | **act** 63:3 119:20 | **advise** 118:23 | 15:1 16:1 17:1 | 155:1 156:1 157:1 |
| 96:9 112:20 | 160:2 | 120:2 | 18:1 19:1 20:1 | 158:1 159:1 160:1 |
| 127:17 139:11 | **acted** 55:7,8,9 | **advised** 59:3 60:12 | 21:1 22:1 23:1 | 161:1 162:1 163:1 |
| 144:19 167:23 | 120:20 | 62:4 134:20 135:2 | 24:1 25:1 26:1 | 164:1 165:1 166:1 |
| **ABS** 54:8,18 74:22 | **acting** 63:7 158:2 | **advisement** 20:18 | 27:1 28:1 29:1 | 167:1 168:1 169:1 |
| 100:25 101:22 | **action** 12:12 24:9 | **adviser** 55:10 56:11 | 30:1 31:1 32:1 | 169:7 172:11 |
| 102:4 103:14 | 98:21,25 99:7,10 | 59:5 62:6 99:13 | 33:1 34:1 35:1 | 173:5,22 174:3 |
| 106:25 110:20 | 101:14 102:13 | 100:5,11 105:4,15 | 36:1 37:1 38:1 | **alignment** 71:3 |
| **absence** 67:8 | 126:24,25 130:14 | 105:21,24 119:7 | 39:1 40:1 41:1 | **Allen** 10:2,10 11:5 |
| 130:13 | 140:9 172:16 | 121:10 | 42:1 43:1 44:1 | **allowing** 159:21 |
| **absent** 32:10 | **actions** 102:15 | **advisers** 140:24 | 45:1 46:1 47:1 | **alternative** 99:7 |
| **absolutely** 33:6 | 106:13 127:7 | 141:12 | 48:1 49:1 50:1 | 126:7 127:7,11,13 |
| 116:24 159:5 | 144:11 | **advising** 62:17 | 51:1 52:1 53:1 | 162:20 |
| **ABSs** 74:15 110:8 | **activities** 50:16 | **advisory** 57:6 | 54:1 55:1 56:1 | **alternatives** 68:10 |
| **academic** 38:10,25 | 74:10 83:19 120:4 | 113:21 | 57:1 58:1 59:1 | 99:19 119:21 |
| 39:8,19,22 40:17 | 131:3 139:3 154:9 | **affect** 6:15 80:16 | 60:1 61:1 62:1 | 125:4 127:15 |
| 46:12 49:9 137:18 | 154:14,20 155:12 | 141:16 152:16 | 63:1 64:1 65:1 | 135:5,9,14,20 |
| **accelerate** 68:8 | 155:13 160:10 | **affiliates** 1:13 | 66:1 67:1 68:1 | **aluminum** 161:10 |
| 120:10 | **activity** 74:18 | **affirmatively** | 69:1 70:1 71:1 | 161:11 |
| **accelerated** 120:7 | **actors** 52:16 | 107:12 | 72:1 73:1 74:1 | **Alvarez** 21:25 |
| 120:12 | **actual** 16:9 76:17 | **afforded** 57:12 | 75:1 76:1 77:1 | **America** 86:11 |
| **accept** 33:17 | **add** 165:20 | **afternoon** 146:12 | 78:1 79:1 80:1 | 87:11,13,14 89:9 |
| 150:21 | **addition** 84:6 109:8 | **agent** 55:8,16 | 81:1 82:1 83:1 | 90:7,9 91:4 92:15 |
| **accepted** 32:4,15 | **additional** 45:10 | **aggregated** 82:2 | 84:1 85:1 86:1 | 104:9 |
| **access** 57:12,22 | 46:11 125:5 | **ago** 20:12 22:4 | 87:1 88:1 89:1 | **Americas** 1:21 2:12 |
| 58:11 72:14 80:24 | 135:18 136:20 | 50:14 69:24 76:22 | 90:1 91:1 92:1 | 3:17 |
| 81:5,17 83:9,15 | **addressed** 132:10 | 149:13,23 | 93:1 94:1 95:1 | **amount** 11:2 26:12 |
| 84:4 85:24 93:5 | **addresses** 39:22 | **agree** 60:9 66:5,12 | 96:1 97:1 98:1 | 26:15 42:17 80:15 |
| 109:10 110:23 | 40:20 | 102:3,9 109:25 | 99:1 100:1 101:1 | 159:14 |
| **accommodations** | **adequately** 19:25 | 113:2,11 114:12 | 102:1 103:1 104:1 | **amounts** 126:16 |
| 93:17 94:2 | **Administered** 1:5 | 118:7 138:2,9 | 105:1 106:1 107:1 | **analyses** 9:21 41:19 |
| **account** 61:2 | **adopt** 136:6 | 146:17 147:15 | 108:1 109:1 110:1 | 53:25 151:3,22 |
| 142:11 143:10 | **Adv** 1:7 | 148:23 | 111:1 112:1 113:1 | **analysis** 11:6 43:10 |
| 152:14 155:14 | **adverse** 63:3 | **agreed** 28:20 95:15 | 114:1 115:1 116:1 | 43:21,24,25 44:9 |
| **accounts** 142:20,22 | **advice** 56:20 57:2 | 139:10,17 140:7 | 117:1 118:1 119:1 | 48:15 50:24 51:2 |
| 143:6 | 59:11,14,24,25 | 168:22 | 120:1 121:1 122:1 | 85:11 88:22 |
| **accrued** 153:21 | 60:3,5,16,18,23 | **agreement** 1:22 | 123:1 124:1 125:1 | 112:19 126:6 |
| **accruing** 82:25 | 61:2,13 63:7,9,16 | 105:5,16,25 122:4 | 126:1 127:1 128:1 | 127:5,5,23 135:4 |
| **accurate** 80:9 | 74:17 84:9 97:7 | **Ah** 89:17 92:10 | 129:1 130:1 131:1 | 135:7,16,19 |
| 113:3 | 100:18 103:23 | 143:9 | 132:1 133:1 134:1 | 136:20 148:24 |
| **acknowledge** 170:5 | 106:4,9,10,17,18 | **ahead** 149:9,9,10 | 135:1 136:1 137:1 | 150:18 164:12 |
| **ACKNOWLED...** | 106:23 107:7,12 | 158:5 167:22 | 138:1 139:1 140:1 | 165:9,20,25 |
| 170:3 | 108:8 112:25 | **al** 1:4 3:9,10 | 141:1 142:1 143:1 | 166:21 167:21,24 |
| **acquired** 50:16 | 115:6 120:7,10,13 | **Alan** 1:19 3:1,3,8 | 144:1 145:1 146:1 | **analysts** 108:12 |
| | 128:13 134:11 | 4:1 6:1 7:1 8:1 | 147:1 148:1,7 | **analyzed** 93:5 |
| | 139:22 140:3 | 9:1 10:1 11:1 | 149:1 150:1 151:1 | 134:15 |

analyzing 57:9
and/or 99:6
Angeles 2:7
answer 6:5 31:24
34:17 48:16 63:20
63:22,24 106:16
145:9 160:15
answered 92:21
anticipated 154:8
154:13
anybody 18:13
53:19 59:10,11
60:14,15 103:24
124:13 140:3
145:13 161:20
anytime 101:18
anyway 168:16
apart 29:2 123:13
appear 170:8
Appendix 46:3
49:17
applied 143:11
applies 143:5
apply 142:21,24
approach 167:11
appropriate 63:9
63:10 135:14
approximately
16:8 25:12,20
78:21
approximation
25:15 49:14
approximations
145:10
April 4:23 16:7,22
41:10,25
argue 144:4
argumentative
70:23
arithmetic 26:6
arrangement 88:25
arrangements
145:10
articles 46:12 49:9
72:23 74:4 98:17
aside 83:17 97:6
98:24 99:15
100:12,15 102:25

103:6,22 106:20
107:8,10 125:18
167:11
asked 4:25 6:24 7:5
7:12,15,23 14:2
23:22 24:12 27:2
27:5 28:6,9 30:10
31:5 36:21,25
37:18 41:2 43:11
43:23 44:2 47:18
59:10 60:15 61:12
73:25 85:20 92:4
92:21 99:11
110:22 137:11
145:11 147:25
148:13,16,23
149:4
asking 31:25 32:23
146:19
aspect 130:24
aspects 27:23 123:8
150:2
assessed 112:23
135:9
assessment 112:17
144:6
asset 154:5
assets 81:17 88:16
88:18 109:15
157:22 158:3,7
asset-backed 30:18
31:2 54:8 74:15
76:12,19 77:3
78:9 86:15 110:2
assignment 77:8
150:4
assignments
129:10
assist 11:11
assistance 11:15
105:8
assistant 10:12
associated 88:8
136:23
associates 8:21 9:8
25:19
association 89:2

assume 4:15,25
27:2 30:4,10 31:5
36:21 37:2 44:2
49:12 85:20 92:5
117:23 118:3
141:2 152:19,24
153:11
assumed 29:17
43:12 89:10,15
165:14
assuming 136:14
assumption 5:7 6:2
6:7,25 7:5,12,15
7:24 27:6 28:7,23
32:25 33:2 36:21
37:11,16,18 39:16
41:2,6 72:4 92:23
122:7 124:15
150:5 160:4
161:22 165:12,15
167:15
assumptions 120:5
assure 41:20 44:7
as-is 59:22 143:24
attached 170:9
attempt 114:7
126:22 130:3
140:11 162:19
163:8
attempted 80:12
145:13
attempting 59:18
attention 108:12
109:3,6 149:18
attitude 136:7
attorneys 2:4,10
23:22
Atulya 8:22 9:14
10:8,17 12:6
13:10,11,14
audio 168:16
audit 97:7
August 26:10 56:15
59:6 62:7 100:6
105:2,3,16,22
106:7,21 128:4
132:24 133:19

134:12 148:11
automatically
65:21 154:18
available 48:14
62:24 86:2 109:9
135:10,17 139:14
162:21 163:17
164:3 165:4 166:7
Avenue 1:20 2:6,12
3:17
avoid 88:7
aware 51:19 58:15
125:22 140:3
a)04-57060 1:7
A-l-l-e-n 10:2
A-t-u-l-y-a 9:16
a.m 1:17 2:23

**B**
B 46:3 47:20,22
48:13,19 49:4,12
49:16,17 112:11
162:11
back 14:2 17:19
25:16 26:24 44:19
52:10 57:3,10
59:16 61:9,22
62:2 65:25 69:25
93:6 95:8,12
117:8 145:21
155:17 160:15
167:5
backed 93:12
background 10:23
22:19 51:2 56:18
97:15
balance 103:10
112:4 156:4
bank 50:8,18,20
52:4 58:11 72:21
73:2,10 86:11
87:11,13,14 89:9
90:6,9 91:4 92:14
104:9 108:8 111:7
111:25 115:22
banker 72:16 83:14
banking 1:8 50:15

51:10,10 113:21
140:14
bankrupt 65:24
bankruptcy 1:2
5:25 19:17 59:4
62:5,17,19 64:22
65:4 71:23 75:7
88:6 89:23 90:19
94:4 96:10 99:24
105:9 108:4
109:24 110:6
113:9 120:3,19
121:2 124:20
125:2,6,7,9,12,17
125:24 134:8,13
134:20 135:3
137:2 152:21
153:2 154:10
157:25 158:2
banks 50:13 52:3
52:12 56:19 72:14
73:6,22 83:12
104:5 111:10,21
111:22
barrelhead 66:4
based 25:22 36:24
41:6 49:21 57:4
58:4 59:18 60:24
77:4 120:5,17
167:4,14
bases 41:17
basically 28:3
50:21 71:19 75:6
75:7 86:18 87:4
87:25 88:19
121:16
basis 24:15 27:12
36:19 56:17 59:22
62:23 79:21 98:12
99:16 101:7
143:24
Bates 46:16,24 47:3
118:12 142:13
bearing 84:11
beauty 21:13,15
becoming 95:17,18
began 7:6,8,19 16:8

16:14 57:7,8 77:8
78:17,18
**beginning** 49:19
61:23 107:17
117:9 131:19
**begins** 3:6 72:10
**behalf** 19:22
154:11,11
**behave** 5:18 6:21
68:19,25 69:3,5
69:13 72:12
160:10
**behaved** 6:20 33:5
67:9 68:20,25
69:10
**behaving** 66:25
**behavior** 5:13 6:23
24:11 63:10 66:23
67:5 68:8 69:17
144:25
**believe** 6:9 7:10,25
9:24 17:2 19:21
22:6 25:5 28:19
30:5 33:10 36:4
39:24 40:3 42:5
43:9 46:20 48:24
50:7,12 52:8
53:17 54:8 64:16
65:6 67:13 74:16
74:18 76:20 88:23
90:10 91:7,11
93:11 103:25
106:9 107:23
108:20 109:2,5
112:14 120:17
124:6 128:15
138:17 141:6
143:20 147:2,14
**believed** 63:17,19
65:3,24
**believes** 79:17
**beneficial** 91:10
**benefits** 112:17
**best** 4:19 19:13
25:15 28:12 45:13
47:10 48:16 49:15
63:3 78:4 90:8

121:6 123:11
124:2 129:20
138:6 143:5
154:24
**better** 9:15 68:5
126:12 136:3,8
156:3
**bill** 12:25 13:2
70:16
**billed** 25:7 26:7,8
26:15
**billings** 25:9,18,23
**billion** 78:20
**Bills** 14:4
**bit** 29:2 36:24
49:25
**BlackBerry** 147:5
**blood** 172:16
**blow** 147:10
**blown** 44:9
**board** 40:8,10,11
40:12,14,14 86:2
96:20,23 97:7,19
97:24 99:6,18,23
104:4 107:22
112:10 133:14,18
136:11 137:15
138:20 139:19,21
140:4 173:16
**boards** 109:3
**bond** 152:9 164:25
**bondholders** 22:10
36:13 37:3,12
152:21 153:2
**bonds** 35:18,25
36:5 142:19
152:14 154:5,7
165:17
**borrowed** 76:3
**borrower** 94:2,3
**borrowers** 110:19
**Boston** 1:7,8,10,10
1:12 3:10 19:9
23:15 50:5,16,18
141:23 173:19
**bottom** 101:11
109:7 112:15

**bounce** 84:7
**boxes** 20:21 44:25
**boy** 43:17
**bracket** 52:4
**breach** 91:3
**bread** 149:3 151:22
**break** 29:2 61:17
94:7 106:15
116:23 123:13
145:16
**bridge** 86:19
**bridged** 86:23
**briefly** 10:4 145:24
**bringing** 24:9
**broke** 96:13
**broker-dealer**
142:22
**broker-dealers**
143:6
**brought** 42:21
139:25
**build** 60:7
**bulge** 52:3
**bundle** 75:7
**business** 4:14 56:19
60:21,22 63:8
90:25 91:9 95:24
96:3,9 98:8,22
100:23 101:19
103:5 107:14
121:16 123:9,10
126:16,20 135:23
139:12 155:2
158:4 160:23
162:14 163:25
165:7 168:2
**businesses** 106:14
106:19
**business-as-usual**
91:21
**busy** 149:15
**butchering** 52:19
**butter** 149:3
151:22
**buy** 86:20 90:21
161:2
**buyer** 109:16

