IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>　　　　　　Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC Liquidation Trust,<br><br>　　　　　　Plaintiff,<br>v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>　　　　　　Defendants. | Adv. Proc. No. 04-57060 (PJW)<br><br>Civil Action No. 07-799 (JJF) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION PURSUANT TO FED. R. EVID. 402 AND 403 TO EXCLUDE CERTAIN TESTIMONY AND DOCUMENTS RELATING TO CREDIT RISK MANAGEMENT REVIEWS**

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000

Dated: April 16, 2008

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Defendants*

RLF1-3274014-2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS .......................................................... 2

FACTUAL BACKGROUND .............................................................................................. 3

    A.    Plaintiff's Claims ................................................................................................. 3

    B.    Role Of Credit Risk Management Group .......................................................... 4

ARGUMENT ....................................................................................................................... 6

I.    STANDARDS FOR EXCLUSION OF EVIDENCE UNDER
F.R.E. 402 AND 403 ............................................................................................... 6

II.    ALL DOCUMENTS AND TESTIMONY RELATED TO CRM'S
REVIEW OF THE PROPOSED REVERSE REPO FACILITY IN 1999
AND 2000 SHOULD BE HELD INADMISSIBLE ............................................... 7

III.    ALL DOCUMENTS AND TESTIMONY RELATED TO CRM'S
REVIEW OF THE LOAN PURCHASE FACILITY IN LATE 2000
AND EARLY 2001 SHOULD BE HELD INADMISSIBLE ................................. 9

IV.    EVEN IF THE COURT CONSIDERS THE EVIDENCE RELEVANT,
IT SHOULD BE EXCLUDED ON THE GROUNDS OF PREJUDICE,
CONFUSION, AND WASTE OF TIME .............................................................. 11

CONCLUSION ................................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

## CASES

*Coleman v. Home Depot, Inc.*,
306 F.3d 1333 (3d Cir. 2002)..................................................................................7, 11, 12

*Herskowitz v. Nutri/System, Inc.*,
857 F.2d 179 (3d Cir. 1988).................................................................................................11

*Sheridan v. E.I. DuPont de Nemours & Co.*,
100 F.3d 1061 (3d Cir. 1996)...............................................................................................11

*Sprint/United Mgmt. Co. v. Mendelsohn*,
128 S. Ct. 1140 (2008).............................................................................................................7

## STATUTES & RULES

Fed. R. Evid. 401 ......................................................................................................................6-7

Fed. R. Evid. 402 ......................................................................................................................2, 6

Fed. R. Evid. 403 ......................................................................................................................2, 7

## INTRODUCTION

Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants" or "Credit Suisse"), respectfully submit this Memorandum in Support of Their Motion pursuant to Federal Rules of Evidence 402 and 403 to Exclude Certain Testimony and Documents Relating to Credit Risk Management Reviews.

## SUMMARY OF ARGUMENT

Credit Risk Management is a group of professionals that analyzes credit facilities to be extended by Credit Suisse, New York Branch ("New York Branch") for their potential risks to the bank. Credit Risk Management ("CRM") is divided into several subgroups, the relevant one here being the subgroup that reviewed proposed asset-backed credits, which included those secured by mortgages. During the years when Oakwood used the securitization services of Defendant Credit Suisse Securities LLC ("CSS"), certain proposed transactions involving Oakwood were reviewed by CRM as part of its ordinary credit review function.

As part of this litigation, Defendants produced documents relating to the CRM reviews in response to discovery demands from Plaintiff, and Plaintiff took depositions of two former CRM employees. Plaintiff questioned the CRM employees about a variety of transactions and documents dating back to 1999 and asked similar questions of employees of Defendant CSS during their depositions. It is clear that Plaintiff intends to make use of those documents and testimony at trial even though virtually all of them are irrelevant to Plaintiff's theory of the case.

1

As explained in more detail below, documents and testimony relating to CRM reviews of a proposed reverse repurchase ("reverse repo") facility and the Loan Purchase Facility should be excluded from evidence pursuant to Fed. R. Evid. 402 on the following relevance grounds:

- It was employees of Defendant CSS, not New York Branch or CRM, who were the service providers to Oakwood. Plaintiff has yet to articulate the theory by which it named New York Branch as a defendant in this case.

- CRM's internal reports were not shared with Oakwood and were not intended to be.

- Much of the CRM-related testimony and documentary evidence that Plaintiff wishes to use at trial concern proposed transactions with Oakwood that never occurred and cannot form the basis of any liability or damages theory.

