## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------x

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>              Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC Liquidation Trust,<br><br>            Plaintiff,<br>    v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>           Defendants. | Adv. Proc. No. 04-57060 (PJW)<br><br>Civil Action No. 07-799 (JJF) |

--------------------------------------------------------------

## DECLARATION OF ELIZABETH M. DOWD
## IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE CERTAIN TESTIMONY AND DOCUMENTS RELATING TO CREDIT RISK MANAGEMENT REVIEWS

I, Elizabeth M. Dowd, declare as follows:

1.     I am an attorney associated with the law firm of Linklaters LLP, counsel to

Defendants in this action.  I submit this Declaration in connection with Defendants' Motion

Pursuant to Fed. R. Evid. 402 and 403 to Exclude Certain Testimony and Documents Relating to

Credit Risk Management Reviews.

2.    Attached hereto as Exhibit A is a true and correct copy of excerpts from the Deposition of Jared Felt, dated June 15, 2006.

3.    Attached hereto as Exhibit B is a true and correct copy of excerpts from the Deposition of James Xanthos, dated August 24, 2006.

4.    Attached hereto as Exhibit C is a true and correct copy of excerpts from the Deposition of Thomas Irwin, dated November 8, 2006.

5.    Attached hereto as Exhibit D is a true and correct copy of excerpts from the Deposition of Fiachra O'Driscoll, dated June 29, 2006.

6.    Attached hereto as Exhibit E is a true and correct copy of the March 13, 2001, Memorandum to File, CSFB-00512903.

7.    Attached hereto as Exhibit F is a true and correct copy of the Supplemental Report of Alan C. Shapiro, Ph.D., dated August 28, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 16, 2008
New York, New York

Elizabeth M. Dowd, Esq.

**EXHIBIT A**

1  IN THE UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE

3

4  IN RE:

5  OAKWOOD HOMES CORPORATION, ET AL.,)
                                    )
6          DEBTORS,                 )
   _____  )
7                                   )
                                    )
8  OHC LIQUIDATION TRUST,           )  No. 02-13396(PJW)
                                    )
9          PLAINTIFF,               )  VOLUME 1
                                    )  PAGES 1 THROUGH 292
10 vs.                              )
                                    )
11 CREDIT SUISSE FIRST BOSTON, A    )
   SWISS BANKING CORPORATION, CREDIT)
12 SUISSE FIRST BOSTON LLC, A       )
   DELAWARE LIMITED LIABILITY       )
13 CORPORATION, CREDIT SUISSE FIRST )
   BOSTON, INC., CREDIT SUISSE FIRST)
14 BOSTON (USA), INC., A DELAWARE   )
   CORPORATION AND A WHOLLY OWNED   )
15 SUBSIDIARY OF CREDIT SUISSE FIRST)
   BOSTON, INC., THE SUBSIDIARIES AND)
16 AFFILIATES OF EACH, AND DOES 1   )
   THROUGH 100,                     )
17                                  )
           DEFENDANTS.              )
18 _____  )

19

20 VIDEOTAPED
   DEPOSITION OF:
21              JARED FELT
                THURSDAY, JUNE 15, 2006
22              LOS ANGELES, CALIFORNIA

23

24 REPORTED BY:
25 FELIPE F. CARRILLO, CSR 9555

**202**

1  warehouse lender?
2      A.  That was the post -- that was the entity that
3  provided the loan purchase facility, as well as the
4  provider of the loan purchase facility after bankruptcy.
5      Q.  Okay.  All right.  And can you tell me what New
6  York branch is?  How does it fit in the family of -- is
7  it a branch of some other corporation?
8      A.  It is the entity that has the legal right to lend
9  money.
10     Q.  And is it a subsidiary?
11     A.  It is a bank -- it's a bank.
12     Q.  It's a bank.  Is it related in same way through
13 common ownership or parent-subsidiary relationship to
14 CSFB that signed the August 19th contract?
15     A.  It is a -- I believe it is a federal reserve
16 regulated entity that has ultimate control under the
17 Credit Suisse group.
18     Q.  It is the parent of all other entities in the
19 group?
20     A.  No.
21     Q.  When you say it has ultimate control, you lost me
22 there.
23     A.  It is ultimately owned by the Credit Suisse
24 group.
25     Q.  Oh, okay.

**203**

1      A.  A Swiss company.
2      Q.  And is that also true of either the CSFB entity
3  this signed the August 19th contract or its parent?
4      A.  Yes.
5      Q.  So New York branch and the CSFB entities that
6  signed the contract are sister companies?
7      A.  I'm not sure if they're sister or not.  They are
8  under the same ultimate ownership.
9      Q.  Okay.
10     A.  But separate legal entities with separate
11 management.
12     Q.  Okay.  Let's now return to Exhibit 10, if we
13 could.
14         Forgive me, but I've covered a number of these,
15 things that I intend to ask you about this, and I will
16 not trouble you with them again.
17         As of the time of the preparation of this
18 document, did you believe that CSFB had any particular
19 expertise in the manufactured housing industry?
20     A.  We had worked -- I had worked with another firm,
21 another manufactured housing company.
22     Q.  And which was that?
23     A.  Champion Enterprises.
24     Q.  Had you also entered into a contract with
25 Champion?

**204**

1      A.  We had -- I had worked on a team that helped
2  Champion raise capital in early 2002.
3      Q.  All right.  That was not a restructuring then?
4      A.  It was not.
5      Q.  And other than your attempt to help Champion
6  raise capital, did your -- did CSFB have any particular
7  expertise in the manufactured housing industry?
8      A.  Credit Suisse provided or did securitizations for
9  a number of other manufactured housing companies, as
10 well as for CONSECO, a financing arm for the industry or
11 finance company for the industry.
12     Q.  Did CSFB have any relationship with CONSECO other
13 than securitization?
14     A.  Yes.
15     Q.  What was that?
16     A.  I don't know.
17     Q.  Do you know who within CSFB would likely know the
18 answer to that question?
19     A.  There are a number of people who would.
20     Q.  Can you name a couple of them for me anyway?
21     A.  I cannot.
22     Q.  Okay.  Do you know what group or branch to look
23 in or can you give me any better guidance to who I
24 would -- who might I learn who these people were?
25     A.  It is a finance company.  Perhaps the Financial

**205**

1  Institutions Group.
2      Q.  All right.  Was CSFB a lender to CONSECO?
3      A.  I don't know.
4      Q.  Have you told me everything you know about CSFB's
5  relationship with CONSECO?
6      A.  We, Fuhchu and I, went to CONSECO and offered to
7  help them with restructuring services for their business
8  as well.
9      Q.  When did that happen?
10         MS. WARREN:  I would like to caution the
11 witness to just talk about public information with
12 respect to CONSECO.
13         THE WITNESS:  Fair.
14 BY MR. CASTANARES:
15     Q.  I don't think I'm going to ask you for any
16 non-public information, and if I do, you let me know.
17     A.  That's non-public information.
18     Q.  When it happened is non-public information?
19     A.  The fact that it happened is non-public
20 information.
21     Q.  Okay.  I'm going to ask you for some non-public
22 information, I guess.
23         MS. WARREN:  About other clients or
24 potential clients of Credit Suisse?  Because I'm not
25 going to let him answer those questions.

1    MS. WARREN:  Objection to the form.
2        THE WITNESS:  That's speculation.  The
3    reason that it had -- the number of providers had
4    increased substantially because of profits in the space
5    in the early '90s.  So if lenders, the potential loan
6    purchasers, saw it as profitable, they would have
7    reentered the market.
8    BY MR. CASTANARES:
9    Q.  As of the time you prepared Exhibit 10, were you
10   aware that CSFB's credit department had recommended in
11   January of 2000 against providing some sort of line or
12   facility to Oakwood?
13   A.  No.
14   Q.  Did you become aware of that at some later date?
15   A.  No.
16   Q.  So is this the first you've heard of it right
17   now?
18   A.  I saw a document yesterday long after the case
19   ended.
20   Q.  And that's the first time you heard that
21   Mr. Zanthos had declined a proposed credit for Oakwood?
22   A.  Yes.
23       MS. WARREN:  Objection to the form.
24   BY MR. CASTANARES:
25   Q.  Just so we understand, yesterday was the first

214

1    time you learned that?
2    A.  Yes.
3    Q.  Okay.  And that was in the course of reviewing
4    documents in preparation for this deposition?
5    A.  It was because I was told that you had
6    requested --
7        MS. WARREN:  Hold.  Hold.  Don't go into
8    details.  The short answer is yes.
9        THE WITNESS:  Yeah.
10   BY MR. CASTANARES:
11   Q.  The short answer is yes.  I don't want to be
12   asking what your counsel told you.  I just want to -- my
13   question was, what was the occasion of your reviewing
14   this document, was preparing for this deposition?
15   A.  (Nods his head up and down).
16   Q.  Okay.  Now, did the Chinese wall that existed at
17   Oakwood, would that have prevented you in August of 2002
18   from getting Mr. Zanthos's report of January '00 if you
19   had wanted?
20       MS. WARREN:  Objection to the form.  You
21   used the term -- you said "Oakwood."  I'm not sure
22   that's what you meant.
23       MR. CASTANARES:  Let's start again.
24   Q.  Did the Chinese wall that existed at CSFB, would
25   that have prevented you from obtaining Mr. Zanthos's

215

1    January '00 credit report on Oakwood if you had wanted
2    to get it?
3    A.  I don't know.
4        MS. WARREN:  Objection to the form.
5    BY MR. CASTANARES:
6    Q.  You don't know?
7    A.  I don't know.
8    Q.  Would any other kind of -- was there any other
9    kind of internal inhibition on your being able to get
10   information from credit or Credit Risk Management if you
11   had wanted to do so in the course of the performance of
12   a financial services advisory contract?
13   A.  New York branch is a separate entity.  I have
14   never asked New York branch for information in
15   performing an assignment.
16   Q.  Okay.  So do I understand from that that the --
17   did Mr. Zanthos work for New York branch?
18   A.  I believe he does, but I don't know.
19   Q.  Or at least he did then; right?
20   A.  (Nods his head up and down).
21   Q.  And as of about the time of the execution of the
22   August contract, was CSFB itself or New York branch, to
23   your knowledge, reducing its activities either as a
24   lender, if it had any, or as a provider of warehouse
25   lines in the manufactured home industry?

216

1        MS. WARREN:  Would you read that back,
2    please.
3        (Record read)
4        MS. WARREN:  Objection to the form, but go
5    ahead.
6        THE WITNESS:  There was less activity in the
7    space in the securitization market and in the industry,
8    therefore, the activity of Credit Suisse would have been
9    diminished.
10   BY MR. CASTANARES:
11   Q.  Okay.  Do you know?  Do you know whether Credit
12   Suisse had decided to diminish its activities in this
13   field or was it purely a result of diminished amount of
14   business out there?
15       MS. WARREN:  Are you asking about CSFB?
16       MR. CASTANARES:  I'm using the same word as
17   the witness used, Credit Suisse.
18       THE WITNESS:  CSFBC would have diminished
19   its activities in the securitization market because
20   there were fewer securitizations.  I don't know what New
21   York branch was doing.
22   BY MR. CASTANARES:
23   Q.  Okay.  And to the extent that CSFBC was reducing
24   its activities in the securitization markets, it was
25   doing that purely because there was less business out

217

**EXHIBIT B**

```
 1

 2     UNITED STATES BANKRUPTCY COURT
            DISTRICT OF DELAWARE
 3     ----------------------------x
       In Re:                      )Chapter 11
 4     OAKWOOD HOMES CORPORATION,   )Case No. 02-13396
       et al.,                      )(PJW)
 5                      Debtors. )Jointly Administered
       ----------------------------x
 6     OHC LIQUIDATION TRUST,       )
                      Plaintiff, )
 7               vs.               )Adv. Proc. No.
       CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
 8     Swiss banking corporation,   )
       CREDIT SUISSE FIRST BOSTON   )
 9     LLC, a Delaware limited      )
       liability corporation, CREDIT)
10     SUISSE FIRST BOSTON, INC.,   )
       CREDIT SUISSE FIRST BOSTON   )
11     (U.S.A.), INC., a Delaware   )
       corporation and a wholly     )
12     owned subsidiary of CREDIT   )
       SUISSE FIRST BOSTON, INC.,the)
13     subsidiaries and affiliates  )
       of each, and DOES 1 through  )
14     100,                         )
                      Defendants.)
15     ----------------------------x

16                 August 24, 2006

17                  8:43 a.m.

18

19          Deposition of JAMES XANTHOS, held at the

20     law offices of Linklaters, 1345 Avenue of the

21     Americas, New York, New York, pursuant to

22     agreement, before Donald R. DePew, an RPR, CRR and

23     Notary Public within and for the State of

24     New York.

25
```

## Page 6

James Xanthos

A.  We provide warehouse lines to mortgage banks. We also buy mortgages from sellers of mortgages. And it's any mortgage that doesn't meet Fannie Mae or Freddie Mac's guidelines.

Q.  All right. Do your current duties in any way involve the manufactured housing business?

A.  No.

Q.  When did you first go to work for Credit Suisse?

A.  In October of 1999.

Q.  And did you go to work there in a credit management function?

A.  Yes.

Q.  Had you worked elsewhere before then?

A.  In a credit risk management --

Q.  In any function.

A.  Yes, before Credit Suisse First Boston --

Q.  Why don't you give me, if you would be so -- if you would be so kind give me a short rundown on your employment history since you graduated from your education.

A.  Sure. I graduated college, Fordham University, in 1989. And I started -- I

## Page 7

James Xanthos

was a bank examiner for three and a half years at the Office of Thrift Supervision. And from there I went back to graduate school, received my MBA. And then I started at PaineWebber in 1996 and I was there for -- I was there up until October of 1999. Then I left PaineWebber for CSFB. And I was at CSFB from October of '99 until July of 2004.

Q.  Okay. What did you do at PaineWebber?

A.  Also in credit risk management.

Q.  Did your duties there involve the manufactured housing industry?

A.  No.

Q.  So I take it you had no contact with Oakwood Homes in your time at PaineWebber?

A.  No.

Q.  What's your current office address, please?

A.  390 Greenwich Street, New York, New York, 10013.

Q.  Would you give me a brief rundown of the positions and titles that you held during your time at Credit Suisse?

A.  I started off as an assistant

## Page 8

James Xanthos

vice president and then I was promoted to a vice president level.

Q.  And were you in a credit management function throughout that employment?

A.  Yes.

Q.  And were you employed here in New York at all times?

A.  Yes.

Q.  Was Mr. Irwin your supervisor throughout your employment?

A.  Not initially, but for the bulk of my employment at CSFB he was.

Q.  Was he your supervisor at all times during which you dealt with Oakwood?

A.  No. The initial supervisor was Michael Criscito.

Q.  Could you spell that for the reporter, please.

A.  Criscito?

Q.  Or just say it slowly.

A.  Criscito.

And then Tom Irwin replaced him I guess the tail end of 1999, early 2000.

Q.  All right. How many other people

## Page 9

James Xanthos

worked in credit risk management during the time that you dealt with Oakwood in your employment at CSFB?

