IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>          Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC Liquidation Trust,<br><br>          Plaintiff,<br>v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>          Defendants. | Adv. Proc. No. 04-57060 (PJW)<br><br>Civil Action No. 07-799 (JJF) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE AT TRIAL TESTIMONY AND ARGUMENT REGARDING
THE CURRENT SUBPRIME MORTGAGE CRISIS**

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9000

Dated: April 16, 2008

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT .........................................................................................................................3

I. THE SUBPRIME MORTGAGE CRISIS IS NOT RELEVANT .................................3

II. EVIDENCE OF THE SUBPRIME MORTGAGE CRISIS
WOULD MISLEAD THE JURY, WASTE TIME AND IS
UNFAIRLY PREJUDICIAL ......................................................................................6

CONCLUSION ......................................................................................................................8

# TABLE OF AUTHORITIES

**Page**

## CASES

*Coleman v. Home Depot, Inc.*,
306 F.3d 1333 (3d Cir. 2002)......................................................................................6

*Herskowitz v. Nutri/System, Inc.*,
857 F.2d 179 (3d Cir. 1988)........................................................................................7

*Sprint/United Mgmt. Co. v. Mendelsohn*,
128 S. Ct. 1140 (2008)................................................................................................6

## RULES

Fed. R. Evid. 401 ........................................................................................................4

Fed. R. Evid. 402 ................................................................................................2, 3, 5

Fed. R. Evid. 403 ...................................................................................................2, 6

## **INTRODUCTION**

The subprime mortgage crisis exploded into the consciousness of the American public in the middle of 2007. Since then, it has been at the forefront of the news – a search of the Westlaw Major Papers database reveals 8921 articles mentioning subprime mortgages between January 2007 and April 2008. In the five years between January 2002 and January 2007, by contrast, the database records only 265 articles that mention subprime mortgages. Indeed, the Wilmington News Journal's online archives reflect 105 articles that reference subprime mortgages written since February 2007, and only 20 that were run between January 2002 and December 2006.

The news coverage in Wilmington has hardly been neutral; for example, the Wilmington News Journal thundered on December 20, 2007 that "[t]he Federal Reserve is way too late in cracking down on wayward mortgage lending practices" but that "at least the Fed … has finally come to grips with the extent of risky and deceptive offers that have undermined real estate and banking." Sherman Decl. Ex. A. Mortgage brokers were depicted by the Wilmington News Journal on October 18, 2007 as preying on the "little people [who] were those who really did not qualify for the best mortgages and for whom homeownership seem destined to always be a dream. As in [sic] the case in modern-day America, that meant minority, low-income and urban borrowers." Sherman Decl. Ex. B. The Wilmington News Journal went on to state "[b]ut alas, kindhearted brokers took pity on these 'little people' with a mercy that [Alan] Greenspan now says state attorneys general ought to use their authority to begin prosecuting." *Id.* The Wilmington News Journal pointed to "the high-roller hedge funds and big monied Wall Street financiers responsible for financing reckless mortgage brokers." *Id.*

The subprime mortgage crisis, therefore, is an issue that likely will be on the minds of the jurors hearing this case. The temptation of Plaintiff's counsel to suggest to the jury

1

that the issues in this case have some connection to the current subprime mortgage situation may be hard to resist. But the Court should insist that the temptation should be resisted because the subprime mortgage crisis, with which jurors will undoubtedly have some familiarity, has nothing whatever to do with the claims in this case. Even if such evidence were somehow relevant, its probative value would be far outweighed by its propensity to prejudice and mislead the jury and waste the jury's time. Finally, discussion of the subprime mortgage crisis could lead the jury to identify Defendants, part of a bulge-bracket Wall Street investment bank, as players in the subprime mortgage crisis, tempting the jury to punish Defendants for things that have nothing to do with the work Defendants did for Oakwood.

Accordingly, the Court should bar any evidence or argument regarding the subprime mortgage crisis because it does not meet the relevancy requirement of Fed. R. Evid. 402 and under Fed. R. Evid. 403 because it would mislead the jury, waste the jury's time and would be unfairly prejudicial to Defendants.

