## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| Oakwood Homes Corporation, <u>et al.</u>, | Case No. 02-13396 (PJW) |
| Debtors. | |

| | |
|---|---|
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 04-57060 (PJW) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Civil Action No. 07-799 (JJF) |
| Defendants. | |

-------------------------------------------------------------x

## DECLARATION OF ANTONIA B. SHERMAN IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE AT TRIAL TESTIMONY AND ARGUMENT REGARDING THE <u>CURRENT SUBPRIME MORTGAGE CRISIS</u>

I, Antonia B. Sherman, declare as follows:

1.     I am an attorney associated with the law firm of Linklaters LLP, counsel to Defendants in this action.  I submit this Declaration in connection with Defendants' Motion to Exclude at Trial Testimony and Argument Regarding the Current Subprime Mortgage Crisis.

2.      Attached hereto as Exhibit A is a true and correct copy of *Fed's Ideas to Rein in Mortgage Abuses Come Too Late for Too Many*, NEWS J. (Wilmington, Del.), Dec. 20, 2007 (*available at* http://www.newsbank.com).

3.      Attached hereto as Exhibit B is a true and correct copy of Rhonda B. Graham, *Shady Brokers Had Big Hand in Subprimes*, NEWS J. (Wilmington, Del.), Oct. 18, 2007 (*available at* http://www.newsbank.com).

4.      Attached hereto as Exhibit C is a true and correct copy of an excerpt from the transcript of the March 25, 2008 deposition testimony of Thomas F. Boland.

5.      Attached hereto as Exhibit D is a true and correct copy of Debtors' Motion Pursuant to §§ 365 and/or 363 of the Bankruptcy Code for Authority for Oakwood Acceptance Corporation to (I) Assume and Assign Servicing Agreements and Related Advance Receivables to, and Enter Into Subservicing Agreement With, an Affiliate or, in the Alternative, (II) Reject Servicing Agreements, *In re Oakwood Homes Corp.*, Case No. 02-13396 (PJW) (Bankr. D. Del. Nov. 18, 2002).

6.      Attached hereto as Exhibit E is a true and correct copy of the Declaration of Douglas R. Muir in Support of First Day Relief, *In re Oakwood Homes Corp.*, Case No. 02-13396 (PJW) (Bankr. D. Del. Nov. 18, 2002).

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the transcript of the September 21, 2006 deposition testimony of Myles Standish.

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts from the transcript of the September 26, 2006 deposition testimony of Douglas R. Muir.

9.      Attached hereto as Exhibit H is a true and correct copy of excerpts from the transcript of the September 27, 2006 deposition testimony of Douglas R. Muir

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 16, 2008
     New York, New York

Antonia B. Sherman, Esq.

**<u>EXHIBIT A</u>**

**Sherman, Antonia**

| | |
|---|---|
| From: | infoweb@newsbank.com |
| Sent: | Sunday, April 13, 2008 3:56 PM |
| To: | Sherman, Antonia |
| Subject: | Requested NewsBank Article |

NewsBank NewsLibrary
NewsLibrary


Paper: News Journal, The (Wilmington, DE)
Title: Fed's ideas to rein in mortgage abuses come too late for too many
Date: December 20, 2007

SUBPRIMEOUR VIEW


The Federal Reserve is way too late in cracking down on wayward mortgage lending practices, as critics of former Chairman Alan Greenspan repeatedly warned back through the boom before this bust.


That's cold comfort to homeowners confronting foreclosure.


And Tuesday's announcement of proposed restrictions on loans still won't save borrowers unable to carry their existing debts given rising interest rates.


But at least the Fed, under its new chairman, Ben Bernanke, has finally come to grips with the extent of risky and deceptive offers that have undermined real estate and banking.


Those practices  now threaten local and state governments as they  try to deal with property and tax losses.


Yet still some banking representatives object that even belated controls on subprime and undocumented loans go too far -- even though brokerage companies have folded in the dying market.


Their blinkered self-interest is appalling.


There are already bills in Congress to curb unscrupulous lenders that likely will take a harder line than what the Fed intends.


The record number of defaults and foreclosures, predicted to extend through 2009, are testament to the failure of regulation.


The Fed's proposals are so rudimentary that a sensible borrower or banker wouldn't dignify them with the word "reform."


They're just basic business sense.


The Fed is calling for qualifying mortgage applicants with documents verifying their income and assets. It also would restrict future monthly payments to be within earnings.

Also, the Fed would require escrow accounts to cover property taxes and insurance as well as more disclosure of brokers' fees.

The Fed also proposes a 60-day window in which prepayment penalties expire before a low introductory interest rate moves higher.

That's meant to give borrowers a chance to refinance.

All these points are valid, but sadly irrelevant for already trapped purchasers.

And it'll be at least three months until the Fed finishes its public hearing process and can make these rules stick.

That still leaves local institutions and consumers scrambling to salvage what they can from among millions of bad deals.

**EXHIBIT B**

**Sherman, Antonia**

| | |
|---|---|
| **From:** | infoweb@newsbank.com |
| **Sent:** | Sunday, April 13, 2008 4:21 PM |
| **To:** | Sherman, Antonia |
| **Subject:** | Requested NewsBank Article |

NewsBank NewsLibrary
NewsLibrary


Paper: News Journal, The (Wilmington, DE)
Title: Shady brokers had big hand in subprimes
Date: October 18, 2007

These are times when beating a dead horse is necessary, if for no other reason than to
be sure that the cadaver is truly lifeless.In the case of the fallout from the subprime
mortgage crisis that came to a head in August, there's plenty of reason to believe that
rigor mortis has not yet set in.


On Tuesday, Treasury Secretary Henry Paulson said that government and the financial
industry should provide immediate help for homeowners trying to refinance current
mortgages before they reset at much higher rates. Federal Reserve Chairman Ben Bernanke
said Monday that the housing problem would be a "significant drag" on economic growth
into next year and that it would take time for Wall Street to fully recover from a
significant credit crunch.


It's been characterized as the worst credit crisis for financial markets around the
world in nearly a decade as investors worry about rising defaults in the mortgage
market.


Chalk one up for those of us who have been saying this crisis had tentacles beyond the
reach of the high-roller hedge funds and big monied Wall Street financiers responsible
for financing reckless mortgage brokers.


Even former Federal Reserve Board Chairman Alan Greenspan has called the behavior of
those who got their money and ran -- i.e. shut down business as their customers faced
losing their chief capital assets -- criminal.


But hindsight in this case is not 20/20. It's taken on more of a scapegoating role and
abdication of responsibility with some pretty offensive, faulty logic.


The rationale is typically characterized as "well, we were only trying to help out the
little people." The ubiquitous little people were those who really did not qualify for
the best mortgages and for whom homeownership seem destined to always be a dream. As in
the case in modern-day America, that meant minority, low-income and urban borrowers.


But alas, kindhearted brokers took pity on these "little people" with a mercy that
Greenspan now says state attorneys general ought to use their authority to begin
prosecuting.


The Wall Street Journal last week put the kibosh on some of this poppycock.


The Journal analyzed more than 250 million records on mortgage applications and
origination. Subprime mortgages were initially aimed at lower-income consumers with
spotty credit. But the data contradict the conventional wisdom that subprime borrowers
are overwhelmingly low-income residents of inner cities. "Although the concentration of

high-rate loans is higher in poorer communities, the numbers show that high-rate lending also rose sharply in middle-class and wealthier communities."

It concluded that: "From investors hoping to strike it rich by speculating on condominiums to the working poor chasing the home ownership dream, subprime loans burrowed into the heart of the American financial system -- and now are bringing deepening woe."

In fact people of color for once can say they share parity with the rest of Americans who were fleeced by shady brokers, financed by Wall Street high rollers.

But this lower income end of the housing market had special products available to them in the form of state and local government first-time homebuyers programs that were never offered. Loans insured by the Federal Housing Administration and the Veterans Administration, intentionally more restrictive on behalf of the low-income applicants to avoid foreclosures, saw referrals from brokers drastically dip during the subprime craze.

For example, from 2001-2006, VA referrals went from 47.9 percent to 2.7 percent.

As one foreclosure counselor shared with me recently: "How much did they help if they were pushing them into products that would fail. They didn't push them into first-time home buyers programs. They weren't asking if they were veterans or not, they didn't give a crap."

Contact Rhonda B. Graham at rgraham@delawareonline.com.

**EXHIBIT C**

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
-------------------------------------------x

In re:

                           Chapter 11
OAKWOOD HOMES CORPORATION,  Case No. 02-13396 (PJW)
et al.,                 Jointly Administered

                  Debtors.
-------------------------------------------x
OHC LIQUIDATION TRUST,

               Plaintiff,

   - against -         Adv. Proc. No.
                    04-57060 (PJW)


CREDIT SUISSE FIRST BOSTON, et al.,

              Defendants.
-------------------------------------------x


     Videotaped DEPOSITION of THOMAS F. BOLAND, held

at the offices of Linklaters LLP, 1345 Avenue of the

Americas, New York, New York 10105, on the 25th day

of March 2008, commencing at 9:03 a.m., before

Colette Cantoni, a Registered Professional Reporter

and Notary Public of the State of New York.

MERRILL   LEGAL   SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com
fde3021c-121e-4454-a74b-8565f534854d

Page 62

Boland

1              Boland
2  turnaround in Oakwood's business. Yes.
3    Q   Okay. And how about, did there come a
4  point in 2002 that you felt it was -- that you think
5  it would no longer have been reasonable for either
6  Oakwood or CSFB or both of them to forecast a
7  turnaround of Oakwood's business?
8      MS. WARREN:  The same objection.
9      Go ahead.
10   A   The issue here is this is a cyclical
11  business. It would turn around eventually.
12    Q   The manufacturing portion of it would?
13  Manufacturing and sale?
14   A   Yes.
15    Q   Do you think the losses that were being
16  taken in Oakwood's -- in the financing aspect of
17  Oakwood's business would turn around cyclically?
18   A   Yes.
19    Q   And that would be brought about because it
20  would be selling more homes?
21   A   A combination of their increased
22  efficiency and they were downsizing. So not
23  necessarily selling more homes, but operating more
24  efficiently.
25    Q   But what about the financing aspects of

Page 63

Boland

1              Boland
2  it? Once it had taken the mortgages from whomever it
3  had sold the homes to, do you believe that as of 2001
4  it would be reasonable to expect that Oakwood would
5  enjoy in the future a greater profitability from the
6  financing aspect of its business?
7      MS. WARREN:  Objection to the form.
8   A   Possibly.
9    Q   Okay. And what would be the variables
10  that might influence that?
11   A   An improvement in the economy.
12    Q   And how would an improvement in the
13  economy influence the profitability of the finance
14  aspect of Oakwood's business?
15   A   Well, as the economy improved, they were
16  tightening their credit standards, which would result
17  in better quality paper, which would hopefully
18  produce better results.
19    Q   Okay. So in other words, the quality of
20  the paper in that hundred million dollar bundle that
21  we've been talking about as an example would improve
22  because there wouldn't be as many bad loans made in
23  it; is that right?
24   A   Yes.
25    Q   Can you differentiate for me the -- let's

Page 64

Boland

1              Boland
2  take as a starting point the point where Oakwood has
3  gone out and sold enough homes to have a bunch of
4  mortgages in its possession that aggregate, say,
5  $100 million altogether, and it now goes out to
6  securitize those.
7      How does that process differ from the
8  process of the sub-prime lenders that we've been
9  reading about in the newspapers recently, where they
10  go out and make a hundred million dollars worth of
11  loans and securitize them?
12   A   Again, by sub-prime lenders are you
13  talking about secondary loans?
14    Q   Is the term "sub-prime lender" a term that
15  has a meaning to you? You know who I am talking
16  about, don't you?
17   A   Well --
18      MS. WARREN:  He asked you to clarify,
19  Tony, so please clarify.
20      MR. CASTANARES:  Okay. I'm asking the
21  witness to help me do so.
22    Q   What is it you don't understand about
23  sub-prime lenders, sir?
24   A   Well, if we're talking about a package of
25  mortgages that gets securitized and tranched, there

Page 65

Boland

1              Boland
2  would be a similarity.
3    Q   And in fact, this exact process, this
4  taking $100 million and putting them into a package
5  and tranching them and selling them to the public,
6  that is the exact process that is so much in the
7  headlines today, isn't it --
8      MS. WARREN:  Objection to the form.
9    Q   -- as it relates to sub-prime lenders?
10      MS. WARREN:  Objection to the form.
11    Q   Correct?
12   A   Yes.
13    Q   And the basic problem that is causing all
14  the financial distress in the sub-prime market today
15  is that the loans were lousy loans in the first
16  place, isn't it?
17   A   The underwriting standards were weak, yes.
18    Q   That is, the loans from John Smith and
19  Mary Jones, John Smith and Mary Jones really weren't
20  creditworthy to get that mortgage in the first place
21  in the sub-prime lenders situation, right?
22   A   That's a broad statement, but --
23    Q   It's a correct one?
24   A   -- there was an issue with underwriting
25  standards.

17 (Pages 62 to 65)

MERRILL   LEGAL   SOLUTIONS
800 826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
fde3021c-121e-4454-a74b-8565f534854d

**EXHIBIT D**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

## DEBTORS' MOTION PURSUANT TO §§ 365 AND/OR 363 OF THE BANKRUPTCY CODE FOR AUTHORITY FOR OAKWOOD ACCEPTANCE CORPORATION TO (I) ASSUME AND ASSIGN SERVICING AGREEMENTS AND RELATED ADVANCE RECEIVABLES TO, AND ENTER INTO SUBSERVICING AGREEMENT WITH, AN AFFILIATE OR, IN THE ALTERNATIVE, (II) REJECT SERVICING AGREEMENTS

Oakwood Acceptance Corporation, LLC ("OAC"), together with its affiliated debtors and debtors in possession in the above-referenced bankruptcy cases (collectively, the "Debtors"), hereby move the Court for the entry of an order pursuant to sections 365 and 363(f) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing OAC to (i) assume the servicing agreements included in the Pooling and Servicing Agreements identified on Exhibit A hereto (collectively, the "Pooling and Servicing Agreements"), (ii) assume the servicing agreement included in that certain Sale and Servicing Agreement, dated as of February 9, 2001 (the "Sale and Servicing Agreement"; together with the Pooling and Servicing Agreements, the "Servicing Agreements"), by and among OAC, Ginkgo Corporation ("Ginkgo"), OMI Note Trust 2001-A (the "Warehouse Trust"), Oak Leaf Holdings, LLC ("Oak Leaf"), and The Chase Manhattan Bank, as backup servicer, indenture trustee, and custodian ("Chase"), (iii) assign OAC's servicing rights under the Servicing Agreements and certain advance receivables to Oakwood Servicing Holdings Co., LLC, a newly created limited purpose wholly-owned subsidiary of OAC

("OSHC"), free and clear of all liens, claims, interests, causes of action, rights of setoff, recoupment and any similar defenses, and other defenses (collectively, "Encumbrances"), and (iv) enter into a subservicing agreement with OSHC. In the alternative, if the Court denies any or all of the relief requested in the preceding sentence, OAC moves the Court for entry of an order authorizing it to reject the Servicing Agreements effective as of the date hereof pursuant to § 365 of the Bankruptcy Code. In support of this Motion, the Debtors rely upon the Declaration of Douglas R. Muir in Support of First Day Relief (the "Muir Declaration"), filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtors respectfully represent as follows:

### Introduction

1.     On November 15, 2002 (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No creditors' committee has yet been appointed in these cases by the United States Trustee. The Debtors are operating their respective businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.     The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

4.     The Debtors and their non-Debtor affiliates manufacture, market, and finance manufactured housing. Collectively, they constitute the third largest manufacturer and one of the largest retailers of manufactured housing in the United States, with annual sales currently approaching one billion dollars.

2

## The Debtors' Securitization Transactions

5.     Because traditional financing sources are insufficient to sustain the manufacturing and sales volume the Debtors historically have experienced, the Debtors with retail sales operations and various independent dealers (collectively, the "Retailers") provide financing options to their customers through OAC, which purchases on a non-recourse basis certain of the retail installment sales contracts and mortgage loans (collectively, "RICs") originated by the Retailers. OAC itself originates the RICs that are mortgage loans. OAC funds its purchases and originations of RICs by participating in public and private asset securitization transactions as described herein.

6.     Historically, securitization transactions have provided the most effective and least expensive financing technique for satisfying OAC's tremendous liquidity needs. In fact, OAC historically made a material profit on its securitization transactions. Although that profit has been reduced or even eliminated, the securitization transactions engaged in by the Debtors pre-petition still remain the least expensive method for financing for the Debtors' operations. Accordingly, the Debtors believe that continuing to participate in the securitization transactions described herein and other similar transactions in the ordinary course of business is critical to the Debtors' ability to reorganize successfully under Chapter 11.

### *The Warehouse Facility*

7.     As noted above, when one of the Retailers originates a non-mortgage loan RIC through the sale of a manufactured home, OAC finances the RIC by taking a non-recourse assignment of the RIC from the applicable Retailer in exchange for OAC's payment of the face amount of the RIC, plus or minus various agreed upon adjustments, if any. OAC funds the originations of mortgage loan RICs itself. Merely holding the RICs it obtains from the Retailers and collecting payments on the RICs until they are securitized in a public or private term

3

securitization, however, does not leave OAC with sufficient liquidity to sustain its financing operations. Most companies in the manufactured housing industry achieve the necessary pre-securitization liquidity through a traditional asset-based secured "warehouse" line of credit. OAC, in contrast, achieves the necessary liquidity at a much lower cost through a securitized warehouse facility (the "Warehouse Facility") established pursuant to the Sale and Servicing Agreement and various related documents.

8.      Under the Warehouse Facility, OAC sells each RIC it acquires to Ginkgo in exchange for cash in an amount equal to 100% of their fair market value of the RICs (the "Cash Purchase Price"). Ginkgo simultaneously sells the RICs acquired from OAC to Oak Leaf, a non-debtor indirect subsidiary of OAC ("Oak Leaf"), in exchange for the Cash Purchase Price. Oak Leaf simultaneously sells the RICs to the Warehouse Trust, the residual interest in which is owned by Oak Leaf. The Warehouse Trust periodically issues notes (the "Warehouse Trust Notes") with an aggregate face amount of up to 81% of the aggregate face amount of the RICs and distributes the resulting proceeds to Oak Leaf as consideration for the RICs. The remaining difference, if any, between the fair market value of the RICs and the proceeds of the Warehouse Trust Notes distributed to Oak Leaf constitutes a capital contribution to the Warehouse Trust and increases the value of Oak Leaf's residual interest in the Trust and with it, Oakwood's indirect ownership interest in Oak Leaf. A diagram displaying the ownership structure and flow of funds in connection with the Warehouse Facility is annexed hereto as Exhibit B.

9.      Each sale of the RICs in connection with the Warehouse Facility is structured to constitute a "true sale" for bankruptcy purposes and, therefore, is effective to extricate the RICs from each seller's bankruptcy estate. The net economic effect of the transactions effected by the Warehouse Facility is the monetization of up to 81% of OAC's investment in RICs acquired

from the Retailers. The residual value, if any, of the RICs remains non-monetized as an investment in the Warehouse Trust (which redounds to the benefit of OAC through its ownership of Oakwood Capital Corporation, the parent corporation of Oak Leaf) pending a conventional public term securitization as described below. Following such a public term securitization, any residual value of the RICs in the Warehouse Trust is monetized and the resulting proceeds distributed upstream through Oak Leaf and Oakwood Capital Corp. to OAC.

