# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ———————————————— | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) | **Re: Civil Docket No. 74** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF WHITMAN L. HOLT
## IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

I, Whitman L. Holt, declare as follows:

1.    I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.    I submit this declaration in support of the *Plaintiff's Motions in Limine* filed by the OHC Liquidation Trust ("**Plaintiff**") in the above-captioned proceeding.

3.    I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for Plaintiff in this proceeding.

4.    Plaintiff's counsel deposed Mr. Thomas F. Boland – a proposed expert witness on Defendants' behalf – on March 25, 2008.  True and correct copies of relevant excerpts from the transcript of Mr. Boland's deposition are attached hereto as Exhibit "A."

5.    Plaintiff's counsel deposed Mr. Jared Felt – an employee of the entity formerly known as Credit Suisse First Boston LLC, and the signatory of the proofs of claim underlying portions of this proceeding – on June 15-16, 2006.  True and correct copies of relevant excerpts from the transcript of Mr. Felt's deposition are attached hereto as Exhibit "B."

6.    Attached hereto as Exhibit "C" is a true and correct copy of an August 19, 2002 e-mail from Peter Landon attaching an executed copy of a letter agreement of the same date, which was produced by Defendants with bates numbers CSFB-00013644 – CSFB-00013659.  This document was previously marked as deposition exhibit 7.

7.    Attached hereto as Exhibit "621" is a true and correct copy of the *Expert Witness Report of Thomas F. Boland*, dated February 29, 2008.

8.    Attached hereto as Exhibit "622" is a true and correct copy of the *Report of Alan C. Shapiro, Ph.D.*, dated April 30, 2007.

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 21, 2008, at Los Angeles, California.

Whitman L. Holt

# EXHIBIT

# A

1

2

3    UNITED STATES BANKRUPTCY COURT
     DISTRICT OF DELAWARE
4    ----------------------------------------x

5    In re:

6                                    Chapter 11
     OAKWOOD HOMES CORPORATION,      Case No. 02-13396 (PJW)
7    et al.,                         Jointly Administered

8                      Debtors.
     ----------------------------------------x
9    OHC LIQUIDATION TRUST,

10                              Plaintiff,

11        - against -              Adv. Proc. No.
                                   04-57060 (PJW)
12

13   CREDIT SUISSE FIRST BOSTON, et al.,

14                       Defendants.
     ----------------------------------------x
15

16        Videotaped DEPOSITION of THOMAS F. BOLAND, held

17   at the offices of Linklaters LLP, 1345 Avenue of the

18   Americas, New York, New York 10105, on the 25th day

19   of March 2008, commencing at 9:03 a.m., before

20   Colette Cantoni, a Registered Professional Reporter

21   and Notary Public of the State of New York.

22

23

24

25

1                              Boland

2          A     Yes.

3          Q     Do you see that?

4          A     Yes.

5          Q     Now let me ask you, after that first

6     sentence, I take it that's the sentence you disagree

7     with, at least you disagree with that sentence in

8     your opinion; but I would like to ask you about the

9     remainder of this paragraph.

10               The next sentence reads "CSFB's various

11    relationships with Oakwood afforded it access to

12    information, both public and inside, about Oakwood's

13    financial condition."

14               Do you disagree with that statement?

15         A     I think it's very broad.

16         Q     Well, do you think it's correct that CSFB

17    had public information about Oakwood's financial

18    condition?

19         A     Yes.

20         Q     Do you think it is correct that CSFB at

21    any time had inside information about Oakwood's

22    finance condition?

23         A     It had certain nonpublic information, yes.

24         Q     All right.  And do you believe that that

25    information, both public and nonpublic, came to CSFB

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1                             Boland

2      in some capacity other than its various relationships

3      with Oakwood, as set forth in this sentence?

4           A      It came through its relationships, yes.

5           Q      Okay.  Now do you believe that at any time

6      CSFB or any CSFB entity had any fiduciary

7      relationship to Oakwood?

8                  MS. WARREN:  Objection to the form.  Calls

9      for a legal conclusion.

10                 I direct the witness not to answer.

11          Q      Do I take it, sir, that -- I do take it --

12                 MR. CASTANARES:  I'll just state for the

13     record, I take exception to the instruction, it being

14     based upon neither a privilege nor to make a motion

15     to suspend the deposition, therefore plainly outside

16     the rules of practice.

17                 MS. WARREN:  I disagree, Tony.

18                 MR. CASTANARES:  However, I don't think

19     we're --

20                 MS. WARREN:  You're asking a

21     businessperson for a legal conclusion, which is

22     improper.

23                 MR. CASTANARES:  All right.

24                 MS. WARREN:  Go ahead.

25     BY MR. CASTANARES:

79

```
 1                          Boland

 2        Q    Do I take it, sir, that you have no

 3   opinion on whether or not the relationship between

 4   CSFB or any entity in the Credit Suisse family and

 5   Oakwood and every entity in the Oakwood family ever

 6   gave rise to a fiduciary duty?

 7              MS. WARREN:  Object and direct the witness

 8   not to answer.

 9              MR. CASTANARES:  You're not going to let

10   him answer whether he has an opinion or not?

11              MS. WARREN:  Ask the question again.

12        Q    Do you have an opinion on whether any CSFB

13   entity ever owed any fiduciary duty to any Oakwood

14   entity?

15              MS. WARREN:  All right.  Assuming that

16   you're asking him for a legal conclusion, whether he

17   has a legal conclusion, you can go ahead and answer

18   that.

19              MR. CASTANARES:  I am simply asking

20   whether he has an opinion.  It is subject to a yes or

21   no answer.

22              MS. WARREN:  Well, not particularly.

23              If you're asking him whether he's come to

24   a legal conclusion, the answer is no.  And he can

25   tell you that himself.  But if you're trying to ask
```

80

1                          Boland

2     him for a fiduciary duty type of opinion under the

3     guise of some other question, then he is not going to

4     answer.

5                  MR. CASTANARES:  My question stands.

6          Q     Do you have an opinion, sir, on whether

7     CSFB ever owed any fiduciary duty to Oakwood?

8                  MS. WARREN:   Objection on the same basis

9     as before, that it calls for a legal conclusion, but

10    you can answer.

11         A     I'm not in the position of giving legal

12    opinions.

13         Q     Okay.  So would it be correct for me then

14    to read your report as not attempting to express an

15    opinion on the subject of whether CSFB ever owed a

16    fiduciary duty to Oakwood?

17                 MS. WARREN:   Objection to the form.

18                 His -- his opinion speaks for itself.

19                 MR. CASTANARES:  You may not say anything

20    more than "objection to the form," counsel.

21                 MS. WARREN:   No, I do need to say more,

22    because you keep asking him about legal concepts.

23                 MR. CASTANARES:  Everything you say is

24    going to appear before this Judge in connection with

25    whether this witness gets to testify or not.  I just

81

1                           Boland

2       want to let you know that right here and now.

3                   So go ahead and say anything you want to

4       say.

5                   MS. WARREN:  That's fine, Tony.

6                   You're asking him about a legal construct.

7                   His opinion is right in this report, it

8       speaks for itself, and you can ask him about it.

9                   He is not going to testify about a legal

10      matter.  That's a matter for the Judge and the jury

11      in this case to decide.

12                  Go ahead with your next question.

13      BY MR. CASTANARES:

14          Q    Do you have -- strike that.

15                  Does your report attempt to express an

16      opinion on whether or not CSFB ever owed a fiduciary

17      duty to Oakwood?

18                  MS. WARREN:  Same objection, direct the

19      witness not to answer.

20          Q    I take it, sir, that you will follow

21      Ms. Warren's instructions not to answer questions

22      when she instructs you not to answer them?

23          A    Yes.

24          Q    Okay.

25                  MR. CASTANARES:  And I take it, counsel, I

82

1                          Boland

2    need make no further record of the fact that the

3    witness has refused to answer the question based upon

4    your instruction?

5                  MS. WARREN:  You need not.

6                  MR. CASTANARES:  Thank you.

7        Q    Do you have an opinion, sir, on whether

8    CSFB ever owed any duty of any kind to Oakwood?

9        A    I think CSFB had a responsibility to

10   deliver their products and services professionally.

11       Q    And when you say professionally, are you

12   referring to in accordance with the standard of care

13   that would be prevalent in the community of clients

14   and investment banks giving similar services?

15       A    Yes.

16       Q    What sources would we go to to find out

17   what that standard of care is?

18       A    I'm basing my opinion on my experience and

19   looking at what actions were conducted here.

20       Q    All right.  And I take it your opinion is

21   that -- strike that.

22            Is it your opinion that to the extent that

23   CSFB ever owed any duty of any kind to Oakwood it was

24   to act as a reasonable investment bank would act in

25   the performance of the duties it undertook to take?

                                                        83

1                          Boland

2      so --

3           Q     Yes, okay.   That's fair enough.

4                 (Pause.)

5           Q     Let me come back to that rather than go

6      through the report right now.

7                 Okay.   Tell me the precise nature of your

8      assignment in this case.

9                 MS. WARREN:   Objection, asked and

10     answered.

11                Go ahead.

12          A     I was asked by counsel to opine on, give

13     my opinion on Dr. Shapiro's two opinions in his

14     report.

15          Q     Okay.   Were you asked to perform any

16     independent investigation of your own as

17     distinguished from merely opining on Dr. Shapiro's

18     report?

19                MS. WARREN:   Objection to the form.

20          A     Could you explain what you're talking

21     about.   I don't understand that question.

22          Q     Yes.   If I understand your last answer

23     correctly --

24          A     Okay.

25          Q     -- you were asked to opine on whether

86

1                            Boland

2    Dr. Shapiro was correct in what he said; is that

3    right?

4          A       That's correct.

5          Q       Okay.  And I'm asking you whether or not,

6    in addition to simply opining on whether Shapiro was

7    right or wrong, you were asked to come to any

8    opinions of your own.

9          A       No.

10         Q       We talked in valuation techniques about a

11   discounted cash flow and market data techniques.

12                 Does the term "Black-Scholes,"

13   S-C-H-O-L-E-S, mean anything to you?

14         A       Yes.  It's a valuation model.

15         Q       And what does it study?

16         A       I'm not an expert in Black-Scholes.

17         Q       Okay.  Have you ever used it yourself?

18         A       No.

19         Q       So I take it you would have no opinion on

20   whether the Black-Scholes' technique would be

21   appropriate to look at Oakwood at any point in time?

22         A       I have no opinion.

23         Q       Okay.  Now, do you have any experience at

24   all on the subject of the duties of a fiduciary?

25                 MS. WARREN:  Objection.

87

```
 1                          Boland

 2              Direct the witness not to answer.

 3         Q    Have you ever been a fiduciary?

 4              MS. WARREN:  You can go ahead.

 5         A    Yes.

 6         Q    Okay.  And describe for me the

 7    circumstances under which you have been a fiduciary.

 8         A    As a director, a member of a board of

 9    directors.

10         Q    And how many such memberships have you

11    held?

12         A    Five.

13         Q    Okay.  And aside from being a member of a

14    board of directors, have you ever had any fiduciary

15    duties?

16         A    Yes.

17         Q    Describe, please.

18         A    As an investment banking restructuring

19    assignment, working for a board of directors.

20         Q    That is to say the investment bank that

21    you worked for had a fiduciary duty to the client?

22         A    Yes.

23         Q    And what was the nature of that fiduciary

24    duty?

25         A    To operate in their best interest.
```

88

1                          Boland

2          Q      Okay.  And did that fiduciary duty arise

3     because the investment bank that you worked for

4     received confidential information from the client?

5          A      No.

6          Q      What was the nature of your -- what was

7     your understanding of the reason that a fiduciary

8     duty had arisen between the investment bank and the

9     client in that particular instance?

10         A      We were -- we agreed to take on a

11    particular assignment and felt we had an obligation

12    to perform that assignment for our client to the best

13    we could.

14         Q      All right.  Was the assignment embodied in

15    a written contract?

16         A      Yes.

17         Q      Was the existence of the fiduciary duty

18    set forth in a written contract or was it the case

19    that the investment bank simply considered itself to

20    have a fiduciary duty, irrespective of whether or not

21    it was in a writing?

22                MS. WARREN:  I just want to just object

23    again that the witness isn't a lawyer, so you can

24    just testify to your understanding as a

25    businessperson.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1                           Boland

2          A      As a businessperson, I felt I had an

3    obligation to my client.

4          Q      Okay.   And in this particular instance, as

5    distinguished from the obligation of any other

6    businessperson to this client, you felt that that

7    rose to the level of a fiduciary relationship; is

8    that right?

9          A      Because of the existing of the contract,

10   yes.

11         Q      Was that because the contracts said in so

12   many words that the relationship was a fiduciary one?

13         A      It did not use those words in the

14   contract.

15         Q      So there was something about the

16   relationship set forth by the contract that in your

17   mind created a fiduciary duty to the client?

18         A      Yes.

19         Q      What was it about that relationship that

20   gave rise to the fiduciary duty?

21         A      It was a very detailed contract that

22   spelled out what our -- what was expected of us and

23   what we would deliver --

24         Q      Okay.

25         A      -- for the client.

90

1                              Boland

2         Q      And what was the basic nature of the

3    investment bank's role in that transaction?

4         A      To help the firm restructure their balance

5    sheet.

6         Q      Now, I recognize you're not a lawyer.  I'm

7    just asking presently what your experience is.

8                Had you ever been involved in any

9    restructuring transactions as of that time where you

10   hadn't believed that the nature of the investment

11   bank's duty had risen to the level of fiduciary duty?

12        A      Yes.

13        Q      What differentiated this particular

14   assignment from other ones where you didn't believe

15   there was a fiduciary duty?

16        A      A restructuring assignment can cover a

17   broad array of issues.  So I would say in most there

18   is not a fiduciary duty.

19                I think what distinguished this one was a

20   very specific contract.

21        Q      And what was the nature of that contract?

22        A      I just described it.

23        Q      It was restructuring?

24        A      Yes.

25        Q      Was it advising a company on a bankruptcy?

91

1                          Boland

2          A     Yes.

3          Q     Okay.  In your experience in investment

4    banking have you ever been involved in any other

5    relationship in which you believe that the investment

6    bank owed a fiduciary duty to its client?

7          A     No.

8          Q     And so other than -- other than the

9    transactions you've already described to me, are

10   there any others in which you have been a fiduciary?

11         A     Other than as a director, no.

12         Q     Okay.  And when you -- in situations in

13   which you believed you had a fiduciary duty, describe

14   for me what you understood that duty to consist of.

15         A     To operate in the best interests of

16   another party.

17         Q     Okay.  So did you understand that it

18   included a duty of loyalty, that is to say to put the

19   client's interests above your own?

20               MS. WARREN:  Objection.  The witness has

21   testified to his understanding, and this witness is

22   not a lawyer.

23               MR. CASTANARES:  Okay.

24         Q     So did --

25               MS. WARREN:  You can go ahead.

92

```
 1                          Boland
 2         Q     Did you understand that that was part of
 3    your duty?
 4         A     Yes.
 5         Q     Okay.  And did you understand that the
 6    duty of a fiduciary included not only that duty of
 7    loyalty but a duty of care toward the client?
 8         A     Yes.
 9         Q     And did you understand that duty of care
10    to be any different from the duty of care you had to
11    a client in any other sort of relationship other than
12    a fiduciary one?
13         A     Could you define "care."
14         Q     Let me go back a step.
15               What was your understanding of the nature
16    of the duty of care that you had as a fiduciary in
17    these various relationships in which you were a
18    fiduciary?
19         A     As I said, to operate in the best
20    interests of that party.
21         Q     Okay.  Did you understand that in order to
22    operate in the best interests of the party that your
23    duty might require you to inquire as to what the best
24    interests of the party were?
25               MS. WARREN:  Objection to the form.
```

93

1                           Boland

2          A      Not necessarily.

3          Q      Okay.  In order to operate -- was it your

4    understanding that in order to operate in the best

5    interests of the client you had to undertake some

6    investigation of what the client's best interests

7    were?

8                 MS. WARREN:  Objection to the form.

9          A      As I said, we had a very detailed contract

10   which detailed that understanding.

