# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re: Civil Docket Nos. 66-71** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# CONSOLIDATED ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' ATTEMPTS TO EXCLUDE CERTAIN NON-EXPERT EVIDENCE

Tony Castañares (CA SBN 47564)          -&-     Marla Rosoff Eskin (No. 2989)
Stephan M. Ray (CA SBN 89853)                   Kathleen Campbell Davis (No. 4229)
Scott H. Yun (CA SBN 185190)                    Kathryn S. Keller (No. 4660)
Whitman L. Holt (CA SBN 238198)                 CAMPBELL & LEVINE, LLC
STUTMAN, TREISTER & GLATT, P.C.                 800 N. King Street, Suite 300
1901 Avenue of the Stars, 12th Floor            Wilmington, DE 19801
Los Angeles, CA 90067                           (302) 426-1900
(310) 228-5600

*Special Counsel for the OHC Liquidation Trust*

Dated: April 28, 2008

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................ 1

RELEVANT BACKGROUND FACTS .................................................................................... 2

ARGUMENT .......................................................................................................................... 7

    A.    Plaintiff's Unified Statement Of The Case. ................................................... 8

        1.    Overview. ....................................................................................... 8

        2.    Plaintiff's Case, As Stated By *Plaintiff*. .......................................... 9

    B.    Defendants Simply Misapprehend The Nature Of The Required
        Analysis Under FRE 401, 402, And 403. ................................................. 21

    C.    The CRM Motion Should Be Denied. ....................................................... 23

        1.    All Of The CRM Evidence Is Relevant. ....................................... 24

        2.    None Of The CRM Evidence Is Unfairly Prejudicial. ................... 27

    D.    The Subprime Motion Should Be Denied. .................................................. 30

        1.    If The Subprime Motion Is Directed At *Evidence*, It Fails
              Because Such Evidence Is Relevant And In No Way
              *Unfairly* Prejudicial. .................................................................. 30

        2.    If The Subprime Motion Is Directed At *Argument*, Such A
              Word-Ban Is An Inappropriate Request Unsupported By
              Any Case Law. ............................................................................. 33

    E.    Credit Suisse's Various Other Evidentiary Objections Should Be
        Denied. ....................................................................................................... 35

CONCLUSION ..................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Blancha v. Raymark Indus.*,
  972 F.2d 507 (3d Cir. 1992) ............................................................................... 22

*BrandAid Mktg. Corp. v. Biss*,
  462 F.3d 216 (2d Cir. 2006) ............................................................................... 20

*Carter Equip. Co. v. John Deere Indus. Equip. Co.*,
  681 F.2d 386 (5th Cir. 1982) ............................................................................. 11

*Carter v. Hewitt*,
  617 F.2d 961 (3d Cir. 1980) ............................................................................... 22

*Colo. Capital v. Owens*,
  227 F.R.D. 181 (E.D.N.Y. 2005) ....................................................................... 17

*Crowley v. Chait*,
  No. 85-2441, 2004 U.S. Dist. LEXIS 27235 (D.N.J. Dec. 27, 2004) ...................... 26, 27, 28

*Crowley v. Chait*,
  No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006) ....................................... 17

*Floyd v. Hefner*,
  No. 03-5693, 2008 U.S. Dist. LEXIS 25642 (S.D. Tex. Mar. 31, 2008) ............................ 21

*Gibson v. Mayor & Council of Wilmington*,
  355 F.3d 215 (3d Cir. 2004) ............................................................................... 22

*Goodman v. Pa. Tpk. Comm'n*,
  293 F.3d 655 (3d Cir. 2002) ........................................................................... 2, 22

*Grant Thornton, LLP v. FDIC*,
  535 F. Supp. 2d 676 (S.D.W. Va. 2007) ........................................................ 17, 37

*Hugo Boss Fashions, Inc. v. Federal Ins. Co.*,
  No. 98-6454, 1999 U.S. Dist. LEXIS 17016 (S.D.N.Y. Nov. 1, 1999) .............................. 11

*Indian Towing Co. v. United States*,
  350 U.S. 61 (1955) ............................................................................................. 10

*JPMorgan Chase Bank v. Liberty Mut. Life Ins. Co.*,
  No. 01-11523, 2002 U.S. Dist. LEXIS 24518 (S.D.N.Y. Dec. 23, 2002) ................... 28, 33

*Langford v. Roman Catholic Diocese*,
  677 N.Y.S.2d 436 (N.Y. Sup. Ct. 1998) ........................................................... 11

*Levine v. United States Dist. Court*,
  764 F.2d 590 (9th Cir. 1985), *cert. denied*, 476 U.S. 1158 (1986) ....................... 35

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
    173 F.3d 454 (2d Cir. 1999) ........................................................................... 16

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) ....................................................... 12, 19

*Mauney v. Boyle*,
    865 F. Supp. 142 (S.D.N.Y. 1994) ................................................................. 17

*McAdam v. Dean Witter Reynolds, Inc.*,
    896 F.2d 750 (3d Cir. 1990) ........................................................................... 20

*McEachron v. Glans*,
    No. 98-17, 1999 U.S. Dist. LEXIS 21926 (N.D.N.Y. Aug. 23, 1999) .............. 34

*Meinhard v. Salmon*,
    249 N.Y. 458 (1928) ....................................................................................... 14

*Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*,
    No. 88-CV-819, 1992 U.S. Dist. LEXIS 7721 (N.D.N.Y May 23, 1992) .......... 11

*O'Halloran v. PricewaterhouseCoopers LLP*,
    969 So. 2d 1039 (Fla. Dist. Ct. App. 2007) ................................................... 20

*In re Olympia Brewing Co. Sec. Litig.*,
    No. 77-1206, 1985 U.S. Dist. LEXIS 13796 (N.D. Ill. Nov. 13, 1985) ............ 19

*Palka v. ServiceMaster Mgmt. Servs. Corp.*,
    83 N.Y.2d 579 (1994) ..................................................................................... 10

*Parvi v. Kingston*,
    41 N.Y.2d 553 (1977) ..................................................................................... 10

*In re Safety-Kleen, Bondholders Litig.*,
    No. 00-1145-17, 2005 U.S. Dist. LEXIS 46268 (D.S.C. Feb. 4, 2005) ........... 34

*Scott v. Dime Sav. Bank*,
    886 F. Supp. 1073 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 107 (2d Cir. 1996),
    *cert. denied*, 520 U.S. 1122 (1997) .............................................................. 11

*Smith v. Sheahan*,
    No. 95-7203, 2000 U.S. Dist. LEXIS 8140 (N.D. Ill. June 8, 2000) ................ 34

*Stagl v. Delta Airlines, Inc.*,
    52 F.3d 463 (2d Cir. 1995) ............................................................................. 17

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
    335 B.R. 539 (D. Del. 2005) ........................................................................... 21

*Thropp v. Bache Halsey Stuart Shields, Inc.*,
    650 F.2d 817 (6th Cir. 1981) .......................................................................... 37

*United States v. Fieger*,
    No. 07-CR-20414, 2008 U.S. Dist. LEXIS 28240 (E.D. Mich. Apr. 8,
    2008) ............................................................................................................. 34

*United States v. Tse*,
    375 F.3d 148 (1st Cir. 2004) ...................................................................... 23

*Wechsler v. Hunt Health Sys., Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003) ................................................. 22, 23

*Zal v. Steppe*,
    968 F.2d 924 (9th Cir.), *cert. denied*, 506 U.S. 1021 (1992) ...................... 35

## STATUTES AND RULES

Fed. R. Evid. 401 ..........................................................................................*passim*

Fed. R. Evid. 402 ..........................................................................................*passim*

Fed. R. Evid. 403 ..........................................................................................*passim*

## OTHER AUTHORITIES

1 MCCORMICK ON EVIDENCE § 185 at 645 (5th ed. 1999)..............................22

Oliver W. Holmes, Jr., *The Common Law* (1881) .......................................10

Standard & Poor's, *For U.S. Subprime RMBS, Positive Implications When
    Compared With Manufactured Housing ABS* (Apr. 27, 2007), *available at*
    http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,
    0,1148443670700.html (last accessed April 26, 2008)......................32

## NATURE AND STAGE OF THE PROCEEDINGS

For the convenience of the Court and the parties, the OHC Liquidation Trust, by and through its duly appointed trustee, Alvarez & Marsal, LLC ("**Plaintiff**") respectfully submits this consolidated Answering Brief in opposition to certain of the non-expert evidentiary motions and objections made by the defendants in the above-captioned proceeding (collectively, "**Defendants**" or "**Credit Suisse**"), particularly Defendants' April 16 motions to exclude certain testimony and documents related to their credit risk management group (the "**CRM Motion**" [D.I. #66]) and to the current "subprime mortgage crisis" (the "**Subprime Motion**" [D.I. #69]).

## SUMMARY OF ARGUMENT

This brief contains a Unified Statement of Plaintiff's case, which we present for the Court's convenience in assessing this and other matters that have or will come before it. We do this because it is important for this Court finally to hear Plaintiff's case as stated by Plaintiff, rather than the distorted view of Plaintiff's case presented in Defendants' numerous motions, such as the CRM Motion and the Subprime Motion. That Unified Statement is *infra* at pages 8-21.

Among the evidence that Credit Suisse hopes to keep from the jury are the very "smoking gun" documents showing Defendants (i) had actual knowledge that the transactions they were engineering for Oakwood Homes, or actually participating in with Oakwood, were value-destroying to Oakwood; and (ii) knew Oakwood's management did not fully understand the risks and damages of those transactions. As detailed below, such evidence is highly relevant to live issues in this case, particularly Defendants' breaches of duty and causation of damages (this would be true even under Defendants' grossly distorted, strawman presentation of Plaintiff's positions). Hence, such evidence should be excluded only if Defendants set forth *unfair* prejudice that substantially outweighs its probative value. The only "prejudice" that Defendants

ever articulate is the concern that such evidence may cause the jury to decide this case against

them.  Third Circuit case law makes clear, however, that a party's fear of losing on the merits is

not the "unfair prejudice" Federal Rule of Evidence ("**FRE**") 403 is designed to address.  *See,*

*e.g.*, *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002).  As such, Defendants have

failed to counter the basic presumption that all relevant evidence ought to be admitted at trial.

## RELEVANT BACKGROUND FACTS

Oakwood Homes Corporation and its affiliates (collectively, "**Oakwood**") began

producing and selling manufactured homes in the 1940s.  In the mid-1990s, Oakwood greatly

expanded a business that was ancillary to these two functions: providing financing to the

purchasers of its products, who often were low-income individuals with poor credit records.

