## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re:  Civil Docket Nos. 60-65** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CONSOLIDATED ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY

Tony Castañares (CA SBN 47564)    -&-    Marla Rosoff Eskin (No. 2989)
Stephan M. Ray (CA SBN 89853)            Kathleen Campbell Davis (No. 4229)
Scott H. Yun (CA SBN 185190)             Kathryn S. Keller (No. 4660)
Whitman L. Holt (CA SBN 238198)          CAMPBELL & LEVINE, LLC
STUTMAN, TREISTER & GLATT, P.C.          800 N. King Street, Suite 300
1901 Avenue of the Stars, 12th Floor     Wilmington, DE 19801
Los Angeles, CA 90067                    (302) 426-1900
(310) 228-5600

*Special Counsel for the OHC Liquidation Trust*

Dated:  April 30, 2008

<u>**TABLE OF CONTENTS**</u>

NATURE AND STAGE OF THE PROCEEDINGS .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 1

ARGUMENT .................................................................................................................... 4

    A.    Plaintiff's Unified Statement Of The Case............................................. 6

    B.    The Tennenbaum Motion Should Be Denied In Its Entirety. .................. 6

        1.    Dr. Tennenbaum Is Well Qualified As An Expert........................ 7

        2.    Dr. Tennenbaum Used A Reliable Methodology. ....................... 8

            a.    All Of The Techniques Used By Dr. Tennenbaum Have Been Recognized As "Reliable" For *Kumho-Daubert* Purposes........................................................... 11

            b.    The Assorted Criticisms Made By Defendants And Their Disingenuous Expert, Mr. Pfeiffer, Are Fatally Flawed, And Could Only Go To The Issue Of Weight, Not Admissibility.......................................... 13

        3.    Dr. Tennenbaum's Testimony "Fits" Numerous Issues In This Case..................................................................... 17

    C.    The Shapiro Motion Should Be Denied In Its Entirety........................... 21

        1.    Dr. Shapiro Is Well Qualified As An Expert. ........................... 21

        2.    Dr. Shapiro Used A Reliable Methodology................................ 27

            a.    Defendants' Own Expert Witness Validated Dr. Shapiro's Methodology; Indeed, He Used The *Exact Same* Methods................................................. 28

            b.    Numerous Courts Have Recognized The Reliability Of The Method Dr. Shapiro Used Here – The Systematic Application Of Specialized Knowledge To Facts Gleaned From Documents And Testimony. ....................................................... 29

            c.    Defendants' Remaining Criticisms Of Dr. Shapiro Are Meritless................................................... 31

3. Dr. Shapiro's Testimony, Including That Contained In The Supplemental Shapiro Report, "Fits" Numerous Issues In This Case.................................................................................... 33

4. Neither Dr. Shapiro's Testimony Nor Plaintiff's Theory Of The Case Rests Upon Credit Suisse's Strawman Tale Of Direct Fiduciary Duties To "Bondholders"; Plaintiff's Theory Of Duty Is Uncontroversial. ........................................................ 36

D. Defendants Fail To Provide Actual Evidence Of Any "Unfair Prejudice" That Would Befall Them Were The Jury To Hear Plaintiff's Experts. ...................................................................... 39

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.),*
No. 07-352, 2008 U.S. Dist. LEXIS 24019 (D. Del. Mar. 25, 2008) ...............................11, 15

*Betterbox Commc'ns Ltd. v. BB Techs., Inc.,*
300 F.3d 325 (3d Cir. 2002)..................................................................................................7, 24

*Brown v. SEPTA (In re Paoli R.R. Yard PCB Litig.),*
35 F.3d 717 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190 (1995)............................5, 10, 11, 24

*Cary Oil Co. v. MG Ref. & Mktg., Inc.,*
No. 99-1725, 2003 U.S. Dist. LEXIS 6150 (S.D.N.Y. Apr. 11, 2003) ...........................26, 30

*Clark v. Heidrick,*
150 F.3d 912 (8th Cir. 1998) .....................................................................................................5

*Crowley v. Chait,*
322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................................................31

*Crowley v. Chait,*
No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006).........................................18

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)........................................................................................................ *passim*

*In re Exide Techs.,*
303 B.R. 48 (Bankr. D. Del. 2003) .........................................................................................11

*Grant Thornton, LLP v. FDIC,*
535 F. Supp. 2d 676 (S.D.W. Va. 2007).................................................................................18

*Holbrook v. Lykes Bros. S.S. Co.,*
80 F.3d 777 (3d Cir. 1996)......................................................................................................27

*Inline Connection Corp. v. AOL Time Warner Inc.,*
472 F. Supp. 2d 604 (D. Del. 2007).........................................................................................16

*Kannankeril v. Terminix Int'l, Inc.,*
128 F.3d 802 (3d Cir. 1997)...............................................................................................5, 6, 26

*Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC),*
316 B.R. 451 (Bankr S.D.N.Y. 2004) ....................................................................................19

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999)........................................................................................................ *passim*

*LNC Invs., Inc. v. First Fid. Bank, N.A.,*
No. 92-7584, 2000 U.S. Dist. LEXIS 10271 (S.D.N.Y. July 24, 2000)...........................30, 31

*LaSalle Nat'l Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000) ....................................................................35

*Mauney v. Boyle*,
    865 F. Supp. 142 (S.D.N.Y. 1994) ...................................................................18

*Miller v. McCown De Leeuw & Co. (In re Brown Schools)*,
    No. 06-50861, 2008 WL 1849790 (Bankr. D. Del. Apr. 24, 2008) .......................19

*Odyssey Partners v. Fleming Cos.*,
    735 A.2d 386 (Del. Ch. 1999) ........................................................................35

*Petruzzi's IGA Supermarkets v. Darling-Del. Co.*,
    998 F.2d 1224 (3d Cir.), *cert. denied*, 510 U.S. 994 (1993) ..............................40

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008) ..................................................................... *passim*

*Protocomm Corp. v. Novell Advanced Servs., Inc.*,
    171 F. Supp. 2d 473 (E.D. Pa. 2001) ......................................................15, 27, 30

*R.A. Mackie & Co. v. PetroCorp Inc.*,
    329 F. Supp. 2d 477 (S.D.N.Y. 2004) ..............................................................11

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006) ...........................................................................31

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ....................................................................4, 5, 25

*Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*,
    350 B.R. 520 (Bankr. N.D. Okla. 2005) ....................................................16, 17, 32

*Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*,
    350 B.R. 559 (Bankr. N.D. Okla. 2005) .............................................................17

*Stagl v. Delta Airlines, Inc.*,
    52 F.3d 463 (2d Cir. 1995) ............................................................................18

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005) .............................................................11, 16

*United States v. 14.38 Acres*,
    80 F.3d 1074 (5th Cir. 1996) ...........................................................................6

*United States v. Ford*,
    481 F.3d 215 (3d Cir.), *cert. denied*, 128 S. Ct. 213 (2007) ...........................17, 18

*United States v. L.E. Cooke Co.*,
    991 F.2d 336 (6th Cir. 1993) ......................................................................15, 40

*United States v. Mathis*,
    264 F.3d 321 (3d Cir. 2001), *cert. denied*, 535 U.S. 908 (2002) .........................17

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir.), *cert. denied*, 543 U.S. 974 (2004) ........................................6

*United States v. Rutland*,
    372 F.3d 543 (3d Cir. 2004) ........................................21

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ........................................35

*Voilas v. Gen. Motors Corp.*,
    73 F. Supp. 2d 452 (D.N.J. 1999) ........................................25, 30

*Vollmert v. Wis. Dep't of Transp.*,
    197 F.3d 293 (7th Cir. 1999) ........................................12

*Wechsler v. Hunt Health Sys., Ltd.*,
    381 F. Supp. 2d 135 (S.D.N.Y. 2003) ........................................25, 30

## STATUTES AND RULES

11 U.S.C. § 547(b)(3). ........................................35

11 U.S.C. § 548(a)(1) ........................................35

Fed. R. Civ. P. 26(e) ........................................2

Fed. R. Evid. 702 ........................................*passim*

## OTHER AUTHORITIES

Stephen L. Schwarcz, *Commercial Trusts as Business Organizations: An Invitation to Comparatists*, 13 DUKE J. COMP. & INT'L L. 321 (2003) ........................................35

## NATURE AND STAGE OF THE PROCEEDINGS

For the convenience of the Court and the parties, the OHC Liquidation Trust, by and through its duly appointed trustee, Alvarez & Marsal, LLC ("**Plaintiff**") respectfully submits this consolidated Answering Brief in opposition to the two expert evidentiary motions filed on April 16, 2008 by the defendants in the above-captioned proceeding (collectively, "**Defendants**" or "**Credit Suisse**"), specifically their motions to exclude at trial the expert testimony of Dr. Michael Tennenbaum (the "**Tennenbaum Motion**" [D.I. #60]) and Dr. Alan C. Shapiro (the "**Shapiro Motion**" [D.I. #63]; together with the Tennenbaum Motion, the "**Expert Motions**").[1]

## SUMMARY OF ARGUMENT

The Expert Motions rest on a fundamental misunderstanding and distortion of (1) the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (hereafter, "***Daubert***") and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (together with *Daubert*, "***Kumho-Daubert***"); (2) Third Circuit case law deploying the *Kumho-Daubert* analysis; (3) Plaintiff's theory of this case; and (4) the actual backgrounds of, methodologies used by, and opinions of Plaintiff's two experts.[2]  Once the misunderstandings are clarified and the distortions are lifted, it becomes quite clear that all the testimony to be proffered by Plaintiff's two experts meets the *Kumho-Daubert* test, and thus that evidence should be admitted at trial pursuant to Federal Rule of Evidence 702.

---

[1]  Defendants also submitted separate memoranda of law in support of both the Tennenbaum Motion and the Shapiro Motion, which memoranda will be cited hereinafter as, respectively, the "**Tennenbaum Memo**" [D.I. #61] and the "**Shapiro Memo**" [D.I. #64].

[2]  To allow Drs. Tennenbaum and Shapiro to articulate their many concerns about the assorted misrepresentations and omissions Defendants make in the Expert Motions using their own words, Plaintiff has submitted concurrently herewith declarations from both of its experts (which are cited hereinafter as "**Tennenbaum Decl.**" and "**Shapiro Decl.**," respectively).

Plaintiff's first expert, Dr. Michael Tennenbaum, will testify[3] at trial about the financial condition of the Oakwood Homes Corporation and its affiliates (collectively, "**Oakwood**") at various points in time.  More precisely, Dr. Tennenbaum intends to testify that Oakwood was deeply and hopelessly insolvent at least as of September 2001, and that Oakwood's financial condition only worsened thereafter.  Specifically, Oakwood's participation in various "securitization" and "LOTUS" transactions during the next year, which were structured by Credit Suisse and indirectly supported by the Credit Suisse "warehouse" facility, resulted in a diminution of Oakwood's assets (i.e., economic damages) of at least $50 million and further eviscerated even the remote chance of Oakwood's return to solvency.  Dr. Tennenbaum, a highly credentialed and respected economist with over thirty years of practical consulting and teaching experience, reached these conclusions by applying standard and accepted financial techniques – including a discounted cash flow ("**DCF**") and Black-Scholes call option analysis – to Oakwood's contemporaneously available financial data and projections, while taking into account other then-available information and data.  The use of this methodology produced results which are testable and verifiable, and thus could be challenged by an opposing expert.

The Tennenbaum Report provides a detailed description of the data underlying Dr. Tennenbaum's opinions, the calculations Dr. Tennenbaum performed, and the specific results of that analysis.  In contrast, the February 2008 report provided by Defendants' "rebuttal" expert, Mr. Allen Pfeiffer, proffers *no* competing data, performs *no* competing calculations, and reaches

---

[3]    Dr. Tennenbaum has disclosed his anticipated testimony to Defendants via a 52-page initial expert report (the "**Tennenbaum Report**" [D.I. #62, Ex. D]) and at his deposition (the "**Tennenbaum Depo**" [D.I. #62, Ex. E]).  Furthermore, Dr. Tennenbaum has concluded that, on the basis of new data and suggested methodologies in Mr. Pfeiffer's report and the documents produced by him last month, Dr. Tennenbaum should provide Defendants with a supplemental report under Federal Rule of Civil Procedure 26(e), which he will do shortly.

*no* contrary conclusions; rather, in the words of Mr. Pfeiffer's team, his report is designed to take "pot shots" at Dr. Tennenbaum.[4]  These empty challenges go to the weight of Dr. Tennenbaum's testimony, not its admissibility.  As such, Defendants are unable to establish any grounds to preclude Dr. Tennenbaum's testimony under the tripartite *Kumho-Daubert* framework – qualification, reliability, and fit – and Dr. Tennenbaum should be allowed to testify at trial.

Plaintiff's second expert, Dr. Alan C. Shapiro, will testify[5] at trial about (1) his detailed review of the facts and transactions at issue in this case, (2) the reasonableness of Credit Suisse's conduct under those facts, (3) the incentives that shaped Defendants' behavior given their multifaceted relationship with Oakwood, and (4) the results of a "market data" analysis of Oakwood's financial condition at various points in time.  Dr. Shapiro, an eminent and experienced professor of finance and banking, reached his conclusions about these matters by closely examining the details of the relationship and transactions between Credit Suisse and Oakwood, as well as data about the collective opinion of all "market" participants, and then applying his unique and specialized knowledge to arrive at his conclusions.

---

[4]  Defendants have previously filed a copy of Mr. Pfeiffer's 2008 expert report (the "**2008 Pfeiffer Report**" [D.I. #62, Ex. F]) and the transcript of his deposition testimony (the "**Pfeiffer Depo**" [D.I. #62, Ex. G]) with the Court.  Because Mr. Pfeiffer's current attacks must be read against the backdrop of a draft report he prepared for Credit Suisse in 2007 (the "**2007 Pfeiffer Report**") – which reaches conclusions utterly inconsistent with the 2008 Pfeiffer Report – Plaintiff submits a copy of the 2007 Pfeiffer Report as Exhibit "D" to the accompanying declaration of Whitman L. Holt (cited hereinafter as "**Holt Decl.**").

[5]  Dr. Shapiro has disclosed his anticipated testimony to Defendants via a 47-page initial expert report (the "**Shapiro Report**" [D.I. #65, Ex. A]) and at his deposition (the "**Shapiro Depo**" [D.I. #65, Ex. B]).  Dr. Shapiro has further provided a supplemental expert report proffering "market data" evidence of Oakwood's financial state at various times (the "**Supplemental Shapiro Report**" [Holt Decl. Ex. "A"]).  Although Credit Suisse essentially disregards the existence of the Supplemental Shapiro Report in connection with the Shapiro Motion, that report remains quite relevant here, for the reasons explained below at pages 33-36, and thus Dr. Shapiro should unquestionably be allowed to testify about its subject matter at trial.

