IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF DR. MICHAEL TENNENBAUM
IN SUPPORT OF PLAINTIFF'S CONSOLIDATED ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT
<u>TESTIMONY</u>**

I, Michael Tennenbaum, declare as follows:

1.  I have been retained to testify as an expert witness in this case. I have been provided with a copy of "Defendants' Memorandum of Law in Support of Their Motion to Exclude the Expert Testimony of Michael Tennenbaum Pursuant to Fed. R. Evid. 702." That document mischaracterizes my testimony and opinions in this matter, and contains allegations with respect to my methodology which are inaccurate and misleading. I set forth the accurate information below.

2.  As I understand it, Defendants' Memorandum consists of the following main arguments:

    a.  My approach to damages is alleged to be "simply the now widely-discredited theory of 'deepening solvency'" (Memorandum, page 2).

    b.  My Discounted Cash Flow-based valuation analyses rely on cash flow projections whose source supposedly I don't know and which I supposedly did not believe to be realistic (Memorandum, pp.3, 18-19)

    c.  My analysis ignored market based information, including publicly traded Oakwood stock and bonds and the eventual sale of Oakwood's assets to a subsidiary of Berkshire-Hathaway (Memorandum, pp.3, 20-21)

    d.  In order to "fit Plaintiff's theory of the case," I "should have" compared the results of the actual Oakwood bankruptcy to the results of a hypothetical bankruptcy in 2001 (Memorandum, pp.3, 14)

    e.  I assume that all of the reduction in Oakwood's value between September 2001 and September 2002 was Defendants' fault, purportedly ignoring extrinsic factors (Memorandum, pp.3, 14-17).

1

I shall deal with each of these points in brief form below.

       3.    **"Deepening insolvency."** My analysis is *not* a "deepening insolvency" analysis. As indicated throughout my report and, indeed cited in Defendants' Memorandum (p.6), I valued Oakwood's *asset value* (*i.e.*, enterprise value) at various points in time and computed the *diminution in asset value*. That diminution in asset value was $50 million. As I testified in my deposition, if one wanted to compute the extent of "deepening insolvency," one would add the approximate increase in long-term liabilities to the diminution in asset values, resulting in an estimate of approximately $90 million. However, my analysis stands regardless of the amount (if any) of the other change in liabilities. It is thus totally independent of any "deepening insolvency" issues.

       4.    **Cash flow projections.** It is not true that I do not know the sources of the cash flow projections I used, nor is it true that I regard them as unrealistic.

      With respect to the 2002 projections in my report, I testified in my deposition that the projections were authored by Miller-Buckfire and, while providing more detailed background, were very similar to, and based on, internal Oakwood projections developed in mid 2002. Some of the projections were prepared in connection with the company's rationalization process, and some became presentations to Oakwood's Board of Directors in the fall of 2002. While I do not know the name of the *individual* who authored the 2002 cash flow projections, I know the background of their preparation, and the assumptions and basis of their preparation. I have never said that I do not believe them to be realistic. They were discussed, in general terms, in my deposition at pages 30-39.

      With respect to the two cash flow projections for 2001, I testified that they were derived from presentations to Oakwood's board of directors by CSFB, and were at least in part

2

derived from internal Oakwood analyses. The projections, including background and assumptions upon which they were based, were included in documents I reviewed and identified to counsel. Furthermore, one of the 2001 projections was utilized by Defendants as part of a self described "DCF Analysis" as of mid 2001 (*see* CSFB 33259-33262). All of this was described in my report and deposition (pp.39-42). While the individual author of these projections is unknown, to characterize me as not knowing their source, as Defendants' Memorandum does, is untrue and misleading.

Finally, Defendants' Memorandum attempts to depict me as viewing the projections as being unreliable. This is simply not true. Both in my report and in my deposition I described them as "aggressive," in that they presume a substantial industry recovery (deposition, pp. 42-43). A number of market participants shared the view that a market recovery would soon begin, including CSFB's home building industry analyst, Ivy Zelman. I have *never* said that the 2001 cash flow projections, viewed from the perspective of late 2001, were unrealistic or unreliable, nor do I believe that to be the case. Defendants insist on attributing that opinion to me, but it is untrue. "Aggressive" does not necessarily equate to "unrealistic" or "unreliable." In passing, I note that Defendants' expert, Mr. Pfeiffer, has produced workpapers and draft reports which conclude that 2001 projections were indeed realistic, at the time. I concur. His concurrence conflicts with Defendants' present argument (at 19) that I "should have made adjustments to the projections to render them more realistic…or used different projections…"

My focus on DCF analysis as the appropriate valuation methodology is entirely consistent with well accepted valuation principles. Professor Aswath Damodaran has described it well:

> "In discounted cash flow valuation, the value of an asset is the present value of the expected cash flows on the asset, discounted back at a rate that reflects the

3

> riskiness of these cash flows. This approach gets the most play in academia and comes with the best theoretical credentials."

Continuing, Professor Damodaran describes "Firm DCF Models" (which is the approach my DCF analysis utilizes) as follows:

> "The value of the firm is obtained by discounting the free cash flow to the firm at the weighted average cost of capital."

