# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) | **Re:  Civil Docket No. 76** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**\*\*CONFIDENTIAL – FILED UNDER SEAL SUBJECT TO PROTECTIVE ORDER\*\***

### DECLARATION OF WHITMAN L. HOLT
### IN SUPPORT OF PLAINTIFF'S CONSOLIDATED ANSWERING BRIEF IN
### OPPOSITION TO DEFENDANTS' ATTEMPTS TO EXCLUDE CERTAIN NON-
### EXPERT EVIDENCE

I, Whitman L. Holt, declare as follows:

1.      I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.      I submit this declaration in support of the *Consolidated Answering Brief in Opposition to Defendants' Attempts to Exclude Certain Non-Expert Evidence* filed by the OHC Liquidation Trust ("**Plaintiff**") in the above-captioned proceeding.

3.      I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for Plaintiff in this proceeding.

**CRM Documents-**

4.      Attached hereto as Exhibit "A" is a true and correct copy of a January 10, 2000 "Memorandum," which was produced by Defendants with bates numbers CSFB-00250116 – CSFB-00250129.  This document was previously marked as deposition exhibit 54.

5.      Attached hereto as Exhibit "B" is a true and correct copy of a March 13, 2000 "Memorandum," which was produced by Defendants with bates numbers CSFB-00250131 – CSFB-00250132.  This document was previously marked as deposition exhibit 134.

6.      Attached hereto as Exhibit "C" is a true and correct copy of a March 21, 2000 "Memorandum," which was produced by Defendants with bates number CSFB-00512903.  This document was previously marked as deposition exhibit 53.

7.      Attached hereto as Exhibit "D" is a true and correct copy of a January 2, 2001 e-mail from James Xanthos, which was produced by Defendants with bates number CSFB-00485340.  This document was previously marked as deposition exhibit 64.

8.    Attached hereto as Exhibit "E" is a true and correct copy of a January 9, 2001 e-mail from Thomas Irwin, which was produced by Defendants with bates number CSFB-00512061. This document was previously marked as deposition exhibit 65.

9.    Attached hereto as Exhibit "F" is a true and correct copy of a January 9, 2001 "Memorandum," which was produced by Defendants with bates number CSFB-00483869. This document was previously marked as deposition exhibit 111.

10.    Attached hereto as Exhibit "G" is a true and correct copy of a February 14, 2001 e-mail from Thomas Irwin, which was produced by Defendants with bates number CSFB-00515234. This document was previously marked as deposition exhibit 140.

11.    Attached hereto as Exhibit "H" is a true and correct copy of the January 31, 2001 "Annual Review," attaching a memorandum of the same date by James Xanthos, which was produced by Defendants with bates numbers CSFB-00513799 – CSFB-00513819. This document was previously marked as deposition exhibit 138.

12.    Attached hereto as Exhibit "I" is a true and correct copy of a February 19, 2002 e-mail from Fiachra O'Driscoll, which was produced by Defendants with bates number CSFB-00478613. This document was previously marked as deposition exhibit 94.

13.    Attached hereto as Exhibit "J" is a true and correct copy of a "Originator/Servicer Assessment" prepared after Oakwood filed for bankruptcy, which was produced by Defendants with bates numbers CSFB-00250104 – CSFB-00250114. This document was previously marked as deposition exhibit 112.

**Depositions-**

14.    Plaintiff's counsel deposed Mr. Thomas F. Boland – a proposed expert witness on Defendants' behalf – on March 25, 2008.  True and correct copies of relevant excerpts

from the transcript of Mr. Boland's deposition are attached hereto as Exhibit "K."

15.    Plaintiff's counsel deposed Mr. Thomas Irwin – one of the principal CRM employees involved with Oakwood – on November 8, 2006. True and correct copies of relevant excerpts from the transcript of Mr. Irwin's deposition are attached hereto as Exhibit "L."

16.    Plaintiff's counsel deposed Mr. Fiachra O'Driscoll – an employee of Credit Suisse and the individual with primary responsibility for, *inter alia*, Oakwood's securitization transactions – on June 29-30, 2006. True and correct copies of relevant excerpts from the transcript of Mr. O'Driscoll's deposition are attached hereto as Exhibit "M."

**Other Documents-**

17.    Attached hereto as Exhibit "N" is a true and correct copy of the Credit Suisse First Boston "Compliance Manual," which was produced by Defendants with bates numbers CSFB-00053059 – CSFB-00053226. This document was previously marked as deposition exhibit 506.

18.    Attached hereto as Exhibit "O" is a true and correct copy of an April 14, 2000 e-mail from Kareem Serageldin, which was produced by Defendants with bates number CSFB-00173794. This document was previously marked as deposition exhibit 55.

19.    Attached hereto as Exhibit "P" is a true and correct copy of an April 17, 2000 e-mail from Jeff Hinshaw, which was produced by Defendants with bates number CSFB-00173796 – CSFB-00173797. This document was previously marked as deposition exhibit 56.

20.    Attached hereto as Exhibit "Q" is a true and correct copy of a May 16, 2000 e-mail from John Chrystal, which was produced by Defendants with bates number CSFB-00492624. This document was previously marked as deposition exhibit 57.

21.    Attached hereto as Exhibit "R" is a true and correct copy of a September

14, 2000 e-mail from Fiachra O'Driscoll, which was produced by Defendants with bates number CSFB-00485278. This document was previously marked as deposition exhibit 59.

22.    Attached hereto as Exhibit "S" is a true and correct copy of a November 27, 2000 e-mail from Graham Hunt, which was produced by Defendants with bates number CSFB-00173581. This document was previously marked as deposition exhibit 61.

23.    Attached hereto as Exhibit "T" is a true and correct copy of an August 9, 2001 e-mail from Fiachra O'Driscoll, which was produced by Defendants with bates number CSFB-00014152.

24.    Attached hereto as Exhibit "U" is a true and correct copy of an October 19, 2002 e-mail from Jared Felt, which was produced by Defendants with bates numbers CSFB-00035156 – CSFB-00035157. This document was previously marked as deposition exhibit 20.

25.    Attached hereto as Exhibit "V" is a true and correct copy of a draft financial data presentation dated October 24, 2002, which was produced by Plaintiff with bates numbers OHCLT-02616 – OHCLT-02635. This document was previously marked as deposition exhibit 628.

26.    Attached hereto as Exhibit "W" is a true and correct copy of a November 14, 2002 e-mail from Alberto Zonca, which was produced by Defendants with bates number CSFB-00518061. This document was previously marked as deposition exhibit 147.

27.    Attached hereto as Exhibit "X" is a true and correct copy of a November 23, 2002 e-mail from Mark Millard, which was produced by Defendants with bates numbers CSFB-00514175 – CSFB-00514177. This document was previously marked as deposition exhibit 130.

28.    Attached hereto as Exhibit "Y" is a true and correct copy of a November

28, 2002 e-mail from Mark Mallard, which was produced by Plaintiff with bates numbers OHCLT-029671 – OHCLT-029672.  This document was previously marked as deposition exhibit 153.

29.    Attached hereto as Exhibit "Z" is a true and correct copy of a Standard & Poor's article dated April 27, 2007 and titled *For U.S. Subprime RMBS, Positive Implications When Compared With Manufactured Housing ABS*, which article is available on-line at http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148443670700.html (last accessed April 26, 2008).

30.    Attached hereto as Exhibit "AA" is a true and correct copy of Plaintiff's most recent draft of its trial exhibit chart, which chart includes certain evidentiary objections proffered by Defendants.  This version of the chart was circulated to Defendants' counsel via e-mail on April 25, 2008.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 27, 2008, at Los Angeles, California.

Whitman L. Holt

# <u>EXHIBIT</u> <u>A</u> REDACTED
# IN ITS ENTIRETY

# EXHIBIT B REDACTED IN ITS ENTIRETY

# EXHIBIT C REDACTED IN ITS ENTIRETY

# EXHIBIT D REDACTED
# IN ITS ENTIRETY

# EXHIBIT E REDACTED IN ITS ENTIRETY

# EXHIBIT F REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>G</u> REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>H</u> REDACTED
# IN ITS ENTIRETY

# EXHIBIT I REDACTED IN ITS ENTIRETY

# EXHIBIT J REDACTED IN ITS ENTIRETY

# EXHIBIT K REDACTED IN ITS ENTIRETY

# Exhibit "L"

CERTIFIED
COPY

1          THOMAS IRWIN

2          UNITED STATES BANKRUPTCY COURT

3              DISTRICT OF DELAWARE

4     ------------------------------x

5     In Re:
      OAKWOOD HOMES CORPORATION,
6     et al.,

7                  Debtors.

8     Chapter 11
      Case No. 02-13396 (PJW)
9     ------------------------------x

10    OHC LIQUIDATION TRUST,

11                  Plaintiff,

12              v.            ADV. Proc.No. 04-57060 (PJW)

13    CREDIT SUISSE FIRST BOSTON, a
      Swiss banking corporation,
14    CREDIT SUISSE FIRST BOSTON
      LLC, a Delaware limited
15    liability corporation, CREDIT
      SUISSE FIRST BOSTON, INC.,
16    CREDIT SUISSE FIRST BOSTON
      (U.S.A.), INC., a Delaware
17    corporation and a wholly owned
      subsidiary of CREDIT SUISSE
18    FIRST BOSTON, INC., the
      subsidiaries and affiliates of
19    each, and DOES 1 through 100,

20                  Defendants.

21    ------------------------------x

22

23                            November 8, 2006
                                 9:04 a.m.

24

25



**LEGALINK®**

A MERRILL
COMMUNICATIONS
COMPANY

20750 Ventura Blvd          tel (818) 593-2300      www.merrillcorp.com
Suite 205                   tel (800) 826-0277
Woodland Hills, CA 91364    fax (818) 593-2301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1

1                              THOMAS IRWIN

2          Q.    Do you know why Mr. Zonca thought you

3    and Mr. Xanthos and Mr. -- who is Roger Machlis,

4    actually?

5          A.    Internal legal counsel.

6          Q.    For a particular department or just

7    generally?

8          A.    CSFB.

9          Q.    For a particular business unit or --

10         A.    I don't know.

11         Q.    Returning to my prior question, do you

12    have any reason or do you have any understanding

13    of why Mr. Zonca thought that you and Mr.

14    Xanthos and Mr. Machlis would find the

15    definition of eligible receivables to be of

16    particular interest?

17              MR. OSNATO:  Objection as to the form.

18    You can answer.

19         A.    I'm always interested in what the

20    eligible receivables are in a facility.

21         Q.    Why?

22         A.    Because it is the component -- it is

23    the asset side of the transaction.

24         Q.    How is that information -- why would

25    that information be germane upon a bankruptcy

142

1                          THOMAS IRWIN

2      filing of the originator?

3          A.    It's always important that the

4      eligible receivables are the primary risk of any

5      facility or structure.

6          Q.    Can you think of any reason why it

7      would have been of particular interest on

8      November 14, 2002?

9          A.    If I was going to review the facility

10     I would want to know exactly what I was

11     financing.

12         Q.    Can you think of any reason why you

13     were going to review the facility on November

14     14, 2002?

15         A.    There are obviously -- he is

16     proposing -- he is giving me a sheet for a new

17     facility, so the fact that he is asking me to

18     look at it is why I would be looking at it.

19         Q.    I'm sorry, where is the sheet for the

20     new facility?  What new facility --

21         A.    Huh?  I said a sale -- I'm sorry, I'm

22     saying please enclose the current sale -- okay,

23     I misread that.

24         Q.    If I were to tell you that Oakwood

25     filed for bankruptcy on November 15, would that

143

1        THOMAS IRWIN

2     in any way affect your opinion of why it may

3     have been of particular interest to you to

4     review this document on November 14, 2002?

5        A.     Yes.   I was with Fiachra in -- what is

6     it, North Carolina?

7            MR. OSNATO:   Correct.

8        A.     I went down there that afternoon.   So

9     we were preparing to meet with Oakwood.

10       Q.     Okay.   Let's talk about that some

11    more.  So you and Mr. O'Driscoll went to North

12    Carolina on November 14, 2002?

13       A.     Yes.

14       Q.     Do you recall reviewing this document

15    prior to traveling to North Carolina?

16       A.     No, I don't.

17       Q.     Do you recall when you reviewed this

18    document?

19       A.     What document?

20       Q.     These sale and service -- the sale and

21    servicing agreement?

22       A.     No, I don't.

23       Q.     Would it have been likely that you

24    would have reviewed it prior to November 14,

25    2002 at 10:27 p.m.?

144

1                    THOMAS IRWIN

2          A.     It's possible.

3          Q.     So when on the 14th did you travel to

4     North Carolina, Mr. Irwin?

5          A.     Approximately 8:00 p.m.

6          Q.     When did you return to New York?

7          A.     I think the following evening.

8          Q.     So what precisely did you do while you

9     were in North Carolina?

10         A.     I was asked to go down there to meet

11    with the company, sat down, met with the

12    company, met senior management, they informed me

13    of what their -- what was going to transpire on

14    the 15th.

15         Q.     Which was a bankruptcy filing?

16         A.     I think that was being contemplated at

17    the time.  I don't know if it was decided or

18    not.

19         Q.     Did you have reason to suspect that a

20    bankruptcy petition would be filed on the 15th

21    before you flew down to North Carolina?

22         A.     No, I did not.

23         Q.     So that was news to you, that was the

24    first time you had heard of that possibility?

