## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Oakwood Homes Corporation, et al.,<br>　　　　　　　　　　　　Debtors. | Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　　v.<br>Credit Suisse (f/k/a. Credit Suisse First Boston, a<br>Swiss banking corporation), Credit Suisse<br>Securities (USA), LLC (f/k/a Credit Suisse First<br>Boston LLC), Credit Suisse Holdings (USA), Inc.<br>(f/k/a<br>Credit Suisse First Boston, Inc.), and Credit Suisse<br>(USA), Inc. (f/k/a Credit Suisse First Boston<br>(U.S.A.), Inc.), the subsidiaries and affiliates of<br>each, and Does 1 through 100,<br><br>　　　　　　　　　　Defendants. | Adversary Proceeding<br>Civil Action<br>No. 07-799 (JFF) |

## DECLARATION OF J. JUSTIN WILLIAMSON
## IN SUPPORT OF DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION IN LIMINE

I, J. Justin Williamson, declare as follows:

　　　　1.　　　I am an attorney associated with the law firm of Linklaters LLP, counsel to

Defendants in this action. I submit this Declaration in support of Defendants' Opposition to

Plaintiff's Motion in Limine.

　　　　2.　　　Attached hereto as Exhibit A is a true and correct copy of the Report of Alan C.

Shapiro, Ph.D., served April 30, 2007.

3.     Attached hereto as Exhibit B is a true and correct copy of selected portions of the Deposition of Alan C. Shapiro, Ph.D., dated September 5, 2007.

4.     Attached hereto as Exhibit C is a true and correct copy of the Expert Witness Report of Thomas F. Boland, served February 29, 2008.

5.     Attached hereto as Exhibit D is a true and correct copy of selected portions of the Deposition of Thomas F. Boland, dated March 25, 2008.

6.     Attached hereto as Exhibit E is a true and correct copy of selected portions of the Deposition of Jared Felt, dated June 15 and 16, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2008
    New York, New York


_____
J. Justin Williamson, Esq.

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, *et al.*, | ) ) ) | Case No. 02-13396 (PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) ) | |
| OHC LIQUIDATION TRUST, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Adv. Proc. No. 04-57060 (PJW) |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) ) | |
| Defendants. | ) | |

# REPORT OF ALAN C. SHAPIRO, PH.D.

**April 30, 2007**

**CONFIDENTIAL**

# Table of Contents

I.      Scope of Engagement ......................................................................................... 1

II.     Credentials ........................................................................................................... 1

III.    Basis for Opinions .............................................................................................. 3

IV.     Summary of Opinions ........................................................................................ 3

V.      Assumptions ........................................................................................................ 4

        V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty ................................. 4

        V.B    Oakwood Was Insolvent in September 2001 ...................................................... 4

VI.     Background .......................................................................................................... 4

        VI.A   Manufactured Housing Industry ........................................................................ 4

        VI.B   Business Overview of Oakwood .......................................................................... 5

        VI.C   Financial Performance of the Industry Prior to 1999 ............................................ 5

        VI.D   Industry Downturn Beginning in 1999 ................................................................ 6

        VI.E   Oakwood's Downturn and Bankruptcy ............................................................... 7

               VI.E.1  Oakwood's Financial Condition Was Deteriorating in 1999 and 2000 .... 7

               VI.E.2  Oakwood Continued to Report Significant Losses in 2001 ...................... 9

               VI.E.3  Oakwood Discontinued Its Loan Assumption Program and Reported
                       Losses in 2002 ........................................................................................ 10

               VI.E.4  Oakwood Filed for Bankruptcy in November 2002 ................................ 11

VII.    CSFB Did Not Behave In a Prudent Manner ................................................ 12

        VII.A  CSFB Had Access to Public and Private Information Concerning
               Oakwood's Financial Condition ......................................................................... 12

               VII.A.1  Investment Banks Have Unique Access to Information ......................... 12

               VII.A.2  Relationship between Oakwood and CSFB ......................................... 14

               VII.A.3  CSFB Obtained Both Public and Inside Information about
                        Oakwood's Financial Condition .......................................................... 22

        VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy
               Risk ................................................................................................................. 24

               VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial
                        Condition ........................................................................................... 24

VII.B.2 Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood ............................................................................... 26

VII.C CSFB's Own Guidelines Require a High Standard of Care to its Clients ............ 27

VII.D CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors ..................................................................... 28

VII.D.1 CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy .............................................................................. 29

VII.D.2 CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives ................................................................ 34

VII.E The Advice CSFB Provided to Oakwood was Inappropriate ............................ 35

VII.F The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition ............................ 36

VII.G CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value ........................................... 37

VIII. CSFB Had a Financial Incentive to Keep Oakwood Operating ............................ 39

VIII.A CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood .................................................................................................. 39

VIII.A.1 Fees Earned by CSFB for Underwriting Oakwood Securitizations ..... 40

VIII.A.2 Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood ................................................................................... 40

VIII.A.3 Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor ....................................................................................... 41

VIII.A.4 Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern .................................................. 41

VIII.B CSFB's Equity Interest provided it with a Financial Interest in Oakwood Continuing Operations ................................................................................ 42

VIII.B.1 Agency Conflict between Equity and Debt Holders ........................... 42

VIII.B.2 CSFB Had a Conflict of Interest with Oakwood's Debt Holders ......... 45

VIII.C Even Though CSFB was a Lender, Its Interests Differed from Those of Other Debt Holders .................................................................................. 45

VIII.D Conclusion Regarding CSFB's Incentives ......................................................... 47

## List of Tables

Table 7.1: CSFB's Roles and Fees Earned....................................................................................21

Table 7.2: Summary of Strategic Options Provided by CSFB .....................................................32

Table 8.1: Illustration of Payoffs and Probabilities of Projects ..................................................44

## List of Figures

Figure 7.1: Oakwood's Securitization Process .............................................................................17

## I.    Scope of Engagement

I have been retained by Stutman, Treister & Glatt, P.C., counsel for Plaintiff Oakwood Homes Corporation Liquidation Trust ("Oakwood Liquidation Trust"), to provide an expert opinion on whether Credit Suisse First Boston ("CSFB") performed its responsibilities in its capacity as underwriter, lender, and financial advisor to Oakwood Homes Corporation ("Oakwood") in a reasonable or reasonably prudent manner.

   This report contains my opinions on this matter, as well as the analysis and methodologies I have employed in forming my opinions. As part of my analysis, I have reviewed various materials from public sources, as well as those provided to me by counsel for Oakwood Liquidation Trust from the discovery in the litigation. The opinions and conclusions contained herein represent my current opinions and conclusions in this matter. I reserve the right to supplement or amend my opinions and conclusions in light of any new information that becomes available through discovery or other means. A list of documents on which I relied in writing this report is included in Appendix B.

## II.   Credentials

I am the Ivadelle and Theodore Johnson Professor of Banking and Finance, and past chairman of the Department of Finance and Business Economics, Marshall School of Business, University of Southern California. I received a B.A. in Mathematics from Rice University (1967) and a Ph.D. in Economics from Carnegie Mellon University (1971). Prior to joining USC in 1978, I was an Assistant Professor at the Wharton School of the University of Pennsylvania (1971-1978). I have also been a Visiting Professor at Yale University, UCLA, the U.S. Naval Academy, the Stockholm School of Economics, and the University of British Columbia.

   My teaching experience at these universities includes courses in corporate finance, international finance, international economics, corporate financial strategy, international banking, macroeconomics, and microeconomics, for which I have won several teaching awards. Additionally, I have taught in numerous executive education programs, including programs sponsored by Yale University, the Wharton School, University of Southern California, UCLA, UC Berkeley, Columbia University, University of Hawaii, University of Washington, University of Melbourne, Stockholm School of Economics, and the American Management Association.

1

I have conducted numerous in-house training and executive programs for banks, corporations, government agencies, consulting firms, and law firms in the areas of corporate finance and international finance and economics.

In October 1993, I was recognized by *Business Week* as one of the ten most in-demand business school professors in the U.S. for in-house corporate executive education programs.

My publication credits include over 50 articles in such leading academic and professional journals as the *Journal of Finance, Harvard Business Review, Columbia Journal of World Business, Journal of Financial and Quantitative Analysis, Review of Financial Studies, Journal of Business, Journal of International Money and Finance, Financial Management, Management Science,* and *Journal of Applied Corporate Finance.* In 1988 I was cited as one of the "100 Most Prolific Authors in Finance." I was also cited in 2005 in the *Journal of Finance Literature* as one of the most frequent contributors to the academic finance literature over the past 50 years. Another study published in 1991 ranked me as one of the most prolific contributors to international business literature.

My article "Corporate Stakeholders and Corporate Finance," for which my co-author Brad Cornell and I received the 1987 Distinguished Applied Research Award from the Financial Management Association, is the most frequently cited article published in *Financial Management* since 1985.

I am a member of the American Finance Association, the American Economic Association, and the Financial Management Association.

I have published several books. These books include my textbook, *Multinational Financial Management* (John Wiley, 8th ed., 2006), which is in use in most of the leading MBA programs around the world; *Modern Corporate Finance* (Macmillan, 1990), cited by the *Journal of Finance* as potentially the "standard reference volume in corporate finance;" *Foundations of Multinational Financial Management* (John Wiley, 5th ed., 2005); *International Corporate Finance* (Ballinger, 1989); *Capital Budgeting and Investment Analysis,* (Prentice-Hall, 2005); and *Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000), coauthored with Sheldon Balbirer. In addition, I have published two monographs, *International Corporate Finance: Survey and Synthesis* and *Foreign Exchange Risk Management.*

I have served as a director of the American Finance Association, the Academy of International Business, and the Western Finance Association.

Among the various government agencies and departments for whom I have consulted are the FBI, Internal Revenue Service, Federal Home Loan Bank System, Resolution Trust Corp., Department of Justice, Securities and Exchange Commission ("SEC"), Department of Energy, California Franchise Tax Board, New York State Department of Taxation and Finance, Massachusetts Department of Revenue, Alabama Department of Revenue, and Federal Deposit Insurance Corporation.

I have also consulted with numerous firms and banks, involving analyzing various aspects of financial markets, financial institutions, and securities, including such matters as pricing stocks and bonds, corporate valuation, mergers and acquisitions, value-based management, and derivatives.

I also frequently serve as an expert witness in cases involving valuation of businesses and debt and equity securities, economic damages, economic substance, international finance, takeovers, financial analysis and accounting, and transfer pricing.

My curriculum vita is included in this report as Appendix A.

## III.  Basis for Opinions

My opinions are based on my professional knowledge and experience, as well as on a review of documents and information relevant to this matter and analyses described in this report and assumptions I have been asked by counsel to make. Documents and other materials that I have relied on as a basis for my opinions are cited in this report; all documents and materials are of the type typically relied on by experts or financial economists in their research. Assumptions and analyses that form the bases for my opinions are described in this report.

The opinions offered in this report are subject to refinement or revision based on new or additional information that may be provided to or obtained by me in the course of this matter.

## IV.  Summary of Opinions

My opinions in this matter are as follow:

- *CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.* CSFB's various relationships with Oakwood afforded it access to information, both public and inside, about Oakwood's financial condition. Given Oakwood's financial condition and in line with its fiduciary responsibility to Oakwood and its creditors and its own guidelines and principles of conduct, CSFB should have advised Oakwood to reduce its operations or file for bankruptcy prior to its engagement as a financial advisor for restructuring purposes in August 2002.

3

- ***CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.*** These incentives came in two forms: 1) CSFB continued to earn fees for the underwriting, lending, and advising services it provided as long as Oakwood continued as a going concern; and 2) due to its equity interest in Oakwood through warrants issued as a result of its participation in the loan purchase facility, CSFB stood to benefit if Oakwood did recover from its dire financial position. At the same time, even though CSFB was a lender to Oakwood, its interests differed from those of other Oakwood debt holders because its exposure to Oakwood was protected from the threat of bankruptcy. Thus, as a bankruptcy-insulated lender with an equity interest in the borrower, CSFB was exposed to the upside of an Oakwood recovery, no matter how remote the possibility, while insulated from the costs of a futile turnaround attempt. And, due to the potential of continued securitizations and other fees, CSFB stood to profit from the turnaround attempt even if it was not successful.

## V.    Assumptions

### V.A    CSFB Owed Oakwood and its Creditors a Fiduciary Duty

I have been asked by counsel to assume that CSFB owed Oakwood and its creditors a fiduciary responsibility.

### V.B    Oakwood Was Insolvent in September 2001

I have also been asked by counsel to assume that Oakwood was insolvent in September 2001. This assumption is based on the expert report of Dr. Michael Tennenbaum.

## VI.    Background

### VI.A    Manufactured Housing Industry

The manufactured housing industry consists of companies that design and manufacture pre-fabricated and modular single- and multi-family homes. Manufactured homes are constructed in a controlled factory environment and include varying types that are designed for long-term residential use. Units are transported to a site and installed subsequent to being built in a factory. Top industry competitors include Clayton Homes, Champion Enterprises, Fleetwood Enterprises, and Oakwood Homes (which has subsequently been acquired by Clayton Homes). In addition to providing manufacturing and retailing services, some of these companies also assist homebuyers with financing needs. A number of companies, including Oakwood, have vertically integrated their manufacturing, retailing, and financing services.

## VI.B  Business Overview of Oakwood

Oakwood was founded in North Carolina in 1946. The Company went public in 1971 and experienced consistent growth throughout the 1970s and 1980s. Oakwood designed, manufactured, and marketed manufactured and modular homes and financed the majority of its sales. In 2000, the Company operated 32 manufacturing plants in 12 states and sold its homes through 371 company-owned-and-operated sales centers and 575 independent retailers. The Company also sold insurance to its customers and assumed the related underwriting risk through its captive reinsurance business.[1]

In 1999, Oakwood was the largest U.S. retailer of manufactured homes and the third-largest manufacturer. Oakwood's financial services unit, Oakwood Acceptance Corporation ("OAC") securitized its loans and generated revenue through servicing fees as well as interest spreads.[2] Thus, Oakwood operated under a fully vertically integrated business strategy that offered its customers one-stop shopping by providing manufacturing, retailing, and financing services.

## VI.C  Financial Performance of the Industry Prior to 1999

The manufactured housing industry has experienced a cyclical pattern of growth and decline over the past several decades. In the 1970s and early 1980s, steady growth occurred throughout the industry. However, in the mid 1980s, manufactured home companies began experiencing steep declines in their earnings as the result of changing economic and financial conditions: "Beginning in 1984, manufactured housing shipments posted eight years of consecutive declines, falling over 40% to a 1991 trough of 170,713 units. The significant downturn was due to a severe recession in the oil patch economy and a lack of available financing due to the savings and loan crisis. During this period, the number of manufacturers declined to 85 from 170."[3]

The manufactured housing market experienced a resurgence in the 1990s, due in part to the rising cost of conventional homes, the general economic recovery from the 1991 recession, and favorable financing terms. In the early 1990s, manufactured housing shipments grew at a five-year compound annual rate of 16.3 percent. In addition, increased competition among financing companies resulted in manufactured housing loans with down payments of 5 percent and longer maturities of 20 years to 25 years. As well, lenders effectively lowered credit standards by reducing

---

[1] Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

[2] CSFB, Equity Research. "Manufactured Housing Industry." January 13, 1998. p. 16.

[3] *Ibid.*, p. 2.

the minimum acceptable level of credit worthiness.[4] Thus, the resurgence stemmed largely from a strong overall economy and greater availability of financing, as well as from improved product offerings by industry manufacturers.

All of the major competitors enjoyed high returns on invested capital and extremely attractive valuations. Throughout the 1990s, shares of manufactured housing companies outperformed the Standard & Poor's ("S&P") 500 Index; in particular, an index of manufactured housing companies experienced annual growth rates in stock prices of 40 percent, 26 percent, and 29 percent over three-, five-, and ten-year periods, respectively.[5] Also, the favorable effects of economies of scale resulted in consolidation within the industry. In 1996, the largest four companies, Champion, Fleetwood, Oakwood, and Clayton, accounted for almost half of all industry shipments.[6]

The year 1998 was a particularly auspicious year for the industry. Shipments of manufactured houses had increased by 5.5 percent over 1997, and the pace of the increase was accelerating (December 1998 shipments were 10.9 percent higher than in December 1997). Strong job growth, low interest rates, and the continuing desire for home ownership supported continued growth.[7] The significant upturn in the overall industry throughout the 1990s led manufactured housing companies to drastically expand the number of manufacturing production sites and retail outlet stores. However, as discussed below, as conditions changed near the end of the decade, overcapacity began to plague the industry.

## VI.D   Industry Downturn Beginning in 1999

After a dramatic increase in manufactured housing demand throughout the 1990s, sales began to decline by 1999, due largely to tightening lending standards.[8] Aggressive lending practices that emerged in the 1990s began to catch up with the industry. Delinquency and repossession rates rose dramatically, forcing lenders to tighten their lending criteria by increasing both credit standards and mortgage interest rates. Tighter standards led to lower demand. The industry's poor performance also stemmed from problems in the securitization market. Lenders were engaging in aggressive underwriting and accounting practices, which translated into paying more to have their loans securitized.[9]

---

[4] *Ibid.*
[5] *Ibid.,* p. 7.
[6] *Ibid.,* p. 3.
[7] Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 1.
[8] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[9] Arnold and Bleichroder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999. p. 2.

The reduction in demand led to an industry-wide excess-inventory problem. Manufacturers had expanded too quickly to support this adjustment in demand, leading to overcapacity of manufactured housing plants. Likewise, retailers had purchased too much inventory. By November 1999, manufactured housing shipments had dropped 14.7 percent compared to the previous November, and analysts projected a 7.5 percent decline for the 1999 calendar year.[10]

The pace of the decline in shipments accelerated in the following months. In March 2000, for example, shipments of manufactured homes had decreased by 23 percent from March 1999 as manufacturers continued to cut back production in response to deteriorating demand.[11] Several companies began closing retail outlets because they could not secure inventory financing as a result of many consumers failing to qualify for loans. "While [industry] stocks ... [had] been inexpensive for some time, [Arnold & Bleichroeder] believed the bad news had not yet stopped,"[12] recommending against purchasing stocks in the manufactured housing industry.

By the end of 2000, companies began responding to the sluggish demand by closing plants or exiting the industry altogether. By November 2000, manufacturers had closed at least 50 plants and capacity had declined by 15 percent since the beginning of the year.[13] Nearly 800 retailers had exited the industry, with another 1,000 expected to follow.[14] Although many hoped the industry would reach the bottom of its downturn in late 2000, the industry had still failed to rebound by 2002.

## VI.E    Oakwood's Downturn and Bankruptcy

### VI.E.1    Oakwood's Financial Condition Was Deteriorating in 1999 and 2000

Like other companies in the manufactured housing industry, Oakwood enjoyed tremendous growth in the 1990s. While it experienced greater growth than many of its competitors during that time, Oakwood's financial condition and operations also suffered more than most during the industry downturn.

---

[10] Arnold and Bleichroeder, Inc. Global Viewpoint. Manufactured Housing: November. "November Shipment Fell Nearly 15% - Bad News Continues." January 13, 2000.
[11] Arnold and Bleichroder, Inc. Global Viewpoint. Manufactured Housing: March. "Shipments Dropped 23% This Month." April 28, 2000. p. 1.
[12] *Ibid.*
[13] Amilda Dymi. National Mortgage News. "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.
[14] *Ibid.*

By June 1999, Oakwood's retail sales had dropped 16 percent on a per-home basis while total dollar sales dropped 10 percent, on a year-over-year basis. The Company's inventory had increased more than any of its competitors. With higher inventory per dealer and lower sales per outlet, Oakwood's inventory days outstanding increased by 57 percent year-over-year.[15]

The Company's earnings and valuation declined dramatically. In the second quarter of 1999, Oakwood took a $45 million earnings charge because of higher-than-expected defaults and refinancings on its mortgage loans. With a market value of $600 million, the Company's share price dropped 52 percent over a 12-month period to about $12 per share. The credit-rating agencies also reacted to Oakwood's precarious financial condition; Moody's downgraded the junior tranches of some of the company's asset-backed securities ratings.[16]

These trends continued in the following quarters. In September 1999, Oakwood's inventory per outlet was up 13 percent year-over-year. The increase was attributed to lower-than-expected sales. The Company responded by closing three plants and lowering manufacturing rates. In addition, Oakwood significantly discounted prices and mortgage rates in hope of reducing its inventory.[17]

In January 2000, Oakwood's $300 million in long-term debt traded for around 50 cents on the dollar, causing some analysts to believe that "Oakwood's foundation had sunk deeper into the distressed pit and that there was not much to buttress it."[18] With its financial condition spiraling downward, the Company struggled to maintain its operations. Oakwood was in a liquidity crisis, and it tried to stay above water until overall industry conditions could rebound.

However, in November 2000, an article in the *Winston-Salem Journal* reported that "if there is a light at the end of the tunnel, Oakwood Homes Corporation does not expect to see it for a while." In particular, Oakwood lost $82.9 million in the fourth quarter of 2000 from its excessive retail outlets and high inventory levels. This was the fifth consecutive quarter in which Oakwood lost money. During calendar year 2000, Oakwood's stock price fell 86 percent. In fiscal year ("FY") 2000, Oakwood reported a net loss of $121 million, compared to a net loss of $31.3 million in 1999. On November 28, 2000, Oakwood's stock price closed at 56 cents per share on the New York Stock Exchange, raising the possibility that it would be de-listed.[19]

---

[15] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

[16] Shane Kite. Asset Sales Report. "Oakwood: Earnings halved, ABS roots intact." June 28, 1999. Vol. 13. Issue 26.

[17] CSFB. Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

[18] Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

[19] Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

Oakwood's outlook became more precarious given that no industry upturn was expected in the near future. Robert Curran, a financial analyst at Merrill Lynch Global Securities, stated that "the manufactured housing industry would continue to suffer into spring 2001, if not longer."[20] Mr. Curran reasoned that higher lending standards and interest rates were restricting demand for an already-overbuilt market. In addition, loan foreclosures and repossessions were diminishing demand for new homes.[21] These predictions turned out to be correct as Oakwood continued to suffer losses throughout 2001.

### VI.E.2 Oakwood Continued to Report Significant Losses in 2001

In the first quarter of 2001, Oakwood reported losses of 91 cents per share. Duane Daggert, Oakwood's President and Chief Executive Officer at the time, stated that "we expect the current difficult market conditions to continue, possibly into next year."[22] With little hope of a recovery any time soon, Oakwood shares were trading at approximately $1.40 per share in late January 2001. The second quarter of 2001 affirmed Mr. Daggert's expectations. Oakwood lost $28 million, more than double its $12 million loss during the same period the year before. Given that Oakwood financed most of its home sales, the Company was widely exposed to buyers who were unable to continue to make mortgage payments.[23] By the fourth quarter of 2001, Oakwood lost $49.5 million, or $5.24 a share. In all, the Company lost $176 million, or $18.68 per share, in fiscal year 2001. Not only was this loss greater than its previous fiscal year loss, it was also the third straight fiscal year for which Oakwood reported a loss.[24]

---

[20] *Ibid.*

[21] *Ibid.*

[22] Amy Joyner. Greensboro News & Record. "Oakwood Homes Loses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

[23] Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

[24] Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9

### VI.E.3 Oakwood Discontinued Its Loan Assumption Program and Reported Losses in 2002

In the first quarter of 2002, Oakwood reported a loss of $1.05 per share compared with a loss of $5.36 per share the previous year. Delinquencies on Oakwood-originated contracts rose to 6.7 percent compared with 5.8 percent a year before. Likewise, repossessions rose 25 percent from the prior year.[25] By this time, Oakwood's stock was trading at less than a third of its book value and CSFB research analysts believed the current valuation reflected a more dismal outlook.[26]

In the second quarter of 2002, Oakwood reported operating losses amounting to $6.25 per share. While wholesale sales increased somewhat, retail sales declined 20 percent, resulting in a 7 percent overall decline in total sales. Provisions for credit losses also increased to $25 million compared with $2.3 million the year before, $20.4 million of which was associated with its Loan Assumption Program ("LAP"). The Company's earnings before income and taxes (EBIT) margin declined to -18.7 percent versus -8.9 percent from 2001. Oakwood also experienced a loss of $2.2 million associated with a $156 million securitization.[27]

By May 2002, CSFB research analysts noted "the uncertainty in the industry with respect to how long it drags along the bottom before realizing any meaningful rebound."[28] Oakwood's financial condition still suffered from increases in its delinquency and repossession rates. With respect to the Company's balance sheet, Oakwood had about $41 million in short-term debt outstanding, $25.9 million in cash, and $322.9 million in long-term debt. Oakwood also recorded pre-tax charges of $1.2 million relating to the impairment of the value of certain retained interests in loan securitizations. The Company took a similar charge of $0.4 million in the second quarter of 2001.[29]

In July 2002, Oakwood terminated its LAP after significantly increasing its use in 2001 and early 2002. The Company used the LAP mainly to avoid the high costs associated with repossession, including refurbishment costs, relocation costs, and costs associated with forced eviction. Under the LAP, Oakwood would arrange for new mortgagees to assume mortgages that were in default instead of repossessing the home. Oakwood would offer a borrower in default an opportunity to assign its mortgage to another borrower with a credit profile similar to the current

---

[25] CSFB. Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.
[26] *Ibid.*
[27] CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002. p.1.
[28] *Ibid.*
[29] *Ibid.*, p. 2.

borrower. The delinquent loan would remain classified as such until a qualified borrower was found, and would then become re-aged. The payments during the delinquent months would be advanced by the servicer and the new mortgagee would then be required to pay all of the back payments from the original borrower, thus reimbursing the servicer.

For the nine-month period ending the second quarter of 2002, the mostly cash LAP expense had grown to $51 million. Oakwood could not afford this cash cost and thus terminated the LAP. In so doing, it passed much of the expected future losses to the bondholders. With the discontinuation of the LAP, all new problem loans were classified as repossessions.

In the third quarter of 2002, Oakwood's retail sales continued to drop. Oakwood reported an operating loss of $1.29 per share compared with a loss of $6.92 the year before. Two non-recurring expenses totaling $100.8 million were recorded, $86.5 million of which consisted of charges related to the curtailment of Oakwood's LAP. Thus, Oakwood reported an earnings loss of $12.61 per share. Future credit losses were also expected from Oakwood's plan to sell off inventory through lower-margin wholesale channels rather than through retail channels.[30] By September 2002, Oakwood shares had lost approximately 99 percent of their value over the course of a three-year period.[31] On October 25, 2002, CSFB dropped its coverage of Oakwood due to its lack of liquidity and small market capitalization.[32]

### VI.E.4 Oakwood Filed for Bankruptcy in November 2002

On November 15, 2002, Oakwood filed for Chapter 11 bankruptcy. At this time, Oakwood had structural problems with its loan portfolio and was out of cash; Oakwood's board of directors and senior management made the decision to file for bankruptcy.[33]

Between 1999 and 2002, many factors caused both Oakwood and the industry to suffer a major financial downturn, including overcapacity, excessive number of retailers, increasing number of repossessions and lenders exiting the industry. During his testimony, Douglas Muir, Oakwood's Chief Financial Officer, stated several reasons for the decline in Oakwood's performance that led to its Chapter 11 filing. First, he believes there was "a deep and sustained downturn" in the industry, during which shipments from manufacturers to retailers declined by 60 percent from their peak in 1998. This decline was causing lenders to exit the business. He

---

[30] CSFB. Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

[31] Monte Burke. Forbes. "Trailer King." September 30, 2002. Vol. 170, Issue 6.

[32] CSFB. Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

[33] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 9.

believes the downturn could still be occurring. Second, Mr. Muir believes Oakwood built too many sales centers and factories and expanded at a rate that it could not manage. Third, he cited insufficiently stringent underwriting standards.[34] Finally, there was an economic recession during this period. Mr. Muir gave an example of North Carolina textile workers losing 30,000 jobs over a two- to three-year timeframe. Because a large number of those workers lived in mobile homes, a large number of loans defaulted.[35]

## VII.    CSFB Did Not Behave In a Prudent Manner

In this section I demonstrate that CSFB did not behave in a prudent manner in its dealings with Oakwood given its fiduciary responsibilities. I first establish that CSFB was, as a result of its multiple relationships with Oakwood, in a unique position to know Oakwood's true financial condition (as noted previously, I have been asked to assume that Oakwood was insolvent in the fall of 2001). I then show that CSFB's actions with respect to its own risk exposure to Oakwood suggest cognizance of Oakwood's bankruptcy risk. Finally, I demonstrate that CSFB's advice and conduct with respect to Oakwood was inappropriate given the Company's financial condition and violated its fiduciary duty to Oakwood and its creditors as well as its own guidelines.

### VII.A    CSFB Had Access to Public and Private Information Concerning Oakwood's Financial Condition

Among its roles, CSFB acted as Oakwood's lender, financial advisor, and underwriter. As such, CSFB had access to information about the Company's true financial condition. In this section I discuss the access to information that investment bankers enjoy, review the investment banking activities and other functions performed by CSFB for Oakwood, and demonstrate that CSFB had access to both public and inside information concerning Oakwood's financial situation and outlook.

#### VII.A.1    Investment Banks Have Unique Access to Information

An investment bank is a financial intermediary that performs functions for the issuer of securities including underwriting and advising. By providing these services, investment banks necessarily have access to information about the financial conditions of their clients.

---

[34] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006, p. 59.
[35] *Ibid.*, p.183.

The role of the investment bank begins with pre-underwriting counseling to the issuer and continues after the distribution of securities in the form of advice.[36] The advising function has value to the issuer because investment banks have better information about the capital market than does the issuer.[37]

Before an investment bank can commence with issuing securities, it must first conduct a due-diligence investigation of the issuing firm it represents. This investigation begins with inquiries into the issuer's business and operations consisting of an investigation into the issuer's industry and discussions with the issuer's management.[38] This study entails gathering and assessing all essential and relevant information that could have a bearing on the valuation of the securities the investment bank is seeking to place. Such information would include a review of the company's basic business strategy and competitive advantages, as well as evidence of the company's success in pursuing its business strategy. During its discussions with management, the investment bank is provided with information management believes should appear in the registration statement.[39] The investigation is designed to give the investment banker a reasonable basis to believe that the key representations made to investors are true, accurate, and complete, so that investors can make informed decisions after understanding the risks and returns of the securities they are purchasing. It is also designed to enable the investment bank to assess whether management is capable of achieving its prospective goals. The underwriter's duty is to independently verify the information that the issuer's management provides to it.[40]

As underwriter, the investment bank is also responsible for examining the issuer's current financial health and future financial prospects. Toward this end, the investment bank must review the issuer's financial statements, which in turn requires scrutinizing the independent auditor's report and letters to management to determine whether all potential problem areas were uncovered during the audit. In addition, it should examine general financial issues of the issuer, including profits and revenue, budget concerns, and the internal audit controls the issuer has in place; this review provides the investment bank with an in-depth understanding of the issuer's overall financial condition.[41]

---

[36] "Investment Bank," Investopedia website. http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.
[37] David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982, p. 1.
[38] FindLaw, "Underwriter Due Diligence in Securities Offerings," FindLaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*

To thoroughly assess a company's financial condition, investment banks rely on both publicly available information and inside information supplied by the client. Investment banks also interact with other financial intermediaries to obtain all publicly available information. These institutions include credit-rating agencies, lawyers, accountants, other investment banks, and market analysts.

In addition to providing underwriting services, investment banks provide advice and assist corporate clients with mergers and acquisitions, reorganizations, and strategic matters such as leveraged buyouts and joint ventures. Other activities involve structuring and implementing transactions as a way to manage the variety of risks a client is exposed to. These transactions include structured or project finance through the use of derivatives and off-balance-sheet transactions. In addition, investment bankers aid their clients in obtaining funding on more desirable terms, thereby providing liquidity and investment opportunities, as well as facilitating risk dispersion. As discussed below, the functions CSFB performed for Oakwood went beyond those associated with underwriting securitizations; CSFB also served an advisory role.

### VII.A.2   Relationship between Oakwood and CSFB

CSFB served as Oakwood's investment banker and thus enjoyed the type of access to information described previously. In fact, the services provided by CSFB to Oakwood consisted of assisting the Company in raising funds through the capital markets by underwriting securities, acting as a lender for Oakwood's loan purchase facility, and serving as Oakwood's financial advisor.

### VII.A.2.a   Role as Lead Securities Underwriter

CSFB began to serve as Oakwood's securities underwriter in 1994. Over the next eight years, CSFB wrote more than \$7.5 billion in Oakwood securities over approximately 25 securitizations.[42] As Oakwood's lead securities underwriter, CSFB's roles were

- Advising and assisting Oakwood's management and directors in setting the terms of the securities sales;
- Conducting reasonable due diligence into the accuracy of the written representations of the prospectuses;
- Testing the financial information contained in the prospectuses; and
- Facilitating the sale of the securities.

