# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>      Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW) |
| OHC Liquidation Trust,<br><br>      Plaintiff,<br>v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>      Defendants. | Adv. Proc. No. 04-57060 (PJW)<br><br>Civil Action No. 07-799 (JJF) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE AT TRIAL CERTAIN TESTIMONY AND DOCUMENTS RELATED TO CREDIT RISK MANAGEMENT REVIEWS

Of Counsel:

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 903-9000
Facsimile: (212) 903-9100

Dated: May 5, 2008

Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Defendants*

A09385079/0 15a/05 May 2008

RLF1-3280108-1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 3

I.  EVIDENCE ABOUT CRM'S INTERNAL REVIEWS IS IRRELEVANT ................ 3

    A.  Nothing in the CRM evidence makes the facts about Oakwood's financial and operational problems more or less probable or more or less ascertainable ........... 4

    B.  Plaintiff's generalities do not establish that the CRM evidence relates to proximate cause, even Plaintiff's theory of proximate cause ............................... 7

II. ADMISSION OF THE CRM DOCUMENTS AND TESTIMONY WOULD PROVE LITTLE TO NOTHING, WHILE CAUSING UNFAIR PREJUDICE TO DEFENDANTS AND WASTING THE JURY'S TIME ................................................ 10

CONCLUSION ...................................................................................................................... 12

# TABLE OF AUTHORITIES

Page

## CASES

*Call v. Ellenville Nat. Bank,*
774 N.Y.S.2d 76 (App. Div. 2004) ......................................................................................... 5

*Crowley v. Chait,*
322 F. Supp. 2d 530 (D.N.J. 2004) ......................................................................................... 5

*Fab Indus., Inc. v. BNY Fin. Corp.,*
675 N.Y.S.2d 77 (App. Div. 1998) ......................................................................................... 6

*Sears v. First Pioneer Farm Credit,*
850 N.Y.S.2d 219 (App. Div. 2007) ....................................................................................... 4

*Wiener v. Lazard Freres & Co.,*
672 N.Y.S.2d 8 (App. Div. 1998) ........................................................................................... 4

## RULES

Fed. R. Evid. 403 .......................................................................................................................... 10

## OTHER AUTHORITIES

*U.S. Manufactured Housing: The Perfect Storm . . . But When Will it End?*
(USB Warburg, December 5, 2000) .......................................................................................... 4

## INTRODUCTION

In their Opening Brief, Defendants showed that evidence concerning CRM's internal analyses of potential transactions with Oakwood was irrelevant. That evidence consists of memoranda drafted in 2000 by a junior CRM analyst discussing Oakwood's creditworthiness in respect of a proposed reverse repurchase facility that never happened; several emails between or among CRM personnel and Mr. O'Driscoll discussing credit approval for that facility and for the later Loan Purchase Facility, and related deposition testimony.[1] In response, Plaintiff offers complicated rationales for relevance that seem to fall into two categories: (1) the CRM evidence shows "institutional knowledge" on the part of "Credit Suisse" of Oakwood's uncertain financial condition; and (2) the CRM evidence supports causation because it discusses Oakwood's uncertain financial condition. Both arguments are makeweight. The CRM evidence contains nothing new or surprising; Oakwood's financial and operational difficulties were publicly discussed in analyst reports and well recognized by Oakwood's management. As to breach of duty, Plaintiff's argument that Mr. O'Driscoll of CSS "should have known" what was contained in the CRM documents and "should have told" Oakwood about them rests on two erroneous assumptions that are contradicted by the record: (1) that Oakwood's management had no idea that the company

---

[1] As Plaintiff's counsel knows perfectly well, Defendants' Motion was filed while the parties were still conferring about the Pre-Trial Order and while it was not clear which pieces of CRM evidence Plaintiff would insist on designating. Now that Defendants have obtained more information from Plaintiff about its case, we attach as Appendix A to this Reply a list of the documents and testimony that Defendants believe should be excluded pursuant to their Motion. The evidence includes 11 documents and 13 deposition designations. As Plaintiff also knows, Defendants added Thomas Irwin, formerly of CRM, to its witness list only after Plaintiff made clear its intention to designate portions of his deposition testimony and that of Mr. Xanthos at trial. If the CRM evidence is excluded, Defendants will almost certainly withdraw the designation.

was in trouble, or what its troubles were, unless CSS told it; and (2) that the information in the CRM documents was some kind of secret. There is no evidence whatever in the record tosuggest that, had the CRM evidence been handed to Oakwood's management, management would have been surprised, shocked, or moved to do something different (aware of the company's and the industry's challenges, Oakwood's management was already engaged in a "turnaround plan".) Moreover, Plaintiff's characterization of the CRM evidence as "institutional knowledge" conflates four Defendants into one, and places far too much weight on the views of one junior analyst in one department.

