**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Oakwood Homes Corporation, et al., | |
| Debtors. | |
| | Case No. 02-13396 (PJW) |
| | Jointly Administered |
| OHC Liquidation Trust, | |
| Plaintiff, | |
| v. | |
| Credit Suisse (f/k/a. Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | Adversary Proceeding Civil Action No. 07-799 (JFF) |
| Defendants. | |

**DECLARATION OF J. JUSTIN WILLIAMSON**
**IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE CERTAIN TESTIMONY**
**AND DOCUMENTS RELATING TO CREDIT RISK MANAGEMENT REVIEWS**

I, J. Justin Williamson, declare as follows:

      1.     I am an attorney associated with the law firm of Linklaters LLP, counsel to Defendants in this action.  I submit this Declaration in connection with Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion Pursuant to Fed. R. Evid. 402 and 403 to Exclude Certain Testimony and Documents Relating to Credit Risk Management Reviews.

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the Deposition of Myles Standish, dated September 21, 2006.

3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the Deposition of Douglas R. Muir, dated September 26-27.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the Deposition of Clarence Walker, dated December 12, 2006.

5.      Attached hereto as Exhibit D is a true and correct copy of BNP Paribus, *Oakwood Homes Corporation*, CSFB 00363574-97.

6.      Attached hereto as Exhibit E is a true and correct copy of USB Warbrug, *U.S. Manufactured Housing: The Perfect Storm . . . But When Will it End?*

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the Deposition of James Xanthos, dated August 24, 2006.

8.      Attached hereto as Exhibit G is a true and correct copy of the Minutes of Special Meeting of the Board of Directors Held Monday, August 2, 1999, KCLH 0956-9.

9.      Attached hereto as Exhibit H is a true and correct copy of the Minutes of Meeting of Audit Committee of Board of Directors Held July 23, 2001, OHC 045530-2.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2008
New York, New York

J. Justin Williamson, Esq.

# EXHIBIT A

# In The Matter Of:

## OHC LIQUIDATION TRUST, v. CREDIT SUISSE FIRST BOSTON, ET AL.,

---

### MYLES STANDISH
#### September 21, 2006

---

# LEGALINK MANHATTAN

### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
#### PH: 212-557-7400 / FAX: 212-692-9171

**STANDISH, MYLES - Vol. I**



LEGALINK
A MERRILL COMPANY

MYLES STANDISH

**Page 10**

1  to cover today, and so I think it would be useful for
2  us first to have a general discussion about what this
3  case is about and your general recollection of the
4  underlying facts. So what I'd like to do is ask you
5  a series of questions that go more to background and
6  from that we'll segue into some of the more specific
7  events and documents. Does that sound fair?
8      A.  Okay.
9      Q.  Okay. Do you have a general understanding
10  of what this particular lawsuit is about?
11      A.  I have a general understanding. I read
12  the complaint I think shortly after it was filed. I
13  have not seen the complaint since.
14      Q.  Can I take from your answer that you did
15  not review the counterclaims before they were filed?
16      A.  I did not, not the specific written form,
17  no.
18      Q.  And did anyone from the liquidation trust
19  seek out your guidance as to the allegations in the
20  suit before the suit was filed?
21      A.  I was interviewed by attorneys
22  representing the trust on a number of occasions.
23      Q.  And do you know if the purpose of any of
24  those interviews was to gather information to be used
25  in this lawsuit?

**Page 11**

1      A.  I don't know that specifically. I would
2  -- I would suspect that was the case.
3      Q.  Can you tell me your general understanding
4  of what you understand this lawsuit to be about?
5          MR. CASTANARES:  I'm going to caution the
6  witness in the course of answering the question
7  not to reveal attorney-client communications,
8  but you can -- you can testify as to any
9  knowledge you have other than what you've
10  learned from counsel.
11          THE WITNESS:  The -- I think that the
12  genesis of the -- of the lawsuit was a claim
13  filed by First Boston for some $3 million that
14  First Boston claimed was due on their financial
15  advisory contract. I know that there were some
16  counterclaims that have since been made by the
17  liquidation trust relating to fees that had been
18  paid by Oakwood to First Boston.
19          And I know that -- I recall that there was
20  a claim made as well, I don't know if this was
21  with respect to the fees or an independent
22  claim, about First Boston and their role in the
23  assumption program that Oakwood Acceptance
24  Corporation had for a period of time.
25      Q.  (By Mr. Osnato) Are you referring to the

**Page 12**

1  loan assumption program?
2      A.  Yes.
3      Q.  Okay. And do you have an understanding of
4  the allegations that are being directed specifically
5  at Credit Suisse's conduct in this lawsuit?
6      A.  As I said, I read the complaint shortly
7  after it was filed, so my -- but my recollection of
8  that is rather sketchy.
9      Q.  Fair enough. Do you recall agreeing with
10  the allegations in the counterclaims when you
11  reviewed them some time ago?
12      A.  I recall both agreeing with some as well
13  as disagreeing with some.
14      Q.  Okay. Well, we'll go through the
15  counterclaims at some point later and if you can
16  refer me to those that you disagree with, I would be
17  grateful. Broadly speaking, Mr. Standish, do you
18  have any views on the adequacy of the services that
19  Credit Suisse provided to Oakwood?
20      A.  That's a rather general question. I have
21  some views on some services that I think were
22  adequate and some services that were not.
23      Q.  That's a fair observation, so let me do it
24  this way. What services did Credit Suisse provide to
25  Oakwood during your tenure with the company?

**Page 13**

1      A.  Well, when you say my tenure, are you
2  talking about all the time I was employed by the
3  company?
4      Q.  Let's focus on the period 1999 through the
5  filing.
6      A.  Okay. Credit Suisse served as our primary
7  underwriter in our securitization program. Credit
8  Suisse also served in a more general capacity as a --
9  as an advisor with respect to our overall financial
10  condition, liquidity condition with respect to
11  options that might be available. Credit Suisse was
12  also provided a loan purchase facility where we
13  liquified our loans prior to securitization.
14          First Boston also served as the financial
15  advisor as we were looking to restructure the company
16  pursuant to a contract entered into in August of
17  2002. First Boston I believe during that period of
18  time had a research analyst that followed the company
19  for at least a period of time. They may have had
20  other roles, but those are the ones I recall at the
21  moment.
22      Q.  Okay. Now, let's focus specifically on
23  the underwriting services that Credit Suisse
24  provided. It's my understanding that those services
25  included performing some measure of diligence,

MYLES STANDISH

| Page 14 | Page 16 |
|---|---|
| 1 interacting with rating agencies on behalf of Oakwood<br>2 and generating potential investor interest in<br>3 securitizations; is that correct?<br>4     MR. CASTANARES: Objection to form.<br>5     THE WITNESS: Among other things, yes,<br>6 they did those things.<br>7     Q. (By Mr. Osnato) What did I leave out?<br>8     A. Well, they certainly were the primary<br>9 people involved in structuring the transaction<br>10 itself. That's the only thing I can -- additional<br>11 thing that I can recall at the moment.<br>12     Q. Am I correct that the securitizations<br>13 tended to use the same structure?<br>14     A. The same general structure in the sense<br>15 that it was a securitization. You would have<br>16 different tranches. You would have sometimes<br>17 interest-only strips. You would have sometimes bonds<br>18 that were guaranteed, sometimes bonds that were not<br>19 guaranteed. So there was -- there was a good bit of<br>20 variability in the structure of each of the<br>21 securitizations.<br>22     Q. Again focusing only on the underwriting<br>23 services that Credit Suisse provided, do you think<br>24 that it provided those services adequately and<br>25 competently? | 1 better liquidity for Oakwood. None of the things<br>2 that they brought to the table ever came to pass<br>3 other than when we entered into the loan purchase<br>4 agreement with them.<br>5     So they brought ideas to the table which<br>6 either didn't come to pass because First Boston<br>7 ultimately wouldn't approve them or they didn't come<br>8 to pass because management didn't think that the<br>9 ideas were worth pursuing to finality.<br>10     So in general I can't -- I don't know if<br>11 there were other things that they could have brought<br>12 to the table that would have provided us with better<br>13 options than we ended up taking, but -- but they did<br>14 not come to the table with things that management<br>15 viewed to be workable.<br>16     So, you know, were they trying to bring<br>17 ideas to the table that might work? I think so.<br>18 Ultimately they didn't work. Does that mean that<br>19 they were unsatisfactory? I don't know. I can just<br>20 tell you what the results were.<br>21     Q. Credit Suisse's role as an advisor was to<br>22 bring options to the board and senior management and<br>23 it was senior management and the directors' role to<br>24 select options they thought were in the best<br>25 interests of the company; isn't that right? |

| Page 15 | Page 17 |
|---|---|
| 1     A. In general, yes.<br>2     Q. Focusing on the financial advisory<br>3 services that you described a moment ago, I'm going<br>4 to ask you the same question. Do you think that<br>5 Credit Suisse provided those services adequately and<br>6 competently?<br>7     A. When you say financial advisory services,<br>8 does that include the financial advisory contract in<br>9 August of 2002?<br>10     Q. Well, again, that's a fair observation, so<br>11 let's break that question down into two pieces; okay?<br>12 Separate out for the moment the services provided<br>13 under the August contract, and please give me your<br>14 views on whether Credit Suisse provided its services<br>15 adequately and competently?<br>16     A. Under the August 2002 contract?<br>17     Q. No. Anything other than --<br>18     A. Anything other than that contract?<br>19     Q. -- under that contract.<br>20     A. Okay. The -- I know that -- I know that<br>21 Credit Suisse came to us with a number of<br>22 alternatives during the years --<br>23     Q. Uh-huh.<br>24     A. -- as far as ways that we could provide<br>25 better liquidity or that they could help us provide | 1     A. With the advice of First Boston, yes.<br>2     Q. But ultimately it was the prerogative and<br>3 responsibility of the board to make the decisions as<br>4 to which options to pursue; isn't that correct?<br>5     A. Certainly the board -- to actually pursue<br>6 an option, the board or management would have to be<br>7 the ones to say that we were going ahead with that<br>8 option, yes.<br>9     Q. At any point in your tenure with Oakwood<br>10 did Credit Suisse control Oakwood?<br>11     A. Not in the colloquial sense of the word.<br>12 I think that they did have a 19.9 percent option,<br>13 which under some securities definitions might make<br>14 them a controlling party.<br>15     Q. Well, let me try and focus the question a<br>16 bit then. Can you recall an instance where Credit<br>17 Suisse demanded the hiring or firing of any employees<br>18 of Oakwood?<br>19     A. I do not.<br>20     Q. Can you recall an instance where Credit<br>21 Suisse demanded that a certain director be removed<br>22 from the board?<br>23     A. I do not.<br>24     Q. Did --<br>25     A. If you'd give me a moment. I left my cell |

Page 86

1    Q.   Okay.  And if you return to paragraph 43,
2  please --
3    A.   Yes.
4    Q.   -- there's a reference in the first
5  sentence to the company incurring substantial debt
6  during the mid to late 1990s.  Am I correct in
7  understanding that to mean public bond offerings?
8    A.   Well, in part.  There were some public
9  bond offerings that were there.  There was a small
10  one I believe in the early '90s, but in the -- there
11  was a public debt offering I believe in 1999.
12  However, before that public debt offering in 1999
13  there had been increasing use from '97 forward, maybe
14  even in '96, I'm not sure, but there had been
15  increasing use of short-term credit facilities --
16    Q.   Uh-huh.
17    A.   -- which essentially were replaced by that
18  public bond offering in 1999.
19    Q.   And am I correct that Credit Suisse was
20  not among the underwriters on the 1999 offering?
21    A.   They were not.
22    Q.   Do you recall who the underwriters were?
23    A.   I think Bank of America was involved in
24  it.  It would have been NationsBank at the time.  I
25  can't recall whether J.C. Bradford or Legg Mason was

Page 87

1  involved in it.  They may have been.  First Union,
2  now Wachovia, may have been, but I'm -- I don't
3  recall the specifics of that very well.
4    Q.   Do you recall if Merrill Lynch played a
5  role in that underwriting?
6    A.   They may have.  They played roles in other
7  underwritings for the company.
8    Q.   Other public bond offerings?
9    A.   Public equity offerings.  I think they may
10  have been -- well, they were also involved in
11  Oakwood's initial securitizations.
12    Q.   Uh-huh.  Apart from securitization
13  underwriting and perhaps some equity underwritings,
14  do you recall if Merrill Lynch provided the company
15  with any other kinds of services?
16    A.   No.  The company had a relationship with
17  Merrill Lynch in the early 1990s.
18    Q.   Uh-huh.
19    A.   And I think Merrill Lynch did either the
20  first or the first two securitization deals for
21  Oakwood.  The major finance company at that time in
22  the industry was a company called Greentree that
23  filed for bankruptcy in 2002, but they were the major
24  player in the industry at that time.  And they told
25  Merrill Lynch that if Merrill Lynch did any more

Page 88

1  underwriting for Oakwood, that they would no longer
2  use Merrill Lynch.  So Merrill Lynch chose to partner
3  up with Greentree and cast us aside, so I don't think
4  that there was too much relationship between Oakwood
5  and Merrill Lynch after that period of time.
6    Q.   And do you recall the approximate date
7  that Merrill left the scene as to Oakwood?
8    A.   Well, that would have been -- and I'm not
9  saying there wasn't any relationship after that
10  time --
11    Q.   Uh-huh.
12    A.   -- but that would have been around 1994.
13    Q.   Uh-huh.  I see.  Okay.  Are you familiar
14  with something that was known as the nine point plan,
15  sometimes called the performance enhancement plan?
16    A.   Sounds like a Bill Edwards plan.
17    Q.   What do you remember about that plan, if
18  anything?
19    A.   I remember some -- it was not in my mind
20  what I would call a plan.  It was certain bullets,
21  but what they were, I couldn't tell you.
22    Q.   In your initial answer you characterized
23  it as a Bill Edwards plan.  My interpretation at
24  least was that that had a negative connotation in
25  your mind.  Am I right?

Page 89

1    A.   Well, not necessarily a negative.
2    Q.   Okay.  Well, tell me what you meant.
3    A.   It's just that Bill was one to come up
4  with slogans.  So hearing the nine point plan, it
5  rings a vague bell in my head, but it just sounds
6  like the kind of thing that Bill would come up and
7  name something.
8    Q.   Uh-huh.  Do you recall the general time
9  frame when the nine point plan was unveiled?
10    A.   Well, if I'm right that it was a Bill
11  Edwards plan, it would have been around 1998, 1999.
12    MR. OSNATO:  Okay.  I'm going to mark,
13  please, as Defendant's Exhibit 203 a document
14  bearing the Bates range OHC-025774 through 776.
15  This is an April 13th, 2000 memo from Bob Smith
16  to the board of directors.
17    (Exhibit Number 203 was marked for
18  identification.)
19    THE WITNESS:  You want me to review the
20  whole thing?
21    Q.   (By Mr. Osnato)  Have you seen this
22  document before?
23    A.   I probably have, but it doesn't ring a
24  bell.
25    Q.   Okay.  Does this refresh your recollection

**Page 90**

1 that in the March or April time frame of 2000 the
2 nine point plan was something that was under
3 consideration by the company?
4      A.   Well, I'm going to have to look through it
5 a little more.
6      MR. CASTANARES:  Again, you haven't given
7 him a chance to read it, so --
8      MR. OSNATO:  Understood.  If you need to
9 read it to refresh your memory, that's fine.
10      THE WITNESS:  Okay.  What's the question?
11      Q.   (By Mr. Osnato)  Did you have any role in
12 developing the nine point plan that's outlined in
13 this document?
14      A.   I don't believe I did.
15      Q.   Do you know who did?
16      A.   I think it was Bill Edwards.
17      Q.   Uh-huh.  Mr. Edwards was the chief
18 executive at the time?
19      A.   I think he was the chief executive until
20 September of 2000.
21      Q.   And I take it that Credit Suisse had no
22 involvement in developing this plan; is that right?
23      A.   Not that I'm aware of.
24      Q.   What was the purpose of this plan as you
25 understood it?

**Page 91**

1      A.   Well, again, as I say, I wouldn't call
2 this a plan.
3      Q.   What would you call it?
4      A.   I would call it bullets.
5      Q.   And were the objectives outlined in the
6 plan achieved by the company?
7      A.   I think certain of them were and certain
8 of them weren't.
9      Q.   Okay.  And which were not in your view?
10      A.   Okay.  Let's go through them.  Increased
11 sales, that was not achieved.
12      Q.   Uh-huh.
13      A.   Number two, grow independent business, I
14 think that that was achieved.  Increase cash flow and
15 liquidity, obviously, the fact that we ended up
16 filing for bankruptcy because we didn't have
17 sufficient liquidity, we did not achieve that.
18      Reduce inventory, we achieved that.
19 Reduce costs, I think to a certain extent we achieved
20 that.  Limit expansion, we achieved that at the time.
21 The goal should have been to eliminate facilities
22 rather than limit expansion, but we did limit
23 expansion.  Reorganize finance company, we did do
24 that and then we later reorganized it again.  Reduce
25 repos and delinquency, ultimately we did not achieve

**Page 92**

1 that.  Focus on core business, I think we achieved
2 that.
3      Q.   Okay.  Do you have any understanding of
4 why this plan was put in place in the 2000 time
5 period?
6      A.   Well, we had deteriorating performance
7 during that time period from -- really from 1998
8 forward.  The -- I think that in my mind, and that's
9 why I'm -- I said this is a Bill Edwards thing, that
10 in why I say it's not a plan, this was really
11 intended to I believe -- I never had a discussion
12 with Bill I don't believe as far as how he came up
13 with this or what its purpose was, but I think it was
14 intended to keep the important objectives there and
15 be clear what they are so you don't get involved with
16 the minutiae but you keep in your mind what the
17 important goals are.
18      Q.   And when you became chief executive
19 officer did the nine point plan remain in effect?
20      A.   I don't think I ever referred to it.  Now,
21 you know, did I want to do all these things?  Sure,
22 but, you know, to say that nine bullets are a plan,
23 this is -- to me, and I don't mean any offense to
24 Bill Edwards, but it's a difference in style.  I view
25 this as slogans and not a -- not a plan.  A plan

**Page 93**

1 tells you how you're going to do something.
2      Q.   When you became chief executive officer,
3 was it your view that you'd been placed in a hole by
4 some of the decisions by your predecessors?
5      A.   Yes.
6      Q.   Can you identify what you thought were the
7 key mistakes that had been made by your predecessors?
8      A.   The overriding mistake that had been made
9 by my predecessors were -- was the credit quality of
10 our portfolio.
11      Q.   Uh-huh.
12      A.   That was something that it's almost
13 impossible to have much of an impact on because those
14 loans are written for 25, 30-year periods.  As I
15 mentioned to you before, I think that we also had --
16 we hadn't reacted quickly enough to the market
17 downturn to downsize upward to be a profitable entity
18 from a manufacturing and a retail standpoint.  The
19 other thing that was troublesome was that we had a
20 retail network that was still not sufficiently
21 controlled.
22      Q.   Uh-huh.
23      A.   Finally, we still had a large overhang of
24 old inventory that still had to get rid of -- that
25 still had -- that we still had to get rid of.  I may

MYLES STANDISH

25 (Pages 94 to 97)

---

**Page 94**

1 have misspoke earlier talking about the overhang of
2 inventory. I think I said we operated our plants
3 full out until June of '98 and I think I meant to say
4 June of '99.
5   Q.   Uh-huh.  Fair enough.  Of the factors you
6 just identified, am I right that the poor credit
7 quality of the loan portfolio was the most serious in
8 your view?
9   A.   Yes.
10   Q.   And is that -- strike that.  Was the poor
11 quality of the portfolio a result of aggressive
12 underwriting standards by Oakwood in the mid to late
13 '90s?
14   A.   Yes.
15   Q.   And who -- strike that.  Am I right that
16 Oakwood was responsible for setting its own
17 underwriting standards during that period?
18   A.   Oakwood had responsibility for setting its
19 underwriting standards during that time and, of
20 course, there were constraints in our warehouse
21 agreement at that time as to what the warehouse would
22 take.  And I think at that point in time in the '90s
23 it was a warehouse agreement, not a loan purchase
24 agreement.  The -- Oakwood had made strides between
25 '96 and '98 in improving the quality of its

---

**Page 95**

1 underwriting.  In '98 the CFO of Oakwood at that
2 time, a man named Mike Kilbourne, thought that
3 perhaps we could go back to the same underwriting
4 standards that we were using in '96 —
5   Q.   Uh-huh.
6   A.   — and capture a lot more sales, and he
7 drew up a plan.  I don't know if it was a detailed
8 plan but whereby we would risk adjust our pricing and
9 have what was ultimately named the select lending
10 program.
11        And if you were selected into the select
12 lending program, you got an interest rate of three or
13 four percent higher than what our standard rate was,
14 but that was to risk adjust the — the interest rate,
15 which in doing that Mike's view was that we would
16 separately securitize and service these select loans.
17        And he consulted with First Boston with
18 respect to that, and First Boston got back to Mike
19 and said that that was a securitization vehicle that
20 would work and that the market because of the excess
21 spread would accept those bonds.
22        The — ultimately what happened in '98 was
23 that we, Oakwood, did move forward with this select,
24 more risky underwriting program but, in fact, did not
25 use these as — did not pool these in separate

---

**Page 96**

1 securitizations but put these in the same
2 securitization as we put our other loans.  That
3 program was around for a period of time, which made
4 those '98, '99 loans very difficult.  We had a high
5 level of repossessions off of that select program.
6   Q.   Uh-huh.  Am I right that the poor quality
7 of the company's loan portfolio ultimately was a
8 factor in causing it to file for bankruptcy?
9   A.   It was.
10        MR. CASTANARES:  Mike, at some convenient
11 point if you would be so kind?
12        MR. OSNATO:  I'm happy to do that now,
13 Tony.
14        MR. CASTANARES:  That's fine.  I don't
15 want to interrupt you.
16        THE VIDEOGRAPHER:  We're off the record at
17 11:14.
18        (A recess was taken.)
19        THE VIDEOGRAPHER:  Tape number three.
20 We're on the record at 11:22.
21   Q.   (By Mr. Osnato)  Mr. Standish, can you
22 refresh my memory as to the exact approximate date
23 that you became CEO of the company?
24   A.   I believe it was late July of 2001.
25   Q.   And at that time did you have any views as

---

**Page 97**

1 to the financial condition of the company?
2   A.   Yes.
3   Q.   What were they?
4   A.   It was poor.
5   Q.   Okay.  And at that time did you take any
6 steps to improve the financial condition of the
7 company?
8   A.   Yes.  Either at -- I'm not -- not
9 immediately, but over a period of time we took a
10 number of actions.  I don't think I can remember all
11 of them, but we lowered our inventory.
12   Q.   Uh-huh.
13   A.   We closed stores.  We closed plants.  We
14 improved our underwriting standards.  Those would be
15 some of the significant ones.
16   Q.   Uh-huh.  And in taking those steps am I
17 correct that you did not rely upon Credit Suisse to
18 assist you?
19   A.   I think I probably would have talked with
20 Fiachra with respect to our underwriting standards,
21 what actions we should take, what actions would help
22 our bonds sell.  I may have talked to him about other
23 things, but that would be the primary thing.
24   Q.   Uh-huh.  And as you sit here today is it
25 your view that the measures you've described were too

---

**Page 142**

1  recall exactly the time it was. It should be in the
2  board minutes I would think.
3     Q.  Uh-huh.
4     A.  But that was about the time where the
5  assumption program was either being called into
6  question or curtailed or terminated. I was aware
7  that -- around that time I became fully aware of what
8  the costs of the assumption program were, which were
9  higher than what I had previously believed that they
10  were. I knew that something had to be done.
11        I knew that the alternative would be
12  selling our repos in the wholesale market, which
13  would put a lot of stress on these securitizations.
14  And I was worried once that stress came on the
15  securitizations and they started performing
16  significantly worse what our access to the
17  securitization market would be.
18        I also at that point in time realized that
19  once we started wholesaling those repos, that we
20  would essentially be receiving no servicing income
21  despite the fact that we had a run rate of about
22  $30 million a year in servicing costs. So all of
23  those things combined made me feel that a bankruptcy
24  filing would be a significant possibility.
25     Q.  And again, to be clear, this is at some

**Page 143**

1  point in the summer of 2002?
2     A.  The summer or the spring.
3     Q.  And did you at that point in time view
4  your responsibility as developing a range of options
5  to present to the board for its consideration and
6  ultimate approval?
7     A.  No. I considered it my responsibility to
8  bring the best option to the board.
9     Q.  And as part of that process would you as
10  chief executive officer consider a range of options
11  yourself perhaps with other officers to determine
12  what the best option was?
13     A.  Yes.
14     Q.  Okay. And did you ultimately reach a
15  conclusion as to the best option for Oakwood as of
16  the summer of 2002?
17     A.  I was convinced at some point in time in
18  the summer of 2002 that the only feasible option that
19  we had was a bankruptcy filing.
20     Q.  Did you believe that a bankruptcy filing
21  could help Oakwood shed some of its liabilities and
22  emerge a stronger company?
23     A.  I did.
24     Q.  At any point in 2001 did you believe that
25  Oakwood should file for chapter 11 bankruptcy?

**Page 144**

1     A.  I didn't in 2001 believe that Oakwood
2  should file for bankruptcy at that time. I certainly
3  saw at that time the possibility that we would need
4  to file for bankruptcy.
5     Q.  And if I ask you the same question as to
6  2000, your answer would be?
7     A.  Again, there was no event in 2000 that
8  caused me to think that we would need to file for
9  bankruptcy at that time, but there was certainly
10  consideration of a possibility that we might have to
11  file for bankruptcy at some point in time in the
12  future.
13     Q.  In 2001 were you of the view that
14  disciplined restructuring of Oakwood would allow it
15  to avert bankruptcy?
16     A.  Are you asking did I think that that was a
17  probability?
18     Q.  I'm asking whether you thought in 2001 if
19  Oakwood aggressively downsized whether it could avoid
20  bankruptcy?
21     A.  In 2001 I believed that downsizing Oakwood
22  was in the best interest of the company and gave the
23  company a better chance of avoiding bankruptcy, but I
24  believe in 2001 had I been asked, which I don't think
25  I was, I think I would have said that a bankruptcy

**Page 145**

1  filing was more probable than not despite whatever
2  action we could take at the time.
3     Q.  Uh-huh. Do you recall consideration ever
4  being given to a bond buy-back program by Oakwood?
5     A.  I recall First Boston making certain
6  proposals with respect to the bond -- to a bond
7  buy-back. I thought that those proposals were
8  misguided.
9     Q.  Why did you think that?
10     A.  Because they would consume liquidity.
11     Q.  Did you express that view to Oakwood --
12  excuse me -- to Credit Suisse?
13     A.  I believe I did.
14     Q.  What was the response?
15     A.  I don't -- I don't recall a response.
16     Q.  And so I take it -- strike that. Did
17  Oakwood ever engage in a bond buy-back program?
18     A.  There were certain bonds that I believe
19  matured in 2002. There was a small issuance of
20  bonds. I can't recall when it was, but we did buy
21  back some of those bonds in the open market back in
22  2001, I believe.
23     Q.  Am I correct that that buy-back was
24  separate and distinct from the proposal that was
25  being put forward by Credit Suisse in 2002?

# EXHIBIT B

# In The Matter Of:

## *In re:  OAKWOOD HOMES CORPORATION/OHC LIQUIDATION v. CREDIT SUISSE FIRST BOSTON*

---

### *DOUGLAS R. MUIR*
*September 26, 2006*

---

## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
**PH: 212-557-7400 / FAX: 212-692-9171**

**MUIR, DOUGLAS R. - Vol. 1**



DOUGLAS R. MUIR

Page 57

1  warrant, the greater the potential dilution. And
2  dilution was adverse to the existing shareholders.
3      Q.   I understand. Shall we take a short
4  break?
5      A.   Sure.
6          THE VIDEOGRAPHER: We're off the record at
7  10:07.
8          (A recess was taken.)
9          THE VIDEOGRAPHER: This is tape number
10  two. We're on the record at 10:16.
11      Q.   (By Ms. Warren) Mr. Muir, in your opinion
12  what caused Oakwood to have to file for chapter 11
13  relief?
14      A.   The most immediate cause is we exhausted
15  our liquidity. We ran out of cash.
16      Q.   What were the greater causes?
17          MR. CASTANARES: I object to the form of
18  the question.
19          THE WITNESS: There were several.
20  Contributors were --
21      Q.   (By Ms. Warren) I'm sorry. Before you go
22  on, your lawyer objected to the form of the question
23  so I'll ask the question differently. In your
24  opinion what were the root causes of Oakwood's filing
25  for chapter 11?

Page 58

1      A.   There were several. The highlights that
2  come to mind, and I haven't sat back to think about
3  this in years, but there were several. Number one is
4  a very deep and sustained downturn in our industry
5  that roughly from the peak of the industry in 1998 to
6  the trough cut the industry by about 60 percent in
7  terms of its shipments. It's a very deep and
8  sustained downturn in the industry generally is one
9  factor.
10          The company expanded more rapidly than it
11  should have in retrospect. You're expanding a
12  business perhaps more rapidly than your ability to
13  run it and to some extent expanding into the
14  beginnings of a downturn in the industry generally.
15  And insufficiently stringent underwriting standards
16  in the finance company.
17      Q.   In Oakwood Acceptance Corporation?
18      A.   Correct.
19      Q.   Is there anything else that comes to mind?
20      A.   I'm sure if I thought about it some others
21  would, but those are key contributors.
22      Q.   Did what was known as the loan assumptions
23  program or the increased use of assumptions
24  contribute at all to Oakwood's difficulties?
25      A.   I think that it did.

