**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| —————————————————— | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re: Civil Docket No. 81** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

**DECLARATION OF WHITMAN L. HOLT
IN SUPPORT OF PLAINTIFF'S CONSOLIDATED ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S
<u>EXPERT TESTIMONY</u>**

I, Whitman L. Holt, declare as follows:

1.    I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.    I submit this declaration in support of the *Consolidated Answering Brief in Opposition to Defendants' Motions to Exclude Plaintiff's Expert Testimony* filed by the OHC Liquidation Trust ("**Plaintiff**") in the above-captioned proceeding.

3.    I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for Plaintiff in this proceeding.

4.    Attached hereto as Exhibit "A" is a true and correct copy of the *Supplemental Report of Alan C. Shapiro, Ph.D.*, dated August 28, 2007.

5.    Attached hereto as Exhibit "B" is a true and correct copy of the *Expert Witness Report of Thomas F. Boland*, dated February 29, 2008. This document was previously marked as deposition exhibit 621.

6.    Plaintiff's counsel deposed Mr. Thomas F. Boland – a proposed expert witness on Defendants' behalf – on March 25, 2008. A true and correct copy of the transcript of Mr. Boland's deposition is attached hereto as Exhibit "C."

7.    Attached hereto as Exhibit "D" is a true and correct copy of a May 31, 2007 e-mail from Allen Pfeiffer, attaching a draft Expert Rebuttal Report dated June 18, 2007 (the "**2007 Pfeiffer Report**"), which was produced by Defendants with bates numbers CSFB-00523314 – CSFB-00523346. This document was previously marked as deposition exhibit 630.

8.    Attached hereto as Exhibit "E" is a true and correct copy of certain data and spreadsheets that Defendants' counsel has represented to be the exhibits and schedules

referenced in the 2007 Pfeiffer Report, which was produced by Defendants with bates numbers CSFB-00523839 – CSFB-00523848.

9.    Attached hereto as Exhibit "F" is a true and correct copy of a February 6, 2008 e-mail from Michael Vitti, which was produced by Defendants with bates number CSFB-00521759.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 30, 2008, at Los Angeles, California.

Whitman L. Holt

# Exhibit "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OAKWOOD HOMES CORPORATION, | ) | Case No. 02-13396 (PJW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| OHC LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| CREDIT SUISSE FIRST BOSTON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# SUPPLEMENTAL REPORT OF ALAN C. SHAPIRO, PH.D.

**August 28, 2007**

### 1.    Introduction

In my report dated April 30, 2007, I opine that Credit Suisse First Boston did not behave in a reasonable or reasonably prudent manner with respect to services it provided to Oakwood Homes Corporation ("Oakwood"). In forming this opinion, I was asked by counsel to assume that Oakwood was insolvent in September 2001 – more than a year prior to when the company filed for bankruptcy on November 15, 2002. This assumption is based on the expert report of Dr. Michael Tennenbaum.

I have since been informed by counsel that a recent decision, *VFB LLC v. Campbell Soup Company*, 482 F.3d 624, places emphasis on the use of market data in reaching economic conclusions. Based on this additional information, I have analyzed market data to test the validity of that assumption.

This supplemental report summarizes this analysis. As I explain, market data indicate that Oakwood was economically insolvent by June 30, 2000.

### 2.    Market Data Demonstrate Oakwood Was Insolvent On June 30, 2000

A company is balance sheet insolvent, from an economic perspective, if the market value of its assets is less than the value of its outstanding debt. I assessed Oakwood's economic solvency by calculating the market value of its equity and its debt (the sum of which equals the market value of its assets),[1] and comparing this figure to the company's debt. As I show below, Oakwood was insolvent as of June 30, 2000.

*Market Value of Equity*

The market value of a company's equity is obtained by multiplying its share price by the number of shares outstanding. Oakwood's share price began a downward spiral in March 1998, declining by more than 72 percent from late March 1998 to early October 1998. After a brief recovery in late 1998, the share-price decline resumed in 1999. By September 1999, Oakwood's shares were trading below $5.00 and had lost nearly 90 percent of their March 1998 value. The share price fell to $1.50 by September 2000, down 96 percent from its March 1998 value. The resulting decline in the market value of its equity is shown in Figure 1.

---

[1] This approach relies on the fact that the market value of assets equals the market value of claims against those assets (that is why it is called a balance sheet). These claims come in the form of debt and equity, with equity as the residual claimant receiving the value remaining (if any) after paying off all debt claims.

1

**Figure 1: Steep Decline in Market Value of Equity Beginning in 1998**



The steep decline in Oakwood's market value of equity is indicative not just of recent dismal operating performance, but of diminished expectations regarding the company's future performance, as a company's equity value represents the present value of all expected future corporate earnings. Beginning in March 1998, the market's expectations of Oakwood's future earnings declined markedly and remained low until the company's bankruptcy filing. While the market value of equity is still positive, this is just a reflection of its option value, not that it provides any cushion for the claims of bondholders.

***Market Value of Debt***

I then calculated the market value of Oakwood's reported debt. Exhibit 1 provides a summary of Oakwood's outstanding debt for each year from 1996 to 2002, as per its balance sheet.[2] To derive the market value of reported debt, I first calculated the ratio of the market price of Oakwood's 10-year, 8.125 percent coupon, $175 million, senior note issued March 1, 1999, to its face value of $175 million (please see Exhibit 2 for details regarding Oakwood's note issues).[3] This ratio fell from 52 percent on March 31, 2000, to 30 percent on December 31, 2000, and was approximately 40 percent for 2001 and early 2002. The deep discount at which the note traded indicates that creditors did not expect to be paid in full (and were thus willing to accept 50 cents, or less, on the dollar for the debt), meaning that they considered Oakwood to be insolvent.

---

[2] Data after June 30, 2002 were not available because Oakwood did not file a Form 10-Q with the Securities and Exchange Commission for the third quarter of 2002.

[3] I obtained the bond price data from JP Morgan's research website (www.morganmarkets.com). Data prior to January 2000 were not available.

2

As the 8.125 percent coupon senior note was the only Oakwood note or bond for which pricing was available, I used the discount on this note as a proxy for the discount on both of the notes reported on Oakwood's balance sheet.[4] The 8.125 percent coupon bond represented between 35 percent and 49 percent of Oakwood's reported liabilities in each year from 1999 to 2002. Oakwood's other note during this period was a similar senior note, also issued March 1, 1999, with a five-year maturity, a 7.875 percent coupon rate, and a face value of $125 million. This note represented another 25 percent to 35 percent of the company's reported liabilities during those years.

I applied the price discount on the 8.125 percent coupon note to the face value of Oakwood's notes ($300 million) to estimate the market value of the notes for each quarter from 2000 through the second quarter of 2002. I next added the face value of Oakwood's other debt, with no discount applied, to calculate the market value of debt. I then added the market value of debt to the market value of equity to calculate the market value of Oakwood's assets (Table 1).

### Table 1: Calculation of Market Value of Assets
### (in thousands, except share price)

|  | 3/00 | 6/00 | 9/00 | 12/00 | 3/01 | 6/01 | 9/01 | 12/01 | 3/02 | 6/02 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Equity** |  |  |  |  |  |  |  |  |  |  |
| Shares Outstanding | 47,125 | 47,125 | 47,125 | 47,125 | 47,694 | 9,529 | 9,531 | 9,532 | 9,530 | 9,530 |
| Share Price | $3.81 | $1.81 | $1.50 | $0.62 | $1.06 | $5.00 | $4.15 | $5.30 | $7.20 | $4.99 |
| MV Equity | $179,664 | $85,414 | $70,688 | $29,453 | $50,556 | $47,645 | $39,554 | $50,520 | $68,616 | $47,555 |
| **Market Value of Debt** |  |  |  |  |  |  |  |  |  |  |
| BV Long-Term Debt | $389,948 | $391,739 | $395,429 | $452,368 | $356,637 | $378,633 | $370,620 | $323,107 | $363,912 | $339,214 |
| Discount on Face Value of Notes | 48% | 64% | 68% | 70% | 58% | 62% | 60% | 60% | 59% | 42% |
| MV of Debt | $245,948 | $199,739 | $191,429 | $242,368 | $182,637 | $192,633 | $190,620 | $143,107 | $186,912 | $213,214 |
| **Market Value of Assets** | **$425,612** | **$285,153** | **$262,117** | **$271,821** | **$233,193** | **$240,278** | **$230,174** | **$193,627** | **$255,528** | **$260,769** |

---

[4] My insolvency date conclusions do not change even if it is assumed that the 7.875% coupon note was worth its face value during the period – the market value of Oakwood's assets was still less than the company's outstanding debt by June 30, 2001.

