IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Oakwood Homes Corporation, et al.,<br>          Debtors.<br><br>―――――――――――――――――――――<br>OHC Liquidation Trust,<br><br>          Plaintiff,<br><br>  v.<br>Credit Suisse (f/k/a. Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a<br>Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>          Defendants. | Chapter 11<br><br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered<br><br><br><br><br>Adversary Proceeding<br>Civil Action<br>No. 07-799 (JFF) |

**DECLARATION OF J. JUSTIN WILLIAMSON
IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY
OF MICHAEL TENNENBAUM PURSUANT TO FED. R. EVID. 702**

I, J. Justin Williamson, declare as follows:

  1.  I am an attorney associated with the law firm of Linklaters LLP, counsel to Defendants in this action. I submit this Declaration in support of Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Exclude the Expert Testimony of Michael Tennenbaum.

2.  Attached hereto as Exhibit A is a true and correct copy of selected portions of the Deposition of Michael Tennenbaum, Ph.D, dated October 22, 2007.

3.  Attached hereto as Exhibit B is a true and correct copy of selected portions of the Deposition of Allen M. Pfeiffer, dated March 27, 2008.

4.  Attached hereto as Exhibit C is a true and correct copy of an e-mail from Whitman Holt to Paul Wickes et al., dated April 14, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 7, 2008
New York, New York

_____
J. Justin Williamson, Esq.

# EXHIBIT A

## In The Matter Of:

### OAKWOOD HOMES CORPORATION, et al./OHC LIQUIDATION TRUST v.
### CREDIT SUISSE, et al.

---

### MICHAEL TENNENBAUM, Ph.D.
October 22, 2007

---

## MERRILL LEGAL SOLUTIONS

25 West 45th Street - Suite 900

New York, NY 10036

PH: 212-557-7400 / FAX: 212-692-9171

**TENNENBAUM, MICHAEL - Vol. 1**

Page 34

1  basis of your analysis?
2     A. This set of projections deals with Oakwood on a
3  scale-down basis where it has essentially reduced the
4  financial services income flow in prospect dramatically
5  from what was the case while it was heavily engaged in
6  securitizations. So these are the kinds of projections
7  that would underlie the going-forward operations of
8  Oakwood in prospect, as of fall 2002.
9         Knowing that you are going to have to cut
10 back on securitizations, you are going to cut back on
11 loan-to-value ratios, you are going to be much more
12 careful with respect to your customers, and you are
13 going to cut back on manufacturing plants, consistent
14 with the rationalization plan that had been under
15 consideration for quite sometime.
16    Q. So these are projections with respect to an
17 Oakwood group of companies, rather different in shape
18 and business from Oakwood as it actually existed in the
19 summer of 2002; is that correct?
20    A. It is -- no. It is a set of projections for an
21 Oakwood that on a going-forward basis whose revenue
22 stream would be below what it had been during the late
23 1990s, when it was actively involved in a lot of
24 securitizations and would reflect a cutback in the
25 securitization aspect of its business.

Page 35

1     Q. And it would reflect a number of other
2  differences from the company as it actually existed in
3  the summer of 2002. For example, it assumes, doesn't
4  it, a significant reduction in the number of retail
5  sales centers?
6     A. It does.
7     Q. And it assumes, for example, a significant
8  reduction in manufacturing capacity?
9     A. Yes. It's all part of the rationalizations
10 process that I referred to.
11    Q. What do you mean by "the rationalization
12 process"?
13    A. That's what the company was calling it in
14 internally. It was a series of steps which the company
15 was considering and was looking at going forward with,
16 which would reduce the number of manufacturing plants,
17 reduce the number of retail sales operations, exit
18 states where there had been a lot of foreclosure
19 problems, and cut back on securitizations.
20    Q. And the way in which they were going to be able
21 to cut down on securitizations, essentially, was that
22 they were going to go out of the business of providing
23 retail financing for the customers and let other third
24 parties do that; isn't that right?
25    A. Largely, yes.

