## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re:  Civil Docket Nos.** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | **39-40, 50-53, 55-57, 59 & 80** |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Tony Castañares (CA SBN 47564)     -&-     Marla Rosoff Eskin (No. 2989)
Stephan M. Ray (CA SBN 89853)              Kathleen Campbell Davis (No. 4229)
Scott H. Yun (CA SBN 185190)               Kathryn S. Keller (No. 4660)
Whitman L. Holt (CA SBN 238198)            CAMPBELL & LEVINE, LLC
STUTMAN, TREISTER & GLATT, P.C.            800 N. King Street, Suite 300
1901 Avenue of the Stars, 12th Floor       Wilmington, DE 19801
Los Angeles, CA 90067                      (302) 426-1900
(310) 228-5600

*Special Counsel for the OHC Liquidation Trust*

Dated:  May 12, 2008

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

SUMMARY OF ARGUMENT ................................................................................1

RELEVANT BACKGROUND FACTS.......................................................................4

ARGUMENT .....................................................................................................13

    A.      Plaintiff's Unified Statement Of The Case................................................13

    B.      *In Pari Delicto* Simply Has No Application Here; Or, At The Very
           Most, It Raises Factual Inquiries That Must Be Resolved By The
           Jury At Trial................................................................................19

           1.      Any "Wrongdoing" By Oakwood Was Separate And
                  Distinct From The Inherently Personal Wrongdoing Of
                  Credit Suisse. ...............................................................19

           2.      Because Credit Suisse Was An Oakwood "Insider,"
                  Defendants Cannot Claim Shelter Under *In Pari Delicto* As
                  A Matter Of Law.............................................................21

           3.      At A Bare Minimum, The Jury Must Weigh The Relative
                  Allocation Of Culpability As Between Oakwood And
                  Credit Suisse. ...............................................................26

    C.      Neither Dr. Shapiro's Testimony Nor Plaintiff's Theory Of The
           Case Rests Upon Credit Suisse's Strawman Tale Of Exclusive
           Fiduciary Duties To "Bondholders."..................................................27

    D.      Because The Damages Suffered By Oakwood Would Not Have
           Happened "But For" Credit Suisse's Malfeasance And Were A
           Reasonably Foreseeable Outcome For Credit Suisse, Plaintiff Can
           Easily Prove "Proximate Cause" At Trial. ...........................................30

           1.      The $50 Million In Damages Calculated By Dr.
                  Tennenbaum Was Plainly Foreseeable To Credit Suisse
                  And Directly Traceable To Their Misconduct..............................32

           2.      The Proximate Cause Element Is Easily Satisfied With
                  Respect To The Roughly $21 Million In Fees Received By
                  Credit Suisse In 2001-2002..................................................36

           3.      There Remains A Lower Standard Of Causation And
                  Damages For Plaintiff's Breach Of Fiduciary Duty Claim,
                  Which Is Easily Met.........................................................37

E.    There Is Ample Evidence That Credit Suisse Was Acting As A Financial Advisor To Oakwood Long Before August 19, 2002, Thus Creating An Implied Contract...........................................................38

F.    Defendants Simply Misunderstand Plaintiff's Theory Of Negligence, As To Which There Is Substantial Supporting Evidence.................................................................................................39

CONCLUSION................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
   722 F.2d 988 (2d Cir. 1983) .................................................................................. 37

*In re Allegheny Int'l, Inc.*,
   118 B.R. 282 (Bankr. W.D. Pa. 1990) ............................................................. 23, 24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 13

*Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*,
   203 B.R. 184 (Bankr. S.D.N.Y. 1996) ................................................................. 39

*Baltimore & Ohio R.R. Co. v. United States*,
   261 U.S. 592 (1923) ............................................................................................. 39

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) ............................................................................................. 26

*Bear Stearns & Co. v. Daisy Sys. Corp. (In re Daisy Sys. Corp.)*,
   97 F.3d 1171 (9th Cir. 1996) ............................................................................... 36

*Bellis v. Tokio Marine & Fire Ins. Co.*,
   No. 93-6549, 2002 U.S. Dist. LEXIS 1714 (S.D.N.Y. Feb. 5, 2002) .................... 31

*In re Boice*,
   640 N.Y.S.2d 681 (N.Y. App. Div. 1996) ............................................................. 39

*BrandAid Mktg. Corp. v. Biss*,
   462 F.3d 216 (2d Cir. 2006) ................................................................................. 21

*Butler v. Shaw*,
   72 F.3d 437 (4th Cir. 1996) ................................................................................. 24

*Chemical Bank v. Stahl*,
   655 N.Y.S.2d 24 (N.Y. App. Div. 1997) ............................................................... 26

*Colo. Capital v. Owens*,
   227 F.R.D. 181 (E.D.N.Y. 2005) .......................................................................... 15

*Comeau v. Rupp*,
   810 F. Supp. 1127 (D. Kan. 1992) ....................................................................... 36

*Comeau v. Rupp*,
   810 F. Supp. 1172 (D. Kan. 1992) ....................................................................... 35

*Cooper Indus., Inc. v. Agway, Inc.*,
   987 F. Supp. 92 (N.D.N.Y. 1997) ........................................................................ 40

*Crowley v. Chait*,
    No. 85-2441, 2004 U.S. Dist. LEXIS 27238 (D.N.J. Aug. 25, 2004) .................... 34, 35, 36

*Crowley v. Chait*,
    No. 85-2441, 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006).............................. 35, 36

*Dexia Credit Local v. Rogan*,
    No. 02-8288, 2003 U.S. Dist. LEXIS 18368 (N.D. Ill. Oct. 10, 2003) ............................ 28

*Floyd v. Hefner*,
    No. 03-5693, 2008 U.S. Dist. LEXIS 25642 (S.D. Tex. Mar. 31, 2008).................... 21, 26

*Grant Thornton, LLP v. FDIC*,
    535 F. Supp. 2d 676 (S.D.W. Va. 2007).............................................................. 33, 34, 36

*HA2003 Liquidating Trust v. Credit Suisse Sec. (USA) LLC*,
    517 F.3d 454 (7th Cir. 2008) ................................................................................................ 22

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*,
    286 B.R. 256 (Bankr. S.D.N.Y. 2002)................................................................................ 25

*Hollinger v. Wagner Mining Equip. Co.*,
    667 F.2d 402 (3d Cir. 1981).................................................................................................. 31

*Indian Towing Co. v. United States*,
    350 U.S. 61 (1955)................................................................................................................. 40

*Jemzura v. Jemzura*,
    36 N.Y.2d 496 (1975) ........................................................................................................... 39

*Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*,
    316 B.R. 451 (Bankr S.D.N.Y. 2004)................................................................................. 30

*Koch v. Rogers (In re Broumas)*,
    203 B.R. 385 (D. Md. 1996), *aff'd in part rev'd in part*, 135 F.3d 769 (4th
    Cir. 1998) .............................................................................................................................. 24

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999), *cert. denied*, 528 U.S. 1080 (2000)..................................... 33

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
    173 F.3d 454 (2d Cir. 1999)........................................................................................... 18, 37

*In re Locke Mill Partners*,
    178 B.R. 697 (Bankr. M.D.N.C. 1995)............................................................................... 24

*Lucent Techs., Inc. v. Shubert (In re Winstar Commc'ns, Inc.)*,
    No. 06-147, 2007 U.S. Dist. LEXIS 31137 (D. Del. Apr. 26, 2007)............................ 24, 25

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005)................................................................................. 37

*Maxwell v. KPMG LLP*,
    520 F.3d 713 (7th Cir. 2008) ............................................................................................... 33

*McAdam v. Dean Witter Reynolds,*
    896 F.2d 750 (3d Cir. 1990)................................................................ 19, 21, 26

*Meinhard v. Salmon,*
    249 N.Y. 458 (1928) ............................................................................ 16

*Milbank, Tweed, Hadley & McCloy v. Boon,*
    13 F.3d 537 (2d Cir. 1994)................................................................... 37

*Miller v. McCown De Leeuw & Co. (In re Brown Sch.),*
    No. 06-50861, 2008 Bankr. LEXIS 1226 (Bankr. D. Del. Apr. 24, 2008)......................... 30

*Mirchel v. RMJ Sec. Corp.,*
    613 N.Y.S.2d 876 (N.Y. App. Div. 1994) ......................................... 39

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998).............................................................................. 25

*In re Oakwood Homes Corp.,*
    449 F.3d 588 (3d Cir.), *cert. denied*, 127 S. Ct. 736 (2006) ................................. 9

*Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.),*
    353 B.R. 820 (Bankr. D. Del. 2006) .................................................. 22

*O'Halloran v. PricewaterhouseCoopers LLP,*
    969 So. 2d 1039 (Fla. Dist. Ct. App. 2007) ...................................... 21

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),*
    340 B.R. 510 (Bankr. D. Del. 2006) .............................................. 21, 24

*OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.),*
    378 B.R. 59 (Bankr. D. Del. 2007) ................................................. 8, 39

*In re Olympia Brewing Co. Sec. Litig.,*
    No. 77-1206, 1985 U.S. Dist. LEXIS 13796 (N.D. Ill. Nov. 18, 1985) ........................... 19

*Palka v. ServiceMaster Mgt. Servs. Corp.,*
    83 N.Y.2d 579 (1994) .......................................................................... 40

*Pan Am Corp. v. Delta Air Lines, Inc.,*
    175 B.R. 438 (S.D.N.Y. 1994)............................................................. 23

*Parvi v. Kingston,*
    41 N.Y.2d 553 (1977) .......................................................................... 40

*Pinter v. Dahl,*
    486 U.S. 622 (1988).............................................................................. 19

*Pratt v. Liberty Mut. Ins. Co.,*
    952 F.2d 667 (2d Cir. 1992)................................................................ 40

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)...................................................................................... 13

*In re Rimell,*
    111 B.R. 250 (Bankr. E.D. Mo. 1990)........................................................... 23

*Rios v. Theodore,*
    624 N.Y.S.2d 949 (N.Y. App. Div. 1995) ..................................................... 31

*Ross v. Bolton,*
    904 F.2d 819 (2d Cir. 1990)........................................................................... 26

*RTC v. Fid. & Deposit Co.,*
    205 F.3d 615 (3d Cir. 2000)........................................................................... 31

*Sea-Land Serv., Inc. v. Barry,*
    41 F.3d 903 (3d Cir. 1994)............................................................................. 24

*In re S. Beach Sec., Inc.,*
    376 B.R. 881 (Bankr. N.D. Ill. 2007) ............................................................ 25

*Stagl v. Delta Airlines, Inc.,*
    52 F.3d 463 (2d Cir. 1995)........................................................................ 31, 40

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),*
    335 B.R. 539 (D. Del. 2005)........................................................................... 21

*Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship),*
    213 B.R. 292 (D. Md. 1997) ..................................................................... 24, 25

*Valhal Corp. v. Sullivan Assocs.,*
    44 F.3d 195 (3d Cir. 1995)............................................................................. 13

## STATUTES AND RULES

11 U.S.C. § 101(31)............................................................................................. 25

11 U.S.C. § 102(3)............................................................................................... 25

Fed. R. Civ. P. 56(c)............................................................................................ 13

## OTHER AUTHORITIES

S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), *reprinted in* 1978 U.S.C.C.A.N.
    5787, 5810, 6269............................................................................................. 23

Black's Law Dictionary (7th ed. 1999).......................................................... 19

1 J. Story, Equity Jurisprudence (13th ed. 1886) ....................................... 26

Restatement (Second) Conflict of Laws §§ 6 & 145 (1971)..................... 14

## NATURE AND STAGE OF THE PROCEEDINGS

Pursuant to the Court's April 29 Order [D.I. #80], Plaintiff submits this Answering Brief in opposition to the Motion for Partial Summary Judgment (the "**MSJ**" [D.I. #39]) filed by the defendants (collectively, "**Defendants**" or "**Credit Suisse**") and in response to their opening brief in support of the MSJ (the "**Defendants' Brief**" [D.I. #40]; cited herein as "Def. Br. at __").

