**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>Debtors. | ) | Chapter 11<br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>Defendants. | ) | Civil Action No. 07-0799 (JJF)<br><br>**Re: Civil Docket Nos. 60-61, 81 & 95** |

**STATEMENT OF SUBSEQUENT AUTHORITIES**


Tony Castañares (CA SBN 47564)
Stephan M. Ray (CA SBN 89853)
Scott H. Yun (CA SBN 185190)
Whitman L. Holt (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600

-&-

Marla Rosoff Eskin (No. 2989)
Kathleen Campbell Davis (No. 4229)
Kathryn S. Keller (No. 4660)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

*Special Counsel for the OHC Liquidation Trust*


Dated: May 19, 2008

Pursuant to Rule 7.1.2.(b) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Plaintiff submits this Statement of Subsequent Authorities to bring the Court's attention to a recent decision that bears on Credit Suisse's pending *Daubert* motion regarding Plaintiff's expert Dr. Michael Tennenbaum: *In re Scrap Metal Antitrust Litigation*, No. 06-4511 (6th Cir. May 15, 2008) (copy attached hereto).

Plaintiff believes that the discussion on pages 3-9 of the *Scrap Metal* slip opinion further supports Plaintiff's analysis about why all of Credit Suisse's attacks on Dr. Tennenbaum ultimately go to the weight of his testimony, not its admissibility. (*See* D.I. #81 at pp. 8-17.) Like here, the plaintiff in *Scrap Metal* presented expert testimony on damages to the jury. The defendant argued that the expert's testimony should have been excluded under *Daubert* because the data-set underlying the damages analysis supposedly was "fatally flawed." *See Scrap Metal*, slip op. at 4. The Sixth Circuit rejected this entire line of reasoning, and, in a particularly notable moment, spurned the very same "garbage in, garbage out" argument that Credit Suisse has made here. *See id.*, slip op. at 7. (*Cf.* D.I. #95 at p. 1.) Noting that the defendant had the opportunity to cross-examine the plaintiff's expert witness and present contrary evidence, the Sixth Circuit ultimately concluded that "[t]he question of whether [the expert's] opinion is accurate in light of his use of the [challenged] data goes to the weight of the evidence, not to its admissibility, and the district court appropriately passed the torch to the jury to make this determination." *See Scrap Metal*, slip op. at 9. As we have explained, precisely the same result should obtain here.

Respectfully submitted,

Dated: May 19, 2008
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0182p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

In re: SCRAP METAL ANTITRUST LITIGATION

No. 06-4511

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00844—Kathleen McDonald O'Malley, District Judge.

Argued: October 30, 2007

Decided and Filed: May 15, 2008

Before: BATCHELDER, COLE, and SUTTON, Circuit Judges.

## COUNSEL

**ARGUED:** Leslie W. Jacobs, THOMPSON HINE, Cleveland, Ohio, for Appellant. William A. Isaacson, BOIES, SCHILLER & FLEXNER, Washington, D.C., for Appellees. **ON BRIEF:** Leslie W. Jacobs, THOMPSON HINE, Cleveland, Ohio, for Appellant. William A. Isaacson, Tanya S. Chutkan, Jennifer Milici, BOIES, SCHILLER & FLEXNER, Washington, D.C., Edmund W. Searby, McDONALD HOPKINS, Cleveland, Ohio, for Appellees.

## OPINION

R. GUY COLE, JR., Circuit Judge. Defendant-Appellant Columbia Iron and Metal Company ("Columbia") appeals a jury verdict finding Columbia liable for antitrust violations and awarding the Plaintiffs-Appellees damages exceeding $20 million. The most critical question on appeal relates to the damages testimony of Plaintiffs-Appellees' expert, Dr. Jeffrey Leitzinger. Columbia asserts that Leitzinger's damages calculations are unreliable, and that the district court therefore erred in admitting his testimony. Columbia also raises three additional arguments on appeal: (1) the damages award is not supported by sufficient evidence and represents an impermissible "fluid recovery"; (2) the district court improperly allowed the case to proceed as a class action; and (3) the district court improperly instructed the jury on the tolling of the statute of limitations. Finding no reversible error by the district court, we **AFFIRM** the verdict and damages award.

## I. BACKGROUND

Plaintiffs-Appellees Lincoln Electric Company and Profile Grinding, Inc. filed suit in 2002 on behalf of themselves and a class of industrial scrap-generating companies in Northeastern Ohio (collectively, "Plaintiffs") against, inter alia, Defendant-Appellant Columbia; Columbia National Group (Columbia's parent company); Harry Rock & Associates; M. Weingold & Co., Inc.; DeMilta Iron and Metal; Bay Metal, Inc.; Bluestar Metal Recycling, Inc.; and Parkwood Iron and Metal, Inc. (collectively, "Defendants"). Plaintiffs generate scrap metal, both ferrous (iron-based) and non-ferrous, as a byproduct of their manufacturing. Plaintiffs sell the unprocessed scrap metal to brokers and dealers, such as Defendants, who then haul, clean, sort, and process the scrap before selling it to end users, such as steel mills. The movement of unprocessed scrap from generators to dealers generally works as follows: The dealers submit bids to the generators for the purchase of unprocessed scrap during a specified time period at a set price. In setting their bid price, dealers consult various trade publications, which report the prevailing prices that dealers can expect to charge users for the scrap after they have processed it. To ensure that they turn a profit, dealers set their bid price for the unprocessed scrap below the amount they will ultimately charge the users for the processed scrap. If the bid is accepted by the scrap generator, the generator and the dealer enter into a contract at the bid price for the bid period.

