## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————— | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | **Re: Civil Docket No. 100** |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

***CONFIDENTIAL – FILED UNDER SEAL SUBJECT TO PROTECTIVE ORDER***

## DECLARATION OF WHITMAN L. HOLT
## IN SUPPORT OF PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Whitman L. Holt, declare as follows:

1.      I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.      I submit this declaration in support of the *Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment* filed by the OHC Liquidation Trust ("**Plaintiff**") in the above-captioned proceeding.

3.      I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for Plaintiff in this proceeding.

**Depositions-**

4.      Plaintiff's counsel deposed Mr. Thomas F. Boland – a proposed expert witness on Defendants' behalf – on March 25, 2008.  True and correct copies of relevant excerpts from the transcript of Mr. Boland's deposition are attached hereto as Exhibit "A."

5.      Plaintiff's counsel deposed Mr. Thomas Irwin – one of the principal CRM employees involved with Oakwood – on November 8, 2006.  True and correct copies of relevant excerpts from the transcript of Mr. Irwin's deposition are attached hereto as Exhibit "B."

6.      Defendants' counsel deposed Mr. Douglas R. Muir – a former Oakwood officer, and an individual directly involved with Oakwood's securitization programs – on September 26-27, 2006.  True and correct copies of relevant excerpts from the transcript of Mr. Muir's deposition are attached hereto as Exhibit "C."

7.      Plaintiff's counsel deposed Mr. Fiachra O'Driscoll – an employee of Credit Suisse and the individual with primary responsibility for, *inter alia*, Oakwood's securitization transactions – on June 29-30, 2006.  True and correct copies of relevant excerpts from the

transcript of Mr. O'Driscoll's deposition are attached hereto as Exhibit "D."

        8.     Defendants' counsel deposed Dr. Alan C. Shapiro – one of Plaintiff's

proposed expert witnesses – on September 5, 2007.  True and correct copies of relevant excerpts

from the transcript of Dr. Shapiro's deposition are attached hereto as Exhibit "E."

        9.     Defendants' counsel deposed Mr. Myles Standish – a former Chief

Executive Officer of Oakwood – on September 21, 2006.  True and correct copies of relevant

excerpts from the transcript of Mr. Standish's deposition are attached hereto as Exhibit "F."

        10.     Plaintiff and Defendants' counsel telephonically deposed Mr. Clarence W.

Walker – a former member of Oakwood's board of directors – on December 12, 2006.  True and

correct copies of relevant excerpts from the transcript of Mr. Walker's deposition are attached

hereto as Exhibit "G."

**Documents-**

        11.     Attached hereto as Exhibit "H" is a true and correct copy of an April 17,

2000 e-mail from Jeff Hinshaw, which was produced by Defendants with bates numbers CSFB-

00173796 – CSFB-00173797.  This document was previously marked as deposition exhibit 56.

        12.     Attached hereto as Exhibit "I" is a true and correct copy of a January 2,

2001 e-mail from James Xanthos, which was produced by Defendants with bates number CSFB-

00485340.  This document was previously marked as deposition exhibit 64.

        13.     Attached hereto as Exhibit "J" is a true and correct copy of a May 17,

2001 e-mail from John Chrystal, which was produced by Defendants with bates numbers CSFB-

00482331 – CSFB-00482332.  This document was previously marked as deposition exhibit 75.

        14.     Attached hereto as Exhibit "K" is a true and correct copy of an August 9,

2001 e-mail from Fiachra O'Driscoll, which was produced by Defendants with bates number

CSFB-00014152.

15.     Attached hereto as Exhibit "L" is a true and correct copy of a February 19, 2002 e-mail from Fiachra O'Driscoll, which was produced by Defendants with bates number CSFB-00478613. This document was previously marked as deposition exhibit 94.

16.     Attached hereto as Exhibit "M" is a true and correct copy of a November 14, 2002 e-mail from Alberto Zonca, which was produced by Defendants with bates number CSFB-00518061. This document was previously marked as deposition exhibit 147.

17.     Attached hereto as Exhibit "N" is a true and correct copy of a November 23, 2002 e-mail from Mark Millard, which was produced by Defendants with bates numbers CSFB-00514175 – CSFB-00514177. This document was previously marked as deposition exhibit 130.

18.     Attached hereto as Exhibit "O" is a true and correct copy of an "Originator/Servicer Assessment" prepared after Oakwood filed for bankruptcy, which was produced by Defendants with bates numbers CSFB-00250104 – CSFB-00250114. This document was previously marked as deposition exhibit 112.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2008, at Los Angeles, California.

Whitman L. Holt

3

# EXHIBIT A REDACTED IN ITS ENTIRETY

# Exhibit "B"

CERTIFIED
COPY

1          THOMAS IRWIN

2          UNITED STATES BANKRUPTCY COURT

3              DISTRICT OF DELAWARE

4     -------------------------------x

5     In Re:
      OAKWOOD HOMES CORPORATION,
6     et al.,

7                    Debtors.

8     Chapter 11
      Case No. 02-13396 (PJW)
9     -------------------------------x

10    OHC LIQUIDATION TRUST,

11                   Plaintiff,

12             v.              ADV. Proc.No. 04-57060 (PJW)

13    CREDIT SUISSE FIRST BOSTON, a
      Swiss banking corporation,
14    CREDIT SUISSE FIRST BOSTON
      LLC, a Delaware limited
15    liability corporation, CREDIT
      SUISSE FIRST BOSTON, INC.,
16    CREDIT SUISSE FIRST BOSTON
      (U.S.A.), INC., a Delaware
17    corporation and a wholly owned
      subsidiary of CREDIT SUISSE
18    FIRST BOSTON, INC., the
      subsidiaries and affiliates of
19    each, and DOES 1 through 100,

20                   Defendants.

21    -------------------------------x

22

23                                 November 8, 2006
                                       9:04 a.m.
24

25



**LEGALINK®**

**A MERRILL
COMMUNICATIONS
COMPANY**

20750 Ventura Blvd          tel (818) 593-2300      www.merrillcorp.com
Suite 205                   tel (800) 826-0277
Woodland Hills, CA 91364    fax (818) 593-2301

GLOBAL COURT REPORTING  ·  LEGAL VIDEOGRAPHY  ·  TRIAL SERVICES

1

1                 THOMAS IRWIN

2         Q.    Do you know why Mr. Zonca thought you

3    and Mr. Xanthos and Mr. -- who is Roger Machlis,

4    actually?

5         A.    Internal legal counsel.

6         Q.    For a particular department or just

7    generally?

8         A.    CSFB.

9         Q.    For a particular business unit or --

10        A.    I don't know.

11        Q.    Returning to my prior question, do you

12   have any reason or do you have any understanding

13   of why Mr. Zonca thought that you and Mr.

14   Xanthos and Mr. Machlis would find the

15   definition of eligible receivables to be of

16   particular interest?

17             MR. OSNATO:   Objection as to the form.

18   You can answer.

19        A.    I'm always interested in what the

20   eligible receivables are in a facility.

21        Q.    Why?

22        A.    Because it is the component -- it is

23   the asset side of the transaction.

24        Q.    How is that information -- why would

25   that information be germane upon a bankruptcy

                                                142

THOMAS IRWIN

1
2     filing of the originator?

3          A.    It's always important that the

4     eligible receivables are the primary risk of any

5     facility or structure.

6          Q.    Can you think of any reason why it

7     would have been of particular interest on

8     November 14, 2002?

9          A.    If I was going to review the facility

10    I would want to know exactly what I was

11    financing.

12         Q.    Can you think of any reason why you

13    were going to review the facility on November

14    14, 2002?

15         A.    There are obviously -- he is

16    proposing -- he is giving me a sheet for a new

17    facility, so the fact that he is asking me to

18    look at it is why I would be looking at it.

19         Q.    I'm sorry, where is the sheet for the

20    new facility?  What new facility --

21         A.    Huh?  I said a sale -- I'm sorry, I'm

22    saying please enclose the current sale -- okay,

23    I misread that.

24         Q.    If I were to tell you that Oakwood

25    filed for bankruptcy on November 15, would that

143

1          THOMAS IRWIN

2     in any way affect your opinion of why it may

3     have been of particular interest to you to

4     review this document on November 14, 2002?

5          A.    Yes.  I was with Fiachra in -- what is

6     it, North Carolina?

7               MR. OSNATO:  Correct.

8          A.    I went down there that afternoon.  So

9     we were preparing to meet with Oakwood.

10         Q.    Okay.  Let's talk about that some

11    more.  So you and Mr. O'Driscoll went to North

12    Carolina on November 14, 2002?

13         A.    Yes.

14         Q.    Do you recall reviewing this document

15    prior to traveling to North Carolina?

16         A.    No, I don't.

17         Q.    Do you recall when you reviewed this

18    document?

19         A.    What document?

20         Q.    These sale and service -- the sale and

21    servicing agreement?

22         A.    No, I don't.

23         Q.    Would it have been likely that you

24    would have reviewed it prior to November 14,

25    2002 at 10:27 p.m.?

144

1                    THOMAS IRWIN

2        A.    It's possible.

3        Q.    So when on the 14th did you travel to

4    North Carolina, Mr. Irwin?

5        A.    Approximately 8:00 p.m.

6        Q.    When did you return to New York?

7        A.    I think the following evening.

8        Q.    So what precisely did you do while you

9    were in North Carolina?

10       A.    I was asked to go down there to meet

11   with the company, sat down, met with the

12   company, met senior management, they informed me

13   of what their -- what was going to transpire on

14   the 15th.

15       Q.    Which was a bankruptcy filing?

16       A.    I think that was being contemplated at

17   the time.  I don't know if it was decided or

18   not.

19       Q.    Did you have reason to suspect that a

20   bankruptcy petition would be filed on the 15th

21   before you flew down to North Carolina?

22       A.    No, I did not.

23       Q.    So that was news to you, that was the

24   first time you had heard of that possibility?

25       A.    Yes.

LegaLink, a Merrill Communications Company
800-826-0277   818-593-2300   Fax 818-593-2301   www.legalink.com

THOMAS IRWIN

1

2      Q.    How did you react to being informed of

3  that fact?

4      A.    I got on the plane and flew down there

5  with them.

6      Q.    I'm sorry, so you were informed of the

7  possibility of a bankruptcy prior to flying down

8  to North Carolina or while you were in North

9  Carolina?

10     A.    I don't recall exactly when I was

11 notified.

12     Q.    But it wasn't before the 14th?

13     A.    No, it was not.  It was after the

14 start of the trip.  I just don't recall exactly

15 when.

16     Q.    Besides meeting with Oakwood's

17 management, do you remember doing anything else

18 in North Carolina?

19     A.    No, that was it.

20     Q.    Do you recall having any discussions

21 with Mr. Felt while you were in North Carolina?

22     A.    I met Mr. Felt while I was there.

23     Q.    Do you recall any discussions you had

24 with Mr. Felt?

25     A.    Not specifically.

146

1                    THOMAS IRWIN

2          Q.    Do you remember generally the nature

3     of any discussions you had with Mr. Felt?

4          A.    Just I think it was ongoing, whatever

5     was transpiring in those meetings which I don't

6     recall the direct content of.

7          Q.    So you had never met Mr. Felt prior to

8     your trip to North Carolina?

9          A.    No, I had not.

10         Q.    Had you ever corresponded with Mr.

11    Felt or spoke with him on the phone?

12         A.    No, not that I am aware of.

13         Q.    Do you recall any discussions you had

14    with Mr. O'Driscoll while you were in North

15    Carolina?

16         A.    It was more in terms of, you know,

17    that the company was evaluating its situation

18    and that was -- you know, that's as much as I

19    remember specifically.  And meeting with

20    management as they started to present some of --

21    some financial information on the company.

22         Q.    Does this discussion refresh your

23    recollection at all of when Mr. O'Driscoll first

24    approached you about potentially modifying the

25    facility upon an Oakwood bankruptcy petition?

147

THOMAS IRWIN

1

2      A.   At some point during this there were

3   discussions about a new facility.

4      Q.   Do you recall whether or not that was

5   the first time such discussions occurred?

6      A.   To my recollection, yes.

7      Q.   In your experience based on your

8   ordinary practice, would review of the main

9   document in a particular deal be one of the

10   first steps in the analysis of whether or not to

11   grant a new credit facility or continue an old

12   one upon a bankruptcy petition?

13      A.   I'm sorry, can you restate?

14      Q.   Sure.  Where in the order of priority

15   would review of the existing documents fall in

16   the analysis that would be performed following a

17   request to either grant a new credit facility or

18   continue an old one upon a bankruptcy petition

19   of a counter party or originator, would that be

20   high on the list, low on the list in terms of

21   priority?

