*DRAFT: For discussion purposes only; not binding on any party*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Oakwood Homes Corporation, et al.,<br><br>              Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br>              Plaintiff,<br><br>           v.<br><br>Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100,<br><br>              Defendants. | Civil Action No. 07-00799 (JJF) |

## [PROPOSED] PRE-TRIAL ORDER

*DRAFT:  For discussion purposes only; not binding on any party*

Pursuant to Rule 16.3(c) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, the parties to the above-captioned proceeding (the "Proceeding") hereby submit the following proposed pre-trial order (the "Proposed PTO"):

## I.    NATURE OF THE ACTION AND RELEVANT PLEADINGS

1.    The plaintiff in the Proceeding is the OHC Liquidation Trust, by and through its duly appointed trustee, Alvarez & Marsal, LLC (the "Trust" or the "Plaintiff").

2.    The defendants in the Proceeding are Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC) ("CSS"), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, the "Defendants" or "Credit Suisse").

3.    Defendant CSS filed four identical proofs of claim in the jointly-administered bankruptcy cases of Oakwood Homes Corporation ("Oakwood") and certain of its affiliates (collectively, the "Debtors" and together with the non-debtor affiliates, the "Oakwood Entities") as follows: (1) Proof of Claim No. 6118 filed as to the debtor in Bankruptcy Case No. 02-13397; (2) Proof of Claim No. 6119 filed as to the debtor in Bankruptcy Case No. 02-13396; (3) Proof of Claim No. 6120 filed as to the debtor in Bankruptcy Case No. 02-13393; and (4) Proof of Claim No. 6121 filed as to the debtor in Bankruptcy Case No. 02-13395 (collectively, the "Proofs of Claim").

4.    On November 13, 2004, the Trust commenced the Proceeding by filing an objection to the Proofs of Claim, which objection was coupled with ten counterclaims against the Defendants (the "Objection/Counterclaims"), in the United States Bankruptcy Court for the

1

*DRAFT:  For discussion purposes only; not binding on any party*

District of Delaware (the "Bankruptcy Court") [Bankr. Adv. Proc. No. 04-57060 (PJW) (hereinafter, "Adv. Proc."), Docket No. 1].

5.   Following briefing regarding the Defendants' motion to dismiss certain counts of the Objection/Counterclaims and the Bankruptcy Court's March 31, 2006 Memorandum Opinion denying the same [Adv. Proc. Docket No. 127], the Defendants filed their "Answer and Affirmative Defenses" (the "Answer" [Adv. Proc. Docket No. 132]).

6.   Plaintiff subsequently filed a motion to withdraw the bankruptcy reference [Civil Docket No. 1], which motion was granted by the United States District Court for the District of Delaware, Farnan, *J.* (the "District Court" or the "Court") via an Order dated January 23, 2008 [Civil Docket No. 24].

7.   Of the claims originally pled in the Objection/Counterclaims, Plaintiff intends to try the following claims:

- Claims to be Decided by a Jury-
    a.    Negligence.
    b.    Breach of fiduciary duty.
    c.    Breach of implied contract.
- Claims to be Decided by the Court-
    a.    Objection to CSS's Proofs of Claim.
    b.    Avoidance and recovery of preferences from CSS pursuant to 11 U.S.C. §§ 547 & 550 with respect to amounts identified in paragraph 65.
    c.    Avoidance and recovery of fraudulent transfers from CSS pursuant to 11 U.S.C. §§ 548 & 550 with respect to amounts identified in paragraph 65.

*DRAFT: For discussion purposes only; not binding on any party*

      d.       Equitable subordination of CSS's claims, if any are allowed,

                pursuant to 11 U.S.C. § 510(c).

## II.      BASIS OF FEDERAL JURISDICTION

8.   The Trust is the Debtors' successor in interest pursuant to the chapter 11 plan that was confirmed in the Debtors' bankruptcy cases and the related Liquidation Trust Agreement dated April 13, 2004.  The Proceeding involves causes of actions that either arise under title 11 of the United States Code (the "Bankruptcy Code") or were property of the Debtors' bankruptcy estates under 11 U.S.C. § 541(a).

9.   As determined by the Bankruptcy Court, this is a "core" bankruptcy proceeding under 28 U.S.C. § 157(b)(2) [Adv. Proc. Docket No. 231].  Thus, this Court has original jurisdiction pursuant to 28 U.S.C. § 1334(b), and the Proceeding is properly before this Court pursuant to this Court's ability to withdraw the bankruptcy reference under 28 U.S.C. § 157(d).

## III.      UNDISPUTED FACTS THAT REQUIRE NO PROOF

**10.** The following facts are agreed to be true by both parties and require no proof.  The parties do not agree that all such facts are relevant.  For convenience, the facts are grouped by topic, but inclusion of a fact within one particular topic does not preclude that fact's relevance to other topics.  Moreover, the order and captioning of topics does not indicate agreement as to the order of trial or other scheduling issues, and the captions are to be used only for ease of reference.

**Background.**

11. Oakwood was a publicly held corporation that was in the manufactured housing business.  Oakwood was incorporated under the laws of North Carolina and had its principal place of business in Greensboro, North Carolina.

*DRAFT:  For discussion purposes only; not binding on any party*

12. The Oakwood Entities together were a vertically integrated manufactured housing company, which designed, manufactured, and sold mobile homes through their own retail distribution centers and through independent dealers.  The Oakwood Entities also provided financing to certain of their customers.

13. During the period between 2001-2002, the primary corporate officers of the Oakwood Entities were: (i) Myles E. Standish ("Standish"); (ii) Douglas R. Muir ("Muir"); (iii) Robert A. Smith ("Smith"); and (iv) Suzanne H. Wood ("Wood"; and together with Standish, Muir, and Smith, the "Oakwood Management").

14. During 2000 through 2002, Oakwood's board of directors consisted of:

| **2000** | **2001** | **2002** |
|---|---|---|
| Kermit G. Phillips, II | Kermit G. Phillips, II | Kermit G. Phillips, II |
| Clarence W. Walker | Clarence W. Walker | Clarence W. Walker |
| H. Michael Weaver | H. Michael Weaver | H. Michael Weaver |
| Francis T. Vincent, Jr. | Francis T. Vincent, Jr. | |
| Sabin C. Streeter | Sabin C. Streeter | Sabin C. Streeter |
| Dennis I. Meyer | Dennis I. Meyer | Dennis I. Meyer |
| Roger W. Schipke | Roger W. Schipke | |
| Duane D. Daggett | Duane D. Daggett | |
| Standish | Standish | Standish |
| Smith | Smith | Smith |

15. Defendant CSS provides a broad range of investment banking services, including (i) asset-backed securitization underwriting and (ii) restructuring and financial advisory services.

**The Oakwood Entities' Securitizations.**

*DRAFT: For discussion purposes only; not binding on any party*

16. A significant percentage of the manufactured housing units Oakwood sold were financed by installment sale contracts or loans arranged by the Oakwood Entities, each of which provided for monthly payments generally over a period of five to thirty years.

17. The Oakwood Entities generally retained a security interest in the manufactured homes they financed, with the related loans documented either as installment sales contacts or as traditional mortgages (collectively, "RICs").

18. The Oakwood Entities, at their retail sales operations and through various independent dealers (collectively, the "Retailers"), provided financing options to their customers through the Oakwood Acceptance Corporation, a debtor-affiliate of Oakwood ("OAC"). OAC originated certain RICs itself and also purchased on a non-recourse basis other RICs originated by the Retailers. OAC funded its ongoing originations and purchases of RICs by participating in public and private asset securitization transactions as generally described herein.

19. The Oakwood Entities' asset-backed securitizations would occur on an approximately quarterly basis, and typically included the pooling of a number of outstanding RICs, placement of the RICs into Real Estate Mortgage Investment Conduit ("REMIC") trusts, and the sale of interests in the REMIC trusts to public and private investors.

20. The securitization process would result in a descending series of levels or "tranches," many of which would be rated by an outside rating agency. The ratings for the rated tranches typically would range from investment grade to non-investment grade.

21. The lowest structured tranche of each series of securitizations was generally known as the "B-2" tranche.

22. In addition to the structured tranches, the securitizations would include a "residual" or "equity" tranche, which tranches were known as the "Class X" or "Class R" pieces.

*DRAFT:  For discussion purposes only; not binding on any party*

23. As part of the securitization process, OAC retained the contractual right to service all securitized RICs in exchange for a monthly fee.  As part of its servicing duties, certain pooling and servicing agreements required OAC to make principal and interest advances to certain securitization trusts.  OAC also was required to make recoverable advances to those trusts for reasonable and customary costs and expenses (including reasonable legal fees) incurred in the performance of OAC's servicing obligations.

24. The monthly fee and the other recoverable advances described in the prior paragraph were subordinated to certain other obligations.  Accordingly, OAC sometimes did not actually receive any fee or advance reimbursement.

25. From time to time the Oakwood Entities were unable to sell the B-2 tranches of particular securitizations, and those B-2 securities remained owned by the Oakwood Entities.

26. Oakwood guaranteed the full payment of principal and interest on certain B-2 securities created during certain securitizations.

27. In connection with the securitizations described above, Oakwood used certain investment banks to provide underwriting services.  Beginning in the early 1990s, the Oakwood Entities used Merrill Lynch as the securitization underwriter.  Beginning in 1996 and continuing through the Petition Date, CSS provided securitization underwriting services to Oakwood.  Merrill Lynch also participated as co-manager in certain of the Oakwood Entities' securitizations from 1996 through May 2002, but CSS was the lead manager for all such transactions.

28. The securitization-related services provided by CSS from time to time included the following: (i) analyzing and structuring the pools of receivables that would ultimately be securitized; (ii) marketing and placing the various tranches in each series of securitized receivables; (iii) testing the financial information contained in the securitization prospectuses;

*DRAFT:  For discussion purposes only; not binding on any party*

(iv) interfacing with the rating agencies regarding the securitization transactions; and (v) coordinating the closing process and post-closing follow-up tasks.

29. In exchange for its securitization underwriting services, CSS received an underwriting fee from the securitization proceeds calculated as a variable percentage of each tranche of a particular securitization.  These securitization underwriting fees were negotiated by Oakwood and CSS based upon Muir's knowledge of fees for similar transactions in the market, and it was Muir's understanding that the fees were usual and customary in the market for these types of transactions.

30. Between January 1, 2001 and the Petition Date, CSS received the following fees with respect to the following specified securitization transactions:

| **Date** | **Series** | **Size of the Series** | **Fee** |
|---|---|---|---|
| March 12, 2001 | 2001-B | $226,864,000 | $797,945.00 |
| May 30, 2001 | 2001-C | $159,371,000 | $785,149.00 |
| August 30, 2001 | 2001-D | $203,944,000 | $626,029.00 |
| December 7, 2001 | 2001-E | $159,215,000 | $525,836.00 |
| February 28, 2002 | 2002-A | $138,810,000 | $430,816.00 |
| May 31, 2002 | 2002-B | $220,956,000 | $731,421.00 |
| August 30, 2002 | 2002-C | $194,647,000 | $705,049.65 |
|  | **TOTAL** | **$1,303,807,000** | **$4,602,245.65** |

In each case, the fee was realized as a reduction in the proceeds payable to the respective securitization trust, a non-debtor.  Defendants believe that all pre-September 2001 fees are irrelevant; Plaintiff disagrees.

31. In connection with its securitization underwriting services, CSS received and reviewed certain information from OAC that was not otherwise public for the purpose of, among

*DRAFT: For discussion purposes only; not binding on any party*

other things, preparing disclosure materials for potential investors, including the historical loss experience of loans in the pool, prior repossession and foreclosure rates, and data about the credit quality of the underlying purchasers of the Oakwood Entities' products.

32. From approximately 1999 to the Petition Date, the Oakwood Entities' principal contact at CSS regarding the securitization underwriting services provided by CSS was Mr. Fiachra O'Driscoll ("O'Driscoll").

**Summary of Certain Credit Facilities and Oakwood Debt.**

    **A.**    **Revolving Facilities.**

33. Prior to 2001, Oakwood maintained a revolving credit facility through a syndicate of banks; the primary lender was First Union, now known as Wachovia. This credit facility was retired in January 2002. Defendants had no role with respect to this facility.

34. The Oakwood Entities obtained a new $65 million revolving credit facility (the "Prepetition Bank Facility") established under that certain Loan and Security Agreement dated as of January 22, 2002, by and among certain of the Oakwood Entities, as borrowers, Foothill Capital Corporation, as a lender and agent for the lenders ("Foothill"), and certain other lenders specified therein. Although considered and approved in December 2000 by Oakwood's board of directors, the Prepetition Bank Facility was not finalized and complete until summer 2001 and was not executed until January 2002. Defendants had no role with respect to this facility.

    **B.**    **Senior Notes.**

35. In 1999, Oakwood issued unsecured 7.875% Senior Notes in the aggregate principal amount of $125 million due March 2004, and unsecured 8.125% Senior Notes in the aggregate principal amount of $175 million due March 2009 pursuant to an Indenture and First Supplemental Indenture, both dated March 2, 1999, between Oakwood and Bank One, N.A.,

*DRAFT: For discussion purposes only; not binding on any party*

formerly known as The First National Bank of Chicago. U.S. Bank National Association was substituted as Indenture Trustee on January 10, 2000.

36. Bank of America Securities underwrote the 2004 and 2009 bonds. The Defendants were not involved in the issuance of either the 2004 or the 2009 bonds.

**The Loan Purchase Facility.**

37. Prior to 2001 the Oakwood Entities financed their initial originations of new RICs via a revolving "warehouse" facility with an affiliate of Bank of America ("BofA"). Although the original BofA facility was structured as a secured lending facility whereby funds advanced by BofA were secured by the underlying RICs the Oakwood Entities were financing, in the late 1990s the BofA facility was converted to a securitized credit facility or "loan purchase facility."

38. In or about mid-2000, BofA informed the Oakwood Entities that it no longer wished to provide its loan purchase facility on materially similar terms.

39. After being informed that BofA was unlikely to renew its facility, the Oakwood Entities attempted to locate a new source of temporary liquidity to fund their ongoing origination of RICs.

40. Following a series of discussions and negotiations, Defendant Credit Suisse, acting through its New York branch ("New York Branch") agreed to provide a three-year, $200,000,000 loan purchase facility (the "Loan Purchase Facility"). The Loan Purchase Facility closed in February 2001.

41. The Loan Purchase Facility was structured as a bankruptcy-remote, securitized credit facility. Under the Loan Purchase Facility, a special purpose trust – OMI Note Trust 2001-A – was created to purchase from OAC the RICs that were generated by manufactured housing sales. This trust generated funding to purchase the RICs by issuing secured notes to an affiliate of CSS.

*DRAFT: For discussion purposes only; not binding on any party*

42. As consideration for its provision of the Loan Purchase Facility, New York Branch received monthly interest payments, as well as a monthly fee of $416,666.67 (the "Monthly LPF Fee") from OMI Note Trust 2001-A. New York Branch received the Monthly LPF Fee in each month between March 2001 and the Petition Date – i.e., a total of twenty-one months of fees, or a sum of $8,750,000.07.

43. In connection with the Loan Purchase Facility, a CSS affiliate received a warrant to purchase 19.99% of Oakwood's common stock (the "Oakwood Warrant"). The Oakwood Warrant was exercisable from February 26, 2001 through February 26, 2009 at a price of $1.96875 per share.

44. The Oakwood Entities used the Loan Purchase Facility to obtain short-term liquidity to fund the origination of certain new RICs, before those receivables could be securitized. This funding under this facility provided the Oakwood Entities with liquidity to conduct their business operations.

45. If the Loan Purchase Facility had not been established or was not utilized, then the Oakwood Entities would have been unable to finance additional new RICs and generate operating liquidity.

**The "LOTUS" Transactions.**

46. During the second half of 2001 and the first half of 2002, the Oakwood Entities engaged in four transactions through which certain B-2 securities and "Class X" certificates previously held on the Oakwood Entities' books were sold in a "resecuritization" transaction to an affiliate of Berkshire Hathaway Inc. ("Berkshire"). These four transactions were generally known by the code name "LOTUS" (collectively, the "LOTUS Transactions").

47. In exchange for a note secured by the cash flows on the B-2 securities and Class X certificates, Berkshire paid a gross price equal to 55% of the par value of the B-2 securities.

*DRAFT: For discussion purposes only; not binding on any party*

48. In return for their sale of the B-2 securities and the associated guarantees, the Oakwood Entities received, in the aggregate, approximately $80,410,166.35 (or 53% of par).

49. CSS served as underwriter and placement agent for each of the four LOTUS Transactions.

50. In exchange for its services with respect to the LOTUS Transactions, CSS received a fee from the proceeds equal to 2% of the face amount of the B-2 securities sold to Berkshire (the "LOTUS Fees").

51. The details of the LOTUS Transactions and the LOTUS Fees are:

| **Date** | **Transaction** | **Principal Amount** | **Fee** |
|---|---|---|---|
| August 14, 2001 | LOTUS I | $111,117,295 | $2,222,346.00 |
| February 14, 2002 | LOTUS II | $17,292,000 | $345,840.00 |
| March 12, 2002 | LOTUS III | $8,993,000 | $179,860.00 |
| June 14, 2002 | LOTUS IV | $14,315,000 | $286,300.00 |
| | **TOTAL** | **$151,717,295** | **$3,034,346.00** |

Defendants believe that all pre-September 2001 fees are irrelevant; Plaintiff disagrees.

52. Mr. Mark D. Millard ("Millard") was the Berkshire employee who was principally involved with the LOTUS Transactions.

53. O'Driscoll and Mr. Thomas Connors ("Connors") were the CSS employees who were principally involved with the LOTUS Transactions.

54. The Oakwood board of directors considered and approved the LOTUS Transactions.

**The Servicer Advance Facility.**

55. In September 2001, CSS assisted the Oakwood Entities in structuring a $50,000,000 "servicer advance facility" with the Prudential Insurance Company (and certain of its affiliates) for the Oakwood Entities, which advance facility functioned to provide a temporary liquidity

*DRAFT:  For discussion purposes only; not binding on any party*

source for servicing costs that had to be advanced by OAC and other Oakwood entities with regard to existing REMIC trusts.  This facility was approved by Oakwood's board of directors.

56. As consideration for structuring the "servicer advance facility" and for placing the related notes, CSS received a fee of $250,000.00 from the proceeds of the transaction.

**The Loan Assumption Program.**

57. The Oakwood Entities, consistent with industry practice, historically used a loss mitigation technique generally referred to as a loan assumption program.

58. The loan assumption program was originally conceived as a method of reducing the number of repossessions recognized on a monthly basis, while also lowering the amount of losses incurred on a per-home basis.