**buying** 82:4,8 87:5
128:13
**B2** 75:20 78:7
131:23 132:4

- -- -
C

**C** 1:19 2:2 3:3 4:6
14:9 95:4 148:7
169:7 172:2,2,11
173:5,22 174:3
**calendar** 23:2,4
**California** 2:7
11:25
**call** 21:8 32:2,13
52:3 76:6 125:9
129:11 158:3,7
**called** 4:6 12:7
24:18 72:18,19
76:8 79:4 93:20
133:18 142:10
149:17 151:15,16
**calling** 31:23 32:19
36:10 64:6
**calls** 17:11 33:15
38:23 42:23 45:7
84:25
**Campbell** 148:22
149:12,17 163:9
167:12
**Canada** 10:24
**capable** 97:25
**capacity** 72:16
98:18 100:7
**capital** 52:7
**care** 27:23,25
**careful** 57:25
108:12
**carefully** 11:3
85:15 93:3
**carry** 138:6 161:24
161:24
**case** 1:4 3:11 4:24
10:19 19:17 21:21
22:13,17 30:3,15
36:4 45:6,14
47:13 49:21 51:23
55:8 66:11 67:12

69:15 70:9,12,16
70:20 71:2,9
75:19 79:4,14
80:3,17 82:13
90:11 123:25
128:15 141:16
142:18 148:19,22
148:22 149:12,17
152:22 153:2
154:16,18 161:14
162:16 163:9
167:12 171:3
**cases** 10:20,23
23:21 45:15
**cash** 66:3 75:10,15
156:20 166:23
**cast** 8:8
**Castanares** 2:8 4:2
4:2 5:9 8:11
20:17 26:22 30:14
31:15,22 32:18
34:8,15,17 35:14
36:9 37:4,21
38:22 39:15 42:23
45:7 51:14 53:6,8
53:23 61:18 63:21
64:4 66:22 68:17
70:22 71:18 84:25
88:15 92:21 94:9
96:24 117:4
125:15 127:3
128:14 133:3,7
134:24 140:16
142:17 145:17
146:23 147:11,20
149:21 156:12,14
163:2,5 168:10,13
168:15,20 169:3
174:5
**cause** 160:18
**causes** 31:14
**Center** 163:21
**cents** 153:3,6,12,23
**Century** 42:10
**CEO** 40:8,11,13
117:24
**certain** 6:21 18:5

Page 4

66:16 90:24
115:24
certainly 6:10 57:8
69:2,4 70:25
82:20 102:22
114:20 120:24
121:2
certainty 67:12
Certified 172:8
certify 172:10,15
cetera 113:9,10
119:2,2
CFO 117:24
chain 77:10
chairman 40:12
change 38:12 66:2
68:8 122:14 123:2
124:20 136:21
160:5 171:5,6,7,8
171:9,10,11,12,13
171:14,15,16,17
171:18,19,20,21
171:22
changed 50:17
changes 171:3
changing 59:20
Chapter 1:3 133:24
134:3,7
characterization
136:6
characterized
155:11
chart 30:16
check 80:21 112:4
Chicago 163:23
circumstances
63:11 91:18,19
92:14 96:18 98:19
136:16 141:17
144:18
citation 73:14
citations 73:13,15
73:16
cite 72:17 74:4 79:2
80:15 100:9
City 42:10
claim 157:21

claimants 32:7 68:7
claims 75:9 121:14
121:21 125:7,25
157:15,15
Clara 10:9
clarify 131:21
class 93:19
clear 24:4,8 59:24
74:13 115:2 124:5
clearly 80:11
client 149:7
clients 62:17
close 56:9
closely 10:18
collapsed 90:12
95:25 96:4,5
colleague 10:17
colleagues 10:6
73:17
combination 46:4
50:7,18
come 13:2 21:5
41:12 47:16 59:16
74:2 87:3 116:4
124:18 130:16
144:9 145:9
148:19 151:10
157:16 164:15,15
comes 52:17
coming 57:3 119:3
132:11
comment 107:3
150:11
comments 17:5
37:25
commercial 50:7
50:13,18 51:10
111:21
commission 67:20
169:11
commit 67:21
committee 97:8
common 86:25
commonly 88:25
167:25
communicating
60:4

communities 34:7
companies 52:6
140:14,18,23
141:3,12
company 12:7
21:25 29:9,13
30:4,5,19 31:13
31:16,18,20 32:5
32:6 34:7 35:8,9
38:5,5,7,14,15
44:3 59:21 60:19
61:3 65:19,24
66:14 68:6 69:12
84:12 91:22 92:11
101:14 102:13,16
106:23 107:13
108:13 110:7
112:25 114:10
115:3,23 119:4
120:20,21,24,24
120:25 121:8
123:6,12,14,19,22
124:5,7,8,14
125:4,6 128:12
130:18 131:2
132:11,18 133:23
134:4,23 136:15
137:4,7,14,16
138:22 139:2,7,14
141:18 142:20,25
148:25 150:6
154:8,9 155:19,21
156:7 158:8 159:2
159:11,14,20,21
159:21,24 161:11
161:19 163:13,18
166:18
company's 120:7
152:8 158:25
164:22 165:11
166:3,6,12,18
company-specific
120:6
compare 166:2
compensated 24:15
competency 98:11
competent 97:20

complaint 79:9,13
79:16,25 80:20
complemented
118:24
complete 125:14,19
170:7
completely 62:21
completion 147:24
compliance 5:14
6:4 141:24 142:5
173:19
computer 15:20,23
15:25 16:13 17:23
22:23 23:3
concerned 84:22
concerning 80:25
conclude 44:4 62:3
66:20 151:24
conclusion 6:15
31:23 32:2,14,19
32:21,22 33:7,9
33:16 36:10 38:23
41:12,18,20 44:8
65:8 66:20 68:13
71:20 72:11
144:10 150:6,21
151:8,11 160:5
166:10 167:8,15
167:17
conclusions 5:6,15
6:6,10,11,13
15:12 19:24 41:18
70:20 79:18 112:8
166:17
condition 31:14
57:14,17 58:7,17
62:9 65:18 80:25
107:19
conditions 66:3
120:6
conduct 62:12
conducted 51:16
112:18
conducting 96:9
conference 17:11
confidence 26:18
127:19

conflate 31:12
conjunction 54:3
connected 16:4
connection 21:3
23:15 56:4 81:2
97:9
consequence 28:18
33:8 90:14 96:7
121:6
consequences 91:8
99:24 127:6
consider 164:7
consideration
99:23
considered 112:22
123:20
considering 99:7
99:19 100:24
103:16
consistent 28:21
68:21 69:17,20
70:20 112:11
152:2
constant 111:21
constituency
123:19
consulting 12:7,10
12:16,19 103:4
consumer 55:20
contact 18:17 62:15
contains 48:13 80:6
contest 21:13,15
contestants 21:18
context 29:6
continuance
154:14
continuation 92:20
continue 67:4 96:9
120:4 122:9
134:21 143:22
145:23 159:21
161:11
continued 109:23
160:9
continues 69:22
continuing 66:7
contractor 10:10

contractors 13:16
contracts 13:14
contrary 63:16
    68:24 143:19
conversation
    149:24
conversations 7:17
convince 115:23
copies 20:9
copy 20:4 42:11
    148:21
corporation 1:4,8,9
    1:11 3:9 13:20,21
    13:22,24,25 14:6
    14:7,8,11 15:14
    33:13 34:4 40:6
    40:22 50:22 85:6
    85:10 88:4 117:12
    128:8 133:13
    157:8 173:8,11,16
corporations
    108:11
corporation's
    157:6
correct 5:3 7:20
    11:19 12:2,24
    13:5 14:16 15:13
    15:22 18:24 22:15
    25:11 26:17 34:9
    34:18 38:24 39:17
    41:7,8,9 53:7,10
    55:18 77:6,9
    78:14,15 80:22
    81:3 82:3,7 89:17
    89:21 96:6 99:25
    100:2 103:20
    104:17 105:17,18
    107:15 108:5
    109:20 111:11
    113:15 116:16
    121:24 123:17,21
    130:10 132:16,23
    139:15,20 140:10
    140:21,22 148:3
    152:5,23 155:15
    157:5 159:6 161:4
    166:4 170:7

corrections 170:8
correctly 37:17
    41:24 104:13
    106:3
correspondence
    146:3,24 147:2
corroborated
    166:11 167:7
cost 149:6
costs 112:17
counsel 2:23 3:19
    4:25 27:2 36:25
    146:3
Counterclaims
    79:5
County 19:16 20:3
    172:5
couple 9:20 50:14
    104:13 110:12
    118:19 126:19
    163:2
course 20:8 45:10
    47:2 53:14 76:10
    83:5 88:21 98:3
    99:4 121:13 122:5
    126:24,25 136:23
    137:6 138:14
    140:8 159:22
courses 98:21,25
    98:25 99:7,9
court 1:2 4:4 146:4
    146:15 168:24
cover 101:2 107:4
    146:10
covered 146:9
create 40:23
created 15:5 110:4
creates 147:16
creating 68:11
creation 163:7
credit 1:7,8,9,10,12
    2:24 3:10,25 5:12
    19:8,8,21 23:14
    24:4 31:7 50:5,12
    50:17 53:16,25
    54:5,12 59:11
    65:23 79:10 81:18

87:25 88:8,17
    90:6 92:12 109:16
    110:16,18 111:9
    111:18,20,23
    123:2 141:23
    161:7,19 173:19
creditors 5:2 27:3
    28:25 29:18 30:6
    30:11 31:6,13
    34:6,14,19,20,21
    34:23,25 35:2,2
    35:11,13,15,20
    36:7,15 37:5,7,13
    37:17,20 38:9,17
    38:19 39:12,14
    40:24 62:11 65:23
    68:6 91:10,23
    112:24 123:12,14
    123:20,23 124:4,8
    125:25 136:16
    137:14,22 154:11
creditworthiness
    110:23,24
CRISP 163:21
    164:11
critical 134:11
    154:4
criticisms 134:16
CRM 54:12,18
    111:9
cross 113:24 114:2
    114:3,4,20 115:5
    130:3
CRR 1:22 172:22
CSFB 5:2,17,22
    19:22,25 21:2
    27:3 28:24 29:17
    30:10,16,18 31:5
    33:5 37:2 41:19
    46:6,22 47:25
    50:3,4,9 51:3,6
    52:14,16 53:3,12
    54:6,10 57:17
    58:2,7,18 59:3,14
    59:16 60:11,15
    61:13 62:4,16
    63:15 64:7,14,15

64:19 65:2,8,16
    66:23 67:4,9,17
    70:4 71:11,21
    72:11 75:11,21
    78:18,20 80:23
    81:4,16 83:9,13
    84:7,16,17,22
    85:5,24 86:6
    87:23 88:3 89:10
    89:15 91:3,12
    92:17 93:4,11
    95:17,18,23 96:14
    97:8 99:9,16
    100:18 101:2,6,13
    101:24 102:12
    103:4,24 104:5,21
    104:24 106:6,23
    107:11,17 109:10
    109:13,22 110:13
    110:15,21 111:9
    112:16,22 113:8
    113:19 115:24
    116:9 118:13,14
    118:22 119:12
    120:3,13,18
    122:16 124:18
    129:9 132:25
    133:7 134:12,19
    135:2,3 136:10,14
    136:21 137:3,12
    138:14,17,23,25
    139:4,13,23
    141:14 142:5
    143:12,16,20
    144:5,6,22 151:2
    155:6 160:4,7
    161:22 162:4
    165:16
CSFB's 51:18,25
    54:22,24 57:11
    62:10,14 66:20
    68:14 74:8 83:21
    96:3 99:12 100:5
    100:11 105:14,19
    106:4 108:2,17
    115:5 135:7 160:6
currently 26:8

customer 57:3
    60:24 63:4,5 66:7
    70:7 72:2 76:3
    93:17,17 114:6,8
    114:11,17 142:11
    142:21 143:4,7,10
    144:7,13,15,19,23
customers 56:20,24
    56:25 62:22 70:8
    75:2,3 78:13
    81:10,18 86:20
    88:20 108:8
    111:15 114:15
    142:15,19,19
cut 65:25 120:2
    122:17,19 137:4

——— D ———
damages 126:6
data 9:20 11:6
    41:19 93:4,4
    148:20 151:10
    155:24 156:4
    163:16 164:10,21
    164:24,25 165:3,6
    165:15 166:15,17
    167:2,2,11
database 163:21
    164:11
date 3:5,11 41:10
    42:4 43:23 85:21
    116:15 117:13
    128:9 131:13
    133:16 141:25
    148:9 170:15
dated 3:4 4:23 16:7
    41:24 79:5 117:12
    128:8 133:14
    148:8 173:5,8,11
    173:17,22
dates 55:24 57:5
    115:12,15 165:16
DATE(S) 171:2
day 21:8 169:9
    171:23 172:20
deadline 132:15
dealing 38:13 47:7

Page 6

47:11 63:15 65:2
159:19,20
dealings 68:14
deals 39:8 42:18
dealt 104:5
debt 39:2,3,9
104:14 125:7
156:4,18 157:2,6
157:16,19,21,23
158:6 159:12,14
164:18,22 165:11
165:14,23 166:3,6
debtor 93:20
Debtors 1:5
decades 50:14
decided 50:14 89:9
136:5,7,8
deciding 138:11
decision 100:23
101:19 134:23
148:21
decreased 153:16
deep 159:5
deeply 122:23
135:8
default 83:5 102:21
defaults 57:20
98:18 101:3,4
defendant 3:22
24:9,11
defendants 1:14
2:10 19:20
definition 28:9
108:6 156:21,22
degree 10:24
111:17 127:19
Delaware 1:2,9,11
delay 5:24 64:21
71:22
delete 18:4,6
deleting 18:2
deliberate 67:22
deliberately 69:12
delimited 64:5
delivered 118:5
demonstrates
122:22

depending 38:4,12
depends 33:9 107:2
159:23
DePew 1:22 172:7
172:22
DEPONENT 170:3
deposit 50:19
deposition 1:19 3:7
3:16 100:9 101:10
101:17 172:12,13
depositions 4:14
45:11 47:2 87:20
97:3 115:9 162:9
describe 81:14,15
99:13 100:13
104:24 132:9
described 25:10
28:8 77:11 83:15
142:11
describes 120:13
describing 36:7
40:17 89:3 102:4
124:10
description 72:15
72:20 73:21 75:6
77:2 83:11 119:25
173:3
destroying 68:11
131:3 139:3 154:9
154:14,20 155:11
160:9
destructive 145:2
detail 100:14
detailed 72:9,10
determination
141:10
determinative
141:16
determine 139:11
140:13 141:11
148:25 162:19
163:17 164:18
166:5 167:23
determined 164:20
167:4
determining
163:12

develop 57:2
dialogue 135:13
difference 37:19
153:22
different 5:7 6:6
8:14,15 30:8,12
34:23 35:3,13
38:11 39:2 44:20
51:13 59:17 65:10
71:24 75:12 111:8
114:11 118:14
124:24 126:12
127:20 140:8
144:10 150:17
156:12 160:13
differently 67:9
140:8
difficult 119:5
148:23 158:13
162:10
difficulties 140:21
difficulty 162:12
167:19
direct 104:14
direction 69:10
70:17
directly 47:7,16
102:6 109:18
124:4
director 2:23 97:6
97:11 118:19,19
directors 39:23
40:3,9,10,11,21
86:3 96:21 97:2,4
97:15,19 100:18
108:11,16 120:25
124:10,11 133:14
133:19 136:5,12
136:17,19 137:8,9
137:22 138:4,10
138:16,21 139:19
139:22 140:4
173:17
disagreed 23:21
disappeared 82:22
disclose 20:2
discontinue 92:15

discount 157:7,18
157:23
discounting 154:7
discounts 165:18
discovery 45:5 46:7
discuss 10:19 43:6
107:20 112:7
131:18
discussed 121:9,23
128:19
discussing 86:15
discussion 36:20,25
72:11 122:20
131:11 134:2
137:20 173:13
discussions 37:22
37:24 84:15 99:16
distinction 59:23
distinguish 38:25
distressed 129:7
DISTRICT 1:2
Doble 2:20 3:23
doctor 52:25 62:2
69:19 70:18 76:25
93:14 117:15
126:22 146:19
162:24
document 3:2
45:14 47:6 48:4,7
49:11 58:22 76:15
79:4,8 87:17
115:21,22 116:13
116:14 117:10
118:8,11 119:25
120:14 121:12,18
128:6 129:4,5,19
131:10,14 132:6
133:12,20 141:22
142:7,12 148:6
173:4,7,10,13,15
173:18,21
documentation
64:13
documents 11:2,4
20:2 23:23 44:12
44:15,16,19,23,25
45:5,10,16,19,24