- Much of the CRM-related testimony and documentary evidence that Plaintiff wishes to use at trial dates from 1999 and 2000, one to two years before September 2001 when Plaintiff claims that Oakwood's situation was so dire that Defendants should have advised or forced Oakwood into bankruptcy.

- As Plaintiff's theory is that the Loan Purchase Facility somehow harmed Oakwood, the relevant evidence is the terms of the Facility and communications with Oakwood about it, not the internal process leading up to the approval of it.

In addition, this evidence should be excluded pursuant to Fed. R. Evid. 403 on the grounds of prejudice, confusion, and waste of time. Plaintiff wants to use the CRM documents and testimony to the extent they contain negative opinions of Oakwood's financial situation. But that evidence is not only cumulative, it is irrelevant to the actual services provided to Oakwood. It will only confuse and possibly prejudice the trier of fact when the real issue, according to Plaintiff, is what did or didn't happen to Oakwood around September 2001.

## NATURE AND STAGE OF THE PROCEEDINGS

This adversary proceeding was commenced in November 2004 by the filing of the Objection and Counterclaims with the Bankruptcy Court. (Adv. Proc. D.I. No. 1.) Motion

practice and discovery proceeded before the Bankruptcy Court over the course of the following three years. On December 7, 2007, Plaintiff filed a Motion to Withdraw the Reference (Civ. D.I. No. 1.) Following briefing on the Motion to Withdraw the Reference and a status conference before this Court on January 22, 2008, the Court issued an order withdrawing the reference of this Adversary Proceeding to the Bankruptcy Court on the basis of judicial economy. (Civ. D.I. No. 23.) The present motion by Defendants requests that the Court exclude from evidence certain testimony and documents relating to the Credit Risk Management group.

## FACTUAL BACKGROUND

**A.    Plaintiff's Claims**

On November 15, 2002, Oakwood Homes Corp. and certain of its subsidiaries and affiliates ("Oakwood") filed petitions for bankruptcy protection under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. Oakwood was one of the largest manufacturers and retailers of manufactured housing in the country. Many of the manufactured housing units sold through Oakwood's retail centers were financed by installment sale contracts or loans arranged by Oakwood, and Oakwood generally retained a security interest in all the homes it financed, with the related loans documented as installment sales contracts or traditional mortgages (collectively, "RICs"). Oakwood originated these RICs itself and purchased other RICs originated by various independent entities. Oakwood funded its originations and purchases of the RICs through various public and private asset securitizations. From 1996 until Oakwood filed for bankruptcy, Defendant CSS provided services to Oakwood in connection with these securitizations, including the underwriting of securitization transactions and the maintenance of a loan purchase or "warehouse" facility. In August 2002, Oakwood engaged Defendant CSS as its financial advisor, pursuant to an engagement letter, to assist it with its bankruptcy filing.

3

Subsequent to the bankruptcy filing, CSS filed proofs of claim seeking payment of fees and expenses stemming from its August 2002 letter agreement with Oakwood. On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims.

Plaintiff's common law causes of action are: (1) for breach of an implied contract, asserting that the Credit Suisse Defendants breached an implied agreement to provide general financial and strategic advice which somehow arose out of the securitization services; (2) for negligence, asserting that Defendants failed to exercise due care; and (3) for breach of fiduciary duty, apparently based on the prior assertions and the fact that Defendants earned fees for the securitization services provided. Plaintiff alleges that beginning sometime in 2001 the Credit Suisse Defendants harmed Oakwood by providing the securitization services (and getting paid for them), by continuing to provide them when the company was in financial distress, and by failing to advise or to force the company to file for bankruptcy earlier than it did. The focus of Plaintiff's claims is the alleged failure of Defendants to advise or force Oakwood to file for bankruptcy in or around September 2001, a year earlier than its actual bankruptcy filing. This failure, according to Plaintiff, entitles it to a damages award of more than $50 million, plus disgorgement of Defendants' fees. (*See* Motion to Exclude Expert Testimony of Alan Shapiro Pursuant to Fed. R. Evid. 702 ("Shapiro Motion") and attached exhibits, concurrently filed herewith.)