A.  I don't know the exact number.

Q.  Can you give me any kind of range, is it five, or ten, or 100, or --

A.  The amount of people that worked in credit?

Q.  Is credit something different from credit risk management?

A.  No, credit risk management at one -- I take that to be how many people were in the immediate group within New York.

Q.  Okay. That's --

A.  In the credit risk management group within New York.

Q.  All right.

A.  Is that just the amount of people?

Q.  Professionals.

A.  My best guess would be 40 people.

Q.  And did you --

Was there some division of labor where certain of you concentrated on certain industries, or certain clients, or some sort of division like

James Xanthos

```
08:49:30  2   that?
08:49:30  3       A.  Yes, it was divided up by industries.
08:49:34  4       Q.  And what was your division?
08:49:38  5       A.  We were in charge of reviewing credits
08:49:41  6   for the asset-backed group.
08:49:51  7       Q.  And by that do you mean that you
08:49:52  8   reviewed any kind of credit risk related to an
08:49:55  9   entity which did asset-backed transactions?
08:49:59 10       A.  Yes.
08:49:59 11       Q.  So that would be reviews of -- even
08:50:03 12   just like unsecured or secured loans, for example?
08:50:06 13       A.  Almost everything that we did was
08:50:07 14   secured, on a secured basis.
08:50:09 15       Q.  But it would involve any kind of credit
08:50:11 16   risk or any kind of transaction that would present
08:50:14 17   a credit risk issue to CSFB?
08:50:17 18       A.  Yes.
08:50:19 19       Q.  And when is the first time you can
08:50:20 20   remember dealing with anything related to Oakwood?
08:50:24 21       A.  November of 1999.
08:50:27 22       Q.  Okay.  And was that a $75 million
08:50:30 23   reverse repo proposal?
08:50:33 24       A.  Yes.
08:50:34 25       Q.  How did you happen to come into that
```
                                                                10

James Xanthos

```
08:50:37  2   transaction?
08:50:41  3       A.  I was asked to -- I was asked by my
08:50:43  4   supervisor to -- that there was a request from the
08:50:49  5   banking group to look at -- basically was to look
08:50:54  6   at the financial statements of Oakwood Homes.
08:50:57  7       Q.  And was your supervisor at that time
08:50:59  8   Mr. Crisetta?
08:51:02  9       A.  Yes.
08:51:02 10       Q.  Who was his supervisor at that time?
08:51:10 11       A.  Dan Miller.
08:51:11 12       Q.  Dan Miller?
08:51:12 13       A.  Yes.
08:51:13 14       Q.  All right.  Was he your boss's
08:51:17 15   supervisor throughout your employment at CSFB?
08:51:20 16       A.  Yes.
08:51:28 17       Q.  I'd like to ask you some questions
08:51:30 18   about the process that you engaged in as a credit
08:51:33 19   risk manager for your group.
08:51:40 20       After receiving an -- and I'm going to
08:51:43 21   speak in general here -- after receiving an
08:51:45 22   assignment from your supervisor what steps did you
08:51:49 23   ordinarily take in the ordinary course to perform
08:51:51 24   your function?
08:51:54 25       A.  If it's a public company I would have
```
                                                                11

James Xanthos

```
08:51:57  2   gone onto the Internet and basically pulled down
08:52:02  3   the most recent financial statements, 10-Qs,
08:52:06  4   10-Ks, whatever news articles I could find on the
08:52:10  5   company that were in the public marketplace.  I
08:52:16  6   would have also gone onto Bloomberg and looked to
08:52:19  7   see if there were any types of securitizations
08:52:21  8   that were completed.  Those were the normal
08:52:24  9   initial steps of the credit risk management
08:52:27 10   function.
08:52:28 11       Q.  All right.  And did you seek to
08:52:29 12   gather -- strike that.
08:52:32 13       If Credit Suisse people were dealing
08:52:35 14   with that company on other matters, such as
08:52:39 15   securitizations, for example, would you seek to
08:52:41 16   gather further information from those people?
08:52:43 17       A.  No.
08:52:45 18       Q.  So in the ordinary course, for example,
08:52:47 19   taking Oakwood now as an example, you wouldn't
08:52:49 20   have gone to, say, Mr. O'Driscoll for further
08:52:53 21   information?
08:52:54 22       MR. OSNATO:  Let me object there.
08:52:55 23       Are we speaking hypothetically, because
08:52:57 24   you used the word "example," or are we
08:53:00 25   talking specifically about his recollection
```
                                                                12

James Xanthos

```
08:53:01  2   of work done for Oakwood?
08:53:03  3       MR. CASTANARES:  No, I thought my
08:53:04  4   question was clear, but if it wasn't I'll
08:53:06  5   rephrase it.
08:53:07  6       Q.  I'm trying to find out if you followed
08:53:09  7   your ordinary course, path with respect to
08:53:12  8   Oakwood, would you have gone to Mr. O'Driscoll for
08:53:16  9   further information in your credit risk management
08:53:22 10   function?
08:53:23 11       A.  No.
08:53:27 12       Q.  Did you seek any information in the
08:53:30 13   ordinary course beyond what was available
08:53:31 14   publicly?
08:53:36 15       A.  No.
08:53:44 16       Q.  In the ordinary course did your group
08:53:46 17   do any modeling, or run any cash flows, or
08:53:49 18   projections, or that sort of thing?
08:53:54 19       A.  On the corporate entity?
08:53:56 20       Q.  Yes.
08:53:58 21       A.  That occurred as the review progressed.
08:54:03 22       Q.  Okay.  And when you asked me to
08:54:07 23   distinguish the corporate entity from something
08:54:09 24   else what were you asking me to distinguish it
08:54:12 25   from?
```
                                                                13

James Xanthos

```
          1
08:54:13  2    A.  Well, there's two ways to look at --
08:54:16  3  there's two ways that -- you know, at CSFB that we
08:54:21  4  looked at the entire credit picture.  There was a
08:54:26  5  corporate analysis, and a facility type of
08:54:29  6  analysis, a securitization type of analysis.  Most
08:54:32  7  of our facilities were securitized credit
08:54:35  8  facilities, which were structured as
08:54:38  9  securitizations.
08:54:40 10    Q.  What do you mean by that term,
08:54:41 11  "securitized credit facilities"?
08:54:44 12    A.  Meaning it is -- it resembles public
08:54:48 13  securitizations.
08:54:55 14    Q.  All right.  And in those cases did you
08:55:00 15  run some sort of cash flows, or projections, or
08:55:02 16  modeling?
08:55:06 17    A.  Yes.
08:55:07 18    Q.  And describe those for me, please.
08:55:10 19    A.  Well, you would look -- you know, you
08:55:14 20  would look at past securitizations and you would
08:55:17 21  look at what types of enhancement levels were
08:55:25 22  required to do a securitization.  So a lot of this
08:55:30 23  information is public.  You would look to see what
08:55:32 24  types of credit enhancement levels were required
08:55:35 25  to achieve an A rating, a AA rating, a AAA rating.
                                                      14
```

James Xanthos

```
          1
08:55:45  2    Q.  All right.  And after looking at the
08:55:48  3  public information what was the next step that you
08:55:50  4  would take in the ordinary course of evaluating a
08:55:53  5  proposed credit?
08:55:57  6    A.  Most times we would go to do an on site
08:56:01  7  visit with management, especially if it was a new
08:56:04  8  client.  Here, again, it was a new client for me.
08:56:06  9  So, you know, it's pretty common to go out and
08:56:11 10  visit with the management team and hear the story
08:56:15 11  directly from them.
08:56:16 12    Q.  All right.  And after doing that what
08:56:18 13  was the next step in the ordinary course?
08:56:21 14    A.  The next step would be to basically
08:56:26 15  complete your -- normally at that point in time
08:56:30 16  you would have enough information to make a
08:56:35 17  decision.  And the decision would be -- would
08:56:42 18  result in a credit write-up, to which you would
08:56:46 19  present to your manager and superior.
08:56:49 20    Q.  All right.  And did you have a certain
08:56:52 21  level of authority that you could make a decision
08:56:59 22  yea or nay or a particular credit?
08:57:02 23    A.  Well, as the analyst you were the
08:57:04 24  person responsible for doing the analysis of the
08:57:07 25  credit and of the facility.  Within CSFB, within
                                                      15
```

James Xanthos

```
          1
08:57:12  2  the credit group, there is an approval matrix
08:57:17  3  depending on various different things, the dollar
08:57:22  4  amount of a facility or the risk rating of a
08:57:25  5  facility.  So depending on the amount that was
08:57:30  6  being asked to be provided to a client and their
08:57:32  7  rating there would be a -- you know, there would
08:57:36  8  be a matrix of different approval levels.
08:57:40  9    Q.  All right.  Let me see if I could ask
08:57:42 10  the question -- a slightly different question.
08:57:44 11    Let's suppose that in the ordinary
08:57:46 12  course you found a business that clearly did not
08:57:48 13  meet credit criteria, was it within your power to
08:57:50 14  turn it down or was it merely within your power to
08:57:53 15  recommend that it be turned down?
08:57:55 16    A.  It's in my power to recommend that it
08:57:57 17  be turned down.
08:57:58 18    Q.  And would the person who would make the
08:58:00 19  final decision have been your immediate
08:58:02 20  superior if it was going to be turned down?
08:58:08 21    A.  Yes.
08:58:09 22    Q.  All right.  And if you were
08:58:10 23  recommending that it be granted would it be
08:58:12 24  correct for me to infer that there was a certain
08:58:15 25  level and dollar amount and other risk factors
                                                      16
```

James Xanthos

```
          1
08:58:18  2  that would be within your power, and if not then
08:58:23  3  within your immediate superior's, and then if not
08:58:26  4  within his?
08:58:28  5    MR. OSNATO:  Objection as to the form.
08:58:29  6    You can answer the question if you
08:58:30  7  understand it.
08:58:31  8    A.  Can you just repeat it one more time.
08:58:33  9    Q.  Yeah.  Were there certain levels of
08:58:34 10  approval that you had authority to approve on your
08:58:37 11  own, and if it exceeded your own authority that
08:58:39 12  your superior probably had that -- had a greater
08:58:41 13  authority, and so forth up the line?
08:58:43 14    A.  Yes.
08:58:46 15    Q.  Speaking of the $75 million reverse
08:58:49 16  repo facility that was proposed in '99 for
08:58:52 17  Oakwood, would that have been within your
08:58:54 18  authority to grant if you had chosen to do so?
08:58:56 19    A.  I don't recall.
08:58:59 20    Q.  Now, I think you said that after you
08:59:02 21  got to the point of decision then there was some
08:59:05 22  sort of write-up or report that was prepared, am
08:59:07 23  I --
08:59:08 24    A.  Yes.
08:59:10 25    Q.  All right.  And tell me about that
                                                      17
```

James Xanthos

```
08:59:12  2   process, please.
08:59:13  3       A.   It really is a summation of the
08:59:15  4   analysis that was completed, from the review of
08:59:19  5   public statements, from management meetings,
08:59:24  6   things such as that.
08:59:25  7       Q.   All right. And was the person in your
08:59:30  8   position, that is to say an analyst, the one who
08:59:33  9   had the primary responsibility for preparing that
08:59:36 10   kind of report?
08:59:37 11       A.   Yes.
08:59:37 12       Q.   Were there criteria that governed what
08:59:40 13   was supposed to go into such reports?
08:59:44 14       A.   Yes.
08:59:45 15       Q.   Were those in some sort of manual?
08:59:47 16       A.   I believe so.
08:59:48 17       Q.   What was the title of that manual,
08:59:50 18   please?
08:59:50 19       A.   I don't recall.
08:59:51 20       Q.   Was that a manual that was available to
08:59:53 21   you in the CRM department?
08:59:57 22       A.   It's a manual that is available, yes.
09:00:01 23       Q.   All right. If you wanted to ask
09:00:03 24   somebody for that manual what would you call it?
09:00:07 25       A.   It would be a credit policy manual.
                                                          18
```

James Xanthos

```
09:00:09  2       Q.   All right. Did you have any part in
09:00:12  3   the authorship of any portion of that manual?
09:00:15  4       A.   I don't believe so.
09:00:22  5       Q.   In preparing such written reports,
09:00:25  6   Mr. Xanthos, were you supposed to put in a bunch
09:00:29  7   of negative information, whether you believed it
09:00:31  8   or not, or were you supposed to put into the
09:00:35  9   report what you thought was actually true?
09:00:37 10       MR. OSNATO:  Objection as to the form
09:00:38 11   of the question.
09:00:39 12       You can answer it.
09:00:40 13       A.   Can you please repeat the question.
09:00:42 14       Q.   Yes. In preparing such reports did you
09:00:46 15   understand your job to be to put into those
09:00:49 16   reports negative information about the company,
09:00:52 17   whether or not you believed it to be true, or on
09:00:55 18   the other hand to put into the reports what you
09:00:58 19   actually believed to be true?
09:01:00 20       A.   The report was a summation of what I --
09:01:04 21   my evaluation of a company at that particular
09:01:08 22   point in time.
09:01:10 23       Q.   And did you endeavor to put into such
09:01:13 24   reports what you actually believed to be true?
09:01:16 25       A.   Anything that was in the report, again,
                                                          19
```

James Xanthos

```
09:01:18  2   was my summation of what -- where the credit was
09:01:22  3   at that particular point in time.
09:01:26  4       Q.   All right. Was there anything that
09:01:28  5   guided you to put negative information in credit
09:01:32  6   reports, whether you believed it or not?
09:01:34  7       MR. OSNATO:  Objection as to the form.
09:01:35  8       You can answer.
09:01:37  9       A.   Please repeat it one more time.
09:01:40 10       Q.   Yeah. Either by any directions you had
09:01:42 11   from your superiors or anything that was in the
09:01:44 12   manual or from any other source, did you have any
09:01:47 13   belief that it was your job to put negative
09:01:50 14   information into credit reports, whether you
09:01:53 15   believed that information to be true or not?
09:01:55 16       A.   Anything that I would have written I
09:01:59 17   would have written it because I believed it to be
09:02:01 18   true.
09:02:02 19       Q.   All right. Now, in the ordinary course
09:02:05 20   then what would next happen after you prepared the
09:02:07 21   credit report?
09:02:09 22       A.   Well, the credit report would be
09:02:11 23   reviewed by my superiors and then we would meet
09:02:14 24   and discuss the findings and come to a conclusion
09:02:19 25   as to what we were going to decide.
                                                          20
```

James Xanthos

```
09:02:22  2       Q.   And at that point was there some sort
09:02:24  3   of written record made of the conclusion or of the
09:02:27  4   deliberations of your meeting?
09:02:29  5       A.   I don't recall.
09:02:31  6       Q.   And in the ordinary course then to whom
09:02:33  7   would that decision be communicated, to the
09:02:37  8   borrower directly or to somebody else at CSFB?
09:02:45  9       A.   It normally would not be the borrower
09:02:47 10   directly. It would be to the person that has
09:02:50 11   proposed the facility.
09:02:52 12       Q.   And that would ordinarily be somebody
09:02:55 13   else within CSFB?
09:02:55 14       A.   Yes.
09:02:57 15       Q.   All right. And in the ordinary course
09:02:58 16   was the communication of the decision made orally
09:03:01 17   or in writing?
09:03:02 18       A.   I don't recall.
09:03:03 19       Q.   Were there occasions in your time at
09:03:06 20   CSFB when a decision was communicated in writing
09:03:10 21   to the other person?
09:03:13 22       A.   I don't recall.
09:03:16 23       Q.   Was there any kind of Chinese wall
09:03:19 24   situation that existed between information that
09:03:21 25   you developed in the CRM function and the
                                                          21
```

**James Xanthos**

```
09:03:26  businesspeople at CSFB, such that you were
09:03:30  prohibited from communicating information to them?
09:03:37     A. There is a Chinese wall, as there is in
09:03:39  most firms. Anything that -- the write-ups were
09:03:44  just for the credit risk management group. So I
09:03:48  don't believe anyone would have seen the write-ups
09:03:50  outside of the group.
09:03:53     Q. Okay. Were you prohibited from showing
09:03:56  Oakwood's write-ups to Mr. O'Driscoll?
09:03:58     A. I don't recall if I was prohibited, but
09:04:04  I don't believe that he ever saw the write-ups.
09:04:06     Q. Well, I really want to try to focus my
09:04:08  question on whether you sense that there was any
09:04:12  prohibition or inhibition upon your --
09:04:15        If Mr. O'Driscoll had asked you for
09:04:18  those reports was there something that prohibited
09:04:20  you from furnishing them to you?
09:04:21     A. No one ever asked me for -- my whole
09:04:24  time at CSFB no one ever asked for the credit
09:04:27  reports. And to the best of my knowledge, they
09:04:29  were never provided to anyone outside of the
09:04:32  credit risk management group.
09:04:39     Q. When a decision was communicated in the
09:04:42  ordinary course to someone within CSFB was it
```
                                                    22

**James Xanthos**

```
09:04:45  common that that person asked the reason for CRM's
09:04:49  decision?
09:04:56     A. It would be common. Just human nature
09:04:59  that someone would ask why, yes or no.
09:05:03     Q. And in the ordinary course then what
09:05:05  did CRM do to respond to such inquiries?
09:05:10     A. I don't know.
09:05:13     Q. Okay. Were you the person who
09:05:16  communicated the negative recommendation on the
09:05:20  $75 million reverse repo decision to somebody
09:05:25  within CSFB?
09:05:28     A. Well, any -- my recommendation would
09:05:30  have gone, as we described before, through the
09:05:33  proper channels within CRM. What happened as to
09:05:39  who was notified or who was told at different
09:05:44  points in time, I had no knowledge.
09:05:45     Q. You don't remember communicating the
09:05:46  negative decision on that facility to anyone?
09:05:50     A. Like I said, it would -- my
09:05:52  recommendation would have went to my direct
09:05:54  supervisor and to people above my direct
09:05:58  supervisor.
09:06:01     Q. Okay. And then a decision was made,
09:06:03  correct?
```
                                                    23

**James Xanthos**

```
09:06:04     A. A decision was made, yes.
09:06:05     Q. And that decision was communicated to
09:06:07  someone, correct?
09:06:09     A. I would imagine so.
09:06:09     Q. But you don't recall whether you were
09:06:11  involved in making it?
09:06:13     A. I was involved with making a decision
09:06:15  or having a viewpoint on a corporate credit. The
09:06:19  process of who was told, and when, and how, I have
09:06:22  no recollection of.
09:06:26     Q. All right. Let me ask you to look at
09:06:27  what's been previously marked as Exhibit 112.
09:06:43        MR. CASTANARES:  And I'll tell counsel
09:06:44  for Citigroup I'm not sure I have enough
09:06:47  copies of everything to show you --
09:06:48        MS. VALENTINE:  That's all right, we
09:06:49  can share.
09:06:51        MR. CASTANARES:  But the ones that I do
09:06:51  have you can keep.
09:06:53     Q. Are you the author of this document,
09:06:55  sir?
09:06:55        MR. OSNATO:  You can take a moment,
09:06:57  James, to familiarize yourself with it.
09:07:01        MR. CASTANARES:  Yes.
```
                                                    24

**James Xanthos**

```
09:07:02        (Witness looks at document.)
09:07:46     A. Just from the review of these pages
09:07:49  here I don't recall if I was the author of this
09:07:56  document, just because there is no place on here
09:08:00  that has a listing of who, in fact, put this
09:08:04  together. So I can't tell you definitively
09:08:09  whether I was the author or not.
09:08:11     Q. Were you involved in the credit review
09:08:13  of this proposed credit?
09:08:15     A. Yes.
09:08:17     Q. Was there another analyst involved in
09:08:18  the credit review of this proposed credit?
09:08:22     A. To the best of my knowledge, no.
09:08:23     Q. So if this proposed credit followed the
09:08:27  ordinary course would it be logical to infer that
09:08:29  you were the likely author of this document?
09:08:32        MR. OSNATO:  Objection as to the form.
09:08:33  He's already testified that he doesn't
09:08:35  recall authoring this document.
09:08:37        You can answer the question.
09:08:39     A. Like I said, I don't have a direct
09:08:41  recollection of writing this credit memo or this
09:08:45  update.
09:08:46     Q. Well, in the ordinary course would
```
                                                    25