## **BACKGROUND**

Oakwood was in the manufactured housing business, designing, manufacturing and selling mobile homes. Oakwood also provided financing to some purchasers of its homes, with the loans documented as installment sales contracts or as traditional mortgages (collectively, "RICs"). Oakwood funded these activities by participating in asset securitizations. Securitization was a financing technique used to produce current liquidity from the long-term RICs signed by purchasers of manufactured houses at the time of purchase. The underwriter bundled together a large number of RICs and sold them to investors for cash, who looked to the mortgage payments by the retail customers for repayment. Oakwood's securitizations occurred approximately four times a year, and were split into various tranches according to their credit

2

ratings. In between securitizations, liquidity was provided to Oakwood through interim facilities.

Starting in 1996, Defendants' securitization group served as the underwriter of Oakwood's securitizations and assisted Oakwood with related transactions. Beginning in February 2001, Defendants arranged interim financing for Oakwood through an arrangement known as the "Warehouse Facility," which held RICs until there were enough for the next securitization. Defendants also assisted Oakwood in selling the most subordinated tranches to Berkshire Hathaway beginning in 2001.

Defendants' expert, Thomas F. Boland was deposed by Plaintiff's attorney, Mr. Castanares, on March 25, 2008. Mr. Castanares asked Mr. Boland to distinguish Plaintiff's securitization program "from the process of the sub-prime lenders that we've been reading about in the newspapers recently, where they go out and make a hundred million dollars worth of loans and securitize them." Sherman Decl. Ex. C, Mar. 25, 2008 Boland Dep. at 64:7- 11. Mr. Boland, after requesting clarification, responded that "if we're talking about a package of mortgages that gets securitized and tranched, there would be a similarity." Id. at 64:24-2.

On April 8, 2008, Defendants' counsel, as part of the meet-and-confer process regarding motions *in limine*, asked Mr. Castanares whether Plaintiff intended to raise the current subprime mortgage crisis at trial either by way of analogy or otherwise. Mr. Castanares' response made it clear that Plaintiff does, in fact, intend to suggest to the jury that the issues in this case have something to do with the current subprime mortgage crisis.

## ARGUMENT

### I. THE SUBPRIME MORTGAGE CRISIS IS NOT RELEVANT

Under Federal Rule of Evidence 402, only evidence that is relevant may be admitted. Fed. R. Evid. 402. Federal Rule of Evidence 401 provides that "'[r]elevant evidence'

3

means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence." Fed. R. Evid. 401. In deciding whether evidence is relevant, the court assesses whether the evidence "tends to prove the matter sought to be proved." 1972 Advisory Committee Notes to Fed. R. Evid. 401.

Evidence regarding the subprime mortgage crisis does not even come close to meeting this standard. There is no allegation in this case that the *nature* of the financing services provided by Defendants to Oakwood were inappropriate or caused Oakwood harm. On the contrary, even after it filed for bankruptcy, Oakwood was clear that the securitization services provided by Credit Suisse were the best means of financing available to the company. Sherman Decl. Ex. D, Debtors' Motion Pursuant to §§ 365 and/or 363 of the Bankruptcy Code for Authority for Oakwood Acceptance Corporation to (I) Assume and Assign Servicing Agreements and Related Advance Receivables to, and Enter Into Subservicing Agreement With, an Affiliate or, in the Alternative, (II) Reject Servicing Agreements, at ¶¶ 5-6; Sherman Decl. Ex. E, Declaration of Douglas R. Muir in Support of First Day Relief, at ¶¶ 18-19. Oakwood's officers were clear and emphatic in their deposition testimony that Credit Suisse's services with regard to securitizations were well performed and benefitted the company. Sherman Decl. Ex. F, Sept. 21, 2006 Standish Dep. at 14:22 – 15:1, 23:3 – 13, 110:3 – 7; Sherman Decl. Ex. G, Sept. 26, 2006 Muir Dep. at 66:8 – 14, 72:4 – 17, 134:23 – 136:7, 198:24 – 199:8; Sherman Decl. Ex. H, Sept. 27, 2006 Muir Dep. at 60:17 – 61:4.

On the contrary, Plaintiff's claim is that by continuing to underwrite securitizations and provide related support, Credit Suisse enabled Oakwood to continue in business longer than it should have, and it was that *continuation* of Oakwood's business that

caused harm. That claim would be the same regardless of what *form* of financing Oakwood used. Plaintiff's claim would be no different if Credit Suisse had been an old-fashioned secured or unsecured lender to Oakwood. The fact that Credit Suisse was underwriting the securitization of RICs (which might be compared in some respects to subprime loans) has nothing whatever to do with Plaintiff's claims.