### *Public Term Securitizations*

10.    Once a sufficient face amount of RICs have accumulated in the Warehouse Trust (typically $150-300 million per quarter), the Warehouse Trust securitizes the RICs as part of a conventional public term securitization (an "OMI Securitization"). The net proceeds of each OMI Securitization are used first to pay off the then-outstanding Warehouse Trust Notes. Any additional proceeds are distributed upstream to Oak Leaf and ultimately to OAC. The net economic effect of an OMI Securitization is to monetize OAC's indirect residual interest in the Warehouse Trust.

11.    Each OMI Securitization involves the true sale, for bankruptcy and accounting purposes, of warehoused RICs by the Warehouse Trust to Oakwood Mortgage Investors, Inc., a non-debtor limited purpose wholly-owned subsidiary of OAC ("OMI"), pursuant to a sales agreement. OMI simultaneously sells the acquired RICs to a securitization trust established for each OMI Securitization pursuant to a Pooling and Servicing Agreement (a "Securitization Trust") in exchange for multiple tranches of "pass-through" asset-backed securities ("Pass-Through Certificates") collectively representing 100% of the beneficial ownership interest in the securitized RICs.

12.    Payments of principal and interest on the securitized RICs constitute the principal and frequently sole source of payment for amounts due to holders of the Pass-Through

5

Certificates.[1]  The higher rated  "AAA" tranches of the Pass-Through Certificates are generally

entitled to be paid prior to the lower rated or "B-piece" Pass-Through Certificates.  Residual

Pass-Through Certificates are entitled to paid if and only if all other Pass-Through Certificates

have been paid in full and, therefore, are frequently non-economic.  OMI sells the higher-rated

tranches of the Pass-Through Certificates it issues to one or more underwriters (the

"Underwriters"), who resell them to third-party investors in connection with one or more public

offerings (the "Certificate Owners").  OMI then sells the lower rated or B-piece tranches of the

Pass-Through Certificates either to a third-party investor or to Oakwood Financial Corporation, a

non-debtor limited purpose sister subsidiary of OAC ("OFC").  OFC then either holds such B-

piece Pass-Through Certificates, sells or securitizes them.  The Residual Certificates also are

typically sold to OFC.  OFC funds its acquisition of B-piece and residual Pass-Through

Certificates with the proceeds of capital contributions from its parent corporation, Oakwood

Homes.  A diagram depicting the ownership structure and flow of funds in each OMI

Securitization is annexed hereto as Exhibit C.

### *OAC's Servicing Rights and Obligations*

13.    OAC currently acts as the "Servicer" with respect to the securitized RICs owned

by each Trust[2].  In that capacity, OAC is required to (i) collect payments of principal and interest

from obligors and remit them to the appropriate Securitization Trusts, (ii) escrow payments of

taxes and interest and remit them to the appropriate recipients, (iii) enforce the Trusts' rights

---

[1]    Certain of the B-piece Pass-Through Certificates have a "stapled" limited guarantee from the Debtor Oakwood Homes Corporation that may provide an additional source of payment for such certificates.

[2]    OAC also services a very small portfolio of owned RICs that for a variety of reasons (principally ineligibility) have not been pooled and sold into the Warehouse Facility or an OMI Securitization.

under the securitized RICs when they fall into default, including commencing and prosecuting replevin and foreclosure actions, and (iv) otherwise monitor and report on the status of the RICs for the benefit of the Trusts as the holders of the securitized RICs.

14.    As and when necessary to perform its servicing duties, OAC, as the Servicer, is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations, including without limitation, (i) advances for taxes, insurance and other charges against property securing the RICs, (ii) enforcement or judicial proceedings, including foreclosures, and (iii) the management of foreclosed property through liquidation ("Servicing Advances"). OAC is obligated to make Servicing Advances, however, only if OAC deems the Servicing Advance to be recoverable. Servicing Advances are designed to be temporary and solely for the sake of convenience and expediency. Accordingly, OAC, as servicer, is entitled to reimbursement for all Servicing Advances from subsequent tax and insurance escrow payments, insurance proceeds, and liquidation proceeds collected by the related Trust. In addition, if at any point OAC, as the Servicer, deems certain kinds of Servicing Advance to be non-recoverable, OAC is entitled to reimbursement for that Servicing Advance immediately from any available funds in the related Trust.

15.    Currently, OAC has approximately $47,970,000 of outstanding Servicing Advances owed by the Trusts (collectively, the "Servicing Advance Receivables"). Of that amount, $16,120,000 represents advances for taxes and insurance escrow payments and $31,850,000 represents advances for repossession costs.

16.    In addition, to the extent obligors on the securitized RICs are delinquent in the payment of principal or interest, OAC, as the "Servicer" under the Servicing Agreements, in

most cases must advance the amount of such delinquent principal and interest ("P&I Advances," together with Servicing Advances, the "Advances"), generally on the 15th of each month.  Like Servicing Advances, OAC is obligated to make a P&I Advance only if it deems the P&I Advance to be recoverable. P&I Advances are temporary and for liquidity purposes only. Accordingly, OAC, as Servicer, is entitled to reimbursement from the applicable Trusts for all P&I Advances made, either from subsequent collections on the related delinquent RICs or subsequent collections on the entire pool of RICs in a particular Trust, depending upon the terms of the Applicable Servicing Agreement.  Also, if OAC at any point deems a previously made P&I Advance to be non-recoverable in any particular month, OAC may reimburse itself for that P&I Advance from any funds in the related Trust.

17.    OAC typically advances between $35 to $45 million in P&I Advances to the Trusts each month and books a receivable in the aggregate amount of such P&I Advances ("P&I Advance Receivables," together with the Servicing Advance Receivables, the "Advance Receivables"), then generally reimburses itself for such P&I Advances over the course of the following month.

18.    In exchange for servicing the securitized RICs at a cost of approximately [$30] million per year, OAC is entitled to a monthly fee in amounts ranging from 1/12th of .75% to 1/12th of 1% of the outstanding balance of the RICs in each Trust (the "Servicing Fee"). The right to payment of the Servicing Fee from most of the Trusts, however, is contractually subordinate to the payment of amounts due on the particular Trust's outstanding Pass-Through Certificates (or notes, with respect to the Warehouse Trust) in a given month for so long as OAC remains the "Servicer" under the Servicing Agreements.  Because of this subordination provision and the losses experienced by the Trusts on the securitized RICs, OAC currently is not receiving

8

any significant payments on account of the Servicing Fee from the Trusts. If and when any party other than OAC[3] becomes the "Servicer" under the Servicing Agreements, however, the priority of the Servicing Fee is elevated, and in many cases, the amount of the monthly Servicing Fee is increased to $1/12^{th}$ of 1.5% of the outstanding balance of the RICs.

19.     Accordingly, in order to elevate the priority and in many cases increase the amount of the Servicing Fee, OAC formed OSHC, a wholly-owned limited purpose entity, and entered into an Assignment, Contribution, and Assumption Agreement in substantially the form annexed hereto as <u>Exhibit D</u> (the "Assumption Agreement"). Pursuant to the Assumption Agreement, OAC has agreed to assume the Servicing Agreements and assign them and the Advance Receivables to OSHC. Contemporaneously with that assignment, OAC and OSHC have agreed to enter into a Subservicing Agreement in substantially the form annexed hereto as <u>Exhibit E</u>, pursuant to which OAC will perform OSHC's obligations under the Servicing Agreements. Under this structure, OSHC will be come the "Servicer" of record for the purposes of the Servicing Agreements, thereby elevating the priority and in many cases increasing the amount of the Servicing Fees, while OAC will continue to perform  day-to-day servicing of the RICs in accordance with the terms of the Servicing Agreements, thereby assuring the non-debtor parties to the Servicing Agreements of continued performance of the Servicing Agreements.

<u>**Relief Requested**</u>

20.     By this Motion, OAC seeks entry of an order authorizing OAC to (i) assume the Servicing Agreements, (ii) assign the Servicing Agreements and the Advance Receivables to

---

[3]     Pooling and servicing agreements underlying securitization transactions often provide that the related servicing fee is elevated only if another party ***that is not a wholly-owned affiliate of the originating servicer*** takes over as the servicer of the loan portfolio. Such a restriction was ***not included in*** the Servicing Agreements to which OAC is a party.

OSHC, free and clear of all Encumbrances and otherwise in accordance with the terms of the Assumption Agreement, and (iii) contemporaneously enter into and perform under the Subservicing Agreement.

21.    In the alternative, if the Court denies any or all of the relief requested paragraph 18 above, OAC seeks entry of an order authorizing the rejection of the Servicing Agreements effective as of the date hereof.

### **Basis for Relief Requested**

22.    Section 365(a) of the Bankruptcy Code provides, in relevant part that: "the trustee, subject to court approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Numerous courts, including this Court, have determined that agreements substantially similar to the Servicing Agreements constitute executory contracts subject to assumption or rejection under § 365. See, e.g., In re United Companies Financial Corp., Case No. 99-450 (MFW) (Bankr. D. Del. 1999); In re Helig Meyers Company, Case No. 0-34533 (DOT) (Bankr. E.D. Va. 2000); In re Cityscape Financial Corp. and Cityscape Corp., Case Nos. 98-B-22569 and 98-B-22570 (ASH) (Bankr. S.D.N.Y. 1998). Accordingly, provided that the Debtors (i) first cure any outstanding defaults under the Servicing Agreements and (ii) provide adequate assurance of OSHC's future performance under the Servicing Agreements, the Debtors may assign the Servicing Agreements to OSHC following assumption. 11 U.S.C. § 365(b)(1), (f)(1).

23.    A debtor's motion to assume, assume and assign, or reject an executory contract should be approved if the debtor has demonstrated that rejection or assumption and assignment is warranted and represents a valid exercise of the Debtors' business judgment. E.g., Sharon Steel, 872 F.2d at 40 (adopting business judgment test for determining propriety of trustee's decision to reject an executory contract); In re ANC Rental Corp., 277 B.R. 226, 238 (Bankr. D. Del. 2002)

("In order to assume and assign an executory contract . . . under section 365(f), the debtor must establish that the decision is one made in its sound business judgment."); In re Pinnacle Brands, Inc., 259 B.R. 46 (Bankr. D. Del. 2001) (same).

24.    As set forth above, assumption and assignment of the Servicing Agreements to OSHC clearly represents a valid exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and creditors.    Currently, OAC believes that there are no outstanding defaults under the Servicing Agreements, and thus, no cure costs associated with the proposed assumption.    Moreover, given the Debtors' current liquidity situation, OAC cannot continue to spend over $30 million annually servicing the RICs without receiving any material compensation.    Accordingly, the assumption and assignment of the Servicing Agreements to OSHC, and the resulting elevation in priority and increase in amount of some of the Servicing Fees, will provide for the payment of approximately $50-60 million per year in Servicing Fees to the Debtors' estates.

25.    Moreover, assumption and assignment of the Servicing Agreements to OSHC, with the Subservicing Agreement back to OAC, ensures that the RICs will continue to be serviced without disruption and that the Trusts are assured of future performance.    As previously stated, OAC cannot continue to service the RICs without adequate compensation.    If the Debtors' request to assume and assign the Servicing Agreements is not approved, the Debtors must reject the Servicing Agreements immediately because of the more than $2.5 million in monthly costs currently incurred in servicing the RICs.    The Debtors estimate that the rejection of the Servicing Agreements, followed by an immediate disruptive transfer of the servicing to a third party unfamiliar with the securitized RICs portfolio and without OAC's experience, would result in a permanent material decline in the overall value of the securitized RICs.    Thus, while the Trusts

11

will be required to pay market rates for the servicing going forward, the proposed assumption and assignment remains in their best interest.

26.    For all of these reasons, the assumption and assignment of the Servicing Agreements to OSHC, together with OAC's entry into the Subservicing Agreement, represents a sound and reasoned exercise of the OAC's business judgment and is in the best interests of the Debtors' estates and creditors.    Alternatively, absent the assumption and assignment of the Servicing Agreements as requested above, immediate rejection is in the best interests of the Debtors' estates and will allow them to avoid the needless expenses related to continuing to honor OAC's obligations under the Servicing Agreements.

## Notice

27.    No trustee, examiner or creditors' committee has been appointed in the Debtors' Chapter 11 cases.    Notice of the hearing on this Motion has been provided to the United States Trustee, counsel to the Debtors' principal prepetition secured lenders and the holders of the forty (40) largest unsecured claims of the Debtors on a consolidated basis.    The Debtors submit that under the circumstances no further notice is necessary.

## No Previous Request

28.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request the entry of an order entry of an order (a)(i) authorizing OAC to assume Servicing Agreements, (ii) assign the Servicing Agreements and the Advance Receivables to OSHC, free and clear of all claims, liens and other encumbrances and otherwise in accordance with the terms of the Assumption Agreement, and (iii) contemporaneously enter into the Subservicing Agreement or, alternatively, (b) if the Court

denies any or all of the relief requested in the previous sentence, authorizing the rejection of the

Servicing Agreements effective as of the date hereof and (c) granting such other and further

relief to the Debtors as is just.

Dated:  Wilmington, Delaware
        November ₁ʳ , 2002

                     HUNTON & WILLIAMS

                     Peter S. Partee, VSB No. 34140
                     Michael G. Wilson, VSB No. 48927, DE Bar No. 4022
                     Riverfront Plaza, East Tower
                     951 East Byrd Street
                     Richmond, Virginia  23219-4074
                     Tel. (804) 788-8200
                     Fax. (804) 788-8218

                     Proposed Special Bankruptcy Securitization Counsel to
                     Oakwood Homes Corporation, et al., Debtors and
                     Debtors in Possession

                     - and -

                     MORRIS, NICHOLS, ARSHT & TUNNELL

                     _____
                     Robert J. Dehney (No. 3578)
                     Derek C. Abbott (No. 3376)
                     Michael G. Busenkell (No. 3933)
                     1201 North Market Street
                     P.O. Box 1347
                     Wilmington, Delaware 19899-1347
                     (302) 658-9200

                     Proposed Co-Counsel for Oakwood Homes
                     Corporation, et al., Debtors and Debtors In Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| et al., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

## ORDER PURSUANT TO §§ 365 AND/OR 363 OF THE BANKRUPTCY CODE AUTHORIZING OAKWOOD ACCEPTANCE CORPORATION TO (i) ASSUME AND ASSIGN SERVICING AGREEMENTS AND RELATED ADVANCE RECEIVABLES TO, AND ENTER INTO SUBSERVICING AGREEMENT WITH, AN AFFILIATE OR, IN THE ALTERNATIVE, (ii) REJECT SERVICING AGREEMENTS

Upon the motion (the "Motion") of Oakwood Homes Corporation and its affiliated debtors and debtors in possession in the above-referenced bankruptcy cases (together, the "Debtors") for entry of an order pursuant to sections 365 and 363 of title 11 of the Untied States Code (the "Bankruptcy Code") authorizing Debtor Oakwood Acceptance Corporation, LLC ("OAC") to (i) assume the servicing agreements included in the Pooling and Servicing Agreements (collectively, the "Pooling and Servicing Agreements"), (ii) assume the servicing agreement included in that certain Sale and Servicing Agreement, dated as of February 9, 2001 (the "Sale and Servicing Agreement"; together with the Pooling and Servicing Agreements, the "Servicing Agreements"), (iii) assign OAC's servicing rights under the Servicing Agreements and certain advance receivables to Oakwood Servicing Holdings Co., LLC ("OSHC") pursuant to the terms of that certain Assignment, Contribution, and Assumption Agreement (the "Assumption Agreement"), free and clear of all claims, liens and other encumbrances, and (iv) enter into a subservicing agreement (the "Subservicing Agreement") with OSHC; the Court having reviewed the Motion and the Declaration of Douglas Muir in Support of First Day Relief

(the "Muir Declaration"); and the Court having conducted a hearing (the "Hearing") to consider, among other things, the relief requested in the Motion; the Court having determined that the legal and factual bases set forth in the Motion and the Muir Declaration and the argument at the Hearing establish just cause for the relief granted herein; therefore, it is hereby FOUND and DETERMINED that:

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.    Notice of the Motion was sufficient under the circumstances.

D.    The Debtors have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Servicing Agreements

E.    There are no defaults under the Servicing Agreements and thus, no cure payments required to be paid.

F.    The Debtors' decision to assume and assign the Servicing Agreements to OSHC is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

G.    The Debtors' decision to enter into and perform their obligations under the Subservicing Agreement is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

Accordingly, it is hereby ORDERED that:

1.    The Motion is GRANTED.

2.      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3.      OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assume and assign the Servicing Agreements to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

4.      OAC is hereby authorized, pursuant to Bankruptcy Code § 363(f), to assign the Advance Receivables to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

5.      OAC is authorized, pursuant to Bankruptcy Code § 363(b)(1), to enter into and perform all obligations under the Subservicing Agreement.

6.      Each of the Debtors is hereby authorized to take such other and further actions as may be reasonably required or appropriate to effectuate the transactions contemplated by the Assumption Agreement and the Subservicing Agreement.

Dated: Wilmington, Delaware
       November _____, 2002

_____
UNITED STATES BANKRUPTCY JUDGE

320190

3

## EXHIBIT A

## Pooling and Servicing Agreements

Note: All Pooling and Servicing Agreements listed below include all amendments thereto as of the date hereof.

| Agreement | Date |
|---|---|
| Oakwood Acceptance Corporation REMIC Trust 1992-1 Pooling and Servicing Agreement | July 1, 1992 |
| Oakwood Acceptance Corporation REMIC Trust 1994-1 Pooling and Servicing Agreement | July 1, 1994 |
| Merrill Lynch Mortgage Investors, Inc. Series 1994-G Pooling and Servicing Agreement | April 1, 1994 |
| Oakwood Mortgage Investors, Inc. Series 1994-A Pooling and Servicing Agreement | November 1, 1994 |
| Oakwood Acceptance Corporation REMIC Trust 1995-1 Pooling and Servicing Agreement | February 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1995-A Pooling and Servicing Agreement | June 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1995-B Pooling and Servicing Agreement | October 1, 1995 |
| Oakwood Mortgage Investors, Inc. Series 1996-A Pooling and Servicing Agreement | February 1, 1996 |
| Oakwood Acceptance Corporation Series 1996-1 Pooling and Servicing Agreement | April 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1996-B Pooling and Servicing Agreement | July 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1996-C Pooling and Servicing Agreement | October 1, 1996 |
| Oakwood Mortgage Investors, Inc. Series 1997-A Pooling and Servicing Agreement | February 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-B Pooling and Servicing Agreement | May 1, 1997 |

| Agreement | Date |
|---|---|
| Deutsche Financial Capital Securitization, LLC Series 1997-I Pooling and Servicing Agreement | June 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-C Pooling and Servicing Agreement | August 1, 1997 |
| Oakwood Mortgage Investors, Inc. Series 1997-D Pooling and Servicing Agreement | November 1, 1997 |
| Deutsche Financial Capital Securitization, LLC Series 1998-I Pooling and Servicing Agreement | January 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-A Pooling and Servicing Agreement | February 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-B Pooling and Servicing Agreement | May 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-C Pooling and Servicing Agreement | August 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1998-D Pooling and Servicing Agreement | October 1, 1998 |
| Oakwood Mortgage Investors, Inc. Series 1999-A Pooling and Servicing Agreement | January 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-B Pooling and Servicing Agreement | April 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-C Pooling and Servicing Agreement | June 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-D Pooling and Servicing Agreement | August 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 1999-E Pooling and Servicing Agreement | November 1, 1999 |
| Oakwood Mortgage Investors, Inc. Series 2000-A Pooling and Servicing Agreement | March 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2000-B Pooling and Servicing Agreement | June 1, 2000 |

| Agreement | Date |
|---|---|
| Oakwood Mortgage Investors, Inc. Series 2000-C Pooling and Servicing Agreement | September 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2000-D Pooling and Servicing Agreement | December 1, 2000 |
| Oakwood Mortgage Investors, Inc. Series 2001-B Pooling and Servicing Agreement | February 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-C Pooling and Servicing Agreement | May 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-D Pooling and Servicing Agreement | August 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2001-E Pooling and Servicing Agreement | November 1, 2001 |
| Oakwood Mortgage Investors, Inc. Series 2002-A Pooling and Servicing Agreement | February 1, 2002 |
| Oakwood Mortgage Investors, Inc. Series 2002-B Pooling and Servicing Agreement | May 1, 2002 |
| Oakwood Mortgage Investors, Inc. Series 2002-C Pooling and Servicing Agreement | August 1, 2002 |

## EXHIBIT B

### Warehouse Facility Structure



**EXHIBIT C**

**OMI Securitization**



## <u>EXHIBIT D</u>

## ASSIGNMENT, CONTRIBUTION AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("**Agreement**"), is made and entered into as of November [__], 2002, between Oakwood Acceptance Corporation, LLC, a Delaware limited liability company ("**Assignor**"), and Oakwood Servicing Holdings Co., LLC, a Nevada limited liability company ("**Assignee**").