11         Q      Okay.  Now, in your understanding, when

12   the relationship between an investment bank and its

13   client does not rise to the level of a fiduciary

14   relationship does the Bank owe any duty of any kind

15   at all to its client?

16         A      As I indicated, they should deliver their

17   products and services professionally and as

18   contracted for.

19         Q      Okay.  Do you have an understanding of

20   whether that obligation as you just described it in

21   the nonfiduciary relationship is any different from

22   the fiduciary obligation that you have described to

23   operate in the client's best interests?

24         A      Could you explain that.  That sounds

25   somewhat broad.

94

1                          Boland

2        Q     Okay.   What I'm trying to determine is

3    whether you have any understanding of whether the

4    duty of the nonfiduciary, I think which you have

5    described as -- I wouldn't be able to repeat it

6    precisely -- but as carrying out one's duties

7    according to the contract is a different duty from

8    the fiduciary's duty that you have described, which

9    you describe as to operate in the client's best

10   interests.

11              MS. WARREN:  Objection to the form.

12       Q     Is there a difference in your mind between

13   those two things?

14              MS. WARREN:  Objection to the form.

15       A     Possibly, there could be.

16       Q     Could you give me the circumstances under

17   which there would or would not be?

18              MS. WARREN:  Objection to the form.   That

19   is awfully vague.

20       A     Yeah.   If I was making you a loan and

21   wanted to charge you 10 percent, it may be in your

22   best interest if I charge you 9 percent.

23       Q     Okay.   Do you have any other experience

24   with fiduciary relationships at all other than what

25   you've described to me of being on the board of

95

1                          Boland

2      directors and the one financial restructuring

3      transaction that you have described?

4          A       I believe as an employee of various

5      companies I had a fiduciary obligation to my

6      shareholders.

7          Q       Okay.  And was your understanding of that

8      fiduciary obligation similar to the one that you have

9      described before in that you understand it to mean an

10     obligation to act in the shareholders' best

11     interests?

12         A       Yes.

13         Q       Did you interview Mr. O'Driscoll in this

14     case?

15         A       I had a telephonic conversation with him,

16     yes.

17         Q       When did that occur?

18         A       Mid February of sometime.

19         Q       So about a month ago, as we sit here?

20         A       Yes.

21         Q       All right.  And was anybody else present

22     on that telephone call?

23         A       Yes.  Ms. Warren was on the telephone

24     call.

25         Q       Did this call occur because you had asked

```
 1                          Boland
 2    for it?
 3          A     Yes.
 4          Q     How long did the telephone call last?
 5          A     Thirty minutes.
 6          Q     Okay.  And were you seeking information
 7    from Mr. O'Driscoll?
 8          A     Clarification, yes.
 9          Q     Okay.  What did you ask him?
10          A     I asked him some organizational issues.
11    Some title issues.  Some clarifications about the
12    products.
13          Q     Okay.  When you say organizational issues,
14    were you asking him which particular CSFB entities
15    were involved in the relationship with Oakwood, and
16    how they related to one another?
17          A     Primarily, I was asking about where he was
18    domiciled, just confirming where he was in fixed
19    income, that type of thing.
20          Q     Did he tell you which particular
21    Credit Suisse entity he worked for?
22          A     I don't believe I asked him that.
23          Q     Did it matter to you in the rendition of
24    your opinion which one he worked for?
25          A     It -- in reviewing the documents, it was
```

97

```
 1                              Boland
 2     firm, Linklaters, before?
 3           A     No.
 4           Q     Or for the attorneys in this law firm?
 5           A     No.
 6           Q     Have you ever done any work for
 7     Credit Suisse before --
 8           A     No.
 9           Q     -- as an expert witness?
10           A     No.
11           Q     I noticed that in your resume you were
12     involved with FINOVA, F-I-N-O-V-A, all caps, at one
13     point or another; is that correct?
14           A     Still am.
15           Q     And were you involved in either of its
16     bankruptcies?
17           A     No.  Sorry.  I take that back.
18                 FINOVA was a client of Citigroup.
19                 The bankruptcy was handled in the workout
20     area of Citigroup, which reported to me.
21           Q     This was the first bankruptcy of FINOVA?
22           A     Was there more than one?
23           Q     Yes.  The one about 10 years ago, or so.
24           A     I was involved in the one in about 1999.
25           Q     Okay.  That's nine years ago.  Okay.
```

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1                              Boland

2              And are you aware of any subsequent

3      bankruptcy filing by FINOVA?  I gather the answer's

4      no?

5          A     It would be a surprise to me.

6          Q     Okay.  What is your current position with

7      FINOVA?

8          A     I'm a director.

9          Q     Okay.  You've read deposition testimony in

10     this case, correct?

11         A     I've read several depositions in this

12     case.

13         Q     Did you read them all the way through or

14     only certain portions of them?

15         A     I've read them all the way through.

16         Q     Okay.  Let me ask you hypothetically,

17     Mr. Boland, let's suppose that the Judge in this case

18     were to make a ruling that at all times Credit Suisse

19     owed a fiduciary duty to Oakwood.  Would that in any

20     way change the opinion that you've rendered?

21              MS. WARREN:  Object and direct the witness

22     not to answer.

23         Q     Let me ask you hypothetically, Mr. Boland,

24     to assume that the Judge made a ruling that at all

25     relevant times Oakwood was insolvent.  Would that in

                                                              219

```
 1                          Boland
 2    any way change the opinion that you have rendered?
 3         A    No.
 4         Q    Let me ask you to take a look at what has
 5    been marked as Exhibit 623, which consists of CSFB
 6    521153 through 58.  And I'll ask you if you can
 7    identify what this document is for me.
 8              (Marked for identification.)
 9         A    Initially, I did a summary of my review of
10    the board minutes of Oakwood.
11         Q    I take it this was intended at one point
12    or another for inclusion within your report?
13         A    As I was trying to determine what form the
14    report was going to take, and I was still requesting
15    additional information from counsel, I took the
16    opportunity to go through the board minutes because I
17    thought that would give me a good overview of what
18    was happening at Oakwood, and produce this document,
19    not sure what I was going to do with it, but I
20    thought it would be helpful to me to understand what
21    was going on.
22         Q    Okay.  Does the fact that the -- do you
23    see there's a "G" at the beginning of the document,
24    it indicates that it was intended to follow Section F
25    of some other document?
```

220

# EXHIBIT
# B

1        IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE DISTRICT OF DELAWARE   **CERTIFIED COPY**

3

4  IN RE:

5  OAKWOOD HOMES CORPORATION, ET AL.,)
                           )

6          DEBTORS,        )
                           )

7  ————————————————————————)
                           )
  OHC LIQUIDATION TRUST,     )No. 02-13396(PJW)

8                   )
           PLAINTIFF,   )VOLUME 2

9                   )PAGES 292 THROUGH 497
  VS.                   )

10                   )
  CREDIT SUISSE FIRST BOSTON, A  )

11  SWISS BANKING CORPORATION, CREDIT )
  SUISSE FIRST BOSTON LLC, A    )

12  DELAWARE LIMITED LIABILITY    )
  CORPORATION, CREDIT SUISSE FIRST )

13  BOSTON, INC., CREDIT SUISSE FIRST )
  BOSTON (USA), INC., A DELAWARE  )

14  CORPORATION AND A WHOLLY OWNED  )
  SUBSIDIARY OF CREDIT SUISSE FIRST )

15  BOSTON, INC., THE SUBSIDIARIES AND)
  AFFILIATES OF EACH, AND DOES 1   )

16  THROUGH 100,              )
                           )

17          DEFENDANTS.  )
  ————————————————————————)

18

19

20  VIDEOTAPED
  DEPOSITION OF:

21         JARED FELT
         FRIDAY, JUNE 16, 2006

22         LOS ANGELES, CALIFORNIA

23

24

25  REPORTED BY:
  FELIPE F. CARRILLO, CSR 9555

292


**LEGALINK**
A MERRILL COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

| | | |
|---|---|---|
| 11:31:11 | 1 | Q.   That fits the definition you just gave me of |
| 11:31:11 | 2 | positive noncommittal response? |
| 11:31:15 | 3 | A.   The way I would -- |
| 11:31:15 | 4 | MS. WARREN:  Objection to the form.  Let him |
| 11:31:19 | 5 | finish the question.  And, Tony, please don't cut him |
| 11:31:22 | 6 | off. |
| 11:31:22 | 7 | MR. CASTANARES:  I don't think I have.  I |
| 11:31:22 | 8 | think what actually happened was your objection got cut |
| 11:31:24 | 9 | off. |
| 11:31:26 | 10 | Did the reporter get the answer? |
| 11:31:27 | 11 | THE REPORTER:  No, I didn't, sir. |
| 11:31:27 | 12 | MR. CASTANARES:  I didn't either, so I'll |
| 11:31:29 | 13 | rephrase the question.  Allow me to state the question. |
| 11:31:32 | 14 | Allow your counsel to state her formal objection, and |
| 11:31:35 | 15 | then you can answer it. |
| 11:31:36 | 16 | BY MR. CASTANARES: |
| 11:31:37 | 17 | Q.   The response that you have just described that |
| 11:31:39 | 18 | Mr. O'Driscall gave to Oakwood as to why -- as to what |
| 11:31:45 | 19 | progress was being made on getting New York branch to |
| 11:31:48 | 20 | commit to a post-bankruptcy warehouse line, fit within |
| 11:31:55 | 21 | the definition you just gave of quote "positive non- |
| 11:32:04 | 22 | committal response," close quote, when you define that |
| 11:32:10 | 23 | term for me a few questions ago; correct? |
| 11:32:12 | 24 | MS. WARREN:  Objection to the form. |
| 11:32:15 | 25 | BY MR. CASTANARES: |

375

| | | |
|---|---|---|
| 11:32:16 | 1 | Q.  Please answer. |
| 11:32:16 | 2 | A.  Foothill was a third party to whom we had no |
| 11:32:21 | 3 | fiduciary duty.  We were trying to sell to them -- we |
| 11:32:27 | 4 | were trying to help the company sell to them a DIP |
| 11:32:30 | 5 | facility.  We had a fiduciary duty to Oakwood.  We were |
| 11:32:38 | 6 | very honest in our assessment of progress made in all |
| 11:32:42 | 7 | situations, including with respect to the loan purchase |
| 11:32:47 | 8 | facility. |
| 11:32:48 | 9 | Q.  Tell me, sir, in capsule form your formal |
| 11:32:54 | 10 | education since high school. |
| 11:32:55 | 11 | A.  Sure.  I graduated summa cum laude from Weaver |
| 11:33:04 | 12 | State College.  I graduated with an MBA from Stanford |
| 11:33:09 | 13 | University. |
| 11:33:09 | 14 | Q.  Okay.  What years did you get those two degrees, |
| 11:33:11 | 15 | please? |
| 11:33:12 | 16 | A.  I officially received my degree from Weaver State |
| 11:33:16 | 17 | College in 1990, I believe. |
| 11:33:19 | 18 | Q.  And the master's? |
| 11:33:21 | 19 | A.  In 1994. |
| 11:33:22 | 20 | Q.  Thank you.  Do you know whether Mr. O'Driscall |
| 11:33:32 | 21 | communicated the progress with New York branch on the |
| 11:33:36 | 22 | post-bankruptcy warehouse line to the company in writing |
| 11:33:39 | 23 | at any time? |
| 11:33:40 | 24 | A.  I don't know. |
| 11:33:43 | 25 | Q.  Okay.  Were you ever in contact with any of the |

376

| | | |
|---|---|---|
| 11:33:55 | 1 | New York branch people regarding the post-bankruptcy |
| 11:33:58 | 2 | warehouse line? |
| 11:33:58 | 3 | A.  Yes. |
| 11:33:59 | 4 | Q.  Whom did you contact there? |
| 11:34:02 | 5 | A.  After the company filed, I was asked to |
| 11:34:06 | 6 | participate in at least one credit meeting where it was |
| 11:34:14 | 7 | discussed. |
| 11:34:14 | 8 | Q.  When you say a "credit meeting," that's a meeting |
| 11:34:17 | 9 | of the credit managers or credit risk managers of New |
| 11:34:21 | 10 | York branch? |
| 11:34:21 | 11 | A.  Yes. |
| 11:34:22 | 12 | Q.  And about how long after the filing was that? |
| 11:34:24 | 13 | A.  Soon after.  I don't recall specific dates. |
| 11:34:28 | 14 | Q.  Okay.  What occurred at that meeting? |
| 11:34:31 | 15 | A.  There was discussion about whether or not the |
| 11:34:37 | 16 | company -- that New York branch should provide a loan |
| 11:34:40 | 17 | purchase facility.  There was discussion about the |
| 11:34:44 | 18 | credit -- the credit worthiness of that facility, and |
| 11:34:51 | 19 | the loans underlying the facility at the time. |
| 11:34:54 | 20 | There was a lot of discussion of needs for |
| 11:34:58 | 21 | capital elsewhere within the bank, and there was also a |
| 11:35:05 | 22 | strong focus on ascertaining or making sure that the -- |
| 11:35:13 | 23 | that OAC was considered by the court a bankruptcy-remote |
| 11:35:17 | 24 | entity and that there was a true sale opinion associated |
| 11:35:20 | 25 | with those loans. |

377

| 13:53:03 | 1 | Q. It either refreshes your memory, sir, or it does |
| 13:53:07 | 2 | not. |
| 13:53:07 | 3 | A. Sir, I haven't read it yet. |
| 13:53:09 | 4 | Q. Okay. |
| 13:53:11 | 5 | (Brief pause) |
| 13:53:39 | 6 | THE WITNESS: I believed at the time |
| 13:53:44 | 7 | management -- management had indicated to me that they |
| 13:53:48 | 8 | thought that having access to a loan purchase agreement, |
| 13:53:53 | 9 | purchase facility was important to obtaining a DIP. |
| 13:53:59 | 10 | BY MR. CASTANARES: |
| 13:54:00 | 11 | Q. So the statement on this page is incorrect? |
| 13:54:03 | 12 | A. Please let me finish. |
| 13:54:04 | 13 | Q. Okay. I'm sorry. I thought you were finished. |
| 13:54:09 | 14 | Excuse me. |
| 13:54:09 | 15 | A. When I mention there's a difference between |
| 13:54:11 | 16 | providing a DIP and providing access, we knew that it |
| 13:54:19 | 17 | was important. And things happened to get -- to |
| 13:54:21 | 18 | actually borrow under a DIP facility, we believed that |
| 13:54:25 | 19 | the company would need access to a loan purchase |
| 13:54:28 | 20 | facility, and we believed at the time that the company |
| 13:54:32 | 21 | would obtain one, and they ultimately did. |
| 13:54:35 | 22 | Q. Thank you, sir. Let me ask you to turn to page |
| 13:54:51 | 23 | 2704 of Exhibit 1. |
| 13:54:59 | 24 | A. (Complies). |
| 13:55:01 | 25 | Q. What was the purpose of providing a slimmed down |

LegaLink,   a Merrill Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

| | | |
|---|---|---|
| 13:55:09 | 1 | package to strategic investors compared to, apparently, |
| 13:55:15 | 2 | a larger package to financial investors or potential |
| 13:55:20 | 3 | financial investors? |
| 13:55:21 | 4 | A.  It is my recollection that there was -- |
| 13:55:29 | 5 | management had concerns about confidentiality associated |
| 13:55:32 | 6 | with the information in the larger package and wanted to |
| 13:55:36 | 7 | ascertain interest before providing that information. |
| 13:55:40 | 8 | This was extremely sensitive competitive information. |
| 13:55:44 | 9 | Q.  Did CSFB ever give the more ample package to any |
| 13:55:57 | 10 | potential strategic investor? |
| 13:56:00 | 11 | A.  I don't recall. |
| 13:56:01 | 12 | Q.  You didn't anticipate, though, that the potential |
| 13:56:07 | 13 | strategic investor would be able to reach a decision as |
| 13:56:11 | 14 | to whether to acquire Oakwood without having the more |
| 13:56:14 | 15 | ample package, did you? |
| 13:56:15 | 16 | A.  We would have ultimately provided a larger |
| 13:56:21 | 17 | package. |
| 13:56:56 | 18 | MR. CASTANARES:  I'm going to have the |
| 13:56:58 | 19 | reporter mark as next in order 31, OHCLT 24046 through |
| 13:57:11 | 20 | 24115. |
| 13:57:11 | 21 | (THE DOCUMENT WAS MARKED PLAINTIFF'S |
| 13:57:16 | 22 | EXHIBIT 31 FOR IDENTIFICATION.) |
| 13:57:16 | 23 | THE WITNESS:  Before we move on, can I make |
| 13:57:18 | 24 | one clarification? |
| 13:57:18 | 25 | BY MR. CASTANERAS: |

411

| 13:57:20 | 1 | Q. Certainly. |

13:57:20    2    A. Of something I said earlier. Earlier today I

13:57:23    3    used a legal buzz word or term, "fiduciary duty," that I

13:57:28    4    don't fully understand as just shorthand for we wanted

13:57:35    5    to do the right thing by our client.