This dramatic expansion of Oakwood's financing business was aided, in large part, by the access

to capital obtained via "securitizations," most of which were structured by Credit Suisse.

Things turned for the worse for the manufactured housing industry in general, and

for Oakwood in particular, in 1999 – a period that overlapped with the rapid rise of the now-

floundering "subprime" mortgage industry.  In need of liquidity, Oakwood turned to its trusted

advisor at Credit Suisse, Mr. Fiachra O'Driscoll, for help.  Mr. O'Driscoll in turn made a proposal

to the New York branch of Credit Suisse's banking arm ("**New York Branch**") that Credit Suisse

provide a committed "reverse repurchase" facility that would allow Oakwood to monetize lower

rated tranches of securitizations which Oakwood had been holding on its own balance sheet.

The proposed reverse repurchase facility was reviewed by employees of New

York Branch's "credit risk management" department ("**CRM**"), particularly analyst James

Xanthos and his supervisor, Thomas Irwin.  In November 1999, Mr. Xanthos and Mr. O'Driscoll

traveled to North Carolina to meet with Oakwood's management about the proposed facility.

Shortly thereafter, Mr. Xanthos wrote a detailed memorandum in which he outlined his observations and conclusions about Oakwood and strongly recommended that the proposed credit facility be denied (the "**Xanthos Memo**"[1]).

The Xanthos Memo provides a blistering account of a corporation in rather deep trouble.  Among other things, the Xanthos Memo states that Oakwood had "very real/immediate bankruptcy risk issues/concerns," a "Negative Cash Flow Position which does not appear will reverse anytime soon," a "management [that] does not have a strong understanding of its marketplace," and a glut of "securitized subordinated securities of which currently their [sic] is no strong investor demand."  (*See* Xanthos Memo at CSFB-00250117 [Holt Decl. Ex. "A"].)  Based upon such concerns, Mr. Xanthos concluded that Oakwood "is the weakest company in its industry's [sic]" and would "not meet their forecasted profitability levels but will rather be fortunate to at best break even."  (*See id.* at CSFB-00250117 – CSFB-00250118.)  Even worse, Mr. Xanthos found it "hard to believe that management will not continue to experience . . . losses on the sale of its loans due to the fact that the company must securitize quarterly . . . even if doing so results in large losses."  (*See id.* at CSFB-00250118.)  Accordingly, notwithstanding "Oakwood's relationship with [Credit Suisse's investment banking division,] a review of all the negative factors noted above strongly indicates that [Credit Suisse's] risk are large and that repayment of our line is unknown due to the company's other debt obligations and lack of cash flow capacity."  (*See id.* at CSFB-00250117.)

Two months later, Mr. Xanthos, Mr. O'Driscoll, and Mr. Irwin had a conference call with Oakwood's management, after which Mr. Xanthos wrote an update memorandum,

---

[1]    A true and correct copy of the Xanthos Memo is attached as Exhibit "A" to the accompanying declaration of Whitman L. Holt (cited hereinafter as "**Holt Decl.**").

stating that his "opinion of Oakwood as well as this industry as a whole has not changed since" the Xanthos Memo and reiterating his concerns about lending "to a counterpart that is currently facing real bankruptcy risk concerns." (*See* March 13, 2000 "Memorandum" at CSFB-00250131 [Holt Decl. Ex. "B"].) Within days, CRM declined the proposed facility and informed Mr. O'Driscoll of that decision.[2] (*See* March 21, 2000 "Memorandum" at CSFB-00512903 [Holt Decl. Ex. "C"].) As Defendants note in the brief in support of their CRM Motion, neither the Xanthos Memo nor the negative information contained therein was ever shared with Oakwood by anyone at Credit Suisse. (*See* D.I. #67 at p. 2.)

Things turned even worse for Oakwood in 2000, and by the end of the year, Bank of America informed Oakwood that it would not renew the "warehouse" facility Oakwood used for short-term financing of new loans prior to their securitization. Once again, Oakwood turned to its most trusted advisor at Credit Suisse – Mr. O'Driscoll – for help. Following a series of discussions, Mr. O'Driscoll concluded that *Credit Suisse* could replace Bank of America and provide the warehouse, and he made such a proposal to New York Branch. And once again, Mr. Xanthos and Mr. Irwin were the CRM employees who evaluated the proposed Oakwood credit.

The principal concern CRM had about Oakwood in early 2001 was its underwriting process – specifically, the fact that Oakwood was lending money to people with very poor credit, which was resulting in numerous "repos" (i.e., repossessions of defaulted homes, which had to be remarketed, resold, and perhaps refinanced). Mr. Xanthos expressed the need "to gain control of Oakwood's underwriting process." (January 2, 2001 e-mail from James

---

[2]     Interestingly, Mr. O'Driscoll denies that he was ever informed that CRM declined his proposed transaction. (*See* O'Driscoll Dep. Tr. at 186:8-191:13 [Holt Decl. Ex. "M"].) Thus, at a very bare minimum, the CRM documents related to the reverse repo facility that Credit Suisse wants to exclude go directly to Mr. O'Driscoll's credibility.

Xanthos, CSFB-00485340 [Holt Decl. Ex. "D"].)  Similarly, Mr. Irwin worried that "Repo'd

assets are going to be the major issue [Credit Suisse] face[s] going forward, clear the ability of

[Oakwood] to survive hinges on this asset class remaining in 'control.'"  (February 14, 2001 e-

mail from Thomas Irwin, CSFB-00515234 [Holt Decl. Ex. "G"].)  Indeed, the problem was so

bad that CRM asked Mr. O'Driscoll to draft a memorandum explaining the negative trends in

Oakwood's underwriting and reassuring CRM that the problem was under "control."  (*See*

January 9, 2001 "Memorandum," CSFB-00483869 [Holt Decl. Ex. "F"].)

      As in 2000, Mr. Xanthos drafted a lengthy memorandum to evaluate the proposed

"warehouse" or "loan purchase" facility (the "**Second Xanthos Memo**" [Holt Decl. Ex. "H"]).

Even though Oakwood had dropped from "B-" to "CCC" on CRM's internal credit scale, "CRM

has approved this transaction as a result of its structure and the economic benefit that [Credit

Suisse] can potentially realize."  (*See id.* at CSFB-00513803.)  Put differently, and more directly,

(1) the "bankruptcy-remote" nature of the facility ensured that Credit Suisse had virtually no risk

of loss if Oakwood filed for bankruptcy, and (2) Credit Suisse would be paid $2.5 million up-

front and $15 million over three years in exchange for providing the "warehouse."  Plus, Credit

Suisse would receive a warrant to purchase nearly 20% of the equity of Oakwood through 2009,

which gave Credit Suisse the power to become Oakwood's largest shareholder by far.

      The initial February 2001 Credit Suisse "warehouse" facility contained a strict

17.5% limitation on the financing of "repo-refi" loans.  However, as Oakwood's prospects turned

even worse in 2001 and 2002, that limitation proved too tight.  Oakwood attempted to divert the

wave of "repos" via the use of the Loan Assumption Program, which they discussed with Mr.

O'Driscoll, but ultimately they asked Mr. O'Driscoll to see if CRM would increase the limitation

in the warehouse, thereby allowing Oakwood to finance even more bad loans.  (*See* February 19,

2002 e-mail from Fiachra O'Driscoll, CSFB-00478613 [Holt Decl. Ex. "I"].)

As Oakwood continued to deteriorate it increasingly turned to Mr. O'Driscoll for short-term financing solutions. Mr. O'Driscoll designed a number of transactions, such as the so-called "LOTUS" transactions involving the "resecuritization" and guaranty of low-grade "B-2" tranches of past securitizations, that provided Oakwood with quick cash, but came at horrifyingly high costs (such as the guaranty of hundreds of millions of dollars of debt that Oakwood could never repay). Mr. O'Driscoll further attempted to spread the stream of Oakwood fees around Credit Suisse, suggesting that his colleague, Mr. Jared Felt, "pitch" Oakwood on some costly bond buyback proposals. When Mr. Felt asked Mr. O'Driscoll if a draft engagement contract should contain a "lockup" requiring that Oakwood commit to using only Credit Suisse as an investment banker for various transactions, Mr. O'Driscoll found it prudent to correct Mr. Felt's misunderstanding of the nature of the Oakwood relationship, informing him in August 2001 that "[t]he idea of [Oakwood] doing anything away from us is so unlikely that it's probably a little offensive to them" and that the multifaceted nature of Credit Suisse's roles vis-à-vis Oakwood made Oakwood "feel very shackled to [Credit Suisse]." (*See* August 9, 2001 e-mail from Fiachra O'Driscoll, CSFB-00014152 [Holt Decl. Ex. "T"].) That "shackle" only grew tighter into 2002.

Ultimately, the increase in Oakwood's ability to refinance "repos," as well as every other trick Mr. O'Driscoll used to keep Oakwood afloat (and paying him fees), failed to address the basic problem: Oakwood was continuing to make, securitize, and guarantee bad loans. The huge drain on liquidity caused by these value-destroying transactions ultimately led Oakwood to file bankruptcy in November 2002, but not before Oakwood had finally retained Mr. Felt to help prepare for that bankruptcy (in exchange for an additional bag of fees, of course). Part of the preparation involved reviving the New York Branch warehouse post-petition, since

bankruptcy was an event of default thereunder.  Although Oakwood relied on the ever-present Mr. O'Driscoll to assist them with finalizing the "warehouse," Mr. O'Driscoll procrastinated and waited until November 14, 2002 – the day before Oakwood filed for bankruptcy – even to approach Mr. Irwin about the matter.[3]  As a result, CRM's due diligence on the post-petition warehouse was delayed until after Oakwood filed for bankruptcy.  So too was the preparation of another CRM review memo, although this one again underscored how "[o]ver the past three years CRM has consistently questioned [Oakwood] Management's competency and abilities." (*See* "Originator/Servicer Assessment" at CSFB-00250105 [Holt Decl. Ex. "J"].)  Once again, the CRM review memo paints a portrait of a management team that simply does not understand basic aspects of its market, sales projections, financing, and strategy in bankruptcy.