Defendants essentially ignore Dr. Shapiro's "market data" analysis, instead attacking his qualifications and methodology while contending that his opinions turn on a legally deficient theory.  While there are many problems with Defendants' attacks, the common theme is Defendants' apparently purposive ignorance or distortion of Dr. Shapiro's background and the *actual* opinions he has rendered.  Indeed, Defendants further fail to mention that Dr. Shapiro's methods – a studious review of the facts, and application of specialized knowledge to those facts – is *precisely* the same method used by their own "rebuttal" expert, Mr. Thomas Boland,[6] who expressly stated that such a method is considered a reliable way to obtain valid expert opinions.  Accordingly, Defendants are again unable to establish the absence of any of the three relevant criteria for the admission of Dr. Shapiro's testimony, and he should be allowed to testify at trial.

## ARGUMENT

The *Daubert* decision enunciates several criteria for trial courts to consider when performing their "gatekeeping" function regarding the admission of scientific expert testimony under Federal Rule of Evidence 702, *see* 509 U.S. at 589-95, which criteria the Supreme Court extended to non-scientific expertise in *Kumho Tire*, *see* 526 U.S. at 147-49.  In *Schneider v. Fried*, the Third Circuit focused the *Kumho-Daubert* inquiry through the following lens:

> We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit.  Qualification refers to the requirement that the witness possess specialized expertise.  We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert.  Secondly, the testimony must be reliable; it must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief. . . .  Finally, Rule 702 requires that the expert testimony must fit the issues in the case.  In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

---

[6]    A copy of the competing expert report rendered by Mr. Boland (the "**Boland Report**") and the complete transcript of his deposition testimony (the "**Boland Depo**") are attached as Exhibits "B" and "C," respectively, to the Holt Declaration.

320 F.3d 396, 404 (3d Cir. 2003) (citations, footnote, and quotation marks omitted).  A court's

attention throughout this three-pronged inquiry "must be solely on principles and methodology,

not on the conclusions that they generate."  *See Daubert*, 509 U.S. at 595.

      *Daubert* itself also emphasizes that "[t]he inquiry envisioned by Rule 702 is . . . a

flexible one."  *Id.* at 594.  Indeed, in a recent opinion the Third Circuit reaffirmed that "Rule 702,

which governs the admissibility of expert testimony, has a liberal policy of admissibility."

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix

Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  This "liberal policy" rests against the backdrop of

evidentiary rules that "embody a strong and undeniable preference for admitting ***any evidence***

which has the potential for assisting the trier of fact."  *See Kannankeril*, 128 F.3d at 806

(emphasis added); *accord, e.g.*, *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) ("Rule 702

favors admissibility if the testimony will assist the trier of fact, and doubts regarding whether an

expert's testimony will be useful should generally be resolved in favor of admissibility."

(citations and quotation marks omitted)).[7]  Thus, the Expert Motions have a high hill to climb.

      *Daubert* also underscores the distinction between the *admissibility* of evidence

and the *weight* to be given that evidence at trial, noting how "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 596.

Accordingly, once the minimal threshold for admissibility is met, such "conventional devices"

---

[7]   In the face of this preference for admissibility, the Third Circuit has cautioned district courts
to be especially vigilant against the "significant risk that district judges will set the [Rule
702] threshold too high and will in fact force plaintiffs to prove their case twice," likening
that risk to the deprivation of a party's Seventh Amendment right to a jury trial.  *See Brown v.
SEPTA (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 750, 750 n.20 (3d Cir. 1994), *cert.
denied*, 513 U.S. 1190 (1995).  It seems notable, then, that these particular Defendants have
sought to deprive Plaintiff of both the right to a jury *and* the right to offer expert testimony.

remain "the appropriate safeguards" for a party that disputes conclusions reached by the other side's experts. *See id.*[8] This key distinction between considerations that properly go to the weight of the expert testimony rather than its admissibility permeates the entire *Kumho-Daubert* analysis. *See, e.g.*, *Kannankeril*, 128 F.3d at 808-09 (repeatedly referencing the weight vs. admissibility distinction during discussion of reliability and qualification aspects of the analysis).

As demonstrated in turn below, both the Tennenbaum Motion and the Shapiro Motion ought to be denied because the testimony of both Dr. Tennenbaum and Dr. Shapiro easily satisfies each of the three standards for admissibility – qualification, reliability, and fit.

**A.    Plaintiff's Unified Statement Of The Case.**

We refer the Court to the Unified Statement set forth in our *Consolidated Answering Brief in Opposition to Defendants' Attempts to Exclude Certain Non-Expert Evidence* (the "**Relevance Brief**" [D.I. #76]).[9] As explained in the Unified Statement, Defendants have consistently relied upon a false "strawman" theory of Plaintiff's case, which continues here.

**B.    The Tennenbaum Motion Should Be Denied In Its Entirety.**

The Tennenbaum Motion presents essentially two attacks on Dr. Tennenbaum: (1) Dr. Tennenbaum's testimony is unreliable because his "analysis is [] riddled with errors of

---

[8]    *See also, e.g.*, *United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir.) (similarly noting the value of "trial practices and procedural devices" as a check "designed to expose flawed expertise"; reciting "[t]he principle that cross-examination and counter-experts play a central role in the Rule 702 regime," which means "[e]xperts with diametrically opposed opinions may nonetheless both have good grounds for their views, and a district court may not make winners and losers through its choice of which side's experts to admit"), *cert. denied*, 543 U.S. 974 (2004); *United States v. 14.38 Acres*, 80 F.3d 1074, 1079 (5th Cir. 1996) ("The perceived flaws in the testimony of [a party's] experts are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.").

[9]    We also attach a copy of that Unified Statement as Exhibit "1" for the Court's convenience if the Court is considering the Expert Motions before the motions the Relevance Brief answers.

approach and execution"; and (2) Dr. Tennenbaum's testimony does not "fit" Plaintiff's theory of the case.  (*See* Tennenbaum Memo at pp. 1-4.)  Unfortunately, Defendants' twin attacks rest on a myopic (and incorrect) understanding of both Plaintiff's case and the actual testimony that Dr. Tennenbaum will provide at trial.  These dispositive problems are only exacerbated by the flimsy critiques of Defendants' shape-shifting "expert," Mr. Pfeiffer, who initially prepared a 2007 expert report containing several elements even *more favorable* for Plaintiff's position than the Tennenbaum Report, but now prefers to just ignore that fact and throw blunderbuss "pot shots" at Dr. Tennenbaum without forming *even one* opinion of his own.  Simply put, Defendants have failed to show that Dr. Tennenbaum's methods resemble the "junk science" *Kumho-Daubert* is designed to exclude, and thus there is no reason to prohibit Dr. Tennenbaum from testifying.

### 1.    Dr. Tennenbaum Is Well Qualified As An Expert.

In the Third Circuit recent words, expert "[q]ualification requires that the witness possess specialized expertise."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citation and quotation marks omitted).  This requirement is interpreted liberally and covers a range of knowledge and skills.  *See id.*  Indeed, the boundary of this standard merely asks that the expert have "skill or knowledge greater than the average layman."  *See Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327-28 (3d Cir. 2002) (Alito, *J.*) (citation omitted).

Defendants do not contest Dr. Tennenbaum's qualifications here, and for good reason.  Dr. Tennenbaum received a Ph.D. in economics from the University of California, Los Angeles in 1973.  In the subsequent thirty-five years, Dr. Tennenbaum honed his specialized knowledge and skills by practicing as a consulting economist and by teaching college-level economics courses.  Dr. Tennenbaum has conducted literally thousands of valuation analyses, and has served as an economic expert in a multitude of litigation touching on myriad issues of bankruptcy and commercial law.  It is beyond dispute that Dr. Tennenbaum has ample

specialized knowledge and skills far "greater than the average layman." Accordingly, Dr. Tennenbaum unquestionably qualifies as an expert for purposes of the *Kumho-Daubert* analysis.

**2.    Dr. Tennenbaum Used A Reliable Methodology.**

In order to evaluate the reliability of Dr. Tennenbaum's methodology, it is first necessary to understand that methodology. Dr. Tennenbaum's assignment was "to provide [his] professional opinion as to the financial condition of [Oakwood] as of various dates of value . . ., and to consider the impact of certain financial activities of the company in view of its financial condition" (Tennenbaum Report at p. 7). Dr. Tennenbaum's analysis began with a thorough "review of numerous documents, including filings with the court, deposition transcripts and exhibits, brokerage firm analyst reports, SEC filings, Oakwood Homes Corporation financial documents, and financial and economic texts and professional journal literature" (*id.* at p. 3). Specific documents included thousands of pages of "internal Oakwood documents, [Credit Suisse] documents and Price Waterhouse Coopers documents." (*See id.* at pp. 5-6.) Throughout this intense process of document review and analysis, Dr. Tennenbaum's goal was to identify financial data and projections that would allow him to determine Oakwood's Asset Value and solvency as of September 2001 and September 2002;[10] the change in such values between 2001 and 2002; the implied value of Oakwood based upon a call option analysis; the probability of default and return to solvency as of September 2001 and 2002; "[t]he impact of continued

---

[10]    Dr. Tennenbaum selected the September dates because they marked the end of Oakwood's fiscal year, thereby yielding actual and contemporaneous financial data, which also happened to fall within close proximity of the petition date. While Defendants accuse Dr. Tennenbaum of "conduct[ing] two valuations of Oakwood at two virtually random times" (Tennenbaum Memo at p. 16), any other date would have required Dr. Tennenbaum to reconstruct financial data and projections, a costly process which would inevitably cause Credit Suisse to charge him with "hindsight bias" and provide fodder for Defendants to challenge the reconstruction. Instead of hopping into that thicket, Dr. Tennenbaum chose to rely on the projections that would allow him to make what he considered to be an informed and accurate analysis of Oakwood's financial state at the relevant times. (*See* Tennenbaum Depo at 31:11-34:25.)

securitization of loans, guarantee of loans and servicing of loans on Oakwood's solvency and default probability between September 2001 and September 2002"; and the "[d]amages suffered by Oakwood's Enterprise as a result of the foregoing issues." (*See id.* at pp. 7-8.)

Dr. Tennenbaum's extensive review of the materials in this case allowed him to identify financial projections that provided a contemporaneous presentation of the expected cash flows from Oakwood's operations. (*See id.* at pp. 20-32.) Although Dr. Tennenbaum's personal opinion was that certain of the 2001 projections were "aggressive," he concluded that it was proper to use such projections since they represented a portrait of Oakwood's expected prospects in 2001. (*See* Tennenbaum Decl. ¶ 4.) Plus, the "aggressive" nature of those projections could be explained to some degree by the beliefs of certain equity analysts, *including at Credit Suisse*, that the manufactured housing industry might stage a possible turnaround of sorts. (*See id*.)

Dr. Tennenbaum's analysis then turned to the application of an analytic tool which is part of any economist's stock in trade: the use of a DCF analysis to determine the enterprise value of a corporation on a given date. Dr. Tennenbaum performed the traditional steps in that analysis, first utilizing the Capital Asset Pricing Model ("CAPM") to determine the required rate of return for an equity investor in Oakwood, and then working that data through the Weighted Average Cost of Capital ("WACC") model to determine the appropriate discount rate by which to value Oakwood's anticipated cash flows. (*See* Tennenbaum Report at pp. 33-36.) Dr. Tennenbaum further confirmed the results obtained by his use of the CAPM by utilizing the more nuanced Fama-French Three Factor Model. (*See id.* at p. 37.) Once he had determined the appropriate discount rate, Dr. Tennenbaum ran his DCF calculations on the Oakwood projections, and arrived at the conclusion that (i) Oakwood was quite insolvent and had a remote prospect of a return to solvency in 2001; (ii) Oakwood's enterprise value fell substantially

between 2001 and 2002, worsening Oakwood's financial condition and making continued

insolvency "a virtual certainty"; and (iii) Oakwood's continued engagement in securitization and

"LOTUS" transactions with Credit Suisse "resulted in dissipation of [Oakwood's] Enterprise

Value, i.e., reduction in the value of corporate assets." (*See id.* at pp. 38-44.)

In order to confirm the results of his DCF analysis, Dr. Tennenbaum turned to a

second mode of analysis: a valuation of Oakwood's equity as "an out-of-the-money call option

on the Enterprise Value of the firm" via application of the Black-Scholes model. (*See id.* at pp.

45-47.) This second level of analysis produced results consistent with the DCF; Oakwood was

highly insolvent in September 2001 and suffered a substantial loss in asset value between then

and September 2002, or put more informally, Oakwood was "a bad business getting worse."

(*See id.* at pp. 48-50.) Ultimately, based upon his use of the DCF and the Black-Scholes model,

Dr. Tennenbaum reached a number of discrete opinions, among them the key conclusion that

Oakwood "suffered damages as a result of continued operation of its business model in an

amount of at least $50 Million," which harm was *in addition* to the massive fees that Credit

Suisse extracted from Oakwood in 2001-2002. (*See id.* at p. 51.) Accordingly, it is this *actual*

methodology – the application of a DCF and the Black-Scholes model to contemporaneous

financial projections – that must be determined to be "reliable" for *Kumho-Daubert* purposes.

It is crucial to note at the outset how the Third Circuit took extra care in *Pineda* to

insist that every reliability inquiry "demonstrate the appropriate level of flexibility required by

Rule 702 and our past precedent." 520 F.3d at 248. Indeed, the authorities are clear that Plaintiff

does "not have to demonstrate to the judge by a preponderance of the evidence that the

assessments of [its] experts are *correct*, [it] only [has] to demonstrate by a preponderance of

evidence that their opinions are reliable." *Brown v. SEPTA (In re Paoli R.R. Yard PCB Litig.)*,

35 F.3d 717, 744 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995).  Thus, even if the Court "thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate," it is often still the case that "a jury attempting to reach an accurate result should consider the evidence."  *See id.* at 745.  Does Dr. Tennenbaum meet this flexible standard of reliability?

  a.  **All Of The Techniques Used By Dr. Tennenbaum Have Been Recognized As "Reliable" For *Kumho-Daubert* Purposes.**

   The actual economic techniques that Dr. Tennenbaum used to prepare the Tennenbaum Report are uncontroversial and have been recognized by numerous courts as appropriate and reliable methods of producing expert testimony.[11]  Indeed, courts in Delaware have applied the precise techniques used by Dr. Tennenbaum, including the CAPM and WACC, for purposes of their own, objective financial analyses.  *See, e.g.*, *In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003).  Thus, any criticisms Credit Suisse may have cannot stem from problems with the methods Dr. Tennenbaum used *per se* since there is no claim (nor could there be) that Dr. Tennenbaum did not recite or understand the DCF or Black-Scholes formulas, or that he committed some mathematical error when applying those formulas.  Rather, all complaints must stem from Defendants' (1) broad disagreement with the use of such methods to measure Plaintiff's damages (i.e., "fit," which is discussed in Part B.3. *infra*); or (2) minute quibbles with Dr. Tennenbaum's specific applications of those methods.