Further:

> "In the cost of capital approach, we begin by valuing the firm, rather than the equity. Netting out the market value of the non-equity claims from this estimate yields the value of equity in the firm. Implicit in the cost of capital approach is the assumption that the cost of capital captures both the tax benefits of borrowing and the expected bankruptcy costs. The cash flows discounted are the cash flows to the firm, computed as if the firm had no debt and no tax benefits from the interest expense." (A. Damodaran, <u>Valuation Approaches and Metrics: A Survey of the Theory and Evidence</u> pp.25-26).

My DCF methodology is the standard, well-accepted approach in finance. Furthermore, in this instance it is, in my opinion, the preferred approach for a variety of reasons, including the fact that other approaches, including consideration of market capitalization data for Oakwood, may not have been aware of or incorporated longer term (i.e., five year) internally developed (by the company and its adviser) projected cash flows.

    5.    **Market-based information.** Notwithstanding the foregoing advantages of DCF analysis, analysis of market data may shed some light on the valuation issues addressed by my damages analysis. I have therefore investigated the impact of comparing market capitalization data (*i.e.*, equity share prices multiplied by the number of shares and bond prices expressed as a percentage of face value) for the same dates utilized in my DCF analyses: September 30, 2001 and 2002.

    The results can be summarized as follows:

4

a.  Utilizing stock and bond prices reported in Dr. Shapiro's supplemental report as well as price data reported by CSFB for September 30, 2002 and October 20, 2002 results in the following (in millions of dollars):

| Date | Stock Capitalization | Bond Capitalization | Total |
|---|---|---|---|
| 9/01 | $39.55 | $120.00 | $159.55 |
| 9/02 | $14.80 | $102.30 | $117.10 |
| 10/02 | $8.10 | $60.00 | $68.10 |

b.  Utilizing bond price data obtained by Defendants' expert, the following market capitalization data results (again in millions of dollars):

| Date | Stock Capitalization | Bond Capitalization | Total |
|---|---|---|---|
| 9/01 | $39.55 | $146.63 | $186.18 |
| 9/02 | $14.80 | $102.89 | $117.69 |
| 10/02 | $8.10 | $60.00 | $68.10 |

It should be noted that in utilizing Defendants' bond price data, I selected the *highest* bond price for each issue on the value date or within the following 30 days (to allow for market absorption of information).

The results of the foregoing analysis are that following Defendants' suggestion of utilizing market data regarding stock and bond prices results in a market-based diminution in Oakwood's asset value of approximately $42.45 to $68.5 million by September 30, 2002, increasing dramatically thereafter as both stock and bond prices collapsed in October. In my view, this data supports my DCF analysis, which concluded to a diminution in Oakwood's asset value in the amount of $50 million. I disagree with the statement in Defendants' Memorandum (at 21) that market prices for Oakwood's stock and bonds contradict my conclusions. Rather, they *confirm* them.

5

6. **Sale of Oakwood assets in bankruptcy, November 2003.** Defendants and their expert point to Oakwood's bankruptcy sale in November 2003, to Clayton Homes, a Berkshire-Hathaway subsidiary, as contradicting my valuation as of September 30, 2002 (Mr. Pfeiffer opines that I "should have" used the actual $373 million sale as a test of reasonableness for the September 2002 valuation). While I disagree with the implicit assumption that a sale one year in the future is dispositive of value, nonetheless a proper consideration of the data supports the "reasonableness" of my September 30, 2002, value conclusion of $300 million. It must be noted that the approximately 1.25 year delay (as the payment was in early 2004) requires compensating (*i.e.*, discounting) for risk and delay. My discount rate analyses indicate that an appropriate discount rate (*i.e.*, cost of capital) to compensate for risk and delay with respect to Oakwood was approximately 18% (*see* my Report, pp. 33-37). Application of this rate to the September 30, 2002 valuation and/or the $373 million asset sale to Clayton results in the following:

    a)    Evaluated in the first quarter of 2004 (the Clayton payment date) the September 2002 valuation had an implied 2004 value of $369 million.

    b)    Evaluated in September, 2002, the Clayton transaction had an implied 2002 value of $303 million.

Thus, the Clayton transaction strongly supports, rather than contradicts, the reasonableness of my valuation.

7. **Comparison of actual bankruptcy to a hypothetical bankruptcy a year earlier.** While I do not agree that the appropriate methodology requires a comparison of the results of a hypothetical 2001 bankruptcy to the outcome of the actual bankruptcy, the parameters of such a comparison are easily described. They include:

     a.) An adjustment for the 2 to 2.25 year timing difference between the two bankruptcy outcome calculations; and

     b.) Adjustment for the costs of the hypothetical 2001 bankruptcy. Defendants' expert has indicated that a recent study shows that professional fees averaged $8.8 million for major bankruptcies. For the sake of argument, assume bankruptcy costs of nearly three times such an amount, or $25 million (I make this assumption because it disfavors, rather than favors, Plaintiff). Then net proceeds in 2001 would have been $325 million.