25         A.     Yes.


                                                      145

1          THOMAS IRWIN

2          Q.    How did you react to being informed of

3     that fact?

4          A.    I got on the plane and flew down there

5     with them.

6          Q.    I'm sorry, so you were informed of the

7     possibility of a bankruptcy prior to flying down

8     to North Carolina or while you were in North

9     Carolina?

10          A.    I don't recall exactly when I was

11     notified.

12          Q.    But it wasn't before the 14th?

13          A.    No, it was not.  It was after the

14     start of the trip.  I just don't recall exactly

15     when.

16          Q.    Besides meeting with Oakwood's

17     management, do you remember doing anything else

18     in North Carolina?

19          A.    No, that was it.

20          Q.    Do you recall having any discussions

21     with Mr. Felt while you were in North Carolina?

22          A.    I met Mr. Felt while I was there.

23          Q.    Do you recall any discussions you had

24     with Mr. Felt?

25          A.    Not specifically.

146

1                    THOMAS IRWIN

2        Q.    Do you remember generally the nature

3   of any discussions you had with Mr. Felt?

4        A.    Just I think it was ongoing, whatever

5   was transpiring in those meetings which I don't

6   recall the direct content of.

7        Q.    So you had never met Mr. Felt prior to

8   your trip to North Carolina?

9        A.    No, I had not.

10       Q.    Had you ever corresponded with Mr.

11  Felt or spoke with him on the phone?

12       A.    No, not that I am aware of.

13       Q.    Do you recall any discussions you had

14  with Mr. O'Driscoll while you were in North

15  Carolina?

16       A.    It was more in terms of, you know,

17  that the company was evaluating its situation

18  and that was -- you know, that's as much as I

19  remember specifically.  And meeting with

20  management as they started to present some of --

21  some financial information on the company.

22       Q.    Does this discussion refresh your

23  recollection at all of when Mr. O'Driscoll first

24  approached you about potentially modifying the

25  facility upon an Oakwood bankruptcy petition?

147

1                    THOMAS IRWIN

2          A.    At some point during this there were

3    discussions about a new facility.

4          Q.    Do you recall whether or not that was

5    the first time such discussions occurred?

6          A.    To my recollection, yes.

7          Q.    In your experience based on your

8    ordinary practice, would review of the main

9    document in a particular deal be one of the

10   first steps in the analysis of whether or not to

11   grant a new credit facility or continue an old

12   one upon a bankruptcy petition?

13         A.    I'm sorry, can you restate?

14         Q.    Sure.  Where in the order of priority

15   would review of the existing documents fall in

16   the analysis that would be performed following a

17   request to either grant a new credit facility or

18   continue an old one upon a bankruptcy petition

19   of a counter party or originator, would that be

20   high on the list, low on the list in terms of

21   priority?

22         A.    It would be an existing document.  If

23   you were looking at an existing sale and

24   servicing agreement, it would be an important

25   document to review at about that time, yes.

148

1                          THOMAS IRWIN

2        Q.    Where in the relative order of

3    priority would that review fall, would that be

4    one of the first things you do, one of the last

5    things you would do, somewhere in the middle?

6        A.    You would review your existing

7    documentation prior to the bankruptcy because

8    you would want to know what your situation was

9    in the event of a bankruptcy.

10       Q.    Right, but in terms of the order in

11   which things would be done, in the review

12   process, where would the analysis of existing

13   documentation fall, would that be one of the

14   first things done in the process, one of the

15   last things done in the process?

16       A.    Prior to bankruptcy it would be

17   done -- if you were aware that one was pending

18   or if there was a distress situation, you would

19   look at your documents and understand what the

20   legal ramifications were of an event if you were

21   aware of it.

22       Q.    Would you look at those documents

23   prior to reviewing the present financial

24   condition of the originator?

25       A.    Those documents would be a part of the

                                                    149

# Exhibit "M"

**CERTIFIED COPY**

```
 1

 2     UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
 3     ----------------------------x
       In Re:                      )Chapter 11
 4     OAKWOOD HOMES CORPORATION,   )Case No. 02-13396
       et al.,                     )(PJW)
 5                    Debtors.  )Jointly Administered
       ----------------------------x
 6     OHC LIQUIDATION TRUST,       )
                     Plaintiff, )
 7              vs.               )Adv. Proc. No.
       CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
 8     Swiss banking corporation,   )
       CREDIT SUISSE FIRST BOSTON   )
 9     LLC, a Delaware limited      )
       liability corporation, CREDIT)
10     SUISSE FIRST BOSTON, INC.,   )
       CREDIT SUISSE FIRST BOSTON   )
11     (U.S.A.), INC., a Delaware   )
       corporation and a wholly     )
12     owned subsidiary of CREDIT   )
       SUISSE FIRST BOSTON, INC.,the)
13     subsidiaries and affiliates  )
       of each, and DOES 1 through  )
14     100,                         )
                    Defendants.)
15     ----------------------------x

16                    June 29, 2006

17                    9:22 a.m.

18

19            Deposition of FIACHRA O'DRISCOLL, held

20     at the law offices of Linklaters, 1345 Avenue of

21     the Americas, New York, New York, pursuant to

22     notice, before Donald R. DePew, an RPR, CRR and

23     Notary Public within and for the State of

24     New York.

25
```



**LEGALINK**
A MERRILL COMPANY

20750 Ventura Blvd
Suite 205
Woodland Hills, CA 91364

tel (818) 593-2300
tel (800) 826-0277
fax (818) 593-2301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1

```
              1              Fiachra O'Driscoll
10:07:05      2    that to the extent that you had contact with CSFB
10:07:11      3    New York branch regarding this facility your
10:07:13      4    contact was with somebody in the CRM department?
10:07:19      5         A.    Not necessarily, because CRM covered
10:07:23      6    not just the New York branch, but it also covered
10:07:26      7    Credit Suisse First Boston Corporation, the
10:07:28      8    broker-dealer.  I would also have talked to
10:07:30      9    Tony Giordano, who is the -- one of the officers
10:07:35     10    at least during that period of time within the
10:07:36     11    New York branch, and probably to other people as
10:07:39     12    well.
10:07:40     13         Q.    All right.  And Mr. Giordano was
10:07:44     14    employed by the broker-dealer?
10:07:46     15         A.    I believe he was employed by the
10:07:48     16    branch.
10:07:50     17         Q.    Is that the broker-dealer?
10:07:51     18         A.    No, the branch.
10:07:53     19         Q.    The branch.  Okay.
10:07:55     20              All right.  And what was his role in
10:07:59     21    that -- this facility?
10:08:02     22         A.    His role was to represent the branch.
10:08:04     23         Q.    On issues other than CRM issues?
10:08:07     24         A.    Precisely.
10:08:08     25         Q.    Okay.  And what was the nature of his
```

                                                                    50

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | Fiachra O'Driscoll                                 |
| 10:08:09 | 2  | responsibility?                                    |
| 10:08:11 | 3  | A.    Ensuring that from the point of view of      |
| 10:08:12 | 4  | the branch that the transaction was put together   |
| 10:08:17 | 5  | correctly.                                          |
| 10:08:19 | 6  | Q.    All right.  Now, had this cast of            |
| 10:08:21 | 7  | characters changed -- or strike that.              |
| 10:08:23 | 8  | Did this cast of characters change with            |
| 10:08:25 | 9  | respect to the transaction or proposed transaction |
| 10:08:31 | 10 | that was referred to as the warehouse facility in  |
| 10:08:35 | 11 | the weeks leading up to and shortly following      |
| 10:08:39 | 12 | Oakwood's bankruptcy?                               |
| 10:08:40 | 13 | MR. OSNATO:  Objection as to the form.       |
| 10:08:42 | 14 | You can answer.                             |
| 10:08:44 | 15 | A.    Now, what do you mean --                     |
| 10:08:46 | 16 | Q.    Was it the same people?                      |
| 10:08:48 | 17 | A.    When you refer to the warehouse              |
| 10:08:51 | 18 | facility are you referring to the loan purchase    |
| 10:08:53 | 19 | facility?                                           |
| 10:08:54 | 20 | Q.    I'm talking about --                         |
| 10:08:56 | 21 | You are aware, sir, that in the weeks       |
| 10:08:59 | 22 | preceding up to the bankruptcy of Oakwood on       |
| 10:09:06 | 23 | November 15th, 2002 CSFB was acting as financial   |
| 10:09:11 | 24 | adviser to Oakwood?                                 |
| 10:09:13 | 25 | MR. OSNATO:  Objection as to the form.       |

51

1                    Fiachra O'Driscoll

10:09:14    2          You can answer.

10:09:15    3      A.    I believe that's correct.

10:09:18    4      Q.    And one of the things that CSFB was

10:09:20    5    attempting to do was to put into place what it

10:09:24    6    referred to at the time as a warehouse facility,

10:09:26    7    correct?

10:09:27    8          MR. OSNATO:   Same objection.

10:09:30    9      A.    I don't think that's correct.

10:09:32    10     Q.    Do you think it referred to it at the

10:09:34    11   time as a loan purchase facility?

10:09:37    12     A.    I don't recall us putting together

10:09:39    13   anything in that period of time.

10:09:41    14     Q.    I'm sure you didn't, but the question

10:09:42    15   is whether you were attempting to do so.

10:09:45    16     A.    Not that I recall.

10:09:45    17     Q.    So is it your testimony that during the

10:09:49    18   period leading up to Oakwood's bankruptcy CSFB was

10:09:53    19   not making any effort to put together some sort of

10:09:56    20   warehouse or loan purchase facility for Oakwood?

10:10:00    21         MR. OSNATO:   Same objection.

10:10:02    22         You can answer.

10:10:05    23     A.    During that period of time there was a

10:10:06    24   loan purchase facility in place.  There -- I was

10:10:10    25   never asked to put together any type of warehouse,

52

1          Fiachra O'Driscoll

10:10:13   2   that I can recall.

10:10:14   3       Q.    Or loan purchase facility?

10:10:16   4       A.    Or a loan purchase facility.

10:10:17   5       Q.    Were you asked to obtain a waiver from

10:10:19   6   CSFB New York branch of the provision in that

10:10:22   7   facility that created a right to suspend it upon

10:10:28   8   Oakwood's bankruptcy?

10:10:29   9            MR. OSNATO:   Objection as to the form.

10:10:30  10            Asked by whom?

10:10:31  11            MR. CASTANARES:   You may answer.

10:10:32  12       A.    Yes.

10:10:33  13       Q.    Who asked you to do that?

10:10:36  14       A.    An Oakwood officer.   Precisely whom, I

10:10:39  15   don't recall.

10:10:39  16       Q.    And did you make any such efforts?

10:10:42  17       A.    Yes.

10:10:43  18       Q.    And at any time after the putting into

10:10:49  19   place of the facility of early 2001 that we have

10:10:51  20   been talking about, as distinguished from

10:10:56  21   obtaining a waiver of a provision in that

10:10:58  22   facility, was there any effort to put together a

10:11:02  23   new facility of that type?

10:11:04  24            MR. OSNATO:   Objection as to the form.

10:11:06  25       Q.    Including after Oakwood's bankruptcy.

53

|          |    | Fiachra O'Driscoll |
|----------|----|---|
| 10:11:09 | 2  | MR. OSNATO:  You can answer it. |
| 10:11:10 | 3  | A.    Not that I'm aware of. |
| 10:11:11 | 4  | Q.    So do I take it then, sir, that you |
| 10:11:14 | 5  | never made any effort to go out to any other |
| 10:11:16 | 6  | potential provider of warehouse or loan purchase |
| 10:11:18 | 7  | facilities outside of CSFB to attempt to put one |
| 10:11:23 | 8  | into place on Oakwood's behalf? |
| 10:11:25 | 9  | A.    I was never asked to. |
| 10:11:26 | 10 | Q.    And you never did it, right? |
| 10:11:28 | 11 | A.    I was never asked to. |
| 10:11:29 | 12 | Q.    You never did it? |
| 10:11:30 | 13 | A.    I never did it either. |
| 10:11:34 | 14 | Q.    Were the people who were involved in |
| 10:11:39 | 15 | deciding whether or not to waive the provision |
| 10:11:48 | 16 | that I've described of the 2001 loan purchase |
| 10:11:52 | 17 | facility the same people who were involved in its |
| 10:11:54 | 18 | approval in the first instance? |
| 10:11:56 | 19 | A.    Some of them would have been the same. |
| 10:11:58 | 20 | Q.    Who changed? |
| 10:11:59 | 21 | A.    I don't recall, but certainly some of |
| 10:12:01 | 22 | them would have been the same. |
| 10:12:02 | 23 | Q.    Was Irwin still involved? |
| 10:12:04 | 24 | A.    Yes. |
| 10:12:04 | 25 | Q.    And was Xanthos still involved? |

54

                                    Fiachra O'Driscoll

10:12:06    2        A.     I don't recall.

10:12:06    3        Q.     Was anybody else from CRM still

10:12:09    4    involved?

10:12:10    5        A.     Bob O'Brien was still involved, for

10:12:12    6    sure.  I think David Malletta was involved as

10:12:14    7    well.

10:12:15    8        Q.     Who was your main interface in CRM on

10:12:17    9    that transaction?

10:12:18   10        A.     My main interface on any of those kind

10:12:21   11    of transactions was Tom Irwin.

10:12:24   12        Q.     And were you the person principally

10:12:26   13    charged with attempting to get that waiver?