---

[42] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

Fiachra O'Driscoll, a Managing Director of CSFB's Asset Finance Group, stated that CSFB's role as Oakwood's lead securities underwriter entailed the structural and financial engineering of Oakwood's securitizations.[43] In particular, the structural and financial engineer's role was to

> [D]o the analysis of the loans themselves, the characteristics of the loans, the performance of the loans, to do the analysis of the securities to put together scenarios for those securities that are commonly referred to in the industry as what's known as computational material.[44]

In the course of a mortgage securitization, CSFB would then approach the rating agencies and explain the nature of the transaction to be conducted. CSFB would "prepare the rating agencies for the rating process and [would] prepare materials which included circulars, red herring, sales points and sales materials for purely internal consumption."[45] The information that CSFB supplied to the rating agencies entailed a summary form of information on the loan pool itself, which included, among other things, the principal balances and weighted average coupon rates on the loans, as well as the loan-to-value ratio on average for all of the loans. In addition, CSFB supplied information on the performance of Oakwood's past securitizations with a summary of prepayment, delinquency, and loss performances, as well as changes in the coupon rate and in the characteristics of the loan pools in question.[46] Finally, on completing analysis of the loan portfolios and working closely with the credit rating agencies, Mr. O'Driscoll explained that the role of the asset securitization team was to

> [E]nsure that the transaction was put together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investors questions were answered, to make sure that the legal structure of the mortgage securitization itself worked as it probably – or properly should do, and to make sure that the transaction got closed, processed, and that it was dealt with in the after market in a timely fashion.[47]

---

[43] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 29, 2006, Vol. 1. p. 13.
[44] *Ibid.*, p. 16.
[45] *Ibid.*, p. 17.
[46] *Ibid.*, p. 21.
[47] *Ibid.*, p. 18.

In 2001 and 2002, CSFB sold and underwrote approximately $850 million in real estate mortgage investment conduit ("REMIC") certificates. The securitization process was an integral part of Oakwood's business model. In addition to selling the manufactured homes to a customer, as discussed, Oakwood also typically provided the customer with financing for the home. To provide the liquidity it needed to offer the mortgage loans, Oakwood would bundle these loans and securitize them. Typically, Oakwood would accumulate between $150 million and $200 million worth of mortgages before engaging in the securitization process and selling REMIC certificates to the public. REMICs are mortgage-backed securities ("MBSs"), a class of asset-backed securities ("ABSs"), that are pass-through securities in which mortgages are pooled, securities are issued, and investors receive a pro rata share of principal and interest payments paid by the homeowners. In particular, investors in the Oakwood-issued REMICs were receiving their share of the principal and interest payments paid by the homeowners who purchased and financed their homes through Oakwood. Therefore, the riskiness of these securities was directly related to the credit-worthiness of these homeowners. The ability to finance the sales of its manufactured homes was critical to Oakwood's integration strategy, as it generated the liquidity necessary to continue financing the homes it was selling and enabled Oakwood to maintain its competitive position.[48]

As discussed, CSFB was responsible for underwriting these REMICs. As part of this process, Oakwood provided CSFB with inside information, including the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectus for an impending securitization. CSFB also provided the credit-rating agencies with enough information to obtain bond ratings for each class of the issued securities.

### VII.A.2.b   Role as Provider of Loan Purchase Facility

In February 2001, CSFB became a secured lender to Oakwood via the $200 million "Warehouse Facility." Prior to February 2001, Enterprise Funding Corporation, a Bank of America affiliate, acted as lender to Oakwood by purchasing these notes from the Warehouse Trust. In February, Bank of America decided not to renew the Warehouse Facility, and CSFB assumed the role as lender to Oakwood by purchasing the notes from the Warehouse Trust. The Warehouse Trust was vital to providing liquidity for Oakwood's securitization business.

---

[48] Foothill Interoffice Memorandum. Credit modification request between Oakwood and Foothill. November 26, 2002. p. F-658.

This Warehouse Facility was another integral part of Oakwood's business because it provided the temporary liquidity Oakwood needed to securitize the loans. In essence, the Warehouse Facility was like a revolving line of credit. As the lender to Oakwood, CSFB purchased short-term notes from Oakwood. Oakwood used the funds it received from selling these notes to CSFB to originate the loans to its customers. As discussed, after accumulating a pool of mortgages valued between $150 million and $200 million, Oakwood proceeded with its securitization process, with CSFB as its underwriter. Upon receiving the funds from the securitization, Oakwood would pay off the outstanding notes purchased by CSFB. Figure 7.1 illustrates this process. Because the Warehouse Facility provided the temporary liquidity Oakwood needed to originate the loans to its customers, if CSFB did not take over the role as lender, its securitization business would have immediately collapsed.

**Figure 7.1: Oakwood's Securitization Process**



### VII.A.2.c  Role as Financial Advisor

While acting as an underwriter and lender, CSFB also served as a financial advisor to Oakwood. According to Myles Standish, Oakwood's Chief Executive Officer, prior to signing the Financial Advisory Services agreement on August 19, 2002, CSFB's role was an advisor to Oakwood's overall financial and liquidity condition.[49] Likewise, Clarence Walker, a thirty-one year member of Oakwood's Board of Directors, stated:

---

[49] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 13.

I know that there was a point in time when the board approved a specific contractual arrangement with CSFB, but that was fairly late in the game and I have the sense that CSFB was providing advice both to the audit committee and the board prior to that. The audit committee looked to CSFB for some advice relating to the model that [Oakwood was] using to evaluate the repossessions and the securitizations.[50]

Jared Felt, Director of CSFB's Restructuring Group, confirmed that CSFB acted as advisor to Oakwood prior to formally being engaged in that role, testifying that "prior to being engaged [as a formal financial advisor], [CSFB] was working to provide ideas and to provide [Oakwood] with [CSFB's] best advice."[51]

During its relationship with Oakwood, CSFB provided financial advice and presented Oakwood with certain business strategies to help the Company overcome its precarious financial position. CSFB assisted and advised Oakwood on a number of financial and business-related issues aside from its roles as an underwriter of securitizations and secured lender. Prior to CSFB's formal engagement as Oakwood's financial advisor, Douglass Muir noted that

[t]here were a number of occasions when people from CSFB outside the investment banking side, for example, perhaps from the investment banking side or the financial advisory side came and talked to us about ideas. These were not engagements where there was an engagement letter and they were getting a fee. [CSFB would] just come down and say hey, we've been thinking about you. Here's an idea. Why don't you consider this.[52]

Mr. Muir also testified that Oakwood regularly solicited feedback from CSFB with respect to any significant action taken by the Company:

It was not unusual and, in fact, it was practice for me anytime [Oakwood] made any substantive business decision that might have a material impact or even a less than material but significant impact on anything having to do with loan originations, the ABS program, loan servicing, it was my practice always to inform CSFB of what we were doing and why we were doing it and solicit feedback. So to the extent that's weighing in, yeah, [CSFB] sure did. [CSFB was] asked to weigh in.[53]

---

[50] Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006, p. 73.
[51] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006, p. 89.
[52] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1, p. 64-5.
[53] *Ibid.*, p. 194-5.

18

Furthermore, CSFB advised Oakwood on issues relating to the Company's credit standards. In an attempt to reduce its defaults rate and improve the collateral of Oakwood's subordinated notes, CSFB consulted Oakwood regularly with respect to ways in which the Company could tighten its lending standards. As Mr. Muir stated:

> So in the event that someone was thinking about making a decision that affected which customers got approved and which didn't or the terms under which loans were originated in terms of down payment, interest rate, credit score, real property versus personal property, [Oakwood] would often consult with CSFB on that to get their view on how that would affect the market's perception of the collateral.[54]

Aside from attempting to help Oakwood reduce its levels of defaults and repossessions in the Company's securitization portfolios, CSFB assisted the Company in other general business issues such as the condition of Oakwood's balance sheet. Jared Felt stated that CSFB was "initially trying to solicit [Oakwood's] business and in the process of doing that, trying to help them understand creative ways to address their balance sheet issues that we saw."[55] Furthermore, Mr. Felt stated that CSFB was "trying to provide [Oakwood] with good ideas primarily and also hoping to gain their trust so that they would work with us as opposed to someone else."[56] In response to being asked how CSFB's advisory role changed subsequent to its formal engagement, Felt testified that "then of course [CSFB] shifted from an idea generation mode to more of an active role in trying to help [Oakwood] address their needs."[57]

CSFB provided financial advice and assistance to Oakwood both before and after it was engaged as a financial advisor. Although CSFB did not begin earning fees specific to its role as a financial advisor until after its formal engagement with Oakwood, the Company still relied on CSFB's representations and assistance prior to that time as financial advice. In describing the long-standing relationship between Oakwood and CSFB, Mr. Standish asserted that "certainly there was a lot of trust, a lot of loyalty between the two entities."[58] In light of CSFB's advice and assistance prior to and subsequent to its formal engagement with Oakwood as a financial advisor, the parties created an extra-contractual financial advisory relationship.

---

[54] *Ibid.*, p. 45.
[55] Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 15, 2006, p. 64.
[56] *Ibid.*, p. 86.
[57] *Ibid.*, p. 89.
[58] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006. Vol. 1, p. 47.

### VII.A.2.d    Role as Financial Advisor for Restructuring Purposes

As discussed, on August 19, 2002, CSFB became Oakwood's exclusive restructuring and financial advisor pursuant to the Financial Advisory Agreement (the "Agreement") between Oakwood and CSFB.[59] Upon being asked as to why Oakwood decided to retain CSFB as its financial advisor for restructuring purposes, Mr. Muir responded that "[CSFB] had a very, very long history with the company going back to 1994 ... We liked them. We trusted them."[60] According to the Agreement, Oakwood retained CSFB as its exclusive financial advisor by fulfilling the following services:

- Assisting Oakwood in its evaluation of certain strategic alternatives and possible means of execution;

- Assisting in preparing materials describing Oakwood's operations, its historical financial results, and future prospects to be provided to qualified acquirers;

- Identifying and contacting potential acquirers of Oakwood;

- If requested, rendering an opinion as to the fairness from a financial perspective of a proposed sale transaction;

- Advising Oakwood with respect to the terms and timing of any restructuring transaction;

- Assisting Oakwood in the preparation of documents that relate to the terms of a restructuring transaction; and

- Assisting Oakwood in soliciting tenders and consents in connection with any restructuring transaction.

The Agreement between Oakwood and CSFB also stated that Oakwood was to use its best efforts to secure a court order approving the retention of CSFB as its exclusive financial advisor in the event of an order for relief concerning a case by or against the Company pursuant to Title 11. In addition, the Agreement stated that CSFB had the right but not the obligation to act as dealer manager with respect to any restructuring transaction, and CSFB had the right but not the obligation to act as exclusive placement agent for Oakwood in connection with any sale of its securities.[61]

---

[59] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.
[60] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006. Vol. 1, p. 143.
[61] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

According to Mr. Standish, CSFB's primary role as Oakwood's restructuring financial advisor was to prepare the Company for a bankruptcy filing. Toward that end, he believed CSFB was to do everything possible to avoid a free-fall bankruptcy and to make the bankruptcy as close to a prepackaged bankruptcy as possible. However, Mr. Standish also stated that CSFB believed its role included providing alternative courses of action, such as a sale of the Company, but that he personally saw CSFB's role as preparing for the bankruptcy filing.[62] Mr. Muir believed CSFB's role as restructuring financial advisor was to be an effective advisor to Oakwood and to get the Company through bankruptcy successfully with minimal damage to the business. Oakwood needed to have debtor-in-possession financing arranged and a warehouse financing facility.[63]

Table 7.1 provides a brief summary of the roles performed by CSFB and the fees earned for its services to Oakwood (I discuss the fees received by CSFB in more detail in Section VIII).

### Table 7.1: CSFB's Roles and Fees Earned

| Role | Description | Fees Earned |
|------|-------------|-------------|
| Lead Securities Underwriter | Lead securities underwriter for about 25 securitizations; underwriting totaling more than $7.5 billion in Oakwood securities | At least $30 million |
| Secured Lender | Over-secured lender to Oakwood's $200 million Loan Purchase Warehouse Facility in February 2001 | • Warrants of 19.9% of Oakwood's Common Stock<br>• Upfront fee of $2.5 million<br>• Program Fee of $15 million |
| Financial Advisor | Provide ideas and advice to Oakwood regarding its overall financial and liquidity condition | No direct fees earned; Role used to pitch business as a way to earn underwriting and lending fees |
| Financial Advisor for Restructuring Purposes | Assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm, and preparing Oakwood for bankruptcy | $1.8 million |

---

[62] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 163.

[63] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 152.

This section and section VII.A.1 demonstrate that investment banks are in a unique position to access information concerning the financial conditions of their clients and that CSFB's professional responsibilities with respect to Oakwood went beyond its role of underwriter. In light of the numerous roles CSFB served for Oakwood, CSFB had access to both public and private information about the Company's financial condition. In the following section I show that CSFB did in fact obtain public and inside information about Oakwood's financial condition and outlook.

### VII.A.3    CSFB Obtained Both Public and Inside Information about Oakwood's Financial Condition

Given its roles as underwriter, lender, and financial advisor, CSFB obtained both public and private information from Oakwood, credit-rating agencies, and other market analysts. Oakwood provided CSFB personnel with substantial amounts of confidential information, including the historical loss experience of the securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. This information was relevant to an assessment of whether the manufactured housing industry in general was experiencing a significant downturn, and whether Oakwood in particular was suffering from an insolvent financial position from which it would not likely recover.

As early as June 1999, Moody's and S&P rated Oakwood's unsecured senior notes as Baa3 and BBB-, respectively – the lowest investment-grade ratings. Any downgrade would result in a junk bond status. Both Moody's and S&P placed the Company on a negative credit watch given that Oakwood's third-quarter results were anticipated to be as much as 50 percent lower than expectations.[64] By November 1999, Moody's and S&P had downgraded Oakwood's ratings on its corporate credit and long-term senior debt securities to below investment grade with a negative outlook.[65] In late 2000, the credit-rating agencies continued to downgrade Oakwood's credit rating. In lowering the credit rating of the Company's senior notes from BB- to CCC, S&P viewed Oakwood as having the highest-risk junk bond rating possible before entering default status. S&P maintained a negative outlook on Oakwood based on its belief that the Company's "current operating loss position will continue well into [2001], due to lower volumes at manufacturing, continued pricing pressures at retail, and higher costs within its captive finance

---

[64] CSFB New Customer Credit Review dated July 16, 1999. Document # CSFB-00250093.
[65] Email from David Caspar to Douglass Muir dated November 2, 1999. Document # CSFB-00175025.

unit."[66] By June 2001, Fiachra O'Driscoll noted that Oakwood "was rated Baa3/BBB- two years ago and is now Caa1/CCC."[67] In closely monitoring the actions taken by the credit-rating agencies, CSFB knew Oakwood had fallen below investment-grade status in 1999 and continued to be downgraded through 2002 to a level just above default junk bond status.

Through its own information processing, CSFB identified a number of credit issues and concerns with Oakwood in late 1999. In particular, CSFB noted that Oakwood was in a "poor financial condition."[68] Based on estimates provided by CSFB's Manufactured Housing analysts, CSFB projected in 2000 that Oakwood would realize a gross operating margin of 26.1 percent, resulting in a net loss of $1.8 million. CSFB further projected that Oakwood's EBIT would be about $15 million in 2000, significantly less than the level needed to cover its anticipated interest expense of $50 million in that year.[69] In estimating Oakwood's free cash flows in 2000, which included the repayment of interest expense and a $125 million revolver, CSFB's Credit Risk Management ("CRM") Team predicted negative cash flows ranging from losses of $75 million to $110 million.[70]

In addition to obtaining publicly available information about Oakwood, CSFB also had access to private, inside information. As discussed, as part of preparing the securitization prospectuses, Oakwood provided CSFB with inside information, including the historical loss experience of a securitized pool of assets, repossession and foreclosure rates, and the credit quality of each home buyer. CSFB used this information to prepare the prospectuses for securitizations. CSFB was given access to all deal files and closing binders on all retail installment sales contracts ("RICs") to be included in each securitized asset pool and had access to prior deal files and monthly tracking reports. Furthermore, Oakwood consulted with CSFB as to which customer would be approved to determine how those decisions would affect the market's perception of the collateral.[71]

---

[66] Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus dated October 30, 2000. Document # CSFB-00170815.
[67] Email from Fiachra O'Driscoll to Phil Jacob dated June 6, 2001. Document # CSFB-00154641.
[68] CSFB Credit Issues/Concerns with Oakwood Homes Corp. Document # CSFB-00250130.
[69] *Ibid.*
[70] *Ibid.*
[71] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 45.

23

## VII.B  In Evaluating Its Own Exposure, CSFB Considered Oakwood a Bankruptcy Risk

CSFB's internal credit memoranda indicate that CSFB recognized as early as 2000 that Oakwood was a significant bankruptcy risk. Throughout its relationship with Oakwood, CSFB took steps to monitor Oakwood's bankruptcy and insulate itself from it.

### VII.B.1  Credit Memoranda Suggest Recognition of Oakwood's Financial Condition

### VII.B.1.a  Xanthos January 10, 2000 Memorandum

Even as early as 2000, CSFB's CRM Team anticipated Oakwood's bankruptcy in the foreseeable future. On January 10, 2000, James Xanthos, Vice President of the CSFB CRM Team, issued a memorandum concerning a November 19, 1999, on-site visit to Oakwood. On evaluating Oakwood's financial statements and its 2000 Summary Business Plan, Mr. Xanthos stated in the memorandum that he "strongly recommend" that CSFB not grant a proposed $75 million Committed Reverse Repurchase Facility for ABS Manufactured Housing Securities.[72] Mr. Xanthos cited a number of reasons to support his recommendation. First, Oakwood maintained a negative cash flow position that did not appear to be reversible in the foreseeable future. Second, Oakwood was in a weak financial condition in light of its excessive inventory and debt-to-equity levels. Third, the manufactured housing industry was severely contracting at the same time that Oakwood needed to sell off a significant portion of its inventory. Fourth, the only source of repayment would have been through the sale of subordinated securities. Finally and significantly, he explicitly stated that Oakwood suffered from "real bankruptcy risk issues."[73]

Mr. Xanthos' memo indicated that the manufactured housing industry was suffering from a significant downturn caused by "inventory levels being too high, excessive retail centers and lenders tightening their underwriting standards."[74] Although the industry had experienced a number of upturns and downturns throughout the past few decades, Mr. Xanthos believed the current downturn was unique, in that it did not stem from macroeconomic factors such as high interest rates, but rather from substantial overcapacity in the industry's retail distribution system. Therefore, determining if or when the industry had bottomed out and whether a recovery in retail profitability would occur would be complicated.

---

[72] James Xanthos, CSFB Memorandum dated January 10, 2000. Document # CSFB-00250117.
[73] *Ibid.*
[74] *Ibid.*, Document # CSFB-00250116.

With respect to Oakwood management's 2000 projections and Summary Business Plan, Mr. Xanthos stated that "a review of this plan in light of the company's 1999 performance and the current negative industry economic conditions does not lend me much confidence in Oakwood's projections."[75] He further stated that CSFB's "CRM [Team] was well aware of Oakwood's relationship with [CSFB's] Investment Banking Division but a review of all of the negative factors noted above strongly indicates that CSFB's risks are large and that repayment of [CSFB's] line is unknown due to the company's other debt obligations and lack of cash flow capacity. Oakwood is the weakest company in its industry with very real/immediate bankruptcy risk issues/concerns."[76] As also reflected in the significant drop in Oakwood's stock price at the time, Mr. Xanthos believed Oakwood was in a precarious financial position, one that would be extremely difficult to turn around.

In 1999, Oakwood's earnings before income, taxes, depreciation, and amortization (EBITDA) were well below the level necessary to cover its interest payments, taxes, and expenses. In addition, Oakwood had taken more than $80 million of special asset valuation charges against its income related to its various loan securitizations over the previous two years.[77] Clearly, Oakwood was in a tenuous state. To improve its weak financial position and meet its operating and investing obligations, Oakwood explored dramatically reducing its excess inventory levels by $100 million by September 2000. Mr. Xanthos warned that tightened lending and underwriting standards would lead Oakwood to sell its inventories "at unfavorable prices to un-creditworthy borrowers in order to meet inventory reduction goals. If this were to occur, the company's future securitizations (REMIC Interests & Residuals) would be disasters."[78]

When an uncommitted repurchase line was first established in June 1999, CSFB rated Oakwood as a BBB-. Yet CSFB's CRM lowered Oakwood's rating to a B- at the time of Mr. Xanthos' memorandum, which noted that "if Oakwood does declare bankruptcy, CSFB's sole source of repayment would be Oakwood's securitized subordinated securities of which currently there is no strong investor demand and in the event of a bankruptcy there will definitely be no investor demand due to servicing, collections and underwriting concern risks."[79]

---

[75] *Ibid.*

[76] *Ibid.*, Document # CSFB-00250117.

[77] *Ibid.*, Document # CSFB-00250121.

[78] *Ibid.*, Document # CSFB-00250118.

[79] *Ibid.*, Document # CSFB-00250117.

### VII.B.1.b    March 13, 2000, Xanthos Memorandum

On March 13, 2000, Mr. Xanthos issued another memorandum supporting his initial observations. Again, he stated that Oakwood was facing a real bankruptcy risk:

> "On January 10, 2000, I completed a very detailed analysis/review of Oakwood's financial/cash flow position, industry fundamentals and 2000 business plan outlook. My opinion of Oakwood as well as this industry as a whole has not changed since this review. CSFB is being asked to lend against very illiquid collateral (Oakwood's 'BB,' 'B' & Residual securities) to a counterpart that is currently facing real bankruptcy risk concerns. Oakwood's last four months of operating results/performance as well as industry events have validated my original recommendation/opinion."[80]

Given that CSFB believed Oakwood was insolvent or would become insolvent in the near future, CSFB structured its transactions with Oakwood such that it was protected in the event of bankruptcy. In particular, Mr. Xanthos' memorandum points out that Fiachra O'Driscoll, "with CRM's guidance, [had] crafted a term sheet that attempts to protect CSFB in case of an Oakwood bankruptcy or non-adherence to Bank/CSFB covenants."[81] Thus, although CSFB believed Oakwood posed a significant bankruptcy risk, it continued to assist Oakwood in its financing needs, such as underwriting securitizations, to earn fees for such business, while protecting itself from the threat of Oakwood's bankruptcy.

### VII.B.2    Throughout Its Relationship with Oakwood, CSFB Continued to Monitor and Insulate Itself from the Bankruptcy Risks Surrounding Oakwood

CSFB took several steps to minimize its exposure to Oakwood's bankruptcy risk. Internal CSFB correspondence reveals that CSFB constantly monitored and evaluated the possibility of an Oakwood bankruptcy. An April 2000 email to Mr. O'Driscoll asked if Mr. O'Driscoll could "get someone to shoot over the latest Oakwood MH deal prospectus? Also, we need to look into the stay period if they go into bankruptcy before we can sell the inventory. We need to make sure all inventory has insurance, etc."[82]

In a December 2000 presentation to CSFB's Investment Banking Committee, CSFB's Asset Finance Group recommended that CSFB provide a $200 million Revolving Loan Purchase Facility for Oakwood. In particular, the Asset Finance Group noted that "the transaction provides the company with liquidity for its loan originations but is structured with strong protections for

---

[80] James Xanthos, CSFB Memorandum dated March 13, 2000. Document # CSFB-00250131.

[81] *Ibid.*, Document # CSFB-00250132.

[82] CSFB Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000. Document # CSFB-00173794.

CSFB."[83] Such protections insulated CSFB from the numerous investment concerns identified in the presentation. These concerns included Oakwood's sales remaining soft, its holding of $77 million in B pieces of securitizations, its rising rate of repossessed homes, its sales compensation being based on volume and not profitability, its high delinquency rates, its inventor levels being the highest in CSFB's coverage universe, and its balance sheet remaining leveraged.[84]

Likewise, CSFB closely evaluated the possibility of an Oakwood bankruptcy by asking the credit-rating agencies about the rationale behind the downgrades in Oakwood's credit rating as well as what would happen if Oakwood went bankrupt. As late as February 2002, Fiachra O'Driscoll sent an in-house email stating, "[l]et's talk to [Moody's] about what would happen in an Oakwood bankruptcy, because it probably wouldn't mean liquidation of the company. The Oakwood rating is driven by the effective subordination of the senior unsecured."[85]

Finally, as I discuss in Section VIII, Oakwood's lending relationship with Oakwood was conducted through a bankruptcy-remote entity, insulating the bank from Oakwood's bankruptcy risk. This is another indication that CSFB was aware of and sensitive to Oakwood's bankruptcy risk, at least with respect to protecting its own interests.

## VII.C  CSFB's Own Guidelines Require a High Standard of Care to its Clients

I have been asked to assume that CSFB owed Oakwood and its creditors a fiduciary duty. In addition, CSFB's own compliance manual requires that CSFB fulfill a high standard of care to its clients. With respect to the principles of conduct its employees were to follow, the manual specifically states that CSFB "be completely open and truthful with customers" and "make no recommendation unless you have a reasonable basis to do so and can substantiate it through publicly available information."[86] The guidelines state that no recommendation should be made "contrary to a position taken by the CSFB Research Department, or inconsistent with the customer's investment objectives, financial resources and needs."[87] In addition, CSFB is "never [to] act in a manner adverse to the best interests of [its] customer. Self-dealing, either at the expense of a customer or CSFB, is strictly prohibited."[88]

---

[83] CSFB Presentation to the Investment Banking Committee re: Oakwood Homes Corporation dated December 13, 2000. Document # CSFB-00205989.004.
[84] *Ibid.*, Document # CSFB-00205989.009.
[85] CSFB Email from Fiachra O'Driscoll to Susan Menkhaus dated February 15, 2002. Document # CSFB-00148791.
[86] CSFB Compliance Manual. Section 2 – Principles of Conduct. Document # CSFB-00053080-81.
[87] *Ibid.*
[88] *Ibid.*

Furthermore, with respect to handling customer accounts, CSFB's compliance manual requires adherence to the New York Stock Exchange's ("NYSE") "Know your Customer" rule. This rule mandates "every member organization to learn the essential facts concerning every customer, every account and every order executed on behalf of a customer,"[89] and is intended to protect customers of NYSE members in cases where "investors who suffer losses in securities transactions often allege that their loss resulted from recommendations made by brokers which were unsuitable for them in light of their financial situation and investment objectives."[90] Given CSFB's access to both public and inside information about Oakwood, CSFB was in a position in which it could have known all the essential facts concerning the Company's insolvent financial condition. Yet its recommendations and advice to Oakwood to maintain its operations were inappropriate given that both public and inside information about Oakwood indicated that the Company was in an irreversible spiral to bankruptcy.

### VII.D  CSFB's Advice to Oakwood Was Inconsistent with Oakwood's Situation, the Information It Had, Its Own Concerns, and the Duties It Owed Oakwood and its Creditors

The previous sections demonstrate that, given its roles as financial advisor, lender, and underwriter, CSFB had access to public and private information about Oakwood's financial condition and outlook and was concerned about Oakwood's bankruptcy risk. Further, in addition to the fiduciary duty CSFB owed Oakwood and its creditors, its own internal guidelines required that it know its customers and avoid conducting transactions harmful to its clients. Nevertheless, CSFB's advice and conduct with respect to Oakwood were inconsistent with the Company's bleak financial condition and outlook, and thus in violation of the duties it owed.

Although Oakwood was insolvent by the fall of 2001, CSFB continued until August 2002 to provide advice and arrange transactions that did not properly consider the Company's financial condition and outlook and that served to exacerbate its insolvency. No evidence exists that CSFB performed any assessment of the costs and benefits of the securitizations it was leading or conducted any type of analysis regarding the likelihood that Oakwood would be able to turn itself around and pull itself out of its financial predicament. Also, no evidence exists that CSFB considered and assessed the harmful impact on Oakwood's existing creditors when engaging in transactions and providing advice to the Company.

---

[89] CSFB Compliance Manual. Section 5- Customer Accounts. Document # CSFB-0053089.
[90] *Ibid.*

In the rest of Section VII.D, I assess the advice CSFB provided to Oakwood. As I discuss, no evidence exists that CSFB suggested filing for bankruptcy as an option for Oakwood until August 2002. In Section VII.E, I demonstrate that CSFB's advice to Oakwood did not duly consider the Company's financial situation. In Section VII.F, I show that the transactions CSFB engaged in with Oakwood were value-destroying and exacerbated the Company's financial problems. In Section VII.G, I explain that CSFB should have advised Oakwood to curtail its operations and should not have enabled the Company to continue to destroy value to its creditors.

### VII.D.1    CSFB Presentations to Oakwood Prior to August 2002 Made No Mention of the Fact that Oakwood Should Have Considered Bankruptcy

As discussed, between 2001 and August 19, 2002, the date CSFB signed a formal advisory agreement with Oakwood, CSFB was acting as a financial advisor to Oakwood. Based on the documents I have examined, CSFB never advised Oakwood of its insolvency or to even consider bankruptcy. Rather, the financial advice CSFB offered Oakwood centered on refinancing its outstanding debt to prolong the business. The objective of the CSFB presentations was to pitch certain financing schemes as a way to continue earning fees. I will now highlight the financial advice CSFB offered Oakwood throughout this period.

### VII.D.1.a    CSFB Presentation to Oakwood on June 26, 2001

On June 26, 2001, in a presentation made by CSFB to Oakwood, CSFB claimed that its equity research analysts "believed that signals exist which may point to a bottom for the manufactured housing industry"[91] and that the industry "will rebound."[92] Whereas CSFB's CRM Team believed that there was great uncertainty as to whether the manufactured housing industry had reached a bottom yet, its Investment Banking Division provided Oakwood with information that expressed optimism that industry trends would soon begin to work in the Company's favor. This had the effect of prolonging Oakwood's financing activities rather than encouraging Oakwood to consider bankruptcy in light of its unrecoverable, insolvent financial condition.

Without discussing the option of bankruptcy, CSFB maintained that it was "uniquely suited to advise Oakwood [and that its] restructuring expertise [was] complemented by its #1 position in the High Yield market, strength in the asset-backed market and #1 ranked research."[93] CSFB also provided an update on its view of Oakwood's financial health. In particular, it forecasted the

---

[91] CSFB Presentation to Oakwood Homes Corporation dated June 26, 2001. Document # CSFB-00052958.
[92] *Ibid.*
[93] *Ibid.*, Document # CSFB-00052956.

Company's net income to increase from -$120.9 million in fiscal year 2000, to -$59.7 million in FY 2001, to -$23.3 million in FY 2002, and forecasted its EBITDA margin to increase from -0.3% in FY 2000, to 1.9% in FY 2001, to 4.6% in FY 2002. CSFB further claimed Oakwood had made great progress in addressing its capital structure and operating strategy issues and believed more could be accomplished to reduce the capital structure's drag on the business with the following key objectives: reducing the cash interest burden on Oakwood, shortening the time to a positive cash flow, reducing the book value of debt and increasing the common share price, and improving Oakwood's credit profile, thereby facilitating Oakwood's future access to the capital markets.[94]

When Oakwood's senior notes were trading at a combined discount of $150 million, CSFB recommended three strategies to Oakwood. The first strategy was called the "B-2 Sale and Bond Buyback." CSFB claimed Oakwood could capture a significant portion of the $150 million discount by monetizing its retained B-2 securities and using the proceeds to quietly buy back and retire some of its outstanding senior notes. CSFB's recommendation was based on the assumption that the industry had bottomed out and the Company's financial condition was going to improve, resulting in an increase in the prices of Oakwood's bonds in the near future. The second strategy was called the "Package Exchange Offer." Under this alternative, CSFB recommended that Oakwood offer its bondholders a package of new debt and common shares in exchange for old notes to capture more of the current bond discount. The third strategy was called "One-Off Equity for Debt Exchange." CSFB claimed that Oakwood could chip away at its debt by quietly offering individual bondholders common shares in exchange for senior notes. CSFB advised Oakwood that individual bondholders would be willing to sell bonds to Oakwood at a pre-negotiated price in exchange for shares based on the stock's average closing price over time.

Rather than advise Oakwood to cut its losses and file for bankruptcy, CSFB encouraged Oakwood to continue to engage in financing activities based on uncertain assumptions that industry-wide and company-specific conditions would improve. This advice only accelerated the Company's insolvent financial position.