Plaintiff's relevance justifications as to causation fall equally flat. First, Plaintiff's own damages expert did not rely on the CRM evidence to calculate his damages estimate. He used projections unrelated to anything that CRM did. Nothing in the CRM evidence establishes "foreseeability" under Plaintiff's strained causation theory. The factors identified in the documents as being particular challenges for Oakwood were publicly discussed by analysts and well known to Oakwood's management itself, and the fact that some employees discussed the same factors does not establish some sort of duty to alert management to what it already knew. Plaintiff wishes to characterize the CRM evidence to the jury as something deliberately concealed and illicit that might have changed the company's future had it been disclosed. Since that is foreclosed by the record evidence in the case, Plaintiff should be precluded from using the CRM evidence to try to "prove" facts that are not in dispute.

**ARGUMENT**

I.   **EVIDENCE ABOUT CRM'S INTERNAL REVIEWS IS IRRELEVANT.**

That Plaintiff asserts that CRM-related evidence is "among the most important evidence in this case" simply highlights the weakness of the case. (*See* Ans. Br. at 23 n.19.) One might expect the most important evidence in a case of this nature to be the testimony of Oakwood management or the directors who might suggest they were displeased with Defendants' services, or say that they would have done something different "if only" they knew what CSS knew. Instead, all members of Oakwood's management and board who have testified have expressed satisfaction with Defendant CSS's securitization underwriting services and the Loan Purchase Facility. (*See* Deposition of Myles Standish, dated September 21, 2006 at 13-15 (hereinafter cited "Standish Dep. at __") (attached as Ex. A to Declaration of J. Justin Williamson dated May 5, 2008 (hereinafter cited "Williamson Decl.") (contemporaneously filed herewith); Deposition of Douglas R. Muir, dated September 26-27 2006 at 66 (hereinafter cited "Muir Dep. at __") (Williamson Decl. Ex. B); Deposition of Clarence Walker, dated December 12, 2006 at 75 (Williamson Decl. Ex. C).

Faced with that record, Plaintiff's most recent articulation of its case is that Defendants knew Oakwood was a substantial bankruptcy risk, should have investigated it further, counseled Oakwood to file for bankruptcy, and if the company did not do so, refuse to do business with it further. (Ans. Br. at 13.) The CRM evidence assists this theory, according to Plaintiff, by showing that "Credit Suisse knew" that Oakwood was a bankruptcy risk. Of course, so did management and every equity analyst covering the industry. Plaintiff asserts that "New York Branch participated in value-destroying transactions with Oakwood for over 21 months" and received compensation for doing so, and that is why it is a defendant. (*Id.* at 24.) But it is axiomatic under New York law that a relationship between a

A09385079/0 15a/05 May 2008

3

RLF1-3280108-1

lender and a borrower is an ordinary arms-length business relationship. *See Sears v. First Pioneer Farm Credit*, 850 N.Y.S.2d 219, 223 (App. Div. 2007) ("[A] fiduciary relationship usually does not exist in arms-length transactions between debtors and creditors); *Wiener v Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (App. Div. 1998) (lender-borrower contractual relationships generally do not give rise to a fiduciary relationship. To overcome this significant problem, Plaintiff offers a welter of contradictory rationales for why CRM's risk reviews are relevant despite the clear precedent saying they are not. Each can be easily disposed of.

> **A.   Nothing in the CRM evidence makes the facts about Oakwood's financial and operational problems more or less probable or more or less ascertainable.**

Rather than provide support for opposing Defendants' Motion, Plaintiff's theory of relevance actually strengthens Defendants' argument for exclusion. Plaintiff has pinned its theory of relevance on the importance of demonstrating Defendants' "knowledge" or "reason to know" of Oakwood's financial difficulties. Plaintiff ignores the fact that Oakwood's financial troubles were widely recognized and publicly commented on during the period 2000 – 2002. Contemporary equity analyst reports, which Defendants have designated as exhibits in this case, raised concerns about Oakwood's financial situation, oversupply of inventory, and loan underwriting standards, and noted that Oakwood faced a risk of bankruptcy in the absence of an industry turnaround. (*See e.g.*, BNP Paribus, *Oakwood Homes Coporation*, CSFB 00363577-9 (attached as Exhibit D to Williamson Decl.); USB Warburg, *U.S. Manufactured Housing: The Perfect Storm . . . But When Will it End?* (Williamson Decl. Ex. E).) That fact alone entirely distinguishes this situation from the

one in Plaintiff's (only) authority, *Crowley v. Chait*, in which there was no transparency about the AIC "practices" complained of.[2]

Plaintiff bases its relevance theory (and its case in general) on a ludicrous premise: that nobody at Oakwood had any idea that the company had troubles, or what those troubles were, unless Defendants told them so. But that pretense is contradicted by every fact in this case including *the testimony of Oakwood's management*. (*See* Muir Dep. at 58-63, 122-33; Standish Dep. at 92-97, 143-44.)