Page 59

1      Q.   Whose idea was the loan assumptions
2  program?
3      A.   Let me answer that this way. There was a
4  long standing servicing technique at Oakwood and at
5  other servicers in the manufactured housing finance
6  business to use a loan assumption as a way to deal
7  with a troubled credit. It's not uncommon. It's
8  been used for years and had been used at Oakwood for
9  years.
10          The first I recall hearing about a
11  significant expansion in the loan assumption program
12  was along about -- and I'm -- I'm sorry I can't be
13  more precise, but probably in the summer of 2000 or
14  thereabouts. And the first person I remember
15  speaking about it was a gentlemen by the name of Mike
16  Rutherford.
17          MS. WARREN: Would you read that back,
18  please?
19          (The record was read by the reporter.)
20      Q.   (By Ms. Warren) Who was Mike Rutherford?
21      A.   Mike Rutherford was the person in charge
22  of Oakwood Acceptance on a day-to-day basis.
23      Q.   Did he have a particular title?
24      A.   He did, and he was at least a vice
25  president, might have been a senior vice president.

Page 60

1      Q.   Did he report to Mr. Smith?
2      A.   He did.
3      Q.   And what was the substance of the
4  conversation about the expansion of the loan
5  assumptions program?
6      A.   And I remember the conversation, but I
7  don't remember the particulars. The gist of it was
8  was it possible to make enhanced use of the loan
9  assumption program as an alternative to repossession
10  in dealing with delinquent obligors.
11      Q.   And was Mr. Rutherford asking you that
12  question or was it -- did he convey this as an issue
13  that was being discussed with Mr. Smith or something
14  else?
15      A.   He conveyed it -- my recollection is he
16  conveyed it to me at the time as an idea, a what if,
17  let's talk about this, is there something that makes
18  sense.
19      Q.   What was the next thing you learned about
20  the expansion of the loan assumption program?
21      A.   Again, I don't remember any specific
22  events, but a discussion must have ensued at some
23  point because we did, in fact, undertake to expand
24  the use of the loan assumption concept as an
25  alternative to repossession.

15 (Pages 57 to 60)

DOUGLAS R. MUIR

Page 61

1    Q.   How was that decision taken?  Who made the
2  decision?
3    A.   I don't know that any one individual did,
4  but certainly Mike and I discussed it.  Bob and I
5  would have discussed it, Myles and I.  We talked to
6  the people in our retail organization.
7       The reason they were important is they
8  were part of the process of helping sell repossessed
9  properties and they had a significant role in the
10  loan assumption program.  So we all discussed it and
11  discussed the merits and thought that -- that it was
12  possible to run a program that made sense.
13    Q.   Do you remember approximately when
14  Oakwood, in fact, implemented the expansion of the
15  loan assumption program?
16    A.   I don't remember exactly, but my best
17  recollection is it's sometime in the summer or
18  perhaps the fall of 2000.  I could be off.
19    Q.   Who was in charge, if anyone, of
20  monitoring the expansion -- the expanded assumptions
21  program to see if it was doing what it was supposed
22  to do?
23    A.   I don't know.
24    Q.   Was there anyone monitoring the loan
25  assumptions program at Oakwood?

Page 62

1    A.   I don't know of anyone who was tasked
2  specifically with monitoring it.  There was
3  information available including some available to me
4  that enabled me to get an understanding of how many
5  loans were being put through the program.  What
6  information others had, I don't know.
7    Q.   Am I correct that at some point it came to
8  your attention that the assumptions program was not
9  having the desired effect?
10    A.   I would -- I would characterize it as
11  having come to my attention that it had some side
12  effects.
13    Q.   Explain that to me.
14    A.   The information came to my attention that
15  caused me to believe that we were doing too many loan
16  assumptions, that the loan assumption process was
17  being applied to delinquent loans that were not good
18  candidates for it, and that as a consequence that
19  running the program was having some significant
20  adverse liquidity effects.  It was eating up cash.
21    Q.   When did that come to your attention?
22    A.   As best I can recall would be sometime in
23  the spring, late winter, early spring, early summer
24  of 2001, certainly by July of that year.
25    Q.   And do you remember when you informed

Page 63

1  Credit Suisse that the expanded loan assumption
2  program was having difficulties or side effects?
3    A.   I don't.
4    Q.   To your knowledge was Credit Suisse
5  involved in the decision to expand the loan
6  assumptions program?
7    A.   I don't think they -- to my knowledge they
8  were not involved in the decision.  They were
9  certainly informed of it.
10    Q.   Was the loan assumption program eventually
11  terminated?
12    A.   Yes.
13    Q.   And around when was that?
14    A.   Around July of 2001 I believe is the
15  correct date.
16    Q.   Who made the decision to terminate the
17  loan assumption program?
18    A.   As best I recall, Bob and Myles and I
19  collectively discussed it.  Myles was very much in
20  favor of terminating it and so was I.  So I guess
21  ultimately Myles, who was CEO of the company, made
22  the decision.
23    Q.   Do you remember when or if Credit Suisse
24  was informed of the decision to terminate the loan
25  assumption program?

Page 64

1    A.   No.  I'm sorry.  Did you say -- was the
2  question when or if?
3    Q.   Yes.
4    A.   I know we told them.  When we told them, I
5  don't know.
6    Q.   Do you remember any reaction from the
7  Credit Suisse people about being informed that the
8  loan assumption program had terminated?
9    A.   I don't because, again, I don't have a
10  specific recollection of calling and telling anyone.
11    Q.   We've touched on this a bit in passing,
12  but what services did Credit Suisse provide for
13  Oakwood during the period 1999 to the petition date?
14    A.   Two or three depending on how you count.
15  The ones that I remember are they were the ongoing
16  lead underwriter for the ABS transactions, which was
17  a — generally a quarterly type event.  They were the
18  arranger of the servicing advance facility in the
19  fall of 2001 as I recall, around October.
20       There were a number of occasions when
21  people from CSFB outside the investment banking side,
22  for example, perhaps from the investment banking side
23  or the financial advisory side came and talked to us
24  about ideas.  These were not engagements where there
25  was an engagement letter and they were getting a fee.

16 (Pages 61 to 64)

DOUGLAS R. MUIR

Page 65

1  They'd just come down and say hey, we've been
2  thinking about you. Here's an idea. Why don't you
3  consider this.
4      Q.   Did you consider they were pitching for
5  more business from you with those ideas?
6      A.   Yes. If they were hoping to get an
7  engagement, yeah. I thought that's what they were
8  doing, sure. And then ultimately we signed an
9  engagement letter with them in August of 2002 to
10  provide financial advisory services.
11      Q.   So have I understood you correctly to say
12  that the services that Credit Suisse provided to
13  Oakwood during the period 1999 to the petition date
14  were serving as lead underwriter for the asset backed
15  securities, being the arranger of the servicing
16  advance facility and eventually beginning in 2002
17  serving as financial advisor?
18      A.   All of those and I forgot the loan
19  purchase facility, the warehouse facility. That was
20  pretty important.
21      Q.   And when Credit Suisse came and pitched
22  for your business by giving you ideas, you didn't
23  compensate them for that; right?
24      A.   No.
25      Q.   I mean, they were hoping that they could

Page 66

1  get more business from you to the best of your
2  knowledge; right?
3      A.   That was --
4      Q.   You weren't paying them to come and just
5  give you ideas?
6      A.   We were not paying them for ideas. I
7  assume they hoped to land an engagement.
8      Q.   In your view did Credit Suisse perform its
9  services as lead underwriter for the securitizations
10  competently?
11      A.   Yes.
12      Q.   Did Credit Suisse perform its services in
13  providing the loan purchase facility competently?
14      A.   Yes. I believe so.
15      Q.   Did Credit Suisse perform the financial
16  advisory services beginning in August of 2002
17  competently?
18      A.   Of that I'm a little less certain.
19      Q.   And why do you say that?
20      A.   There are a couple of reasons. And by
21  saying I'm not certain they were competent, I'm not
22  saying they were incompetent.
23      Q.   I understand. Is it fair to say that
24  you're saying that there were some problems?
25      A.   There were what I perceived to be some

Page 67

1  problems.
2      Q.   And what were those?
3      A.   My recollection is that the financial
4  advisory people did an immense focus and attention on
5  one of a number of elements that were part of that
6  engagement. The one that they had tremendous focus
7  on was working with us and the company that turned
8  out to be the major creditor of the bankruptcy case
9  to obtain at least an indication of support from that
10  creditor as we entered the bankruptcy process.
11      Q.   That creditor was Berkshire Hathaway?
12      A.   Correct.
13      Q.   And did you think that that focus was
14  appropriate? Did you think it was important to get
15  an indication of support from Berkshire Hathaway for
16  whatever plan of reorganization the company was going
17  to come up with?
18      A.   I did.
19      Q.   So what was the problem?
20      A.   The things that perhaps didn't go so well
21  where there were some other elements that I felt
22  should have been part of the engagement. Number one
23  was working with us to help arrange DIP financing,
24  which again, I didn't have visibility to everything
25  that CSFB was doing, but I seldom if ever discussed

Page 68

1  DIP financing with anybody from CSFB. And, in fact
2  we ultimately entered bankruptcy without a DIP.
3  Another area of focus was CSFB was the lender under
4  the warehouse facility. And not having been told by
5  CSFB to the contrary, you know, I expected that when
6  we entered bankruptcy there wouldn't be any surprises
7  in terms of continued access to that source of
8  financing.
9          And, in fact, there were some significant
10  surprises. And third, there was a -- I had a
11  frustration if you will in that the item that did
12  have tremendous focus, that is, obtaining an
13  indication of support from Berkshire while it was
14  critically important, they seemed to have a
15  perception that we had an infinite amount of time to
16  achieve that objective.
17      Q.   They meaning Credit Suisse?
18      A.   Correct.
19      Q.   Uh-huh.
20      A.   When, in fact, we informed them repeatedly
21  that the amount of time fixed or available to
22  accomplish that was fixed. I was frustrated that
23  they never seemed to understand that there was going
24  to come a point in time where we were going to be
25  compelled to file whether we had Berkshire on board

17 (Pages 65 to 68)

DOUGLAS R. MUIR

| Page 121 |
| --- |

1  A.  Yes.
2  Q.  When was that?
3  A.  I sent the trustee's representative an E
4  mail around the end of June of 2005 terminating the
5  contract as I recall.
6  Q.  Why did you want to terminate the
7  contract?
8  A.  That I had gone to work for an employer
9  and the company's employment policies prohibit me
10  from having other employment outside my employment
11  for my existing employer.  So I wanted the record to
12  be clear that I was terminating that employment
13  relationship and that employment contract.
14  Q.  Who was your new employer?
15  A.  A company called Krispy Kreme Doughnuts,
16  Inc.
17  Q.  And you're still employed by Krispy Kreme?
18  A.  I am.
19  Q.  What's your role there?
20  A.  I'm the chief accountant.
21  Q.  Do you have any other employment now?
22  A.  I do not.
23  Q.  Mr. Muir, we had talked earlier about the
24  reasons why Oakwood Homes and its subsidiaries filed
25  for bankruptcy.  And I believe you told me, and

| Page 122 |
| --- |

1  correct me if I'm wrong, that the three primary
2  factors in your mind were a downturn in the industry,
3  that the company expanded more rapidly than it should
4  have and the company was using insufficiently
5  stringent underwriting standards; is that correct?
6  A.  I think those were the three factors that
7  I cited as most readily coming to mind.  If I thought
8  about it some more I might come up with some others
9  equally important, but those are three that are
10  etched in my memory.
11  Q.  All right.  Well, we'll talk a little bit
12  about those and if anything else comes to mind, feel
13  free to let me know.  A downturn in the industry,
14  when did that begin?
15  A.  I think most people would date the
16  beginning of the industry decline as probably 1998,
17  1999, certainly by '99.
18  Q.  What was the nature of the downturn?
19  A.  By 1999 there was a -- began to be a
20  pronounced decline in sales.  And while retail sales
21  statistics, the number of homes sold at retail are
22  hard to come by, data about the number of homes sold
23  by manufacturers to retailers is pretty readily
24  available.  So we began to see a fairly pronounced
25  down tick in terms of shipments from manufacturers to

| Page 123 |
| --- |

1  retailers that's usually indicative of slower retail
2  demand, you know, from retail consumers.  We saw
3  companies that loaned money to consumers to enable
4  them to buy homes, we saw lenders exiting the
5  business.  Just generally, you know, slower consumer
6  demand, less lending availability and reduced rates
7  of operation in factories generally.
8  Q.  How long did that downturn continue?  How
9  long did it last?
10  A.  It may still be going on.  When I was last
11  involved in the industry in I guess theoretically in
12  '04, we were still operating the business before we
13  sold it and it had not corrected then.
14  Q.  The next factor was that the company
15  expanded more rapidly than it should have.  Explain
16  that to me.
17  A.  I think in retrospect our ability to build
18  sales centers, put inventory on sales centers was
19  perhaps greater than our ability to successfully
20  operate sales centers profitably for the long-term.
21  I think we probably built too many sales centers.  I
22  think we probably built too many factories.
23  And the industry had a very sustained
24  run-up prior to 1998, 1999.  Credit was easily
25  available.  Money was easily available in the

| Page 124 |
| --- |

1  industry to us and to others.  And I think in
2  retrospect we probably built the business more
3  rapidly than we should have and more rapidly than our
4  ability to effectively manage it.
5  Q.  Did Credit Suisse have any role in the
6  decisions to build more sales centers and to expand
7  rapidly?
8  A.  Not to my knowledge.
9  Q.  The other factor that you mentioned was
10  insufficiently stringent underwriting standards.
11  Explain that to me.
12  A.  I think the record shows over the
13  long-term that a lot more loans that were
14  underwritten at Oakwood, loans that were -- consumer
15  loans that we did for people to buy houses, a more
16  than acceptable number of those failed to perform.
17  That certainly wasn't limited to Oakwood.
18  It was limited to a lot of lenders.  There
19  were certainly many poor lending practices that
20  developed in the industry during the '90s and we
21  adopted our fair share of some poor practices.
22  Q.  What were the poor practices?
23  A.  There were a number.  I testified about
24  DPAP.
25  Q.  Yes.

31 (Pages 121 to 124)

DOUGLAS R. MUIR

Page 125

1    A.   That was a very small one.  It was very
2  useful in enabling us to bring about some management
3  change, but in absolute terms it was not a big deal.
4  The worst decision that was made in the industry in
5  which we participated in my view was the decision
6  that was made by Greentree, who is the largest lender
7  in the industry, along about 1994 to reduce the
8  minimum downpayment level that customers were
9  generally required to make in order to purchase a
10  home.  Prior to 1994 this had been always at least a
11  minimum ten percent cash down business.
12       In what I think was a move to gain market
13  share, Greentree, the largest player, virtually
14  overnight changed it to a five percent down business
15  and that ultimately proved to be a very poor decision
16  in which we participated.
17    Q.   So Oakwood's management followed suit as
18  to your lending practices after Greentree instituted
19  this change?
20    A.   We did.
21    Q.   And I think I can guess what the effect
22  was, but tell me what the effect of that change was.
23    A.   Well, I think the -- I haven't studied a
24  lot of the statistics, but there are plenty of them
25  out there that show that relatively lower downpayment

Page 126

1  loans tend to perform relatively poorly compared to
2  loans where customers had higher cash downpayments.
3    Q.   Did Credit Suisse have any role with
4  respect to the change to the lower downpayment?
5    A.   Not to my knowledge.
6       (Exhibit Number 219 was marked for
7       identification.)
8    Q.   (By Ms. Warren)  I've asked the court
9  reporter to mark as Exhibit 219 a document entitled
10  Oakwood Homes Corporation minutes of special meeting
11  of the board of directors held Wednesday, June 30th,
12  1999.  It's Bates numbered KCLH-0938 to 0943.  No
13  page is missing that I can see.  Do you recognize
14  this document?
15    A.   I don't.
16    Q.   Does it appear to you to be board minutes
17  from Oakwood Homes Corporation?
18    A.   Yes.
19    Q.   I want to refer you to the bottom
20  paragraph of the first page of Exhibit 219 and the
21  paragraph that follows, and just let me know if you
22  -- if you generally agree with what's in those
23  paragraphs?
24    A.   This is the paragraph beginning Mr. St.
25  George began the meeting?

Page 127

1    Q.   Yes.
2    A.   And running to the first paragraph on the
3  next page?
4    Q.   Yes.  Ending at key markets.
5    A.   This all sounds pretty familiar.
6    Q.   Do those paragraphs strike you as a
7  generally accurate account of what was going on at
8  the time in the industry and with the company?
9    A.   More so the first paragraph than the
10  second one.  I mean, the second one is Edwards
11  talking about what he's going to do about it.  I
12  mean, he does talk about what competitors are doing,
13  discounting homes, rate buy-downs.  I remember that.
14    Q.   What's a rate buy-down?
15    A.   A rate buy-down is a -- is like discount
16  points in the mortgage world in which the customer is
17  offered a rate of interest on a loan that is less
18  than the currently prevailing fixed rate in exchange
19  for an up front payment, like a mortgage discount
20  point.
21       The difference between what was going on
22  in the industry and the conventional mortgage world
23  at the time is if you wanted to buy down a rate at
24  mortgage world, you showed up with the cash to pay
25  the discount point at closing.  You had to come out

Page 128

1  of pocket to pay for it.  The deal in the MH business
2  at the time was that the company would finance the
3  points for you.
4       So if you -- if you get -- customer gets a
5  lower rate of interest but gets a higher up front
6  loan balance.  That's the distinction.  That was
7  going on.  It was a poor lending practice in my
8  judgment.  So yeah, that was going on.  I think what
9  Nick said here is consistent with my recollection of
10  what life was like at the time.
11       (Exhibit Number 220 was marked for
12       identification.)
13    Q.   (By Ms. Warren)  I'm showing you a
14  document that's entitled Oakwood Homes Corporation
15  minutes of special meeting of the board of directors
16  held Monday, August 2, 1999.  It's Bates number
17  KCLH-956 to 959.  Mr. Muir, does this appear to you
18  to be minutes of Oakwood Homes Corporation's board
19  meeting?
20    A.   Yes.  It does.
21    Q.   Would you take a look, please, at the
22  second page of the document, specifically the third
23  paragraph down, that begins Mr. St. George then
24  began?  Would you read that over and let me know when
25  you're finished?

32 (Pages 125 to 128)

DOUGLAS R. MUIR

Page 129

1    A.    I've read it.
2    Q.    Does that paragraph generally comport with
3    your recollection of what was going on in the
4    industry at the time?
5    A.    I remember all these events. I mean, at
6    the time, yeah. The answer is yes.
7    Q.    Would you explain to me the reference to
8    widening spreads in the securitization markets at the
9    bottom of the paragraph?
10    A.    Yes. That is referring to the -- an
11    expansion in the rate of interest that must be paid
12    on an asset backed security in order to induce a
13    customer to buy it in that rate that the customer
14    demands, the buyer of the bond demands over
15    prevailing risk-free rates in the capital markets.
16          Frequently in talking about interest rates
17    on asset backed securities or corporates for that
18    matter, rather than speak in absolute -- terms of
19    absolute rates which change from day to day, you
20    speak of them in terms of spread to treasuries.
21          You can get a ten-year bond sold at
22    treasuries plus 200 or you can get a LIBOR floater
23    done at L plus 38, but it's referring to the spread
24    between the necessary rate to attract a buyer and the
25    rate of an underlying risk-free security of

Page 130

1    comparable duration. So what Nick is saying is
2    spreads are widening out. Investors are demanding a
3    higher spread over a risk-free rate in order to
4    purchase the securities.
5    Q.    And was this particularly relevant to the
6    2004 and 2009 bonds?
7    A.    This is not talking about corporates.
8    This is talking about the asset backed securities
9    that we were buying -- or we were selling.
10    Q.    And what impact did that have on Oakwood?
11    A.    It adversely -- all things being equal, it
12    adversely affects profitability because the cost of
13    permanent financing for your loans is -- increases
14    when credit spreads widen. And unless you're able to
15    raise the rates you're charging to customers to
16    correspond for that, you have a profit margin
17    squeeze.
18    Q.    Turning to the first page of Exhibit 220,
19    there's a reference in the last paragraph to
20    management's pursuit of a management led buy-out of
21    the corporation. Do you see that?
22    A.    Yes. I see that.
23    Q.    Was that something that you were involved
24    in?
25    A.    To some extent, yes.

Page 131

1    Q.    Why was consideration being given to a
2    management led buy-out of the corporation?
3          MR. CASTANARES: Counsel, could you
4    specify by whom or I'll just object to the form
5    of the question.
6          MS. WARREN: You can go ahead and answer.
7          THE WITNESS: I'm sorry. What was the
8    question again, please?
9    Q.    (By Ms. Warren) The question was what is
10    your understanding of why a management led buy-out of
11    the corporation was being considered?
12    A.    My understanding at the time was that Nick
13    St. George, who was then the CEO, observing that the
14    stock price had been under considerable pressure,
15    that it was way, way off its highs that were reached
16    early in '98 and having watched, you know, LBO-type
17    transactions happen in other industries, wondered if
18    there was an opportunity that would be in the
19    interests of the shareholders for management to try
20    and buy the company and take it private.
21    Q.    To your knowledge were any outside
22    financial advisors consulted about this possibility
23    of a management led buy-out?
24    A.    Yes.
25    Q.    And who was that?

Page 132

1    A.    To the best of my recollection a firm by
2    the name of Soles Brower Smith was involved in that
3    potential transaction. I guess Lanty Smith, who was
4    the Smith name in that firm, happened to be a
5    director of Oakwood. So as I recall, Soles Brower
6    was involved in talking to management, mainly to
7    Nick, but also to me and to others about, you know,
8    whether a deal could be put together and that would
9    make sense.
10    Q.    Did Oakwood Homes use Soles Brower to
11    advise on any other potential transactions or
12    financings?
13    A.    Let me clarify one point. I'm not sure --
14    and again, my recollection of this is a little hazy,
15    but I'm not sure Soles Brower Smith was working for
16    the company when we were talking about a management
17    buy-out. I think they were talking to management.
18    So I'm not sure Soles -- you see my point?
19          At some point I believe -- and I'm certain
20    that it's prior to the time when we filed for
21    bankruptcy -- we had some additional discussions with
22    Soles Brower Smith about the state of the industry,
23    the state of the company, what we might do about it.
24    I don't believe we ever signed an engagement letter
25    with respect to, you know, rendering financial

33 (Pages 129 to 132)

DOUGLAS R. MUIR

Page 133

1  advice; but they -- Soles Brower was involved
2  prefiling as I remember in helping us put together
3  some financial projections. I wasn't directly
4  involved in that. That was more Bob Smith's thing.
5      They may have been involved in -- I
6  believe they were if my memory serves, in making some
7  informal inquiries around the industry to see if
8  there were strategic buyers that might be interested
9  in buying the company. Again, whether there was a
10  formal engagement letter signed on that, I don't
11  know, but I think there must have been because I know
12  they were paid money for services at least in respect
13  to putting together some financial projections.
14      Q.  Who was the point person dealing with
15  Soles Brower in the 2002 time frame?
16      A.  I think Suzanne Wood. She was running the
17  accounting operation at that time, was involved with
18  them. Bob Smith, probably Myles. I really had very
19  little to do with it. I was trying to manage the
20  liquidity side of the game and keep the place
21  organized and running, but I think each of those
22  three probably were involved with Soles Brower and
23  the work that they did.
24      (Exhibit Number 221 was marked for
25  identification.)

Page 134

1      Q.  (By Ms. Warren) Changing topics a bit,
2  I'm showing you a document that the court reporter
3  has marked Defendant's Exhibit 221. It's an E mail
4  attaching what looks like a presentation. The E mail
5  is from Susan Menkhaus to you dated Wednesday, March
6  28th, 2001. Would you just take a look through this
7  document briefly and let me know when you're
8  finished?
9      A.  Okay. I've reviewed it.
10      Q.  Does this document refer to the servicing
11  advance facility that eventually Oakwood implemented?
12      A.  It certainly refers to a concept for a
13  facility. This doesn't appear to be the exact form
14  in which it was ultimately implemented, but it's the
15  same basic transaction.
16      Q.  Okay. And as I think you testified
17  earlier that a version of this structure or
18  transaction was implemented by Oakwood?
19      A.  That's correct.
20      Q.  And you thought this was a helpful idea
21  from Credit Suisse?
22      A.  I did.
23      Q.  What -- in the course of particularly 1999
24  to 2001 what, if any, other ideas that Credit Suisse
25  proposed to the company did you find helpful?

Page 135

1      A.  That would require an inventory of the
2  ideas. Could you ask the reporter to read back the
3  question? I just want to make sure I'm answering the
4  question that you asked.
5      MS. WARREN:  Absolutely.
6      (The record was read by the reporter.)
7      Q.  (By Ms. Warren) And let me just amend
8  that to say I meant to say through the petition date.
9      A.  There were -- one that comes to mind is
10  Fiachra or his team came up with a structural change
11  to the ABS transactions that we had not previously
12  employed that was beneficial to us economically.
13      And it was a very creative idea in terms
14  of playing off an arbitrage between the rating
15  agencies and the fixed income markets, but the basic
16  concept was taking a chunk of the excess spread in
17  the transaction, the difference between the rate of
18  interest on the loans and the rate of interest
19  accruing on the bonds that is of limited value from a
20  rating agency point of view, and taking something
21  that they didn't think was worth very much and
22  creating a security out of it and creating an IO that
23  was -- that investors were willing to pay a lot of
24  cash for in the bond market. What you gave up with
25  the agencies was not nearly so valuable as the cash

Page 136

1  you got from the purchaser of the IO, and it was a
2  very creative idea and we employed it in a number of
3  deals. That's one.
4      I'm sure if I -- if you have an inventory
5  of neat things we did during that time frame, I could
6  give you some more, but there were some very
7  innovative ideas that came out of First Boston.
8      Q.  Okay. Were there any ideas floated to you
9  by Credit Suisse that management rejected?
10      A.  I'm sure there were. There were -- there
11  had to have been.
12      Q.  And when you say there had to have been,
13  why do you say that?
14      A.  Well, I can remember one and there were no
15  doubt more because we'd hear from CSFB. I think they
16  were thinking about us, thinking about our situation,
17  thinking about our industry, thinking about how they
18  could be helpful, thinking how they could make some
19  fees and they pitched ideas.
20      I remember some of them being really bad
21  ideas or at least one, but there may have been some
22  -- you know, some good ones. Certainly I've already
23  testified there were some good ideas as well.
24      Q.  Shall we take a short break?
25      A.  Sure.

34 (Pages 133 to 136)

DOUGLAS R. MUIR

Page 220

1    A.    I don't remember what the amount of any
2 front end commitment fee paid to Foothill was if
3 there, in fact, was one or what the rate of interest
4 was compared to Wachovia. You know, we have the
5 documents and we could research it, but off the top
6 of my head I don't remember.
7    Q.    Going back to the third page of
8 Exhibit 231, there's the reference at the top of the
9 page to Mr. Muir's work on a new credit facility
10 secured by servicing advances. Do you see that?
11   A.    I do.
12   Q.    And what does that refer to?
13   A.    This refers to what ultimately wound up
14 being the servicing advance facility that we closed
15 in October in which Prudential was the investor.
16   Q.    Looking back at the same page in the next
17 paragraph, there's a reference to a report from Mr.
18 Smith on the assumptions program that we talked about
19 yesterday. Do you see that?
20   A.    I've read it, but I've lost track of the
21 question. Could you ask the reporter to read it
22 back, please?
23   Q.    The question was just do you see the
24 reference to Mr. Smith reporting on the assumption
25 program?