3

*Comparing the Market Value of Assets to Outstanding Debt*

I then compared the market value of assets first with the book value of reported debt. As shown in Table 2 and Figure 2, Oakwood was insolvent as of June 30, 2000. The market value of Oakwood's assets is less than the book value of the company's reported debt for each quarter from June 2000 through June 2002. The difference is never less than $78 million. That is, for each quarter from June 2000 to June 2002, Oakwood's balance sheet debt exceeded the market value of its assets by at least $78 million.

     This analysis understates Oakwood's insolvency, as it does not include the Company's off-balance sheet liabilities, such as those associated with the guarantees on the principal and interest payments of $275 million of subordinated B-2 REMIC securities (the B-2 guarantees are discussed in my original report).

### Table 2:  Market Value of Assets Less than Face Value of Debt ($ 000)

|  | 3/00 | 6/00 | 9/00 | 12/00 | 3/01 | 6/01 | 9/01 | 12/01 | 3/02 | 6/02 |
|---|---|---|---|---|---|---|---|---|---|---|
| MV Equity | $179,664 | $85,414 | $70,688 | $29,453 | $50,556 | $47,645 | $39,554 | $50,520 | $68,616 | $47,555 |
| MV of Debt | $245,948 | $199,739 | $191,429 | $242,368 | $182,637 | $192,633 | $190,620 | $143,107 | $186,912 | $213,214 |
| MV Assets | $425,612 | $285,153 | $262,117 | $271,821 | $233,193 | $240,278 | $230,174 | $193,627 | $255,528 | $260,769 |
| BV Debt | $389,948 | $391,739 | $395,429 | $452,368 | $356,637 | $378,633 | $370,620 | $323,107 | $363,912 | $339,214 |
| MV Assets Less BV Debt | $35,664 | -$106,586 | -$133,313 | -$180,547 | -$123,444 | -$138,355 | -$140,446 | -$129,480 | -$108,384 | -$78,445 |
| Insolvency Conclusion | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

4

**Figure 2:  Market Value of Assets Below Book Value of Debt by June 30, 2000**



### CSFB's Own Analysis Is Consistent with My Findings

CSFB also concluded that the market value of Oakwood's assets was less than the value of the debt owed by the company by June 2001. In a presentation dated June 26, 2001, CSFB calculated the market value of Oakwood's assets as $358 million, compared with total debt outstanding of $460 million.[5] In a March 2002 presentation, CSFB also calculated the market value of Oakwood's assets ($238.4 million) to be less than the company's outstanding debt ($324.1 million).[6] As such, CSFB's own internal analysis demonstrated that Oakwood was economically insolvent by no later than June 2001. CSFB's analysis also understates Oakwood's insolvency as it does not include liabilities associated with the B-2 guarantees.

---

[5] CSFB 00052973.
[6] CSFB 00033241.

5

## Oakwood Solvency Analysis
### Exhibit 1
*Oakwood's Existing Debt per 10-K Filings*

In Thousands USD

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Short Term Notes | $175,000 | $175,000 | $282,200 | $144,800 | $64,000 | $49,000 | $49,000 |
| 12.58% subordinated notes payable 1997 -2001 | $8,350 | $7,372 | $4,692 | $2,075 | | | |
| 8.65% Notes Due 2000 | $22,936 | $9,699 | $3,246 | $231 | | | |
| 10.5% subordinated notes payble 2001 to 2004 | $12,954 | $12,954 | $11,876 | $8,837 | | | |
| Term Notes Due July 2000 | $25,740 | $18,334 | $11,076 | $12,615 | $3,560 | | |
| Capitalized Leases | $4,916 | $3,835 | $3,270 | | | | |
| 8 1/8% senior notes due March 2009 | | | | $174,050 | $174,120 | $174,196 | $174,280 |
| 7 7/8% senior notes due March 2004 | | | | $124,693 | $124,754 | $124,819 | $124,530 |
| Industrial revenue bonds due in installments through 2011 | | | $5,492 | $7,099 | $6,700 | $6,200 | $5,565 |
| Industrial revenue bonds due in installments through 2001 | $2,250 | $2,125 | $2,025 | $1,925 | $1,825 | | |
| Industrial revenue bonds due in installments through 1996 | $4,700 | | | | | | |
| Facilities Loans due in installments through 1996 | $8,000 | $4,000 | | | | | |
| 8% reset debentures due 2007 | $39,908 | $16,945 | $16,945 | $16,925 | $16,783 | $16,194 | $2,633 |
| Other notes payable | $2,945 | $2,351 | $2,542 | $3,474 | $2,187 | $1,711 | $2,159 |
| ESOP Notes | $1,680 | $1,200 | $720 | $240 | | | |
| Total | $309,379 | $253,815 | $344,084 | $496,964 | $393,929 | $372,120 | $358,167 |

Source: Oakwood 10-k filings

## Oakwood Solvency Analysis
## Exhibit 2
### *Details of Bonds Issued*

8 1/8% senior notes due March 2009

| | |
|---|---|
| Settlement Date | 3/2/1999 |
| Maturity Date | 3/1/2009 |
| Coupon | 8.125% |
| Amount Issued ($mil.) | $175.0 |

7 7/8% senior notes due March 2004

| | |
|---|---|
| Settlement Date | 3/2/1999 |
| Maturity Date | 3/1/2004 |
| Coupon | 7.875% |
| Amount Issued ($mil.) | $125.0 |

# Exhibit "B"

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE


In re:

OAKWOOD HOMES CORPORATION et al.

Debtors

vs.

CREDIT SUISSE FIRST BOSTON, et al.

Defendants


# EXPERT WITNESS REPORT OF THOMAS F. BOLAND

February 29. 2008



EXHIBIT
621
3/8/08

## A.     Introduction and Qualifications

1.     I, Thomas F. Boland, am a former member of senior management of Citigroup, Inc., New York, New York and a former Managing Director of Seneca Financial Group, Inc., New York, New York. I consider myself to be an expert in corporate and investment banking, credit and capital markets and corporate restructures.

2.     I graduated with a degree in Business Administration from the University of Notre Dame, South Bend, Indiana in 1965. From 1970 through 2001, I held various executive positions with Citicorp and Citigroup. From 1978 through 1980, I was assigned to the Restructuring Department of Citibank, managing numerous complex problem credits and working with borrowers both inside and outside of bankruptcy. From 1980 through 1985 I was the Corporate Bank Head for Citibank Canada, responsible for corporate relationships throughout Canada and their international subsidiaries. From 1999 through 2001, I was Head of Credit and Operating Risk Management for Japan, North America and Europe. As such, I managed a 540 person organization with financial accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup, including Corporate Banking, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Solomon Smith Barney. I had the highest level of credit approval authority within the Citigroup Corporate and Investment Bank. I had management responsibility for a $170 billion loan and unfunded commitment portfolio. Under my direction, Citigroup's use of asset sales and credit derivatives in tandem with proactive remedial management by my group's highly experienced workout department made the credit quality of this portfolio among the best in the industry. From 2001 through 2005, as a principal in the Seneca Financial Group, I worked on numerous financial advisory assignments on behalf of troubled companies including a $1 billion out of court restructure of a major U.S. airline which was impacted by the events of September 11, 2001. A copy of my curriculum vitae

and published articles are attached as Exhibit 1.