Page 36

1     Q. So instead of saying: We'll make you the loan,
2  they'd say: Here's our friend at XYZ Company that you
3  can talk to about a loan?
4     A. Yes.
5     Q. Okay. Did you compare the numbers in the
6  five-year plan forecast that's included in your report
7  with contemporaneous projections that were done in the
8  summer of 2002 or thereabouts?
9     A. I did, yes.
10    Q. So could you tell me, for example, how the net
11 sales figure on page 22, the top line, how that number
12 would have compared to other internal cash flow
13 forecasts at the company at the time, that is, in the
14 summer of 2002?
15    A. They would be lower because the company would not
16 be making sales on as high loan-to-value ratio basis as
17 it had been in the past. So there will be fewer
18 qualified buyers, less in the way of manufacturing. So
19 net sales would be rather consistently lower than other
20 projections which preceded this.
21    Q. Okay. Are you familiar with the provisions of
22 the plan of reorganization of Oakwood Homes that was
23 actually confirmed in this case?
24    A. Only very vaguely.
25    Q. Do you know whether in connection with a plan of

Page 37

1  reorganization the company was sold?
2     A. That's my understanding.
3     Q. It was sold to Clayton Homes; is that right?
4     A. That's my understanding.
5     Q. And are you familiar with the fact that prior to
6  the agreement to sell the company to Clayton Homes there
7  was a so-called stand-alone plan of reorganization
8  proposed?
9     A. I don't recall.
10    Q. These forecasts that we're looking at here
11 starting at page 22, these are forecasts that assume
12 that Oakwood continues as an independent entity, but on
13 the reduced scale that you've described; is that right?
14    A. Yes.
15    Q. Okay.
16       THE REPORTER: Excuse me, Counsel. When you
17 have a moment, I could use a short break.
18       MR. WICKES: I'd be happy to take a break
19 right now.
20       THE REPORTER: Thank you.
21       THE VIDEOGRAPHER: Okay. One second,
22 please. Going off the record, the time is 10:39.
23          (Recess)
24       THE VIDEOGRAPHER: We're back on the record.
25 The time is 10:52.

Page 38

1  BY MR. WICKES:
2  Q. Doctor, before we took our break, we were talking
3  about the five-year plan projections that start on page
4  20 of your report, just to summarize where we are.
5      These projections were prepared by someone
6  at the Miller Buckfire firm; right?
7  A. I believe so.
8  Q. Do you know who?
9  A. No.
10 Q. Did you ever talk to anyone at Miller Buckfire
11 about them?
12 A. No.
13 Q. Okay. Do you know what sources they used to
14 prepare them?
15 A. I know part of the source was backup work that --
16 prior work that had been done by the company.
17 Q. And you know that from your discussions with
18 Mr. Muir?
19 A. Yes.
20 Q. Okay. And you are not sure when they were
21 prepared?
22 A. That's correct.
23 Q. Okay. And they were prepared in connection with
24 a plan of reorganization different from the one that was
25 actually confirmed; is that right?

Page 39

1  A. I don't know that to be a fact.
2  Q. Well, you know that the plan of reorganization
3  that was confirmed involved a sale of the company to
4  Clayton Homes; right?
5  A. That's my understanding.
6  Q. And these projections are for a stand-alone
7  company?
8  A. Which may have been information that Clayton used
9  to formulate its offer price. I don't know.
10 Q. But these are not -- these numbers don't assume a
11 combination with Clayton homes?
12 A. Oh, no, they don't, that's correct.
13 Q. And your conclusion about the value of the
14 company as of September of 2002 is based on using the
15 methodology you disclosed, you describe, later in your
16 report to this set of numbers in this so-called
17 five-year plan?
18 A. Yes.
19 Q. Okay. And if you go to page 29, there's
20 something called "late 2001 projections." Where do
21 these projections come from?
22 A. These are also projections that were contained in
23 various presentations from or done by CS First Boston.
24 Q. Let me stop you. What do you mean when you say
25 "also" in that answer?