## SUMMARY OF ARGUMENT

As set forth in the Counter-Statement Certifying That Genuine Issues of Material Fact Exist (the "**Counter-Statement**" [D.I. #50]),[1] myriad genuine issues of material fact prevent summary disposition of this case as a matter of law. Our goal here is to amplify that Counter-Statement in three ways: (1) clarify and state our *actual* theory of this case, so the Court may evaluate the MSJ against the backdrop of *that* case, not Defendants' "strawman" case; (2) provide the legal standards which govern the issues raised by the real case; and (3) further develop the case's factual background and apply the law to those facts. Upon completion of this process, it will be clear why all the arguments raised in the Defendants' Brief are fatally flawed and why the MSJ should be denied in its entirety. Among those flaws are the following overarching issues.

First, the *whole* MSJ is tainted from the initial lines of the Defendants' Brief, at which they assert that "the proposition on which Plaintiff's claims rest" is that "Credit Suisse, one of Oakwood's banks, had a duty to force Oakwood into bankruptcy at a time when the Company

---

[1]    Plaintiff recognizes that the Court's review of the Counter-Statement and related papers led the Court to conclude that full briefing on the MSJ was necessary. Nevertheless, we submit that the Counter-Statement continues to be valuable and should be read in conjunction with this Answering Brief. Additionally, in order to avoid duplication, we have not reproduced the exhibits already submitted with the Counter-Statement, but will instead refer to exhibits attached to the Holt Declaration previously filed in support of the Counter-Statement (which are cited herein as "CS Ex. '__'"). Materials not previously submitted with the Counter-Statement are attached to the accompanying declaration of Whitman L. Holt in support of this Answering Brief (which are cited herein as "Holt Decl. Ex. '__'").

was intent upon trying to survive" (Def. Br. at 1). But that simply is *not* what this case is about.

This case is about a financial institution that over time developed many mutually interdependent and reciprocally reinforcing relationships with Oakwood, including as a risk-insulated lender, underwriter, financial advisor, and powerful warrant holder – making it a fiduciary and insider with ready access to material, non-public information, not a mere "bank." While acting as Oakwood's trusted fiduciary, Credit Suisse embarked on a lucrative campaign (for Credit Suisse) of breaching duties by, *inter alia*, (1) failing to investigate the effects of the many value-destroying transactions it structured and executed; (2) failing to advise Oakwood about those effects or the problems Credit Suisse knew plagued Oakwood's "business-as-usual" path; and (3) ultimately failing to withdraw from what it knew to be a harmful, value-destroying relationship. While an alternative path *may* have led to an earlier bankruptcy, it is misleading at best to suggest Credit Suisse ever had to "force" Oakwood into bankruptcy. But the law *did* require Credit Suisse to exercise far greater care in the course of its dealings with Oakwood in 2001-2002, and the failure to exercise such care caused at least $50 million in damages. Indeed, the law also required Credit Suisse to act with utmost loyalty toward Oakwood, not to exacerbate a course of value destruction by extracting nearly $21 million in fees for itself. This formulation – one grounded in centuries of black letter law – is the case that Plaintiff will present to the jury and prove at trial, and it in no way resembles the crass strawman fabricated by defense counsel.

Second, Defendants resort to another red herring to support their causation point, creating an absurd chain of causal hoops for Plaintiff to jump. Yet such leaps are not necessary, because the evidence demonstrates that Oakwood's losses were a direct consequence of Credit Suisse's conduct and were foreseeable (and actually foreseen) by Credit Suisse. Indeed, the huge fees received by Credit Suisse are a particularly direct and foreseeable damages component, as to

which Plaintiff's breach of fiduciary duty claim allows for a lower standard of causation in any event. Consequently, the evidence justifies putting both damages theories to the jury at trial.

Third, Defendants are not entitled to the defense of *in pari delicto*, for at least three separate reasons. First, any supposed "wrongdoing" by Oakwood was distinct from Credit Suisse's inherently personal wrongdoing. Blame for the fact that *Credit Suisse* failed to meet proper standards of diligence and advice, and continued to build value-destroying transactions, lies exclusively at Credit Suisse's own feet – Oakwood did not participate, and logically *could not* have participated, in that wrongdoing. Second, the record reveals an extremely close and multifaceted relationship between Oakwood and Credit Suisse, one from which the jury could reasonably find that Credit Suisse was an "insider" who cannot ever rely on *in pari delicto*. Third, in the unlikely event that the doctrine of *in pari delicto* applies here at all, there remains a hotly disputed factual question about the relative culpability of the parties to resolve at trial.

Fourth, Defendants' repeated suggestion that Plaintiff's theory of liability turns on Credit Suisse owing a *direct and exclusive* duty to Oakwood's "former bondholders" is incorrect. Plaintiff is the successor to Oakwood, the corporate debtors, and also represents the interests of *all* beneficiaries of Oakwood's bankruptcy estates, including but not limited to "bondholders." Plaintiff submits that Credit Suisse's fiduciary relationship with Oakwood meant that Credit Suisse always owed fiduciary duties to Oakwood, *the corporation*, which duties expanded to require at least *some consideration* of the effects of a "business-as-usual" course on Oakwood's creditors (as residual stakeholders) once Oakwood was insolvent, or nearly so. This construct is the only one ever embraced by Plaintiff's expert, Dr. Shapiro (although even it is not necessary to his opinions), and is the same one recited in the Defendants' Brief. It easily survives the MSJ.

Fifth, Defendants also offer the Court an excessively limited characterization of

Plaintiff's negligence and breach of implied contract claims. Both claims stem from the clear record evidence that Credit Suisse voluntarily chose to engage in numerous activities outside the scope of any written contract with Oakwood, which actions not only had to be undertaken with due care but also established a course of conduct giving rise to an implied advisory contract.

In the final analysis, whether considered individually or in the aggregate, all of the arguments Defendants offer in support of the MSJ fail to demonstrate that this is a case fit for disposition as a matter of law. To the contrary, the record contains ample evidence reflecting genuine factual disputes, with very immediate legal consequences, all of which warrant a trial.

## RELEVANT BACKGROUND FACTS

Plaintiff represents the bankruptcy estates of Oakwood Homes Corporation and its affiliates (collectively, "**Oakwood**"). Oakwood was a publicly traded corporation that began producing and selling manufactured homes in the 1940s. In the mid-1990s, Oakwood greatly expanded a business that was ancillary to these two functions: providing financing to the buyers of its products, who often were low-income individuals with poor credit. The rapid and dramatic expansion of Oakwood's financing business was aided, in large part, by the access to capital obtained via "securitizations," most of which were structured and underwritten by Credit Suisse.[2] The quantity and amount of mobile home loans repackaged by Credit Suisse is startling. For example, merely in the period between 2001-2002, Credit Suisse "securitized" over $1.3 *billion* in Oakwood loans, and charged Oakwood approximately $4,600,000 in fees for doing so.[3]

---

[2]    "Securitization" is a process whereby expected payment streams are pooled and structured into descending levels or "tranches" of securities, which are then sold. For a description of this process as to Oakwood, see, e.g., Muir Dep. Tr. at 42:17- 44:5 [Holt Decl. Ex. "C"].

[3]    This amount is solely for the securitizations and just the tip of the fees iceberg. While Credit Suisse hopes to limit this case to "securitization-related services," *far* more is at issue here.

Oakwood's principal contact at Credit Suisse regarding the securitizations was Mr. Fiachra O'Driscoll.  Although Mr. O'Driscoll initially focused his time on only those tasks that were directly related to the securitization services for which Oakwood had contracted,[4] he soon began to greatly expand his role vis-à-vis Oakwood, as described in further detail below.

Things turned for the worse for the manufactured housing industry in general, and for Oakwood in particular, in 1999 – a period that overlapped with the rapid rise of the now-floundering "subprime" mortgage industry.  In need of liquidity, Oakwood turned to its trusted advisor at Credit Suisse, Mr. O'Driscoll, for help.  Mr. O'Driscoll in turn made a proposal to the New York branch of Credit Suisse's banking arm ("**New York Branch**") that Credit Suisse provide a committed "reverse repurchase" facility that would allow Oakwood to monetize lower rated tranches of securitizations which Oakwood had been holding on its own balance sheet.

The proposed reverse repurchase facility was reviewed by New York Branch's "credit risk management" department ("**CRM**"), including James Xanthos and his supervisor, Thomas Irwin.  In November 1999, Mr. Xanthos and Mr. O'Driscoll traveled to North Carolina to meet with Oakwood's management about the proposed facility.  Shortly thereafter, Mr. Xanthos wrote a detailed memorandum stating his conclusions about Oakwood and strongly recommending that the proposed credit facility be denied (the "**Xanthos Memo**" [CS Ex. "N"]).

The Xanthos Memo provides a blistering account of a corporation in rather deep trouble.  Among other things, the Xanthos Memo states that Oakwood had "very real/immediate bankruptcy risk issues/concerns," a "Negative Cash Flow Position which does not appear will reverse anytime soon," a "management [that] does not have a strong understanding of its marketplace," and a glut of "securitized subordinated securities of which currently their [sic] is

---

[4]    For an account of those services, see O'Driscoll Dep. Tr. at 14:2-18:23 [Holt Decl. Ex. "D"].

no strong investor demand." (*See* Xanthos Memo at CSFB-00250117.) Based upon such concerns, Mr. Xanthos concluded that Oakwood "is the weakest company in its industry's [sic]" and would "not meet their forecasted profitability levels but will rather be fortunate to at best break even." (*See id.* at CSFB-00250117 – CSFB-00250118.) Even worse, Mr. Xanthos found it "hard to believe that management will not continue to experience . . . losses on the sale of its loans due to the fact that the company must securitize quarterly . . . even if doing so results in large losses." (*See id.* at CSFB-00250118.) Accordingly, notwithstanding "Oakwood's relationship with [Credit Suisse's investment banking division,] a review of all the negative factors noted above strongly indicates that [Credit Suisse's] risks are large and that repayment of our line is unknown due to the company's other debt obligations and lack of cash flow capacity." (*See id.* at CSFB-00250117.) Neither the Xanthos Memo nor the multitude of negative information contained therein was ever shared with Oakwood by anyone at Credit Suisse.[5]

In addition to advocating the reverse repurchase facility for Oakwood, Mr. O'Driscoll stepped outside his "securitization" role on numerous other occasions during 1999-2000. For example, Mr. O'Driscoll sought to structure joint transactions between Oakwood and GreenPoint Financial, and provided advice about Oakwood's lending systems and modeling of subordinated REMIC securities. (*See* CS Exs. "L" & "M"; Holt Decl. Ex. "H.") In exchange for these and other non-securitization-related proposals, services, and advice, Mr. O'Driscoll was given information about material, non-public aspects of Oakwood's business "in the strictest

---

[5]    Defendants have suggested elsewhere that nothing in the Xanthos Memo was "a big secret" to Oakwood. (*See* D.I. #90 at p. 10.) Unsurprisingly, this idea is incorrect. As an example, Oakwood's board member, Clarence Walker, testified that in "2000 the issue of bankruptcy was not on the horizon at all" and that he had no "reason to believe that the securitizations engaged in by Oakwood were a harmful financing technique." (Walker Dep. Tr. at 16:4-5, 33:24-34:4 [Holt Decl. Ex. "G"].) These statements are in dramatic contrast to the Xanthos Memo and strongly suggest that no one at Oakwood *was* aware of Credit Suisse's concerns.

confidence," which he then relayed to others at Credit Suisse.  (*See, e.g.*, CS Ex. "O.")

Things turned even worse for Oakwood in 2000, and by the end of the year, Bank of America informed Oakwood that it would not renew the "warehouse" facility Oakwood used for short-term financing of new loans prior to their securitization.  Once again, Oakwood turned to Mr. O'Driscoll for his advice.  Following a series of discussions, Mr. O'Driscoll concluded that *Credit Suisse* could provide a new "warehouse," and he enlisted the help of New York Branch.