In this case, Plaintiffs allege that Defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to restrain and eliminate competition in the purchase of unprocessed industrial scrap metal in Northeastern Ohio. Specifically, Plaintiffs claim that Defendants engaged in a variety of unlawful acts including allocating scrap metal generators among dealers, agreeing not to compete with one another, submitting rigged bids, setting prices for the purchase of unprocessed scrap metal, and imposing financial penalties on co-conspirators for disobeying allocation agreements.

On May 30, 2003, Plaintiffs moved to certify a class consisting of all generators who sold scrap metal to Defendants and/or their co-conspirators between December 1992 and March 2000. The district court certified the class in March 2004.

Prior to trial, Plaintiffs settled with or dismissed all but three Defendants. In 2005, the remaining Defendants, including Columbia, filed a motion to preclude damages testimony from Plaintiffs' expert economist, Dr. Jeffrey Leitzinger. The district court denied the motion, finding that Defendants' arguments relating to Leitzinger's damages analysis went to the weight, not the admissibility, of his testimony. Defendants then moved for summary judgment, which the district court also denied. Three days before trial, Columbia moved to decertify the class, claiming that it had just discovered that the class notice was inadequate. The district court denied Columbia's motion, and the three remaining Defendants, including Columbia, proceeded to trial.

At the conclusion of the trial, the court directed a verdict against Plaintiffs for all claims relating to non-ferrous scrap-metal sales on the ground that Plaintiffs failed to establish any proof of injury or damages relating to such transactions. As for the remaining claims, those relating to ferrous scrap-metal sales, the jury returned a verdict against Columbia only and awarded Plaintiffs $11.5 million in damages. The district court, pursuant to 15 U.S.C. § 15(a), tripled the jury's award to $34.5 million, subtracted the amount received from the settling Defendants, and thereupon entered a judgment against Columbia in the amount of $23,036,000.

Columbia moved for judgment as a matter of law and, alternatively, for a new trial or a reduction of the damages. The district court denied both motions, and Columbia timely appealed.

## II. ANALYSIS

Columbia presents four issues on appeal. First, Columbia claims that the district court erred in denying its motion to exclude Leitzinger's testimony. Second, Columbia asserts that the evidence

was insufficient to support the damages award and that the award represents an impermissible "fluid recovery." Third, Columbia argues that the district court did not comply with Federal Rule of Civil Procedure 23 in certifying a class and allowing the case to proceed as a class action. Finally, Columbia challenges the district court's instructions to the jury on the tolling of the statute of limitations. We address each of these arguments in turn.

**A. Admissibility of Leitzinger's Testimony**

**1. Leitzinger's Calculations**

We begin by summarizing Leitzinger's testimony, which Plaintiffs offered to prove the amount of damages the class incurred as a result of Defendants' anticompetitive conduct. Leitzinger employed what is referred to interchangeably as the "during and after" or "before and after" method to determine the amount Defendants underpaid Plaintiffs for unprocessed scrap metal. Employing this method, the profits made by antitrust defendants *during* the alleged conspiracy are compared with the profits made by the defendants in the period *after* the alleged conspiracy. In simple terms, by analyzing this difference, an expert can determine the amount of profit during the conspiracy period had the antitrust violation not occurred. Presumably, the data would show that, but for the anticompetitive conduct, the defendants' profit margin would have been lower and the plaintiffs' profit margin would have been higher.

Here, Leitzinger calculated the difference, both during and after the alleged conspiracy, between (1) the generator-dealer transactions, i.e., the amount the dealers paid to the generators for unprocessed scrap metal, and (2) the dealer-user transactions, i.e., the amount for which the dealers sold processed scrap metal to users. Leitzinger used actual transaction data from a sample of generators and dealers for the generator-dealer transactions. However, in order to control for factors other than the conspiracy that might have affected prices, Leitzinger used index prices for the dealer-user transactions, which were published on a weekly basis in American Metal Market ("AMM") and *Iron Age* magazine's Scrap Price Bulletin ("SPB"). These index prices represented the prevailing prices users paid dealers for processed scrap. Leitzinger testified that Defendants also used these published prices to determine the amount they would bid on the generators' unprocessed scrap. The "price spread"—the difference between (1) the price a dealer paid to a generator for unprocessed scrap, and (2) the comparative figure from a price index, representing the amount the dealer earned from selling the processed scrap to a user—was the dealer's profit. By comparing the price spread during the conspiracy period with the price spread after the conspiracy period, Leitzinger concluded that the results were consistent with anticompetitive conduct: Defendants' profits declined after the conspiracy, while the generators' profits rose.

Leitzinger used the SPB index to analyze only the ferrous scrap-metal market. He concluded that, on average, there had been a 16.4 percent undercharge on the purchase of unprocessed ferrous scrap metal during the conspiracy period. Put another way, Leitzinger concluded that Defendants would have paid Plaintiffs 16.4 percent more for unprocessed ferrous scrap metal in the absence of an antitrust conspiracy. Because Defendants' total purchases of ferrous scrap metal from the class members during the class period amounted to $127.6 million, Leitzinger calculated damages at $20.9 million ($127.6 million times 16.4 percent).