22      A.   It would be an existing document.  If

23   you were looking at an existing sale and

24   servicing agreement, it would be an important

25   document to review at about that time, yes.

148

1                    THOMAS IRWIN

2          Q.    Where in the relative order of

3     priority would that review fall, would that be

4     one of the first things you do, one of the last

5     things you would do, somewhere in the middle?

6          A.    You would review your existing

7     documentation prior to the bankruptcy because

8     you would want to know what your situation was

9     in the event of a bankruptcy.

10          Q.    Right, but in terms of the order in

11     which things would be done, in the review

12     process, where would the analysis of existing

13     documentation fall, would that be one of the

14     first things done in the process, one of the

15     last things done in the process?

16          A.    Prior to bankruptcy it would be

17     done -- if you were aware that one was pending

18     or if there was a distress situation, you would

19     look at your documents and understand what the

20     legal ramifications were of an event if you were

21     aware of it.

22          Q.    Would you look at those documents

23     prior to reviewing the present financial

24     condition of the originator?

25          A.    Those documents would be a part of the

149

# Exhibit "C"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -X

|  |  |
|---|---|
| In Re: | : Chapter 11 |
| OAKWOOD HOMES CORPORATION, | Case No. 02-13396 |
| et al., | : (PJW) |
|  | Jointly Administered |
|  | : |
| Debtors. | |

OHC LIQUIDATION TRUST,

ORIGINAL

Plaintiff,

v.                                      Adv. Proc. No.
                                      : 04-57060 (PJW)

CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation, :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited         :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,    :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware       :
corporation and a wholly
owned subsidiary of CREDIT    :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and             :
affiliates of each, and
DOES 1 through 100,             :

Defendants.                   :

- - - - - - - - - - - - - - -X

Videotape Deposition of DOUGLAS R. MUIR, VOLUME I
(Taken by Defendants)
Winston-Salem, North Carolina
September 26, 2006

Prepared by:  K. Denise Neal
              Registered Professional Reporter
              Notary Public



LEGALINK

A MERRILL
COMMUNICATIONS
COMPANY

420 Lexington Ave
Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

DOUGLAS R. MUIR

38

1    its predecessor, First Union.

2        Q.    Why did Oakwood's management decide on

3    Foothill as the provider of the second bank credit

4    facility?

5        A.    I don't know.

6        Q.    Who made the decision to use Foothill?

7        A.    I don't know.

8        Q.    No one consulted you about that?

9        A.    I was only very tangentially involved in

10    the Foothill transaction.

11        Q.    But how could that be if you were the

12    person who was really in charge of financing for the

13    company?

14        MR. CASTANARES:  I object to the form of

15        the question.

16        THE WITNESS:  At that particular time for

17        whatever reason I was not running the train on

18        Foothill.  I did not negotiate with Foothill.  I

19        did review drafts of Foothill documents.  So, I

20        mean, I knew what the transaction was about, but

21        I didn't negotiate it.  Bob Smith handled that

22        negotiation with Foothill.

23        Q.    (By Ms. Warren)  To the best of your

24    recollection did Credit Suisse have anything to do

25    with either the First Union syndicated facility or

1    the Foothill facility?

2        A.    They weren't in the lender group for

3    either of them.  I can think of no relationship at

4    all between Credit Suisse and either of those

5    facilities.

6        Q.    Let's talk about the servicing advance

7    facility that you referred to earlier.  Was that

8    something that Oakwood set up using a financial

9    institution?

10       A.    Well, the idea for the servicing advance

11   facility came from First Boston and they helped us

12   set it up, helped us structure it, work with the

13   rating agencies on it.

14       Q.    And forgive me because I know you

15   described this briefly before, but what was the

16   purpose of that facility?

17       A.    It was as follows:  In the mortgage

18   servicing business the servicing contract typically

19   requires the servicer of a mortgage loan to make a

20   mortgage payment on behalf of delinquent obligors.

21            So if an obligor's loan payment is due on

22   the 1st and is past due on the 15th and on the 20th

23   of the month when the -- when the proceeds of the

24   loans in a particular securitization vehicle are

25   scheduled to be passed through to investors, if that

1    person hasn't made their mortgage payment, the pot of

2    money is going to be light if you will because that

3    payment isn't there.   The servicing agreement

4    requires the servicer to advance that delinquent

5    payment on behalf of the obligor.

6        That requires the servicer to have the

7    money to do so, to make the advance on behalf of the

8    delinquent obligor.  The servicer again has to make

9    that advance in virtually all circumstances.   There

10   are certain exceptions, but having made the advance,

11   the servicer's right to be repaid the advance from

12   the assets of the trust is a very senior obligation

13   of the trust even ahead of the bondholders.

14       So the whole idea with the servicing

15   advance facility was to provide Oakwood additional

16   liquidity to enable it to make advances on behalf of

17   delinquent obligors and finance the cash required to

18   make those advances from an investor using a true

19   sale bankruptcy remote special purpose entity type

20   structure.

21       Q.    When did Credit Suisse propose the

22   servicing advance facility?

23       A.    As best I can recall it was probably

24   sometime in the summer of 2001, roughly that vintage.

25   I think Fiachra O'Driscoll and I first discussed the

1    concept of in essence securitizing these advance

2    receivables in a way not terribly dissimilar to how

3    once securitizes loans and we said, gee, that would

4    be neat and it would be a neat transaction that could

5    be done.  We knew an investor who thought would be

6    interested and so we proceeded to think about it.  It

7    was relatively new technology at the time that it was

8    done.

9         Q.    And when you say we knew an investor who

10   might be interested, who's the we?

11        A.    It was at least -- at least me and I think

12   CSFB as well.

13        Q.    And who was that investor?

14        A.    Prudential Insurance.

15        Q.    And how did you come to know or believe

16   that Prudential would be interested in this

17   transaction?

18        A.    Oakwood had done a series of

19   securitization transactions with Prudential going

20   back to 1989.  There had been ten of them at least.

21   We knew them very well.  The people at Prudential

22   knew us very well, knew our operation very well, and

23   we felt we could create an instrument that would be

24   attractive to them.

25        Q.    And they went for it?

DOUGLAS R. MUIR

42

1        A.    We ultimately closed a transaction that

2    was -- that worked for everyone.

3        Q.    And did you or someone else in Oakwood

4    management direct Credit Suisse to approach

5    Prudential about this facility?

6        A.    I probably did.  I don't have an explicit

7    recollection but, I mean, I would imagine I had a

8    conversation with Fiachra and we said gee, this is a

9    good fit for Pru.  Why don't you call up Mike, call

10   up Mike Bozzo and draw him a picture of it and see if

11   he wants to talk about it.  Probably how it happened.

12       Q.    You also spoke about the ABS market, which

13   was the securitization of the loans; right?

14       A.    Uh-huh, correct.

15       Q.    Would you just describe generally how that

16   worked?

17       A.    Yes.  You'd like me to describe the

18   securitization process generally?

19       Q.    Yes.

20       A.    Okay.  The process is basically this:

21   Step one is assemble a pool of loans, a pool simply

22   being a number of loans, could be a hundred, more

23   likely 5,000, that you had originated over a period

24   of time.  You tested the loans to make sure that they

25   met certain criteria that you felt were important,

1    that you thought that the rating agencies would think

2    was important, thought that potential buyers of the

3    securities would think was important.  You ultimately

4    arrived at a pool of loans.

5        You basically take those -- that pool of

6    loans and deposit them into a securitization vehicle.

7    Typically we use trusts.  Doesn't have to be trusts.

8    You convey title of the loans to a trust.  You

9    appoint a trustee.  Trustee now is the record owner

10   of all of those assets and the trustee is entitled to

11   receive all the proceeds of those assets.  Then the

12   trust then issues a series of securities.

13       Typically they look like debt.  They have

14   principal balances.  They have rates of interest that

15   accrue on them, sometimes fixed, sometimes variable.

16   Sometimes the securities have no principal.  They may

17   be interest only securities.  You basically create a

18   set of securities that ultimately capture all of the

19   cash that is thrown off by the assets and then you go

20   into the market and sell some or all of the

21   securities that you've created.

22       Sometimes you do it pure private deal.

23   Sometimes you do it exempt transaction.  Sometimes

24   you do it in the public market off a registration

25   statement.  And at the end of the day after you've

44

1    sold the securities, you receive the proceeds and

2    that's how you ultimately complete the cycle of way

3    back when, building a home, selling a home, creating

4    a loan.   That's how you ultimately realize the value

5    of those loans that you create ~~an advance~~ *a finance* company.

6        Q.    During the period 1999 to 2000 who set

7    Oakwood's credit standards for the loans that it

8    originated?

9        A.    I don't know that a single individual did.

10   It certainly would be discussed by people in Oakwood

11   Acceptance.   Again, I didn't have anything to do

12   really with the origination or an origination side of

13   Oakwood Acceptance.   I was strictly on the servicing

14   and securitization side.

15            So credit would be involved, the CEO of

16   the company would be involved, Bob Smith would be

17   involved because he was operationally in charge of

18   Oakwood Acceptance.   Occasionally I might be

19   consulted particularly if something were contemplated

20   that might influence the securitization process.

21       Q.    To your knowledge did Credit Suisse have

22   any role in determining or setting Oakwood's credit

23   standards?

24       A.    They had a role that I would describe as

25   this.   At all times we desired to originate loans

1    that could be packaged and securitized because if

2    we're unable to securitize them, we had no

3    alternative means to obtain the permanent financing

4    to originate those loans.  So we were very interested

5    in coming up and originating loans that could be

6    securitized.

7            So in the event that someone was thinking

8    about making a decision that affected which customers

9    got approved and which didn't or the terms under

10   which loans were originated in terms of downpayment,

11   interest rate, credit score, real property versus

12   personal property, we would often consult with CSFB

13   on that to get their view on how that would affect

14   the market's perception of the collateral.

15       Q.    Did management consult anyone else outside

16   of the company about credit standards?

17       A.    Besides CSFB?  Not that I recall.  I'd

18   have to think about it, but off the top of my head I

19   can't recall anyone.

20       Q.    Who had the final decision over the credit

21   standards for loan origination?  Was that Bob Smith?

22       A.    I'm not sure I always know the answer and

23   here's why.  Again, I wasn't directly in the loop.

24   We did not have, for example, a credit committee as

25   some financial institutions do to make those

DOUGLAS R. MUIR

50

1        Q.    (By Ms. Warren)   Were you generally

2    successful in -- in setting a fee that you thought

3    was appropriate for -- to compensate Credit Suisse

4    for its underwriting services?

5        A.    Yes.

6        Q.    How was Credit Suisse compensated for

7    providing the OMI Note Trust facility?

8        A.    There were several elements.   I'm doing

9    this from memory, but I think I have this right.

10   There was a rate of interest applied to amounts that

11   OMI Trust borrowed from CSFB.   So we paid them

12   interest on the outstandings as a form of

13   compensation.

14           There was a fee letter or more than one

15   fee letter that specified a monthly fee that was to

16   be paid to CSFB, and it was a fixed fee.   And then in

17   addition when the transaction was first put together

18   in February of 2001, part of the consideration was

19   CSFB received a warrant to acquire Oakwood shares.

20       Q.    I didn't hear the last part.   A warrant to

21   acquire --

22       A.    Shares, common shares of Oakwood.

23       Q.    Common shares.   Did you negotiate the

24   compensation arrangement with Credit Suisse for the

25   OMI Note Trust?

1      A.    I discussed it with Fiachra.  We discussed

2   it a lot internally.  We discussed it with the board.

3      Q.    Were you the point person for dealing with

4   Credit Suisse on this issue?

5      A.    I was involved.  I think -- I think Bob

6   Smith was also involved.

7      Q.    What were Oakwood management's criteria

8   for determining how much they thought it would be

9   appropriate to pay Credit Suisse for the OMI Note

10  Trust facility?

11     A.    Well, I can't speak for others.  It was an

12  interesting negotiation in that it was not a

13  transaction in which there were a half a dozen credit

14  providers lined up at the door, each of which was

15  offering to do this transaction.  At the time CSFB

16  was the only game in town.

17          It's difficult to negotiate with someone

18  when you are trying to get them to bid against

19  themselves.  So we did the best we could and

20  ultimately agreed on a package that we agreed was in

21  our best interests to do and that our board agreed

22  that it was in our best interests to do it.

23     Q.    How did Oakwood's management determine

24  that the package was acceptable?

25     A.    Again, I can't speak for anyone else, but

DOUGLAS R. MUIR

52

1    at the time --

2        Q.    Well, I'm asking for your understanding

3    based on your conversations with others.  I'm not

4    asking to go into their heads, but that's the basis

5    of my question.