59. The loan assumption program allowed a borrower or purchaser of a mobile home whose loan had become delinquent to arrange (either by itself or through the lender) for a third-party to assume the delinquent loan, thereby avoiding a complete default under the loan and a corresponding repossession of the underlying collateral.

60. Although the Oakwood Entities historically used a loan assumption program to some degree, in or about mid-2001 the Oakwood Entities began to use a variant of the program more extensively (the "LAP").  Oakwood's board of directors was generally aware of the use of a loan assumption program.

61. The Oakwood Management and Oakwood's board of directors chose to terminate the LAP as of June 30, 2002.

62. In July 2002, following the termination of the LAP, several Oakwood employees (Standish, Muir, and Smith), as well as representatives of Credit Suisse (Connors and O'Driscoll), prepared a presentation for, and traveled to Nebraska to meet with, Berkshire regarding (i) the effects of the LAP's discontinuation vis-à-vis the B-2 securities that Berkshire

*DRAFT: For discussion purposes only; not binding on any party*

held as a result of the LOTUS Transactions; and (ii) the state of the manufactured housing industry in general, and the Oakwood Entities' business in particular, at the time.

**The Financial Advisory Contract.**

63. On August 19, 2002, certain of the Debtors entered into a written agreement with CSS to provide restructuring and financial advisory services (the "RFA").

64. The restructuring and financial advisory services were provided by a team within CSS's restructuring group, which team included Mr. Jared C. Felt ("Felt").

65. In connection with this engagement, Oakwood made the following transfers to CSS:

| Date | Nature | Transfer |
|------|--------|----------|
| October 1, 2002 | August and September Retainer | $300,000.00 |
| October 15, 2002 | October Retainer and Expenses | $154,595.08 |
| November 1, 2002 | "Phase One Restructuring Transaction Fee" | $1,205,833.50 |
| November 15, 2002 | November Retainer and Expenses | $150,700.96 |
| | **TOTAL TRANSFERS** | **$1,811,129.54** |

66. On October 15, 2002, Standish, Muir, O'Driscoll, Felt, and Connors met with representatives of Berkshire, including Mr. Warren E. Buffett and Millard.

67. A restructuring proposal presented to Berkshire on October 15, 2002 was considered to be unacceptable and was rejected by Berkshire. Instead, Berkshire requested that the Oakwood Management attempt to sell the company.

*DRAFT:  For discussion purposes only; not binding on any party*

68. CSS and the Oakwood Entities treated the October 15, 2002 meeting with Berkshire as an "approach" for purposes of the RFA, and thus it was the basis for the November 1, 2002 transfer of $1,205,833.50 listed in the chart in paragraph 65.

**Andrew Davidson & Co.**

69. As the Debtors approached bankruptcy, they desired to obtain an independent, third-party valuation of Oakwood's liability under its guarantees of certain B-2 securitization tranches, including those B-2 securities which were included in the LOTUS Transactions.  Toward that end, CSS suggested, and Oakwood retained, Andrew Davidson & Co., Inc. ("Andrew Davidson"), an appraiser of asset-backed and mortgage-backed securities, to perform this analysis.

70. Employees of the Oakwood Entities and CSS, including Muir and O'Driscoll, assisted Andrew Davidson with its analysis of the guaranty claims related to the B-2 securities and the LOTUS Transactions.

**The Bankruptcy Filing.**

71. On the evening of November 15, 2002, Berkshire signed a "non-binding letter of intent" relating to a proposed restructuring plan (the "BH Term Sheet").

72. Thereafter on November 15, 2002 (the "Petition Date"), certain of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The remaining Debtors filed for chapter 11 protection on March 5, 2004.

73. One condition in the BH Term Sheet was that the Debtors obtain acceptable financing during their bankruptcy proceeding.

74. The filing of a bankruptcy petition was an event of default under the Loan Purchase Facility, which led to the automatic termination of that facility by its own terms.  Accordingly, it was necessary for the Oakwood Entities to obtain a "waiver" of this event of default from New

York Branch if the Oakwood Entities were to have access to the Loan Purchase Facility after the Petition Date.

75. As of the Petition Date, the Oakwood Entities did not have a committed DIP financing facility, nor had they received a "waiver" of the event of default under the Loan Purchase Facility. Both a DIP facility and a "waiver" of default under the Loan Purchase Facility were secured by November 27, 2002.

**Post-Petition Events.**

76. On November 18, 2002, Oakwood and its affiliated debtors filed the "Debtors' Motion Pursuant to §§ 365 and/or 363 of the Bankruptcy Code for Authority for Oakwood Acceptance Corporation to (I) Assume and Assign Servicing Agreements and Related Advance Receivables to, and Enter into Subservicing Agreement with, an Affiliate or, in the Alternative, (II) Reject Servicing Agreements" (the "Assumption Motion" [Bankr. Docket No. 20]). In the Assumption Motion, the Debtors requested authority pursuant to sections 365 and/or 363 of the Bankruptcy Code to assume certain pooling and servicing agreements associated with Oakwood's prior securitizations and the Loan Purchase Facility and to assign certain servicing rights and obligations to a new subsidiary. Specifically with respect to the Loan Purchase Facility, Oakwood sought to assume the Sale and Servicing Agreement, dated as of February 9, 2001 (the "SSA"). No Credit Suisse entity was a party to the SSA.

77. Following a hearing and amendments to the proposed order concerning the Assumption Motion, and the filing of relevant documentation to effect the assumption and assignment of rights, the Bankruptcy Court entered an order that OAC was authorized to assume the SSA pursuant to Bankruptcy Code section 365. [*See* Bankr. Docket Nos. 228 & 298.]

78. Also on November 19, 2002, Oakwood filed the "Debtors Motion for Authority to (i) Honor Certain Pre-Petition Servicing and Related Obligations, (ii) Continue Securitizing

*DRAFT: For discussion purposes only; not binding on any party*

Advance Reimbursement Rights in the Ordinary Course of Business, (iii) Continue Funding and Purchasing Retail Installment Sales contracts and Other Loans Originated by the Debtors in the Ordinary Course of Business, and (iv) Continue Securitizing such Contracts and Loans in the Ordinary Course of Business" (the "Ordinary Course Motion" [Bankr. Docket No. 21]).  In the Ordinary Course Motion, among other relief, Oakwood requested the authority to "continue securitizing all RICs acquired by OAC by selling them . . . ultimately to the Warehouse Trust in the ordinary course of OAC's business and substantially in accordance with the Warehouse Facility Agreements, and . . . engaging in such other and further securitization-related activities as are within the ordinary course of Debtors' businesses."

79.    Following consideration of the Ordinary Course Motion and a hearing, the Bankruptcy Court granted the Oakwood Entities authority to continue to engage in certain securitization-related transactions.  [*See* Bankr. Docket Nos. 41 & 86.]  Notwithstanding this authorization, the Oakwood Entities did not actually complete any securitizations after the Petition Date.

80.    By order entered on March 31, 2004, the Bankruptcy Court confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors in Possession" (the "Plan").  [*See* Bankr. Docket No. 3937.]  The Plan became effective as to all but one of the Debtors on April 13, 2004, and for the remaining Debtor on April 27, 2004.

81.    Pursuant to the Plan, the Debtors' remaining operating assets, subject to certain exceptions, were sold to Clayton Homes, Inc., a Berkshire subsidiary, for approximately $373 million, subject to certain offsets, and the Trust was created to wind-down the Debtors' estates.

*DRAFT: For discussion purposes only; not binding on any party*

82. Alvarez & Marsal LLP is the duly appointed trustee of the Trust. Matthew E. Kvarda ("Kvarda") is the Alvarez & Marsal LLP employee who is principally responsible for winding-up the affairs of the Trust.

## IV.    DISPUTED ISSUES OF FACT TO BE LITIGATED

83. The following constitute factual propositions that are disputed by one of the parties to the Proceeding and must be litigated at trial. If any such issues are found to be mixed issues of law and fact, or issues of law, then they should be considered as such.

**For the Plaintiff:**

84. **Note**: In this section the Trust uses the term "Credit Suisse" to mean, collectively, all defendants. The Defendants contest the use of this term.

85. Are Defendants each part of the global financial services firm now known as the Credit Suisse Group?

86. In 1999-2001, did New York Branch consider several proposed credit transactions with the Oakwood Entities, including a $50,000,000 repurchase facility and a $75,000,000 reverse repurchase facility, and were both proposed facilities ultimately declined?

87. Were the credit proposals made with respect to the Oakwood Entities reviewed and analyzed by New York Branch's Credit Risk Management department ("CRM")?

88. Were the principal CRM personnel involved with the several Oakwood-related credit proposals, including the approved Loan Purchase Facility, Messrs. James Xanthos ("Xanthos") and Thomas P. Irwin ("Irwin")?

89. In addition to the Monthly LPF Fee, did New York Branch receive an additional, upfront fee of $2,500,000.00 upon the closing of the Loan Purchase Facility?

90. Is it correct that among the eligibility criteria for financing through the Loan Purchase Facility was the requirement that no more than 17.5% of any given pool of receivables could

*DRAFT:  For discussion purposes only; not binding on any party*

take the form of receivables generated by the Oakwood Entities' resale of repossessed properties ("Repo Refis")?

91. After requests from the Oakwood Entities in the summer of 2001 and the spring of 2002, did New York Branch agree to amend the eligibility requirements in the Loan Purchase Facility so that a larger percentage of receivables could be in the form of Repo Refis?

92. Were Xanthos and Irwin the principal members of CRM who were responsible for the evaluation of any proposed "waiver" of defaults under the Loan Purchase Facility, and/or the creation of a new, post-petition loan purchase facility in November 2002?  Did they do so?

93. Were the Debtors insolvent at all relevant times, and what was the extent of their insolvency?

94. Were the Debtors sufficiently insolvent as of September 2001, and at all relevant times thereafter, such that the prospects of a return to solvency were minimal?

95. If the Debtors were sufficiently insolvent as of September 2001, and at all relevant times thereafter, such that the prospects of a return to solvency were minimal, should Credit Suisse reasonably have been aware of that fact?

96. Was there a relationship of trust, confidence, or loyalty between the Oakwood Entities and Credit Suisse in 2001-2002?

97. Did Credit Suisse possess superior knowledge, information, or expertise about the many financial transactions they structured for the Oakwood Entities?

98. Did the Oakwood Management reasonably rely on Credit Suisse to fully investigate and advise the Oakwood Management about, and to act in the Debtors' best interests regarding, the many complex financial transactions that permeated the parties' relationship?

*DRAFT: For discussion purposes only; not binding on any party*

99. Did the Oakwood Entities provide Credit Suisse with material non-public information unrelated to the receivables that were part of the securitization program and/or within the scope of the Loan Purchase Facility?

100.    Based upon the multiplicity of positions occupied by Credit Suisse and their affiliates – including as underwriter, de facto lender, financial advisor, and holder of a warrant for nearly 20% of Oakwood's equity – did the relationship between Credit Suisse and the Debtors advance beyond a mere arms-length business relationship?

101.    Did Credit Suisse have a fiduciary relationship with the Oakwood Entities?

102.    Was Credit Suisse an "insider" of the Oakwood Entities?

103.    Did the Oakwood Management reasonably rely on Credit Suisse for financial advice prior to August 19, 2002?

104.    Did Credit Suisse affirmatively undertake the duty to act for, or to give financial advice for, the Oakwood Entities' benefit prior to August 19, 2002?

105.    Did Credit Suisse actually provide the Oakwood Entities with financial advice in 2001-2002 that was not the subject of any express contract between the parties?

106.    Did Credit Suisse provide any such financial advice negligently or otherwise breach their duties in connection with providing any such financial advice?

107.    Did any breach of any non-contractual duty to provide financial advice by Credit Suisse proximately cause damages to the Debtors and/or benefit Credit Suisse?

108.    Were substantial losses to the Debtors resulting from the Oakwood Entities' continuing use of securitization transactions, use of the Loan Purchase Facility, and/or participation in the LOTUS Transactions a reasonably foreseeable outcome for a party in the same position as Credit Suisse?

*DRAFT: For discussion purposes only; not binding on any party*

109.    Did Credit Suisse ever separately consider or analyze (i) the net effect of the Oakwood Entities' securitization program on the Oakwood Entities' long-term ability to pay their just debts or (ii) Oakwood's ability to satisfy the B-2 guarantees that were created in conjunction with certain securitizations?

110.    Did Credit Suisse ever advise the Oakwood Management or Oakwood's board of directors that the Oakwood Entities' continued use of the securitization program was not in the best interests of the company and/or its creditors?

111.    Did any failure by Credit Suisse to investigate and advise regarding the effects of continued securitizations and guarantees of B-2 securities proximately cause damages to the Debtors and/or benefit Credit Suisse?

112.    Should Credit Suisse reasonably have been aware of the effects of the Oakwood Entities' participation in the LOTUS Transactions?

113.    Did Credit Suisse ever separately consider or analyze (i) the net effect of the LOTUS Transactions on the Oakwood Entities' long-term ability to pay their just debts or (ii) Oakwood's ability to satisfy the liabilities that were created in conjunction with each of the LOTUS Transactions?

114.    Did Credit Suisse ever advise the Oakwood Management or Oakwood's board of directors that the Oakwood Entities' participation in the LOTUS Transactions was not in the best interests of the company and/or its creditors?

115.    Did any failure by Credit Suisse to investigate and advise regarding the effects of the LOTUS Transactions proximately cause damages to the Debtors and/or benefit Credit Suisse?

*DRAFT: For discussion purposes only; not binding on any party*

116.    Should Credit Suisse reasonably have been aware of the effects of the Oakwood Entities' use of the LAP?

117.    Did Credit Suisse ever separately consider or analyze the net effect of the LAP on the Oakwood Entities' long-term ability to pay their just debts?

118.    Did Credit Suisse ever advise the Oakwood Management or Oakwood's board of directors that the Oakwood Entities' participation in the LAP was not in the best interests of the company and/or its creditors?

119.    Did Credit Suisse behave in a reasonable or reasonably prudent manner with respect to the various "services" provided to the Oakwood Entities in 2001-2002?

120.    Did any failure by Credit Suisse to behave in a reasonable or reasonably prudent manner with respect to the various "services" provided to the Oakwood Entities in 2001-2002 proximately cause damages to the Debtors and/or benefit Credit Suisse?

121.    Did Credit Suisse behave in manner consistent with their own compliance manuals with respect to the various "services" provided to the Oakwood Entities in 2001-2002?

122.    Did any failure by Credit Suisse to behave in manner consistent with their own compliance manuals with respect to the various "services" provided to the Oakwood Entities in 2001-2002 proximately cause damages to the Debtors and/or benefit Credit Suisse?

123.    Did Credit Suisse have financial incentives to keep the Oakwood Entities operating and to delay recommending that Oakwood stop operating on a "business as usual" basis?

124.    Did Credit Suisse behave in a self-dealing manner by elevating their own interests above the Oakwood Entities' interests?

*DRAFT:  For discussion purposes only; not binding on any party*

125.    Did Credit Suisse's breaches of a fiduciary duty, breaches of an implied advisory contract, and/or negligence constitute a substantial factor contributing to Credit Suisse's receipt of any or all of the fees listed in paragraphs 30, 42, 51, 56, 65, and 89?

126.    To the extent that Oakwood Entities could be said to have "participated" in any of the malfeasance in which Credit Suisse engaged for purposes of the *in pari delicto* doctrine, and to the extent that Credit Suisse is not precluded from taking advantage of that doctrine because they were "insiders" or otherwise, what is the relative allocation of responsibility and culpability as between the parties?

127.    Did the RFA obligate Credit Suisse to use their best efforts to procure a DIP financing facility and/or a post-petition "warehouse" or "loan purchase" facility prior to the Petition Date?

128.    Did Credit Suisse have an independent, non-contractual duty to use their best efforts to procure a DIP financing facility and/or a post-petition "warehouse" or "loan purchase" facility prior to the Petition Date?

129.    Did Credit Suisse take all reasonable steps to procure a DIP financing facility and/or a post-petition "warehouse" or "loan purchase" facility prior to the Petition Date?

130.    Did any failure by Credit Suisse to use their best efforts to procure a DIP financing facility and/or a post-petition "warehouse" or "loan purchase" facility prior to the Petition Date breach the RFA?

131.    Did any failure by Credit Suisse to use their best efforts to procure a DIP financing facility and/or a post-petition "warehouse" or "loan purchase" facility prior to the Petition Date proximately cause damages to the Debtors and/or benefit Credit Suisse?

*DRAFT:  For discussion purposes only; not binding on any party*

132.    Did Credit Suisse lead the Oakwood Management to believe that a "waiver" of any defaults in the Loan Purchase Facility would be obtained prior to the Petition Date?

133.    Did Credit Suisse misrepresent the fact that they would obtain an immediate "waiver" of any defaults in the Loan Purchase Facility?

134.    Did any misrepresentations by Credit Suisse about a "waiver" of any defaults in the Loan Purchase Facility proximately cause damages to the Debtors and/or benefit Credit Suisse?

135.    Did the condition in the BH Term Sheet that the Debtors obtain acceptable financing during their bankruptcy proceeding mean that Berkshire insisted on Oakwood's access to (i) a DIP financing facility and (ii) a post-petition loan purchase or "warehouse" facility?

136.    Did Credit Suisse mislead Berkshire that a committed DIP financing facility and/or a post-petition "loan purchase" or "warehouse" facility had been finalized in order to induce Berkshire into executing the BH Term Sheet?

137.    Did Berkshire's execution of the non-binding BH Term Sheet satisfy the terms of the RFA such that the "phase two" restructuring fee was due and owing on the Petition Date?

138.    Did CSS contribute in any way to the Plan?

139.    Is CSS entitled to any additional compensation under the terms of the RFA?

140.    Did CSS engage in inequitable conduct?

141.    Did any inequitable conduct by CSS damage the Debtors' other creditors or confer an unfair advantage on CSS?

142.    Did the Debtors receive "less than a reasonably equivalent value" in exchange for any of the transfers listed in paragraph 65?

*DRAFT: For discussion purposes only; not binding on any party*

143.    To the extent that the Debtors received any value in exchange for any of the transfers listed in paragraph 65, did CSS take such transfers in "good faith"?

144.    Were any of the transfers listed in paragraph 65 transfers of an interest of the Debtors in property?

145.    Were any of the transfers listed in paragraph 65 made for or on account of an antecedent debt?

146.    Did any of the transfers listed in paragraph 65 enable CSS to receive more than CSS would have received in a hypothetical chapter 7 case if the transfers had not been made?

147.    Did Credit Suisse represent that, or behave as if, the various Credit Suisse entities performing services or otherwise interacting with the Oakwood Entities were doing so, in effect, as a single entity?