46:5,5,7,10 47:11
47:13,15,25 48:14
49:6,17 58:5
64:24 76:15,18
79:21 88:22 108:7
115:12,14,18
166:7
doing 42:22 43:25
84:3 90:25 91:8
101:4,24,24
121:13,14,16
123:10 135:19
139:4 143:6 155:2
163:6
dollar 80:15 153:3
153:7
dollars 126:19
Donald 1:22 172:7
172:22
Douglas 2:25 3:14
downsize 68:9
downsizing 98:23
Dr 8:22 9:14 11:18
13:21,22 14:10
17:3,9,20 25:2,3
41:6,23 42:3,16
42:21 43:10,15,20
44:4 47:19 73:18
73:25 95:12
145:25 146:8,13
147:23 150:6,18
150:21 151:19
163:3,6 166:12,20
167:8,10,13,20
168:7
draft 16:18 42:5
drafting 16:9,13
drafts 16:16,21
17:3,19 18:10,15
42:3
drags 70:12
dramatic 125:10
136:25
drastic 130:14
draws 79:18
drive 16:12 68:9
due 42:11 132:11

duly 4:7 172:12
duties 40:22,23
   97:25 138:5,6
   161:18
duty 27:23,23 28:3
   29:13,20 31:6,19
   32:10,11 33:13
   34:3,4 36:6 37:19
   91:3 122:16 124:7
   124:8,9,17 136:10
   136:17 137:16,21
   160:5

——————— E ———————
E 2:2,2 95:2,2
   172:2,2
earlier 100:20
   134:19 167:13
early 16:11 52:10
   110:13
earn 71:2,9
economic 27:10
   28:2,18,21 29:14
   34:2 36:16 37:25
   38:8,14 67:3
   68:19 69:5 91:8
   91:22 123:11
   124:6 136:22
   138:3 141:9
   144:17 145:2
   158:14
economically 31:17
   31:18 122:21
   135:8 139:2
   148:25 155:21,23
   156:11,16,19
   157:2,8,20 159:15
   167:6
economics 10:23
   158:13
economist 19:20
   27:11 32:3,9
   33:16 149:3
economists 32:4,15
   33:18 79:24 80:4
   109:2 145:7
   151:23

EC2Y 2:19
edited 36:24
editing 17:9
edits 17:5
effect 30:4 79:9
   86:23 122:7 123:9
   135:24 154:21
   161:12 162:10
effectively 151:2
effort 41:11,15
   80:21 141:11
eight 78:20
Eight-page 148:6
   173:21
either 28:9 71:13
   73:18 128:11
   144:3 147:16
emphasis 39:24
employees 10:6
   34:6 35:22 39:5
   66:13
enabled 91:9,20
   131:2
encompass 33:13
encompasses 34:4
encouraged 120:3
ended 69:24,25
   154:15,20
engage 120:4
   122:20 129:22
   132:25
engaged 19:7 66:24
   69:16 139:2
engagement 21:16
   59:5 62:6 105:16
   118:15
engaging 44:8
   112:24 131:3
engineering 129:12
   129:22
enhance 51:23
enjoyed 83:14
enriching 28:4
entered 75:4
enterprise 29:7
   66:25 153:16
   154:18,22 156:17

156:25 157:2,13
   157:14,15,19
enterprises 14:12
   14:13 93:22
enterprise's 154:23
   157:2
entirely 82:13
entities 14:14,18
   19:9 110:5
entitled 3:3 117:11
   128:7 131:11
   133:13 141:23
   148:7 173:4,7,10
   173:13,15,18,21
entity 12:4,18
   32:10 33:19 34:12
   34:21,22 35:4
   75:8 88:6 89:23
entries 22:23
entry 23:9
equal 157:14
equity 32:11 33:14
   34:5 46:21 98:16
   108:2,12,17 125:7
   157:16,17,22
   158:2,15,25
   159:13 164:16
   165:22
Errata 170:9
error 49:15
errors 67:19,20
   68:2
ESQ 2:8,14,15,20
estimate 25:17,22
   145:8 154:23
   156:3
estimated 25:23
et 1:4 3:9,10 113:9
   113:10 119:2,2
evaluate 111:9
event 31:13 37:15
events 115:8
eventual 152:15
eventually 119:13
   119:14
evidence 65:5
   104:2 112:16,22

113:4,4,8,13,13
evil 114:23
evolution 37:23
exact 107:6
exactly 37:23 90:17
   110:9 113:20
   115:4
EXAMINATION
   4:10 95:10 163:4
examine 146:7
   167:16
examined 4:8 95:6
   170:5
examining 166:15
   167:10,12
example 46:12
   47:14,25 51:5,9
   57:18 61:6 65:10
   66:4 82:17 83:25
   99:21 103:17
   104:8
examples 103:4
   107:10
excess 98:18
exchange 130:7
exclusive 137:2
excuse 86:14
execution 106:25
exercise 138:21,23
exercised 139:5
Exhibit 3:2 4:24
   11:18 15:5 20:23
   41:11,25 47:20,22
   48:13,19,23 49:4
   49:12,16 54:21
   57:11 62:3 85:17
   117:10,16 128:6
   128:19 131:10,16
   132:6 133:12
   141:22 142:3
   147:25 148:5,6
EXHIBITS 173:2
exist 6:16
existence 5:20 33:9
   68:15 82:21
   136:22
existing 112:23

exists 112:16,22
   113:5,8,14
expect 108:22
   111:14,17 146:3
expectations 154:4
expected 103:18
expense 28:5
experience 45:15
   56:18 108:10
   109:14 111:6,13
   129:9
experienced 4:14
experiences 22:20
experiencing
   140:20
expert 4:13,22 12:3
   12:12 18:22 19:20
   20:8 22:13 23:13
   42:18 138:18
expertise 118:13,24
   119:5 129:8
   138:19 139:18
experts 79:23 80:3
Expires 169:11
explain 4:15 28:10
   63:24 64:2 151:14
explained 33:3,15
explaining 38:11
exposure 111:10
express 23:13,24
   24:3 71:21
expressed 5:17
   105:13
expression 156:11
extended 37:13
extending 161:19
extensive 135:4
extensively 60:20
   73:3
extent 38:2 77:24
   78:2 80:6 82:14
   88:7 99:5,17,22
   102:19 124:13
   138:25 145:3
   161:23
external 73:4,15
e-mail 17:19

e-mails 17:22 18:3
  18:4,7

———— **F** ————
F 95:2 172:2
face 152:9 156:18
  156:25 157:7
  159:14 165:10
  166:2,5
faced 140:14
facilitate 144:25
  160:9
facilitation 123:10
facilities 90:22
  122:9,18 124:22
  130:7 134:22
  162:6
facility 55:9 56:5
  86:12,13,23 87:14
  87:24 89:10,20
  91:5,16 92:20
  93:10 104:10
  106:12 110:20,25
  122:4 123:4,5
  131:2 143:24
  162:15
facing 61:3
fact 14:23 63:19
  68:18 71:5,20
  80:9 83:25 84:20
  98:14 103:13
  104:3 107:24
  108:21,25 118:2,3
  122:13,22 132:10
  132:24 134:6
  135:25 141:8
  155:10 160:8
factor 67:14
facts 41:21 79:18
  80:7 112:8,9
  135:17,18 136:20
  141:17 155:9
factual 79:13
  139:12
fail 60:25
failed 129:24 137:9
  144:23

fails 130:3
failure 130:21
  138:20
fair 10:25 23:11
  36:19 39:21 42:16
  76:25 129:14
  134:17
fairly 101:3 147:8
faith 150:22
familiar 28:17
far 25:7 85:3 93:6
  132:17 139:11,15
  155:4 165:8 167:5
February 89:9 90:5
  91:5,13 92:8,19
  92:22 93:6,10
  104:4
fee 57:4 74:18
feedback 101:13,25
  102:12
fees 56:23 71:16,17
  114:19
Felt 84:8 100:13,15
  103:2,18,22 105:8
  113:17,19 115:3
  115:14 116:4
  118:19 119:3
  128:17 143:2
  151:4
Felt's 103:7 107:10
  115:11,24 121:9
  127:21 129:7
  133:2,22
Fiachra 52:20,21
  52:21 53:4
fiduciary 5:2,12,21
  6:2,9,12,17,21
  27:3,7,12,13,18
  28:7,22,24 29:4
  29:19 30:11 31:6
  31:19 32:5,10
  33:10,12,19,20
  34:3,13 36:6,14
  37:3 38:2,17
  39:20,23 40:18,22
  40:23 62:10 72:5
  91:24 124:14,17

136:14 137:7,10
  137:13,16,21
  138:22,23 139:7
  159:24,25 160:4,8
  161:21,22,24,25
  166:2
figure 165:10,21
  166:2
figuring 6:19
file 5:24 59:4 62:5
  62:17,18 64:21
  65:3 71:23 120:3
  124:19
files 134:7
filing 99:24 105:9
  113:9 120:19
  134:14,20 135:2
final 16:25 165:25
finally 104:23
finance 10:8,12
  68:23 75:4,5
  129:9
financial 5:23 6:16
  27:11 32:4,9,15
  33:16,18 55:9
  56:11,20,25 57:13
  57:17 58:6,15,17
  59:5,15,24 60:18
  60:22,23 61:2
  62:6,9 64:20 65:8
  65:10,14,17,18
  66:13,21 67:8,13
  67:18 68:16,24
  69:9,13,18,20
  70:19 71:4,21,24
  71:25 74:17 79:23
  80:4,25 83:20,24
  84:11 91:19 93:16
  93:16,25 94:2
  99:9,13 100:5,11
  105:4,14,20,24
  107:19 109:2
  112:21 114:13,21
  119:7 120:8
  121:10,14,22
  129:11,22 138:18
  138:19 139:18
  140:3,24 143:17

143:20 145:6
  149:3 151:22,25
  152:3 162:6
financing 59:21
  75:2 86:19 100:19
  120:4 125:5
  162:21
find 24:19 30:17
  73:16,17,21 84:2
  111:14 116:19
findings 166:8
FindLaw 73:13
findlaw.com 72:19
finds 92:13
fine 129:15 147:19
finger 81:15 107:25
firm 3:24 7:3 9:2
  16:21 18:14,23
  26:19 43:12
firm's 118:23
first 1:7,8,10,10,12
  3:10 18:21,25
  19:8 22:16,24
  23:14 24:14 43:22
  47:17 49:14 50:2
  50:5,16,17 52:19
  56:12 57:22 59:7
  75:17 132:3,25
  135:5 141:23
  144:18 148:13
  149:17 150:20
  153:18 157:21
  163:12 173:19
five 10:15 117:3
flip 130:8
Floor 2:6
flow 156:20 166:23
flows 75:10,15
fluke 166:25
flux 124:3
focus 26:25 74:20
  106:4
focusing 59:7
folks 108:18 114:17
  118:20
follow 137:5 139:9
  143:14 163:8

followed 123:7
  126:25 135:25
  138:14 140:9
following 126:17
  167:20 171:3,4
follows 4:9 95:7
footnote 72:17,18
  78:24
force 134:23
forced 93:12 96:16
forecast 166:24
foreclosure 82:18
  109:15
foregoing 170:6
forget 168:22
form 5:9 16:25
  30:14 31:15 34:8
  34:15 35:14 37:4
  37:21 38:22 39:15
  51:14 56:24 64:5
  66:22 68:17 71:18
  85:2 88:15 98:4
  127:3 128:14
  134:24 140:16
  142:17 157:16
formally 100:7
formed 99:5
forth 17:19 60:8
  81:18 95:18 101:5
  116:10 125:8
  163:9 168:22
  172:12
found 47:8,14
  73:19 74:3 165:21
four 22:7
fourth 104:23
front 146:15
FTI 139:25
fulfilling 97:25
full 44:8 48:13 57:8
  146:14
fully 98:9
function 79:8
  111:25
further 34:11
  166:15,16 168:10
  168:12 172:15

**F-i-a-c-h-r-a** 53:6
**F-i-c-h-r-e** 53:5

**G**

**garage** 20:20
**gathered** 135:18
**geared** 63:7 67:2
  68:10
**general** 8:8 33:17
  33:24 39:3 51:2
  51:19,24 59:13
  66:5 72:15 73:21
  78:8 83:11,17
  91:14 144:14
**generally** 10:15
  18:19 19:23 20:11
  27:11,22 29:24
  32:4,15 75:2 77:4
  100:10 163:24
  164:3 165:4,7
**generated** 75:10
**generating** 74:18
**generic** 39:9 89:18
**getting** 66:9 68:5
  71:16,17 105:9
  139:22 150:2
**give** 4:19 5:10 28:9
  45:4 51:2 60:17
  60:25 72:14
  144:19,23 156:3
**given** 30:3 38:15
  39:16 41:21 44:17
  45:19 46:9,11
  58:14 62:8 77:3
  84:17 91:18 92:22
  93:11 117:15,22
  127:17 131:15
  133:17 138:17
  144:17,24 170:8
  172:14
**gives** 40:10 61:11
**giving** 63:6 99:23
  106:23 107:12,12
  124:16
**Glatt** 2:5 4:3
**go** 14:2 26:24 47:16
  61:9 83:25 95:12