## B.    Role Of Credit Risk Management Group

Defendant New York Branch is a separate legal entity from the other Credit Suisse Defendants that is authorized to engage in lending and credit transactions. (Deposition of Jared Felt, dated June 15, 2006, at 202-03 (hereinafter cited "Felt Dep. at __") (attached as Ex. A

to Declaration of Elizabeth M. Dowd dated April 16, 2008) (hereinafter cited "Dowd Decl. Ex. __, at __") (contemporaneously filed herewith).) Among other functions, the Credit Risk Management group ("CRM") analyzes proposed credit facilities for the potential risk exposure to the bank. (Deposition of James Xanthos, dated August 24, 2006, at 9-10; Dowd Decl. Ex. B at 9-10 (heireinafter cited "Xanthos Dep. at __"); Deposition of Thomas Irwin, dated November 8, 2006, at 15; Dowd Decl. Ex. C at 15 (hereinafter cited "Irwin Dep. at __").) At the times relevant to this case, CRM was divided into several subgroups, one of which reviewed proposed asset-backed credits, which included those secured by mortgages. (Xanthos Dep. at 9-10). This subgroup reviewed asset-backed credits proposed by various business units of different Credit Suisse entities, including CSS. The business units would present proposals or ideas for client credit facilities orally or by means of written presentations as they chose. (Irwin Dep. at 14-17, 20, 160; Deposition of Fiachra O'Driscoll, dated June 29, 2006, at 46-50; Dowd Decl. Ex. D at 46-50 (hereinafter cited "O'Driscoll Dep. at __").) Although CRM of course discussed its decisions and reasoning about a proposal to the business unit that backed it, internal CRM reports were not shared with the business units. (Xanthos Dep. at 21-22; Felt Dep. at 214-16.)

During the period when Oakwood was using the securitization services of Defendant CSS, Oakwood proposed certain credit transactions that were reviewed by CRM as part of its ordinary review function. (Irwin Dep. at 14-17, 21) (O'Driscoll Dep. at 46-50.) Tom Irwin, a director, and James Xanthos, an analyst, were two of the CRM employees involved in reviewing the proposed Oakwood transactions, and Plaintiff has taken both of their depositions.[1]

In 1999, Mr. Xanthos, a junior analyst, was asked to write a credit report in connection with Oakwood's request for a $75 million reverse repo securitization facility.

---

[1] Both men left Credit Suisse years ago and presently work at other financial institutions. Consequently, if permitted, Plaintiff would have to present their testimony by deposition.

Oakwood's request for this facility was relayed to CRM by Fiachra O'Driscoll of the Asset Backed Securities group of Defendant CSS. (O'Driscoll Dep. at 163-69, 177.) Mr. Xanthos performed a review in November and December 1999 and wrote some reports based on that review in early 2000. Mr. Irwin reviewed the reports and spoke to others within CRM about the proposal, including a modified proposal for a $50 million facility. (March 13, 2001, Memorandum to File, CSFB-00512903; Dowd Decl. Ex. E). CRM decided to decline the proposed reverse repo facility in March 2000. (*Id.*) Plaintiff has spent several hours' worth of deposition time with almost every one of Defendants' witnesses asking questions about these transactions that never happened.

In 2000, Oakwood informed Mr. O'Driscoll that its current warehouse facility provider, Bank of America, was dissatisfied with the relationship, and that Oakwood wanted Credit Suisse to step in and provide a similar facility. (O'Driscoll Dep. at 315-17.) CRM reviewed the proposal for a three-year committed loan purchase, or "warehouse", facility for Oakwood. CRM approved the Loan Purchase Facility and it closed in February 2001. Plaintiff has spent significant time in depositions questioning CRM and CSS witnesses about internal discussions and emails concerning the loan purchase facility proposal, even though it was evaluated and approved well before September 2001.

## ARGUMENT

### I. STANDARDS FOR EXCLUSION OF EVIDENCE UNDER F.R.E. 402 AND 403

Under Federal Rule of Evidence 402, only evidence that is relevant may be admitted. Fed. R. Evid. 402. Federal Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

6

evidence." Fed. R. Evid. 401. In deciding whether evidence is relevant, the court assesses whether the evidence "tends to prove the matter sought to be proved." Fed. R. Evid. 401 advisory committee's notes.

Even if evidence is relevant, it is inadmissible under Federal Rule of Evidence 403, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The district court's wide discretion with respect to the admissibility of evidence "is particularly true with respect to Rule 403 since it requires an 'on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.'" *Sprint/United Mgmt. Co. v Mendelsohn*, 128 S. Ct. 1140, 1145 (2008) (internal citations omitted). This balancing "ensures that juries are not presented with evidence that is far less probative than it is prejudicial." *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002).

## II. ALL DOCUMENTS AND TESTIMONY RELATED TO CRM'S REVIEW OF THE PROPOSED REVERSE REPO FACILITY IN 1999 AND 2000 SHOULD BE HELD INADMISSIBLE

Evidence relating to a transaction that was declined 18 months before what Plaintiff considers to be the relevant period of its claims is irrelevant and will only waste the time of the trier of fact. Plaintiff apparently believes that because some of the memoranda that CRM generated as part of its consideration contain negative views about Oakwood's financial situation, they are automatically relevant. Plaintiff is wrong on several counts.