James Xanthos

```
1
10:04:26  2    A.  It's not unusual.
10:04:28  3    Q.  Okay.  And does looking at the name of
10:04:30  4    Douglas Faulk, F-a-u-l-k, refresh your memory as
10:04:34  5    to whom you met with at Oakwood?
10:04:36  6    A.  No.
10:04:36  7        MR. OSNATO:  Just to clarify, Tony, I
10:04:38  8    think you meant to refer to Richard Faulk.
10:04:41  9        MR. CASTANARES:  I'm sorry, you're
10:04:42 10    absolutely correct.
10:04:44 11    Q.  Do you recall anything specific that
10:04:45 12    either Mr. Muir, or Mr. Faulk, or whomever you met
10:04:48 13    with at Oakwood said?
10:04:51 14    A.  No.
10:05:03 15    Q.  What is a committed versus an
10:05:05 16    uncommitted reverse repo facility?
10:05:08 17    A.  "Committed" is -- committed meaning the
10:05:12 18    facility -- if it's 12-month committed meaning
10:05:15 19    that the facility is in place for the 12 months.
10:05:19 20    If it's uncommitted meaning there is no obligation
10:05:22 21    for the facility to be outstanding for the period
10:05:24 22    of time that you've agreed.  So provided all the
10:05:29 23    terms and conditions of a committed facility are
10:05:32 24    met, the facility is outstanding.  If it is a
10:05:35 25    12-month facility, for 12 months.
                                                          62
```

```
1
10:05:43  2    Q.  All right.  And did committed versus
10:05:50  3    uncommitted reverse repo facilities have a
10:05:53  4    different risk characteristic from the perspective
10:05:57  5    of the lender?
10:05:58  6    A.  Yes.
10:05:59  7    Q.  Describe that, please.
10:06:02  8    A.  Committed you are in the facility for
10:06:05  9    the amount of period of time that you've --
10:06:06 10    through the maturity, provided all of the
10:06:10 11    conditions are met versus uncommitted can be the
10:06:13 12    facility is not obligated -- you're not obligated
10:06:18 13    to be out for I'll say 12 months.
10:06:26 14    Q.  In an uncommitted facility is the
10:06:28 15    lender basically free to turn down any proposed
10:06:31 16    transaction within it at will?
10:06:36 17    A.  Yes.
10:06:37 18    Q.  So it's basically an option on the part
10:06:39 19    of the lender to lend or not to lend, is that it?
10:06:42 20    A.  Yes.
10:06:46 21    Q.  And describe for me briefly, please,
10:06:48 22    what a reverse repo facility is.
10:06:52 23    A.  It's where the counterparty is
10:06:55 24    providing you with securities and you're providing
10:06:58 25    the counterparty with cash, which is derived from
                                                          63
```

```
1
10:07:04  2    the value of the security less a specific haircut.
10:07:10  3    Q.  And so if we have an asset which is a
10:07:15  4    mortgage or a retail installment contract with a
10:07:19  5    face value of 100 the haircut is a percentage
10:07:23  6    taken off that?
10:07:24  7    A.  Yes.
10:07:24  8    Q.  And so a haircut of 19 percent would
10:07:26  9    indicate that the lender would lend $81 on that
10:07:30 10    asset.
10:07:30 11    A.  Yes.
10:07:32 12    Q.  And then is it correct that in a
10:07:34 13    reverse repo facility the borrower is essentially
10:07:37 14    required to purchase the asset back from the
10:07:39 15    lender?
10:07:41 16    A.  Yes, at a specific point in time.
10:07:42 17    Q.  For $81 plus a rate of interest; is
10:07:45 18    that right?
10:07:46 19    A.  Yes.
10:07:54 20    Q.  And what is meant by the term "risk
10:07:57 21    free haircut"?
10:07:59 22    A.  Risk free haircut is -- the meaning
10:08:02 23    there is a -- if you say -- the terminology we
10:08:09 24    used in credit risk management was that if you --
10:08:12 25    basically you're not taking -- the haircut is
                                                          64
```

```
1
10:08:15  2    protecting you from any type of risk.  Meaning if
10:08:23  3    a AAA -- if a AAA enhancement level was let's say
10:08:29  4    20 percent and you have a haircut of 20 percent
10:08:31  5    theoretically you were a AAA, so you were at --
10:08:35  6    theoretically don't have any risk in the
10:08:37  7    transaction.
10:08:42  8    Q.  And what do you mean by the term
10:08:44  9    "enhancement" in this context?
10:08:46 10    A.  Everything -- when I say enhancement
10:08:48 11    I'm referring to securitization enhancement,
10:08:52 12    meaning if a most recent deal had a 20 percent
10:08:59 13    enhancement to AAA, meaning a credit enhancement
10:09:02 14    below the seniors notes, that's translating to a
10:09:05 15    risk free haircut of 20 percent for a AAA advance.
10:09:09 16    Q.  What is an enhancement?
10:09:12 17    A.  It's subordination, it's
10:09:14 18    overcollateralization, and it's excess spread.
10:09:17 19    Q.  It's one of those three things or a
10:09:19 20    combination?
10:09:21 21    A.  Actually it could be a combination of
10:09:23 22    all three.
10:09:24 23    Q.  And when you say excess spread what do
10:09:25 24    you mean by that term, please?
10:09:26 25    A.  It's the difference between what the
                                                          65
```

James Xanthos

```
10:14:18  2   that was the conclusion that I came up with.
10:14:20  3       Q.   Well, how did you conclude that it was
10:14:22  4   weaker than other players in the industry?
10:14:25  5       A.   Just looking at the financial
10:14:26  6   statements of other companies within the industry.
10:14:31  7   And I made the judgment that I thought at that
10:14:34  8   point in time that Oakwood was having issues.
10:14:40  9       Q.   Issues greater than other players in
10:14:43 10   the industry, correct?
10:14:44 11       A.   I think issues -- I think, like I said
10:14:46 12   before, most companies within this industry were
10:14:48 13   facing the same issues.  And I think me writing
10:14:53 14   this was -- I was still learning the industry at
10:14:57 15   that point in time.  So, again, this was my
10:15:01 16   estimation of what I -- where I thought Oakwood
10:15:04 17   was at that point in time.
10:15:05 18       Q.   Okay.  But what caused you to use the
10:15:07 19   superlative saying that Oakwood was the weakest
10:15:10 20   company in this industry?
10:15:11 21       A.   I don't recall.
10:15:12 22       Q.   Nonetheless, you did believe that at
10:15:14 23   the time or you wouldn't have written it down,
10:15:17 24   correct?
10:15:17 25       A.   I believe so.
```
70

James Xanthos

```
10:15:26  2       Q.   Now, in the next paragraph -- I'm
10:15:31  3   sorry, it's the last paragraph in this -- under
10:15:35  4   this conclusion header, "It should be noted."
10:15:38  5       A.   Okay.
10:15:39  6       Q.   All right.  And it says that in June
10:15:43  7   '99 Oakwood was internally rated BBB minus.
10:15:48  8           And when you say "internally rated"
10:15:50  9   that's within CSFB?
10:15:51 10       A.   Within CRM.
10:15:53 11       Q.   Within CRM.
10:15:58 12           And the next paragraph refers to a
10:16:00 13   B minus, is that a lower rating than BBB minus?
10:16:04 14       A.   Yes.
10:16:04 15       Q.   How many rungs down is it?
10:16:09 16       A.   I might have to sit here and -- I
10:16:10 17   mean --
10:16:12 18       Q.   Don't write anything.
10:16:12 19           MR. OSNATO:  Please don't write
10:16:13 20   anything.
10:16:13 21           If you know the answer, James, you can
10:16:14 22   answer.  If you don't know the answer, that's
10:16:17 23   fine, too.
10:16:19 24       A.   I don't know the answer.
10:16:21 25           MR. CASTANARES:  Let me suggest that we
```
71

James Xanthos

```
10:16:22  2   substitute a different copy of Exhibit --
10:16:24  3           MR. OSNATO:  Why don't we just -- do
10:16:25  4   you want to use a Post-it so he can --
10:16:26  5           MR. CASTANARES:  No, actually it
10:16:26  6   doesn't really matter because Exhibit 54 has
10:16:29  7   already been marked.  This is a previously
10:16:31  8   marked exhibit.  It doesn't really matter
10:16:34  9   that he's written on it.
10:16:35 10           MR. OSNATO:  I understand.  No, I take
10:16:36 11   your point.  But if you're asking him to
10:16:37 12   write on it further I don't know that that's
10:16:38 13   a good idea.
10:16:38 14           MR. CASTANARES:  No, I'm not asking him
10:16:40 15   to write on it further.  I was only
10:16:42 16   suggesting that since he did write on it, we
10:16:44 17   substitute, but then I realized that's really
10:16:44 18   not necessary.
10:16:44 19           MR. OSNATO:  I agree, there's no
10:16:46 20   grievous harm done here.
10:16:49 21           MR. CASTANARES:  No even mild harm
10:16:50 22   here.
10:16:51 23       Q.   Is there a BB minus rating that's like
10:16:53 24   a BB as opposed to triple that's someplace between
10:16:59 25   B minus and BB minus?
```
72

James Xanthos

```
10:17:01  2       A.   The next level below BBB minus is
10:17:04  3   BB plus, then it goes down from there.
10:17:08  4       Q.   Okay.  So this is six or seven rungs
10:17:13  5   down?
10:17:14  6       A.   I don't know the exact number, but it
10:17:15  7   is below the BBB minus level.
10:17:17  8       Q.   It is several rungs down; is that
10:17:20  9   right?
10:17:22 10       A.   It is.
10:17:23 11       Q.   What caused Oakwood to go several rungs
10:17:26 12   down within CRM's mind in the space of six months?
10:17:29 13       A.   Again, I can't speak for you, know, why
10:17:32 14   the rating was BBB minus in June of 1999.  All I
10:17:36 15   can tell you is from my evaluation of the credit
10:17:39 16   when I looked at it, in my viewpoint the rating
10:17:42 17   was a B minus.
10:17:44 18       Q.   You were the person who assigned that
10:17:46 19   rating?
10:17:47 20       A.   Myself and from discussions after
10:17:50 21   reviewing the company with my managers, yes.
10:17:54 22       Q.   All right.  Do you know who had
10:17:55 23   assigned the earlier rating in June?
10:17:58 24       A.   I don't recall.
10:18:03 25       Q.   At the time that you gave it the
```
73

James Xanthos

10:23:56 2 managers were ex-Price Waterhouse accountants?
10:24:04 3     A.   I don't know.
10:24:05 4     Q.   Does it have anything to do with the
10:24:08 5 prior sentence, which discusses their lack of
10:24:10 6 understanding of their marketplace?
10:24:14 7     A.   I don't know.
10:24:17 8     Q.   Now, what did you know in the following
10:24:21 9 sentence, that "Various Rating Agencies have also
10:24:24 10 noted and commented on management's performance
10:24:27 11 and execution"?
10:24:29 12         What had you seen from rating agencies?
10:24:32 13     A.   I'm taking -- you know, as part of the
10:24:34 14 diligence this is -- I've read -- I read rating
10:24:37 15 agency reviews and that was the comment that
10:24:43 16 agencies had put out there.
10:24:56 17     Q.   Now, did you go down to North Carolina
10:25:03 18 together with Mr. Criscito and Mr. O'Driscoll on
10:25:08 19 the same plane?
10:25:14 20     A.   I don't recall.
10:25:15 21     Q.   Did you come back together?
10:25:17 22     A.   I don't recall.
10:25:18 23     Q.   Do you recall whether you discussed any
10:25:20 24 of these things with Mr. O'Driscoll at all?
10:25:22 25     A.   I don't recall.

78

James Xanthos

10:25:28 2     Q.   Specifically can you recall whether you
10:25:30 3 discussed with Mr. O'Driscoll your prediction in
10:25:33 4 the next paragraph, that management would not meet
10:25:37 5 forecasted profitability levels?
10:25:40 6     A.   I don't recall.
10:25:43 7     Q.   And did you have any basis for making
10:25:45 8 that prediction, other than what you got from
10:25:48 9 publicly available information and from your visit
10:25:50 10 with the executives at Oakwood?
10:25:57 11     A.   Please repeat the question.
10:26:00 12     Q.   When you predicted that management
10:26:03 13 would not meet the forecasted profitability levels
10:26:08 14 in the next reporting period or in the future did
10:26:12 15 you have any basis for making that statement other
10:26:14 16 than what you had derived from publicly available
10:26:18 17 information and from your visit to the executives
10:26:19 18 in North Carolina?
10:26:22 19     A.   No.
10:26:28 20     Q.   Now, in the next paragraph beginning
10:26:31 21 with the words "Consumer Finance" -- you're
10:26:37 22 probably going to need to read this paragraph, I
10:26:39 23 recognize. But you in the middle of that
10:26:42 24 paragraph, you talk about loss on sale of loans of
10:26:45 25 10.7 million. And I'm going to ask what you meant

79

James Xanthos

10:26:50 2 by that, so please read whatever you think is
10:26:52 3 necessary.
10:26:53 4         (Witness looks at document.)
10:27:33 5     A.   Can you please repeat the question.
10:27:36 6     Q.   Yes.
10:27:38 7         What was this $10.7 million loss on the
10:27:43 8 sale of loans?
10:27:44 9     A.   I don't recall.
10:27:47 10     Q.   Well, when you talk about the sale of
10:27:50 11 loans were these -- did these sales occur in
10:27:54 12 securitizations?
10:27:56 13     A.   I don't recall.
10:27:56 14     Q.   Did you learn of any other transactions
10:27:58 15 where the company sold loans besides
10:28:02 16 securitizations?
10:28:03 17     A.   I don't recall.
10:28:14 18     Q.   In the following sentence after the
10:28:19 19 10.7 million you state, "It is hard to believe
10:28:25 20 that management will not continue to experience
10:28:27 21 the same or greater levels of losses on the sale
10:28:31 22 of its loans due to the fact that the company must
10:28:37 23 securitize quarterly (in order to free up its
10:28:40 24 warehouse lines) even if doing so results in large
10:28:44 25 losses."

80

James Xanthos

10:28:47 2         Under what circumstances would
10:28:49 3 quarterly securitizations result in large losses?
10:28:54 4     A.   I don't recall.
10:28:57 5     Q.   Well, as you understood securitizations
10:29:01 6 for a company such as Oakwood, is it possible for
10:29:06 7 a company such as Oakwood to lose money in a
10:29:09 8 securitization?
10:29:12 9     A.   I do not know.
10:29:14 10     Q.   So do you have any recollection of what
10:29:16 11 you meant by that sentence at the time you wrote
10:29:19 12 it?
10:29:22 13     A.   No.
10:29:28 14     Q.   Did the publicly available documents
10:29:31 15 indicate to you whether Oakwood had made or lost
10:29:36 16 money on securitizations in the past?
10:29:39 17     A.   I do not recall.
10:29:40 18     Q.   In the ordinary course do publicly
10:29:42 19 available documents for companies such as Oakwood
10:29:47 20 disclose that information?
10:29:52 21     A.   Again, I do not recall.
10:29:58 22     Q.   What was the basis of your conclusion
10:29:59 23 that Oakwood would have to engage in such
10:30:02 24 securitizations, whether or not they suffered
10:30:04 25 losses?