The events at issue in this case pre-dated the current subprime mortgage crisis by at least five years. Obviously, there are no allegations that the services provided to Oakwood by Credit Suisse affected, or were affected by, the subprime mortgage crisis. Likewise, there are no allegations (nor could there be) that that the subprime mortgage crisis had any impact on Oakwood. Nor is this case in any respect about the effect of financing on retail borrowers -- whose plight is the focus of much of the press coverage of the contemporary subprime crisis.

Testimony or argument regarding the subprime mortgage crisis will not assist the jury in reaching a determination whether Defendants breached any fiduciary duty or implied contract, or were negligent in rendering services to Plaintiff. Evidence of the subprime mortgage crisis would not prove any facts of any consequence to any of Plaintiff's claims. Any suggestion by Plaintiff's counsel or witnesses that the Oakwood transactions resembled or were "just like," the transactions that are involved in the current subprime mortgage crisis would serve no purpose other than to confuse and mislead the jury as it considers the issues actually presented by this case.

The subprime mortgage crisis, therefore, has no relevance whatever to Plaintiff's claims and any evidence or argument relating to it should be excluded under Fed. R. Evid. 402.

## II. EVIDENCE OF THE SUBPRIME MORTGAGE CRISIS WOULD MISLEAD THE JURY, WASTE TIME AND IS UNFAIRLY PREJUDICIAL

Even if evidence of the subprime mortgage crisis were relevant, it would be inadmissible under Federal Rule of Evidence 403, which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The district court's wide discretion with respect to the admissibility of evidence "is particularly true with respect to Rule 403 since it requires an 'on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.'" *Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140, 1145 (2008) (internal citations omitted). This balancing "ensures that juries are not presented with evidence that is far less probative than it is prejudicial." *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002).

The jury will be presented with explanations of Plaintiff's complicated financial transactions, and comparing those transactions to the subprime mortgage crisis could cause confusion on the part of the jury as to whether there is a relationship between the subprime mortgage crisis and the services rendered by Credit Suisse to Oakwood. It will be very difficult in any event for the parties to explain the financing arrangements and securitization transactions relevant to Plaintiff's legal claims to jurors who do not have first-hand knowledge of the finance industry. Allusions to, and explanations about, the subprime mortgage crisis would add needless complication, since it has no bearing on whether Defendants in any way breached any duties to Plaintiff. In deciding Plaintiff's claims, the jury will be presented with complex theories of

6

damages analysis and calculations. Dragging the subprime mortgage crisis into the trial will not serve to clarify any of these theories, and will waste the jury's time.

Moreover, allowing evidence of the subprime mortgage crisis is likely to lead the jury to identify Defendants as a player in the crisis. Given the treatment by the media of all involved in the crisis as toxic -- whether merited or not -- it would be unfairly prejudicial to Defendants to be associated with the crisis in the minds of the jury. Whether Defendants have had any role in the subprime mortgage crisis has no connection to the work they performed for Oakwood many years ago. *See Herskowitz v Nutri/System, Inc.*, 857 F.2d 179, 188 (3d Cir. 1988) (upholding court's exclusion of evidence of post-merger performance "on the ground that the possible prejudice arising from use of events long after the preparation of the proxy statement to cast light on the defendants' earlier intention outweighed its limited probative value."). This case is not about the subprime mortgage crisis, subprime lending practices, the loss of borrowers' homes through foreclosures, the sharp increase in foreclosures or the need to reform the subprime mortgage industry. Rather, it boils down to whether Credit Suisse breached any duties to Plaintiff -- which has nothing to do with the subprime mortgage crisis or any part that Credit Suisse may or may not have played in it.

Finally, should Plaintiff open the door to either argument or evidence about the subprime mortgage crisis, Defendants would need to point out that if there was subprime lending going on here, Oakwood was the lender. The "victims" of the subprime mortgage abuses that are currently in the news are the borrowers who were extended loans they could not repay or the investors in securitization products. Neither are parties to this case, and the Court should not permit the case to descend into confusion by permitting any suggestion that issues relating to the subprime mortgage crisis have anything to do with the case.

7

Accordingly, even if the Court finds evidence of the subprime mortgage crisis to be relevant, the Court should bar evidence or argument about it under Fed. R. Evid. 403.

## CONCLUSION

For all the reasons stated above, the Court should exclude any evidence or argument regarding the subprime mortgage crisis.

Dated:  April 16, 2008
       Wilmington, Delaware

Respectfully submitted,

/s/

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, NY 10105
Telephone:  (212) 903-9000
Facsimile:  (212) 903-9100

*Attorneys for Defendants*