## WITNESSETH

WHEREAS, Assignee is a wholly-owned subsidiary of the Assignor;

WHEREAS, Assignor is the servicer under the pooling and servicing agreements set forth on Schedule 1 hereto (collectively, the "**Pooling Agreements**") and the sale and servicing agreement dated February 9, 2001 (as amended from time to time, the "**Sale and Servicing Agreement**" and together with the Pooling Agreements, the "**Servicing Agreements**");

WHEREAS, Assignor desires to assign, transfer, grant and convey to Assignee, as a contribution to the Assignee, all of its right, title and interest under the Assets (defined below); and

WHEREAS Assignee desires to accept all right, title and interest of Assignor in and to the Assets and to assume all of the Assignor's obligations under the Servicing Agreements.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby act and agree as follows:

## ARTICLE I

## DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

SECTION 1.1        <u>Definitions</u>.  For all purposes of this Agreement, capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreements.  The following words shall have the following meanings:

"**Advance Company**" Oakwood Advance Receivables Company, L.L.C., a Nevada limited liability company.

"**Assets**" means all of the right, title and interest of Assignor in and to the Servicing Agreements other than receivables arising from any Liquidation Expenses, provided that, for the avoidance of doubt, Assets shall not include certain receivables created by the advance of principal and interest that the Assignor previously conveyed to the Advance Company under the First Amended and Restated Receivables Contribution Agreement, dated as of April 1, 2002, between the Assignor and the Advance Company.

SECTION 1.2    <u>Principles of Construction</u>. The principles of construction set forth or referred to in the Pooling Agreements apply to this Agreement as if set forth herein, *mutatis mutandis*.

## ARTICLE II

## ASSIGNMENT OF INTERESTS

SECTION 2.1    <u>Assignment and Contribution</u>. As a capital contribution to the Assignee, Assignor hereby irrevocably grants, conveys, assigns, transfers, bargains, delivers and sets over to Assignee and its successors and assigns, without recourse and forever, all of Assignor's right, title and interest in and to the Assets.

SECTION 2.2    <u>Assumption</u>. Assignee hereby accepts the foregoing assignment, transfer and conveyance of Assignor's right, title, interest and obligations in and to the Assets and agrees and confirms that it shall be bound by all the terms of the Servicing Agreements. Assignee hereby accepts and assumes and undertakes to perform all of the obligations and liabilities of Assignor under the Servicing Agreements, whether arising before, on or after the date of this Agreement, to the extent not paid or performed by Assignor prior to the date of this Agreement.

SECTION 2.3    <u>Trustee Acknowledgments and Rating Agency Letters</u>. The Assignee shall endeavor to obtain the written acknowledgment of each Trustee under the Servicing Agreements substantially in the form of Schedule 2 to this Agreement to the transactions effected under this Agreement,  and (ii) letters from each Rating Agency that the transactions effected under this Agreement, in and of themselves will not result in a downgrading of the ratings initially assigned by the Rating Agency to any Class of Certificates issued pursuant to the Pooling Agreements.

## ARTICLE III

## GENERAL PROVISIONS

SECTION 3.1    <u>Further Assurances</u>. Assignor and Assignee shall each take any and all further actions and execute and deliver any and all such further documents and undertakings as are necessary or reasonably requested by any other party to effectuate the purposes of this Agreement.  The undertakings set forth in this section shall survive the execution and delivery of this Agreement.

SECTION 3.2    <u>Notices</u>. Any notice, request, demand or other communication to be given or made under the Servicing Agreements shall be as provided to the following addresses:

    Assignor:    Oakwood Acceptance Corporation, LLC
            P.O. Box 27081
            Greensboro, NC  27425-7081
            Attn:  Douglas R. Muir
            Phone:  (336) 664-2360

2

Fax:  (336) 664-3224

Assignee:    Oakwood Servicing Holdings Co., LLC
             Bank of America Center
             101 Convention Center Drive, Suite 850
             Las Vegas, NV 89109
             Attn:  Susan J. Miller
             Phone: (702) 598-3738
             Fax: (702) 598-3651

SECTION 3.3        Successors and Assigns.  This Agreement shall bind and inure to the benefit of Assignor, Assignee and their respective successors and assigns.

SECTION 3.4        No Waiver.  The execution, delivery and performance of this Agreement shall not, except to the extent expressly set forth herein, constitute a waiver, amendment or modification of any provision of the Servicing Agreements.

SECTION 3.5        Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to choice of law principles.

SECTION 3.6        Counterparts.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

SECTION 3.7        Captions.  The section headings appearing in this Agreement are included solely for ease of reference and are not intended to and shall not affect the interpretation of any provision of this Agreement or the Servicing Agreements.

SECTION 3.8        Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of any provision in any other jurisdiction.  Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the parties to this Agreement to the full extent permitted by law so that this Agreement shall be deemed a valid, binding agreement, enforceable in accordance with its terms.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto, acting by and through their respective duly authorized officers or representatives, have executed this Agreement as of the day and year first written above.

**Oakwood Acceptance Corporation, LLC**

By:_____
Name:
Title:

**Oakwood Servicing Holdings Co., LLC**

By:_____
Name:
Title:

[ASSIGNMENT, CONTRIBUTION AND ASSUMPTION AGREEMENT]

SCHEDULE 1
TO ASSIGNMENT AND
ACCEPTANCE AGREEMENT

**Pooling Agreements**

SCHEDULE 2
TO ASSIGNMENT AND
ACCEPTANCE AGREEMENT

### Form of Trustee Acknowledgment

Oakwood Acceptance Corporation, LLC
P.O. Box 27081
Greensboro, NC  27425-7081

Oakwood Servicing Holdings Co., LLC
Bank of America Center
101 Convention Center Drive, Suite 850
Las Vegas, NV 89109

Re:    Assignment and Assumption Agreement, dated as of November __, 2002 (the
       "Assignment and Assumption Agreement"), between Oakwood Acceptance Corporation,
       LLC ("OAC") and Oakwood Servicing Holdings Co., LLC ("OSH").

Dear Sirs:

    The undersigned hereby acknowledges that, pursuant to the terms of the Assignment and
Acceptance Agreement, (a) OAC has assigned of all its right, title and interest to the Servicing
Agreements to OSH, (b) OSH has accepted such right, title and interest in the Servicing
Agreements, and (c) OSH has assumed all of OAC's obligations under the Servicing Agreements
and has agreed to be bound by each of the servicer's obligations thereunder.  The undersigned
further acknowledges that OSH subseqently has delegated its duties and obligations under the
Servicing Agreements and OAC has agreed to perform such duties and obligations pursuant to a
Subservicing Agreement, dated as of November __, 2002, by and between OAC and OSH.  The
undersigned further acknowledges that the servicing fees under the Servicing Agreements have
been adjusted in accordance with the terms of the Servicing Agreements.

**[Trustee]**

By:_____
Name:
Title:

**EXHIBIT E**

**SUBSERVICING AGREEMENT**

This Subservicing Agreement ("**Agreement**"), is made and entered into as of November [__], 2002, between Oakwood Acceptance Corporation, LLC, a Delaware limited liability company ("**OAC**" or "**Subservicer**"), and Oakwood Servicing Holdings Co., LLC, a Nevada limited liability company ("**Owner**").

**WITNESSETH**

WHEREAS, pursuant to the Assignment, Contribution and Assumption Agreement, dated as of November __, 2002 (the "**Assignment Agreement**"), the Owner acquired from OAC all of the rights and obligations of the servicer under the pooling and servicing agreements set forth on Schedule 1 hereto (collectively, the "**Pooling Agreements**") and under the sale and servicing agreement, dated as of February 9, 2001 (as amended from time to time, the "**Sale and Servicing Agreement**" and together with the Pooling Agreements, the "**Servicing Agreements**");

WHEREAS, Owner desires to engage the Subservicer as its agent to perform all of the duties and obligations of the servicer under the Servicing Agreements; and

WHEREAS, Subservicer desires to perform, as agent of the Owner, all of the duties and obligations of the servicer under the Servicing Agreements.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subservicer and Owner hereby act and agree as follows:

**ARTICLE I**

**DEFINITIONS AND PRINCIPLES OF CONSTRUCTION**

SECTION 1.1       Definitions.  For all purposes of this Agreement, capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreements.  The following words shall have the following meanings:

"Advance Receivables" means all Extension Receivables and Servicing Advance Receivables due to OAC and assigned to the Owner pursuant to the Assignment Agreement.

"Extension Receivables" means all amounts due to OAC as a result of OAC having made certain corporate advances made under the Loan Assumption Program or related programs.

"Servicing Advance Receivables" means all amounts due to OAC as a result of OAC having made certain Servicing Advances under the Servicing Agreements; provided that for the avoidance of doubt, Servicing Advance Receivables shall not include any receivables arising

from any Liquidation Expenses.

SECTION 1.2      <u>Principles of Construction</u>. The principles of construction set forth or referred to in the Pooling Agreements apply to this Agreement as if set forth herein, *mutatis mutandis*.

**ARTICLE II**

**ENGAGEMENT**

SECTION 2.1      <u>General</u>. The Owner hereby delegates to the Subservicer, and the subservicer hereby agrees to perform, the Owner's duties and obligations under the Servicing Agreements. Subservicer shall service and administer each Contract or Mortgage Loan in accordance with the terms of the applicable Servicing Agreement, as such terms may be supplemented hereby, and shall have full power and authority, acting alone, to do or cause to be done any and all actions in connection with such servicing and administration that the Subservicer reasonably may deem necessary or desirable and consistent with the terms of the applicable Servicing Agreement, as such terms may be supplemented hereby. The Subservicer shall service each Contract or Mortgage Loan in its own name and shall be under no obligation, unless required by law, to disclose that it will service such Contract or Mortgage Loan on behalf of the Owner.

SECTION 2.2      <u>Advancing</u>. The Subservicer, on behalf of the Owner, will make all advances required under the Servicing Agreements; provided that, upon instruction and notification from the Owner that the Owner will off-set a specified advancing obligation with an Advance Receivable, the Subservicer shall not make or cause to be made the specified advance.

SECTION 2.3      <u>Title; Possession of Documents,</u>. This Agreement shall be an agency agreement. The Subservicer hereby acknowledges that the Owner will retain ownership of the right to service Contracts and Mortgage Loans under the Servicing Agreements, and agrees that this Agreement shall not convey any title to such rights. The Owner will deliver into the possession of the Subservicer all documentation related to the Contracts and the Mortgage Loans, and the Subservicer hereby agrees to hold such documentation as custodian for the Owner. The Subservicer will deliver any and all documentation to the Owner as the Owner may request upon five calendar days prior written notice.

SECTION 2.4      <u>Compensation</u>. As on-going consideration for its performance under the Servicing Agreements and this Agreement, the Subservicer shall be entitled to [1/4] of all amounts paid to the servicer as "Servicing Fees" under the Servicing Agreements (the "**Subservicing Fee**"). The Subservicer may retain the Subservicing Fee from all amounts remitted to the Owner under Section 2.4 of this Agreement.

SECTION 2.5      <u>Remittance to Owner</u>. On each Distribution Date, the Subservicer shall remit to Owner all amounts paid to the servicer under the Servicing Agreements less amounts equal to the Subservicing Fee. All amounts remitted to the Owner shall be made in Dollars in immediately available funds to the Administrative Agent by wire or electronic transfer

2

to [Bank Name], [Bank Address], ABA #[___], Account # [___], Ref: OSH/OAC Subservicing Agreement.

SECTION 2.6    <u>Reports to Owner</u>.  Except as requested by the Owner in writing, the Subservicer shall not be required to furnish any reports to the Owner; provided that the Subservicer shall make available any and all reports provided to or received from the Trustee under a Servicing Agreement.

SECTION 2.7    <u>Term</u>.  The Owner may terminate this Agreement only upon the Subservicers failure to perform under the Servicing Agreements and upon thirty Business Days' prior written notice to the Subservicer of the Owner's intent to terminate this Agreement.  The Subservicer may resign, assign or otherwise terminate its obligations so long as the Subservicer has provided to the Owner sixty Business Days' prior written notice of its intent to resign, assign or terminate this Agreement.

SECTION 2.8    <u>Actions Required of Owner</u>.  To the extent required in the course of servicing any Contract or Mortgage Loan, the Owner will provide a corporate officer, who shall have full authority to act by on behalf of the Owner, to execute and deliver documents, and otherwise handle matters that require actions by the Owner that cannot be delegated to or performed by the Subservicer.

SECTION 2.9    <u>Trustee Acknowledgments and Rating Agency Letters</u>.  The Owner shall endeavor to obtain (i) the written acknowledgment of each Trustee under the Servicing Agreements substantially in the form of Schedule 2 to this Agreement to the subservicing arrangement established pursuant to this Agreement, and (ii) letters from each Rating Agency that the subservicing arrangement established pursuant to this Agreement will not result in a downgrading of the ratings in and of itself, initially assigned by the Rating Agency to any Class of Certificates issued pursuant to the Pooling Agreements.

## ARTICLE III

## GENERAL PROVISIONS

SECTION 3.1    <u>Further Assurances</u>.  Subservicer and Owner shall each take any and all further actions and execute and deliver any and all such further documents and undertakings as are necessary or reasonably requested by any other party to effectuate the purposes of this Agreement.  The undertakings set forth in this section shall survive the execution and delivery of this Agreement.

SECTION 3.2    <u>Notices</u>.  Any notice, request, demand or other communication to be given or made under the Servicing Agreements shall be as provided to the following addresses:

Subservicer:    Oakwood Acceptance Corporation, LLC
P.O. Box 27081
Greensboro, NC  27425-7081
Attn:  Douglas R. Muir
Phone:  (336) 664-2360

3

Fax:  (336) 664-3224

Owner:        Oakwood Servicing Holdings Co., LLC
              Bank of America Center
              101 Convention Center Drive, Suite 850
              Las Vegas, NV 89109
              Attn:  Susan J. Miller
              Phone: (702) 598-3738
              Fax: (702) 598-3651

SECTION 3.3        Successors and Assigns.  This Agreement shall bind and inure to the benefit of Subservicer, Owner and their respective successors and assigns.

SECTION 3.4        No Waiver.  The execution, delivery and performance of this Agreement shall not, except to the extent expressly set forth herein, constitute a waiver, amendment or modification of any provision of the Servicing Agreements.

SECTION 3.5        Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without regard to choice of law principles.

SECTION 3.6        Counterparts.  This Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

SECTION 3.7        Captions.  The section headings appearing in this Agreement are included solely for ease of reference and are not intended to and shall not affect the interpretation of any provision of this Agreement or the Servicing Agreements.

SECTION 3.8        Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of any provision in any other jurisdiction.  Where provisions of any law or regulation resulting in such prohibition or unenforceability may be waived, they are hereby waived by the parties to this Agreement to the full extent permitted by law so that this Agreement shall be deemed a valid, binding agreement, enforceable in accordance with its terms.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto, acting by and through their respective duly authorized officers or representatives, have executed this Agreement as of the day and year first written above.

**Oakwood Acceptance Corporation, LLC**

By:_____
Name:
Title:

**Oakwood Servicing Holdings Co., LLC**

By:_____
Name:
Title:

SCHEDULE 1
TO SUBSERVICING AGREEMENT

**<u>Pooling Agreements</u>**

[See schedule attached to Assignment Agreement]

SCHEDULE 2
TO SUBSERVICING AGREEMENT

**Form of Trustee Acknowledgements**

[See form attached to Assignment Agreement]

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

IN RE:                                    )        Chapter 11
                                          )
OAKWOOD HOMES CORPORATION,                )        Case No. 02-13396 (PJW)
et al.,                                   )
              Debtors.                    )        Jointly Administered
                                          )
                                          )        related docket # 20

### ORDER PURSUANT TO §§ 365 AND 363 OF THE BANKRUPTCY CODE AUTHORIZING OAKWOOD ACCEPTANCE CORPORATION TO (i) ASSUME THE OMI NOTE TRUST 2001-A SALE AND SERVICING AGREEMENT, (ii) ASSIGN ITS RIGHTS AS "SERVICER" UNDER THE SALE AND SERVICING AGREEMENT TO AN AFFILIATE, AND (iii) ENTER INTO A SUBSERVICING AGREEMENT WITH AN AFFILIATE

Upon the motion (the "Motion") of Oakwood Homes Corporation and its affiliated debtors and debtors-in-possession in the above-referenced bankruptcy cases (collectively, the "Debtors") for entry of an order pursuant to sections 365 and 363(b) and (f) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), authorizing Debtor Oakwood Acceptance Corporation, LLC ("OAC") to, among other things, (i) assume that certain Sale and Servicing Agreement, dated as of February 9, 2001 (as previously amended and as hereafter amended, supplemented or modified from time to time, the "Sale and Servicing Agreement"), and (ii) assign all of OAC's right, title and interest as "Servicer" in, to and under the Sale and Servicing Agreement to a wholly-owned subsidiary of OAC, Oakwood Servicing Holdings Co., LLC ("OSHC"), pursuant to an assignment, contribution, and assumption agreement, free and clear of all Encumbrances (as defined in the Motion), and (iv) enter into and perform its obligations under a subservicing agreement with OSHC; the Debtors having filed with the court (x) an Assignment, Contribution and Assumption Agreement (Sale and Servicing Agreement), a copy of which is annexed hereto as Exhibit A (as amended, supplemented or

1

otherwise modified from time to time, the "Assumption Agreement"), and (y) a Subservicing Agreement (Sale and Servicing Agreement), a copy of which is annexed hereto as Exhibit B (as amended, supplemented or otherwise modified from time to time, the "Subservicing Agreement"); the Court having reviewed the Motion and the Declaration of Douglas Muir in Support of First Day Relief (the "Muir Declaration"); and the Court having conducted a hearing on December 12, 2002 (the "Hearing") to consider, among other things, the relief requested in the Motion; the Court having determined that the legal and factual bases set forth in the Motion and the Muir Declaration and the argument at the Hearing establish just cause for the relief granted herein; therefore, it is hereby FOUND and DETERMINED that:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.      Notice of the Motion was sufficient under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the surrounding facts and circumstances.

D.      OAC has satisfied the applicable requirements of § 365 of the Bankruptcy Code in connection with its assumption of the Sale and Servicing Agreement, and OAC's decision to so assume the Sale and Servicing Agreement constitutes a reasonable exercise of OAC's business judgment and is in the best interest of the Debtors' bankruptcy estates.