13:57:37    6    Q. Was it entirely your own idea to make this

13:57:45    7    clarification?

13:57:45    8    A. Excuse me.

13:57:45    9    Q. Did this idea to clarify that prior testimony

13:57:47    10    come to you spontaneously or did it come to you in

13:57:50    11    discussion with anybody else?

13:57:51    12         MS. WARREN: If you are asking whether this

13:57:55    13    was -- this correction was discussed with counsel, the

13:57:58    14    answer is yes, and that is all the inquiry I'll allow on

13:58:02    15    that.

13:58:02    16         MR. CASTANARES: I'm sorry. I didn't hear

13:58:03    17    the last thing you said.

13:58:05    18         MS. WARREN: That's all the inquiry I will

13:58:07    19    allow on that topic.

13:58:08    20         MR. CASTANARES: I'll make my record. If

13:58:10    21    you want to instruct him not to answer, you may

13:58:12    22    certainly to do so.

13:58:15    23    Q. Was it originally your idea, sir, that you make

13:58:17    24    this correction to your testimony?

13:58:18    25    A. Yes.

412

| 13:58:20 | 1 | Q. Okay. And before doing so, did you discuss it |
| 13:58:25 | 2 | with someone else? |
| 13:58:26 | 3 | MS. WARREN: And I am going to direct the |
| 13:58:29 | 4 | witness not to answer. |
| 13:58:35 | 5 | MR. CASTANARES: Okay. |
| 13:58:36 | 6 | Q. In discussions with anybody else, did you come to |
| 13:58:39 | 7 | a conclusion as to what you would say on this subject? |
| 13:58:41 | 8 | MS. WARREN: Object and direct the witness |
| 13:58:43 | 9 | not to answer. |
| 13:58:44 | 10 | MR. CASTANARES: Okay. |
| 13:58:45 | 11 | Q. Was anything suggested to you by anyone else as |
| 13:58:51 | 12 | to what you would say in the course of this correction? |
| 13:58:53 | 13 | MS. WARREN: Object and direct the witness |
| 13:58:55 | 14 | not to answer. |
| 13:58:56 | 15 | MR. CASTANARES: Counsel, I don't have the |
| 13:58:58 | 16 | least expectation that you will withdraw that |
| 13:59:00 | 17 | instruction. I would like to ask you, however, to |
| 13:59:03 | 18 | consider the fact that the question as phrased asks the |
| 13:59:08 | 19 | witness to tell me whether he was told something to |
| 13:59:13 | 20 | place on the record of this deposition, which by its |
| 13:59:17 | 21 | very nature cannot possibly be intended to be |
| 13:59:20 | 22 | confidential. |
| 13:59:21 | 23 | I, therefore, would request that you withdraw the |
| 13:59:23 | 24 | instruction and allow the witness to answer the |
| 13:59:25 | 25 | question. |

413

| | | |
|---|---|---|
| 13:59:25 | 1 | MS. WARREN:  And that is not going to |
| 13:59:27 | 2 | happen. |
| 13:59:28 | 3 | MR. CASTANARES:  Okay. |
| 13:59:32 | 4 | Q.  In the course of the discussions which took place |
| 13:59:35 | 5 | regarding -- |
| 13:59:37 | 6 | A.  Excuse me.  May I confer with counsel? |
| 13:59:40 | 7 | Q.  Certainly.  If you think it will be long, we'll |
| 13:59:46 | 8 | go on the record.  If you think -- |
| 13:59:49 | 9 | A.  It will be short. |
| 14:00:12 | 10 | (Brief pause) |
| 14:01:54 | 11 | MR. CASTANARES:  I have counsel's agreement |
| 14:01:55 | 12 | to go off the record. |
| 14:01:57 | 13 | THE VIDEOGRAPHER:  Okay.  We're going off |
| 14:01:58 | 14 | the record, and the time is 14:01.  We're off the |
| 14:02:03 | 15 | record. |
| 14:04:00 | 16 | (Brief pause) |
| 14:04:59 | 17 | THE VIDEOGRAPHER:  We're back on the record, |
| 14:06:35 | 18 | and the time is 14:06. |
| 14:06:35 | 19 | BY MR. CASTANARES: |
| 14:06:39 | 20 | Q.  Mr. Felt while we were off the record the |
| 14:06:40 | 21 | reporter marked as Exhibit 32, 41246 and 7? |
| 14:06:40 | 22 | (THE DOCUMENT WAS MARKED PLAINTIFF'S |
| 14:07:04 | 23 | EXHIBIT 32 FOR IDENTIFICATION.) |
| 14:07:04 | 24 | BY MR. CASTANARES: |
| 14:07:04 | 25 | Q.  I wouldn't be surprised if there were a number of |

414

| 14:07:06 | 1 | calls on the 14th of November. Can you tell me what |
| 14:07:14 | 2 | this particular one refers to? |
| 14:07:16 | 3 | A. Based on what's written, a 2:00 p.m. board call. |
| 14:07:21 | 4 | Q. Okay. All right. I saw that, too, but I was |
| 14:07:29 | 5 | sort of mystified by the 7:10 p.m. time signature, and |
| 14:07:34 | 6 | perhaps it's explained by what your counsel said |
| 14:07:37 | 7 | yesterday, which was that it's Greenwich Mean Time. |
| 14:07:40 | 8 | A. If this were Greenwich Mean Time, that would be |
| 14:07:45 | 9 | 2:10 p.m. |
| 14:07:46 | 10 | Q. All right. And do you recall anything about -- |
| 14:07:50 | 11 | were you on the board call? |
| 14:07:52 | 12 | A. I don't recall. |
| 14:07:53 | 13 | Q. Okay. In the contacts that you had made with |
| 14:08:23 | 14 | either financial or strategic buyers shortly before the |
| 14:08:28 | 15 | filing of the bankruptcy, had you informed them that the |
| 14:08:31 | 16 | company was about to file bankruptcy? |
| 14:08:33 | 17 | A. No. |
| 14:08:34 | 18 | Q. And was Centex, C-E-N-T-E-X, a company that was |
| 14:08:54 | 19 | contacted by CSFB in that connection? |
| 14:08:56 | 20 | A. I believe it was. |
| 14:08:57 | 21 | Q. And was that a strategic or a financial buyer? |
| 14:09:02 | 22 | A. Strategic. |
| 14:09:11 | 23 | MR. CASTANERAS: All right. As Exhibit 33, |
| 14:09:23 | 24 | I'll ask the reporter to mark 41242. |
| 14:09:23 | 25 | (THE DOCUMENT WAS MARKED PLAINTIFF'S |

415

1

2                                    * * *

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Jared Felt, do hereby acknowledge

5        that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14     ___Nov 15, 2006___                _____

15        (DATE)                          (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

| 1 | | | ERRATA SHEET |
|---|---|---|---|
| 2 | PAGE | LINE | CHANGE CORRECTION (REASON) |
| 3 | 298 | 17 | "16th department" to "Fixed Income Department" (incorrect) |
| 4 | 323 | 10 | "It may have been a" to "It may have been" (incorrect) |
| 5 | 327 | 16 | "Bane" to "Bain" (incorrect) |
| 6 | 327 | 19 | "leverage to buy out" to " leveraged buyout" (incorrect) |
| 7 | 327 | 24 | "Bane" to "Bain" (incorrect) |
| 8 | 327 | 25 | "Bane" to "Bain" (incorrect) |
| 9 | 328 | 10 | "Bane" to "Bain" (incorrect) |
| 10 | 344 | 23 | "The color" to "Color" (incorrect) |
| 11 | 345 | 11 | "our" to "any" (incorrect) |
| 12 | 363 | 21 | "Felt" to "felt" (lower case) |
| 13 | 364 | 22 | "Felt" to "felt" (lower case) |
| 14 | 376 | 11 | "Weaver" to "Weber" (incorrect) |
| 15 | 376 | 16 | "Weaver" to "Weber" (incorrect) |
| 16 | 395 | 8 | "in" to "and" (incorrect) |
| 17 | 405 | 11 | "Felt" to "felt" (lower case) |
| 18 | 408 | 11 | "believe" to "believed" (incorrect) |
| 19 | 412 | 4 | "understand" to "understand," (omitted coma) |
| 20 | 423 | 13 | "Felt" to "felt" (lower case) |
| 21 | 427 | 25 | "didn't to be" to "didn't want to be" (omitted word) |
| 22 | 446 | 21 | "spectrum" to "Spectrum" (capitalize) |
| 23 | 453 | 18 | "GAP" to "GAAP" |
| 24 | 482 | 7 | "talk" to "talked" (incorrect) |
| 25 | 489 | 3 | "economic basis" to "economics based" (incorrect) |

| | PAGE | LINE | CHANGE CORRECTION |
|---|---|---|---|
| 1 | | | ERRATA SHEET |
| 2 | PAGE | LINE | CHANGE CORRECTION |
| 3 | 490 | 11 | "concepts" to "consents" (incorrect) |
| 4 | 491 | 5 | "Tyco" to "Taiko" (incorrect) |
| 5 | 491 | 7 | "Donaldson" to "Donaldson," (omitted coma) |
| 6 | 491 | 8 | "Lefton and Generat" to "Lufkin and Jenrette" (incorrect) |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

# EXHIBIT

# C

| | |
|---|---|
| **From:** | Landon, Peter |
| **Sent:** | Monday, August 19, 2002 9:38 PM |
| **To:** | May, Beth; O'Driscoll, Fiachra; Antill, Egan; Kurganska, Alysa; Schachter, Mark |
| **Cc:** | Felt, Jared; Wales, Dod |
| **Subject:** | Oakwood Has Signed the Letter |



fax1.tif (506 KB)

All,

Attached is the signed copy of the engagement letter from Oakwood.

Cheers,
Peter


-----Original Message-----
From: FaxSr SNYC14721 [FAX:FaxSr SNYC14721]
Sent: Monday, August 19, 2002 5:25 PM
To: Landon, Peter
Subject: You have just received a new inbound Fax at 08/19/02 05:24:40 PM


You have just received a new inbound
fax containing a total of 15 pages.
Your fax was received at 08/19/02 05:24:40 PM.

Your entry number in Fax Sr. was 0.22.1584

1



**EXHIBIT**
6/15/06  7

CSFB-00013644

P. O. Box 27081, Greensboro, NC  27425-7081
7800 McCloud Rd., Greensboro, NC  24709
Phone: (336) 664-2400
Fax: (336) 664-3224



**OAKWOOD HOMES CORPORATION**

# Fax

| | | | |
|---|---|---|---|
| **To:** *Peter London* | **From:** *Muir* |
| **Fax:** *212 448-3677* | **Pages:** *1 + 14* |
| **Phone:** | **Date:** *8/5/02* |
| **Re:** | **CC:** |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

● Comments:

Any questions regarding this fax, please contact 336-664-*260*.

CSFB-00013645

AUG. 19. 2002  5:15PM    3366643224 SSE FIRST BOSTON          NO. 7773   P. 2/15

**CREDIT SUISSE** | **FIRST BOSTON**

CREDIT SUISSE FIRST BOSTON

Eleven Madison Avenue
New York, NY 10010-3629          Telephone   212 325 3000

August 19, 2002

Oakwood Homes Corporation
7800 McCloud Road
Greensboro, NC 27409

Attention:    Robert A. Smith
              Executive Vice President

Gentlemen:

   This letter agreement (the "Agreement") will confirm the understanding between Oakwood Homes Corporation, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc. and HBOS Manufacturing, LP (collectively, the "Company") and Credit Suisse First Boston Corporation ("CSFB") pursuant to which the Company has retained CSFB to render financial advisory services to the Company, on the terms and subject to the conditions set forth herein, in connection with (i) the sale, merger, consolidation or any other business combination, in one or a series of transactions involving all or a portion of the business, securities or assets of the Company, other than sales in the ordinary course of business and disposition of surplus assets consistent with the Company's past practice (a "Sale Transaction") and/or (ii) any complete or partial recapitalization, restructuring and/or refinancing of the Company including (in one or a series of transactions) each offer to holders of one or more classes of Old Securities to purchase or acquire (whether by tender offer, exchange offer, open market purchase, private purchase or otherwise) Old Securities, and/or any solicitation by the Company and/or any Related Entity with respect to any Old Securities, (including but not limited to, each offer or solicitation involving issuance of New Securities (as defined in paragraph 7 hereof) and/or the payment of other consideration (including cash) to holders of Old Securities in exchange for, in consideration of, or as the purchase price of: (x) any or all of the Old Securities, (y) consents or waivers with respect to any or all of the Old Securities or (z) any combination of the foregoing and any amendment or modification to any of the foregoing (a "Restructuring Transaction"). A consent or waiver under, or an amendment to, the Foothill Credit Facility (in any such case that does not affect any payment or collateral arrangements under the Foothill Credit Facility and that is not effected as part of a broader Restructuring Transaction affecting other Old Securities), to conform to changed circumstances or revised forecasts shall not constitute a Restructuring Transaction. The Sale Transaction and the Restructuring Transaction are hereinafter collectively referred to as the "Transactions".

1.   Certain Definitions.  For the purposes of this Agreement, all defined references shall have the meanings as set forth herein.

2.   Retention.  The Company hereby retains CSFB as its exclusive financial advisor, and CSFB agrees to act as exclusive financial advisor to the Company, in connection with the Transactions. Subject to the terms and conditions of this Agreement, CSFB proposes to undertake certain services on behalf of the Company as its exclusive financial advisor until the Termination Date, including, as requested by the Company:

     (a)   assist the Company in its evaluation of certain strategic alternatives, their feasibility and possible means of execution;

     (b)   with respect to a Sale Transaction:

[00089994_v 2] Oakwood Homes.doc

CSFB-00013646

Oakwood Homes Corporation
Page 2

August 19 , 2002

(i)    assist in preparing materials describing the Company or certain of the Company's assets, its operations, its historical financial results and future prospects to be provided to selected qualified acquirors acceptable to the Company ("Potential Acquirors");

(ii)    identify and contact Potential Acquirors;

(iii)    arrange for Potential Acquirors and holders of the Old Securities to conduct reasonable business investigations into the Company or certain of the Company's assets;

(iv)    if requested and subject to further mutual agreement of the parties, render an opinion as to the fairness from a financial point of view to the Company or its stockholders of the consideration to be received in the proposed Sale Transaction (a "Fairness Opinion"). If we are requested to render an opinion, the nature and scope of our analysis as well as the form and substance of our opinion shall be such as we deem appropriate. If requested by you, our opinion shall be delivered in writing;

(c)    and with respect to a Restructuring Transaction:

(i)    advise the Company with respect to the terms and timing of any Restructuring Transaction, provided, however, that the Company shall retain its own legal counsel and accountants for legal and tax advice;

(ii)    assist the Company in preparing Offer Documents (as defined below) to the extent that such documents relate to the terms of a Restructuring Transaction; and

(iii)    except in connection with a Section 3(a)(9) Offer (as defined in paragraph 4(e) below), and to the extent otherwise permitted by applicable law, assist the Company in soliciting tenders and consents in connection with any Restructuring Transaction.