In retrospect, it is all too clear that the many problems identified by CRM in 2000 and 2001 – real bankruptcy risk, continued losses on securitizations, rising defaults and "repos," and a management that just did not understand its declining market and value-destroying financing structures – *are* the same problems that ultimately led to Oakwood's 2002 bankruptcy. In other words, as Defendants' own expert witness forthrightly admits,[4] Mr. Xanthos was *right*. Unfortunately, no one from Credit Suisse – including Oakwood's trusted advisor Mr. O'Driscoll – ever shared these many concerns (or, indeed, expressed *any* similar concern) with Oakwood.

## ARGUMENT

Defendants' evidentiary objections not only stem from a deep misunderstanding of the analytic framework and respective burdens created by the Federal Rules of Evidence, but

---

[3]  *See, e.g.*, Irwin Dep. Tr. at 143:12-148:6 [Holt Decl. Ex. "L"]; O'Driscoll Dep. Tr. at 51:8-53:17 [Holt Decl. Ex. "M"].

[4]  *See, e.g.*, Boland Dep. Tr. at 174:13-177:16, 186:14-21, 190:3-16 [Holt Decl. Ex. "K"].

also rest on a myopic and distorted understanding of Plaintiff's theory of this case.  Once the proper clarifications are made, it is clear that the challenged evidence is highly relevant and that Defendants have utterly failed to show that any ***unfair*** prejudice would result if all that evidence were put before the jury.  As such, all Defendants' non-expert evidentiary challenges must fail.

**A.    Plaintiff's Unified Statement Of The Case.**

**1.    Overview.**

In responding to the veritable flood of motions, evidentiary objections, and the like filed by Defendants in recent days, Plaintiff seeks to avoid burdening the Court with having to read the same or very similar material over and over.  Plaintiff therefore takes this opportunity to offer this Unified Statement, which will help respond to several of Defendants' motions and to Defendants' relevance objections to certain of Plaintiff's trial exhibits and deposition testimony.

Other briefs, such as Plaintiff's responses to Defendants' *Daubert* motions, will avoid unnecessary repetition of what is contained here, but will refer the Court to this Statement.

Much of Defendants' efforts to date have consisted of the creation of simple "strawmen" by mischaracterization of Plaintiff's theories and evidence, followed by attempts to limit Plaintiff's evidence to the strawman case created for Plaintiff by Defendants.

Thus our analysis begins with a statement of Plaintiff's *actual* case.[5]  We do not attempt to lay out every piece of evidence, or every inference from it, that supports our case –

---

[5]   We also note the pendency of Defendants' Motion for Partial Summary Judgment (D.I. #39).  As matters stand, and in accordance with the Court's expressed preference, Plaintiff filed a Counter-Statement Certifying that Genuine Issues of Material Fact Exist (D.I. #50), and awaits the Court's directions as to whether it will deny Defendants' motion on the papers filed to date, or will require Plaintiff to file an answering brief in opposition to Defendants' motion. Thus, the record heretofore contained only Defendants' mischaracterized strawman version of Plaintiff's case.  If Plaintiff must file a responsive brief, much of this Unified Statement will help explain Plaintiff's *actual* case, and demonstrate why summary judgment should not be granted on *that* case, whatever might be said of the strawman case.

rather, our purpose is to provide the general outlines of the case succinctly to assist the Court in

considering relevance, prejudice, expert testimony, and related concepts.  We also point out that

this Unified Statement relates only to the "jury" issues in the case.

    **2.**    **Plaintiff's Case, As Stated By *Plaintiff*.**

    **a. Theories of liability.**    Defendants are correct in their observation that

Plaintiff asserts three common law causes of action to try to a jury: negligence, implied contract,

and breach of fiduciary duty.  The three have much in common, principally the duty of care.

    It is useful to analogize this case to one for professional malpractice, albeit

malpractice committed by an insider and fiduciary of the victim.  Plaintiff contends that Credit

Suisse, well before the 2000-2002 period that will be the principal focus of most of the evidence

in this case, undertook to provide financial advice to Oakwood.  This embodies a main factual

dispute: Plaintiff claims that Defendants undertook this role, and Defendants deny it, claiming

that they merely provided securitization services, much like a supplier of lumber or stationery.

    Plaintiff will offer considerable evidence that Defendants undertook a broader

role, particularly through Mr. O'Driscoll's actions.  In the interests of brevity we will not discuss

all the relevant evidence here, but some salient examples are: (1) Oakwood's executives, as a

regular course, sought advice from Mr. O'Driscoll on a variety of business matters, especially in

the financial area; (2) in the course of this seeking of advice, Oakwood gave him confidential

information about Oakwood that Mr. O'Driscoll had no need to know if his work had actually

been confined to executing securitization transactions; (3) in some cases at Oakwood's request,

and in other cases entirely unbidden, Mr. O'Driscoll sought avenues of financing for Oakwood,

sometimes from Credit Suisse and sometimes from others – the purpose, in all cases, being to

hock anything that was not nailed down so as to provide temporary liquidity to sustain the

"business-as-usual" death spiral that was so detrimental to Oakwood and so profitable to Credit

Suisse; (4) when outside arm's-length lenders decided that they no longer wanted to finance Oakwood, Defendants (being the "only game in town") stepped in with the "warehouse" facility, which was, in essence, a payday loan scheme designed to keep the patient breathing until the next securitization – and in the course of that facility, Credit Suisse acquired a warrant for Oakwood's equity, making them, by admissions in their own documents, an "insider"; (5) Credit Suisse put together a sale to Berkshire Hathaway of low-tranche "B-2" securities that Defendants had not been able to sell on Oakwood's behalf in their underwritings of prior securitizations, which *Mr. O'Driscoll* negotiated on Oakwood's "behalf" with Berkshire's executives.

All of this occurred even though the securitization documents did not require it. Accordingly, Credit Suisse affirmatively chose to undertake such tasks with due care, just as, for example, a lawyer whose formal retainer agreement was confined to the defense of a single lawsuit could have a far greater role if he actually gave advice on other matters. No one would argue that such a lawyer is free to commit malpractice in the course of performing his expanded duties. This is because of the black-letter principle that, while one is not obligated to perform services for another, once one undertakes to do so one must use ordinary care in the process.[6]

This fundamental principle prevails whether a claim for breach sounds in tort or contract. In tort, we say that one must use reasonable care; in contract, that one must deliver the services bargained for, namely competent ones. Analogizing again to a professional liability claim against a malpracticing lawyer, such as one who allows a statute of limitations to run, we would say that he is liable, either in negligence or for breach of his contract (whether expressed in a retainer agreement or merely implied from his having undertaken the work) to perform

---

[6] *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Palka v. ServiceMaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585-87 (1994); *Parvi v. Kingston*, 41 N.Y.2d 553, 559-60 (1977); Oliver W. Holmes, Jr., *The Common Law*, 278-79 (1881).

according to professional standards.

Of great significance is the congruity of the standard by which we assess the professional's performance: whether in tort or contract, the professional is under a *duty* to render competent professional services, measured by what reasonable practitioners of the same profession do – i.e., the *standard of care.*

What of the fiduciary duty claim?  Defendants deny that such a relationship existed, so Plaintiff will undertake the burden of proving it.  There is considerable evidence of this, including the five undertakings by Mr. O'Driscoll described above; the numerous and multifaceted roles that Credit Suisse occupied vis-à-vis Oakwood; and, perhaps most glaringly, the outright admission by Jared Felt (one of Defendants' main witnesses):  "We had a fiduciary duty to Oakwood."[7]  Mr. Felt was Defendants' principal actor regarding the *formal* financial advisory contract that prevailed in the last 88 days of Oakwood's existence.  That contract did not mention any fiduciary duty, but it did contain an integration clause.  The necessary conclusion is that the fiduciary duty Mr. Felt mentioned came from somewhere else.

*Precisely.*  And this leads directly to the law governing the existence of fiduciary relationships.  This is a factual issue for the jury,[8] and it is to be determined in a case-by-case,

_____

[7]    (Felt Dep. Tr. at 376:5.)  To lessen the burden of paper on the Court, we do not attach another copy here, but refer the Court to the Motion *in Limine* No. 2 contained in our recently filed consolidated motions *in limine* (D.I. #74 at pp. 8-13), which deals with Mr. Felt's later effort to "clarify" this testimony after a lunchtime conference with counsel, itself forbidden by the rules of this Court, the details of which were concealed behind refusals to answer questions based on a spurious claim of attorney-client privilege.

[8]    *See, e.g., Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, No. 98-6454, 1999 U.S. Dist. LEXIS 17016, at *16-18 (S.D.N.Y. Nov. 1, 1999); *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 107 (2d Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp*., No. 88-CV-819, 1992 U.S. Dist. LEXIS 7721, at *71-72 (N.D.N.Y May 23, 1992); *Langford v. Roman Catholic*

fact-specific inquiry to determine whether a relationship of trust and confidence exists between the parties "independent of the contractual obligation."  This quotation is from Senior Judge Conner's recent succinct and scholarly collection of New York law about the subject in *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 304-05 (S.D.N.Y. 2005).  We believe that the standard set by New York law, as explained in this case, means that in the inquiry *anything* is relevant if it tends to prove whether trust and confidence existed between the parties, or whether one party relied on the other for superior expertise.

We will not here set forth all of the evidence that establishes the relationship in this case; the present point simply is to clarify the legal standard by which "relevance" (and any related weighing of probative value against assertions of "prejudice") should be measured.

If a fiduciary relationship existed between Oakwood and Credit Suisse, it gave rise to a *standard of care* quite similar to the negligence and contract standard.  But the fiduciary relationship adds two important wrinkles: first, "a claim for breach of fiduciary duty need not meet the standard requirements of causation and damages," *Lumbermens*, 388 F. Supp. 2d at 304, a point discussed below; second, there is an added duty of loyalty.  As to the latter wrinkle, Plaintiff will offer considerable evidence that virtually all of the advice, express or implied, that Defendants gave Oakwood, especially as the end approached, had two characteristics: first, it was enormously remunerative to Defendants; second, it damaged Oakwood.

**b.  Breach of duties of care and loyalty.**    The previous section of this Unified Statement explained the three theories under which a duty of care arose between Credit Suisse and Oakwood, and described why the standard of care is quite similar on all three.  That section

---

*Diocese*, 677 N.Y.S.2d 436, 439 (N.Y. Sup. Ct. 1998).  *Accord, e.g.*, *Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386, 390 (5th Cir. 1982) ("The existence or nonexistence of a fiduciary relationship between parties is a question of fact for the jury.").

also explained that Credit Suisse bore a duty of loyalty to Oakwood. What are these standards and how were they breached here?