---

[11] *See, e.g.*, *Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, No. 07-352, 2008 U.S. Dist. LEXIS 24019 (D. Del. Mar. 25, 2008) (Farnan, *J.*) (affirming bankruptcy court decision relying on an expert's DCF analysis for evaluating insolvency); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 494-95 (D. Del. 2005) (Farnan, *J.*) (admitting expert testimony from witness who "employed a standard DCF analyses according to the same procedures he follows in his practice"); *R.A. Mackie & Co. v. PetroCorp Inc.*, 329 F. Supp. 2d 477, 514 (S.D.N.Y. 2004) (finding that Black-Scholes damages model and opinion based thereon "meet the test for reliability under [FRE] 702" and were "relevant because they assist the Court in understanding the plaintiffs' damage evidence and determining the amount of the plaintiffs' damages").

While the quibbles are discussed below, the proper scope of Dr. Tennenbaum's analysis is further clarified at the fore by *Vollmert v. Wisconsin Dep't of Transportation*, 197 F.3d 293 (7th Cir. 1999), which went beyond admissibility to consider issues of weight.  There, the court expressly rejected a party's request for a "roadmap" that "would require an expert to not only provide the justification for the opinion, but also to give a primer on why the facts allow the expert to reach that conclusion."  *See id.* at 300-01.  The court concluded that "[a]n expert need not conclusively establish a fact and need not answer all potential challenges to the opinion in order for his opinion to be given weight," reasoning that a contrary rule would require:

> a radiologist not just to present the X-Ray and her diagnosis, but to explain why the X-Ray allows her to arrive at that conclusion.  The X-Ray itself provides the basis for her conclusion, and that is sufficient to entitle the diagnosis to weight.  A person seeking to challenge it can easily do so by having another radiologist read the X-Ray.

*Id.* at 301.  So too here; Dr. Tennenbaum does not need to present a "primer" on corporate finance and valuation.  Rather, Dr. Tennenbaum must clearly state his final opinions (which he does at pages 9-10 of the Tennenbaum Report) and explain his basis for those opinions (which he does at pages 11-50 of the Tennenbaum Report).  If Credit Suisse disagreed with Dr. Tennenbaum's conclusions, methodologies, or inputs, then they were free to have someone else "read the X-Ray" – i.e., they had the right to retain their own expert to analyze whatever materials that expert wanted to review and then to reach conclusions based upon such materials. In fact, Credit Suisse hired someone to "read the X-Ray" in this case – Mr. Pfeiffer – but that person expressly took pains not to reach *any* definite conclusion about what the X-Ray said, because any such conclusion would be undeniably negative for Credit Suisse's position at trial.[12]

---

[12]   *See* note 13, *infra*, for a detailed discussion of Mr. Pfeiffer's initial readings of the X-Ray, which were devastating to Defendants' cause.

### b. The Assorted Criticisms Made By Defendants And Their Disingenuous Expert, Mr. Pfeiffer, Are Fatally Flawed, And Could Only Go To The Issue Of Weight, Not Admissibility.

The bulk of Defendants' methodological attacks originate with their "rebuttal" "expert," Mr. Pfeiffer, who was re-retained[13] in late January 2008. The focus of his assignment was clear: Mr. Pfeiffer was not to proffer *any* affirmative opinions of his own, but rather was retained to prepare what members of his team called "pot shots" at Dr. Tennenbaum, with the stated purpose of setting up the Tennenbaum Motion.[14] Those "pot shots" form the heart of

---

[13]  Before turning to the specifics of his "rebuttal" opinion, it is helpful to consider some history about Mr. Pfeiffer's role in this case, which provides important background context about the confidence one ought to place in Mr. Pfeiffer's work. Mr. Pfeiffer was initially retained as a "rebuttal" expert in April 2007. In connection with that assignment, he and his team prepared a draft report – the 2007 Pfeiffer Report [Holt Decl. Ex. "D"] – to respond to the conclusions in the Tennenbaum Report. That report was a broad-based attack on the "solvency" aspects of the Tennenbaum Report, which began with a discussion of why Mr. Pfeiffer's "analysis clearly shows that the [2001 projections Defendants now attack Dr. Tennenbaum for using] prepared contemporaneously were not 'extremely aggressive' relative to [Oakwood's] past performance." (*See id.* at CSFB-00523321.) Based upon *his* use of what *he* thought were reasonable projections, Mr. Pfeiffer opined that "Oakwood's default probability using reasonable discount rates and guarantee figures based on contemporaneous projections was consistent with a strong credit rating" (*id.* at CSFB-00523342), even though Oakwood was by then a "junk" credit in the eyes of the public rating agencies and a "CCC" credit on Credit Suisse's internal scale. In fact, Mr. Pfeiffer's use of "a discount rate that is consistent with the view of a highly respected valuation professor" suggested that Oakwood had net "equity values" of "*upwards of $1.0 billion*" in mid-2001, in clear contrast to Dr. Tennenbaum's conclusion that Oakwood was hopelessly insolvent as of that time. (*See id.* at CSFB-00523321 (emphasis added).) Defendants have subsequently produced the data supporting the 2007 Pfeiffer Report's claim that Oakwood was a billion dollar company in mid-2001 [Holt Decl. Ex. "E"]. A quick comparison of the data which could support the "upwards of $1.0 billion" contention reveals that Mr. Pfeiffer's figures demonstrate a diminution of Oakwood enterprise value between September 2001 and September 2002 of somewhere between $428 and $593 million dollars – a full order of magnitude higher than Dr. Tennenbaum's calculation of that diminution! (*See id.* at CSFB-00523846 – CSFB-00523847.) Since this diminution would allow Plaintiff to assert an astronomically higher damages claim, it is no small wonder that Defendants abandoned the 2007 Pfeiffer Report.

[14]  *See, e.g.*, February 6, 2008 e-mail from Michael Vitti, CSFB-00521759 (message from a member of Mr. Pfeiffer's team instructing team members to "think about which pot shots we can/should take" on Dr. Tennenbaum, and expressly noting how, consistent with the 2007

Defendants' requested relief, but they ultimately fail to persuade, for multiple reasons.

The first "pot shot" relates to Dr. Tennenbaum's use of the 2001 projections – the same ones undergirding the 2007 Pfeiffer Report – about which he supposedly "does not know the source of and/or considers unreliable." (*See* Tennenbaum Memo at pp. 18-19; 2008 Pfeiffer Report at pp. 7-9.) These charges simply are inaccurate misrepresentations; as Dr. Tennenbaum explains, "aggressive" projections are not the same as inherently unreliable projections or projections from an unknown source. (*See* Tennenbaum Decl. ¶ 4.) Thus, because Defendants' entire attack turns on their faulty perception of what Dr. Tennenbaum believed about the 2001 projections, rather than any actual opinion of Mr. Pfeiffer, it should quickly fall by the wayside.

The second "pot shot," which regrettably turbo-charges the rhetoric, is that Dr. Tennenbaum engaged in "sloppy analysis" with a "lack of care," contrary to the DCF methods suggested by "a respected valuation treatise." (*See* Tennenbaum Memo at p. 20; 2008 Pfeiffer Report at pp. 7-9, p. 8 n.17.) This slander is also wrong. Dr. Tennenbaum applied the widely-accepted techniques suggested by Professor Damodaran, whose textbook Dr. Tennenbaum often uses in his course, making Defendants' charges totally misleading. (*See* Tennenbaum Decl. ¶ 9.) Indeed, Dr. Tennenbaum's methodology here was *precisely* the same as that recommended in a text co-authored by Roger J. Grabowski, a managing director at Mr. Pfeiffer's employer. (*See id.*) Presumably Mr. Pfeiffer would consider his own colleague's work to be sufficiently reliable.

The third "pot shot" relates to Dr. Tennenbaum's supposed "failure" to consider contemporaneous "market data" and the proceeds of the 2004 sale of Oakwood to Berkshire. (*See* Tennenbaum Memo at pp. 20-21; 2008 Pfeiffer Report at pp. 4-7.) As a threshold matter, this analysis is not *required*, as this Court recently made clear in the *American Classic Voyages*

Pfeiffer Report, "for the most part the quibbles go against us") [Holt Decl. Ex. "F"].

case.  *See* 2008 U.S. Dist. LEXIS 24019, at *7-8 (rejecting contention that the Third Circuit's *VFB* opinion requires a "market data" analysis, and concluding that contemporaneous DCF was an appropriate expert methodology).  Equally important, however, and strikingly absent from Defendants' papers, is the fact that both the "market data" and "sale" approaches *confirm and validate* the results of Dr. Tennenbaum's analysis.  (*See* Tennenbaum Decl. ¶¶ 5-6.)  Indeed, Dr. Shapiro's supplemental report – which Defendants inexplicably hope to ignore – consists of a pure "market data" approach which confirms that Oakwood was deeply insolvent in 2001 and suffered a steep drop in enterprise value between 2001-2002.  (*See* Supplemental Shapiro Report [Holt Decl. Ex. "A"]; *see also* Shapiro Decl. ¶ 13; Tennenbaum Decl. ¶ 5.)  Indeed, Mr. Pfeiffer's own 2008 "market data" supports the same conclusion, and actually suggests an *even larger* drop in Oakwood's enterprise value.  (*See* Tennenbaum Decl. ¶ 5.)  Thus, as in *American Classic Voyages*, Dr. Tennenbaum's DCF is fully "consistent with the available marketplace data," which makes it wholly appropriate expert testimony.  *See* 2008 U.S. Dist. LEXIS 24019, at *7.

In addition to their defects as matters of actual fact and economic technique, the critiques made by Credit Suisse through Mr. Pfeiffer ultimately go to the specific *factual* bases of Dr. Tennenbaum's opinion, not to the *methodology* that he used.  Such criticisms are not relevant to the *Kumho-Daubert* analysis, however, since they merely go to the weight of the testimony.[15]  As such, Delaware courts in analogous contexts have rejected *Daubert* motions premised on the

---

[15]    *See, e.g.*, *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility."); *Protocomm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 481 (E.D. Pa. 2001) ("It appears to this Court that defendants are really arguing that [the expert's] opinions are inaccurate in light of the facts.  In other words, they focus not on whether the reasoning is valid and the methodology reliable, but rather on whether the conclusions themselves are *correct*.  That is not the proper inquiry in a test for admissibility.").

same bases as Defendants' attack, reasoning that such issues simply do not go to admissibility.[16]

At bottom, Defendants' inability to preclude the admission of Dr. Tennenbaum on "reliability" grounds is forcefully underscored by a recent opinion issued in the *Commercial Financial Services* case, which also involved an adversary proceeding stemming from complex, value-destroying securitizations that were aided in large part by a prominent investment bank. That scholarly opinion stemmed from a motion to preclude the opinion of plaintiff's solvency expert, who had performed DCF and other analyses to calculate the debtor's solvency at various points. Much like this case, defendant Chase objected to the expert's methodology on virtually every conceivable grounds. *See Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 350 B.R. 520, 535 (Bankr. N.D. Okla. 2005) ("Chase quibbles with almost every step of [the expert's] application of the asset approach in rendering her solvency opinion."). The court systematically deconstructed all twelve of Chase's methodological objections, and ultimately admitted the expert's testimony because:

> she used recognized and logical methods to value assets and liabilities in order to apply the balance sheet test that is the hallmark of a solvency analysis under applicable law, [] her underlying economic assumptions have some evidentiary foundation and are not unrealistic or unreasonable in light of the evidence relied upon, and [] her conclusions logically follow from a well-explained path of data, leaving no "analytical gap" between the facts relied upon and the opinion rendered.

*Id.* at 558-59. Thus, because the testimony was "probative and not palpably irrelevant and unreliable," the proper path for Chase was to challenge the expert's economic assumptions and

---

[16]  *See, e.g.*, *Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 612-13 (D. Del. 2007) (concluding that "eight points of argument" about whether an expert used the right assumptions, properly modeled the data, or was sufficiently familiar with the issues "primarily focus on the weight to be afforded his opinions, and not on reliability," and thus were no basis for exclusion); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 494-95 (D. Del. 2005) (Farnan, *J.*) (refusing to exclude expert who "employed a standard DCF analyses," that was the subject of testing and critique, notwithstanding arguments about whether he appropriately considered all relevant factors or improperly situated the analysis).

methods at trial by utilizing contradictory evidence, all of which would go to *weight*.  *See id.*

This analysis[17] applies with equal force here, and demonstrates why Mr. Pfeiffer's various attacks

on the factual bases of the Tennenbaum Report, rather than on the analytic methods applied to

those facts, provide no rationale to exclude Dr. Tennenbaum's testimony on "reliability" grounds.

### 3.    Dr. Tennenbaum's Testimony "Fits" Numerous Issues In This Case.

Defendants devote much of the Tennenbaum Memo to their claim that Dr.

Tennenbaum's testimony does not "fit" this case.  The Third Circuit has set the bar for "fit" fairly

low, however; once the reliability factor has been met, the "fit" element merely requires that the

proposed testimony meet "the basic relevancy standard in Federal Rule of Evidence 401" by

making "a fact of consequence more probable or less probable than it would be without the

evidence."  *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir.), *cert. denied*, 128 S. Ct. 213

(2007).[18]  Here, Dr. Tennenbaum's testimony goes directly to several key factual disputes in this

---

[17]  The *Commercial Financial Services* court also issued a companion opinion, which addressed
Chase's challenges to a different expert, one who applied her experience with non-performing
credit card debt to the specific debt bought and then securitized by the debtor, all with an eye
toward determining whether the debtor overpaid for those bad loans.  Chase again made a
blizzard of objections to the expert's methodology, particularly the assumptions she used.
The court once again rejected the attacks and admitted the testimony, noting how:

> pre-trial inquiry into the admissibility of an expert opinion should not focus on the
> *choice* of facts or assumptions utilized by the expert in reaching a conclusion,
> although assumptions must have *some* reasonable evidentiary foundation. . . .
> Weaknesses in the data upon which an expert relied go to the weight the jury should
> have given her opinions.  The fundamental purpose of conducting a trial is to allow
> opposing parties an opportunity to convince the fact-finder to accept their version of
> disputed facts; thus, one party's expert will likely assume a set of facts that the other
> party vehemently disputes.  An expert's assumption of certain facts to the exclusion of
> others does not necessarily render the expert's opinion unreliable.

*Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 350 B.R.
559, 568 (Bankr. N.D. Okla. 2005) (citations and internal punctuation omitted).  Exactly.