  There are two ways to view the adjustments for time. One way is to consider the rates of return available to the recipients of the $325 million in net proceeds as of late 2001. For example, the Citigroup Long Term High-Grade Corporate Bond Index data indicates that the annual rate of return form investment in long term, relatively low risk corporate bonds was in excess of 10% over this time period (reported in <u>Stocks, Bonds, Bills and Inflation</u> 2007 yearbook, Table C-3, p.303). Therefore the $325 million would have grown to more than $393 by early 2004, the date of completion of the actual sale. Thus the "hypothetical" bankruptcy would have left the recipients at least $20 million "better off" compared to the actual bankruptcy results, evaluated as of the same date, and in an investment much less risky than ownership of Oakwood's assets.

  Alternatively, proper technique could consider the rate of return which market data indicates would have been necessary to compensate Oakwood's asset owners for the risk and delay involved in foregoing a 2001 sale in bankruptcy and instead staying in the mobile home industry until the actual bankruptcy sale. The discount rate analysis developed in my report concludes to 18% as the appropriate required rate of return. Application of this rate of return implies that if Oakwood's owners were to be adequately compensated for risk in foregoing the

7

2001 net sale proceeds, they would have had to receive at least $450 million in early 2004. This is $78 million more than the actual sale proceeds. By either approach, net sale proceeds from a 2001 bankruptcy leaves the asset owners better off than the results of the actual bankruptcy.

8. **Causation.** Defendants' "causation" argument with respect to attributing the reduction in Oakwood's asset value to Defendants misses the point. I testified that Oakwood could have sold its assets on a going concern basis in the fall of 2001 for $350 million, and since its flawed business model was dissipating asset value, it should have done so (most likely, but not necessarily, in the context of a bankruptcy filing). Had it done so, it could have avoided *any* future value reductions whatever their cause. It is certain, however, that it would have avoided the transactions that resulted in the loss of value.

9. **Other matters.** In addition to the foregoing, I note that Defendants' Memorandum repeats Mr. Pfeiffer's claim that my analysis does not adequately consider the impact of Oakwood's distress (Defendants' Memorandum, page 20), citing Professor Damodaran's text on Investment Valuation. Both Defendants and their expert are mistaken. First of all, the Damodaran admonition cited by Defendants merely contains the common sense suggestion to extend the cash flow projections until they turn positive, if (as is not the case here) they are initially negative. The Damodaran text (which I have often used as a textbook in my classes) does not suggest discarding DCF analysis with respect to asset (*i.e.*, enterprise) valuation in circumstances like the distress in which Oakwood found itself. To suggest otherwise is misleading.

There are, moreover, well accepted techniques for dealing with valuation of the assets of a company in distress. For example, a recently published text entitled Cost of Capital,

8

3rd edition, by Dr. Shannon Pratt and Roger J. Grabowski identifies several alternative methods to value distressed firms, including:

> "Estimating betas for the subject distressed firms from beta estimates for guideline public companies not going through such a period of adjustment, relevering beta, and adding a company specific risk adjustment to account for the added risk due to distress.
>
> "Estimating fundamental beta for the subject company (e.g., regressing operating earnings of subject company against operating earnings of S&P 500)." (page 239)

This is *precisely* the approach I utilized. It is also noteworthy that one of the authors of this text, Mr. Grabowski, is a managing director of Duff & Phelps, Mr. Pfeiffer's employer

10. In conclusion, I believe that Defendants' Memorandum is rife with inaccuracies, mischaracterizes my testimony and opinions, and is misleading. It attempts to build a "straw man" by attributing to me opinions which I do not hold. It mischaracterizes my methodology and conclusions. When properly analyzed, the alternative analyses it insists (without analytic support) "should have" been pursued are actually supportive of my conclusions. Neither Defendants' Memorandum nor their expert's report (upon which it seems to be partly based) has provided *any* actual evidence or analysis showing my analyses and conclusions to be inconsistent with well accepted methodology, properly applied.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 28, 2008, at Miami Beach, Florida.

_Michael Tennenbaum_
Michael Tennenbaum, Ph.D.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| Oakwood Homes Corporation, et al., ) | Case No. 02-13396 (PJW) |
| ) | |
| Debtors. ) | Jointly Administered |
| _____ ) | |
| OHC Liquidation Trust, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-0799 (JJF) |
| ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a ) | |
| Swiss banking corporation), Credit Suisse ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of ) | |
| each, and Does 1 through 100, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on April 30, 2008, I caused a copy of the *Declaration of Dr. Michael Tennenbaum in Support of Plaintiff's Consolidated Answering Brief in Opposition to Defendants' Motions to Exclude Plaintiff's Expert Testimony,* to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

{D0110604.1 }

| | |
|---|---|
| Dated: April 30, 2008 | CAMPBELL & LEVINE, LLC |
| | */s/ Kathryn S. Keller* |
| | Kathryn S. Keller (No. 4660) |
| | 800 N. King Street, Suite 300 |
| | Wilmington, DE 19801 |
| | (302) 426-1900 |

{D0110604.1 }