10:12:28   14               MR. OSNATO:  Object to the form.

10:12:29   15        A.     By whom?

10:12:30   16        Q.     By your employer.

10:12:34   17        A.     No.

10:12:34   18        Q.     Who was?

10:12:35   19        A.     Nobody was.

10:12:37   20               You asked "by my employer."

10:12:40   21        Q.     By anybody in the Credit Suisse family.

10:12:44   22               Was there somebody else who was --

10:12:45   23        A.     Well, to be precise, the company were

10:12:47   24    the people who asked us to go and get that waiver.

10:12:50   25        Q.     "The company" was Oakwood?

                                                                        55

1                 Fiachra O'Driscoll

12:07:09   2   news'"?

12:07:09   3      A.   I -- in truth I -- this is darn near

12:07:13   4   seven years ago, so I'm not sure I remember the

12:07:16   5   e-mail specifically, but that's the context to

12:07:18   6   what would have been the "managing 'bad news'" at

12:07:20   7   that point in time.

12:07:21   8      Q.   Okay.  And how did that have an effect

12:07:23   9   on fixed income investors?

12:07:24   10      A.   I think the description here, I think

12:07:26   11   that the phrase was "spooked" --

12:07:28   12      Q.   Yes.

12:07:29   13      A.   -- is pretty accurate, which is that

12:07:30   14   the fixed income investors, specifically the fixed

12:07:33   15   income investors in the guaranteed B2 securities,

12:07:36   16   were significantly concerned about the prospect

12:07:38   17   for a management buyout, because, of course, what

12:07:41   18   that would have meant by its nature, that the

12:07:44   19   company which was sure, you know, an investment

12:07:46   20   grade company with a couple of billion dollars in

12:07:48   21   market cap, $600 million in shareholders equity,

12:07:52   22   investment grade rated would suddenly become a

12:07:56   23   much more leveraged entity with much thinner

12:07:58   24   shareholders equity, almost certainly not an

12:08:01   25   investment grade rating, which would have two

144

1                     Fiachra O'Driscoll

12:08:03    2    effects.

12:08:03    3              First of all, it would reduce the

12:08:05    4    rating and have a direct economic consequence on

12:08:07    5    all of the B2 securities, which still at that

12:08:09    6    point were trading at par, give or take, and it

12:08:12    7    would have a downstream effect possibly of

12:08:16    8    changing the nature of the way the company was

12:08:17    9    run.

12:08:18    10             So, you know, it upset investors fairly

12:08:21    11   significantly largely -- largely because of the

12:08:24    12   uncertainly around what Oakwood was going to look

12:08:28    13   like.

12:08:28    14        Q.   At the time Oakwood filed bankruptcy

12:08:31    15   did you personally have a view as to what caused

12:08:33    16   its demise?

12:08:35    17             MR. OSNATO:   Objection as to the form.

12:08:36    18             You can answer.

12:08:42    19        A.   Yes.

12:08:43    20        Q.   What was it?

12:08:43    21        A.   There were a number of factors.  The --

12:08:51    22   the first was -- while I said that from the time

12:08:56    23   that I was involved with Oakwood, which was the

12:09:00    24   1996-A securitization, if my memory is clear,

12:09:06    25   Oakwood was on a flat to improving -- generally

                                                              145

                              1                    Fiachra O'Driscoll
12:09:09    2    improving credit trend with most of its lending.
12:09:12    3              With the exception of the occasional
12:09:15    4    situation in which the overall quality of the
12:09:18    5    credit might improve somewhat, but there might be
12:09:21    6    particular programs that were weaker credits.  By
12:09:24    7    and large the credit was improving.
12:09:26    8              But in the period from September 1994
12:09:29    9    on the standards of credit in the industry took a
12:09:35    10   significant turn for the worse.  What happened was
12:09:37    11   that in September 1994 Conseco Finance or at least
12:09:42    12   its precursor at that time, which was called
12:09:45    13   Green Tree Financial, introduced as its standard
12:09:51    14   5 percent down payment loans.
12:09:54    15             And what that essentially meant was
12:09:56    16   that borrowers were able to get a home making only
12:09:59    17   a 5 percent down payment, whereas before for many
12:10:02    18   years 10 percent had been the tradition in the
12:10:05    19   industry.  Now, that didn't mean that all of the
12:10:07    20   loans were being done as 5 percent down payments,
12:10:10    21   but I think fairly quickly the 5 percent down
12:10:13    22   payments rose to be probably -- I would guess at
12:10:16    23   the peak in probably late '95 somewhere -- maybe
12:10:19    24   50 percent of total production, give or take.
12:10:23    25             And if you look at many of the problems

                                                                    146

1              Fiachra O'Driscoll

12:10:24    2    that the industry had, an astonishingly high

12:10:29    3    percentage of the repossessions came -- really two

12:10:32    4    things happened.  First was that the -- the reason

12:10:36    5    for the 5 percent down payment lending was largely

12:10:40    6    to maintain the loan origination volume growth.

12:10:44    7    And one way in which it did that was it probably

12:10:47    8    brought forward a lot of sales that would have

12:10:49    9    been spread over the following decade, perhaps by

12:10:53    10   making borrowers who wouldn't have been --

12:10:54    11   wouldn't have had the wherewithal to put

12:10:56    12   10 percent down enabled them to buy a home with

12:11:00    13   only 5 percent down.  Secondly, many of those

12:11:02    14   loans were among the loans that subsequently got

12:11:05    15   repossessed.

12:11:06    16           Now, the problem was such, even though

12:11:08    17   credit was improving after a measure, but, you

12:11:13    18   know, by and large steady pace from 1996 on, there

12:11:17    19   was still plenty of 5 percent down payment loans

12:11:21    20   out there.  And I don't think that they finally

12:11:23    21   were eliminated entirely until probably 2002.

12:11:26    22   They'd come down to a very small percentage by the

12:11:29    23   time of this e-mail, for instance.  But the net

12:11:33    24   result was -- of that 5 percent down payment

12:11:36    25   lending was that there was a significant drawing

147

1                    Fiachra O'Driscoll

12:11:39    2    forward of loans -- of sales being made that

12:11:42    3    otherwise would have been made out further into

12:11:45    4    the future.  And secondarily, there was a

12:11:48    5    significant number of loans made that three, four,

12:11:51    6    five, six years down the load turned into

12:11:54    7    repossessions where the company made a loss.

12:11:56    8           There's a second very significant

12:11:58    9    factor with us, which was that the industry had

12:12:03    10    done a great deal to reduce, I think, its credit

12:12:08    11    problems by that continual tightening in credit

12:12:11    12    that I talked about.  And when I mean "continual

12:12:12    13    tightening in credit," I mean a far smaller

12:12:15    14    percentage of loans being done at 5 percent down

12:12:17    15    payment.  Those 5 percent down payment loans only

12:12:19    16    being made to people with far higher credit

12:12:22    17    histories, as measured by their credit scores, by

12:12:24    18    their information companies, generally would have

12:12:28    19    gathered from them more exact documentation as to

12:12:31    20    people's incomes, people's financial resources,

12:12:33    21    where the source of those down payments were

12:12:35    22    coming from, all of those kind of factors.

12:12:39    23           But the other factor that had a very

12:12:41    24    significant impact, which isn't as clear, was that

12:12:47    25    one of the great changes that happened in the U.S.

148

1        Fiachra O'Driscoll

12:12:49    2    housing market, is if you go back to the early

12:12:52    3    1990s for a low income family their choices really

12:12:57    4    for a low income family with poor credit, as many

12:13:01    5    low income families necessarily did do, their

12:13:06    6    choices as to where to live were really narrowed

12:13:09    7    down to three things.  No. 1, they could either

12:13:12    8    rent a place; No. 2, they could continue to live

12:13:14    9    with their families or wait to inherit property

12:13:18    10   from their families; or No. 3, they could buy a

12:13:22    11   manufactured home.  Because this kind of lending

12:13:25    12   was routinely, you know, the kind of lending that

12:13:27    13   was done to low income families.

12:13:30    14       The big change that happened -- and it

12:13:34    15   wasn't really -- you know, hindsight is a

12:13:36    16   wonderful thing, because it's easy to do this

12:13:39    17   diagnosis now.  And frankly, this wasn't a

12:13:40    18   diagnosis that would have been clear to me even at

12:13:44    19   the time of the company's bankruptcy, but it was

12:13:47    20   becoming fairly clear then.

12:13:49    21       The big change that happened was the

12:13:51    22   emergence of the subprime mortgage market.  People

12:13:55    23   like -- you'll have heard of all the household

12:13:57    24   names.  Ameriquest is probably the most prominent

12:14:00    25   of them, but also people like Countrywide,

149

|  | 1 | Fiachra O'Driscoll |
| 12:14:03 | 2 | GreenPoint here in New York. |
| 12:14:05 | 3 | There's many, many people within that |
| 12:14:08 | 4 | space who make loans to people whose credit |
| 12:14:11 | 5 | quality is less than that required to meet the |
| 12:14:15 | 6 | standards of the federal agencies, which again is |
| 12:14:17 | 7 | what I -- is one segment of what I referred to |
| 12:14:20 | 8 | earlier on as being the non-conforming mortgage |
| 12:14:23 | 9 | market. |
| 12:14:24 | 10 | And one of the things that actually did |
| 12:14:25 | 11 | was it meant there was a much broader array of |
| 12:14:28 | 12 | credit available out there for lower income |
| 12:14:31 | 13 | families with weaker credit histories.  And in |
| 12:14:34 | 14 | particular, one of the things that happened was, |
| 12:14:36 | 15 | that as that form of lending became more -- better |
| 12:14:39 | 16 | understood, more competitive, the interest rates |
| 12:14:44 | 17 | on those kind of loans fell pretty sharply.  If |
| 12:14:47 | 18 | you look at what they were at say 1990, they were |
| 12:14:49 | 19 | probably 13 or 14 percent.  If you look at what |
| 12:14:52 | 20 | they were in 1995, '96, they were probably 10, |
| 12:14:56 | 21 | 11 percent still. |
| 12:14:57 | 22 | By the year 2000 people with |
| 12:14:59 | 23 | surprisingly shaky credit histories could borrow |
| 12:15:04 | 24 | at a -- you know, 5 and a half percent interest |
| 12:15:07 | 25 | rate loan.  The kind of thing we'd -- you know, |

150

1          Fiachra O'Driscoll

12:15:08   2    any of us trying to refinance our mortgages right

12:15:12   3    now would be very happy to see, indeed.

12:15:14   4          And in the meantime manufactured

12:15:15   5    housing mortgage rates in part, because of the

12:15:19   6    greater stress that the manufactured housing was

12:15:22   7    under by that stage and the higher spreads that

12:15:25   8    people were having to pay for financing,

12:15:29   9    manufactured housing rates were much higher, were

12:15:31   10   at 8, 9, 10 percent.  And as a consequence it

12:15:35   11   became much more difficult for the manufactured

12:15:37   12   housing industry to be competitive with that type

12:15:40   13   of regular site-built lending.

12:15:42   14         Because, you know, if one thinks about

12:15:43   15   it, the advantage the manufactured housing

12:15:45   16   industry had was that its price per square foot to

12:15:48   17   a homeowner was significantly less than the price

12:15:51   18   per square foot for a regular -- what they call

12:15:56   19   stick-built house or a site-built house.  Largely

12:15:59   20   because of the economies that one can achieve by

12:16:01   21   instead of building the entire thing on site,

12:16:03   22   doing it in an assembly line in a factory.

12:16:06   23         But the difficulty is that from the

12:16:07   24   point of view of most people, frankly what their

12:16:10   25   mortgage rate is neither here nor there.  The

151

1          Fiachra O'Driscoll

12:16:13    2    thing that matters is what their monthly payment

12:16:15    3    is on the home.  And the fact that these subprime

12:16:18    4    mortgage loans could -- were extended at so much a

12:16:21    5    lower rate, it meant that even though the purchase

12:16:23    6    price of the home might be higher the net monthly

12:16:27    7    payment that a borrower could get was the same or

12:16:31    8    better than was the case for the manufactured

12:16:34    9    housing area.

12:16:35    10         So the net result of that was that --

12:16:36    11    really, those two factors.  First the credit

12:16:39    12    factor and then, you know, just a phenomenon that

12:16:42    13    frankly is not a bad one for America, because it's

12:16:45    14    given a lot more people access, people on regular,

12:16:50    15    ordinary middle class incomes access to home

12:16:53    16    ownership who didn't have that kind of access

12:16:55    17    before.

12:16:56    18         And the net result of that,

12:16:58    19    unfortunately, was that it was without a doubt,

12:17:01    20    with the benefit of hindsight, a key factor in the

12:17:03    21    manufactured housing market not recovering as

12:17:08    22    quickly as it would have done, I think, in an

12:17:11    23    environment where the subprime market hadn't

12:17:14    24    opened up.