---

[94] *Ibid.*, Document # CSFB-00052978.

### VII.D.1.b   CSFB Presentation to Oakwood on August 9, 2001

On August 9, 2001, CSFB made another presentation to Oakwood to provide further restructuring alternatives to the Company. Although Oakwood's bankruptcy appeared to be imminent, CSFB stated that "Oakwood has taken the right steps to improve the Company's prospects and should take advantage of the current trading level of its outstanding Notes."[95] Again, CSFB stated that it believed signals existed indicating that the manufactured housing industry had reached its bottom and that Oakwood should aggressively pursue strategies to capitalize on the trading levels of its public bonds.[96]

In stating that recent liquidity transactions had successfully positioned Oakwood to pursue restructuring options, CSFB recommended that the Company proceed with a three-step process. First, CSFB believed Oakwood should proceed with the application of the B-2 and receivables purchase facility proceeds that it proposed in its June 26, 2001, presentation. The second step was for Oakwood to refinance its credit facility with a new facility of $50 million. The goal of this strategy was to replace the current senior lenders with non-traditional lenders to allow Oakwood greater latitude. Third, CSFB advised Oakwood, as it did in its previous presentation, to further reduce its debt by considering a "Package Exchange Offer" and a "One-off Equity for Debt Exchange."[97] At the end of the presentation, CSFB listed more than one hundred "distressed finance assignments" it had performed for companies in which CSFB acted as a financial advisor to companies suffering from precarious financial and operating conditions.

Interestingly, shortly before making these presentations to Oakwood in 2001, CSFB issued a negative equity research report about the Company on April 26, 2001. In that report, CSFB lowered its fiscal 2001 estimate to a loss of $2.00 per share "based on the company's latest results and the continued softness in the manufactured housing industry."[98] In addition, the report maintained a Hold rating "given [Oakwood's] recent losses and excessive leverage (51% debt to capital and negative interest coverage) as well as the continued soft industry conditions."[99] While CSFB's equity research analysts were pessimistic about the condition of both Oakwood and the entire manufactured housing industry, CSFB's investment banking division was optimistic about the future prospects of the Company and the industry as a whole as a way to solicit more business from Oakwood.

---

[95] CSFB Presentation to Oakwood Homes Corporation dated August 9, 2001. Document # CSFB-00052854.
[96] *Ibid.*, Document # CSFB-00052855.
[97] *Ibid.*, Document # CSFB-00052873.
[98] CSFB Equity Research. "Oakwood Homes Corporation." April 26, 2001. Document # CSFB 001555802.
[99] *Ibid.*

### VII.D.1.c  CSFB Presentation to Oakwood in March 2002

In a March 2002 presentation to Oakwood, CSFB advised Oakwood that it could reduce its March 2004 refinancing risk by exchanging the notes coming due in 2004 for a package of new notes and cash. CSFB noted that at that time notes coming due in 2004 had a face value of $125 million. CSFB recommended that these notes be exchanged for notes with a face value of $125 million with the same coupon and maturity as its notes coming due in 2009, with the cash portion of the exchange being sized to provide a modest premium to the trading levels of the 2004 notes.[100]

Table 7.2 below provides a summary of the strategic options and alternatives provided by CSFB in its presentations to Oakwood prior to August 2002.

**Table 7.2: Summary of Strategic Options Provided by CSFB**

| Presentation Date | Key Company Objectives Identified by CSFB in the Presentation | Strategic Alternatives Provided by CSFB |
|---|---|---|
| June 26, 2001 | ▪ Reduce cash interest burden on Oakwood<br>▪ Shorten the time to positive cash flow levels<br>▪ Reduce book value of debt and increase common share price<br>▪ Improve Oakwood's credit profile<br>▪ Reduce distraction/pressure from vendors, customers, and employees due to financial uncertainty | ▪ B-2 sale and open-market bond buyback<br>▪ Package exchange offer<br>▪ One-off equity for debt exchange<br>▪ Negotiate a flip-up transaction with a non-traditional senior lender |
| August 9, 2001 | ▪ Avoid a going-concern issue<br>▪ Replace current bank group<br>▪ Better utilize assets to raise non-traditional capital<br>▪ Reduce cash interest burden on Company<br>▪ Reduce debt & increase common share price<br>▪ Improve Oakwood's credit profile, thereby facilitating future access to the capital markets | ▪ Proceed with application of B-2 and Receivables Purchase Facility Proceeds<br>▪ Refinance credit facility with a new facility of $50 million or more<br>▪ Consider reducing debt through package exchange offer and one-off equity for debt exchange |
| March 2002 | Reduce Oakwood's March 2004 refinancing risk by exchanging the 2004 Notes for a package of new notes and cash | ▪ 2004 notes exchanged for $125M face value of new notes structured with the same coupon and maturity as 2009 notes<br>▪ Package exchange offer<br>▪ Flip-up transaction |

---

[100] CSFB Presentation to Oakwood Homes Corporation dated March 2002. Document # CSFB-00033246.

In providing a number of strategic alternatives for Oakwood to pursue to address its capital structure, at no point prior to August 2002 did CSFB advise Oakwood to consider filing for bankruptcy or that industry fundamentals were unlikely to improve soon enough for Oakwood to maintain its operations through the industry downturn. While CSFB's investment banking division failed to discuss the probability of bankruptcy with Oakwood until August 2002, its equity research group concluded that Oakwood posed a significant chance of bankruptcy throughout that time. On June 11, 2001, CSFB released a manufactured housing industry report stating that "[Oakwood] is still operating well in the red and the industry is not reaccelerating at this time."[101] In light of the weakness in Oakwood and the manufactured housing industry, CSFB explicitly asserted in the June 2001 report:

> Our probability that Oakwood does not file for bankruptcy is now 50%, compared to a much lower probability six months ago. Therefore, given the financial risk associated with Oakwood, as well as our belief that there may be more short-term downside for the industry and continued soft retail conditions, we are maintaining our Hold rating on the shares.[102]

On September 20, 2001, CSFB released another analyst report that stated verbatim its beliefs about the likelihood of Oakwood having to file for bankruptcy. CSFB still maintained a Hold rating on Oakwood, based again on its opinion that the "probability that Oakwood does not file for bankruptcy is now 50%."[103] While CSFB's investment banking division continued to present strategic options to Oakwood in 2001 and 2002 without discussing the possibility of bankruptcy, CSFB's research analysts contemporaneously published reports reflecting its concern that Oakwood posed a significant probability of bankruptcy. Not only did CSFB's research analysts believe that Oakwood had a fifty percent chance of filing for bankruptcy in June 2001, it believed that the probability of this occurrence had been even higher six months prior. Thus, CSFB's investment banking division continued to engage in activities that exacerbated Oakwood's insolvent financial condition and never advised the Company about the option of filing for bankruptcy until August 2002, even though its research analysts explicitly opined that the Company posed at least a 50 percent chance of filing for bankruptcy throughout 2001.

---

[101] CSFB Equity Research. "Manufactured Housing Industry Outlook: Approaching Bottom of Cycle; Not Out of the Woods Yet." June 11, 2001. Document # CSFB-00266476.

[102] *Ibid.*

[103] CSFB Equity Research. "Manufactured Housing- Retail Inventory Update: Second Quarter 2001." September 20, 2001. Document # CSFB 00266317.

### VII.D.2   CSFB's Presentation to Oakwood on August 19, 2002, Marked the First Time CSFB Discussed and Presented Potential Restructuring Alternatives

Only on August 19, 2002, in a presentation to Oakwood's board of directors, did CSFB advise Oakwood that its best course of action might have been a restructuring. CSFB discussed Oakwood's capital structure and the potential courses of action it felt Oakwood should have considered pursuing to meet its liquidity and capital needs "in light of the sustained losses suffered by Oakwood in the past four years."[104] Contrary to its previous presentations, which stated that the manufactured housing industry had bottomed out and would soon rebound, CSFB stated that "while many thought that the industry had bottomed, there continues to be a downward trend as lenders exit the industry."[105] In addition, the presentation covered Oakwood's current state of operations and its short- and long-term prospects. Of particular concern was the maturity on March 1, 2004, of $125 million of senior notes and the substantial long-term guarantee obligations associated with the current high level of repossessions.

CSFB noted that Oakwood and the manufacturing industry were operating in an environment characterized by weak conditions overall. Nevertheless, CSFB suggested that many restructuring alternatives were available to Oakwood, including a sale of the Company. CSFB pointed out that the factors threatening Oakwood's short-term liquidity position were $24 million in annual interest expense, the $125 million principal amount outstanding on the 7.875 percent senior notes maturing on March 1, 2004, and the servicing fees on the REMIC securities it was receiving, which were inadequate to cover the servicing costs. CSFB stated that the recent trend in default rates and a structural change in the industry would place additional stress on Oakwood and that the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities could become a real liability if the current conditions persisted.[106]

During the presentation, CSFB advised that the restructuring timing and path Oakwood chose should be based on its degree of optimism or pessimism as to its ability to grow into its capital structure before exhausting its liquidity. Based on both optimistic and pessimistic views, CSFB offered a number of strategic alternatives. An optimistic view was seen as having a moderate-to-high probability of being able to service and refinance debt capitalization. If this were the case, CSFB advised that Oakwood should take a "wait and see" approach or pursue debt chip-away strategies to take advantage of the distressed trading levels. A negative view was

---

[104] CSFB Presentation to Oakwood Board of Directors on August 19, 2002. Document # MNAT006734.
[105] *Ibid.*
[106] *Ibid.*, Document # MNAT006735.

seen as a low probability of being able to service and refinance debt capitalization. If this were the position, CSFB advised that Oakwood should act early to avoid negotiating from a position of weakness and to maximize value to shareholders; once liquidity decreased to the point that unsecured claimholders know a bankruptcy is imminent, the unsecured claimholders would have more leverage. Acting early would give Oakwood time to negotiate and pursue more than one option.[107] In advising Oakwood on a number of alternatives, including the option of filing for bankruptcy if management did not believe industry conditions were going to improve in the near future, CSFB provided the advice it should have offered Oakwood beginning in 2000.

## VII.E   The Advice CSFB Provided to Oakwood was Inappropriate

Throughout 2001 and 2002, CSFB provided Oakwood with prospective business strategies. In its presentations to Oakwood, CSFB offered ideas on how to restructure and refinance its debt. In advising Oakwood, CSFB never discussed what it believed Oakwood's financial condition was or whether Oakwood should have considered bankruptcy, even though CSFB had inside access to Oakwood's management personnel and financial information as a result of the multiple functions it performed for the Company.

The advice CSFB offered Oakwood failed to adequately consider the Company's insolvent financial situation. Mr. Standish has testified that he did not believe CSFB ever understood the financial difficulty Oakwood was in[108] and that CSFB failed to grasp that its strategic alternatives were not feasible. Mr. Standish pointed in particular to CSFB's recommendation to buy back $125 million of bonds that were to come due in 2004.[109] He also testified that while CSFB was Oakwood's financial advisor, nothing it brought to the table, other than the loan purchase agreement, ever came to fruition.[110]

In addition, Mr. Muir echoed the concerns of Mr. Standish. With respect to the bond buy-back program proposed by CSFB, Mr. Muir also said that CSFB's proposal to refinance the $125 million was a "neat" plan, but not a useful plan for Oakwood because it would have consumed substantial cash that Oakwood did not have. In addition, Mr. Muir stated that, knowing where he thought Oakwood was headed, he did not think it was a smart idea to trade off

---

[107] *Ibid.*, Document # MNAT006739.
[108] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 201.
[109] *Ibid.*, pp. 169-170.
[110] *Ibid.* p. 16.

the small amount of liquidity it did have.[111] Finally, Mr. Standish testified that even after retaining CSFB in August 2002 to help with the impending bankruptcy, CSFB advised Oakwood to delay the bankruptcy filing several times.[112]

## VII.F   The Actions CSFB Engaged in with Oakwood Destroyed Value and Exacerbated the Company's Insolvent Financial Condition

The transactions CSFB engaged in with Oakwood enabled Oakwood to continue operating and thus exacerbated the Company's insolvent financial condition and destroyed value. For Oakwood to continue as a going concern, its business model required that it securitize loans it had issued and sell notes to CSFB through the Warehouse Facility to provide the temporary liquidity used to fund the loans. If Oakwood did not engage in these transactions, it would not have been able to sustain its business operations.

Although CSFB had the ability to effectively shut down Oakwood's business by not continuing to provide underwriting activities and a loan purchase facility, it continued to perform these functions. For example, CSFB acted as an underwriter to the Lotus transactions in 2001 and 2002. As a way to enhance the marketability of Oakwood's B-Piece REMIC Certificates, CSFB proposed that Oakwood provide a limited guaranty of principal to an aggregate amount of approximately $275 million plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").[113] Under the terms of the B-2 Guarantees, the underlying RICs owned by the REMIC trust generated cash to make all required payments on the B-Piece REMIC Certificates. However, if default rates on the underlying mortgages reached a level that resulted in insufficient cash available to service all of the tranches, Oakwood was obligated to pay the difference directly to Berkshire Hathaway, the holders of the B-2 Guarantees.[114] Although economic conditions had been weakening and Oakwood's default rates were rising, CSFB actively engaged as an underwriter for the Lotus securitization. With an increasingly large number of delinquent loans and repossessions, the RICs did not generate enough money to cover all the payments on the B-2 Guarantees and Oakwood had to subsequently pay the difference. As a result of transactions such as Lotus, Oakwood continued to experience losses associated with impairments in the value of its retained interests in the loan securitizations.

---

[111] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 27, 2006, Vol. 2, p. 232.
[112] Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 21, 2006, p. 19.
[113] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.
[114] *Ibid.*

Further, not until CSFB's last securitization prior to Oakwood filing for bankruptcy did CSFB disclose its concerns surrounding the Company's financial condition. In the prospectuses CSFB prepared for Oakwood's February Series 2002-A and May Series 2002-B Senior Subordinated Pass-Through Certificates, the recent events that CSFB noted that may adversely affected the return on the certificates centered on the events of September 11, 2001, without mention of Oakwood's precarious financial condition.[115, 116] Only subsequent to its engagement as a financial advisor for restructuring purposes in August 2002 did CSFB include in its August 27, 2002, prospectus for Oakwood's Series 2002-C Senior Subordinated Pass-Through Certificates recent events with respect to Oakwood itself that may have adversely affected the return of the certificates. In particular, the prospectus noted that Oakwood had reported a net loss of $119 million in the quarter ending June 30, 2002, which included an $86.5 million charge related to previously securitized loans.[117] Although Oakwood was insolvent in the fall of 2001, CSFB actively engaged in further costly borrowing and financing practices with the Company without disclosing its concern about the financial condition of Oakwood until after it was retained as a financial advisor for restructuring purposes. By continuing to underwrite securities, CSFB enabled Oakwood to incur further losses associated with impairments in the value of its retained interests in the loan securitizations, which effectively drove the Company further into insolvency, destroyed value, and worsened the position of Oakwood's debt holders.

## VII.G  CSFB Should Have Advised Oakwood to Curtail Operations and Should Not Have Enabled it to Continue to Destroy Value

Given Oakwood's insolvency, and CSFB's access to information about the Company's financial condition, CSFB's advice to Oakwood should have considered its insolvent position and bleak outlook. Instead of making the recommendation that Oakwood curtail its operations, CSFB advised Oakwood to re-purchase its bonds, which would have consumed liquidity it desperately needed, and continued to securitize its loans and fund its warehouse facility, which enabled it to continue operating, further exacerbating its insolvent financial condition.

CSFB should have been advising Oakwood to make operational changes. For example, the Company could have curtailed its business operations as a way to address its four-year decline in operating income, which continued through 2002. In fact, the Company did curtail its business in December 2002, after it terminated CSFB. In a presentation to the Oakwood Creditors

---

[115] CSFB Prospectus Supplement to Prospectus dated February 22, 2002. Document # CSFB-00220219.

[116] CSFB Prospectus Supplement to Prospectus dated May 20, 2002. Document # CSFB-00220040.

[117] CSFB Prospectus Supplement to Prospectus dated August 27, 2002. Document # OHCLT-230798.

Committee in December 2002, Oakwood provided details of a rationalization plan ("the Plan") that sought to address the difficulties surrounding the Company's operations. The strategy of the Plan was to downsize Oakwood's operations, reduce fixed operating expenses, and improve the Company's cash flow and profitability.[118] In particular, the Plan proposed that Oakwood eliminate poorly performing retail stores, increase its focus on wholesales sales, adjust manufacturing capacity to a level in line with expected future sales, and reduce corporate overhead in line with the downsized company.[119] The Plan proposed accomplishing these objectives by eliminating Oakwood's presence in high-default states as well as closing seventy-four retail centers, five manufacturing plants and its Austin, Texas loan origination office. These actions alone were predicted to increase Oakwood's 2002 manufacturing and retail operating income by $30 million.[120] In light of the fact that the downturn in the manufactured housing industry was due in large part to overcapacity and excessive growth by companies like Oakwood, the advice CSFB provided should have entailed operational improvement strategies which focused upon downsizing the Company's operations. Rather, CSFB proposed alternative financing options which resulted in losses on securitization transactions and further impairment charges on Oakwood's REMIC valuations.

In addition, similar to providing the optimistic and pessimistic scenarios set forth in its presentation to Oakwood's board of directors after it was formally retained as a financial advisor for restructuring purposes, CSFB should have provided the Company with certain alternative courses of action if Oakwood's management believed it could not turn around its insolvent financial condition prior to mid-2002. Throughout its relationship with Oakwood, CSFB should have emphasized that the Company was confronted with both immediate and future liquidity-draining issues. Over the long term, CSFB should have advised that additional stress was going to be placed on the Company if the trends in default rates and industry structural change continued.[121] On further pointing out that Oakwood's securities were trading at distressed levels, its annual interest expense was high, and the servicing fees it earned on its REMIC securities were insufficient to cover the associated servicing costs, CSFB should have informed Oakwood of its unlikely prospect of improving its capital structure and provided more comprehensive restructuring solutions prior to August 2002 based on the assumption that the downturn in the manufactured housing industry was going to continue.

---

[118] Oakwood Homes Corporation. Creditors Committee Meeting dated December 9, 2002. Document # MNAT024088.
[119] *Ibid.*
[120] *Ibid.*, Document # MNAT024090.
[121] CSFB Presentation to Oakwood Board of Directors dated August 19, 2002. Document # OHCLT-01706.

Further, CSFB should have advised Oakwood that if the Company was pessimistic about the future prospects of its financial and operating conditions, it should not continue to employ a wait-and-see approach or take advantage of the discounted trading levels of its debt. Assuming Oakwood was insolvent in the fall of 2001, CSFB should have recognized and considered early in its relationship with Oakwood that the Company's outstanding indebtedness exceeded its fundamental value and that a sale of the Company or a filing for bankruptcy were options Oakwood should have thoroughly evaluated. Prior to August 2002, CSFB should have been recommending that Oakwood scale back its operations or begin implementing a pre-arranged or pre-packaged bankruptcy strategy. Both of these options would have been in the best interests of the Company and its credit holders. Instead, CSFB's recommendations were centered on its financial incentive to keep Oakwood operational to earn exorbitant fees through its roles as an underwriter, lender, and advisor.

## VIII.    CSFB Had a Financial Incentive to Keep Oakwood Operating

In this section, I describe the financial incentives CSFB had to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy. I first describe the fees CSFB was earning, and stood to continue earning, from its relationship with Oakwood. I then explain how CSFB's equity interest in Oakwood allowed it to share in the upside of an Oakwood recovery. Finally, I describe how, despite being a lender to Oakwood, CSFB did not share in the costs of the turnaround attempt because its debt was bankruptcy protected. In short, because of its unique position as a bankruptcy-insulated lender and equity owner, CSFB would enjoy the upside of an Oakwood recovery without facing the consequences of the attempt (that continuing operations was further exacerbating Oakwood's insolvent financial condition), and because of its relationships with Oakwood, CSFB would earn more fees the longer the attempt continued.

### VIII.A    CSFB Stood to Continue Earning Fees for the Services It Provided to Oakwood

As I described in Section VII, CSFB provided several services and played varying roles over the course of its relationship with Oakwood from the early 1990s through 2002. During this period, CSFB acted as Oakwood's general financial advisor, primary underwriter of its securitization program, secured lender, and as of August 19, 2002, its financial advisor for restructuring purposes. As discussed below, CSFB earned significant fees for providing these services to Oakwood.

39

### VIII.A.1  Fees Earned by CSFB for Underwriting Oakwood Securitizations

According to Mr. Muir, CSFB's compensation for its role in underwriting more than 25 securitizations was based on a percentage of the principal balance of the securities. The percentage was negotiated with CSFB, generally with Fiachra O'Driscoll, and the criteria for negotiations were based on benchmarking against other issuers. According to Tom Connors, a managing director of CSFB's Fixed Income Division, CSFB earned fees of two percent,[122] approximately $2 million, on the first Lotus securitization.[123] All of the securitizations CSFB completed for Oakwood resulted in underwriting fees of at least $30 million.[124]

The importance of the underwriting fees is highlighted by the pressure placed on CSFB's CRM department to approve certain transactions to ensure continuation of the securitizations. For example, with respect to a $50 million reverse repurchase facility to finance BBB and BB tranches issued from Oakwood manufactured housing securitizations, a March 2000 memorandum from CSFB's Asset Finance Group to its CRM department stated that "[Oakwood] has been an important client of the asset finance group since 1995 and has generated over $15 million in revenues in that time. CSFB expects to underwrite a bond offering for the company next week, which will be the first issue the asset finance group has led since the recent management changes … We urge you to approve this facility, which we strongly support."[125]

### VIII.A.2  Fees Earned by CSFB for Providing Loan Purchase Facility to Oakwood

In exchange for agreeing to be a lender via the Warehouse Facility, CSFB received warrants in Oakwood that, if exercised, would have been valued at 19.9 percent of Oakwood's common stock. In addition, CSFB was to receive an upfront fee of $2.5 million and a $15 million program fee payable over the three-year term of the facility. [126, 127]

---

[122] Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, August 22, 2006, p. 33.

[123] Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, June 30, 2006, Vol. 2, p. 398.

[124] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*. Objections and Counterclaims. November 13, 2004.

[125] CSFB Memorandum from Joe Donovan, Scott Ulm, and Fiachra O'Driscoll to Credit Risk Management dated March 15, 2000. Document # CSFB-00204186.

[126] CSFB email from Alberto Zonca to Joseph Soave, Josh Borg and Carl Iovine dated Feb. 27, 2001. CSFB-00165521.

[127] CSFB memorandum from Fiachra O'Driscoll and Kareem Serageldin to Jack DiMaio, John Chrystal and Sanjeev Gupta dated May 25, 2001. CSFB-00485359.

### VIII.A.3  Fees Earned by CSFB as Oakwood's Restructuring Financial Advisor

The advisory agreement presented a complex fee structure for CSFB. Some of the many terms included

- A monthly non-refundable cash fee of $150,000;

- A non refundable success fee of 1 percent of the aggregate value of a sale transaction;

- A non refundable restructuring transaction fee of 1 percent of:
  - The face amount of the old securities;
  - One third of the face amount of the securitization guarantees; and
  - One third of the face amount of the floor plan guarantees;

- A non refundable fee of $1,000,000 at the time CSFB notified Oakwood it was prepared to deliver a Fairness Opinion, irrespective of the conclusion reached.[128]

The agreement stated that CSFB was entitled to receive all fees in the event CSFB resigned or was terminated by the Company. Pursuant to the Financial Advisory Agreement, CSFB received more than $1.8 million in advisory fees from August 19, 2002, through November 15, 2002.[129]

### VIII.A.4  Fees Provided CSFB with a Financial Interest in Oakwood Continuing as a Going Concern

The securitization and lender fees earned by CSFB provided it with an interest in Oakwood continuing as a going concern. The longer Oakwood continued to operate, the more securitizations it would conduct, and the more times it would draw on the Warehouse Facility. CSFB thus had an incentive to delay recommending that Oakwood file for bankruptcy. As I discuss in Section VIII.C, CSFB was not affected by the costs of Oakwood continuing operations even while insolvent, as the Warehouse Facility was bankruptcy protected.

---

[128] Financial advisory services agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, LP. And Credit Suisse First Boston, August 19, 2002.

[129] *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

## VIII.B   CSFB's Equity Interest Provided It with a Financial Interest in Oakwood Continuing Operations

As discussed, as part of its compensation for taking over the role of lender to the Warehouse Facility from Bank of America, CSFB received warrants in Oakwood valued at 19.9 percent of its common stock. Warrants are essentially call options issued by a firm. When they are issued, the company satisfies the option holder by issuing more of its common stock and selling it to the option holder at the strike price. Had it exercised its warrants, CSFB would have owned a significant amount of equity in Oakwood.

CSFB's equity interest in Oakwood meant that it had an interest in Oakwood pursuing risky courses of action. If Oakwood had declared bankruptcy, CSFB's warrants would have been worth nothing. The warrants would have been worth zero no matter what extent Oakwood's insolvency was. Conversely, if Oakwood had managed a successful turnaround, CSFB's equity interest may have gained positive value. CSFB therefore had an incentive to keep Oakwood as a going concern, even if it harmed Oakwood's creditors. As I describe below, this scenario is a well-known conflict in financial theory. Equity holders are willing to subject the firm to more risk to gain the upside of the return.

### VIII.B.1   Agency Conflict between Equity Holders and Debt Holders

As discussed, CSFB's equity interest in Oakwood caused it to have conflicting interests from those of Oakwood's creditors, leading to an agency problem. An agency problem is a conflict of interest arising among creditors, shareholders, and management because of differing goals in which each stakeholder pursues its own self-interests. When a firm has debt, the interests of equity holders and debt holders differ because these two claimants have different pay-off functions. Shareholder incentives to maximize the value of their shares are not necessarily consistent with the incentives to maximize the total value of debt and equity.[130] For the long-lived firm, as long as it is highly profitable, the interests of the equity holders and debt holders will be aligned. The equity holders effectively hold a call option on the firm with an exercise price equal to the debt. In good times, this option is in the money and the equity holders' interest in the long-term survival of the firm argues for giving them control over the firm. However, as the firm's profits decrease and bankruptcy becomes likely, the equity holders' option moves out of the money, which creates incentives for the equity holders to gamble with the firm's assets at the debt holders' expense.[131]

---

[130] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 p. 8.

[131] Janet Mitchell, "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets," Dec. 2004, p. 8.

Equity holders participate in the upside of risky gambles that pay off and do not have to pay all of the losses under limited liability. Conversely, debt holders do not participate in the upside beyond the pre-specified interest and principal payments and may receive nothing if the gamble does not pay off. When a firm faces significant financial difficulties and the market value of the equity holders' investment in a firm is reduced, the equity holders have greater incentives to increase the firm's riskiness because they have less to lose. In contrast, debt holders have precisely the opposite desire because they simply want to protect the value of the debt. Debt holders typically value a risk-averse strategy because that will increase the probability of getting their investment back. However, equity holders are willing to take on very risky projects. If the risky projects succeed, they will get all of the profits themselves, whereas if the projects fail the risk is shared with the debt holders.[132]

In finance theory, the *asset substitution problem* is a well-known agency problem that can be applied in a situation when a firm is facing financial distress.[133] The asset substitution problem occurs when a company is likely to default. In this case, shareholders tend to take on overly risky projects, including projects with a negative net present value ("NPV"). The following example demonstrates this agency conflict.

Assume the firm has a debt payment of $60 outstanding. The managers of the firm have to make a choice to invest between two distinct projects, A and B, which have the same expected payoff. Moreover, assume that the cash required for the two investment projects is equivalent and will exhaust the total cash of the firm. At the end of the period, the payoff of the selected project is the final amount that shareholders and debt holders obtain. Table 8.1 lists the payoffs and probabilities of each of these projects.

---

[132] George G. Kaufman and Randall S. Kroszner, "How Should Financial Institutions and Markets Be Structured, Analysis and Options for Financial System Design," September 27-28, 1996 pp. 8- 9.

[133] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 4.

**Table 8.1: Illustration of Payoffs and Probabilities of Projects**

| Cash Flow | Project A | | Project B | |
|---|---|---|---|---|
| | Unsuccessful | Successful | Unsuccessful | Successful |
| | Payoff (80% Prob.) | Payoff (20% Prob.) | Payoff (50% Prob.) | Payoff (50% Prob.) |
| Total Cash Flow | $0 | $250 | $50 | $50 |
| Cash Flow to Shareholders | $0 | $190 | $0 | $0 |
| Cash Flow to Debt Holders | $0 | $60 | $50 | $50 |

If Project A is successful, the firm will receive $250 in total cash flow. Of this $250, $60 will go to the debt holders to repay the $60 of outstanding debt payments. The shareholders will receive the remaining $190. If Project A is not successful, the firm will receive no cash, and both the shareholders and the debt holders will receive no cash. If Project B is successful, the firm will receive $50 in total cash flow. Because the firm has $60 of outstanding debt, the entire $50 will go to pay off the debt holders, leaving the shareholders with $0. The outcome is the same if Project B is unsuccessful. The firm will receive $50, which will go to the debt holders to pay off the $60 in outstanding debt.

For shareholders, Project A offers an expected payoff of $38 ($0 x 80% + $190 x 20%), and Project B offers shareholders an expected payoff of $0 ($0 x 50% + $0 x 50%). Because the Project A's expected payoff is higher than that of Project B, the firm's management will choose to invest in Project A to maximize shareholder value. Even if Project B is successful, the $50 in total cash flow is not sufficient to pay the debt holders; therefore, the shareholders would have to hand the firm over to the debt holders when the debt matures. Because the payoff is insufficient to cover the full amount of outstanding debt payments, the company would go into default.

For debt holders, Project A offers an expected payoff of $12 ($0 x 80% + $60 x 20%), and Project B offers an expected payoff of $50 ($50 x 50% + $50 x 50%). Therefore, debt holders would prefer that management invest in Project B, which would give them a guaranteed $50.

This example illustrates the agency conflict of the asset substitution problem. This problem was first raised in 1976, by Jensen and Meckling in their paper "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure" in the *Journal of Financial Economics*. The example demonstrates that when a company is likely to default, shareholders will have nothing to lose and will tend to pursue extremely risky but not necessarily positive NPV investment projects. The shareholders are in essence gambling with the money of the debt holders.[134]

---

[134] Ren-Raw Chen and Hsuan-Chu Lin, "The Structural Agency Problem under Credit Risk," Rutgers Business School, June 2005, p. 25.

44

## VIII.B.2  CSFB Had a Conflict of Interest with Oakwood's Debt Holders

As an equity holder, CSFB's interests were aligned with those of Oakwood's other equity holders and were in conflict with those of Oakwood's creditors. CSFB was aware of the conflict of interest that exists between being an equity holder and a lender.[135] CSFB had an interest in Oakwood continuing operations, even if doing so meant further deterioration in the Company's insolvent financial condition: Its equity interest could not be worth less than $0, and it could attain positive value if Oakwood managed a successful turnaround. As discussed, equity holders are willing to subject the firm to greater risk to gain the upside of the return. While Oakwood was insolvent in the fall of 2001, CSFB had an incentive to attempt to prolong the business to reap the potential rewards. While filing for Chapter 11 was in the best interest of the debt holders, as an equity holder, CSFB's interest was in deferring the bankruptcy in the hope of turning the Company around. Had Oakwood not continued as a going concern, CSFB not only would have lost out on the securitization and lending fees it was earning (described in Section VIII.A), but it also would have lost the option value provided by its warrants.

## VIII.C  Even Though CSFB Was a Lender, Its Interests Differed from Those of Other Debt Holders

As discussed, CSFB's interests conflicted with those of Oakwood and its creditors because of the fees it earned as long as Oakwood continued to operate, and because of its equity interest in Oakwood. This was the case despite CSFB's position as a lender to Oakwood. While CSFB acted as a lender to the Company, by providing a credit line through the Warehouse Facility, CSFB's position as an over-secured lender was different from those of other debt holders to Oakwood due to its insulation from the risk of Oakwood bankruptcy.

The Warehouse Facility was structured as a bankruptcy-remote special purpose vehicle ("SPV") securitization credit facility. Oakwood's finance subsidiary, OAC, originated and sold the contracts to a bankruptcy-remote special purpose entity ("SPE") called Ginkgo LLC. The SPE pledged the paper to CSFB under a $200 million, three-year warehouse line and received funding based on 81 percent of qualifying loan principal balances. Oakwood financed the remaining 19 percent from cash flows and replenished liquidity or paid CSFB through proceeds generated from quarterly asset securitizations. In addition, the notes CSFB purchased were secured by the loans in the OMI Note Trust. Thus, CSFB's credit risk was limited to the credit risk of the Notes and did not include the bankruptcy risk of Oakwood or any of its subsidiaries.[136]

---

[135] CSFB email from Fiachra O'Driscoll to John Crystal dated May 16, 2000. Document # CSFB-00492624.
[136] CSFB Memorandum dated December 11, 2000. Document # CSFB-00205989.301.