Plaintiff claims that the CRM evidence is related to "breach" of a standard of care. (Ans. Br. at 25.) As to "breach", Plaintiff conflates separate Defendants and separate functions into one amorphous Defendant, asserting that "Credit Suisse" "had institutional knowledge of the problems Oakwood was facing". (*Id.*) There are several problems with this construct. One is that the opinions of one junior employee, Mr. Xanthos, did not and cannot represent the "institutional knowledge" or, for that matter, the "institutional position" of all employees of all four Defendants. The second problem is Plaintiff's deliberate vagueness about which Credit Suisse Defendant(s) it means. Plaintiff has simply never offered any theory of liability about any defendant other than CSS, except for its belated theory articulated in responding to this Motion that New York Branch provided the LPF and therefore is liable. And that is contrary to New York law. *See, e.g., Call v. Ellenville Nat. Bank*, 774 N.Y.S.2d 76 (App. Div. 2004) ("In general, the relationship between a bank and customer is that of debtor and creditor and, without more, is not a fiduciary relationship");

---

[2] *Crowley v. Chait* is also distinguishable in that the defendant against whom the documents were to be used was AIC's auditor and had a clear duty concerning the accuracy of AIC's financial reporting to the SEC and the public. Notably, Plaintiff has not sued Oakwood's auditor, PricewaterhouseCoopers, even though under Crowley and Plaintiff's bizarre theory of its case, Plaintiff should sue Oakwood's auditor for not being aware of the content of CRM's internal memos.

*Fab Indus., Inc v. BNY Fin Corp.*, 675 N.Y.S.2d 77 (App. Div. 1998) (noting that there is no fiduciary duty arising out of arm's length debtor/creditor legal relationship between borrower and bank). "Having knowledge" is not sufficient to impose liability, neither is acting as a lender, and neither is earning fees from a client transaction. The CRM evidence does not help Plaintiff's theories in any of these regards.

As to Defendant CSS, at most Plaintiff has alleged that the CRM evidence is relevant because Mr. O'Driscoll's asset backed securities ("ABS") group within CSS, which did not receive CRM's internal analyses, "should have had" the knowledge anyway. But, again, there is no evidence that Mr. O'Driscoll *did not* grasp Oakwood's situation or that the CRM reviews contribute any new information that he or others did not know or could not ascertain. Particularly given that the evidence is clear that it was not the practice of CRM to share its internal analyses with the business units of CSS, Plaintiff's desire to use the CRM evidence to show what Mr. O'Driscoll "should have known" is untethered from any practical reality.

Moreover, Plaintiff simply ignores several of the arguments raised in Defendants' Motion. As to CRM's recommendation to decline the reverse repo facility in 2000, Plaintiff utterly fails to address the fact that the transaction never happened and so cannot be part of Plaintiff's liability or damages case, and that it was a transaction with a different risk profile, and financial structure, from any other transaction that Plaintiff complains of. (*See* Opening Br. at 8-9.) As to CRM evidence relating to the Loan Purchase Facility ( the "LPF") approved in early 2001, Plaintiff similarly fails to address the fact that its own case is premised on showing that the "value-destroying" LPF harmed Oakwood. The

relevant evidence for Plaintiff's case is therefore how exactly the LPF destroyed value and harmed Oakwood, not what CRM thought about its risk to the New York Branch.

What Plaintiff wants to do with the CRM evidence is as clear as it is impermissible: to use the evidence to "prove" facts that are not in dispute, while sowing unwarranted confusion in the jury's mind about whether Oakwood management knew these facts (it did) and whether some Defendant had some duty to tell Oakwood what opinion was held by every one of its employees.