Page 221

1    A.    I do.
2    Q.    Do you remember if this was the first time
3 the board had been apprised of the increased use of
4 the assumption program?
5    A.    I don't remember specifically, but I doubt
6 it.
7    Q.    Why do you doubt it?
8    A.    Because I can remember -- I attend
9 virtually all of the board meetings and a topic that
10 was often discussed was the level of incoming repo
11 properties, how to go about effectively and
12 efficiently disposing of them.
13      And I know from time to time the loan
14 assumption program came up for discussion as one of
15 the things that we were doing trying to deal with
16 that issue, but I don't have a recollection of
17 exactly when but it was more than once.
18      (Exhibit Number 232 was marked for
19      identification.)
20   Q.    (By Ms. Warren) I'm showing you a
21 document that the court reporter has marked as
22 Exhibit 232. It's entitled Oakwood Homes Corporation
23 minutes of the meeting of the board of directors held
24 Tuesday, July 24th, 2001. It's Bates numbered
25 KCLH-1176 to 1181 and I note that Mr. Muir is listed

Page 222

1 as secretary of the meeting. Looking at the first
2 page of Exhibit 232, the second paragraph from the
3 bottom references a report from Mr. Standish on the
4 plan discussed at the last board meeting to
5 substantially reduce the size of the retail
6 organization. Do you see that reference?
7    A.    I do.
8    Q.    We can certainly look back at the last
9 board meeting minutes if that would help you, but do
10 you remember generally what that plan involved?
11   A.    I do not.
12   Q.    Do you know why the plan to substantially
13 reduce the size of the retail organization was
14 contemplated?
15   A.    Again, without referring back to a more
16 detailed report of which plan this was, I don't
17 remember.
18   Q.    Take a look back at Exhibit 231. On the
19 second page of Exhibit 231 in the center of the page
20 there's a reference to Mr. Standish's leading a
21 discussion about the company's retail and
22 manufacturing operations. Why don't you look at that
23 paragraph and see if it refreshes your memory and let
24 me know when you're finished?
25   A.    This language on page two of Exhibit 231

Page 223

1 rings a bell, but I do know, for example, what states
2 we were talking about when Myles was reporting about
3 states being particularly problematic from a
4 litigation point of view. I know exactly what
5 regions we were talking about exiting for that very
6 reason, but this doesn't help me remember the
7 particulars of what Myles was talking about in these
8 particular reports.
9    Q.    Do you remember whose idea this plan was
10 to reduce the operations in certain states?
11   A.    That would be Myles.
12   Q.    Looking back at Exhibit 232, there's a
13 reference on the first page of Exhibit 232 to Mr.
14 Smith giving copies of presentation materials
15 regarding the plan during a management meeting with
16 the corporation's bank group. Do you see that?
17   A.    I don't just yet, but I'm looking.
18   Q.    It's in the second paragraph from the
19 bottom.
20   A.    Yes. I see it.
21   Q.    Were you present at that management
22 meeting with the corporation's bank group?
23   A.    I probably was, but I have no specific
24 recollection of it.
25   Q.    Is it fair to say that you were usually

5 (Pages 220 to 223)

DOUGLAS R. MUIR

Page 224

1  present when management met with the corporation's
2  bank group?
3     A.   Yes, usually.
4     Q.   During the 2000 to 2002 period do you
5  remember approximately how often management would
6  meet with the corporation's bank group?
7     A.   We met with the bank group from time to
8  time let me say, and the extent to which we did so
9  varied.  There were a handful of meetings usually
10  held in Charlotte which representatives of all of the
11  banks in the group attended.
12     Q.   And this was still at the stage where you
13  were dealing with the five banks?
14     A.   Yes.
15     Q.   Five banks we talked about earlier?
16     A.   In the syndicated Wachovia facility.  So
17  periodically there would be a bank group meeting
18  usually in Charlotte hosted by Wachovia or First
19  Union and we'd go down there and meet with them.
20  We'd have a presentation.  We'd have Q&A.
21        At other times we had meetings just
22  between management and First Union as the syndicate
23  manager.  And it seems like we talked to
24  representatives of the syndicate manager at least
25  weekly on the phone and sometimes far more than

Page 225

1  weekly.  So there were -- there's a lot of
2  communication.
3     Q.   What was the purpose of sharing
4  management's operational plans such as this plan to
5  reduce the size of the retail organization with your
6  bank group?
7     A.   We felt it was important that we keep the
8  bank group fully advised of what we were intending to
9  do with the business.  The bank group was spending a
10  lot of money, our money, monitoring what we were
11  doing so they understood where the business was
12  headed, and they wanted to be kept informed of our
13  plans and we certainly tried to do that.
14     Q.   Did the bank group members ever make
15  suggestions to you or comment on what management's
16  plans were?
17     A.   Yes.
18     Q.   Do you remember any of those comments?  I
19  know that's a broad question.
20     A.   I remember there were plenty of -- there
21  was plenty of input from the banks.  One thing in
22  particular that sticks out, and if I thought about it
23  I could probably think of more, we had a fair amount
24  of capital deployed in an insurance business in
25  Bermuda.

Page 226

1        It was a consistently profitable business,
2  but by deployed capital I mean letters of credit
3  issued by members of this bank group and, therefore,
4  represented a credit exposure to them.  There was
5  considerable discussion and they tried to reduce
6  their exposure to Oakwood.  They gave us plenty of
7  encouragement to reduce the amount of capital
8  deployed into the insurance business.
9     Q.   Did management accept that suggestion?
10     A.   We did.  And just so you can get the full
11  flavor of it, if we found ourselves in a default
12  situation it was not unusual for the banks to say to
13  us we'll waive this default and not make your
14  indebtedness due and payable under the following
15  conditions.  And they -- there would be one, two,
16  three.
17        Generally one of those conditions was we
18  reduce their credit commitments under the facility.
19  So if you want to do that, something has to go.  So
20  it's not so much that they necessarily told us we
21  want you to get out of the insurance business, but
22  they from time to time as a condition to not calling
23  the credit wanted to reduce their exposure, and we
24  had to figure out ways to do that to avoid having the
25  facility called.

Page 227

1     Q.   And did you think that the banks -- the
2  bank group's use of their leverage in that way was
3  unfair?
4     A.   No.
5     Q.   Why not?
6     A.   I didn't think the banks were trying to do
7  anything that our original agreement with them didn't
8  permit them to do.  They were looking out for their
9  best interests and we were looking out for ours.
10  They certainly could have been much more draconian
11  than they were.
12        They had plenty of opportunities to call
13  the credit, which would have been to our great
14  disadvantage.  So no, I don't think they were unfair.
15     Q.   I think I know the answer to this
16  question, but to get your view on it, why would the
17  bank group's calling the credit have been bad for
18  Oakwood Homes?
19     A.   We would have been unable to repay them.
20     Q.   And what would have been the consequences?
21     A.   That would have been very interesting.
22  Presumably -- presumably we would have had to file
23  for bankruptcy.  Presumably they could have seized
24  the assets if they'd cared to.  They had a security
25  interest in virtually everything we owned.  I don't

6 (Pages 224 to 227)

# EXHIBIT C

12/12/2006  WALKER, Clarence

```
     0001
1                         CLARENCE WALKER
2                UNITED STATES BANKRUPTCY COURT
3                    DISTRICT OF DELAWARE
4        -----------------------------x
5        In Re:
6        OAKWOOD HOMES CORPORATION,
         et al.,
7
                      Debtors.
8
9        Chapter 11
         Case No. 02-13396 (PJW)
10       -----------------------------x
11       OHC LIQUIDATION TRUST,
12                    Plaintiff,
13            v.            ADV. Proc.No. 04-57060 (PJW)
14       CREDIT SUISSE FIRST BOSTON, a
         Swiss banking corporation,
15       CREDIT SUISSE FIRST BOSTON
         LLC, a Delaware limited
16       liability corporation, CREDIT
         SUISSE FIRST BOSTON, INC.,
17       CREDIT SUISSE FIRST BOSTON
         (U.S.A.), INC., a Delaware
18       corporation and a wholly owned
         subsidiary of CREDIT SUISSE
19       FIRST BOSTON, INC., the
         subsidiaries and affiliates of
20       each, and DOES 1 through 100,
21                    Defendants.
22       -----------------------------x
23
24                           December 12, 2006
25                              1:04 p.m.
```

12/12/2006 WALKER, Clarence

CLARENCE WALKER

1    CLARENCE WALKER
2    was just wondering if he provided any other
3    materials aside from what was sent to you on
4    December 6?
5    A.    No.
6    Q.    Aside from the -- well, we covered the
7    telephone conversation.  You also mentioned an
8    e-mail.
9          Can you tell me what the e-mail was
10   about?
11   A.    The e-mail exchange had to do with
12   settling on a date for the deposition and he
13   advised me by e-mail that he -- I think I had
14   told him in the telephone conversation that I'm
15   in a fairly remote place out here in Arizona,
16   that it would be a long drive for me to go
17   either to Phoenix or Tucson, and I think that in
18   the e-mail exchange he explained to me that he
19   could conduct the deposition by telephone and
20   that was pleasing to me.  And the rest of the
21   e-mail exchange had to do simply with settling
22   on a time and date.  There is no substance in
23   the e-mail exchange.
24   Q.    Have you spoken to any -- strike that.
25         Earlier in this deposition you had

03/08/2007 11:50 AM                                    73

12/12/2006 WALKER, Clarence

1    CLARENCE WALKER
2    testified to the effect that you were satisfied
3    with the financial advisory services provided by
4    CSFB, is that a fair statement?
5    A.    Yes.
6    Q.    Can you tell me over what period of
7    time those services were being provided to
8    Oakwood?
9    A.    I really can't.  CSFB had been an
10   underwriter in some of the securities that
11   Oakwood had sold publicly, but in terms of its
12   service as a financial advisor, those services
13   were probably provided to management at a time
14   prior to the time the board became aware of
15   that.  I don't know that.  But I know that there
16   was a point in time when the board approved a
17   specific contractual arrangement with CSFB, but
18   that was fairly late in the game and I have the
19   sense that CSFB was providing advice both to the
20   audit committee and the board prior to that.
21         The audit committee looked to CSFB for
22   some advice relating to the model that we were
23   using to evaluate the repossessions and the
24   securitizations, and so I really can't tell you
25   what period of time all of that took place.

03/08/2007 11:50 AM                                    74

12/12/2006 WALKER, Clarence

1    CLARENCE WALKER
2    Q.    Maybe if I can help narrow that down a
3    bit, would it -- obviously the bankruptcy was in
4    November of 2002.  Would you say that the
5    services were being provided throughout 2002 up
6    until the bankruptcy?
7    A.    I don't know the answer to that.  If
8    you say throughout -- going back to January of
9    2002, I doubt it.  I doubt that any services
10   were being provided to the board of Oakwood in
11   the early part of 2002 by CSFB.  But I don't
12   really know.  It just is not in my recollection.
13   Q.    Fair enough.  It was quite a while
14   ago.
15         With respect to the securitizations,
16   you again testified that you were satisfied with
17   the securitizations that were provided by CSFB;
18   again, is that a fair statement?
19   A.    I was satisfied with the services that
20   CSFB provided in reference to the
21   securitizations, yes.
22   Q.    I believe that you had mentioned that
23   you relied on the input of management in terms
24   of arriving at that conclusion.  Was my
25   understanding correct?

03/08/2007 11:50 AM                                    75

12/12/2006 WALKER, Clarence

1    CLARENCE WALKER
2    A.    Yes, the -- it's correct in -- but I
3    need to elaborate on that because there were
4    times when CSFB spoke directly to the board and
5    those times it undoubtedly, though I don't
6    recall specific instances, spoke with reference
7    to the securitizations.
8          But the services that CSFB provided
9    with reference to the securitizations were
10   reported on not to the audit committee and the
11   board most of the time, not by CSFB itself, but
12   by management.  Management would say we have --
13   we've discussed this with CSFB and they say thus
14   and such and thus and such and thus and such and
15   thus and such.  And we were relying on
16   management's assessment of that as we went
17   along.
18   Q.    Are you familiar with the proof of
19   claim that CSFB filed against the estate?
20   A.    I am not.  Let me say this.  I am
21   aware of it because I did generally look at the
22   complaint.
23   Q.    Let me clarify.  The pleading that you
24   are referring to, is that the pleading that was
25   included in the December 6 package?

03/08/2007 11:50 AM                                    76

# EXHIBIT D



**BNP PARIBAS**
HIGH YIELD RESEARCH

# OAKWOOD HOMES CORPORATION

14 June 2002    **Manufactured Housing**    *INITIATING COVERAGE*

## *Asset Protection—Shelter from the Storm*

**(OH)**    *Recommendations: Speculative BUY/BUY*

| Coup | Desc | Rec | Mat | Amt | Ratings | NC Date* | NC Price | Price | YTW | Spread |
|------|------|-----|-----|-----|---------|----------|----------|-------|------|--------|
| 7.875% | Sr Notes | Spec Buy | 3/1/04 | $125.0 | Caa2/CCC | NA | NA | 69 | 23.00% | 3027 |
| 8.125% | Sr Notes | Buy | 3/1/09 | $175.0 | Caa2/CCC | NA | NA | 58 | 19.65% | 1521 |

*Market Capitalization as of 6/13/02 $63.9 million. 9.5 million shares outstanding @6.71/share

## Investment Thesis

*We are initiating coverage of Oakwood's 8 1/8% Sr Notes due March 2009 with a BUY recommendation and Oakwood's 7 7/8% Sr Notes due March 2004 with a Speculative BUY recommendation.*

We are initiating coverage of Oakwood's 7 7/8% Senior Notes due March 2004 with a **Speculative BUY** recommendation and Oakwood's 8 1/8% Senior Notes due March 2009 with a **BUY** recommendation. Given Oakwood's currently negative EBITDA and the uncertainty regarding the timing and extent of a rebound for the manufactured housing industry, our recommendation respects the real possibility of a restructuring when the 7 7/8% Notes mature in March 2004. However, we are forecasting improved operating results and a modest industry rebound in 2003, and in the worst case scenario of a restructuring we believe bondholders are covered based on asset value. Therefore, recognizing that the two issues are *pari passu*, we favor the long bond for its higher current yield. That said, for aggressive investors, we believe that the 7 7/8% Senior Notes due March 2004 represent an interesting opportunity, offering considerable potential upside, along with significant downside protection from the company's balance sheet and low near-term bankruptcy risk.

*For aggressive investors, we believe that the 7 7/8% Sr Notes due March 2004 represent an interesting opportunity, offering considerable potential upside, along with significant downside protection from the company's balance sheet and low near-term bankruptcy risk.*

While LTM EBITDA is negative, we believe asset protection covers net debt at par. We estimate liquidation value of the assets (see "Liquidation Analysis" schedule below) to be roughly $362 million. Discounted for one year at 20% creates a recovery value of $302 million—more than covering net debt of $291 million at par (pro forma for the $47 million income tax receipt in April). Oakwood also has substantial liquidity in the form of $26 million in cash and roughly $197 million available on its three credit facilities. Given this liquidity position and our expectation for positive free cash flow going forward, we believe a liquidity crisis before the 2004 maturity is unlikely.

Based on an expected modest seasonal up-tick in sales and the substantial margin improvements achieved by Oakwood's housing operations in the first half of the year, we are expecting positive EBITDA of $14.9 million in the second half. Although LTM EBITDA for the year will remain negative, this would be an important turning point for the company. In 2003, we are expecting a modest industry rebound, driven by a stronger economy, improved credit availability and a moderation of repossessions in the industry (repossessions are expected to absorb roughly 30% of demand in 2002). In this scenario, we anticipate better capacity utilization and less discounting. Moreover, we expect that the impact of Oakwood's significant fixed cost reductions will yield substantially improved profitability next year. Based on these assumptions and an expected moderation in loan assumption costs, we are forecasting $57 million of EBITDA, $47 million

**Trent Porter, CPA, CFA**
212.841.3023
trent.porter@americas.bnpparibas.com

of positive free cash flow (including a $26 million tax refund), and leverage at the end of the year of 4.9 times.

*In our view, the key risk is the potential impact of the repossession rate on free cash flow and earnings.*

In our view, the key risk is the potential impact of the repossession rate on free cash flow and earnings. As described in more detail within the body of this report, the current delinquency and repossession rate is significantly higher than historical levels as a result of industry-wide excesses in the mid-1990s. Oakwood's loan origination peaked in fiscal 1999 (at $1.36 billion) and has come down since then ($1 billion in 2000 and $840 million in 2001). Furthermore, credit standards were tightened significantly, beginning in 2000. However, loans are the most vulnerable to default in the second through fourth years following origination. During those years, the timing and severity of the default rate are highly unpredictable. (Our Conseco contact believes that years three through five are the most vulnerable—which would add even more uncertainty.) Therefore, we believe the cost of delinquencies associated with loans that originated in 1998 and 1999 will remain a "wild card" for at least another year.

## Business Description

*Oakwood designs and manufactures homes for sale through 238 company-owned and operated sales centers and a network of 700 independent sales centers throughout the U.S.*

Oakwood designs and manufactures homes for sale through 238 company-owned and operated sales centers and a network of 700 independent sales centers throughout the U.S. Additionally, the company offers consumer financing for the purchase of its homes, originating loans for roughly 75% of the homes sold through company-owned retail centers in 2001 and 38% of sales through independent dealers. Through its captive reinsurance company, Oakwood also offers property and casualty insurance to homebuyers.

## Investment Positives

### New Credit Facilities Provide Significant Liquidity

At the end of March, Oakwood had $26 million in unrestricted cash and roughly $197 million in aggregate availability (our estimate based on borrowing base calculations) on the company's three credit facilities. Our base-case projections for the rest of 2002 and full-year 2003 suggest that liquidity will be sufficient to fund operations and to provide a cushion against further cash burn in a downside scenario (our base case assumes positive free cash flow going forward). Oakwood's availability comes from three separate facilities, with a total of $305 million in aggregate commitments. The largest facility is a $200 million "loan purchase" facility with Credit Suisse First Boston ("CSFB"), maturing in 2004, which serves as a "bridge" facility to warehouse loans until securitization. Borrowing availability is based on the lessor of 81% of the loans held in the facility, or 100% of the loans less the percentage credit enhancement required by the rating agencies. Amounts available under the facility can be used for general corporate purposes. The second facility is a revolving credit facility with Foothill Capital (a unit of Wells Fargo), which matures in 2007. The revolver supports Letters of Credit—required as minimum reserves for the reinsurance business and for miscellaneous items such as workmen's compensation (roughly $45 million at the end of March). Availability, which is based on trade receivables and inventory, can otherwise be used for general corporate purposes. Finally, a $50 million "service advance" facility provides short-term liquidity for cash that Oakwood advances into real estate mortgage investment conduits ("REMICs") to cover temporary cash shortfalls arising from delinquent payments. The latter is a sole purpose facility to be used solely for the purpose of providing liquidity to the REMICs. Only the revolving facility with

Foothill carries financial covenants[1], which are reasonably flexible (including minimum EBITDA and tangible net worth).

### Asset Protection Covers Notes

Although the notes are unsecured, our rough liquidation analysis suggests that Oakwood's balance sheet assets will provide significant downside protection in the event of a restructuring. In fact, after taking what we believe to be conservative haircuts on net current assets and long-term assets (see "Liquidity Analysis" schedule below), we arrive at a liquidation value of $362 million. Discounted at 20% for one year, recovery value would be $302 million, covering net debt of $291 million at par (pro forma the $47 million tax refund received in April)[2]. As mentioned above, we believe that the greatest risk in this analysis is uncertainty regarding costs relating to repossessions—which could lead to negative free cash flow and ballooning debt, in a worst-case scenario. We should also point out that we expect substantial short-term swings in the level of net debt related to the timing on loan securitizations. However, these temporary swings will be offset from the perspective of the asset protection analysis by increases in loans held for sale.

### Restructuring Substantially Complete; Positioned for Profitable Operations

*We believe that Oakwood's negative cash flows and high loan assumption costs have obscured the improving results of the company's core housing business.*

We believe that Oakwood's negative cash flows and high loan assumption costs have obscured the improving results of the company's core housing business. While housing has been operating at a loss over the past five quarters, gross margins and SG&A have shown steady improvement, due to cost savings and more efficient capacity utilization. Gross margins for housing in the fiscal second quarter improved to 24.4% from 19.1% a year ago—despite slightly lower sales—and SG&A as a percent of sales improved to 30.8% from 34.9% a year ago (in dollars, a $9.4 million savings for the quarter). As a result of Oakwood's significant restructuring activities we believe that the housing operations are now positioned for profitable operations going forward after five quarters of negative results.

By closing four and idling eight[3] manufacturing plants and through curtailing production at the 20 remaining plants, the company has drawn down inventories by $237 million of inventory from the peak in September of 1999. Inventories are now significantly more manageable with an average of roughly 17 units per sales center from a high of 30 units per center in 1999, however management targets further reduction of about 500 "floors" (a single-section unit has one floor, a double-section has two). The company has reduced its base of sales centers from a peak of 415 centers in 1999 to 238 at the end of the fiscal second quarter[4]. Since the fourth quarter of 1999, the company has laid-off 2,400 employees from manufacturing operations, corporate, finance and retail.

---

[1] Minimum EBITDA for the 9-month period ending 6/30/02 is $6 million. For the 12 month period ending 9/30/02, minimum EBITDA is $23.4 million. EBITDA for the purposes of the covenant allows for the add back of up to $35 million in loan assumption expenses (our EBITDA calculation does not add these back). The minimum EBITDA covenant will be reset at the end of fiscal 2002. The covenants also impose a maximum capex level of $14.5 million. Minimum tangible net worth ranges from $133 million to $136.5 million at end of fiscal 2002.

[2] Oakwood benefited from the Job Creation and Worker Assistance Act of 2002 (the "economic stimulus package," which Bush signed in March). The company expects to receive another $26 million in April 2003 as a result of the bill.

[3] Although capacity utilization at the 20 plants in operation is currently 60% or less, idling additional plants in order to improve absorption is problematic: an idled plant must be re-certified when brought online again—which can be time consuming and costly.

[4] The process of closing sales centers was particularly slow because of the problem of finding space for (or liquidating) inventory sitting on dealer lots that were to be closed. Clayton had a significant advantage over Oakwood in this respect, because of Clayton's significant ownership parks and land. This gave Clayton a place to store inventory and the option of renting rather than selling excess homes, which grants Clayton a further advantage with regard to repossessions, for the same reason.

CSFB-00363576

### Industry Upturn May be "Just Around the Corner"

*We are expecting an 18% rebound of new home shipments for the industry in 2003, driven by a strengthening of the economies in core demographic markets and a moderation of the repossession rate.*

We are expecting an 18% rebound of new home shipments for the industry in 2003, driven by a strengthening of the economies in core demographic markets and a moderation of the repossession rate. Notwithstanding the near term impact of turmoil in the financial side of the business and continued weakness in key demographic sectors, industry insiders agree that structural demand for manufactured housing is as strong as it has ever been (or actually increasing). Moreover, after industry-wide rebalancing over the past 32 months, industry fundamentals are nearing equilibrium. Manufacturers have collectively reduced capacity by more than 30%. The number of dealers in the industry has come down from a high of 9,500 in June of 1999 to less than 6,000 at the end of 2001. The remaining dealers have been able to significantly draw down inventories on their lots, improving industry-wide inventory levels (from 94,000 new units in June 1999 to 65,000 at the end of February 2002). While we speculate that further inventory reduction will be necessary, manufacturers are still limiting production; we believe that inventory will be in line by year-end. Furthermore, an anticipated moderation of repossessions in the industry next year (driven by economic recovery and the staggered effects of lower loan origination volume and tightened credit standards beginning in 2000) could go a long way toward driving new unit sales improvement. To put this in perspective, there were roughly 90,000 repossessions in 2001 (versus a "normal" rate of approximately 25,000), and the same is expected in 2002—absorbing more than 30% of demand. Based on our survey of industry insiders and a review of loan origination patterns, we expect repossessions to moderate to roughly 65,000–70,000 in 2003.

### Vertical Integration Increases Competitive Advantage

*Oakwood's wholesale unit sales growth has significantly outpaced industry growth over the past two quarters—increasing 25% in the December quarter and 17% in the March quarter.*

Oakwood's wholesale unit sales growth has significantly outpaced industry growth over the past two quarters—increasing 25% in the December quarter and 17% in the March quarter. This compares to 4.2% year-over-year industry growth in the December quarter and flat year-over-year industry sales in the March quarter—suggesting that Oakwood has been gaining share. We suspect that this trend is primarily attributable to two factors related to the company's vertical integration. First, Oakwood's experience as an owner and operator of retail sales centers makes the company uniquely suited to address the challenges faced by independent dealers. Second, and possibly more important, is the issue of financing. As scores of consumer lenders have exited the business (GreenPoint, CIT and Bombardier, to name a few significant recent withdrawals), independent dealers must scramble to line up financing for prospective homebuyers. However, Oakwood's dealers and a select number of the dealers that have signed exclusive selling agreements with Oakwood, have a ready and uninterrupted source of financing. Furthermore, as one of only three vertically integrated companies in the business (Clayton and Palm Harbor are the other two), we suspect that Oakwood leads the industry in migrating toward more land-home loans,[5] which can be accomplished with significantly better terms than those of chattel loans. Because of these factors, we believe that Oakwood-affiliated dealers have an edge over their competitors.

# Investment Concerns

### Repossession Rate Presents "Wild Card" Risk to Cash Flow and Liquidity

Fallout from lax credit standards in 1997 and 1998 and economic weakness in core demographic sectors will keep near-term delinquency rates (and repossession rates) high and somewhat unpredictable, despite tightened credit standards

---

[5] See the Business Overview section on page 10 for a more detailed explanation of land-home loans.

CSFB-00363577

**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

and a recovering economy. Consensus holds that the repossession rate will level off at 90,000 repossessions, equal to 2001. However, while loan origination peaked in 1998 for the industry overall, Oakwood's loan origination peaked in 1999—suggesting that Oakwood's "leveling-off period" may lag behind that of the industry. Although it is widely accepted that loans are most vulnerable to default in years two through four following the origination of the loan, the timing and the severity of the default rate during this period is highly volatile and unpredictable. Furthermore, the high percentage of loans outstanding within the industry attributable to customers at the lower end of the credit spectrum creates an added layer of uncertainty with respect to the severity of the repossession rate.

The costs of repossessions are manifold (at the end of March, Oakwood's delinquency rate was 5.1%, compared to an average of 1.7% for the six years prior to the industry collapse in 1999). First, repossessions flooding the market cannibalize a portion of the new-home market (expected to absorb 30% of demand in 2002) and depress resale values of used homes. Second, greater perceived risk could result in rating agencies demanding heightened credit enhancement for future securitizations, REMIC investors may require higher returns, and lower-rated bonds may be harder to sell. All of the latter consequences would negatively impact cash flows associated with Oakwood's securitization program. *It is worth noting, however, that all 15 manufactured housing REMIC upgrades (due to better-than-expected performance) by Moody's over the past 18 months have been Oakwood deals, according to our Moody's contact.* As a liquidity provider to the REMICs, Oakwood may be obliged to advance cash intra-month to cover cash shortfalls in the REMICs due to borrower delinquencies.[6] Because the cost of repossessions is netted out of a REMIC's residual cash flows, high repossession rates (and declining recovery values) impair the value of Oakwood's retained interests. Most importantly, costs associated with Oakwood's loan assumption program[7] (whereby Oakwood finds a new home buyer to take over a defaulted loan as a cheaper alternative to repossession) results in current cash charges. These charges can be significant: they amounted to more than $20 million in the March quarter.

### Industry Weakness Persists Despite Economic Recovery

In spite of the gradual recovery in the overall economy, weakness in key demographic sectors for the manufactured housing industry—and turmoil on the financing side of the business—will continue to hamper the industry recovery in the near term. The relatively high unemployment rate (the overall U.S. unemployment rate fell from 6% to 5.8% in May, but remains high by historical standards) has a disproportionate impact on lower-income consumers—who are the primary purchasers of manufactured homes. Furthermore, certain sub-sectors of the economy (such as the textile industry) that employ significant numbers of the industry's target market continue to flounder. Although the manufacturing sector overall posted its fourth consecutive month of growth in May, manufacturing employment has continued to decline—albeit at a more moderate pace. (For the three-month period from February 2002 through April 2002, an average of 137,000 manufacturing jobs were lost.)

Financing remains another obstacle to recovery—at least in the very near term. Conseco—a major lender on both sides of the business, which has been reducing

*Weakness in key demographic sectors for the manufactured housing will continue to hamper the industry recovery in the near term.*

---

[6] It is important to point out that Oakwood provides liquidity, but is not a credit enhancer. Advances will be returned within 15 days; however, the need to make higher-than-expected advances could hurt short-term liquidity.

[7] In theory, Oakwood could discontinue this program at any time and could opt to allow all repossession costs to run through the REMICs, thereby incurring significantly less near term "out of pocket" cash expenses. However, we believe that a certain level of loan assumptions is necessary to offset the potential long-term cost of a reactive tightening in the REMIC market.

CSFB-00363578

its exposure to floor plan financing for at least a year—was the latest financial institution to announce its withdrawal from the floor plan financing side of the business (effective 31 March 2002). Conseco currently provides at least 25% of the $3 billion in floor plan financing within the industry. Although other lenders are expected to fill the vacuum (major lenders such as Bombardier, Deutsche, Transamerica and Textron are likely candidates), we suspect that the transition will continue to act as a drag on sales in the near term. The consumer lending side of the business has been equally ravaged: since 1995, Access Financial Corp., INDYMAC Inc., United Financial Companies and Deutsche Financial Services have left the business. The exodus continued unabated in the first quarter of 2002, with three key lenders announcing their withdrawal—including GreenPoint Financial (formerly the number two lender in the industry), Bombardier and CIT. As a result of these trends, industry sales were extremely disappointing, at 13.7 thousand units (modestly above February sales, but down 17.7% year-over-year), and the seasonally adjusted sales total for March was 166,000—a new low. Alarmingly, this marks the first time in decades that March sales fell below January sales. (March is traditionally the beginning of the "selling season," as the warmer weather begins.)

## Repurchase Agreements are Important Contingent Liability

*Under the terms of repurchase agreements with various financial institutions that provide floor plan financing to independent dealers, Oakwood is required to repurchase homes sold to the dealers in the event that the dealers default on the floor plan.*

Under the terms of repurchase agreements (customary within the industry) with various financial institutions that provide floor plan financing to independent dealers, Oakwood is required to repurchase homes sold to the dealers in the event that the dealers default on the floor plan. At the end of March, Oakwood estimated its total potential liabilities to be roughly $108 million (which appears reasonable in relation to inventory on the balance sheet). In a healthy industry environment, we believe that this risk would be immaterial, as it is spread over at least 700 independent dealers. However, given the current environment and the mass exodus of retailers from the business (more than 800 dealers have folded over the past several years), this contingency must be taken seriously. Possibly more importantly, in mid-May, Conseco (a major floor plan lender in the industry, which is exiting the commercial financing side of the business) sent a letter to the dealers to which it lends, demanding full payment of their floor plans by 17 July 2002. According to the Conseco letter, failure to make full payment by the deadline (or to enter into an acceptable workout plan) would constitute default, and Conseco would then be "obligated to notify the respective manufacturers of the repurchase obligation." We anticipate that this issue will be resolved without significant repurchases by Oakwood, as other third-party lenders are likely to step in and carry the Conseco loans. Furthermore, as the third-largest manufacturer in the industry, we believe that Oakwood will hold enough sway with its dealer network to compel these dealers to liquidate inventories—at reduced prices, if necessary—to avoid "putting" homes back to Oakwood.