3.    In the course of my duties I have directly managed hundreds of corporate relationships and had management responsibility for thousands of corporate relationships. I have worked in a large financial institution and fully understand the interrelationships among client managers, investment bankers, product specialists and risk assessment. I have worked with hundreds of troubled companies and have first hand experience regarding the complexities and uncertainties of dealing with a company in financial distress.

4.    I have presented expert testimony as follows:

| | |
|---|---|
| October 8, 2002 | Federal Energy Regulatory Commission<br>PacifiCorp v. Reliant Energy, et al.<br>Docket EL 02-80-000 |
| January 3, 2003 | Federal Energy Regulatory Commission<br>Nevada Power/Sierra Pacific v. El Paso et al.<br>Docket EL 02-26-000 |

Both of these cases involved the abrogation of long-term energy contracts in California. I testified as an expert in the capital markets.

| | |
|---|---|
| August 5, 2003 | Rebel Rents, Inc. 307 B. R. 171 |

This case involved the valuation of a business that was emerging from bankruptcy.

| | |
|---|---|
| March 22, 2005 | Federal Energy Regulatory Commission<br>Devon Power LLC, et al.<br>Docket ER03-563-030 |

In this case I testified on the adequacy of returns on debt and equity.

| | |
|---|---|
| March 13, 2006 | Duke Energy v. ExxonMobil Energy Canada<br>Under the Alberta Arbitration Act |

In this arbitration I testified as to the reasonableness of ExxonMobil's actions concerning a credit dispute.

B.    Nature of Assignment

5.    I have been retained by Linklaters LLP counsel for Defendants Credit Suisse First Boston, et al., to provide an expert opinion regarding the conclusions of Professor Alan C. Shapiro in his report dated April 30, 2007. Specifically, his conclusions are as follows;

- CSFB did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood.

- CSFB had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy.

6.    Based upon my over thirty years of experience working in a large financial institution and understanding the dynamics of relationship management and my extensive experience dealing with financially distressed companies, I believe I am qualified to offer expert testimony on matters I address in this opinion. I have agreed to be compensated at an hourly rate of $600 per hour for my services plus any actual and reasonable expenses.

C.    Records and Information

7.    In addition to general contextual background from counsel, I have considered certain specific information listed in Exhibit 2. This Exhibit contains a list of information provided to me by counsel for CSFB and a list of additional materials, which I have retrieved from public sources.

D.   Analysis

8.   In his report Professor Shapiro discusses the role of an Investment Bank; he reviews the actions of CSFB personnel and concludes that since CSFB is an Investment Bank this automatically makes them a trusted advisor to Oakwood's management and Board of Directors. Accordingly, in the course of their dealings with the company, CSFB should have been providing strategic operational and financial advice including filing for bankruptcy a year sooner than they did. By not taking these actions, Professor Shapiro concludes that CSFB acted imprudently.

9.   To respond to Professor Shapiro's conclusion it is necessary to examine the complexities and structure of an Investment Bank and to understand what was the true nature of CSFB's relationship with Oakwood and to clarify what Investment Banks can do and what Investment Banks should not do.

E.   Investment Banking

10.   Investment Banks provide a broad range of financial and investment related services, such as, advising clients on security issues, acquisitions and business disposals, arranging and underwriting new issues, distributing securities and running fund-management companies. Also, proprietary trading has become an increasingly important part of Investment Banking. Typically, Investment Banks are divided into three areas; Investment Banking, Capital Markets and, Sales and Trading. Targeted clients and prospects are managed in the Investment Banking Division. The role of the Investment Banker is to understand the client's needs and to coordinate with the appropriate product group a solution to the client's problem. The Boston Consulting Group recommends that "client relationship managers should be responsible for a customer's P&L

account across all investment and corporate banking products."[1]  Most large financial institutions

now take this approach.  For example;

- Deutsche Bank – We have integrated our coverage model and aligned our coverage intensity to our new client tiering system.  We aim to further integrate our various businesses within the Corporate and Investment Bank to capture cross-divisional opportunities.[2]

- NatCity Investment Banking -   We have unique access including 500 corporate bankers, private equity services, commercial lending groups, proprietary equity research, and leading economists.[3]

- BMO Financial Group – Successfully leveraging lending relationships by cross selling fee based products and fully integrated, advisory-oriented coverage.[4]

11.    The model recommended by the Boston Consulting Group calls for a client relationship

manager to be the primary interface with the client.  A successful Investment Banker works

closely with the client's management to understand what products and services can be sold to the

client.  This Investment Banker centered approach is now utilized by most major financial

institutions.  Once an opportunity is identified by an Investment Banker a sales presentation is

prepared by the appropriate product group.  The sales presentation takes the form of a

"pitchbook".  Most firms use a standard format pitchbook which includes sections on the client

based upon available public information, the idea or product being pitched, a market analysis,

relevant financial analysis and information about the bankers who will be involved with the

mandate.  A pitchbook presentation is the standard marketing document utilized by an Investment

Bank.

12.    The most lucrative transactions for an Investment Bank are Merger & Acquisition

transactions, equity offerings and bond issuance.  The in depth client due diligence described in

Professor Shapiro's report would be required for these products.  There are some Investment

Banking products, such as a derivative transaction, which could require little or no due diligence.

---

[1] Growing Profits Under Pressure, Boston Consulting Group, 2002.
[2] Deutsche Bank Annual Report 2006.
[3] www.nationalcity.com/investmentbanking/Aboutus.asp
[4] BMO Financial Group, U.S. Expansion Strategy

In other words, the level and type of due diligence on the part of the Investment Bank depends upon what service or product the Investment Bank is providing and to whom they would be providing the product or service.

13.     Since Investment Bankers are expensive it is important to focus their efforts on clients and prospects that may use a wide array of products. Most Investment Banks have screening criteria which help identify top prospects and eliminate prospects where significant potential opportunities may be limited. Companies that do not make the Investment Banking cut may find a home in a product group in the Capital Markets Division. These are companies with a specific need which can be addressed with a specific product. A client in this category would be characterized as a Product Managed Relationship and not as an Investment Banking Relationship.

14.     It is clear that from the inception of the CSFB/Oakwood relationship in 1994 until August 2002 Oakwood was a Product Managed Relationship focusing exclusively on securitization transactions and nothing more. Based upon this type of relationship, the broad, in depth coverage which would have existed if Oakwood was in the Investment Banking Division did not exist. As will be discussed, the securitization product revolves around the credit worthiness of Oakwood's customers and not on the credit quality of the Oakwood Homes Corporation. This being the case, there was no need for CSFB to access in depth non public information about the Oakwood Homes Corporation.

F.     Oakwood Homes Corporation

15.     It has been well documented that Oakwood, which was founded in 1946, was a fully integrated company in terms of manufacturing, selling and financing homes. In 1999 they were the nation's largest retailer of manufactured housing operating 371 company-owned retail sales centers in 29 states. They were also the third largest manufacturer of manufactured housing, with 26 manufacturing lines in 12 states. In addition to sales and manufacturing Oakwood had a large consumer finance operation, Oakwood Acceptance Corporation, which originated and purchased

loans originated by the company's retail operations as well as from third parties. At year end 1999, Oakwood had total revenues in excess of $1.5 billion.

16.    It is worth noting that since its founding in 1946, Oakwood and the manufactured housing industry have gone through numerous cycles, the worst being in 1972 when more than one-third of America's mobile home dealers went bankrupt and in the late 1980's when over half of the 200 mobile home companies operating in 1978 went bankrupt. Oakwood successfully made it through these downturns and subsequently prospered.[5] As Oakwood and other housing manufacturers were growing the challenge of financing their sales became an impediment to continued growth. This dilemma was addressed in the late 1970's when Salomon Brothers distributed the first mortgage-backed securities. This was the start of the asset securitization business.