Page 40

1  A. Did I say "also"?
2  Q. Yes.
3  A. I apologize.
4  Q. It's all right.
5  A. These are presentations -- these are projections
6  that came from presentations to the board of directors
7  of Oakwood by CS First Boston, which had at least as
8  part of their basis prior work done by Oakwood Homes
9  internally.
10 Q. Now, with respect to the late 2001 projections,
11 the text of your report doesn't tell us where those
12 projections come from. How is it that you are able to
13 tell me now where they came from?
14 A. I recall where they came from as a result of
15 doing the work. I recall the documents that I reviewed.
16 Q. Okay. And do you know -- you say the projections
17 were in a report prepared by CSFB. Do you know the date
18 of that report?
19 A. There were several that contained this. My
20 recollection is that they were contained in
21 presentations to the board in late 2002.
22 Q. And do you know who the author is of these
23 projections?
24 A. I don't.
25 Q. Do you know whether they represent independent

Page 41

1  work of CSFB as opposed to just taking information from
2  the company and including it in the report?
3  A. I don't know.
4  Q. Okay. Did you talk about that question with
5  Mr. Muir?
6  A. I did.
7  Q. And what did he tell you?
8  A. He indicated that these were projections that
9  were presented to the board by CS First Boston, and that
10 they were at least in part derived from prior work done
11 in Mr. Muir's shop at the firm, at the company.
12 Q. Do you know whether these materials are just
13 copies of work that Mr. Muir's shop had done as opposed
14 to based on some work Mr. Muir had done with some
15 independent input from CSFB?
16 A. I don't know.
17 Q. So you have no idea with respect to the
18 projections shown on page 30 how much of those
19 projections represent work done by CSFB and how much
20 represents work done by the company?
21 A. Correct.
22 Q. And with respect to the mid-2001 projections,
23 same question. Do you know who the author of those
24 projections is?
25 A. These were also contained in a document that was

# EXHIBIT B

```
 1

 2

 3     UNITED STATES BANKRUPTCY COURT

 4     DISTRICT OF DELAWARE
       ------------------------------------x
 5
       In re:
 6                                    Chapter 11
       OAKWOOD HOMES CORPORATION,     Case No. 02-13396 (PJW)
 7     et al.,                        Jointly Administered

 8                      Debtors.
       ------------------------------------x
 9     OHC LIQUIDATION TRUST,

10                      Plaintiff,

11                                    Adv. Proc. No.
                                      04-57060 (PJW)
12              -against-

13     CREDIT SUISSE FIRST BOSTON, et al.,

14                      Defendants.
       ------------------------------------x
15

16          Videotaped DEPOSITION of ALLEN M. PFEIFFER,

17     held at the offices of Linklaters LLP, 1345 Avenue of

18     the Americas, New York, New York 10105, on the 27th

19     day of March 2008, commencing at 9:36 a.m., before

20     Colette Cantoni, a Registered Professional Reporter

21     and Notary Public of the State of New York, pursuant

22     to Notice.

23

24

25
```

                                                                1

**Page 186**

Pfeiffer

are the projections which you opine in this paragraph were not extremely aggressive; isn't that true?

MR. WILLIAMSON: Objection.

A    What I'm trying to say is that this was a report written in draft with one potential rebuttal of Tennenbaum being that maybe those projections were not extremely aggressive.

But I also remember sitting here today that we were unclear as to exactly what Tennenbaum's sources were for all his projections. And therefore, it likely became more clear after his deposition in which he clarified that, and then at that point, if I saw the schedules and analyzed them, I could then ascertain as to whether we indeed thought the projections he used were the projections that he indeed did use.

Q    You're testifying here today under your oath right now that you don't know whether the projections that you're referring to on page 523321 are the set of projections that Dr. Tennenbaum used in his 2001 DCF?

MR. WILLIAMSON: Objection. I think he just answered that.

A    Okay. What I'm saying is once again that

**Page 187**

Pfeiffer

the paragraph refers to what we believe to be the projections that he used in his report.

However, I also know that as of this time we asked the attorneys to clarify certain things in depositions that were unclear to us. And I just don't know 100 percent for sure if after clarifying that we understood the projections to be the same projections we understood them to be as of this date.