With the background of the Xanthos Memo in mind, the main concern CRM had in early 2001 was Oakwood's underwriting process – Oakwood was lending money to people with very poor credit, which was in turn resulting in numerous "repos" (i.e., repossessions of defaulted homes, which then had to be remarketed, resold, and perhaps refinanced).  Mr. Xanthos expressed the need "to gain control of Oakwood's underwriting process."  (*See* Holt Decl. Ex. "I.")  Similarly, Mr. Irwin worried that "Repo'd assets are going to be the major issue [Credit Suisse] face[s] going forward, clear the ability of [Oakwood] to survive hinges on this asset class remaining in 'control.'"  (*See* CS Ex. "S"; *see also, e.g.*, CS Exs. "P" & "Q.")

As in 2000, Mr. Xanthos evaluated the proposed "warehouse" facility.  (*See* CS Ex. "R.")  Even though Oakwood had dropped from "B-" to "CCC" on CRM's internal credit scale, "CRM has approved this transaction as a result of its structure and the economic benefit that [Credit Suisse] can potentially realize."  (*See id.* at CSFB-00513803.)  Put differently, and more directly, (1) the "bankruptcy-remote" nature of the facility ensured that Credit Suisse had virtually no risk of loss if Oakwood filed for bankruptcy, and (2) Credit Suisse would be paid $2.5 million upfront and $15 million over time in exchange for providing the "warehouse."[6]

---

[6]     *See* Holt Decl. Ex. "J."  Of this $17.5 million in anticipated fees, Credit Suisse actually got roughly $11,750,000 (i.e., the $2.5 million upfront and 21 monthly charges of $416,666.67).

Plus, Credit Suisse would get a warrant to purchase nearly 20% of Oakwood's equity through 2009, which gave Credit Suisse the power to become Oakwood's largest shareholder by far.

By the time Credit Suisse agreed to provide the "warehouse" facility, no other lender was willing to consider such a transaction with Oakwood; Credit Suisse "was the only game in town" for that type of facility.  (*See* Muir Dep. Tr. at 52:6-16 [Holt Decl. Ex. "C"].)  Consequently, Oakwood's weak bargaining position left it no choice but to agree to whatever terms and conditions Credit Suisse proposed, no matter how onerous.  (*See id.* at 51:7-52:22.[7])

The initial February 2001 Credit Suisse "warehouse" facility contained a strict 17.5% limitation on the financing of "repo-refi" loans.  However, as Oakwood's prospects turned even worse in 2001 and 2002, that limitation proved too tight.  Oakwood attempted to divert the wave of "repos" via the Loan Assumption Program, which they discussed with Mr. O'Driscoll,[8] but ultimately they asked Mr. O'Driscoll to see if CRM would loosen the limitation, thereby allowing Oakwood to finance even more bad loans.  (*See* CS Ex. "AA"; Holt Decl. Ex. "L.")  Although the eventual problems associated with the "repos" were foreseeable to Credit Suisse in 2000 and 2001, Credit Suisse made no effort to alert Oakwood, but rather let Oakwood suffer the predictably devastating harm.  (*See* Counter-Statement at pp. 2-3 ¶ 2 and the associated exhibits.)

As Oakwood continued to deteriorate it increasingly turned to Mr. O'Driscoll for short-term financing patches.  Foremost among them were the so-called "LOTUS" transactions.  These transactions, which Mr. O'Driscoll unilaterally designed and "negotiated" with Berkshire

---

[7]     *See also OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.)*, 378 B.R. 59, 73 (Bankr. D. Del. 2007) (concluding that "there is a good argument that the two Oakwood Companies were at a severely disadvantaged bargaining [position]" in early 2001).

[8]     *See, e.g.*, Muir Dep. Tr. at 62:7-63:9 [CS Ex. "C"]; Standish Dep. Tr. at 26:23-27:20 [Holt Decl. Ex. "F"]; CS Ex. "CC."

Hathaway,[9] involved the "resecuritization" and guaranty of over $150 million of low-grade "B-2" tranches from past securitizations, which provided Oakwood with quick cash but came at horrifyingly high costs – in economic terms, Oakwood essentially sold these assets for 53 cents on the dollar, but guaranteed full payment of the entire 100 cents.  (*See, e.g.*, O'Driscoll Dep. Tr. at 61:2-63:17 [CS Ex. "D"].)  Despite occupying the lead role in negotiating and structuring the transactions, Credit Suisse performed minimal due diligence of the expected liabilities Oakwood faced as a result of these B-2/LOTUS guarantees, and made absolutely no effort to consider Oakwood's long-term ability to satisfy the massive new liabilities, let alone the adverse effects on Oakwood's existing creditors.  (*See, e.g.*, *id.* at 115:21-116:7 & 574:20-575:8.)  While Oakwood paid Credit Suisse over $3 million in fees in connection with the four "LOTUS" transactions, it subsequently had to pay an outside firm – Andrew Davidson & Co. – to remodel the liabilities properly.  (*See, e.g.*, O'Driscoll Dep. Tr. at 118:5-121:15 [Holt Decl. Ex. "D"].)  Needless to say, Andrew Davidson's work (which really should have been done by Credit Suisse at inception) was challenging due to the nature of the securities,[10] and it also yielded a far higher quantification of the new Oakwood exposure created by Mr. O'Driscoll's complicated structures.

Another stop-gap transaction Mr. O'Driscoll engineered in 2001 was the "servicer advance facility," which allowed Oakwood to pledge receivables it expected to receive as reimbursement for servicing expenses.  (*See* Muir Dep. Tr. at 39:10- 42:11 [Holt Decl. Ex. "C"].)  While no contract obligated Mr. O'Driscoll to design this "facility" for Oakwood, he had no

---

[9]    *See, e.g.*, Millard Dep. Tr. at 17:1-16 [CS Ex. "B"]; Standish Dep. Tr. at 112:8-113:18 [CS Ex. "F"]; CS Exs. "W" & "Y."

[10]    In fact, the legal and factual issues associated with properly valuing the B-2 liabilities in Oakwood's bankruptcy produced a split Third Circuit decision.  *See In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir.), *cert. denied*, 127 S. Ct. 736 (2006).  For a general sense of the analytic difficulties relating to the "LOTUS" securities, see also, e.g., Holt Decl. Ex. "N."

hesitation about suggesting the idea – after all, it too was accompanied by a healthy fee for Credit Suisse (another quarter million). Mr. O'Driscoll took additional steps in 2001 to seek out and structure transactions, ostensibly for Oakwood's benefit, including a sale-leaseback with Credit Suisse and a reinsurance transaction with Chubb Insurance. (*See* CS Exs. "V" & "BB.")

Mr. O'Driscoll further attempted to spread the wealth of Oakwood fees around Credit Suisse, suggesting that his colleague, Jared Felt, "pitch" Oakwood on some costly bond buyback proposals. (*See, e.g.*, Felt Dep. Tr. at 62:20-64:4 [CS Ex. "A"].) Toward that end, Mr. Felt made several presentations for Oakwood, in which Mr. Felt's team knowingly and expressly represented that Credit Suisse was an Oakwood "insider." (*See, e.g.*, *id.* at 448:5-25; CS Ex. "Z," at CSFB-00052890.) When Mr. Felt asked Mr. O'Driscoll if a draft engagement contract should contain a "lockup" requiring that Oakwood contractually commit to using only Credit Suisse as an investment banker for various transactions, Mr. O'Driscoll found it prudent to correct Mr. Felt's misunderstanding of the nature of the Oakwood relationship, informing him in August 2001 that the mere "idea of [Oakwood] doing anything away from us is so unlikely that it's probably a little offensive to them" and that the multifaceted nature of Credit Suisse's roles vis-à-vis Oakwood made Oakwood "feel very shackled to [Credit Suisse]." (*See* Holt Decl. Ex. "K.") The "shackle" that Credit Suisse had managed to get onto Oakwood only grew tighter into 2002.

The great trust and confidence Oakwood placed in Credit Suisse is evident in correspondence sent in 2001-2002. On Oakwood's side, its CFO, Bob Smith, regularly sent Mr. O'Driscoll e-mails containing material, non-public information unrelated to any securitization, and seeking Mr. O'Driscoll's advice about general business problems Oakwood was facing. (*See, e.g.*, CS Exs. "T," "U," "X," "DD," "GG" & "HH.") On Credit Suisse's side, Mr. O'Driscoll and Mr. Felt were given access to Oakwood's outside counsel, with whom they were permitted to

discuss Oakwood's legal issues, sometimes without even copying anyone from Oakwood.  (*See, e.g.*, CS Exs. "EE" & "JJ.")  As this relationship of trust and confidence grew, Oakwood's Mr. Muir increasingly turned to Credit Suisse for all sorts of advice (*see* Muir Dep. Tr. at 194:8-195:5 [CS Ex. "C"]), and Oakwood's CEO Mr. Standish (an ex-attorney) now conceptualizes the parties' relationship in plain fiduciary terms (*see* Standish Dep. Tr. at 46:5-47:10 [CS Ex. "F"]).

Ultimately, the increase in Oakwood's ability to refinance "repos," as well as every other trick Mr. O'Driscoll used to keep Oakwood afloat (and paying him fees), failed to address the basic problem:  Oakwood was continuing to make, securitize, and guarantee bad loans.  The resulting costs led Oakwood to discontinue its Loan Assumption Program in June 2002.  Although no contract required him to do so, Mr. O'Driscoll chose to undertake to prepare a detailed presentation for Berkshire Hathaway explaining the effects of that discontinuation; he then traveled with Oakwood's management to Nebraska to deliver the Credit Suisse presentation to Warren Buffett.  (*See* Standish Dep. Tr. at 122:24-127:25 [Holt Decl. Ex. "F"]; CS Ex. "II.")

The huge and persistent liquidity drain caused by Credit Suisse's value-destroying transactions ultimately led Oakwood to file bankruptcy on November 15, 2002, but not before Oakwood had retained Mr. Felt under a formal contract to help prepare for that bankruptcy (in exchange for an additional bag of fees).  Needless to say, Oakwood's decision to hire Mr. Felt's group was driven by the multifaceted and lengthy relationship of trust and confidence that had been carefully tailored by Mr. O'Driscoll; Credit Suisse's "unique position" and all the financial advice already given Oakwood entitled Credit Suisse to formalize that advisory role in exchange for several million more dollars.[11]  (*See, e.g.*, Muir Dep. Tr. at 143:7-144:14 [CS Ex. "C"].)

---

[11]    In fact, Mr. Felt had long been a *de facto* advisor, regularly approaching Oakwood with his advice, presentations, and other "ideas."  (*See* Muir Dep. Tr. at 64:20-65:3 [CS Ex. "C"].)

Part of this preparation involved reviving the "warehouse" post-petition, because bankruptcy was an event of default thereunder.  Mr. O'Driscoll repeatedly assured Oakwood that this would be done and the "warehouse" would make a seamless transition.  (*See, e.g.*, Standish Dep. Tr. at 201:1-203:19 [Holt Decl. Ex. "F"].)  Although Oakwood relied on Mr. O'Driscoll's word, unbeknownst to Oakwood Mr. O'Driscoll procrastinated and waited until the day before Oakwood filed for bankruptcy even to approach Mr. Irwin about the matter.[12]  As a result, due diligence for the post-petition facility was delayed, which meant Oakwood started bankruptcy without any of the warehouse financing Mr. O'Driscoll had promised, and the warehouse was not partially reopened for weeks.  The preparation of another CRM review memo was also delayed, but this one also underscored how "[o]ver the past three years CRM has consistently questioned [Oakwood] Management's competency and abilities."  (*See* Holt Decl. Ex. "O," at CSFB-00250105.)  Once again, the CRM review memo paints a portrait of managers who simply do not understand basic aspects of their market, projections, complicated financing, and exit strategy.

In retrospect, it is all too clear that the many problems Credit Suisse identified in 2000 and 2001 – real bankruptcy risk, continued losses on securitizations, rising defaults and "repos," Oakwood's lack of any choice but to continue with destructive transactions, and a management that just did not understand its declining market and complex financing structures – *are* the same problems that ultimately led to Oakwood's 2002 bankruptcy.  In other words, as Defendants' own expert witness forthrightly admits,[13] Mr. Xanthos was *right*.  Unfortunately, no one from Credit Suisse – including Oakwood's trusted advisor Mr. O'Driscoll – ever shared Credit Suisse's many concerns (or, indeed, expressed *any* similar concern) with Oakwood.