As to the non-ferrous scrap-metal market, Leitzinger used the AMM index to make his calculations, rather than the SPB index, because market participants regularly used the AMM index to price non-ferrous scrap. Leitzinger was unable to identify any undercharge affecting dealers' purchase of non-ferrous scrap, which he attributed to his inability to assemble "enough data of the right quality to be able to really and truly see what had happened on the nonferrous side."

**2. Scrap Price Bulletin**

Columbia objects to Leitzinger's use of the SPB index to ascertain the pricing of dealer-user ferrous scrap-metal sales. Although evidence at trial showed that the SPB index was commonly used by dealers as a benchmark for pricing processed ferrous scrap, Columbia argues that this index is not a reliable source for damages calculations because on December 7, 1998 and October 4, 1999, *Iron Age* issued a correction to the SPB, stating that thirteen of the eighteen categories of processed ferrous scrap had been reported incorrectly for an unknown period of time. At his deposition, Leitzinger explained that this adjustment was merely a result of the magazine's "change in [its] method of reporting prices." Leitzinger said that *Iron Age* decided to switch from reporting prices "FOB dealer to FOB user," thereby adding additional costs like transportation and broker fees to the reported prices.[1] To "account for the *Iron Age* reporting method change" and "to measure the value that generators received relative to a consistent processed scrap price," Leitzinger "backed out" the December 1998 and October 1999 "corrections" by subtracting them from the SPB index prices.

Following Leitzinger's deposition, Columbia submitted the affidavit of John Ambrosia, an *Iron Age* reporter, who explained that the magazine adjusted the SPB prices because, for some unexplained reason, they failed to reflect actual transaction prices for the Northeastern Ohio area. The corrections were therefore necessary to ensure that the SPB index accurately reported market prices. Ambrosia stated that the adjustments had nothing to do with a change in pricing measuring points, e.g., "FOB dealer to FOB user," as Leitzinger believed. Moreover, Ambrosia said that he did not know when the ferrous scrap prices had begun to depart from actual market prices.

Columbia asserts that because Leitzinger assumed that the increases in the SPB index simply reflected a change in the price measuring point, he mistakenly concluded that he could create a "consistent processed-ferrous-scrap-price data set" by "backing out" the amount of the SPB increases. Plaintiffs concede that Leitzinger's assumption that *Iron Age* simply changed reporting methods was incorrect and that the SPB corrections were necessary to accurately report market prices for processed ferrous scrap. Columbia thus argues that Leitzinger's analysis is fatally flawed for two reasons: First, as the argument goes, Leitzinger did not have a reliable data set to work with prior to December 7, 1998, when the SPB index was brought back into alignment with actual market prices. Second, by "backing out" the corrections, Leitzinger made the SPB data with which he was working inaccurate.

Columbia compares Leitzinger's conclusion that there was a 16.4 percent undercharge during the conspiracy with his inability to identify any measurable damages in connection with non-ferrous scrap sales. Columbia argues that this inconsistency makes no sense because the same scrap dealers were purchasing both ferrous and non-ferrous scrap during the conspiracy, usually from the same generators. It is therefore reasonable to expect that if there was an undercharge for the sale of ferrous scrap, there similarly would have been an undercharge for the sale of non-ferrous scrap. Columbia argues that there is an obvious culprit behind this discrepancy: Whereas Leitzinger used the inaccurate SPB price index in calculating the ferrous-scrap undercharge (and then made that data even more inaccurate by subtracting out the 1998 and 1999 adjustments), he used the AMM price index in analyzing the non-ferrous scrap market. Columbia points out that, unlike the SPB index, the AMM required no "corrections" to ensure that it accurately reflected actual market prices. Further, at trial, Columbia's expert testified that when he substituted the AMM data into Leitzinger's ferrous analysis, "most of the apparent damages disappeared."

[1]"FOB," meaning "free on board" is a delivery term which indicates what transportation costs and risks the dealer must assume. "FOB dealer" means that the dealer is responsible for getting the goods to a common carrier; "FOB user" means that the dealer is responsible for getting the goods to the user. 18 Richard A. Lord, Williston on Contracts § 52:11 (4th ed. 2007).

Plaintiffs counter Columbia's argument in several ways. First, Plaintiffs claim that Leitzinger's decision to rely on the SPB index for ferrous transactions and on the AMM index for non-ferrous transactions was proper because that is exactly what the relevant industry actors did. Testimony at trial established that industry participants used the SPB to price ferrous scrap and the AMM to price non-ferrous scrap. Second, and relatedly, Plaintiffs argue that regardless of whether the SPB numbers were accurate, because the industry participants referred to those numbers for their pricing decisions, it was entirely appropriate for Leitzinger to rely on them to calculate Plaintiffs' damages in connection with their ferrous scrap sales. Third, Plaintiffs argue that Leitzinger made the right call when he "backed out" the SPB adjustments because the dealers themselves did the same thing. In other words, the dealers did not increase their bid price to the generators based on the new SPB numbers, but instead held firm to the old numbers. Thus, according to Plaintiffs, even though Leitzinger got the reason for the SPB adjustments wrong, all that matters is that he treated the adjustments just as the industry participants did—by backing them out of the SPB prices. Stated otherwise, Plaintiffs claim that Leitzinger relied on the SPB index to account for market changes, and when the SPB index adjusted, he, *just like Defendants*, backed out the adjustments. Finally, Plaintiffs assert that Columbia's argument founders on the testimony of its own expert, who stated at trial that as long as the SPB index moved "roughly parallel" to actual prices of processed ferrous scrap, inaccuracies in the index were not material. Indeed, Plaintiffs displayed a graph at trial showing "roughly parallel" lines representing actual sales prices for processed ferrous scrap and the SPB indices.