6        A.    I don't have a recollection of

7    conversations with others.  At the time the Bank of

8    America facility was due to expire.  There was

9    immense pressure from Bank of America to take them

10   out, to retire that facility.  There were tremendous

11   fees being charged by Bank of America for failing to

12   take them out.

13            CSFB was the only game in town.  It was a

14   critical facility, had to get done.  And on -- in

15   that -- in the light of those circumstances I

16   concluded that it was a deal that should get done.

17       Q.    Were the fees for the Credit Suisse loan

18   purchase facility approximately what B of A had been

19   charging?

20       A.    No.

21       Q.    Were they higher?

22       A.    Yes.

23       Q.    Did you apply any pressure on Credit

24   Suisse to take over the loan purchase facility from

25   Bank of America when Bank of America informed you

1    that it wanted out?

2         A.    I wouldn't characterize it as pressure,

3    but we certainly -- having a successor facility to

4    the Bank of America warehousing facility was of

5    critical importance.  While I don't remember any

6    specific conversations with CSFB, I know there were a

7    number of them in which, you know, I was hopeful that

8    CSFB working through Fiachra would be able to serve

9    up a proposal to provide that liquidity that would

10   work for them and would work for us.

11        Q.    Well, how was the subject raised with

12   Credit Suisse?  Did you raise it?

13        A.    Again, I don't have any recollection of

14   any specific conversations with CSFB during the time

15   we were contemplating that agreement.  My

16   recollection at the time was I was clearly aware that

17   we were under pressure from B of A and I would have

18   discussed that with Fiachra.

19        Q.    Did you ever tell Mr. O'Driscoll in words

20   or substance that Credit Suisse had better help out

21   on this bank facility or Oakwood would terminate all

22   or part of the securitization relationship?

23        A.    I don't remember ever telling him that.  I

24   do remember but I can't tell you when there were --

25   there was a conversation with Fiachra somewhere along

1     Q.    How was that decision taken?  Who made the

2  decision?

3     A.    I don't know that any one individual did,

4  but certainly Mike and I discussed it.  Bob and I

5  would have discussed it, Myles and I.  We talked to

6  the people in our retail organization.

7         The reason they were important is they

8  were part of the process of helping sell repossessed

9  properties and they had a significant role in the

10  loan assumption program.  So we all discussed it and

11  discussed the merits and thought that -- that it was

12  possible to run a program that made sense.

13     Q.   Do you remember approximately when

14  Oakwood, in fact, implemented the expansion of the

15  loan assumption program?

16     A.   I don't remember exactly, but my best

17  recollection is it's sometime in the summer or

18  perhaps the fall of 2000.  I could be off.

19     Q.    Who was in charge, if anyone, of

20  monitoring the expansion -- the expanded assumptions

21  program to see if it was doing what it was supposed

22  to do?

23     A.    I don't know.

24     Q.    Was there anyone monitoring the loan

25  assumptions program at Oakwood?

62

1    A.    I don't know of anyone who was tasked

2    specifically with monitoring it.  There was

3    information available including some available to me

4    that enabled me to get an understanding of how many

5    loans were being put through the program.  What

6    information others had, I don't know.

7    Q.    Am I correct that at some point it came to

8    your attention that the assumptions program was not

9    having the desired effect?

10    A.    I would -- I would characterize it as

11    having come to my attention that it had some side

12    effects.

13    Q.    Explain that to me.

14    A.    The information came to my attention that

15    caused me to believe that we were doing too many loan

16    assumptions, that the loan assumption process was

17    being applied to delinquent loans that were not good

18    candidates for it, and that as a consequence that

19    running the program was having some significant

20    adverse liquidity effects.  It was eating up cash.

21    Q.    When did that come to your attention?

22    A.    As best I can recall would be sometime in

23    the spring, late winter, early spring, early summer

24    of 2001, certainly by July of that year.

25    Q.    And do you remember when you informed

1    Credit Suisse that the expanded loan assumption

2    program was having difficulties or side effects?

3         A.    I don't.

4         Q.    To your knowledge was Credit Suisse

5    involved in the decision to expand the loan

6    assumptions program?

7         A.    I don't think they -- to my knowledge they

8    were not involved in the decision.  They were

9    certainly informed of it.

10        Q.    Was the loan assumption program eventually

11   terminated?

12        A.    Yes.

13        Q.    And around when was that?

14        A.    Around July of 2001 I believe is the

15   correct date.

16        Q.    Who made the decision to terminate the

17   loan assumption program?

18        A.    As best I recall, Bob and Myles and I

19   collectively discussed it.  Myles was very much in

20   favor of terminating it and so was I.  So I guess

21   ultimately Myles, who was CEO of the company, made

22   the decision.

23        Q.    Do you remember when or if Credit Suisse

24   was informed of the decision to terminate the loan

25   assumption program?

DOUGLAS R. MUIR

64

1      A.    No.   I'm sorry.  Did you say -- was the

2  question when or if?

3      Q.    Yes.

4      A.    I know we told them.  When we told them, I

5  don't know.

6      Q.    Do you remember any reaction from the

7  Credit Suisse people about being informed that the

8  loan assumption program had terminated?

9      A.    I don't because, again, I don't have a

10  specific recollection of calling and telling anyone.

11      Q.    We've touched on this a bit in passing,

12  but what services did Credit Suisse provide for

13  Oakwood during the period 1999 to the petition date?

14      A.    Two or three depending on how you count.

15  The ones that I remember are they were the ongoing

16  lead underwriter for the ABS transactions, which was

17  a -- generally a quarterly type event.  They were the

18  arranger of the servicing advance facility in the

19  fall of 2001 as I recall, around October.

20          There were a number of occasions when

21  people from CSFB outside the investment banking side,

22  for example, perhaps from the investment banking side

23  or the financial advisory side came and talked to us

24  about ideas.  These were not engagements where there

25  was an engagement letter and they were getting a fee.

1    it's been a while; but I think the note account is a

2    bank account maintained at Chase by the trustee of

3    the trust into which was deposited the proceeds of

4    the assets of the trust, collections on the loans,

5    for example.

6        Q.   And section 3.2 below it entitled flow of

7    funds sets out priorities to which those funds were

8    to be devoted.  Is that generally correct?

9        A.   Yeah.  I think so.

10       Q.   And looking at those priorities from the

11   first one on page 37 of the document to the last one,

12   the 11th on page 38 of the document, do these

13   generally accord with your recollection of the

14   priorities for the flow of funds in the note account?

15       A.   Yes.

16       Q.   And do you ever recollect the flow of

17   funds from the note account being different from

18   what's set forth in section 3.2?

19       A.   I have no reason to think that they were

20   ever different.

21       Q.   Where in this section 3.2 is there a

22   description of any residual interest that Oakwood may

23   have had in these funds in the note account?

24           MR. CASTANARES:  Object to the form of the

25       question.

83

1           THE WITNESS:  Could you repeat the

2      question, please?

3           MS. WARREN:  Sure.  Why don't you read it

4      back.

5           (The record was read by the reporter.)

6           THE WITNESS:  I'm trying to find a

7      definition.  I'm not sure without reviewing the

8      documents taken as a whole, but I suspect

9      Romanette ten will accomplish that goal.

10     Q.    (By Ms. Warren)  And that's the section

11 that refers to the certificate distribution account?

12     A.    Yes.  I was trying to find the definition

13 of certificates to refresh my recollection of what

14 that means.

15     Q.    When you testified earlier that it's your

16 belief that Oakwood had a beneficial interest in

17 funds in the note account, was this what you were

18 referring to?

19          MR. CASTANARES:  Object to the form of the

20     question.

21          THE WITNESS:  This provision may be part

22     of it, but if you look at the agreements taken

23     as a whole and we were to dissect them, I think

24     what we would find is that the trustee was the

25     owner of the assets in the trust, collected all

1    of the proceeds of those assets and disbursed

2    all of those assets in accordance with this

3    agreement, perhaps with other agreements; but at

4    the end of the day to the extent once everybody

5    ahead of Oakwood in the payment priority was

6    paid, any cash that was left over ultimately

7    made its way back to Oakwood.

8        Q.    (By Ms. Warren)   And is it your

9    recollection that that, in fact, would happen over

10   the course of the existence of this OMI Note Trust?

11       A.    It did happen.

12       Q.    And do you remember approximately how much

13   in funds would come back to Oakwood eventually?

14       A.    A lot of money, but I couldn't give you a

15   dollar amount.  It is derivable if we were to take

16   the records and look, but it's a substantial amount

17   of money.

18       Q.    Take a look at section 3.8, please, which

19   is entitled sale of receivables.  And that's at page

20   CSFB-92194 of Exhibit 212 -- I'm sorry -- 213.  Does

21   this provision concern the sale of mortgages into the

22   REMIC trust?

23           MR. CASTANARES:  Objection to form.

24           THE WITNESS:  It certainly could.

25       Q.    (By Ms. Warren)   What's your --

DOUGLAS R. MUIR

85

1        A.      And often did.

2        Q.      Is it your understanding that this

3    provision allows the OMI Note Trust to use proceeds

4    to pay note holders?

5        A.      Proceeds of sale of assets?

6        Q.      Yes.

7        A.      Yes.

8        Q.      Do you know of any claim that Oakwood

9    could assert over funds that were to be paid to note

10   holders pursuant to this agreement, Exhibit 213?

11       A.      I'm not sure I understand the question.

12   I'm sorry.

13       Q.      Do you know of any reason why Oakwood

14   would have any right to proceeds that were paid to

15   note holders out of the OMI Note Trust account

16   pursuant to this agreement, Exhibit 213?

17       A.      Let me say it another way to make sure I

18   understand the question.  If you're asking me if the

19   class A note holders received money pursuant to this

20   agreement and there wasn't some error made, does

21   Oakwood have any claim to that money.  I think the

22   answer -- so far as I know the answer is no, but I'm

23   not a lawyer.

24       Q.      Understood.  I'm just asking for your

25   understanding as the business person who dealt with

1    DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN
2        I do hereby certify that I have read all
questions propounded to me and all answers given by
3    me on the 26th day of September, 2006, taken before
K. Denise Neal, and that:

4

        1)   There are no changes noted.
5        2)   The following changes are noted:
6        Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure, which reads in part:  Any changes in
7    form or substance which you desire to make shall be
entered upon the deposition...with a statement of the
8    reasons given...for making them.  Accordingly, to
assist you in effecting corrections, please use the
9    form below:
10

Page No. **44**   Line No. **5**      should read: "An advance
11                                    Company" should
12   Page No.       Line No.         should read: "in
13                                    a finance
                                      Company"
14
15   Page No. **145**  Line No. **22**     should read: "liquidated"
16                                    should be
                                      "unliquidated"
Page No.        Line No.          should read:
17
18   Page No. **150**  Line No. **44**     should read: "in Durham"
19                                    should be
                                      "in Durham"
Page No.        Line No.          should read:
20
21   Page No. **159**  Line No. **3**      should read: "nonbonding"
22                                    should be
                                      "nonbinding"
Page No.        Line No.          should read:
23

24   Page No.        Line No.          should read:
25

DOUGLAS R. MUIR

203

1          DEPOSITION OF DOUGLAS R. MUIR, VOLUME I/KDN

2    Page No.          Line No.          should read:

3

     Page No.          Line No.          should read:

4

5    Page No.          Line No.          should read:

6

     Page No.          Line No.          should read:

7.

8    Page No.          Line No.          should read:

9

     Page No.          Line No.          should read:

10

11   Page No.          Line No.          should read:

12

     Page No.          Line No.          should read:

13

14

     If supplemental or additional pages are necessary,

15   please furnish same in typewriting annexed to this

     deposition.

16

17

                    DOUGLAS R. MUIR

18

19

20

21

22

23

24

25

# <u>EXHIBIT D</u> REDACTED IN ITS ENTIRETY

# Exhibit "E"

Page 1

UNITED STATES BANKRUPTCY COURT

    DISTRICT OF DELAWARE

# COPY

-----------------------------x

In Re:              ) Chapter 11

OAKWOOD HOMES CORPORATION,  ) Case No. 02-13396

et al.,              ) (PJW)

              Debtors. ) Jointly Administered

-----------------------------x

OHC LIQUIDATION TRUST,     )

          Plaintiff, )

      vs.       ) Adv. Proc. No.

CREDIT SUISSE FIRST BOSTON, a) 04-57060 (PJW)

Swiss banking corporation,  )

CREDIT SUISSE FIRST BOSTON  )

LLC, a Delaware limited    )

liability corporation, CREDIT)

SUISSE FIRST BOSTON, INC.,  )

CREDIT SUISSE FIRST BOSTON  )

(U.S.A.), INC., a Delaware  )

corporation and a wholly    )

owned subsidiary of CREDIT  )

SUISSE FIRST BOSTON, INC.,the)

subsidiaries and affiliates )

of each, and DOES 1 through )

100,               )

        Defendants.)