**For the Defendants:**

148.    During 2000 through 2002, Oakwood's operations and strategic planning were directed by experienced senior management and a sophisticated outside board of directors. Credit Suisse did not direct, control, or otherwise unduly influence Oakwood's strategy or operations.

149.    Credit Suisse was hired by Oakwood to provide securitization underwriting services and it performed this work for Oakwood properly and well. Oakwood's senior management and board of directors considered and approved of the securitization transactions as a method to generate liquidity. CSS was compensated for its securitization underwriting services through an underwriting fee that was deducted from the proceeds of an offering before the proceeds were paid to a non-debtor trust. Oakwood did not pay CSS additional fees for securitization underwriting services.

*DRAFT:  For discussion purposes only; not binding on any party*

150.    During the period 2001 and 2002, Oakwood encountered financial difficulties similar to those of its competitors, as a result of problems in the manufactured housing industry and the economy in general.  Oakwood's financial problems and risks were well known to its management and board, and indeed were widely discussed by public investment analysts.

151.    Oakwood had relationships with a variety of banks and had access to any type of advice and analysis it required.

152.    As Oakwood tried to overcome the financial challenges it faced, Credit Suisse stood by it loyally, continuing to provide its expertise in securitization transactions in support of the strategy adopted by the company's management and board of directors.  Credit Suisse did not, in its continued provision of these services, provide any advice or services that was detrimental to Oakwood.  Likewise, Credit Suisse exercised reasonable care in carrying out its work for Oakwood; its performance of these obligations met Oakwood's needs and expectations.

153.    In 2000, following Bank of America's decision to withdraw its securitized credit facility, Oakwood requested that CSS assist in securing a new facility.  CSS assisted in the arrangement of a new securitized credit facility provided by an affiliate of CSS (the "Loan Purchase Facility").  The Loan Purchase Facility provided that payment of a program fee, and all principal and interest payments were paid by the non-debtor trust established by the facility.  Oakwood did not pay fees on the Loan Purchase Facility.  Oakwood sought and obtained the Bankruptcy Court's approval to assume the Loan Purchase Facility and its related agreements in the Oakwood bankruptcy proceedings.

154.    At Oakwood's request in 2001, Credit Suisse assisted Oakwood in structuring the Lotus transaction, which provided Oakwood with much-needed liquidity.  Oakwood's board of directors duly considered and approved the Lotus transaction.  Similar to its fees associated with

*DRAFT: For discussion purposes only; not binding on any party*

other Oakwood securitization offerings, CSS retained an agreed underwriting fee from the proceeds of the Lotus transaction offerings. CSS was not paid additional fees by Oakwood for its assistance in the Lotus transactions. The fees received by CSS for its role in structuring the Lotus transaction on behalf of Oakwood were reasonable and customary.

155.    During 2001 through August 2002, Credit Suisse was not obligated to provide services to Oakwood beyond those called for in its underwriting agreements. Beginning in 2001, Credit Suisse repeatedly suggested to Oakwood that it should hire Credit Suisse to provide it with more general financial advice with respect to its overall business strategy, but Oakwood repeatedly declined to do so, until August 2002. Oakwood did not request additional financial advisory services until August 2002, when Oakwood formally engaged CSS's restructuring group to provide restructuring services.

156.    CSS did not enter into a contract, express or implied, to provide any restructuring or financial advisory services to Oakwood until August 19, 2002 when the parties signed a contract for the provision of restructuring services. (the "August 2002 Contract.") CSS performed its obligations under the August 2002 Contract in a competent fashion.

## V.    DISPUTED ISSUES OF LAW TO BE LITIGATED

157.    The following issues constitute legal propositions that are disputed by the parties. If any such issues are found to be mixed issues of fact and law, or issues of fact, then they should be considered as such.

**For the Plaintiff:**

158.    The Trust believes the following issues of law are disputed and must be decided or otherwise resolved before or at trial.

159.    **Note**: In this section, the Trust again uses the term "Credit Suisse" to mean, collectively, all defendants. The Defendants contest the use of this term.

26

*DRAFT:  For discussion purposes only; not binding on any party*

160.    **Defendants' General Objections:**  Defendants object to Plaintiff's aggregation of separate Credit Suisse legal entities into a single Defendant.  As Plaintiff has made no veil piercing or alter-ego allegations, Plaintiff must prove all elements of each of its causes of action against each named Defendant.

161.    **Choice-of-law**:  What state's substantive law should apply to any issues that require reference to a body of non-bankruptcy law?

**Plaintiff's Position and Authorities**

Pursuant to the "most significant relationship" test contained in sections 6 and 145 of the Restatement (Second) of Conflict of Laws – which is used by Delaware's courts and should thus be used here, *see Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 358-59 (3d Cir. 2007) – New York state plainly has the "most significant relationship" to the Proceeding.  As admitted by the Defendants in their motion to dismiss the Objection/Counterclaims:

> Given the presence and business of all named U.S. Defendants in New York, the presence of a New York choice of law clause each agreement governing the relationships among the parties, and the absence of any substantive allegations relating to any jurisdiction other than New York, New York law applies to the . . . state law claims . . . .

[Adv. Proc. Docket No. 22 at p. 28.]  The Defendants' prior analysis is further buttressed by the facts that (i) the vast majority of the misconduct underlying the Proceeding stems from actions or inactions by Credit Suisse employees in New York City and (ii) the relationship between Credit Suisse and the Oakwood Entities was centered in New York.  Consequently, the choice-of-law analysis requires reference to New York law as the applicable body of non-bankruptcy law.  Notwithstanding any suggestions to the contrary by the Defendants, this same analysis applies to Plaintiff's breach of fiduciary duty claim.  *See, e.g.*, *Huber v. Taylor*, 469 F.3d 67 (3d Cir. 2006) (in action for breach of fiduciary duty, court applied "most significant relationship" test and

27

*DRAFT: For discussion purposes only; not binding on any party*

concluded that it required application of the law of the state in which the fiduciary was located and performed the actions giving rise to the plaintiffs' claims for breach).

**Defendants' Position and Authorities**

Defendants agree that New York law governs common-law-based claims and defenses.

Defendants contend that, insofar as the nature and extent of the fiduciary duties of Oakwood's board of directors are relevant, North Carolina law governs that aspect of the case as Oakwood was a corporation organized under the laws of North Carolina.

162.    Was Credit Suisse an "insider" of the Debtors?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that the multitude of roles occupied by Credit Suisse, as well as the full extent of the parties' history, led the parties' relationship to advance well beyond an arms-length commercial relationship, and instead become one that merits heightened scrutiny. *See, e.g.*, 11 U.S.C. § 101(31); S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5819, 6269; *Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist LEXIS 25642, at *109-12 (S.D. Tex. Mar. 31, 2008); *Lucent Techs., Inc. v. Shubert (In re Winstar Commc'ns, Inc.)*, No. 06-147, 2007 WL 12332185, at *2-3 (D. Del. Apr. 26, 2007); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005); *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292, 297-300 (D. Md. 1997); *Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 261-66 (Bankr. S.D.N.Y. 2002); *Schreiber v. Emerson (In re Emerson)*, 244 B.R. 1, 31-34 (Bankr. D.N.H. 1999); *In re Locke Mill Partners*, 178 B.R. 697, 700-02 (Bankr. M.D.N.C. 1995); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 297-99 (Bankr. W.D. Pa. 1990).

**Defendants' Position and Authorities**

*DRAFT: For discussion purposes only; not binding on any party*

Defendants object insofar as insider status is primarily a question of fact rather than a question of law. To the extent insider status is a legal question, Defendants do not satisfy the statutory criteria for insider status under the Bankruptcy Code, nor any other standard for insider status however derived. Moreover, given the nature of claims and defenses here, insider status has no application to any issues in this case.

163.    Did Credit Suisse owe the Debtors a duty of care for purposes of the negligence doctrine?

**Plaintiff's Position and Authorities**

Yes; the relationship between the parties, as well as Credit Suisse's affirmative decision to undertake actions and provide services and advice that they otherwise may have had no legal duty to provide, gave rise to an duty of reasonable care. *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469-70 (2d Cir. 1995); *Breeden v. Generali U.S. Branch (In re Bennett Funding Group)*, No. 96-70196, 1997 Bankr. LEXIS 2366, at *57-59 (Bankr. N.D.N.Y. Dec. 19, 1997); *Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*, 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996); *Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 579, 585-87 (1994); *Parvi v. Kingston*, 41 N.Y.2d 553, 559-60 (1977).

**Defendants' Position and Authorities**

This is a question for the Court rather than a jury to decide. It is Plaintiff's burden to establish the existence, nature, and duration of any alleged fiduciary duty on the part of any of the Defendants, and for the Court to instruct the jury as to any such duty and its scope. *Weigand v. Univ. Hosp. of N.Y. Univ. Med. Ctr.*, 659 N.Y.S.2d 395, 397 (Sup. Ct. 1997)*; De Angelis v. Lutheran Med. Ctr.*, 462 N.Y.S.2d 626 (1983). Defendants' relationships, if any, with Oakwood were grounded in contracts, whether expressly providing for services, or documenting transactions arranged by Credit Suisse. Where the parties' relationship is grounded in

agreements, extra-contractual duties are not imposed on that relationship. *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987); *TD Waterhouse Investors Servs., Inc. v. Integrated Fund Servs., Inc.*, No. 01 Civ. 8986, 2003 WL 42013 (S.D.N.Y. Jan. 6, 2003).

164.    In the event that Credit Suisse owed the Debtors a duty of care, did Credit Suisse breach that duty?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that Credit Suisse's conduct was not reasonable or prudent under the circumstances, was inconsistent with the customs and practices of the relevant industry, violated the standard of care used in the relevant industry, and was at odds with Credit Suisse's internal policy manuals. *See, e.g., Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469-70 (2d Cir. 1995); *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir. 1981); *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 709 (S.D.W. Va. 2007); *Colo. Capital v. Owens*, 227 F.R.D. 181, 187 (E.D.N.Y. 2005); *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 385-88 (1980).

**Defendants' Position and Authorities**

Breach of a duty of care is factual issue for the trier of fact to resolve, based upon evidence of an appropriate standard of care.

165.    Did Credit Suisse occupy a fiduciary relationship vis-à-vis the Debtors such that fiduciary duties arose for Credit Suisse?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that the relationship between the parties was sufficiently close that it gave rise to fiduciary duties of care and loyalty on Credit Suisse's part. *See, e.g., Lumbermens Mut. Cas. Co. v. Franey Muha Alliant*

*DRAFT: For discussion purposes only; not binding on any party*

*Ins. Servs.*, 388 F. Supp. 2d 292, 305-06 (S.D.N.Y. 2005); *Scott v. Dime Sav. Bank of N.Y., FSB*,

886 F. Supp. 1073, 1078 (S.D.N.Y. 1995); *McCory v. Goldberg*, 810 F. Supp. 539, 548

(S.D.N.Y. 1993); *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 25 (S.D.N.Y. 1985); *EBC I, Inc. v.*

*Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-22 (2005); *Pergament v. Roach*, 838 N.Y.S.2d 591, 593-

94 (N.Y. App. Div. 2007); *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77,

79-81 (N.Y. App. Div. 2005); *Frydman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d

77, 79 (N.Y. App. Div. 2000); *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13-15 (N.Y.

App. Div. 1998); *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281-83 (N.Y.

App. Div. 1988); RESTATEMENT (SECOND) OF TORTS § 874, cmt. a, cmt. b. (1979).

**Defendants' Position and Authorities**

Plaintiff asserts that one or more of the Defendants had a fiduciary duty to Oakwood in

connection with all activities associated with Oakwood at the relevant times; Defendants dispute

that assertion. This is a question for the Court rather than a jury to decide. It is Plaintiff's burden

to establish the existence, nature, and duration of any alleged fiduciary duty on the part of any of

the Defendants, and for the Court to instruct the jury as to any such duty and its scope. *Weigand*

*v. Univ. Hosp. of N.Y. Univ. Med. Ctr.*, 659 N.Y.S.2d 395, 397 (Sup. Ct. 1997)*; De Angelis v.*

*Lutheran Med. Ctr.*, 462 N.Y.S.2d 626 (1983). Defendants further object that the cited cases do

not support any fiduciary duty on the part of Credit Suisse. A fiduciary duty arises under New

York law wherever one person is under a duty to act for or give advice for the benefit of another

upon matters within the scope of the relation. New York law recognizes no general fiduciary

duty as between a bank and its creditor, or an underwriter and issuer. During 2001 and 2002,

and following its bankruptcy, Oakwood used the securitization services of CSS, for which CSS

earned agreed fees in connection with ABS securitizations and the loan purchase facility.

31

Commencing August 15, 2002, Oakwood retained CSS as its financial advisor pursuant to the RFA. Each of these relationships was carefully delineated and gave rise to no generalized fiduciary duty to Oakwood as Plaintiff claims. *Flickinger v. Harold Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 122 (2d Cir. 1984); *HF Mgmt. Servs. LLC v. Pistone*, 34 A.D.3d 82, 84 818 N.Y.S.2d 40, 42 (1st Dep't 2006; *Village on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996); *Compania Sud-Americana v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992); *Argonaut P'ship L.P. v. Bankers Tr. Co. Ltd.*, 96 Civ. 1970, 2001 U.S. Dist. LEXIS 7100, at *9 (S.D.N.Y. May 30, 2001); *Sumitomo Corp. v. Chase Manhattan*, 99 Civ. 4004, 2000 U.S. Dist. LEXIS 15707, at *8-9 (S.D.N.Y. Oct. 30, 2000); *Prestancia Mgmt Group., Inc. v. Virginia Heritage Found., II LLC*, No. Civ A. 1032-S, 2005 WL 1364616, at *5 (Del. Ch. May 27, 2005); *HF Mgmt. Servs. LLC v. Pistone*, 34 A.D.3d 82, 84 818 N.Y.S.2d 40, 42 (App Div. 2006); *EBC I Inc. v. Goldman, Sachs & Co.,* 832 N.E.2d 26, 31 (N.Y. 2005).

166.    Assuming Credit Suisse owed the Debtors fiduciary duties, did Credit Suisse breach the duty of care?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that, as discussed above, Credit Suisse's conduct fell well below the standard of care applied in the negligence context, let alone the more heightened standard that must be used by corporate fiduciaries. *See also, e.g.*, *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273-77 (2d Cir. 1986); *Colo. Capital v. Owens*, 227 F.R.D. 181, 189 (E.D.N.Y. 2005); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.)*, 353 B.R. 324, 339-43 (Bankr. D.D.C. 2006).

**Defendants' Position and Authorities**

Breach of a fiduciary duty is a factual issue for the trier of fact to resolve.

*DRAFT: For discussion purposes only; not binding on any party*

167.    Assuming Credit Suisse owed the Debtors fiduciary duties, did Credit Suisse breach the duty of loyalty?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that Credit Suisse engaged in a consistent course of self-dealing intended to enrich themselves without due consideration of whether the proposed transactions were harmful to the Debtors. Likewise, Credit Suisse consistently profited while breaching the duty of care.  *See, e.g.*, *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.)*, 353 B.R. 324, 344-49 (Bankr. D.D.C. 2006); *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989); *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569-73 (1984); *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928); *Flaum v. Birnbaum*, 508 N.Y.S.2d 115, 122 (N.Y. App. Div. 1986); *Foley v. D'Agostino*, 248 N.Y.S.2d 121, 128 (N.Y. App. Div. 1964); *Lippman v. Shaffer*, 836 N.Y.S.2d 766, 778-79 (N.Y. Sup. Ct. 2006).

**Defendants' Position and Authorities**

Breach of a duty of loyalty is a factual issue for the trier of fact to resolve.

168.    Was there an implied advisory contract between Credit Suisse and the Oakwood Entities prior to August 19, 2002?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that the course of dealing between the parties establishes the existence of a relationship akin to an implied contract that gave rise to a duty to provide reasonable financial advice on the part of Credit Suisse.  *See, e.g.*, *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923); *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-04 (1975); *In re Boice*, 640 N.Y.S.2d 681, 682-83 (N.Y. App. Div. 1996); *Mirchel v. RMJ Sec. Corp.*, 613 N.Y.S.2d 876, 878 (N.Y. App. Div. 1994).

*DRAFT: For discussion purposes only; not binding on any party*

**Defendants' Position and Authorities**

The existence of an implied contract is a factual issue for the trier of fact to resolve.

169.    If there was an implied advisory relationship akin to an implied contract between Credit Suisse and the Oakwood Entities prior to August 19, 2002, did Credit Suisse breach it?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that, as discussed above, the advisory services provided by Credit Suisse prior to August 19, 2002 were completely unreasonable and inadequate under the circumstances.

**Defendants' Position and Authorities**

Breach of an implied contract is a factual issue for the trier of fact to resolve.

170.    Did any negligence, breach of fiduciary duty, or breach of implied contract proximately cause damages to the Debtors?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that Credit Suisse's conduct directly caused at least $50,000,000 of harm to the Debtors, and that such injury was the reasonably foreseeable result of Credit Suisse's conduct. *See, e.g.*, *Bear Stearns & Co. v. Daisy Sys. Corp. (In re Daisy Sys. Corp.)*, 97 F.3d 1171, 1176-77 (9th Cir. 1996); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995); *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 710-14, 725-29 (S.D.W. Va. 2007); *Colo. Capital v. Owens*, 227 F.R.D. 181, 189-90 (E.D.N.Y. 2005); *Mauney v. Boyle*, 865 F. Supp. 142, 147-48 (S.D.N.Y. 1994); *Comeau v. Rupp*, 810 F. Supp. 1127, 1143-44 (D. Kan. 1992); *Bell v. N.Y. City Health & Hosps. Corp.*, 456 N.Y.S.2d 787, 796-97 (N.Y. App. Div. 1982); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 186-88 (Tex. Ct. App. 1987).

**Defendants' Position and Authorities**

*DRAFT: For discussion purposes only; not binding on any party*

Proximate cause is a factual issue for the trier of fact to resolve. Defendants, however, assert that no damages experienced by Oakwood were directly and proximately caused by any action or inaction on the part of CSS; Plaintiff's theory of damages is too speculative as a matter of law. *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 2008 WL 423451 (N.Y. 2008); *Kurtzman v. Bergstol,* 835 N.Y.S.2d 644, 646 (App. Div. 2007); *Wai Ming Ng v. Tow*, 688 N.Y.S.2d 647, 649 (2 Dept. 1999); *R.M. Newell Co. v. Rice,* 653 N.Y.S.2d 1004 (App. Div. 1997); *Kenford Co. v. County of Erie*, 493 N.E.2d 234, 235 (1986); *Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000); *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *Semi-Tech Litigation, LLC v. Bankers Trust Co.,* 353 F. Supp.2d 460 (S.D.N.Y. 2005), *aff'd*, 450 F.3d 121 (2d Cir. 2006); *T. Frederick Jackson, Inc. v. Pepper Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.),* No. 98-140-SLR, 2000 WL 376398 (D. Del. March 28, 2000); *W. Page Keeton et al., Prosser and Keeton on Torts* § 41, at 263 (5th ed.1984).