109:11 125:9
149:9,9 154:15
158:5,19,22
168:15
**goes** 10:25 138:4
  150:14 158:16,20
**going** 9:8 11:2 23:7
  44:14 59:22 61:6
  61:19 64:9 65:24
  82:5,10 91:21
  94:10 99:12 115:4
  117:5 127:10
  145:8,18 146:12
  149:6 155:14
  168:18
**good** 22:5 26:23
  30:24 52:10 60:23
  79:15 94:7,9
  143:8,13,14
  144:14 147:20
  149:16 169:3
**gotten** 80:11 90:19
  90:20 162:13
**grail** 114:21
**greater** 83:6 111:17
  157:17,22
**group** 7:23 8:2,5
  12:7,10,17,19
  22:10 23:12 53:17
  54:8,18 111:8
  118:18 119:12
  121:10 133:2,23
**group's** 129:7
**guarantee** 47:12
**guarantees** 77:25
  78:3,5,7 131:24
**guess** 5:11 26:20
  45:13 46:15 50:14
  53:11 98:10
  110:19 118:12
  136:3 142:20
  151:6,7,9,24
**guideline** 143:14
**guidelines** 5:14 6:4
  62:12,14,16,20
  72:4

**H**

**H** 4:6 95:4
**habit** 18:2
**half** 22:4
**hand** 172:20
**handed** 142:2
**handles** 13:10
**handling** 124:21
**Hang** 8:23
**Hanouna** 10:3,11
  11:6,11 13:9
**happen** 31:14
  134:3
**happened** 90:4,18
  90:23 129:19
  153:19,20 154:19
**happens** 132:22
**happenstance**
  166:22
**hard** 16:12
**harm** 91:21 130:11
  130:20 131:5
**harmful** 112:23
**headed** 72:13
  107:17 118:13
**headings** 129:2
**hear** 27:11 125:15
**heard** 156:20
**heavily** 50:15 154:6
  154:7
**held** 1:19
**help** 11:7 15:2
  66:24,24 75:11,21
  121:17,19,20
  122:2 133:23
**helped** 8:21 52:8
  55:21 144:25
**helping** 11:3 52:6
**helps** 57:3 82:20
**hereinbefore**
  172:12
**hereunto** 172:19
**hesitated** 16:4
**High** 118:25
**higher** 71:8 83:5
**hindsight** 98:13

**hire** 115:23
**hired** 129:21
**historical** 109:14
**history** 81:7,9,18
**hold** 21:10 26:4
  80:11,12 169:2
**holders** 33:14 34:5
  38:3,20 39:2,3,5
**holy** 114:20
**home** 15:16,18,21
  17:12 21:21 22:8
  23:2 50:22 76:2
  81:10 82:22,23
  109:16
**homes** 1:4 3:8
  23:15 82:18
  117:11 128:7
  131:11 133:13
  160:24 173:8,11
  173:13,16
**hope** 26:20 56:24
  136:7
**hoping** 136:2
**hour** 25:5 69:22
  70:9
**hourly** 24:24,25
**hours** 25:21,25
  70:12,15,25
**house** 44:24 147:10
**housing** 65:13
  74:25 77:18 86:21
  110:21 140:19
  141:4
**Huebner** 2:25 3:14
**huff** 147:9
**hundred** 126:19
**H-a-n-o-u-n-a** 10:3

**I**

**ID** 173:3
**idea** 23:20 43:3
  54:17 88:7 144:14
  151:6,7,7
**ideas** 84:7 101:7,8
  119:8,22 121:8,22
  129:10 130:18
**identical** 165:18

**identification** 3:4
  117:13,16 128:9
  131:12 133:15
  141:24 148:5,9
**identified** 6:7
**identifies** 118:17
**identify** 10:5 11:3
  83:20
**III** 79:20
**Ilkhani** 9:23 10:11
  11:11 13:8
**imagine** 42:14
  147:6
**immediate** 120:19
**immediately** 52:17
  68:14 95:24
**impact** 21:2 100:24
  101:20,21 102:16
  102:20,22 112:23
**implicitly** 122:2
  135:24
**import** 102:10
**importance** 148:20
**important** 33:2
**impossible** 145:3,5
**improve** 120:6
**imprudent** 92:24
  93:25
**inappropriate**
  143:22
**incentive** 65:10,11
  65:14,21 66:10
  69:5,14
**incentives** 5:23
  6:16 38:12,15
  64:20 65:8 66:13
  66:21 67:3,8,13
  67:18 68:16,19,24
  69:3,9,18,21
  70:16,19 71:4,22
  71:25 151:25
  152:4
**include** 23:7 48:3
  81:7
**included** 26:12
**includes** 49:16,17
**including** 41:19

49:9 81:17 101:3
  109:13
income 71:9
inconsistent 5:13
  6:3
incorrect 84:24
increase 154:19,22
increased 153:16
independent 6:16
  10:10 13:15 24:12
  41:11 80:8 110:17
  139:5
independently
  80:18
INDEX 174:2
indicate 22:23 41:5
  64:19 155:24
indicated 121:12
  146:2,5
indicates 30:17
  63:14 64:13,25
  85:12
indicating 164:21
indication 61:11
  100:17 103:23
  122:14 143:16
individual 53:2
  63:14 64:13,15
  67:16 78:13
individuals 71:11
  84:16,16
industrial 36:4
industry 51:18 77:4
  98:17 140:19
  141:4
industry-wide
  120:5
inference 37:13
influence 110:24
inform 51:17 101:2
  101:23
informal 105:24
information 57:12
  57:16,22,23 58:6
  58:12,16,20,23
  60:25 62:25 63:16
  72:14,18,24 79:3

80:24 81:4,5,16
  81:21,21,24 83:10
  83:15,20,24 84:4
  84:10,17,19,21,23
  85:25 107:18,20
  109:4,9,11,13,17
  120:17 136:20
  139:12 150:25
  164:5
inherent 58:10
initial 52:6
inside 57:13 107:18
  109:10,13
insofar 33:22 40:14
insolvency 32:10
  39:16 41:13 92:4
  92:23 93:11 96:18
  136:22 166:13,18
  167:15
insolvent 30:4
  31:17,19 34:12
  35:9 38:7,13,16
  41:3 44:3 66:25
  67:2 68:4 85:19
  92:5 93:18,21
  94:3 120:8 122:21
  122:23 124:7
  135:8 139:2 149:2
  150:7 155:17,19
  155:21,23 156:2,8
  156:11,13,16,19
  156:20 157:3,8
  159:2,15 167:6
instance 50:21
  91:18 123:24
institution 50:19
  51:13 72:2 93:16
  93:25 162:6
institutions 114:14
  114:21
instruction 40:7
instructions 40:9
  40:10
instruments 35:25
insulate 109:23
intend 146:20
intended 88:10

interchangeably
  29:9
interest 31:12
  34:14 66:7 71:16
  77:11 78:11 82:9
  82:16,25 83:4,6
  152:15 153:21
  160:2
interested 56:16
  82:5 126:11
  128:13 130:19
  151:21 172:17
interests 28:2 29:14
  33:14 34:5 63:4
  82:15 91:22
  123:11
Internet 16:5
interpret 107:3
interrupt 85:14
interruption 63:22
intervening 86:22
interview 21:12
interviewed 43:22
introduce 3:19
  114:17
introduces 115:3
inventory 87:5
investment 20:3
  50:8,15,20 51:10
  52:3,11 56:19
  58:11 72:13,16,21
  72:25 73:6,9,22
  77:16,23 83:12,14
  111:22 113:21
  140:14 142:20
Investopedia 72:19
  73:13
investor 88:11
invoice 26:9
involve 163:11
involved 19:10 24:2
  110:5 118:15
in-person 7:18
irrelevant 162:3
isolate 110:5
issue 26:6 33:4 75:9
  91:7 93:3 160:13

issued 78:9
issues 42:18 104:13
I-l-k-h-a-n-i 9:24

## J

J 2:15
Jacob 118:18
James 53:15
Jared 118:19
job 137:25 138:3
  139:8 150:19
  151:19
Jointly 1:5
judge 148:23
judge's 148:21
judgment 136:10
  136:11 138:4,15
  138:15 139:5
  150:16
June 106:6,20
  115:4 116:7,9,20
  117:18 121:7
  122:8,16 124:19
  126:13,17,25
  127:21 128:10
  155:18 156:7
  167:5
Justin 2:15 3:23
J.P 165:2

## K

keep 5:23 16:16
  20:9 23:2 57:3
  59:21 64:20 65:9
  65:14,21 66:14,25
  71:16,22 102:18
  121:13,16 131:3
  139:4
keeping 87:5
kept 23:5 90:25
keyboard 15:6
  47:21
kind 12:18 60:15
  76:4 105:24 110:2
  112:4 114:16
  115:25 121:12
  132:13 142:15

150:17 161:6
kinds 34:23 35:13
  35:24 71:13 81:16
  114:18 119:5
  134:3
King 9:2
knew 120:24 121:2
  137:4 155:13
know 8:18 9:5
  10:18 11:2,13
  12:17 21:7,13,17
  21:17,20,23 23:6
  23:6,8 25:12,14
  25:20 28:15,18
  37:14 42:5 43:2
  43:19 45:18 47:5
  47:24 50:9 51:5
  52:22 53:12 54:6
  54:10 56:12 57:20
  60:24 61:5,10
  63:4,9 64:8 66:2
  70:4 74:2 78:3,4
  80:17 83:2 85:3
  87:16 90:17 91:23
  92:3 96:22 97:5
  97:13,13,22 98:20
  98:24 99:21
  100:22 103:13
  104:18,22 108:22
  113:22 116:6,11
  116:12 117:21
  118:2,3,6 119:10
  120:12,21,23
  121:6 123:25
  125:23 126:9,10
  126:21 127:5
  129:16,18 131:22
  132:17 134:6
  135:13,15,16
  136:2,2 137:5,8
  137:15 138:10
  139:15,17,21,24
  140:6,23,25 141:2
  141:8 142:10,21
  143:3,7,10 144:13
  144:15,18,23
  147:5 151:2,12

152:20 153:19
154:13,16 155:4
155:22,23 158:12
161:10 162:4,8,17
162:17 165:8
166:22
**knowing** 45:9,17
71:10 80:9 84:14
137:3
**knowledge** 60:24
65:17,18 77:4
129:21 154:25
**known** 52:4 57:24
98:15,15 107:21
108:17 112:10
155:9
**Kozlowski** 2:23
3:24

———— **L** ————
**L** 4:6 95:4
**labeled** 46:6
**laid** 119:21
**large** 38:10
**law** 1:20 7:3 10:23
10:24 43:12 124:2
124:2 137:19
**lawsuit** 80:2
**lawyer** 8:20 10:25
27:9 158:12
**lawyers** 8:25 9:10
16:20 44:6
**lead** 136:21 166:9
**leading** 112:18
**learn** 41:17
**learned** 43:20
**Leave** 98:24
**leaving** 102:25
103:22 107:10
**led** 132:5
**legal** 3:14 5:10
27:21 31:23 32:2
32:14,19,21,22
33:8,16 36:10,11
38:23 39:7 79:4
79:15 91:6 124:16
143:4 160:12

**leisure** 70:14,15
71:7,8
**lender** 55:8 56:3
88:4,6,11 89:11
89:16,22 90:10
91:15 95:17,18,23
**lenders** 93:20
**lending** 111:22
143:23
**lends** 86:20
**lent** 89:22
**letter** 147:3,9,12
**let's** 28:25 39:6
49:24 54:23 63:2
72:8 74:20 82:17
106:15 113:16
123:13 125:9
128:3 145:15
148:4 168:15
**liabilities** 39:4,5
**liability** 1:9 158:21
158:22
**lie** 138:5
**life-threatening**
92:14
**liked** 23:22
**likelihood** 112:19
152:15
**limited** 1:9 158:21
**limits** 72:5
**line** 54:4 62:9 87:25
88:17 171:5
**Linklaters** 1:20
2:11,17 3:17,22
**liquidation** 1:6 3:9
26:21 123:7
**list** 19:5 44:18
45:22,23,24 46:8
46:9 48:13 49:4
**literature** 38:11,25
39:8,19,22 40:4
40:17,20 73:7
137:19
**litigation** 24:2
69:22,24 79:9
125:13,18
**little** 119:17 128:16

**LLC** 1:9 2:24 12:20
12:21 13:12,20
**LLP** 1:20 2:11,17
**loads** 45:16
**loan** 74:8 76:8,9
86:12,13 90:21
100:24,25 101:22
101:22 102:4,5,17
102:20 111:20
**loans** 77:18 88:20
93:21
**London** 2:19
**long** 20:20 66:8
157:16
**look** 20:22 23:23
25:16 39:10,12
40:4 68:9 72:8
88:16 118:10
119:4 127:14,16
128:3 135:6,10
150:22 151:17
160:22
**looked** 41:19 76:20
76:24 88:11,22
93:3,4 150:25
151:10 167:2
**looking** 27:25
32:21,22 36:23
59:14,21 77:15,22
78:12 90:9 98:20
100:18 148:20
**looks** 131:14 142:7
142:8
**loose** 75:6
**loosely** 48:6
**Los** 2:7
**lose** 82:23
**losing** 63:8 106:14
106:19 126:16
**loss** 109:14
**losses** 120:2
**lost** 126:18,20
**lot** 44:14 52:5 73:7
91:15
**lots** 34:23
**Lotus** 132:5
**lousy** 150:2,3

**loyalty** 27:24 28:3
**lunch** 94:8 95:15
**Luncheon** 94:12

———— **M** ————
**main** 39:22
**maintain** 16:16
18:15 59:19 91:9
91:20 98:22
102:19 135:23
**maintaining** 63:8
**maintains** 18:11
159:8
**major** 50:13 52:2,2
56:18 96:11
114:13 161:9
**making** 65:12 67:2
93:21 111:20
116:5 124:15
138:4 161:21
167:14
**management** 53:17
54:13 84:6 86:2
98:6,20,25 99:2,6
99:9,18,22 100:17
104:4 107:22
108:10,16 109:3
110:17 111:19
112:10 120:25
124:11,12 136:4
136:12,18,19
137:5,8,9 138:21
139:4 140:5
**managers** 39:25
40:2,5,6,12,21
**managing** 118:18
143:13
**manner** 5:19 6:20
33:5 63:3 72:12
160:11
**manual** 5:14 6:4
141:24 142:5,24
173:19
**manufactured**
65:13 74:25 76:2
77:18 86:21
110:21 140:19

141:4
**manufacturing**
160:24
**March** 16:10,11
106:7,21 131:12
155:25 156:6
173:14
**marginal** 157:7
**mark** 128:5 131:8
133:11 148:4
**marked** 4:23
117:12,16 118:11
128:8 131:12,16
133:15,17 141:24
142:3 148:8
**market** 52:9 118:25
148:20,24 151:10
151:21 152:13
154:4,6,13 155:9
155:12 156:17,24
156:24 157:12,13
157:14,17,18
159:11,12,13
163:12,17 164:15
164:18,21 165:13
165:21,22 167:11
**marketing** 75:22
**market's** 154:23
**marks** 61:23
**marriage** 172:17
**material** 80:3
101:20,20 118:5
161:5,18
**materials** 20:21
58:13 59:9 61:11
63:12 64:11 65:12
79:22 99:3 100:16
127:17 131:11
143:15 161:2,6
173:14
**math** 26:4
**matter** 8:22 11:9
12:23 15:4 17:8
18:21 19:7,14
20:8 21:3,6 24:21
25:7,21 42:20
43:6 44:22 51:19