RLF1-3274032-1

First, Plaintiff has never articulated why CRM's views are relevant to this case.[2] Plaintiff's causes of action focus on the securitization services provided to Oakwood by CSS and on the August 2002 financial advisory contract between Oakwood and CSS. It was the employees of CSS who were providing services to Oakwood in 2001 and 2002. In contrast, the CRM group was never retained by Oakwood (or any other Credit Suisse client) to do anything. CRM was an internal group whose mission was to assess credit risk to New York Branch relating to the relevant transactions. The only contact that the CRM group ever had with Oakwood was a handful of visits in the context of diligence for proposed credit facilities for New York Branch. (*See, e.g.*, Xanthos Dep. at 187.) Its internal evaluations were never shared or intended to be shared with Oakwood. Even Plaintiff cannot credibly argue that CRM assumed some kind of duty to Oakwood based on these facts.

Moreover, the CRM group was not an advisory group to any of the business units; it protected the interests of the bank, not particular business units or clients. Its internal reports on Oakwood, for example, were not shared with CSS individuals working with Oakwood. (*See, e.g.*, O'Driscoll Dep. at 188-89, 192-93; Felt Dep. at 214-16.) Consequently, the views of CRM should have no relevance and Plaintiff has never put forward a rationale for spending trial time on them.

Second, the reverse repo proposal considered in late 1999 and 2000 never happened. It was declined in March 2000. It therefore cannot be a component of Plaintiff's liability or damages theories.

---

[2] This at least is consistent with the fact that Plaintiff has never articulated a theory for naming New York Branch as a defendant, or indeed for naming the other Credit Suisse entities that are not CSS.

Third, the analysis and approval (or lack thereof) of this phantom transaction is not relevant to later events. The committed reverse repo facility evaluated by CRM involved a different structure, a different risk profile, and a different internal approval matrix than later transactions. (*See, e.g.*, O'Driscoll Dep. at 184-87; Xanthos Dep. at 15-16, 62-64, 133-34.) And the financial situation of Oakwood, not surprisingly, changed in the ensuing 18 months, as would be expected in the case of any large corporation. For example, even Plaintiff's expert Dr. Shapiro states that the market value of Oakwood's assets increased from 2001 to mid-2002. (*See, e.g.*, Supplemental Report of Alan C. Shapiro, Ph.D., dated August 28, 2007, at 3; Dowd Decl. Ex. F at 3.)

Finally, the age and ephemeral nature of the proposed transactions means that witness' recollections of its consideration by CRM are poor. Even Mr. Xanthos, the analyst who wrote the initial credit report, cannot remember the reasons or the context for many of the things he wrote. (*See, e.g.*, Xanthos Dep. at 80-85.) To the extent that Plaintiff believes it can make a sort of unpaid expert out of Mr. Xanthos, it should be noted that this credit report was Mr. Xanthos' first contact with the manufactured housing industry, as he was a relatively junior employee who had not been with Credit Suisse for long at the time of the report. (Xanthos Dep. at 6-7, 70.)

### III. ALL DOCUMENTS AND TESTIMONY RELATED TO CRM'S REVIEW OF THE LOAN PURCHASE FACILITY IN LATE 2000 AND EARLY 2001 SHOULD BE HELD INADMISSIBLE

First, the same threshold problem arises with this evidence as it does with the reverse repo facility evidence: Plaintiff has never articulated why the views of the CRM group are relevant to this case at all. Plaintiff's claims focus on the securitization services provided to Oakwood by CSS and on the August 2002 financial advisory contract between Oakwood and CSS.

It was the employees of CSS who were providing services to Oakwood in 2001 and 2002. In contrast, the CRM group was never retained by Oakwood (or any other client) to do anything. It was an internal group whose mission was to assess credit risk to the bank. For the reasons stated in Section II *supra*, the views of CRM should have no relevance and Plaintiff has never put forward a rationale for spending trial time on them.

As to evidence about CRM's consideration of the Loan Purchase Facility, Plaintiff will argue that it is not very far in time from Plaintiff's focal period beginning September 2001. But that is missing the point. In this instance, CRM approved the proposed Loan Purchase Facility, and Oakwood made use of it both before and after its bankruptcy filing. Plaintiff apparently intends to prove that the Loan Purchase Facility was somehow harmful to Oakwood. (*See* Shapiro Motion Ex. A at 36 ("The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value.").) To do so, Plaintiff must show the effects of the Loan Purchase Facility on the company. The Oakwood board of directors' approval of the Loan Purchase Facility is in the record. The terms and conditions of the Loan Purchase Facility are in the record. Whatever discussions and negotiations occurred concerning the facility between Oakwood on the one hand and anyone from Credit Suisse on the other, are also in the record. Plaintiff is free to make use of those facts however it can. But the internal CRM process leading up to the granting of the Loan Purchase Facility is entirely irrelevant to any supposed harm that this transaction inflicted on Oakwood.