81

1
James Xanthos
10:30:12 2    A. I don't recall.
10:30:13 3    Q. Or was it that you recognized, sir,
10:30:16 4  that Oakwood would run out of money if it didn't
10:30:19 5  engage in securitization transactions, even though
10:30:23 6  those securitization transactions might result in
10:30:25 7  losses to Oakwood?
10:30:27 8    A. I don't recall.
10:30:33 9    Q. Oakwood would have run out of money had
10:30:34 10  it not engaged in securitization transactions,
10:30:37 11  correct?
10:30:39 12    A. I don't recall.
10:30:52 13    Q. You knew that Mr. O'Driscoll was the
10:30:53 14  person at CSFB in charge of Oakwood's
10:30:59 15  securitizations, correct?
10:31:01 16    MR. OSNATO: Objection as to the form.
10:31:02 17    You can answer.
10:31:03 18    A. I knew that Mr. O'Driscoll was the main
10:31:08 19  point of contact for Oakwood.
10:31:11 20    Q. Okay. And you knew that CSFB was the
10:31:15 21  underwriter of a large majority of Oakwood
10:31:18 22  securitizations, correct?
10:31:20 23    A. Yes.
10:31:21 24    Q. Okay. Did you inquire of
10:31:23 25  Mr. O'Driscoll as to whether Oakwood was gaining
82

1
James Xanthos
10:33:00 2    Q. All right. Turning to the paragraph
10:33:02 3  that begins with the word "Management," what was
10:33:06 4  the basis of your prediction that future
10:33:09 5  securitizations would be disastrous if the company
10:33:11 6  had to sell at unfavorable prices to
10:33:14 7  uncreditworthy customers?
10:33:25 8    (Witness looks at document.)
10:33:43 9    A. Can you please repeat the question.
10:33:45 10    MR. CASTANARES: Would the reporter
10:33:46 11  please read it back.
10:33:47 12    (Record read.)
10:34:08 13    A. I don't recall.
10:34:09 14    Q. Is that something you discussed with
10:34:11 15  Mr. O'Driscoll?
10:34:14 16    A. No.
10:34:15 17    Q. Did you observe anything about the
10:34:18 18  company's credit underwriting standards at that
10:34:21 19  time?
10:34:23 20    A. No.
10:34:26 21    Q. What was the basis of your concern that
10:34:29 22  the company might have to sell to uncreditworthy
10:34:32 23  customers?
10:34:33 24    A. I don't recall.
10:34:37 25    Q. Did Oakwood differ from other players
84

1
James Xanthos
10:31:26 2  or losing money on securitizations?
10:31:29 3    A. I don't recall.
10:31:30 4    Q. Did you inquire of Mr. O'Driscoll
10:31:32 5  whether, in fact, Oakwood needed to continue doing
10:31:36 6  quarterly securitizations, whether or not it
10:31:38 7  gained or lost money on those transactions?
10:31:42 8    A. I don't recall.
10:31:42 9    Q. When you used the term warehouse
10:31:45 10  facility in this document were you referring to
10:31:47 11  the same kind of facility that you have earlier
10:31:49 12  today characterized as a securitized credit
10:31:52 13  transaction?
10:31:57 14    A. I don't recall.
10:32:08 15    Q. In the paragraph that begins with the
10:32:09 16  term "As noted" you conclude that management had
10:32:15 17  used long-term debt and equity to finance current
10:32:19 18  assets.
10:32:21 19    Do you see that?
10:32:27 20    (Witness looks at document.)
10:32:43 21    A. Okay.
10:32:44 22    Q. Was there any connection in your mind
10:32:46 23  between — or relationship between that fact and
10:32:49 24  the need to do constant securitizations?
10:32:55 25    A. No.
83

1
James Xanthos
10:34:40 2  in the industry in terms of the potential
10:34:45 3  necessity to sell at unfavorable prices to
10:34:48 4  uncreditworthy customers?
10:34:50 5    A. I don't recall.
10:35:00 6    Q. And assuming that the company would
10:35:06 7  have to sell at unfavorable prices to
10:35:10 8  uncreditworthy customers, how would that have
10:35:13 9  caused future securitizations to be disastrous?
10:35:25 10    A. Well, anytime a change in underwriting
10:35:30 11  occurs, whether it be good or bad, future
10:35:35 12  performance will most likely reflect what changes
10:35:39 13  were made at any given point in time.
10:35:42 14    Q. And how does that relate to the
10:35:44 15  question I just asked?
10:35:47 16    A. Well, I think your question was how
10:35:49 17  would securitization performance change over time?
10:35:53 18    Q. Why would future securitizations be
10:35:55 19  disastrous if management had to sell at
10:35:57 20  unfavorable prices to uncreditworthy customers?
10:36:03 21    A. I don't recall why that statement was
10:36:06 22  made.
10:36:15 23    Q. You observed this company again in 2001
10:36:18 24  in connection with a transaction that you have
10:36:22 25  called a securitized credit facility, correct?
85

<table>
<tr><td colspan="2">

1
James Xanthos
11:57:21 2    MR. CASTANARES: Yes.
11:57:22 3    MR. OSNATO: Because Mr. Xanthos
11:57:23 4 appears to be looking at the first two pages
11:57:26 5 of the narrative document.
11:57:27 6    MR. CASTANARES: Oh, I'm sorry.
11:57:28 7    MR. OSNATO: Let's try that again.
11:57:28 8    MR. CASTANARES: Hold on one second.
11:57:30 9    THE WITNESS: I'm sorry.
11:57:3010    Q.   I'm going to ask you to look at the
11:57:3211 first two pages of Exhibit 138, which is Bates
11:57:3512 stamped 99 and 00, and ask you what function that
11:57:3813 document performed other than simply summarizing
11:57:4414 the transaction.
11:57:4415    A.   I think that's all it was meant to
11:57:4616 represent, as well as who the ultimate sign-off on
11:57:5117 the credit was.
11:57:5318    Q.   All right. And the ultimate sign-off
11:57:5719 being Irwin, Miller, and O'Brien; is that correct?
11:58:0020    A.   Yes.
11:58:0521    Q.   Do you know who Deborah Herrrera was?
11:58:0922    A.   She was in the control/operations
11:58:1423 group. They basically processed these credit
11:58:1724 applications.
11:58:2025    Q.   Was that part of CRM?

                                    130

</td></tr>
</table>

1
James Xanthos
11:59:38 2    Q.   What exactly is the "conduit group"?
11:59:41 3    A.   It's the funding arm of the bank, which
11:59:44 4 funded most of these facilities.
12:00:01 5    Q.   Was the conduit group the arm that
12:00:03 6 generally would be taking the credit risk that you
12:00:05 7 were being asked to evaluate?
12:00:09 8    A.   It would depend on the specific credit
12:00:12 9 or situation.
12:00:1410    Q.   In this case was it?
12:00:2411    A.   It appears that in this case it wasn't.
12:00:2712    Q.   Who was it in this case?
12:00:3013    A.   From the write-up that you provided me
12:00:3214 it seems that it is CSFBi that is taking on the
12:00:3715 credit risk.
12:00:3816    Q.   All right. Now, in the ordinary course
12:00:4117 did you review credit risk undertaken by CSFBi?
12:00:4518    A.   No.
12:00:4819    Q.   Was there any other transaction besides
12:00:5020 this one in which you did so?
12:00:5221    A.   Not that I recall.
12:00:5322    Q.   Do you have any understanding of why it
12:00:5523 was that you were asked to do so in connection
12:00:5724 with this one transaction?
12:00:5925    A.   Not that I recall.

                                    132

1
James Xanthos
11:58:21 2    A.   I believe so.
11:58:26 3    Q.   And her duties were clerical?
11:58:28 4    A.   I believe so.
11:58:29 5    Q.   How about Prescott Harris?
11:58:36 6    A.   The same.
11:58:37 7    Q.   Okay. And is this a document that you
11:58:39 8 prepared, these first two pages?
11:58:41 9    A.   No.
11:58:4110    Q.   Who would have prepared that?
11:58:4311    A.   I think it would be -- this is system
11:58:4612 generated.
11:58:5613    Q.   All right. So it wouldn't have had a
11:58:5814 specific author?
11:58:5915    A.   It would. You can see above
11:59:0216 Mr. Miller, Mr. Irwin, and Mr. O'Brien's
11:59:0717 signature, that the -- I guess the recommendation
11:59:1218 came through from the conduit group,
11:59:1519 Mr. Alberto Zonca.
11:59:1920    Q.   Okay.
11:59:2021    A.   Just take a step back.
11:59:2322         The credit process evolved over time
11:59:2723 where you could -- you would see an officer within
11:59:3124 the conduit group submit a credit package, which
11:59:3525 would have been reviewed by the credit group.

                                    131

1
James Xanthos
12:01:00 2    Q.   Does CSFBi, to your knowledge, have or
12:01:03 3 did it at the time have its own credit risk
12:01:06 4 management team?
12:01:07 5    A.   I don't know.
12:01:12 6    Q.   Is there somebody at CSFBi that you
12:01:15 7 dealt with with respect to this transaction?
12:01:18 8    A.   Not that I recall.
12:01:19 9    Q.   What did you understand CSFBi to be?
12:01:2310    A.   I don't recall.
12:01:3411    Q.   Now, did you do a completely new credit
12:01:3812 review at the time of this transaction similar to
12:01:4313 the one you had done a year before with respect to
12:01:4614 the reverse repo or did you just simply build on
12:01:4915 the old one?
12:01:5016    A.   That I don't recall.
12:01:5417    Q.   Did you --
12:01:5518         I take it with respect to this one at
12:01:5619 least you examined publicly available documents?
12:02:0020    A.   Always evaluate publicly available.
12:02:0221    Q.   Do you recall whether you made a new
12:02:0322 visit to the company in connection with this one?
12:02:0623    A.   I don't recall.
12:02:0924    Q.   Do you recall anything else that you
12:02:1025 did or any other sources of information that you

                                    133

James Xanthos

12:02:12  had in connection with the review that is part of
12:02:16  Exhibit 138?
12:02:22  (Witness looks at document.)
12:02:58  A.  It seems that I'm -- that there were
12:03:03  three items that were being asked for as
12:03:05  follow-ups, which were obtained.  It's actually on
12:03:08  802.  It appears that most of the information I
12:03:11  received was from public -- EDGAR public
12:03:16  documents.  And here there's three other items
12:03:21  that were being asked for.  I guess some of them
12:03:24  would be public, some of them wouldn't be.
12:03:34  Q.  All right.  So does that help you to
12:03:36  answer the question of whether -- of exactly what
12:03:39  you did, besides looking at public documents, in
12:03:42  connection with this credit review?
12:03:44  A.  I don't recall.
12:03:53  Q.  There's evidence that as part of this
12:03:55  transaction CSFB or somebody in the Credit Suisse
12:04:00  family was to get a warrant to purchase
12:04:01  approximately 20 percent of the stock of Oakwood
12:04:04  Homes, was that something you were aware of at the
12:04:07  time?
12:04:10  A.  I was aware of it, but I didn't know
12:04:12  the specifics of it.

134

James Xanthos

12:04:14  Q.  Okay.  Are you aware of any effort made
12:04:16  at that time to place a value upon that warrant?
12:04:20  A.  No.
12:04:25  Q.  In the ordinary course when such
12:04:28  consideration was received by CRM would anybody
12:04:31  make an effort to place a value upon it?
12:04:36  A.  I don't know.
12:04:44  Q.  Do you recall asking any questions
12:04:45  about that warrant?
12:04:46  A.  It had nothing to do with my
12:04:47  evaluation.
12:05:02  Q.  Let me ask you to turn to page 805.
12:05:04  And under -- down at the bottom there there is a
12:05:11  bold-faced caption, "Assumptions Used to," et
12:05:16  cetera.
12:05:17  Do you see that?
12:05:19  A.  Yes.
12:05:32  Q.  Were you the one who performed
12:05:35  evaluation of residual interests?
12:05:38  A.  No.
12:05:38  Q.  Do you know who did?
12:05:41  A.  No.
12:05:43  Q.  What was the source of this information

135

James Xanthos

12:05:44  about the assumptions used for that purpose?
12:05:47  MR. OSNATO:  Objection as to the form.
12:05:55  (Witness looks at document.)
12:06:01  A.  I don't know.
12:06:03  Q.  Do you know what interests it was that
12:06:09  were being evaluated?
12:06:11  A.  Per this write-up it says "Retained
12:06:14  Residual Interests."
12:06:16  Q.  Do you know what those consisted of?
12:06:19  A.  This is the excess spread that we
12:06:20  talked about earlier.  The difference between the
12:06:22  bonds -- the weighted average coupon upon the
12:06:26  asset versus what the investor is receiving in
12:06:29  terms of a coupon.
12:06:34  Q.  I'm sorry, could you elaborate on that
12:06:36  explanation for me a little bit, I don't think I
12:06:38  follow it.
12:06:39  A.  It's the excess -- it's the difference
12:06:41  between the interest that is being earned on a
12:06:44  mortgage, let's say it's 8 percent, for example,
12:06:46  versus the bond that is paying 5 percent to
12:06:49  investors.  It's that 3 percent difference.
12:06:55  Q.  In doing credit evaluations for
12:07:02  companies having securitizations such as these did

136

James Xanthos

12:07:07  CRM in the ordinary course attempt to evaluate
12:07:11  those residual interests?
12:07:19  A.  I don't recall.
12:07:19  Q.  Well, can you give me any information
12:07:21  at all about how this information under
12:07:25  "Assumptions Used to Value Retained Residual
12:07:30  Interests" came to be in this document,
12:07:32  Exhibit 138?
12:07:33  A.  No.
12:07:37  Q.  And can you give me any information at
12:07:38  all about where you got this information?
12:07:41  A.  No.
12:07:44  Q.  Did you attempt to evaluate how
12:07:47  realistic these valuations were?
12:07:50  A.  I don't recall.
12:07:55  Q.  Let me ask you to look at the next
12:07:57  paragraph.
12:08:02  (Witness looks at document.)
12:08:08  A.  "Beginning in 1994"?
12:08:11  Q.  Yes.  Please read through that
12:08:13  paragraph.  I'm going to ask you really about the
12:08:16  last sentence of it.
12:08:17  (Witness looks at document.)
12:08:43  A.  Okay.

137

James Xanthos

```
          1
14:15:16 2   this e-mail?
14:15:17 3       A.  I don't recall.
14:15:20 4       Q.  Did you ever see any particular
14:15:23 5   documents or did conversation occur that informed
14:15:26 6   you that the decision-making function from a risk
14:15:31 7   management perspective was transferred from CRM to
14:15:34 8   this other group?
14:15:40 9       A.  I'm sure I don't remember.
14:15:42 10      Q.  All right.  Other than supervising you
14:15:46 11  in the various Oakwood-related transactions that
14:15:53 12  we have discussed today do you know whether
14:15:55 13  Mr. Irwin performed any other role?
14:16:02 14      MR. OSNATO:  Object to the form of the
14:16:02 15  question.
14:16:03 16      I mean, in his job at Credit Suisse
14:16:06 17  across the board?
14:16:08 18      MR. CASTANARES:  With respect to
14:16:10 19  Oakwood.  Yeah, sorry.
14:16:11 20      A.  What's the question one more time?
14:16:13 21      Q.  Yeah.  Did Mr. Irwin do anything with
14:16:14 22  respect to the Oakwood transactions, other than
14:16:17 23  send the e-mails we've seen today and supervise
14:16:20 24  you?
14:16:21 25      MR. OSNATO:  Same objection.
                                                    186
```

James Xanthos

```
          1
14:16:22 2       You can answer if you understand the
14:16:24 3   question.
14:16:25 4       A.  I don't recall.
14:16:26 5       Q.  Okay.  Do you know whether he ever met
14:16:28 6   with any Oakwood people?
14:16:30 7       A.  Again, I don't recall.
14:16:33 8       Q.  Do you know whether he ever met with
14:16:36 9   any Berkshire people?
14:16:38 10      A.  I do not know.
14:16:38 11      Q.  Or discussed anything with them about
14:16:41 12  Oakwood?
14:16:41 13      A.  I have no knowledge about it.
14:16:42 14      Q.  Okay.  Have you now told me everything
14:16:45 15  that you can recall about any direct contact that
14:16:47 16  you had with any Oakwood people?
14:16:50 17      A.  To the best of my ability, yes.
14:16:53 18      Q.  Okay.  And that was limited to that one
14:16:56 19  meeting that you had with respect to the first
14:16:59 20  credit, and then there's a reference to a
14:17:01 21  conference call with Mr. Muir in another e-mail.
14:17:05 22      Do you recall any direct contact with
14:17:07 23  Oakwood other than those two events?
14:17:08 24      A.  Not that I can remember, no.
14:17:20 25      Q.  Have you discussed this lawsuit with
                                                    187
```

James Xanthos

```
          1
14:17:22 2   anyone other than Credit Suisse's counsel and
14:17:26 3   obviously your counsel who is here today?
14:17:28 4       A.  No.
14:17:36 5       Q.  Okay.  Did you see any documents in
14:17:38 6   preparing for your deposition that refreshed your
14:17:41 7   memory of the events that I've asked you about
14:17:44 8   today?
14:17:44 9       MR. OSNATO:  You can answer that yes or
14:17:47 10  no for now.
14:17:48 11      A.  I saw a few documents.
14:17:51 12      Q.  Did any of them refresh your memory
14:17:53 13  about the events that I've asked you about today?
14:17:55 14      A.  Not -- not to any large degree, no.
14:17:59 15      Q.  Well, to any degree?
14:18:07 16      A.  Again, depending on the situation it
14:18:12 17  may have -- I may have remembered something over
14:18:16 18  the past six years, yes.
14:18:18 19      Q.  Well, to the extent that any documents
14:18:20 20  you saw in preparation for this deposition did
14:18:23 21  refresh your memory of those events, have we seen
14:18:27 22  them today in this deposition?
14:18:28 23      A.  I believe so, yes.
14:18:29 24      MR. CASTANARES:  Thank you, sir.  I
14:18:30 25  have no further questions for you.
                                                    188
```

James Xanthos

```
          1
14:18:32 2       THE WITNESS:  Thank you.
14:18:33 3       THE VIDEOGRAPHER:  Any further
14:18:34 4   questions?
14:18:34 5       MR. OSNATO:  No further questions from
14:18:35 6   defense counsel.
14:18:37 7       THE VIDEOGRAPHER:  Okay.  This
14:18:37 8   concludes for today, August 24, 2006, the
14:18:40 9   videotaped deposition of James Xanthos.  The
14:18:43 10  total number of tapes used was four.  Going
14:18:47 11  off the record.  The time is 2:18 p.m.
14:18:59 12      (Time noted:  2:18 p.m.)
14:18:59 13
14:18:59 14           JAMES XANTHOS
14:18:59 15  Subscribed and sworn to before me
14:18:59 16  this _____ day of _____, 2006.
14:18:59 17
14:18:59 18  _____
         19  (Notary Public)    My Commission Expires:
         20
         21
         22
         23
         24
         25
                                                    189
```

**EXHIBIT C**

THOMAS IRWIN

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

------------------------------x

In Re:
OAKWOOD HOMES CORPORATION,
et al.,

        Debtors.

Chapter 11
Case No. 02-13396 (PJW)
------------------------------x

OHC LIQUIDATION TRUST,

       Plaintiff,

     v.            ADV. Proc.No. 04-57060 (PJW)

CREDIT SUISSE FIRST BOSTON, a
Swiss banking corporation,
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware
corporation and a wholly owned
subsidiary of CREDIT SUISSE
FIRST BOSTON, INC., the
subsidiaries and affiliates of
each, and DOES 1 through 100,

       Defendants.

------------------------------x

                         November 8, 2006
                          9:04 a.m.