E.      OAC has satisfied the applicable requirements of § 365 of the Bankruptcy Code in connection with its assignment of all of its right, title and interest as "Servicer" in, to and under the Sale and Servicing Agreement to OSHC, and OAC's decision to so assign such right, title and interest constitutes a reasonable exercise of OAC's business judgment and is in the best interest of the Debtors' bankruptcy estates.

F.    The Debtors' decision to enter into and perform their obligations under the Subservicing Agreement is based on the reasonable exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

Accordingly, it is hereby ORDERED that:

1.    The Motion is GRANTED.

2.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3.    OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assume the Sale and Servicing Agreement.

4.    OAC is hereby authorized, pursuant to Bankruptcy Code § 365, to assign all of OAC's right, title and interest as "Servicer" in, to and under the Sale and Servicing Agreement to OSHC pursuant to the terms of the Assumption Agreement, free and clear of all Encumbrances.

5.    OAC is hereby authorized, pursuant to Bankruptcy Code § 363(b)(1), to enter into deliver the Assumption Agreement substantially in the form annexed hereto, and to perform its obligations thereunder.

6.    OAC is authorized, pursuant to Bankruptcy Code § 363(b)(1), and to enter into deliver the Subservicing Agreement substantially in the form annexed hereto, and to perform its obligations thereunder.

7.    OAC shall perform its obligations under the Assumption Agreement, the Subservicing Agreement, the Sale and Servicing Agreement and any and all prepetition agreements governing the sale of RICs to the Warehouse Trust, the purchase of notes issued by the Warehouse Trust and the servicing of such notes (the Assumption Agreement, the Subservicing Agreement, the Sale and Servicing Agreement and all such other agreements, each

3

as previously amended and as hereafter amended, supplemented or otherwise modified from time to time, the "Warehouse Facility Agreements", all as identified more specifically on Exhibit C annexed hereto) and any and all liability of OAC arising from or related to any failure to perform such obligations shall be an allowed administrative expense pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

8.      Each non-Debtor party to the Warehouse Facility Agreements, and each of the Indenture Trustee and the Class A Note Agent (in their capacity as express third-party beneficiaries to the Assumption Agreement and the Subservicing Agreement), shall be entitled to enforce its respective rights and remedies thereunder against OAC (and any other applicable Debtor) (subject to the immediately following sentence) and each non-Debtor party thereto and against all property subject thereto, and in the case of rights and remedies against OAC (or such other Debtor), shall be entitled to appropriate relief from this Court in furtherance of such enforcement. Each non-Debtor party to the Warehouse Facility Agreements shall be entitled to enforce its rights and remedies thereunder against OAC (or such other Debtor) free from the automatic stay imposed by § 362(a) of the Bankruptcy Code or by any stay or other relief issued under § 105 of the Bankruptcy Code or otherwise in any of the Debtors' cases, provided that, if any stay or other relief would otherwise be applicable absent the provisions of this Order, such non-Debtor party shall not exercise such rights and remedies until five business days after it has provided written notice of the event of default or other circumstance or condition giving rise to such rights and remedies to the Debtors' special bankruptcy securitization counsel and counsel to any official committee appointed in the Debtors' bankruptcy cases (it being hereby ordered that the only issue that may be raised by any party-in-interest seeking to oppose or otherwise affect

4

the exercise of such rights and remedies is the non-existence of such event of default or other circumstance or condition).

9.    Each of the Debtors is hereby authorized to take such other and further actions as may be reasonably required or appropriate to effectuate the transactions contemplated by, and to perform its obligations under, the Sale and Servicing Agreement, the Assumption Agreement and the Subservicing Agreement.

10.    This Court retains jurisdiction to resolve any disputes relating to the relief granted in this Order.

Dated: Wilmington, Delaware
~~December ___, 2002~~
Jan. 7, 2003

_____
UNITED STATES BANKRUPTCY JUDGE

5

**EXHIBIT E**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| NEW DIMENSION HOMES, INC., | ) | |
| | ) | Case No. 02-13390 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 38-3070192 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| DREAM STREET COMPANY, LLC, | ) | |
| | ) | Case No. 02-13391 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 52-2281698 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| OAKWOOD SHARED SERVICES, LLC, | ) | |
| | ) | Case No. 02-13392 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 56-2211751 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| HBOS MANUFACTURING, LP, | ) | |
| | ) | Case No. 02-13393 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 56-2211938 | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| OAKWOOD MHD4, LLC, | ) | |
| | ) | Case No. 02-13394 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 56-2271726 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| OAKWOOD ACCEPTANCE CORPORATION, LLC, | ) | |
| | ) | Case No. 02-13395 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No.  56-2211924 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| OAKWOOD HOMES CORPORATION, | ) | |
| | ) | Case No. 02-13396 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 56-0985879 | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| OAKWOOD MOBILE HOMES, INC., | ) | |
| | ) | Case No. 02-13397 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 56-0574589 | ) | |
| IN RE: | ) | |
| | ) | Chapter 11 |
| SURBURBAN HOME SALES, INC., | ) | |
| | ) | Case No. 02-13398 (PJW) |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 38-2134305 | ) | |

IN RE: )
)                    Chapter 11
FSI FINANCIAL SERVICES, INC., )
)                    Case No. 02-13399 (PJW)
           Debtor. )
)
Tax I.D. No. 38-2632769 )
)

IN RE: )
)                    Chapter 11
HOME SERVICE CONTRACT, INC., )
)                    Case No. 02-13400 (PJW)
           Debtor. )
)
Tax I.D. No. 38-2627907 )
)

IN RE: )
)                    Chapter 11
TRI-STATE INSURANCE AGENCY, INC.,)
)                    Case No. 02-13401 (PJW)
           Debtor. )
)
Tax I.D. No. 38-2170935 )
)

IN RE: )
)                    Chapter 11
GOLDEN WEST LEASING, LLC, )
)                    Case No. 02-13402 (PJW)
           Debtor. )
)
Tax I.D. No. 56-2211749 )
)

IN RE: )
)                    Chapter 11
CREST CAPITAL, LLC, )
)                    Case No. 02-13403 (PJW)
           Debtor. )
)
Tax I.D. No. 88-0475518 )
)

IN RE:                                    )
                                          )        Chapter 11
PREFERRED HOUSING SERVICES, LP,  )
                                          )        Case No. 02-13404 (PJW)
                Debtor.                   )
                                          )
Tax I.D. No. 56-2207613                   )
————————————————————————)

## DECLARATION OF DOUGLAS R. MUIR
## IN SUPPORT OF FIRST DAY RELIEF

I, Douglas R. Muir, hereby declare under penalty of perjury:

1.     I am Executive Vice President, Secretary and Treasurer of Oakwood Homes Corporation ("Oakwood"), one of the above-captioned debtors, and hold a variety of offices in certain other Debtors (collectively, the "Debtors"). In connection with my duties for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.     On November 15, 2002 (the "Petition Date"), each of the Debtors commenced a reorganization case by filing a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3.     To enable the Debtors to minimize any adverse effects of the commencement of their Chapter 11 cases on their businesses, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Relief"). The First Day Relief seeks, among other things, to: (a) preserve customer relationships; (b) maintain employee morale and confidence; (c) maintain critical vendor/supplier relationships and confidence; (d) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; and (e)

establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtors' customers, employees, vendors, service providers and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the Debtors' reorganization efforts.

4.    I submit this Declaration in support of the First Day Relief. Any capitalized terms not expressly defined herein have the meanings given to them in the applicable motion or application. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition or information provided to me by company employees. If I were called upon to testify, I could and would testify to each of the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors. Part I of this Declaration describes the Debtors' businesses, capital structure and the circumstances giving rise to the commencement of these Chapter 11 cases. Part II of this Declaration sets forth relevant facts in support of the First Day Relief.

## **BACKGROUND**

### General

5.    Oakwood, which was founded in 1946, together with its debtor and non-debtor affiliates and related parties (collectively, the "Oakwood Companies") designs, manufactures and markets manufactured and modular homes and finances the majority of its retail sales and a portion of the retail sales of its homes by its independent dealer network. The Debtors also provide a variety of insurance products to their customers.

Prior to closures announced concurrently with this petition, the Debtor's manufactured homes were being sold at retail through 199 owned and operated sales centers located primarily in the southeastern and southwestern United States and sold at wholesale to over 700 independent retailers located throughout the United States. The Company also sells insurance for customers choosing to purchase insurance and historically assumed a portion of the related underwriting risk through its non-debtor captive reinsurance business.

<u>Manufactured Homes</u>

      6.    The Debtors manufacture a number of models of single-section homes, multi-section and modular homes consisting of two or more component parts that are joined at the home site. Each home contains a living room, dining area, kitchen, one, two, three or four bedrooms and one or two bathrooms, and is equipped with a hot water heater and central heating. Some homes are furnished with a sofa and matching chairs, dinette set, coffee and end tables, carpeting, lamps, draperies, curtains and screens. Optional furnishings and equipment include a range and oven, refrigerator, beds, a fireplace, washing machine, dryer, microwave oven, dishwasher, air conditioning, intercom, stereo systems, wet bar, vaulted ceilings, skylights, hardwood cabinetry and energy conservation items. The homes manufactured by the Company are primarily sold under the registered trademarks "Oakwood®," "Freedom®," "Golden West®," "Schult®," "Crest®," and "Marlette®".

      7.    The Debtors' manufactured homes are constructed and furnished at the Debtors' manufacturing facilities and transported on wheels to the homesite. The Debtors' manufactured homes are normally occupied as permanent residences but can be transported on wheels to new homesites.

8.    In addition to traditional manufactured homes, the Debtors also manufacture modular homes that are built in accordance with state or local building codes and therefore are similar in specifications and design to site-built homes. The Debtors' modular homes range in size from 960 square feet to 3,355 square feet and include a variety of single story ranch homes, one and a half story homes, two story homes, townhouses and duplex units, all of which can include attached garages built at the site by others.

9.    The Debtors historically manufactured homes at twenty-seven plants located in North Carolina, Texas, Georgia, Indiana, Oregon, Pennsylvania, California, Minnesota, and Tennessee.  Thirteen of these are idle plants.

10.    The Debtors purchase components and materials used in the manufacture of its homes on the open market and is not dependent upon any particular new material supplier although due to the scarcity of certain raw materials, the Debtors may face supplier allocation issues. The principal raw materials purchased by the Debtors for use in the construction of its homes are lumber, steel, aluminum, galvanized pipe, insulating materials, drywall and plastics. Steel I-beams, axles, wheels and tires, roof and ceiling materials, home appliances, plumbing fixtures, furniture, floor coverings, windows, doors and decorator items are purchased or fabricated by the Debtors and are assembled and installed at various stages on the assembly line. Construction of the manufactured homes and the plumbing, heating and electrical systems installed in them must comply with the standards set by the Department of Housing and Urban Development ("HUD") under the National Manufactured Home Construction and Safety Standards Act of 1974 or, with respect to modular homes, local building codes.

7

11.    The Debtors furnish to each purchaser of a new home manufactured by the Debtors a five year limited warranty against defects in materials and workmanship, except for equipment and furnishings supplied by others which are frequently covered by the supplier's warranties.

Sales

12.    The Debtors operate their sales centers primarily under the names Oakwood® Mobile Homes and Freedom Homes®. At September 30, 2002, the Company also operated 36 Factory Certified Homes sales centers that sell primarily repossessed homes. The majority of the Factory Certified Homes locations will be closed as part of the reorganization. During the fiscal year ended September 30, 2002, substantially all the Debtors' retail sales of new homes were homes manufactured by the Debtors.

13.    Each of the Debtors' sales centers hires and trains sales personnel. Generally, each salesperson is paid a commission based on the gross margin of his or her sales and certain volume targets, and each general manager is paid performance based compensation keyed to the profits of the sales center.

14.    Since 1999 the Debtors have been scaling back operations, closing both sales centers and manufacturing facilities. Most recently, the Debtors closed forty sales centers beginning in early October and announced contemporaneously herewith approximately seventy-five additional sales center closures and five plant closings.

15.    The Debtors also sell their homes to approximately 700 independent retailers located throughout the United States. Sales to independent retail dealers accounted for approximately 44% of sales in fiscal 2002, up from 35% in fiscal 2001. The Debtors'

sales have traditionally been higher in the period from late spring through early fall than in the winter months.

Securitization

16.    A significant factor affecting sales of manufactured homes is the availability and terms of financing.   Approximately 77% of the units sold through the Debtors' retail centers in  fiscal 2002 were financed by installment sale contracts or loans arranged by the Debtors, each of which provided for monthly payments generally over a period of 5 to 30 years.  The remaining 23% of retail unit sales were paid for with cash or financing obtained from other sources.

17.    The Debtors retain a security interest in all homes they finance with loans documented either as installment sales contacts or traditional mortgages (collectively, "RICs").

18.    Because traditional financing sources are insufficient to sustain the tremendous manufacturing and sales volume the Debtors historically have experienced, the Debtors with retail sales operations and various independent dealers (collectively, the "Retailers") provide financing options to their customers through OAC, which originates the mortgage loan RICs itself and purchases on a non-recourse basis the other RICs originated by the Retailers.   OAC funds its originations and purchases of RICs by participating in public and private asset securitization transactions as described herein.

19.    Historically, securitization transactions have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs.  In fact, OAC historically made a material profit on its securitization transactions.  Although that profit has been reduced or even eliminated, the securitization transactions engaged in

9

by OAC pre-petition still remain the least expensive method for financing for the Debtors' operations. Continuing to participate in the securitization transactions described herein and other similar transactions in the ordinary course of business is absolutely essential to the Debtors' ability to reorganize successfully under Chapter 11.

20.    As part of the securitization process, OAC retains the contractual right to service all securitized RICs in exchange for a monthly fee. As part of its servicing duties, the Pooling and Servicing Agreements (as defined below) require OAC to make P&I Advances to the Securitization Trusts. OAC also is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations.

21.    Continuing to service securitized RICs, including making advances when and if required, substantially decreases the costs of securitization transactions and increases the liquidity available to the Debtors through securitization. As a result, OAC's continued performance of its servicing and related advance obligations is critical to ensuring the Debtors' ability to continue engaging in securitization transactions on favorable terms. In addition to that benefit, once the priority of its servicing fee is restructured as described below, OAC's servicing rights will have substantial independent economic value.

Independent Dealer Retail Sales Financing

22.    The Debtors provide permanent financing for homes sold by certain independent dealers that sell the Debtors' manufactured homes. During fiscal 2002, the Debtors financed approximately 38% of the Company manufactured units sold by its independent dealers.

10

Delinquency and Repossession

23.    In the event an installment sale contract or loan becomes delinquent, the Debtors typically contact the customer in an effort to have the default cured. The Debtors generally repossess the home after payments have become a number of days delinquent if they are not able to work out a satisfactory arrangement with the customer. A growing number of defaults over the last three years has led to a reduction in servicing fees received (due to their subordination) and greater liquidity demand for amounts necessary to make advances under the applicable service agreements.

Independent Retailer Repurchase Obligations

24.    Substantially all of the independent retailers who purchase homes from the Debtors finance new home inventories through wholesale credit lines ("Floor Plans") provided by third parties. In these arrangements, typically a financial institution provides the retailer with a credit line for the purchase price of the home and maintains a security interest in the home as collateral. The retailer uses a Floor Plan to finance the acquisition of its display models, as well as to finance the initial purchase of a home from a manufacturer until the home buyers obtain permanent financing or otherwise pay the dealer for the installed home. The Floor Plan Lenders generally require the Debtors to enter into a repurchase agreement under which the Debtors are obligated, upon default by the retailer, to repurchase any of the homes financed by the Floor Plan Lender. Under the terms of such repurchase agreements, the Debtors typically agree to repurchase homes at prices scaled to the age of the units. As of the Petition Date, the Debtors estimate that their contingent liability under these repurchase agreements was approximately $101 million. The Debtors' losses under these arrangements to date have not been significant.

Insurance

25.     In order to, among other things, facilitate retail purchases of its homes, the Debtors historically have sold, as an agent for an unrelated domestic insurance company, property and casualty insurance to certain customers in connection with their purchase of a home.  In addition, the Debtors entered the reinsurance business directly through their own captive, Bermuda-based reinsurer during 1997, when it, as a reinsurer, accepted certain risk of policies it had written as agent, in exchange for standard reinsurance premiums.  This venture allowed the Debtors to participate more fully in the profitable income streams associated with the property and casualty insurance and service contract business.  Shortly before the Petition Date, the Debtors exited the third party reinsurance business in order to relocate capital to the Debtors' core businesses, and are arranging an orderly wind down of their insurance subsidiary.

Competition

26.     The Debtors face stiff competition in three major aspects of their operations:  manufacturing, marketing and finance.  There are numerous firms producing manufactured homes in the Debtors' market areas, many of which are direct competitors.  Several of these manufacturers, which sell the majority of their homes through independent dealers, are larger than the Debtors and have greater financial resources.  Similarly, several of the financing sources in the industry are larger than the Debtors and have greater financial resources.  Finally, there are numerous retail dealers in most locations where the Debtors conduct retail and financing operations.   The Debtors compete with other manufacturers, retailers and finance companies on the basis of reputation, quality, financing ability, service, features offered and price.

27.    In addition, manufactured homes are a form of permanent, low-cost housing and therefore compete with other forms of housing, including site-built and prefabricated homes and apartments. Historically, manufactured homes have been financed as personal property with shorter term and higher interest financing than has been available for site-built homes. In recent years, however, there has been a growing trend toward financing manufactured housing with maturities equal to those in traditional residential real estate finance, especially when the manufactured housing is attached to permanent foundations on individually-owned lots, as is frequently the case in the Debtors' growing multi-section or modular homes market.  As a result, maturities for certain manufactured housing loans have moved closer to those for site-built housing.

<u>Employees</u>

28.    The Debtors employ approximately 7,400 persons, of which approximately 2,200 were engaged in sales and service, 4,400 in manufacturing, 600 in consumer finance, and 200 in executive, administrative and clerical positions.

<u>Financial Information</u>

29.    For the fiscal year ended September 30, 2002, the Oakwood Companies, on a consolidated basis, generated net sales of approximately $927 million.  As of September 30,  2002, the Oakwood Companies, on a consolidated basis, had approximately $$820 million in assets, and approximately $731 million in liabilities.

<u>Current Capital Structure</u>

30.    The Oakwood Companies are comprised of a number of direct and indirect subsidiaries, certain of which are party to several financing arrangements.   An organizational chart of the Oakwood Companies is attached hereto.

**Summary of Certain Lending Facilities**

    A.    <u>Loan and Security Agreement</u>

    31.    Prior to the Petition Date, the Oakwood Companies partially funded their operations through a $65 million credit facility (the "Prepetition Bank Facility") established under that certain Loan and Security Agreement, dated as of January 22, 2002, by and among the Debtors, as borrowers, Foothill Capital Corporation, as a lender and agent for the lenders ("Foothill"), and certain other lenders specified therein (as amended by that certain First Amendment to Loan Agreement dated July 2002 and that certain Second Amendment to Loan Agreement dated July 31, 2002, the "Credit Agreement").  As of November 15, 2002, borrowings and letters of credit under this facility totaled approximately $52 million.  The Prepetition Bank Facility is secured by substantially all of the assets of the Company.