3.      Further Agreements. CSFB shall have the right, but not the obligation, to the extent the Company requests anyone to be dealer manager in connection with a Restructuring Transaction on or prior to the Termination Date and to the extent permitted by applicable law, to act as dealer manager with respect to any Restructuring Transaction commenced on or prior to the Termination Date; provided, however, that the Company shall, on or prior to the commencement of any Restructuring Transaction, execute and deliver a dealer manager agreement containing terms and conditions customary for such agreements entered into by CSFB, the terms of which shall be reasonably satisfactory to CSFB and its counsel and to the Company and its counsel.

In connection with the entry of an order for relief concerning a case by or against the Company pursuant to Title 11 of the United State Code, if requested by CSFB, the Company shall use its best efforts to obtain the entry of an order by such court approving of the retention of CSFB as exclusive financial advisor to the Company on terms substantially similar to those set forth in this Agreement and reasonably acceptable to CSFB and to the Company. In addition, immediately prior to the entry of an order for relief concerning a case by the Company pursuant

100089998 v 2] Oakwood Homes.doc

CSFB-00013647

AUG. 19. 2002 5:16PM    3366643224SSE FIRST BOSTON          NO. 7773  P. 4/15

Oakwood Homes Corporation
Page 3

August 19 , 2002

to Title 11 of the Unites States Code, the Company shall pay to CSFB (or cause CSFB to be paid), in cash, all amounts earned or incurred but unpaid to CSFB pursuant to this Agreement.

In addition, CSFB shall have the right, but not the obligation, to act as exclusive placement agent for the Company in connection with any sale of its securities. In the event any such sale of securities is to be effected pursuant to an underwritten offering, the issuer of such securities and CSFB will enter into a customary underwriting agreement acceptable to CSFB and its counsel and to the Company and its counsel, which together with this Agreement shall govern the terms of such sale. In the event any such sale of securities is to be pursuant to a non-underwritten offering, the issuer of such securities and CSFB will enter into a customary placement agent agreement acceptable to CSFB and its counsel and to the Company and its counsel, which together with this Agreement shall govern the terms of such sale.

Notwithstanding any other provision contained herein, this Agreement does not constitute any agreement, express or implied, on the part of CSFB or any commitment by CSFB to underwrite, purchase, place, or cause the placement of any securities or indebtedness. Any such commitment by CSFB shall be at CSFB's option and would, in each case, be subject to, among other things, the satisfactory completion by CSFB of an appropriate due diligence investigation of the Company and the execution and delivery by CSFB and the issuer of the securities of a customary agreement acceptable to CSFB and its counsel.

4.  Compensation. As compensation for services rendered and to be rendered hereunder by CSFB, the Company agrees, subject to the provisions of paragraph 5 hereof, to pay CSFB non-refundable fees as follows:

   (a)  a monthly non-refundable cash fee of $150,000 payable in advance on August 19, 2002 and thereafter on the first business day of each month prior to the Termination Date; provided, however, that no additional monthly fee shall be paid pursuant to this paragraph after the payment of the transaction fee referred to in paragraph 4(b) below; provided further, the Company may credit any of the fees paid (except to the extent previously credited) under paragraph 4(a) hereof against the aggregate amount of fees that become payable pursuant to paragraphs 4(b) or 4(c);

   (b)  in connection with a Sale Transaction commenced on or prior to the Termination Date, a non-refundable success fee, payable upon closing thereof, of 1.00% of the Aggregate Value (the "Sale Transaction Fee"); provided however, if the proceeds from the Sale Transaction are expressly used to effectuate a Restructuring Transaction, in this case the Company may credit any of the fees paid under paragraph 4(b) hereof against the aggregate amount of fees that become payable pursuant to this paragraph 4(c);

   (c)  in connection with a Restructuring Transaction commenced on or prior to the Termination Date, a non-refundable cash transaction fee (the "Restructuring Transaction Fee"), payable upon closing thereof, equal to 1.00% of the total of (i) the face amount (for purposes of this Agreement, the term "face amount" means principal amount in the case of debt obligations) of the Old Securities, (ii) 1/3 (one-third) of the face amount of the Securitization Guarantees and (iii) 1/3 (one-third) of the face amount of the Floor Plan Guarantees that the Company or any Related Entity offers to amend, modify, purchase, exchange or otherwise acquire in such Restructuring Transaction; provided

CSFB-00013648

AUG. 19. 2002  5:17PM    3366643224 SSE FIRST BOSTON                    NO. 7773  P. 5/15

Oakwood Homes Corporation
Page 4

August 19 , 2002

however, that 25% of the Restructuring Transaction Fee (calculated assuming all Old Securities, Securitization Guarantees and Floor Plan Guarantees are subject to such Restructuring Transaction) pursuant to this paragraph 4(c) hereof will be due and payable when CSFB, at the direction of the Company or the Company's Board of Directors, first approaches any of the holders of the Company's Old Securities in connection with a possible Restructuring Transaction (the "Phase One Restructuring Transaction Fee").

(d)  in connection with a Fairness Opinion, a non-refundable cash transaction fee (the "Fairness Opinion Fee") of $1,000,000 payable at the time CSFB notifies the Company that it is prepared to deliver the Fairness Opinion, irrespective of the conclusion reached therein; provided however, the Company may credit any of the fees paid under paragraph 4(d) hereof against the aggregate amount of fees that become payable pursuant to paragraph 4(b);

(e)  in connection with any Restructuring Transaction described in paragraph 4(c) hereof that is intended to be effected, in whole or in part, as all or a portion of a prepackaged, partial prepackaged or prearranged plan of reorganization anticipated to involve the solicitation of consents, waivers, acceptances, authorizations or approvals of such plan in compliance with the bankruptcy laws of any jurisdiction, by or on behalf of the Company, from holders of any class of the Company's securities or indebtedness (a "Plan"), (1) 25% of the Restructuring Transaction Fee (calculated assuming all Old Securities, Securitization Guarantees and Floor Plan Guarantees are subject to such Restructuring Transaction) will be due and payable when CSFB, at the direction of the Company or the Company's Board of Directors, first approaches any of the holders of the Company's Old Securities in connection with a possible Restructuring Transaction (also, the "Phase One Restructuring Transaction Fee"), (2) 50% of the Restructuring Transaction Fee (the "Phase Two Restructuring Transaction Fee") shall be payable upon (i) receipt of votes from the Company's creditors necessary to confirm a Plan, the terms of which are acceptable to the Board of Directors of the Company or (ii) obtaining indications of support from the Company's creditors, which in the good faith judgement of the Board of Directors of the Company are sufficient to justify filing a Plan upon acceptable terms, and the balance of the Restructuring Transaction Fee (the "Final Restructuring Transaction Fee") upon consummation of the Restructuring Transaction; provided that the Company may credit seventy-five percent (75%) of the payments made under paragraph 4(a) hereof first against the Phase Two Restructuring Transaction Fee and thereafter, if applicable, the remainder against the Final Restructuring Transaction Fee;

(f)  in connection with any Restructuring Transaction described in paragraph 4(c) hereof that is intended to comply with the requirements of Section 3(a)(9) (a "Section 3(a)(9) Offer") of the Securities Act of 1933, as amended (the "Securities Act"), CSFB's Restructuring Transaction Fee shall be earned immediately prior to the Company's mailing, delivering, or otherwise disseminating the Offer Documents and shall not be contingent upon the consummation of or results of such Section 3(a)(9) Offer or any other event. In the case of a Section 3(a)(9) Offer, the Company shall pay the Restructuring Transaction Fee immediately upon the first mailing, delivery, or other dissemination of any Offer Documents to any holder in connection with a Section 3(a)(9)

100042999 v21 Oakwood Homes.doc

CSFB-00013649

Oakwood Homes Corporation
Page 5

August 19 , 2002

Offer; *provided, however*, that the Company may credit any payments under paragraph 4(a) hereof, to the extent paid, against the Restructuring Transaction Fee;

(g)   in addition to the compensation to be paid to CSFB as provided above, and without regard to whether any Sale Transaction or Restructuring Transaction is consummated, the Company shall pay to, or on behalf of CSFB, promptly as billed, all reasonable out-of-pocket expenses (including all reasonable fees and expenses of CSFB's counsel) incurred by CSFB in connection with its services to be rendered hereunder.

5.   Termination or Resignation. Subject to paragraph 11 hereof, if CSFB resigns or the Company terminates CSFB's services for any reason, CSFB and its counsel shall be entitled to receive all of the amounts earned and payable pursuant to paragraph 4 hereof, up to and including the Termination Date; *provided, however*, that if the Company terminates CSFB's services or CSFB resigns due to a disagreement over the terms of any Transaction and (i) the Company thereafter proceeds with any Restructuring Transaction within twelve months from the Termination Date, on terms and conditions similar to those proposed by CSFB prior to the Termination Date or (ii) at any time prior to the expiration of twelve months after any such termination the Company consummates, or enters into an agreement providing for, a Sale Transaction, CSFB shall also be entitled to receive all of the compensation provided for in paragraph 4 hereof as if CSFB had been the financial advisor in connection therewith as though this Agreement had not been terminated.

6.   Indemnity. As CSFB will be acting on behalf of the Company, the Company agrees to indemnify CSFB as set forth in Schedule I hereto, which is incorporated herein and made a part hereof.

7.   Representations and Warranties of Company. The Company represents and warrants to CSFB that at the commencement, throughout the continuance, and at the consummation of each Restructuring Transaction:

(a)   each of the Offer Documents will comply in all material respects with the Securities Act, the Securities Act of 1934, as amended (the "Exchange Act"), and the Trust Indenture Act of 1939, as amended (the "TIA" and collectively with the Securities Act and the Exchange Act, the "Acts"), as such Acts may be applicable, and in each case the applicable rules and regulations of the Securities and Exchange Commission (the "Commission" or "SEC") thereunder, and with all material applicable rules or regulations of any governmental or regulatory authority or body, including applicable Blue Sky or similar securities laws or statutes, and no consent or approval of, or filing with, any governmental or regulatory authority or body is required in connection with the commencement or consummation of any such transaction, other than those consents or approvals which will have been obtained or any filing which will have been made prior to the consummation of each such transaction and other than notice filings which may be made after the consummation of such transaction without any adverse effect upon the Company;

(b)   none of the Offer Documents and no other report, filing, document, release or communication published or filed by or on behalf of the Company in connection with any of such transactions will contain any untrue statement of a material fact or omit to

CSFB-00013650

Oakwood Homes Corporation
Page 6

August 19, 2002

state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(c)     any new securities offered in consideration of any Old Securities ("New Securities") that are debt instruments (the "New Debt Securities"), if any, and the indentures pertaining to the New Debt Securities and any supplemental indentures pertaining to any amendments to the Old Securities (together, the "Indentures") will be duly authorized by the Company, and when the Indentures are duly executed in accordance with such authorization and when the New Securities are issued, the Indentures and the New Debt Securities will be the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and each of the New Securities and the Indentures, if any, will conform to the description thereof in the Offer Documents in all material respects;

(d)     the New Securities that are capital stock, if any, will be duly authorized by the Company and, when issued, will be validly issued, fully paid and non-assessable;

(e)     the New Debt Securities, if any, and the Indentures, if any, will comply in all material respects with the TIA;

(f)     the issuance of the New Securities and the consummation of the transactions contemplated by the Offer Documents will not result in a breach of any of the terms or provisions of, or constitute a default or cause an acceleration of any obligation under, the Company's charter or bylaws or any material bond, note, debenture or other evidence of indebtedness or any material indenture, mortgage, deed of trust or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of them is bound, or any order of any court or governmental agency or authority entered in any proceeding to which the Company or any of its subsidiaries was or is a party or by which it or any of them is bound, except as could not, singly or in the aggregate, have a material adverse effect on the properties, business, results of operations or condition (financial or otherwise) of the Company, taken as a whole;

(g)     this Agreement will be duly authorized and validly executed and delivered by the Company and will constitute a legal, valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law) and except as rights to indemnification and contribution under this Agreement may be limited by applicable law; and

(h)     in connection with any Restructuring Transaction purported by the Company to be made pursuant to a Section 3(a)(9) Offer, the Company has not paid any commission or other remuneration, directly or indirectly, for soliciting or recommending such Section 3(a)(9) Offer to any soliciting broker, dealer, salesman, agent, employee or director of the

CSFB-00013651

AUG. 19. 2002  5:18PM    3366643224 SSE FIRST BOSTON                    NO. 7773    P. 8/15

Oakwood Homes Corporation
Page 7

August 19, 2002

Company, or any other person involved in any way on behalf of the Company in conflict with such Section 3(a)(9) of the Securities Act.

8.   Further Covenants of the Company. The Company agrees as follows:

(a)   the Company agrees that any reference to CSFB or any affiliate of CSFB in any Offer Document, or any other release or communication to any party outside the Company, is subject to CSFB's prior approval in writing. If CSFB resigns or is terminated prior to the dissemination of any Offer Document or any other release or communication, no reference shall be made therein to CSFB without CSFB's prior written permission; and

(b)   in connection with CSFB's activities hereunder, the Company agrees to furnish CSFB with all information concerning the Company that the CSFB reasonably deems appropriate and agrees to provide CSFB with accountants, counsel, consultants and other appropriate agents and representatives. The Company acknowledges that CSFB may rely upon the completeness and accuracy of information and data furnished to it by the Company's officers, directors, employees, agents and representatives without an independent verification of such information and data or an appraisal of the Company's assets.

9.   Opinions of Counsel. Prior to the commencement and at the closing of each Restructuring Transaction, the Company's outside counsel shall deliver to CSFB an opinion or opinions reasonably satisfactory to CSFB and its counsel. Without limitation, such counsel shall state that such counsel has participated in conferences with officers and representatives of the Company and representatives of the independent accountants of the Company at which such transaction and related matters were discussed and the Offer Documents were prepared, and that, subject to the limitations inherent in the nature of factual inquiry, nothing has come to the attention of such counsel to cause it to believe that any of the Offer Documents, as of their respective dates, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except that no belief need be expressed with respect to the financial information contained in any of the Offer Documents). The Company's counsel shall also deliver such other opinions covering matters incidental to each Restructuring Transaction as CSFB and its counsel may reasonably request.

10.   Confidentiality. Except to the extent authorized by the Company or required by any Federal or state law, rule or regulation or any decision or order of any court or regulatory authority, CSFB agrees that it will refrain from disclosing to any person, other than to holders of the Old Securities and their affiliates, representatives and agents, and any agents, attorneys, accountants, employees, officers, and directors of CSFB who need to know the information in connection with CSFB's engagement hereunder, any confidential information which has not become public (other than through disclosure in violation of this paragraph 10 hereof), about the Company received by CSFB from the Company or its agents, attorneys or accountants in connection with the services rendered hereunder (the "Confidential Information"). In addition, CSFB has policies and procedures, including a Chinese Wall, designed to prevent the misuse of non-public information received hereunder.

100085994.v.2] Oakwood Homes.doc

CSFB-00013652

AUG. 19. 2002  5:18PM    3366643224SSE FIRST BOSTON                    NO. 7773 ─ P. 9/15

Oakwood Homes Corporation
Page 8

August 19 , 2002

11.   **Survival of Certain Provisions.**  The compensation and expense reimbursement provisions contained in paragraph 4 hereof, the termination provisions contained in paragraph 5 hereof, this paragraph 11 hereof, the indemnity and contribution agreements contained in paragraph 6 hereof and Schedule I of this Agreement and the representations and warranties of the Company contained in paragraph 7 hereof shall remain operative and in full force and effect regardless of (a) any investigation made by or on behalf of CSFB or by or on behalf of any affiliate of CSFB, any Indemnified Person, or any person controlling any of them, (b) consummation of any Restructuring Transaction, or (c) any termination or expiration of this Agreement, and shall be binding upon, and shall inure to the benefit of, any successors, assigns, heirs and personal representatives of the Company, CSFB, the Indemnified Persons and any such person.

12.   **Notices.** Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered to the Company at Oakwood Homes Corporation, 7800 McCloud Road, Greensboro, NC 27409, Attention: Robert A. Smith and to CSFB at 11 Madison Avenue, New York, NY 10010, Attention: Beth Barish May.