As in other professional liability cases, any duty owed by Credit Suisse would have required Credit Suisse to act reasonably under the circumstances. And, as is usual in such cases, Plaintiff has an expert witness to testify about the subject, Dr. Alan Shapiro. Although Dr. Shapiro's expert report does not use legal buzzwords, its substance is to analyze the economics of the various transactions Credit Suisse either engineered or participated in and their effects. After doing so, Dr. Shapiro concludes that these transactions were value-destroying and unreasonable.

Dr. Shapiro also points to evidence among Defendants' own documents that Defendants knew this, knew that Oakwood faced immediate and significant bankruptcy risk as early as January 2000, and knew that Oakwood's management did not fully understand the risks, the danger, and the expected losses associated with its business-as-usual course of transactions with Defendants or engineered by Defendants.

Dr. Shapiro opines that under these circumstances, Defendants had the obligation to investigate fully the effects of such transactions, to advise Oakwood that Defendants knew the transactions were not in Oakwood's best interest, and ultimately, if necessary, to refuse to participate any further. (It should be noted that this is not an opinion on the *existence* of any duty – the subject of the previous section of this Statement – but on standards of care and loyalty.) He also points to additional evidence of the standard of care in the form of Defendants' own manuals governing relations with Defendants' customers (including fiduciary relationships), and finds that Defendants' conduct in this case fell far short of the standards established by their own manuals.

While Dr. Shapiro's conclusion as to the standard of care would obtain absent any fiduciary duty on the part of Credit Suisse, its weight (and the analysis more generally) is

13

undoubtedly amplified by the fact that Credit Suisse was an Oakwood insider and fiduciary, who was obligated to act toward Oakwood with a degree of loyalty and care significantly beyond that normally required by the "morals of the market place" in which arms-length parties interact.[9]

Defendants are scornful of any notion that a "bank" ever has a duty to refrain from a transaction, but banks get no exceptions to the ordinary rules of law.[10] Consider the case of a physician approached by a patient who says, "Hey Doc, give me some more of those addictive pain pills." Carried to this analogy, Defendants' position would have us say, "Well, the doctor filled out the prescription legibly, and that's what the patient wanted, judgment for defendant." But no one would deny that the physician's duty of care – to act reasonably under the circumstances – required him to investigate the patient's actual needs and weigh them against the dangers of addiction; let alone the doctor's duty, if that was his belief, to tell the patient how the pills would damage more than help; or ultimately, if the patient replied, "I know that they will harm me, but I want them anyway," to refuse to participate in damaging a patient his duty compelled the doctor to help rather than hurt.[11]

---

[9] *See, e.g., Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) ("Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.").

[10] Credit Suisse, of course, was also far more than a mere "bank" for Oakwood; rather, it was a close and intimate advisor providing various devices and schemes for Oakwood to raise short-term liquidity, a lender of its own capital (albeit in a nearly risk-free way), and a powerful warrant holder. As such, the analysis goes beyond duties typically discussed with regard to investment banks and other financial institutions, and requires Credit Suisse to act in accordance with the obligations imposed by law on corporate fiduciaries and insiders.

[11] It is also worth mentioning that Defendants misstate Plaintiff's theory by repeating that we claim Defendants had an obligation to demand that Oakwood file bankruptcy in 2001. Given

And now suppose that doctor just happened to own the pharmacy downstairs. And then suppose further that the doctor also occupied a fiduciary status vis-à-vis the patient.

**c. Damages and proximate causation.**     It seems axiomatic to say that Oakwood's continuation of its business-as-usual course of value-destroying transactions caused it to lose value (and garnered massive fees for Credit Suisse). But this succinct formula is Plaintiff's theory of damages here, and it must be contrasted with the absurd chain of causation posited in Defendants' strawman version of Plaintiff's case.

The loss of value ("fact of damages") and the amount of that loss are established by the expert testimony of Dr. Michael Tennenbaum.[12] Using dates giving the best available data (the ends of Oakwood fiscal years), he compares the fair market value ("FMV") of Oakwood's assets on September 30, 2001 with that same value on September 30, 2002 (mere weeks before the bankruptcy), and finds a diminution of $50 million. Dr. Tennenbaum does this

---

Oakwood's addiction to the value-destroying transactions and mounting debt burden advised and engineered by Defendants, it is highly likely that if Defendants had complied with their duty, and Oakwood had stopped engaging in the value-destroying transactions, Oakwood may have had to file bankruptcy, but that is not a necessary result (the company could have been sold to someone who could finance it without the value-destroying transactions, or any number of other results could have occurred). The key point, as we show in the Damages section below, is that even if Oakwood had needed to file bankruptcy earlier than it did, it would have had a far greater value than it had after another year of value destruction.

[12]  Dr. Tennenbaum, in addition to the fact and amount of damages, also opines on the issue of Oakwood's insolvency as of various dates. This testimony is of significance to some "bench" issues in the case, but it also is relevant to Dr. Shapiro's opinion regarding the standard of care. Plaintiff contends that a financial advisor to a company that is insolvent or in danger of insolvency must take into account the company's obligation to pay its just debts, which, after all, is an obligation fully imposed by the law. What may be reasonable advice regarding risk and loss to an Exxon or a Microsoft may not be reasonable to a company betting creditors' money against long odds. Defendants deride Dr. Shapiro for not phrasing this standard in the verbiage *du jour* of the rapidly shifting case law on this subject, but it doesn't matter whether we say any third party owes a duty directly to creditors – what matters is that the corporation undeniably does. *The real question is the reasonableness of financial advice to that corporation, taking that duty into account.*

by using the time-honored method of discounted cash-flow studies for each date. Defendants'

valuation expert, Mr. Pfeiffer, criticizes Dr. Tennenbaum for not giving more weight to the

"market data" approach, but using Mr. Pfeiffer's own bond price data, such an approach would

have shown a loss of some $72 million, well in excess of Dr. Tennenbaum's $50 million.[13]

Defendants would like to conflate Dr. Tennenbaum's testimony with the legal

theory of "deepening insolvency," to which they then apply adjectives such as "discredited,"

"moribund," and the like. Once again, Defendants are simply mischaracterizing Plaintiff's case

to fit their arguments, because their attacks in no way pertain to Plaintiff's *actual* case.

"Deepening insolvency," whatever livelihood it may have, is a comparison of the

extent to which a debtor is insolvent (in the sense of an excess of liabilities over FMV of assets)

on day one versus some subsequent date. But that is not what Dr. Tennenbaum has done here. If

he had, he would have taken Oakwood's *liabilities* into account (and the damages figure would

have dramatically bigger). Dr. Tennenbaum's work includes a comparison of the FMV of assets

on two dates. This is pure economic damages, in the form of plain vanilla loss of asset value,

and that measure of economic damages is available *in addition* to all the fees Credit Suisse was

paid.[14] *See, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 464-66 (2d Cir. 1999).

If Defendants had their way, the effect would be to deny an insolvent company

---

[13]    Small wonder that Defendants apparently did not engage Mr. Pfeiffer actually to provide an
affirmative opinion of any kind, but only to confine his work to "pot shots" (his term) at Dr.
Tennenbaum. In virtually all cases, if Mr. Pfeiffer had carried his work through to an actual
opinion, it would have been more favorable to Plaintiff's position than Dr. Tennenbaum's.

[14]    Defendants are only able to attempt to conflate this with "deepening insolvency" on the false
theory that Plaintiff is comparing the results of a hypothetical earlier bankruptcy to the actual
later one. *That* would be deepening insolvency, and interestingly enough, one of Mr.
Pfeiffer's "pot shots" is to criticize Dr. Tennenbaum for *not* doing it.

the right to recover economic damages, ever.  Consider a claim against an insurance broker who negligently fails to insure the factory against fire, causing a loss of assets of $50 million to an insolvent company – no one would claim this is a "deepening insolvency" measure.  Yet it is no different from a financial advisor who negligently advises a corporation to engage in financial transactions that result in a $50 million loss.  This harm isn't actionable because of the diminished dividend to creditors; it is actionable because the negligence resulted in the loss.

"But no," say Defendants, "you can't prove that *all* of that loss is our fault." While on the surface this argument might seem to have some appeal, it is important to consider it in its proper place in the analysis.  It is not an argument against the fact of damages, or against the amount of damages; instead, it is an argument about *causation*, to which we now turn.

One thing the parties agree on is that the appropriate test is proximate cause. Under New York law, this has two elements, the traditional "but for" test, and a notion of foreseeability, and both parts are for the jury.[15]  Again contrasted with the silly "chain of causation" Defendants attempt to thrust upon Plaintiff in their summary judgment brief, the first portion is straightforward and easily stated: *but for* Defendants' wrongful advice, participation in, and engineering of value-destroying transactions, Oakwood would not have engaged in them. There is considerable proof of this, some of it cited by Defendants in their various briefs.  It is

---

[15] *See, e.g.*, *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995) (discussing foreseeability aspect of proximate cause, as well as nature of issues for the jury to determine at trial); *Colo. Capital v. Owens*, 227 F.R.D. 181, 189-90 (E.D.N.Y. 2005) (same); *Mauney v. Boyle*, 865 F. Supp. 142, 147-48 (S.D.N.Y. 1994) (describing proximate cause concept under New York law, and stating that foreseeability issue is left for the jury to resolve).  *Accord, e.g.*, *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 710-14, 725-29 (S.D.W. Va. 2007) (very detailed post-trial ruling finding that proximate causation and damages elements were met in a case with facts and legal issues fairly similar to those presented by the case at bar); *Crowley v. Chait*, No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006) (denying twin motions for judgment as a matter of law and for a new trial made by defendant that lost a jury trial involving issues of proximate causation and damages broadly similar to this case).

undeniable; but if Defendants deny it, then it is an issue of fact for the jury to decide.

Now let us consider the second prong, foreseeability.  Suppose Defendants had done exactly what they did, Oakwood limped along for another year, and, in the ensuing year an uninsured fire destroyed a building worth $50 million.  On a purely "but for" test, a plaintiff (not this one) might say the loss would not have occurred but for the transactions.  Yet in that case, no one could cogently argue that Credit Suisse should have reasonably foreseen the uninsured fire.

But that case is a dramatic contrast with this one.  In this one, there is proof not only that Credit Suisse *could have* reasonably foreseen the economic damage of its transactions with Oakwood, but also that they *actually did foresee it*.  The most dramatic examples of this are found in the detailed and damning credit analyses done by Defendants' own employees – the very CRM evidence that Defendants now ask this Court to exclude as "irrelevant."  In the face of such evidence, though, the jury should have little difficulty with the proximate cause element.