[18]  *See also, e.g.*, *United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (noting why "[the
'fit'] requirement is not intended to be a high one, however, and its principle is not dissimilar

case (by which we mean Plaintiff's *actual* case, as described in the Unified Statement, not Credit Suisse's strawman), including Oakwood's financial condition, its prospects for a return to any semblance of financial health, whether Oakwood suffered harm as a result of Credit Suisse's malfeasance, and the extent of the damage. One cannot plausibly dispute that Dr. Tennenbaum's testimony makes it far "more probable" that Oakwood suffered damages than if Dr. Tennenbaum offered no testimony at all. As such, Defendants' "fit" critiques must be about something else.

In fact, the bulk of Defendants' "fit" analysis is just a thinly-disguised attempt to bolster their claim that summary judgment should be granted on "causation" grounds. Whatever its merits,[19] this entire discussion is radically out of place in a *Daubert* motion, which simply focuses on whether the proffered expert testimony goes to any live issue in the case. And, as discussed in the prior paragraph, Defendants' "fit" critique fails under *Ford*, 481 F.3d at 219-20.

---

to the Federal Rules' general provision that, unless otherwise specified, 'all relevant evidence is admissible'" (citation and quotation marks omitted)), *cert. denied*, 535 U.S. 908 (2002).

[19] As explained in our Unified Statement, the "causation" analysis is fairly direct in this case, and is certainly a far cry from the absurd chain-of-causation Defendants posit. Under New York law, proximate causation requires evidence of "but for" causation and proof that the damages were reasonably foreseeable to the tortfeasor, both of which are jury issues. *See, e.g.*, *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995); *Mauney v. Boyle*, 865 F. Supp. 142, 147-48 (S.D.N.Y. 1994). Here, the "but for" element is unquestionable: *but for* Credit Suisse's provision of the "warehouse" and securitizations, Oakwood could not have continued down a value-destroying, business-as-usual path, and Credit Suisse would not have continued enriching itself via massive fees, interest, and other remuneration. Foreseeability is also satisfied, both as to the broader damages and the fees; indeed, as discussed at length in the Relevance Brief, further harm to Oakwood not only was reasonably foreseeable, but also *actually was foreseen* by Credit Suisse (*see* D.I. #76 at pp. 15-19 & 25-26), which explains why Defendants are so desperate to exclude the "smoking gun" CRM evidence of this fact. At bottom, then, because other courts have rejected similar causation and damages arguments in generally analogous cases at the *post-trial* stage (as opposed to the pre-trial or summary judgment stage), there is no real question here about whether the issues of causation and damages should be presented to, and resolved by, the proper body: the jury. *See, e.g.*, *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 710-14, 725-29 (S.D.W. Va. 2007); *Crowley v. Chait*, No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006).

Yet that is not the end of the story; there are additional flaws that pervade Defendants' analysis.

Defendants initially intimate that Dr. Tennenbaum used a "deepening insolvency" measure of damages, to which they apply an adjectival assault. (*See* Tennenbaum Memo at p. 2.) That is a mistake. Dr. Tennenbaum's damages analysis is separate from issues of "insolvency" (i.e., the difference between assets and liabilities); instead, it focuses on the diminution in the value of Oakwood's *assets*. (*See* Tennenbaum Decl. ¶ 3.) A loss of assets is a classic measure of damages, one unaffected by some courts' rejection of "deepening insolvency" as a separate cause of action. Indeed, if Dr. Tennenbaum *had* performed a "deepening insolvency" damages analysis, then he would have also included the $40,000,000 increase in Oakwood's *liabilities* between 2001-2002, which would result in a much larger damages claim of $90 million. (*See id.*)

After debasing "deepening insolvency," [20] Defendants then have the audacity to claim that Dr. Tennenbaum's testimony does not fit this case because he *didn't* do a deepening insolvency analysis. Specifically, Defendants argue that Dr. Tennenbaum should have constructed a hypothetical bankruptcy scenario for September 2001, and then compared the recovery creditors would have received in *that* bankruptcy to what they received in the *actual* Oakwood bankruptcy. (*See* Tennenbaum Memo at pp. 12-14; *see also* 2008 Pfeiffer Report at pp. 4, 9-10.) But this approach is nothing if not "deepening insolvency"; after all, a comparison

---

[20]  Although Dr. Tennenbaum's damages analysis is not "deepening insolvency," such an approach probably would be appropriate under New York law (which both parties agree applies here, and whose courts have never addressed "deepening insolvency"). *See, e.g.*, *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 458 (Bankr S.D.N.Y. 2004) (explaining why case law "suggest[s] that the New York courts regard 'deepening insolvency' as a theory of damages that may result from the commission of a separate tort"). Indeed, even under Delaware law, "deepening insolvency" remains a viable theory of damages for certain claims at issue here, including breach of fiduciary duty. *See, e.g.*, *Miller v. McCown De Leeuw & Co. (In re Brown Schools)*, No. 06-50861, 2008 WL 1849790, at *7-8 (Bankr. D. Del. Apr. 24, 2008). Thus, Defendants would seem well-advised to temper their enthusiasm about labeling this a "deepening insolvency" case.

of creditor recoveries necessarily would require inclusion of the additional liabilities created between 2001-2002 (since those new claims effectively diluted the recovery to preexisting 2001 creditors). Thus, Defendants' preferred approach would only *increase* Plaintiff's damages claim. Indeed, while Dr. Tennenbaum disagrees with this approach, he nevertheless believes that, even after making several assumptions favorable to Defendants, "a 2001 bankruptcy leaves the asset owners better off than the results of the actual bankruptcy" by at least $20 million in nominal dollars, and perhaps by as much as $78 million. (*See* Tennenbaum Decl. ¶ 7.) Given that Dr. Tennenbaum's actual damages analysis produced a number in the range of the results under Defendants' approach, it is disingenuous at best to argue that his testimony does not "fit" here.

Defendants' final tack is to return to their "causation" argument, asserting that "Dr. Tennenbaum's proposed testimony offers no guidance about causation." (*See* Tennenbaum Memo at pp. 14-16.) As discussed at page 18 and note 19, *supra*, this is a summary judgment and trial issue, not a *Daubert* issue, and it is one that Defendants cannot win given the evidence in the record about the reasonable foreseeability of further damage to Oakwood from continuing a "business-as-usual" course in 2001-2002. Nevertheless, as Dr. Tennenbaum notes, this argument also "misses the point" because it ignores how a sale in 2001 would have realized $350 million, thereby allowing Oakwood to "have avoided *any* future value reductions whatever their cause." (*See* Tennenbaum Decl. ¶ 8.) Thus, continuing down the path laid by Credit Suisse was unquestionably a "but for" cause of the $50 million of lost enterprise value, to say nothing of the millions of dollars of fees paid to Credit Suisse. Indeed, the losses and the fees not only were foreseeable consequences of Credit Suisse's conduct, but *actually were foreseen* by employees of Credit Suisse – all the harm is directly traceable to Defendants' wrongful conduct. As such, there is no "causation" issue here, either as to Dr. Tennenbaum or for Plaintiff more broadly.

In sum, neither rhyme nor reason nor law supports Credit Suisse's "fit" argument. Dr. Tennenbaum has applied standard economic techniques to the facts of this case, and by doing so yielded results that bear directly on live issues of fact. Hence, he has produced "relevant" evidence that "fits" the case and should be considered by the jury at trial. Defendants, on the contrary, flip-flop incoherently between rejecting and embracing "deepening insolvency" and advance factual *arguments* that should be considered and weighed by the trier-of-fact, but they fail to raise concerns that justify excluding Dr. Tennenbaum's testimony under *Kumho-Daubert*.

**C.     The Shapiro Motion Should Be Denied In Its Entirety.**

The Shapiro Motion presents three attacks on Dr. Shapiro: (1) he is not qualified because he is "a career academic who lacks any professional or academic experience" regarding securitizations; (2) his conclusions are "nothing more than his own wholly subjective opinion and therefore not the product of reliable principles and methods"; and (3) his opinion rests "on the proposition that Credit Suisse . . . had a direct duty to Oakwood's bondholders." (*See* Shapiro Memo at p. 7.) As discussed in turn below, each of these attacks is fatally undermined by the *actual* facts of this case, Dr. Shapiro's *actual* methods and opinions, and the relevant case law. Thus, the Court should reject Defendants' baseless attacks and let Dr. Shapiro testify at trial.

**1.     Dr. Shapiro Is Well Qualified As An Expert.**

Defendants expressly concede that Dr. Shapiro has impressive credentials and a vast array of specialized knowledge that could qualify him as an expert. (*See* Shapiro Memo at pp. 9-10.) Indeed, Defendants raise the specter that Dr. Shapiro's qualifications may be *too good* and might make him *too persuasive* to the jury.[21] (*See id.* at pp. 12-13.) The crux of Defendants'

---

[21] The Third Circuit has heard and rejected this theory before. In *United States v. Rutland*, 372 F.3d 543 (3d Cir. 2004), the defendant argued on appeal "that the probative value of the exceptionally well-qualified expert's testimony is outweighed by unfair prejudice caused

concerns, then, is not that Dr. Shapiro is unqualified to be an expert in *some* cases, but rather that Dr. Shapiro does not have the precise qualifications Defendants believe are necessary under *their* grotesque theory of the case. This attack on Dr. Shapiro's qualifications fails, for several reasons.

First, the basic premise underlying Defendants' argument – that this case is merely about "the provision of securitization-related services by an investment bank, or the role of a bank providing such services to a company in financial distress" (Shapiro Memo at p. 2) – is wrong.  While Dr. Shapiro will opine that the "services" provided by Credit Suisse, which *included* but were not limited to securitization transactions, were value-destroying, neither his testimony nor Plaintiff's case turns on whether Credit Suisse's *execution* of the transactions was adequate.  Rather, as discussed in our Unified Statement, this case is about far broader questions, such as whether these "services" should have been provided *at all* (particularly once it was known to Credit Suisse that Oakwood was hopelessly insolvent), and whether Credit Suisse – a fiduciary and insider – satisfied its legal duties when it failed to investigate the effects of the securitizations and related transactions on Oakwood, failed to impart Oakwood with the actual knowledge it had about the value-destroying nature of those transactions, and ultimately failed to refuse to participate in a "business-as-usual" approach that Credit Suisse knew would result in diminished assets for Oakwood and all its stakeholders but enrich Credit Suisse.

In fact, Defendants are well aware that the focus of this case is on the overall nature of the relationship between Oakwood and Credit Suisse, and is not limited to just the

---

solely by his stellar qualifications."  *See id.* at 546.  The court swiftly rejected this "novel argument" on the grounds that "experience and credentials are properly taken into account by jurors when determining how much weight to give the expert's testimony" and that it leads to the "absurd result" of forcing parties "to determine if their proposed experts were overly qualified, and find less qualified experts."  *Id.*  This Court should give Defendants' reiteration of this no longer "novel" argument equally short shrift – Dr. Shapiro's eminent qualifications are in areas directly relevant here, which makes their persuasive effect at trial a proper one.

"securitization" aspect of that multifaceted and lengthy relationship (which ultimately made

Credit Suisse an insider and a fiduciary).[22]  And Defendants concede that Dr. Shapiro is an

expert in areas which *are* germane to the broader (and actual) nature of the claims here, such as

risk management, the link between finance and corporate strategy, value-based management, and

matters involving sub-investment grade (i.e., financially distressed) companies and their

securities (such as "junk bonds").  (*See* Shapiro Memo at pp. 9-10, p. 10 n.4; *see also* Shapiro

Decl. ¶ 9 (explaining why Dr. Shapiro's specialized knowledge concerning these various areas

bears directly on whether Credit Suisse acted reasonably in this case).)  Thus, Dr. Shapiro is

sufficiently qualified as an expert on these grounds alone.

> <u>Second</u>, Defendants offer the Court an unduly myopic view of Dr. Shapiro's

---

[22]  Indeed, Defendants have made precisely the *opposite* argument in connection with their
recent motion to exclude evidence and argument about the "subprime mortgage crisis."
Specifically, in their supporting memorandum of law, Defendants told the Court that:

> Plaintiff's claim is that by continuing to underwrite securitizations and provide
> related support, Credit Suisse enabled Oakwood to continue in business longer
> than it should have, and it was that *continuation* of Oakwood's business that
> caused harm.  That claim would be the same regardless of what *form* of financing
> Oakwood used.  **Plaintiff's claim would be no different if Credit Suisse had been
> an old-fashioned secured or unsecured lender**.  **The fact that Credit Suisse was
> underwriting the securitization of [Oakwood's loans] has nothing whatever to
> do with Plaintiff's claims**.

(D.I. #70 at pp. 4-5 (bolded emphasis added); *cf.* Shapiro Memo at p. 2 (asserting that
"[t]his case . . . turns on the very different and very specific question of how
securitization-related services were provided to Oakwood").)  While Defendants
overstate the matter somewhat when they write that, "[t]here is no allegation in this case
that the *nature* of the financing services provided by Defendants to Oakwood were
inappropriate or caused Oakwood harm" (*id.* at p. 4), their own arguments demonstrate
their knowledge that this case is not about issues wholly unique to "securitization"
(indeed, if the text quoted above is to be believed, Defendants' position is that
"securitization . . . has nothing whatever to do with Plaintiff's claims").  As Plaintiff has
noted elsewhere, Defendants are not entitled to have it both ways.  In fact, *both* of
Defendants' mutually exclusive positions are incorrect; while Oakwood's use of
securitizations is a *relevant* fact, it hardly defines the entirety of what this case is about.

*actual* qualifications, including with respect to the specific area they consider pertinent –

investment banks underwriting securitizations and providing related services.  Specifically, Dr.

Shapiro not only has analyzed securitization transactions, but also has previously been qualified

as and served as an expert in several securitization-related cases.  (*See* Shapiro Decl. ¶ 4.)

Likewise, Dr. Shapiro has conducted research about and written several academic articles and

textbooks about the role of investment banks and securitization-related services.  (*See id.* ¶ 5.)

More broadly, Dr. Shapiro has taught academic programs and professional seminars about the

roles and duties of investment banks and bankers, and has worked directly and extensively with

investment bankers in his capacity as a director of several public companies.  (*See id.* ¶¶ 6-8.)

Thus, even under Defendants' own flawed paradigm, Dr. Shapiro indisputably

possesses an array of specialized skills and knowledge about "how an investment bank providing

securitization-related service to a financially distressed company should behave" that is "greater

than the average layman."  *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327-28

(3d Cir. 2002) (Alito, *J.*) (citation omitted).[23]  Consequently, Dr. Shapiro's far better than

"average layman" understanding of these specialized areas, particularly when amplified by his

undisputedly acclaimed knowledge about corporate finance and banking more generally, allows

him to proffer testimony that will help the jury understand the issues presented in this case.