12:17:15    25         Q.    Oakwood failed while not every other

152

|  | 1 | Fiachra O'Driscoll |
| 12:17:17 | 2 | manufactured housing manufacturer failed. |
| 12:17:23 | 3 | Why do you think that these factors |
| 12:17:26 | 4 | brought about Oakwood's failure, but not that of |
| 12:17:29 | 5 | other players in the industry? |
| 12:17:31 | 6 | A.    Very few of the manufacturers in the |
| 12:17:33 | 7 | industry survived without financial distress, and |
| 12:17:36 | 8 | more of the manufacturers failed than did not. |
| 12:17:39 | 9 | Oakwood's result was more typical than atypical. |
| 12:17:43 | 10 | Q.    Okay.   What -- why did some of them |
| 12:17:46 | 11 | survive? |
| 12:17:51 | 12 | A.    Clayton Homes was the most close |
| 12:17:53 | 13 | comparison to Oakwood Homes. |
| 12:18:02 | 14 | I'm -- forgive me, I'm cognizant of my |
| 12:18:05 | 15 | counsel's advice here to stick to what's in the |
| 12:18:08 | 16 | public record. |
| 12:18:10 | 17 | Clayton's results also got worse and |
| 12:18:12 | 18 | worse.   Their repo problems became tougher and |
| 12:18:15 | 19 | tougher.   And in the end Clayton, the company, was |
| 12:18:19 | 20 | not quite controlled by the Clayton family, but |
| 12:18:23 | 21 | they had a -- I think a 35 percent ownership of |
| 12:18:26 | 22 | the total equity in the thing.   Clayton in the end |
| 12:18:28 | 23 | sold out to Mr. Buffett at a price that was |
| 12:18:34 | 24 | subsequently very aggressively contested by its |
| 12:18:38 | 25 | institutional investors, who felt that the family |

153

1          Fiachra O'Driscoll

13:43:23    2    purchase line?

13:43:24    3        A.    There would have been, yes.

13:43:25    4        Q.    And what were they?

13:43:27    5        A.    The reverse repo line was intended, if

13:43:29    6    I recall -- and I don't have the documents in

13:43:32    7    front of me so I don't -- you know, you'll have to

13:43:34    8    forgive me.  If you refresh my recollection, we'll

13:43:37    9    put the documents in front of me, it may be

13:43:39    10    somewhat different.

13:43:40    11        But the reverse repo line had a fairly

13:43:42    12    significant element of loans -- sorry, of

13:43:44    13    securities within it, maybe the whole lot, as a

13:43:47    14    way of financing those loans.  It was also a much

13:43:50    15    shorter term.  Typically these things were not

13:43:52    16    three-year committed lines.  Typically these

13:43:55    17    things were at three month, or six month, or some

13:43:57    18    shorter period of time.

13:43:59    19        I don't recall what the period of time

13:43:59    20    was that the commitment was for this reverse repo,

13:44:03    21    but it would have been very short.  So both the

13:44:05    22    assets were different and the maturity of the

13:44:08    23    exposure was very different.

13:44:09    24        Q.    Would the shorter maturity of the

13:44:11    25    exposure have tended to increase or decrease the

185

1                    Fiachra O'Driscoll

13:44:15    2    risk characteristics of the line from the

13:44:18    3    perspective of CSFB?

13:44:20    4        A.    Decrease.

13:44:22    5        Q.    And would the asset mix have tended to

13:44:25    6    increase or decrease that exposure?

13:44:27    7        A.    As opposed to outright loans?

13:44:29    8        Q.    As opposed -- I'm trying to contrast

13:44:33    9    the CSFB risk in the proposed reverse repo

13:44:40    10   proposal with the risk in the asset purchase

13:44:48    11   proposal, which was adopted approximately a year

13:44:50    12   later.  And I believe you told me that the one

13:44:54    13   aspect was the difference in maturity and the

13:44:56    14   other had to do with the securities themselves.

13:44:58    15            So I'm asking you if the difference in

13:45:00    16   the securities themselves was greater or presented

13:45:03    17   greater risks to CSFB in one transaction than the

13:45:07    18   other or lesser ones?

13:45:09    19       A.    No.  Because they weren't

13:45:10    20   contemporaneous in time, I didn't have occasion to

13:45:12    21   make such comparison at that time.  And to be

13:45:15    22   honest, I'd need to go back and look at the nature

13:45:17    23   of the instruments in a good deal, more detail now

13:45:19    24   to make an honest assessment.

13:45:22    25       Q.    Do you have any knowledge of why it was

                                                         186

1                        Fiachra O'Driscoll

13:45:23    2    that CRM turned one down and approved the other?

13:45:27    3                    MR. OSNATO:  Objection to the form.

13:45:28    4        A.    No.

13:45:29    5        Q.    Okay.  Did you have any knowledge of

13:45:32    6    why CRM turned the first one down?

13:45:39    7        A.    I was never actually informed that they

13:45:42    8    had turned it down.

13:45:48    9        Q.    So as far as you know, it was still an

13:45:49    10   open proposal a year later when the asset purchase

13:45:53    11   facility was being discussed?

13:45:55    12       A.    It hadn't been discussed at that point.

13:45:58    13             What frequently happened was that --

13:46:01    14   was one of three things.  Either a credit

13:46:05    15   situation would be approved, a credit situation

13:46:08    16   would be declined, or very frequently a credit

13:46:15    17   situation would have been left open.

13:46:18    18   Particularly -- and I don't want to cast

13:46:21    19   aspersions towards my colleagues here --

13:46:24    20   Tom Irwin, though, is one of the people who -- and

13:46:28    21   again, I don't want to, you know, draw comments on

13:46:31    22   somebody's professional capabilities, and so on --

13:46:34    23   would very often leave something open.  So he

13:46:37    24   would sometimes -- he would sometimes never quite

13:46:42    25   tell one whether the thing was actually approved

LegaLink,  a Merrill Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

|            | 1  | Fiachra O'Driscoll |
| --- | --- | --- |
| 13:46:45 | 2  | or not approved. |
| 13:46:46 | 3  | Q.    Did you ever receive a copy -- |
| 13:46:48 | 4  | Did you ever see a copy of the report |
| 13:46:48 | 5  | that Xanthos wrote in January of 2000 turning this |
| 13:46:51 | 6  | down? |
| 13:46:52 | 7  | A.    No. |
| 13:46:53 | 8  | MR. OSNATO:  Objection to the form. |
| 13:46:53 | 9  | Let me -- please, before you answer, |
| 13:46:54 | 10 | let me get my objection in. |
| 13:46:57 | 11 | I'm going to -- |
| 13:46:57 | 12 | THE WITNESS:  Sorry. |
| 13:46:57 | 13 | MR. OSNATO:  -- object to the form of |
| 13:46:57 | 14 | the question. |
| 13:47:00 | 15 | You can answer. |
| 13:47:01 | 16 | Do you want the question read back? |
| 13:47:02 | 17 | THE WITNESS:  Yeah.  Well, actually let |
| 13:47:03 | 18 | me -- |
| 13:47:03 | 19 | MR. OSNATO:  Can you read back the |
| 13:47:04 | 20 | question, please? |
| 13:47:05 | 21 | THE WITNESS:  Let me rephrase my |
| 13:47:06 | 22 | answer. |
| 13:47:07 | 23 | MR. OSNATO:  Well, just listen to the |
| 13:47:09 | 24 | original question and then provide an answer. |
| 13:47:12 | 25 | THE WITNESS:  Let me rephrase my -- if |

188

1            Fiachra O'Driscoll

13:47:12    2        I may, rephrase my answer.

13:47:14    3        A.    In the first place it wouldn't have

13:47:16    4    been James place to turn a facility down in

13:47:19    5    isolation.  He didn't have any authority to

13:47:20    6    approve or disprove credit that I'm aware.  In the

13:47:23    7    second place, actually I didn't know there was

13:47:25    8    such a report.

13:47:27    9        Q.    To this moment, when I asked you this

13:47:29   10    question, you didn't know it?

13:47:31   11            THE WITNESS:  Can I answer that?

13:47:32   12            MR. OSNATO:  You can absolutely answer

13:47:33   13        the question.

13:47:34   14            I, again, am going to object to the

13:47:38   15        lack of foundation in the question.

13:47:39   16            But you can answer the question.

13:47:41   17        A.    I was shown a piece of paper by our

13:47:43   18    counsel yesterday to that effect, that was the

13:47:47   19    first I'd ever seen or heard of it.

13:47:50   20        Q.    Okay.  Now, there was another reverse

13:47:52   21    repurchase facility proposed just a few months

13:47:54   22    later, wasn't there, in the amount of $50 million?

13:47:58   23        A.    I don't recall.

13:47:59   24            MR. CASTANARES:  Let me see if I can

13:48:00   25        help refresh your memory.

189

1              Fiachra O'Driscoll

13:48:01   2           I'll ask the reporter to mark

13:48:03   3      CSFB 512903 as 53.

13:48:07   4         (CSFB Exhibit 53, One-page Memorandum,

13:48:07   5      bearing Bates stamp No. CSFB-00512903, marked

13:48:07   6      for identification, as of this date.)

13:48:20   7        THE WITNESS:  Uh-huh.

13:48:34   8        Q.    Does this document help refresh your

13:48:36   9   memory as to whether there was a proposal for a

13:48:38  10  $50 million reverse repurchase facility in

13:48:41  11  approximately March of 2000?

13:48:42  12       A.    Actually, no.

13:48:43  13       No. 1, there was never a second

13:48:45  14  proposal.  I don't think that there was ever

13:48:47  15  anything that -- to the best of my knowledge,

13:48:50  16  there was only ever one proposal for a reverse

13:48:54  17  repo.  I don't recall its exact dollar amount at

13:48:57  18  the time.  I thought it was a $75 million

13:48:59  19  proposal.  There may have been revised term

13:49:02  20  sheets.  It wasn't unusual actually to have

13:49:04  21  revisions of term sheets of that sort during that

13:49:06  22  period of time.  So I don't think that there was

13:49:09  23  ever multiple proposals, certainly from my

13:49:11  24  perspective.

13:49:12  25       Q.    So if it was all one proposal you were

LegaLink,   a Merrill Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

1                    Fiachra O'Driscoll

13:49:14    2    informed on approximately March 21, 2000 that it

13:49:16    3    was turned down, right?

13:49:18    4        A.    No.

13:49:19    5        Q.    So this, the statement here that Irwin

13:49:21    6    and Xanthos informed you of, this decision is

13:49:24    7    incorrect?

13:49:24    8        A.    It's incorrect.

13:49:25    9        Q.    They never did tell you that?

13:49:27    10       A.    Nope.

13:49:27    11       Q.    Okay.

13:49:27    12       A.    The first I heard about this was

13:49:28    13   yesterday.

13:49:30    14       Q.    So as far as you know, that reverse

13:49:32    15   repo facility was still under consideration as of

13:49:35    16   the time of Oakwood's bankruptcy in 2002?

13:49:39    17       A.    There hadn't been significant

13:49:41    18   discussions about it and it would -- those

13:49:45    19   discussions were from my perspective superseded by

13:49:49    20   the later loan purchase facility discussions.

13:49:51    21       Q.    A year later?

13:49:52    22       A.    Yeah.  And it wasn't unusual for

13:49:54    23   discussions to change in their form.  Because more

13:49:57    24   typically, as I said, rather than -- sometimes

13:50:01    25   you'd get an outright approval.  Very occasionally

191

|  | 1 | Fiachra O'Driscoll |
| 13:50:03 | 2 | you'd get an outright turndown.  Much more often |
| 13:50:06 | 3 | it was the case that their answer was, well, can |
| 13:50:09 | 4 | you think about whether or not you, you know, can |
| 13:50:12 | 5 | approach this thing differently? |
| 13:50:15 | 6 | So term sheets would have been revised, |
| 13:50:17 | 7 | term sheets would have been transformed in their |
| 13:50:19 | 8 | nature, and you would see if there was a meeting |
| 13:50:21 | 9 | of the minds. |
| 13:50:22 | 10 | Q.    Okay.  Now, yesterday for the first |
| 13:50:23 | 11 | time you saw Xanthos's January 2000 |
| 13:50:28 | 12 | recommendation; is that correct? |
| 13:50:30 | 13 | A.    Yes. |
| 13:50:31 | 14 | Q.    Is that the type of document, speaking |
| 13:50:33 | 15 | as of that time, January 2000, that would have |
| 13:50:36 | 16 | evidenced a complete turndown of a proposal? |
| 13:50:41 | 17 | A.    I never saw evidence of a complete |
| 13:50:42 | 18 | turndown of a proposal. |
| 13:50:45 | 19 | Q.    Okay.  Were you ever aware that CSFB |
| 13:50:47 | 20 | had turned down any proposals ever? |
| 13:50:49 | 21 | MR. OSNATO:  Objection as to the form. |
| 13:50:51 | 22 | Q.    Whether they related to Oakwood or |
| 13:50:52 | 23 | anything else? |
| 13:50:53 | 24 | A.    Yes, absolutely. |
| 13:50:54 | 25 | Q.    Okay.  And were those communicated to |

192

```
1                          ERRATA SHEET

2      PAGE   LINE   CHANGE CORRECTION (REASON)

3      23     6      "treasure" to "treasurer" (incorrect)

4      56     22     "them" to "the term" (incorrect)

5      58     14     "hold on" to "whole loan" (incorrect)

6      80     23     "into" to "on" (typo)

7      82     24     "reposession" to "repossession" (typo)

8      96     20     "size" to "size of" (omitted word)

9      104    23     "long term capital management" to "Long Term Capital Management"

10                   (capitalized)

11     165    3      "complied" to "didn't comply" (incorrect)

12     208    9      "late is" to "latest" (incorrect)

13     221    4      "hear" to "here" (typo)

14     286    9      "GAPIS and LAPIS" to "GAPAs and LAPAs" (incorrect)

15     ____   ____   _____

16     ____   ____   _____

17     ____   ____   _____

18     ____   ____   _____

19     ____   ____   _____

20     ____   ____   _____

21     ____   ____   _____

22     ____   ____   _____

23     Dated: October 23, 2006

24

25                                              Fiachra O'Driscoll
```

1

2                                    * * *

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Fiachra O'Driscoll, do hereby

5        acknowledge that I have read and examined the

6        foregoing testimony, and the same is a true,

7        correct and complete transcription of the

8        testimony given by me, and any corrections appear

9        on the attached Errata sheet signed by me.