Had Oakwood filed for bankruptcy, CSFB still would have received the full amount of its loan back. As of November 26, 2002, $148 million was outstanding on the CSFB facility.[137] The corporate credit risk was removed because CSFB had a priority claim on the assets transferred to the SPV. Essentially, CSFB bore no risk with respect to the Warehouse Facility, Mr. Muir stated:

> [T]he warehousing facility was extremely well structured in 2001 and it was the most elaborate structure of its kind I had seen in terms of providing protection to lenders. It was well structured from a credit enhancement point of view such that the credit quality of Oakwood should have been largely irrelevant. It was intended to be that way. So from a risk point of view I didn't see that this bankruptcy had any risk to speak of incrementally to the lender.[138]

Thus, CSFB's position was distinguishable from other debt holders in that its interests were secured and insulated from the event of Oakwood bankruptcy. An email from Mr. Felt to Mr. O'Driscoll reveals that the Warehouse Facility was indeed bankruptcy protected. The email related to Judge Walsh's order protecting the Warehouse Facility, stating that

> Judge Walsh entered an order approving Oakwood's motion to continue its warehouse operations. The order provides the following protections for the facility: All RICs securitized under the Warehouse Facility Agreements (i) shall be deemed sold to the Warehouse Trust free and clear of all liens, claims charges, encumbrances and adverse claims attaching to the proceeds of such sales, (ii) shall not constitute property of any of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code, and (iii) shall not be subject to the automatic stay imposed by Section 362(a) of the Bankruptcy Code or by any other relief issued under Section 105 of the Bankruptcy Code.[139]

Therefore, CSFB's exposure as a lender was bankruptcy remote and limited to the assets owned by the Trust. Although aware of the negative outlook for Oakwood, CSFB was concerned with earning fees while protecting its own interests. As CSFB stated, the Warehouse Facility provided "attractive economics [to CSFB], regardless of [Oakwood's] business outcome. CSFB [received] a program fee of 7.5% ($15 million) payable over three years. If [Oakwood] defaults, the program fee payment [was] secured by assets purchased."[140] CSFB also received eight-year warrants for 19.9 percent of the diluted common shares of Oakwood. Thus, there was "considerable upside to CSFB, even in a default scenario."[141]

---

[137] Foothill Inter-Office Memorandum. Oakwood Homes Corporation dated November 26, 2002. Document # F-657.
[138] Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston*, September 26, 2006, p. 188-9.
[139] Email from Jared Felt to Fiachra O'Driscoll. Document # CSFB-00512527.
[140] CSFB Materials Prepared for Discussion. Oakwood Homes Corp. dated December 18, 2000. Document # CSFB-00141065.
[141] *Ibid.*

As discussed, CSFB effectively positioned itself as a significant equity holder in Oakwood. Although CSFB acted as a lender to Oakwood, its interests differed from those of other debt holders in light of the protections CSFB had in place that essentially limited its exposure to Oakwood in the event of bankruptcy. Thus, CSFB had an interest in only one side of the agency conflict - that is, the equity holders' side. Until August 2002, no evidence exists which reveals that CSFB ever considered the interests of Oakwood's creditors. In light of the agency conflicts that arise between equity holders and debt holders, CSFB had nothing to lose by helping to keep Oakwood operational, and in fact had a financial incentive to continue to earn fees from the services it provided to Oakwood.

### VIII.D  Conclusion Regarding CSFB's Incentives

CSFB had a financial interest in Oakwood continuing its operations. First, CSFB stood to continue earning securitization and lending fees as long as Oakwood continued to borrow money and conduct securitizations to funds its operations. Second, CSFB's warrants in Oakwood would attain value if Oakwood staged a recovery. At the same time, CSFB was insulated from the costs of Oakwood continuing operations. Its warrants could not be worth less than $0, and its position as lender to Oakwood differed from that of Oakwood's other creditors because its exposure to the client was insulated from the threat of Oakwood bankruptcy.

Dated:    April 30, 2007

Alan C. Shapiro, Ph.D.

47

**Appendix A:  Curriculum Vita of Alan C. Shapiro, Ph.D.**

## RESUME AND PRIOR TESTIMONY OF ALAN C. SHAPIRO

Marshall School of Business
University of Southern California
Los Angeles, California 90089-1427

### EDUCATION
| | |
|---|---|
| Ph. D. | Economics, Carnegie Mellon University, 1971 |
| B.A. | Mathematics, Rice University, 1967 |

### CURRENT POSITION
1991-Present:  Ivadelle and Theodore Johnson Professor of Banking and Finance, Marshall School of Business, University of Southern California

### PAST POSITIONS
1993-1997:  Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1984-1990:  Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1986-1987:  Chairman, Department of Finance and Business Economics, Marshall School of Business, University of Southern California

1978-1984:  Associate Professor of Finance and Business Economics, Marshall School of Business, University of Southern California

1981-1984:  Director of Research, International Business Education and Research (IBEAR) program, University of Southern California

1971-1978:  Assistant Professor, The Wharton School, University of Pennsylvania

1975-1978:  Director, Research Group in Multinational Financial Management, The Wharton School, University of Pennsylvania

1968-1971:  Instructor, Graduate School of Industrial Administration, Carnegie Mellon University

### VISITING APPOINTMENTS
Spring 2003:  U.S. Naval Academy

Spring 1990:  Yale School of Management, Yale University

1

1984-1985:     Anderson Graduate School of Management, UCLA

Spring 1981:   Faculty of Commerce, University of British Columbia

Spring 1977:   Stockholm School of Economics

## TEACHING EXPERIENCE

University of Southern California (1978-present): Corporate finance, corporate financial strategy, international financial management, international economics, macroeconomics, political economy, microeconomics.

U.S. Naval Academy (visiting professor, Spring 2003): Micro- and macroeconomics

Yale School of Management (visiting professor, Spring 1990): Corporate financial strategy, international financial management.

UCLA (visiting professor, 1984-1985): International financial management, international economics, corporate finance.

University of British Columbia (visiting professor, Spring 1981): International finance, international financial management.

Stockholm School of Economics (visiting professor, Spring 1977): International financial management.

University of Hawaii (visiting professor, Summer 1976, 1978): Corporate finance.

Wharton School (1971-1978): Multinational enterprise, international financial management, international banking, multinational enterprise policy, corporate finance, various research seminars (e.g., management science for the multinational enterprise, international cash management, risk management in international banking).

Carnegie Mellon University (1968-1971): Microeconomics, macroeconomics, statistical decision theory, industrial administration.

## EXECUTIVE PROGRAMS: UNIVERSITIES

University of Southern California Executive Programs: Global macroeconomics, international finance and economics, corporate finance.
USC Advanced Management Program in Telecommunications: Value-based management, merger and acquisition analysis.

UC Berkeley Advanced Executive Program: Corporate strategy and finance, international finance.

Yale Executive Management Program: Corporate finance, international finance, global macroeconomics.

University of Hawaii (Pacific Asian Management Institute): Country risk analysis, global strategy, international financial markets.

UCLA Executive Programs: International finance, corporate finance.

UCLA: Medical Marketing Program.

UCLA/ITESM: Corporate financial strategy, international finance (for Mexican executives).

Wharton School Executive Programs: International financial management, international banking, international business strategy.

Columbia University Executive Programs: International finance, corporate finance.

University of Melbourne: Value-based management.

University of Washington (Center for the Study of Banking and Financial Markets): International portfolio diversification.

Banff School of Advanced Management: International business and the world economy.

Stockholm School of Economics: International financial management, managing headquarters-subsidiary relations.

Graduate School of Credit and Financial Management (Tuck School, London Business School): Strategy of multinational enterprise.

## EXECUTIVE PROGRAMS: IN-HOUSE CORPORATE AND BANKS
CRL Industries: Implications of shareholder value for managing a diverse business.

Korn/Ferry International: Implications of shareholder value and globalization for executives.

Bank of America: Key trends for commercial banks, coping with a competitive environment.

Times Mirror Corporation: Economic value added.

Kidder-Peabody: Global asset allocation and the risk-reward trade-off in international investing.

Aetna: Value-based management, international finance and economics.

IBM: Macroeconomic environment, corporate finance and corporate strategy.

Knight-Ridder: Value-based management.

Glaxo: Creating shareholder value.

TRW: Finance function and value creation.

Abbott Labs: Value-based management.

Dow Chemical: Creating shareholder value.

Merck: Corporate and international finance.

Southwestern Bell: Corporate finance and building shareowner value.

General Motors: Analyzing foreign operations and global supplier relationships.

Philip Morris: Global financial strategy and structure.

Citicorp Institute for Global Finance: International finance, corporate finance.

Citicorp Worldwide Personal Banking: International portfolio investment.

Andersen Consulting: Value-based management.

Bank of America Training Programs: International finance, advanced corporate finance, international economics, global funds management.

British Petroleum (Australia): Value-based management.

United States Department of Commerce (Asia/Pacific Business Outlook 1988-1991): International finance, foreign exchange risk management.

Capital Group: Corporate finance.

Alcar: International finance.
Business International Corporation: Foreign exchange risk management.

COPARMEX Executive Program (Mexico City): Managerial finance.
American Management Association: International financial management.

Korea Development Finance Corporation (Seoul): The role of financial institutions in economic development.

4

Training programs on the use of expert witnesses for Hastings College of Advocacy; O'Melveny & Myers; and Brobeck, Phleger & Harrison.

## SERVICE TO SCHOLARLY JOURNALS AND ORGANIZATIONS

Editorial Positions

Associate Editor, *International Trade Journal*
Associate Editor, *Journal of Financial Research*
Associate Editor, *Journal of International Financial Management and Accounting*
Associate Editor, *Journal of Applied Corporate Finance*
Associate Editor, *Global Finance Journal*

Boards of Directors

Academy of International Business
Western Finance Association
American Finance Association

Reviewer for

*Journal of Financial Economics*                      *Journal of Banking and Finance*
*Journal of Political Economy*                         *Financial Review*
*Journal of Finance*                                   *International Trade Journal*
*Management Science*                                   *Financial Management*
*Journal of International Economics*                    *Urban Economics*
*Journal of Money, Credit, and Banking*                *Journal of International Business Studies*
*Journal of Financial and Quantitative Analysis*        *Journal of Economics and Business*
*National Science Foundation*                           *Journal of Financial Services Research*
*Journal of International Money and Finance*

## PUBLICATIONS: BOOKS

*Multinational Financial Management*, John Wiley & Sons, 8th ed.

*Foundations of Multinational Financial Management*, John Wiley & Sons, 5th ed., 2005.

*Modern Corporate Finance: An Interdisciplinary Approach to Value Creation* (Prentice-Hall, 2000, coauthored with Sheldon Balbirer).

*Modern Corporate Finance*, Macmillan, 1990.

*International Corporate Finance*, Ballinger, 1989.

*Capital Budgeting and Investment Analysis*, Prentice-Hall, 2005.

## PUBLICATIONS: MONOGRAPHS

*International Corporate Finance: A Survey and Synthesis*, Financial Management Association, 1986.

5

*Foreign Exchange Risk Management*, American Management Association, 1978.

## PUBLICATIONS: ARTICLES

"The Private Company Discount" (with John Koeplin and Atulya Sarin), *Journal of Applied Corporate Finance*, Winter 2000.

"Tobin's q and the Relation Between Accounting ROI and Economic Return" (with Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Winter 1995.

"Competitive Implications of Europe 1992," *European Business Journal*, Fall 1991.

"The Economic Import of Europe 1992," *Journal of Applied Corporate Finance*, Winter 1991.

>  Reprinted in *Studies in International Corporate Finance and Governance Systems: A Comparison of the U.S., Japan, & Europe* (Editor, Donald H. Chew), Oxford University Press, 1997.

"Corporate Stakeholders and Corporate Responsibility," *USC Business*, Summer 1991.

"When Hedging Makes Sense in Managing Foreign Exchange Risk," *Journal of European Business*, March/April 1990.

"When Hedging Makes Sense: Managing Foreign Exchange Risk," *Corporate Controller*, March/April 1990.

"The Mispricing of U.S. Treasury Bonds: A Case Study" (with Bradford Cornell), *Review of Financial Studies*, December 1989.

"Why the Budget Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Fall 1989.

"Cross-Sectional Regularities in the Reaction of Stock Prices to Bond Rating Changes" (with Brad Cornell and Wayne Landsman), *Journal of Accounting, Auditing and Finance*, Fall 1989.

"Ensure Future Access to Capital...," Comments on "The Case of the Expensive Expansion," *Harvard Business Review*, January-February 1989.

"Why the Trade Deficit Does Not Matter," *Journal of Applied Corporate Finance*, Spring 1989.

"Financing Corporate Growth" (with Bradford Cornell), *Journal of Applied Corporate Finance*, Summer 1988.

>  Reprinted in *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

6

"A Market-Based Test of the Effect of Monetary Policy" (with Maurice Levi), *Economic Inquiry*, April 1987.

"Corporate Stakeholders and Corporate Finance" (with Bradford Cornell), *Financial Management*, April 1987.

"Taxes and Stock Return Seasonality: Evidence from the London Stock Exchange" (with Marc Reinganum), *Journal of Business*, April 1987.

"Multinational Corporations and National Regulation: An Economic Audit," *Managerial Finance*, January 1987.

"Guidelines for Long-Term Financing Strategy," *Midland Corporate Finance Journal*, Winter 1986.

> Reprinted in the *Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998.

"The Impact on Bank Stock Prices of Regulatory Responses to the International Debt Crisis" (with Brad Cornell and Wayne Landsman), *Journal of Banking and Finance*, Special supplement, 1986.

"International Banking and Country Risk Analysis," *Midland Corporate Finance Journal*, Fall 1986.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Systematic Risk, Total Risk, and Size as Determinants of Stock Market Returns" (with Josef Lakonishok), *Journal of Banking and Finance*, March 1986.

"The Reaction of Bank Stock Prices to the International Debt Crisis" (with Bradford Cornell), *Journal of Banking and Finance*, March 1986.

"Interest Rates and Exchange Rates: Some New Empirical Results" (with Bradford Cornell), *Journal of International Money and Finance*, December 1985.

"Currency Risk and Country Risk in International Banking," *Journal of Finance*, July 1985.

"An Integrated Approach to Corporate Risk Management" (with Sheridan Titman), *Midland Corporate Finance Journal*, Summer 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and. *Corporate Risk Management* (editors, Gregory Brown and Donald Chew), Risk Books, 2000.

"Corporate Strategy and the Capital Budgeting Decision," *Midland Corporate Finance Journal*, Spring 1985.

> Reprinted in *The Revolution in Corporate Finance* (editors, Joel Stern and Donald Chew), Basil Blackwell, 1998; and *The New Corporate Finance: Where Theory Meets Practice* (editor, Donald Chew), McGraw Hill, 1993.

"Currency Risk and Relative Price Risk," *Journal of Financial and Quantitative Analysis*, December 1984.

"Guidelines for Global Financing Choices" (with Donald Lessard), *Midland Corporate Finance Journal*, Winter 1984.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"A Practical Method of Assessing Foreign Exchange Risk" (with C. Kent Garner), *Midland Corporate Finance Journal*, Fall 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Stock Returns, Beta, Variance, and Size: An Empirical Analysis" (with Josef Lakonishok), *Financial Analysts Journal*, July/August 1984.

"The Impact of Taxation on the Currency-of-Denomination Decision for Long-Term Foreign Borrowing and Lending," *Journal of International Business Studies*, Spring/Summer 1984.

"The Evaluation and Control of Foreign Affiliates," *Midland Corporate Finance Journal*, Spring 1984.

> Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"What Does Purchasing Power Parity Mean?" *Journal of International Money and Finance*, December 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984.

"Managing Foreign Exchange Risk" (with Bradford Cornell), *Midland Corporate Finance Journal*, Fall 1983.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), John Wiley, 1984; and *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Nominal Contracting in a World of Uncertainty," *Journal of Banking and Finance*, March 1983.

"International Capital Budgeting," *Midland Corporate Finance Journal*, Spring 1983.

Reprinted in *New Developments in International Finance* (Editors, Joel Stern and Donald Chew), Basil Blackwell, 1988.

"Risk in International Banking," *Journal of Financial and Quantitative Analysis*, December 1982.

"The Management of Political Risk," *Columbia Journal of World Business*, Fall 1981.

"In Defense of the Traditional Weighted Average Cost of Capital as a Cutoff Rate," *Financial Management*, Summer 1979.

"Evaluation and Control of Foreign Operations," *International Journal of Accounting*, Fall 1978.

Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Payments Netting in International Cash Management," *Journal of International Business Studies*, Fall 1978.

"Financial Structure and Cost of Capital in the Multinational Enterprise," *Journal of Financial and Quantitative Analysis*, June 1978.

Reprinted in *International Accounting and Transnational Decisions* (Editor, S. J. Gray), Butterworth, 1983.

"Capital Budgeting for the Multinational Corporation," *Financial Management*, Spring 1978.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979; *International Finance* (Editors, Gerald D. Gay and Robert W. Kolb), Robert F. Dame, 1983; *International Accounting and Transnational Decision* (Editor, S.J. Gray), Butterworth, 1983; and *International Business Classics* (Editors, James C. Baker, John Ryans, Jr., and Donald G. Howard), Lexington Books, 1988.

"Defining Exchange Risk," *Journal of Business*, January 1977.

"International Cash Management--The Determination of Multicurrency Cash Balances," *Journal of Financial and Quantitative Analysis*, December 1976.

"Managing Exchange Risks in a Floating World" (with David P. Rutenberg), *Financial Management*, Summer 1976.

Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Incentive Systems and the Implementation of Management Science," *Interfaces*, November

1976.

"Financial Goals and Debt Ratio Determinants: A Survey of Practice in Five Countries" (with an international consortium of eight others), *Financial Management*, Autumn 1975.

"Evaluating Financing Costs for Multinational Subsidiaries," *Journal of International Business Studies*, Fall 1975.

> Reprinted in *International Financial Management* (Editor, Donald R. Lessard), Warren, Gorham & Lamont, 1979.

"Exchange Rate Changes, Inflation, and the Value of the Multinational Corporation," *Journal of Finance*, May 1975.

"When to Hedge Against Devaluation" (with David P. Rutenberg), *Management Science*, August 1974.

> Reprinted in *International Capital Markets* (Editors, E. J. Elton and M. J. Gruber), Elsevier, 1975.

"Analyzing Quantitative Models" (with J. Scott Armstrong), *Journal of Marketing*, April 1974.

"Optimal Inventory and Credit-Granting Strategies Under Inflation and Devaluation," *Journal of Financial and Quantitative Analysis*, January 1973.

> Reprinted in *Management of Working Capital* (Editor, Keith V. Smith), West Publishing Co., 1974; and *International Capital Markets* (Editors, Edwin J. Elton and Martin J. Gruber), Elsevier, 1975.

## PUBLICATIONS: BOOK CHAPTERS

"Analysis of the Orange County Disaster," *The Growth of Risk Management - A History*, Risk Books, 2003.

"Capital Structure and Financial Strategy," *Handbook of Modern Finance* (Editor, Dennis E. Logue), 4th ed., Boston: Warren Gorham Lamont, 2002.

"Innovative Financial Strategies for Biotechnology Ventures" (with Paul J.H. Schoemaker), *Wharton on Managing Emerging Technologies*, edited by George Day and Paul Schoemaker, 2000.

"Leveraged Buyouts," *The New Palgrave Dictionary of Money and Finance* (Editor, Peter Newman), London: Macmillan Press Reference Books, 1993.

"Financial Decisions for Multinational Enterprises" (with Richard K. Goeltz), *Financial Handbook* (Edward I. Altman editor) 6th ed., New York: John Wiley & Sons, 1986.

"Management Science Models for Multicurrency Cash Management," in *International*

*Business Systems Perspectives* (Editor, C. G. Alexandrides), Georgia State University, 1973.

## WORKING PAPERS

"Value of Corporate Control: Some International Evidence" (with Paul Hanouna and Atulya Sarin), November 2003, revised.

"Corporate Strategy and Investment Analysis," March 1996.

"Dividend Policy in a Restructuring Company: The Case of Pacific Enterprises," (with Lloyd Levitin and Randy Westerfield), May 1995.

"Systematic Differences in Real Interest Rates Internationally."

"Why Partial Deregulation Is Not Sustainable: Lessons from Ten Industries," May 1992.

"Exchange Rate Volatility and the Value of the Option to Introduce a New Product," (with Warren Bailey, Cornell), April 1991, revised November 1997.

"Economic Analysis of Transfer Pricing for Tax Purposes," a report prepared at the request of the American Law Institute, July 1986.

## CONSULTING AND PROFESSIONAL ACTIVITIES

Member, Board of Directors, Chairman of Audit Committee, Chairman of Compensation Committee, Advanced Cell Technology, Inc.

Consultant, Royal Bank of Canada: Assessing the economic rationale of transactions with Enron.

Consultant, IRS: Analyzing the value of intangible assets for a pharmaceutical company, including drug patents, regulatory skills, and marketing and distribution channels.

Consultant, AT&T: Analyzing the use and importance of most-favored nation ("MFN") provisions in contracts.

Consultant, U.S. Department of Justice: Analyzing the appropriate capital structure for a financial holding company and estimating the cost of financing a thrift absent FIRREA.

Member, Board of Directors, Chairman of Compensation Committee, member and past Chairman of Audit Committee, Remington Oil and Gas Corporation

Trustee, member of Audit Committee, the Pacific Corporate Group Private Equity Fund.

Consultant, Telstra: Estimating the cost of capital for Telstra overall and for each of its divisions.

Member, Advisory Board, LEK Consulting.

Consultant, Anheuser-Busch: Estimating the cost of capital for its wholesale distributors.

Consultant, Northrop Grumman: Participated with members of the NGC shareholder value team to help facilitate the process of institutionalizing shareholder value throughout the organization.

Consultant, Time Warner: Estimating the cost of capital for Time Warner overall and for each of its business units.

Consultant, Southwestern Bell: Estimating the cost of capital for domestic and foreign ventures and projecting their future cash flows. Assessing the consequences of deregulation.

North Broken Hill: Estimating the weighted average cost of capital for their Australian operations.

Consultant, Caltex Petroleum Company: Estimating the cost of capital for its various foreign operations, measuring corporate exposure to foreign exchange risk, increasing shareholder value.

Consultant, Pacific Enterprises: Determining a new dividend policy, the appropriateness of a new equity issue, and the appropriateness of a quasi-reorganization; assessing the likely consequences of a performance-based ratemaking system on SoCalGas' risks and returns.

Director, Lincoln Savings and Loan Association: Appointed by FDIC *after* seizure.

Consultant, U.S. Department of Energy: Estimating the cost of capital for utilities and energy projects.

Consultant, Mary Kay Cosmetics: Assessing the value of foreign investments and alternative foreign market entry strategies.

Consultant, Royal Bank of Canada: Assessing competitive entry strategies in the U.S. corporate and institutional banking markets.

Consultant, Meyer Interest Rate Survey: Valuing a privately-held company.

Consultant, NCR: Measuring corporate exposure to exchange risk.

Consultant, Federal Home Loan Bank: Assessing the investment policies and practices of Lincoln Savings and Loan and CenTrust Bank.

Consultant, Texas Instruments: Estimating the competitive effects of cost of capital differentials between the United States and Japan.

Consultant, Arco Chemical: Measuring corporate foreign exchange risk and integrating its management with overall corporate strategy.

Management Analysis Center (MAC) faculty associate.

Consultant, Computer Sciences Corporation: International treasury management.

Consultant, GTE Microcircuits Division: Corporate strategy.

Consultant, Vulcan Materials Co.: Measuring corporate exposure to foreign exchange risk.

Consultant, OKC Corporation: Valuation of an oil refinery.

Consultant, CKB Associates: Financial, marketing, strategic and economic analyses of a new cement plant.

Member, Board of Directors, OKC Corporation (1979-1981).

Consultant, Wells Fargo Bank: Measuring the riskiness of an international loan portfolio.

Consultant, Flying Tiger Line: Analyzing the impact of exchange rate changes on Pacific air freight business; evaluating return on investment in the international airline industry.

Consultant, Business International Corporation: International cash management; management of blocked funds.

Consultant, Scott Paper Co.: Determining the multinational cost of capital; factoring political and economic risks into foreign investment analyses.

Consultant, Citibank: Multinational financial management; design of a model for management of exposure and short-term financing.

Consultant, Fidelco Associates: Financial management.

Consultant, Carborundum Corporation: Analysis of joint ventures with Hungary and Poland.

Consultant, Maxwell House Division, General Food Corporation: Developing models for long-range marketing strategies.

Consultant, University of Pennsylvania Medical Center: Studying the economic impact of a Health Maintenance Organization on the Medical Center; estimating demand for a new group practice to be located at Graduate Hospital.

Financial columnist: Business International Money Reports.

## AWARDS AND SPECIAL RECOGNITION

My article (with Bradford Cornell), "Corporate Stakeholders and Corporate Finance," April 1987, was listed as the most frequently-cited article published in *Financial Management* since 1985 and one of the 25 most frequently-cited articles published in the history of *Financial Management*.

Cited by *Business Week* as one of the ten most in-demand professors for in-house corporate executive programs: 1993

Ranked as one of the most prolific contributors to international business literature in a study published in the *Journal of International Business Studies*: 1991

Voted the Outstanding Teacher in USC's Executive MBA program: 1991

Nominated as Outstanding Teacher, Yale School of Management: 1990

Voted Best Teacher in the MSMIE program, School of Business Administration, USC: 1989

Cited in *Financial Management* as one of "100 Most Prolific Authors in Finance": 1988

Winner (with Bradford Cornell) First Financial Management Association Distinguished Applied Research Award for the article "Corporate Stakeholders and Corporate Finance": 1987

Second place in dissertation contest sponsored by Association for Education in International Business: 1971

## SPEECHES

Elar Partners: "Globalization of Capital Markets and Its Impact on the U.S. Economy and the Insurance Industry."

Post-EMBA Program: "The Privatization of Latin America."

Dentsu (Tokyo): "Multinationalization of Japanese firms."

Financial Executives Institute: "Why the Budget Deficit Doesn't Matter."

TRW: "The Economic Future of the United States: Myths and Reality."

Fred James Corporation: "Economic Prospects for Los Angeles."

Wharton Club of Los Angeles: "Why the Trade Deficit Doesn't Matter."

Beverly Hills B'nai B'rith: "U.S. Economic Prospects for the 1990s."

Young Presidents Organization: "Why the Twin Deficits Don't Matter."

Republican Women's Club: "Mexico's Economy: Now and in the Future."

Young President's Organization: "Mergers and Acquisitions."
USC Executive MBA Alumni Association: "Clintonomics or Clintonitis."

Young President's Organization: "Why the Twin Deficits Don't Matter... and What Does."

USC MBA Alumni Association: "Global Restructuring of Companies, Governments, and Nations: Causes and Consequences"

USC Orange County Advisory Council: "The Asian Financial Crisis"

Los Angeles Society of Financial Analysts: "Globalization of Financial Markets"

## EXPERT WITNESSING

1. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank.

2. Hopkins & Carley: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior.

3. Ruby and Schofield: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages.

4. New York State Department of Taxation and Finance: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership.

5. Massachusetts Department of Revenue ("MDR"): Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its

15

wholly-owned subsidiaries, T.J. Maxx, Chadwick's of Boston, and Marshalls, Inc., with its Nevada investment holding companies (NCs), as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent.

6. O'Melveny & Myers: Analyzing whether the disclosures made by AMERCO regarding the consolidation of SAC Holdings had an impact on the availability and cost to AMERCO of raising debt capital. A key issue is how consolidation of a special purpose entity (SPE) would affect a company's creditworthiness insofar as it did not affect forecasts of the company's cash flows, asset values, or claims against its assets as opposed to the effects of adverse financial market conditions and the poor operating performance of its different businesses.

7. IRS: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company.

8. IRS: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996.

9. Sachnoff & Weaver: Opining on whether Chase Securities, Inc. did what a reasonable or reasonably prudent investment banker would have done in its capacity as a placement agent, and later as initial purchaser, of securities in transactions sponsored by Commercial Financial Services, Inc. and on whether the statements and omissions made in connection with the sales of these securities placed and offered by Chase were material and had an effect on the price of the securities and the willingness of the investors to purchase these securities.

10. White & Case: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology.

11. U.S. Department of Justice: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions

could have been funded with straight debt.

12. IRS: Estimating the value of a subordinated note, with various terms and conditions, issued by a company to an affiliated company in connection with a cross-border acquisition.

13. Prongay & Borderud: Analyzing whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of directors in selling the company to insiders.

14. U.S. Department of Justice: Determining the fair market value of limited partnership and assignee interests in a family limited partnership.

15. IRS: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC.

16. White & Case: Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband.

17. Arnold & Porter: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the National Rural Telecommunications Cooperative.

18. Kajan Mather and Barish: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada for California state tax purposes.

19. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's Companies Inc. to a Delaware Holding Company.

20. IRS: Determining whether (and to what extent), as of June 30, 1994, it was likely that in 2006, Euro Disney S.C.A. would be compelled, in order to protect its economic or other interests, to exercise the Lease Assignment Option it received as part of a financial restructuring plan that was entered into as a result of large operating losses at Euro Disneyland.

21. IRS: Determining the fair market values of limited partnership interests in a family limited partnership, including appropriate minority and lack of marketability discounts.

22. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (art work and verses) transferred by [name deleted] to a Delaware Holding Company.

17

23. IRS: Determining the fair market value of First Guaranteed Cumulative Preferred and Common Equity Classes of limited partner interests in a family limited partnership, including the appropriate minority and lack of marketability discounts.

24. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the automobile extended warranty business were priced on an arm's length basis.

25. IRS: Determining whether the insurance services provided by an offshore wholly-owned reinsurance subsidiary to its parent in the retail rent-to-own business were priced on an arm's length basis.

26. IRS: Determining whether the research and development and other cost sharing agreements entered into between Conner Peripherals, Inc. and a wholly-owned foreign subsidiary reflect an allocation of sharing of all economic costs of the research program(s) commensurate with the economic benefits, with particular consideration paid to the issue of whether the cost of employee stock options should properly be included in the costs to be shared.

27. White & Case: Analyzing the damages to IPO and secondary market purchasers of an Internet stock associated with risk factors that were allegedly omitted from the offering memorandum.

28. IRS: Determining whether the value of compensation to employees in the form of stock options is an economic cost and, if so, if this cost would be included in arm's length research and development cost-sharing agreements.

29. Hennigan, Bennett & Dorman: Assessing the adequacy of the consideration paid by Gleacher Holdings pursuant to a transaction among National Westminster Bank, Gleacher NatWest, and Gleacher Holdings.

30. IRS: Determining whether the mortgage purchase commitment contracts issued by the FHLMC (Freddie Mac) were equivalent to put options.

31. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Disney Enterprises, Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Disney's New York taxpayer members included in the combined report.

32. Hennigan, Bennett & Dorman: Assessing the economic substance, transfer of risk, and pricing of certain lending transactions entered into by LTV Corp.

33. Hennigan, Bennett & Dorman: Determining the financial condition and business prospects of Counsel Corp. subsequent to its sale of Stadtlander Drug Co. to Bergen Brunswig Corp.

34. New York State Department of Taxation and Finance: Determining whether including the income of certain units of Alpharma Inc. in the computation of apportionable income on a combined franchise tax report, while excluding the New York sales of those same units from the numerator of the receipts factor, would result in a distortion of the income attributable to the activities in New York State of Alpharma's New York taxpayer members included in the combined report.

35. Franchise Tax Board: Determining whether Mission First Financial and its parent company Southern California Edison (SCEcorp) formed a unitary business for tax purposes.

36. Jenner & Block: Estimating the value of a high-technology venture capital investment and its economic viability on behalf of General Dynamics.

37. IRS: Estimating the fair market value of Burndy Corporation's Belgian subsidiary as well as opining on the relative value of Burndy's 50% stock holding in its Japanese joint venture and on whether Burndy's 50% shareholding gave it voting and operational control of Burndy Japan that was disproportionately valuable to it given that there were unanimous consent requirements on certain corporate decisions.

38. Hennigan, Bennett & Dorman: Assessing the value of earnout provisions involving revenue, gross profits, and EBITDA targets for American IC Exchange associated with its acquisition.