> **B.    Plaintiff's generalities do not establish that the CRM evidence relates to proximate cause, even Plaintiff's theory of proximate cause.**

Plaintiff asserts that the CRM evidence is related to "proximate cause", particularly "but-for causation" and "foreseeability".[3] (Ans. Br. at 25-26.) Here, Plaintiff resorts to ignoring the role of Oakwood's board of directors and management entirely. In Plaintiff's "but-for" theory of causation, an opinion by a Credit Suisse Defendant would be immediately translated into action by the Oakwood board of directors, a course of events that is contradicted by the entire record in this case, which is presumably why Plaintiff tries to gloss over the point. In addition, Plaintiff ignores its own admission about "the wrong committed by Oakwood's management and board: the adoption of a flawed business plan that drove their company into the ground." (Unified Brief at 19.) Having made a rare acknowledgment that Oakwood had management at all, Plaintiff cannot now continue to ignore the role of that management in contesting this Motion. Plaintiff has adduced no evidence, despite the fact that three of Oakwood's former board members and management were deposed, that if management had been handed the CRM Memos, it would have been (a)

---

[3]    Defendants contend that Plaintiff's causation theory is erroneous and contrary to precedent, but that issue can be addressed later.

surprised by the contents, or (b) moved to change what it was doing, which was described as a turnaround plan. (*See* Standish Dep. at 88-92.) There is no evidence that Oakwood's management ever asked for any details of the CRM reviews, even though management was well aware that the reviews were taking place. (*See* Deposition of James Xanthos, dated August 24, 2006 at 58-59 (Williamson Decl. Ex. F). In short, the CRM evidence does not make it more likely or less likely that, had it been disclosed in detail to management, management would have done anything different.

Plaintiff's theory that the CRM evidence relates to "foreseeability" is also flawed. What exactly were "the consequences to Oakwood" *as they relate to damages*, "of continuing on a business-as-usual path" (Ans. Br. at 26), and where does the CRM evidence "foresee" them? Plaintiff is deliberately vague on this point. The damage in this case according to Plaintiff is the $50 million diminution in Oakwood's value from September 2001 through September 2002 as reported by Plaintiff's expert Dr. Tennenbaum. The CRM Memos certainly make no discussion of diminution of asset or enterprise value such that the damage would be foreseeable. The only thing the CRM Memos arguably support as being foreseeable is a potential Oakwood bankruptcy, but everyone was aware of that risk, including the board of directors, management, and analysts covering the industry.

If Plaintiff's theory of relevance focuses on the kind of items that it cites in the Answering Brief at pages 3-4, for instance that there was little investor demand for Oakwood's securities and that Oakwood faced losses on the sale of its loans, then how are those items relevant to *damages*? Plaintiff's theory of damages is not lost profits or rescission; it is the difference in the "asset value" of Oakwood between two dates, as calculated by Plaintiff's expert. (*See* Defendants' Memorandum of Law in Support of Their

Motion to Exclude the Expert Testimony of Michael Tennenbaum Pursuant to Fed. R. Evid. 702.) Dr. Tennenbaum uses the Xanthos memoranda for "color" in his expert report, but he certainly does not rely on it to calculate damages. Rather, he premises his valuations on certain projections. (*Id.* at 7.)

If Plaintiff's theory is that the CRM evidence tends to prove that Oakwood's financial situation would decline if certain trends continued, that too is not in dispute. Similar to the risk of bankruptcy, Plaintiff has offered no evidence to show that Oakwood's management was unaware of these trends or would have been surprised to see a memo discussing them. Indeed, the opposite is true: the record shows that concerns with repos, securitization losses, and excess inventory were consistently discussed among management and with the board. (*See* Muir Dep. at 126-33, 221; Standish Dep. at 88-96; Minutes of Special Meeting of the Board of Directors Held Monday, August 2, 1999, KCLH 0956-9 (Williamson Decl. Ex. G); Minutes of Meeting of Audit Committee of Board of Directors Held July 23, 2001, OHCLT 13756-8 (Williamson Decl. Ex. H).).

If Plaintiff's theory of relevance is that the CRM documents express a poor opinion of Oakwood's management, then it's the same story. The ability or inability of management to deal with the company's challenges was discussed in analyst reports and was not uniquely foreseeable by CRM. Indeed, CRM spoke personally with management only a handful of times over the multi-year relationship, far less often than equity analysts participating in company calls and far less often than Oakwood's bank group led by Wells Fargo. (*See* Muir Dep. at 223-225.) Indeed, Oakwood's bank group had far more to do with management generally in the 2001-02 period than did any Credit Suisse Defendant. (*Id.*)

The list could continue, but virtually everything in the CRM evidence is driven either by publicly available information or by information provided *by Oakwood*. Plaintiff has remained intentionally vague about its justifications for spending any jury time on this evidence, stating the CRM documents are "lengthy" and "complex", presumably to excuse itself from explaining its relevance theory to the Court in more detail. (*See* Ans. Br. at 23 n.19.) But that is not enough to make a specific case under Fed. R. Evid. 402 to spend the trier of fact's time on these complexities.