# Industry Overview

*The manufactured housing industry has endured a painful contraction since the middle of 1999.*

**Rapid Industry Expansion in the Mid-1990s** — The manufactured housing industry has endured a painful contraction since the middle of 1999. The trouble arguably originated in the mid 1990s, when financial lenders such as Conseco and Green Tree Financial Corp. dramatically increased the money flow into the industry by tapping the asset-backed securities market to monetize commercial and consumer loans. High interest margins in the industry (according to the S&P, typical margins are 300 basis points or more) and access to the asset-backed market attracted scores of new sub-prime lenders into the market[8] Fierce

---

[8] Significant new entrants in the mid 1990s included lenders such as Access Financial Lending Corp., United Financial Companies, Bombardier Capital Inc., INDYMAC Inc. and the joint venture set up between Oakwood Acceptance Corp. and Deutsche Financial Services Corp.

CSFB-00363579

**BNP PARIBAS**
HIGH YIELD RESEARCH

*Fierce competition encouraged lenders to chase business further down the credit spectrum to gain market share.*

*Oakwood's Crest Homes: Cedar Hill*



*Oakwood's Crest Homes: Richmond II - Plan 2009-2*



*Corrective measures taken over the past several years should benefit the industry over the longer term.*

*The developing trend toward real estate loans ("land-home loans") instead of home-only loans is a long-term positive for the industry.*

competition encouraged lenders to chase business further down the credit spectrum (and to significantly under-price the loans) to gain market share. The immediate result was "easy money." The number of independent dealers in the industry virtually tripled as abundant floor plan financing removed one of the few barriers to entry in the market. The dealer explosion fueled a rapid expansion of shipments as manufacturers cranked up production to fill the proliferating sales lots. To drive loan volumes, lenders also loosened credit on the consumer side of the business—making loans available to buyers with marginal or no credit, on lengthier terms and requiring minimal down payments.

**A Painful Contraction** — Beginning in the middle of 1999, the "house of cards" began to crumble. During the expansion, manufacturers built to capacity and shipped in order to satisfy dealer demand, but capacity and shipments outpaced customer demand. The resulting excess manufacturing capacity and inventory situation was exacerbated as lax credit standards resulted in significantly increased repossessions, adding used homes to the inventory excess. The substantial deterioration of collateral performance caused a number of lenders to fold or withdraw from the business and the remaining lenders significantly tightened credit standards and increased spreads on both the commercial and consumer lending fronts. As the "easy money" dried up, the independent dealer base shrank considerably—from a peak of approximately 9,000 in 1999 to roughly 5,000 in 2002. Sales plunged from a high of 372,000 homes shipped in 1998 to just 192,800 in 2001.

**Corrective Measures Taken Should Pay Off** — On the positive side, corrective measures taken over the past several years should benefit the industry over the longer term. Credit standards have been tightened substantially industry-wide, and the exodus of lenders from the industry reduces the incentive for the remaining lenders to make riskier loans. Manufacturers have collectively closed more than 50 plants. As mentioned above, the dealer base has shrunk to a more reasonable level. Manufacturers have dramatically reduced production in plants still in operation, and inventories have been drawn down industry-wide—from 88,000 homes at the end of 1999 to 62,000 homes at the end of 2001. Before 1999, manufacturers as a group had very little visibility to the level of inventories at retail—now, an investment in better MIS systems allows companies this critical insight. While there is still more to be done, progress made to date should result in a significantly healthier manufactured housing industry over the long run.

**Trend Toward Real Estate Financing is a Long-Term Positive** — The developing trend toward real estate loans ("land-home loans") instead of home-only loans is a long-term positive for the industry. Industry insiders estimate that real estate loans comprised 50% of new home loan funding in 2001 (up from 20% in 2000), and this is expected to grow to 70% in 2003. We attribute this trend to a number of factors, including the growth of higher price-point multi-section homes (if consumers are going to pay that high a price, they might as well buy the land, too). Possibly more important is the impact of recent credit tightening on interest rates for manufactured housing. Homes financed with a real estate component can qualify for significantly lower interest rates than would be charged for a home-only loan, due to the added security.

Manufactured homes situated on owned land appreciate (manufactured homes on leased property are generally depreciating assets). Because of this feature, homeowners build equity faster as the land and home appreciate. Studies have shown that buyers who own the land and the home are significantly less likely to

CSFB-00363580



default than those who lease the land. Recovery in the event of a repossession is significantly higher when land is bundled in the loan, because the home does not depreciate—and because the home does not have to be moved.

In short, the trend toward land-home leases will ultimately increase demand in the industry by making financing more available and affordable. This should also result in lower default rates and higher recovery rates on the defaults.

*We suspect that Oakwood's vertical integration gives the company a leg up with respect to the migration toward land-home loans.*

We suspect that Oakwood's vertical integration gives the company a leg up with respect to the migration toward land-home loans. While land-home loans are available with significantly better terms than chattel (home only) loans, the transition requires training, operational changes and a philosophical shift on the part of the dealers. For a sale financed with a chattel loan, a salesperson can expect to receive a commission within two weeks of the sale; whereas, commissions on a land-home loan can take up to two months or more. The salesperson must also handle added responsibilities, such as appraisal and title work, and processing the loan is much different. Because of Oakwood's control over its company-owned dealer network and the company's ability to originate these loans in-house, we believe that Oakwood will be better able to push this change through the organization.

**Modern Manufactured Homes Defy Stereotypes** — It is worth briefly discussing manufactured housing in general, in order to clear up some common misconceptions. First, manufactured housing is a significant sub-sector of the overall housing industry, accounting for more than one-third of all housing starts in the U.S. In 1999, according to the Manufactured Housing Institute ("MHI"), approximately 7.6% of the U.S. population lived full-time in 8.9 million manufactured homes. Contrary to popular belief, the vast majority of manufactured homes are never moved, once they are situated—and 65% of manufactured homes are placed on private property (as opposed to manufactured home communities or parks).

*Modern manufactured houses bear little resemblance to the stereotypical mobile homes often depicted in Hollywood "trailer parks."*

The industry has come a long way since its inception in the early 1900s; modern manufactured houses bear little resemblance to the stereotypical mobile homes often depicted in Hollywood "trailer parks." By way of definition, a manufactured home is one that is built in a factory and then transported to a site and installed. Because of the economies of scale and efficiencies that can be realized by factory construction, manufactured homes are significantly more affordable than "stick-built" homes (homes built on the site). According to the latest data compiled by the MHI, the average price of a manufactured home (excluding the cost of land) is roughly $43,800, compared to $136,400 for a home built on-site.

*HUD-sponsored inspectors visit each plant at least every other day to ensure that construction quality is up to code.*

As a consequence of the Federal Manufactured Home Construction and Safety Standards Code (the "HUD Code"), which became law in 1976, manufactured home builders must adhere to strict federal standards regulating design and construction, strength, durability, transportability, fire resistance, energy efficiency and quality. The code also sets standards for the performance of heating, plumbing, air conditioning, and thermal and electrical systems. According to the plant manager who conducted our tour, HUD-sponsored inspectors visit each plant at least every other day to ensure that construction quality is up to code. Everything from the space between nails to the amount of insulation is subject to regulation and inspection.

CSFB-00363581



*Modern manufactured homes offer design features such as vaulted ceilings, fireplaces, walk-in closets, recessed floors, skylights, wrap-around decks and even spas.*

Innovations (such as hinged roofs that can be folded for transport) have overcome many of the obstacles presented by the need to deliver homes over interstate highways. Modern manufactured homes offer design features such as vaulted ceilings, fireplaces, walk-in closets, recessed floors, skylights, wrap-around decks and even spas. We walked through a number of single-section, double-section (opposing halves of the house are built separately and joined at the site) and two-story homes.

*We found the higher-end two-story homes to be indistinguishable from comparable site-built homes.*

Our impressions were as follows: we found the higher-end two-story homes to be indistinguishable from comparable site-built homes. The double-section homes we toured were hung with vinyl walls instead of sheet rock, and the resulting "seamed" appearance of the interior stuck out as an oddity. However, sheet rock is an optional choice for all manufactured homes (there are also as many options for the exteriors, such as brick, shingle or stone facades). Were it not for the vinyl walls, we believe that the double-section homes would also have been virtually indistinguishable from site-built homes, both inside and out. The plant manager assured us that the construction of the homes in terms of materials used and basic design is identical in most respects to "stick-built" homes. From the outside, the single-section homes do appear somewhat boxy, simply because of the rectangular shape (reminiscent of a trailer). However, the interiors are surprisingly spacious and include such amenities as large master bathrooms and walk-in closets. All the homes we toured included modern GE appliances.

## Competitive Landscape

The retail side of the manufactured housing industry is highly fragmented, with the five largest players controlling only 26% of the market. Manufacturing, however, is substantially more concentrated around the large manufacturers: the top 10 manufacturers account for roughly 79% of total wholesale shipments, and the top 25 manufacturers account for 91% of the market. Because the top seven companies are public, we provide a brief snapshot of each company's operations in the table below:

| Comparison of Public Manufactured Home Builders | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | Ticker | a/o date | Units Sold | | Dollar Sales | Sales Centers Owned | Plants in Operation |
| | | | Retail | Wholesale | | | |
| Champion Enterprises | CHB | 12/21/2001 | 7,578 | 39,351 | 1,548,225 | 218 | 49 |
| *Note: Champion made a recent foray into the consumer leasing business with its April purchase of CIT for $5 million.* | | | | | | | |
| Fleetwood Enterprises | FLE | 6/30/2001 | 36,201 | 12,752 | 1,291,681 | 188 | 28 |
| *Note: Fleetwood is also the nation's largest manufacturer of RVs.* | | | | | | | |
| Oakwood Homes | OH | 9/30/2001 | 9,889 | 13,227 | 1,005,120 | 238 | 20 |
| Clayton Homes | CMH | 9/30/2001 | 9,119 | 10,804 | 849,157 | 297 | 20 |
| *Note: Clayton is the most integrated player in the business. In addition to manufacturing, retail, own Finance and insurance, Clayton also owns a number of housing "communities." Clayton's finance subsidiary is Vanderbilt Mortgage & Finance* | | | | | | | |
| Palm Harbor Homes | PHHM | 3/29/2002 | 1,640 | 8,298 | 627,380 | 151 | 15 |
| *Note: Palm Harbor is also integrated w/ manufacturing, retail, insurance and a consumer finance sub (Country Mortgage)* | | | | | | | |
| Skyline Corp. | SKY | 6/30/2001 | 10,664 | | 353,610 | 0 | 18 |
| *Note: Skyline is also a manufacturer of RVs.* | | | | | | | |
| Cavalier Homes | CAV | 12/21/2001 | 12,669 | | 348,235 | 5 | 14 |
| *Note: Cavalier's consumer finance sub buys notes from dealers and resells them to financial institutions.* | | | | | | | |

CSFB-00363582

## Business Overview

*By integrating manufacturing, retail, insurance and financial services, Oakwood Homes is a "one-stop shop" for prospective homebuyers.*

Oakwood is one of only three fully integrated companies in the manufacturing industry (Clayton Homes and Palm Harbor are the others). By integrating manufacturing, retail, insurance and financial services, Oakwood Homes is a "one-stop shop" for prospective homebuyers. With 20 manufacturing plants operating in 11 states and a sales presence in 48 states, Oakwood literally serves manufactured housing markets from coast to coast.

### Housing

**Factory-Built Homes** — As described above, Oakwood's homes are manufactured in "assembly-line" fashion within home-building plants. The iron trailer used for transport purposes becomes a permanent part of the home's foundation (minus the axle and tires). After the floor is "lagged" onto the trailer, the home is built inside-out and in sections. Oakwood manufactures virtually every component, from cabinetry to countertops. Appliances such as ranges, ovens, dishwashers, washing machines, dryers, central heating and air conditioning systems are supplied by GE. Besides the economies of scale advantages over comparable "stick-built" homes, the assembly-line process offers significant efficiency benefits. For example, since "stick-built" homes are constructed from the ground up, work must be done in stages; whereas, in a factory environment, the floor, walls, roof and even plumbing and electrical infrastructure can be built somewhat concurrently. Because of this, a manufactured home can be completed within a week. At a minimum, finished homes include a living room, dining room, kitchen, one to four bedrooms, one or two bathrooms, a hot water heater and central heating.

*Besides the economies of scale advantages over comparable "stick-built" homes, the assembly-line process offers significant efficiency benefits.*









**Brands Claim Little Meaning** — Oakwood's homes are marketed through the "Oakwood," "Freedom," "House Smart," "Golden West," "Schult," "Crest," "Marlette" and "Victory" brands. However, there is little product differentiation within manufactured housing in terms of quality, technology, amenities or even design; therefore, brand names carry little weight in this industry. Furthermore, "model years" mean nothing—so new home inventory generally does not depreciate. The competitive battle is waged almost exclusively at the dealer level. The average prospective homebuyer will visit five to six lots (competitive sales centers are generally clustered together in a manner similar to auto malls) before selecting a home based on price, availability of desired models and design features, availability and terms of financing, and the persuasive skills of the salesperson.[9]

*There is little product differentiation within manufactured housing in terms of quality, technology, amenities or even design; therefore, brand names carry little weight in this industry.*

**Wholesale: Lower Margin, but Quicker Cash Cycle** — Prior to the acquisition of Schult (purchased for $101.1 million in April 1998), Oakwood sold only 10% of its homes through independent dealers. Because Schult (formerly the eighth-largest builder of manufactured homes in the U.S.) historically sold primarily through independent dealers, Oakwood's wholesale sales now account for 35%–40% of total housing sales. Of the network of 700 independent dealers through which Oakwood sells, roughly 150–200 dealers offer Oakwood products exclusively (the remainder provide products from several manufacturers). Oakwood offers consumer financing to customers purchasing Oakwood products through independent dealers that have signed exclusive selling agreements with the company.

Because sales through Oakwood's company-owned sales centers ("retail sales") earn the manufacturing margin in addition to the retail markup, retail sales are significantly higher-margin than wholesale sales. For the second quarter, gross

[9] As a point of interest, the salesperson also handles every aspect of the home-buying experience for the customer, from finding a site for the home to getting a septic tank installed to handling building permits, if needed.

CSFB-00363583



*Homes sold wholesale are converted to cash 30–45 days more quickly than those sold retail.*

margins on retail sales were 30%, versus 17% for wholesale sales. However, because the independent dealer pays Oakwood for inventory upon delivery (independent dealers finance their inventories through floor plan agreements with third-party financial institutions), homes sold wholesale are converted to cash 30–45 days more quickly than those sold retail.

*Sales of multi-section homes have been steadily growing since their introduction in the early 1990s.*

**Multi-Section Homes Take Center Stage** — Sales of multi-section homes have been steadily growing since their introduction in the early 1990s. In 1994, Oakwood's sales of multi-section homes represented only 38% of unit sales. By 2001, this number had increased to 75%. Growth is driven primarily by customer preference—a multi-section home is not only at least twice as large as a single-section home, but it is also closer to a "stick-built" home in appearance. The average price of a multi-section home at retail was $55.7 million in 2001, compared to $30.6 million for a single-section home.

*Sales in this industry are skewed toward the warmer months.*

**A Seasonal Business** — Because of the difficulty in placing homes on frozen ground and the outdoor nature of touring dealer lots in search of a home, sales in this industry are skewed toward the warmer months. Traditionally, December, January and February are the slowest months; sales begin to pick up in March, with the strongest sales in the summer months. Interestingly, consumer defaults are also seasonal. Delinquency rates are highest around Christmas, as the less stable homeowners put off installment payments in order to buy Christmas presents. June is also historically a bad month for delinquency, as vacations interfere with installment payments.

**Consumer Finance**

*Oakwood provides financing for roughly 75% of its homes sold retail and 38% of its homes sold wholesale.*

**Sub-Prime Lenders** — Oakwood provides financing for roughly 75% of its homes sold retail and 38% of its homes sold wholesale. Consumer finance operations fall within the purview of Oakwood's consolidated subsidiary, Oakwood Acceptance Corp ("OAC"). OAC processes credit applications using a proprietary scoring system, requiring a minimum score based on stability, income and credit history. ***Despite the proprietary scoring system, credit terms (as scored by a standard credit bureau system, which also must be disclosed to REMIC investors) are fairly uniform industry-wide.*** Although credit standards have tightened industry-wide, make no mistake about it, lenders to the manufactured housing industry are (almost by definition) sub-prime lenders. Manufactured home buyers are generally lower-income consumers[10] who could not afford (and wouldn't qualify for) the down payments and monthly installments required to mortgage a "stick-built" home. While the terms of the loans are comparable (20–30 years), down payments are lower (typically 5%–10%) and interest rates are substantially higher (ranging from 9%–18%)—to compensate for the higher risk and the lower balance (which makes the loans more expensive to service).

**Securitization Converts Loans to Cash** — OAC purchases originated loans from Oakwood (since the entities are consolidated, this is an inter-company transaction) and warehouses the loans until securitization (warehoused loans secure borrowings under OAC's "loan purchase facility"). Quarterly, the pools of loans (generally $150 million to $250 million, in the aggregate) are sold into a bankruptcy-remote special-purpose entity ("SPE") subsidiary of OAC in a transaction qualifying as an FAS 140 "sale." In other words, the SPE is not consolidated with Oakwood and the related assets are effectively transferred off

---

[10] A 1999 survey by Foremost Insurance Group (the largest insurer in the industry) provides detailed demographic information for manufactured housing owners: median income is $26,900, the average age is 53 years and 13% have bachelor's degrees.

CSFB-00363584



the balance sheet without booking an associated liability. In a similar transaction, the loans are again sold into a CSFB-owned SPE, which securitizes the pool of loans, funding the purchase by sales of REMIC trust certificates to third-party investors in the asset-backed securities market. In a manner similar to CMOs, principal and interest payments are carved into tranches with various risk, return and average life characteristics—thus appealing to a broader range of investors. Higher-rated tranches (typically 75% of the deals are AAA-rated) are "fast-pay" classes, which generally receive all principal and interest payments in the early years. As a credit enhancement, BB-rated subordinated classes are subject to a "lockout period," ranging from four to five years, during which time these classes will receive no cash flow. BB-rated bonds are generally 5% or less of the total deal, depending on how much credit enhancement is required by the rating agencies.

***OAC services all the loans it owns and generally services loans sold as well.***

**OAC Services the Loans** — OAC services all the loans it owns and generally services loans sold as well. For those loans sold that OAC services, the company earns a 1% servicing fee. As a servicer, the company is also provides liquidity to the REMICs in the form of a service advance. This means that on the 15th of the month, Oakwood will advance cash to the REMICs as needed to cover any cash shortfalls resulting from payment delinquencies. Any cash received by the RE-MIC is first used to return Oakwood's advance (which means that the advance is usually outstanding for 15 days or less). Oakwood funds these cash advances with availability on the company's $50 million service advance facility.

**Regular and Residual REMIC Interests Retained** — Until very recently, Oakwood retained a significant portion of the BB-rated REMIC bonds (so rated largely because of their subordination), which became significantly more difficult to sell in 1999 due to a "flight to quality". In 2001, the company sold $94.4 million of these bonds (almost all of its regular retained interests) for $72.9 million in cash. Since that time, the company has been able to sell all subsequent BB bonds and we believe there will continued to be a market for these bonds for the foreseeable future. Oakwood also retains residual interests in the REMICs, which are essentially equity interests in the leftover cash flows. Excess cash flows result from the spread between interest rates on the underlying loan and interest rates paid to investors, minus all servicing and repossession expenses.

### Reinsurance

***Oakwood offers to homebuyers property and casualty insurance through the company's captive reinsurance subsidiary, Tarheel.***

Oakwood offers to homebuyers property and casualty insurance through the company's captive reinsurance subsidiary, Tarheel. Policies are underwritten by the American Bankers Insurance Company ("ABI," an unrelated third party), and Tarheel reinsures the policies, effectively sharing 50% of the risks and premiums. Tarheel and ABI have jointly purchased further reinsurance protection for 95% of the losses incurred as a result of a single insured event up to $30 million. Any losses above $30 million (this would be a truly catastrophic event) are shared equally by Tarheel and ABI.

## Liquidity Analysis

As illustrated in the table below, we believe that we have taken some extremely conservative haircuts in appraising Oakwood's liquidation value:

### Inventories

***By far the largest contributor to value is new-home inventory.***

By far the largest contributor to value is new-home inventory, which we have haircut to 80% of cost. While this roughly approximates the typical "borrowing base" value allowed for a manufacturing company's bank facilities, we believe

CSFB-00363585



that this is an extremely conservative haircut. Because the "model year" for manufactured homes is irrelevant, new homes do not depreciate while at the sales center. The units in inventory are primarily display models and, therefore, they are not only furnished, but also "fully loaded" with features and amenities; nevertheless, these models are valued at an average cost per unit. Finally, average selling prices at wholesale for both single-section and multi-section homes actually increased in 2001 and came off only slightly in the first half of 2002—despite the substantial industry-wide new-home liquidation over the past several years. Therefore, we anticipate that Oakwood could reasonably expect to liquidate inventories at wholesale with at least a 15% margin, should the need arise.

**Recovery Rates on Used Inventory Have Significantly Devalued** — We believe that our used inventory haircut is also conservative: we estimate Oakwood's current recovery rate on repossessions at roughly 60%–65% at retail and roughly half that at wholesale. Assuming that at least half of Oakwood's used-home inventory would be sold at retail, a weighted average recovery rate of 40% would be a reasonable assumption. According to our contact at Conseco, that lender's average recovery rate has been 40%, selling the units through both wholesale and retail. According to our contact at GreenPoint, that company was averaging a 65%–70% loss rate on repossessions prior to shutting down (and had assumed that this figure would worsen to 80% afterward), as a result of liquidating the remaining inventory wholesale. Therefore, we have conservatively marked used inventory at 20% of cost (the lowest estimate we received). Given that current recovery rates are significantly depressed due to the flood of repossessions on the market, we believe that a liquidation occurring in 2004 would yield significantly higher recovery rates. (Historic recovery rates have been 70% at retail and 60%–65% at wholesale.) Furthermore, because of Oakwood's network of company-owned sales centers, Oakwood's recovery rate would likely be higher than GreenPoint's, even if the liquidation occurred today.

**Loans and Investments**
Our valuation of loans and investments is similarly conservative: we have haircut loans held for sale (the second-largest contributor to liquidation value) to 85% of carrying value. However, in that this balance represents warehoused loans pending securitization, a 15% haircut is extremely conservative. We haircut loans held for investment (generally BB-rated subordinated REMIC bonds) to 50% of value. However, Oakwood recently sold the majority of its BBB-rated subordinated bonds at 77%—and the buyers have expressed an interest in purchasing all of Oakwood's current and future subordinated REMIC bonds. Moreover, GreenPoint announced in March that after exiting the consumer financing side of the manufactured housing business, the company sold its entire portfolio of loans for a gain. Although residual interests are extremely difficult to value given their high sensitivity to numerous volatile variables, we believe an 80% haircut adequately captures this uncertainty.

**Other Assets**
The largest contributor to value in this line item is "Receivables from REMICs". These are out of pocket costs relating to repossessions paid by Oakwood that are fully reimbursable by the trust and are generally short term in nature. After income tax receivables, the next largest contributor is "Trade Receivables". These are short term receivables (generally 15 days or less) related to sales to wholesale dealers. Payment is funded by that dealers floor plan.

CSFB-00363586

**Liquidation Value Covers Net Debt Even in Downside Scenario**

To evaluate the sensitivity of this analysis to our assumptions, we have created an upside and a downside case by modifying several of our key assumptions. As illustrated in the following table, we believe that the liquidation value of Oakwood's balance sheet covers net debt at market even using the most conservative assumptions, providing significant downside protection to the notes. Our complete liquidation schedules are attached as Appendices A – C.

| Capitalization | Debt Face Value as of 3/31/02 | Price | Debt at Market |
|---|---|---|---|
| Revolving Facilities | 41,000 | 100 | 41,000 |
| Debentures | 16,000 | 100 | 16,000 |
| IRBs and Other | 6,912 | 100 | 6,912 |
| 7.875% Senior Notes due 2004 | 125,000 | 70 | 87,500 |
| 8.125% Senior Notes due 2009 | 175,000 | 58 | 101,500 |
| | | | |
| Total Debt | 363,912 | | 252,912 |
| *less Cash* | *-25,892* | | *-25,892* |
| Net Debt | 338,020 | | 227,020 |
| *less April Tax Refund* | *47,000* | | *47,000* |
| **Pro Forma Net Debt** | **291,020** | | **180,020** |
| | | | |
| Upside Case Liquidation Value | 400,622 | | 400,622 |
| Discounted 1 year at 20% | 333,852 | | 333,852 |
| *less Net Debt* | *291,020* | | *180,020* |
| **Excess Value (shortfall)** | **42,832** | | **153,832** |
| | | | |
| Base Case Liquidation Value | 362,144 | | 362,144 |
| Discounted 1 year at 20% | 301,787 | | 301,787 |
| *less Net Debt* | *291,020* | | *180,020* |
| **Excess Value (shortfall)** | **10,767** | | **121,767** |
| | | | |
| Downside Case Liquidation Value | 223,146 | | 223,146 |
| Discounted 1 year at 20% | 185,955 | | 185,955 |
| *less Net Debt* | *291,020* | | *180,020* |
| **Excess Value (shortfall)** | **-105,065** | | **5,935** |

## Outlook and Projections

*We are modeling a very modest seasonal up-tick in housing sales for Oakwood's fiscal third quarter.*

Given the surprising industry sales weakness in March and the anticipated dampening effect of the Conseco withdrawal on sales for the June quarter, we are modeling a very modest seasonal up-tick in housing sales for Oakwood's fiscal third quarter. For the June quarter, we are projecting a 1.8% year-over-year increase in total sales to $261.4 million. We are holding assumptions relatively flat sequentially with respect to the various components of consumer finance, insurance and other income revenues (ignoring the impact of non-cash impairment and valuation charges, as well as any gains or losses on securitization). In our projections, we have assumed that Oakwood sells roughly 5,600 units in the second quarter (roughly 12% of industry wide sales), with modest increases in units per company owned dealership and double-digit gains to independent dealers. As higher sales leverage the lower fixed costs, we have modeled modest sequential margin improvements for both integrated and wholesale sales, as well as for improvement in SG&A as a percent of sales. Additionally, we have modeled a moderation in costs associated with the loan assumption program (based primar-

CSFB-00363587

**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

ily on company guidance), assuming $11 million in charges for the quarter. For the quarter, we are estimating EBITDA of $2.2 million, based on these assumptions. This would make LTM EBITDA (as defined by the covenants for the Foothill facility) $7.7 million, which allows for the add-back of up to $35 million in loan assumption expenses—a $1.7 million cushion above the $6 million minimum for the quarter.

**For the full year ending 30 September 2002, we are projecting total sales of $1.05 billion and EBITDA of negative $8.7 million.**

For the full year ending 30 September 2002, we are projecting total sales of $1.05 billion, down 4% year-over-year. This is based on an assumed 185,000 new manufactured homes sold industry-wide for the year and a delayed seasonal uptick in sales (resulting in 27.5% of these sales occurring in the September quarter). We have modeled sequential margin improvement and SG&A improvement in the fourth quarter, based on higher capacity utilization and further operating leverage benefits. Based on these assumptions, we are projecting $12.7 million of EBITDA for the fourth quarter and EBITDA for the full year of negative $8.7 million. For the remainder of the year, we are modeling positive free cash flow of $43 million, driven primarily by the receipt of a $48 million tax refund in April. We are assuming CAPEX of roughly $14 million (maintenance CAPEX is roughly $5 million per year), cash interest of $31 million and a $10 million benefit from further inventory reductions.

For 2003, we are assuming an 18% improvement in industry shipments driven by a stronger economy, the creation of service sector jobs in the Midwestern and Southern regions (to replace lost manufacturing jobs) and a moderation of the repossession rate. Based on the modest industry rebound, we are projecting for Oakwood a 13.8% increase in total sales to $1.2 billion, significantly lower loan assumption expenses and further improved margins. Reflecting these improvements, our preliminary estimate for EBITDA is $56.6 million and we are forecasting $47 million of free cash flow. Our free cash flow estimate is based on projected cash interest of $29 million, capex of $12 million, a $5 million reduction in working capital for the year and a $26 million tax refund expected in April. This would bring net debt down to $277.3 million at the end of 2003, and leverage to 4.9 times.