17.    By reviewing the minutes of the Board of Director meetings from 1999 through 2002 it is very evident that management and the Board were well aware of Oakwood's financial situation and understood the cyclical nature of their business. It is typical for a public company such as Oakwood, to have quarterly Board meetings. Over a four year period that would amount to sixteen meetings. In the period 1999-2002 the Oakwood Board met thirty-six times. Instead of meeting every three months the Board was meeting every forty days. This unusually active involvement by the Board would indicate that they were concerned about the company and the industry and wanted to be sure that they were making informed decisions which were in the Corporation's best interest.

## G.    CSFB - Securitization

18.    The primary interface between CSFB and Oakwood Home's management was Fiachra O'Driscoll, a Managing Director in CSFB's Asset Finance Group. O'Driscoll is an asset securitization product specialist. He described his role as "to ensure that the transaction was put

together in a timely fashion, to make sure that the questions of the sales force were answered, to make sure that investor questions were answered, to make sure that the legal structure of the mortgage securitization worked properly, and to make sure that the transaction got closed, processed, and that it was dealt with in the aftermarket in a timely fashion."[6] Since the inception of the CSFB/Oakwood relationship in 1994 until August 17, 2002 the entire relationship was based exclusively on the securitization business and O'Driscoll was Oakwood's primary CSFB interface since 1996.

19.    Securitization is a financial technique that pools assets together by turning future cash flows into tradable, bond-like securities. The customer benefit is that they can immediately realize the value of a cash producing asset and can shed some of the risk that future expected revenues may not materialize. The customer's risk is shed because the pools of assets are generally sold on a non-recourse basis. If the expected cash flow from the pool of assets does not materialize the investors in the securitization have no additional recourse. This being the case, what is critical in structuring a successful securitization is packaging a pool of assets which are diverse and predicable based upon prior experience.

20.    A review of a typical prospectus will show the scope of the business CSFB was doing with Oakwood, including, what was necessary to make a transaction work and what type of due diligence would be needed to put a successful transaction together. The Prospectus and the Prospectus Supplement dated May 20, 2002 is typical of the type of transaction CSFB was executing for Oakwood since 1994.[7] These documents contain 171 pages of detailed information. The key information contained in the documents is a description of the asset pool. On closing the trust would purchase 2,167 initial assets with a principal balance of approximately $119 million. The 2,167 loans are broken down in great detail by credit bureau scores, geographic distribution, breakdown of initial asset amounts, loan to value ratios, year of origination and remaining term to

---

[5] www.referenceforbusiness.com/history/2/60/Oakwood-Homes-Corporation.html
[6] Deposition of Fiachra O'Driscoll, June 29, 2006, page 18.

maturity. A description of investor protections through overcollaterization and subordination is also detailed. What is not in these documents is a description of Oakwood Home Corporation or any financial analysis of Oakwood. This is because, as the document point out, "Neither Oakwood Mortgage nor any underwriter nor any of their affiliates will insure or guarantee the certificates of any series."[8]

21.    In his deposition, Mr. O'Driscoll stated that CSFB had executed numerous securitizations for many firms involved in the manufactured housing business including Clayton Homes and Champion Enterprises.[9] To help follow the industry trends the Asset Finance Group could access the research reports of CSFB's public side equity analyst, Ivy Zelman, who closely followed, home builders, manufactured housing companies, building products and furniture companies. Ms. Zelman has been rated the number –one analyst in the housing industry by the Institutional Investors All American Research Team since 1999 and by the Greenwich Associates Institutional Research Services Poll since 2000. The May 2005 issue of Forbes magazine ranked her number one among 3,300 analysts in all of Wall Street.[10]

## H.    CSFB – Loan Purchase Facility

22.    In 2000 Bank of America decided not to renew its financing arrangement with Oakwood. Since a warehouse facility is an important interim step between a loan origination and a public securitization, early in 2001 O'Driscoll was able to put together a facility utilizing securitization techniques.

23.    In his report Professor Shapiro state that this is when CSFB became a secured lender to Oakwood.[11] This is in fact incorrect. This transaction was structured not as a loan but as an asset purchase, similar to securitization. The individual who negotiated and structured the transaction

---

[7] Prospectus Supplement to Prospectus dated May 20, 2002, CSFB-00220030 – CSFB-00220208.
[8] Ibid., p.54.
[9] Deposition of Fiachra O'Driscoll, June 29,2006, page 34.
[10] www.jwmag.org/site/c.fhLOK0PGLsF/b.2447241/k.2D69/Ivy_Zelman.htm

was Fiachra O'Driscoll.[12] This facility was very similar to the type of business CSFB had been doing with Oakwood since 1994. As part of the compensation for this transaction CSFB received warrants for 19.9% of Oakwood equity. A warrant is a right to purchase equity of an issuer at a specified price within a certain time frame. A warrant is not equity nor does it receive any of the rights of an equity holder. Warrants can be used as a sweetener to increase the marketability of a bond or security and could have been useful to CSFB if they subsequently decided to sell off all or part of this facility. To conclude that these out of the money options somehow made CSFB an equity owner of Oakwood is incorrect. It is also logical to assume that if CSFB believed that Oakwood was insolvent at the time of this transaction they would not have been asking for warrants. Including warrants as a part of their compensation would indicate that there was a belief by CSFB that there would be an upturn in the cycle in the not too distant future.

## I.    CSFB – Proposals

24.    Any attempt to expand the CSFB/Oakwood relationship beyond the Asset Finance Group got nowhere. A proposed $75 million Committed Reverse Repo Facility languished. The proposal was reviewed by an analyst, in Credit Risk Management, James Xanthos who had no experience with the housing industry or with Oakwood.[13] His analysis contained numerous unsupported opinions and ignored the market analysis of the CSFB Equity Research Group. One reason that this transaction never went forward may be the fact that Oakwood did not have an Investment Banker to oversee the relationship and champion the client.

25.    As will be discussed later in this report, the management and Board of Oakwood believed that the company had sufficient liquidity in place until March, 2004. On three occasions, in June and August of 2001 and March of 2002 CSFB made presentations to Oakwood management regarding the 2004 bonds. These presentations contain the standard pitchbook format and were

---

[11] Report of Alan Shapiro, April 30, 2007, page 16.
[12] Deposition of Fiachra O'Driscoll, June 29, 2006, page 41.
[13] Deposition of James Xanthos, August 24, 2006, page 45.

presented to management and not the Board of Directors. The presentations contain no non public information nor do they demonstrate any insiders' knowledge of Oakwood. The pitchbooks contain a number of alternatives which Oakwood could use to deal with the 2004 maturities. None of the proposals contained in the pitchbooks were pursued by Oakwood management. One of Oakwood's troubled competitors, Fleetwood Enterprises, in 2001 was able to use a variation of one of the ideas in the CSFB presentation and working with their investment bank they issued convertible trust preferred securities in exchange for other debt.[14] This type of financial restructuring plus other initiatives assisted Fleetwood in avoiding bankruptcy.

26.    Instead of offering ideas to deal with future liquidity needs, Professor Shapiro believes that CSFB should have been advising Oakwood on operational improvement strategies which focused upon downsizing Oakwood's operations.[15] He also thought that CSFB should have been advising Oakwood to file bankruptcy.[16]

27.    Before commenting on why it would have been inappropriate for CSFB to give anyone this type of advice it needs to be pointed out that no one at CSFB, as with most financial institutions, has the expertise to advise on "operational improvement strategies." There are firms that do this type of consulting but they are not banks. Advice for dealing with a bankruptcy has to be carefully managed within the scope of legally vetted restructuring assignment.

28.    Starting with the Farah case in 1984 creditors learned that if they exercised excessive power and control over the business activities of a debtor, especially when the debtor is in financial difficulty, the creditor can suffer serious adverse consequences.[17] Post the Farah case there was a rash of lender liability cases and bankers learned what "tortious interference" was all about and changed their behavior. Most financial professionals understand where to draw the line with their clients and do not get involved in telling them how to run their business.