Q    Well, tell me anything you ever found out from the beginning of time to this moment that ever would lead you to believe that the projections aren't the same ones.

MR. WILLIAMSON: Objection. Same ones as what?

Q    Name something.

A    What I'm saying is that they were mid 2001, they were described as mid 2001 and late 2001 projections.

We -- I remember being confused as to how they were characterized as that, when you look at the actual document and they're labeled 2002.

So I don't know, and what I'm saying is I just don't know, I didn't draft this report, I don't know what this -- I don't know what the analysis was

**Page 188**

Pfeiffer

behind this. I haven't seen this report in six months, and therefore I just don't know. I don't want to make a statement that I'm not sure of.

Q    Okay. Well, you may not have seen this report in six months; but you did pass upon it and make corrections to it in June of 2007, which is about nine months ago, correct?

A    Right. I probably haven't seen it since. Right.

Q    Okay. And this purported to be a draft of testimony that you were prepared to offer in Court under oath as being your professional opinion, wasn't it?

A    This was a draft of opinions that I might have offered, yes.

Q    Okay.

MR. WILLIAMSON: Just out of curiosity. Tony, you were not going to mark the Tennenbaum report and ask him about the projections that are referenced in here?

MR. CASTANARES: I have no particular reason to mark it at the moment. Thank you.

Q    I notice that at the top of this page you say, after correcting for the mistakes identified in

**Page 189**

Pfeiffer

the bullet points above, "Oakwood's enterprise value exceeded its debts and guarantees under any reasonable discount rate for both the September 2001 and September 2002 valuation dates. See Schedules 3 A and 3 B."

First, what are Schedules 3 A and 3 B? Have you produced those to me?

(Witness reviewing document.)

A    I don't know.

Q    Okay.

A    I probably never saw them.

Q    I haven't seen them.

MR. CASTANARES: And I would like to make an official demand for production of those documents at this time.

Q    Leaving that aside, however. It is correct for me to read that sentence as indicating that Oakwood's enterprise value was far in excess of the $350 million that Dr. Tennenbaum finds by his DCF study in September of 2001; isn't that true?

MR. WILLIAMSON: Objection.

(Witness reviewing document.)

A    It's true that it says that after correcting for the mistakes identified in the pages

Pfeiffer

before, that the enterprise value would go up if you corrected for those mistakes and it would exceed its debt as of both of those dates.

Q   So your analysis in June of 2007, nine months ago as we sit here today, on the previous page shows the debt and guarantees to be $470 million in September of 2001; am I right?

A   That's what it shows.

Q   And the study that you refer to in the next sentence at the top of page 523321 tells us that the enterprise value you found exceeded that number of $470 million in 2001; isn't that true?

A   No. You are mischaracterizing what the report says and what I believe. And you know that. In --

Q   I don't know that. I would like you to explain it to me, please.

A   Okay. I will.

This report does nothing to provide our opinion relative to value.

This report simply says that if you correct his errors with his methodology and his projections, you arrive at a vast -- a very different conclusion, and one that has the value exceeding its

190

Pfeiffer

debt.

We did not, in this report or in my final expert report, attempt to make our own opinion as to what the enterprise value was as of that date.

Q   Well, what do you suppose Schedules 3 A and 3 B are?

A   I suppose that they are what they say they are, which is an explanation in more technical detail as to what the errors are that are summarized in the preceding page, and what the impact of those errors are, and maybe a combination of those errors leading to a particular value.

Q   So the effect of this isn't that you were saying that the value, Oakwood's enterprise value exceeds $470 million, you were saying that Dr. Tennenbaum should have found Oakwood's enterprise value to be larger than the $350 million number that he found; is that right?

MR. WILLIAMSON: Objection.

A   I'm saying that Dr. Tennenbaum's method corrected for errors would conclude on a number that's greater than $470 million.

I certainly don't believe that the method nor the conclusion is accurate.