---

[12]    *See, e.g.*, Irwin Dep. Tr. at 143:12-148:6 [Holt Decl. Ex. "B"]; Holt Decl. Ex. "M."

[13]    *See, e.g.*, Boland Dep. Tr. at 174:13-177:20, 186:14-21, 190:3-16 [Holt Decl. Ex. "A"].

## **ARGUMENT**

Credit Suisse advances five arguments in support of the MSJ: (1) *in pari delicto*; (2) the scope of Credit Suisse's fiduciary duties; (3) an alleged absence of evidence of financial advice prior to August 19, 2002; (4) a supposed lack of negligence; and (5) proximate cause.[14] As demonstrated in turn below, each argument suffers from deep and profuse defects, and none presents a cognizable basis for summary judgment.[15]  Before discussing the details, though, it is crucial to ensure that the Court weighs the MSJ against the backdrop of Plaintiff's *actual* case, not the simple "strawmen" Defendants have created via mischaracterization of Plaintiff's theories and evidence.  Thus our analysis begins with an abbreviated Unified Statement of that case.[16]

**A.    Plaintiff's Unified Statement Of The Case.**

 **a. Theories of liability.**  Plaintiff asserts three common law causes of action

---

[14] Although all five arguments are stated in the Defendants' Brief, Credit Suisse's reply to our Counter-Statement (the "**CS Reply**" [D.I. #59]) reveals that the Defendants really place their faith in only the first and fifth arguments (i.e., *in pari delicto* and proximate causation).

[15] Rule 56(c) provides that summary judgment should be granted only if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "genuine issue" exists whenever "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing that evidence, "inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt."  *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995) (citation and internal punctuation omitted).  More broadly, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[16] We previously set forth a similar and slightly more expansive Unified Statement in our *Consolidated Answering Brief in Opposition to Defendants' Attempts to Exclude Certain Non-Expert Evidence* (the "**Relevance Brief**" [D.I. #76]).  Although the abbreviated statement in this Answering Brief should be sufficient, the Court may also find the statement in the Relevance Brief of use if the Court has yet to consider that specific evidentiary dispute.

13

to try before the jury: negligence, breach of implied contract, and breach of fiduciary duty.[17] These three claims have much in common, principally the duty of reasonable care.

It is useful to analogize this case to one for professional malpractice, albeit malpractice committed by an insider and fiduciary of the victim. Plaintiff contends that Credit Suisse undertook to provide financial advice to Oakwood well before August 19, 2002. This embodies a main and unquestionably material factual dispute: Plaintiff claims that Defendants undertook this role, and Defendants deny it, claiming that they merely provided securitization services, much like a supplier of lumber or stationery. (*See* Counter-Statement at pp. 4-6 ¶ 5.)

Plaintiff will offer considerable evidence that Defendants undertook a far broader role, particularly through Mr. O'Driscoll. All of this occurred even though the securitization documents did not require it. Accordingly, Credit Suisse affirmatively chose to undertake such tasks with due care, just as, for example, a lawyer whose formal retainer was confined to a single lawsuit could have a far greater role if he gives advice on other matters. This basic rule prevails whether a claim sounds in tort or contract. In tort, we say that one must use reasonable care; in contract, that one must deliver the services bargained for, namely competent ones. Analogizing again to a malpracticing lawyer, such as one who allows a statute of limitations to run, we would say that he is liable, either in negligence or for breach of his contract (whether express or merely implied from having undertaken the work) to perform according to professional standards.

Of great significance is the congruity of how we assess the professional's performance: whether in tort or contract, there is a *duty* to render competent services, measured

---

[17]    While Defendants equivocate about the choice-of-law analysis (*see* Def. Br. at 15 n.4 & 25 n.10), the parties agree that New York state has the most significant relationship to this case and that its law should apply here. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS §§ 6 & 145 (1971). Accordingly, we cite New York case law throughout this Answering Brief.

by what reasonable practitioners of the same profession do – i.e., the *standard of care.*

      If a fiduciary relationship existed between Oakwood and Credit Suisse,[18] it also gave rise to a *standard of care* (indeed, a heightened one).  *See, e.g.*, *Colo. Capital v. Owens*, 227 F.R.D. 181, 189 (E.D.N.Y. 2005).  But the fiduciary relationship adds two important wrinkles: first, a claim for breach of fiduciary duty need not meet the usual requirements of causation and damages, a point discussed below; second, there is an added duty of utmost loyalty.  As to the latter wrinkle, Plaintiff will offer considerable evidence that virtually all advice and transactions, express or implied, that Credit Suisse provided Oakwood had two characteristics: first, they were enormously remunerative to Credit Suisse; second, they greatly damaged Oakwood.

      **b.  Breach of duties of care and loyalty.**     The previous section explained the theories under which a duty of care arose between Credit Suisse and Oakwood, and described why a standard of care applies to all three.  That section also explained that Credit Suisse bore a duty of loyalty to Oakwood.  What are these standards and how were they breached here?

      As in other professional liability cases, any duty owed by Credit Suisse required Credit Suisse to act reasonably under the circumstances.  And, as is usual in such cases, Plaintiff has an expert witness to testify about the subject, Dr. Alan C. Shapiro.  Although Dr. Shapiro's expert report does not use legal buzzwords, its substance is to analyze the economics of the various transactions Credit Suisse either engineered or participated in and their effects.  After

---

[18]  Defendants deny such a relationship existed (but they are aware that it is a disputed issue of fact which should be resolved at trial, *see* Def. Br. at 20 n.9), so Plaintiff will prove it.  There is considerable evidence of this, perhaps most glaringly the outright admission by Jared Felt: "We had a fiduciary duty to Oakwood."  (Felt Dep. Tr. at 376:5 [CS Ex. "A"].)  Mr. Felt was Credit Suisse's principal actor regarding the *formal* advisory contract that prevailed in the last 88 days before bankruptcy.  That contract did not mention any fiduciary duty, but it did contain an integration clause.  The necessary conclusion is that the duty Mr. Felt mentioned came from somewhere else – it came from Mr. Felt's understanding and belief, itself based upon his personal knowledge of the totality of Credit Suisse's relationship with Oakwood.

doing so, Dr. Shapiro concludes that the transactions were value-destroying and unreasonable. (*See, e.g.*, Shapiro Report at pp. 36-39 [CS Ex. "I"].)  Dr. Shapiro also points to evidence among Defendants' own documents, including the Xanthos Memo, that Defendants knew this, knew that Oakwood faced immediate bankruptcy risk as early as January 2000, and knew that Oakwood's management did not fully understand the risks, the danger, and the expected losses associated with a business-as-usual course of transactions with Defendants.  (*See id.* at pp. 22-27.)

Dr. Shapiro opines that under these circumstances, Defendants had the obligation to investigate fully the effects of such transactions, to advise Oakwood that Defendants knew the transactions were not in Oakwood's best interest, and ultimately, if necessary, to refuse to partake further.  (*See id.* at pp. 28-36.)  The failure to do *even one* of these things was unreasonable.[19]

While Dr. Shapiro's conclusion as to the standard of care would hold fast absent any fiduciary duty for Credit Suisse, its weight is undoubtedly amplified by the fact that Credit Suisse was an Oakwood insider and fiduciary, obligated to act toward Oakwood with a degree of loyalty and care significantly beyond that normally required by the "morals of the market place" in which arm's length parties interact.  *See, e.g.*, *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928).

Defendants are scornful of any notion that an alleged "bank" must ever refrain from a transaction, but Credit Suisse was no mere "bank," and banks get no exceptions to the ordinary rules of law in any event.  Consider the case of a physician approached by a patient who says, "Hey Doc, give me some more of those addictive pain pills."  Carried to this analogy, Defendants would have us say, "Well, the doctor filled out the prescription legibly, and that's what the patient wanted, judgment for defendant."  But no one would deny that the physician's

---

[19]   Dr. Shapiro also points to additional evidence of the standard of care in Defendants' own manuals governing their relations (including fiduciary relationships), and finds that the conduct here fell short of the standards established by those manuals.  (*See id.* at pp. 27-28.)

duty of care – to act reasonably under the circumstances – required him to investigate the patient's actual needs and weigh them against the dangers of addiction; let alone the doctor's duty to tell the patient how the pills would damage more than help; or ultimately, if the patient replied, "I know that they will harm me, but I want them anyway," to refuse to participate in damaging a patient his duty compelled the doctor to help.

And now suppose that doctor just happened to own the pharmacy downstairs. And then suppose further that the doctor also occupied a fiduciary status vis-à-vis the patient.

**c. Damages and causation.**  It is axiomatic to say that Oakwood's continuation of its business-as-usual path of value-destroying transactions caused it to lose value (and garnered massive fees for Credit Suisse, which were borne by Oakwood).  But this succinct formula is Plaintiff's theory of damages here, and it must be contrasted with the absurd chain of causation posited in Defendants' strawman version of Plaintiff's case.  (*See* Def. Br. at 27.)

The loss of value ("fact of damages") and the amount of that loss are established by the expert testimony of Dr. Michael Tennenbaum.[20]  Using dates giving the best available data (the ends of Oakwood's fiscal years), he compares the fair market value ("FMV") of Oakwood's assets on September 30, 2001 with that same value on September 30, 2002 (mere weeks before the bankruptcy), and finds a diminution of $50 million.  Dr. Tennenbaum does this

---

[20]  Dr. Tennenbaum, in addition to the fact and amount of damages, also opines on the issue of Oakwood's insolvency as of various dates.  This testimony is of significance to some "bench" issues in the case, but it also is relevant to Dr. Shapiro's opinion regarding the standard of care.  Plaintiff contends that a fiduciary of a company that is insolvent or in danger of insolvency must take into account the company's obligation to pay its just debts, which, after all, is an obligation fully imposed by the law.  What may be reasonable advice regarding risk and loss to Exxon or Microsoft may not be reasonable to a company betting creditors' money against long odds.  Defendants deride Dr. Shapiro for not phrasing this standard in the verbiage *du jour*, but it doesn't matter whether we say any third party owes a duty directly to creditors – what matters is that the corporation undeniably does.  *The real question is the reasonableness of financial advice to that corporation, taking that duty into account*.

by using the time-honored method of discounted cash-flow studies for each date.[21]

Defendants would like to conflate Dr. Tennenbaum's testimony with the legal theory of "deepening insolvency," to which they then apply adjectives such as "discredited," "moribund," and the like.  Once again, Defendants are simply mischaracterizing Plaintiff's case to fit their arguments, because their attacks in no way pertain to Plaintiff's *actual* case.  Dr. Tennenbaum's work includes a comparison of the FMV of assets on two dates, rather than a measure of "insolvency."  This is pure economic damages,[22] in the form of plain vanilla loss of asset value, and that measure of damages is available *in addition* to all the fees Credit Suisse was paid.[23]  *See, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 464-66 (2d Cir. 1999).

"But no," say Defendants, "you can't prove that *all* of that loss was our fault." This is not an argument against the fact of damages, or against the amount of damages; instead, it is an argument about *causation*, which we address at length in Part D., *infra*.

---

[21]    *See* Tennenbaum Report at pp. 20-44 [CS Ex. "J"].  Dr. Tennenbaum also used the Black-Scholes model to analyze the implied option value of Oakwood's equity.  *See id.* at pp. 45-50. Defendants have proffered a *Daubert* motion laden with "pot shots" on Dr. Tennenbaum's work, which both we and Dr. Tennenbaum have answered elsewhere.  (*See* D.I. ##81 & 83.)

[22]    If Defendants had their way, the effect would be to deny an insolvent company the right to recover economic damages, ever.  Consider a claim against an insurance broker who negligently fails to insure the factory against fire, causing an asset loss of $50 million to an insolvent company – no one would claim this is a "deepening insolvency" measure.  Yet it is no different from an advisor who negligently advises a corporation to engage in financial transactions that result in a $50 million loss.  This harm isn't actionable because of the diminished dividend to creditors; it is actionable because the negligence resulted in the loss.