**3. The District Court's Ruling**

The district court denied Columbia's motion to preclude Leitzinger's testimony. The court explained that it had

> spent a substantial amount of time and effort reviewing the parties' voluminous filings relative to the admissibility—or inadmissibility—of Dr. Leitzinger's testimony pursuant to the applicable standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Despite [Columbia's] many well-supported attacks on the underlying data employed and assumptions made by Dr. Leitzinger in reaching his assumed damage calculation, the Court finds that those attacks are best reserved for cross-examination and do not, in this case, rise to the level warranting exclusion under *Daubert*.

(JA 799-800.) The court went on to state that there was "substantial room for debate" about Leitzinger's data set and "substantial bases upon which to criticize" certain of his assumptions. Nonetheless, the court concluded that

> Dr. Leitzinger has provided reasoned explanations for the assumptions that he made and has, at least at [this] stage, presented viable arguments to support his data set choices. Whether those explanations will withstand rigorous cross-examination, or challenges based on alternative assumptions or data choices, is not the issue now before the Court. The Court concludes that Dr. Leitzinger's opinions satisfy the *Daubert* standard and that [Columbia's] criticisms of those opinions simply are appropriate fodder for cross-examination.

(*Id*.)

In response to the two post-trial motions filed by Columbia, a motion for judgment as a matter of law and a motion for a new trial, the district court made

> one final observation regarding the nature and strength of Leitzinger's testimony. As noted, the Court spent a substantial period of time analyzing, and re-analyzing,

> the Defendants' *Daubert* motions seeking to exclude Leitzinger's testimony in its entirety. The Court felt that Defendants' challenges were substantial and written attacks on his testimony articulately stated. It was only after several passes through the motion papers that the Court was able to understand that those challenges, though pointed, went to the weight and not the admissibility of Leitzinger's opinions- i.e., did not justify the wholesale exclusion of testimony Defendants sought.
>
> The Court finds it notable that, after hearing Leitzinger's testimony in open court, hearing his responses to counsel's pointed attacks on cross-examination, and hearing what ultimately proved to be only limited critiques of Leitzinger's analysis by [Defendants' expert], the Court was more convinced than it had been when it made its initial *Daubert* ruling that its ruling was correct. . . . Ultimately, the debate over Leitzinger's testimony was left where it should have remained-with the jury.

*In re Scrap Metal Antitrust Litigation*, No. 1:02CV0844, 2006 WL 2850453, at *18 (N.D. Ohio Sept. 30, 2006).

**4. Standard of Review**

We review for abuse of discretion the district court's determination to admit or exclude expert testimony, "recognizing, of course, that such review calls for deference to the district court's decision." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002) (citing *Clay v. Ford Motor Co.*, 215 F.3d 663, 666 (6th Cir. 2000)). Such deference applies to the way in which the court assesses admissibility as well as the court's ultimate decision of admissibility. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999). Thus, we will not substitute our own judgment for that of the district court and will reverse an evidentiary decision "only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *Conwood*, 290 F.3d at 781 (citing *Singleton v. United States*, 277 F.3d 864, 870 (6th Cir. 2002); *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999)).

**5. Discussion**

The starting point in our analysis is Federal Rule of Evidence 702, which governs the use of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule, as amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho*. Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").

Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id*. Third, the testimony must be reliable. *Id.* Rule 702

guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." *Id.* In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94). The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho*, 526 U.S. at 150 (citing *Daubert*, 509 U.S. at 593). Indeed, we have recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).

On appeal, Columbia does not argue that Leitzinger was unqualified as an expert or that his testimony was irrelevant. Nor does Columbia challenge generally the reliability of the "during and after" method to determine damages; indeed, this method is broadly accepted for proving antitrust damages. *See Conwood*, 290 F.3d at 793 n.8 (explaining that "[t]he before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it" and finding such method accepted in antitrust cases) (internal quotation and citation omitted). Columbia's argument, rather, is limited to challenging the reliability of Leitzinger's testimony specifically because of his use of the inaccurate SPB price index and his alterations to the SPB's prices. Columbia contends that Leitzinger used erroneous data and necessarily produced an erroneous conclusion; in sum, "garbage in, garbage out." Columbia argues that the district court should have, therefore, excluded Leitzinger's proposed testimony as insufficiently reliable under Rule 702.

Columbia's argument is unpersuasive because it fundamentally confuses the *credibility and accuracy* of Leitzinger's opinion with its *reliability*. Contrary to Columbia's assertions, a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion. Indeed, although "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), a court must be sure not "to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 advisory committee's note, 2000 amend. Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation. *See* Fed. R. Evid. 702 (explaining that expert testimony must be based on "sufficient facts or data" and the "product of reliable principles and methods"); *Conwood*, 290 F.3d at 792 (stating that the district court must determine whether proffered expert testimony "rests on a reliable foundation") (internal quotation and citation omitted).