-----------------------------x

       September 5, 2007

       10:15 a.m.


    Deposition of ALAN C. SHAPIRO, held at

the law offices of Linklaters LLP, 1345 Avenue of

the Americas, New York, New York, pursuant to

agreement, before Donald R. DePew, an RPR, CRR and

Notary Public within and for the State of

New York.

Page 4

ALAN SHAPIRO

1

10:17:11  2    MR. CASTANARES:  Tony Castanares,

10:17:15  3    Stutman Treister & Glatt, for the plaintiff.

10:17:17  4    THE VIDEOGRAPHER:  Will the court

10:17:17  5    reporter please swear in the witness.

10:17:19  6    A L A N   C .   S H A P I R O,    called as a

10:17:19  7    witness, having been duly sworn by the

10:17:19  8    Notary Public, was examined and testified as

10:17:19  9    follows:

10:17:19 10    EXAMINATION BY

10:17:19 11    MR. WICKES:

10:17:30 12    Q.    Professor Shapiro, I see from your

10:17:32 13    expert report and your qualifications that you are

10:17:35 14    experienced at this business of depositions, so I

10:17:38 15    assume I don't need to explain the process to you;

10:17:40 16    is that right?

10:17:41 17    A.    Yes.

10:17:42 18    Q.    All right.  Is there any reason today

10:17:44 19    why you're not able to give us your best

10:17:47 20    testimony?

10:17:47 21    A.    No.

10:17:48 22    Q.    All right.  Professor, in your expert

10:17:51 23    report, dated April 30th, 2007, which we've marked

10:17:55 24    as Exhibit 501 in this case, you tell us on page 4

10:18:04 25    that you've been "asked by counsel to assume that

Page 5

1

10:18:07  2    CSFB owed Oakwood and its creditors a fiduciary

10:18:14  3    responsibility"; is that correct?

10:18:14  4         A.    Yes.

10:18:15  5         Q.    Tell me, if you would, Professor, how

10:18:16  6    would the conclusions in your report have been

10:18:18  7    different had you not made that assumption.

10:18:23  8         A.    Well, I can't --

10:18:25  9              MR. CASTANARES:  Objection to form.

10:18:27 10         A.    I can't give you -- well, a legal

10:18:33 11    opinion, but I guess I would say even if there

10:18:46 12    were no fiduciary obligation that Credit Suisse's

10:18:53 13    behavior was inconsistent with its -- with the

10:18:59 14    guidelines in its compliance manual.  So from that

10:19:04 15    standpoint I think my conclusions would still

10:19:12 16    stand, in that as my specific opinions, which are

10:19:17 17    expressed on pages 3 and 4, that CSFB did not

10:19:21 18    behave in a reasonable or a reasonably prudent

10:19:26 19    manner with respect to the services it provided to

10:19:30 20    Oakwood doesn't rely specifically on the existence

10:19:34 21    of a fiduciary obligation.

10:19:38 22              And second, that my opinion that CSFB

10:19:41 23    had financial incentives to keep Oakwood operating

10:19:44 24    and to delay recommending that Oakwood file for

10:19:49 25    bankruptcy doesn't -- does not specifically rely

Page 6

ALAN SHAPIRO

10:19:52  2   on the assumption of a fiduciary obligation, but I

10:19:58  3   think that it does -- it's inconsistent with the

10:20:01  4   guidelines in the compliance manual.

10:20:05  5        Q.    So do I understand from that answer

10:20:09  6   that your conclusions would not be any different

10:20:13  7   if you had not made the assumption identified at

10:20:16  8   Roman numeral V.A on page 4 of your report?

10:20:24  9        A.    Yes, I believe that the fiduciary

10:20:26 10   obligation certainly strengthens my conclusions,

10:20:31 11   but I think those conclusions would still stand.

10:20:36 12        Q.    In what way does the fiduciary

10:20:38 13   obligation strengthen your conclusions?

10:20:44 14        A.    Well, it would strengthen the -- it

10:20:50 15   wouldn't affect the second conclusion regarding

10:20:52 16   financial incentives, those exist independent of

10:20:55 17   any fiduciary obligation.  But the reasonable or

10:21:00 18   reasonably prudent, I think you do want to take in

10:21:08 19   figuring whether something -- whether somebody

10:21:11 20   behaved in a reasonable manner.  I think if they

10:21:14 21   had a fiduciary obligation to behave in a certain

10:21:20 22   way that that strengthens that obligation or makes

10:21:28 23   behavior less reasonable than it otherwise would.

10:21:34 24        Q.    Who was it who asked you to make that

10:21:37 25   assumption?

Page 7

ALAN SHAPIRO

10:21:40  2    A.    I don't recall the specific person, but

10:21:45  3    it was somebody from the law firm of Stutman.

10:21:53  4    Q.    Do you remember when it was you were

10:21:55  5    asked to make that assumption?

10:21:57  6    A.    It was sometime before I began writing

10:22:01  7    my report.

10:22:03  8    Q.    Was it before you began work on your

10:22:07  9    report?

10:22:10  10   A.    I believe so.

10:22:12  11   Q.    And you can't remember who it was who

10:22:14  12   asked you to make the assumption?

10:22:15  13   A.    No, I don't.  I can't.

10:22:18  14   Q.    Can you remember the occasion when you

10:22:19  15   were asked to make that assumption?

10:22:22  16   A.    Not specifically.  We had various

10:22:25  17   meetings, both telephonic conversations as well as

10:22:29  18   in-person meetings.

10:22:32  19   Q.    Before you began to write?

10:22:35  20   A.    That's correct, and then while I was

10:22:36  21   working on the report.

10:22:44  22   Q.    Do you remember whether it was in a

10:22:48  23   group meeting that someone asked you to make this

10:22:51  24   assumption or one on one?

10:22:54  25   A.    I believe that all my meetings were

Page 25

ALAN SHAPIRO

10:47:42  2     Q.     And Dr. Sarin's?

10:47:45  3     A.     Dr. Sarin's is $600.

10:47:47  4     Q.     Okay.  And Mr. Sandhu?

10:47:53  5     A.     His rate, I believe, is $400 an hour.

10:47:57  6     Q.     Okay.  How much in total have you

10:48:01  7  billed or been paid so far on this matter?

10:48:06  8     A.     $984,000.

10:48:12  9     Q.     And that's the total billings for your

10:48:14 10  work and the work of the others you've described?

10:48:17 11     A.     That's correct.

10:48:17 12     Q.     Do you know approximately what portion

10:48:19 13  of that represents -- or specifically, if you

10:48:22 14  know -- represents your own time?

10:48:27 15     A.     My best approximation, sitting here --

10:48:29 16  and I have not gone back to look at it -- but I

10:48:32 17  would estimate that about one-third of those

10:48:36 18  billings would be for my time and the other

10:48:38 19  two-thirds for my associates.

10:48:59 20     Q.     Do you know approximately how many

10:49:00 21  hours you've spent on this matter?

10:49:04 22     A.     No.  I could estimate, as I said, based

10:49:08 23  on my rate and my estimated billings.

10:49:13 24     Q.     I just tried to do that here quickly.

10:49:17 25     Is 400 hours, does that seem about

Page 26

ALAN SHAPIRO

| | | |
|---|---|---|
| 10:49:20 | 2 | right? |
| 10:49:21 | 3 | A.     That sounds about right. |
| 10:49:21 | 4 | Q.     Okay.  I won't hold you to that math |
| 10:49:24 | 5 | or -- |
| 10:49:25 | 6 | A.     It's just an arithmetic issue. |
| 10:49:28 | 7 | Q.     And have you been billed -- have you |
| 10:49:31 | 8 | billed and been paid currently up through today? |
| 10:49:34 | 9 | A.     No.  I sent in my last invoice as |
| 10:49:41 | 10 | the -- for August and haven't been paid on that |
| 10:49:44 | 11 | yet. |
| 10:49:45 | 12 | Q.     But is that amount included in the |
| 10:49:47 | 13 | $984,000? |
| 10:49:49 | 14 | A.     Yes. |
| 10:49:50 | 15 | Q.     So that's the total amount billed, some |
| 10:49:53 | 16 | portion is yet unpaid? |
| 10:49:54 | 17 | A.     That's correct. |
| 10:49:54 | 18 | Q.     But you have confidence in the Stutman |
| 10:49:57 | 19 | firm that it will be paid? |
| 10:49:59 | 20 | A.     Well, I hope so.  I guess more in the |
| 10:50:02 | 21 | Oakwood Liquidation Trust or... |
| 10:50:10 | 22 | MR. CASTANARES:  We're solvent. |
| 10:50:12 | 23 | THE WITNESS:  Good. |
| 10:50:13 | 24 | Q.     Let me go back to your report.  And I |
| 10:50:17 | 25 | want to focus again on page 4 on Roman numeral |

Page 27

ALAN SHAPIRO

10:50:22  2   V.A.  "I have been asked by counsel to assume that

10:50:26  3   CSFB owed Oakwood and its creditors a fiduciary

10:50:33  4   responsibility."

10:50:34  5          When you were asked to make that

10:50:36  6   assumption did -- were you told what it meant to

10:50:40  7   have a fiduciary responsibility?

10:50:46  8          A.    Well, I was told -- I'm not -- I'm not

10:50:49  9   a lawyer.  I tried to translate that into -- put

10:50:57 10   some economic substance to that.  I mean,

10:51:00 11   generally as a financial economist you hear the

10:51:05 12   term fiduciary obligation on a regular basis.

10:51:08 13          Q.    Well, this term is fiduciary

10:51:10 14   responsibility.

10:51:10 15          A.    Or responsibility, yeah.

10:51:12 16          Q.    What do you understand that to mean?

10:51:13 17          A.    Well, the same as a fiduciary

10:51:15 18   obligation.  I treat those terms to be synonymous.

10:51:20 19          Q.    Okay.  And what do those synonymous

10:51:24 20   terms mean?

10:51:26 21          A.    Well, I understand from a legal

10:51:30 22   standpoint that there are, generally speaking, two

10:51:35 23   aspects to it, a duty of care and a duty of

10:51:41 24   loyalty.

10:51:44 25          The care I translate into looking after

Page 28

ALAN SHAPIRO

10:51:47  2    the economic interests of the other party or

10:51:51  3    parties.  And the duty of loyalty, basically no

10:52:01  4    self-dealing or no enriching yourself at the

10:52:04  5    expense of the other party.

10:52:11  6        Q.    When you were asked to make the

10:52:12  7    assumption about fiduciary responsibility that is

10:52:16  8    described here in your report, did whoever it was

10:52:19  9    who asked you that give you either a definition or

10:52:23 10    explain to you what was meant by that term?

10:52:30 11        A.    No.

10:52:31 12              Well, as best I recall, we did talk

10:52:34 13    about that.

10:52:35 14        Q.    Okay.

10:52:38 15        A.    And, you know, I tried to -- as I said,

10:52:41 16    I tried to translate that into something that I'm

10:52:45 17    familiar with.  In other words, into something of

10:52:48 18    economic consequence.  And, you know, although I

10:52:54 19    don't have a real specific recollection, I believe

10:52:58 20    that whoever I talked to agreed that that -- the

10:53:06 21    economic terminology that I used was consistent

10:53:10 22    with the notion of a fiduciary obligation.

10:53:21 23        Q.    And you said that the assumption that

10:53:23 24    you made was that CSFB owed that fiduciary

10:53:29 25    obligation to Oakwood and its creditors.  So let's

Page 29

**ALAN SHAPIRO**

10:53:33  2  break that apart a bit.

10:53:35  3      A.    Sure.

10:53:35  4      Q.    When you talk about owing a fiduciary

10:53:37  5  responsibility to Oakwood, what do we mean by

10:53:40  6  Oakwood in that context?

10:53:43  7      A.    Oakwood the enterprise.

10:53:48  8      Q.    So can we sort of use the term Oakwood

10:53:51  9  and the company interchangeably there?

10:53:54 10      A.    Yes.

10:53:55 11      Q.    All right.

10:53:56 12      A.    And I translate that, when I think

10:53:59 13  about the duty to a company I translate that into

10:54:03 14  the economic interests of its owners.

10:54:21 15      Q.    So does that --

10:54:22 16          Do I understand from that, that when

10:54:23 17  you say that you assumed that CSFB owed Oakwood

10:54:29 18  separate from its creditors, that it owed Oakwood

10:54:33 19  a fiduciary responsibility, that in that sense

10:54:35 20  you're really referring to a duty owing to the

10:54:37 21  shareholders?