171.    Did any breaches of fiduciary duty, breaches of an implied advisory contract, and/or negligence constitute a substantial factor contributing to Credit Suisse's receipt of any or all of the fees they received in 2001-2002?

**Plaintiff's Position and Authorities**

Yes; although this is primarily a factual question for the jury, the evidence demonstrates that the lower standard of causation applicable to claims seeking recovery of ill-gotten gains applies here insofar as Credit Suisse would not have received such fees absent the breaches of duty. *See, e.g.*, *LNC Inv., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 464-66 (2d Cir. 1999); *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 542-44 (2d Cir. 1994); *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 304 (S.D.N.Y. 2005); *Mauney v. Boyle*,

*DRAFT: For discussion purposes only; not binding on any party*

865 F. Supp. 142, 147-48 (S.D.N.Y. 1994); *Gomez v. Bicknell*, 756 N.Y.S.2d 209, 215 (N.Y. App. Div. 2002).

**Defendants' Position and Authorities**

Plaintiff erroneously and disingenuously conflates the legal standard for three separate causes of action into one novel causation theory invented by Plaintiff for this case. To name just one logical fallacy in Plaintiff's approach, Plaintiff equates Credit Suisse's receipt of fees to an "injury" and therefore confuses causation with the remedy. Defendants assert that this standard is not applicable to the facts or issues in this case.

172.    Did CSS's performance breach the RFA?

**Plaintiff's Position and Authorities**

Yes; CSS exhibited a reckless disregard for the Oakwood Entities via its categorical failure to prepare the Debtors for a bankruptcy filing or to take timely steps to procure a DIP credit facility and/or a "loan purchase" or "warehouse" facility prior to the Petition Date.

**Defendants' Position and Authorities**

Breach of contract is a factual issue for the trier of fact to resolve.

173.    Were the Debtors insolvent at all relevant times, including when the transfers listed in paragraph 65 were made by Oakwood?

**Plaintiff's Position and Authorities**

Yes; expert analysis using commonly accepted valuation techniques, the results of which are consistent with contemporaneous market data, demonstrates that the Oakwood Entities were deeply and completely insolvent at all relevant times. *See, e.g.*, 11 U.S.C. § 101(32); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631-33 (3d Cir. 2007); *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007); *Shubert v. Lucent Techs. Inc.*

*(In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 273-78 (Bankr. D. Del. 2005), *aff'd*, No. 06-147-JJF, 2007 U.S. Dist. LEXIS 31137 (D. Del. Apr. 26, 2007).

**Defendants' Position and Authorities**

Insolvency is a factual issue for the trier of fact to resolve, and insolvency has no relevance to the claims at issue in this case.

174.    Were the transfers listed in paragraph 65 made "for or on account of an antecedent debt owed by the debtor before such transfer was made"?

**Plaintiff's Position and Authorities**

Yes; CSS possessed contingent "claims" against the Debtors as of the date the RFA was executed, which fact renders any subsequent transfers made by Oakwood under the RFA transfers on account of an antecedent debt.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 38-49 (Bankr. S.D.N.Y. 2006); *Peltz v. New Age Consulting Servs. (In re USN Commc'ns, Inc.)*, 279 B.R. 99, 101-03 (Bankr. D. Del. 2002); *In re Markair, Inc.*, 240 B.R. 581, 586-608 (Bankr. D. Ala. 1999).

**Defendants' Position and Authorities**

Whether transfers were made "for or on account of an antecedent debt owed by the debtor before such transfer was made" is a factual issue for the trier of fact to resolve.

175.    Did the Debtors receive a "reasonably equivalent value" in exchange for the transfers listed in paragraph 65?

**Plaintiff's Position and Authorities**

No; pursuant to the framework set forth by the Third Circuit, the Debtors received *no* value on account of such transfers – the "services" provided by CSS added nothing to the size of the Debtors' estate in bankruptcy, and otherwise evidenced an utter failure of consideration – and any value the Debtors may have received certainly was not equivalent to the size of the transfers.

*DRAFT: For discussion purposes only; not binding on any party*

*See, e.g.*, *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L.)*, 92 F.3d 139, 147-54 (3d Cir. 1996); *In re Jeffrey Bigelow Design Group*, 956 F.2d 479, 484 (4th Cir. 1992); *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.)*, 320 B.R. 265, 280 (Bankr. D. Del. 2005).

**Defendants' Position and Authorities**

Whether the Debtors received a "reasonably equivalent value" in exchange for transfers is a factual issue for the trier of fact to resolve.

176.    In the event that CSS has some allowable claim(s) against the Debtors under 11 U.S.C. § 502, should such claim(s) be equitably subordinated under 11 U.S.C. § 510(c)?

**Plaintiff's Position and Authorities**

Yes; CSS, an insider and fiduciary, engaged in inequitable conduct that harmed the Debtors' other creditors or unjustly advantaged CSS, and subordination would not be inconsistent with any part of the Bankruptcy Code. *See, e.g.*, *Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-92 (3d Cir. 1998); *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 283-85 (Bankr. D. Del. 2005), *aff'd*, No. 06-147-JJF, 2007 U.S. Dist. LEXIS 31137 (D. Del. Apr. 26, 2007); *In re Mid-American Waste Sys.*, 284 B.R. 53, 68-78 (Bankr. D. Del. 2002).

**Defendants' Position and Authorities**

Whether a claim should be equitably subordinated is a mixed question of law and fact.  In addition, no Defendant was an insider under any standard or Bankruptcy Code provision, nor did any Defendant engage in inequitable conduct in providing services to Oakwood that would give rise to equitable subordination. *See Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,  343 B.R. 444, 460-61 (Bankr. S.D.N.Y. 2006).

*DRAFT: For discussion purposes only; not binding on any party*

177.    Can Credit Suisse use the defense of *in pari delicto* as an affirmative defense to any of Plaintiff's claims?

**Plaintiff's Position and Authorities**

No; *in pari delicto* cannot apply here because Credit Suisse was an "insider" of the Debtors. *See, e.g., Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist LEXIS 25642, at *108-09 (S.D. Tex. Mar. 31, 2008); *Stanziale v. McGladrey & Pullen, LLP (In re Student Fin. Corp.)*, No. 05-00072, 2006 U.S. Dist. LEXIS 56759, at *6-8 (D. Del. Aug. 10, 2006); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005); *Official Comm. of Unsecured Creditors v. Shapiro*, No. 99-526, 2001 U.S. Dist. LEXIS 18734, at *5 (E.D. Pa. 2001); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.)*, 353 B.R. 324, 368 n.70 (Bankr. D.D.C. 2006); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 536 (Bankr. D. Del. 2006); *Official Comm. of Unsecured Creditors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999); *Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996). In any event, although primarily factual questions for the jury,[1] the evidence demonstrates that the wrongs committed by Credit Suisse were wholly personal wrongs in which the Debtors did not participate, and to the extent that the Debtors did participate in any wrongdoing, the Debtors' level of participation and culpability is still substantially less than

---

[1]    Defendants have taken the position that *in pari delicto* is not an issue for the jury. Plaintiff disagrees, because the final resolution of that defense turns on disputed factual questions, including whether Credit Suisse was an "insider" (it was), whether Credit Suisse and Oakwood participated in the *same* "wrong" (they did not), and whether any culpability on Oakwood's part was substantially equal to any culpability on Credit Suisse's part (it was not). Case law makes clear that *in pari delicto* is a jury question in such circumstances. *See, e.g., Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 377-78 (1927); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1196-97 (5th Cir. 1995); *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1323-24 (7th Cir. 1995); *Floyd v. Hefner*, No. 03-5693, 2008 U.S. Dist LEXIS 25642, at *112 (S.D. Tex. Mar. 31, 2008).

*DRAFT: For discussion purposes only; not binding on any party*

Credit Suisse's, which also makes *in pari delicto* entirely inapplicable here. *See, e.g.*, *Pinter v. Dahl*, 486 U.S. 622, 632 (1988); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-11 (1985); *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756-58 (3d Cir. 1990); *In re Sanborn, Inc.*, 216 B.R. 697, 701 (Bankr. D. Mass. 1998); *Chemical Bank v. Stahl*, 655 N.Y.S.2d 24, 25 (N.Y. App. Div. 1997); *Wey v. New York Stock Exch.*, No. 602510/05, 2007 N.Y. Misc. LEXIS 7829, at *1-3 (N.Y. Sup. Ct. Nov. 7, 2007); *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044-47 (Fla. Dist. Ct. App. 2007). Finally, *in pari delicto* should not be a cognizable defense to a claim for breach of contract. *See, e.g.*, *In re Olympia Brewing Sec. Litig.*, No. 77-1206, 1985 U.S. Dist. LEXIS 13796, at *7 (N.D. Ill. 1985).

**Defendants' Position and Authorities**

*In pari delicto* applies directly to this case and bars all common law claims by Plaintiff against Defendants. All transactions and services provided to Oakwood by Credit Suisse were considered and approved not only by Oakwood senior management but by Oakwood's board of directors as is reflected in the thorough and detailed board minutes. That record invokes the application of the *in pari delicto* doctrine to bar Plaintiff's common law claims. The cases cited by the Plaintiff to try to create a "personal wrong" exception for this case are inapposite. *Official Comm. of Unsecured Creditors v. R.F. Lafferty*, 267 F.3d 340, 355-58, 360 (3d Cir. 2001); *Shearson Lehman Huggon, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991); *Verestar v. American Tower Corp. (In re Verestar),* 343 B.R. 444 (S.D.N.Y. 2006); *Buechner v. Avery*, 38 A.D.3d 443 (N.Y. App. Div. 2007).

**For the Defendants:**

40

*DRAFT: For discussion purposes only; not binding on any party*

178.    Where Defendants have agreed with Plaintiff that a disputed issue of law exists, Defendants have provided their position and authority above. To the extent disputed issues of law exist and were not identified by Plaintiff, Defendants identify those issues below.

179.    Whether any Credit Suisse Defendant other than CSS had duties to Oakwood.

**Plaintiff's Position and Authorities**

Some or all of the Defendants acted in concert, and in a mutually interdependent and reciprocally reinforcing fashion, with respect to the conduct underlying this case. Furthermore – contrary to Defendants' assertion below – employees of both CSS (e.g., O'Driscoll and Felt) and New York Branch (e.g., Xanthos and Irwin) had substantial interactions with the Oakwood Entities as early as 1999 and continuing through the Petition Date. As such, all duties owed to the Oakwood Entities were parallel in nature, and there is no basis for differentiating among or between the Defendants. Moreover, to the extent relevant, the facts of this case further demonstrate that any legal formalities between the Defendants were effectively ignored on the Credit Suisse side of all relevant transactions, and were never apparent or understood on the Oakwood side of those transactions – the various Credit Suisse entities were, in effect, performing services or otherwise interfacing with the Oakwood Entities as departments of a single entity acting for a common purpose and/or on behalf of each other under principles of agency law. Hence, Defendants' legal rights and obligations are uniform, and should be treated as such at trial. *See, e.g.*, *Retrofit Partners I, L.P. v. Lucas Indus.*, 201 F.3d 155, 163 (2d Cir. 2000); *Trustees Sys. Co. v. Payne*, 65 F.2d 103 (3d Cir. 1933); *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 559-63 (S.D.N.Y. 2003); *Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99-10496, 2002 U.S. Dist. LEXIS 72, at *23-37 (S.D.N.Y. Jan. 3, 2002); *Public Adm'r of County of New York v. Royal Bank of Canada*, 19 N.Y.2d 127, 131-32 (1967); RESTATEMENT (SECOND) OF AGENCY § 1 cmt. a, b (1958).

*DRAFT: For discussion purposes only; not binding on any party*

**Defendants' Position and Authorities**

As nearly all of the interaction between Oakwood and the Defendants occurred through employees of Defendant CSS rather than employees of other Credit Suisse Defendants, as a matter of law no Defendants other than CSS could have had a duty, fiduciary or otherwise, to Oakwood. *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001); *Carefirst of Md., Inc. v. Care First Transp., Inc.*, No. Civ A 02-229, 2002 WL 31500927 (D. Del. Nov. 1, 2002).

180.    Assuming the existence and breach of a fiduciary duty on the part of CSS, whether such breach proximately caused any harm or damages to Oakwood and whether such damages, if any, were remote or speculative.

**Plaintiff's Position and Authorities**

Plaintiff contests several premises embedded in Defendants' statement, including that "CSS" is the only relevant defendant here and that "proximate cause" is a necessary element of Plaintiff's breach of fiduciary duty claim in all instances. In any event, as noted in paragraph 170 above, while this is primarily a factual question for the jury, the evidence demonstrates that Credit Suisse's conduct directly caused at least $50,000,000 of harm to the Debtors, and that such injury was the reasonably foreseeable result of Credit Suisse's conduct. Under those facts, any proximate cause element is satisfied and there is no concern about "remote or speculative" damages. *See, e.g.*, *Bear Stearns & Co. v. Daisy Sys. Corp. (In re Daisy Sys. Corp.)*, 97 F.3d 1171, 1176-77 (9th Cir. 1996); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir. 1995); *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 710-14, 725-29 (S.D.W. Va. 2007); *Colo. Capital v. Owens*, 227 F.R.D. 181, 189-90 (E.D.N.Y. 2005); *Mauney v. Boyle*, 865 F. Supp. 142, 147-48 (S.D.N.Y. 1994); *Comeau v. Rupp*, 810 F. Supp. 1127, 1143-44 (D. Kan. 1992); *Bell v.*

*N.Y. City Health & Hosps. Corp.*, 456 N.Y.S.2d 787, 796-97 (N.Y. App. Div. 1982); *Greenstein,*

*Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 186-88 (Tex. Ct. App. 1987).

**Defendants' Position and Authorities**

No damages experienced by Oakwood were directly and proximately caused by any action or

inaction on the part of CSS; the damages asserted by Plaintiff are too speculative as a matter of

law for recovery. *Kurtzman v. Bergstol,* 835 N.Y.S.2d 644, 646 (App. Div. 2007); *R.M. Newell*

*Co. v. Rice*, 653 N.Y.S.2d 1004 (App. Div. 1997); *Kolbeck v. LIT America, Inc.*, 939 F. Supp.

240, 249 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *Semi-Tech Litigation, LLC v.*

*Bankers Trust Co.,* 353 F. Supp. 2d 460 (S.D.N.Y. 2005); *T. Frederick Jackson, Inc. v. Pepper*

*Hamilton & Scheetz, LLP (In re Olsen Indus., Inc.)*, No. 98-140-SLR, 2000 WL 376398 (D. Del.

March 28, 2000); W. Page Keeton et al., *Prosser and Keeton on Torts § 41*, at 263 (5th ed.1984).

181.    Whether the Court rather than a jury should decide whether CSS had a separate

duty of care to Oakwood.

**Plaintiff's Position and Authorities**

Plaintiff contests the premise in Defendants' statement that "CSS" is the only relevant defendant.

In any case, Plaintiff submits that the resolution of whether Credit Suisse "had a separate duty of

care to Oakwood" turns on the resolution of two *factual* issues that must be decided by the jury.

More specifically, with respect to Plaintiff's negligence claim, the jury must make a predicate

factual determination about whether Credit Suisse affirmatively undertook actions outside the

scope of the written contracts with Oakwood. *See, e.g.*, *Pratt v. Liberty Mut. Ins. Co.*, 952 F.2d

667, 671 (2d Cir. 1992); *Cooper Indus., Inc. v. Agway, Inc.*, 987 F. Supp. 92, 104 (N.D.N.Y

1997); Prosser and Keeton on Torts § 37 (5th ed. 1984). If the jury finds that such actions

were undertaken, then a duty of reasonable care is automatically imposed as a matter of law.

*DRAFT: For discussion purposes only; not binding on any party*

*See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469-70 (2d Cir. 1995); *Breeden v. Generali U.S. Branch (In re Bennett Funding Group)*, No. 96-70196, 1997 Bankr. LEXIS 2366, at *57-59 (Bankr. N.D.N.Y. Dec. 19, 1997); *Palka v. ServiceMaster Mgt. Servs. Corp.*, 83 N.Y.2d 579, 585-87 (1994); *Parvi v. Kingston*, 41 N.Y.2d 553, 559-60 (1977); Oliver W. Holmes, Jr., *The Common Law*, 278-79 (1881). Similarly, with respect to Plaintiff's breach of fiduciary duty claim, the jury must make a predicate factual determination about whether Credit Suisse had a fiduciary relationship with Oakwood. *See, e.g.*, *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, No. 98-6454, 1999 U.S. Dist. LEXIS 17016, at *16-18 (S.D.N.Y. Nov. 1, 1999); *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 107 (2d Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, No. 88-CV-819, 1992 U.S. Dist. LEXIS 7721, at *71-72 (N.D.N.Y May 23, 1992); *Langford v. Roman Catholic Diocese*, 677 N.Y.S.2d 436, 439 (N.Y. Sup. Ct. 1998). *Accord, e.g.*, *Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386, 390 (5th Cir. 1982) ("The existence or nonexistence of a fiduciary relationship between parties is a question of fact for the jury."). If the jury finds that a fiduciary relationship existed here, then fiduciary duties of care and loyalty automatically follow as a matter of law. *See, e.g.*, *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984); *McCory v. Goldberg*, 810 F. Supp. 539, 548 (S.D.N.Y. 1993). Put differently, there simply is no unique "duty" question that the Court must resolve; the existence of duties *vel non* follows directly from black letter legal principles and depends on the jury's resolution of disputed factual questions. In any event, Plaintiff notes that all of Defendants' "duty is an issue for the courts" decisions arise in the context of negligence actions, not claims for breach of fiduciary duty.

*DRAFT: For discussion purposes only; not binding on any party*

**Defendants' Position and Authorities**

Plaintiff asserts that one or more of the Defendants had a duty of care to Oakwood in connection with all activities associated with Oakwood at the relevant times; Defendants dispute that assertion. This is a question for the Court rather than a jury to decide. *Westbrook v. WR Activities-Cabrera Markets*, 773 N.Y.S.2d 38 (App.Div. 2004); *Di Ponzio v. Riordan*, 224 A.D.2d 139 (App. Div. 1996), *aff'd*, 89 N.Y.2d 578 (1997).