57:9 59:13 66:5
69:20 75:25
146:25 148:14
158:25 172:18
**matters** 11:21 19:5
19:12 61:13 71:12
102:5 107:5
136:11 138:15
**maturing** 165:13
**mean** 13:24 27:10
27:16,20 29:5,23
45:14 54:25 60:5
62:10 80:10 82:14
87:11 95:18 98:15
114:3 115:21
120:25 121:19
151:20 156:11,13
156:15,17,19
**meaning** 39:13
**means** 29:25 48:6
96:2 136:16
144:16 152:12
158:2 160:10
**meant** 27:6 28:10
133:4
**measure** 145:4,6
**measures** 122:24
**mechanical** 15:4
17:8 44:22
**mechanically** 47:21
**meet** 42:9
**meeting** 7:23 8:14
22:16,24 23:7,9
23:12 24:14 42:6
43:22 118:4
129:17
**meetings** 7:17,18
7:25 8:2,5,15 9:3
97:11
**members** 111:18
139:19 164:4
165:4
**memoranda** 112:7
**memorize** 128:24
**memory** 41:23
150:2,3,14
**mention** 8:12 14:18

14:21,23
**mentioned** 44:5
130:24 135:20
151:3
**mergers** 52:5
**Merrill** 3:14
**met** 41:16
**method** 166:10
**methodology** 163:9
163:11
**mid-1980** 78:5
**mid-2001** 78:6
**mid-2002** 56:2
**million** 110:20
126:19
**mind** 37:7 50:10
52:18,22 64:7
**minuses** 135:11
**minute** 58:2
**minutes** 97:10,12
117:3
**misstates** 53:8
**mistakes** 69:4
**mobile** 81:9 82:18
82:22,23 160:24
**modest** 98:22
**moment** 74:21
**money** 56:22 61:6
63:8 71:2,13 76:3
86:20 106:14,19
126:17 149:7
153:20
**monitor** 109:23
**month** 128:16
**monthly** 77:17
**months** 149:13,14
149:16,23
**Morgan** 165:2
**mortgage** 76:4,6
**mortgages** 57:20
57:21 75:3,7,10
75:12,22 88:19
**mortgage-backed**
52:9 75:13,16
**motivating** 67:14
**movement** 39:20
**moves** 137:21

**Muir** 100:22
101:11 102:3,11
102:24 103:16
144:3
**Muir's** 101:10,17
107:3,8
**Multipage** 3:2
117:10 128:6
131:10 133:12
141:22 173:4,7,10
173:13,15,18
**multiple** 55:3,5
**multiplied** 163:13
**multiply** 164:13
165:10
**mutually** 137:2
**M&A** 103:17

——————— **N** ———————

N 2:2 4:6 95:2,2,2,4
**name** 8:18 9:14,16
14:8,10 21:10
23:8 50:17 52:19
52:22 53:2,4,15
53:18 84:8 97:3
111:8
**names** 8:12
**nature** 58:10 66:2
110:2
**near** 101:11 112:15
**nearly** 125:13,19
**necessarily** 48:9
62:18 102:14
103:18 122:19
125:2 137:3
141:15 153:18
**necessary** 33:6
164:12
**need** 4:15 123:4
124:19,20 135:21
161:2
**needed** 24:3 96:10
150:18
**needless** 80:13
**negative** 23:13 24:3
24:10 111:3
**neither** 121:8

147:15
**networked** 15:23
**never** 16:24 37:8
43:9,11,23 49:13
63:3 145:8 158:16
158:20
**new** 1:21,21,24
2:13,13 3:15,15
3:18,18 86:6,9
172:3,5,10
**newspaper** 98:16
**non-public** 57:16
58:6,12,15,16
**Notary** 1:23 4:8
95:6 169:11 172:9
**noted** 95:3 169:5
**notes** 22:22 36:2
81:12 89:11 108:2
132:11,13
**notion** 28:22 33:4
143:7
**November** 79:6
134:6
**number** 23:20
30:19 37:22 80:14
80:15 81:15
140:18 163:13
164:13,13
**numbered** 142:13
**numbers** 46:6,15
46:16,24 47:3
80:18,20 165:20
**numeral** 6:8 26:25
36:23 79:20

——————— **O** ———————

O 4:6 95:2,2,2,4
**Oakwood** 1:4 3:8
5:2,20,23,24
23:15 26:21 27:3
28:25 29:5,6,7,8
29:17,18 31:6,8
34:22 35:2,12
37:16 39:11 41:3
41:13 47:7,11
49:5 50:22 52:14
53:3,20 54:3,23

54:25 55:4,21
56:4 57:12 59:3
59:10,14 60:12,15
61:12 62:4,11
63:15,15 64:14,20
64:21 65:2,3,9,11
65:14 66:13 67:10
67:18 68:4,15
70:7 71:12,22,23
74:10,24 75:5
77:19,22,24 78:3
78:4,12,21 82:10
82:16,20,22 83:21
84:2,6,16 85:6,9
85:18,25 86:19,21
88:4,8 89:11,16
89:22 90:17,18
91:9,19 92:5,11
93:13 95:16,17
96:8,17,21,22
97:11,19,24 99:18
99:23 100:17,23
101:12,18 102:11
103:4,23 104:14
104:24 105:7
106:6 108:17,18
109:10,12,22,24
110:4,23 111:3
112:11,12,20
115:5,15,23
116:10 117:11,17
117:21 118:23
119:4,11,20 120:2
120:3 122:5,16,20
122:23 124:18,23
125:13,18 126:11
128:7 129:21
131:11 133:3,5,13
134:7,20 135:7,10
135:13,25 136:4
136:12,16 137:16
139:12 140:4,21
142:25 143:12,18
144:10,11 153:2
155:2,17 160:19
167:5 173:7,10,13
173:16

Oakwood's 30:10
37:2,20 39:14
55:20 57:13,17
58:6,16 59:12
62:9 78:18 80:25
82:11 83:4,6
88:20 96:4 98:6
104:4 107:19,22
112:23 125:24
135:4
object 32:18 51:14
63:21 64:4,9,9
Objection 5:9
30:14 31:15,22
34:8,15 35:14
36:9 37:4,21
38:22 39:15 66:22
68:17 70:22 71:18
84:25 88:15 96:24
127:3 128:14
134:24 140:16
142:17
Objections 79:5
obligated 82:11
obligation 5:12,21
6:2,10,13,17,21
6:22 27:12,18
28:22,25 32:5
33:10,19,20,22
34:2,13 35:8,10
36:14 38:3,4,6,8,9
38:17 72:5 91:24
124:3,4,14 136:15
137:7,10,13
138:22,24 139:8,9
159:24,25 160:8
161:21,22,25
162:2
obligations 39:23
76:2 77:12 81:6,8
81:22 104:14
obtain 164:4
obtained 107:18
obtaining 109:9
obviously 149:6
occasion 7:14
occupation 11:23

occupy 70:2,5
occur 166:16
offering 20:2 129:7
129:10
offerings 52:6
offers 130:7
office 15:18,21
42:10 147:3
officers 111:22
offices 1:20 15:15
15:16 102:18
oh 31:4 44:24 47:18
48:3 53:14 73:14
103:6 114:6
150:20 169:3
OHC 1:6 3:9
okay 8:16 9:7,25
10:4,14,21 12:21
13:17 14:17,22
15:3,8,11,17
16:16,20 17:14
18:9,21 19:15
20:4 21:11,22
22:12 24:20,24
25:4,6 26:4 27:19
28:14 32:8 33:11
33:24 34:19,22
37:9,15 39:18
42:8 43:18 44:10
44:13,16 45:4,22
46:23,25 47:20
48:18 49:2,19,24
50:6 51:5,9,21
53:12,22 54:2,6
55:5,11,13 56:3
56:10 57:10 58:9
59:2 60:3,11 61:4
61:16 64:18 65:7
67:24 68:22 71:20
77:10 79:7 80:19
80:23 83:8 85:23
86:5 87:19,22
88:24 89:8 90:4
91:2 92:8,22 94:6
96:13,20 97:18,22
98:3 100:3,9
102:9 103:21

104:3 105:11,19
106:3 107:8,16,24
108:6 110:11
111:2 112:15
113:7 114:22
115:2 118:7,10,22
119:10,24 120:16
121:4 122:12
123:22 124:12
126:3 127:24
128:21 129:16
130:5,11 131:7
132:24 138:8
139:21 140:6,11
141:7,19 142:9,15
144:8 145:15
150:13 152:6,19
152:24 153:3,4,5
153:7,8,13,14
155:5,16 159:17
161:17 162:4
older 150:2,15
omission 67:20
68:2
once 154:9 164:10
ones 46:11,16
one-third 25:17
ongoing 102:6
122:2 130:25
onward 37:2
open 62:21 102:18
147:4
operate 12:8 60:6,7
66:7
operating 5:23 61:3
64:20 65:9,15
66:8,14 71:22
110:7 160:19,20
operational 59:19
59:25 60:3,5,19
61:13
operations 59:4,12
59:20 60:12,16,22
62:5 63:8 90:21
operator 3:13
opine 42:21
opining 127:6

opinion 5:11,22
23:14,19,24 24:10
30:22 36:12,17
39:8 48:10 61:8
64:19 80:16 91:2
92:17 93:14,23
96:14 97:18 98:5
105:12,13 122:15
123:18 124:16
134:18 136:9,13
136:21 137:11
138:13 141:16
144:22 151:9
155:16,18 156:8
159:17 166:12
167:14
opinions 5:16 24:3
49:20 54:21 62:3
79:21 110:18
opposed 42:22
59:19 68:11 76:8
104:15 112:8
153:6 154:11
opposite 70:17
optimistic 98:8
option 113:9 125:2
158:3,7,17 159:2
159:9
Orange 19:16 20:3
order 68:5 82:21
144:19 164:11
ordinarily 159:8
ordinary 66:6
71:24
organization 12:5
33:21 114:18
organizational
54:16
organized 51:7
original 169:2
originally 150:4
originate 52:9
originations 100:25
101:22 102:4,17
102:21
ought 158:9
outcome 124:23

125:23 126:7,11
127:11,20 172:18
outright 148:16
outset 32:24
outside 121:25
125:6,7
outsider 34:13
outstanding 163:14
164:14 165:11
166:3,6
overly 98:7
overstates 102:10
owe 31:20 124:17
136:17
owed 5:2 27:3
28:24 29:17,18
30:10 31:6 35:8
37:2,20 91:3,23
124:3 136:14
137:14,16,21
owes 31:19 33:13
owing 29:4,20
owned 1:12 30:5
owner 75:15 82:25
owners 14:15 29:14
29:23,24 32:12
35:17 82:14
o'clock 146:12
O'Driscoll 52:18,21
53:7,13,20 54:7
84:8 103:14,19,24
115:3 143:12

—————— P ——————
P 2:2,2 4:6 95:4
packaging 75:11,21
page 4:24 6:8 26:25
30:23,24,25 37:16
54:21 57:10 62:3
62:19 72:10 78:16
79:20 80:23 86:6
89:8 95:13 100:4
101:9,11 102:24
102:25 107:17
109:7,21 110:12
112:15,16 113:7
118:11,11 119:24

128:21,23 131:19
142:10,12 171:5
**pages** 5:17 49:20
142:6
**paid** 12:22 24:20
24:22,23 25:7
26:8,10,19 55:10
56:11,12 66:9,16
69:22 70:9,13
75:17,18
**Pamela** 9:2
**paper** 55:20,22
76:5 77:22 84:23
86:22 87:4,5
88:12
**paragraph** 59:3
95:16
**paraphrase** 147:8
**part** 43:6 53:12,16
54:6,10 56:16
59:7 79:13 85:4
102:2 109:11
110:16 113:18
115:24 122:25
138:20 158:4,6
**participant** 9:3
**participants** 8:4
**participated** 8:13
**participating** 8:15
**particular** 30:3,15
34:19 36:8 46:14
50:20 62:14 69:8
69:15 75:19 91:17
123:24 132:10
138:18 165:16
166:23
**particularly** 11:7
80:14 97:7 106:5
106:11 113:21
114:23
**parties** 28:3 40:21
126:11 159:20
160:17 172:16
**partners** 13:12
**parts** 15:9 48:21
51:13 118:14
**party** 28:2,5 79:17

80:2 147:2
**pass** 75:14
**passes** 124:8
**pattern** 69:17
**Paul** 2:14 3:21 9:18
10:3,9,11,22 11:6
11:18 17:15,17,18
47:8,14,23
**pay** 13:6 82:11
108:11 109:3,5
**paying** 81:12
**payment** 13:4,17
13:22,23 81:7,9
125:25
**payments** 14:4
77:17
**pays** 13:8
**penny** 159:9
**people** 8:7,8,14,21
9:9,19,20,22 10:5
10:15 11:17,21
13:15 14:24 15:2
15:9 21:20,22
22:7 24:23 63:19
84:2 100:10 101:6
109:2 111:15,23
159:19 165:7
**percent** 152:9
**perfect** 67:12 145:9
**perform** 82:6,10,16
97:20 164:11
**performance** 84:11
105:14,20 160:6
**performed** 112:17
**period** 31:10 85:4,7
85:24 86:22
105:22 136:2,5
140:20
**perpetuating**
106:14,18
**persist** 154:8
**persisted** 126:15
**person** 7:2 8:3
63:16 69:21 77:14
82:4,8
**personally** 14:5
**personnel** 84:7

**perspective** 151:18
**pertain** 71:25
**Peter** 2:23 3:24
**Phil** 118:18
**phone** 21:8
**physical** 42:11
**Ph.D** 3:3 148:8
173:5,22
**picture** 149:16
**piece** 64:18 84:18
**pitch** 115:18,21
118:8 120:14
129:5,24 130:23
131:5,23 132:3,7
133:20,22
**pitches** 116:5
131:25 151:4
**PJW** 1:4,7 3:11
**place** 3:16 90:16
125:11 148:18
**plaintiff** 1:6 2:4 4:3
12:25
**plaintiffs** 12:11
**plans** 59:17,17 84:3
**plants** 60:6
**play** 154:4
**played** 10:16 55:19
75:23 81:2
**playing** 155:6
**please** 3:19 4:5
125:16 141:21
**plus** 165:22
**pluses** 135:10
**point** 34:2 40:19
43:19 50:17 54:16
58:8,20,21 59:8
60:13 61:15 62:13
63:13,19 66:23
67:3,23,25 68:4
69:16 71:3 73:12
83:2,23,24 84:18
100:21 101:8
103:12 106:22
107:24,25 119:13
131:23 138:3
159:18 164:16
**pointed** 38:10