IV. **EVEN IF THE COURT CONSIDERS THE EVIDENCE RELEVANT, IT SHOULD BE EXCLUDED ON THE GROUNDS OF PREJUDICE, CONFUSION, AND WASTE OF TIME**

If there is any probative value to be found in evidence about CRM's internal consideration of the reverse repo and loan purchase facilities, it is clearly outweighed by its detriments. *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1346-7 (3d Cir. 2002) (finding the low probative value of an investigative report was substantially outweighed by the "potential risk of undue delay and waste of time"); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061 (3d Cir. 1996) (finding no abuse of discretion in the lower court's determination that certain statements were more prejudicial than probative of the ultimate issue of the case); *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179 (3d Cir. 1988) (finding no abuse of discretion in excluding evidence of post-merger corporate performance on the ground that "the possible prejudice arising from use of events long after the preparation of the [document] to cast light on the defendants' earlier intention outweighed its limited probative value"). First, there is the obvious danger of inciting confusion and prejudice to the Credit Suisse Defendants – a danger so obvious that it is probably why Plaintiff is eager to spend large amounts of trial time on these documents and testimony. If the trier of fact at trial is a jury (as of this filing, that had not yet been determined by the Court), then there is a significant risk that a jury will not understand or be confused by the function of CRM, which is to protect the bank, not the client. Plaintiff has already made the blanket assertion that every single Credit Suisse Defendant was somehow an insider of Oakwood. (*See* Plaintiff's Counter-Statement Certifying That Genuine Issues Of Material Fact Exist, dated March 13, 2007, at 7-10 (Civ. D.I. No. 50).) Plaintiff will try to confuse the jury by painting CRM's legitimate concern with asset quality and credit enhancement as something underhanded and unfair to Oakwood. Yet credit risk management is a necessary function in any bank, and New

11

York Branch is no different just because Plaintiff has decided to name it as a defendant. What is relevant in this case is communications and transactions between Oakwood and Defendants. What is not relevant is internal credit-related deliberations that Oakwood, or any other client, had no part in.

To the extent that Plaintiff wants to use the CRM reviews to demonstrate that Oakwood and its industry were facing financial and operational difficulties, this evidence is not necessary, because no one disagrees with that proposition. The material in the CRM reviews would be duplicative of other, more relevant evidence on this point, including the testimony of Oakwood's executives, the company's SEC filings, public equity analysts' reports about Oakwood and the testimony of all of the parties' proffered experts.

Finally, the Court should consider the waste of time involved with this evidence. *See Coleman*, 306 F. 3d at 1346 (noting that defending against excluded document at trial would have lead to "a great deal of testimony- a trial within a trial"). Based on the many hours Plaintiff has spent at depositions asking witnesses about each sentence of lengthy CRM memoranda, the Court should expect CRM-related testimony and exhibits to consume a significant part of the trial. And that would just promote confusion and sideshows, while the salient factual evidence and expert testimony will be lost in the noise. What matters is evidence about the communications and transactions between Oakwood and Defendants, as well as whatever admissible proof Plaintiff can muster about damages. The Court should exclude the CRM evidence so that the trial can proceed in a focused and efficient way.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court exclude from evidence all testimony and documents relating to Credit Risk Management consideration of the reverse repo facility or facilities, and the Loan Purchase Facility.

| | |
|---|---|
| Dated: April 16, 2008<br>Wilmington, Delaware | Respectfully submitted,<br><br>/s/ Mark D. Collins<br>Mark D. Collins (No. 2981)<br>collins@rlf.com<br>Russell C. Silberglied (No. 3462)<br>silberglied@rlf.com<br>Anne S. Gaza (No. 4093)<br>gaza@rlf.com<br>Lee E. Kaufman (No. 4877)<br>kaufman@rlf.com<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br><br>- and -<br><br>R. Paul Wickes<br>Mary K. Warren<br>Michael J. Osnato, Jr.<br>J. Justin Williamson<br>LINKLATERS<br>1345 Avenue of the Americas<br>New York, NY 10105<br>Telephone: (212) 903-9000<br>Facsimile: (212) 903-9100<br><br>*Attorneys for Defendants* |