Page 1

Page 14

THOMAS IRWIN

1
2     A.   It was different at different times.
3     Q.   Could you just outline for me your
4  formal education after high school and any
5  employment you may have had prior to working at
6  Credit Suisse?
7     A.   Rutgers University, Cook College,
8  Bachelor's of Science in environmental and
9  business economics, 1986. 1986 to 1987, E.F.
10  Hutton & Company. 1987 to 1988, Dean Witter &
11  Company. 1988 to 1990 with Elders Finance.
12  1990 to 1993 with PaineWebber. '93 to '95 with
13  MBIA, Inc. And then '95 to 2003 with Credit
14  Suisse First Boston, originally Credit Suisse,
15  then Credit Suisse First Boston.
16     Q.   Great. Thank you.
17          Now I want to talk just generally
18  about how Credit Suisse's credit department
19  worked. Not focusing on any particular
20  proposals at all, but could you just explain to
21  me the process from start to finish in terms of
22  how would a particular credit normally be
23  proposed, how would it be evaluated, and then
24  how would a decision be rendered on any given
25  proposal in the ordinary course of business?

Page 15

THOMAS IRWIN

1
2     A.   During -- I don't understand.
3     Q.   Just generally how did your department
4  work, like where would you get assignments from?
5  I will break it down into pieces.
6     A.   Thank you.
7     Q.   Where would credit proposals that your
8  department evaluated come from?
9     A.   During what time period? I'm sorry.
10     Q.   During late 1999 to 2000?
11     A.   Credit proposals were generated by the
12  business units, they were submitted into
13  analysts, analysts would perform the initial
14  credit review, they would submit them to me.
15     Q.   What would you do upon receiving that
16  review?
17     A.   Would work -- analyze the credit with
18  the analyst, clarify questions. If I felt that
19  the credit warranted being passed on to a senior
20  credit officer I would.
21     Q.   Was there some type of back and forth
22  conversation with the particular business unit
23  that proposed the -- any given credit?
24     A.   Yes.
25     Q.   What was the nature of that

Page 16

THOMAS IRWIN

1
2  conversation?
3     A.   They would present credits, we would
4  ask questions, they would answer the questions.
5     Q.   In the ordinary course of business did
6  you usually prepare any written work product
7  beyond what the analyst prepared?
8     A.   No.
9     Q.   So your role was principally reviewing
10  the work product of the analyst, honing it and
11  following up on that review?
12     A.   Yes.
13     Q.   Then what in the ordinary course of
14  business would Mr. Miller and Mr. O'Brien be
15  responsible for doing?
16     A.   It was a sequential credit process, so
17  if I approved the credit and wanted to bring it
18  on for further approval I would bring it up to
19  Mr. Miller, then subsequently it could go on to
20  Mr. O'Brien.
21     Q.   Were there particular thresholds of
22  credit beyond a certain amount? Your approval
23  would be sufficient for, say, X amount, but any
24  amount in excess of that particular amount would
25  need to be submitted to Mr. Miller or Mr.

Page 17

THOMAS IRWIN

1
2  O'Brien for their review?
3     MR. OSNATO:  Object as to form. You
4  can answer that question if you understand it.
5     A.   There were thresholds.
6     Q.   Do you recall what those thresholds
7  were?
8     A.   No.
9     Q.   In the ordinary course of business
10  during the time period from 1999 to 2003, what
11  sort of factors generally beared on your
12  decision as to whether or not to grant or deny a
13  particular credit proposal?
14     MR. OSNATO:  Objection as to the form.
15  You can answer if you understand.
16     A.   Could you restate?
17     Q.   Sure. What factors did you consider
18  important in determining whether or not to
19  approve or deny a particular credit proposal?
20     MR. OSNATO:  Same objection. You can
21  answer.
22     A.   The credit analysis.
23     Q.   What sort of factors would be included
24  within the analysis?
25     A.   Structure, collateral, liabilities,

Page 18

THOMAS IRWIN

1 general credit assessment.
2     Q.  In the ordinary course of business,
3 would you normally review the underlying
4 company, the strength of -- say, for example, in
5 your transaction resembling some of those
6 involving Oakwood Homes in which certain
7 affiliates of the company were originators of
8 receivables, would you ordinarily review the
9 credit profile of the originator or the
10 underlying company?
11     MR. OSNATO: Objection as to the form.
12     A.  Yes.
13     MR. OSNATO: You can answer.
14     A.  Yes.
15     Q.  What sort of factors bore on that
16 analysis?
17     A.  Traditional credit analysis, assets,
18 liabilities, cash flow, income.
19     Q.  In the course of the credit analysis,
20 what role did potential fees or profit to Credit
21 Suisse play?
22     A.  Excuse me, I'm sorry, could you
23 rephrase that?
24     Q.  Sure. When reviewing any given credit

Page 19

THOMAS IRWIN

1 proposal, what role did the potential fees or
2 income that could be earned by a business unit
3 of Credit Suisse play in the analysis of whether
4 or not to grant that particular credit proposal?
5     MR. OSNATO: Objection as to the
6 foundation. You can answer.
7     A.  It didn't.
8     Q.  It played absolutely no role
9 whatsoever?
10     A.  In the -- in the analysis? It could
11 be considered in the analysis.
12     Q.  So it did play some role, then?
13     A.  It could be included in the analysis.
14     Q.  Now, in the course of performing a
15 credit analysis, where did the information that
16 was fed into that analysis come from?
17     A.  I'm sorry?
18     Q.  In the course of analyzing a
19 particular credit, where would the analyst look
20 for information to prepare the analysis?
21     A.  It would be presented to us by the
22 business unit or sometimes directly from the
23 counter party.
24     Q.  In the ordinary course would such

Page 20

THOMAS IRWIN

1 information principally be publicly available
2 information or would it be nonpublic
3 information?
4     A.  It could be either or.
5     Q.  Now, once the credit analysis had been
6 performed, how if at all did the results of that
7 analysis go out of the credit department? For
8 example, in your discussions with the business
9 unit that proposed a particular credit, would
10 you relay to them the factors that bore on the
11 credit analysis?
12     A.  Sometimes they were present when the
13 decision was made, sometimes we would notify
14 them.
15     Q.  In the course of notifying them, would
16 you explain why the credit was denied?
17     A.  Yes.
18     Q.  What sort of elaborations would you
19 provide, what sort of detail would you provide?
20     A.  What was necessary.
21     Q.  Was there any detail that you were
22 barred from providing?
23     A.  I don't recall.
24     Q.  Was there any detail that in the

Page 21

THOMAS IRWIN

1 ordinary course of business you generally didn't
2 provide?
3     A.  No, I don't think so.
4     Q.  Now I want to talk specifically about
5 Oakwood Homes.
6     When, Mr. Irwin, did you get first
7 involved with any credit proposal relating to
8 the Oakwood Homes Corporation?
9     A.  I don't recall precisely.
10     Q.  Do you recall approximately?
11     A.  November of '99.
12     Q.  Do you recall what that credit
13 proposal was?
14     A.  No.
15     Q.  During the time period between late
16 1999 and early 2003, approximately what percent
17 of your professional time would you say you
18 spent on credit issues relating to Oakwood
19 Homes?
20     A.  I wouldn't know.
21     Q.  Were there variances in the amount of
22 time that you spent on issues relating to
23 Oakwood Homes?
24     A.  It varied.

LegaLink, a Merrill Communications Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

Page 158

THOMAS IRWIN

1    THOMAS IRWIN
2    would have a negative effect, correct?
3    A.    If Oakwood weren't receiving servicing
4    fees as a result of a transfer, that's possible.
5    Q.    Do you recall ever having discussions
6    with anyone in your department or elsewhere
7    within CSFB regarding whether or not Oakwood
8    could survive such an effect?
9    A.    Servicing transfers are discussed on
10   most facilities so it is possible we would have
11   discussed it on this one also.
12   Q.    But would you have had the specific
13   discussion regarding the effect on Oakwood and
14   whether or not that was a positive event for
15   Oakwood?
16   MR. OSNATO:    Object to the form.  You
17   can answer.
18   A.    It's possible that we had that
19   discussion.
20   Q.    But you don't know specifically?
21   A.    Not specifically.
22   Q.    Do you know, Mr. Irwin, whether or not
23   the proposed transfer of the servicing function
24   was ever actually effected?
25   A.    No, I don't.

Page 159

THOMAS IRWIN

1    THOMAS IRWIN
2    Q.    You just don't know —
3    A.    I don't know.
4    Q.    Do you have any recollection, Mr.
5    Irwin, of a proposal to charge Oakwood a restart
6    fee to restart its warehouse facility after
7    bankruptcy?
8    A.    No, I don't.
9    Q.    Would such a fee be typical or
10   ordinary in your business?
11   A.    I don't know.
12   Q.    You have never been involved in a
13   transaction in which a restart fee was charged?
14   A.    I was never — I have never been
15   directly involved in a restart.
16   Q.    So the answer is no, then —
17   A.    Correct.
18   Q.    Okay.  I'm going to show you what's
19   previously been marked as Exhibit 114.
20   A.    Okay.  I'm not going to look through
21   the whole thing.
22   Q.    Makes sense.
23   Do you recall ever seeing this
24   document before, Mr. Irwin?
25   A.    No, I don't.

Page 160

THOMAS IRWIN

1    THOMAS IRWIN
2    Q.    Do you know who prepared this
3    document?
4    A.    No, I don't.
5    Q.    If you look at the front page of the
6    document it is entitled Presentation to Credit
7    Risk Management.
8    Was it typical that CRM would receive
9    presentations of these sorts?
10   A.    Yes.
11   Q.    From whom would such presentations
12   typically come?
13   A.    A business unit.
14   Q.    For what purpose would such
15   presentations be made?
16   A.    For the purpose of obtaining credit.
17   Q.    But you have no recollection as to why
18   this presentation was made or whether it was
19   made at all?
20   A.    I have no recollection of it.
21   Q.    Whatsoever?  Okay.
22   If you will turn to the page that ends
23   in the Bates No. 144?
24   A.    Okay.
25   Q.    Do you have any recollection as to

Page 161

THOMAS IRWIN

1    THOMAS IRWIN
2    when all these various — all these tasks
3    occurred?
4    A.    I don't recall when they occurred.
5    Q.    Do you have any recollection as to
6    whether any of them were even started prior to
7    Oakwood's bankruptcy?
8    A.    I don't have knowledge of that.
9    Q.    In your experience, Mr. Irwin, would
10   completion of these tasks be the sort of thing
11   that would only be possible following a
12   bankruptcy petition?
13   A.    Some of them.
14   Q.    Which ones?
15   A.    DIP term sheet.
16   Q.    So it would not be possible to review
17   a DIP term sheet prior to a bankruptcy petition?
18   A.    I had not been involved in — so, you
19   know, that would be my view, but I have not —
20   you know.
21   Q.    Can you explain to me why it wouldn't
22   be possible to review a DIP term sheet until
23   after a bankruptcy petition had been filed?
24   A.    I can't explain that.  I'm not a DIP
25   financer.  I guess that is probably the best

**EXHIBIT D**

1

2      UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
3      ----------------------------x
       In Re:                      )Chapter 11
4      OAKWOOD HOMES CORPORATION,   )Case No. 02-13396
       et al.,                     )(PJW)
5                      Debtors. )Jointly Administered
       ----------------------------x
6      OHC LIQUIDATION TRUST,       )
                      Plaintiff, )
7                  vs.            )Adv. Proc. No.
       CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
8      Swiss banking corporation,   )
       CREDIT SUISSE FIRST BOSTON   )
9      LLC, a Delaware limited      )
       liability corporation, CREDIT)
10     SUISSE FIRST BOSTON, INC.,   )
       CREDIT SUISSE FIRST BOSTON   )
11     (U.S.A.), INC., a Delaware   )
       corporation and a wholly     )
12     owned subsidiary of CREDIT   )
       SUISSE FIRST BOSTON, INC.,the)
13     subsidiaries and affiliates  )
       of each, and DOES 1 through  )
14     100,                         )
                      Defendants.)
15     ----------------------------x

16                    June 29, 2006

17                    9:22 a.m.

18

19            Deposition of FIACHRA O'DRISCOLL, held

20     at the law offices of Linklaters, 1345 Avenue of

21     the Americas, New York, New York, pursuant to

22     notice, before Donald R. DePew, an RPR, CRR and

23     Notary Public within and for the State of

24     New York.

25

Fiachra O'Driscoll

```
10:02:55  2      A.  Okay.  Can you rephrase your question?
10:02:57  3      Q.  Who were the persons who had the
10:02:59  4   authority to say yes or nay to that facility?
10:03:01  5          MR. OSNATO:  And I'm going to object
10:03:03  6   as --
10:03:04  7      A.  You know --
10:03:04  8          MR. OSNATO:  -- to the --
10:03:04  9      Let me finish, please.
10:03:05 10      THE WITNESS:  Yeah.
10:03:06 11          MR. OSNATO:  -- as to -- I think we
10:03:06 12   could move forward a lot more expeditiously
10:03:09 13   if we used a term other than yea or nay.
10:03:12 14   Because, as Mr. O'Driscoll has testified,
10:03:14 15   there are multiple approvals.
10:03:16 16          And if you are asking specifically
10:03:18 17   about a credit approval it may be useful to
10:03:22 18   phrase your question accordingly, rather than
10:03:24 19   across the board.
10:03:25 20          MR. CASTANARES:  You may answer.
10:03:27 21      A.  Within -- let me try to answer your
10:03:30 22   question as follows, on any transaction of this
10:03:33 23   sort, which I think is probably the easier way to
10:03:36 24   explain it, we would make a submission, which
10:03:40 25   might be in writing or might be a verbal
```

46

Fiachra O'Driscoll

```
10:03:43  2   submission to credit risk management, usually only
10:03:48  3   after we had discussed the matter with our
10:03:51  4   supervisors.
10:03:52  5          And that that submission to credit risk
10:03:56  6   management would detail the nature of the company
10:04:01  7   in question to whom we would be entering into the
10:04:04  8   loan purchase facility, or the warehouse, or the
10:04:07  9   reverse repo agreement, or whatever the form of it
10:04:10 10   was.
10:04:11 11          Individual people within credit risk
10:04:13 12   management had formally the authority to commit to
10:04:17 13   transactions with exposures up to certain limits.
10:04:24 14   And that -- there was kind of a hierarchy, if you
10:04:28 15   will, of the exposure limits that somebody would
10:04:30 16   be allowed to enter into.
10:04:32 17          How that exposure was measured varied
10:04:34 18   significantly, depending upon the nature of the
10:04:36 19   transaction in question, because you would have to
10:04:39 20   approach CRM for transactions not merely ones that
10:04:48 21   would be things such as, say, a warehouse loan or
10:04:51 22   something of that sort.  But things such as
10:04:53 23   credit -- such as, for instance, interest rate
10:04:57 24   swaps, things such as delayed settlement, really
10:05:00 25   anything that could give rise to a credit exposure
```

47

Fiachra O'Driscoll

```
10:05:04  2   of Credit Suisse to a given counterparty.
10:05:07  3      Q.  All right.  Maybe we can cut this
10:05:08  4   short.
10:05:08  5          Were the people that had the ultimate
10:05:10  6   decision-making authority on whether or not to
10:05:12  7   grant this facility in the CRM department?
10:05:16  8          Because -- let me try to distinguish
10:05:18  9   this for you.  There are certain companies in
10:05:20 10   which a credit manager will make a recommendation.
10:05:23 11   And there is some executive who has the authority
10:05:25 12   to make the decision, irrespective of whether he's
10:05:28 13   following the credit manager's recommendation or
10:05:30 14   not.  I'm just trying to find out who the ultimate
10:05:33 15   decision-making authorities were on this
10:05:34 16   particular facility.
10:05:40 17      A.  The -- Tom Irwin, who is a credit
10:05:43 18   officer for the Oakwood facility, technically had
10:05:47 19   the authority to say yes or nay for the
10:05:49 20   transaction on his own.  In this particular
10:05:53 21   instance he chose not to, which was not an unusual
10:05:56 22   thing.  That was actually fairly common, because
10:05:58 23   even though people had this theoretical capability
10:06:01 24   to approve things, a lot of stuff got done by
10:06:05 25   committee, if you will, within credit risk
```

48

Fiachra O'Driscoll

```
10:06:08  2   management.
10:06:10  3          And he -- the ultimate approval for it
10:06:12  4   came not just from him, but I know for certain
10:06:14  5   that his supervisor, which was a gentleman by the
10:06:18  6   name of David Malletta --
10:06:21  7      Q.  Spell that, please.
10:06:21  8      A.  David Malletta, M-a- -- I'm not so sure
10:06:24  9   I'm going to have the spelling right.  I'm going
10:06:26 10   to have a crack at it.  M-a-l-l-e-t-t-a.
10:06:32 11      Q.  All right.
10:06:32 12      A.  Give or take.
10:06:33 13          And in turn his supervisor,
10:06:35 14   Robert O'Brien, were involved in the
10:06:37 15   transaction, as well as his supervisor, which
10:06:40 16   was Dick Thornburgh, Richard Thornburgh.
10:06:44 17      Q.  How does James Xanthos, X-a-n-t-h-o-s,
10:06:49 18   fit into that hierarchy?
10:06:51 19      A.  He was an associate who worked for
10:06:53 20   Tom Irwin.
10:06:55 21      Q.  All right.  Had you completed your
10:06:57 22   answer?
10:06:58 23      A.  Yes.
10:06:58 24      Q.  Thank you.
10:06:59 25          All right.  And do I take it then, sir,
```

49

## Fischra O'Driscoll — Page 50

```
10:07:05  2    that to the extent that you had contact with CSFB
10:07:11  3    New York branch regarding this facility your
10:07:13  4    contact was with somebody in the CRM department?
10:07:19  5        A.  Not necessarily, because CRM covered
10:07:23  6    not just the New York branch, but it also covered
10:07:26  7    Credit Suisse First Boston Corporation, the
10:07:28  8    broker-dealer. I would also have talked to
10:07:30  9    Tony Giordano, who is the -- one of the officers
10:07:35 10    at least during that period of time within the
10:07:36 11    New York branch, and probably to other people as
10:07:39 12    well.
10:07:40 13        Q.  All right. And Mr. Giordano was
10:07:44 14    employed by the broker-dealer?
10:07:46 15        A.  I believe he was employed by the
10:07:48 16    branch.
10:07:50 17        Q.  Is that the broker-dealer?
10:07:51 18        A.  No, the branch.
10:07:53 19        Q.  The branch. Okay.
10:07:55 20            All right. And what was his role in
10:07:59 21    that -- this facility?
10:08:02 22        A.  His role was to represent the branch.
10:08:04 23        Q.  On issues other than CRM issues?
10:08:07 24        Q.  Precisely.
10:08:08 25        Q.  Okay. And what was the nature of his
                                                        50
```