    B.    <u>Senior Notes</u>

    32.    The Company issued 7.875% Senior Notes in the aggregate principal amount of $125 million due March 2004, and 8.125% Senior Notes in the aggregate principal amount of $175 million due March 2009 (collectively the "Notes") pursuant to an Indenture and First Supplemental Indenture, both dated March 2, 1999, between the Company and Bank One, N.A., f/k/a The First National Bank of Chicago.  U.S. Bank National Association was substituted as Indenture Trustee on January 10, 2000.

    C.    <u>Reset Debentures</u>

    33.    The Company issued 8% Reset Debentures (the "Debentures") in the original principal amount of $17 million due June 1, 2007 pursuant to an Indenture and a

First Supplemental Indenture both dated March 1, 1992, and Debentures in the original principal amount of $23 million due June 1, 2007 pursuant to a Second Supplemental Indenture dated July 15, 1992, between the Company and First Union National Bank, fka Delaware Trust Company.  U.S. Bank Trust National Association was substituted as Indenture Trustee on April 2, 2001.  Of the original Debentures, $2.6 million remains outstanding as of November 15, 2002.

        D.     <u>Guarantees</u>

        34.    Prior to the Petition Date Oakwood Homes Corporation provided limited guarantees of the collateral pools backing payments under the B-2 certificates in twenty REMIC Securitization Trusts.  The undiscounted guaranteed balances as of November 2002 equaled approximately $274.8 million plus any accrued and unpaid interest. Chase Manhattan Bank is the Trustee for each of the Securitization Trust for which an Oakwood Homes Corporation guarantee has been issued.

        E.     <u>IRB Bonds for plants in Kosciusko County, and Elkhart County, IN</u>

        35.    The Debtors are obligated under a Loan Agreement dated February 1, 1998, between Kosciusko County, Indiana and Schult Operating Company (now HBOS Manufacturing, LP) for $6,200,000 Variable Rate Demand Economic Development Revenue Bonds Series 1998 (the "1998 Bonds"). The 1998 Bonds are secured by a Letter of Credit in the amount of $4,766,356.16 issued by Wells Fargo Bank, NA and a Letter of Credit Mortgage secured by the Debtor's plant in Kosciusko County, IN.  Fifth Third Bank, Indiana is the Trustee under the Trust Indenture pursuant to which the Loan Agreement was issued.

36. The Debtors are also obligated under a Loan Agreement dated October 1, 1997, between Elkhart County, IN and Schult Operating Company (now HBOS Manufacturing, LP) for $1,500,000 Variable Rate Demand Economic Development Revenue Bonds, Series 1997 (the "1997 Bonds"). The 1997 Bonds are secured by a Letter of Credit in the amount of $896,282.19 issued by Wells Fargo Bank, N.A. and a Letter of Credit Mortgage secured by one of the Debtor's plants in Elkhart County, IN. Fifth Third Bank, Indiana is the Trustee under the Trust Indenture pursuant to which the Loan Agreement was issued.

## EVENTS LEADING TO CHAPTER 11 FILING

37. Recently, the Debtors have faced increasing financial stress brought on by a sustained downturn in the manufactured housing industry, a weakened economy and an increasing number of delinquent loans and repossessions. Over the last several years, the Debtors expanded into a contracting market and leveraged themselves aggressively to support the rapid growth, leaving more debt load than current performance can support. Despite proactive measures to counter these negative pressures, the Company has continued to experience financial stress. There are three primary problems that must be overcome: poor customer credit performance, poor operating performance in certain parts of the country and high debt service.

38. Aggressive underwriting standards in the late 1990s coupled with the current economic slowdown have led to an unsustainable level of loan defaults. The Debtors have generally been in a first loss position on these default losses as it guaranteed the performance of the collateral pools securing the payment rights of the B-2 (i.e., most junior) certificate holders in twenty REMIC trusts. Making matters worse, the Debtors also

16

subordinated the servicing fees for those pools to the rights of these security holders. As a result of high credit losses, the Debtors are currently receiving substantially less in servicing income than anticipated when the securitizations were closed. As the Debtors are currently incurring in excess of $30 million per year in servicing costs, this subordination of the servicing fees is a serious financial drain on current operations.

39.     As part of its rapid expansion in the 1990s, the Debtors entered markets that ultimately exhibited poor consumer credit performance. As credit standards have been tightened, these markets have experienced a disproportionate reduction in sales volume. As a result, these markets have grown increasingly unprofitable.

General Economic and Retail Downturn

40.     In addition to these debt structure issues, the Debtors have experienced slowing retail sales, gross profit margin contraction due to increased competition and lower operating rates at manufacturing plants, and increasing loan servicing costs.

Increasing Competitive Pressures in Industry

41.     The industry expanded aggressively into a severe economic downturn, a downturn especially severe for its traditional customer of modest means. At the same time, mortgage rates for site built homes are at a thirty-year low which has offset many of the cost advantages of manufactured homes as cost savings were offset by the traditionally higher interest rates for manufactured home buyers. Finally, aggressive lending for several years has led to a high level of repossessed homes, estimated by some to be 90,000 in the current year. These homes must be remarketed, which depresses new home sales volume.

42.     Many of the traditional industry lenders, including both Floor Plan Lenders and retail lenders who provide financing to homebuyers, have left the industry over

17

the last few years or have significantly curtailed operations. This reduction in available financing has led to a contraction of the dealer network and a sharp reduction in chattel home sales.

43.     The Company incurred substantial debt during the mid to late 1990s to support its rapid retail expansion and fund acquisitions of manufacturing operations which management at the time believed would position the Company to take advantage of the industry's then rapid growth. Instead of the continuing growth that was anticipated, the industry in early 1999 entered a severe economic downturn that continues today. This economic downturn, coupled with aggressive lending standards, has caused a substantial increase in loan defaults, for which the Company has been in a first loss position. As a result of the impact of the recession on operations coupled with increased credit losses, the Company has incurred substantial operating losses over each of the last four years which have rendered it unable to meet its current obligations when due and will make it impossible for the Company to repay the $125 million of Senior Notes due in March 2004.

Initiatives to Counter Financial Stress

44.     For over three years, the Oakwood Companies have undertaken specific, proactive efforts designed to counter the deteriorating financial performance. The Debtors developed a strategy to reduce overhead and create and improve their cash flow. The principal element of these efforts was a contraction of operations from a peak of over 425 sales centers and 34 plants to the current planned 119 sales centers and 14 plants. Additionally, the Company aggressively cut costs, tightened underwriting standards, deferred capital spending wherever practicable and embarked on a significant inventory reduction program.

45.     Outside of bankruptcy, the Debtors have been unable to accomplish all the restructuring needed due to its current high debt load, poor operating performance in certain geographic markets, high credit losses coupled with subordination of the loan servicing revenue.  The Debtors have been negotiating for an extended period of time with their principal lenders and largest bondholder to develop a consensual, pre-negotiated bankruptcy process designed to allow the Debtors to emerge as a leaner, profitable enterprise.

46.     Holders of approximately 39% of the combined value of (a) Oakwood Home Corporation's $303 million face value of senior unsecured debt and (b) the net present value, as described above, of future payment obligations under the Company's guarantees of principal and interest on $275 million face value of subordinated B-2 REMIC securities (the "REMIC Guarantees"), have agreed to a non-binding termsheet detailing their treatment in a Chapter 11 Plan, subject to (a) evidence satisfactory to the Holders that the financial information previously provided to them is correct (b) acceptable financing during the pendency of the bankruptcy proceeding.

## FIRST DAY PLEADINGS

47.     Concurrently with the filing of their Chapter 11 cases, the Debtors are filing a number of motions and applications seeking First Day Relief.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 cases (the "First Day Hearing"), at which the Court will hear certain of those matters.  The Debtors also anticipate that the Court will consider other such matters after an appropriate notice period.  Generally, the First Day Relief has been designed to facilitate:  (a) continuing the Debtors' operations in Chapter 11 with as little disruption and

loss of productivity as possible; (b) maintaining the confidence and support of customers, employees, critical venders and service providers and certain other key constituencies; (c) obtaining necessary postpetition financing; and (d) establishing procedures for the smooth and efficient administration of these cases. I have reviewed the First Day Relief, including the exhibits thereto and supporting memoranda, and I believe that the relief sought therein is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

### Joint Administration

48.    The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their Chapter 11 cases. Such an order is a necessary administrative convenience for the Court, the Office of the Clerk of the Court (the "Clerk's Office") and all parties in interest.

### Consolidated Largest Creditors List

49.    The Debtors also will seek the entry of an order authorizing them to file (a) consolidated lists of creditor and equity holders (collectively, the "Lists") and (b) a consolidated list of the Debtors' 40 largest unsecured creditors (the "Top 40 List"). The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors and equity security holders that are entitled to receive notices and other documents in these cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with notices and other similar documents filed in these Chapter

20

11 cases, as contemplated by Rule 1007-1(a) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The consolidated list of creditors is used by the United States Trustee (the "U.S. Trustee") in appointing an official committee of unsecured creditors (the "Committee") in the Debtors' Chapter 11 cases. The Top 40 List will provide the U.S. Trustee with the information necessary to appoint a Committee.

Claims Agent

50.    The Debtors will seek authority to retain and employ Bankruptcy Services LLC ("BSI") as Claims, Noticing and Balloting Agent to, among other things: (i) serve as the Court's noticing agent to mail notices to the estates' creditors and parties in interest, (ii) provide computerized claims, objection and balloting database services, and (iii) provide expertise and consultation and assistance in claim and ballot processing and other administrative information, and (iv) provide disbursement services with respect to the Debtors' bankruptcy cases. The number of creditors and other parties in interest in the Debtors' Chapter 11 cases may impose administrative and other burdens upon the Court and the Clerk's Office. It is for the purpose of relieving the Court and the Clerk's Office of these burdens that the Debtors seek to engage BSI. BSI is a data processing firm that specializes in claims processing, noticing, balloting disbursement and other administrative tasks in Chapter 11 cases, and has extensive experience with large Chapter 11 cases such as this one.

<u>Employee Wages and Benefits</u>

51.    The Debtors' workforce includes approximately 6,400 full- and part-time employees and a number of independent contractors (collectively, the "Employees"). The continued and uninterrupted service of the Employees is essential to the Debtors' continuing operations and their ability to reorganize.    Any delay in the provision of prepetition compensation, employee benefits, reimbursement of employee business expenses or payments for which employee payroll deductions were made (collectively, the "Prepetition Employment Payments") will substantially impair the Debtors' relationship with the Employees and destroy Employee morale at the very time when the dedication, confidence and cooperation of these Employees is most critical.    At this critical early stage, the Debtors simply cannot risk the substantial disruption of business operations that would inevitably result from any decline in workforce morale attributable to the Debtors' failure to make Prepetition Employment Payments in the ordinary course of their businesses.

52.    Accordingly, the Debtors will seek the entry of an order authorizing, among other things, the Debtors, in the Debtors' sole discretion, to pay (a) Prepetition Employment Claims to or for the benefit of their Employees and (b) all costs and expenses incident to the Prepetition Employment Claims.    The Debtors estimate that the aggregate payment authority requested by this motion is approximately $13 million.

<u>Ordinary Course Professionals</u>

53.    The Debtors' employees, in the day-to-day performance of their duties, regularly call upon certain professionals, including attorneys; accountants; actuaries;

22

financial, environmental and other consultants; and other professionals (collectively, the "Ordinary Course Professionals"), to assist them in carrying out their assigned responsibilities. Because of the magnitude and breadth of the Debtors' businesses and the geographic diversity of the professionals regularly retained by the Debtors, it would be costly, time-consuming and administratively cumbersome for the Debtors and this Court to require each Ordinary Course Professional to apply separately for approval of its employment and compensation. Accordingly, the Debtors will seek the entry of an order authorizing them to retain, employ and pay the Ordinary Course Professionals without further order of the Court. Nonetheless, if the monthly fees of any Ordinary Course Professional exceeds $25,000 during any month, the Debtors will seek to retain the Ordinary Course Professional under section 327 of the Bankruptcy Code.

<u>Utilities Motion</u>

54. Utility services are essential to the ability of the Debtors to sustain their operations while their Chapter 11 cases are pending. In the normal conduct of their businesses, the Debtors use gas, water, electric, telephone, and other services provided by the Utility Companies at their various plants and retail locations, as well as at the Debtors' corporate headquarters and regional office facilities. The Debtors' facilities are dependent on electricity for lighting, heating and cooling, security and general office use, including their telecommunications infrastructure. In addition, maintenance of telephone service is imperative because the Debtors' businesses use telephones to communicate with customers, vendors and headquarters. Continued water service is necessary to maintain sanitary lavatory facilities for employees. Finally, maintenance of gas service is essential to provide

heating to certain of the Debtors' facilities. Any interruption of these services would severely disrupt the Debtors' day-to-day operations and result in the spoilage and loss of a significant portion of the Debtors' inventory.

55.    If the utilities are permitted to terminate service, the Debtors will be forced to cease operation of their facilities and offices, resulting in substantial disruption and loss of revenue and profits. To avert the loss of business, the Debtors would be required to pay whatever amounts are demanded by the utilities to avoid the cessation of necessary services and, ultimately, the demise of their businesses.

Cash Management System/Business Forms/Bank Accounts

56.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date. The Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens, causing unnecessary expense and utilization of resources. Additionally, the Debtors, in the ordinary course of their business, use many checks, invoices, stationery and other business forms. In order to continue their operations in an orderly fashion, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Although it is possible to change these forms, the Debtors submit that this would create confusion and delay among their employees and third-parties. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms.

57.    The Debtors are affiliated entities and, prior to the commencement of these Chapter 11 cases, utilized a centralized cash management system, as described in

24

detail below, in the ordinary course of their businesses. The Debtors' centralized cash management system is coordinated through the Debtors' corporate offices in Greensboro, North Carolina. The Debtors manage their cash through approximately 170 bank accounts set forth on Exhibit A attached to the Cash Management Motion and incorporated herein by reference (the "Accounts") and generally illustrated on the diagram attached thereto as Exhibit B. The primary operating accounts utilized in the system are maintained at First Union National Bank ("First Union").

58.    The Debtors seek a waiver of the requirement that new bank accounts replacing all of their existing Accounts be opened as of the Petition Date. The Debtors believe that this requirement would unnecessarily disrupt the Debtors' businesses and impair their efforts to preserve the value of the Debtors' estates and reorganize successfully. The Debtors believe that only if the Accounts are continued in their current form can the transition through Chapter 11 be smooth and orderly. The Debtors' personnel can distinguish between prepetition and post-petition obligations and disbursements without closing existing Accounts and opening new ones. Accordingly, the Debtors respectfully request that the Accounts be maintained in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate order of this Court.

59.    The Debtors' cash management system allows the Debtors to effectively and efficiently run their businesses. The Debtors believe that to maximize the value of their businesses there must be minimal disruption to their administrative affairs,

and that the maintenance of their current cash management system, as provided herein, is essential to limiting disruptions to the Debtors' operations.

60.    Additionally, prior to the Petition Date, the Debtors have provided a number of services to and engaged in intercompany financial transactions with each other in the ordinary course of their respective businesses. Such transactions are appropriately reflected in the books and records of each of the Debtors.

61.    The Debtors believe that the continuation of the provision of intercompany services is beneficial to their estates and creditors and, thus, that corresponding transfers among the appropriate intercompany books and records (collectively, the "Intercompany Transactions") should be permitted. Accordingly, the Debtors seek authority to continue the Intercompany Transactions postpetition. The Debtors' operating and cash management depends on the Debtors' ability to continue to engage in such Intercompany Transactions. The Debtors therefore submit that the continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors.

Investment Guidelines

62.    As described in more detail above, the Debtors have a comprehensive cash management system (the "Cash Management System") consisting of more than 170 bank accounts across the United States through which the Debtors manage their cash receipts and disbursements (the "Bank Accounts"). The Debtors believe that the Bank Accounts are held by large, well-established, stable banking or financing institutions. As set forth in the Cash Management Motion, most of the Bank Accounts are protected by

applicable government-sponsored insurance, such as FDIC or FSLIC insurance, and are maintained in the ordinary course of business as minimum or zero balance accounts that do not carry significant overnight balances, except for funds in the Debtors' concentration account at First Union (the "Concentration Account").

1.     The Debtors believe that the Bank Accounts are held by large, well-established, stable banking or financing institutions. As set forth in the Cash Management Motion, all of the Bank Accounts are protected by applicable government-sponsored insurance, such as FDIC or FSLIC insurance. The Debtors' depository and trust accounts are swept on a weekly basis into the Debtors' concentration account (the "Concentration Account") at First Union National Bank ("First Union"). Wachovia Corporation, parent to First Union currently maintains a A+/Stable rating from Standard & Poor's, a widely recognized rating agency. The funds resident in the Concentration Account are automatically invested overnight in extremely liquid commercial paper by First Union and redeposited in the Concentration Account the following morning. The Concentration Account is the only interest bearing account that is invested in overnight investments. The Debtors primary disbursement accounts are zero-balance accounts funded from the Concentration Account on demand, and thus carry no overnight balances. The Debtors' minor disbursement checking accounts maintain relatively low balances; while these accounts are not paid interest on the resident funds, such interest would be minimal. These minor disbursement accounts allow plant managers to have instant access to funds to pay certain miscellaneous expenses that arise and are necessary for the continuation of operations.

Sales and Use Taxes

63.    "Sales and Use Taxes") to federal and various state and local taxing authorities (each, a "Taxing Authority," and collectively, the "Taxing Authorities").  Prior to the Petition Date, the Debtors paid these obligations in a timely fashion in accordance with and subject to applicable grace periods, if any.  Sales and Use Taxes accrue and generally are calculated based upon a statutorily mandated percentage of the price at which homes are sold at retail by the Debtors.  For the most part, Sales and Use Taxes are paid in arrears.   The Debtors prepare and file the Sales and Use Tax returns for obligations incurred in connection with the retail sale of mobile homes in over thirty states.   The Debtors estimate that monthly Sales and Use Taxes total approximately $850,000.  The Debtors seek authority, but not direction, to pay in the ordinary course of business all Sales and Use Taxes accrued as of the Petition Date.

Rejection of Certain Executory Contracts,  Nonresidential Real Property Leases and Personal Property Leases

64.    The Debtors seek the authority, as of the Petition Date, to reject certain executory contracts, nonresidential real property leases and personal property leases that they have determined, in the exercise of their business judgment, to have carrying costs that outweigh any benefit that might accrue to the Debtors through their maintenance.  These executory contracts and leases primarily concern under performing assets and locations that have constituted a net drain on the assets of the Debtors for a period of time.  While most of

28

the leases to be rejected are primary leases between the Debtors and third party lessors, certain of the leases are (i) subleases or (ii) leases that have already been assigned to another party but as to which the Debtors may risk some degree of financial exposure. In the business judgment of the Debtors, continued performance under these executory contracts and leases is not in the best interests of the Debtors' estates or creditors. Accordingly, the Debtors wish to reject them immediately.

Establishing Procedures for the Rejection or Assumption of Executory

<u>Contracts and Unexpired Leases</u>

65.    The Debtors are parties to numerous executory contracts and unexpired leases that they are not prepared to assume or reject as of the Petition Date. To enable the Debtors to be able to quickly reject those deemed to be, in the business judgment of the Debtors, non-productive and further reduce the burden on their estates from their continued carrying expenses, the Debtors propose to establish procedures by which the Debtors may notify the other parties to the contracts or leases of their assumption or rejection, and allow those parties to either be cured as to past arrearages or regain possession of their property and be allowed to mitigate their potential damages in a commercially reasonable manner. These procedures seek to maximize the value of the leases and contracts for the benefit of the Debtors' estates and their creditors, minimize the Debtors administrative expense burden associated with the post-petition, pre- rejection period, mitigate potential damages from rejection and, particularly with respect to assumptions, capitalize quickly on market opportunities.