13.   **Construction.**  This Agreement incorporates the entire understanding of the parties and supersedes all previous agreements and shall be governed by, and construed in accordance with, the laws of the State of New York as applied to contracts made and performed in such State, without regard to principles of conflict of laws.

14.   **Severability.**  Any determination that any provision of this Agreement may be, or is, unenforceable shall not affect the enforceability of the remainder of this Agreement.

15.   **Headings.**  The paragraph headings in this Agreement have been inserted as a matter of convenience for reference and are not an effective part of this Agreement.

16.   **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

17.   **Third-Party Beneficiaries.**  This Agreement has been and is made solely for the benefit of the Company, CSFB and the other Indemnified Persons referred to in paragraph 5 hereof and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

18.   **Succession.** This Agreement shall be binding upon and inure to the benefit of the Company, CSFB, the Indemnified Persons and their respective successors, assigns, heirs and personal representatives.

19.   **Advertisements.** The Company agrees that CSFB shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing their services to the Company hereunder; provided, that (i) CSFB shall have submitted a copy of any such proposed advertisement to the Company for its prior approval, which approval shall not be unreasonably withheld or delayed and (ii) the publication of such advertisement shall comply with applicable law.

20.   **Acknowledgements.**  CSFB is a full service securities firm engaged in securities trading and brokerage activities as well as investment banking and financial advisory services.  In the

100035994 v 2]Oakwood Homes.doc

CSFB-00013653

AUG. 19. 2002  5:18PM    3366643224SSE FIRST BOSTON                    NO. 7773   P. 10/15

Oakwood Homes Corporation
Page 9

August 19 , 2002

ordinary course of our trading and brokerage activities, CSFB or its affiliates may hold positions, for its own account or the accounts of customers, in equity, debt or other securities of the Company or any other company that may be involved in the matters contemplated by this agreement.

100083994 v 2)Oakwood Homes.doc

CSFB-00013654

AUG. 19. 2002  5:19PM    3366643224SSE FIRST BOSTON                NO. 7773   P. 11/15

If the foregoing terms correctly set forth our agreement, please confirm this by signing and returning to CSFB the duplicate copy of this letter. Thereupon this letter, as signed in counterpart, shall constitute our agreement on the subject matter herein.

CREDIT SUISSE FIRST BOSTON CORPORATION

By: _____

Jared C. Felt
Director

Confirmed and Agreed to:
OAKWOOD HOMES CORPORATION

By: _____
Robert A. Smith
Executive Vice President

OAKWOOD ACCEPTANCE CORPORATION, LLC

By: _____
Robert A. Smith
Vice President

OAKWOOD MOBILE HOMES, INC.

By: _____
Robert A. Smith
Vice President

HBOS MANUFACTURING, LP

By: OAKWOOD MOBILE HOMES, INC._____
As General Partner

By: _____
Robert A. Smith
Vice President

Date: ___8/19/02___

[00089994.x.2]Oakwood Homes.doc

CSFB-00013655

## SCHEDULE I

This Schedule I is a part of and is incorporated into that certain letter agreement (together, the "Agreement"), dated August 19, 2002 by and between Oakwood Homes Corporation and its subsidiaries (collectively, the "Company") and Credit Suisse First Boston Corporation ("CSFB").

The Company agrees to indemnify and hold harmless CSFB, its affiliates and its parent and its affiliates, and the respective directors, officers, agents and employees of CSFB, its affiliates and its parent and its affiliates (CSFB and each such entity or person, an "Indemnified Person") from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively "Liabilities"), and will reimburse each Indemnified Person for all fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), (i) caused by, or arising out of or in connection with, any untrue statement or alleged untrue statement of a material fact contained in the offer documents referred to in the agreement (including any amendments thereof and supplements thereto) ("Offer Documents") or by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (other than untrue statements or alleged untrue statements in, or omissions or alleged omissions from, information relating to an Indemnified Person furnished in writing by or on behalf of such Indemnified Person expressly for use in the Offer Documents or (ii) otherwise arising out of or in connection with advice or services rendered or to be rendered by any Indemnified Person pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions; provided that, in the case of clause (ii) only, the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any of the advice, actions, inactions or services referred to above. The Company also agrees to reimburse each Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Person's rights under this Agreement (including, without limitation, its rights under this Schedule I).

Upon receipt by an Indemnified Person of actual notice of an Action against such Indemnified Person with respect to which indemnity may be sought under this Agreement, such Indemnified Person shall promptly notify the Company in writing; provided that failure so to notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall have been materially prejudiced by such failure. The Company shall, if requested by CSFB, assume the defense of any such Action including the employment of counsel reasonably satisfactory to CSFB. Any Indemnified Person shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person, unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Person and the Company, and such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Action in the same jurisdiction, in addition to any local counsel. The Company shall not be liable for any settlement of any Action effected without its written consent (which shall not be unreasonably withheld). In addition, the Company will not, without prior written consent of CSFB, settle, compromise or consent to the entry of any judgment in or otherwise seek

100080996 v21565492 v1 (NYDOCS1)

CSFB-00013656

to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all Liabilities arising out of such Action.

In the event that the foregoing indemnity is unavailable to an Indemnified Person other than in accordance with this Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement or (ii) if the allocation provided by the immediately preceding clause is not permitted by the applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and CSFB, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations; provided that in no event shall the Company contribute less than the amount necessary to ensure that all Indemnified Persons, in the aggregate, are not liable for any Liabilities and Expenses in excess of the amount of fees actually received by CSFB pursuant to this Agreement. For purposes of this paragraph, the relative benefits to the Company and its shareholders, on the one hand, and to CSFB, on the other hand, of the matters contemplated by this Agreement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company or the Company's shareholders, as the case may be, in the transaction or transactions that are within the scope of this Agreement, whether or not any such transaction is consummated, bears to (b) the fees paid to CSFB under this Agreement.

The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Person pursuant to this agreement, the transactions contemplated hereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions except for Liabilities (and related Expenses) of the Company that are determined by a judgment of a court of competent jurisdiction which is no longer subject to appeal or further review to have resulted solely from such Indemnified Person's gross negligence or willful misconduct in connection with any such advice, actions, inactions or services.

The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Person's services under or in connection with, this Agreement.

## SCHEDULE II

(a)   term "Aggregate Value" shall mean the total fair market value (at the time of closing or, in the case of publicly traded common stock, the average closing price over the fifteen trading days immediately prior to announcement of the Sale Transaction) of all consideration (including cash, securities, property, all debt, guarantees (in the case of the Securitization Guarantees and the Floor Plan Guarantees, one-third of the face amount thereof) and other obligations remaining on the Company's financial statements at closing and other indebtedness, guarantees (in the case of the Securitization Guarantees and the Floor Plan Guarantees, one-third of the face amount thereof) and obligations directly or indirectly assumed, retired or defeased in connection with the Sale Transaction and any other form of consideration) paid or payable, or otherwise to be distributed, directly or indirectly, to the Company or its stockholders in connection with the Sale Transaction.

(b)   the term "Offer Documents" means each document that is filed with the Securities and Exchange Commission (the "Commission" or "SEC") or that is otherwise made publicly available or that is sent or given to the holders of Old Securities in connection with any Restructuring Transaction (which may include, but is not limited to, the following: (i) offering circular(s), sales memoranda, private placement memoranda or other selling material, explanatory statement(s) filed with the SEC under the Securities Act of 1933, as amended, (iii) each registration statement, preliminary and final prospectus required to be filed with the SEC, (iv) each document required to be filed with the SEC pursuant to the provisions of the Securities Exchange Act of 1934, as amended, pertaining to any Restructuring Transaction, and (v) each appendix, attachment, amendment or supplement to any of the foregoing and all related documents, including but not limited to, each related letter of transmittal and each related letter to holders of Old Securities);

(c)   the term "Related Entities" shall mean each subsidiary and affiliate of the Company as of the date hereof and each corporation, partnership, or other entity formed after the date hereof by or on behalf of the Company in connection with, or for the purpose of effecting a Transaction; and

(d)   the term "Termination Date" means the earliest of (i) the date, if any, that the Company terminates CSFB's services under this Agreement pursuant to paragraph 5 hereof, and (ii) the date, if any, that CSFB resigns pursuant to paragraph 5 hereof.

100088094 v21565492 v1 (NYDOCS1)

CSFB-00013658

## SCHEDULE III

The term "Old Securities" shall mean each of the following and any interest or obligations created thereunder:

(a) Foothill Credit Facility;

(b) 7.875% Senior Notes due March 1, 2004; and

(c) 8.125% Senior Notes due March 1, 2009.

The term "Securitization Guarantees" shall mean outstanding amounts of the Company-guaranteed subordinated securities issued by REMIC trusts.

The term "Floor Plan Guarantees" shall mean outstanding floor plan debt which is guaranteed by the Company.

565492 v13 (NYDOCS1)

CSFB-00013659

# EXHIBIT
# 621

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE


In re:

OAKWOOD HOMES CORPORATION et al.

Debtors

vs.

CREDIT SUISSE FIRST BOSTON, et al.

Defendants


# EXPERT WITNESS REPORT OF THOMAS F. BOLAND

February 29. 2008



## A.    Introduction and Qualifications

1.    I, Thomas F. Boland, am a former member of senior management of Citigroup, Inc., New York, New York and a former Managing Director of Seneca Financial Group, Inc., New York, New York.  I consider myself to be an expert in corporate and investment banking, credit and capital markets and corporate restructures.

2.    I graduated with a degree in Business Administration from the University of Notre Dame, South Bend, Indiana in 1965.  From 1970 through 2001, I held various executive positions with Citicorp and Citigroup.  From 1978 through 1980, I was assigned to the Restructuring Department of Citibank, managing numerous complex problem credits and working with borrowers both inside and outside of bankruptcy.  From 1980 through 1985 I was the Corporate Bank Head for Citibank Canada, responsible for corporate relationships throughout Canada and their international subsidiaries.  From 1999 through 2001, I was Head of Credit and Operating Risk Management for Japan, North America and Europe.  As such, I managed a 540 person organization with financial accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup, including Corporate Banking, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Solomon Smith Barney.  I had the highest level of credit approval authority within the Citigroup Corporate and Investment Bank.  I had management responsibility for a $170 billion loan and unfunded commitment portfolio.  Under my direction, Citigroup's use of asset sales and credit derivatives in tandem with proactive remedial management by my group's highly experienced workout department made the credit quality of this portfolio among the best in the industry.  From 2001 through 2005, as a principal in the Seneca Financial Group, I worked on numerous financial advisory assignments on behalf of troubled companies including a $1 billion out of court restructure of a major U.S. airline which was impacted by the events of September 11, 2001.  A copy of my curriculum vitae

and published articles are attached as Exhibit 1.

3.    In the course of my duties I have directly managed hundreds of corporate relationships and had management responsibility for thousands of corporate relationships. I have worked in a large financial institution and fully understand the interrelationships among client managers, investment bankers, product specialists and risk assessment. I have worked with hundreds of troubled companies and have first hand experience regarding the complexities and uncertainties of dealing with a company in financial distress.

4.    I have presented expert testimony as follows:

| | |
|---|---|
| October 8, 2002 | Federal Energy Regulatory Commission<br>PacifiCorp v. Reliant Energy, et al.<br>Docket EL 02-80-000 |
| January 3, 2003 | Federal Energy Regulatory Commission<br>Nevada Power/Sierra Pacific v. El Paso et al.<br>Docket EL 02-26-000 |

Both of these cases involved the abrogation of long-term energy contracts in California. I testified as an expert in the capital markets.

| | |
|---|---|
| August 5, 2003 | Rebel Rents, Inc. 307 B. R. 171 |

This case involved the valuation of a business that was emerging from bankruptcy.

| | |
|---|---|
| March 22, 2005 | Federal Energy Regulatory Commission<br>Devon Power LLC, et al.<br>Docket ER03-563-030 |

In this case I testified on the adequacy of returns on debt and equity.

| | |
|---|---|
| March 13, 2006 | Duke Energy v. ExxonMobil Energy Canada<br>Under the Alberta Arbitration Act |

In this arbitration I testified as to the reasonableness of ExxonMobil's actions concerning a credit dispute.

B.    Nature of Assignment

5.    I have been retained by Linklaters LLP counsel for Defendants Credit Suisse First Boston, et al., to provide an expert opinion regarding the conclusions of Professor Alan C. Shapiro in his report dated April 30, 2007.  Specifically, his conclusions are as follows:

> - CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.
>
> - CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.

6.    Based upon my over thirty years of experience working in a large financial institution and understanding the dynamics of relationship management and my extensive experience dealing with financially distressed companies, I believe I am qualified to offer expert testimony on matters I address in this opinion.  I have agreed to be compensated at an hourly rate of $600 per hour for my services plus any actual and reasonable expenses.

C.    Records and Information

7.    In addition to general contextual background from counsel, I have considered certain specific information listed in Exhibit 2.  This Exhibit contains a list of information provided to me by counsel for CSFB and a list of additional materials, which I have retrieved from public sources.

D.    Analysis

8.    In his report Professor Shapiro discusses the role of an Investment Bank; he reviews the

actions of CSFB personnel and concludes that since CSFB is an Investment Bank this

automatically makes them a trusted advisor to Oakwood's management and Board of Directors.

Accordingly, in the course of their dealings with the company, CSFB should have been providing

strategic operational and financial advice including filing for bankruptcy a year sooner than they

did. By not taking these actions, Professor Shapiro concludes that CSFB acted imprudently.

9.    To respond to Professor Shapiro's conclusion it is necessary to examine the complexities

and structure of an Investment Bank and to understand what was the true nature of CSFB's

relationship with Oakwood and to clarify what Investment Banks can do and what Investment

Banks should not do.

E.    Investment Banking

10.    Investment Banks provide a broad range of financial and investment related services, such

as, advising clients on security issues, acquisitions and business disposals, arranging and

underwriting new issues, distributing securities and running fund-management companies. Also,

proprietary trading has become an increasingly important part of Investment Banking. Typically,

Investment Banks are divided into three areas; Investment Banking, Capital Markets and, Sales

and Trading. Targeted clients and prospects are managed in the Investment Banking Division.

The role of the Investment Banker is to understand the client's needs and to coordinate with the

appropriate product group a solution to the client's problem. The Boston Consulting Group

recommends that "client relationship managers should be responsible for a customer's P&L

account across all investment and corporate banking products."[1]  Most large financial institutions now take this approach.  For example;

- Deutsche Bank – We have integrated our coverage model and aligned our coverage intensity to our new client tiering system.  We aim to further integrate our various businesses within the Corporate and Investment Bank to capture cross-divisional opportunities.[2]

- NatCity Investment Banking -   We have unique access including 500 corporate bankers, private equity services, commercial lending groups, proprietary equity research, and leading economists.[3]

- BMO Financial Group – Successfully leveraging lending relationships by cross selling fee based products and fully integrated, advisory-oriented coverage.[4]

11.     The model recommended by the Boston Consulting Group calls for a client relationship manager to be the primary interface with the client.  A successful Investment Banker works closely with the client's management to understand what products and services can be sold to the client.  This Investment Banker centered approach is now utilized by most major financial institutions.  Once an opportunity is identified by an Investment Banker a sales presentation is prepared by the appropriate product group.  The sales presentation takes the form of a "pitchbook".  Most firms use a standard format pitchbook which includes sections on the client based upon available public information, the idea or product being pitched, a market analysis, relevant financial analysis and information about the bankers who will be involved with the mandate.  A pitchbook presentation is the standard marketing document utilized by an Investment Bank.

12.     The most lucrative transactions for an Investment Bank are Merger & Acquisition transactions, equity offerings and bond issuance.  The in depth client due diligence described in Professor Shapiro's report would be required for these products.  There are some Investment Banking products, such as a derivative transaction, which could require little or no due diligence.

---

[1] Growing Profits Under Pressure, Boston Consulting Group, 2002.
[2] Deutsche Bank Annual Report 2006.
[3] www.nationalcity.com/investmentbanking/Aboutus.asp
[4] BMO Financial Group, U.S. Expansion Strategy

In other words, the level and type of due diligence on the part of the Investment Bank depends upon what service or product the Investment Bank is providing and to whom they would be providing the product or service.