We turn now to the fees paid to Defendants as an element of damages.  The loss-in-asset-value figure of $50 million, discussed above, includes fees of approximately $8,500,000 to Defendants in the year between September 2001 and September 2002.[16]  But Plaintiff's damages claim on such fees is not limited to that one-year period.  In actuality, Plaintiff will seek damages in the form of all such fees reaching back to an earlier date in 2001, when the Credit Suisse "warehouse" (sometimes "loan purchase") facility was first approved.  The total of fees paid to Credit Suisse between that date and the date of bankruptcy is nearly $21 million.

Here, the "but for" element of proximate cause is easily satisfied: *but for*

---

[16]  Defendants have complained that these dates are arbitrary.  They are free to do so.  Plaintiff, recognizing that some of its potential damage claims are stronger than others, chooses to present only that evidence on which it is confident that the trier of fact will agree with Plaintiff.  If Defendants can make something of that with the jury, they are free to do so.

Defendants' participation in these wrongful transactions, the Oakwood entities would not have paid them the fees. The "foreseeability" element is also self-evident. But even if these two elements were not easily proved, damages in the form of fees paid to Defendants are the subject of the relaxed standards of causation and damages referred to in *Lumbermens*, 388 F. Supp. 2d 292, if the jury finds the existence of a fiduciary relationship and breach of the resulting duties.

d. *In pari delicto.*    The foregoing is a succinct statement of Plaintiff's case. We do not attempt here to analyze every affirmative defense Defendants have raised, but since Defendants have made so much of one particular defense – *in pari delicto* – in their summary judgment motion, we anticipate that it will figure heavily in the future. Defendants seem to think it is the answer to all of Plaintiff's claims, largely because of strawman mischaracterizations.

First, we may observe that while this is a defense to some fiduciary duty claims, particularly in the aiding-and-abetting context, it is rarely regarded as a defense to negligence, and in our opinion is improperly considered as a defense to breach of contract. *See, e.g.*, *In re Olympia Brewing Sec. Litig.*, No. 77-1206, 1985 U.S. Dist. LEXIS 13796, at *7 (N.D. Ill. 1985).

Second, Defendant's entire presentation of this defense is based on a deep and fundamental distortion of the wrong Plaintiff alleges. The *in pari delicto* doctrine holds that when both parties participate in a wrong, a plaintiff may not recover. Thus, Defendants aver here that since Oakwood's management and board engaged in the value-destroying transactions, they participated in the same wrong for which Plaintiff now seeks redress from Defendants.

This is intellectual sleight-of-hand. There were *two* wrongs here. One was the wrong committed by Oakwood's management and board: the adoption of a flawed business plan that drove their company into the ground. There is no evidence, and neither party claims, that they had any evil intent. Rather, it appears that they tried to do a good job, but they were wrong.

19

In contrast, Defendants knew all too well that Oakwood's management and board did not understand the implications of the transactions they engaged in with Defendants. Defendants knew that these transactions were value-destroying, and that they would result in future losses. Oakwood relied upon Defendants' greater expertise and advice regarding the these highly complex transactions,[17] but Defendants concealed their knowledge and true opinions from Oakwood, putting their stamp of approval on Oakwood's continuation of its disastrous course. This is an *entirely separate* wrong from the incorrect business judgment observed at Oakwood. It is a wrong wholly personal to Defendants, and there is no way one could meaningfully say that Oakwood had any involvement in it at all. As such, *in pari delicto* should not be an issue here.[18]

This difference may be shown by a simple example (the example assumes that *in pari delicto* applies to negligence at all): a person jaywalks, is hit by a car, and is taken to the hospital, where it is determined that a leg must be amputated. The hospital proceeds to amputate the wrong leg. No one could deny that the victim, as a jaywalker, was in the "wrong." But the wrong the victim committed was entirely different from the hospital's undeniable wrong. This analogy is directly applicable here. In fact, if Defendants' view prevails, it would write out of the

---

[17]  Another mischaracterization of Plaintiff's case that Defendants make repeatedly is that Plaintiff claims Defendants should have provided general business advice to Oakwood. This is not so. We do not claim that Defendants should have told Oakwood to hire this laborer or promote that one; or to expand this plant or to close that one. Rather, we claim that Credit Suisse, which was underwriting these same securitizations (and related transactions like warehouse lines and resecuritizations) for other manufactured housing companies and the enormous subprime market then rising hugely, had far a greater expertise and understanding of the implications of this entire financing scheme, and Oakwood relied on Defendants to do the appropriate investigation to enable them to render good advice, to give good advice, and to speak their actual knowledge about how such transactions adversely affected Oakwood.

[18]  *See, e.g.*, *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756-58 (3d Cir. 1990); *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-47 (Fla. Dist. Ct. App. 2007).

law any cause of action for giving bad advice: "he *took* the advice, therefore he was in the wrong too, therefore judgment for defendant." This is also the exact situation in this case, which means such absurdity would have to be the law for Defendants' view of this defense to prevail. It isn't.

Third, even if Defendants' view of *in pari delicto* could be applied here at all, Defendants cannot take advantage of it because of their plain status as an Oakwood insider. *See, e.g., Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist LEXIS 25642, at *108-09 (S.D. Tex. Mar. 31, 2008) (citing numerous cases); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005) (Farnan, *J.*) ("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."). As we have previously set forth in great detail, this is a fact amply proved, including by documents prepared by Defendants themselves. (*See* D.I. #50 at pp. 7-10, and the associated evidence attached to D.I. ##56-57.) The fact that Defendants' employees bragged to each other, as early as August 2001, about how Oakwood was "very shackled" to Credit Suisse should only cement the point for the jury.

Having disposed of Defendants' army of strawmen, we turn to the law applicable to the merits of their evidentiary objections and motions, all of which should be denied.

**B. Defendants Simply Misapprehend The Nature Of The Required Analysis Under FRE 401, 402, And 403.**

In their supporting memoranda, Defendants recite the proper definition of "relevant evidence" – *viz.* "evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" – but Defendants' analysis promptly runs off the rails. (*See* D.I. #67 at pp. 6-7 & D.I. #70 at pp. 3-4 (each quoting Fed. R. Evid. 401).) After all, the Third Circuit has made clear that "Rule 401 does not raise a high standard," which means "that evidence is irrelevant only when it has no tendency to prove a consequential fact, and . . . while Rule 401

gives judges great freedom to admit evidence, it diminishes substantially their authority to exclude evidence as irrelevant." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004) (citations and internal punctuation omitted). Accordingly, evidence should be excluded as irrelevant under FRE 402 only if it has absolutely no connection to a live issue. Moreover, because Defendants are presently here on motions *in limine*, they must meet an even higher standard for exclusion, given the principle that "[e]vidence should be excluded on a motion in limine only when the evidence is ***clearly inadmissible on all potential grounds***." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003) (emphasis added).

Credit Suisse further understates the level of "prejudice" that must be shown in order to justify the exclusion of evidence under FRE 403:

> This rule . . . . does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is unfairly prejudicial. Evidence is unfairly prejudicial only if it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. It is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.

*Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (citations and quotation marks omitted). Put differently, "[p]rejudice does not simply mean damage to the opponent's cause," and thus "the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403." *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (quoting 1 McCormick on Evidence § 185 at 645 (5th ed. 1999)). No *unfair* prejudice, no exclusion.

Credit Suisse ultimately cannot deny that "[e]vidence should be excluded under Rule 403 only sparingly since the evidence excluded is concededly probative" or that "[t]he balance under the rule should be struck in favor of admissibility." *Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992). Rather, Defendants' sole option is to satisfy their affirmative

burden of *proving*, not simply asserting, that the probative value of Plaintiff's evidence is *substantially outweighed* by a real danger of unfair prejudice. *See, e.g.*, *United States v. Tse*, 375 F.3d 148, 164 (1st Cir. 2004). As discussed in turn below, none of Defendants' several evidentiary attacks come anywhere close to meeting this high standard for exclusion.

**C.    The CRM Motion Should Be Denied.**

It is unclear exactly what Defendants seek to preclude by the CRM Motion. Their requested relief is the exclusion of "certain testimony and documents relating to credit risk management reviews," but Defendants never specify what are those "certain" testimony and documents. Presumably they include both the Xanthos Memo and the Second Xanthos Memo, but beyond that Defendants' request is unclear (does it, for example, include correspondence between Oakwood's point person, Mr. O'Driscoll, and CRM; if so, why?). The ambiguity of Defendants' requested relief is itself grounds to deny the CRM Motion. *See, e.g.*, *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 151 (S.D.N.Y. 2003) (denying motion *in limine* where "Defendants do not specify any evidence that they seek to preclude," which in turn meant that "no certain forecasted evidence presents itself for a ruling *in limine*"). In any event, the precise scope of the CRM Motion may not matter; it is clear that *all* of the documents at which it could be aimed are highly relevant[19] to live issues in this case and that Defendants have failed to provide any proof of countervailing "unfair prejudice."

---

[19]    Although certain of the documents are lengthy and may seem complex without a full understanding of the background facts, Plaintiff submits that much of the CRM evidence, particularly the Xanthos Memo, is among the most important evidence in this case. The portions of the Xanthos Memo quoted at the beginning of this Answering Brief are only *some* of the salient analysis in it. Needless to say, Defendants are also aware of the evidentiary importance of certain CRM materials, which undoubtedly explains why they have proffered an overreaching motion  seeking to exclude all that evidence on a categorical basis.

1.    **All Of The CRM Evidence Is Relevant.**

When measured with the *actual* test for relevance – "*any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable" – it is clear that all of the CRM evidence is admissible under FRE 402, in a number of separate ways.