Third, even if Defendants' skewed presentation of (1) the relevant issues and (2)

Dr. Shapiro's background were correct (they are not), it would not alter the result.  In fact, the

Third Circuit's recent opinion in *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008), only

confirms that Dr. Shapiro is qualified to offer expert testimony.  There, the court reversed the

---

[23]   *See also, e.g.*, *Brown v. SEPTA (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 741 (3d Cir.
1994) ("We have eschewed imposing overly rigorous requirements of expertise and have
been satisfied with more generalized qualifications."), *cert. denied*, 513 U.S. 1190 (1995).

lower court's exclusion of the plaintiff's expert – Clauser – who testified in support of failure to warn claims against Ford. Ford moved to exclude Clauser on grounds similar to Credit Suisse's argument here: while Clauser had some specialized skills, it was in the wrong area (glass dynamics, not warning manuals), which made him unqualified in Ford's view. The Third Circuit rejected this position, first noting how Rule 702's "liberal policy of admissibility extends to the substantive and well as the formal qualifications of experts," and then explaining that:

> To meet Rule 702's liberal qualification requirement, Clauser did not need to be substantively qualified in the design of automobile rear liftgates or the drafting of service manual instructions. Clauser's expertise in the stresses and other forces that might cause a material such as glass to fail was more than sufficient to satisfy Rule 702's substantive qualification requirement.

*See id.*, 520 F.3d at 244-45. So too here; the mere fact that Dr. Shapiro has many broader specializations and qualifications than those demanded by Credit Suisse in no way makes him an *unqualified* expert. To the contrary, as in *Pineda*, Dr. Shapiro is an amply qualified expert.

Although *Pineda* – the Third Circuit's most recent precedential opinion on the matter – is dispositive of whether Dr. Shapiro is "qualified," the decision is in full accord with numerous other authorities, inside and outside of the Third Circuit, all of which reject the argument that an expert is not "qualified" due to a lack of expertise in a specific sub-specialty.[24]

---

[24]  *See, e.g., Schneider v. Fried*, 320 F.3d 396, 407 (3d Cir. 2003) (medical doctor's impressive academic background and teaching position "demonstrate that he is highly knowledgeable about cardiology" and could testify as an expert, even though he was not a practitioner of the interventional cardiology sub-specialty); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 142-44 (S.D.N.Y. 2003) (rejecting argument that expert was not qualified because he had "little or no experience with the health care industry"; noting that although "an expert with extensive experience reviewing records of health care providers would qualify to testify in this matter, [] Rule 702 does not require such specificity among the backgrounds of proposed expert witnesses"); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 457-58 (D.N.J. 1999) (concluding that expert with "an extensive and distinguished professional career in the field of economics" was qualified as an expert even though he did "not have specific experience in the automotive industry or in creating or evaluating business plans").

In fact, courts have gone further and repeatedly rejected the same type of criticism leveled by Credit Suisse here – Dr. Shapiro's lack of direct personal experience working as "an investment banker providing the type of securitization-related services upon which he purports to serve as an expert" (Shapiro Memo at pp. 8-9).[25]  For instance, in *Cary Oil Co. v. MG Refining & Marketing, Inc.* – a case involving a dispute over contracts of a small petroleum company – the defendants offered the expert testimony of Dr. Philip K. Verleger, Jr., a MIT educated economist who had taught and written extensively about issues in the petroleum industry, was on the board of a petroleum company, and did consulting for players in that industry (much like Dr. Shapiro here).  With respect to the plaintiffs' motion to strike Dr. Verleger's testimony, the court wrote:

> Plaintiffs argue that because Verleger has not actually run the day-to-day operations of a small fuel distributor, he is therefore incapable of opining in the case at bar.  However, ***lack of extensive practical experience directly on point does not necessarily preclude an expert from testifying.  A formal education in a particular field is sufficient to qualify a witness as an expert.***  Verleger is clearly not new to the world of petroleum distribution, and his area of expertise certainly enables him to provide an opinion that would assist a jury in understanding the issues relevant in the instant case.

2003 U.S. Dist. LEXIS 6150, at *6 (S.D.N.Y. Apr. 11, 2003) (emphasis added) (citations and internal punctuation omitted).  As a result, the court ruled that it would allow Dr. Verleger's testimony to go to the jury, which could consider how much weight to give his lack of practical experience.  *See id.* at *8-9.  Precisely the same result should obtain here.  At bottom, Defendants' *entire* attack on Dr. Shapiro's qualifications – including their focus on his lack of investment banking experience – is an issue of weight at trial.  *See, e.g.*, *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("If the expert meets liberal minimum qualifications,

---

[25]  It does not appear to be the case that Defendants' rebuttal expert, Mr. Boland, has this hyper-specialized "professional experience" either.  While Defendants tout Mr. Boland's thirty-one years at Citigroup and four years at Seneca Financial, it is not clear that any of Mr. Boland's experience was "proving securitization-related services to a financially distressed company."

then the level of the expert's expertise goes to credibility and weight, not admissibility.").[26]

In sum, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). It is beyond dispute that Dr. Shapiro possesses specialized knowledge far "greater than the average layman" about *every* issue involved in this case, including the conduct of investment banks, the behavior of corporate fiduciaries, execution of securitizations, and related standards. Credit Suisse's shrill complaints about the contours of Dr. Shapiro's extensive knowledge, experience, and expertise are properly ones defense counsel should present to the jury. Simply put, Dr. Shapiro does not have to measure up to Credit Suisse's absurdly inflated standards to qualify as an appropriate expert under *Kumho-Daubert*.

**2.  Dr. Shapiro Used A Reliable Methodology.**

Defendants attempt to argue that Dr. Shapiro's analysis must meet the formal *Daubert* requirements to be reliable. But courts recognize that those "factors were devised in the context of testing the reliability of scientific methods of proof and do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions." *Protocomm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 477 (E.D. Pa. 2001). Indeed, the Supreme Court has specifically recognized that *Daubert*'s standard reliability factors often are not germane in non-scientific cases, where "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150. Here, as detailed above, Dr. Shapiro has extensive personal knowledge of the

---

[26]   Similarly, the fact that Credit Suisse's expert, Mr. Boland, has spent his entire career working on the side of "banks," and has never dispassionately studied the banking field as an academic, also goes to the weight of his testimony for the Defendants, not to its admissibility.

relevant fields as well as substantial experience. Thus, the "reliability" analysis turns only on whether he applied that knowledge in a clear, understandable, and systematic fashion. The detail in the Shapiro Report and Supplemental Shapiro Report, the case law, and Defendants' own expert compel the conclusion that Dr. Shapiro's methodology satisfies the *Kumho-Daubert* test.

### a.    Defendants' Own Expert Witness Validated Dr. Shapiro's Methodology; Indeed, He Used The *Exact Same* Methods.

Defendants' attempt to attack Dr. Shapiro's methodology is fatally undermined by the opinions of their own "rebuttal" expert witness, Mr. Boland, who has testified as follows:

Q.    Aside from reviewing documents, describe your methodology, if any, in reviewing the performance of Credit Suisse in this case.

A.    I – primarily, I relied on the review of documents to give my assessment and my prior experience.

. . . .

Q.    Now do you believe, sir, that a review of documents and deposition testimony is the proper methodology that should be used by an expert in your field in assessing the performance of an investment bank [in this case]?

. . . .

A.    Yes.

Q.    Is that the methodology that you observed from Dr. Shapiro's report that he also used?

A.    He relied on his experience and reviewed documents, yes.

Q.    All right. I recognize that you differ with Dr. Shapiro's conclusions. But I'd like you to point up to me any differences that you perceive in the methodology that the two of you used in approaching the assessment as experts of Credit Suisse's performance as an investment bank in this case.

A.    I have no issue with his methodology.

Boland Depo at 17:3-18:10 [Holt Decl. Ex. "C"]. Mr. Boland further confirmed that he "already knew" what the appropriate methodology was for an expert to reach a proper opinion in this case: the one that both he and Dr. Shapiro *actually* employed – i.e., the review of documents and

deposition testimony to understand the facts, and the application of specialized knowledge or experience to those facts to reach a conclusion. *See id.* at 20:8-22.

Defendants' counsel presumably was acting in good faith when he told this Court at the January 22, 2008 hearing that Mr. Boland would be an appropriate "expert" for purposes of this case. Likewise, Defendants' counsel presumably acted in good faith when they actually served Plaintiff with an "expert" report based upon the specific methodology Mr. Boland described above. Accordingly, Defendants' present attacks on Dr. Shapiro's methodology ring especially hollow given that their own expert validated Dr. Shapiro's approach.[27]

> **b. Numerous Courts Have Recognized The Reliability Of The Method Dr. Shapiro Used Here – The Systematic Application Of Specialized Knowledge To Facts Gleaned From Documents And Testimony.**

Although Defendants suggest that Dr. Shapiro had *no* methodology here (*see* Shapiro Memo at 16-17), such a contention is absurd on its face since the mode of analysis Dr. Shapiro used is the obvious one (and the same as Mr. Boland's): a detailed and extensive analysis of the underlying facts – performed by analyzing mountains of documents and all the relevant deposition transcripts and exhibits – coupled with the application of his own specialized knowledge and germane academic principles and studies to those facts. (*See* Shapiro Decl. ¶¶

---

[27] As between the two experts, a simple juxtaposition of the Shapiro Report (which proceeds in a clear, analytic fashion, with discrete premises logically leading to Dr. Shapiro's ultimate conclusions) with the Boland Report (which is a rambling, incoherent series of conclusory statements, untethered to any recitation of facts and disconnected from any discernible process of reasoning) establishes that Dr. Shapiro's methodology and presentation of his opinions is unquestionably superior to – and therefore more reliable than – Mr. Boland's submission. The vast difference in the two reports' quality makes Defendants' overheated rhetoric about "sloppy and unsupported analysis" (Shapiro Memo at p. 12 n.6) particularly regrettable. As the saying goes, people living in glass houses should not throw stones. In any event, Plaintiff is perfectly content to allow the jury to decide for itself what weight should be accorded to the competing testimony of Dr. Shapiro and Mr. Boland once the process of direct and cross-examination has been completed at trial.

10-19 (describing in more detail the specific methodologies Dr. Shapiro used to reach the

opinions in specific parts of the Shapiro Report).)  These are standard and acceptable methods,

and numerous courts have recognized their reliability for *Kumho-Daubert* purposes.[28]

      A particularly striking example of the appropriateness of Dr. Shapiro's analysis is

*LNC Investments, Inc. v. First Fidelity Bank, N.A.*, No. 92-7584, 2000 U.S. Dist. LEXIS 10271

(S.D.N.Y. July 24, 2000).  There, the plaintiffs retained bankruptcy law professors Kenneth Klee

and J.J. White to review the documents and facts of the Eastern Air Lines bankruptcy case, and

then to opine on whether an indenture trustee breached its fiduciary duties by failing to move for

relief from the automatic stay (which analysis include an opinion that if such motion had been

made, the bankruptcy judge would have granted it).  The defendants in *LNC Investments* argued

that the law professors' testimony was mere speculation, based solely on the professors' personal

opinions, not on any methodology.  The court rejected these arguments on the grounds that, *inter*

*alia, Kumho-Daubert*'s reliability concerns "do not arise in connection with the opinions of these

experts in bankruptcy law" who "will be expressing opinions relevant to the factual issue of

causation, and the jury will make of those opinions what it will."  *See id.* at *12-13.  In fact, the

---

[28]  *See, e.g., Wechsler*, 381 F. Supp. 2d at 141-47 (holding that reliability standard was met as to expert who "reviewed thousands of documents" about the defendant's business, and based on those documents rendered opinions about solvency and the reasonableness of the defendant's accounting methods); *Cary Oil Co.*, 2003 U.S. Dist. LEXIS 6150, at *12-17 (concluding that "the accepted guidelines for admissible testimony" were met with respect to a NYU law professor who was to testify on "veil-piercing" issues, having reached his opinion "by referring to the evidence submitted for trial that he has reviewed"); *Protocomm Corp.*, 171 F. Supp. 2d at 480 (determining that an expert used reliable methods where he "based his opinions on personal knowledge and experience, as well as a seemingly copious review of a multitude of relevant business documents," and "[h]e and his firm conducted their own evaluations based on the materials before them and such knowledge and experience"); *Voilas*, 73 F. Supp. 2d at 460-63 (discussing at length why expert's method – reviewing detailed and complex corporate documents and offering a summary and opinion of them – satisfied the reliability standard; critiques of that method simply went to its weight).

court specifically noted the appropriateness of the testimony the professors were to provide:

> The need for expert opinion in the case at bar is equally apparent. ***This is a case of alleged banking malpractice***, where the participants conducted themselves within the complex and specialized setting of trust indentures, high corporate finance, and bankruptcy law. A lay jury will clearly require the assistance of expert witnesses to understand the standard of conduct the Defendant banks' officers owed to Plaintiffs, whether the officers failed to meet that standard and, if so, what damages (if any) are specifically attributable to that failure.

*Id.* at *8-9 (emphasis added). Here, both of Plaintiff's experts intend to testify about precisely these same issues, in a case involving a similar "complex and specialized setting," as well as claims of "banking malpractice" and breaches of fiduciary duty. As such, *LNC Investments* strongly counsels in favor of allowing both experts, particularly Dr. Shapiro, to testify at trial.

### c.    Defendants' Remaining Criticisms Of Dr. Shapiro Are Meritless.

Defendants repeatedly criticize Dr. Shapiro's testimony as being naked "*ipse dixit*," or subjective opinion. (*See, e.g.*, Shapiro Memo at pp. 2 & 15.) But the mere fact "[t]hat an expert injects personal judgment in the course of offering his testimony is hardly grounds for excluding that testimony." *Crowley v. Chait*, 322 F. Supp. 2d 530, 549 (D.N.J. 2004). Moreover, as discussed above, the methodologies used here – the application of specialized knowledge to a detailed review of the facts – are typical. In addition, the rule posited by Credit Suisse, under which an expert could never apply his personal judgment to the facts before him, would create a categorical ban on the use of experts in a wide array of cases, including virtually all cases alleging professional malpractice and cases involving the application of generalized principles to specific fact-patterns. That clearly is not, and should never be, the law.[29]

Indeed, Dr. Shapiro's approach here resembles the "case method" of analysis

---

[29]    *See, e.g.*, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132-34 (2d Cir. 2006) (overruling exclusion of expert whose testimony consisted of an application of his knowledge about customs and practices in the insurance industry to specific facts).

originated by Harvard Business School professors and now used by prominent business schools around the globe.  This style of reasoning involves a detailed review of specific fact-patterns and the application of one's professional knowledge and judgment to those facts.  (*See* Shapiro Decl. ¶ 10.)  This pedagogy is appropriate for world renowned graduate institutions and business professionals because, while there often may be no single "right" answer, there are *wrong* answers that professional judgment should reveal (a lesson unfortunately not learned by Enron's executives and bankers).  Moreover, as recently explained in the *Commercial Financial Services* case, non-scientific testimony commonly requires "the use of professional judgment," and:

> where the use of professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 . . ., has employed a methodology recognized in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion.