10

11

12

13

14        _Oct 23, 2006_                _signature_

15        (DATE)                        (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

# <u>EXHIBIT N</u> REDACTED
## IN ITS ENTIRETY

# Exhibit "O"

From:      Serageldin, Kareem
Sent:      Friday, April 14, 2000 5:28 PM
To:        O'Driscoll, Fiachra
Subject:   RE:

Could you get someone to shoot over the latest Oakwood MH deal prospectus?

Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory.

We need to make sure all inventory has insurance, etc.

——Original Message——
From:   O'Driscoll, Fiachra
Sent:   14 April 2000 15:17
To:     Serageldin, Kareem
Subject:

Section 1011. Restrictions on Secured Debt. So long as any Securities remain Outstanding, the Company will not issue, assume or guarantee, and will not permit any Subsidiary to issue, assume or guarantee, any Indebtedness secured by a Lien on or of any of the Company's or any Subsidiary's property, or on the shares of stock or debt of any Subsidiary now owned by the Company or acquired after the date hereof. This restriction will not apply if the Securities are secured by a Lien ranking ratably with and equal to (or at the Company's option, prior to) the secured Indebtedness. In any event, the foregoing restriction will not apply to the following: (i) Liens on Indebtedness outstanding or available to the Company or any Subsidiary under facilities existing on the date of original issuance of the Securities; (ii) Liens on Indebtedness secured by the stock of a Subsidiary and Indebtedness of a Subsidiary existing when the Subsidiary becomes a Subsidiary, other than Indebtedness created in connection with the transaction by which the Subsidiary becomes a Subsidiary; (iii) Liens on Indebtedness of the Company or any Subsidiary having a term of less than 365 days arising from any funding arrangement with one or more financial institutions or other lenders or purchasers exclusively to finance the purchase, origination or production of loans held or to be held for sale by the Company or by any Subsidiaries for the purpose of pooling those loans prior to securitization or sale of those loans in the ordinary course of the Company's or any Subsidiary's business; (iv) Liens on property at the time of its acquisition by the Company or a Subsidiary that secure obligations assumed by the Company or a Subsidiary, or on the property of an entity at the time it is merged into the Company or a Subsidiary (other than Indebtedness created in contemplation of the acquisition of the property or the consummation of such a merger); (v) Liens to secure the payment of some or all of the purchase price of property or loan portfolios upon the acquisition of that property or those loan portfolios by the Company or a Subsidiary; (vi) Liens on Indebtedness arising from conditional sales agreements or title retention agreements relating to property acquired by the Company or a Subsidiary; 59 ========================================PAGE BREAK======================================== (vii) Liens on Indebtedness owed by a Subsidiary to the Company or to another Subsidiary that is wholly-owned (directly or indirectly) by the Company; (viii) mechanics', materialmen's, carriers' or similar Liens arising in the ordinary course of business (including in the construction of facilities) relating to obligations not due or which are being contested; (ix) Liens for taxes not due or being contested; landlords' Liens, tenants' rights under leases, and similar Liens not impairing the use or value of the property involved; (x) Liens on any property to secure all or part of the cost of improvements or construction on the property or Indebtedness incurred to provide funds for that purpose in a principal amount not exceeding the cost of the improvements or construction; (xi) Liens incurred in connection with any amendment, restatement, supplement, renewal, replacement, extension, refinancing or refunding in whole or in part, of Indebtedness, provided that the principal amount of the Indebtedness secured by a Lien will not exceed the principal amount of Indebtedness secured at the time any such action is taken (other than with respect to the Company's $175.0 million revolving credit facility with First Union National Bank, as to which the principal amount of Indebtedness may be increased) and that any such action will be limited to the portion of assets that secured the Lien at the time any such action was taken. In addition, the Company and any Subsidiary may issue, assume or guarantee Indebtedness that would be subject to the foregoing restrictions without equally and ratably securing the Securities if immediately thereafter the sum of (i) the aggregate principal amount of all Indebtedness outstanding that would be subject to the foregoing restrictions (excluding Indebtedness permitted under the exceptions to the restriction set forth above), and (ii) all Attributable Debt from a Sale and Leaseback (excluding any sale and leaseback as to which the net proceeds of the property sold or transferred are applied to retire Indebtedness or to the purchase of property as described in Section 1013 as of the date of determination would not exceed 15% of Consolidated Net Tangible Assets.

1

CSFB-00173794


EXHIBIT
CSFB
55 10
SO    (29/06

# Exhibit "P"

From:           JHinshaw@OakwoodHomes.com
Sent:           Monday, April 17, 2000 1:16 PM
To:             fiachra.o'driscoll@csfb.com
Subject:        FW: Changes to 2000-A loss for quarter and regular interest MTM; B-2 loss assumptions

Hello Fiachra. Hope all is going well. Please read the attached e-mail in your abundance
of spare time. In a nut shell we are valuing all retained REMIC interest for the quarter
and want to get your thoughts on our methodology. In summary we are marking the
unguaranteed B-2's to fail cross-over at +850 and the guaranteed B-2's to fail cross-over
at +1000. Please make note of item 5 below and let me know your thoughts. Thanks for your
help.

-----Original Message-----
From: Doug Muir/Corp.Finance
Sent: Friday, April 14, 2000 4:57 PM
To: Bob Smith/Corp.Finance; Eric Burgess/Corporate Finance; Suzanne Wood/Corp.Finance;
Derek Surette/OAC Acct.; Jeff Hinshaw/OAC Accounting
Subject: Changes to 2000-A loss for quarter and regular interest MTM; B-2 loss assumptions


In having a final look at the summary valuation page for 3/31/00, the following issues
arose:

1.  99-C B-2 showed a positive mark-to-market ("MTM") of $1.3 million, which looked very
strange in comparison to negative MTMs on 99-D and 99-E. Turns out we priced 99-C B-2 at
+850 at 3/31/00, same spread as 99-D and 99-E. We priced 99-C B-2 at closing at +1000,
because 99-C B-2 was a guarantee bond and did not have sufficient credit support built in
to sustain anything higher than a single-B rating exclusive of the OH guarantee. I asked
Jeff Hinshaw to reprice 99-C B-2 at 3/31/00 at +1000, a single-B spread (instead of the +
850 BB spread given us by CSFB), which has the effect of reducing the positive MTM from
$1.3 million to $.3 million. As it happens, the 3/31/00 pricing yield (at +1000) is
identical to the bond's yield at closing; the $.3 million positive MTM arises from
discount accretion, which has not been recorded for book purposes.

2.  99-D and 99-E B-2s have negative MTMs of $2.4 million and $.8 million, respectively.
99-D B-2 was priced at +700 at closing, so it has suffered from spread widening to +850.
99-E B-2 was priced at +950 at closing, so it has benefited from spreads coming in since
closing. Changed yields in benchmarks had little effect. Both bonds have been much more
adversely affected by changing pricing assumption from "pass" to "fail" (insofar as the
crossover tests are concerned) in accordance with CSFB's views on what the market view is
on this right now. This leads to point 3 below. (Pass/fail does not affect the 99-C B-2
because it is a bullet structure.)

3.  In discussing item 2 above with Jeff, he pointed out that the loss recorded on the
2000-A deal is based upon a pass assumption on the B-2. This is not consistent with CSFB's
advice on where the market is on this. Accordingly, I have had Jeff recompute assuming B-2
failure pricing, which reduces the B-2 issue price and increases the loss by $1.1 million
in the quarter. To recap, we now have a gross loss of $11.1 million vs. $10.0, and a loss
in the quarter of $2.4 vs. $1.3 million on this deal.

4.  For some reason, the summary of regular interest values I have shows a negative MTM on
the 2000-A of $.7 million. This seems unlikely to have arisen only one day after closing
on 3/30/00. Jeff is following up on this.

Jeff, will you drop Fiachara an email indicating our spreads and pass/fail assumptions on
all bonds in inventory (as adjusted) and get him to have a final look before we lock down
the quarter? Ask him to email us back (so we'll have it for the file.) Might as well
check in with him one more time in case he has changed his view on anything.

5.  Last issue. All bonds have been priced from pricing models, not residual models. The

1

CSFB-00173796



former do not have losses modeled; the latter do. This implicitly says that a buyer assumes he is going to get paid all his principal (or alternatively, that a buyer has factored in the risk of not getting all his principal into his spread) in coming up with his price.

If we were to reprice these securities using the same models we use for valuation purposes, on at least some of them we are going to get a worse answer, because our loss assumptions will cause B-2 writedowns. I guess the real question is whether we should use the market's loss assumption in computing these values, or our assumption.

Jeff, in your email to Fiachra, ask him the above question and see what he says.

What I am trying to avoid is getting surprised down the road if we were somehow to have to change assumptions from the "market's" to "ours." Which view we take might affect the loss on 2000-A.  (Jeff:  What happens if we price the B-2 off the residual model in computing the 2000-A loss?)

One other thought on this is that the price of the bonds at 3/31/00 on a "no losses" vs. a "losses" basis may not be so different as one might expect. While the numbers may be pretty far apart on a purely mathematical basis, the reality may not be so different. What I mean is this:  These wide B-2 spreads are in large measure a reflection of credit risk.  If we have already modeled in a pretty bleak loss assumption in our B-2 valuation (and these assumptions result in an unrecovered writedown), the risk to a buyer is that losses are even worse than we've modeled, which is a lesser risk than what you have if you start from a no writedown position.  In that case, maybe a tighter spread is indicated.

Know these subjects are exactly what you wanted to spend time thinking about this week!

Doug

2

# <u>EXHIBIT</u> Q REDACTED
# IN ITS ENTIRETY

# Exhibit "R"

| | |
|---|---|
| From: | Serageldin, Kareem |
| Sent: | Thursday, September 14, 2000 4:05 PM |
| To: | O'Driscoll, Fiachra |
| Cc: | Donovan, Joseph; Chrystal, John; Herbert, John; May, Beth |
| Subject: | RE: Oakwood: I talked to the CFO again |

(i) yes -- if finished goods then the same 2x coverage as the convertible bond.
(ii) yes -- we could increase to 25% but could we get a bit more spread on the covert in return?

----Original Message----
From:  O'Driscoll, Fiachra
Sent:   14 September 2000 16:53
To:      Serageldin, Kareem
Cc:      Donovan, Joseph; Chrystal, John; Herbert, John; May, Beth
Subject:     Oakwood: I talked to the CFO again

... about our latest proposal (warrants in the form of a convertible bond plus a CP loan warehouse). Bob told me, in the strictest confidence, that the board is likely to replace the CEO, who they feel is not moving quickly enough to change things. He believes that Oakwood needs to exit a number of markets, including the Northwest, and shut more plants. He is also clearly feeling a great deal of personal stress from the business situation, even though their existing financings have been extended for a year.

Bob likes our proposal a lot, and is looking at it alongside an asset-based revolver from Foothill that would also be secured by finished goods inventory. As you will recall, he also liked our last proposal, but the Board members felt it was giving away too much stock too cheaply.

Bob asked two things:  (i) if the revolver could be secured by either finished goods inventory or by loan inventory and (ii) if the conversion premium could be higher.

1



CSFB-00485278

# Exhibit "S"

| From: | Hunt, Graham |
|---|---|
| Sent: | Monday, November 27, 2000 9:29 PM |
| To: | Zonca, Alberto; Miller, Bruce |
| Cc: | O'Driscoll, Fiachra; Menkhaus, Susan; Miller, Dan; Gupta, Sanjeev; Serageldin, Kareem |
| Subject: | RE: Oakwood Term Sheet |

Bruce/Alberto

Notwithstanding the risk to the conduit is fully covered by the TRS from CSFBi can you explain If, as we understand it, CSFBi will be buying the underlying paper originated by Oakwood under a desk inventory limit how they can provide a 3 year commitment to the company ?. CRM has declined the provision of facilities to this name twice for credit reasons so it would be beneficial if we all discussed this transaction before it proceeds much further

Graham

-----Original Message-----
From: Zonca, Alberto
Sent: Tuesday, November 21, 2000 3:39 PM
To: Hunt, Graham
Cc: O'Driscoll, Fiachra; Miller, Bruce; Menkhaus, Susan
Subject: RE: Oakwood Term Sheet

You are correct, CSFBi will provide a TRS to support this asset in the conduit, probably with CSFB NY standing between Alpine and CSFBi.
For the credit approval stage, Fiachra or Susan will be able to update you on their credit process. I do not have a contact at CSFBi yet.
The term sheet was prepared by Fiachra and CSFBi.