39. Hennigan, Bennett & Dorman: Determining the financial condition, solvency, and business prospects of Worldwide Direct, Inc.

40. Department of Justice: Estimating the damages suffered by Republic Savings Bank as a result of the forced phaseout of Republic's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

41. Department of Justice: Estimating the damages suffered by Southern California Federal Savings and Loan Association (SoCal) as a result of the forced phaseout of SoCal's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

42. Department of Justice: Estimating the damages suffered by First Annapolis Federal Savings Bank as a result of the forced phaseout of First Annapolis's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

43. Department of Justice: Estimating the damages suffered by Century Federal Savings Bank as

a result of the forced phaseout of Century's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

44. White & Case: Assessing whether CPI Corp. (Sears Portrait Studios) had suffered a material adverse effect in its business–as indicated by large declines in its most recent quarterly EBITDA and EPS, and cuts in its planned capital expenditures–sufficient to justify an investment partnership's calling off a planned leveraged buyout of the company.

45. Blumberg Family Trust: Determining an appropriate investment strategy for the trust, deviations from the above in co-trustees' actions and omissions, and the money damages incurred by the trust's beneficiaries arising out of fiduciary's failure to properly manage the trust.

46. IRS: Analyzing the business purposes for a series of corporate realignments undertaken by BTR. These realignments involved the creation of a series of new top-tier U.S. holding companies, the elimination of certain other U.S. holding companies, and the shifting of several Canadian companies from one place in the corporate hierarchy to another place.

47. Kajan Mather and Barish: Determining whether the investments in agricultural partnerships associated with American Agri-Corp. (AMCOR) had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor.

48. IRS: Determining the relative fair market values of equity interests in J. Miller Industries, Inc. (JMI) held by two groups of shareholders, each of whom owned 50% of the stock. The first group consisted of two Miller brothers, while the second group consisted of nine JMI employees. The issue was whether the block of stock held by the employees was worth the same as or less than the block held by the Miller brothers.

49. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

50. IRS: Determining the appropriate definition of fair market value as well as the actual fair market values of the British and German subsidiaries of Schlegel Corporation, a wholly-owned U.S. affiliate of BTR Dunlop, that were sold to other units of BTR.

51. Latham & Watkins: Assessing whether the risks associated with high-yield debt issued by Weintraub Entertainment Group and underwritten by Bear Stearns were adequately disclosed in its Private Placement Memorandum, whether statements in an Executive Summary were false and misleading, and what information sophisticated investors could reasonably be expected to rely on.

52. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on trademarks transferred by [name deleted] to a Delaware Holding Company and the legitimacy of the business purposes cited for this transfer.

53. White & Case: Analyzing the impact of Indonesia's debt reorganization in September 1998 on a credit derivatives transaction between Deutsche Bank and Capital Reinsurance Company. The transaction involved a fixed-for-floating rate swap tied to sovereign debt issued by the Republic of Indonesia. The issue was whether a credit event had occurred within the meaning of various terms and conditions in the swap contract.

54. Safeco Insurance: Assessing the economic profitability and solvency of HomeBaker Bread Slicer Company. The case involved determining the demand for and the costs of supplying HomeBaker bread slicers, the adequacy of HomeBaker's financing given its business situation, and the lost profits associated with the use of allegedly adulterated plastic materials in its production process.

55. SEC: Assessing the risks and values associated with the Orange County Investment Pool as of 1994 and determining whether CS First Boston and Merrill Lynch (two separate cases) adequately disclosed the risks connected with the Pool's investment strategy and position (including embedded losses) as of August 1994.

56. Herbert Hafif Law Offices: Determining damages suffered by Novaquest Infosystems and Webvision in failing to gain distribution for Webvision's eCommerce software, a failure that was attributed to interference by En Pointe Technologies. Damages included the potential lost chance to do an IPO.

57. IRS: Analyzing issues involving ownership and control of OPL–an offshore insurance affiliate of UPS–as well as the valuation of OPL and whether the insurance services provided to UPS by OPL were priced on an arm's length basis.

58. White & Case: Analyzing the foreign exchange trading actions of a trader for T.C. Ziraat/Bankasi to assess whether he violated the bank's trading limits, which were somewhat ambiguous.

59. Department of Justice: Estimating the value of canceled offshore leases held by Marathon and Mobil.

60. Sheppard, Mullin, Richter & Hampton:  Opining as to the care, diligence, and actions that one should reasonably expect from a municipal finance officer charged with managing municipal funds and comparing the behavior of various municipal treasurers swindled by Steven Wymer against this standard on behalf of Bank of America.

61. Department of Justice: Estimating the damages suffered by Glendale Federal Bank as a result

21

of the forced phaseout of Glendale's supervisory goodwill mandated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

62. IRS: Assessing the interest rate hedging strategies and risk management practices of Monex.

63. IRS: Assessing the value of RJR Nabisco's nationalized Aminoil subsidiary in Kuwait and the extent to which a payment made in compensation was for going concern value or for the lost time value of money associated with the delay in compensation.

64. White & Case: Assessing the prudence and diligence with which Cantor, Fitzgerald monitored and reported the Treasury bond trading activity of Arab Investment Company, including the use of repos and reverse repos.

65. Sachnoff & Weaver: Assessing the safety and soundness of CenTrust Bank's high yield investment practices and the economic profitability of CenTrust on an ongoing basis.

66. Pillsbury, Madison & Sutro: Analyzing the risks, returns, and investment opportunities in the foreign exchange market on behalf of Bank of America.

67. Smith Hulsey and Busey: Analyzing the appropriateness and consequences of Guarantee Security Life Insurance Co.'s junk bond investment practices and equity stripping.

68. White & Case: Assessing damages associated with Bankers Trust's use of derivatives and yield curve investment strategies in a corporate money management account.

69. White & Case: Assessing the value and solvency of MGM/UA at the time of its acquisition by Pathe. The issue was whether fraudulent conveyance had taken place at the time of the acquisition.

70. FBI: Assessment of CenTrust's junk bond investment practices.

71. Hughes & Luce: Assessing the valuation consequences of overstating Micro-C's equity and its income on the acquisition price paid by Aurora Electronics.

72. Spolin & Silverman: Analyzing the junk bond investment practices and consequences of Pilgrim Management Company.

73. IRS: Valuation of Carnation's intangible assets–including goodwill, brand names, process technology, market position, and work force–in its acquisition by Nestle.

74. IRS: Assessing the appropriateness of capital structure policies of multinationals.

75. IRS: Analyzing the pricing of interest rate/currency swap transactions by Nestle.

76. IRS: Establishing the arm's length price for contract research that should have been charged to Nestle by two contract research firms that worked solely for Nestle.

77. IRS: Estimating expected rates of return and risks on defined benefit pension plans.

78. IRS: Assessing the interest rate risk management practices of Federal National Mortgage Association and the pricing of dual currency bond swaps.

79. Shearman & Sterling: Valuing the damages associated with pipeline contamination suffered by Transwestern Pipeline.

80. Morrison & Hecker: Assessing the junk bond investment practices of Lincoln S&L for the RTC.

81. Troy & Gould: Estimating the damages involved in a class-action securities litigation case brought by Milberg WeissExpert against NTN Communications.

82. Rossbacher & Associates: Estimating damages suffered by Home Insurance in a case involving the economic profitability and financial solvency of windmill farms.

83. Sachnoff & Weaver: Assessing the safety and soundness of the investment practices of CenTrust on behalf of the RTC.

84. Berliner, Cohen & Biagini: Assessing investment banking practices on behalf of California Micro Devices.

85. Brobeck, Phleger & Harrison: Estimating damages suffered by ITT.

86. Ridout & Maybee (Canada): Opining on the foreign investment transfer pricing practices of multinational firms for Beecham, Inc.

87. Brobeck, Phleger & Harrison: Estimating damages associated with certain Wells Fargo's banking practices, specifically, its cutting off of credit to a firm that violated the terms and conditions of its loan.

88. Munger, Tolles & Olson: Expert witness for Beazer on issues related to its acquisition of Koppers.

89. Shearman & Sterling: Estimating damages suffered by Sonatrach (the Algerian national oil company) owing to a breach of contract.

90. Pettit & Martin: Estimating the economic damages associated with various investment

23

practices engaged in by American Diversified Savings Bank.

91. Bird and Marella: Opining on the nature of futures and forward contracts.

92. Mudge, Rose, Guthrie and Ford, Marrin, Esposito: Valuing George A. Fuller and estimating damages it suffered from a loss of major contracts.

**EXPERT WITNESS WORK FOR ALAN C. SHAPIRO LEADING TO TESTIMONY:**
**1994-2006**

1. Fleet Funding, Inc. and Fleet Funding 11, Inc., Appellants v. Commissioner of Revenue, Appellee, Docket No. C271862-C271863, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the mortgage REITs established by Fleet Bank, particularly with regard to the efficiency of their use as a capital-raising device. The hearing was held before Commissioner Frank Scharaffa. I testified on March 30, 2006 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

2. K.C. Multimedia, Inc., Plaintiff, v. Bank of America Technology and Operations, Inc., Defendant, Case No. 1-01-CV798875, Superior Court of the State of California for the County of Santa Clara: Assessing the economic validity of damage claims associated with alleged misappropriation of intellectual property brought against Bank of America and determining the appropriate way to estimate any such damages. I was deposed on February 3, 2006 on behalf of the defendant.

3. Micrel, Inc., Plaintiff, v. Deloitte & Touche, LLP, Defendant, Case No. CV 816477, Superior Court of the State of California for the County of Santa Clara: Assessing the effects of an error in the accounting treatment of stock options on corporate behavior and the economic consequences and costs of that behavior. I was deposed on October 28, 2005 on behalf of the plaintiff.

4. Bluebonnet Savings Bank, FSB, Plaintiffs, v. United States, Defendant, Case No. 95-532C, United States Court of Federal Claims: Estimating the damages suffered by Bluebonnet Savings Bank, FSB resulting from the elimination by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of forbearances Bluebonnet had received relating to the payment of dividends, the maintenance of capital, and the inclusion of subordinated debt in the calculation of its regulatory capital and whether all of the necessary capital contributions could have been funded with straight debt. I was deposed on June 3 and 4, 2004 (Washington, D.C.) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims on February 25 and 28, 2005 in Washington, D.C.

5. Petition of Hallmark Marketing Corporation for Redetermination of a Deficiency Under Article 9-A of the Tax Law for the Tax Year Ended 12/31/99, State of New York, Division of Tax Appeals, DTA No. 819956: Analyzing the arm's length nature of transactions between Hallmark Marketing Corporation and its parent, Hallmark Cards, Inc. Key issues included the identification of intangible assets, the allocation of excess returns among various intangible assets, the basis of fair market value of an intangible asset, and the nature of intangible asset ownership. The hearing was held before Judge Joseph W. Pinto, Jr. I testified

25

on February 16 and 17, 2005 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

6.  TJX Operating Companies, Appellant, vs. Commissioner of Revenue, Appellee, Docket No. C262229-C262231, Commonwealth of Massachusetts, Appellate Tax Board: Analyzing the business purposes and the economic substance of the intellectual property transactions of TJX Companies, Inc. and its wholly-owned subsidiaries with its Nevada investment holding companies, as well as the validity of TJX's use of its promissory notes in conjunction with cash transfers from its NCs back to the parent. The hearing was held before Commissioner Frank Scharaffa. I testified on January 14 and 19, 2005 (Boston, Massachusetts) on behalf of the Massachusetts Department of Revenue.

7.  Tribune Company, as successor by merger to the former The Times Mirror Company, Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 17443-02, United States Tax Court: Estimating the fair market value of the common stock of MB Parent on July 31, 1998, immediately after the merger of MergerSub with and into Matthew Bender & Company, Inc. The key issue was the appropriate discount for lack of control to be applied to MB Parent's Member interest in Eagle I, LLC, which held $1.375 billion of cash at July 31, 1998. Prior to the transaction, TMD owned all the outstanding stock of Bender. TMD, in turn, was wholly owned by Times Mirror Company. I testified on December 13, 2004 on behalf of the IRS in U.S. Tax Court (Los Angeles).

8.  Santa Monica Pictures, LLC, Petitioners v. Commissioner of Internal Revenue, Respondent, Docket Nos. 6163-03, 6164-03, United States Tax Court: Estimating the value of (1) the stock of Santa Monica Holdings Corporation ("SMHC") contributed by Credit Lyonnais International Services ("CLIS") to Santa Monica Pictures, LLC ("SMP") at the time it was contributed to SMP, (2) the $79,912,955 of indebtedness owed by MGM Group Holdings Corporation to CLIS and $974,296,600 of indebtedness owed by MGM Group Holdings to Generale Bank Nederland at the time it was contributed to SMP, (3) SMHC's interest in Carolco Pictures, Inc. at the time SMHC's stock was contributed to SMP, and (4) the net operating losses incurred by SMHC between December 31, 1992 and December 11, 1996. I testified on October 28, 2004 on behalf of the IRS in U.S. Tax Court (New York City).

9.  Liberty Digital, Inc., Plaintiff v. AT&T Broadband, LLC, and Comcast Corporation, Defendants, Case No. 03-CV-95, District Court, County of Arapahoe, Colorado: Estimating the fair market value of a cash flow stream in an agreement between Liberty Digital and TCI and whether a multiples approach was a suitable valuation methodology. I was deposed on July 14, 2004 (New York City) on behalf of Comcast.

10. Linda Lukoff, et al Plaintiffs vs. G&L Realty, et al, Defendants, Case Nos. BC241251 and BC271401, Superior Court of the State of California for the County of Los Angeles: Opining as to whether the sale of G&L Realty to its senior executives took place at fair market value and whether proper corporate governance procedures were followed by G&L's board of

directors in selling the company to insiders. I was deposed on January 13, 2004 and February 23, 2004.

11. Rayford L. Keller, et al, Petitioners v. United States of America, Respondent, Civil No. V-02-62, U.S. District Court for the Southern District of Texas, Victoria Division: Determining the fair market value of a 49.95% Limited Partnership interest in a family limited partnership as well as the fair market value of the subject interest if it is an Assignee interest rather than a Limited Partnership interest. I was deposed on November 19, 2003 in Dallas on behalf of the U.S. Department of Justice.

12. New CCI, Inc., Petitioner, v. Commissioner of Internal Revenue, Respondent, Docket No. 14384-99, U.S. Tax Court: Valuing the customer relationship goodwill associated with Technicolor's film processing business at the time of its acquisition by Carlton Communications PLC. I testified on June 25, 2003 in U.S. Tax Court (San Francisco) on behalf of the IRS.

13. AT&T Broadband Management Corporation, Claimant, v. CGS Systems, Respondent, Case No. 77 181 00159 02 VSS, American Arbitration Association. Opining on the use and importance of most-favored nation ("MFN") provisions in contracts generally and specifically with respect to the Master Subscriber Management System Agreement between CSG Systems, Inc. and AT&T Broadband. I was deposed on April 4, 2003 (New York City) on behalf of AT&T Broadband.

14. National Rural Telecommunications Cooperative, Plaintiff, v. DIRECTV, et al, Defendants, Case No. CV 00-00368 LGB, U.S. District Court for the Central District of California: Determining the possible economic meaning of certain contractual terms in two agreements reached between Hughes Communications Galaxy, Inc. and the NRTC. I was deposed on March 11, 2003 (Los Angeles) on behalf of Pegasus Satellite Television.

15. Petition of Disney Enterprises, Inc. for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1989 - 1994, State of New York, Division of Tax Appeals. The hearing was held before Judge Frank W. Barrie. I testified on February 14, 2003 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

16. Robert E. Milhous, an individual, and Gail P. Milhous, an individual, Plaintiffs, v. Franchise Tax Board, Defendant, Case No. GIC 773381, Superior Court of the State of California for the County of San Diego: Allocating the value of a noncompete agreement between California, the rest of the United States, Mexico, and Canada. I was deposed on February 3, 2003 (San Diego) and testified in Superior Court (San Diego) on March 26, 2003.

17. New York State Department of Taxation and Finance: Analyzing the arm's length nature of royalty rates set on intellectual property (trade names and trademarks) transferred by Lowe's

27

Companies, Inc. to a Delaware Holding Company. Petition of Lowe's or Redetermination of a Deficiency/ Revision of a Determination or for Refund of Corporation Franchise Tax under Article 9-A of the Tax Law for the Period ending 01/31/97 & 01/31/98, State of New York, Division of Tax Appeals. The hearing was held before Judge Gary Palmer. I testified on September 4 - 5, 2002 (Troy, New York) on behalf of the New York State Department of Taxation and Finance.

18. IRS, Respondent, v. Clarissa W. Lappo, Petitioner: Determining the fair market values of limited partnership interests in the Lappo Family Limited Partnership, including appropriate minority and lack of marketability discounts. I testified on September 11, 2002 in U.S. Tax Court (Cleveland) on behalf of the IRS.

19. Southern California Federal Savings and Loan Association, SoCal Holdings, Inc., Arbur, Inc., Beverly Thrall, Roy Doumani, Preston Martin, and William E. Simon, Plaintiffs, v. United States of America, Defendant, Case No. 93-52C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on May 31 - June 1, 2000 (Washington, D.C.) and June 20 - 23, 2000 (Los Angeles) on behalf of the U.S. Department of Justice. I testified in the U.S. Court of Federal Claims (Washington, D.C.) on July 12, 15, and 16, 2002.

**20.** Richard C. La Van, et al, Plaintiffs, and Federal Deposit Insurance Corporation, as successor to the rights of Century Federal Savings Bank, Plaintiff Intervenor, v. United States of America, Defendant, Case No. 90-581C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on October 18, 2001 on behalf of the U.S. Department of Justice (Washington, D.C.).

21. Petition of Alpharma Inc., DTA 817895, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1993, 1994, 1995, State of New York, Division of Tax Appeals. The hearing was held before Judge Catherine M. Bennett. I testified on May 5, 2001 on behalf of the New York State Department of Taxation and Finance (New York City).

22. Edison International (1585456), Mission First Financial (1431482), Edison Capital (1417993), Edison Funding Company (1417994), Renewable Energy Capital Company (0715920), Mission Funding Epsilon (1426267), Plaintiffs, v. California Franchise Tax Board, Respondent, State Board of Equalization. I testified on December 12, 2000 before the State Board of Equalization on behalf of the Franchise Tax Board (Sacramento).

23. First Annapolis Bancorp, Inc., Plaintiff, and Federal Deposit Insurance Corporation, as successor to the rights of First Annapolis Federal Savings Bank, F.S.B., Plaintiff Intervenor, v. United States of America, Defendant, Case No. 94-522-C, U.S. Court of Federal Claims. Valuing supervisory goodwill. I was deposed on June 13, 2000 (Washington, D.C.) on behalf of the U.S. Department of Justice.

24. Framatome Connectors USA, Inc., presently known as Framatome Connectors USA Holding, Inc., and Subsidiaries, etc., et al., Petitioners, v. Commissioner of Internal Revenue, Respondent, Docket Nos. 5030-98, 9160-99, United States Tax Court. I testified on October 5, 2000 on behalf of the IRS in U.S. Tax Court (Washington, D.C.).

25. Blumberg Family Trust of 1980 Dated March 26, 1980; Request for Surcharge and Removal of Co-Trustee, Superior Court of the State of California for the County of Los Angeles, Case No. BP 046299. I gave a deposition on August 17, 1999 and testified on February 29, 2000 (Los Angeles) on behalf of Leslie Blumberg.

26. Securities and Exchange Commission, Plaintiff, vs. Dain Rauscher, Inc., Kenneth D. Ough and Virginia O. Horler, Defendants, Case No. SA CV 98-639 GLT (ANx), United States Bankruptcy Court, Central District of California. I was deposed on May 24, 1999 (San Francisco) on behalf of the SEC.

27. IRS, Respondent, v. American Agri-Corp. (AMCOR), Petitioner. Determining whether investments in agricultural partnerships associated with AMCOR had reasonable prospects of earning an economic return or were sham transactions and opining on the nature of public policy in promoting a strong farm sector and the role of the U.S. government in this endeavor. I testified on December 16, 1999 in U. S. Tax Court (Washington, D.C.) on behalf of AMCOR.

28. Petition of the Sherwin-Williams Company, DTA No. 816712, for Redetermination of a Deficiency/Revision of a Determination or for Refund of Corporation Franchise Tax Under Article 9-A of the Tax Law for the Years 1987, 1989, 1990 and 1991, State of New York, Division of Tax Appeals. The hearing was held before Judge Winifred Kathleen Maloney. I testified on July 30, 1999 (Troy, New York) and September 9, 1999 (New York City) on behalf of the New York State Department of Taxation and Finance.

29. BTR Dunlop, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 25438-97. I testified on March 18 and 19, 1999 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

30. West Coast Polymers, Plaintiff, v. Gerald Aknouny dba Homebaker Bread Slicer Co., Case No. 755087, Superior Court of State of California for the County of Orange. I was deposed on May 7, 1998 and testified on December 9, 1998 on behalf of plaintiff (Orange County).

31. UPS, Petitioner v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 15993-95. I testified November 6 and 7, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

32. Antonio Marfia, Plaintiff, v. T.C. Ziraat Bankasi, New York Branch, and Ozer Ozman, Defendants, No. 88, Civ. 3763, United States District Court, Southern District of New York.

29

I gave a deposition on May 13, 1997 and testified on June 9, 1997 on behalf of T.C. Ziraat Bankasi (New York City).

33. City of Sanger, et al., Plaintiffs, v. Refco Group, Ltd., et al, Defendants, Case No. CV-92-7284-RJK, United States District Court, Central District of California. I gave a deposition on March 18 and 19, 1997 (Newport Beach) on behalf of BankAmerica, a defendant.

34. RJR Nabisco, Inc., Petitioners v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket No. 3796-95. I testified February 10, 1997 in U.S. Tax Court (Washington, D.C.) on behalf of the IRS.

35. Monex, Petitioners, v. Commissioner of Internal Revenue Service, Respondent, U.S. Tax Court Docket Nos. 242-51-92 and 161-62-94. I testified January 24, 1997 and January 30, 1997 in U.S. Tax Court (San Francisco) on behalf of the IRS.

36. Glendale Federal Bank, FSB v. the United States, Civil Action No. 90-772 C, United States Court of Federal Claims. Valuing supervisory goodwill. I gave an affidavit dated December 9, 1996 on behalf of the U.S. Department of Justice. I was deposed on January 27, 28, and 29, 1997 (Washington, D.C.).

37. Federal Deposit Insurance Corporation, Plaintiff, v. David L. Paul, Defendant, Case No. 90-1477-CIV-ATKINS. I gave an affidavit dated January 23, 1996 on behalf of the Federal Deposit Insurance Corporation. I testified against David L. Paul on April 1, 1996 in United States District Court, Southern District of Florida.

38. State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Company, Plaintiff, v. Merrill Lynch, et al., defendants, Case No. 91-17911-CA, Division CV-C, Fourth Judicial Circuit, Duval County, Florida. I gave depositions on May 16, 1995 and June 12 and 13, 1995 in Jacksonville, Florida on behalf of the State of Florida Department of Insurance.

39. C. Lea Routledge and David Nath, Plaintiffs, v. Southwest International Exchange, Bank of America, et al, Defendants, Case No. 669348, Superior Court of the State of California for the County of San Diego. I gave a deposition on September 28, 1995 on behalf of Bank of America.

40. Credit Lyonnais v. Tracinda, et al. Case No. 94-2957 R(BQRx) in United States District Court, Central District of California. I gave a deposition on behalf of Credit Lyonnais on January 23 and January 24, 1995 (Los Angeles).

41. Aurora Electronics v. The Morris Family Trust in Arbitration in San Diego before the Honorable J. Lawrence Irving. I wrote a report dated November 1, 1994 on behalf of Aurora Electronics. I testified on behalf of Aurora Electronics on November 15, 1994.

42. United States of America v. David L. Paul, Case No. 92-134-Cr-DLG. I testified on November 18, 1994 on behalf of the FBI in United States District Court, Southern District of Florida, Miami Division.

# Appendix B:  List of Documents Relied On

1. Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as Tougher Lending Standards Cut Demand." November 29, 2000.

2. Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9.

3. Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001.

4. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "A Strong Close for a Good Year: Shipment Rise for Seventh Consecutive Month." February 4, 1999.

5. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "November Shipments Fell Nearly 15% - Bad News Continues." January 13, 2000.

6. Arnold and Bleichroeder, Inc. Manufactured Housing Research. "Shipments Dropped 23% This Month." April 28, 2000.

7. Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001.

8. Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001.

9. CSFB-00033246

10. CSFB-00052854

11. CSFB-00052855

12. CSFB-00052873

13. CSFB-00052956

14. CSFB-00052958

15. CSFB-00052978

16. CSFB-00053080

17. CSFB-00053081

18. CSFB-00053089

19. CSFB-00141065

20. CSFB-00148791

21. CSFB-00154641

22. CSFB-00155802

23. CSFB-00165521

24. CSFB-00170815

25. CSFB-00173794

26. CSFB-00175025

27. CSFB-00204186

28. CSFB-00220040

29. CSFB-00220219

30. CSFB-00250093

31. CSFB-00250116

32. CSFB-00250117

33. CSFB-00250118

34. CSFB-00250121

35. CSFB-00250130

36. CSFB-00250131

37. CSFB-00250132

38. CSFB-00205989.004

39. CSFB-00205989.009

40. CSFB-00205989.301

41. CSFB-00266317

42. CSFB-00266476

43. CSFB-00485359

44. CSFB-00492624

45. CSFB-00512527

46. CSFB Equity Research. "Manufactured Housing Industry." January 13, 1998.

47. CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002.

48. CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002.

49. CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002.

50. CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002.

51. CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999.

52. David P. Baron, "A Model of the Demand for Investment Banking Advising and Distribution Services for New Issues," *Journal of Finance*, Vol. 37, No. 4, September 1982.

53. Deposition of Clarence W. Walker, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* December 12, 2006.

54. Deposition of Douglas Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 26, 2006. Vol. 1.

55. Deposition of Douglass Muir, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 27, 2006. Vol. 2.

56. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 29, 2006. Vol. 1.

57. Deposition of Fiachra O'Driscoll, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 30, 2006. Vol. 2.

58. Deposition of Jared Felt, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* June 15, 2006.

59. Deposition of Myles Standish, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* September 21, 2006. Vol. 1.

60. Deposition of Tom Connors, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston,* August 22, 2006.

61. Expert Witness Report of Dr. Michael Tennenbaum, *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.*

62. F-657

63. F-658

64. Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002.

65. Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007.

66. George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996.

67. Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007.

68. Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004.

69. Mergent FIS. History & Debt. "Oakwood Homes Corporation." December 5, 2000.

70. Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6.

71. MNAT006734

72. MNAT006735

73. MNAT006739

74. MNAT024088

75. MNAT024090

76. *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004.

77. OHCLT-01706

78. OHCLT-230798

79. Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem under Credit Risk." Rutgers Business School, June 2005.

80. Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4.

81. Shane Kite. Asset Sales Report. "Oakwood: Earnings Halved, ABS Roots Intact." June 28, 1999. Vol. 13, Issue 26.

# EXHIBIT B

# In The Matter Of:

*OHC LIQUIDATION TRUST v.*
*CREDIT SUISSE FIRST BOSTON*

---

## ALAN C. SHAPIRO
*September 5, 2007*

---

# MERRILL LEGAL SOLUTIONS

*25 West 45th Street - Suite 900*
*New York, NY 10036*
PH: 212-557-7400 / FAX: 212-692-9171

SHAPIRO, ALAN C. - Vol. 1

1
2  CSFB owed Oakwood and its creditors a fiduciary
3  responsibility"; is that correct?
4      A.  Yes.
5      Q.  Tell me, if you would, Professor, how
6  would the conclusions in your report have been
7  different had you not made that assumption.
8      A.  Well, I can't --
9          MR. CASTANARES:  Objection to form.
10     A.  I can't give you -- well, a legal
11 opinion, but I guess I would say even if there
12 were no fiduciary obligation that Credit Suisse's
13 behavior was inconsistent with its -- with the
14 guidelines in its compliance manual.  So from that
15 standpoint I think my conclusions would still
16 stand, in that as my specific opinions, which are
17 expressed on pages 3 and 4, that CSFB did not
18 behave in a reasonable or a reasonably prudent
19 manner with respect to the services it provided to
20 Oakwood doesn't rely specifically on the existence
21 of a fiduciary obligation.
22         And second, that my opinion that CSFB
23 had financial incentives to keep Oakwood operating
24 and to delay recommending that Oakwood file for
25 bankruptcy doesn't -- does not specifically rely

1          ALAN SHAPIRO
2  on the assumption of a fiduciary obligation, but I
3  think that it does -- it's inconsistent with the
4  guidelines in the compliance manual.
5      Q.  So do I understand from that answer
6  that your conclusions would not be any different
7  if you had not made the assumption identified at
8  Roman numeral V.A on page 4 of your report?
9      A.  Yes, I believe that the fiduciary
10 obligation certainly strengthens my conclusions,
11 but I think those conclusions would still stand.
12     Q.  In what way does the fiduciary
13 obligation strengthen your conclusions?
14     A.  Well, it would strengthen the -- it
15 wouldn't affect the second conclusion regarding
16 financial incentives, those exist independent of
17 any fiduciary obligation.  But the reasonable or
18 reasonably prudent, I think you do want to take in
19 figuring whether something -- whether somebody
20 behaved in a reasonable manner.  I think if they
21 had a fiduciary obligation to behave in a certain
22 way that that strengthens that obligation or makes
23 behavior less reasonable than it otherwise would.
24     Q.  Who was it who asked you to make that
25 assumption?

1          ALAN SHAPIRO
2      A.  I don't recall the specific person, but
3  it was somebody from the law firm of Stutman.
4      Q.  Do you remember when it was you were
5  asked to make that assumption?
6      A.  It was sometime before I began writing
7  my report.
8      Q.  Was it before you began work on your
9  report?
10     A.  I believe so.
11     Q.  And you can't remember who it was who
12 asked you to make the assumption?
13     A.  No, I don't.  I can't.
14     Q.  Can you remember the occasion when you
15 were asked to make that assumption?
16     A.  Not specifically.  We had various
17 meetings, both telephonic conversations as well as
18 in-person meetings.
19     Q.  Before you began to write?
20     A.  That's correct, and then while I was
21 working on the report.
22     Q.  Do you remember whether it was in a
23 group meeting that someone asked you to make this
24 assumption or one on one?
25     A.  I believe that all my meetings were

1          ALAN SHAPIRO
2  group meetings, both telephonically as well as in
3  person.
4      Q.  And who were the participants in those
5  group meetings?
6      A.  They varied.  I couldn't tell you how
7  many there were or which people.  I can tell you
8  the general cast of people.
9      Q.  Would you?
10     A.  Sure.
11         Mr. Castanares.  And again, I have to
12 say that I'll mention names, but I don't think
13 that they were -- that they all participated in
14 each meeting.  I think there were different people
15 participating in different meetings.
16     Q.  Okay.
17     A.  Stephan Ray, Whitman, I can't recall
18 his last name.  Scott Yun and -- you know, I --
19 I'm trying to think.  I think there may have been
20 one or -- possibly another lawyer or two.  And
21 then there were my associates, people who helped
22 me on this matter.  Dr. Atulya Sarin --
23     Q.  Hang on a second.
24     A.  Sure.
25     Q.  Just on the question of the lawyers

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE


In re:

OAKWOOD HOMES CORPORATION et al.

Debtors

vs.

CREDIT SUISSE FIRST BOSTON, et al.

Defendants



# EXPERT WITNESS REPORT OF THOMAS F. BOLAND

February 29. 2008

## A.    Introduction and Qualifications

1.    I, Thomas F. Boland, am a former member of senior management of Citigroup, Inc., New York, New York and a former Managing Director of Seneca Financial Group, Inc., New York, New York.  I consider myself to be an expert in corporate and investment banking, credit and capital markets and corporate restructures.

2.    I graduated with a degree in Business Administration from the University of Notre Dame, South Bend, Indiana in 1965.  From 1970 through 2001, I held various executive positions with Citicorp and Citigroup.  From 1978 through 1980, I was assigned to the Restructuring Department of Citibank, managing numerous complex problem credits and working with borrowers both inside and outside of bankruptcy.  From 1980 through 1985 I was the Corporate Bank Head for Citibank Canada, responsible for corporate relationships throughout Canada and their international subsidiaries.  From 1999 through 2001, I was Head of Credit and Operating Risk Management for Japan, North America and Europe.  As such, I managed a 540 person organization with financial accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup, including Corporate Banking, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Solomon Smith Barney.  I had the highest level of credit approval authority within the Citigroup Corporate and Investment Bank.  I had management responsibility for a $170 billion loan and unfunded commitment portfolio.  Under my direction, Citigroup's use of asset sales and credit derivatives in tandem with proactive remedial management by my group's highly experienced workout department made the credit quality of this portfolio among the best in the industry.  From 2001 through 2005, as a principal in the Seneca Financial Group, I worked on numerous financial advisory assignments on behalf of troubled companies including a $1 billion out of court restructure of a major U.S. airline which was impacted by the events of September 11, 2001.  A copy of my curriculum vitae

2

and published articles are attached as Exhibit 1.