## II. ADMISSION OF THE CRM DOCUMENTS AND TESTIMONY WOULD PROVE LITTLE TO NOTHING, WHILE CAUSING UNFAIR PREJUDICE TO DEFENDANTS AND WASTING THE JURY'S TIME.

As demonstrated above, the CRM evidence has little if any probative value; however, Plaintiff's Answering Brief illustrates the very prejudicial effect Rule 403 is meant prevent. The only fact that the CRM evidence suggests is that CRM considered Oakwood a bankruptcy risk and in poor financial condition. Plaintiff concedes that itself is not "underhanded and unfair to Oakwood." (Ans. Br. at 28.) However, Plaintiff wants to argue that "what **was** 'underhanded and unfair to Oakwood' was the fact that *no one* at Credit Suisse, not Mr. O'Driscoll, not Mr. Xanthos, not anyone else, ever took steps to investigate the roots of this 'legitimate concern' further, or to communicate that knowledge to Oakwood." (*Id.*) This is precisely the prejudicial effect Plaintiff desires to create. Plaintiff would like to present the CRM evidence suggesting bankruptcy risk and a problematic financial condition as a big secret that Defendants kept from Oakwood and that would have changed Oakwood's future had it been revealed to management. But nothing in the CRM evidence was secret – that is only the effect Plaintiff wishes to create. That's also the prejudicial effect that Fed. R. Evid. 403 is designed to prevent.

This prejudice is exacerbated by Plaintiff's use of "Credit Suisse" and its "institutional knowledge." (Ans. Br. at 25.) The evidence shows CSS and Mr. O'Driscoll's asset backed securities team were the "Credit Suisse" that provided underwriting services and eventually the restructuring and financial advisory services. No other individual or team or entity had a substantial relationship with Oakwood. However, Plaintiff uses words like "institutional knowledge" so it can say the CRM Memos are what "Credit Suisse" knew and based on that "Credit Suisse" acted inappropriately. But the CRM evidence is not what "Credit Suisse" knew – it's how one individual in a unit charged with analyzing credit risk viewed certain proposed transactions with Oakwood. The fact that Plaintiff intends to argue the evidence in this manner only highlights the prejudice to Defendants. The Court should exclude the CRM evidence.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court exclude testimony and documents relating to credit risk management reviews as specified in this Reply and in Defendant's evidentiary objections to Plaintiff's designations of documents and deposition testimony in the Pre-Trial Order.

Dated:  May 5, 2008
        Wilmington, Delaware

Respectfully submitted,

_____
Mark D. Collins (No. 2981)
collins@rlf.com
Russell C. Silberglied (No. 3462)
silberglied@rlf.com
Anne S. Gaza (No. 4093)
gaza@rlf.com
Lee E. Kaufman (No. 4877)
kaufman@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, NY  10105
Telephone:  (212) 903-9000
Facsimile:  (212) 903-9100

*Attorneys for Defendants*

# APPENDIX A

**List of Plaintiff's documents to be excluded pursuant to this Motion:**

PX 133
PX 112
PX 54
PX 134
PX 53
PX 137
PX 64
PX 65
PX 111
PX 140
PX 147

**List of Plaintiff's deposition designations to be excluded pursuant to this Motion:**

<u>James Xanthos</u>

Entirety of Plaintiff's designations.

<u>Thomas P. Irwin</u>

Entirety of Plaintiff's designations.

<u>Jared Felt</u>

74:12 - 74:20
79:19 - 80:12
487:6 - 487:8

<u>Fiachra O'Driscoll</u>

47:21 - 49:2
56:8 - 57:12
178:12 - 178:17
185:9 - 187:4
190:3 - 190:10
196:3 - 196:18
543:20 - 545:4
576:17 - 583:15

## CERTIFICATE OF SERVICE

I, Lee E. Kaufman, do hereby certify that on May 5, 2008, I caused a copy of the foregoing **Reply Memorandum of Law in Further Support of Defendants' Motion to Exclude at Trial Certain Testimony and Documents Related to Credit Risk Management Reviews** to be served upon each party on the attached service list in the manner indicated thereon.

Lee E. Kaufman (No. 4877)

RLF1-3280106-1

## SERVICE LIST

**Via Hand Delivery**
Marla R. Eskin, Esq.
Kathleen Campbell Davis, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

**Via First Class Mail**
Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

RLF1-3280106-1