CSFB-00363588



## Oakwood Homes Corporation
### 7 7/8% Senior Notes due 2004
### 8 1/8% Senior Notes due 2009

| | |
|---|---|
| **Amount** | $125 million outstanding on the 7 7/8% Notes due 2004<br>$175 million outstanding on the 8 1/8% Notes due 2009 |
| **Maturity Dates** | 7 7/8% Notes mature 1 March 2004<br>8 1/8% Notes mature 1 March 2009 |
| **Interest Payment Dates** | March 1st and September 1st |
| **Ranking** | The issues are *pari passu*, and also rank *pari passu* with all other unsecured and unsubordinated debt. Because the notes are unsecured, they are effectively subordinated to senior secured debt, which includes each of the three credit facilities described in the body of this report. |
| **Optional Redemption** | The notes of each issue are redeemable at any time, at a price that would "make whole" the noteholders, for remuneration that equals the principal plus the present value of all scheduled principal and interest payments through maturity (discounted at the Treasury rate plus 25 basis points). |
| **Secured Debt Limit** | Oakwood is not permitted to issue any debt secured by mortgage, pledge, security interest, lien or other encumbrance unless the notes are also ratably secured. Key exceptions to this provision include liens incurred to amend, renew, replace, extend, refund or refinance existing credit facilities—as long as the principal amount is not greater than the secured debt existing at the time such an action takes place. Liens for 365 days or less related to securitization of loans are also specifically excluded, as are liens to secure the purchase price of property or loan portfolios acquired. |
| **Change of Control** | In the event of a change of control, noteholders have the right to put the notes to the company at 101% of face value plus accrued interest. |

CSFB-00363589

 **BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

## Appendix A

### Liquidation Schedule, Base Case Assumptions

| | Carrying Value | Assumed % of Value Recoverable | Est. Liquidation Value |
|---|---|---|---|
| **Loans and investments:** | | | |
| Loans held for sale | 136,920 | 85.00% | 116,591 |
| Loans held for investment | 3,174 | 50.00% | 1,587 |
| Less Reserve for uncollectible loans ccvbl | -4,395 | 100.00% | -4,395 |
| Regular Retained Interests | 769 | 90.00% | 885 |
| Residual Retained Interests | 31,888 | 30.00% | 9,566 |
| **Other receivables:** | | | |
| Receivable from REMICs | 27,769 | 100.00% | 27,769 |
| Extensions Receivable | 25,988 | 30.00% | 7,796 |
| Trade Receivables | 25,352 | 90.00% | 22,817 |
| Escrow Advances Receivable | 12,546 | 100.00% | 12,546 |
| Insurance Premiums Receivable | 2,585 | 60.00% | 1,551 |
| Federal Income Taxes refundable | 26,000 | 100.00% | 26,000 |
| Other receivables | 21,823 | 30.00% | 6,547 |
| **Inventories:** | | | |
| New Manufactured homes | 152,058 | 80.00% | 121,646 |
| Used Manufactured Homes | 11,445 | 20.00% | 2,289 |
| Work-in-process, materials and supplies | 31,144 | 80.00% | 24,915 |
| Land/homes under development | 12,185 | 80.00% | 9,748 |
| **Properties and facilities** | | | |
| Land and improvements | 41,720 | 90.00% | 37,557 |
| Buildings and field offices | 134,745 | 70.00% | 94,322 |
| Furniture, fixtures and equipment | 124,557 | 45.00% | 56,051 |
| Leasehold Improvements | 25,619 | 0.00% | 0 |
| **Other assets** | | | |
| Goodwill | 16,247 | 0.00% | 0 |
| Prepaid expenses | 12,591 | 0.00% | 0 |
| Restricted Cash and Investments | 11,673 | 100.00% | 11,673 |
| Deferred Debt Issue Costs | 11,578 | 0.00% | 0 |
| Loan Servicing Costs | 7,661 | 0.00% | 0 |
| Deferred Insurance Policy Acquisition Costs | 4,299 | 0.00% | 0 |
| Intangibles from Schult Acquisition | 3,011 | 0.00% | 0 |
| Other | 10,299 | 0.00% | 0 |
| **Total Assets/Liquidation Value** | **952,273** | | **587,260** |
| **Less Current Liabilities:** | | | |
| Accounts payable and accrued liabilities | 209,863 | 100.00% | 209,863 |
| Insurance reserves and unearned premiums | 15,253 | 100.00% | 15,253 |
| **Total Liquidation Value** | **727,157** | | **362,144** |

*Callout (pointing to Federal Income Taxes refundable):* At 3/31/02 estimated income tax refundable balance was $72 million. $47 million was received in April. For this analysis, we assume $47 million was received 3/31/02 and net against debt.

*Note: Components of Other Rcvbles, Other Assets, Finished Homes Inventory and P,P & E*
*are estimated based on 9/30/01 values.*

CSFB-00363590

 **BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

## Appendix B

### Liquidation Schedule, Upside Case Assumptions

| | Carrying Value | Assumed % of Value Recoverable | Est. Liquidation Value |
|---|---|---|---|
| **Loans and investments:** | | | |
| Loans held for sale | 136,930 | 90.00% | 123,237 |
| Loans held for investment | 3,174 | 50.00% | 1,587 |
| Less Reserve for uncollectible loans avail | -4,395 | 100.00% | -4,395 |
| Regular Retained Interests | 1,769 | 50.00% | 885 |
| Residual Retained Interests | 31,883 | 20.00% | 6,378 |
| **Other receivables:** | | | |
| Receivable from REMICs | 27,769 | 100.00% | 27,769 |
| Extensions Receivable | 25,988 | 60.00% | 15,593 |
| Trade Receivables | 25,352 | 90.00% | 22,817 |
| Escrow Advances Receivable | 12,546 | 100.00% | 12,546 |
| Insurance Premiums Receivable | 2,585 | 70.00% | 1,810 |
| Federal Income Taxes refundable | 26,000 | 100.00% | 26,000 |
| Other receivables | 21,823 | 50.00% | 10,911 |
| **Inventories:** | | | |
| New Manufactured Homes | 152,058 | 90.00% | 136,852 |
| Used Manufactured Homes | 11,445 | 45.00% | 5,150 |
| Work in process, materials and supplies | 31,144 | 90.00% | 28,030 |
| Land, homes under development | 12,185 | 90.00% | 10,967 |
| **Properties and facilities** | | | |
| Land and improvements | 41,730 | 90.00% | 37,557 |
| Buildings and field offices | 134,746 | 70.00% | 94,322 |
| Furniture, fixtures and equipment | 124,557 | 45.00% | 56,051 |
| Leasehold Improvements | 25,619 | 0.00% | 0 |
| **Other assets** | | | |
| Goodwill | 46,247 | 0.00% | 0 |
| Prepaid expenses | 12,591 | 0.00% | 0 |
| Restricted Cash and Investments | 11,673 | 100.00% | 11,673 |
| Deferred Debt Issue Costs | 11,578 | 0.00% | 0 |
| Loan Servicing Costs | 7,661 | 0.00% | 0 |
| Deferred Insurance Policy Acquisition Costs | 4,299 | 0.00% | 0 |
| Intangibles from Schult Acquisition | 3,011 | 0.00% | 0 |
| Other | 10,299 | 0.00% | 0 |
| **Total Assets / Liquidation Value** | **952,273** | | **625,738** |
| | | | |
| Accounts payable and accrued Liabilities | 209,863 | 100.00% | 209,863 |
| Insurance reserves and unearned premiums | 15,253 | 100.00% | 15,253 |
| **Total Liquidation Value** | **727,157** | | **400,622** |

*Note: Components of Other Rcvbles, Other Assets, Finished Homes Inventory and P,P & E*
*are estimated based on 9/30/01 values.*

CSFB-00363591

**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

## Appendix C

### Liquidation Schedule, Downside Case Assumptions

| | Carrying Value | Assumed % of Value Recoverable | Est. Liquidation Value |
|---|---|---|---|
| **Loans and investments:** | | | |
| Loans held for sale | 136,930 | 75.00% | 102,698 |
| Loans held for investment | 3,174 | 20.00% | 635 |
| Less Reserve for uncollectible loans recvbl | -4,395 | 100.00% | -4,395 |
| Regular Retained Interests | 1,769 | 0.00% | 0 |
| Residual Retained Interests | 31,888 | 0.00% | 0 |
| **Other receivables:** | | | |
| Receivable from REMICs | 27,769 | 20.00% | 5,554 |
| Extension Receivable | 25,988 | 20.00% | 5,198 |
| Trade Receivables | 25,352 | 20.00% | 5,070 |
| Escrow Advances Receivable | 12,546 | 20.00% | 2,509 |
| Insurance Premiums Receivable | 2,585 | 20.00% | 517 |
| Federal IncomeTaxes refundable | 26,000 | 100.00% | 26,000 |
| Other receivables | 21,823 | 20.00% | 4,365 |
| **Inventories:** | | | |
| New Manufactured homes | 152,058 | 80.00% | 121,646 |
| Used Manufactured Homes | 11,445 | 20.00% | 2,289 |
| Work in process, materials and supplies | 31,144 | 80.00% | 24,915 |
| Land/homes under development | 12,185 | 80.00% | 9,748 |
| **Properties and facilities** | | | |
| Land and improvements | 41,730 | 90.00% | 37,557 |
| Buildings and field offices | 134,745 | 50.00% | 67,373 |
| Furniture, fixtures and equipment | 124,557 | 20.00% | 24,911 |
| Leasehold Improvements | 25,619 | 0.00% | 0 |
| **Other assets** | | | |
| Goodwill | 46,247 | 0.00% | 0 |
| Prepaid expenses | 12,591 | 0.00% | 0 |
| Restricted Cash and Investments | 11,673 | 100.00% | 11,673 |
| Deferred Debt Issue Costs | 11,578 | 0.00% | 0 |
| Loan Servicing Costs | 7,661 | 0.00% | 0 |
| Deferred Insurance Policy Acquisition Costs | 4,299 | 0.00% | 0 |
| Intangibles from Schult Acquisition | 3,011 | 0.00% | 0 |
| Other | 10,299 | 0.00% | 0 |
| **Total Assets/ Liquidation Value** | **952,273** | | **448,262** |
| | | | |
| Accounts payable and accrued liabilities | 209,863 | 100.00% | 209,863 |
| Insurance reserves and unearned premiums | 15,253 | 100.00% | 15,253 |
| **Total Liquidation Value** | **727,157** | | **223,146** |

*Note: Components of Other Recvbles, Other Assets, Finished Homes Inventory and P,P & E*
*are estimated based on 9/30/01 values.*

CSFB-00363592



**BNP PARIBAS** — HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

*(Full-page financial spreadsheet — "Oakwood Homes Income Statement" — with columns for 12 Mos Ended 9/30/1999, Actual 12 Mos Ended 9/30/2000, Actual quarterly periods 12/31/2000, 3/31/2001, 6/30/2001, 9/30/2001, 12 Mos Ended 9/30/2001, and subsequent actual/estimate quarterly and 12-month periods through 9/30/2003. Row labels include Revenue, Net sales, YOY Change, Financial Services Revenues, Contract Sales net of repurchase valuation, Insurance, Other income, Total Revenue, Cost of Sales, Gross Margin, Selling general and administrative expenses, Loan loss reserve, Insurance, Restructuring charge (recovery), Provision for losses on credit sales, Operating Income, EBITDA, EBITDA Margin, EBITDA (adjusted), Interest expense, and related items. Numeric data is too faded/low-resolution to transcribe reliably.)*

Source: company data, BNP Paribas

CSFB-00363593

**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

| Oakwood Homes Credit Stats | 12 Mos Ended 9/30/1999 | Actual 12 Mos Ended 9/30/2000 | Actual 12 Mos Ended 9/30/2001 | Actual 3 Mos Ended 12/31/2001 | Actual 3 Mos Ended 3/31/2002 | Estimated 3 Mos Ended 6/30/2002 | Estimated 3 Mos Ended 9/30/2002 | Estimated 12 Mos Ended 9/30/2002 | Estimated 12 Mos Ended 9/30/2002 |
|---|---|---|---|---|---|---|---|---|---|
| **Coverage:** | | | | | | | | | |
| LTM EBITDA / Interest | 2.66 | 0.95 | 0.01 | NA | NA | NA | NA | NA | 1.94 |
| LTM EBITDA less Capex / Interest | 1.55 | 0.45 | NA | NA | NA | NA | NA | NA | 1.53 |
| **Capitalization** | | | | | | | | | |
| Revolving Facility | 65,384 | 63,390 | 41,468 | 43,848 | 40,840 | 0 | 0 | 10,620 | 0 |
| Receivables | 4,602 | 11,193 | 36,581 | 30,089 | 16,698 | 0 | 0 | 0 | 0 |
| IEBs total (this) | 9,522 | 13,529 | 5,200 | 7,505 | 8,712 | 8,712 | 8,712 | 8,712 | 8,712 |
| 7.875% Senior Notes due 2004 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 |
| 8.125% Senior Notes due 2009 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 |
| **Total Debt** | 385,671 | 353,571 | 358,628 | 353,607 | 362,017 | 316,512 | 332,74 | 177,711 | 342,617 |
| Net cash | 16,531 | 32,251 | 44,566 | 36,617 | 23,392 | 45,900 | 32,991 | 20,061 | 36,617 |
| **Net Debt** | 372,036 | 321,306 | 326,871 | 316,900 | 338,030 | 330,603 | 340,600 | 340,602 | 377,344 |
| **Rolling Debt/LTM EBITDA** | | | | | | | | | |
| Revolving Facility | 0.44 | 1.38 | 40.98 | NA | NA | NA | NA | NA | 0.44 |
| Receivables | 0.05 | 0.63 | 35.21 | NA | NA | NA | NA | NA | 0.00 |
| IEBs and Other | 0.06 | 2.16 | 50.65 | NA | NA | NA | NA | NA | 0.32 |
| Senior Notes (both issues) | 3.62 | 9.05 | 473.74 | NA | NA | NA | NA | NA | 5.72 |
| Net Debt/LTM EBITDA | 4.02 | 8.95 | 418.27 | NA | NA | NA | NA | NA | 4.08 |

Source: Company data, BNP Paribas

CSFB-00363594


**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

**Oakwood Homes Cash Flow**

| | Actual 12 Mos. Ended 9/30/1998 | Actual 12 Mos. Ended 9/30/2000 | Actual 3 Mos. Ended 12/31/2000 | Actual 3 Mos. Ended 3/31/2001 | Actual 3 Mos. Ended 6/30/2001 | Actual 3 Mos. Ended 9/30/2001 | Actual 12 Mos. Ended 9/30/2001 | Actual 3 Mos. Ended 12/31/2001 | Actual 3 Mos. Ended 3/31/2002 | Actual 3 Mos. Ended 6/30/2002 | Actual 3 Mos. Ended 9/30/2002 | Actual 12 Mos. Ended 9/30/2002 | Actual 12 Mos. Ended 12 Mos. |

*Free Cash Flow:*

EBITDA

Interest

Taxes

Change in Working capital

**Free Cash Flow**

*Operating Cash Flow Adjustments:*

...

**Adjusted FCF from Operations**

*Cash flow from Other Operating Activities:*

...

**FCF from Operations**

*Other Investing activities:*

...

*Other Financing activities:*

...

**Net change after cash in all paid cash transactions**

Source: Company data, BNP Paribas

CSFB-00363595

**BNP PARIBAS**
HIGH YIELD RESEARCH

Oakwood Homes Corporation — 14 June 2002

## Unclassified Balance Sheet

| Assets | 9/30/1999 | 12/31/1999 | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/01 | 3/31/2002 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $22,525 | $29,450 | $28,366 | $31,252 | $22,533 | $32,518 | $18,530 | $20,063 | $13,286 | $10,02 | $26,812 |
| Loans and investments | 522,896 | 394,803 | 291,725 | 383,191 | 322,166 | 362,352 | 329,198 | 296,913 | 277,403 | 1991068 | 197,700 |
| Other receivables | 113,466 | 77,344 | 87,447 | 80,473 | 113,466 | 92,903 | 103,046 | 96,210 | 214807 | 157,846 | 184,563 |
| Inventories | | | | | | | | | | | |
| Manufactured homes | 272,628 | 341,950 | 315,555 | 309,642 | 272,628 | 237,964 | 227,514 | 203,491 | 204,980 | 143,643 | 148,568 |
| Work-in process, materials and supplies | 35,847 | 43,975 | 39,544 | 39,464 | 35,847 | 32,266 | 24,334 | 30,068 | 30,643 | 27,962 | 31,344 |
| Other inventory related items | 12,728 | 14,775 | 15,504 | 14,472 | 12,728 | 13,703 | 11,528 | 14,374 | 13,779 | 12,973 | 13,545 |
| Total inventory | 123,941 | 399,750 | 190,563 | 354,518 | 123,943 | 284,680 | 267,032 | 249,831 | 225,372 | 249,562 | 399,832 |
| Property, plant and equipment | 241,805 | 221,580 | 249,277 | 260,154 | 241,805 | 224,574 | 236,063 | 225,284 | 235,708 | 252,967 | 204,336 |
| Deferred tax net assets | | 25,579 | 31,137 | 40,526 | | | | | | | |
| Other assets | 126,513 | 155,048 | 144,196 | 145,193 | 126,513 | 125,493 | 130,443 | 131,768 | 116,464 | 124,081 | 107,366 |
| Total Assets | 11,146,772 | 1,323,818 | 11,284,691 | 11,073,835 | 11,146,772 | 11,311,529 | 1,390,471 | 1,380,471 | 1,322,290 | 928,210 | 1,077,618 |

| Liabilities & Shareholders' Equity | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Short-term borrowings | $6,599 | $130,075 | $45,049 | $53,064 | $65,505 | $124,291 | $8,0,980 | $52,541 | $8,3,041 | | $41,646 |
| Notes and loans payable | 529,724 | 547,780 | 542,418 | 338,730 | 529,724 | 625,134 | 526,657 | 525,615 | 523,520 | 3,0,623 | 522,512 |
| Accounts payable and accrued liabilities | 201,868 | 208,015 | 216,955 | 228,625 | 201,868 | 216,813 | 227,156 | 214,523 | 230,058 | 246,082 | 207,061 |
| Insurance reserves and deferred premiums | 84,932 | 75,850 | 74,554 | 46,483 | 43,695 | 39,555 | 18,529 | 17,337 | 17,539 | 15,566 | 15,533 |
| Deferred income taxes | 6,568 | | | | 6,568 | 7,505 | 7,925 | 1,114 | 6,109 | 8,848 | 9,595 |
| Other long-term obligations | 39,846 | 26,046 | 26,134 | 50,473 | 35,866 | 14,942 | 31,245 | 522,892 | 50,750 | 50,213 | 50,215 |
| Shareholders' equity | | | | | | | | | | | |
| Common stock, $.50 par value, (no. of shares) | | | | | | | | | | | |
| shares authorized, 9,520,945 and 9,526,848 | | | | | | | | | | | |
| share issued and outstanding | 23,532 | 23,562 | 23,562 | 23,562 | 4,710 | 23,847 | 23,629 | 4,764 | 4,764 | 4,764 | 4,764 |
| Additional paid-in capital | 160,742 | 171,111 | 170,155 | 170,055 | 160,508 | 189,496 | 190,438 | 189,898 | 199,368 | 199,364 | 199,364 |
| Retained earnings | 494,946 | 311,512 | 279,896 | 287,444 | 204,144 | 165,073 | 133,555 | 83,721 | 21,477 | 98,655 | 89,801 |
| Accumulated other comprehensive income | 7,623 | 5,973 | 10,633 | 7,002 | 7,423 | 6,912 | 7,733 | 17,742 | 9,522 | 10,588 | 10,625 |
| Treasury stock | 101 | 2,692 | 11,438 | 3,942 | 101 | 2,569 | 57,548 | 1,726 | 251 | 1,131 | 94,619 |
| **Total Liabilities and Shareholders' Equity** | 11,146,772 | 1,323,818 | 11,284,691 | 11,073,835 | 11,146,772 | 11,311,529 | 1,390,471 | 1,380,471 | 1,322,290 | 928,210 | 1,077,618 |

Source: Company data, BNP Paribas



## GLOBAL HIGH YIELD GROUP

www.bnpparibas.com

**Global Head of High Yield**
Kathryn Swintek
New York: 1.212.841.3014 / London: 44.207.595.3789
kathryn.swintek@americas.bnpparibas.com

| | New York | London |
| --- | --- | --- |
| | The Equitable Tower | 10 Harewood Avenue |
| | 787 Seventh Avenue | London NW1 6AA |
| | New York, NY 10019 | United Kingdom |

**U.S. High Yield Research**

John Maxwell, Head of U.S. High Yield Res. (Gaming/Lodging/Leisure/Thr.) .1.212.841.2676   john.maxwell@americas.bnpparibas.com
Barbara E. Meehan, Sr Analyst (Consumer Prod./Food & Bev./Healthcare; ...1.212.841.2768   barbara.meehan@americas.bnpparibas.com
Mat Chyra, Analyst (Energy/Healthcare) ...................................................1.212.841.2645   matthew.chyra@americas.bnpparibas.com
Gregg M. Klein, Analyst (Auto Suppliers/Gaming/Motorsports/Packaging) ...1.212.841.2545   gregg.klein@americas.bnpparibas.com
Trent Porter, CPA, CFA, Analyst (Special Situations) .............................1.212.841.3023   trent.porter@americas.bnpparibas.com
Mathew Zucker, Analyst (Media/Telecom) ..............................................1.212.841.2842   matthew.zucker@americas.bnpparibas.com
Group Fax ..........................................................................................1.212.841.2695/2655

**European High Yield Research**

Mark Hughes, Head of European High Yield Res. (Chemicals/Packaging) ....1.212.841.3951   mark.hughes@americas.bnpparibas.com
Aiaz Shaikh, Sr Analyst (European Telecoms and Media) ......................44.207.595.8607   aiaz.shaikh@brpparibas.com
Pilar Manzanaro, Analyst (European Telecoms and Media) ....................44.207.595.8597   pilar.manzanaro@bnpparibas.com
James Nolan, Analyst (Industrial) .........................................................44.207.595.8909   james.nolan@bnpparibas.com
Oleksiy Soroka, Analyst (Food/Consumer Products/Publishing/Retail) ......44.207.595.4878   oleksiy.soroka@bnpparibas.com
Group Fax ..........................................................................................44.207.595.5206

**U.S. High Yield Sales & Trading**

David Atkinson, Head of Sales .............................................................1.212.841.2520   david.atkinson@americas.bnpparibas.com
Andrew Brummer, Sales .......................................................................1.212.841.2612   andrew.brummer@americas.bnpparibas.com
Thomas Champion, Sales ....................................................................1.212.841.2990   thomas.champion@americas.bnpparibas.com
Jim Glanzer, Sales ..............................................................................1.212.841.2623   jim.glanzer@americas.bnpparibas.com
Bryan Sanders, Sales ..........................................................................1.212.841.2639   bryan.sanders@americas.bnpparibas.com
Robert Lambert, Trader .......................................................................1.212.841.2215   robert.lambert@americas.bnpparibas.com
John Mitchell, Trader ..........................................................................1.212.841.2475   john.mitchell@americas.bnpparibas.com
Group Fax ..........................................................................................1.212.841.3930

**European High Yield Sales & Trading**

Kelly Gromoll, Head of Sales ...............................................................44.207.595.8678   kelly.gromoll@bnpparibas.com
Manuela Roth-Daglio, Sales ................................................................44.207.595.8141   manuela.roth-daglio@bnpparibas.com
Chris Shepherd, Sales .........................................................................44.207.595.8592   chris.shepherd@bnpparibas.com
Andrei Korolev, Trader ........................................................................44.207.595.8350   andrei.korolev@bnpparibas.com
Deepali Misra-Sharp, Trader ...............................................................44.207.595.8552   deepali.misra-sharp@bnpparibas.com
Group Fax ..........................................................................................44.207.595.5206

**High Yield Capital Markets**

John Ong, Head of High Yield Capital Markets ...................... 44.207.595.3656/1.212.841.3517   john.ong@brpparibas.com
Tanneguy de Carne ............................................................................44.207.595.6478   tanneguy.decarne@bnpparibas.com
David Barcus ......................................................................................1.212.841.3157   david.barcus@americas.bnpparibas.com
Konstantin Driker ..............................................................................1.212.841.3069   kdriker@americas.bnpparibas.com
Ponty Singh .......................................................................................44.207.595.6494   ponty.singh@bnpparibas.com
Arnaud Tresca ....................................................................................44.207.595.3268   arnaud.tresca@bnpparibas.com
Igor Goverdovsky ...............................................................................44.207.595.6468   igor.goverdovsky@bnpparibas.com
Guillaume Cendrier .............................................................................1.212.841.3149   guillaume.cendrier@bnpparibas.com
London Group Fax ..............................................................................44.207.595.5596
New York Group Fax ...........................................................................1.212.841.3183

**Research Production**

William T. Johnson, Head of Publishing ................................................1.212.841.2271   william.johnson@americas.bnpparibas.com
Andy Fosberry, European Publishing .....................................................44.207.595.8655   andy.fosberry@bnpparibas.com



BNP Paribas Securities Corp. 787 Seventh Avenue, New York, New York 10019 Tel 212.841.2000
BNP Paribas is incorporated in France with Limited Liability. Registered Office 16 boulevard des Italiens, 75009 Paris
BNP Paribas is regulated by the FSA for the conduct of its investment business in the United Kingdom and is a member of the London Stock Exchange.
BNP Paribas London Branch is registered in England and Wales under No. FC13447. Registered Office. 10
Tel +44 (0) 20 7595 2000  Fax +44 (0) 20 7595 2555  www.bnpparibas.com

This report was produced by a BNP Paribas group company. BNP Paribas Securities Corp. accepts responsibility for this report in circumstances where it was distributed to U.S. persons. This report has been approved for publication in the United Kingdom by BNP Paribas London Branch, a branch of BNP Paribas whose head office is in Paris, France. BNP Paribas London Branch is regulated by the Financial Services Authority ('FSA') for the conduct of its investment business in the United Kingdom and is a member of the London Stock Exchange. BNP Paribas Securities Corp. is a subsidiary of BNP Paribas and a member of the BNP Paribas group. BNP Paribas Securities Corp. is a member of the NASD and is registered as a broker dealer with the U.S. Securities and Exchange Commission.

The information and opinions contained in this report have been obtained from public sources believed to be reliable, but no representation or warranty, express or implied, is made that such information is accurate or complete and it should not be relied upon as such. This report does not constitute a prospectus or other offering document or an offer or solicitation to buy any securities or other investment, and is not intended to provide the sole basis for any evaluation of the instruments discussed herein. All estimates and opinions included in this report constitute our judgements as of the date of this report and are subject to change without notice. BNP Paribas Securities Corp., BNP Paribas and their affiliates collectively 'BNP Paribas') may make a market in, or may, at any time, have a long or short position in, the securities mentioned in this report, including options, futures or other derivative instruments based thereon. BNP Paribas may, from time to time, solicit, perform or have performed investment banking, underwriting or other services (including acting as adviser, manager, underwriter or lender) within the last three years for any company referred to in this report and may to the extent permitted by law, have acted upon or used the information contained herein, or the research or analysis upon which it is based, before its publication. This report is for the use of intended recipients and may not be reproduced (in whole or in part) or delivered or transmitted to any other person without the prior written consent of BNP Paribas Securities Corp and BNP Paribas.

This report is prepared for professional investors and is not intended for Private Customers in the United Kingdom as defined in FSA rules and should not be passed on to any such persons.
By accepting this document you agree to be bound by the foregoing limitations. ©BNP Paribas (2002). All rights reserved.

# EXHIBIT E

United States

Global
Equity
Research

www.ubswarburg.com/researchweb

In addition to the
**UBS Warburg** web site
our research products are available
over third-party systems
provided or serviced by:
Bloomberg, First Call, I/B/E/S, IFIS,
Multex, QUICK and Reuters



# U.S. Manufactured Housing

## The Perfect Storm... But When Will it End?

- The industry continues to be hindered by excess retail inventory, tightened lending standards, and increased repossessions.

- We believe manufactured housing is in the fifth or sixth inning of the current downturn and that shares of the four companies we view as "survivors" will continue to be depressed until a clear light at the end of the tunnel emerges.

**Trip Rodgers**
+1-212-821-4668
trip.rodgers@ubsw.com

**Bilal Basrai**
+1-212-821-2312
bilal.basrai@ubsw.com



# Contents

                                                                                    page

Highlights ..................................................................................................3

   — Introduction .....................................................................................4

   — Rise and Fall of Manufactured Housing ......................................4

The Perfect Storm .....................................................................................9

   — Storm 1 — Excess Retail Inventory ...........................................9

   — Storm 2 — Tightened Lending Standards ...................................9

   — Storm 3 — More Repossessed Homes .....................................12

All About Financing ..................................................................................13

Light at the End of the Tunnel? ...............................................................15

The "Haves" and the "Have Nots" ...........................................................20

   — Clayton Homes .........................................................................20

   — Palm Harbor Homes ..................................................................20

   — Champion Enterprises ...............................................................21

   — Fleetwood Enterprises ...............................................................21

   — Site-Built Players ......................................................................22

Securitization Market ...............................................................................23

   — Why the Securitization Market is Important ...............................23

   — How it Works ............................................................................23

   — Accounting ................................................................................23

   — Current Market Conditions ........................................................24

Big Picture Problems ...............................................................................25

   — Penetration of Urban and Suburban Markets ...........................25

   — Marketing Sophistication ..........................................................27

   — Operating Sophistication ...........................................................27

   — Industry Data ............................................................................29

Valuation ..................................................................................................30

# Highlights

- We believe the past decade for manufactured housing has been nearly a text book example of the industry life cycle, consisting of development (pre-1990s), expansion (1992-1996), maturity (1997-1999), and decline (1999-present).

- The industry, in our opinion, is hampered by three primary issues: (1) excess retail inventory, stemming from an overabundance of retail dealers; (2) tightened lending standards at the consumer and wholesale segments; and (3) increasing levels of repossessed homes.

- We believe the rise and fall of manufactured housing over the past decade have been largely functions of financing standards. Lax financing standards in prior years appear to have artificially inflated retail demand and wholesale shipments, boosted the number of repossessed homes, and encouraged retailers to increase the number of homes in inventory.

- We believe nearly 1,500 retail locations have exited the market and that another 1,000 stores or more must be closed before an equilibrium is reached.

- As a result of retail closings and manufacturers' efforts to reduce their contingent liabilities, the number of excess units at retail appears to have fallen from 50,000 to approximately 20,000 over the past 16-18 months.