---

[14] Fleetwood Enterprises Annual Report, 2005, page 49.
[15] Deposition of Alan Shapiro, April 30, 2007, page 38.
[16] Ibid., page 39.
[17] Third Party Interference, Phillip Campanella, at 13.06.

29.    The primary oversight for the financial and legal well being of a corporation is its Board of Directors and not its bankers. The Oakwood Board was meeting very frequently and they were briefed by management on the state of the company and the outlook for the industry. The Board brought about management changes and authorized significant downsizing. The Board explored strategic alternatives with Merrill Lynch and pursued numerous capital raising initiatives without the assistance of CSFB. It appears that the Directors acted on an informed basis and in good faith.

## J.    CSFB – Financial Advisor for Restructuring Purposes

30.    On August 24, 2002 Oakwood retained the restructuring group of CSFB in the role of a Financial Advisor for Restructuring Purposes. Their mandate was to assist Oakwood in evaluating strategic alternatives, employing restructuring options, contacting potential acquirers of the firm and preparing the company for bankruptcy. This was the first time in the eight year CSFB/Oakwood relationship that the Asset Finance Group was not the focal point of the relationship.

31.    The signing of this agreement singled an important change in the relationship between CSFB and Oakwood. To understand what brought about this agreement it is worthwhile to examine the events which led Oakwood's management and Board to conclude that their company needed assistance in restructuring their balance sheet.

32.    In June 2001 Equity Research at CSFB was stating, "While we believe the industry may be nearing a bottom and are encouraged by the low shipment levels and inventory levels per store, as well as the declining delinquency rates, we remain cautious due to the uncertainty of the length of the downturn."[18] In the same report they opinioned, "we believe the increased demand for OH

---

[18] Manufactured Housing Industry Outlook, CSFB Equity Research, June 11, 2001, page 1. (CSFB-00050117)

deals and the tightening spreads support a more positive long-term outlook for the company."[19]
In reviewing 2001 the Monthly Labor Review cited housing as one of the bright spots in the
economy stating, "Declining mortgage rates benefited not only prospective home buyers, but also
homeowners who either wanted to tap into their equity or refinance." [20]  In working through the
cycle Oakwood management appeared to be doing the right things as pointed out in a CSFB
Equity Research Report, "Although management should be praised for its proactive decisions at
this point in the cycle, we believe that neither the industry or OH are out of the woods yet."[21]

33.     Although Oakwood had managed through prior down cycles and management and the
Board were taking actions to manage through this one, there were a series of events which made
this cycle longer and deeper than anyone expected nor could have predicted.  In late 2001 and
early 2002 an unprecedented number of financing sources exited the market, including Bank of
America, Bombardier Capital, Greenpoint Financial, CIT and Conseco.  Contributing to the
lenders problems was the September 11 terrorist attacks.  According to the New York Times,
"The attacks that destroyed the World Trade Center towers and the Pentagon brought the
American economy to an unprecedented halt and made a recession far more likely than before."[22]
Commenting on the attacks, Standard & Poor's stated that, "Manufactured-housing producers
could see further rating downgrades in the near term, as this segment's buyers may be
disproportionately more vulnerable to expected layoff."[23]

34.     The deepening recession and industry specific problems were reflected in Oakwood's June
25, 2002 Board of Directors meeting.  This meeting was the first time that the Board understood
the severity of the Corporation's situation.  Given that the last Board meeting had been only six
weeks prior it is probable that management did not reach the conclusions discussed at the meeting
much before the meeting.  Several reasons were given for the change in outlook.  First, Mr.

---

[19] Ibid., page 18.
[20] U.S. Labor Markets in 2001, Monthly Labor Review, February 2002, page 11.
[21] Oakwood Homes, CSFB Equity Research, July 27, 2001, page 3. (CSFB-00050085)
[22] A Body Blow to the Economy, David Leonhardt, New York Times, September 16, 2001, page 1.
[23] Housing Market is Suddenly Uncertain, Alan Heavens, The Philadelphia Inquirer, October 7, 2001.

Standish indicated that "it appears that conditions may be softer than had been the case at the last board meeting." He cited Champion Enterprises wider than expected losses and the impact of Conseco's withdrawal from the dealer floorplan lending business as contributing factors. In response to these conditions management decided to close a Texas plant, close some retail locations and revamp the retail pay plan. Mr. Standish also indicated that the loan assumption program would be eliminated in order to improve the Corporation's liquidity. Mr. Standish told the Board that management had updated the company's cash flow projections and "those cash flow projections indicated that adequate liquidity was in place to fund operations until the March 1, 2004 maturity of $125 million of senior notes."[24]

35.    By the end of July, Mr. Standish was telling the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well as considered other potential financial advisors." From this statement it can be concluded that at the end of July, Oakwood had not yet decided which firm to hire as a financial advisor.[25] It would appear that Oakwood management was starting to understand the impact that the loan assumption program had on their liquidity position. On August 6, 2002, Oakwood released their third quarter results which indicated that, "During the first nine months of 2002, the Company expended cash approximating $47.6 million related to the loan assumption program."[26]

36.    In his deposition Mr. Standish indicated that he was surprised by the expense of the loan assumption program. He indicated that, "the program itself was not structured sufficiently so that we could get data from it as far as costs, as far as performance, as far as general underwriting guidelines or what was actually being underwritten."[27] Making it through a difficult period is all about managing your liquidity. Although management had taken steps to bolster liquidity the

---

[24] Binder of Meeting Minutes, No. 04-57060 (Bankr. D De.), Tab 35.
[25] Ibid., Tab 36.
[26] Oakwood Homes Corporation Reports Third Quarter 2002 Results, August 6, 2002, Exhibit 99.1.
[27] Deposition of Myles Standish, September 21, 2006, page 33.

worse than expected economy coupled with a $48 million surprise would indicate that their belief in late June 2002 that they had sufficient liquidity for the next twenty-one months was wrong.

37.    Oakwood's financial situation was not unique in the manufactured housing sector. Many of their competitors were encountering similar difficulties but managed to make it through the cycle without having to file for bankruptcy. In November 2002 BB&T Capital Markets raised their ratings on Champion Enterprises, Clayton Homes, Fleetwood Enterprises and Palm Harbor Homes from Hold to Buy based upon the likely entry of GMAC Residential Funding unit into manufactured housing retail chattel lending. BB&T stated, "Because we believe that the health of the industry is so closely tied to the availability of financing, an infusion of new financing dollars into an already tight retail lending environment would be a major plus for the MH industry."[28] This indication that there was some good news for the industry came just ten days after Oakwood's bankruptcy filing. The success that these firms had in avoiding bankruptcy clearly demonstrates that it was possible to avoid a filing. Those experienced in working with companies in financial difficulty know that an out of court restructuring is much more preferable than going into Chapter 11. When dealing with the troubled auto parts supply company, Delphi, Steve Miller, the noted restructuring guru was quoted as saying, "Not going into Chapter 11 is much to be preferred. It is simpler, cheaper, quicker to avoid it, whereas the Chapter 11 process takes longer, costs more and has a lot of aggravation that goes with it."[29]

## K.    CSFB/OAKWOOD RELATIONSHIP

38.    Professor Shapiro claims that CSFB had financial incentives to keep Oakwood operating. An Investment Bank has financial incentives for doing business with all of their clients. CSFB was paid fairly for the work they performed. I can see no conflict of interest in the work CSFB did for Oakwood and see no issue on how they performed that work.

---

[28] BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10.