191

Pfeiffer

Q   In fact, sir, the next sentence of the report at 523321 says "The equity values contained in Schedules 3 A and 3 B are upwards of 1.0 billion, using a discount rate that is consistent with the view of a highly respected valuation professor and author cited as an authority by Dr. Tennenbaum."

Now, are you saying, sir, that if you took Dr. Tennenbaum's 2001 projections and applied the discount rate that's contained in Schedules 3 A and 3 B you'd get to a billion dollars in enterprise value?

MR. WILLIAMSON: Objection.

A   What I'm saying is, as described in the pages that follow, is exactly that. That it's poking fun at the ridiculousness of his methodology and his cash flow.

That he uses a set of projections and slaps on a discount rate between 60 and 20 percent, and the methodology is unreasonable, speculative, and the conclusions are illogical, as if you apply that, those projections to the appropriate discount rate you would arrive at an equity value -- an enterprise value over a billion dollars.

Q   What was the appropriate discount rate?

192

Pfeiffer

I thought you told me you didn't derive an appropriate discount rate.

MR. WILLIAMSON: Objection.

A   What I told you is I didn't opine on an appropriate discount rate for purposes of my report.

I said probably I didn't recall if I opined on a discount rate otherwise.

And I'm going to look at right now this report to see if there's a discount rate.

However, even if there's a discount rate in here, that's not my opinion on what a discount rate is. It's correcting for his errors in the way he applies his discount rates based on the sources that he quotes. So --

Q   So you don't really have any idea what the appropriate discount rate to apply to the September 2001 projections should be, do you?

MR. WILLIAMSON: Objection.

A   I have not reached an opinion on what the discount rate should be, yes.

Q   All right. Let me ask you to look back to page 523320, paragraph 6.

"Tennenbaum report provides no analysis to support the assertion that the projections he used

193

# EXHIBIT C

**Williamson, Justin (New York)**

| | |
|---|---|
| **From:** | Holt, Whitman L. [wholt@Stutman.com] |
| **Sent:** | Monday, April 14, 2008 12:25 PM |
| **To:** | Wickes, R. Paul; Warren, Mary K.; Osnato, Mike; Williamson, Justin (New York); Machan, Kate |
| **Cc:** | Castanares, Tony; Ray, Stephan M.; Yun, Scott H.; Marla R. Eskin (E-mail); Kathryn S. Keller |
| **Subject:** | RE: Oakwood Homes: PTO, Etc. |
| **Attachments:** | OHC_PTO_ExC.doc; OHC_PTO_ExA.xls |

Counsel:

Please find attached an updated deposition designation chart, which includes our designations from the Boland and Pfeiffer depositions. We have also added a few documents to our proposed trial exhibit chart, and I have attached an updated version of that chart. If we have any further changes prior to receiving your turns of all the documents this Thursday, we will send them to you.

Please also note that, based upon the additional information recently provided during Mr. Pfeiffer's deposition and in the associated document production, Dr. Tennenbaum believes that his April 2007 written report and his October 2007 deposition offer an incomplete statement of the opinions that Dr. Tennenbaum will express at trial. Accordingly, and in compliance with the obligation created by FRCP 26(e) and 26(a)(2)(D), Dr. Tennenbaum intends to provide a supplemental expert report to Defendants. While we will unquestionably provide you with that supplemental report within the window required by the FRCP (i.e., 30 days before trial), we hope to have it for you prior to the May 8 pre-trial conference.

Thanks,

***Whitman L. Holt***
Stutman, Treister & Glatt, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5690
Facsimile: (310) 228-5788
wholt@stutman.com

>   -----Original Message-----
>   **From:** Holt, Whitman L.
>   **Sent:** Wednesday, April 02, 2008 3:21 PM
>   **To:** 'Wickes, R. Paul'; Warren, Mary K.; Osnato, Mike; Williamson, Justin (New York); Machan, Kate
>   **Cc:** Castanares, Tony; Ray, Stephan M.; Yun, Scott H.; Marla R. Eskin (E-mail); 'Kathryn S. Keller'
>   **Subject:** Oakwood Homes: PTO, Etc.
>
>   Counsel:
>
>   Please find attached Word/Excel copies of our proposed drafts of the following:
>
>   1.   The Pre-Trial Order;
>
>   2.   Our chart of trial exhibits;
>
>   3.   Our chart of deposition designations;
>
>   4.   Jury instructions for the start of trial;