[23]    Plaintiff's claim on such fees is not limited to those paid between September 2001 and September 2002.  In actuality, Plaintiff seeks damages in the form of all fees reaching back to an earlier date in 2001, when Oakwood's "warehouse" facility was initially approved.  Here, any concept of causation and damages is easily satisfied: *but for* Defendants' participation in these wrongful transactions, they would not have received the fees, and their receipt was a direct and foreseeable consequence of Defendants' actions.  The unquestionable sturdiness of Plaintiff's claim to these fees (a valid form of damages for all three jury claims) likely explains why Defendants take such pains to overlook the fees in all their recent briefing.

Having clarified the basic contours of Plaintiff's case, we move to the arguments made in the Defendants' Brief and the CS Reply, explaining in turn why each one fails.

**B.** **_In Pari Delicto_ Simply Has No Application Here; Or, At The Very Most, It Raises Factual Inquiries That Must Be Resolved By The Jury At Trial.**

_In pari delicto_ is Latin for "in equal fault." BLACK'S LAW DICTIONARY 794 (7th ed. 1999). This common law defense is traditionally "limited to situations where the plaintiff bore at least substantially equal responsibility for his injury, and where the parties' culpability arose out of the same illegal act." _Pinter v. Dahl_, 486 U.S. 622, 632 (1988) (citations and quotation marks omitted). It also is the focus of over 40% of the "argument" portion of the Defendants' Brief. (_See_ Def. Br. at 13-20.) There are three separate, yet equally forceful, reasons why summary judgment should not be granted based upon an _in pari delicto_ defense: (1) all "wrongdoing" underlying this suit was inherently personal to Credit Suisse; (2) Credit Suisse was an "insider"; and (3) there is a disputed factual issue about the parties' relative culpability.[24]

**1.** **Any "Wrongdoing" By Oakwood Was Separate And Distinct From The Inherently Personal Wrongdoing Of Credit Suisse.**

As explained by the Third Circuit, in order to bar recovery based upon _in pari delicto_, "the plaintiff must be an active, voluntary participant in the unlawful activity that is the _subject of the suit._" _McAdam v. Dean Witter Reynolds_, 896 F.2d 750, 757 (3d Cir. 1990). As such, it is necessary to focus on the _precise_ nature of the wrongdoing underlying Plaintiff's suit.

Defendants' entire presentation of _in pari delicto_ is based on a deep and fundamental distortion of the wrong Plaintiff alleges. Specifically, Defendants aver that since Oakwood's management and board decided to engage in the value-destroying transactions that

---

[24] In addition, contrary to Defendants' assertion, there are good reasons to question whether _in pari delicto_ should be considered any defense to breach of contract. _See, e.g._, _In re Olympia Brewing Co. Sec. Litig._, No. 77-1206, 1985 U.S. Dist. LEXIS 13796, at *7 (N.D. Ill. 1985).

were structured and executed by Credit Suisse, they participated in the same wrong for which Plaintiff now seeks redress from Defendants. (*See, e.g.*, Def. Br. at 12-20; CS Reply at pp. 4-5.)

This is intellectual sleight-of-hand. There are *two* wrongs alleged here. One is the adoption of a business plan that ultimately failed by Oakwood's board and management. No evidence suggests, and neither party claims, that they had any evil intent. Rather, it appears that they tried to do a good job. Plus, in discharging their duties, Oakwood's board and management relied and depended on Credit Suisse fulfilling all of its own duties, which it plainly failed to do.

In contrast, Defendants knew all too well that Oakwood's management and board did not understand the implications of the transactions they engaged in with Defendants. Defendants knew that these transactions were value-destroying, and that they would result in future losses. Oakwood placed trust in Defendants' greater expertise and advice about the these highly complex transactions, but Defendants concealed their knowledge and true opinions from Oakwood, putting their stamp of approval on Oakwood's continuation of a disastrous course. (*See, e.g.*, Counter-Statement at pp. 2-3 ¶ 2 & pp. 10-11 ¶ 2, as well as the associated exhibits.)

This misconduct by Credit Suisse is an *entirely separate* wrong from the incorrect business judgment observed at Oakwood. It is a wrong wholly personal to Defendants, and there is no way one could meaningfully say that Oakwood had any involvement in it at all.[25] As such,

---

[25] Likewise, Defendants can take no solace in the continuation of the "warehouse" post-petition, which they inexplicably insist on emphasizing. (*See* Def. Br. at 10-12; CS Reply at p. 5 n.2.) First, Oakwood *never* engaged in another securitization post-petition, and it certainly did not (and could not) do one in the destructive style Credit Suisse designed pre-petition (with large "B-2" tranches, which were directly guaranteed by Oakwood, essentially amounting to the issuance of new unsecured debt). Second, the fact that continuation of the "warehouse" may have been necessary post-petition (in large part due to Credit Suisse's disastrous failure to search for and finalize alternative financing, despite undertaking the obligation to do so) says *nothing* about whether it was reasonable for that facility to be utilized earlier. Third and finally, no aspect of Oakwood's decision to continue a facility that had been value-destroying

*in pari delicto* should not be any issue here.[26]  *See, e.g., O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-47 (Fla. Dist. Ct. App. 2007) (reversing dismissal on *in pari delicto* grounds where defendant's misconduct was intentionally giving the debtor bad financial advice about pursuing a merger and the debtor's distinct misconduct was following that bad advice).[27]

In sum, the blame for Credit Suisse's three-fold "wrongs," the breach of its duties to Oakwood, lies at the feet of only one party: Credit Suisse.  Oakwood did not – and logically could not – participate in any of this distinct misconduct, because it was wholly personal to Credit Suisse.  Consequently, there is absolutely no basis for *in pari delicto* to apply in this case.

### 2. Because Credit Suisse Was An Oakwood "Insider," Defendants Cannot Claim Shelter Under *In Pari Delicto* As A Matter Of Law.

"*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."  *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005) (Farnan, *J.*).[28]  Thus, if there is a genuine question of fact about whether Credit

---

in the past excuses Credit Suisse's prior personal failures to fully investigate the effects of that facility and related transactions, or to properly advise Oakwood of its actual knowledge about the irreversible damage being done by the transactions facilitated via the "warehouse."

[26] This difference may be shown by a simple example.  A person jaywalks, is hit by a car, and is taken to the hospital, where it is determined that a leg must be amputated.  The hospital then amputates the wrong leg.  No one could deny that the victim, as a jaywalker, was in the "wrong" (*in delicto*).  But the wrong of the victim was entirely different from the hospital's undeniable wrong.  This analogy is directly applicable here.  In fact, if Credit Suisse's view prevails, it would write out of the law any cause of action for giving bad advice: "he *took* the advice, therefore he was in the wrong too, therefore judgment for defendant."  This is also the exact situation in this case, which means such absurdity would have to be the law for Defendants' view of the *in pari delicto* defense to prevail.  It isn't; nor should it ever be.

[27] *See also, e.g., BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006) (vacating dismissal on *in pari delicto* grounds; defendant's wrongdoing was personal, and plaintiff did not join); *McAdam*, 896 F.2d at 757-58 (affirming inapplicability of *in pari delicto*; plaintiff's conduct was distinct and "not the underlying illegality which forms the basis of this suit").

[28] *See also, e.g., Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist. LEXIS 25642, at *108-09 (S.D.

21

Suisse was an Oakwood insider, summary judgment cannot be granted based on *in pari delicto*.

We have previously set forth **ten** separate sets of evidence – including the fact that Mr. Felt knowingly labeled Credit Suisse an "insider" in materials he gave to Oakwood, the great level of trust and confidence between the parties, the multitude of different "hats" Credit Suisse wore, and Credit Suisse's receipt of non-public information – any *one* of which could reasonably lead the jury to conclude that Credit Suisse was an insider.  (*See* Counter-Statement at pp. 7-10 ¶ 1 and the many associated exhibits.)  Those ten sets are hardly exhaustive.  For instance, Mr. O'Driscoll's August 9, 2001 e-mail to Mr. Felt [Holt Decl. Ex. "K"] is dramatic evidence of "insider" status.  The fact that the mere "idea of [Oakwood] doing anything away from [Credit Suisse] is so unlikely that it's probably a little offensive to them" unquestionably suggests a close relationship that should be the subject of greater scrutiny.  And the concept of Oakwood being "very shackled" to Credit Suisse is the stark, diametric opposite of interacting at "arm's length."

In the CS Reply, Defendants make no effort to contest any of Plaintiff's ten sets of evidence, let alone to set forth affirmative evidence demonstrating non-insider status.  Rather, Credit Suisse rests its entire position on one legal proposition: "'*control*' and the ability to 'dictate corporate policy' are the essential elements of insider status," and so "insider" status can *never* obtain as a matter of law absent such power.  (*See* CS Reply at pp. 6-9.)  Unfortunately for Credit Suisse, that one, absolutely key proposition is demonstrably false, for several separate reasons.[29]

---

Tex. Mar. 31, 2008) (reciting the same rule and citing numerous supporting cases); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 536 (Bankr. D. Del. 2006) ("*In pari delicto* does not provide a defense for insiders.").

[29]  Beyond relying on a fallacious proposition of law, the CS Reply further rests on inapposite and readily distinguishable authority.  For example, the *Radnor Holdings Corp.* decision, 353 B.R. 820 (Bankr. D. Del. 2006), involved a relationship that was markedly different from the relationship Credit Suisse enjoyed with Oakwood; the *Radnor* defendants did not have a

      First, while *Defendants* may believe that "[o]ne does not . . . become an insider

merely because of a 'sufficiently close relationship' that requires 'close scrutiny'" (*id.* at p. 6),

*Congress* disagrees:  "An insider is one who has a sufficiently close relationship with the debtor

that his conduct is made subject to closer scrutiny than those dealing at arms length with the

debtor."  S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787,

5810, 6269.  There is no "remainder of the test" (CS Reply at p. 7) reflected anywhere in the

legislative history; the quoted language is *the test* Congress told courts to use when determining

"insider" status, and numerous courts have embraced this legislative history as providing the

right rule.[30]  If Credit Suisse disagrees with the balance our legislative branch struck and wishes

that the "insider" test was more restrictive, such a complaint is one that Credit Suisse should put

---

    lengthy and multifaceted history with the debtor, were not receiving regular fee income from
the debtor, were not tasked with structuring and executing complex transactions on the
debtor's behalf, did not possess long-time actual knowledge of the debtor's dire straits, were
not the object of the debtor's trust and reliance, had not labeled themselves "insiders," did not
concede that they "had a fiduciary duty to" the debtor, and did not assert that the debtor was
"very shackled" to them.  Simply put, the brief, one-dimensional relationship in *Radnor* was
much closer to an arm's length relationship than what prevailed between Oakwood and Credit
Suisse.  Likewise, *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517
F.3d 454 (7th Cir. 2008), involved a one-dimensional, arm's length, contractual relationship,
where the *only* service provided by the defendant was the rendering of a single "fairness
opinion."  As in *Radnor*, this relationship stands in marked contrast to the multi-dimensional
history between Oakwood and Credit Suisse, one not based on a single contract but rather
developed through *years* of informal advice, great trust and confidence, and the deliberate
occupation of an array of roles by Credit Suisse.  At the end of the day, the case law does not
provide Defendants with *even one* decision in which a defendant occupying such varied roles
for such a long time was found not to be an "insider," which explains why Defendants are
driven to cite case law that involves radically different facts, such as *Radnor* and *HA2003*.

[30]   *See, e.g.*, *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994)
(observing how "[i]n applying the term 'insider,' courts generally rely on the legislative
history of the 'insider' definition"); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 298 (Bankr.
W.D. Pa. 1990) (commenting that the legislative history makes it "clear to this court [what]
Congress intended" regarding the test for "insider" status); *In re Rimell*, 111 B.R. 250, 254
(Bankr. E.D. Mo. 1990) (noting how "the legislative history . . . is instructive" and shows that
the insider "definition is not limited and should be applied flexibly, on a case by case basis").

to Congress, not to this Court.  *See, e.g.*, *Sea-Land Serv., Inc. v. Barry*, 41 F.3d 903, 910 (3d Cir. 1994).  In the meantime, Plaintiff will live (and prevail before the jury) with the current law.