An analogous case is illustrative. In *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343-44 (11th Cir. 2003), the appellant challenged the admission of the appellee's expert testimony relating to computational fluid dynamics ("CFD"). The appellant focused on the specific application of the CFD method, not on the reliability of the CFD method in general. Specifically, the appellant argued that the expert used incorrect data or was missing data to run the CFD study and used the wrong equations to run the analysis. *Id.* at 1344. If the data used was incorrect, the appellant argued, the conclusions necessarily were flawed as well and should be excluded from the jury. *Id.* at 1344-45. The Eleventh Circuit, however, held that such an attack goes to the weight of the evidence, rather than to its admissibility:

> [The appellant] does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that [the appellee] employed, but rather that the specific numbers that [the appellee] used were wrong. Thus, the alleged flaws in [the appellee's] analysis are of a character that impugn the *accuracy* of his results, not the general scientific *validity* of his methods.
>
> The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.

*Id*. at 1345 (emphasis added).

That is not to say that a significant error in application will never go to the admissibility, as opposed to the weight, of the evidence. Indeed, the 2000 amendments to Rule 702 explain that an expert witness must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702(3); *see also* Fed. R. Evid. 702 advisory committee's note, 2000 amend. ("[*A*]*ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotation marks omitted). But "rejection of expert testimony is the exception, rather than the rule," *id*., and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record.

For example, in *Jahn v. Equine Services*, 233 F.3d 382 (6th Cir. 2000), this Court reversed a district judge's decision holding inadmissible proposed expert testimony, and remanded for a hearing. The Court explained that although the opinions of the proffered testimony "may very well be 'shaky,'" because the opinions were based upon facts in the record, and were not "assumptions" or "guesses," challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony. *Id.* at 390-93. *See also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.' (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)) (internal citations omitted)); *Cooke*, 991 F.2d at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.")

Here, Columbia takes issue with the factual basis of Leitzinger's testimony, specifically his use of the SPB data, his understanding of what the December 1998 and October 1999 adjustments meant, and his reasons for backing out those adjustments. But Columbia does not argue that Leitzinger's opinion is entirely unsupported, that he merely pulled the numbers comprising his calculations out of thin air. Insofar as Columbia claims that Leitzinger should not have used the SPB index at all, that argument fails in light of the uncontroverted testimony at trial establishing that the industry participants used the SPB index to fix prices for ferrous scrap.

Next, we agree with the district court that Leitzinger's "backing out" of the SPB adjustments did not render his expert opinion fatally unreliable and subject to exclusion. Leitzinger offered a foundation for how and why he analyzed the data as he did. He testified at trial that subtracting the SPB corrections mirrored exactly what dealers had done in the marketplace at the time the corrections were announced. In support, he referred to three letters that dealers sent in December 1998 to three generators with unexpired contracts that contained price formulas tied to the SPB. The letters requested a modification to the contracts in light of the substantial increase in the SPB index. As Leitzinger explained at trial:

> [T]he major dealers . . . promptly sent letters to customers [i.e., generators] saying here's the change in index. We want to adjust the differential to back it out.

> Just because the magazine changed the index doesn't mean we are now going to pay you more money. If our contract used to be index less 20, and they just raised the index by $20, . . . we want it to be index less 40. So they immediately sent letters out saying we want to, in effect, unwind the increase by Scrap Price Bulletin.

(JA 1195.)

In addition, Leitzinger referenced a graph at trial that showed "roughly parallel" lines, one representing actual sale prices for processed ferrous scrap and the other representing the corresponding SPB index prices. Even Defendants' expert agreed that for the purposes of Leitzinger's analysis, it did not matter whether the SPB index accurately reflected price for processed scrap and that all that mattered was that the SPB index moved "roughly parallel" to actual prices for processed scrap. Thus, the graph provided evidence that indeed the market followed the SPB index even after December 1998 and October 1999 corrections were made and that any inaccuracies in the SPB were irrelevant so long as the index moved up and down over time parallel to actual market prices.

In sum, the jury was free to give Leitzinger's opinion little or no weight, and to credit instead Defendants' attacks on his decision to back out the adjustments. We cannot say that the district court abused its discretion in admitting Leitzinger's testimony when the record shows that he performed his analysis according to a reliable method (the "during and after" method) and reliably applied that method to the facts of this case. Moreover, Leitzinger's calculations were tested on cross-examination and subjected to further scrutiny and criticism by Defendants' own expert. *Daubert*, 509 U.S. at 593 (explaining that in analyzing the reliability of an expert's testimony, the "key question" is "whether it can be (and has been) tested"). The question of whether Leitzinger's opinion is accurate in light of his use of the SPB data goes to the weight of the evidence, not to its admissibility, and the district court appropriately passed the torch to the jury to make this determination. *See id.* at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 n.3 (3d Cir. 2002) ("While the Federal Rules of Evidence call upon the courts to serve as gatekeepers who independently evaluate the admissibility of expert opinion testimony, they rely upon the discretion of the trial courts—not the discretion of the courts of appeals. Because the record contains *some* factual basis—albeit shaky—for [the expert's] testimony, the District Court did not abuse its discretion in performing this gatekeeping function." (internal citations omitted)).