10:54:38 22      A.    No.  When I -- I think I wasn't precise

10:54:43 23  enough.  When I talk about owners I mean the

10:54:46 24  owners of all its securities.  Generally that

10:54:49 25  means a responsibility to the shareholders.

Page 30

ALAN SHAPIRO

Q.     Right.

10:54:55      A.     But in this particular case, given that
10:55:03  I assume that the company was insolvent in effect,
10:55:10  I believe that the company was owned by its
10:55:15  creditors.

10:55:39      Q.     So when you say -- well, let me ask a
10:55:44  different --

10:55:45             If I read that sentence to say simply I
10:55:47  was asked to assume that CSFB owed Oakwood's
10:55:52  creditors a fiduciary responsibility, is that
10:55:55  saying anything different than what the sentence
10:55:57  says as its written?

10:55:59             MR. CASTANARES:  Objection to form.

10:56:04      A.     Not really in this particular case.

10:56:11      Q.     CSFB -- you have a chart I was just
10:56:14  trying to find in your report that indicates that
10:56:17  CSFB was underwriting asset-backed securities for
10:56:23  this company for a number of years.

10:56:25             Do you remember that?

10:56:26      A.     Yes.

10:56:30      Q.     And is your opinion that --

10:56:34      A.     Page 17.

10:56:36      Q.     Page 17.  Good.

10:56:46             Page 17 doesn't tell us when they

Page 31

ALAN SHAPIRO

| | | |
|---|---|---|
| 10:56:48 | 1 | |
| | 2 | started underwriting asset-backed securities, does |
| 10:56:52 | 3 | it? |
| 10:56:53 | 4 | A.    Oh, I think that was 1994 or so. |
| 10:56:55 | 5 | Q.    So were you asked to assume that CSFB |
| 10:56:58 | 6 | owed Oakwood and its creditors a fiduciary duty |
| 10:57:01 | 7 | throughout the time that Credit Suisse worked with |
| 10:57:07 | 8 | Oakwood? |
| 10:57:09 | 9 | A.    We didn't talk about that.  It was just |
| 10:57:12 | 10 | in the relevant time period, from about 2000 on. |
| 10:57:36 | 11 | Q.    And that -- |
| 10:57:37 | 12 | When you conflate the interest of the |
| 10:57:47 | 13 | company and the creditors is there some event or |
| 10:57:50 | 14 | some condition that causes that to happen? |
| 10:57:54 | 15 | MR. CASTANARES:  Objection to form. |
| 10:57:57 | 16 | A.    Yes, and that is when a company is |
| 10:58:01 | 17 | economically insolvent. |
| 10:58:15 | 18 | Q.    When a company is not economically |
| 10:58:19 | 19 | insolvent, if someone owes a fiduciary duty to |
| 10:58:25 | 20 | that company to whom do they owe it? |
| 10:58:30 | 21 | A.    Well, I think that -- |
| 10:58:32 | 22 | MR. CASTANARES:  Objection, the |
| 10:58:33 | 23 | question is calling for a legal conclusion. |
| 10:58:35 | 24 | You may answer it. |
| 10:58:36 | 25 | MR. WICKES:  I'm asking him -- |

Page 32

ALAN SHAPIRO

10:58:37  2    A.    That does call for a legal conclusion.

10:58:40  3  But speaking as an economist, I think that it's

10:58:43  4  generally accepted among financial economists that

10:58:46  5  for a solvent company the fiduciary obligation is

10:58:50  6  to the shareholders of the company, the residual

10:58:54  7  claimants.

10:58:55  8    Q.    Okay.  And in your understanding as a

10:58:58  9  financial economist, when we talk about that

10:59:01 10  fiduciary duty to an entity absent insolvency does

10:59:12 11  the duty run to stakeholders other than the equity

10:59:22 12  owners?

10:59:23 13    A.    Well, again, that would call for a

10:59:25 14  legal conclusion.  I can tell you what is

10:59:26 15  generally accepted among financial economists.

10:59:30 16    Q.    Well, instead of that why don't you

10:59:32 17  tell me what your understanding is.

10:59:34 18         MR. CASTANARES:  Object to the question

10:59:34 19     as calling for a legal conclusion.

10:59:36 20    A.    Well, I don't have -- if you're just

10:59:38 21  looking for a legal conclusion I can't --

10:59:41 22    Q.    I'm not looking for a legal conclusion.

10:59:43 23  I'm asking your -- you --

10:59:43 24         At the very outset of your report you

10:59:45 25  tell us that you made an assumption, is that an

Page 33

ALAN SHAPIRO

important assumption?

A.    Well, as I explained before, I think it
strengthens the notion of -- or the issue of
whether CSFB behaved in a reasonable manner.  I
don't think that it's absolutely necessary to
reach the conclusion that I did.

Whether there's any legal consequence
to the conclusion depends on the existence of a
fiduciary obligation, I believe.

Q.    Okay.  According to your understanding,
in a pre-insolvency situation does the fiduciary
duty that someone owes to a corporation encompass
only the interests of its equity holders?

A.    As I've explained, that calls for a
legal conclusion.  But as a financial economist I
can tell you I accept what the general view is
among financial economists, which is that the
fiduciary obligation to an entity ultimately
becomes a fiduciary obligation to the shareholders
and not to other stakeholders of the organization,
except insofar as there's a specific obligation to
those other stakeholders.

Q.    Okay.  So in general in a
pre-insolvency situation your understanding from

1
10:59:49  2
10:59:52  3
11:00:00  4
11:00:03  5
11:00:08  6
11:00:12  7
11:00:15  8
11:00:17  9
11:00:20 10
11:00:23 11
11:00:29 12
11:00:33 13
11:00:39 14
11:00:43 15
11:00:47 16
11:00:50 17
11:00:57 18
11:01:03 19
11:01:09 20
11:01:13 21
11:01:17 22
11:01:21 23
11:01:22 24
11:01:25 25

Page 34

ALAN SHAPIRO

11:01:31  2   an economic point of view is that the obligation

11:01:35  3   of someone who has a fiduciary duty to a

11:01:38  4   corporation, is that that duty encompasses the

11:01:41  5   interests of the equity holders and not other

11:01:44  6   stakeholders, such as creditors, or employees, or

11:01:47  7   the communities where the company works or others?

11:01:51  8           MR. CASTANARES:  Objection to form.

11:01:53  9       A.    That's correct.

11:01:55  10      Q.    But that --

11:01:56  11           Do I further understand you to be

11:01:58  12   saying that when the entity is insolvent that that

11:02:09  13   fiduciary obligation of the outsider now switches

11:02:14  14   and runs to the interest of the creditors?

11:02:19  15           MR. CASTANARES:  Objection to form.

11:02:20  16      A.    That is --

11:02:21  17           MR. CASTANARES:  You may answer.

11:02:22  18      A.    That is correct.

11:02:24  19      Q.    Okay.  Any particular creditors or all

11:02:27  20   creditors?

11:02:29  21      A.    The creditors of an entity, and then --

11:02:31  22      Q.    Okay.  But an entity such as Oakwood

11:02:36  23   had lots of different kinds of creditors, right?

11:02:47  24      A.    Well, you'd have to -- well, they did

11:02:54  25   have various creditors.  Some actually were

Page 35

ALAN SHAPIRO

| | |
|---|---|
| 11:02:58 | 2 |

creditors of Oakwood.  Others were creditors of

its SPE.  I think that's a very different --

special purpose entity, the one through which

securitizations were done.

Q.   Right.  But when we're talking about --

I just want to understand your understanding.  The

obligation that's owed to the company when the

company is insolvent, you tell us your

understanding is that's now an obligation to the

creditors.

Oakwood had in 2000, 2001 many

different kinds of creditors; isn't that right?

MR. CASTANARES:  Objection to form.

A.   I'm not -- they had various creditors,

yes.

Q.   They had owners of publicly traded

bonds, right?

A.   Yes.

Q.   They had trade creditors, right?

A.   Yes.

Q.   They had employees, right?

A.   Yes.

Q.   They had as I remember some other kinds

of instruments other than publicly traded bonds.

The timestamps in the left margin read:
11:02:58  2
11:03:03  3
11:03:09  4
11:03:13  5
11:03:15  6
11:03:18  7
11:03:23  8
11:03:26  9
11:03:29 10
11:03:31 11
11:03:33 12
11:03:37 13
11:03:41 14
11:03:43 15
11:03:46 16
11:03:47 17
11:03:50 18
11:03:51 19
11:03:51 20
11:03:54 21
11:03:54 22
11:03:56 23
11:03:57 24
11:04:02 25

Page 36

ALAN SHAPIRO

11:04:05  2        There were some private notes; is that

11:04:07  3  right?

11:04:08  4        A.    I believe that's the case, industrial

11:04:11  5  revenue bonds or something like that.

11:04:14  6        Q.    And is the fiduciary duty that you're

11:04:16  7  describing, does it run to all of those creditors

11:04:19  8  or does it run to some particular subsets of them?

11:04:22  9        MR. CASTANARES:   Objection to the

11:04:22 10     question as calling for a legal conclusion.

11:04:27 11        A.    Again, that does require a legal

11:04:31 12  opinion.   I can tell you that my understanding was

11:04:37 13  specifically with regard to the bondholders.

11:04:44 14  There may have been some fiduciary obligation to

11:04:50 15  other creditors that I -- we did not talk about

11:04:55 16  that.   I can think of economic reasons why that

11:04:58 17  would make sense, but I don't have an opinion

11:05:02 18  about that.

11:05:07 19        Q.    So would it be fair to say on the basis

11:05:26 20  of the discussion we've had that what you were

11:05:29 21  actually asked to assume -- the assumption that

11:05:32 22  you actually made here in your report is that --

11:05:37 23  and I'm looking here again at Roman numeral V.A,

11:05:40 24  and I've just edited it a bit based on our

11:05:45 25  discussion -- that you were asked by counsel to

Page 37

1                    ALAN SHAPIRO

11:05:46  2   assume that from 2000 onward CSFB owed Oakwood's

11:05:52  3   bondholders a fiduciary responsibility?

11:05:54  4            MR. CASTANARES:  Objection to form.

11:05:57  5        A.    Well, those were the only creditors

11:05:59  6   that we talked about.  It may well be that they

11:06:03  7   had other creditors in mind as well, I can't speak

11:06:10  8   to -- I never raised that question.

11:06:12  9        Q.    Okay.  But --

11:06:15 10        A.    So my understanding was that the

11:06:17 11   specific -- that the assumption talked

11:06:23 12   specifically about the bondholders.  It may by

11:06:28 13   inference have extended to other creditors, but

11:06:32 14   that I don't know.

11:06:33 15        Q.    Okay.  But in any event where the

11:06:36 16   assumption on page 4 of your report, Oakwood and

11:06:40 17   its creditors, do I correctly understand that what

11:06:47 18   the assumption you were asked to make was there

11:06:50 19   was no difference there, that is, the duty was

11:06:53 20   owed to Oakwood's creditors?

11:06:56 21            MR. CASTANARES:  Objection to form.

11:06:59 22        A.    Well, we had a number of discussions.

11:07:07 23   I can't recall exactly what the evolution of those

11:07:12 24   discussions were, but I do recall -- I do recall

11:07:27 25   my comments, which was that it would make economic

Page 38

ALAN SHAPIRO

11:07:31  2    sense for -- to the extent there's a fiduciary

11:07:38  3    obligation to security holders, that that

11:07:41  4    obligation would shift depending on the solvency

11:07:44  5    of the company.  That for a solvent company the

11:07:49  6    obligation would be to the shareholders and when

11:07:53  7    the company became insolvent that the

11:07:57  8    obligation -- it would make economic sense for

11:08:01  9    that obligation to shift to the creditors.

11:08:06  10           And I pointed to a large academic

11:08:10  11   literature explaining the different -- the ways in

11:08:13  12   which incentives change, depending on whether

11:08:18  13   you're dealing with a solvent or insolvent

11:08:21  14   company.  And why it would make economic sense

11:08:25  15   given the shift in incentives for a company that

11:08:28  16   is insolvent, why it would make sense to shift any

11:08:33  17   fiduciary obligation to creditors and away from

11:08:37  18   shareholders.

11:08:38  19       Q.    And that shift would be to creditors of

11:08:42  20   any sort, not just security holders; is that

11:08:45  21   right?

11:08:46  22           MR. CASTANARES:  Objection to form.  It

11:08:47  23       calls for a legal conclusion.

11:08:49  24       A.    That's correct.  From the standpoint of

11:08:50  25   the academic literature we don't distinguish

Page 39

ALAN SHAPIRO

1

11:08:54  2    between different types of debt holders.  We talk

11:08:58  3    about debt holders in general.

11:09:04  4            I can't speak to other liabilities --

11:09:07  5    holders of other liabilities, such as employees

11:09:09  6    and the like, let's say unpaid taxes, and so on.