182.    Whether CSS's contract-based relationship with Oakwood gave rise to a separate duty of care.

**Plaintiff's Position and Authorities**

Plaintiff contests several premises embedded in Defendants' statement, including that "CSS" is the only relevant defendant here and that that the relationship between any Credit Suisse entity and Oakwood was merely "contract-based." In any event, the law imposes a duty for parties to undertake their contractual obligations with reasonable care, the breach of which can give rise to liability even absent some "separate duty of care." *See, e.g.*, *OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.)*, 378 B.R. 59, 66 (Bankr. D. Del. 2007); *Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*, 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996).

**Defendants' Position and Authorities**

During 2001 and 2002, and following its bankruptcy, Oakwood used the securitization services of CSS, for which CSS earned agreed fees in connection with quarterly securitizations and the loan purchase facility. Commencing August 15, 2002, Oakwood retained CSS as its financial advisor pursuant to the RFA. None of these relationships, nor any other activities of CSS, gave rise to a duty of care to Oakwood beyond the services contracted for. *Clark-Fitzpatrick, Inc. v.*

*DRAFT: For discussion purposes only; not binding on any party*

*Long Island R.R. Co.*, 70 N.Y. 2d 382, 389 (N.Y. 1987); *TD Waterhouse Investors Servs., Inc. v.*

*Integrated Fund Servs., Inc.*, No. 01 Civ. 8986, 2003 WL 42013 (S.D.N.Y. Jan. 6, 2003).

183.    Whether Oakwood's bankruptcy court motions to assume the contracts associated

with the Loan Purchase Facility pursuant to 11 U.S.C. § 365, and seeking authority to continue

securitization transactions in the ordinary course of business, bar a subsequent suit concerning

the subject of those motions on either legal or equitable grounds as a matter of law.

**Plaintiff's Position and Authorities**

It is unclear precisely what "legal or equitable" doctrine Defendants believe is applicable here.

Nevertheless, there is no basis for "bar[ring] a subsequent suit concerning the subject of" the

only contract that the Debtors actually assumed, the SSA, let alone a suit concerning Oakwood's

"securitizations" more broadly, for several reasons.  As an initial matter, there are no grounds for

the application of either the "judicial admission" or the "judicial estoppel" doctrines, since (1)

Plaintiff's current litigation position is not " irreconcilably inconsistent" with the proposition that

the Oakwood Management honestly believed Oakwood's securitization transactions were

beneficial as of the Petition Date, or that, in light of the state of the world (in general) and

Oakwood (in particular) as of the Petition Date, continuation of the securitization transactions

may have been necessary at *that time*, which is a wholly distinct inquiry from whether they

should have been used *at all* earlier in 2001-2002, particularly in the specific form designed by

Credit Suisse; (2) to the extent that there has been any change in position, Plaintiff has not acted

in "bad faith" or with the intent to "play fast and loose with the courts," but instead seeks a

deeper analysis of the *actual* effects of the securitization transactions on the Debtors; and (3) it is

not clear that, as a factual matter, any of the assertions contained in Oakwood's first day

pleadings were adopted by or essential to the corresponding orders of the Bankruptcy Court.

*DRAFT: For discussion purposes only; not binding on any party*

*See, e.g., Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-86 (3d Cir. 2001); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996); *EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.)*, 316 B.R. 817, 824-25 (Bankr. D. Del. 2004); *Pickett v. Integrated Health Servs. (In re Integrated Health Servs.)*, 304 B.R. 101, 109-10 (Bankr. D. Del. 2004). Additionally, both such doctrines are rendered even more irrelevant here in light of the fact that the instant Proceeding is treated as a separate matter from Oakwood's main bankruptcy case, which in turn allows parties greater flexibility about their positions. *See, e.g., V.W. Bldg. & Design, Inc. v. Woskob (In re Woskob)*, No. 00-1215, 2001 U.S. Dist. LEXIS 13749, at *8-14 (M.D. Pa. Feb. 6, 2001), *vacated on other grounds*, 305 F.3d 177 (3d Cir. 2002); *Oak Mill Enters. 2000, Inc. v. Knopfler (In re Schraiber)*, 141 B.R. 1000, 1006-07 (Bankr. N.D. Ill. 1992). Next, if Defendants are attempting to claim shelter under some rule that may be uniquely applicable when an executory contract is assumed under 11 U.S.C. § 365, any such rule has no application here since (i) no Credit Suisse entity was a party to the only contract that the Debtors assumed under section 365, the SSA; and (ii) none of the fees listed in paragraphs 30, 42, 51, 56, 65, and 89 were payments made pursuant to the SSA. *See, e.g., Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75, 77 (Bankr. D. Del. 2005). Finally, as a general and overarching matter, Defendants should not be allowed to use *any* "equitable" defense or doctrine to escape liability here given that (i) they can prove no detrimental reliance or other prejudice stemming from any statement or action by the Debtors; and (ii) such a result would provide an inequitable windfall to a wrongdoing insider and fiduciary, all at the expense of innocent unsecured creditors. *See, e.g., Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-92 (3d Cir. 1998); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996).

*DRAFT: For discussion purposes only; not binding on any party*

**Defendants' Position and Authorities**

During its bankruptcy proceedings, Oakwood petitioned the Bankruptcy Court to be permitted to assume the obligations and benefits of the Loan Purchase Facility with Credit Suisse and to continue with securitizations conducted by CSS.  The Bankruptcy Court granted both requests. Consequently, Oakwood having represented to the Bankruptcy Court that these methods of financing were necessary and appropriate, and the Bankruptcy Court's having acceded to and ordered the relief sought, Plaintiff is barred from seeking damages for Credit Suisse's provision of those services.  *Kiwi Int'l Airlines, Inc. v. Port Auth. of NY and NJ (In re Kiwi Int'l Airlines, Inc.)*, 344 F.3d 311 (3d Cir. 2003); *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.)*, 330 B.R. 67 (Bankr. D. Del. 2005); *Vision Metals Inc. v. SMS Demage Inc. (In re Vision Metals Inc.)*, 327 B.R. 719 (Bankr. D. Del. 2005).

184.    Whether, because any alleged implied contract between Oakwood and Credit Suisse was not made in writing, Oakwood's claim for breach of implied contract is barred by the statute of frauds.

**Plaintiff's Position and Authorities**

This affirmative defense was not alleged in the Answer and thus was waived by Defendants. *See, e.g.*, FED. R. CIV. P. 8(c)(1); *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991) (Alito, *J.*).  Defendants have not moved to amend their Answer, and they could not make the necessary showing since Plaintiff would be prejudiced by the assertion of new defenses at this late hour. *See, e.g.*, *Horwitz v. Sheldon (In re Donald Sheldon & Co.)*, 153 B.R. 661, 662-64 (Bankr. S.D.N.Y. 1993).  In any event, the statute of frauds has no applicability here because an implied contract to provide reasonable and prudent financial advisory services does not fall within any of the "certain contracts" covered by the statutory provisions Defendants cite.  *See* N.Y. Gen. Oblig.

*DRAFT: For discussion purposes only; not binding on any party*

Law §§ 5-701 (listing seven specific types of contracts that must be in writing, none of which are relevant here), 5-703 (contracts concerning real property required to be in writing), 15-301 (prohibiting oral modification of pre-existing written contracts on the same subject).

**Defendants' Position and Authorities**

Plaintiff has consistently failed to aver specific facts tending to show the existence of an implied contract. However, even if an implied contract could be proved, it would be unenforceable because it would fall within the Statute of Frauds. There is no alleged agreement, or note or memorandum thereof, in writing and subscribed to by Credit Suisse or any lawful agent of Credit Suisse. Furthermore, Plaintiff asserts an implied contract based on a long-standing and continuous advisory relationship. Therefore, even if an implied contract were established, the Statute of Frauds, which requires certain contracts be in writing, applies and prohibits enforcement of the alleged implied contract. N.Y. Gen. Oblig. Law § 5-701, 5-703, 15-301; *Am. Federal Group, Ltd. v. Rothenberg*, 136 F.3d. 897, 910 (2d Cir. 1998).

## VI.    TRIAL EXHIBITS

185.    A chart of the exhibits that Plaintiff presently intends to offer as evidence at trial is attached hereto as Exhibit "A." The chart includes Defendants' evidentiary objections, along with supporting citations to the Federal Rules of Evidence.

186.    Except as otherwise noted in Exhibit "A," Defendants presently have no objection to the admission of Plaintiff's proposed trial exhibits into evidence. Yet, because Defendants do not know for what purpose specific exhibits will be used, Defendants reserve all rights to proffer appropriate evidentiary objections under the Federal Rules of Evidence – such as a hearsay objection if Plaintiff improperly attempts to use certain exhibits to prove the truth of the matter asserted therein – at trial.

*DRAFT:  For discussion purposes only; not binding on any party*

187.    A chart of the exhibits that Defendants presently intend to offer as evidence at trial is attached hereto as Exhibit "B."  The chart includes Plaintiff's evidentiary objections, along with supporting citations to the Federal Rules of Evidence.

188.    Except as otherwise noted in Exhibit "B," Plaintiff presently has no objection to the admission of the Defendants' proposed trial exhibits into evidence.  Yet, because Plaintiff does not know for what purpose specific exhibits will be used, Plaintiff reserves all rights to proffer appropriate evidentiary objections under the Federal Rules of Evidence – such as a hearsay objection if Defendants improperly attempt to use certain exhibits to prove the truth of the matter asserted therein – at trial.

189.    The parties have stipulated that, except as otherwise noted in Exhibit "A" or Exhibit "B," all documents included in the parties' respective document productions are deemed authentic and comply with the requirements of Federal Rule of Evidence 901.

## VII.    LIST OF WITNESSES

190.    Plaintiff intends to call the following witnesses to testify as live fact witnesses at trial:

A.    Matthew E. Kvarda; Alvarez & Marsal, LLC; 633 West Fifth Street, Suite 2560; Los Angeles, CA 90071.

B.    Douglas R. Muir; 4200 Cranleigh Drive; Greensboro, NC 27407.

C.    Myles E. Standish; 6 Gwynedd Lane; Summerville, NC 27358.

D.    Fiachra O'Driscoll; [address not yet provided by Linklaters].

E.    Jared C. Felt; [address not yet provided by Linklaters; may not testify live].

F.    Tom Connors; [address not yet provided by Linklaters].

G.    Thomas P. Irwin; [address not yet provided by Linklaters].

50

*DRAFT:  For discussion purposes only; not binding on any party*

191.    A chart of the deposition testimony that Plaintiff intends to designate as possible evidence at trial is attached hereto as Exhibit "C."  The chart includes Defendants' evidentiary objections, along with supporting citations to the Federal Rules of Evidence.

192.    Plaintiff intends to call the following witnesses to testify as expert witnesses at trial:

A.    Dr. Alan C. Shapiro; Trident Consulting Group LLC; 17567 Camino De Yatasto; Pacific Palisades, CA 90272.

Dr. Shapiro's specialties include financial analysis, corporate finance, banking corporate financial strategy, and business practices.

B.    Dr. Michael Tennenbaum; Flavell, Tennenbaum & Edwards; 27913 Smyth Drive; Valencia, CA 91355.

Dr. Tennenbaum's specialties include financial analysis, corporate finance, and financial valuation.

193.    Defendants intend to call the following witnesses to testify as live fact witnesses at trial:

A.    Fiachra O'Driscoll; [address not yet provided by Linklaters].

B.    Jared C. Felt; [address not yet provided by Linklaters; may not testify live].

C.    Douglas R. Muir; 4200 Cranleigh Drive; Greensboro, NC 27407.

D.    Myles E. Standish; 6 Gwynedd Lane; Summerville, NC 27358.

E.    Tom Connors; [address not yet provided by Linklaters].

F.    Thomas P. Irwin; [address not yet provided by Linklaters].

194.    A chart of the deposition testimony that Defendants intend to designate as possible evidence at trial is attached hereto as Exhibit "D."  The chart includes Plaintiff's evidentiary objections, along with supporting citations to the Federal Rules of Evidence.

195.    Defendants intend to call[2] the following witnesses to testify as expert witnesses at trial:

> A.    Allen M. Pfeiffer [Linklaters to fill-in the rest].
>
> B.    Thomas F. Boland [Linklaters to fill-in the rest].

## VIII.   STATEMENT OF WHAT THE PLAINTIFF INTENDS TO PROVE

*First*, with respect to the Defendants' actions and inactions unrelated to the RFA, Plaintiff will demonstrate to the jury that the Defendants repeatedly breached duties owed to the Oakwood Entities (by virtue of a fiduciary relationship, an implied advisory contract, and/or the traditional duty of care implicit in Plaintiff's negligence claim), thereby proximately causing substantial damages to the Oakwood Entities.

> a.    Plaintiff will prove the existence of those duties by reference to Defendants' conduct and the entire relationship between the parties, which included a longstanding underwriting relationship, a de facto lending relationship arising from the Loan Purchase Facility, the Oakwood Warrant, and an unwritten financial advisory relationship which arose and strengthened over several years.  Additional factors bearing on the parties' relationship and contributing to the rise of non-contractual duties for the Defendants include (i) the repeated provision of non-public information by the Oakwood Entities to the Defendants; (ii) the reposition of trust and confidence by the Oakwood Entities in the Defendants' superior knowledge, information, and expertise; (iii) the Defendants' "insider" status; and (iv) the heavily

---

[2]    Plaintiff has designated portions of the deposition transcripts for both Mr. Pfeiffer and Mr. Boland, and reserves all rights to proffer such testimony as evidence at trial in the event that Defendants do not call one or both of their proposed experts to testify live.

insolvent nature of the Oakwood Entities. Based upon the parties' close and multifaceted relationship, the evidence will prove that the Defendants' duties to the Oakwood Entities rose to the level of a fiduciary, and included fundamental duties of care and loyalty.

      b.     Plaintiff will prove that the Defendants breached their non-contractual duties by failing to exercise due care and act reasonably under the circumstances. In the case of their fiduciary duties, the Defendants further breached the duty of loyalty by virtue of the great profits they earned while repeatedly breaching their duty of care to the Oakwood Entities.

      c.     Plaintiff will further prove that the Defendants' habitual breaches proximately caused substantial damages to the Oakwood Entities and simultaneously benefited the Defendants. As such, Plaintiff will seek money damages at trial for that harm, which damages include (i) direct economic losses of $50 million in the year preceding the Debtors' descent into bankruptcy (i.e., actual economic damage in the form of a diminution of corporate assets); and (ii) any and all fees collected by the Defendants as a result of their relationship with the Oakwood Entities between the closing of the Loan Purchase Facility and the Petition Date, which fees total $20,947,721.26 (there may be some overlap between the amounts recited in parts (i) and (ii)).

      *Second*, with respect to the Defendants' actions and inactions related to the RFA, Plaintiff will prove to the Court that (i) the associated transfers from Oakwood to CSS – which transfers total $1,811,129.54 – are avoidable as constructive fraudulent transfers under Bankruptcy Code section 548 and/or preferences under Bankruptcy Code section 547, and thus are recoverable under Bankruptcy Code section 550(a); (ii) CSS breached the RFA by, *inter alia*, failing adequately to prepare the Debtors for a chapter 11 filing and not procuring a post-petition DIP facility and/or a "waiver" regarding the Loan Purchase Facility; and (iii) to the extent that

the conduct described in point (ii) did not breach the RFA, such conduct nevertheless breached separate, non-contractual duties owed to the Oakwood Entities. The breaches set forth in points (ii) and (iii) proximately caused damages to the Debtors (by, for example, causing the Debtors to incur additional costs in their chapter 11 cases).

        To the extent that CSS seeks to prove additional claims arising from the RFA, the evidence will show that CSS has not satisfied the conditions giving rise to any allowable claims under the terms of the RFA and/or under Bankruptcy Code section 502, which flaws include a basic lack of consideration and a failure of consideration. Furthermore, even if CSS is held to have some allowable claim, equitable subordination of any such claims is justified under the facts of this case and Bankruptcy Code section 510(c).

## IX.    STATEMENT OF WHAT THE DEFENDANTS INTEND TO PROVE

        196.    With respect to the Plaintiff's bankruptcy law claims concerning payments received in connection with Defendant CSS's engagement as Oakwood's financial advisor, Defendant CSS bears the burden of proof on the following affirmative defenses that it will assert at trial: (a) that the payments received by Defendant CSS were made and incurred in the ordinary course of business pursuant to 11 U.S.C. § 547 (c)(2); and (b) that the payments were for contemporaneous new value pursuant to 11 U.S.C. § 547 (c)(1). With respect to Plaintiff's remaining allegations concerning CSS's engagement as Oakwood's financial advisor, Defendant CSS does not bear the burden of proof. Nonetheless, the evidence at trial will show that Oakwood engaged Defendant CSS on August 19, 2002, pursuant to the RFA, an express letter agreement to provide specific services in connection with a restructuring of Oakwood; that CSS performed fully under the terms of the agreement; that CSS was entitled to payment of certain fees; that Oakwood failed to make certain payments to CSS required under the agreement; that no duties were breached and no damages were incurred as a result of any of CSS's activities; that

*DRAFT:  For discussion purposes only; not binding on any party*

the RFA disclaims liability of CSS except in certain narrow circumstances which are not present here; and that the doctrine of equitable subordination does not apply.  CSS is therefore entitled to have its claim as memorialized in the Proof of Claim allowed.

197.    With respect to Plaintiff's common law claims of breach of fiduciary duty, breach of implied contract, and negligence, Defendants do not bear the burden of proof on any element. Nonetheless, the evidence will demonstrate that no fiduciary duty arose between Oakwood and any Defendant; and that even if the Court were to find there existed a  fiduciary duty, there was no breach.  The evidence at trial will further show that there was no implied contract between Oakwood and any Defendant.  The evidence at trial will further demonstrate that to the extent that any Defendant had a duty of care to Oakwood, that duty was satisfied.  The evidence at trial will further demonstrate that no damages were incurred as a result of Defendants' actions or inactions and that Plaintiff's theories of damages are speculative and unproven.  Finally, the evidence at trial will show that Plaintiff cannot state a claim against any Defendant other than CSS.

198.    Defendants will assert the following affirmative defenses as to all of Plaintiff's claims:  (a) the doctrine of *in pari delicto*; (b) judicial estoppel; (c) equitable estoppel; (d) waiver; and, to the extent that Plaintiff is unable to prove mitigation of its alleged damages, Defendants will assert (e) failure to mitigate.  As to Plaintiff's implied contract claim, Defendants will assert the Statute of Frauds.

*DRAFT: For discussion purposes only; not binding on any party*

## X.    AMENDMENTS OF THE PLEADINGS

199.    The parties' pleadings, including the Objection/Counterclaims and the Answer, are hereby deemed amended to the extent inconsistent with this Proposed PTO.[3]

## XI.    CERTIFICATION OF GOOD FAITH SETTLEMENT EFFORTS

200.    The parties certify that two-way communication has occurred between persons having settlement authority in a good faith effort to explore the resolution of the Proceeding by settlement.  No agreement has been reached.