70:24 148:19
149:2
**pointing** 71:5 97:6
106:13
**points** 106:10
**policy** 135:25
136:24 137:6
**pool** 20:3 77:12
78:13 82:5 109:15
**poor** 105:20
**popular** 139:6,8
**portion** 25:12
26:16
**position** 80:2
118:25 120:8
160:18
**positions** 146:21
**positive** 23:19
**possession** 58:17
83:21 93:20
**possibility** 49:15
108:3 121:2
159:10
**possible** 88:7 92:19
119:22
**possibly** 8:20 22:3
90:20 102:14
123:4
**potential** 110:18
**practice** 101:18,23
**precarious** 59:15
**precise** 29:22
**predicament**
112:21
**preface** 62:8
**premarked** 3:4
**premiere** 52:11
**preparation** 76:10
134:13 140:12
**preparatory** 163:7
**prepare** 47:21,23
48:20,23 147:25
148:14,16
**prepared** 48:18
51:11 72:6 85:17
92:3 97:14 115:22
128:10 146:7

**preparing** 9:11
48:15 50:10,25
76:16 81:25 83:19
88:21 97:10,23
98:4 99:4 109:12
109:18 120:18
152:2 163:6
**PRESENT** 2:22
**presentation** 103:9
116:8,9,12 117:11
117:17 119:11
121:7 122:8,22
128:4,7,10,17
129:18 130:12
131:17 133:14,18
173:7,10,16
**presentations** 99:8
100:13,15 103:2
106:6,20 107:11
135:6
**presented** 115:12
115:15 128:11
**preserve** 123:9
**preserved** 17:22
**preserving** 68:10
**pressure** 132:14
**presumably** 16:12
65:13 161:6
**presume** 141:11
**pretty** 10:18 24:8
90:24 107:4 111:2
111:6 149:2
**previously** 83:16
95:5
**pre-insolvency**
33:12,25
**price** 71:8
**prices** 163:22
165:13
**pricing** 75:22 154:5
**primarily** 40:4 74:9
137:21
**principal** 9:19
11:12,17,23 18:17
52:15 72:24 84:21
146:11
**principals** 13:12

principles 62:12,14
  62:16
prior 16:21 41:16
  42:10 53:9 59:4
  62:5 65:4 74:8
  100:5 105:22
  116:4 126:5 140:2
  167:2
private 36:2 80:24
  83:10 84:4,10
  109:10
probability 157:24
probably 16:10
  20:6 23:9 56:2
  65:25 69:24 99:11
  108:22 116:20
  117:24 141:2
  155:13
problems 57:21
Proc 1:7
proceed 146:15
proceeded 121:8
proceeding 94:4
  125:12
proceedings 125:17
  146:4
process 4:15 50:24
  135:19 154:12
produced 45:5
  108:7
product 20:10
  114:8
production 102:18
  102:19
products 114:7,11
professional 97:14
  98:5 172:8
professionals
  163:25 168:2
professor 4:12,22
  5:5 10:8,12 11:24
  91:2 93:23 122:15
  134:18 136:9
  142:2
program 100:25
  101:22 102:4,7
  143:23

programs 141:5
pronounce 52:19
proposal 132:18
proposed 111:9,16
prospect 157:25
prospects 139:13
prospectus 81:25
  109:18
prospectuses 76:21
  80:12,13 109:12
protect 68:6
prove 68:20
provide 11:6 12:12
  12:17 20:15 43:7
  53:16 59:21 75:2
  78:3,5 86:18
  93:16 105:8
  110:22 114:18
  115:24 144:17
  162:15
provided 5:19
  50:21 52:14 53:3
  53:19 58:5 74:16
  77:25 78:6 89:19
  104:9 106:9,10
  109:13 161:14
  165:15
provider 86:11
  87:13,23
providing 56:19
  93:9 106:17,18
  112:25 114:16
  122:3 125:5 140:3
  143:2 162:5
proviso 66:15
prudent 5:18 6:18
  72:12 91:12 92:18
  93:15 138:13
  160:11
public 1:23 4:8
  46:4 52:6 57:13
  80:24 83:10,22
  84:17 95:6 107:18
  108:7 164:4 165:4
  169:11 172:9
publicly 35:17,25
  57:23 62:24

104:13 108:11
  109:9 112:12
  152:8 166:6
puff 147:10
pull 112:21
purchaser 77:15,21
  78:11
purchases 77:11,17
purchasing 89:11
purely 15:4
purpose 35:4 81:25
  95:19 111:24
  144:15
purposes 24:2 62:7
  105:15
pursuant 1:21
  105:4,15 134:12
put 27:9 55:13,24
  56:7 57:5 71:7,13
  71:14 107:25
  154:10
putting 57:18 68:12
p.m 94:12 95:3
  169:5

——— Q ———
qualifications 4:13
quality 109:16
quarter 155:25
  156:2,4
quarterly 109:6
  166:8
question 8:25 14:2
  31:23 32:18 36:10
  37:8 44:20 61:9
  63:20,25 64:5,11
  85:15 92:16
  125:16 126:5
  138:12 150:11,12
  151:5 158:10
questions 146:13
  146:19 163:3
  168:11
quick 116:22
quickly 25:24
quite 19:4 60:20
  76:22 111:11

115:8 123:3
  143:19 148:15
  162:2
quo 59:19
quote 101:10,16
  102:10,23,24
quoted 102:2

——— R ———
R 1:22 2:2,14 4:6
  95:2,4 172:2,7,22
radical 122:24
raise 52:6
raised 37:8
ran 55:25 69:9
range 101:3 107:5
  127:14,16
rate 24:24,25 25:5
  25:23 83:6
rates 24:19 102:21
  109:16 152:16
ratify 135:24
raw 161:2,5,18
Ray 8:17 18:20
  21:9,24 149:21
reach 33:7 167:17
reached 49:21
  70:21 159:18
read 30:9 73:7
  87:17 90:10 97:3
  115:9 160:14,16
  170:5
reader 66:19 67:5,7
ready 87:7 105:9
  133:24
real 28:19 39:24
  60:21 153:22
  158:20
realistic 145:10
realities 61:3
really 13:12 21:7
  22:18,20 23:16
  29:20 30:15 39:7
  39:13 80:16 95:18
  113:12 121:12
  125:20 126:5
  140:6 149:8

160:21
Realtime 172:8
rearrange 121:14
  125:6
rearranging
  121:21
reason 4:18 14:17
  14:20,22 80:17
  85:23 108:15,20
  120:16 137:12
  138:23 158:15,20
  158:20,24,24
  159:7 171:7,9,11
  171:13,15,17,19
  171:21
reasonable 5:18
  6:17,20,23 23:18
  33:5 41:21 44:8
  62:23 91:25
  138:13 144:17,19
  160:11
reasonably 5:18
  6:18 66:16 91:12
  92:18 93:25
  138:13 160:11
reasons 36:16
  43:13 108:21
  171:4
recall 7:2 8:17 9:4
  11:14,14 18:16
  19:13 20:12 21:7
  21:9 22:11,18
  23:16 24:17 28:12
  37:23,24,24 42:7
  43:17,21 53:4
  96:25 97:2,8,12
  97:16 99:20
  113:20 115:7,10
  116:3 117:23,25
  131:21,22,25
  149:7,8,20
receipt 149:12
receive 45:10
received 44:25
  45:16 46:21 47:3
  48:4 49:18 145:24
  146:6

recess 61:21 94:12
  117:7 145:20
recognize 146:24
recollect 22:6 24:6
recollection 9:6
  22:5,21 24:12
  28:19 42:13 47:10
  48:16
recommend 130:21
recommendation
  62:22 63:2 120:20
  130:13
recommendations
  59:17 135:11
recommended
  120:19
recommending
  5:24 64:21 71:23
record 3:20 16:13
  18:9 60:13 61:19
  61:22 63:13 67:16
  68:3 79:13 94:10
  95:8 103:3 106:22
  106:23 117:6,8
  145:18,21,24
  160:16 168:16,16
  168:19 169:4
  172:14
records 22:22
  103:21
recovered 153:10
recovery 152:20,25
reduce 59:4 60:12
  62:4
redundant 39:12
  123:23
refer 39:13 50:3
  95:16 117:18
  142:18
reference 39:18
  106:5 142:9 144:4
  164:20
references 106:8
referred 74:14
  86:24 115:15
  142:5
referring 29:20

refinance 132:12
refinancing 132:14
reflected 155:13
reflects 152:13
refurbish 82:21
refused 96:15
  134:21 161:10
regard 11:7 19:22
  20:25 36:13 83:3
  106:5,11 126:4
  130:23 137:11
  145:14 151:5
regarding 6:15
  112:19 131:23
  146:25
regardless 139:3
Registered 172:7
regular 27:12
  101:7
regularly 101:12
  101:14 102:11
related 10:19 19:9
  109:18 172:15
relationship 54:17
  56:24 57:2,6
  60:20 84:15,21
  86:14,17 92:13
  109:22 114:15
  142:25 143:11
relationships 51:12
  54:22,24 55:2,3,6
  55:14 57:11 83:18
Relative 93:2
relevance 11:4
relevant 31:10
  62:20 107:5
reliable 164:7
reliance 166:11
relied 45:24 47:25
  48:6 76:15 79:22
  79:23 163:25
  165:7
rely 5:20,25 44:6
  80:4 151:8
remember 7:4,11
  7:14,22 16:11
  19:23 30:20 35:24

53:19 97:17 98:2
  104:12 149:22,24
  151:16
remembered 84:7
remote 75:8 88:6
  89:23
render 137:11
renew 89:9
reorganization
  96:11
repay 76:3 77:22
repayment 77:16
  78:14 82:6 88:12
  152:15
repeat 125:16
  130:15 135:21
repeatedly 156:10
replace 90:9 162:11
repo 54:4 110:20
report 3:3 4:13,23
  5:6 6:8 7:7,9,21
  9:11 11:8,12,16
  14:19,23,25 15:4
  15:12,17 16:7,9
  16:17,21,22 17:3
  17:6,9 18:10,15
  19:21,24 20:5,22
  26:24 28:8 30:17
  32:24 36:22 37:16
  40:7,13,13,15
  41:6,15,17,23
  42:4,10,12,15
  44:19 45:23 48:21
  49:7,19 50:11,25
  51:12,17 52:15
  62:19 68:13 69:19
  72:9 74:14 76:11
  76:17 77:2 83:19
  85:5,12 86:6 92:3
  92:12 93:2,8
  95:13 97:10,14,23
  98:4 99:4 100:4
  100:21 101:9
  107:17,21 116:7
  117:18 119:22,24
  120:18 127:21
  128:20 131:18

140:12 142:6
  146:2,11,14,20,22
  147:24 148:2,7,10
  148:14,17 149:5
  149:10 150:22
  152:3,7 163:8
  167:10,13,24
  168:7 173:5,22
reporter 4:5 168:24
  172:8,8
reports 40:8 46:21
  98:16 110:12
repossession
  109:15
representative 22:9
represents 15:12
  25:13,14
reputation 51:18
  51:20,25 52:11
request 54:4 61:15
requests 40:14
  174:6
require 36:11 39:7
  126:5
requirement
  162:14
research 46:21
  50:25 79:24 80:5
  108:2,2,18 140:12
  140:13 163:22
resell 82:21
reserve 146:14
  147:14
residual 32:6 68:7
residuals 75:19
respect 5:19 14:4
  21:2,2 40:18
  46:14,15 52:13
  55:19 59:11 65:7
  74:9,13 76:18
  78:8 81:22 84:5
  84:14 101:13
  102:12 104:24
  106:4,24 124:23
  125:18,24 142:24
  146:10,21 155:6
responded 120:22

response 132:18
  147:12
responsibility 5:3
  27:4,7,14,15 28:7
  29:5,19,25 30:11
  37:3 39:20 40:19
  62:11 159:19
restructure 90:21
  125:5
restructuring 62:7
  90:16 93:13 96:16
  103:9 105:3,15
  113:23 115:6
  118:13,18,24
  119:12,22 121:22
  125:10 126:21
  129:8 136:25
result 67:18 119:10
  132:22 133:22
  166:23
results 109:6
resume 48:24
resumed 95:4
retail 78:13 142:18
  142:22 143:9
retain 119:6 121:9
retained 12:11 21:5
  22:13 43:5,15
  44:10 100:7 105:2
  105:8 119:11
  133:23
retains 158:25
retention 70:19
  134:12
revenue 36:5
reverse 54:4 110:20
review 44:17,23
  58:4 76:16,17
  97:10 99:3 150:22
reviewed 41:15
  42:6 48:7 49:18
  58:14 59:9 60:14
  61:11 62:15 63:12
  64:12,25 100:16
  103:22 120:17
  127:18 143:16
  148:22

reviewing 44:12 97:12
revolving 87:25
Reza 9:23 10:11 11:5
Richard 2:20 3:23
right 4:16,18,22 11:20,25 12:23 13:13 16:25 18:11 19:18 21:19 22:14 26:2,3 29:11 30:2 34:23 35:6,13,18 35:20,22 36:3 38:21 40:16 45:12 46:13,25 47:4 48:5,11 49:2,2,8 49:11,22 52:13,23 54:20 55:17,23 57:14 58:18,19,24 58:25 60:8 61:17 64:10,22 66:18 70:10 72:7,8,21 74:12 77:12,20 78:16,22,24 79:19 81:12,15,19 82:12 82:19 86:7 88:9 88:13 89:15,16,24 91:15 92:6 94:8 95:20 96:17 100:7 101:14 102:23 103:11 104:6,10 105:5,25 106:12 107:25 108:4,7 109:7,19 110:9 112:5 113:16 114:5,9 115:16 116:2,6,25 118:15 118:20 119:8,17 119:19,23 120:15 121:15 123:20 124:9,10 125:12 126:22 127:9 128:2,13,17,20,25 129:23 130:2,22 131:4 132:2,7,21 133:20 134:9,17 137:23 142:22

144:21 147:21 148:2,13 150:24 152:10,17,22 153:9,25 160:7,14 160:20,24 165:19 166:9 167:9
rights 146:14 147:14,17
rising 98:19
risk 53:17 54:12 88:8 116:6,17,18 111:18,23,23
riskiness 20:2
risks 109:24
road 153:24
role 10:15 53:24 55:19 72:15,25 73:21 74:9 75:23 81:2 86:6,9 89:10 89:16 91:5,13 92:15 95:23 96:15 99:13 100:5,11 104:23,25 105:14 105:20,21 110:15 154:4 155:6
roles 72:20 97:20
Roman 6:8 26:25 36:23 79:20
roughly 55:13,24
RPR 1:22 172:22
rule 63:5 142:11 143:4,8,10,13 144:13
rules 142:16,21
run 32:11 36:7,8 70:16 154:10 165:2
running 141:5
runs 34:14
R-e-z-a 9:23

_____

S

S 2:2 4:6 13:20,21 13:22,24,25 14:6 14:7 15:14 95:2,2 95:2,4
Saagar 14:12

sale 125:4 131:23 132:4 136:25
Sandhu 9:18 10:9 10:22 11:18 17:15 17:17,18,20 25:4 47:8,14,17,23,24 48:18,20 49:3 73:19 74:2
Santa 10:9
Sarin 8:22 9:14,17 10:8,17 11:18 12:6 13:10,21 17:3,9,20 47:19 73:18,25
Sarin's 13:22 14:10 25:2,3
sat 15:6
saw 16:24 41:22 42:5 45:19 52:22 58:14 61:10 97:23 99:8,15 151:2
saying 24:7 30:12 34:12 54:22 62:8 78:18 108:13,18 119:4 121:25 123:6 143:7 147:9 154:17 156:13 161:20
says 30:13 45:24 62:21 71:17 98:10 101:17 118:22 128:12 130:18 132:18 147:6
Scott 8:18 149:20
se 144:16
search 20:15
SEC 19:19,22 20:6
second 5:22 6:15 8:23 64:18 75:18 156:2
secret 154:25 155:5
section 39:11 72:9 72:9,13,25 78:17 80:23 83:8,9 95:13,22 100:3 104:25 107:16,20 109:8,21 110:11