## Fischra O'Driscoll — Page 51

```
10:08:09  2    responsibility?
10:08:11  3        A.  Ensuring that from the point of view of
10:08:12  4    the branch that the transaction was put together
10:08:17  5    correctly.
10:08:19  6        Q.  All right. Now, had this cast of
10:08:21  7    characters changed -- or strike that.
10:08:23  8            Did this cast of characters change with
10:08:25  9    respect to the transaction or proposed transaction
10:08:31 10    that was referred to as the warehouse facility in
10:08:35 11    the weeks leading up to and shortly following
10:08:39 12    Oakwood's bankruptcy?
10:08:40 13        MR. OSNATO: Objection as to the form.
10:08:42 14            You can answer.
10:08:44 15        A.  Now, what do you mean --
10:08:46 16        Q.  Was it the same people?
10:08:48 17        A.  When you refer to the warehouse
10:08:51 18    facility are you referring to the loan purchase
10:08:53 19    facility?
10:08:54 20        Q.  I'm talking about --
10:08:56 21            You are aware, sir, that in the weeks
10:08:59 22    preceding up to the bankruptcy of Oakwood on
10:09:06 23    November 15th, 2002 CSFB was acting as financial
10:09:11 24    adviser to Oakwood?
10:09:13 25        MR. OSNATO: Objection as to the form.
                                                        51
```

## Fischra O'Driscoll — Page 52

```
10:09:14  2            You can answer.
10:09:15  3        A.  I believe that's correct.
10:09:18  4        Q.  And one of the things that CSFB was
10:09:20  5    attempting to do was to put into place what it
10:09:24  6    referred to at the time as a warehouse facility,
10:09:26  7    correct?
10:09:27  8        MR. OSNATO: Same objection.
10:09:30  9        A.  I don't think that's correct.
10:09:32 10        Q.  Do you think it referred to it at the
10:09:34 11    time as a loan purchase facility?
10:09:37 12        A.  I don't recall us putting together
10:09:39 13    anything in that period of time.
10:09:41 14        Q.  I'm sure you didn't, but the question
10:09:42 15    is whether you were attempting to do so.
10:09:45 16        A.  Not that I recall.
10:09:45 17        Q.  So is it your testimony that during the
10:09:49 18    period leading up to Oakwood's bankruptcy CSFB was
10:09:53 19    not making any effort to put together some sort of
10:09:56 20    warehouse or loan purchase facility for Oakwood?
10:10:00 21        MR. OSNATO: Same objection.
10:10:02 22            You can answer.
10:10:05 23        A.  During that period of time there was a
10:10:06 24    loan purchase facility in place. There -- I was
10:10:10 25    never asked to put together any type of warehouse,
                                                        52
```

## Fischra O'Driscoll — Page 53

```
10:10:13  2    that I can recall.
10:10:14  3        Q.  Or loan purchase facility?
10:10:16  4        A.  Or a loan purchase facility.
10:10:17  5        Q.  Were you asked to obtain a waiver from
10:10:19  6    CSFB New York branch of the provision in that
10:10:22  7    facility that created a right to suspend it upon
10:10:28  8    Oakwood's bankruptcy?
10:10:29  9        MR. OSNATO: Objection as to the form.
10:10:30 10            Asked by whom?
10:10:31 11        MR. CASTANARES: You may answer.
10:10:32 12        A.  Yes.
10:10:33 13        Q.  Who asked you to do that?
10:10:36 14        A.  An Oakwood officer. Precisely whom, I
10:10:39 15    don't recall.
10:10:39 16        Q.  And did you make any such efforts?
10:10:42 17        A.  Yes.
10:10:43 18        Q.  And at any time after the putting into
10:10:49 19    place of the facility of early 2001 that we have
10:10:51 20    been talking about, as distinguished from
10:10:56 21    obtaining a waiver of a provision in that
10:10:58 22    facility, was there any effort to put together a
10:11:02 23    new facility of that type?
10:11:04 24        MR. OSNATO: Objection as to the form.
10:11:06 25        Q.  Including after Oakwood's bankruptcy.
                                                        53
```

Fischra O'Driscoll

```
12:27:05  2      A.  He was in the financial institutions
12:27:08  3   advisory group.
12:27:09  4      Q.  All right.  And just generally
12:27:12  5   speaking, what kind of services did that group
12:27:18  6   perform for GreenPoint?
12:27:21  7      A.  I don't know.
12:27:23  8      Q.  Okay.  Who runs that group now?
12:27:29  9      A.  It's run by two gentlemen, Eric Varvel
12:27:33 10   and Mark Granetz.
12:27:36 11      Q.  And they're both here in New York?
12:27:39 12      A.  I am not sure, actually.
12:27:41 13      Q.  Okay.  Do you recall that at some point
12:27:58 14   or another there was a proposition put to CRM
12:28:03 15   about a $75 million reverse repurchase facility?
12:28:08 16      A.  Yes.
12:28:08 17      Q.  I believe in earlier testimony you
12:28:10 18   talked about a reverse repurchase facility as
12:28:12 19   being similar in some respect to a warehouse or
12:28:15 20   asset purchase facility, am I correct?
12:28:19 21      A.  It might be or it might not be
12:28:21 22   depending on the circumstances.
12:28:23 23      Q.  Okay.
12:28:23 24      A.  In this particular instance that
12:28:25 25   reverse repurchase facility was actually pretty
```

                                                162

Fischra O'Driscoll

```
12:28:29  2   dissimilar.
12:28:30  3      Q.  "Pretty dissimilar"?
12:28:32  4      A.  Pretty dissimilar.
12:28:33  5      Q.  In what respects was it dissimilar?
12:28:36  6          Now, we're not talking --
12:28:37  7      A.  For one thing --
12:28:37  8      Q.  -- about 75 million --
12:28:38  9      A.  -- in truth, I think I'd need to see
12:28:41 10   the documents to refresh my recollection of
12:28:43 11   exactly what was in there.  I know one of the
12:28:45 12   things it provided for was financing securities as
12:28:48 13   well as financing loans.
12:28:53 14      Q.  Okay.  And whose idea was it to --
12:28:57 15          Who brought up this potential facility,
12:28:59 16   was it you, or was it Oakwood, or was it some
12:29:02 17   third party?
12:29:03 18      A.  Oakwood on a couple of occasions,
12:29:06 19   specifically Doug Muir, made it clear to us that
12:29:13 20   their other banking relationships, in particular
12:29:16 21   Bank of America and First Union, who were -- had a
12:29:22 22   broader relationship with Oakwood and were also
12:29:26 23   providing direct credit to Oakwood, were putting
12:29:29 24   him under a good deal of pressure and saying that
12:29:32 25   Credit Suisse should also provide financing in
```

                                                163

Fischra O'Driscoll

```
12:29:34  2   some shape or form as well.
12:29:36  3      Q.  And did he say why they felt that way?
12:29:39  4      A.  I don't recall enough about the
12:29:41  5   conversation to say.
12:29:43  6      Q.  Based upon your knowledge of the
12:29:45  7   industry trends, et cetera, was there any -- did
12:29:48  8   you need him to tell you why they felt that way or
12:29:51  9   did you --
12:29:51 10      A.  No.
12:29:52 11      Q.  Did you understand why they felt that
12:29:53 12   way?
12:29:53 13      A.  Yes.
12:29:54 14      Q.  What was it?
12:29:55 15      A.  At that period of time, that was a
12:29:57 16   period of time in which Bank of America in
12:29:59 17   particular was, quote, unquote, making a big push
12:30:02 18   into the investment banking industry, into a
12:30:04 19   variety of different things, into straight
12:30:06 20   investment banking advisory activities, M&A,
12:30:10 21   corporate bond offerings like the one that they
12:30:12 22   did right around that time.  But also mortgage
12:30:18 23   securitizations and my piece of the business, if
12:30:19 24   you will.
12:30:20 25          And they were very aggressive at that
```

                                                164

Fischra O'Driscoll

```
12:30:22  2   point in time.  And while I don't want to suggest
12:30:26  3   that they complied with the law, they skirted very
12:30:30  4   close to the fed rules about linking together the
12:30:35  5   provision of credit together with seeking other
12:30:37  6   banking services to come their way.
12:30:40  7          So they had made it very clear to not
12:30:42  8   just Oakwood, but I saw the same thing with
12:30:45  9   Conseco, I saw the same thing I think with
12:30:47 10   Clayton Homes as well, that they were putting
12:30:52 11   companies under a good deal of pressure to -- in
12:30:55 12   exchange for credit give them further assignments
12:30:58 13   and further opportunities to earn fees from either
12:31:01 14   underwriting, securities underwriting businesses,
12:31:03 15   or from investment banking advisory businesses.
12:31:06 16      Q.  Okay.  I may have misunderstood what
12:31:08 17   you said before.  I hope you'll clarify this for
12:31:10 18   me.
12:31:11 19          I had understood that you told me that
12:31:12 20   B of A was pressuring Oakwood to get Credit Suisse
12:31:16 21   First Boston to lend money, did I misunderstand
12:31:19 22   you?
12:31:22 23      A.  May I rephrase myself?
12:31:24 24      Q.  Yeah.  And let me phrase this a little
12:31:26 25   broader.
```

                                                165

Fiachra O'Driscoll

12:31:26 2  A. Yeah.

12:31:26 3  Q. Because -- and I think what I

12:31:27 4  understood you to say in response was that B of A

12:31:30 5  was trying to get investment banking business, so

12:31:32 6  I'm confused by the two answers.

12:31:34 7  A. No. And I'm not sure if I misspoke or

12:31:39 8  whether alternatively it could easily be

12:31:41 9  misunderstood.

12:31:42 10  Doug's response to that pressure that

12:31:44 11  was clearly being applied to him was to say, well,

12:31:48 12  the counter to that is that Credit Suisse has to

12:31:55 13  step up. At which point it's harder for Bank of

12:31:58 14  America to be demanding a bigger share of the

12:32:00 15  services if Credit Suisse is also seen as

12:32:03 16  providing the same sort of facilities.

12:32:09 17  Q. Okay. Now I'm probably even more

12:32:11 18  confused.

12:32:12 19  Are you telling me that you understood

12:32:15 20  what Mr. Muir said to be that in order for CSFB to

12:32:18 21  continue to get --

12:32:19 22  THE WITNESS: I hate to interrupt, but

12:32:21 23  weren't we going to take a pit stop at 12:30?

12:32:25 24  MR. OSNATO: We are going to break for

12:32:26 25  lunch. Why don't we finish this line of

166

Fiachra O'Driscoll

12:32:27 2  questioning.

12:32:28 3  THE WITNESS: And then we'll take a

12:32:30 4  break?

12:32:31 5  MR. OSNATO: If that's okay. And then

12:32:31 6  it is -- we are at about the three hour mark,

12:32:34 7  so...

12:32:35 8  MR. CASTANARES: Now that the question

12:32:36 9  stands where it is interrupted, I don't care

12:32:38 10  whether we do it before lunch or after.

12:32:40 11  MR. OSNATO: Are you sure?

12:32:41 12  MR. CASTANARES: So if you want to

12:32:42 13  break, that's fine with me.

12:32:43 14  THE WITNESS: If I may, can I clarify

12:32:44 15  the point?

12:32:45 16  MR. OSNATO: Let's leave a clean record

12:32:46 17  and then pick up after lunch.

12:32:49 18  MR. CASTANARES: Fine.

12:32:52 19  MR. OSNATO: Do you need the question

12:32:54 20  read back? I mean, are you clear what you're

12:32:55 21  answering?

12:32:56 22  THE WITNESS: Yeah, I'm clear as to the

12:32:57 23  question.

12:32:58 24  MR. CASTANARES: Okay.

12:33:00 25  A. Bank of America's approach to

167

Fiachra O'Driscoll

12:33:02 2  customers, generally speaking at that point in

12:33:04 3  time is -- back in the days when we were a pure

12:33:08 4  commercial bank we simply extended credit to you.

12:33:12 5  Now -- and I'm not suggesting that they

12:33:15 6  didn't stay within the law. But they were making

12:33:17 7  it very clear to customers that their continued

12:33:22 8  provision of credit in whatever shape or form it

12:33:26 9  was provided was going to be contingent on getting

12:33:30 10  a bigger share of the assignments, both advisory

12:33:36 11  assignments and also securities underwriting

12:33:40 12  business that that company had to offer.

12:33:43 13  Q. Okay. So now I think perhaps I

12:33:45 14  understand. Let me see if I've got it.

12:33:47 15  And so Muir's reaction was that if CSFB

12:33:50 16  wants to keep B of A from horning in on its

12:33:54 17  investment banking service it's got to lend some

12:33:56 18  money?

12:33:57 19  MR. OSNATO: Objection as to the form.

12:33:58 20  I'm not sure that accurately

12:33:59 21  characterizes his testimony.

12:34:01 22  But you can tell us if that's right.

12:34:03 23  A. For clarity, at that point in time we

12:34:05 24  weren't providing what in the industry would be

12:34:08 25  regarded as being investment banking services,

168

Fiachra O'Driscoll

12:34:10 2  which would typically be seen as -- the euphemism

12:34:12 3  for investment banking advisory services. What we

12:34:16 4  were providing, of course, was securities

12:34:18 5  underwriting services.

12:34:20 6  And what Doug made it fairly clear was

12:34:23 7  that he was going to have to give larger

12:34:25 8  assignments and more, perhaps, lead assignments,

12:34:29 9  and perhaps sole assignments to Bank of America if

12:34:34 10  it was not possible for him to counter argue

12:34:37 11  to Bank of America that, in fact, Credit Suisse

12:34:41 12  First Boston was also committing credit on a

12:34:44 13  comparable basis.

12:34:45 14  Q. All right. And that's what gave rise

12:34:47 15  to this requested $75 million reverse repurchase

12:34:51 16  facility?

12:34:54 17  A. I think that that is -- that is the

12:34:56 18  assumption that I drew at the time.

12:34:58 19  MR. CASTANARES: Okay. Great. This is

12:34:59 20  a good place to break for lunch.

12:35:01 21  MR. OSNATO: It is good?

12:35:02 22  Thank you.

12:35:04 23  THE VIDEOGRAPHER: Okay. We'll go off

12:35:06 24  the record at 12:35, tape 2.

12:35:11 25  (Luncheon recess: 12:35 p.m.)

169

## Page 174

Fiachra O'Driscoll

```
13:32:54  2  sale under the repurchase. But because it's not
13:32:58  3  an optional repurchase, because it's a compulsory
13:33:02  4  repurchase the accounting profession has always
13:33:05  5  viewed these things as being financing from an
13:33:07  6  accounting point of view, without regard to the
13:33:09  7  legal form in which these things are taken.
13:33:11  8       And if you go back to -- you know,
13:33:12  9  historically these things were typically -- and if
13:33:12 10  you look at the core of the market for this kind
13:33:14 11  of stuff it's mostly treasuries and other highly
13:33:18 12  liquid securities. But probably over the last
13:33:20 13  decade or so there's been a tendency to use these
13:33:23 14  kind of facilities for raw loans, particularly
13:33:27 15  mortgage loans and things of that sort as well.
13:33:29 16  And that would have been the kind of thing that
13:33:31 17  was contemplated here.
13:33:32 18       And again, from a structure point of
13:33:34 19  view it's one of these things that -- particularly
13:33:36 20  with regard to the financing of loans that are
13:33:40 21  being aggregated for securitization, it's kind of
13:33:44 22  come in and out of fashion. I'd have to say that
13:33:46 23  it was somewhat in vogue as a style. These vogues
13:33:50 24  are ones selected by the lawyers, rather than
13:33:53 25  anybody else, but it was somewhat in vogue during
```

## Page 175

Fiachra O'Driscoll

```
13:33:56  2  that period of time.
13:33:57  3       And these days something more like the
13:33:59  4  kind of mechanisms that were put in place for the
13:34:02  5  Oakwood loan purchase facility is probably more
13:34:03  6  typical than what's there now.
13:34:05  7  Q.   Okay. And you may have answered this
13:34:07  8  question in the course of the answer you've just
13:34:08  9  given, but I'm not -- I just want to make certain
13:34:10 10  of it.
13:34:11 11       Were the securities which were to be
13:34:13 12  the subject of the -- or strike that.
13:34:17 13       Well, let's call it securities.
13:34:19 14       Were the securities or loans which were
13:34:21 15  to be the subject of this particular facility the
13:34:23 16  mortgages, as you referred to them, or were they
13:34:26 17  REMIC securities held by Oakwood?
13:34:29 18  A.   They were definitely REMIC securities
13:34:32 19  held by Oakwood, for sure. As to the other, I
13:34:34 20  don't recall.
13:34:35 21  Q.   Okay. And just to put names to the
13:34:38 22  structure you've just described, Oakwood would
13:34:41 23  sell a security to CSFB and at the same time
13:34:44 24  promise to buy it back at a specified price at a
13:34:48 25  later date?
```