<u>Cash Collateral/Debtor in Possession Financing?</u>

66.    The Debtors have insufficient cash to meet ongoing obligations necessary to allow them to operate their businesses while they implement their financial and operational restructuring. Specifically, without the use of Cash Collateral, the Foothill DIP Facility, and additional financing, the Debtors cannot purchase the components and finance the services that they need to maintain their business operations, nor can the Debtors pay the wages, salaries, rent, utilities and other expenses associated with operating their manufacturing, retail and financing businesses.

67.    Through the Foothill DIP Facility, the Debtors have obtained the commitment of the Foothill DIP Lenders to provide an $80,000,000 facility with $15,000,000 available under an interim order, which represents availability over and above the Prepetition Facility. In addition to the Foothill DIP Lenders, the Debtors are working with two additional parties to obtain the balance of funds they require to operate. The Debtors anticipate that one of those other parties, Greenwich Capital Corporation ("<u>Greenwich</u>"), will provide a $60,000,000 facility with $15,000,000 available under an interim order to the Debtors (the "<u>Greenwich DIP Facility</u>"), for which relief will be requested in a companion financing motion (the "<u>Greenwich DIP Motion</u>") to this Motion.

68.    Over approximately the next thirteen (13) weeks, the Debtors anticipate requiring approximately $57 million to continue operations in accordance with their operating budget (the "<u>Budget</u>"). To fund the operating expenditures, the Debtors will require, in addition to normal receipts, access to the Foothill DIP Facility and the use of Cash Collateral. The Debtors were unable to locate a lender that would fund the Debtors'

postpetition operations on terms as good as or better than the terms offered by the Lenders. In essence, the Foothill DIP Facility is the only realistic vehicle today for accomplishing the Debtors' goal of a successful reorganization and maximization of creditor recoveries.

69.     The Debtors believe the Foothill DIP Facility and the use of Cash Collateral is integral to the Debtors' ability to allow them to operate and reorganize.  The Debtors' access to the Foothill DIP Facility and use of Cash Collateral is critical to the success of these cases and to preserve the going concern value of the Debtors' businesses. Absent such financing, the Debtors would have little or no working capital, even on an interim basis, with which to meet their ongoing obligations to employees, customers and others.

70.     In sum, without immediate access to postpetition financing, the Debtors will continue to suffer the acute liquidity crisis that existed prepetition and that threatens the Debtors' ability to maintain operations in the short term.  Moreover, even if the Debtors' businesses survive this difficult period, it faces a substantial and devastating loss of revenue and other irreparable harm from the cancellation of sales orders, delayed production schedules, loss of employees and employee morale and deteriorating relationships with its suppliers and independent retailers if cash and credit support are not immediately available to jumpstart the Debtors' operations -- all of which will adversely impact the value of the Debtors as going concerns.  The ability of the Debtors to remain viable entities and reorganize under Chapter 11 of the Bankruptcy Code therefore depends upon obtaining the interim and final relief requested in this Motion.

Workers Compensation

71.    The Debtors, in the ordinary course of their business, must provide workers compensation benefits for its employees pursuant to various state laws and regulations.   Prior to the Petition Date, the Debtors paid these obligations in a timely fashion in accordance with and subject to applicable grace periods, if any, and provided bonds to some states.    The Debtors request the authority, in their sole discretion, to continue payment of their obligations for workers compensation in states in which they will continue to incur such obligations.

72.    It is critical that the Debtors be permitted to continue the Insured Programs and ensure that any outstanding Prepetition Insurance Costs and Prepetition Insured Claims are paid.   If the Insured Programs are not maintained, the Debtors could be required to make alternative arrangements for workers' compensation coverage — at a much higher cost — because such coverage is required under all applicable state workers' compensation laws, with severe penalties if an employer fails to comply with such laws.   In fact, if workers' compensation coverage is not maintained as required by such laws, without interruption, (a) employees could bring lawsuits for potentially unlimited damages, (b) the Debtors' ongoing business operations in certain states could be enjoined and (c) the Debtors' officers could be subject to criminal prosecution.[1]

---

[1]    See, e.g., N.C. Gen. Stat. §§ 97-94, 97-95 (1999) (providing for civil and criminal penalties and expanded liability against non-complying employers); Va. Code Ann. §§ 65.2-805, 65.2-806 (1995) (permitting employee lawsuits against non-complying employers for on-the-job injuries and providing for a deemed waiver of certain common law defenses and civil and criminal penalties).

73.    Moreover, the Debtors anticipate that their failure to pay the Prepetition Self-Insured Claims (a) would result in North Carolina and Georgia drawing on the bonds securing their obligations, and (b) could endanger the Debtors' ability to continue to operate in those states.  Similarly, if the Debtors fail to pay the Prepetition Current Claims or the Prepetition Prior Claims, the Debtors anticipate that the Current Providers and Lumbermens, being the primary insurers for such claims, would draw down the collateral securing the Debtors obligations under the Current and Prior Programs and cancel the policies.

74.    Furthermore, the Debtors believe that any delay in the timely payment of the Prepetition Insured Claims would have a negative impact on the morale of the Debtors' current employees at a time when the support of such employees is most critical. In contrast, (a) the payment of the Prepetition Insured Claims will not harm the Debtors' estates because any amount not paid by the Debtors on account of the Prepetition Insured Claims would come out of collateral posted by the Debtors and (b) the payment of the Prepetition Insured Claims will permit the Debtors to continue their operations without interruption.

Transportation and Installation Vendors

75.    The Debtors, in the ordinary course of their business, incur obligations to various transportation and installation/set up vendors.  These vendors supply critical services to the Debtors, without which the Debtors would be unable to perform the obligations that buyers of their homes expect, such as moving a home to its site, preparing the site for home placement and installation and hookup of the home to the site and utilities.

In addition, certain vendors expedite and facilitate the shipment of parts and supplies necessary to allow the Debtors to meet their warranty obligations. Without the continued services, these few and specialized vendors provide, the Debtors will not be able to meet their customers' expectations and such a failure will effectively eliminate their ability to sell homes.

### Establish Bar Date & Approve Form and Manner of Notice

76.     The Debtors are currently trying to determine, among other things, the extent, validity, priority, aggregate amount and identity of holders of claims that may be asserted against the Debtors' bankruptcy estates. In order to facilitate such a determination, the Debtors request that the Court enter an order establishing the following deadlines and procedures regarding the filing of proofs of claims in these cases. For general unsecured creditors, the bar date will be not less than 45 days from the date of service of a bar date notice package sent out by the Debtors or their agent, BSI. For governmental entities, the bar date shall be 180 days from the Petition Date.

### Retail Customer Practices and Programs

77.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in many practices to facilitate retail sales and to develop and sustain positive reputations in the marketplace for their products and services. Among these practices are warranties, field and sales problem resolution, parts and service support, customer deposit and other similar programs, practices and commitments directed at customers (collectively, the "Customer Practices"). The common goals of the Customer Practices have been to meet competitive pressures, ensure customer satisfaction, and

generate goodwill for the Debtors -- thereby retaining current customers, attracting new ones, and ultimately increasing sales.

78.    The great majority of the Customer Practices constitute services that are provided to customers under existing contracts. The Debtors believe that it is the most prudent and cost-efficient course of action to ensure that the Debtors continue to perform under such contracts, in order to maintain goodwill and reputation in the marketplace. Failure to honor the Customer Practices will destroy that goodwill and reputation, effectively eliminates the Debtors' ability to continue to sell homes.

Wholesale Customer Practices and Programs

79.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in many practices to develop and sustain positive reputations and relationships in the manufactured home dealer community for their products and services. Among these practices are the financing of consumer loans to retail customers of the Debrors' independent dealers, incentive plans, rebates, and other similar programs, practices and commitments directed at customers (the "Wholesale Customers") who buy homes from the Debtors at wholesale for later retail sale to consumers (collectively, the "Wholesale Customer Practices"). As illustrations, several of the Wholesale Customer Practices are described with greater detail below. The common goals of the Wholesale Customer Practices have been to meet competitive pressures, ensure the continuance of distribution channels, and generate goodwill for the Debtors on the wholesale side of the business -- thereby retaining current Wholesale Customers, attracting new ones, and ultimately increasing sales.

80.    When Wholesale Customers, who purchase manufactured homes from the Debtors with the intent of selling those homes on the retail market, make purchasing decisions between the Debtors' manufactured homes and services and that of the Debtors' competitors, they closely evaluate the deals and incentives offered to the Wholesale Customers by the various manufacturers. As a result, wholesale buyers will only consider purchasing product from manufacturers with a proven record of supporting their dealer network through various incentive programs. If a manufacturer fails to gain and retain the loyalty of the Wholesale Customers, then the manufacturer risks losing its dealer network and whatever sales value that distribution channel produces.

81.    The Debtors seek to continue the Wholesale Customer Practices because they have historically allowed the Debtors to attract and retain independent dealers, ultimately increasing wholesale sales volume. The Debtors believe that maintaining relationships with certain of these dealers throughout these bankruptcy cases is essential to the continued vitality of their businesses – and ultimately to their prospects for a successful reorganization. In particular, the Debtors' goodwill and ongoing business relationships may erode if the Wholesale Customers perceive that the Debtors are unable or unwilling to continue the Wholesale Customer Practices. The same would be true if the Wholesale Customers perceive that the Debtors will not offer the full package of services the wholesale customers demand – and receive – from other manufacturers.

Continuing the Sale and Securitization of RICs

82.    Historically, securitization transactions as described above have provided the most effective and least expensive financing technique for satisfying OAC's liquidity needs. In fact, until recently, OAC made a material profit on its securitization

36

transactions. Although that profit has been reduced or even eliminated, the securitization transactions engaged in by OAC pre-petition remain the least expensive method for financing for the Debtors' operations. Accordingly, the Debtors believe that continuing to participate in the securitization transactions described herein in the ordinary course of business is absolutely essential to the Debtors' ability to reorganize successfully under Chapter 11.

### Assumption and Assignment/Rejection of Various Pooling and Servicing Agreements

83.    OAC currently acts as the "Servicer" with respect to the securitized RICs owned by each Trust[2]. In that capacity, OAC is required to (i) collect payments of principal and interest from obligors and remit them to the appropriate Securitization Trusts, (ii) escrow payments of taxes and interest and remit them to the appropriate recipients, (iii) enforce the Trusts' rights under the securitized RICs when they fall into default, including commencing and prosecuting replevin and foreclosure actions, and (iv) otherwise monitor and report on the status of the RICs for the benefit of the Trusts as the holders of the securitized RICs.

84.    As and when necessary to perform its servicing duties, OAC, as the Servicer, is required to make recoverable advances to the Trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of its servicing obligations ("Servicing Advances"). OAC is obligated to make Servicing Advances, however, only if OAC deems the Servicing Advance to be recoverable. Servicing Advances are designed to be temporary and solely for the sake of convenience

---

[2]    OAC also services a very small portfolio of owned RICs that for a variety of reasons (principally ineligibility) have not been pooled and sold into the Warehouse Facility or an OMI Securitization.

and expediency. Accordingly, OAC, as servicer, is entitled to reimbursement for all Servicing Advances from subsequent tax and insurance escrow payments, insurance proceeds, and liquidation proceeds collected by the related Trust. In addition, if at any point OAC, as the Servicer, deems certain kinds of Servicing Advance to be non-recoverable, OAC is entitled to reimbursement for that Servicing Advance immediately from any available funds in the related Trust.

85. Currently, OAC has approximately $47,970,000 of outstanding Servicing Advances owed by the Trusts (collectively, the "Servicing Advance Receivables"). Of that amount, $16,120,000 represents advances for taxes and insurance escrow payments and $31,850,000 represents advances for repossession costs.

86. In addition, to the extent obligors on the securitized RICs are delinquent in the payment of principal or interest, OAC, as the "Servicer" under the Servicing Agreements, in most cases must advance the amount of such delinquent principal and interest ("P&I Advances," together with Servicing Advances, the "Advances"), generally on the 15th of each month. Like Servicing Advances, OAC is obligated to make a P&I Advance only if it deems the P&I Advance to be recoverable. P&I Advances are temporary and for liquidity purposes only. Accordingly, OAC, as Servicer, is entitled to reimbursement from the applicable Trusts for all P&I Advances made, either from subsequent collections on the related delinquent RICs or subsequent collections on the entire pool of RICs in a particular Trust, depending upon the terms of the Applicable Servicing Agreement. Also, if OAC at any point deems a previously made P&I Advance to be non-recoverable in any particular month, OAC may reimburse itself for that P&I Advance from any funds in the related Trust.

87.    OAC typically advances between $35 to $45 million in P&I Advances to the Trusts each month and books a receivable in the aggregate amount of such P&I Advances ("P&I Advance Receivables," together with the Servicing Advance Receivables, the "Advance Receivables"), then generally reimburses itself for such P&I Advances over the course of the following month.

88.    In exchange for servicing the securitized RICs at a cost of over $30 million per year, OAC is entitled to a monthly fee in amounts ranging from 1/12th of .75% to 1/12th of 1% of the outstanding balance of the RICs in each Trust (the "Servicing Fee"). The right to payment of the Servicing Fee from most of the Trusts, however, is contractually subordinate to the payment of amounts due on the particular Trust's outstanding Pass-Through Certificates (or notes, with respect to the Warehouse Trust) in a given month for so long as OAC remains the "Servicer" under the Servicing Agreements. Because of this subordination provision and the losses experienced by the Trusts on the securitized RICs, OAC currently is not receiving any significant payments on account of the Servicing Fee from the Trusts.  If and when any party other than OAC[3] becomes the "Servicer" under the Servicing Agreements, however, the priority of the Servicing Fee is elevated, and in many cases, the amount of the monthly Servicing Fee is increased to 1/12th of 1.5% of the outstanding balance of the RICs.

89.    Accordingly, in order to elevate the priority and in many cases increase the amount of the Servicing Fee, OAC formed OSHC, a wholly-owned limited purpose

---

[3]    Pooling and servicing agreements underlying securitization transactions often provide that the related servicing fee is elevated only if another party *that is not a wholly-owned affiliate of the originating servicer* takes over as the servicer of the loan portfolio.  Such a restriction was *not included in* the Servicing Agreements to which OAC is a party.

entity, and entered into an Assignment, Contribution, and Assumption Agreement in substantially the form annexed hereto as Exhibit D (the "Assumption Agreement"). Pursuant to the Assumption Agreement, OAC has agreed to assume the Servicing Agreements and assign them and the Advance Receivables to OSHC. Contemporaneously with that assignment, OAC and OSHC have agreed to enter into a Subservicing Agreement in substantially the form annexed hereto as Exhibit E, pursuant to which OAC will perform OSHC's obligations under the Servicing Agreements.  Under this structure, OSHC will be come the "Servicer" of record for the purposes of the Servicing Agreements, thereby elevating the priority and in many cases increasing the amount of the Servicing Fees, while OAC will continue to perform  day-to-day servicing of the RICs in accordance with the terms of the Servicing Agreements, thereby assuring the non-debtor parties to the Servicing Agreements of continued performance of the Servicing Agreements.

### Payment of Escrowed Funds

90.    Debtor Oakwood Acceptance Corporation, LLC ("OAC") continues to act as servicer for loans owned by the Securitization Trusts.  As servicer, OAC receives and escrows funds remitted by borrowers in order to pay certain taxing authorities and homeowner's insurance providers (the "T&I Obligations"). A fraction of the loans serviced by the Debtors carry an escrow balance; that is, the mortgagors have escrowed funds with the Debtors for the payment of the T&I Obligations.  OAC, as servicer, routinely transfers these funds on a timely basis to the entities for which these funds where escrowed.  Like trust fund taxes that are collected by the Debtors and held on behalf of a taxing authority, equitable title to these funds never passes to the Debtors, thus these funds are not property

of the estate. As such, use of these funds to pay the T&I Obligations does not prejudice the estates nor the creditors of the Debtors.

91.     A similar obligation of the Debtors as loan servicer includes the advancement of funds to pay certain obligations on behalf of the Securitization Trusts in connection with the individual mortgages being serviced (the "Servicing Advances"). Under the various pooling and servicing agreements, the Debtors are entitled to be reimbursed by the Securitization Trusts for all Servicing Advances made by the Debtors on their behalf in the event that the delinquent borrower does not pay or the repossession proceeds are insufficient to cover the advances. The only cost to the Debtors' estates from the Servicing Advances is the interest lost from the time the funds are advanced to the time when the funds are reimbursed. This loss is offset, to some extent, by the servicing fees that the Debtors earn for servicing these loans.

92.     The T&I Obligations described above are paid from checks drawn on a single disbursement account (the "EDA") the Debtors maintain at Wachovia. If it were possible to pay only the checks already drawn on the EDA for T&I Obligations, and dishonor all existing non-T&I Obligations Servicing Advance checks, that is what the Debtors would seek authority from this Court to do. Unfortunately, the Debtors understand that the only way to be able to honor the prepetition checks for the T&I Obligations, which constitute a vast majority of the checks drawn on the EDA, is to also honor the limited number of checks drawn on the EDA for non-T&I Obligation Servicing Advances. The Debtors estimate that there are approximately 3,500 checks outstanding on the EDA, totaling approximately $2.3 million. Of this amount, the Debtors estimate only 10-15% is attributable to non-T&I Obligations.

41

93.    Due to the highly complex nature of the Debtors' cash management and inventory accounting systems, certain of the individuals who perform work on the repossessed units are paid from the Debtors' accounts payable account (the "AP Account") while others are paid from the EDA. This accounting difference is rooted in how the Debtors' track and allocate costs associated with their servicing portfolio. Specifically, the source of payment for such services depends on whether an account is formally categorized as "in repossession." Unfortunately, this system is not executed to perfection, and some overlap applies.

94.    In light of the fact that the estates of the Debtors will not be prejudiced by the payment of all of the T&I Obligations and outstanding non-T&I Servicing Advances, the Debtors submit that the preferential treatment afforded the a limited number of creditors who will receive full payment is an acceptable trade-off in comparison to the potential damage which could befall the Debtors' borrowers if the T&I Obligations are not paid.

Treatment of Reclamation Claims

95.    The Debtors purchase substantial amounts of goods on a daily basis. During calendar year 2001, the Debtors' total purchases aggregated approximately $394 million. Moreover, the Debtors estimate that their more recent purchases have been approximately $29.5 million on a monthly basis. Given this volume of purchases, the Debtors anticipate receiving demands during the early days of these cases from numerous vendors asserting such vendors' purported rights of reclamation (each a "Reclamation Claim" and, collectively, the "Reclamation Claims"). The Reclamation Claims, if properly asserted, will request that the Debtors either return, or pay in full, certain goods identified in the Reclamation Claims (the "Goods").

96.     The Debtors believe that procedures to govern the Reclamation Claims will simplify the process of addressing such claims while adequately safeguarding the reclamation rights of the creditors asserting them.

## Administrative Expense Status For And Authority To Pay Vendors

97.     In the ordinary operation of the Debtors' businesses, numerous vendors provide the Debtors with goods every month.  These goods are essential to the sustained operations of the Debtors during the reorganization period.  As of the Petition Date, and in the ordinary course of their businesses, the Debtors had numerous pending outstanding orders with the vendors for such goods.  As of the Debtors' filing of their Chapter 11 cases, many of the vendors may be concerned that delivery or shipment of goods after the Petition Date pursuant to a prepetition purchase order will render a Vendor who makes such shipment a general unsecured creditor of the Debtors' estates.