13.    Since Investment Bankers are expensive it is important to focus their efforts on clients and prospects that may use a wide array of products. Most Investment Banks have screening criteria which help identify top prospects and eliminate prospects where significant potential opportunities may be limited. Companies that do not make the Investment Banking cut may find a home in a product group in the Capital Markets Division. These are companies with a specific need which can be addressed with a specific product. A client in this category would be characterized as a Product Managed Relationship and not as an Investment Banking Relationship.

14.    It is clear that from the inception of the CSFB/Oakwood relationship in 1994 until August 2002 Oakwood was a Product Managed Relationship focusing exclusively on securitization transactions and nothing more. Based upon this type of relationship, the broad, in depth coverage which would have existed if Oakwood was in the Investment Banking Division did not exist. As will be discussed, the securitization product revolves around the credit worthiness of Oakwood's customers and not on the credit quality of the Oakwood Homes Corporation. This being the case, there was no need for CSFB to access in depth non public information about the Oakwood Homes Corporation.

F.    Oakwood Homes Corporation

15.    It has been well documented that Oakwood, which was founded in 1946, was a fully integrated company in terms of manufacturing, selling and financing homes. In 1999 they were the nation's largest retailer of manufactured housing operating 371 company-owned retail sales centers in 29 states. They were also the third largest manufacturer of manufactured housing, with 26 manufacturing lines in 12 states. In addition to sales and manufacturing Oakwood had a large consumer finance operation, Oakwood Acceptance Corporation, which originated and purchased

loans originated by the company's retail operations as well as from third parties. At year end 1999, Oakwood had total revenues in excess of $1.5 billion.

16.     It is worth noting that since its founding in 1946, Oakwood and the manufactured housing industry have gone through numerous cycles, the worst being in 1972 when more than one-third of America's mobile home dealers went bankrupt and in the late 1980's when over half of the 200 mobile home companies operating in 1978 went bankrupt. Oakwood successfully made it through these downturns and subsequently prospered.[5] As Oakwood and other housing manufacturers were growing the challenge of financing their sales became an impediment to continued growth. This dilemma was addressed in the late 1970's when Salomon Brothers distributed the first mortgage-backed securities. This was the start of the asset securitization business.

17.     By reviewing the minutes of the Board of Director meetings from 1999 through 2002 it is very evident that management and the Board were well aware of Oakwood's financial situation and understood the cyclical nature of their business. It is typical for a public company such as Oakwood, to have quarterly Board meetings. Over a four year period that would amount to sixteen meetings. In the period 1999-2002 the Oakwood Board met thirty-six times. Instead of meeting every three months the Board was meeting every forty days. This unusually active involvement by the Board would indicate that they were concerned about the company and the industry and wanted to be sure that they were making informed decisions which were in the Corporation's best interest.

## G.     CSFB - Securitization

18.     The primary interface between CSFB and Oakwood Home's management was Fiachra O'Driscoll, a Managing Director in CSFB's Asset Finance Group. O'Driscoll is an asset securitization product specialist. He described his role as "to ensure that the transaction was put

together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investor questions were answered, to make sure that the legal structure of the mortgage securitization worked properly, and to make sure that the transaction got closed, processed, and that it was dealt with in the aftermarket in a timely fashion."[6] Since the inception of the CSFB/Oakwood relationship in 1994 until August 17, 2002 the entire relationship was based exclusively on the securitization business and O'Driscoll was Oakwood's primary CSFB interface since 1996.

19.    Securitization is a financial technique that pools assets together by turning future cash flows into tradable, bond-like securities.  The customer benefit is that they can immediately realize the value of a cash producing asset and can shed some of the risk that future expected revenues may not materialize.  The customer's risk is shed because the pools of assets are generally sold on a non-recourse basis.  If the expected cash flow from the pool of assets does not materialize the investors in the securitization have no additional recourse.  This being the case, what is critical in structuring a successful securitization is packaging a pool of assets which are diverse and predicable based upon prior experience.

20.    A review of a typical prospectus will show the scope of the business CSFB was doing with Oakwood, including, what was necessary to make a transaction work and what type of due diligence would be needed to put a successful transaction together.  The Prospectus and the Prospectus Supplement dated May 20, 2002 is typical of the type of transaction CSFB was executing for Oakwood since 1994.[7]  These documents contain 171 pages of detailed information. The key information contained in the documents is a description of the asset pool.  On closing the trust would purchase 2,167 initial assets with a principal balance of approximately $119 million. The 2,167 loans are broken down in great detail by credit bureau scores, geographic distribution, breakdown of initial asset amounts, loan to value ratios, year of origination and remaining term to

---

[5] www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html
[6] Deposition of Fiachra O'Driscoll, June 29, 2006, page 18.

9

maturity. A description of investor protections through overcollaterization and subordination is also detailed. What is not in these documents is a description of Oakwood Home Corporation or any financial analysis of Oakwood. This is because, as the document point out, "Neither Oakwood Mortgage nor any underwriter nor any of their affiliates will insure or guarantee the certificates of any series."[8]

21.     In his deposition, Mr. O'Driscoll stated that CSFB had executed numerous securitizations for many firms involved in the manufactured housing business including Clayton Homes and Champion Enterprises.[9] To help follow the industry trends the Asset Finance Group could access the research reports of CSFB's public side equity analyst, Ivy Zelman, who closely followed, home builders, manufactured housing companies, building products and furniture companies. Ms. Zelman has been rated the number –one analyst in the housing industry by the Institutional Investors All American Research Team since 1999 and by the Greenwich Associates Institutional Research Services Poll since 2000. The May 2005 issue of Forbes magazine ranked her number one among 3,300 analysts in all of Wall Street.[10]

## H.     CSFB – Loan Purchase Facility

22.     In 2000 Bank of America decided not to renew its financing arrangement with Oakwood. Since a warehouse facility is an important interim step between a loan origination and a public securitization, early in 2001 O'Driscoll was able to put together a facility utilizing securitization techniques.

23.     In his report Professor Shapiro state that this is when CSFB became a secured lender to Oakwood.[11] This is in fact incorrect. This transaction was structured not as a loan but as an asset purchase, similar to securitization. The individual who negotiated and structured the transaction

---

[7] Prospectus Supplement to Prospectus dated May 20, 2002, CSFB-00220030 – CSFB-00220208.
[8] Ibid., p.54.
[9] Deposition of Fiachra O'Driscoll, June 29,2006, page 34.
[10] www.jwmag.org/site/c.fhLOK0PGLsF/b.2447241/k.2D69/Ivy_Zelman.htm

was Fiachra O'Driscoll.[12] This facility was very similar to the type of business CSFB had been doing with Oakwood since 1994. As part of the compensation for this transaction CSFB received warrants for 19.9% of Oakwood equity. A warrant is a right to purchase equity of an issuer at a specified price within a certain time frame. A warrant is not equity nor does it receive any of the rights of an equity holder. Warrants can be used as a sweetener to increase the marketability of a bond or security and could have been useful to CSFB if they subsequently decided to sell off all or part of this facility. To conclude that these out of the money options somehow made CSFB an equity owner of Oakwood is incorrect. It is also logical to assume that if CSFB believed that Oakwood was insolvent at the time of this transaction they would not have been asking for warrants. Including warrants as a part of their compensation would indicate that there was a belief by CSFB that there would be an upturn in the cycle in the not too distant future.

## I.    CSFB – Proposals

24.    Any attempt to expand the CSFB/Oakwood relationship beyond the Asset Finance Group got nowhere. A proposed $75 million Committed Reverse Repo Facility languished. The proposal was reviewed by an analyst, in Credit Risk Management, James Xanthos who had no experience with the housing industry or with Oakwood.[13] His analysis contained numerous unsupported opinions and ignored the market analysis of the CSFB Equity Research Group. One reason that this transaction never went forward may be the fact that Oakwood did not have an Investment Banker to oversee the relationship and champion the client.

25.    As will be discussed later in this report, the management and Board of Oakwood believed that the company had sufficient liquidity in place until March, 2004. On three occasions, in June and August of 2001 and March of 2002 CSFB made presentations to Oakwood management regarding the 2004 bonds. These presentations contain the standard pitchbook format and were

---

[11] Report of Alan Shapiro, April 30, 2007, page 16.
[12] Deposition of Fiachra O'Driscoll, June 29, 2006, page 41.
[13] Deposition of James Xanthos, August 24, 2006, page 45.

presented to management and not the Board of Directors. The presentations contain no non public information nor do they demonstrate any insiders' knowledge of Oakwood. The pitchbooks contain a number of alternatives which Oakwood could use to deal with the 2004 maturities. None of the proposals contained in the pitchbooks were pursued by Oakwood management. One of Oakwood's troubled competitors, Fleetwood Enterprises, in 2001 was able to use a variation of one of the ideas in the CSFB presentation and working with their investment bank they issued convertible trust preferred securities in exchange for other debt.[14] This type of financial restructuring plus other initiatives assisted Fleetwood in avoiding bankruptcy.

26.    Instead of offering ideas to deal with future liquidity needs, Professor Shapiro believes that CSFB should have been advising Oakwood on operational improvement strategies which focused upon downsizing Oakwood's operations.[15] He also thought that CSFB should have been advising Oakwood to file bankruptcy.[16]

27.    Before commenting on why it would have been inappropriate for CSFB to give anyone this type of advice it needs to be pointed out that no one at CSFB, as with most financial institutions, has the expertise to advise on "operational improvement strategies." There are firms that do this type of consulting but they are not banks. Advice for dealing with a bankruptcy has to be carefully managed within the scope of legally vetted restructuring assignment.

28.    Starting with the Farah case in 1984 creditors learned that if they exercised excessive power and control over the business activities of a debtor, especially when the debtor is in financial difficulty, the creditor can suffer serious adverse consequences.[17] Post the Farah case there was a rash of lender liability cases and bankers learned what "tortious interference" was all about and changed their behavior. Most financial professionals understand where to draw the line with their clients and do not get involved in telling them how to run their business.

---

[14] Fleetwood Enterprises Annual Report, 2005, page 49.
[15] Deposition of Alan Shapiro, April 30, 2007, page 38.
[16] Ibid., page 39.
[17] Third Party Interference, Phillip Campanella, at 13.06.

29.    The primary oversight for the financial and legal well being of a corporation is its Board of

Directors and not its bankers.  The Oakwood Board was meeting very frequently and they were

briefed by management on the state of the company and the outlook for the industry.  The Board

brought about management changes and authorized significant downsizing.  The Board explored

strategic alternatives with Merrill Lynch and pursued numerous capital raising initiatives without

the assistance of CSFB.  It appears that the Directors acted on an informed basis and in good

faith.


J.    CSFB – Financial Advisor for Restructuring Purposes

30.    On August 24, 2002 Oakwood retained the restructuring group of CSFB in the role of a

Financial Advisor for Restructuring Purposes.  Their mandate was to assist Oakwood in

evaluating strategic alternatives, employing restructuring options, contacting potential acquirers

of the firm and preparing the company for bankruptcy.  This was the first time in the eight year

CSFB/Oakwood relationship that the Asset Finance Group was not the focal point of the

relationship.

31.    The signing of this agreement singled an important change in the relationship between

CSFB and Oakwood.  To understand what brought about this agreement it is worthwhile to

examine the events which led Oakwood's management and Board to conclude that their company

needed assistance in restructuring their balance sheet.

32.    In June 2001 Equity Research at CSFB was stating, "While we believe the industry may be

nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as

well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of

the downturn."[18]  In the same report they opinioned, "we believe the increased demand for OH

---

[18] Manufactured Housing Industry Outlook, CSFB Equity Research, June 11, 2001, page 1. (CSFB-00050117)

deals and the tightening spreads support a more positive long-term outlook for the company."[19]
In reviewing 2001 the Monthly Labor Review cited housing as one of the bright spots in the
economy stating, "Declining mortgage rates benefited not only prospective home buyers, but also
homeowners who either wanted to tap into their equity or refinance." [20] In working through the
cycle Oakwood management appeared to be doing the right things as pointed out in a CSFB
Equity Research Report, "Although management should be praised for its proactive decisions at
this point in the cycle, we believe that neither the industry or OH are out of the woods yet."[21]

33.    Although Oakwood had managed through prior down cycles and management and the
Board were taking actions to manage through this one, there were a series of events which made
this cycle longer and deeper than anyone expected nor could have predicted.  In late 2001 and
early 2002 an unprecedented number of financing sources exited the market, including Bank of
America, Bombardier Capital, Greenpoint Financial, CIT and Conseco.  Contributing to the
lenders problems was the September 11 terrorist attacks.  According to the New York Times,
"The attacks that destroyed the World Trade Center towers and the Pentagon brought the
American economy to an unprecedented halt and made a recession far more likely than before."[22]
Commenting on the attacks, Standard & Poor's stated that, "Manufactured-housing producers
could see further rating downgrades in the near term, as this segment's buyers may be
disproportionately more vulnerable to expected layoff."[23]

34.    The deepening recession and industry specific problems were reflected in Oakwood's June
25, 2002 Board of Directors meeting.  This meeting was the first time that the Board understood
the severity of the Corporation's situation.  Given that the last Board meeting had been only six
weeks prior it is probable that management did not reach the conclusions discussed at the meeting
much before the meeting.  Several reasons were given for the change in outlook.  First, Mr.

---

[19] Ibid., page 18.
[20] U.S. Labor Markets in 2001, Monthly Labor Review, February 2002, page 11.
[21] Oakwood Homes, CSFB Equity Research, July 27, 2001, page 3. (CSFB-00050085)
[22] A Body Blow to the Economy, David Leonhardt, New York Times, September 16, 2001, page 1.
[23] Housing Market is Suddenly Uncertain, Alan Heavens, The Philadelphia Inquirer, October 7, 2001.

Standish indicated that "it appears that conditions may be softer than had been the case at the last board meeting." He cited Champion Enterprises wider than expected losses and the impact of Conseco's withdrawal from the dealer floorplan lending business as contributing factors. In response to these conditions management decided to close a Texas plant, close some retail locations and revamp the retail pay plan. Mr. Standish also indicated that the loan assumption program would be eliminated in order to improve the Corporation's liquidity. Mr. Standish told the Board that management had updated the company's cash flow projections and "those cash flow projections indicated that adequate liquidity was in place to fund operations until the March 1, 2004 maturity of $125 million of senior notes."[24]

35.    By the end of July, Mr. Standish was telling the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well as considered other potential financial advisors." From this statement it can be concluded that at the end of July, Oakwood had not yet decided which firm to hire as a financial advisor.[25] It would appear that Oakwood management was starting to understand the impact that the loan assumption program had on their liquidity position. On August 6, 2002, Oakwood released their third quarter results which indicated that, "During the first nine months of 2002, the Company expended cash approximating $47.6 million related to the loan assumption program."[26]

36.    In his deposition Mr. Standish indicated that he was surprised by the expense of the loan assumption program. He indicated that, "the program itself was not structured sufficiently so that we could get data from it as far as costs, as far as performance, as far as general underwriting guidelines or what was actually being underwritten."[27] Making it through a difficult period is all about managing your liquidity. Although management had taken steps to bolster liquidity the

---

[24] Binder of Meeting Minutes, No. 04-57060 (Bankr. D De.), Tab 35.
[25] Ibid., Tab 36.
[26] Oakwood Homes Corporation Reports Third Quarter 2002 Results, August 6, 2002, Exhibit 99.1.
[27] Deposition of Myles Standish, September 21, 2006, page 33.

worse than expected economy coupled with a $48 million surprise would indicate that their belief

in late June 2002 that they had sufficient liquidity for the next twenty-one months was wrong.