<u>First</u>, and most basically, Credit Suisse New York Branch is a defendant in this case. Although Defendants profess confusion about why this is the case in their memorandum in support of the CRM Motion (*see, e.g.*, D.I. #67 at p. 8),[20] the answer should be obvious: New York Branch participated in value-destroying transactions with Oakwood for over 21 months, and received over $11 million in fees for its troubles (and an affiliated entity also received a warrant for 20% of Oakwood's equity in this deal). Thus, evidence which helps the jury understand the nature of these transactions and CRM's stated reasons for approving New York Branch's participation in them (i.e., the structure and the fees) is unquestionably relevant. Indeed, it should be noted that Defendants have recently placed Mr. Irwin on their list of trial witnesses. But Mr. Irwin's *only* involvement in this case was as a CRM member generally, and

---

[20]    Defendants' stated position is defeated simply by prior representations that they have made to this Court and to Bankruptcy Judge Walsh. For example, in the memorandum in support of Defendants' most recent attack on Plaintiff's jury rights, Defendants expressly argued that "[s]o central to plaintiff's theory of its fiduciary duty claim is the Loan Purchase Facility" provided by New York Branch and approved by CRM "that ***there could be no such claim*** absent those allegations about the Facility's 'value destructive' financing." (*See* D.I. #31 at p. 22 (emphasis added).) This statement is incorrect, of course, but it nevertheless totally refutes the proposition that New York Branch and CRM have nothing to do with this case. Indeed, Defendants' prior arguments before this Court went even further and suggested that a purported jury waiver in the Loan Purchase Facility documentation, *which was signed <u>only</u> by New York Branch*, should have the effective of depriving Plaintiff of its constitutional jury rights on *all* claims against *all* Defendants. (*See id.* at pp. 20-23.) Plaintiff has detailed the problems with this contractual waiver claim elsewhere (relying on Judge Walsh's carefully considered opinion for support), but the important point at this juncture is that Defendants should not have it both ways. Simply put, Defendants cannot just ignore supposed corporate formalities when doing so seems to benefit them (as in the case of their attempt to apply New York Branch's jury waiver to other entities via osmosis) and then insist on rigid recognition of the corporate form when doing that seems to benefit them.

as Mr. Xanthos' supervisor specifically, which belies Defendants' broad-brush "relevance" claim.

Second, the CRM documents, particularly the Xanthos Memo, go directly to the issue of breach. As detailed in part A.2.b. *supra*, it is Plaintiff's position that the applicable standard of care required Defendants to investigate the effects of the transactions they structured for Oakwood, fully advise Oakwood about those effects, and ultimately decline to participate if Oakwood was not receptive to that advice. The CRM documents, particularly the Xanthos Memo, go directly to the breach of that duty, because they demonstrate that Credit Suisse actually had institutional knowledge of the problems Oakwood was facing and the probable effects of going-forward, knowledge Defendants admit they never shared with Oakwood. Importantly, the same conclusion would obtain even if the only relevant defendant were Credit Suisse Securities LLC (i.e., for most purposes, Mr. O'Driscoll). After all, even if Mr. O'Driscoll never saw the Xanthos Memo and never discussed its contents with Mr. Xanthos, it is knowledge that he – a more experienced investment banker – reasonably should have had. As such, the fact that Mr. O'Driscoll either (i) did not actually bother to obtain such knowledge despite holding himself out as the Credit Suisse point person for all Oakwood matters, or (ii) had such knowledge but did not share it with Oakwood, goes directly to the reasonableness of his actions in the context of this case, with resulting implications for all three of Plaintiff's claims. Hence, because the Xanthos Memo and related CRM documents are contemporaneous evidence of what everyone at Credit Suisse actually knew or reasonably should have known in 2000-2001, they are highly relevant to whether Credit Suisse complied with its duties in 2001-2002.

Third, the CRM documents, particularly the Xanthos Memo, are directly relevant to the issue of proximate cause, an issue about which Defendants have raised much clamor. More specifically, Plaintiff's ability to recover the $50 million in damages Oakwood suffered

between September 2001 and September 2002 turns on proving that (i) such damages would not have occurred "but for" Credit Suisse's breaches of duty, and (ii) such damages were the reasonably foreseeable result of those breaches.  The CRM evidence demonstrates not only that the consequences to Oakwood of continuing on a business-as-usual path (i.e., increasing losses, on-going repos, continuous risks of filing for bankruptcy, etc.) were reasonably foreseeable as early as January 2000, but also that they *actually were foreseen* by individuals at Credit Suisse.  As such, all the CRM evidence unquestionably has some tendency to make a fact of consequence to the outcome of this action (indeed, a fact of such consequence that Defendants pin their summary judgment motion on it) more probable than it would be without such evidence, rendering it "relevant" under FRE 401 and admissible under FRE 402.

While reference to the facts and posture of this particular case establishes the relevance of the CRM evidence, it is worth noting how the case law provides further support.  For example, in *Crowley v. Chait*, No. 85-2441, 2004 U.S. Dist. LEXIS 27235 (D.N.J. Dec. 27, 2004), the court was faced with several motions *in limine* to exclude certain evidence.  The court began by describing the background facts and issues in the case, which involved the receiver of an insolvent and liquidated insurance company ("AIC") suing, among others, Pricewaterhouse Coopers LLP ("PwC"), as successor to Coopers & Lybrand ("C&L"), for negligence and professional malpractice.  One area of evidence PwC sought to exclude related to North American Reinsurance ("NARe"), a non-party to the lawsuit which had acted as AIC's primary reinsurer for some time and had produced internal documents that were very critical of AIC's practices.  PwC objected to the admission of the internal NARe documents, making points that mirror Credit Suisse's current arguments about the CRM evidence:

> PwC contends that Rules 402 and 403 warrant exclusion of all NARe internal
> documents.  First, PwC states that these documents were never intended to be

seen by PwC, and they had nothing to do with PwC's audits of AIC's financial statements.  Second, PwC warns that if these documents are admitted at trial, PwC will have to engage in extensive fact development regarding the respective roles and interests of AIC, PwC, and NARe.  Third, PwC argues that even if these documents do have some minimal probative value, that value is substantially outweighed by the prospect of wasting time at trial and the danger of misleading the jury into basing a finding of liability on something other than negligence in connection with PwC's audits of AIC's 1981 and 1982 financial statements.

*See id.* at *58-59.  Senior District Judge Ackerman was not convinced:

the Court finds that the NARe documents that Plaintiff has designated for introduction at trial are relevant under the Rule 401/402 standard, and that Rule 403 concerns do not substantially outweigh the probative value of these documents.  It is undisputed that NARe representatives were periodically present at AIC during the final few years of AIC's business operations. . . ., and the reports they generated memorialize the conditions at AIC at the time of PwC's alleged negligence and the [other] Defendants' alleged misfeasance.  ***Plaintiff intends to use this evidence to demonstrate what . . . PwC knew or should have known in 1981 and 1982, and the Court finds that the NARe documents are highly probative for this purpose.*** . . .  Finally, the Court does not see any compelling reason for finding that Rule 403 concerns substantially outweigh the significant probative value of this evidence.

*See id.* at *60-61.  Precisely the same conclusion should obtain here; the CRM documents are contemporaneous evidence of the dire problems at Oakwood as early as 2000 (as well as the future problems that were foreseeable to Defendants at that early date), and further are evidence of what *everyone* at Credit Suisse actually knew or reasonably should have known – and should have communicated to Oakwood.  Indeed, the facts of the instant case weigh even more strongly in favor of allowing the CRM documents into evidence given that New York Branch is actually a party-defendant to this suit – unlike NARe in *Crowley v. Chait*.  In sum, then, Credit Suisse's claim that the CRM documents are "irrelevant" under FRE 402 fails, as a matter of fact and law.

**2.    None Of The CRM Evidence Is Unfairly Prejudicial.**

In order to overcome the highly probative nature of the CRM evidence, Defendants bear the burden of demonstrating a tangible and immediate risk that they will suffer some *unfair* prejudice if Plaintiff is allowed to use the CRM evidence at trial.  Defendants have

27

failed to meet this burden, for several reasons.

First, it is clear that what Defendants fear is that the "negative opinions of Oakwood's financial situation" contained in the CRM evidence will be damaging to their position on issues of breach and proximate causation. (*See* D.I. #67 at pp. 11-12.) Unfortunately for Defendants, that is *precisely* the point, but this is not the type of "prejudice" that courts consider "unfair" under FRE 403. Indeed, Defendants' assertion that CRM had a "legitimate concern with asset quality and credit enhancement" – itself not "underhanded and unfair to Oakwood" (*id.* at p. 11) – might be right; what ***was*** "underhanded and unfair to Oakwood" was the fact that *no one* at Credit Suisse, not Mr. O'Driscoll, not Mr. Xanthos, not anyone else, ever took steps to investigate the roots of this "legitimate concern" further, or to communicate that knowledge to Oakwood. There is nothing "unfair" about using the CRM evidence in this way, because it goes directly to the merits of this dispute. *See, e.g.*, *Crowley v. Chait*, No. 85-2441, 2004 U.S. Dist. LEXIS 27235, at *58-61 (D.N.J. Dec. 27, 2004); *JPMorgan Chase Bank v. Liberty Mut. Life Ins. Co.*, No. 01-11523, 2002 U.S. Dist. LEXIS 24518, at *13-14 (S.D.N.Y. Dec. 23, 2002).

Second, Defendants' stated concern that "there is a significant risk that a jury will not understand or be confused by the function of CRM, which is to protect the bank, not the client" (D.I. #67 at p. 11) is one that is easily solved by effective lawyering at trial. If understanding this "function" is important to the jury and diffuses the force of the CRM evidence (Plaintiff submits that the precise CRM "function" is belied by their own words, including in the Xanthos Memo, and also has minimal import when evaluating the relevance and weight of the CRM evidence), then defense counsel ought to be able to make the point by questioning Defendants' witnesses about it. The risk that this might not occur – i.e., that Defendants cannot

get this simple point into evidence at trial – raises no specter of "unfairness" that could justify a wholesale exclusion of key evidence.

<u>Third</u>, the categorical and overreaching nature of the CRM Motion undermines any claim of "unfair prejudice."  Defendants have utterly failed to point to *specific* documents and testimony, detail the unfair prejudice latent in *that* evidence, and invite the Court to engage in focused weighing of relevance vs. prejudice.  Rather, Defendants have attempted to exclude an entire class of evidence on a wholesale basis, relying on broad rhetoric about "confusion and sideshows" (D.I. #67 at p. 12), without any discussion of the details.  The reason for this strategy should be obvious.  If Defendants engaged in a document-by-document analysis, they would have to explain what it is about, for example, the Xanthos Memo that they find so irrelevant or prejudicial; but that act would require Defendants to ask the Court actually to read the materials Defendants are attacking, and reading the documents starkly reveals Defendants' *real* concern – the fact that such evidence is extremely damaging to their position and is likely to be very persuasive to the jury.  Thus, Defendants' present exercise is not about applying the framework of the FRE, but instead is about attempting to keep out very damaging evidence.  No claim of "unfair prejudice" lies in such facts, and no exclusion is justified here.