350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005).  Here, all of the described conditions have been met, and thus Defendants' objections to Dr. Shapiro's exercise of his professional judgment in his analysis of this case are issues of weight, to be explored before the jury, not admissibility.

Defendants further criticize Dr. Shapiro on the grounds that he "never sets out how a 'reasonable' or 'prudent' investment bank should have operated."  (Shapiro Memo at p. 17 n.8.)  In fact, Dr. Shapiro *does* give examples of what should have been done, including further investigation of the effects of "securitization" and "LOTUS" transactions on Oakwood, as well as the provision of more fulsome and detailed advice to Oakwood's management and board.  In any event, such testimony is not necessary to demonstrate that on *these facts*, in *this case*, Credit Suisse did not behave reasonably.  Indeed, the Third Circuit recently rejected a similar attempt to indict an expert on the grounds that he did not discuss what *would* have avoided the harm:

> [The expert] did not have to develop or test alternative warnings to render an opinion that the 2002 service manual did not provide adequate, step-by-step instructions to account for the different stresses that might be exerted when an automobile technician replaces the rear liftgate brackets and hinges, or that the lack of instructions was a safety issue for the technician.

*Pineda*, 520 F.3d at 248.  Accordingly, it was simply not necessary for Dr. Shapiro to explain what Credit Suisse could have done to avoid breaching its duty; all that was necessary was for Dr. Shapiro to explain why on *these facts* what Credit Suisse *actually* did was inappropriate.

**3.    Dr. Shapiro's Testimony, Including That Contained In The Supplemental Shapiro Report, "Fits" Numerous Issues In This Case.**

Defendants do not contest that Dr. Shapiro's testimony "fits" the issues in this case.[30]  The reason should be obvious:  Dr. Shapiro's testimony goes directly to whether Credit Suisse breached the standard of care, which bears on elements of Plaintiff's negligence, implied contract, and breach of fiduciary duty claims.  After all, if Credit Suisse owed a duty of reasonable care to Oakwood, the fact that an impressively qualified expert will testify that Credit Suisse "did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood" (Shapiro Report at p. 3) is unquestionably relevant.  Likewise, the second prong of the initial Shapiro Report – that Credit Suisse "had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy" (*id.* at p. 4) – not only helps the jury understand *why* Credit Suisse would breach the standard of care it owed to Oakwood, but also goes directly to whether the duty of loyalty was breached if the jury concludes that a fiduciary relationship existed here.  Put simply, the opinions detailed in the

---

[30]   In fact, it is *Defendants*' proposed expert – Mr. Boland – whose testimony does not "fit" certain issues in the case.  As Plaintiff has explained in its Motion *in Limine* No. 1, Defendants' counsel unlawfully instructed Mr. Boland not to answer any questions about Plaintiff's breach of fiduciary duty claim, and Mr. Boland complied with those illicit instructions.  (*See* D.I. #74 at pp. 5-8.)  Accordingly, Mr. Boland has not proffered any testimony that "fits" the fiduciary duty claim, and should not be allowed to address it at trial.

Shapiro Report are undeniably relevant to – and thus "fit" – the issues presented by this case.

It ought not be forgotten that Dr. Shapiro also submitted the Supplemental Shapiro Report, which includes an analysis of what objective "market data" existed with respect to Oakwood's insolvency and enterprise value on various dates. (*See* Holt Decl. Ex. "A"; *see also* Shapiro Decl. ¶ 13.) Indeed, the Supplemental Shapiro Report further contains an analysis of Credit Suisse's contemporaneous analyses of Oakwood's market value, which leads Dr. Shapiro to conclude that "[Credit Suisse's] own internal analysis demonstrated that Oakwood was economically insolvent by no later than June 2001" (*see* Supplemental Shapiro Report at p. 5), which in turns means Credit Suisse either was or should have been aware of Oakwood's tremendous insolvency by that point. This knowledge on the part of Credit Suisse in turn relates back to Dr. Shapiro's testimony about whether it behaved reasonably. (*See* Shapiro Decl. ¶ 16.)

Defendants confine their discussion of the Supplemental Shapiro Report to a lone footnote, asserting that it merely "purports to opine upon Oakwood's solvency, a topic that is no longer germane to Plaintiff's claims and is not addressed by this Motion." (Shapiro Memo at p. 5 n.1.) This analysis is wrong for a number of reasons, and Defendants have thus failed to make any persuasive case for precluding Dr. Shapiro from testifying before the jury about his opinions.

First, "solvency" remains an issue "germane to Plaintiff's claims" because the resolution of that issue affects the reasonableness of Credit Suisse's behavior, particularly if Credit Suisse was an Oakwood fiduciary. Defendants' own Shapiro Memo recites the "commonly understood" principle that the scope of a fiduciary's duties "may shift when a company becomes insolvent or enters the 'zone of insolvency.'" (Shapiro Memo at p. 19.) Indeed, authorities that Defendants have previously cited to this Court confirm that this "shift" requires a fiduciary to consider the interests of *all* a corporation's stakeholders when a

corporation is insolvent.[31]  While Dr. Shapiro does not opine on the existence of any duty, he did

explain why the legal "shift" described above makes good economic sense.  (*See* Shapiro Depo at

32:8-39:9.)  Thus, because whether Oakwood was insolvent at various dates in 2000, 2001, or

2002 directly affects the nature and scope of any fiduciary duty Credit Suisse had, as well as

whether that duty was breached, it is a topic highly germane to Plaintiff's claims.[32]

      Second, the Supplemental Shapiro Report not only is an "insolvency" opinion, but

also touches on several other issues, including the "market data" valuation of Oakwood's equity,

debt, and assets as of various dates.  This data is relevant for purposes of the damages phase of

Plaintiff's case, and further functions as evidence that validates and supports Dr. Tennenbaum's

analysis and the opinions in the initial Shapiro Report.  *See* Shapiro Decl. ¶ 13; *see also VFB*

*LLC v. Campbell Soup Co.*, 482 F.3d 624, 631-33 (3d Cir. 2007) (recognizing the evidentiary

value of market data).  Accordingly, the "market data" analysis in the Supplemental Shapiro

Report would be relevant and admissible evidence even if Oakwood was *never* insolvent.

      Third, the Supplemental Shapiro Report also contains Dr. Shapiro's opinion that

Credit Suisse's own analyses of Oakwood's securities strongly suggest that they actually knew or

---

[31]  *See, e.g.*, *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) (holding that fiduciaries of insolvent entities have a "duty to act in the best interests of the estate as a whole including its creditors, equity interest holders and other parties in interest"); *Odyssey Partners v. Fleming Cos.*, 735 A.2d 386, 420 (Del. Ch. 1999) (rejecting equity's complaints that the board should have filed for bankruptcy, rather than allowing foreclosure action, since fiduciaries of an insolvent corporation must "consider and protect interests other than those of the stockholders"); *see also* Stephen L. Schwarcz, *Commercial Trusts as Business Organizations:  An Invitation to Comparatists*, 13 Duke J. Comp. & Int'l L. 321, 331 n.58 (2003) ("[D]irectors of an insolvent corporation have been held to owe a fiduciary duty to the corporation's creditors (senior claimants) as well as shareholder (residual claimants).").

[32]  Indeed, although likely not the target of Defendants' Expert Motions, it is indisputable that whether Oakwood was insolvent at all relevant dates bears on the avoiding powers claims that will be decided by the Court.  *See* 11 U.S.C. §§ 547(b)(3) & 548(a)(1)(B)(ii)(I).

reasonably should have known that Oakwood was in dire financial straits as of June 2001. As noted above, this opinion goes directly to the breach of duty and foreseeability of future damages aspects of Plaintiff's claims, and thus is further relevant – i.e., "fits" the case – on those grounds.

> **4.    Neither Dr. Shapiro's Testimony Nor Plaintiff's Theory Of The Case Rests Upon Credit Suisse's Strawman Tale Of Direct Fiduciary Duties To "Bondholders"; Plaintiff's Theory Of Duty Is Uncontroversial.**

Defendants' final ploy is to argue that "Professor Shapiro's opinion . . . depends on the notion that . . . Credit Suisse had an obligation to Oakwood's *bondholders*, to the exclusion of all the company's other stakeholders, to cut off Oakwood's financial lifeline and precipitate its reorganization." (*See* Shapiro Memo at pp. 18-21.) This statement begins as a strawman in two respects vis-à-vis Plaintiff's theory of the case, and then completes the hat trick by mischaracterizing Dr. Shapiro's actual opinion and testimony.

The first absolute mischaracterization embedded in Defendants' statement is the notion that either Plaintiff's case or Dr. Shapiro's testimony turns on the existence of some *direct and exclusive* fiduciary duty to creditors. Plaintiff's actual theory is that Credit Suisse had a fiduciary relationship with Oakwood, and thus owed a fiduciary duty to Oakwood itself, which duty expanded to include *at least some consideration* of the interests of Oakwood's creditors (as residual stakeholders) once Oakwood was insolvent. This construct, as noted above, is well supported in the law (including by Defendants' own authorities), and it creates a regime under which any fiduciary duty owed by Credit Suisse would have been breached if (1) Oakwood was insolvent; and (2) Credit Suisse acted unreasonably in a way that either (a) was value-destroying to Oakwood as a whole, or (b) disregarded the effects on Oakwood's creditors. This regime is the only one assumed by Dr. Shapiro. (*See* Shapiro Report at p. 4 (noting assumption of duty to "Oakwood and its creditors"); Shapiro Depo at 26:24-32:7 (explaining how Dr. Shapiro relied upon assumption that a fiduciary duty was owed to Oakwood, *the corporation*, and that, as an

economic matter, such a duty expands to include the interests of shareholders upon insolvency).)
Indeed, as discussed below, Dr. Shapiro made it clear that his conclusion that Credit Suisse acted
unreasonably under the circumstances would not change in any respect under the framework of
duties described on pages 18-21 of the Shapiro Memo.  (*See also* Shapiro Decl. ¶ 20.)  Likewise,
nothing about that framework would alter Dr. Shapiro's opinions about Defendants' compliance
with the standard of care against which their conduct must be measured (which standard is
helpfully defined, in part, by Defendants' own policy manuals).  (*See id.* ¶¶ 20-21.)

The second absolute mischaracterization in this portion of Defendants' argument
is the notion that Plaintiff and Dr. Shapiro believe that Credit Suisse had a duty to "force"
Oakwood into bankruptcy, a false tale Defendants have spun elsewhere.  Plaintiff's *actual* theory
of the case – and Dr. Shapiro's *actual* opinion about what should have occurred – is that Credit
Suisse, as a fiduciary and insider, should have paid substantially more attention to the interests of
its client, Oakwood, and the stakeholders ultimately affected by Oakwood's "business-as-usual"
course, its creditors, than to its own interests.  This proper level of behavior could have taken
many forms, but at a minimum would have included: (1) *some* investigation about the effects of
Oakwood's securitizations and "LOTUS" transactions on Oakwood's future prospects and the
probability that Oakwood would be able to satisfy all its just debts; (2) *some* advice to Oakwood
about what Credit Suisse actually knew to be the deleterious consequences of continuing to make
bad loans, which were then securitized and guaranteed by the main Oakwood entity, thereby
*compounding* the damage; and (3) ultimately declining to participate in these value-destroying
transactions (which decreased the enterprise value of Oakwood itself, the harm of which was
ultimately felt by creditors) if Oakwood was not receptive to Defendants' advice.  While the
consequences of this *may* have been an Oakwood bankruptcy in 2001, that is not a necessary

outcome, and it is an outcome several steps removed from Credit Suisse's breaches of duty.

Indeed, Dr. Shapiro clarified his position on this point for Defendants' counsel at his deposition.[33]  In any case, there is no reason to assume an Oakwood bankruptcy would have required it to "liquidate the business."  (*See* Shapiro Memo at p. 19.)  As such, Defendants' refrain about a duty to "force Oakwood into bankruptcy" represents some fictional case that defense counsel has created for themselves, one far more extreme than Plaintiff's actual case.

Defendants' argument is riddled with additional gross mischaracterizations of what Dr. Shapiro actually said at his deposition.  For example, Dr. Shapiro never testified that he understood there to be any duty exclusively to "bondholders," but merely noted that "bondholders" were the only example of a class of Oakwood's creditors that he remembered having specific discussions about.  (*See* Shapiro Depo at 34:11-38:24.)  Defendants' argument to the contrary is simply a mischaracterization of Dr. Shapiro's testimony, pure and simple.  Likewise, *and perhaps most importantly*, Dr. Shapiro expressly told Defendants' counsel that his ultimate conclusions would obtain even if no fiduciary duty was owed to anyone:

> Q.      Tell me, if you would, Professor, how would the conclusions in your report have been different if you had not made that assumption.
>
> . . . .
>
> A.      I can't give you – well, a legal opinion, but I guess I would say even if there were no fiduciary obligation that Credit Suisse's behavior was inconsistent . . . with the guidelines in its compliance manual.  So from that standpoint I think my conclusions would still stand, in that . . . [Credit Suisse] did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood doesn't rely specifically on the existence of a fiduciary obligations.

---

[33]  *See* Shapiro Depo at 121:11-125:11 (explaining that a bankruptcy filing was not a *necessary* scenario, but merely one outcome had Credit Suisse "engage[d] in a discussion with Oakwood as to what its situation was, that it was economically insolvent," and advised Oakwood that "the effect of facilitation, of doing business as usual, . . . was not in the economic best interest of [Oakwood] or its creditors").

And second, that my opinion that [Credit Suisse] had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy . . . does not specifically rely on the assumption of a fiduciary obligation . . . .

Q.        So do I understand from that answer that your conclusion would not be any different if you had not made the assumption [that Credit Suisse owed a fiduciary duty to Oakwood and its creditors]?

A.        Yes, *I believe that the fiduciary obligation certainly strengthens my conclusions, but I think <u>those conclusions would still stand</u>.*

*Id.* at 5:5-6:11 (emphasis added).  Thus, Defendants know full well that Dr. Shapiro's conclusion in no way "<u>depends upon</u> his misunderstanding of [Credit Suisse's] duties" (Shapiro Memo at p. 20), but rather would be completely viable in the absence of any fiduciary duty to anyone.  As such, the entire argument presented on pages 18-21 of the Shapiro Memo is a mere sideshow, intended only to muddle the waters and complicate the issues for the Court.