Alberto

-----Original Message-----
From: Hunt, Graham
Sent: Tuesday, November 21, 2000 2:19 PM
To: Zonca, Alberto
Cc: O'Driscoll, Fiachra; Miller, Bruce
Subject: RE: Oakwood Term Sheet

Alberto

Am I correct in assuming that CSFBi are providing a TRS to support this asset in the conduit ?. If so at what stage are CSFBi at in obtaining credit approval for the other side of this trade. Also why are we issuing term sheets to clients on behalf of CSFBi ?.
Graham
-----Original Message-----
From: Zonca, Alberto
Sent: Friday, November 17, 2000 6:02 PM
To: Hunt, Graham
Subject: Oakwood Term Sheet

As promised.

-----Original Message-----
From: O'Driscoll, Fiachra
Sent: Thursday, November 16, 2000 12:01 PM
To: Zonca, Alberto; Miller, Bruce
Subject: Oakwood Term Sheet

1

CSFB-00173581


EXHIBIT
CSFB
61  10
1/31  CS2/05

<< File: 003741035.doc >>

2

CSFB-00173582

# <u>EXHIBIT T</u> REDACTED IN ITS ENTIRETY

# Exhibit "U"

From:           C. Richard Rayburn, Jr. [CRR@rcdlaw.net]
Sent:           Saturday, October 19, 2002 3:22 PM
To:             Felt, Jared
Subject:        RE: RE: OH Draft Term Sheet

Good question.I am at office now.ARe you at home?Rick

-----Original Message-----
From: Felt, Jared [mailto:jared.felt@csfb.com]
Sent: Saturday, October 19, 2002 9:35 AM
To: C. Richard Rayburn, Jr.
Subject: Fw: RE: OH Draft Term Sheet

Rick

Could the Company selectively reinstate floor plan repurchase obligations made to certain
lenders, while attempting to push the remainder into an impaired senior unsecured class?
(See below.) How much do you think it would cost the Company in the end to effect,
recognizing that the Company would have to some how size the claim by assessing (a) the
likelihood that the underlying retailers would default and then (b) the likely recoveries
selling off the resuling distressed inventory in bulk sales?

Jared

--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Standish, Myles <MES@OakwoodHomes.com>
To: Wales, Dod <dod.wales@csfb.com>; martin.flics@lw.com <martin.flics@lw.com>;
crr@rcdlaw.net <crr@rcdlaw.net>; Smith, Bob <RAS@OakwoodHomes.com>; Muir, Doug
<DRM@OakwoodHomes.com>; Wood, Suzanne <SWood@OakwoodHomes.com>; Antill, Egan
<egan.antill@csfb.com>; Felt, Jared <jared.felt@csfb.com>; Kurganska, Alysa
<alysa.kurganska@csfb.com>; Landon, Peter <peter.landon@csfb.com>; May, Beth
<beth.may@csfb.com>; O'Driscoll, Fiachra <fiachra.o'driscoll@csfb.com>; Schachter, Mark
<mark.schachter@csfb.com>
Sent: Sat Oct 19 09:24:07 2002
Subject: RE: OH Draft Term Sheet

Attached are my comments on the draft. With respect to the treatment of floor plan, I
agree in general. However, given that the majority of our floor plan is still with
Deutsche and Conseco, who we really could care less about, shouldn't we reject those
obligations if we can and keep the obligations to the remaining floor plan lenders. Also,
when do we hear from Andrew Davidson? We need to get that part wrapped up asap.

-----Original Message-----
From: Wales, Dod [mailto:dod.wales@csfb.com]
Sent: Friday, October 18, 2002 7:41 PM
To: 'martin.flics@lw.com'; 'crr@rcdlaw.net'; Smith, Bob; Muir, Doug; Standish, Myles;
Wood, Suzanne; Antill, Egan; Felt, Jared; Kurganska, Alysa; Landon, Peter; May, Beth;
O'Driscoll, Fiachra; Schachter, Mark; Wales, Dod
Subject: OH Draft Term Sheet

Please find attached a draft of the OH restructuring term sheet prepared by CSFB for
Lotus. Please fax any comments to the number below, or email them to myself or Peter
Landon (peter.landon@csfb.com)

                                   1

CSFB-00035156



EXHIBIT
6/14/06  20

Thanks and have a good weekend.

```
> Dod E. Wales
> Investment Banking
> CREDIT | FIRST
> SUISSE | BOSTON
> Distressed Finance
11 Madison Avenue
New York, NY 10010
Tel (212) 538 5490
Cell (650) 823 1753
Fax (646) 935 7867
```

    <<#579143 v3 - Oakwood - Restructuring Term Sheet to Lotus.doc>>

This message is for the named person's use only. It may contain sensitive and private proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you are not the intended recipient, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. CREDIT SUISSE GROUP and each legal entity in the CREDIT SUISSE FIRST BOSTON or CREDIT SUISSE ASSET MANAGEMENT business units of CREDIT SUISSE FIRST BOSTON reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Unless otherwise stated, any pricing information given in this message is indicative  only, is subject to change and does not constitute an offer to deal at any price quoted. Any reference to the terms of executed transactions should be treated as  preliminary only and subject to our formal written confirmation.

This message is for the named person's use only. It may contain sensitive and private proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you are not the intended recipient, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. CREDIT SUISSE GROUP and each legal entity in the CREDIT SUISSE FIRST BOSTON or CREDIT SUISSE ASSET MANAGEMENT business units of CREDIT SUISSE FIRST BOSTON reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Unless otherwise stated, any pricing information given in this message is indicative  only, is subject to change and does not constitute an offer to deal at any price quoted. Any reference to the terms of executed transactions should be treated as  preliminary only and subject to our formal written confirmation.

2

CSFB-00035157

# EXHIBIT V REDACTED IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>W</u> REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>X</u> REDACTED IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>Y</u> REDACTED
# IN ITS ENTIRETY

# Exhibit "Z"

The McGraw·Hill Companies

# STANDARD &POOR'S

## S&P Viewpoint

# For U.S. Subprime RMBS, Positive Implications When Compared With Manufactured Housing ABS
# Back

Publication Date:   Apr 27, 2007 12:01 EST

**For U.S. Subprime RMBS, Positive Implications When Compared With Manufactured Housing ABS**

Primary Credit Analyst:
Monica Perelmuter, New York (1) 212-438-6309;
monica_perelmuter@standardandpoors.com

Publication date: 27-Apr-07, 12:01:42 EST
Reprinted from RatingsDirect

Lesson No. 1: Site-Built Homes Remain The American Dream

Lesson No. 2: Artificially Stimulating Demand May Lead To Higher Delinquencies And Defaults

Lesson No. 3: Artificially Stimulating Demand May Lower Home Prices In Certain Regions

Lesson No. 4: The Disciplined Should Survive

Differences Between U.S. RMBS And U.S. MH ABS

Difference No. 1: Some RMBS Lenders And Servicers May Have More Alternative Funding Strategies

Difference No. 2: RMBS Servicers May Have More Opportunities To Employ Loss Mitigation Strategies

Difference No. 3: The MH Lending And Servicing Industries Were More Concentrated

Difference No. 4: RMBS Loss Severities May Be Lower

Difference No. 5: RMBS Servicing Fees Cover Costs To Service

RMBS Cumulative Losses Should Remain Lower Than What MH ABS Suffered

• Current Ratings

Imagine the following scenario: Originators compete for market share by loosening underwriting standards and widening the credit spectrum to which they will lend, thereby stimulating demand for both housing and borrowing. To meet the higher housing demand, manufacturers and builders produce new homes and increase inventory.

This scenario describes not only a segment of the current U.S. residential mortgage and

housing market, but also the U.S. manufactured housing (MH) lending and building cycle in the late 1990s and earlier this decade. And that raises some interesting questions: What lessons can the residential mortgage-backed securities (RMBS) industry learn from the most recent MH asset-backed securities (ABS) cycle, and does a similar fate await RMBS investors?

Standard & Poor's Ratings Services finds four lessons that are common to the RMBS and MH ABS markets and five key differences that exist between them. These five distinctions indicate that subprime RMBS performance shouldn't suffer to as great an extent as did MH ABS performance. Thus, we expect future rating actions on investment-grade subprime RMBS to be less severe than those experienced by the 1995 to 2002 MH ABS vintages, when a combination of events prompted downgrade actions on many outstanding transactions. (For more information regarding the MH ABS cycle, see " U.S. Manufactured Housing ABS Continues to Struggle," published Aug. 2, 2004, on RatingsDirect.)

## Lesson No. 1: Site-Built Homes Remain The American Dream

Unfortunately for the MH production industry, interest rates fell earlier this decade, and with them so did Treasury yields and mortgage rates for site-built homes. Lending rates for commercial projects, such as apartment buildings, also declined. Hence, some MH borrowers faced attractive housing opportunities and alternatives.

MH borrowers typically compare monthly housing payment obligations of site-built homes, MH units, and apartments when contemplating their housing decisions. As interest and mortgage rates began to fall in 2001, MH borrowers who could purchase site-built homes with similar monthly payment terms began to do so, leading to adverse selection of the remaining borrowers in the outstanding MH securitizations. For borrowers who had little to no equity in their MH units, apartment rentals also became attractive alternatives as vacancies rose in certain markets where renters had purchased site-built homes. The shift away from MH units to site-built housing and apartment rentals exacerbated the inventory overhang that the MH production industry experienced, as the used MH units competed with new MH units for a dwindling buyer pool.

This shift away from MH and into other alternatives was significant. Although the MH and site-built housing markets are typically countercyclical, the MH industry downturn earlier this decade was more pronounced than in previous cycles. In the mid-to-late 1990s, the MH industry produced and shipped over 300,000 units per year, while in 2003 and 2004, it shipped slightly over 130,000 units annually (data sources include the Manufactured Housing Institute, the Institute for Building Technology and Safety, the U.S. Department of Commerce, and the U.S. Census Bureau). These numbers show that a marked shift in demand occurred. Ultimate recoveries on repossessed units of MH also foretold the shift in demand, as some units yielded 10% to 15% of their outstanding balance following liquidation. The U.S. site-built housing market is not expected to, nor has it ever suffered, such widescale loss severities on first-lien mortgages.

The U.S. RMBS industry may take heed, however, as more site-built home borrowers have less equity in their homes today than in the past. Should financial hardship strike, some may opt for other housing alternatives. Many MH borrowers and subprime mortgage borrowers focus more on their monthly housing payments than the interest rates being charged. As adjustable-rate mortgage (ARM) rates reset and monthly housing payments increase, site-built home borrowers may opt to reduce their payment obligations by moving to apartments that carry similar monthly rent payments.

[↑back to top]

## Lesson No. 2: Artificially Stimulating Demand May Lead To Higher Delinquencies And Defaults

Manufacturers took their cues from certain originators that were entering the MH lending sector and loosening underwriting standards (as MH loans typically carried higher coupons than did mortgages for site-built homes), as well as from various dealers, some of whom received incentives to sell the most units. Looser underwriting standards allowed borrowers who may not have otherwise qualified to purchase MH, which helped stimulate production

demand. In the mid-to-late 1990s, the MH industry produced and shipped over 300,000 units per year, which was up from the historical average of 235,000. The demand proved transitory, however, lasting until underwriting guidelines were tightened.

Had the dealer incentives differed, excessive lending may have been partially curbed, thereby depressing the demand for new units and limiting production. Some dealers and lenders sold borrowers homes and loans they could ill afford, and, not surprisingly, delinquencies and defaults increased (many of these loans had been packaged into MH ABS transactions).

Beginning in 2001, when mortgage rates began their decline to 40-year lows, a refinance boom began in the mortgage market. Industry participants, including lenders and brokers, expanded their operations and staffs to handle the increased volume and larger market. As volume, revenue, and market share grew, the participants began to rely on new products to remain competitive. By expanding the universe of borrowers to whom they would lend and introducing affordability products, while remaining competitive on pricing, lenders began to trade volume and revenues for performance and profitability. Both subprime RMBS borrowers and nonprime MH borrowers rely heavily on their continued employment to meet their monthly housing payments, as they typically have fewer reserves. So long as home price appreciation remained robust, borrowers could stave off default when faced with unemployment or other financial difficulties by refinancing the existing loan or selling the property. But as home price appreciation began to wane, exit opportunities began to diminish, and delinquencies and defaults started to rise.

While delinquencies are trending higher for the 2006 RMBS vintage than for previous vintages, slowing home price appreciation and higher mortgage rates may be more responsible for the increase than overproduction of new site-built homes. As the RMBS market contains a greater percentage of rate/term and cash-out refinancings than did the MH market, the run-up in home prices during the past few years may have contributed to the demand for new affordability products.

↑back to top

## Lesson No. 3: Artificially Stimulating Demand May Lower Home Prices In Certain Regions

MH manufacturers took several years to recognize the artificial run-up in demand, and they and the dealers were left with unsold inventory of new homes, which depressed both retail and resale prices. Rising inventories of used homes also contributed to the decline in sales prices. As borrowers defaulted on their loans, their homes were repossessed and at times transported back to dealer locations. As defaults mounted, some servicers began to sell the units at auction—in bulk, at wholesale prices—depressing recoveries.

The MH industry tracks the number of units produced by manufacturers and shipped to dealers, but it does not necessarily focus on the number of units placed onto sites. Hence, a lag occurs between declines in demand and curbs on supply. This delayed reaction contributed to the inventory overhang that plagued the MH industry between 2002 and 2005, and depressed resale and recovery values nationally.

Since MH is constructed to federal standards outlined in the HUD code, the units can be transported and situated anywhere in the U.S. However, given the costs involved with transportation and potential for damage while in transit, units are not typically moved great distances from the regional manufacturing plants. Site-built housing is built to state and local building codes and is typically not moved after construction is complete.