3.     In the course of my duties I have directly managed hundreds of corporate relationships and had management responsibility for thousands of corporate relationships. I have worked in a large financial institution and fully understand the interrelationships among client managers, investment bankers, product specialists and risk assessment. I have worked with hundreds of troubled companies and have first hand experience regarding the complexities and uncertainties of dealing with a company in financial distress.

4.     I have presented expert testimony as follows;

| | |
|---|---|
| October 8, 2002 | Federal Energy Regulatory Commission<br>PacifiCorp v. Reliant Energy, et al.<br>Docket EL 02-80-000 |
| January 3, 2003 | Federal Energy Regulatory Commission<br>Nevada Power/Sierra Pacific v. El Paso et al.<br>Docket EL 02-26-000 |

Both of these cases involved the abrogation of long-term energy contracts in California. I testified as an expert in the capital markets.

| | |
|---|---|
| August 5, 2003 | Rebel Rents, Inc. 307 B. R. 171 |

This case involved the valuation of a business that was emerging from bankruptcy.

| | |
|---|---|
| March 22, 2005 | Federal Energy Regulatory Commission<br>Devon Power LLC, et al.<br>Docket ER03-563-030 |

In this case I testified on the adequacy of returns on debt and equity.

| | |
|---|---|
| March 13, 2006 | Duke Energy v. ExxonMobil Energy Canada<br>Under the Alberta Arbitration Act |

In this arbitration I testified as to the reasonableness of ExxonMobil's actions concerning a credit dispute.

3

## B.    Nature of Assignment

5.    I have been retained by Linklaters LLP counsel for Defendants Credit Suisse First Boston, et al., to provide an expert opinion regarding the conclusions of Professor Alan C. Shapiro in his report dated April 30, 2007.  Specifically, his conclusions are as follows;

> - CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.
>
> - CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.

6.    Based upon my over thirty years of experience working in a large financial institution and understanding the dynamics of relationship management and my extensive experience dealing with financially distressed companies, I believe I am qualified to offer expert testimony on matters I address in this opinion.  I have agreed to be compensated at an hourly rate of $600 per hour for my services plus any actual and reasonable expenses.

## C.    Records and Information

7.    In addition to general contextual background from counsel, I have considered certain specific information listed in Exhibit 2.  This Exhibit contains a list of information provided to me by counsel for CSFB and a list of additional materials, which I have retrieved from public sources.

## D.    Analysis

8.    In his report Professor Shapiro discusses the role of an Investment Bank; he reviews the actions of CSFB personnel and concludes that since CSFB is an Investment Bank this automatically makes them a trusted advisor to Oakwood's management and Board of Directors. Accordingly, in the course of their dealings with the company, CSFB should have been providing strategic operational and financial advice including filing for bankruptcy a year sooner than they did. By not taking these actions, Professor Shapiro concludes that CSFB acted imprudently.

9.    To respond to Professor Shapiro's conclusion it is necessary to examine the complexities and structure of an Investment Bank and to understand what was the true nature of CSFB's relationship with Oakwood and to clarify what Investment Banks can do and what Investment Banks should not do.

## E.    Investment Banking

10.    Investment Banks provide a broad range of financial and investment related services, such as, advising clients on security issues, acquisitions and business disposals, arranging and underwriting new issues, distributing securities and running fund-management companies. Also, proprietary trading has become an increasingly important part of Investment Banking. Typically, Investment Banks are divided into three areas; Investment Banking, Capital Markets and, Sales and Trading. Targeted clients and prospects are managed in the Investment Banking Division. The role of the Investment Banker is to understand the client's needs and to coordinate with the appropriate product group a solution to the client's problem. The Boston Consulting Group recommends that "client relationship managers should be responsible for a customer's P&L

account across all investment and corporate banking products."[1]  Most large financial institutions

now take this approach.  For example;

- Deutsche Bank – We have integrated our coverage model and aligned our coverage intensity to our new client tiering system.  We aim to further integrate our various businesses within the Corporate and Investment Bank to capture cross-divisional opportunities.[2]

- NatCity Investment Banking -   We have unique access including 500 corporate bankers, private equity services, commercial lending groups, proprietary equity research, and leading economists.[3]

- BMO Financial Group – Successfully leveraging lending relationships by cross selling fee based products and fully integrated, advisory-oriented coverage.[4]

11.    The model recommended by the Boston Consulting Group calls for a client relationship

manager to be the primary interface with the client.  A successful Investment Banker works

closely with the client's management to understand what products and services can be sold to the

client.  This Investment Banker centered approach is now utilized by most major financial

institutions.  Once an opportunity is identified by an Investment Banker a sales presentation is

prepared by the appropriate product group.  The sales presentation takes the form of a

"pitchbook".  Most firms use a standard format pitchbook which includes sections on the client

based upon available public information, the idea or product being pitched, a market analysis,

relevant financial analysis and information about the bankers who will be involved with the

mandate.  A pitchbook presentation is the standard marketing document utilized by an Investment

Bank.

12.    The most lucrative transactions for an Investment Bank are Merger & Acquisition

transactions, equity offerings and bond issuance.  The in depth client due diligence described in

Professor Shapiro's report would be required for these products.  There are some Investment

Banking products, such as a derivative transaction, which could require little or no due diligence.

---

[1] Growing Profits Under Pressure, Boston Consulting Group, 2002.
[2] Deutsche Bank Annual Report 2006.
[3] www.nationalcity.com/investmentbanking/Aboutus.asp
[4] BMO Financial Group, U.S. Expansion Strategy

In other words, the level and type of due diligence on the part of the Investment Bank depends upon what service or product the Investment Bank is providing and to whom they would be providing the product or service.

13.    Since Investment Bankers are expensive it is important to focus their efforts on clients and prospects that may use a wide array of products. Most Investment Banks have screening criteria which help identify top prospects and eliminate prospects where significant potential opportunities may be limited. Companies that do not make the Investment Banking cut may find a home in a product group in the Capital Markets Division. These are companies with a specific need which can be addressed with a specific product. A client in this category would be characterized as a Product Managed Relationship and not as an Investment Banking Relationship.

14.    It is clear that from the inception of the CSFB/Oakwood relationship in 1994 until August 2002 Oakwood was a Product Managed Relationship focusing exclusively on securitization transactions and nothing more. Based upon this type of relationship, the broad, in depth coverage which would have existed if Oakwood was in the Investment Banking Division did not exist. As will be discussed, the securitization product revolves around the credit worthiness of Oakwood's customers and not on the credit quality of the Oakwood Homes Corporation. This being the case, there was no need for CSFB to access in depth non public information about the Oakwood Homes Corporation.

## F.    Oakwood Homes Corporation

15.    It has been well documented that Oakwood, which was founded in 1946, was a fully integrated company in terms of manufacturing, selling and financing homes. In 1999 they were the nation's largest retailer of manufactured housing operating 371 company-owned retail sales centers in 29 states. They were also the third largest manufacturer of manufactured housing, with 26 manufacturing lines in 12 states. In addition to sales and manufacturing Oakwood had a large consumer finance operation, Oakwood Acceptance Corporation, which originated and purchased

loans originated by the company's retail operations as well as from third parties. At year end 1999, Oakwood had total revenues in excess of $1.5 billion.

16.    It is worth noting that since its founding in 1946, Oakwood and the manufactured housing industry have gone through numerous cycles, the worst being in 1972 when more than one-third of America's mobile home dealers went bankrupt and in the late 1980's when over half of the 200 mobile home companies operating in 1978 went bankrupt. Oakwood successfully made it through these downturns and subsequently prospered.[5] As Oakwood and other housing manufacturers were growing the challenge of financing their sales became an impediment to continued growth. This dilemma was addressed in the late 1970's when Salomon Brothers distributed the first mortgage-backed securities. This was the start of the asset securitization business.

17.    By reviewing the minutes of the Board of Director meetings from 1999 through 2002 it is very evident that management and the Board were well aware of Oakwood's financial situation and understood the cyclical nature of their business. It is typical for a public company such as Oakwood, to have quarterly Board meetings. Over a four year period that would amount to sixteen meetings. In the period 1999-2002 the Oakwood Board met thirty-six times. Instead of meeting every three months the Board was meeting every forty days. This unusually active involvement by the Board would indicate that they were concerned about the company and the industry and wanted to be sure that they were making informed decisions which were in the Corporation's best interest.

## G.    CSFB - Securitization

18.    The primary interface between CSFB and Oakwood Home's management was Fiachra O'Driscoll, a Managing Director in CSFB's Asset Finance Group. O'Driscoll is an asset securitization product specialist. He described his role as "to ensure that the transaction was put

together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investor questions were answered, to make sure that the legal structure of the mortgage securitization worked properly, and to make sure that the transaction got closed, processed, and that it was dealt with in the aftermarket in a timely fashion."[6] Since the inception of the CSFB/Oakwood relationship in 1994 until August 17, 2002 the entire relationship was based exclusively on the securitization business and O'Driscoll was Oakwood's primary CSFB interface since 1996.

19.    Securitization is a financial technique that pools assets together by turning future cash flows into tradable, bond-like securities.  The customer benefit is that they can immediately realize the value of a cash producing asset and can shed some of the risk that future expected revenues may not materialize.  The customer's risk is shed because the pools of assets are generally sold on a non-recourse basis.  If the expected cash flow from the pool of assets does not materialize the investors in the securitization have no additional recourse.  This being the case, what is critical in structuring a successful securitization is packaging a pool of assets which are diverse and predicable based upon prior experience.

20.    A review of a typical prospectus will show the scope of the business CSFB was doing with Oakwood, including, what was necessary to make a transaction work and what type of due diligence would be needed to put a successful transaction together.  The Prospectus and the Prospectus Supplement dated May 20, 2002 is typical of the type of transaction CSFB was executing for Oakwood since 1994.[7]  These documents contain 171 pages of detailed information. The key information contained in the documents is a description of the asset pool.  On closing the trust would purchase 2,167 initial assets with a principal balance of approximately $119 million. The 2,167 loans are broken down in great detail by credit bureau scores, geographic distribution, breakdown of initial asset amounts, loan to value ratios, year of origination and remaining term to

---

[5] www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html
[6] Deposition of Fiachra O'Driscoll, June 29, 2006, page 18.

9

maturity. A description of investor protections through overcollaterization and subordination is also detailed. What is not in these documents is a description of Oakwood Home Corporation or any financial analysis of Oakwood. This is because, as the document point out, "Neither Oakwood Mortgage nor any underwriter nor any of their affiliates will insure or guarantee the certificates of any series."[8]

21.    In his deposition, Mr. O'Driscoll stated that CSFB had executed numerous securitizations for many firms involved in the manufactured housing business including Clayton Homes and Champion Enterprises.[9] To help follow the industry trends the Asset Finance Group could access the research reports of CSFB's public side equity analyst, Ivy Zelman, who closely followed, home builders, manufactured housing companies, building products and furniture companies. Ms. Zelman has been rated the number –one analyst in the housing industry by the Institutional Investors All American Research Team since 1999 and by the Greenwich Associates Institutional Research Services Poll since 2000. The May 2005 issue of Forbes magazine ranked her number one among 3,300 analysts in all of Wall Street.[10]

## H.    CSFB – Loan Purchase Facility

22.    In 2000 Bank of America decided not to renew its financing arrangement with Oakwood. Since a warehouse facility is an important interim step between a loan origination and a public securitization, early in 2001 O'Driscoll was able to put together a facility utilizing securitization techniques.

23.    In his report Professor Shapiro state that this is when CSFB became a secured lender to Oakwood.[11] This is in fact incorrect. This transaction was structured not as a loan but as an asset purchase, similar to securitization. The individual who negotiated and structured the transaction

---

[7] Prospectus Supplement to Prospectus dated May 20, 2002, CSFB-00220030 – CSFB-00220208.
[8] Ibid., p.54.
[9] Deposition of Fiachra O'Driscoll, June 29,2006, page 34.
[10] www.jwmag.org/site/c.fhLOK0PGLsF/b.2447241/k.2D69/Ivy_Zelman.htm

was Fiachra O'Driscoll.[12] This facility was very similar to the type of business CSFB had been doing with Oakwood since 1994. As part of the compensation for this transaction CSFB received warrants for 19.9% of Oakwood equity. A warrant is a right to purchase equity of an issuer at a specified price within a certain time frame. A warrant is not equity nor does it receive any of the rights of an equity holder. Warrants can be used as a sweetener to increase the marketability of a bond or security and could have been useful to CSFB if they subsequently decided to sell off all or part of this facility. To conclude that these out of the money options somehow made CSFB an equity owner of Oakwood is incorrect. It is also logical to assume that if CSFB believed that Oakwood was insolvent at the time of this transaction they would not have been asking for warrants. Including warrants as a part of their compensation would indicate that there was a belief by CSFB that there would be an upturn in the cycle in the not too distant future.

## I.    CSFB – Proposals

24.    Any attempt to expand the CSFB/Oakwood relationship beyond the Asset Finance Group got nowhere. A proposed $75 million Committed Reverse Repo Facility languished. The proposal was reviewed by an analyst, in Credit Risk Management, James Xanthos who had no experience with the housing industry or with Oakwood.[13] His analysis contained numerous unsupported opinions and ignored the market analysis of the CSFB Equity Research Group. One reason that this transaction never went forward may be the fact that Oakwood did not have an Investment Banker to oversee the relationship and champion the client.

25.    As will be discussed later in this report, the management and Board of Oakwood believed that the company had sufficient liquidity in place until March, 2004. On three occasions, in June and August of 2001 and March of 2002 CSFB made presentations to Oakwood management regarding the 2004 bonds. These presentations contain the standard pitchbook format and were

---

[11] Report of Alan Shapiro, April 30, 2007, page 16.
[12] Deposition of Fiachra O'Driscoll, June 29, 2006, page 41.
[13] Deposition of James Xanthos, August 24, 2006, page 45.

presented to management and not the Board of Directors. The presentations contain no non public information nor do they demonstrate any insiders' knowledge of Oakwood. The pitchbooks contain a number of alternatives which Oakwood could use to deal with the 2004 maturities. None of the proposals contained in the pitchbooks were pursued by Oakwood management. One of Oakwood's troubled competitors, Fleetwood Enterprises, in 2001 was able to use a variation of one of the ideas in the CSFB presentation and working with their investment bank they issued convertible trust preferred securities in exchange for other debt.[14] This type of financial restructuring plus other initiatives assisted Fleetwood in avoiding bankruptcy.

26.    Instead of offering ideas to deal with future liquidity needs, Professor Shapiro believes that CSFB should have been advising Oakwood on operational improvement strategies which focused upon downsizing Oakwood's operations.[15] He also thought that CSFB should have been advising Oakwood to file bankruptcy.[16]

27.    Before commenting on why it would have been inappropriate for CSFB to give anyone this type of advice it needs to be pointed out that no one at CSFB, as with most financial institutions, has the expertise to advise on "operational improvement strategies." There are firms that do this type of consulting but they are not banks. Advice for dealing with a bankruptcy has to be carefully managed within the scope of legally vetted restructuring assignment.

28.    Starting with the Farah case in 1984 creditors learned that if they exercised excessive power and control over the business activities of a debtor, especially when the debtor is in financial difficulty, the creditor can suffer serious adverse consequences.[17] Post the Farah case there was a rash of lender liability cases and bankers learned what "tortious interference" was all about and changed their behavior. Most financial professionals understand where to draw the line with their clients and do not get involved in telling them how to run their business.

---

[14] Fleetwood Enterprises Annual Report, 2005, page 49.
[15] Deposition of Alan Shapiro, April 30, 2007, page 38.
[16] Ibid., page 39.
[17] Third Party Interference, Phillip Campanella, at 13.06.

29.    The primary oversight for the financial and legal well being of a corporation is its Board of Directors and not its bankers.  The Oakwood Board was meeting very frequently and they were briefed by management on the state of the company and the outlook for the industry.  The Board brought about management changes and authorized significant downsizing. The Board explored strategic alternatives with Merrill Lynch and pursued numerous capital raising initiatives without the assistance of CSFB.  It appears that the Directors acted on an informed basis and in good faith.

## J.    CSFB – Financial Advisor for Restructuring Purposes

30.    On August 24, 2002 Oakwood retained the restructuring group of CSFB in the role of a Financial Advisor for Restructuring Purposes.  Their mandate was to assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm and preparing the company for bankruptcy.  This was the first time in the eight year CSFB/Oakwood relationship that the Asset Finance Group was not the focal point of the relationship.

31.    The signing of this agreement singled an important change in the relationship between CSFB and Oakwood.  To understand what brought about this agreement it is worthwhile to examine the events which led Oakwood's management and Board to conclude that their company needed assistance in restructuring their balance sheet.

32.    In June 2001 Equity Research at CSFB was stating, "While we believe the industry may be nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of the downturn."[18]  In the same report they opinioned, "we believe the increased demand for OH

---

[18] Manufactured Housing Industry Outlook, CSFB Equity Research, June 11, 2001, page 1. (CSFB-00050117)

deals and the tightening spreads support a more positive long-term outlook for the company."[19]

In reviewing 2001 the Monthly Labor Review cited housing as one of the bright spots in the

economy stating, "Declining mortgage rates benefited not only prospective home buyers, but also

homeowners who either wanted to tap into their equity or refinance." [20]  In working through the

cycle Oakwood management appeared to be doing the right things as pointed out in a CSFB

Equity Research Report, "Although management should be praised for its proactive decisions at

this point in the cycle, we believe that neither the industry or OH are out of the woods yet."[21]

33.    Although Oakwood had managed through prior down cycles and management and the

Board were taking actions to manage through this one, there were a series of events which made

this cycle longer and deeper than anyone expected nor could have predicted.  In late 2001 and

early 2002 an unprecedented number of financing sources exited the market, including Bank of

America, Bombardier Capital, Greenpoint Financial, CIT and Conseco.  Contributing to the

lenders problems was the September 11 terrorist attacks.  According to the New York Times,

"The attacks that destroyed the World Trade Center towers and the Pentagon brought the

American economy to an unprecedented halt and made a recession far more likely than before."[22]

Commenting on the attacks, Standard & Poor's stated that, "Manufactured-housing producers

could see further rating downgrades in the near term, as this segment's buyers may be

disproportionately more vulnerable to expected layoff."[23]

34.    The deepening recession and industry specific problems were reflected in Oakwood's June

25, 2002 Board of Directors meeting.  This meeting was the first time that the Board understood

the severity of the Corporation's situation.  Given that the last Board meeting had been only six

weeks prior it is probable that management did not reach the conclusions discussed at the meeting

much before the meeting.  Several reasons were given for the change in outlook.  First, Mr.

---

[19] Ibid., page 18.
[20] U.S. Labor Markets in 2001, Monthly Labor Review, February 2002, page 11.
[21] Oakwood Homes, CSFB Equity Research, July 27, 2001, page 3. (CSFB-00050085)
[22] A Body Blow to the Economy, David Leonhardt, New York Times, September 16, 2001, page 1.
[23] Housing Market is Suddenly Uncertain, Alan Heavens, The Philadelphia Inquirer, October 7, 2001.

Standish indicated that "it appears that conditions may be softer than had been the case at the last board meeting." He cited Champion Enterprises wider than expected losses and the impact of Conseco's withdrawal from the dealer floorplan lending business as contributing factors. In response to these conditions management decided to close a Texas plant, close some retail locations and revamp the retail pay plan. Mr. Standish also indicated that the loan assumption program would be eliminated in order to improve the Corporation's liquidity. Mr. Standish told the Board that management had updated the company's cash flow projections and "those cash flow projections indicated that adequate liquidity was in place to fund operations until the March 1, 2004 maturity of $125 million of senior notes." [24]

35.    By the end of July, Mr. Standish was telling the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well as considered other potential financial advisors." From this statement it can be concluded that at the end of July, Oakwood had not yet decided which firm to hire as a financial advisor.[25] It would appear that Oakwood management was starting to understand the impact that the loan assumption program had on their liquidity position. On August 6, 2002, Oakwood released their third quarter results which indicated that, "During the first nine months of 2002, the Company expended cash approximating $47.6 million related to the loan assumption program."[26]

36.    In his deposition Mr. Standish indicated that he was surprised by the expense of the loan assumption program. He indicated that, "the program itself was not structured sufficiently so that we could get data from it as far as costs, as far as performance, as far as general underwriting guidelines or what was actually being underwritten."[27] Making it through a difficult period is all about managing your liquidity. Although management had taken steps to bolster liquidity the

---

[24] Binder of Meeting Minutes, No. 04-57060 (Bankr. D De.), Tab 35.
[25] Ibid., Tab 36.
[26] Oakwood Homes Corporation Reports Third Quarter 2002 Results, August 6, 2002, Exhibit 99.1.
[27] Deposition of Myles Standish, September 21, 2006, page 33.

worse than expected economy coupled with a $48 million surprise would indicate that their belief in late June 2002 that they had sufficient liquidity for the next twenty-one months was wrong.

37.    Oakwood's financial situation was not unique in the manufactured housing sector. Many of their competitors were encountering similar difficulties but managed to make it through the cycle without having to file for bankruptcy. In November 2002 BB&T Capital Markets raised their ratings on Champion Enterprises, Clayton Homes, Fleetwood Enterprises and Palm Harbor Homes from Hold to Buy based upon the likely entry of GMAC Residential Funding unit into manufactured housing retail chattel lending. BB&T stated, "Because we believe that the health of the industry is so closely tied to the availability of financing, an infusion of new financing dollars into an already tight retail lending environment would be a major plus for the MH industry."[28] This indication that there was some good news for the industry came just ten days after Oakwood's bankruptcy filing. The success that these firms had in avoiding bankruptcy clearly demonstrates that it was possible to avoid a filing. Those experienced in working with companies in financial difficulty know that an out of court restructuring is much more preferable than going into Chapter 11. When dealing with the troubled auto parts supply company, Delphi, Steve Miller, the noted restructuring guru was quoted as saying, "Not going into Chapter 11 is much to be preferred. It is simpler, cheaper, quicker to avoid it, whereas the Chapter 11 process takes longer, costs more and has a lot of aggravation that goes with it."[29]

## K.    CSFB/OAKWOOD RELATIONSHIP

38.    Professor Shapiro claims that CSFB had financial incentives to keep Oakwood operating. An Investment Bank has financial incentives for doing business with all of their clients. CSFB was paid fairly for the work they performed. I can see no conflict of interest in the work CSFB did for Oakwood and see no issue on how they performed that work.

---

[28] BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10.

39.    The fees paid to CSFB by Oakwood were for services rendered.  Pricing on a securitization can vary depending upon the asset pool and the size of the transaction.  Pricing is transparent since fees on public transactions are disclosed in the prospectus.  In his deposition Douglas Muir stated that he was able to benchmark what he was paying against other issues.  He said, "you can benchmark and find out where the market is, not only what CSFB was charging but what other banks were charging."[30]  Pricing on the Loan Purchase Facility is difficult to assess since as Douglas Muir stated, "CSFG was the only game in town."[31]  At the time when the facility was put in place Oakwood's bonds were rated CCC.  According to Fitch Ratings the definition of a CCC rating is Substantial Risk.  As ratings decrease the probability of default increases, therefore, transactions with lower investment grade companies need to build in the increased default risk into their pricing.  The Advisory Agreement pricing is well within industry norms. The monthly fee is in the mid-range of transactions I am familiar with, normal M&A and restructuring fees range from 1% to 2%.  Fairness opinions can be a percentage of the M&A fee or a flat amount.  It is not uncommon in this type of engagement to have a success fee on top of the other fees.


L.    Conclusions

40.    From the actions and services provided by CSFB for the Oakwood Homes Corporation it is very evident that CSFB was not a financial advisor to Oakwood until August, 2002.  In addition to the analysis contained in my report this conclusion is supported by a review of the minutes of the Board of Director meetings.[32]  In June of 1999 the Board hired Merrill Lynch as an advisor. A year latter it was reported to the Board that Merrill recommended holding off pursuing a merger.  Merrill's input regarding financial alternatives was again discussed at the August, 2000 meeting.  In meetings in April, June and July of 2001 the Board discussed various asset sale

---

[29] Delphi CEO Would Rather Fix Company's Woes out of Court, Wall Street Journal, Sep. 21, 2005, pg.A5
[30] Deposition of Douglas Muir, September 26, 2006, page 49.
[31] Ibid., page 52.
[32] Binder of Minute Meetings, No.04-57060.

possibilities and sources of new investment. It is clear that CSFB was not involved with these important initiatives. At the July 29, 2002 meeting Myles Standish told the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well considered other potential financial advisors."[33] From this statement it can be concluded that at the end of July, 2002, Oakwood had not yet decided which firm to hire as a financial advisor.

41.    Prior to August 2002 the involvement of CSFB in the Oakwood relationship was limited to securitization transactions and proposals dealing with the bonds maturing in 2004. The only CSFB professional closely involved with the company was the securitization product specialist, Fiachra O'Driscoll. For example, Jared Felt demonstrated his distance from Oakwood when on December 14, 2001 he emailed Fiachra O'Driscoll and asked, "Do you have any sense of what we can do for Oakwood given that they've already completed a refinancing with Foothill?"[34] The relationship between CSFB and Oakwood was a very typical banking/client product driven relationship and was conducted in an appropriate manner.

42.    In the period 2000 through 2002 the manufactured housing industry was experiencing significant problems. There were many factors causing the downturn and many opinions as to the depth and length of the downturn. Forcing companies into bankruptcy is not an optimum solution in times of duress. Yearly, federal bank examiners review the loan portfolios of all U.S. regulated banks. At the end of 2001 the regulators reported that there were $193 billion in problem loans including over $30 billion in loans where full repayment was doubtful.[35] Many of these exposures got restructured outside of a courtroom. Suggesting that lenders would be required to perform ongoing valuations of their clients and to liquidate them if their valuations came up short would lead to economic chaos. This type of behavior would be deemed inappropriate.

43.    On September 5, 2001 First Union Securities Equity Research issued a report on the state of the manufactured housing industry in which they stated that, "Things should look much better

---

[33] Ibid., Tab 35.
[34] Email, Jared Felt, December 13, 2001, CSFB-00148970.

in 2002. Profitability looks like it has bottomed."[36] They were wrong, as were other analysts and as was Oakwood's Board of Directors. It is very difficult in a middle of an economic downturn to accurately predict when the cycle will turn up. The Oakwood Board was fully engaged in performing their fiduciary duties. They nor anyone else should be held accountable for not being capable of predicting the future.

44.    The fees paid to CSFB by Oakwood were for services rendered. Pricing for the products and services contracted for by Oakwood from CSFB were market driven and the compensation received by CSFB appears to be within market norms.

45.    Based upon my experience in working with companies in financial situations similar to Oakwood's I believe that most bankers would have not stopped funding the company as long as management and the Board understood the situation and were dealing with it. By structuring transactions which would manage their risk and by understanding the cyclical nature of the industry most bankers would have acted similar to the actions of CSFB.

Thomas F. Boland

---

[35] Board of Governors of the Federal Reserve System, NR 2001-87, October 5, 2001.
[36] First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1.

19

**EXHIBIT 1**

**Thomas F. Boland**
**1209 Thomas Jefferson Parkway**
**Charlottesville, VA 22902**
**(434) 295-2733**
**tfboland162@aol.com**

## Experience

**Seneca Financial Group, Inc.**                                    2001 - 2005
**Managing Director**

Principal in specialty investment bank which focused primarily on financial restructuring advisory services. Assignments ranged from successfully advising a major airline in their Airline Transportation Safety Board loan guaranty application process to working with equipment distributors in their validation of their business models and/or a quantification of their strategic options. Expert witness involving valuations in bankruptcy cases as well as matters before the Federal Energy Regulatory Commission.

**Citigroup Corporate and Investment Bank**                         1999 - 2001
**Head of Credit and Operating Risk Management - Japan, Europe and North America**

Managed a 540 person organization with functional accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup including, Corporate Bank, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Salomon Smith Barney. Accountable for $360 Million in revenues and a $140 Million expense base. This position has the highest level of credit approval authority in the Citigroup Corporate and Investment Bank.

Managed a $170 billion loan and unfunded commitment portfolio. The use of asset sales and credit derivatives in tandem with proactive remedial management by a highly experienced workout department made the credit quality of this portfolio one of the best in the industry.

**Citibank - Global Relationship Bank**                             1993 - 1999
**Senior Risk Manager**

Managed 80 risk professionals in 14 countries, providing risk management oversight for over 2,000 multi-national corporations and financial institutions. As part of the Global Relationship Bank senior management team worked to set strategic direction of global corporate banking business which was based upon ability to make risk/return tradeoffs on both a transactional and portfolio basis.

**Citibank – Credit Policy Committee**                              1990 - 1993
**Credit Policy Committee Member**

Coordinated credit risk management policies for the Global Corporate Bank. Provided counsel to the Corporate Bank and Real Estate businesses evaluating the impact of changes in business direction including associated remedial actions.

THOMAS F. BOLAND                                                                            2

In a difficult credit environment, assisted in refocusing the firm's approach to risk tolerance. Heavy involvement in the unwinding of a $26 billion real estate portfolio. High level of regulatory interface during this tumultuous corporate period.

**Citicorp - Citicorp Industry Credit**                                      1985 - 1990
**Risk Manager / Treasurer**

Provided risk oversight for business units involved in leveraged buyouts, securitization and leasing. Managed a Treasury function responsible for a $5 billion funding book.

**Citicorp - Citibank Canada**                                               1980 - 1985
**Corporate Bank Head**

Managed the Corporate Banking business in Canada, with offices in Toronto, Montreal, Calgary and Vancouver. Customers included Canadian corporates, multinationals, global financial institutions and government entities. Frequently interfaced and negotiated with senior government officials.

**Citibank - Institutional Recovery Management**                              1977 - 1980
**Team Head**

Managed the restructuring of problem loans in North America, Colombia and Libya. Extensive involvement with bankruptcy cases. As Co-Head of the Itel Creditors Committee helped to successfully resolve the largest Californian bankruptcy, at that time. Considerable time spent in Colombia negotiating, litigating and lobbying on a complex fraud case.

**Citibank, Agribusiness-Commodities Department**                            1970 - 1977
**Unit Head /Transactor**

Engaged in an array of lending activities for accounts ranging from global grain trading companies to cattle feedlots. Managed offices in four U.S. cities.

**<u>Additional Information</u>**

- Member Board of Directors and Audit Committee                    2001 - present
  The FINOVA Group, Inc.

- Chairman of the Board of Citicorp North America from 1999 – 2001.

- Chairman of the Board of Shuttle, Inc. from 1992 – 1997.
  Shuttle, Inc. was the successor to the Trump Shuttle.
  Significant debt recoveries were realized by initiating management changes, cost cutting and the negotiated sale of the airline to USAir.

- Completed an advanced management program at the Amos Tuck School of Business BBA, University of Notre Dame. Served as a Lieutenant, U.S. Navy.