- Approximately 70 plants have been closed or mothballed, representing more than 20% of the industry's prior capacity. We expect another 25-30 facilities to close in the short term and wholesale shipments to fall 26% in 2000 and another 7% in 2001.

- The current downturn should (and is already) separate the "haves" from the "have nots." We believe Clayton Homes, Palm Harbor Homes, Champion Enterprises, and Fleetwood Enterprises are likely to survive the downturn and emerge from it in better positions vis-à-vis their peers.

- Spreads in the securitization market for manufactured housing mortgages have improved somewhat in recent periods as lending standards have tightened.

- Bigger picture problems for the industry, in our opinion, include: (1) small penetration of the urban and suburban housing markets; (2) low levels of sophistication in marketing and operations for much of the industry; and (3) lack of available industry data.

- We believe stock valuations for the four companies we view as "survivors" will remain depressed until a clear light at the end of the tunnel materializes. This could be a year away, in our view.

## Introduction

On August 18, 1999, we published a report discussing the rather dismal state of the manufactured housing industry titled "The Wheels Have Fallen Off." As a result of worsening industry conditions since that time, if the proverbial wheels had fallen off then, currently, the whole chaise has probably been dismantled. The industry's troubles in 2000 have been largely the same as those ailing it a year ago. Nevertheless, over the past several months, these problems have intensified drastically, with severe financial and operational consequences for all players.

## Rise and Fall of Manufactured Housing

To appreciate where the industry is today, we believe it is important to understand the changes it has gone through over the past decade. In our opinion, the manufactured housing industry in recent years has been nearly a text book example of the industry life cycle. As such, we believe it is sensible to view its history in four stages.

### Stage 1 — Development (pre-1990s)

The beginning of manufactured housing industry dates back to the 1920s, when travel trailers were originally introduced. The product slowly evolved during the next several decades, becoming less mobile and more commonly used as primary housing. Still, it was not until the late 1980s/early 1990s that the product was truly transformed and given the appearance of a traditional single-family home, rather than a mobile trailer.

**The product slowly evolved in the pre-1990s decades, becoming less mobile**

Congress passed the National Mobile Home Construction and Safety Standards Act (also known as the HUD code) in 1974. This legislation, which became effective in June 1976, made mobile homes the only form of private and single-family building subject to federal regulation. Later, the federal Housing Act of 1980 mandated the use of "manufactured housing" (factory-built homes) to replace "mobile homes" in all federal law and literature for homes built since 1976.

Manufactured housing shipments went through peaks and troughs in the pre-1990 decades, remaining somewhat closely inline with U.S. economic prosperity and general housing start levels. (See Chart 1.) However, comparisons over the decades are far from an apples-to-apples basis, given the vast product changes made over the years. (The nearly 600,000 units the industry sold in 1971 probably resembled the image most people have of "mobile homes," rather than the look of today's manufactured house.)



**Chart 1: Manufactured Housing Shipments and Percentage of Single Family Homes Sold**

Shipment comparisons over the decades are far from an apples-to-apples basis

Source: National Conference of States on Building Codes and Standards, U.S. Census Bureau, and UBS Warburg LLC estimates

At the end of the development stage, profits for most producers were sparse. This largely related to a general economic recession and, more specifically, to the lingering effects of a severe downturn in the economy of Texas, which has historically been the largest market for the industry. (In the second half of the 1980s, the number of operating plants in Texas shrank from more than 50 to six.)

### Stage 2 — Expansion (1992-1996)

**Manufactured homes were significantly upgraded in the late 1980s to early 1990s**

The appearance of manufactured homes was upgraded significantly in the late 1980s to early 1990s. In addition to an increase in the average unit size, a vast number of improvements and amenities became available in most models. Such options include pitched roofs, sky lights, crown molding, high-quality carpets, upscale cabinets and counter tops, his and her baths, spacious closets, master baths, whirlpools, and even porches and garages.

We believe this quality improvement, combined with more available financing opportunities and pent-up demand from the then recent economic downturn (particularly in Texas), resulted in the spike in shipments in the early 1990s. Between 1991-1996, industry shipments grew at an annual rate of 16.3%.

**ROE for the public players rose dramatically in the early to-mid 1990s**

The rise in shipments, in turn, led to dramatically improved financial results for the players in the industry, particularly the better-capitalized public members, who were able to significantly expand their markets during this time. For the public players, return on equity expanded from nearly 5% at the beginning of the 1990s to approximately 18% by 1997.

Chart 2: Average Return on Equity for Manufactured Housing Companies



Source: FactSet and company reports

## Stage 3 — Maturity (1997-1999)

**A retail inventory buildup on a per store basis led to lower wholesale shipments in 1997**

The manufactured housing industry experienced slowing profit growth between 1997-1999. This slowdown was largely sparked by a blip in industry shipments in 1997, when wholesale unit volumes fell 3%. Importantly, this decline resulted mainly from a retail inventory build-up on a per-store basis, unlike the more recent aggregate inventory bulge.

**Several large acquisitions were made in 1996-1998**

At the same time, several of the larger manufacturers shifted somewhat from strategies of greenfield expansion and small, bolt-on acquisitions, to larger consolidation moves. Such sizable acquisitions included Champion's merger with Redman Industries (1996), Centex Corporation's purchase of Cavco Industries (1997), Cavalier Home's merger with Belmont Homes (1997), and Oakwood Home's acquisition of Schult Homes (1998).

Possessing vertically integrated operations also became widely recognized as the preferred business model during this time. This occurred as some of the larger pure manufacturers began to recognize the benefits of also maintaining dedicated retail distribution outlets, as well as the opportunity to capture margin dollars at multiple stages. Branching into other forms of integration (i.e., financing, communities, insurance) was largely avoided by the expanding manufacturers, as such operations were generally left to the traditional players in those areas.

**Champion and Fleetwood aggressively expanded into retail in 1998 and 1999**

In our view, the most significant vertical integration moves in the industry undoubtedly were made by Champion and Fleetwood (the No. 1 and No. 2 manufacturers) in 1998 and 1999. Champion was the first of the two to seek retail ownership by aggressively acquiring 173 retail locations in 13 months (in addition to greenfielding more than 60 stores) and quickly becoming the industry's third largest dealer (behind Oakwood and Clayton).

Largely as a consequence of Champion's retail purchases (including the acquisition of many independent Fleetwood dealers), Fleetwood made its own move to integrate. We note that this decision was far from unanimous at the company and ultimately was a key reason for the resignation of its founder. However, despite

U.S. Manufactured Housing   December 5, 2000

internal disagreements, Fleetwood began to acquire retailers in 1997 and jumpstarted its effort by purchasing Homes USA (a rollup of independent retailers that had recently gone public) for $162 million in July 1998.

**Table 1: Selected Manufactured Housing Acquisitions, 1996-1999**

| Company | Date | Acquisition | Revenues of Target At Time of Acquisition | Description | Purchase Price Paid * |
|---|---|---|---|---|---|
| American Homestar (HSTR) | | | | | |
| | Jul-96 | Heartland Homes and Macu-Fac Homes | $21.2 million | 1 plant and group of retailers in N.C. | $8.5 million |
| | Sep-96 | Guerdon Homes | $100 million | 4 plants in OR,ID,NE, MS | NA |
| | Jun-97 | Brilliant Holding Corp. | $75 million | 3 plants in AL | $19 million |
| | Jun-97 | N.C. Mobile Home Corp. | $18-$20 million | 11 retail locations in NC and 1 in VA | $4.5 million |
| | Jul-96 | R-Anell Homes | $78 million | 2 plants in NC, producing high-end man.homes and modular homes | $50 million |
| | Jul-98 | First Value | $24 million | 2 retail sales centers in NC, modular and manf. homes | |
| | Sep-98 | DWP (Pacific Holdings) | $57 million | 7 retail centers in OR,WA,N.M. | $19 million |
| Cavalier Homes (CAV) | | | | | |
| | Aug-97 | Belmont Homes | $234 million | 11 plants in the Southeast and Texas | $76.7 million |
| Centex Corp (CTX) | | | | | |
| | Dec-98 | Cavco Industries | $130 million | 3 plants in AZ and 1 in NM | $76.2 million |
| | Feb-98 | AAA Homes | $40 million | AZ largest retailer | NA |
| Champion Enterprises (CHB) | | | | | |
| | Mar-96 | Grand Manor | $91 million | 1 plant in GA | $33 million |
| | Apr-96 | Homes of Legend | | 3 plants in AL | |
| | Oct-96 | Redman Industries | $648 million | 18 plants mainly in South and Southwest U.S. | $327 million |
| | Jan-Feb-98 | Southern Showcase, Accent Homes, Advantage Homes | $195 million | 55 retail locations in Carolinas, VA, TX, CA, and TN | NA |
| | Mar-98 | Manufactured Home Buyers | $80 million | 23 retail locations in TX, OK, NM | NA |
| | Apr-98 | Homes America Group | $65 million | 25 retail locations in AZ, CA, ID, NV, OR, OK, UT, WY | NA |
| | Jun-98 | Tom Terry Enterprises | | 3 retailers in NV | NA |
| | Jun-98 | ICA Group | $97 million | 23 retailers in TX, AZ, OK, NM, CO | NA |
| | Sep-98 | Trading Post, Kentuckybilt, and Premier Homes | $50 million | 14 retailers in KY and IN | NA |
| | Nov-98 | Homes of Merit | $120 million | 8 plants in Florida | 4-6x trailing EBITDA |
| | Jan-99 | Heartland Homes Group | $30 million | 9 retailers in TX | NA |
| Fleetwood Enterprises (FLE) | | | | | |
| | Jul-98 | Home USA | $200 million pro-forma | 9 independent national retail companies | $162 million |
| Kevco (KVCO) | | | | | |
| | Feb-97 | Consolidated Forest Products | $90 million | Manf. house wood roofs, facilities in AL and TN | $13.87 million + debt |
| | Feb-97 | Bowen Supply | $40 million | Distributes manf. housing and RV components | $19.5 million |
| | Dec-97 | Shelter Components | $446 million | Wholesale distributor and manufacturer of building products | $136.6 million |
| Oakwood Homes (OH) | | | | | |
| | Jan-98 | Schult Homes | $384 million | 16 plants in 7 states | $101 million |
| | Jan-99 | Suburban Homes Sales | $25 million | Retailer in metro-Detroit | NA |
| Southern Energy (SEHI) | | | | | |
| | Dec-97 | A&G Homes | $19.4 million | 7 retailers in SC | $6.5 million |
| | Apr-98 | Rainbow Homes | NA | 5 retailers in KY and 2 in WV | NA |

* Total consideration paid, estimated in some case

Source: Company reports and UBS Warburg LLC estimates

## Stage 4 — Decline (1999-Present)

**Through October, wholesale volumes were down 26%, with retail sales off an estimated 18%**

Since mid-1999, the manufactured housing industry has experienced a dramatic drop in wholesale shipments, retail sales, and, most importantly, profits in general. Through October, industry wholesale volumes were down 26% and retail unit sales were off an estimated 18%. As a result, many public players have reported significant losses in earnings in recent quarters, with only a few companies (Clayton, Palm Harbor, and Nobility) currently in the black. In the remainder of this report, we discuss the industry's current difficulties and its chances for improvement in upcoming periods.

## Table 2: Third Quarter and Year-to-Date Comparisons

|  | 3q00/3q99 | 3q00/3q98 | YTD 00/YTD 99 | YTD 00/YTD 98 |
|---|---|---|---|---|
| **Cavalier Homes (CAV)** |  |  |  |  |
| Revenues | -48.6% | -55.6% | -44.8% | -42.9% |
| Operating EPS | -975.0% | -234.6% | -419.4% | -274.2% |
| Reported EPS | -488.9% | -234.6% | -606.5% | -337.9% |
| Equity | -25.5% | -30.3% |  |  |
| **Champion Enterprises (CHB)** |  |  |  |  |
| Revenues | -28.3% | -26.4% | -22.4% | -10.3% |
| Operating EPS | -126.7% | -114.0% | -99.2% | -99.3% |
| Reported EPS | -33.3% | -114.0% | -98.9% | -99.3% |
| Equity | 0.5% | 17.2% |  |  |
| **Fleetwood Enterprises (FLE)** |  |  |  |  |
| Revenues | -25.7% | -15.3% | -9.3% | 46.0% |
| Operating EPS | -147.2% | -139.5% | -74.1% | -69.5% |
| Reported EPS | -231.9% | -210.5% | -105.1% | -106.0% |
| Equity | -1.8% | 30.7% |  |  |
| **Nobility (NOBH)** |  |  |  |  |
| Revenues | -18.9% | -33.6% | -31.8% | -8.9% |
| Operating EPS | 30.0% | -37.8% | -34.9% | -31.6% |
| Reported EPS | 44.4% | -37.8% | -23.8% | -21.8% |
| Equity | 3.3% | 14.6% |  |  |
| **Clayton Homes (CMH)** |  |  |  |  |
| Revenues | -10.8% | -4.4% | -9.6% | 2.0% |
| Operating EPS | -16.0% | -6.3% | -12.9% | 0.8% |
| Reported EPS | -16.0% | -6.3% | -12.9% | 0.5% |
| Equity | 11.6% | 22.4% |  |  |
| **Palm Harbor Homes (PHHM)** |  |  |  |  |
| Revenues | -9.2% | -7.9% | -8.3% | -2.6% |
| Operating EPS | -24.4% | -22.7% | -28.5% | -19.9% |
| Reported EPS | -24.4% | -22.7% | -28.5% | -19.9% |
| Equity | 12.7% | 29.6% |  |  |
| **American Homestar (HSTR)** |  |  |  |  |
| Revenues | -27.4% | -11.1% | -19.8% | -2.5% |
| Operating EPS | -5100.0% | -266.7% | -320.9% | -204.4% |
| Reported EPS | -725.0% | -266.7% | -867.6% | -386.8% |
| Equity | -30.2% | -5.7% |  |  |
| **Oakwood Homes (OH)** |  |  |  |  |
| Revenues | -20.0% | -38.5% | -21.9% | -33.3% |
| Operating EPS | 278.7% | -435.8% | 2466.7% | -420.6% |
| Reported EPS | 36.9% | -435.8% | 147.8% | -420.6% |
| Equity | -22.9% | -26.0% |  |  |
| **Southern Energy (SEHI)** |  |  |  |  |
| Revenues | -30.7% | -46.1% | -31.4% | -38.6% |
| Operating EPS | -271.4% | -166.7% | -155.3% | -133.3% |
| Reported EPS | -52.0% | -166.7% | -883.3% | -174.6% |
| Equity | -11.2% | -15.9% |  |  |
| **Kevco (KVCO)** |  |  |  |  |
| Revenues | -34.8% | -42.1% | -29.2% | -30.9% |
| Operating EPS | -50.5% | -1500.0% | -25.6% | -301.2% |
| Reported EPS | -66.7% | -1500.0% | -47.7% | -301.2% |
| Equity | -78.6% | -85.9% |  |  |
| **Patrick Industries (PATK)** |  |  |  |  |
| Revenues | -23.1% | -24.5% | -16.3% | -15.0% |
| Operating EPS | -52.2% | -76.1% | -76.9% | -79.0% |
| Reported EPS | -52.2% | -76.1% | -154.6% | -149.6% |
| Equity | -11.6% | -6.5% |  |  |
| **Drew Industries (DW)** |  |  |  |  |
| Revenues | -6.0% | -14.8% | -10.2% | -8.7% |
| Operating EPS | -71.1% | -71.1% | -50.0% | -44.2% |
| Reported EPS | -71.1% | -71.1% | -50.0% | -44.2% |
| Equity | -4.8% | 21.3% |  |  |

Source: Company reports

# The Perfect Storm

In the 2000 movie "The Perfect Storm," a New England fisherman, played by George Clooney, leaves port with crew below clear skies, only to be caught hopelessly in the center of three converging, fateful storm systems. Not counting the traditional associations of trailers and high-wind storms, we believe the film is largely symbolic of the current environment for manufactured housing.

Similar to the movie, we believe that, over the past 12-18 months, the manufactured housing industry has been hit by three primary issues, or "storms," any of which would be significantly deleterious in its own right.

## Storm 1 — Excess Retail Inventory

**Excessive inventory levels have resulted from an overabundance of retail locations**

Unlike the 1997 inventory buildup that occurred on a per-store basis, the current retail inventory bulge exists on an aggregate level. As such, the primary cause of the buildup has been an overabundance of retail locations.

**Barriers to entry at retail were extremely low for much of the 1990s**

Because of extremely lax lending standards relating to inventory (floor-plan) financing, the barriers to entry at retail for much of the 1990s were virtually nil. In fact, in many cases, new retailer owners (many of whom had no prior experience in running a business and simply had been successful salespeople at another store) were required to put up little, if any, collateral to finance $500,000 or more in inventory. Furthermore, the new dealers then were often supported by rebates and up-front incentives from the manufacturers, largely encouraging them to maintain heightened inventory levels. We note that easy access to floor-plan financing also motivated many existing lot owners to expand their number of locations.

**We estimate that the number of retail locations approximately doubled by 1999 to 9,500**

As a result of low barriers to entry at retail, the number of store locations in the industry exploded in the middle to late 1990s. Although we are not aware of any source that tracks (accurately) the level of retail locations, we estimate the number of lots approximately doubled in five to seven years and totaled 9,500 by 1999. As a consequence, many markets that had once been supported by only a few dealers quickly possessed two to three times that figure.

## Storm 2 — Tightened Lending Standards

Over the past year, the manufactured housing industry has seen a dramatic tightening of lending standards at both the consumer and wholesale (floor-plan financing) levels.

**Recent tightening of credit has resulted from a lower number of lenders**

Much of this tightening has resulted from a contraction in the number of lenders in the industry. Just as financing availability grew dramatically because of the growing number of lenders during the industry's expansion, in recent quarters, a shrinkage of credit sources has led to a less competitive financing arena and to much greater lending scrutiny by the remaining players. Additionally, the poor performance of low-quality loans made in prior years (largely 1997-1998) has served as a wake-up call to lenders that tighter standards are needed.

**Lower retail sales are prolonging the current inventory correction**

Although some pundits think that lenders have overreacted somewhat in their recent credit tightening, we believe the current stricter lending environment is much needed, given the harm that prior years' loose standards have caused. Still, while raising the credit bar should be healthy for the industry in the long term, currently, it is compounding the other dilemmas affecting it. Most notably, lower retail sales resulting from the tighter standards are prolonging today's much needed inventory correction.

It appears that most of the remaining lenders now use the well known Fair Isaac (or Beacon®) scoring system for rating mortgage applications. Beacon scores (also called FICO scores) range from 375 to 900, with higher scores representing lower credit risk. Approximately 30 factors are used to determine FICO scores. These factors can be categorized into five areas: (1) payment history; (2) outstanding debt; (3) credit history; (4) pursuit of new credit; and (5) types of credit in use. Minimum acceptable FICO scores differ by lender. Charts 3-4 show the national distribution of FICO scores (for all groups) and delinquency rate by score.

**Minimum acceptable FICA scores have increased significantly for most remaining lenders**

During the loose credit years of 1997-1998, a score as low as 550 (often representing someone with substantial credit card debt, a prior bankruptcy, or poor credit quality in general) could, in many cases, qualify for a new home purchase with as little as 5% down. Conversely, today the minimum acceptable score for most lenders is above 600, and as high as 650 in many cases. (We note that the minimum acceptable score largely depends on the size of the downpayment, with scores of 600 and slightly above currently typically requiring 15%-20% down.)

**Chart 3: National Distribution of FICO Scores**



Source: Fair, Isaac and Company, Inc.

U.S. Manufactured Housing    December 5, 2000

**Chart 4: Delinquency Rates by FICO Score**



Source: Fair, Isaac and Company, Inc.

**Banks in general appear to have significantly tightened credit to many corporate customers**

On the wholesale financing side, fewer lenders have also been a primary cause of the tighter standards. Additionally, banks in general have appeared to tighten credit to many corporate customers. The November Federal Reserve Senior Loan Officer Survey showed a net 43.8% of banks tightening lending standards to large and medium-size firms. This compares with 33.9% in the August survey, 36.4% in the mini-credit crunch in 1998, and 56.9% before the 1990 recession.

**Chart 5: Net Percentage of Banks Reporting Tightening Business Lending Standards Over Previous Quarter**



Source: Federal Reserve Board

**The current retail shakeout appears to have been accelerated by tighter wholesale credit**

Tighter wholesale lending standards have appeared to accelerate the current retail dealer shakeout. This has particularly been the case following the exit of the Associates (formerly a major wholesale lender) from the manufactured housing lending business early in 2000. Similar to tightening in consumer credit, we believe stricter wholesale financing standards, and the resulting retail fallout, are positives in the long run for the industry. However, in the short term, it should continue to result in difficult operating conditions for retailers. The exit of several wholesale lenders has forced many dealers to seek other financing sources (typically at a

higher rate). In more severe cases, retailers have been forced to leave the business altogether (or reduce their number of stores), as they have not been able to locate alternative, affordable credit from any source.

## Storm 3 — More Repossessed Homes

**Prior loose lending standards have led to higher repossessions recently**

As a result of loose retail lending standards in prior years, the number of repossessed homes has jumped considerably. The recent increase is mainly attributable to the ultra-loose standards in the 1997-1998 period, since the greatest level of mortgage defaults occur in years two and three.

Currently, we estimate that there are 25,000-27,000 used homes at the retail level. (Used homes include repossessions, as well as trade-ins.) This figure appears to differ little from prior periods, as increased repo sales have kept the number down. Therefore, it appears that increased sales of repossessions are somewhat cannibalizing retail sales of new homes and, therefore, slowing the current inventory correction.

**Tighter consumer credit standards appear to have increased repo sales**

Increased repo sales largely stem from tighter consumer credit standards, as many buyers now are only able to qualify for a repo purchase, rather than a mortgage on a new manufactured home. As such, it can be argued that repo sales are having little cannibalization effect since most repo buyers currently would not qualify for a new home anyway.

# All About Financing

We believe the rise and fall of manufactured housing over the past decade has been largely dictated by financing standards. Loose financing standards, in our opinion, had several negative effects on the industry.

**Inflating retail demand.** We believe improved product quality enhanced the demand for manufactured housing in the 1990s. This occurred as more affluent consumers began to consider the product as a viable option for their housing needs and, in some cases, began to purchase the units as second homes.

**We believe loose credit standards artificially inflated the demand for manufactured housing**

Aside from the positive effects of an expanded audience for manufactured housing, loose lending standards allowed many poor and marginal credit quality consumers to attain financing to buy a home (in many cases with little or even no money down). The increased competition from the larger number of lenders was the cause for much of the loose standards. However, easy consumer credit also stemmed from the overly competitive retail environment (which, again, was caused by loose wholesale financing standards). As such, we believe the demand for manufactured housing was artificially inflated for much of the 1990s. For example, it appears that many manufactured home shoppers with poor credit would simply visit dealership after dealership until they were approved for a mortgage. (Such actions, which we believe also inflated retail traffic levels, would seem to require little effort since dealerships often are located in clusters.)

**Figure 1: Example of Prior Loose Standards for Consumer Financing**

**"No Application Refused" illustrates previous loose lending standards**



Source: UBS Warburg LLC

**Much of the increase in prior years' wholesale shipments was attributable to inventory filling**

**Inflating wholesale shipments.** As previously mentioned, easy credit relating to floor-plan financing led to a massive increase in retail stores. This increase, in turn, artificially inflated wholesale demand, since a large portion of manufacturers' shipments was used simply to fill new retail inventories.

U.S. Manufactured Housing   December 5, 2000

**Boosting the number of repossessed homes.** Offering financing to poor and marginal credit customers has come back to haunt the industry, as more and more of these questionable loans have defaulted.

**Many lenders waived curtailments in prior years, encouraging high retail inventory levels**

**Boosting inventories on a per store basis.** The number of homes retailers carried per lot was boosted by the ability to easily secure financing. Additionally, floor-plan lenders were often irresponsible by not collecting curtailments (payments on principle that typically are required after a home remains on the lot for a certain number of months) and allowing retailers to write up the value of a home (which in some cases can be used to "fake" a downpayment).

# Light at the End of the Tunnel?

**We believe the industry is in the fifth or sixth inning of the current downturn**

Over the past 12-18 months, it appears that the industry has made significant progress in correcting the inventory buildup and the overcapacities at the retail and manufacturing levels. Nevertheless, we believe manufactured housing is currently in the fifth or sixth inning of the downturn. We offer the following thoughts regarding the current status of the industry:

**Another 1,000 locations or more must be closed, in our opinion**

- **We believe nearly 1,500 retail locations have exited the market.** As a result, we estimate that the industry now possesses approximately 8,000 stores and that another 1,000 locations or more must be closed before an equilibrium is reached. We derive the latter figure by assuming that a healthy retail inventory turn is 3.0 times or more and that an appropriate average number of homes in inventory per lot is 15. (These figures are probably closer to 2.0 times and 18-20 homes currently.) Using last year's estimated retail sales figure of 316,000 units, an equilibrium number of retail stores would be approximately 7,000. (See Table 3.) We note that using our estimate of 270,000 units for this year's retail sales yields a significantly lower figure, but one that could be understated because of the negative effect that the recent credit tightening has had on retail sales.

Table 3: Computation for Appropriate Number of Industry Retail Locations

|  | Aggressive Case | UBSW Estimate | Conservative Case |
|---|---|---|---|
| Assumed healthy level of retail inventory turn | 2.8x | 3.0x | 3.3x |
| Appropriate average number of homes per lot | 15 | 15 | 15 |
| Annual Homes Sold per Store | 41.3 | 45.0 | 48.8 |
| Retail sales | 325,000 | 316,000* | 270,000** |
| Number of Retail Locations Needed | 7,879 | 7,022 | 5,539 |

\* Based on 1999 retail sales
\* Based on 2000 estimated retail sales

Source: UBS Warburg LLC

**Manufacturers' repurchases have been significant in the most competitive regions**

- **Most of the retail fallout so far has represented multi-lot dealers scaling down their number of locations, rather than bankruptcies.** This has been a positive for the manufacturers, since under repurchase obligations with the floor-plan lenders, they are required to repurchase a home if a retailer defaults on his or her interest payments. Nevertheless, the total amount of manufacturers' repurchases in recent quarters has still been significant, particularly in the most competitive regions (the Southeast and the Carolinas).

- **It appears that the number of excess homes at retail has been cut from approximately 50,000 to 20,000 over the past 16-18 months.** This 20,000 figure supports our forecast for the exit of another 1,000 retail locations (assuming that current inventories are near 20 homes per lot). We believe the Census Bureau's restated figures for prior inventory levels (showing inventories remaining fairly constant 1995-1998 and then increasing in late 1999 and 2000)

are clearly erroneous, but that its estimate of 118,000 homes at the end of August is fairly accurate. Chart 6 is based on the Census Bureau's prior inventory and placement figures (which we believe are much more accurate than its current estimates for previous periods) and our estimates for 2000 and 2001.

**Chart 6: End of Year Units in Retail Inventory and Annual Inventory Turns**

**Based on Census Bureau's figures prior to restatement**



Note: Inventory figures are based on Census Bureau reports prior to 1999 restatement and UBS Warburg LLC estimates.
Source: National Conference of States on Building Codes and Standards, U.S. Census Bureau, and UBS Warburg LLC estimates

- **Inventories per store have also been reduced**. This has resulted from retailers trying to be lean during the downturn, as well as from tighter financing standards. Higher interest rates have also led to lower inventories, as the higher cost of financing has made it unaffordable for many retailers to carry normal inventory levels. Finally, inventories have been reduced as manufactures have sought to lower their total repurchase obligations or contingent liabilities. For instance, at the end of the third quarter, Champion had reduced its inventory at all levels of distribution by 21% since the beginning of the year and lowered its contingent liability 31% (to $480 million) from a year ago. We note that he company was hardest hit by the issue of contingent liability in August 1999, when its largest retailer (Ted Parker Homes) filed for bankruptcy, forcing Champion to repurchase approximately 1,850 homes and initially incur a $20.5 million after-tax charge.

**Inventories have been reduced as Champion and others have lowered their contingent liabilities**

**Table 4: Repurchase Obligations for Public Companies**

| Company | Last Reported | Repurchase Obligation ($MM) | As % of LTM Sales | Repurchase Obligation Mid-1999 ($MM) | As % of LTM Sales | % change |
|---|---|---|---|---|---|---|
| Champion Enterprises | 9/30/00 | $480 | 23.3% | $900 | 36.0% | -47% |
| Clayton Homes | 9/30/00 | $75 | 6.0% | $70 | 5.2% | 7% |
| American Homestar | 9/30/00 | $80 | 15.1% | $108 | 16.5% | -26% |
| Oakwood Homes | 6/30/00 | $195 | 14.2% | $204 | 11.7% | -4% |
| Cavalier Homes | 9/30/00 | $194 | 51.2% | $300 | 46.0% | -35% |
| Southern Energy | 9/29/00 | $72 | 38.3% | $89 | 29.6% | -19% |
| Nobility Homes | 8/5/00 | $0.9 | 2.8% | $0.6 | 1.3% | 42% |

Source: Company reports and UBS Warburg LLC estimates

**We expect another 25-30 plants to be closed or mothballed in the short-term**

■ **Approximately 70 manufacturing plants have been closed or mothballed.** This represents more than 20% of the industry's prior total. As a result, manufacturing shipments (down 26% through September) have dropped somewhat greater than retail sales (down an estimated 18%), allowing retail inventory to burn off. However, given the remaining excess inventory and the current slower retail sales because of tighter financing standards, we believe approximately another 25-30 plants will be closed in the short term. Assuming the average plant produces 900-1,000 homes annually, this reduction is needed, in our view, to sell off the remaining excess inventory and continue to lower inventory levels on a per-store basis.