39.    The fees paid to CSFB by Oakwood were for services rendered. Pricing on a securitization can vary depending upon the asset pool and the size of the transaction. Pricing is transparent since fees on public transactions are disclosed in the prospectus. In his deposition Douglas Muir stated that he was able to benchmark what he was paying against other issues. He said, "you can benchmark and find out where the market is, not only what CSFB was charging but what other banks were charging."[30] Pricing on the Loan Purchase Facility is difficult to assess since as Douglas Muir stated, "CSFG was the only game in town."[31] At the time when the facility was put in place Oakwood's bonds were rated CCC. According to Fitch Ratings the definition of a CCC rating is Substantial Risk. As ratings decrease the probability of default increases, therefore, transactions with lower investment grade companies need to build in the increased default risk into their pricing. The Advisory Agreement pricing is well within industry norms. The monthly fee is in the mid-range of transactions I am familiar with, normal M&A and restructuring fees range from 1% to 2%. Fairness opinions can be a percentage of the M&A fee or a flat amount. It is not uncommon in this type of engagement to have a success fee on top of the other fees.

L.    Conclusions

40.    From the actions and services provided by CSFB for the Oakwood Homes Corporation it is very evident that CSFB was not a financial advisor to Oakwood until August, 2002. In addition to the analysis contained in my report this conclusion is supported by a review of the minutes of the Board of Director meetings.[32] In June of 1999 the Board hired Merrill Lynch as an advisor. A year latter it was reported to the Board that Merrill recommended holding off pursuing a merger. Merrill's input regarding financial alternatives was again discussed at the August, 2000 meeting. In meetings in April, June and July of 2001 the Board discussed various asset sale

[29] Delphi CEO Would Rather Fix Company's Woes out of Court, Wall Street Journal, Sep. 21, 2005, pg.A5
[30] Deposition of Douglas Muir, September 26, 2006, page 49.
[31] Ibid., page 52.
[32] Binder of Minute Meetings, No.04-57060.

possibilities and sources of new investment. It is clear that CSFB was not involved with these important initiatives. At the July 29, 2002 meeting Myles Standish told the Board that "he had undertaken discussions with CSFB about retaining that firm as a financial advisor, as well considered other potential financial advisors."[33] From this statement it can be concluded that at the end of July, 2002, Oakwood had not yet decided which firm to hire as a financial advisor.

41.    Prior to August 2002 the involvement of CSFB in the Oakwood relationship was limited to securitization transactions and proposals dealing with the bonds maturing in 2004. The only CSFB professional closely involved with the company was the securitization product specialist, Fiachra O'Driscoll. For example, Jared Felt demonstrated his distance from Oakwood when on December 14, 2001 he emailed Fiachra O'Driscoll and asked, "Do you have any sense of what we can do for Oakwood given that they've already completed a refinancing with Foothill?"[34] The relationship between CSFB and Oakwood was a very typical banking/client product driven relationship and was conducted in an appropriate manner.

42.    In the period 2000 through 2002 the manufactured housing industry was experiencing significant problems. There were many factors causing the downturn and many opinions as to the depth and length of the downturn. Forcing companies into bankruptcy is not an optimum solution in times of duress. Yearly, federal bank examiners review the loan portfolios of all U.S. regulated banks. At the end of 2001 the regulators reported that there were $193 billion in problem loans including over $30 billion in loans where full repayment was doubtful.[35] Many of these exposures got restructured outside of a courtroom. Suggesting that lenders would be required to perform ongoing valuations of their clients and to liquidate them if their valuations came up short would lead to economic chaos. This type of behavior would be deemed inappropriate.

43.    On September 5, 2001 First Union Securities Equity Research issued a report on the state of the manufactured housing industry in which they stated that, "Things should look much better

---

[33] Ibid., Tab 35.
[34] Email, Jared Felt, December 13, 2001, CSFB-00148970.

in 2002. Profitability looks like it has bottomed."[36] They were wrong, as were other analysts and as was Oakwood's Board of Directors. It is very difficult in a middle of an economic downturn to accurately predict when the cycle will turn up. The Oakwood Board was fully engaged in performing their fiduciary duties. They nor anyone else should be held accountable for not being capable of predicting the future.

44.    The fees paid to CSFB by Oakwood were for services rendered. Pricing for the products and services contracted for by Oakwood from CSFB were market driven and the compensation received by CSFB appears to be within market norms.

45.    Based upon my experience in working with companies in financial situations similar to Oakwood's I believe that most bankers would have not stopped funding the company as long as management and the Board understood the situation and were dealing with it. By structuring transactions which would manage their risk and by understanding the cyclical nature of the industry most bankers would have acted similar to the actions of CSFB.

Thomas F. Boland

---

[35] Board of Governors of the Federal Reserve System, NR 2001-87, October 5, 2001.
[36] First Union Securities Equity Research, The State of the Manufactured Housing Industry, September 5, 2001, page 1.

**EXHIBIT 1**

**Thomas F. Boland**
**1209 Thomas Jefferson Parkway**
**Charlottesville, VA 22902**
**(434) 295-2733**
**tfboland162@aol.com**

## Experience

**Seneca Financial Group, Inc.**                                                    2001 - 2005
**Managing Director**

Principal in specialty investment bank which focused primarily on financial restructuring advisory services. Assignments ranged from successfully advising a major airline in their Airline Transportation Safety Board loan guaranty application process to working with equipment distributors in their validation of their business models and/or a quantification of their strategic options. Expert witness involving valuations in bankruptcy cases as well as matters before the Federal Energy Regulatory Commission.

**Citigroup Corporate and Investment Bank**                              1999 - 2001
**Head of Credit and Operating Risk Management - Japan, Europe and North America**

Managed a 540 person organization with functional accountability for Credit Risk, Portfolio Management, Remedial Management and Operating Risk covering six divisions within Citigroup including, Corporate Bank, Structured Finance, Worldwide Securities Services, Global Cash and Trade Management at Citibank N.A. and Capital Markets Credit at Salomon Smith Barney. Accountable for $360 Million in revenues and a $140 Million expense base. This position has the highest level of credit approval authority in the Citigroup Corporate and Investment Bank.

Managed a $170 billion loan and unfunded commitment portfolio. The use of asset sales and credit derivatives in tandem with proactive remedial management by a highly experienced workout department made the credit quality of this portfolio one of the best in the industry.

**Citibank - Global Relationship Bank**                                      1993 – 1999
**Senior Risk Manager**

Managed 80 risk professionals in 14 countries, providing risk management oversight for over 2,000 multi-national corporations and financial institutions. As part of the Global Relationship Bank senior management team worked to set strategic direction of global corporate banking business which was based upon ability to make risk/return tradeoffs on both a transactional and portfolio basis.

**Citibank – Credit Policy Committee**                                      1990 - 1993
**Credit Policy Committee Member**

Coordinated credit risk management policies for the Global Corporate Bank. Provided counsel to the Corporate Bank and Real Estate businesses evaluating the impact of changes in business direction including associated remedial actions.

THOMAS F. BOLAND                                                                2

In a difficult credit environment, assisted in refocusing the firm's approach to risk tolerance. Heavy involvement in the unwinding of a $26 billion real estate portfolio. High level of regulatory interface during this tumultuous corporate period.

**Citicorp - Citicorp Industry Credit**                           1985 - 1990
**Risk Manager / Treasurer**

Provided risk oversight for business units involved in leveraged buyouts, securitization and leasing. Managed a Treasury function responsible for a $5 billion funding book.

**Citicorp - Citibank Canada**                                    1980 - 1985
**Corporate Bank Head**

Managed the Corporate Banking business in Canada, with offices in Toronto, Montreal, Calgary and Vancouver. Customers included Canadian corporates, multinationals, global financial institutions and government entities. Frequently interfaced and negotiated with senior government officials.

**Citibank - Institutional Recovery Management**                  1977 - 1980
**Team Head**

Managed the restructuring of problem loans in North America, Colombia and Libya. Extensive involvement with bankruptcy cases. As Co-Head of the Itel Creditors Committee helped to successfully resolve the largest Californian bankruptcy, at that time. Considerable time spent in Colombia negotiating, litigating and lobbying on a complex fraud case.

**Citibank, Agribusiness-Commodities Department**                 1970 - 1977
**Unit Head /Transactor**

Engaged in an array of lending activities for accounts ranging from global grain trading companies to cattle feedlots. Managed offices in four U.S. cities.