5/6/2008

5.   Jury instructions at the close of evidence; and

6.   The jury's verdict form.

Please note the following:

1.   Plaintiff fully reserves all rights to modify any or all of these documents based upon Defendants' response(s). In particular, we note that we did not see any of Defendants' statements for Parts IV and V of the PTO when we did this last October (and, indeed, still have yet to receive a list of the affirmative defenses that Defendants will assert at trial), which means Plaintiff will likely have a number of revisions/additions once we are provided with that material.

2.   For similar reasons, we further reserve all rights to modify the trial exhibit chart and the deposition designation chart. In particular, we intend to designate portions of both the Boland and Pfeiffer depositions, and will provide a timely supplement of the designation chart once we receive and review the formal versions of those transcripts (note that during the Boland deposition, Tony told Mary that we did not intend to designate material if you were not going to call Boland as a witness - on further consideration, however, we wish to do so). Please be aware that Plaintiff intends to proffer portions of those depositions as evidence at trial irrespective of whether Defendants actually call either witness to testify.

3.   To smooth this process, we would appreciate it if you send us clean Word copies of any revised drafts and include redlines as against our prior drafts. We will reciprocate during our turns.

In addition, we note the following open issues that were raised in prior e-mails and that we would like to resolve fairly soon:

1.   We understood that Defendants would be sending us drafts of the jury instructions regarding those matters as to which they have the burden of proof today. (*See, e.g.*, Tony's March 13 e-mail to Paul and Paul's March 19 e-mail to Tony.) We have yet to see any drafts of those instructions. Please clarify when we can expect to receive this material.

2.   We would still like to prepare some joint exhibits to assist the jury, such as a cast of characters and a time-line of events. (*See, e.g.*, Tony's March 5 e-mail to Paul.) Please advise as to your thoughts on this, as well as the process you would like to follow if you believe this is worthwhile.

3.   We would appreciate some clarification about Paul's prior reference to "Rule 32 (a)(3)(B)" to ensure we understand the issue he was getting at. (*See* Tony's March 19 e-mail to Paul.)

4.   We reaffirm our request for production of Schedules 3A and 3B (as well as all other attachments) to the 2007 draft Pfeiffer rebuttal report, which was marked as Exhibit 630, and would appreciate some sense of (i) when we can expect to receive that material or (ii) if it will be necessary to bring a formal motion to compel this production. (*See* Tony's March 31 e-mail to Justin.)

5.   We have yet to receive the signature pages and errata sheets for a number of depositions. (*See* my March 6 e-mail to Justin.)

We look forward to your response(s) on April 17 and remain hopeful that the parties will be able to file fully consensual versions of these documents in May.

Best regards,

**_Whitman L. Holt_**
Stutman, Treister & Glatt, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5690
Facsimile: (310) 228-5788
wholt@stutman.com

5/6/2008

```
*****************************************************************
```
This Internet e-mail contains confidential information
which is intended only for the addressee and which may
be privileged under applicable law.  Do not read, copy
or disseminate it if you are not the addressee.  If you
have received this message in error, please notify the
sender immediately and delete it.  Thank you.
```
*****************************************************************
```

5/6/2008

## CERTIFICATE OF SERVICE

I, Lee E. Kaufman, do hereby certify that on May 7, 2008, I caused a copy of the foregoing **Declaration of J. Justin Williamson in Support of Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Exclude the Expert Testimony of Michael Tennenbaum Pursuant to Fed. R. Evid. 702** to be served upon each party on the attached service list in the manner indicated thereon.

*/s/ Lee E. Kaufman*
Lee E. Kaufman (No. 4877)

## SERVICE LIST

**Via Hand Delivery**
Marla R. Eskin, Esq.
Kathleen Campbell Davis, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801

**Via First Class Mail**
Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

RLF1-3281161-1