Second, many courts have expressly rejected the proposition that "control" is a necessary aspect of the "insider" analysis.[31]  In fact, this very Court recently addressed this exact issue in *Lucent Technologies, Inc. v. Shubert (In re Winstar Communications, Inc.)*, No. 06-147, 2007 U.S. Dist. LEXIS 31137 (D. Del. Apr. 26, 2007).  *Winstar* involved Lucent's appeal from a bankruptcy court's post-trial judgment in favor of the bankruptcy trustee, Shubert.  Among the challenged findings was the bankruptcy court's conclusion that Lucent was an insider of Winstar; Lucent argued on appeal, just like Credit Suisse here, "that insider status depends on a finding of managerial control."  *See id.* at *7.  Quoting the unadorned legislative history discussed in the prior paragraph, the Court disagreed, holding that the bankruptcy court "properly concluded that Lucent was an insider of Winstar because the parties' relationship was more than a mere debtor-creditor relationship conducted at arm's length and sufficiently close to warrant such a finding." *See id.* at *7-8.  This is the exact "insider" standard that Plaintiff believes should be applied in the instant case, and Credit Suisse's fervent attempts to impose some far more rigorous standard

---

[31]  *See, e.g.*, *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292, 300 (D. Md. 1997) (noting that "Congress did not intend the insider determination to rest on a finding of actual control," and rejecting interpretation of *Butler v. Shaw*, 72 F.3d 437 (4th Cir. 1996), akin to that urged by Credit Suisse in their CS Reply); *Koch v. Rogers (In re Broumas)*, 203 B.R. 385, 391 (D. Md. 1996) ("Contrary to Defendants' contention, actual control is not a predicate to finding someone to be an extra-statutory insider."), *aff'd in part rev'd in part*, 135 F.3d 769 (4th Cir. 1998) (affirming as to the "insider" analysis); *Oakwood Homes*, 340 B.R. at 523-24 (rejecting strict "control" theory and noting flexibility of "insider" test); *In re Locke Mill Partners*, 178 B.R. 697, 702 (Bankr. M.D.N.C. 1995) ("For purposes of deciding whether an entity is an insider of the debtor it is not necessary that the debtor have actual control in the sense of legal decision making power."); *Allegheny*, 118 B.R. at 298 (although creditor "did not have actual control or legal decision making power," it was still an "insider" due to its receipt of non-public information and attempts "to influence, in not very subtle ways, decisions made by the debtor").

should meet the same fate as Lucent's parallel (and equally baseless) arguments in *Winstar*.[32]

        <u>Third</u>, Defendants' paradigm also fails as a matter of basic statutory construction. Section 101(31)(B)(iii) expressly provides that a "person in control of the debtor" is an insider, but the statute also states on its face that its list "includes" others, and thus is not exhaustive. *See* 11 U.S.C. § 101(31); *see also* 11 U.S.C. § 102(3). This structure makes plain that "[w]here Congress intended control to be an element in determining insider status, it was specified in the statute," and also "puts it beyond argument that Congress did not make control necessary for either statutory or non-statutory insider status." *See Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 264-65 (Bankr. S.D.N.Y. 2002). The alternative reading Credit Suisse urges not only finds *zero* support in the statutory text and legislative history, but also would render the word "includes" totally superfluous, which is to be avoided. *See, e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 609 (1998). As such, the Court should reject that reading *in toto*.

        In sum, "the overwhelming weight of authority supports the proposition that the statutory categories of 'insiders' are not exhaustive, and that an 'insider' relationship may be found where the relationship between the parties is sufficiently close to warrant careful scrutiny." *Three Flint Hill Ltd. P'ship*, 213 B.R. at 299. Because *at least* **ten** separate sets of evidence exist here which could lead a reasonable jury to conclude that Credit Suisse had a "sufficiently close

---

[32]  Another recent decision – one cited in Defendants' briefing (*see* Def. Br. at 15 n.5) – further reveals the fatal flaws in Credit Suisse's "insider" analysis. Specifically, *In re South Beach Securities, Inc.*, 376 B.R. 881 (Bankr. N.D. Ill. 2007), involved facts under which it was unclear if a creditor had "operating control" or could "dictate corporate policy and the disposition of corporate assets" (i.e., met the harsh test Credit Suisse advocates here). *See id.* at 889-90. This uncertainty did "not end the inquiry," however, because an "alleged insider's degree of control over the debtor, though relevant, is not dispositive." *See id.* at 890-91. Rather, just as in *Winstar*, it was also necessary to consider "the closeness of the relationship between the debtor and alleged insider" and whether all their transactions "were conducted at arm's length." *See id.* Once again, this is the "insider" test that should be applied here by the jury. Credit Suisse's contrary position is irredeemably gored by their own cited authorities.

relationship" with Oakwood to be an "insider," summary judgment should not be granted based upon *in pari delicto* – the issue should be submitted to the jury for resolution. *See Floyd*, 2008 U.S. Dist. LEXIS 25642, at *107-12 (denying summary judgment motions for this very reason).

**3.    At A Bare Minimum, The Jury Must Weigh The Relative Allocation Of Culpability As Between Oakwood And Credit Suisse.**

At common law,

> the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because "in cases where both parties are *in delicto* . . . it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt."

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307 (1985) (quoting 1 J. Story, EQUITY JURISPRUDENCE 304-05 (13th ed. 1886)). This remains the law in New York.[33] Thus, assuming *arguendo* that *in pari delicto* could have any application here, the fact-finder still "should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less." *See, e.g.*, *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

This necessary weighing and balancing of relative culpability – which even Credit Suisse must concede is extremely fact-intensive – is certainly not the stuff of summary judgment motions. It is sufficient for present purposes to say that if such a balancing is ever done, the evidence is such that one could reasonably expect that Credit Suisse will lose. After all, any "wrongdoing" attributable to Oakwood is at best a case of negligence; Oakwood's board and management exercised their business judgment and engaged on a course they hoped would be constructive. But that course was charted against the backdrop of, and in reliance on, input received from their trusted advisor Credit Suisse, an insider that unquestionably had superior

---

[33]    *See, e.g.*, *Chemical Bank v. Stahl*, 655 N.Y.S.2d 24, 25 (N.Y. App. Div. 1997). *Accord, e.g.*, *McAdam v. Dean Witter Reynolds*, 896 F.2d 750, 756 (3d Cir. 1990) ("Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated.").

knowledge and expertise about the transactions involving Oakwood, and was acutely aware of the negative, value-destroying effects.  Thus, to the extent that Oakwood engaged in transactions with Credit Suisse, it did so based upon the message it received from Credit Suisse, a message that never should have been given.  Put differently, Oakwood's "wrongdoing" quickly pales when viewed against Credit Suisse's intentional and active participation in, and facilitation of, the relevant transactions, all while possessing knowledge of their value-destroying effects which was not passed on to Oakwood.  Indeed, the particular form of Credit Suisse's wrongdoing essentially involved a deception upon Oakwood itself, which corrupted the deliberative process by which Oakwood might come to learn of basic difficulties with the transactions.  As such, this dispute is one for trial, which further prevents summary judgment on *in pari delicto* grounds.

**C.    Neither Dr. Shapiro's Testimony Nor Plaintiff's Theory Of The Case Rests Upon Credit Suisse's Strawman Tale Of Exclusive Fiduciary Duties To "Bondholders."**

Defendants incomprehensibly assert that "what really lies behind this case is a sectarian view by one set of [Oakwood's] creditors that they would have been advantaged . . . had Oakwood filed bankruptcy a year earlier than it did" (Def. Br. at 13-14), and then extend this notion by averring that Plaintiff's expert, Dr. Shapiro, "testified that, once Oakwood was insolvent, Credit Suisse owed a duty to Oakwood's bondholders, and its bondholders alone" (*id.* at 20; *see also id.* at 1).  This line of analysis not only distorts Plaintiff's legal nature and theory of this case, but also completely mischaracterizes Dr. Shapiro's *actual* opinions and testimony.

The most striking problem with Defendants' argument is the fact that the beneficiaries of the Plaintiff-trust are *all* sorts of Oakwood creditors, not just "bondholders." (*See* Counter-Statement at pp. 11-12 ¶ 3.)  Hence, Credit Suisse's rhetoric about some "sectarian view" supposedly held by "one set" of Oakwood creditors is meaningless and irrelevant.

The next absolute mischaracterization embedded in Defendants' statement is the

notion that either Plaintiff's case or Dr. Shapiro's testimony turns on the existence of some *direct and exclusive* fiduciary duty to creditors.  Plaintiff's actual theory is that Credit Suisse had a fiduciary relationship with Oakwood, and thus owed a fiduciary duty to Oakwood itself, which duty required *at least some consideration* of the interests of Oakwood's creditors (as residual stakeholders) once Oakwood was insolvent.  This construct is well supported in the law (including by Defendants' own cited authorities, *see* Def. Br. at 21[34]), and it creates a regime under which any fiduciary duty owed by Credit Suisse would have been breached if (1) Oakwood was insolvent; and (2) Credit Suisse acted unreasonably in a way that either (a) was value-destroying to Oakwood as a whole, or (b) disregarded the effects on Oakwood's creditors.

This regime is the only one assumed by Dr. Shapiro.[35]  Indeed, while Dr. Shapiro does not opine on or testify as to the existence of any duty, he did explain why the legal shift described above makes good economic sense.  (*See* Shapiro Dep. Tr. at 32:8-39:9 [Holt Decl. Ex. "E"].)  Also, as discussed below, Dr. Shapiro made it clear that his conclusion that Credit Suisse acted unreasonably under the circumstances would not change under the framework of duties described on pages 20-23 of the Defendants' Brief.  Likewise, nothing about that framework

---

[34]   Defendants have suggested elsewhere that any requirement that Oakwood creditors' interests be considered applies *only* to officers and directors.  (*See* D.I. #94 at p. 14.)  Defendants cite no authority for the proposition that other fiduciaries do not owe parallel duties, a concept which *is* evident in the case law.  *See, e.g.*, *Dexia Credit Local v. Rogan*, No. 02-8288, 2003 U.S. Dist. LEXIS 18368, at *21-22 (N.D. Ill. Oct. 10, 2003).  At bottom, Plaintiff submits that the twin duties New York law has long imposed on fiduciaries of each and every type – a heightened standard of care and a duty of utmost loyalty – should apply to fiduciaries of *all* kinds, and Defendants are unable to provide any authority or coherent argument why there should be some set of uniquely limited fiduciary duties tailored just for them in this case.

[35]   *See, e.g.*, Shapiro Report at p. 4 (noting assumption of duty to "Oakwood and its creditors") [CS Ex. "I"]; Shapiro Dep. Tr. at 26:24-32:7 (explaining how Dr. Shapiro relied upon idea that a fiduciary duty was owed to Oakwood, *the corporation*, and that, as an economic matter, the duty expands to include creditors' interests upon insolvency) [Holt Decl. Ex. "E"].

would alter Dr. Shapiro's opinions about Defendants' noncompliance with the standard of care against which their conduct must be measured, including that recited in their own manuals.[36]

The Defendants' Brief is riddled with additional gross mischaracterizations of what Dr. Shapiro actually said at his deposition. For example, Dr. Shapiro never testified that he understood there to be any sole duty to "bondholders," but merely noted that those "bondholders" were the only example of a class of Oakwood's creditors that he remembered having specific discussions about. (*See id.* at 34:11-38:24.) Defendants' claim to the contrary is prevarication, pure and simple. Likewise, *and perhaps most importantly*, Dr. Shapiro expressly told defense counsel that his core conclusions would obtain even if *no* fiduciary duty was owed to anyone:

> Q.        Tell me, if you would, Professor, how would the conclusions in your report have been different if you had not made that assumption.
>
> . . . .
>
> A.        I can't give you – well, a legal opinion, but I guess I would say even if there were no fiduciary obligation that Credit Suisse's behavior was inconsistent . . . with the guidelines in its compliance manual. So from that standpoint I think my conclusions would still stand, in that . . . [Credit Suisse] did not behave in a reasonable or reasonably prudent manner with respect to the services it provided to Oakwood doesn't rely specifically on the existence of a fiduciary obligations.
>       And second, that my opinion that [Credit Suisse] had financial incentives to keep Oakwood operating and to delay recommending that Oakwood file for bankruptcy . . . does not specifically rely on the assumption of a fiduciary obligation . . . .
>
> Q.        So do I understand from that answer that your conclusion would not be any different if you had not made the assumption [that Credit Suisse owed a fiduciary duty to Oakwood and its creditors]?
>
> A.        Yes, ***I believe that the fiduciary obligation certainly strengthens my conclusions, but I think <u>those conclusions would still stand</u>.***

*Id.* at 5:5-6:11 (emphasis added). Thus, Defendants know full well that "Dr. Shapiro's theory of fiduciary liability" in no way resembles the strawman notion they now contend "is wrong, and

---

[36]    *See, e.g.*, CS Ex. "K," at CSFB-00053080 – CSFB-00053082, CSFB-00053100 – CSFB-00053103 & CSFB-00053127 – CSFB-00053130.

would cause great mischief if it were to become the law" (Def. Br. at 21), but rather is a "theory" which would be completely viable in the absence of *any* fiduciary duty to anyone. Hence, the entire line of argument presented on pages 20-23 of the Defendants' Brief is a mere sideshow, disingenuously intended only to muddy the waters and complicate the issues for the Court.