Finally we note that the district court did not abuse its discretion by failing to hold a *Daubert* hearing, because the record on the expert testimony was extensive, and the *Daubert* issue was fully briefed by the parties. *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (stating that a district court is not required to conduct a *Daubert* evidentiary hearing to qualify an expert witness). Columbia claims that the district court's opinion in response to Columbia's motion to preclude Leitzinger's testimony was cursory. We conclude that the court accurately considered the key issues, found the testimony to be sufficiently reliable by stating that Leitzinger "provided reasoned explanations" and "presented viable arguments" for his calculations, and concluded that Columbia's attacks were most appropriate for cross-examination. We, therefore, cannot say that the district court abused its discretion.

**B. Damages Award**

Columbia argues that even crediting Leitzinger's testimony, there is insufficient evidence to support the damages verdict and, in any event, the verdict is an impermissible "fluid recovery."

Columbia raised this issue in its Rule 50(a) and (b) motions for judgment as a matter of law. We review a district court's refusal to grant a party's motion for judgment as a matter of law de novo. *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005). We have explained that the standard of review is identical to that used by the district court:

> The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant.

*Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997)).

**1. Sufficiency of the Evidence**

"An antitrust plaintiff seeking treble damages under section 4 of the Clayton Act must prove an antitrust violation, fact of damage or injury, and measurable damages." *Danny Kresky Enter. Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir. 1983).

Columbia argues that Plaintiffs failed to provide the jury with sufficient evidence to support the jury's finding of individual and market-wide damages. Columbia recognizes that Leitzinger opined that every class member who sold ferrous scrap incurred a 16.4 percent undercharge for every sale during the class period, resulting in aggregate damages of $20.9 million. But because the jury reached a verdict of $11.5 million in damages, Columbia argues, the jury must have resorted to speculation and conjecture to arrive at such a figure, illustrating the insufficiency of the damages evidence on damages.

Columbia's challenge to the jury's verdict on damages is therefore directed at the accuracy of the amount of damages and not the fact of damages. Columbia's argument, in essence, is that Leitzinger's testimony alone was insufficient for the jury to have accurately fixed Plaintiffs' damages.

The district court, rejecting Columbia's argument, explained:

> In sum, Leitzinger testified that, if a conspiracy to depress prices via customer allocation existed during the alleged period, it would have uniformly impacted the relevant scrap metal market, and that impact would have been one that was shared in common by *all* of the ferrous generators. He went on to testify that the uniform injury experienced by *all* of the ferrous class members was a 16.4% undercharge during the conspiracy period. Further, Leitzinger testified that the undercharge experienced by the named Plaintiffs specifically was 16.4% as well.
>
> . . . .
>
> *If credited*, therefore, Leitzinger's testimony clearly established evidence of injury to the named Plaintiffs and the class as a whole, and measurable damages to the named Plaintiffs and the class as a whole. . . . If the jury credited Leitzinger's conclusions—in whole or in part—it reasonably could have reached the conclusions that it did.

*In re Scrap Metal*, 2006 WL 2850453, at *17-18.

We agree. First, a jury is entitled to award damages in an antitrust case based on expert testimony. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 572 (1990 ) (holding that "expert testimony . . . provided a sufficient basis for an acceptable estimate of the amount of damages"). Second, "[t]he antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *South-East Coal Co. v. Consol. Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970). Once liability is established, therefore, a plaintiff's proof of damages is evaluated under a more lenient standard. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981). As the Supreme Court has stated in explaining its "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury," *id.* at 565, "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *Id.* at 566-67 (quoting *Hetzel v. Baltimore & Ohio R.R.*, 169 U.S. 26, 39 (1898)). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Further, "the fact that the jury chose to assess damages in an amount substantially below that recommended by plaintiff's expert does not mean that the evidence offered in support of lost profits was inadequate as a matter of law." *Falls Steel Tube & Mfg. Co. v. Trumark, Inc.*, No. 94-3981, 1995 WL 750541, at *3 (6th Cir. 1995) (per curiam) (explaining that even though defendant identified weaknesses in the evidence of damages, "we do not find it to be so 'speculative or remote' that the matter should have been taken from the jury"). *See also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005) ("A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages.").

We conclude that Leitzinger's testimony is sufficient to support the jury's damage award.

**2. Fluid Recovery**

Columbia further argues that the jury's verdict represents an "impermissible fluid recovery" because the jury was only permitted to return a lump-sum verdict for ferrous generators as a group without determining the damages incurred by individual class members. Columbia's argument again is premised on its disagreement with Leitzinger's finding that every ferrous scrap sale in the class period had been depressed at the same rate (16.4 percent). Because the jury returned a verdict in an amount less than Leitzinger's estimated damages, Columbia argues that there is no basis for concluding that the jury accepted Leitzinger's premise that the alleged conspiracy had a uniform impact. In other words, Columbia states that it is impossible to figure out how the jury reached its verdict or to which class members the verdict applies and in what amounts. Columbia therefore asserts that the verdict is an impermissible fluid recovery.