11:09:13  7    I think that really does require some legal

11:09:16  8    opinion.  The academic literature itself deals

11:09:19  9    only with debt in a generic sense.

11:09:29 10        Q.     But again, to look at your sentence in

11:09:31 11    Section V.A where you wrote Oakwood and its

11:09:37 12    creditors, that's as we now look at it redundant,

11:09:44 13    isn't it, you're really meaning to refer to

11:09:47 14    Oakwood's creditors?

11:09:49 15            MR. CASTANARES:  Objection to form.

11:09:50 16        A.     Given the assumption of insolvency,

11:09:54 17    that's correct.

11:09:55 18        Q.     Okay.  Now, you've made reference to

11:10:07 19    the academic literature around this subject of the

11:10:09 20    movement of fiduciary responsibility.

11:10:10 21            It's fair to say, isn't it, that that

11:10:13 22    academic literature in the main addresses the

11:10:18 23    fiduciary obligations of directors?

11:10:26 24        A.     I believe that the real emphasis is on

11:10:31 25    managers and --

Page 40

ALAN SHAPIRO

11:10:32  2    Q.    Managers?

11:10:33  3    A.    -- as well as directors.  I believe if

11:10:35  4  you look at the literature it primarily talks

11:10:39  5  about managers.

11:10:43  6    Q.    To whom do managers of a corporation

11:10:45  7  report and from whom do they take instruction?

11:10:52  8    A.    Well, the CEO reports to the board of

11:10:56  9  directors and takes instructions -- often as not

11:11:03  10  gives instructions to the board of directors.  The

11:11:06  11  CEO typically sits on the board of directors, many

11:11:08  12  times as chairman of the board.  Other managers

11:11:12  13  would report to the CEO and only report to the

11:11:16  14  board, insofar as the board specifically requests

11:11:22  15  them to report to it.

11:11:23  16    Q.    All right.  If you think about the

11:11:25  17  academic literature that you've been describing

11:11:27  18  with respect to the shift of fiduciary

11:11:29  19  responsibility, can you point me to any of that

11:11:33  20  literature which addresses -- which suggests that

11:11:40  21  third parties, that is, not managers or directors

11:11:46  22  of the corporation, have fiduciary duties that

11:11:48  23  shift in this way to create fiduciary duties to

11:11:52  24  creditors.

11:11:53  25    A.    No, I cannot.

Page 170

* * *

### ACKNOWLEDGEMENT OF DEPONENT

I, _Alan C. Shapiro_ , do hereby
acknowledge that I have read and examined the
foregoing testimony, and the same is a true,
correct and complete transcription of the
testimony given by me, and any corrections appear
on the attached Errata sheet signed by me.

_10/7/07_

(DATE)                          (SIGNATURE)

Page 171

WITNESS: _Alan C. Shapiro_

DATE(S): _10/4/07, 10/7/07_

CASE: _OHC Liquidation Trust V. Credit Suisse, et al_

I wish to make the following changes, for the following reasons:

PAGE LINE _60_ _22_
        CHANGE FROM: _Operations and_
        CHANGE TO: _operations, and_
REASON: _Changes the intended meaning_

_158_ _6_ CHANGE FROM: _debt_
        CHANGE TO: _equity_
REASON: _I misspoke. I was talking about equity, not debt_

_163_ _21_ CHANGE FROM: _CRISP_
        CHANGE TO: _CRSP_
REASON: _That's the correct abbreviation_

_164_ _11_ CHANGE FROM: _CRISP_
        CHANGE TO: _CRSP_
REASON: _Correct abbreviation._

_166_ _8_ CHANGE FROM: _findings_
        CHANGE TO: _fillings_
REASON: _I believe the court stenographer misunderstood me._

_166_ _21_ CHANGE FROM: _2001 just_
        CHANGE TO: _2001. Just_
REASON: _Misunderstanding by stenographer_

____ ____ CHANGE FROM: _____
        CHANGE TO: _____
REASON: _____

____ ____ CHANGE FROM: _____
        CHANGE TO: _____
REASON: _____

____ ____ CHANGE FROM: _____
        CHANGE TO: _____

Subscribed and sworn to before me this _____ day of _____, 2007.

Page 171

WITNESS: _____

DATE(S): _____

CASE: _____

I wish to make the following changes, for the
following reasons:

PAGE LINE _____ _____

           CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

           CHANGE FROM:_____

_____ _____ CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

REASON:_____

_____ _____ CHANGE FROM:_____

           CHANGE TO:  _____

Subscribed and sworn to before me this  7th  day
of _October_ , 2007.

# Exhibit "F"

MYLES STANDISH

UNITED STATES BANKRUPTCY COURT   COPY
DISTRICT OF DELAWARE

- - - - - - - - - - - - - -X
                                  : Chapter 11
In Re:                              Case No. 02-13396
OAKWOOD HOMES CORPORATION,        : (PJW)
et al.,                             Jointly Administered
                                  :
          Debtors.
                                  :
_____
                                  :
OHC LIQUIDATION TRUST,
                                  :
          Plaintiff,
                                  :
          v.                        Adv. Proc. No.
                                  : 04-57060 (PJW)
CREDIT SUISSE FIRST BOSTON,
a Swiss banking corporation,      :
CREDIT SUISSE FIRST BOSTON
LLC, a Delaware limited           :
liability corporation, CREDIT
SUISSE FIRST BOSTON, INC.,        :
CREDIT SUISSE FIRST BOSTON
(U.S.A.), INC., a Delaware        :
corporation and a wholly
owned subsidiary of CREDIT        :
SUISSE FIRST BOSTON, INC.,
the subsidiaries and              :
affiliates of each, and
DOES 1 through 100,               :

          Defendants.             :

- - - - - - - - - - - - - -X

          Videotape Deposition of MYLES STANDISH
                    (Taken by Defendants)
             Winston-Salem, North Carolina
                   September 21, 2006


Prepared by:   K. Denise Neal
               Registered Professional Reporter
               Notary Public

MYLES STANDISH

 1        answer that without reviewing the complaint

 2        itself.

 3        Q.     (By Mr. Osnato)   Fair enough.   Now, in one

 4    of your previous answers you alluded to the

 5    assumption program and specifically the allegations

 6    and the counterclaims relating to it; is that right?

 7        A.     Yes.   I did.

 8        Q.     Is there some aspect of those allegations

 9    you believe to be incorrect?

10        A.     My general recollection of the allegations

11    with respect to the assumption program were that

12    First Boston caused management to enter into the

13    assumption program and that they did so in order to

14    kind of let's say keep the ball rolling to enable the

15    securitization program to continue in place for a

16    period of time longer than perhaps it otherwise would

17    have.

18             While First Boston was certainly aware of

19    the loan assumption program and what Oakwood was

20    doing with respect to the loan assumption program, I

21    disagreed with the idea that First Boston was the

22    driving force behind the loan assumption program if I

23    recall the allegations correctly.

24        Q.     Uh-huh.

25        A.     So I did -- I recall when I read the

MYLES STANDISH

1   complaint disagreeing with that aspect of it.

2       Q.    Do you continue to disagree with that

3   aspect of the complaint?

4       A.    To the extent I recall it correctly, yes.

5           MR. OSNATO:   I have here two copies of the

6       counterclaims.   I see no need to mark these as

7       exhibits.

8           MR. CASTANARES:   Okay.

9       Q.    (By Mr. Osnato)  Mr. Standish, I've just

10  handed you a copy of the counterclaims that were

11  filed in this lawsuit, and I believe you testified

12  earlier that at some point after they were filed you

13  first reviewed them; is that correct?

14      A.    That's correct.

15      Q.    Okay.   I'm going to draw your attention to

16  page 11 of the counterclaims.

17      A.    I'm there.

18      Q.    And in particular heading number two,

19  which reads CSFB encouraged debtors to aggressively

20  use the loan assumption program.  Do you agree with

21  that statement?

22      A.    I do not.

23      Q.    Was the decision to institute the loan

24  assumption program made exclusively by Oakwood?

25      A.    Well, as I said, I think CSFB knew what we

MYLES STANDISH

1    were doing and I believe that Fiachra -- it would

2    have been discussed with Fiachra prior to doing it to

3    make sure there would be no adverse effect on our

4    securitization program; but as far as the decision to

5    -- well, let me -- let me back up.

6           Your -- the question really is based on an

7    incorrect factual assumption and that is that in -- I

8    believe in 2000 or 2001, whatever time period we're

9    talking about that we instituted a loan assumption

10   program, there had always been a loan assumption

11   program at Oakwood Acceptance Corporation.  The --

12   and it's fairly typical in the industry.

13          What we did was there was a decision to

14   expand to be somewhat more aggressive in the loan

15   assumption program sometime in the 2000, 2001 time

16   frame.  And that's what I'm really talking about.

17   And I'm sure before expanding that program it was

18   discussed with Fiachra, but as far as the decision to

19   go ahead and expand that program, that decision was

20   made by Oakwood management.

21      Q.    And to your knowledge was the Oakwood

22   board of directors apprised of Oakwood's use of the

23   assumption program?

24      A.    Yes.  And the world was apprised of the

25   assumption program.  I think that it was in all of

MYLES STANDISH

Page 28

 1    our public documents, how many repossessed homes had

 2    we had, how many -- versus how many homes awaiting

 3    assumption there were.  If you looked at our 10-Qs

 4    and 10-Ks and press releases, it was out there for

 5    the world to see.

 6        Q.    What is the or was the purpose of the loan

 7    assumption program as it was used by Oakwood?

 8        A.    There were two purposes.  One was a loss

 9    mitigation purpose that if you can find a borrower to

10    go ahead and take over a loan that would otherwise

11    result in a repossessed home, then you, number one,

12    avoid the repossession.  You avoid a lot of the

13    expenses typically associated with a repossession,

14    and so it's a -- it's a loss mitigation technique.

15            The other factor which caused Oakwood to

16    more aggressively utilize the loan assumption program

17    in the 2000, 2001 time frame was it increased our

18    liquidity.  It increased the liquidity from the

19    standpoint that that loan had already been financed

20    in a securitization.

21        Q.    Uh-huh.

22        A.    If I can find somebody to assume that

23    loan, then it can stay financed in that

24    securitization so I don't have to look for financing

25    for that home.

MYLES STANDISH

Page 121

1   anyone at Oakwood that two percent was the right

2   number?

3       A.    I do not.

4       Q.    Do you think Credit Suisse had a conflict

5   of interest in the Lotus transaction?

6       A.    In a legal sense?

7       Q.    Any sense.

8       A.    The -- certainly there's some inherent

9   conflict of interest that's, you know, somewhat

10  insurmountable when they're dealing with a company

11  like us that they've represented for a period of time

12  as well as a company like Berkshire Hathaway that

13  they often sell products to and who certainly could

14  have a big appetite for products that they want to

15  make sure that they're happy as well.

16          So there's somewhat of a -- of an inherent

17  conflict there.  That was at the time something that

18  we would have been aware of.  Since this time I

19  understand that Berkshire Hathaway also owned a

20  significant amount of our debt, which I understand

21  First Boston knew about at that time but they did not

22  inform us about that at that time.

23          And I'm not sure why we were not informed

24  of that because again, as I said, you know, there's

25  some trepidation anytime you do something like this

MYLES STANDISH

1    that you have the 800-pound gorilla in your tent, but

2    I would have liked to have known.  I don't know if it

3    would have made any difference, but I would have

4    liked to have known that he was already in our tent.

5         Q.    Uh-huh.  But the board would have approved

6    the deal even if it had been disclosed that Berkshire

7    Hathaway owned some public bonds; isn't that right?

8              MR. CASTANARES:  Objection to form.

9              THE WITNESS:  I don't know.  I think that

10            there may have been certainly some inquiry as to

11            what the level of interest and what the -- what

12            the potential plan of Berkshire Hathaway was had

13            we known that.

14        Q.    (By Mr. Osnato)  Do the terms that are set

15   out in the paragraph in Exhibit 204 that we've been

16   looking at represent the final terms of the deal as

17   you understood it?

18        A.    I do not know.

19        Q.    Do you believe those terms as reflected in

20   204 to be fair?

21        A.    Well, I believe that they were the best

22   price that we -- that we thought that we could get at

23   the time.

24        Q.    After the Lotus securitization transaction

25   closed, did you have any dealings with Berkshire

MYLES STANDISH

1   Hathaway thereafter apart from any discussions as

2   part of the bankruptcy?

3       A.    As I said, Mr. Millard came down to visit

4   us sometime in I believe the fall of 2001.  Really,

5   the next -- the next time that I can remember having

6   any dealings with Berkshire Hathaway was when we

7   decided to eliminate or curtail the loan assumption

8   program, and we had a meeting with Mr. Buffett and

9   Mr. Millard in Omaha at the Berkshire offices to give

10  them an update on that.