## XII.    PENDING MOTIONS

201.    The following motions remain outstanding as of the date of this Proposed PTO, and should be decided by the Court prior to trial:

A.    Defendants' Motion to Strike Plaintiff's Jury Trial Demand (*see* D.I. ##29-32 & 35-37);

B.    Defendants' Motion for Partial Summary Judgment (*see* D.I. ##39-43, 47-53, 55-57, 59, 100-101 & 104-105);

C.    Defendants' Motion to Exclude the Expert Testimony of Michael Tennenbaum Pursuant to Fed. R. Evid. 702 (*see* D.I. ##60-62, 81-83, 92, 95-96 & 102);

D.    Defendants' Motion to Exclude the Expert Testimony of Alan C. Shapiro Pursuant to Fed. R. Evid. 702 (*see* D.I. ##63-65, 81-82, 84, 92 & 94);

E.    Defendants' Motion to Exclude Certain Testimony and Documents Relating to Credit Risk Management Reviews (*see* D.I. ##66-68, 76-79, 85, 90-91 & 93);

F.    Defendants' Motion to Exclude at Trial Testimony and Argument Regarding the Current Subprime Mortgage Crisis (*see* D.I. ##69-71, 76-79, 85 & 86); and

G.    Plaintiff's Motions *in Limine* (*see* D.I. ##74-75, 87-88, 98-99 & 103).

---

[3]    For the avoidance of doubt, Plaintiff does not consent to Defendants' assertion at trial of any affirmative defenses not properly pled in the Answer, and this paragraph 199 should not be read to imply any conclusion to the contrary.

*DRAFT: For discussion purposes only; not binding on any party*

* * * * *

**THIS ORDER SHALL CONTROL THE SUBSEQUENT
COURSE OF THE ACTION, UNLESS MODIFIED BY
THE COURT TO PREVENT MANIFEST INJUSTICE.**

Dated:      June __, 2008
            Wilmington, Delaware

By:_____      By: _____
MARLA R. ESKIN (No. 2989)                 MARK D. COLLINS (No. 2981)
KATHLEEN CAMPBELL DAVIS (No. 4229)        RUSSELL C. SILBERGLIED (No. 3462)
KENNETH L. DORSNEY (No. 3726)             LEE E. KAUFMAN (No. 4877)
Campbell & Levine, LLC                    Richards, Layton & Finger, P.A.
800 N. King Street, Suite 300             One Rodney Square, 920 North King Street
Wilmington, DE 19801                      Wilmington, DE 19801
(302) 426-1900                            (302) 651-7700

-and-                                     -and-

TONY CASTAÑARES (CA SBN 47564)            R. PAUL WICKES
STEPHAN M. RAY (CA SBN 89853)             MARY K. WARREN
SCOTT H. YUN (CA SBN 185190)              MICHAEL J. OSNATO, JR.
WHITMAN L. HOLT (CA SBN 238198)           J. JUSTIN WILLIAMSON
Stutman, Treister & Glatt, P.C.           Linklaters LLP
1901 Avenue of the Stars, 12th Floor      1345 Avenue of the Americas
Los Angeles, CA 90067                     New York, NY 10105
(310) 228-5600                            (212) 903-9000

*Special Counsel for the OHC Liquidation Trust*    *Attorneys for the Defendants*

**IT IS SO ORDERED.**

Dated:  _____, 2008          _____
                                     THE HONORABLE JOSEPH J. FARNAN, JR.
                                     UNITED STATES DISTRICT JUDGE

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | Credit Suisse First Boston Compliance Manual. | CSFB-00053059 to CSFB-00053226; DX 506 | 402 |
| | Handwritten Notebook. | CSFB-00511852 to CSFB-00511877; PX 108 | 901, 602 |
| | List re: Credit Issues/Concerns with OHC. | CSFB-00250130; PX 133 | 901, 602 |
| | Originator / Servicer Assessment. | CSFB-00250104 to CSFB-00250114; PX 112 | 901, 602 |
| | Section G. Board of Directors/Management. | CSFB-00521153 to CSFB-00521158; PX 623 | 402, 802 |
| | Handwritten Notes re: June 17 Trial. | CSFB-00521703 to CSFB-00521706; PX 624 | 402, 802 |
| | 6/21/1999 Email from D. Muir to D. Rich and F. O'Driscoll. | CSFB-00174305 to CSFB-00174306; PX 50 | |
| | 1/10/2000 Email from F. O'Driscoll to C. Richardson. | CSFB-00174238; PX 52 | |
| | 1/10/2000 Memorandum from J. Xanthos to Credit File re: 11/19/1999 On-Site Visit. | CSFB-00250116 to CSFB-00250129; PX 54 | 402 |
| | 3/13/2000 Memorandum from James Xanthos to File re: Update on OHC. | CSFB-00250131 to CSFB-00250132; PX 134 | 402 |
| | 3/21/2000 Memorandum from J. Xanthos to File re: Update on Oakwood Homes. | CSFB-00512903; PX 53 | 402 |
| | 4/13/2000 Memorandum from B. Smith to Board of Directors re: Austin Board Meeting. | OHCLT-05175 to OHCLT-05177; DX 203 | |
| | 4/14/2000 Email from K. Serageldin to F. O'Driscoll. | CSFB-00173794; PX 55 | 402, 602 |
| | 4/17/2000 Email from J. Hinshaw to F. O'Driscoll. | CSFB-00173796 to CSFB-00173797; PX 56 | 402, 602 |
| | 5/15/2000 Email from F. O'Driscoll to J. Chrystal. | CSFB-00492624; PX 57 | 402 |
| | 5/16/2000 Email from J. Chrystal to F. O'Driscoll. | CSFB-00492624; PX 57 | 402, 602 |
| | 9/14/2000 Email from F. O'Driscoll to K. Serageldin. | CSFB-00485278; PX 59 | 402, 602, 802 |
| | 11/2/2000 Email from D. Muir to F. O'Driscoll and D. Rich. | CSFB-00170905; PX 60 | |
| | 11/27/2000 Email from G. Hunt to A. Zonca and B. Miller. | CSFB-00173581 to CSFB-00173582; PX 61 | 402, 602 |
| | 12/13/2000 Presentation to the Investment Banking Committee from J. Donovan, F. O'Driscoll, S. Menkhaus, J. Chrystal, S. Gupta, K. Serageldin, B. Miller, H. Bald and A. Zonca re: $200 Million Revolving Loan Purchase Facility. | CSFB-00205989.001 to CSFB-00205989.024; PX 110 | |
| | 12/18/2000 Presentation re: Materials Prepared for Discussion, OHC. | CSFB-00141064 to CSFB-00141069; PX 137 | 901, 602 |
| | 1/2/2001 Email from J. Xanthos to F. O'Driscoll. | CSFB-00485340; PX 64 | 402, 602 |
| | 1/9/2001 Email from T. Irwin to F. O'Driscoll. | CSFB-00512061; PX 65 | 402 |
| | 1/9/2001 Memorandum from F. O'Driscoll to D. Thornburgh and T. Irwin re: Oakwood Underwriting Standards. | CSFB-00483869; PX 111 | 402 |
| | 2/14/2001 Email from T. Irwin to F. O'Driscoll. | CSFB-00515234; PX 140 | 402 |
| | 2/17/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00178954 to CSFB-00178955; PX 68 | |

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 2/26/2001 Credit Authorization Form.  Including 1/31/2001 Annual Review from J. Xanthos. | CSFB-00513799 to CSFB-00513819; PX 138 | 901, 602, 402 |
| | 4/12/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00182753 CSFB-00182754; PX 71 | |
| | 5/8/2001 Email from M. Heyse to F. O'Driscoll. | CSFB-00182807 to CSFB-00182808; PX 73 | |
| | 5/8/2001 Email from F. O'Driscoll to M. Heyse. | CSFB-00182807 to CSFB-00182808; PX 73 | |
| | 5/9/2001 Email from M. Heyse to F. O'Driscoll. | CSFB-00184168; PX 74 | |
| | 5/17/2001 Email from J. Chrystal to K. Serageldin. | CSFB-00482331 to CSFB-00482332; PX 75 | |
| | 6/5/2001 Email from B. Smith to F. O'Driscoll. | CSFB-00184166; PX 77 | 602 |
| | 6/6/2001 Email from F. O'Driscoll to P. Jacob. | CSFB-00154641; PX 78 | |
| | 6/26/2001 Presentation to Oakwood Homes Corporation. | CSFB-00052953 to CSFB-00053034; PX 43 | |
| | 6/26/2001 Email from J. Felt to P. Jacob. | CSFB-00265232; PX 44 | |
| | 7/3/2001 Email from F. O'Driscoll to T. Connors. | CSFB-00153099; PX 79 | |
| | 7/23/2001 Email from M. Millard to F. O'Driscoll. | CSFB-00184649 to CSFB-00184650; PX 81 | |
| | 7/25/2001 Email from M. Millard to T. Connors and F. O'Driscoll. | CSFB-00514136 to CSFB-00514137; PX 118 | |
| | 8/9/2001 Presentation to Oakwood Homes Corporation. | CSFB-00052849 to CSFB-00052905; PX 46 | |
| | 8/9/2001 Email from F. O'Driscoll to J. Felt. | CSFB-00014152 | |
| | 11/27/2001 Email from G. Richter to S. Menkhaus. | CSFB-00149130; PX 88 | 602 |
| | 12/3/2001 Email from S. Menkhaus to F. O'Driscoll. | CSFB-00188026 to CSFB-00188027; PX 90 | 602 |
| | 12/13/2001 Email from J. Felt to F. O'Driscoll. | CSFB-00148970; PX 47 | |
| | 12/16/2001  Email from F. O'Driscoll to B. Smith.  (With Forwarded Text) | CSFB-00055693 to CSFB-00055694 | |
| | 1/24/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00188944; PX 91 | |
| | 2/19/2002 Email from F.O' Driscoll to K. Serageldin, T. Irwin and J. Xanthos. | CSFB-00478613; PX 94 | |
| | 3/2002 Oakwood Homes Discussion Materials. | CSFB-00033240 to CSFB-00033302; PX 48 | |
| | 4/2002 Oakwood Homes Discussion Materials. | CSFB-00052841 to CSFB-00052848; PX 49 | |
| | 4/25/2002 Email from F. O'Driscoll to M. McCarthy. | CSFB-00191475 to CSFB-00191476; PX 98 | |
| | 4/26/2002 Email from J. Molenkamp to F. O'Driscoll and M. McCarthy. | CSFB-00191475 to CSFB-00191476; PX 98 | |
| | 5/22/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00191543; PX 99 | |
| | 6/14/2002 BNP Paribas Equity Report. | CSFB-00363574 to CSFB-00363597 | |
| | 7/2002 Berkshire Hathaway Presentation. | CSFB-00146183 to CSFB-00146191; PX 100 | |
| | 7/24/2002 Email from B. Smith to F. O'Driscoll. | CSFB-00192307; PX 101 | |
| | 8/12/2002 Email from B. Smith to J. Felt. | CSFB-00064305 | |

## Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 8/16/2002 Email from D. Wales to M. Standish, B. Smith, D. Muir and S. Wood. Attaching 8/19/2002 Presentation to the Board of Directors. | OHCLT-001705 to OHCLT-001750; PX 10 | |
| | 8/19/2002 Email from P. Landon to B. May, F. O'Driscoll, E. Antill, A. Kurganska and M. Schachter.  Attaching Executed 8/19/2002 Engagement Letter from J. Felt to R. Smith. | CSFB-00013644 to CSFB-00013659; PX 7 | |
| | 8/19/2002 Memorandum from J. Felt, P. Landon, D. Wales, F. O'Driscoll, B. May, E. Antill, A. Kurganska and M. Schachter to B. Goodman. | CSFB-00014175 to CSFB-00014177; PX 13 | |
| | 8/30/2002 Email from P. Landon to M. Standish, B. Smith, D. Muir and S. Wood. Attaching 8/2002 Report re Responsibilities & Timetable. | OHCLT-001850 to OHCLT-001854; PX 14 | |
| | 9/29/2002 Email from D. Wales to J. Felt.  Attaching 9/30/2002 Presentation to the Board of Directors. | CSFB-00034725 to CSFB-00034767; PX 16 | |
| | 10/2002 Information Presentation. | CSFB-00265172 to CSFB-00265210; PX 626 | |
| | 10/15/2002 Presentation to Lotus. | OHCLT-020578 to OHCLT-020598; PX 17 | |
| | 10/18/2002 Email from F. O'Driscoll to J. Felt.  Attaching 7/2002 Berkshire Hathaway Presentation. | CSFB-00035143 to CSFB-00035153; PX 19 | |
| | 10/19/2002 Email from J. Felt  to C. Rayburn. | CSFB-00035156 to CSFB-00035157; PX 20 | 402 |
| | 10/24/2002 Information Presentation. | OHCLT-02616 to OHCLT-02635; PX 628 | 402, 802, 901, 602 |
| | 11/2002 Presentation to Credit Risk Management. | CSFB-00250135 to CSFB-00250212; PX 114 | |
| | 11/5/2002 Email from J. Felt to D. Wales. | CSFB-00041156; PX 24 | 402 |
| | 11/5/2002 Email from D. Wales to J. Felt. | CSFB-00041156; PX 24 | 402 |
| | 11/7/2002 Email from J. Felt to F. O'Driscoll. | CSFB-00041143; PX 30 | |
| | 11/7/2002 Email from J. Felt to P. Landon. | CSFB-00041146; PX 28 | |
| | 11/7/2002 Email from J. Felt to E. Antill, P. Landon, B. May, F. O'Driscoll, M. Schacter and D. Wales. | CSFB-00057375 | |
| | 11/12/2002 OHC Minutes of the Meeting of the Board of Directors.  Attaching Exhibit A, 11/11/2002 Memorandum from Rayburn Cooper & Durham, P.A.. Exhibit B, 11/12/2002 OHC Board Update Presentation.  Exhibit C, 11/11/2002 OHC Restructuring Term Sheet.  Exhibit D, Chart titled Warrant Analysis (10%). Exhibit E, Chart titled Comparable Equity Recovery Analysis. | OHCLT-002661 to OHCLT-002759; PX 1 | |
| | 11/14/2002 Email from A. Zonca to T. Irwin, J. Xanthos and R. Machlis. | CSFB-00518061; PX 147 | 602, 402, 802 |
| | 11/14/2002 Email from F. O'Driscoll to M. Millard. | CSFB-00057697; PX 123 | 802, 602 |
| | 11/14/2002 Email from M. Millard to F. O'Driscoll. | CSFB-00057697; PX 123 | 802, 602 |
| | 11/14/2002 Email from J. Felt to F. O'Driscoll. | CSFB-00041242; PX 33 | |

# Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 11/15/2002 Email from B. Smith to M. Millard.  Attaching 11/15/2002 Letter from M. Standish to M. Hamburg.  11/15/2002 OHC Restructuring Term Sheet. | CSFB-00039307 to CSFB-00039314; PX 8 | |
| | 11/15/2002 Email from M. Millard to B. Smith. | CSFB-00514168; PX 124 | |
| | 11/15/2002 Letter Agreement from M. Standish to M. Hamburg. | CSFB-0002805; PX 9 | |
| | 11/16/2002 Email from J. Felt to B. May, E. Antill, M. Schachter and D. Wales. | CSFB-00041236; PX 36 | |
| | 11/18/2002 Declaration of Doug Muir in Support of First Day Relief | DX 202 | |
| | 11/17/2002 Email from M. Standish to F. O'Driscoll. | CSFB-00058046 | |
| | 11/19/2002 Email from J. Xanthos to F. O'Driscoll. | CSFB-00058127 to CSFB-00058128; PX 143 | |
| | 11/23/2002 Email from M. Millard to F. O'Driscoll. | CSFB-00514175 to CSFB-00514177; PX 130 | 402 |
| | 11/28/2002 Email from M. Millard to M. Standish. | OHCLT-029671 to OHCLT-029672; PX 153 | 402 |
| | 12/2002 Attachment A: Performance Information re: Oakwood (OMI Trust) Memo BH Finance Guaranty. | CSFB-00511879 to CSFB-00511920; PX 145 | |
| | 12/2/2002 Email from R. Dehney to J. Felt. | CSFB-00041176 to CSFB-00041178; PX 39 | |
| | 12/3/2002  Email from J. Felt to R. Dehney. | CSFB-00041176 to CSFB-00041178; PX 39 | |
| | 12/4/2002 Email from A. Zonca to J. Felt and F. O'Driscoll. | CSFB-00041166; PX 151 | |
| | 3/27/2003 Proof of Claim Filed by Credit Suisse First Boston LLC. | PX 2 | |
| | 11/16/2005 Defendants' Consolidated Responses and Objections to Plaintiff's First Set of Interrogatories. | | |
| | 12/7/2005 Defendants' First Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 12/16/2005 Defendants' Second Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 5/1/2006 Defendants' Supplemental Response to Plaintiff's Interrogatories and Document Requests. | | |
| | 11/14/2006 Defendants' Response to Plaintiff's Interrogatory No. 4. | | |
| | 11/27/2006 Defendants' Response to Plaintiff's Second Set of Interrogatories to Defendants. | | |
| | 11/29/2006 Defendants' Third Supplemental Response to Plaintiff's First Set of Interrogatories. | | |
| | 4/27/2007  Defendants' Supplemental Response to Plaintiff's Interrogatory No. 4. | | |
| | 4/30/2007 Expert Witness Report of Dr. Michael Tennenbaum. | DX 601 | 802 |