129:4 131:18 142:12
secured 76:9 88:4 88:17 90:20
securities 2:24 29:24 30:18 31:2 52:9 54:9 74:15 75:13,16,20 76:13 76:19 77:3 78:9 78:19,21 82:2,5,9 82:12 86:15 110:3 110:21 163:22
securitization 55:7 55:16,20 74:10 75:24 77:21 78:12 81:3 87:8,9 89:2 95:24 96:3,4 100:19 102:6,22 103:5 107:6,13 109:12,19 110:6 122:9,17 124:21 134:22 141:5,11 141:13 143:23 162:5,14
securitizations 35:5 57:4,19 74:19,20 78:22 80:16 104:15 106:11 112:18 122:3 123:2 130:25 155:7 161:13
securitize 55:21 75:8 86:22
securitized 84:24 109:14
security 38:3,20
see 4:12 12:9 17:3 42:3 60:25 63:2 64:12 68:3 89:5 100:16 103:21 106:21 111:17 112:6 116:18 127:10 135:24 136:7,24 140:13 143:16 162:9 166:16 168:6

seeking 103:23
seen 42:14 45:14 59:9 63:14 64:25 65:5 67:15 89:14 103:3,25 107:9 113:4,12 115:11 115:14 134:16 145:12
sees 138:25
self 160:2
self-dealing 28:4
sell 65:22 74:25 75:4 82:2 87:6 114:7,11 115:5 142:20 161:11
selling 65:12,22 113:24 114:2,3,4 114:20 130:3
send 12:25 168:25
sense 29:19 36:17 38:2,8,14,16 39:9 89:18 141:9
sent 26:9 148:21
sentence 30:9,12 39:10
separate 29:18 111:25
separately 100:14 103:3
September 1:16 3:12 41:3 85:21 92:5,23 93:10 150:8,9 166:13,21 167:16 172:20
sequence 115:8
serious 90:16 127:5 130:22
serve 78:18
served 18:22 83:14
serves 41:24
service 114:16
services 5:19 11:7 12:12,17,22 14:5 24:16 50:22 52:14 53:3,16,19 57:4 113:22 114:18 115:25 143:2

servicing 100:25 101:23 102:5
serving 79:8 105:23 105:23
set 95:19 163:9 172:12,19
sets 80:2
setting 79:17 111:24
Shapiro 1:19 3:1,3 3:8 4:1,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1,9 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1,16 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1,12 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1

117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 146:8,13 147:1,23 148:1,8 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,3,6 164:1 165:1 166:1 167:1 168:1 169:1 169:7 172:11 173:5,22 174:3
Shapiro's 145:25
share 16:20 163:12 163:18
shared 144:10
shareholders 29:21 29:25 32:6 33:20 38:6,18 137:22 154:12
shares 163:14 164:14
sheet 103:10 156:5 170:9
Shen 10:2,10 11:11 13:8
shift 38:4,9,15,16 38:19 40:18,23
shipments 47:19
shipped 44:24 45:2
shoes 86:10 87:11 90:6 91:4
short 145:15
show 23:6 112:6 133:2
showed 115:10 165:17
showing 118:14

shows 60:14 106:23 135:7
shut 90:22 141:12
side 60:21,22 108:3
sign 168:25
signature 169:2 170:15
signed 170:9
significance 160:12
significant 101:13 101:21 102:13,15
significantly 124:20
signing 168:21
Silk 2:18
similar 140:14 147:11
similarly 66:12 71:12 113:7
simply 30:9 71:15 139:17 150:5
sincerely 69:25
single 75:14
sinister 110:10 114:23
sit 53:2
site 165:2,4,6
sits 40:11
sitting 23:17 24:7 25:15 47:5 61:14 80:10 99:20 131:22
situation 33:12,25 59:15 60:19 122:21 135:4 143:17,21 144:5
situations 119:6 140:15
skeptical 111:15
skepticism 111:18
skills 98:6
smaller 123:5 130:7
sold 66:9 90:18
sole 74:18
solicit 101:25
solicited 101:12

102:12
Solutions 3:14
solvency 38:4 41:12 43:10,21,24,25 92:4 150:17 151:3 166:18
solvent 26:22 32:5 38:5,13 85:6,9 155:24 156:8 157:20
somebody 6:19 7:3 21:25 23:7,19 24:3,10 47:8 107:11 115:22 128:11 149:9,19 162:12,17
sorry 17:18 48:25 53:14 69:7 78:6 85:5,14 113:25 115:13 126:4 130:15 133:5 156:22 157:10 158:5
sort 29:8 38:20 88:25
sounds 26:3
Soup 163:9 167:12
source 72:24 76:11 78:14 79:3 88:12 163:16,20,24 164:3,24
sources 73:4,15
Southern 11:24
SPE 35:3
speak 37:7 39:4
speaking 27:22 32:3
special 35:4 95:19
specialist 103:14
specialize 93:21
specific 5:16 7:2 28:19 33:22 37:11 58:21,22 76:14 80:14 83:23 84:14 84:18 101:8 106:8 127:12
specifically 5:20,25

7:16 16:11 25:13 36:13 37:12 40:14 51:15,22 52:8 58:8 61:15 64:17 89:22 113:22 135:2 140:25
specifics 107:7
speculating 127:2
speculation 42:24 45:8 64:6 85:2
speculative 127:4
spell 9:15
spelled 9:16
spend 70:25
spends 10:25
spent 25:21 44:14
splitting 43:13
ss 172:4
stakeholders 32:11 33:21,23 34:6
stance 91:21
stand 5:16 6:11
standalone 15:25
standard 89:25 111:7,12
standards 123:3
Standish 144:3
standpoint 5:15 27:22 38:24 71:3 83:7 84:10 124:6 135:9 143:4
stands 52:22
Stars 2:6
start 72:10
started 9:7 31:2 44:3 55:25 56:14 116:3 149:12 154:10
starting 78:10 100:4 110:11 140:9 142:12 144:12
starts 158:2
State 1:23 172:3,9
statement 162:10
STATES 1:2
status 59:19

| | | | | |
|---|---|---|---|---|
| stay 121:12 136:23 | subset 46:19,20 | 66:6,9 161:9 | 40:7 62:10 75:3 | 16:8 19:12 22:17 |
| 137:5 | subsets 36:8 | suppliers 161:5,15 | 94:7 95:23 96:2 | 30:25 32:14,17,25 |
| step 86:10 91:12 | subsidiaries 1:13 | 161:18 | 102:16 116:22 | 33:17 35:9 36:12 |
| 96:15 161:15 | subsidiary 1:12 | supply 65:25 66:3 | 117:2 128:3 | 47:6 50:3,9 57:7 |
| 163:12 164:11,17 | 75:4,5 | supplying 161:6 | 132:14 139:9 | 58:2,4 63:18 64:9 |
| 165:9,19,25 | substance 27:10 | support 166:17 | 145:15 150:5 | 69:12,23 74:22 |
| Stephan 8:17 18:20 | substantial 19:5 | supported 165:15 | 151:17 | 76:6,14 83:13 |
| stepped 87:10 | 42:17 98:18 | 167:6 | taken 45:11 61:21 | 91:7 96:20 105:12 |
| 89:19 90:6 92:18 | 126:16 | suppose 82:17 | 101:14 102:13 | 127:19 142:4 |
| 162:7,13,18 | substantially 123:3 | supposed 64:10 | 117:7 120:14 | 147:8 149:25 |
| stepping 91:3 | substantiate 62:24 | supposition 151:11 | 125:11 145:20 | 152:6 153:15 |
| steps 167:20 | substantive 100:23 | sure 8:10,24 10:7 | 167:20 | 156:14,22 |
| Steve 149:21,21 | 101:19 | 10:17 29:3 52:18 | takes 40:9 | ten 20:12 |
| stipulation 168:21 | substitute 136:10 | 54:15 60:2,4 | talk 17:11 18:13 | tend 109:2 111:14 |
| stocks 142:19 154:5 | 138:14 | 61:18 84:3 85:16 | 21:21 22:8 24:14 | Tennenbaum |
| stop 85:9,13 159:21 | successive 18:10 | 90:23 94:9 107:6 | 28:12 29:4,23 | 42:21 43:10,15,20 |
| 160:19 161:18 | suffering 98:17 | 113:23 117:4 | 31:9 32:9 36:15 | 44:4 166:20 |
| stopped 162:5 | suggest 62:16 97:24 | 119:6 123:25 | 39:2 49:24 50:2 | 167:20 |
| stopping 161:12 | suggested 113:8 | 145:17 149:15 | 54:23 62:20 84:2 | Tennenbaum's |
| stores 60:7 | 146:16 167:11 | 155:20 162:8 | 99:12 100:4,10,14 | 41:6,15,20,23 |
| strategy 123:7 | suggesting 68:12 | 166:22 | 101:7 103:2,18 | 42:3 85:21 150:6 |
| Street 2:18 3:15 | 141:13 143:10 | surprise 89:5 | 105:19 110:12 | 150:18,21 151:8 |
| strengthen 6:13,14 | suggestions 130:6 | surrounding | 113:16 130:14,17 | 151:19 166:12 |
| 151:9 | suggests 40:20 | 109:24 | talked 23:17 24:7 | 167:8,10,13 168:7 |
| strengthens 6:10 | 59:10 67:16 | survival 83:4,7 | 28:20 37:6,11 | tension 111:21 |
| 6:22 33:4 | 132:12 | suspicious 68:14 | 41:16 51:9 87:20 | ten-minute 61:17 |
| stretch 132:13 | Suisse 1:7,8,10,10 | swaps 125:8 | 100:20 104:8,15 | ten-year 152:8 |
| strike 95:14 | 1:12 2:24 3:10,25 | swear 4:5 | 108:3 116:4 152:3 | term 27:12,13 |
| structure 89:2 | 19:8,8,21 23:14 | swing 57:8 | talking 22:19 35:6 | 28:10 29:8 55:17 |
| 90:11 | 31:7 50:5,12,17 | Swiss 1:8 50:13 | 43:4,5 105:21 | 86:25 87:3 |
| structured 88:2 | 59:11 79:10 90:6 | switches 34:13 | 110:3 129:8 | terminology 28:21 |
| structures 110:4 | 92:12 141:23 | sworn 4:7 95:5 | 147:24 | terms 27:18,20 |
| structuring 106:24 | 173:19 | 169:8 171:23 | talks 40:4 | 66:2 70:19 82:6 |
| studies 167:16 | Suisse's 5:12 24:4 | 172:13 | tape 61:24 117:6,9 | 95:17 156:20 |
| study 135:5 | suited 118:23 | synonymous 27:18 | 168:19 | 161:7 167:14 |
| stuffed 20:21 | sum 134:18 159:12 | 27:19 | taxes 39:6 | test 166:16 |
| Stutman 2:5 4:3 | summaries 49:25 | system 17:23 | team 110:17 111:9 | testified 4:8 95:6 |
| 7:3 9:2,10 16:21 | summarize 49:20 | S-a-a-g-a-r 14:12 | 111:19 | 100:22 101:12 |
| 18:13,14,18,23 | summary 54:20 | S-a-n-d-h-u 9:18 | technical 55:17 | 102:11 |
| 23:10 26:18 45:3 | 62:2 64:19 | S-a-r-i-n 9:17 | 75:25 | testimony 4:20 |
| 45:20 46:18 47:7 | supplemental 11:8 | S-h-e-n 10:2 | technically 76:7 | 43:8 53:9 100:10 |
| 47:12,16 149:19 | 11:16 85:12 93:2 | | 89:15 | 101:10 107:4,4,9 |
| Stutman's 42:9 | 145:25 146:20 | **T** | techniques 145:7 | 170:6,8 172:14 |
| subject 39:19 52:15 | 148:2,7,10,14,16 | T 95:2 172:2,2 | telephonic 7:17 | Thank 162:23,25 |
| 142:16 | 152:2,7 163:8 | tab 141:20 | telephonically 8:2 | 168:13,14 |
| Subscribed 169:8 | 173:21 | tacit 122:4 | tell 4:24 5:5 8:6,7 | thanks 128:12 |
| 171:23 | supplier 65:11,20 | take 6:18 20:18 | 9:7,13 10:14 15:4 | 130:19 132:19 |