## Page 176

Fiachra O'Driscoll

```
13:34:48  2  A.   Yes.
13:34:49  3  Q.   And what benefit would Oakwood derive
13:34:51  4  from this transaction?
13:34:52  5  A.   Because it would get cash from the
13:34:55  6  arrangement in much the same way as it would
13:34:58  7  through a straightforward loan arrangement.
13:35:01  8  Q.   And how would CSFB be compensated in
13:35:04  9  such a transaction?
13:35:05 10  A.   It would earn the difference between
13:35:07 11  the price at which it purchased the security and
13:35:10 12  the price at which it sold back the security. And
13:35:13 13  usually that was calculated such as to be a
13:35:16 14  spread, a spread over some form of bank price,
13:35:22 15  usually LIBOR or something of that sort. So in
13:35:25 16  essence you're earning -- in the difference
13:35:28 17  between the two prices you're earning an interest
13:35:31 18  rate.
13:35:32 19  Q.   Right. Okay. Thank you.
13:35:32 20       Now, were you the person at CSFB who
13:35:35 21  carried this proposal within the company
13:35:37 22  primarily?
13:35:38 23  A.   What do you mean by "carried"?
13:35:41 24  Q.   Well, I mean somebody submitted
13:35:43 25  presumably --
```

## Page 177

Fiachra O'Driscoll

```
13:35:44  2  A.   Yeah.
13:35:44  3  Q.   -- some sort of proposal to CRM on this
13:35:47  4  transaction. Somebody may have -- if somebody at
13:35:48  5  CRM or else the New York branch wanted to know
13:35:51  6  about it, know about Oakwood, whatever, they'd
13:35:53  7  probably turn to someone, was that person you?
13:35:58  8  A.   Well, can I separate those two things
13:36:00  9  into one --
13:36:01 10  Q.   Definitely. Uh-huh.
13:36:02 11  A.   -- one part?
13:36:03 12  Q.   Tell me what your role was.
13:36:04 13  A.   The answer for the first part was, yes,
13:36:06 14  I was the one, if I recall, responsible for
13:36:08 15  submitting that thing to credit, either directly
13:36:10 16  or someone at my instruction. As for the second
13:36:12 17  part, it wouldn't necessarily be me.
13:36:16 18  Q.   Okay. Do you recall whether anybody
13:36:17 19  from CRM inquired of you in any way regarding this
13:36:23 20  proposed transaction?
13:36:28 21  A.   I do not recall a specific instance.
13:36:32 22  Q.   Do you recall furnishing any
13:36:34 23  information to CRM about Oakwood, or its
13:36:38 24  transactions, or business?
13:36:41 25  A.   I don't recall it. Again, I don't
```

1
Fiachra O'Driscoll

13:40:31 2    collegial consultation. Which was as a practical
13:40:35 3    matter, he would normally, almost invariably
13:40:38 4    consult with his superiors before making a credit
13:40:40 5    decision.
13:40:40 6    Q.    All right. Let me -- maybe I've asked
13:40:41 7    this question inartfully. As a matter of fact,
13:40:43 8    I'm sure I have. So let me try it again.
13:40:45 9    Did this transaction need any form of
13:40:47 10    approval other than credit risk management
13:40:51 11    approval in order for it to be --
13:40:52 12    A.    Yeah.
13:40:52 13    Q.    -- to move forward?
13:40:54 14    A.    Typically I would need to get my
13:40:56 15    supervisor's approval for the transaction before
13:40:58 16    it would appear. And depending on the specific
13:41:00 17    entity that was actually going to provide the
13:41:02 18    finance, I might also need to get approval from
13:41:06 19    the head of that business unit.
13:41:08 20    You -- if you'll forgive me, one of the
13:41:10 21    earlier questions you asked, the reason I was a
13:41:12 22    little confused was you said the New York branch
13:41:14 23    with respect to the reverse repo. And technically
13:41:18 24    it wouldn't have been the New York branch.
13:41:19 25    Because the New York branch had a certain kind of

182

1
Fiachra O'Driscoll

13:41:23 2    financings that it would do and could do, whereas
13:41:25 3    a reverse repo would have been something that
13:41:28 4    was done out of the broker-dealer, out of
13:41:31 5    Credit Suisse First Boston Corporation.
13:41:32 6    Q.    Okay.
13:41:32 7    A.    So I would have had to potentially go
13:41:34 8    to not just my supervisor, but also to somebody
13:41:37 9    within the business unit who handled those things
13:41:40 10    on a day to day to get their approval as well.
13:41:43 11    Q.    Who was your supervisor at that time?
13:41:45 12    A.    What date was that?
13:41:45 13    That was 1999?
13:41:46 14    Q.    So it's late '99, early 2000.
13:41:48 15    A.    It was a gentleman by the name of
13:41:50 16    Phil Weingord.
13:41:54 17    Q.    Phil Weingart?
13:41:54 18    A.    Gord, g-o-r-d.
13:41:54 19    Q.    Oh, gord. Okay.
13:41:54 20    And did that change before Oakwood's
13:41:55 21    bankruptcy, the identity of your supervisor?
13:42:00 22    A.    Yes.
13:42:00 23    Q.    Who -- just tell me what happened in
13:42:01 24    that regard.
13:42:03 25    A.    He left to go to Deutsche Bank in 2000.

183

1
Fiachra O'Driscoll

13:42:05 2    And from that date till the date of the bankruptcy
13:42:08 3    a guy called Joe Donovan was my supervisor.
13:42:12 4    Q.    All right. Do you know whether
13:42:13 5    Mr. Weingord or Mr. Donovan ever interacted
13:42:18 6    directly or had any communication with any Oakwood
13:42:20 7    people?
13:42:22 8    A.    I don't recall.
13:42:29 9    Q.    Now, in terms of economic risks --
13:42:30 10    which I'm trying to separate that out from any
13:42:33 11    legal questions involved -- what is the difference
13:42:38 12    on the Credit Suisse side between reverse
13:42:41 13    repurchase and the asset purchase facility that
13:42:45 14    was done a year later?
13:42:48 15    MR. OSNATO: I'm going to object to the
13:42:49 16    form of the question.
13:42:58 17    A.    It would depend on the circumstances.
13:43:02 18    Q.    Were there different economic risk
13:43:04 19    characteristics between the -- I mean, aside from
13:43:08 20    the size of the line --
13:43:09 21    A.    Uh-huh.
13:43:09 22    Q.    -- were there different economic risk
13:43:13 23    characteristics from CSFB's perspective in the
13:43:16 24    $75 million reverse repurchase proposal and the
13:43:20 25    proposal a year later that resulted in the asset

184

1
Fiachra O'Driscoll

13:43:23 2    purchase line?
13:43:24 3    A.    There would have been, yes.
13:43:25 4    Q.    And what were they?
13:43:27 5    A.    The reverse repo line was intended, if
13:43:29 6    I recall -- and I don't have the documents in
13:43:32 7    front of me so I don't -- you know, you'll have to
13:43:34 8    forgive me. If you refresh my recollection, we'll
13:43:37 9    put the documents in front of me, it may be
13:43:39 10    somewhat different.
13:43:40 11    But the reverse repo line had a fairly
13:43:42 12    significant element of loans -- sorry, of
13:43:44 13    securities within it, maybe the whole lot, as a
13:43:47 14    way of financing those loans. It was also a much
13:43:50 15    shorter term. Typically these things were not
13:43:52 16    three-year committed lines. Typically these
13:43:55 17    things were at three month, or six month, or some
13:43:57 18    shorter period of time.
13:43:59 19    I don't recall what the period of time
13:43:59 20    was that the commitment was for this reverse repo,
13:44:03 21    but it would have been very short. So both the
13:44:05 22    assets were different and the maturity of the
13:44:08 23    exposure was very different.
13:44:09 24    Q.    Would the shorter maturity of the
13:44:11 25    exposure have tended to increase or decrease the

185

Fiachra O'Driscoll

```
          1
13:44:15  2   risk characteristics of the line from the
13:44:18  3   perspective of CSFB?
13:44:20  4      A.   Decrease.
13:44:22  5      Q.   And would the asset mix have tended to
13:44:25  6   increase or decrease that exposure?
13:44:27  7      A.   As opposed to outright loans?
13:44:29  8      Q.   As opposed -- I'm trying to contrast
13:44:33  9   the CSFB risk in the proposed reverse repo
13:44:40 10   proposal with the risk in the asset purchase
13:44:48 11   proposal, which was adopted approximately a year
13:45:01 12   later.  And I believe you told me that the one
13:45:04 13   aspect was the difference in maturity and the
13:45:06 14   other had to do with the securities themselves.
13:45:08 15      So I'm asking you if the difference in
13:45:00 16   the securities themselves was greater or presented
13:45:03 17   greater risks to CSFB in one transaction than the
13:45:07 18   other or lesser ones?
13:45:09 19      A.   No.  Because they weren't
13:45:10 20   contemporaneous in time, I didn't have occasion to
13:45:12 21   make such comparison at that time.  And to be
13:45:15 22   honest, I'd need to go back and look at the nature
13:45:17 23   of the instruments in a good deal, more detail now
13:45:19 24   to make an honest assessment.
13:45:22 25      Q.   Do you have any knowledge of why it was
                                                  186
```

Fiachra O'Driscoll

```
          1
13:45:23  2   that CRM turned one down and approved the other?
13:45:27  3      MR. OSNATO:  Objection to the form.
13:45:28  4      A.   No.
13:45:29  5      Q.   Okay.  Did you have any knowledge of
13:45:32  6   why CRM turned the first one down?
13:45:39  7      A.   I was never actually informed that they
13:45:42  8   had turned it down.
13:45:48  9      Q.   So as far as you know, it was still an
13:45:49 10   open proposal a year later when the asset purchase
13:45:53 11   facility was being discussed?
13:45:55 12      A.   It hadn't been discussed at that point.
13:45:58 13      What frequently happened was that --
13:46:01 14   was one of three things.  Either a credit
13:46:05 15   situation would be approved, a credit situation
13:46:08 16   would be declined, or very frequently a credit
13:46:15 17   situation would have been left open.
13:46:18 18   Particularly -- and I don't want to cast
13:46:21 19   aspersions towards my colleagues here --
13:46:24 20   Tom Irwin, though, is one of the people who -- and
13:46:28 21   again, I don't want to, you know, draw comments on
13:46:31 22   somebody's professional capabilities, and so on --
13:46:34 23   would very often leave something open.  So he
13:46:37 24   would sometimes -- he would sometimes never quite
13:46:42 25   tell one whether the thing was actually approved
                                                  187
```

Fiachra O'Driscoll

```
          1
13:46:45  2   or not approved.
13:46:46  3      Q.   Did you ever receive a copy --
13:46:48  4      Did you ever see a copy of the report
13:46:48  5   that Xanthos wrote in January of 2008 turning this
13:46:51  6   down?
13:46:52  7      A.   No.
13:46:53  8      MR. OSNATO:  Objection to the form.
13:46:53  9      Let me -- please, before you answer,
13:46:54 10   let me get my objection in.
13:46:57 11      I'm going to --
13:46:57 12      THE WITNESS:  Sorry.
13:46:57 13      MR. OSNATO:  -- object to the form of
13:46:57 14   the question.
13:47:00 15      You can answer.
13:47:01 16      Do you want the question read back?
13:47:02 17      THE WITNESS:  Yeah.  Well, actually let
13:47:03 18   me --
13:47:03 19      MR. OSNATO:  Can you read back the
13:47:04 20   question, please?
13:47:05 21      THE WITNESS:  Let me rephrase my
13:47:06 22   answer.
13:47:07 23      MR. OSNATO:  Well, just listen to the
13:47:09 24   original question and then provide an answer.
13:47:12 25      THE WITNESS:  Let me rephrase my -- if
                                                  188
```

Fiachra O'Driscoll

```
          1
13:47:12  2   I may, rephrase my answer.
13:47:14  3      A.   In the first place it wouldn't have
13:47:16  4   been James place to turn a facility down in
13:47:19  5   isolation.  He didn't have any authority to
13:47:20  6   approve or disprove credit that I'm aware.  In the
13:47:23  7   second place, actually I didn't know there was
13:47:25  8   such a report.
13:47:27  9      Q.   To this moment, when I asked you this
13:47:29 10   question, you didn't know it?
13:47:31 11      THE WITNESS:  Can I answer that?
13:47:32 12      MR. OSNATO:  You can absolutely answer
13:47:33 13   the question.
13:47:34 14      I, again, am going to object to the
13:47:38 15   lack of foundation in the question.
13:47:39 16      But you can answer the question.
13:47:41 17      I was shown a piece of paper by our
13:47:43 18   counsel yesterday to that effect, that was the
13:47:47 19   first I'd ever seen or heard of it.
13:47:50 20      Q.   Okay.  Now, there was another reverse
13:47:52 21   repurchase facility proposed just a few months
13:47:54 22   later, wasn't there, in the amount of $50 million?
13:47:58 23      A.   I don't recall.
13:47:59 24      MR. CASTANARES:  Let me see if I can
13:48:00 25   help refresh your memory.
                                                  189
```

Fiachra O'Driscoll

```
1
13:48:01  2    I'll ask the reporter to mark
13:48:03  3    CSFB 512903 as 53.
13:48:07  4        (CSFB Exhibit 53, One-page Memorandum,
13:48:07  5    bearing Bates stamp No. CSFB-00512903, marked
13:48:07  6    for identification, as of this date.)
13:48:20  7        THE WITNESS: Uh-huh.
13:48:34  8    Q.  Does this document help refresh your
13:48:36  9    memory as to whether there was a proposal for a
13:48:38 10    $50 million reverse repurchase facility in
13:48:41 11    approximately March of 2000?
13:48:42 12    A.  Actually, no.
13:48:43 13    No. 1, there was never a second
13:48:45 14    proposal. I don't think that there was ever
13:48:47 15    anything that -- to the best of my knowledge,
13:48:50 16    there was only ever one proposal for a reverse
13:48:54 17    repo. I don't recall its exact dollar amount at
13:48:57 18    the time. I thought it was a $75 million
13:48:59 19    proposal. There may have been revised term
13:49:02 20    sheets. It wasn't unusual actually to have
13:49:04 21    revisions of term sheets of that sort during that
13:49:06 22    period of time. So I don't think that there was
13:49:09 23    ever multiple proposals, certainly from my
13:49:11 24    perspective.
13:49:12 25    Q.  So if it was all one proposal you were
                                                    190
```

```
1
13:49:14  2    informed on approximately March 21, 2000 that it
13:49:16  3    was turned down, right?
13:49:18  4    A.  No.
13:49:19  5    Q.  So this, the statement here that Irwin
13:49:21  6    and Xanthos informed you of, this decision is
13:49:24  7    incorrect?
13:49:24  8    A.  It's incorrect.
13:49:25  9    Q.  They never did tell you that?
13:49:27 10    A.  Nope.
13:49:27 11    Q.  Okay.
13:49:27 12    A.  The first I heard about this was
13:49:28 13    yesterday.
13:49:30 14    Q.  So as far as you know, that reverse
13:49:32 15    repo facility was still under consideration as of
13:49:35 16    the time of Oakwood's bankruptcy in 2002?
13:49:39 17    A.  There hadn't been significant
13:49:41 18    discussions about it and it would -- those
13:49:45 19    discussions were from my perspective superseded by
13:49:49 20    the later loan purchase facility discussions.
13:49:51 21    Q.  A year later?
13:49:52 22    A.  Yeah. And it wasn't unusual for
13:49:54 23    discussions to change in their form. Because more
13:49:57 24    typically, as I said, rather than -- sometimes
13:50:01 25    you'd get an outright approval. Very occasionally
                                                    191
```

```
1                Fiachra O'Driscoll
13:50:03  2    you'd get an outright turndown. Much more often
13:50:06  3    it was the case that their answer was, well, can
13:50:09  4    you think about whether or not you, you know, can
13:50:12  5    approach this thing differently?
13:50:15  6        So term sheets would have been revised,
13:50:17  7    term sheets would have been transformed in their
13:50:19  8    nature, and you would see if there was a meeting
13:50:21  9    of the minds.
13:50:22 10    Q.  Okay. Now, yesterday for the first
13:50:23 11    time you saw Xanthos's January 2000
13:50:28 12    recommendation; is that correct?
13:50:30 13    A.  Yes.
13:50:31 14    Q.  Is that the type of document, speaking
13:50:33 15    as of that time, January 2000, that would have
13:50:36 16    evidenced a complete turndown of a proposal?
13:50:41 17    A.  I never saw evidence of a complete
13:50:42 18    turndown of a proposal.
13:50:45 19    Q.  Okay. Were you ever aware that CSFB
13:50:47 20    had turned down any proposals ever?
13:50:49 21        MR. OSNATO: Objection as to the form.
13:50:51 22    Q.  Whether they related to Oakwood or
13:50:52 23    anything else?
13:50:53 24    A.  Yes, absolutely.
13:50:54 25    Q.  Okay. And were these communicated to
                                                    192
```

```
1                Fiachra O'Driscoll
13:50:55  2    you orally always?
13:50:57  3    A.  They were always communicated orally.
13:50:59  4    Q.  Okay. Now, in the course of the next
13:51:04  5    few months after the $75 million proposal was
13:51:09  6    being made to CRM, did anybody at Oakwood ask you
13:51:13  7    what was going on with it?
13:51:15  8    A.  I'm sure they did, but I don't have any
13:51:18  9    specific recollection.
13:51:19 10    Q.  Okay. Did it ever occur to you to
13:51:21 11    wonder why you hadn't heard from CRM on this?
13:51:25 12    A.  There was never a situation where I
13:51:26 13    hadn't heard from CRM.
13:51:31 14    Q.  Well, this was one, wasn't it?
13:51:34 15    A.  No.
13:51:36 16    Q.  And you hadn't heard from CRM on this
13:51:39 17    proposal until yesterday, right?
13:51:42 18    A.  I hadn't seen a formal written
13:51:44 19    submission from CRM, but I -- on the various
13:51:48 20    things that we worked on, of which Oakwood was
13:51:51 21    only a component, I probably talked to Tom Irwin
13:51:54 22    every two or three days.
13:51:56 23    Q.  All right. Well, my question to you is
13:51:58 24    did CRM ever communicate to you the turndown of
13:52:00 25    any proposal relating to Oakwood?
                                                    193
```