98.     Accordingly, vendors may decline to ship, or may instruct their shippers not to deliver, goods destined for the Debtors unless the Debtors issue substitute purchase orders postpetition or obtain an order of this Court confirming that all obligations of the Debtors arising from prepetition purchase orders, delivery or satisfaction of which occurs postpetition, are to be paid by the Debtors in the ordinary course of business.

99.     The Debtors' relationship with their vendors is so essential that it is important to give them the utmost reassurance that they will continue to be paid by the Debtors in the ordinary course of business.

## Authority to Pay Warehousing and Transportation in the Ordinary Course of Business

100.     In the normal course of business, the Debtors rely on particular common carriers (the "Shippers") to ship, transport, and deliver various goods, materials,

finished inventory and supplies (the "Goods") between their various manufacturing facilities, sales centers, independent dealers and customer sites. The Debtors depend on the Shippers for timely, consistent deliveries, and the Shippers' services are key to the Debtors' operations. Goods which are in transit are often stored at locations that are not owned or otherwise controlled by the Debtors, but rather are owned and/or controlled by independent third parties (the "Warehousemen"). The Debtors estimate that they rely on approximately 862 Shippers and Warehousemen in the ordinary course of their businesses.

101. As a result of the commencement of these Chapter 11 cases, some Shippers and Warehousemen who hold Goods may refuse to release such goods pending payment of prepetition shipping charges (the "Shipping and Warehousing Charges"), thereby disrupting the Debtors' operations. Unless the Debtors continue to receive delivery of, and ship, Goods on a timely and uninterrupted basis, their manufacturing operations will shut down within a matter of days, thereby causing irreparable damage to the Debtors' business and reorganization efforts. As of the Petition Date, the Debtors accrued Shipping and Warehousing Charges to and from manufacturing facilities are approximately $3.2 million.

102. Additionally, the Debtors use certain vendors to complete the final installation and assembly at the customer's site (the "Delivery and Setup"). The Delivery and Setup process includes but is not limited to grading the land to receive the home, setting the foundation piers, placing the home on the foundation, fastening the modular components, connecting the utilities make the necessary improvements to their customers' property for installation of homes. For example, in connection with the installation of a home, the Debtors may construct sidewalks, install well and septic systems or make other

improvements to the customers' property. In the ordinary course of their businesses, the Debtors use approximately 1,300 vendors across the country to facilitate the timely delivery of the Debtors' product to their customers (the "Delivery and Setup Vendors"). The Delivery and Setup Vendors are often the only providers of services in a particular region.

103. As a result of the commencement of these Chapter 11 cases, some Delivery and Setup Vendors may refuse to continue performing set-up services pending payment of prepetition delivery charges (the "Delivery and Setup Charges"), thereby unnecessarily disrupting the Debtors' operations. Unless the Debtors continue to receive the services of the Delivery and Setup Vendors on a timely and uninterrupted basis, their sales operations will experience significant delays, thereby causing irreparable damage to the Debtors' businesses, cash flow and reorganization efforts. Essentially, the failure to pay certain of the Delivery and Setup Vendors will severely impair the Debtors' ability to sell homes in certain regions. On average, the Debtors incur approximately $10 million in Delivery and Setup Charges per month. As of the Petition Date, the Debtors' accrued Delivery and Setup Charges are approximately $11.5 million. The Debtors expect that certain of the prepetition accrued and unpaid Delivery and Setup Charges will not have to be paid due to the availability of alternative Delivery and Setup Vendors.

104. Finally, as part of their customary business practices, the Debtors provide their customers with product warranties. Prior to the Petition Date, the Debtors used certain delivery services dedicated to the delivery of warranty parts to their customers (the "Parts Shippers" and, collectively with the Shippers and Warehousemen and Delivery and Setup Vendors, the "Transportation Vendors") in satisfaction of their warranty obligations. Unless the Debtors continue to receive the services of the Parts Shippers on a

timely and uninterrupted basis, their ability to promptly and efficiently service their outstanding warranties will be severely impaired, thereby causing irreparable damage to the Debtors' operations, customer goodwill and overall reorganization efforts. As of the Petition Date, the Debtors' accrued Parts Shipper obligations totaled approximately $70,000 (the "Parts Shippers Charges").

CONCLUSION

To preserve the value of their businesses to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 cases by minimizing any adverse impact of the Chapter 11 filings on the Debtors' operations. For the reasons described herein and in the First Day Pleadings, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 18, 2002.

_____
Douglas R. Muir, Executive Vice President
Oakwood Homes Corporation

319231

47

**EXHIBIT F**

0001

```
              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - -X
                                :  Chapter 11
In Re:                          :  Case No. 02-13396
OAKWOOD HOMES CORPORATION,      :  (PJW)
et al.,                         :     Jointly Administered
                                :
          Debtors.              :
_____ :
OHC LIQUIDATION TRUST,          :
                                :
          Plaintiff,            :
                                :
          v.                    :  Adv. Proc. No.
                                :  04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,     :
a Swiss banking corporation,    :
CREDIT SUISSE FIRST BOSTON      :
LLC, a Delaware limited         :
liability corporation, CREDIT   :
SUISSE FIRST BOSTON, INC.,      :
CREDIT SUISSE FIRST BOSTON      :
(U.S.A.), INC., a Delaware      :
corporation and a wholly        :
owned subsidiary of CREDIT      :
SUISSE FIRST BOSTON, INC.,      :
the subsidiaries and            :
affiliates of each, and         :
DOES 1 through 100,             :
          Defendants.           :
- - - - - - - - - - - - - - - -X
          Videotape Deposition of MYLES STANDISH
                  (Taken by Defendants)
              Winston-Salem, North Carolina
                   September 21, 2006
Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public
```

1

APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.

Stutman, Treister & Glatt

1901 Avenue of the Stars

Twelfth Floor

Los Angeles, California  90067-6013

(310) 228-5755

(310) 228-5788 FAX

TCastanres@stutman.com

For the Defendants:

MICHAEL J. OSNATO, JR., Esq.

BRENDAN MURPHY, Esq.

Linklaters

1345 Avenue of the Americas

New York, New York  10105

(212) 903-9000

(212) 903-9041 FAX

Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

* * * * *

2

```
          Videotape Deposition of MYLES STANDISH, taken
by the Plaintiff, at the Marriott Hotel, 425 North
Cherry Street, Winston-Salem, North Carolina, on the
21st day of September, 2006 at 8:24 a.m., before K.
Denise Neal, Registered Professional Reporter and
Notary Public.
```

* * * * *

CONTENTS

| THE WITNESS: MYLES STANDISH | EXAMINATION |
|---|---|
| BY MR. OSNATO | 6 |

* * * * *

3

INDEX OF EXHIBITS

| | For the Defendants: | Page |
|---|---|---|
| 201 | Employment agreement - 4-13-04 | 57 |
| 202 | Declaration of Douglas Muir - | |
| | 11-18-02 | 79 |
| 203 | Memorandum - 4-13-00 | 89 |
| 204 | Oakwood minutes of board of | |
| | directors meeting - 7-24-01 | 116 |
| 205 | E mail printout and attachment | |
| | - 7-31-02 | 148 |
| 206 | Oakwood minutes of board of | |
| | directors meeting - 6-25-02 | 153 |
| 207 | Oakwood minutes of board of | |
| | directors meeting - 7-29-02 | 158 |
| 208 | Presentation to board of | |
| | directors - 8-19-02 | 170 |
| 209 | Oakwood minutes of board of | |
| | directors meeting - 8-19-02 | 179 |
| 210 | Presentation to Lotus - | |
| | 10-15-02 | 188 |
| 211 | E mail printout - 10-18-02 | 193 |

4

1    A.    Well, when you say my tenure, are you
2    talking about all the time I was employed by the
3    company?
4    Q.    Let's focus on the period 1999 through the
5    filing.
6    A.    Okay.  Credit Suisse served as our primary
7    underwriter in our securitization program.  Credit
8    Suisse also served in a more general capacity as a --
9    as an advisor with respect to our overall financial
10   condition, liquidity condition with respect to
11   options that might be available.  Credit Suisse was
12   also provided a loan purchase facility where we
13   liquified our loans prior to securitization.
14         First Boston also served as the financial
15   advisor as we were looking to restructure the company
16   pursuant to a contract entered into in August of
17   2002.  First Boston I believe during that period of
18   time had a research analyst that followed the company
19   for at least a period of time.  They may have had
20   other roles, but those are the ones I recall at the
21   moment.
22   Q.    Okay.  Now, let's focus specifically on
23   the underwriting services that Credit Suisse
24   provided.  It's my understanding that those services
25   included performing some measure of diligence,

13

1    interacting with rating agencies on behalf of Oakwood
2    and generating potential investor interest in
3    securitizations; is that correct?
4         MR. CASTANARES:  Objection to form.
5         THE WITNESS:  Among other things, yes,
6    they did those things.
7    Q.    (By Mr. Osnato)  What did I leave out?
8    A.    Well, they certainly were the primary
9    people involved in structuring the transaction
10   itself.  That's the only thing I can -- additional
11   thing that I can recall at the moment.
12   Q.    Am I correct that the securitizations
13   tended to use the same structure?
14   A.    The same general structure in the sense
15   that it was a securitization.  You would have
16   different tranches.  You would have sometimes
17   interest-only strips.  You would have sometimes bonds
18   that were guaranteed, sometimes bonds that were not
19   guaranteed.  So there was -- there was a good bit of
20   variability in the structure of each of the
21   securitizations.
22   Q.    Again focusing only on the underwriting
23   services that Credit Suisse provided, do you think
24   that it provided those services adequately and
25   competently?

14

1    A.    In general, yes.
2    Q.    Focusing on the financial advisory
3    services that you described a moment ago, I'm going
4    to ask you the same question.  Do you think that
5    Credit Suisse provided those services adequately and
6    competently?
7    A.    When you say financial advisory services,
8    does that include the financial advisory contract in
9    August of 2002?
10   Q.    Well, again, that's a fair observation, so
11   let's break that question down into two pieces; okay?
12   Separate out for the moment the services provided
13   under the August contract, and please give me your
14   views on whether Credit Suisse provided its services
15   adequately and competently?
16   A.    Under the August 2002 contract?
17   Q.    No.  Anything other than --
18   A.    Anything other than that contract?
19   Q.    -- under that contract.
20   A.    Okay.  The -- I know that -- I know that
21   Credit Suisse came to us with a number of
22   alternatives during the years --
23   Q.    Uh-huh.
24   A.    -- as far as ways that we could provide
25   better liquidity or that they could help us provide

15

1    better liquidity for Oakwood.  None of the things
2    that they brought to the table ever came to pass
3    other than when we entered into the loan purchase
4    agreement with them.
5         So they brought ideas to the table which
6    either didn't come to pass because First Boston
7    ultimately wouldn't approve them or they didn't come
8    to pass because management didn't think that the
9    ideas were worth pursuing to finality.
10        So in general I can't -- I don't know if
11   there were other things that they could have brought
12   to the table that would have provided us with better
13   options than we ended up taking, but -- but they did
14   not come to the table with things that management
15   viewed to be workable.
16        So, you know, were they trying to bring
17   ideas to the table that might work?  I think so.
18   Ultimately they didn't work.  Does that mean that
19   they were unsatisfactory?  I don't know.  I can just
20   tell you what the results were.
21   Q.    Credit Suisse's role as an advisor was to
22   bring options to the board and senior management and
23   it was senior management and the directors' role to
24   select options they thought were in the best
25   interests of the company; isn't that right?

16

```
 1   complied with that, I don't recall that.  It was more
 2   of a mutual situation.
 3       Q.   Did Credit Suisse have the ability to
 4   force Oakwood to engage in a securitization
 5   transaction if the board determined that wasn't in
 6   the company's interest?
 7       A.   Well, I don't remember those circumstances
 8   happening.  As I said, if Credit Suisse would have
 9   come to the board and said you do this or we will no
10   longer serve as underwriter and we'll withdraw the
11   loan purchase facility, it would have put the board
12   in a difficult position.
13       Q.   But that never happened; right?
14       A.   That's correct.  I do not recall that
15   happening.
16       Q.   Did Credit Suisse have the ability to
17   force Oakwood to file for chapter 11 bankruptcy?
18       A.   Well, in essence they did.  On the -- on
19   the week of November 11th the Credit Suisse for a
20   period of several days stopped funding loans under
21   the warehouse or the loan purchase facility.  They
22   gave us no reason as to why they had done so.
23   Ultimately I believe on the Friday that we filed for
24   bankruptcy Credit Suisse did fund those loans that
25   had been -- that should have been funded several days
```

```
 1   before but notified Oakwood that they were no longer
 2   going to fund loans under the loan purchase facility
 3   until some other agreement was worked out.  So as I
 4   said earlier, the week of November 11th we
 5   essentially had no choice other than to file for
 6   bankruptcy because we were out of money --
 7       Q.   Uh-huh.
 8       A.   -- and the actions of First Boston were
 9   one of the precipitating events to that.
10       Q.   Uh-huh.  Your earlier testimony I believe
11   was that the immediate precipitating factor was that
12   Oakwood ran out of money; is that right?
13       A.   Yes.
14       Q.   At some point in time after the chapter 11
15   filing did Oakwood terminate Credit Suisse?
16            MR. CASTANARES:  Would you care to break
17       down which relationship you're talking about or
18       do you mean under any relationship at all?
19            MR. OSNATO:  Under any relationship.
20            THE WITNESS:  We never terminated Credit
21       Suisse as far as a general matter.  We continued
22       to work with Fiachra O'Driscoll.  He continued
23       to provide us with advisory services on our
24       securitizations as well as working with us to
25       put back in place the loan purchase facility.
```

```
 1   We did terminate First Boston's role under the
 2   August 2002 contract.
 3       Q.   (By Mr. Osnato)  Let's talk for a moment
 4   about Mr. O'Driscoll.  I take it you know who he is?
 5       A.   I do.
 6       Q.   And I take it that you have some views on
 7   his abilities, competence; is that right?
 8       A.   I do.
 9       Q.   Can you tell us what those are?
10       A.   I think Fiachra has provided us -- I think
11   Fiachra in general is very competent.  I think he
12   served us well in general with the securitizations
13   work that he did prior to bankruptcy.  I was
14   disappointed in his work immediately leading up to
15   bankruptcy as far as getting a waiver so that the
16   loan purchase facility could remain in place.
17            I was somewhat disappointed after the
18   bankruptcy filing when we attempted to securitize our
19   loans for the first time in a transaction that would
20   have involved an entity called C-Bass.  Being the
21   servicer, Fiachra had indicated to me that he thought
22   -- what he thought our proceeds would be under that
23   transaction and the transaction never took place, but
24   it never took place because the proceeds were going
25   to be significantly in a very material sense less
```

```
 1   than what he had indicated he expected it to be.
 2       Q.   Mr. Standish, if you were the CEO of
 3   Oakwood at the time this lawsuit was brought, would
 4   you have authorized its filing?
 5            MR. CASTANARES:  Objection to form.
 6            THE WITNESS:  Again, it's been some time
 7       since I read the counterclaim itself, so I can't
 8       say for sure.  I do not think I would have
 9       authorized a filing with respect to the loan
10       assumption program.
11            I can't -- I don't remember enough about
12       the counterclaims, the remaining counterclaims
13       themselves, to say that -- to say one way or the
14       other on the remaining counterclaims.  I
15       certainly as CEO of Oakwood would have defended
16       the lawsuit that was filed by First Boston as
17       far as payments under the August 2002 contract.
18       Q.   (By Mr. Osnato)  I do appreciate your
19   reservations about the services provided under the
20   August contract.  Would you have authorized a suit
21   brought on behalf of Oakwood that asserted the
22   underwriting services provided by Credit Suisse were
23   deficient or negligent?
24            MR. CASTANARES:  Same objection.
25            THE WITNESS:  I don't think I could really
```

1  Boston was always essentially the lead underwriter,
2  that to the extent we used other people along with
3  First Boston, it was to throw a bone to Bank of
4  America or First Union or other people whose services
5  we were using in other areas at the time.
6      Q.   And am I right that it would be Mr. Muir
7  who would be the principal interface on behalf of the
8  company with Credit Suisse?
9      A.   Yes.
10     Q.   Did you get involved at any point in time
11 negotiating the structure of any of these deals?
12     A.   I probably was involved to a certain
13 extent, but not -- I can't -- I can't recall
14 specifics.  I know Doug would come to me from time to
15 time and tell me that there was an issue about this
16 or an issue about that and ask for my input on it,
17 but the specifics I can't remember.
18     Q.   And describe for me, please, what the
19 proceeds of the securitizations were used to do?
20     A.   They were used to do anything.  Cash is
21 fungible.  Once cash comes into the general account,
22 it goes out to pay any bills.
23     Q.   Was the cash used to fund the company's
24 manufacturing?
25     A.   It -- once cash comes into a general

1  it had been provided through Bank of America.  Before
2  Foothill came in we had a line with First Union.  We
3  at some point in time in 2001 entered into a servicer
4  advance agreement with Prudential.  Those would be
5  the major facilities that I could think of.
6      Q.   And it was important for the company to
7  maintain relationships with a number of lenders;
8  right?
9      A.   Well, it certainly doesn't hurt to have
10 relationships with a number of lenders.
11     Q.   Because it's important to diversify your
12 potential sources of liquidity; right?
13     A.   You could argue that one way or the other.
14     Q.   Why do you think it's important?
15     A.   Well, I think that having -- well, it's
16 important in one respect that certain lenders
17 understand certain types of assets.
18     Q.   Uh-huh.
19     A.   For example, Foothill lends primarily
20 based on hard assets, inventory, for example.  There
21 aren't many people around who would understand a
22 warehouse agreement or a loan purchase agreement like
23 we had with First Boston because there's very few
24 people who would understand the collateral that was
25 there.

1  account, it's used for anything that you have a need
2  for cash.
3      Q.   Now, my understanding is that you
4  testified earlier that you were generally satisfied
5  with the securitization services that Credit Suisse
6  provided; is that right?
7      A.   I believe that's an accurate summary.
8      Q.   Okay.  Are you familiar with an entity
9  known as Foothill?
10     A.   I am.
11     Q.   Did Foothill provide any kinds of services
12 to the company?
13     A.   They provided us with a line of credit.
14     Q.   And was that true if you know during the
15 entire period you were with the company?
16     A.   No.
17     Q.   When did they first begin providing credit
18 to Oakwood?
19     A.   Maybe sometime in the late 2001 time
20 period.
21     Q.   Okay.  Focusing on 2001, apart from
22 Foothill were there any other financial institutions
23 that were providing credit to the company?
24     A.   Well, at some point in time CSFB started
25 providing us with a warehouse facility.  Before that

1  Similar to the servicing line that we had
2  with Prudential, I think Prudential had been the
3  first ones to do a similar type of servicing line
4  like that.  They understood what the asset was and
5  was comfortable with the asset.  Generally speaking,
6  it would have been hard to finance these varying
7  types of assets with only one lender.
8      Q.   Okay.  Do you recall the circumstances
9  under which Berkshire Hathaway came to participate in
10 securitization transactions with the company?
11     A.   Generally, yes.
12     Q.   Please tell me what you remember.
13     A.   I remember that we had an inventory of B2
14 pieces that was difficult to liquidate.  We had sold
15 B2s in the past but at some point in time, maybe
16 around '99, 2000, that market had become a very
17 difficult market.  I know that First Boston presented
18 to Berkshire Hathaway the idea of Berkshire Hathaway
19 buying these B2s.
20     How the Lotus structure came about,
21 whether that was an idea that Flacnra had or
22 Flacnra's group or whether that was an idea that
23 Berkshire Hathaway had, I'm not sure, but I suspect
24 it was generated from First Boston.
25     Q.   And did you participate in the

**EXHIBIT G**

# In The Matter Of:

*In re:  OAKWOOD HOMES CORPORATION/OHC LIQUIDATION v. CREDIT SUISSE FIRST BOSTON*

---

## DOUGLAS R. MUIR
### September 26, 2006

---

# LEGALINK MANHATTAN

### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
**PH: 212-557-7400 / FAX: 212-692-9171**

**MUIR, DOUGLAS R. - Vol. 1**



LEGALINK
A MERRILL COMPANY

9/26/2006 MUIR, Douglas R. (vol.1)

APPEARANCE OF COUNSEL

For the Plaintiff:

TONY CASTANARES, Esq.