37.    Oakwood's financial situation was not unique in the manufactured housing sector.  Many

of their competitors were encountering similar difficulties but managed to make it through the

cycle without having to file for bankruptcy.  In November 2002 BB&T Capital Markets raised

their ratings on Champion Enterprises, Clayton Homes, Fleetwood Enterprises and Palm Harbor

Homes from Hold to Buy based upon the likely entry of GMAC Residential Funding unit into

manufactured housing retail chattel lending.  BB&T stated, "Because we believe that the health of

the industry is so closely tied to the availability of financing, an infusion of new financing dollars

into an already tight retail lending environment would be a major plus for the MH industry."[28]

This indication that there was some good news for the industry came just ten days after

Oakwood's bankruptcy filing.  The success that these firms had in avoiding bankruptcy clearly

demonstrates that it was possible to avoid a filing.  Those experienced in working with companies

in financial difficulty know that an out of court restructuring is much more preferable than going

into Chapter 11.  When dealing with the troubled auto parts supply company, Delphi, Steve

Miller, the noted restructuring guru was quoted as saying, "Not going into Chapter 11 is much to

be preferred.  It is simpler, cheaper, quicker to avoid it, whereas the Chapter 11 process takes

longer, costs more and has a lot of aggravation that goes with it."[29]


## K.    CSFB/OAKWOOD RELATIONSHIP

38.    Professor Shapiro claims that CSFB had financial incentives to keep Oakwood operating.

An Investment Bank has financial incentives for doing business with all of their clients.  CSFB

was paid fairly for the work they performed.  I can see no conflict of interest in the work CSFB

did for Oakwood and see no issue on how they performed that work.

---

[28] BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10.

39.    The fees paid to CSFB by Oakwood were for services rendered.  Pricing on a securitization can vary depending upon the asset pool and the size of the transaction.  Pricing is transparent since fees on public transactions are disclosed in the prospectus.  In his deposition Douglas Muir stated that he was able to benchmark what he was paying against other issues.  He said, "you can benchmark and find out where the market is, not only what CSFB was charging but what other banks were charging."[30]  Pricing on the Loan Purchase Facility is difficult to assess since as Douglas Muir stated, "CSFG was the only game in town."[31]  At the time when the facility was put in place Oakwood's bonds were rated CCC.  According to Fitch Ratings the definition of a CCC rating is Substantial Risk.  As ratings decrease the probability of default increases, therefore, transactions with lower investment grade companies need to build in the increased default risk into their pricing.  The Advisory Agreement pricing is well within industry norms.  The monthly fee is in the mid-range of transactions I am familiar with, normal M&A and restructuring fees range from 1% to 2%.  Fairness opinions can be a percentage of the M&A fee or a flat amount.  It is not uncommon in this type of engagement to have a success fee on top of the other fees.

## L.    Conclusions

40.    From the actions and services provided by CSFB for the Oakwood Homes Corporation it is very evident that CSFB was not a financial advisor to Oakwood until August, 2002.  In addition to the analysis contained in my report this conclusion is supported by a review of the minutes of the Board of Director meetings.[32]  In June of 1999 the Board hired Merrill Lynch as an advisor. A year latter it was reported to the Board that Merrill recommended holding off pursuing a merger.  Merrill's input regarding financial alternatives was again discussed at the August, 2000 meeting.  In meetings in April, June and July of 2001 the Board discussed various asset sale

---

[29] Delphi CEO Would Rather Fix Company's Woes out of Court, Wall Street Journal, Sep. 21, 2005, pg.A5
[30] Deposition of Douglas Muir, September 26, 2006, page 49.
[31] Ibid., page 52.
[32] Binder of Minute Meetings, No.04-57060.

possibilities and sources of new investment. It is clear that CSFB was not involved with these important initiatives. At the July 29, 2002 meeting Myles Standish told the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well considered other potential financial advisors."[33] From this statement it can be concluded that at the end of July, 2002, Oakwood had not yet decided which firm to hire as a financial advisor.

41.    Prior to August 2002 the involvement of CSFB in the Oakwood relationship was limited to securitization transactions and proposals dealing with the bonds maturing in 2004. The only CSFB professional closely involved with the company was the securitization product specialist, Fiachra O'Driscoll. For example, Jared Felt demonstrated his distance from Oakwood when on December 14, 2001 he emailed Fiachra O'Driscoll and asked, "Do you have any sense of what we can do for Oakwood given that they've already completed a refinancing with Foothill?"[34] The relationship between CSFB and Oakwood was a very typical banking/client product driven relationship and was conducted in an appropriate manner.

42.    In the period 2000 through 2002 the manufactured housing industry was experiencing significant problems. There were many factors causing the downturn and many opinions as to the depth and length of the downturn. Forcing companies into bankruptcy is not an optimum solution in times of duress. Yearly, federal bank examiners review the loan portfolios of all U.S. regulated banks. At the end of 2001 the regulators reported that there were $193 billion in problem loans including over $30 billion in loans where full repayment was doubtful.[35] Many of these exposures got restructured outside of a courtroom. Suggesting that lenders would be required to perform ongoing valuations of their clients and to liquidate them if their valuations came up short would lead to economic chaos. This type of behavior would be deemed inappropriate.

43.    On September 5, 2001 First Union Securities Equity Research issued a report on the state of the manufactured housing industry in which they stated that, "Things should look much better

---

[33] Ibid., Tab 35.
[34] Email, Jared Felt, December 13, 2001, CSFB-00148970.

in 2002. Profitability looks like it has bottomed."[36] They were wrong, as were other analysts and as was Oakwood's Board of Directors. It is very difficult in a middle of an economic downturn to accurately predict when the cycle will turn up. The Oakwood Board was fully engaged in performing their fiduciary duties. They nor anyone else should be held accountable for not being capable of predicting the future.

44.    The fees paid to CSFB by Oakwood were for services rendered. Pricing for the products and services contracted for by Oakwood from CSFB were market driven and the compensation received by CSFB appears to be within market norms.

45.    Based upon my experience in working with companies in financial situations similar to Oakwood's I believe that most bankers would have not stopped funding the company as long as management and the Board understood the situation and were dealing with it. By structuring transactions which would manage their risk and by understanding the cyclical nature of the industry most bankers would have acted similar to the actions of CSFB.

Thomas F. Boland

---

[35] Board of Governors of the Federal Reserve System, NR 2001-87, October 5, 2001.
[36] First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1.

19

**EXHIBIT I**

**Thomas F. Boland**
**1209 Thomas Jefferson Parkway**
**Charlottesville, VA 22902**
**(434) 295-2733**
**tfboland162@aol.com**

### Experience

**Seneca Financial Group, Inc.**                                    2001 - 2005
**Managing Director**

Principal in specialty investment bank which focused primarily on financial restructuring advisory services. Assignments ranged from successfully advising a major airline in their Airline Transportation Safety Board loan guaranty application process to working with equipment distributors in their validation of their business models and/or a quantification of their strategic options. Expert witness involving valuations in bankruptcy cases as well as matters before the Federal Energy Regulatory Commission.

**Citigroup Corporate and Investment Bank**                         1999 - 2001
**Head of Credit and Operating Risk Management - Japan, Europe and North America**

Managed a 540 person organization with functional accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup including, Corporate Bank, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Salomon Smith Barney. Accountable for $360 Million in revenues and a $140 Million expense base. This position has the highest level of credit approval authority in the Citigroup Corporate and Investment Bank.

Managed a $170 billion loan and unfunded commitment portfolio. The use of asset sales and credit derivatives in tandem with proactive remedial management by a highly experienced workout department made the credit quality of this portfolio one of the best in the industry.

**Citibank - Global Relationship Bank**                             1993 – 1999
**Senior Risk Manager**

Managed 80 risk professionals in 14 countries, providing risk management oversight for over 2,000 multi-national corporations and financial institutions. As part of the Global Relationship Bank senior management team worked to set strategic direction of global corporate banking business which was based upon ability to make risk/return tradeoffs on both a transactional and portfolio basis.

**Citibank – Credit Policy Committee**                              1990 - 1993
**Credit Policy Committee Member**

Coordinated credit risk management policies for the Global Corporate Bank. Provided counsel to the Corporate Bank and Real Estate businesses evaluating the impact of changes in business direction including associated remedial actions.

In a difficult credit environment, assisted in refocusing the firm's approach to risk tolerance. Heavy involvement in the unwinding of a $26 billion real estate portfolio. High level of regulatory interface during this tumultuous corporate period.

**Citicorp - Citicorp Industry Credit**                     1985 - 1990
**Risk Manager / Treasurer**

Provided risk oversight for business units involved in leveraged buyouts, securitization and leasing. Managed a Treasury function responsible for a $5 billion funding book.

**Citicorp - Citibank Canada**                              1980 - 1985
**Corporate Bank Head**

Managed the Corporate Banking business in Canada, with offices in Toronto, Montreal, Calgary and Vancouver. Customers included Canadian corporates, multinationals, global financial institutions and government entities. Frequently interfaced and negotiated with senior government officials.

**Citibank - Institutional Recovery Management**            1977 - 1980
**Team Head**

Managed the restructuring of problem loans in North America, Colombia and Libya. Extensive involvement with bankruptcy cases. As Co-Head of the Itel Creditors Committee helped to successfully resolve the largest Californian bankruptcy, at that time. Considerable time spent in Colombia negotiating, litigating and lobbying on a complex fraud case.

**Citibank, Agribusiness-Commodities Department**          1970 - 1977
**Unit Head /Transactor**

Engaged in an array of lending activities for accounts ranging from global grain trading companies to cattle feedlots. Managed offices in four U.S. cities.

**Additional Information**

- Member Board of Directors and Audit Committee                2001 - present
  The FINOVA Group, Inc.

- Chairman of the Board of Citicorp North America from 1999 – 2001.

- Chairman of the Board of Shuttle, Inc. from 1992 – 1997.
  Shuttle, Inc. was the successor to the Trump Shuttle.
  Significant debt recoveries were realized by initiating management changes, cost cutting and the negotiated sale of the airline to USAir.

- Completed an advanced management program at the Amos Tuck School of Business BBA, University of Notre Dame. Served as a Lieutenant, U.S. Navy.

THOMAS F. BOLAND                                                                          3

# ARTICLES

1.    Getting Through Rough Economic Times With Lessons Learned From Lending
      Law Journal's Equipment Leasing Newsletter
      February, 2002

2.    Airlines And the Internet
      Issues Facing the Airline Industry
      AFN White Paper 2004

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 1. | Objection to the Proof of Claim filed by Credit Suisse First Boston LLC; Plaintiff's Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (G) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency; and Demand for Jury Trial dated November 13, 2004 |
| 2. | Defendants' Opening Brief in Support of Motion to Dismiss Certain Claims of the Complaint dated May 6, 2005 |
| 3. | SEC form 10-Ks for Oakwood Homes Corp. from 1999 – 2002<br>• 10-K Filed 12/29/1999<br>• 10-K Filed 12/29/2000<br>• 10-K Filed 12/28/2001<br>• 10-K Filed 01/14/2003 |
| 4. | SEC Form 8-K for Oakwood Homes Corp. dated August 9, 2002 |
| 5. | Credit Suisse First Boston Equity Research Reports<br>• CSFB–00050263 - CSFB–00050272<br>• CSFB–00050239 - CSFB–00050262<br>• CSFB–00050227 - CSFB–00050238<br>• CSFB–00050219 - CSFB–00050222<br>• CSFB–00050212 - CSFB–00050218<br>• CSFB–00050198 - CSFB–00050211<br>• CSFB–00050195 - CSFB–00050197<br>• CSFB–00050192 - CSFB–00050194<br>• CSFB–00050164 - CSFB–00050191<br>• CSFB–00050152 - CSFB–00050163<br>• CSFB–00049523 - CSFB–00049528<br>• CSFB–00050117 - CSFB–00050145<br>• CSFB–00050115 - CSFB–00050116<br>• CSFB–00050094 - CSFB–00050114<br>• CSFB–00050091 - CSFB–00050093 |

## EXHIBIT 2

**Materials Considered in Preparation of Expert Report of Thomas Boland**

|   |   |
|---|---|
|   | • CSFB–00050085 - CSFB–00050090<br>• CSFB–00266304 - CSFB–00266330<br>• CSFB–00052800 - CSFB–00052839<br>• CSFB–00052680 - CSFB–00052755<br>• CSFB–00050081 - CSFB–00050084<br>• CSFB–00052644 - CSFB–00052675<br>• CSFB–00052596 - CSFB–00052619<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00050072 - CSFB–00050075<br>• CSFB–00050069 - CSFB–00050071<br>• CSFB–00050066 - CSFB–00050068<br>• CSFB–00050039 - CSFB–00050065<br>• CSFB–00049908 - CSFB–00050038<br>• CSFB–00049905 - CSFB–00049907<br>• CSFB–00049298 - CSFB–00049309<br>• CSFB–00049862 - CSFB–00049892<br>• CSFB–00049732 - CSFB–00049861<br>• CSFB–00049004 - CSFB–00049136<br>• CSFB–00049674 - CSFB–00049704<br>• CSFB–00049533 - CSFB–00049673<br>• CSFB–00049529 - CSFB–00049532 |
| 6. | Credit Suisse First Boston Manufacts<br>• (CSFB–00052575 – CSFB–00052595)<br>• (CSFB–00052453 – CSFB–00052475)<br>• (CSFB–00052356 – CSFB–00052382)<br>• (CSFB–00052176 – CSFB–00052202)<br>• (CSFB–00052102 – CSFB–00052127)<br>• (CSFB–00051980 – CSFB–00052008)<br>• (CSFB–00051843 – CSFB–00051875)<br>• (CSFB–00051574 – CSFB–00051606)<br>• (CSFB–00051348 – CSFB–00051376)<br>• (CSFB–00051226 – CSFB–00051225) |
| 7. | Engagement Letter (MNAT 003849 – MNAT 003862) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 8. | Warrant (CSFB-00092357 – CSFB-00092369) |

| DEPOSITIONS & EXHIBITS | |
|---|---|
| 9. | Deposition of Jared Felt dated June 15-16, 2006 |
| 10. | Deposition of Thomas Irwin (with exhibits) dated November 8, 2006 |
| 11. | Deposition of Douglas Muir dated September 26-27, 2006 |
| 12. | Deposition of Fiachra O'Driscoll (with exhibits) dated June 29-30, 2006 |
| 13. | Deposition of Alan Shapiro dated September 5, 2007 |
| 14. | Deposition of Myles Standish dated September 21, 2006 |
| 15. | Deposition of Michael Tennenbaum dated October 22, 2007 |
| 16. | Deposition of James Xanthos (with exhibits) August 24, 2006 |
| 17. | Exhibit # 202 to Standish Deposition (Declaration of Douglas Muir in Support of First Day Relief (filed in In re Oakwood Homes Corp., No. 02-13396 (Bankr. De.)), dated November 18, 2002) |
| 18. | Exhibit # 203 to Standish Deposition (OHCLT-05175 – OHCLT-05177) |
| 19. | Exhibit # 205 to Standish Deposition (CSFB-00055756 – CSFB-00055760) |

| EXPERT REPORTS | |
|---|---|
| 20. | The Expert Report of Alan Shapiro dated April 30, 2007 |
| 21. | The Supplemental Expert Report of Alan Shapiro dated August 28, 2007 |
| 22. | The Expert Report of Michael Tennenbaum dated April 27, 2007 |