In sum, Plaintiff merely asks that the Court take Defendants at their word:  "What matters is evidence about the communications and transactions between Oakwood and Defendants, as well as whatever admissible proof Plaintiff can muster about damages."  (D.I. #67 at p. 12.)  The CRM evidence goes to the first point precisely because the many concerns expressed in the Xanthos Memo and the 2001 e-mails were never communicated to Oakwood by Credit Suisse.  The CRM evidence goes to the second point precisely because it demonstrates that the damages suffered by Oakwood not only were reasonably foreseeable for a party in Credit

Suisse's position, but *actually were foreseen* by Credit Suisse. As such, the CRM evidence is relevant even under Defendants' framework, and they have stated no cogent theory of "prejudice" – "unfair" or otherwise – that could justify the exclusion of any of that CRM evidence at trial.

**D.    The Subprime Motion Should Be Denied.**

As with the CRM Motion, it is unclear precisely what Defendants' Subprime Motion asks the Court to do – Defendants' requested relief is the exclusion of "any evidence or argument regarding the subprime mortgage crisis" – and that fact alone creates grounds to deny the motion. While Defendants fail to define what it is they mean by "the subprime mortgage crisis," they most likely seek to bar one or all of the following: (i) any evidence or argument that Oakwood was engaging in "subprime" lending; (ii) any evidence or argument that the rise of the "subprime" mortgage market contributed to Oakwood's bankruptcy; (iii) any comparison between the methods Oakwood used to finance its lending operations and the methods concurrently used by "subprime" companies; or (iv) any use of the word "subprime" in *any* context. Exclusion of any one of these areas of evidence or argument would be inappropriate.

**1.    If The Subprime Motion Is Directed At *Evidence*, It Fails Because Such Evidence Is Relevant And In No Way *Unfairly* Prejudicial.**

To the extent that the Subprime Motion is directed at precluding Plaintiff from introducing *evidence* that Oakwood was engaging in "subprime" lending, financing itself using the same methods as "subprime" borrowers, or adversely affected by the rise of the "subprime" mortgage market, the motion should by denied because such evidence is highly relevant and Credit Suisse has failed to proffer any evidence (or even a coherent explanation) of prejudice.

First, it is undeniable that Oakwood was, in essence, engaging in "subprime" lending – i.e., providing financing to individuals with low credit scores, problematic credit histories, and a high probability of default. Indeed, Credit Suisse's CRM employees repeatedly

expressed their great concern about Oakwood's shoddy underwriting problems and the associated

problem of defaults and "repos."[21]  Those minimal underwriting standards on the front-end were

further amplified by programs such as the Loan Assumption Program, which provided financing

for even *less* creditworthy borrowers in order to avoid a default.  Although the term was not

nearly as prevalent at the turn of the millennium as it is today, there can be no real dispute that

Oakwood *was* a "subprime" lender, which makes evidence of that fact descriptively accurate.[22]

       <u>Second</u>, the Credit Suisse employee who had the most intimate relationship with

Oakwood has expressly attributed the rise of the "subprime" market as one of the root causes of

Oakwood's ultimate demise, testifying at his deposition that:

> if you go back to the early 1990s . . . for a low income family **with poor credit**, as
> many low income families necessarily [have], their choices as to where to live
> were really narrowed down to three things. . . . [1] rent a place; [2] continue to
> live with their families or wait to inherit property from their families; or [3] buy a
> manufactured home.  Because this kind of lending was routinely, you know, the
> kind of lending that was done to low income families.
>
>    . . . .
>
> The big change that happened was the emergence of the subprime
> mortgage market. . . .
>
>    . . . .
>
> . . . [T]he fact that these subprime mortgage loans could – were extended
> at so much a lower rate, it meant that even though the purchase price of the home
> might be higher the net monthly payment that a borrower could get was the same
> or better than was the case for the manufactured housing area.

---

[21]   *See, e.g.*, January 9, 2001 e-mail from Thomas Irwin, CSFB-00512061 [Holt Decl. Ex. "E"];
January 9, 2001 "Memorandum," CSFB-00483869 [Holt Decl. Ex. "F"]; February 14, 2001
e-mail from Thomas Irwin, CSFB-00515234 [Holt Decl. Ex. "G"].

[22]   To the extent that the facts alone do not make this proposition self-evident, one of Plaintiff's
experts – Dr. Michael Tennenbaum – informed Defendants of his expert opinion that
"[l]enders to mobile home purchasers are, in effect, sub-prime lenders," as well as that
Oakwood's loans and financing structures had "characteristics . . . similar to the recently
imploding sub-prime mortgage/ABS market, with similar market results," in his April 2007
report.  (*See* Tennenbaum Report, D.I. #62, Ex. D at p. 16.)

> . . . .
>
> And the net result of that, unfortunately, was that it was without a doubt, with the benefit of hindsight, a key factor in the manufactured housing market not recovering as quickly as it would have done, I think, in an environment where the subprime market hadn't opened up.

O'Driscoll Dep. Tr. at 145:14-152:24 (emphasis added) [Holt Decl. Ex. "M"]. This testimony by Defendants' own witness again makes abundantly clear that Oakwood *was* the equivalent of a "subprime" lender and that it was negatively impacted by the rise of the now notorious "subprime" market. Indeed, Mr. O'Driscoll's testimony makes clear that the rise of subprime lending in the early 2000s had the effect of taking the *better* qualified "subprime" borrowers *away* from Oakwood, which may make "sub-subprime" the fully descriptive adjective here.

 Third, it is abundantly clear that the financing schemes constructed by Credit Suisse for Oakwood bear a striking similarity to those utilized by now-imploding "subprime" lenders. Beyond the fact that Defendants' own expert witness expressly conceded the point at his deposition,[23] independent third-parties with no interest in this litigation have also drawn the connection, specifically juxtaposing Oakwood with subprime lenders.[24] Simply put, Defendants cannot in good faith deny the obvious parallels between these financial transactions.

Given that the above factors demonstrate the clear relevance of discussions about the "subprime" industry vis-à-vis Oakwood, Defendants shoulder the burden of showing that they would suffer "unfair prejudice" if such evidence is placed before the jury. Instead of meeting this burden, Credit Suisse simply asserts that allusions to all issues "subprime" will

---

[23] *See* Boland Dep. Tr. at 63:25-67:25 [Holt Decl. Ex. "K"].

[24] *See, e.g.*, Standard & Poor's, *For U.S. Subprime RMBS, Positive Implications When Compared With Manufactured Housing ABS* (Apr. 27, 2007), *available at* http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148443670700. html (last accessed April 26, 2008) [Holt Decl. Ex. "Z"].

confuse and distract the jury.  No evidence exists to support the thesis that the term "subprime"

has become a shibboleth so terrible as to forever taint any party indirectly associated with it.

Rather, the issue presented by the Subprime Motion resembles the situation in *JPMorgan Chase*

*Bank v. Liberty Mutual Life Insurance Co.*, No. 01-11523, 2002 U.S. Dist. LEXIS 24518

(S.D.N.Y. Dec. 23, 2002), in which the plaintiff, JPMorgan Chase, sought to preclude the

introduction of e-mails describing "disguised loans" to Enron on the grounds that such a term

was inherently prejudicial.  District Judge Rakoff firmly rejected this argument, reasoning that:

> This is not a situation such as might exist, for example, in a case where a witness
> to a commercial dispute is forced to admit, in recounting a conversation, that he
> had used an ethnic slur, i.e., where the term in question is at once both irrelevant
> and inflammatory.  Here, by contrast, if the jury accepts defendants' view of what
> the emails are referring to (as the jury reasonably might), the term "disguised
> loan" is highly relevant and precisely descriptive of what is involved.  It does not
> constitute "unfair" prejudice any more than would, say, a confession.

*See id.* at *13-14.  So too here; evidence regarding Oakwood's status as a "subprime" lender is

precisely descriptive of what was occurring, and it is not the type of inflammatory or illicit

evidence that is regularly excluded on "unfair prejudice" grounds.  Indeed, if anything, the recent

information about the subprime market that has appeared in the press has given the public at least

some vague idea of how complicated securitization transactions involving loans of dubious credit

quality were structured and how they functioned.  All this should *help* the jury, not hinder it.

Consequently, Credit Suisse's flimsy cries of "prejudice" simply ring hollow.

### 2.    If The Subprime Motion Is Directed At *Argument*, Such A Word-Ban Is An Inappropriate Request Unsupported By Any Case Law.

Although the entirety of Defendants' Subprime Motion and supporting

memorandum is couched in terms of the standard relevance/prejudice rubric used for the

admissibility of *evidence*, Defendants repeatedly suggest that they want to bar Plaintiff from

making *arguments* at trial about anything related to "subprime" matters.  Not a single authority is

cited to support the remarkable position that a court may preclude a party's use of certain words to present its theory of the case, and for several good reasons.

First, many courts have declined to grant the relief Defendants appear to seek here: the total ban on the use of particular words at trial. For instance, in *In re Safety-Kleen, Bondholders Litigation*, No. 00-1145-17, 2005 U.S. Dist. LEXIS 46268, at *7 (D.S.C. Feb. 4, 2005), the court denied a motion *in limine* to preclude use of the term "junk bonds" at trial – a term broadly comparable in origin and implication to "subprime." *See also, e.g.*, *United States v. Fieger*, No. 07-CR-20414, 2008 U.S. Dist. LEXIS 28240, at *20-21 (E.D. Mich. Apr. 8, 2008) (denying a motion *in limine* to preclude the use of certain words at trial as "without basis"); *Smith v. Sheahan*, No. 95-7203, 2000 U.S. Dist. LEXIS 8140, at *13 (N.D. Ill. June 8, 2000) (denying motion *in limine* to preclude the use of the word "promotion" to describe an event, and noting that the defendant remained free to characterize it otherwise). The pragmatic rationale underlying the rejection of word-bans akin to that proposed by Credit Suisse is easily grasped:

> The essence of the adversary system of justice is the vigorous advocacy of each party's position. The rich resources of the English language enable complex, subtle and nuanced arguments and representations of fact before judge and jury. This Court is disinclined to restrain the discretion of counsel in their choice of words in arguing their clients' cases, absent a showing of egregiously unfair prejudice arising out of that choice of words. The essence of the word choices that Defendant is here objecting to is a legitimate difference of opinion between the parties. That is a basic feature of our adversarial system, not an improper incitement to prejudice, and Defendant has cited no authority that indicates otherwise.