In sum, Dr. Shapiro's testimony will be that, under the facts of this case, Credit Suisse did not act reasonably and with due care toward Oakwood.  While Dr. Shapiro believes that conclusion would be even stronger if Credit Suisse owed fiduciary duties of care and loyalty to Oakwood (and had to at least consider the interests of residual stakeholders, which would be Oakwood's creditors if Oakwood was insolvent), he has been clear that his opinion in no way depends on any duty.  In particular, Dr. Shapiro has never stated that his opinion turns on some *direct and exclusive* fiduciary duty to "bondholders."  Likewise, Dr. Shapiro has never stated that his analysis would require Credit Suisse to "force" Oakwood to file bankruptcy.  Thus, because Defendants' argument rests on a fundamental misunderstanding and distortion of Dr. Shapiro's testimony and Plaintiff's theory of the case, the Court should reject it without hesitation.

**D.    Defendants Fail To Provide Actual Evidence Of Any "Unfair Prejudice"
That Would Befall Them Were The Jury To Hear Plaintiff's Experts.**

Throughout the memoranda in support of both Expert Motions, Defendants suggest that there is some risk of "prejudice" in allowing either Dr. Tennenbaum or Dr. Shapiro

to testify before the jury.  Given that both experts' testimony is highly relevant to live issues in this case and otherwise admissible under Federal Rule of Evidence 702, Defendants must proffer a very weighty showing if either of Plaintiff's experts is to be excluded on "unfair prejudice" grounds.[34]  Defendants have utterly failed to make any such showing here.

In fact, the only possible "prejudice" Defendants can point to is the possibility that the jury might be confused.  While Plaintiff's counsel fully intends to present both its experts in a way that is comprehensible to the jury, the risk of any "unfair" confusion ultimately is solved by effective lawyering by defense counsel, not by a wholesale exclusion of key evidence.  *See, e.g.*, *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an adversary party has full opportunity to refute an expert's testimony during cross-examination, exclusion due to the danger of misleading the jury is generally inappropriate.").  Indeed, exclusion on "prejudice" grounds would be particularly inappropriate here given that Defendants have two "experts" of their own who they could marshal at trial to rectify any "prejudice" they perceive in allowing the jury to hear Plaintiff's witnesses.  There is no "prejudice" on these facts, simply a fair ball game.

## CONCLUSION

For the reasons and based on the authorities set forth above, the Court should deny both the Tennenbaum Motion and the Shapiro Motion in their entirety.

Respectfully submitted,

Dated:  April 30, 2008
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*

---

[34]  *See, e.g.*, *Petruzzi's IGA Supermarkets v. Darling-Del. Co.*, 998 F.2d 1224, 1239-41 (3d Cir.) (reversing exclusion of expert testimony because lower court used too low a test for "unfair prejudice"; noting that "if expert testimony survives the rigors of Rules 702 and 703, then Rule 403 becomes an unlikely basis for exclusion"), *cert. denied*, 510 U.S. 994 (1993).

# Exhibit "1"

also rest on a myopic and distorted understanding of Plaintiff's theory of this case.  Once the

proper clarifications are made, it is clear that the challenged evidence is highly relevant and that

Defendants have utterly failed to show that any ***unfair*** prejudice would result if all that evidence

were put before the jury.  As such, all Defendants' non-expert evidentiary challenges must fail.

**A.    Plaintiff's Unified Statement Of The Case.**

   **1.    Overview.**

        In responding to the veritable flood of motions, evidentiary objections, and the

like filed by Defendants in recent days, Plaintiff seeks to avoid burdening the Court with having

to read the same or very similar material over and over.  Plaintiff therefore takes this opportunity

to offer this Unified Statement, which will help respond to several of Defendants' motions and to

Defendants' relevance objections to certain of Plaintiff's trial exhibits and deposition testimony.

        Other briefs, such as Plaintiff's responses to Defendants' *Daubert* motions, will

avoid unnecessary repetition of what is contained here, but will refer the Court to this Statement.

        Much of Defendants' efforts to date have consisted of the creation of simple

"strawmen" by mischaracterization of Plaintiff's theories and evidence, followed by attempts to

limit Plaintiff's evidence to the strawman case created for Plaintiff by Defendants.

        Thus our analysis begins with a statement of Plaintiff's *actual* case.[5]  We do not

attempt to lay out every piece of evidence, or every inference from it, that supports our case –

---

[5]    We also note the pendency of Defendants' Motion for Partial Summary Judgment (D.I. #39).
As matters stand, and in accordance with the Court's expressed preference, Plaintiff filed a
Counter-Statement Certifying that Genuine Issues of Material Fact Exist (D.I. #50), and
awaits the Court's directions as to whether it will deny Defendants' motion on the papers filed
to date, or will require Plaintiff to file an answering brief in opposition to Defendants'
motion. Thus, the record heretofore contained only Defendants' mischaracterized strawman
version of Plaintiff's case.  If Plaintiff must file a responsive brief, much of this Unified
Statement will help explain Plaintiff's *actual* case, and demonstrate why summary judgment
should not be granted on *that* case, whatever might be said of the strawman case.

rather, our purpose is to provide the general outlines of the case succinctly to assist the Court in considering relevance, prejudice, expert testimony, and related concepts.  We also point out that this Unified Statement relates only to the "jury" issues in the case.

**2.** **Plaintiff's Case, As Stated By** *Plaintiff.*

**a. Theories of liability.**      Defendants are correct in their observation that Plaintiff asserts three common law causes of action to try to a jury: negligence, implied contract, and breach of fiduciary duty.  The three have much in common, principally the duty of care.

It is useful to analogize this case to one for professional malpractice, albeit malpractice committed by an insider and fiduciary of the victim.  Plaintiff contends that Credit Suisse, well before the 2000-2002 period that will be the principal focus of most of the evidence in this case, undertook to provide financial advice to Oakwood.  This embodies a main factual dispute: Plaintiff claims that Defendants undertook this role, and Defendants deny it, claiming that they merely provided securitization services, much like a supplier of lumber or stationery.

Plaintiff will offer considerable evidence that Defendants undertook a broader role, particularly through Mr. O'Driscoll's actions.  In the interests of brevity we will not discuss all the relevant evidence here, but some salient examples are: (1) Oakwood's executives, as a regular course, sought advice from Mr. O'Driscoll on a variety of business matters, especially in the financial area; (2) in the course of this seeking of advice, Oakwood gave him confidential information about Oakwood that Mr. O'Driscoll had no need to know if his work had actually been confined to executing securitization transactions; (3) in some cases at Oakwood's request, and in other cases entirely unbidden, Mr. O'Driscoll sought avenues of financing for Oakwood, sometimes from Credit Suisse and sometimes from others – the purpose, in all cases, being to hock anything that was not nailed down so as to provide temporary liquidity to sustain the "business-as-usual" death spiral that was so detrimental to Oakwood and so profitable to Credit

Suisse; (4) when outside arm's-length lenders decided that they no longer wanted to finance Oakwood, Defendants (being the "only game in town") stepped in with the "warehouse" facility, which was, in essence, a payday loan scheme designed to keep the patient breathing until the next securitization – and in the course of that facility, Credit Suisse acquired a warrant for Oakwood's equity, making them, by admissions in their own documents, an "insider"; (5) Credit Suisse put together a sale to Berkshire Hathaway of low-tranche "B-2" securities that Defendants had not been able to sell on Oakwood's behalf in their underwritings of prior securitizations, which *Mr. O'Driscoll* negotiated on Oakwood's "behalf" with Berkshire's executives.

All of this occurred even though the securitization documents did not require it. Accordingly, Credit Suisse affirmatively chose to undertake such tasks with due care, just as, for example, a lawyer whose formal retainer agreement was confined to the defense of a single lawsuit could have a far greater role if he actually gave advice on other matters. No one would argue that such a lawyer is free to commit malpractice in the course of performing his expanded duties. This is because of the black-letter principle that, while one is not obligated to perform services for another, once one undertakes to do so one must use ordinary care in the process.[6]

This fundamental principle prevails whether a claim for breach sounds in tort or contract. In tort, we say that one must use reasonable care; in contract, that one must deliver the services bargained for, namely competent ones. Analogizing again to a professional liability claim against a malpracticing lawyer, such as one who allows a statute of limitations to run, we would say that he is liable, either in negligence or for breach of his contract (whether expressed in a retainer agreement or merely implied from his having undertaken the work) to perform

---

[6]    *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Palka v. ServiceMaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585-87 (1994); *Parvi v. Kingston*, 41 N.Y.2d 553, 559-60 (1977); Oliver W. Holmes, Jr., *The Common Law*, 278-79 (1881).

according to professional standards.

Of great significance is the congruity of the standard by which we assess the professional's performance: whether in tort or contract, the professional is under a *duty* to render competent professional services, measured by what reasonable practitioners of the same profession do – i.e., the *standard of care*.

What of the fiduciary duty claim?  Defendants deny that such a relationship existed, so Plaintiff will undertake the burden of proving it.  There is considerable evidence of this, including the five undertakings by Mr. O'Driscoll described above; the numerous and multifaceted roles that Credit Suisse occupied vis-à-vis Oakwood; and, perhaps most glaringly, the outright admission by Jared Felt (one of Defendants' main witnesses):  "We had a fiduciary duty to Oakwood."[7]  Mr. Felt was Defendants' principal actor regarding the *formal* financial advisory contract that prevailed in the last 88 days of Oakwood's existence.  That contract did not mention any fiduciary duty, but it did contain an integration clause.  The necessary conclusion is that the fiduciary duty Mr. Felt mentioned came from somewhere else.

*Precisely.*  And this leads directly to the law governing the existence of fiduciary relationships.  This is a factual issue for the jury,[8] and it is to be determined in a case-by-case,

---

[7]  (Felt Dep. Tr. at 376:5.)  To lessen the burden of paper on the Court, we do not attach another copy here, but refer the Court to the Motion *in Limine* No. 2 contained in our recently filed consolidated motions *in limine* (D.I. #74 at pp. 8-13), which deals with Mr. Felt's later effort to "clarify" this testimony after a lunchtime conference with counsel, itself forbidden by the rules of this Court, the details of which were concealed behind refusals to answer questions based on a spurious claim of attorney-client privilege.

[8]  *See, e.g.*, *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, No. 98-6454, 1999 U.S. Dist. LEXIS 17016, at *16-18 (S.D.N.Y. Nov. 1, 1999); *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 107 (2d Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, No. 88-CV-819, 1992 U.S. Dist. LEXIS 7721, at *71-72 (N.D.N.Y May 23, 1992); *Langford v. Roman Catholic*

fact-specific inquiry to determine whether a relationship of trust and confidence exists between

the parties "independent of the contractual obligation."  This quotation is from Senior Judge

Conner's recent succinct and scholarly collection of New York law about the subject in

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs*., 388 F. Supp. 2d 292, 304-05

(S.D.N.Y. 2005).  We believe that the standard set by New York law, as explained in this case,

means that in the inquiry *anything* is relevant if it tends to prove whether trust and confidence

existed between the parties, or whether one party relied on the other for superior expertise.

We will not here set forth all of the evidence that establishes the relationship in

this case; the present point simply is to clarify the legal standard by which "relevance" (and any

related weighing of probative value against assertions of "prejudice") should be measured.

If a fiduciary relationship existed between Oakwood and Credit Suisse, it gave

rise to a *standard of care* quite similar to the negligence and contract standard.  But the fiduciary

relationship adds two important wrinkles: first, "a claim for breach of fiduciary duty need not

meet the standard requirements of causation and damages," *Lumbermens*, 388 F. Supp. 2d at 304,

a point discussed below; second, there is an added duty of loyalty.  As to the latter wrinkle,

Plaintiff will offer considerable evidence that virtually all of the advice, express or implied, that

Defendants gave Oakwood, especially as the end approached, had two characteristics: first, it

was enormously remunerative to Defendants; second, it damaged Oakwood.

**b.  Breach of duties of care and loyalty.**    The previous section of this Unified

Statement explained the three theories under which a duty of care arose between Credit Suisse

and Oakwood, and described why the standard of care is quite similar on all three.  That section

---

*Diocese*, 677 N.Y.S.2d 436, 439 (N.Y. Sup. Ct. 1998).  *Accord, e.g.*, *Carter Equip. Co. v.
John Deere Indus. Equip. Co*., 681 F.2d 386, 390 (5th Cir. 1982) ("The existence or
nonexistence of a fiduciary relationship between parties is a question of fact for the jury.").

also explained that Credit Suisse bore a duty of loyalty to Oakwood.  What are these standards and how were they breached here?

As in other professional liability cases, any duty owed by Credit Suisse would have required Credit Suisse to act reasonably under the circumstances.  And, as is usual in such cases, Plaintiff has an expert witness to testify about the subject, Dr. Alan Shapiro.  Although Dr. Shapiro's expert report does not use legal buzzwords, its substance is to analyze the economics of the various transactions Credit Suisse either engineered or participated in and their effects.  After doing so, Dr. Shapiro concludes that these transactions were value-destroying and unreasonable.

Dr. Shapiro also points to evidence among Defendants' own documents that Defendants knew this, knew that Oakwood faced immediate and significant bankruptcy risk as early as January 2000, and knew that Oakwood's management did not fully understand the risks, the danger, and the expected losses associated with its business-as-usual course of transactions with Defendants or engineered by Defendants.

Dr. Shapiro opines that under these circumstances, Defendants had the obligation to investigate fully the effects of such transactions, to advise Oakwood that Defendants knew the transactions were not in Oakwood's best interest, and ultimately, if necessary, to refuse to participate any further.  (It should be noted that this is not an opinion on the *existence* of any duty – the subject of the previous section of this Statement – but on standards of care and loyalty.)  He also points to additional evidence of the standard of care in the form of Defendants' own manuals governing relations with Defendants' customers (including fiduciary relationships), and finds that Defendants' conduct in this case fell far short of the standards established by their own manuals.

While Dr. Shapiro's conclusion as to the standard of care would obtain absent any fiduciary duty on the part of Credit Suisse, its weight (and the analysis more generally) is

13

undoubtedly amplified by the fact that Credit Suisse was an Oakwood insider and fiduciary, who was obligated to act toward Oakwood with a degree of loyalty and care significantly beyond that normally required by the "morals of the market place" in which arms-length parties interact.[9]

      Defendants are scornful of any notion that a "bank" ever has a duty to refrain from a transaction, but banks get no exceptions to the ordinary rules of law.[10]  Consider the case of a physician approached by a patient who says, "Hey Doc, give me some more of those addictive pain pills."  Carried to this analogy, Defendants' position would have us say, "Well, the doctor filled out the prescription legibly, and that's what the patient wanted, judgment for defendant."  But no one would deny that the physician's duty of care – to act reasonably under the circumstances – required him to investigate the patient's actual needs and weigh them against the dangers of addiction; let alone the doctor's duty, if that was his belief, to tell the patient how the pills would damage more than help; or ultimately, if the patient replied, "I know that they will harm me, but I want them anyway," to refuse to participate in damaging a patient his duty compelled the doctor to help rather than hurt.[11]

---

[9]   *See, e.g.*, *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) ("Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . .  Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.").