Sales prices for site-built homes may be more stable, as the homes are available in more areas than MH (in terms of zoning ordinances) and land is almost always included. Hence, although bulk sales may occur in the site-built market, the recoveries in many regions should be greater than what MH realized. In addition, the market value of site-built housing is more transparent, given the national real property listings found in the Multiple Listing Service database. Although the MH industry now benefits from similar services, they were not as widely available or extensively used during the most recent MH downturn. The recent run-up in site-built home prices in some regions, however, may make certain home prices more volatile in the near future. MH is an affordable housing option, and its price range is thus typically narrower than that of site-built housing.

With U.S. RMBS, fewer site-built homes are constructed on speculation, so overproduction should be more limited than with MH. However, the total number of unsold homes in inventory will be higher because the site-built market is considerably larger.

↑back to top

## Lesson No. 4: The Disciplined Should Survive

As delinquencies, defaults, and losses mounted, some lenders and servicers exited the MH industry. Two of the largest MH securitizers (originators and servicers), Conseco Finance Corp. and Oakwood Homes Inc., filed for bankruptcy protection during the fourth quarter of 2002. A consortium of buyers, including Fortress Investment Group LLC and Cerberus Capital Management L.P., bought Conseco's MH lending and servicing operations in 2003, while Clayton Homes Inc., which Berkshire Hathaway acquired in 2003, purchased Oakwood shortly thereafter.

Prudent underwriting standards allowed disciplined MH lenders to survive despite dismal market conditions. These MH lenders focused on two key areas: verification of income and employment, and providing value to the borrowers. Some lenders began to move away from low-documentation loans and required greater equity in the units through larger down payments. As MH is typically a depreciating asset when real property isn't attached, equity at the onset is critical to maintaining borrowers' willingness to meet their monthly payment obligations.

Gain-on-sale accounting may have contributed to the decline in MH lenders' financial health, as they wrote down the values of their transaction residuals when defaults and losses increased. Access to funding became more expensive and difficult as a result, sending some MH lenders into a downward spiral.

Consolidation has begun in the U.S. subprime mortgage sector, as investment banks and other parties have been acquiring mortgage originators and servicers, while other lenders have exited the subprime origination business. Subprime mortgage lenders that continue to originate have indicated that they are tightening underwriting guidelines, including requiring more income, employment, and asset verification and greater equity in the properties. We expect further consolidation and exits throughout 2007.

↑back to top

## Differences Between U.S. RMBS And U.S. MH ABS

Although the current RMBS environment resembles that of the MH industry in several respects, important differences remain. These differences will most likely have positive implications for outstanding RMBS performance, and the magnitude of downgrades and defaults should be less pronounced for this asset type. Here's where MH and RMBS part ways:

↑back to top

## Difference No. 1: Some RMBS Lenders And Servicers May Have More Alternative Funding Strategies

Securitization was the preferred exit strategy for some MH lenders, who were unable to raise financing when defaults and losses grew, rating agencies required additional credit enhancement, and investors demanded higher margins to assume the associated risks. Without additional financing, lenders couldn't originate new loans, which contributed to bankruptcy filings and exits from the industry.

Some diversified residential mortgage lenders have a variety of financing alternatives, including warehouse facilities, lines of credit, loans from other parties, covered bonds, disparate revenue streams, and strong balance sheets, and they may not be as reliant on securitization for continued operations. In addition, investment banks, hedge funds, and other parties have been acquiring or providing working capital and financing to specialty finance mortgage lenders and servicers, providing them with additional funding and liquidity.

Because many MH ABS transactions were issued off the originator's shelves, the MH lenders that securitized directly (as opposed to through banker conduits or shelves) didn't face the volume of loan repurchase requests that some subprime RMBS originators, particularly specialty finance companies, are currently experiencing. Many banker conduits have been enforcing remedies against first payment and early payment defaults by putting back the affected loans to the related mortgage originators. Although loan repurchase requirements may reduce a mortgage lender's cash reserves and working capital, such repurchases would flow through as prepayments to the related RMBS banker conduit transactions, partially mitigating losses on such loans. Repurchase requirements have so adversely affected some specialty finance companies that they have filed for bankruptcy protection. This differs from the MH lending industry, which was hobbled by a decline in investor demand for securitized MH ABS products.

↑back to top

## Difference No. 2: RMBS Servicers May Have More Opportunities To Employ Loss Mitigation Strategies

Although MH servicers employed a host of loss mitigation strategies, including offering extensions, transfers of equity/loan assumptions, and loan modifications, they had limited opportunities to refinance MH borrowers into new loans. Aggressive use of MH loss mitigation strategies may have masked poor loan performance, and the depreciating nature of the collateral may have reduced the number of available refinancing alternatives, as borrowers had little equity that could be restructured.

RMBS servicers may have additional loss mitigation tools available, as well as federal and/or state support for working with borrowers to minimize the risk of foreclosure. Many RMBS servicers are expanding their staffs and proactively contacting borrowers prior to the reset dates on ARMs (for more information regarding RMBS servicers' loss mitigation efforts, see "Subprime Loan Servicers Step Up Loss Mitigation Efforts to Avoid Foreclosures," published March 14, 2007, on RatingsDirect).

Residential mortgage originators continue to develop new loan products for borrowers who are approaching ARM resets. Fannie Mae and Freddie Mac recently announced that they are developing new loan products, which may contain reduced margins and longer fixed-rate periods for hybrid ARMs, to provide subprime mortgage borrowers with refinance opportunities. Longer-term loans and interest-only products remain popular, and market participants continue to ask Standard & Poor's about credit enhancement requirements for potential new products.

By offering rate/term refinancing or cash-out opportunities to borrowers who will prepay their existing mortgages, originators and servicers may be able to lower ultimate defaults and losses on outstanding RMBS transactions. In addition, by refinancing site-built home borrowers into mortgage products that contain affordable monthly housing payment provisions, lenders and servicers can reduce the potential for foreclosure.

↑back to top

## Difference No. 3: The MH Lending And Servicing Industries Were More Concentrated

The MH industry remains a small portion of the total U.S. housing industry (approximately 8% in 2005, according to the Manufactured Housing Institute). Hence, borrowers for site-built homes have more mortgage loan options, and originators and investors have more servicers from which to choose. Servicing transfers may occur prior to securitization, and the universe of available RMBS servicers remains larger.

Given the larger group of players and available capacity, RMBS performance shouldn't be as adversely affected as that of MH ABS, which suffered when the two largest originators/servicers filed for bankruptcy protection. Servicing capacity remains a critical distinction, as few, if any, MH servicers had available capacity to assume Conseco Finance's entire servicing portfolio. The mortgage servicing industry appears to have sufficient capacity to assume servicing transfers, as well as demand by third parties for acquisitions of servicing platforms.

Servicing is more difficult to transfer once an originator/servicer has filed for bankruptcy, as the court may determine that the servicing assets are vital to attracting potential buyers for the servicing platform or for the entity to emerge from bankruptcy.

↑ back to top

## Difference No. 4: RMBS Loss Severities May Be Lower

Given that fewer homes are built on speculation and fewer "fire sales" (bulk sales at low prices) occur in the site-built market, recoveries on outstanding RMBS transactions should be higher than what MH ABS experienced. Many of the MH ABS loans were chattel and didn't include the land (and thus were more likely to decline in value), and some were located in remote areas with less consumer demand, which also contributed to the lower recovery rates. In addition, MH units are sometimes damaged during transit and/or installation, which may further reduce recovery values.

Certain regions of the U.S. have experienced home price declines. However, the fall in MH unit prices, which were less regional and more national, as well as more rapid and more dramatic, contributed to the greater-than-anticipated losses on the defaulted loans in MH ABS transactions. Although some site-built mortgage borrowers may have less equity in their homes than borrowers in previous cycles, the impact on losses may be limited based on regional home price trends.

↑ back to top

## Difference No. 5: RMBS Servicing Fees Cover Costs To Service

Certain MH ABS transactions contained subordinated or below-market servicing fees, which were designed to increase the excess spread available to cover losses and maintain overcollateralization. As performance declined and servicing costs increased, however, some originator/servicers that used such structures may not have been able to cover their costs to service from the fees in the transactions. If they relied mostly on the securitization market for financing, they may have been left with few funding alternatives.

Currently, RMBS servicing fees are senior in the waterfall and market-rate, which should provide sufficient funding for servicers to continue following accepted servicing practices and minimize losses to the outstanding transactions.

↑ back to top

## RMBS Cumulative Losses Should Remain Lower Than What MH ABS Suffered

RMBS performance will most likely remain a function of loosened underwriting and slowing home price appreciation, whereas MH performance was affected by aggressive underwriting, depressed recoveries, the bankruptcy filings of two of the largest originator/servicers (in a smaller universe of available originators and/or servicers), and greatly reduced industry demand.

Recoveries may be the distinguishing characteristic between subprime RMBS and MH ABS performance. Recoveries plummeted for MH units and, in certain instances, losses to the securitized transaction exceeded 100% of the outstanding loan balance when principal and interest advances and servicing advances for taxes and insurance were included. We expect RMBS recoveries to be generally higher than what the MH industry experienced.

While early payment defaults and rising delinquencies remain a concern for RMBS investors, lenders have indicated that they're tightening underwriting guidelines. Although refinancing existing borrowers out of securitizations may decrease ultimate defaults and losses, the timing may be affected, as these transactions may potentially suffer back-ended defaults and losses resulting from adverse selection. However, cumulative RMBS defaults and losses should remain lower, and recoveries should be higher, than those associated with outstanding MH ABS from the 1995 to 2002 vintages. Consequently, the magnitude of rating actions for investment-grade RMBS should be less severe than the MH ABS market recently experienced.

↑ back to top

Analytic services provided by Standard & Poor's Ratings Services (Ratings Services) are the result of separate activities designed to preserve the independence and objectivity of ratings opinions. The credit ratings and observations contained herein are solely statements of opinion and not statements of fact or recommendations to purchase, hold, or sell any securities or make any other investment decisions. Accordingly, any user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision. Ratings are based on information received by Ratings Services. Other divisions of Standard & Poor's may have information that is not available to Ratings Services. Standard & Poor's has established policies and procedures to maintain the confidentiality of non-public information received during the ratings process.

Ratings Services receives compensation for its ratings. Such compensation is normally paid either by the issuers of such securities or third parties participating in marketing the securities. While Standard & Poor's reserves the right to disseminate the rating, it receives no payment for doing so, except for subscriptions to its publications. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

4/26/2008 10:38 AM

# Exhibit "AA"

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | Credit Suisse First Boston Compliance Manual. | CSFB-00053059 to CSFB-0053226; DX 506 | 402 |
| | Handwritten Notebook. | CSFB-00511852 to CSFB-00511877; PX 108 | 901, 602 |
| | List re: Credit Issues/Concerns with OHC. | CSFB-0250130; PX 133 | 901, 602 |
| | Originator / Servicer Assessment. | CSFB-00250104 to CSFB-00250114; PX 112 | 901, 602 |
| | Section G. Board of Directors/Management. | CSFB-00521153 to CSFB-00521158; PX 623 | 402, 802 |
| | Handwritten Notes re: June 17 Trial. | CSFB-00521703 to CSFB-00521706; PX 624 | 402, 802 |
| | 6/21/1999 Email from D. Muir to D. Rich and F. O'Driscoll. | CSFB-00174305 to CSFB-00174306; PX 50 | |
| | 1/10/2000 Email from F. O'Driscoll to C. Richardson. | CSFB-00174238; PX 52 | |
| | 1/10/2000 Memorandum from J. Xanthos to Credit File re: 11/19/1999 On-Site Visit. | CSFB-00250116 to CSFB-00250129; PX 54 | 402 |
| | 3/13/2000 Memorandum from James Xanthos to File re: Update on OHC. | CSFB-00250131 to CSFB-00250132; PX 134 | 402 |
| | 3/21/2000 Memorandum from J. Xanthos to File re: Update on Oakwood Homes. | CSFB-00512903; PX 53 | 402 |
| | 4/13/2000 Memorandum from B. Smith to Board of Directors re: Austin Board Meeting. | OHCLT-05175 to OHCLT-05177; DX 203 | |
| | 4/14/2000 Email from K. Serageldin to F. O'Driscoll. | CSFB-00173794; PX 55 | 402, 602 |
| | 4/17/2000 Email from J. Hinshaw to F. O'Driscoll. | CSFB-00173796 to CSFB-00173797; PX 56 | 402, 602 |
| | 5/15/2000 Email from F. O'Driscoll to J. Chrystal. | CSFB-00492624; PX 57 | 402 |
| | 5/16/2000 Email from J. Chrystal to F. O'Driscoll. | CSFB-00492624; PX 57 | 402, 602 |
| | 9/14/2000 Email from F. O'Driscoll to K. Serageldin. | CSFB-00485278; PX 59 | 402, 602, 802 |
| | 11/2/2000 Email from D. Muir to F. O'Driscoll and D. Rich. | CSFB-00170905; PX 60 | |
| | 11/27/2000 Email from G. Hunt to A. Zonca and B. Miller. | CSFB-00173581 to CSFB-00173582; PX 61 | 402, 602 |
| | 12/13/2000 Presentation to the Investment Banking Committee from J. Donovan, F. O'Driscoll, S. Menkhaus, J. Chrystal, S. Gupta, K. Serageldin, B. Miller, H. Bald and A. Zonca re: $200 Million Revolving Loan Purchase Facility. | CSFB-00205989.001 to CSFB-00205989.024; PX 110 | |
| | 12/18/2000 Presentation re: Materials Prepared for Discussion, OHC. | CSFB-00141064 to CSFB-00141069; PX 137 | 901, 602 |
| | 1/2/2001 Email from J. Xanthos to F. O'Driscoll. | CSFB-00485340; PX 64 | 402, 602 |
| | 1/9/2001 Email from T. Irwin to F. O'Driscoll. | CSFB-00512061; PX 65 | 402 |
| | 1/9/2001 Memorandum from F. O'Driscoll to D. Thornburgh and T. Irwin re: Oakwood Underwriting Standards. | CSFB-00483869; PX 111 | |
| | 2/14/2001 Email from T. Irwin to F. O'Driscoll. | CSFB-00515234; PX 140 | 402 |
| | 2/17/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00178954 to CSFB-00178955; PX 68 | 402 |