THOMAS F. BOLAND                                                3

# ARTICLES

1.  Getting Through Rough Economic Times With Lessons Learned From Lending
    Law Journal's Equipment Leasing Newsletter
    February, 2002

2.  Airlines And the Internet
    Issues Facing the Airline Industry
    AFN White Paper 2004

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 1. | Objection to the Proof of Claim filed by Credit Suisse First Boston LLC; Plaintiff's Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (G) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency; and Demand for Jury Trial dated November 13, 2004 |
| 2. | Defendants' Opening Brief in Support of Motion to Dismiss Certain Claims of the Complaint dated May 6, 2005 |
| 3. | SEC form 10-Ks for Oakwood Homes Corp. from 1999 – 2002<br>• 10-K Filed 12/29/1999<br>• 10-K Filed 12/29/2000<br>• 10-K Filed 12/28/2001<br>• 10-K Filed 01/14/2003 |
| 4. | SEC Form 8-K for Oakwood Homes Corp. dated August 9, 2002 |
| 5. | Credit Suisse First Boston Equity Research Reports<br>• CSFB–00050263 - CSFB–00050272<br>• CSFB–00050239 - CSFB–00050262<br>• CSFB–00050227 - CSFB–00050238<br>• CSFB–00050219 - CSFB–00050222<br>• CSFB–00050212 - CSFB–00050218<br>• CSFB–00050198 - CSFB–00050211<br>• CSFB–00050195 - CSFB–00050197<br>• CSFB–00050192 - CSFB–00050194<br>• CSFB–00050164 - CSFB–00050191<br>• CSFB–00050152 - CSFB–00050163<br>• CSFB–00049523 - CSFB–00049528<br>• CSFB–00050117 - CSFB–00050145<br>• CSFB–00050115 - CSFB–00050116<br>• CSFB–00050094 - CSFB–00050114<br>• CSFB–00050091 - CSFB–00050093 |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

|     |     |
| --- | --- |
|     | <ul><li>CSFB–00050085 - CSFB–00050090</li><li>CSFB–00266304 - CSFB–00266330</li><li>CSFB–00052800 - CSFB–00052839</li><li>CSFB–00052680 - CSFB–00052755</li><li>CSFB–00050081 - CSFB–00050084</li><li>CSFB–00052644 - CSFB–00052675</li><li>CSFB–00052596 - CSFB–00052619</li><li>CSFB–00052620 - CSFB–00052643</li><li>CSFB–00052620 - CSFB–00052643</li><li>CSFB–00050072 - CSFB–00050075</li><li>CSFB–00050069 - CSFB–00050071</li><li>CSFB–00050066 - CSFB–00050068</li><li>CSFB–00050039 - CSFB–00050065</li><li>CSFB–00049908 - CSFB–00050038</li><li>CSFB–00049905 - CSFB–00049907</li><li>CSFB–00049298 - CSFB–00049309</li><li>CSFB–00049862 - CSFB–00049892</li><li>CSFB–00049732 - CSFB–00049861</li><li>CSFB–00049004 - CSFB–00049136</li><li>CSFB–00049674 - CSFB–00049704</li><li>CSFB–00049533 - CSFB–00049673</li><li>CSFB–00049529 - CSFB–00049532</li></ul> |
| 6.  | Credit Suisse First Boston Manufacts<ul><li>(CSFB–00052575 – CSFB–00052595)</li><li>(CSFB–00052453 – CSFB–00052475)</li><li>(CSFB–00052356 – CSFB–00052382)</li><li>(CSFB–00052176 – CSFB–00052202)</li><li>(CSFB–00052102 – CSFB–00052127)</li><li>(CSFB–00051980 – CSFB–00052008)</li><li>(CSFB–00051843 – CSFB–00051875)</li><li>(CSFB–00051574 – CSFB–00051606)</li><li>(CSFB–00051348 – CSFB–00051376)</li><li>(CSFB–00051226 – CSFB–00051225)</li></ul> |
| 7.  | Engagement Letter (MNAT 003849 – MNAT 003862) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| 8. | Warrant (CSFB-00092357 – CSFB-00092369) |
|---|---|

| **DEPOSITIONS & EXHIBITS** | |
|---|---|
| 9. | Deposition of Jared Felt dated June 15-16, 2006 |
| 10. | Deposition of Thomas Irwin (with exhibits) dated November 8, 2006 |
| 11. | Deposition of Douglas Muir dated September 26-27, 2006 |
| 12. | Deposition of Fiachra O'Driscoll (with exhibits) dated June 29-30, 2006 |
| 13. | Deposition of Alan Shapiro dated September 5, 2007 |
| 14. | Deposition of Myles Standish dated September 21, 2006 |
| 15. | Deposition of Michael Tennenbaum dated October 22, 2007 |
| 16. | Deposition of James Xanthos (with exhibits) August 24, 2006 |
| 17. | Exhibit # 202 to Standish Deposition (Declaration of Douglas Muir in Support of First Day Relief (filed in In re Oakwood Homes Corp., No. 02-13396 (Bankr. De.)), dated November 18, 2002) |
| 18. | Exhibit # 203 to Standish Deposition (OHCLT-05175 – OHCLT-05177) |
| 19. | Exhibit # 205 to Standish Deposition (CSFB-00055756 – CSFB-00055760) |

| **EXPERT REPORTS** | |
|---|---|
| 20. | The Expert Report of Alan Shapiro dated April 30, 2007 |
| 21. | The Supplemental Expert Report of Alan Shapiro dated August 28, 2007 |
| 22. | The Expert Report of Michael Tennenbaum dated April 27, 2007 |

| **DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO** | |
|---|---|
| 25. | Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| | Tougher Lending Standards Cut Demand." November 29, 2000 |
| 26. | Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9 |
| 27. | Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001 |
| 28. | Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001 |
| 29. | Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001 |
| 30. | Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007 |
| 31. | George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996 |
| 32. | Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007 |
| 33. | Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004 |
| 34. | Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6 |
| 35. | Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem Under Credit Risk." Rutgers Business School, June 2005 |
| 36. | Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4 |
| 37. | *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004 |
| 38. | Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS |

4

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| | Manufacturing, L.P., and Credit Suisse First Boston. August 19, 2002 (MNAT003849 – MNAT003862) |
| 39. | Credit Suisse - Oakwood Discussion Materials - March 2002 CSFB-00033240 – CSFB-00033258 (at CSFB-00033246) |
| 40. | Credit Suisse – Presentation to Oakwood Homes Corp. - April 9, 2001 CSFB-00052849 – CSFB-00052905 (at CSFB-00052854, CSFB-00052855 and CSFB-00052873) |
| 41. | Credit Suisse – Presentation to Oakwood Homes Corp. – June 26, 2001 CSFB-00052953 – CSFB-00053034 (at CSFB-00052956, CSFB-00052958 and CSFB-00052978) |
| 42. | Credit Suisse – Compliance Manual CSFB-00053059 – CSFB-00053226 (at CSFB-00053080, CSFB-00053081and CSFB-00053089) |
| 43. | Materials Prepared for Discussion – Oakwood Homes Corp. December 18, 2000 CSFB-00141064 – CSFB-00141069 (at CSFB-00141065) |
| 44. | Email from Fiachra O'Driscoll to Susan Menkhaus Cc: John Herbert re: Moody's Rating dated February 15, 2002 (CSFB-00148791) |
| 45. | Email from Fiachra O'Driscoll to Phil Jacob Cc: John Herbert re: Oakwood Homes dated June 6, 2001 (CSFB-00154641) |
| 46. | Credit Suisse Equity Research Report – OH Reported a FY2Q01 Loss of $0.60 per Share CSFB-00155802 – CSFB-00155808 (at CSFB-00155802) |
| 47. | Email from Alberto Zonca to Joseph Spave, Josh Borg and Carl Iovine Cc: Mark Lengel re: Oakwood Datails (Alpine) dated June 6, 2001 (CSFB-00165521 – CSFB-00165522) |
| 48. | Email from John Herbert to Fiachra O'Driscoll and Susan Menkhaus re: S&P Cuts Oakwood Homes dated October 30, 2000 (CSFB-00170815 – CSFB-00170816) |
| 49. | Email from Kareem Serageldin to Fiachra O'Driscoll dated April 14, 2000 (CSFB-00173794 – CSFB-00173795) |
| 50. | Email from David Caspar to Doug Muir Cc: Fiachra O'Driscoll dated November 2, 1999 (CSFB-00175025) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 51. | Memorandum from Joe Donovan, Scott Ulm and Fiachra O'Driscoll to Credit Risk Management re: Oakwood Homes $50 Million Repo dated March 15, 2000 (CSFB-00204186) |
| 52. | Prospectus Supplement to Prospectus dated May 20, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-B CSFB-00220030 – CSFB-00220208 (at CSFB-00220040) |
| 53. | Prospectus Supplement to Prospectus dated February 22, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-A  CSFB-00220209 – CSFB-00220387 (at CSFB-00220219) |
| 54. | Credit Suisse First Boston – New Customer Credit Review (CSFB-00250093 – CSFB-00250100) |
| 55. | Memorandum from James Xanthos to Credit File re: November 19, 1999 On Site Visit dated January 10, 2000 CSFB-00250116 – CSFB-00250129 (at CSFB-00250116, CSFB-00250117, CSFB-00250118 and CSFB-00250121) |
| 56. | Credit Issues/Concerns with Oakwood Homes Corp. (CSFB-00250130) |
| 57. | Memorandum from James Xanthos to File re: Update on Oakwood Homes Corp. dated March 13, 2000 (CSFB-00250131 – CSFB-00250132) |
| 58. | Memorandum from Fiachra O'Driscoll re: Oakwood Transaction dated December 11, 2000 CSFB-00205989.301 - CSFB-00205989.304 (at CSFB-00205989.301) |
| 59. | Credit Suisse First Boston – Equity Research – Manufactured Housing: Retail Inventory Update: Second Quarter 2001 dated September 20, 2001 CSFB-00266304 – CSFB-00266330 (at CSFB-00266317) |
| 60. | Credit Suisse First Boston – Equity Research – Manufactured Housing: Approaching Bottom of Cycle; Not Out of the Woods Yet dated June 11, 2001 CSFB-00266459 – CSFB-00266488 (at CSFB-00266476) |
| 61. | Memorandum from Fiachra O'Driscoll re: Oakwood Homes Transaction dated May 25, 2001 (CSFB-00485359 – CSFB-00485360) |
| 62. | Email from John Chrystal to Fiachra O'Driscoll re: Oakwood dated May 16, 2000 (CSFB-00492624) |

## EXHIBIT 2

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 63. | Email from Fiachra O'Driscoll to Kareem Serageldin re: Judge Walsh's Order Protecting Warehouse Facility dated November 22, 2002 (CSFB-00512527) |
| 64. | CSFB Equity Research. "Oakwood Homes Corporation: Dropping Coverage." October 25, 2002 (CSFB-00048801 – CSFB-00048804) |
| 65. | CSFB Equity Research. "OH: Fiscal 3Q02 Operating Loss of $1.29 Per Share." August 8, 2002 (CSFB-00049310 – CSFB-00049312) |
| 66. | CSFB Equity Research. "OH: FY1Q02 EPS Loss of $1.05 Versus a Loss of $5.36 A Year Ago." January 25, 2002 (CSFB-00049449 – CSFB-00049452) |
| 67. | CSFB Equity Research. "OH: FY2Q02 Operating Loss of $6.25." May 1, 2002 (CSFB-00050066 – CSFB-00050068) |
| 68. | CSFB Equity Research. "Second Quarter 1999: Retail Inventory Update." September 9, 1999 (CSFB-00050386 – CSFB-00050397) |
| 69. | Credit Modification Request F-656 – F-667 (at F-657 and F-658) |
| 70. | Credit Suisse First Boston – Presentation to the Board of Directors dated August 19, 2002 MNAT006731 – MNAT006775 (at MNAT006734, MNAT006735 and MNAT006739) |
| 71. | Oakwood Homes Corp. – Creditors Committee Meeting dated December 9, 2002 MNAT024062 – MNAT0024101 (at MNAT024088 and MNAT024090) |
| 72. | Credit Suisse First Boston - Presentation to the Board of Directors dated August 19, 2002 (OHCLT-1706 – OHCLT-01750) |
| 73. | Prospectus Supplement to Prospectus dated August 27, 2002 - Senior/Subordinated Pass-Through Certificates Series 2002-C OHCLT-230789 - OHCLT-230961 (at OHCLT-230798) |

| SECURITIZATION DOCUMENTS | |
|---|---|
| 74. | Confidential Offering Circular - $111,117,295 Pass-Through Securities (Aug. 13, 2001) (CSFB 00244002 – 00244050) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| SECURITIZATION DOCUMENTS | |
|---|---|
| 75. | Trust Agreement - Oakwood Mortgage Resecuritization Trust 2001(Aug. 1, 2001) (CSFB 00243854 – 00243946) |
| 76. | Purchase Agreement - Oakwood Mortgage REMIC Trust 2001 Pass-Through Securities, Class A (Aug. 14, 2001) (CSFB 00122183 – 00122199) |
| 77. | Note Purchase Agreement - Oakwood Mortgage Resecuritization Trust 2001 Collateralized Notes, Class A $8,993,000 (March 12, 2002) (CSFB 00089648 – 00089666) |
| 78. | Note Purchase Agreement - Oakwood Mortgage Resecuritization Trust 2001 Collateralized Notes, Class A $17,292,000 (February 14, 2002)(CSFB 00089783 – 00089801) |
| 79. | Pooling & Servicing Agreement – Oakwood Mortgage REMIC Trust, Series 2001 (Aug. 1, 2001) (CSFB 00124135 – 00124213) |
| 80. | Confidential Offering Supplement to the Confidential Offering Circular dated August 14, 2001, as supplemented - $8,993,000 Collateralized Notes (March 11, 2001) (CSFB 00089591 – 00089645) |
| 81. | Confidential Offering Supplement to the Confidential Offering Circular dated August 13, 2001 - $17,292,000 Collateralized Notes (Feb. 13, 2001) (CSFB 00089727 – 00089780) |
| 82. | Confidential Offering Supplement to the Confidential Offering Circular dated Aug. 14, 2001, as supplemented - $8,993,000 14,315,000 Collateralized Notes (CSFB 00121884 – 00121937) |
| 83. | Amended and Restated Trust Agreement – Oakwood Mortgage Resecuritization Trust 2001 – Hunton & Williams Draft of February 1 13, 2002 (Feb. 1, 2002) (CSFB 00122013 – 00122117) |

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 84. | Board Minutes dated 29 April 1998  (MNAT020038 – MNAT020041) |
| 85. | Board Minutes dated 18 November 1998  (MNAT020025 – MNAT020037) |
| 86. | Board Minutes dated 3 February 1999  (KCLH0888 – KCLH0890) |

# EXHIBIT 2

## Materials Considered in Preparation of Expert Report of Thomas Boland

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 87. | Board Minutes dated 22 April 1999  (KCLH 0925 – KCLH 0927) |
| 88. | Board Minutes dated 17 June 1999  (KCLH 0931 – KCLH 0936) |
| 89. | Board Minutes dated 30 June 1999 (KCLH 0938 – KCLH 0943) |
| 90. | Board Minutes dated 21 July 1999  (KCLH 0948 – KCLH 0954) |
| 91. | Board Minutes dated 2 August 1999 (KCLH0956 – KCLH0959) |
| 92. | Board Minutes dated 10 August 1999  (KCLH 0961 – KCLH 0969) |
| 93. | Board Minutes dated 20 September 1999  (KCLH 0971 – KCLH 0972) |
| 94. | Board Minutes dated 27 September 1999  (KCLH 0974 – KCLH 0976) |
| 95. | Board Minutes dated 20 October 1999  (KCLH 0978 – KCLH 0981) |
| 96. | Board Minutes dated 3 November 1999  (KCLH 0983 – KCLH 0985) |
| 97. | Board Minutes dated 17 November 1999 KCLH 0987 – KCLH 0992 |
| 98. | Board Minutes dated 20 December 1999 (KCLH 0994 – KCLH 0996) |
| 99. | Board Minutes (Shareholders) dated 9 February 2000 (MNAT002742 - MNAT002744) |
| 100. | Board Minutes dated 9 February 2000  (MNAT002745 - MNAT002746) |
| 101. | Board Minutes (Audit Committee) dated 16 February 2000 (OHCLT-13763 - OHCLT-13765) |
| 102. | Board Minutes (Audit Committee) dated 18 April 2000 (OHCLT-13737 – OHCLT13739) |
| 103. | Board Minutes (Valuation Committee) dated 6 June 2000 (OHCLT-04860 – OHCLT-0486) |
| 104. | Board Minutes dated 30 June 2000 (KCLH 1034 – KCLH 1036) |
| 105. | Board Minutes dated 8 August 2000  (KCLH 1038 – KCLH 1042) |
| 106. | Board Minutes dated 20 September 2000 (RCDA 033115 – RCDA 033118) |

## EXHIBIT 2

### Materials Considered in Preparation of Expert Report of Thomas Boland

| | BOARD OF DIRECTORS MEETING MINUTES |
|---|---|
| 107. | Board Minutes dated 16 October 2000 (KCLH 1059 – KCLH 1061) |
| 108. | Board Minutes dated 15 November 2000 (MNAT006717 – MNAT006722) |
| 109. | Board Minutes dated 20 December 2000 (MNAT006712 – MNAT006716) |
| 110. | Board Minutes dated 30 and 31 January 2001 (KCLH 1124 – KCLH1128) |
| 111. | Board Minutes dated 19 April 2001 (KCLH 1151 – KCLH 1154) |
| 112. | Board Minutes dated 8 June 2001 (KCLH 1172 – KCLH 1174) |
| 113. | Board Minutes (Audit Committee) dated 23 July 2001 (OHCLT-13756 – OHCLT-13758) |
| 114. | Board Minutes dated 24 July 2001 (KCLH 1176 – KCLH 1181) |
| 115. | Board Minutes dated 20 August 2001 (MNAT002585 – MNAT002586) |
| 116. | Board Minutes dated 15 November 2001 (KCLH 1201 – KCLH 1207) |
| 117. | Board Minutes dated 6 May 2002 (OHCLT-02877 – OHCLT-02879) |
| 118. | Board Minutes (Audit Committee) dated 6 May 2002 (KCLH 1229 – KCLH 1230) |
| 119. | Board Minutes dated 25 June 2002 (MNAT006726 – MNAT006728) |
| 120. | Board Minutes dated 29 July 2002 (MNAT006776 – MNAT006777) |
| 121. | Board Minutes (Audit Committee) dated 29 July 2002 (OHCLT-037993 – OHCLT-037994) |
| 122. | Board Minutes dated 19 August 2002 (MNAT006729 – MNAT006730) |
| 123. | Board Minutes dated 30 September 2002 (MNAT006780 – MNAT006782) |
| 124. | Board Minutes dated 18 October 2002 (MNAT006825 – MNAT006826) |
| 125. | Board Minutes dated 28 October 2002 (MNAT006827 – MNAT006828) |
| 126. | Board Minutes dated 4 November 2002 (OHCLT-02761 – OHCLT-02763) |
| 127. | Board Minutes dated 12 November 2002 (MNAT006829 – MNAT006837) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 128. | Board Minutes dated 14 November 2002 (OHCLT-02655 – OHCLT-02660) |

| PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND | |
|---|---|
| 1. | Growing Profits Under Pressure: Integrating Corporate and Investment Banking, Ludger Kubel-Sorger, Jurgen E. Schwarz, The Boston Consulting Group, 2002. |
| 2. | Deutsche Bank Annual Report 2006 – Corporate and Investment Banking http://annualreport.deutsche bank.com/2006/ar/managementreport/outlook/corporateandinvestmentbank.html. |
| 3. | Investment Banking – National City Corporation https://www.nationalcity.com/investmentbanking/Aboutus.asp. |
| 4. | BMO Financial Group, U.S. Expansion Strategy, Successfully Leveraging Lending Relationships. |
| 5. | Oakwood Homes Corporation – Company Profile http://www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html. |
| 6. | Ivy Zelman – Excelling in Stock Analysis, Robin Heffler, JW Magazine, Fall, 2005. |
| 7. | Fleetwood Enterprises Annual Report, 2005, page 49. |
| 8. | Third Party Interference, Philip J. Campanella, Joseph A. Castrodale, Matthew Bender & Company, 2008 |
| 9. | U.S. Labor Markets in 2001: Economy Enters a Recession, David S. Langdon, Monthly Labor Review, February 2002. |
| 10. | A Body Blow to the Economy, David Leonhardt, Luis Uchitelle, New York Times September 16, 2001. |
| 11. | Housing Market is Duddenly Uncertain, Alan J. Heavens, The Philadelphia Inquirer October 7, 2001. |
| 12. | BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10. |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND |
|---|---|
| 13. | Delphi CEO Would Rather Fix Company's Woes Out of Court, Wall Street Journal, September 21, 2005, Page A.5. |
| 14. | Joint Releas Board of Governors of the Federal Reserve, FDIC, Comptroller of the Currency, NR 2001-87, October 5, 2001 |
| 15. | First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1. |

# EXHIBIT D

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
-------------------------------------------x

In re:

                                Chapter 11
OAKWOOD HOMES CORPORATION,      Case No. 02-13396 (PJW)
et al.,                         Jointly Administered

                    Debtors.
-------------------------------------------x
OHC LIQUIDATION TRUST,

                    Plaintiff,

     - against -              Adv. Proc. No.
                              04-57060 (PJW)


CREDIT SUISSE FIRST BOSTON, et al.,

                    Defendants.
-------------------------------------------x


          Videotaped DEPOSITION of THOMAS F. BOLAND, held

at the offices of Linklaters LLP, 1345 Avenue of the

Americas, New York, New York 10105, on the 25th day

of March 2008, commencing at 9:03 a.m., before

Colette Cantoni, a Registered Professional Reporter

and Notary Public of the State of New York.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
fde3021c-121e-4454-a74b-8565f534854d

Page 78

Boland

1
2    A    Yes.
3    Q    Do you see that?
4    A    Yes.
5    Q    Now let me ask you, after that first
6  sentence, I take it that's the sentence you disagree
7  with, at least you disagree with that sentence in
8  your opinion; but I would like to ask you about the
9  remainder of this paragraph.
10        The next sentence reads "CSFB's various
11 relationships with Oakwood afforded it access to
12 information, both public and inside, about Oakwood's
13 financial condition."
14        Do you disagree with that statement?
15   A    I think it's very broad.
16   Q    Well, do you think it's correct that CSFB
17 had public information about Oakwood's financial
18 condition?
19   A    Yes.
20   Q    Do you think it is correct that CSFB at
21 any time had inside information about Oakwood's
22 finance condition?
23   A    It had certain nonpublic information, yes.
24   Q    All right. And do you believe that that
25 information, both public and nonpublic, came to CSFB

Page 79

Boland

1  in some capacity other than its various relationships
2  with Oakwood, as set forth in this sentence?
3    A    It came through its relationships, yes.
4    Q    Okay. Now do you believe that at any time
5  CSFB or any CSFB entity had any fiduciary
6  relationship to Oakwood?
7        MS. WARREN: Objection to the form. Calls
8  for a legal conclusion.
9        I direct the witness not to answer.
10   Q    Do I take it, sir, that -- I do take it --
11       MR. CASTANARES: I'll just state for the
12 record, I take exception to the instruction, it being
13 based upon neither a privilege nor make a motion
14 to suspend the deposition, therefore plainly outside
15 the rules of practice.
16       MS. WARREN: I disagree, Tony.
17       MR. CASTANARES: However, I don't think
18 we're --
19       MS. WARREN: You're asking a
20 businessperson for a legal conclusion, which is
21 improper.
22       MR. CASTANARES: All right.
23       MS. WARREN: Go ahead.
24 BY MR. CASTANARES:

Page 80

Boland

1
2    Q    Do I take it, sir, that you have no
3  opinion on whether or not the relationship between
4  CSFB or any entity in the Credit Suisse family and
5  Oakwood and every entity in the Oakwood family ever
6  gave rise to a fiduciary duty?
7        MS. WARREN: Object and direct the witness
8  not to answer.
9        MR. CASTANARES: You're not going to let
10 him answer whether he has an opinion or not?
11       MS. WARREN: Ask the question again.
12   Q    Do you have an opinion on whether any CSFB
13 entity ever owed any fiduciary duty to any Oakwood
14 entity?
15       MS. WARREN: All right. Assuming that
16 you're asking him for a legal conclusion, whether he
17 has a legal conclusion, you can go ahead and answer
18 that.
19       MR. CASTANARES: I am simply asking
20 whether he has an opinion. It is subject to a yes or
21 no answer.
22       MS. WARREN: Well, not particularly.
23       If you're asking him whether he's come to
24 a legal conclusion, the answer is no. And he can
25 tell you that himself. But if you're trying to ask

Page 81

Boland

1
2  him for a fiduciary duty type of opinion under the
3  guise of some other question, then he is not going to
4  answer.
5        MR. CASTANARES: My question stands.
6    Q    Do you have an opinion, sir, on whether
7  CSFB ever owed any fiduciary duty to Oakwood?
8        MS. WARREN: Objection on the same basis
9  as before, that it calls for a legal conclusion, but
10 you can answer.
11   A    I'm not in the position of giving legal
12 opinions.
13   Q    Okay. So would it be correct for me then
14 to read your report as not attempting to express an
15 opinion on the subject of whether CSFB ever owed a
16 fiduciary duty to Oakwood?
17       MS. WARREN: Objection to the form.
18       His -- his opinion speaks for itself.
19       MR. CASTANARES: You may not say anything
20 more than "objection to the form," counsel.
21       MS. WARREN: No, I do need to say more,
22 because you keep asking him about legal concepts.
23       MR. CASTANARES: Everything you say is
24 going to appear before this Judge in connection with
25 whether this witness gets to testify or not. I just

21 (Pages 78 to 81)

Boland

1 want to let you know that right here and now.
2
3        So go ahead and say anything you want to
4 say.
5        MS. WARREN:  That's fine, Tony.
6 You're asking him about a legal construct.
7        His opinion is right in this report, it
8 speaks for itself, and you can ask him about it.
9        He is not going to testify about a legal
10 matter. That's a matter for the Judge and the jury
11 in this case to decide.
12        Go ahead with your next question.
13 BY MR. CASTANARES:
14    Q    Do you have -- strike that.
15        Does your report attempt to express an
16 opinion on whether or not CSFB ever owed a fiduciary
17 duty to Oakwood?
18        MS. WARREN:  Same objection, direct the
19 witness not to answer.
20    Q    I take it, sir, that you will follow
21 Ms. Warren's instructions not to answer questions
22 when she instructs you not to answer them?
23    A    Yes.
24    Q    Okay.
25        MR. CASTANARES:  And I take it, counsel, I

Boland

1 need make no further record of the fact that the
2 witness has refused to answer the question based upon
3 your instruction?
4        MS. WARREN:  You need not.
5        MR. CASTANARES:  Thank you.
6    Q    Do you have an opinion, sir, on whether
7 CSFB ever owed any duty of any kind to Oakwood?
8    A    I think CSFB had a responsibility to
9 deliver their products and services professionally.
10    Q    And when you say professionally, are you
11 referring to in accordance with the standard of care
12 that would be prevalent in the community of clients
13 and investment banks giving similar services?
14    A    Yes.
15    Q    What sources would we go to to find out
16 what that standard of care is?
17    A    I'm basing my opinion on my experience and
18 looking at what actions were conducted here.
19    Q    All right. And I take it your opinion is
20 that -- strike that.
21        Is it your opinion that to the extent that
22 CSFB ever owed any duty of any kind to Oakwood it was
23 to act as a reasonable investment bank would act in
24 the performance of the duties it undertook to take?

Boland

1
2    A    That's a pretty broad statement, but yes.
3    Q    Okay. And your opinion is that CSFB did
4 exactly that, it acted as a reasonable investment
5 bank would act in its various dealings with Oakwood;
6 is that right?
7    A    That's correct.
8    Q    And if I understand correctly, your
9 opinion is based upon your experience with investment
10 banking transactions; is that correct?
11    A    My experience and a review of the records.
12    Q    All right. Is it based upon anything else
13 other than your own experience and review of the
14 records of this particular series of transactions?
15    A    No.
16    Q    Okay. Now, do you understand that
17 Dr. Shapiro's view is in conflict with your own on
18 that subject?
19    A    Yes.
20    Q    Do you have any understanding of what he
21 based his opinion on?
22    A    As outlined in his report, he gives a very
23 broad definition of what he believes investment
24 banking is.
25    Q    Okay.

Boland

1
2    A    Which I believe is not appropriate in this
3 situation.
4    Q    Aside from the def- -- are you talking
5 about how he defines the term "investment banking"?
6    A    And his description of due diligence.
7    Q    I believe you defined the term "due
8 diligence" in reference to a particular transaction
9 in which Citicorp was acquiring something called
10 Associates. But could you give me a general
11 definition of the term "due diligence" as you use it
12 and as you use it in your report?
13    A    I think due diligence is the work you need
14 to do to understand a particular transaction.
15    Q    Okay. And what is your understanding of
16 the basis that Dr. Shapiro used to describe what he
17 termed the standard of care that was applicable to
18 any aspect of the relationship between CSFB and
19 Oakwood?
20    A    Could you point out the particular section
21 in the report where he referred to that so I can
22 understand what you're talking about.
23    Q    You're asking me to find it in
24 Dr. Shapiro's report; is that right?
25    A    Well, that's what you're referring to

22 (Pages 82 to 85)

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
fde3021c-121e-4454-a74b-8565f534854d

Page 86

Boland

1    so --
2    Q    Yes, okay.  That's fair enough.
3        (Pause.)
4    Q    Let me come back to that rather than go
5  through the report right now.
6        Okay.  Tell me the precise nature of your
7  assignment in this case.
8        MS. WARREN:  Objection, asked and
9  answered.
10       Go ahead.
11   A    I was asked by counsel to opine on, give
12  my opinion on Dr. Shapiro's two opinions in his
13  report.
14   Q    Okay.  Were you asked to perform any
15  independent investigation of your own as
16  distinguished from merely opining on Dr. Shapiro's
17  report?
18       MS. WARREN:  Objection to the form.
19   A    Could you explain what you're talking
20  about.  I don't understand that question.
21   Q    Yes.  If I understand your last answer
22  correctly --
23   A    Okay.
24   Q    -- you were asked to opine on whether

Page 87

Boland

1  Dr. Shapiro was correct in what he said; is that
2  right?
3    A    That's correct.
4    Q    Okay.  And I'm asking you whether or not,
5  in addition to simply opining on whether Shapiro was
6  right or wrong, you were asked to come to any
7  opinions of your own?
8    A    No.
9    Q    We talked in valuation techniques about a
10  discounted cash flow and market data techniques.
11       Does the term "Black-Scholes,"
12  S-C-H-O-L-E-S, mean anything to you?
13   A    Yes.  It's a valuation model.
14   Q    And what does it study?
15   A    I'm not an expert in Black-Scholes.
16   Q    Okay.  Have you ever used it yourself?
17   A    No.
18   Q    So I take it you would have no opinion on
19  whether the Black-Scholes' technique would be
20  appropriate to look at Oakwood at any point in time?
21   A    I have no opinion.
22   Q    Okay.  Now, do you have any experience at
23  all on the subject of the duties of a fiduciary?
24       MS. WARREN:  Objection.

Page 88

Boland

1    Direct the witness not to answer.
2    Q    Have you ever been a fiduciary?
3        MS. WARREN:  You can go ahead.
4    A    Yes.
5    Q    Okay.  And describe for me the
6  circumstances under which you have been a fiduciary.
7    A    As a director, a member of a board of
8  directors.
9    Q    And how many such memberships have you
10  held?
11   A    Five.
12   Q    Okay.  And aside from being a member of a
13  board of directors, have you ever had any fiduciary
14  duties?
15   A    Yes.
16   Q    Describe, please.
17   A    As an investment banking restructuring
18  assignment, working for a board of directors.
19   Q    That is to say the investment bank that
20  you worked for had a fiduciary duty to the client?
21   A    Yes.
22   Q    And what was the nature of that fiduciary
23  duty?
24   A    To operate in their best interest.

Page 89

Boland

1    Q    Okay.  And did that fiduciary duty arise
2  because the investment bank that you worked for
3  received confidential information from the client?
4    A    No.
5    Q    What was the nature of your -- what was
6  your understanding of the reason that a fiduciary
7  duty had arisen between the investment bank and the
8  client in that particular instance?
9    A    We were -- we agreed to take on a
10  particular assignment and felt we had an obligation
11  to perform that assignment for our client to the best
12  we could.
13   Q    All right.  Was the assignment embodied in
14  a written contract?
15   A    Yes.
16   Q    Was the existence of the fiduciary duty
17  set forth in a written contract or was it the case
18  that the investment bank simply considered itself to
19  have a fiduciary duty, irrespective of whether or not
20  it was in a writing?
21       MS. WARREN:  I just want to just object
22  again that the witness isn't a lawyer, so you can
23  just testify to your understanding as a
24  businessperson.