**Chart 7: Manufactured Housing Operating Plants (EOY) and Homes Produced Per Plant**



Source: Manufactured Housing Institute and UBS Warburg LLC estimates

**Wholesale shipments and retail sales should to continue to be off significantly**

■ **The current winter should be tough.** Manufactured housing sales (retail and wholesale) normally slow meaningfully in November through March. (The industry's large Nashville dealer show in early April typically kicks off the spring selling season.) However, this year's winter months should be particularly difficult, given intensified troubles in the industry. Most importantly, we expect slower retail sales to lead to further retail and manufacturing shutdowns. Year-over-year shipment comparisons are fairly easy in upcoming months. Nevertheless, we expect wholesale and retail sales to continue to be off significantly. For 2000, we expect wholesale shipments to finish at approximately 259,000 (down 26%) and for retail sales to drop 15% to 270,000 units. Our forecast for 2001 is for wholesale shipments to drop another 7% to approximately 240,000 and for retail sales to be flat to slightly down.

■ **Economic slowdown is also having an effect.** Manufactured housing has been often considered somewhat impervious to higher interest rates because buyers are believed to be focused on a monthly payment. Therefore, when interest rates increase, lenders often simply extend the life of the mortgage. Also, some believe higher rates make traditional housing unaffordable for many buyers, who are then forced to seek cheaper housing alternatives. Even considering these factors, we believe the effects of slower job growth and, in some cases, lower stock prices on consumer confidence has begun to, and will continue to, hinder overall demand.

**We expect financing standards to remain tight for the foreseeable future**

■ **Financing standards should remain tight.** With financing likely to remain in the hands of a few larger lenders (e.g. Conseco, Greenpoint, Vanderbilt, Chase, CIT, Bombardier) we expect the current tight lending standards to be maintained for the foreseeable future.

**Chart 8: Monthly Manufactured Housing Shipments**



**Represents seasonal declines**

Source: National Conference of States on Building Codes and Standards

**Chart 9: Monthly Manufactured Housing Shipments**



Source: National Conference of States on Building Codes and Standards

**U.S. Manufactured Housing**  December 5, 2000

## Table 5: Manufactured Housing Shipments by Month

### Single Wide Shipments

| | 1996 | 1997 | 1998 | 1999 | 2000 | % Change |
|---|---|---|---|---|---|---|
| Jan | 13,303 | 11,756 | 10,403 | 9,534 | 6,908 | -8.35% |
| Feb | 13,295 | 11,645 | 11,567 | 10,652 | 7,351 | -7.91% |
| Mar | 15,480 | 13,359 | 13,096 | 12,954 | 8,601 | -1.48% |
| Apr | 16,163 | 14,668 | 13,490 | 12,978 | 7,430 | -3.80% |
| May | 16,334 | 13,625 | 12,568 | 11,168 | 7,082 | -11.14% |
| Jun | 15,018 | 13,286 | 12,969 | 11,525 | 7,315 | -11.27% |
| Jul | 13,533 | 11,666 | 12,105 | 9,074 | 5,345 | -25.04% |
| Aug | 16,040 | 12,920 | 12,308 | 10,638 | 6,655 | -13.57% |
| Sep | 14,971 | 12,295 | 12,110 | 9,615 | 5,588 | -20.60% |
| Oct | 16,870 | 13,373 | 12,774 | 9,284 | 5,558 | -27.32% |
| Nov | 12,638 | 10,136 | 11,059 | 9,129 | 5,097 | -17.45% |
| Dec | 10,009 | 9,680 | 9,857 | 7,137 | | -27.59% |
| YEAR | 173,674 | 148,809 | 144,328 | 123,638 | | -14.34% |

### Multi-Wide Shipments

| | 1996 | 1997 | 1998 | 1999 | 2000 | % Change |
|---|---|---|---|---|---|---|
| Jan | 13,660 | 14,528 | 15,959 | 17,250 | 14,700 | 8.09% |
| Feb | 13,744 | 14,124 | 15,980 | 18,268 | 15,455 | 14.30% |
| Mar | 14,825 | 15,665 | 18,715 | 21,301 | 17,537 | 13.82% |
| Apr | 16,290 | 17,649 | 19,776 | 21,267 | 15,232 | 7.94% |
| May | 17,376 | 17,657 | 18,829 | 19,382 | 17,101 | 2.94% |
| Jun | 16,358 | 17,694 | 20,578 | 21,362 | 17,115 | 3.81% |
| Jul | 15,602 | 17,287 | 18,980 | 17,725 | 12,344 | -6.61% |
| Aug | 18,180 | 18,336 | 20,248 | 20,252 | 16,972 | 0.02% |
| Sep | 16,468 | 18,916 | 20,600 | 19,260 | 14,017 | -6.50% |
| Oct | 18,995 | 20,765 | 22,411 | 18,855 | 14,117 | -15.42% |
| Nov | 15,297 | 16,388 | 19,051 | 16,546 | | -13.15% |
| Dec | 12,938 | 14,879 | 17,386 | 14,742 | | -15.21% |
| YEAR | 189,737 | 204,568 | 228,515 | 226,310 | | -0.96% |

### Total Shipments

| | 1996 | 1997 | 1998 | 1999 | 2000 | % Change |
|---|---|---|---|---|---|---|
| Jan | 26,963 | 26,284 | 26,362 | 26,784 | 21,508 | 1.60% |
| Feb | 27,039 | 25,969 | 27,549 | 28,920 | 22,806 | 4.98% |
| Mar | 30,309 | 29,044 | 31,813 | 34,255 | 26,138 | 7.52% |
| Apr | 32,473 | 32,317 | 33,266 | 34,245 | 22,662 | 2.94% |
| May | 33,710 | 31,282 | 31,397 | 30,550 | 24,783 | -2.70% |
| Jun | 31,376 | 31,180 | 33,547 | 32,887 | 24,430 | -2.03% |
| Jul | 29,135 | 28,953 | 31,085 | 26,799 | 17,689 | -13.79% |
| Aug | 34,220 | 31,256 | 32,556 | 30,890 | 23,637 | -5.12% |
| Sep | 31,439 | 31,211 | 32,710 | 28,875 | 19,606 | -11.72% |
| Oct | 35,865 | 34,138 | 35,185 | 28,239 | 19,214 | -19.74% |
| Nov | 27,935 | 26,524 | 30,110 | 25,675 | | -14.73% |
| Dec | 22,947 | 24,559 | 27,243 | 21,879 | | -19.69% |
| YEAR | 363,411 | 353,377 | 372,843 | 349,948 | | -6.14% |

### Multi-Wide % of Total Shipments

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Jan | 50.7% | 55.3% | 60.5% | 64.4% | 68.3% |
| Feb | 50.8% | 54.4% | 60.5% | 63.2% | 67.8% |
| Mar | 48.9% | 54.0% | 58.8% | 62.3% | 66.6% |
| Apr | 50.2% | 54.6% | 59.4% | 62.1% | 67.2% |
| May | 51.5% | 56.7% | 60.0% | 63.4% | 69.0% |
| Jun | 52.1% | 57.4% | 61.3% | 65.0% | 70.1% |
| Jul | 53.6% | 59.7% | 61.1% | 66.1% | 69.8% |
| Aug | 53.1% | 58.7% | 62.2% | 66.2% | 71.8% |
| Sep | 52.4% | 60.6% | 63.0% | 66.7% | 71.5% |
| Oct | 53.0% | 60.8% | 63.7% | 67.1% | 73.5% |
| Nov | 54.8% | 61.8% | 63.3% | 64.4% | |
| Dec | 56.4% | 60.6% | 63.3% | 67.4% | |
| YEAR | 52.2% | 57.9% | 61.3% | 64.7% | |

### Total Shipments in Floors

| | 1996 | 1997 | 1998 | 1999 | 2000 | % Change |
|---|---|---|---|---|---|---|
| Jan | 41,000 | 41,344 | 42,815 | 44,601 | 36,979 | -17.09% |
| Feb | 41,173 | 40,566 | 44,074 | 47,430 | 38,713 | -18.38% |
| Mar | 45,577 | 45,288 | 51,064 | 56,119 | 46,111 | -17.84% |
| Apr | 49,308 | 51,224 | 53,816 | 56,360 | 38,370 | -31.92% |
| May | 51,687 | 49,949 | 50,850 | 50,252 | 42,405 | -15.62% |
| Jun | 48,269 | 49,664 | 54,794 | 55,054 | 42,078 | -23.57% |
| Jul | 45,230 | 46,888 | 50,758 | 45,206 | 31,285 | -30.79% |
| Aug | 53,052 | 50,383 | 53,490 | 51,827 | 41,123 | -20.65% |
| Sep | 48,437 | 50,770 | 53,944 | 48,786 | 34,079 | -30.15% |
| Oct | 55,487 | 55,624 | 58,357 | 47,809 | 33,783 | -29.34% |
| Nov | 43,735 | 43,448 | 49,744 | 47,810 | | -18.07% |
| Dec | 36,323 | 36,971 | 45,215 | 36,997 | | -18.18% |
| YEAR | 559,288 | 563,102 | 608,921 | 588,450 | | -3.30% |

### Year-to-Date Shipments

| | 1996 | 1997 | 1998 | 1999 | 2000 | % Change |
|---|---|---|---|---|---|---|
| Jan | 26,963 | 26,284 | 26,362 | 26,784 | 21,508 | -19.70% |
| Feb | 54,002 | 52,253 | 53,911 | 55,704 | 44,314 | -20.45% |
| Mar | 84,311 | 81,297 | 85,724 | 89,909 | 70,652 | -21.42% |
| Apr | 116,784 | 114,014 | 120,590 | 124,154 | 93,314 | -24.84% |
| May | 150,494 | 145,496 | 150,187 | 154,704 | 118,097 | -23.66% |
| Jun | 181,870 | 176,676 | 183,654 | 187,591 | 142,527 | -24.02% |
| Jul | 211,005 | 205,629 | 214,739 | 214,390 | 160,216 | -25.27% |
| Aug | 245,225 | 236,945 | 247,595 | 245,280 | 183,853 | -25.04% |
| Sep | 276,664 | 268,156 | 280,305 | 274,155 | 203,459 | -25.79% |
| Oct | 312,529 | 302,294 | 315,490 | 302,394 | 222,673 | -26.36% |
| Nov | 340,464 | 328,818 | 345,600 | 328,069 | | |
| Dec | 363,411 | 353,377 | 372,843 | 349,946 | | |
| YEAR | 363,411 | 353,377 | 372,843 | 349,946 | | -6.14% |

Source: National Conference of States on Building Codes and Standards

19

# The "Haves" and the "Have Nots"

We expect the current downturn for manufactured housing to thin out the ranks in the industry, and it has already done so in a few cases. In our opinion, there are a handful of companies likely to survive the downturn and emerge from it in a stronger position vis-à-vis its peers. Those companies should be the larger integrated players that:

(1) Possess strong dedicated distribution.

(2) Are well capitalized.

(3) Have generally avoided poor performing acquisitions.

(4) Are not overly exposed to regions with the most overcapacity (the Southeast and the Carolinas).

(5) Have not compromised financing standards in recent years (if they possess a financial services division).

(6) Are making changes to improve their business in the downturn and adapting to the current operating climate (rather than sitting on their hands). We believe such improvements include targeting buyers outside the traditional manufactured housing clientele (e.g., working with developers to attract otherwise site-built buyers), embracing technology and the Internet, and enhancing marketing sophistication.

In our opinion, the four companies that will survive the current downturn and further separate themselves from the rest of the pack are the following:

## Clayton Homes

In our opinion, Clayton Homes has earned the title of "Best in Class" in the industry. With approximately 45% of its revenues recurring and a financing subsidiary that remained conservative during the industry's prior period of "silly lending," Clayton has remained considerably profitable and in a financial position that should allow it to soon capitalize on the difficulties of its peers. Clayton's decision in recent years to expand only internally (with the exception of purchasing a few mortgage portfolios), while its public competitors were aggressively pursuing acquisitive strategies, is now paying big benefits for the company.

*Clayton's recurring revenues and lending conservatism are paying large benefits*

## Palm Harbor Homes

In addition to its strong retail distribution network, Palm Harbor's higher-end product positioning largely has separated it from the rest of the manufactured housing pack. Currently, nearly 80% of the company's output are multi-section homes. As such, Palm Harbor has benefited from the industry's trend toward multi-sections, which currently account for approximately 70% of industry shipments, up from 52% in 1996 and 37% in 1986. Although year-over-year sales and earnings have declined considerably in recent quarters, the company has maintained profitability and has so far has avoided any plant closings or net reduction in retail

*Palm Harbor's high-end positioning has largely separated it from its peers*

U.S. Manufactured Housing   December 5, 2000

sales centers. In fact, the company plans to open 15-20 new retail locations (net) over the next year, largely through purchasing the assets of distressed dealers.

**Chart 10: Multi-Section Home Percentage and Average Retail Price**



Source: National Conference of States on Building Codes and Standards, U.S. Census Bureau, and UBS Warburg LLC estimates

## Champion Enterprises

**We expect Champion to remain an industry leader, despite our forecasts for continuing earnings losses**

Despite its closing/mothballing of 14 plants and 41 retail locations in recent quarters, Champion remains the largest manufacturer and the third largest retailer in the industry. In recent periods, the company has been significantly hindered by the industry's difficulties, as profits have been depressed and actually were in the red in the third quarter. Although we expect Champion to record a loss in the fourth quarter and throughout 2001, we believe with its large size and capital position, it should continue to be a leader in the industry. Furthermore, several ongoing initiatives should benefit the company in upcoming periods, including: (1) its alliance with Homestore.com; (2) its venture with Sun Communities to develop manufactured housing communities; (3) its new advertising campaign, "Lucky Dogs," building on last year's successful "Stop Dreaming and Start Living" campaign; (4) its new high-end Genesis Homes, targeted at tradition homebuilders/developers; and (5) its efforts to dramatically lower its inventory at all levels of distribution and reduce its total contingent liability.

## Fleetwood Enterprises

**Fleetwood's RV business has turned south, similar to its manufactured housing operations**

Like Champion, Fleetwood also has been severely hindered by the industry's ailments. Additionally, the manufactured housing downturn has come at the same time as problems encountered by the other side of its business, recreational vehicles. (Fleetwood's RV sales have been hit by a number of issues including lofty fuel prices, a negative wealth effect from the recent stock market performance, product positioning difficulties, and, until recently, heightened retail inventory levels.) Nevertheless, in manufactured housing, given its size of production (36 plants, down from 46) and its network of dedicated distribution (company-owned retailers and exclusive dealers), we believe the company will remain an industry leader on a long-term basis.

## Site-Built Players

Prior to the industry's current downturn, several public traditional homebuilders expressed the desire to enter manufactured housing. These thoughts appear to have quickly vanished when the manufactured housing industry turned south (and site-builders' profits continued to rapidly expand). Despite some of the bargains that currently exist and should develop in upcoming periods, we believe few builders are likely to revisit their thoughts of entering the business. We note that some builders had poor experiences with the industry in prior years. Also, most of them today already appear to have rather full plates of expansion opportunities.

**Ideas of entering manufactured housing appear to have been discarded by most builders**

Centex Corp. is the only public site-builder today with meaningful manufactured housing operations through its acquisition of Phoenix-based Cavco Industries in 1997. The company recently hired Joe Stegmeyer (former CFO of Champion Enterprises and earlier vice chairman of Clayton Homes) to head its manufactured housing division. We believe the hiring of Mr. Stegmeyer (who, in our opinion, is one of the most experienced and knowledgeable individuals in the industry) demonstrates Centex's commitment to manufactured housing and the likelihood of further expansion at some point down the line.

**Centex Corp. appears committed to the Industry**

U.S. Manufactured Housing   December 5, 2000

# Securitization Market

A few of the larger lenders (e.g., Conseco, Clayton's Vanderbilt, and Oakwood) utilize the asset-back securities (ABS) market to securitize the mortgages they originate or acquire from other lenders. We offer the following comments regarding the securitization market for manufactured housing mortgages.

## Why the Securitization Market is Important

**The ABS market acts as the end provider of financing**

Almost all manufactured housing buyers use financing to some extent when purchasing a home. As a result, the ABS market is immensely important, since it acts as the end provider of financing. Utilization of the ABS market for manufactured housing mortgages grew dramatically over the past decade, largely replacing funding from S&Ls and local banks.

## How it Works

Manufactured housing mortgages are first originated using a finance company's warehouse credit lines. (The lender receives an origination fee for initially taking on the mortgage.) The credit lines are then paid down with the funds from the securitization.

**Loans are pooled, tranched, and sold to investors**

In the securitization, loans are first pooled together. Then, cash flows are tranched according to maturity and credit quality and sold to investors. S&P, Moody's, and Fitch assign credit ratings to the various tranches, with higher rated tranches (i.e., A-AAA) possessing the lowest spreads (above treasuries, LIBOR, or, most recently, swaps). The higher spreads associated with lower rated tranches (i.e., BB-BBB) naturally result from investors' higher required returns for the more risky cash flows.

## Accounting

**Servicing the mortgages results in recurring revenue for the lenders**

Once loans are securitized and sold, proceeds are received by the financial company performing the securitization. In most cases, the company also receives recurring revenue after the securitization by retaining the servicing rights to the mortgages.

**Gain on sale recorded is a function of interest rate spreads and prepayment and default assumptions**

A gain on sale is recorded at the time of the securitization. This amount represents the projected NPV of the future cash flows from servicing the loans and is treated as an asset on the balance sheet. The amount of gain on sale recorded is a function of: (1) the spread between the interest rate to the consumer and the rate of interest incorporated in the securitization; and (2) assumptions regarding default rates, loss severity, and prepayment levels. Therefore, high gain-on-sale recognition results from wide securitization spreads and/or low (aggressive) assumptions for default rates and prepayment levels. If the prepayment and default assumptions are determined to be too aggressive, then the value of the "residual interests" of the securitization held on the balance sheet must be adjusted, resulting in a charge to equity.

A considerable cash shortfall can occur if a lender is unable (or unwilling) to sell, and therefore must retain, a significant portion of the securitization. At times, securitizers have retained a small percentage of the offering, typically the lowest rated (i.e., B or BB) piece. When the ABS market is most unfavorable (i.e., wide spreads over treasuries), lenders may choose to retain a larger portion of the

securitization (i.e., the BB and BBB tranches), with the idea of selling those pieces when the ABS market improves.

By not selling a portion of the securitization, the securitizer is not receiving any cash proceeds from the associated loans that are retained. Therefore, the manufacturer or retailer (in vertically integrated operations) is not receiving any cash (excluding interest) from the sale of the homes that correspond with the loans. This negative cash flow dynamic can be problematic for companies when access to capital is tight.

## Current Market Conditions

Over the past couple of years, credit spreads for manufactured housing securitizations (the spread above treasuries or LIBOR) have been quite wide for most lenders. This occurred as much of the industry's poor credit quality became obvious through higher default rates and through charges by some public players (most notably by Oakwood and Conseco) to reverse gain-on-sale income recorded under aggressive assumptions in prior periods.

**Retaining lower quality mortgages has resulted in negative cash flow effects for some**

As a result of wide spreads and a general lack of appetite for lower-rated tranches or paper from low-quality issuers by the ABS market, several lenders have been forced to retain the BB and BBB pieces of the securitization. As discussed previously, this has had negative cash flow effects to those lenders.

Also, rising rate environments are typically difficult for financial services companies, which often incur a lag for the higher rates to be passed down to consumers. However, with the recent round of Fed rate hikes now appearing to be complete, we believe this factor has largely diminished.

**Securitization spreads recently have contracted somewhat**

Most recently, spreads for manufactured housing securitizations have contracted somewhat, largely because of tightened lending standards in the industry. Still, spreads continue to differ meaningfully by the quality of the lender.

# Big Picture Problems

In addition to today's structural problems, we believe there are a number of "bigger picture" dilemmas that need to be addressed for the industry to attain meaningful growth following the current downturn.

## Penetration of Urban and Suburban Markets

**We believe manufactured housing remains largely a rural phenomenon**

With its improved product, manufactured housing has become a more popular means of affordable housing in the United States. Nevertheless, we continue to believe the industry remains largely a rural phenomenon and that it has generally done a poor job in expanding to new markets (namely, urban and suburban communities).

Much of the continued exclusion of manufactured homes in urban and suburban markets relates to existing poor perceptions of the product and from unyielding zoning laws. Unfortunately, the industry in recent years has appeared to do little to change this image or to tear down existing zoning requirements (which requires more local action).

An article in the May 2000 issue of *Manufactured Home Merchandiser*, Fred Townsend, owner of an Atlanta-based consulting group, states that during the 1990s, "we [the manufactured housing industry] did practically nothing to expand our market or acceptability to a wider audience." Mr. Townsend supports this claim by a recent example in which the Mayo Clinic and other private businesses plan to build 500 entry-level homes and 375 townhouse rental units in the Rochester, New York area. In total, Rochester is estimated to need 3,000 entry-level homes over the next five years. Although this would appear to be an excellent fit for the low-cost alternative of manufactured homes, this option is not being considered.

## Genesis Homes

**We believe Champion's Genesis Homes is a step in the right direction**

On a positive note, we believe a few proactive players in manufactured housing have recognized the need to expand the product's popularity in metropolitan areas. For example, recently, Champion introduced Genesis Homes, a subsidiary producing homes for developers, for which we offer the following comments:

- Genesis Homes are up-scale homes targeted at the aging baby boomer segment.

- Champion is selling the homes exclusively to conventional home builders/developers. As such, the homes will never sit on a retail lot.

**The new homes are targeted exclusively at builders/developers**

- By partnering with developers that possess significant clout with local zoning officials, Champion believes it will be successful in increasing its presence in suburban markets.

- Prices for the homes to the developers range are $60,000-$250,000 (excluding land), compared with the average price for the company's traditional product of about $49,000 (retail) and $28,000 (wholesale).

- Most of the new homes are produced with two sections and a "tag" (or smaller)

section. This arrangement reduces the amount of marriage walls required and allows the home to deviate from the tradition rectangular appearance of manufactured housing. The homes in the series can be produced according to the HUD code (national specifications) or in modular form (local specifications).

**Champion is trying to stray away from the titles "double- or triple-wide" with the new product**

■ Genesis Homes are built with upgraded products and are sold to the developer for as high as $250,000. Importantly, Champion is not focusing purely on price with the new product, but instead on its ability to quickly deliver a high-quality home to the developer. In fact, it is adamantly trying to stray away from the titles "double- or triple-wide" with the new product. (Genesis Homes refers to its new homes as off-site construction.)

■ The new homes eliminate most of a builder's scheduling problems that result from labor shortages and weather. Furthermore, development costs to place the homes are substantially less for the developer in most cases, since the homes' numerous designs permit their placement on various lot sizes.

■ Currently, Champion is producing the new homes in 12 manufacturing plants across the country. For 2000 (the first year), it appears the company will produce approximately 2,000 Genesis homes. This figure is likely to be expanded significantly in upcoming years, with a goal of 5,000 homes in 2001 and 10,000-12,000 in 2002.

■ Because of their up-scale positioning, the new homes should generate margins greater than the company's traditional product.

**Figure 2: A Champion Genesis Home**



Source: Champion Enterprises

U.S. Manufactured Housing   December 5, 2000

## Marketing Sophistication

**We believe much of the industry remains behind the times in terms of marketing**

It appears that much of the manufactured housing industry remains in the dark ages when it comes to marketing its product. In our view, manufactured homes are all too often sold from glorified (or perhaps not so glorified) used car lots. Illustrations of this can be seen by the gravel retail lots, cheap signage (see Figure 3), and homes displayed on concrete blocks at many retail locations.

An example of contrasting (and more appropriate, in our opinion) marketing strategy is that taken by Palm Harbor Homes. At Palm Harbor's retail Supercenters, model homes are attractively furnished and decorated with home skirting, landscaping, and sidewalks. Furthermore, the main retail office for most lots is professionally designed and accompanied by a paved entrance and parking lot.

**We expect the current retail shakeout to weed out much of the less sophisticated retailers**

We believe the lower marketing sophistication that remains prevalent in the industry has made it difficult to erase the stigma associated with manufactured homes and, therefore, has compounded the difficulties in expanding the product to new markets. Nevertheless, we expect the current retail shakeout to weed out many of the less sophisticated retailers and to result in a collection of higher level remaining dealers.

**Figure 3: Example of Low-End Marketing Still Prevalent in Manufactured Housing**



Source: UBS Warburg LLC

## Operating Sophistication

Similar to marketing, we believe many retailers have been slow to change their overall operating sophistication to fit the times. This is most notable in the area of technology, where the Internet has so far had little (if any) impact on the operations of many dealers. We believe the advantages of new technology benefits the larger (typically public) retailers. For example, Clayton's proprietary Internet-based LINK$^{TM}$ communication system allows it to efficiently communicate with all its sales centers in critical matters such as mortgage application approval, sales and inventory monitoring, training, and human resources issues.

**Several manufacturers have begun to market their homes through HomeBuilder.com**

Although we have been critical of the industry's utilization of technology, we are encouraged by the increasing use of the Internet by several producers (mainly the publicly held players) to market their homes. In late 1999, Champion became the first manufacturer to announce an agreement with HomeBuilder.com (a subsidiary of Homestore.com) to market its homes online. Since then, numerous other manufacturers have begun to market their homes on HomeBuilder.com, including, American Homestar, Cavalier, Clayton, Fleetwood, Oakwood, and Patriot. Champion states that its experience with HomeBuilder.com has been very positive and has led to thousands of referrals for its company-owned and independent dealers.

**Figure 4: http://www.factorybuilthousing.com (part of homestore.com)**

**The main page for manufactured housing on homestore.com**



**Results of a test search show numerous dealers with homes matching our criteria**



Source: Homestore.com

U.S. Manufactured Housing    December 5, 2000

## Industry Data

**The lack of industry data
remains frustrating**

We continue to be frustrated by the lack of industry data, particularly regarding retail sales, number of retail locations, inventory, and financing information. We believe the availability of this information would allow the industry to better evoke change and measure its progress.

# Valuation

The current valuations for manufactured housing stocks provide for a fairly quick discussion. This is because a multiple of earnings is nonexistent for most of the group, given the unprofitable recent results for all but three companies (Clayton, Palm Harbor, and Nobility). Nevertheless, we offer the follow thoughts regarding the group's valuation:

■ Similar to earnings multiples, price-to-book valuations, in our opinion, are also quite meaningless in most cases. This is because the shareholders' equity currently held by most companies is not likely to be maintained and should continue to dwindle, given further losses and operating charges.

**We believe the market's assessment that several companies may not survive could prove accurate**

■ We believe stock valuations for several members of the group suggest that investors believe they are not likely to survive the industry's downturn. Despite improved capital structures for a few companies (vis-à-vis prior cycles), we believe this assessment could prove accurate in a few cases.

**We believe shares of CMH, PHHM, CHB, and FLE will remain depressed in the short term**

■ We believe the stock prices for the four companies we view as "survivors" (Clayton, Palm Harbor, Champion, and Fleetwood) should remain depressed until a clear light at the end of the tunnel for the industry materializes. Given the current industry dilemmas, this should be as long as a year from now, in our opinion.

■ We believe Clayton and Palm Harbor have proven to be the highest quality members of the group. Nevertheless, in our view, their valuation will continue to be dragged down by the difficulties of their competitors. (We find it interesting that the market capitalization for Clayton now exceeds the total of its publicly traded industry peers — 11 members, including component distributors.)

**We believe our four "survivors" are attractively valued on a long-term basis**

■ On a long-term basis, we believe the stocks of the four companies we view as "survivors" represent attractive value opportunities. However, with industry conditions likely to remain difficult, we believe it will be several quarters or longer before such value begins to be recognized.