**<u>Additional Information</u>**

- Member Board of Directors and Audit Committee                   2001 - present
  The FINOVA Group, Inc.

- Chairman of the Board of Citicorp North America from 1999 – 2001.

- Chairman of the Board of Shuttle, Inc. from 1992 – 1997.
  Shuttle, Inc. was the successor to the Trump Shuttle.
  Significant debt recoveries were realized by initiating management changes, cost cutting and the negotiated sale of the airline to USAir.

- Completed an advanced management program at the Amos Tuck School of Business BBA, University of Notre Dame. Served as a Lieutenant, U.S. Navy.

THOMAS F. BOLAND                                                                    3

## ARTICLES

1.   Getting Through Rough Economic Times With Lessons Learned From Lending
     Law Journal's Equipment Leasing Newsletter
     February, 2002

2.   Airlines And the Internet
     Issues Facing the Airline Industry
     AFN White Paper 2004

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 1. | Objection to the Proof of Claim filed by Credit Suisse First Boston LLC; Plaintiff's Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence; (3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance and Recovery of 90 Day Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (G) Avoidance and Recovery of One Year Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency; and Demand for Jury Trial dated November 13, 2004 |
| 2. | Defendants' Opening Brief in Support of Motion to Dismiss Certain Claims of the Complaint dated May 6, 2005 |
| 3. | SEC form 10-Ks for Oakwood Homes Corp. from 1999 – 2002<br><br>• 10-K Filed 12/29/1999<br>• 10-K Filed 12/29/2000<br>• 10-K Filed 12/28/2001<br>• 10-K Filed 01/14/2003 |
| 4. | SEC Form 8-K for Oakwood Homes Corp. dated August 9, 2002 |
| 5. | Credit Suisse First Boston Equity Research Reports<br><br>• CSFB–00050263 - CSFB–00050272<br>• CSFB–00050239 - CSFB–00050262<br>• CSFB–00050227 - CSFB–00050238<br>• CSFB–00050219 - CSFB–00050222<br>• CSFB–00050212 - CSFB–00050218<br>• CSFB–00050198 - CSFB–00050211<br>• CSFB–00050195 - CSFB–00050197<br>• CSFB–00050192 - CSFB–00050194<br>• CSFB–00050164 - CSFB–00050191<br>• CSFB–00050152 - CSFB–00050163<br>• CSFB–00049523 - CSFB–00049528<br>• CSFB–00050117 - CSFB–00050145<br>• CSFB–00050115 - CSFB–00050116<br>• CSFB–00050094 - CSFB–00050114<br>• CSFB–00050091 - CSFB–00050093 |

1

## EXHIBIT 2

### Materials Considered in Preparation of Expert Report of Thomas Boland

|   | |
|---|---|
|   | • CSFB–00050085 - CSFB–00050090<br>• CSFB–00266304 - CSFB–00266330<br>• CSFB–00052800 - CSFB–00052839<br>• CSFB–00052680 - CSFB–00052755<br>• CSFB–00050081 - CSFB–00050084<br>• CSFB–00052644 - CSFB–00052675<br>• CSFB–00052596 - CSFB–00052619<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00052620 - CSFB–00052643<br>• CSFB–00050072 - CSFB–00050075<br>• CSFB–00050069 - CSFB–00050071<br>• CSFB–00050066 - CSFB–00050068<br>• CSFB–00050039 - CSFB–00050065<br>• CSFB–00049908 - CSFB–00050038<br>• CSFB–00049905 - CSFB–00049907<br>• CSFB–00049298 - CSFB–00049309<br>• CSFB–00049862 - CSFB–00049892<br>• CSFB–00049732 - CSFB–00049861<br>• CSFB–00049004 - CSFB–00049136<br>• CSFB–00049674 - CSFB–00049704<br>• CSFB–00049533 - CSFB–00049673<br>• CSFB–00049529 - CSFB–00049532 |
| 6. | Credit Suisse First Boston Manufacts<br>• (CSFB–00052575 – CSFB–00052595)<br>• (CSFB–00052453 – CSFB–00052475)<br>• (CSFB–00052356 – CSFB–00052382)<br>• (CSFB–00052176 – CSFB–00052202)<br>• (CSFB–00052102 – CSFB–00052127)<br>• (CSFB–00051980 – CSFB–00052008)<br>• (CSFB–00051843 – CSFB–00051875)<br>• (CSFB–00051574 – CSFB–00051606)<br>• (CSFB–00051348 – CSFB–00051376)<br>• (CSFB–00051226 – CSFB–00051225) |
| 7. | Engagement Letter (MNAT 003849 – MNAT 003862) |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | |
|---|---|
| 8. | Warrant (CSFB-00092357 – CSFB-00092369) |

| DEPOSITIONS & EXHIBITS | |
|---|---|
| 9. | Deposition of Jared Felt dated June 15-16, 2006 |
| 10. | Deposition of Thomas Irwin (with exhibits) dated November 8, 2006 |
| 11. | Deposition of Douglas Muir dated September 26-27, 2006 |
| 12. | Deposition of Fiachra O'Driscoll (with exhibits) dated June 29-30, 2006 |
| 13. | Deposition of Alan Shapiro dated September 5, 2007 |
| 14. | Deposition of Myles Standish dated September 21, 2006 |
| 15. | Deposition of Michael Tennenbaum dated October 22, 2007 |
| 16. | Deposition of James Xanthos (with exhibits) August 24, 2006 |
| 17. | Exhibit # 202 to Standish Deposition (Declaration of Douglas Muir in Support of First Day Relief (filed in In re Oakwood Homes Corp., No. 02-13396 (Bankr. De.)), dated November 18, 2002) |
| 18. | Exhibit # 203 to Standish Deposition (OHCLT-05175 – OHCLT-05177) |
| 19. | Exhibit # 205 to Standish Deposition (CSFB-00055756 – CSFB-00055760) |

| EXPERT REPORTS | |
|---|---|
| 20. | The Expert Report of Alan Shapiro dated April 30, 2007 |
| 21. | The Supplemental Expert Report of Alan Shapiro dated August 28, 2007 |
| 22. | The Expert Report of Michael Tennenbaum dated April 27, 2007 |

| DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|
| 25. | Adrian Zawada. Winston-Salem Journal. "Set for a Long Haul; Oakwood Homes' Losses Grow; Outlook of Manufactured-Housing Industry Still Uncertain as |

3

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| | DOCUMENTS CITED IN THE EXPERT REPORT OF ALAN SHAPIRO | |
|---|---|---|
| | Tougher Lending Standards Cut Demand." November 29, 2000 | |
| 26. | Amilda Dymi. National Mortgage News, "Recovery When for Manufactured Housing?" November 13, 2000. Vol. 25, Issue 9 | |
| 27. | Amy Joyner. Greensboro News & Record. "Oakwood Homes Losses $43 Million The Manufactured Housing Company Says That Sales are Improving Slightly." January 27, 2001 | |
| 28. | Associated Press Newswires. "Oakwood Homes Struggles to Pull Out of Slump." May 10, 2001 | |
| 29. | Brian Louis. Winston-Salem Journal. "Oakwood Cuts Losses in Quarter; Fiscal Year is Worse than 2000; Woes are Industrywide." November 21, 2001 | |
| 30. | Findlaw. "Underwriter Due Diligence in Securities Offerings." Findlaw website, http://library.findlaw.com/1999/May/27/126952.html, accessed April 2007 | |
| 31. | George G. Kaufman & Randall S. Kroszner. "How Should Financial Institutions and Markets be Structured, Analysis and Options for Financial System Design." September 27-28, 1996 | |
| 32. | Investopedia. "Investment Bank." Investopedia website, http://www.investopedia.com/terms/i/investmentbank.asp, accessed April 2007 | |
| 33. | Janet Mitchell. "Financial Intermediation Theory and the Sources of Value in Structured Finance Markets." December 2004 | |
| 34. | Monte Burke. Forbes. "Trailer King." September 20, 2002. Vol. 170. Issue 6 | |
| 35. | Ren-Raw Chen & Hsuan-Chu Lin. "The Structural Agency Problem Under Credit Risk." Rutgers Business School, June 2005 | |
| 36. | Rick Appin. High Yield Report. "Bonds Sink to Distressed Area." January 24, 2000. Vol. 11, Issue 4 | |
| 37. | *Oakwood Homes Corporation/OHC Liquidation v. Credit Suisse First Boston.* Objections and Counterclaims. November 13, 2004 | |
| 38. | Financial Advisory Services Agreement between Oakwood Homes Corporation, Oakwood Acceptance Corporation, Oakwood Mobile Homes, Inc., HBOS | |