In sum, Dr. Shapiro's testimony will be that, under the facts of this case, Credit Suisse did not act reasonably and with due care toward Oakwood. While his conclusion would be even stronger if Credit Suisse owed fiduciary duties of care and loyalty to Oakwood, Dr. Shapiro has been clear that his opinion does not turn on those duties. In particular, Dr. Shapiro has *never* stated that his opinion rests on some exclusive fiduciary duty to "bondholders."

**D.    Because The Damages Suffered By Oakwood Would Not Have Happened "But For" Credit Suisse's Malfeasance And Were A Reasonably Foreseeable Outcome For Credit Suisse, Plaintiff Can Easily Prove "Proximate Cause" At Trial.**

At trial, Plaintiff will seek the following damages: (1) the $50 million diminution in Oakwood's asset value between September 2001 and September 2002[37]; and (2) the nearly $21 million in fees received by Credit Suisse in 2001-2002. The Defendants' Brief is strangely silent about the fees, perhaps because Defendants know there is no argument they can make that the

---

[37]  Contrary to Defendants' repeated suggestion (*see, e.g.*, Def. Br. at 16), this is *not* a "deepening insolvency" measure of damages, but rather based on diminution of Oakwood's *assets* – a classic measure of damages, unaffected by some courts' rejection of "deepening insolvency" as a cause of action. In fact, a "deepening insolvency" damages analysis would have included the $40 million increase in Oakwood's *liabilities* between 2001-2002, which results in a much larger damages claim of $90 million. In any case, although Plaintiff's analysis is not "deepening insolvency," such an approach probably would be appropriate under New York law. *See, e.g.*, *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 458 (Bankr S.D.N.Y. 2004) (explaining why case law "suggest[s] that the New York courts regard 'deepening insolvency' as a theory of damages that may result from the commission of a separate tort"). Indeed, even under Delaware law, "deepening insolvency" remains a viable theory of damages for claims at issue here, including breach of fiduciary duty. *See, e.g.*, *Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, No. 06-50861, 2008 Bankr. LEXIS 1226, at *19-23 (Bankr. D. Del. Apr. 24, 2008). As such, Credit Suisse would seem well-advised to temper its enthusiasm about calling this a "deepening insolvency" case.

fees were not directly caused by Credit Suisse's malfeasance.[38]  Rather, Defendants baldly assert that summary judgment must be granted on *every* claim based solely upon a "speculative and attenuated chain of causation" conjured up by defense counsel.  (*See* Def. Br. at 27-28.)

As demonstrated in turn below, summary judgment is not warranted on *any* of Plaintiff's claims, because Plaintiff does not rely on Defendants' absurd "chain of causation" as to either the $50 million in economic damages *or* the nearly $21 million in fees.  Before turning to that discussion, however, it is worth highlighting the relevant standard; under New York law,

> damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the damage, and that the damage was either a direct result or a reasonably probable consequence of the act or omission.  In discharging the burden to provide "specific facts" demonstrating "that there is a genuine issue for trial," and even during trial, the plaintiff is not required to produce direct evidence in order to prove proximate cause to a mathematical certainty.  The causal sequence rather may be inferred from circumstantial evidence or common knowledge.

*Bellis v. Tokio Marine & Fire Ins. Co.*, No. 93-6549, 2002 U.S. Dist. LEXIS 1714, at *39-40 (S.D.N.Y. Feb. 5, 2002) (citations and quotation marks omitted).  The inherently fact-specific nature of this inquiry makes it an issue for the jury in all but the most extreme circumstances – i.e., where the jury could only reach one conclusion based upon the record.  *See id.* at *40.[39]

---

[38]  Defendants' apparent amnesia about the fees stands in marked contrast to prior statements to this Court.  (*See, e.g.*, D.I. #31 at pp. 4, 13-16.)  While Plaintiff has detailed the procedural and substantive problems with Defendants' prior hypotheses elsewhere (D.I. #35), the key point at this juncture is that Defendants should not now be permitted to just ignore the fees.

[39]  *See also, e.g.*, *RTC v. Fid. & Deposit Co.*, 205 F.3d 615, 654-57 (3d Cir. 2000) (affirming summary judgment denial where "facts pertaining to the issue of proximate causation" were not "so one-sided so as to require judgment as a matter of law"); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995) (New York law's fact-heavy analysis meant "proximate cause in this case remains an issue for the jury to determine"); *Hollinger v. Wagner Mining Equip. Co.*, 667 F.2d 402, 406 (3d Cir. 1981) ("Ordinarily a jury must determine the issue of proximate cause."); *Rios v. Theodore*, 624 N.Y.S.2d 949, 950 (N.Y. App. Div. 1995) ("It is well settled that the determination of proximate cause is an issue for the jury.").

**1.**   **The $50 Million In Damages Calculated By Dr. Tennenbaum Was Plainly Foreseeable To Credit Suisse And Directly Traceable To Their Misconduct.**

Sufficient evidence of proximate causation exists regarding Plaintiff's claim for the $50 million diminution of Oakwood's enterprise value between September 2001 and September 2002. Defendants essentially concede, and overstate, the "but for" aspect of causation when they assert that "everyone agrees that without the liquidity provided by the securitizations and the Warehouse Facility, Oakwood would have gone out of business" (Def. Br. at 26). Thus, the issue is really only whether the damages that accrued as a result of a "business-as-usual" path endorsed by Credit Suisse's silence and aided by active participation in destructive transactions are sufficiently close to the breaches of duty embodied by such actions and inaction. They are.

The great harm to Oakwood was a natural consequence of, and directly traceable to, the value-destroying transactions Credit Suisse designed. Those transactions facilitated a flawed model of originating, guaranteeing, and securitizing bad loans – a model that, over time, would *inevitably* result in damages. The fact that such damages would naturally follow from the transactions was evident to Credit Suisse as early as 2000, at which time the Xanthos Memo explained how it was "hard to believe that management will not continue to experience . . . losses on the sale of its loans due to the fact that the company must securitize quarterly . . . even if doing so results in large losses." (*See* CS Ex. "N," at CSFB-00250118.) Likewise, in 2001, Credit Suisse recognized that Oakwood was destined to lose more money and would not survive if "repos," which were steadily increasing, did not get under "control." (*See, e.g.*, CS Ex. "S.") Thus it is clear that Credit Suisse actually knew about the problems Oakwood was facing and the probable effects of going-forward, knowledge Defendants never deigned to share with Oakwood.

The Xanthos Memo and related documents likewise demonstrate Credit Suisse's contemporaneous belief that Oakwood's management did not understand the problems created by

its business-as-usual course, one facilitated by securitizations and related transactions with Credit Suisse.  (*See* CS Ex. "N," at CSFB-00250117 – CSFB-00250118; *see also* Counter-Statement at pp. 2-3 ¶ 2 and the associated exhibits.)  From this evidence, the jury could reasonably conclude that Credit Suisse foresaw, or should have foreseen, that Oakwood would continue along its path to ruin unless and until *Credit Suisse* took some affirmative step to impart Oakwood with its knowledge.  This conclusion, in turn, provides the only causal link that the law deems necessary to directly connect Credit Suisse's malfeasance with the $50 million in losses,[40] as demonstrated by several decisions involving generally analogous issues of causation and damages.

Perhaps most instructive is *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676 (S.D.W. Va. 2007), a lengthy post-trial opinion stemming from a professional negligence case against Grant Thornton ("GT").  GT was an auditor for the First National Bank of Keystone ("Keystone"), a small community bank that engaged in "highly unprofitable" securitizations

---

[40]  Credit Suisse suggests that evidence of some even more "direct" causal link is needed.  (*See* CS Reply at pp. 2-4.)  While the *Grant Thornton*, *Crowley*, and *Comeau* cases discussed in the text below adequately disprove this idea, it is also notable that Defendants' authorities arise in inapposite contexts.  *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999) (employee funds could not show a direct causal link as to damages they asserted *derivatively* based upon harm beneficiaries suffered by using tobacco products), *cert. denied*, 528 U.S. 1080 (2000).  The focus on "direct" causality – i.e., the connection between the plaintiff and the alleged harm – in such cases is absent here.  After all, *every* form of damages Oakwood suffered was necessarily a "direct" harm, and involved no "injuries that are wholly derivative of harm to a third party" in this matter.  *Cf. id.* at 236-37.  Similarly, *Maxwell v. KPMG LLP*, 520 F.3d 713 (7th Cir. 2008), involved the easily distinguishable fact-pattern of an arm's length auditor being charged with all the loss resulting from a transaction which was not foreseen on the date of the alleged breach and in which the auditor had no participation (the failed purchase of a dot.com entity in early 2000).  Here, in contrast, all relevant transactions were on-going, periodic, and necessarily involved Credit Suisse's active participation.  As such, the causal gap that concerned Judge Posner in *Maxwell* simply does not exist here – there are no relevant transactions not involving the integral involvement of Credit Suisse, and all of Plaintiff's damages are directly traceable back to Credit Suisse (who, in any event, had a parasitic relationship with Oakwood in no way resembling the "outside advisors," CS Reply at p. 3, role played by KPMG in *Maxwell*).

involving high risk mortgage loans. *See id.* at 680-81. The FDIC, as receiver for Keystone, sued GT for accounting malpractice, and maintained that GT was liable for *all* net operating losses Keystone incurred after GT's breach. Following a bench trial, GT argued that the FDIC was unable to prove proximate causation or damages. Applying law which resembles New York's, the court concluded that the FDIC had met both elements. As to proximate cause, the court noted how "it was a virtual certainty that [Keystone] would continue to lose money for as long as it operated. Accordingly, losses stemming from these natural and foreseeable events are an appropriate component of damages attributable to [GT's] negligent audit." *See id.* at 713; *see also id.* at 714 (explaining how GT's breach "allowed a dangerous condition to continue, i.e., Keystone's continued operations," which led Keystone to incur foreseeable expenses that "would not have been incurred but for [GT's] failure to alert the board of Keystone's true financial condition"). The court similarly rejected GT's challenges to the FDIC's damages analysis, concluding that it was appropriate to award damages equal to all value lost as a result of Keystone's continued operations. *See id.* at 725-29. Of critical importance is the fact that this conclusion obtained *after trial*, which means that summary judgment should be denied if there is even a *possibility* of a similar result in this case. Clearly the jury *could* reach such a conclusion.

Similarly helpful are the summary judgment and post-trial opinions in *Crowley v. Chait*, a professional malpractice case brought by the receiver of a failed insurance company against PricewaterhouseCoopers ("PwC"). The receiver sought to recover all losses incurred after PwC's breach of duty, but was met with a summary judgment motion on the grounds that, *inter alia*, this "damages theory violates proximate causation principles of remoteness, fairness, proportionality, and foreseeability" and was based on "assumptions defying reason and logic." *See* 2004 U.S. Dist LEXIS 27238, at *21 (D.N.J. Aug. 25, 2004). Like Credit Suisse here, PwC

posited a many-step chain of causation and argued "that unless Plaintiff can prove definitively that this exact script would have occurred, there is no causation." *See id.* at *24. The court rejected PwC's causation arguments and denied its summary judgment motion, reasoning that the evidence suggested – as is the case here – that the jury could conclude that the losses would not have been incurred "but for" PwC's breach and were reasonably foreseeable to PwC. *See id.* at *21-32. In fact, the jury reached precisely those conclusions, and the *Crowley v. Chait* court again determined that such factual findings were an appropriate result under the applicable legal standards for causation and damages. *See* 2006 U.S. Dist. LEXIS 8894 (D.N.J. Mar. 7, 2006).