Columbia, however, confuses the concept of fluid recovery with aggregate damages. "Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525 (S.D.N.Y. 1996). *See also Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 3032556, at *1 (E.D.N.Y. 2005) ("Recoveries described as 'fluid' include distribution of damages through price reductions rather than by cash to individual plaintiffs; distribution of settlement or damage funds left unclaimed by individuals to nonprofit organizations or to states for uses intended to benefit class members; and distribution of damages calculated on a classwide basis to individual plaintiffs or through various indirect means." (internal citations omitted)). Indeed, the cases on which Columbia relies involved scenarios where damages could not be returned to any meaningful number of class members, and the plaintiffs accordingly proposed a fluid recovery.

Here, Plaintiffs did not propose a fluid recovery; instead they provided evidence of a class-wide *aggregate* injury. "Damages in an antitrust class action may be determined on a classwide, or aggregate, basis, without resorting to fluid recovery where the [evidence] . . . provide[s] a means to

distribute damages to injured class members in the amount of their respective damages." *In re NASDAQ*, 169 F.R.D. at 526. Leitzinger produced evidence supporting an aggregate recovery because *each* Plaintiff suffered a 16.4 percent undercharge. Leitzinger testified that the scrap metal market was well-functioning so as to distribute the effect of an antitrust violation equally across class members. The jury accepted Leitzinger's uniform-impact theory and awarded aggregate damages based on the injury to each class member. That the jury awarded a lower amount than Leitzinger suggested does not mean that it rejected Leitzinger's uniform-impact theory; instead, the jury may have simply rejected the undercharge amount of 16.4 percent.

**C. Class Certification**

Columbia argues that the district court erred in certifying a class and allowing the trial to proceed as a class action because (1) the "predominance of common questions" requirement of Rule 23(b)(3) was not met, and (2) Plaintiffs did not satisfy the notice requirement of Federal Rule of Civil Procedure 23(c)(2)(B). "The district court's decision *certifying* the class is subject to a 'very limited' review and will be reversed 'only upon a strong showing that the district court's decision was a clear abuse of discretion.'" *Olden v. LaFarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004) (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001)).

**1. Predominance of Common Questions**

Columbia contends that Plaintiffs did not meet the "predominance of common questions" requirement of Rule 23(b)(3) because damages could not be calculated on a class-wide basis.

In addition to the prerequisites of Rule 23(a)—numerosity, commonality, typicality, and fair representation—Rule 23(b) requires that (1) questions common to the class predominate over questions affecting only individual members, and (2) class resolution is superior to alternative methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Put differently, the proposed class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Columbia erroneously assumes that the issue of damages must predominate. To the contrary, "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws," *Amchem*, 521 U.S. at 625, because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case. 7AA Wright & Miller § 1781. Indeed, we have never required a precise mathematical calculation of damages before deeming a class worthy of certification. *See Olden*, 383 F.3d at 508 (affirming class certification where liability could be determined for the class as a whole, despite individual issues of damages). Thus, even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.").

Here, the district court found that the "*allegations* of price-fixing and market allocation . . . will not vary among class members." (JA 263 (emphasis added).) Accordingly, the court found that the "fact of damages" was a question common to the class even if the amount of damages sustained by each individual class member varied. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) ("[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues") (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)); *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (explaining that although damages calculation in antitrust

action may involve some individualized issues, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"). We, therefore, find no error in the district court's analysis.

**2. Notice**

Columbia next argues that Plaintiffs failed to inform sufficiently absent class members of "the binding effect of a class judgment." Fed. R. Civ. P. 23(c)(2)(B). In April 2004, the district court issued a Notice of Class Determination and Proposed Partial Settlements (hereinafter, "Notice"). Columbia did not object to this Notice until January 2006, three days before the scheduled trial. Without commenting on Columbia's dilatory decertification motion, we conclude that the district court did not abuse its discretion in determining that the Notice was adequate.

In three distinct places, the Notice informed class members of the effects of remaining a member of the class. First, contrary to Columbia's contention that the Notice focused exclusively on the agreements with the settling defendants, it concisely and clearly informed class members that "[w]hether or not the settlements . . . are approved, the litigation will continue against the non-settling defendants." (JA 283.) Second, the Notice specified the binding effect of both the proposed settlement and any future lawsuit by advising class members of the need to opt out in order to "pursue any claims against any defendants." (JA 283.) Third, the Notice informed the class members that by opting out of the class and the proposed settlements, they would not be bound by a judgment: "You will be excluded from the Class Plaintiffs' prosecution of the claims against all defendants . . .[and] you may present any claim you may have against . . . any other defendant by filing your own lawsuit." (JA 291-92.) Thus, the Notice was adequate in form and content to satisfy the requirements of the Federal Rules and due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (class notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

**D. Jury Instructions**

Columbia contends that the trial court erred when it instructed the jury on tolling and the applicable statute of limitations. We review a district court's jury instructions for abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (internal quotations and citations omitted).

Antitrust actions are subject to a four-year statute of limitations, meaning of course, that suit must be brought within four years after the cause of action accrued. 15 U.S.C. § 15(b). A cause of action, however, does not necessarily "accrue" when the defendant commits the act causing the plaintiff's injury, but may be tolled until the plaintiff discovers or should have discovered the injury. *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971). For instance, acts of fraudulent concealment by the defendant toll the limitations period for as long as the concealment continues. *Norton-Children's Hosp., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 443 (6th Cir. 1981). In addition, pursuant to 15 U.S.C. § 16(i), the limitations period is tolled during the pendency of related criminal or civil proceedings by the government, plus an additional one-year period thereafter.