11      Q.    And do you recall who requested that

12  meeting?

13      A.    Well, the request to Berkshire Hathaway

14  went through First Boston.  I would think that

15  Fiachra would have talked to Tom Connor at First

16  Boston and have Tom arrange a meeting.

17            Now, I'm not sure where the -- I'm not

18  sure whose idea that we needed a meeting with

19  Berkshire Hathaway was, whether it was something

20  after we talked with Fiachra and talked about the

21  changes to the loan assumption program that he said,

22  you know, we don't want to surprise the guys in Omaha

23  or whether it's something that we suggested to him.

24  I don't recall that.

25      Q.    But your recollection is that the purpose

MYLES STANDISH

Page 124

1    of the meeting was to discuss the consequences of the

2    loan assumption program with Berkshire Hathaway?

3        A.    That was the -- that was the general

4    purpose of the meeting, yes.

5        Q.    Okay.  And were you at the meeting?

6        A.    I was.

7        Q.    And did you speak at the meeting?

8        A.    I did.

9        Q.    Did you make a presentation?

10       A.    I walked through a brief presentation,

11   yes.

12       Q.    Okay.  And what was the subject matter of

13   your presentation?

14       A.    It was -- as I recall, it was mostly about

15   the loan assumption program and the impact that this

16   was going to have on the Lotus transaction.  There

17   was probably also material in there that gave them a

18   general update on the -- on the business.

19       Q.    How did the assumption program impact the

20   Lotus transaction?

21       A.    It devastated it.

22       Q.    In what sense?

23       A.    Well, rather than Oakwood assuming the

24   losses or mitigating the losses, we now had half of

25   our foreclosures being sold into the wholesale

MYLES STANDISH

Page 125

```
 1    market.  Whereas traditionally how we had disposed of
 2    our repos had been either through assumptions or
 3    through repo refinances where with assumptions the
 4    securitization didn't take any hit, with repo
 5    refinances over the broader period of time we were
 6    having a recovery rate of about 80 percent, although
 7    that had deteriorated some by July of 2002 or June of
 8    2002.
 9              When we started wholesaling repos at that
10    point in time the repo market, the wholesale market
11    for repos, was the worst it had ever been.  So the
12    losses that we were incurring, our recovery rate was
13    only about 20 percent, give or take a few, on those
14    wholesale units and the -- and the -- that loss gets
15    passed on to the securitizations.
16              So Oakwood as I discussed before would
17    take the first loss from the standpoint that it
18    wouldn't get paid a servicing fee, but the next loss,
19    it's the residuals and the B2s, which is what
20    Berkshire owned.  So there was little immediate
21    impact because the Lotus transaction called for a
22    reserve fund to be built up.  And there was a reserve
23    fund built up, but after a few months I think that
24    the Berkshire cash flows decreased dramatically.
25        Q.    And do you recall the reaction of
```

MYLES STANDISH

Page 126

1    Berkshire to this news at the meeting?

2         A.    I think they understood what we had to say

3    and understood why we were doing what we were doing.

4         Q.    Uh-huh.

5         A.    They asked some general questions about

6    the business, where we were headed, but it was

7    overall a fairly pleasant meeting.

8         Q.    And do you recall how you or anyone else

9    from Oakwood responded when asked where you were

10   headed?

11        A.    I think we explained what our business

12   strategy was going forward, what the obstacles were,

13   where the industry was.

14        Q.    Uh-huh.

15        A.    As far as specifically saying where we

16   were headed, I think we just talked about what the --

17   what the issues were.

18        Q.    Was there any discussion at the meeting of

19   a bankruptcy filing at that point in time?

20        A.    Warren Buffett made a comment as he looked

21   at the numbers.  He said, well, you know, it's pretty

22   simple.  Either you start making money or you're

23   going to have to file for bankruptcy at some point in

24   time, and we agreed with that comment.

25        Q.    Did you tell him that you intended to

1    start making money?

2        A.    No.

3        Q.    Was that your view at the time?

4        A.    My view at the time was that we would

5    probably have to file for bankruptcy.

6        Q.    As of the summer of 2002?

7        A.    Yes.

8        Q.    And do you know if the board shared that

9    sentiment?

10       A.    I don't know that the board necessarily

11   agreed with that sentiment or disagreed with that

12   sentiment.  I know that at some point in time, I

13   believe it was probably June of 2002, in that time

14   frame I advised the board that I thought it was

15   prudent to obtain -- to retain bankruptcy counsel,

16   and they agreed with that.

17       Q.    Apart from -- strike that.  In addition to

18   Mr. Millard and Mr. Buffett and yourself, who else

19   attended the meeting in Omaha in the summer of 2002?

20       A.    Fiachra, Tom Connor, Bob Smith and Doug

21   Muir.

22       Q.    Did Credit Suisse have a speaking role at

23   this meeting?

24       A.    I think they spoke, yes.  They didn't have

25   a main speaking role, I don't think.

MYLES STANDISH

1       Q.    Uh-huh.  You testified earlier about a

2    warehouse facility that had been provided by Bank of

3    America?

4       A.    Yes.

5       Q.    At some point in time did that facility

6    terminate?

7       A.    That facility, Bank of America applied

8    increasing pressure to us to get out of that

9    facility.

10      Q.    Uh-huh.

11      A.    It did not ever terminate, although I

12    think it would have terminated in -- by its terms in

13    September of 2002 --

14      Q.    Uh-huh.

15      A.    -- I believe.  But when we went to the

16    Credit Suisse facility, that Bank of America facility

17    had not terminated.

18      Q.    And why if you know did Bank of America

19    place pressure on Oakwood with respect to the B of A

20    facility?

21      A.    I'm not really sure what their motivation

22    was.  I think at the time Bank of America had been

23    going through some financial issues and was cutting

24    back on some of their exposures, but I -- I can't

25    tell you any more than that.

MYLES STANDISH

Page 200

1    did you have any more interactions with either Mr.

2    Buffett or Mr. Millard before the bankruptcy filing

3    in November?

4        A.    I think on the day of the bankruptcy

5    filing I had several E mails from Mark Millard, but

6    other than that, no.

7        Q.    Okay.  And do you know if Berkshire

8    Hathaway ultimately came to support the filing by

9    Oakwood?

10       A.    I was told -- I can't recall exactly when

11   we filed, but I was told on the morning of

12   November 15th I believe by Jared Felt that Berkshire

13   had supported our filing and we issued a press

14   release sometime during that morning, which

15   essentially said that without Berkshire's name being

16   on the press release.

17           I later I believe got an E mail from Mark

18   Millard probably around 3:00 o'clock that afternoon

19   asking me what was going on, that he didn't think

20   that we were going to file until Monday and that

21   Berkshire had not yet supported our plan, although he

22   thought that they would.  So when we filed I thought

23   we had Berkshire's support, but according to Mark's

24   communication to me we did not have their support at

25   that time.

MYLES STANDISH

1          Q.      I want to talk about the services that

2    Credit Suisse provided to Oakwood under the August

3    2002 financial advisory contract.

4          A.      Yes.

5          Q.      And I take it from some of your previous

6    answers that you were less than satisfied with some

7    of the things that Credit Suisse did; is that right?

8          A.      That's correct.

9          Q.      Can you tell me what it is that you were

10   dissatisfied with in the work by Credit Suisse?

11         A.      I don't believe that Credit Swiss ever

12   understood the financial difficulty that we were in.

13   As I mentioned to you earlier, there were a couple of

14   times when Credit Suisse advised us to delay a

15   bankruptcy filing.  One time was on the flight back

16   after visiting Berkshire Hathaway in the middle of

17   October and one was the Friday before we filed.

18              Both times Credit Suisse indicated that we

19   should consider putting off the filing for a period

20   of time.  Both of those times both Doug and I told

21   them that we didn't have an option to put off the

22   filing past -- that we were going to be lucky to get

23   to November 15 when we were planning the filing.  We

24   didn't have the option to go any longer.  I think at

25   the time by November 8th, the Friday before we filed,

MYLES STANDISH

Page 202

1    Credit Suisse had done virtually nothing in

2    connection with obtaining a DIP other than Jared went

3    down to a meeting at Foothill which he arrived at

4    about a half an hour or 45 minutes late and he popped

5    in and he popped out.  All of the work that was done

6    with Foothill to the extent I know of it was done by

7    FTI as well as the company.

8             I think that -- I don't think that Jared

9    even contacted any other potential DIP lender until

10   the Monday of our filing, if he did it that soon.  I

11   was repeatedly advised that there would not be a

12   problem in getting a waiver for the warehouse.  That

13   did, in fact, turn out to be a significantly

14   problematic manner -- matter and, in fact, we had to

15   basically shut down our lending for a period of time

16   after the filing.

17            There was no contact of any other

18   warehouse lender, potential warehouse lender by First

19   Boston prior to the filing because presumably they

20   felt that we would get a waiver, which we did not on

21   a timely basis.  The first time anyone from First

22   Boston showed up to do any due diligence with respect

23   to a waiver of the warehouse was when Fiachra, Jared

24   and Tom Irwin showed up in our offices on the night

25   of November 14th, the day before we filed.

MYLES STANDISH

Page 203

```
 1              I did not know nor did anyone else at
 2    Oakwood know that anyone from First Boston was even
 3    coming down until Fiachra informed me that they were
 4    coming down just a couple of hours or he may have
 5    actually been on the way to catch the plane at that
 6    time.  Having basically starting diligence on the
 7    renewal of the warehouse the day before -- the night
 8    before we filed and the next day was significantly
 9    disruptive at a time when we were trying to negotiate
10    a DIP with a new lender that FTI had brought to the
11    scene.
12              Having your financial advisor with no
13    notice suspend fundings under the warehouse for a
14    reason that I've never been able to know the week of
15    filing was disruptive.  And being told that there
16    would be no filings -- no further fundings
17    essentially until further notice on the day that
18    you're filing was certainly disruptive.  Those are
19    the major concerns that come to mind right now.
20         Q.    Okay.  Is there anything else that comes
21    to mind?
22         A.    Not at the moment.
23         Q.    Okay.  So to be clear, you were
24    dissatisfied with --
25         A.    There is -- there is one other thing that
```

MYLES STANDISH

 1     comes to mind.  The week -- I believe it was the week

 2     before we filed or it may have been the Monday of the

 3     week that we were -- that we filed, I received a call

 4     from Fiachra as I was driving into work, so about at

 5     7:30 or 8:00 o'clock in the morning, that advised me

 6     that CSFB's legal department was working on matters

 7     but they thought that they would have a problem being

 8     retained as our financial advisor after we filed for

 9     bankruptcy because of potential conflicts with the

10     fact that they had served as underwriters for us.

11              Fiachra said that there was a technical

12     argument that because they had served as underwriter

13     for a bankruptcy remote entity, that perhaps they

14     could be retained as a financial advisor, but he

15     couldn't give me any assurance as to that.  That was

16     the first time that had ever been mentioned to me.

17         Q.    Focusing only on the DIP issue, at some

18     point after the filing on November 15th Oakwood did,

19     in fact, obtain sufficient DIP financing; isn't that

20     right?

21         A.    We obtained DIP financing, yes.

22         Q.    And who provided that financing?

23         A.    Greenwich Capital, Ranch Capital and

24     Berkshire Hathaway.

25         Q.    And do you recall the date upon which that

# Exhibit "G"

COPY                              Page 1

CLARENCE WALKER

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

------------------------------x

In Re:

OAKWOOD HOMES CORPORATION,

et al.,


            Debtors.


Chapter 11

Case No. 02-13396 (PJW)

------------------------------x

OHC LIQUIDATION TRUST,

            Plaintiff,

        v.              ADV. Proc.No. 04-57060 (PJW)

CREDIT SUISSE FIRST BOSTON, a

Swiss banking corporation,

CREDIT SUISSE FIRST BOSTON

LLC, a Delaware limited

liability corporation, CREDIT

SUISSE FIRST BOSTON, INC.,

CREDIT SUISSE FIRST BOSTON

(U.S.A.), INC., a Delaware

corporation and a wholly owned

subsidiary of CREDIT SUISSE

FIRST BOSTON, INC., the

subsidiaries and affiliates of

each, and DOES 1 through 100,

            Defendants.

------------------------------x




                              December 12, 2006

                              1:04 p.m.

1              CLARENCE WALKER

2    filed for bankruptcy, is it your view, Mr.

3    Walker, that the board of directors of Oakwood

4    was comprised of competent and qualified

5    directors who acted in the company's best

6    interest?