## Exhibit "A" - Plaintiff's Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | GENERAL DESCRIPTION | BATES RANGE / DEPO EXHIBIT NUMBER | EVIDENTIARY OBJECTION(S) AND BASIS |
|---|---|---|---|
| | 4/30/2007 Report of Alan C. Shapiro, Ph.D.. | DX 501; PX 622 | 802 |
| | 5/31/2007 Email from A. Pfeiffer to J. Goldblatt. Attaching 6/18/2007 Draft Expert Rebuttal Report of Allen M. Pfeiffer. | CSFB-00523314 to CSFB-00523346; PX 630 | 802 |
| | Exhibits to Draft Expert Rebuttal Report of Allen M. Pfeiffer. | CSFB-00523839 to CSFB-00523848 | |
| | 8/28/2007 Supplemental Report of Alan C. Shapiro, Ph.D.. | DX 507 | 802 |
| | 2/21/2008 Email From A. Pfeiffer to M. Warren, P. Wickes and J. Williamson. Attaching Bond Price Spreadsheet and Draft Outline of Rebuttal Issues Regarding the Report of Michael Tennenbaum. | CSFB-00519279 to CSFB-00519291; PX 627 | 802 |
| | 2/24/2008 Email from A. Besio to A. Pfeiffer and A. Warren. | CSFB-00521719 | 802 |
| | 2/26/2008 Email from A. Besio to A. Pfeiffer and A. Warren. Attaching Bond Indices Spreadsheet. | CSFB-00522133 to CSFB-00522134; PX 629 | 802 |
| | 2/27/2008 Email from A. Besio to A. Warren. | CSFB-00522199 | 802 |
| | 2/29/2008 Expert Witness Report of Thomas F. Boland. | PX 621 | 802 |
| | 2/29/2008 Expert Rebuttal Report of Allen M. Pfeiffer. | PX 625 | 802 |
| | Credit Suisse 2007 Annual Report | | |
| | 4/11/2008 Hard Rock Hotel Holdings, LLC SEC Form 4, Including Exhibit 99.1 thereto. | | |
| | 5/9/2008 Supplemental Expert Witness Report of Dr. Michael Tennenbaum. | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Dillon Read - Equity Research: Manufactured Housing: Current Outlook for the Industry (dated 5 July 1996) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Dillon Read - Equity Research: Manufactured Housing Update (Spring Wrap-Up: First-Quarter Review; Second Quarter Preview) (dated 9 July 1997) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Paine Webber – Real Estate Research: Manufactured Housing Industry (An Improving Image; A Stable Investment) (dated July 10, 1997) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 29 April 1998) | MNAT020038-20041 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 18 November 1998) | MNAT020025-20037 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 3 February 1999) | KCLH 0888- 0890 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 22 April 1999) | KCLH 0925-0927 | |
| | Southwest Securities – Research Update (Manufactured Housing: Is it Over? – Value Investors Ought to Take Another Look) (dated 4 March 1999) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 17 June 1999) | KCLH 0931-0936 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 30 June 1999) | KCLH 0938-0943; DX 219 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 21 July 1999) | KCLH 0948-0954 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 2 August 1999) | KCLH 0956-0959; DX 220 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 10 August 1999) | KCLH 0961-0969 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 September 1999) | KCLH 0971-0972 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 27 September 1999) | KCLH 0974-0976 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 October 1999) | KCLH 0978-0981 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 3 November 1999) | KCLH 0983-0985 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 17 November 1999) | KCLH 0987-0992 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 December 1999) | KCLH 0994-0996 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Shareholders (dated 9 February 2000) | MNAT002742-002744 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 9 February 2000) | MNAT002745-002746 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q, (dated 14 February 2000) | | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Audit Committee. (dated 16 February 2000) | OHCLT 13763-13765 | |
| | Memo to Board of Directors from Bob Smith, Re: Austin Board Meeting. (dated 13 April 2000) | OHCLT 05175-05177; DX 203. | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Audit Committee. (dated 18 April 2000) | OHCLT 13737-13739 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q, (dated 15 May 2000) | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Valuation Committee. (dated 6 June 2000) | OHCLT 04860-04861 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 30 June 2000) | KCLH 1034-1036 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 8 August 2000) | KCLH 1038-1042 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q, (dated 14 August 2000) | | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 September 2000) | RCDA 033115-033118 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 16 October 2000) | KCLH 1059-1061 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 15 November 2000) | MNAT006717-006722; DX 229 | |
| | UBS Warburg – Global Equity Research (U.S. Manufactured Housing: The Perfect Storm… But When Will it End?) (dated 5 December 2000) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 December 2000) | MNAT006712-006716; DX 230; DX 300-1 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | REORGANIZED SALE OKWD INC, Form 10-K, (dated 29 December 2000) | | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 30 and 31 January 2001) | KCLH 1124-1128; DX 300-2 | |
| | Class A Note Purchase Agreement (dated 9 February 2001) | CSFB 00092240-92322 | |
| | Sale and Servicing Agreement (dated 9 February 2001) | CSFB 00092153-92238; DX 213 | |
| | Indenture (dated 9 February 2001) | CSFB 00092086-92151 | |
| | Trust Agreement (dated 9 February 2001) | CSFB 00092032-92084 | |
| | Letter re: Class A Asset Backed Note, Series 2001_A Purchase Agreement (dated 9 February 2001) | CSFB 00092324-92327 | |
| | Custodial Agreement (dated 9 February 2001) | CSFB 00092329-92355 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 February 2001) | | |
| | Registration Rights Agreement (dated 26 February 2001) | CSFB 00092371-92383 | |
| | Warrant (dated 26 February 2001) | CSFB 00092357-92369 | |
| | First Union - Equity Research: Manufactured Housing Industry: Down But Not Out (Industry Investment Thesis: A recovery in Manufactured Home Production is Likely Still 12-18 Months Away) (dated 5 April 2001) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Email from Bob Smith to Fiachra O'Driscoll. (dated 12 April 2001) | CSFB 00182753-182754; PX 71 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 19 April 2001) | KCLH 1151-1154; DX 300-3 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q, (dated 15 May 2001) | | |
| | Email from Fiachra O'Driscoll to Phil Jacob copied to John Herbert (dated 6 June 2001) | CSFB 00014205 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 8 June 2001) | KCLH 1172-1174; DX 231; DX 300-4 | |
| | Email from Jared Felt to Fiachra O'Driscoll, re: "Oakwood"  (dated 14 June 2001) | CSFB 00014207 | |
| | Credit Suisse Presentation to Oakwood Homes Corp. (dated 26 June 2001) | CSFB-00052953 to CSFB-00053034; PX 43 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Audit Committee (dated 23 July 2001) | OHCLT 13756-13758; DX 300-5 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 24 July 2001) | KCLH 1176-1181; DX 204 | |
| | Credit Suisse Presentation to Oakwood Homes Corp. (dated 9 August 2001) | CSFB-00052849 to CSFB-00052905; PX 46 | |
| | Letter from Jared Felt to Robert Smith  (dated 10 August 2001) | MNAT003863; CSFB 00052840; PX 6 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 August 2001) | | |
| | Confidential Offering Circular $111,117,295 (dated 31 August 2001) | CSFB 00186024-186071 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 20 August 2001) | MNAT002585-002586; DX 300-6 | |
| | First Union - Equity Research: The State of the Manufactured Housing Industry – Summer 2001 (dated 5 September 2001) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Summary financial forecast for the year ending 30 September 2002 (dated 25 September 2001) | OHCLT 02287-02341 | |
| | Press release in relation to OHC's fourth quarter 2001 results, script of call with Myles Standish, Bob Smith, Suzanne Wood and Doug Muir including Myles Standish's comments (dated November 2001) | OHCLT 08645-08649 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 15 November 2001) | KCLH 1201-1207; DX 300-7 | |
| | Email from Jared Felt to Fiachra O'Driscoll (dated 18 December 2001) | CSFB 00265236-265239 | |
| | REORGANIZED SALE OKWD INC, Form 10-K (dated 28 December 2001) | | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 February 2002) | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Credit Suisse Presentation to Oakwood Homes re: Discussion Materials (dated April 2002) | CSFB 00052841-00052848; PX 49 | |
| | Memorandum from Bob Smith to Files re: Repossession Information (dated 2 May 2002) | OHCLT-07576-07589 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 6 May 2002) | OHCLT 02877-02879; DX 233; DX 300-8 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Audit Committee (dated 6 May 2002) | KCLH 1229-1230; DX 300-9 | |
| | Term Sheet - $235,271,000 (B-2 Tranche), Oakwood Mortgage Investors, Inc. (Depositor), Manufactured Housing Contracts Senior/Subordinated Pass-Through Certificates, Series 2002-B (dated 15 May 2002) | CSFB 00244715-244757 | |
| | Term Sheet - $220,956,000, Oakwood Mortgage Investors, Inc. (Depositor), Manufactured Housing Contracts Senior/Subordinated Pass-Through Certificates, Series 2002-B (dated 15 May 2002) | CSFB 00123176-123216 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 15 May 2002) | | |
| | Prospectus Supplement to Prospectus – OMI Trust 2002-B (Issuer), Oakwood Mortgage Investors, Inc. (Depositor), $220,956,000 Senior/Subordinated Pass-Through Certificates, Series 2002-B, Oakwood Acceptance Corporation (Servicer) (dated 20 May 2002) | CSFB 00244462-244639 | |
| | 2002-B Terms Agreement – Oakwood Mortgage Investors, Oakwood Acceptance Corporation, LLC, regarding Underwriting Agreement Standard Provisions Feb. 2002 (May 20, 2002) | CSFB 00244647-244658 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Confidential Circular Offering – OMI Trust 2002-B (Issuer), Oakwood Mortgage Investors, Inc. (Depositor), Oakwood Acceptance Corporation (Servicer) $14,315,000 Subordinated Pass-Through Certificates, Series 2002-B, Class B-2 Certificates (dated 30 May 2002) | CSFB 00123289-123318 | |
| | BNP Paribas Equity Report (dated 14 June 2002) | CSFB-00363574-363597 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 25 June 2002) | MNAT006726-006728; DX 206, DX 300-10 | |
| | Credit Suisse Berkshire Hathaway Presentation (dated July 2002) | CSFB 00035144-35153 | |
| | Credit Suisse Presentation to Oakwood Homes re: Discussion Materials (dated July 2002) | CSFB 00063659-63683 | |
| | Credit Suisse Berkshire Hathaway Presentation (dated July 2002) | CSFB 00146183-146191; PX 100 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 29 July 2002) | MNAT006776-006777; DX 207; DX 224; DX 300-11 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. - Audit Committee (dated 29 July 2002) | OHCLT 37993-37994; DX 300-11 | |
| | Email from Renee Dye of McKinsey Consulting to Bob Smith, Myles Standish, re: Thoughts on how we might work together (dated 31 July 2002) | CSFB 00055756-00055760; DX 205 | |
| | Credit Suisse Preliminary Due Diligence List (dated August 2002) | OHCLT-001850 to OHCLT-001854; PX 14 | |
| | Credit Suisse Presentation to Oakwood Homes Corp. re: Responsibilities & Timetables (dated August 2002) | CSFB 00033313-33317 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Confidential Circular Offering – OMI Trust 2002-C (Issuer), Oakwood Mortgage Investors, Inc. (Depositor), Oakwood Acceptance Corporation (Servicer) $13,903,000 Subordinated Pass-Through Certificates, Series 2002-C, Class B-2 Certificates (dated August 2002) | CSFB 00246697-246725 | |
| | Press Release - OAKWOOD HOMES CORPORATION REPORTS THIRD QUARTER 2002 RESULTS (dated 6 August 2002) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 August 2002) | | |
| | Term Sheet - $194,647,000 Oakwood Mortgage Investors, Inc. (Depositors) Manufactured Housing Contracts Senior/Subordinated Pass-Through Certificates, Series 2002-C (dated 19 August 2002) | CSFB 00162068-162107 | |
| | Senior/Subordinated Pass-Through Certificates, Series 2002-C $194,647,000 Oakwood Mortgage Investors, Inc. (Depositors), Oakwood Acceptance Corporation (Servicer) $194,647,000 – Sales Point Broadcast – Not for Distribution Outside CSFB Under Any Circumstances (dated 19 August 2002) | CSFB 00162108-162114 | |
| | Senior/Subordinated Pass-Through Certificates, Series 2002-C $194,647,000 Oakwood Mortgage Investors, Inc. (Depositors), Oakwood Acceptance Corporation (Servicer) $194,647,000 – Sales Point Broadcast – Not for Distribution Outside CSFB Under Any Circumstances (dated 19 August 2002) | CSFB 00118252-118261 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Credit Suisse Presentation to Oakwood Homes Corp. re: Presentation to the Board of Directors (dated 19 August 2002) | OHCLT 001705-1750; PX 10 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 19 August 2002) | MNAT006729-006730; DX 209; DX 300-12 | |
| | Prospectus Supplement to Prospectus – OMI Trust 2002-C (Issuer), Oakwood Mortgage Investors, Inc. (Depositor), $194,647,000 Senior/Subordinated Pass-Through Certificates, Series 2002-C, Oakwood Acceptance Corporation (Servicer) (dated 27 August 2002) | CSFB 00246347-246420 | |
| | 2002-C Terms Agreement – Oakwood Mortgage Investors, Oakwood Acceptance Corporation, LLC, regarding Underwriting Agreement Standard Provisions (dated 27 August 2002) | CSFB 00246726-246735 | |
| | 9/29/2002 Email from D. Wales to J. Felt.  Attaching Presentation to the Board of Directors (dated 30 September 2002) | OHCLT 001850-001854; PX 14 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 30 September 2002) | MNAT006780-006782; DX 300-13 | |
| | Credit Suisse Information Presentation to Oakwood Homes Corp. (dated October 2002) | CSFB 00265172-00265210; PX 626 | |
| | Oakwood Homes Corp Presentation to Lotus (dated 15 October 2002) | OHCLT 020578-020598; PX 17 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 18 October 2002) | MNAT006825-006826; DX 300-14 | |
| | Email from Fiachra O'Driscoll to Jared Felt, FW: Lotus attaching emails from Myles Standish to Fiachra O'Driscoll (dated 18 October 2002) | CSFB 00035137-00035142; DX 211; DX 226 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 28 October 2002) | MNAT006827-006828; DX 227; DX 300-15 | |
| | Letter from Myles Standish (dated 1 November 2002) | OHCLT 02573-02584; PX 22 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 4 November 2002) | OHCLT 02761-02763; DX 228; DX 300-16 | |
| | Email from Jared Felt to Egan Antill, Peter Landon, Beth May, Fiachra O'Driscoll, Mark Schachter and Dod Wales (dated 7 November 2002) | CSFB 057375 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 12 November 2002) | OHCLT 002661- 002759; DX 1; DX 300-17 | |
| | Email from Peter Landon to Myles Standish, Bob Smith, Doug Muir, Suzanne Wood, Richard Rayburn, "scooper@rcdlaw.net", copied to Fiachra O'Driscoll, Jared Felt and Dod Wales  (12 November 2002) | CSFB 014245 | |
| | Minutes of the Meeting of the Board of Directors of Oakwood Homes Corp. (dated 14 November 2002) | OHCLT 02655-02660; DX 300-18 | |
| | Press Release - OAKWOOD HOMES CORPORATION REACHES AN AGREEMENT IN PRINCIPLE WITH CERTAIN OF ITS CREDITORS TO RESTRUCTURE ITS BALANCE SHEET (dated 15 November 2002) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Letter from Myles Standish to Marc Hamburg  (dated 15 November 2002) | OHCLT 05894-05900 | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Declaration of Douglas R. Muir in Support of First Day Relief (dated 18 November 2002) | DX 202; DX 238 | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 18 November 2002) | | |
| | Debtors' Motion Pursuant To Sections 365 And/Or 363 Of Bankruptcy Code For Authority For Oakwood Acceptance Corporation To (I) Assume And Assign Servicing Agreements And Related Advance Receivables To, And Enter Into Subservicing Agreement With, An Affiliate Or, In The Alternative, (II) Reject Servicing Agreements Filed by Oakwood Homes Corporation (Entered: 11/19/2002) | | |
| | Debtors' Motion For Authority To (I) Honor Certain Pre-Petition Servicing And Related Obligations, (II) Continue Securitizing Advance Reimbursement Rights In The Ordinary Course Of Business, (III) Continue Funding And Purchasing Retail Installment Sales Contracts And Other Loans Originated By The Debtors In The Ordinary Course Of Business, And (IV) Continue Securitizing Such Contracts And Loans In The Ordinary Course Of Business Filed by Oakwood Homes Corporation (Entered: 11/19/2002) | | |
| | Order Authorizing Debtors To (I) Honor Certain Pre-Petition Servicing And Related Obligations, (II) Continue Securitizing Advance Reimbursement Rights In The Ordinary Course Of Business, (III) Continue Funding And Purchasing Retail Installment Sales Contracts And Other Loans Originated By The Debtors In The Ordinary Course Of Business, And (IV) Continue Securitizing Such Contracts And Loans In The Ordinary Course Of Business. Signed In Court on 11/19/2002 | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | BB&T Capital Markets – Equity Research (Manufactured Housing Monthly – Vol. 2, No. 11) (dated 25 November 2002) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Form 8-K filed by Oakwood Homes Corp. (dated 26 November 2002) | | |
| | Order Signed in Court (First Amended and Restated) Authorizing debtors to (I) Honor Certain Pre-Petition Servicing and Related Obligations, (II) Continue Securitizing Advance Reimbursement Rights in the Ordinary Course of Business, (III) Continue Funding and Purchasing Retail Installment sales Contracts and Other Loans Originated by the Debtors in the Ordinary course of Business, and (IV) Continue Securitizing such Contracts and Loans in the Ordinary Course of Business signed on 11/26/02 (Entered: 11/27/2002) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 9 December 2002) | | |
| | Order Authorizing Oakwood Acceptance Corporation To (i) Assume Servicing Agreements, (ii) Assign Its Rights As "Servicer" Under Servicing Agreements And Certain Related Advance Receivables To An Affiliate, And (iii) Enter Into Subservicing Agreement With An Affiliate. Signed on 12/12/2002 | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Certification of Counsel Regarding Order Pursuant To § 365 And 363 Of The Bankruptcy Code Authorizing Oakwood Acceptance Corporation To (i) Assume Servicing Agreements, (ii) Assign Its Rights As "Servicer" Under Servicing Agreements And Certain Related Advance Receivables To An Affiliate, And (iii) Enter Into Subservicing Agreement With An Affiliate Filed by Oakwood Homes Corporation. (Entered: 12/19/2002) | | |
| | Order (Amended) Authorizing Oakwood Acceptance Corp. to (i)Assume Servicing Agreement, (ii) Assign its Rights as "Servicer" Under Servicing Agreements & Certain Related Advance Receivables to an Affiliate, & (iii) Enter into Subservicing Agreement w/an Affiliate signed on 12/20/2002 (Entered: 12/24/2002) | | |
| | Order Authorizing Oakwood Acceptance Corp. to (i) Assume The Omi Note Trust 2001-A Sale & Servicing Agreement, (ii) Assign its Rights as "Servicer" Under the Sale & Servicing Agreement to an Affiliate, & (iii) Enter into a Subservicing Agreement with an Affiliate Signed in Court on 1/7/2003. | | |
| | REORGANIZED SALE OKWD INC, Form 10-K (dated 14 January 2003) | | |
| | Debtors' Motion For (I) Authority To Sell Retail Installment Sales Contracts And Other Loans Originated By The Debtors In The Ordinary Course Of Business To Newly Created Warehouse Trust And (II) For Certain Related Relief Filed by Oakwood Homes Corporation. (Entered: 01/16/2003) | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Order Authorizing Debtors To Sell Retail Installment Sales Contracts & Other Loans Originated by the Debtors in the Ordinary Course of Business to Newly Created Warehouse Trust & Granting Certain Related Relief Signed in Court on 1/23/2003. | | |
| | Press Release - OAKWOOD HOMES CORPORATION CLOSES DIP FACILITY (dated 31 January 2003) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Form 8-K filed by Oakwood Homes Corp. (dated 10 February 2003) | | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 February 2003) | | |
| | Press Release - OAKWOOD HOMES CORPORATION FINALIZES DIP FACILITY (dated 18 February 2003) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Form 8-K filed by Oakwood Homes Corp. (dated 4 March 2003) | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Proof of Claim (dated 27 March 2003) | DX 225 | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 15 May 2003) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 26 June 2003) | | |
| | Disclosure Statement for Revised First Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors-in-Possession, with supplements thereto (dated 9 September 2003) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 12 September 2003) | | |
| | Press Release - OAKWOOD HOMES CORPORATION AUTHORIZED TO SEEK APPROVAL OF REORGANIZATION PLAN - OBTAINS COMMITMENT FOR EXIT FINANCING (dated 3 October 2003) | | Document not produced to Plaintiff. In the event the Court allows Defendants to offer this document despite its non-production at this date, Plaintiff reserves all rights to raise evidentiary objections after Plaintiff sees it. |
| | Letter from Rayburn Cooper & Durham to Counsel for the Office Committee of Unsecured Creditors (dated 8 October 2003) | OHCLT 456928-456930; DX 237 | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 14 October 2003) | | |
| | REORGANIZED SALE OKWD INC, Form 10-Q (dated 14 November 2003) | | |