| | | | | |
|---|---|---|---|---|
| theory 158:15 | 152:13 157:10 | 146:17 | trying 8:19 22:3 | 16:6 27:16,21 |
| thereabouts 149:14 | 160:3 | top 102:25 113:7 | 30:17 63:23 67:25 | 29:16 34:11 35:7 |
| thing 65:16,20 | three 11:10 22:7 | 118:17 | 98:21 115:5 133:8 | 37:17 48:12 53:24 |
| 90:24 92:2,3 | 50:21 100:13 | total 25:6,9 26:15 | 158:12 | 57:19 61:4,8 67:6 |
| 125:22 135:22 | 107:11 149:14,23 | totally 160:13 | turn 12:16 13:14 | 67:7 75:25 79:7 |
| 150:14 154:2,3 | 165:16 | trade 35:20 65:22 | 56:25 57:3 62:19 | 105:11,13 106:3 |
| things 11:14 45:23 | tie 162:16 | 66:6 161:7,19 | 75:5 112:20 | 143:17,20 144:5,6 |
| 60:6 68:5 70:2,5 | till 126:18 | traded 35:17,25 | 159:10 | 152:12 158:11,12 |
| 71:6 91:15 114:14 | time 3:12 11:2 | 104:13 108:11 | turned 23:20 | 158:13,14 168:8 |
| 126:23 127:21 | 17:10 18:25 24:18 | 152:8 | 126:23 140:8 | understanding |
| 130:8 133:9 134:3 | 24:22,23 25:14,18 | trade-offs 136:23 | TV 168:15 | 32:8,17 33:11,25 |
| 136:3,7 152:6,16 | 31:7,10 42:14 | trading 152:9 | Twelfth 2:6 | 35:7,10 36:12 |
| think 5:15 6:3,11 | 44:14 45:10 51:6 | 153:7 157:6 | two 8:20 14:14 | 37:10 41:9 43:14 |
| 6:18,20 8:12,14 | 56:7 59:10 65:4 | 165:17 | 27:22 47:18 72:23 | 49:16 50:4 51:12 |
| 8:19,19 18:12,19 | 70:6,14,15 71:8 | tranche 75:14,17 | 73:12 74:3,4 | 51:23,24 52:25 |
| 20:6 21:8,23,24 | 71:14 74:8,17 | 75:18 | 76:20 97:3 112:7 | 54:14 56:17 60:18 |
| 22:19 23:8 29:12 | 84:20 85:4,6,17 | tranches 75:17 | 149:13,23 153:23 | 74:7 75:23 76:12 |
| 29:22 31:4,21 | 85:24 86:19,21 | transaction 76:17 | 159:9 162:9 | 79:12,16 83:17 |
| 32:3 33:3,6 35:3 | 90:21 92:2 93:7 | 89:6 103:17 132:5 | 165:20 | 85:18 88:3 90:5,8 |
| 36:16 39:7 40:16 | 94:7 95:3 96:8 | transactions 74:23 | two-thirds 25:19 | 90:12 99:5,17 |
| 42:11 45:22 46:20 | 97:13 100:6 | 74:23 77:5 81:3 | type 16:19 58:20 | 110:14 113:18 |
| 47:5,10 52:23 | 112:13 119:16 | 106:25 111:16 | 76:8 79:22 80:3 | 124:2 125:14,20 |
| 53:5 54:4,12,15 | 120:24 122:23,24 | 112:24 143:8 | 83:15 89:3 90:20 | 143:5 |
| 55:12,25 56:8,14 | 123:18 132:25 | transcription 170:7 | 93:12 96:16 | understood 23:12 |
| 58:19,20,25 59:13 | 135:17 136:6 | translate 27:9,25 | 112:19 125:10 | 23:25 98:9 |
| 60:17,23 66:10 | 138:4 140:20 | 28:16 29:12,13 | 126:21 135:13 | undertake 99:10 |
| 67:19 68:18,21,23 | 153:20 164:8,16 | transpire 125:21 | 136:24,24 162:16 | undertaking 127:7 |
| 85:23 87:20 89:14 | 166:24 167:13 | treat 27:18 | 167:25 | undertook 167:17 |
| 94:6 95:15 96:13 | 168:21 169:5 | Treister 2:5 4:3 | types 39:2 50:21 | 167:25 |
| 98:7,9,14,19 | times 17:12 40:12 | Trident 12:7,10,16 | 75:12 | underwriter 78:19 |
| 105:22 108:15 | 55:13 164:13 | 12:18 13:2,6,18 | typical 114:13 | 104:18 |
| 113:20 122:6 | 165:10 166:19 | 14:15 15:14 | typically 40:11 | underwriting |
| 123:10,16 126:15 | timing 56:12 146:6 | tried 25:24 27:9 | 65:22 75:16 79:23 | 30:18 31:2 72:16 |
| 126:17,18 133:3 | today 3:13 4:18 | 28:15,16 44:18 | 80:4 | unfamiliar 77:7 |
| 133:10 134:10 | 26:8 53:2 100:20 | tries 114:10 | | unfortunate 149:25 |
| 135:12,15,22 | 126:23 145:3 | trouble 98:9 | _____U_____ | unique 72:14 |
| 137:3 139:4,10,16 | 146:8 153:23 | true 17:2 69:19 | Uh-huh 22:2 | 141:18 |
| 139:16,24 140:7 | 156:10 | 70:18,25 108:25 | ultimate 124:23 | uniquely 118:22 |
| 143:3,21,25 144:2 | Today's 3:11 | 170:6 172:13 | 134:13 152:20,25 | unit 111:25 |
| 144:3,9,14,24 | told 22:21 27:6,8 | truly 150:3 | ultimately 33:19 | UNITED 1:2 |
| 145:2 146:7 147:8 | 43:9,24 48:3 | trust 1:6 3:9 26:21 | 102:20 132:4 | units 60:7 |
| 152:19 155:10,12 | 64:14 67:17 78:10 | 57:2 79:10 89:12 | unable 147:4 168:7 | University 10:9,13 |
| 158:11 161:23 | 96:14 123:16 | truthful 62:21 | uncertain 120:5 | 11:24 163:23 |
| 162:3,12 | 134:10 148:18 | 67:17 | underlies 122:7 | unlimited 158:22 |
| thinking 84:9 | 160:3 | try 80:18 88:7 | underlying 81:6,22 | unpaid 26:16 39:6 |
| third 40:21 159:20 | tomorrow 136:3 | 114:14,16 115:23 | 88:12 | 55:10 56:11,16,20 |
| thought 69:23 | Tony 2:8 4:2 94:6 | 127:10 | understand 6:5 | 57:6 |

**unreasonable**
91:11 92:17,25
93:6,9,15,24
**unreasonable**
93:15,24
**unrelated** 100:19
103:5 107:13
**unsecured** 65:23
**unspecified** 126:24
**untruth** 67:22
**upcoming** 132:15
**USA** 2:24
**use** 29:8 115:5
167:7,7
**uses** 71:13,14
**usual** 90:25 91:10
98:22 121:17
123:10 135:23
168:20
**U.S.A** 1:11

——— **V** ———
**vague** 96:24
**valuable** 123:8
**valuation** 42:18,22
43:7 151:17
154:23 166:11
**valuations** 81:17
**value** 68:11,11
70:15 71:7 82:24
82:24 131:3 139:3
145:2 148:24
151:21 152:10,14
152:16 153:15,20
154:9,14,15,19,20
154:21 155:11
156:17,18,24,25
157:7,12,13,14,17
157:18,22 158:6,7
158:15,17,25
159:3,7,8,9,11,12
159:13 160:9
163:12,17 164:16
164:18,21 165:10
165:22,22 166:2,5
**varied** 8:6 18:19
**variety** 59:16 68:9

145:7
**various** 7:16 9:20
10:22 11:3 34:25
35:15 41:21 46:21
52:23 54:22,24,25
57:11 79:18 84:2
90:22 99:8,9
100:10 101:7
135:5 151:4 166:8
**vehicle** 95:19
**verify** 80:18
**versus** 3:10 136:24
**video** 3:13,16
**Videographer** 2:25
3:6 4:4 61:19,22
94:10 95:8 117:5
117:8 145:18,21
168:18
**videotape** 3:7
**view** 33:17 34:2
54:16 111:3
126:10 130:12,21
138:3 157:6
**views** 111:15
**VII** 72:9 83:8
**VII.A** 80:23 83:9
**VII.A.1** 72:13,25
83:10
**VII.A.2** 83:13
**VII.A.2.a** 78:17
**VII.A.2.b** 95:13
**VII.A.2.c** 100:3
**VII.A.2.d** 104:25
**VII.A.3** 107:16
109:8
**VII.B** 110:11
**VII.B.2** 109:21
**VII.D.1.b** 128:20
**VII.D.1.c** 131:18
**Villanova** 10:12
**violate** 137:13
**virtually** 165:18
**visit** 84:2
**vis-a-vis** 67:10
**vs** 1:7
**V.A** 6:8 27:2 36:23
39:11

**V.B** 41:5
——— **W** ———
**wait** 23:23 135:24
136:6,24
**waive** 146:21
**waives** 147:17
**want** 6:18 23:19
24:10 26:25 35:7
58:2,4 60:4 61:5,8
61:10 66:19 67:7
85:13,14 105:12
123:17 124:5
131:21 142:4
145:24 146:10,18
150:20
**wanted** 23:13 44:7
87:15 137:5 139:4
166:20,24.
**wants** 92:15
**warehouse** 55:9
56:4 74:8 86:11
86:13,23,24 87:14
87:24 88:22,24
89:10,12,20 90:2
91:5,16 92:15,20
93:9 95:20 104:9
106:12,25 107:13
122:3,8,17 123:4
123:5 124:22
131:2 134:22
143:23 155:7
162:5,15
**warehousing** 87:4
**wasn't** 24:4 29:22
148:15,16 150:18
154:24 155:5
166:22,25
**way** 6:12,22 40:23
44:21 45:9,17
63:7 66:8,25
68:19,20 69:2,3,6
69:10 71:10 80:8
83:8 84:13 88:2
88:10 89:25
132:12 141:13
148:18 160:19

172:17
**ways** 38:11 124:21
124:22 152:3
**Web** 74:4 165:2,3,6
**week** 18:5,6 145:25
**went** 56:8 110:22
149:10 150:23
156:7 167:2
**weren't** 115:18
129:20 141:5
**West** 3:15
**we'll** 9:9 20:18
50:23 100:14
103:2 121:17,19
121:20 122:2
128:4 131:8
135:15
**we're** 26:22 35:6
59:24 60:4 74:12
92:8 99:12 124:21
128:12 130:19
**we've** 4:23 36:20
49:4 86:15 89:3
89:14 100:20
108:21 110:3
131:15 133:17
139:10,16,16
140:7 142:2 146:2
146:5,15 147:24
**WHEREOF**
172:19
**Whitman** 8:17 22:3
**wholly** 1:11
**Wickes** 2:14 3:21
3:21 4:11 20:14
31:25 42:25 53:11
61:16,25 64:8
94:6 95:11 116:17
116:24 117:2,14
128:3 131:8 133:5
133:8 141:19
145:15,23 147:7
147:19,21,22
148:4 160:14
162:23 168:12
174:4,7
**wide** 101:3 107:5

**Williamson** 2:15
3:23 168:24
**willing** 161:15
**wish** 69:25 164:4
171:3
**witness** 4:5,7 12:4
18:22 20:9 26:23
42:18 95:5 116:22
116:25 131:14
142:7 162:25
168:14 171:2
172:11,14,19
174:2
**witness's** 63:22
**word** 18:11 44:6
**words** 28:17 44:6
50:19 56:23 57:23
59:20 67:21 69:9
75:9 87:24 102:17
114:10 121:13
126:7 153:22
162:15 166:25
**work** 7:8 10:6,16
10:20,25 12:3
15:17 20:9,9,25
21:3 23:14 24:4
24:20 25:10,10
42:17 43:13,15
44:3,11 49:21
51:17 52:5 66:17
77:5 97:9,23 98:4
103:9 127:18
134:11 145:13
163:7
**worked** 9:11 11:17
11:20 14:24 17:12
19:6,19 31:7
53:13 54:7,11
73:6,9 76:13
83:18 113:19
**working** 7:21 15:20
18:22,25 20:23
43:10,20 71:12
72:2 150:12
**works** 10:18,22
34:7 83:8
**world** 52:12 108:25

114:13 140:7
**wouldn't** 6:15 23:4
  23:19 41:14 44:5
  102:3 103:17
  111:13 113:11
  114:12 127:4,13
  141:15 145:5
  161:13 162:7
**write** 7:19 15:8,9
  149:5
**writing** 7:6
**written** 30:13 60:20
  73:3,7 98:16
  105:4,25 110:13
  118:4
**wrong** 91:14
  105:12 123:17
**wrote** 11:8 14:25
  15:3,6,10 19:21
  39:11 78:20 93:7
  149:10

**X**
**x** 1:3,5,15
**Xanthos** 53:15,22
  54:11 83:25
  110:13 111:2
**Xanthos's** 110:15
  112:7
**X-a-n-t-h-o-s** 53:23

**Y**
**yeah** 10:7 27:15
  46:17 49:9 129:3
  147:11
**year** 22:4 69:24
  119:18 126:17
  134:19
**years** 20:12 30:19
  78:20 153:23
**yesterday** 147:3
**Yield** 118:25
**York** 1:21,21,24
  2:13,13 3:15,15
  3:18,18 172:3,5
  172:10
**Yun** 8:18

**Z**
**zero** 158:16,21,23
  159:4

**$**
**$400** 25:5
**$600** 25:3
**$7.5** 78:20
**$75** 110:20
**$800** 24:25
**$984,000** 25:8
  26:13

**0**
**01** 56:8 92:23 93:10
  93:11 126:18
  150:10
**02** 56:9,15 126:18
**02-13396** 1:4 3:11

**1**
**1** 1:13 3:7 118:11
  118:25
**1st** 92:22
**1:34** 95:3,9
**10:15** 1:17 3:12
**100** 1:1
**10105** 2:13
**11** 1:3 133:24 134:3
  134:7
**11:39** 61:20
**11:55** 61:23
**117** 173:6
**12** 72:10 80:23
**12:44** 94:11,12
**128** 173:9
**13th** 79:6
**131** 173:12
**133** 173:15
**1345** 1:20 2:12 3:17
**14** 78:16
**142** 173:18
**148** 173:20
**15** 20:12
**16** 86:6 89:8 95:14
**163** 174:5
**17** 30:23,24,25

95:13,14 100:4
**17th** 172:20
**18** 101:9 102:24
**19** 102:25 105:2
  141:20
**19th** 105:3,16
  133:19
**1901** 2:6
**1980s** 52:10
**1994** 31:4 55:25
  78:2,10,19 92:13

**2**
**2** 61:24 117:6 130:3
**2:10** 117:6
**2:18** 117:9
**20** 174:7
**2000** 31:10 35:12
  37:2 51:6 57:9
  110:13 155:18,25
  156:2,7
**2001** 35:12 41:4
  70:6 78:2 85:22
  86:5 90:5 91:5,13
  92:6,9,19 99:19
  99:23 104:4 106:7
  106:7,21 115:4
  116:7,9,20 117:19
  122:16 124:19
  126:13 127:2
  139:23 140:9
  144:12 150:9
  152:7 153:7,17,21
  155:2 160:18
  165:16 166:13,19
  166:21 167:5,16
**2002** 51:6 56:14
  59:6 62:7 100:6
  105:3,16,22 106:7
  106:21 131:12
  132:25 133:19
  134:7,12 139:23
  139:25 152:8
  155:3 165:16
  173:14
**2004** 79:6 132:11
  165:13

**2007** 1:16 3:12 4:23
  16:7 41:10 148:11
  153:17,21 169:9
  171:24 172:20
**2009** 132:13 164:25
**22** 107:17
**23** 109:7
**24** 110:12
**25** 3:15 78:21
**26** 109:21
**26th** 116:7,9,20
  117:18 121:7
  122:8,16 124:19
  127:21
**27** 62:19 142:6
**28** 112:15 142:6,10
**28th** 148:11
**29** 113:7

**3**
**3** 5:17 49:20 54:21
  57:10 62:3 79:20
  117:9 146:12
  168:19 173:4
**3:04** 145:19
**3:13** 145:22
**3:42** 168:19
**3:43** 169:5
**30** 119:24
**30th** 4:23 16:7,22
  41:10,25 155:18
  156:6,7 167:5
**31** 128:23
**32** 131:19
**36** 72:17
**38** 72:18

**4**
**4** 4:24 5:17 6:8
  26:25 37:16 49:20
  133:20 174:4
**4/30/07** 3:4 173:5
**40** 152:9 153:6,10
**400** 25:25
**45** 46:15 153:3,11
  153:12,23
**45th** 3:15

**5**
**5** 1:16 142:12
**5th** 3:12
**50** 153:3,11,12
**501** 3:2 4:24 11:18
  15:5 20:23 41:11
  41:25 54:21 57:11
  62:3 85:17 147:25
  173:4
**502** 117:10,16
  173:6
**503** 128:5,6,19
  129:5 173:9
**504** 131:9,10,16
  132:6,22 173:12
**505** 133:10,11,12
  133:18 173:15
**506** 141:21,22
  142:3 173:18
**507** 148:5,6 173:20
**52956** 118:12
**53089** 142:13

**6**
**6/26/01** 117:12
  173:8
**6/30/2000** 155:22

**8**
**8HQ** 2:19
**8/19/02** 133:15
  173:17
**8/28/07** 148:8
  173:22
**8/9/01** 128:8 173:11

**9**
**9** 46:15
**90067-6013** 2:7