Fiachra O'Driscoll

```
16:34:57  2    A.  Yes.
16:34:58  3    Q.  -- who its officers were, whether it
16:35:00  4  had bank accounts, whether it held meetings,
16:35:03  5  et cetera?
16:35:04  6    A.  We can shortcut all those questions,
16:35:07  7  yes.
16:35:07  8        MR. CASTANARES:  Okay.  Thank you.
16:35:07  9        We've got five minutes on the
16:35:08 10  videotape, so why don't we take five.
16:35:12 11        MR. OSNATO:  Okay.
16:35:12 12        THE VIDEOGRAPHER:  We're off the record
16:35:13 13  at 4:35.  This is the end of tape No. 3.
16:40:54 14        (Recess taken.)
16:42:11 15        THE VIDEOGRAPHER:  Okay.  We're back on
16:42:12 16  the record.  It's 4:42.  This is tape No. 4.
16:42:16 17  BY MR. CASTANARES:
16:42:17 18    Q.  Do you think that the loan purchase
16:42:18 19  program that was instituted in early 2001 for
16:42:23 20  Oakwood represented an improvement for Oakwood
16:42:25 21  over its prior facility?
16:42:32 22    A.  Can you expand on "improvement,"
16:42:37 23  please.
16:42:37 24    Q.  Was it cheaper money?
16:42:38 25    A.  It was slightly more expensive money.
```
314

Fiachra O'Driscoll

```
16:42:41  2    Q.  Okay.  Was it more money?
16:42:43  3    A.  It -- I don't recall.  I think -- I
16:42:46  4  think it was about the same amount.
16:42:49  5    Q.  Okay.  Did it give more leeway to the
16:42:53  6  company in terms of collateral quality?
16:42:57  7    A.  I don't know, because I actually don't
16:42:58  8  know the full terms of the predecessor facility.
16:43:01  9    Q.  Can you think of any particular
16:43:03 10  advantage that this facility gave -- strike that.
16:43:06 11        Did the earlier facility require
16:43:07 12  Oakwood to give the provider of the facility
16:43:11 13  20 percent of its stock?
16:43:14 14    A.  Nope.
16:43:16 15    Q.  Can you think of any term of this
16:43:17 16  transaction which represented an improvement from
16:43:20 17  Oakwood's perspective from what it had before?
16:43:23 18    A.  Absolutely.
16:43:24 19    Q.  Please do.
16:43:24 20    A.  There was two key things.  The first
16:43:27 21  was that the Bank of America facility was a
16:43:30 22  short-term facility.  And Bank of America -- it
16:43:33 23  was a time period when B of A had kind of reversed
16:43:36 24  what we talked about earlier on.  Because you may
16:43:39 25  recall that I mentioned that B of A in particular
```
315

Fiachra O'Driscoll

```
16:43:41  2  were pushing hard to -- in exchange for its -- for
16:43:47  3  taking on credit risk, pushing hard to get
16:43:50  4  mandates for investment banking advisory services,
16:43:53  5  securities underwriting and so on.
16:43:55  6        And B of A had actually kind of gone
16:43:58  7  through a transition, not just with Oakwood, but
16:44:00  8  with quite a lot of other people as we got into
16:44:03  9  that period of time where they actually started
16:44:06 10  retrenching and they withdrew credit from a lot of
16:44:09 11  customers.
16:44:10 12        So one of the things that was -- that
16:44:14 13  almost certainly the case was that the Bank of
16:44:16 14  America facility was one that Oakwood was being
16:44:19 15  put under at -- Bank of America was making it
16:44:23 16  clear that they were looking to get out.
16:44:26 17        Furthermore, the Bank of America
16:44:28 18  facility was fairly short dated.  I don't know
16:44:30 19  what the term of it was, but the term was
16:44:32 20  364 days, perhaps, that would have been fairly
16:44:35 21  typical.  Whereas what this facility was, was a
16:44:38 22  three-year committed facility.
16:44:41 23    Q.  Anything else?
16:44:42 24    A.  So having the three-year term as
16:44:45 25  opposed to a 364-day term gave Oakwood a great
```
316

Fiachra O'Driscoll

```
16:44:49  2  deal more certainty that its problem of how to
16:44:52  3  deal with its inventory of newly originated loans
16:44:56  4  had gone away.
16:44:57  5    Q.  All right.  Any other advantages you
16:44:58  6  can think of over --
16:45:00  7    A.  That was an enormous advantage, in my
16:45:02  8  opinion.
16:45:03  9    Q.  Can you think of any others, however
16:45:05 10  slight?
16:45:05 11    A.  That was the salient advantage.
16:45:09 12    Q.  Okay.  Were you involved in the
16:45:13 13  negotiation of the various ceilings in the
16:45:20 14  facility on loan-to-value ratio, FICO scores,
16:45:23 15  et cetera?
16:45:24 16    A.  Yes.
16:45:25 17    Q.  Were you the primary person who
16:45:27 18  negotiated those ratios and terms on behalf of
16:45:30 19  CSFB?
16:45:30 20    A.  There were several people involved in
16:45:32 21  it at different points of time.  I would have been
16:45:34 22  the main point of contact with Oakwood.
16:45:36 23    Q.  Okay.  Was anybody else in direct
16:45:38 24  contact with Oakwood on those points?
16:45:40 25    A.  I don't recall.
```
317

**EXHIBIT E**



**CREDIT SUISSE | FIRST BOSTON**


### Memorandum


To:        File

From:      James Xanthos

Date:      March 21, 2000

Subject:   Update on Oakwood Homes

On March 21, 2000, Bob O'Brien, Dan Miller, Thomas Irwin and James Xanthos discussed Oakwood Homes and the proposed $50MM Repurchase facility.

CRM decided that it would decline this credit/financing proposal

Thomas Irwin & James Xanthos informed Fiachra O'Driscoll of this decision.



EXHIBIT
CSFB
53
6/29/06

**CONFIDENTIAL**

CSFB-00512903

**EXHIBIT F**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# SUPPLEMENTAL REPORT OF ALAN C. SHAPIRO, PH.D.

### August 28, 2007

### CONFIDENTIAL

## 1.    Introduction

In my report dated April 30, 2007, I opine that Credit Suisse First Boston did not behave in a reasonable or reasonably prudent manner with respect to services it provided to Oakwood Homes Corporation ("Oakwood"). In forming this opinion, I was asked by counsel to assume that Oakwood was insolvent in September 2001 – more than a year prior to when the company filed for bankruptcy on November 15, 2002. This assumption is based on the expert report of Dr. Michael Tennenbaum.

I have since been informed by counsel that a recent decision, *VFB LLC v. Campbell Soup Company*, 482 F.3d 624, places emphasis on the use of market data in reaching economic conclusions. Based on this additional information, I have analyzed market data to test the validity of that assumption.

This supplemental report summarizes this analysis. As I explain, market data indicate that Oakwood was economically insolvent by June 30, 2000.

## 2.    Market Data Demonstrate Oakwood Was Insolvent On June 30, 2000

A company is balance sheet insolvent, from an economic perspective, if the market value of its assets is less than the value of its outstanding debt. I assessed Oakwood's economic solvency by calculating the market value of its equity and its debt (the sum of which equals the market value of its assets),[1] and comparing this figure to the company's debt. As I show below, Oakwood was insolvent as of June 30, 2000.

### *Market Value of Equity*

The market value of a company's equity is obtained by multiplying its share price by the number of shares outstanding. Oakwood's share price began a downward spiral in March 1998, declining by more than 72 percent from late March 1998 to early October 1998. After a brief recovery in late 1998, the share-price decline resumed in 1999. By September 1999, Oakwood's shares were trading below $5.00 and had lost nearly 90 percent of their March 1998 value. The share price fell to $1.50 by September 2000, down 96 percent from its March 1998 value. The resulting decline in the market value of its equity is shown in Figure 1.

---

[1] This approach relies on the fact that the market value of assets equals the market value of claims against those assets (that is why it is called a balance sheet). These claims come in the form of debt and equity, with equity as the residual claimant receiving the value remaining (if any) after paying off all debt claims.

1

**Figure 1:  Steep Decline in Market Value of Equity Beginning in 1998**



The steep decline in Oakwood's market value of equity is indicative not just of recent dismal operating performance, but of diminished expectations regarding the company's future performance, as a company's equity value represents the present value of all expected future corporate earnings. Beginning in March 1998, the market's expectations of Oakwood's future earnings declined markedly and remained low until the company's bankruptcy filing. While the market value of equity is still positive, this is just a reflection of its option value, not that it provides any cushion for the claims of bondholders.

***Market Value of Debt***

I then calculated the market value of Oakwood's reported debt. Exhibit 1 provides a summary of Oakwood's outstanding debt for each year from 1996 to 2002, as per its balance sheet.[2] To derive the market value of reported debt, I first calculated the ratio of the market price of Oakwood's 10-year, 8.125 percent coupon, $175 million, senior note issued March 1, 1999, to its face value of $175 million (please see Exhibit 2 for details regarding Oakwood's note issues).[3] This ratio fell from 52 percent on March 31, 2000, to 30 percent on December 31, 2000, and was approximately 40 percent for 2001 and early 2002. The deep discount at which the note traded indicates that creditors did not expect to be paid in full (and were thus willing to accept 50 cents, or less, on the dollar for the debt), meaning that they considered Oakwood to be insolvent.

---

[2] Data after June 30, 2002 were not available because Oakwood did not file a Form 10-Q with the Securities and Exchange Commission for the third quarter of 2002.

[3] I obtained the bond price data from JP Morgan's research website (www.morganmarkets.com). Data prior to January 2000 were not available.

2

As the 8.125 percent coupon senior note was the only Oakwood note or bond for which pricing was available, I used the discount on this note as a proxy for the discount on both of the notes reported on Oakwood's balance sheet.[4] The 8.125 percent coupon bond represented between 35 percent and 49 percent of Oakwood's reported liabilities in each year from 1999 to 2002. Oakwood's other note during this period was a similar senior note, also issued March 1, 1999, with a five-year maturity, a 7.875 percent coupon rate, and a face value of $125 million. This note represented another 25 percent to 35 percent of the company's reported liabilities during those years.

I applied the price discount on the 8.125 percent coupon note to the face value of Oakwood's notes ($300 million) to estimate the market value of the notes for each quarter from 2000 through the second quarter of 2002. I next added the face value of Oakwood's other debt, with no discount applied, to calculate the market value of debt. I then added the market value of debt to the market value of equity to calculate the market value of Oakwood's assets (Table 1).

### Table 1: Calculation of Market Value of Assets
### (in thousands, except share price)

|  | 3/00 | 6/00 | 9/00 | 12/00 | 3/01 | 6/01 | 9/01 | 12/01 | 3/02 | 6/02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Equity** |  |  |  |  |  |  |  |  |  |  |
| Shares Outstanding | 47,125 | 47,125 | 47,125 | 47,125 | 47,694 | 9,529 | 9,531 | 9,532 | 9,530 | 9,530 |
| Share Price | $3.81 | $1.81 | $1.50 | $0.62 | $1.06 | $5.00 | $4.15 | $5.30 | $7.20 | $4.99 |
| MV Equity | $179,664 | $85,414 | $70,688 | $29,453 | $50,556 | $47,645 | $39,554 | $50,520 | $68,616 | $47,555 |
| **Market Value of Debt** |  |  |  |  |  |  |  |  |  |  |
| BV Long-Term Debt | $389,948 | $391,739 | $395,429 | $452,368 | $356,637 | $378,633 | $370,620 | $323,107 | $363,912 | $339,214 |
| Discount on Face Value of Notes | 48% | 64% | 68% | 70% | 58% | 62% | 60% | 60% | 59% | 42% |
| MV of Debt | $245,948 | $199,739 | $191,429 | $242,368 | $182,637 | $192,633 | $190,620 | $143,107 | $186,912 | $213,214 |
| **Market Value of Assets** | $425,612 | $285,153 | $262,117 | $271,821 | $233,193 | $240,278 | $230,174 | $193,627 | $255,528 | $260,769 |

---

[4] My insolvency date conclusions do not change even if it is assumed that the 7.875% coupon note was worth its face value during the period – the market value of Oakwood's assets was still less than the company's outstanding debt by June 30, 2001.

*Comparing the Market Value of Assets to Outstanding Debt*

I then compared the market value of assets first with the book value of reported debt. As shown in Table 2 and Figure 2, Oakwood was insolvent as of June 30, 2000. The market value of Oakwood's assets is less than the book value of the company's reported debt for each quarter from June 2000 through June 2002. The difference is never less than $78 million. That is, for each quarter from June 2000 to June 2002, Oakwood's balance sheet debt exceeded the market value of its assets by at least $78 million.

This analysis understates Oakwood's insolvency, as it does not include the Company's off-balance sheet liabilities, such as those associated with the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities (the B-2 guarantees are discussed in my original report).

**Table 2: Market Value of Assets Less than Face Value of Debt ($ 000)**

|  | 3/00 | 6/00 | 9/00 | 12/00 | 3/01 | 6/01 | 9/01 | 12/01 | 3/02 | 6/02 |
|---|---|---|---|---|---|---|---|---|---|---|
| MV Equity | $179,664 | $85,414 | $70,688 | $29,453 | $50,556 | $47,645 | $39,554 | $50,520 | $68,616 | $47,555 |
| MV of Debt | $245,948 | $199,739 | $191,429 | $242,368 | $182,637 | $192,633 | $190,620 | $143,107 | $186,912 | $213,214 |
| MV Assets | $425,612 | $285,153 | $262,117 | $271,821 | $233,193 | $240,278 | $230,174 | $193,627 | $255,528 | $260,769 |
| BV Debt | $389,948 | $391,739 | $395,429 | $452,368 | $356,637 | $378,633 | $370,620 | $323,107 | $363,912 | $339,214 |
| MV Assets Less BV Debt | $35,664 | -$106,586 | -$133,313 | -$180,547 | -$123,444 | -$138,355 | -$140,446 | -$129,480 | -$108,384 | -$78,445 |
| Insolvency Conclusion | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

4



**Figure 2: Market Value of Assets Below Book Value of Debt by June 30, 2000**

### CSFB's Own Analysis Is Consistent with My Findings

CSFB also concluded that the market value of Oakwood's assets was less than the value of the debt owed by the company by June 2001. In a presentation dated June 26, 2001, CSFB calculated the market value of Oakwood's assets as $358 million, compared with total debt outstanding of $460 million.[5] In a March 2002 presentation, CSFB also calculated the market value of Oakwood's assets ($238.4 million) to be less than the company's outstanding debt ($324.1 million).[6] As such, CSFB's own internal analysis demonstrated that Oakwood was economically insolvent by no later than June 2001. CSFB's analysis also understates Oakwood's insolvency as it does not include liabilities associated with the B-2 guarantees.

---

[5] CSFB 00052973.
[6] CSFB 00033241.

5

## Oakwood Solvency Analysis
### Exhibit 1
*Oakwood's Existing Debt per 10-K Filings*

In Thousands USD

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Short Term Notes | $175,000 | $175,000 | $282,200 | $144,800 | $64,000 | $49,000 | $49,000 |
| 12.58% subordinated notes payable 1997-2001 | $8,350 | $7,372 | $4,692 | $2,075 | | | |
| 8.65% Notes Due 2000 | $22,936 | $9,699 | $3,246 | $231 | | | |
| 10.5% subordinated notes paybie 2001 to 2004 | $12,954 | $12,954 | $11,876 | $8,837 | | | |
| Term Notes Due July 2000 | $25,740 | $18,334 | $11,076 | $12,615 | | | |
| Capitalized Leases | $4,916 | $3,835 | $3,270 | | $3,560 | | |
| 8 1/8% senior notes due March 2009 | | | | $174,050 | $174,120 | $174,196 | $174,280 |
| 7 7/8% senior notes due March 2004 | | | | $124,693 | $124,754 | $124,819 | $124,530 |
| Industrial revenue bonds due in installments through 2011 | | | $5,492 | $7,099 | $6,700 | $6,200 | $5,565 |
| Industrial revenue bonds due in installments through 2001 | $2,250 | $2,125 | $2,025 | $1,925 | $1,825 | | |
| Industrial revenue bonds due in installments through 1996 | $4,700 | | | | | | |
| Facilities Loans due in installments through 1996 | $8,000 | $4,000 | | | | | |
| 8% reset debentures due 2007 | $39,908 | $16,945 | $16,945 | $16,925 | $16,783 | $16,194 | $2,633 |
| Other notes payable | $2,945 | $2,351 | $2,542 | $3,474 | $2,187 | $1,711 | $2,159 |
| ESOP Notes | $1,680 | $1,200 | $720 | $240 | | | |
| Total | $309,379 | $253,815 | $344,084 | $496,964 | $393,929 | $372,120 | $358,167 |

Source: Oakwood 10-k filings

**Oakwood Solvency Analysis**
**Exhibit 2**
*Details of Bonds Issued*

8 1/8% senior notes due March 2009

| | |
|---|---|
| Settlement Date | 3/2/1999 |
| Maturity Date | 3/1/2009 |
| Coupon | 8.125% |
| Amount Issued ($mil.) | $175.0 |

7 7/8% senior notes due March 2004

| | |
|---|---|
| Settlement Date | 3/2/1999 |
| Maturity Date | 3/1/2004 |
| Coupon | 7.875% |
| Amount Issued ($mil.) | $125.0 |