Stutman, Treister & Glatt

1901 Avenue of the Stars

Twelfth Floor

Los Angeles, California  90067-6013

(310) 228-5755

(310) 228-5788 FAX

TCastanres@stutman.com

For the Defendants:

MARY K. WARREN, Esq.

J. JUSTIN WILLIAMSON, Esq.

Linklaters

1345 Avenue of the Americas

New York, New York  10105

(212) 903-9000

(212) 903-9041 FAX

Michael.osnato@linklaters.com

Videographer:

Mr. Donald Graves

* * * * *

2

---

9/26/2006 MUIR, Douglas R. (vol.1)

INDEX OF EXHIBITS

For the Defendants:                                          Page

212   Oakwood Homes Corporation
      corporate record tickler                                 9

213   Sale and servicing agreement
      - 2-9-01                                                 80

214   Letter - 2-26-01                                         86

215   Account statement - 9-2002                               87

216   Prospectus supplement - 5-20-02                          97

217   Prospectus supplement - 8-27-02                         112

218   Inter-office memo - 9-12-02                             112

219   Meeting minutes - 6-30-99                               126

220   Meeting minutes - 8-2-99                                128

221   E mail printout and attachment
      - 3-28-01                                               133

222   Project coconut briefing book                          137

223   E mail printouts                                        138

224   Meeting minutes - 7-29-02                               140

225   Proof of claim - 3-27-03                                148

226   E mail printout - 10-18-02                              168

227   Meeting minutes - 10-28-02                              184

228   Meeting minutes - 11-4-02                               186

4

---

9/26/2006 MUIR, Douglas R. (vol.1)

Videotape Deposition of DOUGLAS MUIR, VOLUME I,
taken by the Plaintiff, at the Marriott Hotel, 425
North Cherry Street, Winston-Salem, North Carolina,
on the 26th day of September, 2006 at 8:40 a.m.,
before K. Denise Neal, Registered Professional
Reporter and Notary Public.

* * * * *

CONTENTS

THE WITNESS:  DOUGLAS R. MUIR          EXAMINATION
        BY MS. WARREN                        6

* * * * *

3

---

9/26/2006 MUIR, Douglas R. (vol.1)

1       THE VIDEOGRAPHER:  We're on the record at
2   9:26 -- I mean, sorry -- 8:40.  I'm sorry.
3   Today's date is 9-26, September 26th, 2006.
4   This is the deposition of Douglas Muir taken in
5   the matter of In Re: Oakwood Homes Corporation,
6   et al., Debtors, and OHC Liquid Trust,
7   Plaintiff, versus Credit Suisse First Boston, et
8   al., Defendants, in the United States Bankruptcy
9   Court, District of Delaware.
10      This deposition is being held at 425 North
11  Cherry Street, Winston-Salem, North Carolina.
12  My name is Donald Graves.  The court reporter is
13  Denise Neal.  Will counsel introduce themselves
14  for the record, please?
15      MS. WARREN:  Mary Warren of Linklaters for
16  the Defendants.  And with me is my colleague,
17  Justin Williamson.
18      MR. CASTANARES:  Tony Castanares of
19  Stutman, Treister & Glatt for the Plaintiff.
20      THE VIDEOGRAPHER:  Will the court reporter
21  please place the witness under oath?
22          DOUGLAS R. MUIR,
23  having been first duly sworn, was examined and
24  testified as follows:
25  ///

5

1　get more business from you to the best of your
2　knowledge; right?
3　　　A.　That was --
4　　　Q.　You weren't paying them to come and just
5　give you ideas?
6　　　A.　We were not paying them for ideas.  I
7　assume they hoped to land an engagement.
8　　　Q.　In your view did Credit Suisse perform its
9　services as lead underwriter for the securitizations
10　competently?
11　　　A.　Yes.
12　　　Q.　Did Credit Suisse perform its services in
13　providing the loan purchase facility competently?
14　　　A.　Yes.  I believe so.
15　　　Q.　Did Credit Suisse perform the financial
16　advisory services beginning in August of 2002
17　competently?
18　　　A.　Of that I'm a little less certain.
19　　　Q.　And why do you say that?
20　　　A.　There are a couple of reasons.  And by
21　saying I'm not certain they were competent, I'm not
22　saying they were incompetent.
23　　　Q.　I understand.  Is it fair to say that
24　you're saying that there were some problems?
25　　　A.　There were what I perceived to be some

66

1　DIP financing with anybody from CSFB.  And, in fact,
2　we ultimately entered bankruptcy without a DIP.
3　Another area of focus was CSFB was the lender under
4　the warehouse facility.  And not having been told by
5　CSFB to the contrary, you know, I expected that when
6　we entered bankruptcy there wouldn't be any surprises
7　in terms of continued access to that source of
8　financing.
9　　　　And, in fact, there were some significant
10　surprises.  And third, there was a -- I had a
11　frustration if you will in that the item that did
12　have tremendous focus, that is, obtaining an
13　indication of support from Berkshire while it was
14　critically important, they seemed to have a
15　perception that we had an infinite amount of time to
16　achieve that objective.
17　　　Q.　They meaning Credit Suisse?
18　　　A.　Correct.
19　　　Q.　Uh-huh.
20　　　A.　When, in fact, we informed them repeatedly
21　that the amount of time fixed or available to
22　accomplish that was fixed.  I was frustrated that
23　they never seemed to understand that there was going
24　to come a point in time where we were going to be
25　compelled to file whether we had Berkshire on board

68

　problems.
　　　Q.　And what were those?
　　　A.　My recollection is that the financial
　advisory people did an immense focus and attention on
　one of a number of elements that were part of that
　engagement.  The one that they had tremendous focus
　on was working with us and the company that turned
　out to be the major creditor of the bankruptcy case
　to obtain at least an indication of support from that
　creditor as we entered the bankruptcy process.
1　　　Q.　That creditor was Berkshire Hathaway?
2　　　A.　Correct.
3　　　Q.　And did you think that that focus was
4　appropriate?  Did you think it was important to get
5　an indication of support from Berkshire Hathaway for
6　whatever plan of reorganization the company was going
7　to come up with?
8　　　A.　I did.
9　　　Q.　So what was the problem?
10　　　A.　The things that perhaps didn't go so well
11　where there were some other elements that I felt
12　should have been part of the engagement.  Number one
13　was working with us to help arrange DIP financing,
14　which again, I didn't have visibility to everything
15　that CSFB was doing, but I seldom if ever discussed

67

1　or not.  They may have understood that, but they gave
2　me indications that they did not and I did find that
3　frustrating.
4　　　Q.　Who was the point person if there was one
5　at Oakwood dealing with Credit Suisse in their
6　capacity as financial advisor?
7　　　A.　I think there were three of us that talked
8　to CSFB, perhaps not always as -- together or
9　always about the same matters, but the principal
10　players were Myles Standish, the chief executive, Bob
11　Smith, who was the -- at the time the executive vice
12　president of financial operations, and me.
13　　　Q.　Who was the point person from Credit
14　Suisse on the financial advisory engagement?
15　　　A.　Jared Felt.
16　　　Q.　Who at Oakwood was responsible for getting
17　DIP financing?
18　　　A.　I don't know that we ever sat down and
19　delegated tasks.  I was not focusing on that piece.
20　Bob Smith spent a lot of time focusing on it.  I
21　think perhaps Myles may have been involved as well,
22　but Bob pretty much had the ball on the DIP.
23　　　Q.　From the period 1999 to -- well, strike
24　that.  Going back in time, how did the relationship
25　between Oakwood and Credit Suisse begin?  Do you

69

1   remember?

2       A.      Yes.

3       Q.      How?

4       A.      We called them up in New York and asked to

5   come visit with them.

6       Q.      Who did you call?

7       A.      It was one of two people.  It was either

8   Fred Terrell or Pilar Esperon.

9       Q.      Who were they?

10      A.      They were asset backed investment bankers

11  at CSFB.

12      Q.      How did it come about that you decided to

13  call them and ask them to come see you?

14      A.      We called them and asked to come visit

15  them --

16      Q.      Sorry.  I heard that wrong.

17      A.      -- to understand their capabilities in

18  underwriting manufactured housing asset backed

19  securities.  That was motivated by the fact that we

20  had been fired by Merrill Lynch.

21      Q.      How did Credit Suisse come to your

22  attention as another provider of this kind of

23  service?

24      A.      At the time there were three banks that

25  were the major players in manufactured housing asset

70

1   backed to the virtual exclusion of all the other

2   investment banks.  And they were -- gee, I'm doing

3   this from memory -- CSFB, Merrill and Lehman

4   brothers.

5               We didn't know anybody or really had had a

6   lot of exposure to anybody at Lehman, but we had

7   heard good things about CSFB.  And having been fired

8   by Merrill they seemed, you know, a logical candidate

9   to go at least have a visit with and discuss a

10  relationship.

11      Q.      And did the relationship -- did that visit

12  happen?

13      A.      It did.

14      Q.      And did the securitization relationship

15  begin soon after?

16      A.      It did.

17      Q.      When did Fiachra O'Driscoll enter the

18  picture?

19      A.      About 1996 to the best of my recollection.

20      Q.      And do you remember how that happened?

21      A.      Yes.  Pilar Esperon and Fred Terrell with

22  whom we had been working from the inception of the

23  relationship in 1994 decided to leave CSFB as I

24  recall in 1996.  And I had a discussion with Pilar,

25  who -- on the phone one day and she said I have

71

1   picked an outstanding successor for me.  I want to

2   bring him down and introduce him to you because

3   you're going to really like him.

4       Q.      And that was Fiachra?

5       A.      That was Fiachra.

6       Q.      I take it you did like him?

7       A.      I liked him a lot.

8       Q.      Why?

9       A.      A lot of reasons.  Fiachra is extremely

10  bright.  He works very, very hard.  He delivers

11  results.  He doesn't surprise you.  He's

12  unquestionably honest and I trusted him.  I mean, I

13  could think of other -- he's just an absolutely first

14  rate person.

15      Q.      And do you believe that as firmly now as

16  you did at the beginning of the relationship?

17      A.      Absolutely.

18      Q.      Could I ask you to take a look back at

19  Exhibit 212?  Looking at the first page of the list

20  of officers, tell me why did Nicholas St. George

21  leave the company?

22      A.      He retired.

23      Q.      And Bill Edwards took over as chairman

24  from Mr. St. George, correct, and chief executive

25  officer?

72

1       A.      I think that's correct, yes.

2       Q.      Okay.  Why did Mr. Edwards leave the

3   company?

4       A.      The board asked him to.

5       Q.      Why?

6       A.      I wasn't consulted, but I thought Bill was

7   the wrong man for the job and the board did the right

8   thing.

9       Q.      Is it your understanding that the board

10  terminated Mr. Edwards for general underperformance

11  or was there any specific incident that caused this?

12      A.      Again, I wasn't privy to the conversation.

13  I didn't attend the meeting.  I knew the meeting was

14  going to take place before it took place.  I knew

15  what the subject matter was and I knew from

16  discussions with others in the company at least some

17  of the reasons that other members of management had

18  cited to the board as a reason for getting rid of

19  Bill.

20      Q.      And what were the reasons?

21      A.      There's one in particular that sticks in

22  my mind, and it was a -- interestingly, a credit

23  underwriting related issue.  There was a program

24  called DPAP that Mr. Edwards insisted on running

25  against the advice of others in the company.

73

1    Q.    (By Ms. Warren)  Changing topics a bit,
2    I'm showing you a document that the court reporter
3    has marked Defendant's Exhibit 221.  It's an E-mail
4    attaching what looks like a presentation.  The E-mail
5    is from Susan Menkhaus to you dated Wednesday, March
6    28th, 2001.  Would you just take a look through this
7    document briefly and let me know when you're
8    finished?
9    A.    Okay.  I've reviewed it.
10   Q.    Does this document refer to the servicing
11   advance facility that eventually Oakwood implemented?
12   A.    It certainly refers to a concept for a
13   facility.  This doesn't appear to be the exact form
14   in which it was ultimately implemented, but it's the
15   same basic transaction.
16   Q.    Okay.  And as I think you testified
17   earlier that a version of this structure or
18   transaction was implemented by Oakwood?
19   A.    That's correct.
20   Q.    And you thought this was a helpful idea
21   from Credit Suisse?
22   A.    I did.
23   Q.    What -- in the course of particularly 1999
24   to 2001 what, if any, other ideas that Credit Suisse
25   proposed to the company did you find helpful?

134

1    you got from the purchaser of the IO, and it was a
2    very creative idea and we employed it in a number of
3    deals.  That's one.
4    I'm sure if I -- if you have an inventory
5    of neat things we did during that time frame, I could
6    give you some more, but there were some very
7    innovative ideas that came out of First Boston.
8    Q.    Okay.  Were there any ideas floated to you
9    by Credit Suisse that management rejected?
10   A.    I'm sure there were.  There were -- there
11   had to have been.
12   Q.    And when you say there had to have been,
13   why do you say that?
14   A.    Well, I can remember one and there were no
15   doubt more because we'd hear from CSFB.  I think they
16   were thinking about us, thinking about our situation,
17   thinking about our industry, thinking about how they
18   could be helpful, thinking how they could make some
19   fees and they pitched ideas.
20   I remember some of them being really bad
21   ideas or at least one, but there may have been some
22   -- you know, some good ones.  Certainly I've already
23   testified there were some good ideas as well.
24   Q.    Shall we take a short break?
25   A.    Sure.

136

1    A.    That would require an inventory of the
2    ideas.  Could you ask the reporter to read back the
3    question?  I just want to make sure I'm answering the
4    question that you asked.
5    MS. WARREN:  Absolutely.
6    (The record was read by the reporter.)
7    Q.    (By Ms. Warren)  And let me just amend
8    that to say I meant to say through the petition date.
9    A.    There were -- one that comes to mind is
10   Fiachra or his team came up with a structural change
11   to the ABS transactions that we had not previously
12   employed that was beneficial to us economically.
13   And it was a very creative idea in terms
14   of playing off an arbitrage between the rating
15   agencies and the fixed income markets, but the basic
16   concept was taking a chunk of the excess spread in
17   the transaction, the difference between the rate of
18   interest on the loans and the rate of interest
19   accruing on the bonds that is of limited value from a
20   rating agency point of view, and taking something
21   that they didn't think was worth very much and
22   creating a security out of it and creating an IO that
23   was -- that investors were willing to pay a lot of
24   cash for in the bond market.  What you gave up with
25   the agencies was not nearly so valuable as the cash

135

1    THE VIDEOGRAPHER:  We're off the record at
2    2:36.
3    (A recess was taken.)
4    THE VIDEOGRAPHER:  We are on the record at
5    2:47.
6    Q.    (By Ms. Warren)  Mr. Muir, are you aware
7    of something called Project Coconut?
8    A.    Gee, I remember the name.
9    Q.    And I will tell you there's a document in
10   the files called Project Coconut and it has the Soles
11   Brower firm name on it.
12   A.    Okay.  That -- that might have been the
13   management buy-out secret code name.  I remember we
14   had that code name for something, but I can't connect
15   the dots.  I'm sorry.
16   MS. WARREN:  Well, let me try and dig that
17   out for you.
18   (Discussion off the record and Exhibit
19   Number 222 was marked for identification.)
20   Q.    (By Ms. Warren)  I'm showing you a
21   document that the court reporter has marked
22   Defendant's Exhibit 222.  It's entitled Project
23   Coconut briefing book dated September 18th, 2001 with
24   the Soles Brower name on it and it's Bates numbered
25   RCDA-01432 to 01432.42.

137

9/26/2006 MUIR, Douglas R. (vol.1)

1  to accomplish what needed to be accomplished.  And I
2  shared with CSFB very early in the game what that
3  time period was.  And I was frustrated routinely that
4  I don't -- by what I perceived at least as Jared's
5  failure completely to grasp the fact that we were
6  going to be compelled to file on a date certain
7  whether we were ready to or not.
8          I had an impression that his view was that
9  we will file when we get Berkshire on board and it's
10  just unthinkable to file before then.  And I was
11  frustrated that he seemed unwilling and unable to
12  come to grips that filing was inevitable at a date
13  certain.  And that's what by I mean at least in my
14  perception as, you know, a lack of focus and a lack
15  of sense of urgency.
16      Q.   Did you convey your feelings on that topic
17  to anyone at CS?
18      A.   I conveyed them to Fiachra on a -- and to
19  Jared on a number of occasions.  The most vivid was
20  on the way back from the second trip to Omaha.
21  Fiachra assured me that they understood the
22  situation.  I was still not convinced that Jared
23  understood the situation.
24      Q.   Leaving aside the financial advisory work,
25  which I understand did not accomplish everything you

198

9/26/2006 MUIR, Douglas R. (vol.1)

1  would have liked, did you have any issues with the
2  other services provided by Credit Suisse during the
3  period 1999 to the petition date?
4      A.   No, not at all.
5      Q.   Do you think the people at Credit Suisse
6  were honest with you?
7      A.   I had no reason to think that anybody from
8  CSFB ever lied to me.
9      Q.   Did you in words or substance ever tell
10  anyone at Credit Suisse that you thought Credit
11  Suisse had done a good job in a very difficult
12  situation in getting through the bankruptcy filing
13  during that whole period, pre and post bankruptcy?
14      A.   I don't recall doing so, but I may have.
15  We were just glad to be done.  It was a -- it was a
16  wrenching process and I know when we finally got into
17  bankruptcy I was glad to have arrived there, painful
18  though it may have been.  And I -- and again, while I
19  wasn't totally satisfied with all aspects of that
20  engagement by CSFB, they helped us get there and it
21  was difficult.
22      MS. WARREN:  Let's take a break for a
23  minute.
24      THE VIDEOGRAPHER:  We're off the record at
25  5:04.

199

9/26/2006 MUIR, Douglas R. (vol.1)

1  (Deposition adjourned at 5:04 p.m.)
2          * * * * *

200

9/26/2006 MUIR, Douglas R. (vol.1)

1  STATE OF NORTH CAROLINA      C E R T I F I C A T E
2  COUNTY OF GUILFORD
3      I, K. Denise Neal, RPR, Registered
4  Professional Reporter and Notary Public, do hereby
5  certify that DOUGLAS R. MUIR, VOLUME I was duly sworn
6  by me prior to the taking of the Deposition; that
7  said Deposition was taken and transcribed under my
8  supervision; and that the foregoing 200 pages are a
9  true and accurate transcription of the testimony of
10  the said deponent.
11      I further certify that review and signing
12  of the transcript by the witness was reserved.
13      I further certify that the persons were
14  present as stated.
15      I further certify that I am not related
16  to, of counsel for or in the employment of any of the
17  parties to this action.
18      IN WITNESS WHEREOF, I have hereunto
19  subscribed my name, this the 3rd day of October,
20  2006.
21          K. Denise Neal, RPR
22          Registered Professional Reporter
23          and Notary Public
24  My Commission Expires
25  June 23, 2010.

201