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 25. | Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| | Tougher Lending Standards Cut Demand." November 29, 2000 |
| 26. | Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9 |
| 27. | Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001 |
| 28. | Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001 |
| 29. | Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001 |
| 30. | Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007 |
| 31. | George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996 |
| 32. | Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007 |
| 33. | Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004 |
| 34. | Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6 |
| 35. | Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem Under Credit Risk." Rutgers Business School, June 2005 |
| 36. | Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4 |
| 37. | *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004 |
| 38. | Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 87. | Board Minutes dated 22 April 1999  (KCLH 0925 – KCLH 0927) |
| 88. | Board Minutes dated 17 June 1999  (KCLH 0931 – KCLH 0936) |
| 89. | Board Minutes dated 30 June 1999 (KCLH 0938 – KCLH 0943) |
| 90. | Board Minutes dated 21 July 1999  (KCLH 0948 – KCLH 0954) |
| 91. | Board Minutes dated 2 August 1999 (KCLH0956 – KCLH0959) |
| 92. | Board Minutes dated 10 August 1999 (KCLH 0961 – KCLH 0969) |
| 93. | Board Minutes dated 20 September 1999  (KCLH 0971 – KCLH 0972) |
| 94. | Board Minutes dated 27 September 1999  (KCLH 0974 – KCLH 0976) |
| 95. | Board Minutes dated 20 October 1999  (KCLH 0978 – KCLH 0981) |
| 96. | Board Minutes dated 3 November 1999  (KCLH 0983 – KCLH 0985) |
| 97. | Board Minutes dated 17 November 1999 KCLH 0987 – KCLH 0992 |
| 98. | Board Minutes dated 20 December 1999 (KCLH 0994 – KCLH 0996) |
| 99. | Board Minutes (Shareholders) dated 9 February 2000 (MNAT002742 - MNAT002744) |
| 100. | Board Minutes dated 9 February 2000  (MNAT002745 - MNAT002746) |
| 101. | Board Minutes (Audit Committee) dated 16 February 2000 (OHCLT-13763 - OHCLT-13765) |
| 102. | Board Minutes (Audit Committee) dated 18 April 2000 (OHCLT-13737 – OHCLT13739) |
| 103. | Board Minutes (Valuation Committee) dated 6 June 2000 (OHCLT-04860 – OHCLT-0486) |
| 104. | Board Minutes dated 30 June 2000 (KCLH 1034 – KCLH 1036) |
| 105. | Board Minutes dated 8 August 2000  (KCLH 1038 – KCLH 1042) |
| 106. | Board Minutes dated 20 September 2000 (RCDA 033115 – RCDA 033118) |

9

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 107. | Board Minutes dated 16 October 2000 (KCLH 1059 – KCLH 1061) |
| 108. | Board Minutes dated 15 November 2000 (MNAT006717 – MNAT006722) |
| 109. | Board Minutes dated 20 December 2000 (MNAT006712 – MNAT006716) |
| 110. | Board Minutes dated 30 and 31 January 2001 (KCLH 1124 – KCLH1128) |
| 111. | Board Minutes dated 19 April 2001 (KCLH 1151 – KCLH 1154) |
| 112. | Board Minutes dated 8 June 2001 (KCLH 1172 – KCLH 1174) |
| 113. | Board Minutes (Audit Committee) dated 23 July 2001 (OHCLT-13756 – OHCLT-13758) |
| 114. | Board Minutes dated 24 July 2001 (KCLH 1176 – KCLH 1181) |
| 115. | Board Minutes dated 20 August 2001 (MNAT002585 – MNAT002586) |
| 116. | Board Minutes dated 15 November 2001 (KCLH 1201 – KCLH 1207) |
| 117. | Board Minutes dated 6 May 2002 (OHCLT-02877 – OHCLT-02879) |
| 118. | Board Minutes (Audit Committee) dated 6 May 2002 (KCLH 1229 – KCLH 1230) |
| 119. | Board Minutes dated 25 June 2002 (MNAT006726 – MNAT006728) |
| 120. | Board Minutes dated 29 July 2002 (MNAT006776 – MNAT006777) |
| 121. | Board Minutes (Audit Committee) dated 29 July 2002 (OHCLT-037993 – OHCLT-037994) |
| 122. | Board Minutes dated 19 August 2002 (MNAT006729 – MNAT006730) |
| 123. | Board Minutes dated 30 September 2002 (MNAT006780 – MNAT006782) |
| 124. | Board Minutes dated 18 October 2002 (MNAT006825 – MNAT006826) |
| 125. | Board Minutes dated 28 October 2002 (MNAT006827 – MNAT006828) |
| 126. | Board Minutes dated 4 November 2002 (OHCLT-02761 – OHCLT-02763) |
| 127. | Board Minutes dated 12 November 2002 (MNAT006829 – MNAT006837) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 128. | Board Minutes dated 14 November 2002 (OHCLT-02655 – OHCLT-02660) |

| PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND | |
|---|---|
| 1. | Growing Profits Under Pressure: Integrating Corporate and Investment Banking, Ludger Kubel-Sorger, Jurgen E. Schwarz, The Boston Consulting Group, 2002. |
| 2. | Deutsche Bank Annual Report 2006 – Corporate and Investment Banking http://annualreport.deutsche bank.com/2006/ar/managementreport/outlook/corporateandinvestmentbank.html. |
| 3. | Investment Banking – National City Corporation https://www.nationalcity.com/investmentbanking/Aboutus.asp. |
| 4. | BMO Financial Group, U.S. Expansion Strategy, Successfully Leveraging Lending Relationships. |
| 5. | Oakwood Homes Corporation – Company Profile http://www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html. |
| 6. | Ivy Zelman – Excelling in Stock Analysis, Robin Heffler, JW Magazine, Fall, 2005. |
| 7. | Fleetwood Enterprises Annual Report, 2005, page 49. |
| 8. | Third Party Interference, Philip J. Campanella, Joseph A. Castrodale, Matthew Bender & Company, 2008 |
| 9. | U.S. Labor Markets in 2001: Economy Enters a Recession, David S. Langdon, Monthly Labor Review, February 2002. |
| 10. | A Body Blow to the Economy, David Leonhardt, Luis Uchitelle, New York Times September 16, 2001. |
| 11. | Housing Market is Duddenly Uncertain, Alan J. Heavens, The Philadelphia Inquirer October 7, 2001. |
| 12. | BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10. |

# EXHIBIT
# 622

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, *et al.*, | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT OF ALAN C. SHAPIRO, PH.D.

**April 30, 2007**

**CONFIDENTIAL**



EXHIBIT
622
3/25/08
PENGAD 800-631-6989

# Table of Contents

I.      Scope of Engagement ................................................................................ 1

II.     Credentials ............................................................................................... 1

III.    Basis for Opinions .................................................................................... 3

IV.     Summary of Opinions ............................................................................... 3

V.      Assumptions ............................................................................................. 4

        V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty ............. 4

        V.B    Oakwood Was Insolvent in September 2001 ................................. 4

VI.     Background ............................................................................................... 4

        VI.A   Manufactured Housing Industry .................................................. 4

        VI.B   Business Overview of Oakwood ................................................... 5

        VI.C   Financial Performance of the Industry Prior to 1999 .................. 5

        VI.D   Industry Downturn Beginning in 1999 ........................................ 6

        VI.E   Oakwood's Downturn and Bankruptcy ......................................... 7

                VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

                VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ...................... 9

                VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported
                        Losses in 2002 .................................................................... 10

                VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ................................. 11

VII.    CSFB Did Not Behave In a Prudent Manner ............................................. 12

        VII.A  CSFB Had Access to Public and Private Information Concerning
               Oakwood's Financial Condition ................................................. 12

                VII.A.1  Investment Banks Have Unique Access to Information ........................ 12

                VII.A.2  Relationship between Oakwood and CSFB ....................................... 14

                VII.A.3  CSFB Obtained Both Public and Inside Information about
                         Oakwood's Financial Condition ............................................. 22

        VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy
               Risk ......................................................................................... 24

                VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial
                         Condition ................................................................. 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood ................................................................................. 26

VII.C CSFB's Own Guidelines Require a High Standard of Care to its Clients ............ 27

VII.D CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors ........................................................................ 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy ......................................................................... 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives ..................................................................... 34

VII.E The Advice CSFB Provided to Oakwood was Inappropriate ............................... 35

VII.F The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition .............................. 36

VII.G CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value ......................................... 37

VIII. CSFB Had a Financial Incentive to Keep Oakwood Operating ................................. 39

VIII.A CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood ............................................................................................ 39

VIII.A.1 Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2 Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood ...................................................................................... 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor ......................................................................................... 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern ............................................... 41

VIII.B CSFB's Equity Interest provided it with a Financial Interest in Oakwood Continuing Operations ............................................................................ 42

VIII.B.1 Agency Conflict between Equity and Debt Holders ............................. 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C Even Though CSFB was a Lender, Its Interests Differed from Those of Other Debt Holders ............................................................................. 45

VIII.D Conclusion Regarding CSFB's Incentives ....................................................... 47

## List of Tables

Table 7.1: CSFB's Roles and Fees Earned.................................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB ..................................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects ...............................................44

## List of Figures

Figure 7.1: Oakwood's Securitization Process ..........................................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.    Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance.* In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis*, (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management*.

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

2

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.    Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.    Summary of Opinions

My opinions in this matter are as follow:

- *CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.* CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

3

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V. Assumptions

### V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B    Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI. Background

### VI.A   Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

## VI.B   Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C   Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.
[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.
[3] *Ibid.*, p. 2.

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D   Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*
[5] *Ibid.*, p. 7.
[6] *Ibid.*, p. 3.
[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.
[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

6

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks ... [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E    Oakwood's Downturn and Bankruptcy

### VI.E.1    Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.
[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000. p. 1.
[12] *Ibid.*
[13] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[14] *Ibid.*

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13. Issue 26.
[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.
[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.
[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2  Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] Ibid.

[21] Ibid.

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

### VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.
[26] *Ibid.*
[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.
[28] *Ibid.*
[29] *Ibid.,* p. 2.

10

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4  Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.

[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A    CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

### VII.A.1    Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006, p. 59.
[35] *Ibid.,* p.183.

12

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website. http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*

13

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

## VII.A.2    Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

## VII.A.2.a    Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than $7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;

- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;

- Testing the financial information contained in the prospectuses; and

- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

15

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

### VII.A.2.b   Role as Provider of Loan Purchase Facility

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[t]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, December 12, 2006, p. 73.
[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 89.
[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 64-5.
[53] *Ibid.*, p. 194-5.

18

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

19

### VII.A.2.d    Role as Financial Advisor for Restructuring Purposes

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 … We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.

[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

**Table 7.1: CSFB's Roles and Fees Earned**

| Role | Description | Fees Earned |
|---|---|---|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | ▪ Warrants of 19.9% of Oakwood's Common Stock ▪ Upfront fee of $2.5 million ▪ Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 163.

[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 152.

## VII.B    In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1    Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a    Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] *Ibid.*
[74] *Ibid.*, Document # CSFB-00250116.

24

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] Ibid.
[76] Ibid., Document # CSFB-00250117.
[77] Ibid., Document # CSFB-00250121.
[78] Ibid., Document # CSFB-00250118.
[79] Ibid., Document # CSFB-00250117.

25

### VII.B.1.b    March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2    Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.
[81] *Ibid.*, Document # CSFB-00250132.
[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventory levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C    CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] Ibid., Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] Ibid.
[88] Ibid.

**VII.D.2    CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives**

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise Oakwood that its best course of action might have been a restructuring. CSFB discussed Oakwood's capital structure and the potential courses of action it felt Oakwood should have considered pursuing to meet its liquidity and capital needs "in light of the sustained losses suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB stated that "while many thought that the industry had bottomed, there continues to be a downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's current state of operations and its short- and long-term prospects. Of particular concern was the maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that the factors threatening Oakwood's short-term liquidity position were $24 million in annual interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving, which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default rates and a structural change in the industry would place additional stress on Oakwood and that the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood chose should be based on its degree of optimism or pessimism as to its ability to grow into its capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views, CSFB offered a number of strategic alternatives. An optimistic view was seen as having a moderate-to-high probability of being able to service and refinance debt capitalization. If this were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid.*
[106] *Ibid.*, Document # MNAT006735.

34

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

### VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid.*, Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006, p. 201.
[109] *Ibid.*, pp. 169-170.
[110] *Ibid.* p. 16.

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F    The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006, Vol. 2, p. 232.
[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 19.
[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.
[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

## VII.G    CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.
[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.
[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility.[126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.

[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.

[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.

[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.

[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

### VIII.A.3   Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:
  - The face amount of the old securities;
  - One third of the face amount of the securitization guarantees; and
  - One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

 The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

### VIII.A.4   Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

## VIII.B    CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1    Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.
[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

42

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.
[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

43

**Table 8.1: Illustration of Payoffs and Probabilities of Projects**

| | Project A | | Project B | |
|---|---|---|---|---|
| | **Unsuccessful** | **Successful** | **Unsuccessful** | **Successful** |
| **Cash Flow** | **Payoff (80% Prob.)** | **Payoff (20% Prob.)** | **Payoff (50% Prob.)** | **Payoff (50% Prob.)** |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

44

### VIII.B.2  CSFB Had a Conflict of Interest with Oakwood's Debt Holders

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

### VIII.C  Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.
[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989.301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection to lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict – that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

**VIII.D    Conclusion Regarding CSFB's Incentives**

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.

Dated:    April 30, 2007

Alan C. Shapiro, Ph.D.

47

**Appendix A:  Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California 90089-1427

**EDUCATION**

| | |
|---|---|
| Ph. D. | Economics, Carnegie Mellon University, 1971 |
| B.A. | Mathematics, Rice University, 1967 |

**CURRENT POSITION**

1991-Present:     Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

**PAST POSITIONS**

1993-1997:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:     Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:     Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:     Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:     Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:     Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:     Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:     Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

**VISITING APPOINTMENTS**

Spring 2003:     U.S. Naval Academy

Spring 1990:     Yale School of Management, Yale University

1

1984-1985:     Anderson Graduate School of Management, UCLA

Spring 1981:   Faculty of Commerce, University of British Columbia

Spring 1977:   Stockholm School of Economics

## TEACHING EXPERIENCE

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

## EXECUTIVE PROGRAMS: UNIVERSITIES

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

2

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

## EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS

CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

3

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy;
O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

<u>Editorial Positions</u>

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

<u>Boards of Directors</u>

Academy of International Business
Western Finance Association
American Finance Association

<u>Reviewer for</u>

*Journal of Financial Economics*          *Journal of Banking and Finance*
*Journal of Political Economy*            *Financial Review*
*Journal of Finance*                      *International Trade Journal*
*Management Science*                      *Financial Management*
*Journal of International Economics*      *Urban Economics*
*Journal of Money, Credit, and Banking*  *Journal of International Business Studies*
*Journal of Financial and Quantitative Analysis*  *Journal of Economics and Business*
*National Science Foundation*             *Journal of Financial Services Research*
*Journal of International Money and Finance*

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management
    Association, 1986.

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

> Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

> Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

6

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

> Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

## WORKING PAPERS

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

## CONSULTING AND PROFESSIONAL ACTIVITIES

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

## AWARDS AND SPECIAL RECOGNITION

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

## SPEECHES

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

14

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

**EXPERT WITNESSING**

1. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2. Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3. Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4. New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

15

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6.  O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7.  IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8.  IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9.  Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

18

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread–slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Hafif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton: Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

23

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:**
**1994-2006**

1.  Fleet Funding, Inc. and Fleet Funding 11, Inc., Appellants v. Commissioner of Revenue,
    Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax
    Board: Analyzing the business purposes and the economic substance of the mortgage REITs
    established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-
    raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on
    March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of
    Revenue.

2.  K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc.,
    Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the
    County of Santa Clara: Assessing the economic validity of damage claims associated with
    alleged misappropriation of intellectual property brought against Bank of America and
    determining the appropriate way to estimate any such damages. I was deposed on February 3,
    2006 on behalf of the defendant.

3.  Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior
    Court of the State of California for the County of Santa Clara: Assessing the effects of an
    error in the accounting treatment of stock options on corporate behavior and the economic
    consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the
    plaintiff.

4.  Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C,
    United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet
    Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform,
    Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating
    to the payment of dividends, the maintenance of capital, and the inclusion of subordinated
    debt in the calculation of its regulatory capital and whether all of the necessary capital
    contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004
    (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court
    of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5.  Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under
    Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division
    of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions
    between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues
    included the identification of intangible assets, the allocation of excess returns among various
    intangible assets, the basis of fair market value of an intangible asset, and the nature of
    intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6.  TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7.  Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8.  Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9.  Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

27

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

20. Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

29

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

# Appendix B:  List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.*

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on April 21, 2008, I

caused a copy of the Declaration of Whitman L. Holt in Support of Plaintiff's Motions *in Limine*,

to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

{D0109884.1 }

Dated:  April 21, 2008                    CAMPBELL & LEVINE, LLC


                                          */s/ Kathryn S. Keller*
                                          Kathryn S. Keller (No. 4660)
                                          800 N. King Street, Suite 300
                                          Wilmington, DE 19801
                                          (302) 426-1900