*McEachron v. Glans*, No. 98-17, 1999 U.S. Dist. LEXIS 21926, at *13-14 (N.D.N.Y. Aug. 23, 1999) (citations omitted). Here Credit Suisse has made no showing of *any* "unfair prejudice," let alone "egregiously unfair prejudice," but they too can cite no authority to support their word-ban.

Second, Credit Suisse's proposed restriction on Plaintiff's ability to argue its case at trial – whatever the precise target – effectively seeks a prior restraint on speech, and thus

raises troubling constitutional issues.  After all, courts have been clear that "attorneys and other trial participants do not lose their constitutional rights at the courthouse door."  *See, e.g.*, *Levine v. United States Dist. Court*, 764 F.2d 590, 595 (9th Cir. 1985), *cert. denied*, 476 U.S. 1158 (1986).  As such, any order along the lines of what Defendants seek could impinge on the First Amendment rights of Plaintiff and its counsel.  The precise resolution of this thorny inquiry is uncertain, but Plaintiff nevertheless submits that it is better to avoid this possible quagmire entirely absent some extraordinary showing by Credit Suisse.[25]  No showing has been made.

In sum, it is clear that (i) Oakwood was, in effect, a "subprime" lender; (ii) Oakwood was adversely affected by the rise of the actual "subprime" industry; and (iii) Oakwood's sophisticated but fatally flawed financing methods mirror those used by "subprime" lenders.  These are relevant facts that are not outweighed by any "unfair prejudice," and Plaintiff should be able to present them to the jury at trial.  More broadly, Plaintiff should unquestionably be permitted to use such characterizations at trial given the reluctance of courts to issue broad word-bans and the constitutional concerns that would be created were this Court now to do so.

**E.**    **Credit Suisse's Various Other Relevance Objections Should Be Denied.**

Although they have yet to make a formal motion, Defendants recently provided Plaintiff with initial evidentiary objections to certain documents and testimony that Plaintiff plans to introduce at trial.[26]  For reasons of judicial economy (many of the issues being identical

---

[25]    While this issue appears to be one of first impression in the Third Circuit, it has produced a deeply-divided (and oft-criticized) 2-1 decision in the Ninth Circuit, in which that court upheld a pre-trial ban on certain abortion-related terms in a criminal case.  *See Zal v. Steppe*, 968 F.2d 924 (9th Cir.), *cert. denied*, 506 U.S. 1021 (1992).  Needless to say, *Zal* is readily distinguished both on the facts (the term "subprime" is not nearly as inflammatory as those in *Zal*) and as a matter of procedure (the instant case does not have any criminal law overlay).

[26]    For ease of reference, we use exhibits numbers as marked in depositions, shown on Plaintiff's

to the foregoing discussion), and also because it would be helpful to both parties for the Court to rule on Defendants' related evidentiary objections in advance of trial, Plaintiff quickly addresses many of Defendants' relevance objections here (Defendants have also objected on other limited grounds, but we do not address those objections today).

We begin with some statistics:

1. "Relevance" objections by Plaintiff to documents on Defendants' exhibit list:  **0**

2. "Relevance" objections by Defendants to documents on Plaintiff's exhibit list:  **24**

3. Number of those 24 documents that are Credit Suisse's own documents, as distinguished from Oakwood or third-party documents:  **22**

We now briefly addresses certain "relevance" objections in turn below.  Several of the documents are CRM documents. We do not repeat all of the foregoing arguments, but will identify the relevant documents, and where not already covered above, add brief comments:

### A.    CRM Documents.

PX 54 [Holt Decl. Ex. "A"], PX 134 [Holt Decl. Ex. "B"], and PX 53 [Holt Decl. Ex. "C"] are certain of the Xanthos documents discussed at length above.  PX 61 [Holt Decl. Ex. "S"] is not a CRM document, but it shows other parts of Credit Suisse voicing reluctance to take on Oakwood-related risks because of CRM's previous refusals, indicating that while Defendants used this information for their own benefit, they did not share it with Oakwood so that other creditors or potential creditors would get its benefit.

PX 64 [Holt Decl. Ex. "D"] and PX 65 [Holt Decl. Ex. "E"] are also discussed above.  These documents show CRM communicating with Mr. O'Driscoll and emphasizing the need to gain "control" of Oakwood's underwriting standards.  As a consequence, this line of

_____

current draft of its proposed trial exhibit list [Holt Decl. Ex. "AA"] as "PX" and a number.  A copy of each of the relevant documents is also attached as an exhibit to the Holt Declaration.

communication means that Mr. O'Driscoll now actually knows what CRM knows, even if he claims not to have known it before.  PX 111 [Holt Decl. Ex. "F"], also discussed above, is the memorandum that Mr. O'Driscoll prepared at CRM's request regarding Oakwood's deteriorating underwriting standards.  PX 140 [Holt Decl. Ex. "G"] is Mr. Irwin's communication to Mr. O'Driscoll of CRM's knowledge that Oakwood's ability to survive hinges on gaining "control" of the escalating "repo" levels.

PX 138 [Holt Decl. Ex. "H"] is the Second Xanthos Memo, which was prepared at the time Credit Suisse became Oakwood's "warehouse" lender and took a 20% equity warrant in Oakwood.  It is also discussed above.

This takes care of the "CRM" documents to which Defendants object to on relevance grounds.  The remainder of Defendants' "relevance" objections can also be disposed of economically with very brief analysis.

### B.    Non-CRM Documents.

PX 506 [Holt Decl. Ex. "N"] is an internal Credit Suisse global policy manual, which is highly relevant because it contains lengthy discussions of the "principles of conduct" expected of all Credit Suisse employees, including when they act as "insiders" or "fiduciaries." (*See id.* at CSFB-00053080 – CSFB-00053082, CSFB-00053100 – CSFB-00053101 & CSFB-00053127 – CSFB-00053130.)  Such evidence is important because it helps the jury understand the standard of care against which they should weigh Credit Suisse's conduct, as Dr. Shapiro will amplify further at trial.  Numerous courts have recognized that internal policy manuals are relevant and admissible evidence for this very reason.  *See, e.g.*, *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir. 1981); *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 709 (S.D.W. Va. 2007).

PX 55 [Holt Decl. Ex. "O"] shows Defendants planning in early 2000 (just after Mr. Xanthos' first memo) to protect themselves when Oakwood inevitably went into bankruptcy, which goes to the knowledge aspects of breach of duty and foreseeability.  PX 57 [Holt Decl. Ex. "Q"] shows Defendants' awareness of Oakwood's diminishing value in the same time frame.

In the identical time frame, PX 56 [Holt Decl. Ex. "P"] shows Oakwood's lack of understanding about how to value the low-grade B-2 securities that Oakwood could not sell and had to keep on its own books.  Unsurprisingly, Oakwood turns to Credit Suisse for advice.

In PX 59 [Holt Decl. Ex. "R"], Mr. O'Driscoll acknowledges that he has received information "in the strictest confidence" from Oakwood, which is unquestionably strong proof of a relationship of trust and *confidence*.  Mr. O'Driscoll then brags about it to his superiors and employees in several other business units of Credit Suisse, so that they know it too.

Similarly, PX 20 [Holt Decl. Ex. "U"] shows Credit Suisse officer Jared Felt seeking legal advice on Oakwood's behalf from Oakwood's lawyers, another strong indication that Credit Suisse enjoyed a relationship of great trust and confidence with Oakwood.  It is obvious that Mr. Felt expected Oakwood's lawyer to share that view and respond to him.  It is also interesting that Mr. Felt did not even bother to copy anyone at Oakwood with this request for legal advice from Oakwood's lawyers.  *That's* trust and confidence!

PX 628 [Holt Decl. Ex. "V"] contains information about the market and book values of Oakwood securities; it goes to damages and will be used by Plaintiff's experts at trial.

PX 147 [Holt Decl. Ex. "W"] provides striking evidence of how Mr. O'Driscoll procrastinated in regards to his discussion of a post-petition "warehouse" facility with New York Branch and CRM, all to Oakwood's detriment.

PX 130 [Holt Decl. Ex. "X"] highlights the complexity of the B-2 and "LOTUS"

securities created by Credit Suisse. Indeed, the cash flows (and thus Oakwood's additional guarantee liability) on those securities were so difficult to understand that (i) even Berkshire Hathaway had to turn to Credit Suisse for help with the modeling and (ii) the analyses performed by a third-party asset-backed securities expert hired by Oakwood on the eve of bankruptcy (Andrew Davidson) were flawed. Plaintiff submits that the analysis requested by PX 130 should have been performed contemporaneously with the creation of those B-2 and "LOTUS" securities by the party structuring them – Credit Suisse. Credit Suisse's failure to engage in such analysis or discuss the issue with Oakwood is directly relevant to their breaches of duty in 2001-2002.

Finally, PX 153 [Holt Decl. Ex. "Y"] goes directly to a number of issues that will be decided by the Court at trial, including the value provided by Credit Suisse Securities pursuant to its August 19, 2002 contract with Oakwood, as well as whether Credit Suisse Securities satisfied various "triggers" such that it is entitled to even more money from Oakwood.

As with all the CRM evidence, Defendants' "relevance" objections simply fall short. All of the evidence to which Defendants object will make at least one live factual issue in this case *somewhat* more probable than it would be without such evidence. As such, all that evidence is relevant under FRE 401 and admissible under FRE 402, and the Court should so rule in advance of the jury trial set to begin on June 17, 2008.

[Remainder of page intentionally left blank]

## <u>CONCLUSION</u>

For the reasons and based on the authorities set forth above, the Court should deny Defendants' non-expert evidentiary motions and objections, including the CRM Motion and the Subprime Motion, in their entirety.

Respectfully submitted,

Dated:  April 28, 2008
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*
MARLA ROSOFF ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
KATHRYN S. KELLER (No. 4660)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

 -and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the OHC
Liquidation Trust

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on April 28, 2008, I

caused a copy of the ***Consolidated Answering Brief in Opposition to Defendants' Attempts to

Exclude Certain Non-Expert Evidence***, to be served upon the individuals listed below via the

method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: April 28, 2008                    CAMPBELL & LEVINE, LLC


                                         */s/ Kathryn S. Keller*
                                         Kathryn S. Keller (No. 4660)
                                         800 N. King Street, Suite 300
                                         Wilmington, DE 19801
                                         (302) 426-1900