[10]   Credit Suisse, of course, was also far more than a mere "bank" for Oakwood; rather, it was a close and intimate advisor providing various devices and schemes for Oakwood to raise short-term liquidity, a lender of its own capital (albeit in a nearly risk-free way), and a powerful warrant holder.  As such, the analysis goes beyond duties typically discussed with regard to investment banks and other financial institutions, and requires Credit Suisse to act in accordance with the obligations imposed by law on corporate fiduciaries and insiders.

[11]   It is also worth mentioning that Defendants misstate Plaintiff's theory by repeating that we claim Defendants had an obligation to demand that Oakwood file bankruptcy in 2001.  Given

And now suppose that doctor just happened to own the pharmacy downstairs. And then suppose further that the doctor also occupied a fiduciary status vis-à-vis the patient.

**c. Damages and proximate causation.** It seems axiomatic to say that Oakwood's continuation of its business-as-usual course of value-destroying transactions caused it to lose value (and garnered massive fees for Credit Suisse). But this succinct formula is Plaintiff's theory of damages here, and it must be contrasted with the absurd chain of causation posited in Defendants' strawman version of Plaintiff's case.

The loss of value ("fact of damages") and the amount of that loss are established by the expert testimony of Dr. Michael Tennenbaum.[12] Using dates giving the best available data (the ends of Oakwood fiscal years), he compares the fair market value ("FMV") of Oakwood's assets on September 30, 2001 with that same value on September 30, 2002 (mere weeks before the bankruptcy), and finds a diminution of $50 million. Dr. Tennenbaum does this

---

Oakwood's addiction to the value-destroying transactions and mounting debt burden advised and engineered by Defendants, it is highly likely that if Defendants had complied with their duty, and Oakwood had stopped engaging in the value-destroying transactions, Oakwood may have had to file bankruptcy, but that is not a necessary result (the company could have been sold to someone who could finance it without the value-destroying transactions, or any number of other results could have occurred). The key point, as we show in the Damages section below, is that even if Oakwood had needed to file bankruptcy earlier than it did, it would have had a far greater value than it had after another year of value destruction.

[12]  Dr. Tennenbaum, in addition to the fact and amount of damages, also opines on the issue of Oakwood's insolvency as of various dates. This testimony is of significance to some "bench" issues in the case, but it also is relevant to Dr. Shapiro's opinion regarding the standard of care. Plaintiff contends that a financial advisor to a company that is insolvent or in danger of insolvency must take into account the company's obligation to pay its just debts, which, after all, is an obligation fully imposed by the law. What may be reasonable advice regarding risk and loss to an Exxon or a Microsoft may not be reasonable to a company betting creditors' money against long odds. Defendants deride Dr. Shapiro for not phrasing this standard in the verbiage *du jour* of the rapidly shifting case law on this subject, but it doesn't matter whether we say any third party owes a duty directly to creditors – what matters is that the corporation undeniably does. *The real question is the reasonableness of financial advice to that corporation, taking that duty into account.*

by using the time-honored method of discounted cash-flow studies for each date. Defendants'

valuation expert, Mr. Pfeiffer, criticizes Dr. Tennenbaum for not giving more weight to the

"market data" approach, but using Mr. Pfeiffer's own bond price data, such an approach would

have shown a loss of some $72 million, well in excess of Dr. Tennenbaum's $50 million.[13]

Defendants would like to conflate Dr. Tennenbaum's testimony with the legal

theory of "deepening insolvency," to which they then apply adjectives such as "discredited,"

"moribund," and the like. Once again, Defendants are simply mischaracterizing Plaintiff's case

to fit their arguments, because their attacks in no way pertain to Plaintiff's *actual* case.

"Deepening insolvency," whatever livelihood it may have, is a comparison of the

extent to which a debtor is insolvent (in the sense of an excess of liabilities over FMV of assets)

on day one versus some subsequent date. But that is not what Dr. Tennenbaum has done here. If

he had, he would have taken Oakwood's *liabilities* into account (and the damages figure would

have dramatically bigger). Dr. Tennenbaum's work includes a comparison of the FMV of assets

on two dates. This is pure economic damages, in the form of plain vanilla loss of asset value,

and that measure of economic damages is available *in addition* to all the fees Credit Suisse was

paid.[14] *See, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 464-66 (2d Cir. 1999).

If Defendants had their way, the effect would be to deny an insolvent company

---

[13]   Small wonder that Defendants apparently did not engage Mr. Pfeiffer actually to provide an affirmative opinion of any kind, but only to confine his work to "pot shots" (his term) at Dr. Tennenbaum. In virtually all cases, if Mr. Pfeiffer had carried his work through to an actual opinion, it would have been more favorable to Plaintiff's position than Dr. Tennenbaum's.

[14]   Defendants are only able to attempt to conflate this with "deepening insolvency" on the false theory that Plaintiff is comparing the results of a hypothetical earlier bankruptcy to the actual later one. *That* would be deepening insolvency, and interestingly enough, one of Mr. Pfeiffer's "pot shots" is to criticize Dr. Tennenbaum for *not* doing it.

the right to recover economic damages, ever.  Consider a claim against an insurance broker who negligently fails to insure the factory against fire, causing a loss of assets of $50 million to an insolvent company – no one would claim this is a "deepening insolvency" measure.  Yet it is no different from a financial advisor who negligently advises a corporation to engage in financial transactions that result in a $50 million loss.  This harm isn't actionable because of the diminished dividend to creditors; it is actionable because the negligence resulted in the loss.

"But no," say Defendants, "you can't prove that *all* of that loss is our fault." While on the surface this argument might seem to have some appeal, it is important to consider it in its proper place in the analysis.  It is not an argument against the fact of damages, or against the amount of damages; instead, it is an argument about *causation*, to which we now turn.

One thing the parties agree on is that the appropriate test is proximate cause. Under New York law, this has two elements, the traditional "but for" test, and a notion of foreseeability, and both parts are for the jury.[15]  Again contrasted with the silly "chain of causation" Defendants attempt to thrust upon Plaintiff in their summary judgment brief, the first portion is straightforward and easily stated: *but for* Defendants' wrongful advice, participation in, and engineering of value-destroying transactions, Oakwood would not have engaged in them. There is considerable proof of this, some of it cited by Defendants in their various briefs.  It is

---

[15] *See, e.g.*, *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995) (discussing foreseeability aspect of proximate cause, as well as nature of issues for the jury to determine at trial); *Colo. Capital v. Owens*, 227 F.R.D. 181, 189-90 (E.D.N.Y. 2005) (same); *Mauney v. Boyle*, 865 F. Supp. 142, 147-48 (S.D.N.Y. 1994) (describing proximate cause concept under New York law, and stating that foreseeability issue is left for the jury to resolve).  *Accord, e.g.*, *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 710-14, 725-29 (S.D.W. Va. 2007) (very detailed post-trial ruling finding that proximate causation and damages elements were met in a case with facts and legal issues fairly similar to those presented by the case at bar); *Crowley v. Chait*, No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006) (denying twin motions for judgment as a matter of law and for a new trial made by defendant that lost a jury trial involving issues of proximate causation and damages broadly similar to this case).

undeniable; but if Defendants deny it, then it is an issue of fact for the jury to decide.

Now let us consider the second prong, foreseeability.  Suppose Defendants had done exactly what they did, Oakwood limped along for another year, and, in the ensuing year an uninsured fire destroyed a building worth $50 million.  On a purely "but for" test, a plaintiff (not this one) might say the loss would not have occurred but for the transactions.  Yet in that case, no one could cogently argue that Credit Suisse should have reasonably foreseen the uninsured fire.

But that case is a dramatic contrast with this one.  In this one, there is proof not only that Credit Suisse *could have* reasonably foreseen the economic damage of its transactions with Oakwood, but also that they *actually did foresee it*.  The most dramatic examples of this are found in the detailed and damning credit analyses done by Defendants' own employees – the very CRM evidence that Defendants now ask this Court to exclude as "irrelevant."  In the face of such evidence, though, the jury should have little difficulty with the proximate cause element.

We turn now to the fees paid to Defendants as an element of damages.  The loss-in-asset-value figure of $50 million, discussed above, includes fees of approximately $8,500,000 to Defendants in the year between September 2001 and September 2002.[16]  But Plaintiff's damages claim on such fees is not limited to that one-year period.  In actuality, Plaintiff will seek damages in the form of all such fees reaching back to an earlier date in 2001, when the Credit Suisse "warehouse" (sometimes "loan purchase") facility was first approved.  The total of fees paid to Credit Suisse between that date and the date of bankruptcy is nearly $21 million.

Here, the "but for" element of proximate cause is easily satisfied: *but for*

---

[16]  Defendants have complained that these dates are arbitrary.  They are free to do so.  Plaintiff, recognizing that some of its potential damage claims are stronger than others, chooses to present only that evidence on which it is confident that the trier of fact will agree with Plaintiff.  If Defendants can make something of that with the jury, they are free to do so.

Defendants' participation in these wrongful transactions, the Oakwood entities would not have paid them the fees. The "foreseeability" element is also self-evident. But even if these two elements were not easily proved, damages in the form of fees paid to Defendants are the subject of the relaxed standards of causation and damages referred to in *Lumbermens*, 388 F. Supp. 2d 292, if the jury finds the existence of a fiduciary relationship and breach of the resulting duties.

        **d. *In pari delicto*.** The foregoing is a succinct statement of Plaintiff's case. We do not attempt here to analyze every affirmative defense Defendants have raised, but since Defendants have made so much of one particular defense – *in pari delicto* – in their summary judgment motion, we anticipate that it will figure heavily in the future. Defendants seem to think it is the answer to all of Plaintiff's claims, largely because of strawman mischaracterizations.

        <u>First</u>, we may observe that while this is a defense to some fiduciary duty claims, particularly in the aiding-and-abetting context, it is rarely regarded as a defense to negligence, and in our opinion is improperly considered as a defense to breach of contract. *See, e.g.*, *In re Olympia Brewing Sec. Litig.*, No. 77-1206, 1985 U.S. Dist. LEXIS 13796, at *7 (N.D. Ill. 1985).

        <u>Second</u>, Defendant's entire presentation of this defense is based on a deep and fundamental distortion of the wrong Plaintiff alleges. The *in pari delicto* doctrine holds that when both parties participate in a wrong, a plaintiff may not recover. Thus, Defendants aver here that since Oakwood's management and board engaged in the value-destroying transactions, they participated in the same wrong for which Plaintiff now seeks redress from Defendants.

        This is intellectual sleight-of-hand. There were *two* wrongs here. One was the wrong committed by Oakwood's management and board: the adoption of a flawed business plan that drove their company into the ground. There is no evidence, and neither party claims, that they had any evil intent. Rather, it appears that they tried to do a good job, but they were wrong.

In contrast, Defendants knew all too well that Oakwood's management and board did not understand the implications of the transactions they engaged in with Defendants. Defendants knew that these transactions were value-destroying, and that they would result in future losses. Oakwood relied upon Defendants' greater expertise and advice regarding the these highly complex transactions,[17] but Defendants concealed their knowledge and true opinions from Oakwood, putting their stamp of approval on Oakwood's continuation of its disastrous course. This is an *entirely separate* wrong from the incorrect business judgment observed at Oakwood. It is a wrong wholly personal to Defendants, and there is no way one could meaningfully say that Oakwood had any involvement in it at all. As such, *in pari delicto* should not be an issue here.[18]

This difference may be shown by a simple example (the example assumes that *in pari delicto* applies to negligence at all): a person jaywalks, is hit by a car, and is taken to the hospital, where it is determined that a leg must be amputated. The hospital proceeds to amputate the wrong leg. No one could deny that the victim, as a jaywalker, was in the "wrong." But the wrong the victim committed was entirely different from the hospital's undeniable wrong. This analogy is directly applicable here. In fact, if Defendants' view prevails, it would write out of the

---

[17]  Another mischaracterization of Plaintiff's case that Defendants make repeatedly is that Plaintiff claims Defendants should have provided general business advice to Oakwood. This is not so. We do not claim that Defendants should have told Oakwood to hire this laborer or promote that one; or to expand this plant or to close that one. Rather, we claim that Credit Suisse, which was underwriting these same securitizations (and related transactions like warehouse lines and resecuritizations) for other manufactured housing companies and the enormous subprime market then rising hugely, had far a greater expertise and understanding of the implications of this entire financing scheme, and Oakwood relied on Defendants to do the appropriate investigation to enable them to render good advice, to give good advice, and to speak their actual knowledge about how such transactions adversely affected Oakwood.

[18]  *See, e.g., BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756-58 (3d Cir. 1990); *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-47 (Fla. Dist. Ct. App. 2007).

law any cause of action for giving bad advice: "he *took* the advice, therefore he was in the wrong too, therefore judgment for defendant."  This is also the exact situation in this case, which means such absurdity would have to be the law for Defendants' view of this defense to prevail.  It isn't.

Third, even if Defendants' view of *in pari delicto* could be applied here at all, Defendants cannot take advantage of it because of their plain status as an Oakwood insider.  *See, e.g.*, *Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist LEXIS 25642, at *108-09 (S.D. Tex. Mar. 31, 2008) (citing numerous cases); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005) (Farnan, *J.*) ("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation.").  As we have previously set forth in great detail, this is a fact amply proved, including by documents prepared by Defendants themselves.  (*See* D.I. #50 at pp. 7-10, and the associated evidence attached to D.I. ##56-57.)  The fact that Defendants' employees bragged to each other, as early as August 2001, about how Oakwood was "very shackled" to Credit Suisse should only cement the point for the jury.

Having disposed of Defendants' army of strawmen, we turn to the law applicable to the merits of their evidentiary objections and motions, all of which should be denied.

**B.     Defendants Simply Misapprehend The Nature Of The Required Analysis Under FRE 401, 402, And 403.**

In their supporting memoranda, Defendants recite the proper definition of "relevant evidence" – *viz.* "evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" – but Defendants' analysis promptly runs off the rails.  (*See* D.I. #67 at pp. 6-7 & D.I. #70 at pp. 3-4 (each quoting Fed. R. Evid. 401).)  After all, the Third Circuit has made clear that "Rule 401 does not raise a high standard," which means "that evidence is irrelevant only when it has no tendency to prove a consequential fact, and . . . while Rule 401

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on April 30, 2008, I caused a copy of the ***Consolidated Answering Brief in Opposition to Defendants' Motions to Exclude Plaintiff's Expert Testimony,*** to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: April 30, 2008          CAMPBELL & LEVINE, LLC

{D0110551.1 }

*/s/ Kathryn S. Keller*
Kathryn S. Keller (No. 4660)
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900