OHC_PTO_ExA.xls

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 2/26/2001 Credit Authorisation Form. Including 1/31/2001 Annual Review from J. Xanthos. | CSFB-00513799 to CSFB-00513819; PX 138 | 901, 602, 402 |
| | 4/12/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00182753 CSFB-00182754; PX 71 | |
| | 5/8/2001 Email from M. Heyse to F. O'Driscoll. | CSFB-00182807 to CSFB-00182808; PX 73 | |
| | 5/8/2001 Email from F. O'Driscoll to M. Heyse. | CSFB-00182807 to CSFB-00182808; PX 73 | |
| | 5/9/2001 Email from M. Heyse to F. O'Driscoll. | CSFB-00184168; PX 74 | |
| | 5/17/2001 Email from J. Chrystal to K. Serageldin. | CSFB-00482331 to CSFB-00482332; PX 75 | |
| | 6/5/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00184166; PX 77 | |
| | 6/6/2001 Email from F. O'Driscoll to P. Jacob. | CSFB-00154641; PX 78 | 602 |
| | 6/26/2001 Presentation to Oakwood Homes Corporation. | CSFB-00052953 to CSFB-00053034; PX 43 | |
| | 6/26/2001 Email from J. Felt to P. Jacob. | CSFB-00265232; PX 44 | |
| | 7/3/2001 Email from F. O'Driscoll to T. Connors. | CSFB-00153099; PX 79 | |
| | 7/23/2001 Email from M. Millard to F. O'Driscoll. | CSFB-00184649 to CSFB-00184650; PX 81 | |
| | 7/25/2001 Email from M. Millard to T. Connors and F. O'Driscoll. | CSFB-00514136 to CSFB-00514137; PX 118 | |
| | 8/9/2001 Presentation to Oakwood Homes Corporation. | CSFB-00052849 to CSFB-00052905; PX 46 | |
| | 8/9/2001 Email from F. O'Driscoll to J. Felt. | CSFB-00014152 | |
| | 11/27/2001 Email from G. Richter to S. Menkhaus. | CSFB-00149130; PX 88 | 602 |
| | 12/3/2001 Email from S. Menkhaus to F. O'Driscoll. | CSFB-00180026 to CSFB-00180027; PX 90 | 602 |
| | 12/13/2001 Email from J. Felt to F. O'Driscoll. | CSFB-00148970; PX 47 | |
| | 12/16/2001 Email from F. O'Driscoll to B. Smith. (With Forwarded Text) | CSFB-00055693 to CSFB-00055694 | |
| | 1/24/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00188944; PX 91 | |
| | 2/19/2002 Email from F.O Driscoll to K. Serageldin, T. Irwin and J. Xanthos. | CSFB-00478613; PX 94 | |
| | 3/2002 Oakwood Homes Discussion Materials. | CSFB-00033240 to CSFB-00033302; PX 48 | |
| | 4/2002 Oakwood Homes Discussion Materials. | CSFB-00052841 to CSFB-00052848; PX 49 | |
| | 4/25/2002 Email from F. O'Driscoll to M. McCarthy. | CSFB-00191475 to CSFB-00191476; PX 98 | |
| | 4/26/2002 Email from J. Molenkamp to F. O'Driscoll and M. McCarthy. | CSFB-00191475 to CSFB-00191476; PX 98 | |
| | 5/22/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00191543; PX 99 | |
| | 6/14/2002 BNP Paribas Equity Report. | CSFB-00363574 to CSFB-00363597 | |
| | 7/2002 Berkshire Hathaway Presentation. | CSFB-00146183 to CSFB-00146191; PX 100 | |
| | 7/24/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00192307; PX 101 | |
| | 8/12/2002 Email from B. Smith to J. Felt. | CSFB-00064305 | |

2

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 8/16/2002 Email from D. Wales to M. Standish, B. Smith, D. Muir and S. Wood. Attaching 8/19/2002 Presentation to the Board of Directors. | OHCLT-001705 to OHCLT-001750; PX 10 | |
| | 8/19/2002 Email from P. Landon to B. May, F. O'Driscoll, E. Antill, A. Kurganska and M. Schachter. Attaching Executed 8/19/2002 Engagement Letter from J. Felt to R. Smith. | CSFB-00013644 to CSFB-00013659; PX 7 | |
| | 8/19/2002 Memorandum from J. Felt, P. Landon, D. Wales, F. O'Driscoll, B. May, E. Antill, A. Kurganska and M. Schachter to B. Goodman. | CSFB-00014175 to CSFB-00014177; PX 13 | |
| | 8/30/2002 Email from P. Landon to M. Standish, B. Smith, D. Muir and S. Wood. Attaching 8/2002 Report re Responsibilities & Timetable. | OHCLT-001850 to OHCLT-001854; PX 14 | |
| | 9/29/2002 Email from D. Wales to J. Felt. Attaching 9/30/2002 Presentation to the Board of Directors. | CSFB-00034725 to CSFB-00034767; PX 16 | |
| | 10/2002 Information Presentation. | CSFB-00265172 to CSFB-00265210; PX 626 | |
| | 10/15/2002 Presentation to Lotus. | OHCLT-020578 to OHCLT-020598; PX 17 | |
| | 10/18/2002 Email from F. O'Driscoll to J. Felt. Attaching 7/2002 Berkshire Hathaway Presentation. | CSFB-00035143 to CSFB-00035153; PX 19 | |
| | 10/19/2002 Email from J. Felt to C. Rayburn. | CSFB-00035156 to CSFB-00035157; PX 20 | 402 |
| | 10/24/2002 Information Presentation. | OHCLT-02616 to OHCLT-02635; PX 628 | 402, 802, 901, 602 |
| | 11/2002 Presentation to Credit Risk Management. | CSFB-00250135 to CSFB-00250212; PX 114 | |
| | 11/5/2002 Email from J. Felt to D. Wales. | CSFB-00041156; PX 24 | 402 |
| | 11/5/2002 Email from D. Wales to J. Felt. | CSFB-00041156; PX 24 | 402 |
| | 11/7/2002 Email from J. Felt to F. O'Driscoll. | CSFB-00041143; PX 30 | |
| | 11/7/2002 Email from J. Felt to P. Landon. | CSFB-00041146; PX 28 | |
| | 11/7/2002 Email from J. Felt to E. Antill, P. Landon, B. May, F. O'Driscoll, M. Schacter and D. Wales. | CSFB-00057375 | |
| | 11/12/2002 OHC Minutes of the Meeting of the Board of Directors. Attaching Exhibit A, 11/11/2002 Memorandum from Rayburn Cooper & Durham, P.A.; Exhibit B, 11/12/2002 OHC Board Update Presentation. Exhibit C, 11/11/2002 OHC Restructuring Term Sheet. Exhibit D, Chart titled Warrant Analysis (10%). Exhibit E, Chart titled Comparable Equity Recovery Analysis. | OHCLT-002661 to OHCLT-002759; PX 1 | |
| | 11/14/2002 Email from A. Zonca to T. Irwin, J. Xanthos and R. Machlis. | CSFB-00518061; PX 147 | 602, 402, 802 |
| | 11/14/2002 Email from F. O'Driscoll to M. Millard. | CSFB-00057697; PX 123 | 802, 602 |
| | 11/14/2002 Email from M. Millard to F. O'Driscoll. | CSFB-00057697; PX 123 | |
| | 11/14/2002 Email from J. Felt to F. O'Driscoll. | CSFB-00041242; PX 33 | 802, 602 |

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 11/15/2002 Email from B. Smith to M. Millard. Attaching 11/15/2002 Letter from M. Standish to M. Hamburg. 11/15/2002 OHC Restructuring Term Sheet. | CSFB-00039307 to CSFB-00039314; PX 8 | |
| | 11/15/2002 Email from M. Millard to B. Smith. | CSFB-0514168; PX 124 | |
| | 11/15/2002 Letter Agreement from M. Standish to M. Hamburg. | CSFB-0002805; PX 9 | |
| | 11/16/2002 Email from J. Felt to B. May, E. Antili, M. Schachter and D. Wales. | CSFB-00041296; PX 36 | |
| | 11/17/2002 Email from M. Standish to F. O'Driscoll. | CSFB-00058046 | |
| | 11/19/2002 Email from J. Xanthos to F. O'Driscoll. | CSFB-00058127 to CSFB-0058128; PX 143 | |
| | 11/23/2002 Email from M. Millard to F. O'Driscoll. | CSFB-00514175 to CSFB-0514177; PX 130 | 402 |
| | 11/28/2002 Email from M. Millard to M. Standish. | OHCLT-029671 to OHCLT-029672; PX 153 | 402 |
| | 12/2002 Attachment A: Perfomance Information re: Oakwood (OMI Trust) Memo BH Finance Guaranty. | CSFB-00511879 to CSFB-0511920; PX 145 | |
| | 12/2/2002 Email from R. Dehney to J. Felt. | CSFB-00041176 to CSFB-0041178; PX 39 | |
| | 12/3/2002 Email from J. Felt to R. Dehney. | CSFB-00041176 to CSFB-0041178; PX 39 | |
| | 12/4/2002 Email from A. Zonca to J. Felt and F. O'Driscoll. | CSFB-00041166; PX 151 | |
| | 3/27/2003 Proof of Claim Filed by Credit Suisse First Boston LLC. | PX 2 | |
| | 11/16/2005 Defendants' Consolidated Responses and Objections to Plaintiff's First Set of Interrogatories. | | |
| | 12/7/2005 Defendants' First Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 12/16/2005 Defendants' Second Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 5/1/2006 Defendants' Supplemental Response to Plaintiff's Interrogatories and Document Requests. | | |
| | 11/14/2006 Defendants' Response to Plaintiff's Interrogatory No. 4. | | |
| | 11/27/2006 Defendants' Response to Plaintiff's Second Set of Interrogatories to Defendants. | | |
| | 11/29/2006 Defendants' Third Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 4/27/2007  Defendants' Supplemental Response to Plaintiff's Interrogatory No. 4. | | |
| | 4/30/2007 Expert Witness Report of Dr. Michael Tennenbaum. | DX 601 | 802 |
| | 4/30/2007 Report of Alan C. Shapiro, Ph.D.. | DX 501; PX 622 | 802 |

4

OHC_PTO_ExA.xls

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 5/31/2007 Email from A. Pfeifer to J. Goldblatt. Attaching 6/18/2007 Draft Expert Rebuttal Report of Allen M. Pfeifer. | CSFB-00523314 to CSFB-00523346; PX 630 | 802 |
| | Exhibits to Draft Expert Rebuttal Report of Allen M. Pfeifer. | CSFB-00523839 to CSFB-00523848 | |
| | 8/28/2007 Supplemental Report of Alan C. Shapiro, Ph.D. | DX 507 | 802 |
| | 2/21/2008 Email From A. Pfeifer to M. Warren, P. Wickes and J. Williamson. Attaching Bond Price Spreadsheet and Draft Outline of Rebuttal Issues Regarding the Report of Michael Tennenbaum. | CSFB-00519279 to CSFB-00519291; PX 627 | 802 |
| | 2/24/2008 Email from A. Besio to A. Pfeifer and A. Warren. | CSFB-00521719 | 802 |
| | 2/26/2008 Email from A. Besio to A. Pfeifer and A. Warren. Attaching Bond Indices Spreadsheet. | CSFB-0052133 to CSFB-00522134; PX 629 | 802 |
| | 2/27/2008 Email from A. Besio to A. Warren. | CSFB-00522199 | 802 |
| | 2/29/2008 Expert Witness Report of Thomas F. Boland. | PX 621 | 802 |
| | 2/29/2008 Expert Rebuttal Report of Allen M. Pfeifer. | PX 625 | 802 |
| | Credit Suisse 2007 Annual Report | | |
| | Supplemental Expert Witness Report of Dr. Michael Tennenbaum. | | |

5

OHC_PTO_ExA.xls

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on May 5, 2008, I

caused a copy of the ***Declaration of Whitman L. Holt in Support of Plaintiff's Consolidated***

***Answering Brief in Opposition to Defendants' Attempts to Exclude Certain Non-Expert***

***Evidence,*** to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: May 5, 2008                    CAMPBELL & LEVINE, LLC


                                      */s/ Kathryn S. Keller*
                                      Kathryn S. Keller (No. 4660)
                                      800 N. King Street, Suite 300
                                      Wilmington, DE 19801
                                      (302) 426-1900

{D0110824.1 }