23  (Pages 86 to 89)

MERRILL   LEGAL   SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
fde3021c-121e-4454-a74b-8565f534854d

# EXHIBIT E

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    IN RE:

5    OAKWOOD HOMES CORPORATION, ET AL.,)
                                       )
6              DEBTORS,                )
     _____)
7                                      )
     OHC LIQUIDATION TRUST,            )   No. 02-13396(PJW)
8                                      )
               PLAINTIFF,              )   VOLUME 1
9                                      )   PAGES 1 THROUGH 292
     vs.                               )
10                                     )
     CREDIT SUISSE FIRST BOSTON, A     )
11   SWISS BANKING CORPORATION, CREDIT )
     SUISSE FIRST BOSTON LLC, A        )
12   DELAWARE LIMITED LIABILITY        )
     CORPORATION, CREDIT SUISSE FIRST  )
13   BOSTON, INC., CREDIT SUISSE FIRST )
     BOSTON (USA), INC., A DELAWARE    )
14   CORPORATION AND A WHOLLY OWNED    )
     SUBSIDIARY OF CREDIT SUISSE FIRST )
15   BOSTON, INC., THE SUBSIDIARIES AND)
     AFFILIATES OF EACH, AND DOES 1    )
16   THROUGH 100,                      )
                                       )
17             DEFENDANTS.             )
     _____)
18

19

20   VIDEOTAPED
     DEPOSITION OF:
21                  JARED FELT
                    THURSDAY, JUNE 15, 2006
22                  LOS ANGELES, CALIFORNIA

23

24
     REPORTED BY:
25   FELIPE F. CARRILLO, CSR 9555

1  Q. Are you currently employed by CSFB?
2  A. I'm currently employed by Credit Suisse.
3  Q. Is that the same entity as CSFB?
4  A. It's a new name.
5  Q. Same entity but renamed?
6  A. Uh-huh.
7  Q. If I call it CSFB in the course of this, can we
8  dispense with your directing me every time. I've got it
9  that way in the notes and all the documents.
10     MS. WARREN: Let me just make sure you are
11 clear about which entity you are talking about.
12     MR. CASTANARES: Okay. I will be talking to
13 this witness today almost exclusively about the entity
14 that signed the contract of August 19th, 2002. And if I
15 mean to distinguish some other CSFB or Credit Suisse
16 entity from it, I will let you know that. But the
17 default setting is the entity that signed that contract.
18    I take it that --
19     THE WITNESS: So CSFBC --
20     MS. WARREN: Did you have a question?
21     THE WITNESS: Is it CSFBC then that you are
22 referring to.
23     MR. CASTANARES: Why don't we get the proof
24 of claim mark it. If you would be so kind. That's the
25 entity I'm talking about, too, the one that filed proofs

14

1  of claim.
2     So I'm going to ask the reporter to mark four
3  documents, the first being a proof of claim filed in the
4  case of Oakwood Mobile Homes, Inc., as Exhibit 2.
5     (THE DOCUMENT WAS MARKED PLAINTIFF'S
6      EXHIBIT 2 FOR IDENTIFICATION.)
7     THE WITNESS: Thank you.
8     MR. CASTANARES: Next being proof of claim
9  filed in the claim of Oakwood Homes Corporation as
10 Exhibit 3.
11    (THE DOCUMENT WAS MARKED PLAINTIFF'S
12     EXHIBIT 3 FOR IDENTIFICATION.)
13    MR. CASTANARES: The next being a proof of
14 claim filed in HBOS Manufacturing LP as Exhibit 4.
15    (THE DOCUMENT WAS MARKED PLAINTIFF'S
16     EXHIBIT 4 FOR IDENTIFICATION.)
17    MR. CASTANARES: And lastly, the proof of
18 claim filed in the case of Oakwood Acceptance
19 Corporation as Exhibit 5.
20    (THE DOCUMENT WAS MARKED PLAINTIFF'S
21     EXHIBIT 5 FOR IDENTIFICATION.)
22 BY MR. CASTANERAS:
23 Q. Let me withdraw the pending question and ask you,
24 sir, if that is your signature on the first page of each
25 of Exhibits 2 through 5, inclusive?

15

1  A. It is.
2  Q. Okay. And the entity which is named as a
3  creditor in this document, I'm looking at Exhibit 5
4  right here, is Credit Suisse First Boston, LLC, the
5  successor to Credit Suisse First Boston Corporation?
6  A. Yes.
7  Q. That is the entity that I will call CSFB today as
8  the default setting, if that's okay with you.
9  A. That's fine.
10 Q. And that was the entity that signed the contract
11 of August 19th, 2002; correct? It's attached to the
12 proof of claim, if you would like to see it.
13 A. Yes.
14 Q. And that's your signature on that contract as
15 well; is that correct?
16 A. Yes, it is.
17 Q. What's your office address?
18 A. My current office address is 2121 Avenue of the
19 Stars here in Los Angeles.
20 Q. Okay. And is that the main office was CSFB or
21 Credit Suisse here in Los Angeles?
22 A. It is.
23 Q. Okay. And are you paid by some particular
24 division or branch or business suborganization of Credit
25 Suisse?

16

1  A. Yes.
2  Q. What is that?
3  A. I am a member of the restructuring group.
4  Q. Okay. That's the same group you were a member of
5  in 2001 and 2002?
6  A. Yes.
7  Q. And are you a managing director of that group
8  now?
9  A. I am.
10 Q. How long have you been here in Los Angeles?
11 A. I've been here since 2003.
12 Q. Okay.
13 A. I was in New York at the time.
14 Q. What month in 2003 did you come out to
15 Los Angeles, please?
16 A. Let me quickly read one thing.
17 Q. Or early in the year, late in the year, whatever?
18 A. I came in approximately July.
19 Q. Okay. What does the restructuring — what shall
20 we call the restructuring part of CSFB? Is it a
21 division or is it a unit or is it a branch?
22 A. It's a group.
23 Q. It's a group. How large is the restructuring
24 group -- strike that.
25    How large was the restructuring group in New York

17

1    Q. Well, here's what I'd like to do. Suppose that
2  Oakwood had countersigned this and sent it back to you.
3    A. Then we would have said, sorry, we need an
4  engagement letter. This is nothing more than an
5  introduction of fees.
6    Q. I see. And would the engagement letter then have
7  contained different fee structures in your
8  contemplation?
9    A. Had they -- it's -- it's -- this is nothing more
10  than an introduction of fees.
11    Q. Okay. So let's suppose the company had gotten
12  this letter and said, yeah, we want to go forward?
13    A. Okay.
14    Q. Okay. You would then have had a contract
15  prepared; right?
16    A. Sure.
17    Q. And would that contract then have contained
18  exactly the fees that are in this Exhibit 6 or would it
19  have said anything else about fees?
20    A. It would have had to have described what a
21  success is and when those payments are due, which is, I
22  think, what you are getting at.
23    Q. What I am really get at is this: Would it have
24  described the filing of a prearranged plan of
25  reorganization?

46

1    A. A restructuring, a potential sale of the company,
2  all of the things that are covered in the August 19th
3  engagement letter. Our August 19th engagement letter is
4  based on a standard form. This is a shorthand to try to
5  describe to the company what our fees might be before we
6  get into the longer negotiation of an engagement letter.
7    Q. All right. And with respect then to the second
8  success fee matter, is there something in the definition
9  of success regarding the obtaining of a new credit
10  facility that you believe needed further clarification
11  in the contract?
12    A. Sure.
13    Q. Why?
14    A. This is just introducing that if we were to go
15  out and raise money for the company, and we were hoping
16  to win that business, that we would charge three and a
17  half percent as a gross spread.
18    Q. All right. So suppose if you went to Bank of
19  America, and they agreed to a revolving line of credit
20  for this company for a hundred million. Your fee for
21  that would be three and a half?
22    A. We were hoping to charge three and a half
23  percent, yes.
24    Q. Okay. And what is there about this definition of
25  success that you felt was in need of further

48

1    A. Absolutely.
2    Q. As a success?
3    A. Yes.
4    Q. Okay. And would it have had a separate fee
5  structure from the success fees that are in Exhibit 6
6  for those kinds of services?
7    A. No. Had they agreed to them, we would have
8  happily agreed to these.
9    Q. All right.
10    A. But it still would have had to address what is
11  success and when were the payments due, and we typically
12  ask for a staggered payment.
13    Q. What is there about -- let's look at the success
14  fees. The first one talks about the company's two note
15  issues, the 2004s and the 2009s, and calls them the
16  notes, and I'll call them that for the purposes of this
17  line of questions. Okay?
18    A. Uh-huh.
19    Q. So was two percent of the face amounts
20  repurchased, redeemed, exchanged or otherwise altered.
21  What is there about definition that you felt would
22  need further clarification in an engagement contract?
23    A. "Otherwise altered" is shorthand for many things.
24    Q. Okay. What things did you have in mind at that
25  time?

47

1  clarification with respect to the obtaining of the
2  financing line such as that?
3    MS. WARREN: Objection to the form.
4    THE WITNESS: This is nothing more than an
5  introduction of fees. If we do a financing for you, we
6  will charge three and a half percent. If we do a
7  restructuring transaction, we will charge you two
8  percent of face.
9  BY MR. CASTANARES:
10    Q. Okay. And did you discuss these particular fees
11  with the company at the time of this letter in August of
12  2001?
13    A. This was an introduction of what those fees would
14  be. I had hoped to go from here to an engagement
15  letter. Obviously, it didn't work out that way.
16    Q. Okay. Now, is this the document, Exhibit 6, that
17  you earlier testified contained your hope of a
18  approximately twice what the August 19th contract wound
19  up providing?
20    A. Yes.
21    Q. Okay. Now, did the company make a written
22  counter proposal at some point or another that -- as a
23  next step in this process sometime between August 10th
24  of 2001, and August 19th of 2002?
25    A. If you look at the -- at what happened, we

49

1  continued to pitch for a long time after this letter.
2  We had not won the business at this point. When we
3  ultimately started negotiating the engagement letter, it
4  was sometime later. It was in the summer, fall — the
5  summer of 2002, and most of those discussions were
6  verbal as opposed to written.
7      Q. So may I take your answer as meaning that you
8  don't recall getting a counter proposal to Exhibit 6
9  from the company at any time?
10     A. I would have been elated because that would have
11 meant we were winning the business. We did not receive
12 a counter proposal at the time.
13     Q. Okay. What — after the August 10th, 2001,
14 letter, which is Exhibit 6, what was the next step that
15 occurred either oral or in writing in terms of the
16 negotiation of fees that wound up in the August 19th,
17 2002, contract?
18     A. A lot of analysis, a lot of work, a lot of
19 pitching when we were not engaged and had no promise of
20 any fees.
21     Q. Okay.
22     A. That was the next step.
23     Q. I'm sorry. Would it be correct for me to infer
24 from the answers you've just given that you really
25 didn't get around to discussing fees again until you

50

1  sent them our standard form. I'm sure that was altered
2  based on our best guess of how things would — we hoped
3  would end up, and then we started going back and forth
4  and discussing specifics of the size of the fee and
5  under what conditions they would be payable.
6      Q. All right. Do I understand you to be saying that
7  CSFB made some written proposal to Oakwood that
8  contained a fee structure different from either that to
9  be found in Exhibit 6 or in the August 19th contract?
10     A. I don't recall if it was written or not, but it
11 was certainly discussed.
12     Q. All right. So how did it come about that there
13 was a next step after the Exhibit 6? Did the company
14 come to you and say, okay, we want to work with you, but
15 now we need to talk about fees, or did they come to you
16 and say, we want to work with you, and then you went to
17 the company and said, let's talk about fees? How did it
18 come about?
19     A. That's a — I don't recall. That's a pretty —
20 there's a pretty close thing that you are asking. Who
21 asked about fees first?
22     Q. Yeah. I want to go through the steps of how the
23 fees came into the August 19th contract. That's where
24 I'm going with all of this.
25     A. Okay.

52

1  had, quote, "won" the business, as you've used that
2  term?
3      MS. WARREN: Object to the form.
4      THE WITNESS: I can see that my words are
5  potentially misunderstood. Until the company had
6  indicated at a later date that they wanted to work with
7  us, subject to the arrangement and the contract and the
8  fees, we did not discuss fees again.
9  BY MR. CASTANARES:
10     Q. Okay. When did that happen?
11     A. That would have been in the summer of 2002.
12     Q. All right. So in the summer of 2002, the next
13 step occurred after Exhibit 6 in the negotiation of the
14 fees that wound up in the August 19th, 2002, contract;
15 correct?
16     A. That would be my recollection, yes.
17     Q. What was that next step?
18     A. When the company decided that it would like to
19 work with us subject to — that it decided that we were
20 well qualified, subject to the arrangements, that they
21 would like to engage us as restructuring advisor.
22     Q. What was the next step in the negotiation of the
23 fees?
24     A. The next step in the negotiation of the fees? We
25 probably had another conversation about it, and then

51

1      Q. Okay. I don't want to dance around it. I just
2  want to get there.
3      A. I'm answering the question.
4      Q. Okay.
5      A. The answer is it was discussed — it was
6  discussed with a number of parties over a period of
7  time. It was negotiated, both the size of the fees and
8  under what conditions they would be payable.
9      Q. All right. Can you recall any of the particulars
10 that were contained in any counter proposal made by
11 either Credit Suisse or the company, besides those that
12 are contained in the two documents that are Exhibit 6
13 and the August 19th, 2002, contract?
14     MS. WARREN: Objection to the form. That's
15 awfully — it's broad and complicated at the same time.
16 Can you break it down a little bit?
17     MR. CASTANARES: All right. Let me go
18 through this.
19     Q. When it comes to the fees that CSFB was to be
20 paid under the exclusive financial advisory contract, as
21 between the proposal that's made in Exhibit 6 and what
22 ultimately came to be in the contract, can you remember
23 what any parties proposal or counter proposal was?
24     A. I don't have a strong recollection of this, but I
25 do remember a conversation about what is typical. We

53

1    A. The first presentation we made to the company was
2  in June. We made many other presentations to the
3  company about ideas and different things that they could
4  do.
5    Q. Just to clarify your question.
6    A. Yes.
7    Q. I believe there have been a couple presentations
8  in June. There was one in June 2001. I believe there
9  was another in 2002. Did your last answer refer to the
10  one approximately a year earlier in June 2001?
11    A. Yes. Thank you.
12    Q. Okay. All right. And during that period of
13  time, even though you weren't formally engaged, was the
14  nature of the work that you were doing for Oakwood
15  similar to the kind of work you would have done if you
16  were formally engaged?
17        MS. WARREN: Objection to the form.
18        THE WITNESS: We were trying to provide them
19  with good ideas and — with good ideas primarily and,
20  also, hoping to gain their trust so that they would work
21  with us as opposed to someone else.
22  BY MR. CASTANERAS:
23    Q. Okay. And I gather you were trying to give them
24  good ideas before, before and after —
25    A. Yes.

86

1  restructuring debt-related questions.
2        If you look at the transaction, it was both the
3  bond pieces that's typical of companies and then the
4  REMIC related questions, which are far less common and
5  far fewer firms can provide advice.
6    Q. And how did that fact help you gain the company's
7  trust?
8    A. It didn't help me gain the company's trust.
9  Instead it helped — I think it was instrumental in
10  their deciding to work with us as opposed to someone
11  else.
12    Q. All right. You had already gained their trust,
13  and this was just a business factor that helped them
14  decide?
15    A. Of course not.
16        MS. WARREN: Objection to the form.
17        THE WITNESS: Of course I hadn't gained
18  their trust yet.
19  BY MR. CASTANARES:
20    Q. When did you gain their trust?
21    A. You'd have to ask them.
22    Q. But you know that you did?
23        MS. WARREN: Objection to the form.
24        THE WITNESS: All I know is they hired us.
25  BY MR. CASTANARES:

88

1    Q. — the August 19th contract was signed; correct?
2    A. Yes.
3    Q. And I assume you were trying to gain their trust
4  both before and after August 19th as well; correct?
5    A. Yes.
6    Q. And you did gain their trust; correct?
7    A. I believe we did.
8    Q. And, actually, CSFB through Mr. O'Driscall had
9  gained their trust at an earlier time, didn't they?
10        MS. WARREN: Objection to the form.
11        THE WITNESS: The company worked with
12  Fihchra and with the rest of the ABS team on a number of
13  occasions, so they must have trusted his work and
14  respected his work.
15  BY MR. CASTANARES:
16    Q. Do you think that that assisted you in gaining
17  the trust of Oakwood Homes and the assignment you had
18  for it?
19    A. In a number of ways, yes.
20    Q. How so?
21    A. First of all, they trusted him, therefore, they
22  were more inclined to talk to me. Second, it was very
23  important to management to find a restructuring advisor
24  or a firm that could help them with both the very
25  difficult REMIC questions as well as the more typical

87

1    Q. Okay.
2    A. They hired us, so they must have assumed that we
3  could help them.
4    Q. All right. Now, how did the nature of the work
5  that you were doing change from August 18th to August
6  20th of 2002?
7    A. One day before and one day after.
8    Q. Let me rephrase it. How did the nature of the
9  work that you were doing for the company change after
10  the contract was signed from what it was before that?
11    A. Prior to being engaged, we were working to
12  provide ideas and to provide them with our best advice,
13  but we were not engaged. Once we were engaged and the
14  company had said, okay, let's work together, please help
15  us with these issues, then, of course, we shifted from
16  an idea generation mode to more of an active role in
17  trying to help them address their needs.
18    Q. What did you do?
19    A. We started pulling together timelines, we started
20  pulling together specific assignments of who would do
21  what, we tried to set out — because now we were in a
22  position to be more active participants in the process,
23  we tried to set up a game plan of how they would be able
24  to work through the process from August 19th until there
25  was some resolution of the case. And by then we had a

89

1    THE WITNESS: Okay.
2    THE VIDEOGRAPHER: This marks the end of
3 tape No. 1, volume one, in the deposition of Jared Felt.
4 We're going off the record. The time is 11:29.
5    (Brief recess)
6    THE VIDEOGRAPHER: We're back on the record.
7 Here marks the beginning of tape No. 2, volume one, in
8 the deposition of Jared Felt. The time is 11:38. We're
9 on the record.
10 BY MR. CASTANARES:
11    Q. When is the first time you remember visiting the
12 company's headquarters in North Carolina for any purpose
13 other than pitching the company?
14    A. I had no interaction with the company prior to
15 pitching.
16    Q. Okay. What I'd like to do is get past the
17 pitching. So what I want to do is, what's the first
18 contact you had with the company that was something more
19 than just pitching?
20    A. I consider the entire process from when we met --
21 when I first started, was introduced to the company,
22 until when we were engaged, the whole process of trying
23 to help them and also to be retained. So I'm not sure
24 what you are asking.
25    Q. Okay. I believe you told me that you made
                                                                98

1 presentations and worked trying to get yourselves hired,
2 you were pitching the company during '01 and early '02;
3 is that correct?
4    A. Up until August 19th, I consider that entire
5 process, working -- both pitching and a combination of
6 working for free, but yes.
7    Q. Okay. Did you visit the company at any time
8 before August 19th for any purpose other than making a
9 presentation?
10    MS. WARREN: Objection to the form.
11 BY MR. CASTANARES:
12    Q. To negotiate any purpose?
13    MS. WARREN: If they weren't hired -- I'm
14 sorry. Objection to the form.
15    THE WITNESS: (No response).
16 BY MR. CASTANARES:
17    Q. I'll break it up. Did you visit the company in
18 the course of negotiating the contract of August 19,
19 2002?
20    A. We did not negotiate face to face.
21    Q. Did you visit the company before August 19th,
22 2002, for the purpose of gathering any information about
23 the company?
24    A. Sure, in the process of going and making
25 presentations, that's always a learning process.
                                                                99

1    Q. Okay. Did you visit the company at any time
2 before August 19th, 2002, for the purpose of gaining
3 information about the company at any time other than
4 times you were making presentations?
5    A. I don't recall.
6    Q. Can you recall visiting the company at any time
7 prior to August 19th, 2002, other than those times that
8 you made presentations?
9    A. I don't recall.
10    Q. Can you recall whether anyone on your staff did
11 so for any purpose other than making presentations?
12    A. I don't recall, but we did spend time with the
13 company to try to understand its business and start the
14 due diligence process.
15    Q. Okay. But you don't recall whether anybody from
16 your group actually went there as a part of that before
17 August 19th?
18    A. We went there, but you asked a slightly different
19 question of, did you ever do it when you weren't making
20 a presentation.
21    Q. Right.
22    A. I don't recall.
23    Q. Okay.
24    A. If there were ever a separate flight to North
25 Carolina.
                                                                100

1    Q. Okay. What was this due diligence process that
2 you mentioned?
3    A. Trying to understand the company's situation.
4    Q. And when did that begin?
5    A. From the first day we met them.
6    Q. From the first day -- I just didn't hear you.
7 I'm sorry?
8    A. From the first day I started learning about the
9 company.
10    Q. Spring of '01?
11    A. Sure.
12    Q. Okay.
13    A. Yes.
14    Q. And you -- did that due diligence continue after
15 August 19, '02?
16    A. Yes.
17    Q. Okay. Did it continue right up through the date
18 of bankruptcy?
19    A. It continued -- yes.
20    Q. Okay. Did the due diligence process change
21 either in intensity or the nature of the things you were
22 doing after August 19th from where it had been before
23 August 19th?
24    A. I don't recall, but I would -- but I would assume
25 that it became more intense.
                                                                101

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4      IN RE:

 5      OAKWOOD HOMES CORPORATION, ET AL.,)
                                         )
 6                      DEBTORS,         )
        _____)
 7                                       )
        OHC LIQUIDATION TRUST,           )No. 02-13396(PJW)
 8                                       )
                        PLAINTIFF,       )VOLUME 2
 9                                       )PAGES 292 THROUGH 497
        vs.                              )
10                                       )
        CREDIT SUISSE FIRST BOSTON, A    )
11      SWISS BANKING CORPORATION, CREDIT)
        SUISSE FIRST BOSTON LLC, A       )
12      DELAWARE LIMITED LIABILITY       )
        CORPORATION, CREDIT SUISSE FIRST )
13      BOSTON, INC., CREDIT SUISSE FIRST)
        BOSTON (USA), INC., A DELAWARE   )
14      CORPORATION AND A WHOLLY OWNED   )
        SUBSIDIARY OF CREDIT SUISSE FIRST)
15      BOSTON, INC., THE SUBSIDIARIES AND)
        AFFILIATES OF EACH, AND DOES 1.  )
16      THROUGH 100,                     )
                                         )
17                      DEFENDANTS.      )
        _____)
18

19

20      VIDEOTAPED
        DEPOSITION OF:
21                      JARED FELT
                        FRIDAY, JUNE 16, 2006
22                      LOS ANGELES, CALIFORNIA

23

24
        REPORTED BY:
25      FELIPE F. CARRILLO, CSR 9555
```

11:24:25 1   BY MR. CASTANARES:
11:24:29 2   Q. What was your understanding as of November 7th of
11:24:31 3   why New York branch had not previously signed a term
11:24:33 4   sheet for the warehouse line?
11:24:35 5   A. This was a difficult time in the industry, in the
11:24:43 6   overall financial industry, many banks including ours
11:24:48 7   were losing money. They were uncomfortable extending
11:24:52 8   credit to any company.
11:24:56 9   Q. Your bank was losing money at this time?
11:24:59 10  A. Yes.
11:24:59 11  Q. And by "your bank," you mean the entire Credit
11:25:02 12  Suisse family?
11:25:02 13  A. Excuse me. Let me restate. All banks were
11:25:06 14  losing money on positions held by them. New York branch
11:25:10 15  was among those losing money.
11:25:12 16  Q. Okay. And all right. Was New York branch losing
11:25:23 17  money on its warehouse line with Oakwood?
11:25:26 18  A. I don't believe so.
11:25:26 19  Q. Was New York branch losing money on any of its
11:25:31 20  activities in the manufactured housing industry?
11:25:34 21  A. I don't know.
11:25:35 22  Q. Had you communicated to the company, whether we
11:25:48 23  characterize it as a condition or an indication of
11:25:54 24  desirability that New York branch had apparently
11:25:56 25  communicated to Mr. O'Driscall that a deal be signed up

369

11:25:59 1   with Berkshire Hathaway before it would commit to
11:26:02 2   reinstitution of the warehouse line?
11:26:04 3   MS. WARREN: Could you please read back the
11:26:04 4   question.
11:26:30 5   (Record read)
11:26:30 6   MS. WARREN: Objection to the form.
11:26:31 7   MR. CASTANARES: I'll rephrase the question.
11:26:33 8   BY MR. CASTANARES:
11:26:37 9   Q. Do I understand correctly that Mr. O'Driscall had
11:??   10  communicated to you something to the effect that New
11:?:4? 11  York branch wanted a deal signed up with Berkshire
11:26:49 12  Hathaway before it would commit to reinstitute the
11:26:5? 13  warehouse line?
11:26:52 14  A. No.
11:26:53 15  Q. Okay. Tell me how I misunderstood you then.
11:26:58 16  Tell me what you understood the case to be in terms of
11:27:01 17  New York branch's position -- strike that.
11:27:06 18  As of November 7th, what was your understanding
11:27:10 19  of what New York branch wanted before it would commit to
11:27:14 20  a warehouse line?
11:27:16 21  A. It was my understanding that it would be helpful,
11:27:21 22  that Fihchra thought it would be helpful, to gain
11:27:?5 23  approval of a new loan purchase facility if there was a
11:27:?6 24  deal cut with Mr. Millard.
11:27:?6 25  Q. Okay. Had you communicated that fact to the

370

11:27:31 1   company?
11:27:31 2   A. I don't recall.
11:27:32 3   Q. Had you communicated that fact to Foothill?
11:27:40 4   MS. WARREN: You are asking if he
11:27:42 5   individually communicated that?
11:27:45 6   MR. CASTANARES: That's a good place to
11:27:47 7   start.
11:27:47 8   THE WITNESS: Again, I don't know if New
11:27:49 9   York branch ever made an indication to Fihchra that
11:27:52 10  there were certain conditions. He thought that it would
11:27:54 11  be helpful if there were a deal, and that's what he
11:27:57 12  communicated to me.
11:27:58 13  BY MR. CASTANARES:
11:27:58 14  Q. All right.
11:27:58 15  A. I don't recall communicating that to the company.
11:28:01 16  He may have.
11:28:04 17  Q. All right. Do you recall whether anybody at CSFB
11:28:06 18  communicated that to Foothill?
11:28:08 19  A. We would not have communicated that to Foothill.
11:28:11 20  Q. Why's that?
11:28:13 21  A. Because you are trying to convince Foothill to
11:28:20 22  participate and provide a DIP.
11:28:22 23  Q. Right, but Foothill had just told you, as
11:28:25 24  reflected in the same e-mail, that they wanted the
11:28:28 25  warehouse line in place before they were going to commit

371

11:28:30 1   to the DIP; right?
11:28:31 2   A. Yes.
11:28:33 3   Q. And Foothill knew that New York branch was
11:28:36 4   contemplating doing the warehouse line; correct?
11:28:40 5   A. Foothill knew that New York branch was
11:28:45 6   considering a -- providing a loan purchase facility if
11:28:48 7   the company chose to file for bankruptcy.
11:28:50 8   Q. Okay. And you -- in fact, you hadn't contacted
11:28:53 9   any other potential warehouse line provider besides New
11:28:58 10  York branch as of November 7th on behalf of Oakwood, had
11:29:01 11  you?
11:29:01 12  A. I personally had not.
11:29:02 13  Q. Had CSFB?
11:29:03 14  A. I don't know.
11:29:04 15  Q. Okay. So what did you tell Foothill when they
11:29:15 16  signaled that they wanted the warehouse facility with
11:29:18 17  regard to why New York branch hadn't committed to it
11:29:21 18  yet?
11:29:22 19  A. The company's -- OAC still had a loan purchase
11:29:29 20  facility until the company filed for bankruptcy. If the
11:29:34 21  question is did I discuss with them whether or not New
11:29:35 22  York branch was going to provide one -- is that the
11:29:41 23  question?
11:29:42 24  Q. I'll withdraw the question. Let's go back to the
11:29:45 25  first line of this.

372

```
11:29:45 1    A. Yes.
11:29:45 2    Q. "Foothill signals strongly that without a
11:29:48 3    warehouse line." Now, there was a warehouse line at
11:29:51 4    that time, wasn't there?
11:29:51 5    A. There was.
11:29:52 6    Q. So you knew that Foothill wasn't talking about
11:29:54 7    the existing warehouse line, didn't you?
11:29:56 8    A. If there's a debtor possession -- yes.
11:30:00 9    Q. You knew they were talking about a post-
11:30:02 10   bankruptcy warehouse line; correct?
11:30:03 11   A. Yes.
11:30:03 12   Q. All right. What did you tell Foothill in
11:30:07 13   response to that, about why New York branch hadn't yet
11:30:09 14   committed to that post-bankruptcy line?
11:30:12 15   MS. WARREN: Objection to the form.
11:30:13 16   THE WITNESS: I don't recall. But in a
11:30:15 17   situation like this, you would make -- you would make
11:30:18 18   noncommittal positive -- say noncommittal positive
11:30:21 19   things.
11:30:21 20   BY MR. CASTANARES:
11:30:21 21   Q. What does that mean?
11:30:22 22   A. They're working on it.
11:30:24 23   Q. That's what you told them? That's your
11:30:28 24   recollection?
11:30:28 25   A. I don't recall.
                                              373
```

```
11:30:29 1    Q. Okay. Had the company from time to time asked
11:30:34 2    you what kind of progress was happening on New York
11:30:40 3    branch coming up with the post-bankruptcy warehouse
11:30:43 4    line?
11:30:43 5    A. Not me personally, but the question was asked,
11:30:46 6    of course.
11:30:46 7    Q. Of CSFB?
11:30:47 8    A. Yes.
11:30:47 9    Q. Just not you personally there?
11:30:50 10   A. Those would be questions that were primarily
11:30:52 11   directed to Fihchra.
11:30:53 12   Q. Okay. Do you know how he responded to them if at
11:30:55 13   all?
11:30:55 14   A. Yes.
11:30:56 15   Q. Tell me how?
11:30:57 16   A. That he was working with New York branch toward
11:31:03 17   that end.
11:31:03 18   Q. Positive noncommittal response?
11:31:05 19   MS. WARREN: Objection to the form.
11:31:07 20   BY MR. CASTANARES:
11:31:07 21   Q. Correct?
11:31:07 22   MS. WARREN: Objection to the form.
11:31:09 23   THE WITNESS: That is your statement not
11:31:10 24   mine.
11:31:10 25   BY MR. CASTANARES:
                                              374
```

```
11:31:11 1    Q. That fits the definition you just gave me of
11:31:11 2    positive noncommittal response?
11:31:15 3    A. The way I would --
11:31:15 4    MS. WARREN: Objection to the form. Let him
11:31:19 5    finish the question. And, Tony, please don't cut him
11:31:22 6    off.
11:31:22 7    MR. CASTANARES: I don't think I have. I
11:31:22 8    think what actually happened was your objection got cut
11:31:24 9    off.
11:31:26 10   Did the reporter get the answer?
11:31:27 11   THE REPORTER: No, I didn't, sir.
11:31:27 12   MR. CASTANARES: I didn't either, so I'll
11:31:29 13   rephrase the question. Allow me to state the question.
11:31:32 14   Allow your counsel to state her formal objection, and
11:31:35 15   then you can answer it.
11:31:36 16   BY MR. CASTANARES:
11:31:37 17   Q. The response that you have just described that
11:31:39 18   Mr. O'Driscall gave to Oakwood as to why -- as to what
11:31:45 19   progress was being made on getting New York branch to
11:31:48 20   commit to a post-bankruptcy warehouse line, fit within
11:31:55 21   the definition you just gave of quote "positive non-
11:32:04 22   committal response," close quote, when you define that
11:32:10 23   term for me a few questions ago; correct?
11:32:12 24   MS. WARREN: Objection to the form.
11:32:15 25   BY MR. CASTANARES:
                                              375
```

```
11:32:16 1    Q. Please answer.
11:32:16 2    A. Foothill was a third party to whom we had no
11:32:21 3    fiduciary duty. We were trying to sell to them -- we
11:32:27 4    were trying to help the company sell to them a DIP
11:32:30 5    facility. We had a fiduciary duty to Oakwood. We were
11:32:38 6    very honest in our assessment of progress made in all
11:32:42 7    situations, including with respect to the loan purchase
11:32:47 8    facility.
11:32:48 9    Q. Tell me, sir, in capsule form your formal
11:32:54 10   education since high school.
11:32:55 11   A. Sure. I graduated summa cum laude from Weaver
11:33:04 12   State College. I graduated with an MBA from Stanford
11:33:09 13   University.
11:33:09 14   Q. Okay. What years did you get those two degrees,
11:33:15 15   please?
11:33:12 16   A. I officially received my degree from Weaver State
11:33:16 17   College in 1990, I believe.
11:33:19 18   Q. And the master's?
11:33:21 19   A. In 1994.
11:33:22 20   Q. Thank you. Do you know whether Mr. O'Driscall
11:33:32 21   communicated the progress with New York branch on the
11:33:36 22   post-bankruptcy warehouse line to the company in writing
11:33:39 23   at any time?
11:33:40 24   A. I don't know.
11:33:43 25   Q. Okay. Were you ever in contact with any of the
                                              376
```