U.S. Manufactured Housing   December 5, 2000

**Chart 11: UBSW Manufactured Housing Stock Price Index**

**Our index has fallen more than 70% since its peak in March 1998**



Source: FactSet, company reports, and UBS Warburg LLC estimates

**Chart 12: Market Capitalization of Clayton Homes Versus Manufactured Housing Group**

**The market cap of Clayton now exceeds the total for the rest of the industry**



Source: FactSet and company reports

**Chart 13: Price to Book Value and Stock Price Index**



Source: Company reports and UBS Warburg LLC estimates

**Chart 14: Manufactured Housing Stock Price Performance Year to Date**



Source: FactSet

**Chart 15: Manufactured Housing Stock Price Performance Since March 1998**



Source: FactSet

U.S. Manufactured Housing    December 5, 2000

## Table 6: U.S. Manufactured Housing Comparables

| Company (Ticker) | 12/4/00 Price | Fiscal Year | Shares Out. (MM) | Market Cap. ($MM) | Calendar EPS | | | Calendar P/E | | | Book Value | Price / Book |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1999 | 2000E | 2001E | 1999 | 2000E | 2001E | | |
| **Manufacturers** | | | | | | | | | | | | |
| American Homestar - HSTR | $0.31 | June | 18.4 | $5.8 | -$0.04 | ($1.62) | NE | NM | NM | NA | $4.54 | 0.07 |
| Cavalier Homes - CAV | $0.81 | Dec. | 17.8 | $14.5 | $0.26 | ($1.20) | NE | 3.13 | NM | NA | $5.62 | 0.14 |
| Champion Enterprises - CHB | $3.19 | Dec. | 47.3 | $150.8 | $1.43 | ($0.22) | ($0.25) | 2.23 | NM | NM | $9.40 | 0.34 |
| Clayton Homes - CMH | $9.88 | June | 137.8 | $1,360.8 | $1.10 | $0.95 | $1.05 | 8.98 | 10.39 | 9.40 | $7.72 | 1.28 |
| Fleetwood Enterprises - FLE | $12.19 | Apr. | 32.8 | $399.2 | $2.70 | ($0.13) | $0.64 | 4.51 | NM | 19.04 | $16.74 | 0.73 |
| Nobility Homes - NOBH | $6.00 | Oct. | 4.6 | $27.6 | $0.50 | $0.51 | NE | 12.00 | 11.76 | NA | $4.52 | 1.33 |
| Oakwood Homes - OH | $0.56 | Sept. | 46.5 | $26.2 | ($0.40) | ($1.10) | NE | NM | NM | NA | $8.72 | 0.06 |
| Palm Harbor Homes - PHHM | $15.13 | Mar. | 22.7 | $343.3 | $1.78 | $1.26 | NE | 8.50 | 12.00 | NA | $10.15 | 1.49 |
| Southern Energy Homes - SEHI | $1.06 | Dec. | 12.1 | $12.9 | ($0.18) | ($0.33) | NE | NM | NM | NA | $5.19 | 0.20 |
| **Distributors** | | | | | | | | | | | | |
| Drew Industries - DW | $5.63 | Dec. | 10.6 | $59.4 | $1.34 | $1.51 | $0.75 | 4.20 | 3.73 | 7.50 | $7.27 | 0.77 |
| Kevco - KVCO | $0.53 | Dec. | 9.6 | $5.1 | -$3.14 | -$2.00 | NE | NM | NM | NA | $0.69 | 0.77 |
| Patrick Industries - PATK | $5.13 | Dec. | 5.1 | $26.3 | $1.23 | $0.35 | NE | 4.17 | 14.64 | NM | $13.68 | 0.37 |

ne - no estimates available, nm - not meaningful

| Company (Ticker) | 52 Week High | 52 Week Low | Enterprise Value ($MM) | Yield | Net Debt/ Capital* | Operating Divisions |
|---|---|---|---|---|---|---|
| **Manufacturers** | | | | | | |
| American Homestar - HSTR | $41.75 | $0.44 | $168 | 0.0% | 54.5% | Manufacturing, Retail |
| Cavalier Homes - CAV | $4.75 | $0.75 | $23 | 0.0% | 6.0% | Manufacturing and Finance (small) |
| Champion Enterprises - CHB | $10.06 | $2.75 | $475 | 0.0% | 43.7% | Manufacturing and Retail |
| Clayton Homes - CMH | $11.00 | $7.75 | $1,427 | 0.6% | 6.4% | Manufacturing, Retail, Finance, and Communities |
| Fleetwood Enterprises - FLE | $21.88 | $10.50 | $739 | 6.2% | 36.7% | Manufacturing, Retail, and Recreational Vehicles |
| Nobility Homes - NOBH | $7.00 | $4.75 | $19 | 0.0% | cash | Manufacturing and Retail |
| Oakwood Homes - OH | $4.88 | $0.50 | $434 | 0.0% | 41.7% | Manufacturing, Retail and Finance |
| Palm Harbor Homes - PHHM | $19.75 | $11.50 | $285 | 0.0% | -39.1% | Manufacturing, Retail and Finance |
| Southern Energy Homes - SEHI | $2.50 | $0.75 | $37 | 0.0% | 24.8% | Manufacturing and Retail (small) |
| **Distributors** | | | | | | |
| Drew Industries - DW | $9.75 | $5.63 | $127 | 0.0% | 30.0% | Production and Distribution of components |
| Kevco - KVCO | $3.25 | $0.75 | $218 | 0.0% | 83.9% | Distribution of components, Wood Products (small) |
| Patrick Industries - PATK | $14.13 | $5.25 | $48 | 3.1% | 21.4% | Production and Distribution of components |

* Includes short-term inventory financing
ne - no estimates available, na - not available

Source: Company reports, UBS Warburg LLC estimates, and First Call

U.S. Manufactured Housing   December 5, 2000

**U.S. Manufactured Housing**  December 5, 2000



**UBS Warburg LLC,299 Park Avenue, New York, NY 10171-0026 Phone:+1-212-821-6834**

This report has been prepared by the division, group, subsidiary or affiliate of UBS AG ("UBS") identified herein. In certain countries UBS AG is referred to as UBS SA, which is a translation of UBS AG, its registered legal name. UBS Warburg is a business group of UBS AG. This report is for distribution only under such circumstances as may be permitted by applicable law, including the following:

This report has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. The report is published solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. The report is based on information obtained from sources believed to be reliable but is not guaranteed as being accurate, nor is it a complete statement or summary of the securities, markets or developments referred to in the report. The report should not be regarded by recipients as a substitute for the exercise of their own judgement. Any opinions expressed in this report are subject to change without notice and UBS is not under any obligation to update or keep current the information contained herein. UBS and/or its directors, officers and employees may have or have had interests or long or short positions in, and may at any time make purchases and/or sales as principal or agent, or UBS may act or has acted as market-maker in the relevant securities or related financial instruments discussed in this report. Furthermore, UBS may have or has had a relationship with or may provide or has provided corporate finance, capital markets and/or other financial services to the relevant companies. Employees of UBS may serve or have served as officers or directors of the relevant companies. UBS may rely on information barriers, such as "Chinese Walls," to control the flow of information contained in one or more areas within UBS, into other areas, units, divisions, groups, or affiliates of UBS.

Options, derivative products and futures are not suitable for all investors, and trading in these instruments is considered risky. Past performance is not necessarily indicative of future results. Foreign currency rates of exchange may adversely affect the value, price or income of any security or related instrument mentioned in this report. Clients wishing to effect transactions should contact their local sales representative. UBS accepts no liability whatsoever for any loss or damage of any kind arising out of the use of all or any part of this report. **Additional information will be made available upon request.**

Except as otherwise specified herein, this report has been issued by UBS Warburg Ltd., a subsidiary of UBS AG. **United Kingdom:** This report has been issued by UBS Warburg Ltd., regulated in the UK by the Securities and Futures Authority, for distribution in the United Kingdom to persons who are not UK private customers. Customers should approach the analyst(s) named on the cover regarding the contents of this report. For investment advice, trade execution or any other queries, customers should contact their London representative. **Switzerland:** This report is being distributed in Switzerland by UBS AG. **Italy:** Should persons receiving this research in Italy require additional information or wish to effect transactions in the relevant securities, they should contact either Giubergia UBS Warburg SIM SpA, an associate of UBS SA, in Milan or UBS Warburg (Italia) SIM SpA, a subsidiary of UBS SA, in Milan or its London or Lugano Branch. **South Africa:** UBS Warburg Securities (South Africa) (Pty) Ltd. (incorporating J.D. Anderson  & Co.) is a member of the Johannesburg Stock Exchange. **United States:** This report is being distributed to US persons by either (i) UBS Warburg LLC, a subsidiary of UBS AG; or (ii) PaineWebber Incorporated, an indirect  subsidiary of UBS AG; or (iii) by a division, group, subsidiary or affiliate of UBS AG, that is not registered as a US broker-dealer (a "non-US affiliate"), to major US institutional investors only. UBS Warburg LLC or PaineWebber Incorporated accepts responsibility for the content of a report prepared by another non-US affiliate when distributed to US persons by UBS Warburg LLC or PaineWebber Incorporated, as identified herein. All transactions by a US person in the securities mentioned in this report must be effected through UBS Warburg LLC or PaineWebber Incorporated, and not through a non-US affiliate. **Canada:** UBS Bunting Warburg Inc. will provide upon request a statement of its financial condition and a list of its directors and senior officers. **Singapore:** This report is being distributed in Singapore by UBS Warburg & Associates (Singapore) Research Pte. Ltd. **Hong Kong:** This report is being distributed in Hong Kong by UBS Warburg (Japan) Limited to investors who fall within section 3(1) of the Securities Ordinance (Cap 333) by UBS Warburg Asia Limited. **Japan:** This report is being distributed in Japan by UBS Warburg (Japan) Limited to institutional investors only. **Australia:** This report is being distributed in Australia by UBS Warburg Australia Limited in relation to fixed income securities, and UBS Warburg Australia Equities Limited in relation to equity securities. **New Zealand:** This report is being distributed in New Zealand by UBS Warburg New Zealand Ltd in relation to fixed income securities and UBS Warburg New Zealand Equities Ltd in relation to equity securities.

UBS Warburg LLC, PaineWebber Incorporated and/or one of their affiliates has acted as a manager/co-manager or placement agent in underwriting securities of these companies or one of their subsidiaries in the past three years: American Homestar, Fleetwood Enterprises.

© 2000. All rights reserved. No part of this report may be reproduced or distributed in any manner without the written permission of UBS. UBS specifically prohibits the re-distribution of this report, via the Internet or otherwise, and accepts no liability whatsoever for the actions of third parties in this respect.

# EXHIBIT F

1

2      UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
3      ----------------------------x
       In Re:                     )Chapter 11
4      OAKWOOD HOMES CORPORATION, )Case No. 02-13396
       et al.,                    )(PJW)
5                       Debtors. )Jointly Administered
       ----------------------------x
6      OHC LIQUIDATION TRUST,      )
                      Plaintiff, )
7                 vs.            )Adv. Proc. No.
       CREDIT SUISSE FIRST BOSTON, a)04-57060 (PJW)
8      Swiss banking corporation,  )
       CREDIT SUISSE FIRST BOSTON  )
9      LLC, a Delaware limited     )
       liability corporation, CREDIT)
10     SUISSE FIRST BOSTON, INC.,  )
       CREDIT SUISSE FIRST BOSTON  )
11     (U.S.A.), INC., a Delaware  )
       corporation and a wholly    )
12     owned subsidiary of CREDIT  )
       SUISSE FIRST BOSTON, INC.,the)
13     subsidiaries and affiliates )
       of each, and DOES 1 through )
14     100,                        )
                      Defendants.)
15     ----------------------------x

16                 August 24, 2006

17                  8:43 a.m.

18

19          Deposition of JAMES XANTHOS, held at the

20     law offices of Linklaters, 1345 Avenue of the

21     Americas, New York, New York, pursuant to

22     agreement, before Donald R. DePew, an RPR, CRR and

23     Notary Public within and for the State of

24     New York.

25

James Xanthos

```
09:57:51  2      Q.  Is the same true of a reverse repo
09:57:55  3   transaction?
09:57:58  4      A.  Well, the reverse repo transaction, if
09:58:02  5   it's done on balance sheet with the client, it's
09:58:06  6   different than the securitized credit facility.
09:58:09  7      Q.  Is it different in terms of the risk to
09:58:12  8   the lender?
09:58:47  9      A.  I would say, no.
09:58:48 10      Q.  And when you talk about doing it on
09:58:50 11   balance sheet you're talking about doing it as
09:58:53 12   distinct from through a bankruptcy remote entity?
09:58:55 13      A.  Yes.
09:58:58 14      Q.  And is it also true that all three such
09:59:03 15   transactions, either an ordinary secured loan, or
09:59:06 16   a reverse repo transaction, or a securitized
09:59:10 17   credit facility, share in common the fact that the
09:59:15 18   lender is compensated by an interest rate?
09:59:24 19      A.  I believe so.
09:59:26 20      Q.  So just in terms of the economics of
09:59:28 21   these transactions can you think of anything that
09:59:30 22   differentiates one from the other?
09:59:34 23         MR. OSNATO:  Objection as to the form.
09:59:37 24      A.  Can you please repeat it.
09:59:39 25      Q.  Yeah.  Just is there anything that
```

58

```
09:59:42  2   differentiates a reverse repo from a securitized
09:59:47  3   credit facility, from an ordinary secured loan in
09:59:52  4   pure economic terms from the perspective of the
09:59:58  5   lender and its counterparty?
10:00:06  6      A.  I don't know in terms of economics.  I
10:00:10  7   don't know.
10:00:11  8      Q.  All right.  When you first came into
10:00:15  9   contact with Oakwood in the 1999 reverse repo
10:00:18 10   facility did you go down and visit the facility?
10:00:24 11      A.  "Facility" --
10:00:27 12      Q.  Did you go down and visit Oakwood?
10:00:28 13      A.  I believe so, yes.
10:00:33 14      Q.  Was anybody else with you?
10:00:35 15      A.  I believe so, yes.
10:00:35 16      Q.  Who was that?
10:00:41 17      A.  To the best of my recollection,
10:00:43 18   Michael Criscito and Fiachra O'Driscoll.
10:00:49 19      Q.  And what did you do when you visited
10:00:52 20   Oakwood?
10:00:54 21      A.  Normal sit down with management,
10:00:57 22   discuss what -- where they were at that particular
10:01:01 23   point in time, get a better understanding of the
10:01:03 24   company, the industry.  And get a better
10:01:09 25   understanding for the request from the company as
```

59

```
10:01:11  2   to the credit facility.
10:01:14  3      Q.  All right.  Can you recall whom you met
10:01:16  4   with from Oakwood?
10:01:17  5      A.  I don't.
10:01:20  6      Q.  Does the name Doug Muir refresh your
10:01:22  7   memory?
10:01:23  8      A.  I believe he probably would be the
10:01:25  9   person that we met with, yes.
10:01:27 10      Q.  Did you meet with more than one person?
10:01:28 11      A.  I think we did, but I'm not sure of the
10:01:30 12   people.
10:01:31 13      Q.  I'll throw out a couple of names and
10:01:32 14   see if they refresh your memory.  Bob Smith, Myles
10:01:36 15   Standish, Suzanne Wood.
10:01:38 16      A.  I don't recall if those people were
10:01:41 17   there.
10:01:42 18      Q.  Was any written record kept of these
10:01:45 19   meetings or did anybody take notes at them?
10:01:49 20      A.  You know, "notes," I believe there were
10:01:54 21   most likely notes taken.  Was it -- I mean, there
10:01:59 22   probably was a summation of the meeting.
10:02:07 23      Q.  And did you have any discussion with
10:02:09 24   Mr. O'Driscoll about Oakwood before actually going
10:02:13 25   down to visit Oakwood?
```

60

```
10:02:18  2      A.  I don't believe so, no.
10:02:25  3      Q.  Was it common that someone in
10:02:26  4   Mr. Criscito's position would accompany you on
10:02:31  5   such visits?
10:02:32  6      A.  Yes.
10:02:35  7      Q.  I'm going to ask you to look at what's
10:02:37  8   been previously marked as Exhibit 54.
10:03:03  9         (Witness looks at document.)
10:03:04 10      Q.  I'm going to ask you a number of
10:03:05 11   questions about this document and we're going to
10:03:07 12   go through quite a bit of it page by page.
10:03:10 13         For the present purposes, have you seen
10:03:12 14   this document before?
10:03:15 15      A.  I'm observing it right now.
10:03:17 16         MR. CASTANARES:  Okay.
10:03:18 17         (Witness looks at document.)
10:04:12 18      Q.  Are you the author of this document?
10:04:15 19      A.  Yes.
10:04:16 20      Q.  And is this the kind of document that
10:04:18 21   was prepared in the ordinary course in connection
10:04:20 22   with a credit review that you were involved in at
10:04:23 23   about this time --
10:04:24 24      A.  Yes.
10:04:24 25      Q.  -- or was this unusual in some respect?
```

61

# EXHIBIT G

## OAKWOOD HOMES CORPORATION

### Minutes of Special Meeting of the Board of Directors
### Held Monday, August 2, 1999

Pursuant to written notice sent to all the directors of Oakwood Homes Corporation (the "Corporation"), a special meeting of the Board of Directors of the Corporation was held on Monday, August 2, 1999, beginning at 10:00 a.m., eastern time.

Nicholas J. St. George, Chairman and Chief Executive Officer of the Corporation, called the meeting to order and served as Chairman of the meeting. Mr. St. George and William G. Edwards were present at the meeting in person. Dennis I. Meyer, Kermit G. Phillips, Roger H. Schipke, Sabin C. Streeter, Francis T. Vincent, Clarence W. Walker and H. Michael Weaver participated in the meeting via telephonic conference call such that all directors could simultaneously hear each other. Also present in person at the request of the Chairman were Myles E. Standish, Executive Vice President, Chief Administrative Officer and General Counsel of the Corporation, and Robert A. Smith, Executive Vice President and Chief Financial Officer of the Corporation. Additionally, at the request of the Chairman, Brian Sterling and Lisa Donohoe, both of Merrill Lynch and Co., financial adviser to the Board of Directors and the Special Committee, and Stephen K. Rhyne and Sean M. Jones, both of Kennedy Covington Lobdell & Hickman, LLP, counsel to the Corporation, participated in the meeting telephonically. Mr. Rhyne served as Secretary of the meeting.

The Chairman declared that a quorum was present and the meeting was therefore organized and constituted for the transaction of business.

The first item raised by Mr. St. George was the need to schedule a follow-up meeting on August 9 or 10 at which the directors could consider in greater detail certain matters to be discussed in the meeting. Mr. St. George said that he would like to defer scheduling that meeting until the conclusion of the discussion at this meeting.

Mr. St. George then briefed the Board on the status of management's pursuit of a management led buyout of the Corporation. He stated that management's preferred financial partner was a buyout fund managed by The Cypress Group, L.L.C ("Cypress") and that management had cooperated with Cypress and its advisers in their due diligence investigation of the Company, which had been very thorough. Mr. St. George indicated that Cypress had a very favorable opinion of the Company and the manufactured housing industry, but that it was concerned with its ability to finance a transaction in the current market environment. In particular, Cypress noted that conditions in the high-yield debt market are presently unfavorable. As a result, Cypress advised management that it was no longer interested in pursuing a transaction with the Corporation. In response to a question from Mr. Schipke, Mr. St. George confirmed to the Board that management was no longer pursuing a buyout transaction with Cypress or any other financial sponsor.

1721330.02
LIB: CH

KCLH    0956

Mr. Schipke then requested that management advise the Board in the event that members of management decide to re-initiate their pursuit of a management-led buyout. Mr. St. George indicated that he had received assurances from the other members of management that they would discuss the possibility of a management-led buyout with the Board of Directors before they began to pursue any such transaction.

Mr. Sterling informed the Board of Directors that even though management may no longer be pursuing a buyout, as a result of the June 18 press release in which the Corporation publicly announced the exploration of strategic alternatives, the Board should be prepared for the possibility of a third party approaching the Company regarding a transaction.

Mr. St. George then began a discussion of current industry conditions by noting that a critical issue being faced by the Corporation and its competitors is an oversupply of inventory at the retail level. Mr. St. George indicated that others in the industry are reducing margin through aggressive programs designed to increase sales and reduce their inventory. Additionally, Mr. St. George said that the combination of softening demand and price reductions was adversely impacting many dealers. Mr. St. George said that Champion Homes had recently announced a $21 million after-tax charge from the bankruptcy of Ted Parker Home Sales, Inc., which operates 42 sales centers. Mr. St. George then noted that in announcing record sales for the first quarter of its current fiscal year, Fleetwood Enterprises, citing declining margins and weakening demand, warned that profits for the quarter could fall between 20% and 30% below earnings for the first quarter of 1998. He also noted that Southern Energy had recently announced a $7 million charge related to plant closings. Mr. St. George said that he thought that most of the Corporation's competitors would be negatively impacted by the current conditions in the industry. Mr. St. George also said that while it was impossible to predict with any degree of certainty, he believed that the down cycle in the industry would last for at least six to nine months. Finally, Mr. St. George said that management was exploring alternate financing sources, in part due to widening spreads in the securitization markets.

Mr. St. George then turned the meeting over to Mr. Edwards for a report on the Corporation's cost-cutting measures. Mr. Edwards informed the Board that management had decided to close the Corporation's plant in Ennis, Texas. The closing of this plant would be in addition to the two plants in Georgia and North Carolina that had previously been closed. Mr. Edwards said that as a result of these plant closings and other inventory reduction measures, the Corporation had reduced inventory by 1,000 floors in just four weeks. Mr. Edwards continued by noting that other initiatives discussed at previous Board meetings (e.g., the "Rate Busters" program, customer rebates and television advertising) were being implemented and management was optimistic that these initiatives would help the Corporation reduce its inventory levels. Mr. Edwards also said that management had identified a number of other cost-cutting measures that could result in significant cost savings. After a general discussion of the plant closings and other efforts to reduce costs, Mr. Walker inquired as to whether there would be any special charges associated with the plant closings. Mr. Smith indicated that although in all

1721330.02
LIB: CH

KCLH    0957

likelihood there would be some special charges (primarily as a result of severance costs) in the fourth quarter, any charges related to the plant closings would be relatively small insofar as the Corporation carried little or no goodwill on its books related to these plants. Mr. St. George emphasized that, in light of current industry conditions, management was focused on substantially reducing costs and that, if appropriate, additional plants would be closed in the future. Mr. St. George concluded the discussion by noting that the Corporation's expansion plans had been curtailed and that management's current goal was to maximize return on the Corporation's current assets.

Mr. St. George then raised the issue of his pending retirement and stated that, in his view, the succession plan that began two years ago was now complete. He noted that he believed that an excellent succession team had been put in place and that he had full confidence in management's strategic and tactical plan to deal with the issues currently facing the Corporation and the manufactured housing industry. Mr. Rhyne then reminded the Directors that Mr. St. George's retirement must be treated confidentially until a public announcement had been made.

Mr. St. George then turned the meeting over to Mr. Sterling to report on the status of Merrill Lynch's preliminary contacts with potential financial and strategic buyers. Mr. Sterling informed the Board that following the last meeting of the Special Committee, Merrill Lynch had gone back to all of its initial contacts and informed them that, as a result of uncertainty regarding the Corporation's results for the third quarter, the Board's exploration of strategic alternatives had slowed.

Mr. Sterling then said that he concurred with Mr. St. George's analysis of current industry conditions. He noted that many industry participants were also being impacted by the overcapacity issues affecting the Corporation. He indicated that he also believed the industry down cycle would last for at least another six to nine months.

Mr. Sterling then led a general discussion of issues likely to impact those parties Merrill Lynch had already contacted as part of its process. He stated that many of the Corporation's competitors would most likely be focused on their internal issues for the foreseeable future and that this could negatively impact their willingness and ability to engage in a transaction with the Corporation in the near term. Mr. Sterling also said that the current difficulties in the public and private debt markets could adversely impact a financial buyer's ability to finance and consummate a transaction involving the Corporation at an acceptable price. After a general discussion, several directors and Mr. Sterling noted that these and other conditions suggested that now might not be an optimal time for the Board to explore strategic alternatives. They further noted that the best course of action available to the Board could be to stay independent and provide management with the opportunity to implement its strategic plan.

The Board then discussed an appropriate time for a follow-up meeting and agreed that such meeting should take place at the Corporation's offices on Tuesday, August 10 at 11:00 a.m., eastern time.

3

1721330.02
LIB: CH

KCLH    0958

There being no further business to come before the Board, upon motion duly made, seconded and carried, the meeting was adjourned at approximately 11:15 a.m.

Stephen K. Rhyne
Secretary

APPROVED:

Nicholas J. St. George
Chairman of the Board

4

1721330.02
LIB: CH

KCLH    0959

# EXHIBIT H



## OAKWOOD HOMES CORPORATION

Minutes of Meeting of Audit Committee of Board of Directors
Held July 23, 2001

Pursuant to notification given to all members of the Audit Committee of the Board of Directors of Oakwood Homes Corporation (the "Company"), a meeting of the Audit Committee (the "Committee") was held at 2:00 p.m. on Monday, July 23, 2001 at the offices of the Company, 7800 McCloud Road, Greensboro, North Carolina.

Members of the Committee were present as follows: Clarence W. Walker, Kermit G. Phillips, II, and H. Michael Weaver. Participating via conference call was Sabin C. Streeter.

Also present from the Company at the request of the Committee were Robert A. Smith, Executive Vice President – Financial Operations, Suzanne H. Wood, Executive Vice President and Chief Financial Officer, Duane D. Daggett, President and Chief Executive Officer, and during a certain portion of the meeting, Douglas R. Muir, Executive Vice President, Secretary and Treasurer and Wallace C. Tyser, Director of Compliance. Timothy G. Morgan, Charles L. Melman and Stephen P. Jackson of PricewaterhouseCoopers LLP (PwC) were also present; and Michael J. Stork with PwC participated via conference call.

Mr. Walker, Chairman of the Committee, presided and called the meeting to order. Gwendalyn C. Scott, Human Resources Manager, acted as Secretary.

Minutes of the April 19 and April 25, 2001 meetings of the Committee were approved as distributed.

The Committee was advised that as a result of a Comment Letter from the Securities and Exchange Commission regarding fiscal 1999 and 2000 annual and quarterly financial statements, the contents of which appeared to be relatively minor in nature, the Company has amended the 10-Q for the period ending March 31, 2001 to reflect the additional historical disclosures requested by the Commission.

Ms. Wood led a review of the Amended Corporate Disclosure Policy (Policy). The Committee suggested one minor change. On the third page under the section "Distributing analysts' report" the Committee agreed to amend the last sentence in that section to now read: However, upon request, the company will provide the names and addresses of all analysts who follow the company as shown on First Call. Subject to this change, Mr. Weaver moved that the Policy be adopted, Mr. Phillips seconded and the motion unanimously carried.



The next topic of discussion was an annual report to the Committee given by Wallace C. Tyser, Jr., Director of Compliance for Oakwood Acceptance Corporation (OAC), relating to legal and regulatory requirements and internal policies and procedures concerning loan origination and services. The report was discussed in detail and Mr. Tyser addressed various questions by the Committee. The Committee agreed to place on the agenda of the next day's Board of Directors meeting a discussion regarding a possible name change for OAC. The

OHC 045530

Committee asked that by its next Committee meeting Candy H. Grose, Vice President of Loan Origination and Risk Review, provide a report on the Compliance function for which she is responsible to include the number of people in this department, their areas of responsibility and the general results of their Compliance testing.

Ms. Wood then conducted a review of the preliminary results of operations and balance sheet for the quarter ending June 30, 200, which included a summary of impairment charges during this period. An in depth discussion ensued. Ms. Wood was asked to include the EBITDA calculation in future financials. The manufactured housing industry and its continuing deteriorated state were discussed. PwC has substantially completed their review of the quarter. No major adjustments for the quarter were anticipated. A status report was given on the relationships with our banks regarding the financial covenants for our line of credit. Management informed the Committee that preliminary results indicate that the Company may not be in compliance with certain debt covenants. If it is determined that that is the case, management will seek to obtain waivers and modifications for the current period and for the remainder of fiscal 2001. The press release on the results of the quarter and the analysts' conference call are scheduled to take place Thursday, July 26, 2001.

There followed a discussion concerning the REMIC default and recovery rate sensitivity analysis. Management responded to various questions by the Committee.

The next topic of discussion was a review of the Company's loan extension policy and procedures. Ms. Wood led the group through an analysis of the various situations that would qualify for loan extension. The Committee then reviewed an analysis of the loan assumptions program and a report on the methodology associated with the REMIC gain (or loss) on sale calculation. Mr. Walker asked that Ms. Wood provide the Committee with a list of all policies that we presently have in written form.

Ms. Wood then presented a complete summary of REMIC valuations. The recent B-piece sale in July was discussed, as was the timing of the potential sale of the remaining B-pieces and, specifically, an offer in aggregate from an unnamed buyer. The Committee agreed to continue discussions on the latter at the Board of Directors meeting the following day. It is anticipated that another securitization may take place in August. The Committee asked PwC what procedures they performed as part of their assessment of going concern relative to REMIC market conditions and the possibility that the Company be unable to access the market. Se Specifically, the Committee is interested in an analysis of the market today and its anticipated direction in the future, to include a sensitivity report regarding Oakwood and the impact to the Company should it go for an extended period without the funding from a securitization's deal. PwC noted that they conferred with Doug Muir and First Boston relative to the market and the marketability of Oakwood's paper relative to perceptions of the Company's ability to continue as a going concern. It was noted that the forecast and stress case assumptions reviewed in the FY 2000 audit included consideration of the percentage of par which the Company would be able to receive in Securitizations transactions and the consequences of a short term disruption in the market. An underlying assumption in the Company's forecasts is the ability to access the market and receive approximately 95% of par. The Committee asked to be informed of PwC's considerations of this assumption as part of their FY 2001 audit.

2

OHC 045531

PwC then presented information regarding the process it will follow in order to form a conclusion on the type of opinion to be rendered during its audit of the September 30, 2001 financials, including authoritative literature and guidance governing auditors' work, industry and Company-specific factors that could influence the conclusion, timing of the review and information needed from the Company. A lengthy discussion followed. PwC will closely monitor Company developments during the fourth quarter and be in close contact with Management in preparations for the evaluation of the financial statements and audit opinion.

Deferred to the next Committee meeting was the topic of Asset Protection in terms of other areas in the Company that are exposed to risk in light of the most recent reorganization of the Internal Audit function.

Company representatives were excused from the meeting, whereupon the committee went into Executive session with the outside auditors.

There being no further business to come before the meeting, motion was made, seconded and carried that it be adjourned.

Gwendalyn C. Scott, Secretary

APPROVED:

Clarence W. Walker, Chairman

3

OHC 045532

## CERTIFICATE OF SERVICE

I, Lee E. Kaufman, do hereby certify that on May 5, 2008, I caused a copy of the foregoing **Declaration of J. Justin Williamson in Support of Defendants' Motion to Exclude Certain Testimony and Documents Relating to Credit Risk Management Reviews** to be served upon each party on the attached service list in the manner indicated thereon.

Lee E. Kaufman (No. 4877)

## SERVICE LIST

**Via Hand Delivery**
Marla R. Eskin, Esq.
Kathleen Campbell Davis, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

**Via First Class Mail**
Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067