**EXHIBIT 2**

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 87. | Board Minutes dated 22 April 1999  (KCLH 0925 – KCLH 0927) |
| 88. | Board Minutes dated 17 June 1999  (KCLH 0931 – KCLH 0936) |
| 89. | Board Minutes dated 30 June 1999 (KCLH 0938 – KCLH 0943) |
| 90. | Board Minutes dated 21 July 1999  (KCLH 0948 – KCLH 0954) |
| 91. | Board Minutes dated 2 August 1999 (KCLH0956 – KCLH0959) |
| 92. | Board Minutes dated 10 August 1999  (KCLH 0961 – KCLH 0969) |
| 93. | Board Minutes dated 20 September 1999  (KCLH 0971 – KCLH 0972) |
| 94. | Board Minutes dated 27 September 1999  (KCLH 0974 – KCLH 0976) |
| 95. | Board Minutes dated 20 October 1999  (KCLH 0978 – KCLH 0981) |
| 96. | Board Minutes dated 3 November 1999  (KCLH 0983 – KCLH 0985) |
| 97. | Board Minutes dated 17 November 1999 KCLH 0987 – KCLH 0992 |
| 98. | Board Minutes dated 20 December 1999 (KCLH 0994 – KCLH 0996) |
| 99. | Board Minutes (Shareholders) dated 9 February 2000 (MNAT002742 - MNAT002744) |
| 100. | Board Minutes dated 9 February 2000  (MNAT002745 - MNAT002746) |
| 101. | Board Minutes (Audit Committee) dated 16 February 2000 (OHCLT-13763 - OHCLT-13765) |
| 102. | Board Minutes (Audit Committee) dated 18 April 2000 (OHCLT-13737 – OHCLT13739) |
| 103. | Board Minutes (Valuation Committee) dated 6 June 2000 (OHCLT-04860 – OHCLT-0486) |
| 104. | Board Minutes dated 30 June 2000 (KCLH 1034 – KCLH 1036) |
| 105. | Board Minutes dated 8 August 2000  (KCLH 1038 – KCLH 1042) |
| 106. | Board Minutes dated 20 September 2000 (RCDA 033115 – RCDA 033118) |

## EXHIBIT 2

## Materials Considered in Preparation of Expert Report of Thomas Boland

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 107. | Board Minutes dated 16 October 2000 (KCLH 1059 – KCLH 1061) |
| 108. | Board Minutes dated 15 November 2000 (MNAT006717 – MNAT006722) |
| 109. | Board Minutes dated 20 December 2000 (MNAT006712 – MNAT006716) |
| 110. | Board Minutes dated 30 and 31 January 2001 (KCLH 1124 – KCLH1128) |
| 111. | Board Minutes dated 19 April 2001 (KCLH 1151 – KCLH 1154) |
| 112. | Board Minutes dated 8 June 2001 (KCLH 1172 – KCLH 1174) |
| 113. | Board Minutes (Audit Committee) dated 23 July 2001 (OHCLT-13756 – OHCLT-13758) |
| 114. | Board Minutes dated 24 July 2001 (KCLH 1176 – KCLH 1181) |
| 115. | Board Minutes dated 20 August 2001 (MNAT002585 – MNAT002586) |
| 116. | Board Minutes dated 15 November 2001 (KCLH 1201 – KCLH 1207) |
| 117. | Board Minutes dated 6 May 2002 (OHCLT-02877 – OHCLT-02879) |
| 118. | Board Minutes (Audit Committee) dated 6 May 2002 (KCLH 1229 – KCLH 1230) |
| 119. | Board Minutes dated 25 June 2002 (MNAT006726 – MNAT006728) |
| 120. | Board Minutes dated 29 July 2002 (MNAT006776 – MNAT006777) |
| 121. | Board Minutes (Audit Committee) dated 29 July 2002 (OHCLT-037993 – OHCLT-037994) |
| 122. | Board Minutes dated 19 August 2002 (MNAT006729 – MNAT006730) |
| 123. | Board Minutes dated 30 September 2002 (MNAT006780 – MNAT006782) |
| 124. | Board Minutes dated 18 October 2002 (MNAT006825 – MNAT006826) |
| 125. | Board Minutes dated 28 October 2002 (MNAT006827 – MNAT006828) |
| 126. | Board Minutes dated 4 November 2002 (OHCLT-02761 – OHCLT-02763) |
| 127. | Board Minutes dated 12 November 2002 (MNAT006829 – MNAT006837) |

## EXHIBIT 2

**Materials Considered in Preparation of Expert Report of Thomas Boland**

| BOARD OF DIRECTORS MEETING MINUTES | |
|---|---|
| 128. | Board Minutes dated 14 November 2002 (OHCLT-02655 – OHCLT-02660) |

| PUBLIC SOURCED MATERIALS CONSIDERED IN THE EXPERT REPORT OF THOMAS BOLAND | |
|---|---|
| 1. | Growing Profits Under Pressure: Integrating Corporate and Investment Banking, Ludger Kubel-Sorger, Jurgen E. Schwarz, The Boston Consulting Group, 2002. |
| 2. | Deutsche Bank Annual Report 2006 – Corporate and Investment Banking http://annualreport.deutsche bank.com/2006/ar/managementreport/outlook/corporateandinvestmentbank.html. |
| 3. | Investment Banking – National City Corporation https://www.nationalcity.com/investmentbanking/Aboutus.asp. |
| 4. | BMO Financial Group, U.S. Expansion Strategy, Successfully Leveraging Lending Relationships. |
| 5. | Oakwood Homes Corporation – Company Profile http://www.referenceforbusiness.com/history2/60/Oakwood-Homes-Corporation.html. |
| 6. | Ivy Zelman – Excelling in Stock Analysis, Robin Heffler, JW Magazine, Fall, 2005. |
| 7. | Fleetwood Enterprises Annual Report, 2005, page 49. |
| 8. | Third Party Interference, Philip J. Campanella, Joseph A. Castrodale, Matthew Bender & Company, 2008 |
| 9. | U.S. Labor Markets in 2001: Economy Enters a Recession, David S. Langdon, Monthly Labor Review, February 2002. |
| 10. | A Body Blow to the Economy, David Leonhardt, Luis Uchitelle, New York Times September 16, 2001. |
| 11. | Housing Market is Duddenly Uncertain, Alan J. Heavens, The Philadelphia Inquirer October 7, 2001. |
| 12. | BB&T Capital Markets Equity Research, Manufactured Housing Monthly, November 25, 2002, page 10. |

# <u>EXHIBIT</u> <u>C</u> REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>D</u> REDACTED
# IN ITS ENTIRETY

# EXHIBIT E REDACTED IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>F</u> REDACTED
# IN ITS ENTIRETY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on May 6, 2008, I

caused a copy of the ***Declaration of Whitman L. Holt in Support of Plaintiff's Consolidated***

***Answering Brief in Opposition to Defendants' Motions to Exclude Plaintiff's Expert***

***Testimony,*** to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: May 6, 2008                    CAMPBELL & LEVINE, LLC


                                      */s/ Kathryn S. Keller*
                                      Kathryn S. Keller (No. 4660)
                                      800 N. King Street, Suite 300
                                      Wilmington, DE 19801
                                      (302) 426-1900