The twin decisions in *Comeau v. Rupp* also highlight the defects in Credit Suisse's causation argument. There, the FDIC, as receiver for a failed savings and loan association, sued the association's accountants, arguing that they failed to recognize and inform the board of the high risk nature of certain loans. The FDIC sought damages equal to the losses suffered on account of the loans, and the accountants moved for summary judgment on causation grounds. Applying principles of proximate causation, the court noted that "the inquiry is whether it was reasonably foreseeable to the Accountants that the lending and/or loan servicing practices of [the S&L], if unchecked, could be expected to result in loan losses of the type sustained," which element was met by evidence showing that the accountants should have been aware "of the probable loss on [] loans *already* in existence at the time of" breach. *See* 810 F. Supp. 1172, 1177-79 (D. Kan. 1992). As discussed above, similar evidence exists here with respect to Oakwood's "lending and/or loan servicing practices" and Credit Suisse's knowledge of the effects of those practices. The *Comeau* court further took dead aim at the defendants' efforts to block consideration of the kind of causation analysis that should be considered by the jury at bar:

> the Accountants fail to recognize that plaintiff's proof of causation in this case is
> rendered more difficult by the very nature of the claims: negligent omissions on the

> part of defendants that in turn caused inaction on the part of the [S&L's] Board. Because this necessarily poses the causation question of what "would have" happened if the Accountants had adequately fulfilled their duties . . . . the Accountants' argument would allow them to profit from an uncertainty of their own creation, notwithstanding that the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*See* 810 F. Supp. 1127, 1144 n.8 (D. Kan. 1992) (citations and quotation marks omitted). Credit Suisse likewise should not now "profit from an uncertainty" that its "own wrong" has wrought.

At bottom, Plaintiff's causation evidence is similar, if not superior, to that in *Grant Thornton*, *Crowley*, and *Comeau*. That evidence could easily lead the jury to find that the harm to Oakwood directly flowed from Credit Suisse's misconduct and was foreseeable to Credit Suisse, and it should be tested in the proper arena: before the jury at trial. *See, e.g.*, *Bear Stearns & Co. v. Daisy Sys. Corp. (In re Daisy Sys. Corp.)*, 97 F.3d 1171, 1175-77, 1181 (9th Cir. 1996).

**2.     The Proximate Cause Element Is Easily Satisfied With Respect To The Roughly $21 Million In Fees Received By Credit Suisse In 2001-2002.**

The $50 million diminution in Oakwood asset value is not the end of the damages story; there remains the nearly $21 million in fees that Credit Suisse extracted from Oakwood. Here, the damages and causation analysis is elementary. Credit Suisse would not have received such fees *but for* its breaches of duty to Oakwood, and the receipt of such fees is directly and immediately traceable back to those breaches. While there is *no* causal "chain" implicated by the fees, the foreseeability inquiry is also obvious: by encouraging "business-as-usual" for Oakwood, Credit Suisse could know with confidence that it would continue to receive regular securitization and warehouse fees, and also could anticipate the opportunity to earn various other fees, such as the over $3 million charged for the "LOTUS" transactions. Thus, proximate cause is manifest.

Nor is there any concern about the fees being too "remote" or "speculative" a measure of damages. The precise sum of the fees is readily quantified, and it is apparent that their payment directly and immediately deprived Oakwood of needed cash and diminished the

value of Oakwood's assets.[41]  As such, the fees remain viable damages for *all* Plaintiff's claims.

**3.    There Remains A Lower Standard Of Causation And Damages For Plaintiff's Breach Of Fiduciary Duty Claim, Which Is Easily Met.**

Although unnecessary for Plaintiff to rely on this principle in light of the above analysis, under New York law, "unlike a breach of contract claim, a claim for breach of fiduciary duty need not meet the standard requirements of causation and damages." *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 304 (S.D.N.Y. 2005) (citation and quotation marks omitted); *see also, e.g.*, *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465-66 (2d Cir. 1999) (discussing twin causation frameworks under New York law).  This relaxed standard merely requires Plaintiff to show that Credit Suisse's breach was a "substantial factor" in terms of the damages – a test that is readily apparent and easily satisfied.  *See, e.g.*, *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994).  Put differently, because "an action for breach of fiduciary duty is a prophylactic rule intended to remove all incentives to breach," the jury ought to be allowed to analyze all the facts and draw reasonable inferences about the effects of any breaches on Oakwood – Credit Suisse simply "cannot enjoy impunity by showing that [Plaintiff's] losses *might* have resulted from other possible causes." *See id.* at 543-44 (quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995-96 (2d Cir. 1983)).  Accordingly, in the unlikely event that the Court believes the current record

---

[41]  Credit Suisse may attempt to blunt this point by asserting that, as a matter of form, the immediate transferor of some fees was a non-debtor securitization trust, not Oakwood itself. But this is irrelevant, because it does not alter the fact that, as a matter of substance and economics, all the fees came from or reduced Oakwood's assets.  After all, Credit Suisse cannot reasonably challenge the truth that non-payment of the fees would have yielded greater proceeds to Oakwood, either on the transactions' front-end when receivables were "sold" to the non-debtor trusts or on their back-end when excess proceeds were upstreamed from the trusts to Oakwood.  (*See, e.g.*, Muir Dep. Tr. at 83:15-84:17 [Holt Decl. Ex. "C"].) "Securitization" may do many things, but creating money from thin air is not one of them. Thus, because the fees ultimately reduced Oakwood's asset value, they are an appropriate measure of damages here, irrespective of the specific method by which they were paid.

would preclude the jury from finding "proximate cause" as to either the $50 million in lost asset value *or* the $21 million in fees, Plaintiff's breach of fiduciary duty claim should still proceed to trial based upon the lower standards of causation and damages utilized by New York courts.

**E.    There Is Ample Evidence That Credit Suisse Was Acting As A Financial Advisor To Oakwood Long Before August 19, 2002, Thus Creating An Implied Contract.**

The entirety of Defendants' short argument about the implied contract claim turns on the *factual* assumption that Credit Suisse provided no financial advisory services to Oakwood prior to August 19, 2002. (*See* Def. Br. at 23-24.) That assumption is demonstrably false, or at a minimum hotly disputed, because the record shows Oakwood repeatedly turning to Credit Suisse for advice unrelated to securitization and Credit Suisse repeatedly giving such advice, even when not asked to do so. (*See, e.g.*, Counter-Statement at pp. 4-6 ¶ 5 and all the associated exhibits.)

Defendants profess great confusion about what type of contract could be implied in fact as a result of the parties' course of conduct (*see* Def. Br. at 23), but the analysis is not difficult. The parties agreed, as evidenced by their behavior, that Credit Suisse would provide reasonable financial advice to Oakwood when called upon to do so (and often when not asked expressly), in exchange for (i) an on-going stream of large fees for securitizations, "warehouse" lending, and the other stop-gap proposals (such as the "LOTUS" transactions) Credit Suisse designed from time-to-time; (ii) a powerful equity warrant; and (iii) access to "pitch" other "services" to Oakwood and otherwise be Oakwood's "first choice" investment bankers. Obviously no written contract specifies these terms, but that is intrinsic to any implied contract.

What *is* evident – and would provide a basis for the jury to rule in Plaintiff's favor – is that the parties behaved as though this agreement existed. Indeed, internal e-mails between Defendants' employees reveal their understanding of the presence and nature of that implied contract as of August 2001. Specifically, Mr. O'Driscoll found it worthwhile to tell Mr. Felt not

to include a "lockup" in an agreement with Oakwood since the very "idea of [Oakwood] doing anything away from [Credit Suisse] is so unlikely that it's probably a little offensive to them." (*See* Holt Decl. Ex. "K.")  What gave rise to this "unlikely" state of affairs – in which the *mere proposal* of a "lockup" would be "offensive" to Oakwood?  What made Oakwood "feel very shackled to" Credit Suisse?  The answers, of course, lie in the on-going and non-arm's length nature of the parties' relationship, one in which that "lockup" was fully implied and already in effect.  Consequently, because there is sufficient evidence upon which the jury could conclude that there was an implied contract between the parties,[42] summary judgment should be denied.

**F.**  **Defendants Simply Misunderstand Plaintiff's Theory Of Negligence, As To Which There Is Substantial Supporting Evidence.**

The Defendants' Brief attempts to address Plaintiff's negligence claim in a single paragraph, cursorily asserting that "no witness who has been deposed has said that Credit Suisse's provision of securitization services was anything other than highly professional and capable," and so "summary judgment is required" on the negligence claim.  (*See* Def. Br. at 24.) As an initial matter, the factual premise of this paragraph is wrong; there is clear evidence in the record that Credit Suisse's "provision of securitization services" was flawed.[43]  More importantly, this entire argument misses the point and reflects a deep misunderstanding of Plaintiff's claim.

Plaintiff's case does not turn on whether Credit Suisse's actual *execution* of the

---

[42]  *See, e.g.*, *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923); *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-04 (1975); *In re Boice*, 640 N.Y.S.2d 681, 682-83 (N.Y. App. Div. 1996); *Mirchel v. RMJ Sec. Corp.*, 613 N.Y.S.2d 876, 878 (N.Y. App. Div. 1994).

[43]  *See* Counter-Statement at p. 4 ¶ 4 and the associated exhibits.  While not the primary focus of Plaintiff's claim, Credit Suisse's lack of reasonable care evident in this material nevertheless supports a triable negligence claim since the law requires parties to undertake all their contractual obligations with reasonable care.  *See, e.g.*, *OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.)*, 378 B.R. 59, 66 (Bankr. D. Del. 2007); *Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*, 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996).

securitization transactions was adequate.  Nor is it, as Defendants tend to assert, only about "the delivery of securitization-related services."[44]  Rather, this case is about far broader questions, such as whether any such "services" should have been provided *at all* (particularly once it was known to Credit Suisse that Oakwood was hopelessly insolvent).  Specifically with respect to Plaintiff's negligence claim, the jury must make a predicate factual determination about whether Credit Suisse affirmatively undertook actions outside the scope of the written contracts with Oakwood.[45]  If the jury finds that such actions were undertaken (and the evidence discussed in Part E., *supra*, shows that they were), then a duty of reasonable care was automatically imposed on Credit Suisse as a matter of law.[46]  It is *this* broader duty of care – to follow through on providing Oakwood with financial advice which was reasonable under the circumstances – that Credit Suisse breached, and it is that breach which grounds Plaintiff's negligence claim.  As such, Defendants provide the Court no basis for summary judgment on the negligence claim.

## <u>CONCLUSION</u>

For all the reasons set forth above, the Court should deny the MSJ in its entirety.

Respectfully submitted,

Dated:  May 12, 2008
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*

---

[44]  *See, e.g.*, D.I. #94 (repeating this refrain no fewer than 8 times); *cf.* D.I. #86 (advancing the completely opposite conclusion – i.e., that this case has *nothing* to do with "securitization").

[45]  *See, e.g.*, *Pratt v. Liberty Mut. Ins. Co.*, 952 F.2d 667, 671 (2d Cir. 1992); *Cooper Indus., Inc. v. Agway, Inc.*, 987 F. Supp. 92, 104 (N.D.N.Y. 1997).

[46]  *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469-70 (2d Cir. 1995); *Palka v. ServiceMaster Mgt. Servs. Corp.*, 83 N.Y.2d 579, 585-87 (1994); *Parvi v. Kingston*, 41 N.Y.2d 553, 559-60 (1977).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ———————————————————— | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on May 12, 2008, I

caused a copy of the ***Answering Brief in Opposition to Defendants' Motion for Partial***

***Summary Judgment,*** to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: May 12, 2008                      CAMPBELL & LEVINE, LLC

_/s/ Kathryn S. Keller_
Kathryn S. Keller (No. 4660)
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900