Plaintiffs filed suit on August 15, 2002. Columbia asserts, therefore, that August 15, 1998 is the date on or after which Plaintiffs must establish Columbia's participation in the alleged conspiracy. The district court, however, suspended the limitations period pursuant to 15 U.S.C. § 16(i) and instructed the jury that it could consider Defendants' acts four years prior to March 2000,

based on ongoing, related government proceedings beginning at that time. The district court's ruling meant that the jury could consider Defendants' conduct as of March of 1996. The district court also gave a fraudulent concealment instruction allowing the jury to alter further the dates in consideration, if it found the requisite elements. Columbia claims that both of these instructions were erroneous. Because we conclude that the jury could have reached the verdict based on the fraudulent concealment theory, we do not reach Columbia's objection to the statutory tolling instruction.

The district court gave the following fraudulent concealment instruction:

> To establish fraudulent concealment as to a specific defendant in this case, plaintiffs must prove each of the following elements by a preponderance of the evidence:
>
> (1) First, that the members of the conspiracy actively concealed the alleged conduct that caused plaintiff's antitrust injuries. It is not enough for plaintiffs to show that the members of the conspiracy failed to disclose the alleged conduct; rather plaintiffs must prove that they took active and affirmative steps to prevent plaintiffs from learning about the alleged conduct, such as by keeping their meetings or agreements secret from their accounts or taking steps to conceal the fact of their non-competition; and
>
> (2) Second, that plaintiffs failed to discover the fact of the unlawful conspiracy; and
>
> (3) Third, that plaintiffs exercised reasonable diligence in the circumstances and still did not discover the alleged conduct.
>
> In deciding whether plaintiffs have proved fraudulent concealment by the alleged conspirators, you may consider a number of factors. First, the law recognizes that a conspiracy is, by nature, self-concealing. Thus, you may consider the very acts giving rise to the conspiracy when deciding whether it was concealed from the plaintiffs; there is no requirement that the affirmative acts of concealment be independent of the conspiracy itself. You may also consider other activities which operate to conceal anti-competitive conduct such as prearranged or phone bids, confining knowledge of any anti-competitive activity to a limited core group of individuals, engaging in clandestine meetings or using false identities . . . .
>
> [A]s with other acts in a conspiracy, any affirmative acts of concealment by one conspirator are chargeable to all you find to have been members of the conspiracy. Similarly, plaintiffs need not establish concealment on a victim-by-victim basis; affirmative acts of concealment generally are considered to have an industry-wide effect.
>
> If you find that plaintiffs have proven each of the elements of fraudulent concealment, then you may find that the doctrine of fraudulent concealment applies to plaintiffs' claims. In that event, plaintiffs may then seek to recover damages from the date of the earliest injury that you find they suffered, if any. If you find that plaintiffs have *failed to prove any one of these elements*, then you are *limited to the post-March 1996 time period* outlined in the previous "affirmative defense" instruction.

(JA 1033-34.) Columbia argues that the court erred by instructing the jury, in the foregoing emphasized language, that it could find fraudulent concealment or apply statutory tolling (with the

earliest date of consideration in March 1996), instead of stating that the jury could find fraudulent concealment, statutory tolling, *or* find that *neither* applied (meaning the earliest date of consideration would be August 1998). Because the jury heard evidence based upon which it could have found fraudulent concealment even *before* 1996 and lasting through 1998, we conclude that any error in the jury instructions is harmless. *See United States v. Rayborn*, 491 F.3d 513, 520 (6th Cir. 2007) ("Even assuming *arguendo* that the instruction was given in error, 'a legally-erroneous jury charge will not justify reversal of a conviction if its probable effect on the verdict was inconsequential.'") (quoting *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004)).

Columbia argues that some of the evidence of fraudulent concealment should not apply to it because it was based on acts taken by other Defendants. Fraudulent concealment, however, may be established through the acts of co-conspirators. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) ("affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations"); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084-85 (2d Cir. 1988) (same). Columbia cites no authority to support its argument that fraudulent concealment must be shown in relation to each plaintiff in a class action.

Finally, Columbia argues that the district court erred by instructing that "the law recognizes that a conspiracy is, by nature, self-concealing." Indeed, in the law of this Circuit, a plaintiff seeking to invoke the doctrine of fraudulent concealment in order to toll the statute of limitations in an antitrust case must prove "affirmative acts" of concealment; "concealment by mere silence is not enough." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1467 (6th Cir. 1988) (citation omitted). The district court's instruction, however, stated accurately this standard in its instruction: "It is not enough for plaintiffs to show that the members of the conspiracy failed to disclose the alleged conduct; rather plaintiffs must prove that they took active and affirmative steps to prevent plaintiffs from learning about the alleged conduct . . . ." (JA 1033.)

Therefore, we find no abuse of discretion.

## III. CONCLUSION

For these reasons, we **AFFIRM**.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>Defendants. | Civil Action No. 07-0799 (JJF) |

**CERTIFICATE OF SERVICE**

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on May 19, 2008, I caused a copy of the ***Statement of Subsequent Authorities***, to be served upon the individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: May 19, 2008

CAMPBELL & LEVINE, LLC

*/s/ Kathryn S. Keller*

Kathryn S. Keller (No. 4660)
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900