7         A.    Yes.

8              MS. CHOW:  Objection as to form.  I'm

9    sorry, Mr. Walker, if you could perhaps give me

10   an opportunity to raise the objection,

11   especially with the doing this by telephone.

12   Hopefully the court reporter can hear the

13   objection before the testimony.

14              I apologize, I didn't mean to

15   interrupt.

16              THE WITNESS:  I will undertake to

17   pause after the question.

18              MS. CHOW:  Thank you.

19   BY MR. OSNATO:

20        Q.    And, Mr. Walker, if I was to ask you

21   the same question for the year 2001, would your

22   answer also be yes?

23              MS. CHOW:  Same objection.

24        A.    Yes.

25        Q.    And for the year 2000?

Page 16

1                CLARENCE WALKER

2          MS. CHOW:  Same objection.

3     Q.    Is your --

4     A.    In the year 2000 the issue of

5     bankruptcy was not on the horizon at all.

6     Q.    Thank you.  Am I correct, Mr. Walker,

7     that the Oakwood board of directors would meet

8     on a regular basis?

9     A.    That's correct.

10    Q.    And again focusing on the period from

11    2000 through 2002, approximately how many times

12    per year did the board meet?

13    A.    In that period the board met more

14    regularly than it normally had in the past.  The

15    board prior to that time had met approximately

16    four times a year.  During that period the board

17    met if not on a monthly basis, even on a more

18    frequent basis than monthly because of the

19    necessity of monitoring the situation that was

20    developing fairly fast.

21    Q.    Focusing on the year 2002 for the

22    moment, in addition to yourself as an outside

23    director, do you recall the names of the other

24    outside directors who sat on the board?

25    A.    Yes.

1          CLARENCE WALKER

2      Q.    Who were they?

3      A.    Dennis Meyer of Washington, D.C.

4  Kermit Phillips of Greensboro, North Carolina.

5  Michael Weaver, also of Greensboro, North

6  Carolina.  Fay Vincent of New York, the State of

7  New York.  I'm not certain just where his

8  principal residence was.  His name is Francis T.

9  Vincent.

10         Roger Schipke who at the time was in

11  Florida.  Sabin C. Streeter, S-T-R-E-E-T-E-R, of

12  New York.  I think his home is in Chappaqua.

13  His work was in New York City.

14         I'm trying to think if there were

15  others.  I think there certainly were others

16  during that period but right now they don't

17  occur to me.  Those were the outside directors,

18  that is, the nonemployee directors.

19     Q.    Thank you.  And do you believe that

20  the individuals that you have just identified

21  provided Oakwood with disinterested and

22  impartial advice during their tenure on the

23  Oakwood board?

24         MS. CHOW:  Objection as to form.

25     A.    Yes.

Page 32

CLARENCE WALKER

1

2        MS. CHOW:  Objection to the form of

3    the question.

4        A.    Yes, you are correct.

5        Q.    Was the board of directors --

6        A.    I'm sorry, I have lost you.

7        Q.    I'm sorry, can you hear me now?

8        A.    No, I can hear you very faintly.

9        Q.    Is this better?

10       A.    Suddenly your voice has become

11   distant.

12       Q.    Is this any better?

13       A.    Much better.

14       Q.    Okay.  Good.  I will not move.

15            Am I correct, Mr. Walker, that the

16   board of directors was kept apprised by senior

17   management of developments in the securitization

18   market?

19            MS. CHOW:  Object to the form of the

20   question.

21       A.    You are correct.  The board was kept

22   advised in a general way by both senior

23   management and the audit committee, and the

24   audit committee was kept advised in a more -- in

25   more depth by Doug Muir.

Page 33

CLARENCE WALKER

1

2      Q.    Am I correct that the board of

3      directors approved the use of securitizations by

4      the company to generate liquidity?

5            MS. CHOW:  Object to the form of the

6      question.

7      A.    You are correct in this sense.  The

8      securitization program had been an integral part

9      of the company's operation for a long time.  I

10     don't recall when it was first initiated, but it

11     certainly was not in this 2001-2002 period, it

12     was earlier than that.  And the board got

13     continual reports about the status of the

14     securitization and acquiesced in it.

15           Now, I don't think particular

16     securitizations ever were presented to the board

17     for its approval, but the board was fully aware

18     of how the program operated, how it was doing,

19     and at no time undertook to mandate the

20     discontinuance of it.

21     Q.    Thank you.  I take it that your answer

22     remains true for all of the year 2002?

23     A.    That's correct.

24     Q.    In your capacity as a director, do you

25     have any reason to believe that the

Page 34

1                      CLARENCE WALKER

2      securitizations engaged in by Oakwood were a

3      harmful financing technique?

4          A.    No.

5                MS. CHOW:   Object to the form of the

6      question.

7          Q.    I'm sorry, your answer was, sir?

8          A.    The answer to the question was no.

9          Q.    Thank you.

10               You also mentioned, Mr. Walker, the

11     warehouse facility.  You have provided us with a

12     brief description of that facility.

13               Am I correct that the board was kept

14     apprised of Oakwood's use of the warehouse

15     facility?

16         A.    Yes, you are correct.  The warehouse

17     facility became an integral part of the whole

18     securitization process and the board was kept

19     aware of that as a part of the whole

20     securitization process.

21         Q.    To your knowledge did the board

22     approve of Oakwood's use of the warehouse

23     facility?

24               MS. CHOW:   Objection to the form of

25     the question.

Page 35

1                    CLARENCE WALKER

2        A.    There was never any specific action by

3   the board in which it approved the use of the

4   warehouse facility.  But if you use "approved"

5   in the generalized sense of acquiescing after

6   having been informed of this operation, the

7   answer is yes.

8        Q.    Thank you.  Did Credit Suisse have the

9   ability in your view to dictate corporate policy

10  to the board of directors?

11             MS. CHOW:  Objection to the form of

12  the question.

13        A.    Absolutely not.

14        Q.    Did Credit Suisse have the ability to

15  dictate to senior management policy?

16             MS. CHOW:  Object to the form of the

17  question.

18        A.    I'm not able to answer that.

19        Q.    Fair enough.  Did Credit Suisse have

20  any representatives on the board of directors of

21  Oakwood at any time during your tenure?

22        A.    No.

23        Q.    In your service on the board of

24  directors, can you recall any instance in which

25  Credit Suisse demanded that the board terminate

# Exhibit "H"

| From: | JHinshaw@OakwoodHomes.com |
|---|---|
| Sent: | Monday, April 17, 2000 1:16 PM |
| To: | fiachra.o'driscoll@csfb.com |
| Subject: | FW: Changes to 2000-A loss for quarter and regular interest MTM; B-2 loss assumptions |

Hello Fiachra. Hope all is going well. Please read the attached e-mail in your abundance of spare time. In a nut shell we are valuing all retained REMIC interest for the quarter and want to get your thoughts on our methodology. In summary we are marking the unguaranteed B-2's to fail cross-over at +850 and the guaranteed B-2's to fail cross-over at +1000. Please make note of item 5 below and let me know your thoughts. Thanks for your help.

-----Original Message-----
From: Doug Muir/Corp.Finance
Sent: Friday, April 14, 2000 4:57 PM
To: Bob Smith/Corp.Finance; Eric Burgess/Corporate Finance; Suzanne Wood/Corp.Finance; Derek Surette/OAC Acct.; Jeff Hinshaw/OAC Accounting
Subject: Changes to 2000-A loss for quarter and regular interest MTM; B-2 loss assumptions

In having a final look at the summary valuation page for 3/31/00, the following issues arose:

1. 99-C B-2 showed a positive mark-to-market ("MTM") of $1.3 million, which looked very strange in comparison to negative MTMs on 99-D and 99-E. Turns out we priced 99-C B-2 at +850 at 3/31/00, same spread as 99-D and 99-E. We priced 99-C B-2 at closing at +1000, because 99-C B-2 was a guarantee bond and did not have sufficient credit support built in to sustain anything higher than a single-B rating exclusive of the OH guarantee. I asked Jeff Hinshaw to reprice 99-C B-2 at 3/31/00 at +1000, a single-B spread (instead of the + 850 BB spread given us by CSFB), which has the effect of reducing the positive MTM from $1.3 million to $.3 million. As it happens, the 3/31/00 pricing yield (at +1000) is identical to the bond's yield at closing; the $.3 million positive MTM arises from discount accretion, which has not been recorded for book purposes.

2. 99-D and 99-E B-2s have negative MTMs of $2.4 million and $.8 million, respectively. 99-D B-2 was priced at +700 at closing, so it has suffered from spread widening to +850. 99-E B-2 was priced at +950 at closing, so it has benefited from spreads coming in since closing. Changed yields in benchmarks had little effect. Both bonds have been much more adversely affected by changing pricing assumption from "pass" to "fail" (insofar as the crossover tests are concerned) in accordance with CSFB's views on what the market view is on this right now. This leads to point 3 below. (Pass/fail does not affect the 99-C B-2 because it is a bullet structure.)

3. In discussing item 2 above with Jeff, he pointed out that the loss recorded on the 2000-A deal is based upon a pass assumption on the B-2. This is not consistent with CSFB's advice on where the market is on this. Accordingly, I have had Jeff recompute assuming B-2 failure pricing, which reduces the B-2 issue price and increases the loss by $1.1 million in the quarter. To recap, we now have a gross loss of $11.1 million vs. $10.0, and a loss in the quarter of $2.4 vs. $1.3 million on this deal.

4. For some reason, the summary of regular interest values I have shows a negative MTM on the 2000-A of $.7 million. This seems unlikely to have arisen only one day after closing on 3/30/00. Jeff is following up on this.

Jeff, will you drop Fiachara an email indicating our spreads and pass/fail assumptions on all bonds in inventory (as adjusted) and get him to have a final look before we lock down the quarter? Ask him to email us back (so we'll have it for the file). Might as well check in with him one more time in case he has changed his view on anything.

5. Last issue. All bonds have been priced from pricing models, not residual models. The

1

CSFB-00173796



former do not have losses modeled; the latter do. This implicitly says that a buyer assumes he is going to get paid all his principal (or alternatively, that a buyer has factored in the risk of not getting all his principal into his spread) in coming up with his price.

If we were to reprice these securities using the same models we use for valuation purposes, on at least some of them we are going to get a worse answer, because our loss assumptions will cause B-2 writedowns. I guess the real question is whether we should use the market's loss assumption in computing these values, or our assumption.

Jeff, in your email to Fiachra, ask him the above question and see what he says.

What I am trying to avoid is getting surprised down the road if we were somehow to have to change assumptions from the "market's" to "ours." Which view we take might affect the loss on 2000-A. (Jeff: What happens if we price the B-2 off the residual model in computing the 2000-A loss?)

One other thought on this is that the price of the bonds at 3/31/00 on a "no losses" vs. a "losses" basis may not be so different as one might expect. While the numbers may be pretty far apart on a purely mathematical basis, the reality may not be so different. What I mean is this: These wide B-2 spreads are in large measure a reflection of credit risk. If we have already modeled in a pretty bleak loss assumption in our B-2 valuation (and these assumptions result in an unrecovered writedown), the risk to a buyer is that losses are even worse than we've modeled, which is a lesser risk than what you have if you start from a no writedown position. In that case, maybe a tighter spread is indicated.

Know these subjects are exactly what you wanted to spend time thinking about this week!

Doug

CSFB-00173797

# <u>EXHIBIT</u> <u>I</u> REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> J REDACTED
# IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>K</u> REDACTED
# IN ITS ENTIRETY

# EXHIBIT L REDACTED IN ITS ENTIRETY

# <u>EXHIBIT M</u> REDACTED IN ITS ENTIRETY

# <u>EXHIBIT</u> <u>N</u> REDACTED
## IN ITS ENTIRETY

# EXHIBIT O REDACTED IN ITS ENTIRETY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on May 19, 2008, I

caused a copy of the ***Declaration of Whitman L. Holt in Support of Plaintiff's Answering Brief***

***in Opposition to Defendants' Motion for Partial Summary Judgment,*** to be served upon the

individuals listed below via the method indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq.<br>Russell C. Silberglied, Esq.<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>**VIA HAND DELIVERY** | Mary K. Warren, Esq.<br>Michael Osnato, Esq.<br>J. Justin Williamson, Esq.<br>Paul R. Wickes, Esq.<br>Linklaters<br>1345 Avenue of the Americas<br>Nineteenth Floor<br>New York, NY 10105<br>**VIA FEDERAL EXPRESS** |

Dated: May 19, 2008                    CAMPBELL & LEVINE, LLC


                                       _/s/ Kathryn S. Keller_
                                       Kathryn S. Keller (No. 4660)
                                       800 N. King Street, Suite 300
                                       Wilmington, DE 19801
                                       (302) 426-1900