## Exhibit "B" – Defendants' Proposed Trial Exhibits

| TRIAL EXHIBIT NUMBER | DESCRIPTION | BATES RANGE / DEPOSITION EXHIBIT NUMBER | EVIDENTIARY OBJECTIONS AND BASIS |
|---|---|---|---|
| | Press Release - OAKWOOD HOMES CORPORATION ARRANGES $415 MILLION IN CREDIT FACILITIES (dated 23 November 2003) | | |
| | Press Release - OAKWOOD HOMES CORPORATION AGREES TO BE ACQUIRED BY CLAYTON HOMES, INC. (dated 25 November 2003) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 26 November 2003) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 6 February 2004) | | |
| | Form 8-K filed by Oakwood Homes Corp. (dated 17 February 2004) | | |
| | Form 10-Q filed by Oakwood Homes Corp. (dated 17 February 2004) | | |
| | Employment Agreement between Douglas R. Muir and the OHC Liquidation Trust (dated 13 April 2004) | OHCLT 456660-456672; DX 236 | |
| | Employment Agreement between Myles E. Standish and the OHC Liquidation Trust (dated 13 April 2004) | OHCLT 456810-456818; DX 201 | |

# Exhibit "C" – Plaintiff's Designation of Deposition Testimony

| Deposition | Pages and Lines | Objections and Basis |
|---|---|---|
| August 22, 2006 Deposition of Tom Connors ("**Connors**") | 32:13-22 | |
| Connors | 36:8-37:12 | |
| Connors | 43:9-16 | FRE 602<br><br>Incomplete |
| Connors | 57:10-59:17 | |
| Connors | 69:19-70:12 | |
| | | |
| November 8, 2006 Deposition of Thomas Irwin ("**Irwin**") | 29:17-30:2 | FRE 402 (irrelevant) |
| Irwin | 68:5-9 | FRE 402 (irrelevant) |
| Irwin | 96:25-97:9 | FRE 402 (irrelevant) |
| Irwin | 124:17-125:17 | |
| Irwin | 131:7-132:9 | Incomplete |
| Irwin | 136:14-25 | FRE 402 (irrelevant)<br><br>FRE 602 (speculative) |

1

| Irwin | 144:10-146:15 | |
|---|---|---|
| Irwin | 147:22-148:6 | |
| Irwin | 172:8-19 | FRE 402 (irrelevant) FRE 602 (speculative) |
| | | |
| September 24, 2007 Deposition of Mark D. Millard ("**Millard**") | 15:13-16:13 | Attorney colloquy |
| Millard | 17:7-16 | |
| Millard | 28:7-29:9 | FRE 402 (irrelevant) |
| Millard | 29:10-30:19 | |
| Millard | 42:3-43:20 | FRE 402 (relevance) FRE 602(lack of personal knowledge) |
| Millard | 44:8-19 | FRE 602 (speculative) |
| Millard | 45:9-15 | FRE 602 (speculative) |
| Millard | 46:2-18 | FRE 402, 403 (irrelevant) FRE 602 (speculative) |
| Millard | 47:17-49:16 | FRE 402 (irrelevant) |
| Millard | 51:23-52:5 | Incomplete |

| | | FRE 402 (irrelevant) |
| | | FRE 602 (lack of personal knowledge) |
| Millard | 52:7-53:4 | FRE 402 (irrelevant) |
| | | FRE 602 (lack of personal knowledge) |
| Millard | 53:9-23 | FRE 402 (irrelevant) |
| | | FRE 602 (lack of personal knowledge) |
| | | |
| December 12, 2006 Deposition of Clarence W. Walker ("**Walker**") | 14:24-16:5 | |
| Walker | 21:11-22:14 | FRE 602 (lack of personal knowledge) |
| Walker | 33:2-34:4 | |
| Walker | 73:6-25 | FRE 602 (lack of personal knowledge) |
| | | |
| August 24, 2006 Deposition of James Xanthos ("**Xanthos**") | 10:19-24 | FRE 402 (irrelevant) |
| Xanthos | 13:6-15 | FRE 402 (irrelevant) |
| Xanthos | 19:14-20:18 | FRE 402 (irrelevant) |
| Xanthos | 21:6-14 | |

| Xanthos | 31:11-32:22 | FRE 402 (irrelevant) <br><br> FRE 701 (inappropriate testimony by a lay witness) |
|---|---|---|
| Xanthos | 56:12-21 | FRE 402 (irrelevant) |
| Xanthos | 57:8-58:19 | FRE 402 (irrelevant) |
| Xanthos | 67:17-68:25 | FRE 402 (irrelevant) |
| Xanthos | 69:15-70:25 | FRE 402 (irrelevant) <br><br> FRE 701 (inappropriate testimony by a lay witness) |
| Xanthos | 96:23-100:16 | FRE 402 (irrelevant) <br><br> FRE 602 (lack of recollection) |
| Xanthos | 109:13-22 | FRE 402 (irrelevant) |
|  |  |  |
| June 15-16, 2006 Deposition of Jared Felt ("**Felt**") | 11:10-13:7 |  |
| Felt | 20:19-21:3 |  |
| Felt | 21:11-22:10 | 22:4-22:10 – Form (ambiguous, assumes facts not in evidence) |
| Felt | 22:17-19 |  |
| Felt | 23:16-24:25 |  |

4

| Felt | 26:25-27:12 | |
|------|-------------|---|
| Felt | 59:23-60:18 | |
| Felt | 61:2-8 | |
| Felt | 65:2-10 | |
| Felt | 70:18-71:11 | FRE 403 (cumulative) <br><br> FRE 602 (speculative) |
| Felt | 74:12-20 | |
| Felt | 75:13-23 | |
| Felt | 79:19-80:12 | |
| Felt | 81:2-83:23 | FRE 402 (irrelevant) <br><br> 81:2-81:11 – Form (misstatement, argumentative) |
| Felt | 85:19-86:21 | 86:12-86:22 – FRE 602 (speculative) |
| Felt | 86:12-88:5 | 87:8-87:15 – FRE 602 (speculative) |
| Felt | 89:8-17 | |
| Felt | 90:23-91:16 | Form (broad, vague) |
| Felt | 96:5-97:24 | |
| Felt | 101:1-11 | |

| Felt | 103:18-23 | |
|------|-----------|---|
| Felt | 105:7-16 | |
| Felt | 109:17-111:9 | |
| Felt | 114:2-16 | |
| Felt | 115:6-10 | |
| Felt | 129:2-138:20 | FRE 402 (irrelevant) <br><br> 32:3-21 - Form (argumentative, assumes facts not in evidence) <br><br> 137:22-138:20 - Form (argumentative, mischaracterizes testimony: asked and answered) |
| Felt | 138:17-20 | FRE 402 (irrelevant) <br><br> Legal conclusion |
| Felt | 153:13-154:10 | 153:13-17 - Form (vague, ambiguous) <br><br> 153:18-154:10 - FRE 402 (irrelevant) |
| Felt | 156:12-158:17 | |
| Felt | 159:9-12 | FRE 402 <br><br> Form (asked and answered, argumentative) |
| Felt | 177:23-179:9 | |

| | | |
|---|---|---|
| Felt | 183:11-24 | FRE 402<br><br>FRE 602 (speculative)<br><br>Incomplete<br><br>Form (argumentative, vague) |
| Felt | 191:23-193:5 | FRE 402<br><br>FRE 701 |
| Felt | 193:6-12 | FRE 402 |
| Felt | 194:21-195:6 | |
| Felt | 201:21-203:11 | |
| Felt | 210:5-213:19 | 211:20-212:1, 212:6-8, 212:14-213:1 - Attorney colloquy |
| Felt | 220:2-16 | FRE 802 (hearsay) |
| Felt | 222:8-22 | FRE 402 (irrelevant) |
| Felt | 224:19-227:3 | FRE 602 (speculative)<br><br>226:2-5 - FRE 802 (hearsay) |
| Felt | 233:2-15 | Form (no foundation, assumes facts not in evidence) |
| Felt | 247:1-24 | FRE 402 and 403 (irrelevant) |

| Felt | 255:3-258:11 | FRE 402 |
|---|---|---|
| Felt | 269:21-273:5 | |
| Felt | 286:3-287:2 | |
| Felt | 298:7-23 | |
| Felt | 314:7-22 | |
| Felt | 376:2-8 | Legal conclusion<br><br>FRE 602<br><br>Incomplete<br><br>Form (argumentative, foundation, vague) |
| Felt | 387:21-391:12 | FRE 402, 403 (irrelevant)<br><br>390:7-391:12 – Form (foundation, assumes facts not in evidence) |
| Felt | 392:12-394:21 | FRE 402 (irrelevant) |
| Felt | 399:17-400:17 | FRE 402, 403 (irrelevant) |
| Felt | 406:1-8 | |
| Felt | 409:2-5 | Incomplete |
| Felt | 417:1-421:19 | FRE 402 (irrelevant)<br><br>418:21-419:11, 420:20-421:19 - Form |

| | | (speculation, foundation) |
|---|---|---|
| Felt | 430:3-20 | |
| Felt | 431:15-432:10 | |
| Felt | 446:3-448:25 | FRE 402 (irrelevant) <br><br> FRE 602 (speculative) <br><br> FRE 802 (hearsay) <br><br> Legal conclusion <br><br> 447:7-24 – Form |
| Felt | 465:24-467:9 | FRE 402 (irrelevant) <br><br> FRE 602 (speculative) <br><br> FRE 802 (hearsay) <br><br> Legal conclusion |
| Felt | 490:5-18 | |
| Felt | 490:19-24 | FRE 402 (irrelevant) <br><br> FRE 602 (speculative) |
| | | |
| June 29-30, 2006 Deposition of Fiachra O'Driscoll ("**O'Driscoll**") | 14:1-18:23 | Incomplete |

| | | No foundation |
|---|---|---|
| O'Driscoll | 39:24-41:24 | Attorney colloquy |
| O'Driscoll | 46:21-48:2 | |
| O'Driscoll | 51:21-53:17 | |
| O'Driscoll | 54:4-13 | FRE 402 (irrelevant) |
| O'Driscoll | 55:8-56:12 | |
| O'Driscoll | 61:2-64:2 | |
| O'Driscoll | 80:14-81:7 | |
| O'Driscoll | 91:15-96:25 | |
| O'Driscoll | 98:14-99:8 | |
| O'Driscoll | 105:9-106:16 | |
| O'Driscoll | 115:21-116:4 | |
| O'Driscoll | 118:5-120:4 | |
| O'Driscoll | 131:9-134:4 | |
| O'Driscoll | 153:3-156:10 | FRE 402 (irrelevant) |
| O'Driscoll | 177:12-17 | FRE 402 (irrelevant) |
| O'Driscoll | 184:9-186:4 | FRE 402 (irrelevant) |

| O'Driscoll | 211:10-23 | |
|---|---|---|
| O'Driscoll | 268:18-285:3 | FRE 802 (hearsay) <br><br> Attorney colloquy |
| O'Driscoll | 289:19-21 | |
| O'Driscoll | 293:14-15 | |
| O'Driscoll | 303:9-309:9 | |
| O'Driscoll | 314:18-317:11 | |
| O'Driscoll | 338:20-344:20 | |
| O'Driscoll | 346:4-12 | |
| O'Driscoll | 352:17-354:23 | |
| O'Driscoll | 359:8-360:16 | FRE 402 (irrelevant) <br><br> FRE 602 (lack of personal knowledge) |
| O'Driscoll | 367:16-368:2 | FRE 602 (lack of personal knowledge) |
| O'Driscoll | 368:13-16 | FRE 402 (irrelevant) <br><br> FRE 602 (lack of personal knowledge) |
| O'Driscoll | 374:17-377:9 | Attorney colloquy |
| O'Driscoll | 380:13-388:20 | |

| O'Driscoll | 399:17-403:9 | |
|---|---|---|
| O'Driscoll | 424:6-425:11 | FRE 602 (lack of personal knowledge, foundation)<br><br>FRE 802 (hearsay)<br><br>Form (vague) |
| O'Driscoll | 465:18-470:4 | |
| O'Driscoll | 491:17-493:14 | |
| O'Driscoll | 497:6-502:24 | FRE 602 (lack of personal knowledge, foundation)<br><br>Incomplete |
| O'Driscoll | 519:8-521:14 | |
| O'Driscoll | 523:16-527:17 | |
| O'Driscoll | 527:10-528:10 | Incomplete |
| O'Driscoll | 537:9-17 | |
| O'Driscoll | 541:15-544:4 | 541:21-542:15 - No foundation |
| O'Driscoll | 562:12-565:2 | |
| O'Driscoll | 574:20-575:8 | |
| O'Driscoll | 575:17-579:25 | FRE 602 (lack of personal knowledge) |

| | | |
|---|---|---|
| O'Driscoll | 580:2-581:11 | 580:2-9 – No foundation |
| O'Driscoll | 581:12-582:15 | |
| | | |
| March 25, 2008 Deposition of Thomas F. Boland ("**Boland**") | 37:14-38:11 | |
| Boland | 61:19-62:2 | |
| Boland | 63:25-67:25 | |
| Boland | 78:20-79:4 | |
| Boland | 83:7-15 | |
| Boland | 83:22-84:2 | |
| Boland | 88:13-90:18 | |
| Boland | 92:12-93:20 | |
| Boland | 123:6-9 | |
| Boland | 147:14-148:15 | |
| Boland | 192:21-195:14 | |
| Boland | 197:20-201:5 | |
| Boland | 214:23-215:9 | |
| | | |

| | | |
|---|---|---|
| March 27, 2008 Deposition of Allen M. Pfeiffer ("**Pfeiffer**") | 120:4-132:4 | |
| Pfeiffer | 135:3-24 | |
| Pfeiffer | 137:13-139:25 | |
| | | |
| | | |
| | | |
| | | |

# Exhibit "D" – Defendants' Designation of Deposition Testimony

| Deposition | Pages and Lines | Objections and Basis |
|---|---|---|
| August 22, 2006 Deposition of Tom Connors ("**Connors**") | 5:4-6:3 | |
| Connors | 14:5-14:9 | |
| Connors | 20:11-20:21 | |
| Connors | 25:3-29:25 | |
| Connors | 31:12-33:12 | |
| Connors | 33:24-34:23 | FRE 602 (lack of personal knowledge) Form (lack of foundation) |
| Connors | 36:12-37:8 | |
| Connors | 38:19-42:12 | |
| | | |
| September 24, 2007 Deposition of Mark D. Millard ("**Millard**") | 9:2-9:16 | |
| Millard | 10:13-10:23 | |
| Millard | 68:17-69:6 | |
| Millard | 69:19-71:5 | Attorney colloquy |

1

| Millard | 71:14-72:11 | |
|---|---|---|
| Millard | 74:11-75:6 | FRE 602 (lack of personal knowledge) FRE 802 (hearsay) |
| Millard | 77:3-78:20 | FRE 402 (irrelevant) FRE 408 (settlement discussions) FRE 602 (lack of personal knowledge) FRE 802 (hearsay) |
| | | |
| December 12, 2006 Deposition of Clarence W. Walker ("**Walker**") | 15:24-17:5 | |
| Walker | 19:10-22:14 | |
| Walker | 25:10-26:17 | |
| Walker | 26:24-27:14 | |
| Walker | 27:21-29:2 | |
| Walker | 29:8-32:20 | |
| Walker | 33:15-38:8 | |
| Walker | 43:19-44:12 | |
| Walker | 49:6-51:16 | |

| Walker | 54:9-55:2 | |
|--------|-----------|---|
| Walker | 55:23-56:19 | |
| Walker | 60:12-62:23 | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0799 (JJF) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a | ) | |
| Swiss banking corporation), Credit Suisse | ) | |
| Securities (USA), LLC (f/k/a Credit Suisse First | ) | |
| Boston LLC), Credit Suisse Holdings (USA), Inc. | ) | |
| (f/k/a Credit Suisse First Boston, Inc.), and Credit | ) | |
| Suisse (USA), Inc. (f/k/a Credit Suisse First Boston | ) | |
| (U.S.A.), Inc.), the subsidiaries and affiliates of | ) | |
| each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, of Campbell & Levine, LLC, hereby certify that on June 9, 2008,

I caused a copy of the ***[Proposed] Pre-Trial Order***, to be served upon the individuals on the

attached service list, via the manner indicated.

| | |
|---|---|
| Lee E. Kaufman, Esq. | Mary K. Warren, Esq. |
| Russell C. Silberglied, Esq. | Michael Osnato, Esq. |
| Richards, Layton & Finger, P.A. | J. Justin Williamson, Esq. |
| One Rodney Square | Paul R. Wickes, Esq. |
| 920 North King Street | Linklaters |
| Wilmington, DE 19801 | 1345 Avenue of the Americas |
| **VIA HAND DELIVERY** | Nineteenth Floor |
| | New York, NY 10105 |
| | **VIA FEDERAL EXPRESS** |

CAMPBELL & LEVINE, LLC


*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (No. 3726)
800 N. King Street
Suite 300
Wilmington, DE  19801
(302) 426-1900

Dated: June 9, 2008